NEW ISSUE - BOOK-ENTRY ONLY

# $2,184,860,553

# Puerto Rico Highways and Transportation Authority

### $250,000,000 Transportation Revenue Bonds (Series M)
### $1,502,904,943.95 Transportation Revenue Refunding Bonds (Series N)
### $431,955,609.05 Highway Revenue Refunding Bonds (Series CC)

The Transportation Revenue Bonds (Series M) (the "Series M Bonds") and the Transportation Revenue Refunding Bonds (Series N) (the "Series N Bonds") are being issued by the Puerto Rico Highways and Transportation Authority (the "Authority") pursuant to Resolution No. 98-06 adopted by the Authority on February 26, 1998, as amended (the "1998 Resolution"), for the purpose of financing various highway projects and refunding certain of the Authority's Transportation Revenue Bonds, respectively.  The Highway Revenue Refunding Bonds (Series CC) (the "Series CC Bonds") are being issued by the Authority pursuant to Resolution No. 68-18 adopted by the Authority on June 13, 1968, as amended (the "1968 Resolution") for the purpose of refunding certain of the Authority's Highway Revenue Bonds.

The Series M Bonds, the Series N Bonds, the outstanding bonds of the Authority previously issued under the 1998 Resolution, and any additional bonds that the Authority may from time to time issue under the 1998 Resolution (collectively, the "Transportation Revenue Bonds") are payable from, and are secured by a pledge of, certain revenues of the Authority, which include: (i) the total amount of excise taxes, up to $120 million per fiscal year, imposed by the Commonwealth of Puerto Rico (the "Commonwealth") on certain petroleum products; (ii) toll revenues of the Authority's traffic facilities that were not financed with Highway Revenue Bonds; (iii) certain investment earnings; and (iv) the 1968 Resolution Revenues (as described below) available after payment of debt service on the Authority's outstanding Highway Revenue Bonds (collectively, the "1998 Resolution Revenues").

The Series CC Bonds, the outstanding bonds of the Authority previously issued under the 1968 Resolution, and any additional bonds that the Authority may from time to time issue under the 1968 Resolution (collectively, the "Highway Revenue Bonds") are payable from, and are secured by a pledge of, certain revenues of the Authority, which include: (i) all current gasoline taxes, a portion of the current gas oil and diesel oil taxes, and a portion of the current motor vehicle license fees allocated to the Authority by the Commonwealth; (ii) all toll revenues of the Authority's traffic facilities financed with Highway Revenue Bonds and any extensions and improvements thereto; and (iii) certain investment earnings (collectively, the "1968 Resolution Revenues").

All of the aforesaid revenues of the Authority that constitute taxes and license fees are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if and to the extent that all other Commonwealth revenues are not sufficient therefor.

The Series M Bonds, the Series N Bonds and the Series CC Bonds (collectively, the "Bonds") will have the following characteristics:

*   The Bonds will be dated their date of delivery.

*   The Bonds will be registered under The Depository Trust Company's book-entry only system.  Purchasers of the Bonds will not receive definitive Bonds.

*   The inside cover pages of this Official Statement contain information concerning the maturity schedule, interest rates and prices or yields of the Bonds.

*   The Bonds will be issued as Fixed Rate Bonds, LIBOR Bonds, Capital Appreciation Bonds and CPI Bonds.  The interest rate on the Fixed Rate Bonds will be a fixed interest rate as set forth on the inside cover pages of this Official Statement.  The interest rate on the LIBOR Bonds will be equal to 67% of the Three-Month LIBOR Rate plus 0.53%, but will not be greater than the maximum rate permitted under Puerto Rico law (currently 12%), and will be reset quarterly.  Interest on the Capital Appreciation Bonds will accrue semi-annually at a fixed rate as set forth on the inside cover pages of this Official Statement but will be paid only at maturity.  The interest rate on the CPI Bonds will be based on changes in the Consumer Price Index plus a spread of 1.12%, but will not be greater than the maximum rate permitted under Puerto Rico law (currently 12%), and will be reset monthly.

*   Interest on the Fixed Rate Bonds will be payable on each January 1 and July 1, commencing on July 1, 2007.  Interest on the CPI Bonds will be payable on the first Business Day of each month, commencing on July 2, 2007.  Interest on the LIBOR Bonds will be payable on each January 1, April 1, July 1 and October 1, commencing on July 1, 2007.  Interest on the Capital Appreciation Bonds will be payable only at maturity.

*   The Bonds will be issued in denominations of $5,000 principal amount (or maturity amount, in the case of the Capital Appreciation Bonds) and integral multiples thereof.

*   The scheduled payment of principal and interest on some of the Bonds when due will be guaranteed under insurance policies to be issued concurrently with the delivery of the Bonds by Financial Guaranty Insurance Company, MBIA Insurance Corporation, Financial Security Assurance Inc., Ambac Assurance Corporation and Assured Guaranty Corp., as indicated on the inside cover pages of this Official Statement.

*   In the opinion of Nixon Peabody LLP, Bond Counsel, under existing law and assuming compliance with the tax covenants described herein, and the accuracy of certain representations and certifications made by the Authority described herein, interest on the Bonds is excluded from gross income for Federal income tax purposes under section 103 of the Internal Revenue Code of 1986, as amended (the "Code").  Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations.  Interest on the Bonds is, however, included in the adjusted current earnings of certain corporations for purposes of computing the alternative minimum tax imposed on such corporations.  Bond Counsel is further of the opinion that the Bonds and interest thereon are exempt from state, Commonwealth and local income taxation.  See "Tax Matters" herein regarding certain other tax considerations.

*   It is expected that settlement for the Bonds will occur on or about March 6, 2007.

**The Bonds are not a debt of the Commonwealth or any of its political subdivisions, other than the Authority, and neither the Commonwealth nor any such subdivisions, other than the Authority, is liable thereon.**

## Citigroup

| Goldman, Sachs & Co. | | RBC Capital Markets |
|---|---|---|
| Banc of America Securities LLC | BBVAPR MSD | JP Morgan |
| Lehman Brothers | Merrill Lynch & Co. | Morgan Stanley |
| Popular Securities | Raymond James & Associates, Inc. | Samuel A. Ramirez & Co. |
| Santander Securities | UBS Investment Bank | Wachovia Bank, National Association |

February 15, 2007

$2,184,860,553

# Puerto Rico Highways and Transportation Authority

### $250,000,000 Transportation Revenue Bonds (Series M)

**$75,490,000 Serial Bonds (Fixed Rate Bonds)**

| Maturity July 1, | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| 2008 | $2,385,000 | 4% | 3.75% |
| 2009 | 2,480,000 | 4 | 3.82 |
| 2010 | 2,580,000 | 4 | 3.88 |
| 2011 | 2,685,000 | 4 | 3.93 |
| 2012 | 2,790,000 | 5 | 3.97 |
| 2013 | 2,930,000 | 5 | 3.99 |
| 2014 | 3,080,000 | 4 | 4.02 |
| 2015 | 3,200,000 | 4 | 4.06 |
| 2016 | 3,330,000 | 4 | 4.09 |
| 2017 | 3,460,000 | 4 | 4.12 |
| 2018 (1) | 2,545,000 | 5 | 4.16 |
| 2018 | 1,055,000 | 4 1/8 | 4.16 |
| 2019 | 3,770,000 | 4 1/8 | 4.19 |
| 2020 (1) | 3,745,000 | 5 | 4.21 |
| 2020 | 180,000 | 4.20 | 4.21 |
| 2021 (1) | 4,120,000 | 5 | 4.23 |
| 2022 (1) | 4,220,000 | 5 | 4.25 |
| 2022 | 105,000 | 4 1/4 | 4.25 |
| 2023 (1) | 3,180,000 | 5 | 4.28 |
| 2023 | 1,365,000 | 4 1/4 | 4.28 |
| 2024 (1) | 4,515,000 | 5 | 4.30 |
| 2024 | 245,000 | 4.30 | 100% |
| 2025 (1) | 4,895,000 | 5 | 4.32 |
| 2025 | 100,000 | 4.30 | 4.32 |
| 2026 (1) | 5,045,000 | 5 | 4.34 |
| 2026 | 200,000 | 4.30 | 4.34 |
| 2027 (1) | 4,800,000 | 5 | 4.36 |
| 2027 | 705,000 | 4.30 | 4.36 |
| 2037 | 1,780,000 | 4 1/2 | 100% |

**$174,510,000 Term Bonds (Fixed Rate Bonds)**

$31,915,000   5%   Term Bonds due on July 1, 2032 − yield 4.38% (1)
$38,955,000   5%   Term Bonds due on July 1, 2037 − yield 4.41% (1)
$103,640,000   5%   Term Bonds due on July 1, 2046 − yield 4.49% (1)

(1)        Priced to the first call date on July 1, 2017

### $1,502,904,943.95 Transportation Revenue Refunding Bonds (Series N)

**$593,265,000 Serial Bonds (Fixed Rate Bonds)**

| Maturity July 1, | Principal Amount | Interest Rate | Yield |
|---|---|---|---|
| 2021 | $ 18,995,000 | 5 ½% | 4.27% |
| 2022 | 9,795,000 | 5 ½ | 4.30 |
| 2023 | 10,320,000 | 5 ½ | 4.33 |
| 2024 | 21,420,000 | 5 ½ | 4.35 |
| 2025 | 25,480,000 | 5 ½ | 4.37 |
| 2026 | 26,865,000 | 5 ½ | 4.39 |
| 2029 | 51,580,000 | 5 ½ | 4.43 |
| 2030  (A) | 66,520,000 | 5 ¼ | 4.18 |
| 2031  (A) | 92,540,000 | 5 ¼ | 4.19 |
| 2032  (M) | 97,580,000 | 5 ¼ | 4.20 |
| 2033  (M) | 83,875,000 | 5 ¼ | 4.21 |
| 2034  (AS) | 88,295,000 | 5 ¼ | 4.31 |

**$445,290,000 Term Bonds (Fixed Rate Bonds)**

$181,500,000   5 ¼% Term Bonds Due July 1, 2036 – yield 4.32% (AS)
$263,790,000   5 ¼ % Term Bonds Due July 1, 2039 – yield 4.25% (F)

**$17,324,943.95 Capital Appreciation Bonds**

| Maturity July 1, | Initial Principal Amount | Maturity Amount | Yield |
|---|---|---|---|
| 2019 | $ 5,736,793.40 | $ 9,890,000 | 4.47% |
| 2020 | 11,588,150.55 | 20,935,000 | 4.49 |

**$57,965,000 CPI Bonds**

| Maturity July 1, | Principal Amount | Rate | Price |
|---|---|---|---|
| 2027  (A) | $28,545,000 | CPI* | 100% |
| 2028  (A) | $29,420,000 | CPI* | 100% |

**$389,060,000 LIBOR Bonds**

$155,620,000  LIBOR-Based Interest Rate Bonds Due July 1, 2041 – price 100% (L)(M)
$233,440,000  LIBOR-Based Interest Rate Bonds Due July 1, 2045 – price 100% (L)(A)

(A)   Insured by Ambac Assurance Corporation

(AS)   Insured by Assured Guaranty Corp.

(F)   Insured by Financial Guaranty Insurance Company

(M)   Insured by MBIA Insurance Corporation

(L)   The LIBOR Bonds will bear interest from their date of delivery at a per annum rate for each period equal to (a) 67% of the Three-Month LIBOR Rate for such period plus (b) a per annum spread equal to 0.53%; provided that the LIBOR-Based Interest Rate will never exceed the maximum rate permitted under Puerto Rico law (currently 12%).

*   For a description of the CPI Rate and its calculation, see Appendix VII – Provisions Applicable to CPI Bonds.

**$431,955,609.05 Highway Revenue Bonds (Series CC)**

### $308,965,000 Serial Bonds (Fixed Rated Bonds)

| Maturity July 1, | Principal Amount | Interest Rate | Yield |
|---|---|---|---|
| 2012 | $ 1,020,000 | 5% | 3.96% |
| 2013 | 1,070,000 | 5 | 3.99 |
| 2014 | 1,125,000 | 5 | 4.01 |
| 2015 | 1,180,000 | 5 | 4.05 |
| 2016 | 19,330,000 | 5 | 4.07 |
| 2028 | 34,545,000 | 5 ½ | 4.38 |
| 2029 | 36,445,000 | 5 ½ | 4.40 |
| 2030 | 38,445,000 | 5 ½ | 4.41 |
| 2031 | 40,565,000 | 5 ½ | 4.42 |
| 2032  (FS) | 42,790,000 | 5 ¼ | 4.20 |
| 2033  (FS) | 45,045,000 | 5 ¼ | 4.21 |
| 2034  (FS) | 47,405,000 | 5 ¼ | 4.22 |

### $102,410,000 Term Bonds (Fixed Rate Bonds)

$102,410,000   5 ¼%   Term Bonds Due July 1, 2036 – yield 4.23% (FS)

### $20,580,609.05 Capital Appreciation Bonds

| Maturity July 1, | Initial Principal Amount | Maturity Amount | Yield |
|---|---|---|---|
| 2017 | $      836,191.80 | $  1,305,000 | 4.36% |
| 2018 | 798,229.35 | 1,305,000 | 4.39 |
| 2019 | 761,558.85 | 1,305,000 | 4.42 |
| 2020 | 727,080.75 | 1,305,000 | 4.44 |
| 2021 | 693,894.60 | 1,305,000 | 4.46 |
| 2022 | 659,425.00 | 1,300,000 | 4.48 |
| 2023 | 627,835.00 | 1,300,000 | 4.51 |
| 2024 | 598,416.00 | 1,300,000 | 4.53 |
| 2025 | 570,154.00 | 1,300,000 | 4.55 |
| 2026 | 543,023.00 | 1,300,000 | 4.57 |
| 2027 | 13,764,800.70 | 34,545,000 | 4.58 |

(FS)        Insured by Financial Security Assurance Inc.

No dealer, broker, sales representative or other person has been authorized by the Authority or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority or any Underwriter. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds by any person, in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale. The information set forth herein has been obtained from the Authority and other official sources that are believed to be reliable. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs or condition of the Authority since the date hereof.

The Underwriters have provided the following sentence for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THE OFFERING OF THE BONDS, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE BONDS, THE OUTSTANDING TRANSPORTATION REVENUE BONDS AND THE OUTSTANDING HIGHWAY REVENUE BONDS OF THE AUTHORITY AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL ON THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

Other than with respect to information concerning Financial Guaranty Insurance Company ("FGIC"), MBIA Insurance Corporation ("MBIA"), Financial Security Assurance Inc. ("FSA"), Ambac Assurance Corporation ("Ambac") and Assured Guaranty Corp. ("Assured") contained under the caption "Bond Insurance" and Appendices VIII, IX, X, XI AND XII, respectively, none of the information in this Official Statement has been supplied or verified by FGIC, MBIA, FSA, Ambac or Assured.  FGIC, MBIA, FSA, Ambac and Assured make no representation or warranty, express or implied, as to the accuracy or completeness of such information, the validity of the Bonds, or the tax exempt status of the interest on the Bonds.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................... 1
RECENT DEVELOPMENTS ...................................... 3
Recent Developments Relating to the Authority ....... 3
Recent Developments Relating to the
    Commonwealth ................................................. 3
FINANCING PLAN ..................................................... 7
Series M Bonds ......................................................... 7
Series N Bonds ......................................................... 7
Series CC Bonds ...................................................... 9
Sources and Uses of Funds ..................................... 10
THE BONDS .............................................................. 10
General .................................................................... 10
Principal and Interest .............................................. 10
Redemption of the Bonds ...................................... 12
Book-Entry Only System ......................................... 15
Payments and Transfers........................................... 17
Discontinuance of Book-Entry Only System .......... 17
BOND INSURANCE .................................................. 18
The FGIC Bond Insurance Policy ........................... 18
The MBIA Bond Insurance Policy ........................... 20
The FSA Bond Insurance Policy .............................. 22
The Ambac Bond Insurance Policy .......................... 23
The Assured Bond Insurance Policy ....................... 25
Certain Rights of the Bond Insurers ....................... 27
SECURITY AND SOURCES OF PAYMENT
    FOR THE BONDS ............................................. 27
Pledged Revenues ................................................... 27
Flow of Funds Under 1968 Resolution and 1998
    Resolution ......................................................... 28
1998 Senior Bond Reserve Account........................ 30
1968 Reserve Account............................................. 31
Replenishment of 1968 and 1998 Reserve
    Accounts ........................................................... 31
Commitment Not to Reduce Taxes and Fees .......... 31
Special Fund for Deposit of Taxes and Fees
    Allocated to the Authority.................................. 31
Prior Payment of Full Faith and Credit
    Obligations of the Commonwealth .................... 32
Additional Bonds under the 1998 Resolution
    and the 1968 Resolution .................................. 33
Proposed 1968 Supplemental Resolutions.............. 34
Consent of Purchasers of Series CC Bonds ............ 34
THE AUTHORITY ....................................................... 34
General Description ................................................. 34
Organization ........................................................... 35
Management ........................................................... 35
Consultants ............................................................. 36

**Page**

Employee Relations.................................................. 36
Pending Legislation Affecting the Authority .......... 36
Restatement of 2004 and 2005 Financial
    Statements of the Authority............................... 37
TRANSPORTATION SYSTEM REVENUES
    AND EXPENDITURES ..................................... 38
Revenues ................................................................ 38
Operating Expenses and Capital Expenditures........ 46
Teodoro Moscoso Bridge........................................ 51
DEBT ........................................................................ 52
Debt of the Authority............................................... 52
Principal and Interest Requirements of the
    Bonds ............................................................... 53
TAX MATTERS.......................................................... 54
UNDERWRITING....................................................... 55
VERIFICATION OF MATHEMATICAL
ACCURACY .............................................................. 56
LITIGATION ............................................................. 56
LEGAL MATTERS ..................................................... 56
LEGAL INVESTMENT............................................... 57
GOVERNMENT DEVELOPMENT BANK .............. 57
RATINGS.................................................................. 57
CONTINUING DISCLOSURE ................................. 57
MISCELLANEOUS .................................................. 59

APPENDIX I          FINANCIAL STATEMENTS INCLUDING
                    THE REPORT OF HLB MORALES
                    PADILLO  & CO. PSC .........................I-1
APPENDIX II         FORMS OF OPINIONS OF BOND
                    COUNSEL.......................................... II-1
APPENDIX III        SUMMARY OF CERTAIN PROVISIONS
                    OF THE 1968 RESOLUTION.............III-1
APPENDIX IV         SUMMARY OF CERTAIN PROVISIONS
                    OF THE 1998 RESOLUTION.............IV-1
APPENDIX V          LETTER FROM THE TRAFFIC
                    ENGINEERS......................................... V-1
APPENDIX VI         TABLE OF ACCRETED VALUES.................VI-1
APPENDIX VII        PROVISIONS APPLICABLE TO CPI
                    BONDS ............................................. VII-1
APPENDIX VIII       SPECIMEN OF FINANCIAL
                    GUARANTY INSURANCE COMPANY
                    BOND INSURANCE POLICY ......................VIII-1
APPENDIX IX         SPECIMEN OF MBIA INSURANCE
                    CORPORATION BOND INSURANCE
                    POLICY ..............................................IX-1
APPENDIX X          SPECIMEN OF FINANCIAL SECURITY
                    ASSURANCE INC. BOND INSURANCE
                    POLICY ............................................X-1
APPENDIX XI         SPECIMEN OF AMBAC ASSURANCE
                    CORPORATION BOND INSURANCE
                    POLICY ............................................XI-1
APPENDIX XII        SPECIMEN OF ASSURED GUARANTY
                    CORP. BOND INSURANCE POLICY .......... XII-1

# $2,184,860,553

# Puerto Rico Highways and Transportation Authority

### $250,000,000 Transportation Revenue Bonds (Series M)
### $1,502,904,943.95 Transportation Revenue Refunding Bonds (Series N)
### $431,955,609.05 Highway Revenue Refunding Bonds (Series CC)

### INTRODUCTION

This Official Statement sets forth information in connection with the sale by Puerto Rico Highways and Transportation Authority (the "Authority") of $250,000,000 aggregate principal amount of its Transportation Revenue Bonds (Series M) (the "Series M Bonds"), $1,502,904,943.95 aggregate principal amount of its Transportation Revenue Refunding Bonds (Series N) (the "Series N Bonds"), and $431,955,609.05 aggregate principal amount of its Highway Revenue Refunding Bonds (Series CC) (the "Series CC Bonds").  The Series M Bonds, the Series N Bonds and the Series CC Bonds are referred to collectively as the "Bonds."

The Series M Bonds and the Series N Bonds will be issued pursuant to Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended (the "Authority Act"), Resolution No. 98-06 adopted by the Authority on February 26, 1998, as previously amended (the "1998 Resolution"), and as further amended, including by a resolution adopted by the Authority on February 15, 2007, in connection with the issuance of such bonds.  The Series CC Bonds will be issued pursuant to the Authority Act, Resolution No. 68-18 adopted by the Authority on June 13, 1968, as previously amended (the "1968 Resolution"), and as further amended, including by a resolution adopted by the Authority on February 15, 2007, in connection with the issuance of such bonds.  The Bank of New York acts as fiscal agent under the 1968 Resolution (in such capacity, the "1968 Fiscal Agent") and under the 1998 Resolution (in such capacity, the "1998 Fiscal Agent").

The scheduled payment of principal of and interest on the Series N Bonds maturing on July 1 of 2027, 2028, 2030, 2031, and 2045 (the "Ambac Insured Bonds") will be insured by a bond insurance policy (the "Ambac Bond Insurance Policy") to be issued by Ambac Assurance Corporation concurrently with the delivery of the Bonds.  The scheduled payment of principal of and interest on the Series N Bonds maturing on July 1 of 2032, 2033, and 2041 (the "MBIA Insured Bonds") will be insured by a municipal bond insurance policy (the "MBIA Bond Insurance Policy") to be issued by MBIA Insurance Corporation concurrently with the delivery of the Bonds.  The scheduled payment of principal of and interest on the Series N Bonds maturing on July 1 of 2034 and 2036 (the "Assured Insured Bonds") will be insured by a municipal bond insurance policy (the "Assured Bond Insurance Policy") to be issued by Assured Guaranty Corp. concurrently with the delivery of the Bonds.  The scheduled payment of principal of and interest on the Series N Bonds maturing on July 1 of 2039  (the "FGIC Insured Bonds") will be insured by a municipal bond insurance policy (the "FGIC Bond Insurance Policy") to be issued by Financial Guaranty Insurance Company concurrently with the delivery of the Bonds.  The scheduled payment of principal of and interest on the Series CC Bonds maturing on July 1 of 2032, 2033, 2034 and 2036 (the "FSA Insured Bonds") will be insured by a municipal bond insurance policy (the "FSA Bond Insurance Policy"), to be issued by Financial Security Assurance Inc. concurrently with the delivery of the Bonds.  The FGIC Insured Bonds, the MBIA Insured Bonds, the Ambac Insured Bonds, the FSA Insured Bonds and the Assured Insured Bonds are herein called the "Insured Bonds."

The Authority is issuing the Series M Bonds to finance various highway projects included in its Construction Improvement Program.  The Authority is issuing the Series N Bonds to refund a portion of its outstanding Transportation Revenue Bonds and achieve debt service savings.   The Authority is issuing the Series CC Bonds to refund a portion of its outstanding Highway Revenue Bonds and achieve debt service savings.

The Authority has determined to finance most of its future capital requirements, after applying other available funds, through the issuance of senior Transportation Revenue Bonds under the 1998 Resolution ("Senior Transportation Revenue Bonds").  Under the 1998 Resolution, the Authority is authorized to issue Senior Transportation Revenue Bonds for any lawful purpose of the Authority.  As of February 1, 2007, the Authority had $4,146,834,649 aggregate principal amount of Senior Transportation Revenue Bonds outstanding (including the accreted value of capital appreciation bonds).  The Series M Bonds and Series N Bonds are Senior Transportation Revenue Bonds.  The 1998 Resolution also permits the Authority to issue bonds subordinated in right of payment to the Senior Transportation Revenue Bonds ("Subordinated Transportation Revenue Bonds") to pay for certain qualifying projects and for the purpose of refunding all

1

or any part of the outstanding Subordinated Transportation Revenue Bonds.  As of February 1, 2007, the Authority had $791,975,000 aggregate principal amount of Subordinated Transportation Revenue Bonds outstanding.

The Authority has covenanted in the 1998 Resolution not to issue additional Highway Revenue Bonds under the 1968 Resolution, other than bonds whose maturity does not extend beyond July 1, 2036 and which are issued to refund outstanding Highway Revenue Bonds to achieve debt service savings.  As of February 1, 2007, the Authority had $1,713,220,000 aggregate principal amount of Highway Revenue Bonds outstanding.  The Series CC Bonds are Highway Revenue Bonds.

The aggregate outstanding debt of the Authority, including Highway Revenue Bonds and Transportation Revenue Bonds, amounted to $6,652,029,649 as of February 1, 2007.

All Senior Transportation Revenue Bonds will be secured equally and ratably under the 1998 Resolution and will be payable from 1998 Resolution Revenues (as defined below).  All Subordinated Transportation Revenue Bonds will be secured equally and ratably under the 1998 Resolution (except for differences in any debt service reserve requirements related thereto as permitted by the 1998 Resolution) and will be payable from 1998 Resolution Revenues remaining after providing for the payment of debt service on Senior Transportation Revenue Bonds and providing the required debt service reserve therefor.  All Highway Revenue Bonds will be secured equally and ratably under the 1968 Resolution and will be payable from 1968 Resolution Revenues (as defined below).

In the event that other revenues of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") are not sufficient to pay general obligation bonds of the Commonwealth and bonds guaranteed by the Commonwealth, a significant portion of the Authority's revenues may be used to pay these general obligation bonds and Commonwealth guaranteed bonds. Accordingly, this Official Statement incorporates by reference (i) the Commonwealth's Financial Information and Operating Data Report dated July 1, 2006 (the "Commonwealth Report") included as *Appendix I* to the Official Statement, dated August 2, 2006, relating to the offering of the Commonwealth's Public Improvement Bonds of 2006, Series A and Public Improvement Refunding Bonds, Series 2006 B (the "2006 GO Official Statement") and (ii) the Comprehensive Annual Financial Report of the Commonwealth for the Fiscal Year ended June 30, 2005, prepared by the Department of the Treasury of Puerto Rico (the "Commonwealth's Annual Financial Report"), which report includes the basic financial statements of the Commonwealth as of and for the Fiscal Year ended June 30, 2005, which have been audited by KPMG LLP, independent auditors, as stated in their report dated March 14, 2006, accompanying the financial statements. The Commonwealth's Annual Financial Report was filed by the Commonwealth with each nationally recognized municipal securities information repository ("NRMSIR").

The Commonwealth Report includes important information about the Commonwealth, including information about its economy, historical revenues and expenditures of the Commonwealth's General Fund, the preliminary year-end results for fiscal year 2006, the fiscal year 2007 budget, and the debt of the Commonwealth's public sector, and should be read in its entirety.

Any official statement of the Commonwealth or of any instrumentality of the Commonwealth filed with each nationally recognized municipal securities information repository ("NRMSIR") and with the Municipal Securities Rulemaking Board ("MSRB"), or any other document filed with each NRMSIR, after the date hereof and prior to the termination of the offering of the Bonds, which supplements or amends the information appearing in the Commonwealth Report shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in any of the above described documents incorporated by reference shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein modifies or supersedes such statement. Any statement contained herein or in any of the above described documents shall also be deemed to be modified or superseded to the extent that a statement contained in any subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

This Official Statement describes the terms of and security for the Bonds and the use of proceeds of the Bonds. Also included are summaries and descriptions of certain provisions of the 1968 Resolution and the 1998 Resolution. These descriptions and summaries do not purport to be comprehensive or definitive.  All references herein to the 1968 Resolution and the 1998 Resolution are qualified in their entirety by reference to the definitive form thereof, all references to Federal and Commonwealth laws are qualified in their entirety by reference to the complete statutes, regulations and published interpretations by Federal or Commonwealth officials, and all references to the Bonds are qualified in their entirety by the forms thereof contained in the corresponding resolution and are further qualified in their entirety by reference to laws and principles of equity relating to or affecting the enforceability of creditors' rights.

2

This Official Statement, including information incorporated in this Official Statement by reference, contains certain "forward-looking statements" concerning the operations, financial condition, plans and objectives of the Authority and the Commonwealth. These statements are based upon a number of assumptions and estimates which are subject to significant uncertainties, including general economic conditions, many of which are beyond the control of the Authority and the Commonwealth. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the summaries of the 1968 Resolution and the 1998 Resolution in Appendices III and IV, respectively.

## RECENT DEVELOPMENTS

**Recent Developments Relating to the Authority**

*Resignation of Mr. Gabriel Alcaraz as Secretary of Transportation and Public Works and Executive Director of the Authority*

On February 21, 2007, Mr. Gabriel Alcaraz resigned, for personal reasons, as Secretary of Transportation and Public Works and Executive Director of the Authority, effective as of February 28, 2007. Mr. Alcaraz had been originally appointed to both positions in 2005. The Governor of Puerto Rico has announced that Mr. Fernando Pont, who is the current Under Secretary of Transportation and Public Works, will be the Acting Secretary pending the nomination of a new Secretary by the Governor and the confirmation of such nominee by the Puerto Rico Senate. In accordance with the Authority's by-laws, Mr. Jose Hernandez Borges, the current Senior Deputy Executive Director of the Authority, will assume the role of Acting Executive Director of the Authority pending the appointment of a new Executive Director.

*The Authority had an operating loss in fiscal year 2006*

The Authority had an operating loss of $56.7 million in fiscal year 2006, compared to operating income of $88.3 million in fiscal year 2005. Although operating revenues increased from $504.5 million in 2005 to $541.9 million in 2006, operating expenses (before depreciation and amortization) during the same period increased from $113.1 million in 2005 to $216.8 million in 2006. As a result, income before depreciation and amortization decreased from $391.4 million in 2005 to $325.1 million in 2006. The increase in revenues was primarily the result of the increase in toll rates and the opening of two new toll highways. The increase in expenses was primarily the result of the commencement of operations of Tren Urbano (see "THE AUTHORITY - General Description"), an increase in the amount of non-capitalized repairs and maintenance of roads and bridges and higher toll highway operations, maintenance and administration expenses resulting from the implementation of the AutoExpreso electronic toll collection system and the opening of two new toll highways. After considering interest expense and contributions from the federal government, the Authority's net assets decreased by $247.9 million in 2006, compared with a reduction of $19.3 million in 2005.

**Recent Developments Relating to the Commonwealth**

A significant portion of the revenues of the Authority are subject to prior claim to pay general obligation bonds of the Commonwealth of Puerto Rico and bonds guaranteed by the Commonwealth in the event that other Commonwealth revenues were not sufficient to pay these general obligation bonds and Commonwealth guaranteed bonds. Therefore, this Official Statement includes the following information with respect to recent developments affecting the Commonwealth. This information has been provided by the Puerto Rico Department of Treasury, the Puerto Rico Office of Management and Budget and the Government Development Bank for Puerto Rico.

*Budget Deficit for Fiscal Year 2006*

Unaudited total revenues for fiscal year 2006, according to the Secretary of the Treasury, were $8.645 billion (including for purposes of this discussion $100 million of proceeds generated by the issuance of the Commonwealth's Public Improvement Refunding Bonds, Series 2006 A, which were privately placed). This amount is $350 million less than the amount originally budgeted of $8.995 million. This reduction in revenues is attributable primarily to the current economic slowdown, caused mainly by the historically high prices of oil and its derivatives during the year, the government's fiscal crisis, which resulted in a two-week shutdown of non-essential government services in May 2006, and the uncertainty that prevailed during the later part of fiscal year 2006 regarding the enactment of proposed tax and fiscal

reform measures designed to resolve the fiscal crisis. The Commonwealth does not expect these reduced revenue levels to continue during fiscal year 2007. Total expenditures for fiscal year 2006 were $9.596 billion, or approximately $951 million above the estimate of total revenues for fiscal year 2006. Taking into account certain additional General Fund cash requirements in the amount of $368 million that were covered by alternative financing mechanisms, the fiscal year 2006 budget deficit totals approximately $1.3 billion. See "Commonwealth's Structural Budget Imbalance" below. The excess expenditures experienced during fiscal year 2006 (totaling $951 million) were partially covered with funds from the Emergency and Budgetary Funds ($64 million) and a Government Development Bank for Puerto Rico ("GDB" or "Government Development Bank") loan ($741 million). The remaining shortfall, totaling $146 million, did not have a cash impact during fiscal year 2006 as a result of various cash management mechanisms, including the postponement of certain payments to third party vendors. This shortfall will impact the Commonwealth's cash flow during fiscal year 2007.

The excess expenditures of $951 million do not include the previously mentioned $368 million cash requirement related to debt service due during fiscal year 2006 on the Commonwealth's general obligation bonds, which was paid from the proceeds of another Government Development Bank loan and refunded with the proceeds of the Commonwealth Public Improvement Refunding Bonds, Series 2006 B and 2006 C (the "Financed Debt Service").

*Commonwealth's Structural Budget Imbalance*

The budget imbalance in fiscal year 2006 comes in the wake of several recent fiscal years during which the Commonwealth's recurring expenditures exceeded its recurring revenues. These budget imbalances were covered in the past with loans from Government Development Bank, financing transactions (including long-term bond issues payable from the General Fund) and other non-recurring resources. The Commonwealth's recurring operating expenditures during fiscal year 2006 exceeded recurring revenues (the so-called structural imbalance) by approximately $1 billion.  The $1 billion structural imbalance for fiscal year 2006 is the difference between expenditures of $9.596 billion plus the Financed Debt Service, for a total of $9.964 billion, less budgeted recurring revenues of $8.895 billion. The calculation of the $1 billion structural imbalance excludes (i) the $350 million reduction in revenues during fiscal year 2006 discussed above because the government does not consider it a permanent reduction in recurring revenues and (ii) net proceeds of $100 million received in fiscal year 2006 from the issuance of the Commonwealth's Public Improvement Refunding Bonds, Series 2006 A, which is non-recurring.  If considered recurring, the Financed Debt Service discussed above would increase the structural imbalance. The Commonwealth covered the fiscal year 2006 structural imbalance by financing the Financed Debt Service ($368 million), issuing the Commonwealth's Public Improvement Refunding Bonds, Series 2006 A ($100 million), transferring approximately $64 million from the Emergency and Budgetary Funds and financing most of the remaining portion of the Commonwealth's fiscal year 2006 structural budget imbalance with a GDB loan of $741 million. In addition to the Financed Debt Service, there are certain other expenditures not included in the amount of unaudited expenditures for fiscal year 2006 that may increase the structural imbalance. These include estimated amounts required to cover maintenance expenses incurred by Public Buildings Authority ("PBA") (approximately $75 million) and subsidy and operational expenses incurred by the Agricultural Services and Development Administration ("ASDA") (approximately $75 million). These last two items were covered by lines of credit from Government Development Bank collateralized by real estate of PBA and ASDA and accounts receivable of PBA, with payment expected from the sale of such pledged real estate and/or the collection of such pledged receivables. For more information, see "2006 Budget Approval Process" under *Budget of the Commonwealth of Puerto Rico* in the Commonwealth Report.

*Other Fiscal Challenges*

Other than its current budgetary shortfalls, the principal challenge facing the Commonwealth involves resolving the unfunded pension liability of the Employees Retirement System and the Teachers Retirement System, which totaled $9.2 billion as of June 30, 2003 and $2.3 billion as of June 30, 2004, respectively. The Commonwealth may be able to reduce the unfunded liability of the Employees Retirement System through proposed (but not enacted) legislation providing for increased employer and employee contributions and the issuance of up to $2 billion of pension obligation bonds, which would be payable from the Commonwealth's General Fund, and, subject to regulatory approval and other conditions, the sale of its remaining Puerto Rico Telephone Company stock for approximately $500 million, which the Employees Retirement System expects to be able to invest in higher-yielding assets.  The Employees Retirement System and the Teachers Retirement System are seeking reimbursement from the Commonwealth for certain special retirement benefits paid by them in prior fiscal years under legislation providing such retirement benefits.  The Employees Retirement System is seeking reimbursement from the Commonwealth in the amount of $77.4 million for cumulative benefits paid to beneficiaries through June 30, 2005. The Employees Retirement System projects an additional shortfall of

$39.4 million for fiscal year 2006 in connection with payments pursuant to special benefit laws. The Office of Management and Budget ("OMB") believes that the basis of the claims from the Employees Retirement System is valid but that the amounts claimed remain to be verified and reconciled. Recently, the Employees Retirement System received a $42.9 million payment from OMB to cover shortfalls related to payments made in connection with special benefits laws. OMB does not recognize as a Commonwealth liability part of the claims by the Teachers Retirement System ($119 million). OMB and the Teachers Retirement System are currently under inter-agency arbitration in an effort to resolve their differences

*Tax Reform*

Act No. 117 of July 4, 2006 ("Act 117") amends the Puerto Rico Internal Revenue Code of 1994 (the "PR Code") to provide, among other things, for a general sales and use tax of 5.5% to be imposed by the central government (the "Central Government Sales Tax") and authorizes each municipal government to impose a municipal sales and use tax of 1.5% (the "Municipal Sales Tax" and, together with the Central Government Sales Tax, the "Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for unprocessed foods) and limitations as those provided for the Central Government Sales Tax. Act 117 also provides certain income tax reductions to address the regressive effect of the Sales Tax on taxpayers in lower income tax brackets. The Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations provided therein. The Sales Tax is not imposed on, among other things: (i) taxable items acquired by merchants for resale, (ii) taxable items acquired by manufacturing plants, (iii) taxable items acquired for use and consumption outside of Puerto Rico, (iv) certain food products that do not need to be heated before their sale, (v) prescription drugs, (vi) the rental payments received by a lessor of real property which is used for residential or commercial purposes, (vii) services provided by designated professionals, (viii) cash, cash equivalents, stocks, bonds, notes, mortgage loans, insurance, securities and interest derived for the use or forbearance of money, (ix) sales of real property, and (x) leases in which the Industrial Development Company is the owner of the property. Act 117 also repeals the 5% general excise tax imposed on certain imported goods and on goods manufactured in Puerto Rico. Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items and are not subject to the Sales Tax. The gasoline, gas and diesel oil, and petroleum products taxes payable to the Authority are not affected by this legislation.

The Sales Tax became effective on November 15, 2006 and the effective date of the repeal of the 5% general excise tax was October 17, 2006. Municipalities were authorized to implement the Municipal Sales Tax starting on July 1, 2006, and most have already done so. The revenues derived from the Sales Tax will be distributed as follows: (i) municipal governments will retain 1.3% of the Sales Tax, (ii) the Dedicated Sales Tax Fund, created by Act No. 91 of May 13, 2006, as amended, will receive 1% of the Sales Tax, and (iii) the General Fund will receive 4.7% of the Sales Tax. The Secretary of the Treasury projects that each percentage point of the Sales Tax will generate annually approximately $191 million of gross revenues and that the Sales Tax will generate total annual gross revenues of approximately $1.337 billion. The increase in revenues to be generated by the Sales Tax will be partly offset by the elimination of the 5% general excise tax and the effect of the income tax reduction measures included in Act 117.

On October 31, 2006 the Supreme Court of Puerto Rico granted certiorari to a group of plaintiff taxpayers that sought declaratory judgment alleging that the House of Representatives intended to enact a 5.5% aggregate sales and use tax, including the portion attributable to the municipalities. On November 10, 2006, the Supreme Court, in a majority decision, ruled against the plaintiffs and held that Act 117 is clear that the Sales Tax is comprised of the Central Government Sales Tax and the Municipal Sales Tax, for an aggregate Sales Tax of 7%.

*Fiscal Reform*

On May 31, 2006, the Governor signed Act No. 111 providing for a fiscal reform of the Commonwealth government (the "Fiscal Reform Legislation"). The Fiscal Reform Legislation applies to every instrumentality and entity of the Executive Branch funded, in whole or in part, from the General Fund and sets forth as the public policy of the Commonwealth the reduction of government spending, the elimination or consolidation of redundant agencies, the reduction of government payroll without causing the layoff of regular employees or increasing the actuarial liability of the retirement systems, the limitation of unnecessary, extravagant or excessive spending, and the limitation of public relations and other similar expenses. For more information on the Fiscal Reform Legislation, see "Fiscal Reform" under *Budget of the Commonwealth of Puerto Rico* in the Commonwealth Report. Despite his approval of the Fiscal Reform Legislation,

5

the Governor has stated that certain of its provisions may be unconstitutional because they infringe on Executive Branch prerogatives. As such, the Governor has informed the Legislative Assembly that certain provisions of the Fiscal Reform Legislation will be implemented at the Executive Branch's discretion and through the use of the Executive Branch's prerogatives. There is no assurance that the Fiscal Reform Legislation will result in the intended reduction of expenditures or that it will be implemented as enacted.

*Government Reorganization Plan*

On October 22, 2006, the Commonwealth issued the "The Economic Development and Government Transformation Plan for Puerto Rico" (the "Plan"). The Plan's purpose is to establish strategies to develop the economy of the Commonwealth and ensure that it competes successfully with the economies of other countries.  The Plan focuses on six main strategies which consist of: (i) improving infrastructure; (ii) developing bio-sciences and high-technology industries; (iii) promoting local industry; (iv) expanding tourism to promote further economic development; (v) reducing petroleum dependency to 50% (currently at 73%) in four years; and (vi) transforming the government's structure by decentralizing services and using principles of regionalization.

*Fiscal Year 2007 Budget*

On July 10, 2006, the Governor signed a General Fund budget for fiscal year 2007 authorizing expenditures of $9.488 billion, or approximately $108 million less than the expenditures for fiscal year 2006 of $9.596 billion (excluding the Financed Debt Service). This reduction of approximately $108 million is attributable principally to decreases in the amount allocated to the Department of Education and certain health-related expenditures. Currently, the Department of Education is working on an internal restructuring to reduce its expenditures so as to remain within its reduced operating budget.  On November 19, 2006 the Governor signed Act No. 249 authorizing Government Development Bank to extend a $253 million loan to a special health fund created by such Act to cover certain health-related expenditures of the Commonwealth.  The State Insurance Fund will repay the loan over six years and will be reimbursed for amounts paid from the General Fund.

The revenue projection for fiscal year 2007 is $9.163 billion, an increase of $618 million, or 7.2%, from preliminary net revenue collections for fiscal year 2006 of $8.545 billion. The Secretary of the Treasury's revenue projection for fiscal year 2007 consists of $8.899 billion in recurring revenues, a 4.1% increase over fiscal year 2006, and $264 million to be generated by certain non-recurring tax measures.  The revenue projection for fiscal year 2007 reflects (i) the Planning Board's downward revision of its forecast for real growth in gross national product from 2.5% to 0.6%, (ii) the implementation of the Sales Tax (4.7% of which Sales Tax is allocated to the General Fund) starting on November 15, 2006 through June 30, 2007, (iii) the elimination of the 5% general excise tax, and (iv) certain income tax rate reductions included in the tax reform legislation. For more information, see "Summary and Management's Discussion of General Fund Results - Fiscal Year 2007 Projected Revenues" under *Puerto Rico Taxes, Other Revenues, and Expenditures* in the Commonwealth Report.

The revenues projected by the Secretary of the Treasury for fiscal year 2007 include approximately $643 million from the implementation of the Sales Tax. This amount consists of the 4.7% allocable to the General Fund for the period from November 15, 2006 through June 30, 2007. The impact of the repeal of the excise tax revenue on projections for the period between October 17 and November 15, 2006 is a reduction of approximately $50 million. The Commonwealth's budgeted expenditures for fiscal year 2007 of $9.488 billion exceed projected revenues of $9.163 billion by approximately $325 million. The Commonwealth expects to eliminate this budget deficit through the implementation of additional expenditure reducing measures, a possible increase in tax revenues resulting from the reduction of the uncertainty surrounding the government's fiscal crisis, and cash management mechanisms. Among such measures, OMB has established a 10% reserve from the budgeted amounts of certain agencies totaling $540 million which may be used only with OMB approval. Currently, OMB estimates savings of at least $160 million out of the $540 million reserved. The possible increase in tax revenues may be tempered by a number of factors, including without limitation, the adverse economic impact resulting from increases in the price of oil and the implementation of the Sales Tax.

The Commonwealth has also excluded from the fiscal year 2007 budget, based on the provisions of Act No. 91 of May 13, 2006, approximately $522 million of debt service payments on a portion of its outstanding appropriation debt. The debt service requirements for this appropriation debt or any debt issued to refund this appropriation debt for fiscal year 2007 will be covered with amounts to be deposited in the Dedicated Sales Tax Fund, a special fund created by Act No. 91. The Dedicated Sales Tax Fund will be funded with one percentage point of the Sales Tax, which is expected to

generate annually approximately $191 million. However, due to the implementation of the Sales Tax on November 15, 2006, the Fund is expected to receive approximately $136.8 million for the seven and a half months in fiscal year 2007 for which the Sales Tax will be in effect. Government Development Bank advanced and, on July 15, 2006, deposited with the trustee $303 million corresponding to debt service of the Public Finance Corporation. The Commonwealth is currently evaluating various restructuring alternatives for its outstanding appropriation debt in order to cover these debt service payments with the expected revenues of the Dedicated Sales Tax Fund. Based on previous legislation, amounts not covered by the Dedicated Sales Tax Fund, if any, would have to be covered by additional legislative appropriations from the Commonwealth's General Fund.

*Fiscal Year 2007 Net Revenues*

Preliminary net revenues for the first seven months of the current fiscal year (July of 2006 through January of 2007) totaled $4.650 billion, $25 million less than the Treasury Department's estimate for that period. This is attributed mainly to a decrease in motor vehicles excise taxes due to a significant reduction in vehicles sales. In the two and one-half months since the implementation of the sales tax, it has generated $209 million, compared to an original estimate of $234 million. Also, net revenues from non-recurring tax measures amounted to $266 million, which represents $2 million in excess of the estimate.

*Recent Rating Action Involving the Commonwealth*

On July 20, 2006, Standard & Poor's Rating Services, a Division of The McGraw-Hill Companies, Inc. ("S&P"), confirmed its "BBB" and "BBB-" rating on the Commonwealth's general obligation debt and appropriation debt, respectively, and removed the ratings from CreditWatch with negative implications, where it had been placed on March 22, 2006. S&P's ratings outlook, however, remains negative. On July 21, 2006, Moody's Investors Service ("Moody's") confirmed its "Baa3" and "Ba1" rating on the Commonwealth's general obligation debt and appropriation debt, respectively, and removed the ratings from Watchlist with negative implications, where it had been placed on February 24, 2006. Moody's ratings outlook, however, also remains negative.

## FINANCING PLAN

### Series M Bonds

The Authority is issuing the Series M Bonds to (i) provide long-term financing (including through the repayment of short-term debt) to various highway projects included in the Authority's current Construction Improvement Program, (ii) make a deposit to the 1998 Senior Bond Reserve Account, and (iii) pay the costs of issuance of the Series M Bonds. See "Operating Expenses and Capital Expenditures – Construction Improvement Program" under "TRANSPORTATION SYSTEM REVENUES AND EXPENDITURES."

### Series N Bonds

The Authority is issuing the Series N Bonds to (i) refund a portion of the Authority's Senior Transportation Revenue Bonds (the "1998 Resolution Refunded Bonds") in the amounts and maturities identified in the table below and (ii) pay the costs of issuance of the Series N Bonds. See "Issuance of Additional Bonds" in "APPENDIX IV - SUMMARY OF CERTAIN PROVISIONS OF THE 1998 RESOLUTION."

**1998 Resolution Refunded Bonds**

| 1998 Resolution Refunded Bonds | Maturity Date July 1, | Interest Rate | Principal Amount to be Refunded | Redemption Date July 1, | Redemption Price |
|---|---|---|---|---|---|
| 1998 Series A | 2007 | 4.30% | $10,560,000 | At maturity | N/A |
| | 2008 | 5 | 4,825,000 | At maturity | N/A |
| | 2009 | 5 ½ | 5,060,000 | At maturity | N/A |
| | 2010 | 5 ½ | 5,345,000 | At maturity | N/A |
| | 2011 | 5 ½ | 18,790,000 | At maturity | N/A |
| | 2028 | 5 | 108,860,000 | 2008 | 101% |
| | 2038 | 5 | 237,975,000 | 2008 | 101% |
| 2000 Series B | 2007 | 5.10% | $ 5,795,000 | At maturity | N/A |
| | 2008 | 5 1/8 | 6,090,000 | At maturity | N/A |
| | 2009 | 5.20 | 3,000,000 | At maturity | N/A |
| 2002 Series D | 2027 | 5 | $48,750,000 | 2012 | 100% |
| | 2032 | 5 | 80,280,000 | 2012 | 100% |
| 2003 Series G | 2020 | 5 ¼ % | $11,060,000 | 2013 | 100% |
| | 2021 | 5 ¼ | 9,720,000 | 2013 | 100% |
| | 2028 | 5 | 4,360,000 | 2013 | 100% |
| | 2033 | 5 | 94,335,000 | 2013 | 100% |
| | 2042 | 5 | 171,295,000 | 2013 | 100% |
| 2003 Series H | 2028 | 5% | $3,435,000 | 2013 | 100% |
| | 2035 | 5 | 6,470,000 | 2013 | 100% |
| 2004 Series J | 2007 | 5% | $ 2,905,000 | At maturity | N/A |
| | 2007 | 2 ½ | 1,160,000 | At maturity | N/A |
| | 2008 | 5 | 2,045,000 | At maturity | N/A |
| | 2008 | 2 5/8 | 2,195,000 | At maturity | N/A |
| | 2034 | 5 | 67,185,000 | 2014 | 100% |
| | 2039 | 5 1/8 | 85,945,000 | 2014 | 100% |
| | 2043 | 5 1/8 | 86,020,000 | 2014 | 100% |
| 2005 Series K | 2007 | 3% | $ 7,450,000 | At maturity | N/A |
| | 2008 | 3.20 | 7,675,000 | At maturity | N/A |
| | 2035 | 5 | 123,065,000 | 2015 | 100% |
| | 2040 | 5 | 159,050,000 | 2015 | 100% |
| | 2045 | 5 | 202,990,000 | 2015 | 100% |

The Authority will deposit the net proceeds of the Series N Bonds, together with other available moneys, with the 1998 Fiscal Agent, as escrow agent, under the terms of an escrow deposit agreement. The net proceeds, together with such other moneys, will be invested in Government Obligations (as defined in the 1998 Resolution) the principal of and interest on which when due, together with any moneys deposited with the 1998 Fiscal Agent remaining uninvested, will provide moneys sufficient to pay the interest coming due on the 1998 Resolution Refunded Bonds through their dates of redemption and to pay the principal of and premium, if any, on the 1998 Resolution Refunded Bonds on their dates of redemption. The sufficiency of the amount so deposited, with investment earnings thereon, to accomplish the refunding of the 1998 Resolution Refunded Bonds will be verified by the Verification Agent. See "VERIFICATION OF MATHEMATICAL ACCURACY."

Upon the deposit with the 1998 Fiscal Agent referred to above, the 1998 Resolution Refunded Bonds will, in the opinion of Bond Counsel, based on the report of the Verification Agent (see "VERIFICATION OF MATHEMATICAL ACCURACY"), no longer be deemed to be outstanding under the 1998 Resolution, and the 1998 Resolution Refunded Bonds will thereupon be defeased.

**Series CC Bonds**

The Authority is issuing the Series CC Bonds to (i) refund a portion of the Authority's Highway Revenue Bonds (the "1968 Resolution Refunded Bonds") in the amounts and maturities identified in the table below (the 1968 Resolution Refunded Bonds and the 1998 Resolution Refunded Bonds are collectively referred to as the "Refunded Bonds"); and (ii) pay the costs of issuance of the Series CC Bonds.  See "Issuance of Additional Bonds" in "APPENDIX III - SUMMARY OF CERTAIN PROVISIONS OF THE 1968 RESOLUTION."

**1968 Resolution Refunded Bonds**

| 1968 Resolution Refunded Bonds | Maturity Date July 1, | Interest Rate | Principal Amount to be Refunded | Redemption Date July 1, | Redemption Price |
|---|---|---|---|---|---|
| 1996 Series Y | 2007 | 6 ¼% | $10,630,000 | At maturity | N/A |
| | 2008 | 6 ¼ | 7,000,000 | At maturity | N/A |
| | 2009 | 6 ¼ | 6,500,000 | At maturity | N/A |
| | 2016 | 5 | 18,090,000 | 2007[1] | 101.5% |
| | 2036 | 5 ½ | 197,680,000 | 2016 | 100% |
| | 2036 | 5 | 225,000,000 | 2016 | 100% |

(1)  Redemption Date is April 9, 2007.

The Authority will deposit the net proceeds of the Series CC Bonds, together with other available moneys, with the 1968 Fiscal Agent, as escrow agent, under the terms of an escrow deposit agreement. The net proceeds, together with such other moneys, will be invested in Government Obligations (as defined in the 1968 Resolution) the principal of and interest on which when due, together with any moneys deposited with the 1968 Fiscal Agent remaining uninvested, will provide moneys sufficient to pay the interest coming due on the 1968 Resolution Refunded Bonds through their dates of redemption and to pay the principal of and premium, if any, on the 1968 Resolution Refunded Bonds on their dates of redemption. The sufficiency of the amount so deposited, with investment earnings thereon, to accomplish the refunding of the 1968 Resolution Refunded Bonds will be verified by the Verification Agent.  See "VERIFICATION OF MATHEMATICAL ACCURACY."

Upon the deposit with the 1968 Fiscal Agent referred to above, the 1968 Resolution Refunded Bonds will, in the opinion of Bond Counsel, based on the report of the Verification Agent (see "VERIFICATION OF MATHEMATICAL ACCURACY"), no longer be deemed to be outstanding under the 1968 Resolution, and the 1968 Resolution Refunded Bonds will thereupon be defeased.

**Sources and Uses of Funds**

**Sources:**

| | |
|---|---|
| Principal Amount of the Bonds................................................. | $2,184,860,553.00 |
| Net Original Issue Premium or Discount.................................. | 240,821,059.45 |
| Other available moneys ........................................................... | 42,951,730.36 |
|     Total Sources ......................................................... | $2,468,633,342.81 |

**Uses:**

| | |
|---|---|
| Deposit into 1998 Construction Fund........................................ | $   53,232,325.88 |
| Deposit into 1968 Escrow Fund................................................ | 497,283,713.96 |
| Deposit into 1998 Escrow Fund................................................ | 1,650,106,990.44 |
| Deposit into 1998 Bond Reserve Account................................. | 3,932,464.00 |
| Underwriting discount and bond insurance premium, legal, printing, and other financing expenses........................... | 62,638,375.43 |
| Repayment of Subordinated Transportation Revenue Bonds Series 2007A.......................................................................... | 201,439,473.10 |
|     Total Uses ............................................................... | $2,468,633,342.81 |

## THE BONDS

**General**

The Bonds will be issued as registered bonds without coupons, and will be dated, will bear interest at the rates, will be payable at the times, and will mature on the dates and in the principal amounts set forth on the cover and inside cover pages of this Official Statement. The Bonds will be issued in denominations of $5,000 principal amount (or maturity amount in the case of the Capital Appreciation Bonds) and integral multiples thereof and will initially be registered in the name of Cede & Co., as nominee of the Depository Trust Company ("DTC") the initial security depository for the Bonds.

The Bonds will be issued as Fixed Rate Bonds, LIBOR Bonds, Capital Appreciation Bonds and CPI Bonds. The Series M Bonds, the Series N Serial Bonds and Term Bonds, and the Series CC Serial Bonds and Term Bonds are Fixed Rate Bonds.

**Principal and Interest**

*General*

The principal and premium, if any, on the Series M Bonds and the Series N Bonds shall be payable in lawful money of the United States of America at the designated office of the 1998 Fiscal Agent. The principal and premium, if any, on the Series CC Bonds shall be payable in lawful money of the United States of America at the designated office of the 1968 Fiscal Agent. Interest shall be computed, in the case of the Fixed Rate Bonds and the CPI Bonds, on the basis of a 360-day year consisting of twelve 30 day months and, in the case of the LIBOR Bonds, on the basis of a 365 or 366-day year, as appropriate, and the actual number of days elapsed.

*Fixed Rate Bonds*

Interest on the Fixed Rate Bonds will be payable on each January 1 and July 1, commencing on July 1, 2007, to the person whose name appears on the registration books of the 1998 Fiscal Agent (in the case of the Series M Bonds and the Series N Bonds) or the 1968 Fiscal Agent (in the case of the Series CC Bonds) as the registered owner thereof on the 15th day of the month immediately preceding the month in which payment is due.

*LIBOR Bonds*

Interest on the LIBOR Bonds will be payable on each January 1, April 1, July 1, and October 1, commencing on July 1, 2007, to the person whose name appears on the registration books of the 1998 Fiscal Agent as the registered owner thereof on the 15th day of the month immediately preceding the month in which payment is due.

During each LIBOR-Based Interest Rate Period, the LIBOR Bonds will bear interest at the LIBOR-Based Interest Rate from the first day of the LIBOR-Based Interest Rate Period and ending on the day immediately prior to the

first Interest Payment Date and thereafter during the period commencing on and including an Interest Payment Date to but not including the following Interest Payment Date.

The LIBOR-Based Interest Rate will be the rate of interest per annum determined by the 1998 Fiscal Agent to be equal to the sum of (a) 67% of the Three-Month LIBOR Rate plus (b) a per annum spread equal to 0.53%; provided that in the calculation of the initial LIBOR-Based Interest Rate for the LIBOR Bonds, the Three-Month LIBOR Rate will be calculated through the use of straight-line interpolation by reference to the Three-Month LIBOR Rate and a LIBOR Rate with a four-month maturity; provided further that in all cases, the LIBOR-Based Interest Rate will never exceed the maximum rate permitted under Puerto Rico law (currently 12%).

As soon as possible after 11:00 a.m., New York City time, on each LIBOR Rate Determination Date (as defined below), but in no event later than 11:00 a.m., New York City time, on the Business Day immediately following each LIBOR Rate Determination Date, the 1998 Fiscal Agent will notify the Holders of the LIBOR-Based Interest Rate for the next LIBOR-Based Interest Accrual Period (as defined below).

The "Three-Month LIBOR Rate" for each LIBOR-Based Interest Accrual Period, which is the period from and including the date of issuance or any Interest Payment Date to and excluding the next such Interest Payment Date (each a "LIBOR-Based Interest Accrual Period"), means the rate for deposits in U.S. dollars with a three-month maturity that appears on Telerate Page 3750 as of 11:00 a.m., London time, on the day that is two London Banking Days preceding the first day of such LIBOR-Based Interest Accrual Period (each a "LIBOR Rate Determination Date"). The term "London Banking Day" means any day on which commercial banks are open for general business (including dealings in foreign exchange currency deposits) in London. The term "Telerate" means, when used in connection with any designated page, the display page so designated on Bridge's Telerate Service (or such other page as may replace that page on that service, or such other service as may be nominated for the purpose of displaying rates or prices comparable to the Three-Month LIBOR Rate).

If the Three-Month LIBOR Rate does not appear on the Telerate Page 3750 on such LIBOR Rate Determination Date, the Three-Month LIBOR Rate will be determined on the basis of the rates at which deposits in U.S. dollars for a three-month maturity and in a principal amount as set forth on the 1998 Resolution are offered at approximately 11:00 a.m., London time, on such LIBOR Rate Determination Date, to prime banks in the London interbank market by four major banks in the London interbank market (the "Reference Banks") selected by a market agent appointed by the 1998 Fiscal Agent to identify such Reference Banks (the "Market Agent"), as further set forth on the 1998 Resolution.

In connection with the issuance of the LIBOR Bonds, the Authority has entered into two interest rate swap agreements. In general, the swap agreements provide that, subject to the terms thereof, the Authority will pay to the swap provider a fixed rate and the swap provider will pay to the Authority a floating rate based on LIBOR plus a spread, in each case based on a notional amount equal to the principal amount of the LIBOR Bonds outstanding. The purpose of the swap agreements is generally to convert the Authority's floating rate obligations with respect to the LIBOR Bonds to fixed rate obligations.

Under certain circumstances, the swap agreements are subject to termination prior to their scheduled termination date and prior to the maturity of the LIBOR Bonds. In the event of an early termination of any of the swap agreements, there can be no assurance that (i) the Authority will receive any termination payment payable to it by the swap provider, (ii) the Authority will have sufficient amounts to pay a termination payment payable by it to the swap provider, and (iii) the Authority will be able to obtain a replacement swap agreement with comparable terms. Payment due upon early termination may be substantial. The swap provider has no obligation to make any payments to the holders of the LIBOR Bonds with respect to the principal of, interest on, or redemption price of, the LIBOR Bonds. Neither the holders of the LIBOR Bonds nor any other person acting on behalf of such holders shall have any rights under the swap agreements or against the swap provider.

The Authority will be obligated to pay interest on and the principal of the LIBOR Bonds regardless of whether the swap provider performs its obligations under the swap agreements.

*Capital Appreciation Bonds*

Interest on the Capital Appreciation Bonds will accrue from the date of issuance. Such interest will be added to the accreted value of such Bonds (which is initially equal to their initial principal amount) on each January 1 and July 1, commencing on July 1, 2007, and will be paid only at maturity. Appendix VI sets forth the accreted value of the Capital Appreciation Bonds on each January 1 and July 1. The accreted value of the Capital Appreciation Bonds on any other

day is calculated on the assumption that such accreted value increases in equal daily amounts up to the accreted value on the next January 1 or July 1, as applicable.

*CPI Bonds*

Interest on the CPI Bonds will be payable on the first Business Day of each month commencing on July 2, 2007. The CPI Rate, which will be reset monthly, is an interest rate based on changes in the Consumer Price Index. Appendix VII sets forth a more detailed description of the CPI Rate and certain risks associated with an investment in the CPI Bonds.

In connection with the issuance of the CPI Bonds, the Authority has entered into an interest rate swap agreement. In general, the swap agreement provides that, subject to the terms thereof, the Authority will pay to the swap provider a fixed rate and the swap provider will pay to the Authority a floating rate based on the CPI Rate, based on a notional amount equal to the principal amount of the CPI Bonds outstanding. The purpose of the swap agreement is generally to convert the Authority's floating rate obligations with respect to the CPI Bonds to fixed rate obligations.

Under certain circumstances, the swap agreement is subject to termination prior to its scheduled termination date and prior to the maturity of the CPI Bonds. In the event of an early termination of the swap agreement, there can be no assurance that (i) the Authority will receive any termination payment payable to it by the swap provider, (ii) the Authority will have sufficient amounts to pay a termination payment payable by it to the swap provider, and (iii) the Authority will be able to obtain a replacement swap agreement with comparable terms. Payment due upon early termination may be substantial. The swap provider has no obligation to make any payments to the holders of the CPI Bonds with respect to the principal of, interest on, or redemption price of, the CPI Bonds. Neither the holders of the CPI Bonds nor any other person acting on behalf of such holders shall have any rights under the swap agreement or against the swap provider.

The Authority will be obligated to pay interest on and the principal of the CPI Bonds regardless of whether the swap provider performs its obligations under the swap agreement.

**Redemption of the Bonds**

*Optional Redemption*

*Series M Bonds.* The Series M Bonds maturing on or after July 1, 2018 may be redeemed on any date on or after July 1, 2017, at the option of the Authority, either in whole or in part (and, if in part, in such order of maturities as the Authority may direct), from any available moneys (other than moneys deposited in the 1998 Senior Bond Sinking Fund in respect of an Amortization Requirement) at a redemption price equal to the principal amount of the bonds to be redeemed plus accrued interest to the redemption date, without premium.

*LIBOR Bonds.* The LIBOR Bonds are subject to optional redemption prior to their stated maturity, at the option of the Authority, in whole or in part, in such amounts as may be specified by the Authority (i) on any date prior to July 1, 2017 (the "Par Call Date"), at a Redemption Price equal to the Spread Premium for such Bonds and (ii) on any date on or after the Par Call Date, at a Redemption Price equal to 100% of the principal amount thereof, without premium, plus in each case accrued interest to the date fixed for redemption (the "Redemption Date").

For purposes of this provision, the "Spread Premium" shall be calculated as follows:

1. A hypothetical cash flow schedule shall be calculated by assuming that the principal of the Bonds called for redemption would be payable on the Par Call Date and that interest on such Bonds would be payable quarterly on each January 1, April 1, July 1 and October 1 until, and including, the Par Call Date (each a "Quarterly Payment Date") at a rate per annum equal to the sum of (a) 67% of the USD-ISDA-Swap Rate plus (b) the spread above the percentage of the Three-Month LIBOR Rate at which such Bonds bear interest (0.53% per annum in the case of the LIBOR Bonds).

2. Each principal and interest payment in the hypothetical cash flow schedule determined in accordance with the preceding paragraph shall be discounted as of each Quarterly Payment Date to the Redemption Date at a discount rate equal to the sum of (a) 67% of the USD-ISDA-Swap Rate plus (b) 0.25% per annum.

3.   The sum of the present values of such principal and interest payments as of the Redemption Date determined pursuant to the preceding paragraph shall be the Spread Premium.

For purposes of this calculation,

"USD-ISDA-Swap Rate" means the rate for U.S. dollar swaps maturing on July 1, 2017, expressed as a percentage, which appears on the Reuters Money 3000 Service on the page designated ISDAFIX1 (or such other page as may replace that page on such service for the purpose of displaying comparable rates) at 11:00 a.m., New York City time, on the day which is two U.S. Government Securities Business Days prior to such date.  If such rate does not appear on such page on such day, then "USD-ISDA-Swap Rate" for such maturity and date shall mean the percentage determined on the basis of mid-market semiannual swap rate quotations provided by five leading swap dealers in the New York City interbank market at approximately such time on such day as the mean of the bid and offered rates for the semiannual fixed leg, calculated on a 30/360 day count basis, of a fixed-for-floating U.S. dollar interest rate swap transaction with an effective date of the relevant early termination date and a termination date equal to such maturity, in an amount that is representative for a single transaction in such market at such time, with an acknowledged dealer of good credit in such market, where the floating rate, calculated on the basis of a 360-day year for actual days elapsed, is equal to the London Interbank Offered Rate for loans with a three-month duration.

"U.S. Government Securities Business Day" means any day except for a Saturday, a Sunday, or a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading U.S. government securities.

*Series N Bonds (other than LIBOR Bonds) and Series CC Bonds.* The Series N Bonds (other than the Series N Bonds that are LIBOR Bonds) and the Series CC Bonds are not subject to redemption at the option of the Authority.

*Mandatory Redemption*

*Series M Bonds*. The Series M Bonds maturing on July 1, 2032, 2037 and 2046, are subject to redemption on each July 1 immediately after the fiscal year for which there is an Amortization Requirement to the extent of the Amortization Requirement for said bonds (less the amount of bonds retired by purchase from moneys in the 1998 Senior Bond Sinking Fund) from moneys in the 1998 Senior Bond Sinking Fund at par plus accrued interest in the years and amounts set forth below.

| | Amortization Requirements for Series M Bonds due July 1, | | |
|---|---|---|---|
| **Year** | **2032** | **2037** | **2046** |
| 2028 | $ 5,775,000 | | |
| 2029 | 6,065,000 | | |
| 2030 | 6,370,000 | | |
| 2031 | 6,685,000 | | |
| 2032 | 7,020,000* | | |
| 2033 | | $ 7,370,000 | |
| 2034 | | 7,740,000 | |
| 2035 | | 8,130,000 | |
| 2036 | | 8,535,000 | |
| 2037 | | 7,180,000* | |
| 2038 | | | $ 9,400,000 |
| 2039 | | | 9,870,000 |
| 2040 | | | 10,365,000 |
| 2041 | | | 10,880,000 |
| 2042 | | | 11,425,000 |
| 2043 | | | 11,995,000 |
| 2044 | | | 12,595,000 |
| 2045 | | | 13,225,000 |
| 2046 | | | 13,885,000* |
| Average life (years) | 23.417 | 28.330 | 35.643 |

*Maturity

If less than all of the Series M Bonds of any one maturity shall be called for redemption, the particular bonds or portions thereof to be redeemed shall be selected by the 1998 Fiscal Agent, in such manner as it in its discretion may determine to be appropriate and fair.

*Series N Bonds.* The Series N Bonds maturing on July 1, 2036, 2039, 2041 and 2045, are subject to redemption on each July 1 immediately after the fiscal year for which there is an Amortization Requirement to the extent of the Amortization Requirement for said bonds (less the amount of bonds retired by purchase from moneys in the 1998 Senior Bond Sinking Fund) from moneys in the 1998 Senior Bond Sinking Fund at par plus accrued interest in the years and amounts set forth below.

| | Amortization Requirements for Series N Bonds due July 1, | | | |
|---|---|---|---|---|
| **Year** | **2036** | **2039** | **2041** | **2045** |
| 2035 | $92,925,000 | | | |
| 2036 | 88,575,000* | | | |
| 2037 | | $93,225,000 | | |
| 2038 | | 98,125,000 | | |
| 2039 | | 72,440,000* | | |
| 2040 | | | $76,245,000 | |
| 2041 | | | 79,375,000* | |
| 2042 | | | | $82,640,000 |
| 2043 | | | | 64,150,000 |
| 2044 | | | | 42,450,000 |
| 2045 | | | | 44,200,000* |
| Average life (years) | 28.807 | 31.241 | 33.830 | 36.526 |

*Maturity

*Series CC Bonds.*  The Series CC Bonds maturing on July 1, 2036, are subject to redemption on each July 1 immediately after the fiscal year for which there is an Amortization Requirement to the extent of the Amortization Requirement for said bonds (less the amount of bonds retired by purchase from moneys in the 1968 Sinking Fund) from moneys in the 1968 Sinking Fund at par plus accrued interest in the years and amounts set forth below.

| | Amortization Requirements for Series CC Bonds due July 1, 2036 |
|---|---|
| **Year** | |
| 2035 | $49,895,000 |
| 2036 | 52,515,000* |
| Average life (years) | 28.832 |

*Maturity

If less than all of the Series CC Bonds of any one maturity shall be called for redemption, the particular bonds or portions thereof to be redeemed shall be selected by the 1968 Fiscal Agent, in such manner as it in its discretion may determine to be appropriate and fair.

**Book-Entry Only System**

The following information concerning DTC and DTC's book-entry system has been obtained from DTC. Neither the Authority nor the Underwriters take any responsibility for the accuracy thereof.  Beneficial Owners of the Bonds should confirm this information with DTC or the DTC Participants.

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully registered bonds in the name of Cede & Co. (DTC's partnership nominee) or such other nominee as may be requested by an authorized representative of DTC. One fully registered Bond will be issued for each maturity of each series of the Bonds in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds) of such maturity and will be deposited with DTC.  So long as the nominee of DTC is the registered owner of the Bonds, such nominee, subject to the limitations set forth under "Bond Insurance" above, will be considered the sole owner or holder of the Bonds for all purposes under the 1998 Bond Resolution, the 1968 Bond Resolution and any applicable laws.  Except as otherwise

provided below, a Beneficial Owner (as hereinafter defined) of Bonds will not be entitled to have the Bonds registered in such owner's name, will not be entitled to receive definitive Bonds and will not be considered an owner or holder of the Bonds under the 1998 Bond Resolution or the 1968 Bond Resolution.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others, such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has Standard & Poor's highest rating:  AAA.  The DTC rules applicable to its Participants are on file with the Securities and Exchange Commission.  More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of each Bond (a "Beneficial Owner") will in turn be recorded in the Direct or Indirect Participants' records. Beneficial Owners will not receive written confirmations from DTC of their purchases. Beneficial Owners, however, are expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds will be accomplished by entries made on the books of Direct or Indirect Participants acting on behalf of the Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, all Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other nominee as may be requested by an authorized representative of DTC. The deposit of Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Bonds may wish to take certain steps to augment transmission to them of notices of significant events with respect to the Bonds, such as redemptions, defaults, and proposed amendments to the documents governing the Bonds.  For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners.

Redemption notices will be sent to DTC.  If less than all of the Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in the Bonds of that maturity to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC's procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

16

Principal and interest payments on the Bonds will be made to Cede & Co. or to such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Authority, the 1968 Fiscal Agent or the 1998 Fiscal Agent, on the payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC or its nominee, the Authority, the 1968 Fiscal Agent or the 1998 Fiscal Agent, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Authority, the 1968 Fiscal Agent or the 1998 Fiscal Agent, disbursement of such payments to Direct Participants shall be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

**Payments and Transfers**

No assurance can be given by the Authority that DTC will make prompt transfer of payments to the Direct Participants or that Direct Participants will make prompt transfer of payments to Indirect Participants or to Beneficial Owners. The Authority is not responsible or liable for payment by DTC or Participants or for sending transaction statements or for maintaining, supervising or reviewing records maintained by DTC or its Participants.

**The Authority, the 1968 Fiscal Agent, and the 1998 Fiscal Agent will have no responsibility or obligation to such Direct Participants, Indirect Participants, or the persons for whom they act as nominees with respect to the payments to or the providing of notice for the Direct Participants, the Indirect Participants, or the Beneficial Owners. Payments made to DTC or its nominee shall satisfy the obligations of the Authority to the extent of such payments.**

For every transfer of the Bonds, the Beneficial Owner may be charged a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto.

**Discontinuance of Book-Entry Only System**

DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to the Authority, the 1968 Fiscal Agent, and the 1998 Fiscal Agent. Under such circumstances, in the event that a successor securities depository is not obtained, definitive Bonds are required to be printed and delivered. The Authority may decide to discontinue the use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, definitive Bonds will be printed and delivered.

In the event that such book-entry only system is discontinued for the Bonds, the following provisions will apply to the Bonds: principal of the Bonds and redemption premium, if any, will be payable in lawful money of the United States of America at the principal corporate trust office of the 1968 Fiscal Agent or the 1998 Fiscal Agent, as the case may be, in New York, New York. Interest on the Bonds will be payable on each July 1 and January 1, by check mailed to the respective addresses of the registered owners thereof as shown on the registration books of the Authority maintained by the 1968 Fiscal Agent and the 1998 Fiscal Agent, as applicable, as of the close of business on the record date therefor as set forth in the 1968 Resolution and the 1998 Resolution.

The Bonds will be issued only as registered bonds without coupons in authorized denominations. The transfer of the Bonds will be registrable and the Bonds may be exchanged at the principal corporate trust office of the 1968 Fiscal Agent or the 1998 Fiscal Agent, as applicable, in New York, New York upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**The Authority will have no responsibility or obligation to DTC, to Direct Participants or to Indirect Participants with respect to (1) the accuracy of any records maintained by DTC, any Direct Participant, or any Indirect Participant; (2) any notice that is permitted or required to be given to the owners of the Bonds under the 1968 Resolution or the 1998 Resolution; (3) the selection by DTC or any Direct Participant or Indirect Participant of any person to receive payment in the event or a partial redemption of the Bonds; (4) the payment by DTC or any Direct Participant or Indirect Participant of any amount with respect to the principal or redemption premium, if any, or interest due with respect to the Bonds; or (5) any consent given or other action taken by DTC as the owner of the Bonds.**

# BOND INSURANCE

**The FGIC Bond Insurance Policy**

Financial Guaranty Insurance Company ("FGIC") has supplied the following information for inclusion in this Official Statement.  No representation is made by the Authority or the Underwriters as to the accuracy or completeness of this information.

*Payments Under the FGIC Bond Insurance Policy*

Concurrently with the issuance of the Bonds, FGIC will issue its Municipal Bond New Issue Insurance Policy (the "FGIC Bond Insurance Policy") for those bonds indicated in the inside cover of this Official Statement (the "FGIC Insured Bonds").  The FGIC Bond Insurance Policy unconditionally guarantees the payment of that portion of the principal or accreted value (if applicable) of and interest on the FGIC Insured Bonds which has become due for payment, but shall be unpaid by reason of nonpayment by the Authority.  Financial Guaranty will make such payments to U.S. Bank Trust National Association, or its successor as its agent (the "Fiscal Agent"), on the later of the date on which such principal, accreted value or interest (as applicable) is due or on the business day next following the day on which Financial Guaranty shall have received notice (in accordance with the terms of the FGIC Bond Insurance Policy) from an owner of FGIC Insured Bonds or the 1998 Fiscal Agent, of the nonpayment of such amount by the Authority.  The Fiscal Agent will disburse such amount due on any FGIC Insured Bond to its owner upon receipt by the Fiscal Agent of evidence satisfactory to the Fiscal Agent of the owner's right to receive payment of the principal, accreted value or interest (as applicable) due for payment and evidence, including any appropriate instruments of assignment, that all of such owner's rights to payment of such principal, accreted value or interest (as applicable) shall be vested in FGIC.  The term "nonpayment" in respect of a FGIC Insured Bond includes any payment of principal, accreted value or interest (as applicable) made to an owner of a FGIC Insured Bond which has been recovered from such owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

Once issued, the FGIC Bond Insurance Policy is non-cancellable by FGIC.  The FGIC Bond Insurance Policy covers failure to pay principal (or accreted value, if applicable) of the FGIC Insured Bonds on their stated maturity dates and their mandatory sinking fund redemption dates, and not on any other date on which the FGIC Insured Bonds may have been otherwise called for redemption, accelerated or advanced in maturity.  The FGIC Bond Insurance Policy also covers the failure to pay interest on the stated date for its payment.  In the event that payment of the FGIC Insured Bonds is accelerated, FGIC will only be obligated to pay principal (or accreted value, if applicable) and interest in the originally scheduled amounts on the originally scheduled payment dates.  Upon such payment, FGIC will become the owner of the FGIC Insured Bond, appurtenant coupon or right to payment of principal or interest on such FGIC Insured Bond and will be fully subrogated to all of the Bondholder's rights thereunder.

The FGIC Bond Insurance Policy does not insure any risk other than Nonpayment by the Authority, as defined in the FGIC Bond Insurance Policy.  Specifically, the FGIC Bond Insurance Policy does not cover: (i) payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity; (ii) payment of any redemption, prepayment or acceleration premium; or (iii) nonpayment of principal (or accreted value, if applicable) or interest caused by the insolvency or negligence or any other act or omission of the trustee or paying agent, if any.

As a condition of its commitment to insure the FGIC Insured Bonds, FGIC may be granted certain rights under the FGIC Insured Bond documentation.  The specific rights, if any, granted to FGIC in connection with its insurance of the FGIC Insured Bonds may be set forth in the description of the principal legal documents appearing elsewhere in this Official Statement, and reference should be made thereto.

The FGIC Bond Insurance Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

*Financial Guaranty Insurance Company*

FGIC is a New York stock insurance corporation that writes financial guaranty insurance in respect of public finance and structured finance obligations and other financial obligations, including credit default swaps.  FGIC is licensed to engage in the financial guaranty insurance business in all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands and the United Kingdom.

FGIC is a direct, wholly owned subsidiary of FGIC Corporation, a Delaware corporation.  At December 31, 2006, the principal owners of FGIC Corporation and the approximate percentage of its outstanding common stock owned

18

by each were as follows: The PMI Group, Inc. – 42%; affiliates of the Blackstone Group L.P. – 23%; and affiliates of the Cypress Group L.L.C. – 23%. Neither FGIC Corporation nor any of its stockholders or affiliates is obligated to pay any debts of FGIC or any claims under any insurance policy, including the FGIC Bond Insurance Policy, issued by FGIC.

FGIC is subject to the insurance laws and regulations of the State of New York, where FGIC is domiciled, including New York's comprehensive financial guaranty insurance law. That law, among other things, limits the business of each financial guaranty insurer to financial guaranty insurance (and related lines); requires that each financial guaranty insurer maintain a minimum surplus to policyholders; establishes limits on the aggregate net amount of exposure that may be retained in respect of a particular issuer or revenue source (known as single risk limits) and on the aggregate net amount of exposure that may be retained in respect of particular types of risk as compared to the policyholders' surplus (known as aggregate risk limits); and establishes contingency, loss and unearned premium reserve requirements. In addition, FGIC is also subject to the applicable insurance laws and regulations of all other jurisdictions in which it is licensed to transact insurance business. The insurance laws and regulations, as well as the level of supervisory authority that may be exercised by the various insurance regulators, vary by jurisdiction.

At December 31, 2006, FGIC had net admitted assets of approximately $3.894 billion, total liabilities of approximately $2.763 billion, and total capital and policyholders' surplus of approximately $1.131 billion, determined in accordance with statutory accounting practices ("SAP") prescribed or permitted by insurance regulatory authorities.

The audited consolidated financial statements of FGIC and subsidiaries, on the basis of U.S. generally accepted accounting principles ("GAAP"), as of December 31, 2006 and December 31, 2005, which have been filed with the Nationally Recognized Municipal Securities Information Repositories ("NRMSIRs"), are hereby included by specific reference in this Official Statement. Any statement contained herein under the heading "BOND INSURANCE – The FGIC Bond Insurance Policy," or in any documents included by specific reference herein, shall be modified or superseded to the extent required by any statement in any document subsequently filed by FGIC with such NRMSIRs, and shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement. All financial statements of FGIC (if any) included in documents filed by FGIC with the NRMSIRs subsequent to the date of this Official Statement and prior to the termination of the offering of the Bonds shall be deemed to be included by specific reference into this Official Statement and to be a part hereof from the respective dates of filing of such documents.

The New York State Insurance Department recognizes only SAP for determining and reporting the financial condition and results of operations of an insurance company, for determining its solvency under the New York Insurance Law, and for determining whether its financial condition warrants the payment of a dividend to its stockholders. Although FGIC prepares both GAAP and SAP financial statements, no consideration is given by the New York State Insurance Department to financial statements prepared in accordance with GAAP in making such determinations. A discussion of the principal differences between SAP and GAAP is contained in the notes to FGIC's audited SAP financial statements.

Copies of FGIC's most recently published GAAP and SAP financial statements are available upon request to: Financial Guaranty Insurance Company, 125 Park Avenue, New York, NY 10017, Attention: Corporate Communications Department. FGIC's telephone number is (212) 312-3000.

*Recent Developments*

On November 15, 2006, FGIC received a subpoena from the Antitrust Division of the U.S. Department of Justice. Based upon press reports, FGIC believes that the subpoena relates to an ongoing criminal investigation of alleged bid rigging of awards of municipal guaranteed investment contracts ("Municipal GICs") and that several other companies (including other financial guarantors) have received similar subpoenas. Until December 18, 2003, when FGIC was acquired from General Electric Capital Corporation ("GE Capital") by its current owners, FGIC was affiliated with certain companies (the "Former Affiliates") that provided Municipal GICs. The Former Affiliates remained a part of GE Capital after the acquisition of FGIC, and the outstanding Municipal GICs remained with the Former Affiliates. The subpoena contains no allegations or statements concerning the activities of FGIC. FGIC intends to cooperate fully with the investigation.

*FGIC's Credit Ratings*

The financial strength of FGIC is rated "AAA" by Standard & Poor's, a Division of The McGraw-Hill Companies, Inc., "Aaa" by Moody's Investors Service, and "AAA" by Fitch Ratings. Each rating of FGIC should be evaluated independently. The ratings reflect the respective ratings agencies' current assessments of the insurance financial strength of FGIC. Any further explanation of any rating may be obtained only from the applicable rating agency. These ratings are not recommendations to buy, sell or hold the FGIC Insured Bonds, and are subject to revision

19

or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the Bonds. FGIC does not guarantee the market price or investment value of the FGIC Insured Bonds nor does it guarantee that the ratings on FGIC Insured the Bonds will not be revised or withdrawn.

**Neither FGIC nor any of its affiliates accepts any responsibility for the accuracy or completeness of the Official Statement or any information or disclosure that is provided to potential purchasers of the FGIC Insured Bonds, or omitted from such disclosure, other than with respect to the accuracy of information with respect to FGIC or the FGIC Bond Insurance Policy under the heading "BOND INSURANCE – The FGIC Bond Insurance Policy." In addition, FGIC makes no representation regarding the Bonds or the advisability of investing in the Bonds.**

### The MBIA Bond Insurance Policy

The following information has been furnished by MBIA Insurance Corporation ("MBIA") for use in this Official Statement. Reference is made to Appendix IX for a specimen of MBIA's policy (the "MBIA Bond Insurance Policy"). No representation is made by the Authority or the Underwriters as to the accuracy or completeness of this information.

MBIA does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding the MBIA Bond Insurance Policy and MBIA set forth under the heading "BOND INSURANCE – The MBIA Bonds Insurance Policy." Additionally, MBIA makes no representation regarding the bonds insured by MBIA, as indicated in the inside cover of this Official Statement ("MBIA Insured Bonds") or the advisability of investing in the MBIA Insured Bonds.

The MBIA Bond Insurance Policy unconditionally and irrevocably guarantees the full and complete payment required to be made by or on behalf of the Authority to the 1998 Fiscal Agent or its successor of an amount equal to (i) the principal of (either at the stated maturity or by an advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the MBIA Insured Bonds as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the MBIA Bond Insurance Policy shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration, unless MBIA elects in its sole discretion, to pay in whole or in part any principal due by reason of such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any Owner of the MBIA Insured Bonds pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such Owner within the meaning of any applicable bankruptcy law (a "Preference").

MBIA Bond Insurance Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any MBIA Insured Bond. MBIA Bond Insurance Policy does not, under any circumstance, insure against loss relating to: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; (iii) payments of the purchase price of the MBIA Insured Bonds upon tender by an owner thereof; or (iv) any Preference relating to (i) through (iii) above. MBIA's Bond Insurance Policy also does not insure against nonpayment of principal of or interest on the MBIA Insured Bonds resulting from the insolvency, negligence or any other act or omission of the 1998 Fiscal Agent or any other paying agent for the MBIA Insured Bonds.

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by MBIA from the 1998 Fiscal Agent or any owner of a MBIA Insured Bond the payment of an insured amount for which is then due, that such required payment has not been made, MBIA on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with U.S. Bank Trust National Association, in New York, New York, or its successor, sufficient for the payment of any such insured amounts which are then due. Upon presentment and surrender of such MBIA Insured Bonds or presentment of such other proof of ownership of the MBIA Insured Bonds, together with any appropriate instruments of assignment to evidence the assignment of the insured amounts due on the MBIA Insured Bonds as are paid by MBIA, and appropriate instruments to effect the appointment of MBIA as agent for such owners of the MBIA Insured Bonds in any legal proceeding related to payment of insured amounts on the MBIA Insured Bonds, such instruments being in a form satisfactory to U.S. Bank Trust National Association, U.S. Bank Trust National Association shall disburse to such owners or the 1998 Fiscal Agent payment of the

insured amounts due on such MBIA Insured Bonds, less any amount held by the 1998 Fiscal Agent for the payment of such insured amounts and legally available therefor.

*MBIA Insurance Corporation*

MBIA is the principal operating subsidiary of MBIA Inc., a New York Stock Exchange listed company (the "Company"). The Company is not obligated to pay the debts of or claims against MBIA. MBIA is domiciled in the State of New York and licensed to do business in and subject to regulation under the laws of all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, the Virgin Islands of the United States and the Territory of Guam. MBIA, either directly or through subsidiaries, is licensed to do business in the Republic of France, the United Kingdom and the Kingdom of Spain and is subject to regulation under the laws of those jurisdictions.

The principal executive offices of MBIA are located at 113 King Street, Armonk, New York 10504 and the main telephone number at that address is (914) 273-4545.

*Regulation*

As a financial guaranty insurance company licensed to do business in the State of New York, MBIA is subject to the New York Insurance Law which, among other things, prescribes minimum capital requirements and contingency reserves against liabilities for MBIA, limits the classes and concentrations of investments that are made by MBIA and requires the approval of policy rates and forms that are employed by MBIA. State law also regulates the amount of both the aggregate and individual risks that may be insured by MBIA, the payment of dividends by MBIA, changes in control with respect to MBIA and transactions among MBIA and its affiliates.

The Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

*Financial Strength Ratings of MBIA*

Moody's Investors Service, Inc. rates the financial strength of MBIA "Aaa."

Standard & Poor's, a division of The McGraw-Hill Companies, Inc. rates the financial strength of MBIA "AAA."

Fitch Ratings rates the financial strength of MBIA "AAA."

Each rating of MBIA should be evaluated independently. The ratings reflect the respective rating agency's current assessment of the creditworthiness of MBIA and its ability to pay claims on its policies of insurance. Any further explanation as to the significance of the above ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell or hold the MBIA Insured Bonds, and such ratings may be subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the MBIA Insured Bonds. MBIA does not guaranty the market price of the MBIA Insured Bonds nor does it guaranty that the ratings on the MBIA Insured Bonds will not be revised or withdrawn.

*MBIA Financial Information*

As of December 31, 2005, MBIA had admitted assets of $11.0 billion (audited), total liabilities of $7.2 billion (audited), and total capital and surplus of $3.8 billion (audited), each as determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. As of September 30, 2006, MBIA had admitted assets of $11.5 billion (unaudited), total liabilities of $7.0 billion (unaudited), and total capital and surplus of $4.4 billion (unaudited), each as determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.

For further information concerning MBIA, see the consolidated financial statements of MBIA and its subsidiaries as of December 31, 2005 and December 31, 2004 and for each of the three years in the period ended December 31, 2005, prepared in accordance with generally accepted accounting principles, included in the Annual Report on Form 10-K of the Company for the year ended December 31, 2005 and the consolidated financial statements of MBIA and its subsidiaries as of September 30, 2006 and for the nine month periods ended September 30, 2006 and September 30, 2005 included in the Quarterly Report on Form 10-Q of the Company for the period ended September 30, 2006, which are hereby incorporated by reference into this Official Statement and shall be deemed to be a part hereof.

Copies of the statutory financial statements filed by MBIA with the State of New York Insurance Department are available over the Internet at the Company's web site at http://www.mbia.com and at no cost, upon request to MBIA at its principal executive offices.

*Incorporation of Certain Documents by Reference*

The following documents filed by the Company with the Securities and Exchange Commission (the "SEC") are incorporated by reference into this Official Statement:

(1)     The Company's Annual Report on Form 10-K for the year ended December 31, 2005; and

(2)     The Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2006.

Any documents, including any financial statements of MBIA and its subsidiaries that are included therein or attached as exhibits thereto, filed by the Company pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of the Company's most recent Quarterly Report on Form 10-Q or Annual Report on Form 10-K, and prior to the termination of the offering of the Bonds offered hereby shall be deemed to be incorporated by reference in this Official Statement and to be a part hereof from the respective dates of filing such documents. Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in this Official Statement, shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any other subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Company files annual, quarterly and special reports, information statements and other information with the SEC under File No. 1-9583. Copies of the Company's SEC filings (including (1) the Company's Annual Report on Form 10-K for the year ended December 31, 2005, and (2) the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2006, June 30, 2006 and September 30, 2006 are available (i) over the Internet at the SEC's web site at http://www.sec.gov; (ii) at the SEC's public reference room in Washington, D.C.; (iii) over the Internet at the Company's web site at http://www.mbia.com; and (iv) at no cost, upon request to MBIA at its principal executive offices.

**The FSA Bond Insurance Policy**

The following information has been furnished by Financial Security Assurance Inc. ("FSA") for inclusion in this Official Statement. No representation is made by the Authority or the Underwriters as to the accuracy or completeness of this information.

Concurrently with the issuance of the Bonds, FSA will issue its Municipal Bond Insurance Policy (the "FSA Bond Insurance Policy") for those bonds indicated in the inside cover of this Official Statement (the "FSA Insured Bonds"). The FSA Bond Insurance Policy guarantees the scheduled payment of principal of and interest on the FSA Insured Bonds when due as set forth in the form of the Policy included as an exhibit to this Official Statement.

The FSA Bond Insurance Policy is not covered by any insurance security or guaranty fund established under New York, California, Connecticut or Florida insurance law.

*Financial Security Assurance Inc.*

FSA is a New York domiciled financial guaranty insurance company and a wholly owned subsidiary of Financial Security Assurance Holdings Ltd. ("Holdings"). Holdings is an indirect subsidiary of Dexia, S.A., a publicly held Belgian corporation, and of Dexia Credit Local, a direct wholly-owned subsidiary of Dexia, S.A. Dexia, S.A., through its bank subsidiaries, is primarily engaged in the business of public finance, banking and asset management in France, Belgium and other European countries. No shareholder of Holdings or FSA is liable for the obligations of FSA.

At September 30, 2006, FSA's combined policyholders' surplus and contingency reserves were approximately $2,581,107,000 and its total net unearned premium reserve was approximately $1,992,163,000 in accordance with statutory accounting principles. At September 30, 2006, FSA's consolidated shareholder's equity was approximately $3,058,987,000 and its total net unearned premium reserve was approximately $1,590,538,000 in accordance with generally accepted accounting principles.

The consolidated financial statements of FSA included in, or as exhibits to, the annual and quarterly reports filed after December 31, 2005 by Holdings with the Securities and Exchange Commission are hereby incorporated by reference into this Official Statement. All financial statements of FSA included in, or as exhibits to, documents filed by Holdings pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 after the date of this Official Statement and before the termination of the offering of the Bonds shall be deemed incorporated by reference into this Official Statement. Copies of materials incorporated by reference will be provided upon request to Financial Security Assurance Inc.: 31 West 52nd Street, New York, New York 10019, Attention: Communications Department (telephone (212) 826-0100).

The FSA Bond Insurance Policy does not protect investors against changes in market value of the FSA Insured Bonds, which market value may be impaired as a result of changes in prevailing interest rates, changes in applicable ratings or other causes. FSA makes no representation regarding the FSA Insured Bonds or the advisability of investing in the FSA Insured Bonds. FSA makes no representation regarding the Official Statement, nor has it participated in the preparation thereof, except that FSA has provided to the Authority the information presented under this caption for inclusion in the Official Statement.

**The Ambac Bond Insurance Policy**

The following information has been furnished by Ambac Assurance Corporation ("Ambac") for inclusion in this Official Statement. No representation is made by the Authority or the Underwriters as to the accuracy or completeness of this information.

*Payment Pursuant to Financial Guaranty Insurance Policy*

Ambac has made a commitment to issue a financial guaranty insurance policy (the "Ambac Bond Insurance Policy") relating to those bonds indicated in the inside cover of this Official Statement (the "Ambac Insured Bonds"), effective as of the date of issuance of the Ambac Insured Bonds. Under the terms of the Ambac Bond Insurance Policy, Ambac will pay to The Bank of New York, in New York, New York, or any successor thereto (the "Insurance Trustee"), that portion of the principal of and interest on the Ambac Insured Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor (as such terms are defined in the Ambac Bond Insurance Policy). Ambac will make such payments to the Insurance Trustee on the later of the date on which such principal and/or interest becomes Due for Payment or within one business day following the date on which Ambac shall have received notice of Nonpayment from the 1998 Fiscal Agent. The insurance will extend for the term of the Ambac Insured Bonds and, once issued, cannot be canceled by Ambac.

The Ambac Bond Insurance Policy will insure payment only on stated maturity dates and on mandatory sinking fund installment dates, in the case of principal, and on stated dates for payment, in the case of interest. If the Ambac Insured Bonds become subject to mandatory redemption and insufficient funds are available for redemption of all outstanding Ambac Insured Bonds, Ambac will remain obligated to pay the principal of and interest on outstanding Ambac Insured Bonds on the originally scheduled interest and principal payment dates, including mandatory sinking fund redemption dates. In the event of any acceleration of the principal of the Ambac Insured Bonds, the insured payments will be made at such times and in such amounts as would have been made had there not been an acceleration, except to the extent that Ambac elects, in its sole discretion, to pay all or a portion of the accelerated principal and interest accrued thereon to the date of acceleration (to the extent unpaid by the Obligor). Upon payment of all such accelerated principal and interest accrued to the acceleration date, Ambac's obligations under the Ambac Bond Insurance Policy shall be fully discharged.

In the event the 1998 Fiscal Agent has notice that any payment of principal of or interest on an Ambac Insured Bond that has become Due for Payment and that is made to a holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code in accordance with a final, non-appealable order of a court of competent jurisdiction, such registered owner will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

The Ambac Bond Insurance Policy does not insure any risk other than Nonpayment (as set forth in the Ambac Bond Insurance Policy). Specifically, the Ambac Bond Insurance Policy does not cover:

1. payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity;

2. payment of any redemption, prepayment or acceleration premium; and

3. nonpayment of principal or interest caused by the insolvency or negligence of the Trustee, Paying Agent or Bond Registrar, if any.

If it becomes necessary to call upon the Ambac Bond Insurance Policy, payment of principal requires surrender of the Ambac Insured Bonds to the Insurance Trustee together with an appropriate instrument of assignment so as to permit ownership of such Ambac Insured Bonds to be registered in the name of Ambac to the extent of the payment under the Ambac Bond Insurance Policy. Payment of interest pursuant to the Ambac Bond Insurance Policy requires proof of holder entitlement to interest payments and an appropriate assignment of the holder's right to payment to Ambac.

Upon payment of the insurance benefits, Ambac will become the owner of the Ambac Insured Bond, appurtenant coupon, if any, or right to payment of the principal of or interest on such Ambac Insured Bond and will be fully subrogated to the surrendering holder's rights to payment.

*Ambac Assurance Corporation*

Ambac is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin, and is licensed to do business in 50 states, the District of Columbia, the Territory of Guam, the Commonwealth of Puerto Rico and the U.S. Virgin Islands, with admitted assets of approximately $9,699,000,000 (unaudited) and statutory capital of approximately $6,223,000,000 (unaudited) as of September 30, 2006. Statutory capital consists of Ambac's policyholders' surplus and statutory contingency reserve. Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., Moody's Investors Service, Inc. and Fitch Ratings have each assigned a triple-A financial strength rating to Ambac.

Ambac has obtained a ruling from the Internal Revenue Service to the effect that the insuring of an obligation by Ambac will not affect the treatment for federal income tax purposes of interest on such obligation and that insurance proceeds representing maturing interest paid by Ambac under policy provisions substantially identical to those contained in the Ambac Bond Insurance Policy shall be treated for federal income tax purposes in the same manner as if such payments were made by the Obligor.

Ambac makes no representation regarding the Ambac Insured Bonds or the advisability of investing in the Ambac Insured Bonds and makes no representation regarding, nor has it participated in the preparation of, this Official Statement other than the information supplied by Ambac and presented under the heading "BOND INSURANCE - The Ambac Bond Insurance Policy."

*Available Information*

The parent company of Ambac, Ambac Financial Group, Inc. (the "Company"), is subject to the informational requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and in accordance therewith files reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). These reports, proxy statements and other information can be read and copied at the SEC's public reference room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. The SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements and other information regarding companies that file electronically with the SEC, including the Company. These reports, proxy statements and other information can also be read at the offices of the New York Stock Exchange, Inc., 20 Broad Street, New York, New York 10005.

Copies of Ambac's financial statements prepared in accordance with statutory accounting standards are available from Ambac. The address of Ambac's administrative offices is One State Street Plaza, 19th Floor, New York, New York 10004, and its telephone number is (212) 668-0340.

*Incorporation of Certain Documents by Reference*

The following documents filed by the Company with the SEC (File No. 1-10777) are incorporated by reference in this Official Statement:

1. The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2005 and filed on March 13, 2006;

2. The Company's Current Report on Form 8-K dated and filed on April 26, 2006;

3. The Company's Quarterly Report on Form 10-Q for the fiscal quarterly period ended March 31, 2006 and filed on May 10, 2006;

4.  The Company's Current Report on <u>Form 8-K</u> dated July 25, 2006 and filed on July 26, 2006;

5.  The Company's Current Report on <u>Form 8-K</u> dated and filed on July 26, 2006;

6.  The Company's Quarterly Report on <u>Form 10-Q</u> for the fiscal quarterly period ended June 30, 2006 and filed on August 9, 2006;

7.  The Company's Current Report on <u>Form 8-K</u> dated and filed on October 25, 2006;

8.  The Company's Quarterly Report on <u>Form 10-Q</u> for the fiscal quarterly period ended September 30, 2006 and filed on November 8, 2006;

9.  The Company's Current Report on <u>Form 8-K</u> dated and filed on January 31, 2007; and

10. The Company's Current Report on <u>Form 8-K</u> dated and filed on February 12, 2007.

All documents subsequently filed by the Company pursuant to the requirements of the Exchange Act after the date of this Official Statement will be available for inspection in the same manner as described above in "Available Information."

**The Assured Bond Insurance Policy**

The following information has been furnished by Assured Guaranty Corp. ("Assured") for inclusion in this Official Statement. The following information is not complete and reference is made to Appendix XII for a specimen of the financial guaranty insurance policy of Assured (the "Assured Bond Insurance Policy"). No representation is made by the Authority or the Underwriters as to the accuracy or completeness of this information.

Assured has made a commitment to issue the Assured Bond Insurance Policy relating to the bonds indicated in the inside cover of this Official Statement (the "Assured Insured Bonds"), effective as of the date of issuance of the Bonds. Under the terms of the Assured Bond Insurance Policy, Assured will unconditionally and irrevocably guarantee to pay that portion of principal of and interest on the Assured Insured Bonds that becomes Due for Payment but shall be unpaid by reason of Nonpayment by the Authority (the "Insured Payments"). Insured Payments shall not include any additional amounts owing by the Authority solely as a result of the failure by the 1998 Fiscal Agent to pay such amount when due and payable, including without limitation any such additional amounts as may be attributable to penalties or to interest accruing at a default rate, to amounts payable in respect of indemnification, or any other additional amounts payable by the 1998 Fiscal Agent by reason of such failure. The Assured Bond Insurance Policy is non-cancelable for any reason, including without limitation the non-payment of premium.

"Due for Payment" means, when referring to the principal of the Assured Insured Bonds, the stated maturity date thereof, or the date on which such Assured Insured Bonds shall have been duly called for mandatory sinking fund redemption, and does not refer to any earlier date on which payment is due by reason of a call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity (unless Assured in its sole discretion elects to make any principal payment, in whole or in part, on such earlier date) and, when referring to interest on such Assured Insured Bonds, means the stated dates for payment of interest.

"Nonpayment" means the failure of the Authority to have provided sufficient funds to the 1998 Fiscal Agent for payment in full of all principal and interest Due for Payment on the Assured Insured Bonds. It is further understood that the term Nonpayment in respect of an Assured Insured Bond also includes any amount that is paid, credited, transferred or delivered to the holder of such Assured Insured Bond in respect of any Insured Payment by the 1998 Fiscal Agent, which amount has been rescinded or recovered from or otherwise required to be returned or repaid by such holders pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction that such payment constitutes an avoidable preference with respect to such holder. Nonpayment does not include nonpayment of principal or interest caused by the failure of the 1998 Fiscal Agent, to pay such amount when due and payable.

Assured will pay each portion of an Insured Payment that is Due for Payment and unpaid by reason of Nonpayment by the Authority to the 1998 Fiscal Agent, as beneficiary of the Assured Bond Insurance Policy on behalf of the holders of the Assured Insured Bonds, on the later to occur of (i) the date such principal or interest becomes Due for Payment, or (ii) the business day next following the day on which Assured shall have received a completed notice of claim therefor in accordance with the terms of the Assured Bond Insurance Policy.

Assured shall be fully subrogated to the rights of the holders of the Assured Insured Bonds to receive payments in respect of the Insured Payments to the extent of any payment by Assured under the Assured Bond Insurance Policy.

The Assured Bond Insurance Policy is not covered by any insurance or guaranty fund established under New York, California, Connecticut or Florida insurance law.

*Assured Guaranty Corp.*

Assured is a Maryland-domiciled insurance company regulated by the Maryland Insurance Administration and licensed to conduct financial guaranty insurance business in forty-nine states, the District of Columbia and Puerto Rico. Assured commenced operations in 1988. Assured is a wholly owned, indirect subsidiary of Assured Guaranty Ltd. ("AGL"), a Bermuda-based holding company whose shares are publicly traded and are listed on the New York Stock Exchange under the symbol "AGO." AGL, through its operating subsidiaries, provides credit enhancement products to the U.S. and global public finance, structured finance and mortgage markets. Neither AGL nor any of its shareholders is obligated to pay any debts of Assured or any claims under any insurance policy issued by Assured.

Assured is subject to insurance laws and regulations in Maryland and in New York (and in other jurisdictions in which it is licensed) that, among other things, (i) limit Assured's business to financial guaranty insurance and related lines, (ii) prescribe minimum solvency requirements, including capital and surplus requirements, (iii) limit classes and concentrations of investments, (iv) regulate the amount of both the aggregate and individual risks that may be insured, (v) limit the payment of dividends by Assured, (vi) require the maintenance of contingency reserves, and (vii) govern changes in control and transactions among affiliates. Certain state laws to which Assured is subject also require the approval of policy rates and forms.

Assured's financial strength is rated "AAA" by Standard & Poor's, a division of The McGraw-Hill Companies, Inc., "AAA" by Fitch, Inc. and "Aa1" by Moody's Investors Service, Inc. Each rating of Assured should be evaluated independently. An explanation of the significance of the above ratings may be obtained from the applicable rating agency. The above ratings are not recommendations to buy, sell or hold any security, and such ratings are subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of any security guaranteed by Assured. Assured does not guaranty the market price of the securities it guarantees, nor does it guaranty that the ratings on such securities will not be revised or withdrawn.

*Capitalization of Assured Guaranty Corp.*

As of December 31, 2005, Assured had total admitted assets of $1,140,661,558 (audited), total liabilities of $844,915,840 (audited), total surplus of $295,745,718 (audited) and total statutory capital (surplus plus contingency reserves) of $854,790,565 (audited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. As of September 30, 2006, Assured had total admitted assets of $1,214,267,268 (unaudited), total liabilities of $942,146,442 (unaudited), total surplus of $272,120,826 (unaudited) and total statutory capital (surplus plus contingency reserves) of $897,674,981 (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. The Maryland Insurance Administration recognizes only statutory accounting practices for determining and reporting the financial condition and results of operations of an insurance company, for determining its solvency under the Maryland Insurance Code, and for determining whether its financial condition warrants the payment of a dividend to its stockholders. No consideration is given by the Maryland Insurance Administration to financial statements prepared in accordance with accounting principles generally accepted in the United States ("GAAP") in making such determinations.

The following documents are hereby incorporated by reference into this Official Statement and shall be deemed to be a part hereof:

- The consolidated balance sheets of Assured as of December 31, 2005 and December 31, 2004 and the related consolidated statements of operations and comprehensive income, of shareholder's equity and of cash flows for each of the three years in the period ended December 31, 2005, prepared in accordance with GAAP, included as Exhibit 99.1 to the Annual Report on Form 10-K of AGL for the fiscal year ended December 31, 2005 (which was filed by AGL with the Securities and Exchange Commission (the "SEC") on March 2, 2006);

- The unaudited consolidated balance sheet and statement of shareholder's equity of Assured as of and for the period ended March 31, 2006, respectively, and the related consolidated statements of operations and comprehensive income and cash flows for the three months ended March 31, 2006 and March 31, 2005, prepared in accordance with GAAP, included as Exhibit 99.1 to the Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2006 (which was filed by AGL with the SEC on May 10, 2006);

- The unaudited consolidated balance sheet and statement of shareholder's equity of Assured as of and for the period ended June 30, 2006, respectively, and the related consolidated statements of operations and comprehensive income for the three and six months ended June 30, 2006 and June 30, 2005,  and the statements of cash flows for the six months ended June 30, 2006 and June 30, 2005, prepared in accordance with GAAP, included as Exhibit 99.1 to the Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2006 (which was filed by AGL with the SEC on August 8, 2006);

- The unaudited consolidated balance sheet and statement of shareholder's equity of Assured as of and for the period ended September 30, 2006, respectively, and the related consolidated statements of operations and comprehensive income for the three and nine months ended September 30, 2006 and September 30, 2005, and the statements of cash flows for the nine months ended September 30, 2006 and September 30, 2005, prepared in accordance with GAAP, included as Exhibit 99.1 to the Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2006 (which was filed by AGL with the SEC on November 7, 2006); and

- The Current Reports on Form 8-K filed by AGL with the SEC on April 12, 2006, May 9, 2006, August 22, 2006, October 10, 2006, November 9, 2006, December 13, 2006, December 18, 2006 and December 20, 2006, as they relate to Assured, are hereby incorporated by reference into this Official Statement and shall be deemed to be a part hereof.

Any statement contained in a document incorporated herein by reference or contained herein under the heading "BOND INSURANCE – The Assured Bond Insurance Policy" shall be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any subsequently filed document which is incorporated by reference herein also modifies or supersedes such statement. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

All consolidated financial statements of Assured included in documents filed by AGL with the SEC pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, subsequent to the date of this Official Statement and prior to the termination of the offering of the Bonds shall be deemed to be incorporated by reference into this Official Statement and to be a part hereof from the respective dates of filing such consolidated financial statements.

Copies of the consolidated financial statements of Assured incorporated by reference herein and of the statutory financial statements filed by Assured with the Maryland Insurance Administration are available upon request by contacting Assured Guaranty at 1325 Avenue of the Americas, New York, New York 10019 or by calling Assured Guaranty at (212) 974-0100.

Assured makes no representation regarding the Assured Insured Bonds or the advisability of investing in the Assured Insured Bonds.  In addition, Assured  makes no representation regarding, nor does it accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding Assured supplied by Assured and presented under the heading "BOND INSURANCE – The Assured Bond Insurance Policy."

**Certain Rights of the Bond Insurers**

As provided in the insurance agreements to be entered into by the Authority and the 1968 Fiscal agent and the 1998 Fiscal Agent, as applicable, for the benefit of each of FGIC, MBIA, FSA, Ambac and Assured, concurrently with the delivery of their respective bond insurance policies, as long as FGIC, MBIA, FSA, Ambac and Assured shall not be in default on their respective obligations under the bond insurance policies, FGIC, MBIA, FSA, Ambac and Assured shall be deemed to be the owner of the Bonds insured by each of them for purposes of, among other things (1) taking remedial actions under the 1968 Resolution and the 1998 Resolution and (2) the giving of consents to the execution of any supplemental resolution to the 1968 Resolution or the 1998 Resolution.

## SECURITY AND SOURCES OF PAYMENT FOR THE BONDS

**Pledged Revenues**

The Series M Bonds, the Series N Bonds, and any other Senior Transportation Revenue Bonds issued under the 1998 Resolution are payable solely from, and secured by a pledge of, the 1998 Resolution Revenues and all other moneys held for the credit of the 1998 Senior Bond Sinking Fund, which includes the 1998 Senior Bond Service Account, the

1998 Senior Bond Redemption Account, and the 1998 Senior Bond Reserve Account. Under certain circumstances described below, unencumbered moneys in the 1998 Construction Fund or the 1998 Subordinated Bond Sinking Fund may be used to pay debt service on the Senior Transportation Revenue Bonds, if moneys in the 1998 Senior Bond Service Account or the 1998 Senior Bond Redemption Account are insufficient therefor, prior to applying moneys in the 1998 Senior Bond Reserve Account.

The Series CC Bonds and any other Highway Revenue Bonds issued under the 1968 Resolution are payable solely from, and secured by a pledge of, the 1968 Resolution Revenues and all other moneys held for the credit of the 1968 Sinking Fund, which includes the 1968 Bond Service Account, the 1968 Redemption Account and the 1968 Reserve Account.

*1998 Resolution Revenues.* The 1998 Resolution Revenues consist of: (i) all excise taxes on crude oil, unfinished oil and derivative products ("petroleum products"), up to $120 million per fiscal year, imposed by the Commonwealth and allocated to the Authority by Act No. 34 of the Legislature of Puerto Rico, approved July 16, 1997, as amended ("Act No. 34"), which amended Subtitle B of Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended (the "Puerto Rico Internal Revenue Code"); (ii) the tolls and other charges imposed by the Authority for the use of Toll Facilities (other than Existing Toll Facilities Revenues, as defined below, prior to the repeal and cancellation of the 1968 Resolution); (iii) the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico allocates to the Authority in the future and which the Authority pledges to the payment of Transportation Revenue Bonds; (iv) investment earnings on deposit to the credit of funds and accounts established under the 1998 Resolution, except for the 1998 Construction Fund; and (v) prior to the repeal and cancellation of the 1968 Resolution, any unencumbered 1968 Resolution Revenues remaining on deposit in the 1968 Construction Fund after payment or provision for payment of debt service and required reserves on the outstanding Highway Revenue Bonds (the "Excess 1968 Resolution Revenues"), and after said repeal and cancellation, all 1968 Resolution Revenues.  The 1998 Resolution Revenues do not include excise taxes on petroleum products which may be levied or collected from time to time other than the amount of such taxes described in this paragraph unless allocated to the Authority and pledged by the Authority to the payment of Transportation Revenue Bonds. The excise tax on petroleum products imposed by the Puerto Rico Internal Revenue Code and allocated to the Authority by Act No. 34 is a different tax from the excise tax on gasoline and gas oil and diesel oil imposed by the Puerto Rico Internal Revenue Code and allocated to the Authority, as discussed below.

Under the 1998 Resolution, the Authority has covenanted not to encumber, withdraw or pledge any Excess 1968 Resolution Revenues deposited in the 1968 Construction Fund except for the transfer of Excess 1968 Resolution Revenues to the 1998 Revenue Fund.

*1968 Resolution Revenues.* The 1968 Resolution Revenues consist of: (i) the gross receipts of the current $0.16 per gallon excise tax on gasoline and $0.04 of the current $0.08 per gallon excise tax on gas oil and diesel oil imposed by the Commonwealth and allocated to the Authority (after any deductions for taxes on fuels used in sea and air transportation that are required to be reimbursed under certain circumstances) by the Puerto Rico Internal Revenue Code (the remaining $0.04 per gallon excise tax has been allocated to the Metropolitan Bus Authority by Act No. 39 of July 19, 1997); (ii) the gross receipts derived from the $15 per vehicle increase of annual motor vehicle license fees imposed by the Commonwealth and allocated to the Authority by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 ("Act No. 9"); (iii) Existing Toll Facilities Revenues; and (iv) investment earnings on deposits to the credit of funds and accounts established under the 1968 Resolution, except for the 1968 Construction Fund.  1968 Resolution Revenues do not include gasoline taxes, gas oil and diesel oil taxes, and motor vehicle license fees which may be levied or collected from time to time other than the amounts of the taxes and fees described in this paragraph unless allocated to the Authority and pledged by the Authority to the payment of Highway Revenue Bonds.

**Flow of Funds Under 1968 Resolution and 1998 Resolution**

The following chart illustrates the flow of 1968 Resolution Revenues and 1998 Resolution Revenues into the various funds and accounts established under the 1968 Resolution and the 1998 Resolution. The chart is provided only as a summary of the flow of funds under the 1968 Resolution and the 1998 Resolution, and does not purport to be complete. Reference is made to the summaries of the 1968 Resolution and the 1998 Resolution in Appendix III and Appendix IV, respectively, which should be read in conjunction herewith.

**Flow of Funds Under the 1968 and 1998 Resolutions**



_____

(1) Under the 1998 Resolution, separate accounts in the Subordinated Bond Reserve Fund may be
     established for Series of Subordinated Bonds with different Subordinated Reserve Requirements.
(2) Certain Authority operation and maintenance expenses are paid from the 1998 Construction Fund.

Upon receipt of any moneys constituting 1968 Resolution Revenues, including moneys in the Special Fund constituting 1968 Resolution Revenues received from the Department of the Treasury (see "Special Fund" below), the Authority is required under the 1968 Resolution to deposit such moneys in equal monthly amounts into the 1968 Bond Service Account and the 1968 Redemption Account to provide for the payment of principal of and interest and premium, if any, on the Highway Revenue Bonds and in the amounts necessary for the required deposits to the 1968 Reserve Account.  Any remaining 1968 Resolution Revenues (other than investment earnings) are deposited into the 1968 Construction Fund.  Under the 1998 Resolution, the Authority has agreed not to encumber or withdraw or pledge any 1968 Resolution Revenues deposited in the 1968 Construction Fund except for the transfer of Excess 1968 Resolution Revenues to the 1998 Revenue Fund, which Excess 1968 Resolution Revenues must be withdrawn monthly and transferred to the 1998 Revenue Fund for application as described below.

Upon receipt of any moneys constituting 1998 Resolution Revenues (other than investment earnings), including moneys in the Special Fund constituting 1998 Resolution Revenues received from the Department of the Treasury, the Authority is required under the 1998 Resolution to deposit such moneys into the 1998 Revenue Fund.  In addition, the Authority is required to deposit monthly into the 1998 Revenue Fund all Excess 1968 Resolution Revenues. The Authority is required to withdraw monthly from the 1998 Revenue Fund and deposit into the 1998 Senior Bond Service Account and the 1998 Senior Bond Redemption Account the respective equal monthly amounts necessary to provide for the payment of principal of and interest and premium, if any, on the Senior Transportation Revenue Bonds and deposit to the 1998 Senior Bond Reserve Account the amount necessary, if any, to replenish the 1998 Senior Bond Reserve Account.  Any remaining 1998 Resolution Revenues (other than investment earnings) are then required to be deposited monthly (in the respective equal monthly amounts) first into the accounts within the 1998 Subordinated Bond Service Account and the 1998 Subordinated Bond Redemption Account to provide for the payment of principal of and interest and premium, if any, on the Subordinated Transportation Revenue Bonds and then, into the 1998 Subordinated Bond Reserve Fund, as required.  Any remaining 1998 Resolution Revenues are then deposited into the 1998 Construction Fund and are available to the Authority for any of its authorized purposes, but subject to the payment of certain operation and maintenance expenses and repair, renewal and replacement costs, as required by the 1998 Resolution.  Once all outstanding Highway Revenue Bonds are paid or defeased and the 1968 Resolution is repealed and canceled, all revenues of the Authority formerly constituting 1968 Resolution Revenues will be deposited monthly into the 1998 Revenue Fund for application as described above.

**Neither the 1968 Resolution nor the 1998 Resolution contains events of default or provides for the acceleration of the maturities of the Highway Revenue Bonds or the Transportation Revenue Bonds.**

**1998 Senior Bond Reserve Account**

The 1998 Resolution establishes a 1998 Senior Bond Reserve Account, the moneys in which are to be applied to the payment of interest on the Senior Transportation Revenue Bonds, and maturing principal of serial Senior Transportation Revenue Bonds whenever moneys in the 1998 Senior Bond Service Account are insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the 1998 Senior Bond Redemption Account to satisfy any Amortization Requirements for the term Senior Transportation Revenue Bonds whenever 1998 Resolution Revenues are insufficient for such purpose. The 1998 Resolution provides, however, that before the moneys in the 1998 Senior Bond Reserve Account are used to cover any insufficiency in the 1998 Senior Bond Service Account or the 1998 Senior Bond Redemption Account, the 1998 Fiscal Agent shall cover such insufficiency by first withdrawing from the 1998 Construction Fund any unencumbered 1998 Resolution Revenues deposited therein and, to the extent such moneys are insufficient to cover said deficiency, by withdrawing moneys on deposit in the 1998 Subordinated Bond Service Account and 1998 Subordinated Bond Redemption Account.

The Authority covenants to accumulate and maintain in the 1998 Senior Bond Reserve Account an amount equal to the lesser of the maximum annual Principal and Interest Requirements for any fiscal year on all outstanding Senior Transportation Revenue Bonds and 10% of the original principal amount of each Series of Senior Transportation Revenue Bonds outstanding (the "1998 Senior Bonds Reserve Requirement").

On October 31, 2006, approximately $273,772,901 was on deposit in the 1998 Senior Bond Reserve Account. The 1998 Senior Bonds Reserve Requirement will be $279,435,487 upon the issuance of the Series M Bonds and Series N Bonds and the refunding of the 1998 Resolution Refunded Bonds, and such amount will be on deposit in the 1998 Senior Bond Reserve Account following the issuance of the Series M Bonds and Series N Bonds. The 1998 Resolution permits any increase in the Senior Bonds Reserve Requirement to be funded over not more than five years and allows the Authority to use a letter of credit or insurance policy to fund the 1998 Senior Bonds Reserve Requirement.

Excess moneys in the 1998 Senior Bond Reserve Account may be retained in such Reserve Account, may be applied to the payment of outstanding notes issued by the Authority to finance temporarily any Transportation Facilities or outstanding Senior Transportation Revenue Bonds to be refunded or may be transferred to the 1998 Senior Bond Service Account, the 1998 Senior Bond Redemption Account, or the 1998 Construction Fund, as directed by the Authority.

**1968 Reserve Account**

The 1968 Resolution establishes the 1968 Reserve Account, the moneys in which are to be applied to the payment of interest on the Highway Revenue Bonds and maturing principal of serial Highway Revenue Bonds whenever moneys in the 1968 Bond Service Account are insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the 1968 Redemption Account to satisfy any Amortization Requirements for the term Highway Revenue Bonds whenever 1968 Resolution Revenues are insufficient for such purpose. The Authority covenants to accumulate and maintain in the 1968 Reserve Account an amount equal to the lesser of the maximum annual Principal and Interest Requirements for any fiscal year on all outstanding Highway Revenue Bonds and 10% of the original principal amount of each Series of Bonds outstanding (the "1968 Reserve Requirement").

On October 31, 2006, approximately $155,877,411 was on deposit in the 1968 Reserve Account ($1,690,473 less than the 1968 Reserve Requirement as a result of a reduction in the market value of the investments in such account). The 1968 Reserve Requirement will be $137,356,109 upon the issuance of the Series CC Bonds and the refunding of the 1968 Resolution Refunded Bonds, after giving effect to the adoption of the 1968 Variable Rate Supplement described below under "Proposed 1968 Supplemental Resolutions." Such amount will be on deposit in the 1968 Reserve Account following the issuance of the Series CC Bonds. The 1968 Resolution allows the Authority to use a letter of credit or insurance policy to fund the 1968 Reserve Requirement.

Excess moneys in the 1968 Reserve Account are transferred to the 1968 Construction Fund, the 1968 Bond Service Account or the 1968 Redemption Account, as directed by the Authority.

**Replenishment of 1968 and 1998 Reserve Accounts**

Under the Puerto Rico Internal Revenue Code, if moneys in the 1968 Reserve Account, 1998 Senior Bond Reserve Account or any accounts established in the 1998 Subordinated Bond Reserve Fund (collectively, the "Reserve Accounts") are applied to cover a deficiency in the amounts necessary for payment of the principal of and interest on the Highway Revenue Bonds, Senior Transportation Revenue Bonds or Subordinated Transportation Revenue Bonds, respectively, the amounts used from any of the applicable Reserve Accounts to cover said deficiency shall be reimbursed to the Authority from the first amounts received in the next fiscal year or subsequent years by the Commonwealth derived from (i) any other taxes which may then be in effect on any other fuel or propellant which is used, among other purposes, to propel highway vehicles, and (ii) any remaining portion of the gasoline tax and petroleum products tax then in effect. The proceeds of said other taxes and the remainder of the gasoline tax and petroleum products tax to be used to reimburse the applicable Reserve Accounts are not deposited in the General Fund of the Commonwealth when collected, but are deposited instead in the Special Fund for the benefit of the Authority, and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, used to reimburse said Reserve Accounts. In the 1998 Resolution, the Authority covenants to apply any such reimbursement received first to replenish the 1968 Reserve Account, then to replenish the 1998 Senior Bond Reserve Account, and finally to replenish any accounts in the 1998 Subordinated Bond Reserve Fund.

**Commitment Not to Reduce Taxes and Fees**

The Commonwealth has agreed and committed in the Puerto Rico Internal Revenue Code that it will not reduce the gasoline tax below $0.16 per gallon, the tax on gas oil and diesel oil below $0.04 per gallon or the tax on petroleum products below the tax rates in effect on July 16, 1997 (as described below), and that it will not reduce the amount of any such taxes allocated to the Authority until all obligations of the Authority, including the Highway Revenue Bonds and the Transportation Revenue Bonds, secured by the pledge thereof are fully paid. The Commonwealth has also agreed and pledged in Act No. 9 that it will not reduce the motor vehicle license fees allocated and pledged to the payment of obligations of the Authority, including the Highway Revenue Bonds and the Transportation Revenue Bonds, so long as the proceeds of such fees remain pledged to the payment of such obligations.

**Special Fund for Deposit of Taxes and Fees Allocated to the Authority**

Under the Puerto Rico Internal Revenue Code and Act No. 9, the proceeds of the taxes and license fees allocated to the Authority are deposited by the Department of the Treasury in a special fund (the "Special Fund") in favor of the

31

Authority. In accordance with the Constitution of Puerto Rico, the proceeds of such taxes and license fees are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if and to the extent that all other Commonwealth revenues are insufficient therefor. The Commonwealth has never applied the proceeds of such taxes or license fees allocated to the Authority to the payment of such debt nor has the Commonwealth ever defaulted on the payment of principal of or interest on any of such debt. For information with respect to the Commonwealth's debt and the economic and financial condition of the Commonwealth, see "Prior Payment of Full Faith and Credit Obligations of the Commonwealth" below and *Debt* in the Commonwealth Report.

**Prior Payment of Full Faith and Credit Obligations of the Commonwealth**

*Provision for Prior Payment.* The Constitution of Puerto Rico provides that in the event the Commonwealth has insufficient funds to pay all approved appropriations, the available resources of the Commonwealth shall be used first to pay public debt before being used for other purposes.  Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged, and, according to opinions heretofore rendered by the Secretary of Justice of the Commonwealth, any payments which are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations. The Bonds do not constitute public debt.

The proceeds of the gasoline tax, the gas oil and diesel oil tax, the petroleum products tax and the motor vehicle license fees allocated to the Authority by the Puerto Rico Internal Revenue Code and Act No. 9 are available Commonwealth resources under the Constitution. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth.  However, under the Puerto Rico Internal Revenue Code and Act No. 9, such taxes and license fees are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth are insufficient for such purpose. Tolls and other fees and charges collected by the Authority and investment earnings are not considered available Commonwealth resources.

The Commonwealth has never applied taxes or license fees allocated to the Authority to the payment of its public debt; nor has the Commonwealth ever defaulted on the payment of principal of or interest on any of its public debt. See *Debt* in the Commonwealth Report.

Under the provisions of Act No. 39 of the Legislature of Puerto Rico, approved May 13, 1976, as amended ("Act No. 39"), the Secretary of the Treasury of Puerto Rico is obligated to fund annual debt service on general obligation bonds and notes of the Commonwealth by monthly deposits into the Special Fund for the Amortization of General Obligations Evidenced by Bonds and Promissory Notes (the "Commonwealth Redemption Fund"). As of the date of this Official Statement, the amount on deposit in the Commonwealth Redemption Fund complied with such requirement. Moneys in the Commonwealth Redemption Fund may also be applied to the payment of other Commonwealth guaranteed obligations outstanding prior to adoption of Act No. 39. Such moneys are not available to pay the Bonds.

*Debt Limitation.* Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued which is payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico (hereinafter "internal revenues") in the two fiscal years preceding the then current fiscal year. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded.

Internal revenues consist principally of income taxes, property taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury of Puerto Rico, and motor vehicle fuel taxes and license fees, which are allocated to the Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service.

All or a portion of the proceeds of certain refunding bonds issued by the Commonwealth have been invested in guaranteed investment contracts or federal agency securities (in each case rated in the highest rating category by Moody's Investors Service and Standard & Poor's Ratings Services), none of which is eligible to be used for legal defeasance under Puerto Rico law ("non-eligible investments").  Since the bonds being refunded with proceeds invested in non-eligible investments are not legally defeased, such bonds are treated as outstanding for purposes of the 15% debt limitation.

Future maximum annual debt service for the Commonwealth's currently outstanding general obligation debt is $768,843,245 in the fiscal year ending June 30, 2020 (based on certain assumptions). This amount is equal to 9.48% of $8,113,386,000, which is the average of the adjusted internal revenues of the Commonwealth for the two fiscal years ended June 30, 2006.

Information about the Commonwealth public sector debt and debt service requirements for the Commonwealth's general obligation bonds and the Commonwealth's guaranteed debt appear in *Debt* in the Commonwealth Report.

**The Bonds are not a debt of the Commonwealth or any of its political subdivisions (other than the Authority), and neither the Commonwealth nor any such subdivision (other than the Authority) shall be liable thereon.**

**Additional Bonds under the 1998 Resolution and the 1968 Resolution**

*Senior Transportation Revenue Bonds.* The Authority may issue additional Senior Transportation Revenue Bonds under the 1998 Resolution to provide funds for any lawful purpose of the Authority, including the payment of all or any part of the cost of Transportation Facilities (including the payment of any outstanding notes of the Authority issued for the purpose of paying all or a part of such cost); provided that the 1998 Resolution Revenues for any 12 consecutive months of the 15 months immediately preceding the issuance of such Senior Transportation Revenue Bonds (adjusted to take into account for such entire 12 months moneys allocated to and pledged by the Authority to the payment of the Transportation Revenue Bonds under legislation enacted and toll rate revisions made effective on or prior to the date of delivery of such bonds and tolls from Toll Facilities to be financed from the proceeds of such bonds) are not less than 150% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Senior Transportation Revenue Bonds and the additional Senior Transportation Revenue Bonds then to be issued and not less than 100% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Transportation Revenue Bonds (including Subordinated Transportation Revenue Bonds) and the additional Senior Transportation Revenue Bonds then to be issued.

The Authority may also issue additional Senior Transportation Revenue Bonds to refund all or any part of the outstanding Senior Transportation Revenue Bonds of any Series without satisfying such requirement, provided that the Authority certifies that the maximum annual Principal and Interest Requirements on the Senior Transportation Revenue Bonds to be outstanding after the issuance of such additional Senior Transportation Revenue Bonds will be equal to or less than the maximum annual Principal and Interest Requirements on the Senior Transportation Revenue Bonds outstanding immediately prior to the issuance of the additional Senior Transportation Revenue Bonds. See "Issuance of Additional Bonds" in "APPENDIX IV – SUMMARY OF CERTAIN PROVISIONS OF THE 1998 RESOLUTION."

Any additional Senior Transportation Revenue Bonds issued under the 1998 Resolution will be on a parity with the outstanding Senior Transportation Revenue Bonds and will be entitled to the equal benefit, protection and security of the provisions, covenants and agreements of the 1998 Resolution. The Series M Bonds and Series N Bonds are being issued as Senior Transportation Revenue Bonds.

*Subordinated Transportation Revenue Bonds.* The Authority may issue Subordinated Transportation Revenue Bonds under the 1998 Resolution to pay all or any part of the cost of any highway project or transit project eligible for financial assistance under federal legislation, provided that the 1998 Resolution Revenues for any 12 consecutive months of the 15 months immediately preceding the issuance of such Subordinated Transportation Revenue Bonds (adjusted to take into account for such entire 12 months moneys allocated to and pledged by the Authority to the payment of the Transportation Revenue Bonds under legislation enacted and toll rate changes made effective on or prior to delivery of such bonds and tolls from Toll Facilities to be financed from the proceeds of such bonds) are not less than 125% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Transportation Revenue Bonds and the Subordinated Transportation Revenue Bonds then to be issued.

The Authority may also issue Subordinated Transportation Revenue Bonds to refund all or any part of the outstanding Subordinated Transportation Revenue Bonds of any Series without satisfying such requirement, provided that the Authority certifies that the maximum Principal and Interest Requirements on the Subordinated Transportation Revenue Bonds to be outstanding after the issuance of such additional Subordinated Transportation Revenue Bonds will be equal to or less than the maximum annual Principal and Interest Requirements on the Subordinated Transportation Revenue Bonds outstanding immediately prior to the issuance of the additional Subordinated Transportation Revenue Bonds. See "Issuance of Additional Bonds" in "APPENDIX IV – SUMMARY OF CERTAIN PROVISIONS OF THE 1998 RESOLUTION."

*Highway Revenue Bonds.* The Authority may not issue additional Highway Revenue Bonds under the 1968 Resolution except bonds maturing no later than July 1, 2036, which are issued to refund outstanding Highway Revenue Bonds in order to achieve debt service savings. The issuance of such Highway Revenue Bonds must meet the tests for the issuance of such bonds under the 1968 Resolution, which tests are more fully described in "Issuance of Additional Bonds" in "APPENDIX III – SUMMARY OF CERTAIN PROVISIONS OF THE 1968 RESOLUTION."

**Proposed 1968 Supplemental Resolutions**

The Authority proposes to adopt a supplemental resolution (the "1968 Variable Rate Supplement") when the consent of the owners of two-thirds in aggregate principal amount of the Highway Revenue Bonds outstanding has been obtained. Such supplemental resolution will permit the 1968 Fiscal Agent to treat Variable Rate Bonds (as defined in the 1968 Resolution) as having an assumed fixed interest rate equal to the latest five-year or one-year (if higher) average of the historical interest rates on such bonds or based upon certain commonly used interest rate indices for the purpose of calculating Principal and Interest Requirements (as defined in the 1968 Resolution).

The Authority proposes to adopt another supplemental resolution (the "Parity Lien Supplement") when the consent of the owners of 100% of the Highway Revenue Bonds outstanding has been obtained. Such supplemental resolution will provide, among other things, for certain modifications to the amendment provisions of the 1968 Resolution, including a reduction of the 66-2/3% consent requirement for certain amendments to a majority. In addition, the Authority will be permitted to grant a parity lien on 1968 Resolution Revenues to secure reimbursement agreements with the providers of any credit facility or liquidity facility securing Highway Revenue Bonds.

**Consent of Purchasers of Series CC Bonds**

By purchasing the Series CC Bonds, the owners of such bonds will have consented to and approved, for themselves and future owners of such bonds, the adoption of the proposed supplemental resolutions. The underwriters of the Bonds, as initial purchasers of the Bonds, will also execute a consent to the adoption of the proposed supplemental resolutions. Upon the issuance of the Series CC Bonds and the refunding of the 1968 Resolution Refunded Bonds, the owners of 68.98% in respect of the 1968 Variable Rate Supplement and 68.98% in respect of the Parity Lien Supplement of the aggregate principal amount of the Highway Revenue Bonds outstanding will have consented to the adoption of the respective proposed supplemental resolutions. Since the consents received after the issuance of the Series CC Bonds will exceed the percentage required for the adoption of the Variable Rate Supplement, the Authority expects to adopt the Variable Rate Supplement after the issuance of the Series CC Bonds.

## THE AUTHORITY

**General Description**

The Authority was created in 1965 to assume responsibility for the construction of roads and highways and related transportation facilities in Puerto Rico. The Authority is a separate entity from the Department of Transportation and Public Works for purposes of financing and constructing Puerto Rico's transportation system, but since 1971, the Secretary of Transportation and Public Works (the "Secretary"), appointed by the Governor, has overseen the management of the Authority and exercises the powers of the Governing Board of the Authority.

The Authority has adopted a long-term master plan for development of the transportation infrastructure necessary to foster and sustain Puerto Rico's economic growth and a five-year Construction Improvement Program to implement that plan. (The current Construction Improvement Program covers the period from fiscal year 2007, which began on July 1, 2006, through fiscal year 2011). As required by the 1968 Resolution and the 1998 Resolution, the Authority supplements the master plan as necessary and annually updates the five-year Construction Improvement Program.

The Authority Act gives the Authority broad powers to carry out its responsibilities in accordance with the Department's overall transportation policies. These powers include, among other things, the complete control and supervision of any highway and other transportation facilities owned, operated or constructed by it; the ability to set tolls and other charges for the use of the highway and other transportation facilities; and the power to issue bonds, notes and other obligations. The Authority plans and manages the construction of all major projects relating to Puerto Rico's transportation system, undertakes major repairs and maintains the toll highways. The Department maintains Puerto Rico's highway system, other than the toll highways, and undertakes construction of smaller projects.

The Authority classifies its highways and roads within the following categories: primary, primary urban, secondary, and tertiary. As of December 31, 2006, the Commonwealth had 4,620 miles of highways and 11,328 miles of local streets and roads. The highway system comprises 391 miles of primary system highways, which are the more important interregional traffic routes and include the Luis A. Ferré (PR-52), De Diego (PR-22), PR-53, Eastern Corridor (PR-66), PR-5 and Martínez Nadal (PR-20) toll highways, 230 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic and 3,041 miles of tertiary highways and roads and public housing development roads serving local, intra-regional traffic.

In August 1990, the Authority Act was amended to empower the Authority to enter into concession agreements, subject to approval by a government board of adjudications, with private parties for the design, construction, operation and maintenance of highway projects. Such projects, to be owned by the Authority and the Commonwealth, could be financed by such private parties by the imposition of tolls or otherwise. To date, the only highway facility subject to a private concession agreement is the Teodoro Moscoso Bridge, which is operated by Autopistas de Puerto Rico y Compañía, S.E.

In March 1991, the Authority Act was further amended to authorize the Authority to work with and implement policies established by the Secretary for the purpose of developing a multi-modal transportation system for the Commonwealth to alleviate traffic congestion. Pursuant to this power, the Authority undertook the planning, design, construction and operation of Tren Urbano, a mass transit rail project for the San Juan Metropolitan area. The initial phase of Tren Urbano became fully operational in fiscal 2005. It consists of approximately 17 km. of trackway, running from Bayamón to Santurce, via Río Piedras and Hato Rey, sixteen stations and a maintenance and storage facility. Also, the Authority initially purchased 74 passenger rail cars. The total cost of this initial phase was approximately $2.419 billion, of which $685.7 million has been paid with funds provided by the federal government. Tren Urbano was constructed under seven separate design/build contracts. Siemens Transit Team ("Siemens") was the contractor under the largest of these contracts, which included: (i) the design and construction of two stations and a 2.6 km. test track; (ii) the design, procurement and installation of all systems for the project, such as the trackway, the train control system, and the communications system; (iii) the design and manufacturing of the vehicles; (iv) the design and construction of the maintenance and storage facility; (v) the responsibility for design and construction coordination among the several contractors; and (vi) operating Tren Urbano for a period of five years, with an additional five-year option exercisable by the Authority.

**Organization**

To carry out its responsibilities to develop the Commonwealth's transportation system, the Authority is organized into the Executive Director's Office, which provides overall management of the Authority, the office of the Senior Deputy Executive Director, who assists the Executive Director in the overall management of the Authority, and the offices of three Deputy Executive Directors, each of whom reports to the Executive Director and the Deputy Executive Director. The Deputy Executive Director for Infrastructure oversees the Planning Area, which is responsible for the development of the Construction Improvement Program as well as long-term planning, the Design Area, which is responsible for designing and supervising the design by consultants of Authority projects, the Property Acquisition Area, which acquires necessary easements and rights-of-way for Authority projects, and the Construction Area, which supervises and inspects the construction work performed by the Authority's contractors. The Deputy Executive Director for Administration and Finance oversees the Finance Area, which is responsible for the financial affairs of the Authority, including budgetary services, the Administration Area, which provides administrative support to the Authority, and the Information Technologies Area, which oversees computer operations. The Deputy Executive Director for Traffic and Toll Operations oversees all aspects of the operation, maintenance, and repair of the toll highways. Most construction, renovation and improvement of highway facilities is performed by private contractors selected through a public bidding process mandated by the Authority Act. The Authority plans, inspects and supervises such work.

**Management**

The Authority's organic law, as amended in 1971, provides that the powers and duties of the Authority shall be exercised by the Secretary of Transportation and Public Works, who replaced the Board of Directors of the Authority pursuant to the 1971 amendment to the Authority's organic law. The Authority also has an Executive Director, who oversees the Authority's day-to-day operations. As of February 15, 2007, Dr. Gabriel Alcaraz Emmanuelli, Ph.D. was both the Secretary of Transportation and Public Works and the Executive Director of the Authority. He was originally appointed to these positions in 2005.

On February 21, 2007, Mr. Alcaraz resigned, for personal reasons, as Secretary of Transportation and Public Works and Executive Director of the Authority, effective as of February 28, 2007.  The Governor of Puerto Rico has announced that Mr. Fernando Pont, who is the current Under Secretary of Transportation and Public Works, will be the Acting Secretary pending the nomination of a new Secretary by the Governor and the confirmation of such nominee by the Puerto Rico Senate.  In accordance with the Authority's by-laws, Mr. Jose Hernandez Borges, the current Senior Deputy Executive Director of the Authority, will assume the role of Acting Executive Director of the Authority pending the appointment of a new Executive Director.

Other principal officers of the Authority include the following:

| Name | Position | Date of Appointment |
|------|----------|---------------------|
| Jose Hernández Borges | Senior Deputy Executive Director | August 2006 |
| Tomás Montalvo Torres | Deputy Executive Director for Infrastructure | August 2006 |
| Norberto Mass Bernard | Deputy Executive Director for Administration and Finance | February 2001 |
| Felipe Luyanda Andino | Deputy Executive Director for Traffic and Toll Operations | June 2003 |

The administrative offices of the Authority are in the Roberto Sanchez Vilella Government Center, De Diego Avenue, Stop 22, San Juan, Puerto Rico.  Its mailing address is P.O. Box 42007, San Juan, Puerto Rico 00940-2007.  Its telephone number is (787) 721-8787.

**Consultants**

The Authority retains the firm of Roy Jorgensen Associates, Inc. as independent traffic engineers to carry out certain responsibilities under the 1968 Resolution and the 1998 Resolution.  These include an annual evaluation of the Authority's master plan and Construction Improvement Program for capital improvements and the maintenance activities of the Department and the Authority with respect to Puerto Rico's highway system.

The Authority employs HLB Morales Padillo & Co.-PSC as independent accountants responsible for auditing the Authority's books and accounts.

**Employee Relations**

As of July 2006, the Authority employed 3,040 persons, of whom 215 were senior management officials, 1,262 were professionals and office workers, and 1,563 were technicians and laborers.  Of the total number of employees, 2,543 were permanent employees and 497 were temporary employees.  The Authority believes that relations with its employees are good.

In 1987, the Puerto Rico Supreme Court classified the Authority as a "private employer" for purposes of Puerto Rico labor law, permitting the Authority's employees to engage in collective bargaining.  An independent union, representing approximately 1,348 of the Authority's 2,543 permanent employees, has been certified for collective bargaining purposes.  The new collective bargaining agreement of the Authority was executed in 2006.  The collective bargaining agreement is effective as of July 1, 2006 and expires on June 30, 2010.

**Pending Legislation Affecting the Authority**

The following bills have been introduced in the Puerto Rico Legislature.  If ultimately enacted into law, these bills could affect the Authority.

Senate Bill 885, introduced in the Puerto Rico Senate on August 10, 2005, and sponsored by several members of the New Progressive Party, was approved by the Senate on September 12, 2005.  The proposed bill would assign to the Authority additional vehicle registration fee revenues estimated by the bill's sponsors to be equal to the amount of additional toll revenues resulting from the 2005 toll increase.  However, the intent of the bill is to make such toll

increases unnecessary. The Secretary had publicly expressed his opposition to this proposed bill in its original form because it would reduce the Authority's fiscal independence by limiting its ability to fix tolls as the Authority determines to be necessary. The Governor of Puerto Rico has also publicly expressed his opposition to the proposed bill in its original form and his willingness to veto it if it restricted the Authority's ability to raise tolls.

After the announcement of the toll increases, the principal sponsor of Senate Bill 885 publicly expressed disappointment with the Authority's decision to implement the toll increases. This senator also commented that the toll increases were implemented in violation of a 1985 law that establishes a procedure that must be followed by certain public corporations when approving rate increases. The Authority's position is that the 1985 law is not applicable to the Authority.

The bill was sent to the House of Representatives on September 13, 2005 and currently is assigned to the Infrastructure and Transportation and Treasury and Financial Affairs Committees.

House Joint Resolution 995 was introduced in the Puerto Rico House of Representatives on September 8, 2005 by a member of the New Progressive Party. The joint resolution provides that, in order to increase ridership, Tren Urbano fares must be reduced from $1.50 to $0.75. Tren Urbano fares are not pledged to the payments of the Bonds. The joint resolution is currently assigned to the Infrastructure and Transportation Committee.

Other bills have been introduced in the Puerto Rico Legislature that require the Authority to exempt permanently or temporarily certain persons from paying highway tolls or Tren Urbano fares. These include a bill to exempt policemen from paying highway tolls when traveling to work, a bill to exempt beneficiaries of the public health insurance system from paying Tren Urbano fares, and a bill to exempt vehicles using alternate clean fuels from paying highway tolls for two years. The Authority has opposed the adoption of these bills. The Authority does not believe that these bills would have a material impact on the Authority.

The Authority cannot predict whether any of these bills, or any other bill affecting the Authority, will ultimately become law.

**Restatement of 2004 and 2005 Financial Statements of the Authority**

The financial statements of the Authority for the fiscal year ended June 30, 2004, were restated in November of 2005 (the "2004 restatement"). These financial statements were not audited by the Authority's current auditors, but by a different auditing firm. Prior to the 2004 restatement, certain interest and other financing expenses incurred by the Authority in connection with the construction of its transportation facilities had been treated as an expense in the year in which they were incurred. As a result of the 2004 restatement, most of these interest and financing expenses were capitalized, with expense recognition occurring in the form of depreciation expense over the life of the applicable project. The 2004 restatement resulted in an increase in capital assets in 2004 of approximately $1.675 billion, an increase in the beginning balance of net assets in 2003 of approximately $1.214 billion, an increase in operating income in 2004 of approximately $243.7 million, and an increase in operating income in 2003 of approximately $219.8 million.

For the fiscal year ended June 30, 2006, the Authority determined that it should not have capitalized all the interest and financing expenses that it capitalized as a result of the 2004 restatement, but that in fact a significant portion of that expense should be recognized in the year in which it was incurred. In addition, the Authority determined that certain construction projects were recorded both as construction in progress and as roads and bridges, and that certain projects that should have been recognized as an expense in the year incurred were included in construction in progress. The Authority therefore restated its financial statements for the fiscal year ended June 30, 2005 (the "2005 restatement"). The 2005 restatement resulted in a reduction in capital assets and net assets as of June 30, 2005, of $3.789 billion and in a decrease in capital assets and operating income as of and for the year ended June 30, 2005 of $240 million. The Authority's current auditors concurred with the 2005 restatement.

## TRANSPORTATION SYSTEM REVENUES AND EXPENDITURES

**Revenues**

Various factors affect the level of 1968 Resolution Revenues and 1998 Resolution Revenues available to the Authority, including, in particular, general economic conditions, the supply and cost of crude oil and gasoline and other oil-derived fuels. These factors have an impact on motor vehicle usage and fuel consumption and are discussed further below. In addition, decisions by the Authority as to the types and level of charges it may impose for the use of its Transportation Facilities will affect the amount of moneys available to the Authority.

*Sources of 1968 Resolution Revenues*

*General.* The major sources of the Authority's 1968 Resolution Revenues are the gasoline tax and the gas oil and diesel oil tax allocated to the Authority pursuant to the Puerto Rico Internal Revenue Code, the motor vehicle license fee allocated to the Authority pursuant to Act No. 9, and the toll charges on the Authority's existing toll highways (which do not include the Eastern Corridor), including tolls collected on any extension thereof, however financed. In fiscal 2006, 1968 Resolution Revenues were derived 42.0% from gasoline taxes, 44.6% from toll charges, 7.4% from motor vehicle license fees, 3.7% from gas oil and diesel oil taxes, and 2.3% from investment earnings.

*Gasoline and Gas Oil Taxes.* The Puerto Rico Internal Revenue Code, which currently imposes a $0.16 per gallon tax on gasoline and an $0.08 per gallon tax on gas oil and diesel oil, provides for the deposit of the entire $0.16 tax on gasoline and $0.04 of the tax on gas oil and diesel oil in the Special Fund, and authorizes the Authority to pledge such amounts to the payment of the principal of and interest on its bonds and other obligations or for any other lawful purpose of the Authority. The Authority has pledged such tax receipts to the holders of the Highway Revenue Bonds, but such pledge is subject to the Constitution of Puerto Rico, which permits the Commonwealth to apply such taxes to payment of certain Commonwealth bonds to the extent other Commonwealth moneys are insufficient therefor. The Authority has also pledged such tax receipts to the holders of the Transportation Revenue Bonds, subject to the prior application of such tax receipts to the payment of debt service on Highway Revenue Bonds and the maintenance of a reserve therefor. The Commonwealth has agreed and committed in the Puerto Rico Internal Revenue Code that the tax on gasoline will not be reduced below $0.16 per gallon and the tax on gas oil and diesel oil will not be reduced below $0.04 per gallon and that the amount of such taxes allocated to the Authority will not be reduced until all obligations of the Authority secured by the pledge thereof, together with the interest thereon, are fully paid. Gasoline taxes and gas oil and diesel oil taxes which may be levied or collected from time to time other than the amounts of the taxes and fees described in this paragraph are not required to be allocated to the Authority or pledged by the Authority to the holders of the Highway Revenue Bonds or the Transportation Revenue Bonds.

Gasoline taxes, gas oil and diesel oil taxes are collected by the Department of the Treasury. The portions of such taxes allocated to the Authority are transferred to the Authority at least monthly as such taxes are collected.

The Department of the Treasury periodically conducts an audit of gasoline, gas oil, diesel oil and petroleum products importers, producers and wholesalers to verify amounts reported and paid. In addition to such audit procedures, the Authority reviews monthly the records of the Department of the Treasury for consistency with monthly reports provided to the Authority by distributors of oil, gasoline and petroleum products.

*Motor Vehicle License Fees.* Under the Vehicle and Traffic Law (Act No. 141 of July 20, 1960, as amended), the Commonwealth imposes annual license fees on various classes of motor vehicles. The current license fees range from $25 to $40 for passenger cars and vary for other vehicles. Act No. 9 increased the per vehicle annual motor vehicle license fees by $15 and provided for the deposit of the proceeds of the $15 increase in the Special Fund, which proceeds may be pledged to the payment of debt service on obligations of the Authority or any other legal purpose of the Authority. As with the gasoline and gas and diesel oil taxes described above, the Authority has pledged such license fees to the holders of the Highway Revenue Bonds and, subject to the prior application of such fees to the payment of debt service on Highway Revenue Bonds and the maintenance of a reserve therefor, the Authority has also pledged such fees to the holders of the Transportation Revenue Bonds. Such fees are also collected by the Department of the Treasury and the portion of such fees allocated to the Authority is transferred to the Authority at least monthly, as such fees are collected. Under Act No. 9, the Commonwealth has agreed and pledged that the license fees allocated to the Authority, as described herein, will not be reduced so long as such proceeds remain pledged to the payment of such obligations.

*Tolls on Existing Toll Highways.* Until the 1968 Resolution is repealed and canceled, all tolls collected on the Authority's existing toll highways financed with Highway Revenue Bonds, including tolls collected on any extension thereof financed with Transportation Revenue Bonds (the "Existing Toll Facilities Revenues"), will constitute 1968

38

Resolution Revenues.  As such, they are pledged to the payment of the Highway Revenue Bonds and, subject to the prior application of such toll revenues to the payment of debt service on the Highway Revenue Bonds and the maintenance of a reserve therefor, are additionally pledged to the payment of Transportation Revenue Bonds.

Under the 1968 Resolution, the Authority has covenanted not to reduce or eliminate any tolls and other charges for the use of Traffic Facilities if such tolls and other charges have been taken into account in the calculation of 1968 Resolution Revenues for purposes of satisfying the tests for the issuance of additional bonds under the 1968 Resolution and if the 1968 Resolution Revenues for any 12 consecutive months out of the immediately preceding 15 months prior to the proposed adjustment, after adjusting such revenues for the proposed decrease in tolls, would have been less than 150% of the maximum Principal and Interest Requirements for any fiscal year thereafter for all Highway Revenue Bonds then outstanding.  Such tolls and other charges have been taken into account for satisfying such additional bonds test under the 1968 Resolution.

The Authority has also covenanted, under the 1998 Bond Resolution, that it will not reduce or eliminate any tolls or other charges imposed for the use of its Toll Facilities unless the 1998 Resolution Revenues received by the Authority for any 12 consecutive months out of the 15 months immediately prior to such reduction (adjusted to give effect for such entire 12 months to moneys allocated to and pledged by the Authority to the payment of the Transportation Revenue Bonds under legislation enacted and toll rate changes made effective on or prior to the effective date of any such toll reduction, and tolls from Toll Facilities which have begun operations or been removed from operation during such 12 months) is at least equal to 150% and 100% of the maximum Principal and Interest Requirements for any fiscal year thereafter for all Senior Transportation Revenue Bonds then outstanding and for all Transportation Revenue Bonds then outstanding, respectively.

Tolls are currently imposed on the Luis A. Ferré toll highway (PR-52), which extends 67 miles from San Juan to Ponce and has four ramps and five toll stations; the De Diego toll highway (PR-22), which extends 52 miles from San Juan to Arecibo and has one ramp and six toll stations; PR-53, which will connect Fajardo and Salinas upon its completion, a distance of 57 miles, of which 37 miles have been completed, and which has five toll stations; the Martínez Nadal Expressway (PR-20), which extends six miles, connecting PR-2 with PR-1 near Caguas, and has one toll station; and PR-5, which extends 2.5 miles, connecting PR-2 to PR-199 (Las Cumbres Avenue), and has one toll station.  PR-5 was inaugurated in February 2006.

Effective on September 10, 2005, after conducting public hearings, the Authority increased toll rates by approximately 43% in the aggregate.  The new toll rates are taken into consideration in the Authority's financing plan for its Construction Improvement Program.  Under the new toll structure, the total minimum toll for a vehicle passing all tolls stations from San Juan to Ponce by the Luis A. Ferré toll highway (PR-52) was increased from $3.80 to $6.00 (roundtrip); the total minimum toll for a vehicle passing through all six stations from San Juan to Arecibo by the De Diego toll highway (PR-22) was increased from $4.30 to $7.00 (roundtrip); the minimum toll for the Martinez Nadal Expressway was increased from $0.50 to $0.75; the total minimum toll for PR-53 was increased from $3.10 to $5.00 (roundtrip); and the minimum toll for PR-5 was set at $0.50 (one way).

In 2004, the Authority began implementing a high-speed electronic toll collection system known as AutoExpreso.  This technology employs radio transmissions from transponder-equipped vehicles to plaza-mounted antennas, and video systems for violation enforcement.  AutoExpreso has exceeded the Authority's usage and performance expectations.  It has significantly increased vehicle circulation throughout toll plazas without costly infrastructure expansion, and has resulted in reduced travel time and increased convenience for customers.  Direct benefits to the Authority include reduced cost of toll collection, enhanced auditing capabilities, additional payment option offering and receipt of toll payments in advance.  AutoExpreso has been implemented on 14 of the 24 existing toll stations.

The Authority's toll highway revenues have always exceeded its toll highway operation and maintenance expenses.  Toll highway revenues and operation and maintenance expenses for fiscal 2006 were $192.04 million and $53.3 million (includes $11.9 million of AutoExpreso), respectively, compared to $146.3 million and $45.6 million (does not include AutoExpreso expense), respectively, for fiscal 2005.

*Investment Earnings.*  Moneys held for the credit of the 1968 Bond Service Account and the 1968 Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Government Obligations.  Moneys held for the credit of the 1968 Reserve Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations.  Such Government Obligations and Investment Obligations shall mature, or be subject to redemption, at the option of the

39

holder, not later than the respective dates when moneys held for the credit of such Accounts will be required for the purposes intended; provided, however, that the amounts on deposit in the 1968 Reserve Account shall be invested in Investment Obligations which mature not later than the final maturity date of any Highway Revenue Bonds outstanding. Income from the investment of moneys held for the credit of the 1968 Construction Fund is not considered 1968 Resolution Revenues under the 1968 Resolution.

*Sources of 1998 Resolution Revenues*

   *Petroleum Products Tax.*  In 1997, the Puerto Rico Internal Revenue Code was amended by Act No. 34 to allocate to the Authority the total amount of excise taxes, up to $120 million per fiscal year, imposed by the Commonwealth on petroleum products (which include crude oil, unfinished oil and derivative products).  The tax is imposed on any petroleum product introduced, consumed, sold or transferred in the Commonwealth.  The petroleum products tax rate varies on a monthly basis according to an index price of crude oil determined by the Department of the Treasury (based on the market price of crude oil quoted in certain markets specified in the Puerto Rico Internal Revenue Code), as follows:

| Index Price of Crude Oil (per barrel) | Rate of Tax (per barrel) |
|---|---|
| $16.00 and lower | $6.00 |
| $16.01 to $24.00 | $5.00 |
| $24.01 to $28.00 | $4.00 |
| $28.01 and higher | $3.00 |

   Petroleum products taxes are collected by the Department of the Treasury.  All taxes collected, up to $11 million per month, are deposited in the Special Fund and transferred on a monthly basis to the Authority during the first ten months of the fiscal year.  All taxes collected during the last two months of each fiscal year are also transferred, subject to the $120 million annual limit.  If the total amount of the taxes collected by the Department of the Treasury and transferred to the Authority in any month is less than $11 million, such deficiency must be made up by the Department of the Treasury with the amount of such taxes in excess of $11 million which were collected in any prior month or which may be collected in any subsequent month of the same fiscal year.

   The following table presents the number of barrels of crude oil on which the petroleum products tax was imposed, the average annual tax rate (per barrel) and the total taxes collected by the Department of the Treasury in each fiscal year since fiscal 1987 (the first full fiscal year in which the tax was collected.

## COLLECTIONS OF PETROLEUM PRODUCTS TAX

| Fiscal Year Ended June 30, | Number of Barrels Taxed (millions) | Average Annual Tax Rate[1] ($ per barrel) | Total Tax Collected ($ million) |
|---|---|---|---|
| 1987 | 23.67 | $4.91 | $119.90 |
| 1988 | 22.13 | 4.41 | 98.54 |
| 1989 | 25.11 | 5.00 | 128.23 |
| 1990 | 22.74 | 4.91 | 112.79 |
| 1991 | 26.80 | 4.16 | 112.17 |
| 1992 | 24.07 | 5.00 | 120.37 |
| 1993 | 26.09 | 5.00 | 130.47 |
| 1994 | 28.27 | 5.42 | 152.91 |
| 1995 | 27.90 | 5.00 | 139.59 |
| 1996 | 31.55 | 5.00 | 157.74 |
| 1997 | 32.29 | 4.92 | 158.74 |
| 1998 | 32.20 | 5.33 | 171.64 |
| 1999 | 31.70 | 6.00 | 190.10 |
| 2000 | 32.20 | 4.50 | 144.80 |
| 2001 | 34.82 | 3.50 | 121.90 |
| 2002 | 35.88 | 4.42 | 158.60 |
| 2003 | 34.80 | 3.50 | 121.90[2] |
| 2004 | 36.50 | 3.16 | 115.30 |
| 2005 | 36.75 | 3.00 | 110.26 |
| 2006 | 34.07 | 3.00 | 102.21 |
| 2007[e] | 33.72 | 3.00 | 101.16 |

(1) The average annual tax rate is the arithmetic average of the monthly tax rate determined by the Department of the Treasury during such fiscal year. The total tax collected is the actual amount of tax collected during the fiscal year. Due to the monthly fluctuations in the tax rate, the total tax collected is different from the result produced from multiplying the number of barrels taxed by the average annual tax rate.

(2) Does not include $11.0 million collected from taxes in arrears paid by a delinquent insolvent taxpayer that filed for protection under the Bankruptcy Code.

(e) Estimated

*Source:* Department of the Treasury and the Authority.

The Authority has been adversely affected during the last two fiscal years by reductions in collections of these taxes resulting from high oil prices. For the first time since 1991, collections of petroleum product taxes in fiscal years 2004, 2005 and 2006 were below the $120 million maximum allocated to the Authority. Since current crude oil prices significantly exceed the $28 index price, the Authority believes that petroleum product taxes collected will continue to be less than $120 million per fiscal year for the next several years.

The Puerto Rico Internal Revenue Code authorizes the Authority to pledge the entire amount of petroleum products tax allocated to the Authority (not to exceed $120 million in any fiscal year) to the payment of the principal of and interest on bonds and other obligations of the Authority or for any other lawful purpose of the Authority. The Authority has pledged the petroleum products tax receipts to the holders of the Transportation Revenue Bonds, but such pledge is subject to the Constitution of Puerto Rico, which permits the Commonwealth to apply such tax receipts to the payment of certain Commonwealth debts to the extent other Commonwealth funds are insufficient therefor. The Commonwealth has agreed and committed in the 1997 amendment to the Puerto Rico Internal Revenue Code not to eliminate or reduce the rates of excise tax on petroleum products in effect on the date of the amendment (which are the rates set forth above) or the amount of such taxes allocated to the Authority until all obligations of the Authority secured by the pledge thereof, together with the interest thereon, are fully paid. Any petroleum product tax collected in excess of $120 million per fiscal year is not required to be allocated to the Authority and is not pledged by the Authority to the holders of Transportation Revenue Bonds.

*Tolls and Other Charges.*  The Authority Act grants to the Authority plenary power to fix, impose, alter and collect tolls and other reasonable charges for the use of the Transportation Facilities operated by the Authority or for services rendered thereby.  The Authority is obligated to take into account in setting or changing such tolls and other charges such factors as will promote the use of the Transportation Facilities in the broadest and most varied manner economically possible.  Prior to fixing or altering such tolls or other charges, the Authority must hold a public hearing to receive comments with respect thereto.

Until the 1968 Resolution is repealed and canceled, all Existing Toll Facilities Revenues will constitute 1968 Resolution Revenues and are pledged to the payment of the Transportation Revenue Bonds only to the extent they become Excess 1968 Resolution Revenues.  Upon the repeal and cancellation of the 1968 Resolution, the Existing Toll Facilities Revenues will constitute 1998 Resolution Revenues and will be pledged to the payment of the Transportation Revenue Bonds.  To date, the only toll facility that provides toll revenues that are not Existing Toll Facilities Revenues, but that instead constitute 1998 Resolution Revenues, is PR-66, also known as Eastern Corridor Phase I, which was inaugurated in April 2006, with a minimum roundtrip toll of $3.00.  PR-66 extends 9 miles, connecting Carolina to Canovanas, and has one toll plaza and two ramp plazas.

The Authority has not pledged the fare box revenues of Tren Urbano to the payment of the bonds issued under the 1998 Resolution or the 1968 Resolution, including the Bonds.

*Excess 1968 Resolution Revenues.*  Before the repeal and cancellation of the 1968 Resolution, the Excess 1968 Resolution Revenues (which consist of all unencumbered 1968 Resolution Revenues remaining after payment of debt service and required reserves on the outstanding Highway Revenue Bonds issued under the 1968 Resolution) are included as 1998 Resolution Revenues.  After the payment or defeasance of all Highway Revenue Bonds and the repeal and cancellation of the 1968 Resolution, all 1968 Resolution Revenues will become 1998 Resolution Revenues.

*Investment Earnings.*  Moneys held for the credit of the 1998 Senior Bond Service Account, the 1998 Senior Bond Redemption Account, the 1998 Subordinated Bond Service Account and the 1998 Subordinated Bond Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Government Obligations.  Moneys held for the credit of the 1998 Senior Bond Reserve Account and each account in the 1998 Subordinated Bond Reserve Fund shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations.  Such Government Obligations and Investment Obligations shall mature, or be subject to redemption, at the option of the holder, not later than the respective dates when moneys held for the credit of such Accounts will be required for the purposes intended; provided, however, that the amounts on deposit in the 1998 Senior Bond Reserve Account and each account in the 1998 Subordinated Bond Reserve Fund shall be invested in Investment Obligations which mature not later than the final maturity date of any Senior Transportation Revenue Bonds or Subordinated Transportation Revenue Bonds outstanding.  Income from investments of moneys held for the credit of the 1998 Construction Fund is not considered 1998 Resolution Revenues under the 1998 Resolution.

*Historical Revenues*

The following table presents the Authority's revenues, debt service and debt service coverage ratio for the five fiscal years ended June 30, 2002 to June 30, 2006.  Under the 1998 Resolution, the Excess 1968 Resolution Revenues representing unencumbered funds in the 1968 Construction Fund must be deposited monthly in the 1998 Revenue Fund and are available for the payment of debt service on Transportation Revenue Bonds, for required deposits to the reserve accounts established thereunder and for other authorized purposes under the 1998 Resolution.  See APPENDIX IV – SUMMARY OF CERTAIN PROVISIONS OF THE 1998 RESOLUTION."

## HISTORICAL REVENUES AND DEBT SERVICE COVERAGE
### (dollars in thousands)

|  | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** | **2006** |
| 1968 Resolution Revenues: | | | | | |
| Gasoline taxes | $174,885 | $173,507 | $188,529 | $185,883 | $178,932 |
| Gas oil and diesel oil taxes | 18,922 | 15,298 | 14,556 | 16,679 | 15,676 |
| **Subtotal** | $193,807 | $188,805 | $203,085 | $202,562 | $194,608 |
| Motor vehicle license fees | 30,693 | 31,920 | 32,491 | 32,385 | 31,655 |
| **Subtotal** | $224,500 | $220,725 | $235,576 | $234,947 | $226,263 |
| Toll receipts | 130,498 | 135,352 | 141,378 | 146,286 | 189,618 |
| Investment income | 10,168 | 12,947 | 9,264 | 9,858 | 9,923 |
| **Total 1968 Resolution Revenues** | **$365,166** | **$369,024** | **$386,218** | **$391,091** | **$425,804** |
| Debt Service on Highway Revenue Bonds | $177,400 | $95,056 | $120,723 | $153,925 | $145,080 |
| 1968 Resolution Coverage Ratio | 2.06 | 3.88 | 3.20 | 2.54 | 2.93 |
| Excess 1968 Resolution Revenues | $187,766 | $273,968 | $265,495 | $237,166 | $280,724 |
| | | | | | |
| 1998 Resolution Revenues: | | | | | |
| Petroleum Products Tax | $120,000 | $120,000 | $115,295 | $110,262 | $102,206 |
| Excess 1968 Resolution Revenues | 187,766 | 273,968 | 265,495 | 237,166 | 280,724 |
| Toll Receipts | | | | | 2,452 |
| Investment income | 11,198 | 11,586 | 11,440 | 16,692 | 16,801 |
| **Total 1998 Resolution Revenues** | **$318,964** | **$405,554** | **$392,230** | **$364,120** | **$402,183** |
| Debt Service on Senior Transportation Revenue Bonds | $116,150 | $135,168 | $162,868 | $196,726 | $225,891 |
| 1998 Resolution Senior Coverage Ratio [1] | 2.75 | 3.00 | 2.41 | 1.85 | 1.78 |
| Debt Service on Subordinated Transportation Revenue Bonds | $3,795 | $6,654 | $20,398 | $20,398 | $24,018 |
| Total Debt Service on Transportation Revenue Bonds | $119,945 | $141,822 | $183,266 | $217,124 | $249,909 |
| 1998 Resolution Senior and Subordinated Coverage Ratio [2] | 2.66 | 2.86 | 2.14 | 1.68 | 1.61 |
| **Aggregate Revenues** [3] | **$496,364** | **$500,610** | **$512,953** | **$518,045** | **$547,263** |
| Aggregate Debt Service [4] | $297,345 | $236,878 | $303,989 | $371,049 | $394,989 |
| Aggregate Coverage Ratio [5] | 1.67 | 2.11 | 1.69 | 1.40 | 1.39 |

(1)    Equals ratio of Total 1998 Resolution Revenues to Debt Service on the Senior Transportation Revenue Bonds.

(2)    Equals ratio of Total 1998 Resolution Revenues to Debt Service on the Senior Transportation Revenue Bonds and the Subordinated Transportation Revenue Bonds.

(3)    Represents the sum of Total 1968 Resolution Revenues and Total 1998 Resolution Revenues (less Excess 1968 Resolution Revenues).

(4)    Represents the sum of Debt Service on all Highway Revenue Bonds, all Transportation Revenue Bonds and a $300 million loan from the federal government (repaid in full in April 2003) incurred to finance a portion of the costs of construction of Tren Urbano.

(5)    Aggregate Revenues divided by Aggregate Debt Service.

The Authority's 1968 Resolution Revenues increased at a compound annual rate of 3.2% during the period from fiscal year 2002 through fiscal year 2006 due primarily to the growth in toll receipts. Toll receipts rose at an average compound annual rate of 8.3% during the period from fiscal 2002 through fiscal 2006, increasing every year during that period, most dramatically in 2006 as a result of a 43% aggregate increase in toll rates that was implemented on September 10, 2005. Toll revenues grew by 29.6% from fiscal 2005 to 2006, reflecting the impact of approximately 10 months of higher toll rates.

Gasoline tax revenues, which accounted for approximately 42.0% of 1968 Resolution Revenues for fiscal 2006, grew slightly during this five year period. After increasing in 2004, gasoline taxes decreased in 2005 and 2006. In fiscal year 2006, revenues from gasoline taxes decreased by 3.7% when compared to fiscal year 2005. Gasoline tax revenues are closely related to gasoline consumption. Gasoline consumption in turn is affected by gasoline prices and by the number of vehicles in circulation. Although gasoline prices rose significantly during this five year period, the adverse impact on gasoline consumption was initially offset by an increase in the number of vehicles in circulation. However, the more dramatic increase in gasoline prices in the latter part of this period resulted in a small decrease in gasoline consumption in 2005 and 2006.

Gas oil and diesel oil tax receipts, which accounted for approximately 3.7% of 1968 Resolution Revenues for fiscal 2006, decreased from fiscal 2002 through fiscal 2006. This decrease resulted primarily from the decision by the Puerto Rico Electric Power Authority to increase the amount of electricity purchased from private co-generation plants using natural gas and coal as fuels.

Motor vehicle license fees accounted for approximately 7.4% of 1968 Resolution Revenues for fiscal year 2006. From fiscal 2002 to fiscal 2006, license fee collections rose slightly.

The revenues allocated to the Authority from the petroleum products tax are capped at $120 million in each fiscal year. The Authority received this amount each year during fiscal years 2002 and 2003. For fiscal years 2004, 2005 and 2006, the petroleum products tax collected amounted to $115.3 million, $110.3 million and $102.2 million, respectively. This was due primarily to the rise in the price of petroleum products, which resulted in a lower tax rate and lower collections.

The foregoing discussion of past revenue growth is not intended to be predictive of future revenue growth. Economic conditions in Puerto Rico, as well as the price of oil and petroleum products and the levels of automobile registration and usage, will affect the Authority's revenues in the future.

*Projected 1968 Resolution Revenues and 1998 Resolution Revenues*

The following table presents the Authority's estimates of 1968 Resolution Revenues, 1998 Resolution Revenues, debt service on Highway Revenue Bonds and Transportation Revenue Bonds (including the Bonds and other bonds expected to be issued during this period), and debt service coverage for each of the five fiscal years ending June 30, 2007 to June 30, 2011. The projected 1968 Resolution Revenues and 1998 Resolution Revenues shown below are based on toll rates, tax rates and allocations to the Authority now in effect, and debt service is based on Highway Revenue Bonds and Transportation Revenue Bonds currently outstanding and projected to be issued during the forecast period. Such projections are subject to periodic review and may be adjusted to reflect such factors as changes in general economic conditions, in the demand for gasoline and other petroleum products and in the levels of automobile registration and usage. The projections are based on assumptions that the Authority believes to be reasonable; however, there is no assurance that the projections will prove to be accurate. The projections have been prepared by, and are the responsibility of the management of the Authority. The Authority's auditors have neither examined nor compiled the projections, and accordingly they have not expressed an opinion or any other form of assurance with respect thereto.

44

**PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY**
**PROJECTED REVENUES AND DEBT SERVICE COVERAGE**
**(dollars in thousands)**

|  | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
|  | **2007** | **2008** | **2009** | **2010** | **2011** |
| ***1968 Resolution Revenues*** |  |  |  |  |  |
| Gasoline Taxes | $177,470 | $180,320 | $185,580 | $190,150 | $195,140 |
| Gas oil and diesel oil taxes | 15,500 | 12,500 | 12,750 | 9,000 | 9,000 |
| Subtotal | 192,970 | 192,820 | 198,330 | 199,150 | 204,140 |
| Motor vehicle license fees | 31,980 | 32,310 | 32,640 | 32,980 | 33,320 |
| Subtotal | 224,950 | 225,130 | 230,970 | 232,130 | 237,460 |
| Toll receipts | 205,760 | 214,950 | 223,780 | 232,710 | 242,290 |
| Investment Income | 8,950 | 9,018 | 9,033 | 9,149 | 9,075 |
| **Total 1968 Resolution Revenues** | **439,660** | **449,098** | **463,783** | **473,989** | **488,825** |
|  |  |  |  |  |  |
| Debt Service on Highway Revenue Bonds | 124,942 | 129,018 | 129,928 | 136,871 | 132,430 |
| 1968 Resolution Coverage Ratio | 3.52 | 3.48 | 3.57 | 3.46 | 3.69 |
|  |  |  |  |  |  |
| Excess 1968 Resolution Revenues | 314,718 | 320,080 | 333,855 | 337,118 | 356,395 |
| ***1998 Resolution Revenues*** |  |  |  |  |  |
| Petroleum Products Tax | 101,160 | 102,780 | 105,780 | 108,380 | 111,230 |
| Investment Income | 17,543 | 18,548 | 19,374 | 19,702 | 19,776 |
| Eastern Corridor Toll Receipts | 16,130 | 21,000 | 21,630 | 22,279 | 22,947 |
| Subtotal 1998 Resolution Revenues | 134,833 | 142,328 | 146,784 | 150,360 | 153,953 |
| Excess 1968 Resolution Revenues | 314,718 | 320,080 | 333,855 | 337,118 | 356,395 |
| **Total 1998 Revenues** | **449,551** | **462,408** | **480,639** | **487,479** | **510,348** |
| Debt Service on 1998 Senior Transportation Revenue Bonds (1) | 206,476 | 246,705 | 266,582 | 269,902 | 274,187 |
| 1998 Senior Coverage Ratio (2) | 2.18 | 1.87 | 1.80 | 1.81 | 1.86 |
|  |  |  |  |  |  |
| Additional Bond Test, Senior Transportation Revenue Bonds (3) | 1.57 | 1.57 | 1.63 | 1.66 | 1.74 |
|  |  |  |  |  |  |
| Additional Bond Test, Subordinated Transportation Revenue Bonds (4) | 1.36 | 1.43 | 1.48 | 1.29 | 1.35 |
| **Available to Pay 1998 Subordinated Transportation Revenue Bonds (5)** | **243,074** | **215,703** | **214,057** | **217,577** | **236,162** |
| Debt service on 1998 Subordinated Transportation Revenue Bonds | 41,816 | 33,751 | 30,321 | 30,344 | 83,557 |
| Senior and Subordinate Debt Service | 248,292 | 280,457 | 296,903 | 300,246 | 357,744 |
| Senior and Subordinate Debt Service Coverage Ratio | 1.81 | 1.65 | 1.62 | 1.62 | 1.43 |
| Aggregate Revenues (6) | 574,493 | 591,426 | 610,567 | 624,349 | 642,778 |
| Aggregate Debt Service (7) | **373,234** | **409,475** | **426,831** | **437,116** | **490,174** |
| Aggregate Debt Service Coverage Ratio (8) | 1.54 | 1.44 | 1.43 | 1.43 | 1.31 |

(1)   Assumes issuance of additional Senior Transportation Revenue Bonds in July 2007 at 5% with 40 year final maturity and Subordinated Transportation Revenue Bonds in June 2010 at 6% with a 40 year final maturity.

(2)   Equals ratio of Total 1998 Resolution Revenues to debt service on the Senior Transportation Revenue Bonds in the fiscal year in question.

(3)   This test uses as its denominator maximum annual debt service on all Senior Transportation Revenue Bonds outstanding under the 1998 Resolution (including the Senior Transportation Revenue Bonds then proposed to be issued) and as its numerator the 1998 Resolution Revenues of the Authority.  Revenues are adjusted for 1968 Resolution sinking funds contributed to the Series CC refunding.

(4)   This test uses as its denominator maximum annual debt service on all Senior and Subordinated Transportation Revenue Bonds outstanding under the 1998 Resolution (including the Senior and Subordinated Transportation Revenue Bonds then proposed to be issued) and as its numerator the 1998 Resolution Revenues of the Authority.  Revenues are adjusted for 1968 Resolution sinking funds contributed to the Series CC refunding.

(5)   Represents total 1998 Resolution Revenues less debt service on the Senior Transportation Revenue Bonds.

(6)   Represents the sum of the Total 1968 Resolution Revenues and Total 1998 Resolution Revenues (less Excess 1968 Resolution Revenues) for the fiscal year in question.

(7)   Represents the sum of Highway Revenue Bonds, Transportation Revenue Bonds and Subordinated Transportation Revenue Bonds debt service for the fiscal year in question.

(8)   Aggregate Revenues divided by Aggregate Debt Service.

Total 1968 Resolution Revenues and 1998 Resolution Revenues for the period from fiscal 2007 through fiscal 2011 are projected to grow at a compound annual rate of 2.1% and 2.8%, respectively. The projected growth in gasoline tax revenues is based on econometric models prepared for the Authority by an independent firm. The Authority has found such projections to be the most reliable indicator of future growth in gasoline tax receipts. The Authority's projections of growth in its other revenues is based on historic trends and, in the case of toll revenues, on the additional receipts expected from the increase in traffic.

**Operating Expenses and Capital Expenditures**

*Operation and Maintenance - Highway Facilities*

The Department of Transportation has the responsibility for maintaining Puerto Rico's highway system, except for the toll highways and related connecting roads, which are maintained by and at the expense of the Authority. The maintenance expenses of the Department are paid with moneys appropriated annually by the Legislature of Puerto Rico. On occasion, the Authority advances funds to pay the costs of emergency repairs that are the responsibility of the Department, and is subsequently reimbursed for these advances. To the extent funds are not provided by the Legislature, the Authority has agreed under the 1998 Resolution that it will pay from available moneys in the 1998 Construction Fund the costs of maintenance of the Traffic Facilities financed with proceeds of Highway Revenue Bonds and Transportation Revenue Bonds. The 1998 Resolution requires the Authority to pay from available moneys in the 1998 Construction Fund (and not from moneys in the 1968 Construction Fund) the costs of any necessary repairs to, or renewals or replacements of, Traffic Facilities financed with proceeds of Highway Revenue Bonds and Transportation Revenue Bonds, as recommended by the transportation engineers retained by the Authority.

The Authority's operation and maintenance expenses payable from available moneys in the 1998 Construction Fund consist of the expenses of operating and maintaining the toll highways and related roads and, beginning in fiscal 2005, the expenses of operating and maintaining Tren Urbano. Under the 1998 Resolution, these expenses are payable from available moneys in the 1998 Construction Fund after payment of debt service on the Highway Revenue Bonds and Transportation Revenue Bonds and any required deposits to the 1998 Senior Bond Reserve Account and the accounts in the 1998 Subordinated Bond Reserve Fund. Certain other expenses of the Authority, including certain of its administration costs, are included in the Construction Improvement Program and are capitalized.

The following table sets forth the annual toll highway operation and maintenance expenses and beginning in 2006, the electronic toll collection expenses paid by the Authority from unencumbered moneys in the 1998 Construction Fund for each of the five fiscal years in the five-year period ended June 30, 2006, as well as the annual amount contributed by the Authority to the Department to help pay the cost of maintaining the non-toll highways (which amount is not reimbursed by the Department to the Authority). The table also sets forth the Authority's projected annual toll highway operation and maintenance expenses and electronic toll collection expenses to be paid by the Authority from unencumbered moneys in the 1998 Construction Fund for the five fiscal years ending June 30, 2011, as well as the projected contributions by the Authority to the Department for maintenance of non-toll highways.

## HIGHWAY FACILITIES
### OPERATION AND MAINTENANCE EXPENSES
(in thousands)

| Fiscal Year Ended June 30 | Contributions of the Authority to the Department | Toll Highway Operation & Maintenance | Electronic Toll Collection | Total[1] |
|---|---|---|---|---|
| 2002 | $ 6,902 | $37,293 | - | $37,293 |
| 2003 | 15,200 | 38,784 | - | 38,784 |
| 2004 | 13,074 | 40,302 | - | 40,302 |
| 2005 | 8,271 | 45,563 | - | 45,563 |
| 2006 | 9,250 | 53,315 | $11,933 | 65,248 |
| 2007[p] | 10,000 | 46,018 | 14,400 | 60,418 |
| 2008[p] | 10,000 | 48,760 | 14,472 | 63,232 |
| 2009[p] | 10,000 | 49,735 | 14,544 | 64,279 |
| 2010[p] | 10,000 | 50,978 | 14,617 | 65,595 |
| 2011[p] | 10,000 | 52,253 | 14,690 | 66,943 |

(1)    Total does not include the contributions of the Authority to the Department.

(p)    Projected.

46

In certain years, emergency repairs to the highway system have been necessary, particularly as a result of storm or flood damage.  The cost of these repairs is borne by the Department, except for the cost of repairs to the toll highways, which is borne by the Authority.  The Department and the Authority generally have been reimbursed from the Federal Emergency Management Agency for some of the costs of such repairs attributable to federally designated disaster areas.  The Legislature of Puerto Rico also appropriates funds from time to time for emergency repairs by the Department in addition to amounts appropriated for maintenance.

The traffic engineers retained by the Authority under the 1968 Resolution and 1998 Resolution conduct an annual evaluation of the level of maintenance of the highway system.  In their most recent evaluation completed in November 2006, the traffic engineers found that the current level of maintenance was generally adequate.  The projected maintenance budgets for the next five fiscal years reflect an average annual rate of growth of 2.5% for both non-toll roads and toll highways. The traffic engineers believe that the Authority's maintenance program represents an adequate level of maintenance to preserve the investment and provide an acceptable level of service. The results of the traffic engineers' most recent maintenance evaluation are summarized in the letter of such traffic engineers included as Appendix V.

*Operation and Maintenance - Tren Urbano*

Tren Urbano began revenue operations in June 2005.  All construction work of Phase I of Tren Urbano has now been completed.  As of December 2006, the average daily ridership was 33,000 passengers.  For the six months ending December 31, 2006, ridership increased by 11% over the same period in 2005. Over the same period, Tren Urbano recorded on-time performance of 97% and a trip completion level of over 99%.

The Authority has entered into a Systems and Test Track Turnkey Contract with Siemens covering, among other things, the operation and maintenance of Tren Urbano.  Under the agreement, Siemens is responsible for operating and maintaining Tren Urbano and is entitled to receive for such services an annual base compensation, which is subject to an inflation adjustment for changes in the cost of labor (based on changes in the consumer price index) and materials (based on changes in the producer price index).  The base compensation does not include the cost of insurance and electricity which is paid separately by the Authority.  In addition, Siemens is entitled to receive incentive compensation, and is subject to penalties, based on meeting or not meeting certain operating and maintenance performance measures.  The contract with Siemens has an initial term that expires on June 5, 2010, with an option by the Authority to extend the term for an additional five years.

In addition to the direct costs of operating Tren Urbano, the Authority funds the costs associated with the technical, administrative and contractual oversight of Tren Urbano and its intermodal operations, which is done through the Integrated Transportation Alternative (ATI, by its Spanish acronym), a division within the Authority.  Additional costs related to Tren Urbano include a contract for security services with the Puerto Rico Police Department, a subsidy of fixed-route feeder services for operators of private jitney services (*carros públicos*), and paratransit feeder bus services provided by the Metropolitan Bus Authority.  These additional operating costs totaled $40.51 million in fiscal year 2006, and are projected to increase to $42.2 million per year during the first five years of service.

The table below shows the Tren Urbano operating and maintenance expenses paid by the Authority in fiscal year 2006.  The table also shows the Authority's estimate of the annual operating and maintenance expenses of Tren Urbano for the period from fiscal 2007 through fiscal 2011.  These estimates are based upon the terms of the Authority's contract with Siemens and include an inflation adjustment and the Authority's estimate of the cost of insurance and electricity.  They also include the costs of the ATI oversight organization, financial incentives for *carros públicos*, security services, and feeder bus services.

**Operating and Maintenance Expenses for**
**Tren Urbano and Intermodal Service**
**(in millions)**

| Fiscal Year | Estimated Annual Operating and Maintenance Expenses |
|---|---|
| 2006 | $ 38.1 |
| 2007[p] | 92.5 |
| 2008[p] | 94.5 |
| 2009[p] | 96.5 |
| 2010[p] | 98.6 |
| 2011[p] | 100.7 |

(p)  Projected.

The costs of operation and maintenance of Tren Urbano will be covered by available moneys in the 1998 Construction Fund and passenger fares, which currently cover approximately 10% of the operation and maintenance costs.

*Operation and Maintenance – Ferry Service*

Since July 1, 2005, the Authority is responsible for the operation and maintenance of part of the ferry transportation system known as Aquaexpreso. The Authority is in charge of the operations of the ferry covering the route from San Juan to Cataño. The other ferries comprising the Aquaexpreso system continue under the management of the Puerto Rico Ports Authority.

The operating cost of the San Juan-Cataño ferry is projected to be $10 million per year. The Authority expects to receive annual appropriations from the Commonwealth in the amount of $6.0 million to assist in the cost of the ferry operations.

*Construction Improvement Program*

As required by the 1968 Resolution and the 1998 Resolution, the Authority has developed a master plan to serve as the basis for the long-term planning of Puerto Rico's transportation facilities, which it supplements as necessary. To implement the plan, the Authority prepares a five-year Construction Improvement Program that is updated annually. Since completing the construction of Tren Urbano in fiscal year 2005, the Authority has focused its current Construction Improvement Program on improving the primary and primary urban highway facilities, while also addressing the most essential needs of secondary and tertiary roads. The Authority has also included in its Construction Improvement Program the cost of repairs, renewals and replacements to the highway system bridges in the Puerto Rico strategic network, plans for dealing with urban congestion and for local improvements, and certain capitalized expenditures.

The following table presents the Authority's current Construction Improvement Program for the five fiscal years ending June 30, 2011 and the sources of funds required to finance such program. The Construction Improvement Program is subject to various changing factors, including cost increases, variations in availability of internal and external funds, availability of qualified construction resources, the need for emergency repairs and changing traffic patterns. The Authority's projections assume no changes in the statutory taxes and license fees currently allocated to the Authority, and that the Authority will not be required to assume the payment of the Special Facility Revenue Refunding Bonds, 2003 Series A, described under "Teodoro Moscoso Bridge" below.

48

**CONSTRUCTION IMPROVEMENT PROGRAM**

**Fiscal Year Ending June 30,**
**(in thousands)**

|  | 2007 | 2008 | 2009 | 2010 | 2011 | TOTAL |
|---|---|---|---|---|---|---|
| **Sources of Funds:** | | | | | | |
| Internally Generated Funds | $29,127 | $19,513 | $5,632 | - | - | **$54,272** |
| Federal aid for highways | 155,744 | 176,422 | 160,412 | $98,946 | $72,441 | **663,966** |
| Federal aid for Tren Urbano | - | 25,000 | - | - | - | **25,000** |
| External Financing | 538,289 | 265,032 | 261,905 | 234,349 | 226,492 | **1,526,066** |
| **Total** | $723,160 | $485,966 | $427,949 | $333,295 | $298,933 | **$2,269,304** |
| **Uses of Funds:** | | | | | | |
| Design | $21,000 | $20,000 | $20,000 | $20,000 | $20,000 | **$101,000** |
| Rights of Way | 90,000 | 40,000 | 30,000 | 30,000 | 30,000 | **220,000** |
| Construction | 488,750 | 315,966 | 265,199 | 167,727 | 130,475 | **1,368,117** |
| Capitalized Expenditures | 123,410 | 110,000 | 112,750 | 115,569 | 118,458 | **580,187** |
| **Total** | $723,160 | $485,966 | $427,949 | $333,295 | $298,933 | **$2,269,304** |

In the five-year period from fiscal year 2002 through fiscal year 2006 the Authority expended approximately $3.65 billion on its Construction Improvement Program, a significant portion of which represented the cost of Tren Urbano.  The current five-year Construction Improvement Program projects expenditures of approximately $2.3 billion from fiscal year 2007 through fiscal year 2011.

The Authority's internally generated funds available to finance its current Construction Improvement Program consist primarily of 1998 Resolution Revenues remaining after payment of debt service on the Highway Revenue Bonds and Transportation Revenue Bonds, provision for reserve requirements for the Highway Revenue Bonds and the Transportation Revenue Bonds, and payment of expenses for operating and maintaining the toll highways and the Tren Urbano.  Such internally generated funds are estimated to aggregate approximately $54.3 million during the five-year period from fiscal year 2007 through fiscal year 2011.

The current Construction Improvement Program contemplates new construction borrowings, including the issuance of the Series M Bonds, aggregating approximately $1.305 billion of principal to produce $1.227 billion of net proceeds from fiscal year 2007 to fiscal year 2011.

*Highway Construction.*  Highway construction projects included by the Authority in its current Construction Improvement Program are designed to address the transportation needs of the people of Puerto Rico and to enhance the economic development of Puerto Rico.  The current Construction Improvement Program includes all the construction projects that the Authority believes are required at the present time to complete the Puerto Rico highway network. Projects include new highway construction, principally of primary roads and toll highways, and construction of improvements designed to alleviate the traffic congestion of the San Juan metropolitan area as well as to provide access to the proposed Port of the Americas that is currently planned for the southern region of Puerto Rico.  It also includes reconstruction of existing highways, a bridge program and installation of safety features and other projects.

The Authority's current Construction Improvement Program includes the investment of approximately $221 million in reconstruction and repavement of the existing highways and $625.4 million in congestion relief and strategic island-wide network

49

Other major highway projects that have strategic importance for Puerto Rico's highway network include the construction of sections of PR-53 from Yabucoa to Maunabo and the design of the section that will complete the toll highway from Maunabo to Guayama (which includes the first highway tunnel through a mountain in Puerto Rico), the construction of the section of PR-10 from Utuado to Adjuntas (which will complete the connector between the north and south areas of the island), the conversion into an expressway of the section of PR-2 from Mayagüez to Ponce, which, together with PR-10, will service the proposed transhipment port to be known as "Port of Las Américas," the widening of sections of PR-22 and the conversion of a portion of PR-2 in San Juan into an expressway.

The Authority receives aid for highway construction from the Federal Highway Administration ("FHWA"). Such aid is recorded as related costs are billed to the FHWA, regardless of the year of appropriation. In fiscal years, 2002, 2003, 2004, 2005 and 2006 such aid from FHWA amounted to $35.22 million, $47.74 million, $48.14 million, $51.13 million, and $41.91 million respectively. The Authority also receives aid from the FHWA under the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"). The Authority expects to receive $665 million in funds during the five year period from fiscal 2005 through fiscal 2009, of which $69.3 million have been already allocated.

Federal aid for highway construction is received under a number of federal programs, including those directed to construction of new roads and repair and reconstruction of existing roads. The programs provide for matching federal assistance, ranging generally from 80% to 90% of the cost of a project. The level of federal highway aid is dependent upon Congressional authorizations that are apportioned or allocated to the states and the Commonwealth. The U.S. Department of Transportation has broad discretion to release funds for spending within the limits set by Congress. Upon its approval of a state's program, funds are reserved but not committed. Federal-aid funds are committed when the U.S. Department of Transportation approves the detailed plans for specific projects. Congress has authorized funding for the federal highway programs through September 30, 2009. Federal highway legislation has liberalized certain types of federal highway aid and granted more flexibility to the states and the Commonwealth in the use of such aid in highway or other transportation projects. No assurance can be given that the level of federal highway aid will be maintained at the levels projected in the above table. In the event of material reductions in such aid, the Construction Improvement Program will be appropriately adjusted in the absence of internally generated funds, external financing or other sources of funds shown in the above table available to offset any such reductions.

The federal government conducts periodic audits of the federal aid it provides to the Authority to ascertain that funds are being expended consistently with the federal programs pursuant to which they are provided. Audit findings of a failure by the Authority to expend funds in compliance with federal programs could result in the withholding of federal aid for the project involved or could result in offset claims by the federal government for funds previously received by the Authority.

The traffic engineers retained by the Authority under the 1968 Resolution and the transportation engineers under the 1998 Resolution, if different, annually review the Construction Improvement Program and the Authority's estimates of revenue sources available for its implementation. In their most recent evaluation, dated November 30, 2006, the traffic engineers concluded that the Authority's 2006-2010 Construction Improvement Program is a reasonable response to the immediate and short-term transportation needs and is generally consistent with the Authority's long-term transportation master plan. The traffic engineers also concluded that revenue projections have been reasonably accurate and provide a sound basis for determining the size of future programs. The results of that review are summarized in the traffic engineers' letter included as Appendix V. The traffic engineers have not yet evaluated the Authority's 2007-2011 Construction Improvement Program.

*Tren Urbano*. All construction and testing for Phase I of Tren Urbano, which consists of approximately 17 km. of trackway running from Bayamón to Santurce via Rio Piedras and Hato Rey, and 16 stations, was substantially completed in fiscal 2005. Therefore, no significant amounts are included in the Construction Improvement Program for Tren Urbano for the 2007–2011 period, except for $34.2 million for the feasibility planning and design for extensions to the Tren Urbano.

The final cost of construction of Phase I of Tren Urbano is estimated to be $2.419 billion, of which $2.15 billion have already been incurred through July 2006. Of that amount, approximately $685.7 million has already been paid with federal funds pursuant to the Full Funding Grant Agreement between the Authority and the Federal Transit Administration ("FTA"). The Authority expects to receive $54.8 million in funds assigned by the FTA to the Authority for Tren Urbano as part of the federal appropriations for fiscal years 2005 and 2006. Of said amount, $27.4 million have already been received by the Authority. In January 2007, the Authority presented a requisition upon the FTA for disbursement of an additional $13.7 million in funds. The Authority's estimate of the total cost of Tren Urbano includes a

50

contingency for the aggregate amount that the Authority estimates may be required to resolve various claims from contractors (mostly related to cost overruns or damages allegedly suffered because of delays in the design and construction of the project). No assurance can be given, however, that these claims will be resolved for the amounts estimated by the Authority.

**Teodoro Moscoso Bridge**

The Teodoro Moscoso Bridge represents one of the links to San Juan's strategic highway network. In furtherance of its expanded powers to enter into concession agreements with private companies, the Authority entered into a concession agreement with Autopistas de Puerto Rico y Compañía, S.E. ("APR") for the design, construction, operation and maintenance of the Teodoro Moscoso Bridge, a bridge spanning the San Jose Lagoon from San Juan to Carolina. Pursuant to the concession agreement, APR constructed the bridge and is obligated to operate and maintain the bridge for a term of 35 years, subject to extension or to earlier termination by either party under certain circumstances. The bridge opened in February 1994. Its construction cost was approximately $109.5 million. The bridge does not constitute a Traffic Facility under the 1968 Resolution or a Transportation Facility under the 1998 Resolution.

Construction of the bridge was financed through the issuance by the Authority of Special Facility Revenue Bonds in the principal amount of approximately $116.8 million. In October 2003, the Authority refunded the Special Facility Revenue Bonds by issuing its Special Facility Revenue Refunding Bonds, 2003 Series A (the "Special Facility Revenue Refunding Bonds") in the principal amount of approximately $153.2 million. The proceeds derived from the sale of the Special Facility Revenue Refunding Bonds were loaned by the Authority to APR, and such proceeds were used to refund the Special Facility Revenue Bonds. APR agreed to repay the loan in amounts sufficient to pay the principal of and interest on the bonds. Pursuant to the terms of the Special Facility Revenue Refunding Bonds, APR will continue operating the bridge pursuant to the aforementioned concession agreement with the Authority, as amended at the time of the refunding, and the bridge will continue being owned by the Authority. The Special Facility Revenue Refunding Bonds will be payable primarily from net toll revenues from the bridge collected by APR, after payment of bridge operating expenses.

Under the Special Facility Revenue Refunding Bonds, the Authority has covenanted that if net toll revenues, together with available reserves, are insufficient to pay the Special Facility Revenue Refunding Bonds, or if the concession agreement is terminated, the Authority will assume APR's obligation to pay the Special Facility Revenue Refunding Bonds. If the Authority assumes the obligation to pay the Special Facility Revenue Refunding Bonds, the Authority will be required to exchange the Special Facility Revenue Refunding Bonds for new bonds issued under the 1998 Resolution, provided it meets the requirements for the issuance of such new bonds. These new bonds would be issued as either Senior Transportation Revenue Bonds or Subordinated Transportation Revenue Bonds, at the option of the Authority, and would have the same interest rates, maturity dates and redemption provisions as the Special Facility Revenue Refunding Bonds. If the Authority cannot issue such new bonds in exchange for the Special Facility Revenue Refunding Bonds, the Special Facility Revenue Refunding Bonds would continue to be payable from revenues available to the Authority after payment of debt service on the Transportation Revenue Bonds.

# DEBT

### Debt of the Authority

The outstanding debt of the Authority as of February 1, 2007, as adjusted for the issuance of the Bonds and the refunding of the Refunded Bonds is shown on the following table.

| | Outstanding as of [1][2]<br>February 1, 2007 | As Adjusted[3][4] |
|---|---|---|
| Highway Revenue Bonds | $1,713,220,000 | $1,680,275,609 |
| Senior Transportation Revenue Bonds [1] | 4,146,834,649 | 4,316,049,593 |
| Subordinated Transportation Revenue Bonds | 791,975,000 | 591,975,000 |
| Total | $6,652,029,649 | $6,588,300,202 |

(1)   Includes accretion on capital appreciation bonds through February 1, 2007, totaling $21.75 million of accreted interest. Does not include the Bonds being offered under this Official Statement.  Does not include the bonds issued to finance the Teodoro Moscoso Bridge and the Grant Anticipation Bonds issued by the Authority in April of 2004.

(2)   Subordinated Transportation Revenue Bonds include interim bond anticipation note financing in the amount of $400 million.

(3)   Adjusted to include the Bonds and to exclude the Refunded Bonds.

(4)   Subordinated Transportation Revenue Bonds include interim bond anticipation note financing in the amount of $200 million.

**Principal and Interest Requirements of the Bonds**

The Principal and Interest Requirements for the outstanding Highway Revenue Bonds and Transportation Revenue Bonds and for the Bonds for each of the fiscal years 2007 through 2046 (after taking into account the refunding of the Refunded Bonds) are set forth in the following table:

|  |  | **The Bonds** | | | |
|---|---|---|---|---|---|
| **Years Ending June 30,** | **Unrefunded Transportation Revenue Bonds and Highway Revenue Bonds** | **Principal** | **Interest** | **Total** | **Total Debt Service** |
| 2007 | $338,935,502 | - | $ 34,298,974 | $ 34,298,974 | $373,234,476 |
| 2008 | 295,229,497 | $ 2,385,000 | 107,370,701 | 109,755,701 | 404,985,198[1] |
| 2009 | 302,506,470 | 2,480,000 | 107,275,301 | 109,755,301 | 412,261,771 |
| 2010 | 312,790,844 | 2,580,000 | 107,176,101 | 109,756,101 | 422,546,945 |
| 2011 | 312,632,304 | 2,685,000 | 107,072,901 | 109,757,901 | 422,390,205 |
| 2012 | 332,549,791 | 3,810,000 | 106,965,501 | 110,775,501 | 443,325,292 |
| 2013 | 332,514,331 | 4,000,000 | 106,775,001 | 110,775,001 | 443,289,332 |
| 2014 | 333,729,628 | 4,205,000 | 106,575,001 | 110,780,001 | 444,509,629 |
| 2015 | 333,722,334 | 4,380,000 | 106,395,551 | 110,775,551 | 444,497,885 |
| 2016 | 314,471,919 | 22,660,000 | 106,208,551 | 128,868,551 | 443,340,470 |
| 2017 | 333,408,276 | 4,296,192 | 105,108,851 | 109,873,851 | 443,282,127 |
| 2018 | 329,823,629 | 4,398,229 | 104,970,451 | 109,875,451 | 439,699,080 |
| 2019 | 314,424,371 | 10,268,352 | 104,799,682 | 119,764,682 | 434,189,053 |
| 2020 | 300,541,871 | 16,240,231 | 104,644,169 | 130,809,169 | 431,351,040 |
| 2021 | 282,949,117 | 23,808,895 | 104,449,359 | 128,869,359 | 411,818,476 |
| 2022 | 270,001,291 | 14,779,425 | 103,198,634 | 118,618,634 | 388,619,925 |
| 2023 | 225,962,405 | 15,492,835 | 102,444,447 | 118,609,447 | 344,571,852 |
| 2024 | 215,436,559 | 26,778,416 | 101,659,834 | 129,139,834 | 344,576,393 |
| 2025 | 212,514,770 | 31,045,154 | 100,245,449 | 132,020,449 | 344,535,219 |
| 2026 | 212,551,530 | 32,653,023 | 98,594,999 | 132,004,999 | 344,556,529 |
| 2027 | 179,151,160 | 47,814,801 | 96,856,574 | 165,451,574 | 344,602,734 |
| 2028 | 179,446,109 | 69,740,000 | 95,430,187 | 165,170,187 | 344,616,296 |
| 2029 | 149,684,388 | 94,090,000 | 92,047,010 | 186,137,010 | 335,821,398 |
| 2030 | 140,451,648 | 111,335,000 | 86,902,385 | 198,237,385 | 338,689,033 |
| 2031 | 117,914,503 | 139,790,000 | 80,977,110 | 220,767,110 | 338,681,613 |
| 2032 | 117,738,780 | 147,390,000 | 73,553,435 | 220,943,435 | 338,682,215 |
| 2033 | 136,469,593 | 136,290,000 | 65,833,010 | 202,123,010 | 338,592,603 |
| 2034 | 136,386,923 | 143,440,000 | 58,696,210 | 202,136,210 | 338,523,133 |
| 2035 | 136,320,720 | 150,950,000 | 51,184,960 | 202,134,960 | 338,455,680 |
| 2036 | 123,994,238 | 149,625,000 | 43,280,410 | 192,905,410 | 316,899,648 |
| 2037 | 123,987,863 | 102,185,000 | 35,446,435 | 137,631,435 | 261,619,298 |
| 2038 | 123,987,137 | 107,525,000 | 30,113,022 | 137,638,022 | 261,625,159 |
| 2039 | 89,993,775 | 82,310,000 | 24,491,460 | 106,800,228 | 196,794,003 |
| 2040 | 53,217,650 | 86,610,000 | 20,194,860 | 106,804,861 | 160,022,511 |
| 2041 | 53,218,675 | 90,255,000 | 16,545,228 | 106,800,228 | 160,018,903 |
| 2042 | 11,466,000 | 94,065,000 | 12,741,296 | 106,806,296 | 118,272,296 |
| 2043 | - | 76,145,000 | 8,776,848 | 84,921,848 | 84,921,848 |
| 2044 | - | 55,045,000 | 5,543,099 | 60,588,099 | 60,588,099 |
| 2045 | - | 57,425,000 | 3,170,352 | 60,595,352 | 60,595,352 |
| 2046 | - | 13,885,000 | 694,250 | 14,579,250 | 14,579,250 |

* Totals may not add up due to rounding.

[1] Does not include $200 million principal amount of interim financing in the form of Subordinated Transportation Revenue Bonds due in 2008 that the Authority expects to refinance prior to their maturity date.

Upon the issuance of the Bonds, the remaining average life of the Highway Revenue Bonds and the Transportation Revenue Bonds will be approximately 19.817 years.

## TAX MATTERS

### Federal Income Taxes

The Internal Revenue Code of 1986, as amended (the "Code"), imposes certain requirements that must be met subsequent to the issuance and delivery of the Bonds for interest thereon to be and remain excluded from gross income for Federal income tax purposes. Noncompliance with such requirements could cause the interest on the Bonds to be included in gross income for Federal income tax purposes retroactive to the date of issue of the Bonds. The Authority has covenanted to comply to the extent permitted by the Constitution and the laws of Puerto Rico with the applicable requirements of the Code in order to maintain the exclusion of the interest on the Bonds from gross income for Federal income tax purposes pursuant to Section 103 of the Code.

In the opinion of Nixon Peabody LLP, Bond Counsel, under existing law and assuming compliance with the aforementioned covenant, and the accuracy of certain representations and certifications made by the Authority described above, interest on the Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code. Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. Interest on the Bonds is, however, included in the adjusted current earnings of certain corporations for purposes of computing the alternative minimum tax imposed on such corporations.

### State Taxes

Bond Counsel is also of the opinion that the Bonds and interest thereon are exempt from state, Commonwealth and local income taxation.

### Original Issue Discount

Bond Counsel is further of the opinion that the difference between the principal amount of the Series M Bonds maturing on July 1 of 2014 through 2017, 2018 (4.125% coupon), 2019 (4.125% coupon), 2020 (4.2% coupon), 2023 (4.25% coupon), 2025 (4.3% coupon), 2026 (4.3% coupon) and 2027 (4.3% coupon) (collectively the "OID Bonds") and the initial offering price to the public (excluding bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Discount Bonds of the same maturity was sold constitutes original issue discount which is excluded from gross income for federal income tax purposes to the same extent as interest on the Bonds. Bond Counsel is also of the opinion that, with respect to the Capital Appreciation Bonds, the difference between the Accreted Value at maturity of the Capital Appreciation Bonds and the initial offering price to the public (excluding bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Capital Appreciation Bonds of the same maturity was sold constitutes original issue discount on the Capital Appreciation Bonds. Further, original issue discount on the OID Bonds and the Capital Appreciation Bonds (collectively, the "Discount Bonds") accrues actuarially on a constant interest rate basis over the term of each Discount Bond and the basis of each Discount Bond acquired at such initial offering price by an initial purchaser thereof will be increased by the amount of such accrued original issue discount. The accrual of original issue discount may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Discount Bonds, even though there will not be a corresponding cash payment. Owners of the Discount Bonds are advised that they should consult with their own advisors with respect to the state and local tax consequences of owning such Discount Bonds.

### Original Issue Premium

The Series M Bonds maturing on July 1 of 2008 through 2013, 2018 (5% coupon), 2020 (5% coupon), 2021, 2022 through 2027 (5% coupon), 2032, 2037 (5% coupon) and 2046, the Series N Bonds maturing on July 1 of 2021 through 2026, 2029 through 2034, 2036 and 2039 and the Series CC Bonds maturing on July 1 of 2012 through 2016, 2028 through 2034 and 2036 (collectively, the "Premium Bonds") are being offered at prices in excess of their principal amounts. An initial purchaser with an initial adjusted basis in a Premium Bond in excess of its principal amount will have amortizable bond premium which is not deductible from gross income for federal income tax purposes. The amount of

54

amortizable bond premium for a taxable year is determined actuarially on a constant interest rate basis over the term of each Premium Bond based on the purchaser's yield to maturity (or, in the case of Premium Bonds callable prior to their maturity, over the period to the call date, based on the purchaser's yield to the call date and giving effect to any call premium).  For purposes of determining gain or loss on the sale or other disposition of a Premium Bond, an initial purchaser who acquires such obligation with an amortizable bond premium is required to decrease such purchaser's adjusted basis in such Premium Bond annually by the amount of amortizable bond premium for the taxable year.  The amortization of bond premium may be taken into account as a reduction in the amount of tax-exempt income for purposes of determining various other tax consequences of owning such Bonds.  Owners of the Premium Bonds are advised that they should consult with their own advisors with respect to the state and local tax consequences of owning such Premium Bonds.

**Ancillary Tax Matters**

Ownership of the Bonds may result in other federal tax consequences to certain taxpayers, including, without limitation, certain S corporations, foreign corporations with branches in the United States, property and casualty insurance companies, individuals receiving Social Security or Railroad Retirement benefits, individuals seeking to claim the earned income credit, and taxpayers (including banks, thrift institutions and other financial institutions) who may be deemed to have incurred or continued indebtedness to purchase or to carry the Bonds.

Commencing with interest paid in 2006, interest paid on tax-exempt obligations such as the Bonds is subject to information reporting to the Internal Revenue Service (the "IRS") in a manner similar to interest paid on taxable obligations.  In addition, interest on the Bonds may be subject to backup withholding if such interest is paid to a registered owner that (a) fails to provide certain identifying information (such as the registered owner's taxpayer identification number) in the manner required by the IRS, or (b) has been identified by the IRS as being subject to backup withholding.

Bond Counsel is not rendering any opinion as to any Federal tax matters other than those described under the caption "Tax Matters."  Prospective investors, particularly those who may be subject to special rules described above, are advised to consult their own tax advisors regarding the federal tax consequences of owning and disposing of the Bonds, as well as any tax consequences arising under the laws of any state or other taxing jurisdiction.

**Changes in Federal Tax Law and Post Issuance Events**

From time to time proposals are introduced in Congress that, if enacted into law, could have an adverse impact on the potential benefits of the exclusion from gross income for Federal income tax purposes of the interest on the Bonds, and thus on the economic value of the Bonds.  This could result from reductions in Federal income tax rates, changes in the structure of the Federal income tax rates, changes in the structure of the Federal income tax, or its replacement with another type of tax, repeal of the exclusion of the interest on the Bonds from gross income for such purposes, or otherwise.  It is not possible to predict whether any legislation having an adverse impact on the tax treatment of holders of the Bonds may be proposed or enacted.

Bond Counsel has not undertaken to advise in the future whether any events after the date of issuance and delivery of the Bonds may affect the tax status of interest on the Bonds.  Bond Counsel expresses no opinion as to any Federal, State or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken with respect to the Bonds or the proceeds thereof upon the advice or approval of other counsel.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Authority at an aggregate discount of $12,110,795.74 from the initial offering prices of the Bonds set forth or derived from information set forth on the inside cover pages hereof. The obligations of the Underwriters are subject to certain conditions precedent, and they will be obligated to purchase all the Bonds if any Bonds are purchased. The Bonds may be offered and sold to certain dealers (including dealers depositing Bonds into investment trusts) and institutional purchasers at prices lower than such public offering prices and such offering prices may be changed, from time to time, by the Underwriters.  The Authority has agreed to indemnify the Underwriters against certain liabilities, including liabilities under the Federal securities laws.

BBVAPR Division de Valores Municipales ("BBVA") and RBC Dain Rauscher, Inc., doing business under the name RBC Capital Markets ("RBC"), have entered into an Agreement to jointly pursue underwritings with the Commonwealth and its issuers.  In furtherance of the Agreement, BBVA and RBC will form a joint account and will allocate the agreed participations in any bond offering to one another.

Morgan Stanley & Co. Incorporated ("Morgan Stanley") has entered into a joint venture agreement (the "JV Agreement") with Popular Securities, Inc. ("Popular"), under which the parties shall provide services and advice to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Santander Securities Corporation ("SSC") and Banc of America Securities LLC ("BAS") have entered into an agreement to jointly pursue municipal securities underwriting opportunities with the Commonwealth, its agencies, and other municipalities and governmental conduit issuers in the Commonwealth.  Under the terms of the agreement, SSC and BAS will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds in consideration for their professional services.

A portion of the proceeds of the sale of the Series M Bonds are being used to repay a portion of the Authority's Subordinated Transportation Revenue Bonds (Series 2007A), issued by the Authority on February 1, 2007 and purchased in a private placement by an affiliate of Citigroup Global Markets Inc., one of the underwriters of the Bonds.  The Series 2007A Bonds were issued to provide interim financing for certain highway projects included in the Authority's Construction Improvement Program.

## VERIFICATION OF MATHEMATICAL ACCURACY

Causey Demgen & Moore, Inc., will verify, from the information provided to them, the mathematical accuracy as of the date of delivery of the Series N Bonds and the Series CC Bonds of (i) the computations contained in the provided schedules to determine that the anticipated receipts from the securities and cash deposits listed in such schedules, to be held in escrow, will be sufficient to pay, when due, the principal, interest and call premium payment requirements, if any, of the Refunded Bonds, and (ii) the computations of yield on the securities and the Bonds contained in such schedules used by Bond Counsel in its determination that interest on the Bonds is excluded from gross income for federal income tax purposes.  Causey Demgen & Moore, Inc. will express no opinion on the assumptions provided to them, nor as to the exclusion from gross income for Federal income tax purposes of the interest on the Bonds.

## LITIGATION

There is no pending litigation of any nature restraining or enjoining or seeking to restrain or enjoin the issuance, sale or delivery of the Bonds or in any way contesting or affecting the validity of the Bonds, the resolutions or the proceedings of the Authority taken with respect to the authorization, issuance or sale thereof, or the pledge or application of any moneys under the 1968 Resolution, the 1998 Resolution, or the existence or powers of the Authority.

The Authority is involved as defendant in various legal proceedings arising in the normal course of its business. Many of these proceedings involve claims against the Authority based on breach of contract, claims for additional compensation under construction contracts, claims for damages from automobile accidents allegedly caused by alleged defects in highway construction or maintenance and challenges to public bidding procedures conducted by the Authority, among others. The Authority and its General Counsel do not believe that liability from any such legal proceedings, in excess of available insurance coverage and the provision for losses not covered by insurance, as shown on the financial statements, will have a material adverse effect on the financial condition of the Authority.

## LEGAL MATTERS

The forms of opinions of Nixon Peabody LLP, New York, New York, Bond Counsel, are set forth in Appendix II to this Official Statement. Certain legal matters will be passed upon for the Underwriters by O'Neill & Borges, San Juan, Puerto Rico.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## GOVERNMENT DEVELOPMENT BANK

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the issuance of the Bonds. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

## RATINGS

The Series CC Bonds have been assigned ratings of "Baa2" (with stable outlook) by Moody's Investors Service, Inc. ("Moody's") and of "A-" (with stable outlook) by Standard & Poor's Ratings Services ("Standard & Poor's"). The Series M Bonds and Series N Bonds have been assigned ratings of "Baa3" (with negative outlook) by Moody's and of "BBB+" (with stable outlook) by Standard & Poor's. Moody's and Standard & Poor's are expected to give ratings of "Aaa" and "AAA," respectively, to the FGIC Insured Bonds, the MBIA Insured Bonds, the FSA Insured Bonds and the Ambac Insured Bonds. Moody's and Standard & Poor's are expected to give ratings of "Aa1" and "AAA," respectively, to the Assured Insured Bonds.

The ratings reflect only the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that the ratings will continue for any given period of time or will not be revised downward or withdrawn entirely by any or all of such rating agencies. Any such downward revision or withdrawal of the ratings could have an adverse effect on the market prices of the Bonds.

## CONTINUING DISCLOSURE

In order to assist the Underwriters in complying with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC"), the Authority, as specifically stated hereinbelow, will agree to the following:

1. Each of the Authority and the Commonwealth will agree to file within 305 days after the end of each fiscal year, beginning with its fiscal year ending on June 30, 2006, with each NRMSIR and with any Commonwealth state information depository ("SID"), core financial information and operating data for the prior fiscal year, including (i) its audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Authority and the Commonwealth, as the case may be, and information as to revenues, expenditures, financial operations and indebtedness of the Authority and the Commonwealth, as the case may be, in each case, generally found or incorporated by reference in this Official Statement; and

2. The Authority will agree to file, in a timely manner, with each NRMSIR or with the MSRB and with any SID, notice of any failure to comply with paragraph 1 above and of the occurrence of any of the following events with respect to the Bonds if, in the judgment of the Authority or its agent, such event is material:

(a)   principal and interest payment delinquencies; non-payment related defaults;
(b)   unscheduled draws on debt service reserves reflecting financial difficulties;
(c)   unscheduled draws on credit enhancements reflecting financial difficulties;
(d)   substitution of credit or liquidity providers, or their failure to perform;
(e)   adverse tax opinions or events affecting the tax-exempt status of the Bonds;
(f)   modifications to rights of the holders (including Beneficial Owners) of the Bonds;
(g)   bond calls;
(h)   defeasances;
(i)   release, substitution, or sale of property securing repayment of the Bonds; and
(j)   rating changes.

With respect to the following events:

Events (c) and (d). For a description of the Bonds, see "THE BONDS." The Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Authority applies for or participates in obtaining the enhancement.

Event (e). For information on the tax status of the Bonds, see "TAX MATTERS."

Event (g). The Authority does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under "The Bonds-Redemption of the Bonds," (ii) the only open issue is which Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Bondholders as required under the terms of the Bonds, the 1968 Resolution or 1998 Resolution, and (iv) public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 3423856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of Bonds.

The Commonwealth expects to provide the information described in (1) above by delivering the first bond official statement of the Commonwealth or of any instrumentality of the Commonwealth that includes its financial statements for the preceding fiscal year and operating data generally containing the information set forth in the Commonwealth Report or, if no official statement is issued by the 305-day deadline, by delivering such Commonwealth Report and the Commonwealth Annual Financial Report by such deadline.

The Commonwealth has made similar continuing disclosure covenants in connection with prior bond issuances, and has complied with all such covenants, except as hereinafter noted. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2002 were filed after the Commonwealth's filing deadline of May 1, 2003 because of delays in finalizing such financial statements resulting from the implementation of Governmental Accounting Standards Board Statement No. 34 ("GASB 34"). The Commonwealth's audited financial statements for the fiscal year ended June 30, 2003 were also filed after the Commonwealth's filing deadline of April 30, 2004, because of delays in finalizing the financial statements of certain of the Commonwealth's reporting units due to the implementation of GASB 34. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2004 were also filed after the Commonwealth's filing deadline of May 1, 2005, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying the submission of the Commonwealth's audited financial statements.

As of the date of this Official Statement, there is no Commonwealth SID, and the nationally recognized municipal securities information repositories are: Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's, Securities Evaluation, Inc., 55 Water Street, 45th Floor, New York, New York 10041; FT Interactive Data, Attn. NRMSIR, 100 William Street, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above whether or not, such other events are material with respect to the Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any event, except those events, if material, listed above.

The Commonwealth and the Authority acknowledge that their respective undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of their respective undertakings shall be limited to a right to obtain specific enforcement of the Authority's or the Commonwealth's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Authority and the Commonwealth written notice of any request to cure such breach, and the Authority or the Commonwealth, as applicable, shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan for the equal benefit of all Beneficial Owners of the outstanding Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of any of the Covenants at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Sections 2 and 2A of Act No.

104, approved June 29, 1955, as amended, which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth, and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1)  the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority or the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by parties unaffiliated with the Authority or the Commonwealth; or

(2)  all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Authority or the Commonwealth, as applicable, elects that the Covenants shall be deemed amended accordingly.

The Authority and the Commonwealth have further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

## MISCELLANEOUS

The foregoing references to and summaries of certain provisions of the 1968 Resolution and 1998 Resolution, the various acts and the Bonds are made subject to all the detailed provisions thereof, to which reference is hereby made for further information, and do not purport to be complete statements of any or all of such provisions.

There are appended to this Official Statement the audited financial statements of the Authority for the fiscal years ended June 30, 2006 and 2005 together with the report of HLB Morales Padillo & Co.-PSC (Appendix I), the proposed forms of opinions of Bond Counsel (Appendix II), the Summary of the 1968 Resolution (Appendix III), the Summary of the 1998 Resolution (Appendix IV), the letter of the Traffic Engineers (Appendix V), a table of accreted values for the Capital Appreciation Bonds (Appendix VI), a description of certain provisions applicable to the CPI Bonds (Appendix VII), and specimens of the bond insurance policies insuring the Insured Bonds (Appendices VIII through XII).

The financial statements of the Authority included in Appendix I and the Commonwealth Financial Statements have been audited by HLB Morales Padillo & Co.-PSC, San Juan, Puerto Rico, and KPMG LLP, San Juan, Puerto Rico, respectively, as set forth in their respective reports therein. The prospective financial information of the Authority included in this Official Statement has been prepared by, and is the responsibility of the management of the Authority. HLB Morales Padillo & Co.-PSC has neither examined nor compiled the prospective financial information, and accordingly, HLB Morales Padillo & Co.-PSC does not express an opinion or any other form of assurance with respect thereto. The HLB Morales Padillo & Co.-PSC report included in Appendix I to this Official Statement relates to the historical financial information of the Authority. Such report does not extend to any prospective financial information (whether or not contained in this Official Statement) and should not be read to do so. The information in the Commonwealth Report was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents, respectively. The information pertaining to DTC was supplied by DTC. The remaining information set forth in this Official Statement, except the information appearing in "UNDERWRITING," was supplied by the Executive Director of the Authority in his official capacity and is included in this Official Statement on his authority.

This Official Statement will be filed with each NRMSIR and with the Municipal Securities Rulemaking Board.

**PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY**


By: _____/s/ Gabriel Alcaraz Emmanuelli___

             Executive Director

**HLB** **Morales Padillo & Co. - PSC**
Certified  Public  Accountants and  Business  Advisors

**APPENDIX I**

**PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY**
*(A Component Unit of the Commonwealth of Puerto Rico)*

AUDITED FINANCIAL STATEMENTS
*YEARS ENDED JUNE 30, 2006 AND 2005*

A&M Tower – Suite 700, 207 Del Parque Street, San Juan  Puerto Rico  00912  Telephone: (787) 726-3300 Fax: (787) 726-3400

HLB Morales Padillo & Co. is a member of   **HLB International**  a world-wide organization of accounting firms and business advisors

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Independent Auditors' Report | 1-2 |
| Managements' Discussion and Analysis | 3-7 |
| Financial Statements for the Years Ended June 30, 2006 and 2005 | |
| Statements of Net Assets | 8-9 |
| Statements of Revenues, Expenses and Changes in Net Assets | 10 |
| Statements of Cash Flows | 11-12 |
| Notes to Financial Statements | 13-32 |
| Supplemental Information for the Year Ended June 30, 2006 | |
| Combined Statement of Revenues, Expenditures and Changes in Fund Balance – Budget and Actual – Budgetary Basis | 33-34 |
| Report of Independent Auditors on Compliance and Internal Control over Financial Reporting in Accordance with Government Auditing Standards | 35-36 |

**HLB** **Morales Padillo & Co. - PSC**
Certified Public Accountants and Business Advisors

## INDEPENDENT AUDITORS' REPORT

Hon. Gabriel Alcaraz Emmanuelli, Secretary
Department of Transportation and Public Works,
  Commonwealth of Puerto Rico

We have audited the accompanying statement of net assets of **Puerto Rico Highways and Transportation Authority** (the Authority), a component unit of the Commonwealth of Puerto Rico, as of June 30, 2006, and the related statements of revenues, expenses and changes in net assets, and cash flows for the year then ended. These financial statements are the responsibility of the Authority's management. Our responsibility is to express an opinion on these financial statements based on our audit.  The financial statements of **Puerto Rico Highways and Transportation Authority** as of and for the year ended June 30, 2005 were audited by other auditors whose report dated February 26, 2006, expressed an unqualified opinion on those statements. As discussed in Note 13 the Authority has restated its 2005 financial statements during the current year to correct amounts reflected as construction in progress and to correct the amount of interest capitalized to capital assets in prior years. The other auditors reported on the 2005 financial statements before the restatement.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards,* issued by the Comptroller General of the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Authority's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statements presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of **Puerto Rico Highways and Transportation Authority** at June 30, 2006, and the changes in its net assets and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

We also audited the adjustments described in Note 13 that were applied to restate the 2005 financial statements. In our opinion, such adjustments are appropriate and have been properly applied.

In accordance with *Government Auditing Standards*, we have also issued our report, dated September 29, 2006, on our consideration of the Authority's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts and grants agreements and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on the internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* and should be read in conjunction with this report in considering the results of our audit.

The management's discussion and analysis information on pages 3 through 7 is not a required part of the basic financial statements but is supplementary information required by accounting principles generally accepted in the United States of America. We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information. However, we did not audit the information and express no opinion on it.

Our audit was conducted for the purpose of forming an opinion on the basic financial statements taken as a whole. The required supplementary information listed in the table of contents, is presented for purpose of additional analysis and is not a required part of the basic financial statement. This information is the responsibility of the Authority's management. Such information has not been subjected to the auditing procedures applied in the audit of the 2006 financial statements and, accordingly, we express no opinion on it.

*HLB Morales Padillo & Co*

CERTIFIED PUBLIC ACCOUNTANTS
September 29, 2006

Stamp #2168797
was affixed to
the original of
this report.

**OVERVIEW OF THE AUDITED FINANCIAL STATEMENTS**

Our financial statements are prepared using proprietary fund (enterprise fund) accounting that uses the same basis of accounting as private-sector business enterprises. The Authority is operated under one enterprise fund. Under this method of accounting, an economic resources measurement focus and an accrual basis of accounting is used.

Revenue is recorded when earned and expenses are recorded when incurred. The financial statements include statements of net assets, statements of revenues, expenses and changes in net assets, and statements of cash flows. These are followed by notes to the financial statements. In addition to the financial statements, this report also contains required supplementary information pertaining to the budgetary data of the Authority.

The statements of net assets present information on the Authority's assets and liabilities, with the difference between the two reported as net assets. Over time, increases or decreases in net assets may serve as a useful indicator of whether the financial position of the Authority is improving or deteriorating.

The statements of revenues, expenses and changes in net assets report the operating and non-operating revenues and expenses of the Authority for each fiscal year with the difference being combined with capital grants and contributions to determine the net change in assets for the fiscal year. That change combined with the net assets from the end of the previous year equals the net assets at the end of the fiscal year.

The statements of cash flows report cash and cash equivalents activities for each fiscal year resulting from operating activities, capital and related financing activities, non-capital and related financing activities and investing activities. The net result of these activities added to the beginning of the year balance of cash and cash equivalents total to the cash and cash equivalents balance at the end of the fiscal year.

The Authority's audited financial statements are prepared in conformity with accounting principles generally accepted in the United States of America as established by the Governmental Accounting Standards Board (GASB). The Authority has implemented the provisions of GASB Statement No. 34, *Basic Financial Statements and Management's Discussion and Analysis for States and Local Governments* (Statement 34) for the fiscal year beginning July 1, 2001.

During the year ended June 30, 2006, the Authority evaluated the projects included in construction in progress and found that certain projects included as in process in fiscal years 2002 were also recorded as roads and bridges and therefore were duplicated. In addition, certain projects that should have been recorded as an expense or completed after 2002 were included in construction in progress. Also, the Authority evaluated the amount of interest capitalized to roads, bridges and construction in progress and found that the amount capitalized was overstated. As the result, the financial statements for the year ended June 30, 2005 and before were restated to correct the above overstatements.

The effect of this adjustment was to decrease net assets and capital assets at July 1, 2004 by $3.8 billion and to decrease capital assets and change in net assets as of and during the year ended June 30, 2005 by approximately $240 million.

3

## CONDENSED FINANCIAL INFORMATION

The following table summarizes the Authority's condensed financial information as of and for the two years ended June 30, 2006 and 2005.

|  | June 30 | |
|---|---|---|
|  | **2006** | 2005 |
| **ASSETS:** | | |
| Current assets | $ **82,178,867** | $ 57,452,609 |
| Restricted assets | **854,679,141** | 811,956,572 |
| Capital assets | **11,157,748,509** | 11,070,377,562 |
| Other assets | **133,179,778** | 114,327,961 |
| Total assets | $ **12,227,786,295** | $ 12,054,114,704 |
| **LIABILITIES:** | | |
| Current liabilities | $ **455,929,741** | $ 827,303,672 |
| Non-current liabilities | **6,587,011,925** | 5,794,121,464 |
| Total liabilities | **7,042,941,666** | 6,621,425,136 |
| **NET ASSETS:** | | |
| Invested in capital assets, net of related debt | **4,478,815,288** | 4,821,378,418 |
| Restricted | **678,280,592** | 610,513,439 |
| Unrestricted | **27,748,749** | 797,711 |
| Total net assets | **5,184,844,629** | 5,432,689,568 |
| Total liabilities and net assets | $ **12,227,786,295** | $ 12,054,114,704 |

|  | Years Ended June 30, | |
|---|---|---|
|  | **2006** | 2005 |
| Operating revenues | $ **541,922,651** | $ 504,515,739 |
| Operating expenses | **216,797,895** | 113,147,923 |
| Depreciation and amortization | **381,874,421** | 303,049,157 |
| Operating (loss) income | **(56,749,665)** | 88,318,659 |
| Interest and other non-operating expenses, net | **274,863,082** | 235,619,908 |
| Loss before contributions | **(331,612,747)** | (147,301,249) |
| Contributions | **83,767,808** | 127,984,250 |
| Change in net assets | $ **(247,844,939)** | $ (19,316,999) |

**FINANCIAL HIGHLIGHTS**

1.  Operating revenues for fiscal year 2006 and 2005 were approximately **$541.9 million** and $504.5 million respectively.

2.  Operating expenses for fiscal year 2006 and 2005 were approximately **$216.8 million** and $113.1 million respectively.

3.  Total net assets at June 30, 2006 and 2005 amounted to approximately **$5.18 billion** and $5.43 billion respectively.

4.  Total capital assets (net of accumulated depreciation) at June 30, 2006 and 2005 were approximately **$11.16 billion** and $11.07 billion respectively.

**FINANCIAL ANALYSIS OF THE AUTHORITY**

**Net Assets**

Net assets may serve, over time, as a useful indicator of a government's financial position. In the case of the Authority, assets exceeded liabilities by approximately **$5.18 billion** at the close of the 2006 fiscal year and $5.43 billion in 2005.

**Changes in Net Assets**

The net assets at June 30, 2006 decreased by approximately **$247.8 million** or **4.6%** from net assets at June 30, 2005 and decreased $19.3 million or .3% from the restated net assets at June 30, 2004. Major components of the change in net assets consist of the following:

*   Total operating revenues increased by **7%** during fiscal year 2006 to approximately **$541.9 million** and .14% during fiscal year 2005 to approximately $504.5 million. This is mainly due to an increase in tolls fares during the current fiscal year.

*   Total operating expenses increased by **92%** to approximately **$216.8 million** during fiscal year 2006 and increased by 23% to approximately $113 million during fiscal year 2005.

*   Non-operating expenses were approximately **$274.8 million** in 2006, an increase of approximately 17**%** over the $235.6 million in 2005.

*   Contributions, primarily from the US Federal Government, amounted to approximately **$83.7 million** during fiscal year 2006 and $127.9 million during 2005.

**CAPITAL ASSETS AND DEBT ADMINISTRATION**

**Capital Assets**

At June 30, 2006, the Authority had invested approximately **$11.16 billion** in capital assets (net of related depreciation) including roads, bridges, buildings, land and equipment. At June 30, 2005, the Authority had invested approximately $11.07 billion in capital assets.

At the end of fiscal year 2005, the Authority started operation of the mass rail transportation system for the San Juan Metropolitan area known as "Tren Urbano". Through June 30, 2006, the Authority has incurred approximately **$2.40 billion** in costs for this project which consists of

5

approximately 17 km. of track running from Bayamón to Santurce. The Authority entered into a five-year contract for the operation and maintenance of the system.

**Debt Administration**

The Authority's bond sales must be approved by the Secretary of Transportation and Public Works, who exercises the powers of the Governing Board of the Authority in coordination with the Government Development Bank for Puerto Rico and the Fiscal Agent of the Commonwealth of Puerto Rico. The Authority must comply with certain rules and regulations of the United States Treasury Department and the United States Securities and Exchange Commission relating to such sales.

The principal amount by the end of fiscal year 2006 of the Highway Transportation, and Grant Anticipation Revenues Bonds outstanding, net of unamortized discounts and net losses on advance refunding approximately **$6.6 billion** is insured and rated AAA by Moody's Investors Service (Moody's) and AAA by Standard & Poor's (S&P). The remaining uninsured bonds are rated BAA1 by Moody's and A by S&P, except for the Subordinated Transportation Revenue Bonds, which are rated BAA2 and A-, respectively.

## ECONOMIC FACTORS AND NEXT YEAR'S BUDGET

The economy of Puerto Rico must be analyzed as a region within the U.S. economy, since it is part of the U.S. monetary and banking system, and it is located its customs and territorial boundaries. The main driver of the Puerto Rico economy is a huge external sector closely tied to the flow of merchandise, tourists, and capital between Puerto Rico and the Mainland. Thus, historically, the real growth rates of the Puerto Rico economy have closely followed those of the U.S. economy, except in periods of energy crisis, when the rise in oil prices exerted a more profound negative effect on the level of economic activity in Puerto Rico. In fiscal year 2005, the real GNP growth rate dropped to 2.04% in Puerto Rico, or about one percentage point below the U.S. real GNP growth rate (3.04%), as a result of the slowdown in the U.S. economy and a substantial rise of 38.37% in oil prices. Although the U.S. economy remained relatively stable in fiscal year 2006, Puerto Rico suffered the onslaught of another substantial increase in oil prices, which rose by 36.42%, and the negative impact of the Central Government fiscal crisis leading to a temporary partial or total closing of many government agencies in the first two weeks of May 2006. In a span of only two years the average refiners' acquisition cost of crude oil rose from $30.80 per barrel in fiscal year 2004 to $58.13 per barrel in fiscal year 2006, causing a depletion of real resources of more than $2,000 million in the economy of Puerto Rico. As a consequence of the special negative macroeconomic factors affecting de economy of Puerto Rico in fiscal year 2006, real GNP growth dropped below 1% (0.77%), according to the Inter American University Econometric Model.

Due to adverse macroeconomic environment, and especially the energy crisis, the Authority was not able to achieve the level of projected revenues at the beginning of last fiscal year. However, in spite of an adverse macroeconomic environment and a deepening of the energy crisis, revenues of the Authority demonstrate a high resilience in avoiding major declines. Gasoline tax revenues dropped from $185.88 million in fiscal year 2005 to $178.93 million in fiscal year 2006, a decline of 3.7% in spite of a weak macroeconomic environment and an increase of 53.1 cents per gallon in average gasoline prices, equivalent to 27.3%. A 5.9% decline was recorded in diesel oil tax revenues, a minor source of income for the Authority, which reached $15.68

million in fiscal year 2006, down from $16.68 million in fiscal year 2005. Revenues from the petroleum tax were the most affected by the onslaught of the energy crisis, dropping from $110.3 million in fiscal year 2005 to $102.2 million in fiscal year 2006, posting a 7.3% decline. The substantial increase of about 31% in tollgate fees, which the Authority implemented on September 12, 2005, more than offset the decline in revenues caused by the energy crisis and the weak macroeconomic environment. Although the higher toll fees were in effect during approximately 9.5 months of fiscal year 2006, and there was a decline of about 8% in the number of transactions after the rise in toll fees, revenues from the 22 plazas operating at the beginning of fiscal year 2006 rose by $40.8 million, from $146.3 million in fiscal year 2005 to an estimated $187.1 million in fiscal year 2006. In addition, revenues from tollgate fees were positively affected by the opening of a new plaza in Highway PR-5 and the plazas of the Eastern Corridor. Thus, the total amount of tollgate fees increased to $192.0 million in fiscal year 2006, advancing by $45.7 million, or 31.2%, over the level attained in fiscal year 2005 ($146.3 million). As a consequence of the increase in tollgate fees, which offset the decline in other revenue sources of the Authority, total operating revenues of the Authority, excluding train fares and investment income, rose to $533.0 million in fiscal year 2006, surpassing by $29.1 million, or 5.8%, the $503.9 million of revenues collected in fiscal year 2005.

A weak macroeconomic environment is expected to persist in fiscal year 2007, without any significant growth in real GNP, as projected by the Inter American University Econometric Model, although we can expect some improvement in the energy crisis, after the first quarter of the fiscal year, and in the fiscal situation of the Central Government and municipalities after the new sales tax is implemented on November 15, 2006. Thus, we expect that oil-related revenues of the Authority will remain stable or experience small declines in fiscal year 2007. However, total operating revenues will continue to expand, although moderately, due to an expected increase of more than $20 million in tollgate revenues, resulting from these three positive factors: 1. The higher toll fees established on September 12, 2005, will be effective during 12 months in fiscal year 2007, as compared to only 9.5 months in fiscal year 2006; 2. The toll plaza in Highway PR-5 will operate during 12 months in fiscal year 2007, while it only operated about five months in fiscal year 2006, and 3. The toll plazas of the Eastern Corridor will also operate during 12 months in fiscal year 2007, while they only operated less than three months in fiscal year 2006.

## CONTACTING THE AUTHORITY'S FINANCIAL MANAGEMENT

*This financial report is designed to provide our bondholders, patrons, and other interest parties with a general overview of the Authority's finances and to demonstrate the Authority's accountability for the money it receives. If you have question or need additional financial information, contact the Puerto Rico Highways and Transportation Authority, Finance Area, P.O. Box 42007, San Juan, Puerto Rico 00940-2007.*

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
**(A Component Unit of the Commonwealth of Puerto Rico)**

**STATEMENTS OF NET ASSETS**
**JUNE 30, 2006 AND 2005**

| | 2006 | 2005 |
|---|---|---|
| ASSETS | | *(As restated)* |
| CURRENT ASSETS: | | |
| Cash and cash equivalents | $ 73,092,873 | $ 48,506,964 |
| Accounts receivable, net of allowance for doubtful accounts of $41,280,000 and $41,643,000 in 2006 and 2005, respectively | 3,791,396 | 4,779,082 |
| Prepaid expenses and other assets | 5,294,598 | 4,166,563 |
| Total current assets | 82,178,867 | 57,452,609 |
| | | |
| RESTRICTED ASSETS: | | |
| Cash and cash equivalents | 34,536,637 | 39,630,398 |
| Cash and investments with trustee | 807,610,919 | 757,824,579 |
| Receivables: | | |
| Puerto Rico Treasury Department | 1,094,354 | 903,592 |
| US Federal Government | 7,919,979 | 11,358,003 |
| Accrued interest and other | 3,517,252 | 2,240,000 |
| Total restricted assets | 854,679,141 | 811,956,572 |
| | | |
| CAPITAL ASSETS: | | |
| Land | 1,719,109,481 | 1,713,667,705 |
| Construction work in progress | 1,484,695,591 | 1,357,083,012 |
| Roads and bridges, net | 5,543,446,000 | 5,646,063,782 |
| Transportation system, net | 2,371,271,219 | 2,320,097,195 |
| Equipment, vehicles and other, net | 39,226,218 | 33,465,868 |
| Total capital assets | 11,157,748,509 | 11,070,377,562 |
| | | |
| REVENUE BONDS ISSUANCE COSTS, net of accumulated amortization of $30,789,000 and $23,805,000 in 2006 and 2005, respectively | 104,451,631 | 93,589,469 |
| | | |
| ADVANCES TO GOVERNMENTAL ENTITY | 28,728,147 | 20,738,492 |
| | | |
| TOTAL | $ 12,227,786,295 | $ 12,054,114,704 |

8

The accompanying notes are integral part these financial statements.

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
**(A Component Unit of the Commonwealth of Puerto Rico)**

**STATEMENTS OF NET ASSETS**
**JUNE 30, 2006 AND 2005**

|  | 2006 | 2005 |
|---|---|---|
|  |  | *(As restated)* |
| **LIABILITIES AND NET ASSETS** |  |  |
| CURRENT LIABILITIES: |  |  |
| Checks issued over bank balance | $  13,324,200 | $   54,842,379 |
| Accounts payable | 18,949,325 | 10,719,897 |
| Accrued other liabilities | 19,888,461 | 20,807,176 |
| Liabilities payable from restricted assets: |  |  |
| Borrowings under line of credit | 29,996,123 | 274,999,997 |
| Accounts and subcontracts payable | 112,178,178 | 232,673,469 |
| Accrued interest payable | 163,073,454 | 143,048,114 |
| Accrued and other liabilities | - | 3,552,640 |
| Current portion of bonds payable | 98,520,000 | 86,660,000 |
| Total current liabilities | 455,929,741 | 827,303,672 |
|  |  |  |
| LONG-TERM DEBT: |  |  |
| Bonds payable | 6,542,691,446 | 5,748,255,147 |
| Accrued legal claims | 31,940,000 | 31,940,000 |
| Accrued vacations and sick leave | 12,380,479 | 13,926,317 |
| Total long-term debt | 6,587,011,925 | 5,794,121,464 |
|  |  |  |
| Total liabilities | 7,042,941,666 | 6,621,425,136 |
|  |  |  |
| NET ASSETS: |  |  |
| Investment in capital assets, net of related debt | 4,478,815,288 | 4,821,378,418 |
| Restricted for debt service | 605,863,651 | 504,877,057 |
| Restricted for construction | 72,416,941 | 105,636,382 |
| Unrestricted | 27,748,749 | 797,711 |
| Total net assets | 5,184,844,629 | 5,432,689,568 |
|  |  |  |
| TOTAL | $  12,227,786,295 | $   12,054,114,704 |

9

The accompanying notes are integral part these financial statements.

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
**(A Component Unit of the Commonwealth of Puerto Rico)**

**STATEMENTS OF REVENUES, EXPENSES AND CHANGES IN NET ASSETS**
**YEARS ENDED JUNE 30, 2006 AND 2005**

|  | 2006 | 2005 |
|---|---|---|
|  |  | *(As restated)* |
| OPERATING REVENUES: |  |  |
| Excise Taxes: |  |  |
| Gasoline, diesel and oil | $    194,607,996 | $    202,561,942 |
| Petroleum tax | 102,205,993 | 110,262,322 |
| Toll fares | 192,042,937 | 146,286,003 |
| Vehicle license fee | 31,654,582 | 32,384,896 |
| Train fares | 8,990,215 | 599,051 |
| Other | 12,420,928 | 12,421,525 |
| Total operating revenues | 541,922,651 | 504,515,739 |
| OPERATING EXPENSES: |  |  |
| Toll highways administration and maintenance | 53,314,509 | 45,563,132 |
| Repairs and maintenance of roads and bridges | 42,044,395 | 4,627,552 |
| Train operating and maintenance costs | 40,509,033 | - |
| General and administrative | 79,139,445 | 59,629,045 |
| Other | 1,790,513 | 3,328,194 |
| Total operating expenses | 216,797,895 | 113,147,923 |
| INCOME BEFORE DEPRECIATION AND AMORTIZATION | 325,124,756 | 391,367,816 |
| DEPRECIATION AND AMORTIZATION | 381,874,421 | 303,049,157 |
| OPERATING (LOSS) INCOME | (56,749,665) | 88,318,659 |
| NON-OPERATING INCOME (EXPENSE): |  |  |
| Interest on bonds and line of credit | (306,301,880) | (263,537,017) |
| Interest and investment income | 31,438,798 | 27,917,109 |
| Total | (274,863,082) | (235,619,908) |
| LOSS BEFORE CAPITAL GRANTS | (331,612,747) | (147,301,249) |
| CAPITAL GRANTS | 83,767,808 | 127,984,250 |
| CHANGE IN NET ASSETS | (247,844,939) | (19,316,999) |
| NET ASSETS, at beginning of year | 5,432,689,568 | 9,240,529,428 |
| ADJUSTMENT TO PRIOR YEARS' FINANCIAL STATEMENTS | - | (3,788,522,861) |
| NET ASSETS, at end of year | $    5,184,844,629 | $    5,432,689,568 |

10

The accompanying notes are integral part these financial statements.

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
**(A Component Unit of the Commonwealth of Puerto Rico)**

**STATEMENTS OF CASH FLOWS**
**YEARS ENDED JUNE 30, 2006 AND 2005**

| | 2006 | 2005 |
|---|---|---|
| | | *(As restated)* |
| OPERATING ACTIVITIES: | | |
| Receipts from excise tax and vehicle license fee | $    328,277,809 | $    344,559,408 |
| Receipts from toll and train fares | 201,033,152 | 146,885,054 |
| Receipts from other sources | 13,408,614 | 12,625,571 |
| Payments to employees and related benefits | (31,081,480) | (20,483,461) |
| Payments to suppliers for goods and services | (181,000,945) | (88,069,177) |
| Net cash flows provided by operating activities | 330,637,150 | 395,517,395 |
| | | |
| NON-CAPITAL FINANCING ACTIVITIES: | | |
| Net change in advances to governmental entity | (7,989,655) | 3,240,741 |
| Net change in checks issued over bank balance | (41,518,179) | 39,245,711 |
| Net cash (used in) provided by non-capital financing activities | (49,507,834) | 42,486,452 |
| | | |
| CAPITAL AND RELATED FINANCING ACTIVITIES: | | |
| Receipts from US Federal Government grants | 87,205,832 | 123,591,157 |
| Acquisition and construction of capital assets, net of capitalized interest | (523,401,707) | (615,323,144) |
| Payment for bond issuance cost | (38,714,996) | - |
| Net (payments to) advance from line of credit | (245,003,874) | 274,999,997 |
| Proceeds from bond issuance | 906,221,955 | - |
| Payments to retire bonds | (86,660,000) | (29,135,000) |
| Interest paid | (341,659,584) | (289,536,899) |
| Net cash flows used in capital and related financing activities | (242,012,374) | (535,403,889) |
| | | |
| INVESTING ACTIVITIES: | | |
| Deposits to cash and investments with trustee | 437,597,675 | 290,025,715 |
| Payments from cash and investments with trustee | (489,983,136) | (228,974,493) |
| Investment and interest income received | 32,760,667 | 31,411,442 |
| Net cash flows (used in) provided by investing activities | (19,624,794) | 92,462,664 |

11

The accompanying notes are integral part these financial statements.

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
**(A Component Unit of the Commonwealth of Puerto Rico)**

**STATEMENTS OF CASH FLOWS**
**YEARS ENDED JUNE 30, 2006 AND 2005**

| | 2006 | 2005 |
|---|---|---|
| | | *(As restated)* |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | $ 19,492,148 | $ (4,937,378) |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | 88,137,362 | 93,074,740 |
| CASH AND CASH EQUIVALENT AT END OF YEAR | $ 107,629,510 | $ 88,137,362 |
| RECONCILIATION TO CASH AND CASH EQUIVALENTS PRESENTED IN THE STATEMENTS OF NET ASSETS: | | |
| Cash and cash equivalents | $ 73,092,873 | $ 48,506,964 |
| Cash and cash equivalents - restricted | 34,536,637 | 39,630,398 |
| Total | $ 107,629,510 | $ 88,137,362 |
| RECONCILIATION OF OPERATING (LOSS) INCOME TO NET CASH PROVIDED BY OPERATING ACTIVITIES: | | |
| Operating (loss) income | $ (56,749,665) | $ 88,318,659 |
| Adjustments to reconcile operating (loss) income to net cash provided by operating activities: | | |
| Depreciation and amortization | 381,874,421 | 303,049,157 |
| Net change in operating assets and liabilities: | | |
| Accounts receivable | 987,686 | 204,046 |
| Accounts receivable Puerto Rico Department of Treasury | (190,761) | (649,752) |
| Prepaid expenses and other assets | (1,128,035) | (135,571) |
| Accounts payable | 8,229,428 | 1,090,413 |
| Accrued liabilities, excluding accrued interest | (840,086) | 5,736,455 |
| Accrued vacations and sick leave | (1,545,838) | (2,096,012) |
| Net cash provided by operating activities | $ 330,637,150 | $ 395,517,395 |
| SUPPLEMENTAL CASH FLOWS INFORMATION Non-Cash Transactions: | | |
| Bonds defeased in issuance of bonds | $ 726,915,000 | $ - |

12

The accompanying notes are integral part these financial statements.

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
**(A Component Unit of the Commonwealth of Puerto Rico)**

**NOTES TO FINANCIAL STATEMENTS**

## 1.  ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Puerto Rico Highways and Transportation Authority (the Authority) is a public corporation and instrumentality of the Commonwealth of Puerto Rico, created by Act No. 74 of June 23, 1965, as amended, to provide roads and other facilities for the movement of persons, vehicles and vessels, and for the planning, promotion and feasibility of mass transportation systems. The Authority is a component unit of the Commonwealth of Puerto Rico and accordingly is included in the general-purpose financial statements of the Commonwealth. The powers normally exercised by a Board of Directors are vested with the Secretary of the Department of Transportation and Public Works (DTPW). The Authority is exempt from the payment of any taxes on its revenues and properties.

The accounting policies of the Authority conform to accounting principles generally accepted in the United States of America as applicable to governmental units. The Governmental Accounting Standards Board (GASB) is the accepted standards setting body for establishing governmental accounting and financial reporting principles. The following is a summary of the significant accounting policies:

The Authority adopted the provisions of Governmental Accounting Standards Board Statement No. 20, *Accounting and Financial Reporting for Proprietary Funds and Other Governmental Entities that use Proprietary Fund Accounting* (GASB No. 20). In adopting GASB No. 20, the Authority elected not to apply all Statements and Interpretations of the Financial Accounting Standards Board, Accounting Principles Board Opinions and Accounting Research Bulletins of the Committee on Accounting Procedure issued after November 30, 1989.

**Use of Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the period. Actual results could differ from those estimates.

The implementation of Statement 34 involved the use of assumptions and estimates in the determination of the cost of general infrastructure assets, such as roads, highways, bridges and land. The cost of such assets was estimated based on current costs for similar assets deflated using the general price index through the estimated average age of the assets.

**Cash and Cash Equivalents**

The Authority considers all highly liquid investments with maturities of three months or less when purchased to be cash equivalents.

13

**Reclassifications**

Certain reclassifications have been made to the 2005 figures to conform with current year's presentation.

**Capital Assets**

Cost Basis

Capital assets are recorded at historical cost or estimated historical cost. The cost of property and equipment includes costs for infrastructure assets (rights-of-way and bridge substructures and highways and bridges), toll facilities, equipment and other related costs (including software), buildings and furniture and equipment. Highways and bridge substructures include road sub-base, grading, land clearing, embankments, and other related costs. Costs for infrastructure assets include construction costs, design and engineering fees and administrative and general expenses paid from construction monies.

Capitalization Policy

Capital assets are defined by the Authority as assets with an initial, individual cost of more than $500,000 and an estimated useful life of more than one year.

Costs to acquire additional capital assets, which replace existing assets or otherwise prolong their useful lives, are generally capitalized.

The costs of normal maintenance and repairs that do not add to the value of the assets or materially extend assets lives are not capitalized.

Interest cost is capitalized as part of the historical cost of acquiring certain assets. To qualify for interest capitalization, assets must require a period of time before they are ready for their intended purpose. Interest earned on proceeds of tax-exempt borrowings arrangements restricted for the acquisition of qualifying assets is offset against interest cost to determine the net amount to be capitalized. Interest cost is not capitalized on costs paid with the proceeds of grants or donations restricted solely for construction.

Depreciation of Capital Assets

Depreciation is provided using the straight-line method over an estimated useful live of 40 years for roads and highways, 50 years for bridges and transportation system and 10 years for equipment, vehicles and other.

Impairment of Capital Assets

In 2006, the Authority implemented GASB No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries.* The objective of GASB 42 is to establish accounting and financial reporting standards for impairment of capital assets. A capital asset is considered impaired when its service utility has declined significantly and unexpectedly. This statement also clarifies and establishes accounting requirements for insurance recoveries.

Governments are required to evaluate prominent events or changes in circumstances affecting capital assets to determine whether impairment of a capital asset has occurred. Such events or changes in circumstances that may be indicative of impairment include evidence of

physical damage, enactment or approval of laws or regulations or other changes in environmental factors, technological changes or evidence of obsolescence, changes in the manner or duration of use of a capital asset, and construction stoppage among others.

The Authority evaluated its capital assets as required by GASB 42 and no impairment was identified during the year ended June 30, 2006.

### Claims and Judgments

The estimated amount of the liability for claims and judgments is recorded on the accompanying Statements of Net Assets based on the Authority's evaluation of the probability of an unfavorable outcome in the litigation of such claims and judgments. The Authority consults with legal counsel upon determining whether an unfavorable outcome is expected.

### Vacation and Sick Leave

Employees earn annual vacation leave at the rate of 30 days per year up to a maximum permissible accumulation of 60 days for regular employees. Employees accumulate sick leave at the rate of 18 days per year. Sick leave is only payable if the regular employee resigns and has more than 10 years of employment, or retires and takes a pension. Maximum permissible accumulation for sick leave is 90 days for all employees, and the excess is paid within the next year. The Authority records as a liability and as an expense the vested accumulated vacation and sick leave as benefits accrue to employees.

### Unamortized Gains/Losses on Advance Refunding

Gains/losses resulting from current or advance refunding of debt are deferred and amortized over the shorter of the life of the new debt and the remaining life of old debt. The amount deferred is reported as a reduction of the debt and the amount amortized is reported as a component of interest expense.

### Bond Premiums/Discounts and Bond Issuance Costs

Bond premiums/discounts are presented in the accompanying Statements of Net Assets as an increase/reduction of the face amount of bonds payable. Bond issuance costs are presented as a deferred asset in the accompanying Statements of Net Assets. The premiums/discounts and issuance costs are amortized over the life of the bonds on a method that approximates the effective interest method. Amortization expense related to bond premium/discounts was approximately $13,266,000 and $10,724,000 for the years ended June 30, 2006 and 2005, respectively, and is included as a component of interest expense in the accompanying Statements of Revenues, Expenses and Changes in Net Assets. Depreciation and amortization expense in the accompanying Statements of Revenues, Expenses and Changes in Net Assets includes amortization of bond issuance costs for the years ended June 30, 2006 and 2005 of approximately $27,853,000 and $3,167,000, respectively.

**Revenues Recognition**

Revenues associated with excise taxes are recorded as operating revenues at the moment of the Puerto Rico Department of the Treasury collects those taxes. Revenues associated with vehicles license fees, toll and train fares are recorded as operating revenues when cash is received. Expenses related to the administration and maintenance of toll highways and transportation system, repair and maintenance of roads and bridges, and administrative expenses are recorded as operating expenses. All other revenues and expenses are considered non-operating.

**Contributions**

Contributions are funds assigned by the federal and local governments, agencies and/or private companies such as Federal Highway Administration (FHWA), Federal Transit Administration (FTA), and Federal Emergency Management Agency (FEMA) to the Authority for the exclusive purpose of the construction of specific projects or infrastructure repairs and maintenance. Capital grants of the Authority are reported as non-operating revenues rather than contributed capital as required by GASB Statement No 33, *Accounting and Financial Reporting for Nonexchange Transactions*.

**New Accounting Pronouncements**

In June 2004, the GASB issued GAS No. 45, *Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions*. The objective of Statement 45 is to establish standards for the measurement, recognition, and display of other post employment benefits expense/expenditures and related assets/liabilities, note disclosures, and, if applicable, required supplementary information in the financial reports of state and local governmental employers. This statement is effective for financial statements for fiscal years beginning after December 15, 2006. The Authority is currently evaluating the impact of this pronouncement on results of operations, financial position and cash flows and its financial statement presentation.

2.  **CASH AND CASH EQUIVALENTS**

Cash and cash equivalents at June 30, 2006 and 2005 consist of:

|  | 2006 | 2005 |
|---|---|---|
| Cash on hand and in banks | $ 34,669,652 | $   5,448,316 |
| Repurchase agreements | 37,927,830 | 42,584,037 |
| Certificates of deposit | 495,391 | 474,611 |
| Total | $ 73,092,873 | $ 48,506,964 |

3. **RESTRICTED CASH AND INVESTMENTS WITH TRUSTEE**

Restricted cash and investments with Trustee at June 30, 2006 and 2005 consist of:

|  | 2006 | 2005 |
|---|---|---|
| **Cash and cash equivalents** | | |
| Cash on hand and in banks | $ **4,099,422** | $ 4,019,464 |
| Cash held by: | | |
| Puerto Rico Treasury Department | **23,900,699** | 30,217,885 |
| Government Development Bank | **165,938** | 5,603 |
| Puerto Rico State Infrastructure | | |
| Bank Deposit | **6,370,578** | 5,387,446 |
| Total | $ **34,536,637** | $ 39,630,398 |
| | | |
| **Cash and investments with trustee** | | |
| Cash and cash equivalents | $ **249,417,488** | 221,600,203 |
| Guaranteed investment contracts | **464,925,574** | 437,803,122 |
| US Government securities | **57,377,021** | 66,321,685 |
| Mortgage backed securities | **35,890,836** | 32,099,569 |
| Total | $ **807,610,919** | $ 757,824,579 |

At June 30, 2006 and 2005 the above amounts were restricted to comply long-term principal and interest debt service requirements (sinking funds). These restricted assets are held by the Fiscal Agent under the Bonds Resolutions in the following funds and accounts

*1968 Reserve Account* - Reserve for payment of principal of and interest on Highway Revenue Bonds in the event moneys in Bond Service Account or Redemption Account under Resolution 68-18 are insufficient for such purpose.

*1968 Bond Service Account and Redemption Account* (Sinking Fund under Resolution 68-18) - Current year requirements for principal and interest on Highway Revenue Bonds.

*1998 Senior Reserve Account* - Reserve for payment of principal of and interest on Senior Transportation Revenue Bonds in the event moneys in Senior Bond Service Account or Senior Bond Redemption Account under Resolution 98-06 are insufficient for such purpose.

*1998 Senior Bond Service Account and Senior Bond Redemption Account* (Senior Bond Sinking Fund under Resolution 98-06) - Current year requirements for principal and interest on Senior Transportation Revenue Bonds.

***1998 Subordinated Reserve Fund*** - Reserve for payment of principal of and interest on Subordinated Transportation Revenue Bonds in the event moneys in Subordinated Bond Service Account or Subordinated Bond Redemption Account under Resolution 98-06 are insufficient for such purpose.

***1998 Subordinated Bond Service Account and Subordinated Bond Redemption Account*** (Subordinated Bond Sinking Fund under Resolution 98-06) - Current year requirements for principal of and interest on Subordinated Transportation Revenue Bonds.

***1998 Construction Fund*** - Special fund created by the Resolution 98-06. The proceeds of any Transportation Revenue Bonds issued for the purpose of paying the cost of acquiring or constructing transportation facilities, together with the money received from any other source for such purpose, except proceeds which are (i) applied to the repayment of advances, (ii) deposited in the 1998 Senior Bond Reserve Account or 1998 Subordinated Bond Reserve Fund, (iii) deposited in the 1998 Senior or Subordinated Bond Service Account as capitalized interest or (iv) used for the payment of financing expenses, shall be deposited in the 1998 Construction Fund and held by the Fiscal Agent in trust.

***2004 Grant Anticipation Bond Reserve Account*** - Reserve for payment of principal of and interest on 2004 Grant Anticipation Bonds in the event insufficient funds for such purpose are available in the Bond Payment Fund.

At June 30, 2006 and 2005 amounts held by Fiscal Agent in the above accounts amounts to (in thousands)

|  | 2006 | 2005 |
|---|---|---|
| 1968 Reserve Account | $ 160,066 | $ 159,630 |
| 1968 Sinking Fund | 100,819 | 107,201 |
| 1998 Senior Reserve Account | 275,435 | 230,031 |
| 1998 Senior Sinking Fund | 120,020 | 99,641 |
| 1998 Subordinated Reserve Fund | 42,143 | 42,153 |
| 1998 Subordinated Sinking Fund | 14,062 | 10,294 |
| 1998 Construction Fund | 64,339 | 96,426 |
| 1998 Capitalized Funds | 17,518 | - |
| 2004 Grant Anticipation Reserve Account | 13,209 | 12,448 |
| Total | $ 807,611 | $ 757,824 |

Deposits in Puerto Rico Infrastructure Bank (SIB) represent funds held by Government Development Bank (GDB) related to the establishment of a state infrastructure bank account, which is dedicated solely to provide loans or other form of financial assistance consistent with the National Highway System Designation Act of 1995. The SIB is funded by a matching share agreement whereby on or before the date the Authority receives a Federal payment, the Authority must deposit an amount equal to at least 25% of such payment. These time deposits are held in the Authority's name.

4. **DEPOSITS AND INVESTMENTS**

The following disclose essential risk information about deposits and investments as required by Governmental Accounting Standard Board Statement No. 40, *Deposits and Investments Risk Disclosures.*

The Authority is restricted by law to deposit funds only in institutions approved by the Puerto Rico Treasury Department, and such deposits are required to be kept in separate accounts in the name of the Authority. Resolutions 68-18, 98-06 and 04-18 (the Bond Resolutions) require that moneys in the debt service funds be held by JP Morgan Chase Bank (the Fiscal Agent) in trust and applied as provided in the Bond Resolutions.

Pursuant to the Investment Guidelines for the Commonwealth adopted by Government Development Bank for Puerto Rico ("GDB"), the Authority may invest in obligations of the Commonwealth, obligations of the United States, certificates of deposit, commercial paper, banker's acceptances, or in pools of obligations of the municipalities of Puerto Rico, among others. Monies in the sinking funds can only be invested in direct obligations of the United States government, or obligations unconditionally guaranteed by the United States government, and/or interest-bearing time deposits, or other similar arrangements, as provided by the Bond Resolutions.

Custodian Credit Risk - Deposits

For deposits, custodial credit risk is the risk that in the event of bank failure, the Authority's deposits may not be returned to it.  Under Puerto Rico statutes public funds deposited in commercial bank must be fully collateralized for the amount deposited in excess of federal depository insurance. All securities pledged as collateral are held by the Secretary of the Treasury of the Commonwealth of Puerto Rico. The bank balance of the Authority's deposit at June 30, 2006 and 2005 amounts to $87,912,000 and $27,884,900 respectively.

As of June 30, 2006 and 2005, the Authority's custodial credit risk was approximately $37.9 million and $42.5 million respectively, which is the bank balance of cash deposited at the Government Development Bank and Economic Development Bank, for Puerto Rico. These deposits are exempt from the collateral requirement established by the Commonwealth.

Custodian Credit Risk – Investments

For an investment, custodial credit risk is the risk that in event of the failure of the counterparty, the Authority will not be able to recover the value of its investment or collateral securities that are in the possession of an outside party.  The Authority invests in prime commercial paper with a minimum quality rating of A1 Moody's or Standard and Poor's.  In addition, investment in bond sinking funds are limited to investments in direct obligations of the United States government, or obligations unconditionally guaranteed by the United States government, and/or interest-bearing time deposits, or other similar arrangements, as provided by the Bond Resolutions.

19

The Authority holds guaranteed investment contracts with a fair value of $464.9 million and $437.8 million at June 30, 2006 and 2005 respectively. These investments are unconditionally guaranteed by, or insured by, or backed by the full faith and credit of, the United States, its agencies or instrumentalities.

Providers of guaranteed investment contracts as of June 30, 2006 and 2005 are as follows:

|  | 2006 | 2005 |
|---|---|---|
| Westdeutsche Landesbank | $ 45,200,000 | $ 44,454,000 |
| Societe Generale | 79,846,000 | 81,491,000 |
| First Union National Bank | 37,916,000 | 38,498,000 |
| Salomon Brothers Holding Co | 61,903,000 | 61,882,000 |
| Wachovia Bank NA | 26,512,201 | 27,142,000 |
| FSA Capital Management Service | 44,674,424 | 45,551,000 |
| Citigroup Financial Product, Inc. | 57,651,171 | 40,959,000 |
| Banks of America | 46,883,778 | - |
| Morgan Stanley Corp. | 64,339,000 | 97,826,000 |
| Total | $ 464,925,574 | $ 437,803,000 |

Interest Rate Risk

Interest rate risk is the risk that changes in interest rates will adversely affect the fair value of an investment. Generally, the longer the maturity of an investment, the greater the sensitivity of its fair value is to changes to market interest rate. Maturities of restricted cash and investments with Trustee at June 30, 2006 are as follows:

|  | Maturing From/To | Fair Market Value |
|---|---|---|
| Cash and cash equivalents | N/A | $ 249,417,488 |
| Mortgage backed securities | 7/2007 to 3/2019 | 35,890,836 |
| US Government and agencies securities | 4/2010 to 1/2019 | 57,377,021 |
| Guaranteed investment contracts | 7/2006 to 6/2028 | 464,925,574 |
| Total |  | $ 807,610,919 |

All investments have been classified from AAA by Standard & Poors.

5.  **CAPITAL ASSETS**

The following schedule summarizes the capital assets held by the Authority as of June 30, 2006 and 2005:

| | Balance at July 1, 2005 As Restated | Increases | Decreases | Balance June 30, 2006 |
|---|---|---|---|---|
| **Assets not being depreciated** | | | | |
| Land | $ 1,713,667,705 | $ 5,441,776 | $ - | $ 1,719,109,481 |
| Construction in progress | 1,357,083,012 | 429,762,746 | (302,150,167) | 1,484,695,591 |
| Total | 3,070,750,717 | 435,204,522 | (302,150,167) | 3,203,805,072 |
| | | | | |
| **Assets being depreciated** | | | | |
| Transportation system | 2,320,097,195 | 98,883,454 | - | 2,418,980,649 |
| Roads | 9,500,437,603 | 151,378,745 | - | 9,651,816,348 |
| Bridges | 3,004,834,606 | 46,446,190 | (1,648,608) | 3,049,632,188 |
| Equipment, vehicles and other | 79,433,968 | 12,501,511 | (2,003,383) | 89,932,096 |
| Total | 14,904,803,372 | 309,209,900 | (3,651,991) | 15,210,361,281 |
| Less accumulated depreciation | (6,905,176,527) | (354,021,587) | 2,780,270 | (7,256,417,844) |
| Total assets being depreciated | 7,999,626,845 | (44,811,687) | (871,721) | 7,953,943,437 |
| Total capital assets | $11,070,377,562 | $ 390,392,835 | $ (303,021,888) | $ 11,157,748,509 |

| | Balance at July 1, 2004 As Restated | Increases | Decreases | Balance June 30, 2005 |
|---|---|---|---|---|
| **Assets not being depreciated** | | | | |
| Land | $ 1,713,473,209 | $ 194,496 | $ - | $ 1,713,667,705 |
| Construction in progress | 3,142,942,339 | 713,056,331 | (2,498,915,658) | 1,357,083,012 |
| Total | 4,856,415,548 | 713,250,827 | (2,498,915,658) | 3,070,750,717 |
| | | | | |
| **Assets being depreciated** | | | | |
| Transportation system | - | 2,320,097,195 | - | 2,320,097,195 |
| Roads | 9,399,792,163 | 100,645,440 | - | 9,500,437,603 |
| Bridges | 2,931,211,944 | 77,978,527 | (4,355,865) | 3,004,834,606 |
| Equipment, vehicles and other | 78,335,829 | 5,375,514 | (4,277,375) | 79,433,968 |
| Total | 12,409,339,936 | 2,504,096,676 | (8,633,240) | 14,904,803,372 |
| Less accumulated depreciation | (6,611,541,751) | (299,881,911) | 6,247,135 | (6,905,176,527) |
| Total assets being depreciated | 5,797,798,185 | 2,204,214,765 | (2,386,105) | 7,999,626,845 |
| Total capital assets | $10,654,213,733 | $ 2,917,465,592 | $(2,501,301,763) | $ 11,070,377,562 |

The Authority capitalized interest for approximately $42 millions and $25 millions during the years ended June 30, 2006 and 2005, respectively.

## 6.  ADVANCES TO GOVERNMENTAL ENTITY

Advances to governmental entities at June 30, 2006 and 2005 consist principally of advances made by the Authority to the Department of Transportation and Public Works of the Commonwealth of Puerto Rico (DTPW) to carry-out its participation in the construction improvement program of the Authority.  These advances are collected by the Authority through charges made by DTPW. During 2006 and 2005, the Authority advances $28,728,000 and $20,738,000 respectively to DTPW.  The net balance of these advances is presented as non-current assets in the accompanying Statements of Net Assets because these advances do not have formal repayment terms. In addition no interest is charged by the Authority on the outstanding balances.

## 7.  BONDS PAYABLE

The Bond Resolutions authorize the issuance of revenue bonds to obtain funds to pay the construction and related costs of transportation facilities. Bonds outstanding under the Bond Resolutions at June 30, 2006 and 2005 consist of:

|  | 2006 | 2005 |
|---|---|---|
| **RESOLUTION 68-18** | | |
| Serial bonds, maturing through 2023 with interest ranging from 3.30% to 6.50% | $    710,875,000 | $    736,035,000 |
| Term bonds, maturing through 2036 with interest ranging from 5.25% to 6.25% | 1,053,940,000 | 1,092,965,000 |
| **RESOLUTION 98-06** | | |
| Serial bonds, maturing through 2045 with interest ranging from 2.25% to 5.75% | 1,463,995,000 | 1,299,490,000 |
| Term bonds, maturing through 2045 with interest ranging from 3.00% to 5.75% | 3,053,880,000 | 2,461,775,000 |
| Capital appreciation bonds, maturing through 2018 with interest ranging from 4.95% to 5.07% | 60,116,952 | 57,211,327 |
| **RESOLUTION 04-18** | | |
| Serial bonds, maturing through 2021 with interest ranging from 2.25% to 5.00% | 133,785,000 | 139,875,000 |
| Total bonds outstanding | 6,476,591,952 | 5,787,351,327 |
| Add net unamortized premium | 178,652,905 | 56,434,509 |
| Less unamortized loss on advance refundings | (14,033,411) | (8,870,689) |
| Net bonds payable | 6,641,211,446 | 5,834,915,147 |
| Less current portion | (98,520,000) | (86,660,000) |
| Long-term portion | $  6,542,691,446 | $  5,748,255,147 |

The outstanding bonds as of June 30, 2006 require future payments of principal and interest as follows:

| Fiscal year ended June 30, | Principal | Interest | Total |
|---|---|---|---|
| 2007 | $ 98,520,000 | $ 325,645,724 | $ 424,165,724 |
| 2008 | 104,380,000 | 320,775,680 | 425,155,680 |
| 2009 | 111,385,000 | 315,863,216 | 427,248,216 |
| 2010 | 116,170,000 | 310,200,384 | 426,370,384 |
| 2011 | 122,860,000 | 300,041,730 | 422,901,730 |
| Thereafter | 5,923,276,952 | 4,931,501,090 | 10,854,778,042 |
| Total | $ 6,476,591,952 | $ 6,504,027,824 | $ 12,980,619,776 |

The bonds are secured by a pledge of the gross receipts of the gasoline excise taxes and one half of the diesel oil excise taxes, a maximum of $11 million monthly (but not more than $120 million annually) derived from excise taxes over crude oil and its derivatives, $15 per vehicle per year from certain motor vehicle license fees, the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority in the future and which the Authority may pledge, proceeds of any tolls or other charges which the Authority may impose for the use of any of its traffic facilities and certain investment earnings. The proceeds of the gasoline tax, the gas oil and diesel oil tax, the crude oil tax and the motor vehicle license fees allocated to the Authority are available taxes and revenues under the Constitution of the Commonwealth of Puerto Rico. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth, but such taxes and license fees are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth under the Constitution are insufficient for such purpose. The Commonwealth has never applied these revenues for such payments.

The Bond Resolutions further provide that receipts of pledged revenues (other than investment earnings) be deposited in certain accounts with the Fiscal Agent for the payment of interest and principal of the bonds outstanding.

Nothing in the Bond Resolutions is to be construed as preventing the Authority from financing any facilities authorized by the Act that created the Authority, as amended, through the issuance of bonds or other obligations, which are not secured under the provisions of the Bond Resolutions.

On October 4, 2005, the Authority issued Transportation Revenue Bonds (Series K), Transportation Revenue Refunding Bonds (Series L) and Highway Revenues Refunding Bonds (Series BB).The proceeds of the Series K and L for the purpose of financing various highway projects and refunding certain of the Authority's Transportation Revenues Bonds. The Highway Revenues Refunding Bonds (Series BB) are being issued by the Authority pursuant to Resolution No. 68-18 adopted by the Authority on June 13, 1968 as amended for the purpose of refunding certain of the Authority's Highway Revenues Bonds.

As a result of this refunding, the Authority recognized a gain of in amount of approximately $5.7 million and has been presented as a reduction in the amount of outstanding debt and will be amortized over the life of the refunded bonds.

A summary of the Series K Bonds, Series L Bonds, and BB Bonds issued during fiscal year 2006 follows:

| | |
|---|---|
| Serial bonds | $   439,175,000 |
| Term bonds | 1,060,735,000 |
| Total | $ 1,499,910,000 |

A summary of the net proceeds of the Series K Bonds, Series L Bonds, and BB Bonds and their application follows:

**Sources of Funds:**

| | |
|---|---|
| Principal amount | $1,499,910,000 |
| Add original issue premium | 130,321,412 |
| Add amounts from refunding accounts | 9,960,465 |
| Total | $1,640,191,877 |

**Uses of Funds:**

| | |
|---|---|
| Deposit to construction fund | $   294,220,068 |
| Deposit to debt service reserve | 46,883,778 |
| Deposit to bonds service | 27,007,323 |
| Payment of GDB line of credit | 453,000,000 |
| Refunding escrow deposits | 780,365,712 |
| Costs of issuance | 2,189,326 |
| Underwriters' discount | 9,553,167 |
| Bond insurance premium | 26,972,503 |
| Total | $1,640,191,877 |

During fiscal year 2005, the Authority issued under Resolution No. 04-18 (the Resolution), adopted on April 7, 2004, the "2004 Grant Anticipation Bonds" for the purpose of financing a portion of the costs of certain qualified federal aid transportation projects in the Commonwealth of Puerto Rico (the "Commonwealth"), to fund a debt service reserve fund and to pay the costs of issuance of the 2004 Grant Anticipation Bonds. The 2004 Grant Anticipation Bonds are special and limited obligations of the Authority.

The 2004 Grant Anticipation Bonds, together with any additional Grant Anticipation Revenue Bonds that are subsequently issued on a parity therewith, are payable from, and secured solely by a pledge of, the Trust Estate (as defined in the Resolution), which consists primarily of Federal Transportation Funds (as defined in the Resolution) that are paid or payable to the Authority or Trustee in accordance with Title 23 (as defined in the Resolution), and amounts on deposit in the Bond Payment Fund (as defined in the Resolution) and the Debt Service Reserve Fund (as defined in the Resolution) and held by the Trustee.

The outstanding balances as of June 30, 2006 and 2005 of the bond issues defeased by the Authority are as follows:

|  | 2006 | 2005 |
|---|---|---|
| Series C | $ 14,880,000 | $ - |
| Series J | 29,950,000 | - |
| Series A | 40,400,000 | - |
| Series B | 434,720,000 | 399,745,000 |
| Series D | 419,545,000 | - |
| Series AA | 5,900,000 | - |
| Series Y | 212,990,000 | 173,965,000 |
| Total outstanding defeased bond issues | $ 1,158,385,000 | $ 573,710,000 |

A summary roll forward of bonds at June 30, 2006 and 2005 follows:

|  | June 30, 2006 | | | | |
|---|---|---|---|---|---|
|  | Balance 2005 | Issuance Accretions | Payments Amortization | Balance 2006 | Current Portion |
| **Serial Bonds** | | | | | |
| Resolution 68-18 | $  736,035,000 | $  101,625,000 | $ (126,785,000) | $  710,875,000 | $40,690,000 |
| Resolution 98-06 | 1,284,360,000 | 337,550,000 | (173,045,000) | 1,448,865,000 | 51,595,000 |
| Resolution 04-18 | 139,875,000 | - | (6,090,000) | 133,785,000 | 6,235,000 |
| Totals serial bonds | 2,160,270,000 | 439,175,000 | (305,920,000) | 2,293,525,000 | 98,520,000 |
| **Term Bonds** | | | | | |
| Resolution 68-18 | 1,092,965,000 | - | (39,025,000) | 1,053,940,000 | - |
| Resolution 98-06 | 2,476,905,000 | 1,060,735,000 | (468,630,000) | 3,069,010,000 | - |
| Total term bonds | 3,569,870,000 | 1,060,735,000 | (507,655,000) | 4,122,950,000 | - |
| **Capital Appreciation Bonds** | | | | | |
| Resolution 98-06 | 57,211,327 | 2,905,625 | - | 60,116,952 | - |
| Total bonds outstanding | $ 5,787,351,327 | $ 1,502,815,625 | $ (813,575,000) | $ 6,476,591,952 | $98,520,000 |

|  | June 30, 2005 | | | | |
|---|---|---|---|---|---|
|  | Balance 2004 | Issuance Accretions | Payments Amortization | Balance 2005 | Current Portion |
| **Serial Bonds** | | | | | |
| Resolution 68-18 | $  757,140,000 | $  - | $  (21,105,000) | $  736,035,000 | $24,945,000 |
| Resolution 98-06 | 1,292,390,000 | - | (8,030,000) | 1,284,360,000 | 55,625,000 |
| Resolution 04-18 | 139,875,000 | - | - | 139,875,000 | 6,090,000 |
| Totals serial bonds | 2,189,405,000 | - | (29,135,000) | 2,160,270,000 | 86,660,000 |
| **Term Bonds** | | | | | |
| Resolution 68-18 | 1,092,965,000 | - | - | 1,092,965,000 | - |
| Resolution 98-06 | 2,476,905,000 | - | - | 2,476,905,000 | - |
| Total term bonds | 3,569,870,000 | - | - | 3,569,870,000 | - |
| **Capital Appreciation Bonds** | | | | | |
| Resolution 98-06 | 54,446,151 | 2,765,176 | - | 57,211,327 | - |
| Total bonds outstanding | $ 5,813,721,151 | $  2,765,176 | $  (29,135,000) | $ 5,787,351,327 | $86,660,000 |

## 8. BORROWING UNDER LINE OF CREDIT

The Authority executed a credit agreement with GDB for the interim financing of its capital improvement program in an amount not to exceed $50 millions ($275 millions in 2005). Borrowings outstanding under the credit agreement are due and payable on June 30, 2007 and bears interest at a monthly rate equal to the cost of tax-exempt commercial papers plus a mark up of 150 basis points (5.67% at June 30, 2006).

## 9. RETIREMENT PLAN

The Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities (ERS) is a cost-sharing, multiple-employer, defined benefit pension plan sponsored by, and reported as a component unit of, the Commonwealth of Puerto Rico. All regular employees of the Authority under age 55 at the date of employment become members of the System as a condition of their employment.

ERS provides retirement, death and disability benefits pursuant to Act No. 447, approved on May 15, 1951, as amended, which became effective on January 1, 1952. Retirement benefits depend upon age at retirement and number of years of credited service. Benefits vest after ten years of plan participation.

Participants who have attained an age of at least fifty-five (55) years and have completed at least twenty-five (25) years of creditable service or members who have attained an age of at least fifty-eight (58) years and have completed at least ten (10) years of creditable service (or who have attained an age of at least sixty five (65) years and have completed at least 10 years of service if hired after April, 1990) are entitled to an annual benefit, payable monthly for life.

The annuity, for which a plan member is eligible, is limited to a minimum of $200 per month and a maximum of 75% of the average compensation.

Participants who have completed at least thirty (30) years of creditable service are entitled to receive a Merit Annuity. Participants who have not attained fifty-five (55) years of age will receive 65% of such average compensation. Participants who have attained fifty-five (55) years of age will receive 75% of such average compensation. Disability retirement benefits are available to members for occupational and non-occupational disability. However, for non-occupational disability a member must have at least ten (10) years of creditable service.

No benefit is payable if the participant receives a refund of his accumulated contributions.

System 2000 became effective on January 1, 2000. Authority employees participating in the defined-benefit plan system at December 31, 1999, had the option to either stay in the defined benefit plan or transfer to System 2000. Persons employed by the Authority on or after January 1, 2000 are only allowed to become members of System 2000.

Participants receive periodic account statements similar to those of defined contribution plans showing their accrued balances. Disability pensions are not being granted under System 2000. The employers' contributions (9.275% of the employee's salary) will be used to fund the defined benefit plan instead of System 2000.

System 2000 will reduce the retirement age from 65 years to 60 for those employees who joined the current plan on or after April 1, 1990.

27

Additional information on the System is provided in its financial statements for the year ended June 30, 1998, a copy of which can be obtained from Mrs. Marisol Marchand, Administrator, Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities, PO Box 42005 Minillas Station, Santurce, P.R. 00940.

The Authority has a labor union contract that provides all union employees who work for the Authority upon retirement with the following lump-sum bonus payable at the retirement date computed as follows:

| Years worked | Amount |
|---|---|
| 10-15 years | $170 per year of service |
| 16-20 | $200 per year of service |
| 21-25 | $225 per year of service |
| 26-30 | $250 per year of service |

In addition, management employees have similar benefits under the same conditions granted to labor union personnel, as follows:

| Years worked | Amount |
|---|---|
| 10-15 years | $170 per year of service |
| 16-20 | $200 per year of service |
| 21-25 | $225 per year of service |
| 26-30 | $250 per year of service |

## 10. COMMITMENTS AND CONTINGENT LIABILITIES

### Construction

As of June 30, 2006 and 2005, the Authority had commitments for approximately $747,559,000 and $917,753,000, respectively, related to construction contracts.

### Leases

The Authority has various noncancelable operating leases for office space with the Puerto Rico Public Buildings Authority and other lessors, the latest of which expires in 2025. The rental expense for the years ended June 30, 2006 and 2005 were approximately $1,005,000 and $1,321,000, respectively. Future rental payments as of June 30, 2006 under these leases are as follows:

| Year ending June 30, | |
|---|---|
| 2007 | $    1,323,000 |
| 2008 | 1,323,000 |
| 2009 | 1,323,000 |
| 2010 | 1,214,000 |
| 2011 | 1,214,000 |
| Thereafter | 13,533,000 |
| Total future rental payments required | $   19,930,000 |

28

## Litigation

The Authority is defendant or co-defendant in various lawsuits for alleged damages. Substantially all of these cases are in connection with construction projects, which are generally either fully or partially covered by insurance. The contractors are required, under the terms of the construction agreements, to carry adequate public liability insurance and to hold harmless the Authority from lawsuits brought on account of damages relating to the construction of the projects.

The Authority, based on legal advice, has recorded an adequate provision to cover probable losses on those claims not fully covered by insurance. In the opinion of legal counsel, any liability in excess of the insurance coverage and/or the recorded provision that may arise from such claims would not be significant to affect to the Authority's financial position or results of operations.

## Special Facility Revenue Bonds

On December 20, 1992, the Authority and Autopistas de Puerto Rico y Compañía S.E. (Autopistas) entered into a concession agreement (the Concession Agreement), amended in 1992, and again in 2004, for the design, construction, operation and maintenance of the Teodoro Moscoso Bridge (the Bridge), a toll bridge, which traverses the San Jose Lagoon between the municipalities of San Juan and Carolina. Autopistas designed and constructed the Bridge and commenced operating the Bridge on February 23, 1994. The initial term of this agreement is 35 years, expiring on April 3, 2027.

In March 1992, the Authority issued Special Facility Revenue Bonds, 1992 Series A, B and C amounting to approximately $117 million for the purpose of facilitating the construction of the Bridge. The proceeds from the sale of the bonds were transferred by the Authority to Autopistas, the borrower, pursuant to a loan agreement (the Loan Agreement) by and between Autopistas and the Authority.

On October 30, 2003, the Authority issued Special Facility Revenue Refunding Bonds, 2004 Series A amounting to approximately $153 million for the purpose of refunding the Authority's Special Facility Revenue Bonds, 1992 Series A, B, and C, which were issued to fund the construction of the Bridge, and to pay the cost of issuance of the bonds. The proceeds from sale of the bonds were transferred by the Authority to Autopistas, pursuant to a new loan agreement by and between Autopistas and the Authority.

Under certain circumstances, the Concession Agreement may be terminated and the Authority is then obligated to assume all of the Autopistas's obligations to pay principal of and interest on the bonds, which pursuant to the Loan Agreement will be paid from the net revenues of the use and operation of the Bridge. The Authority does not currently expect the Concession Agreement to terminate. The outstanding bonds (including accrued interest) at June 30, 2006 and 2005 amounted to approximately $155,369,000 and $153,856,000, respectively.

## Metrobus

In connection with the responsibilities of the Authority for mass transportation systems, the Metrobus project was developed. The project consists of bus operations in part of the San Juan metropolitan area named Metrobus I, which operations are conducted by First Transit, a private company, under an agreement of $2,800,000, which will expire on December 31, 2006.  In addition, the project consists of bus operations between Bayamón and Stop 18

named Metrobus II, which operations are conducted by the Metropolitan Bus Authority (MBA), a public corporation, under a thirty-six month agreement of $13,594,000, which expires on December 31, 2006.

On January 28, 2004, the Authority amended the MBA service contract for the purpose of add certain additional routes to the mass transportation system.  This service contract amounting to $22,165,000 with a term of thirty-six months expires on December 31, 2007.

During 1995, MBA entered into a contract agreement with the Authority to operate and maintain one of Metrobus' route from Río Piedras to Old San Juan, provide service for Para-transit and maintain the transfer stations.  This contract is renewable every year with an increase of 6% over the last year contract amount. The total amount of this contract is approximately $1,091,000 and expires on June 30, 2007.

The contract for the operation of the Metrobus Project provides for fixed payments to the operator. Operators' compensation is based on monthly payments amounting to one-twelfth of the total annual operating costs. Bus fares, which are retained by the operator, reduce such payments. In addition, the Operator has various incentive fees for meeting or exceeding various performance standards.

**Autoridad de Transporte Marítimo**

Service Contract

On February 14, 2006, the Authority entered into a service contract with "Autoridad de Transporte Marítimo de Puerto Rico y las Islas Municipio" (ATM) to operate the water transportation system of the metropolitan area also known as "Acuaexpreso" and "Cataño-San Juan route" up to June 30, 2006.  This contract could be renovated on a year to year basis.  The Authority received during 2006 compensation from ATM in connection with this service contract of approximately $3.1 million.  Furthermore, the Authority incurred costs of approximately $6.2 million resulting in net loss of approximately $3.1 million.

**Federal Assistance Programs**

The Authority participates in a number of federal financial assistance programs. These programs are subject to audits in accordance with the provisions of OMB Circular A-133, *Audits of States, Local Governments, and Non-Profit Organizations*, or to compliance audits by grantor agencies. The resolution of certain previously identified questioned costs has not occurred. The amount, if any, of expenditures which may be disallowed by the granting agencies cannot be determined at this time, although the Authority expects such amounts, if any, not to be significant.

**Tren Urbano Project**

Operation and Maintenance Contract

The Authority entered into a System and Test Track Turnkey Contract (STTT Contract) with Siemmens Transportation Partnership Puerto Rico, S.E., Juan R. Requena y Asociados, and Alternate Concepts, Inc. (all together known as "Siemmens") for the purpose of operating and maintaining the Tren Urbano once it begins operations. During 2005, the STTT Contract became effective upon the execution of the contract for an initial term of five years with an option by the Authority to extend the term for an additional five years. The compensation is

based on a schedule included in the master agreement which approximate $4 million on a monthly base. The total annual operation and maintenance cost including cost of insurance and electricity for the first year of operations was approximately $40.5 million.

Integrated Transportation Alternative

The Authority plans to contract the services of over 500 minibus drivers and integrate these services with Tren Urbano and with the MBA's services to provide an integrated mass transportation services named "Alternativa de Transporte Integrado" or ATI. The costs of this initiative are included in the Tren Urbano's operating costs.

Claims

During 2001, a number of contractors presented claims related to the Authority's Tren Urbano project. These contractors' claims, which are at various stages of analysis to reach a final resolution, amounted to $289 millions, From the total amount claimed approximately $166 millions have been categorized as merited claims and recorded as accounts payable for restricted assets. The outstanding balance of these claims at June 30, 2006 and 2005 amounted to approximately $3,141,000 and $11,541,000, respectively.

In the opinion of management, based on advice from legal counsel, the final resolutions of these claims will not have an adverse effect on the Authority's financial position.

## 11. NET ASSETS

Net assets are classified in the following three components in the accompanying statements of net assets at June 30, 2006 and 2005:

Restricted for Debt Service

Net assets restricted for debt service consists of restricted assets for the principal and interest payment of the bonds payable.  This restriction is imposed by the bondholders through debt covenants.

Restricted for Construction

Net assets restricted for construction consists of restricted assets for the specific purpose of pay the construction projects. This restriction is imposed by the grantors and contributors, as well as the bondholders through debt covenants.

Unrestricted

Unrestricted net assets consist of net assets that do not meet the definition of "restricted for debt service", "restricted for construction" or "invested in capital assets, net of related debt".

## 12. BUDGETARY DATA

The Authority prepares its annual budget following the cash basis of accounting while the financial statements are presented under generally accepted accounting principles (GAAP) and standards established by the GASB. The actual results of operations presented in the Combined Statement of Revenues, Expenditures and Changes in Fund Balance - Budget and

Actual are in accordance with the budgetary basis of accounting to provide a meaningful comparison of actual with budget.

The Authority uses the following procedures in establishing the budgetary data reflected in the financial statements:

- The Executive Director submits to the Commonwealth Secretary of Transportation and Public Works (the Secretary) a proposed operating budget for the fiscal year commencing the following July 1. The operating budget includes proposed expenditures and the means of financing them.

- The budget is approved through a resolution by the Secretary.

- After the approval of the operating budget, the Secretary is authorized to transfer budgeted amounts within any funds.

The major differences between the budgetary basis of accounting and GAAP are:

- Revenues are recorded when payments are received (budgetary), as opposed to when earned (GAAP).

- Expenditures are recorded when payments are made (budgetary) as opposed to when the liability is incurred (GAAP).

- Advances to governmental entities for construction projects are recorded when paid (budgetary) as opposed to being capitalized as property and equipment when costs are incurred (GAAP).

## 13. ADJUSTMENTS TO PRIOR YEARS FINANCIAL STATEMENTS

During the year ended June 30, 2006, Authority evaluated the projects included in construction in progress and found that certain projects included as in process in fiscal years 2002 were also recorded as roads and bridges and therefore were duplicated. In addition certain projects that should have been recorded as an expense or completed after 2002 were also included in construction in progress. Also the Authority evaluated the amount of interest capitalized to roads, bridges and construction in progress in 2005 and prior years and found that the amount capitalized was also overstated. As the result, financial statements for the year ended June 30, 2005 and before were restated to correct the above overstatements.

The effect of this adjustment was to decrease net assets and capital assets at July 1, 2004 by $3.8 billions and to decrease capital assets and change in net assets as of and during the year ended June 30, 2005 by approximately $240 millions.

## 14. SUBSEQUENT EVENT

Subsequent to June 30, 2006, the Authority made an agreement with a commercial bank in which the Authority may borrow up to $400 millions in a revolving line of credit. The proceeds from the loan will be used to finance the Authority's capital improvement program and to repay the amount due to GDB under the line of credit agreement. The borrowings under this agreement are due on August 2009 and will bear interest at a variable rate as defined in the agreement equal to the BMA index plus 145 basis points.

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
**STATEMENT OF REVENUES, EXPENSES AND CHANGES IN FUND BALANCE**
**BUDGET AND ACTUAL - BUDGETARY BASIS (UNAUDITED)**
**YEAR ENDED JUNE 30, 2006**

| | Budget (Cash Basis) | Actual (Cash Basis) | Variance Favorable (Unfavorable) |
|---|---|---|---|
| **Revenues:** | | | |
| Excise taxes and vehicle license fees | $   351,100,000 | $   328,277,810 | $   (22,822,190) |
| Toll fares & Train | 215,000,000 | 201,033,152 | (13,966,848) |
| Capital contribution grants | 217,600,000 | 100,254,445 | (117,345,555) |
| Interest and other revenue | 38,900,000 | 32,760,667 | (6,139,333) |
| Total revenues | 822,600,000 | 662,326,074 | (160,273,926) |
| | | | |
| **Other financing sources (uses):** | | | |
| Bond issuance | 800,000,000 | 906,221,955 | 106,221,955 |
| Payments to refunded bond escrow agent | (479,500,000) | (283,718,870) | 195,781,130 |
| Proceeds from Line of Credit | | | |
| Carry Forward | 26,000,000 | - | (26,000,000) |
| Garvee Projects | 61,700,000 | - | (61,700,000) |
| Total revenues and other financings sources | 408,200,000 | 622,503,085 | 214,303,085 |
| | | | |
| **Expenditures:** | | | |
| Carry Forward | (25,000,000) | - | 25,000,000 |
| Construction, equipment and administrative | (602,200,000) | (569,889,094) | 32,310,906 |
| Toll highways, electronic collection and ATI | (160,700,000) | (212,082,425) | (51,382,425) |
| Payment of debt services and Credit line | (430,700,000) | (423,340,376) | 7,359,624 |
| Net Sale of Investments | | (52,385,461) | (52,385,461) |
| Advances to Department of Transportation and Public Works | (10,000,000) | (7,989,655) | 2,010,345 |
| Transfers to proprietary fund | | | |
| Other expenditures | (2,200,000) | - | 2,200,000 |
| Total expenditures | (1,230,800,000) | (1,265,687,011) | (34,887,011) |
| | | | |
| Excess (deficiency) of revenues and other financing sources over/under expenditures | - | 19,142,148 | $   19,142,148 |
| Funds carried forward from prior year | | | |
| Fund balance at beginning of year | - | 1,401,106,123 | |
| Fund balance at end of year | $   - | $ 1,420,248,271 | |

Adjustments necessary to convert the revenues and expenses and fund balances at end-of-year from GAAP basis to the budgetary basis are as follows (*Unaudited*):

| | Revenues | Excess of Expenses over Revenues |
|---|---|---|
| GAAP Basis | $ 657,129,257 | $ (247,844,939) |
| Adjustments: | | |
| Accounts receivables, accrued interest and other | 1,829,661 | 1,829,661 |
| Depreciation and amortization | - | 381,874,421 |
| Prepaid expenses | 1,128,036 | 1,128,036 |
| Accrued vacation and sickleave | - | (1,545,838) |
| Decrease in fair value of investments | 2,599,120 | 2,599,120 |
| Contributions from US federal government and other | - | (3,438,024) |
| Sales of investments | - | (52,385,461) |
| Construction cost capitalized | - | (528,897,919) |
| Advances to DTOP | - | (7,989,655) |
| Redemptions of bonds and issuance costs | - | (125,374,996) |
| Proceeds of bonds issuance | - | 906,221,995 |
| Proceeds line of credit | - | 29,996,123 |
| Interest paid | - | (336,680,376) |
| Per Combined Statement of Revenues, Expenditures and Changes in Fund Balances - Budget and Actual - All Govermental fund types (Budgetary Basis) | $ 662,686,074 | $ 19,492,148 |

**HLB** **Morales Padillo & Co. - PSC**
Certified Public Accountants and Business Advisors

**REPORT OF INDEPENDENT AUDITORS' ON COMPLIANCE AND INTERNAL
CONTROL OVER FINANCIAL REPORTING IN ACCORDANCE WITH
GOVERNMENT AUDITING STANDARDS**

Hon. Gabriel Alcaraz Emmanuelli, Secretary
Department of Transportation and Public Works
Commonwealth of Puerto Rico

We have audited the financial statements of Puerto Rico Highways and Transportation Authority
(the Authority) as of and for the year ended June 30, 2006, and have issued our report thereon
dated September 29, 2006. We conducted our audit in accordance with auditing standards
generally accepted in the United States of America and the standards applicable to financial
audits contained in *Government Auditing Standards,* issued by the Comptroller General of the
United States.

Internal Control over Financial Reporting

In planning and performing our audit, we considered the Authority's internal control over
financial reporting in order to determine our auditing procedures for the purpose of expressing
our opinion on the financial statements and not to provide assurance on the internal control over
financial reporting. Our consideration of the internal control over financial reporting would not
necessarily disclose all matters in the internal control over financial reporting that might be
material weaknesses. A material weakness is a reportable condition in which the design or
operation of one or more of the internal control components does not reduce to a relatively low
level the risk that misstatements caused by error or fraud in amounts that would be material in
relation to the financial statements being audited may occur and not be detected within a timely
period by employees in the normal course of performing their assigned functions. We noted no
matters involving the internal control over financial reporting and its operation that we consider
to be material weaknesses. However, we noted other matters involving the internal control over
financial reporting that we have reported to management of the Authority in a separate letter
dated September 29, 2006.

Compliance and Other Matters

As part of obtaining reasonable assurance about whether the Authority's financial statements are
free of material misstatement, we performed tests of its compliance with certain provisions of
laws, regulations, contracts and grants, noncompliance with which could have a direct and
material effect on the determination of financial statement amounts. However, providing an
opinion on compliance with those provisions was not an objective of our audit and, accordingly,
we do not express such an opinion. The results of our tests disclosed no instances of
noncompliance an other matters that are required to be reported under *Government Auditing
Standards.*

This report is intended solely for the information and use of the Authority's management, the U.S. Department of Transportation and pass-through entities and is not intended to be and should not be used by anyone other than these specified parties.

*HLB Morales Padillo & Co*

CERTIFIED PUBLIC ACCOUNTANTS
September 29, 2006

Stamp #2168798
was affixed to
the original of
this report.

APPENDIX II

**FORMS OF OPINIONS OF BOND COUNSEL**

_____, 2007

Hon. Gabriel Alcaraz
Secretary of Transportation and Public Works
San Juan, Puerto Rico

*$250,000,000.00*
*Puerto Rico Highways and Transportation Authority*
*Transportation Revenue Bonds*
*(Series M)*

Dear Sir:

We have acted as bond counsel in connection with the issuance by the Puerto Rico Highways and Transportation Authority (the "Authority") of its $250,000,000.00 Transportation Revenue Bonds (Series M) (the "Bonds"). The Bonds are issued pursuant to Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended (the "Act") and Resolution No. 98-06 adopted by the Authority on February 26, 1998, as previously amended (the "1998 Resolution"), and as further amended, including by a resolution adopted on February 15, 2007, with respect to the Bonds (the "Series M Resolution" and together with the 1998 Resolution, the "Authorizing Resolution").

The Bonds are dated, mature, are payable and bear interest in the manner and upon the terms set forth in the Authorizing Resolution. The Bonds are issuable in the form of fully registered bonds in denominations of $5,000 each or any integral multiple thereof and will be initially registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York, which will act as securities depository for the Bonds.

We have examined (i) the Act, (ii) certified copies of the proceedings of the Authority, including the Authorizing Resolution and Resolution No. 68-18, adopted on June 13, 1968, as amended (the "1968 Resolution"), (iii) the Puerto Rico Internal Revenue Code of 1994 (Subtitle B of Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended among other things by Act No. 34 of the Legislature of Puerto Rico, approved July 16, 1997, as amended), which allocated (A) the proceeds of the sixteen cents per gallon tax imposed on gasoline and four cents of the eight cents per gallon tax on gas oil and diesel oil (the "Allocated Gasoline Tax Proceeds") and (B) the proceeds (up to $120 million per fiscal year) of the tax imposed on crude oil, unfinished oil and derivative products (the "Allocated Crude Oil Tax Proceeds") to the Authority for use for its corporate purposes, (iv) the Vehicle and Traffic Law of Puerto Rico, approved July 20, 1960, as amended, which allocated the proceeds of the fifteen dollar increase in the motor vehicle license fees for public and private service automobiles imposed by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 (the "Allocated Additional License Fees"),

to the Authority for use for its corporate purposes and (v) Reorganization Plan No. 6 of 1971 (Act No. 113 of the Legislature of Puerto Rico, approved June 21, 1968), which attached the Authority to the Department of Transportation and Public Works.

We have also examined the law and such certified proceedings and other papers as we deem necessary to render the following opinions.

In rendering the following opinions we have assumed the genuineness of all signatures, the authenticity of all documents tendered to us as originals and the conformity to original documents of all documents submitted to us as certified or photostatic copies. As to questions of fact material to our opinion, we have relied upon the certified proceedings and other certifications of public officials furnished to us without undertaking to verify the same by independent investigation.

Based upon the foregoing, we are of the opinion, under existing law, as follows:

1.      The Act is valid.

2.      The proceedings authorizing the issuance of the Bonds have been validly and legally taken.

3.      The Act and such proceedings show lawful authority of the issuance and sale of the Bonds.

4.      The Authority has heretofore issued various series of bonds under and in compliance with the provisions of the 1968 Resolution (the "Highway Revenue Bonds"). The 1968 Resolution provides for the issuance of additional Highway Revenue Bonds under the conditions and limitations therein set forth, and the Authority has covenanted in the 1998 Resolution to limit the issuance of such additional Highway Revenue Bonds.

5.      The 1998 Resolution provides for the issuance of additional bonds on a parity with the Bonds under the conditions, limitations and restrictions therein set forth (the Bonds and such additional parity bonds being herein called the "Senior Transportation Bonds") for any lawful purpose of the Authority and for the purpose of refunding any bonds issued by the Authority under the 1998 Resolution and any other obligations of the Authority, including outstanding Highway Revenue Bonds. In addition, the 1998 Resolution provides for the issuance of bonds subordinate to the Senior Transportation Revenue Bonds as to their lien on the revenues and other moneys of the Authority, as described below, under the conditions, limitations and restrictions and for the purposes set forth therein (the Senior Transportation Revenue Bonds and such bonds subordinate thereto being herein collectively called the "Transportation Revenue Bonds").

6.      The 1998 Resolution provides for the creation of a special fund designated "Puerto Rico Highways and Transportation Authority Transportation Revenue Fund" (the "Revenue Fund"), and, subject to the limitations of the next two paragraphs for the deposit to the credit of said special fund of all moneys received by the Authority (i) from the Allocated Crude Oil Tax Proceeds, (ii) from the Allocated Gasoline Tax Proceeds, (iii) from the Allocated Additional License Fees, (iv) from any tolls or other charges imposed by the Authority for the use of any Toll Facilities and (v) from the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority and expressly authorizes the Authority to pledge to the payment of the principal of and interest on bonds or other obligations issued by the Authority and which are pledged by the Authority to the payment of the

principal of and interest on Transportation Revenue Bonds issued under the provisions of the 1998 Resolution.

The Allocated Gasoline Tax Proceeds, the Allocated Crude Oil Tax Proceeds and the Allocated Additional License Fees, and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority, are subject to first being applied to the payment of interest and amortization of public debt in accordance with the provisions of, and to the extent provided by, Section 8 of Article VI of the Constitution of Puerto Rico if needed for such purpose.

The 1968 Resolution provides for the prior deposit to the credit of a special fund designated "Puerto Rico Highways and Transportation Authority Construction Fund" (herein called the "1968 Construction Fund") of the Allocated Gasoline Tax Revenues, the Allocated Additional License Fees and all Existing Toll Facilities Revenues (as such term is defined in the 1998 Resolution), after the required deposits of such moneys have been made to the credit of the Puerto Rico Highways and Transportation Authority Highway Revenue Bonds Interest and Sinking Fund. In the 1998 Resolution, the Authority has covenanted (i) to withdraw monthly from the 1968 Construction Fund and deposit to the credit of the Revenue Fund until the outstanding Highway Revenue Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution, all unencumbered moneys held to the credit of the 1968 Construction Fund and (ii) except for the foregoing withdrawal and any encumbrances on the moneys in the 1968 Construction Fund existing on the date of adoption of and as provided in the 1998 Resolution, not further to encumber or otherwise withdraw or pledge any such available moneys in the 1968 Construction Fund.

7.      The Bonds are valid and binding special obligations of the Authority payable solely from the special fund created by the 1998 Resolution and designated "Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds Interest and Sinking Fund." The Authority has covenanted to deposit to the credit of said Interest and Sinking Fund a sufficient amount of the moneys held to the credit of the Revenue Fund, together with any other funds of the Commonwealth of Puerto Rico allocated to the Authority and available under the 1998 Resolution for the payment of principal of and interest on the Senior Transportation Revenue Bonds, to pay the principal of and interest on all Senior Transportation Revenue Bonds (including the Bonds) issued under the provisions of the 1998 Resolution as the same may become due and payable and to create and maintain a reserve therefore. Said Interest and Sinking Fund is pledged to and charged with the payment of the principal of the principal and the interest on all Senior Transportation Revenues Bonds (including the Bonds) issued by the Authority under the provisions of the 1998 Resolution.

8.      The Bonds do not constitute a debt of the Commonwealth of Puerto Rico or of any of its municipalities or other political subdivisions, and neither the Commonwealth of Puerto Rico nor any such municipality or other political subdivision is liable thereon, and the Bonds are payable only out of the revenues and other moneys of or allocated to the Authority, to the extent provided in the 1998 Resolution.

9.      The Internal Revenue Code of 1986, as amended (the "Code") sets forth certain requirements which must be met subsequent to the issuance and delivery of the Bonds for interest thereon to be and remain excluded from gross income for Federal income tax purposes. Noncompliance with such requirements could cause the interest on the Bonds to be included in gross income for Federal income tax purposes retroactively to the date of issue of the Bonds. The Authority has covenanted in the Resolution to comply with each provision of the Code applicable to the Bonds necessary to maintain the exclusion from gross income of the interest on the Bonds pursuant to Section 103 of the Code. In addition, the Authority has made certain representations and certifications relating to the Bonds in its

"Tax Certificate as to Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986" of even date herewith.

Under existing law, assuming compliance with the tax covenants described herein and the accuracy of certain representations and certifications made by the Authority described above, interest on the Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code. We are also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. Interest on the Bonds is, however, included in the adjusted current earnings of certain corporations for purposes of computing the alternative minimum tax imposed on such corporations.

10. The interest on the Bonds is exempt from state, Commonwealth and local personal income taxation.

11. Bond Counsel is further of the opinion that the difference between the principal amount of the Bonds maturing on July 1 of 2014 through 2017, 2018 (4.125% coupon), 2019 (4.125% coupon), and 2020 (4.2% coupon), 2023 (4.25% coupon), 2025 (4.3% coupon), 2026 (4.3% coupon), and 2027 (4.3% coupon) (collectively, the "Discount Bonds") and the initial offering price to the public (excluding bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Discount Bonds of the same maturity was sold constitutes original issue discount which is excluded from gross income for federal income tax purposes to the same extent as interest on the Bonds. Further, such original issue discount accrues actuarially on a constant interest rate basis over the term of each Discount Bond and the basis of each Discount Bond acquired at such initial offering price by an initial purchaser thereof will be increased by the amount of such accrued original issue discount. The accrual of original issue discount may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Discount Bonds, even though there will not be a corresponding cash payment.

Except as stated in paragraphs 9, 10 and 11 above, we express no opinion as to any other Federal or state, Commonwealth or local tax consequences of the ownership or disposition of the Bonds. Furthermore, we express no opinion as to any Federal, state, Commonwealth or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken with respect to the Bonds or the proceeds thereof upon the advice or approval of other bond counsel.

It is to be understood that the rights of the holders of the Bonds and the enforceability thereof may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that their enforcement may also be subject to the exercise of judicial discretion in appropriate cases.

Very truly yours,

_____, 2007

Hon. Gabriel Alcaraz
Secretary of Transportation and Public Works
San Juan, Puerto Rico

$1,502,904,943.95
*Puerto Rico Highways and Transportation Authority*
*Transportation Revenue Refunding Bonds*
*(Series N)*

Dear Sir:

We have acted as bond counsel in connection with the issuance by the Puerto Rico Highways and Transportation Authority (the "Authority") of its $1,502,904,943.95 Transportation Revenue Refunding Bonds (Series N) (the "Bonds"). The Bonds are issued pursuant to Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended (the "Act") and Resolution No. 98-06 adopted by the Authority on February 26, 1998, as previously amended (the "1998 Resolution"), and as further amended, including by a resolution adopted on February 15, 2007, with respect to the Bonds (the "Series N Resolution" and together with the 1998 Resolution, the "Authorizing Resolution").

The Bonds are dated, mature, are payable and bear interest in the manner and upon the terms set forth in the Authorizing Resolution. The Bonds are issuable in the form of fully registered bonds in denominations of $5,000 each or any integral multiple thereof and will be initially registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York, which will act as securities depository for the Bonds.

We have examined (i) the Act, (ii) certified copies of the proceedings of the Authority, including the Authorizing Resolution and Resolution No. 68-18, adopted on June 13, 1968, as amended (the "1968 Resolution"), (iii) the Puerto Rico Internal Revenue Code of 1994 (Subtitle B of Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended among other things by Act No. 34 of the Legislature of Puerto Rico, approved July 16, 1997, as amended), which allocated (A) the proceeds of the sixteen cents per gallon tax imposed on gasoline and four cents of the eight cents per gallon tax on gas oil and diesel oil (the "Allocated Gasoline Tax Proceeds") and (B) the proceeds (up to $120 million per fiscal year) of the tax imposed on crude oil, unfinished oil and derivative products (the "Allocated Crude Oil Tax Proceeds") to the Authority for use for its corporate purposes, (iv) the Vehicle and Traffic Law of Puerto Rico, approved July 20, 1960, as amended, which allocated the proceeds of the fifteen dollar increase in the motor vehicle license fees for public and private service automobiles imposed by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 (the "Allocated Additional License Fees"), to the Authority for use for its corporate purposes and (v) Reorganization Plan No. 6 of 1971 (Act No. 113 of the Legislature of Puerto Rico, approved June 21, 1968), which attached the Authority to the Department of Transportation and Public Works.

II-5

We have also examined the law and such certified proceedings and other papers as we deem necessary to render the following opinions.

In rendering the following opinions we have assumed the genuineness of all signatures, the authenticity of all documents tendered to us as originals and the conformity to original documents of all documents submitted to us as certified or photostatic copies.  As to questions of fact material to our opinion, we have relied upon the certified proceedings and other certifications of public officials furnished to us without undertaking to verify the same by independent investigation.

Based upon the foregoing, we are of the opinion, under existing law, as follows:

1.    The Act is valid.

2.    The proceedings authorizing the issuance of the Bonds have been validly and legally taken.

3.    The Act and such proceedings show lawful authority of the issuance and sale of the Bonds.

4.    The Authority has heretofore issued various series of bonds under and in compliance with the provisions of the 1968 Resolution (the "Highway Revenue Bonds").  The 1968 Resolution provides for the issuance of additional Highway Revenue Bonds under the conditions and limitations therein set forth, and the Authority has covenanted in the 1998 Resolution to limit the issuance of such additional Highway Revenue Bonds.

5.    The 1998 Resolution provides for the issuance of additional bonds on a parity with the Bonds under the conditions, limitations and restrictions therein set forth (the Bonds and such additional parity bonds being herein called the "Senior Transportation Bonds") for any lawful purpose of the Authority and for the purpose of refunding any bonds issued by the Authority under the 1998 Resolution and any other obligations of the Authority, including outstanding Highway Revenue Bonds.  In addition, the 1998 Resolution provides for the issuance of bonds subordinate to the Senior Transportation Revenue Bonds as to their lien on the revenues and other moneys of the Authority, as described below, under the conditions, limitations and restrictions and for the purposes set forth therein (the Senior Transportation Revenue Bonds and such bonds subordinate thereto being herein collectively called the "Transportation Revenue Bonds").

6.    The 1998 Resolution provides for the creation of a special fund designated "Puerto Rico Highways and Transportation Authority Transportation Revenue Fund" (the "Revenue Fund"), and, subject to the limitations of the next two paragraphs for the deposit to the credit of said special fund of all moneys received by the Authority (i) from the Allocated Crude Oil Tax Proceeds, (ii) from the Allocated Gasoline Tax Proceeds, (iii) from the Allocated Additional License Fees, (iv) from any tolls or other charges imposed by the Authority  for the use of any Toll Facilities and (v) from the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority and expressly authorizes the Authority to pledge to the payment of the principal of and interest on bonds or other obligations issued by the Authority and which are pledged by the Authority to the payment of the principal of and interest on Transportation Revenue Bonds issued under the provisions of the 1998 Resolution.

The Allocated Gasoline Tax Proceeds, the Allocated Crude Oil Tax Proceeds and the Allocated Additional License Fees, and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority, are subject to first being applied to the payment of interest and amortization of public debt in accordance with the provisions of, and to the extent provided by, Section 8 of Article VI of the Constitution of Puerto Rico if needed for such purpose.

The 1968 Resolution provides for the prior deposit to the credit of a special fund designated "Puerto Rico Highways and Transportation Authority Construction Fund" (herein called the "1968 Construction Fund") of the Allocated Gasoline Tax Revenues, the Allocated Additional License Fees and all Existing Toll Facilities Revenues (as such term is defined in the 1998 Resolution), after the required deposits of such moneys have been made to the credit of the Puerto Rico Highways and Transportation Authority Highway Revenue Bonds Interest and Sinking Fund. In the 1998 Resolution, the Authority has covenanted (i) to withdraw monthly from the 1968 Construction Fund and deposit to the credit of the Revenue Fund until the outstanding Highway Revenue Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution, all unencumbered moneys held to the credit of the 1968 Construction Fund and (ii) except for the foregoing withdrawal and any encumbrances on the moneys in the 1968 Construction Fund existing on the date of adoption of and as provided in the 1998 Resolution, not further to encumber or otherwise withdraw or pledge any such available moneys in the 1968 Construction Fund.

7.      The Bonds are valid and binding special obligations of the Authority payable solely from the special fund created by the 1998 Resolution and designated "Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds Interest and Sinking Fund." The Authority has covenanted to deposit to the credit of said Interest and Sinking Fund a sufficient amount of the moneys held to the credit of the Revenue Fund, together with any other funds of the Commonwealth of Puerto Rico allocated to the Authority and available under the 1998 Resolution for the payment of principal of and interest on the Senior Transportation Revenue Bonds, to pay the principal of and interest on all Senior Transportation Revenue Bonds (including the Bonds) issued under the provisions of the 1998 Resolution as the same may become due and payable and to create and maintain a reserve therefore. Said Interest and Sinking Fund is pledged to and charged with the payment of the principal of the principal and the interest on all Senior Transportation Revenues Bonds (including the Bonds) issued by the Authority under the provisions of the 1998 Resolution.

8.      The Bonds do not constitute a debt of the Commonwealth of Puerto Rico or of any of its municipalities or other political subdivisions, and neither the Commonwealth of Puerto Rico nor any such municipality or other political subdivision is liable thereon, and the Bonds are payable only out of the revenues and other moneys of or allocated to the Authority, to the extent provided in the 1998 Resolution.

9.      The Internal Revenue Code of 1986, as amended (the "Code") sets forth certain requirements which must be met subsequent to the issuance and delivery of the Bonds for interest thereon to be and remain excluded from gross income for Federal income tax purposes. Noncompliance with such requirements could cause the interest on the Bonds to be included in gross income for Federal income tax purposes retroactively to the date of issue of the Bonds. The Authority has covenanted in the Resolution to comply with each provision of the Code applicable to the Bonds necessary to maintain the exclusion from gross income of the interest on the Bonds pursuant to Section 103 of the Code. In addition, the Authority has made certain representations and certifications relating to the Bonds in its "Tax Certificate as to Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986" of even date herewith.

Under existing law, assuming compliance with the tax covenants described herein and the accuracy of certain representations and certifications made by the Authority described above, interest on the Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code. We are also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations.  Interest on the Bonds is, however, included in the adjusted current earnings of certain corporations for purposes of computing the alternative minimum tax imposed on such corporations.

10.     The interest on the Bonds is exempt from state, Commonwealth and local personal income taxation.

11.     Bond Counsel is further of the opinion that, with respect to the Bonds which are Capital Appreciation Bonds, the difference between the Accreted Value at maturity of the Capital Appreciation Bonds and the initial offering price to the public (excluding bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Capital Appreciation Bonds of the same maturity was sold constitutes original issue discount on the Capital Appreciation Bonds.  Further, such original issue discount on the Capital Appreciation Bonds accrues actuarially on a constant interest rate basis over the term of each Capital Appreciation Bond and the basis of each Capital Appreciation Bond acquired at such initial offering price by an initial purchaser thereof will be increased by the amount of such accrued original issue discount.  The accrual of original issue discount may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Capital Appreciation Bonds, even though there will not be a corresponding cash payment.

Except as stated in paragraphs 9, 10 and 11 above, we express no opinion as to any other Federal or state, Commonwealth or local tax consequences of the ownership or disposition of the Bonds. Furthermore, we express no opinion as to any Federal, state, Commonwealth or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken with respect to the Bonds or the proceeds thereof upon the advice or approval of other bond counsel.

It is to be understood that the rights of the holders of the Bonds and the enforceability thereof may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that their enforcement may also be subject to the exercise of judicial discretion in appropriate cases.

Very truly yours,

_____, 2007

Hon. Gabriel Alcaraz
Secretary of Transportation and Public Works
San Juan, Puerto Rico

$$\$431,955,609.05$$
***Puerto Rico Highways and Transportation Authority***
***Highway Revenue Refunding Bonds***
***(Series CC)***

Dear Sir:

We have acted as bond counsel in connection with the issuance by the Puerto Rico Highways and Transportation Authority (the "Authority") of its $431,955,609.05 Highway Revenue Refunding Bonds (Series CC) (the "Bonds"). The Bonds are issued pursuant to Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended (the "Act") and Resolution No. 68-18, adopted on June 13, 1968, as previously amended (the "1968 Resolution"), and as further amended, including by a resolution adopted on February 15, 2007, with respect to the Bonds (the "Series CC Resolution" and together with the 1968 Resolution, the "Authorizing Resolution"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Authorizing Resolution.

The Bonds are dated, mature, are payable and bear interest in the manner and upon the terms set forth in the Authorizing Resolution. The Bonds are issuable in the form of fully registered bonds in denominations of $5,000 each or any integral multiple thereof and will be initially registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York, which will act as securities depository for the Bonds.

We have examined (i) the Act, (ii) certified copies of the proceedings of the Authority, including the Authorizing Resolution and Resolution No. 98-06 adopted by the Authority on February 26, 1998, as amended (the "1998 Resolution"), (iii) the Puerto Rico Internal Revenue Code of 1994 (Subtitle B of Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended among other things by Act No. 34 of the Legislature of Puerto Rico, approved July 16, 1997, as amended), which allocated (A) the proceeds of the sixteen cents per gallon tax imposed on gasoline and four cents of the eight cents per gallon tax on gas oil and diesel oil (the "Allocated Gasoline Tax Proceeds") and (B) the proceeds (up to $120 million per fiscal year) of the tax imposed on crude oil, unfinished oil and derivative products (the "Allocated Crude Oil Tax Proceeds") to the Authority for use for its corporate purposes, (iv) the Vehicle and Traffic Law of Puerto Rico, approved July 20, 1960, as amended, which allocated the proceeds of the fifteen dollar increase in the motor vehicle license fees for public and private service automobiles imposed by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 (the "Allocated Additional License Fees"), to the Authority for use for its corporate purposes and (v) Reorganization Plan

No. 6 of 1971 (Act No. 113 of the Legislature of Puerto Rico, approved June 21, 1968), which attached the Authority to the Department of Transportation and Public Works.

We have also examined the law and such certified proceedings and other papers as we deem necessary to render the following opinions.

In rendering the following opinions we have assumed the genuineness of all signatures, the authenticity of all documents tendered to us as originals and the conformity to original documents of all documents submitted to us as certified or photostatic copies.  As to questions of fact material to our opinion, we have relied upon the certified proceedings and other certifications of public officials furnished to us without undertaking to verify the same by independent investigation.

Based upon the foregoing, we are of the opinion, under existing law, as follows:

1.      The Act is valid.

2.      The proceedings authorizing the issuance of the Bonds have been validly and legally taken.

3.      The Act and such proceedings show lawful authority of the issuance and sale of the Bonds.

4.      The Authority has heretofore issued various series of bonds under and in compliance with the provisions of the 1968 Resolution (the "Highway Revenue Bonds").  The 1968 Resolution provides for the issuance of additional Highway Revenue Bonds under the conditions and limitations therein set forth, and the Authority has covenanted in the 1998 Resolution to limit the issuance of such additional Highway Revenue Bonds.

5.      The Bonds are valid and binding special obligations of the Authority payable solely from the special fund created by the 1968 Resolution and designated "Puerto Rico Highways and Transportation Authority Highway Revenue Bonds Interest and Sinking Fund."  The Authority has covenanted to deposit to the credit of said Interest and Sinking Fund a sufficient amount of the Revenues, together with any other funds of the Commonwealth of Puerto Rico allocated to the Authority for the payment of its bonds and pledged by the Authority to the payment of principal and interest on the Highway Revenue Bonds (including the Bonds) as the same may become due and payable and to create and maintain a reserve therefore.  Said Interest and Sinking Fund is pledged to and charged with the payment of the principal of the principal and the interest on all Highway Revenues Bonds (including the Bonds) issued by the Authority under the provisions of the 1968 Resolution.

The Allocated Gasoline Tax Proceeds and the Allocated Additional License Fees, and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority, are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of, and to the extent provided by, Section 8 of Article VI of the Constitution of Puerto Rico if needed for that purpose.

6.      The Bonds do not constitute a debt of the Commonwealth of Puerto Rico or of any of its municipalities or other political subdivisions, and neither the Commonwealth of Puerto Rico nor any such municipality or other political subdivision is liable thereon, and the Bonds are payable only out of the revenues and other moneys of or allocated to the Authority, to the extent provided in the 1968 Resolution.

7.      The Internal Revenue Code of 1986, as amended (the "Code") sets forth certain requirements which must be met subsequent to the issuance and delivery of the Bonds for interest thereon to be and remain excluded from gross income for Federal income tax purposes.  Noncompliance with such requirements could cause the interest on the Bonds to be included in gross income for Federal income tax purposes retroactively to the date of issue of the Bonds.  The Authority has covenanted in the Resolution to comply with each provision of the Code applicable to the Bonds necessary to maintain the exclusion from gross income of the interest on the Bonds pursuant to Section 103 of the Code.  In addition, the Authority has made certain representations and certifications relating to the Bonds in its "Tax Certificate as to Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986" of even date herewith.

Under existing law, assuming compliance with the tax covenants described herein and the accuracy of certain representations and certifications made by the Authority described above, interest on the Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code.  We are also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations.  Interest on the Bonds is, however, included in the adjusted current earnings of certain corporations for purposes of computing the alternative minimum tax imposed on such corporations.

8.      The interest on the Bonds is exempt from state, Commonwealth and local personal income taxation.

9.      Bond Counsel is further of the opinion that, with respect to the Bonds which are Capital Appreciation Bonds, the difference between the Accreted Value at maturity of the Capital Appreciation Bonds and the initial offering price to the public (excluding bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Capital Appreciation Bonds of the same maturity was sold constitutes original issue discount on the Capital Appreciation Bonds.  Further, such original issue discount on the Capital Appreciation Bonds accrues actuarially on a constant interest rate basis over the term of each Capital Appreciation Bond and the basis of each Capital Appreciation Bond acquired at such initial offering price by an initial purchaser thereof will be increased by the amount of such accrued original issue discount.  The accrual of original issue discount may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Capital Appreciation Bonds, even though there will not be a corresponding cash payment.

Except as stated in paragraphs 7,  8 and 9 above, we express no opinion as to any other Federal or state, Commonwealth or local tax consequences of the ownership or disposition of the Bonds.  Furthermore, we express no opinion as to any Federal, state, Commonwealth or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken with respect to the Bonds or the proceeds thereof upon the advice or approval of other bond counsel.

It is to be understood that the rights of the holders of the Bonds and the enforceability thereof may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that their enforcement may also be subject to the exercise of judicial discretion in appropriate cases.

Very truly yours,

(This page intentionally left blank)

APPENDIX III

## SUMMARY OF CERTAIN PROVISIONS OF THE 1968 RESOLUTION

The following are brief summaries of certain provisions of the 1968 Resolution. Such statements do not purport to be complete and reference is made to the 1968 Resolution, copies of which are available from the Authority or the 1968 Fiscal Agent. The 1968 Resolution, the Highway Revenue Bonds issued thereunder and the 1968 Resolution Revenues are referred to in this summary as the "Resolution," the "Bonds," and "Revenues," respectively. The Authority proposes to amend the 1968 Resolution as described in *Summary of Certain Provisions of the Proposed Supplemental Resolution*.

**Definition of Certain Terms**

"Accreted Value" means, with respect to any Capital Appreciation Bond or Capital Appreciation and Income Bond, an amount equal to the principal amount of such Bond on the date of original issuance plus the interest accrued on such Bond from the date of original issuance to the date of calculation or the Interest Commencement Date, as the case may be, compounded on the dates and in the manner provided for in the resolution authorizing the issuance of such Capital Appreciation Bond or Capital Appreciation and Income Bond.

"Balloon Bonds" mean any Bonds, the interest on which is payable periodically and twenty-five percent (25%) or more of the original principal amount of which matures during any one fiscal year and for which maturing principal amount Amortization Requirements have not been fixed.

"Capital Appreciation Bonds" means any Bonds as to which interest is compounded periodically on each of the applicable dates designated for compounding in the resolution authorizing said Bonds and payable in an amount equal to the then current Accreted Value only at the maturity (or extended maturity date for Extendible Maturity Bonds), earlier redemption or other payment date therefor, all as so provided by such resolution, and which may be either serial bonds or term bonds.

"Capital Appreciation and Income Bonds" means any Bonds as to which accruing interest is not paid prior to the interest payment date immediately succeeding the Interest Commencement Date specified in the resolution authorizing such Bonds and the interest on which is compounded periodically on the dates designated in such resolution prior to the Interest Commencement Date for such Capital Appreciation and Income Bonds, and which may be either serial bonds or term bonds.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder and applicable regulations promulgated under the Internal Revenue Code of 1954, as amended.

"Extendible Maturity Bonds" means Bonds the maturities of which, by their terms, may be extended by and at the option of the holders of the Bonds or the Authority.

"1968 Fiscal Agent" means the bank or trust company appointed by the Authority and acting as fiscal agent whether original or successor pursuant to the provisions of the Resolution.

"Fiscal year" means the period commencing on the first day of July of any year and ending on the last day of June of the following year or any other twelve month period designated by the Authority.

"Government Obligations" means (i) direct obligations of, or obligations the payment of the principal of and interest on which are unconditionally guaranteed by, the United States of America; (ii) municipal obligations, the payment of the principal of and interest and redemption premium, if any, on which are irrevocably secured by obligations described in clause (i) above and which obligations are not subject to redemption prior to the date on which the proceeds attributable to the principal of the obligations are to be used and have been deposited in an escrow account which is irrevocably pledged to the payment of the principal of and interest and redemption premium, if any, on such municipal obligations; (iii) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clauses (i) and (ii) above held by a bank (including the 1968 Fiscal Agent) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the issuer of the underlying obligations described in said clauses (i) and (ii) and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated; and (iv) secured time deposits.

"Interest Commencement Date" means, with respect to any particular Capital Appreciation and Income Bonds, the date specified in the resolution authorizing the issuance of such Bonds after which interest accruing on such Bonds shall be payable on a periodic basis prior to maturity, with the first such payment date being the applicable interest payment date immediately succeeding such Interest Commencement Date.

"Interim Bonds" means any Bonds issued under the Resolution on an interim basis which are expected to be repaid from the proceeds of Bonds or other indebtedness.

"Investment Obligations" means any of the following, to the extent that the same is legal for the investment of public funds under the laws of the Commonwealth:

(i)       Government Obligations;

(ii)      obligations issued or guaranteed by any instrumentality or agency of the United States of America, whether now existing or hereafter organized, including but not limited to those of the Federal Financing Bank, Federal Home Loan Banks, the Export-Import Bank, Government National Mortgage Association and the Tennessee Valley Authority;

(iii)     bankers' acceptances, certificates of deposit or time deposits of any bank, national banking association (including the 1968 Fiscal Agent), trust company or savings and loan association (including any investment in pools of such bankers acceptances, certificates of deposit or time deposits), which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation, are either (A) issued by a bank, trust company, or savings and loan association having a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by such securities as are described in clause (i) or (ii) above or (iv) or (v) below, having a market value at least equal to the principal amount of such bankers' acceptances, certificates of deposit or time deposits (or portion thereof not so insured); provided that the 1968 Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(iv)      obligations issued by any state or territory of the United States, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's or any successors thereto and S&P or any successors thereto;

(v)      municipal obligations, the payment of the principal of and the interest on which is insured, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's or any successors thereto and S&P or any successors thereto;

(vi)      any repurchase, reverse repurchase or investment agreement with any bank or trust company organized under the laws of any state of the United States or the Commonwealth or any national banking association (including the 1968 Fiscal Agent), insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any one or more of the securities described in clause (i) or (ii) above, provided that the 1968 Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(vii)      commercial paper rated, or backed by a letter of credit or line of credit the issuer of which is rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's or any successors thereto and S&P or any successors thereto; and

(viii)      any other investment obligations, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's or any successors thereto and S&P or any successors thereto.

"Principal and Interest Requirements" for any period, as applied to the Bonds of any Series, means the sum of:

(i)      the amount required to pay interest on all Bonds of such Series then outstanding which is payable on each interest payment date in such period;

(ii)      the amount required to pay principal of all serial Bonds of such Series then outstanding which is payable upon the stated maturity of such serial Bonds in such period; and

(iii)      the Amortization Requirements for the term Bonds of such Series for such period.

To the extent that the period for calculating Principal and Interest Requirements shall be a fiscal year and the first day of the next fiscal year shall be an interest or principal payment date, such first day of the next fiscal year shall be included in the preceding fiscal year and not in the current fiscal year for purposes of calculating Principal and Interest Requirements.

The following rules apply in determining the amount of the Principal and Interest Requirements for any period:

(a)      in the case of Variable Rate Bonds the interest rate thereon shall be assumed to be the greater of (A) one hundred ten percent (110%) of the average interest rate on such Variable Rate Bonds during the twelve months ending with the month preceding the date of calculation or such shorter period that such Variable Rate Bonds shall have been outstanding, (B) the actual rate of interest on such Variable Rate Bonds on the date of calculation and (C) the lesser of the maximum rate then permitted by law and the maximum rate permitted on such Variable Rate Bonds by the resolution authorizing the issuance thereof; *provided*, *however*, that if the Authority has notified the 1968 Fiscal Agent that a Swap

agreement is in effect in respect of such Variable Rate Bonds, then for all purposes of this paragraph the interest rate on such Variable Rate Bonds shall be the Swap rate under such Swap agreement.

(b)   in the case of Put Bonds, the tender date or dates shall be ignored if the source for payment of said tender is a liquidity facility and the stated periods for Amortization Requirements and the stated dates for principal payments shall be used, and in the case of Bonds secured by a credit facility or a liquidity facility, the terms of the reimbursement obligation to the issuers thereof shall be ignored and the stated periods for Amortization Requirements and the stated dates for principal payments shall be used; provided, however, that during any period after the issuer of a credit facility or a liquidity facility, as the case may be, has advanced funds thereunder, the reimbursement obligation of which is payable from and secured on a parity with the Bonds and before such amount is repaid, Principal and Interest Requirements shall include the principal amount so advanced and interest thereon, in accordance with the principal repayment schedule and interest rate or rates specified in the credit facility or liquidity facility, as the ease may be, in lieu of the stated principal of and Amortization Requirements and interest on such Bonds;

(c)   in the case of Extendible Maturity Bonds, the Bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date shall have been extended;

(d)   in the case of Capital Appreciation Bonds, the Accreted Value of Capital Appreciation Bonds becoming due at maturity or by virtue of an Amortization Requirement shall be included during such period in which said principal and interest portions are due;

(e)   in the case of Capital Appreciation and Income Bonds, the principal and interest portions of the Appreciated Value of Capital Appreciation and Income Bonds shall be included during the period in which said principal and interest portions are due;

(f)   in the case of Balloon Bonds or Interim Bonds, the debt service requirements of the Balloon Bonds or Interim Bonds may be excluded and in lieu thereof the Balloon Bonds or interim Bonds shall be viewed as debt securities having a comparable federal tax status as such Balloon Bonds or Interim Bonds maturing in substantially equal annual payments of principal and interest over a period of not more than 30 years from the date of issuance thereof, bearing interest at a fixed rate per annum equal to the average interest rate per annum for such debt securities on the date of issuance of the Balloon Bonds or Interim Bonds and issued by issuers having a credit rating, issued by Moody's or any successors thereto or S&P or any successors thereto comparable to that of the Authority, as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities; and

(g)   if all or a portion of the principal of or interest on a Series of Bonds is payable from moneys irrevocably set aside or deposited for such purpose, together with projected earnings thereon to the extent such earnings are projected to be from Investment Obligations irrevocably set aside or deposited for such purpose on the date of computation, such principal or interest shall not be included in determining Principal and Interest Requirements; provided that the above computation shall be supported by a verification report from a nationally recognized independent certified public accountant as to the sufficiency of such moneys set aside and projected earnings.

"Put Bonds" means Bonds which by their terms may be tendered by and at the option of the holder thereof for payment prior to the stated maturity thereof.

"Reserve Account Insurance Policy" means the insurance policy, surety bond or other acceptable evidence of insurance, which policy, bond or other evidence of insurance constitutes an unconditional senior obligation of the issuer thereof. The issuer shall be a municipal bond insurer whose senior debt obligations, ranking *pari passu* with its obligations under such policy, bond or other evidence of

insurance, are rated at the time of deposit to the credit of the 1968 Reserve Account in any of the three highest rating categories (without regard to any gradation within any such category) of either Moody's or any successors thereto or S&P or any successors thereto.

"Reserve Account Letter of Credit" means the irrevocable, transferable letter of credit, if any, which letter of credit constitutes an unconditional senior obligation of the issuer thereof. The issuer shall be a banking association, bank or trust company or branch thereof whose senior debt obligations, ranking *pari passu* with its obligations under such letter of credit, are rated at the time of deposit to be credit of the 1968 Reserve Account in any of the three highest rating categories (without regard to any gradation within any such category) of either Moody's or any successors thereto or S&P or any successors thereto.

"1968 Reserve Requirement" means the lesser of (a) the maximum Principal and Interest Requirements for any fiscal year on account of the outstanding Bonds and (b) ten percent (10%) of the original principal amount of each Series of Bonds outstanding (determined on the basis of their initial offering prices to the public).

"1968 Revenues" means (a) all moneys received by the Authority on account of the gasoline tax allocated to the Authority by Act No. 75, approved June 23, 1965; (b) Toll Revenues; (c) the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico has allocated or may hereafter allocate to the Authority and expressly authorize the Authority to pledge to the payment of the principal of and interest on bonds or other obligations of the Authority and which are pledged by the Authority to the payment of the principal of and interest on Bonds issued under the provisions of the Resolution; provided that written notice of such pledge has been delivered to S&P, Moody's, and any other rating agency then rating the Bonds and (d) investment earnings on deposits to the credit of funds and accounts established under the Resolution, except for the Construction Fund.

"Swap agreement" means an agreement between the Authority and a Swap party whereby the Swap party agrees to pay to the Authority amounts calculated on the basis of all or a portion of the interest on Variable Rate Bonds at or prior to the times such interest is due and payable in consideration of the Authority's payment to the Swap party of amounts set forth in the Swap agreement

"Swap party' means a person who is party to a Swap agreement and whose senior obligations are rated at the time of the execution and delivery of such Swap agreement in one of the three highest rating categories (without regard to gradations within a category) by (i) S&P or its successor and (ii) Moody's or its successor.

"Swap rate" means the fixed rate per annum on the principal amount of Variable Rate Bonds covered by a Swap agreement equal to the percentage derived by dividing (i) the sum of the amounts in the last twelve months paid by the Authority in respect of interest on such bonds and to the Swap party less the amount paid to the Authority by the Swap party by (ii) such principal amount of Variable Rate Bonds; provided, however, that if such Swap agreement has been in effect for less than twelve months, such percentage shall be multiplied by 360 divided by the number of days between the effective date of such Swap agreement and the date of calculation determined on the basis of 30-day month; provided further, that if no amount has been paid under the Swap agreement, the Swap rate shall be deemed to be the fixed rate per annum contracted to be paid by the Authority to the Swap party.

"Toll Revenues" means the tolls or other charges, if any, imposed by the Authority for the use of any of its Traffic Facilities.

"Traffic Facilities" means any of the following facilities for which Bonds shall be issued under the Resolution the cost of which facilities paid from the proceeds of such Bonds shall not have been

reimbursed to the Authority from funds not encumbered by the Resolution: (1) roads, avenues, streets, thoroughfares, speedways, bridges, tunnels, channels, stations, terminals, and any other land or water facilities necessary or desirable in connection with the movement of persons, freight, vehicles or vessels; (2) parking lots and structures and other facilities necessary or desirable in connection with the parking, loading or unloading of all kinds of vehicles and vessels; and (3) all property, rights, easements, and interests therein necessary or desirable for the construction, maintenance, control, operation or development of such traffic facilities.

"Variable Rate Bonds" means Bonds issued with a variable, adjustable, convertible or similar interest rate which is not fixed in percentage at the date of issue for the term thereof, but which may or may not be convertible to a fixed interest rate for the remainder of their term. (Section 101).

**Sinking Fund**

The Resolution creates the "Puerto Rico Highways Authority Highway Revenue Bonds Interest and Sinking Fund" (the "1968 Sinking Fund"). The "1968 Bond Service Account," "1968 Redemption Account," and "1968 Reserve Account" are created within the 1968 Sinking Fund. (Section 401).

The moneys in each Account are held by the 1968 Fiscal Agent in trust and, pending application, are subject to a lien in favor of the holders of the outstanding Bonds and for the further security of such holders until paid out or transferred as provided in the Resolution. (Section 401).

All Revenues (other than investment earnings), and any other funds of the Commonwealth allocated to the Authority for the payment of principal of and interest on any Bonds, are deposited monthly with the 1968 Fiscal Agent as follows:

(1) To the 1968 Bond Service Account, an amount equal to 1/6th of the amount of interest payable on all Bonds of each Series on the next succeeding interest payment date and an amount equal to 1/12th of the next maturing installment of principal of any serial bonds; provided, however, that the amount so deposited on account of the interest in each month after the delivery of the Bonds of any Series up to and including the month immediately preceding the first interest payment date thereafter of the Bonds of such Series shall be that amount which when multiplied by the number of such deposits will be equal to the amount of interest payable on such Bonds on such first interest payment date less the amount of any accrued interest paid on such Bonds and deposited to the credit of the 1968 Bond Service Account;

(2) To the 1968 Redemption Account, an amount equal to 1/12th of the Amortization Requirement for such fiscal year for the term bonds of each Series then outstanding plus an amount equal to 1/12th of the premium, if any, which would be payable on the first redemption date in the following fiscal year on a like principal amount of Bonds if such principal amount of Bonds should be redeemed prior to their maturity from moneys in the 1968 Sinking Fund;

(3) To the 1968 Reserve Account, such amount as is required to make the amount deposited to the credit of said Account in the then current fiscal year at least equal to 20% of the 1968 Reserve Requirement; provided, however, that such deposits shall only be made to the extent necessary to make the amount then in the 1968 Reserve Account equal to the 1968 Reserve Requirement; provided, further, that in the event of an increase in the 1968 Reserve Requirement due to the issuance of additional Series of Bonds, such increase may be funded by deposits in each of the five (5) years, commencing in the fiscal year in which such additional Series of Bonds is issued, of 20% of such increase in the Reserve Requirement; and

(4)     Any 1968 Revenues remaining after making the deposits referred to above shall be deposited to the credit of the 1968 Construction Fund for use by the Authority for any of its authorized purposes.  (Section 401).

The requirements specified in paragraphs (1), (2), and (3) above are cumulative.  (Section 401).

In lieu of any required deposit of Revenues into the 1968 Reserve Account, or in substitution for all or a portion of the moneys then on deposit in the 1968 Reserve Account, the Authority may deposit into the 1968 Reserve Account a Reserve Account Insurance Policy or a Reserve Account Letter of Credit for the benefit of the holders in an amount equal to the required deposit, which Reserve Account Insurance Policy or Reserve Account Letter of Credit shall be payable or available to be drawn upon, as the case may be (upon the giving of notice as required thereunder), on any interest payment date on which a deficiency exists which cannot be cured by moneys in any other fund or account held by the 1968 Fiscal Agent pursuant to the Resolution and available for such purpose. If a disbursement is made under the Reserve Account Insurance Policy or the Reserve Account Letter of Credit, the Authority shall be obligated either to reinstate the limits of such Reserve Account Insurance Policy or Reserve Account Letter of Credit following such disbursement, or to deposit into the 1968 Reserve Account from Revenues, funds in the amount of the disbursement made under such Reserve Account Insurance Policy or Reserve Account Letter of Credit.  (Section 401).

Moneys in the 1968 Redemption Account shall be applied to the retirement of Bonds as follows:

(a)     Subject to the provisions of paragraph (c) below, the 1968 Fiscal Agent shall endeavor to purchase outstanding Bonds, whether or not such Bonds shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, having regard to interest rate and price, such price not to exceed the principal of such Bonds plus the amount of the premium, if any, which would be payable on the next redemption date to the holders of such Bonds if such Bonds should be called for redemption on such date from moneys in the 1968 Sinking Fund. The 1968 Fiscal Agent shall pay the interest accrued on such Bonds to the date of delivery thereof from the 1968 Bond Service Account and the purchase price from the 1968 Redemption Account, but no such purchase shall be made within 45 days next preceding any interest payment date on which such Bonds are subject to redemption except from moneys in excess of the amounts set aside or deposited for the redemption of Bonds.

(b)     Subject to the provisions of paragraph (c) below, the 1968 Fiscal Agent shall call for redemption on each interest payment date on which Bonds are subject to redemption from moneys in the 1968 Sinking Fund such amount of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the 1968 Redemption Account as nearly as may be; provided, however, that not less than $50,000 principal amount of Bonds shall be called for redemption at any one time.

(c)     Moneys in the 1968 Redemption Account shall be applied to the purchase or redemption of Bonds in the following order:

First, the term Bonds of each Series, if any, in the order of their issuance, to the extent of the Amortization Requirement, if any, of the then current fiscal year for such term Bonds and any deficiency in preceding fiscal years in the purchase or redemption of such term Bonds under the provisions of this subdivision; provided, however, that if none of the term Bonds of a Series shall be subject to redemption from moneys in the 1968 Sinking Fund and if the 1968 Fiscal Agent shall at any time be unable to exhaust the moneys applicable to the Bonds of any such Series in the purchase of such bonds under the provisions of paragraph (a) above, such moneys or the balance of such moneys, as the case may be, shall be retained in the 1968 Redemption Account and, as soon as it is feasible, applied to the retirement of the Bonds of such Series;

Second, to the purchase of any outstanding Bonds, whether or not such Bonds shall then be subject to redemption, in accordance with the provisions of paragraph (a) above;

Third, term Bonds of each Series in proportion (as nearly as practicable) to the aggregate principal amount of the Bonds of each such Series originally issued; and

Fourth, after the retirement of all term Bonds, serial Bonds in the inverse order of their maturities, and to the extent that serial Bonds of different Series mature on the same date, in proportion (as nearly as practicable) to the principal amount of each Series maturing on such date. (Section 403).

All expenses in connection with such purchase or redemption shall be paid from the 1968 Construction Fund. (Section 403).

Moneys in the 1968 Reserve Account shall be used for the purpose of paying interest on the Bonds and maturing principal of serial Bonds whenever and to the extent that the moneys held for the credit of the 1968 Bond Service Account shall be insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the 1968 Redemption Account pursuant to the requirements mentioned in paragraph (2) above whenever and to the extent that the Revenues are insufficient for such purpose. Excess moneys in the 1968 Reserve Account shall be transferred to the 1968 Construction Fund, the 1968 Bond Service Account or the 1968 Redemption Account, as directed by the Authority. (Section 404).

**1968 Construction Fund**

Moneys in the 1968 Construction Fund may be used for any authorized purpose of the Authority, including, prior to the adoption of the 1998 Resolution, the payment of the cost of maintaining, repairing, and operating the Traffic Facilities and the cost of necessary renewals and replacements of Traffic Facilities. (Sections 401, 604, and 605). Before any payment or withdrawal shall be made from moneys in the 1968 Construction Fund there shall be filed with the 1968 Fiscal Agent a certificate signed by a designated officer of the Authority setting forth the amount of money to be so disbursed and stating that such money will be used to pay the costs of constructing Traffic Facilities or for other purposes permitted by the Resolution. Upon receipt of such certificate the 1968 Fiscal Agent shall withdraw from the 1968 Construction Fund and deposit to the credit of a special checking account in its commercial department in the name of the Authority the amount so specified in such certificate. The 1968 Fiscal Agent shall also at any time at the written direction of the Authority transfer any part of the moneys in the 1968 Construction Fund to the credit of the 1968 Redemption Account. (Section 405).

**Issuance of Additional Bonds**

As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the Authority may not withdraw, expend, pledge or otherwise encumber moneys held to the credit of the 1968 Construction Fund whether for the purpose of satisfying the Authority's priorities construction program or otherwise, except for the payment over to the 1998 Resolution as described in the third sentence of the fourth paragraph under "Summary of Certain Provisions of the 1998 Resolution-Sinking Funds." See "Summary of Certain Provisions of the 1998 Resolution--Miscellaneous Covenants--Relating to the 1968 Resolution."

**Defeasance**

If all the outstanding Bonds shall have been paid or deemed to have been paid as provided below, then and in that case the right, title, and interest of the bondholders under the Resolution shall cease,

terminate, and become void, and such Bonds shall, except as described in the next sentence, cease to be entitled to any lien, benefit or security under the Resolution. In such event, the Authority shall repeal and cancel the Resolution and may apply any surplus in the 1968 Sinking Fund and all balances remaining in any other funds and accounts other than moneys held for the redemption or payment of Bonds to any lawful purposes of the Authority as the Secretary shall determine. Under the terms of the 1998 Resolution, all such surplus and balances are required upon the repeal and cancellation of the Resolution to be transferred to the 1998 Revenue Fund.

Any outstanding Bond shall be deemed to have been paid within the meaning and with the effect expressed in the Resolution when the whole amount of the principal of, redemption premium, if any, and interest on such Bond shall have been paid or duly provided for and the conditions set forth in clause (c) below have been satisfied or when (a) in case such Bond has been called for redemption or the Authority has given irrevocable instructions to call such Bond for redemption, (b) there shall have been deposited either moneys in an amount which shall be sufficient, or Government Obligations the principal of and interest on which are sufficient, to pay when due the principal of and premium, if any, and interest due and to become due on such Bond on or prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event such Bond does not mature and is not to be redeemed within the next succeeding sixty (60) days, the Authority shall have given irrevocable instructions to give, as soon as practicable, a notice to the holder of such Bond by first-class mail, postage prepaid, stating that the deposit in trust of moneys or such time deposits or Government Obligations required by clause (b) of this paragraph has been made and that such Bond is deemed to have been paid in accordance with the Resolution and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of and premium, if any, and interest on such Bond.

Neither the moneys nor Government Obligations deposited with the 1968 Fiscal Agent or other appropriate fiduciary institution acting as escrow agent nor principal or interest payments on any such obligations shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal of and redemption premium, if any, and interest on the Bonds which have been defeased.

As to Variable Rate Bonds, the amount required for the interest thereon shall be calculated at the maximum rate permitted by the terms of the provisions of the resolution which authorized the issuance of such Variable Rate Bonds.

Notwithstanding any of the provisions of the Resolution to the contrary, Put Bonds and Extendible Maturity Bonds may only be fully discharged and satisfied either by paying the principal of and interest on said Bonds as they become due and payable or by depositing moneys which shall be sufficient at the time of such deposit to pay when due the maximum amount of principal of and redemption premium, if any, and interest on such Put Bonds and Extendible Maturity Bonds which could become payable to the holders of such Bonds upon the exercise of any options provided to the holders of such Bonds and the Authority; provided, however, that if, at the time a deposit is made pursuant to this paragraph, the options originally exercisable on the Put Bonds and Extendible Maturity Bonds are no longer exercisable, such Bonds shall not be considered Put Bonds or Extendible Maturity Bonds for these purposes.

If any portion of the moneys deposited for the payment of the principal of and redemption premium, if any, and interest on any portion of Bonds is not required for such purpose, the Authority may use the amount of such excess, subject to certain tax covenants contained in the Resolution, free and clear of any trust, lien, security interest, pledge or assignment securing said Bonds or otherwise existing under the Resolution.  (Section 901).

As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the purposes for which additional Bonds may be issued are limited to refunding other Bonds for debt service savings and to exchange Bonds for Special Facility Bonds. See "Additional Bonds-Highway Revenue Bonds" under *The 2003 Bonds* above in this Official Statement.

Bonds may be issued under and secured by the Resolution, subject to the conditions hereinafter described, at any time or times for the purpose of providing funds to pay the cost of Traffic Facilities, to refund all or any part of the outstanding Bonds of any one or more Series by payment at maturity or redemption at a selected redemption date or dates, including the payment of any redemption premium thereon, to fund a deposit to the 1968 Reserve Account and to pay any costs of issuance of such Bonds. (Sections 208 and 209).

Before such Bonds shall be authenticated and delivered, there shall be filed with the 1968 Fiscal Agent, among other things, a certificate dated the date of original issuance of the Bonds, signed by the Executive Director, setting forth:

    (i)      the amount of the Revenues for any twelve (12) consecutive calendar months out of the fifteen (15) calendar months immediately preceding the month in which such certificate is signed;

    (ii)     the amount of the Toll Revenues for the twelve (12) calendar months for which the Revenues are shown in item (i) above;

    (iii)    the difference between the amounts set forth in items (i) and (ii) above;

    (iv)    the amount of the maximum Principal and Interest Requirement for any fiscal year thereafter on account of the Bonds then outstanding and the Bonds then requested to be delivered;

    (v)     the percentage derived by dividing the amount in item (i) above by the amount in item (iv) above; and

    (vi)    the percentage derived by dividing the amount in item (iii) above by the amount in item (iv) above.  (Section 208).

The 1968 Fiscal Agent may only deliver such additional Bonds if the percentage shown in either item (v) or item (vi) is not less than 150%.  (Section 208). The Authority need not deliver said certificate in connection with the issuance of refunding bonds if the Executive Director delivers a certificate to the effect that the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the Bonds to be outstanding after the issuance of the refunding Bonds shall be equal to or less than the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the Bonds outstanding prior to the issuance of such refunding Bonds. (Section 209),

If the percentage shown in item (vi) of the certificate mentioned above and filed with the 1968 Fiscal Agent in connection with the issuance of any additional Bonds is less than 150%, the Authority may not reduce the tolls or other charges imposed by it for the use of its Traffic Facilities such that, as of the effective date of such reduction, the amount of Revenues for any twelve (12) consecutive calendar months out of the fifteen (15) calendar months immediately preceding such effective date, adjusted to reflect the Toll Revenues it would have received, based on the volume of traffic for such twelve (12) months, if such reduction had been in effect for such twelve (12) months, is less than 150% of the

maximum Principal and Interest Requirements for any fiscal year thereafter on account of all Bonds then outstanding.  (Section 609).

As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the ability of the Authority to reduce tolls or other charges imposed by it for the use of its Toll Facilities is further restricted as described in "Miscellaneous Covenants--Level of Tolls and Other Charges" under *Summary of Certain Provisions of the 1998 Resolution.*

Any increase in the 1968 Reserve Requirement resulting from the issuance of such additional Bonds may be satisfied by equal deposits of 20% of such increase into the 1968 Reserve Account in each of the next five years beginning with the fiscal year in which such additional Bonds were issued.  (Section 401).

**Other Indebtedness**

The Authority will not incur any indebtedness nor create or cause or suffer to be created any debt, lien, pledge, assignment, encumbrance or any other charge having a priority to or being on a parity with the lien on Revenues of the Bonds issued under the Resolution, except upon the conditions and in the manner provided in the Resolution. Any other indebtedness incurred by the Authority shall contain an express statement that such indebtedness is junior, inferior and subordinate in all respects to the Bonds. For purposes of the above limitation in incurrence of indebtedness, indebtedness shall not be deemed to include contracts entered into in the ordinary course of business or agreements to repay advances received from the federal government. Nothing in the Resolution shall be deemed to prohibit the Authority from entering into currency swaps, interest rate swaps or other arrangements for hedging of interest rates on any indebtedness.  (Section 602).

Nothing in the Resolution is to be construed as preventing the Authority from financing any facilities authorized by the act creating the Authority by the issuance of bonds or other obligations which are not secured under the provisions of the Resolution.  (Section 1001).

As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the Authority may not incur any indebtedness nor create or suffer to be created any lien, pledge, assignment, encumbrance or charge upon the Existing Toll Facilities or the Existing Tax and Fee Revenues ranking equally with or prior to the Bonds.

**Investment of Funds**

Moneys held for the credit of the 1968 Bond Service Account and the 1968 Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Government Obligations, and moneys held for the credit of the 1968 Construction Fund and the 1968 Reserve Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations, which Government Obligations and Investment Obligations shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when moneys held for the credit of such Fund or Accounts will be required for the purposes intended. Amounts on deposit in the 1968 Reserve Account shall be invested in Investment Obligations which mature not later than the final maturity date of any Bonds outstanding.  (Section 502).

Investment earnings on moneys on deposit to the credit of the following Fund and Accounts shall be applied as follows:

(a)     investment earnings on moneys on deposit to the credit of the 1968 Construction Fund shall be retained to the credit of said Fund;

(b)     investment earnings on moneys on deposit to the credit of the 1968 Reserve Account shall be retained in said Account at any time that the amounts on deposit to the credit of said Account are less than the 1968 Reserve Requirement and, if moneys on deposit therein are sufficient for such purposes, then such earnings shall be withdrawn and deposited to the credit of the 1968 Construction Fund, the 1968 Bond Service Account or the 1968 Redemption Account, as the Authority shall direct; and

(c)     investment earnings on moneys on deposit to the credit of the 1968 Bond Service Account and the 1968 Redemption Account shall be transferred to the 1968 Construction Fund or at the option of the Authority retained in such Account.  (Section 502).

In computing the amount in any Fund or Account created pursuant to the provisions of the Resolution, obligations purchased as an investment of moneys therein shall be valued at par if purchased at par or at amortized value if purchased at other than par, plus, in each case, accrued interest. Amortized value, when used with respect to an obligation purchased at a premium above or a discount below par, means the value as of any given time obtained by dividing the total premium or discount at which such obligation was purchased by the number of days remaining to maturity on such obligation at the date of such purchase and by multiplying the amount thus calculated by the number of days having passed since such purchase; and (1) in the case of an obligation purchased at a premium by deducting the product thus obtained from the purchase price, and (2) in the case of an obligation purchased at a discount by adding the product thus obtained to the purchase price. Valuation on any particular date shall include the amount of interest then earned or accrued to such date on any moneys or investments in such Fund or Account. The computation of the amount on deposit in or credited to the Fund and Accounts created under the Resolution and the valuation of the investments of such amount shall be performed by the 1968 Fiscal Agent as of the close of business on the last day of each fiscal year and at such other times as the Authority shall request, and such computation and valuation shall not be required to be performed at other times.  (Section 503).

## Modifications

As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the ability of the Authority to amend the Resolution will be limited. See "Miscellaneous Covenants--Relating to the 1968 Resolution" in *Summary of Certain Provisions of the 1998 Resolution.*

The Authority may adopt resolutions supplemental to the Resolution without the consent of the bondholders to cure any ambiguity, formal defect or omission, or to correct any inconsistent provisions or errors in the Resolution or any supplemental resolution, or to grant or confer upon the bondholders any additional rights, remedies, powers, authority or security, or to add to the conditions, limitations and restrictions on the issuance of Bonds under the provisions of the Resolution, or to add to the covenants and agreements of the Authority in the Resolution or to surrender any right or power reserved to or conferred upon the Authority, or to make necessary changes to facilitate the issuance of Variable Rate Bonds, Capital Appreciation Bonds, Capital Appreciation and Income Bonds, Put Bonds, Extendible Maturity Bonds, Balloon Bonds, Interim Bonds, and such other bonds as may be marketable from time to time, or to make changes as may evidence the right and interest of an issuer of a Credit Facility or a Liquidity Facility that secures any Series of Bonds.  (Section 801).

The holders of not less than two-thirds in aggregate principal amount of the Bonds then outstanding shall have the right to consent to and approve the adoption of such resolution or resolutions

supplemental to the Resolution as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding any of the terms and provisions contained in the Resolution or in any supplemental resolution; provided, however, that nothing contained in the Resolution shall permit, or be construed as permitting, (a) an extension of the maturity of the principal of or the interest on any Bond, or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) the creation of a lien upon or a pledge of Revenues other than the lien and pledge created by the Resolution, or (d) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental resolution.  (Section 802).

Upon the adoption of any supplemental resolution pursuant to the provisions of the Resolution, the Resolution shall be and be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under the Resolution of the Authority, the 1968 Fiscal Agent and all holders of Bonds then outstanding shall thereafter be determined, exercised, and enforced in all respects under the provisions of the Resolution as so modified and amended.  (Section 802).

**Miscellaneous Covenants**

*Master Plan*.  The Authority covenants that the master plan for the construction of required Traffic Facilities in the Commonwealth will be supplemented periodically as necessary and that the five-year Construction Improvement Program will be updated each year to cover the Traffic Facilities to be constructed by the Authority in the ensuing five-year period.  (Section 603).

*Costs of Maintenance, Repair and Operation of Traffic Facilities*.  The Authority covenants that, if and to the extent funds for the purpose of maintaining, repairing, and operating all Traffic Facilities financed by the Authority in whole or in part by the issuance of Bonds of the Authority under the provisions of the Resolution are not provided by the Commonwealth, the Authority will pay such costs from unencumbered funds then on deposit in the 1968 Construction Fund or from the Revenues thereafter deposited to the credit of the 1968 Construction Fund pursuant to the Resolution.  (Section 604).  As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the Authority's obligations under this paragraph will be payable from moneys in the 1998 Construction Fund instead of the 1968 Construction Fund.

The Authority covenants that it will cause an annual general evaluation to be made by the Traffic Engineers of the level of maintenance of Traffic Facilities financed in whole or in part by the issuance of Bonds, which Traffic Facilities shall be, in the judgment of the Authority with the approval of the Traffic Engineers, material to the overall system of traffic facilities operated by the Authority. This evaluation is to be directed towards surface and shoulder conditions and condition of structures and signs on the Traffic Facilities. The annual report delivered by the Traffic Engineers under Section 605 of the Resolution and the Authority's obligations to cause repairs, renewal or replacements to be made to Traffic Facilities, shall pertain to the Traffic Facilities financed in whole or in part with Bond proceeds and adjudged to be material to the overall system of traffic facilities operated by the Authority.  (Section 604).

*Annual Report of Traffic Engineers*.  The Authority covenants that it will cause the Traffic Engineers to prepare a report each year promptly after the completion of their general evaluation of the level of maintenance of the Traffic Facilities referred to in the preceding paragraph setting forth (i) their comments with respect to any supplements or revisions made by the Authority in the master plan or in the five-year Construction Improvement Program referred to above under "Master Plan" and their recommendations as to any supplements or revisions which should be made in such plan or in the Construction Improvement Program, and (ii) their findings as to whether the Traffic Facilities have been

maintained in good repair, working order and sound condition and their recommendations as to necessary repairs, renewals or replacements.  (Section 605).

If it appears from such report that repairs, renewals or replacements of any such Traffic Facilities are necessary, the Authority shall promptly cause the same to made and if and to the extent that funds for such purpose have not been made available by the Commonwealth, moneys on deposit to the credit of the 1968 Construction Fund which have not theretofore been encumbered for other purposes, and moneys which are thereafter deposited to the credit of the 1968 Construction Fund pursuant to the Resolution shall first be applied for such purpose.  (Section 605).  As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the Authority's obligations under this paragraph will be payable from moneys in the 1998 Construction Fund instead of the 1968 Construction Fund.

**SUMMARY OF CERTAIN PROVISIONS
OF THE PROPOSED SUPPLEMENTAL RESOLUTIONS**

The following is a summary of certain provisions of a resolution proposing to amend the 1968 Resolution, which resolution will be adopted when the consent of the owners of 100% of the Highway Revenue Bonds has been obtained. Such statements do not purport to be complete and reference is made to the proposed supplemental resolution, copies of which are available from the Authority or the 1968 Fiscal Agent. See "Modifications" in *Summary of Certain Provisions of the 1968 Resolution* for limitations as to the ability of the Authority to modify the 1968 Resolution further. The 1968 Resolution, the Highway Revenue Bonds issued thereunder, and the 1968 Resolution Revenues are referred to in this summary as the "Resolution," the "Bonds," and "Revenues," respectively.

The proposed supplemental resolution will provide as follows:

**Modification with Consent of Holders of Majority of Bonds**

Subject to the terms and provisions contained below, and not otherwise, the holders of not less than a majority in aggregate principal amount of the Bonds at the time outstanding (or in case less than all of several Series of Bonds then outstanding are affected by the supplement thereto, the holders of a majority or more in principal amount of the Bonds of the Series so affected and outstanding at the time the consent and approval are given) shall have the right, from time to time, anything contained in the Resolution to the contrary notwithstanding, to consent to and approve the adoption by the Authority of such resolution or resolutions supplemental thereto as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in the Resolution or in any supplemental resolution; provided, however, that nothing contained in the Resolution shall permit, or be construed as permitting, without the consent of the holders of one hundred percent (100%) of the Bonds outstanding (a) an extension of the maturity of the principal of or interest on any Bond issued thereunder (other than as provided for by the terms of an Extendible Maturity Bond), or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) the creation of a lien upon or a pledge of Revenues ranking prior to or on a parity with the lien or pledge created by the Resolution, except for a parity lien on or pledge of Revenues given to any provider of a credit facility or liquidity facility under any reimbursement or similar agreement, or (d) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Bonds required for consent to and approval of such supplemental resolution. Nothing contained in the Resolution, however, shall be construed as making necessary the approval by bondholders of the adoption of a supplemental resolutions that would otherwise not require their consent. Except as to supplemental resolutions containing changes described in clauses (a) through (e) of the proviso to the first sentence of this

III-14

paragraph, the provider of any credit facility or liquidity facility shall have the right, in lieu of the holders of Bonds secured thereby; to give consent and approval to any supplemental resolution for which the consent of the holders of such Bonds is required under the Resolution, and all references to bondholders for purposes of such consent and approval shall mean instead the provider of said credit facility or liquidity facility; provided, however, that said provider of a credit facility or liquidity facility shall not be in default on its obligations in connection with said credit facility or liquidity facility.

The consent of the holders of any Series of additional Bonds shall be deemed given if the underwriters or initial purchasers for resale consent in writing to such supplemental resolution and the nature of the amendment effected by such supplemental resolution is disclosed in the official statement or other offering document pursuant to which such series of additional Bonds is offered and sold to the public.

**Parity Liens to Providers of Credit Facilities and Liquidity Facilities**

In connection with the execution and delivery of a reimbursement or similar agreement in which the Authority agrees to reimburse a provider of a credit facility or a liquidity facility for amounts drawn on any such facility or to pay fees for any such facility, the Authority can grant a security interest and lien upon all or any portion of the Revenues to secure said reimbursement obligation on a parity with the Bonds.

**Calculation of Interest Rate on Variable Rate Bonds**

The following is a summary of certain provisions of a resolution proposing to amend the 1968 Resolution, which resolution will be adopted when the consent of owners of two-thirds in aggregate principal amount of the Highway Revenue Bonds has been obtained. Such statements do not purport to be complete and reference is made to the proposed supplemental resolution, copies of which are available from the Authority or the 1968 Fiscal Agent. See "Modifications" in *Summary of Certain Provisions of the 1968 Resolution* for limitations as to the ability of the Authority to modify the 1968 Resolution further.

The proposed supplemental resolution will provide as follows:

(a)       in the ease of Variable Rate Bonds, the interest rate thereon shall be assumed to be (A) in the case of Variable Rate Bonds outstanding on and before the date of calculation the greater of the average interest rate on such Bonds during the sixty months or twelve months ending in either case with the month preceding the date of calculation (or such shorter period (ending with the same month as aforesaid) that such Variable Rate Bonds shall have been Outstanding), and (B) in the case of Variable Rate Bonds first being delivered on such date of calculation and are being issued (1) on the basis that interest on such Variable Rate Bonds would be excludible from gross income of the owners thereof for federal income tax purposes, the greater of the average of the Bond Market Association Swap Index (the "BMA Index") (i) for the twelve month period and (ii) the sixty month period in either case ending seven days before the date of calculation plus 100 basis points, or (2) as Variable Rate Bonds not described in clause (B)(1), the greater of the average of the London Interbank Offered Rate ("LIBOR") for the time period most closely resembling the reset period for the Variable Rate Bonds (i) for the twelve month period and (ii) for the sixty month period in either case ending seven days before the date of calculation plus 100 basis points (if the BMA Index or LIBOR shall cease to be published, the index to be used shall be that index which the Authority, in consultation with Government Development Bank for Puerto Rico, determines most closely replicates such index, as set forth in a certificate of the Executive Director filed with the Fiscal Agent); provided, however, that if the Authority has notified the Fiscal Agent that a Swap agreement is in effect in respect of Variable Rate Bonds, then for all purposes of this paragraph the

interest rate on such Variable Rate Bonds shall be the Swap rate under such Swap agreement; and provided further, however, that in no event shall the interest rate so determined exceed the lesser of (x) the maximum rate then permitted by law and (y) the maximum rate permitted on such Variable Rate Bonds by the resolution authorizing the issuance thereof.

APPENDIX IV

**SUMMARY OF CERTAIN PROVISIONS OF THE 1998 RESOLUTION**

The following are brief summaries of certain provisions of the 1998 Resolution. Such statements do not purport to be complete and reference is made to the 1998 Resolution, copies of which are available from the Authority or the 1998 Fiscal Agent. For the purposes of this summary, the term "senior bonds" shall refer to "Senior Transportation Revenue Bonds"; the term "Subordinated Transportation Revenue Bonds" shall refer to "Subordinated Transportation Revenue Bonds"; and the term "bonds" shall refer to "Transportation Revenue Bonds"; as those terms are used in this Official Statement.

**Definition of Certain Terms**

"Accreted Value" means, with respect to any Capital Appreciation Bond or Capital Appreciation and Income Bond, an amount equal to the principal amount of such Bond on the date of original issuance plus the interest accrued on such Bond from the date of original issuance to the date of computation or the Interest Commencement Date, as the case may be, such interest to accrue at the rate set forth in the resolution providing for the issuance of said Bond, but not exceeding the maximum rate permitted by law, compounded periodically at the times provided for in such resolution.

"Capital Appreciation Bonds" means any bonds as to which interest is compounded periodically on each of the applicable dates designated for compounding in the resolution authorizing said Bonds and payable in an amount equal to the then current Accreted Value only at the maturity, earlier redemption or other payment date therefor, all as so provided by said resolution, and which may be either serial bonds or term bonds.

"Capital Appreciation and Income Bonds" means any bonds as to which accruing interest is not paid prior to the interest payment date immediately following the Interest Commencement Date specified in the resolution authorizing such Bonds and the interest on which is compounded periodically on the dates designated in such resolution prior to the Interest Commencement Date for such Capital Appreciation and Income Bonds, and which may be either serial bonds or term bonds.

"Cost of Transportation Facilities" or "cost of Transportation Facilities" means the cost of acquisition and construction of Transportation Facilities and the cost of all labor, materials, machinery and equipment, the cost of all lands, property, rights, easements and franchises acquired, interest prior to and during construction and for any additional period authorized by law if so provided by, and subject to any limitations in, the resolution authorizing the issuance of a Series of bonds, the cost of engineering and legal services, preliminary surveys, or plans and specifications, expenses of administration properly chargeable to such construction or acquisition, legal, architectural and engineering expenses and fees, the cost of audits and of preparing and issuing the bonds, fees and expenses of the 1998 Fiscal Agent and consultants, financing charges, taxes or other governmental charges lawfully assessed during construction, claims arising in connection with construction, premiums on insurance in connection with construction, premiums for bond insurance, interest rate insurance or insurance assuring availability of the amounts required to be on deposit in the Senior Bond Reserve Account or any account in the Subordinated Bond Reserve Fund, any amounts required to be deposited in the Senior Bond Reserve Account or any account in the Subordinated Bond Reserve Fund, initial set-up fees and annual fees for any Credit Facility or Liquidity Facility and tender agent fees and fees payable for remarketing bonds

supported by any Credit Facility or Liquidity Facility during such period, as may be specified in the resolution authorizing the issuance of such Series of bonds and all other items of expense not elsewhere in this definition specified, incident to the financing or construction of any Transportation Facilities and the placing of the same in operation.

"Existing Tax and Fee Revenues" means (1) the proceeds of the sixteen cents a gallon tax imposed on gasoline and one-half of the eight cents per gallon tax imposed on gas oil and diesel oil imposed by Subtitle B of Act No. 120, approved October 31, 1994, as amended, and allocated to the Authority by Act No. 223 of November 30, 1995, as amended, and by said Act's predecessor statutes and (2) the proceeds of the $15 increase per vehicle of annual motor vehicle license fees imposed by the Commonwealth and allocated to the Authority by Act. No. 9, approved August 12, 1982.

"Existing Toll Facilities Revenues" means the tolls or other charges imposed by the Authority for the use of any Traffic Facilities financed in whole or in part by the issuance of 1968 Resolution Bonds, including any extensions, betterments or improvements to such Facilities however financed or otherwise paid for.

"Fiscal Year" means the period commencing on the first day of July of any year and ending on the last day of June of the following year or any other twelve month period designated by the Authority.

"Government Obligations" means (i) direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States Government, (ii) bonds, debentures or notes issued by any of the following Federal Agencies: Banks for Cooperatives, Federal Intermediate Credit Banks, Federal Home Loan Banks, Export-Import Bank of the United States, Government National Mortgage Association or Federal Land Banks, (iii) obligations issued or guaranteed by an agency of the United States of America or person controlled or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by the Congress, (iv) municipal obligations, the payment of the principal of and interest and redemption premium, if any, on which are irrevocably secured by obligations described in clause (i) of this definition and which obligations are not subject to redemption prior to the date on which the proceeds attributable to the principal of the obligations are to be used and have been deposited in an escrow account which is irrevocably pledged to the payment of the principal of and interest and redemption premium, if any, on such municipal obligations, and (v) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clauses (i), (ii), (iii) and (iv) of this definition held by a bank (including the 1998 Fiscal Agent) or trust company as custodian and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated.

"Interest Commencement Date" means, with respect to any particular Capital Appreciation and Income Bonds, the date specified in the resolution providing for the issuance of such bonds after which interest accruing on such bonds shall be payable on a periodic basis prior to maturity, with the first such payment date being the applicable interest payment date immediately succeeding such Interest Commencement Date.

"Investment Obligations" means:

       (i)      Government Obligations,

(ii) direct and general obligations of any state or territory of the United States of America to the payment of the principal of and interest on which the full faith and credit of such state or territory is pledged, provided that such obligations are rated, on the date of investment therein, in any of the three highest rating categories (without regard to any gradations within any such category) by both Moody's or any successors thereto and S&P or any successors thereto,

(iii) bankers' acceptances, certificates of deposit or time deposits of any bank or national banking association (including the 1998 Fiscal Agent), trust company or savings and loan association (including any investment in pools of such bankers' acceptances, certificates of deposit or time deposits), which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation, are either (A) issued by a bank, trust company or savings and loan association having a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by such securities as are described in clauses (i) or (ii) above, having a market value at least equal to the principal amount of such bankers' acceptances, certificates of deposit or time deposits (or portion thereof not so insured); provided that the 1998 Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties,

(iv) any repurchase, reverse repurchase or investment agreement with any bank or trust company organized under the laws of any state of the United States or the Commonwealth or any national banking association (including the 1998 Fiscal Agent), insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any one or more of the securities described in clauses (i) or (ii) above, provided that the 1998 Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties,

(v) obligations, whether or not insured, issued by any state or territory of the United States, or any political subdivision, agency or instrumentality thereof which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's or any successors thereto and S&P or any successors thereto,

(vi) participating shares in a mutual fund or investment pool for local government investment; provided that the investments of such mutual fund or investment pool are rated in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's or any successors thereto, and S&P or any successors thereto,

(vii) (1) shares of stock in a corporation rated in the highest rating category by Moody's or any successors thereto and S&P or any successors thereto (without regard to gradations within such category) that (A) is a regulated investment company within the meaning of Section 851(a) of the Internal Revenue Code of 1986, as amended, and, meets the requirements of Section 852(a) of said Code for the calendar year; (B) invests all of its assets in obligations described in clauses (i) and (ii) above; and (C) has at least 98% of (I) its gross income derived from interest on, or gain from the sale of or other disposition of, such obligations or (II) the weighted average of its assets is represented by investments in such obligations or (2) money market accounts of the 1998 Fiscal Agent

IV-3

or any state or federally chartered bank, banking association, trust company or subsidiary trust company that is rated or whose parent state bank is rated in the highest short-term rating category or in one of the two highest long-term rating categories by Moody's or any successors thereto and S&P or any successors thereto (without regard to any gradations within such category), and

(viii)   any other obligations permitted under the laws of the Commonwealth which are rated, or which are issued by issuers which are rated, on the date of investment therein, in any of the three highest rating categories (without regard to any gradations within any such category) by both Moody's or any successors thereto and S&P or any successors thereto, or which are collateralized by such Investment Obligations.

"Mass Transit Facilities" means the equipment, omnibus facilities, rail facilities, and real property, constituting or to constitute part of, or used or reasonably anticipated to be used in connection with the operation of, any mass transportation facility or system, and related services operated by the Authority directly or by contract, lease or other arrangements entered into by the Authority, as the foregoing may from time to time be augmented or diminished.

"1968 Resolution Bonds" means all bonds issued under the 1968 Resolution.

"Principal and Interest Requirements" means for any fiscal year, as applied to the bonds of any Series issued under the provisions of the 1998 Resolution, the sum of:

(i)   the amount required to pay the interest on all outstanding bonds of such Series which is payable after July 31 in such fiscal year and on or before July 31 in the following fiscal year,

(ii)   the amount required to pay the principal of the serial bonds of such Series then outstanding which is payable after July 31 in such fiscal year and on or before July 31 in the following fiscal year, and

(iii)   the Amortization Requirement for the term bonds of such Series for such fiscal year.

The following rules shall apply in determining the amount of the Principal and Interest Requirements for any period:

(a)   in the case of Capital Appreciation Bonds, the Accreted Value of Capital Appreciation Bonds becoming due at maturity or by virtue of an Amortization Requirement shall be included when due and payable as part of the principal or Amortization Requirements in accordance with the above provisions;

(b)   in the case of Capital Appreciation and Income Bonds, the Appreciated Value of Capital Appreciation and Income Bonds becoming due at maturity or by virtue of an Amortization Requirement shall be included when due and payable as part of the principal or Amortization Requirements in accordance with the above provisions;

(c)   the interest rate on bonds issued with a variable, adjustable, convertible or similar rate of interest shall be in the case of (A) in the case of such bonds outstanding on and before the date of calculation the greater of the average interest rate on such bonds during the sixty months or twelve months ending in either case with the month preceding the date of calculation (or such

IV-4

shorter period (ending with the same month as aforesaid) that such bonds shall have been Outstanding), and (B) in the case of such bonds first being delivered on such date of calculation and are being issued (1) on the basis that interest on such bonds would be excludible from gross income of the owners thereof for federal income tax purposes, the greater of the average of the Bond Market Association Swap Index (the "BMA Index") (i) for the twelve month period and (ii) the sixty month period in either case ending seven days before the date of calculation plus 100 basis points, or (2) as bonds not described in clause (B)(1), the greater of the average of the London Interbank Offered Rate ("LIBOR") for the time period most closely resembling the reset period for such bonds (i) for the twelve month period and (ii) for the sixty month period in either case ending seven days before the date of calculation plus 100 basis points (if the BMA Index or LIBOR shall cease to be published, the index to be used shall be that index which the Authority, in consultation with Government Development Bank for Puerto Rico, determines most closely replicates such index, as set forth in a certificate of the Executive Director filed with the Fiscal Agent); provided, however, that if the Authority has notified the Fiscal Agent that a Swap agreement is in effect in respect of such bonds, then for all purposes of this paragraph, except for the purpose of determining the required deposits to the Senior Bond Sinking Fund or the Subordinated Bond Sinking Fund described in "Sinking Funds" below, the interest rate on such bonds shall be the Swap rate under such Swap agreement; and if such Swap rate is a variable rate, the interest rate on such bonds (except for the purpose specified above in this paragraph) shall be the average Swap rate for the preceding sixty months (or such shorter period that the Swap agreement has been in effect), or if such Swap agreement has not been in effect prior to the date of calculation, the Swap rate on the date of calculation;

(d)     in the case of the bonds which by their terms may be tendered at the option of the holder thereof for payment prior to maturity, the tender date or dates shall be ignored if the tender price for such bonds is payable from a letter of credit or insurance policy or similar credit or liquidity facility and the stated dates for Amortization Requirements and principal payments shall be used; provided, however, that if the issuer of the letter of credit or insurance policy or similar credit or liquidity facility has advanced funds thereunder and such amount has not been repaid, Principal and Interest Requirements shall include the repayment obligations thereof in accordance with the principal repayment schedule and interest rate or rates specified in the letter of credit or insurance policy or similar credit or liquidity facility or in the agreement with the Authority providing for the issuance of such instrument;

(e)     in the case of bonds the maturity of which may be extended by and at the option of the holder of the bonds or the Authority, the bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date has been extended;

(f)     in the case of bonds (A) which are expected to be repaid from the proceeds of bonds or other indebtedness or (B) on which interest is payable periodically and for which twenty-five percent (25%) or more of the principal amount matures during any one year and for which no Amortization Requirements have been established, the debt service requirements of the bonds may be excluded and in lieu thereof the bonds shall be treated, for purposes of the computation of Principal and Interest Requirements, as debt securities having a comparable federal tax status as such bonds, maturing in substantially equal annual payments of principal and interest over a period of not more than thirty (30) years from the date of issuance thereof, bearing interest at a fixed rate per annum equal to the average interest rate per annum for such debt securities issued on the date of issuance of the bonds and issued by issuers having a credit rating, issued by Moody's or any successors thereto or S&P or any successors thereto, comparable to that of the Authority, as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities; and

(g)    if all or a portion of the principal of or interest on a Series of bonds is payable from moneys irrevocably set aside or deposited for such purpose, together with projected earnings thereon to the extent such earnings are projected to be from Investment Obligations irrevocably set aside or deposited for such purpose on the date of computation, such principal or interest shall not be included in determining Principal and Interest Requirements; provided that the above computation shall be supported by a verification report from a nationally recognized independent certified public accountant as to the sufficiency of such moneys set aside and projected earnings.

"Reserve Account Insurance Policy" means an insurance policy, surety bond or other acceptable evidence of insurance, which policy, bond or other evidence of insurance constitutes an unconditional senior obligation of a municipal bond insurer whose policy or bond results in the rating of municipal obligations secured by such policy or bond, at the time of deposit to the credit of the Reserve Account, in either of the two highest rating categories (without regard to any gradations within either such category) of either Moody's or any successors thereto or S&P or any successors thereto.

"Reserve Account Letter of Credit" means an irrevocable, transferable letter of credit, which letter of credit constitutes an unconditional senior obligation of a banking association, bank or trust company or branch thereof whose letter of credit results in the rating of municipal obligations secured by such letter of credit, at the time of deposit to the credit of the Reserve Account, in either of the two highest categories (without regard to any gradations within either such category) of either Moody's or any successors thereto or S&P or any successors thereto and any agreement of the type referred to in the definition of "Subordinated Reserve Requirement."

"Revenues" means all moneys received by the Authority on account of the crude oil tax allocated to the Authority by Act No. 34, approved July 16, 1997, as amended, all Existing Tax and Fee Revenues upon the repeal and cancellation of the 1968 Resolution, any tolls or other charges imposed by the Authority for the use of any of the Toll Facilities other than Existing Toll Facilities Revenues received by the Authority prior to the repeal and cancellation of the 1968 Resolution, the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may hereafter allocate to the Authority and expressly authorize the Authority to pledge to the payment of the principal of and interest on bonds or other obligations of the Authority and which are pledged by the Authority to the payment of the principal of and interest on bonds or other obligations issued under the provisions of the 1998 Resolution, and investment earnings on deposits to the credit of funds and accounts established under the 1998 Resolution, except for the 1998 Construction Fund.

"Senior Reserve Requirement" with respect to the senior bonds means the lesser of (i) the maximum Principal and Interest Requirements for any fiscal year on account of the outstanding senior bonds and (ii) ten (10%) percent of the original principal amount of each Series of senior bonds outstanding determined on the basis of their initial offering prices to the public.

"Subordinated Reserve Requirement" with respect to any Series of Subordinated Transportation Revenue Bonds means that amount fixed from time to time by resolution of the Authority as the amount required to be held to the credit of a separate account in the Subordinated Bond Reserve Fund corresponding to such Series.  For purposes of determining the amount on deposit to the credit of any such separate account, any agreement between the 1998 Fiscal Agent and a financial institution serving as the depository institution of the Commonwealth state infrastructure bank (or other similar fund) created by virtue of Section 350 of the National Highway System Designation Act of 1995, as amended (23 U.S.C. Section 101), or any similar federal legislation, pursuant to which agreement such depository institution irrevocably agrees to

provide funds to the 1998 Fiscal Agent for deposit to the credit of any separate account in the Subordinated Bond Reserve Fund shall be treated as satisfying the applicable Subordinated Reserve Requirement to the extent of the maximum amount of funds so available to be provided to the 1998 Fiscal Agent for deposit to the credit of such separate account.

"Swap agreement" means an agreement between the Authority and a Swap party whereby the Swap party agrees to pay to the Authority amounts calculated on the basis of all or a portion of the interest on bonds issued under the 1998 Resolution with a variable, adjustable, convertible or similar rate of interest at or prior to the times such interest is due and payable in consideration of the Authority's payment to the Swap party of amounts set forth in the Swap agreement.

"Swap party" means a person who is party to a Swap agreement and whose senior obligations are rated at the time of the execution and delivery of such Swap agreement in one of the three highest rating categories (without regard to any gradations within any such category) by (i) S&P or its successors and (ii) Moody's or its successors.

"Swap rate" means the fixed rate per annum on the principal amount of bonds issued under the 1998 Resolution with a variable, adjustable, convertible or similar rate of interest covered by a Swap agreement equal to the percentage derived by dividing (i) the sum of the amounts in the last twelve months paid by the Authority in respect of interest on such bonds and to the Swap party less the amount paid to the Authority by the Swap party by (ii) such principal amount of bonds; provided, however, that if such Swap agreement has been in effect for less than twelve months, such percentage shall be multiplied by 360 divided by the number of days between the effective date of such Swap agreement and the date of calculation determined on the basis of 30-day months;

"Toll Facilities" means any Traffic Facilities for the use of which the Authority imposes tolls.

"Traffic Facilities" means any of the following facilities for which 1968 Resolution Bonds or bonds or other obligations shall be issued by the Authority under the provisions of the 1998 Resolution the cost of which facilities paid from the proceeds of such bonds or other obligations shall not have been reimbursed to the Authority from funds not encumbered by the 1998 Resolution or the 1968 Resolution:

      (i)     roads, avenues, streets, thoroughfares, speedways, bridges, tunnels, channels, stations, terminals and any other land or water facilities necessary or desirable in connection with the movement of persons, freight, vehicles or vessels;

      (ii)    parking lots and structures and other facilities necessary or desirable in connection with parking, loading or unloading of all kinds of vehicles or vessels; and

      (iii)   all property rights, easements, and interests therein necessary or desirable for the construction, maintenance, control, operation or development of such traffic facilities.

"Transportation Engineers" means the engineer or engineers or engineering firms or corporations at the time employed by the Authority under the provisions of the 1998 Resolution.

"Transportation Facilities" means all Traffic Facilities, all Mass Transit Facilities, and any other highway, road, transportation or other facilities or undertakings permitted from time to

time by the enabling act for which bonds or other obligations shall be issued by the Authority under the provisions of the 1998 Resolution the cost of which facilities paid from the proceeds of such bonds or other obligations shall not have been reimbursed to the Authority from funds not encumbered by the 1998 Resolution.

**Sinking Funds**

The 1998 Resolution creates the "Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds Interest and Sinking Fund" (the "Senior Bond Sinking Fund"). The "Senior Bond Service Account," "Senior Bond Redemption Account," and "Senior Bond Reserve Account" are created within the Senior Bond Sinking Fund. (Section 401).

The 1998 Resolution also creates the "Puerto Rico Highways and Transportation Authority Subordinated Transportation Revenue Bonds Interest and Sinking Fund" (the "Subordinated Bond Sinking Fund"). The "Subordinated Bond Service Account," and "Subordinated Bond Redemption Account" are created within the Subordinated Bond Sinking Fund. (Section 401).

The 1998 Resolution also creates the "Puerto Rico Highways and Transportation Authority Subordinated Transportation Revenue Bonds Reserve Fund" (the "Subordinated Bond Reserve Fund"). The Authority may establish one or more accounts in the Subordinated Bond Reserve Fund to correspond to Series of Subordinated Transportation Revenue Bonds with different Subordinated Reserve Requirements. (Section 401).

The 1998 Resolution also creates the "Puerto Rico Highways and Transportation Authority Transportation Revenue Fund" (the "Revenue Fund"). The Authority has covenanted that all Revenues (except investment earnings on deposits to the credit of the funds and accounts established under the 1998 Resolution) will be deposited when received to the credit of the Revenue Fund. Until the outstanding 1968 Resolution Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution, the Authority shall on or before the last day of the month during which the 2003 Bonds shall be issued and on or before the 25th day of each month thereafter withdraw from the 1968 Construction Fund and transfer to the credit of the Revenue Fund all unencumbered moneys held for the credit of the 1968 Construction Fund (herein "unencumbered 1968 Construction Fund moneys"), such transfer to be made on the books of the Authority as of the close of the preceding month. (Section 401).

The moneys in each Fund or Account are held by the 1998 Fiscal Agent in trust and, pending application, are subject to a lien in favor of the holders of the outstanding bonds and for the further security of such holders until paid out or transferred as provided in the 1998 Resolution. (Section 401).

All Revenues (other than investment earnings), Excess 1968 Resolution Revenues and any other funds of the Commonwealth allocated to the Authority for the payment of principal of and interest on any bonds, are withdrawn monthly from the Revenue Fund and deposited with the 1998 Fiscal Agent as follows:

(1)     to the Senior Bond Service Account, an amount equal to 1/6th of the amount of interest payable on all senior bonds of each Series on the next succeeding interest payment date and an amount equal to 1/12th of the next maturing installment of principal of any serial bonds of such Series until the amount in the Senior Bond Service Account equals the amount of interest

payable on such interest payment date and the amount of such principal installment; but the amount so deposited on account of the interest in each month after the delivery of the senior bonds of any Series up to and including the month immediately preceding the first interest payment date thereafter of the bonds of such Series shall be that amount which when multiplied by the number of such deposits will be equal to the amount of interest payable on such bonds on such first interest payment date less the amount of any accrued interest paid on such bonds and deposited to the credit of the Senior Bond Service Account;

(2)  to the Senior Bond Redemption Account, an amount equal to 1/12th of the Amortization Requirement for such fiscal year for the term bonds of each Series of senior bonds then outstanding plus an amount equal to 1/12th of the premium, if any, which would be payable on the first redemption date in the following fiscal year on a like principal amount of bonds if such principal amount of bonds should be redeemed prior to their maturity from moneys in the Senior Bond Sinking Fund;

(3)  to the Senior Bond Reserve Account, such amount as is required to make the amount deposited to the credit of said Account in the then current fiscal year at least equal to 20% of the Senior Reserve Requirement; but such deposits shall only be made to the extent necessary to make the amount then in the Senior Bond Reserve Account equal to the Senior Reserve Requirement; and provided, further, that in the event of an increase in the Senior Reserve Requirement due to the issuance of additional Series of senior bonds, such increase will be funded by deposits in each of the five (5) years, commencing in the fiscal year in which such additional Series of senior bonds is issued, of 20% of such increase in the Senior Reserve Requirement;

(4)  to the Subordinated Bond Service Account, an amount equal to one-sixth (1/6) of the amount of interest payable on all Subordinated Transportation Revenue Bonds of each Series on the interest payment date next succeeding and an amount equal to one-twelfth (1/12) of the next maturing installment of principal of such serial bonds of such Series until the amount in the Subordinated Bond Service Account equals the amount of interest payable on such interest payment date and the amount of such principal installment; but the amount so deposited on account of interest in each month after the delivery of the Subordinated Transportation Revenue Bonds of any Series up to and including the month immediately preceding the first interest payment date thereafter of the bonds of such Series shall be that amount which when multiplied by the number of such deposits will be equal to the amount of interest payable on such bonds on such first interest payment date less the amount of any accrued interest paid on such bonds and deposited with the 1998 Fiscal Agent to the credit of the Subordinated Bond Service Account;

(5)  to the Subordinated Bond Redemption Account, an amount equal to one-twelfth (1/12) of the Amortization Requirement for such fiscal year for the term bonds of each Series of Subordinated Transportation Revenue Bonds then outstanding plus one-twelfth (1/12) of the premium, if any, which would be payable on the first redemption date in the following fiscal year on a like principal amount of bonds if such principal amount of bonds should be redeemed prior to their maturity from moneys in the Subordinated Bond Sinking Fund;

(6)  to each separate account within the Subordinated Bond Reserve Fund, such amount, if any, of any balance remaining after making the deposits described under paragraph (1) through (5) above (allocated pro rata to each account on the basis of the corresponding Subordinated Reserve Requirements) at least equal to the respective deposit requirements corresponding to each such account established by the Authority; but no such deposits to any such account described under this paragraph will be made in any month if the amount then to the

credit of such account shall be equal to the applicable Subordinated Reserve Requirement; and provided, further, that notwithstanding the above, in the event that any Subordinated Reserve Requirement increases on account of the issuance of additional Series of Subordinated Transportation Revenue Bonds, the Authority may provide for equal annual deposits as will ensure that the applicable Subordinated Reserve Requirement will be met not earlier than the end of a five year period following the issuance of such Series of Subordinated Transportation Revenue Bonds; and

(7)     the balance remaining after making the deposits referred to above shall be deposited to the credit of the 1998 Construction Fund for use by the Authority for any of its authorized purposes, subject to the provisions of Sections 604 and 605 of the 1998 Resolution. (Section 401).

The requirements specified in paragraphs (1) through (6) above are cumulative.  (Section 401).

The Authority further covenants that any other funds which it receives from the Commonwealth or any other source to make up any deficiencies in the amounts needed to pay the principal of and interest on any bonds issued under the provisions of the 1968 Resolution and the 1998 Resolution will be applied for such purpose first to make up any deficiencies in the amounts needed to pay the principal and interest on any 1968 Resolution Bonds and then to make up any such deficiencies needed to pay such principal of and interest on the senior bonds and then the Subordinated Transportation Revenue Bonds.  (Section 401).

When the 1968 Resolution is repealed and cancelled, all moneys (other than those held for the redemption or payment of 1968 Resolution Bonds), including obligations purchased as an investment of such moneys will be withdrawn from the 1968 Construction Fund and 1968 Sinking Fund and deposited into the Revenue Fund.  (Section 402).

Moneys in the Senior Bond Redemption Account shall be applied to the retirement of senior bonds as follows:

(a)     Subject to the provisions of paragraph (c) below, the 1998 Fiscal Agent shall endeavor to purchase outstanding senior bonds, whether or not such bonds shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, having regard to interest rate and price, such price not to exceed the principal of such bonds plus the amount of the premium, if any, which would be payable on the next redemption date to the holders of such bonds if such bonds should be called for redemption on such date from moneys in the Senior Bond Sinking Fund.  The 1998 Fiscal Agent shall pay the interest accrued on such bonds to the date of delivery thereof from the Senior Bond Service Account and the purchase price from the Senior Bond Redemption Account, but no such purchase shall be made within 45 days next preceding any interest payment date on which such bonds are subject to redemption except from moneys in excess of the amounts set aside or deposited for the redemption of senior bonds.

(b)     Subject to the provisions of paragraph (c) below, the 1998 Fiscal Agent shall call for redemption on each date on which senior bonds are subject to redemption from moneys in the Senior Bond Sinking Fund on the forty-fifth day prior to such redemption date such amount of senior bonds then subject to redemption as, with the redemption premium, if any, will exhaust the Senior Bond Redemption Account as nearly as may be; but not less than $50,000 principal amount of senior bonds shall be called for redemption at any one time.

(c)      Moneys in the Senior Bond Redemption Account shall be applied to the purchase or redemption of senior bonds in the following order:

First, the term bonds of each Series of senior bonds, if any, in the order of their issuance, to the extent of the Amortization Requirement, if any, of the then current fiscal year for such term bonds and any deficiency in preceding fiscal years in the purchase or redemption of such term bonds under the provisions of this subdivision; but if none of the term bonds of a Series of senior bonds shall be subject to redemption from moneys in the Senior Bond Sinking Fund and if the 1998 Fiscal Agent shall at any time be unable to exhaust the moneys applicable to the bonds of any such Series in the purchase of such bonds under the provisions of paragraph (a) above, such moneys or the balance of such moneys, as the case may be, shall be retained in the Senior Bond Redemption Account and, as soon as it is feasible, applied to the retirement of the bonds of such Series;

Second, to the purchase of any outstanding senior bonds, whether or not such bonds shall then be subject to redemption, in accordance with the provisions of paragraph (a) above;

Third, term bonds of each Series of senior bonds in proportion (as nearly as practicable) to the aggregate principal amount of the bonds of each such Series originally issued; and

Fourth, after the retirement of all term senior bonds, any balance shall be applied to the retirement of serial senior bonds of each Series in proportion to the aggregate principal amount of each such Series originally issued.

All expenses in connection with such purchase or redemption shall be paid from the 1998 Construction Fund.  (Section 404).

Moneys in the Senior Bond Reserve Account shall be used for the purpose of paying interest on the senior bonds and maturing principal of serial senior bonds whenever and to the extent that the moneys held for the credit of the Senior Bond Service Account shall be insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the Senior Bond Redemption Account whenever and to the extent that the Revenues or other moneys deposited to the credit of the Revenue Fund are insufficient for such purpose; but prior to making any withdrawal from the Senior Bond Reserve Account, the 1998 Fiscal Agent shall withdraw first available unencumbered moneys in the 1998 Construction Fund and then any moneys held to the credit of the Subordinated Bond Redemption Account and then any moneys held to the credit of the Subordinated Bond Service Account in respect of the principal of any Subordinated Transportation Revenue Bonds and finally any other moneys held to the credit of the Subordinated Bond Service Account and transfer all such money so withdrawn to the Senior Bond Service Account or the Senior Bond Redemption Account in the respective amounts necessary to cure any insufficiencies in said Accounts.  (Sections 405, 409, and 411).

Moneys held in the Subordinated Bond Service Account and Subordinated Bond Redemption Account will be applied to the payment of Subordinated Transportation Revenue Bonds' debt service in the same manner as moneys in the Senior Bond Service Account and the Senior Bond Redemption Account are applied to the payment of senior bonds' debt service, subject to the provisions employing moneys in the Subordinated Bond Sinking Fund to address insufficiencies in the Senior Bond Sinking Fund described in the previous paragraph.  (Sections 406, 407, and 411).

Money held for the credit of each account in the Subordinated Bond Reserve Fund shall be used for the purpose of paying interest on each Series of Subordinated Transportation Revenue Bonds and maturing principal of serial Subordinated Transportation Revenue Bonds of each such Series to which such account relates whenever and to the extent that the moneys held for the credit of the Subordinated Bond Service Account shall be insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the Subordinated Bond Redemption Account whenever and to the extent that the Revenues or other moneys deposited to the credit of the Revenue Fund are insufficient for such purpose. (Section 408).

The Authority may deposit into the Senior Bond Reserve Account or any account in the Subordinated Bond Reserve Fund, a Reserve Account Insurance Policy or a Reserve Account Letter of Credit in an amount equal to all or a portion of the applicable reserve requirement, which Reserve Account Insurance Policy or Reserve Account Letter of Credit shall be payable or available to be drawn upon, as the case may be (upon the giving of notice as required thereunder), on any interest payment date on which a deficiency exists in the applicable reserve account which cannot be otherwise cured. If a disbursement is made under the Reserve Account Insurance Policy or the Reserve Account Letter of Credit, the Authority shall be obligated either to reinstate the limits of such Reserve Account Insurance Policy or Reserve Account Letter of Credit following such disbursement, or to deposit into the Senior Bond Reserve Account or any account in the Subordinated Bond Reserve Fund from Revenues, funds in the amount of the disbursement made under such Reserve Account Insurance Policy or Reserve Account Letter of Credit, and any moneys held in any such reserve account may be applied for such purpose. (Sections 401, 405, and 408).

**1998 Construction Fund**

Before any payment or withdrawal shall be made from moneys in the 1998 Construction Fund there shall be filed with the 1998 Fiscal Agent a certificate signed by a designated officer of the Authority setting forth the amount of money to be so disbursed and stating that such money will be used to pay the costs of constructing Transportation Facilities or for other authorized purposes. Upon receipt of such certificate the 1998 Fiscal Agent shall withdraw from the 1998 Construction Fund and deposit to the credit of a special checking account in its commercial department in the name of the Authority the amount so specified in such certificate. The 1998 Fiscal Agent shall also at any time at the written direction of the Authority transfer any part of the unencumbered moneys in the 1998 Construction Fund to the credit of any account in the Senior Bond Sinking Fund and shall make the transfers to the Senior Bond Service Account and Senior Bond Redemption Account to cure deposit deficiencies therein as described above. (Section 409).

**Defeasance**

If all the outstanding bonds shall have been paid or deemed to have been paid as provided below, then and in that case the rights, title, and interest of the 1998 Fiscal Agent under the 1998 Resolution shall cease, terminate, and become void, and such bonds shall cease to be entitled to any lien, benefit or security under the 1998 Resolution. In such event, the Authority shall repeal and cancel the 1998 Resolution and may apply any surplus in the Senior Bond Sinking Fund, Subordinated Bond Sinking Fund, and all balances remaining in any other fund and accounts other than moneys held for the redemption or payment of bonds to any lawful purposes of the Authority.

Any outstanding bond shall be deemed to have been paid within the meaning and with the effect expressed in the 1998 Resolution when the whole amount of the principal of, redemption premium, if any, and interest on such bond shall have been paid or duly provided for and the conditions set forth in clause (c) below have been satisfied, when (a) in case such bond has been called for redemption or the Authority shall have given to the 1998 Fiscal Agent irrevocable instructions to call such bond for redemption, (b) there shall have been deposited with the 1998 Fiscal Agent Government Obligations the principal of and interest on which are sufficient, without any reinvestment thereof, to pay when due the principal of and premium, if any, and interest due and to become due on such bond on or prior to the redemption date or maturity date thereof, as the case may be, and (c) if such bond does not mature and is not to be redeemed within the next succeeding sixty (60) days, the Authority shall have given the 1998 Fiscal Agent irrevocable instructions to give, as soon as practicable, a notice to the holder of such bond by first-class mail, postage prepaid, stating that the deposit of moneys or Government Obligations required by clause (b) of this paragraph has been made with the 1998 Fiscal Agent or other appropriate fiduciary institution acting as escrow agent for the holder of such bond, and that such bond is deemed to have been paid in accordance with the 1998 Resolution and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of and premium, if any, and interest on such bond.

Neither the moneys nor Government Obligations deposited with the 1998 Fiscal Agent nor principal or interest payments on any such obligations shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal of and redemption premium, if any, and interest on the bonds which have been defeased.

As to Variable Rate Bonds, the amount required for the interest thereon shall be calculated at the maximum rate permitted by the terms of the provisions of the resolution which authorized the issuance of such Variable Rate Bonds.  (Section 1001).

**Issuance of Additional Bonds**

Senior bonds may be issued under and secured by the 1998 Resolution, subject to the conditions hereinafter described, at any time or times for any lawful purpose of the Authority. (Sections 208 and 209).

Before such bonds shall be delivered, there shall be filed with the 1998 Fiscal Agent, among other things, a certificate signed by the Executive Director not earlier than thirty (30) days prior to the delivery date of such bonds setting forth:

(i)     the amount of Revenues received by the Authority and until the outstanding 1968 Resolution Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution, the amount of Excess 1968 Resolution Revenues deposited to the credit of the Revenue Fund in each of the fifteen (15) months immediately preceding the month in which such certificate is signed, adjusted (I) to give effect to legislation enacted on or prior to the date of delivery of such bonds that would have increased the Revenues or the amounts of Excess 1968 Resolution Revenues deposited to the credit of the Revenue Fund as aforesaid if such legislation (x) had been in effect throughout such fifteen (15) months, (y) allocates additional moneys to the Authority and (z) expressly permits the Authority to pledge to the payment of the bonds issued under the provisions of the 1998 Resolution or the 1968 Resolution until the 1968 Resolution Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution and the Authority has expressly

pledged such additional moneys to such payment on or prior to such date of delivery and (II) to reflect the moneys which would have been received if (A) the schedule of tolls in effect on the date of delivery of such bonds had been in effect and (B) the Toll Facilities to be financed in whole or part with the proceeds of such bonds had been in operation throughout such fifteen (15) months,

(ii)     the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds theretofore issued under the provisions of the 1998 Resolution and then outstanding and the senior bonds then requested to be delivered, and

(iii)     the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds and Subordinated Transportation Revenue Bonds theretofore issued under the provisions of the 1998 Resolution and then outstanding and the senior bonds then requested to be delivered; and

(iv)     the percentage derived by dividing the amount in item (i) above for any twelve consecutive months by the amount in item (ii) above; and

(v)     the percentage derived by dividing the amount in item (i) above for any twelve consecutive months by the amount in item (iii) above.  (Section 208).

The 1998 Fiscal Agent may only deliver such additional senior bonds if the percentages shown in item (iv) and item (v) are not less than 150% and 100%, respectively.  (Section 208).

The Authority need not deliver said certificate in connection with the issuance of senior bonds issued for the purpose of refunding senior bonds of any Series if the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the senior bonds to be outstanding after the issuance of such refunding senior bonds shall be equal to or less than the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the senior bonds outstanding prior to the issuance of such refunding senior bonds. (Section 209).

Subordinated Transportation Revenue Bonds may be issued under and secured by the 1998 Resolution, subject to the conditions described below, at any time or times for the purpose of paying the cost of any Transportation Facilities falling within the definition of "Federal-aid highway" or "capital projects" under Section 101 of Title 23 and Section 5302 of Title 49, respectively, of the United States Code, as such definitions may be amended from time to time, or qualifying for any other federal transportation assistance for the defraying (directly or indirectly) of such cost.  (Section 210).

Before Subordinated Transportation Revenue Bonds shall be delivered, there shall be filed with the 1998 Fiscal Agent, among other things, a certificate signed by the Executive Director not earlier than thirty (30) days prior to the delivery date of such Subordinated Transportation Revenue Bonds indicating that the percentage derived by dividing (a) the amount of Revenues and Excess 1968 Resolution Revenues determined in the same manner as specified in clause (i) above by (b) the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds and Subordinated Transportation Revenue Bonds theretofore issued under the provisions of the 1998 Resolution and then outstanding and the Subordinated Transportation Revenue Bonds then requested to be delivered is not less than 125%.  (Section 210).

Refunding Subordinated Transportation Revenue Bonds may be issued only to refund other Subordinated Transportation Revenue Bonds of any Series. The Authority need not deliver said certificate in connection with the issuance of refunding Subordinated Transportation Revenue Bonds if the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the Subordinated Transportation Revenue Bonds to be outstanding after the issuance of such refunding Subordinated Transportation Revenue Bonds shall be equal to or less than the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the Subordinated Transportation Revenue Bonds outstanding prior to the issuance of such refunding Subordinated Transportation Revenue Bonds. (Section 211).

**Other Indebtedness**

The Authority will not incur any indebtedness nor create or suffer to be created any lien, pledge, assignment, encumbrance or charge upon the Revenues ranking equally with or prior to the senior bonds issued under the 1998 Resolution, except the lien and charge of the senior bonds secured by the 1998 Resolution, or ranking equally with the Subordinated Transportation Revenue Bonds except the lien and charge of the Subordinated Transportation Revenue Bonds secured by the 1998 Resolution. Any other indebtedness incurred by the Authority after the effective date of the 1998 Resolution under documents not in effect on the effective date of the 1998 Resolution shall contain a statement that such indebtedness is junior, inferior and subordinate in all respects to the bonds. For purposes of the above limitation on incurrence of indebtedness, indebtedness shall not be deemed to include contracts entered into in the ordinary course of business, agreements to repay advances received from the Federal government or agreements to repay (to the extent drawn) all or a portion of the stated amount drawn under any Credit Facility, Liquidity Facility, Reserve Account Letter of Credit or Reserve Account Insurance Policy. Nothing in the 1998 Resolution shall be deemed to prohibit the Authority from entering into currency swaps, interest rate swaps or other arrangements for hedging of interest rates on any indebtedness. (Section 602).

Nothing in the 1998 Resolution is to be construed as preventing the Authority from financing any facilities authorized by the act creating the Authority, as amended, by the issuance of bonds or other obligations which are not secured under the provisions of the 1998 Resolution. (Section 1101).

**Investment of Funds**

Moneys held for the credit of the Revenue Fund, Senior Bond Service Account, Senior Bond Redemption Account, Subordinated Bond Service Account, and Subordinated Bond Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Government Obligations, and moneys held for the credit of the 1998 Construction Fund, Senior Bond Reserve Account and each account in the Subordinated Bond Reserve Fund shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations, which Government Obligations and Investment Obligations shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when moneys held for the credit of said Fund or Accounts will be required for the purposes intended. Amounts on deposit in the Senior Bond Reserve Account and each account in the Subordinated Bond Reserve Fund shall be invested in Investment Obligations which mature not later than the final maturity date of any senior bonds or Subordinated Transportation Revenue Bonds outstanding, as the case may be. (Section 502).

IV-15

Investment earnings on moneys on deposit to the credit of the following Funds and Accounts shall be applied as follows:

(a)      Investment earnings on moneys on deposit to the credit of the Senior Bond Service Account, the Senior Bond Redemption Account, the Subordinated Bond Service Account, the Subordinated Bond Redemption Account and the 1998 Construction Fund shall be transferred to the credit of or retained in the 1998 Construction Fund; but the Authority may elect to have such investment earnings remain to the credit of the Senior Bond Service Account, the Senior Bond Redemption Account, the Subordinated Bond Service Account or the Subordinated Bond Redemption Account to fund the next payment of principal of, Amortization Requirements for and interest on the senior bonds or the Subordinated Transportation Revenue Bonds, in which event the Authority shall receive a credit against the amounts required to be deposited in said Accounts as applicable;

(b)      Investment earnings on moneys on deposit to the credit of the Senior Bond Reserve Account and each account in the Subordinated Bond Reserve Fund shall be retained in said accounts at any time that the respective amounts on deposit to the credit of said accounts is less than the Senior Reserve Requirement or the corresponding Subordinated Reserve Requirement, as applicable; and

(c)      Investment earnings on moneys on deposit to the credit of the Revenue Fund shall be retained therein.  (Section 502).

In computing the amount in any Fund or Account created pursuant to the provisions of the 1998 Resolution, obligations purchased as an investment of moneys therein shall be valued at par if purchased at par or at amortized value if purchased at other than par, plus, in each case, accrued interest.  Amortized value, when used with respect to an obligation purchased at a premium above or a discount below par, means the value as of any given time obtained by dividing the total premium or discount at which such obligation was purchased by the number of days remaining to maturity on such obligation at the date of such purchase and by multiplying the amount thus calculated by the number of days having passed since such purchase; and (1) in the case of an obligation purchased at a premium by deducting the product thus obtained from the purchase price, and (2) in the case of an obligation purchased at a discount by adding the product thus obtained to the purchase price.  Valuation on any particular date shall include the amount of interest then earned or accrued to such date on any moneys or investments in such Fund or Account.  The computation of the amount on deposit in or credited to the Fund and Accounts created under the 1998 Resolution and the valuation of the investments of such amount shall be performed by the 1998 Fiscal Agent as of the close of business on the last day of each fiscal year and at such other times as the Authority shall request, and such computation and valuation shall not be required to be performed at other times.  (Section 503).

**Modifications**

The Authority may adopt resolutions supplemental to the 1998 Resolution without the consent of the bondholders to cure any ambiguity, formal defect or omission, or to correct any inconsistent provisions or errors in the 1998 Resolution or any supplemental resolution, or to grant or confer upon the bondholders any additional rights, remedies, powers, authority or security, or to add to the conditions, limitations and restrictions on the issuance of bonds under the provisions of the 1998 Resolution or to add to the covenants and agreements of the Authority in the 1998 Resolution or to surrender any right or power reserved to or conferred upon the Authority, or to amend the conditions, limitations and restrictions on the issuance of Subordinated

Transportation Revenue Bonds or the covenants and agreements relating to the Subordinated Transportation Revenue Bonds (as shall not adversely affect the interests of the holders of any senior bonds) as may be required to enable the Authority to comply with the provisions of any federal legislation, rules or regulations or court decisions or orders relating to the receipt by the Authority of grants or other assistance from the United States Government.  (Section 801).

The holders of not less than a majority in aggregate principal amount of the senior bonds and of the Subordinated Transportation Revenue Bonds then outstanding and affected thereby shall have the right to consent to and approve the adoption of such resolution or resolutions supplemental to the 1998 Resolution as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding any of the terms and provisions contained in the 1998 Resolution or in any supplemental resolution; but nothing contained in the 1998 Resolution shall permit, or be construed as permitting, without consent of the holders of all bonds affected thereby, (a) an extension of the maturity of the principal of or the interest on any bond, or (b) a reduction in the principal amount of any bond or the redemption premium or the rate of interest thereon, or (c) the creation of a lien upon or a pledge of Revenues other than the lien and pledge created by the 1998 Resolution, or (d) a preference or priority of any bond or bonds over any other bond or bonds, or (e) a reduction in the aggregate principal amount of the bonds required for consent to such supplemental resolution, or (f) a change in the subordination provisions.  (Section 802).

If at any time the Authority determines that it is necessary or desirable to adopt any supplemental resolution for any of the purposes of the above paragraph, the 1998 Fiscal Agent at the expense and request of the Authority shall cause notice of the proposed adoption of such supplemental resolution to be mailed, first class, postage prepaid, to all bondholders and to Government Development Bank for Puerto Rico.  Such notice shall briefly set forth the nature of the proposed supplemental resolution and shall state that copies thereof are on file at the office of the 1998 Fiscal Agent for inspection by all bondholders.  The 1998 Fiscal Agent shall not, however, be subject to any liability to any bondholder by reason of its failure to cause such notice to be mailed, and any such failure shall not affect the validity of such supplemental resolution when consented to and approved.  (Section 802).

Whenever, at any time within one year after the date of the mailing of such notice, the Authority shall obtain an instrument or instruments in writing purporting to be executed by the holders of not less than a majority in aggregate principal amount of the senior bonds and of the Subordinated Transportation Revenue Bonds then Outstanding, which instrument or instruments shall refer to the proposed supplemental resolution described in such notice and shall specifically consent to and approve the adoption thereof in substantially the form of the copy thereof referred to in such notice, and the Authority shall deliver to the 1998 Fiscal Agent a certificate signed by the Executive Director that the holders of such required percentages of bonds have filed such consents, thereupon, but not otherwise, the Authority may adopt such supplemental resolution in substantially such form, without liability or responsibility to any holder of any bond, whether or not such holder shall have consented thereto.  (Section 802).

If the holders of not less than a majority in aggregate principal amount of the affected senior bonds and of the affected Subordinated Transportation Revenue Bonds outstanding at the time of the adoption of such supplemental resolution shall have consented to and approved the adoption thereof, no holder of any bond shall have any right to object to the adoption of such supplemental resolution, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the adoption thereof, or to enjoin or restrain the Authority from adopting the same or from taking any action pursuant to the

provisions thereof and such consent shall be binding on the holder giving such consent and upon any subsequent holder whether or not he has notice thereof.  (Section 802).

Upon the adoption of any supplemental resolution pursuant to the provisions of the 1998 Resolution, the 1998 Resolution shall be and be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under the 1998 Resolution of the Authority, the 1998 Fiscal Agent, and all holders of bonds then outstanding shall thereafter be determined, exercised and enforced in all respects under the provisions of the 1998 Resolution as so modified and amended.  (Section 803).

**Miscellaneous Covenants**

*Master Plan.*  The Authority covenants that the master plan for the construction of required Transportation Facilities in the Commonwealth will be supplemented periodically as necessary and that the five-year Construction Improvement Program will be updated each year to cover the Transportation Facilities to be constructed by the Authority in the ensuing five-year period. (Section 603).

*Costs of Maintenance, Repair and Operation of Traffic Facilities.*  The Authority covenants that, if and to the extent funds for the purpose of maintaining, repairing and operating all Traffic Facilities financed by the Authority in whole or in part by 1968 Resolution Bonds and all Transportation Facilities financed by the Authority in whole or in part by bonds under the provisions of the 1998 Resolution are not provided by the Commonwealth, the Authority will pay such costs from unencumbered funds then on deposit in the 1998 Construction Fund or from the Revenues or unencumbered 1968 Construction Fund moneys thereafter deposited to the credit of the 1998 Construction Fund pursuant to the 1998 Resolution and not from funds then on deposit or thereafter deposited to the credit of the 1968 Construction Fund.  (Section 604).

The Authority further covenants that it will cause an annual general evaluation to be made by the Transportation Engineers of the level of maintenance of all Traffic Facilities and Transportation Facilities financed in whole or in part by the issuance of bonds under the provisions of, respectively, the 1968 Resolution and the 1998 Resolution, which Facilities shall be, in the judgment of the Authority and of the Traffic Engineers, material to the overall system of Transportation Facilities of the Authority.  (Section 604).

The Authority further covenants that it will operate or cause to be operated the Toll Facilities, any Mass Transit Facilities and all other Transportation Facilities that it may from time to time operate or cause to be operated in an efficient and economical manner, that it will at all times maintain or cause to be maintained such Transportation Facilities in good repair and in sound operating condition and that it will make or cause to be made all necessary repairs, renewals and replacements thereto.  (Section 604).

*Annual Report of Traffic Engineers.*  The Authority covenants that it will cause the Transportation Engineers to prepare a report each year promptly after the completion of their general evaluation of the level of maintenance, repair and operating condition of the Transportation Facilities setting forth (i) their comments with respect to any supplements or revisions made by the Authority in the master plan or in the five-year Construction Improvement Program referred to above under "Master Plan" and their recommendations as to any supplements or revisions which should be made in such plan or in the Construction Improvement Program, and (ii) their findings as to whether those Traffic Facilities have been maintained in good repair,

working order and sound operating condition and their recommendations as to necessary repairs, renewals or replacements.  (Section 605).

If it appears from such report that repairs, renewals or replacements of any such Facilities are necessary, the Authority shall promptly cause the same to be restored to a condition of good repair and to sound operating condition, and if and to the extent that funds for such purpose have not been made available by the Commonwealth, moneys on deposit to the credit of the 1998 Construction Fund which have not theretofore been encumbered for other purposes, and moneys which are thereafter deposited to the credit of the 1998 Construction Fund pursuant to the 1998 Resolution shall first be applied for such purpose.  No funds then on deposit or thereafter deposited to the credit of the 1968 Construction Fund shall be applied for such purpose.  (Section 605).

*Relating to the 1968 Resolution.*  The Authority covenants that immediately upon the repeal and cancellation of the 1968 Resolution, all Existing Tax and Fee Revenues and Existing Toll Revenues shall be pledged to the payment of the principal of and premium, if any, and interest on the bonds issued under the provisions of the 1998 Resolution to the same extent and with the same effect as the pledge of Revenues and other moneys deposited to the credit of the Revenue Fund.  (Section 601).

The Authority further covenants that it will cause the 1968 Resolution to be repealed and cancelled at the earliest practicable date.  The Authority further covenants that, except for the proposed supplemental resolution described in *Summary of Certain Provisions of the Proposed Supplemental Resolution,* it will not adopt any resolution supplemental to the 1968 Resolution for the purpose of granting to or conferring upon the 1968 Fiscal Agent for the benefit of the holders of the bonds issued under the 1968 Resolution any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon such holders or the 1968 Fiscal Agent, or for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in the 1968 Resolution, or for the purpose of extending the maturity of any 1968 Resolution Bond or creating a lien upon or a pledge of revenues ranking prior to or on a parity with the lien or pledge created by the 1968 Resolution.  Nothing shall prevent the Authority from adopting a resolution supplemental to the 1968 Resolution to cure any ambiguity or formal defect or omission in the 1968 Resolution.  (Section 609).

The Authority covenants that so long as any 1968 Resolution Bonds are outstanding under the provisions of the 1968 Resolution it will cause to be made the deposits to the credit of the 1968 Construction Fund required by the 1968 Resolution.  The Authority further covenants that except for any withdrawals required to be made as set forth in the third sentence of the fourth paragraph of "Sinking Funds" above, it will not withdraw, expend, pledge or otherwise encumber moneys held to the credit of the 1968 Construction Fund whether for the purpose of satisfying the Authority's Construction Improvement Program or otherwise, except for the satisfying the Authority's obligations under Section 513 of that certain trust agreement, dated as of April 1, 1992, by and between the Authority and Banco Santander Puerto Rico, successor trustee.  See, "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures* above in this Official Statement (Section 610).

*Use of Revenues.*  The Authority covenants and agrees that, so long as any of the bonds secured by the 1968 Resolution shall be outstanding, none of the Revenues will be used for any purpose other than as provided in the 1968 Resolution and the 1998 Resolution, and that no

contract or contracts will be entered into or any action taken by which the rights of the 1998 Fiscal Agent or of the bondholders might be impaired or diminished. (Section 611).

*Additional 1968 Resolution Bonds.* The Authority covenants that so long as any bonds shall be outstanding under the provisions of the 1998 Resolution it will not issue additional 1968 Resolution Bonds which mature after July 1, 2036 and except for (a) Series I Bonds and (b) bonds issued for the purpose of meeting the obligations of the Authority under Section 11.4(b) of that certain Concession Agreement for the Final Design, Construction, Operation and Maintenance of a Privatized Transportation Facility, dated December 20, 1991, as amended, by and between the Authority and Autopistas de Puerto Rico y Compañía, S.E. relating to its obligations in respect of the Teodoro Moscoso Bridge. See, "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures* above in this Official Statement.

*Swap Agreements.* The Authority covenants that it will not enter into a Swap agreement unless it first delivers copies of the proposed Swap agreement to S&P and Moody's and any other rating agency then rating the bonds. (Section 613).

*Level of Tolls and Other Charges.* Notwithstanding any provisions in the 1968 Resolution enabling the Authority to reduce tolls or other charges, the Authority covenants that it will not reduce the tolls or other charges imposed by it for the use of its Toll Facilities unless, as of the effective date of such reduction, the Authority delivers to the 1998 Fiscal Agent a certificate, signed by the Executive Director of the Authority not earlier than thirty (30) days prior to the effective date of such reduction, setting forth:

      (i)      the amount of Revenues received by the Authority and, until the outstanding 1968 Resolution Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution, the amount of Excess 1968 Resolution Revenues deposited to the credit of the Revenue Fund in each of the fifteen (15) months immediately preceding the month in which such certificate is signed, adjusted (I) to give effect to legislation enacted on or prior to the effective date of such reduction that would have increased the Revenues or the amounts deposited to the credit of the Revenue Fund from the 1968 Construction Fund as aforesaid if such legislation (x) had been in effect throughout such fifteen (15) months, (y) allocates additional moneys to the Authority, and (z) expressly permits the Authority to pledge to the payment of the bonds issued under the provisions of the 1998 Resolution or the 1968 Resolution until the 1968 Resolution Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution and the Authority has expressly pledged such additional moneys to such payment on or prior to such date of delivery and (II) to reflect the moneys which would have been received if (A) the schedule of tolls in effect on such effective date had been in effect and (B) any Toll Facilities which have commenced operation or been removed from operation during such fifteen (15) months either had been in operation or not operating, throughout such fifteen (15) months,

      (ii)      the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds theretofore issued under the provisions of the 1998 Resolution and then outstanding, and

      (iii)      the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds and all Subordinated Transportation Revenue Bonds theretofore issued under the provisions of the 1998 Resolution and then

outstanding and it shall appear from such certificate that the percentages derived by dividing the sum of the amounts shown in item (i) of such certificate for any twelve (12) consecutive months by the amount shown in item (ii) of said certificate and by the amount shown in item (iii) of said certificate, shall not be less than one hundred fifty per centum (150%) and one hundred per centum (100%), respectively.  (Section 614).

(This page intentionally left blank)



**APPENDIX V**

*Corporate Offices*

3735 Buckeystown Pike
Post Office Box 70
Buckeystown, MD 21717-0070

Telephone: 1-301-831-1000
Facsimile: 1-301-874-2876

26 January 2007

Dr. Gabriel Alcaraz Emmanuelli
Secretary and Executive Director
Puerto Rico Highway and Transportation Authority
P.O. Box 42007
San Juan, Puerto Rico 00940-2007

Dear Dr. Emmanuelli:

This letter summarizes the results of our evaluation of the level of maintenance of the Puerto Rico Highway and Transportation Authority's Traffic Facilities and our review of the Construction Improvement Program. Our study was conducted in accordance with Resolution No. 68-18, adopted June 13, 1968, as amended, and Resolution No. 98-06, adopted February 26, 1998. Results of the study are documented in our Final Report, entitled "Maintenance Evaluation and Program Review – 2005-2006", dated November 2006.

Based on our field inspections for 2006 period, we find that the overall level of maintenance is generally adequate to preserve the investment and provide an acceptable level of service to users of the road and other traffic facilities. Maintenance work methods and levels of service have been in general conformance to accepted maintenance policies and procedures in transportation and public works agencies throughout North America.

We have reviewed the 5-year Construction Improvement Program for Fiscal Years 2006-2010. In our opinion, the program is a reasonable response to the immediate and short-term transportation needs of the Commonwealth and is generally consistent with the Authority's long-range transportation master plan. Funding for the program appears to be adequate, based on revenue projections that have been reasonably accurate in the past and provide a sound basis for determining the size of future programs.

Please let us know if you need any additional information.

Sincerely,

Steven K. Griffith
Senior Associate

(This page intentionally left blank)

**APPENDIX VI**

## TABLE OF ACCRETED VALUES

### Puerto Rico Highways and Transportation Authority
### Highway Revenue Refunding Bonds (Series CC)

| Date | Capital Appreciation Bonds Due July 1, | | | | | |
|------|------|------|------|------|------|------|
| | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** |
| March 6, 2007 | 3,203.80 | 3,058.35 | 2,917.85 | 2,785.75 | 2,658.60 | 2,536.25 |
| July 1, 2007 | 3,248.25 | 3,101.10 | 2,958.85 | 2,825.10 | 2,696.30 | 2,572.40 |
| January 1, 2008 | 3,319.05 | 3,169.15 | 3,024.25 | 2,887.80 | 2,756.45 | 2,630.05 |
| July 1, 2008 | 3,391.40 | 3,238.70 | 3,091.10 | 2,951.90 | 2,817.90 | 2,688.95 |
| January 1, 2009 | 3,465.35 | 3,309.80 | 3,159.40 | 3,017.45 | 2,880.75 | 2,749.20 |
| July 1, 2009 | 3,540.90 | 3,382.45 | 3,229.25 | 3,084.45 | 2,945.00 | 2,810.75 |
| January 1, 2010 | 3,618.10 | 3,456.70 | 3,300.60 | 3,152.90 | 3,010.70 | 2,873.75 |
| July 1, 2010 | 3,696.95 | 3,532.60 | 3,373.55 | 3,222.90 | 3,077.80 | 2,938.10 |
| January 1, 2011 | 3,777.55 | 3,610.15 | 3,448.10 | 3,294.45 | 3,146.45 | 3,003.90 |
| July 1, 2011 | 3,859.90 | 3,689.35 | 3,524.30 | 3,367.60 | 3,216.60 | 3,071.20 |
| January 1, 2012 | 3,944.05 | 3,770.35 | 3,602.20 | 3,442.35 | 3,288.35 | 3,140.00 |
| July 1, 2012 | 4,030.05 | 3,853.10 | 3,681.80 | 3,518.80 | 3,361.70 | 3,210.35 |
| January 1, 2013 | 4,117.90 | 3,937.70 | 3,763.15 | 3,596.90 | 3,436.65 | 3,282.25 |
| July 1, 2013 | 4,207.65 | 4,024.10 | 3,846.35 | 3,676.75 | 3,513.30 | 3,355.75 |
| January 1, 2014 | 4,299.40 | 4,112.45 | 3,931.35 | 3,758.40 | 3,591.65 | 3,430.95 |
| July 1, 2014 | 4,393.10 | 4,202.70 | 4,018.20 | 3,841.80 | 3,671.70 | 3,507.80 |
| January 1, 2015 | 4,488.90 | 4,294.95 | 4,107.00 | 3,927.10 | 3,753.60 | 3,586.35 |
| July 1, 2015 | 4,586.75 | 4,389.25 | 4,197.80 | 4,014.30 | 3,837.30 | 3,666.70 |
| January 1, 2016 | 4,686.75 | 4,485.60 | 4,290.55 | 4,103.40 | 3,922.90 | 3,748.85 |
| July 1, 2016 | 4,788.90 | 4,584.05 | 4,385.40 | 4,194.50 | 4,010.35 | 3,832.80 |
| January 1, 2017 | 4,893.30 | 4,684.65 | 4,482.30 | 4,287.60 | 4,099.80 | 3,918.65 |
| July 1, 2017 | 5,000.00 | 4,787.50 | 4,581.35 | 4,382.80 | 4,191.20 | 4,006.45 |
| January 1, 2018 | | 4,892.60 | 4,682.60 | 4,480.10 | 4,284.70 | 4,096.20 |
| July 1, 2018 | | 5,000.00 | 4,786.10 | 4,579.55 | 4,380.25 | 4,187.95 |
| January 1, 2019 | | | 4,891.85 | 4,681.25 | 4,477.90 | 4,281.75 |
| July 1, 2019 | | | 5,000.00 | 4,785.15 | 4,577.75 | 4,377.65 |
| January 1, 2020 | | | | 4,891.40 | 4,679.85 | 4,475.70 |
| July 1, 2020 | | | | 5,000.00 | 4,784.20 | 4,576.00 |
| January 1, 2021 | | | | | 4,890.90 | 4,678.50 |
| July 1, 2021 | | | | | 5,000.00 | 4,678.50 |
| January 1, 2022 | | | | | | 4,783.30 |
| July 1, 2022 | | | | | | 4,890.45 |
| January 1, 2023 | | | | | | 5,000.00 |
| July 1, 2023 | | | | | | |
| January 1, 2024 | | | | | | |
| July 1, 2024 | | | | | | |
| January 1, 2025 | | | | | | |
| July 1, 2025 | | | | | | |
| January 1, 2026 | | | | | | |
| July 1, 2026 | | | | | | |
| January 1, 2027 | | | | | | |
| July 1, 2027 | | | | | | |

# TABLE OF ACCRETED VALUES

## Puerto Rico Highway and Transportation Authority
## Highway Revenue Refunding Bonds (Series CC)

| Date | Capital Appreciation Bonds Due July 1, | | | | |
|---|---|---|---|---|---|
| | **2023** | **2024** | **2025** | **2026** | **2027** |
| March 6, 2007 | 2,414.75 | 2,301.60 | 2,192.90 | 2,088.55 | 1,992.30 |
| July 1, 2007 | 2,449.40 | 2,334.80 | 2,224.65 | 2,118.90 | 2,021.35 |
| January 1, 2008 | 2,504.65 | 2,387.65 | 2,275.25 | 2,167.30 | 2,067.60 |
| July 1, 2008 | 2,651.10 | 2,441.75 | 2,327.05 | 2,216.85 | 2,114.95 |
| January 1, 2009 | 2,618.85 | 2,497.05 | 2,379.95 | 2,267.50 | 2,163.40 |
| July 1, 2009 | 2,677.95 | 2,553.60 | 2,434.10 | 2,319.30 | 2,212.95 |
| January 1, 2010 | 2,738.30 | 2,611.45 | 2,489.50 | 2,372.30 | 2,263.60 |
| July 1, 2010 | 2,800.05 | 2,670.60 | 2,546.15 | 2,426.50 | 2,315.45 |
| January 1, 2011 | 2,863.20 | 2,731.10 | 2,604.05 | 2,481.95 | 2,368.50 |
| July 1, 2011 | 2,927.75 | 2,792.95 | 2,663.30 | 2,538.70 | 2,422.70 |
| January 1, 2012 | 2,993.80 | 2,856.20 | 2,723.90 | 2,596.70 | 2,478.20 |
| July 1, 2012 | 3,061.30 | 2,920.90 | 2,785.85 | 2,656.00 | 2,534.95 |
| January 1, 2013 | 3,130.35 | 2,987.05 | 2,849.28 | 2,716.70 | 2,593.00 |
| July 1, 2013 | 3,200.95 | 3,054.70 | 2,914.05 | 2,778.80 | 2,652.40 |
| January 1, 2014 | 3,273.10 | 3,123.90 | 2,980.35 | 2,842.30 | 2,713.15 |
| July 1, 2014 | 3,346.90 | 3,194.65 | 3,048.15 | 2,907.25 | 2,775.25 |
| January 1, 2015 | 3,422.40 | 3,267.05 | 3,117.50 | 2,973.65 | 2,838.80 |
| July 1, 2015 | 3,499.55 | 3,341.05 | 3,188.45 | 3,041.60 | 2,903.80 |
| January 1, 2016 | 3,578.50 | 3,416.70 | 3,260.95 | 3,111.10 | 2,970.30 |
| July 1, 2016 | 3,659.20 | 3,494.10 | 3,335.15 | 3,182.20 | 3,038.35 |
| January 1, 2017 | 3,741.70 | 3,573.25 | 3,411.05 | 3,254.90 | 3,107.90 |
| July 1, 2017 | 3,826.05 | 3,654.15 | 3,488.65 | 3,329.30 | 3,179.10 |
| January 1, 2018 | 3,912.35 | 3,736.95 | 3,568.00 | 3,405.35 | 3,251.90 |
| July 1, 2018 | 4,000.55 | 3,821.60 | 3,649.15 | 3,483.20 | 3,326.35 |
| January 1, 2019 | 4,090.80 | 3,908.15 | 3,732.20 | 3,562.75 | 3,402.55 |
| July 1, 2019 | 4,183.05 | 3,996.65 | 3,817.10 | 3,644.20 | 3,480.45 |
| January 1, 2020 | 4,277.35 | 4,087.20 | 3,903.95 | 3,727.45 | 3,560.15 |
| July 1, 2020 | 4,373.80 | 4,179.75 | 3,992.75 | 3,812.60 | 3,641.70 |
| January 1, 2021 | 4,472.45 | 4,274.45 | 4,083.60 | 3,899.75 | 3,725.10 |
| July 1, 2021 | 4,573.30 | 4,371.25 | 4,176.50 | 3,988.85 | 3,810.40 |
| January 1, 2022 | 4,676.45 | 4,470.25 | 4,271.50 | 4,080.00 | 3,897.65 |
| July 1, 2022 | 4,781.90 | 4,571.50 | 4,368.70 | 4,173.25 | 3,986.90 |
| January 1, 2023 | 4,889.70 | 4,675.05 | 4,468.05 | 4,268.60 | 4,078.20 |
| July 1, 2023 | 5,000.00 | 4,780.95 | 4,569.70 | 4,366.10 | 4,171.60 |
| January 1, 2024 | | 4,889.25 | 4,673.70 | 4,465.90 | 4,267.10 |
| July 1, 2024 | | 5,000.00 | 4,780.00 | 4,567.95 | 4,364.85 |
| January 1, 2025 | | | 4,888.75 | 4,672.30 | 4,464.80 |
| July 1, 2025 | | | 5,000.00 | 4,779.05 | 4,567.05 |
| January 1, 2026 | | | | 4,888.30 | 4,671.65 |
| July 1, 2026 | | | | 5,000.00 | 4,778.60 |
| January 1, 2027 | | | | | 4,888.05 |
| July 1, 2027 | | | | | 5,000.00 |

## TABLE OF ACCRETED VALUES

## Puerto Rico Highway and Transportation Authority
## Transportation Revenue Refunding Bonds (Series N)

| Date | Capital Appreciation Bonds Due July 1, | |
|------|------|------|
| | **2019** | **2020** |
| March 6, 2007 | 2,900.30 | 2,767.65 |
| July 1, 2007 | 2,941.55 | 2,807.20 |
| January 1, 2008 | 3,007.30 | 2,870.20 |
| July 1, 2008 | 3,074.50 | 2,934.65 |
| January 1, 2009 | 3,143.20 | 3,000.55 |
| July 1, 2009 | 3,213.45 | 3,067.90 |
| January 1, 2010 | 3,285.30 | 3,136.75 |
| July 1, 2010 | 3,358.70 | 3,207.20 |
| January 1, 2011 | 3,433.80 | 3,279.20 |
| July 1, 2011 | 3,510.55 | 3,352.80 |
| January 1, 2012 | 3,589.00 | 3,428.10 |
| July 1, 2012 | 3,669.20 | 3,505.05 |
| January 1, 2013 | 3,751.20 | 3,583.75 |
| July 1, 2013 | 3,835.05 | 3,664.20 |
| January 1, 2014 | 3,920.75 | 3,746.45 |
| July 1, 2014 | 4,008.40 | 3,830.55 |
| January 1, 2015 | 4,098.00 | 3,916.55 |
| July 1, 2015 | 4,189.60 | 4,004.50 |
| January 1, 2016 | 4,283.20 | 4,094.40 |
| July 1, 2016 | 4,378.95 | 4,186.30 |
| January 1, 2017 | 4,476.80 | 4,280.30 |
| July 1, 2017 | 4,576.90 | 4,376.40 |
| January 1, 2018 | 4,679.15 | 4,474.65 |
| July 1, 2018 | 4,783.75 | 4,575.10 |
| January 1, 2019 | 4,890.65 | 4,677.80 |
| July 1, 2019 | 5,000.00 | 4,782.80 |
| January 1, 2020 | | 4,890.20 |
| July 1, 2020 | | 5,000.00 |

(This page intentionally left blank)

**APPENDIX VII**

**Provisions Applicable to CPI Bonds**

**Definitions**

The following definitions apply to the descriptions of the CPI Bonds and the CPI Rate contained in this Official Statement.

"Bloomberg CPURNSA" (See "**Consumer Price Index**" below)

"BLS" (See "**Consumer Price Index**" below)

"Business Day" means a day other than (i) a Saturday and Sunday, (ii) a day on which the 1998 Fiscal Agent, the Calculation Agent or banks and trust companies in The City of New York are authorized or required to remain closed, or (iii) a day on which the New York Stock Exchange is closed.

"Calculation Agent" means, initially, Morgan Stanley & Co. Incorporated, or such other Calculation Agent as may be selected by the Authority or the Holders of a majority in principal amount of outstanding CPI Bonds, their successors or assigns.

"CPI" (See "**Consumer Price Index**" below)

"CPI Bonds" means the Transportation Revenue Refunding Bonds (Series N) in the amount of $28,545,000 maturing on July 1, 2027, and $29,420,000 maturing on July 1, 2028.

"CPI Rate" (See "**CPI Rate**" below)

"Initial Interest Rate" means 3.585% per annum.

"Initial Interest Period" means the period from and including the date of the delivery of the CPI Bonds to but excluding the initial Interest Reset Date.

"Interest Payment Date" means the first Business Day of each month beginning July 2, 2007.

"Interest Period" means each period (other than the Initial Interest Period) from and including one Interest Reset Date to but excluding the next Interest Reset Date; provided that the final Interest Period shall end on but exclude the maturity date for the CPI Bonds.

"Interest Reset Dates" means the first calendar day of each month, beginning July 1, 2007.

"Maximum Interest Rate" means the maximum rate permitted by applicable law.

"Record Date" means the 15th day of the month immediately preceding the month in which payment is due.

"Reference Month" means, with respect to an Interest Reset Date, the third calendar month preceding that Interest Reset Date. For example, the Reference Month for the April Interest Reset Date will be January.

"Spread" (See "**CPI Rate**" below)

**Consumer Price Index**

The amount of interest payable on the CPI Bonds on each Interest Payment Date will be linked to changes in the Consumer Price Index. The Consumer Price Index for purposes of the CPI Bonds is the non-seasonally adjusted U.S. City Average All Items Consumer Price Index for All Urban Consumers ("CPI"), published monthly by the Bureau of Labor Statistics of the U.S. Department of Labor ("BLS") and reported on Bloomberg CPURNSA or any successor service ("Bloomberg CPURNSA"). The CPI for a particular month is generally released and published during the following month. The CPI is a measure of the average change in consumer prices over time for a fixed market basket of goods and services, including food, clothing, shelter, fuels, transportation, charges for doctors' and dentists' services, and drugs. In calculating the index, price changes for the various items are averaged together with weights that represent their importance in the spending of urban households in the United States. The contents of the market basket of goods and services and the weights assigned to the various items are updated periodically by the BLS to take into account changes in consumer expenditure patterns. The CPI is expressed in relative terms in relation to a time base reference period for which the level is set at 100.0. The base reference period for the CPI Bonds is the 1982-1984 average.

**CPI Rate**

The CPI Bonds will bear interest at the Initial Interest Rate during the Initial Interest Period.[1]  Thereafter, the CPI Bonds will bear interest at an annual rate (the "CPI Rate") that the Calculation Agent determines as of each Interest Reset Date, for the Interest Period beginning on that Interest Reset Date, pursuant to the following formula:

$$[(CPI_t - CPI_{t-12}) / CPI_{t-12}] + Spread$$

Where:

$CPI_t$ =      CPI for the applicable Reference Month;

$CPI_{t-12}$ =      CPI for the twelfth month prior to the applicable Reference Month; and

Spread =      1.12% in respect of the CPI Bonds maturing July 1, 2027 and 1.12% in respect of the CPI Bonds maturing July 1, 2028.

$CPI_t$ for each Interest Reset Date is the CPI for the applicable Reference Month, which is generally released and published in the second calendar month prior to such Interest Reset Date.  $CPI_{t-12}$ for each Interest Reset Date is the CPI for the twelfth month prior to the applicable Reference Month, which is generally released and published in the eleventh month prior to the applicable Reference Month.  For example, for the July 1, 2007 Interest Reset Date, $CPI_t$ will be the CPI for April 2007 and $CPI_{t-12}$ will be the CPI for April 2006.  The CPI for April 2007 is expected to be published by BLS and reported on Bloomberg CPURNSA in May 2007 and the CPI for April 2006 was published and reported in May 2006.  For more information regarding the calculation of interest rates on the CPI Bonds, including historical CPI levels and hypothetical interest rates, see "**Hypothetical Interest Rate Calculations**" below.

As stated in the risk factors, movements in the CPI that have occurred in the past are not necessarily indicative of changes that may occur in the future.  Actual changes in the CPI may be less than or greater than those that have occurred in the past.

The amount of interest accruing on the CPI Bonds during the Initial Interest Period and each Interest Period will be computed on the basis of a 360-day year of twelve 30 day calendar months and will be payable in arrears on the Interest Payment Date for the Initial Interest Period and each Interest Period to the owners thereof as of the applicable Record Date.  If, for any Interest Period, the CPI Rate is zero or a negative number, the interest rate for the CPI Bonds for that Interest Period will be 0%.  In no event will the CPI Rate be greater than the Maximum Interest Rate.  All calculations and determinations by the Calculation Agent will be final, absent manifest error.

At or prior to 12:00 noon, New York time, on each Interest Reset Date (or, if such Interest Reset Date is not a Business Day, on the next succeeding Business Day), the Calculation Agent will calculate the CPI Rate applicable to that Interest Reset Date and shall supply to the 1998 Fiscal Agent and the Authority the CPI Rate so determined in writing or by electronic communication promptly confirmed in writing.  As noted, the calculation of the CPI Rate by the Calculation Agent will be final and conclusive and binding on the 1998 Fiscal Agent, the holders of the CPI Bonds and the Authority, absent manifest error.

If the CPI is not reported on Bloomberg CPURNSA for a particular month by 11:00 AM on an Interest Reset Date, but the CPI has otherwise been published by the BLS, the Calculation Agent will determine the CPI as published by the BLS for such month using a source it deems to be accurate and appropriate.  If the CPI is not published by the BLS for a particular month by 11:00 AM on an Interest Reset Date, the Calculation Agent will determine the CPI with reference to an index number based on the last twelve-month change in the CPI available and announced by the Department of Treasury for its Inflation-Indexed Securities as described at 62 Federal

---

[1] The Initial Interest Rate was determined by using the same interest rate formula that will be used to determine the CPI Rate.  The following values were used to determine the Initial Interest Rate pursuant to such interest rate formula: (a) 201.89935 as $CPI_t$ , which was determined by linear interpolation between the CPI for December 2006 (the "Initial Reference Month") and the CPI for January 2007; (b) 197.04194 as $CPI_{t-12}$ , which was determined by linear interpolation between CPI for the twelfth calendar month prior to the Initial Reference Month and the CPI for the eleventh calendar month prior to the Initial Reference Month; and (c) 1.12% as the Spread, which is the same as the Spread that will be used to determine the CPI Rate.

Register 846-874 (January 6, 1997) (the "Treasury Inflation-Indexed Securities Regulation") or, if no such index number is announced, in accordance with general market practice at the time.

In calculating $CPI_t$ and $CPI_{t-12}$, the Calculation Agent will use the most recently available value of the CPI determined as described above on the applicable Interest Reset Date, even if such value has been adjusted from a prior reported value for the relevant month. However, if a value of $CPI_t$ and $CPI_{t-12}$ used by the Calculation Agent on any Interest Reset Date to determine the interest rate on the CPI Bonds (an "Initial CPI Value") is subsequently revised by the BLS, the Calculation Agent will continue to use the Initial CPI Value for all purposes hereunder, and the interest rate for the related Interest Period, as determined based upon the Initial CPI Value, will not be revised.

If the CPI is rebased to a different year or period, the base reference period for the CPI Bonds will continue to be the 1982-1984 reference period as long as the 1982-1984 CPI continues to be published. If the 1982-1984 CPI is not published, the Calculation Agent will determine the percentage change in inflation in accordance with general market practice at the time.

If, while the CPI Bonds are outstanding, the CPI is discontinued or substantially altered, as determined in the sole discretion of the Calculation Agent, the Calculation Agent will determine the CPI Rate with reference to an applicable substitute index chosen by the Secretary of the Treasury for the Department of Treasury's Inflation-Indexed Securities as described in the Treasury Inflation-Indexed Securities Regulation or, if no such securities are outstanding or no such substitute index is chosen, in accordance with general market practice at the time.

There will be no adjustment to the principal amount of the CPI Bonds at maturity or at any other time during the term of the CPI Bonds. The amount that holders of the CPI Bonds will receive at maturity is equal to the principal amount of CPI Bonds purchased by such holders.

**Rounding**

All values used in the interest rate formula for the CPI Bonds will be truncated to six decimal places and rounded to the nearest fifth decimal place (one-one hundred thousandth of a percentage point), rounding upwards if the sixth decimal place is five or greater (e.g., 9.876555% (or .09876555) would be rounded up to 9.87656% (or .0987656) and 9.876554% (or .09876554) would be rounded down to 9.87655% (or .0987655)). All percentages resulting from any calculation of the interest rate will be truncated to four decimal places and rounded to the nearest third decimal place (one thousandth of a percentage point), rounding upwards if the fourth decimal place is five or greater (e.g., 9.8765% (or .098765) would be rounded up to 9.877% (or .09877) and 9.8764% (or .098764) would be rounded down to 9.876% (or .09876)). All dollar amounts used in or resulting from such calculation on the CPI Bonds will be rounded to the nearest cent (with one-half cent being rounded upward).

**Risk Factors**

An investment in the CPI Bonds involves risks not associated with an investment in ordinary floating rate securities, which prospective investors should consider before purchasing the CPI Bonds.

***The interest rate on the CPI Bonds may be less than the Spread and, in some cases, could be zero.***

The CPI Rate, which represents the interest payable on the CPI Bonds during any Interest Period, is calculated based upon year over year changes in the level of the CPI, plus the Spread, determined semiannually over the term of the CPI Bonds.

If the CPI for the same month in successive years does not increase, which is likely to occur when there is little or no inflation, investors in the CPI Bonds will receive an interest payment for the applicable Interest Period equal to the Spread. If the CPI for the same month in successive years decreases, which is likely to occur in periods of deflation, investors in the CPI Bonds will receive an interest payment for the applicable Interest Period that is less than the Spread. If the CPI for the same month in successive years declines by a percentage equal to or greater than the Spread, the CPI Rate will equal zero for the related Interest Period and investors in the CPI Bonds will receive no interest payment on the corresponding Interest Payment Date.

*The interest rate is based upon the CPI. The CPI itself and the way BLS calculates the CPI may change in the future.*

An investment in securities with interest determined by reference to an inflation index involves factors independent of the creditworthiness of the Authority or otherwise not associated with an investment in securities with interest determined by reference to a fixed rate, floating rate or other index-linked rate. Such factors may include, without limitation, the volatility of the CPI, the amount of other securities linked to the CPI, the level, direction and volatility of the market interest rates generally, the possibility that the CPI may be subject to significant changes, that changes in the CPI may or may not correlate to changes in interest rates generally or with changes in other indices and that the resulting interest may be greater or less than that payable on other securities of similar maturities.

In addition, the value of the CPI may depend on a number of factors, including economic, financial and political events over which the Authority has no control. The historical experience of the CPI should not be taken as an indication of its performance during the term of the CPI Bonds. While the CPI measures changes for prices in goods and services, movements in the CPI that have occurred in the past are not necessarily indicative of changes that may occur in the future.

Further, there can be no assurance that the BLS will not change the method by which it calculates the CPI. Changes may also occur in the way CPI is calculated, which could reduce the level of the CPI and lower the interest payment with respect to the CPI Bonds. Accordingly, the amount of interest, if any, payable on the CPI Bonds, and therefore the value of the CPI Bonds, may be significantly reduced. If the CPI is discontinued or substantially altered, a substitute index may be employed to calculate the interest payable on the CPI Bonds, as described above, and that substitution may adversely affect the value of the CPI Bonds.

The historical levels of the CPI are not an indication of the future levels of the CPI during the term of the CPI Bonds. The CPI has experienced periods of volatility in the past and such volatility may occur in the future. On the other hand, fluctuations and trends in the CPI that may have been observed in the past are not necessarily predictive of fluctuations and trends that may occur in the future.

*The CPI Rate is based upon historical CPI changes and may not reflect the most recent changes in the CPI.*

The calculation methodology for determining CPI incorporates an approximate three-month lag with payments of interest up to six months after such determination. This timing lag may have an impact on the trading price of the CPI Bonds, particularly during periods of significant, rapid changes in the CPI.

*Limited liquidity.*

Tax-exempt municipal securities bearing interest at a CPI Rate is a relatively new investment instrument. There can be no assurance that a secondary market for the CPI Bonds will develop or, if a secondary market does develop, that it will continue or that it will provide owners of the CPI Bonds with liquidity for their investment. In addition, as a new product, the CPI Bonds may not be widely traded or as well understood as fixed rate securities, ordinary floating rate securities or other types of index-linked securities. Lesser liquidity and fewer market participants may result in larger spreads between bid and asked prices for the CPI Bonds than the bid-asked spreads for fixed rate securities, ordinary floating rate securities or other types of index-linked securities of the same maturity as the CPI Bonds. Larger bid-asked spreads normally result in higher transaction costs and/or lower overall returns. The liquidity of the CPI Bonds may be enhanced over time as other issuers of tax-exempt bonds issue similar securities, or as more entities participate in the market for inflation-protection securities, generally; but, there can be no assurance that either or both of these phenomenon will occur.

**Hypothetical Interest Rate Calculations**

The following table sets forth the CPI from January 2000 to December 2006, as published by the BLS and reported on Bloomberg CPURNSA:

| MONTH | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 |
|-------|------|------|------|------|------|------|------|
| January | 198.3 | 190.7 | 185.2 | 181.7 | 177.1 | 175.1 | 168.8 |
| February | 198.7 | 191.8 | 186.2 | 183.1 | 177.8 | 175.8 | 169.8 |
| March | 199.8 | 193.3 | 187.4 | 184.2 | 178.8 | 176.2 | 171.2 |
| April | 201.5 | 194.6 | 188.0 | 183.8 | 179.8 | 176.9 | 171.3 |
| May | 202.5 | 194.4 | 189.1 | 183.5 | 179.8 | 177.7 | 171.5 |
| June | 202.9 | 194.5 | 189.7 | 183.7 | 179.9 | 178.0 | 172.4 |
| July | 203.5 | 195.4 | 189.4 | 183.9 | 180.1 | 177.5 | 172.8 |
| August | 203.9 | 196.4 | 189.5 | 184.6 | 180.7 | 177.5 | 172.8 |
| September | 202.9 | 198.8 | 189.9 | 185.2 | 181.0 | 178.3 | 173.7 |
| October | 201.8 | 199.2 | 190.9 | 185.0 | 181.3 | 177.7 | 174.0 |
| November | 201.5 | 197.6 | 191.0 | 184.5 | 181.3 | 177.4 | 174.1 |
| December | 201.8 | 196.8 | 190.3 | 184.3 | 180.9 | 176.7 | 174.0 |

By way of example, the following illustrates the way in which the CPI Rate would be calculated on the CPI Bonds. Based upon the above table, the hypothetical interest rate that would have been payable on the CPI Bonds for the Interest Period commencing on April 1, 2003, is 3.197%. This hypothetical interest rate is calculated by inserting the following CPI levels into the interest rate formula described under "**CPI Rate**" and using the hypothetical Spread of 0.60%:

$CPI_t$ = 181.7, which is equal to the CPI level for January 2003, which as the third calendar month prior to the Interest Reset Date of April 1, 2003, would be the Reference Month; and

$CPI_{t-12}$ = 177.1, which is equal to the CPI level for January 2002, the twelfth calendar month prior to the Reference Month for the Interest Reset Date of April 1, 2003,

as follows:     3.197%     = (181.7 - 177.1) / 177.1 + 0.60%

                = 2.59740260% + 0.60%

                = 2.597402% (truncated to six decimal places) + 060%

                = 2.59740 (rounded to five decimal places) + 0.60%

                = 3.1974% (truncated to four decimal places)

                = 3.197% (rounded to three decimal places)

The numbers in the foregoing example were provided by the Calculation Agent and are given for illustration and information purposes only. The historical levels of the CPI should not be taken as an indication of future levels of the CPI, and no assurance can be given as to the level of the CPI for any Reference Month. The Spread in the example is not the Spread applicable to the CPI Bonds.

**Interest Rate Swap Agreement**

In connection with the issuance of the CPI Bonds, the Authority has entered into an interest rate swap agreement (the "Swap Agreement") with Morgan Stanley Capital Services Inc. ("MSCS"), an affiliate of Morgan Stanley & Co. Inc., one of the underwriters and the Calculation Agent for the CPI Bonds, pursuant to the terms of which the Authority is required to pay a fixed interest rate and is entitled to receive a floating interest rate equal to the CPI Rate, each based on a notional amount equal to the principal amount of the CPI Bonds.

The purpose of the Swap Agreement is generally to convert the Authority's CPI Rate obligation with respect to the CPI Bonds to a fixed rate obligation. As a result of entering into the Swap Agreement, the Authority

expects to achieve reduced financing costs and to reduce the risk to the Authority associated with the fluctuation in inflation rates.

The agreement by MSCS to make payments to the Authority under the Swap Agreement does not affect the Authority's obligation under the 1998 Resolution to pay the principal of, interest on, and premium, if any, on any of the CPI Bonds.  The 1998 Fiscal Agent and the Bondholders will have no recourse against MSCS.

Under certain circumstances, the Swap Agreement is subject to early termination prior to its scheduled termination and prior to the maturity of the CPI Bonds, in which event, the Authority may be obligated to make a substantial payment to MSCS.

**APPENDIX VIII**



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
**T** 212·312·3000
**T** 800·352·0001

# Municipal Bond
# New Issue Insurance Policy

| Issuer: | | Policy Number: | |
|---|---|---|---|
| | | Control Number: | 0010001 |
| Bonds: | | Premium: | |

Financial Guaranty Insurance Company ("Financial Guaranty"), a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy, hereby unconditionally and irrevocably agrees to pay to U.S. Bank Trust National Association or its successor, as its agent (the "Fiscal Agent"), for the benefit of Bondholders, that portion of the principal and interest on the above-described debt obligations (the "Bonds") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

Financial Guaranty will make such payments to the Fiscal Agent on the date such principal or interest becomes Due for Payment or on the Business Day next following the day on which Financial Guaranty shall have received Notice of Nonpayment, whichever is later. The Fiscal Agent will disburse to the Bondholder the face amount of principal and interest which is then Due for Payment but is unpaid by reason of Nonpayment by the Issuer but only upon receipt by the Fiscal Agent, in form reasonably satisfactory to it, of (i) evidence of the Bondholder's right to receive payment of the principal or interest Due for Payment and (ii) evidence, including any appropriate instruments of assignment, that all of the Bondholder's rights to payment of such principal or interest Due for Payment shall thereupon vest in Financial Guaranty. Upon such disbursement, Financial Guaranty shall become the owner of the Bond, appurtenant coupon or right to payment of principal or interest on such Bond and shall be fully subrogated to all of the Bondholder's rights thereunder, including the Bondholder's right to payment thereof.

This Policy is non-cancellable for any reason. The premium on this Policy is not refundable for any reason, including the payment of the Bonds prior to their maturity. This Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Bond.

As used herein, the term "Bondholder" means, as to a particular Bond, the person other than the Issuer who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof. "Due for Payment" means, when referring to the principal of a Bond, the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity and means, when referring to interest on a Bond, the stated date for payment of interest. "Nonpayment" in respect of a Bond means the failure of the Issuer to have provided sufficient funds to the paying agent for payment in full of all

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form 9000 (10/93)                                                                                                     Page 1 of 2



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

## Municipal Bond
## New Issue Insurance Policy

principal and interest Due for Payment on such Bond. "Notice" means telephonic or telegraphic notice, subsequently confirmed in writing, or written notice by registered or certified mail, from a Bondholder or a paying agent for the Bonds to Financial Guaranty. "Business Day" means any day other than a Saturday, Sunday or a day on which the Fiscal Agent is authorized by law to remain closed.

In Witness Whereof, Financial Guaranty has caused this Policy to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:**                                    **Authorized Representative**

U.S. Bank Trust National Association, acknowledges that it has agreed to perform the duties of Fiscal Agent under this Policy.

**Authorized Officer**



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T  212·312·3000
T  800·352·0001

## Endorsement
## To Financial Guaranty Insurance Company
## Insurance Policy

| Policy Number: | | Control Number: | 0010001 |
|---|---|---|---|

It is further understood that the term "Nonpayment" in respect of a Bond includes any payment of principal or interest made to a Bondholder by or on behalf of the issuer of such Bond which has been recovered from such Bondholder pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY.  IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:**

**Authorized Representative**

**Acknowledged as of the Effective Date written above:**

**Authorized Officer**
**U.S. Bank Trust National Association, as Fiscal Agent**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form E-0002 (10/93)                                                                                          Page 1 of 1

(This page intentionally left blank)

# FINANCIAL GUARANTY INSURANCE POLICY

## MBIA Insurance Corporation
## Armonk, New York 10504

Policy No. [NUMBER]

MBIA Insurance Corporation (the "Insurer"), in consideration of the payment of the premium and subject to the terms of this policy, hereby unconditionally and irrevocably guarantees to any owner, as hereinafter defined, of the following described obligations, the full and complete payment required to be made by or on behalf of the Issuer to [PAYING AGENT/TRUSTEE] or its successor (the "Paying Agent") of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations (as that term is defined below) as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed hereby shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration, unless the Insurer elects in its sole discretion, to pay in whole or in part any principal due by reason of such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence shall be referred to herein collectively as the "Insured Amounts." "Obligations" shall mean:

**[PAR]**
**[LEGAL NAME OF ISSUE]**

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the Paying Agent or any owner of an Obligation the payment of an Insured Amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with U.S. Bank Trust National Association, in New York, New York, or its successor, sufficient for the payment of any such Insured Amounts which are then due. Upon presentment and surrender of such Obligations or presentment of such other proof of ownership of the Obligations, together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Obligations in any legal proceeding related to payment of Insured Amounts on the Obligations, such instruments being in a form satisfactory to U.S. Bank Trust National Association, U.S. Bank Trust National Association shall disburse to such owners, or the Paying Agent payment of the Insured Amounts due on such Obligations, less any amount held by the Paying Agent for the payment of such Insured Amounts and legally available therefor. This policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligation.

As used herein, the term "owner" shall mean the registered owner of any Obligation as indicated in the books maintained by the Paying Agent, the Issuer, or any designee of the Issuer for such purpose. The term owner shall not include the Issuer or any party whose agreement with the Issuer constitutes the underlying security for the Obligations.

Any service of process on the Insurer may be made to the Insurer at its offices located at 113 King Street, Armonk, New York 10504 and such service of process shall be valid and binding.

This policy is non-cancellable for any reason. The premium on this policy is not refundable for any reason including the payment prior to maturity of the Obligations.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed in facsimile on its behalf by its duly authorized officers, this [DAY] day of [MONTH, YEAR].

**COUNTERSIGNED:**

**MBIA Insurance Corporation**

_____
Resident Licensed Agent

_____
President

_____        Attest:
City, State

_____
Assistant Secretary

STD-RCS-7
01/05

1

(This page intentionally left blank)

**APPENDIX X**


**FINANCIAL SECURITY ASSURANCE®**

# MUNICIPAL BOND INSURANCE POLICY

ISSUER:

BONDS:

Policy No.: -N

Effective Date:

Premium: $

FINANCIAL SECURITY ASSURANCE INC. ("Financial Security"), for consideration received, hereby UNCONDITIONALLY AND IRREVOCABLY agrees to pay to the trustee (the "Trustee") or paying agent (the "Paying Agent") (as set forth in the documentation providing for the issuance of and securing the Bonds) for the Bonds, for the benefit of the Owners or, at the election of Financial Security, directly to each Owner, subject only to the terms of this Policy (which includes each endorsement hereto), that portion of the principal of and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

On the later of the day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which Financial Security shall have received Notice of Nonpayment, Financial Security will disburse to or for the benefit of each Owner of a Bond the face amount of principal of and interest on the Bond that is then Due for Payment but is then unpaid by reason of Nonpayment by the Issuer, but only upon receipt by Financial Security, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in Financial Security. A Notice of Nonpayment will be deemed received on a given Business Day if it is received prior to 1:00 p.m. (New York time) on such Business Day; otherwise, it will be deemed received on the next Business Day. If any Notice of Nonpayment received by Financial Security is incomplete, it shall be deemed not to have been received by Financial Security for purposes of the preceding sentence and Financial Security shall promptly so advise the Trustee, Paying Agent or Owner, as appropriate, who may submit an amended Notice of Nonpayment. Upon disbursement in respect of a Bond, Financial Security shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by Financial Security hereunder. Payment by Financial Security to the Trustee or Paying Agent for the benefit of the Owners shall, to the extent thereof, discharge the obligation of Financial Security under this Policy.

Except to the extent expressly modified by an endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy. "Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or the Insurer's Fiscal Agent are authorized or required by law or executive order to remain closed. "Due for Payment" means (a) when referring to the principal of a Bond, payable on the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity unless Financial Security shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration and (b) when referring to interest on a Bond, payable on the stated date for payment of interest. "Nonpayment" means, in respect of a Bond, the failure of the Issuer to have provided sufficient funds to the Trustee or, if there is no Trustee, to the Paying Agent for payment in full of all principal and interest that is Due for Payment on such Bond. "Nonpayment" shall also include, in respect of a Bond, any payment of principal or interest that is Due for Payment

Page 2 of 2
Policy No. -N

made to an Owner by or on behalf of the Issuer which has been recovered from such Owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.   "Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Trustee or the Paying Agent to Financial Security which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment.   "Owner" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds.

Financial Security may appoint a fiscal agent (the "Insurer's Fiscal Agent") for purposes of this Policy by giving written notice to the Trustee and the Paying Agent specifying the name and notice address of the Insurer's Fiscal Agent.   From and after the date of receipt of such notice by the Trustee and the Paying Agent, (a) copies of all notices required to be delivered to Financial Security pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to Financial Security and shall not be deemed received until received by both and (b) all payments required to be made by Financial Security under this Policy may be made directly by Financial Security or by the Insurer's Fiscal Agent on behalf of Financial Security.   The Insurer's Fiscal Agent is the agent of Financial Security only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of Financial Security to deposit or cause to be deposited sufficient funds to make payments due under this Policy.

To the fullest extent permitted by applicable law, Financial Security agrees not to assert, and hereby waives, only for the benefit of each Owner, all rights (whether by counterclaim, setoff or otherwise) and defenses (including, without limitation, the defense of fraud), whether acquired by subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to Financial Security to avoid payment of its obligations under this Policy in accordance with the express provisions of this Policy.

This Policy sets forth in full the undertaking of Financial Security, and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto.   Except to the extent expressly modified by an endorsement hereto, (a) any premium paid in respect of this Policy is nonrefundable for any reason whatsoever, including payment, or provision being made for payment, of the Bonds prior to maturity and (b) this Policy may not be canceled or revoked.   THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, FINANCIAL SECURITY ASSURANCE INC. has caused this Policy to be executed on its behalf by its Authorized Officer.

[Countersignature]                                    FINANCIAL SECURITY ASSURANCE INC.

By _____          By _____
                                                                    Authorized Officer

A subsidiary of Financial Security Assurance Holdings Ltd.                    (212) 826-0100
31 West 52nd Street, New York, N.Y.  10019

Form 500NY (5/90)

**Ambac**

# Financial Guaranty Insurance Policy

Ambac Assurance Corporation
One State Street Plaza, 15th Floor
New York, New York 10004
Telephone: (212) 668-0340

Obligor:                                                                 Policy Number:

Obligations:                                                             Premium:

**Ambac Assurance Corporation (Ambac),** a Wisconsin stock insurance corporation, in consideration of the payment of the premium and subject to the terms of this Policy, hereby agrees to pay to The Bank of New York, as trustee, or its successor (the "Insurance Trustee"), for the benefit of the Holders, that portion of the principal of and interest on the above-described obligations (the "Obligations") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor.

Ambac will make such payments to the Insurance Trustee within one (1) business day following written notification to Ambac of Nonpayment. Upon a Holder's presentation and surrender to the Insurance Trustee of such unpaid Obligations or related coupons, uncanceled and in bearer form and free of any adverse claim, the Insurance Trustee will disburse to the Holder the amount of principal and interest which is then Due for Payment but is unpaid. Upon such disbursement, Ambac shall become the owner of the surrendered Obligations and/or coupons and shall be fully subrogated to all of the Holder's rights to payment thereon.

In cases where the Obligations are issued in registered form, the Insurance Trustee shall disburse principal to a Holder only upon presentation and surrender to the Insurance Trustee of the unpaid Obligation, uncanceled and free of any adverse claim, together with an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee duly executed by the Holder or such Holder's duly authorized representative, so as to permit ownership of such Obligation to be registered in the name of Ambac or its nominee.  The Insurance Trustee shall disburse interest to a Holder of a registered Obligation only upon presentation to the Insurance Trustee of proof that the claimant is the person entitled to the payment of interest on the Obligation and delivery to the Insurance Trustee of an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, transferring to Ambac all rights under such Obligation to receive the interest in respect of which the insurance disbursement was made. Ambac shall be subrogated to all of the Holders' rights to payment on registered Obligations to the extent of any insurance disbursements so made.

In the event that a trustee or paying agent for the Obligations has notice that any payment of principal of or interest on an Obligation which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from the Holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such Holder will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

As used herein, the term "Holder" means any person other than (i) the Obligor or (ii) any person whose obligations constitute the underlying security or source of payment for the Obligations who, at the time of Nonpayment, is the owner of an Obligation or of a coupon relating to an Obligation.  As used herein, "Due for Payment", when referring to the principal of Obligations, is when the scheduled maturity date or mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity; and, when referring to interest on the Obligations, is when the scheduled date for payment of interest has been reached.  As used herein, "Nonpayment" means the failure of the Obligor to have provided sufficient funds to the trustee or paying agent for payment in full of all principal of and interest on the Obligations which are Due for Payment.

This Policy is noncancelable.   The premium on this Policy is not refundable for any reason, including payment of the Obligations prior to maturity.  This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Obligation, other than at the sole option of Ambac, nor against any risk other than Nonpayment.

In witness whereof, Ambac has caused this Policy to be affixed with a facsimile of its corporate seal and to be signed by its duly authorized officers in facsimile to become effective as its original seal and signatures and binding upon Ambac by virtue of the countersignature of its duly authorized representative.

President                                                                Secretary



Effective Date:                                                          Authorized Representative

THE BANK OF NEW YORK acknowledges that it has agreed
to perform the duties of Insurance Trustee under this Policy.

Form No.: 2B-0012 (1/01)                                                  Authorized Officer of Insurance Trustee

A-

(This page intentionally left blank)

**APPENDIX XII**



Assured Guaranty Corp.
1325 Avenue of the Americas
New York, NY 10019
212-974-0100
www.assuredguaranty.com

Financial Guaranty Insurance Policy

| Issuer: | Policy No. |
|---------|-----------|

| Bonds: | Premium: |
|--------|----------|

| Effective Date: | Term: | The period from and including the Effective Date to and including the date on which all Insured Payments (including Avoided Payments) have been paid. |
|-----------------|-------|---|

Assured Guaranty Corp., a Maryland insurance company ("Assured Guaranty"), in consideration of the payment of the premium set forth above and subject to the terms of this financial guaranty insurance policy (the "Policy"), hereby unconditionally and irrevocably agrees to pay to [insert name of trustee], as trustee (the "Trustee") (as set forth in the documentation providing for the issuance of and securing the above-referenced Bonds (the "Bonds"; such documentation, the "Transaction Documentation")) for the benefit of the holders of the Bonds (the "Holders"), and in any case subject to the terms of this Policy, that portion of the principal of and interest on the Bonds that shall become Due for Payment (as hereinafter defined) but shall be unpaid by reason of Nonpayment by the Issuer (as hereinafter defined; such portion of principal and interest, hereinafter the "Insured Payments").  Insured Payments shall not include any additional amounts owing by the Issuer solely as a result of the failure by the Trustee to pay such amount when due and payable, including without limitation any such additional amounts as may be attributable to penalties or to interest accruing at a default rate, to amounts payable in respect of indemnification, or to any other additional amounts payable by the Trustee by reason of such failure.  Capitalized terms used in this Policy are used with the meanings ascribed thereto elsewhere herein.

Assured Guaranty will make such Insured Payments to the Trustee on the later to occur of (i) the date applicable principal or interest becomes Due for Payment, or (ii) the Business Day next following the day on which Assured Guaranty shall have Received a completed notice of claim in the form attached hereto as Exhibit A.  Payment by Assured Guaranty to the Trustee for the benefit of the Holders shall discharge the obligation of Assured Guaranty under this Policy to the extent of such payment.  The Trustee will disburse the Insured Payments to the Holders in accordance with the terms of the Transaction Documentation only upon receipt by the Trustee, in form reasonably satisfactory to it, of (i) evidence of the Holder's right to receive such payments, and (ii) evidence, including any appropriate instruments of assignment, that all of the Holder's rights to payment of such principal or interest Due for Payment shall thereupon vest in Assured Guaranty.  Upon such disbursement, Assured Guaranty shall become the Holder of the Bond, appurtenant coupon thereto, or right to payment of principal or interest thereon, and shall be fully subrogated to all of the Holder's right, title and interest thereunder, including without limitation the right to payment thereof.

This Policy is non-cancelable for any reason.  The premium on this Policy is not refundable for any reason, including without limitation any payment of the Bonds prior to maturity.  This Policy does not insure against loss of any prepayment premium which may be payable with respect to all or any portion of any Bond at any time, or the failure of the Trustee to remit amounts received hereunder to the Holder in accordance with the terms of the Transaction Documentation.  No payment shall be made under this Policy

in excess of the Policy Limit.  No payment shall be made under this Policy with respect to a Bond if the Holder is the Issuer of such Bond.

At any time during the Term of the Policy, Assured Guaranty may appoint a fiscal agent (the "Fiscal Agent") for purposes of this Policy by written notice to the Trustee, specifying the name and notice address of such Fiscal Agent.  From and after the date of receipt of such notice by the Trustee or Paying Agent, copies of all notices and documents required to be delivered to Assured Guaranty pursuant to this Policy shall be simultaneously delivered to the Fiscal Agent and to Assured Guaranty.  All payments required to be made by Assured Guaranty under this Policy may be made directly by Assured Guaranty or by the Fiscal Agent on behalf of Assured Guaranty.  The Fiscal Agent is the agent of Assured Guaranty only, and the Fiscal Agent shall in no event be liable to Trustee for any acts of the Fiscal Agent or any failure of Assured Guaranty to deposit, or cause to be deposited, sufficient funds to make payments due under this Policy.

Certain Defined Terms

"Avoided Payment" means any amount that is paid, credited, transferred or delivered to a Holder in respect of any Insured Payment by the Trustee, which amount has been rescinded or recovered from or otherwise required to be returned or repaid by such Holder pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction that such payment constitutes an avoidable preference with respect to such holder.

"Business Day" means any day other than (i) a Saturday or Sunday, (ii) any day on which the offices of the Trustee or Assured Guaranty are closed, or (iii) any day on which banking institutions are authorized or required by law, executive order or governmental decree to be closed in New York City or in the States of Maryland or New York.

"Due for Payment" means, when referring to the principal of a Bond, the stated maturity date thereof, or the date on which such Bond shall have been duly called for mandatory sinking fund redemption, and does not refer to any earlier date on which payment is due by reason of a call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity (unless Assured Guaranty in its sole discretion elects to make any principal payment, in whole or in part, on such earlier date) and means, when referring to interest on a Bond, the stated date for payment of such interest.

"Nonpayment" in respect of a Bond means the failure of the Issuer to have provided sufficient funds to the Trustee for payment in full of all principal and interest Due for Payment on such Bond.  It is further understood that the term "Nonpayment" in respect of a Bond includes any Avoided Payment.

"Notice" means a written notice from a Holder or the Trustee mailed by registered mail or personally delivered or telecopied to Assured Guaranty at 1325 Avenue of the Americas, New York, NY  10019, Telephone Number:  (212) 974-0100, Facsimile Number:  (212) 581-3268, Attention:  Risk Management, with a copy to the General Counsel, or to such other address as shall be specified by Assured Guaranty to the Trustee in writing.

"Policy Limit" means $_____, together with interest thereon at the rate or rates set forth in the Transaction Documentation; provided, however, that nothing set forth herein shall be construed to include in the coverage provided by this Policy interest calculated at a default rate.

"Receipt" or "Received" means actual receipt or notice of or, if notice is given by overnight or other delivery service, or by certified or registered United States mail, by a delivery receipt signed by a person authorized to accept delivery on behalf of the person to whom the notice was given.

To the fullest extent permitted by applicable law, Assured Guaranty agrees not to assert, and hereby waives, for the benefit of the Holders only, all rights and defenses to the extent that such rights and defenses may be available to Assured Guaranty to avoid payment of claims made under this Policy in accordance with its terms.

This Policy sets forth in full the undertaking of Assured Guaranty with respect to the subject matter hereof, and may not be modified, altered or affected by any other agreement or instrument, including without limitation any modification thereto or amendment thereof.

This Policy will be governed by, and shall be construed in accordance with, the laws of the State of New York (other than with respect to its conflicts of laws principles).

This Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

IN WITNESS WHEREOF, Assured Guaranty has caused this Policy to be affixed with its corporate seal and to be signed by its duly authorized officer to become effective and binding upon Assured Guaranty by virtue of such signature.



ASSURED GUARANTY CORP.

SEAL

By: _____
Name:
Title:

Signature attested to by:

_____
Counsel

(This page intentionally left blank)