# Debtor's Ex. 26

CONCESSION AGREEMENT FOR THE FINAL DESIGN, CONSTRUCTION,
OPERATION AND MAINTENANCE OF A
PRIVATIZED TRANSPORTATION FACILITY


BETWEEN


AUTOPISTAS DE PUERTO RICO Y COMPAÑIA, S. E.


AND


THE PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY

HTA_CONF 00011857

# TABLE OF CONTENTS

ARTICLE I . . . . . . . . . . . . . . . . . . . . . . . .  3

DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . .  3
    Section 1.1.   Acceptance Date . . . . . . . . . . . .  3
    Section 1.2.   Agent . . . . . . . . . . . . . . . . .  3
    Section 1.3.   Agreement . . . . . . . . . . . . . . .  4
    Section 1.4.   Application for Payment . . . . . . . .  4
    Section 1.5.   Available Cash Flow . . . . . . . . . .  4
    Section 1.6.   Base Prices . . . . . . . . . . . . . .  4
    Section 1.7.   Base Return on Partner's Capital . . . .  4
    Section 1.8.   Bond Counsel . . . . . . . . . . . . . .  4
    Section 1.9.   Bonds . . . . . . . . . . . . . . . . .  4
    Section 1.10.  Bond Trustee . . . . . . . . . . . . .  5
    Section 1.11.  Capital Outlay Costs . . . . . . . . .  5
    Section 1.12.  Certificate for Payment . . . . . . .  5
    Section 1.13.  Change in Law . . . . . . . . . . . .  5
    Section 1.14.  Compliance Order . . . . . . . . . . .  5
    Section 1.15.  Construction Costs . . . . . . . . . .  6
    Section 1.16.  Construction Cost Savings . . . . . .  6
    Section 1.17.  Construction Fund . . . . . . . . . .  6
    Section 1.18.  Contractor . . . . . . . . . . . . . .  6
    Section 1.19.  Costs . . . . . . . . . . . . . . . . .  6
    Section 1.20.  Date of Contribution . . . . . . . . .  6
    Section 1.21.  Debt . . . . . . . . . . . . . . . . .  6
    Section 1.22.  Debt Service . . . . . . . . . . . . .  6
    Section 1.23.  Escrow Fund . . . . . . . . . . . . .  6
    Section 1.24.  Excess Revenue . . . . . . . . . . . .  6
    Section 1.25.  Fast Track Construction Method . . . .  7
    Section 1.26.  Final Design . . . . . . . . . . . . .  7
    Section 1.27.  Final Plans and Specifications . . . .  7
    Section 1.28.  Fiscal Year . . . . . . . . . . . . .  7
    Section 1.29.  Force Majeure . . . . . . . . . . . .  7
    Section 1.30.  Guaranteed Maximum Price . . . . . . .  7
    Section 1.31.  Incentive Return . . . . . . . . . . .  8
    Section 1.32.  Intangible Property . . . . . . . . .  8
    Section 1.33.  Internal Rate of Return on Partner's
      Capital . . . . . . . . . . . . . . . . . . . . .  8
    Section 1.34.  Investment . . . . . . . . . . . . . .  8
    Section 1.35.  Laws and Regulations . . . . . . . . .  8
    Section 1.36.  Letter of Credit Bank . . . . . . . .  9
    Section 1.37.  Loan Agreement . . . . . . . . . . . .  9
    Section 1.38.  Modification Report . . . . . . . . .  9
    Section 1.39.  Notice of Completion . . . . . . . . .  9
    Section 1.40.  Operating and Maintenance Costs . . .  9
    Section 1.41.  Operation and Maintenance Period . . .  9
    Section 1.42.  Overhead and Profit Fee . . . . . . .  9
    Section 1.43.  Partner or Partners . . . . . . . . . 10
    Section 1.44.  Partner's Capital . . . . . . . . . . 10

ii

Section 1.45.    Plans and Specifications . . . . . . . .    10
Section 1.46.    Project . . . . . . . . . . . . . . . .    10
Section 1.47.    Punch List . . . . . . . . . . . . . .    10
Section 1.48.    Quality Assurance . . . . . . . . . .    10
Section 1.49.    Quality Control Program . . . . . . .    10
Section 1.50.    Reasonable Return on Partner's Capital .    10
Section 1.51.    Renewal and Replacement Costs . . . . .    11
Section 1.52.    Representative of Public Interest . . . .    11
Section 1.53.    Reserve Accounts . . . . . . . . . . .    11
Section 1.54.    Substantial Completion . . . . . . . .    11
Section 1.55.    Term . . . . . . . . . . . . . . . . .    11
Section 1.56.    Termination Option . . . . . . . . . .    11
Section 1.57.    Toll Rates . . . . . . . . . . . . . .    11
Section 1.58.    Toll Revenues . . . . . . . . . . . . .    11
Section 1.59.    Total Revenues . . . . . . . . . . . .    11
Section 1.60.    Traffic Estimate . . . . . . . . . . .    12
Section 1.61.    Transportation Facility . . . . . . . .    12
Section 1.62.    Transportation Facility Acceptance . . .    12
Section 1.63.    Trust Agreement . . . . . . . . . . . .    12

ARTICLE II  . . . . . . . . . . . . . . . . . . . . . .    12

CONCESSION . . . . . . . . . . . . . . . . . . . . . .    12
Section 2.1    Grant of Concession . . . . . . . . . .    12
Section 2.2.    Term . . . . . . . . . . . . . . . . .    13
Section 2.3.    Operation and Maintenance . . . . . . .    14

ARTICLE III . . . . . . . . . . . . . . . . . . . . . .    14

REPRESENTATIONS AND WARRANTIES . . . . . . . . . . . .    14
Section    3.1    Representation   and   Warranties   of
Concessionaire . . . . . . . . . . . . . . . . .    14
Section 3.2.    Representations and Warranties of the
Authority . . . . . . . . . . . . . . . . . . .    15

ARTICLE IV  . . . . . . . . . . . . . . . . . . . . . .    16

TRANSPORTATION    FACILITY    PROPERTY    AND    RIGHT    OF    WAY
ACQUISITION  . . . . . . . . . . . . . . . . . .    16
Section 4.1.    Acquisition of Land; Expropriation . . . .    16
Section 4.2.    Easements; Rights of Way . . . . . . . .    17
Section 4.3.    Air rights and utilities's support and
publicity along the Transportation Facility . . . .    17

ARTICLE V . . . . . . . . . . . . . . . . . . . . . . .    18

PERMITS AND LICENSES . . . . . . . . . . . . . . . . .    18
Section 5.1.    Permits . . . . . . . . . . . . . . . .    18
Section 5.2.    Mitigation . . . . . . . . . . . . . . .    18
Section 5.3.    Municipal Excise Licenses . . . . . . . .    18

ARTICLE VI . . . . . . . . . . . . . . . . . . . . . .    18

iii

HTA_CONF 00011859

DESIGN . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Section 6.1. Preliminary and Final Design . . . . . . 18
    Section 6.2. Modifications . . . . . . . . . . . . 19
    Section 6.3. Procedures . . . . . . . . . . . . . . 19

ARTICLE VII . . . . . . . . . . . . . . . . . . . . . . . . 19

FINANCIAL COVENANTS . . . . . . . . . . . . . . . . . . . . 19
    Section 7.1. Investment . . . . . . . . . . . . . . 19
    Section 7.2. Revision of the Guaranteed Maximum Price . 19
    Section 7.3. Construction Cost Savings . . . . . . . 20
    Section 7.4. Partner's Capital . . . . . . . . . . . 21
    Section 7.5. Funds and Finance Obligations . . . . . 21
    Section 7.6. Disbursements to Concessionaire by the
        Bond Trustee . . . . . . . . . . . . . . . . . . . 22
    Section 7.7. Reserve Accounts . . . . . . . . . . . 22
    Section 7.8. Uses of Funds; Recoveries . . . . . . . 23
    Section 7.9. Excess Revenue . . . . . . . . . . . . 23
    Section 7.10. Reporting . . . . . . . . . . . . . . . 24

ARTICLE VIII . . . . . . . . . . . . . . . . . . . . . . . 25

CONSTRUCTION . . . . . . . . . . . . . . . . . . . . . . . 25
    Section 8.1. Construction of the Transportation
        Facility . . . . . . . . . . . . . . . . . . . . . 25
    Section 8.2. Design, Construction Standards and
        Compliance Order . . . . . . . . . . . . . . . . . 26
    Section 8.3. Control of Works . . . . . . . . . . . 26
    Section 8.4. Construction Cost Audit . . . . . . . . 27
    Section 8.5. Completion of the Transportation
        Facility . . . . . . . . . . . . . . . . . . . . . 27
    Section 8.6. Opening to Traffic . . . . . . . . . . 28

ARTICLE IX . . . . . . . . . . . . . . . . . . . . . . . . 28

OPERATION AND MAINTENANCE . . . . . . . . . . . . . . . . . 28
    Section 9.1. Rendering of Services by Concessionaire . 28
    Section 9.2. Police and Preservation . . . . . . . . 29
    Section 9.3. Changes to the Transportation Facility . . 29
    Section 9.4. Concessionaire's Personnel . . . . . . . 30

ARTICLE X . . . . . . . . . . . . . . . . . . . . . . . . . 30

TOLL RATES . . . . . . . . . . . . . . . . . . . . . . . . 30
    Section 10.1. Initial Toll Rates . . . . . . . . . . 30
    Section 10.2. Revision of Toll Rates . . . . . . . . 31
    Section 10.3. Toll Collection . . . . . . . . . . . . 32
    Section 10.4. Traffic and Control Statistics . . . . . 32

ARTICLE XI . . . . . . . . . . . . . . . . . . . . . . . . 32

TERMINATION OPTION . . . . . . . . . . . . . . . . . . . . 32

iv

Section 11.1.   Condition for Termination Option  . . . .   32
Section 11.2.   Exercise of the Termination Option  . . .   33
Section 11.3.   Security . . . . . . . . . . . . . . . .   35
Section 11.4.   Issuance of Bonds Under Bond Resolution;
                Subordination of Obligations  . . . . . .   35
Section 11.5.   Exercise of the Termination Option  . . .   36

ARTICLE XII  . . . . . . . . . . . . . . . . . . . . . .   36

FURTHER COVENANTS . . . . . . . . . . . . . . . . . . . .   36
Section 12.1.   Mutual Cooperation  . . . . . . . . . . .   36
Section  12.2.   Mutual  Assistance  in  Obtaining
                Financing . . . . . . . . . . . . . . . .   37
Section 12.3.   Mutual Legal Assistance . . . . . . . . .   37
Section 12.4.   Approvals . . . . . . . . . . . . . . . .   37
Section 12.5.   Toll Violation Enforcement  . . . . . . .   37
Section 12.6.   Competing Facilities  . . . . . . . . . .   37
Section 12.7    Change in Law . . . . . . . . . . . . . .   38
Section 12.8    Transfer Stamps, Vouchers and Fees  . . .   39
Section 12.9    Authority's Commitments . . . . . . . . .   39

ARTICLE XIII  . . . . . . . . . . . . . . . . . . . . . .   39

LIABILITY . . . . . . . . . . . . . . . . . . . . . . . .   39
Section 13.1    Independent Contractor . . . . . . . . .   39
Section 13.2    Concessionaire Responsibility . . . . . .   39
Section 13.3    Indemnification . . . . . . . . . . . . .   40
Section 13.4.   Authority Liability . . . . . . . . . . .   40
Section 13.5.   Limitation of Liability . . . . . . . . .   40
Section 13.6.   Rights of the Public  . . . . . . . . . .   41

ARTICLE XIV . . . . . . . . . . . . . . . . . . . . . . .   41

PERFORMANCE AND OPERATION BONDS AND INSURANCE . . . . . .   41
Section 14.1.   Performance and Operation Bonds  . . . .   41
Section 14.2.   Insurance . . . . . . . . . . . . . . . .   42

ARTICLE XV  . . . . . . . . . . . . . . . . . . . . . . .   43

DEFAULT AND TERMINATION . . . . . . . . . . . . . . . . .   43
Section 15.1.   Concessionaire's Default  . . . . . . . .   43
Section 15.2.   Authority's Remedies  . . . . . . . . . .   44
Section 15.3.   Authority's Default . . . . . . . . . . .   44
Section 15.4.   Concessionaire's Remedies . . . . . . . .   45
Section 15.5.   Right to Cure . . . . . . . . . . . . . .   45
Section 15.6.   Default Materiality . . . . . . . . . . .   46
Section 15.7.   Ownership of Intellectual Property  . . .   46
Section 15.8.   Other events of Termination . . . . . . .   46

ARTICLE XVI . . . . . . . . . . . . . . . . . . . . . . .   47

DISPUTE RESOLUTION  . . . . . . . . . . . . . . . . . . .   47

HTA_CONF 00011861

        Section 16.1.   Administrative Dispute Resolution . . . .   47
        Section 16.2.   Arbitration . . . . . . . . . . . . .   47

ARTICLE XVII  . . . . . . . . . . . . . . . . . . . .   48

SECURITY HOLDER'S RIGHTS AND REMEDIES . . . . . . . . .   48
        Section 17.1.   Financing Security  . . . . . . . .   48
        Section 17.2.   Notices to Security Holder  . . . .   48
        Section 17.3.   Interpretation of Default . . . . .   48
        Section 17.4.   Security Holder's Rights  . . . . .   49
        Section 17.5    Effect of Security Interest . . . .   49
        Section 17.6.   New Agreement . . . . . . . . . . .   50
        Section 17.7.   Security Enforcement  . . . . . . .   51
        Section 17.8.   Participation in Dispute Resolution . . .   51
        Section 17.9.   Estoppel Certificates . . . . . . .   51
        Section 17.10.  Consent of the Security Holder  . . .   51
        Section 17.11.  Future Amendments; Cooperation  . . .   51

ARTICLE XVIII . . . . . . . . . . . . . . . . . . . .   52

DAMAGE, DESTRUCTION OR CONDEMNATION . . . . . . . . . .   52
        Section 18.1.   Concessionaire to Give Notice . . .   52
        Section 18.2.   Restoration . . . . . . . . . . . .   52
        Section 18.3.   Application of Insurance Proceeds . .   52
        Section 18.4.   Condemnation  . . . . . . . . . . .   53

ARTICLE XIX . . . . . . . . . . . . . . . . . . . . .   53

CONDITIONS PRECEDENT  . . . . . . . . . . . . . . . .   53
        Section 19.1.   Effective Date  . . . . . . . . . .   53

ARTICLE XX  . . . . . . . . . . . . . . . . . . . . .   54

MISCELLANEOUS . . . . . . . . . . . . . . . . . . . .   54
        Section 20.1.   Labor Requirements  . . . . . . . .   54
        Section 20.2.   Assignment  . . . . . . . . . . . .   54
        Section 20.3.   Interpretation  . . . . . . . . . .   55
        Section 20.4.   Notices . . . . . . . . . . . . . .   55
        Section 20.5.   Entire Agreement  . . . . . . . . .   56
        Section 20.6.   Parties . . . . . . . . . . . . . .   56
        Section 20.8.   Counterparts  . . . . . . . . . . .   56
        Section 20.9.   Disclaimers . . . . . . . . . . . .   56
        Section 20.10.  Survival  . . . . . . . . . . . . .   57
        Section 20.11.  Governing Law . . . . . . . . . . .   57
        Section 20.12.  Waiver  . . . . . . . . . . . . . .   57
        Section 20.13.  Severability  . . . . . . . . . . .   57
        Section 20.14.  Amendments  . . . . . . . . . . . .   57
        Section 20.15.  Further Assurances  . . . . . . . .   57

HTA_CONF 00011862

CONCESSION AGREEMENT FOR THE FINAL DESIGN,
CONSTRUCTION, OPERATION AND MAINTENANCE
OF A
PRIVATIZED TRANSPORTATION FACILITY

CONCESSION AGREEMENT made at San Juan, Puerto Rico this 20th day of December, 1991 by and between AUTOPISTAS DE PUERTO RICO Y COMPAÑIA, S. E., (hereinafter the " Concessionaire"), a special partnership organized and existing under the laws of the Commonwealth of Puerto Rico (the "Commonwealth") and the PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY (the "Authority"), a body corporate and politic constituting a public corporation and governmental instrumentality of the Commonwealth, created under Act No. 74 of June 23, 1965, as amended (the "Act").

## WITNESSETH:

WHEREAS, the Commonwealth Legislature passed House Bill 1092, adding Article 4-A through 4-G and paragraph (h) to Article 12 to the Act relating to ground transportation facilities and declaring the urgency thereof;

WHEREAS, that Bill was approved by the Governor on August 23, 1990 as Act No. 4 (the "Act") to be effective immediately;

WHEREAS, the Legislature found and declared that it was essential for the economic and social development of the Commonwealth to maintain an efficient ground transportation system;

WHEREAS, present and future needs of the Commonwealth for highway systems require substantial additional investments, and alternative funding sources should be developed to augment or supplement available public sources of revenue;

WHEREAS, identified important alternatives are privately funded projects whereby private entities obtain concession agreements to prepare the final design, and to build, operate maintain and manage with private funds, all or a portion of public ground transportation facilities;

WHEREAS, privately financed projects allow for joint ventures of private and public entities to take advantage of private sector efficiencies and allow for rapid formation of capital for funding purposes, subject to continued compliance with applicable Commonwealth and federal laws, offer the traveling public alternate route selections in project areas and more quickly reduce congestion;

WHEREAS, Article VI, section 13 of the Constitution of the Commonwealth and the Act authorize and empower the Authority to grant an administrative concession to a private entity to operate

a transportation facility of public domain for a certain term not to exceed fifty (50) years and to collect tolls for its use, provided that the private entity prepare the final design and construct the transportation facility and thereafter, upon Transportation Facility Acceptance (as hereinafter defined) by the Authority, operate, maintain and manage the transportation facility during the term of the concession;

WHEREAS, the Act provides, among other things, that the private entity use the income from the tolls on the transportation facility to cover the costs of operating and maintaining said transportation facility, to recover its capital investment and expenses incurred in the development, to cover financing and construction of the transportation facility, the repayment or amortization of any indebtedness incurred in the construction and operation, and obtain a reasonable return on its capital investment;

WHEREAS, said transportation facility shall be designed and constructed by a private entity and upon its completion and acceptance by the Authority, the transportation facility shall be of public domain pursuant to the Act.

WHEREAS, plans and specifications for each project constructed pursuant to the Act shall comply with the Authority's standards for such projects;

WHEREAS, a transportation facility constructed and operated by a private entity shall, during the term of the concession, be deemed to be a part of the Commonwealth highway system for all purposes including, but not limited to, identification, enforcement of traffic laws, and the like;

WHEREAS, in accordance with the above objectives the Authority identified two projects the realization of which, including their final design, construction, operation, maintenance and financing on a toll basis, were deemed urgent and appropriate to be undertaken by a private entity.  These projects were designated as project A consisting of various phases or segments including a bridge over San José Lagoon with its approaches and project B related to road PR-66;

WHEREAS, the Authority, through notices published in newspapers, informed interested persons of these two projects and requested them to submit their qualifications for the realization of such projects.;

WHEREAS, on February 6, 1990 the Authority announced the selection of three groups of firms among those which had previously submitted the letters of interest and related qualification documents for projects A and B.;

HTA_CONF 00011864

WHEREAS, on February 13, 1990 the selected groups of firms received a request for proposals and bidding documents related to such projects and the corresponding proposals were submitted by these three groups on April 30, 1990.;

WHEREAS, after evaluation of the proposals received the Authority announced that it would commence negotiations with the Concessionaire to enter into an agreement for the development of projects A and B.;

WHEREAS, at a meeting held on June 15, 1990, the Authority established as its first priority the development of what it designated as Segment 1 of project A, consisting of the San José Lagoon Bridge and its approaches (the Transportation Facility as hereinafter defined) as it was the only segment of project A on which tolls could be charged in accordance with the Act;

WHEREAS, the Authority declares that the procedures followed in the qualification, selection, nomination and negotiation with the Concessionaire have fully complied with all the terms and provisions of the Act;

WHEREAS, the parties to this Agreement have agreed to implement the final design, construction, transfer, operation, maintenance and financing of such private toll Transportation Facility in accordance with the Act; and

WHEREAS, the Authority and the Concessionaire, respectively, are empowered to enter into this Agreement and perform their obligations hereunder.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the Authority and the Concessionaire agree as follows:

## ARTICLE I

### DEFINITIONS

Unless the context otherwise specifies or requires, for the purposes of this Agreement, the following terms shall have the meanings set forth in this Article I:

Section 1.1.  <u>Acceptance Date</u>.  The term "Acceptance Date" shall mean the date of the Transportation Facility Acceptance and the date the Transportation Facility is placed in service.

Section 1.2.  <u>Agent</u>.  The term "Agent" shall mean any properly authorized individual appointed by the Authority to represent and bind the Authority for the purpose of oversight of the activities of the Concessionaire hereunder and subject to the limitations set forth herein.

3

Section 1.3.   <u>Agreement</u>.   The term "Agreement" shall mean this Concession Agreement for the final design, construction, operation, maintenance and management of a privatized Transportation Facility together with all exhibits hereto, including all supplemental agreements amending or modifying the provisions hereof, including, without limitation, the extension of the work as required to complete the Transportation Facility in a substantial and acceptable manner, consistent with the Authority's standards in effect on November 28, 1990, except as otherwise provided herein.

Section 1.4.   <u>Application for Payment</u>.   The term "Application for Payment" shall mean the itemized list of Construction Costs and other Investment costs incurred by the Concessionaire to build the Transportation Facility during the period covered by such application submitted by the Concessionaire to the Authority, as more specifically set forth in Exhibit G of this Agreement.

Section 1.5.   <u>Available Cash Flow</u>.   The term "Available Cash Flow" shall mean for purposes of this Agreement, for any Fiscal Year after Transportation Facility Acceptance, the balance of cash available for distribution, calculated on a cash basis, resulting from (a) Total Revenues received for that year minus (b) the sum of the following disbursements and provisions for the same year: Operating and Maintenance Costs, Debt Service, payment of subordinated loans under section 7.4(c), if any, provisions made to the Reserve Accounts and Capital Outlay Costs incurred in that year in excess of any reserves therefor (as hereinafter defined), and which shall be distributed to each Partner in the proportions set forth in Exhibit N.

Section 1.6.   <u>Base Prices</u>.   The term "Base Prices" shall mean the construction prices prevailing as of December 1990.

Section 1.7.   <u>Base Return on Partner's Capital</u>.   The term "Base Return on Partner's Capital" shall mean the Available Cash Flow which produces a yearly Internal Rate of Return of nineteen percent (19%) on the Partner's Capital calculated from the Date of Contribution net after income or withholding taxes payable by each Partner of the Concessionaire with respect to such Fiscal Year. For purposes of a monthly calculation, the Internal Rate of Return shall be 1.46%.

Section 1.8.   <u>Bond Counsel</u>.   The term "Bond Counsel" shall mean the firm or firms selected by the Government Development Bank for Puerto Rico to act as such in connection with the issuance of Bonds.

Section 1.9.   <u>Bonds</u>.   The term "Bonds" shall mean the bonds issued by the Authority as a limited obligation to finance a portion of the development costs of the Transportation Facility.

4

HTA_CONF 00011866

Section 1.15.   Construction Costs.   The term "Construction Costs shall mean all those costs incurred by Concessionaire in the construction of the Transportation Facility and described in Exhibit G attached hereto.

Section 1.16.   Construction Cost Savings.   The term "Construction Cost Savings" shall have the meaning set forth in Section 7.3 of this Agreement.

Section 1.17.   Construction Fund.   The term "Construction Fund" shall mean the fund created for such purpose under the Trust Agreement.

Section 1.18.   Contractor.   The term "Contractor" shall mean the Concessionaire or a corporation or partnership, organized or authorized to do business under the Laws of the Commonwealth of Puerto Rico, and engaged or to be engaged in the general construction business to whom Concessionaire may contract the construction of the Project.

Section 1.19.   Costs.   The term "Costs" shall mean the aggregate of Operating and Maintenance Costs (as hereinafter defined), Capital Outlay Costs, Debt Service after Transportation Facility Acceptance and Renewal and Replacement Costs (as hereinafter defined) and described in Exhibit G which are incurred, reported, and documented by the Concessionaire in accordance with generally accepted accounting principles, but excluding unrealized contingencies, losses on other agreements or contracts unrelated to the Transportation Facility, fraud proceedings, write down or amortization of goodwill, and legal penalties or fines assessed under the Laws and Regulations by governmental agencies.

Section 1.20.   Date of Contribution.   The term "Date of Contribution" shall mean any date on which Partner's Capital is contributed to Concessionaire.

Section 1.21.   Debt.   The term "Debt" shall mean the principal amount of the Bonds and interest accrued thereon.

Section 1.22.   Debt Service.   The term "Debt Service" shall mean the payment of the principal amount of the Debt and interest paid thereon, as applicable under the Financing Documents (as hereinafter defined), and fees relating thereto such as Bond Trustee fees and letter of credit or guaranty fees.

Section 1.23.   Escrow Fund.   The term Escrow Fund shall mean the fund established by the Authority in the amount of Nine Million US Dollars ($9,000,000.00), deposited in an escrow account plus any interest earned thereon as provided in Article XI.

Section 1.24.   Excess Revenue.   The term "Excess Revenue" shall mean that portion of the Available Cash Flow allocated to each

6

Partner in the proportions set forth in Exhibit N during the Operation and Maintenance Period (as hereinafter defined) remaining after the Base Return on Partner's Capital has been fully recovered by such Partner of the Concessionaire.

Section 1.25.  Fast Track Construction Method.  The term  "Fast Track Construction Method" shall mean that method of construction whereby the Final Design (as hereinafter defined) of the Transportation Facility is not entirely complete at the commencement of construction and the construction takes place while the design process is underway.

Section 1.26.  Final Design.  The term "Final Design" shall have the meaning set forth in Section 6.1(b) of this Agreement.

Section 1.27.  Final Plans and Specifications.  The term " Final Plans and Specifications" shall mean the final right of way maps and the as-built drawings and specifications detailing construction of the Transportation Facility, which shall be prepared by the Concessionaire as the logical extension and development of the Final Design defined in Section 6.1(b) and the Plans and Specifications proposed by the Concessionaire and approved by the Authority.  Those plans shall be in such a state that all acquired and necessary rights-of-way and all completed construction can be fully identified, including work conforming to Compliance Orders.

Section 1.28.  Fiscal Year.  The term "Fiscal Year" shall mean the calendar year or any other consecutive 12 month period selected by Concessionaire.

Section 1.29.  Force Majeure.  The term "Force majeure" shall mean any cause, circumstance or event not reasonably within the control of the parties, including, without limitation, fire, flood, typhoon, hurricane, earthquake, unforeseeable geological and archaeological conditions, nuclear or other explosion, radioactive or chemical contamination or ionizing radiation, epidemic, quarantine restriction, acts of God, riot, public disorder, civil disturbance, acts of public enemies, loss of power or other utilities, war (whether declared or undeclared), orders or restraints of any kind of the Government of the United States or of the Commonwealth or any of their departments, agencies, political subdivisions or officials, or any civil or military authority, shortages of labor, equipment, materials, supplies or transportation, and strikes, lockouts or other industrial disturbances.

Section 1.30.  Guaranteed Maximum Price.  The term "Guaranteed Maximum Price" shall mean the amount of Eighty Three Million US Dollars (US $83,000,000.00) estimated on the Base Prices and to be revised as provided in Section 7.2.  Such Guaranteed Maximum Price is comprehensive and includes all direct and indirect costs incurred in the construction of the Transportation Facility as

7

defined in Exhibit A, including, but not limited to, municipal excise on construction (up to 0.4%) and an Overhead and Profit fee of 14.42% for the Contractor, both percentages calculated on the amount of Construction Costs actually incurred by the Contractor.

Section 1.31.  Incentive Return.  The term "Incentive Return" shall mean the participation of each Partner of Concessionaire in Excess Revenue, which shall be equivalent in the aggregate to forty percent (40%) of any such Excess Revenue until such time as the Internal Rate of Return on Partner's Capital calculated from the Date of Contribution is equal to twenty-two percent (22%) net after income or withholding of taxes payable thereon by each Partner and thereafter, to fifteen percent (15%) of any such Excess Revenue.

Section 1.32.  Intangible Property.  The term "Intangible Property" shall mean all property, other than the personal property and the Transportation Facility, including, without limitation, the as-built Final Plans and Specifications, all engineering documents, geotechnical soils data and analysis, property acquisition documents, title policies, parcel diaries, utilities relocation plans, right-of-way maps, and other reports and samples relating to the Transportation Facility and licenses, contracts, warranties and contract rights of the Concessionaire relating to the Transportation Facility to the extent the latter are assignable, but not including the specific expertise of the Concessionaire, its individual employees and operating entities.

Section 1.33.  Internal Rate of Return on Partner's Capital.  The term "Internal Rate of Return on Partner's Capital" shall mean the discount rate that equates the present value of all future Available Cash Flow received by a Partner to the present value of said Partner's Capital as of the date such capital is contributed. For Internal Rate of Return calculation purposes, whenever Partner's Capital is contributed monthly, the value of such contribution will be restated to its future value from the month it is contributed to the Acceptance Date at a monthly rate equivalent to the applicable yearly discount rate.

Section 1.34.  Investment.  The term "Investment" shall have the meaning set forth in Section 7.1 of this Agreement.

Section 1.35.  Laws and Regulations.  The term "Laws and Regulations" shall mean the Act and all applicable United States of America (federal), Commonwealth, local, and other laws, codes, orders, ordinances, rules, regulations, and statutes, including, without limitation, those relating to fire, safety, land use, health, labor, environmental protection, seismic design, conservation, parking, handicapped access, zoning, and construction.

8

HTA_CONF 00011869

Section 1.36. <u>Letter of Credit Bank</u>. The term "Letter of Credit Bank" shall mean the bank or banks issuing a letter of credit in support of the Bonds.

Section 1.37. <u>Loan Agreement</u>. The term "Loan Agreement" shall mean the agreement between the Authority and Concessionaire whereby the Authority shall lend to the Concessionaire the net proceeds from the Bonds.

Section 1.38. <u>Modification Report</u>. The term "Modification Report" shall be the report submitted by Concessionaire to the Authority for its approval, evidencing the nature of the proposed alterations, improvements, modifications or changes to the Transportation Facility, the estimated costs and the evaluation of their effectiveness under this Agreement. A Modification Report shall be implemented by the Concessionaire upon the issuance of a Compliance Order by the Authority.

Section 1.39. <u>Notice of Completion</u>. The term "Notice of Completion" shall mean the notice given by the Concessionaire to the Authority upon substantial completion of the Transportation Facility in accordance with this Agreement.

Section 1.40. <u>Operating and Maintenance Costs</u>. The term "Operating and Maintenance Costs" shall mean those costs related to the operation, administration and maintenance of the Transportation Facility incurred by the Concessionaire after the Acceptance Date, as well as those costs associated with the preservation, protection, and keeping of the Transportation Facility in good working order, excluding police services, medical, ambulance and mechanical assistance services. Those costs will include, without limitation, personnel salaries, supervision and overhead, payroll expenses, utilities services, machinery and equipment, materials and supplies, insurance, municipal license taxes, property taxes, excise taxes, franchise taxes or similar charges and other taxes or charges other than income taxes imposed by any governmental entity, and contracted work so that the Transportation Facility be safely available for its intended purpose as designed, constructed, improved, altered or repaired in accordance with Authority standards. Those costs will also include spill containment, clean-up and restoration work related to hazardous materials, as well as the costs associated with marketing, collecting, protecting, transferring and accounting for the tolls charged and collected for the use of the Transportation Facility and professional service costs associated with the foregoing, all the above costs not being classified as Capital Outlay Costs as defined.

Section 1.41. <u>Operation and Maintenance Period</u>. The term "Operation and Maintenance Period" shall mean the period starting upon the Acceptance Date and ending at the termination of this Agreement.

Section 1.42. <u>Overhead and Profit Fee</u>. The term "Overhead and Profit Fee" shall mean the amount payable to the Contractor which

9

HTA_CONF 00011870

equals fourteen point forty two percent (14.42%) of the Construction Costs incurred by the Contractor.

Section 1.43.   Partner or Partners.   The term "Partner" or "Partners" shall mean a partner or all the Partners of Concessionaire at any time.

Section 1.44.   Partner's Capital.   The term " Partner's Capital" shall mean all the money and property contributed at any time and from time to time by each of the Partners to Concessionaire, which represents its investment in Concessionaire.

Section 1.45.   Plans and Specifications.   The term "Plans and Specifications" shall mean the plans, drawings and specifications for a phase or stage of construction of all, or portions of, the Transportation Facility at a stage of completion under the Fast Track Construction Method which demonstrates compliance with Authority standards and with sufficient detail that said plans, drawings and specifications can be reasonably approved by a registered engineer in the discipline to which those plans, drawings and specifications apply.

Section 1.46.   Project.   The term "Project" shall mean the development activity undertaken by the Concessionaire pursuant to this Agreement outside and within the Transportation Facility, and refers to Project A, Segment 1, as defined in Exhibit A attached to this Agreement.

Section 1.47.   Punch List.   The term "Punch list" shall mean an itemized list of minor construction corrective work not affecting the opening to service, operation, and the beneficial use and enjoyment of the Transportation Facility by the public, prepared by the Authority's Agent in connection with the issuance of a Notice of Completion.

Section 1.48.   Quality Assurance.   The term "Quality Assurance" shall mean the measures to be taken by the Concessionaire to assure that the Contractor of the Transportation Facility complies with the Quality Control Program.

Section 1.49.   Quality Control Program.   The term "Quality Control Program" shall mean the program prepared by Concessionaire and approved by the Authority, describing the procedures and systems to be followed, observed and implemented by the Contractor of the Transportation Facility in the construction of the same in accordance with the Plans and Specifications.

Section 1.50.   Reasonable Return on Partner's Capital.   The term "Reasonable Return on Partner's Capital" shall be defined as the aggregate of the Base Return on Partner's Capital plus the Incentive Return.

10

HTA_CONF 00011871

Section 1.51. <u>Renewal and Replacement Costs</u>. The term "Renewal and Replacement Costs" shall mean those costs incurred by Concessionarie for the rehabilitation of and enhancements to the Transportation Facility, including but not limited to those items described in Exhibit G attached hereto.

Section 1.52. <u>Representative of Public Interest</u>. The term "Representative of Public Interest" shall mean the Secretary of Transportation and Public Works or any agent nominated by him, who shall have the faculties and duties vested upon him by the Act.

Section 1.53. <u>Reserve Accounts</u>. The term "Reserve Accounts" shall mean those reserve funds described in Section 7.7 of this Agreement.

Section 1.54. <u>Substantial Completion</u>. The term "Substantial Completion" shall mean that stage of construction of the Transportation Facility when the Concessionaire has issued a Notice of Completion requesting the Authority to certify that the Transportation Facility, or designated portion or segment thereof, has been substantially completed in accordance with the Plans and Specifications, so that the Concessionaire can occupy and operate the Transportation Facility for its intended purposes.

Section 1.55. <u>Term</u>. The term "Term" shall mean the period of time set forth in Section 2.2 of this Agreement.

Section 1.56. <u>Termination Option</u>. The term "Termination Option" shall mean the option described in Article XI of this Agreement.

Section 1.57. <u>Toll Rates</u>. The term "Toll Rates" shall mean the amounts set by the Concessionaire to be charged for the use of the Transportation Facility in accordance with this Agreement.

Section 1.58. <u>Toll Revenues</u>. The term "Toll Revenues" shall mean the gross revenues from Toll Rates collected and actually received by Concessionaire from users of the Transportation Facility in exchange for the use of the Transportation Facility.

Section 1.59. <u>Total Revenues</u>. The term "Total Revenues" shall mean, for any Fiscal Year, all revenues actually received by Concessionaire in connection with the Transportation Facility, including Toll Revenues, proceeds of business interruption insurance, interest earned and received after the Acceptance Date on cash balances and on Reserve Accounts, balances of Reserve Accounts which do not have to be maintained after payment of the Bonds excluding casualty insurance and condemnation proceeds or any security received by Concessionaire from the Authority or any other governmental entity in relation with the Transportation Facility or this Agreement.

11

HTA_CONF 00011872

Section 1.60. <u>Traffic Estimate</u>. The term Traffic Estimate shall mean the estimated number of vehicles per year or per day set forth in the estimated traffic report prepared by Vollmer Associates, acting as traffic consultant for the Authority, a final original of which is attached hereto as Exhibit F.

Section 1.61. <u>Transportation Facility</u>. The term "Transportation Facility" shall mean all improvements, personal and other property constructed or installed on the Project, including all easements, rights of way and other property or interests therein described in Exhibit A, but for purposes of operation and maintenance shall exclude certain access roads to be modified by Concessionaire for the use of which no tolls will be charged.

Section 1.62. <u>Transportation Facility Acceptance</u>. The term "Transportation Facility Acceptance" shall mean the acceptance by the Authority of the substantial completion of the Transportation Facility in accordance with this Agreement.

Section 1.63. <u>Trust Agreement</u>. The term "Trust Agreement" shall mean the agreement between the Authority and the Bond Trustee and any amendments or supplements thereto.

## ARTICLE II

## CONCESSION

Section 2.1 <u>Grant of Concession</u>.

(a)   The Authority hereby grants to the Concessionaire, and the Concessionaire hereby accepts, an exclusive administrative concession in accordance with the Act pursuant to which the Concessionaire shall have the exclusive right and authority to operate and manage the Transportation Facility and charge tolls for its use during the term of this Agreement and any extension thereof, as herein provided (the "concession"); and in consideration of such right, the Concessionaire shall finally design, develop and construct the Transportation Facility and, thereafter, upon the occurrence of the Transportation Facility Acceptance, operate, maintain and manage the Transportation Facility, subject to the terms and conditions of this Agreement.

(b) In compliance with the Act, upon Transportation Facility Acceptance, all ownership rights that the Concessionaire has to the Transportation Facility arising out of the Final Design and construction thereof shall be transferred to the Commonwealth as part of the consideration of this Agreement, and the Transportation Facility shall thereafter be of public domain and form part of the Commonwealth highway system for the purposes herein provided, subject to all the rights of the Concessionaire under this Agreement, particularly the right to charge and collect Toll Rates for the use of the Transportation Facility and its operation,

12

HTA_CONF 00011873

maintenance and management during the Term of this Agreement.
Prior to the Acceptance Date the Concessionaire shall be the sole
owner of the improvements constructed by it as contemplated in this
Agreement.

(c)  The Concessionaire shall invest and obtain the financing
of such amounts as required hereunder which are necessary (i) to
finally design and construct the Transportation Facility and (ii)
to operate and maintain the Transportation Facility.  For such
purposes,  the  Concessionaire  shall  obtain  such  capital
contributions and incur in such indebtedness which may be necessary
for the design, construction, operation, maintenance and management
of the Transportation Facility.

(d)  The rights of the Concessionaire hereunder with respect
to the Transportation Facility are real property rights, which can
be  registered  as  separate  property  of  Concessionaire  in  the
Registry of Property.

(e)  In order to exercise the rights of the Concessionaire
hereunder, the Concessionaire shall have full and absolute right to
the possession and use of the Transportation Facility it has
constructed and to operate and maintain the Transportation Facility
during the entire Term of this Agreement.  The use of the
Transportation Facility by the users thereof during the Term of
this Agreement shall be in the nature of a lease from the
Concessionaire to such users in consideration of the Toll Rates
paid by them.

(f)  Throughout the Term of this Agreement, but in accordance
with and subject to the terms and conditions set forth herein, the
Concessionaire shall be entitled to make and adopt all decisions of
any kind whatsoever, as Concessionaire deems appropiate, relative
to the final design, construction, operation, maintenance and
management of the Transportation Facility.

Section 2.2.  Term.

(a)  This Agreement shall have an original Term of 35 years
commencing on the effective date of this Agreement as provided in
Section 19.1 hereof.  The Term may be earlier terminated as
specifically provided herein.

(b)  The use and enjoyment of the Transportation Facility by
the public is expected to commence no later than two (2) years
after the effective date of this Agreement unless such period is
extended due to Force Majeure, Compliance Orders or any changes in
Laws or Regulations which delay construction.

(c)  If an event of Force Majeure occurs and continues for a
period of two or more consecutive days prior to Transportation
Facility Acceptance, and any such event causes a delay in the

13

construction of the Transportation Facility, the Term shall be extended by the number of days in excess of two which such event lasts. If an event of Force Majeure occurs and continues for a period of two or more consecutive days after Transportation Facility Acceptance, and any such event results in a reduction in traffic through the Transportation Facility which is not compensated by insurance, the Term shall be extended by the number of days in excess of two which such event lasts.

(d) If the performance of works required by a Compliance Order causes a delay in the construction of the Transportation Facility, the Term shall be extended by the number of days of delay in excess of two caused thereby. If the performance of work required by a Compliance Order results in a reduction in traffic through the Transportation Facility which is not compensated by insurance, the Term shall be extended by the number of days of reduction in excess of two caused thereby.

Section 2.3. <u>Operation and Maintenance</u>. Concessionaire shall continuously operate and maintain the Transportation Facility for the Term of this Agreement, twenty-four (24) hours a day, every day, and in accordance with the concession granted by the Authority hereunder, except for necessary temporary closing due to rehabilitation or restoration work or Force Majeure. The enforcement of traffic laws and police services shall be provided by the governmental entities as set forth in the laws of the Commonwealth. Concessionaire shall not be responsible for providing medical, ambulance and mechanical assistance services to the users of the Transportation Facility.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

Section 3.1 <u>Representation and Warranties of Concessionaire</u>. The Concessionaire represents and warrants to the Authority:

(a) the Concessionaire is a Special Partnership ("Sociedad Especial") duly organized and validly existing under the Laws of the Commonwealth of Puerto Rico and is duly authorized to transact business in the Commonwealth of Puerto Rico. The Concessionaire has full power and capacity to own its properties, to carry on its business, and to enter into and perform the transactions contemplated in this Agreement;

(b) the Concessionaire's execution, delivery and performance of this Agreement has been duly authorized by all necessary partnership action and does not and shall not conflict with or constitute a default under any agreement or instrument to which the Concessionaire is a party or by which the Concessionaire or any of its properties may be bound or affected;

14

HTA_CONF 00011875

(c) except as otherwise disclosed herein, there are no actions, suits or proceedings pending, or to the best of the Concessionaire's knowledge threatened against or affecting the Concessionaire or its properties before any court, administrative board or tribunal or before or by any governmental authority, which would have a material adverse effect on its obligations hereunder;

(d) all construction work shall be performed substantially in accordance with the Plans and Specifications and all applicable governmental requirements in a diligent manner; and all construction work shall be performed with good workmanship and in observance of the prevailing construction techniques in Puerto Rico under applicable Laws and Regulations;

(e) this Agreement constitutes a valid and binding obligation of Concessionaire, enforceable against Concessionaire in accordance with its respective terms; and

(f) concurrently with the execution hereof the Concessionaire shall deliver to the Authority the certification(s) or sworn statement(s) required by Administrative Bulletin No. OE-1991-24 of June 18, 1991 (the"Order"), which certification(s) or sworn statement(s) is incorporated by reference herein and made a part hereof, and at all times subsequent to the execution hereof will comply with said Order.

Section 3.2. Representations and Warranties of the Authority. The Authority represents and warrants to the Concessionaire:

(a) the Authority is a body corporate and politic constituting a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, has all requisite power, authority and capacity to own its properties, to carry on its business as presently conducted and proposed to be conducted, and to execute, deliver, enter into and perform the transactions contemplated by this Agreement;

(b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary action, and does not, and shall not, conflict with the Laws and Regulations or constitute a default under any deed of trust, resolution, agreement or other instrument to which the Authority is a party or by which the Authority or its properties may be bound or affected;

(c) except as otherwise disclosed herein, there are no actions, suits or proceedings pending, or to the best of the Authority's knowledge threatened against or affecting the Authority or its properties before any court, administrative board, body or tribunal or before or by any governmental entity, which would have a material adverse effect on its obligations under this Agreement;

15

HTA_CONF 00011876

(d)  this Agreement constitutes a valid and binding obligation of the Authority, enforceable against the Authority in accordance with its respective terms;

(e)  all consents, approvals, permits, clearances, endorsements, authorizations and orders of, or qualification with, any governmental or regulatory authorities which are required to be obtained by the Authority for consummation of the transactions contemplated by this Agreement, have been or will be duly and validly obtained or performed on or before the effective date of this Agreement and, as to those already obtained, are in full force and no default exists thereunder; and

(f)  the Authority has obtained and concurrently with the execution of this Agreement by the parties hereto shall furnish to Concessionaire a legal opinion confirming the Authority's legal capacity, power and authority to enter into the covenants and obligations set forth in this Agreement, and that such obligations constitute legal, valid and binding obligations of the Authority enforceable against the Authority in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency or other laws affecting creditors' rights generally, and subject to general principles of equity, a copy of which opinion is attached hereto as Exhibit J and made to form an integral part of this Agreement, and concurrently with the execution of the Financing Documents shall furnish such other opinions as may be reasonably required thereby.

## ARTICLE IV

## TRANSPORTATION FACILITY PROPERTY AND RIGHT OF WAY ACQUISITION

Section 4.1.  Acquisition of Land; Expropriation.

(a) The Concessionaire shall prepare plans defining the right of way limits to allow the Authority to identify the affected owners, search ownership titles and obtain from the Property Registries the corresponding title certificates. The field surveys required for the property acquisition plans or right of way shall be performed by the Authority.

(b)  The lands, other properties and/or rights of way necessary for the construction of the Project and its facilities shall be acquired by the Authority, at its sole cost, through expropriation, negotiated purchase or any other legally available means acceptable to the Authority. The required and necessary properties and rights of way shall be available to the Concessionaire before the effective date of this Agreement in order to enable the Concessionaire to promptly commence the construction of the Transportation Facility.

16

(c)   If hazardous substances are discovered at any time (in circumstances, concentrations and amounts required by applicable Laws and Regulations to be treated, encapsulated or removed) in, on or under real property within the proposed or delivered Transportation Facility rights of way or within real property used by the Concessionaire for construction which the Authority owned as of the date of this Agreement or acquired thereafter, and the presence of such hazardous substances is not attributable to the activities of Concessionaire or its Contractor, the Authority shall, at its sole cost and expense, cause any such hazardous substances to be encapsulated, treated or removed from such real property, and transported for final disposal, in accordance with all applicable Laws and Regulations and shall cause such real property to be restored to its condition existing prior to such encapsulation, treatment or removal (except for the absence of the hazardous substances, including, to the extent required, any grading and reinforcement necessary to restore the weight-bearing capacity of such real property). The Authority shall remove, treat or encapsulate any and all such hazardous substances and restore the real property in such a manner as to permit Concessionaire's use of such real property fully as contemplated hereby in accordance with all applicable Laws and Regulations and without cost or potential liability to Concessionaire.

Section 4.2.   Easements; Rights of Way.

(a) Title to the land, property, or rights of way and any other easement or rights acquired by the Authority for the Transportation Facility shall be vested in the Commonwealth of Puerto Rico upon its acquisition.

(b) During the construction works for the Transportation Facility, Concessionaire shall use its reasonable best efforts to avoid material obstruction or damage to existing easements and rights of way for private and public utilities. Any indemnification for damages and relocation of such utilities shall be assumed and paid by the Concessionaire.

Section 4.3.   Air rights and utilities's support and publicity along the Transportation Facility.

(a) 'The Concessionaire, with the prior written consent of the Authority, shall be entitled at any time during the term of this Agreement to enter into lease agreements with entities interested in using the airspace or structures of the Transportation Facility for any business or any other legal purposes, including but not limited to utilities uses such as cables, tubes and pipes, conveyances, or any real property interest above, below, adjacent to or connected with the Transportation Facility.

(b) The Concessionaire, with the prior written consent of the Authority, shall also be entitled at any time during the term of

17

this Agreement to enter into agreements with third parties for publicity or advertisements along the Transportation Facility, provided such publicity or advertisements are in accordance with the prevailing Laws and Regulations.

(c)   All income derived from such agreements shall be deemed revenue earned in connection with the Transportation Facility and form a part of Total Revenues.

(d)   The Authority may deny its consent to any of the agreements contemplated by this Section when in its reasonable opinion the aesthethics of the Transportation Facility may be materially adversely affected by any of them.

## ARTICLE V

### PERMITS AND LICENSES

Section 5.1.   _Permits_.   The Authority shall obtain, and renew if applicable, at its own cost the necessary permits, approvals, endorsements and authorizations of any kind required from Puerto Rico and United States governmental, municipal or other agencies with jurisdiction over the Transportation Facility, including, without limitation, permits for the relocation of utilities and environmental clearances and approvals, and preparation of any environmental study or review required or necessary for obtaining such permits, approvals, endorsements or authorizations.

Section 5.2.   _Mitigation_.   Whenever mitigation on the ecological conditions at the Project's site is required as a condition to obtain a necessary permit, such costs shall be part of the costs of such permit.

Section 5.3.   _Municipal Excise Licenses_.   The Concessionaire shall obtain at its own cost the municipal licenses necessary for the construction of the Transportation Facility, which shall constitute part of the Construction Costs.

## ARTICLE VI

### DESIGN

Section 6.1.   _Preliminary and Final Design_.

(a)   The preliminary design for the Transportation Facility was prepared by persons not related to Concessionaire and provided to it by the Authority.

(b)   The Final Design of the Transportation Facility, including its Plans and Specifications, shall consist of such design and drawings prepared in complete compliance with the description, scope, requirements and standards set forth in

18

Exhibits A and B by competent professionals duly authorized to perform such work under the laws of Puerto Rico, and shall be based on the drawings in Attachment A-1 to Exhibit A. The Final Design shall be prepared in a manner to facilitate the Fast-Track Construction Method.

(c) The Concessionaire shall submit to the Authority copies of the Final Plans and Specifications ("as built") upon completion of the Transportation Facility.

Section 6.2. Modifications.

(a) The scope and standards for the Final Design of the Transportation Facility may be changed or modified at the request of the Authority or the Concessionaire, subject to mutual agreement of both parties as to the specific conditions of performance and the consequences resulting from said modifications.

(b) Changes in the scope and standards for Final Design of the Transportation Facility will be implemented by Concessionaire only after receipt of a Compliance Order from the Authority.

Section 6.3. Procedures. The Schedule for submission of Plans and Specifications, their approval, and the procedure to be followed for any modification are set forth in detail in Exhibit B of this Agreement.

## ARTICLE VII

## FINANCIAL COVENANTS

Section 7.1. Investment.

(a) The term "Investment" shall mean the costs actually incurred by Concessionaire in the performance of the development of the Project which consist of the aggregated cost items estimated on the Base Prices as indicated in Exhibit L.

(b) The Investment does not include the costs incurred in connection with the issuance of the Bonds, including, but not limited to, legal, printing, underwriter's fee, letter of credit up-front fee and related commissions, and the the Debt Service during the construction period of the Transportation Facility, which are estimated as set forth in Exhibit L under the heading "Financial Costs".

Section 7.2. Revision of the Guaranteed Maximum Price.

(a) The Guaranteed Maximum Price, which is part of the Investment, shall be revised and adjusted if any of the following events occurs:

19

HTA_CONF 00011880

(i)  An increase or decrease in the Base Prices.  Said adjustment shall be calculated as set forth in Exhibit D attached hereto.

(ii) Any modification resulting from Compliance Orders issued by the Authority.

(b)  The Authority and the Concessionaire shall exercise their best efforts to limit the modifications referred to in subsection (a)(ii) above to Two Million Five Hundred Thousand US Dollars (US $2,500,000.00).

(c)  All costs incurred by the Concessionaire as a result of carrying out and complying with any Compliance Orders as herein set forth shall be paid from the Contingency Fund indicated in section 7.7(b) if funds in the Construction Fund have been exhausted.

(d)  In the event that the funds indicated above are insufficient, and the aggregate amount of such insufficiency is such that it materially adversely affects the economic and financial bases and provisions of this Agreement, the Authority and the Concessionaire shall promptly renegotiate in good faith to modify the Toll Rates, the Term and the economic and financial covenants contained in this Agreement with the object of obtaining the most favorable financial structure under the circumstances.  In the absence of agreement, the controversy shall be submitted to arbitration as provided herein.

Section 7.3.  Construction Cost Savings.  Construction Cost Savings shall mean the Guaranteed Maximum Price, as revised pursuant to Section 7.2, less the sum of the Construction Costs actually incurred and the Overhead and Profit Fee.  Said Construction Cost Savings, if any, shall be shared equally between the parties and used as follows:

(a)  The 50% share of the Construction Cost Savings allocated to the Authority shall be retained by the Bond Trustee as an additional reserve for Debt Service during the first year of operation.  This additional reserve shall be used during such year to replenish the Debt Service Reserve Fund (as hereinafter defined), if necessary.  Any moneys not used during such year shall be paid by the Bond Trustee to Concessionaire to retire Partner's Capital.

(b)  The 50% share of the Construction Cost Savings allocated to Concessionaire shall be used as follows:

(i)  to reduce proportionally Partner's Capital to an aggregate of not less than seven percent (7%) of the Investment.

HTA_CONF 00011881

(ii)  any funds remaining after reduction in Partner's Capital shall be used, to the extent possible, to replenish the Debt Service reserve funds or to redeem Bonds.

Section 7.4.  <u>Partner's Capital</u>.

(a)  Concessionaire shall have available as Partner's Capital an aggregate amount equivalent to ten percent (10%) of the Investment, which shall be contributed proportionally with each drawdown made by the Concessionaire from the Construction Fund during the construction period of twenty four (24) months, subject to extensions as provided in Section 2.2(b).  In the event the Investment exceeds the amount set forth in Exhibit L (as revised pursuant to Section 7.2), such excess shall be paid as provided in Section 7.4(c) below.  The initial Partner's Capital contribution shall be an amount equivalent to ten percent (10%) of the amount disbursed as provided in Section 7.6(a)(i), and any subsequent Partner's Capital contribution shall be made periodically as stated above.

(b)  After Transportation Facility Acceptance and determination of the actual Investment, Partner's Capital shall be adjusted by the difference between the sum of the actual amount of the Construction Costs and Overhead and Profit Fee and the Guaranteed Maximum Price, as revised pursuant to Section 7.2.

(c)  Any Construction Costs and Overhead and Profit Fee incurred in excess of the Guaranteed Maximum Price, as it may be revised, shall be fully paid by the Concessionaire from Partner's Capital, loans subordinated to the Bonds, or a combination thereof, as required, at the election of Concessionaire; provided, however, that the Concessionaire will first pursue debt financing and assure the least expensive financial structure available to the project under the circumstances.

(d)  Concessionaire shall be entitled to increase or decrease its Partner's Capital whenever the financial and economic condition of the Transportation Facility, as well as the results of its operation for any given semester, make it reasonably necessary; provided, however, that the Concessionaire will first pursue debt financing and assure the least expensive financial structure available to the project under the circumstances.

Section 7.5.  <u>Funds and Finance Obligations</u>.

(a)  The total development costs of the Project, as defined in Exhibit L, will be financed as follows:

(i) Ten percent (10%) of the Investment shall be financed by Partner's Capital; and

21

(ii) The balance thereof by the Bonds, the net proceeds of which shall be loaned to the Concessionaire under a Loan Agreement to be entered into with the Authority. These funds shall be made available to Concessionaire immediately after the effective date of this Agreement, and shall be used by Concessionaire in accordance with the provisions of this Agreement, the Trust Agreement and the Loan Agreement.

(b) In the event of any conflict between this Agreement and the Loan Agreement, Trust Agreement, the Letter of Credit Reimbursement Agreement or other agreement related to the bond financing (collectively the "Financing Documents"), the provision of the Financing Documents shall prevail as to those specific and applicable matters governed by them.

Section 7.6. <u>Disbursements to Concessionaire by the Bond Trustee</u>.

(a) The Authority shall cause the Bond Trustee to disburse to the Concessionaire as provided in Exhibit G and from funds available in the Construction Fund created by the Trust Agreement the following:

(i) One hundred percent (100%) of the initial Certificate for Payment on the date the Bond Trustee has in its possession all Bond proceeds. The Application for Payment related thereto shall include and document all amounts of money expended or incurred by the Concessionaire prior to the closing of the Bond issue as part of the Guaranteed Maximum Price or otherwise related to the Project, which Concessionaire has paid or is obligated to pay within fifteen (15) days of closing.

(ii) One hundred percent (100%) of the monthly Certificates for Payment covering the Investment costs incurred during the previous month, payable within two (2) business days after receipt of each Certificate for Payment.

(iii) A Certificate for Payment up to the sum of Two Million Dollars ($2,000,000) for preopening costs and expenses and working capital advance which shall be submitted prior to Transportation Facility Acceptance and paid by the Bond Trustee within two (2) business days of receipt.

(b) The Authority shall cause the Bond Trustee to disburse and pay from Bond proceeds the costs of issuance of the Bonds as described in Section 7.1(b).

Section 7.7. <u>Reserve Accounts</u>.

(a) The Trust Agreement shall provide for a reserve account for Debt Service ("Debt Service Reserve Fund") the amount of which shall be determined in accordance with customary financial

22

requirements and which shall be funded initially from Bond proceeds.

(b)   The Trust Agreement shall provide for a reserve account for contingencies ("Contingency Fund") of Four Million ($4,000,000.00) Dollars to cover any contingency in the development and construction of the Project. After the Acceptance Date, any unused monies therein shall be used as an operating reserve to pay Operating and Maintenance Costs or interest on the Bonds.

(c)   The Trust Agreement shall provide for a reserve account for renewal and replacement of the Transportation Facility ("Renewal and Replacement Reserve Fund"), which shall be funded from Total Revenues in the amount of $150,000 per year.

(d)   The Trust Agreement shall provide for such other reserve accounts as may be customary.

(e)   Funds deposited to the credit of the Reserve Accounts shall be invested in obligations as provided by the Trust Agreement. Any interest earned thereon, after provision for replenishment of the Reserve Accounts, shall be paid periodically to Concessionaire as provided in the Trust Agreement.

Section 7.8.   Uses of Funds; Recoveries.

(a)   The Concessionaire has the right and shall be allowed to pay from Total Revenues all Debt Service Costs, Operating and Maintenance Costs, Renewal and Replacement Costs not covered by reserves, subordinated loans, provision to the Reserve Accounts and to recover the Reasonable Return on Partner's Capital.

(b)   After the end of every Fiscal Year and delivery of financial statements to the Authority by Concessionaire as set forth in Section 7.10, any Available Cash Flow shall be distributed to each Partner in the proportion set forth in Exhibit N until the Base Return on Partner's Capital reaches nineteen percent (19%) calculated from the Date of Contribution.

Section 7.9. Excess Revenue.

(a)   In any Fiscal Year that the Base Return on Partner's Capital has been reached by any Partner as herein provided, any Excess Revenue of such Partner will be shared by such Partner with the Authority in the proportion of sixty per cent (60%) for the Authority and forty percent (40%) for the Partner until such time as the Internal Rate of Return on Partner's Capital is equal to twenty-two percent (22%) net after income or withholding taxes payable by such Partner, and thereafter in the proportion of eighty-five per cent (85%) for the Authority and fifteen per cent (15%) for such Partner.

23

HTA_CONF 00011884

(b) The Concessionaire will pay to the Authority its share of Excess Revenue within fifteen (15) days after delivery of the Concessionaire's Financial Statements for the corresponding Fiscal Year audited by its independent certified public accountant ("CPA"), but in no event later than 120 days from the end of such Fiscal Year, and such payment will be treated as a fee which constitutes an operational expense of the concession.

(c) Any income earned by Concessionaire from sources other than those set forth under this Agreement and that is unrelated to the Transportation Facility shall not be considered as income for purposes of this Agreement.

Section 7.10. Reporting.

(a) The Concessionaire shall submit to the Authority within one hundred twenty (120) days after the Acceptance Date, a statement of the Capital Outlay Costs incurred, which shall be prepared in accordance with the accounting guidelines set forth in Exhibit G attached hereto.

(b) The Concessionaire shall submit to the Authority traffic reports setting forth the following information:

(i) A report on the number of vehicles, and their category that used the Transportation Facility during each day of the month within fifteen (15) days after the end of each month. Within fifteen (15) days after the Authority receives such report, it shall notify in writing to the Concessionaire any objection the Authority may have to such report. If no objection is notified within such period, the report shall be deemed approved by the Authority.

(ii) A report on the traffic, Toll Rates and Toll Revenues within fifteen (15) days after the end of each semester specifying the number of vehicles (per category) that used the Transportation Facility, the Toll Revenues collected during each month of the semester, as well as the total and average daily traffic for the semester and accumulated traffic to said date from the commencement of the operation of the Transportation Facility. This report shall also provide a comparison for said semester of the total and average daily traffic and Toll Revenues with the Traffic Estimate attached hereto as Exhibit F.

(c) Within one hundred twenty (120) days after the end of each Fiscal Year, the Concessionaire shall submit to the Authority financial statements setting forth the following information for such Fiscal Year:

(i) The amount of Total Revenues, Operating and Maintenance Costs, Capital Outlay Costs, Debt Service, and Available Cash Flow;

24

(ii) Financial information demonstrating the current payments of Debt Service, the outstanding balance of the Debt, the amount of the Debt Service Reserve and the coverage ratios set forth in the Financing Documents;

(iii) The amount of any Available Cash Flow, its distribution by Concessionaire and the amount of Excess Revenues, if any, and its distribution to the Authority and the Concessionaire;

(iv) The amount of, and changes in, the Reserve Accounts, if any.

(d) The statements and reports described above shall cover the operations of the Transportation Facility only, and shall be prepared by Concessionaire in accordance with this Agreement and generally accepted accounting principles to the extent applicable and shall be audited or examined by a recognized firm of independent certified public accountants selected by the Concessionaire and approved by the Authority. The statements and reports shall be submitted to the Authority in a format substantially similar to the format set forth in Exhibit H. The final format and content of these statements and reports shall be determined by the Concessionaire and its CPA subject to the approval of the Authority.

(e) In order to facilitate the identification of the information required above, the Concessionaire shall maintain a separate self balancing set of accounts exclusively for the Transportation Facility. Such accounts shall include all assets, liabilities, operating revenues and operating expenses and, to the extent applicable, shall be maintained in accordance with generally accepted accounting principles and practices, consistently applied.

(f) The Authority, at its sole cost and expense, may audit the books of accounts related to the Transportation Facility with respect to the matters described in this Section 7.10(b) through 7.10(e), within one (1) year after the Authority has received the report.

(g) Any unresolved dispute, controversy or disagreement arising out of matters covered by Section 7.10 shall be resolved in accordance with the provisions of Article XVI.

ARTICLE VIII

CONSTRUCTION

Section 8.1. Construction of the Transportation Facility.

(a) The construction of the Transportation Facility will be performed by Concessionaire through a cost plus an Overhead and

25

HTA_CONF 00011886

Profit Fee contract with a Guaranteed Maximum Price with the Contractor selected solely by Concessionaire. Concessionaire shall commence the construction activities of the Transportation Facility and proceed with said construction (or cause the same to be commenced or proceeded with) in accordance with the schedule to be agreed upon by the parties not later than thirty (30) days after the effective date of this Agreement. In the construction schedule for the Transportation Facility, Concessionaire shall take the necessary steps to minimize interference with the normal traffic flow around the Transportation Facility. Concessionaire shall keep the Authority informed of the progress of construction of the Transportation Facility, through monthly progress reports in form and substance agreed upon by them.

(b) The construction schedule for the Transportation Facility shall be modified by reason of delays caused by Compliance Orders, events of Force Majeure or Change in Law.

(c) The construction shall be performed in a good and workmanlike manner and substantially in accordance with the Plans and Specifications. Except as otherwise provided herein, the construction works shall be performed at Concessionaire's own cost and expense. The Concessionaire or the Contractor shall have the absolute right to subcontract specific parts or segments of the construction works for the Project to any reputable firms selected by Concessionaire, in its sole discretion.

Section 8.2. <u>Design, Construction Standards and Compliance Order</u>.

(a) Any contract executed by Concessionaire for design or construction of the Transportation Facility, or a portion thereof shall incorporate the applicable provisions, standards and requirements of the design and construction set forth in Exhibits B and C.

(b) Concessionaire shall comply with timely Compliance Orders in the design or in the construction stages of the Transportation Facility.

(c) Concessionaire shall comply with Compliance Orders with respect to completed portions of the Transportation Facility, whenever the Authority is incorporating the same critical safety changes in the Authority's transportation facilities.

Section 8.3. <u>Control of Works</u>. Concessionaire, at its own cost, shall at all times comply with the Quality Assurance during the construction of the Transportation Facility. Subject to the above, the Authority may inspect the construction works of the Transportation Facility and its related installations to ensure they conform with the standards established for the Final Design, provided said inspections do not interfere unduly with the

26

performance of the construction of the Transportation Facility.
The costs of Quality Control and its assurance are not included in
the Guaranteed Maximum Price.

Section 8.4.   Construction Cost Audit.

(a)   In order to compare the final Construction Costs with the
Guaranteed Maximum Price and to determine the Construction Cost
Savings, if any, the Authority shall audit the Construction Costs
on an annual basis and upon Transportation Facility Acceptance.

(b)   During the construction period the Authority will monitor
for   compliance   with   this   Agreement   the   Construction   Costs,
Applications   for   Payment   and   the   reports   submitted   by
Concessionaire.   Such monitoring shall not unduly interfere with,
or adversely affect, the development and performance of the works,
the decision-making process with respect thereto and the processing
of the Certificates for Payment.

(c)   Cost Accounting and Audit Guidelines are set forth in
Exhibit G.

Section 8.5.   Completion of the Transportation Facility.

(a)   After the Concessionaire has substantially completed the
construction of the Transportation Facility in accordance with the
Plans and Specifications and this Agreement, the Concessionaire
shall deliver to the Authority the Notice of Completion.   Within
ten (10)   days   of   receipt   of   such   notice   the   Authority   shall
commence   and   diligently   pursue   until   completion   the   final
inspection of the Transportation Facility to verify that it has
been completed in substantial accordance with the approved Final
Design.     Such   inspection   shall   not   include   any   section   of
construction previously inspected.   If the Authority determines
that the Transportation Facility has been substantially completed
in accordance with the approved Final Design, the Authority shall
notify in writing the Transportation Facility Acceptance to the
Concessionaire.

(b)   A Punch List of pending items, if any, shall be prepared
by the Authority and submitted to and agreed by Concessionaire
simultaneously with the Transportation Facility Acceptance.   If
Concessionaire agrees with the items listed it shall proceed
promptly to complete and correct the items to the satisfaction of
the Authority's Agent.   Within five (5) days after the Punch list
items are substantially completed, the Authority shall notify in
writing its approval or rejection.   If no rejection is received by
Concessionaire within such period the completion of such items
shall be deemed approved.   If the parties do not agree as to the
correctness of the Punch List or any item therein, such controversy
shall be submitted to arbitration as herein provided.

27

Section 8.6. <u>Opening to Traffic</u>.

Upon Transportation Facility Acceptance the Concessionaire shall immediately place the Transportation Facility in service and open it to traffic and the public.

**ARTICLE IX**

**OPERATION AND MAINTENANCE**

Section 9.1. <u>Rendering of Services by Concessionaire</u>.

(a) Upon termination of the construction phase of the Transportation Facility and its facilities, Concessionaire is authorized and has the exclusive right to hold, possess and use the Transportation Facility during the Term for the purposes set forth in this Agreement, including the leasing of the Transportation Facility to users against the payment of the applicable Toll Rates. The Concessionaire shall be solely responsible for the management, operation and maintenance of the Transportation Facility in accordance with this Agreement.

(b) Concessionaire may operate the Transportation Facility and perform maintenance work thereon with its own employees or through operation and maintenance contracts with third parties.

(c) Concessionaire shall submit to the Authority a manual ("Operation Manual") to deal with the operation of the Transportation Facility at least thirty (30) days prior to Transportation Facility Acceptance. The Operation Manual shall contain all the terms and provisions necessary for the adequate and proper operation and management of the Transportation Facility and its utilization by the public (excluding police, ambulance and mechanical assistance). The Operation Manual shall be approved by the Authority within thirty (30) days of submittal. The Operation Manual shall be deemed approved unless objections to any provision thereof are notified within such period. If there is any controversy regarding any portion or provision of the Operation Manual and the same is not settled by the parties within ten (10) days after such dispute arises, the portion or provision in dispute shall be provisionally implemented and the controversy with respect thereto shall be submitted and resolved by Arbitration as provided herein.

(d) All equipment markings, colors, lettering, badges and other identification labels on uniforms worn by operation and maintenance personnel employed by Concessionaire or any third party engaged for such purposes by Concessionaire, will not create confusion which would lead anyone to believe that operation and maintenance equipment is owned by the Authority or that operation and maintenance personnel are employees of the Authority.

28

(e) Concessionaire shall perform maintenance, preventive repair, renewal and replacement and other works necessary to keep the Transportation Facility in good working order in accordance with the maintenance standards set forth in Exhibit E.

(f) Concessionaire shall perform maintenance on the Transportation Facility in accordance with a detailed maintenance plan ("Maintenance Manual") which shall be submitted by Concessionaire to the Authority no later than thirty (30) days before the date when the Transportation Facility is expected to be substantially completed for the Authority's review and approval. The Maintenance Manual, once in final form, shall become part of this Agreement after approval by the Authority. The Authority shall diligently review the Maintenance Manual so that its approval may be given by the Acceptance Date. The Maintenance Manual shall be deemed approved unless objections to any provision thereof are notified by such date. If there is any controversy regarding any portion or provision of the Maintenance Manual, and the same is not settled by the parties within ten (10) days after such dispute arises, the portion or provision in dispute shall be provisionally implemented and the controversy with respect thereto shall be submitted and resolved by Arbitration as provided herein.

Section 9.2. <u>Police and Preservation</u>.

(a) Concessionaire shall keep and maintain the Transportation Facility in good working order and repair in accordance with the Operation Manual and the Maintenance Manual and shall comply with all Laws and Regulations, rules and ordinances applicable to bridges, roads, and highways in Puerto Rico and shall obey the authorities in charge of the security within the Transportation Facility, such as the police force, with whom Concessionaire will cooperate.

(b) Concessionaire shall make all necessary repairs, alterations, changes, renewal and replacements which Concessionaire may deem necessary or which are required for the proper operation of the Transportation Facility. The Authority will be entitled to make annual inspections of the physical condition of the Transportation Facility in such a manner that does not interfere unduly with its normal operations. The report made by the Authority after its inspection may contain suggestions addressed to Concessionaire to improve the conditions of the Transportation Facility.

Section 9.3. <u>Changes to the Transportation Facility</u>.

(a) Any improvement, change, modification, or alteration to the Transportation Facility which materially affects the public safety and security shall require the prior approval of the Authority.

29

(b) Concessionaire shall supply a proposed Modification Report evidencing the nature of the proposed improvements, changes, modifications or alterations, as well as the estimated costs, and an evaluation of the cost effectiveness of these proposed improvements, changes, modifications or alterations over the period of this Agreement.

(c) Any changes to the Transportation Facility proposed by Concessionaire during the Operation and Maintenance Period, including the addition of new lanes, new ramps and enhanced lighting, shall be accompanied with a reasonable description of the changes and the estimated costs of design and construction of the proposed modification.

(d) Upon approval by the Authority of a proposed Modification Report through the issuance of a Compliance Order, Concessionaire may proceed with the work.  The costs incurred in such modification shall be considered as Capital Outlay Costs of the Transportation Facility and be recovered by Concessionaire from Total Revenues collected during the Term or any extension thereof.

(e)  All completed changes, modifications, improvements, or alterations to the Transportation Facility shall be detailed in the revised Final Plans and Specifications which shall be delivered to the Authority by the Concessionaire.

Section 9.4.   Concessionaire's Personnel.  Concessionaire shall specifically name a Project Manager who shall represent Concessionaire at all times with respect to all matters pertaining to development, design, construction and operation of the Transportation Facility.   Concessionaire shall also name another person who will be the designated representative of Concessionaire in the absence of the Project Manager.

## ARTICLE X

## TOLL RATES

Section 10.1.   Initial Toll Rates.   Concessionaire shall charge all drivers who use the Transportation Facility according to the following initial Toll Rates for the year 1993:

| | | U.S. Dollars |
|---|---|---|
| (a) | Buses, lorries and trucks (per axle) | $2.00 |
| (b) | Microbuses | $3.00 |
| (c) | Motorcycles | $0.75 |
| (d) | Motorcars and industrial vehicles with load not exceeding 1,000 kg. | $1.50 |

30

Section 10.2. <u>Revision of Toll Rates</u>.

(a) Concessionaire shall have the right to progressively revise and increase the Toll Rates on January 1st of every year, based on the initial Toll Rate established for the year ended 1993, by applying the Consumer Price Index for all families as published by the Department of Labor of the Commonwealth as described in Exhibit D hereof ("CPI") plus such other adjustment which may be required to comply with the rate covenants in the Financing Documents.

(b) Whenever the publication of the CPI is suspended or its cumulative application is clearly in contradiction with other actual objective indexes commonly in use in the Commonwealth, the parties shall, at the written request of any of them, substitute the CPI by such other index. If the parties are unable to reach an agreement within sixty (60) days after any such request, the matter shall be resolved by arbitration as provided herein; provided, however, that such proceedings shall not prevent the provisional implementation of an increase in Toll Rates.

(c) The procedure to revise and adjust the Toll Rates shall be as follows:

(i) The Concessionaire shall notify the Authority within twenty (20) days before the end of each Fiscal Year the new Toll Rates to be charged during the following year and the date such new rates will be effective.

(ii) The new rates shall become automatically effective on the date indicated by the Concessionaire, after informing the public by means of one announcement in two (2) newspapers of general circulation.

(iii) In the application of the revised Toll Rates, the resulting figures shall be rounded up or down to the nearest five cents ($0.05).

(d) All users of the Transportation Facility shall pay the established Toll Rates. The following vehicles, however, shall not be required to pay the Toll Rates:

(i) Vehicles belonging to the Authority at the time it is on official business with respect to the Transportation Facility.

(ii) Vehicles belonging to the Puerto Rico Police, Municipal Police, Fire Department and ambulances in emergency situations.

(iii) Vehicles performing services on the Transportation Facility.

31

(e)    The Toll Rates may be temporarily reduced by Concessionaire, in its sole discretion, during certain holidays, weekends, seasons, hours of the day, or for any other reason that Concessionaire deems appropriate.  Such reductions may remain in force and effect as long as Concessionaire deems appropriate or convenient, and Concessionaire may, in its sole discretion, increase and reinstate the Toll Rates established for the specific year at any time. Concessionaire shall also have the right to establish, in its sole discretion, any system to charge and collect the Toll Rates, including, but not limited to, automatic toll charges, credit cards or any other device or means to increase the efficiency of the operation and the collection of Toll Rates in the Transportation Facility.

Section 10.3.   Toll Collection.  All toll collection services for the Transportation Facility shall be undertaken within the limits of the toll collection points by employees of Concessionaire, or by a private contractor engaged by Concessionaire for such purposes.

Section 10.4.   Traffic and Control Statistics.

(a)  Concessionaire will install an automatic vehicle computer system at each main or secondary toll gate of the Transportation Facility which will discriminate among the classes of vehicles pursuant to the rates applied.  Concessionaire shall also install the necessary systems to achieve standard conditions for the safety and health of the Transportation Facility users.

(b)  Concessionaire will maintain daily statistics of the traffic on the Transportation Facility which are usually taken in this type of project, and may install a data processing system recommended by professionals or organizations selected by the Concessionaire with extensive experience in this type of business.

(c)   The Authority shall have the right to examine, after reasonable prior notice and during normal business hours, the information maintained by Concessionaire, provided that the exercise of such right shall not interfere unduly with the daily operation of the Transportation Facility.

**ARTICLE XI**

**TERMINATION OPTION**

Section 11.1.   Condition for Termination Option.

(a)   The Authority has caused its traffic consultant to prepare the Traffic Estimate, on the basis of which the Concessionaire has demonstrated the economic and financial viability of the Transportation Facility as a privatized project. Concessionaire shall have the unrestricted right to terminate this Agreement, in its sole discretion (the "Termination Option"), and

32

be compensated therefor as provided herein, in the event that the total number of vehicles that have used the Transportation Facility, computed on a cumulative basis from the Acceptance Date up to the end of every six (6) month period thereafter, is less than the following percentages of the number of vehicles in the Traffic Estimate, computed to the same date on a cumulative basis:

(i) during the first three (3) years of operation from the Acceptance Date, eighty percent (80%);

(ii) during the fourth through sixth years of operation from the Acceptance Date, eighty five percent (85%);

(iii) during the seventh and eighth years of operation from the Acceptance Date, ninety percent (90%); or

(iv) during the ninth year of operation from the Acceptance Date and thereafter until termination of this Agreement or abrogation of the option as provided in Section 11.1 (c), one hundred percent (100%);

(b) The Traffic Estimate shall be calculated and accumulated since the Acceptance Date on a semiannual basis to correlate with the Debt Service payments. The actual traffic using the Transportation Facility shall be calculated on the same basis. The Concessionaire shall submit to the Authority monthly reports of the traffic that has used the Transportation Facility during the immediately preceding month, and semester, accumulated since the Acceptance Date as hereinbefore provided.

(c) The provisions of this Article XI shall be in full force and effect during the Term of this Agreement; provided, however, that this Article XI shall cease to be in effect in the event that (i) the number of vehicles that have used the Transportation Facility for each complete six month period during five (5) consecutive years is at least equal to the number of vehicles in the Traffic Estimate (computed for the same period on a cumulative basis) and (ii) the Concessionaire and the Authority have received in writing a rating for the Bonds which is at least equivalent to A by Standard & Poor's Ratings Group. On the date such conditions have been satisfied, the Termination Option shall be deemed abrogated and no longer in effect, other than to the extent one or more Sections thereof are used to provide specific remedies under this Agreement.

Section 11.2. <u>Exercise of the Termination Option</u>.

(a) Upon the occurrence of any of the events set forth in Section 11.1(a) Concessionaire may, in its sole discretion, exercise its right under this Article XI by delivering written notice thereof to the Authority within thirty (30) days after the

33

HTA_CONF 00011894

end of the first year of operation or after the end of any six (6) month period of operation thereafter.

(b) After the Concessionaire notifies the Authority of its excercise of the Termination Option, the Authority shall be automatically and irrevocably obligated to acquire the concession as hereinafter provided. Within twenty (20) days after receipt of such notice, the Authority shall include the acquisition of Concessonaire's rights over the Transportation Facility in its Capital Improvements Program ("Programa de Mejoras de Capital"). After such inclusion but no later than thirty (30) days prior to the next Debt Service payment date, the Concessionaire shall take all necessary steps to transfer to the Authority and the Authority shall acquire all of Concessionaire's right, title, and interest in the Transportation Facility in exchange for the following:

(i) The assumption by the Authority of, and the full release and discharge of Concessionaire by the Authority and other parties to the Financing Documents from, all of the payment obligations of the Concessionaire under the Financing Documents executed in connection with the issuance of the Bonds for the financing of the Transportation Facility, without any further act or formality, other than those that may be required under said agreements.

(ii) The payment by the Authority to the Concessionaire of an amount of money, in United States immediately available funds, equivalent to the aggregate of Partner's Capital contributed for the development, design, construction and operation of the Transportation Facility, to the extent not recovered by the Partners as of the date such acquisition takes place, plus a return on such capital at an annually compounded rate of twelve and one half percent (12.5%) from the date of investment to the date of payment. Such payment shall be made from monies in the Escrow Fund or other monies available to the Authority as set forth in Section 11.4(a) no later than the date of the transfer of the concession as provided above.

(c) The assumption by the Authority of the payment obligations under the Financing Documents as provided in Section 11.2(b)(i) herein shall be absolute and shall not be delayed, opposed or excused as a result of any claim or dispute by or between the Authority and the Concessionaire arising from or related to any provision of this Agreement.

(d) Anything herein to the contrary notwithstanding, the exercise by the Concessionaire of the Termination Option shall not release any party hereto from any of its obligations to the other party arising from or related to its failure to perform or observe any of the covenants, terms and conditions of this Agreement.

34

Section 11.3.  Security

(a)  To secure the performance of its obligations pursuant to Section 11.2(b)(ii) hereof, the Authority shall deposit and place in escrow with the Bond Trustee at the closing of the Bond issue the sum of Nine Million U.S. Dollars ($9,000,000.00 U.S.) in immediately available funds.  Interest earned on such escrow amount shall constitute additional security and remain in escrow.

(b) The Authority shall be entitled to retire the Escrow Fund after the Termination Option has ceased to be in effect as provided in Section 11.1 (c) of this Agreement.

Section 11.4.  Issuance of Bonds Under Bond Resolution; Subordination of Obligations.

(a)  The payment obligations assumed by the Authority pursuant to Section 11.2(b)(i) of this Agreement with respect to the Loan Agreement, the Letter of Credit and Reimbursement Agreement, the Trust Agreement and any reimbursement of the aggregate of Partner's Capital not covered by the Escrow Fund shall be payable solely from moneys in the Construction Fund established by Section 401 of the Bond Resolution (as hereinafter defined) and shall be subordinated to the obligations of the Authority under the Bond Resolution until such time as those obligations are exchanged for obligations issued by the Authority under the Bond Resolution as hereinafter provided.

(b)  Notwithstanding any other provision hereof, the Authority agrees that, upon acquisition of the concession rights to the Transportation Facility, it will  (i) immediately effect the assumption and release described in Section 11.2(b)(i) above, and (ii) exercise its best efforts to either exchange the Bonds for other bonds (the "Substitute Bonds") issued under Section 208 of Resolution 68-18, as amended (the "Bond Resolution"), or redeem the Bonds.  The election to redeem the Bonds or issue Substitute Bonds after the assumption and release mentioned above shall be in the Authority's sole discretion.  The Authority agrees that after the date of acquisition of the concession pursuant to the provisions of this Article it will not issue any additional bonds under Section 208 of the Resolution (other than bonds to pay interim borrowings or commitments in effect at the time) until the Substitute Bonds are issued or the Bonds are redeemed, and to take all necessary action to such effect.

(c)  If the Authority elects to issue Substitute Bonds, such bonds shall have the same principal amount, maturity and bear interest at the same rates as the Bonds for which they are to be substituted.

35

Section 11.5.   Exercise of the Termination Option.

(a)     The  obligations  of  the  Authority  hereunder  are
irrevocable and upon the exercise of the Termination Option as
herein set forth the Authority shall be automatically bound and
obligated to comply with the terms and provisions of this Article
XI.

(b)  The failure by the Concessionaire to exercise its right
to request the acquisition of the concession by the Authority and
terminate this Agreement upon the occurrence of an event set forth
in Section 11.1(a) shall not be deemed to constitute a waiver of
such right for future events.

## ARTICLE XII

### FURTHER COVENANTS

Section  12.1.    Mutual  Cooperation.    The  Authority  and  the
Concessionaire shall cooperate with each other, reasonably and in
good faith, for the purposes of facilitating the performance of
their respective obligations and undertakings hereunder and to
preserve, protect, and avoid any impairment of their respective
rights hereunder.  In furtherance thereof and without limiting the
generality of the foregoing, but subject to applicable Laws and
Regulations, the Authority and the Concessionaire in the reasonable
exercise of their respective rights, powers and duties hereunder,
shall:

(a)    Use their best efforts to avoid and/or minimize any
interference with or interruption of the development, construction
or operation of the Transportation Facility or any oversight, audit
or other activities relative thereto; provided, however, that when
such  interference  or  interruption  is  reasonably  necessary  or
unavoidable, the parties shall ensure that such interference or
interruption does not have a duration or extent greater than is
necessary under the circumstance giving rise thereto;

(b)   use their best efforts, respectively, to maintain the
Transportation  Facility  and  the  Commonwealth  transportation
facilities  connected  therewith,  proceeding  with  reasonable
dispatch, in the event of casualty damage, to repair, rebuild or
replace said facilities;

(c)   not take any action which may interfere or adversely
affect the collection of Total Revenues and their utilization in
accordance with the provisions of this Agreement, and assist in the
defense or prosecution of actions taken by others which may impair
or have an adverse effect upon such revenue collection and its
utilization, and the rights of the parties under this Agreement.

36

Section 12.2.  <u>Mutual Assistance in Obtaining Financing</u>.  To the
maximum extent consistent with the Laws and Regulations and this
Agreement, the Authority and the Concessionaire shall assist each
other with the documentation reasonably necessary to obtain and
maintain financing for the development, property acquisition,
design, construction and subsequent operation and maintenance of
the Transportation Facility and any airspace improvements, which
assistance shall include the prompt review, approval and execution
of financial documents, and the execution and delivery of estoppel
certificates requested by third parties providing debt financing.

Section 12.3.  <u>Mutual Legal Assistance</u>.

   (a)  The Authority and the Concessionaire shall assist each
other in the defense or prosecution of any actions by or against
third parties relating to the Transportation Facility or this
Agreement, independently of the fact that only one of them may be
a party to such action.

   (b)  The Authority shall, at its sole cost and expense,
protect and defend the Concessionaire, against any challenges to
the validity and enforceability of the Act, the procurement
processes conducted by the Authority pursuant to which the
Concessionaire was selected to develop the Transportation Facility
and this Agreement and any provision thereof, and shall diligently
prosecute or cause to be prosecuted, the defense of the Act, the
selection process and the provisions of this Agreement.

   (c)  The Concessionaire and the Authority shall not take any
action that would render unenforceable any material provision of
this Agreement nor shall the Authority cause such effect by failing
to take the lawful action necessary or required pursuant to the
provisions of this Agreement.

Section 12.4.  <u>Approvals</u>.  Whenever any party's approval or consent
is required under this Agreement, such approval or consent shall
not be unreasonably withheld or delayed.

Section 12.5.  <u>Toll Violation Enforcement</u>.  The Authority agrees to
cause the Department of Transportation and Public Works to include
toll violations as an administrative infraction of its regulations,
recordable in the records of the Department of Motor Vehicles as an
outstanding obligation requiring satisfaction prior to vehicle
registration, licensing or transfer.  The Concessionaire agrees to
provide to the Department of Transportation and Public Works or
other governmental authorities the evidence necessary to prove such
violations.

Section 12.6.  <u>Competing Facilities</u>.

   For purposes of this Agreement "Competing Facility" shall mean
a bridge or expressway, leading to or from the Luis Muñoz Marín

37

International Airport or connecting Baldorioty de Castro Avenue (PR-26) with Ramal Este (PR-4) through which traffic may flow without the interruption of traffic lights or other controls other than toll gates, which affects the volume of traffic on the Transportation Facility to such an extent that the Base Return on Partner's Capital is impaired. The Authority covenants and agrees that it shall not construct or cause a Competing Facility to be constructed. In the event the Authority constructs or causes a Competing Facility to be constructed, the Concessionaire shall have the option, in its sole discretion, to:

(a) Continue to possess, operate and maintain the Transportation Facility and notify the Authority of such event; or

(b) At any time thereafter, but not later than two years after the Competing Facility is completed, terminate this Agreement under the same terms and conditions provided in Sections 11.2(b) and (c), 11.3(a) 11.4 and 11.5 of this Agreement by delivering written notice to the Authority and opt for the remedy provided for in Section 15.4 (e) of this Agreement.

Section 12.7 <u>Change in Law</u>.

(a) For purposes of this Agreement "Change in Law" shall mean the enactment or adoption by any Legislative, regulatory, executive or administrative body of the Commonwealth or of the United States of America of any law, rule or regulation or any change or amendment to any law, rule or regulation in force as of the date of this Agreement, or any change in the interpretation thereof not subject to administrative or judicial review, or if subject to administrative or judicial review the validity or interpretation of which has been sustained by final judgment, which materially adversely affects the obtaining by the Concessionaire of the Base Return on Partner's Capital.

(b) Upon the occurrence or threat of occurrence of a Change in Law, the Authority and the Concessionaire shall cooperate actively with each other as provided in this Article XII to remove or reduce its effect by taking such judicial or other action which may be convenient, necessary or proper for such purposes. If notwithstanding the foregoing actions such Change in Law occurs or persists, the parties shall negotiate diligently, reasonably and in good faith the termination or the modification of this Agreement to compensate the Concessionaire for the consequences of such Change in Law.

(c) If Concessionaire exercises its right to terminate this Agreement, such termination shall be under the same terms and conditions provided in Article XI and, upon notice from the Concessionaire, the Authority shall fully comply with, and fulfill its obligations under the provisions of Sections 11.2(b) and (c), Section 11.3(a) and Section 11.5 of said Article.

38

(d)   Notwithstanding any other provision herein contained, changes in law which amount to or have the effect of an inverse condemnation may be governed alternatively by the provisions of Section 20.9(b) hereof, at the election of the Concessionaire.

Section 12.8   <u>Transfer Stamps, Vouchers and Fees</u>.   The Authority shall assume the obligation to pay applicable transfer stamps, vouchers and fees, which might be required, imposed or due pursuant to any Federal or Commonwealth law as a result of, or related to the transfer to the Authority of the Transportation Facility and the rights thereon pursuant to this Agreement, the creation of an administrative concession thereon in the Registry of Property and the mortgage or assignment as security of such concession, provided that the Authority shall at all times approve the manner of such transfer, creation and mortgage.

Section 12.9   <u>Authority's Commitments</u>.   The Authority agrees that any construction works performed by the Authority in connection with its existing works at Baldorioty de Castro Avenue ("PR-26"), particularly in the vincinity of the area where the Transportation Facility will be constructed and the entrance to Luis Muñoz Marín Airport, shall not interfere with the construction of the Transportation Facility, and shall be completed within twenty (20) months from the effective date of this Agreement.

### ARTICLE XIII

### LIABILITY

Section 13.1   <u>Independent Contractor</u>.   It is the intention of the parties that the Concessionaire shall be an independent contractor in connection with the Final Design, construction, operation and maintenance of the Transportation Facility and the performance of its duties hereunder.   Nothing in this Agreement shall create a fiduciary relationship between the parties or shall constitute either of them an employee, legal representative, joint venturer, agent or partner of the other for any purpose whatsoever and neither party shall be responsible for the debts, obligations or liabilities incurred by the other, except as otherwise provided herein.   The Concessionaire shall represent himself solely as an independent contractor who has been engaged to finally design, construct, operate and maintain the Transportation Facility in accordance with the terms of this Agreement.   The Concessionaire shall not have any authority to contract for or bind the Commonwealth or the Authority in any manner.   The Concessionaire agrees that all contracts it may enter into in connection with the Final Design, construction, operation and maintenance of the Transportation Facility hereunder shall be in its own name.

Section 13.2   <u>Concessionaire Responsibility</u>.   Except as otherwise provided herein, the Concessionaire agrees that among the Commonwealth, the Authority and the Concessionaire, the

39

Concessionaire shall be solely responsible for all costs, expenses and liabilities of any kind and nature arising out of the Final Design, construction, operation or maintenance of the Transportation Facility, including all contractual, personal injury and property damage claims arising therefrom, and neither the Commonwealth nor the Authority shall be liable for any such costs, expenses and liabilities.  The Concessionaire's responsibility hereunder shall be limited to the amount of insurance policies required by this Agreement.

Section 13.3   <u>Indemnification</u>.  The Concessionaire agrees to indemnify, defend and save the Commonwealth, and the Authority, their agents, officers and employees, harmless from any claims, lawsuits or actions that may be asserted against them by third parties not related to the Authority, and to indemnify each of them for any liability, including damages, costs and expenses, resulting from such claims, lawsuits or actions, on account of injury to or death of any person or damage to real or personal property, provided that such claim or liability (i) is independent of contract, (ii) arises out of the Final Design, construction, operation or maintenance of the Transportation Facility, and (iii) does not arise out of the fault or negligence of the Commonwealth, the Authority or their agents, officers or employees.  The Concessionaire's responsibility hereunder shall be limited to the amount of insurance policies required by this Agreement.

Section 13.4.   <u>Authority Liability</u>.  The Authority agrees to indemnify, defend and save Concessionaire, its agents, officers, and employees, harmless from any claims, lawsuits or actions that may be asserted against them by third parties not related to the Concessionaire, and to indemnify each of them for any liability, including damages, costs and expenses, resulting from such claims, lawsuits or actions, on account of injury to or death of any person or damage to real or personal property, providing that such claim or liability (i) is independent of contract, and (ii) arises out of any act or omission by the Authority, its agents, officers and employees related to the design, construction, operation, maintenance and toll collection of the Transportation Facility.

Section 13.5.   <u>Limitation of Liability</u>.

     Notwithstanding anything contained in this Agreement the liability of Concessionaire hereunder for damages or otherwise shall be limited solely to Concessionaire's and its Partners interest in the Transportation Facility, including any funds of Concessionaire held by banks or financial institutions pursuant to any of the provisions of this Agreement, the proceeds of any insurance policies covering or relating to the Transportation Facility, any award payable in connection with any condemnation of the Transportation Facility and any other rights, privileges, licenses, claims, causes of action or other interests, sums or receivables arising out of this Agreement or appurtenant to the

40

HTA_CONF 00011901

Transportation Facility, and no other property or assets of Concessionaire's Partners, directors, officers, joint venturers, principals, employees or agents, their successors or assigns shall be subject to any claim, suit, demand or liability hereunder, whether personal or otherwise.

Section 13.6. <u>Rights of the Public</u>. Nothing in this Agreement or in any insurance agreement provided for herein is intended to make the public or any member thereof a third party beneficiary to this Agreement, nor is any term condition or other provision of this Agreement intended to establish a standard of care owed or give any rights to the public or any member thereof which would not exist in the absence of this Agreement.

### ARTICLE XIV

### PERFORMANCE AND OPERATION BONDS AND INSURANCE

Section 14.1. <u>Performance and Operation Bonds</u>.

(a) To secure the faithful performance of its obligations in connection with the construction of the Transportation Facility, Concessionaire shall submit a Payment and Performance Bond in the amount that represents one hundred percent (100%) of the Guaranteed Maximum Price. The total amount of the Payment and Performance Bond may be constituted as a whole by Concessionaire or integrated by the bond, or the aggregate of bonds, of the Contractor(s), as the Concessionaire may determine. Such Payment and Performance Bond shall be issued with the Authority as dual obligee and submitted to the Authority when the financing for the construction of the Transportation Facility is closed. The Payment and Performance Bond(s) shall be in effect until Transportation Facility Acceptance and shall be immediately cancelled on the Acceptance Date.

In the event of abandonment or cessation of work for a period of thirty (30) consecutive days or more not due to either Force Majeure or a Change in Law by Concessionaire or the Contractor(s), the Authority shall have the right, subject to the provisions of the Financing Documents, to request the surety company to complete the construction of the Transportation Facility or otherwise fulfill its obligations under the Payment and Performance Bond(s).

(b) Concessionaire shall deliver to the Authority after the Transportation Facility is placed in service a bond to secure the obligations of Concessionaire during the Operation and Maintenance Period of the Transportation Facility which shall be cancelled on the same day that the concession granted by the Authority hereunder and this Agreement terminates. Such Bond shall be in a sum equivalent to two percent (2%) of the Capital Outlay Costs.

41

HTA_CONF 00011902

(c)  The termination of this Agreement pursuant Articles XI and XV shall cause the automatic cancellation of the above mentioned bond, and the return of the bond to Concessionaire unless otherwise expressly provided in this Agreement.  Said bond shall be returned to Concessionaire within ten (10) days from the date this Agreement terminates.

Section 14.2.  Insurance.

(a)  Concessionaire shall obtain and provide the Authority with a copy of separate policies of multi-risk insurance for physical loss or damage to the facility, business interruption resulting from such loss or damage and liability insurance with coverage for bodily injury and property damage, with Additional Insured Endorsements to the liability insurance policy naming the Commonwealth of Puerto Rico and the Authority, its Agent, officers and employees as additional insureds.  Said liability insurance shall provide a minimum bodily injury liability and property damage liability coverage per occurrence of $1,000,000 per each occurrence, and not less than $10 million in the aggregate coverage (excess liability acceptable), subject to commercial availability.  Insurance for physical loss or damage to the Transportation Facility shall be in an amount sufficient to pay the outstanding balance of the Debt and business interruption insurance resulting from such loss or damage shall be in an amount sufficient to cover Debt Service during the period of reconstruction, unless otherwise provided in the Financing Documents.

(b)  At the time of the Transportation Facility Acceptance Concessionaire shall obtain and provide the Authority with a copy of a policy of liability insurance with coverage for bodily injury and property damage, with Additional Insured Endorsements naming the Commonwealth of Puerto Rico and the Authority, its Agent, officers and employees as additional insureds against all risks arising from Concessionaire's administration, maintenance and toll collection activities related to the Transportation Facility.  Said liability insurance will provide a minimum bodily injury and property damage liability coverage per occurrence of $1,000,000 and not less than $10,000,000.00 in the aggregate coverage (excess liability acceptable), subject to commercial availability.

(c)  Concessionaire will obtain and provide the Authority with a copy of a policy of fidelity insurance with coverage for misappropriation or conversion of funds by Concessionaire's employees in an amount that reasonably insures 100% of said risks.

(d)  Evidence of insurance in compliance with the requirements of this section shall be furnished to the Authority by certificate(s) of insurance in form approved by the Authority.  The Additional Insured Endorsements to the aforementioned insurance policies naming the Commonwealth of Puerto Rico and the Authority, its Agent, officers and employees as additional insured shall also

42

be furnished to the Authority. Neither the insurance policies nor
the Additional Insured Endorsements shall contain provisions or
exclusions materially inconsistent with this Agreement.

(e) Such insurance shall be issued by a company or companies
authorized to transact business in the Commonwealth of Puerto Rico
and rated A or better by A. M. Best Company.

(f) Failure by the Concessionaire to obtain or renew said
policies in accordance with the foregoing provisions will render
inoperant any limitation of liability contained in this Agreement
and expressed in terms of proceeds of insurance policies.

## ARTICLE XV

### DEFAULT AND TERMINATION

Section 15.1. <u>Concessionaire's Default</u>. The occurrence of any of
the following events, unless attributable to Force Majeure, shall
constitute a Default by Concessionaire:

(a) A breach or default by the Concessionaire in the
performance of any material obligation under this Agreement which
breach or default arises out of the fault, negligence or delay of
the Concessionaire and has not been cured or action towards its
cure has not been taken within the applicable grace period, if any;

(b) The Transportation Facility is unjustifiedly abandoned by
Concessionaire before all of the obligations of Concessionaire
hereunder have been satisfied;

(c) Concessionaire shall fail to disclose any
misappropriation of any portion of Total Revenue which would be
credited against Costs under the terms of this Agreement;

(d) Concessionaire shall commence a voluntary case or other
proceeding seeking liquidation, reorganization, or other relief
with respect to itself or its debts under any bankruptcy,
insolvency, or other similar law now or hereafter in effect or seek
the appointment of a trustee, receiver, liquidator, custodian, or
other similar official of any substantial part of its assets, file
an answer admitting the material allegations of a petition filed
against it in any involuntary case or other proceeding commenced
against it, or shall consent to any such relief or to the
appointment of or taking possession by any such official in any
voluntary case or other proceeding commenced against it, or shall
make an assignment for the benefit of creditors, except as required
or permitted under the Financing Documents, or shall fail, be
unable, or admit in writing its inability generally to pay its
debts as they become due, or shall take any action to authorize any
of the foregoing; and

43

HTA_CONF 00011904

(e)   An involuntary case or other proceeding shall be commenced against the Concessionaire seeking liquidation, reorganization, dissolution, winding up, a composition or arrangement with creditors, a readjustment of debts, or other relief with respect to it or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official of any substantial part of its assets, or similar relief, or the issuance of a writ of attachment, execution, or similar process and such involuntary case or other proceeding shall not be contested by it in good faith or shall remain undismissed and unstayed for a period of sixty (60) days.

Section 15.2.   Authority's Remedies.   Upon the occurrence and during the continuance of any Default by Concessionaire, if such Default is capable of being cured and has not been cured within the period set forth in Section 15.5 hereof, the Authority may, by written notice to Concessionaire, declare this Agreement to be in default.   At any time after declaring this Agreement to be in default, subject to the provisions of Article XVII hereof and of the Financing Documents the Authority may, in its sole discretion, do any one or more of the following:

(a)   grant to Concessionaire an additional period of time to cure the Default; or

(b)   if Transportation Facility Acceptance has not occurred, request that the design and construction contracts of the Transportation Facility be assigned by the Concessionaire to the Authority; or

(c)   in the event of any material default, terminate this Agreement upon notice in writing to Concessionaire and enter upon and take possession of the Transportation Facility and to be compensated for actual damages.

Section 15.3.   Authority's Default.   The occurrence of any of the following events, unless attributable to Force Majeure, shall constitute a Default by the Authority:

(a)   The Authority terminates the concession granted under this Agreement in the absence of a material default by Concessionaire;

(b)   Any representation or warranty made by the Authority herein shall be false in any material respect on the date made;

(c)   A breach or default by the Authority in the performance of any material obligation under this Agreement which breach or default arises out of the fault, negligence, omission or delay of the Authority and has not been cured or action toward its cure has not been taken within the applicable grace period, if any;

44

(d)  This Agreement or any provision hereof shall at any time after its execution and delivery and for any reason whatsoever cease to be in full force and effect, valid and enforceable in the Commonwealth; and

(e)  The Authority shall at any time assert that this Agreement or any provision hereof is not in full force and effect or valid and enforceable in the Commonwealth in accordance with its terms.

Section 15.4.  <u>Concessionaire's Remedies</u>.  Upon the occurrence and during the continuance of any Default by the Authority, if such Default is capable of being cured and has not been cured within the period set forth in Section 15.5 hereof, the Concessionaire, by written notice to the Authority, may declare this Agreement to be in default.  At any time after declaring this Agreement to be in default, Concessionaire may, in its sole discretion, do anyone or more of the following:

(a)  Grant the Authority an additional period of time to cure the Default; or

(b)  Continue to possess and operate the Transportation Facility in accordance with the terms of this Agreement pending the accomplishment of an appropriate remedy as provided herein, or in the absence thereof, as available at law or in equity based on any applicable legal theory;

(c)  Retain all documents, plans and specification, studies, drawings, or other intellectual property relating to the Transportation Facility not previously submitted to the Authority and such items shall be considered property of Concessionaire; and

(d)  In the event of any material default, terminate this Agreement without any further liability hereunder or under the Financing Documents upon notice in writing to the Authority and be compensated by the Authority for all damages suffered by Concessionaire, as determined by a court of competent jurisdiction as a result of such Default, and the Authority shall promptly assume all Concessionaire's obligations under the Financing Documents and release the Concessionaire therefrom.

(e)  Should a Competing Facility be built, or caused to be built, by the Authority, to require the Authority to acquire, and the Authority shall thereupon acquire Concessionaire's rights under this Agreement for a just compensation which shall not exceed the net after tax present value (discounted at a 10% annual rate) of the concession, computed as of the time of the exercise of this option.

Section 15.5.  <u>Right to Cure</u>.  Notwithstanding any other provisions in this Agreement or in any related agreement, neither party shall

45

be entitled to terminate this Agreement or to any other remedy as a result of the occurrence of a Default which is capable of being cured, unless it has (i) given prior notice to the defaulting party specifying such event of default; (ii) specified in such notice that the defaulting party has a period of sixty (60) days from such notice to cure such default; and (iii) within such sixty (60) day period the defaulting party has not cured or taken action to cure said default if such default is capable of being cured within said period.

Section 15.6.  Default Materiality.  Materiality of any default by either the Authority or the Concessionaire shall be determined in relation to the scope and nature of any adverse economic impact on the continuing operational and economic viability of the Transportation Facility as contemplated by this Agreement.

Section 15.7.  Ownership of Intellectual Property.  In the event of termination of this Agreement as a result of a default on the part of Concessionaire, all documents, drawings or other intellectual property of the Concessionaire submitted to or in the possession of the Authority shall be considered as property of the Authority and to the extent that the Authority may utilize that intellectual property or make it available to others, the Authority shall hold harmless and indemnify Concessionaire with respect to such use.

Section 15.8.  Other events of Termination.

In addition to termination by reason of default under Sections 15.2 and 15.4 above, this Agreement may terminate in any of the following events:

(a)  Upon the exercise of the Termination Option set forth in Article XI, or by operation of Section 12.6 or 12.7 hereof;

(b)  Upon expiration of the Term or any extension thereof as set forth in Section 2.2, the operation, administration and maintenance of the Transportation Facility shall be transfered to the Authority in accordance with the Act.  Concessionaire shall then surrender the possession of the Transportation Facility to the Authority except for machinery, equipment, appliances and other personal property owned by Concessionaire and used by it for maintaining and/or repairing the Transportation Facility, the cost of which was not paid in whole or in part from Total Revenues;

(c)  By mutual agreement of the parties; or

(d)  At the election of Concessionaire, if the Transportation Facility is totally or substantially destroyed for causes not attributable to the fault, negligence or omission of the Concessionaire or its agents, it proves economically infeasible to restore, reconstruct or repair the Transportation Facility by the Concessionaire and the proceeds of insurance are sufficient to

46

redeem the Bonds.   For purposes hereof, destruction is deemed substantial if the cost of restoration, reconstruction or repair of the Transportation Facility exceeds 25% of the replacement costs.

(e)   In the event that the construction or the operation and use of the Transportation Facility is interrupted due to Force Majeure (other than as contemplated by Article XVIII hereof) for a period of time exceeding six (6) consecutive months, the Concessionaire may terminate this Agreement without any further liability hereunder and the Authority shall be obliged to assume the obligations of the Concessionaire under the Financing Documents and reimburse Concessionaire the balance of the aggregate of Partner's Capital not recovered by such date in the manner and to the extent provided in Article XI.

## ARTICLE XVI

### DISPUTE RESOLUTION

Section 16.1.   <u>Administrative Dispute Resolution</u>.   In the event of any dispute or controversy arising between  Concessionaire and the Authority relative to the legal obligations and responsibilities of the respective parties, the same will be resolved by submission of the complete documented dispute to the Authority's Executive Director or his duly authorized designee for an administrative determination within thirty (30) days of submission.   In the event that the administrative determination is not acceptable, Concessionaire may then seek the resolution through arbitration as provided hereinafter.

Section 16.2.   <u>Arbitration</u>.

(a)   Any claim, dispute or controversy arising under this Agreement or with regard to the performance hereof which has not been satisfactorily resolved (other than with respect to the enforceability of Section 11.2(b)(i), Section 18.4 or Section 20.9(b), shall be submitted to Arbitration in San Juan, Puerto Rico as provided herein.   The party desiring Arbitration shall give written notice to the other party, including in such notice the appointment of a disinterested person as Arbitrator.   Within ten (10) days thereafter, the other party shall appoint a second disinterested person as Arbitrator and give notice thereof to the other party.   The two (2) arbitrators thus appointed shall together appoint a third disinterested person within fifteen (15) days after the appointment of the second Arbitrator, and said three Arbitrators shall, as promptly as possible, consider the matter which is the subject of the arbitration and resolve the dispute. The decision of the majority of the Arbitrators shall be conclusive and binding on all parties and judgment upon the award may be entered in any court having jurisdiction.   If a party who shall have the right pursuant to the foregoing to appoint an Arbitrator fails or neglects to do so, then and in such event the other party

HTA_CONF 00011908

HTA_CONF 00011909

redeem the Bonds. For purposes hereof, destruction is deemed substantial if the cost of restoration, reconstruction or repair of the Transportation Facility exceeds 25% of the replacement costs.

(e) In the event that the construction or the operation and use of the Transportation Facility is interrupted due to Force Majeure (other than as contemplated by Article XVIII hereof) for a period of time exceeding six (6) consecutive months, the Concessionaire may terminate this Agreement without any further liability hereunder and the Authority shall be obliged to assume the obligations of the Concessionaire under the Financing Documents and reimburse Concessionaire the balance of the aggregate of Partner's Capital not recovered by such date in the manner and to the extent provided in Article XI.

## ARTICLE XVI

### DISPUTE RESOLUTION

Section 16.1. <u>Administrative Dispute Resolution</u>. In the event of any dispute or controversy arising between Concessionaire and the Authority relative to the legal obligations and responsibilities of the respective parties, the same will be resolved by submission of the complete documented dispute to the Authority's Executive Director or his duly authorized designee for an administrative determination within thirty (30) days of submission. In the event that the administrative determination is not acceptable, Concessionaire may then seek the resolution through arbitration as provided hereinafter.

Section 16.2. <u>Arbitration</u>.

(a) Any claim, dispute or controversy arising under this Agreement or with regard to the performance hereof which has not been satisfactorily resolved (other than with respect to the enforceability of Section 11.2(b)(i), Section 18.4 or Section 20.9(b), shall be submitted to Arbitration in San Juan, Puerto Rico as provided herein. The party desiring Arbitration shall give written notice to the other party, including in such notice the appointment of a disinterested person as Arbitrator. Within ten (10) days thereafter, the other party shall appoint a second disinterested person as Arbitrator and give notice thereof to the other party. The two (2) arbitrators thus appointed shall together appoint a third disinterested person within fifteen (15) days after the appointment of the second Arbitrator, and said three Arbitrators shall, as promptly as possible, consider the matter which is the subject of the arbitration and resolve the dispute. The decision of the majority of the Arbitrators shall be conclusive and binding on all parties and judgment upon the award may be entered in any court having jurisdiction. If a party who shall have the right pursuant to the foregoing to appoint an Arbitrator fails or neglects to do so, then and in such event the other party

47

(or if the two (2) arbitrators appointed by the parties shall fail
to appoint the third Arbitrator required hereunder, then either
party) may apply for a court appointment of such arbitrator.

(b)  The Arbitration shall be conducted in San Juan of Puerto
Rico, and shall be subject to the Arbitration Laws of Puerto Rico.
The arbitrators' decision shall also make reference to applicable
provisions of Puerto Rico's statutory law and to its judicial
interpretations, and any decision shall be delivered with due
diligence.  The language for Arbitration shall be Spanish.

(c)  The expenses of Arbitration shall be shared equally by
the Authority and Concessionaire, but each party shall be
responsible for its fees, disbursements and the expenses of its own
proof.  The Authority and the Concessionaire shall sign all
documents and do all other things necessary to submit any such
matter to Arbitration and further shall, and hereby do, waive any
and all rights they or either of them may at any time have to
revoke their agreement under this subsection.  The arbitrators
shall resolve the controversies submitted to arbitration in
accordance with law, but shall have no power to vary or modify any
of the provisions of this Agreement and their jurisdiction is
limited accordingly.

(d)  Each of the Arbitrators nominated by the parties shall
be a professional with more than fifteen (15) years of experience
in the technical, legal or administrative area in dispute and the
third arbitrator shall be an attorney with at least fifteen (15)
years of experience.

## ARTICLE XVII

### SECURITY HOLDER'S RIGHTS AND REMEDIES

Section 17.1.  _Financing Security_.  For the purpose of financing
the construction or operation of the Transportation Facility, the
Concessionaire shall have the right to mortgage, pledge, assign or
otherwise encumber or create, grant or assign any form of security
("Security Interest") in or with respect to this Agreement, whether
as a whole or in part, of its rights arising therefrom and the
Total Revenues, and permits, payment and performance bond(s),
insurance proceeds, and any other revenue and rights related to the
Project, as required by the party providing such financing (the
"Security Holder").

Section 17.2.  _Notices to Security Holder_.  A copy of any notice of
default given by any party pursuant to this Agreement shall be sent
to the Security Holder to its address as it appears in the
Financing Documents.

Section 17.3.  _Interpretation of Default_.  Any event of default
specified in this Agreement will be fully defined or amplified in

48

writing by the Authority or the Concessionaire, if necessary, taking into account the provisions of the Financing Documents.

Section 17.4.   Security Holder's Rights.

(a)   Notwithstanding any other provision contained herein, if an event of default has not been cured nor action towards its cure has been taken, the Security Holder shall have the right, but not the obligation, to remedy any default by Concessionaire or cause the same to be remedied by its designee and the Authority shall accept such performance as if done by Concessionaire.  The Security Holder shall have the same period of time to cure said default as the Concessionaire originally had, provided that the applicable period shall commence upon the receipt by the Security Holder of notice to the effect that the Concessionaire has failed to cure said default.

(b)   If any default by Concessionaire shall occur which entitles the Authority to terminate this Agreement, the Authority shall stay the termination of this Agreement for a period of sixty (60) days from the date of notice to the Security Holder if such event of default by Concessionaire is capable of being cured by the payment of money, or for a period of ninety (90) days from the date of notice to the Security Holder if such event of default by Concessionaire is not capable of being cured by the payment of money.  During such 60 or 90 day period, the Security Holder may:

(i)  notify the Authority of its desire to avoid such termination; pay or cause to be paid all amounts then due to Authority from Concessionaire as specified in the termination notice copied to such Security Holder; and commence to comply and diligently prosecute with all nonmonetary requirements of this Agreement that are events of default by Concessionaire capable of being complied with by such Security Holder, in which event this Agreement shall continue as if no default had occurred; or

(ii) notify the Authority that notwithstanding such termination it intends to foreclose upon its Security Interest on the concession, in which event the Authority shall execute a New Agreement (as hereinafter defined) with the Security Holder, its designee or the successful bidder at foreclosure.

Section 17.5   Effect of Security Interest.

(a) The creation or grant of a Security Interest shall not be deemed to constitute an assignment or transfer of this Agreement or of the Concessionaire's rights hereunder, nor shall a Security Holder, as such be deemed to be an assignee or transferee of this Agreement or of the rights of Concessionaire hereunder so as to require such Security Holder to assume the performance of any of the terms, covenants or conditions on the part of the Concessionaire to be performed hereunder, and such Security

49

Interest shall survive termination of the concession and this Agreement. The purchaser at any sale of Concessionaire's interest under this Agreement in foreclosure proceedings, or the assignee or transferee of this Agreement and Concessionaire's rights under this Agreement under any instrument of assignment or transfer in lieu of foreclosure of any Security Interest shall be deemed to have agreed to perform all of the terms, covenants and conditions on the part of Concessionaire to be performed hereunder from and after the date of such purchase and assignment.

(b)   The Security Holder or other purchaser of the interests and rights of the Concessionaire pursuant to the foreclosure or agreement in lieu of foreclosure, or assignment of the Security Interest, may, upon acquiring such interest, sell and assign such interest on such terms and to such professionally competent persons and organizations as are acceptable to such Security Holder; when such assignee or purchaser delivers to the Authority its written agreement to be bound by all of the provision of this Agreement, then in such event the Security Holder or prior purchaser shall be relieved from all obligations under this Agreement.

(c)   Notwithstanding any other provision of this Agreement, any sale of this Agreement and the Concessionaire's rights and interest herein in any foreclosure proceedings of any Security Interest, or the assignment or transfer of such rights and interest in lieu of foreclosure shall be deemed to be a permitted sale, transfer or assignment of this Agreement.

Section 17.6.   <u>New Agreement</u>.   In the event that (i) the Concessionaire's rights and interest hereunder shall be sold, assigned (other than for security purposes) or otherwise transferred pursuant to the exercise of any right, power or remedy by the Security Holder or pursuant to judicial proceedings, and satisfactory provision for indemnification of the Authority against any adverse claims arising out of or with respect to this Agreement shall have been made, (ii) no sums payable hereunder shall then be due and payable to the Authority, (iii) the Security Holder or any other purchaser of Concessionaire's interest hereunder shall have arranged for the correction of any default susceptible of being corrected and (iv) upon payment of all expenses, including, without limitation, attorneys' fees and expenses, incident thereto, the Authority will execute and deliver a new agreement for the design, construction, operation and maintenance of the  Transportation Facility to the Security Holder or its nominee, purchaser, assignee or transferee, as the case may be, for the remainder of the Term and under the same terms and conditions as are contained herein and with priority equal to that hereof (the "New Agreement").   Upon execution and delivery of such New Agreement, the Security Holder, at the expense of the new concessionaire, shall take such steps as shall be necessary to cancel and discharge this Agreement of record and remove Concessionaire from the Transportation Facility.

50

HTA_CONF 00011913

Section 17.7. <u>Security Enforcement</u>. The Security Holder shall be entitled to enforce the Security Interest and the rights and obligations of Concessionaire under this Agreement with regard to the Transportation Facility or its operation.

Section 17.8. <u>Participation in Dispute Resolution</u>. The Bond Trustee or the Letter of Credit Bank shall have the right to participate in every dispute resolution procedure initiated under Article XVI of this Agreement. The parties hereto shall notify the Security Holder of any Arbitration at least twenty (20) days prior to its comencement.

Section 17.9. <u>Estoppel Certificates</u>. The Authority, without charge, at any time and from time to time hereafter, within ten (10) days after written request of Concessionaire or the Security Holder, shall certify by written instrument duly executed and acknowledged, to the Security Holder or purchaser, or proposed Security Holder or proposed purchaser, or any other person, firm or corporation specified in such request, the following:

(i) as to whether this Agreement has been supplemented or amended, and if so, the substance and manner of such supplement or amendment;

(ii) as to the validity and force and effect of this Agreement, in accordance with its terms;

(iii) as to the existence of any event of default hereunder;

(iv) as to the existence of events which, by the passage of time or notice or both, would constitute an event of default hereunder;

(v) as to the existence of any claims by the Authority regarding this Agreement;

(vi) as to the commencement and expiration dates of the Term; and

(vii) as to any other matters as may be reasonably requested. Any such certificate may be relied upon by Concessionaire and any other person or entity to whom the same may be delivered, and the contents of such certificate shall be binding on the Authority.

Section 17.10. <u>Consent of the Security Holder</u>. No modification or termination of this Agreement which may affect the rights of the Security Holder shall be effective unless consented to in writing by the Security Holder, except for the exercise of Concessionaire's rights under Article XI hereof.

Section 17.11. <u>Future Amendments; Cooperation</u>. The Authority shall cooperate by including in this Agreement, by suitable

51

HTA_CONF 00011914

amendment from time to time, any provision which may reasonably be
requested by a proposed Security Holder.

## ARTICLE XVIII

### DAMAGE, DESTRUCTION OR CONDEMNATION

Section 18.1.  <u>Concessionaire to Give Notice</u>.  In the event of any
material damage to, or destruction of, the Transportation Facility
or any part thereof, Concessionaire shall promptly give written
notice thereof to the Authority, generally describing the nature
and extent of such damage or destruction.

Section 18.2.  <u>Restoration</u>.

(a)  Except as provided in Section 15.8(d) hereof, in case of
any damage to, or partial destruction of, the Transportation
Facility or any part thereof, if the costs of restoration,
replacement or rebuilding of the Transportation Facility is not in
excess of 25% of the new replacement cost of the Transportation
Facility, as determined by an independent appraiser, and such
restoration, replacement or rebuilding can be made under existing
Laws and Regulations applicable thereto, Concessionaire shall
promptly commence and complete the restoration, replacement or
rebuilding of the Transportation Facility as nearly as possible to
its condition and character immediately prior to such damage or
destruction, with such alterations and additions as may be made by
the Concessionaire at its election (such restoration, replacement,
rebuilding, alterations and additions, together with any temporary
repairs and property protection pending completion of the work,
being herein called "Restoration").

(b)  If the cost of Restoration of the Transportation Facility
to its former condition is in excess of 25% of the new replacement
cost of the Transportation Facility, as determined by an
independent appraiser and such Restoration can be made under
exsiting Laws and Regulations applicable thereto, the
Concessionaire may elect, in its sole discretion, not to restore,
replace or rebuild the Transportation Facility provided there is
sufficient insurance proceeds available to cover the payment of the
Bonds, and this Agreement shall terminate and the insurance
proceeds shall be used to pay the outstanding amount due on the
Bonds and any excess thereof shall be paid to Concessionaire to
recover its Partners Capital.

Section 18.3.  <u>Application of Insurance Proceeds</u>.  Except as
otherwise provided in Section 18.2(b), insurance proceeds received
by the Concessionaire on account of any damage to, or destruction
of, the Transportation Facility or any part thereof shall be paid
to Concessionaire or as Concessionaire may direct, from time to
time, as Restoration progresses, to pay (or reimburse
Concessionaire for) the cost of Restoration, together with costs

52

reasonably incurred by Concessionaire in connection with accomplishing such Restoration. Upon receipt by the Insurance Company(s) of evidence that Restoration has been completed and the cost thereof paid in full, and that there are no mechanics' or similar liens for labor or materials supplied in connection therewith, the balance, if any, of such proceeds shall, be paid to Concessionaire or as Concessionaire may direct.

Section 18.4.  Condemnation.  In the event that the concession on the Transportation Facility is taken for any public use or purpose by the exercise of the power of eminent domain (or deed given in contemplation thereof) then all the obligations of Concessionaire and the Authority under this Agreement shall fully terminate as of the taking and all awards payable on account thereof shall be paid as follows:

(a)  First, to the Security Holder;

(b)  Second, to Concessionaire in such amounts as are available to reimburse it for the aggregate of Partner's Capital in the Transportation Facility; and

(c)  Third, the balance, if any, shall be disbursed to the parties in accordance with their respective interests (including future interests) and losses (including lost profits) under this Agreement, as determined by the condemning authority (or court) in its condemnation award.

## ARTICLE XIX

### CONDITIONS PRECEDENT

Section 19.1.  Effective Date.

(a)  The obligations and covenants of the Authority and the Concessionaire under this Agreement are subject to the occurrence or performance of all the following conditions:

(i) The receipt by the Authority or the Concessionaire of all the Transportation Facility's necessary permits, approvals, endorsements and authorizations from the Puerto Rico and United States governmental agencies and municipalities with jurisdiction thereon.

(ii) The securing and obtaining by the Authority and the Concessionaire of the Bond financing required for the Transportation Facility or other financing acceptable to the Authority and its fiscal agent within a period of six months after the conditions in paragraph (i) above have been satisfied.

53

(iii)   The confirmation in writing by the Secretary of the Treasury of the tax determinations (rulings) requested by the Concessionaire set forth in Exhibit M of this Agreement.

(iv)  The securing of all necessary land, rights of way, properties, and their facilities by the Authority to enable Concessionaire to commence the works and activities contemplated in this Agreement.

(v)   the receipt by each of the parties of opinion(s) of counsel satisfactory in form and substance to each of them as to the validity and enforceability of the provisions of this Agreement.

(b)  Whenever the occurrence or fulfillment of any of the above conditions is delayed by reasons beyond the control of the Authority or the Concessionaire or due to any other reason, and such delay causes or may cause the delay of the anticipated date for the obligations of the parties hereunder to take effect, the parties shall immediately use their best efforts to find a satisfactory and reasonable solution to eliminate or remedy the event causing the delay.

(c)   If the Parties are not able to reach a mutually satisfactory agreement as to the fulfillment of any of the conditions precedent set forth herein within ninety (90) days after written notice is sent by either party as to the nonfulfillment of any of said conditions, then this Agreement shall be considered null and void.

(d)  The term provided in Section 19.1(a)(ii) shall be extended for an additional four months to permit the Concessionaire to seek other financing acceptable to the Authority and its fiscal agent in the event that the Bond financing contemplated hereby is not obtained.

## ARTICLE XX

### MISCELLANEOUS

Section 20.1.  Labor Requirements.

(a)   Concessionaire shall ensure that every contract for construction, alteration, demolition, repair, improvement, or maintenance issued by Concessionaire and involving the Transportation Facility shall comply with any applicable labor requirements.

Section 20.2.  Assignment.

(a)  This Agreement may not be assigned by Concessionaire without the written consent of the Authority, except:

54

(i)  To (1) An entity under common control with Concessionaire, (2) the corporate parent or subsidiary of Concessionaire , (3) a partnership of which Concessionaire or its affiliate is a general partner or (4) a corporation in which Concessionaire, its Partners or its affiliate has an ownership interest and the right to control the performance of the obligations of Concessionaire under this Agreement and which is legally obligated to assume the full responsibility for performance of the obligation of Concessionaire under this Agreement; or

(ii)  To a third party as a condition of obtaining financing.

(iii)  To a joint powers agency, an infrastructure financing district, other public entity or non-profit corporation which assumes full responsibility for performance of the obligations of Concessionaire under this Agreement; or

(iv)  To a Security Holder as a result of such Security Holder foreclosing on Concessionaire's interest under this Agreement and the successor or assignee of such Security Holder.

(b)  Upon the transfer or assignment of this Agreement all the provisions hereunder shall survive and continue to be in full force and effect, including but not limited to, the provisions of Article XI.

Section 20.3.  <u>Interpretation.</u>  Unless the context clearly requires otherwise, words of masculine gender shall be construed to include the correlative words of feminine and neuter genders and vice versa, and words of singular number shall be construed to include correlative words of plural number and vice versa.  Words importing persons include firms, associations and corporations.  The words "herein", "hereby", "hereof" and "hereunder" and words of similar import refer to this Agreement and all the provisions hereof shall be liberally construed to effectuate the purposes set forth herein and to sustain the validity hereof.

Section 20.4.  <u>Notices.</u>  All notices, authorizations and other communication required under this Agreement shall be in writing and shall be personally delivered or sent by United States mail and postage prepaid, by Federal Express or similar courier service or by telecopier, facsimile or other forms of electronic transmission to the addresses of the Authority or Concessionaire as set forth below.  Communications shall be deemed delivered, in the case of delivery by personal service, electronic transmision or Federal Express or similar courier service, at the time of delivery or, in the case of mailing as provided above on the fifth business day after mailing.  A party may change its address for communications hereunder by giving notice of such change to the other party as provided in this Section.  Rejection or refusal to accept, or inability to deliver because of a change of address of which no

HTA_CONF 00011918

notice was given as provided herein, shall be deemed to be receipt of the notice sent.

To the Authority:

Centro Gubernamental Minillas
Edificio Sur, Piso 10
Santurce, P. R.
Tel.: 722-2265
Fax: 727-5456

To Concessionaire:

Calle A #23
Urb. Mario Julia
Puerto Nuevo, P. R. 00922
Tel.: 781-5066
Fax: 781-6520

Section 20.5. _Entire Agreement_. This Agreement and the exhibits hereto constitute the entire agreement between the parties relating to the subject matter hereof, and all prior and contemporaneous oral agreements relating to such subject matter are revoked and merged into this Agreement. The exhibits attached hereto are incorporated by reference as a part of this Agreement.

Section 20.6. _Parties_. This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

Section 20.7. _Headings_. The table of contents and headings of Articles and Sections herein are for convenience only and are not a part of this Agreement.

Section 20.8. _Counterparts_. This Agreement may be executed in counterparts, each of which shall be deemed to be an original but all of which, taken together, shall constitute one and the same instrument.

Section 20.9. _Disclaimers_.

(a) In all cases for which this Agreement provides a specific remedy, each party hereto shall be bound and limited to the remedy so provided.

(b) Concessionaire and the Authority shall at all times have the constitutional right to receive, in accordance with their respective interests in this Agreement, just compensation in the event of direct or inverse condemnation, or action equivalent to a taking of the rights or property hereunder.

56

HTA_CONF 00011919

Section 20.10. <u>Survival</u>. All representations and warranties made herein shall be true and correct as of the effective date of this Agreement and shall survive the closing hereunder.

Section 20.11. <u>Governing Law</u>. This Agreement shall be construed under and governed by the laws of Puerto Rico.

Section 20.12. <u>Waiver</u>. No failure by any party to insist upon the strict performance of any covenant, duty, obligation, term or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof, shall constitute a waiver of any such breach or any other covenant, duty obligation, term or condition. Any party may waive any of its rights or any conditions to its obligations hereunder, or any duty, obligation or covenant of any other party. No waiver shall affect or alter the remainder of this Agreement but each and every covenant, duty, obligation, term and condition hereof shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

Section 20.13. <u>Severability</u>. If any part of this Agreement is found to be invalid or unenforceable by a court having proper jurisdiction, such finding shall not invalidate the remaining portions hereof, but such provisions shall remain in full force and effect; provided, however, that the parties any immediately renegotiate, reasonably and in good faith, the term(s) or provision(s) found to be invalid, as well as any other terms and provisions as necessary to achieve as nearly as possible the parties' original contractual intent as evidenced hereby and in a manner which protects and preserves the parties' procedural, economic and remedial expectations as set forth herein.

Section 20.14. <u>Amendments</u>. This Agreement attempts to set forth in full all requirements applicable under the Act as to the design development, construction, operation, financing and maintenance of the private Transportation Facility and attempts to define in full the rights and responsibilities of each party in connection therewith. To the extent requirements and rights and responsibilities have not been addressed, the parties agree to negotiate reasonably and in good faith to obtain agreement. The parties agree to carry out their respective responsibilities in a spirit of cooperation, recognizing that they may not have defined in a sufficient detail or anticipated fully all activities necessary for the full implementation of the private Transportation Facility.

Section 20.15. <u>Further Assurances</u>. The parties hereto will execute, acknowledge and deliver or cause to be executed, acknowledged and delivered all such instruments and take all such action as the other party from time to time may reasonably request for better assuring to the other party of its rights hereunder.

57

HTA_CONF 00011920

**IN WITNESS WHEREOF,** the Authority and Concessionaire have executed this instrument as of the day and year first above written.


AUTHORITY:

PUERTO RICO HIGHWAY AND
TRANSPORTATION AUTHORITY

By: _____
      Jorge L. Rigas
      Executive Director

By: _____
      Hermenegildo Ortiz Quiñones
      Secretary of Transportation and
      Public Works


CONCESSIONAIRE:

AUTOPISTAS DE PUERTO RICO AND
COMPANY, S.E.

Autopistas Corporation
Managing Partner

By: _____
      Rubén Vélez Lebrón
      Chairman

By: _____
      José Antonio Estrada
      President


58

<u>C E R T I F I C A T I O N</u>

I, José R. Fernández, Secretary of the Board of Awards (the Board) created pursuant to Act No. 74, of June 23, 1965, as amended, DO HEREBY CERTIFY that attached hereto is a true and correct copy of the Resolution No. 3 duly adopted by the Board at the meeting duly called and held on December 6, 1991, at which all members were present. Said resolution has not been repealed, revoked, rescinded or amended, and is in full force and effect on the date hereof.

IN WITNESS WHEREOF, I SET my signature this 20th day of December 1991.

José R. Fernández
Secretary of the
Board of Awards

# BROWN & WOOD

ONE WORLD TRADE CENTER
NEW YORK, N.Y. 10048-0557

TELEPHONE: 212-839-5300
FACSIMILE: 212-839-5599

555 CALIFORNIA STREET
SAN FRANCISCO, CA. 94104-1715
TELEPHONE: 415-395-3900
FACSIMILE: 415-397-4621

10900 WILSHIRE BOULEVARD
LOS ANGELES, CA. 90024-3959
TELEPHONE: 310-443-0200
FACSIMILE: 310-208-8740

915 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C. 20006-4004
TELEPHONE: 202-223-0210
FACSIMILE: 202-223-0458

BLACKWELL HOUSE
GUILDHALL YARD
LONDON EC2V 5AE
TELEPHONE: 071-606-1866
FACSIMILE: 071-796-1807

December 20, 1991

Autopistas de Puerto Rico y Compañia, S.E.
San Juan, Puerto Rico

Puerto Rico Highway and Transportation Authority
San Juan, Puerto Rico

Gentlemen:

We have examined certified copies of the proceedings of the Secretary of Transportation and Public Works authorizing the execution and delivery of the Concession Agreement for the Final Design, Construction, Operation and Maintenance of a Privatized Transportation Facility, dated as of December 20, 1991 (the "Concession Agreement"), by and between Autopistas de Puerto Rico y Compañia, S.E. and Puerto Rico Highway and Transportation Authority (the "Authority"), certified copies of the proceedings of the Adjudications Board approving and ratifying the Concession Agreement, an executed counterpart of the Concession Agreement and such other proofs as we have deemed necessary as a basis for the following opinion.

Based upon the foregoing, and having regard for legal considerations which we deem relevant, we are of the opinion that the Authority has the legal capacity and authority to enter into the covenants and obligations set forth in the Concession Agreement and that the Concession Agreement constitutes the legal, valid and binding obligation of the Authority enforceable against the Authority in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency or other laws affecting creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Respectfully submitted,

Brown & Wood

RESOLUTION No. 3

A RESOLUTION RATIFYING A CONTRACT FOR THE
FINAL DESIGN, CONSTRUCTION, OPERATION AND
MAINTENANCE OF A BRIDGE OVER THE SAN JOSE
LAGOON AND AUTHORIZING THE EXECUTION THEREOF.

WHEREAS, by Act No. 4 of the Legislature of Puerto Rico
approved August 23, 1990, the Board of Awards of contracts for the
final design, construction, operation and maintenance of highways
was duly created (the "Board of Awards");

WHEREAS, by virtue of said Act No. 4 the Board of Awards is
authorized and empowered, among other things, to ratify contracts
to which Articles 4-A and 4-B of Act No. 4 refer,  once these have
been negotiated by the Secretary of Transportation and Public Works
(the "Secretary") and/or the Puerto Rico Highway and Transportation
Authority (the "Authority"); and

WHEREAS, the Authority has negotiated with Autopistas de
Puerto Rico y Compañía, S.E. ("Autopistas") a contract for the
final design, construction, operation and maintenance of a bridge
over the San José Lagoon (the "Contract");

NOW, THEREFORE, BE IT RESOLVED by the Board of Awards:

Section 1.   The Contract, as submitted, and subject to the
prior compliance with all the conditions precedent contained
therein, is hereby ratified, and the execution and delivery of the
Contract, as submitted, is hereby authorized, as provided herein.

Section 2.   Upon their execution and delivery, the Authority
and Autopistas shall submit to the Board of Awards for its review
such opinions and certificates as are or may be required by the
Contract and/or the Financing Documents (as that term is defined in
the Contract).

Section 3.   The financing plan and structure contemplated by
the Contract shall be subject to the final review and approval by
the Government Development Bank.

Section 4.   Any material amendments to the Contract, as
submitted, and the execution of such amended Contract, shall be
subject to the ratification and approval by the Board of Awards,
acting thorough its president.

Section 5.  The Board of Awards shall retain jurisdiction over
this matter until its conclusion.

## TRIAS, ACEVEDO & OTERO

1900 POPULAR CENTER
HATO REY, PUERTO RICO 00918-1052

José Trías Monge
Francisco L. Acevedo
Eugenio Otero Silva
Arturo Trías
Peter J. Trías
Héctor Meléndez Cano
Roberto E. Vega Pacheco
Héctor Pabón Vega
Miguel R. Garay-Aubán
Ena Acevedo Ramos
Ana T. Ruiz Comas
Manuel E. Izquierdo
Liana González García
Ana Raquel Santiago

Tels. (809) 753-7777
753-7704
P O Box 366283
San Juan, P R 00936-6283

Telecopier
(809) 751-3405

December 20, 1991

Autopistas de Puerto Rico y
    Compañía, S. E.
Banco Central Building
Suite 708
Hato Rey, P. R. 00918

Gentlemen:

We have examined Act No. 74 of the Legislature of Puerto Rico,
approved June 23, 1965, as amended (the "Act") creating the Puerto
Rico Highway and Transportation Authority (the "Authority"), a body
corporate and politic constituting a public corporation and
governmental instrumentality of the Commonwealth of Puerto Rico
(the "Commonwealth").

We have also examined certified copies of the proceedings of
the Board of Awards of contracts for the final design,
construction, operation and maintenance of highways (the "Board of
Awards") created by Act No. 4 of the Legislature of Puerto Rico,
approved August 23, 1990, ratifying (subject to certain conditions)
and authorizing the execution of a certain Concession Agreement for
the Final Design, Construction, Operation and Maintenance of a
Privatized Transportation Facility (the "Concession Agreement")
between the Authority and Autopistas de Puerto Rico y Compañía,
S.E. (the "Concessionaire"), and certified copies of the
proceedings of the Secretary of Transportation and Public Works
authorizing the execution and delivery by the Authority of the
Concession Agreement.

We have also examined executed counterparts of the Concession
Agreement, and originals, or copies otherwise authenticated to our
satisfaction, of such other documents, records, certificates,
instruments or opinions as we have deemed necessary or appropriate
as a basis for our opinions hereinafter expressed.

In our examination we have assumed the genuineness of all
signatures, the authenticity of all documents, certificates and
instruments submitted to us as originals, and the conformity to
originals of all documents, certificates and instruments submitted
to us as reproduced or certified copies.

HTA_CONF 00011925

TRIAS, ACEVEDO & OTERO

Autopistas de Puerto Rico                                              -2-
December 20, 1991


     As to any questions of fact material to our opinion, we have
relied upon the representations of the Authority and the
Concessionaire contained in the Concession Agreement, the certified
proceedings and other certifications by officials of the Board of
Awards, the Secretary of Transportation and Public Works, the
Authority and the Concessionaire without undertaking to verify the
same by independent investigation.

     Based upon such examination, we are of the opinion as of the
date hereof and under existing law:

     1.   The Act is valid.

     2.   The proceedings of the Board of Awards and of the
Secretary of Transportation and Public Works required in connection
with the ratification, authorization, execution and delivery of the
Concession Agreement have been validly and legally taken.

     3.   The Concession Agreement has been duly authorized,
executed and delivered by the Authority and, assuming its due
authorization, execution and delivery by the Concessionaire and the
compliance with all the conditions precedent contained therein,
constitutes the legal, valid and binding obligation of the
Authority enforceable against the Authority in accordance with its
terms, except as enforceability may be limited by bankruptcy,
insolvency or other laws affecting creditor's rights generally and
by general principles of equity.

     This opinion may be relied upon solely by the persons to whom
it is addressed, unless otherwise expressly authorized by us in
writing.

                              Very truly yours,

                              *Trias, Acevedo & Otero*

                              TRIAS, ACEVEDO & OTERO

kf

*— N. Hass*
*— atender este particular*
*Ale*

# AUTOPISTAS DE PUERTO RICO
## Y COMPAÑIA S.E.

31 de mayo de 2001

Dr. José Francisco Lluch García
Director Ejecutivo
**Autoridad de Carreteras y Transportación (ACT)**
Centro Gubernmental Minillas
Torre Sur, Piso 10
Santurce, P.R. 00908

Estimado doctor Lluch:

De acuerdo con la Sección 7 del "Exhibit G" del Contrato de Concesión, le adjunto el presupuesto
y las estimaciones correspondientes al año fiscal 2001-2002.

Cordialmente,

Pedro J. Zapata
Contralor

ams

Anejo

acosta\letter\LLUCH-PRESUPUESTO 2001.wd

Calle Montellano (Final), Sector Embalse San José, San Juan, Puerto Rico 00923
P.O. Box 2780, Carolina, Puerto Rico 00984-2780
Tel: (787) 767-9191 ◦ Fax (787) 767-9199
http://www.puentetmoscoso.com ◦ e-mail: puente@puentetmoscoso.com

05314001027

HTA_CONF 00011927

# PRESUPUESTO OPERACIONAL GENERAL
## AÑO FISCAL 01-02

A: ESTIMACION DE INGRESOS

INGRESOS TOTALES                    $14,414,310

B: PRESUPUESTO DE MANTENIMIENTO Y OPERACIONES

| | |
|---|---:|
| 1-PERSONAL FIJO APR | 810,964 |
| 2- PERSONAL SUBCONTRATADO DE PEAJE | 599,798 |
| 3-MANTENIMIENTO | 284,646 |
| 4- UTILIDADES | 143,673 |
| 5- VEHICULOS | 81,446 |
| 6- MATERIAL DE PEAJE | 15,387 |
| 7- GASTOS DE OFICINA | 96,423 |
| 8- SEGUROS | 296,031 |
| 9- MERCADEO Y RELACIONES PUBLICAS | 648,171 |
| 10-SERVICIOS PROFESIONALES | 69,000 |
| 11- GASTOS GENERALES | 264,200 |
| 12- GASTOS DE MANEJO DE FONDOS | 118,661 |
| 13- GASTOS FISCALES | 63,600 |
| 14- GASTOS EXTRAORDINARIOS | 60,000 |
| | ----------------- |
| | 3,552,000 |

C: PROVISIONES:

| | |
|---|---:|
| 1- INTERESES A LOS BONISTAS A CORTO PLAZO Y SERVICIOS DEL ACREEDOR | 7,140,585 |
| 2- RENEWAL AND REPLACEMENT FUND" | 150,000 |
| | ----------------- |
| | 7,290,585 |

D: ESTIMACION:

| | |
|---|---:|
| 1- BASE RETURN | 3,571,725 |