# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3567-LTS |

**THE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY'S LIMITED OBJECTION TO SECTION 2.4 OF THE THIRD AMENDED TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................. 4

ARGUMENT .................................................................................................... 6

    I.    THE TITLE III COURT DOES NOT HAVE AUTHORITY TO
    CONFIRM THE PLAN WITH THE PROVISIONS OF SECTION 2.4. ............. 6

        A.    This Court Lacks Jurisdiction To Compel Non-Debtor Third
             Parties To Take The Actions Required By Section 2.4 Of The Plan......... 6

        B.    PROMESA Section 303 Expressly Preserves Certain Government
             Functions That Cannot Be Impaired Under A Plan of Adjustment. .......... 9

    II.    THE PROVISIONS OF SECTION 2.4 OF THE PLAN ARE NOT
    NECESSARY FOR IMPLEMENTATION OF THE PLAN. ............................ 12

CONCLUSION ................................................................................................ 189

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gupta v. Quincy Med. Ctr.*,
  858 F.3d 657 (1st Cir. 2017) ......................................................................... 7

*In re Irving Tanning Co.*,
  496 B.R. 644 (1st Cir. BAP 2013) ............................................................... 12

*In re The Fin. Oversight & Mgmt. Bd. for P.R.*,
  583 B.R. 626 (D.P.R. 2017) ............................................................... 9, 10, 13

**Statutes**

48 U.S.C. § 2128(a)(2) ................................................................................... 11

48 U.S.C. § 2141(b)(1)(F) .............................................................................. 11

48 U.S.C. § 2144(a)(5) ................................................................................... 11

48 U.S.C. § 2163 ........................................................................................ 3, 9

48 U.S.C. § 2166(a) ......................................................................................... 7

48 U.S.C. § 2174(b)(7) ................................................................................ 3, 9

**Other Authorities**

2022 HTA Fiscal Plan, ch. 1, *available at*
  https://drive.google.com/file/d/1TRpSafLdOjpXLtzBqkjSPdfXpSWFfj4F/view
  (last visited Jul. 26, 2022) ................................................................ 2, 4, 5, 11

ii

To the Honorable United States District Judge Laura Taylor Swain:

The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") supports approval of the debt restructuring for the Puerto Rico Highways and Transportation Authority ("HTA") set forth in the *Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority*, as filed on June 17, 2022 [ECF No. 1240] (the "HTA Plan of Adjustment" or the "Plan").[1]  However, AAFAF, through its undersigned counsel, submits this limited objection (the "Objection") to Section 2.4 of the Plan because it seeks to exert operational control over governmental entities in a manner inconsistent with PROMESA and is unnecessary for the implementation of the Plan and debt restructuring transactions contemplated therein. Notwithstanding this Objection, the Government remains willing to work with the Board to resolve open issues regarding Section 2.4 of the Plan.  The Government is hopeful that a resolution of these issues can be reached prior to the Plan's confirmation hearing. If the Government and Board are able to reach a mutually agreeable alternative to Section 2.4, then the Government will withdraw this Objection.

## PRELIMINARY STATEMENT

1.      The proposed Plan reflects significant cooperation between the Government of Puerto Rico (the "Government") and the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or the "Board") to achieve a sustainable debt restructuring for HTA that will re-establish HTA's access to the capital markets, fairly repay creditors, and ensure fiscal responsibility for years to come.  The Government supports approval of the debt restructuring, but it objects to Plan provisions that (a) require HTA to take on certain functions of different

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan. Unless otherwise noted, references to ECF docket numbers refer to filings in HTA's Title III case under Case No. 17-3567-LTS.

government agencies; (b) require non-debtor governmental agencies to take on functions of HTA; and (c) govern operations of a governmental non-debtor that performs vital functions in the transportation sector.  No legal basis exists for the Plan to include these provisions.  Accordingly, the Government objects to the operational restructuring provisions of Section 2.4 of the Plan and urges the Court to condition Plan confirmation on removal of those provisions.

2.      The HTA Plan of Adjustment adopts certain provisions of the Fiscal Plan for HTA, certified on February 22, 2022 (the "2022 HTA Fiscal Plan"), in which the Board proposed an overall transportation sector restructuring that would separate HTA's Transit Assets[2] from its Highway Assets.[3]  Through Section 2.4 of the Plan, the Board seeks an order requiring HTA to transfer its Transit Assets to the Puerto Rico Integrated Transit Authority ("PRITA")—a non-debtor Commonwealth instrumentality.  PRITA has no say in this matter.  The order would further require non-debtor PRITA to accept, operate and pay for those assets, while HTA retains its Highway Assets.[4]  In addition, Section 2.4 of the Plan would compel HTA to assume management responsibilities that currently belong to the Puerto Rico Department of Transportation and Public Works ("DTOP"), a non-debtor Commonwealth executive branch agency, into newly reorganized HTA.[5]  The Plan further purports to require DTOP to relinquish its current responsibilities and obligations related to the management of Puerto Rico's non-toll roads.

---

[2] "Transit Assets" are defined in the Plan as "Tren Urbano."  Plan § 1.287.

[3] "Highway Assets" are defined in the Plan as "Collectively, the Toll Facilities and the toll-free road in Puerto Rico, managed, operated or maintained by HTA."  Plan § 1.149.

[4] *See* Plan § 2.4; *see also* 2022 HTA Fiscal Plan, ch. 1 at 11-16, *available at* https://drive.google.com/file/d/1TRpSafLdOjpXLtzBqkjSPdfXpSWFfj4F/view (last visited Jul. 26, 2022).

[5] *See* Plan § 2.4(b).  Toll road assets and non-toll road assets are not specifically defined in the Plan.

3.     Under PROMESA, this Court lacks authority to enter such an order.   The
Commonwealth, PRITA, and DTOP are not Title III debtors subject to this Court's jurisdiction—
PRITA has never been a Title III debtor and the Commonwealth (including its agency DTOP) is
no longer a debtor after emerging from its Title III case as of March 15, 2022.   Because the Court
cannot mandate that non-debtor third parties cede their property or governmental functions to a
debtor under a Title III plan of adjustment, the Plan cannot be confirmed unless Section 2.4 is
deleted.

4.     Not only are the Plan's provisions not expressly authorized under PROMESA, they
are barred by PROMESA section 303, which expressly preserves the Government's exercise of its
"political and governmental powers" over non-fiscal matters, including how the Government
structures the operations of its public companies such as HTA.   While Title III requires a plan of
adjustment to be consistent with a fiscal plan,[6] it does not permit every provision of the 2022 HTA
Fiscal Plan to be imported into the HTA Plan of Adjustment.   Whatever powers the Board has to
enforce a certified fiscal plan pursuant to Titles I and/or II of PROMESA (which the Government
does not concede permit enforcement of the operational provisions contained in Section 2.4), the
Board does not have those powers in connection with this plan confirmation proceeding under
Title III.[7]

5.     While not a relevant legal issue, AAFAF notes that striking these impermissible
provisions of the proposed Plan will not undermine the negotiated transaction to be implemented

_____

[6] *See* PROMESA § 314(b)(7); 48 U.S.C. § 2174(b)(7) ) ("The Court shall confirm a plan if . . . (7) the plan
is consistent with the applicable Fiscal Plan certified by the Oversight Board under title II.").

[7] The Government reserves all rights to dispute the Board's authority to enforce any of Section 2.4's
operational provisions under its authority under Titles I and/or II of PROMESA, should the Board attempt
to do so in a separate proceeding.

through the Plan.  The covenants creditors bargained for in the New HTA Bonds Indenture[8]—
which, among other things, require (a) toll-road revenues to be deposited in a segregated account
held by the Trustee, (b) the appointment of a Consulting Engineer that will have sole discretion to
determine the costs of HTA's toll facility operations, and (c) the appointment of a Traffic
Consultant to ensure HTA's compliance with sustainable toll rates—are specifically designed to
ensure that toll-road revenues are sufficient to pay bonds issued under the Plan, protected from
diversion, and available in sufficient amounts to maintain efficient toll-road operations.  This last
point is critical:  maintaining efficient toll-road expenses both protects collateral for the New HTA
Bonds and will keep toll road properly cared for to the benefit the people of Puerto Rico.  These
protections are also integrated into the Plan and proposed HTA Confirmation Order.  Section 2.4
is not necessary to achieve these goals.

6.      Accordingly, AAFAF requests the Court to condition confirmation of the HTA Plan
of Adjustment on the removal of the provisions contained in Section 2.4 of the Plan.

## BACKGROUND

7.      On February 22, 2022, the Board certified the 2022 HTA Fiscal Plan.  Under that
fiscal plan, the Board proposed an overall transportation sector reform that "calls for the
segmentation of transport assets across three distinct classes:  non-toll roads, toll roads and an
integrated transit system."[9]  To implement this approach, the 2022 HTA Fiscal Plan prescribes
(i) integrating all transit assets under PRITA; (ii) maintaining toll road and non-toll roads under

---

[8] The New HTA Bonds Indenture has been filed as Exhibit A to the *Plan Supplement and Plan Related
Documents of the Puerto Rico Highways and Transportation Authority*, dated July 20, 2022 [ECF No.
1279].

[9] 2022 HTA Fiscal Plan, ch. 1 at 12, *available at*
https://drive.google.com/file/d/1TRpSafLdOjpXLtzBqkjSPdfXpSWFfj4F/view (last visited Jul. 26,
2022).

4

HTA with a ring-fenced structure between these asset classes; and (iii) preparing and advancing a future toll-road concession for further structural independence through a potential public-private partnership ("P3") transaction.[10]

8.    On May 2, 2022, the Board filed its initial version of the HTA Plan of Adjustment, which was later amended as the current version of the Plan on June 17, 2022.  In each iteration of the Plan, the Board included Section 2.4 to impose an operational reorganization on HTA, the Commonwealth, PRITA, and DTOP similar to the transportation sector reform proposed in the 2022 HTA Fiscal Plan.  Section 2.4 of the Plan provides that:

> **2.4 HTA Operational Restructuring**:  On or as soon as practicable following the HTA Effective Date, including, without limitation, upon approval of the United States Department of Transportation Federal Transit Administration, Reorganized HTA shall be operationally restructured through the separation of the Highway Assets from the Transit Assets, with such Transit Assets and all Transit Revenues being transferred to PRITA.
>
> **(a) Transit Assets.**  The Transit Assets shall be supported by the Transit Revenues and by such other expressly identified, dedicated revenue stream, or revenue streams of PRITA or the Commonwealth, as the case may be, sufficient to cover the Transit Assets' operational and maintenance expense deficits and capital improvement expenditure needs and approved as adequate for such purposes by the United States Department of Transportation Federal Transit Administration and the Oversight Board.
>
> **(b) Highway Assets.**  From and after the HTA Effective Date, Reorganized HTA shall retain the Highway Assets and, as soon as practicable thereafter, such Highway Assets shall be operationally and financially separated between Toll Road Assets and non-toll road assets, with a "Ring-Fenced" structure and allocation of cost and expenses implemented, including, without limitation, (i) the internal separation of legal, financial and operational functions and the establishment of separate Toll Road Assets and non-toll road

---

[10] *See id.*  On July 25, 2022, the Board sent the Government a letter pursuant to PROMESA section 201(a) setting forth a schedule for revising the 2022 HTA Fiscal Plan and HTA's fiscal year 2023 budget in anticipation of Plan confirmation.  Under the Board's proposed schedule, the 2022 HTA Fiscal Plan is expected to be revised and re-certified by August 30, 2022 and HTA's fiscal year 2023 budget by September 6, 2022.

assets management offices, and (ii) the consolidation of all non-toll-road management responsibilities of the Puerto Rico Department of Transportation and Public Works with and into Reorganized HTA.

**(c) Inventory of Highway Assets.**  From and after the HTA Effective Date, Reorganized HTA shall use its reasonable best efforts to inventory all available Highway Assets and provide such inventory to the Oversight Board.

9.      With respect to Section 2.4(a) of the Plan, the Government is currently in the process of transferring the Transit Assets to PRITA, including among other things, by seeking approval of the United States Department of Transportation and the Federal Transit Administration.  However, the Government's actions to voluntarily pursue the transfer of the Transit Assets to PRITA does not mean that either the Board or this Court can compel the Government to do so under the Plan.

## ARGUMENT

### I.      THE TITLE III COURT DOES NOT HAVE AUTHORITY TO CONFIRM THE PLAN WITH THE PROVISIONS OF SECTION 2.4.

#### A.      This Court Lacks Jurisdiction To Compel Non-Debtor Third Parties To Take The Actions Required By Section 2.4 Of The Plan.

10.     The provisions of Section 2.4 of the Plan would require non-debtors PRITA and the Commonwealth to take certain actions that this Court cannot compel.  Under Section 2.4(a), non-debtors PRITA and the Commonwealth would be required to, among other things, allocate dedicated revenue streams to support the Transit Assets.  And Section 2.4(b) would also require non-debtor Commonwealth agency DTOP to relinquish its current management responsibilities and obligations related to non-toll roads.  The Court cannot grant this relief under the Plan because PRITA and the Commonwealth (including its agency DTOP) are non-debtor third parties over which the Court does not have jurisdiction.

6

11.     Under Title III, the Court only has jurisdiction to control the actions of a Title III debtor.  *See* PROMESA § 306(a); 48 U.S.C. § 2166(a) ("The district courts shall have . . . original and exclusive jurisdiction of all cases under this title; and . . . original but not exclusive jurisdiction of all civil proceedings arising under this title, or arising in or related to cases under this title."). PRITA has never submitted to this Court's jurisdiction because it has not filed a Title III case. And the Commonwealth (including its agency DTOP) is no longer a Title III debtor as a result of the confirmation of the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated January 14, 2022 [ECF No. 19813-1] (the "Commonwealth Plan of Adjustment"), which became effective on March 15, 2022.  In the Commonwealth Plan of Adjustment, this Court retained jurisdiction over matters arising in or related to the Title III cases covered by the Commonwealth Plan of Adjustment (namely, the Commonwealth, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority) and those matters expressly reserved under Section 91.1 of that plan.[11]  But as the First Circuit has held, any retained "related to" jurisdiction is limited only to matters "which potentially have some effect on the bankruptcy estate, such as altering ***debtor's*** rights, liabilities, options, or freedom of action, or otherwise have an impact upon the handling and administration of the bankruptcy estate." *Gupta v. Quincy Med. Ctr.*, 858 F.3d 657, 663 (1st Cir. 2017) (interpreting and applying the language of 28 U.S.C. § 1334, which is identical to the language of PROMESA § 306(a)) (emphasis added).  Because the operational restructuring of HTA is not related to the Commonwealth's restructuring or implementation of the Commonwealth Plan of Adjustment and would alter the rights and freedom of action of several non-debtors, the Court does not have jurisdiction to compel PRITA and the

---

[11] *See* Commonwealth Plan of Adjustment § 91.1 (Reservation of Jurisdiction).

7

Commonwealth (including its agency DTOP) to take any actions necessary to effectuate Sections 2.4(a) and 2.4(b) of the HTA Plan of Adjustment.

12.     Importantly, by the Board's own descriptions, HTA, PRITA and DTOP are separate entities with unique roles and responsibilities related to the transportation system. The Board has acknowledged that Puerto Rico's "transportation system falls under the organizational structure of [DTOP], which includes [HTA] and [PRITA]," wherein "asset ownership is fragmented across Puerto Rico's transportation entities."[12]  But HTA is "a separate entity from DTOP for purposes of financing and constructing Puerto Rico's transportation system."[13]  Although HTA must execute its responsibilities "in accordance with the DTOP's overall transportation policies" and "in coordination with the Secretary of DTOP," HTA has "the complete control and supervision of any highway and other transportation facilities owned, operated or constructed by it," including "the ability to set tolls and other charges for the use of the highway and other transportation facilities; and the power to issue bonds, notes, and other obligations."[14]  The Board has also acknowledged that "HTA has historically received significant fiscal support from the Commonwealth . . . to fund necessary maintenance and capital expenditures,"[15] but "the existence of these appropriations is subject to revision, in line with the broader priorities of the Commonwealth."[16] Thus, the Board suggests in the 2022 HTA Fiscal Plan that "HTA should leverage DTOP's help to estimate what additional resources would be required to carry out non-toll road maintenance . . . [so that] any

---

[12] 2022 Fiscal Plan for Puerto Rico, as certified on January 27, 2022 (the "2022 Commonwealth Fiscal Plan"), *available at* https://drive.google.com/file/d/1STrf0ksj1Sqc54UkABGcjyrbIZvc_JEm/view (last visited Jul. 28, 2022), at 156.

[13] Disclosure Statement [Case No. 17-3283-LTS, ECF No. 21269], at 43.

[14] *Id.*

[15] 2022 HTA Fiscal Plan, at 30.

[16] *Id.* at 31.

funding implications can be determined (e.g., size of the general Commonwealth transfer)."[17]

These statements show the Board's understanding that HTA is a distinctly separate instrumentality

from PRITA and from the Commonwealth and its executive branch agency DTOP, such that

Section 2.4's mandate for their financial support would require non-debtors PRITA and the

Commonwealth (including DTOP) to act and provide funding to HTA and make operational

changes in a manner that is outside the Court's "related to" jurisdiction over the Commonwealth

and the Commonwealth Plan of Adjustment.  Because the Court does not have jurisdiction to

mandate the actions of non-debtors required by Section 2.4, confirmation of the Plan should be

conditioned on the elimination of those provisions from the Plan.

**B.     PROMESA Section 303 Expressly Preserves Certain Government Functions
That Cannot Be Impaired Under A Plan of Adjustment.**

13.     While PROMESA section 314(b)(7) requires that a Plan be "consistent with the

applicable Fiscal Plan certified by the Oversight Board under title II,"[18] not all fiscal plan

provisions are permitted or required to be included in a Title III plan of adjustment.  In particular,

PROMESA section 303 expressly carves out certain Government functions that cannot be

impaired under a plan of adjustment.  Section 303 specifically provides that Title III "does not

limit or impair the power of a covered territory to control, by legislation or otherwise, the territory

or any territorial instrumentality thereof in the exercise of the political or governmental powers of

the territory or territorial instrumentality . . . ."[19]  This means that the Plan cannot include

provisions that would limit or impair the Government's political or governmental powers.  *See In

re The Fin. Oversight & Mgmt. Bd. for P.R.*, 583 B.R. 626, 635 (D.P.R. 2017) (in applying

---

[17] *Id.* at 14.

[18] 48 U.S.C. § 2174(b)(7).

[19] 48 U.S.C. § 2163.

PROMESA section 303 to the appointment of a chief transformation officer for PREPA, finding that "nothing in Titles I and II permits the [Board] to displace local government structures and authority by declaration").

14.    Section 2.4 of the Plan impermissibly limits the Government's political and governmental powers because it seeks to control the operational functions of HTA, PRITA and DTOP.  The operational function of a Government entity constitutes a quintessential governmental power because how the Government structures its operations necessitates policy decisions that elected and appointed officials must make to efficiently deploy essential services.  Congress made clear through PROMESA section 303 that this Court cannot use a plan of adjustment to interfere with a debtor's political and governmental powers and prerogatives.  And while this Court has previously held that the Board may use its "guidance, gatekeeping, and enabling powers" to "provide guardrails for the territorial government on its journey to fiscal credibility and responsibility," it cannot "supplant, bypass, or replace the Commonwealth's elected leaders and their appointees in the exercise of their managerial duties whenever the Oversight Board might deem such a change expedient."  *Id.* at 634.  Because this is exactly what Section 2.4 of the Plan does, that section is improperly included in the Plan and should be eliminated.

15.    While the provisions of Section 2.4 are lifted from the 2022 HTA Fiscal Plan, the Board's attempt to imbed these operational restructuring provisions in the HTA Plan of Adjustment oversteps its specific fiscal plan enforcement powers under Titles I and II of PROMESA.  PROMESA sections 108, 201, and 204 provide the full extent of the Board's powers to certify and enforce fiscal plans:

- Section 108(a)(2) authorizes the Board to prevent the implementation of Government policies that would "impair or defeat the purposes of [PROMESA]."[20]

- Section 201(b)(1)(F) permits the Board to certify a fiscal plan that "improve[s] fiscal governance, accountability, and internal controls."[21]

- Section 204(a)(5) provides that "the Oversight Board may take such actions as it considers necessary, consistent with [PROMESA] to ensure that the enactment or enforcement of the law will not adversely affect the territorial government's compliance with the Fiscal Plan."[22]

16.    The Board has stated that the 2022 HTA Fiscal Plan seeks to accomplish Section 201(b)(1)(F)'s goals of improved fiscal governance through a reorganization of Puerto Rico's transportation assets into transportation mode-specific entities.[23]   Although the Government disagrees with the Board's specific approach, the Board's inclusion of these provisions in the 2022 HTA Fiscal Plan is not the subject of this Objection and the Government reserves all rights to object if the Board seeks to enforce the operational restructuring provisions of the 2022 HTA Fiscal Plan in a separate proceeding.  Rather, it is their inclusion in the Plan that renders them problematic and improper.

17.    If the HTA Plan of Adjustment is confirmed with Section 2.4 intact, the Court would effectively be giving the Board an additional enforcement mechanism that PROMESA does not authorize.  Specifically, the Board could argue that any failure to implement operational

---

[20] 48 U.S.C. § 2128(a)(2).

[21] *Id.* § 2141(b)(1)(F).

[22] *Id.* § 2144(a)(5).

[23] 2022 HTA Fiscal Plan, ch. 1 at 12, available at
https://drive.google.com/file/d/1TRpSafLdOjpXLtzBqkjSPdfXpSWFfj4F/view (last visited Jul. 25, 2022).

restructurings—whether through a P3 transaction or otherwise—violates the Plan and confirmation order, thus providing the Board with an additional ability to seek this Court's intervention to force HTA to implement the asset separation in the precise manner set forth in the Plan. That additional enforcement mechanism is not authorized under PROMESA.

18.    The Board's ability to enforce the operational restructuring in the 2022 HTA Fiscal Plan is limited only to its express powers under Title I and II of PROMESA, and those powers cannot be extended by imbedding the HTA operational restructuring provisions in the Plan.

## II.    THE PROVISIONS OF SECTION 2.4 OF THE PLAN ARE NOT NECESSARY FOR IMPLEMENTATION OF THE PLAN.

19.    The First Circuit has recognized that Bankruptcy Code section 1123(a)(5)[24] requires provisions that are "sufficient to implement the plan, equal to what is required, but also not more than is required."[25]  The Court should not order plan provisions "that are superfluous or unnecessary."[26]  Here, Section 2.4 is unnecessary for the Plan's implementation. As discussed above, Section 2.4 would require the Commonwealth, its agency DTOP, and PRITA—all of which are non-debtors—to either receive and accept HTA assets, provide significant financial contributions in support of the Transit Assets, or fundamentally modify responsibilities and obligations related to the non-toll road assets.  In addition to the fact that the Court lacks jurisdiction over these non-debtors to grant such relief, these operational restructuring provisions are not necessary to effectuate the debt restructuring transactions under the Plan.

20.    The covenants in the New HTA Bonds Indenture were negotiated to ensure that toll-road revenues are not used to offset losses caused by the Transit Assets or to fund operations

---

[24] Incorporated into PROMESA by section 301(a).

[25] *In re Irving Tanning Co.*, 496 B.R. 644, 663-64 (1st Cir. BAP 2013).

[26] *Id.* at 664.

related to the non-toll road assets.  They were specifically designed to "ring-fence" HTA's toll revenues and toll facility expenses.  Accordingly, the New HTA Bonds Indenture already includes several provisions specifically designed to ensure that HTA revenues are allocated appropriately. These guardrails are precisely the type of "guidance, gatekeeping, and enabling powers" that Congress authorized the Board to use in guiding HTA on its journey to fiscal credibility and responsibility without "supplant[ing], bypass[ing], or replac[ing]" HTA's current operational structure. *In re The Fin. Oversight & Mgmt. Bd. for P.R.*, 583 B.R. at 634.  By directly addressing the Board's concerns related to how HTA's post-confirmation revenues are used, the New HTA Bonds Indenture protects those revenues from internal misuse such that Section 2.4's operational restructuring of HTA is unnecessary to implement the Plan.

21.     Specifically, the New HTA Bonds Indenture provides that:

- All Toll Road Revenues must be transferred to the Escrow Account when paid, and the Escrow Agent will be directed to transfer the Toll Road Revenues (such revenues are included as "Toll Receipts" as defined in the New HTA Bonds Indenture) to a Toll Receipts Fund held by the Trustee.[27]

- The Trustee must make monthly transfers from the Toll Receipts Fund in accordance with a Monthly Disbursement Schedule with the following flow of funds:  (i) first to pay Annual Trustee Fees; then (ii) two months of operating expenses for Toll Facilities as determined by the Annual Budget; then (iii) one-sixth and one-twelfth of annual debt service on the New HTA Bonds; the (iv) to fund a reserve for an additional two months of operating expenses of Toll Facilities as determined by the Annual Budget; then (v) a deposit into the Renewal and Replacement Fund for capital expenses of Toll Facilities

---

[27] *See* New HTA Bonds Indenture §§ 1.02 (definition of "Toll Receipts") and 5.04.

as determined by the Annual Budget; then (vi) the appropriate payment for debt service on Subordinated Indebtedness; and finally (vii) a transfer to the General Reserve Fund, which is used only to pay debt service or Toll Facility related costs.[28]

- Any excess Toll Revenues are never released from the Toll Receipts Fund.[29]

- HTA must appoint a Consulting Engineer from a list of Board-approved candidates[30] and will have the following roles and responsibilities:

  o The Consulting Engineer has the sole discretion to determine the annual Costs of Operating, Maintenance and Administration of Toll Road Facilities,[31] and must review the Annual Budget and each Monthly Disbursement Schedule.[32]

  o HTA is not permitted to expend Costs of Operating, Maintenance and Administration that exceed amounts established by the Consulting Engineer and set forth in the Annual Budget.[33]

  o The Consulting Engineer will be responsible for approving HTA's calculation of Net Receipts for the Additional Bonds test.[34]

  o For purposes of the Rate Covenant, the Consulting Engineer must prepare an annual projection of (a) the Required Deposits and (b) Annual Debt Service on Subordinated Indebtedness.[35]

---

[28] *See* New HTA Bonds Indenture §§ 5.05 and 5.10.

[29] *See id.*

[30] *See id.* § 1.02 (definition of "Consulting Engineer").

[31] *See id.* § 1.02 (definition of "Cost of Operation, Maintenance and Administration").

[32] *See id.* § 7.02.

[33] *See id.* § 7.02(a)(vii).

[34] *See id.* § 2.04(b).

[35] *See id.* § 7.01(c)(ii).

- In the event that amendments to the Annual Budget result in a 5% decrease in Net Revenues, the Consulting Engineer must deliver a report explaining the amendments made to the Annual Budget, and what actions, if any, HTA should take to decrease Costs of Operation, Maintenance and Administration and/or to increase Net Receipts to the level set forth in the Annual Budget.[36]

- HTA must also appoint a Traffic Consultant from a list of Board-approved candidates[37] with the following roles and responsibilities:

  - The Traffic Consultant must approve HTA's calculation of Net Receipts for the Additional Bonds test.[38]

  - For purposes of the Rate Covenant, the Traffic Consultant must prepare an annual projection of Toll Receipts.[39]

  - If HTA fails to comply with the Rate Covenant, the Traffic Consultant must conduct a study and recommend a schedule of Tolls that will provide sufficient Toll Receipts in the current or succeeding Fiscal Year to comply with the Rate Covenant.[40]

  - The Traffic Consultant must review the Annual Budget and each Monthly Disbursement Schedule.[41]

---

[36] *See id.* § 7.02(a)(vi).

[37] *See id.* § 1.02 (definition of "Traffic Consultant").

[38] *See id.* § 2.04(b).

[39] *See id.* § 7.01(c)(i).

[40] *See id.* § 7.01(d).

[41] *See id.* § 7.02(a)(i).

- o If HTA wants to reduce tolls, then the Traffic Consultant must prepare a projection of Toll Receipts based on the proposed toll rate reduction.[42]

- o If HTA wants to increase tolls or otherwise change the toll structure, it cannot do so until the Traffic Consultant delivers an opinion that such change will not cause non-compliance with the Rate Covenant.[43]

- o If any amendments to the Annual Budget result in a 5% decrease in Net Revenues, the Traffic Consultant must deliver a report explaining amendments to the Annual Budget and what actions, if any, HTA should take to increase Net Receipts to the level set forth in the Annual Budget.[44]

- o The Traffic Consultant must also approve HTA's calculation of Net Receipts for any Partial Disposition of the Toll Facilities.[45]

- In addition, HTA covenants that it will (i) operate the Toll Facilities in conformity with applicable law,[46] and (ii) establish reasonable rules and regulations governing the use and operations of the Toll Facilities.[47]

22.     As a result of these covenants in the New HTA Bonds Indenture, HTA will have a mechanism in place to ensure that the Plan can be implemented by segregating toll-road revenues so that funds are available to pay both the New HTA Bonds and the toll-road operating expenses

---

[42] *See id.* § 7.01(f).

[43] *See id.* § 7.01(g).

[44] *See id.* § 7.02(a)(vi).

[45] *See id.* § 7.18(b).

[46] *See id.* § 7.03(a).

[47] *See id.* § 7.03(b).

authorized by the Consulting Engineer, while toll rates are established and monitored by the Transit Consultant.[48]

23.     But here, the operational restructuring provisions improperly attempt to fundamentally change the operations of non-debtors to modify the operations of HTA beyond the scope of what a plan of adjustment is meant to accomplish.  Deleting Section 2.4 would not undermine the viability of the Plan's core debt restructuring transactions.  Going further, by requiring HTA (and non-debtors) to implement the exact measures in Section 2.4, the Plan creates unnecessary duplication by (i) requiring the segregation of toll road and non-toll road assets immediately after Plan confirmation when a similar separation could occur within the next year through a P3 transaction, and (ii) adding additional segregation expenses when the guardrails provided under the New HTA Bonds Indenture already accomplish the same objectives in a more cost-effective manner.

24.     In lieu of deleting Section 2.4 in its entirety, the Government would be willing to withdraw its objections if Section 2.4 is modified to provide the following:

### 2.4 HTA Operational Restructuring:

**(a) Consistent with Puerto Rico law and agreements between HTA and PRITA, o**n or as soon as practicable following the HTA Effective Date, including, without limitation, upon approval of the United States Department of Transportation Federal Transit Administration, Reorganized HTA ~~shall be operationally restructured through the separation of~~ **is authorized to separate** the Highway Assets from the Transit Assets, **and transfer** ~~with~~ such Transit Assets ~~and all Transit Revenues being transferred~~ to PRITA.

**(a) Transit Assets.** ~~The Transit Assets shall be supported by the Transit Revenues and by such other expressly identified, dedicated revenue stream, or revenue streams of PRITA or the~~

---

[48] In addition, the Government believes that creating separate management structures within HTA for toll road and non-toll road assets as required under Section 2.4(b) of the Plan coupled with the account segregation already required under the New HTA Bonds Indenture would in fact create further costs and inefficiencies for HTA operations that should be avoided.

~~Commonwealth, as the case may be, sufficient to cover the Transit Assets' operational and maintenance expense deficits and capital improvement expenditure needs and approved as adequate for such purposes by the United States Department of Transportation Federal Transit Administration and the Oversight Board~~.

**(b) Highway Assets.**  From and after the HTA Effective Date, Reorganized HTA shall retain the Highway Assets and, as soon as practicable thereafter, such Highway Assets shall be operationally and financially separated between Toll Road Assets and non-toll road assets, with a "Ring-Fenced" structure and allocation of cost and expenses implemented, including, without limitation, ~~(i) the internal separation of legal, financial and operational functions and the establishment of separate Toll Road Assets and non toll road assets management offices, and (ii) the consolidation of all non-toll-road management responsibilities of the Puerto Rico Department of Transportation and Public Works with and into Reorganized HTA~~ **as required by the New HTA Bonds Indenture, the allocation by the independent consulting engineer of Reorganized HTA's costs of the legal, financial and operational functions related to the separate Toll Road Assets.**

**(c) Inventory of Highway Assets.**  From and after the HTA Effective Date, Reorganized HTA shall use its reasonable best efforts to inventory all available Highway Assets and provide such inventory to the Oversight Board.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

## CONCLUSION

25.     For these reasons, the Court should condition confirmation of the Plan on the

removal of the HTA operational restructuring provisions contained in Section 2.4 of the HTA Plan

of Adjustment.

Dated:  July 28, 2022
        San Juan, Puerto Rico

Respectfully submitted,

**O'MELVENY & MYERS LLP**                           **MARINI PIETRANTONI MUÑIZ LLC**

*/s/ Peter Friedman*                                 */s/ Luis C. Marini-Biaggi*
John J. Rapisardi                                    Luis C. Marini-Biaggi
Peter Friedman                                       USDC No. 222301
Maria J. DiConza                                     Carolina Velaz-Rivero
Matthew P. Kremer                                    USDC No. 300913
(Admitted *Pro Hac Vice*)                            250 Ponce de León Ave., Suite 900
7 Times Square                                       San Juan, Puerto Rico 00918
New York, New York 10036                             Telephone:  (787) 705-2171
Telephone:  (212) 326-2000                           Facsimile:  (787) 936-7494
Facsimile:  (212) 326-2061
Email:  jrapisardi@omm.com                           *Attorneys for the Puerto Rico Fiscal Agency*
        pfriedman@omm.com                            *and Financial Advisory Authority*
        mdiconza@omm.com
        mkremer@omm.com

*Attorneys for the Puerto Rico Fiscal Agency*
*and Financial Advisory Authority*