## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*,<br><br>Debtors.[1] | PROMESA Title III<br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of,<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>Debtor. | PROMESA Title III<br><br>Case No. 17 BK 3567-LTS<br><br>**This Court Filing Relates Only to HTA's Title III Case (Case No. 17-BK-3567-LTS)** |

## REPLY OF ASSURED GUARANTY CORP. AND ASSURED GUARANTY MUNICIPAL CORP. TO LIMITED OBJECTION OF THE HTA INSURED BONDHOLDER GROUP TO THE THIRD AMENDED TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY (ECF NO. 21617)

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ......................................................................................................................4

ARGUMENT ...........................................................................................................................7

I.     THE ASSURED INSURANCE POLICIES EXPRESSLY CONTEMPLATE
       ACCELERATION. ..........................................................................................................7

       A.     In the event of an acceleration, Assured can satisfy its obligations by
              paying the Assured Acceleration Price. ...................................................................7

       B.     The HTA Bonds were accelerated by the Debtor's Title III filing. .........................8

       C.     The Plan recognizes the acceleration of the Assured Insured Bonds, and
              the relevant classes have accepted that treatment. ................................................12

       D.     Assured's right to pay the Assured Acceleration Price applies to all
              Assured Insured Bonds, including those issued at a premium...............................15

II.    THE PLAN DOES NOT CONTAIN AN IMPERMISSIBLE THIRD PARTY
       RELEASE. .....................................................................................................................17

       A.     Objectors mischaracterize the Plan's exculpation and related provisions as
              impermissible third party releases. ........................................................................18

       B.     In any event, a third party release would be justified under the relevant
              standard....................................................................................................................20

III.   PURSUANT TO THE DISCLOSURE STATEMENT ORDER, THE
       OBJECTION WAS UNTIMELY AND SHOULD BE DEEMED OVERRULED. .........27

CONCLUSION........................................................................................................................29

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

<u>**Cases:**</u>

*Claybrook v. Autozone Texas, L.P. (In re Am. Remanufacturers, Inc.),*
    451 B.R. 349 (Bankr. D. Del. 2011) ..........................................................................9

*Grinnell Corp. v. Lebron & Asociados, Inc.,*
    Civ. No. 08-2077 (CVR), 2011 WL 2728444 (D.P.R. July 12, 2011) ....................10

*HSBC Bank USA, Nat. Ass'n v. Calpine Corp.,*
    07 CIV 3088 GBD, 2010 WL 3835200 (S.D.N.Y. Sept. 15, 2010) .........................9

*In re Advanced Cellular Systems, Inc.,*
    483 F.3d 7 (1st Cir. 2007)........................................................................................10

*In re City of Colorado Springs Spring Creek Gen. Improvement Dist.,*
    187 B.R. 683 (Bankr. D. Colo. 1995) .....................................................................14

*In re City of Detroit,*
    524 B.R. 147 (Bankr. E.D. Mich. 2014)..................................................................14

*In re Connector 2000 Assoc., Inc.,*
    Case No. 10-04467-dd (Bankr. D.S.C.) ...................................................................11

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
    361 F. Supp. 3d 203 (D.P.R. 2019)................................................................. *passim*

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
    637 B.R. 223 (D.P.R. 2022), *aff'd*, 32 F. 4th 67 (1st Cir. 2022) .......................3, 20

*In re Granite Broad. Corp.,*
    369 B.R. 120 (Bankr. S.D.N.Y. 2007) ......................................................................8

*In re Manville Forest Prods. Corp.,*
    43 B.R. 293 (Bankr. S.D.N.Y. 1984).........................................................................8

*In re Master Mortg, Inv. Fund, Inc.,*
    168 B.R. 930 (Bankr. W.D. Mo. 1994)............................................................ *passim*

*In re Oakwood Homes Corp.,*
    449 F.3d 588 (3d Cir. 2006)......................................................................................9

*In re Princess Baking Corp.,*
    5 B.R. 587 (Bankr. S.D. Cal. 1980) ..........................................................................9

*In re PWS Holding Corp.,*
    228 F.3d 224 (3d Cir. 2000)....................................................................................20

**TABLE OF AUTHORITIES (cont'd)**

<u>Page(s)</u>

*In re Ridgewood Apartments of DeKalb Cnty., Ltd.*,
    174 B.R. 712  (Bankr. S.D. Ohio 1994) .................................................................9

*In re Skyler Ridge*,
    80 B.R. 500 (C.D. Cal. 1987) ............................................................................8

*Oppenheimer AMT-Free Municipals v. ACA Fin. Guar. Corp.*,
    110 A.D. 3d 280 (N.Y. App. Div. 2013) ...................................................... *passim*

*Petroleum & Franchise Funding, LLC v. Dhaliwal*,
    688 F. Supp. 2d 844 (E.D. Wis. 2010)..............................................................9

<u>Statutes and Other Authorities</u>

11 U.S.C.

    § 524(e) .........................................................................................................19
    § 1123(a)(5)(F) ...............................................................................................13
    § 1123(a)(5)(H) ..............................................................................................13
    § 1123(b)(1) ...................................................................................................13

PROMESA § 301(a) .................................................................................................20

Restatement (First) Contracts § 236 (1932)................................................................10

Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together, "Assured")

respectfully submit this reply (the "Reply") in further support of the *Third Amended Title III Plan*

*of Adjustment of the Puerto Rico Highways and Transportation Authority* (ECF No. 21267, and

including as further amended, the "HTA Plan" or "Plan") and in response to the *Limited Objection*

*of the HTA Insured Bondholder Group to the Third Amended Title III Plan of Adjustment of the*

*Puerto Rico Highways and Transportation Authority* (ECF No. 21617, the "Objection" or "Obj."),[2]

and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Objection represents an attempt by a small but sophisticated group of HTA

Bondholders to avoid the effects of the bond acceleration that occurred by operation of law when

HTA commenced a Title III case.  Although the Objection asserts that the Plan "impermissibly

modifies contractual obligations of Assured, a non-debtor, to the beneficial holders of the Assured

Insured Bonds" (Obj. ¶ 1), the Assured policy at issue clearly contemplates the possibility of an

acceleration by operation of law.  And, in that instance, the policy already gives Assured precisely

the rights set forth in the Plan.  As can be seen from the specimen Assured Insurance Policy cited

by Objectors (the "Sample Insurance Policy"), Assured is required to pay the relevant Assured

Insured Bonds when they are "Due for Payment," which includes not only the stated maturity date

of the bonds and the stated date for the payment of interest, but also "**any earlier date on which**

**payment is due by reason of** . . . **acceleration or other advancement of maturity**" to the extent

**Assured "in its sole discretion elects to make any principal payment, in whole or in part, on**

**such earlier date."**  The Plan merely preserves Assured's right to make this election.  Moreover,

---

[2] Capitalized terms not defined in this Reply shall have the meanings ascribed to them in the HTA Plan
(including the Plan Supplement) or the Objection, as applicable.  Unless otherwise indicated, all references
to ECF numbers in this Reply refer to the docket in Case No. 17-BK-3283-LTS.

the policy expressly disavows any liability for lost premium, which is the essence of the Objection. The Sample Insurance Policy provides that "[t]his Policy **does not insure against loss of any prepayment premium which may be payable with respect to all or any portion of any Bond at any time.**"

2.      Objectors rely on the fact that the HTA Bond Resolutions did not expressly provide for acceleration as a matter of contract.  But the acceleration that occurred here was not by contract, but by law.  Indeed, a New York court interpreting substantially similar policy language governed by the New York Insurance Law concluded that a highway authority's Chapter 9 bankruptcy filing triggered an insurer's right to satisfy its policy by paying an accelerated amount.  *Oppenheimer AMT-Free Municipals v. ACA Fin. Guar. Corp.*, 110 A.D. 3d 280, 283 (N.Y. App. Div. 2013). Consistent with *Oppenheimer*, this Court has already held in *COFINA*, with respect to the first confirmed Title III plan that contained provisions providing for the payment of insured bonds at an accelerated amount, that insured bondholders would "receive (through payment by Assured), on the Effective Date, the Acceleration Price for their Assured Insured Bonds, and thus, **be effectively rendered unimpaired.**"  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 361 F.Supp.3d 203, 231 (D.P.R. 2019) (emphasis added), *aff'd*, 987 F.3d 173 (1st Cir. 2021).

3.       Thus, it is the Objectors, not Assured, who are attempting to modify their insurance contract by deleting, or inventing limitations to, the provision addressing acceleration.  Similarly, Objectors seek to delete the express disavowal of liability for make-whole premiums.  Ironically, the Plan is actually favorable to the Objectors by maintaining the status quo, including future interest payments under the policy, subject to a reservation of Assured's already-existing right to terminate such payments and pay off the bond principal in full.

4.      What is more, acceleration and related exculpation provisions virtually identical to those in the HTA Plan have already been approved by this Court in the COFINA, Commonwealth,

-2-

PBA, CCDA, and PRIFA restructurings.[3]  Even though the HTA case represents at least the *sixth* Title III or Title VI case in which substantially the same acceleration and exculpation provisions have been presented to this Court for approval or confirmation, this is the first time that bondholders have filed a formal objection to the relevant acceleration provisions.[4]  And the small number of prior objections to the related exculpation provisions have all been overruled by this Court.[5]  The reason the provisions at issue in the Objection have so seldom been challenged is because those provisions give insured bondholders *at least* what they are entitled to—a full, 100% recovery of all principal, plus all accrued interest they are owed—and in the case of the custodial trust arrangement specifically at issue in the Objection, additional potential benefits that exceed the bondholders' legal entitlements under the applicable policies.  As a result, the acceleration and exculpation provisions Objectors now challenge in the face of the overwhelming precedent in these Title III cases were proper and justified when they were approved in the cases of COFINA, the Commonwealth, PBA, CCDA, and PRIFA, and they continue to be proper and justified in the HTA Plan as well.

---

[3] *See* ECF No. 5055-1 § 10.2 (confirmed COFINA plan provision recognizing acceleration); ECF No. 19784 § 75.1(c) (confirmed Commonwealth/PBA plan provision recognizing acceleration); Case No. 21-CV-1493 (LTS), ECF No. 72-1 § 6.2(b) (approved CCDA qualifying modification provision recognizing acceleration); Case No. 21-CV-1492 (LTS), ECF No. 82 -1 § 6.2(b) (approved PRIFA qualifying modification provision recognizing acceleration); ECF No. 5055-1 § 30.7(b) (confirmed COFINA plan exculpation provision); ECF No. 19784 § 92.7(f) (confirmed Commonwealth/PBA plan exculpation provision); Case No. 21-CV-1493 (LTS), ECF No. 72-1 § 15.8(b) (approved CCDA qualifying modification exculpation provision); Case No. 21-CV-1492 (LTS), ECF No. 82 -1 § 15.8(b) (approved PRIFA qualifying modification exculpation provision).

[4] Objectors also object only to the Assured-related acceleration provisions in the HTA Plan, but the HTA Plan contains substantially similar acceleration provisions related to other monoline insurers to which neither Objectors nor any other bondholders have objected. *See, e.g.*, HTA Plan §§ 26.2(c) (recognizing acceleration of National Insured Bonds); 26.3(d) (recognizing acceleration of FGIC Insured Bonds); 26.4(c) (recognizing acceleration of Ambac Insured Bonds).

[5] *See, e.g. In re Fin. Oversight & Mgmt. Bd. for P.R.*, 637 B.R. 223, 318 n.54 (D.P.R. 2022), *aff'd*, 32 F. 4th 67 (1st Cir. 2022) (overruling objection to exculpation provisions in Commonwealth Plan).

5.      Finally, this Court need not even consider the Objection, because the Objection was untimely, and therefore is to be "deemed overruled" pursuant to this Court's Disclosure Statement Order (ECF No. 21293).

6.      For all of these reasons and the additional reasons set forth below, the Objection should not be permitted to obstruct HTA's efforts to join COFINA, the Commonwealth, PBA, CCDA, and PRIFA in completing a successful restructuring.  Instead, the HTA Plan should be confirmed on substantially the same terms as those prior successful restructurings.

## **BACKGROUND**

7.      Objectors are two sophisticated mutual funds that together hold less than 10% of all outstanding HTA Bonds and less than 10% of all Assured Insured Bonds.[6]  The Objection relates to one relatively minor aspect of the Objectors' treatment under the Plan, which treatment was designed precisely as an accommodation to Objectors and other similarly situated bondholders.

8.      Specifically, Objectors assert they hold bonds that *at issuance* were sold to investors at a price higher than the face amount of the bonds.[7]  The fact that these bonds may have initially been sold to investors at a premium to face value has no impact on the mechanics of the

---

[6] *See Verified Statement of the HTA Insured Bondholder Group Pursuant to Federal Rule of Bankruptcy Procedure 2019* (ECF No. 21673); Obj. ¶ 1. Somewhat confusingly, the Objection states that "[t]he HTA Insured Bondholder Group collectively holds more than $145 million of Assured Insured Bonds . . ., approximately $159 million of which [were issued at a premium]." *Id.* Whichever number is correct, the price at which any given bond was issued should have no impact on the outcome here. The policy treats all insured bonds the same way.

[7] Notably, Objectors do not establish that *they* purchased any of their bonds at a premium at issuance in 2005 or 2007. Indeed, Objectors' most recent 2019 statement (ECF No. 21673), together with the 2019 statements they previously filed as members of the Ad Hoc Group of PREPA Bondholders, seem to indicate that Objectors may have acquired HTA Bonds during the pendency of HTA's Title III case, possibly at a discount in the secondary market. Moreover, it appears that Objectors may have continued acquiring HTA Bonds in the period after the COFINA and/or Commonwealth/PBA plans had been confirmed, in which case Objectors were on notice that the HTA bonds might also be recognized to be accelerated under a future Title III plan.

bond agreements or associated insurance policies.   Nonetheless, to account for the possible preference of some bondholders holding such bonds to continue receiving future interest payments, Section 26.1 of the HTA Plan gives Objectors and other similarly situated bondholders an option to choose between two different treatments, which together constitute part of the "Assured Treatment" as defined in the Plan.  *See* Plan §§ 1.48, 26.1.

9.     First, under Assured Bondholder Election 1, such holders can elect to receive the Assured Acceleration Price of 100% of the outstanding principal amount of their bonds, plus any accrued but unpaid interest, on the HTA Effective Date.  *See* Plan § 26.1(b)(i).  Alternatively, to the extent such bondholders would prefer to continue receiving additional interest payments beyond the HTA Effective Date, such holders can elect Assured Bondholder Election 2, under which they opt into a custodial trust structure that will hold the relevant plan consideration and the applicable Assured Insurance Policy.  *See* Plan § 26.1(b)(ii).  Under that custodial trust structure, bondholders will continue to receive interest payments substantially as originally scheduled through a combination of payments generated by the New HTA Bonds or other plan consideration and, to the extent of any shortfall, the Assured Insurance Policy.  As Objectors themselves concede, this custodial trust option gives Objectors the ability to "maintain the status quo and continue to hold their Assured Insured Bonds and maintain their existing rights with respect to the Assured Insurance Policies" (Obj. ¶ 6), which is exactly why Assured chose to offer this accommodation as an option to bondholders.

10.     It appears that Objectors have elected Assured Bondholder Election 2, the custodial trust option.  Objectors' objection to this custodial trust treatment appears generally to be limited to a provision in Section 26.1(b)(ii) of the Plan and the related custodial trust documentation that incorporates Assured's right to satisfy its obligations under the Assured Insurance Policies at some future date by collapsing the trust and paying 100% of outstanding principal, plus any accrued

interest. The relevant Plan and custodial trust provisions also impose a new obligation on Assured to provide 30 days' notice to bondholders before exercising this right to collapse the trust, a notice period that is not required under the Assured Insurance Policies themselves.

11. The entire Objection is premised on the notion that the custodial trust treatment is inherently superior to receiving immediate payment of par, plus accrued interest, such that Objectors find it objectionable that Assured retains the ability under the custodial trust documentation to pay par, plus accrued interest at a later date. Notably, however, many similarly situated investors apparently disagreed as to the inherent superiority of the custodial trust treatment, because 43% of Assured Insured Bondholders entitled to make an election opted to receive par, plus accrued interest on the HTA Effective Date through Assured Bondholder Election 1. Moreover, these results are probably artificially skewed in favor of the custodial trust option, because the custodial trust treatment was the *default* for any holders who did not actively make an election.[8] By contrast, the 43% of relevant holders electing immediate payment (Election 1) *actively* chose that option by tendering their securities through DTC. Therefore, although Objectors ask this Court to *assume* that they would be harmed by receiving 100% of principal, plus accrued interest, at least 43% of the relevant investment community *actively* disagrees.

12. In any event, Assured has not elected to exercise its retained right to terminate the custodial trust at this time, meaning that the Objection relates not to what Objectors will actually be receiving on the HTA Effective Date (the custodial trust treatment), but rather to the hypothetical possibility that Assured may exercise its right to pay par, plus accrued interest at some point in the future.

---

[8] *See* Plan § 26.1(b) ("[I]n the event that an Assured Insured Bondholder eligible to make an Assured Bondholder Election fails to make such an Assured Bondholder Election, such Assured Insured Bondholder shall be deemed to have elected Assured Bondholder Election 2 [*i.e.*, the custodial trust treatment].").

13.     Leaving aside the fact that Objectors' main concern is currently only hypothetical in nature, Objectors have no basis to object to the provision retaining Assured's right to satisfy its obligations by paying par, plus accrued interest at some point in the future, because that provision merely preserves contractual rights that Assured already has.

## ARGUMENT

## I.     The Assured Insurance Policies Expressly Contemplate Acceleration.

14.     The entire Objection, including its arguments about exculpation and third party releases, is premised on the idea that Assured is not able to satisfy its obligations under the Assured Insurance Policies by paying the Assured Acceleration Price, defined in the HTA Plan as "[a] price equal to the outstanding principal amount of an Assured Insured Bond plus accrued and unpaid interest thereon . . . as of the date of payment."  *See* HTA Plan § 1.36.  However, the Assured Insurance Policies unambiguously give Assured the right to satisfy its obligations in this manner. No modification to the Assured Insurance Policies is necessary in order to give Assured this right, and the HTA Plan does not effectuate any modification to the policies.

### A.     In the event of an acceleration, Assured can satisfy its obligations by paying the Assured Acceleration Price.

15.     Specifically, as reflected in the Sample Insurance Policy relied on by Objectors, the Assured Insurance Policies require Assured to "pay that portion of the principal of and interest on the Bonds that shall become **Due for Payment** (as hereinafter defined) but shall be unpaid by reason of Nonpayment by the Issuer".  *See* Assured's Exhibit 18, ECF No. 21608.  The scope of Assured's obligations under the policies is therefore defined largely by the defined term "Due for Payment", which is defined as follows:

> **"Due for Payment"** means, when referring to the principal of a Bond, the stated maturity date thereof, or the date on which such Bond shall have been duly called for mandatory sinking fund redemption, and **does not refer to any earlier date on which**

**payment is due by reason of** a call for redemption (other than by mandatory sinking fund redemption), **acceleration or other advancement of maturity (<u>unless Assured Guaranty in its sole discretion elects to make any principal payment, in whole or in part, on such earlier date</u>)** and means, when referring to interest on a Bond, the stated date for payment of such interest.

16.    Under this definition, "Due for Payment" includes not only the stated maturity date of the bonds, but also "**any earlier date on which payment is due by reason of** . . . **acceleration or other advancement of maturity**" to the extent **Assured "in its sole discretion elects to make any principal payment, in whole or in part, on such earlier date."[9]** This type of acceleration-related language is not unique to Assured's insurance policies, and instead is required by New York Insurance Law § 6905(a) to be included in all financial guaranty insurance policies governed by New York law.  Moreover, the fact that Objectors quote this language from a specimen of the Sample Policy attached to an Official Statement used to market the bonds demonstrates that Objectors had notice of this provision of the Assured Insurance Policies at the time they purchased their bonds.

**B.    <u>The HTA Bonds were accelerated by the Debtor's Title III filing.</u>**

17.    Objectors' primary contention appears to be that the HTA Bonds cannot be accelerated, because the HTA Bond Resolutions do not contain express acceleration provisions. However, acceleration does not only occur by contract.  Acceleration also occurs by operation of law.  It is well-established that the filing of a bankruptcy petition, or in this case a Title III petition, necessarily results in the automatic acceleration of the principal amount of all claims against a debtor.[10]  Such automatic acceleration by operation of a bankruptcy filing occurs either with or

---

[9] The Financial Security Assurance Inc. policy also cited by Objectors in a footnote (Obj. ¶ 3 n.5) contains substantially similar language, as do all Assured Insurance Policies. *See* Assured's Exhibit 6.

[10] *See*, *e.g.*, *In re Skyler Ridge*, 80 B.R. 500, 507 (C.D. Cal. 1987) ("The automatic acceleration of a debt upon the filing of a bankruptcy is well established."); *see also, e.g.*, *In re Manville Forest Prods. Corp.*, 43 B.R. 293, 297-98 (Bankr. S.D.N.Y. 1984) ("It is a basic tenet of the Bankruptcy Code that '[b]ankruptcy operates as the acceleration of the principal amount of all claims against the debtor.'"); *In re Granite Broad.*

without contractual provisions providing for automatic acceleration of debt upon the filing of a bankruptcy petition.[11]   Indeed, this Court has previously recognized the acceleration of bonds lacking express acceleration provisions, such as the Commonwealth's GO Bonds and the PBA Bonds restructured under the Commonwealth and PBA's plan of adjustment.[12]   Objectors' wholly unsupported contention that automatic acceleration by operation of a bankruptcy filing is somehow dependent on the presence of acceleration provisions in the underlying bond documentation is simply incorrect.  *Cf.* Obj. ¶¶ 4, 19.  Once that brick is removed from the Objection's foundation, the entire argument collapses.

18.   Furthermore, the acceleration-related provision in the Sample Insurance Policy is not limited by its terms to an acceleration provided for in the underlying bond documentation.  The policy refers broadly and unambiguously to any "acceleration or other advancement of maturity," which plainly includes an acceleration by operation of a bankruptcy filing.  Indeed, the fact that the Bond Resolutions do not expressly provide for contractual acceleration supports the conclusion that the reference to "acceleration" in the Assured Insurance Policies must include acceleration by

---

*Corp.*, 369 B.R. 120, 144 (Bankr. S.D.N.Y. 2007) (observing that a bankruptcy filing automatically accelerates the payment of debt); *In re Princess Baking Corp.*, 5 B.R. 587, 590 (Bankr. S.D. Cal. 1980) ("[B]ankruptcy proceedings operate to accelerate the principal amounts of all claims against the debtor[.]"); *Petroleum & Franchise Funding, LLC v. Dhaliwal*, 688 F. Supp. 2d 844, 848–49 (E.D. Wis. 2010) (holding that the debtors' debt was accelerated on the date of their bankruptcy petition).

[11] *See, e.g.*, *In re Ridgewood Apartments of DeKalb Cnty., Ltd.*, 174 B.R. 712, 720 (Bankr. S.D. Ohio 1994) ("Even without specific contractual language, a bankruptcy filing acts as an acceleration of all of a debtor's obligations."); *HSBC Bank USA, Nat. Ass'n v. Calpine Corp.*, 07 CIV 3088 GBD, 2010 WL 3835200, at *3 (S.D.N.Y. Sept. 15, 2010) ("Even without [the provisions providing for automatic acceleration of notes upon a voluntary bankruptcy filing], the Bankruptcy Code would require the same result, as the filing of a bankruptcy petition renders all of a petitioner's outstanding debts mature and payable."); *see also In re Oakwood Homes Corp.*, 449 F.3d 588, 602 n.19 (3d Cir. 2006) ("Simply stated, the filing of a petition accelerates the principal amount of all unmatured claims against the debtor, whether or not a clause in a prepetition agreement provides that a bankruptcy filing accelerates the maturity date."); *Claybrook v. Autozone Texas, L.P. (In re Am. Remanufacturers, Inc.)*, 451 B.R. 349, 367 (Bankr. D. Del. 2011) ("Even absent the CDA's acceleration clause . . . [u]pon a debtor's bankruptcy filing, the principal amount of all claims against the debtor is accelerated.").

[12] *See* ECF No. 19784 § 75.1(c) (confirmed Commonwealth/PBA plan provision recognizing acceleration).

operation of law, including the Bankruptcy Code or PROMESA, because otherwise that language in the policies would be rendered surplusage.  *See*, *e.g.*, *In re Advanced Cellular Systems, Inc*., 483 F.3d 7, 12 (1st Cir. 2007) (citing Restatement (First) Contracts § 236 (1932)) ("It is well-established that courts should avoid interpretations that render a provision of an agreement surplusage."); *Grinnell Corp. v. Lebron & Asociados, Inc.*, Civ. No. 08-2077 (CVR), 2011 WL 2728444, at *6 (D.P.R. July 12, 2011) ("In construing a contract, we must give reasonable effect to all its terms whenever possible.").

19.     Importantly, a New York court has recognized automatic acceleration by operation of a bankruptcy filing in a case specifically involving financial guaranty insurance on highway toll bonds.  The Court stated that a municipal bond issuer's "bankruptcy filing had the effect of accelerating the claims on the original bonds."  *Oppenheimer AMT-Free Municipals v. ACA Fin. Guar. Corp*., 110 A.D. 3d 280, 283 (N.Y. App. Div. 2013); *see also id.* at 284 ("The filing of the bankruptcy petition by the issuer . . . served to accelerate plaintiffs' claims against the issuer"). The insurance policies at issue in *Oppenheimer* contained acceleration-related language similar to that in the Assured Insurance Policies, as required by New York Insurance Law § 6905(a).  As the *Oppenheimer* court stated, "This policy provision is consistent with Insurance Law § 6905(a), which, as a protection for the insurer, provides that where payments on the insured bonds are ***accelerated <u>for any reason</u>***, the guaranteed payments shall still be made when the payments were originally scheduled to come due, ***unless the insurer accelerates payment***."  *Id.* at 283 (emphasis added).

20.     Consistent with the *Oppenheimer* court's conclusion that the relevant acceleration-related policy language applies where payments on the underlying bonds are accelerated "*for any reason*," the *Oppenheimer* court viewed the automatic acceleration of the underlying bonds by operation of the issuer's bankruptcy filing as triggering the insurer's right to elect to accelerate its

own payment obligations.  *Id.*  The court in *Oppenheimer* also recognized that language of the type

contained in the Assured Insurance Policies gives an insurer "the sole right to accelerate payment"

under its policies and thereby gives the insurer "control over when it makes payments," such that

the insurer can do so at a time "it believes . . . is favorable to it, provided payment is no later than

the maturity date of the original bonds." *Id.* at 286.[13]  Notably, the underlying "Toll Road Revenue

Bonds" at issue in *Oppenheimer* did not provide for acceleration as a contractual remedy,[14]

demonstrating that acceleration does not need to be provided for under the prepetition bond

documents in order for the applicable policy language to be triggered by a bankruptcy filing.[15]

21.     Consistent with *Oppenheimer*, this Court, too, has recognized the accelerated status

of a Title III debtor's debts many times in these Title III cases, and not only by approving the plan

provisions expressly recognizing such acceleration.

22.     For example, in confirming the COFINA plan, the Court expressly concluded that

insured bondholders would "receive (through payment by Assured), on the Effective Date, the

---

[13] Objectors argue in a footnote (Obj. ¶ 7 n.9) that Sections 3.04 and 305 of the Standard Terms governing the custodial trusts, which mirror substantially similar provisions already approved by this Court with respect to the GO and PBA custodial trusts (*see* ECF No. 20019, Exhibit F), "impermissibly allow for partial reductions in the outstanding principal amount of the Assured Insured Bonds prior to their stated maturity date." Such reductions in principal amount are the result of the custodial trusts being structured as pass-through entities. This was done in an effort to reduce the risk that the trusts could be subject to a corporate level tax or that income from the New HTA Bonds held by the trusts could lose its tax-exempt status. *See* "Risks Related to the Assured Bondholder Elections," Disclosure Statement § VIII.E (ECF No. 21269); *see also* Plan Supplement, ECF No. 21560, Ex. E, Standard Terms § 3.02 (requiring trustee to "promptly" distribute trust income "on a 'pass-through' basis"). In any event, those provisions are consistent with the principle that, following acceleration, payment can be made at any time, "provided payment is no later than" the original maturity date.  *Oppenheimer*, 110 A.D. 3d 280 at 286.

[14] *See In re Connector 2000 Assoc., Inc.*, Case No. 10-04467-dd (Bankr. D.S.C.), *First Amended Disclosure Statement to First Amended Plan for Adjustment of Debts*, ECF No. 108 at 33 ("While the Original Trust Indenture does not provide for automatic acceleration, as a matter of bankruptcy law, claims on the Bonds are deemed accelerated on the Petition Date"); *id.*, "Master Indenture of Trust", ECF No. 54-2.

[15] Objectors cite *Oppenheimer* for the proposition that the Sample Insurance Policy is ambiguous (Obj. ¶ 21), but the *Oppenheimer* court did not identify any ambiguity in the relevant acceleration-related policy language. Instead, the court viewed the relevant language as unambiguously being triggered by an acceleration upon a bankruptcy filing.

Acceleration Price for their Assured Insured Bonds, and thus, **be effectively rendered unimpaired.**" *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 361 F.Supp.3d 203, 231 (D.P.R. 2019) (emphasis added), *aff'd*, 987 F.3d 173 (1st Cir. 2021).

23.     More recently, the Court included in the Commonwealth Confirmation Order a provision (paragraph 52) that authorized interim payments to uninsured HTA Bondholders, and that expressly provided that such interim payments would result in the reduction of the *principal* amount of the HTA Bonds:

> 52. <u>HTA Bond Claims</u>. In consideration for the agreements set forth in the HTA/CCDA Plan Support Agreement, and within ten (10) Business Days following satisfaction of the HTA Distribution Conditions, HTA shall make an interim distribution to holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims in the amounts of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00), respectively, in Cash, **which distributions shall reduce the principal amount of such HTA 68 Bonds and HTA 98 Senior Bonds**, respectively, and the corresponding HTA Bond Claims . . . .[16]

24.     This payment of principal on the HTA Bonds prior to their stated maturity date occurred notwithstanding the absence of contractual acceleration language in the HTA Bond Resolutions.  Such a payment of principal prior to the stated maturity date could only have occurred as a result of the automatic acceleration of the HTA Bonds, by operation of HTA's Title III filing.

25.     Therefore, both in these Title III cases generally and specifically with respect to the HTA Bonds, the precedent is that the Title III Debtors' debts are recognized to be accelerated. That precedent disposes of the Objection, in its entirety.

**C.     <u>The Plan recognizes the acceleration of the Assured Insured Bonds, and the relevant classes have accepted that treatment.</u>**

---

[16] *See* ECF No. 19813 ¶ 52.

26.     Notably, the HTA Plan itself also expressly states that "the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the HTA Effective Date, and such Assured Insured Bonds shall be due and payable from and after the HTA Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof plus accrued interest thereon . . . to the date of payment." HTA Plan § 26.1(c). This Court has approved equivalent provisions in the COFINA, Commonwealth, PBA, CCDA, and PRIFA cases.[17]

27.     This provision merely gives further effect to the existing acceleration already effectuated by the Title III filing. Indeed, despite Objectors' complaints about Section 26.1(c), that provision actually serves to limit the impact of the already-existing Title III acceleration in a manner beneficial to Objectors and other insured bondholders, because it treats the relevant "date of acceleration" as the HTA Effective Date, thereby retroactively validating the years of additional interest payments Objectors and other insured bondholders have received during the pendency of HTA's Title III case. In the case of Assured Insured Bondholders, this amounts to more than $387 million of interest paid since the HTA Petition Date.

28.     In addition, Section 26.1(c) would independently serve to accelerate the HTA Bonds as of the HTA Effective Date. *See*, *e.g.*, 11 U.S.C. § 1123(a)(5)(F), (H); 1123(b)(1).

29.     Objectors' complaint that the prepetition Bond Resolutions "do not provide for the maturities of the Assured Insured Bonds to be accelerated" (Obj. ¶ 4) becomes meaningless in the face of these Plan and Bankruptcy Code provisions, because the Plan becomes effective through

---

[17] *See* ECF No. 5055-1 § 10.2 (confirmed COFINA plan provision recognizing acceleration); ECF No. 19784 § 75.1(c) (confirmed Commonwealth/PBA plan provision recognizing acceleration); Case No. 21-CV-1493 (LTS), ECF No. 72-1 § 6.2(b) (approved CCDA qualifying modification provision recognizing acceleration); Case No. 21-CV-1492 (LTS), ECF No. 82 -1 § 6.2(b) (approved PRIFA qualifying modification provision recognizing acceleration).

operation of law, not contract.  Objectors try to characterize this as a modification to the *policy*, but the Objectors do not actually identify any specific modifications to the Assured Insurance Policies, nor could they.   Indeed, the Assured Insurance Policies have always expressly contemplated that the HTA Bonds might someday be accelerated, by one means or another, and have always specified the effect of such an acceleration.  Section 26.1(c) therefore does not vitiate or modify any obligations of Assured under the Assured Insurance Policies, because (i) the policy terms expressly include the possibility of accelerated payment upon an acceleration of the underlying bonds; (ii) the trigger for the early payment option is drafted in the broadest possible terms, using terms like "acceleration or other advancement of maturity" that would clearly include an acceleration by operation of the Bankruptcy Code and the HTA plan; and (iii) Assured Insured Bondholders were on notice of the accelerated payment option before they purchased the Assured Insured Bonds, and Assured Insured Bondholders therefore knowingly accepted the risk that a subsequent event could trigger Assured's right to make an early payment.[18]

30.     More importantly, the relevant classes of claims have voted to accept the Plan containing Section 26.1(c), and that vote is binding on all claims in the class.  The general rule, including in Chapter 9 cases, is that "dissenting creditors in an accepting class are bound by the accepting vote of the other members."   *In re City of Colorado Springs Spring Creek Gen. Improvement Dist.*, 187 B.R. 683, 690 (Bankr. D. Colo. 1995); *see also In re City of Detroit*, 524 B.R. 147, 183 (Bankr. E.D. Mich. 2014) (quoting the same).  And here, Objectors do not even

_____

[18] In *Oppenheimer*, cited by Objectors at Obj. ¶ 23, the court rejected an argument by the insurer that "the cancellation of the original bonds [under a plan] . . . relieve[d] it from any obligation to make payments to plaintiffs under the policies," noting that the policy by its terms was "noncancellable." *Oppenheimer*, 110 A.D. 3d at 285. Here, the Plan does not cancel the HTA Bonds as they relate to the Assured Insurance Policies, so the issue does not arise in this case. *See* Plan § 28.6 ("the HTA Bonds . . . shall . . . continue in effect solely . . . (vi) as may be necessary to preserve any claims under the respective insurance policies and related documents issued by a Monoline . . . ."). Moreover, Assured is not seeking to cancel its policies. Rather, the Plan requires Assured to fulfill its policy obligations completely. Objectors simply refuse to acknowledge that those policy obligations are subject to the acceleration provision in the policy itself.

have the status of dissenting creditors, because in purchasing their Assured Insured Bonds and receiving the benefits of the Assured Insurance Policies, they agreed to give Assured the right to control consent and voting rights with respect to those bonds.[19]  Reflecting that basic bargain, the Disclosure Statement Order correctly gave Assured the sole right to vote to accept or reject the HTA Plan with respect to the relevant classes (*see* ECF No. 21293, ¶ 7), and Objectors did not object to the Disclosure Statement Order or to Assured's voting rights, because there was no basis to do so.

31.     Consistent with Assured's voting rights as provided in the underlying bond documentation and recognized in the Disclosure Statement Order, Assured has voted to accept the HTA Plan, including Section 26.1(c), and other holders of claims in those classes no longer have any right to challenge the binding class vote.  This provides yet another independent ground for overruling the Objection.

> **D.     <u>Assured's right to pay the Assured Acceleration Price applies to all Assured Insured Bonds, including those issued at a premium.</u>**

32.     Finally, Objectors appear to contend that Assured's right to satisfy its obligations by paying par, plus accrued interest in the event of an acceleration should not apply to them, because they hold what they assert to be "Premium Bonds," which Objectors describe as bonds for which bondholders paid "up to 115% of the face amount of each Premium Bond upon their

---

[19] *See* Insurance Agreement § 6(c) (Assured's Exhibit 25, ECF No. 21667) ("Any reorganization or liquidation plan with respect to the Authority must be acceptable to Assured Guaranty.  In the event of any reorganization or liquidation, Assured Guaranty shall have the right to vote on behalf of all Bondholders who hold Assured Insured Bonds guaranteed by Assured Guaranty, absent a default under the Assured Guaranty Insurance Policy").

issuance in 2007" in the hopes of recouping such premium through scheduled interest payments in subsequent years.  *See* Obj. ¶ 2.[20]

33.    The Assured Insurance Policies applicable to all Assured Insured Bonds are materially identical.  The term "Premium Bond" was invented by Objectors.  It does not appear in either the Assured Insurance Policies or the Bond Resolutions.  For the purposes of these contracts, bonds are bonds.  There is neither recognition of, nor special treatment for, bonds that may have been issued at a premium.  Indeed, the policies specifically disclaim any obligation to pay a premium.

34.    The  Sample Insurance Policy expressly provides that "[t]his Policy **does not insure against loss of any prepayment premium which may be payable with respect to all or any portion of any Bond at any time.**"  *See* Assured's Exhibit 18, ECF No. 21608 (emphasis added).  The Assured Insurance Policies therefore do not obligate Assured to pay any prepayment or "make-whole" premium in the event of an acceleration, and this Court has already held in the COFINA case with respect to relevantly similar Ambac and National policies that "neither the Ambac Insurance Policy nor the National Insurance Policies insures against loss of prepayment premiums, which include 'make-whole' provisions."  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 361 F.Supp.3d 203, 249 (D.P.R. 2019) (emphasis added), *aff'd*, 987 F.3d 173 (1st Cir. 2021).

35.    However, notwithstanding Assured's right to satisfy such "Premium Bonds" at the Assured Acceleration Price, HTA and Assured have chosen to give Objectors the ability to instead opt into a custodial trust arrangement under which Objectors will continue to receive future interest payments after  the  HTA  Effective  Date  through  a  combination  of  cash  flows  from  the  plan

---

[20] As noted above, it is not clear that Objectors themselves in fact paid this premium by purchasing the bonds at issuance, or whether they instead acquired at least some of their bonds later in the secondary market at a price closer to or even lower than par. *See supra* n. 7.

consideration distributed under the HTA Plan and ongoing payments under the Assured Insurance Policies, thereby permitting bondholders who may have purchased at a premium to recoup a larger percentage of their premium. *See* Plan § 26.1(b)(ii). As Objectors acknowledge, this custodial trust treatment "**maintain[s] the status quo**" with respect to their bonds by providing for continued future interest payments that will amortize additional amounts of any premium. *See* Obj. ¶ 6 (emphasis added). HTA and Assured are under no obligation to maintain the status quo in this manner, and are doing so on a voluntary basis.

36.     Objectors choose to overlook this valuable accommodation to bondholders offered by Assured, complaining that under the governing custodial trust documentation Assured retains the right to repay the bonds, plus accrued interest, with 30 days' notice. But this provision merely preserves Assured's existing right to satisfy its obligations by paying par, plus accrued interest at any time following an acceleration, as described above. Moreover, the 30-day notice period required by the custodial trust documentation is not required under the Assured Insurance Policies, which would permit Assured to pay the acceleration price without any advance notice to bondholders.[21]

## II.     The Plan Does Not Contain an Impermissible Third Party Release.

37.     Objectors also object to the Plan's exculpation provisions and other related provisions that they mischaracterize as impermissible third party releases. But these objections are entirely derivative of the objection to Assured's right to pay the Assured Acceleration Price. To the extent Assured's payment of the Assured Acceleration Price is found to be consistent with

---

[21] To the extent Objectors attempt to characterize the 30-day notice period as a modification of the Assured Insurance Policies, this is incorrect, because the notice period is just an additional obligation imposed on Assured by the custodial trust documentation and does not require any modification of the policies. In any event, as noted above, the notice period is for the benefit of bondholders, and therefore gives Objectors no basis to object.

Assured's obligations under the Assured Insurance Policies, as set forth above, those exculpation-related objections will become moot.  In any event, a third party release, if there were one, would easily be justified under the applicable *Master Mortgage* standard.

A.   **Objectors mischaracterize the Plan's exculpation and related provisions as impermissible third party releases.**

38.   Not content to attack acceleration-related provisions that this Court has already approved multiple times, the Objectors also challenge exculpation provisions that have already been approved multiple times,[22] as well as other Plan provisions that Objectors mischaracterize as impermissible third party releases.  Crucially, however, Objectors' attack on these purported releases is premised entirely on their theory that payment of the Assured Acceleration Price does not satisfy Assured's obligations under the Assured Insurance Policies, which has already been refuted above.

39.   Specifically, with respect to the exculpation provisions (Plan § 41.7(c)), Objectors acknowledge that such "exculpation provisions are objectionable" only to the extent "the Assured Treatment is not . . . consistent with Assured's contractual obligations."  Obj. ¶ 18 n.13.  Given that the Assured Treatment, including Assured's right to pay the Assured Acceleration Price, is in fact consistent with Assured's contractual obligations, however, this means that the exculpation provisions are not objectionable under Objectors' own standard.  Indeed, the relevant exculpation provision contains a carve-out preserving Assured Insured Bondholders' ability to enforce their right to receive what they are entitled to under the Assured Insurance Policies, namely the Assured

---

[22] *See, e.g.*, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 361 F. Supp. 3d 203, 255 (D.P.R. 2019) (approving COFINA exculpation provisions because exculpated parties "greatly contributed to the Debtor's reorganization efforts and enabled the successful prosecution of the Plan"); *see also* ECF No. 5055-1 § 30.7(b) (confirmed COFINA plan exculpation provision); ECF No. 19784 § 92.7(f) (confirmed Commonwealth/PBA plan exculpation provision); Case No. 21-CV-1493 (LTS), ECF No. 72-1 § 15.8(b) (approved CCDA qualifying modification exculpation provision); Case No. 21-CV-1492 (LTS), ECF No. 82 -1 § 15.8(b) (approved PRIFA qualifying modification exculpation provision).

Treatment.[23]  The exculpation provision therefore does not deprive Objectors of any rights under

the Assured Insurance Policies.

40.      Objectors also object to language in Section 26.1 of the Plan stating that "[p]ayment

of the applicable Assured Acceleration Price with respect to any Assured Insured Bond . . . shall

satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with

respect to such Assured Insured Bond."  *See* Obj. ¶ 8.  Equivalent language has already been

approved in the COFINA, Commonwealth, PBA, CCDA, and PRIFA cases.[24]  In any event, this

statement is not an impermissible third party release, as Objectors contend.

41.      Where third party releases have been rejected, it is generally because Section 524

of the Bankruptcy Code, which describes the effect of the Debtor's discharge under the Bankruptcy

Code, provides *in chapter 11 cases* that "discharge of a debt of the debtor does not affect the

liability of any other entity on, or the property of any other entity for, such debt."  11 U.S.C. §

524(e); *see also In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 934 (Bankr. W.D. Mo. 1994).

---

[23] *See* Plan ¶ 41.7(c) ("notwithstanding anything contained herein to the contrary, the terms and provisions
of the HTA Plan shall not, and shall not be construed to, release or exculpate, any payment obligation under
the applicable . . . Assured Insurance Policy . . . to any beneficial holder of . . . Assured Insured Bonds . . .
in accordance with its terms . . . to the extent of any failure of such holder to receive the . . . Assured
Treatment . . . .").

[24] *See* ECF No. 5055-1 § 10.1 (confirmed COFINA plan stating "Payment of the applicable Acceleration
Price with respect to any Assured Insured Bond in accordance with this Section 10.1 shall satisfy and
discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured
Insured Bond."); ECF No. 19784 § 75.1(b)(ii) (confirmed Commonwealth/PBA plan stating "Payment of
the applicable Assured Acceleration Price with respect to any Assured Insured Bond in accordance with
any of the provisions above shall satisfy and discharge all of Assured's obligations under the Assured
Insurance Policies with respect to such Assured Insured Bond."); Case No. 21-CV-1493 (LTS), ECF No.
72-1 § 6.2(a) (approved CCDA qualifying modification stating "Payment of the applicable Assured
Acceleration Price with respect to any Assured Insured CCDA Bond, including in accordance with the
Assured Election, shall satisfy and discharge all of Assured's obligations under the Assured Insurance
Policies with respect to such Assured Insured CCDA Bond."); Case No. 21-CV-1492 (LTS), ECF No. 82 -
1 § 6.2(a) (approved PRIFA qualifying modification stating "Payment of the applicable Assured
Acceleration Price with respect to any Assured Insured PRIFA Bond, including in accordance with the
Assured Election, shall satisfy and discharge all of Assured's obligations under the Assured Insurance
Policies with respect to such Assured Insured PRIFA Bond.").

But Section 524(e) does not even apply under PROMESA,[25] and in any event, the language cited

by Objectors in Section 26.1 does *not* depend on the Debtor's discharge under Section 524 or any

other special bankruptcy or restructuring power to discharge Assured's debts.   Instead, this

language simply mirrors and acknowledges language in the Assured Insurance Policies themselves

to the effect that "**Payment by Assured Guaranty to the Paying Agent for the benefit of the**

**Holders shall discharge the obligation of Assured Guaranty under this Policy to the extent**

**of such payment**."   *See* Sample Insurance Policy (Assured's Exhibit 18, ECF No. 21608)

(emphasis added).   The Section 26.1 language is therefore *not* based on any discharge under the

Bankruptcy Code, and is instead in the nature of a conclusion of law simply recognizing that

payment of the Assured Acceleration Price satisfies and discharges Assured's obligations under

the Assured Insurance Policies by the terms of those very policies.   The Court has already held

that this language does not constitute a non-consensual third-party release, because the Court held

in confirming the Commonwealth Plan, which contained substantially the same language, that "the

[Commonwealth] Plan does not provide for non-consensual third-party releases."   *In re Fin.*

*Oversight & Mgmt. Bd. for P.R.*, 637 B.R. 223, 317 (D.P.R. 2022), *aff'd*, 32 F. 4th 67 (1st Cir.

2022).

     **B.**     **In any event, a third party release would be justified under the relevant**
         **standard.**

     42.     In any event, even though the Plan contains no provision that can properly be

characterized as a third party release, such a release would be justified under the standard

---

[25] *See* PROMESA § 301(a).  Objectors rely on *In re PWS Holding Corp.*, 228 F.3d 224, 245-46 (3d Cir.
2000) for the proposition that "discharge in bankruptcy does not extinguish claims by third parties against
guarantors . . . for the debt discharged in bankruptcy" (Obj. ¶ 22), but the language Objectors cite from
*PWS* is interpreting Section 524(e), which does not apply under PROMESA. In any event, *Master
Mortgage*, which this Court has previously adopted, follows the "permissive view" holding that, even in
chapter 11 cases where Section 524(e) does apply, "the Court has the authority to issue a . . . third-party
release." *See Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 936 (Bankr. W.D. Mo. 1994).

previously applied by this Court and now invoked by Objectors.  Specifically, the Objectors

purport to apply the five-factor test from *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930 (Bankr.

W.D. Mo. 1994),[26] which was previously employed by this Court in *In re Fin. Oversight & Mgmt.*

*Bd. for P.R.*, 361 F.Supp.3d 203, 254-55 (D.P.R. 2019), *aff'd*, 987 F.3d 173 (1st Cir. 2021).[27]

Objectors' attempt to apply these factors is riddled with factual inaccuracies, and a more accurate

application of the factors demonstrates that this is a paradigmatic case in which a third party release

would be justified.   Notably, the *Master Mortgage* analysis is not a "list of conjunctive

requirements," meaning that not all of the factors need to weigh in favor of a release in order for

the release to be granted, although all of the factors would clearly weigh in favor of a release in

this instance.  *See Master Mortg.*, 168 B.R. at 935.  The relevant factors are:

---

[26] As summarized by Objectors, the *Master Mortgage* factors are "(1) whether there is an identity of interest between the debtor and the third party such that a suit against the non-debtor is one against the debtor and will deplete the estate; (2) the non-debtor has contributed substantial assets to the reorganization; (3) the injunction [or release] is essential to the reorganization; (4) the affected classes have voted in favor of the plan; and (5) the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction [or release]." Obj. ¶ 13.

[27] Objectors assert that this Court previously applied *Master Mortgage* only to approve consensual releases (Obj. ¶ 12), but they appear to be misreading the relevant paragraph of the Court's *COFINA* decision. The Court discussed consensual releases in the first three sentences of the paragraph, but then went on to approve other, third party releases under the *Master Mortgage* standard: "The consensual releases are necessary and essential to the Plan. As mentioned above, the releases have been negotiated with COFINA's key creditor constituencies as part of the formulation of the Plan. Thus, it is clear that a substantial number of creditors have expressly consented to the releases. **The two third-party releases included in the Plan—in favor of the Commonwealth and BNYM—can likewise be approved**. The Commonwealth has committed substantial assets to the reorganization, by funding the expenses of the Commonwealth Agent (and AAFAF) in negotiating the Plan, and in agreeing to the Settlement. *See In re Master Mortg. Inv. Fund, Inc*., 168 B.R. 930, 934-35 (Bankr. W.D. Mo. 1994) (enumerating various factors to be considered in approving third-party releases, including whether the non-debtor has contributed substantial assets to the reorganization)." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 361 F.Supp.3d 203, 254 (D.P.R. 2019) (emphasis added), *aff'd*, 987 F.3d 173 (1st Cir. 2021). The Court therefore approved two non-consensual third party releases in *COFINA* under the *Master Mortgage* standard. *See also Memorandum of Law in Support of Puerto Rico Sales Tax Financing Corporation's Third Amended Title III Plan of Adjustment*, ECF No. 4664 at p. 64 (noting that "the releases in Section 30.2 of the [COFINA] Plan are consensual releases" "*with two exceptions*" later approved by the Court under *Master Mortgage*) (emphasis added).

43.     **(1) Whether there is an identity of interest between the debtor and the third party.**  This factor generally applies where "[t]here is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate." *Master Mortg.*, 168 B.R. at 935.  Objectors argue that this first factor does not apply because Assured purportedly has no "rights of indemnification or contribution against the Debtor that would justify providing Assured with a third-party release."  Obj. ¶ 14.  However, the insurance agreement related to the Sample Insurance Policy Objectors rely on in their Objection demonstrates that Objectors are simply mistaken.  *See* Assured's Exhibit 25, ECF No. 21667 (the "Insurance Agreement").  Under Section 4(i) of the Insurance Agreement, the Debtor agreed to pay or reimburse Assured for all amounts paid by Assured under the policy, as well as for a host of other fees and expenses related to Assured's enforcement of its rights under the bond documents, including Assured's legal fees and expenses.  The Debtor also agreed to pay interest on these reimbursement amounts owed to Assured.  As a result, any claim or suit against Assured under the Sample Insurance Policy immediately gives rise to at least an equal claim or suit against the Debtor, and the claim against the Debtor is actually likely to be larger than the original claim against Assured once fees, expenses, and interest are factored in, depleting the assets of the Debtor.  Specifically, Section (4)(i) provides:

> (i)     The Authority hereby agrees to pay or reimburse Assured Guaranty (A) for **all amounts paid by Assured Guaranty under the terms of the Assured Guaranty Insurance Policy**, and (B) **any and all charges, fees, costs and expenses which Assured Guaranty may reasonably pay or incur**, including, but not limited to, fees and expenses of attorneys, accountants, consultants and auditors and reasonable costs of investigations, in connection with (i) any accounts, established to facilitate payments under the Assured Guaranty Insurance Policy, (ii) the administration, enforcement, defense or preservation of any rights in respect of the

1998 Resolution including defending, monitoring or participating in any litigation or proceeding (including any bankruptcy proceeding in respect of the Authority or any affiliate thereof) relating to this Agreement or the 1998 Resolution, any party to this Agreement or the 1998 Resolution or the transaction contemplated by the 1998 Resolution, (iii) the foreclosure against, sale or other disposition of any collateral securing any obligations under this Agreement or the 1998 Resolution, or the pursuit of any remedies under this Agreement or the 1998 Resolution, to the extent such costs and expenses are not recovered from such foreclosure, sale or other disposition, or (iv) any amendment, waiver or other action with respect to, or related to, this Agreement or the 1998 Resolution whether or not executed or completed; costs and expenses shall include a reasonable allocation of compensation and overhead attributable to time of employees of Assured Guaranty spent in connection with the actions described in clauses (ii) - (iv) above.  In addition, Assured Guaranty reserves the right to charge a reasonable fee as a condition to executing any amendment, waiver or consent proposed in respect of this Agreement or any the 1998 Resolution. **The Authority will pay interest on the amounts owed in this paragraph from the date of any payment due or paid**, at the per annum rate of interest publicly announced from time to time by JP Morgan Chase Bank, National Association at its principal office in New York, New York as its prime lending rate (any change in such prime rate of interest to be effective on the date such change is announced by JPMorgan Chase Bank, National Association) plus three percent (3%) per annum (the "Reimbursement Rate").  The Reimbursement Rate shall be calculated on the basis of the actual number of days elapsed over a 360-day year.  In the event JPMorgan Chase Bank ceases to announce its prime rate publicly, the prime rate shall be the publicly announced prime rate or base lending rate of such national bank, as Assured Guaranty shall specify.

44.     While Objectors suggest that Assured has only subrogation rights against the Debtor (*see* Obj. ¶ 14), this is incorrect.  The Insurance Agreement expressly states that Assured's subrogation rights are "In addition" to it reimbursement rights.  *See* Insurance Agreement § 4(k). The Insurance Agreement also addresses subrogation in different provisions than reimbursement. *See*, *e.g.*, Insurance Agreement §§ 3(b), 4(h)(i), 4(k).  Similarly, the Insurance Agreement refers *separately* to "reimbursement, subrogation, and  . . . other rights."  *See* Insurance Agreement § 4(j).   And for good measure, the Insurance Agreement also contains a second broad

indemnification provision requiring the Debtor to reimburse Assured or its officers, directors, shareholders, employees, or agents for any losses related to claims under the securities laws. *See* Insurance Agreement § 4(j).

45.      Given Assured's direct reimbursement right against the Debtor for every draw on its policy and all or most related expenses, plus interest, there is clearly an identity of economic interest between Assured and the Debtor. *See Master Mortg.*, 168 B.R. at 937 (existence of a "right of indemnification against" the debtor "pursuant to pre-petition contracts" weighed in favor of a release).

46.      **(2) The non-debtor has contributed substantial assets to the reorganization.** This factor generally applies where a party has contributed substantial financial assets to the reorganization. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 361 F.Supp.3d 203, 254 (D.P.R. 2019) (approving third party release for the Commonwealth where the Commonwealth "committed substantial assets to the reorganization"); *Master Mortg.*, 168 B.R. at 937 ("substantial contribution of assets" weighs in favor of a release). Assured fits within this classic fact pattern, because Assured will be contributing at least $726,167,548.00 pursuant to the Plan to fund a full recovery for all Assured Insured Bondholders.[28]  Assured has also made numerous other contributions to the reorganization, including acting as a lead negotiator of the HTA/CCDA Plan Support Agreement and agreeing to the settlement embodied therein. *See In re Fin. Oversight &*

---

[28] This figure is derived by calculating the amount that will be required to bring Class 7 (HTA 98 Senior Bond Claims (Assured)) and Class 11 (HTA 98 Sub Bond Claims (Assured)) from their respective estimated 22% and 0% recoveries "from the Debtor" set forth in the chart on pages 20 and 21 of the Disclosure Statement (ECF No. 21269) to a 100% recovery, with the difference between the recovery "from the Debtor" and a full 100% recovery reflecting the amount of Assured's contribution. Because the recovery estimates in the Disclosure Statement assume a claim consisting only of principal plus *prepetition* interest, the recovery for Assured Insured Bond Claims in these classes will actually be greater than 100% when calculated on the same basis, because holders of Assured Insured Bonds Claims will be receiving payment of interest at least through the HTA Effective Date rather than only through the HTA Petition Date.

*Mgmt. Bd. for P.R.*, 361 F.Supp.3d at 254 (finding that the Commonwealth made a substantial contribution where it agreed to the settlement of the Commonwealth-COFINA Dispute).

47.        **(3) The injunction [or release] is essential to the reorganization.**  Assured was clearly essential to HTA's reorganization, because it was one of the first parties to the HTA/CCDA Plan Support Agreement and, together with National, acted as the Oversight Board's primary interlocutor in the negotiation and drafting of that plan support agreement, which serves as the foundation for the HTA Plan.  Moreover, Assured was previously one of the most active litigants defending HTA Bondholder rights against HTA and the Commonwealth, and probably could have used litigation to delay an HTA restructuring if it had not opted to lay down arms and negotiate and support the HTA Plan instead.  Objectors try to create the impression that the Plan provisions they are challenging are somehow separate from the overall restructuring, but it is not at all clear that Assured would support a plan that did not contain the challenged provisions, and absent Assured's support, an overall HTA restructuring would probably not be possible.  *See Master Mortg.*, 168 B.R. at 938 (third factor favored release where absent release, key creditor "would not have been willing to settle.").  The Court already held in the COFINA case that Assured "greatly contributed to the Debtor's reorganization efforts and enabled the successful prosecution of the Plan," and the same is true here.  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 361 F. Supp. 3d 203, 255 (D.P.R. 2019).

48.        **(4) The affected classes have voted in favor of the plan.**  This factor is clearly satisfied, as all affected classes have voted 100% to accept the Plan.  Because this factor so clearly weighs against them, Objectors attempt to unilaterally argue that the factor is "inapplicable," but they do not dispute Assured's right to vote the claims in the relevant classes, and even go so far as to concede that Assured voted "on behalf of the holders of the Assured Insured Bonds," which amounts to an acknowledgement that Objectors are bound by that vote.  *See* Obj. ¶  17; *see also*

Insurance Agreement § 6(c) (Assured's Exhibit 25, ECF No. 21667) ("In the event of any reorganization or liquidation, **Assured Guaranty shall have the right to vote on behalf of all Bondholders who hold Assured Insured Bonds guaranteed by Assured Guaranty**, absent a default under the Assured Guaranty Insurance Policy") (emphasis added); *see also Master Mortg.*, 168 B.R. at 938 (approving release where 94.8%, 93.4%, and 96.2% of the relevant classes had voted in favor of the plan).

49.     **(5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction [or release].**  Finally, the fifth *Master Mortgage* factor is satisfied, because through the Assured Treatment under Section 26.1 of the Plan all Assured Insured Bondholders are receiving *at least* the Assured Acceleration Price of 100% of their principal plus interest accrued to the date of payment.  Objectors' supposed evidence to the contrary is a carefully worded statement in the Disclosure Statement (ECF No. 21269) identifying the "Projected Fixed Recovery **from HTA**" for their class as 22%. *See* Obj. ¶ 18; *see also* Disclosure Statement at 213.  But the reason the Disclosure Statement needed to specify "***from HTA***" in this context was specifically because some classes, including Objectors' class, are also receiving additional recoveries from Assured or other insurers.  Indeed, this same type of careful wording is also used elsewhere in the Disclosure Statement to clarify that the recovery percentages identified only reflect the component of the recovery that comes "from the Debtor." *See* Disclosure Statement p. 20 (chart with heading "Appx. Fixed Recovery **from the Debto**r (%)") (emphasis added).  Given that all Assured Insured Bond Claims are receiving at least the Assured Acceleration Price of 100% of principal plus interest accrued to the date of payment, all such Assured Insured Bond Claims are being paid in full.  And this Court has already held in *COFINA* that through receipt of the Assured Acceleration Price bondholders are "effectively rendered

unimpaired." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 361 F.Supp.3d 203, 231 (D.P.R. 2019)

(emphasis added), *aff'd*, 987 F.3d 173 (1st Cir. 2021).

**III.    Pursuant to the Disclosure Statement Order, the Objection was Untimely and Should be Deemed Overruled.**

50.    Finally, this Court need not even consider the Objection, because the Objection was

untimely and therefore is to be "deemed overruled" pursuant to this Court's Disclosure Statement

Order (ECF No. 21293).

51.    Specifically, on June 22, 2022, this Court entered the Disclosure Statement Order,

which unambiguously set forth certain deadlines with respect to the HTA Plan confirmation

proceedings.    Paragraph 23 of the publicly filed Order made clear that "any Confirmation

Objections must . . . be filed . . . and served so that such objections . . . are actually received by no

later than **5:00 p.m. (Atlantic Standard Time) on July 27, 2022 . . . .**".[29]    Paragraph 24 of the

Order further provided that "Confirmation Objections that are not timely filed, served and actually

received in the manner set forth above shall not be considered and shall be deemed overruled."[30]

The Court's language, including the word "shall", is mandatory in nature and suggests no

flexibility.    Rather, the Order on its face states in Paragraph 52 that "the terms and conditions of

this Order shall be immediately effective and enforceable upon its entry."

52.    There are strong reasons to enforce the deadline.    Objectors have long been on

notice of the matters they now raise in the Objection.    Such matters have been disclosed for months

in the various filed proposed HTA Plans and corresponding Disclosure Statements.    Moreover,

each of the issues raised concerns matters that were at the heart of the treatment of insured bonds

relating to COFINA, the Commonwealth, PBA, CCDA, and PRIFA and approved in such prior

---

[29] ECF No. 21293 ¶ 23.

[30] ECF No. 21293 ¶ 24.

confirmation or Title VI proceedings.  Despite such notice, and notice of the objection deadline, the Objection indisputably was filed after the "Confirmation Objection Deadline," as defined in the Disclosure Statement Order.  *See* ECF No 1301 in Case No. 17-BK-3567 (filing noted at 6:33 P.M. on July 27, 2022) and ECF No. 21617 in Case No. 17-BK-3283 (filing noted at 6:30 P.M. on July 27, 2022).  The Objectors had complete control over when to prepare their Objection and obtain authority for its filing.  They just did not do it in a timely way.  Pursuant to the terms of the Disclosure Statement Order, the Objection is not to be considered and is to be deemed overruled.

53.    In addition, Paragraph 25 of the Disclosure Statement Order provides that "[a]ny objecting party that has not filed a timely Confirmation Objection will not be permitted to make an oral presentation at the Confirmation Hearing."[31]  Based on that paragraph, Objectors are also not permitted to make an oral presentation at the HTA Confirmation Hearing in view of the untimeliness of the Objection.

54.    Deadlines must mean something, especially when, as here, there is a specific judicial warning of the consequences of non-compliance, there was no effort to seek an extension either before, simultaneously with, or after submission of the untimely objection, and there was no proffered explanation.  The Objectors failed to act timely and now want their late Objection to an otherwise largely uncontested confirmation to be considered, at expense to both Assured and the Debtor, and adding a level of uncertainty to the ultimate Plan confirmation.  Assured respectfully submits that the Court should confirm that the Objection is deemed overruled pursuant to the Disclosure Statement Order.

---

[31] ECF No. 21293 ¶ 25.

## **CONCLUSION**

For the reasons set forth above, the Court should overrule the Objection and confirm the

HTA Plan.

[*Remainder of Page Intentionally Left Blank*]

Dated:   New York, New York
         August 7, 2022

CASELLAS ALCOVER & BURGOS P.S.C.          CADWALADER, WICKERSHAM & TAFT LLP

By: */s/ Heriberto Burgos Pérez*             By: */s/ Howard R. Hawkins*
    Heriberto Burgos Pérez                       Howard R. Hawkins, Jr.*
    USDC-PR 204809                               Mark C. Ellenberg*
    Ricardo F. Casellas-Sánchez                  Casey J. Servais*
    USDC-PR 203114                               William J. Natbony*
    Diana Pérez-Seda                             Thomas J. Curtin*
    USDC-PR 232014                               200 Liberty Street
    P.O. Box 364924                              New York, NY 10281
    San Juan, PR 00936-4924                      Telephone:  (212) 504-6000
    Telephone:(787) 756-1400                     Facsimile:   (212) 504-6666
    Facsimile: (787) 756-1401                    Email:  howard.hawkins@cwt.com
    Email:  hburgos@cabprlaw.com                         mark.ellenberg@cwt.com
            rcasellas@cabprlaw.com                       casey.servais@cwt.com
            dperez@cabprlaw.com                          bill.natbony@cwt.com
                                                         thomas.curtin@cwt.com

*Attorneys for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*                * Admitted *pro hac vice*

                                                 *Attorneys for Assured Guaranty Corp. and
                                                 Assured Guaranty Municipal Corp.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed this document electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all parties of record in the captioned case.

At New York, New York, the 7th day of August, 2022.

By:  <u>/s/ *Howard R. Hawkins, Jr.*  </u>

Howard R. Hawkins, Jr.*
*admitted pro hac vice