**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK-3567-LTS |

**DECLARATION OF DAVID SKEEL IN RESPECT OF**
**CONFIRMATION OF FOURTH AMENDED TITLE III**
**PLAN OF ADJUSTMENT FOR THE PUERTO RICO**
**HIGHWAYS AND TRANSPORTATION AUTHORITY**

I, David A. Skeel, Jr., hereby declare and state as follows:

1.      I am the Chairman of the Financial Oversight and Management Board for Puerto

Rico (the "Oversight Board"), the sole Title III representative of the Puerto Rico Highways and

Transportation Authority ("HTA" or the "Debtor") pursuant to Section 315(b) of the *Puerto Rico*

*Oversight, Management, and Economic Stability Act* ("PROMESA").

---

[1]     The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801). Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.

2.     I submit this declaration (the "<u>Declaration</u>") in respect of confirmation of the *Fourth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (as may be amended, supplemented, or modified further, the "<u>HTA Plan</u>") (Debtor's Exhibit 58) [Case No. 17-BK-3567-LTS, ECF No. 1354-6], and in response to certain objections interposed to confirmation of the HTA Plan. I have reviewed the HTA Plan and any capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the HTA Plan.

3.     My statements set forth in this Declaration are based on my personal knowledge except where I reference specific documents or communications as the basis of my statements. In those instances where I reference a specific document or communication, the specific document or communication either is not being offered to prove the truth of the matter asserted in the statement or, I am informed, is otherwise admissible because, for instance, it is a self-authenticating public record or can be otherwise authenticated and shown to be admissible.

4.     I have read and am familiar with (i) the HTA Plan, (ii) the *Disclosure Statement for the Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Debtor's Exhibit 2) [Case No. 17-BK-3567-LTS, ECF No. 1299-2;1299-3] (the "<u>HTA Disclosure Statement</u>") as approved by an order of the Title III Court, dated June 22, 2022 [Case No. 17-BK-3567-LTS, ECF No. 1248]; (iii) the *Amended Plan Supplement and Plan Related Documents of the Puerto Rico Highways and Transportation Authority* (the "<u>Plan Supplement</u>")[2] (Debtor's Exhibit 60) [Case No. 17-BK-3567-LTS, ECF No. 1354-8]; (iv) the agreements among the Oversight Board and various parties to support the HTA Plan (including, the HTA/CCDA Plan

---

[2]    The Plan Supplement amends the *Supplement to the Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Debtor's Exhibit 22) [Case No. 17-BK-3567-LTS, ECF No. 1300-2], which I have also reviewed.

Support Agreement, and the DRA Stipulation, and collectively the "PSAs"); (v) the HTA Committee Agreement (Debtor's Exhibit 15) [Case No. 17-BK-3567-LTS, ECF No. 1299-17]; (vi) the June 2020 HTA Fiscal Plan (Debtor's Exhibit 3) [Case No. 17-BK-3567-LTS, ECF No. 1299-4]; (vii) the May 2021 HTA Fiscal Plan (Debtor's Exhibit 4) [Case No. 17-BK-3567-LTS, ECF No. 1299-5]; and the February 2022 HTA Fiscal Plan (Debtor's Exhibit 5) [Case No. 17-BK-3567-LTS, ECF No. 1299-6] (collectively, the "HTA Fiscal Plans"), (viii) the 2022 HTA Budget (Debtor's Exhibit 6) [Case No. 17-BK-3567-LTS, ECF No. 1299-7], (ix) the 2023 HTA Budget (Debtor's Exhibit 7) [Case No. 17-BK-3567-LTS, ECF No. 1299-8], (x) the 2021 Commonwealth Fiscal Plan (Debtor's Exhibit 8) [Case No. 17-BK-3567-LTS, ECF No. 1299-9], (xi) the 2022 Commonwealth Fiscal Plan (Debtor's Exhibit 9) [Case No. 17-BK-3567-LTS, ECF No. 1299-10; 1299-11], (xii) the 2022 Commonwealth Budget (Debtor's Exhibit 10) [Case No. 17-BK-3567-LTS, ECF No. 1299-12], (xiii) the 2022 Commonwealth Amended Budget (Debtor's Exhibit 11) [Case No. 17-BK-3567-LTS, ECF No. 1299-13], (xiv) the 2022 Commonwealth Second Amended Budget (Debtor's Exhibit 12) [Case No. 17-BK-3567-LTS, ECF No. 1299-14], (xv) the 2023 Commonwealth Budget (Debtor's Exhibit 13) [Case No. 17-BK-3567-LTS, ECF No. 1299-15], (xvi) the list of covered entities approved by the Oversight Board at its September 30, 2016 meeting (Debtor's Exhibit 61) [Case No. 17-BK-3567-LTS, ECF No. 1354-9], and (xvii) the documents filed in the HTA Title III Case.

5.     As described below, in my role as Chairman of the Oversight Board, I believe (i) the HTA Plan complies with the factual requirements of PROMESA Section 314(b), (ii) the payment of Consummation Costs or Restriction Fees under the HTA Plan is reasonable and fair, (iii) the HTA Plan's release, injunction, and exculpation provisions are reasonable, and (iv) the

Commonwealth laws identified in Exhibit F to the HTA Plan as preempted are inconsistent with

PROMESA. (Debtor's Exhibit 58) [Case No. 17-BK-3567-LTS, ECF No. 1354-6].

I.     **Introduction and Overview Regarding Development of the HTA Plan**

       A.     **My Background and Experience, and the Creation and Function of the Oversight Board**

       6.     I received my Juris Doctorate from the University of Virginia School of Law in

1987, and my Bachelor of Arts degree in Zoology and English from the University of North

Carolina at Chapel Hill in 1983.

       7.     I am the S. Samuel Arsht Professor of Corporate Law at the University of

Pennsylvania Carey Law School, a position I have held since 2004.  I have been a Professor of

Law at the University of Pennsylvania Law School since 1999.

       8.     My research and academic focus is on bankruptcy and restructuring law. I have

authored, co-authored or edited several books on this topic, including *Bankruptcy, Debt's*

*Dominion: A History of Bankruptcy Law in America, and When States Go Broke: The Origins,*

*Context, and Solutions for the American States in Fiscal Crisis.*  I have written over fifty (50)

academic articles on issues related to bankruptcy and debt restructuring, including issues arising

in bankruptcies of municipalities and sovereign entities.  I have also written numerous short articles

and opinion pieces for newspapers and other similar publications, including *The Wall Street*

*Journal, The New York Times,* and *The Washington Post.*

       9.     I have been a member of the American College of Bankruptcy since 2009.  In 2016,

I co-founded the University of Pennsylvania Institute for Restructuring Studies (the "Institute").

Among other things, the Institute hosts conferences and other events related to restructuring and

offers resources to enhance the understanding of restructuring and bankruptcy.  In June 2016, I

was appointed by Chief Justice John Roberts to the Advisory Committee on Bankruptcy Rules.

10.    On June 30, 2016, President Obama signed into law PROMESA.  I understand the primary goals of PROMESA are to meet Puerto Rico's immediate need to provide its residents effective services, to formulate a debt restructuring, and to implement fiscal reform leading to a sustainable economy, fiscal responsibility, and access to the capital markets on reasonable terms. To achieve these goals, PROMESA established an independent entity within Puerto Rico's government—the Oversight Board—as the sole representative of any debtor entity in a Title III case, with the exclusive authority to propose a plan of adjustment and the mandate to restore fiscal responsibility and market access to the Commonwealth of Puerto Rico (the "Commonwealth") and its instrumentalities.

11.    On August 31, 2016, I was one of seven (7) individuals appointed by President Barack Obama to serve on the Oversight Board for a term of three (3) years, and on January 6, 2021, I was reappointed by President Donald J. Trump.  On October 6, 2020, I was elected Chairman of the Oversight Board.  None of the members of the Oversight Board receive compensation for our service.

12.    As Chairman of the Oversight Board, I am responsible for, among other things: (i) overseeing the Oversight Board's review, discussion, and certification of fiscal plans and annual budgets for the Commonwealth and its covered territorial instrumentalities, including HTA, as well as any plan of adjustment with respect to a Title III debtor; and (ii) participating, on behalf of the Oversight Board, in negotiations, mediations, and the debt restructuring processes for the Commonwealth and its covered territorial instrumentalities, including HTA.  In this capacity, I received regular updates, presentations, and analyses from the Oversight Board's advisors, in person or by telephone, including at the Oversight Board's weekly sessions, as well as at meetings with smaller groups of Oversight Board members and one-on-one.

13.     Based on my experience as a member of the Oversight Board since August 31, 2016 and as Chairman since October 6, 2020, I understand that, since its establishment, the Oversight Board has focused on achieving its mandates under PROMESA, including, among other things, providing a method for Puerto Rico to regain fiscal responsibility and access to capital markets. To accomplish this, the Oversight Board's responsibilities include, without limitation, (i) the annual certification of fiscal plans and budgets for the Commonwealth, and covered instrumentalities, such as HTA, pursuant to PROMESA Section 202, (ii) a review of executive and legislative acts to ensure compliance with certified fiscal plans and budgets, and PROMESA, and (iii) recommendations to the Governor or the Legislature with respect to actions the Commonwealth and its instrumentalities may take to ensure compliance with a certified fiscal plan, or to otherwise promote the financial stability, economic growth, management responsibility, and efficient delivery of government services to the people of the Commonwealth.  The Oversight Board's responsibilities also include, as the sole representative of a debtor pursuant to Title III of PROMESA, the filing of a plan of adjustment, which must satisfy certain criteria set forth in PROMESA, including that the plan be (i) feasible, (ii) in the best interests of creditors, and (iii) consistent with the applicable fiscal plan certified by the Oversight Board.

14.     Over the past several years, the Oversight Board has certified fiscal plans setting forth initiatives and reforms the Commonwealth and its agencies and instrumentalities must adopt to enable fiscal responsibility, to reduce Commonwealth spending while ensuring more efficient government services for the residents of the Island, to promote economic growth, and set Puerto Rico back on the path to prosperity.  No solution to the Commonwealth's (including HTA's) financial condition would be complete without addressing Puerto Rico's unsustainable debt burden. Accordingly, in 2017, the Oversight Board commenced Title III cases for the

Commonwealth (the "Commonwealth Title III Case"), the Puerto Rico Sales Tax Financing Corporation, ERS, HTA (the "HTA Title III Case"), and the Puerto Rico Electric Power Authority, and, in 2019, for PBA.

15.    The Oversight Board already has accomplished several milestones towards achieving fiscal responsibility of the Commonwealth and its instrumentalities.  These milestones include, among other things, (i) restructuring the debt of the Government Development Bank for Puerto Rico ("GDB") under Title VI of PROMESA, by approving GDB's Qualifying Modification and modifying approximately $4 billion of GDB's debt, (ii) restructuring the debt of COFINA pursuant to a plan of adjustment under Title III of PROMESA, which reduced COFINA's debt by thirty-two percent (32%), and resulted in approximately $17.5 billion in debt service savings, (iii) restructuring the debt of the Puerto Rico Infrastructure Finance Authority ("PRIFA") under Title VI of PROMESA, which eliminated approximately $1.9 billion of debt, (iv) restructuring the debt of the Puerto Rico Convention Center District Authority ("CCDA") under Title VI of PROMESA, which eliminated approximately $400 million of debt, and (v) restructuring the debt of the Commonwealth, ERS, and PBA pursuant to a joint plan of adjustment under Title III of PROMESA, which was confirmed by the Title III Court on January 18, 2022, and was substantially consummated on March 15, 2022, reducing the Commonwealth's $30.5 billion of general obligation and guaranteed debt to approximately $7.4 billion, and eliminating all of ERS's and PBA's debt.

16.    The Oversight Board continues to work toward Puerto Rico attaining fiscal responsibility, gaining access to capital markets on reasonable terms, and achieving renewed economic prosperity and growth. I believe the HTA Plan represents a significant additional step towards achieving those goals. The HTA Plan was made possible by the Oversight Board's

extensive negotiations with numerous claimholder constituencies. To date, the Oversight Board has executed agreements with multiple groups of claimholders, garnering support for the HTA Plan, including entering into agreements with: (i) certain holders and insurers of bonds issued by HTA (the "HTA Bonds," and the holders of HTA Bonds, the "HTA Bondholders"); (ii) the Official Committee of Unsecured Creditors (the "UCC"), and (iii) the DRA Parties (as defined below). The terms of these agreements are embodied and defined in multiple agreements, including the HTA/CCDA PSA, the DRA Stipulation, and the HTA Committee Agreement.

### B.    The Oversight Board's Initial Actions to Fulfill PROMESA's Mandate

17.    As noted above, PROMESA was signed into law on June 30, 2016. As of the filing of the HTA Title III Case, HTA had approximately $4.3 billion in aggregate principal amount of outstanding HTA Bonds.  Prior to the enactment of PROMESA, in 2010, HTA stopped issuing bonds, relying instead on GDB for liquidity and fiscal management support. HTA repeatedly drew on its lines of credit with GDB to fund its operational, working capital, and construction needs as well as ongoing deficits. As of June 30, 2021, the outstanding principal of these credit lines due to the Debt Recovery Authority (the holder of the loans following GDB's restructuring pursuant to PROMESA Title VI) amounted to approximately $1.7 billion, plus accrued interest of roughly $0.9 billion. HTA has had insufficient resources to provide necessary services and meet the aforementioned obligations, while striving towards achievement of fiscal sustainability.

18.    Upon formation, the Oversight Board immediately (i) announced a process for the development, submission, approval, and certification of fiscal plans for the Commonwealth and for covered territorial instrumentalities, including HTA, (ii) designated an initial group of sixty-three (63) entities as covered entities under PROMESA, including the Commonwealth, HTA, GDB, ERS, the Judiciary Retirement System, the Teachers Retirement System, COFINA, the Puerto Rico Aqueduct and Sewer Authority ("PRASA"), PRIFA, PREPA, and PBA, (iii) requested

a significant amount of financial and budgetary information from the Commonwealth as a first step to developing improvements to the Government's fiscal governance, accountability, internal controls, and financial affairs, and (iv) began developing selection criteria and processes for expediting certain critical energy and infrastructure projects.

19.     The Oversight Board has been and continues to be aware of the wide variety of stakeholders in the Commonwealth, as well as in HTA, and the multiple interested parties affected by its efforts toward fiscal responsibility.  In an effort to gather information, understand concerns of the various constituencies, and begin progress towards a consensual resolution of Puerto Rico's financial emergency, the Oversight Board commenced meetings with representatives of multiple groups of claim holders, including retirees, HTA Bondholders and insurers, public employee unions, the Retiree Committee, the UCC, the DRA Parties, and many others.

### C.     The Oversight Board's Policy Reforms

20.     The Oversight Board has included significant structural and governance reforms in the certified fiscal plans, enabling reinvestment into areas of highest need for the Commonwealth and its instrumentalities, including HTA.  For example, the HTA Fiscal Plan calls for HTA to pursue transportation sector reform by setting up a Toll Road Management Office, transferring over transit assets to the Puerto Rico Integrated Transit Authority, pursuing public-private partnership opportunities to access new sources of capital funding, and recruiting a new Board of Directors with four (4) of seven (7) members being independent and private positions.

### D.     Actions Undertaken by the Oversight Board in Response to Natural Disasters and the COVID-19 Pandemic

21.     In September 2017, Puerto Rico's financial status, and the difficulties in improving it, worsened when the Island was devastated by Hurricanes Irma and Maria.  Hurricanes Irma and Maria caused catastrophic destruction, leaving Puerto Rico completely without power, with many

streets and roads flooded, and homes and buildings throughout the Island without roofs or running water.

22.     Acting in concert, the Government and the Oversight Board immediately undertook a series of actions to address this crisis.  The Oversight Board provided the Government with the flexibility to reapportion up to $1 billion in budgeted expenditures to cover disaster-related expenses.  Additionally, the Oversight Board sought the maximum amount of federal assistance, access to an emergency liquidity program, parity treatment for Medicaid funding, and waivers of caps and local share requirements for federal disaster assistance. The Oversight Board also (i) collaborated with the Government to provide short and medium term worst case liquidity estimates, (ii) participated in numerous meetings with members of Congress, Congressional staff, and federal agencies (including the Office of Management and Budget and the U.S. Treasury), and (iii) had dozens of informational meetings with reporters, think-tanks, and universities.

23.     Unfortunately, Hurricanes Irma and Maria were only the first of several natural disasters that have plagued the Commonwealth's recent history.  On December 28, 2019, Puerto Rico experienced what was reported as a magnitude 4.7 earthquake—a harbinger of many significant earthquakes and aftershocks to follow.  On January 6, 2020, according to reports, Puerto Rico was struck by a magnitude 5.8 earthquake, closely followed by a 6.4 magnitude tremblor the next day. On May 2, 2020, a 5.4 magnitude earthquake reportedly struck Puerto Rico's southwestern coast.  To help respond to these disasters, the Oversight Board authorized the additional use of emergency reserve funds, including the allocation of funds to effect repairs to the transportation system, which the certified fiscal plans established after the experience with Hurricanes Irma and Maria pointed to the need for emergency liquidity.

24.     While efforts to recover from these earthquakes were underway, Puerto Rico suffered a public health disaster when, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.  The Oversight Board acted swiftly—and in conjunction with the Government—to combat the pandemic.  Making use of the available emergency reserve funds, the Oversight Board made an initial $5 million available to the Government to contain and mitigate COVID-19, and thereafter authorized the use of the balance of the $160 million emergency reserve fund to try and address the health and economic challenges created by this virus.  On March 23, 2020, the Government and the Oversight Board agreed to provide $787 million in additional financial support to those on the front line of the COVID-19 pandemic.  This funding was used as a bridge to address the dire condition of the Commonwealth until the Federal Government established the Coronavirus Aid, Relief, and Economic Security Act.

### E.     The Oversight Board Certifies HTA Fiscal Plans

25.     PROMESA provides for the creation of fiscal plans for the Commonwealth and its covered instrumentalities, such as HTA, which, in general terms, are intended to provide estimates of revenues and expenditures for the applicable entity for the period covered by the fiscal plan, among other statutory requirements. The Oversight Board is tasked with determining in its sole discretion whether proposed fiscal plans comport with PROMESA section 201(b). Among PROMESA's goals is that the fiscal plan provides Puerto Rico with permanent, pro-growth fiscal reforms, and a method to achieve fiscal responsibility and access to the capital markets.

26.     The Government submitted the first proposed fiscal plan for HTA on February 21, 2017. After incorporating additional revisions and public commentary, the Oversight Board certified the first HTA fiscal plan on April 28, 2017. The certified HTA fiscal plan was based on the Government's proposed fiscal plan with six (6) amendments added by the Oversight Board, which included the need for the public corporation to address the sustainability of HTA by asset,

11

and to adopt more aggressive fiscal and revenue enhancement measures of the transit system. Subsequent fiscal plans have been certified annually for HTA.

27.    Over the years, the Oversight Board has worked diligently to facilitate the successful development and implementation of additional fiscal plans, structural reforms and fiscal measures, including for HTA, by engaging in at least the following actions: (i) monthly meetings with priority agencies to spur implementation progress; (ii) public reporting of the status of progress achieved in Government implementation plans and progress reports; (iii) utilizing readiness assessments based on best practices to provide a framework for agencies to track progress on implementation and understand the scope of the different milestones; (iv) conducting public hearings on implementation in areas of much needed transformation; and (v) milestone budgeting to incentivize implementation.

28.    During the months following Hurricanes Irma and Maria, the Oversight Board collaborated with the Government to continue to develop new fiscal plans. The Oversight Board sought to re-certify the first filed HTA fiscal plan to account for the fundamental effects of the hurricanes on Puerto Rico.  On April 20, 2018, the Oversight Board voted to certify a revised HTA fiscal plan, which provided a roadmap for transforming the highway and transit infrastructure system all across Puerto Rico to catalyze economic growth and combat the effects of the hurricane destruction. The revised HTA fiscal plan projected a total six (6)-year post-measure surplus of $355 million, based on several changes, including updated pre-measures financial information, toll increases, and personnel cost reductions on a level consistent with the rest of the Commonwealth. Over the past several years, the Oversight Board has certified further revised HTA fiscal plans to reflect new information, delays in implementation, updated financial projections, investments into

the infrastructure and construction of roads, highways, and related transportation facilities in Puerto Rico; and to account for additional natural disaster and public health crises.

29.    In 2019, Puerto Rico faced significant political turmoil culminating in the resignation of then-governor Rosselló.  Just as the Island was recovering from political disruption and embarking on reconstruction at the end of 2019, Puerto Rico suffered the series of earthquakes and aftershocks described above, causing structural damage to the highway infrastructure across southwestern Puerto Rico.  Only two months later, Puerto Rico (along with the rest of the world) was confronted with the global COVID-19 pandemic.  Amidst the uncertainty, the Oversight Board represented a steady hand and worked diligently to address the economic and social impact of these events.  Accordingly, on June 26, 2020 the Oversight Board certified a new fiscal plan for HTA (the "June 2020 HTA Fiscal Plan") (Debtor's Exhibit 3) [Case No. 17-BK-3567-LTS, ECF No. 1299-4], which I have read. Among other things, the June 2020 HTA Fiscal Plan reflected the substantial impacts of the 2020 earthquakes and COVID-19 pandemic on Puerto Rico's highway infrastructure. Additionally, the June 2020 HTA Fiscal Plan required establishment of an independent board with experienced and knowledgeable directors, and six (6) measures to improve revenue, including, increases in toll fine collections, introduction of congestion pricing, as well as four (4) measures to cut health expenses, including reducing pension and employee healthcare costs. The June 2020 HTA Fiscal Plan supported a total transformation of Puerto Rico's transportation system to provide for a more productive, competitive, and resilient economic future for Puerto Rico's transportation system.

30.    As the COVID-19 pandemic continued to impact the world, on May, 27, 2021, the Oversight Board certified a new fiscal plan for HTA (the "May 2021 HTA Fiscal Plan") (Debtor's Exhibit 4) [Case No. 17-BK-3567-LTS, ECF No. 1299-5], which I have also read. The May 2021

HTA Fiscal Plan reflected new macroeconomic policy and technological developments, while accounting for the impacts of COVID-19 on Puerto Rico's transportation system.  Among other things, the May 2021 HTA Fiscal Plan introduced the Transportation Sector Reform, which lays out key initiatives to address the underperformance of Puerto Rico's transportation sector. The Transportation Sector Reform calls for HTA, as a key stakeholder in Puerto Rico's transportation sector, to play a lead role in executing the necessary measures to enable the reform. The Transportation Sector Reform intends to reorganize transportation assets to improve overall efficiency and performance of transportation systems in Puerto Rico through measures that promote long-term sustainability. The May 2021 HTA Fiscal Plan also included measures that would enhance HTA's revenues to ensure fiscal sustainability, such as, fare increases, toll optimization, fine price modifications, bi-directional tolling, transit enhancements, and ancillary revenue improvements. The fiscal measures described in the May 2021 HTA Fiscal Plan are critical to HTA's long-term financial success and embody the need for HTA to optimize expenses, generate revenues, and support the transportation network for long term fiscal sustainability.

31.     More recently, on February 22, 2022, the Oversight Board again certified a new fiscal plan for HTA (the "February 2022 HTA Fiscal Plan") (Debtor's Exhibit 5) [Case No. 17-BK-3567-LTS, ECF No. 1299-6]. Among other things, the February 2022 HTA Fiscal Plan (1) provides updates for new information, as well as fiscal measures that generate revenues and optimize expenses, including, (i) inflation-based increases on toll fares and fines, (ii) new electronic systems for toll collection, (iii) transit enhancements, and (iv) the re-assessment of Tren Urbano contracts and the reduction of healthcare expenses, and (2) presses HTA to implement much-needed reform measures including, (a) implementing the Transportation Sector Reform, (b) transferring ownership of Tren Urbano to the Puerto Rico Integrated Transit Authority ("PRITA"),

(c) setting up a dedicated Toll Road Management Office, and (d) pursuing a Public-Private Partnership to access new sources of capital funding.

### F.     The HTA Plan and Plan Settlement Agreements

32.     As described herein, following the filing of the HTA Title III Case, the Oversight Board, either directly or through its advisors, engaged in extensive mediation sessions under the guidance and direction of the Mediation Team (the "Mediation Team")[3], and continued to negotiate directly with various constituencies, all in an effort to build support for the restructuring of Commonwealth and HTA debt.   Eventually, those negotiations culminated in certain agreements with various stakeholders in furtherance of the successful implementation of the HTA Plan.

33.     On May 5, 2021, the Oversight Board reached an agreement with certain holders and insurers of HTA Bonds and certain holders and insurers of CCDA Bonds, regarding the proposed treatment and settlement of, among other things, certain "clawback claims" against the Commonwealth (the "HTA/CCDA PSA" or the "HTA/CCDA Plan Support Agreement") (Debtor's Exhibit 14) [Case No. 17-BK-3567-LTS, ECF No. 1299-16]. The HTA/CCDA PSA, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, (ii) provides for the issuance of new bonds and Contingent Value Instruments ("CVIs"), along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) provides for $184.8 million in cash to holders of claims against HTA arising from or relating to the HTA 68 Bonds and $79.2 million in cash to holders of claims

---

[3] The "Mediation Team" is the mediation team led by Judge Barbara J. Houser of the United States Bankruptcy Court for the Northern District of Texas (the "Mediation Team Leader") as established by the Title III Court under its *Order Appointing Mediation Team*, dated June 23, 2017 [ECF No. 430].

against HTA arising from or relating to HTA 98 Senior Bonds upon satisfaction of the HTA Distribution Conditions, (iv) resolves the outstanding disputes between the Commonwealth and the other parties to the HTA/CCDA PSA, (v) provides for the bondholders and insurers to support the HTA Plan, and (vi) provides an agreement regarding the structure of a potential plan of adjustment for HTA.

34.     Following entry into the HTA/CCDA Plan Support Agreement, negotiations undertaken with the assistance and guidance of the Mediation Team between the Oversight Board and certain monoline insurers, Ambac and FGIC, continued.  As a result of those negotiations, on July 15, 2021, Ambac and FGIC joined the HTA/CCDA Plan Support Agreement pursuant to separate Joinder Agreements to the HTA/CCDA Plan Support Agreement, subject to a right to terminate the HTA/CCDA Plan Support Agreement solely as to themselves, which right expired on July 26, 2021.

35.     The HTA/CCDA Plan Support Agreement has the support of (i) over $700 million of the aggregate amount of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), and HTA 68 Bond Claims (National), and (ii) over $2.1 billion of the aggregate amount of HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National).

36.     On November 5, 2021, the Oversight Board reached an agreement with AmeriNational Community Services, LLC (as servicer for the GDB Debt Recovery Authority (the "DRA")), and Cantor-Katz Collateral Monitor LLC (a Delaware limited liability company and as collateral monitor for Wilmington Trust, N.A.) (collectively, the "DRA Parties"), regarding the proposed treatment and settlement of, among other things, the DRA's claims against HTA (the

"DRA Stipulation") (Debtor's Exhibit 16) [Case No. 17-BK-3567-LTS, ECF No. 1299-18].  The

DRA Stipulation, among other things, provides for the DRA Parties to (i) support the HTA Plan

and solicitation process, and (ii) vote to accept the HTA Plan.

37.     On January 18, 2022, the Court entered the *Order and Judgment Confirming*

*Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,*

*the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and*

*the Puerto Rico Public Buildings Authority* (the "CW Confirmation Order") (Debtor's Exhibit 29)

[Case No. 17-BK-3567-LTS, ECF No. 1300-9], confirming the *Modified Eighth Amended Title III*

*Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System*

*of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings*

*Authority* (the "Commonwealth Plan") (Debtor's Exhibit 28) [Case No. 17-BK-3567-LTS, ECF

No. 1300-8]. The Commonwealth Plan incorporated, among other things, the terms, provisions,

and agreements for the settlement and compromise of various disputes relating to the

Commonwealth as provided in the HTA/CCDA PSA and DRA Stipulation.  On March 15, 2022,

the Commonwealth Plan became effective.

38.     On May 2, 2022, the Oversight Board filed the *Title III Plan of Adjustment of the*

*Puerto Rico Highways and Transportation Authority* (the "Initial Plan"), the filing of which the

Oversight Board certified pursuant to a resolution dated April 28, 2022 (Debtor's Exhibit 18) [Case

No. 17-BK-3567-LTS, ECF No. 1299-20]. The Initial Plan implemented the material terms

outlined in the HTA/CCDA PSA and the DRA Stipulation as they relate to HTA.

39.     Following the filing of the Initial Plan, the Oversight Board continued to negotiate

with various stakeholders, including the Creditors' Committee, to generate further support for a

plan of adjustment. On May 9, 2022, the Oversight Board reached an agreement with the Creditors'

Committee, which provided for the terms of a recommended global settlement regarding the treatment of HTA General Unsecured Claims, including, among other things, the increase of the HTA GUC Recovery from $25 million to $48 million (the "HTA Committee Agreement") (Debtor's Exhibit 15) [Case No. 17-BK-3567-LTS, ECF No. 1299-17]

40.     On May 16, 2022, the Oversight Board filed the *Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [Case No. 17-3567, ECF No. 1177] (the "First Amended Plan"), the filing of which the Oversight Board certified pursuant to a resolution dated May 13, 2022 (Debtor's Exhibit 19) [Case No. 17-BK-3567-LTS, ECF No. 1299-21]. The First Amended Plan incorporated the material terms of the HTA Committee Agreement.

41.     On June 7, 2022, the Oversight Board filed the *Second Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [Case No. 17-3567, ECF No. 1202] (the "Second Amended HTA Plan"), the filing of which the Oversight Board certified pursuant to a resolution dated June 7, 2022 (Debtor's Exhibit 20) [Case No. 17-BK-3567-LTS, ECF No. 1299-22].  The Second Amended HTA Plan reflects other comments received from various parties in interest.

42.     On June 17, 2022, the Oversight Board filed the *Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Debtor's Exhibit 1) [Case No. 17-3567, ECF No. 1299-1] (the "Third Amended HTA Plan"), the filing of which the Oversight Board certified pursuant to a resolution dated June 17, 2022 (Debtor's Exhibit 21) [Case No. 17-BK-3567-LTS, ECF No. 1300-1]. The Third Amended HTA Plan reflects certain comments received from various parties in interest.

43.     On August 7, 2022, the Oversight Board filed the HTA Plan, the filing of which the Oversight Board certified pursuant to a resolution dated August 5, 2022 (Debtor's Exhibit 59) [Case No. 17-BK-3567-LTS, ECF No. 1354-7].

44.     Members of the Oversight Board, including me, participated in negotiations that led to the entry into the PSAs.  In addition, the Oversight Board was represented in negotiations of the PSAs by either its principal financial advisors, PJT Partners and Citigroup, and/or its legal counsel, Proskauer Rose LLP ("Proskauer"). The Oversight Board's advisors made regular presentations to the Oversight Board in person or by telephone, including at its weekly sessions, as well as at meetings with smaller groups of Oversight Board members and one-on-one.  I attended virtually all, if not all, of those group meetings and telephone conferences.  These presentations updated the Oversight Board on how the key features of the negotiations were evolving over the course of the parties' discussions.  The Oversight Board also discussed the negotiations regarding the PSAs at additional strategy sessions.

45.     At our regular meetings, the other members of the Oversight Board and I provided feedback to our advisors regarding our views concerning the appropriate structure for the PSAs and the ultimate terms of the agreements. The advisors incorporated that feedback into the proposals and counterproposals that were sent to the various PSA counterparties and, in most circumstances, the Court-appointed Mediation Team.

46.     The Oversight Board and its advisors also discussed best and worst case scenarios for the outcome of pending and potential litigations brought by and against the Oversight Board and the Debtor.  Our advisors, including Proskauer, provided us with assessments of the strengths and weaknesses of the arguments asserted or that could be asserted by various parties under PROMESA.  Although the details of these analyses are privileged, I believe the Oversight Board's

advisors provided me (and the other members of the Oversight Board) with the information needed

to assess and understand the potential risks that litigation posed, including risks and expense of

continued litigation to the Oversight Board's overarching goals of HTA exiting Title III, achieving

fiscal responsibility, and regaining access to the capital markets.  The Oversight Board weighed

all these factors against our strategic goals for HTA.

47.     In Section III, below, I describe the details of the above-referenced settlements and

why I believe they are fair and reasonable.

## II.     The HTA Plan Complies with the Factual Requirements in PROMESA Section 314(b)

48.     I believe the HTA Plan complies with the factual requirements in PROMESA

Section 314(b) discussed below, based on (a) my understanding of the HTA Plan, (b) the events

that occurred throughout the Debtor's Title III Case, and (c) various orders entered by the Title III

Court during the Debtor's Title III Case.

### A.     PROMESA § 314(b)(1):  The HTA Plan Fully Complies with the Provisions of the Bankruptcy Code Made Applicable by PROMESA § 301

#### 1.     Bankruptcy Code Section 1122(a): Classification of Claims and Interests

49.     Section 1122(a) of the Bankruptcy Code states a claim may be classified in a

particular class if it is substantially similar to the other claims or interests in such class.  In

assessing this requirement, the Oversight Board considered many factors, including the security

and priority of claims, in determining whether claims are substantially similar.

50.     The HTA Plan (Debtor's Exhibit 58) [Case No. 17-BK-3567-LTS, ECF No. 1354-

6], provides for the separate classification of Claims in twenty (20) Classes.  I believe such

classifications comply with section 1122(a) of the Bankruptcy Code because Claims in each Class

are either all unsecured Claims or are all secured Claims secured by the same collateral.

Specifically, Article IV of the HTA Plan classifies the following twenty (20) Classes of Claims:

| Claim | Class |
|---|---|
| HTA 68 Bond Claims | 1 |
| HTA 68 Bond Claims (Ambac) | 2 |
| HTA 68 Bond Claims (Assured) | 3 |
| HTA 68 Bond Claims (National) | 4 |
| HTA 98 Senior Bond Claims | 5 |
| HTA 98 Senior Bond Claims (Ambac) | 6 |
| HTA 98 Senior Bond Claims (Assured) | 7 |
| HTA 98 Senior Bond Claims (FGIC) | 8 |
| HTA 98 Senior Bond Claims (National) | 9 |
| HTA 98 Sub Bond Claims | 10 |
| HTA 98 Sub Bond Claims (Assured) | 11 |
| HTA 98 Sub Bond Claims (FGIC) | 12 |
| HTA 98 Sub Bond Claims (National) | 13 |
| HTA Moscoso Bond Claims | 14 |
| Eminent Domain/Inverse Condemnation Claims | 15 |
| HTA General Unsecured Claims | 16 |
| HTA/GDB Claims | 17 |
| Section 510(b) Subordinated Claims | 18 |
| Convenience Claims | 19 |
| Federal Claims | 20 |

Bond Claims (Classes 1-14).

51.     To the extent Claims are separately classified, the reason for separate classification

is never to gerrymander an accepting Class.  Indeed, the PSAs provide the Debtor many accepting

Classes. Rather, separate classification is used for governmental or business reasons usually

requiring different treatment of separate Classes' Claims. I understand that bond claims against

HTA in Classes 1-14 are classified separately based on the seniority, and security claimed by

holders of, different bond issuances and whether the bonds are insured and, if so, the insurer, as

follows: (a) bonds issued by HTA pursuant to Resolution No. 68-18, adopted June 13, 1968, as amended and supplemented thereafter (Classes 1-4), senior bonds issued by HTA pursuant to Resolution 98-06, adopted February 16, 1998 (Classes 5-9), subordinated bonds issued by HTA pursuant to Resolution 98-06, adopted February 16, 1998 (Classes 10-13), or Special Facility Revenue Refunding Bonds, 2003 Series A, issued by HTA pursuant to that certain Trust Agreement, dated as of October 1, 2003, between HTA and Banco Popular de Puerto Rico, as trustee (Class 14), and (b) whether the bonds are (i) uninsured (Classes 1, 5, 10, and 14), or (ii) insured by Assured Guaranty Corp. or Assured Guaranty Municipal Corp. (together, "Assured") (Classes 3, 7, 11), National Public Finance Guarantee Corporation ("National") (Classes 4, 9, and 13), Financial Guaranty Insurance Company ("FGIC") (Classes 8 and 12), or Ambac Assurance Corporation ("Ambac") (Classes 2 and 6).

Eminent Domain/Inverse Condemnation Claims (Class 15).

52. The Claims held by eminent domain claimants are separately classified in Class 15. I understand those claimants assert constitutional Claims based upon an alleged seizure of property pursuant to HTA's eminent domain power, and are partially secured by deposits submitted by HTA with the Clerk of the Court of First Instance in connection with condemnation proceedings underlying such Claims. The HTA Plan provides that these Claims will be treated as HTA General Unsecured Claims entitled to the same treatment as other holders of HTA General Unsecured Claims to the extent each allowable Claim exceeds the cash on deposit for it. However, the amount of the Claim in excess of the deposit, if any, will be paid in full upon entry of separate Final Orders (i) setting the amount of Allowed Claims for just compensation, and (ii) determining that such claims may not be impaired or discharged. These Claims are classified separately because the

treatment of this Class settles the claimholders' Fifth Amendment Claims, which would entitle the Claims to payment if their Fifth Amendment argument were correct.

HTA General Unsecured Claims (Class 16).

53.     Class 16 consists of Claims against HTA, other than those excluded pursuant to Section 1.194 of the HTA Plan, or otherwise treated in other Classes under the HTA Plan. I understand all Claims in Class 16 are unsecured and substantially similar to the other Claims in this Class.

HTA/GDB Claims (Class 17).

54.     Class 17 consists of Claims against HTA with respect to loans extended by GDB to HTA, other than any Claims in Classes 1-14.  These Claims are classified separately because, pursuant to the terms and provisions of the DRA Stipulation, the DRA, as holder of the HTA/GDB Claims, has agreed to receive no distribution on account of its HTA/GDB Claims.

Section 510(b) Subordinated Claims Class (Class 18).

55.     Class 18 consists of Claims determined pursuant to a Final Order to be subject to section 510(b) of the Bankruptcy Code. I understand section 510(b) of the Bankruptcy Code subordinates such Claims to other general unsecured claims, and that such Claims are only eligible to receive a recovery under the HTA Plan once all other unsecured creditors have been paid in full. Because they have a lower priority than general unsecured claims, they are sufficiently dissimilar to general unsecured claims to warrant separate classification and treatment.

Federal Claims (Class 20).

56.     Class 20 consists of Claims of the United States of America, its agencies, departments or agents, including, without limitation, the United States Department of Housing and Urban Development, the United States Department of Homeland Security, and the United States

Department of Labor. Due to the unique relationship of the Commonwealth and its instrumentalities, including HTA, with the federal government and its instrumentalities, as well as the long-term nature of many federal programs, it is reasonable and justified to classify such Federal Claims separately.

### 2.     Bankruptcy Code Section 1122(b)

57.     Section 1122(b) of the Bankruptcy Code permits a plan to "designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." Class 19 contains a Class of "Convenience Claims," consisting of Claims equal to or less than $20,000, or Claims which a given holder elected to reduce to $20,000 in accordance with the terms of the HTA Plan.  In addition, any holder of multiple Claims in an aggregate amount of $40,000 or more may elect to reduce all such Claims to an aggregate amount of $40,000 and be treated within this Class. Given the extraordinarily large number of Claims asserted against HTA, I believe the separate classification of such "Convenience Claims" is reasonable and necessary to ease the administrative burden on HTA. I further believe it would be less costly simply to pay such Claims than it would to administer them through the claims reconciliation process.

### 3.     Bankruptcy Code Section 1123(a)(1)

58.     Section 1123(a)(1) of the Bankruptcy Code requires a plan to designate certain claims, other than (as relevant here) those specified in section 507(a)(2), into separate classes in accordance with section 1122 of the Bankruptcy Code.  As stated above, Article IV of the HTA Plan designates twenty (20) separate Classes of Claims for the Debtor and the claims in each such Class are substantially similar to other claims or interests within that Class.  None of those twenty (20) separate Classes of Claims contain claims of the type described in section 507(a)(2) of the Bankruptcy Code.

24

### 4.  Bankruptcy Code Section 1123(a)(2)

59.     Section 1123(a)(2) of the Bankruptcy Code requires a plan to specify any class of claims unimpaired under the plan. The election to be treated as a Convenience Claim pursuant to Section 20.1(b) of the HTA Plan allows Holders of Allowed HTA General Unsecured Claims to reduce the amount of such holder's Allowed Claim and accept the HTA Plan as a holder of a Claim in Class 19.  Section 33.1 of the HTA Plan specifies that Claims in Classes 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, and 20 are impaired and will receive distributions pursuant to the HTA Plan, and that such Classes are entitled to vote to accept or reject the HTA Plan; provided, however, that, based upon the elections made on the Ballot/Election Form, Class 19 is deemed to have accepted the HTA Plan.  Additionally, the Claims in Class 18 are impaired and not receiving a distribution pursuant to the HTA Plan and Class 18 is deemed to have rejected the HTA Plan.

60.     I also am aware that Section 33.2 of the HTA Plan specifies that Claims in Classes 14 and 19 are unimpaired pursuant to the HTA Plan, are deemed to have accepted the HTA Plan and are not entitled to vote to accept or reject the HTA Plan. In sum, the HTA Plan specifies each unimpaired class of claims.

### 5.  Bankruptcy Code Section 1123(a)(3)

61.     Section 1123(a)(3) of the Bankruptcy Code requires a plan to specify the treatment of any class of claims impaired under the plan. I am aware that Articles V through XXIV of the HTA Plan identify the treatment of each Class of Claims impaired by the HTA Plan.

### 6.  Bankruptcy Code Section 1123(a)(4)

62.     Section 1123(a)(4) of the Bankruptcy Code requires a plan to provide the same treatment for all claims in any given class, subject to a claimant agreeing to less favorable treatment.  Articles V through XXIV of the HTA Plan provide that the treatment of each Claim in each particular Class is the same as the treatment of each other Claim in such Class, except to the

25

extent a holder of an Allowed Claim has agreed to less favorable treatment of its Claim.  I therefore believe that all holders of Claims in each of the Classes receive the same treatment as holders of other Claims in the same Class pursuant to the HTA Plan.

63.     Certain parties are receiving payment of Consummation Costs or Restriction Fees under the HTA Plan and in accordance with the HTA/CCDA Plan Support Agreement or the DRA Stipulation negotiated by the Oversight Board, as described further above. The Oversight Board is not awarding such costs and fees on account of the respective creditors' Claims. Rather, (i) the Consummation Costs are provided in consideration of certain creditors' assistance in the formulation of the HTA Plan for all creditors and to compensate them for the reasonable fees and expenses incurred in connection with the negotiation and execution of the HTA/CCDA Plan Support Agreement benefitting classes of creditors, which made development of the HTA Plan possible; and (ii) Restriction Fees are provided in connection with certain parties' commitment to support the confirmation of the HTA Plan and, in connection therewith, to "lock up" their bonds pursuant to the terms of the HTA/CCDA Plan Support Agreement or the DRA Stipulation, as applicable.  Because these fees are not being paid on account of the creditors' Claims, but as consideration for actions taken by these creditors to create the HTA Plan benefitting all creditors, the Oversight Board believes these fees do not cause the Claims of the creditors receiving them to be treated differently than other Claims in each Class.

### 7.     Bankruptcy Code Section 1123(a)(5)

64.     Section 1123(a)(5) of the Bankruptcy Code requires a plan to provide adequate means for the plan's implementation. Various provisions of the present HTA Plan provide adequate and proper means for its implementation.  More specifically:

    a.     Article II provides for the terms of the operational restructuring of HTA consistent with the HTA 2022 Fiscal Plan;

b.   Article III provides for the payment of Administrative Expense Claims required to be paid on the later of the (i) HTA Plan Effective Date or (ii) the date on which an Administrative Expense Claim shall become an Allowed Claim;

c.   Section 25.1 provides for the issuance and distribution of the New HTA Bonds;

d.   Section 25.3 ensures the feasibility of the present HTA Plan by providing for the adoption and maintenance of a debt management policy "designed to ensure that certain past Debt issuance practices of HTA are not repeated;"

e.   Section 27.1 provides, subject to Sections 27.5 and 27.7 of the HTA Plan, that "all Executory Contracts and Unexpired Leases that exist between the Debtor and any Entity, and which have not expired by their own terms on or prior to the HTA Effective Date, shall be deemed rejected by the Debtor as of the HTA Effective Date, except for any Executory Contract and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the HTA Effective Date, (b) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the HTA Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, or (g) by or between any Commonwealth agencies, departments, municipalities, public corporations or instrumentalities (other than leases to which PBA is a party) . . . ."

f.   Article XXVIII provides for distributions to be made to holders of all Allowed Claims under the HTA Plan;

g.   Sections 1.51 and 29.1 provide for the authority to litigate and compromise and settle the Avoidance Actions to be transferred to the Avoidance Actions Trust on the HTA Effective Date and to be administered pursuant to the Avoidance Actions Trust Agreement;

h.   Section 31.2 vests in the Disbursing Agent, among other things, the power to issue distributions contemplated by the HTA Plan;

i.   Article XXXII provides for the Debtor to reconcile, and to the extent ultimately allowed, pay, any and all Disputed Claims;

27

j.   Article XXXVII provides that, "[o]n the HTA Effective Date, all matters provided for under the HTA Plan that would otherwise require approval of the directors of the Debtor or Reorganized HTA, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New HTA Bonds, the authorization to enter into the Definitive Documents, the adoption of Reorganized HTA By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized HTA pursuant to the HTA Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New HTA Bonds Indenture, and the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule. Other matters provided under the HTA Plan involving the corporate structure of Reorganized HTA or corporate action by Reorganized HTA, as applicable, shall be deemed to have occurred, be authorized, and shall be in effect in accordance with the New HTA Bonds Indenture, and the new corporate governance documents, as applicable, and without requiring further action by any Entity under any other applicable law, regulation, order, or rule;" and

k.   Section 41.1 provides for the re-vesting of assets:  "[e]xcept as provided in the HTA Confirmation Order, on the HTA Effective Date, title to all Assets and properties of the Debtor encompassed by the HTA Plan shall vest in Reorganized HTA, free and clear of all Liens, including, without limitation, any Lien upon or security interest in the SIB Account, but expressly excluding Liens granted pursuant to the HTA Plan and the HTA Confirmation Order."

65.   Additionally, I have reviewed the documents included in the Plan Supplement (Debtor's Exhibit 60) [Case No. 17-BK-3567-LTS, ECF No. 1354-8].  It contains substantially final forms of: (a) the New HTA Bonds Indenture, (b) Amended and Restated Avoidance Actions Trust Agreement, (c) Schedule of Executory Contracts and Unexpired Leases to be Assumed, (d) Ambac Custodial Trust Documents, (e) Assured Custodial Trust Documents, (f) FGIC Trust Documents, (g) Initial Board of Directors of Reorganized HTA, (h) First Supplemental Trust Agreement (New HTA Bonds), and (i) Second Supplemental Trust Agreement (Subordinated Indebtedness). I believe that the HTA Plan, together with the documents and arrangements set forth in the Plan Supplement, provides adequate means for its implementation.

28

### 8.  Bankruptcy Code Section 1123(b)(1)

66.  Section 1123(b)(1) of the Bankruptcy Code permits a plan to impair or leave unimpaired any class of claims. Article XXXIII of the HTA Plan identifies which Classes of Claims are impaired and which Classes of Claims are left unimpaired.

### 9.  Bankruptcy Code Section 1123(b)(2)

67.  Section 1123(b)(2) of the Bankruptcy Code permits a plan to provide for the assumption, rejection, or assignment of any executory contract or unexpired lease not previously rejected.  Article XXVII of the HTA Plan provides that, "all Executory Contracts and Unexpired Leases that exist between the Debtor and any Entity, and which have not expired by their own terms on or prior to the HTA Effective Date, shall be deemed rejected by the Debtor as of the HTA Effective Date, except for any Executory Contract and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the HTA Effective Date, (b) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, or (g) by or between any Commonwealth agencies, departments, municipalities, public corporations or instrumentalities (other than leases to which PBA is a party); provided, however, that the Debtor reserves the right, on or prior to the HTA Effective Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed

to be, as the case may be, either rejected, assumed, or assumed and assigned as of the HTA Effective Date."  HTA Plan § 27.1.

### 10.    Bankruptcy Code Section 1123(b)(3)(A)

68.    Section 1123(b)(3)(A) of the Bankruptcy Code permits a plan to provide for the settlement or adjustment of any claim belonging to the debtor. As described further below, the Commonwealth Plan, as well as the PSAs, set forth the terms and conditions for a global compromise and integrated settlement of, among other issues, asserted and unasserted disputes concerning the rights of holders of HTA 68 Bond Claims and HTA 98 Bond Claims including the disputes: (a)  raised by certain holders of CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally appropriated to HTA, as applicable, and "clawed back" by the Commonwealth pursuant to the provisions of the Commonwealth Constitution, (b) relating to the validity, priority, secured status and related rights attendant to the GDB HTA Loans, and (c) raised by the Lift Stay Motions and the Clawback Actions relating to the CW/HTA Claims and  certain holders' asserted security interest in toll and fine revenues collected by HTA.  The settlement and compromise of such issues as they relate to the Commonwealth have been approved pursuant to the confirmation of the Commonwealth Plan on January 18, 2022.  I believe such settlements and compromises are in the best interests of the Debtor and its creditors, and well within the range of reasonableness.

### 11.    Bankruptcy Code Section 1123(b)(3)(B)

69.    Section 1123(b)(3)(B) of the Bankruptcy Code permits a plan to provide for the retention and enforcement by the debtor, the trustee, or by a representative of the estate appointed for such purpose, of any claim belonging to the debtor. Section 1.51 references the Avoidance Actions Trust, dated March 15, 2022, entered into by the Commonwealth in connection with the consummation of the Commonwealth Plan. This section provides that, on the HTA Effective Date,

the authority to litigate or compromise and settle the Avoidance Actions, relating to HTA, will be transferred to the Avoidance Actions Trust, established by the Commonwealth Plan.

70.     Further, Section 29.1 of the HTA Plan provides that: "[e]xcept as settled and released herein, from and after the HTA Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court."

71.     Section 32.1(a) of the HTA Plan further provides that: "[e]xcept with respect to Allowed Claims, and subject to the terms and conditions of the ADR Procedures and the ADR Order, Reorganized HTA, by and through the Oversight Board, and in consultation with AAFAF, shall object to, and shall assume any pending objection filed by the Debtor to, the allowance of Claims filed with the Title III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto.  All objections, affirmative defenses and counterclaims shall be litigated to Final Order; provided, however, that Reorganized HTA, by and through the Oversight Board, and in consultation with AAFAF, shall have the authority to file, settle, compromise or withdraw any objections to Claims, without approval of the Title III Court."

72.     Based on the foregoing provisions, I believe the HTA Plan provides for the retention and enforcement by the Debtor or an assigned estate representative of all claims and interests.

### 12.     Bankruptcy Code Section 1123(b)(4)

73.     Section 1123(b)(4) of the Bankruptcy Code permits a plan to provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among claim holders. The HTA Plan does not provide for the sale of all or substantially all of the property of HTA, but instead, provides for HTA to undergo an operational restructuring.

31

Section 2.4 provides for timely operational restructuring of HTA through the separation of Highway Assets from the Transit Assets, with such Transit Assets and all Transit Revenues being transferred to PRITA.

### 13.    Bankruptcy Code Section 1123(b)(5)

74.    Section 1123(b)(5) of the Bankruptcy Code permits a plan to modify the rights of claimholders.  Articles V through XXIV of the HTA Plan modify the rights of holders of Claims in the Impaired Classes, and leave intact those holders of Claims in the Unimpaired Classes.

### 14.    Bankruptcy Code Section 1123(b)(6)

75.    Section 1123(b)(6) of the Bankruptcy Code permits a plan to include any other provision not inconsistent with the Bankruptcy Code.  Article XLI of the HTA Plan provides for, among other things, (a) certain releases, injunctions, and exculpations, and (b) an exemption from registration pursuant to Bankruptcy Code section 1145 for the issuance and distribution of the New HTA Bonds.  I am unaware of any facts rendering Article XLI inconsistent with any requirements in the Bankruptcy Code.

### 15.    Bankruptcy Code Section 1123(d)

76.    Section 1123(d) of the Bankruptcy Code requires a plan that proposes to cure a default to do so in accordance with the underlying agreement and applicable nonbankruptcy law. Section 27.4 of the HTA Plan provides for the payment of cure amounts required to be paid to the counterparties of Executory Contracts and Unexpired Leases assumed, or assumed and assigned under the HTA Plan.  I am aware that any cure amounts will be determined in accordance with the underlying agreements and applicable nonbankruptcy law, and pursuant to the procedures established by the HTA Plan.

32

### 16.    Bankruptcy Code Section 1129(a)(2)

77.    Section 1129(a)(2) of the Bankruptcy Code requires the proponent of a plan to comply with applicable provisions of the Bankruptcy Code.  To the best of my knowledge and belief, based on my experience and involvement in the process culminating in the HTA Plan, as well as the plan process associated with the Commonwealth Plan, the HTA/CCDA PSA, the DRA Stipulation, and the HTA Committee Agreement, the Debtor has complied with all statutory requirements in the Bankruptcy Code as shown by (i) the outcomes of each action brought by creditors to enforce against the Oversight Board requirements in the Bankruptcy Code, and (ii) the actions taken by the Oversight Board to procure approval of the Disclosure Statement and confirmation of the HTA Plan. For instance, the Oversight Board, with the assistance of its professionals, and in coordination with AAFAF, expended significant time and effort preparing the Disclosure Statement and sought and received input and comment thereon from parties to the PSAs, and all other parties in interest. This Court approved the Disclosure Statement as containing adequate information and meeting the requirements of section 1125 and 1126 of the Bankruptcy Code. Likewise, the Oversight Board will be proffering at the confirmation hearing evidence that the Debtor properly solicited and tabulated votes with respect to the HTA Plan.

### 17.    Bankruptcy Code § 1129(a)(3)

78.    Section 1129(a)(3) of the Bankruptcy Code requires a plan to be proposed in good faith and not by any means forbidden by law. The HTA Plan was proposed by the Oversight Board in good faith, and with the legitimate and honest purpose, consistent with its statutory mandate under PROMESA, of providing a method for HTA to achieve fiscal responsibility and access to capital markets.  As discussed in great detail in Section I above, the HTA Plan (including the settlements and compromises contained therein) is the result of extensive, arms'-length

negotiations among certain constituencies through the independent mediation process developed and guided by the Mediation Team, and direct settlement negotiations.

79.     The HTA Plan put forth for confirmation is the fourth amended version of the plan of adjustment because the Oversight Board has worked tirelessly since this Title III Case began, with the assistance of its legal and financial advisors, to develop consensus with creditors and to evaluate HTA's current and future financial circumstances. These circumstances have been subject to constant change as the Oversight Board, HTA, creditors, and the people of Puerto Rico have fought to address the Island's needs and develop a path to fiscal responsibility in the midst of multiple major hurricanes, earthquakes, and other natural disasters, as well as the impact of the global COVID-19 pandemic.

80.     The HTA Plan is the culmination of all of these efforts and is designed to implement the settlement and compromise of numerous risky and costly disputes (and further the settlements and compromises that have been approved in connection with the Commonwealth Plan), while avoiding protracted litigation that could delay distributions to creditors.

### 18.     Bankruptcy Code Section 1129(a)(6)

81.     Section 1129(a)(6) of the Bankruptcy Code requires any rate changes provided for under the plan to be approved by any governmental regulatory commission with jurisdiction. The HTA Plan contemplates certain toll rate increases; however, I understand that such increases do not require the approval of any governmental regulatory commission with jurisdiction over HTA and such toll rate increases.

### 19.     Bankruptcy Code Section 1129(a)(8)

82.     Section 1129(a)(8) of the Bankruptcy Code requires each class of claims to either accept the plan or to be unimpaired thereunder unless section 1129(b) of the Bankruptcy Code is applied to a rejecting class.  It is my understanding based on preliminary voting results reported to

me by Kroll Restructuring Administration, LLC ("Kroll") that Classes 15 and 16 are impaired under the HTA Plan and have voted to reject the HTA Plan (collectively, the "Cramdown Classes"). For these Cramdown Classes, the Oversight Board will request confirmation pursuant to section 1129(b) of the Bankruptcy Code.

### 20.    Bankruptcy Code Section 1129(a)(10)

83.    Section 1129(a)(10) of the Bankruptcy Code requires that at least one class of claims that is impaired by the plan has accepted the plan. At least one Class of impaired claims will be proven to have accepted the HTA Plan. It is reported to me by Kroll, and will be proven at the confirmation hearing that, as of August 7, 2022, the following Classes have voted in the listed amount and number to accept the HTA Plan:

| Class | Claim | Number Voting to Approve (%) | Amount Voting to Approve (%) |
|---|---|---|---|
| 1 | HTA 68 Bond Claims | 95.76% | 99.80% |
| 2 | HTA 68 Bond Claims (Ambac) | 100% | 100% |
| 3 | HTA 68 Bond Claims (Assured) | 100% | 100% |
| 4 | HTA 68 Bond Claims (National) | 100% | 100% |
| 5 | HTA 98 Senior Bond Claims | 94.68% | 99.83% |
| 6 | HTA 98 Senior Bond Claims (Ambac) | 100% | 100% |
| 7 | HTA 98 Senior Bond Claims (Assured) | 100% | 100% |
| 8 | HTA 98 Senior Bond Claims (FGIC) | 100% | 100% |
| 9 | HTA 98 Senior Bond Claims (National) | 100% | 100% |
| 10 | HTA 98 Sub Bond Claims | 93.67% | 98.41% |
| 11 | HTA 98 Sub Bond Claims (Assured) | 100% | 100% |
| 12 | HTA 98 Sub Bond Claims (FGIC) | 100% | 100% |
| 13 | HTA 98 Sub Bond Claims (National) | 100% | 100% |
| 14 | HTA Moscoso Bond Claims | Deemed to Accept | |
| 15 | Eminent Domain/Inverse Condemnation Claims | 50% | 50% |
| 16 | HTA General Unsecured Claims | 38.46% | 99.79% |
| 17 | HTA/GDB Claims | 100% | 100% |

| Class | Claim | Number Voting to Approve (%) | Amount Voting to Approve (%) |
|-------|-------|------------------------------|------------------------------|
| 18 | Section 510(b) Subordinated Claims | Deemed to Reject | |
| 19 | Convenience Claims | Deemed to Accept | |
| 20 | Federal Claims | No Ballots Received - Deemed to Accept | |

### 21. Bankruptcy Code Section 1129(b)(1)

84.  Section 1129(b)(1) of the Bankruptcy Code provides that, if all of the applicable requirements of section 1129(a) are met with the exception of section 1129(a)(8), the Court is required to confirm the plan so long as such plan does not discriminate unfairly, and is fair and equitable, with respect to each impaired class of claims that has not accepted the plan.  As described further above, I understand that the HTA Plan does not comply with section 1129(a)(8) of the Bankruptcy Code with respect to the Cramdown Classes, but believe that the HTA Plan remains confirmable under this section.  As described in further detail below, the HTA Plan is fair and equitable with respect to holders of Claims in the Cramdown Classes.

### 22. Bankruptcy Code Section 1129(b)(2)

85.  Section 1129(b)(2) of the Bankruptcy Code provides an impaired class of claims is treated fairly and equitably if (i) such class is secured and either (a) retains the liens securing such claims and receives deferred cash payments totaling at least the allowed amount of such claims, (b) the property subject to such liens is sold, with the liens attaching to the proceeds of such sale, or (c) such class receives the indubitable equivalent of its claims; or (ii) such class is unsecured and (a) receives property of a value equal to allowed amount of such claim, or (b) no class of claims that is junior to such class receives or retains property under the plan.  I understand the Eminent Domain/Inverse Condemnation Claims will be treated as HTA General Unsecured Claims entitled to the same treatment as other holders of HTA General Unsecured Claims to the extent

each allowable Claims exceeds the cash on deposit for it.  However, the amount of the Claim in excess of the deposit, if any, will be paid in full upon entry of separate Final Orders (i) setting the amount of Allowed Claims for just compensation, and (ii) determining that such claims may not be impaired or discharged.

86.     Additionally, no class of junior Claims will receive distributions under the HTA Plan and no class of senior Claims will receive more than one hundred percent (100%) on account of such Claims.

**B.     PROMESA § 314(b)(2):  The HTA Plan Fully Complies with the Provisions in Title III of PROMESA**

87.     PROMESA section 314(b)(2) requires the HTA Plan to comply with the provisions in Title III.  The Oversight Board has strived to comply with every provision of Title III since it commenced HTA's Title III Case and evidence of such compliance is contained in the declarations being submitted in respect of confirmation, and any other evidence offered at the confirmation hearing will be referenced in the arguments of counsel.

**C.     PROMESA § 314(b)(3):  The Debtor is Not Prohibited By Law From Taking Any Action Necessary to Carry Out the HTA Plan**

88.     PROMESA section 314(b)(3) requires that a debtor not be prohibited by law from taking any action necessary to carry out the HTA Plan. To the best of my knowledge, the HTA Plan contains no provisions that would require it to violate Commonwealth law that is not preempted.  For instance, I believe virtually all jurisdictions have laws mandating payment in full of all lawful obligations.  But reorganization plans paying creditors less than in full are routinely confirmed because the local laws to the contrary are necessarily preempted.  The Oversight Board does not believe local legislation is required to issue debt under a Title III plan of adjustment, and the currently proposed Title III plan of adjustment does not require such legislation.

**D.    PROMESA Section 314(b)(4): The HTA Plan Provides Each Holder of an Administrative Claim Cash, Equal to the Allowed Amount of Such Claim, on the Effective Date**

89.    PROMESA section 314(b)(4) provides, except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, a plan must provide that, on its effective date, each holder of a claim specified in Bankruptcy Code section 507(a)(2), which I understand is an administrative expense claim, will receive on account of such claim cash equal to the allowed amount of such claim.  Section 3.1 of the HTA Plan provides that: "[o]n the later to occur of (a) the HTA Effective Date and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, Reorganized HTA shall (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and Reorganized HTA; provided, however, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course prior to the HTA Effective Date by the Debtor shall be paid in full and performed by Reorganized HTA in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions, including, without limitation, all obligations of HTA and Reorganized HTA with respect to payment of the Commonwealth Loan; and, provided, further, that, with respect to the Commonwealth Loan, the repayment thereof shall be satisfied in accordance with the terms and provisions of the New HTA Bonds Indenture; and, provided, further, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within one hundred fifty (150) days after the HTA Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the HTA Plan." As provided for by the HTA Plan, certain Consummation Costs, and

Restriction Fees shall be paid in Cash on the Effective Date of the HTA Plan. All other Allowed

Administrative Expense Claims, if any, will likewise be paid pursuant to the terms of Section 3.1

of the HTA Plan.

### E.   PROMESA § 314(b)(5):   The HTA Plan Has Obtained All Necessary Legislative, Regulatory, and Electoral Approvals

90.   PROMESA section 314(b)(5) requires any legislative, regulatory, or electoral

approval necessary under applicable law to carry out any provision of the HTA Plan to either have

been obtained, or be required as a condition to implementing such provision. As discussed above,

legislative, regulatory, and electoral approvals are not required in order for HTA to raise toll rates

and fares, or issue the New HTA Bonds.

### F.   PROMESA § 314(b)(6):   The HTA Plan Is Feasible for HTA

91.   PROMESA section 314(b)(6) requires the HTA Plan be feasible and in the best

interests of creditors. I understand that, to make the best interests determination, the Court must

consider whether creditors would receive under non-bankruptcy laws and the Puerto Rico

Constitution a greater recovery than is provided under the HTA Plan. The Disclosure Statement

contains the Oversight Board's best interest analysis, and a witness from McKinsey will testify to

it at the confirmation hearing. In addition, a witness from Citigroup Global Markets Inc. ("Citi")

will testify as to the HTA Plan's feasibility with respect to HTA. I believe the HTA Plan is feasible

as to HTA for the following reasons: (i) HTA has the resources and liquidity necessary to make

the payments on the HTA Effective Date which it is required to make; (ii) the HTA Plan reduces

HTA's debt to an amount which the February 2022 HTA Fiscal Plan projects HTA will be able to

pay; (iii) the HTA Plan and New HTA Bonds Indenture, which I have reviewed, include multiple

provisions, including the Toll Rate Covenant, which, along with a significant cash reserve HTA

will maintain for contingencies, are designed to ensure HTA can cover projected debt obligations;

(iv) HTA will be able to pay the HTA Moscoso Bonds; and (v) HTA's operating revenues, as well as projected appropriations from the Commonwealth in accordance with the Commonwealth 2022 Fiscal Plan, are sufficient to cover HTA's maintenance and operating expenses and other required disbursements.  I understand that, to the extent the Oversight Board certifies a revised fiscal plan for HTA prior to the occurrence of the HTA Effective Date, such revised fiscal plan for HTA will conform with the transactions contemplated in the HTA Plan.

### G.    PROMESA § 314(b)(7):  The HTA Plan Is Consistent with the Applicable Fiscal Plan Certified by the Oversight Board Under Title III

92.    Section 314(b)(7) of PROMESA requires a plan of adjustment to be consistent with the applicable fiscal plan as certified by the Oversight Board pursuant to Title II.  The Oversight Board has oversight responsibility for Puerto Rico's fiscal plans under Title II of PROMESA. PROMESA contemplates the Oversight Board and the Government will work together to adopt a fiscal plan, but grants the Oversight Board the power to develop and certify its own fiscal plan if the Government does not provide it with a proposed fiscal plan it determines to certify.

93.    On February 22, 2022, the Oversight Board certified the February 2022 HTA Fiscal Plan, which (1) provides updates for new information, as well as fiscal measures that generate revenues and optimize expenses, including, (i) inflation-based increases on toll fares and fines, (ii) new electronic systems for toll collection, (iii) transit enhancements, and (iv) the re-assessment of Tren Urbano contracts and the reduction of healthcare expenses, and (2) presses HTA to implement much-needed reform measures including, (a) pursuing the Transportation Sector Reform, (b) transferring ownership of Tren Urbano to PRITA, (c) setting up a dedicated Toll Road Management Office, and (c) pursuing a P3 to access new sources of capital funding.

94.    Similarly, as part of the Title III process, Section 104(j)(2) of PROMESA requires the Oversight Board to certify the submission or modification of the HTA Plan.  Section 104(j)(3)

of PROMESA provides that the Oversight Board may certify the filing of the HTA Plan only if it determines, in its sole discretion, that the HTA Plan is consistent with the February 2022 HTA Fiscal Plan.  On August 5, 2022, the Oversight Board certified submission of the HTA Plan Debtor's Exhibit 58 [Case No. 17-BK-3567-LTS, ECF No. 1354-6].

95.     During the certification process for the HTA Plan and the February 2022 HTA Fiscal Plan, the Oversight Board's advisors made regular presentations to the Oversight Board in person, by telephone, or virtually, including at its weekly sessions, as well as at meetings with smaller groups of Oversight Board members and one-on-one.  These presentations updated the Oversight Board on how the key features of the HTA Plan and the February 2022 HTA Fiscal Plan were evolving during their development.  The Oversight Board also conducted separate strategy sessions to discuss the HTA Plan and the February 2022 HTA Fiscal Plan.

96.     Based on my review of both the HTA Plan (Debtor's Exhibit 58) [Case No. 17-BK-3567-LTS, ECF No. 1354-6] and the February 2022 HTA Fiscal Plan (Debtor's Exhibit 5) [Case No. 17-BK-3567-LTS, ECF No. 1299-6], I believe that the HTA Plan is consistent with the February 2022 HTA Fiscal Plan. Nothing contained in the HTA Plan would violate or otherwise interfere with the February 2022 HTA Fiscal Plan. The debt levels under the HTA Plan are consistent with the debt levels set forth in the February 2022 HTA Fiscal Plan.  I understand that, to the extent any provision of the HTA Plan may be inconsistent with the February 2022 HTA Fiscal Plan, the Oversight Board intends to certify a revised fiscal plan for HTA to conform with the transactions contemplated in the HTA Plan prior to the occurrence of the HTA Effective Date.

**H.     Bankruptcy Rule 3019:  The Plan Does Not Adversely Change the Treatment of Claims of Creditors.**

97.     The Oversight Board filed the HTA Plan on August 7, 2022, after the Voting Deadline had passed.  Based on my review of the HTA Plan and updates provided to the Oversight

Board by its advisors, I understand that the HTA Plan contains technical changes that do not adversely affect the treatment of any Claims and do not materially or adversely modify the treatment to be afforded to creditors pursuant to the Third Amended HTA Plan.

### III.    The Plan Settlement Agreements

98.    Following the filing of the Commonwealth and HTA Title III Cases, the Oversight Board, either directly or through its advisors, engaged in extensive mediation sessions under the guidance and direction of the Mediation Team, and continued to negotiate directly with various constituencies, all in an effort to build support for the restructuring of Commonwealth and HTA debt, among others.  I participated in many of the negotiation and mediation sessions on behalf of the Oversight Board.  And, for those I did not attend personally, I received real-time detailed reporting of what transpired from either the former Executive Director, Natalie Jaresko, the Oversight Board's advisors, or both.  As described above, these mediation sessions culminated in the execution of the HTA/CCDA Plan Support Agreement.  In addition to the HTA/CCDA Plan Support Agreement, the Oversight Board reached an agreement with the DRA and executed the DRA Stipulation.

99.    Execution of the HTA/CCDA Plan Support Agreement and the DRA Stipulation led directly to the development and filing of the Initial Plan, which was filed on May 2, 2022.  The Initial Plan embodied the terms of the HTA/CCDA Plan Support Agreement and the DRA Stipulation, providing a path for HTA to emerge from Title III.

100.    Following the filing of the Initial Plan, the Oversight Board continued to negotiate with various stakeholders, including the Creditors' Committee, to generate further support for a plan of adjustment. Those negotiations culminated in the entry into the HTA Committee Agreement and the filing of the First Amended Plan incorporating the terms of such agreement.

Following additional discussions with various parties in interest, the Oversight Board filed the Second Amended HTA Plan and the Third Amended HTA Plan.

101.    I have read the HTA/CCDA Plan Support Agreement and the DRA Stipulation, and since I participated in many mediation sessions or other negotiations in which they were developed, and agreed with approving the Oversight Board's execution of them, I am generally familiar with their respective business terms.  I describe in general terms below (i) the key disputes and litigation resolved by each agreement, (ii) the key terms of each agreement, including the consideration provided in exchange for (a) resolution of the relevant litigation and (b) support for the HTA Plan, and (iii) why I believe payment of the Consummation Costs and Restriction Fees as contemplated in the Plan Support Agreements, and incorporated into the HTA Plan, is fair, reasonable and necessary to compensate the parties to the Plan Support Agreement for the development of the terms of the HTA Plan and to achieve a global consensual restructuring in the HTA Title III Case.

### A.  HTA/CCDA PSA

#### 1. Existing Disputes and Litigation Resolved by the HTA/CCDA PSA

102.    The Oversight Board, acting as the Title III representative of the Commonwealth and, where applicable, HTA, has engaged in various disputes and litigations with HTA Bondholders, the fiscal agent for the HTA Bonds, and monoline insurers of HTA Bonds relating to claims against (i) HTA own source revenues (*e.g.*, tolls) or other monies received by HTA, and (ii) the Commonwealth's retention of certain revenues from gasoline and cigarette excise taxes and vehicle license fees historically conditionally appropriated and transferred to HTA (the "HTA Allocable Revenues").  The parties to the HTA/CCDA PSA agreed to resolve the various adversary proceedings, contested matters, and lawsuits related to, among others, the HTA Bonds described

below, on the terms set forth in the HTA/CCDA PSA (Debtor's Exhibit 14) [Case No. 17-BK-3567-LTS, ECF No. 1299-16].

### i.    The Commonwealth-HTA Revenue Bond Litigations

103.    Ambac, Assured, National and FGIC, as holders and insurers of HTA Bonds, HTA Bondholder Peaje Investment, LLC ("Peaje"), and Bank of New York Mellon ("BNYM"), as fiscal agent for the HTA Bonds (collectively, the "HTA Defendants"), filed proofs of claim in the Commonwealth Title III case, asserting, among other things, (i) HTA Bondholders have a statutory lien, security interest and/or property interest in the HTA Allocable Revenues, and (ii) the Commonwealth is liable to the HTA Defendants under various statutory, tort, contractual and Constitutional theories, for failing to appropriate and transfer the HTA Allocable Revenues to HTA.

104.    The Oversight Board, as the Title III representative of the Commonwealth, filed an adversary proceeding against the HTA Defendants (Adv. No. 20-00005-LTS in Case No. 17-BK-3283-LTS) challenging their proofs of claim against the Commonwealth and seeking to disallow the HTA Defendants' claims in their entirety (the "Commonwealth-HTA Revenue Bond Litigation").

105.    In participating in the various mediation sessions, negotiations, and discussions regarding the HTA/CCDA Plan Support Agreement, I am generally familiar with the issues litigated in the Commonwealth-HTA Revenue Bond Litigation, and understand they include, but are not limited to, whether the HTA Defendants have a valid and enforceable lien, security interest or other property interest in the HTA Allocable Revenues retained by the Commonwealth and not appropriated and transferred to HTA, whether the Commonwealth's retention of HTA Allocable Revenues is a breach of any obligation owed to the HTA Defendants, and whether any laws purporting to appropriate HTA Allocable Revenues to HTA without regard to whether such

appropriations are contained in a Commonwealth fiscal plan certified by the Oversight Board and a Commonwealth budget certified by the Oversight Board are inconsistent with, and preempted by, PROMESA.

106.    The Oversight Board, as the Title III representative of the Commonwealth, filed a motion for partial summary judgment.  At the time the HTA/CCDA Plan Support Agreement was executed, the HTA Defendants were conducting supplemental discovery in connection with the motion for partial summary judgment and that no oral argument had been scheduled.  Pursuant to Section 2.1 of the Commonwealth Plan and decretal paragraph 4 of the Commonwealth Confirmation Order, which incorporated the terms of the HTA/CCDA Plan Support Agreement, the Commonwealth-HTA Revenue Bond Litigation was compromised and settled.

### ii.    The HTA Revenue Bond Litigation

107.    The HTA Defendants filed proofs of claim in the HTA Title III Case asserting, among other things, (i) the HTA Bonds were secured by statutory or equitable liens against certain of HTA's property including toll and fine revenues collected by HTA, (ii) HTA Bondholders held ownership interests in certain of HTA's property, (iii) HTA Bondholders have first priority, perfected security interests against HTA's property including toll and fine revenues extending beyond the security interests (if any) granted in the documents governing the HTA Bonds, and (iv) the security interests continued to attach to revenues received by HTA post-petition.

108.    The Oversight Board, as the Title III representative of HTA, filed an adversary proceeding against the HTA Defendants (Adv. No. 20-00007-LTS in Case No. 17-BK-3567-LTS) seeking to disallow the HTA Defendants' claims against HTA, except as to any amounts deposited by HTA and held in certain specified deposit accounts by the fiscal agent pursuant to

Commonwealth law and documents governing the HTA Bonds (the "HTA Revenue Bond Litigation").

109.     In participating in the various mediation sessions, negotiations, and discussions regarding the HTA/CCDA Plan Support Agreement, I am generally familiar with the issues litigated in the HTA Revenue Bond Litigation, and understand they include, but are not limited to, whether the HTA Defendants have a valid and enforceable lien, security interest or other property interest in certain of HTA's property and the HTA Allocable Revenues retained by the Commonwealth and not appropriated and transferred to HTA, and whether the Commonwealth's retention of HTA Allocable Revenues violates any obligation owed by HTA to the HTA Defendants.

110.     At the time the HTA/CCDA Plan Support Agreement was executed, the HTA Revenue Bond Litigation was stayed pursuant to a case management order issued by the Title III Court.  Pursuant to Section 2.1 of the Commonwealth Plan and decretal paragraph 4 of the Commonwealth Confirmation Order, which incorporated the terms of the HTA/CCDA Plan Support Agreement, the HTA Revenue Bond Litigation was compromised and settled as it relates to the Commonwealth.

### iii.     The HTA Lift Stay Motion

111.     The disputes regarding the HTA Allocable Revenues and HTA's property were not limited to the proofs of claim and adversary proceedings described above.  In this regard, Assured, Ambac, National, and FGIC also filed a motion in the Commonwealth and the HTA Title III cases seeking an order granting (i) relief from the automatic stay under PROMESA to allow them to enforce the application of the HTA Allocable Revenues or other asserted HTA property to the payment of HTA Bonds or, in the alternative, (ii) for adequate protection of their alleged interests

in the HTA Allocable Revenues (the "HTA Lift Stay Motion").  The Oversight Board, as Title III representative of the Commonwealth and HTA, filed an opposition to the HTA Lift Stay Motion.

112.    At the time the HTA/CCDA Plan Support Agreement was executed, the Title III Court issued an order denying the HTA Lift Stay Motion, and the denial was affirmed by the United States Court of Appeals for the First Circuit.  However, I understand the Courts' rulings did not preclude Assured, Ambac, National, or FGIC from seeking stay relief or adequate protection in the future depending on the facts and circumstances.

### iv.    The HTA Section 926 Motion

113.    Beyond the HTA Lift Stay Motion and the other litigations described above, Ambac, Assured, FGIC and National (the "Section 926 Movants") filed a motion for an order appointing them as co-trustees for HTA under section 926 of the Bankruptcy Code for the purpose of pursuing certain avoidance claims against the Commonwealth (the "Section 926 Motion").

114.    I understand the disputes at issue in the Section 926 Motion involve, among other things, whether the Oversight Board unjustifiably refused to pursue avoidance claims HTA allegedly had against the Commonwealth and suffers from an unresolvable conflict of interest because it simultaneously represents both HTA and the Commonwealth in their respective Title III proceedings.

115.    At the time the HTA/CCDA Plan Support Agreement was executed, the Title III Court issued an order denying the Section 926 Motion, which the Section 926 Movants had appealed to the First Circuit Court of Appeals. On April 12, 2021, the DRA Parties filed a motion to intervene in the appeal, which the First Circuit granted on June 4, 2021.  On July 29, 2021, the Section 926 Movants voluntarily dismissed the appeal in light of the agreements reached in the HTA/CCDA Plan Support Agreement.

###### v.      The HTA Lien Challenge Actions

116.    On May 20, 2019, the Oversight Board and the Creditors' Committee filed four

complaints [Adv. Proc. Nos. 19-00362, 19-00363, 19-00364, and 19-00365] (collectively, the

"HTA Lien Challenges") against 148 defendants seeking declarations that holders of the HTA

Bonds do not possess valid, perfected security interests against HTA, except for toll revenues that

have been both received by HTA and deposited in certain accounts held at BNYM, in its capacity

as fiscal agent for holders of HTA Bonds.  The HTA Lien Challenges also seek judgments (i)

declaring HTA's interest in its property is entitled to priority over any interests HTA bondholders

allege they possess in any property beyond revenues both received by HTA and deposited with the

fiscal agent (if even to that extent), (ii) avoiding any security interests HTA bondholders are held

to possess in such property pursuant to the Bankruptcy Code's avoidance powers, (iii) disallowing

all secured claims filed against HTA by bondholders alleging security interests on such property,

(iv) determining that any right HTA or HTA bondholders have to receive certain taxes or fees

historically conditionally appropriated to HTA has been preempted by PROMESA, and (v)

declaring that any security interests in HTA's property ceased attaching to revenues received

postpetition by virtue of section 552(a).

117.    At the time the HTA/CCDA Plan Support Agreement was executed, the Title III

Court issued an order staying the HTA Lien Challenges.

#### 2. Summary of Key Terms of the HTA/CCDA PSA

118.    On April 12, 2021, the Oversight Board announced it had reached an agreement in

principle with Assured and National to settle, among other things, claims against the

Commonwealth and HTA relating to HTA Allocable Revenues, and to restructure, among other

things, the HTA Bonds.  Thereafter, the Oversight Board entered into the HTA/CCDA Plan

Support Agreement with certain HTA Bondholders, certain CCDA Bondholders, Assured, and
National.  On May 5, 2021, the Oversight Board entered into the HTA/CCDA Plan Support
Agreement with certain holders and insurers of HTA Bonds and CCDA Bonds, regarding the
proposed treatment and settlement of, among other things, certain "clawback claims" against the
Commonwealth (Debtor's Exhibit 14) [Case No. 17-BK-3567-LTS, ECF No. 1299-16].  The
HTA/CCDA Plan Support Agreement, among other things, (i) provides for a global resolution of
disputes regarding the bondholders' rights and alleged property interests in certain allocable
"clawed back" revenues of the Commonwealth and certain of HTA's alleged property, (ii)
provides for the issuance of new bonds by HTA and CVIs by the Commonwealth, along with the
payment of certain amounts in cash by HTA, resolving the bondholders' claims against the
Commonwealth and HTA, (iii) provides for the bondholders and insurers to support the
Commonwealth Plan and the HTA Plan, and (iv) provides an agreement regarding the structure of
a potential plan of adjustment for HTA which resolves the parties' disputes regarding the alleged
security interest against HTA's toll and fine revenues.  On July 15, 2021, Ambac, and FGIC joined
the HTA/CCDA Plan Support Agreement pursuant to separate Joinder Agreements to the
HTA/CCDA Plan Support Agreement, subject to a right to terminate the HTA/CCDA Plan Support
Agreement solely as to themselves, which right expired on July 26, 2021.

119.    Pursuant to the HTA/CCDA Plan Support Agreement (Debtor's Exhibit 14) [Case
No. 17-BK-3567-LTS, ECF No. 1299-16], upon confirmation of the Commonwealth Plan, in
exchange for resolving the claims against the Commonwealth and HTA arising from or relating to
the HTA Bonds, including the claims at issue in the Commonwealth-HTA and HTA Revenue
Bond Litigations, and the agreement not to commence or pursue any pending or further litigation
on account of the HTA Bonds, including in connection with the HTA Lift Stay Motion or the

Section 926 Motion, holders of such claims would be entitled to receive a combination of securities, cash, and/or new bonds, as described below.

120.    Pursuant to the Commonwealth Plan and Commonwealth Confirmation Order, upon satisfaction of the HTA Distribution Conditions, (i) holders of Allowed CW/HTA Claims collectively received 68.6% of the Clawback CVI, a contingent value instrument that is based on sharing the potential outperformance of 5.5% of the Commonwealth's Sales and Use Taxes, relative to projections in the 2020 Commonwealth Fiscal Plan, and (ii) holders of claims against HTA arising from or relating to HTA 68 Bonds (as set forth in the HTA/CCDA Plan Support Agreement) (the "HTA 68 Bond Claims") received payment from HTA in the aggregate amount of $184.8 million in cash (the "HTA 68 Bond Cash"), and holders of claims against HTA arising from or relating to HTA 98 Senior Bonds (as set forth in the HTA/CCDA Plan Support Agreement) ("HTA 98 Senior Bond Claims" and, together with the HTA 68 Bond Claims, the "HTA Bond Claims") received payment from HTA in the aggregate amount of $79.2 million in cash (the "HTA 98 Senior Bond Cash" and, together with the HTA 68 Bond Cash, the "HTA Cash").  The principal amount of the HTA 68 Bonds and HTA 98 Senior Bonds, and corresponding HTA Bond Claims, was reduced by the amount of HTA Cash. Based on updates provided to the Oversight Board by its advisors, I understand that the HTA Distribution Conditions were satisfied on June 24, 2022 and the HTA Cash and Clawback CVIs were distributed pursuant to the terms of the Commonwealth Plan and Commonwealth Confirmation Order on or before July 11, 2022.

121.    As also provided in the HTA/CCDA Plan Support Agreement, the HTA Plan provides that HTA will issue $1.245 billion in new bonds (the "New HTA Bonds"), including current interest bonds, capital appreciation bonds, and convertible capital appreciation bonds, to holders of HTA Bond Claims.

122.   To compensate the Initial HTA/CCDA PSA Creditors for fees and expenses incurred in connection with the negotiation and execution of the HTA/CCDA Plan Support Agreement, each Initial HTA/CCDA PSA Creditor will be entitled to receive an amount equal to one percent of its respective HTA Bond Claim (the "HTA Consummation Costs").  In exchange for agreeing to support and vote to accept the HTA Plan and to "lock-up" their respective bonds in accordance with the terms of the HTA/CCDA PSA, each Initial HTA/CCDA PSA Creditor and HTA/CCDA Joinder Creditor holding or insuring HTA Bonds is entitled to receive a restriction fee (the "HTA Restriction Fee").  The HTA Consummation Costs and the HTA Restriction Fee are available up to an aggregate maximum amount of $125 million, payable by HTA upon the effective date of the HTA Plan.

### B.   DRA Stipulation

#### 1. Existing Disputes and Litigation Resolved by the DRA Stipulation

123.   On November 7, 2018, the United States District Court for the District of Puerto Rico approved the GDB Qualifying Modification. To give effect to the GDB Qualifying Modification, the Commonwealth created, pursuant to the *Government Development Bank for Puerto Rico Debt Restructuring Act*, Act 109-2017, the DRA—a statutory public trust and public governmental instrumentality of the Commonwealth. Pursuant to a Master Transfer Agreement, dated as of November 29, 2018 (the "Transfer Agreement"), between DRA and GDB, GDB transferred substantially all of its assets to DRA, including, among other things, GDB's legal rights, title, and interest in twenty-three (23) promissory notes issued by HTA in favor of GDB (the "HTA Notes") and $200,000,000 in aggregate original principal amount of HTA Senior 98 Bonds.

124.    The DRA Parties commenced actions, filed pleadings, and participated in connection with numerous actions related to the Commonwealth's and HTA's Title III cases (collectively, the "DRA-Related Disputes"), including, among others: (1) DRA Parties' lift stay motions, (2) DRA adversary proceeding, and (3) Clawback Actions. The parties to the DRA Stipulation agreed to resolve these various adversary proceedings, contested matters, and lawsuits described below, on the terms set forth in the DRA Stipulation (Debtor's Exhibit 16) [Case No. 17-BK-3567-LTS, ECF No. 1299-18].

### i.      DRA Adversary Proceeding

125.    The DRA Parties filed an adversary complaint [Adv. Proc. No. 21-00068] (the "DRA Adversary Proceeding") against Assured, Ambac, FGIC, National, Peaje, and BNYM as fiscal agent for holders of certain bonds issued by HTA (collectively the "DRA Defendants"). The complaint requested entry of various declaratory judgments regarding the validity, extent, seniority and priority of the DRA Parties' and the Defendants' alleged rights with respect to (1) certain revenues collected pursuant to Acts 30-2013 and 31-2013 ("Act 30-31 Revenues"), (2) the 1968 HTA Bonds and 1998 HTA Bonds, (3) fifteen (15) loan agreements entered into by GDB and HTA between March 2008 and January 2014 (as amended, amended and restated, supplemented or otherwise modified, the "Loan Agreements"), and (4) the assignment and security agreement executed by and between HTA and GDB on August 28, 2013 in connection with the Loan Agreements. On July 28, 2021, the Oversight Board filed a motion for leave to intervene as a defendant and AAFAF filed a joinder to the motion [Adv. Proc. No. 21-00068, ECF Nos. 26, 27]. On August 2, 2021, the DRA Parties filed an opposition to the Oversight Board's motion for leave to intervene [Adv. Proc. No. 21-00068, ECF No. 30].  On August 11, 2021, Magistrate Judge Dein

issued an order granting (i) the Oversight Board's motion for leave to intervene as a defendant and (ii) AAFAF's joinder in connection with the same [Adv. Proc. No. 21-00068, ECF No. 34].

126.    At the time the DRA Stipulation was executed, the Title III Court had previously issued an opinion and order granting Ambac, Assured, National, FGIC, BNYM and Peaje's joint motion to dismiss the complaint. I understand that pursuant to the DRA Stipulation, the DRA Parties agreed to settle and compromise the DRA Adversary Proceeding, including any right to appeal the Title III Court's decision, pursuant to the terms of the Commonwealth Plan, and the adversary proceeding was subsequently dismissed.

### ii.    The DRA Parties' Lift-Stay Motions

127.    The disputes regarding the HTA Notes were not limited to the DRA Adversary Proceeding described above. In this regard, the DRA Parties filed a motion for relief from the automatic stay to exercise remedies against DRA's asserted HTA collateral, including gasoline taxes, gas oil and diesel oil taxes, motor vehicle and license fees, toll revenues, petroleum products taxes and cigarette taxes. To secure obligations to the DRA pursuant to the GDB DRA bonds, the DRA Parties asserted GDB transferred, among other things, certain HTA loans, bond assets, and claimed collateral to DRA. The DRA Parties argued that (i) the Commonwealth and HTA's alleged depletion of the "HTA collateral" without providing adequate protection provided cause to lift the stay, and (ii) the Commonwealth and HTA lacked any property interest or equity in the "HTA collateral," which they claimed are unnecessary for an effective reorganization. In the alternative, the DRA Parties requested the Title III Court require the Commonwealth and HTA to provide adequate protection by paying current interest under the HTA loans and bonds. The DRA Parties subsequently filed an Amended Lift Stay Motion, which alleged substantially the same claims as the DRA Lift Stay Motion.

128.    At the time the DRA Stipulation was executed, the DRA Parties filed a notice withdrawing, with prejudice, the DRA Parties' Lift Stay Motions. Accordingly, the Title III Court issued an order granting the DRA Parties' notice of withdrawal with prejudice. I understand the Court's rulings preclude the DRA Parties from seeking stay relief or adequate protection in the future depending on the facts and circumstances.

### iii.    The HTA Lift Stay Motion

129.    As described above, Assured, Ambac, National, and FGIC filed the HTA Lift Stay Motion in the Commonwealth and the HTA Title III cases seeking an order granting (i) relief from the automatic stay under PROMESA to allow them to commence an action to compel the Commonwealth to use the HTA Allocable Revenues or HTA to apply toll and fine revenues to the payment of HTA Bonds or, in the alternative, (ii) for adequate protection of their alleged interests in the HTA Allocable Revenues or other asserted HTA property. The DRA Parties filed a notice that the DRA was a party in interest and could participate in the HTA Lift Stay Motion, or in the alternative, allow a motion to permit their intervention in the HTA Lift Stay Motion. The Oversight Board, as Title III representative of the Commonwealth and HTA, filed an opposition to the HTA Lift Stay Motion, including a response to the DRA Parties.

130.    At the time the DRA Stipulation was executed, the Title III Court had already issued an order denying the HTA Lift Stay Motion, and the denial was affirmed by the United States Court of Appeals for the First Circuit.  However, I understand the Courts' rulings do not preclude Assured, Ambac, National, or FGIC from seeking stay relief or adequate protection in the future depending on the facts and circumstances. Further, on appeal, the DRA Parties sought that their claimed interests be reserved.  I understand that pursuant to the DRA Stipulation, as incorporated into the HTA Plan, the DRA Parties agreed to settle and compromise the HTA Lift Stay Motion, including any right to appeal.

## 2. Summary of Key Terms of the DRA Stipulation

131.    On November 5, 2021, the DRA Parties and the Oversight Board entered into the

DRA Stipulation, in which the parties agreed to settle and compromise the DRA-Related Disputes

and for the DRA Parties to support the HTA Plan and related solicitation processes, and vote to

accept the HTA Plan, among other things, including: (i) the DRA Parties would support the

Commonwealth Plan and HTA Plan and related solicitation processes; (ii) the DRA Parties would

vote to accept the HTA Plan; (iii) the DRA Parties would withdraw and/or dismiss with prejudice,

as applicable, each of the DRA-Related Disputes; and in consideration for the agreements set forth

in the DRA Stipulation, including the agreement to "lock-up" its HTA Senior 98 Bonds and the

HTA/GDB Claims, and (iv) DRA would be entitled to receive a $15 million restriction fee in the

form of an allowed administrative expense claim.

132.    By entering into the DRA Stipulation, the DRA Parties agreed to vote to accept

both the Commonwealth Plan and further support confirmation of the HTA Plan, which included

supporting approval of the HTA Disclosure Statement.

133.    Pursuant to the DRA Stipulation, in exchange for resolving the claims against the

Commonwealth and HTA arising from or relating to the claims at issue in the DRA-Related

Disputes, and the agreement not to commence, prosecute, or pursue any pending or further

litigation on account of the claims on any basis, including in connection with the DRA Lift Stay

Motions, the Oversight Board included in both the Commonwealth Confirmation Order and the

HTA Plan, customary language providing for the exculpation of the DRA Parties, the DRA, and

their respective professionals and advisors.

134.    In exchange for executing the DRA Stipulation, and agreeing to all of its terms and

conditions, including the agreement to "lock-up" its HTA 98 Senior Bonds and the HTA/GDB

Claims in accordance with the terms and provisions set forth in the DRA Stipulation, on the HTA

Effective Date, or as soon as practicable thereafter in accordance with the terms and provisions set forth in the DRA Stipulation, HTA Plan, and HTA Confirmation Order, but in no event later than ten (10) Business Days following the HTA Effective Date, the DRA shall be entitled to receive the DRA Restriction Fee, payable in cash, in the amount of Fifteen Million Dollars ($15,000,000.00).

135.    Further, on the Effective Date of the HTA Plan, the HTA Senior 98 Bond Claims, the HTA Senior 98 Bond Claims (Ambac), the HTA Senior 98 Bond Claims (Assured), the HTA 98 Senior Bond Claims (National) and the HTA Senior 98 Bond Claims (FGIC) shall be allowed in an aggregate amount of approximately $3 billion and the DRA's ownership of $200 million of principal of the HTA 98 Senior Bonds should also be recognized in the aggregate amount.

### C.    The Consummation Costs and Restriction Fees Contemplated in the Plan Settlement Agreements are Reasonable and Fair

136.    As Chairman of the Oversight Board, as noted, I often participated in and am familiar with the Oversight Board's discussions and negotiations and agreements reached with respect to the HTA/CCDA Plan Support Agreement and the DRA Stipulation. In executing each of these PSAs, and agreeing to their terms and conditions, the Oversight Board considered, among other things, (i) the extensive, good faith and arm's-length negotiations (led by the Mediation Team) among representatives of the Oversight Board, its consultants, and representatives of certain claim holders, (ii) the risks and expenses (and time commitment) relating to the substantial litigation remaining in the HTA/CCDA PSA Litigation and the DRA-Related Disputes (collectively, the "Plan Litigation"), all of which are resolved by the Plan Settlement Agreements, and (iii) the central components of each of the Plan Settlement Agreements. For the reasons described below, I believe that payment of the Consummation Costs and Restriction Fees as

contemplated in the Plan Support Agreements, and as incorporated into the HTA Plan, is fair and reasonable and a necessary component of a largely consensual plan.

137.    Each of the Plan Settlement Agreements was reached following months of negotiations directed by the Mediation Team and/or other informal discussions that included party representatives, legal and financial advisors, and involved vigorous debate and discussion on both sides.  I believe the negotiations leading to the Plan Settlement Agreements were conducted at arms'-length and in good faith.

138.    The Plan Litigation resolved by the Plan Settlement Agreements involves extraordinarily complex, high-stake disputes and, because these are the first Title III cases litigated under PROMESA, novel legal issues.  Collectively, billions of dollars were at stake.  From the Oversight Board's perspective, the consequence of the DRA, monoline insurers, or HTA bondholders prevailing on their property interest contentions would ultimately have inflicted grave harm on HTA, because HTA would have lost control of billions of dollars of revenues needed to sustain its operations and pursue any restructuring.  Instead, the revenues would have been payable to the DRA/GDB Bondholders or the HTA bondholders or monoline insurers, including revenues received by HTA post-petition.  This would have prevented the Oversight Board from developing fiscal plans and budgets necessary to carry out its statutory mission and improve the overall conditions on the Island.  While the Oversight Board believed it should prevail in those litigations, even a small risk of a negative and grave outcome was imprudent to undertake once settlement was possible on the terms in the Commonwealth Plan and the HTA Plan.

139.    Additionally, the Plan Settlement Agreements resolve countless proofs of claim, adversary proceedings, contested matters, and disputes related to the HTA Plan. The Plan Litigation has been vigorously litigated, and, if continued to be litigated to conclusion, would take

up enormous amounts of time and resources (judicial and otherwise), and no matter the outcome, undoubtedly would be appealed by the unsuccessful side, resulting in further delays and protracted litigation, all of which would come at a substantial cost to HTA, because of both the significant expenses that would be incurred in such litigation and the potential impact any such litigation would have on HTA's ability to exit Title III. The Plan Litigation has been, and would certainly continue to be, extremely expensive to litigate. It is my understanding that the likelihood all the disputed issues would be resolved in HTA's favor is not certain. Resolution of the Plan Litigation avoids any such uncertainty, and the delay and significant expense it entailed.

140. In addition, while the Oversight Board believes the risk of a materially adverse outcome in connection with the various litigations was less than fifty percent (50%) based on decisions rendered to date, an adverse determination in any one or more of the actions could have been catastrophic for HTA's restructuring efforts, as explained above.

141. Similarly, if the Plan Litigation described in Sections III.A.1 and III.B.1 relating to HTA were resolved adversely to HTA, it could result in significant liability of HTA that may have to be satisfied in cash. I understand that if, for example as alleged, the HTA Bondholders held security interests that would have attached to revenues received by HTA post-petition, any plan of adjustment that does not provide for full payment of these claims, which totaled approximately $4.3 billion in principal amount alone with respect to the HTA Bonds, would be unconfirmable. As with the other disputes described above and resolved by the various agreements reached, settlement was by far the wiser path—and on terms HTA can afford, while still being able to provide the necessary government services to the residents of Puerto Rico.

142. Beyond avoiding the cost and expense of litigation, the Plan Settlement Agreements also prevent adverse results that could, among other things, dilute recoveries of other HTA

claimholders and jeopardize consensual restructurings. The Plan Settlement Agreements also free up consideration, which saved value can be (and was) used to obtain additional support for achieving a nearly completely consensual confirmation of the Commonwealth Plan, and similarly now, the HTA Plan.

143.    The payments of the Consummation Costs and Restriction Fees are critical components of the Plan Settlement Agreements that made development of the HTA Plan possible. Specifically, in consideration for their efforts in assisting in the formulation of the HTA Plan, and to compensate the HTA/CCDA PSA Creditors for fees and expenses incurred in connection with the negotiation and execution of the HTA/CCDA Plan Support Agreement, the Oversight Board determined that it is fair and reasonable for the PSA Creditors to be paid the Consummation Costs. Similarly, in exchange for executing the HTA/CCDA Plan Support Agreement (Debtor's Exhibit 14) [Case No. 17-BK-3567-LTS, ECF No. 1299-16] or the DRA Stipulation (Debtor's Exhibit 16) [Case No. 17-BK-3567-LTS, ECF No. 1299-18], as applicable, and agreeing to all of its terms and conditions, including agreeing to support the HTA Plan and to "lock up" their respective HTA bonds and HTA/GDB Claims, as applicable, the Oversight Board determined that it is fair and reasonable to make a HTA Restriction Fee available to each Initial HTA/CCDA PSA Creditor and HTA/CCDA Joinder Creditor party to the HTA/CCDA Plan Support Agreement, and the DRA Restriction Fee available to each DRA bondholder party to the DRA Stipulation.

144.    In my judgment, the Consummation Costs and Restriction Fees as contemplated in the Plan Settlement Agreements, and incorporated in the HTA Plan, are reasonable and fair and the product of extensive arms'-length negotiations among sophisticated parties.

IV.     **Discharge, Release, Exculpation and Injunction Provisions**

145.    The HTA Plan includes certain discharge, release, exculpation, and injunction

provisions, which, based on my review of the HTA Plan and my participation in the negotiation

of the Plan Settlement Agreements, I believe are essential to HTA's restructuring and a consensual

restructuring could not be successfully accomplished without these provisions.

A.  **The Releases are Appropriate and Essential to the Reorganization of HTA**

146.    A critical element of the HTA Plan is the complete resolution of the HTA Title III

Case.  To achieve this, the Debtor and claimholders agreed to a mutual release of all Claims and

Causes of Action arising, in whole or in part, prior to the Effective Date.

147.    The Debtor's releases incentivized claimholders to support, and undertake actions

to support, the HTA Plan and its confirmation, without fear of lawsuits in the future.  Based on my

experience, I believe at least some parties to the Plan Settlement Agreements would not have

entered into those agreements absent the HTA Plan's release provisions.  Due in part to the

Debtor's and Reorganized Debtor's (and their Related Persons') releases, the Debtor was able to

secure the substantial concessions reflected in the settlements and, ultimately, the HTA Plan.

148.    The HTA Plan's discharge and releases granted by claimholders likewise provide

the Debtor and Reorganized Debtor with assurance that the restructuring balance struck by the

HTA Plan will not be upset by further claims against the Reorganized Debtor after the Effective

Date.  By obtaining the discharge and release of the Debtor for claims that were or could have been

asserted prior to the Effective Date, the Reorganized Debtor is better positioned to be successful

in fulfilling their obligations under the HTA Plan and, eventually, rejoining the capital markets.

149.    The releases of claims by the Debtor is intended to impact only those parties that

made a significant contribution to the negotiation and development of the HTA Plan, including the

Debtor and Reorganized Debtor (and their Related Persons), the Government Parties, the

60

HTA/CCDA PSA Creditors, the Creditors' Committee, the DRA and the DRA Parties, and the Related Persons. To the extent the HTA Plan is inconsistent with this intention, it is my understanding that the HTA Plan will be modified to reflect that. The released parties and their representatives and advisors incurred cost and expense during the course of their essential participation in the negotiations.

150.    Based on my experience, I believe the Debtor's releases of claims against, among others, certain Government Parties, HTA/CCDA PSA Creditors, and official committees are necessary and essential to the HTA Plan. They were negotiated with each of the key stakeholders in a robust, arms'-length process. That process led to broad support for the restructuring framework contemplated by the HTA Plan, including the release provisions. I further believe the releases are instrumental in obtaining broad support for the HTA Plan and maximizing the HTA Plan's chances for confirmation. I understand that, absent the discharge and release of prepetition Claims against the Debtor under the HTA Plan, the Oversight Board would not be able to certify that expenditures do not exceed revenues of HTA. For these reasons, I believe both the releases of claims against the Debtor by claimholders and the releases of Debtor claims against the releasees are fair and reasonable, and in the best interests of the Debtor to fully and finally resolve the Debtor's Title III Case.

### B.  The HTA Plan Does Not Provide for Third-Party Releases

151.    Based on my understanding of the HTA Plan and the negotiations that led to it, the HTA Plan's releases are limited to those that are necessary to effect the Debtor's successful restructuring. Except as explicitly agreed to by the creditors in their respective Plan Settlement Agreements, the HTA Plan is not intended to release any claims of a creditor of the Debtors, in its capacity as such, against a party that is not a Debtor. To the extent there is any inconsistency

between the HTA Plan and that intention, it is my understanding the HTA Plan will be modified to reflect that intention.

### C.  The Releases Provide for Appropriate Carve-Outs

152.    Sections 41.2(d), (e), and (f) of the HTA Plan also carve out from the Released Claims certain claims, causes of action, or other rights or powers that are held by the Securities and Exchange Commission, the United States, and parties to certain Underwriter Actions. Likewise, as confirmed by the definition of Released Claims (*see* HTA Plan, section 1.262), claims against the Commonwealth, AFICA, CCDA, COFINA, ERS, MBA, MFA, PBA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA, which are or may be subject to their own restructuring proceedings, and Avoidance Actions generally are not released under the HTA Plan.  These carve-outs help to ensure that only those releases that are reasonable and necessary to HTA Plan confirmation are being provided.

### D.  The HTA Plan's Exculpation Provisions are Necessary and Narrowly Tailored

153.    Section 41.7 of the HTA Plan provides for exculpation of the Government Parties, HTA/CCDA PSA Creditors, the Creditors' Committee, the DRA Parties and the monoline bond insurers for, among other things, any acts taken consistent with the HTA Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation or approval of the HTA Plan and the settlements contained therein (including, but not limited to, the Plan Settlement Agreements).  Based on my experience, I believe the expectation of exculpation incentivized claimholders to participate fulsomely in the negotiations and mediations, support, and undertake actions that support confirmation of the HTA Plan without fear of future baseless lawsuits. Accordingly, all of the parties being exculpated in the HTA Plan played a key role in the negotiation of the HTA Plan and the settlements that enabled the HTA Plan. I believe the HTA

Plan's exculpation provisions are narrowly tailored to the exculpated parties' efforts related to the HTA Plan. The HTA Plan's exculpation provisions do not alter the liability of any entity that is determined to have acted or failed to act in a manner that constitutes intentional fraud or willful misconduct. Failing to approve the exculpation provisions would likely expose the parties to litigation after months of good faith negotiations.

### E.  The HTA Plan's Injunction Provisions are Necessary and Narrowly Tailored

154.    The HTA Plan's injunction provisions (Sections 41.3, 41.6, and 41.11) are necessary to the reorganization and are fair to those parties involved.  The injunction ensures that the releases and exculpations discussed above are preserved and enforced by prohibiting legal action concerning the Released Claims, avoiding the time, burden and expense that could be incurred if parties were permitted to pursue Released Claims. The HTA Plan's injunction provisions are narrowly-tailored to serve just that purpose.

### V.    Preemption Pursuant to the HTA Plan

155.    It is my belief the continued application of certain Commonwealth statutes that otherwise require or permit spending inconsistent with the certified fiscal plan and budget (and with any confirmed Title III plan of adjustment as proposed by the Oversight Board) would significantly frustrate the carrying out of PROMESA by hampering the Oversight Board's ability to carry out its mission and threaten the Oversight Board's achievements.

156.    Section 38.3 of the HTA Plan states, among other things, that, as of the Effective Date, ". . . to the extent not previously preempted pursuant to an order of the Title III Court, provisions of the Commonwealth laws that affect the Debtor or Reorganized HTA and are inconsistent with PROMESA shall be preempted for the reasons, and to the extent, set forth in Exhibit 'A' to the Findings of Fact and Conclusions of Law . . . ."  I also reviewed Exhibit F to the

HTA Plan, entitled "List of Statutes Preempted by PROMESA," which contains a list of statutes identified as inconsistent with, and preempted by, PROMESA.  The statutes identified in Exhibit F to Debtor's Exhibit 58 [Case No. 17-BK-3567-LTS, ECF No. 1354-6] are listed in two (2) sections: (i) Section I, "Puerto Rico Highway and Transportation Authority Act" and (ii) Section II, "Uniform Rate Revision and Modification Act." A comprehensive list of statutes, which the Oversight Board has identified as inconsistent with, and preempted by, PROMESA together with the reasons for, and extent of, preemption is attached as Exhibit A to the proposed Findings of Fact and Conclusions of Law, which I understand is being filed contemporaneously with this declaration.

157.    I understand the statutes listed in Section I of Exhibit F to Debtor's Exhibit 58 [Case No. 17-BK-3567-LTS, ECF No. 1354-6] generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board.  In my view, if these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA described above, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.

158.    By way of example, I reviewed Articles V-XXIV of the HTA Plan, which propose to pay HTA 98 Senior Bond Claims and other HTA debt less than one hundred percent (100%) of the presented amount of their claims.  Any Puerto Rico statute or other law requiring HTA to pay

those claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the HTA Plan. Moreover, the continued application of such statutes would significantly hamper the Oversight Board's mission to return HTA, together with Puerto Rico, to fiscal responsibility and access to capital markets because those laws would effectively nullify the HTA Plan's restructuring of HTA's debt and significantly weaken the Oversight Board's ability to control HTA's spending.

159.    Similarly, the statutes listed in Section I to Exhibit F to Debtor's Exhibit 58 [Case No. 17-BK-3567-LTS, ECF No. 1354-6] authorize HTA to issue debt without obtaining Oversight Board approval.   As noted above, I believe continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.

160.    It is my understanding that the statutes listed in Section II of Exhibit F to Debtor's Exhibit 58 [Case No. 17-BK-3567-LTS, ECF No. 1354-6] generally regulate the modification of toll rates fixed and charged for basic and essential services rendered by public corporations, outside the Oversight Board's Fiscal Plan, HTA Plan and Plan Supplement.   Here, too, I believe these statutes are inconsistent with PROMESA's provisions, purposes and goals and, if they remain enforceable, would frustrate the setting of toll rates contemplated by the Oversight Board's proposed HTA Plan, Plan Supplement, or Fiscal Plan. Among other things, Article XXV of the HTA Plan and the New HTA Bonds Indenture establish a Toll Rate Covenant to ensure that HTA Toll Receipts are sufficient to pay amounts due under the New HTA Bonds and the Subordinated Indebtedness.   The Toll Rate Covenant provides that HTA covenants that "it will at all times charge

and collect or cause to be charged and collected Tolls for the use of the Toll Facilities at rates not less than those set forth in the schedule of such Tolls then in effect and as shall be required in order that Toll Receipts in each Fiscal Year shall equal at least the aggregate of (i) one hundred ten percent (110%) of the aggregate of the Required Deposits for such Fiscal Year and (ii) one hundred percent (100%) of Annual Debt Service on Subordinated Indebtedness" and, if such Toll Receipts will not be or were not sufficient to satisfy the Toll Rate Covenant, HTA will hire a "Traffic Consultant" to undertake a study to recommend of schedule of Tolls to satisfy the Toll Rate Covenant and eliminate any deficiency resulting from prior year(s)' failure to satisfy the Toll Rate Covenant. New HTA Bonds Indenture § 7.1(a), (d). Furthermore, the New HTA Bonds Indenture provides for reserve funds for both the New HTA Bonds and the Subordinated Indebtedness to support the debt payment obligations thereunder. HTA Plan § 1.251. Just like the statutes listed in Section I of Exhibit F to the HTA Plan, I believe the continued application of the statutes listed in Section II would significantly hamper the Oversight Board's purpose to provide a method for Puerto Rico, including HTA, to achieve fiscal responsibility and access to capital markets, to the extent they provide a basis for HTA to set toll rates in contravention to the HTA Plan and HTA Fiscal Plan.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 7, 2022
    Shushan, NY

*/s/ David A. Skeel Jr.*
David A. Skeel, Jr.
Oversight Board, Chairman