**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br><br>No. 17 BK 3567-LTS |

**DECLARATION OF DAVID M. BROWNSTEIN IN**
**RESPECT OF CONFIRMATION OF FOURTH AMENDED**
**TITLE III PLAN OF ADJUSTMENT OF THE PUERTO**
**RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

I, David M. Brownstein, hereby declare and state as follows:

1.      I am a Managing Director in the Municipal Finance Department of Citigroup

Global Markets Inc. ("Citi").  Citi has consistently been ranked as a top underwriter of municipal

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

bonds and made commitments in excess of $20 billion to provide both bridge and long-term funding as well as credit and liquidity facilities to Citi's municipal clients.

2.      The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the Title III representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), the Puerto Rico Public Buildings Authority ("PBA"), the Puerto Rico Sales Tax Financing Corporation ("COFINA"), the Puerto Rico Highways and Transportation Authority ("HTA"), and the Puerto Rico Electric Power Authority ("PREPA") (collectively referred to as the "Debtors") pursuant to Section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"), retained Citi to serve as investment banker and financial advisor to the Oversight Board in connection with the Oversight Board's duties pursuant to PROMESA and its task of working with the Commonwealth and its instrumentalities to create the necessary foundation for economic growth and to restore opportunity to the people of the Commonwealth.  Through Citi's expertise in municipal finance, capital markets, restructurings, and infrastructure and utility finance, Citi has assisted the Oversight Board in its efforts to restructure the Debtors' debts, restore their access to capital markets, and put the Debtors on the path to economic recovery.

3.      I have been employed at Citi (or an affiliate of Citi) for more than 30 years and have worked in the "municipal market" for more than 40 years, serving as underwriter or advisor to over 200 municipal issuers on both revenue and general obligation bonds with a par amount in excess of $45 billion.  In addition to a bachelor's degree from Beloit College, I hold a number of professional licenses from the Financial Industry Regulatory Authority.  These include:

(a) General Securities Principal, Series 24;
(b) General Securities Representative, Series 7;

2

(c) Municipal Securities Principal, Series 53; and

(d) Municipal Securities Representative, Series 52.

4.      In 2008, I also served as Chairman of the Municipal Executive Committee of the Securities Industry and Financial Markets Association ("SIFMA").  During that period, I assisted SIFMA in obtaining federal guidance so that municipal governments could restructure outstanding auction-rate securities that failed as a result of liquidity challenges facing the municipal market. For my work in this role during the financial crisis commencing in 2008, I received the SIFMA 2012 Honor Roll Award.

5.      I have been directly involved in assisting distressed governments, serving as a banker to Jefferson County, Alabama in connection with its 2013 sewer refinancing and to Detroit, Michigan in connection with its 2014 water and sewer debt restructuring.  These two debt restructurings were each a significant component of the total debt restructured as part of the largest bankruptcies in the history of the municipal market at the time.

6.      I have significant experience with the Debtors' Title III cases.  I was closely involved in the successful restructuring of COFINA's debt by the Oversight Board pursuant to the confirmed *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3284, ECF No. 561] (the "COFINA Plan"), as the Oversight Board's investment banker.  COFINA's restructuring reduced COFINA's debt from approximately $17.6 billion to $12 billion in the largest confirmed municipal restructuring in U.S. history at the time and reduced debt service payments by over $17 billion.

7.      I was also closely involved in HTA's restructuring, taking a lead role in all aspects of Citi's engagement, including (i) negotiating the settlements and treatment of creditors, including

the settlements contained in the HTA/CCDA Plan Support Agreement[2] (defined below) and the

DRA Stipulation (defined below), and (ii) providing assistance to the Oversight Board in drafting

financial aspects of the HTA plan of adjustment and the corresponding disclosure statement.

8.     In connection with the *Fourth Amended Title III Plan of Adjustment of the*

*Highways and Transportation Authority* [Case No. 17-3567, ECF No. 1350] (as may be amended,

modified, or supplemented, the "HTA Plan") (Debtor's Exhibit 58) [Case No. 17-BK-3567-LTS,

ECF No. 1354-6],[3] I again took a lead role in all aspects of Citi's engagement, including

(i) structuring the New HTA Bonds (defined below) to be issued pursuant to the HTA Plan,

(ii) negotiating the terms and features of the New HTA Bonds with the various creditor

constituencies and AAFAF, including attending numerous mediation and negotiating sessions with

such parties, (iii) assisting counsel in negotiating the terms of the various debt documents to be

issued in connection with the New HTA Bonds, including the New HTA Bonds Indenture

(Debtor's Exhibit 23) [Case No. 17-BK-3567-LTS, ECF No. 1300-3] contained in the *Amended*

*Plan and Plan Related Documents of the Puerto Rico Highways and Transportation Authority*

(Debtor's Exhibit 60) [Case No. 17-BK-3567-LTS, ECF No. 1354-8], and the Subordinated

Indebtedness, and (iv) providing assistance to the Oversight Board in drafting financial aspects of

the HTA Plan and the corresponding disclosure statement.  I have read the Commonwealth fiscal

plans, including the most recent fiscal plan for the Commonwealth certified by the Oversight Board

on January 27, 2022 (the "Commonwealth 2022 Fiscal Plan") (Debtor's Exhibit 9) [Case No. 17-

BK-3567-LTS, ECF Nos. 1299-10, 1299-11], as well as the HTA fiscal plans, including the most

---

[2] Among other things, the HTA/CCDA Plan Support Agreement provided for settlements between the Commonwealth and the HTA bond insurers and bondholders party thereto with respect to claims such insurers and bondholders asserted against the Commonwealth in connection with the Commonwealth's retention of certain revenues historically collected by the Commonwealth and transferred to HTA.  These settlements were incorporated in the Commonwealth Plan.

[3] Capitalized terms not defined herein shall have the same meanings given them in the HTA Plan.

4

recent fiscal plan for HTA certified by the Oversight Board on February 22, 2022 (the "HTA 2022
Fiscal Plan") (Debtor's Exhibit 5) [Case No. 17-BK-3567-LTS, ECF No. 1299-6].

9.      I am authorized to submit this declaration (the "Declaration") in respect of
confirmation of the HTA Plan.  My statements set forth in this Declaration are based on my
personal knowledge except where I reference specific documents or communications as the basis
of my statements.  In those instances where I reference a specific document or communication, the
specific document or communication either is not being offered to prove the truth of the matter
asserted in the statement or, I am informed, is otherwise admissible because, for instance, it is a
self-authenticating public record or can be otherwise authenticated and shown to be admissible.
Where my Declaration provides opinion testimony, in addition to the above, the opinions set forth
herein are based on (i) information shared with me by other members of the Citi team working
directly with me or under my supervision and direction, (ii) additional information of the types
generally relied on by others who have similar experience and expertise in my field, such as
information provided by the Oversight Board and its advisors, and other interested parties and their
respective advisors, concerning the restructuring, and/or (iii) my experience in the industry as
described above.  If I were called upon to testify, I could and would testify competently as to the
facts set forth herein.

10.     My testimony in this Declaration is broken down into four sections.  The first
section details certain HTA Plan settlement negotiations, including negotiations of the
HTA/CCDA Plan Support Agreement (defined below), the DRA Stipulation (defined below), and
the agreement with the statutory committee of unsecured claimholders (the "Creditors'
Committee").  The second section sets forth the amounts payable under the HTA Plan, including
cash and debt service payments to be made pursuant to the HTA Plan, the resources available to

HTA from and after the HTA Effective Date of the HTA Plan, and explains that HTA will be able to make the payments promised to be made pursuant to the HTA Plan. The third section explains why the HTA Plan is consistent with the HTA 2022 Fiscal Plan. The fourth section explains that consummation of the transactions contemplated by the HTA Plan will allow HTA access to the capital markets.

I.   **The Settlements Embodied in the Plan Were Negotiated at Arm's-Length and in Good Faith**

11.   In my role as a senior financial advisor to the Oversight Board, I was intimately involved in the negotiations with various constituents concerning a number of the PSAs and agreements, including the HTA/CCDA Plan Support Agreement (defined below), DRA Stipulation (defined below), and agreement with the Creditors' Committee. I personally participated in the vast majority of the negotiations and discussions concerning those settlements and I have read and am familiar with the terms of the settlements, each as set forth in the HTA Plan. In my opinion, and as described in more detail below, given my participation in the negotiations concerning each of those settlements and my professional experience negotiating many other complex restructuring transactions (many of which are noted above), the settlements reached, both individually and taken as a whole, including payment of the Consummation Costs and Restriction Fees, are reasonable under the facts and circumstances of these cases.

A.   **The HTA Plan and Plan Settlement Agreements**

12.   As described herein, following the filing of the HTA Title III case, the Oversight Board, either directly or through its advisors, engaged in extensive mediation sessions under the guidance and direction of the Mediation Team,[4] and continued to negotiate directly with various

---

[4] The "Mediation Team" is the mediation team led by Judge Barbara J. Houser of the United States Bankruptcy Court for the Northern District of Texas (the "Mediation Team Leader") as established by the Title III Court under its *Order Appointing Mediation Team*, dated June 23, 2017 [ECF No. 430].

6

constituencies, all in an effort to build support for the restructuring of Commonwealth and HTA debt.  Eventually, those negotiations culminated in certain agreements with various stakeholders in furtherance of the successful implementation of the HTA Plan.

13.     On May 5, 2021, the Oversight Board reached an agreement with certain holders and insurers of HTA Bonds, including bond insurers Assured Guaranty Corp. or Assured Guaranty Municipal Corp. (together, "Assured") and National Public Finance Guarantee Corporation ("National") and certain holders and insurers of bonds (the "CCDA Bonds") issued by the Puerto Rico Convention Center District Authority ("CCDA"), regarding the proposed treatment and settlement of, among other things, certain "clawback claims" against the Commonwealth and the treatment of bond claims in an HTA plan of adjustment (the "HTA/CCDA PSA" or the "HTA/CCDA Plan Support Agreement") (Debtor's Exhibit 14) [Case No. 17-BK-3567-LTS, ECF No. 1299-16].  I personally participated in the negotiation of and have reviewed the HTA/CCDA PSA.  My understanding is that, with respect to the HTA bondholders, if the claimants prevailed, the Commonwealth would be required to transfer certain tax and fee revenues to HTA to be applied to payment of HTA bonds and the claimholders would have a security interest in all present and future tolls and fines collected by HTA. The HTA/CCDA PSA, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, by providing  for the issuance of new bonds and Contingent Value Instruments ("CVIs"), along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (ii) provides for $184.8 million in cash to holders of claims against HTA arising from or relating to the HTA 68 Bonds and $79.2 million in cash to holders of claims against HTA arising from or relating to HTA 98 Senior Bonds upon satisfaction of the HTA Distribution Conditions in reduction of the bond

debt, (iii) resolves the outstanding disputes regarding asserted security interests in toll and fine revenues collected by HTA (the "Lien Priority Claims") through the issuance of new HTA bonds pursuant to an HTA plan of adjustment, and (iv) provides for the bondholders and insurers to support the HTA Plan.

14.     Following entry into the HTA/CCDA Plan Support Agreement, I participated in negotiations undertaken with the assistance and guidance of the Mediation Team between the Oversight Board and certain monoline insurers, Ambac Assurance Corporation ("Ambac") and Financial Guaranty Insurance Company ("FGIC"), continued.  As a result of those negotiations, on July 15, 2021, Ambac and FGIC joined the HTA/CCDA Plan Support Agreement pursuant to separate joinder agreements to the HTA/CCDA Plan Support Agreement, subject to a right to terminate the HTA/CCDA Plan Support Agreement solely as to themselves, which right expired on July 26, 2021.

15.     The HTA/CCDA Plan Support Agreement has the support of (i) over $700 million of the aggregate amount of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), and HTA 68 Bond Claims (National), and (ii) over $2.1 billion of the aggregate amount of HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured, HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National).

16.     On November 5, 2021, the Oversight Board reached an agreement with AmeriNational Community Services, LLC (as servicer for the GDB Debt Recovery Authority (the "DRA")), and Cantor-Katz Collateral Monitor LLC (a Delaware limited liability company and as collateral monitor for Wilmington Trust, N.A.) (collectively, the "DRA Parties"), regarding the proposed treatment and settlement of, among other things, the DRA's claims against HTA (the

"DRA Stipulation") (Debtor's Exhibit 16) [Case No. 17-BK-3567-LTS, ECF No. 1299-18].  My understanding is that the DRA Parties asserted (i) their claims were senior to those of holders of HTA Bonds and that they had a security interest in certain tax and fee revenues of HTA ("DRA Priority Claims"), and (ii) that if the DRA Parties prevailed, the Commonwealth would be required to transfer certain tax and fee revenues to HTA to be applied to payment of loans held by the DRA parties.  The DRA Stipulation, provided that, among other things, (i) the DRA Parties would be entitled to receive a $15 million restriction fee in the form of an allowed administration claim and agreed to "lock-up" its HTA claims (ii) the DRA Parties would support the HTA Plan and solicitation process, and vote to accept the HTA Plan.

17.      On January 18, 2022, the Court entered the *Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* [Case No. 17-BK-3283-LTS, ECF No. 19813] (the "CW Confirmation Order") (Debtor's Exhibit 29) [Case No. 17-BK-3567-LTS, ECF No. 1300-9], confirming the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* (the "Commonwealth Plan") [Case No. 17-3283, ECF No. 19784] (Debtor's Exhibit 28) [Case No. 17-BK-3567-LTS, ECF No. 1300-8].  The Commonwealth Plan incorporated, among other things, the terms, provisions, and agreements for the settlement and compromise of various disputes relating to the Commonwealth as provided in the HTA/CCDA PSA and DRA Stipulation, as they relate to the Commonwealth. On March 15, 2022, the Commonwealth Plan became effective.

18.     On May 2, 2022, the Oversight Board filed the *Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [Case No. 17-3567, ECF No. 1164] (the "Initial Plan"), the filing of which the Oversight Board certified pursuant to a resolution dated April 28, 2022 (Debtor's Exhibit 18) [Case No. 17-BK-3567-LTS, ECF No. 1299-20].  The Initial Plan implemented the material terms outlined in the HTA/CCDA PSA and the DRA Stipulation as they relate to HTA.

19.     Following the filing of the Initial Plan, the Oversight Board continued to negotiate with various stakeholders, including the Creditors' Committee, to generate further support for a plan of adjustment.  On May 9, 2022, the Oversight Board reached an agreement with the Creditors' Committee, which provided for the terms of a recommended global settlement regarding the treatment of HTA General Unsecured Claims, including, among other things, the increase of the HTA GUC Recovery from $25 million to $48 million (the "HTA Committee Agreement") (Debtor's Exhibit 15) [Case No. 17-BK-3567-LTS, ECF No. 1299-17].

20.     On May 16, 2022, the Oversight Board filed the *Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [Case No. 17-3567, ECF No. 1177] (the "First Amended HTA Plan"), the filing of which the Oversight Board certified pursuant to a resolution dated May 13, 2022 (Debtor's Exhibit 19) [Case No. 17-BK-3567-LTS, ECF No. 1299-21].  The First Amended HTA Plan incorporated the material terms of the HTA Committee Agreement.

21.     On June 7, 2022, the Oversight Board filed the *Second Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [Case No. 17-3567, ECF No. 1202] (the "Second Amended HTA Plan"), the filing of which the Oversight Board certified pursuant to a resolution dated June 7, 2022 (Debtor's Exhibit 20) [Case No. 17-BK-3567-LTS,

ECF No. 1299-22].  The Second Amended HTA Plan reflects certain comments received from various parties in interest.

22.    On June 17, 2022, the Oversight Board filed the *Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [ECF No. 1240] (the "Third Amended HTA Plan") (Debtor's Exhibit 1) [Case No. 17-BK-3567-LTS, ECF No. 1299-1], reflecting further comments received from various parties in interest, the filing of which the Oversight Board certified pursuant to a resolution dated June 17, 2022 (Debtor's Exhibit 21) [Case No. 17-BK-3567-LTS, ECF No. 1300-1].  The Third Amended HTA Plan reflects other comments received from various parties in interest.

23.    Concurrently herewith, the Oversight Board is filing the HTA Plan, the filing of which the Oversight Board certified pursuant to a resolution dated August 5, 2022 (Debtor's Exhibit 59) [Case No. 17-BK-3567-LTS, ECF No. 1354-7].  The HTA Plan includes modifications in response to certain objections interposed to the Third Amended HTA Plan, and reflects further comments received from various parties in interest.

24.    Members of the Oversight Board participated in negotiations that led to the entry into the agreements among the Oversight Board and various parties to support the HTA Plan (including the HTA/CCDA Plan Support Agreement and the DRA Stipulation, and collectively the "PSAs").  In addition, the Oversight Board was represented in negotiations of the PSAs by either its principal financial advisors, PJT Partners and Citigroup, including me, and/or its legal counsel, Proskauer Rose LLP ("Proskauer").  The Oversight Board's advisors, including Citi and myself, made regular presentations to the Oversight Board in person or by telephone, including at its weekly sessions, as well as at meetings with smaller groups of Oversight Board members and one-on-one.  I attended virtually all, if not all, of those group meetings and telephone conferences.

These presentations updated the Oversight Board on how the key features of the negotiations were evolving over the course of the parties discussions. The Oversight Board also discussed the negotiations regarding the PSAs at additional strategy sessions and provided feedback to its advisors.

### B. The Settlements Embodied in the HTA Plan are Fair and Reasonable

25.     As explained above, following the filing of the Commonwealth and HTA Title III Cases, the Oversight Board, either directly or through its advisors, engaged in extensive mediation sessions under the guidance and direction of the Mediation Team, and continued to negotiate directly with various constituencies, all in an effort to build support for the restructuring of Commonwealth and HTA debt, among others. I participated in many of the negotiation and mediation sessions in my capacity as an advisor to the Oversight Board. And, for those I did not attend personally, I received real-time detailed reporting of what transpired from those that did, including my colleagues from Citi, the Oversight Board's other advisors, or both.

26.     The negotiation sessions in which I participated between the Oversight Board and HTA claimholders included representatives of the various stakeholder parties, as well as the parties' respective legal and financial advisors. During the many mediation sessions that occurred between August 2020 and May 2022, I observed robust discussion among all in attendance concerning the disputed issues, the parties' respective legal and economic positions, and potential means to achieve a consensual debt restructuring.

27.     Throughout, I continued to be involved in numerous formal and informal discussions in which the Oversight Board and its financial and legal advisors engaged with individual claimholders and their respective advisors. Although I will not disclose the specifics of any discussions that took place in these informal sessions or in the negotiations under the auspices

of the Mediation Team, the parties and their advisors (legal and financial) actively participated and strenuously advocated for their respective positions.

28.     As described above, these mediation sessions culminated in the execution of the HTA/CCDA Plan Support Agreement.  In addition to the HTA/CCDA Plan Support Agreement, the Oversight Board reached an agreement with the DRA and executed the DRA Stipulation.

29.     Execution of the HTA/CCDA Plan Support Agreement and the DRA Stipulation led directly to the development and filing of the Initial Plan, which was filed on May 2, 2022.  The Initial Plan embodied the terms of the HTA/CCDA Plan Support Agreement and the DRA Stipulation, providing a path for HTA to emerge from Title III.

30.     Following the filing of the Initial Plan, the Oversight Board continued to negotiate with various stakeholders, including the Creditors' Committee, to generate further support for a plan of adjustment.  Those negotiations culminated in the entry into the HTA Committee Agreement and the filing of the First Amended HTA Plan incorporating the terms of such agreement.  Following additional discussions with various parties in interest, the Oversight Board filed the Second Amended HTA Plan and the HTA Plan.

31.     The constituencies who participated in the above-described negotiations were instrumental in the development of the HTA/CCDA PSA, DRA Stipulation, and the HTA Plan.  The negotiations leading to the execution of the HTA/CCDA PSA and DRA Stipulation were at arm's length and in good faith and led to a compromise of contested positions between the parties to the HTA/CCDA PSA and DRA Stipulation.   The HTA/CCDA PSA and DRA Stipulation avoids the time, expense and uncertainty of continued litigation, as well as the risk of an all-or-nothing outcome for both sides, which would have the potential of thwarting the restructuring efforts.

32.     In my opinion, achieving consensual resolution with Assured and National regarding all HTA bond claims was essential to the eventual treatment of those claims in both the Commonwealth Plan and the HTA Plan.  The HTA/CCDA PSA resolved costly and time-consuming litigation against HTA as it concerned Assured and National, and avoided uncertainty regarding resolution of that litigation.  It was also the linchpin necessary to facilitate negotiations and settlement with other defendants regarding holding or insuring HTA Bonds.  An adverse ruling against HTA would have placed at risk certain revenue streams HTA had forecasted to be available to pay the HTA Bonds and might have made infeasible any restructuring of HTA's debts.  The DRA Stipulation likewise resolved DRA Priority Claims, which could have imperiled any settlement that could lead to a confirmable plan of adjustment for HTA.

33.     The payment of the Consummation Costs and Restriction Fees are likewise critical components of the PSAs that made development of the HTA Plan possible.  Specifically, in consideration for their efforts in assisting in the formulation of the HTA Plan, and to compensate the HTA/CCDA PSA Creditors for fees and expenses incurred in connection with the negotiation and execution of the HTA/CCDA Plan Support Agreement, the Oversight Board determined that it is fair and reasonable for the PSA Creditors to be paid the Consummation Costs.  Similarly, in exchange for executing the DRA Stipulation and agreeing to all of its terms and conditions, including agreeing to support the HTA Plan and to "lock up" their HTA 98 Senior Bonds and HTA/GDB Claims in connection with the DRA Stipulation, the Oversight Board determined that it is fair and reasonable to make a DRA Restriction Fee available to each DRA bondholder party to the DRA Stipulation.

14

34.     In my judgment, the Consummation Costs and Restriction Fees as contemplated in the PSAs, and incorporated in the HTA Plan, are reasonable and fair and the product of extensive arms'-length negotiations among sophisticated parties.

35.     Accordingly, based on my participation in the settlement discussions, and experience in the negotiation and resolution of other complex restructurings, under the totality of the facts and circumstances, including but not limited to the HTA 2022 Fiscal Plan, the Commonwealth's and HTA's cash resources, and potential risks resulting from then-outstanding litigation, I believe the settlements provided under the HTA/CCDA PSA and DRA Stipulation constitute a reasonable settlement of the parties' disputes concerning the HTA bonds and the claims of the DRA.

## II.    <u>The HTA Plan Is Feasible</u>

36.     In this section, I explain that HTA should be able to meet its financial obligations under the HTA Plan.  This section is in two parts.  In subsection A, I set forth HTA's payment obligations under the HTA Plan.  These obligations include (i) payments for administrative claims such as, for example, consummation and restriction fees to creditor constituencies, and unsecured claims, that are to be made on or shortly after the HTA Effective Date, and (ii) after the HTA Effective Date, payments to be made with respect to Eminent Domain/Inverse Condemnation Claims when they become due, Federal Claims, the New HTA Bonds, and the Subordinated Indebtedness to be issued pursuant to the HTA Plan, as well as the HTA Moscoso Bonds (which are unimpaired by the HTA Plan).  In subsection B, I explain that HTA has sufficient liquidity to satisfy HTA Effective Date obligations under the HTA Plan, and the reduction in HTA's funded indebtedness, the reforms provided for by the HTA 2022 Fiscal Plan, the Toll Rate Covenant contained in the HTA New Bonds Indenture, the Debt Management Policy (defined below), the

operational restructuring of HTA, and a significant cash reserve should allow HTA to satisfy its obligations after the HTA Effective Date, while continuing to provide the necessary transportation services and infrastructure for HTA for the benefit of HTA and the benefit of the Commonwealth and its people.

### A. HTA's Financial Obligations Pursuant to the HTA Plan

37.     I have read the HTA Plan, which provides for the following payments by HTA: (1) cash on the HTA Effective Date to satisfy administrative expense claims, including approximately $140 million in Consummation Costs and PSA Restriction fees and a $24 million payment to the GUC Reserve; and (2) payments over time, including (a) an additional $24 million payment to the GUC Reserve on the first anniversary of the HTA Effective Date, (b) an estimated $41.88 million in payments to holders of Eminent Domain/Inverse Condemnation Claims upon occurrence of a Final Order determining the validity and amount of just compensation attributable to such claims, (c) an estimated $20.79 million payment to holders of Allowed Federal Claims in accordance with the terms of Section 24.1 of the HTA Plan allowing HTA to pay the total amount of such Allowed Federal Claims in equal installments over forty years, (d) payments pursuant to (y) New HTA Bonds issued by HTA in the form of New HTA CIBs, New HTA CABs, and New HTA Convertible CABs, and (z) Subordinated Indebtedness to be issued to the Commonwealth as a refinancing of HTA's obligations pursuant to the Commonwealth Loan,[5] and (e) payments pursuant to the existing HTA Moscoso Bonds, which claims are unimpaired under the HTA Plan.

### i. Cash Payments on the HTA Effective Date

---

[5] The Commonwealth Loan is defined in the HTA Plan to mean "[t]he loan extended by the Commonwealth to HTA in the original principal amount up to $362,000,000.00 in connection with, among other things, HTA's obligations pursuant to the HTA/CCDA Plan Support Agreement, the Commonwealth Confirmation Order, and the DRA Stipulation."  HTA Plan § 1.77.

38.     More specifically, the HTA Plan provides for the following cash payments on the

HTA Effective Date:

- $140 million in Consummation Costs and PSA Restriction Fees

    i.   $15 million to the DRA (HTA Plan §§ 3.5, 1.114)

    ii.  $125 million in HTA Consummation Costs (HTA Plan §§ 3.3, 3.4, 1.200)

- $24 million to the GUC Reserve to fund the HTA GUC Recovery (HTA Plan § 20.3), which includes up to $2.5 million in the aggregate to be made available to holders of Allowed Convenience Claims (HTA Plan §§ 1.81, 1.195)

- Up to approximately $3.5 million to holders of Eminent Domain/Inverse Condemnation Claims which already may the subject of a Final Order determining the amount and validity thereof (HTA Plan §§ 19.1, 1.117; *Declaration of Jay Herriman in Respect of Confirmation of Fourth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [ECF No. 1355] (the "Herriman Declaration") ¶ 35) if there has been a Final Order determining such claims may not be impaired or discharged

    **ii.   Cash Payments After the HTA Effective Date (Excluding Payments With Respect to New HTA Bonds and the Subordinated Indebtedness)**

39.     The HTA Plan provides for the following additional payments after the HTA

Effective Date:

- On the first anniversary of the HTA Effective Date, $24 million to the GUC Reserve to fund the HTA GUC Recovery (HTA Plan § 20.3), which includes up to $2.5 million in the aggregate to be made available to holders of Allowed Convenience Claims (HTA Plan §§ 1.81, 1.195).

- If eminent domain and inverse condemnation claims are required to be paid in full in Cash, such claims shall be paid upon the occurrence of a Final Order determining the validity and amount of just compensation attributable to an Eminent Domain/Inverse Condemnation Claim. HTA Plan § 19.1. I have read the Herriman Declaration filed contemporaneously herewith, which projects that approximately $41.88 million of Eminent Domain/Inverse Condemnation Claims might be required to be paid. Herriman Decl. ¶ 34.

- On the later to occur of (a) the HTA Effective Date and (b) the date on which a Federal Claim shall become an Allowed Claim, such claims may be paid in full in a lump sum payment or be paid in forty (40) equal amount installments, with such

payments commencing on the third (3rd) anniversary of the HTA Effective Date and continuing on each anniversary thereafter. HTA Plan § 19.1. According to the Herriman Declaration, the Oversight Board projects that approximately $20.79 million of Federal Claims might be required to be paid. Herriman Decl. ¶ 18.

### iii. New HTA Bonds

40.     The HTA Plan provides Reorganized HTA will issue new HTA bonds on the HTA Effective Date with ten different maturity dates in an aggregate original principal amount of $1,245,000,465.70: (i) $600,000,000 in aggregate principal amount of New HTA CIBs (i.e., current interest bonds) (HTA Plan § 25.1(a)), (ii) $237,955,868.13 in aggregate principal amount of New HTA CABs (i.e., capital appreciation bonds) (HTA Plan § 25.1(b)), and (iii) $407,044,597.57 in aggregate principal amount of New HTA Convertible CABs (collectively, the "New HTA Bonds"). HTA Plan § 25.1(c),

41.     The aggregate amount owed, including all principal and interest over the life of the New HTA Bonds from the Deemed Issuance Date of July 1, 2022 (HTA Plan § 25.1(e)), to the maturity of the final New HTA Bonds on July 1, 2062, is $3,107,435,797.24. Accordingly, regardless of when the HTA Effective Date occurs, accrued interest and/or principal on the New HTA Bonds will be paid on July 1, 2023 and each January 1 and July 1 thereafter until the New HTA Bonds have been paid or satisfied in full in accordance with their terms.

### 1. New HTA CIBs

42.     The New HTA CIBs comprise a series of ten current interest bonds bearing interest of 5.0% per annum of staggered maturity dates spanning from 2053 to 2062. HTA Plan § 25.1(a); *Id.* Ex. D-2. The New HTA CIBs provide for the payment of interest semi-annually starting on July 1, 2023. *Id.* Ex. D-2. The total principal amount of New HTA CIBs issued is $600,000,000, and the aggregated total interest accruing through all ten maturity dates is $1,085,949,250. *Id.*

Accordingly, assuming timely payment, the aggregate amount owed over the life of the New HTA CIBs will be $1,685,949,250.  *Id.*

### 2.   New HTA CABs

43.     The New HTA CABs comprise eight series of capital appreciation bonds, maturing each July 1 from fiscal years 2025 through 2032, with an initial principal amount of $237,955,868.13, bearing interest at 5.0% per annum.  HTA Plan § 25.1(b); *Id.* Ex. D-3.  The New HTA CABs do not provide for the current payment of interest to holders, but rather, for interest to accrete at the specified rate and be added to the principal and compounded.  *Id.* § 25.1(b).  The sum of the principal and accreted interest is then amortized in certain years.  *Id.*  Aggregate payments in respect of the New HTA CABs will be $334,856,647.24, assuming payments are made in accordance with each sinking fund redemption date.  *Id.* Ex. D-3.

### 3.   New HTA Convertible CABs

44.     The New HTA Convertible CABs comprise one series of convertible capital appreciation bonds, maturing in July 1, 2053, with an initial principal amount of $407,044,597.57, bearing interest at 5.0% per annum.  HTA Plan § 25.1(c); *Id.* Ex. D-4.  The New HTA CABs do not provide for the current payment of interest until the Conversion Date of July 1, 2032, but rather, for interest to accrete at the specified rate and be added to the principal and compounded.  HTA Plan § 25.1(c).  The sum of the principal and accreted interest is amortized in certain years.  *Id.* Commencing with the first payment on January 1, 2033, the New HTA Convertible CABs shall convert into current interest bonds, and accrue and pay interest on a semi-annual basis.  *Id.* Ex. D-4.  Aggregate payments in respect of the New HTA Convertible CABs will be $1,086,629,900.00. *Id.*

### iv.   Subordinated Indebtedness

45.     The Plan further provides for the payment of up to $362,000,000 in principal amount of Subordinated Indebtedness, which is the obligation incurred by HTA to repay the Commonwealth Loan.  HTA Plan § 25.1(d).  Payments are to commence on July 1, 2023, and continue annually until fully extinguished on July 1, 2052, with interest at 2.5%.  *Id.* Ex. E-2.  A total of approximately $170 million in interest is projected to be paid with respect to the Subordinated Indebtedness, and aggregate payments in respect thereof will be approximately $530 million.  *Id.*  Repayment of the Subordinated Indebtedness is junior, inferior, and subordinate to repayment of the New HTA Bonds.  New HTA Bonds Indenture § 2.01 (Debtor's Exhibit 23) [Case No. 17-BK-3567-LTS, ECF No. 1300-3].  If the indebtedness incurred by HTA pursuant to the Commonwealth Loan is less than $362,000,000, the principal amount of the Subordinated Indebtedness will be reduced correspondingly.

### v.   Aggregate Annual Debt Service (Excluding the HTA Moscoso Bonds)

46.     The aggregate payments on a yearly basis contemplated by the HTA Plan to service the New HTA Bonds and the Subordinated Indebtedness are set forth in the below chart that was prepared under my direction by aggregating, in each fiscal year, the obligations of Reorganized HTA pursuant to the New HTA Bonds and the Subordinated Indebtedness:

| Fiscal Year (7/1) | Maturity | CIB Debt Service | CAB Accreted Value at each Redemption Date | CCAB Debt Service | Total Debt Service | Sub. Debt Service | Aggregate Debt Service |
|---|---|---|---|---|---|---|---|
| Total | | 1,685,949,250 | 334,856,647 | 1,086,629,900 | 3,107,435,797 | 531,383,663 | 3,638,819,460 |
| 2023 | 7/1/23 | 30,000,000 | - | - | 30,000,000 | 22,401,349 | 52,401,349 |
| 2024 | 7/1/24 | 30,000,000 | - | - | 30,000,000 | 18,169,326 | 48,169,326 |
| 2025 | 7/1/25 | 30,000,000 | 29,327,917 | - | 59,327,917 | 13,296,251 | 72,624,168 |
| 2026 | 7/1/26 | 30,000,000 | 27,183,444 | - | 57,183,444 | 13,563,359 | 70,746,803 |
| 2027 | 7/1/27 | 30,000,000 | 32,108,471 | - | 62,108,471 | 13,835,808 | 75,944,279 |
| 2028 | 7/1/28 | 30,000,000 | 38,756,164 | - | 68,756,164 | 14,113,706 | 82,869,869 |
| 2029 | 7/1/29 | 30,000,000 | 50,221,494 | - | 80,221,494 | 14,397,162 | 94,618,656 |

20

| Year | Date | | | | | | |
|---|---|---|---|---|---|---|---|
| 2030 | 7/1/30 | 30,000,000 | 52,419,173 | - | 82,419,173 | 14,686,288 | 97,105,461 |
| 2031 | 7/1/31 | 30,000,000 | 52,419,984 | - | 82,419,984 | 14,981,196 | 97,401,180 |
| 2032 | 7/1/32 | 30,000,000 | 52,420,000 | - | 82,420,000 | 15,282,002 | 97,702,002 |
| 2033 | 7/1/33 | 30,000,000 | - | 52,419,550 | 82,419,550 | 15,588,824 | 98,008,374 |
| 2034 | 7/1/34 | 30,000,000 | - | 52,420,050 | 82,420,050 | 15,901,783 | 98,321,833 |
| 2035 | 7/1/35 | 30,000,000 | - | 52,419,850 | 82,419,850 | 16,221,000 | 98,640,850 |
| 2036 | 7/1/36 | 30,000,000 | - | 52,419,600 | 82,419,600 | 16,546,602 | 98,966,202 |
| 2037 | 7/1/37 | 30,000,000 | - | 52,419,800 | 82,419,800 | 16,878,716 | 99,298,516 |
| 2038 | 7/1/38 | 30,000,000 | - | 52,419,800 | 82,419,800 | 17,217,473 | 99,637,273 |
| 2039 | 7/1/39 | 30,000,000 | - | 52,419,850 | 82,419,850 | 17,563,004 | 99,982,854 |
| 2040 | 7/1/40 | 30,000,000 | - | 52,420,050 | 82,420,050 | 17,915,446 | 100,335,496 |
| 2041 | 7/1/41 | 30,000,000 | - | 52,420,350 | 82,420,350 | 18,274,937 | 100,695,287 |
| 2042 | 7/1/42 | 30,000,000 | - | 52,420,550 | 82,420,550 | 18,641,618 | 101,062,168 |
| 2043 | 7/1/43 | 30,000,000 | - | 52,420,300 | 82,420,300 | 19,015,633 | 101,435,933 |
| 2044 | 7/1/44 | 30,000,000 | - | 52,420,100 | 82,420,100 | 19,397,128 | 101,817,228 |
| 2045 | 7/1/45 | 30,000,000 | - | 52,420,250 | 82,420,250 | 19,786,252 | 102,206,502 |
| 2046 | 7/1/46 | 30,000,000 | - | 52,419,850 | 82,419,850 | 20,183,159 | 102,603,009 |
| 2047 | 7/1/47 | 30,000,000 | - | 52,419,850 | 82,419,850 | 20,588,004 | 103,007,854 |
| 2048 | 7/1/48 | 30,000,000 | - | 52,419,950 | 82,419,950 | 21,000,946 | 103,420,896 |
| 2049 | 7/1/49 | 30,000,000 | - | 52,419,650 | 82,419,650 | 21,422,147 | 103,841,797 |
| 2050 | 7/1/50 | 30,000,000 | - | 52,420,250 | 82,420,250 | 21,851,773 | 104,272,023 |
| 2051 | 7/1/51 | 30,000,000 | - | 52,419,750 | 82,419,750 | 22,289,991 | 104,709,741 |
| 2052 | 7/1/52 | 30,000,000 | - | 52,420,000 | 82,420,000 | 20,372,779 | 102,792,779 |
| 2053 | 7/1/53 | 44,190,000 | - | 38,230,500 | 82,420,500 | - | 82,420,500 |
| 2054 | 7/1/54 | 82,415,500 | - | - | 82,415,500 | - | 82,415,500 |
| 2055 | 7/1/55 | 82,419,250 | - | - | 82,419,250 | - | 82,419,250 |
| 2056 | 7/1/56 | 82,420,000 | - | - | 82,420,000 | - | 82,420,000 |
| 2057 | 7/1/57 | 82,416,250 | - | - | 82,416,250 | - | 82,416,250 |
| 2058 | 7/1/58 | 82,416,250 | - | - | 82,416,250 | - | 82,416,250 |
| 2059 | 7/1/59 | 82,417,500 | - | - | 82,417,500 | - | 82,417,500 |
| 2060 | 7/1/60 | 82,417,250 | - | - | 82,417,250 | - | 82,417,250 |
| 2061 | 7/1/61 | 82,417,500 | - | - | 82,417,500 | - | 82,417,500 |
| 2062 | 7/1/62 | 82,419,750 | - | - | 82,419,750 | - | 82,419,750 |

### vi.  HTA Moscoso Bonds

47.    The Plan also provides that the HTA Moscoso Bonds, with an aggregate outstanding principal amount of $141,875,411.00 (HTA Plan § 1.197), are unimpaired, and payments of principal and interest thereon be made in accordance with their terms until paid in full. *Id.* § 18.1.

### vii.   Total Financial Obligations Pursuant to the HTA Plan

48.    Together, total HTA Plan consideration—including HTA Effective Date cash payments, cash to be used to fund recoveries for HTA general unsecured creditors, holders of Federal Claims, and Eminent Domain/Inverse Condemnation Claims, and payments with respect to New HTA Bonds, the HTA Moscoso Bonds, and the Subordinated Indebtedness—totals approximately $4 billion.

### B.   Confirmation of the HTA Plan Is Not Likely to Be Followed By the Need for Further Unanticipated Financial Reorganization

49.    In my opinion, confirmation of the HTA Plan is not likely to be followed by the need for further unanticipated financial restructuring.  After my review of HTA's cash balances and the HTA 2022 Fiscal Plan, among other things, I have formed this opinion based on a number of factors, including the following:  (i) HTA has the resources and liquidity necessary to make the payments on the HTA Effective Date which it is required to make; (ii) the HTA Plan reduces HTA's debt to an amount which the HTA 2022 Fiscal Plan projects HTA will be able to pay; (iii) the HTA Plan and New HTA Bonds Indenture, which I have reviewed, include multiple provisions, including the Toll Rate Covenant, which, along with a significant cash reserve HTA will maintain for contingencies, are designed to ensure HTA can cover projected debt obligations; (iv) HTA will be able to pay the HTA Moscoso Bonds; and (v) HTA's operating revenues, as well as projected appropriations from the Commonwealth in accordance with the Commonwealth 2022 Fiscal Plan, are sufficient to cover HTA's maintenance and operating expenses and other required disbursements.

### i.   HTA's Liquidity is Sufficient to Satisfy HTA Effective Date Cash Obligations and to Pay the GUC Reserve

50.     As explained above, HTA is required to make payments of up to $167.5 million on the HTA Effective Date.  *See supra* ¶ 38.  Excluding payments with respect to the New HTA Bonds and Subordinated Indebtedness, HTA is further expected to make one more payment of $24 million to the GUC Reserve on the one-year anniversary of the HTA Effective Date.  HTA also will be required to make payment to holders of Eminent Domain/Inverse Condemnation Claims, and Federal Claims.  *See supra* ¶ 39.

51.     I have reviewed the terms of the Commonwealth Loan agreement (Debtor's Exhibit 24) [Case No. 17-BK-3567-LTS, ECF No. 1300-4], and understand that, on July 8, 2022, pursuant to Section 2.01 thereof, $171,635,806.68 was drawn thereon in order to make payments to HTA Bondholders in accordance with the HTA/CCDA Plan Support Agreement.  The proceeds of the Commonwealth Loan, on which HTA has $188 million remaining available to draw, will provide the cash required to be paid on the HTA Effective Date.  Likewise, the payment to the GUC Reserve on the first anniversary of the HTA Effective Date will be made from the proceeds of the Commonwealth Loan.  Based on my discussions with Oversight Board and AAFAF advisors, I understand that the amount of the Commonwealth Loan was established in order for HTA to pay HTA Effective Date obligations required pursuant to the HTA Plan and to pay the GUC Reserve.  Accordingly, I believe that HTA will be able to satisfy HTA Effective Date obligations and will be able to pay the GUC Reserve as required by the HTA Plan.

### ii.   HTA Will Be Able To Satisfy Obligations Pursuant to the New HTA Bonds and the Subordinated Indebtedness, Which Are Significantly Reduced By the HTA Plan

52.     On the HTA Effective Date, the aggregate principal amount of funded indebtedness will equal approximately $1.6 billion, a significant reduction from the $6.4 billion in such

23

indebtedness that existed prior to the HTA Effective Date. Similarly, average annual debt service for HTA will be approximately $90 million, compared to $294 million prior to confirmation. Annual debt service is therefore significantly lower than it was prior to the HTA Petition Date, and debt levels will continuously decline and remain low until full repayment of the New HTA Bonds, which is projected to occur in 2062.

53. In accordance with the New HTA Bonds Indenture, the holders of the New HTA Bonds and Subordinated Indebtedness are granted a security interest in certain toll revenues and toll fines that HTA will receive, until such debts are extinguished. The protections of this security interest provide the holders of the New HTA Bonds and Subordinated Indebtedness with a property interest and lien in such revenues when they are arise. According to the HTA 2022 Fiscal Plan, after implementing the fiscal reforms provided for therein, HTA is projected to receive $8.196 billion in toll revenue, and $1.480 billion in toll fines in fiscal years 2022 through 2051. HTA 2022 Fiscal Plan at 66 [Case No. 17-BK-3567-LTS, ECF No. 1299-6]. Based upon these projections in the HTA 2022 Fiscal Plan, and with the protections of the Toll Rate Covenant discussed below in paragraph 55, I believe the projected toll and fine revenues against which the holders of the New HTA Bonds and Subordinated Indebtedness have a security interest will be sufficient to pay those obligations pursuant to the HTA Plan.

### iii. Factors Mitigating the Impact of Potential Financial Underperformance and Restrain HTA's Ability to Borrow

54. The HTA Plan and the documents included in the Plan Supplement, including the New HTA Bonds Indenture, incorporate multiple provisions—namely, the Toll Rate Covenant and the Debt Management Policy, discussed in paragraph 55 and 57, respectively—that were structured to mitigate the impact of potential financial underperformance and limit HTA's indebtedness following the HTA Effective Date.

55.     The HTA Plan and the New HTA Bonds Indenture establish a Toll Rate Covenant to ensure that HTA Toll Receipts are sufficient to pay amounts due under the New HTA Bonds and the Subordinated Indebtedness.  The Toll Rate Covenant provides that HTA covenants that "it will at all times charge and collect or cause to be charged and collected Tolls for the use of the Toll Facilities at rates not less than those set forth in the schedule of such Tolls then in effect and as shall be required in order that Toll Receipts in each Fiscal Year shall equal at least the aggregate of (i) one hundred ten percent (110%) of the aggregate of the Required Deposits for such Fiscal Year and (ii) one hundred percent (100%) of Annual Debt Service on Subordinated Indebtedness" and, if such Toll Receipts will not be or were not sufficient to satisfy the Toll Rate Covenant, HTA will hire a "Traffic Consultant" to undertake a study to recommend of schedule of Tolls to satisfy the Toll Rate Covenant and eliminate any deficiency resulting from prior year(s)' failure to satisfy the Toll Rate Covenant.  New HTA Bonds Indenture § 7.1(a), (d) (Debtor's Exhibit 23) [Case No. 17-BK-3567-LTS, ECF No. 1300-3].

56.     Furthermore, the New HTA Bonds Indenture provides for reserve funds for both the New HTA Bonds and the Subordinated Indebtedness to support the debt payment obligations thereunder.  HTA Plan § 1.251.  The New HTA Bonds Indenture also provides that, if a payment default under the Subordinated Indebtedness shall have occurred, amounts required to pay all past due principal and interest thereon must be paid before HTA may deposit additional funds in its operating reserve account.  New HTA Bonds Indenture § 5.05 (Debtor's Exhibit 23) [Case No. 17-BK-3567-LTS, ECF No. 1300-3].  This mechanism is designed to ensure HTA remains fiscally responsible, as HTA must be able to fund its operating reserve account or risk being unable to fund its expenses in a given fiscal year.  Accordingly, I believe that HTA will be able to satisfy its debt obligations following the HTA Effective Date.

57.     The HTA Plan also requires HTA, during all times at which New HTA Bonds (or refinancings thereof) remain outstanding, to maintain and comply with a Debt Management Policy which imposes certain limitations on further borrowings after the HTA Effective Date.  *See* HTA Plan §§ 1.98, 1.99, 25.3.  The Debt Management Policy limitations include restricting long-term borrowing for capital improvements only (*id.* § 25.3(a)), providing that any new debt issued by HTA have a maturity of no greater than thirty years (*id.* § 25.3(b)), requiring principal on such debt to amortize within two years from the "placed-in-service date of the project being financed" (*id.* § 25.3(c)), providing conditions for when refinancings of debt are permissible (*id.* § 25.3(d)), and requiring each HTA fiscal plan certified after the HTA Effective Date to include provisions for paying of all New HTA Bonds and the Subordinated Indebtedness, including, without limitation, sinking fund payments due in such fiscal year (*id.* § 25.3(e)).

### iv.  HTA Will Be Able to Satisfy Its Obligations With Respect to the HTA Moscoso Bonds

58.     I have reviewed the *Disclosure Statement for the Third Amended Title III Plan of Adjustment for the Puerto Rico Highways and Transportation Authority* (as it may be amended, modified, or supplemented, the "Disclosure Statement") (Debtor's Exhibit 2) [Case No. 17-BK-3567-LTS, ECF Nos. 1299-2, 1299-3] and, in particular, the sections describing the HTA Moscoso Bonds and the Teodoro Moscoso Bridge.  I have also reviewed the Teodoro Moscoso Indenture (Debtor's Exhibit 25) [Case No. 17-BK-3567-LTS, ECF No. 1300-5], the Teodoro Moscoso Concession Agreement (Debtor's Exhibit 26) [Case No. 17-BK-3567-LTS, ECF No. 1300-6], and the Amendment to Teodoro Moscoso Concession Agreement (Debtor's Exhibit 27) [Case No. 17-BK-3567-LTS, ECF No. 1300-7].  I understand that the HTA Moscoso Bonds, which were issued in connection with construction of the Teodoro Moscoso Bridge spanning the San José Lagoon, which is operated by a third party pursuant to the Teodoro Moscoso Concession Agreement, as

26

amended, have continued to pay regularly scheduled debt service since the HTA Petition Date.
*See* Disclosure Statement at Exhibit F, p.3 n.1.   The HTA Moscoso Bonds are paid by the
concessionaire from their collections of toll revenues, and following the HTA Effective Date, it is
expected that the concessionaire and the toll revenues securing the HTA Moscoso Bonds will be
sufficient to satisfy payments in full.   *See* Disclosure Statement at 61.   Furthermore, the Teodoro
Moscoso Concession Agreement produces a surplus to HTA, as a percentage of such toll revenues
are paid to HTA each year, increasing from 5% through 2027 to 61.5% thereafter.   *See* Disclosure
Statement at 61.

> ### v.   HTA Is Projected to Be Able to Satisfy Its Maintenance and Operating Expenses and to Pay Eminent Domain/Inverse Condemnation Claims and Federal Claims as Such Claims Become Due

59.     The HTA 2022 Fiscal Plan provides for sufficient revenue to satisfy debt service to
bondholders through modest increases in toll and fine revenue while maintaining significant cash
reserves.   It explains HTA should make a number of operational and structural improvements to
increase operating revenue.   It further lays the groundwork to optimize opportunities to receive
infrastructure funding from the federal government, so that, HTA can receive its fair share of
discretionary federal grants.   Changes in HTA's governance and operating practices, including
managerial improvements in project delivery outlined in its Memorandum of Understanding with
the Federal Highway Administration, will improve HTA's safety and sustainability.   HTA 2022
Fiscal Plan at 8–9.   The projected impact of these fiscal measures is approximately $6.0 billion
over Fiscal Years 2022 through 2051, turning a forecasted $1.2 billion deficit if HTA does not
implement any fiscal measures to a cumulative surplus of $4.8 billion.   These fiscal measures will
enable necessary investments, fiscal sustainability, and affordable restructuring of debt.   HTA
2022 Fiscal Plan at 10, 64 [Case No. 17-BK-3567-LTS, ECF No. 1299-6].

60.    The HTA Plan and HTA 2022 Fiscal Plan also call for operational restructuring, by separating the non-Highway Assets from HTA and moving them to other entities within the Commonwealth.  As of the date of this Declaration, the HTA Plan provides for the timely operational restructuring of HTA through the separation of the Highway Assets from the Transit Assets, with such Transit Assets and all Transit Revenues being transferred to PRITA.  HTA Plan § 2.4(a).  As Tren Urbano receives only four cents for every dollar it costs to operate, HTA 2022 Fiscal Plan at 9 n.4 [Case No. 17-BK-3567-LTS, ECF No. 1299-6], the transfer of Tren Urbano to PRITA will significantly improve HTA's operating budget.  Additional operational restructuring within HTA, including the separation of the Toll Road Assets and non-Toll Road Assets, HTA Plan § 2.4(b), will further allow HTA to improve its operational efficiency and ability to obtain federal grant money.  HTA 2022 Fiscal Plan at 12 [Case No. 17-BK-3567-LTS, ECF No. 1299-6].  These operational changes will ensure that Toll Revenues are used only for the capital and operating expenses of Toll Road Assets before paying debt service on the New HTA Bonds.  I understand that there are ongoing discussions concerning section 2.4 of the HTA Plan.  To the extent any changes are made, I reserve the right to supplement this Declaration based on the results of those discussions.

61.    If HTA fully and promptly implements the measures in the HTA 2022 Fiscal Plan, the HTA 2022 Fiscal Plan projects that HTA could achieve operational surpluses as early as Fiscal Year 2023.  From Fiscal Year 2022 to Fiscal Years 2051, the HTA 2022 Fiscal Plan projects an average operational surplus of approximately $150 million with respect to the Toll Entities and a capital deficit of about $110 million per year.  Non-Toll Assets and Transit Assets will require the annual Commonwealth appropriations contemplated by the Commonwealth Fiscal Plan to remain solvent based on the forecasted expenditures, with or without full implementation of the measures

28

in the HTA 2022 Fiscal Plan.  The Oversight Board will provide for the continuation of such appropriations and, if and when the Oversight Board is dissolved, I expect the Commonwealth will continue to fund the appropriations necessary to maintain the Non-Toll Assets and Transit Assets.

62.     In addition to fiscal and structural reforms, HTA is projected to receive appropriations each year to cover capital and operating expenses.  In accordance with Section 5.2.6 of the Commonwealth 2022 Fiscal Plan (Debtor's Exhibit 9) [Case No. 17-BK-3567-LTS, ECF Nos. 1299-10, 1299-11] over Fiscal Years 2022 through 2051, which I have reviewed, the HTA 2022 Fiscal Plan includes an average annual general unrestricted appropriation of $110 million and average capital appropriation of $68 million per year.  Based on my conversations with officials from the Commonwealth and the Oversight Board, the HTA operating transfer is intended to be used by HTA solely to fund costs associated to non-toll assets and is not available to be used for any other purposes.  The existence of these appropriations is subject to revision, in line with the broader priorities of the Commonwealth.  HTA 2022 Fiscal Plan at 31 [Case No. 17-BK-3567-LTS, ECF No. 1299-6].  Across the full thirty-year period covered, the HTA 2022 Fiscal Plan assumes an operating transfer from the Commonwealth to HTA of $3.3 billion.  HTA 2022 Fiscal Plan at 107 [Case No. 17-BK-3567-LTS, ECF No. 1299-6].  These Commonwealth appropriations are front-loaded, providing significant support in early years to maintain non toll roads and Tren Urbano until such operations are transferred to other Commonwealth entities.  HTA 2022 Fiscal Plan at 107 [Case No. 17-BK-3567-LTS, ECF No. 1299-6].  In addition to Commonwealth appropriations, HTA expects to disburse $241 million in emergency federal relief and stimulus funding from Fiscal Year 2022 to 2026.  HTA 2022 Fiscal Plan at 36 [Case No. 17-BK-3567-LTS, ECF No. 1299-6].

63.     I have reviewed the Herriman Declaration, which indicates Eminent Domain/Inverse Condemnations Claims are estimated at $41.88 million.  Herriman Decl. ¶ 34. The Herriman Declaration explains that, on the HTA Effective Date, up to $3.5 million is anticipated to be payable (Herriman Decl. ¶ 35), with the remainder potentially coming due following the HTA Effective Date, if and only if the Commonwealth courts issue a final order allowing such claims.  With respect to the Eminent Doman/Inverse Condemnation Claims payable on the HTA Effective Date, HTA will be able to pay such claims from cash on hand.  For future Eminent Domain/Inverse Condemnation Claims, HTA will be able to pay such claims from net operating revenues or appropriations from the Commonwealth.

64.     The Herriman Declaration further explains that Federal Claims will be no more than $20.79 million (Herriman Decl. ¶ 18), which under the HTA Plan can be satisfied in forty equal annual installments.  HTA Plan § 19.1.  Obligations to pay Federal Claims will not interfere with HTA's ability to make other necessary payments pursuant to the HTA Plan.  These payments will be made from net operating revenues of HTA and/or appropriations from the Commonwealth as they come due.  I believe HTA has more than sufficient cash on hand and future expected liquidity to pay these claims.

## III.    The HTA Plan Is Consistent with the HTA Fiscal Plan

65.     Title II of PROMESA provides that the Oversight Board has oversight responsibility for Puerto Rico's fiscal plans.  On February 22, 2022, the Oversight Board certified the HTA 2022 Fiscal Plan.

66.     That fiscal plan includes many fiscal and structural reforms, including the operational reform of separating the non-Highway Assets from HTA and moving them to other entities within the Commonwealth.

30

67.     As part of the Title III process, Section 104(j)(2) of PROMESA requires the
Oversight Board to certify the submission or modification of the HTA Plan.  Section 104(j)(3) of
PROMESA provides that the Oversight Board may certify the filing of the HTA Plan only if it
determines, in its sole discretion, that the HTA Plan is consistent with the HTA 2022 Fiscal Plan.
On August 5, 2022, the Oversight Board certified submission of the HTA Plan.

68.     During the certification process for the HTA Plan and the HTA 2022 Fiscal Plan,
the Oversight Board's advisors made regular presentations updating the Oversight Board in person
or by telephone, including at its weekly sessions.  These presentations updated the Oversight Board
and its advisors on how the key features of the HTA Plan and the HTA 2022 Fiscal Plan were
evolving during their development.  Based on my review of the HTA Plan and the HTA 2022
Fiscal Plan, the debt levels and other payment obligations under the HTA Plan are consistent with
the HTA 2022 Fiscal Plan.  To the extent the Oversight Board certifies a revised HTA fiscal plan
prior to the occurrence of the HTA Effective Date, it is my understanding such revised fiscal plan
for HTA will conform with the transactions contemplated in the HTA Plan.

## IV.   Consummation of the Transactions Contemplated by the Plan Will Allow HTA Access to the Capital Markets

69.     I believe confirmation of the HTA Plan satisfies the Oversight Board's mandate to
allow HTA to "achieve . . . access to the capital markets."  PROMESA § 101.  As explained above,
I believe that confirmation of the HTA Plan will allow HTA to service its obligations without the
need for further restructuring.  In light of this anticipated successful restructuring of HTA's
obligations, in addition to the fiscal restraints imposed on HTA, including the Debt Management
Policy and the Toll Rate Covenant, I believe HTA will be able to access the capital markets
following consummation of the HTA Plan.  These restraints, coupled with a substantially reduced
amount of bond obligations and continued support from the Commonwealth, will provide HTA

31

with the ability to go to the capital markets to refinance existing indebtedness and incur new indebtedness in accordance with the Debt Management Policy.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 7, 2022
      New York, New York

                                      */s/ David M. Brownstein*_____
                                      David M. Brownstein
                                      Managing Director
                                      Citigroup Global Markets Inc.