# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3567-LTS |

## MEMORANDUM OF LAW
## IN SUPPORT OF CONFIRMATION
## OF THE FOURTH AMENDED TITLE III PLAN OF ADJUSTMENT
## OF THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY

| | |
|---|---|
| **PROSKAUER ROSE LLP**<br>Eleven Times Square<br>New York, New York 10036<br>Telephone: (212) 969-3000<br>Facsimile: (212) 969-2900 | **O'NEILL & BORGES LLC**<br>250 Muñoz Rivera Ave., Suite 800<br>San Juan, PR 00918-1813<br>Telephone:  (787) 764-8181<br>Facsimile:  (787) 753-8944 |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801). Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.

*Attorneys for the Financial Oversight and Management Board for Puerto Rico as Representative
for the Puerto Rico Highways and Transportation Authority in its Title III Case*

Dated: August 7, 2022

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND AND OVERVIEW
OF THE HTA PLAN ...............................................................................................2

    A.    Procedural Posture of the Debtor's Title III Case....................................................2

    B.    HTA/CCDA PSA and Confirmation of the Commonwealth Plan..........................3

    C.    Filing of the HTA Plan and Disclosure Statement...................................................5

    D.    Overview of Financial Obligations Pursuant to the HTA Plan..............................6

    E.    The HTA 2022 Fiscal Plan .......................................................................................7

    F.    The HTA Disclosure Statement Order and Confirmation Procedures Order .........8

    G.    The Solicitation and Tabulation of Votes in Favor of the HTA Plan .....................8

THE HTA PLAN MEETS EACH OF THE REQUIREMENTS
UNDER TITLE III OF PROMESA AND SHOULD BE CONFIRMED ....................................10

    A.    PROMESA § 314(b)(1):  The HTA Plan Fully Complies with the
            Provisions of the Bankruptcy Code Made Applicable by PROMESA §
            301(a) ......................................................................................................................10

            1.    The HTA Plan Satisfies the Classification Requirements of Section
                 1122 of the Bankruptcy Code ..................................................................11

                 a.    The Oversight Board May Separately Classify Similar
                      Claims For Legitimate Governmental Reasons. ...........................12

                 b.    Legitimate Reasons Justify Separate Classification of HTA
                      Bond Claims Based on Different Legal Risks and Rights.............14

                 c.    Legitimate Government or Other Reasons Justify Separate
                      Classification of Certain Unsecured Claims. ................................16

            2.    The HTA Plan Satisfies Section 1123(a) of the Bankruptcy Code............20

                 a.    The HTA Plan Complies with the Requirements of 11
                      U.S.C. § 1123(a)(1) By Designating Classes of Claims. ...............20

b. The HTA Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(2) By Specifying Unimpaired Classes. .............20

c. The HTA Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(3) By Specifying the Treatment of Impaired Classes. .....................................................21

d. The HTA Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(4) By Providing Equal Treatment within Each Class of Claims. ...................................21

e. The HTA Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(5) By Providing Adequate Means for Its Implementation. ...........................................22

3. The HTA Plan Complies with Section 1123(b) of the Bankruptcy Code ...............................................................24

a. The HTA Plan Permissibly Provides for the Impairment/Unimpairment of Certain Claims. .............24

b. The HTA Plan Permissibly Provides for the Assumption and Rejection of Executory Contracts. ...........................25

c. The HTA Plan Permissibly Provides for the Settlement or Adjustment of the Debtor's Claims. .................................25

d. The HTA Plan Permissibly Provides for the Retention and Enforcement of Claims. ...........................................34

e. The HTA Plan Does Not Provide for the Sale of the Debtor's Property. ........................................................34

f. The HTA Plan Permissibly Provides for Modification of Claimholders' Rights. ...................................................35

g. The HTA Plan Permissibly Includes Other Appropriate Provisions. ...............................................................35

4. The HTA Plan Complies with Section 1123(d) of the Bankruptcy Code by Providing for the Cure of Defaults Under the HTA Plan ............35

5. Section 1129(a)(2):  The Debtor Has Complied with the Applicable Provisions of the Bankruptcy Code ........................36

a. The Debtor Has Complied with Section 1125 of the Bankruptcy Code. ..................................................36

iv

b.      The Debtor Has Obtained Acceptances of the HTA Plan
Consistent with Section 1126 of the Bankruptcy Code. ...............39

6.      Section 1129(a)(3):  The HTA Plan was Proposed in Good Faith
and Not by Any Means Forbidden by Law..................................................40

7.      Section 1129(a)(6):  The HTA Plan Does Not Contain Any Rate
Changes Subject to the Jurisdiction of Any Governmental
Regulatory Commission.................................................................43

8.      Section 1129(a)(8):  The HTA Plan Has Not Been Accepted By
Each Impaired Class of any Debtor Under the HTA Plan, But
Nonetheless Can Be Confirmed By Satisfying 11 U.S.C.
§§ 1129(a)(10) and (b) .................................................................43

9.      Section 1129(a)(10):  At Least One Impaired Class of Claims
Voted in Favor of the HTA Plan, Without Including Claims of
Insiders .........................................................................................44

10.     Section 1129(b)(1):  The HTA Plan Satisfies the Cram-Down
Requirements with Respect to the Classes that Did Not Accept the
HTA Plan .......................................................................................44

a.      The HTA Plan Does Not Unfairly Discriminate Against the
Rejecting Classes and Complies with the Requirements of
11 U.S.C. § 1129(b)(1). ................................................45

B.      PROMESA § 314(b)(2):  The HTA Plan Fully Complies with Title III of
PROMESA.................................................................................................49

C.      PROMESA § 314(b)(3):  The Debtor is Not Prohibited By Law From
Taking Any Action Necessary to Carry Out the HTA Plan....................................49

D.      PROMESA § 314(b)(4):  The HTA Plan Provides for Full Payment of All
Allowed Priority Claims ...........................................................................51

1.      The Support Agreement Administrative Expenses in the HTA Plan
Should be Approved. ....................................................................52

E.      PROMESA § 314(b)(5):  The HTA Plan Has Obtained All Necessary
Legislative, Regulatory, and Electoral Approvals .................................................59

F.      PROMESA § 314(b)(6):  The HTA Plan is in the Best Interests of
Creditors and is Feasible ...........................................................................60

1.      The HTA Plan is in the Best Interests of Creditors. ................................60

2.      The HTA Plan is Feasible. ............................................................63

        a.      The HTA Plan is Not Likely to Be Followed By the Need for Further Financial Reorganization..............................................63

        b.      HTA's Liquidity is Sufficient for HTA Effective Date Cash Obligations and to Fund the GUC Reserve....................................64

        c.      HTA Will Be Able to Satisfy Obligations Pursuant to the New HTA Bonds and the Subordinated Indebtedness..................64

        d.      HTA Will Be Able to Satisfy Its Obligations With Respect to the HTA Moscoso Bonds...........................................................65

        e.      HTA Is Projected to Be Able to Satisfy Its Maintenance and Operating Expenses and to Pay Eminent Domain/Inverse Condemnation Claims and Federal Claims as Such Claims Become Due. ........................................................65

    G.      PROMESA § 314(b)(7):  The HTA Plan is Consistent with the HTA 2022 Fiscal Plan.........................................................................................66

    H.      Bankruptcy Code Section 1127 and Bankruptcy Rule 3019: The HTA Plan May Be Modified Without Resolicitation Because the Modifications Do Not Adversely Change the Treatment of Claims of Creditors..............................67

COMMONWEALTH LAWS INCONSISTENT WITH PROMESA ARE PREEMPTED..........69

    A.      Commonwealth Law Provisions Requiring Payment of Prepetition Debt in Full Are Preempted........................................................................72

    B.      Commonwealth Law Provisions Authorizing Issuance of New Debt Without Oversight Board Approval Are Preempted.............................................73

    C.      Commonwealth Law Provisions Regulating the Modification of Toll Rates Are Preempted ........................................................................73

THE INJUNCTION AND RELEASE PROVISIONS EMBODIED IN THE HTA PLAN ARE PERMISSIBLE AND SHOULD BE APPROVED ..........................74

    A.      The Debtor's Release of Claims Should Be Approved .........................................74

    B.      The Consensual Releases Should Be Approved ....................................................77

    C.      The Exculpation Sought In the HTA Plan Is Appropriate....................................80

    D.      The Injunction Sought is Necessary to Enforce the Releases and Exculpations Contained in the HTA Plan...........................................................85

CONCLUSION...........................................................................................................................86

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Aetna Cas. & Sur. Co. v. Clerk, United States Bankr. Court (In re Chateaugay Corp.)*,
   89 F.3d 942 (2d Cir. 1996) ...................................................................................12

*Airadigm Commc'n, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*,
   519 F.3d 640 (7th Cir. 2008) ................................................................................83

*Andalusian Global Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R.*,
   954 F.3d 1 (1st Cir. 2020) .....................................................................................13

*Antilles Cement Corp. v. Fortuño*,
   670 F.3d 310 (1st Cir. 2012) ................................................................................69

*Arizona v. United States*,
   567 U.S. 387 (2012) ......................................................................................69, 70

*AT&T Mobility v. Concepcion*,
   563 U.S. 333 (2011) .............................................................................................70

*Barnett Bank, N.A. v. Nelson*,
   517 U.S. 25 (1996) ...............................................................................................70

*Berliner v. Pappalardo (In re Puffer)*,
   674 F.3d 78 (1st Cir. 2012) ..................................................................................41

*Blixseth v. Credit Suisse*,
   961 F.3d 1074 (9th Cir. 2020),
   *cert. denied*, 141 S. Ct. 1394 (2021) ..................................................................83

*Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc)*,
   622 F.2d 872 (5th Cir. 1980) ................................................................................46

*Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*,
   280 F.3d 648 (6th Cir. 2002) ................................................................................12

*Cnty. of Orange v. Merrill Lynch & Co. (In re Cnty. of Orange)*,
   191 B.R. 1005 (Bankr. C.D. Cal. 1996) ...............................................................71

*Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.)*,
   709 F.2d 762 (1st Cir. 1983) ................................................................................40

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*,
  416 F.3d 136 (2d Cir. 2005)..................................................................................78

*Fin. Oversight & Mgmt. Bd. v. Cooperativa de Ahorro* (*In re Fin. Oversight & Mgmt. Bd.*),
  No. 22-1119, 2022 U.S. App. LEXIS 19736 (1st Cir. July 18, 2022)....................................17

*Franklin High Yield Tax-Free Income Fund v. City of Stockton (In re City of Stockton)*,
  542 B.R. 261 (B.A.P. 9th Cir. 2015)..................................................................12, 18, 41, 61

*Freightliner Corp. v. Myrick*,
  514 U.S. 280 (1995)..................................................................................70

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
  505 U.S. 88 (1992)..................................................................................70

*Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*,
  748 F.2d 42 (1st Cir. 1984)..................................................................................13

*Grogan v. Garner*,
  498 U.S. 279 (1991)..................................................................................79

*Gustavsen v. Alcon Labs., Inc.*,
  272 F. Supp. 3d 241 (D. Mass. 2017),
  *aff'd*, 903 F.3d 1 (1st Cir. 2018)..................................................................................70

*Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.)*,
  136 F.3d 45 (1st Cir. 1998)..................................................................................26

*In re 203 N. LaSalle St. Ltd. P'ship*,
  190 B.R. 567 (Bankr. N.D. Ill. 1995),
  *aff'd*, 126 F.3d 955 (7th Cir. 1997),
  *rev'd on other grounds sub nom. Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999)..................................................................................45

*In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019)..................................................................................83

*In re  Am. Solar King*,
  90 B.R. 808 (Bankr. W.D. Tex. 1988)..................................................................................68

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006)..................................................................................44-45

*In re Aztec Co.*,
  107 B.R. 585 (Bankr. M.D. Tenn. 1989)..................................................................................45

*In re Barnwell Cnty. Hosp.*,
   471 B.R. 849 (Bankr. D.S.C. 2012) ...................................................................46

*In re BearingPoint, Inc.*,
   453 B.R. 486 (Bankr. S.D.N.Y. 2011) ...............................................................79

*In re Boylan Int'l, Ltd.*,
   452 B.R. 43 (Bankr. S.D.N.Y. 2011) .................................................................67

*In re Burnsbrooke Apts. of Athens Ltd.*,
   151 B.R. 455 (Bankr. S.D. Ohio 1992) .............................................................67

*In re Cellular Info. Sys., Inc.*,
   171 B.R. 926 (Bankr. S.D.N.Y. 1994) ...............................................................68

*In re CHC Grp. Ltd.*, No. 16-31854, 2017 Bankr. LEXIS 1016 (Bankr. N.D. Tex.
   Mar. 3, 2017) ....................................................................................................54

*In re Charles St. African Methodist Episcopal Church of Boston*,
   499 B.R. 66 (Bankr. D. Mass. 2013) ..........................................................10, 11

*In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*,
   187 B.R. 683 (Bankr. D. Colo. 1995) ...............................................................12

*In re City of Detroit*,
   504 B.R. 97 (Bankr. E.D. Mich. 2013) .............................................................71

*In re City of Detroit*,
   524 B.R. 147 (Bankr. E.D. Mich. 2014) ..................................................... *passim*

*In re Concrete Designers, Inc.*,
   173 B.R. 354 (Bankr. S.D. Ohio 1994) .............................................................67

*In re Corey*,
   892 F.2d 829 (9th Cir. 1989) ...........................................................................40

*In re DBSD N. Am., Inc.*,
   419 B.R. 179 (Bankr. S.D.N.Y. 2009),
   *aff'd*, 2010 U.S. Dist. 33253 (S.D.N.Y. Mar. 24, 2010) ...................................78

*In re Dow Corning Corp.*,
   255 B.R. 455 (E.D. Mich. 2000) ......................................................................46

*In re Drexel Burnham Lambert Grp., Inc.*,
   960 F.2d 285 (2d Cir. 1992) .............................................................................84

*In re Enron Corp.*,
   No. 01-16034, 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004) ...........68

*In re Fin. Oversight & Mgmt. Bd.*,
   361 F. Supp. 3d 203 (D.P.R. 2019)..........................................................................72

*In re Firstline Corp.*,
   No. 06–70145, 2007 WL 269086 (Bankr. M.D. Ga. Jan. 25, 2007)........................................84

*In re Freymiller Trucking, Inc.*,
   190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................45

*In re Genesis Health Ventures, Inc.*,
   266 B.R. 591 (Bankr. D. Del. 2001) ................................................................45, 81, 82

*In re Granite Broad. Corp.*,
   369 B.R. 120 (Bankr. S.D.N.Y. 2007)...............................................................80

*In re Great Bay Hotel & Casino, Inc.*,
   251 B.R. 213 (Bankr. D.N.J. 2000) ................................................................12

*In re Hardeman Cnty. Hosp. Dist.*,
   540 B.R. 229 (Bankr. N.D. Tex. 2015)...............................................................13

*In re Heron, Burchette, Ruckert & Rothwell*,
   148 B.R. 660 (Bankr. D.D.C. 1992) ................................................................56

*In re Holywell Corp.*,
   913 F.2d 873 (11th Cir.1990) ................................................................12

*In re Indianapolis Downs, LLC*,
   486 B.R. 286 (Bankr. D. Del. 2013)...............................................................54

*In re Jersey City Med. Ctr.*,
   817 F.2d 1055 (3d Cir. 1987)....................................................................20

*In re Johns-Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y 1986),
   *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987),
   *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ...................36, 45

*In re Midway Gold US, Inc.*,
   575 B.R. 475 (Bankr. D. Colo. 2017) ................................................................75

*In re Montreal Me. & Atl. Ry.*,
   No. 13-10670, 2015 Bankr. LEXIS 3737 (Bankr. D. Me. Oct. 9, 2015)........................80, 83

*In re Mount Carbon Metro. Dist.*,
   242 B.R. 18 (Bankr. D. Colo. 1999) ................................................................41, 62, 63

*In re Nat'l Heritage Found., Inc.*,
  478 B.R. 216 (Bankr. E.D. Va. 2012),
  *aff'd*, 2013 U.S. Dist. LEXIS 49081 (E.D. Va. 2013),
  *aff'd*, 760 F.3d 344 (4th Cir. 2014) ........................................................................82

*In re Nat'l Paper & Type Co. of P.R.*,
  120 B.R. 624 (D.P.R. 1990) ........................................................................12

*In re Oneida Ltd.*,
  351 B.R. 79 (Bankr. S.D.N.Y. 2006) ........................................................80

*In re Pub. Serv. Co. of New Hampshire*,
  108 B.R. 854 (Bankr. D.N.H. 1989) ..........................................................72

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000).............................................36, 80, 81, 82, 83

*In re Quincy Med. Ctr., Inc.*,
  No. 11-16394, 2011 WL 5592907 (Bankr. D. Mass. Nov. 16, 2011) .............82, 83

*In re Resorts Int'l*,
  145 B.R. 412 (Bankr. D.N.J. 1990) ............................................................44

*In re Richmond Unified Sch. Dist.*,
  133 B.R. 221 (Bankr. N.D. Cal. 1991) .......................................................46

*In re Rivera Echevarria*,
  129 B.R. 11 (Bankr. D.P.R. 1991) .............................................................45

*In re Sanitary & Improvement Dist. No. 7*,
  98 B.R. 970 (Bankr. D. Neb. 1989) ..............................49, 50, 60, 62, 71

*In re Simmons*,
  288 B.R. 737 (Bankr. N.D. Tex. 2003)........................................................45

*In re Spansion*,
  426 B.R. 114 (Bankr. D. Del. 2010) ..........................................................75

*In re TCI 2 Holdings, LLC*,
  428 B.R. 117 (Bankr. D.N.J. 2010) ............................................................54

*In re Toy & Sports Warehouse, Inc.*,
  37 B.R. 141 (Bankr. S.D.N.Y. 1984)...........................................................36

*In re U.S. Truck Co.*,
  800 F.2d 581 (6th Cir. 1986) .....................................................................12

*In re Willowood U.S. Holdings, LLC*,
  No. 19-11079, 2020 Bankr. LEXIS 3706 (Bankr. D. Colo. Feb. 14, 2020) ..........................83

*In re Winn-Dixie Stores, Inc.*,
  356 B.R. 239 (Bankr. M.D. Fla. 2006) ....................................................................................80

*In re Yellowstone Mountain Club, LLC*,
  No. 08–61570–11, 2009 WL 2163528 (Bankr. D. Mont. July 16, 2009)...............................80

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) ...........................................................................................44

*Int'l Shoe Co. v. Pinkus*,
  278 U.S. 261 (1929)..................................................................................................................70

*Jeffrey v. Desmond*,
  70 F.3d 183 (1st Cir. 1995).......................................................................................................75

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
  987 F.2d 154 (3d Cir. 1993)................................................................................................12, 44

*Lorillard v. Pons*,
  434 U.S. 575 (1978)..................................................................................................................49

*Marrama v. Citizens Bank of Mass.*,
  549 U.S. 365 (2007)..................................................................................................................79

*Mass. Ass'n of Health Maint. Orgs v. Ruthhardt*,
  194 F.3d 176 (1st Cir. 1999).....................................................................................................69

*Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
  Mgmt. Bd. for P.R.)*,
  916 F.3d 98 (1st Cir. 2019).......................................................................................................70

*Meritage Homes of Nev., Inc. v. JPMorgan Chase Bank, N.A. (In re S. Edge
  LLC)*,
  478 B.R. 403 (D. Nev. 2012).....................................................................................................82

*Mineral Techs., Inc. v. Novinda Corp. (In re Novinda Corp.)*,
  585 B.R. 145 (B.A.P. 10th Cir. 2018).......................................................................................12

*Murphy v. Weathers*,
  No. 7:07-CV-00027, 2008 WL 4426080 (M.D. Ga. Sept. 25, 2008) ..............................80, 84

*Perez v. Campbell*,
  402 U.S. 637 (1971)..................................................................................................................70

*Resolution Tr. Corp.* v. *Best Prods. Co. (In re Best Prods. Co.),*
    177 B.R. 791 (S.D.N.Y. 1995),
    *aff'd*, 68 F.3d 26 (2d Cir. 1995) ........................................................26

*Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*
    *Mgmt. Bd. for P.R.),*
    330 F. Supp. 3d 685 (D.P.R. 2018),
    *aff'd*, 945 F.3d 3 (1st Cir. 2019),
    *cert. denied*, 141 S. St. (2020) ........................................................71

*United States v. Savoie,*
    985 F.2d 612 (1st Cir. 1993) ........................................................11

*United States v. Sterling Consulting Corp. (In re Indian Motorcycle Co.),*
    289 B.R. 269 (B.A.P. 1st Cir. 2003) ........................................................26

*Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.),*
    326 B.R. 497 (S.D.N.Y. 2005) ........................................................80, 84

*W. Mining & Invs., LLC v. Bankers Trust Co.,*
    No. C.A.02-1445, 2003 WL 503403 (D. Del. Feb. 19, 2003) ................................82

*Wells Fargo Bank, N.A. v. Loop 76, LLC (In re Loop 76 LLC),*
    465 B.R. 525 (B.A.P. 9th Cir. 2012),
    *aff'd*, 578 F. App'x 644 (6th Cir. 2014) ........................................................14

**STATUTES**

11 U.S.C. § 105 ........................................................74

11 U.S.C. § 363 ........................................................58

11 U.S.C. § 365 ........................................................25

11 U.S.C. § 502 ........................................................39, 51, 61

11 U.S.C. § 503 ........................................................53, 55, 56

11 U.S.C. § 507 ........................................................20, 51

11 U.S.C. § 510 ........................................................18, 43, 45, 47

11 U.S.C. § 524 ........................................................80

11 U.S.C. § 901 ........................................................41, 59

11 U.S.C. § 943 ........................................................49, 50, 59, 60

11 U.S.C. § 944 ........................................................72, 78

11 U.S.C. § 1122 .................................................................................... *passim*

11 U.S.C. § 1123 .................................................................................... *passim*

11 U.S.C. § 1125 ...........................................................8, 10, 36, 37, 42, 67

11 U.S.C. § 1126 ...............................................9, 35, 38, 39, 42, 43

11 U.S.C. § 1127 ...................................................................................67, 68

11 U.S.C. § 1129 .................................................................................... *passim*

11 U.S.C. § 1145 ...................................................................................35

48 U.S.C. §§ 2101–2241 ...................................................................1

48 U.S.C. § 2175 ...................................................................................3

9 L.P.R.A §§ 2001–2020 ...................................................................69

27 L.P.R.A. § 261. ...............................................................................69

27 L.P.R.A. §§ 261–261(e) ...............................................................43

PROMESA § 4 ...................................................................................70

PROMESA § 101 ...........................................................................2, 41

PROMESA § 104 ...........................................................................3, 66

PROMESA § 201 ...........................................................................70, 71

PROMESA § 202 ...........................................................................70, 71

PROMESA § 203 ...............................................................................71

PROMESA § 206 ...................................................................................3

PROMESA § 207 ...........................................................................71, 73

PROMESA § 301 .................................................................................... *passim*

PROMESA § 305 ...............................................................................71

PROMESA § 306 ...............................................................................74

PROMESA § 314 .................................................................................... *passim*

PROMESA § 315 ...................................................................................2

CONSTITUTION AND OTHER AUTHORITIES

U.S. Const. Article VI, cl. 2 ..................................................................................................69

H.R. REP. NO. 95-595 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963 ...............................10, 36

6 Collier on Bankruptcy ¶ 943.03[7] (16th ed. 2021)...................................................................62

7 Collier on Bankruptcy ¶ 1129.04[3] (15th ed. 2002)..................................................................45

9 Collier on Bankruptcy 113019.01 (15th ed. Rev. 2004)............................................................68

Congressional Research Service, *The Puerto Rico Oversight, Management, and
Economic Stability Act (PROMESA; H.R. 5278, S. 2328)* (2016).........................................59

Fed. R. Bankr. P. 3019 ...............................................................................................................68

**To the Honorable United States District Court Judge Laura Taylor Swain:**

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the sole Title III representative of the Puerto Rico Highways and Transportation Authority ("HTA" or the "Debtor"), pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submits this memorandum of law (this "Memorandum") in support of confirmation of the *Fourth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [ECF No. 1350][3] (as it may be amended, modified, or supplemented, the "HTA Plan").[4]

## PRELIMINARY STATEMENT

1.      The Oversight Board is proud to ask the Court to confirm the HTA Plan, which represents yet another milestone in the Oversight Board's work in returning the Commonwealth and its instrumentalities such as HTA to fiscal responsibility and regaining access to capital markets.  The HTA Plan's pillars are negotiated settlements with holders of a vast majority of the impaired debt.  The HTA Plan includes multiple provisions designed to create reserves for financial debt, institute debt management requirements, restructure HTA's operations, and ensure revenues are sufficient to cover all payments required to be made under the HTA Plan.

2.      After devastating hurricanes, earthquakes, and the COVID-19 pandemic, the Debtor has proposed the HTA Plan, incorporating, among other items, the terms of the HTA/CCDA Plan Support Agreement.  The HTA Plan settles all disputes regarding the extent of the security interest held by holders and insurers of HTA Bonds.  The HTA Plan incorporates the DRA Stipulation, which settles outstanding disputes concerning the GDB/HTA Loans.  The HTA

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101–2241.
[3] All ECF No. references are to Case No. 17-BK-3567-LTS, unless otherwise indicated.
[4] Capitalized terms used not otherwise defined have the meaning given to such terms in the HTA Plan.

Plan also incorporates an agreement with the Official Committee of Unsecured Creditors (the "Creditors' Committee") regarding the treatment of its constituencies' claims.

3.      In sum, the HTA Plan resolves a multitude of disputes surrounding the Debtor's prepetition liabilities.  Resolution of these myriad disputes provides certainty, greatly reduces the Debtor's funded indebtedness, and sets HTA on a path to fiscal responsibility and access to capital markets.  The HTA Plan has broad support.  Only five objections to the HTA Plan were filed, which either are without merit (for the reasons discussed in the *Debtor's Omnibus Reply to Objections to Confirmation of the Fourth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (the "Reply"), filed concurrently herewith) or rendered moot by revisions to the HTA Plan or the inclusion of previously-adopted Court-approved provisions in the HTA Confirmation Order.

4.      As detailed below, the HTA Plan satisfies the confirmation requirements of Title III of PROMESA, including the sections of the Bankruptcy Code incorporated therein by PROMESA Section 301(a).  The Debtor requests that the Court overrule all the objections and confirm the HTA Plan.

## BACKGROUND AND OVERVIEW
## OF THE HTA PLAN

### A.  Procedural Posture of the Debtor's Title III Case

5.      On June 30, 2016, the Oversight Board was established pursuant to PROMESA Section 101(b).  The seven voting members of the Oversight Board currently are: (1) David A. Skeel, Jr. (who is the Chair), (2) Andrew G. Biggs, (3) Arthur J. González, (4) Antonio L. Medina, (5) John E. Nixon, (6) Justin M. Peterson, and (7) Betty A. Rosa.  Governor Pedro Pierluisi Urrutia is currently the Commonwealth's non-voting *ex officio* member of the Oversight Board.

6.      Pursuant to PROMESA Section 315, "[t]he Oversight Board in a case under this subchapter is the representative of the debtor" and "may take any action necessary on behalf of the debtor to prosecute the case of the debtor, including filing a petition under section [304] of [PROMESA] . . . submitting . . . a plan of adjustment . . . or otherwise generally submitting filings in relation to the case with the court."  48 U.S.C. § 2175.

7.      On May 3, 2017 (the "Commonwealth Petition Date"), the Oversight Board issued a restructuring certification pursuant to PROMESA Sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to Section 304(a) of PROMESA, commencing a case under Title III thereof (the "Commonwealth's Title III Case").

8.      On May 21, 2017 (the "HTA Petition Date"), the Oversight Board issued a restructuring certification for HTA pursuant to PROMESA Sections 104(j) and 206 and filed a voluntary petition for relief for HTA pursuant to PROMESA Section 304(a) with the Title III Court, commencing a case under Title III of PROMESA (the "HTA Title III Case").  Pursuant to PROMESA Section 315, the Oversight Board is the sole representative of the Commonwealth and HTA in their Title III cases.

9.      On June 29, 2017, the Title III Court entered an order granting the joint administration of the Title III cases of the Commonwealth and HTA for procedural purposes only [Case No. 17-bk-3283, ECF No. 537].

**B.  HTA/CCDA PSA and Confirmation of the Commonwealth Plan**

10.      In accordance with the Mediation Team's[5] efforts to generate Oversight Board support for a plan of adjustment for the Commonwealth, on May 5, 2021, the Oversight Board, as

---

[5] The "Mediation Team" is the mediation team led by Judge Barbara J. Houser of the United States Bankruptcy Court for the Northern District of Texas as established by the Title III Court under its *Order Appointing Mediation Team*, dated June 23, 2017 [ECF No. 430].

Title III representative of the Commonwealth and HTA, entered into the HTA/CCDA Plan Support Agreement (the "HTA/CCDA PSA") with certain holders of bonds issued by HTA, certain holders of bonds issued by the Puerto Rico Convention Center District Authority ("CCDA"), Assured, and National, with respect to HTA Bonds and CCDA Bonds.

11.     Among other things, the HTA/CCDA PSA provides for: (i) a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, as well as toll and fine revenues collected by HTA; (ii) the issuance of new bonds by HTA; (iii) the issuance of contingent value instruments ("CVIs") by the Commonwealth; (iv) the payment of $184.8 million in cash to holders of claims against HTA relating to the HTA 68 Bonds and $79.2 million in cash to holders of claims against HTA relating to the HTA 98 Senior Bonds; (v) the bondholders and insurers to support the HTA Plan; and (vi) an agreement regarding the structure of a plan of adjustment for HTA.

12.     After the HTA/CCDA Plan Support Agreement was reached, negotiations between the Oversight Board and certain monoline insurers (Ambac and FGIC) continued with the assistance and guidance of the Mediation Team.  Those negotiations resulted in Ambac and FGIC joining the HTA/CCDA Plan Support Agreement on July 15, 2021.

13.     On November 5, 2021, the Oversight Board reached an agreement with the DRA Parties [Case No. 17-bk-3283, ECF No. 19100, Ex. A] (the "DRA Stipulation"), settling the DRA-Related Disputes (as defined in the *Stipulation in Connection with DRA Related Disputes*, attached as Exhibit C to the Disclosure Statement).  Pursuant to the DRA Stipulation: (i) the DRA Parties agreed to support the Commonwealth Plan and HTA Plan and related solicitation processes; (ii) the DRA Parties agreed to vote to accept the HTA Plan; (iii) the DRA Parties agreed to withdraw and/or dismiss with prejudice, as applicable, each of the DRA-Related Disputes; (iv) the DRA

Parties agreed to "lock-up" their HTA 98 Senior Bonds and the HTA/GDB Claims; and (v) DRA is entitled to receive a $15 million restriction fee in the form of an allowed administrative expense claim against HTA on the HTA Effective Date.

14.     In furtherance of the HTA/CCDA PSA, on May 11, 2021, the Oversight Board filed a plan of adjustment for the Commonwealth, along with certain instrumentalities [Case No. 17-bk-3283, ECF No. 16740] (as amended, supplemented, and modified from time to time, the "Commonwealth Plan"), and an associated disclosure statement [Case No. 17-bk-3283, ECF No. 16741].

15.     On January 18, 2022, the Commonwealth Plan was confirmed.  The effective date of the Commonwealth Plan was March 15, 2022 [Case No. 17-bk-3283, ECF No. 20349]. Subsequent thereto, the HTA Distribution Conditions (as defined in the Commonwealth Plan) have been satisfied, and HTA has made an interim distribution to holders of HTA 68 Bonds and HTA 98 Senior Bonds in the amounts of $184.8 million and $79.2 million, respectively.

**C. Filing of the HTA Plan and Disclosure Statement**

16.     On May 2, 2022, the Oversight Board filed the *Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [ECF No. 1164] (the "Initial Plan").  The Initial Plan implemented the material terms of the HTA/CCDA PSA and the DRA Stipulation as they relate to HTA.

17.     The Oversight Board thereafter continued to negotiate with various stakeholders, including the Creditors' Committee, to generate further support for a plan of adjustment.  On May 9, 2022, the Oversight Board and the Creditors' Committee entered into the HTA Committee Agreement, which among other things, increased the HTA GUC Recovery from $25 million (the amount in the Initial Plan) to $48 million.

18.     On May 16, 2022, the Oversight Board filed the *Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [ECF No. 1177] containing the material terms of the HTA Committee Agreement.

19.     On June 7, 2022, the Oversight Board filed the *Second Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [ECF No. 1202], reflecting comments received from various parties in interest.

20.     On June 17, 2022, the Oversight Board filed the *Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [ECF No. 1240] (the "Third Amended Plan"), reflecting further comments received from various parties in interest, and the *Disclosure Statement for the Third Amendment Title III Plan of Adjustment for the Puerto Rico Highways and Transportation Authority* [ECF No. 1241] (the "Disclosure Statement").

21.     Concurrently herewith, the Oversight Board is filing the HTA Plan.  The HTA Plan includes non-substantive modifications in response to certain objections interposed to the Third Amended Plan, and reflects further comments received from various parties in interest.

### D.   **Overview of Financial Obligations Pursuant to the HTA Plan**

22.     The HTA Plan provides for: (1) the payment of cash on the HTA Effective Date to satisfy administrative expense claims, including approximately $140 million in Consummation Costs and PSA Restriction fees, and an initial $24 million payment to the GUC Reserve; and (2) the payment of certain amounts over time, including (a) an additional $24 million payment to the GUC Reserve on the first anniversary of the HTA Effective Date, (b) an estimated maximum amount of $41.9 million in payments to holders of Eminent Domain/Inverse Condemnation Claims upon occurrence of a Final Order determining the validity and amount of just compensation attributable to such claims (assuming it is determined by Final Order such Claims cannot be impaired or discharged), (c) an estimated $20.8 million in payments to holders of Allowed Federal Claims in

equal installments over forty years, (d) amounts to be paid pursuant to New HTA Bonds issued by HTA (in the form of New HTA CIBs, New HTA CABs, and New HTA Convertible CABs), and Subordinated Indebtedness to be issued to the Commonwealth as a refinancing of HTA's obligations pursuant to the Commonwealth Loan,[6] and (e) amounts due pursuant to the existing HTA Moscoso Bonds, which Claims are unimpaired under the HTA Plan.

### E. The HTA 2022 Fiscal Plan

23.     On February 22, 2022, the Oversight Board certified the 2022 HTA Fiscal Plan (the "HTA 2022 Fiscal Plan").  Among other things, the HTA 2022 Fiscal Plan provides updates from prior fiscal plans and incorporates fiscal measures to generate revenues and optimize expenses from prior fiscal plans.  These fiscal measures include (i) inflation-based increases on toll fares and fines, (ii) new electronic systems for toll collection, (iii) transit enhancements, (iv) the re-assessment of Tren Urbano contracts, and (v) the reduction of healthcare expenses.  The HTA Fiscal Plan also calls for HTA to implement much-needed reform measures, including (a) implementing key initiatives to address the underperformance of Puerto Rico's transportation sector (the "Transportation Sector Reform"), (b) transferring ownership of Tren Urbano to the Puerto Rico Integrated Transit Authority ("PRITA"), (c) setting up a dedicated toll road management office, and (d) pursuing a public-private partnership ("P3") to access new sources of capital funding.[7]

---

[6] The Commonwealth Loan is defined in the HTA Plan to mean "[t]he loan extended by the Commonwealth to HTA in the original principal amount up to $362,000,000.00 in connection with, among other things, HTA's obligations pursuant to the HTA/CCDA Plan Support Agreement, the Commonwealth Confirmation Order, and the DRA Stipulation."  HTA Plan § 1.77.

[7] To the extent the Oversight Board certifies a revised HTA Fiscal Plan prior to the occurrence of the HTA Effective Date, such revised fiscal plan for HTA will conform with the transactions contemplated in the HTA Plan.

**F.   The HTA Disclosure Statement Order and Confirmation Procedures Order**

24.     The Disclosure Statement filed on June 17, 2022 was approved by this Court by order entered on June 22, 2022 [ECF No. 1248] (the "Disclosure Statement Order").  Among other things, the Court found the Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code.  *See* Disclosure Statement Order at 3.  The Court (i) established July 27, 2022 at 5:00 p.m. (Atlantic Standard Time) as the deadline to object to confirmation of the HTA Plan (the "Confirmation Objection Deadline"), (*id.* at 13), (ii) established July 27, 2022 at 5:00 p.m. (Atlantic Standard Time) as the voting deadline for Kroll Restructuring Administration LLC ("Kroll") to receive ballots accepting or rejecting the HTA Plan (the "Voting Deadline"), (*id.* at 15), and the election deadline for Kroll to receive ballots to elect the form of distribution (the "Election Deadline") (*id.* at 16), and (iii) scheduled a hearing commencing on August 17, 2022 at 9:30 a.m. (Atlantic Standard Time) and continuing on August 18, 2022 to consider confirmation of the HTA Plan (the "Confirmation Hearing").  *Id.* at 11.

**G.   The Solicitation and Tabulation of Votes in Favor of the HTA Plan**

25.     Consistent with the Disclosure Statement Order, Kroll served solicitation packages (the "Solicitation Packages") on all claimholders entitled to vote and/or make any applicable election.  The Solicitation Packages contained, among other things:  (i) the notice setting forth the time, date, and place of the HTA Confirmation Hearing (the "Confirmation Hearing Notice"); (ii) a flash drive (or otherwise in the Debtor's discretion) containing the Disclosure Statement Order (without the exhibits thereto) and Disclosure Statement (together with all exhibits thereto, including the HTA Plan); (iii) the appropriate form of notice of non-voting status (as applicable), ballot, or election notice, if any, with instructions for voting and/or making any applicable election, and, as applicable, a pre-addressed, pre-paid return envelope; and (iv) solely with respect to holders of Claims in Class 16, the letter from the Creditors' Committee in support of the HTA Plan.  *See*

*Affidavit of Service of Solicitation Materials*, dated July 29, 2022 [ECF No. 1324].  The Debtor also published print newspaper and magazine advertisements, disseminated radio advertisements, and created an information hotline to provide information about the HTA Confirmation Hearing, Confirmation Objection Deadline, Voting Deadline, and Election Deadline, as required by the Disclosure Statement Order.  *See* Affidavit of Publication and Radio Advertisements, filed August 4, 2022 [ECF No. 1342] (the "Publication Affidavit").

26.     As of the filing of this Memorandum, the Debtor has received sufficient votes in favor of the HTA Plan to satisfy section 1129(a)(10) of the Bankruptcy Code and support its request for an order confirming the HTA Plan.  The *Declaration of Christina Pullo of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [ECF No. 1356] (the "Voting Declaration"), filed concurrently herewith, provides the details and audited results of the vote by each Class, and includes information regarding the status of the various bondholder elections.  As set forth in the Voting Declaration, Classes 1–13 and 17 voted to accept the HTA Plan.  Class 16 (HTA General Unsecured Claims) voted to reject the HTA Plan because of the numerosity requirement.  In aggregate dollar amounts across all classes, $5.895 billion voted to accept and $1.6 million voted to reject the HTA Plan.  Only two claimants in Class 15 (Eminent Domain/Inverse Condemnation Claims), each holding an unliquidated Claim attributed $1 of value for voting purposes voted, with one voting to accept the HTA Plan and one voting to reject.  In all, more than 99% in dollar amount of Claims whose holders voted on the HTA Plan voted to accept.

## THE HTA PLAN MEETS EACH OF THE REQUIREMENTS
## UNDER TITLE III OF PROMESA AND SHOULD BE CONFIRMED

27.     To confirm the HTA Plan, PROMESA Section 314(b)(1) requires the Debtor to

demonstrate the HTA Plan satisfies the provisions of title 11 of the Bankruptcy Code made

applicable to the Title III Case by PROMESA Section 301(a).[8]  Additionally, PROMESA Section

314(b)(2) requires the Debtor to demonstrate the HTA Plan complies with the provisions of Title

III of PROMESA.  Through the collective filings with the Court, including the HTA Plan, the

Disclosure Statement, the Plan Supplement, this Memorandum, the Reply, the Voting Declaration

and the other declarations, and any additional evidence adduced at the HTA Confirmation Hearing,

the Debtor will demonstrate the HTA Plan satisfies all applicable provisions of Title 11 of the

Bankruptcy Code and Title III of PROMESA.

### A.   PROMESA § 314(b)(1):  The HTA Plan Fully Complies with the Provisions of the
### Bankruptcy Code Made Applicable by PROMESA § 301(a)

28.     The language in PROMESA Section 314(b)(1) mirrors that of section 1129(a)(1)

of the Bankruptcy Code, which provides a plan must "compl[y] with the applicable provisions of

[the Bankruptcy Code]."  11 U.S.C. § 1129(a)(1).  This provision ensures the requirements of

sections 1122 and 1123 of the Bankruptcy Code, which govern classification of claims and

contents of a plan, respectively, have been satisfied.  H.R. REP. NO. 95-595, at 412 (1977), *as

reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *see also In re Charles St. African Methodist

Episcopal Church of Boston*, 499 B.R. 66, 95 (Bankr. D. Mass. 2013).  The HTA Plan complies

fully with the requirements of sections 1122 and 1123 applied by PROMESA Section 301(a), as

well as other applicable provisions of the Bankruptcy Code.

---

[8] As relevant to this Memorandum, such sections are as follows:  1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4),
1123(a)(5), 1123(b), 1123(d), 1125, 1126(a), 1126(b), 1126(c), 1126(e), 1126(f), 1126(g), 1129(a)(2), 1129(a)(3),
1129(a)(6), 1129(a)(8), 1129(a)(10), 1129(b)(1), 1129(b)(2)(A), and 1129(b)(2)(B).

1.    **The HTA Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code**

29.    Section 1122 of the Bankruptcy Code sets forth the requirements for the classification of claims and interests in a plan.  Section 1122(a) provides:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122(a).  As this Court has recognized, the plain language of section 1122(a) "limits the circumstances in which claims may be joined together in a single class.  It does not require that substantially similar claims be joined together in the same class."  July 14, 2021 Hr'g Tr. 77:15–21 [Case No. 17-bk-3283, ECF No. 17379] (quoting *In re Charles St. Afr. Methodist Episcopal Church of Boston*, 499 B.R. at 95).

30.    The Oversight Board has broad discretion to determine whether claims are substantially similar.  Under PROMESA Section 301(e), the determination of whether claims are "substantially similar" for purposes of placing claims in the *same* class is left to the Oversight Board, which "shall consider whether such claims are secured and whether such claims have priority over other claims."  PROMESA § 301(e); *see* July 14, 2021 Hr'g Tr. 79:23–80:12 [Case No. 17-bk-3283, ECF No. 17379]  ("[T]he plain text of section 301(e) shows that it concerns how the Oversight Board interprets section 1122(a) of the Bankruptcy Code.  It does not expand the scope of section 1122(a).").  By only requiring the Oversight Board to "consider" these factors, Section 301(e) provides the Oversight Board flexibility to consider other factors, and to afford those other factors greater weight.  *United States v. Savoie*, 985 F.2d 612, 618 (1st Cir. 1993) ("the [statute] itself demands no more than that the district court 'consider' the factors enumerated therein.").

11

### a. The Oversight Board May Separately Classify Similar Claims For Legitimate Governmental Reasons.

31.     PROMESA and the Bankruptcy Code do not expressly limit the Oversight Board's ability to place similar claims in *separate* classes.  Given the absence of an express standard for separate classification in the Bankruptcy Code, the overwhelming majority of courts have held that "[g]enerally, § 1122 allows plan proponents broad discretion to classify claims and interests according to the particular facts and circumstances of each case." *Franklin High Yield Tax-Free Income Fund v. City of Stockton (In re City of Stockton)*, 542 B.R. 261, 280 (B.A.P. 9th Cir. 2015) (quoting *In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*, 187 B.R. 683, 687 (Bankr. D. Colo. 1995)).[9]  A plan proponent may exercise significant flexibility in classifying claims under section 1122(a) so long as there is a reasonable, non-gerrymandering, basis for the classification structure.  *See, e.g.*, *Aetna Cas. & Sur. Co. v. Clerk, United States Bankr. Court (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) ("[C]lassification is constrained by two straight-forward rules:  [d]issimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason."); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993) (citation omitted) ("[T]he classification of the claims or interests must be reasonable."); *In re Nat'l Paper & Type Co. of P.R.*, 120 B.R. 624, 626 (D.P.R. 1990) (holding that "as long as the separate classification is not aimed primarily to manipulate class voting, similar claims may be separately classified where supported by a reasonable business or economic justification"); *Mineral Techs., Inc. v. Novinda Corp. (In re Novinda Corp.)*, 585 B.R. 145, 154 (B.A.P. 10th Cir. 2018) (observing "one clear rule" that

---

[9] *See also Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 661 (6th Cir. 2002) (quoting *In re U.S. Truck Co.*, 800 F.2d 581, 585 (6th Cir. 1986) ("Congress incorporated into section 1122 . . . broad discretion to determine proper classification according to the factual circumstances of each individual case."); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 224 (Bankr. D.N.J. 2000) (quoting *In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir.1990)) ("most courts agree that a proponent has 'considerable discretion to classify claims and interests according to the facts and circumstances of the case.'").

separate classification of similar claims is generally permitted if not done for the purposes of gerrymandering classes for confirmability); *In re Hardeman Cnty. Hosp. Dist.*, 540 B.R. 229, 234 (Bankr. N.D. Tex. 2015) ("Under the Bankruptcy Code, classes must contain 'substantially similar' claims, but similar claims can be separated into different classes for 'good business reasons.'"); *In re City of Detroit*, 524 B.R. 147, 245–46 (Bankr. E.D. Mich. 2014) (citation omitted) ("A classification scheme satisfies section 1122(a) of the Bankruptcy Code when a reasonable basis exists for the classification scheme, and the claims or interests within each particular class are substantially similar.").

32.     In PROMESA Title III cases, claims classification requires a governmental justification. As both this Court and the First Circuit Court of Appeals recognized, PROMESA is more akin to Chapter 9 of the Bankruptcy Code than it is to Chapter 11. Thus, "[u]nlike a commercial bankruptcy, which attempts to balance the rights of creditors and debtors, the principle purpose of Chapter 9, and, by analogy, PROMESA, 'is to allow municipal debtors the opportunity to continue operations while adjusting or refinancing their creditor obligations.'" *Andalusian Global Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R.*, 954 F.3d 1, 7–8 (1st Cir. 2020) (citation omitted). Consistent with this purpose, the Court concluded that the purported strict classification rule from *Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42 (1st Cir. 1984), was not imported into PROMESA because the "flexibility to separately classify and treat claims from different unsecured creditors potentially strengthens Title III debtors' ability to propose plans of adjustment that protect the viability of the government and its instrumentalities, and the ability of the government to continue to provide services to its people, and to ensure the economic viability of the territory." July 14, 2021 Hr'g Tr. 80:13–19 [Case No. 17-bk-3283, ECF No. 17379].

33.    The HTA Plan has twenty separate classes:

| Claim | Class |
|---|---|
| HTA 68 Bond Claims | Class 1 |
| HTA 68 Bond Claims (Ambac) | Class 2 |
| HTA 68 Bond Claims (Assured) | Class 3 |
| HTA 68 Bond Claims (National) | Class 4 |
| HTA 98 Senior Bond Claims | Class 5 |
| HTA 98 Senior Bond Claims (Ambac) | Class 6 |
| HTA 98 Senior Bond Claims (Assured) | Class 7 |
| HTA 98 Senior Bond Claims (FGIC) | Class 8 |
| HTA 98 Senior Bond Claims (National) | Class 9 |
| HTA 98 Sub Bond Claims | Class 10 |
| HTA 98 Sub Bond Claims (Assured) | Class 11 |
| HTA 98 Sub Bond Claims (FGIC) | Class 12 |
| HTA 98 Sub Bond Claims (National) | Class 13 |
| HTA Moscoso Bond Claims | Class 14 |
| Eminent Domain/Inverse Condemnation Claims | Class 15 |
| HTA General Unsecured Claims | Class 16 |
| HTA/GDB Claims | Class 17 |
| Section 510(b) Subordinated Claims | Class 18 |
| Convenience Claims | Class 19 |
| Federal Claims | Class 20 |

**b.    Legitimate Reasons Justify Separate Classification of HTA Bond Claims Based on Different Legal Risks and Rights.**

34.    Classes 1–14 are bondholder classes classified separately based on the seniority of the bonds, the security claimed by holders of the different bond issuances, and whether the bonds are insured, and, if so, the insurer.

35.    Separate classification of uninsured versus insured claims is justified because insured claimants have recourse to "sources outside of the debtor's assets, such as the potential for recovery from a nondebtor or nonstate source." *Wells Fargo Bank, N.A. v. Loop 76, LLC (In re Loop 76 LLC)*, 465 B.R. 525, 540 (B.A.P. 9th Cir. 2012) (holding existence of guarantee on

14

deficiency claim enabled debtor to separately classify claims from general unsecured claims),

*aff'd*, 578 F. App'x 644 (6th Cir. 2014).

36.     Claims insured by different insurers are separately classified as different insurance

agreements provide bondholders different rights thereunder leading to the insurers having different

claims against the Debtor.  Each voting bondholder Class, which excludes Class 14, as such Claims

are unimpaired and therefore deemed to accept the HTA Plan, voted overwhelmingly to accept the

HTA Plan.  The voting tabulation summary for Classes 1–13, as set forth in Exhibit A of the Voting

Declaration, is set forth below:

| Class | Class Description | Number Accepting % | Number Rejecting % | Amount Accepting % | Amount Rejecting % | Class Voting Result |
|-------|-------------------|--------------------|--------------------|--------------------|--------------------|---------------------|
| 1 | HTA 68 Bond Claims | 113 | 5 | $64,569,445.89 | $128,850.27 | Accept |
|   |   | 95.76% | 4.24% | 99.80% | 0.20% |   |
| 2 | HTA 68 Bond Claims (Ambac) | 1 | 0 | $30,563,816.00 | $0.00 | Accept |
|   |   | 100% | 0% | 100% | 0% |   |
| 3 | HTA 68 Bond Claims (Assured) | 1 | 0 | $567,219,573.00 | $0.00 | Accept |
|   |   | 100% | 0% | 100% | 0% |   |
| 4 | HTA 68 Bond Claims (National) | 1 | 0 | $87,763,682.00 | $0.00 | Accept |
|   |   | 100% | 0% | 100% | 0% |   |
| 5 | HTA 98 Senior Bond Claims | 943 | 53 | $490,556,661.24 | $838,524.49 | Accept |
|   |   | 94.68% | 5.32% | 99.83% | 0.17% |   |
| 6 | HTA 98 Senior Bond | 1 | 0 | $491,939,990.00 | $0.00 | Accept |

15

| | | | | | | |
|---|---|---|---|---|---|---|
| | Claims (Ambac) | 100% | 0% | 100% | 0% | |
| 7 | HTA 98 Senior Bond Claims (Assured) | 1 | 0 | $865,236,581.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 8 | HTA 98 Senior Bond Claims (FGIC) | 1 | 0 | $389,963,990.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 9 | HTA 98 Senior Bond Claims (National) | 1 | 0 | $530,496,068.00 | $0.00 | |
| | | 100% | 0% | 100% | 0% | Accept |
| 10 | HTA 98 Sub Bond Claims | 355 | 24 | $35,553,418.85 | $574,409.78 | Accept |
| | | 93.67% | 6.33% | 98.41% | 1.59% | |
| 11 | HTA 98 Sub Bond Claims (Assured) | 1 | 0 | $51,283,015.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 12 | HTA 98 Sub Bond Claims (FGIC) | 1 | 0 | $65,942,129.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 13 | HTA 98 Sub Bond Claims (National) | 1 | 0 | $38,424,132.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |

**c.** **Legitimate Government or Other Reasons Justify Separate Classification of Certain Unsecured Claims.**

37.     Consistent with a legitimate governmental purpose, the Oversight Board classified the following unsecured claimants separately from HTA General Unsecured Claims:

38.     <u>Eminent Domain/Inverse Condemnation Claims</u>:  The Claims held by eminent domain and inverse condemnation claimants are separately classified in Class 15.

16

39.     Several claimholders filed proofs of claim in the Commonwealth's Title III case seeking just compensation for alleged prepetition takings of their private property.  Those Claims arose either from eminent-domain proceedings under Puerto Rico's "quick take" statute, 32 L.P.R.A. § 2907, or from inverse-condemnation proceedings.  Certain claimholders objected to the Commonwealth Plan's treatment of eminent-domain and inverse-condemnation Claims, arguing that the Fifth Amendment prohibits the impairment or discharge of any claim for just compensation arising under the Takings Clause.  The Oversight Board responded by citing precedent holding prepetition, unsecured claims under the Takings Clause and other constitutional provisions are subject to impairment and discharge, like any other unsecured claim.  The Title III Court held the Takings Clause creates an "irreducible entitlement to just compensation" that cannot be discharged or impaired in a bankruptcy case.  *See Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* [Case No. 17-BK-3283, ECF No. 19812] (the "Commonwealth Findings of Fact") ¶ 166.  On July 18, 2022, the First Circuit affirmed the Title III Court's ruling.  *See Fin. Oversight & Mgmt. Bd. v. Cooperativa de Ahorro* (*In re Fin. Oversight & Mgmt. Bd.*), No. 22-1119, 2022 U.S. App. LEXIS 19736 (1st Cir. July 18, 2022).  On August 5, 2022, the Oversight Board authorized the filing of a petition for writ of certiorari to the United States Supreme Court from the First Circuit's decision.

40.     Claimants in Class 15 of the HTA Plan assert similar constitutional Claims based on an alleged seizure of property pursuant to HTA's eminent domain power, and are partially secured by deposits submitted by HTA with the Clerk of the Court of First Instance in connection with condemnation proceedings underlying such Claims.  The amount of the Claims in excess of

the deposit, if any, will be paid in full to the extent they are Allowed Claims for just compensation.[10]  These Claims are classified separately because the Claimants allege legal rights that are different than the legal rights asserted by other unsecured Claimants.

41.    HTA General Unsecured Claims.  Class 16 consists of Claims against HTA, other than those excluded pursuant to Section 1.194 of the HTA Plan, or otherwise treated in other Classes under the HTA Plan.  All Claims in Class 16 are unsecured and substantially similar to the other Claims in this Class.

42.    HTA/GDB Claims.  Class 17 consists of Claims against HTA with respect to loans extended by GDB to HTA, other than any Claims in Classes 1–14.  These Claims are classified separately because, pursuant to the terms and provisions of the DRA Stipulation, the DRA, as holder of the HTA/GDB Claims, has agreed to receive no distribution on account of its HTA/GDB Claims.

43.    The settlement of claims constitutes a reasonable basis for separate classification. *See, e.g.*, *In re City of Stockton*, 542 B.R. 261, 281 (B.A.P. 9th Cir. 2015) (court confirmed a plan proposing different treatment, including different payment terms and percentage recoveries, for each settling bond creditor because the debtor "avoided a number of potentially protracted, expensive and risky valuation proceedings," which made legitimate business and economic sense, and therefore the debtor was permitted to separately classify such claims based on the settlement treatment).

44.    Section 510(b) Subordinated Claims.  Class 18 consists of Claims determined pursuant to a Final Order to be subject to section 510(b) of the Bankruptcy Code.  Section 510(b) of the Bankruptcy Code subordinates such Claims to other general unsecured claims.  Because

---

[10] In the event the First Circuit's ruling is reversed, Eminent Domain/Inverse Condemnation Claims will be discharged and will receive the treatment provided to Claims in Class 16 (HTA General Unsecured Claims).

they have a lower priority than general unsecured claims, they are sufficiently dissimilar to general unsecured claims to warrant separate classification and not be provided with any recovery pursuant to the HTA Plan.

45.   <u>Convenience Claims</u>.   Class 19 contains a Class of "Convenience Claims" consisting of Claims equal to or less than $20,000 or Claims held by a common holder who has agreed to reduce such claims to $40,000 or less in the aggregate.   Section 1122(a) of the Bankruptcy Code provides that, "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."   11 U.S.C. § 1122(a).   Section 1122(b), in turn, provides "[a] plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience."   11 U.S.C. § 1122(b).   The significant administrative burden of reconciling all Claims is highly costly to the Debtor.   The Oversight Board has determined and submits that, given the extraordinarily large number of Claims asserted against HTA, that the separate classification of such claims is reasonable and necessary to ease the administrative burden on the Debtor and that it would be less costly to simply pay such Claims than it would be to administer them through the claims reconciliation process.   The separate treatment of such "Convenience Claims" therefore benefits both the Debtor and all its stakeholders in reducing administrative costs and more efficiently administering the HTA Plan and getting payments of Claims to Commonwealth residents as quickly as possible.

46.   <u>Federal Claims</u>.   Class 20 consists of Claims of the United States of America, its agencies, departments or agents, including, without limitation, the United States Department of Housing and Urban Development, the United States Department of Homeland Security and the

United States Department of Labor.  Due to the unique relationship of the Commonwealth and its instrumentalities, including HTA, with the federal government and its instrumentalities, as well as the long-term nature of many federal programs, it is reasonable and justified to classify such Federal Claims separately.  *See, e.g.*, *In re Jersey City Med. Ctr.*, 817 F.2d 1055 (3d Cir. 1987) (confirming a plan by a chapter 9 debtor which separately classified certain constituencies integral to the functioning of the debtor).

### 2.  The HTA Plan Satisfies Section 1123(a) of the Bankruptcy Code

47.     Section 1123(a) of the Bankruptcy Code contains seven requirements a chapter 11 plan must satisfy.  *See* 11 U.S.C. § 1123(a).  However, PROMESA incorporates only the first five of those requirements, sections 1123(a)(1)–(5).  PROMESA § 301(a).  As demonstrated below, the HTA Plan complies with each of these requirements.

#### a.  The HTA Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(1) By Designating Classes of Claims.

48.     Section 1123(a)(1) of the Bankruptcy Code provides a plan may designate, subject to section 1122, classes of claims and interests other than claims of a kind specified in sections 507(a)(2) (administrative expense claims), 507(a)(3) (claims arising during the "gap" period in an involuntary case), and 507(a)(8) of the Bankruptcy Code (unsecured priority tax claims).  *See* 11 U.S.C. § 1123(a)(1).  As discussed above, Article IV of the HTA Plan designates twenty (20) separate Classes of Claims for the Debtor.  *See* HTA Plan, Art. IV.  The HTA Plan therefore complies with the requirements of section 1123(a)(1) of the Bankruptcy Code.

#### b.  The HTA Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(2) By Specifying Unimpaired Classes.

49.     Section 1123(a)(2) of the Bankruptcy Code requires the HTA Plan to "specify any class of claims or interests that is not impaired under the plan."  11 U.S.C. § 1123(a)(2).  The HTA Plan meets this requirement by identifying each unimpaired Class of Claims under the HTA Plan.

Section 33.2 of the HTA Plan specifies that Claims in Classes 14 and 19 are unimpaired pursuant to the HTA Plan, are deemed to have accepted the HTA Plan, and are not entitled to vote to accept or reject the HTA Plan.  Thus, the HTA Plan complies with the requirements of section 1123(a)(2) of the Bankruptcy Code.

**c.**   **The HTA Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(3) By Specifying the Treatment of Impaired Classes.**

50.    Section 1123(a)(3) of the Bankruptcy Code requires the HTA Plan to "specify the treatment of any class of claims or interests that is impaired under the plan."   11 U.S.C. § 1123(a)(3).   The HTA Plan meets this requirement by setting forth the treatment of impaired Classes.  Articles V through XVII, XIX through XXI, and XXIV of the HTA Plan identify the treatment of all Classes of Claims impaired under the HTA Plan.  Thus, the HTA Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

**d.**   **The HTA Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(4) By Providing Equal Treatment within Each Class of Claims.**

51.    Section 1123(a)(4) of the Bankruptcy Code requires that the HTA Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4).  Pursuant to Bankruptcy Code sections 1122 and 1123(a)(4), Articles V through XXIV of the HTA Plan provide each holder of an Allowed Claim within a particular Class will receive the same treatment as other Allowed Claims in such Class, except to the extent that a holder of an Allowed Claim has agreed to less favorable treatment of its Claim.   Certain parties are receiving payment of Support Agreement Administrative Expenses (defined below) under the HTA Plan, as described below.  Such costs and fees are not awarded on account of the respective claimholders' Claims.  Rather, the consummation costs are provided in consideration of certain

21

claimholders' assistance in the formulation of the HTA Plan and to compensate them for the reasonable fees and expenses incurred in connection with the negotiation and execution of various plan support agreements, which made development of the HTA Plan possible. *See infra* ¶ 72. Notably, these claimholders and their professionals participated in the negotiation and drafting of settlement provisions and documents that protect all the Claims in their classes, not just themselves. The restriction fees are provided in connection with certain parties' commitment to "lock up" their Claims pursuant to the terms of respective plan support agreements. *See infra* ¶¶ 72, 79. This Court has previously approved the payment of similar consummation fees in connection with the Commonwealth Title III case and COFINA Title III case. Commonwealth Confirmation Order ¶¶ 46, 48–51; *Amended Order and Judgment Confirmation the Third Amended Title III Plan of Adjustment of the Puerto Rico Sales Tax Financing Corporation* [Case No. 17-BK-3284-LTS, ECF No. 561] (the "COFINA Confirmation Order") ¶ 28. Accordingly, payment of these fees does not violate section 1123(a)(4), and the HTA Plan complies with the requirements of section 1123(a)(4) of the Bankruptcy Code.

        **e.**    **The HTA Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(5) By Providing Adequate Means for Its Implementation.**

52. Section 1123(a)(5) of the Bankruptcy Code requires that, [n]otwithstanding any otherwise applicable nonbankruptcy law, a plan provide "adequate means" for its implementation. *See* 11 U.S.C. § 1123(a)(5). Various provisions of the HTA Plan provide for the means by which the HTA Plan will be implemented:

- Article II provides for the terms of the operational restructuring of HTA consistent with the HTA 2022 Fiscal Plan;

- Article III provides for the payment of administrative expense claims required to be paid on the HTA Effective Date;

- Section 25.1 provides for the issuance and distribution of the New HTA Bonds;

- Section 25.3 supports feasibility of the HTA Plan by providing for the adoption and maintenance of a debt management policy "designed to ensure that certain past Debt issuance practices of HTA are not repeated;"

- Section 27.1 provides, subject to Sections 27.5 and 27.7 of the HTA Plan, that "all Executory Contracts and Unexpired Leases that exist between the Debtor and any Entity, and which have not expired by their own terms on or prior to the HTA Effective Date, shall be deemed rejected by the Debtor as of the HTA Effective Date, except for any Executory Contract and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the HTA Effective Date, (b) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the [HTA] Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the HTA Plan Supplement . . .";

- Article XXVIII provides for distributions to be made to holders of all Allowed Claims under the HTA Plan;

- Sections 1.51 and 29.1 provide for the authority to litigate and compromise and settle the Avoidance Actions to be transferred to the Avoidance Actions Trust on the HTA Effective Date and to be administered pursuant to the Avoidance Actions Trust Agreement;

- Section 31.2 vests in the Disbursing Agent, among other things, the power to make distributions contemplated by the HTA Plan;

- Article XXXII provides for the Debtor to reconcile, and to the extent ultimately allowed, pay, any and all Disputed Claims; and

- Section 41.1 provides for the re-vesting of assets: "Except as provided in the HTA Confirmation Order, on the HTA Effective Date, title to all Assets and properties of the Debtor encompassed by the HTA Plan shall vest in Reorganized HTA, free and clear of all Liens, including, without limitation, any Lien upon or security interest in the SIB Account, but expressly excluding Liens granted pursuant to the HTA Plan and the HTA Confirmation Order."

53.     Additionally, Article XXXVII provides that, "[o]n the HTA Effective Date, all matters provided for under the HTA Plan that would otherwise require approval of the directors of the Debtor or Reorganized HTA, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New HTA Bonds, the authorization to enter into the Definitive Documents, and the election or appointment, as the case may be, of directors and

23

officers of Reorganized HTA pursuant to the HTA Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New HTA Bonds Indenture, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule."

54.    Additionally, the Plan Supplement contains, among other things, the (a) New HTA Bonds Indenture, as supplemented, (b) Avoidance Actions Trust Agreement, (c) Schedule of Executory Contracts and Unexpired Leases to be Assumed, (d) Ambac Custodial Trust Documents, (e) Assured Custodial Trust Documents, (f) FGIC Trust Documents, and (g) list of initial members of the board of directors of Reorganized HTA.  Accordingly, the HTA Plan, together with the documents and arrangements set forth in the Plan Supplement, provides adequate means for its implementation.  The HTA Plan therefore satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

### 3.    The HTA Plan Complies with Section 1123(b) of the Bankruptcy Code

55.    In addition to the requirements of section 1123(a) of the Bankruptcy Code, section 1123(b) contains discretionary provisions that may be (but are not required to be) incorporated into a chapter 11 plan.  *See* 11 U.S.C. § 1123(b).  The HTA Plan contains several discretionary provisions permitted by section 1123(b), as described below.

#### a.    The HTA Plan Permissibly Provides for the Impairment/Unimpairment of Certain Claims.

56.    Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests."  11 U.S.C. § 1123(b)(1).  Article XXXIII of the HTA Plan identifies which Classes of Claims are impaired and which Classes of Claims are left unimpaired.  Accordingly, the HTA Plan is consistent with section 1123(b)(1).

### b. The HTA Plan Permissibly Provides for the Assumption and Rejection of Executory Contracts.

57.     Section 1123(b)(2) allows a plan, subject to section 365 of the Bankruptcy Code, to provide for the assumption, assignment, or rejection of executory contracts and unexpired leases of the debtor not previously rejected.  *See* 11 U.S.C. § 1123(b)(2).  Article XXVII of the HTA Plan provides:

> [A]ll Executory Contracts and Unexpired Leases that exist between the Debtor and any Entity, and which have not expired by their own terms on or prior to the HTA Effective Date, shall be deemed rejected by the Debtor as of the HTA Effective Date, except for any Executory Contract and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the HTA Effective Date, (b) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, or (g) by or between any Commonwealth agencies, departments, municipalities, public corporations or instrumentalities (other than leases to which PBA is a party); provided, however, that the Debtor reserves the right, on or prior to the HTA Effective Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the HTA Effective Date.

HTA Plan § 27.1.  The HTA Plan therefore is consistent with section 1123(b)(2) of the Bankruptcy Code.

### c. The HTA Plan Permissibly Provides for the Settlement or Adjustment of the Debtor's Claims.

58.     The HTA Plan incorporates settlements with almost every major claimholder constituency embodied in stipulations or plan support agreements.  Section 1123(b)(3)(A) of the Bankruptcy Code provides a plan may "provide for the settlement or adjustment of any claim . . .

belonging to the debtor[.]"  11 U.S.C. § 1123(b)(3)(A).  The standard for a settlement pursuant to

section 1123(b)(3)(A) is the same as that for approval of a motion brought under Bankruptcy Rule

9019.  *See, e.g.*, *Resolution Tr. Corp. v. Best Prods. Co.* (*In re Best Prods. Co.*), 177 B.R. 791, 794

n.4 (S.D.N.Y. 1995), *aff'd*, 68 F.3d 26 (2d Cir. 1995).  The First Circuit has emphasized that

"[s]tipulations of settlement are favored by the courts, and they will rarely be set aside absent

fraud, collusion, mistake or other such factors."  *United States v. Sterling Consulting Corp.* (*In re*

*Indian Motorcycle Co.*), 289 B.R. 269, 282 (B.A.P. 1st Cir. 2003) (citation omitted); *see also*

*Hicks, Muse & Co. v. Brandt* (*In re Healthco Int'l, Inc.*), 136 F.3d 45, 50 n.5 (1st Cir. 1998).

59.     An integral component of the settlements embodied in the HTA Plan are the

Support  Agreement  Administrative  Expenses  (defined  below)  to  be  paid  to  the  settling

claimholders (each, an "Administrative Expense Party").  *See* HTA Plan §§ 3.3–3.5.  These

payments, and the agreement pursuant to which the Claims are settled, are described below.  *See*

*infra* ¶¶ 60–80.

### (i)     HTA/CCDA Plan Support Agreement.

60.     Prior to the Commonwealth Petition Date, HTA issued bonds in the principal

amount of approximately $4.3 billion allegedly secured by and payable from certain revenues from

gasoline  and  cigarette  excise  taxes  and  vehicle  license  fees  conditionally  appropriated  and

transferred to HTA (the "HTA Allocable Revenues").  Historically, the HTA Allocable Revenues

were  collected  by  the  Commonwealth,  transferred  to  HTA,  and  deposited  by  HTA  in  certain

accounts maintained by the fiscal agent for such bonds.  Prior to the commencement of HTA's

Title III case, the Commonwealth ceased transferring the HTA Allocable Revenues to HTA.

61.     Additionally, prior to the HTA Petition Date, HTA collected traffic, toll, and fine

revenues and deposited those revenues in accounts maintained by the fiscal agent.  HTA ceased

transferring these collections to the fiscal agent prior to the HTA Petition Date.

62.     The cessation of these transfers resulted in pre-and post-petition litigation by several holders and insurers of HTA Bonds asserting an alleged property interest in HTA Allocable Revenues under a variety of legal theories and a first-priority security interest against HTA's current and future traffic, toll, and fine revenues.  The parties to the HTA/CCDA PSA agreed to resolve the various adversary proceedings, contested matters, and lawsuits related to the HTA Bonds, which, if determined adversely to the Oversight Board, could have resulted in the allowance of fully secured Claims by holders of HTA Bonds, leaving little or no consideration for other holders of Claims and hampering HTA's continued operations.  The actions settled by the HTA/CCDA PSA are described below.

63.     *Commonwealth-HTA Revenue Bond Litigation*.  Certain insurers of HTA Bonds filed a motion in the Commonwealth and HTA Title III cases seeking an order (i) granting relief from the automatic stay to allow them to commence a proceeding in a non-Title III Court to seek to compel the Commonwealth to use the HTA Allocable Revenues and HTA to apply toll and fine revenues to the payment of HTA Bonds or, in the alternative, (ii) for adequate protection.  The Oversight Board opposed the motion arguing, among other things, that the security interest granted to holders of HTA Bonds was limited to amounts actually deposited in accounts controlled by the fiscal agent for the HTA Bonds, which accounts secure HTA's repayment of its bonds.  By opinion and order, dated July 2, 2020, this Court denied the motion because the movants failed to establish a reasonable likelihood that that they possess a legitimate lien or other property interest in the relevant assets.  The Court held that the security interest granted by HTA to the holders of HTA Bonds was limited to revenues actually received by HTA and actually deposited in the applicable bank account maintained by the HTA fiscal agent.  After supplemental briefing, on September 9, 2020, the Court issued another opinion and order denying the requested relief from the automatic

stay because, among other reasons, the issues raised by the movants would be determined in connection with the adversary proceedings commenced by the Oversight Board objecting to the proofs of claim described below.  The First Circuit affirmed on March 3, 2021, holding that the denial of the motions for relief from the automatic stay was not an abuse of discretion.  The First Circuit recognized that the denial of the motion for stay relief was not a decision on a final basis as to whether holders of HTA Bond Claims have a property interest in the relevant assets as would occur in connection with the adversary proceedings.

64.     In addition, certain holders and insurers of HTA Bonds filed proofs of claim in the Commonwealth Title III Case.  These proofs of claim asserted, among other things, that the Commonwealth purportedly violated the Commonwealth and U.S. Constitutions by not appropriating and transferring the HTA Allocable Revenues to HTA.

65.    *HTA Revenue Bond Litigation*.  Certain holders and insurers of HTA Bonds filed proofs of claim in the HTA Title III Case asserting (i) that bondholders have a statutory lien, security interest, and/or property interest in the relevant HTA Allocable Revenues, (ii) various constitutional, statutory, tort, and contractual theories of liability against HTA based on its failure to make payments of debt service on the HTA Bonds, and (iii) the HTA Bonds were secured by a lien on HTA's present and future toll revenues.

66.    The Oversight Board filed an adversary proceeding against certain holders and insurers of HTA Bonds (Adv. No. 20-00007-LTS in Case No. 17-BK-3567-LTS) seeking to disallow such holders' and insurers' claims against HTA, except as to any amounts deposited by HTA and held in certain specified deposit accounts by the fiscal agent and designated by the bond resolutions as the sinking fund (the "HTA Revenue Bond Litigation").  The HTA bond resolutions,

the Oversight Board asserted, contained no language granting a security interest to HTA Bondholders in HTA revenues, or in any revenues not contained in the sinking fund.

67.     *Summary of Terms of the HTA/CCDA Plan Support Agreement.*  On April 12, 2021, the Oversight Board announced it had reached an agreement in principle with Assured and National to settle, among other things, claims against the Commonwealth and HTA relating to HTA Allocable Revenues, and to restructure, among other things, the HTA Bonds.

68.     Pursuant to the HTA/CCDA PSA, upon confirmation of the Commonwealth Plan, in exchange for resolving the Claims against the Commonwealth and HTA arising from or relating to the HTA Bonds, including the Claims at issue in the Commonwealth-HTA Revenue Bonds Litigations and HTA Revenue Bond Litigation, and the agreement not to commence or pursue any pending or further litigation on account of the HTA Bonds, holders of such Claims would be entitled to receive a combination of securities, cash, and/or new bonds, as described below.

69.     In exchange for the settlement of the HTA/CCDA PSA Litigation, holders of such Claims received Clawback CVIs from the Commonwealth Plan, in settlement of their Claims against the Commonwealth, a contingent value instrument based on sharing the potential outperformance of the Commonwealth's 5.5% sales and use tax.  The Clawback CVI allocable to Allowed CW/HTA Claims is subject to a lifetime cap of $3,697,668,995.00.

70.     Additionally, pursuant to the HTA/CCDA PSA and the Commonwealth Confirmation Order, upon satisfaction of the Distribution Conditions (as defined in the Commonwealth Plan), holders of Claims against HTA arising from or relating to HTA 68 Bonds (as set forth in the HTA/CCDA PSA) (the "HTA 68 Bond Claims") received an aggregate $184.8 million in cash from HTA (the "HTA 68 Bond Cash"), and holders of Claims against HTA arising from or relating to HTA 98 Senior Bonds (as set forth in the HTA/CCDA PSA) ("HTA 98 Senior

Bond Claims" and, together with the HTA 68 Bond Claims, the "HTA Bond Claims") received an aggregate $79.2 million in cash from HTA (the "HTA 98 Senior Bond Cash" and, together with the HTA 68 Bond Cash, the "HTA Cash"). The Distribution Conditions have been satisfied; and accordingly, the HTA Cash was paid to the appropriate claimholders, and the principal amount of the HTA 68 Bonds and HTA 98 Senior Bonds and corresponding HTA Bond Claims were reduced by the amount of HTA Cash.

71.     The HTA/CCDA PSA requires that HTA propose a plan of adjustment pursuant to which it will issue holders of HTA Bond Claims $1.245 billion in new bonds (the "New HTA Bonds"), including current interest bonds, capital appreciation bonds, and convertible capital appreciation bonds.

72.     To compensate the Initial HTA/CCDA PSA Creditors for fees and expenses incurred in connection with the negotiation and execution of the HTA/CCDA Plan Support Agreement, each Initial HTA/CCDA PSA Creditor will be entitled to receive an amount equal to one percent of its respective HTA Bond Claim (the "HTA Consummation Costs"). In exchange for agreeing to support and vote to accept the HTA Plan and to "lock-up" their respective bonds in accordance with the terms of the HTA/CCDA PSA, each Initial HTA/CCDA PSA Creditor and HTA/CCDA Joinder Creditor holding or insuring HTA Bonds is entitled to receive a restriction fee (the "HTA Restriction Fee"). The HTA Consummation Costs and the HTA Restriction Fee are available up to an aggregate maximum amount of $125 million, payable by HTA upon the HTA Effective Date.

73.     The HTA/CCDA PSA was executed or subsequently joined by (i) creditors holding over $700 million of HTA 68 Claims (over 85% of such Claims), and (ii) creditors holding over $2.1 billion of HTA 98 Senior Claims (over 67% of such Claims). *See* Skeel Decl. ¶ 35. The

constituencies who participated in the negotiations were instrumental in the development of the HTA/CCDA PSA and the HTA Plan.  The negotiations leading to the execution of the HTA/CCDA PSA were at arm's length and in good faith and led to a compromise of contested positions between the parties to the HTA/CCDA PSA.  *See id.* ¶ 136.

(ii)     <b>DRA Stipulation.</b>

74.     On November 7, 2018, this Court approved the GDB Qualifying Modification.  To give effect to the GDB Qualifying Modification, the Commonwealth created, pursuant to the *Government Development Bank for Puerto Rico Debt Restructuring Act*, Act 109-2017, the DRA, a statutory public trust and public governmental instrumentality of the Commonwealth.  Pursuant to a Master Transfer Agreement, dated as of November 29, 2018, between DRA and GDB, GDB transferred substantially all of its assets to DRA, including, among other things, GDB's legal rights, title, and interest in twenty-three (23) promissory notes issued by HTA in favor of GDB (the "GDB/HTA Loans") and approximately $200,000,000 in aggregate original principal amount of HTA 98 Senior Bonds.

75.     The DRA Parties commenced actions, filed pleadings, and participated in numerous actions asserting claims against the Commonwealth and HTA, including those described above.  The parties to the DRA Stipulation agreed to resolve these adversary proceedings, contested matters, and lawsuits, on the terms set forth in the DRA Stipulation, which, if determined adversely to the Oversight Board could have resulted in the allowance of fully secured first priority claims against certain gasoline taxes, gas oil and diesel oil taxes, motor vehicle and license fees, petroleum products taxes, and cigarette taxes historically collected by the Commonwealth and transferred to HTA and against toll revenues collected by HTA (the "Act 30-31 Revenues").  The actions settled by the DRA Stipulation are described below.

76.     *DRA Parties' Lift-Stay Motions*: On March 31, 2021, the DRA Parties filed an amended motion for adequate protection or relief from the automatic stay in the Commonwealth and HTA Title III cases to exercise remedies against the Act 30-31 Revenues.  In the Motion, the DRA Parties asserted the Commonwealth had not validly exercised its "clawback" powers under the Puerto Rico Constitution.  The DRA Parties further argued they were the only parties granted a security interest in the Act 30-31 Revenues.  On August 13, 2021, this Court entered an order staying the lift stay motion pending a determination of whether the DRA Parties hold an interest in the Act 30-31 Revenues in connection with the adversary proceeding described below.

77.     *DRA Adversary Proceeding*: The DRA Parties filed an adversary complaint [Adv. Proc. No. 21-00068] (the "DRA Adversary Proceeding") against certain holders or insurers of HTA Bonds (the "DRA Defendants").  The complaint requested judgment that: (i) the DRA Parties are the only creditor with a valid, first priority lien in the Act 30-31 Revenues; (ii) the HTA Bonds do not have recourse to the Act 30-31 Revenues; (iii) neither the DRA Parties' claims or liens are subordinated to the HTA Bonds, and (iv) unlike holders of HTA Bonds, the DRA Parties' claims are payable from revenues that have not been deposited in accounts maintained by the fiscal agent.

78.     The Oversight Board was granted leave to intervene.  The DRA Defendants moved to dismiss the Complaint, which motion was granted by opinion and order, dated October 29, 2021. [Adv. Proc. No. 21-00068, ECF No. 86].  The Title III Court dismissed the complaint holding that the HTA Bonds were also secured by Act 30-31 Revenues, and the DRA loans were subordinate to the HTA Bonds.

79.     *Summary of terms of DRA Stipulation*.  On November 5, 2021, the DRA Parties and the Oversight Board entered into the DRA Stipulation [Case No. 17-bk-3283, ECF No. 19100, Ex. A], providing, among other things, that: (i) the DRA Parties would support the Commonwealth

Plan and the HTA Plan and related solicitation processes; (ii) the DRA Parties would vote to accept the HTA Plan; (iii) the DRA Parties would withdraw and/or dismiss with prejudice, as applicable, each of the DRA-Related Disputes; and (iv) in consideration for the agreements set forth in the DRA Stipulation, including the agreement to "lock-up" its HTA 98 Senior Bonds and the HTA/GDB Claims, the DRA would be entitled to receive a $15 million restriction fee in the form of an allowed administrative expense claim.

80.     Pursuant to the DRA Stipulation, the Oversight Board included in both the Commonwealth Confirmation Order and the HTA Plan language providing for the exculpation of the DRA Parties, the DRA, and their respective professionals and advisors.

### (iii)     The Settlements are Fair and Reasonable.

81.     While the Oversight Board believes the risk of a materially adverse outcome in connection with the HTA-related actions being settled pursuant to the HTA/CCDA PSA and the DRA Stipulation was materially less than fifty percent, a final resolution on the issues settled provides certainty to the Oversight Board with respect to the Claims held by the various claimholders, and builds the foundation for a confirmable HTA Plan.  The final resolution also saves significant time and expense and avoids continued litigation in connection with the disputes, which, as briefed, involved significant questions of law and fact that had not yet been determined by the Court, and would likely involve multiple rounds of appeal regardless of which party prevailed initially.

82.     In addition to the substantive fairness of these settlements, the process the Oversight Board undertook to reach them was in good faith and designed to reach a fair, arm's-length agreement, negotiated with the assistance of sophisticated counsel and financial advisors.

83.     Accordingly, the settlements embodied in the HTA Plan are fair and reasonable, and the HTA Plan is consistent with section 1123(b)(3)(A) of the Bankruptcy Code.

#### d.   The HTA Plan Permissibly Provides for the Retention and Enforcement of Claims.

84.     Section 1123(b)(3)(B) of the Bankruptcy Code states a plan may "provide for the retention and enforcement by the debtor" of certain claims or interests.  11 U.S.C. § 1123(b)(3)(B). Section 1.51 of the HTA Plan references the Avoidance Actions Trust established by the Commonwealth in connection with the consummation of the Commonwealth Plan and provides that, on the HTA Effective Date, the authority to litigate or compromise and settle Avoidance Actions relating to HTA[11] will be transferred to the Commonwealth Avoidance Actions Trust.

85.     Section 29.1 of the HTA Plan provides that: "[e]xcept as settled and released herein, from and after the HTA Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court."

86.     The HTA Plan is consistent with section 1123(b)(3)(B) of the Bankruptcy Code because it provides for the retention and enforcement by the Debtor or an assigned estate representative of claims and interests.

#### e.   The HTA Plan Does Not Provide for the Sale of the Debtor's Property.

87.     Bankruptcy Code section 1123(b)(4) permits a plan to provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among claimholders.  The HTA Plan does not provide for the sale of all or substantially all of the property of HTA.  Accordingly, the HTA Plan is consistent with section 1123(b)(4).

---

[11] HTA possesses only one Avoidance Action.

34

### f. The HTA Plan Permissibly Provides for Modification of Claimholders' Rights.

88.     Section 1123(b)(5) of the Bankruptcy Code provides for the modification of rights of secured or unsecured claimholders under the HTA Plan.  Articles V through XXIV of the HTA Plan modify the rights of holders of Claims in the impaired Classes, and leave intact those holders of Claims in the unimpaired Classes.  Accordingly, the HTA Plan is consistent with section 1123(b)(5).

### g. The HTA Plan Permissibly Includes Other Appropriate Provisions.

89.     Bankruptcy Code section 1123(b)(6) permits inclusion of any appropriate provision in a plan which is consistent with applicable provisions of the Bankruptcy Code.  In accordance with the Bankruptcy Code and as further detailed herein, Articles XLI and XXXV of the HTA Plan provide for, among other things, (a) certain releases, injunctions, and exculpations, (b) an exemption from registration pursuant to Bankruptcy Code section 1145 for the issuance and distribution of the New HTA Bonds, and (c) entry of a Confirmation Order that provides that no party, Person, or Entity shall enact, adopt, or implement any law, rule, regulation, or policy that impedes, financially or otherwise, consummation and implementation of the transactions contemplated by the HTA Plan.  Accordingly, the HTA Plan is consistent with section 1123(b)(6) of the Bankruptcy Code.

### 4. The HTA Plan Complies with Section 1123(d) of the Bankruptcy Code by Providing for the Cure of Defaults Under the HTA Plan

90.     Section 1123(d) of the Bankruptcy Code provides that, if a plan proposes to cure a default, the amount necessary to cure the default shall be determined "in accordance with the underlying agreement and applicable nonbankruptcy law."  11 U.S.C. § 1123(d).  Section 27.4 of the HTA Plan provides for the payment of cure amounts required to be paid to the counterparties of Executory Contracts that are assumed, or assumed and assigned under the HTA Plan.  Any cure

amounts will be determined in accordance with the underlying agreements and applicable nonbankruptcy law, and pursuant to the procedures established by the HTA Plan. Accordingly, the HTA Plan complies with the requirements of section 1123(d).

### 5. Section 1129(a)(2): The Debtor Has Complied with the Applicable Provisions of the Bankruptcy Code

91.     Bankruptcy Code section 1129(a)(2) requires that the plan proponent "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(2); *see also In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000).   The legislative history to section 1129(a)(2) explains this provision is intended to incorporate the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code. *See* H.R. REP. NO. 95-595, at 412 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6368 ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986), *aff'd in part*, *rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).  The Debtor (i) has complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of this Court, and (ii) has complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order in transmitting the Disclosure Statement, the HTA Plan, the Ballots, the Election Notices, and related documents, and in soliciting and tabulating votes on the HTA Plan.

### a.     The Debtor Has Complied with Section 1125 of the Bankruptcy Code.

92.     Section 1125 of the Bankruptcy Code provides, in pertinent part, that:

(b)     An acceptance or rejection of a plan may not be solicited after the commencement of the case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information . . . .

(c)     The same disclosure statement shall be transmitted to each holder of a claim or interest of a particular class, but there may be transmitted different disclosure statements, differing in amount, detail, or kind of information, as between classes.

11 U.S.C. § 1125.

93.     On June 17, 2022, the Debtor filed the Disclosure Statement.  After notice and a hearing, on June 22, 2022, the Court entered the Disclosure Statement Order approving the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code as containing "adequate information" of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtor's claimholders to make an informed judgment whether to accept or reject the HTA Plan.  Pursuant to the Disclosure Statement Order, the Court also approved:  (i) all materials to be included in the Solicitation Packages; (ii) the forms of Ballots; (iii) the procedures for voting and for tabulation of votes to accept or reject the HTA Plan; and (iv) the manner of service of the Solicitation Packages.  Furthermore, the Court entered orders establishing the (i) Confirmation Objection Deadline, (ii) Voting Deadline, (iii) Election Deadline, and (iv) Confirmation Hearing Date, putting creditors and other parties in interest on notice of the pertinent deadlines for the process of confirming the HTA Plan.

94.     Thereafter, in accordance with the Disclosure Statement Order, the Debtor, by and through Kroll, the Debtor's balloting agent, distributed Solicitation Packages to all holders of Claims entitled to vote under the HTA Plan, which contained, in English and Spanish translation: (i) the Confirmation Hearing Notice; (ii) a flash drive (or otherwise in the Debtor's discretion) containing the Disclosure Statement Order (without the exhibits thereto) and Disclosure Statement

(together with all exhibits thereto, including the HTA Plan); (iii) the appropriate form of notice of non-voting status (as applicable), ballot or election notice, if any, with instructions for voting and/or making any applicable election, and, as applicable, a pre-addressed, pre-paid return envelope; and (iv) solely with respect to holders of Claims in Class 16, the letter from the Creditors' Committee in support of the HTA Plan. *See Affidavit of Service of Solicitation Materials*, dated July 29, 2022 [ECF No. 1324]. The Debtor did not solicit acceptances or rejections of the HTA Plan from any holder of Claims prior to the transmission of the Solicitation Packages. As will be set forth in the Voting Declaration and established at the Confirmation Hearing, Kroll solicited and tabulated votes in accordance with the Disclosure Statement Order.

95. Additionally, as required by the Disclosure Statement Order, the Debtor, through Kroll, published the Confirmation Hearing Notice, on one occasion, in each of *El Nuevo Dia* in Spanish (primary circulation is in Puerto Rico), *Caribbean Business* in English (primary circulation is in Puerto Rico), *El Diario* in Spanish (primary circulation is in New York), *El Nuevo Herald* in Spanish (primary circulation is Miami), *The New York Times*, *The Bond Buyer*, *El Vocero* in Spanish (primary circulation is in Puerto Rico), and *Primera Hora* in Spanish (primary circulation is in Puerto Rico) to the extent possible, during the weeks beginning on (1) June 27, 2022, (2) July 4, 2022, and (3) July 18, 2022. *See* Publication Affidavit, filed August 4, 2022 [ECF No. 1342].

96. The Debtor, through Kroll, also caused no fewer than ten (10) radio advertisements to be aired during the periods from (i) July 4, 2022, up to and including July 8, 2022, (ii) July 11, 2022, up to and including July 15, 2022, and (iii) July 18, 2022, up to and including July 22, 2022 (for a total of thirty (30) radio advertisements), on (a) WMEG FM (contemporary hit radio) in Spanish and (b) WKAQ AM (Spanish language talk radio) in Spanish, informing listeners of (i) the

approval of the Disclosure Statement and the scheduling of the Confirmation Hearing, (ii) the

Confirmation Objection Deadline, (iii) the Voting Deadline and the Election Deadline, and (iv) an

information hotline to receive certain additional information.  *See* Publication Affidavit, filed

August 4, 2022 [ECF No. 1342].

97.     The Debtor will establish, through the Voting Declaration and, as necessary, at the

Confirmation Hearing, the methodology for the tabulation of ballots and results of voting with

respect to the HTA Plan.  *See generally* Voting Decl.

> **b.     The Debtor Has Obtained Acceptances of the HTA Plan Consistent
> with Section 1126 of the Bankruptcy Code.**

98.     Section 1126 of the Bankruptcy Code sets forth the requirements for acceptance of

a plan of reorganization.  *See* 11 U.S.C. § 1126.  Under section 1126, only holders of allowed

claims and allowed equity interests in impaired classes that will receive or retain property under a

plan on account of such claims or equity interests may vote to accept or reject a plan.  *See id*.  The

statute provides, in pertinent part, that:

> (a)     The holder of a claim or interest allowed under section 502 of [the
> Bankruptcy Code] may accept or reject a plan . . .

> (f)     Notwithstanding any other provision of this section, a class that is not
> impaired under a plan, and each holder of a claim or interest of such class, are
> conclusively presumed to have accepted the plan, and solicitation of acceptances
> with respect to such class from the holders of claims or interests of such class is not
> required.

*Id*.

99.     As to impaired classes entitled to vote to accept or reject a plan, section 1126(c) of

the Bankruptcy Code specifies the requirements for acceptance of a plan by classes of claims:

> (c)     A class of claims has accepted a plan if such plan has been accepted by
> creditors, other than any entity designated under subsection (e) of this section, that
> hold at least two-thirds in amount and more-than one-half in number of the allowed
> claims of such class held by creditors, other than any entity designated under
> subsection (e) of this section, that have accepted or rejected the plan.

11 U.S.C. § 1126(c).

100.    As set forth in the Disclosure Statement and this Memorandum, *see supra* ¶¶ 93–96, and in accordance with section 1126 of the Bankruptcy Code, the Debtor solicited votes from the holders of all Claims allowed for voting purposes in each Class of impaired Claims entitled to vote on the HTA Plan.  Specifically, votes were solicited from the holders of Claims in Classes 1, 5, 10, 15–17, and 20.  Beneficial holders of Claims in Classes 2–4, 6–9, and 11–13 are not entitled to vote to accept or reject the HTA Plan.  Instead, Ambac, Assured, National, or FGIC, as applicable, are entitled to vote on account of such Claims pursuant to the terms of the HTA Plan and the Disclosure Statement Order.

101.    Pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims in unimpaired Classes are conclusively presumed to have accepted the HTA Plan and were not entitled to vote on the HTA Plan.  Accordingly, holders of Claims in Classes 14 and 19 did not receive a ballot.  In addition, Claims in Class 18 are impaired and not receiving a distribution, and are deemed to have rejected the HTA Plan.  Accordingly, holders of Claims in Class 18 did not receive a ballot.  In accordance with the Disclosure Statement Order, the Debtor distributed a Confirmation Hearing Notice and notice of non-voting status to each holder of Claims in Class 18.

### 6. Section 1129(a)(3):  The HTA Plan was Proposed in Good Faith and Not by Any Means Forbidden by Law

102.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Bankruptcy Code does not define "good faith," but rather, courts generally interpret it to mean that there exists a reasonable likelihood the plan will achieve a result consistent with the objectives of the Bankruptcy Code.  *Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.)*, 709 F.2d 762, 765 (1st Cir. 1983); *In re Corey*, 892 F.2d 829, 835 (9th Cir. 1989).

40

103.    Title III of PROMESA is analogous to Chapter 9 of the Bankruptcy Code, as it adopts many of the same provisions of the Bankruptcy Code that Chapter 9 adopts.  *Compare* PROMESA § 301(a) *with* 11 U.S.C. § 901(a).  The principal purpose of Chapter 9 "is to allow an insolvent municipality to restructure its debts in order to continue to provide public services."  *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 41 (Bankr. D. Colo. 1999); *In re City of Detroit*, 524 B.R. at 248.  "The primary purpose of debt restructure for a municipality is not future profit, but rather continued provision of public services."  *In re Mount Carbon Metro. Dist.*, 242 B.R. at 34; *In re City of Detroit*, 524 B.R. at 248.  Furthermore, one of the purposes of PROMESA is to "provide a method for a covered territory to achieve fiscal responsibility and access to capital markets." PROMESA § 101(a).  A sustainable restructuring of existing obligations as provided for in the HTA Plan is a prerequisite to achieving these objectives.

104.    In determining whether the plan achieves a result consistent with the objectives and purposes of Chapter 9, courts look at the totality of the circumstances in a particular case.  *See In re City of Stockton*, 542 B.R. at 279; *In re Mount Carbon Metro Dist.*, 242 B.R. at 39; *In re City of Detroit*, 524 B.R. at 248*; Berliner v. Pappalardo* (*In re Puffer*), 674 F.3d 78, 81–82 (1st Cir. 2012).

105.    The HTA Plan was proposed by the Oversight Board in good faith, and with the legitimate and honest purpose, consistent with its statutory mandate under PROMESA, of providing a method for HTA to achieve fiscal responsibility and access to capital markets.  *See* Skeel Decl. ¶ 78.[12]  The HTA Plan is the result of extensive, arm's-length negotiations among certain constituencies through the independent mediation process developed and guided by the Mediation Team, and direct settlement negotiations.  *See id.*

---

[12] *Declaration of David Skeel in Respect of Confirmation of Fourth Amended Title III Plan of Adjustment for the Puerto Rico Highways and Transportation Authority* [ECF No. 1357] (the "Skeel Declaration").

106.    The HTA Plan is the fourth amended version of the plan of adjustment because the Oversight Board has worked continuously since this Title III Case began, with the assistance of its legal and financial advisors, to develop consensus with claimholders and to evaluate HTA's current and future financial circumstances.  *See id.* ¶ 79.  These circumstances have been subject to constant change as the Oversight Board, HTA, creditors, and the people of Puerto Rico have fought to address the Island's needs and develop a path to fiscal responsibility in the midst of multiple major hurricanes, earthquakes, and other natural disasters, as well as the impact of the global COVID-19 pandemic.  *See id.*

107.    The HTA Plan is the culmination of all of these efforts and is designed to implement the settlement and compromise of numerous risky and costly disputes (and further the settlements and compromises that have been approved in connection with the Commonwealth Plan), while avoiding protracted litigation that could delay distributions to creditors.  *See id.* ¶ 80.

108.    The overwhelming support for the HTA Plan provides independent evidence of the Oversight Board's good faith efforts.  Likewise, the Court's docket shows the extensive litigation and outcomes preceding the HTA Plan.  That litigation demonstrates both the key disputes, many of them novel, among the parties, and the time required to resolve or narrow them.  The HTA Plan is the alternative to continuing that litigation to resolve the remaining issues instead of settling them now.  The Oversight Board, and its members, employees, agents, affiliates, and professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code, thereby satisfying the "good faith" requirement of Bankruptcy Code section 1129(a)(3).

109.    In light of the foregoing, it is clear the HTA Plan was proposed in good faith and promotes the rehabilitative objectives and purposes of PROMESA and the Bankruptcy Code, and therefore satisfies the requirements of section 1129(a)(3).

### 7. Section 1129(a)(6): The HTA Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission

110.    Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission having jurisdiction over the rates charged by a reorganized debtor in the operation of its businesses approve any rate change provided for in the plan. *See* 11 U.S.C. § 1129(a)(6). The HTA Plan contemplates certain toll rate increases; however, such increases do not require the approval of any governmental regulatory commission with jurisdiction over HTA and such toll rate increases. *See* 27 L.P.R.A. §§ 261–261(e) (legislative review of rates for basic and essential services by public corporations does not include HTA). Accordingly, this provision is not applicable for purposes of confirming the HTA Plan.

### 8. Section 1129(a)(8): The HTA Plan Has Not Been Accepted By Each Impaired Class of any Debtor Under the HTA Plan, But Nonetheless Can Be Confirmed By Satisfying 11 U.S.C. §§ 1129(a)(10) and (b)

111.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims either accept the plan or not be impaired under the plan, subject to the exceptions identified in section 1129(b). *See* 11 U.S.C. §§ 1129(a)(8), 1129(b). Section 1126 provides a plan is accepted by an impaired class of claims if the accepting class members hold at least two-thirds in amount and more than one-half in number of the claims held by the class members that voted on the plan. *See* 11 U.S.C. § 1126. Under section 1126(g) of the Bankruptcy Code, however, impaired classes that neither receive nor retain any property under the plan are deemed to reject the plan. Accordingly, the HTA Plan has not been accepted by each Class of the Debtor, as Class 64 (Section 510(b) Subordinated Claims) is deemed to have rejected the HTA Plan.

112.    As the Voting Declaration demonstrates, several classes of creditors holding the vast majority of Claims against HTA voted to accept the HTA Plan with the requisite numerosity and dollar amounts required by section 1126(c). However, Classes 15 and 16 rejected the HTA

Plan.  Voting Decl. Ex. A.  Confirmation is nevertheless achievable, as explained in more detail below, because the HTA Plan satisfies the requirements of sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.  Accordingly, the HTA Plan overcomes the requirement of section 1129(a)(8) by satisfying sections 1129(a)(10) and 1129(b).

### 9.   Section 1129(a)(10):  At Least One Impaired Class of Claims Voted in Favor of the HTA Plan, Without Including Claims of Insiders

113.    Section 1129(a)(10) requires the affirmative acceptance of a plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider." *Id*; *see also In re Resorts Int'l*, 145 B.R. 412, 479 (Bankr. D.N.J. 1990) (where four classes of impaired creditors accepted the plan, exclusive of insiders, requirements of section 1129(a)(10) were satisfied).

114.    As the Voting Declaration demonstrates, Classes 1–13 accepted the HTA Plan without counting votes by insiders.  Accordingly, the requirement of section 1129(a)(10) of the Bankruptcy Code has been met.

### 10. Section 1129(b)(1):  The HTA Plan Satisfies the Cram-Down Requirements with Respect to the Classes that Did Not Accept the HTA Plan

115.    Section 1129(b)(1) of the Bankruptcy Code provides that, if certain requirements are met, a plan shall be confirmed notwithstanding that section 1129(a)(8) is not satisfied with respect to one or more classes.  *See* 11 U.S.C. § 1129(b)(1).  In particular, section 1129(b)(1) requires that, to confirm a plan that has not been accepted by all impaired Classes, the plan proponent must show the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired Classes.  *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999); *see also John Hancock*, 987 F.2d at 157 n.5.  The plan proponent bears the burden of proof by a preponderance of the evidence.  *See In re Armstrong World Indus., Inc.*, 348

B.R. 111, 120 (D. Del. 2006); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001).

116.    Class 18 (Section 510(b) Subordinated Claims) receives no recovery pursuant to the HTA Plan, and is deemed to have rejected the HTA Plan.  HTA Plan § 22.1.  Further, Classes 15 and 16 voted to reject the HTA Plan.  Accordingly, the Debtor must satisfy section 1129(b) of the Bankruptcy Code with respect to these rejecting Classes.

> **a.      The HTA Plan Does Not Unfairly Discriminate Against the Rejecting Classes and Complies with the Requirements of 11 U.S.C. § 1129(b)(1).**

117.    PROMESA incorporates section 1129(b)(1), which allows the confirmation of a plan over the objection of a rejecting, impaired class if the "plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted the plan."  11 U.S.C. § 1129(b)(1).  The Bankruptcy Code does not define unfair discrimination, nor provide a standard for when "unfair discrimination" exists.  *See In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *aff'd*, 126 F.3d 955 (7th Cir. 1997), *rev'd on other grounds sub nom. Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999); *In re Johns-Manville Corp.*, 68 B.R. at 636.  By its terms, section 1129(b)(1) "prohibits only unfair discrimination, not all discrimination." *In re Aztec Co.*, 107 B.R. 585, 588–89 (Bankr. M.D. Tenn. 1989).  Indeed, it is "necessarily inherent in the term 'unfair discrimination' . . . that there may be 'fair' discrimination in the treatment of classes of creditors." *In re Simmons*, 288 B.R. 737, 747–48, 748 n.34 (Bankr. N.D. Tex. 2003) (citing 7 Collier on Bankruptcy ¶ 1129.04[3] (15th ed. 2002)).

118.    Courts typically examine the facts and circumstances of the case and determine whether unfair discrimination has occurred in each particular case.  *See, e.g.*, *In re Rivera Echevarria*, 129 B.R. 11, 13 (Bankr. D.P.R. 1991); *In re Freymiller Trucking, Inc.*, 190 B.R. 913,

916 (Bankr. W.D. Okla. 1996) (holding a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); *Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc)*, 622 F.2d 872, 879 (5th Cir. 1980) ("A bankruptcy court can permit discrimination when the facts of the case justify it."); *In re Dow Corning Corp.*, 255 B.R. 455, 537–38 (E.D. Mich. 2000) (alteration in original) (citation omitted) ("a plan will not unfairly discriminate if there is a 'rational or legitimate basis for discrimination and [if] the discrimination [is] . . . necessary for the reorganization'").

119.    This has been particularly true in Chapter 9 cases. *See In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991) ("[U]nlike the other Chapters, Chapter 9 does not attempt to balance the rights of the debtor and its creditors, but rather, to meet the special needs of a municipal debtor."). In Chapter 9, as under PROMESA, "the purpose . . . is to restructure the municipality's debt so that it can provide adequate municipal services. To that end, chapter 9 leaves the municipality in control of its affairs while facilitating its debt restructuring. This suggests that a more flexible standard of unfair discrimination in chapter 9 cases is appropriate." *In re City of Detroit*, 524 B.R. at 256. Accordingly, courts assessing plans of adjustment in chapter 9 have emphasized the unique need to consider the overarching purpose of chapter 9 and the general social welfare when addressing issues of plan confirmation. *See, e.g.*, *In re Barnwell Cnty. Hosp.*, 471 B.R. 849, 869 (Bankr. D.S.C. 2012) ("[O]f particular importance to the Court is that the [p]lan preserves the availability of healthcare services to citizens and patients in the [c]ounty."); *In re City of Detroit*, 524 B.R. at 257 (permitting discrimination where "necessary to [the City's] mission" and reasoning "if each of the settlements in the plan is reasonable, then the resulting discrimination in the plan must be fair.").

46

>        (i)     **The HTA Plan does not unfairly discriminate
>                against Classes of Claims that voted to reject the
>                HTA Plan.**

120.    Here, certain Classes of unsecured Claims against HTA have voted to reject the HTA Plan. The different treatments of creditor classes is justified and does not constitute unfair discrimination.

121.    <u>HTA General Unsecured Claims</u>.  Under the HTA Plan, Class 16 (HTA General Unsecured Claims) will receive the same recovery or a less favorable recovery than unsecured Claims in Class 15 (Eminent Domain/Inverse Condemnation Claims) and a less favorable recovery than Class 20 (Federal Claims).  The treatment of Claims in Class 16 is justified and does not constitute unfair discrimination.  Claims in Class 20 (Federal Claims) are receiving a more favorable recovery under the HTA Plan due to the unique relationship of the Commonwealth and its instrumentalities, including HTA, with the federal government and its instrumentalities, as well as the long-term nature of many federal programs. As such, it is reasonable and justified for Claims in Class 20 to receive a more favorable treatment than HTA General Unsecured Claims.  In addition, Claims in Class 15 (Eminent Domain/Inverse Condemnation Claims) are receiving a more favorable recovery under the HTA Plan to the extent it is determined by a Final Order such Claims may not be impaired or discharged, unlike other unsecured Claims.  As such, it is reasonable and justified for Claims in Class 15 to receive a more favorable treatment than HTA General Unsecured Claims in such event.  If a Final Order determines such Claims may be impaired or discharged just as unsecured Claims may be impaired or discharged, Claims in Class 15 shall receive the same recovery as Claims in Class 16.

122.    <u>Section 510(b) Subordinated Claims</u>.  Class 18 (Section 510(b) Subordinated Claims), which will not receive any recovery pursuant to the HTA Plan, constitutes Claims

subordinate to general unsecured Claims.  As there are no classes with equal priority in the HTA

Plan, there can be no unfair discrimination with respect to that Class.

123.    <u>Eminent Domain/Inverse Condemnation Claims</u>.  As discussed above, the First

Circuit affirmed the Title III Court's ruling that the Takings Clause creates an irreducible

entitlement to just compensation that cannot be discharged or impaired in a bankruptcy case.  *See*

*supra* ¶ 39.  As such, subject to further review and reversal by the United States Supreme Court

upon a writ of certiorari, Claimants in Class 15 of the HTA Plan will be paid in full to the extent

that the amount of their Claim is in excess of deposits submitted by HTA with the Clerk of the

Court of First Instance in connection with condemnation proceedings underlying such Claims.  *See*

*supra* ¶ 40.  In the event that the United States Supreme Court grants certiorari and reverses the

decision by the First Circuit, Eminent Domain/Inverse Condemnation Claims will be discharged

and will receive the same treatment provided to holders of Claims in Class 16 (HTA General

Unsecured Claims).  Accordingly, the HTA Plan does not unfairly discriminate against such

Claims.

> **(ii)    The HTA Plan Is Fair and Equitable with Respect
> to the Rejecting Classes and Complies with the
> Requirements of 11 U.S.C. § 1129(b)(2)(B).**

124.    Section 1129(b)(2)(B) of the Bankruptcy Code—the codification of the absolute

priority rule—provides that for a plan to be fair and equitable with respect to unsecured

claimholders, such creditors may receive less than the value of their claims as of the effective date

of a plan only if no class of junior claims or interests receives any distribution on account of the

claims therein.  11 U.S.C. § 1129(b)(2)(B).

125.    No class of Claims junior to unsecured Claims will receive distributions under the

HTA Plan and no class of senior Claims will receive more than 100% on account of such Claims.

126.    The HTA Plan is thus fair and equitable with respect to the rejecting Classes, and accordingly satisfies section 1129(b)(2)(B) of the Bankruptcy Code.

**B.   PROMESA § 314(b)(2):  The HTA Plan Fully Complies with Title III of PROMESA**

127.    There is little to no legislative history on Section 314(b)(2) of PROMESA.  As its language mirrors that of Section 314(b)(1) of PROMESA, which in turn is modeled on section 1129(a)(1) of the Bankruptcy Code, the Oversight Board submits it is instructive.  *See, e.g.*, *Lorillard v. Pons*, 434 U.S. 575, 581 (1978) (where "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.").

128.    As set forth herein, the HTA Plan complies fully with the requirements of sections 314(b)(1)–(7) of PROMESA, as well as other applicable provisions of the Bankruptcy Code. Accordingly, the HTA Plan complies with PROMESA Section 314(b)(2).

**C.   PROMESA § 314(b)(3):  The Debtor is Not Prohibited By Law From Taking Any Action Necessary to Carry Out the HTA Plan**

129.    PROMESA Section 314(b) provides, in relevant part, that a court "shall" confirm a plan if "the debtor is not prohibited by law from taking any action necessary to carry out the plan." *Id.* § 314(b)(3).

130.    The legislative history of PROMESA does not provide any guidance on PROMESA Section 314(b)(3).  Chapter 9 of the Bankruptcy Code contains an identical provision to PROMESA Section 314(b)(3)—Bankruptcy Code § 943(b)(4).  *See* 11 U.S.C. § 943(b)(4) ("The court shall confirm a plan if . . . the debtor is not prohibited by law from taking any action necessary to carry out the plan.").  There are very few opinions that analyze the parameters of Bankruptcy Code § 943(b)(4).  In *In re Sanitary & Improvement District No. 7*, 98 B.R. 970 (Bankr. D. Neb. 1989), the debtor proposed a plan of adjustment that issued new notes to the debtor's bondholder

49

at a discounted rate. *Id*. at 972–73.  There, completely ignoring the preemption necessary to render

all bankruptcy laws effective, certain bondholders objected to confirmation, arguing Bankruptcy

Code § 943(b)(4) was not satisfied because state law required bonds to be paid in full and the new

notes did not pay them in full on their prepetition claims.  *Id*. at 973.  The court held the debtor

could impair the bond claims and alter the principal amount, interest rate, and term of the bonds

notwithstanding the existence of state law requiring payment in full.  *Id*. at 974–75.  However, the

bonds issued under the chapter 9 plan had a call provision permitting payment at less than the par

amount of the new notes.  *Id*.  The court found this call provision was "prohibited by state law and

. . . prohibited by Section 943(b)(4) of the Bankruptcy Code."  *Id*. at 975.  The court reasoned the

new bonds "must be issued in conformance with state law and the terms of their redemption and

payment must be in conformance with state law."  *Id*. at 974.  The court determined the ability to

redeem the notes below par violated the state law requirement that bondholders must be paid in

full.  The Oversight Board does not subscribe to the notion that state law or territory law can limit

the types of debt distributable under a Title III plan, but that is not at issue here.

131.    Significantly, in the Title III context, the Tenth Amendment concerns that exist in

the chapter 9 context do not pose a similar barrier to any plan proposed by the Oversight Board or

the transactions to be carried out thereunder.  Accordingly, while the "law" referred to in section

943(b)(4) of the Bankruptcy Code generally refers to state law, under PROMESA, the "law" which

the plan cannot violate includes PROMESA, and, where applicable, PROMESA's preemption of

otherwise contrary Commonwealth laws.  Here, the HTA Plan contains no provisions which would

violate applicable law.  Like in *Sanitary & Improvement Dist. No. 7*, here, the HTA Plan impairs

prepetition Claims.  But, consistent with *Sanitary & Improvement Dist. No. 7*, the Debtor is not

seeking to implement post-HTA Effective Date actions which would require violation of

applicable law.  Further, any Commonwealth laws which otherwise require payments not provided

for by the HTA Plan are preempted.  *See infra* ¶¶ 182–194.

133. 132.    Accordingly, the HTA Plan satisfies PROMESA Section 314(b)(3).

**D.  PROMESA § 314(b)(4):  The HTA Plan Provides for Full Payment of All Allowed
Priority Claims**

133.    Section 1129(a)(9) of the Bankruptcy Code requires persons holding claims entitled

to priority treatment under section 507(a) of the Bankruptcy Code receive specified cash payments

under a plan.  *See* 11 U.S.C. § 1129(a)(9).   While PROMESA does not incorporate section

1129(a)(9), it does include an essentially identical requirement in Section 314(b)(4), which

provides that:

> The court shall confirm the plan if—except to the extent that the holder of a
> particular claim has agreed to a different treatment of such claim, the plan provides
> that on the effective date of the plan each holder of a claim of a kind specified in
> 507(a)(2) of title 11, United States Code, will receive on account of such claim cash
> equal to the allowed amount of such claim[.]

PROMESA § 314(b)(4).  The primary difference between the sections of PROMESA and the

Bankruptcy Code is PROMESA's exclusion of Bankruptcy Code requirements to pay types of

claims which do not exist in a Title III case under PROMESA.  For example, Bankruptcy Code

section 1129(a)(9)(A) provides unsecured claims allowed under section 502(f) of the Bankruptcy

Code are required to be paid in full.  *See* 11 U.S.C. § 1129(a)(9)(A).  As Bankruptcy Code section

502(f) contemplates claims arising in an involuntary case, which cannot occur under PROMESA,

the payment of the amount of such allowed claims in cash could not have been incorporated into

PROMESA.

134.    In accordance with PROMESA Section 314(b)(4), section 3.1 of the HTA Plan

provides that, on the later to occur of (a) the HTA Effective Date and (b) the date on which an

Administrative Expense Claim shall become an Allowed Claim, Reorganized HTA shall (i) pay to

each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such
Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense
Claim in accordance with such other terms agreed upon by and between the holder thereof and
Reorganized HTA; *provided*, *however*, that Allowed Administrative Expense Claims representing
indebtedness incurred in the ordinary course prior to the HTA Effective Date by the Debtor shall
be paid in full and performed by Reorganized HTA in accordance with the terms and subject to
the conditions of any agreement governing, investment evidencing, or other document relating to
such transactions, provided, further, that, if any such ordinary course expense is not billed, or a
written request for payment is not made, within one hundred fifty (150) days after the HTA
Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be
entitled to, or receive, a distribution pursuant to the HTA Plan.  *See* HTA Plan § 3.1.

## 1. The Support Agreement Administrative Expenses in the HTA Plan Should be Approved.

135.    As the Court knows from presiding over this Title III case from its inception, there
have been numerous and unforeseeable setbacks requiring renegotiations to account for the
economic hits caused by hurricanes, earthquakes, and the COVID-19 pandemic.  Thus, while
creditors in each class who negotiated and paid for their professionals to document agreements
benefitting their entire classes are entitled to compensation based on the consistent jurisprudence
cited below, these cases provide a special reason justifying such compensation.  In this Title III
case, creditors (and the Debtor) learned that any negotiated transaction might be delayed and might
have to be revised due to circumstances outside anyone's control.   Under these special
circumstances, it would have been impracticable to expect creditors to undertake the effort and
expense of negotiating and documenting complex transactions without being compensated because
no one could know whether and when any given settlement might be consummated.

136.    The HTA Consummation Costs, HTA Restriction Fee, and DRA Restriction Fee (collectively, the "Support Agreement Administrative Expenses") included in Sections 3.3–3.5 of the HTA Plan should be approved as administrative expenses.  Here, the Support Agreement Administrative Expenses are classified as Administrative Expense Claims in the HTA Plan because they are not payments on account of prepetition claims held by the Administrative Expense Parties.  *See* HTA Plan §§ 3.3–3.5.  Instead, as described in the HTA Plan and in the Disclosure Statement, the payment of the Support Agreement Administrative Expenses is being made to compensate the Administrative Expense Parties for the cost of the negotiation, confirmation, and consummation of the various support agreements and the HTA Plan, and in consideration of (a) the negotiation, execution and delivery of the various support agreements and (b) the obligations and covenants contained therein, as applicable.  *See supra* ¶¶ 72, 79.  Thus, the Support Agreement Administrative Expenses are being paid on account of the actual and necessary expenses in negotiating, and performing under, the various support agreements, which settle extremely complex issues and allow the Debtor to emerge from bankruptcy in an expedited fashion without squandering value in continued contentious litigation to the detriment of the Puerto Rico people and all claimholders as a whole.

137.    As a result, the Support Agreement Administrative Expenses are properly considered administrative expenses under section 503(b)(1)(A), which authorizes the payment of the "actual, necessary costs and expenses of preserving the estate[.]"  11 U.S.C. § 503(b)(1)(A).  In each instance, the creditors receiving the payments negotiated and documented deals benefitting their whole class, yet paid all the fees on the creditors' side.

138.    This Court has approved the distribution of similar administrative expenses in conjunction with the Commonwealth Title III case and the COFINA Title III case.  *See* Commonwealth Confirmation Order ¶¶ 46, 48–51; COFINA Confirmation Order ¶ 28.

139.    Case law supports the payment of the Support Agreement Administrative Expenses.  In *In re CHC Grp. Ltd.*, No. 16-31854, 2017 Bankr. LEXIS 1016 (Bankr. N.D. Tex. Mar. 3, 2017) [ECF No. 1794], Chief Judge Houser approved a plan that provided some members of class 5 with a "put option premium", and held that such premium does not constitute impermissible disparate treatment in violation of section 1123(a)(4) of the Bankruptcy Code, but is instead consideration paid in return for the plan sponsors' agreement to backstop the rights offering pursuant to the plan.  *Id.* at 52–54; *see also In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) (no violation of section 1123(a)(4) when only certain second lien noteholders were permitted to participate in a backstop of a rights offering, and the court ruled that "[h]ere, all holders of allowed Second Lien Note claims are classified together, and receive the same treatment on account of their claims").

140.    Other cases provide additional support for allowing payment of the Support Agreement Administrative Expenses.  In *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013), following months of negotiation, various holders of second and third lien debt (the "Restructuring Support Parties") entered into a restructuring support agreement.  In it, the Restructuring Support Parties pledged to support a plan that contemplated the debtors selling substantially all of their assets, so long as the debtors could obtain a sufficiently high price.  The debtors filed a plan based on the restructuring support agreement, which, among other things, sought to pay the "legal and professional fees of the Restructuring Support Parties."  *Id.* at 300.

Other parties objected to this as a violation of section 1123(a)(4), as it gave certain members of the classes of second and third lien debt "extra" compensation.

141.    The Bankruptcy Court for the District of Delaware held the payments were permissible, holding the payments were permitted under section 503(b)(1)(A) as an actual, necessary cost of the reorganization. For various reasons, including that the Restructuring Support Parties had also supported the debtors' debtor-in-possession financing requests and the fees were also approved under the debtor-in-possession financing order entered in the case, the court agreed with the debtors that in helping draw up the restructuring support agreement, the Restructuring Support Parties "performed a central role in the formulation of the confirmable Plan and to otherwise keep these proceedings moving forward." *Id.* at 301. As such, the court held that:

> Allowance of the fees and expenses under § 503(b) is supported by the record in these proceedings and by the Court's own observations that, in the absence of the laboriously negotiated resolution built into the RSA and the Plan, these cases would either have either dragged on (expensively) for many more months or devolved (much more expensively) into ferocious litigation between and among the Debtors and their stakeholders. Accordingly, the Court finds that the Debtors have carried their burden to demonstrate that payment of the professional fees and expenses of the Restructuring Support Parties is permissible pursuant to Bankruptcy Code § 503(b).

*Id.* As a result, the court held that the plan did not violate section 1123(a)(4). This was because the Restructuring Support Parties were getting the same treatment under the plan as all other members of the same class. While recognizing the professional fee payments were a "substantial sum," the court held the payments did not represent an "enhanced distribution," but rather, separate payments justified by section 503 (and by the previously entered debtor-in-possession financing order).

142.    The parallels between *In re Indianapolis Downs* and the facts here are substantial. As such, the Support Agreement Administrative Expenses should be properly seen as a permissible

payment under section 503 that is *not* on account of the creditors' prepetition claims, and therefore permissible under section 1123(a)(4).

143.    Other cases also support the legitimacy of the Support Agreement Administrative Expenses.  For example, in *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 672 (Bankr. D.D.C. 1992), the plan classified a variety of partners of a law firm together and gave them all the same distribution.  The plan also provided that certain partners who agreed to contribute funds to the plan to release certain other parties would receive the benefit of a permanent injunction of claims against them.  This was challenged as a violation of Bankruptcy Code section 1123(a)(4), on the grounds some partners would end up benefitting from the permanent injunction, while others in the same class would not.

144.    The court held this was not a violation of section 1123(a)(4) because "[t]he plan's provisions dealing with partner contributions, releases, and the permanent injunction have no connection to a partner's status as a claim or interest holder within a particular class.  These provisions constitute a separate feature of the plan, designed to allow adequate funding of the plan." *Id.*  "This policy is applied to every partner without regard to his status as a claim or interest holder.  As such, it does not constitute treatment of a claim of a particular class for purposes of § 1123(a)(4)." *Id.*

145.    Similarly, the Support Agreement Administrative Expenses do not constitute treatment on account of the Administrative Expense Parties' prepetition claims and, therefore, their payment does not violate Bankruptcy Code section 1123(a)(4).  Each category of Support Agreement Administrative Expenses Fees is described below.

146.    HTA/CCDA PSA Fees.  The HTA Plan provides for the payment of the following fees and costs incurred in connection with the HTA/CCDA PSA:

- ***HTA Consummation Costs.*** Creditors party to the Initial HTA/CCDA PSA at its execution are entitled to a *pro rata* share of cash in an amount equal to 1.00% of the aggregate amount of such holders' or insurers' HTA 68 Bond Claims, HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Assured) and HTA 98 Senior Bond Claims (National) (insured or otherwise and, with respect to each of Assured and National, including positions that it holds or has insured), without duplication.  HTA Plan § 3.3.

- ***HTA Restriction Fee.*** HTA/CCDA PSA Creditors will receive a HTA Restriction Fee in an aggregate amount equal to the product of (A) the percentage equal to (a) One Hundred Twenty-Five Million Dollars ($125,000,000.00) minus such amounts as may be payable on account of Consummation Costs, divided by (b) the aggregate amount of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National) held or, in the case of a Monoline, either held or insured and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, governing documents, and applicable law, by HTA/CCDA PSA Restriction Fee Creditors, times (B) the aggregate amount of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National) (without duplication and, to the extent any such Claims are Monoline-insured, solely to the extent an HTA/CCDA PSA Restriction Fee Creditor is authorized to vote any such Claim) held or, in the case of the Monolines held or insured, by such HTA/CCDA PSA Restriction Fee Creditor as of the expiration of the HTA/CCDA PSA Restriction Fee Period.  HTA Plan § 3.4.

147.    The HTA Consummation Costs are in consideration for the fees and expenses incurred by such holders or insurers in connection with the negotiation and execution of the HTA/CCDA PSA and the prosecution of the approval of the Disclosure Statement and confirmation of the HTA Plan.  *See* Skeel Decl. ¶ 143.  Additionally, the HTA Restriction Fee is in consideration for executing the HTA/CCDA PSA and agreeing to tender and "lock-up" such party's bonds in accordance with the terms of the HTA/CCDA PSA.  *See id.*

148.    In considering the "net" cost of paying the HTA Consummation Costs and HTA Restriction Fee, which total an aggregate of $125,000,000, it must be noted that the bondholders receiving such fees hold nearly $3.350 billion in outstanding HTA 68 Bond Claims and HTA 98 Senior Bond Claims, respectively.  Thus, assuming that the HTA Consummation Costs and HTA

Restriction Fee would have been available for distribution to all holders of HTA 68 Bonds Claims and HTA 98 Senior Bond Claims, approximately 84.6% of the HTA Consummation Costs and HTA Restriction Fee would have been distributed to the holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims party to the HTA/CCDA PSA in the absence of the HTA Consummation Costs and the HTA Restriction Fee. Accordingly, the HTA Consummation Costs and HTA Restriction Fee provide for a "net" incremental payment of approximately 0.6% of the total HTA 68 Bond Claims and HTA 98 Senior Bond Claims of the Creditors who are party to the HTA/CCDA PSA, for a total net amount of $19.3 million.

149.    <u>DRA Restriction Fees</u>. The HTA Plan provides for the payment of $15,000,000.00 to the DRA Parties incurred in exchange for executing the DRA Stipulation, and the DRA Parties agreeing to all of its terms and conditions, including the agreement to "lock-up" their HTA 98 Senior Bonds and the HTA/GDB Claims. *See* HTA Plan § 3.5.

150.    The Debtor has the authority to use its property as it sees fit, including to pay the Support Agreement Administrative Expenses to parties who significantly contributed to the HTA Plan. In general, under chapter 11 of the Bankruptcy Code, both sections 1129(a)(4) and 363(b) prohibit the payment of expenses such as the Support Agreement Administrative Expenses without prior court approval. *See* 11 U.S.C. § 1129(a)(4) ("The court shall confirm a plan only if all of the following requirements are met . . . [a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."); 11 U.S.C. § 363(b)(1) (The trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate").

151.    However, similar to chapter 9 of the Bankruptcy Code, PROMESA does not incorporate either of these provisions into Title III.  *See* PROMESA § 301(a); 11 U.S.C. § 901(a). Accordingly, the Debtor can make these payments without seeking prior court approval.  Even though the Support Agreement Administrative Expenses could be paid by the Debtor at any time, the Debtor has structured the payments to coincide with the HTA Effective Date to guarantee that such payments are only made if and when the HTA Plan has been consummated.

152.    As provided for by the HTA Plan, the Support Agreement Administrative Expenses shall be paid in Cash on the HTA Effective Date.  All other Allowed Administrative Expense Claims, if any, will likewise be paid pursuant to the terms of Section 3.1 of the HTA Plan.  Thus, the requirements of PROMESA Section 314(b)(4) are satisfied.

### E.  <u>PROMESA § 314(b)(5):  The HTA Plan Has Obtained All Necessary Legislative, Regulatory, and Electoral Approvals</u>

153.    PROMESA Section 314(b)(5) provides the court shall confirm a plan if, among other things, "any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval."  PROMESA Section 314(b)(5) is plainly modelled upon Bankruptcy Code section 943(b)(6), which requires, in chapter 9 cases, that "any legislative, regulatory, or electoral approval necessary under applicable [nonbankruptcy] law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval."  *See, e.g.*, Congressional Research Service, *The Puerto Rico Oversight, Management, and Economic Stability Act* (PROMESA; H.R. 5278, S. 2328) at 17 (2016).

154.    Here, there are no transactions contemplated pursuant to the HTA Plan requiring any legislative, regulatory, or electoral approvals.  Accordingly, the HTA Plan satisfies PROMESA Section 314(b)(5).

**F.   PROMESA § 314(b)(6):  The HTA Plan is in the Best Interests of Creditors and is Feasible**

   **1.   The HTA Plan is in the Best Interests of Creditors.**

155.     Section 943(b)(7) of the Bankruptcy Code requires a plan to be in the "best interests" of claimholders and interest holders.  11 U.S.C. § 943(b)(7).  The best interests of creditors test in chapter 9 under the Bankruptcy Code "simply requires the Court to make a determination of whether or not the plan as proposed is better than the alternatives."  *In re Sanitary & Improvement Dist.*, No. 7, 98 B.R. at 974.  If it is not at least as good, a plan under chapter 9 is not confirmable.

156.     A different test exists in Title III of PROMESA.  PROMESA Section 314(b)(6) requires the Court to "consider" whether creditors may recover more under non-bankruptcy laws.  Section 314(b)(6) does not impose a litmus test for whether a Title III plan of adjustment can be confirmed.  Specifically, Section 314(b)(6) provides:

> The court shall confirm the plan if—the plan is feasible and in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan.

PROMESA § 314(b)(6).

157.     The chapter 9 best interests test is applied to creditors collectively, not individually, consistent with the wording of PROMESA Section 314(b)(6).  *See* Commonwealth Findings of Fact ¶ 212 ("PROMESA's best interests test requires the Court only to consider whether creditors of each Debtor in the aggregate receive an equal or greater recovery on their Claims pursuant to the Plan than they would outside of Title III if the Debtor's Title III case were dismissed and creditors exercised their remedies.").

158.     *In re City of Detroit* held that "[c]onfirmation may not be denied simply because some creditors may do better upon dismissal . . . The Court finds that the plan is in the best interests

of the creditors as a whole." *In re City of Detroit*, 524 B.R. at 217; *see also In re City of Stockton*, 542 B.R. at 286 ("We conclude that the 'best interests' test in chapter 9 considers the collective interests of all concerned creditors in a municipal plan of adjustment rather than focusing on the claims of individual creditors."). This interpretation (that the test applies to creditors as a whole) is further corroborated by the plain language of Section 314(b)(6) of PROMESA, which uses the plural "creditors" when discussing the best interests test. Accordingly, for the HTA Plan to be in the best interests of creditors, the Court need consider whether creditors in the aggregate receive at least an equal percentage recovery on their Claims pursuant the HTA Plan as such creditors would receive if no plan of adjustment were confirmed, the Title III case were dismissed, and the stay of debt enforcement is terminated. The statute's direction that the Court "consider" the best interest test shows it is not a litmus test and the Court can also consider the Commonwealth's needs for its people and sustainability. *See* Commonwealth Findings of Fact ¶ 211. The Court can also consider that creditors in Title III are not granted allowable Claims for postpetition interest. That is barred by Bankruptcy Code section 502(b)(2). Here, nearly five years have passed, generating interest claims cognizable outside Title III, but not inside Title III.

159. The Shah Declaration[13] establishes the HTA Plan is in the best interests of the creditors. Specifically, the Shah Declaration explains that the analysis performed in the best interests test report for HTA (the "Report") shows that creditors, in the aggregate, will receive a recovery on their claims under the HTA Plan in the aggregate that is within the range or greater than the range of the projected recoveries for such claimholders in the aggregate in the Report. *See* Shah Decl. ¶ 10. A chart setting forth the comparison recoveries under the HTA Plan and the aggregate recoveries (or range of aggregative recoveries) projected in the Report is set forth below.

---

[13] *Declaration of Ojas N. Shah in Respect of Confirmation of Fourth Amended Titel III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [ECF No. 1359] (the "Shah Declaration").

| Aggregate Plan Recoveries for HTA Claimholders (% and $) | Aggregate Recoveries in the Report for HTA Claimholders (% and $) |
|---|---|
| 24%; $1,630 million | 11% to 28%; $706 million to $1,847 million |

*See id.* ¶ 21.  Accordingly, the HTA Plan is in the best interests of HTA's creditors.

160.    *Collier* suggests the chapter 9 "best interests" test acts as a floor requiring a reasonable effort at payment of creditors by the municipal debtor, and the "feasibility" requirement sets a corresponding ceiling which prevents the chapter 9 debtor from promising more than it can deliver.  6 Collier on Bankruptcy ¶ 943.03[7] (16th ed. 2021); *In re Mount Carbon Metro. Dist.*, 242 B.R. at 34.

161.    Here, the dismissal of the Title III Case will result in lower economic growth and worse financial recoveries for all creditors of HTA.  Courts have also acknowledged the instability that would result from lifting the automatic stay and allowing creditors to pursue remedies under Commonwealth law.  *See In re City of Detroit*, 524 B.R. at 216 ("the Court finds that chaos would ensue if the City's creditors engaged in the proverbial 'race to the courthouse' to obtain judgments against the City upon the dismissal of the chapter 9 case.  Moreover, the state courts would be powerless to order the City's creditors to compromise their debts to ensure anything like an equitable or fair distribution.  *Cf. Sanitary & Improvement Dist., No. 7*, 98 B.R. at 975–76.").

162.    If the HTA Plan were not confirmed, the parties will likely lose the benefit of the various settlements resolving the numerous disputes relating to the HTA Bonds, and the GDB/HTA Loans.  Litigation with respect thereto will continue in an all-or-nothing fashion.  Even if an individual creditor might do better if HTA's Title III Case were dismissed, in the aggregate, all creditors receive better treatment pursuant to the HTA Plan than if the HTA Plan is not confirmed and the Title III Case is dismissed.  The overwhelming acceptance of the HTA Plan by the various classes indicates such creditors believe this HTA Plan to be in their best interests.

### 2.   The HTA Plan is Feasible.

163.    Both PROMESA and chapter 9 contain the same language requiring the plan to be feasible.  Therefore, the PROMESA feasibility inquiry should be the same as in chapter 9, *i.e.*, whether the plan offers a reasonable prospect of success and is workable.

164.    This Court has held that the core inquiry is as follows:

"Is it likely that the [debtor], after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of [the debtor] and to meet the obligations contemplated in the Plan without the significant probability of a default?"

Commonwealth Findings of Fact ¶ 188 (citing *In re City of Detroit*, 524 B.R. at 222).

165.    Here, the HTA Plan is feasible.

### a.    The HTA Plan is Not Likely to Be Followed By the Need for Further Financial Reorganization.

166.    Confirmation of the HTA Plan is not likely to be followed by the need for further unanticipated financial restructuring.  *See* Brownstein Decl. ¶ 49.[14]  As set forth in the Brownstein Declaration, this conclusion is based on a number of factors: (i) HTA has the resources and liquidity necessary to make the payments on the HTA Effective Date that it is required to make; (ii) the HTA Plan reduces HTA's debt to an amount which the HTA 2022 Fiscal Plan projects HTA will be able to pay; (iii) the HTA Plan and New HTA Bonds Indenture include multiple provisions, including the Toll Rate Covenant, which, along with a significant cash reserve HTA will maintain for contingencies, are designed to ensure HTA can cover projected debt obligations; (iv) HTA will be able to pay the HTA Moscoso Bonds; and (v) HTA's operating revenues, as well as projected appropriations from the Commonwealth in accordance with the Commonwealth 2022 Fiscal Plan, are sufficient to cover HTA's maintenance and operating expenses and other required disbursements.  *See id*.

---

[14] *Declaration of David M. Brownstein in Respect of Confirmation of Fourth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [ECF No. 1358] (the "Brownstein Declaration").

      **b.**        **HTA's Liquidity is Sufficient for HTA Effective Date Cash Obligations and to Fund the GUC Reserve.**

167.　　HTA is required to make payments of up $167.5 million on the HTA Effective Date. *See* Brownstein Decl. ¶ 50. Excluding payments with respect to the New HTA Bonds and Subordinated Indebtedness, HTA is further expected to make one more payment of $24 million to the GUC Reserve on the one-year anniversary of the HTA Effective Date. HTA also will be required to make payments to holders of Claims in Class 15 (Eminent Domain/Inverse Condemnation Claims) and Class 20 (Federal Claims). *See* HTA Plan §§ 19.1, 24.1.

168.　　The remaining proceeds of the Commonwealth Loan, the amount of which was established in order for HTA to pay HTA Effective Date obligations required pursuant to the HTA Plan and to fund the GUC Reserve, will provide the cash required to be paid on the HTA Effective Date. Likewise, the payment to the GUC Reserve on the first anniversary of the HTA Effective Date will be made from the proceeds of the Commonwealth Loan. *See* Brownstein Decl. ¶ 51. Accordingly, HTA will be able to satisfy HTA Effective Date obligations and will be able to pay the GUC Reserve as required by the HTA Plan. *See id*.

      **c.**        **HTA Will Be Able to Satisfy Obligations Pursuant to the New HTA Bonds and the Subordinated Indebtedness.**

169.　　On the HTA Effective Date, the aggregate principal amount of funded indebtedness will equal approximately $1.6 billion, a significant reduction from the $6.4 billion in such indebtedness that existed prior to the HTA Effective Date. Similarly, average annual debt service for HTA will be approximately $90 million, compared to $294 million prior to confirmation. Annual debt service is therefore significantly lower than it was prior to the HTA Petition Date, and debt levels will continuously decline and remain low until full repayment of the New HTA Bonds, which is projected to occur in 2062. *See id.* ¶ 52.

170.    In accordance with the New HTA Bonds Indenture, the holders of the New HTA

Bonds and Subordinated Indebtedness will be granted a security interest in certain toll revenues

and toll fines that HTA will receive, until such debts are extinguished.  The protections of this

security interest will provide the holders of the New HTA Bonds and Subordinated Indebtedness

with a property interest and lien in such revenues when they arise.  As explained in the Brownstein

Declaration, the projected toll and fine revenues will be sufficient to pay those obligations pursuant

to the HTA Plan.  *See id.* ¶ 53.

### d.    HTA Will Be Able to Satisfy Its Obligations With Respect to the HTA Moscoso Bonds.

171.    The HTA Moscoso Bonds have continued to pay regularly scheduled debt service

since the HTA Petition Date.  *See id.* ¶ 58.  The HTA Moscoso Bonds are paid by the

concessionaire from their collections of toll revenues and, following the HTA Effective Date, it is

expected that the concessionaire and the toll revenues securing the HTA Moscoso Bonds will

remain sufficient to satisfy payments in full.  *See id.*

### e.    HTA Is Projected to Be Able to Satisfy Its Maintenance and Operating Expenses and to Pay Eminent Domain/Inverse Condemnation Claims and Federal Claims as Such Claims Become Due.

172.    The HTA 2022 Fiscal Plan provides for sufficient revenue to satisfy debt service to

bondholders through modest increases in toll and fine revenue while maintaining significant cash

reserves.  *See id.* ¶ 59.  If HTA fully and promptly implements the measures in the HTA 2022

Fiscal Plan, the HTA 2022 Fiscal Plan projects that HTA could achieve operational surpluses as

early as Fiscal Year 2023.  *See id.* ¶ 61.  As set forth in the Brownstein Declaration, to the extent

Eminent Doman/Inverse Condemnation Claims are payable on the HTA Effective Date, HTA will

be able to pay such Claims from cash on hand.  *See id.* ¶ 63.  Additionally, HTA has more than

sufficient cash on hand and future expected liquidity to cover obligations arising from Eminent Domain/Inverse Condemnation Claims and Federal Claims. *See id.*

173.    Accordingly, the HTA Plan is feasible and is not likely to result in the need for a further restructuring.

**G.  PROMESA § 314(b)(7):  The HTA Plan is Consistent with the HTA 2022 Fiscal Plan**

174.    PROMESA Section 314(b)(7) requires that the HTA Plan be consistent with the HTA 2022 Fiscal Plan certified by the Oversight Board.  The Debtor believes the HTA Plan is consistent with the HTA 2022 Fiscal Plan, and the Oversight Board has certified that the HTA Plan is indeed consistent with the HTA 2022 Fiscal Plan pursuant to PROMESA Section 104(j).

175.    On February 22, 2022, the Oversight Board certified the HTA 2022 Fiscal Plan. Among other things, the HTA 2022 Fiscal Plan provides updates from prior fiscal plans, as well as incorporates fiscal measures that generate revenues and optimize expenses from prior fiscal plans, including, (i) inflation-based increases on toll fares and fines, (ii) new electronic systems for toll collection, (iii) transit enhancements, (iv) the re-assessment of Tren Urbano contracts and the reduction of healthcare expenses, and (v) pressing HTA to implement much-needed reform measures including, (a) the Transportation Sector Reform, (b) transferring ownership of Tren Urbano to PRITA, (c) setting up a dedicated toll road management office, and (d) pursuing a P3 to access new sources of capital funding. *See* Skeel Decl. ¶ 93.

176.    Similarly, as part of the Title III process, Section 104(j)(2) of PROMESA requires the Oversight Board to certify the submission or modification of the HTA Plan.  Section 104(j)(3) of PROMESA provides that the Oversight Board may certify the filing of the HTA Plan only if it determines, in its sole discretion, that the HTA Plan is consistent with the HTA 2022 Fiscal Plan. On August 5, 2022, the Oversight Board certified submission of the HTA Plan.  *See* Skeel Decl.

¶ 43.[15]  Accordingly, the HTA Plan is consistent with the HTA 2022 Fiscal Plan.  *See id.* ¶ 94; *see also* Brownstein Decl. ¶ 44.

### H.  Bankruptcy Code Section 1127 and Bankruptcy Rule 3019: The HTA Plan May Be Modified Without Resolicitation Because the Modifications Do Not Adversely Change the Treatment of Claims of Creditors

177.    The Oversight Board filed the HTA Plan on August 7, 2022, after the Voting Deadline had passed.  The HTA Plan contains technical changes as compared to the Third Amended Plan for which creditors' votes were solicited.  These changes do not adversely affect the treatment of any Claims and do not materially or adversely modify the treatment to be afforded to creditors pursuant to the Third Amended Plan.

178.    Section 1127(a) of the Bankruptcy Code provides, in relevant part, that "[t]he proponent of a plan may modify such plan at any time before confirmation" so long as the modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code (*i.e.*, the provisions governing classification of claims or interests under a plan, and the mandatory and permissive contents of a plan, respectively).  11 U.S.C. § 1127(a); *see also In re Burnsbrooke Apartments of Athens, Ltd.*, 151 B.R. 455, 457 (Bankr. S.D. Ohio 1992) ("preconfirmation modifications of a Chapter 11 plan . . . may be done at any time prior to confirmation").  Section 1127(c) further provides that "[t]he proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified."  11 U.S.C. § 1127(c).  "Section 1125, in turn, mandates particular postpetition disclosure and solicitation requirements by the plan proponent."  *In re Boylan Int'l, Ltd.*, 452 B.R. 43, 51 (Bankr. S.D.N.Y. 2011).  "If the proposed modification is sufficiently minor, the existing disclosure may suffice."  *In re Concrete Designers, Inc.*, 173 B.R. 354, 356 (Bankr. S.D. Ohio 1994).

---

[15] To the extent the Oversight Board certifies a revised HTA Fiscal Plan prior to the occurrence of the HTA Effective Date, such revised fiscal plan for HTA will conform with the transactions contemplated in the HTA Plan.

179.    Courts applying section 1127 have held that post-solicitation nonmaterial plan modifications do not mandate re-solicitation of a chapter 11 plan.  *See, e.g.*, *In re Cellular Info. Sys.*, Inc., 171 B.R. 926, 929 n.6 (Bankr. S.D.N.Y. 1994) (finding changes made to plan after solicitation process was completed to be "nonmaterial modifications which do not require resolicitation of the respective impaired classes of creditors and equity security holders").  Rather, additional disclosure is required only when the proposed modifications (a) materially and adversely impact a claimant's treatment and (b) would cause such claimant to change their prior vote to accept to a vote to reject the plan.  *See In re Enron Corp.*, No. 01-16034, 2004 Bankr. LEXIS 2549, at *259–60 (Bankr. S.D.N.Y. July 15, 2004) ("The best test is whether the modification so affects any creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance.") (quoting 9 Collier on Bankruptcy 113019.01 (15th ed. Rev. 2004)).

180.    Such an approach is also consistent with Bankruptcy Rule 3019(a)—the rule designed to implement section 1127—incorporated into this Title III case by PROMESA Section 301(a), which provides, in relevant part that: "If the court finds . . . that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder . . . , [the modified plan] shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan."  Fed. R. Bankr. P. 3019(a); *see also In re Am. Solar King*, 90 B.R. 808, 825 n.32, 826 (Bankr. W.D. Tex. 1988) ("Bankruptcy Rule 3019 implements section 1127 . . . [and] allows a court to attribute prior acceptances to an amended plan where the modification 'does not adversely change' a claimant's treatment . . . Thus, if a modification does not 'materially' impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the amended plan as well.").

181.    Accordingly, the Court may confirm the HTA Plan without resolicitation.

## COMMONWEALTH LAWS INCONSISTENT WITH PROMESA ARE PREEMPTED

182.    Exhibit F to the HTA Plan sets forth the Commonwealth statutes that are subject to preemption because they are inconsistent with PROMESA.  These statutes are sections of the Puerto Rico Highway and Transportation Act (9 L.P.R.A. §§ 2001–2020) and the Uniform Rate Revision and Modification Act (27 L.P.R.A. § 261).  The detailed reasons for, and extent of, preemption is set forth in Exhibit A to the proposed *Findings of Fact and Conclusions of Law in Connection with Confirmation of the Fourth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* filed concurrently with this Memorandum.  In general, the statutes set forth on Exhibit F to the HTA Plan either authorize expenditures, contracts, or financing arrangements by HTA without Oversight Board authorization; provide for enforcement of bondholder rights; or to the extent applicable, regulate toll rates in a manner inconsistent with the HTA Plan, Plan Supplement, or HTA Fiscal Plan.

183.    Under the United States Constitution's Supremacy Clause, federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  A state law that runs afoul of the Supremacy Clause is thus "a nullity" and is preempted.  *Mass. Ass'n of Health Maint. Orgs v. Ruthhardt*, 194 F.3d 176, 178 (1st Cir. 1999).[16]

184.    Preemption can be express (through a preemption provision) or implied (where state law makes impossible or poses an obstacle to compliance with federal law).  *Arizona v. United States*, 567 U.S. 387, 399–400 (2012).  Both forms of preemption apply here.

---

[16] The laws of Puerto Rico are the "functional equivalent" of state laws for preemption purposes.  *Antilles Cement Corp. v. Fortuño*, 670 F.3d 310, 323 (1st Cir. 2012).

185.    Specifically, PROMESA's express preemption provision, section 4, is broad and unequivocal: "The provisions of this Act *shall prevail* over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act."  PROMESA § 4 (emphasis added).

186.    Regarding implied preemption, there are two types:  (i) "impossibility preemption" occurs when "compliance with both federal and state [law] is a physical impossibility"; and (ii) "obstacle preemption" occurs when state law poses an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Arizona*, 567 U.S. at 399 (discussing impossibility preemption);[17] *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (discussing obstacle preemption); *see also Barnett Bank, N.A. v. Nelson*, 517 U.S. 25, 31 (1996) (same).[18]  In assessing obstacle preemption, the Court's "ultimate task . . . is to determine whether state regulation is consistent with the structure and purpose of the [federal] statute as a whole," "[l]ooking to the provisions of the whole law, and to its object and policy."  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98, 103 (1992) (citation omitted).

187.    PROMESA's preemption of inconsistent Commonwealth laws is settled.  *See, e.g.*, *Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 916 F.3d 98, 116 (1st Cir. 2019) ("Under PROMESA's preemption provision, the grants of authority to the [Oversight] Board at §§ 201 and 202 to approve Fiscal Plans and Budgets 'prevail

---

[17] *See also AT&T Mobility v. Concepcion*, 563 U.S. 333, 343, 352 (2011) (holding state rule preempted by the Federal Arbitration Act because the rule stood "as an obstacle to the accomplishment of the FAA's objectives"); *Gustavsen v. Alcon Labs., Inc.*, 272 F. Supp. 3d 241, 246 (D. Mass. 2017) (when "'it is impossible . . . to comply with both state and federal requirements[,]' . . . the state law is preempted." (quoting *Pliva v. Mensing*, 564 U.S. 604, 618 (2011)), *aff'd*, 903 F.3d 1 (1st Cir. 2018).

[18] For this reason, statutes purporting to create obligations that frustrate or interfere with federal bankruptcy law are preempted.  *See, e.g.*, *Perez v. Campbell*, 402 U.S. 637, 654 (1971) (state law conditioning driver's license renewal on bankrupt paying discharged automobile tort judgment was preempted because it had the "effect of frustrating federal [bankruptcy] law"); *Int'l Shoe Co. v. Pinkus*, 278 U.S. 261, 265 (1929) ("States may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations.").

over **any** general or specific provisions of territory law' . . . .") (emphasis added) (citation omitted);
*Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 330 F. Supp. 3d 685, 701 (D.P.R. 2018) ("[A] budget approved and adopted by the Oversight Board as compliant with a certified fiscal plan becomes law . . . and inconsistent Commonwealth laws are preempted."), *aff'd*, 945 F.3d 3 (1st Cir. 2019), *cert. denied*, 141 S. Ct. 241 (2020).

188.    In addition to the express preemptive effect of PROMESA Sections 201 and 202, PROMESA Section 207 likewise expressly preempts inconsistent Commonwealth laws.   It prohibits the creation of, modification of, redemption of, or similar transactions affecting HTA debt without Oversight Board consent (as required under PROMESA such as PROMESA Sections 201–204 and 207).

189.    Title III of PROMESA also expressly preempts any Commonwealth law that would require payment in full of prepetition debt without regard to whether such an entitlement is provided in Title III or the HTA Plan.[19]  *See* Commonwealth Findings of Fact ¶ 155 ("[P]reempted provisions include . . . pursuant to section 4 of PROMESA, all laws, rules, and regulations, to the extent they give rise to obligations of the Debtors discharged by the Plan and the Confirmation Order pursuant to PROMESA, and such discharge shall prevail over any general or specific

---

[19] *See Cnty. of Orange v. Merrill Lynch & Co.* (*In re Cty. of Orange*), 191 B.R. 1005, 1021 (Bankr. C.D. Cal. 1996) ruling that Chapter 9 does not permit states to override the Bankruptcy Code's priority scheme through state laws that require certain creditors—such as bondholders—to be paid in full*); In re City of Detroit*, 504 B.R. 97, 161 (Bankr. E.D. Mich. 2013) ("state law cannot reorder the distributional priorities of the bankruptcy code."); *In re Sanitary & Imp. Dist., No. 7*, 98 B.R. 970, 974 (Bankr. D. Neb. 1989) ("If a municipality were required to pay prepetition bondholders the full amount of their claim with interest as contained on the face of the bonds … the whole purpose and structure of Chapter 9 would be of little value.  State law already requires full payment of the bonds issued prepetition and the state and the municipality are forbidden the opportunity to compromise the amounts due, without 100 percent consent of the bondholders.  To create a federal statute based upon the theory that federal intervention was necessary to permit adjustment of a municipality's debts and then to prohibit the municipality from adjusting such debts is not, in the point of view of this Court, a logical or necessary result.").

provisions of territory laws, rules, and regulations.").  Such Commonwealth laws would contradict Title III's provision of a broad discharge pursuant to a confirmed HTA Plan.[20]

190.    Here, under both express and implied preemption, Commonwealth laws that give rise to obligations of the Debtor discharged by the HTA Plan and the HTA Confirmation Order shall be preempted pursuant to PROMESA, and such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations.

### A.  Commonwealth Law Provisions Requiring Payment of Prepetition Debt in Full Are Preempted

191.    To the extent Commonwealth laws would require HTA to repay in full prepetition debt, without regard to fiscal plans or budgets certified by the Oversight Board, or the HTA Plan itself, such provisions are expressly and impliedly preempted, for the reasons discussed above. Such payment obligations run afoul of the Oversight Board's exclusive authority over HTA finances under Titles II and III; it is impossible to enforce such provisions *and* comply with Oversight Board-certified budgets and fiscal plans, or the HTA Plan; and enforcing such provisions would completely frustrate the purpose of PROMESA and the restructuring contemplated in the HTA Plan.

---

[20] Upon the HTA Effective Date, Claims predicated on breaches of prepetition promises are discharged to the extent not otherwise provided in the Plan.  *See* 11 U.S.C. § 944 ("The provisions of a confirmed plan bind the debtor and any creditor . . . . [T]he debtor is discharged from all debts as of the time when the plan is confirmed . . . ."); *id.* § 1123(a)(5) ("Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide adequate means for the plan's implementation, such as (A) retention by the debtor of all or any part of the property of the estate . . . ."); *In re Fin. Oversight & Mgmt. Bd.*, 361 F. Supp. 3d 203, 256-57 (D.P.R. 2019) ("The Settlement and the allocation of the Pledged Sales Taxes are necessary for the implementation of the Plan, and pursuant to Bankruptcy Code section 1123(a)(5), made applicable to COFINA's Title III Case pursuant to PROMESA Section 301(a), are ***self-executing and preemptive*** notwithstanding otherwise applicable nonbankruptcy law, including otherwise applicable Commonwealth law.") (emphasis added); *In re Pub. Serv. Co. of New Hampshire*, 108 B.R. 854, 893 (Bankr. D.N.H. 1989) (plan preempts inconsistent state regulatory requirements in the future to the extent of "the restructuring necessary and required for a feasible reorganization has been effectuated as part of a confirmed plan of reorganization").

B.  **Commonwealth Law Provisions Authorizing Issuance of New Debt Without Oversight Board Approval Are Preempted**

192.    PROMESA Section 207 is unequivocal: for so long as the Oversight Board is in operation, no debt may be issued, guaranteed, exchanged, modified, repurchased, or redeemed without Oversight Board approval.  To the extent provisions of Commonwealth law would purport to do so, PROMESA Section 4 expressly preempts such provisions because they (i) conflict with the Oversight Board's sole and exclusive authority over HTA finances under PROMESA, (ii) require payment in full of prepetition obligations that are not afforded priority under Title III of PROMESA, and/or (iii) would incur debt inconsistent with Title II of PROMESA and the certified HTA Fiscal Plan.

193.    Additionally, such provisions are impliedly preempted because they (i) cannot be enforced simultaneously with PROMESA Section 207, (ii) are inconsistent with the HTA 2022 Fiscal Plan and may also frustrate the feasibility of the HTA Plan (*cf.* PROMESA § 314(b)(6)), and (iii) would frustrate the purpose of PROMESA to enable Puerto Rico to regain fiscal responsibility and access capital markets.

C.  **Commonwealth Law Provisions Regulating the Modification of Toll Rates Are Preempted**

194.    As set forth above, the Oversight Board does not believe any Commonwealth statutes govern HTA's fixing of toll rates.  However, to the extent any party argues Commonwealth laws regulate the modification of toll rates fixed and charged for basic and essential services rendered by public corporations, outside the Oversight Board's Fiscal Plan, HTA Plan, and Plan Supplement, such provisions are expressly and impliedly preempted.  These statutes are inconsistent with PROMESA's provisions, purposes, and goals and, if they remain enforceable, would frustrate the setting of toll rates contemplated by the HTA Plan, Plan Supplement, or HTA 2022 Fiscal Plan.  Continued application of these statutes would significantly hamper the

Oversight Board's purpose to provide a method for Puerto Rico, including HTA, to achieve fiscal responsibility and access to capital markets, to the extent they provide a basis for HTA to set toll rates in contravention of the HTA Plan and HTA 2022 Fiscal Plan.

## THE INJUNCTION AND RELEASE PROVISIONS EMBODIED IN THE HTA PLAN ARE PERMISSIBLE AND SHOULD BE APPROVED

195.    The HTA Plan includes release, exculpation, and injunction provisions.  These discretionary provisions are proper because, among other things, they are an integral part of the hard fought settlements embedded in the HTA Plan, and are critical to obtaining the support of the Debtor's key creditors for the HTA Plan.  Such release, exculpation, and injunction provisions are fair and equitable, are not overbroad, are given for valuable consideration, and are in the best interests of the Debtor and its creditors.  The release, exculpation, and injunction provisions are consistent with the Bankruptcy Code and, thus, the requirements of section 1123(b) of the Bankruptcy Code are satisfied.

196.    The Court has jurisdiction under PROMESA Section 306 of the United States Code to approve the injunction, exculpation, and releases set forth in the HTA Plan.  In addition, section 105(a) of the Bankruptcy Code permits issuance of the injunction and approval of the releases and exculpation set forth in the HTA Plan.[21]

### A.  **The Debtor's Release of Claims Should Be Approved**

197.    Under Section 41.5 of the HTA Plan, except as otherwise expressly provided in the HTA Plan or the HTA Confirmation Order, on the HTA Effective Date, each of the Debtor and Reorganized HTA, the Disbursing Agent and each of the Debtor's and Reorganized HTA's

---

[21] To the extent granting of the release, exculpation, and injunction requires the Oversight Board to consent to the Court's jurisdiction over the release, exculpation, and injunction, the Oversight Board hereby provides a waiver for this purpose pursuant to PROMESA Section 305.

Related Persons proposed to release the Released Parties[22] from Claims or Causes of Action they may have against such Released Parties.  A plan that proposes to release a claim or a cause of action belonging to a debtor is considered a "settlement" for purposes of satisfying section 1123(b)(3)(A) of the Bankruptcy Code.  *See, e.g.*, *In re Midway Gold US, Inc.*, 575 B.R. 475, 509 & n.121 (Bankr. D. Colo. 2017) (citing *In re Spansion*, 426 B.R. 114, 142–43 n.48 (Bankr. D. Del. 2010)).

198.   Section 41.5 of the HTA Plan represents a valid settlement pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 of any Claims each of the Debtor and Reorganized HTA, the Disbursing Agent and each of the Debtor's and Reorganized HTA's Related Persons may have against the Released Parties in exchange for the treatment set forth in the HTA Plan with respect to such Released Parties' Claims against them.  Here, the Debtor's releases are in the best interests of the Debtor and represent a sound exercise of the Debtor's judgment.   The release of key negotiating claimholders and debtor fiduciaries is customary in a restructuring, and it would have been nearly impossible to convince the HTA/CCDA PSA Creditors, DRA Parties and Creditors' Committee to participate in negotiations and agree to settle, discharge, and release Claims against the Debtor had they not understood that the Debtor would be releasing Claims against them.  *See* Skeel Decl. ¶ 147.  Significantly, this is not a case where any Claims being released have been identified.  This is the classic situation in which the release is being requested to avoid future nuisance litigation.

199.   The settlement embodied in the releases complies with the standard set forth by the First Circuit in *Jeffrey v. Desmond*, 70 F.3d 183, 183 (1st Cir. 1995).  The releases are an integral

---

[22] The "<u>Released Parties</u>" are, "[c]ollectively, solely to the extent provided in the HTA Plan, (a) the Government Parties, (b) the HTA/CCDA PSA Creditors, (c) the Creditors' Committee, (d) the DRA and the DRA Parties, and (e) with respect to the foregoing clauses (a) through (d), each of their respective Related Persons."  HTA Plan § 1.263.

component of the HTA Plan.  *See* HTA Plan § 41.4.  The Debtor's releases are consistent with the

consensual nature of the HTA Plan.  The HTA Plan is a global compromise and integrated

settlement of Claims and causes of action among the Debtor and key stakeholders, embodied in

the provisions of Article II of the HTA Plan.  All parties involved in the negotiation and

development of the HTA Plan benefit from the certainty the releases provide.  The parties receiving

releases all made significant contributions to the negotiation and development of the HTA Plan,

and incurred costs and expenses during the course of their participation in the negotiations.  *See*

Skeel Decl. ¶ 149.

200.    The Debtor's releases constitute a sound exercise of the Debtor's judgment.  The

releases are fair, reasonable, and in the best interests of the Debtor.  It is in the Debtor's interest to

fully and finally resolve the HTA Title III Case, and the releases provided to the Released Parties

substantially increased the likelihood of success that the Debtor would be able to do so.  *See id.*

¶ 150.  The Debtor's releases incentivized the HTA/CCDA PSA Creditors and DRA Parties to

support, and undertake actions to support, the HTA Plan and its confirmation, without fear of

baseless lawsuits in the future.  In exchange for the Debtor's and Reorganized HTA's (and its

Related Persons') releases, the Debtor secured the substantial concessions reflected in the

settlements and, ultimately, the HTA Plan.  Consummation of the HTA Plan would have been

substantially less likely without the Debtor's releases.  *See id*.

201.    As part of the HTA/CCDA PSA and the DRA Stipulation, the Released Parties

have each made material contributions to the HTA Plan, which contributions have flowed directly

to the recovery afforded the claimholders and thus are indispensable to the HTA Plan.  For

example, by agreeing to the terms of the HTA Plan, there were accepting impaired classes of

creditors which would enable the HTA Plan to be confirmed.  This facilitated discussions with the

Creditors Committee and led to an agreement on the treatment of the general unsecured creditor class.  As a result, the HTA Plan is virtually completely consensual and the HTA/CCDA PSA and the DRA Stipulation provided a clear benefit to the Debtor.  Accordingly, as set forth above, the Debtor's release of the Released Parties represents a valid exercise of its authority, is necessary for the consummation of the HTA Plan, and should be approved.

202.    The Consensual Releases (defined below) provide for appropriate carve-outs to ensure the releases are not overly broad.  For example, the HTA Plan does not release Claims or Causes of Action against PREPA arising from or related to PREPA-issued bonds, including Monoline-issued insurance relating to such bonds.  The HTA Plan provides that such Claims and causes of action will be addressed in PREPA's Title III case, which is appropriate because PREPA-related Claims are not addressed in the settlements that form the basis for the HTA Plan.  *See* Skeel Decl. ¶ 152.

203.    Certain claims, causes of action, or other rights or powers held by the SEC, the United States, and parties to certain Underwriter Actions (as defined in section 1.291 of the HTA Plan) are also carved out from the HTA Plan's releases.  Likewise, as confirmed by the definition of Released Claims (*see* HTA Plan, Section 1.262), Claims against CCDA, MBA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA are not released under the HTA Plan, which entities are or may be subject to their own PROMESA proceedings.  These carve-outs help to ensure that only those releases reasonable and necessary to HTA Plan confirmation are being provided.  *See* Skeel Decl. ¶ 152.

### B.  <u>The Consensual Releases Should Be Approved</u>

204.    The HTA Plan also provides for (i) a discharge of the Debtor and Reorganized HTA and a release by all parties having Claims or Causes of Action against the Debtor or Reorganized HTA that arose, in whole or in part, prior to the HTA Effective Date (*see* HTA Plan § 41.2(a)),

and (ii) a release of Claims or Causes of Action by the HTA/CCDA PSA Creditors against the Government Releasees,[23] including those related to the Clawback Actions and Lift Stay Motions (*see* HTA Plan § 41.2(c)) (collectively, the "Consensual Releases").

205.     Courts have also widely acknowledged that it is also appropriate for a chapter 11 plan to contain consensual third party releases.[24]  Indeed, creditors are free to release by contract. Here, the releases in Section 41.2 of the HTA Plan are consensual.

206.     The Debtor submits that, under the circumstances of the Debtor's Title III Case, the Consensual Releases are appropriate and should be approved in their entirety.  The Consensual Releases seek only to release parties that made a significant contribution to the HTA Plan, including:

(a)  The Debtor and Reorganized HTA, from all Claims or Causes of Action, and from all Entities, *see* HTA Plan § 41.2(a)–(b);[25]

(b)  the Government Releasees, from all Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, who are being released by each of the parties to the plan support agreement and their respective Related Persons, *see id.* § 41.2(c); and

(c)  the Released Parties, from all Claims and Causes of Action that arose, in whole or in part, prior to the HTA Effective Date, relating to the Title III Case, the Debtor and Reorganized HTA or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the HTA Petition Date, and regardless of whether any property will have been

---

[23]   The "Government Releasees" are, collectively, "the Government Parties and the Debtor, including all instrumentalities, municipalities, public corporations and public agencies of the Commonwealth, together with their respective current or former board members, directors, principals, agents, officers, employees, advisors and professionals, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the Title III Case in their capacities as such; provided, however, that, notwithstanding the foregoing, 'Government Releasees' shall not include the Commonwealth, AFICA, CCDA, COFINA, ERS, MBA, MFA, PBA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA solely with respect to any Claims against or bonds issued by such Entities ."  HTA Plan § 1.146.

[24]  *See, e.g.*, *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005) ("Nondebtor releases may also be tolerated if the affected creditors consent"); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 218 (Bankr. S.D.N.Y. 2009) (third party releases "may . . . be used if the affected creditors consent"), *aff'd*, 2010 U.S. Dist. LEXIS 33253 (S.D.N.Y. Mar. 24, 2010).

[25]  The release of the Debtor and Reorganized HTA can also be justified as a discharge pursuant to section 944 of the Bankruptcy Code, made applicable to the Debtor's Title III case by PROMESA Section 301(a), which discharges the Debtor "from all debts as of the time when the plan is confirmed[.]"  11 U.S.C. § 944(b)(1).

distributed or retained pursuant to the HTA Plan on account of such Claims or Causes of Action. *See id.* § 41.2(a).

207.     The Consensual Releases are necessary and essential to the HTA Plan. They were negotiated with key stakeholders in the robust, arms'-length process described above. That process led to broad support for the restructuring framework contemplated by the HTA Plan, including the release provisions. The HTA Plan would not be successful without the claimholders' releases. The Consensual Releases provide the parties with assurance that their disputes will be fully and finally resolved upon confirmation of the HTA Plan, and help to enable the prompt, efficient conclusion of the Title III case by providing for a comprehensive resolution and settlement of these disputes. *See* Skeel Decl. ¶¶ 146–50.

208.     The Consensual Releases serve two simple but valuable functions: (i) incentivizing the applicable released parties to support, and undertake actions that support, confirmation of the HTA Plan without the fear of future lawsuits; and (ii) facilitating the Reorganized HTA's fresh start post emergence from the Debtor's Title III Case. *See, e.g.*, *In re BearingPoint, Inc.*, 453 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("[S]takeholders in chapter 11 cases, unhappy with their recoveries, have more than occasionally brought frivolous litigation against estate fiduciaries."); *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) ("The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'") (quoting *Grogan v. Garner*, 498 U.S. 279 (1991)). The Oversight Board submits that such objectives are well-warranted and support approval of the Consensual Releases. The releases are necessary and essential to the HTA Plan. *See* Skeel Decl. ¶ 150. Accordingly, the Consensual Releases should be approved.

C. **The Exculpation Sought In the HTA Plan Is Appropriate**

209.    This Court, as well as others in the First Circuit, have held that exculpation

provisions like the one in Section 41.7 of the HTA Plan (the "Exculpation Provision") are

appropriate when the parties are released or exculpated for acts or omissions in connection with or

related to the "the pursuit of confirmation of the Plan, the consummation of the Plan or the

Administration of the Plan or the property to be distributed under the Plan, except for willful

misconduct or gross negligence . . . ." *See* Commonwealth Findings of Fact ¶ 240; *see also In re*

*PWS Holding Corp.*, 228 F.3d at 245–47 (holding that release of, among others, debtors and

creditor committees, including such parties' officers, directors, employees, professionals and

advisors, was appropriate where it was given for activity related to the pursuit of the chapter 11

plan and excluded willful misconduct and gross negligence); *In re Montreal Me. & Atl. Ry.*, No.

13-10670, 2015 Bankr. LEXIS 3737, at *24, 26 (Bankr. D. Me. Oct. 9, 2015); *In re Yellowstone*

*Mountain Club, LLC*, No. 08–61570–11, 2009 WL 2163528, at *5 (Bankr. D. Mont. July 16, 2009)

(exculpation provision which does not release willful misconduct or gross negligence is "perfectly

proper"); *Murphy v. Weathers*, No. 7:07-CV-00027, 2008 WL 4426080, at *6 (M.D. Ga. Sept. 25,

2008) (exculpation which includes professionals other than just the creditors committee and its

members does not run afoul of section 524(e) of the Bankruptcy Code if it does not extend to acts

of gross negligence, willful misconduct, or breach of fiduciary duties); *In re Granite Broad. Corp.*,

369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation clause that excludes gross

negligence and intentional misconduct); *In re Oneida Ltd.*, 351 B.R. 79, 94 n.22 (Bankr. S.D.N.Y.

2006); *see also Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*, 326 B.R. 497, 504

(S.D.N.Y. 2005) (upholding exculpation provisions of plan that were "reasonable and customary

and in the best interests of the estates"); *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 261 (Bankr.

M.D. Fla. 2006) (exculpation appropriate where beneficiaries of exculpation had expectation of its approval, it was a result of negotiation, and the plan was overwhelmingly accepted).

210.   The parties who are beneficiaries of the Exculpation Provision (the "Exculpated Parties") include: (a) AAFAF; (b) the Oversight Board and each of its members; (c) each of the HTA/CCDA PSA Creditors solely in its capacity as a party to the HTA/CCDA Plan Support Agreement and a Creditor and/or insurer; (d) Ambac, Assured, FGIC, National, and their Related Persons, for any liability to any Entity for any act taken or omitted to be taken consistent with the HTA Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation, or approval of the HTA Plan; (e) each of the members of the Creditors' Committee, solely in its capacity as a member of the Creditors' Committee, and the Creditors' Committee, and each of the Creditors' Committee's Related Persons, and (f) each of the DRA and the DRA Parties up to and including the HTA Effective Date, and each of the DRA Parties' respective predecessors, successors and assigns, and their respective financial advisors, attorneys, accountants, consultants, agents, and professionals, or other representatives.   In general, the Exculpated Parties "shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case," among other things.   *See* HTA Plan § 41.7(a). Such Exculpated Parties have participated in good faith in formulating and negotiating the HTA Plan and should be entitled to protection for the activities engaged in during the Debtor's Title III Case.   In *PWS Holding Corp.*, the Third Circuit approved a plan provision exculpating, among others, the debtors, the reorganized debtors, a certain "Creditor Representative,"[26] the committee or any of their respective members, employees, and professionals from claims of creditors for "any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the pursuit

---

[26]   In *In re Genesis Health Ventures, Inc.*, 266 B.R. at 606 n.14, the bankruptcy court noted the "creditor representative" probably served a similar function to an administrative agent.

of confirmation of the Plan, the consummation of the Plan or the Administration of the Plan or the

property to be distributed under the Plan, except for willful misconduct or gross negligence . . . .”

*In re PWS Holding Corp.*, 228 F.3d at 246.  The *PWS* decision, and subsequent decisions in the

Third and other Circuits, have granted exculpations to entities serving functions that are similar in

nature to the Exculpated Parties.  *See, e.g.*, *W. Mining & Invs., LLC v. Bankers Trust Co.*, No.

C.A.02-1445, 2003 WL 503403, at *4 (D. Del. Feb. 19, 2003) (there is nothing inherently suspect

about a plan provision releasing, among others, the DIP lenders, bank lenders, and the committee,

from any liability for past, present, and future acts or omissions in connection with the sale and

liquidation of the debtor’s assets, other than those arising out of gross negligence or willful

misconduct); *In re Genesis Health Ventures*, 266 B.R. at 605–06 (approving exculpation clause

for administrative agents and lenders under various credit agreements, as well as their respective

members, officers, directors, employees, agents, or professionals, and noting, “to the extent that

[release provisions] set forth the applicable standards of liability for persons associated with and

providing services toward the reorganization of the debtors, the provisions may be approved.”); *In

re Quincy Med. Ctr., Inc.*, No. 11-16394, 2011 WL 5592907, at *3 (Bankr. D. Mass. Nov. 16,

2011) (approving exculpations for parties that provided valuable consideration to the estate by

negotiating the framework of a plan); *In re Nat’l Heritage Found., Inc.*, 478 B.R. 216, 234 (Bankr.

E.D. Va. 2012) (approving “[e]xculpation provision [] limited to acts or omissions taken in

connection [with] the bankruptcy case itself”), *aff’d*, 2013 U.S. Dist. LEXIS 49081 (E.D. Va.

2013), *aff’d*, 760 F.3d 344 (4th Cir. 2014); *Meritage Homes of Nev., Inc. v. JPMorgan Chase Bank,

N.A. (In re S. Edge LLC)*, 478 B.R. 403, 416 (D. Nev. 2012) (affirming bankruptcy court’s approval

of exculpation provision relating generally to the Chapter 11 case, the disclosure statement, the

confirmed plan or any document entered into during the Chapter 11 case).

211.    Exculpation provisions may properly extend beyond estate fiduciaries to, for example, "court-supervised and court-approved transactions" because parties involved in those transactions "should be not be [sic] subject to claims that effectively seek to undermine or second-guess th[e] Court's determinations." *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019); *see also In re Willowood U.S. Holdings, LLC*, No. 19-11079, 2020 Bankr. LEXIS 3706, at *37 (Bankr. D. Colo. Feb. 14, 2020) ("The Court approves the approach taken in *Aegean Marine*, to the extent non-estate fiduciaries should not be able to be sued for implementing and acting upon Court Orders or approved transactions.").

212.    Accordingly, in the *PWS* decision and other decisions within the First and other Circuits, courts have granted exculpations to entities serving functions that are similar in nature to the Exculpated Parties. *See, e.g.*, *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084–85 (9th Cir. 2020) (approving exculpation of creditor closely involved in drafting of plan), *cert. denied*, 141 S. Ct. 1394 (2021); *Airadigm Commc'ns., Inc. v. FCC* (*In re Airadigm Commc'ns., Inc.)*, 519 F.3d 640, 657–58 (7th Cir. 2008) (approving a non-fiduciary exculpation provision); *In re Quincy Med. Ctr., Inc.*, 2011 WL 5592907, at *3 (finding the inclusion of the indenture trustee and bondowners in the exculpation clause reasonable due to their provision of "financial and other consideration to the estate."); *In re Montreal Me. & Atl. Ry.*, 2015 Bankr. LEXIS 3737, at *24–26 (approving a non-fiduciary exculpation provision).

213.    The court in *Montreal Maine*, for example, approved a Chapter 11 plan that included an exculpation clause covering "(a) the Trustee, (b) the Creditors' Committee, (c) the Monitor, [and] (d) MMA Canada" along with their respective fiduciaries. *Id.* at *24 (emphasis omitted).  The court found that "the exculpation provision is appropriate under applicable law because it is part of a Plan proposed in good faith, was vital to the Plan formulation process and is

appropriately limited in scope.  The exculpation provision, including its carve-out for gross negligence and willful misconduct, is consistent with established practice in this jurisdiction and others." *Id.* at *26. Here, too, the exculpation provisions in the HTA Plan carve out intentional fraud or willful misconduct (*see* HTA Plan § 41.7), and are necessary for the reorganization. *See* Skeel Decl. ¶ 153.

214.    Exculpation provisions like the one in Section 41.7 of the HTA Plan provide appropriate protection for key parties involved in negotiating the HTA Plan and preserving assets for the estate, employees, officers, and directors of the debtors, and professionals from frivolous litigation. *See, e.g.*, *Murphy*, 2008 WL 4426080, at *6 (exculpation is appropriate, particularly where litigation has been threatened); *In re Firstline Corp.*, No. 06–70145, 2007 WL 269086, at *3 (Bankr. M.D. Ga. Jan. 25, 2007) (exculpation clauses are "necessary to discourage any frivolous litigation.").

215.    All the Exculpated Parties played a key role in the development of the HTA Plan and the negotiations that paved the way for a successful reorganization, and would expect to receive a customary exculpation for their efforts during these cases. *See* Skeel Decl. ¶ 153.  The expectation the Exculpated Parties would be exculpated incentivized claimholders to participate in the negotiations, and support, and undertake actions that support, confirmation of the HTA Plan without fear of future baseless lawsuits. *See id.*  Failing to approve the exculpation provisions would likely expose the parties to litigation after months of good faith negotiations. *See id.*

216.    Exculpation for parties participating in the plan process also is appropriate where plan negotiations could not have occurred without protection from liability. *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. at 503 (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan,

and would be inequitable to all those who participated in good faith to bring it into fruition"). Accordingly, the Exculpation Provision should be approved.

**D.** **The Injunction Sought is Necessary to Enforce the Releases and Exculpations Contained in the HTA Plan**

217.    Sections 41.3, 41.6, 41.9, and 41.11 of the HTA Plan provide for an injunction (the "Injunction") against all Entities from commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability that is discharged pursuant to the HTA Plan against any of the Released Parties or any of their respective assets or property, from and after the HTA Effective Date.  The Injunction is necessary to preserve and enforce the releases and exculpations, and is narrowly tailored to achieve that purpose.  *See* Skeel Decl. ¶ 154.  Accordingly, the Injunction should be approved.

[*Remainder of Page Intentionally Left Blank*]

## **<u>CONCLUSION</u>**

The Debtor respectfully submits this Court should confirm the HTA Plan.

Dated:  August 7, 2022
     San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*

Martin J. Bienenstock
Brian. S. Rosen
Jeffrey W. Levitan
Joshua A. Esses
(Admission *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as representative for the Debtor*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and Management Board as representative for the Debtor*