```
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF PUERTO RICO

 3
      In Re:                       )       Docket No. 3:17-BK-3283(LTS)
 4                                 )
                                   )       PROMESA Title III
 5    The Financial Oversight and  )
      Management Board for         )
 6    Puerto Rico,                 )       (Jointly Administered)
                                   )
 7    as representative of         )
                                   )
 8    The Commonwealth of          )
      Puerto Rico, et al.          )       August 17, 2022
 9                                 )
                   Debtors,        )
10
      _____
11
12    In Re:                       )       Docket No. 3:17-BK-3567(LTS)
                                   )
13                                 )       PROMESA Title III
      The Financial Oversight and  )
14    Management Board for         )
      Puerto Rico,                 )       (Jointly Administered)
15                                 )
      as representative of         )
16                                 )
      The Puerto Rico Highways     )
17    and Transportation           )
      Authority,                   )
18                                 )
                   Debtor,         )
19
      _____
20

21

22

23

24

25
```

```
 1   _____

 2

 3                     CONFIRMATION HEARING

 4    BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

 5               UNITED STATES DISTRICT COURT JUDGE

 6     AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

 7               UNITED STATES DISTRICT COURT JUDGE

 8   _____

 9
     APPEARANCES:
10
     ALL PARTIES APPEARING IN PERSON OR TELEPHONICALLY:
11
     For The Commonwealth
12   of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
                              Mr. Brian S. Rosen, PHV
13                            Mr. Michael Firestein, PHV
                              Mr. Lary Rappaport, PHV
14

15   For Puerto Rico Fiscal
     Agency and Financial
16   Advisory Authority:      Mr. Peter Friedman, PHV

17   For Ambac Assurance:     Ms. Atara Miller, PHV

18   For AmeriNational
     Community Services,
19   LLC:                     Mr. Arturo Garcia-Sola, Esq.
                              Mr. Nayuan Zouairabani-Trinidad, Esq.
20
     For The Vazquez-
21   Velazquez Group:         Mr. John Mudd, Esq.

22   For Financial Guaranty
     Insurance Company:       Mr. Martin Sosland, PHV
23
     For HTA Insured
24   Bondholder Group:        Mr. Matthew Madden, PHV
                              Mr. Douglas Buckley, PHV
25
```

```
 1   APPEARANCES, Continued:

 2   For Assured Guaranty
     Corp. and Assured
 3   Guaranty Municipal Corp: Mr. Casey Servais, PHV
                              Mr. William J. Natbony, PHV
 4
     For MAPFRE:              Mr. Jose Sanchez-Girona, Esq.
 5                              (Appearing telephonically)

 6   For Finca Matilde, Inc.: Mr. Eduardo J. Capdevila-Diaz, Esq.

 7   For Cantor-Katz:         Mr. Peter Amend, PHV
                                (Appearing telephonically)
 8
     For National Public
 9   Finance:                 Mr. Robert Berezin, PHV
                                (Appearing telephonically)
10

11   Pro Se Speakers:         Ms. Eliza Llenza
                              Mr. Angel T. Pinto-Rivera
12                            Mr. Jose Rivera-Santana

13

14

15

16

17

18

19

20

21

22

23   Proceedings recorded by stenography.  Transcript produced by
     CAT.
24

25
```

```
 1                          I N D E X

 2    WITNESSES:                                    PAGE

 3        The Declaration of Christina Pullo
             submitted into evidence                104
 4
          The Declaration of David Skeel
 5           submitted into evidence                107

 6        The Declaration of David Brownstein
             submitted into evidence                108
 7
          The Declaration of Ojas Shah
 8           submitted into evidence                108

 9        The Declaration of Jay Herriman
             submitted into evidence                109
10
          The Declaration of Carlos Cespedes-Gomez
11           submitted into evidence                113

12

13    EXHIBITS:

14        Debtors Exhibits 1 through 64
          Assured Exhibits 1 through 25
15        Vazquez-Velazquez Exhibits 1 through 3
          Insured Bondholder Group Exhibit 1
16

17

18

19

20

21

22

23

24

25
```

1                                  San Juan, Puerto Rico

2                                  August 17, 2022

3                                At or about 9:31 AM

4                           *    *    *

5      COURTROOM DEPUTY:  In Re:  *The Financial and*

6 *Oversight Management Board of Puerto Rico, as representative*

7 *of the Commonwealth of Puerto Rico, et al., and the Puerto*

8 *Rico Highways and Transportation Authority*, Bankruptcy Case

9 Nos. 2017-3283 and 2017-3567, for Confirmation Hearing and

10 Omnibus Hearing.

11      THE COURT:  Thank you, Ms. Tacoronte.

12      Buenos dias, good morning, and welcome, counsel,

13 parties in interest, and members of the public and press here

14 in San Juan, those observing here and in New York, and

15 telephonic participants.  It is, as always, good to be back in

16 Puerto Rico, and it is good to see so many of you in person

17 again.

18      Now, before I begin my introductory and housekeeping

19 remarks, I do need to remind you that I have set certain

20 procedures, including capacity restrictions for this hearing

21 in light of the ongoing pandemic, and the court personnel are

22 working very hard to make sure that we are all safe and

23 orderly.  So I expect that everyone will cooperate with the

24 court personnel.  I realize that it makes some things more

25 inconvenient than they might be, but that is where we are at

1   this time in the world.  So please do cooperate with the

2   procedures that have been set.

3            In addition, if you happen to step outside of the

4   courtroom, either during a break or to confer quietly in the

5   course of the proceedings, please be mindful that there are

6   many other proceedings going on in the courthouse, and so

7   noise in the atrium and other areas outside needs to be kept

8   to a minimum, and, also, don't impede the progress of people

9   going back and forth to other proceedings.  Thank you so much

10  for your cooperation with these procedures and expectations as

11  well.

12           So today is the beginning of the Confirmation Hearing

13  for the proposed Fifth Amended Plan of Adjustment for the

14  Puerto Rico Highways and Transportation Authority.  The Court

15  has allotted a little under two hours for the presentation of

16  opening arguments by the Financial Oversight and Management

17  Board, several parties and groups of creditors that support

18  the Plan of Adjustment, and five parties or groups of parties

19  who have objected to the Plan of Adjustment.

20           I remind you that, consistent with court and judicial

21  conference policies, and the orders that have been issued,

22  there is to be no use of any electronic devices in the

23  courtroom to communicate with any person, source, or outside

24  repository of information, nor to record any part of the

25  proceedings; thus, all electronic devices are to be turned off

1    unless you're using a particular device to take notes or refer

2    to notes or documents already loaded on the device.  All

3    audible signals, including vibration features, must be turned

4    off.

5         No recording or retransmission of the hearing is

6    permitted by any person, including but not limited to the

7    parties, or the press.  Anyone who's observed or otherwise

8    found to have been texting, e-mailing, or otherwise

9    communicating with a device from a courtroom during the court

10   proceeding will be subject to sanctions, including but not

11   limited to confiscation of the device and denial of future

12   requests to bring devices into the courtroom.

13        All parties who are participating through Court

14   Solutions must mute their phones when they are not speaking,

15   and if you are accessing these proceedings on a computer, and

16   participating through Court Solutions, when it comes time for

17   you to speak, please be sure to select -- actually, when

18   you're not speaking, be sure to select both -- mute on both

19   the Court Solutions dashboard and your phone to ensure that

20   you are truly muted.  When you need to speak, you'll have to

21   unmute on both the dashboard and the phone.

22        I'll be calling on each speaker during the

23   proceedings, and when I do, please identify yourself when you

24   begin to speak for clarity of the record, and please don't

25   interrupt each other or me.  If we interrupt each other, it's

1    difficult to create an accurate transcript, but, as usual, I

2    apologize in advance for breaking the rule, because I may

3    interrupt if I have questions or if you go beyond your

4    allotted time.  If anyone has difficulty hearing me or another

5    participant, please say something right away.

6         The agenda for today's hearing, which was filed at

7    Docket Entry No. 21852 in Case No. 17-3283, is available to

8    the public at no cost on Prime Clerk for those who are

9    interested.  Although Prime Clerk has now been renamed Kroll

10   Restructuring Administration, the Prime Clerk website

11   addresses and telephone numbers are still operational.

12        I encourage each speaker to keep track of his or her

13   own time.  The Court will also be keeping track of the time.

14   Speakers appearing in person here in San Juan will see a

15   yellow signal light when two minutes are remaining, and when

16   their allotted time is up, they will see a red light and hear

17   two buzzes.  Speakers appearing via Court Solutions will just

18   hear two buzzes when time is up.  Here's an example of the

19   buzzer sound.

20        (Sound played.)

21        THE COURT:  If we need to take a break, the telephone

22   listen-only participants who are on the AT&T dial-in line

23   should keep that line open, not hanging up, just keep it open

24   during a break.  We will proceed this morning until 12:50 PM

25   Atlantic Standard Time with a ten-minute break at about 11:15,

1    and will resume, if necessary, from 2:10 to 5:00 o'clock

2    Atlantic Standard Time, with another ten-minute break at about

3    3:30 PM.

4         Before we begin with the opening arguments,

5    Mr. Bienenstock and Mr. Rosen, would you please provide an

6    update as to the status of the now Fifth Amended Plan and

7    Objections since our pretrial conference last week so that

8    everyone knows what to expect?  Mr. Rosen?

9         MR. ROSEN:  Thank you.  Good morning, Your Honor.

10   Brian Rosen, Proskauer Rose, on behalf of the Oversight Board.

11        First of all, Your Honor, it's a pleasure to be back

12   in San Juan.  Thank you very much for having the hearing down

13   here.

14        Your Honor, since we filed the Fifth Amended Plan,

15   and the basis of that Fifth Amended Plan was to clear up any

16   small changes that people had raised with us, we do believe

17   that we have cleared or completely taken care of the objection

18   of AAFAF, the limited objection that AAFAF did have to it.

19   And I believe, Your Honor, the only objections that do remain

20   are four.

21        THE COURT:  I'm sorry.  We have to pause.  We have an

22   issue with the AT&T line.

23        (Pause in proceedings.)

24        THE COURT:  I understand everything's been restored.

25   Apologies for the pause.

1          Please continue, Mr. Rosen.

2          MR. ROSEN:  Thank you, Your Honor.

3          I believe that we're still left with four objections

4     that were filed, although I believe, Your Honor, that we

5     really only have one.  Specifically, the MAPFRE objection I

6     believe was taken care of by the inclusion of paragraph 56 in

7     the confirmation order.  The Finca Matilde objection is taken

8     care of by the plan in Section 19.1, and I believe, Your

9     Honor, although parties may disagree, that the Assured versus

10    Franklin, Nuveen issue is more of an intracreditor issue than

11    an objection to the treatment pursuant to the plan, although

12    they of course will have the opportunity to say what they

13    believe.

14         And that will leave last, Your Honor, the Velazquez

15    plaintiffs' objection, which we believe we will take up during

16    the objection phase of the oral argument.

17         THE COURT:  Thank you.

18         MR. ROSEN:  Your Honor, we'd also like to say, before

19    we get started on opening arguments, that the -- I believe we

20    have four of our five declarants in the room, Your Honor.  As

21    you know, there have been no objections to -- well, at least

22    no requests to cross-examine any of the declarants, Your

23    Honor, and we have asked the parties in the room who have

24    interposed objections whether or not they had any opposition

25    to them remaining in the courtroom, and there is none.

1          THE COURT:  Very good.  I see no one trying to raise

2    their hand to disagree with that statement, and so we'll note

3    for the record that those declarants are in the room for the

4    entirety of the proceeding.

5          MR. ROSEN:  Thank you, Your Honor.

6          Would you like me to begin?

7          THE COURT:  Yes.  Please begin your opening statement

8    for the plan proponent, the Oversight Board.

9          MR. ROSEN:  Thank you very much, Your Honor.  Again,

10   Brian Rosen of Proskauer Rose on behalf of the Oversight

11   Board, and with me, Your Honor, Mr. Michael Firestein,

12   Mr. Martin Bienenstock, and Mr. Lary Rappaport.

13          Your Honor, the HTA Plan is the culmination of the

14   mediation team's efforts, and by mediation team, I'm referring

15   to the mediation team that was lead by Judge Houser.  Your

16   Honor, if the Court recalls, as part of the mediation process

17   associated with the Commonwealth Plan, and the efforts to

18   bring additional parties to support the Commonwealth Plan,

19   Judge Houser and her team brought everyone together, and

20   specifically the monolines, Assured, National, Ambac, and

21   FGIC, in an agreement with respect to HTA and corresponding

22   CCDA, as part of the HTA-CCDA Plan Support Agreement.  And

23   that agreement, Your Honor, was joined by multiple parties,

24   bringing the acceptance or the joinders to that well in excess

25   of what we believe is necessary to comply with voting

1  requirements if they were to have been given for both the 68

2  and the 98 bonds, pursuant to the plan.

3       The agreement itself, Your Honor, provided the bones

4  for that HTA Plan, and that was ultimately added onto by the

5  DRA stipulation that had been entered into and became part of

6  the Commonwealth Plan process, as well as the Committee

7  agreement to the HTA Plan specifically, when we agreed and

8  negotiated to the terms of treatment for the HTA general

9  unsecured creditors.

10       Your Honor, you will hear this morning through the

11  admission of the declarations, and specifically the Pullo

12  Declaration, that the HTA Plan has almost universal

13  acceptance.  Specifically, Your Honor, in dollars, of the

14  claims voted and counted, almost 5.9 billion dollars in claims

15  voted to accept the plan, while only 1.6 million dollars voted

16  to reject the plan.  That is represented, Your Honor, by a

17  99.97 percent vote in dollars to accept the plan, and .03 of

18  one percent voting to reject the plan.

19       There are only two classes, Your Honor, that voted to

20  reject the plan.  The first was the Eminent Domain/Inverse

21  Condemnation, but there, Your Honor, only two creditors voted

22  in connection with the Plan.  One voted in favor, one voted to

23  reject, Your Honor, each in the amount of a dollar.  The

24  second class, Your Honor, and despite having the support of

25  the Creditors Committee, was the HTA general unsecured

1   creditors.  There, Your Honor, only 26 votes were cast:  Ten

2   in support of the plan, and 16 in opposition to the plan.  But

3   interestingly, again, Your Honor, in dollars, over almost 40

4   million dollars of claims voted to accept the plan, and only

5   75 thousand dollars in claims voted to reject the plan.

6        Equally important, Your Honor, are all of the efforts

7   that were undertaken by the Oversight Board and Kroll on

8   behalf of the Oversight Board in generating interest, serving

9   notice, letting the public know about the HTA Plan, about the

10  confirmation process, about the objection period.  As set

11  forth in Ms. Pullo's declaration, there were publications,

12  there were radio announcements, advertisements, and there were

13  mailings to parties in interest.  And, Your Honor, as I said

14  before, there are only a handful of objections interposed,

15  and, as you will hear shortly, we don't believe any of those

16  should be granted.  And, in fact, some of them may not even be

17  applicable to this proceeding.

18       Your Honor, we will put forth today not only

19  Ms. Pullo's declaration, but also those of Mr. David Skeel,

20  Chairman of the Oversight Board, David Brownstein from

21  Citibank, Ojas Shah from McKinsey, and Jay Herriman from

22  Alvarez & Marsal to show compliance with the requirements of

23  PROMESA and the Bankruptcy Code.  They will show, among other

24  things, Your Honor, the efforts undertaken, the terms of the

25  respective agreements that have been reached, satisfaction of

1   the best interest test, feasibility of the obligations to be

2   undertaken, and provide an overall sense of the claims at HTA

3   and the reconciliation process being employed.

4        We will also show, Your Honor, that the Plan of

5   Adjustment is another step along the way in the path of fiscal

6   responsibility for the Commonwealth and HTA, and that it will

7   lead to -- ultimately, to market access for the Commonwealth

8   and HTA.  Hopefully, Your Honor, upon completion of the

9   presentations this morning, and I hope this morning, the Court

10  will agree with the Oversight Board, and the government, and

11  the multitude --

12        (Sound played.)

13        MR. ROSEN:  -- of creditors that support the

14  Oversight Board and this Plan of Adjustment, and confirm the

15  HTA Plan.

16        Thank you, Your Honor.

17        THE COURT:  Thank you, Mr. Rosen.

18        Next to speak is counsel for AAFAF, who's been

19  allotted three minutes.

20        Good morning, Mr. Friedman.

21        MR. FRIEDMAN:  Good morning, Your Honor.  Peter

22  Friedman from O'Melveny & Myers on behalf of AAFAF.  Thank you

23  for the opportunity to address the Court regarding

24  confirmation of the plan.

25        Today we're five years and one week after the Peaje

1    preliminary injunction hearing.  I looked back at that

2    transcript yesterday and was reminded of how precarious the

3    viability of Puerto Rico's transportation systems were in

4    August, 2017.  The threat to funding of roads and operations,

5    bridges, and trains was real.  Those threats were made worse

6    by the pounding the transportation systems took from the

7    hurricanes and the earthquake that occurred during the

8    pendency of this case.  Remember, it wasn't just PREPA that

9    suffered from the hurricanes and earthquakes.

10            So it is good today to see a closing of this Title

11   III case hopefully and a more solid future for Puerto Rico's

12   toll roads, non-toll roads, and other transit assets which

13   serve all of its people.  And it is good that hopefully

14   confirmation of this plan will also bring the government and

15   the people of Puerto Rico one milestone closer to the end of

16   the Oversight Board.

17            As Your Honor saw, AAFAF filed a limited objection to

18   the plan, which it withdrew after resolving its issues with

19   the Oversight Board.  The dispute related to certain

20   operational restructuring issues for HTA and the Commonwealth

21   transportation agency known as DTOP.  As set forth in the

22   amended section 2.4 of the plan, HTA's highway assets will be

23   operationally and financially separated between toll road

24   assets and non-toll road assets with a ring fence structure.

25   Other operational issues will continue to be discussed and

1    worked on between the Oversight Board and the government.

2          With these changes to the plan, AAFAF supports

3    confirmation.  AAFAF and HTA will work collaboratively with

4    the Oversight Board to implement the plan and make it go

5    effective if confirmed.  Importantly, AAFAF hopes that the

6    plan and its work with the Board will lead to a future

7    successful P3 Public-Private Partnership arrangement with

8    respect to toll roads.

9          AAFAF also had concerns with the preemption languages

10   included in the proposed findings of fact and conclusions of

11   law, including the preemptive list of statutes found in

12   Exhibit A of the plan.  Unlike the Commonwealth Plan, which

13   preempted really financial obligations and bond statutes here,

14   some of the preempted statutes related to operational issues,

15   so we had some concerns about that.

16          To alleviate the possible confusion, AAFAF and the

17   Board agreed on certain language in the findings of fact and

18   conclusions of law, specifically paragraphs 113 and 114, where

19   the parties followed what the First Circuit said in its

20   opinion, affirming confirmation of the Commonwealth Plan,

21   specifically, that while it's appropriate to preempt portions

22   of statutes inconsistent with the Plan, and, to quote the

23   First Circuit, "it is also acceptable to leave the details of

24   what constitutes inconsistency to be determined if and as

25   concrete issues arise," that's very important language to the

1    government.

2         I have nothing further, Your Honor --

3         (Sound played.)

4         MR. FRIEDMAN:  -- other than to express my

5    appreciation.  Thank you.

6         THE COURT:  Thank you, Mr. Friedman.

7         Next we have for FGIC, as a supporting party,

8    Mr. Sosland.  He's been allotted five minutes.

9         Good morning, Mr. Sosland.

10        MR. SOSLAND:  Good morning, Your Honor.  Martin

11   Sosland of Butler Snow for FGIC.

12        We stand here today in support of the Plan of

13   Adjustment for HTA, and have no doubt that the Oversight Board

14   as proponent will put forth the evidence that shows that each

15   and every element of PROMESA and the applicable provisions of

16   Chapter 11 will be met, and that the plan should be confirmed.

17   I'd just like to put an emphasis point on one of the items

18   that Mr. Rosen spoke about, namely, the vigorous and

19   arm's-length negotiations that resulted in the plan that's

20   before you today, in which the monolines, as Mr. Rosen said,

21   were involved from the beginning.

22        The HTA/CCDA, PSA, which was the term sheet for this

23   -- principal term sheet for this Plan of Adjustment, was

24   negotiated in the first instance by Assured and National, but

25   the statutory majority of the 98 senior bonds was put in place

1    in July of 2021, when FGIC and Ambac came on board in

2    connection with the negotiation of our long-sought global

3    settlement of the debts, not only of HTA but of the GO and PBA

4    debts, CCDA, and PRIFA.

5         The Court has previously approved the qualified

6    modifications for CCDA and PRIFA, and the -- and the Plan of

7    Adjustment for the Commonwealth.  This is the final piece of

8    that global resolution for FGIC, and we ask that your court

9    confirm the plan at the conclusion of the hearing.

10        Thank you.

11        THE COURT:  Thank you, Mr. Sosland.

12        The next speaker is Mr. Berezin for National.  I

13   understand that Mr. Berezin will be speaking on the Court

14   Solutions line.

15        Mr. Berezin, are you there?  Please --

16        MR. BEREZIN:  I am, Your Honor.

17        THE COURT:  Very good.  You figured out how to

18   unmute.  So you've been allotted five minutes.  Good morning,

19   and please state your full name and then proceed.

20        MR. BEREZIN:  Yes.  Thank you, Your Honor.  Robert

21   Berezin of Weil, Gotshal, & Manges for National Public Finance

22   Guaranty Corporation.

23        Your Honor, National has reserved time to be heard in

24   support of the plan during closing argument, and in the

25   interest of being efficient, National yields time for an

1  opening statement assuming that's acceptable to the Court.

2  THE COURT:  That is acceptable to the Court.  Thank

3  you, and thank you for being mindful of efficiency.  I note

4  that National is a supporter of the plan.

5  Thank you, Mr. Berezin.

6  MR. BEREZIN:  Thank you, Your Honor.  Thank you.

7  THE COURT:  Now for the DRA Parties.  I have first,

8  for five minutes for AmeriNational, Mr. Garcia-Sola.

9  MR. ZOUAIRABANI-TRINIDAD:  Good morning, Your Honor.

10  THE COURT:  Good morning.

11  MR. ZOUAIRABANI-TRINIDAD:  Nayuan Zouairabani.  I'm

12  substituting my colleague Arturo Garcia this morning of

13  McConnell Valdes, LLC, on behalf of AmeriNatonal Community

14  Services, LLC, as servicer for the GDB Debt Restructuring

15  Authority.

16  The DRA, Your Honor, as you know, is likely the

17  largest single creditor of HTA who holds at least 1.7 billion

18  of loans, and at least 200 million in HTA bonds.  Your Honor,

19  we are glad that we are reaching the end of a long, winding

20  road with a final destination of confirmation of HTA's Plan of

21  Adjustment.  This road has not always been a smooth ride.

22  There have been numerous potholes, uneven pavement, and

23  pitfalls along the way.  For example, for years this case was

24  marked by litigation between the FOMB, the monolines, the HTA

25  bondholders, and the DRA Parties.  Despite this, the parties

1  were able to find common ground and build bridges to put an

2  end to their differences.  This includes a stipulation reached

3  between the DRA and the FOMB on November 5, 2021, which

4  resolved the pending disputes with the debtors in the

5  Commonwealth, PBA, and HTA cases.

6        All of this has lead us today to confirmation of an

7  overwhelmingly consensual plan.  This achievement should not

8  be taken lightly, as it would not have occurred had any of the

9  parties refused to build constructively in this case.  The

10  limited pending objections should not hold up confirmation of

11  the plan, because most of these have either been resolved

12  through the reservations and the Fifth Amended Plan, the

13  revised proposed confirmation order, and/or the revised

14  proposed findings of facts and conclusions of law, or revolve

15  around intracreditors' disputes that are not really objections

16  to the plan itself.  Because of this, HTA should be allowed to

17  come out of the other side of this tunnel as a reorganized

18  debtor.

19        Your Honor, it has been a difficult road to get us

20  where we are today, and it is uncertain whether the

21  circumstances that lead us to a massively consensual plan can

22  be recreated.  For these reasons, AmeriNat supports

23  confirmation of the HTA Plan, and I yield the remaining of my

24  time.  Thank you.

25        THE COURT:  Thank you so much.

 1              The next speaker is for Cantor-Katz, allotted five

 2    minutes, Mr. Mintz or Mr. Amend.

 3              MR. AMEND:  Good morning, Your Honor.  Peter Amend --

 4              THE COURT:  Good morning.

 5              MR. AMEND:  -- from Schulte, Roth & Zabel on behalf

 6    of the Cantor-Katz Collateral Monitor, LLC.

 7              At this time, Your Honor, we'd like to yield our

 8    allotted time for the opening to the rest of the supporting

 9    parties.  I note that we have time reserved for closing, and

10    intend to address the Court at that time for the sake of

11    efficiency.

12              THE COURT:  Thank you, Mr. Amend.

13              MR. AMEND:  Thank you, Your Honor.

14              THE COURT:  The next speaker is Mr. Despins for the

15    UCC, also by telephone, who's been allotted three minutes.

16    Oh, not Mr. Despins.

17              MR. BONGARTZ:  Good morning, Your Honor.  Mr. Despins

18    is on the telephone line, but he's unfortunately not able to

19    join us in person. So with the Court's permission, I will

20    address the Court in person.  I'm Alex Bongartz of Paul

21    Hastings.  I'm here on behalf of the Official Committee of

22    Unsecured Creditors, and I'll be very brief.

23              The Committee supports confirmation of the HTA Plan

24    of Adjustment.  I just wanted to just briefly address one

25    point.  We do recognize that the class of unsecured creditors,

1  Class 16, did not vote to accept the plan, but, echoing the

2  point that Mr. Rosen just made, more than 99 percent of -- by

3  claims in amount voted, voted to accept the plan.

4  Unfortunately, the class as a whole did not vote to accept,

5  because the numerosity wasn't satisfied. But, again, as

6  Mr. Rosen has noted, that was because a number of smaller

7  claims voted to reject.

8      But, nevertheless, notwithstanding the plan rejection

9  by our class, the Committee continues to support the plan,

10  including because a number -- overwhelming amount of claims

11  voted to accept. I also wanted to just really briefly echo

12  one point that Mr. Despins had made at the hearing on

13  confirmation of the Commonwealth Plan of Adjustment regarding

14  voting in Puerto Rico. It's incredibly hard to get people to

15  affirmatively cast the ballot. The Committee did submit, and

16  it was included as part of the solicitation package, a letter

17  recommending and urging creditors to vote to accept.

18      We also posted that letter on our website, and,

19  unfortunately, folks weren't -- did not affirmatively vote,

20  but that doesn't necessarily mean that there was a rejection

21  of the plan. I should note that less than ten percent of all

22  members of the class actually submitted a ballot, which is

23  telling, because it does show that many, many claimants were

24  not unhappy about the plan. So -- but with the caveat, of

25  course, we do recognize that that's not a relevant statistic

1   for purposes of the Bankruptcy Code.  But I think it is still

2   an important data point.  So, with that said, the Committee

3   does support the HTA Plan.

4        One final, short disclaimer.  We do support the plan,

5   and we support the confirmation thereof, but I wanted to be

6   clear that we don't necessarily are adopting all the various

7   arguments and analysis that the Board is putting forward in

8   support of confirmation.  But -- and for that reason, the

9   Committee reserves its rights to the extent other plan of

10  confirmation -- other plans of adjustments will be presented

11  for confirmation in the future.

12        Thank you very much, and that's all I have for today.

13        THE COURT:  Thank you, Mr. Bongartz.

14        MR. BONGARTZ:  Thank you.

15        THE COURT:  And now we come to opposing parties.  We

16  first have counsel for MAPFRE, Mr. Sanchez-Girona, who's been

17  allotted eight minutes.

18        MR. SANCHEZ-GIRONA:  Good morning, Your Honor.

19        THE COURT:  Good morning.

20        MR. SANCHEZ-GIRONA:  Jose Sanchez, Your Honor, on

21  behalf of MAPFRE Life Insurance Company.

22        Your Honor, in this case, MAPFRE filed an objection

23  to the plan as presented by HTA.  After MAPFRE filed its

24  objection at docket 1285 of the HTA case, the Oversight Board

25  filed an amended proposed confirmation order, but opposing

1    that -- notwithstanding anything contained in the HTA Plan to

2    the contrary, to the extent that the claim of Assured as a

3    debtor to the secured claim on our part --

4        COURT REPORTER:  I'm sorry --

5        THE COURT:  Mr. Sanchez, I need you to speak more

6    slowly, and even more distinctly to help the court reporter

7    and everyone who's listening here in the courtroom.  So if you

8    could go back to where you began to talk about the Oversight

9    Board's amended proposed confirmation order, I'd be grateful.

10        MR. SANCHEZ-GIRONA:  Yeah.  I'm hearing an echo, and

11   I'm having difficulty speaking, because every time I say

12   something, I hear it back.

13        THE COURT:  We don't hear the echo.  I sympathize.

14   So please just be as slow and distinct for us as you can be.

15        MR. SANCHEZ-GIRONA:  Okay.  I -- after MAPFRE filed

16   its objection at docket 1285 of the HTA case, the Oversight

17   Board filed an amended proposed confirmation order proposing

18   that, "notwithstanding anything contained in the HTA Plan to

19   the contrary, to the extent that the claim of a surety against

20   the Debtor is determined to be a secured claim and allowed in

21   whole or in part, by Final Order, or by operation of section

22   502(a) of the Bankruptcy Code following the expiration of the

23   period to object to any such claim, such claim shall be paid

24   in full, in cash."

25        Such a provision, Your Honor, would be acceptable to

1    MAPFRE if it would be included in the confirmation order.

2    Okay.  So since it was not included in the plan, we're still

3    going to argue our claim.

4             THE COURT:  And --

5             MR. SANCHEZ-GIRONA:  So on May 23, MAPFRE filed a

6    Proof of Claim No. 42 in the amount of $2,698,261.88.  MAPFRE

7    issued surety bonds, naming City Builders as principal, and

8    the Puerto Rico Highways and Transportation Authority as

9    obligee for the construction of the Vega Baja, Humacao, and

10   Ciales projects.  Pursuant to the bonds, MAPFRE guaranteed

11   Builders' compliance of obligations under the contracts

12   entered with HTA for the construction of the projects and its

13   payment of labor and materials furnished therein.  The

14   contracts entered into between HTA and Builders provided that

15   HTA would retain ten percent of each partial payment in

16   compliance of the contract --

17            THE COURT:  Mr. Sanchez.  Pardon me for interrupting

18   you, Mr. Sanchez.  At this point you -- first of all, I

19   understand that MAPFRE still presses its objection and does

20   not find the language offered by the Oversight Board

21   acceptable; is that correct?

22            MR. SANCHEZ-GIRONA:  We do not -- okay.  What we

23   object is to the clarification --

24            THE COURT:  Mr. Sanchez.

25            MR. SANCHEZ-GIRONA:  -- of the general secured claims

1  in the plan.  We would accept the language proposed in the

2  amended proposed confirmation order by the Oversight Board to

3  the effect that, you know, that the claim will be absolved

4  after the confirmation hearing.

5        THE COURT:  All right.  So are you accepting the

6  revised language that the Oversight Board has proposed, or are

7  you asking for different language?

8        MR. SANCHEZ-GIRONA:  We are accepting the language of

9  the proposed confirmation order.

10        THE COURT:  Very well.

11        MR. SANCHEZ-GIRONA:  Obviously that -- yeah, I'm

12  sorry.

13        THE COURT:  So, what I had intended to say was that

14  at this point, we were just hearing opening statements and not

15  the argument of the objection.  But now I understand you to be

16  saying that your objection has been resolved, so that we won't

17  have to have the separate argument of the objection; is that

18  correct?

19        MR. SANCHEZ-GIRONA:  Well, Your Honor, as long as the

20  language proposed is accepted, then we will not argue our

21  objection, but we're not going to -- we're not going to waive

22  our objection until we see that order entered.

23        THE COURT:  Yes.  Well, an order will be entered in

24  accordance with -- in connection with all of my determinations

25  on confirmation, but I'm going to ask Mr. Rosen to speak to

1  confirm the Oversight Board's intention with respect to that

2  language.

3          MR. ROSEN:  Yes, Your Honor.  When I spoke earlier

4  about the objections that I thought were resolved, this was

5  one of them, Your Honor.  Paragraph 56 of the proposed

6  confirmation order is what counsel was reading from.  He

7  stopped I would say two-thirds of the way through, but yes, it

8  is our intention, and when we file this draft confirmation

9  order, to include this express provision.  It was the same

10 exact provision that MAPFRE had accepted and that the Court

11 had included in the Commonwealth Plan of Adjustment

12 Confirmation Order.  So we are absolutely fine with the

13 inclusion, Your Honor, and I believe it does resolve the

14 objection.

15         What counsel was going on to discuss was the

16 underlying claim, which is still subject to whatever

17 litigation is out there, Your Honor.  But we have no problem

18 with this insertion.

19         THE COURT:  All right.  So I believe that that

20 insertion picks up the term "allowed claim."  Is that correct?

21         MR. ROSEN:  It says, Your Honor, to the extent the

22 claim is determined to be a secured claim and allowed in whole

23 or in part.

24         THE COURT:  All right.  So the one question the Court

25 had, and we might as well just deal with it now, is that the

1    definition of allowed claim -- no, actually, I'm sorry.  I'm

2    thinking of a different issue, so I did not have a question

3    about that.

4         So, Mr. Sanchez-Girona, I can confirm to you that

5    with no objection to that particular language that's been

6    proposed, if the Court confirms this plan, that will be

7    included in the confirmation order.

8         MR. ROSEN:  Thank you, Your Honor.

9         MR. SANCHEZ-GIRONA:  Okay.  Then, you know, we're not

10   going to argue our objection then, because we're going to

11   reserve all our arguments to whenever --

12        THE COURT:  Would you slow down again, please?

13        MR. SANCHEZ-GIRONA:  -- the Oversight Board --

14        THE COURT:  Would you say that one more time, but

15   more slowly?

16        MR. SANCHEZ-GIRONA:  Being that the case, then we're

17   not going to keep arguing our objection, but we are not going

18   to waive.

19        THE COURT:  Yes, understood.  I will make a

20   determination on it in light of the proposed change of the

21   language.  Thank you, Mr. Sanchez.

22        MR. SANCHEZ-GIRONA:  Okay.  Thank you, Your Honor.

23        THE COURT:  So the next opposing party is Mr. Mudd

24   for the Vazquez-Velazquez Group.

25        Good morning, Mr. Mudd.

1           MR. MUDD:  Good morning, Your Honor.  Nice to be here

2      again.

3           Your Honor, I represent a group of plaintiffs who are

4      employees of HTA.  They sued in Federal Court.  They lost the

5      case in Federal Court.  They are on appeal right now.  Now, if

6      they win and there's compensation granted, their point is that

7      the compensation is nondischargeable.

8           Now, what do we have in this case?  We have a

9      statement by Mr. Cespedes.  Yes?

10          THE COURT:  So I am going to give you a separate

11     opportunity to argue the specifics of the objection, so the --

12     my expectation here is that you make whatever more general

13     statement you wanted to make as to why you oppose

14     confirmation, but we'd argue the specific objection later.

15          MR. MUDD:  No problem.

16          My point is we have evidence, there is no

17     objection -- there is no counter-evidence to the evidence

18     presented, and, therefore, given that all the evidence shows

19     that they are -- their work was and the compensation they

20     received was involved with safety, under section 7 and Article

21     304(h) of PROMESA, their claims would be nondischargeable, and

22     that would be all.

23          THE COURT:  Thank you, Mr. Mudd.  I will call on you

24     again when we get to the argument section.

25          Now for objector Finca Matilde, Mr. Capdevila.  Good

1   morning.

2         MR. CAPDEVILA-DIAZ:  Good morning, Your Honor, and

3   it's nice to see everybody present in person.  Eduardo

4   Capdevila-Diaz on behalf of Finca Matilde.

5         Your Honor, my client is once again before this Court

6   to defend its Takings Clause -- its Fifth Amendment right to

7   just compensation.  While this time the issue is less

8   convoluted, or it's more straight forward, the thing is that

9   the Board is still attempting to impair eminent domain

10  creditors by limiting their right to collect post-petition

11  interest.

12        As it will be discussed in our objection period --

13  discussion period, you will see that the plan does not provide

14  for post-petition interest, and the right to just compensation

15  is defined to be the right of payment to that for which the

16  government took.  It must pay for the property it took,

17  including interest.  To not pay post-petition interest would

18  be an unconstitutional impairment.

19        Thank you very much.

20        THE COURT:  Thank you, Mr. Capdevila.

21        So now we have arrived at the time for argument of

22  the specific objections, and the first objection on this

23  argument agenda is the objection of the IBG, the Insured

24  Bondholder Group.

25        Mr. Madden has been allotted 16 minutes in total.

1    How much time would you like to reserve, if any, for rebuttal?

2           MR. MADDEN:  Four minutes, Your Honor.

3           THE COURT:  All right.  We'll put you down for 12

4    minutes principal, and four minutes rebuttal.

5           MR. MADDEN:  Thank you.

6           THE COURT:  You may begin now.

7           MR. MADDEN:  Matthew Madden with Kramer Levin for the

8    Insured Bondholder Group.

9           Our group has a limited objection to the plan insofar

10   as the plan purports to accelerate the Assured insured bonds

11   contrary to the bonds resolutions, to give Assured the option

12   to prepay those bonds, and to release Assured from liability

13   once it's done so.  We've heard this dispute called an

14   intracreditor dispute a couple of times this morning.  This is

15   a dispute between the insured bondholders and their insurer as

16   to what the bondholders are entitled to under their policy.

17   The problem here is that the plan purports to resolve that

18   dispute in the insurer's favor, and then release them from any

19   contrary liability.

20          In many financial contracts, Your Honor, including

21   many bond indentures, the parties expressly agree that a

22   debtor's bankruptcy petition shall be an event of default, and

23   expressly agree it shall accelerate all future payments on the

24   debt.  But HTA's bond resolutions do not make a bankruptcy

25   petition an event of default, and they do not accelerate

1    future debt payment upon the filing of a bankruptcy petition.

2    There is no dispute here about that.

3         Assured argues here that this key difference in

4    contractual terms just doesn't matter.  Every bankruptcy

5    petition by a debtor it says, always and automatically

6    accelerates all debt payments for all purposes.  And this

7    acceleration takes place, the argument goes, whether or not

8    that is actually what the insurer and the bondholders agreed

9    to in their contract.

10        Now, that would come as a surprise to many parties

11   over the years who have been negotiating these acceleration

12   provisions in their contracts, but even more to the point,

13   Assured's view is not the law.  Rather, the cases recognize

14   the important difference between two different things.  On the

15   one hand, there is the limited statutory acceleration

16   automatically provided in all cases by section 502(b) of the

17   Bankruptcy Code.  That allows creditors to file claims in the

18   full amount of an unmatured debt.  On the other hand, there is

19   a full acceleration of all future payments on a debt, which is

20   something that is governed only by contract.

21        We cite cases in our brief that say the same.  *In re*

22   *Premier Entertainment* held that the claimants there had tried

23   to support an argument about the effect of an acceleration by

24   conflating these two things, the statutory acceleration and

25   the contractual acceleration.  And the Court there held "the

1   claimant's argument, however, fails to note the distinction

2   between an automatic acceleration effectuated by the

3   Bankruptcy Code and an automatic acceleration effectuated by a

4   contractual provision."  The automatic acceleration of debt

5   under the Bankruptcy Code, as I was saying, allows the lender

6   to file a proof of claim for the unmatured principal amount of

7   the debt under section 502 without violating the automatic

8   stay.  But here's the key part.  "Such acceleration is

9   relatively limited and does not change the maturity date of

10  the debt."

11          Another case is *PCH Associates*, cited in our brief.

12  In that case, a debt had not been accelerated under the term

13  of a note, and the Court there recognized the very same,

14  "distinction between the acceleration of a debt for purposes

15  of filing a proof of claim in the case," and acceleration for

16  other purposes.

17          Another case is *St. Vincent's Catholic Medical

18  Centers of New York*, 440 B.R. 587.  There the parties were

19  arguing over whether a debt's acceleration upon a bankruptcy

20  case was voluntary or automatic, a question on which millions

21  of dollars turned.  One party contended that the debt there

22  had been accelerated automatically upon the commencement of

23  the present bankruptcy case.  The other said it had been

24  accelerated only voluntarily as required by the terms of the

25  governing loan documents.

1            The Court there held that acceleration had been

2    governed by the indenture only and was voluntary.  Quote, it

3    is clear from the loan documents that the acceleration of the

4    debt was not an automatic event triggered by the commencement

5    of the present bankruptcy case.

6            Don't just take our word for it, Your Honor.  Assured

7    has argued the same thing in an adversary proceeding in the

8    COFINA matter.  We cite their brief at paragraph nine of our

9    supplemental reply.  There they argue in a section titled,

10   COFINA'S Title III Filing Did Not Trigger an Acceleration,

11   that there nothing in the resolution, like here, provides for

12   the acceleration of the bonds upon the commencement of a

13   bankruptcy proceeding.  The bonds have not been accelerated by

14   the claims allowance provisions in section 502 of the

15   Bankruptcy Code.  They continue, there's no language in that

16   resolution that provides, excuse me, that a bankruptcy filing

17   is the event of default or can trigger acceleration.  Later,

18   it goes on to make the same distinction of the cases we've

19   made in our briefs here.

20           In cases where Courts have found there to be an

21   automatic acceleration, the language of the operative

22   agreement plainly provided for the bankruptcy as an event of

23   default and placed automatic acceleration upon the occurrence

24   of an event of default.  Later on, as these cases demonstrate,

25   talking about the same body of law, automatic acceleration

1  occurs when a provision provides that upon an event of

2  default, such as a bankruptcy filing, the debt becomes

3  immediately due and payable.

4       Here, by contrast, it argued in the other case, there

5  is no language in the resolution that provides that a

6  bankruptcy filing isn't an event of default or operates to

7  automatically trigger acceleration, and so it continued to

8  argue in the pages cited in our brief that the bonds there had

9  not been accelerated by the bankruptcy filing because the

10 relevant loan documents didn't provide for that.

11      Here, though, Assured relies principally on

12 *Oppenheimer*, a case out of New York.  It says there that that

13 is the leading case, with supposedly relevant similarities,

14 and it has the same relevant issue, but in fact the only issue

15 in *Oppenheimer* was whether the cancellation of insured bonds

16 under a confirmed reorganization plan, and those bonds'

17 replacement with new bonds under the same plan, had somehow

18 negated the insured's obligation to pay the insured

19 bondholders at all.  That's what the decision was about.

20      And that plan, unlike the plan here, did make a

21 bankruptcy petition an event of default, and so that opinion

22 does say in dicta that the bankruptcy had the effect of

23 accelerating claims on the original bonds, but that dictum

24 wasn't relevant to the holding about whether those bonds had

25 or had not been canceled.  Rather, the key holding for our

1   purposes is this one.

2       The Court said, when a municipal bond issuer files

3   for bankruptcy, such reorganization should not in itself

4   vitiate obligations under contracts with third parties.

5   Assured's other cases are generally distinguishable as we

6   describe in our briefs.  Many of them involved contractual

7   acceleration clauses, which, again, this case does not.  And

8   others are about different issues involving make-whole

9   payments, or prepayment premiums, or set off rights.

10      Assured also argues in the alternative that the plan

11  itself can accelerate the insured bonds all on its own, even

12  if that's not allowed by the bond resolutions or under the

13  bankruptcy law upon the filing of a plan.  It relies on

14  section 1123(a)(5)(F) and (H), in particular, and 1123(b)(1).

15  That's at their reply in paragraph 28.  (A)(5)(F) and (H) are

16  about modifying indentures or extending, not accelerating,

17  extending maturity dates in order to provide for the, quote,

18  adequate means for the plan's implementation.  But no one here

19  is trying to modify HTA's bond resolutions as part of the

20  plan, nor is extending the maturity dates at issue here.  And

21  (b)(1) simply allows for classes of claims to be impaired, but

22  that certainly doesn't mean that a plan can go out of its way

23  to undermine a party's rights against a non-debtor under an

24  independent contract between them and then release the

25  non-debtor.

1          That brings me to the release.  Assured and the

2     Oversight Board say that there's no third-party release for

3     Assured here in the plan.  If there is one, in fact, then the

4     Oversight Board says in its supplemental reply at paragraph

5     nine that it will amend the plan to remove it.  That's just

6     not what the plan says.  At section 26.1(b), it says that if

7     insured pays the Assured acceleration price with respect to

8     any Assured insured bond, then that, quote, shall satisfy and

9     discharge all of Assured's obligations under the insurance

10    policies with respect to such Assured insured bond.

11         Discharge means discharge.  That's a release.  It's a

12    clear language of release for Assured in the plan.

13         In section 41.7(c) of the plan, it says that the plan

14    shall not "release or exculpate any payment obligation" under

15    the applicable Assured insurance policy to any beneficial

16    holder of the insured bonds in accordance with its terms, and

17    here's the important part, "solely to the extent of any

18    failure of such holder to receive the Assured treatment."

19         So the plan says there's no third-party release, only

20    if Assured fails to pay the acceleration price, but as it says

21    in section 26.1(b), if Assured does pay the acceleration

22    price, then it is discharged of all of its obligations under

23    the insurance policy.

24         Assured also says that this language is in the nature

25    of a conclusion of law that simply recognizes that if it were

1   to pay the acceleration price, then it will someday have a

2   defense -- it would anyways have a defense to remaining

3   liability, but a non-debtor release by a confirmation order

4   approved by a court can't be justified simply because the

5   beneficiary of that release doesn't think it would be and end

6   up being held liable anyways on the claims being released.

7        The briefs -- we rest on the briefs in terms of the

8   elements for providing a non-debtor release in a confirmation

9   order.  It shouldn't matter, because the Board has said that

10  if this is a third-party release, they would remove it from

11  the plan.

12       Just briefly on our standing to make this objection,

13  11 -- section 1128(b), which is applicable under PROMESA

14  section 301(a) says that, a party in interest may object to

15  the confirmation of the plan.  Both the Board and Assured cite

16  cases in which dissenting creditors who voted no in a class

17  that accepted the plan simply disagreed with the nature of

18  their treatment under the plan, and were held not to be able

19  to basically exercise the veto right over their treatment by

20  the debtor under the plan, having sort of lost the vote in

21  their class.

22       But here the issue involves a third-party release of

23  a non-debtor, who's not adjusting the treatment of these

24  parties under the plan, but instead how they will be treated

25  under separate insurance policies between them and these

1  parties.

2  THE COURT:  Now, may I ask you a question, and this

3  goes to the voting argument that has been made principally by

4  the Oversight Board, but it seems to me, at the end of the

5  day, since Assured has voted for the bondholders in favor of

6  this plan in its entirety, that you're saying, notwithstanding

7  the insurance agreement provision giving Assured the right to

8  vote on behalf of insured bondholders, your clients didn't

9  agree to let Assured vote on something that, in their view,

10  changed their rights vis-a-vis Assured, rather than simply

11  restructuring rights as between the bondholders and the

12  debtor.  Is that your position on the voting issue?

13  MR. MADDEN:  That's exactly right, Your Honor.

14  THE COURT:  And where does that limitation of the

15  authorization to vote for bondholders appear in the insurance

16  agreement?

17  MR. MADDEN:  There's no express language that makes

18  this distinction, but the granting of voting rights is to

19  allow Assured to control consent rights as to how the claims

20  will be treated by HTA under the plan.  We're not objecting to

21  what consideration HTA is providing holders of the claims

22  under the plan, but voting rights can't allow for confirmation

23  orders to provide non-debtor releases for liability under

24  separate contracts that you can't by majority vote put parties

25  out via releases of their obligations under separate

1   contracts.

2        THE COURT:  Can you point me to any examples of cases

3   that you know of in which a vote by a bond insurer was held

4   non-binding on the holders of the bonds, because it approved,

5   among other things, a change in the relationship between the

6   insurer and the bondholders going beyond the restructuring of

7   the bond issuer's obligations?

8        MR. MADDEN:  I can't, Your Honor, only because I'm

9   not aware of any other cases, nor do I think Assured cites

10  anywhere a plan has been used to adjust the rights of the

11  parties under a separate insurance agreement, other than in

12  this case where there were no objections -- other than in

13  other PROMESA cases in which there were no objections made and

14  the issue was not litigated.

15       THE COURT:  So what outcome would satisfy your

16  objection, and is there an outcome that could preserve this

17  plan and satisfy your objection?  What would it be?

18       MR. MADDEN:  Sure.  I think, very simply, the plan

19  and the custodial trust documents simply need to be changed so

20  that Assured doesn't have an unilateral right to accelerate

21  the bonds for insured bondholders that have elected election

22  two and participated in the custodial trust.

23       THE COURT:  For all insured bondholders who've

24  elected the custodial trust, or just for your two clients?

25       MR. MADDEN:  Certainly we'd be happy with the change

 1    to the plan that affects only our clients, seeing as we're the

 2    only ones who have stated an objection.

 3            THE COURT:  All right.  So I'm just -- have you

 4    thought specifically about what that sort of carve-out would

 5    look like?  Is it something that would let you challenge the

 6    legality later if Assured were to exercise this?  Is it

 7    something that would completely eliminate the language?  Just

 8    talk to me a little bit more about what --

 9            MR. MADDEN:  Sure.  We would have to work that out,

10    Your Honor, but I think there are at least two options.  One

11    option is that the acceleration and collapse of the trust

12    requires the consent of the bondholders who would be effected.

13    Obviously, if the bondholders consent to be paid early, then

14    there's no issue.

15            Another option would be to take it out of the plan

16    that Assured has these rights and these releases if they

17    exercise them to pay early, and then if Assured someday

18    decides to do that, then that would be litigated separately

19    before a court under New York law.

20            THE COURT:  Thank you, Mr. Madden.

21            MR. MADDEN:  Thank you.

22            THE COURT:  The next speaker is for Assured.  It

23    looks like Mr. Servais is getting up.

24            Good morning, Mr. Servais.

25            MR. SERVAIS:  Is it acceptable if I remove my mask

1    for the sake of --

2         THE COURT:  Yes.  While you're in the box, it's fine.

3         MR. SERVAIS:  Thank you.

4         THE COURT:  How much time do you want to reserve for

5    rebuttal?

6         MR. SERVAIS:  I'll reserve two minutes.

7         THE COURT:  All right.  We'll put you down for 14 and

8    two.

9         MR. SERVAIS:  Thank you.

10        Good morning, Your Honor.  Casey Servais from

11   Cadwalader on behalf of Assured.

12        I will be speaking in support of the HTA Plan, and

13   I'll be addressing just some of the reasons that Franklin and

14   Nuveen's objection should be overruled, including because, as

15   you alluded to, Franklin and Nuveen's class voted in favor of

16   the plan, because the plan gives Franklin and Nuveen

17   everything that they are entitled to under the policies.  And

18   given that Franklin and Nuveen are receiving everything they

19   are entitled to under the policies, there are no third-party

20   releases because, by Franklin and Nuveen's own concession,

21   there is no remaining liability to be released after Assured

22   has provided the plan treatment.

23        So, as Your Honor knows --

24        THE COURT:  I'm sorry.  You say that they've admitted

25   that this plan treatment provides all of the rights that

1  they're entitled to?

2       MR. SERVAIS:  They have, if there's one additional

3  assumption, which is that Assured is correct on the

4  acceleration issue.

5       THE COURT:  Yeah.  That would be a big assumption.

6       MR. SERVAIS:  That's what I will be addressing.  But

7  if we fill in that blank, at that point in paragraph five of

8  their supplemental brief they've conceded Assured has no

9  remaining liability, which means there is no release, because

10  there's nothing to be released.

11       THE COURT:  If you're right.

12       MR. SERVAIS:  Exactly.

13       THE COURT:  Okay.

14       MR. SERVAIS:  Precisely.  Thank you.

15       THE COURT:  Just checking.

16       MR. SERVAIS:  Okay.  So as Your Honor knows, the HTA

17  Plan contains substantially the same acceleration-related

18  provisions as previous Title III and Title VI plans approved

19  by this Court.  These provisions reflect the fact that all of

20  Assured's insurance policies provide that, in the event of an

21  acceleration of the underlying bonds, Assured may elect to

22  satisfy its policy obligations by paying off the bonds at 100

23  percent of principal, plus accrued interest.

24       The acceleration-related provisions in the HTA Plan

25  and prior plans are based on this existing language in

1    Assured's policies.  Assured is in no way proposing to change

2    the policies, nor does the HTA Plan in any way change the

3    policies.  For the first time in these Title III and Title VI

4    cases, a very small group of bondholders, Franklin and Nuveen,

5    have objected to these acceleration-related provisions.

6         As an initial matter, Assured was authorized, under

7    both the governing insurance agreement and the Court's

8    Disclosure Statement Order, to vote on behalf of Franklin and

9    Nuveen to accept the plan.  And, as a statutory matter,

10   PROMESA section 301(c)(3)(B) also defines the monolines as the

11   relevant holders of claims for purposes of voting on a plan.

12   Assured agrees with the Oversight Board in its supplemental

13   brief that Assured's vote on behalf of Franklin and Nuveen is

14   dispositive of their objection, and that the objection can and

15   should be overruled on that basis alone.

16        THE COURT:  So it is Assured's position that the

17   voting provision of the policy, and the PROMESA provision give

18   Assured free license in this situation to vote bondholder

19   interests in favor of a transaction that favors Assured as

20   against their own bondholders?

21        MR. SERVAIS:  That's the bargain that the bondholders

22   made in exchange for the benefit of the Assured insurance

23   policy.  As a result of that bargain, Franklin and Nuveen are

24   receiving at least 100 percent of principal, plus all accrued

25   interest.  In reality, they're receiving more than that,

1   because they're receiving a special custodial trust treatment

2   that preserves the status quo and allows them to potentially

3   continue receiving interest payments through the maturity

4   date.  If not for that bargain that they made with Assured to

5   allow Assured to vote, they would be receiving 22 percent on

6   their claims, which is what uninsured bondholders are

7   receiving.

8          So overall --

9          THE COURT:  But they would still have an action

10  against Assured, which guaranteed the bonds, so they'd have an

11  action against Assured for the other 78 percent, right?

12         MR. SERVAIS:  Not -- no, because part of the overall

13  insurance agreement was that Assured receive the voting

14  rights, so that's an integral part of the overall bargain that

15  they entered into with Assured.

16         THE COURT:  If Assured decided that overall the best

17  deal here, especially for Assured, would be that Assured would

18  only have to pay out 50 percent on the insurance, Assured

19  could vote for that as part of a plan of the bond-issuer

20  debtor?

21         MR. SERVAIS:  Not at all, because that would, in

22  fact, be inconsistent with the policy.  What's happening here

23  is not inconsistent with the policy, because the policy also

24  always contemplated the possibility of acceleration, and the

25  policy always specified the effect of acceleration.  And

1    Franklin and Nuveen purchased these bonds with knowledge and

2    notice of that aspect of the policy.

3         Assured is not trying to change the interest rate on

4    the bonds or any of its obligations under the policy.  It is

5    merely invoking acceleration-related language that has always

6    been in the policy.

7         THE COURT:  Thank you.  You can continue.

8         MR. SERVAIS:  So, as I specified, we agreed that the

9    Oversight Board -- with the Oversight Board, that Assured's

10   voting rights are sufficient to resolve the objection.  Even

11   if the Court were to reach the merits of the objection,

12   however, it should still be overruled, because the plan is

13   giving Franklin and Nuveen everything they're entitled to

14   under the policies.

15        As previously noted, Franklin and Nuveen even

16   acknowledged this in their most recent supplemental brief,

17   conceding at paragraph five that if the bonds were, in fact,

18   accelerated, then Assured has the right to satisfy its policy

19   obligations by paying principal plus accrued interest.  And in

20   that scenario, quote, according to Franklin and Nuveen,

21   Assured would not have any remaining liability to insured

22   bondholders.  There is, therefore, no dispute that Assured can

23   satisfy its obligations by paying par plus accrued interest

24   upon an acceleration.

25        THE COURT:  If --

1          MR. SERVAIS:  Right.  Exactly.

2          THE COURT:  If I agree with you --

3          MR. SERVAIS:  Right.

4          THE COURT:  -- that you have that right.

5          MR. SERVAIS:  Precisely.

6          So Franklin and Nuveen's only real contention is that

7     an acceleration has not occurred and cannot occur.  However,

8     the language in the policies just refers broad -- so the basis

9     of their contention that there cannot be an acceleration is

10    the bond documentation.  However, the policy does not refer

11    only to a contractual acceleration.  It refers broadly to any

12    acceleration, which would encompass an acceleration by

13    operation of law by virtue of a Title III filing, and --

14          THE COURT:  If 502 provides an acceleration that

15    affects the rights of third parties, and not simply an

16    acceleration that let's a bondholder of the debtor file a full

17    proof of claim.

18          MR. SERVAIS:  Correct.

19          So getting to that point of the effects of a 502

20    acceleration, so, basically, 502 allows a creditor to file a

21    claim for the full amount of the debt regardless of the

22    original maturity date.  Substantively, that is the same as

23    if, outside of bankruptcy, the creditor filed a complaint

24    asserting that the entire debt was due.  The only difference

25    is a procedural one, which is that in a bankruptcy proceeding,

1  there's an automatic stay in place, so the creditor can't file

2  a complaint.  They have to file a proof of claim.  That's the

3  only real distinction.

4         However, the cases cited in the briefing, including,

5  for example, *Granite* and also the *PCH* case that actually

6  Franklin and Nuveen cited, acknowledge that once there's been

7  a bankruptcy filing, creditors cannot only file a proof of

8  claim, they can also bring a lift stay motion to seek to

9  enforce the full amount of the debt.

10         THE COURT:  As against the debtor.

11         MR. SERVAIS:  As against the debtor, correct, but

12  that at that point, that type of acceleration is functionally

13  equivalent to any kind of contractual acceleration, except

14  that there's an automatic stay in place.  But if the stay is

15  lifted, the creditors can, in fact, treat the entire amount of

16  the debt as due and payable, and seek to enforce it as they

17  would outside of bankruptcy.

18         So this large distinction that Franklin and Nuveen

19  are trying to create between acceleration by operation of a

20  contract versus the Bankruptcy Code really isn't that

21  significant in terms of the substantive rights.

22         THE COURT:  Well, that due-on-payment statutory

23  provision seems pretty clearly to say that, in the event a

24  creditor is entitled to force acceleration as in the context

25  of a bankruptcy, whether by lift stay or otherwise, the

1   insurer is not obliged to treat that as the due date of its

2   obligation, unless the insurer agrees in its discretion to do

3   so.  So clearly there's that defensive protection of the

4   insurance business, and the insurer's assets, but where is the

5   affirmative right to do that in the code, an affirmative right

6   of an insurer to accelerate?  Insurer can't be made to

7   accelerate I see in the statute.  Insurer can accelerate

8   whenever it wants to is a little less apparent to me in the

9   statute.

10        MR. SERVAIS:  Are you referring now to the New York

11   insurance law?

12        THE COURT:  The New York insurance law that you argue

13   is at the root of your policy provision.

14        MR. SERVAIS:  Right.  So let's look at that insurance

15   law provision.  So what section 6905(a) of the New York

16   insurance law states is that, quote, every such policy shall

17   provide that, in the event of an insolvency of the obligor,

18   there shall be no acceleration of the payment required to be

19   made under such policy, unless such acceleration is at the

20   sole option of the insurance corporation.

21        So two things are notable there.  Actually, several

22   things are notable there.  One is that this provision is

23   required to be included in every monoline insurance policy,

24   regardless of whether the underlying bond documentation

25   provides for acceleration as a matter of contract.  Now,

1    Franklin and Nuveen's -- the conclusion they draw from that is

2    when this language is included in a policy where there's no

3    acceleration as a matter of contract on the underlying bond

4    documentation, this language is simply meaningless.  And they

5    actually concede that under their reading in the Assured

6    policies at issue here this language is simply surplusage,

7    because it has no application under their theory.

8           However, we know under standard principles of

9    contract interpretation, we should avoid any reading that

10   would render any language in the contract surplusage.  So by

11   virtue of that principle, Franklin and Nuveen's reading should

12   be rejected.  Assured is the only party that has provided

13   meaning to this provision within the policy.

14          Going back to the statute, however, we note that the

15   statute refers specifically to insolvency of the obligor as a

16   circumstance that would trigger this policy language, and it

17   doesn't specify insolvency if there is also a contractual

18   right to accelerate in the event of insolvency.  It just

19   refers generally to insolvency.  So that is evidence that the

20   statute contemplates automatic acceleration by operation of a

21   bankruptcy filing as a circumstance that would trigger this

22   language.

23          And, third, it refers specifically to the option,

24   quote, of the insurer to accelerate payment.  So that -- that

25   is the active element that Your Honor was referring to.  And

1   as Your Honor referred -- alluded to, really the purpose of

2   the statute is to ensure the health of the monoline insurance

3   business by allowing insurers to control when they make

4   payments, when they're faced with a large liability, as

5   Assured is here, as a result of HTA's default.  Basically, to

6   preserve the insurer's health, the insurer needs the

7   flexibility to either pay a lump sum if it can afford to do so

8   or to pay over time if that is the better option for the

9   financial health of the insurer.  And that is the policy

10  underlying this language in the New York insurance law that

11  Franklin and Nuveen are trying to undermine.

12          So just briefly, I'll actually -- I'll take the rest

13  of my time now, if possible, instead of reserving for

14  rebuttal.

15          THE COURT:  Yes.

16          MR. SERVAIS:  I just wanted to touch on a few of the

17  other ways that Franklin and Nuveen are incorrect about the

18  idea that acceleration by operation of law is fundamentally

19  different from contractual acceleration.  If you look just at

20  the cases in the briefing, in almost all of these cases,

21  acceleration by operation of law has very significant effects

22  in terms of economics and in terms of legal rights that are

23  basically indistinguishable from what the effects of a

24  contractual acceleration might be.

25          Most relevantly to this case, in *Petroleum*,

1  acceleration by operation of law imposed liability on

2  guarantors for the full amount of the accelerated debt.  So

3  it's not limited to the obligations of the debtor.  It extends

4  to guarantors as well.

5       That's also supported by the *Oppenheimer* case, where

6  the automatic acceleration was enough to change the rights of

7  the monoline insurer.  Similarly, in *Princess Baking* and in

8  *Claybrook*, acceleration by operation of law created a right of

9  set off of the full amount of the debt versus the debtor's

10  liability.  It's a very significant legal and economic change.

11       In *Manville*, the debtor would have been required to

12  pay interest on the full accelerated amount of the debt if it

13  had not been decelerated.  Similar, in *PCH Associates*, there

14  would have been a default interest rate based on automatic

15  acceleration by operation of law if not -- if the debt had not

16  been decelerated.

17       So the only exception to this rule is really in the

18  case of prepayment premiums, and that is because there is a

19  special policy-driven rule in the case of prepayment premiums,

20  which is that automatic acceleration by operation of law does

21  not defeat the right to a prepayment premium, because if it

22  did, a borrower could always defeat a prepayment premium by

23  filing for bankruptcy.  For that reason, prepayment premium

24  cases are special.  They're not really relevant here.

25  Franklin and Nuveen say as much in their briefing, that

1    prepayment cases are not really relevant, and yet their only

2    main authority that they rely on, *Premier*, is a prepayment

3    premium case that relies on the special prepayment premium

4    doctrine.  So their leading case is actually irrelevant in

5    this context.

6            So just briefly returning to the exculpation, because

7    Assured is right about the accel -- okay.  Well, two more

8    points.  One, in the alternative, as you know, if there's not

9    automatic acceleration, there could be acceleration by virtue

10   of the plan.  They don't really provide any legal reasons that

11   that could not occur.  And because Assured is right about

12   acceleration, there is no release of liability, because if we

13   are right about acceleration, then Franklin and Nuveen agree

14   with exactly what section 26 says, which is that Assured has

15   satisfied its policy obligations if it provides the treatment

16   under the plan.

17           (Sound played.)

18           MR. SERVAIS:  Thank you, Your Honor.

19           THE COURT:  Thank you.

20           I want you to stay there, and your responses to these

21   questions are on my dime timewise.

22           MR. SERVAIS:  Okay.

23           THE COURT:  So you've relied on *Oppenheimer*

24   extensively, but I'm not yet persuaded that *Oppenheimer* is

25   authoritative as to bankruptcy acceleration, much less as to

1    its effect on non-debtor parties.  And it doesn't seem from

2    the research that we've conducted that *Oppenheimer* has been

3    cited by anybody else for these particular propositions, and

4    so I don't really see a basis for it to be characterized as a

5    leading case on these issues as you've done.

6         Do you have any other authority relying on

7    *Oppenheimer* for these issues or any other authority where

8    there was not a contractual acceleration provision?

9         MR. SERVAIS:  So *Oppenheimer* is, for better or worse,

10   the most detailed discussion of the operation of New York law

11   governed financial guarantee insurance in a chapter nine

12   bankruptcy context.  Franklin and Nuveen don't have anything

13   contrary to it.  It's far -- pardon me.  It's far more

14   persuasive than anything that Franklin and Nuveen have

15   presented.

16        It is a New York court analyzing the same policy

17   language, and basically exactly the same context.  In terms of

18   acceleration occurring regardless of a contract provision,

19   that occurred in many of the cases cited in our briefs.  So

20   there simply was no contractual acceleration language in the

21   contract, or because the contractual language wasn't

22   triggered, but the acceleration by operation of law achieved

23   essentially the same result.

24        So in *Petroleum*, for example, there was a mechanism

25   for contractual acceleration, but it wasn't triggered, because

1   the notices weren't sent.  Nonetheless, the Court said that

2   the result was exactly the same as a result of automatic

3   acceleration by operation of the Bankruptcy Code.  In *Princess*

4   *Baking*, there is no discussion of whether there was a

5   contractual acceleration provision, but the Court relied

6   entirely on acceleration by operation of law to conclude that

7   the creditor could assert a set-off claim for the full amount

8   of its debt, not just the amount that had been due prior to

9   the petition date.

10         In *Manville*, again, there was a contractual

11  acceleration provision, but it hadn't been triggered, because

12  the notices hadn't been sent.  Nonetheless, the Court

13  recognized that the debt was accelerated purely by operation

14  of law.

15         In *PCH Associates*, which was actually cited by

16  Franklin and Nuveen, again, there was a contractual

17  acceleration provision.  It wasn't triggered, but the result

18  was the same, because of acceleration by operation of law.

19         And then there are a couple of cases where I would

20  say that the Court essentially made an alternative holding,

21  based on acceleration by operation of law.  So that would

22  include *HSBC*, where this had been a contractual acceleration,

23  but the Court basically said, the result is also the same

24  based purely on acceleration by operation of law.

25         And similar to that, I would say, is *Claybrook*, where

1   there had been a contractual acceleration, but the Court

2   basically said, and the result would be the same alternatively

3   under acceleration by operation of law.  And, really, the only

4   cases that fall outside of that paradigm are these cases

5   dealing with prepayment premiums, which would include

6   specifically *Premier*, which is their lead case.

7           And the special prepayment premium doctrines are also

8   discussed for example in *In re Skyler Ridge*, and that's a

9   special policy-driven doctrine, because otherwise a borrower

10  could always defeat the prepayment premium by filing for

11  bankruptcy.

12          So those cases are a universe unto themselves.  Their

13  only case that they rely on, *Premier*, falls within that

14  universe of cases which are essentially an exception.  Aside

15  from that specific factual scenario, acceleration by operation

16  of law functions very similarly to any kind of contractual

17  acceleration.

18          THE COURT:  Thank you.

19          Another question.  The Oversight Board has said that

20  if there are third-party releases, it will file an amended

21  plan removing them.  In order to resolve this objection, do I

22  have to determine the proper interpretation of your sample

23  plan language regarding acceleration to rule on confirmation?

24  Is there any way that I can confirm here without agreeing with

25  you on acceleration?

1           MR. SERVAIS:  I think there are at least two ways.

2    One is the way that the Oversight Board has pointed to, which

3    is Franklin and Nuveen gave up their voting rights, Assured

4    accepted the plan on their behalf, they have accepted the

5    plan, and their vote also voted in favor of the plan, which is

6    binding under the code.

7           The other way is we did run through the *Master*

8    *Mortgage* factors.  The reason that we did that was not because

9    we think there are any third-party releases.  We agree with

10   the Oversight Board that there are not, but we think that the

11   Court could conclude that it's essentially irrelevant whether

12   there are any third-party releases, because Assured clearly

13   satisfies the *Master Mortgage* factors.  So even if there were

14   such releases, they would be acceptable, and there's no need

15   for a ruling as to whether there are, in fact, such releases.

16   And that was the only reason -- purpose for which we cited

17   *Master Mortgage*.

18          To be clear, we're not proposing that any release

19   language at all be added to the plan.  We fully support the

20   Fifth Amended Plan in its current form, as filed by the

21   Oversight Board.

22          THE COURT:  So that brings me to *Master Mortgage*.  So

23   Assured here is receiving plan consideration, and Assured's

24   already obligated contractually to pay principal and at least

25   some interest.  So how do you satisfy the substantial

1   contribution of assets *Master Mortgage* factor?

2         MR. SERVAIS:  So Assured is paying obviously a huge

3   amount net of what the value of the plan consideration is, and

4   the calculation of Assured --

5         THE COURT:  But you sold an insurance policy, and had

6   a contractual obligation to do that.

7         MR. SERVAIS:  Correct.  So in cases where third-party

8   releases are granted, under *Master Mortgage*, the facts -- I

9   mean, very few people just fund into a bankruptcy case out of

10  the kindness of their hearts or out of charity.  The reason

11  that a substantial contribution is typically made into a

12  bankruptcy case is because the party making that contribution

13  would potentially face some kind of liability of its own, but

14  in the interest of resolving that liability, as part of the

15  larger restructuring, the contribution is made into the

16  bankruptcy case, and then the party making that contribution

17  receives a release.

18        So that's -- that's the classic scenario in which

19  third-party releases are justified, and we clearly fit within

20  that paradigmatic type of scenario.

21        THE COURT:  Even when it is a contribution of assets

22  that otherwise wouldn't be available for satisfaction of the

23  debtor's liability or coverage of the debtor's liability?  I'm

24  trying to articulate a conceptual distinction between paying

25  administrative expenses that the debtor might otherwise be

1    liable for, providing financing, putting in some sort of new

2    money that's not already the subject of a prepetition

3    contractual obligation.  Am I off base in thinking that

4    there's a relevant distinction there?

5              MR. SERVAIS:  I think -- so a class -- a very typical

6    scenario would be that some kind of operating company has a

7    liability.  There are also potential claims against the

8    parent.  The operating company will be put into bankruptcy.

9    The parent will make a contribution to the bankruptcy case in

10   exchange for receiving a release of its own potential

11   liability.

12             So *Residential Capital* would be an example, just one

13   case that I worked on.  *Residential Capital*, the subsidiaries

14   were put into bankruptcy.  The parent company made a

15   substantial contribution, and received a release.  Many of the

16   mass tort cases also follow this pattern.  So often --

17             THE COURT:  So the *Res. Cap.* parent could potentially

18   have been sued, but wasn't directly on the hook for the money

19   that it put into the subsidiary?

20             MR. SERVAIS:  It was potentially -- it could have

21   been sued under theories of, for example, veil piercing,

22   things -- basically types of theories that would collapse the

23   parent's liability into the subsidiary's liability.

24             THE COURT:  And Sacklers, for instance --

25             MR. SERVAIS:  Not a great ex -- right.  So that would

1    be an example.  But -- so it's not the case that simply

2    because Assured would have potentially its own liability, it

3    would not be entitled to a third-party release.  On the

4    contrary, that would be a reason for Assured to fund into the

5    plan.

6          I would also note that Assured's agreement to this

7    plan is based on the language that's currently in the plan.

8    It's not clear that Assured would support a plan that didn't

9    contain that language.  So there is the potential for the HTA

10   restructuring to move back towards square one if any of this

11   language were removed.

12         And I would also note that the equivalent language

13   exists for each of the other monolines.  Every section for

14   each monoline in section 26 has this same language about

15   the -- the obligations of the monoline being satisfied.  So if

16   that were found to be a third-party release, and that were

17   found to be impermissible, that would presumably have to be

18   stricken from every monoline provision, which, again, given

19   that the monolines are the principal supporters of this plan,

20   could move the entire restructuring back to square one.  And

21   --

22         THE COURT:  For that to be found to be a

23   non-consensual third-party release, and we haven't had any

24   other bondholders than the IBG claiming that their monoline

25   misrepresented their level of consent or approval of these

1 | provisions --

2 |       MR. SERVAIS:   Right.   I don't -- I don't know

3 | offhand, to be completely honest, if that type of just lack of

4 | objection would be sufficient to render a third-party release

5 | consensual.   I would have to look into that.   I don't know for

6 | certain.

7 |       But something else I would point out would be if

8 | these -- if this type of language were uniquely stripped out

9 | of Assured's provisions of the plan, Assured would potentially

10 | have an unfair discrimination objection to the plan based on

11 | the fact that the other monolines are receiving superior

12 | treatment to Assured, notwithstanding that they are similarly

13 | situated and Assured has reserved its rights to object to a

14 | plan.

15 |       Assured has rights to terminate the PSA and, in that

16 | case, its votes in favor of a plan would be nullified.

17 | Assured could bring a motion under Rule 3018 to change its

18 | votes.   So there's a lot of potential for the restructuring to

19 | simply go back to square one in the event the plan is not

20 | approved in the form that Assured currently supports.

21 |       THE COURT:   In the world of theory and possibilities,

22 | there's also, at least in theory, a possibility that Assured

23 | could have a side agreement with the IBG that satisfies the

24 | IBG to withdraw its objection and doesn't -- and doesn't

25 | require any changes in the structure of the plan, yes?

1        MR. SERVAIS:  I think that would raise -- I think

2   that would raise issues under 1123 as to whether all claims in

3   the class are receiving the same treatment.  I think it would

4   also potentially raise --

5        THE COURT:  But you're not the debtor.

6        MR. SERVAIS:  Right.  It would raise issues under

7   1123(a)(4) as to whether all claims are receiving the same

8   treatment.  It could also raise -- potentially it probably --

9   this could probably be worked around.  It could raise

10  bankruptcy fraud concerns if Assured were to have some kind of

11  undisclosed agreement between Franklin and Nuveen.

12       So if there were such an agreement, it would probably

13  have to be disclosed, but usually the time for doing that

14  would be in the context of the Disclosure Statement, so that

15  other parties that are either voting or making elections would

16  have knowledge of that special treatment for Franklin and

17  Nuveen, so that that can inform their decisions whether to

18  vote or elect.  And we're kind of past that point right now,

19  so, again, we'd probably have to go more back towards the

20  Disclosure Statement part of the case in order to implement

21  that type of side agreement with Franklin or Nuveen.

22       THE COURT:  Thank you.  Thank you for engaging with

23  me on these questions.

24       MR. SERVAIS:  Thank you very much.

25       THE COURT:  So now we have Ambac.  Thank you.

1          Hello, Ms. Miller.

2          MS. MILLER:  Good morning, Your Honor.  Atara Miller

3    from Milbank on behalf of Ambac Assurance Corporation.

4          So that rabbit hole that you just started going down

5    is part of the reason why we asked to be heard in connection

6    with this objection, despite the fact that we did not put in a

7    formal response, because, frankly, we read the Franklin and

8    Nuveen objection as being limited and addressing only the

9    Assured insured bonds, and not affecting any Ambac-related

10   bonds or policies.

11         I would note in this regard that Franklin and Nuveen,

12   based on their 2019 statement, clearly hold significant

13   insured bonds by other monoline -- insured by monolines other

14   than Assured, and have not raised any objection with respect

15   to the treatment of those bonds under the plan.  So I want to

16   address this sort of argument and suggestion of what happens

17   and how much does this effect all of the monolines.  And I

18   took some comfort in Your Honor's questioning early on about

19   whether a carve-out might be a way to address some of this,

20   because I do think that we run into a lot of issues if we

21   start thinking about this as an objection broadly to the

22   provision in the plan that provides for the acceleration or

23   provides that the HTA bonds have been accelerated.

24         The consequence of that -- I think there are legal

25   issues and practical issues that are raised on the legal

1    issues.  I will say that Ambac's been a proponent from day one

2    in these cases of the fact that the bankruptcy does trigger an

3    acceleration of the bonds.  We think that 502 does impact the

4    insurance policy, because it's not truly an agreement between

5    the third parties, but the insurer's obligation is tied

6    entirely and is entirely derivative of the bankrupt entity's

7    obligation, because it's tied to the due-for-payment, which is

8    when the original bond is due for payment.

9          So if it's accelerated as against the entity, it's

10   also accelerated as under the policy, and that's why you

11   require the policy, and, frankly, the statutory provision that

12   says, wait a minute, insurers don't have to pay.  You know, I

13   would say that I think that the IBG has raised the fact that

14   Assured took a contrary position in COFINA.  I think if you

15   look at the terms of that settlement, that issue was

16   litigated.

17         We obviously took the position that the bonds were

18   accelerated, and if you look at the results of that

19   settlement, there's no question that the stronger view that

20   prevailed was that acceleration was likely going to be the

21   holding.  And that's reflected in the financial treatment of

22   the seniors versus subordinate bondholders.

23         (Sound played.)

24         MS. MILLER:  So I think Assured advocated for a

25   different position, but that was not what carried the day

1  there.

2          Your Honor, can I just have two minutes?  I want to

3  raise two quick, practical issues.

4          THE COURT:  Yes.

5          MS. MILLER:  Thank you, Your Honor.

6          So two practical issues that haven't been raised with

7  respect to acceleration:  One is that acceleration is required

8  here in part to address certain issues that benefit

9  bondholders, and I'll say that it was actually a requirement

10 when we, Ambac, put together the first trust structure in

11 connection with COFINA, it was a requirement of the Oversight

12 Board's advisors that there be a provision that allow for

13 accelerated payments to ensure that early payment on the bonds

14 get passed through directly to bondholders, and that was

15 necessary to preserve any tax exempt status of the bonds for

16 the benefit of the holders, because if you don't immediately

17 pass through those proceeds, they're taxable for the

18 bondholders.  And that was a condition that if you put in

19 place a trust structure, that you preserve that.

20         So here, I think the IBG has said they would be okay

21 with that.  They're either right or wrong.  Accelerated

22 payments are either allowed or not.  They can't be okay

23 accepting early payments when it benefits them, because they

24 don't want to pay taxes on the triple tax exempt bonds, but

25 it's not okay if it's, you know, allowing Assured to get away

1   from paying the premium.

2   The second one is related to some of the issues that

3   Mr. Servais was raising, which is, you know, bondholders under

4   the plan had to elect -- the monolines voted, but the

5   bondholders elected their treatment, and they could elect to

6   either commute their policies and get the plan consideration

7   and additional monoline consideration immediately, or they

8   could elect to go into the trust.  And the terms of the trust

9   included the right of the monolines to make accelerated

10  payments, were disclosed, and presumably were part of the

11  basis on which bondholders made that election.

12  So to the extent you're going to eliminate the right

13  to make accelerated payments --

14  (Sound played.)

15  MS. MILLER:  -- I think you need to resolicit

16  election of the bondholders.  So unless Your Honor has any

17  questions, we rest on the issue.  Thank you.

18  THE COURT:  Thank you, Ms. Miller.

19  Next is MAPFRE, but MAPFRE is resolved, so

20  Mr. Sanchez said he would not want to argue again on that.  So

21  now we'll go to Mr. Mudd for Vazquez-Velazquez.

22  MR. MUDD:  Again, good morning, Your Honor.

23  THE COURT:  Good morning.

24  MR. MUDD:  Let's see what we have.  We have --

25  Mr. Cespedes' statement explains very well the work that they

1    do, that the plaintiffs do or did, actually, most of them do,

2    for safety, et cetera, in the contracts that are involved with

3    the HTA.  Now, we have federal regulation FHWA-1273.

4    Specifically, section one specifies that the -- that that

5    regulation has to be incorporated into the contracts that have

6    federal funding for highways.  Article 7 explains the

7    requirements for safety, which are extensive, and are not only

8    there, but are also explained by Mr. Cespedes.

9         If we go to the HTA regulation 02 -- 02-017, Article

10   1, first paragraph, last sentence, this responsibility lies on

11   the construction area director, the regional director, the

12   supervisors, and the project managers.  Said personnel ensures

13   quality control materials, compliance with contractual

14   obligations, and, thus, the interests of the Authority.

15        The third paragraph, the last sentence -- or next to

16   last sentence specifies, it is emphasized that the fulfillment

17   of the responsibilities -- these officials are obligated to

18   make extraordinary efforts to ensure that the contractors

19   carry out the projects effectively and efficiently, as agreed

20   on in the contract.  The compensation that they received under

21   this regulation was for the work that they did actually in

22   this work -- not all engineers in the HTA do this work.

23   There's actually volunteers who do this.

24        Yes, Your Honor?

25        THE COURT:  So it seems to me that the regulations

1  that you cited talk about particular work that needs to be

2  done, or a quality of work that needs to be done in order to

3  satisfy the regulation.  Is there any federal law, or

4  regulation, or Commonwealth statute implementing the -- a

5  specific federal law regulation requiring HTA to pay this

6  specific extra compensation that was provided for under the

7  regulation 02-017?

8          I'm trying to understand --

9          MR. MUDD:  No.  Okay.

10          THE COURT:  -- whether there's a distinction.

11          MR. MUDD:  I don't believe there's any federal

12  regulation that requires that.  What it requires is that the

13  safety, et cetera, be monitored, et cetera, and the HTA, under

14  the 02-072, specifically created this compensation for these

15  people.  This has been going on -- was going on since the year

16  2000.

17          THE COURT:  So would it be your position that

18  outstanding compensation for any kind of work that was

19  connected to a federal program and helped to promote the safe

20  execution of that program is nondischargeable?

21          MR. MUDD:  Yes, Your Honor.

22          THE COURT:  So health care workers' back pay is

23  nondischargeable if they worked in clinics that received

24  federal funding, notwithstanding normal bankruptcy fences

25  around back pay?

1        MR. MUDD:  Yes, Your Honor, but that is not an issue

2   here.  We're talking about the actual work my clients do.  But

3   yes, I would agree with that.

4        THE COURT:  Yes.  I'm just trying to understand how

5   broad --

6        MR. MUDD:  Yes.

7        THE COURT:  -- your underlying principle is.

8        MR. MUDD:  Yes.

9        THE COURT:  Those were my only questions.

10       MR. MUDD:  If the Court has no further questions, I

11  would have no further arguments.

12       THE COURT:  Thank you, Mr. Mudd.

13       Mr. -- let's see.  It's 11:15.  We'll hear

14  Mr. Capdevila for Finca Matilde, then we'll take our break and

15  hear the Oversight Board's response and the rebuttals.

16       Did you wish to reserve time for rebuttal,

17  Mr. Capdevila?

18       MR. CAPDEVILA-DIAZ:  Yes, Your Honor.  Two minutes.

19       THE COURT:  Okay.  So that leaves you six for

20  principal, and two for rebuttal.  You can begin now.  Thank

21  you.

22       MR. CAPDEVILA-DIAZ:  Your Honor, Eduardo Capdevila,

23  for the record, on behalf of Finca Matilde.

24       Your Honor, Finca Matilde's objection raises three

25  arguments.  One issue is on the voting, which -- whether or

1   not class 15 of the eminent domain claims were entitled to

2   vote or not.  However, that was -- that objection is moot in

3   light that counsel for the Board already informed us that the

4   class objected.  So that issue is moot.

5          The second issue is that the plan does not reflect

6   that the First Circuit confirmed the plan, and that it was not

7   clear that the -- whether or not we were relitigating the same

8   issues as in the main case of the Commonwealth.  Today,

9   Counsel for the Oversight Board does that.  This was probably

10  resolved with the findings of facts and conclusions of law at

11  paragraph 40.  We agree to some extent, to the extent that it

12  shows that it's not attempting to relitigate.

13         However, the third issue, which is the payment of

14  post-petition interest, is still pending.  The definitions of

15  the plans clearly state that an allowed claim that -- are to

16  be paid, and "allowed claim" is defined to not include

17  post-petition interests.  Therefore, in the case of *Nix*, just

18  compensation was -- as stated by the Supreme Court, includes

19  post-petition payments, it includes any interest accrued up

20  and until payment in full.  Therefore, given the definitions

21  of the plan and the proposed treatment, the plan suggests that

22  eminent domain creditors such as my client will not be paid

23  post-petition interest.

24         In the latest proposed findings of facts and

25  conclusions of law, it states that they are not subject to

1     discharge or impairment.  That's what they are proposing the

2     Court to find.  But if you're not paying what we are entitled

3     to, pursuant to non-bankruptcy law, there is an impairment.

4     If, however -- if the Board means, by the inclusion of

5     paragraph 40 in the proposed findings of facts and conclusions

6     of law, that it intends to pay post-petition interest, well,

7     then we would have no objection.  But the fact is that given

8     those definitions, my client is being impaired, and the

9     confirmation would be unconstitutional as violating the

10    Takings Clause of the Fifth Amendment.

11            Thank you, Your Honor.

12            THE COURT:  Thank you, Mr. Capdevila.

13            So, at this point, we will take a ten-minute break,

14    and we will actually -- we'll just return at 11:30 by that

15    clock, which is a bit more than ten minutes.  So, and then we

16    will recommence with Mr. Rosen's remarks for the Oversight

17    Board, and then go to rebuttals.

18            I remind everyone to be respectful of the other

19    proceedings that are going on.  So don't be rowdy in the

20    atrium, please, and let people by.  Thank you.  We'll see you

21    at 11:30.

22            COURT SECURITY OFFICER:  All rise.

23            (At 11:15 AM, recess taken.)

24            (At 11:30 AM, proceedings reconvened.)

25            THE COURT:  Please be seated.

1              Mr. Rosen, it's been brought to my attention that the

2    interpreter who has been brought for the public speakers is on

3    a tight timetable, and so there are three public speakers, so

4    I want to turn to that part of the agenda before your

5    responsive argument.

6              So, ladies and gentlemen, as background -- just one

7    moment.  Thank you.  The Court reserved a block of time on

8    this Confirmation Hearing agenda for the presentation of

9    remarks and arguments for members of the public, and made a

10   registration system available.  Twelve people responded, and

11   three of the five residents of Puerto Rico who registered and

12   confirmed their intention to appear in court are here to speak

13   today.  This is an opportunity for these members of the public

14   to participate in this historic confirmation hearing by

15   sharing their thoughts and perspectives regarding the proposed

16   plan of adjustment for the Highways and Transportation

17   Authority.

18             The Court appreciates that many lives are seriously

19   effected by what has taken place since the Commonwealth filed

20   its Title III petition.  The people of Puerto Rico have

21   valiantly and patiently weathered the roughest storms, endured

22   financial difficulties, and persevered through an

23   unprecedented pandemic, as well as earthquakes during the

24   pendency of these restructuring proceedings, as AAFAF's

25   counsel acknowledged earlier in this proceeding.

1            Members of the public, your comments and reflections

2   on the proposed HTA Plan are an important part of the

3   Confirmation Hearing, and I will be listening carefully, along

4   with the government and party representatives who are present,

5   and those who are listening by phone.  I do remind you and

6   everyone else again that no recording or retransmission of the

7   hearing is permitted by anyone, including but not limited to

8   the parties, members of the public, or the press, and

9   violations of this rule may be punished with sanctions.

10           I will be calling on each member of the public who is

11  here to speak and provide their testimony.  When your name is

12  called, please approach the podium and identify yourself by

13  stating your full name before you begin your remarks.  We have

14  ensured that interpretation services are available to any

15  speaker who needs Spanish-to-English translation.

16           You will see a yellow signal light when two minutes

17  are remaining in your allotted time, and when your time is up,

18  you'll see a red light and hear two buzzes.

19           Can we have a sample of the buzz sound one more time?

20           (Sound played.)

21           THE COURT:  Thank you.

22           If anyone has difficulty hearing me or another

23  participant, raise your hand here in the courtroom.  Also,

24  before I call on the first speaker, I want to remind the

25  speakers that they've each been allotted ten minutes of

1  speaking time, including the time needed to interpret the

2  comments into English.  If additional time seems to be needed,

3  I may permit you to finish your remarks on a particular topic,

4  but I do encourage each of you strongly to stay within your

5  time limitations out of respect for your fellow residents who

6  come to speak and the conduct of these proceedings.  Thank

7  you.

8           The first speaker is Eliza Llenza.  Would you please

9  come to the podium?

10          MS. LLENZA:  Hello, Your Honor.

11          THE COURT:  Hello.

12          MS. LLENZA:  Can I take this off to speak or should I

13  --

14          THE COURT:  Yes, you can take it off to speak in the

15  box, and when you come back out, you can put it on.  Thank you

16  for coming here today.

17          MS. LLENZA:  Thank you.  My name, for the record, is

18  Eliza Llenza, and it's spelled like Eliza.

19          Good morning, Your Honor.  My name is Eliza Llenza,

20  and I thank you for the opportunity to be heard.  I am only

21  one of the thousands of citizens who have been greatly

22  effected by decisions made by the government officials without

23  our knowledge that have provoked the financial crisis that has

24  lead us to bankruptcy.

25          I respectfully wish to say that, as many others, we

 1    feel that the people are not represented in this court.  I am

 2    here to honor past generations of hard-working people who

 3    followed all the rules, pursuing with dedication and

 4    persistence in education under decent work ethics, which

 5    promised stability, progress, and liberty, the American dream.

 6          I am also here deeply concerned of the future of my

 7    island, feeling the need to stand up to a situation which

 8    endangers the well being of present and future generations.

 9    No one was born rich in my family.  I have lived here all my

10    life, raising kids on my own while struggling economically as

11    a freelance journalist and researcher, dedicating a large part

12    of my time to social causes, community work, and cancer

13    patients, experiencing the hardship and suffering of many in

14    this humanitarian crisis.

15          This 14-year economic crisis has deeply impaired the

16    possibility of living a simple, dignified life for a large

17    part of the population here on the island, being that more

18    than 50 percent live under the poverty level.  Most feel

19    shocked and impotent beyond comprehension as it is all being

20    taken away, and they no longer have a chance to start again.

21    Most don't know or understand what's happening and how to

22    defend themselves.

23          In the times of my elders, Puerto Rico was a place of

24    law and order, which gave people a feeling of security and

25    felt protected by the government they trusted.  We feel

1   betrayed and helpless.  This economic mess that we are in came

2   as a surprise, since most transactions were done and still are

3   being done without the knowledge or participation of the

4   people.  We were always made to believe everything was done

5   properly and approved complying with laws and regulations.  We

6   never expected this to happen, since so many regulations and

7   clearances are supposed to be taken before contracts are made.

8   Questions remain unanswered.

9          Now, under bankruptcy, access to the information has

10  been denied, even to elected public officials in some cases,

11  and to the press.  And the press has had to go to court to

12  access information, something individually -- individual

13  people hardly can afford to do.  Bankruptcy is supposed to

14  offer a new start with basic needs provided for people, but

15  instead of alleviating us economically, they are greatly

16  compromising our limited resources.

17         We have seen how economic settlements and agreements

18  are being made that compromise us and future generations for

19  decades, even though the Financial Oversight Management

20  informed the Court that it recognized that part of the debt

21  might be -- that the debt emissions of the government were

22  done in violation of the Constitution.  They were not

23  eliminated before negotiating the agreement.

24         From the beginning, those that have claimed these

25  loans are illegal have demanded an audit of the debt.  And how

1   many other similar claims might be true with this Highways

2   Authority debt and could drastically change things and

3   alleviate our burden?  Now we face a third plan of adjustment

4   for the Puerto Rico Highways & Transportation Authority.  This

5   agreement will impose severe annual raises and toll fairs for

6   decades, which will make it very difficult for ordinary people

7   to afford when people have no choice other than to use

8   personal transportation for daily commuting since Puerto Rico

9   lacks public transportation.

10          The economic development of Puerto Rico is largely

11  concentrated in a few municipalities.  A great percent of jobs

12  are in the Metropolitan San Juan zone and the cities of

13  Guaynabo, Bayamon, Caguas, and Carolina.  It is financially

14  impossible for the majority of minimum wage workers to pay

15  more to use the highways, since all attempts to improve labor

16  conditions and salary raises through legislation is opposed by

17  the Financial Board.  Raising tariffs will also apply to

18  commercial transportation, which will inflate prices for all

19  goods on the island.

20          Bankruptcy is supposed to offer a new start, with

21  basic needs provided, but instead of making it easier for us,

22  we have more compromising of our limited resources.  With

23  PROMESA, the people in bankruptcy have financed a parallel

24  government, the junta, which has cost us millions when the

25  original situation had made it impossible to finance our own

1    government.

2        It is cruel and inhumane to see money squandered

3    recklessly when funds to cover essential services are being

4    drastically reduced, and we were told PROMESA precisely calls

5    for these services to be identified and the necessary fund

6    established to serve the people adequately.  PROMESA's

7    austerity was bad enough, but after Maria's devastation, the

8    earthquakes and COVID-19 pandemic, with the lockdowns and so

9    many restrictions, the new reality makes it unbearable.  It

10   seems that no one is providing a safety net of funds to

11   address unexpected situations like the drastic rise in costs

12   for basic necessities, and the fuel crisis that the Ukrainian

13   conflict has caused.

14       Puerto Rico's reality is quite unique since we are

15   not connected to the mainland, and greatly depend on imports

16   which are directly effected by things we have no control over.

17   The junta has stated that Puerto Rico will default again, most

18   likely, and if more people continue to migrate, complying will

19   become impossible.  God forbid we suffer another natural

20   disaster.

21       We have been fooled and lied to by our government

22   officials, who have not complied with their fiduciary duty to

23   protect and administer our assets and resources, and also by

24   powerful banking and investment companies who went ahead and

25   issued the bonds, and also lied to those trusting clients who

1    originally had their money taken thinking these investments

2    were supposed to be safe, and, therefore, had no knowledge of

3    the risks involved.  Those responsible for this wrongdoing

4    should pay with their money, their assets and insurances, so

5    that justice be served.

6           Judge Swain, please choose justice for the people of

7    Puerto Rico, and go down in history as a bankruptcy judge

8    whose leadership corrected Puerto Rico's finances.  Thank you.

9           THE COURT:  Thank you, Ms. Llenza.

10          The next speaker is Angel Pinto Rivera.

11          Good morning, sir.

12          MR. PINTO-RIVERA:  Good morning, Your Honor.  I

13   prefer to speak in Spanish and use the translator.

14          THE COURT:  Very well then.

15          MR. PINTO-RIVERA:  Thank you.

16          First of all, we would like to thank you for the

17   opportunity to be here.  As representatives of the employees

18   of the PRHTA, we believe the fiscal and adjustment plan of the

19   PRHTA should not be confirmed for several reasons.  First of

20   all, since collective bargaining has been prohibited since

21   2016, our membership has suffered a series of measures of

22   austerity by which acquired rights and fringe benefits

23   resulting from collective bargaining have been reduced or

24   eliminated through administrative orders and legislation.

25          We believe the fiscal situation and the debt of the

1    PRHTA are due in part to erroneous and bad judgment decisions

2    on the part of executive and managerial officers of the PRHTA,

3    other government agencies, and brokerage firms.  And, Your

4    Honor, we believe liability should be imposed on those who

5    abused the trust that was placed in them and misspent public

6    funds.  This measure is urgent, and will guarantee a better

7    public administration in the PRHTA and the country in general.

8          We believe any increase in tolls or services to be

9    paid by citizens should be justified, and should have the

10   effect of citizens receiving better services, not to provide

11   profits to private entities.  This should be used, as was done

12   in the past, through the Department of Public Works, part of

13   the constitutional cabinet, and not through external resources

14   that are led by profits and -- in other words, Your Honor,

15   adjusting the plan to guarantee the money of bondholders, it

16   will be to the detriment of the operations of the HTA, the

17   wages, and the benefits of workers, and it will not allow the

18   PRHTA to become rehabilitated or become -- or get out of

19   bankruptcy successfully.  Therefore, the fiscal plan should

20   not be confirmed.

21          Thank you, and have a very good day.

22          THE COURT:  Thank you for coming here, and I wish you

23   a good day as well.

24          The final public speaker is Jose Rivera-Santana.

25          MR. RIVERA-SANTANA:  Good morning.

1          THE COURT:  Good morning.  Would you please state

2     your full name before you make your remarks?

3          MR. RIVERA-SANTANA:  Of course.  We thank the Court

4     for giving us the opportunity to address the Court this

5     morning.  My name is Jose Rivera-Santana.

6          For the past 28 years, I have worked in planning in

7     Puerto Rico, both in the public sector and the private sector.

8     I appear here today before this Court in my capacity as a

9     resident of this country of ours.  In addition, I am a member

10    of the Citizens Committee for the Incomprehensive Audit of

11    Puerto Rico's Public Debt.  The committee is comprised of

12    citizens.  It is not governmental, partisan, or

13    multi-sectoral.  It was founded by the members of public

14    interests that form part of the public committee created by

15    Act No. 97 of July 1st, 2015, to perform a comprehensive audit

16    of Puerto Rico's public debt.  Unfortunately, this act was

17    repealed in April 2017 by the administration of former

18    Governor Ricardo Rossello-Nevares.

19         We believe that, in considering this adjustment plan,

20    one should have in mind or take into account one of the main

21    criteria, which is an inevitable, objective reality.  In

22    Puerto Rico, the population is of 3.1 million inhabitants, and

23    there are 2.8 million motor vehicles registered according to

24    data from the Department of Transportation and Public Works.

25    This high proportion of vehicles per person is due to several

1  factors, among others, the lack of a collective transportation

2  system, and the adoption of territorial planning policies that

3  have privileged urban spreading and fostered distancing

4  between economic activities and residential areas.

5  Consequently, over 85 percent of people use their private

6  automobile as their main means of transportation to work.

7  This reality, in fact, makes the social disadvantages worse,

8  as it forces medium and low income sectors to spend more of

9  their personal budget on private transportation.  It has been

10  estimated through various studies that this expense fluctuates

11  between 7,500 and 9,000 dollars per year, which is much more

12  than what is spent on food.

13          In keeping with the foregoing, it is easy to conclude

14  that any measure that will entail increases in the cost of

15  transportation to go to work and places to receive services,

16  will entail a greater economic burden on people and families,

17  as private automobiles have become an inevitable necessity.

18  According to the PRHTA's fiscal plan, in order to achieve

19  sustainability of the adjustment plan, annual increases will

20  be imposed on tolls and fines which are divided in four, an

21  annual increase in tolls of 8.3 percent during the first three

22  years.  After 2025, there will be two types of annual

23  increases in tolls for the next 40 years, a set increase of

24  1.5 percent, variable increases for inflation adjustments,

25  also, annual increases and fines will be imposed to adjust

1    those to inflation for 40 years, and the establishment of

2    two-way toll plazas where right now there is only an one-way

3    toll.

4           It is worth mentioning that these increases would be

5    carried out in a country whose economy has been stuck for the

6    past 16 years, and a generalized increase in the cost of every

7    good and service, in other words, the operant inflation trend

8    is eating away the already miserable salaries.  As to what the

9    adjustment plan provides regarding the PRHTA's debt, we want

10   to make the following comments:  The total debt of the PRHTA

11   amounts to about 6.7 billion dollars.  The Board has told the

12   country that the reduction of the debt included in the

13   adjustment plan is of about 80 percent, as the new debt issued

14   would be 1.2 billion dollars.  The reduction seems to be high.

15   However, in order to evaluate it, we must necessarily examine

16   the composition of the PRHTA's debt.

17          This debt can be divided in three different

18   categories:  The debt in bonds, the debt in GDB loans, and the

19   debt in general -- in unsecured general claims.  It must be

20   pointed out that the GDB's debt was the first restructuring

21   carried out under Title VI of PROMESA, a process that was

22   carried out out of court, and the consequence said

23   restructuring of the GDB -- as a consequence of said

24   restructuring of the GDB, it no longer exists as an entity,

25   and most of its assets are transferred to the GDB's Debt

 1  Recovery Authority to pay the bondholders.  In other words,

 2  the greatest reduction of the PRHTA's debt type are the GDB

 3  claims, which consist in delinquent debts, past due debts of

 4  the government with the government itself, with the entity

 5  whose operations have ceased.  These -- therefore, these

 6  unsecured claims are of very low value, if not of no value at

 7  all.

 8          (Sound played.)

 9          MR. RIVERA-SANTANA:  Moreover, we are worried that

10  the supposed sustainability of this plan -- as part of this, a

11  new loan is being taken out, which the central government will

12  have to grant to the Highways Authority to make viable the

13  first payment in cash to bondholders under this new adjustment

14  plan.  The principal amount of this loan will be of 314

15  million dollars, and it will be paid until 2052.

16          It is questionable that the restructuring of the

17  PRHTA's debt requires a central government loan.  That is,

18  more burden for the general fund.

19          THE COURT:  Sir, before you go on, your time has

20  expired, and so I would ask you to go to the conclusion of

21  your remarks.

22          MR. RIVERA-SANTANA:  Certainly.  I was about to do

23  that.

24          THE COURT:  Thank you.

25          MR. RIVERA-SANTANA:  We cannot forget that this

1    payment agreement of the unaudited debt of the PRHTA is added

2    on to the economic burden that the sales tax represents under

3    COFINA.  Also, a reduction in pensions, reductions in funds

4    for essential services, including the -- included in the

5    adjustment plan of the essential government debt, with the

6    bondholders of general obligations.  In addition, the pending

7    agreement with bondholders of the Electric Power Authority,

8    which includes an increase in the power bill, will cause

9    increases in other areas of service.

10         And, to conclude, although the bankruptcy, as defined

11   in PROMESA, was supposed to be a fresh start for the

12   Government of Puerto Rico and the public corporations that

13   filed for bankruptcy, in the case of the Highways and

14   Transportation Authority, the same pattern is being repeated.

15   Its finances will continue to be tied for the next 40 years to

16   pay bondholders, and not to meet the needs of our citizens.

17   We are before another unsustainable adjustment plan for our

18   country.

19         Thank you very much for your attention.

20         THE COURT:  Thank you very much for coming.

21         I thank the members of the public who have shared

22   their thoughts here today, and I also thank the people of

23   Puerto Rico.  Your voices, your remarks, your deep concerns

24   and insights have been heard today both by the Court and by

25   counsel, and, as I make my legal decisions, I will remain

1    mindful of you and of what you have said.  Again, thank you.

2        Now we will return to the arguments concerning the

3    objections, and it is time for Mr. -- well, okay.  Mr. Rosen

4    -- thank you -- to make his response to the arguments.

5        MR. ROSEN:  Thank you, Your Honor.

6        Your Honor, as I said at the outset, we had four

7    objections that we felt remained at the time of the

8    commencement of the hearing, and as we've heard already, the

9    MAPFRE objection has been resolved by the inclusion of

10   paragraph 56 of the proposed confirmation order.  So I'll now

11   turn to the Finca Matilde objection.

12       First, I heard counsel refer several times to the

13   proposed paragraph 40 of the findings and conclusions, and

14   I've looked at it and there was a misstatement.  And counsel

15   and I have discussed this.  And his reference was to paragraph

16   42, not paragraph 40, Your Honor, but I don't think that

17   really matters.

18       Your Honor, in section 19.1 of the plan, which is the

19   class and the section dealing with the eminent domain inverse

20   condemnation claims, we provide, as we provided in paragraph

21   42 of the ongoing litigation that is out there, the appeal of

22   the Court's decision of the confirmation order, and the

23   intention of the Oversight Board to file a petition for writ

24   of certiorari with the Supreme Court for an appeal of the

25   First Circuit's decision.

```
1           But nevertheless, Your Honor, what section 19.1
2   provides is that in the event that that appeal does not
3   reverse this Court's decision in the Commonwealth case, the
4   holders of an allowed eminent domain inverse condemnation
5   claim will -- and upon the occurrence of a final order
6   determining the validity and amount of just compensation
7   attributable to an eminent domain inverse condemnation claim,
8   they shall receive 100 percent of that claim, Your Honor.
9           What our determination is of just compensation is
10  whatever that court determines it to be.  So if it includes,
11  as counsel says, post-petition interest, that will be the
12  determination, Your Honor.  We are not looking in any way to
13  reduce the amount of that claim.  Whatever just compensation
14  is, that is what we'll be paid, Your Honor.
15          THE COURT:  I am grateful for that clarity, but it
16  does --
17          (Sound played.)
18          THE COURT:  Do we know what that's from?
19          Testing.
20          COURTROOM DEPUTY:  It's gone.  I fixed it.
21          THE COURT:  Oh, you fixed it?
22          COURTROOM DEPUTY:  Yes.
23          THE COURT:  All right.  Thank you.  Miracles done yet
24  again.
25          So it seems to me that there's a technical problem,
```

1   that if that is your intention with the way that intention is

2   expressed in the plan, because the defined term "allowed

3   eminent domain/inverse condemnation claim" is used, and

4   section 1.10 of the plan specifically provides that

5   post-petition interest is not part of an allowed claim, so

6   there is an apparent conflict there with your expressed

7   intention.

8           MR. ROSEN:  Your Honor, I apologize.  I think under

9   the Fifth Amended Plan it might have changed.  I'm looking at

10  1.117, which is eminent domain/inverse condemnation claim.  I

11  think that's the reference.

12          THE COURT:  I'm sorry.  I think I was probably

13  working with the fourth or perhaps even the third when I made

14  my notes.

15          MR. ROSEN:  Not a problem, Your Honor.

16          THE COURT:  So it's the thing that defines what an

17  allowed claim is that --

18          MR. ROSEN:  Oh, so I understand what you're doing,

19  Your Honor.  So you're going back to the definition of allowed

20  claim --

21          THE COURT:  Yes.

22          MR. ROSEN:  -- and then applying that to the inverse,

23  the eminent domain.

24          THE COURT:  Precisely.

25          MR. ROSEN:  I apologize, Your Honor.

1          THE COURT:  So "allowed claim" says "allowed claim

2     specifically excludes post-petition interest."

3          MR. ROSEN:  I just want to make sure I see the

4     reference, Your Honor.

5          "Shall not include interest, penalties, or late

6     charges arising from the period from and after the HTA

7     petition date."  So you're referring to the end of it, Your

8     Honor?

9          THE COURT:  Yes.  I'm still --

10         MR. ROSEN:  It's in paragraph -- subsection Y of

11    that, all the way at the bottom I believe it is, Your Honor.

12         THE COURT:  All right.

13         MR. ROSEN:  I believe it is.  Yes, Your Honor.  That

14    does say it does not include interest from and after the HTA

15    petition date.  Your Honor, to the extent necessary, we would

16    make clear that just compensation includes whatever the

17    party's entitled to pursuant to a final order of that court.

18         THE COURT:  Very good.  So you will fix that glitch?

19         MR. ROSEN:  We can do that, Your Honor.

20         THE COURT:  Thank you.

21         MR. ROSEN:  Your Honor, the next item is the --

22    Mr. Mudd's clients, I'll call them the Velazquez plaintiffs,

23    and I thought Your Honor hit upon the very point we have tried

24    to make several times over by way of your questions to

25    Mr. Mudd about whether or not this would apply to any type of

1  proceeding or any type of activity where there was federal

2  funding.

3      Your Honor, we believe that -- and Mr. Mudd's answer

4  was very clear, that there was no reference at all in

5  connection with his type of client's claims, to any federal

6  law being implicated certainly.  And I appreciate that

7  Mr. Mudd used, and highlighted, and bolded, whatever way you

8  want to say it, the word "safety" and "safe" several times

9  over in each one of his pleadings, but that doesn't mean that

10  it actually gets him or leap frogs or quantum leaps, Your

11  Honor, to a federal law.  It is what it is, and it merely was,

12  Your Honor, a compensation scheme by HTA.  It had nothing to

13  do with a federal law.

14      And the carve outs that we've noted, Your Honor, in

15  the reply are clear, that this does not impact the ability of

16  PROMESA to discharge this claim.

17      I understand that Mr. Mudd is desirous and believes

18  that what he was doing today was actually arguing his appeal

19  to you in a certain way, but his claims have already been

20  dismissed.  They've been found not to be at this point in time

21  a valid claim against HTA.

22      He has an appeal pending in the First Circuit, but

23  even if he were to have a claim, Your Honor, we still believe

24  that the claim is dischargeable based upon the express

25  language contained in PROMESA.  He conveniently does not

1   include the language which is out there, which is "except as

2   otherwise provided" several times over.  He really does not

3   want to delve into section 304(h), which expressly deals with

4   this type of situation, Your Honor.

5          So specifically, Your Honor, we believe that while

6   Mr. Mudd believes that these claims are covered because of his

7   usage of the word "safe" and "safety," et cetera, Your Honor,

8   these are claims which are expressly permitted to be

9   discharged in the event that he ultimately would have a claim

10  which, based upon the District Court's decision before, he

11  would not have.  So, Your Honor, we would urge the Court,

12  therefore, to overrule Mr. Mudd's objection on behalf of the

13  Velazquez plaintiffs.

14         The remaining objection, Your Honor, is the one that

15  took up the most of the time before the break, which is the

16  Franklin Nuveen objection and the Assured response to it.

17  Your Honor, you've heard us characterize this as an

18  intercreditor issue, and we believe it is still an

19  intercreditor issue.  And you heard Franklin Nuveen expressly

20  state that they didn't have a problem with the treatment under

21  the plan vis-a-vis HTA.  It's what has happened subsequently

22  to that.

23         Our position, Your Honor, all along has been that

24  this is a -- as I say, an intercreditor issue, and that we do

25  not have third-party releases in the plan itself.  Your Honor,

1   the provisions that were included in the plan vis-a-vis

2   acceleration were specifically required to be included in

3   accordance with the terms of the Plan Support Agreement, and,

4   in that regard, Your Honor, section 5.3, which said we needed

5   to include certain acceleration provisions on behalf of the

6   monolines.

7            Your Honor, this is just an Assured issue, and I know

8   that Mr. Servais tried to raise the specter that it was going

9   to be a much broader issue in connection with other monolines,

10  but it's not, Your Honor.  It's an Assured issue.  And we

11  believe in what we wrote in the reply, but in response to what

12  Mr. Servais said, if Mr. Servais believes that the exclusion

13  of these provisions, or a carve out, or a toning down of these

14  provisions with respect to Assured would give rise to rights

15  on behalf of Assured to withdraw from the Plan Support

16  Agreement, he certainly has that right.  But it's only an

17  Assured right, Your Honor, and his doomsday scenario that he

18  unfolded with respect to the total collapse of the HTA Plan is

19  unfounded, Your Honor, because if Assured wants to withdraw

20  its support for the plan, it may certainly do so.  And it

21  would apply to those classes where Assured is a party, but

22  that does not mean that the other classes are withdrawn, Your

23  Honor.  The other classes have still voted in support.  Even

24  the uninsured bonds voted in support, Your Honor.

25           So we believe, Your Honor, that notwithstanding what

1  Assured's perspective might be, this plan is confirmable based

2  upon the acceptance over all by all of the other parties.

3  With respect to the third-party release, Your Honor, if you

4  believe that there is something that should be toned down, if

5  you believe that Franklin Nuveen should have rights somewhere

6  down the road, five, ten, 15 years, whatever that case may be,

7  Your Honor, and you seek to have us insert something in the

8  findings of the confirmation order that preserves that right,

9  please let us know, Your Honor, and we will do that.

10        Thank you, Your Honor.

11        THE COURT:  So do you want to say anything further

12  about your voting or waiver arguments, or are you resting on

13  your papers for that?

14        MR. ROSEN:  We are resting on our papers, Your Honor.

15  We believe they were comprehensive.

16        THE COURT:  Thank you.

17        So now we return to Mr. Madden.

18        MR. MADDEN:  Thank you, Your Honor.  I thought it was

19  my turn.  I wasn't sure.

20        THE COURT:  You were right.

21        MR. MADDEN:  Well, we certainly believe that the

22  objectionable language in the plan to which we've asserted a

23  limited objection can be toned down and dealt with among the

24  parties, and I've been trying to do that for some time.  We do

25  not believe that resolving our objection requires anything

1 close to a doomsday scenario.

2      THE COURT:  I'm sorry.  Mr. Rosen, are you looking

3 for something?

4      MR. ROSEN:  I was looking for my mask.

5      MR. MADDEN:  Of course.

6      MR. ROSEN:  Thank you.

7      MR. MADDEN:  Just a few other points in the couple of

8 minutes I have.  One just on voting rights, in answer to a

9 question Your Honor posed earlier to Mr. Servais, Assured's

10 voting rights are not a free license to affect its obligations

11 vis-a-vis its insured bondholders.  You posed a question or a

12 hypothetical, what would happen if the plan were to provide

13 for a 50 percent haircut of the insurance payouts, and I heard

14 Mr. Servais to say what I think is the right answer, their

15 vote would not be conclusive of a dissenting insured

16 bondholder's objection to such treatment, because, as he put

17 it, that would be inconsistent with the policy.  Well, so too

18 here.

19      What we're arguing is that plan provisions we've

20 objected to, and the release that accompanies them, are

21 inconsistent with the policy and the bondholders' rights.

22 Mr. Servais says, we are trying to create a distinction

23 without a difference between statutory acceleration under

24 section 502 and full acceleration of debt that's provided for

25 under -- or not provided for here under terms of an indenture.

 1              Again, just to quote Assured from its papers in

 2    COFINA, but just once this time, they wrote at page 20 of the

 3    brief, we've cited, "section 502 simply allows a creditor to

 4    file a claim for the full amount of its debt.  It does not

 5    advance the maturity date of a debt, nor does it operate as a

 6    condition precedent to substantive contractual rights."  We

 7    couldn't agree more.  They made the argument that our reading

 8    of the law and the bond resolutions would render this

 9    provision that's imposed by New York insurance law surplusage,

10    but as both parties agree, that language has to be in every

11    bond insurance policy, whether it includes acceleration rights

12    or not.  It has to be in all of them.  It doesn't create

13    acceleration rights where none exist under the terms of the

14    indenture.

15              Mr. Servais talks about cases, and the parties have

16    gone back and forth about these cases that involve set-off

17    rights or prepayment premiums.  The setoff right cases simply

18    say that the entire claim, which has been accelerated under

19    section 502, can be used to set off against corresponding

20    claims.  That doesn't create the rights of acceleration that

21    Assured is asserting here.  And the prepayment premiums cases,

22    our position is that when Assured cited them, in our brief --

23    they weren't relevant to the question here, but our point was

24    that even those cases draw this distinction between statutory

25    acceleration and contractual acceleration.

1          Again, we believe there is a third-party release, a

2   non-debtor release in the plan, because it provides a

3   discharge from -- of Assured's obligations, if it were to make

4   the acceleration payment.  The Board has said that if the

5   Court agrees, it will amend the plan to remove that

6   third-party release, which should answer the third-party

7   release question.

8          But just briefly, on *Master Mortgage*, I think Your

9   Honor correctly identified that the supposed non-debtor

10  contribution to the debt here is no such thing, it's just

11  payments that Assured has to make to its insured bondholders

12  under its insurance policy.  That's just a separate

13  contractual obligation.  Nor are these provisions we're

14  talking about essential to the plan, another *Master Mortgage*

15  factor.  The Board has more or less just made that point for

16  me, and it doesn't become essential to the plan for purposes

17  of granting a third-party release just because Assured has

18  demanded it in a separate agreement among the parties.

19          Thank you.

20          (Sound played.)

21          THE COURT:  Thank you, Mr. Madden.

22          Mr. Servais, you had two minutes reserved.

23          No.  I'm sorry.  That's right.  You used all your

24  time.

25          MR. SERVAIS:  I did.

1           THE COURT:  You did, and then I asked you some other

2    questions.

3           MR. SERVAIS:  Could I have one minute?

4           THE COURT:  All right.

5           MR. SERVAIS:  Since I'm already here?

6           THE COURT:  Since you're already there.

7           MR. SERVAIS:  Yes.  So on the COFINA point, I didn't

8    have time to cover that.  Ms. Miller did, correctly

9    articulated Assured's position.  We initially did argue

10   against accelleration by operation of law in the COFINA

11   interpleader action.  Assured subsequently conceded that point

12   through the terms of the COFINA settlement.

13          If you look at the declaration of Matthew Rodrigue

14   filed in support of the COFINA -- confirmation of the COFINA

15   Plan, he basically sets out the terms of that settlement,

16   which reflected a 60 percent chance that the parties arguing

17   in favor of acceleration by operation of law would have

18   prevailed.  And the Court approved that settlement under a

19   9019 standard, which required the Court to consider likelihood

20   of success on the merits.  So the Court effectively endorsed

21   that likelihood that the parties arguing in favor of

22   acceleration by operation of law would have prevailed, and

23   Assured then subsequently, with the other settling COFINA

24   parties --

25          (Sound played.)

1          MR. SERVAIS:  If I could just finish my sentence --

2   negotiated a COFINA Plan that recognized acceleration of the

3   bonds, reflecting the terms on which that issue had been

4   settled in COFINA.

5          THE COURT:  Thank you.

6          MR. SERVAIS:  Thank you.

7          THE COURT:  Mr. Capdevila, you had reserved two

8   minutes.

9          MR. CAPDEVILA:  I don't think I'll need them given

10  the discussion with counsel for the Board.  Given this

11  discussion, I am also scheduled to be a speaker at the

12  closing.  However, I don't think that will be necessary, so I

13  formally ask to be excused.

14         THE COURT:  That request is granted.

15         MR. CAPDEVILA:  Thank you, Your Honor.

16         THE COURT:  Thank you, sir.

17         Mr. Mudd, you hadn't wanted to make any rebuttal

18  remarks, correct?  I think you used your time?

19         MR. MUDD:  No, Your Honor.

20         THE COURT:  Okay.  Very good.  Thank you.

21         So the next agenda item had been, again, Mr. Mudd to

22  have an opportunity to argue the objection to the findings of

23  fact and conclusions of law, but I gather that that is the

24  same argument that you've made.

25         MR. MUDD:  (Nodding head up and down.)

1       THE COURT:  So do you wish to say anything further,

2    Mr. Mudd?

3       MR. MUDD:  No, Your Honor.  I can reserve that for

4    closing.

5       THE COURT:  All right.  So Mr. Mudd doesn't want to

6    make any further remarks on the findings and conclusions.

7       MR. MUDD:  (Nodding head up and down.)

8       THE COURT:  Mr. Rosen, did you wish to say anything

9    on that?

10      MR. ROSEN:  No, Your Honor.  I believe that that

11   would take care of the remaining objections to the findings,

12   because of the withdrawal by AAFAF as to its issues.

13      THE COURT:  Yes.  I agree.

14      So let's -- we're scheduled to take our lunch break

15   at ten minutes to 1:00.  Do we have time to do the

16   presentation of the evidence now, so that we can go to closing

17   statements when we come back from lunch?

18      MR. ROSEN:  Yes, Your Honor.  Mr. Firestein will

19   handle that.  There are five witnesses, as the Court knows.

20   Each of those declarations and the exhibits we will be

21   offering into evidence, Your Honor.  There is no effort to

22   cross-examine any of those, so we expect that we will be done

23   rather quickly.

24      THE COURT:  Thank you.

25      Mr. Firestein.

1          MR. FIRESTEIN:  Good afternoon, Your Honor.  Michael

2     Firestein of Proskauer on behalf of the Board.

3          Mr. Rosen stole my thunder, but I think the Court was

4     already well aware that there was little to no opposition to

5     the admission of the evidence.  I do want to take one item

6     that is not specifically listed here, which relates to the

7     exhibits themselves, so if I could just quickly deal with

8     those?

9          THE COURT:  Yes.

10         MR. FIRESTEIN:  On I think it was either Saturday or

11    Sunday, we filed the second amended final exhibit list, which

12    added only two items, which was the Fifth Amended Plan and the

13    resolution of the Board authorizing the filing of that plan,

14    which I don't think are going to be exhibits of any particular

15    consequence for their admissibility on the basis for which

16    they were sought to be admitted.

17         Before that, Your Honor, pursuant to the Court's

18    orders, we submitted to the Court by letter all of the various

19    exhibits, with a representation that none of them were

20    objected to for the basis on which they were sought to be

21    introduced to the Court.  And all relevant counsel were copied

22    on that letter.  And I'm pleased to report, at least to my

23    knowledge, that no one responded or provided any negative

24    comment to that position.

25         So I -- if I can, Your Honor, there -- on the

1   debtors' exhibit list, not all of them are being sought to be

2   admitted for all purposes.  Some of them are being admitted,

3   but not for the truth, and other exhibits are being introduced

4   to the Court solely for purposes of identification.  They've

5   been identified in many locations, as recently as Sunday when

6   the final filing was done.  I'm happy to recite that for the

7   Court, if necessary, or, if the Court wishes, for expeditious

8   purposes, to simply accept the representation that's contained

9   in the exhibit that was filed on Sunday.  But, for the record,

10  I'm happy to identify them.

11          THE COURT:  Well, let me just first verify that we're

12  looking at the same list, because, unfortunately, the copy of

13  the list that I have here doesn't have a filing number on the

14  top.

15          MR. FIRESTEIN:  I'll help you.

16          THE COURT:  So the list that I have has 62 debtors'

17  exhibits, ending with an affidavit of service -- no.  I think

18  this is only the one that goes through the Fourth Amended

19  Title III Plan.  To step back for a minute, the use of exhibit

20  column is clear as to any limitations on the admission.  So

21  where it says "admit," is it your intention that it be

22  admitted for all purposes?

23          MR. FIRESTEIN:  Yes, Your Honor.

24          THE COURT:  And "admit, but not for the truth" means

25  admit for the fact that it exists and says whatever it says?

1          MR. FIRESTEIN:  Correct, Your Honor.

2          THE COURT:  Then I think those are the main

3    variations, and then, for identification, it's just as --

4    something to refer to, but not admitted as substantive

5    evidence?

6          MR. FIRESTEIN:  Exactly, Your Honor.

7          THE COURT:  All right.  Do you have an ECF filing

8    number of the definitive augmented version of the list that

9    you filed on the --

10         MR. FIRESTEIN:  I do.  I do, Your Honor.  I actually

11   had an extra copy printed today, but on the HTA docket, it's

12   1379, and that contains all the way through Exhibit 64, which

13   includes the last two exhibits, the additional ones being the

14   Fifth Amended Plan and the resolution authorizing the filing

15   of it.

16         THE COURT:  Thank you.  So now I will ask the

17   courtroom deputy whether my granting the motion to admit all

18   of the exhibits for the debtor as listed in ECF 1379 subject

19   to the limitations set out in that document will be sufficient

20   for her purposes, and I'm showing her now what the table --

21   what the chart looks like.

22         COURTROOM DEPUTY:  Yes, Your Honor.  Absolutely.

23         THE COURT:  I'm told that we can take advantage of

24   this efficiency, and so, therefore, the debtors' exhibits in

25   ECF No. 1379, subject to those -- any limitations in the

1    exhibit -- use of exhibit column, are admitted without

2    objection.

3            (Whereupon Debtors' Exhibits admitted into evidence.)

4            MR. FIRESTEIN:  Perfect.  Great.

5            With that, Your Honor, I'm happy to move on to the

6    first of the witnesses.

7            THE COURT:  Yes.

8            MR. FIRESTEIN:  The Board, on behalf of the debtor,

9    first calls Ms. Christina Pullo, who I believe is present in

10   the courtroom.

11           MS. PULLO:  (Raised hand.)

12           MR. FIRESTEIN:  There she is.

13           THE COURT:  Hello, Ms. Pullo.

14           MS. PULLO:  (Raised hand.)

15           MR. FIRESTEIN:  So we're happy to oblige whatever

16   protocol the Court would like.  Ms. Pullo is here.  As the

17   Court is aware, and if not, I'll confirm for the Court that

18   both deadlines passed that the Court set for anyone seeking

19   permission to cross-examine Ms. Pullo.  No one at any time has

20   expressed that, but she is here in the event that the Court

21   has any questions.  But other than that, I would move Ms.

22   Pullo's declaration into evidence, and if the Court would like

23   the ECF numbers in both dockets, I'm happy to provide that.

24           THE COURT:  Yes.  That would be very helpful.

25           MR. FIRESTEIN:  Ms. Pullo's declaration, and its

1  associated attachments, are in the HTA docket at ECF No. 1356,

2  and in the Commonwealth docket it is at docket -- ECF No.

3  21774.

4          THE COURT:  Ms. Pullo's declaration, as tendered,

5  without objection, is accepted as Ms. Pullo's direct

6  testimony, and the Court has no further questions for

7  Ms. Pullo.

8          (Whereupon Christina Pullo Declaration admitted into

9  evidence.)

10          MR. FIRESTEIN:  For efficiency purposes, and we can

11  do this all at once before we break for lunch, but can

12  Ms. Pullo be excused then?

13          THE COURT:  Yes.

14          MR. FIRESTEIN:  If the Court has no further use --

15          THE COURT:  Yes.  Thank you, Ms. Pullo.  You may be

16  excused.

17          MR. FIRESTEIN:  May I proceed?

18          THE COURT:  Yes.

19          MR. FIRESTEIN: The next witness, Your Honor, is

20  Chairman David Skeel, who is also present in the courtroom.

21          MR. SKEEL:  (Raised hand.)

22          THE COURT:  Hello, Mr. Skeel, Professor Skeel.

23          MR. SKEEL:  Hello, Your Honor.

24          MR. FIRESTEIN:  Once again, Your Honor, of the two

25  deadlines that passed --

 1           COURTROOM DEPUTY:  Let me check with Pablo, Your

 2   Honor.  I think some line got disconnected for Court

 3   Solutions.

 4           THE COURT:  Okay.  So we have to call and check to

 5   see if the call was disconnected.

 6           COURTROOM DEPUTY:  Court Solutions is down, our

 7   connection.  I don't know if it's something with their service

 8   or our connection.  Pablo's on his way.

 9           THE COURT:  So what can we do about Court Solutions?

10           COURTROOM DEPUTY:  I'm being told that someone is

11   here.

12           THE COURT:  So, Mr. Firestein, if you want to rest

13   for a minute, apparently the Court Solutions connection

14   dropped.

15           MR. FIRESTEIN:  Very good, Your Honor.

16           THE COURT:  So we are trying to figure out how to get

17   that back together.

18           MR. FIRESTEIN:  Thank you.

19           COURTROOM DEPUTY:  Your Honor, the four-hour limit --

20           THE COURT:  It's been so long I forgot that.

21           COURTROOM DEPUTY:  I'm going to take a few minutes to

22   disinfect the podium if I may.

23           THE COURT:  All right.

24           Do you have to check the dashboard to see if people

25   are back in?

1    COURTROOM DEPUTY:  Yes.  Sure.

2    AT&T's back.

3    THE COURT:  AT&T's back?

4    COURTROOM DEPUTY:  Yes.

5    THE COURT:  Good.

6    MR. SEGUI:  We're good, yes.

7    COURTROOM DEPUTY:  We have Court Solutions.

8    THE COURT:  So we're good with everything?

9    COURTROOM DEPUTY:  (Nodding head up and down.)

10   THE COURT:  All right.  Please go on,

11   Mr. Firestein.

12   MR. FIRESTEIN:  Thank you, Your Honor.

13   Again, we were speaking about Chairman Skeel, who is

14   present in the courtroom.  Once again, other than AAFAF, whose

15   request has been withdrawn, no one expressed any interest in

16   cross-examining Chairman Skeel.

17   In the first instance, what I'd like to do is

18   identify the ECF numbers of his declaration, and then move

19   that into evidence.

20   THE COURT:  Yes.  Please go ahead.

21   MR. FIRESTEIN:  Mr. Skeel's HTA ECF Number is 1357,

22   and the Commonwealth ECF Number is 21775.  And, for

23   formality's sake, I move the declaration of David Skeel into

24   evidence at this time.

25   THE COURT:  There having been no objections, the

1    declaration of David Skeel is accepted into evidence as direct

2    testimony, and the Court has no further questions for Chairman

3    Skeel.

4              (Whereupon David Skeel Declaration admitted into

5    evidence.)

6              MR. FIRESTEIN:  Thank you, Your Honor.  And as we did

7    with Ms. Pullo, I gather that when we take a break, that

8    Chairman Skeel will be excused from the proceedings?

9              THE COURT:  Yes.

10             MR. FIRESTEIN:  Thank you very much.

11             The next witness that the debtor proposes to call is

12   David Brownstein, who I believe is also present in the

13   courtroom.

14             THE COURT:  Good afternoon.

15             MR. FIRESTEIN:  As with the other witnesses, Your

16   Honor, or as -- let me rephrase that.  As with Mr. Skeel, only

17   AAFAF sought the opportunity to cross-examine Mr. Brownstein.

18   That request has been withdrawn.  No one else has expressed

19   either an interest or intention to cross or an objection to

20   the declaration.

21             For the record, I'll move the declaration of David

22   Brownstein into evidence, and I'll provide the ECF Numbers for

23   that.  In HTA, it is ECF No. 1358, and in the Commonwealth,

24   it's ECF No. 21776.

25             THE COURT:  The motion is granted, and the Court has

1    no further questions for Mr. Brownstein.

2            (Whereupon David Brownstein Declaration admitted into

3    evidence.)

4            MR. FIRESTEIN:   I'll wrap up, Your Honor, at the end

5    and get everyone excused.

6            The next witness that the debtor proposed -- intends

7    to call is Mr. Ojas Shah, who is also present in the

8    courtroom.

9            THE COURT:   Good afternoon, Mr. Shah.

10           MR. FIRESTEIN:   Your Honor, no one expressed any

11   intention or interest in cross-examining Mr. Shah.   No

12   objections to his declaration have been filed.   I'll identify

13   for the record the HTA ECF Number as 1359 for Mr. Shah, and

14   the Commonwealth ECF Number is 21777.

15           And, for the record, Your Honor, I move the

16   declaration of Ojas Shah into evidence on behalf of the

17   debtor's case in chief.

18           THE COURT:   The motion is granted, and the Court has

19   no further questions for Mr. Shah.

20           (Whereupon Ojas Shah Declaration admitted into

21   evidence.)

22           MR. FIRESTEIN:   Thank you, Your Honor.

23           The last witness that the debtor proposes to call is

24   Mr. Jay Herriman, who is also present in the courtroom in the

25   back.

1          MR. HERRIMAN:  (Raised hand.)

2          THE COURT:  Good afternoon, Mr. Herriman.

3          MR. HERRIMAN:  (Nodding head up and down.)

4          MR. FIRESTEIN:  As with the other witnesses, Your

5  Honor, no one has expressed any intension or interest in

6  cross-examining Mr. Herriman, no objections to his

7  declarations have been filed.  His ECF Number for HTA is 1355,

8  and the Commonwealth ECF Number is 21773.

9          And the debtor moves the declaration of Jay Herriman

10  into evidence as part of its case in chief.

11         THE COURT:  The motion is granted, and the Court has

12  no further questions for Mr. Herriman.

13         (Whereupon Jay Herriman Declaration admitted into

14  evidence.)

15         MR. FIRESTEIN:  Thank you.

16         If I might, Your Honor -- well, that concludes the

17  witnesses that the debtor has to offer, but as a matter of

18  comity and courtesy to the other lawyers who are here, they've

19  asked, since I referenced the exhibits for the debtor, and

20  since there were no objections to anybody's exhibits, they

21  asked me to simply seek to have those matters, not by my own

22  motion but by their respective motions to admit their exhibits

23  into evidence.  And I can provide the ECF Numbers for them,

24  and identify the party if that's acceptable to the Court.

25         THE COURT:  Yes, please.

1      MR. FIRESTEIN:  So for Assured, and unfortunately I

2   only have the Commonwealth ECF Number, but they filed exhibits

3   under two ECF Numbers at 21608 and 21667.  And I believe those

4   are some insurance-related documents, and that's what

5   Assured's counsel has asked me to represent to the Court.

6      THE COURT:  Assured's exhibits filed at 21608 and

7   21667 are admitted in evidence without objection.

8      (Whereupon, Assured's Exhibits filed at 21608 and

9   21667 admitted into evidence.)

10      MR. FIRESTEIN:  Similarly, Your Honor, Mr. Mudd, on

11   behalf of the Velazquez claimants, has asked me to reference

12   for the Court ECF Number in HTA 1287 as being the place on

13   which his exhibits were uploaded into the system, and I

14   believe he is intending to move those into evidence as well;

15   and consistent with the letter that was provided to the Court,

16   there were no objections to those exhibits.

17      THE COURT:  The exhibits of the Vazquez-Velazquez

18   plaintiffs at ECF No. 1287 are admitted in evidence without

19   objection.

20      (Whereupon Vazquez-Velazquez Exhibits at ECF No. 1287

21   admitted into evidence.)

22      MR. FIRESTEIN:  Lastly, Your Honor, the HTA Insured

23   Bondholder Group has seconds ago provided me with the ECF

24   references for the exhibits that they filed as well.  In the

25   HTA docket, they are at ECF No. 1303, and in the Commonwealth

1    docket, they are at ECF No. 21619.  And like the other

2    exhibits, those were previously identified and represented to

3    the Court in a letter that we provided to the Court expressing

4    no objection by any party.

5         THE COURT:  The HTA Bondholder Group exhibits at 1303

6    in the HTA Docket and 26 -- sorry, 21619 in the Commonwealth

7    docket are admitted in evidence without objection.

8         (Whereupon, IBG Exhibits at HTA Docket No. 1304 and

9    Commonwealth Docket No. 21619 admitted into evidence.)

10        MR. FIRESTEIN:  Thank you, Your Honor.

11        I have one final clean-up issue.

12        THE COURT:  Yes.

13        MR. FIRESTEIN:  When the declarations were filed,

14   they were all filed with S slashes, because I have custody and

15   possession of the signature pages for each of those

16   declarants.  My understanding of the rules is as long as I

17   have custody of those executed declarations, we're permitted

18   to file them as S slashes, but as a matter of convenience to

19   the Court, if you would like us to provide the signature

20   pages, we're happy to either file an informative motion or

21   something to that effect.  If it's okay -- I mean, the docket

22   has plenty of stuff on it already.  You know, I'd prefer,

23   unless the Court requires it, that we not file the

24   declarations all over again, but I do have execution pages as

25   of August 7th when these declarations were filed.

1          THE COURT:  Let me ask Ms. Tacoronte.

2          (Discussion held off the record with the Court and

3     courtroom deputy.)

4          THE COURT:  So if you will provide them to

5     Ms. Tacoronte at the break, what she will do is attach them to

6     the minute entry for the proceeding.

7          MR. FIRESTEIN:  Be happy to do that, Your Honor.  I

8     hold them in my hand.

9          COURTROOM DEPUTY:  Thank you.

10         MR. FIRESTEIN:  The last matter of technicality is,

11    on behalf of all our witnesses, we would respectfully request

12    the Court to excuse them so that if they have other

13    arrangements or other things they need to attend to, they can

14    do so, because we've concluded the presentation of the

15    evidence as far as the debtor is concerned.

16         THE COURT:  That request is granted, but before you

17    leave the podium, is someone going to move Mr. Mudd's witness'

18    declaration into evidence?

19         MR. FIRESTEIN:  I would assume Mr. Mudd is, but we

20    did not register any objection to its admission, and so under

21    the assumption that Mr. Mudd is going to move Mr. Cespedes'

22    declaration into evidence, we would have no objection to it.

23         THE COURT:  Okay.  So, Mr. Mudd, I have -- since

24    you're not near an audio, I'll ask you to make hand signals

25    that I'll describe.  So I have, as Docket Entry No. 1287 in

1  the HTA case, the statement of Carlos Cespedes-Gomez in

2  support of your objection.  Do you move that into evidence?

3          MR. MUDD:  Yes, Your Honor.

4          THE COURT:  Mr. Mudd has answered in the affirmative.

5  There have been no objections.  The motion is granted, and

6  that declaration is admitted in evidence.

7          (Whereupon Carlos Cespedes-Gomez Declaration admitted

8  into evidence.)

9          MR. MUDD:  Thank you, Your Honor.

10          THE COURT:  Thank you.

11          MR. FIRESTEIN:  To the best of my understanding, Your

12  Honor, with that, I believe the evidence portion of the

13  confirmation hearing is concluded.

14          THE COURT:  Very well then.  Thank you.  That was

15  quite efficient, and I have been studying my notebook and the

16  exhibits.

17          MR. FIRESTEIN:  Thank you.

18          THE COURT:  So we will now take a break for lunch.

19  We will resume for closing arguments, and then at the

20  conclusion of those arguments, the Omni.  So please be back

21  and ready to proceed at 2:00 PM.  Thank you.  We are

22  adjourned.

23          COURT SECURITY OFFICER:  All rise.

24          (At 12:44 PM, recess taken.)

25          (At 2:00 PM, proceedings reconvened.)

1          THE COURT:  Good afternoon.  Please be seated.

2          All right.  I have found myself again on the

3   computer.  So we are continuing the confirmation hearing with

4   respect to the Fifth Amended Proposed Plan of Adjustment for

5   HTA, and now I'm ready to hear closing statements.  First, for

6   the plan proponent, Mr. Rosen has been allocated ten minutes.

7          MR. ROSEN:  Thank you very much, Your Honor.  Again,

8   Brian Rosen, Proskauer Rose, on behalf of the Oversight Board.

9          Your Honor, the HTA Plan takes approximately 6.4

10  billion dollars of debt, which debt is completely beyond any

11  means of repayment, and replaces it with approximately 1.245

12  billion of new HTA bonds, plus a subordinating note to the

13  Commonwealth for approximately 350 million dollars.

14          As we know from the declaration of David Brownstein,

15  the payment of such new debt pursuant to the terms of the new

16  HTA bonds indenture is entirely feasible.  We also know, Your

17  Honor, that the payment of general unsecured claims is

18  feasible pursuant to the payment of the Commonwealth loan

19  amounts, and that the payment of federal claims over 40 years

20  is projected to occur.

21          Furthermore, Your Honor, we know that procedures are

22  in place to make payments on eminent domain inverse

23  condemnation claims and surety claims as and when they become

24  due.  And following up on the conversation that we had before

25  the break, Your Honor, with respect to language that we might

1    insert into the definition of "allowed," we would suggest,

2    Your Honor, that at the appropriate time, we would go to

3    section 1.10 of the plan, and in subsection Y, insert after

4    "for any purpose under the HTA Plan," "except with respect to

5    any amounts" -- excuse me, "except with respect to amounts

6    that are determined by a final order to be just compensation

7    attributable in connection with the allowance of an eminent

8    domain/inverse condemnation claim," and then it would continue

9    "allowed shall not include the interest," et cetera, et

10   cetera.  So we would make that insert, Your Honor.

11          THE COURT:  That sounds like a clarification that's

12   needed.  So are you anticipating filing further amended

13   versions, and will you hold off on that, or do you want to

14   file an informative motion with that proposed language?

15          MR. ROSEN:  We'll do whatever the Court suggests, but

16   I will tell you, just like I hit my limit on Commonwealth, I

17   think I'm up to modified fifth instead of going to the sixth

18   at this point, Your Honor.

19          THE COURT:  But your precedent is eighth.

20          MR. ROSEN:  I know I can go to eighth, but I think I

21   have to stop at this one.

22          THE COURT:  Well, if you're not planning to do a

23   modified very soon, filing it with an informative motion will

24   help us to have our up-to-date store of materials as we work

25   on our decision.

 1              MR. ROSEN:  Your Honor, we'll follow -- we'll follow

 2    whatever lead you suggest, whether you want it filed right

 3    away, whether we do the informative motion.  If the Court were

 4    to confirm it, I obviously would attach the form of plan to

 5    that order and judgment.  So we'll make sure that you have it

 6    whenever you're ready to have it.

 7              THE COURT:  All right.  We'll figure that out.

 8              MR. ROSEN:  Yes.

 9              THE COURT:  Go on, please.

10              MR. ROSEN:  Your Honor, we know that all the

11    requirements set forth in section 314 of PROMESA have been

12    satisfied, and with respect to the voting to accept or reject

13    the HTA Plan, over 99.9 percent of the claims voted, in dollar

14    amount, in other words, in excess of five billion dollars

15    voted to accept the plan.  And we know that the general

16    unsecured class, while rejecting due to the number of the

17    votes cast, as Mr. Bongartz talked about, overwhelmingly

18    supports acceptance in dollars.

19              We also know, from Mr. Herriman's declaration, that

20    all efforts are being undertaken to expeditiously reconcile

21    claims at HTA, as well as the other Title III debtors.  We

22    know, Your Honor, that a lot of care and attention went into

23    developing the HTA Plan on the part of the mediation team, the

24    Oversight Board, the government, the Creditors Committee, and

25    significant parties in interest.  The Oversight Board has

1    listened to all of these creditors, Your Honor, every step of

2    the way, and to the extent formal objections or informal

3    communications have come our way, the Oversight Board has

4    addressed these concerns, and, thus, the multiple plans that

5    were filed, the draft confirmation orders that were filed, and

6    draft findings and conclusions of law have been filed.  Each

7    one includes modifications designed to address such concerns

8    to the extent appropriate.  The fact that there remains

9    effectively, in our opinion, Your Honor, one objection to

10   confirmation illustrates that point.

11          As I said at the outset, we have resolved the MAPFRE

12   objection, Your Honor.  We believe we have resolved the Finca

13   Matilde objection.  You know our position with respect to the

14   Assured-Franklin Nuveen, which is not in our view truly an

15   objection to confirmation, which would leave only the

16   Velazquez plaintiffs, which also we believe, Your Honor,

17   should be overruled in its entirety, for it is a

18   nondischargeable claim if, in fact, there ever were to be a

19   claim as determined by the First Circuit.

20          Your Honor, we ask that you overrule any remaining

21   objections, confirm the HTA Plan, and facilitate the further

22   restructuring of the island's indebtedness through

23   consummation of a plan of adjustment that has virtual

24   universal support.  Your Honor, unless you have any further

25   questions for me, that would be my closing statement.

1          THE COURT:  Thank you, Mr. Rosen.

2          Next, I'll hear from Ambac.  Good afternoon,

3   Ms. Miller.

4          MS. MILLER:  Good afternoon, Your Honor.  Atara

5   Miller from Milbank on behalf of Ambac Assurance Corporation.

6          I stand up here in a moment of personal disbelief as

7   this may resolve all of Ambac's outstanding bonds in Puerto

8   Rico.  And so, as Mr. Rosen and others noted at the beginning

9   in the openings, the HTA Plan is just one piece of a broad

10  collection of agreements that allowed for a successful

11  restructuring of the Commonwealth, the PBA, PRIFA, CCDA, and

12  now HTA.  This confirmation hearing is that last piece, and it

13  was heavily negotiated on all fronts, and, as this Court is

14  well aware, heavily litigated.

15         There are a number of agreements that we think

16  together will allow the Commonwealth to emerge from these

17  proceedings, stronger rather than crippled, which I think was

18  a guiding light that Your Honor set for all of us at the very

19  beginning and opening of these proceedings.

20         The monolines, as long-term partners with the

21  Commonwealth, were consistently focused on ensuring a bright

22  future for the island, and the monolines, including Ambac,

23  took a leading role in finding the best solution that

24  appropriately balanced rights of creditors and the hopes and

25  dreams of the people of Puerto Rico.  Stable and dependable

1    infrastructure, including roads that are actually well

2    maintained and will allow you to travel for leisure or for

3    work from one place to another are critical in a modern

4    society.  This plan allows HTA to shift to becoming a

5    virtually self-sufficient enterprise.

6         Fundamentally different, and I know there was some

7    criticism of the Commonwealth loan, but as Your Honor is well

8    aware, HTA pre-restructuring was largely funded by a number of

9    transfers from the Central Government, which we disputed on

10   the appropriateness of those revenue streams and who they

11   belonged to for many years.  That is a paradigm shift that

12   will result in a stronger Highways and Transportation

13   Authority.

14        The plan also reflects the creativity of all of the

15   parties involved, allowing optionality for HTA to emerge from

16   Title III today, for when Your Honor approves the plan, if it

17   does, while preserving the flexibility going forward for the

18   Commonwealth to consider public-private partnerships that are

19   deemed beneficial to HTA and the Commonwealth.  We believe

20   that the evidence submitted by the Oversight Board in support

21   of the plan clearly demonstrates that the proposed plan

22   complies with all of the conditions of section 314 of PROMESA,

23   and after five years of heated litigation, specifically

24   related to HTA, I think it is a remarkable moment that we're

25   all sitting here and even shared lunch together in support of

1   a plan that has virtually universal consent and support.

2           I want to thank again the mediation team for their

3   endless effort in getting us here, not letting any of us give

4   up along the way, and also to Your Honor and this court and

5   all of your staff for the -- and Judge Dein, also, for

6   listening and resolving the many disputes that we had along

7   the way that were necessary to get us to this point.  So thank

8   you.

9           Ambac believes that the plan is confirmable, and

10  would urge Your Honor to confirm the Fifth or maybe Modified

11  Fifth Plan of Adjustment for HTA.

12          THE COURT:  Thank you, Ms. Miller.

13          MS. MILLER:  Thank you.

14          THE COURT:  Next will be Mr. Sosland for FGIC.

15          MR. SOSLAND:  Good afternoon, Your Honor.  Martin

16  Sosland on behalf of National Guaranty Insurance Company.

17          My closing comments will largely echo Ms. Miller's,

18  and so I will not repeat some of the things that she said,

19  although I share in the entirety the sentiments of them.  I

20  would emphasize a couple of them.  One, the nature, as I said

21  in the opening, of the extent of the vigorous and arms-length

22  negotiations following vigorous litigation that the Court

23  witnessed firsthand on many of the issues that resolved in the

24  HTA Plan, and I would urge the Court, however the Court

25  determines to resolve the objection related -- the dispute

 1   between the Assured policy holders and Assured within the plan

 2   to not disrupt that bargained-for arrangement that affects all

 3   of the other monolines and bondholders.  And some of us,

 4   including FGIC, negotiated the treatment provisions not only

 5   with the Oversight Board, but with our bondholders that go

 6   into the plan.  And they are indeed consensual, even though,

 7   speaking on FGIC's -- for FGIC specifically, even though we

 8   voted all of our bonds, our bondholders were involved in the

 9   negotiation of the treatment provisions and in the documents

10   that were part of the plan supplement.  And we would -- those

11   should not be disturbed, Your Honor.

12            And speaking of the documents in the plan supplement,

13   so the Court sees what's brought before the Court, you or any

14   other judge, and so you saw all of the litigation that went

15   forward before you for several years before we got to last

16   July, and the settlements that are embodied in this plan, and

17   the others that are already confirmed, what you haven't seen

18   are a lot of pleadings filed by FGIC since July of 2021.  And

19   one of those reasons is once we were all on board with the

20   term sheet for the plan, that work was being done behind the

21   scenes with members of the Oversight Board, all of the

22   monolines, some other bondholders, representatives of AAFAF to

23   get the plan documents done, and people -- people were --

24   those were also arms-length negotiations, in which we didn't

25   always come to it originally from the same perspective, but

1   all of that got done.  And that was a lot of hard work as

2   well.

3           I echo the thanks to the mediation team and to you

4   and Judge Dein.  For FGIC, like Ambac, if you confirm the plan

5   that's before you, then you may not -- you may not see me or

6   even my signature except with respect to some stipulations as

7   we get rid of some ghost litigation that's outstanding,

8   because this is the last of the credits that FGIC is insured

9   on the island.  So I thank you for your patience and your

10  judgment in steering this proceeding.  The Fifth Amended Plan

11  as modified should be confirmed.  We urge you to do so.

12          THE COURT:  Thank you, Mr. Sosland.

13          Now, for National, Mr. Berezin.  Are you on Court

14  Solutions?

15          MR. BEREZIN:  I am, Your Honor.

16          THE COURT:  Good afternoon.

17          MR. BEREZIN:  Good afternoon.  Robert Berezin of

18  Weil, Gotshal, & Manges for National Public Finance Guaranty

19  Corporation.

20          Your Honor, there is an echo, so I will be brief.

21  National strongly supports confirmation of the plan for HTA,

22  and we would ask the Court to leave undisturbed plan

23  provisions to which no party in interest has objected.  With

24  that said, National thanks the Court, the mediation team,

25  Judge Dein, for everything that you all have done for Puerto

1   Rico, and to advance the challenging proceeding.

2          Thank you, Your Honor.

3          THE COURT:  Thank you, Mr. Berezin.

4          Now for AmeriNational.  Good afternoon.

5          MR. GARCIA-SOLA:  Good afternoon, Your Honor.  Arturo

6   Garcia from McConnell Valdes on behalf of AmeriNational for

7   the DRA servicer.  I'll be brief, Your Honor, because a lot

8   has been said.

9          So we're finally reaching the end of a long, long

10  road that has taken all of us a lot of time and sleepless

11  nights to get to where we are, especially those of us who live

12  in Puerto Rico and have to use the roads.  Despite all of the

13  problems we faced along the way, the parties were able to

14  reach, with the support of the FOMB and all the other parties,

15  an agreement that is now before the Court for confirmation,

16  and which is a strongly, highly consensual plan.  The limited

17  objections to the plan have either been resolved or dealt with

18  in a way that I understand that there are some objections

19  still alive, but most of them have been dealt with in a way

20  that is sufficient for most people, most objectors to

21  hopefully lend support to the plan.

22          Confirmation of the plan should not be derailed, and

23  HTA should be allowed to come out on the other side of the

24  tunnel, dark tunnel at times, so that HTA can continue to

25  serve the citizens of Puerto Rico, and so that the people who

1    use the roads can safely drive to their jobs, or even just on

2    leisure.  So AmeriNat strongly supports confirmation of the

3    plan.

4         All of us who live in Puerto Rico need to get back to

5    our usual and normal lives, Your Honor, and for that, I also

6    thank you and your team, your whole team, for a steady hand on

7    the wheel.  Your support of the issues and the parties has

8    been very, very crucial to the success, I believe, PROMESA is

9    enjoying, and Puerto Rico hopefully will come out a stronger

10   and beneficial government for all of us on the island.

11        Thank you very much, Your Honor.

12        THE COURT:  Thank you, Mr. Garcia.

13        Next is it Mr. Amend on Court Solutions for

14   Cantor-Katz?

15        MR. AMEND:  Yes, Your Honor.  Good afternoon.  For

16   the record, Peter Amend from Schulte Roth & Zabel on behalf of

17   Cantor-Katz Collateral Monitor, LLC.

18        Your Honor, similarly, I'll be brief in my remarks.

19   For the reasons set forth by the Oversight Board today and in

20   admissions to the Court, we believe the Fifth Amended HTA Plan

21   should be confirmed.  On behalf of the Collateral Monitor, we

22   want to thank the Oversight Board, and especially Mr. Rosen,

23   for efficiently implementing the terms of the settlement

24   reached by our clients.

25        Today the DRA notes issued pursuant to the GDB's

1   Title VI proceeding trade near 90, up significantly from where

2   they opened, and up nearly 100 percent from their bottom,

3   which is a successful outcome for the holders, including

4   former GDB creditors, and a successful resolution for the

5   people of Puerto Rico.

6         Finally, we'd like to thank Your Honor and Judge Dein

7   for your years of hard work to move these cases forward

8   towards a successful resolution.  Thank you, Your Honor.

9         THE COURT:  Thank you, Mr. Amend.

10        For the UCC, Mr. Bongartz?

11        MR. BONGARTZ:  Yes.  Good afternoon, Your Honor.

12  I'll be very, very brief.  Actually, I have nothing further to

13  add beyond what I have already said earlier this morning as

14  part of my opening statement, other than to reiterate that the

15  Official Committee supports confirmation of the Fifth Amended

16  Plan.  Thank you very much.

17        THE COURT:  Thank you, sir.

18        Mr. Sanchez-Girona, did you wish to say anything

19  further for MAPFRE on Court Solutions?

20        I think he said he was not.

21        MR. ROSEN:  Your Honor, I think he said he would not

22  be at the closing, likewise, Mr. Capdevila.

23        THE COURT:  Yes.

24        So, Mr. Mudd.

25        MR. MUDD:  Good afternoon, Your Honor.

1          THE COURT:  Good afternoon.

2          MR. MUDD:  Let's look at the facts that we have.  We

3    have H -- HWA 1273, Section 7, specifically deals with safety

4    and what the contracts and contractors, et cetera, have to do

5    with safety when funds, federal funds for highways are

6    involved.  HTA regulation 02-017 specifically states that

7    those that are going to review and make sure that the

8    contracts are complied with, including the regulation I just

9    cited, are my clients.  Section -- Article 1 specifically

10   states that.  In addition, there's Mr. Cespedes' statement,

11   which has not been opposed.  And I think, Your Honor, when you

12   add all that, then you see that this would not be a

13   dischargeable debt.

14         That will be all.  Thank you.

15         THE COURT:  Thank you, Mr. Mudd.

16         That concludes the scheduled closing statements.  I

17   want to thank everyone, counsel, the parties, particularly the

18   mediation team for your time, and your efforts, and your

19   patience throughout this long process.  I will now be taking

20   under advisement the proposed plan.

21         I may issue a meet and confer order with a short fuse

22   on it having to do with the IBG objection, but we will be

23   working hard on finalizing and documenting decisions.  The

24   professionalism and meticulous attention paid not only to

25   issues that are financial and structural, but also to the

1  future of Puerto Rico through these proceedings, has been

2  essential, and also impressive, and I thank you for that.

3  We have all been and are in a position that is unique

4  in the history of the United States, and very significant to

5  the future of this island and to day-to-day life here. I

6  don't think that anyone has ever lost sight of it, and I don't

7  expect anyone ever to. So I thank you for that work and the

8  ability to take this important question of confirmation of the

9  proposed HTA Plan under advisement.

10  I don't know what my life would be like if I can't

11  think I'll see Ms. Miller and Mr. Sosland again in a

12  courtroom, but I suppose we'll just all have to cope and go

13  forward; but, you know, will you sprinkle some of that

14  finality dust over PREPA, too? There's still much to be done

15  here, and I expect that that work will continue seriously, and

16  in a focused way, and in that same spirit of finding a proper

17  path forward for Puerto Rico and the lives of her people.

18  So with that, we are adjourned with respect to the

19  confirmation hearing, and we can turn to the scheduled Omnibus

20  hearing.

21  (At 2:25 PM, proceedings concluded.)

22  *    *    *

23

24

25

```
 1  U.S. DISTRICT COURT    )

 2  DISTRICT OF PUERTO RICO)

 3

 4       I certify that this transcript consisting of 128 pages is

 5  a true and accurate transcription to the best of my ability of

 6  the proceedings in this case before the Honorable United

 7  States District Court Judge Laura Taylor Swain, and the

 8  Honorable United States Magistrate Judge Judith Gail Dein on

 9  August 17, 2022.

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```