**Hearing Date: November 2, 2022 at 9:30a.m. (AST)**
**Objection Deadline:  October 18, 2022 at 4:00p.m. (AST)**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **In re** ) | **PROMESA** |
| ) | **Title III** |
| ) | |
| ) | |
| **THE FINANCIAL OVERSIGHT AND** ) | **No.: 17 BK 3283-LTS** |
| **MANAGEMENT BOARD FOR PUERTO** ) | |
| **RICO**, ) | |
| ) | |
| As a representative of ) | **(JOINTLY ADMINISTERED)** |
| ) | |
| ) | |
| **THE COMMONWEALTH OF PUERTO** ) | |
| **RICO** ) | |
| *et al.*, ) | |
| ) | |
| ) | |
| Debtors.[1] | |

## SUMMARY COVER PAGE

**FINAL FEE APPLICATION OF KROLL, LLC, F/K/A DUFF & PHELPS LLC, AS
FINANCIAL ADVISOR TO THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO FOR SERVICES RENDERED AND REIMBURSEMENT
OF EXPENSES FOR THE PERIOD FROM NOVEMBER 1, 2018 THROUGH AND
INCLUDING JULY 31, 2019.**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the: (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

| | |
|---|---|
| Name of Applicant: | Kroll, LLC, formerly known Duff & Phelps LLC |
| Authorized to Provide Professional Services to: | Financial Oversight and Management Board for Puerto Rico |
| Date of Retention: | January 31, 2018 |
| Period for which compensation and reimbursement is sought: | November 1, 2018 through July 31, 2019 |
| | (Retention Date through Effective Date) |

| | |
|---|---|
| Amount of final compensation sought as actual, reasonable, and necessary: | $2,159,097.53 |
| Amount of final expense reimbursement sought as actual. reasonable, and necessary: | $57,400.36 |
| Blended rate in this application for all Professionals/Timekeepers | $403.89/hour [after entry of Reduced Fee Order Dkt. No. 12157] |
| The total time expended for fee application preparation for the Final Fee Period is approximately 20 hours and the corresponding compensation requested is approximately $10,000. | |

| **SUMMARY OF PRIOR INTERIM FEE APPLICATIONS:** | | | | | |
|---|---|---|---|---|---|
| | | Fees and Expenses Approved | | Date and Docket No. of Fee Order | |
| Date [Docket No.] | Interim Fee Period ("IFP") Covered | Fees | Expenses | Date | Docket No. |
| | *First IFP* 5/3/17 to 9/30/17 | | | | |
| | *Second/FP* 10/1/17 to 1/31/18 | | | | |
| | *Third/FP* 2/1/18 to 5/31/18 | | | | |
| | *Fourth IFP* 6/1/18 to 9/30/18 | | | | |
| Amended Docket No. 8450 | *Fifth IFP* 10/1/18 to 1/31/19 | $1,809,414.03 | $51,279.83 | March 6, 2020 | 12157 |
| Docket No. 7997 | *Sixth IFP* 2/1/19 to 5/31/19 | $313,064.50 | $6,120.53 | March 6, 2020 | 12157 |
| | *Seventh IFP* 6/1/19 to 9/30/19 | $36,619 | 0 | - | - |
| | *Eighth IFP* 10/1/19 to 1/31/20 | | | | |
| | *Ninth IFP* 2/1/20 to 5/31/20 | | | | |
| | *Tenth IFP* 6/1/20 to 9/30/20 | | | | |
| | *Eleventh IFP* 10/1/20 to 1/31/21 | | | | |
| | *Twelfth IFP* 2/1/21 to 5/31/21 | | | | |
| | *Thirteenth IFP* 6/1/21 to 9/30/21 | | | | |
| | *Fourteenth IFP* 10/1/21 to 1/31/2027 | | | | |
| | *Fifteenth IFP* 2/1/2022 to Plan Effective Date | | | | |
| | | | | | |
| Total fees ($2,122,478.53) and expenses ($57,400.35) approved by interim orders to date:[2] | | $2,179,878.89 | | March 6, 2020 | 12157 |

---

[2] These totals equal the reduced amount of final fee and expense requests, per Dkt. No. 12157.  Note, though, that Kroll has received only $1,910,230.68 to date under the March 6, 2020 order plus $32,957.10 (90% of the $36,619 fees earned during June and July 2019), for a total of $1,943,187.78 (further reduced by $402,800.56 of taxes withheld by the Commonwealth) and requests the outstanding balance of $273,310.11.

## FEE EXAMINER'S REQUESTED ATTACHMENTS TO FEE APPLICATIONS

**List of Professionals** - ¶ C.2.k of the U.S. Trustee Guidelines  [Exhibit B]

**Compensation by Project Category** - ¶ C.8 of the U.S. Trustee Guidelines [Exhibit C]

**Expense Summary** - ¶ C.12 of the U.S. Trustee Guidelines  [Exhibit D]

**List of Professionals by Matter** - ¶ C.8.c. of the U.S. Trustee Guidelines  [Exhibit C]

**Customary and Comparable Disclosures** - ¶ C.3 of the U.S. Trustee Guidelines [Exhibit A]

**Budget & Staffing Plan** - ¶ E of the U.S. Trustee Guidelines  [Exhibit A]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------------x

In re

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*

                Debtors.[1]

PROMESA
Title III

Case No. 17 BK 3283-LTS

(Jointly Administered)

------------------------------------------------------------------x

## FINAL APPLICATION OF KROLL, LLC, F/K/A DUFF & PHELPS LLC, FINANCIAL ADVISOR, FOR ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES FOR THE PERIOD NOVEMBER 1, 2018 THROUGH JULY 31, 2019

To the Honorable Laura Taylor Swain, United States District Judge:

Kroll, LLC, formerly known as Duff & Phelps LLC ("Kroll"), an independent forensic analysis team ("Financial Advisor") for the Financial Oversight and Management Board for Puerto Rico (the "Board" or "FOMB") as representative of the Commonwealth of Puerto Rico ("Commonwealth"), Puerto Rico Sales Tax Financing Corporation ("COFINA"), Puerto Rico Highways and Transportation Authority ("HTA"), Employees Retirement System for the Commonwealth of Puerto Rico ("ERS"), and Puerto Rico Electric Power Authority ("PREPA," jointly with the Commonwealth, COFINA, HTA and ERS referred to as "Debtors") pursuant to

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four (4) Digits of Federal Tax ID: 3747).

section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] submits this final application (the "Application"), pursuant to PROMESA sections 316 and 317, Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),[3] Rule 2016-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Puerto Rico (the "Local Rules"), and the *United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases* issued by the Executive Office for the United States Trustee, 28 CFR Part 58, Appendix B (the "Guidelines"), and in accordance with this Court's *Third Amended Order Setting Procedures for Final Compensation and Reimbursement of Expenses of Professionals* (Dkt. No. 20546) (the "Final Compensation Order"), for (a) allowance of final compensation for professional services performed by Kroll for the period commencing November 1, 2018 through and including July 31, 2019 (the "Compensation Period") in the amount of $2,159,097.53, and (b) reimbursement of its actual and necessary expenses in the amount of $57,400.36, previously allowed on an interim basis by order dated March 6, 2020 (Dkt. No. 12157) except for $36,619 in fees for June and July, 2019. In support thereof, Kroll alleges as follows:

### Background

1.      The Board first retained Kroll on January 3, 2018, pursuant to a "Letter of Engagement" of that date and as amended on March 31, 2018, August 16, 2018 and December 11, 2018, copies of which are attached as Exhibit A.  Kroll billed the Board consistent with the budgeted guidelines established in the amended engagement letter and received payment without

---

[2]  PROMESA has been codified in 48 U.S.C. §§ 2101-2241.

[3]  The Bankruptcy Rules are made applicable to the Debtor's Title III case pursuant to PROMESA section 310.

objection prior to the Application Period. Unbeknownst to Kroll until April 17, 2019, after Kroll submitted its original fee application on March 18, 2019, the Court had entered an order ("Interim Compensation Order") on November 8, 2017 (Dkt. No. 1715) with additional fee application guidelines. Counsel for the fee examiner provided Kroll with an explanatory memorandum and informed it of the Interim Compensation Order. After receiving the fee examiner's "Letter Report", dated June 6, 2019, Kroll addressed all questions and concerns raised by the fee examiner in prior interim applications. As a result, Kroll negotiated with the fee examiner a settlement approved by the Court on March 6, 2020 (Dkt. No. 12157) ("Reduced Fee Order").

### Jurisdiction

2. The United States District Court for the District of Puerto Rico (the "Court") has subject matter jurisdiction pursuant to PROMESA section 306(a).

3. Venue is proper in this district pursuant to PROMESA section 307(a).

4. Kroll submits this Application pursuant to PROMESA sections 316 and 317.

### Procedural Facts

5. On August 31, 2016, President Barack Obama appointed the Board's seven voting members, having been established the Board on June 30, 2016.

6. Pursuant to PROMESA section 315, "[t]he Oversight Board in a case under this subchapter is the representative of the debtor" and "may take any action necessary on behalf of the debtor to prosecute the case of the debtor, including filing a petition under section [304] of [PROMESA] . . . or otherwise generally submitting filings in relation to the case with the court." 48 U.S.C. § 2175.

7. On September 30, 2016, the Board designated the Debtors as "covered entities" under PROMESA section 101(d).

8. On May 3, 2017, the Board issued a restructuring certification pursuant PROMESA sections 104(j) and 206 and filed a petition for relief for the Commonwealth under section 304(a) of PROMESA, commencing a case under title III (the "Commonwealth Title III Case"). Pursuant to PROMESA section 315(b), the Board is the Debtor's representative in the Title III Case.

9. On May 5, 2017, the Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a petition for relief for the Puerto Rico Sales Tax Financing Corporation ("COFINA") pursuant to section 304(a) of PROMESA, by and through the Board, as COFINA's representative pursuant to PROMESA section 315(b), commencing a case under title III (the "COFINA Title III Case"). Pursuant to PROMESA section 315(b), the Board is COFINA's representative in the COFINA Title III Case.

10. On May 21, 2017, the Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a petition for relief for the Puerto Rico Highways and Transportation Authority ("HTA") pursuant to section 304(a) of PROMESA, by and through the Board, as HTA's representative pursuant to PROMESA section 315(b), commencing a case under title III (the "HTA Title III Case"). Pursuant to PROMESA section 315(b), the Board is HTA's representative in the HTA Title III Case.

11. On May 21, 2017, the Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a petition for relief for the Employees Retirement System for the Commonwealth of Puerto Rico ("ERS") pursuant to section 304(a) of PROMESA, by and through the Board, as ERS's representative pursuant to PROMESA section 315(b), commencing a case under title III (the "ERS Title III Case"). Pursuant to PROMESA section 315(b), the Board is ERS's representative in the ERS Title III Case.

12. On July 3, 2017, the Board issued a restructuring certification pursuant to

4

PROMESA sections 104(j) and 206 and filed a petition for relief for the Puerto Rico Electric Power Authority ("PREPA") pursuant to section 304(a) of PROMESA, by and through the Board, as PREPA's representative pursuant to PROMESA section 315(b), commencing a case under title III (the "PREPA Title III Case"). Pursuant to PROMESA section 315(b), the Board is PREPA's representative in the PREPA Title III Case.

13.     The Commonwealth, COFINA, HTA, ERS, and PREPA Title III Cases are jointly administered for procedural purposes only, pursuant to PROMESA section 304(g) and Bankruptcy Rule 1015. See Dkt. Nos. 242, 537, 1417.

14.     Kroll served on the Notice Parties (as defined in the Interim Compensation Order) its monthly fee statements for the entire Compensation Period.

15.     In accordance with the Reduced Fee Order and as reflected in the foregoing summary, upon submitting such monthly fee statements, Kroll received payment in the total amount of $1,943,187.78 of its fees (90% of $2,122,478.53 and 90% of $36,619) plus reimbursement of $57,400.26 of allowed related expenses.

### Kroll's Reduced Rates For This Engagement

16.     Kroll reduced its standard hourly rates for this engagement, as the following table shows.

| Role | Standard Rates | | Oversight Board Rates | | Discount Provided |
|---|---|---|---|---|---|
| Managing Director | $ | 1,150 | $ | 650 | 43% |
| Director | $ | 1,040 | $ | 550 | 47% |
| Vice President | $ | 825 | $ | 425 | 48% |
| Senior Associate | $ | 625 | $ | 395 | 37% |
| Analyst | $ | 435 | $ | 225 | 48% |

The average across-the-board discount provided to the Financial Oversight Management Board is thus 44.6%, before (a) further education in the Reduced Fee Order and (b) additional taxes of $402,800.56 withheld by the Commonwealth.

DOC ID - 38089162.9

## Summary of Services Rendered by Kroll During the Compensation Period

17.     This is Kroll's final application for compensation in the Debtors' Title III Cases.

18.     Kroll started working for the Board on January 3, 2018, having been retained as independent forensic analyst, responsible for identifying and detailing the Debtors' cash and investment accounts ("Bank Account Project") as of June 30, 2018.  After the Court requested professionals such as Kroll to file detailed fee applications in late 2017, Kroll filed applications to be compensated for its services between January, 2018 and May 31, 2019 (Doc Nos. 7997 and 8450).  The Board ended Kroll's engagement after Kroll filed a detailed "Report on Title III Bank Accounts," dated March 13, 2019 (the "Report"), but asked Kroll to provide Ernst & Young, another Board financial advisor, with non-substantive transitional services through May 31, 2019. Kroll thus had a defined, discrete role, working primarily with the Debtors' counsel through March 13, 2019: "to report and identify Commonwealth bank and investment accounts… with explanations of any restrictions on the resources they hold." Report, at 3.  A copy of the Report is attached as Exhibit "E".  Kroll worked closely with Proskauer Rose LLP ("Proskauer") and O'Neill & Borges ("O&B"), counsel for the Board in the formulation of the different processes designed to further PROMESA's mandate of returning the Commonwealth to fiscal responsibility and access to capital markets.

19.     Kroll seeks an allowance, pursuant to the Reduced Compensation Order (Dkt. No. 20546), of $2,159,097.53 as compensation for professional services rendered plus $57,400.36 as reimbursement for actual and necessary expenses incurred during the Compensation Period.

20.     Kroll maintained electronic invoices in connection with the firm's representation of the Board.  Copies of the Kroll electronic invoices for the Compensation Period were attached to Kroll's interim fee applications (Dkt. Nos. 7997 and 8450).

21.    The professional services performed by Kroll during the Compensation Period resulted in 5,255.80 recorded hours by Kroll professionals representing a blended rate of $403,89, after entry of the Reduced Fee Order but before taxes withheld by the Commonwealth totaling $402,800.56.  The fees charged by Kroll reflect (a) a reduction of the firm's existing billing rates and procedures in effect during the Compensation Period, consistent with the Engagement Letter and Amendments attached hereto as Exhibit A, and (b) a further reduction approved by the Court on March 6, 2020 (Dkt. No. 20546) after negotiations with the fee examiner.

22.    A table of recorded hours performed by individual professionals during the Compensation Period is attached hereto as Exhibit B.  Exhibit C shows, for each Project Category (as defined below), the total recorded hours.  A summary of expenses by Expense Category is included as Exhibit D.

23.    All entries itemized in Kroll's time records comply with the requirements set forth in the Guidelines, including, (a) the utilization of what Kroll identifies as task codes (each a "Project Category"), (b) a description of each activity or service that each individual performed, and (c) the number of hours (in increments of one-tenth of an hour) spent by each individual providing the services.

### Applicant's Statement In Compliance with Appendix B Guidelines C.5

24.    The following answers are provided in response to the questions set forth in Guidelines paragraph C.5:

| | |
|---|---|
| **Question**: | Did you agree to any variations from, or alternatives to, your standard or customary billing rates, fees or terms for services pertaining to this engagement that were provided during the application period?  If so, please explain. |
| Response: | Yes. Kroll agreed to reduced rates in this engagement. Its standard or customary billing rates are significantly higher. |

| Role | Standard Rates | | Oversight Board Rates | | Discount Provided |
|---|---|---|---|---|---|
| Managing Director | $ | 1,150 | $ | 650 | 43% |
| Director | $ | 1,040 | $ | 550 | 47% |
| Vice President | $ | 825 | $ | 425 | 48% |
| Senior Associate | $ | 625 | $ | 395 | 37% |
| Analyst | $ | 435 | $ | 225 | 48% |

Kroll agreed to further reductions in its fees after negotiations with the fee examiner, as reflected in the Reduced Fee Order (Dkt. No. 12157).

**Question**:   If the fees sought in this fee application as compared to the fees budgeted for the time period covered by this fee application are higher by 10% or more, did you discuss the reasons for the variation with the client?

Response:   Kroll prepared various budgets for this project. The fees included in interim fee applications did not exceed the cumulative budget by more than 10%.

**Question**:   Have any of the professionals included in this fee application varied their hourly rate based on the geographic location of the bankruptcy case?

Response:   No, except for voluntary and negotiated reductions previously noted.

**Question**:   Does the fee application include time or fees related to reviewing or revising time records or preparing, reviewing, or revising invoices? (This is limited to work involved in preparing and editing billing records that would not be compensable outside of bankruptcy and does not include reasonable fees for preparing a fee application.).  If so, please quantify by hours and fees.

Response:   Yes, the interim applications included 388 hours and $127,959.50 of fees related to reviewing time records or preparing, reviewing or revising invoices in connection with the preparation of monthly fee statements.  This represented approximately 5% of total fees originally requested, but fee reductions agreed upon with the fee examiner and approved by the Court further reduced these charges, if not eliminated them.

**Question**:   Does this fee application include time or fees for reviewing time records to redact any privileged or other confidential information?  If so, please quantify by hours and fees.

Response:   No.

**Question**:   If the fee application includes any rate increases since retention: (i) Did your client review and approve those rate increases in advance? (ii) Did your client agree when retaining the advisory firm to accept all future rate increases?  If not, did you inform your client that they need not agree

to modified rates or terms in order to have you continue the representation, consistent with ABA Formal Ethics Opinion 11-458?

Response:   Not applicable.  Kroll did not increase any rates since being retained.

### Professionals Billing Fewer Than Five Hours per Month

25.    The following chart indicates (a) professionals who billed fewer than five hours per month, (b) the months for which fewer than five hours were billed by the professional, and (c) an explanation of why the use of such professional was reasonable and necessary.  As a general matter, it was reasonable and necessary to consult with professionals with specific practice area expertise to assist the Debtors in the Title III cases.

| Professional | Month(s) in which less than 5 hours were billed | Explanation of Why Services Were Reasonable and Necessary |
|---|---|---|
| Chavira, Roger | December 2018 | Mr. Chavira is a member of D&P's Legal Management Consulting team.  During this time frame, Mr. Chavira assisted with the design and data elements needed to customize the database so that it was user friendly and operational for our specific purposes. |
| Damodaran, Brendan | November 2018 | Mr. Damodaran is a member of D&P's Disputes & Investigations team.  During this time frame, Mr. Damodaran assisted with Account Holder reviews. |
| Dover, Austin | January 2019 | Mr. Dover is a member of D&P's Disputes & Investigations team.  During this time frame, Mr. Dover assisted with the conversion of documents into a usable excel format. |
| Furman, David | January 2019 | Mr. Furman is a member of D&P's Disputes & Investigations team.  During this time frame, Mr. Furman assisted with a quality control review. |
| Houser, Harley | January 2019 | Ms. Houser is a member of D&P's Legal Management Consulting team.  During this time frame, Ms. Houser transitioned her role to an outside developer that assisted us with TeamConnect. |

| Professional | Month(s) in which less than 5 hours were billed | Explanation of Why Services Were Reasonable and Necessary |
|---|---|---|
| Jacobs, Debra | November 2018 | Ms. Jacobs is a member of D&P's Disputes & Investigations team. |
| Jenkins, Carl | November and December 2018 and January 2019 | Mr. Jenkins is a member of D&P's Disputes & Investigations team. During this time frame, Mr. Jenkins was involved in the preparation of the third Addendum and provided expert advice on the final report. |
| Klyman, Basyah | November 2018 | Ms. Klyman is a member of D&P's Disputes & Investigations team. During this time frame, Ms. Klyman assisted with quality control reviews. |
| McPherson, Deborah | December 2018 | Ms. McPherson is a member of D&P's Legal Management Consulting team. During this time frame, Ms. McPherson assisted with configuring the TeamConnect database. |
| Ennis, Helen | February 2019 | Third party quality control review. |
| Patterson, Nicole | February 2019 | Compliance related question per case administration forms. |
| Albano, Juliana | February 2019 | Third party quality control review. |
| Cappelli, Alexander | February 2019 | Fee Statement assistance at appropriate rate. |
| Levy, Rebecca | March 2019 | Report finalization. |
| Kanto, John | March 2019 | Follow on task from prior period required minimal work. |
| Mcmaster, Griffin | March 2019 | Third party quality control review. |
| Feltman, James | April 2019 | Substantive work ending. Administrative tasks allocated to professionals at appropriate rate. |
| Lattner, Kathryn | April 2019 | Substantive work ending. Administrative tasks allocated to professionals at appropriate rate. |
| Schulke, Douglas | April 2019 | Systems wind down. |
| Houser, Haley | April 2019 | Systems wind down. |
| Tocci, Dom | April 2019 | Transition tasks requested by client regarding prior communication with banking relationships. |

## Summary of Services Provided During the Compensation Period

26.     The following is a brief narrative summary, listed by Project Category, of the professional services rendered by Kroll during the Compensation Period.

**(a) Master List**
**(Project Category 101)**
**(Hours 71.90; Fees[4] $31,297.50)**

27.     Created a master list of Agencies and Public Corporations of Puerto Rico ("Account Holders") for the periods ending November 30, 2017 and June 30, 2018 ("Measurement Dates"): (i). Created an organization chart of Account Holders from various sources (including but not limited to Department of the Treasury ("Hacienda") and FOMB. Requested and obtained from Hacienda the Comprehensive Annual Financial Reports in finalized, audited form for the fiscal year ending June 30, 2014 and in draft form for the fiscal years ending June 30, 2015 through June 30, 2018.

**(b) Document Acquisition – Accounts**
**(Project Category 102)**
**(Hours 3.90; Fees $1,540.50)**

28.     Requested and obtained from (i). Account Holders, their books and records relating to cash and investment accounts sourced from trial balances or general ledgers, as of the Measurement Dates; (ii). The Office of the Commissioner of Financial Information reports ("OCIF Reports") as of the Measurement Dates for financial institutions ("Financial Institutions") of Account Holders.

**(c) Account Holder Requests**
**(Project Category 201);**
**(Hours 412.00; Fees $212,725.00)**

29.     Prepared a template for confirmation letters from the FOMB (on behalf of D&P) to

---

[4] Fees shown here are those Kroll requested at its reduced rates, but, after negotiations with the fee examiner, all such fees were further <u>reduced</u>, as reflected in the Reduced Fee Order (Dkt. No. 12157).

request that Account Holders: (i). Produce financial information from their books and records such as trial balances and /or general ledger as of the Measurement Dates, relating to cash and investment accounts; and (ii). To provide their respective information regarding whether cash and investments accounts are "restricted" and if affirmative, provide the nature and type of restrictions Account Holders believe are applicable. Conducted on-site meetings with key account holders, including Hacienda, PRIDCO, ERS, JRS and PREPA to continue ongoing information requests.

### (d) Financial Institution Requests
### (Project Category 202)
### (Hours 525.60; Fees $207,652.00)

30.     Prepared a template for confirmation letters from the FOMB (on behalf of Kroll) to Financial Institutions as of the Measurement Dates. The confirmation letter requested that on behalf of the Account Holder, the financial institution release all cash and investment information directly to Kroll (on behalf of FOMB) and grant online Webcash access. Included "[Kroll's] role of Project Manager will also include the responsibility to initiate, manage and download for processing, the Financial Institution letters for the Account Holders". Organized information received into relevant schedules, analyses for report publication; quality control review.

### (e) Master Database Development
### (Project Category 203)
### (Hours 372.80; Fees $139,080.50)

31.     Received and processed cash and investment account information, as well as information provided by Account holders regarding "restrictions" and information from each Financial Institution in a master database ("Master Database"). For each Account Holder, created a separate worksheet linked to the Master Database, of all the cash and investment account information received from each Account Holder and each Financial Institution. (i). Initiated and maintained engagement with the Account Holders and Financial Institutions to facilitate receipt of

sufficient and relevant information going forward.  Prepared master database for report publication.

**(f) Request Follow Up**
**(Project Category 204)**
**(Hours 26.20; Fees $10,745.00)**

32.  Recovered and followed up on missing or incomplete cash and investment information, information regarding "restrictions" from Account Holders and Financial Institutions. Reverted to alternative information collection procedures if voluntary requests were unproductive. (i). Maintained a detailed log of information requested, from whom, and when it was requested as well as what and when information was received and from what sources(s).

**(g) Discrepancy and Incompleteness Identification**
**(Project Category 205)**
**(Hours 107.50; Fees $29,058.50)**

33.  Reconciled information received from the Account Holders and the Financial Institutions.  Identified material discrepancies and followed up, as applicable.

**(h) Restriction Analysis**
**(Project Category 301)**
**(Hours 28.20; Fees $12,122.50)**

34.  Based on information received from Account Holders and in consultation with the FOMB staff, determined which cash and investment accounts compiled from the Master Database should be included as unrestricted accounts ("Included Account") (i). Where there were material accounts whose restricted status is in question, communicated with the Account Holders to determine if the account should or should not be considered as an Included Account; (ii). Defined and documented what constituted a material Included Account and if not Included, documented why the account was not an Included Account; (iii). For any material account that is deemed excluded, documented the rationale and supporting exclusion; and (iv). Sought consensus with the

Board to determine materiality threshold for Included Accounts. Update restriction analysis charts, analyses for report publication; quality control process. Prepared due diligence chart for client and other professionals.

**(i) Included Account Comparison**
**(Project Category 302)**
**(Hours 5.90; Fees $2,507.50)**

35.    Reconciled Included Accounts with the AAFAF-produced November 2017 Publication. Sought an explanation from AAFAF for differences, if any, in material restricted accounts and values of each account so identified.

**(j) Restriction Determination**
**(Project Category 401)**
**(Hours 6.20; Fees $3,625.00)**

36.    Determined, in consultation with the Board counsel, the appropriate definitions and categories of legal restrictions, such as (a) federal, (b) bond-related, (c) local legislature, or (d) local executive, and classified accounts in the Master Database accordingly. Responded to client request for clawback information with restriction information schedule.

**(k) Restriction Confirmation**
**(Project Category 403)**
**(Hours 20.80; Fees $11,202.50)**

37.    Collaborated with the Board counsel to confirm the application of agreed upon definitions to the classification of bank accounts as either restricted or unrestricted.

**(l) Restriction Testing**
**(Project Category 404)**
**(Hours 5.40; Fees $2,970.00)**

38.    Tested claimed Restrictions to Account activities: (i). For material accounts where Account Holders claim "restricted" status, on a test basis, performed reviews of transactional activities to determine if the account transaction types matched the claimed "restricted" status.

Classified accounts in the Included Account Database as restricted or unrestricted, accordingly.

**(m) Draft Report**
**(Project Category 501)**
**(Hours 278.80; Fees $158,637.50)**

39.    Prepared a status report or a report for publication as directed by the Board, describing the forensic process, findings and opinions associated with Steps 1 – 4.  Included edits, comments, insight provided through internal quality control process and through client and other professionals' review.

**(n) Priority AH Review Process**
**(Project Category 601)**
**(Hours 1,159.40; $485,299.50)**

40.    Reviewed account holder responses for completeness and accuracy, as agreed in Addendum #3, relating them chronologically between work plan tasks 203 and 204.  Included, as agreed in Addendum # 3, (i). direct supervision to the Clients review and data entry staff assigned to the Project; (ii). provided direct assistance by performing the review function for AH included in the Priority List, including assessment of the completeness and sufficiency of AH responses and develop an open item list and tracking of secondary AH responses.  Included internal quality control tasks for larger priority account holders.

**(o) TeamConnect Database Maintenance & Development**
**(Project Category 801)**
**(Hours 426.80; Fees $139,986.00)**

41.    Tasks associated with developing the TeamConnect database from a technical perspective to adapt to client needs, reporting functionalities, changing facts and circumstances as dictated by the outcomes of the Account Holder and Financial Institution review processes.  Includes technical calls and tasks associated with information transfer requested by client.

**(p) Supplemental FOMB Requests**
**(Project Category 995)**
**(Hours 65.50; Fees $27,840.00)**

42.    Information requested by the Client not included in the scope of the work plans

identified at 101 - 601.

**(q) Fee Statement & Application Preparation**
**(Project Category 997)**
**(Hours 388; Fees $127,959.50)**

43.    Time incurred preparing time entries, fee statements, and fee applications in

accordance with court guidelines.

**(r) Case Administration**
**(Project Category 998)**
**(Hours 624.10; Fees $294,049.50)**

44.    Time incurred for the benefit of case administration tasks, including traveling,

administrative documentation review, and staffing as required by the Board that Kroll "have a

continuing physical presence at the Clients' office in San Juan, Puerto Rico".

**(s) Case Status & Strategy**
**(Project Category 999)**
**(Hours 859.10; $402,826.50)**

45.    Various tasks and meetings regarding case status and strategy which included

written internal and external progress updates and internal and external progress meetings,

including meetings with FOMB, its Counsel, and/or other professionals. Included the required

"weekly project status updates to the Client", as required by Addendum #3.

46.    The professional services performed by Kroll were reasonable, necessary,

appropriate, and beneficial when rendered, facilitated the effective administration of the Debtors'

Title III cases, and were in the best interests of the Board and the Debtors' creditors, residents, and

other stakeholders. The compensation for which approval is being sought was commensurate with

the complexity, importance, and time-sensitive nature of the problems, issues, and tasks involved. The professional services of Kroll were performed in an efficient and effective manner.

47.     The Court should approve the compensation sought by Kroll in compliance with the requirements of the Bankruptcy Code. The fees requested are fair and reasonable because these Title III cases are complex matters that required the time spent by Kroll given the nature and extent of the services. Furthermore, Kroll's financial expertise, plus the value of its services and the costs of comparable services in other cases show full compliance with the Bankruptcy Code, particularly given Kroll's reduction of its standard rates by an average of 44.6%, even before further negotiated reductions sought by the fee examiner and approved by the Court in the Reduced Fee Order (Dkt. No. 12157) plus $402,800.56 of taxes withheld by the Commonwealth.

## Actual and Necessary Expenses of Kroll

48.     Pursuant to the Guidelines, Exhibit D is Kroll's list of actual and necessary expenses incurred on behalf of the Board during the Compensation Period.

49.     Kroll seeks reimbursement for its necessary and reasonable expenses, including client pre-approved: (a) local travel to and from airports, (b) out-of-town travel, (c) out-of-town meals; and (d) professional services.

50.     During the Compensation Period, Kroll has incurred $57,400.36 (per the Reduced Fee Order) as necessary and reasonable expenses. The actual expenses incurred by Kroll were necessary, reasonable, and justified to effectively serve the needs of the Debtors in its Title III cases. All expense entries are detailed and explained in Kroll's interim fee applications (Dkt. Nos. 8450 and 7997), vetted by the fee examiner and approved in the Reduced Fee Order (Dkt. No. 12157).

## Compensation Paid and Its Source

51.    The services and expenses for which Kroll is requesting approval of the Court were performed or incurred on behalf of the Board. In connection with the matters covered by this Application, Kroll received no payment and no promises of payment for services rendered, or to be rendered, from any source other than the Debtors. There is no agreement or understanding between Kroll and any other person, other than members of the Kroll firm, for the sharing of compensation received for services rendered in these Title III cases.

52.    PROMESA sections 316 and 317 provide for compensation of professionals and govern the Court's award of such compensation. 48 U.S.C. §§ 2176-2177. PROMESA section 316 provides that a court may award a professional person employed by the Debtors or the Board under PROMESA "(1) reasonable compensation for actual, necessary services rendered by the professional person, or attorney and by any paraprofessional person employed by any such person; and (2) reimbursement for actual, necessary expenses." 48 U.S.C. § 2176(a). Section 316 also sets forth the criteria for the award of such compensation and reimbursement:

> In determining the amount of reasonable compensation to be awarded … the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
>
> (1) the time spent on such services;
>
> (2) the rates charged for such services;
>
> (3) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this chapter;
>
> (4) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (5) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(6) whether the compensation is reasonable based on the customary
compensation charged by comparably skilled practitioners in cases
other than cases under this subchapter or title 11.

53.     As noted above, the professional services and expenditures described in this

Application were necessary and beneficial to the Board. Kroll worked diligently to anticipate or

respond to the Board's needs and assisted in the Board's role in these Title III cases. The

compensation requested herein is reasonable in light of the nature, extent, and value of such

services to the Board, particularly given Kroll's reduction of its standard rates by an average of

44.6% and the further reductions obtained by the fee examiner, as reflected in the Reduced Fee

Order (Dkt. No. 12157).

## Reservation of Rights

54.     Kroll reserves the right to request compensation for services and reimbursement of

expenses in a future application that have not been processed in relation to the Compensation

Period covering this Application, including the expense of preparing, defending and prosecuting

this application, plus related matters (*e.g.*, possible appeals).

## Notice

55.     Pursuant to the Interim Compensation Order, notice of this Application has been

filed in the Commonwealth's Title III case and served upon:

(a) the Financial Oversight and Management Board, 40 Washington
Square South, Office 314A, New York, NY 10012, Attn: Arthur J.
Gonzalez, Oversight Board Member;

(b) attorneys for the Oversight Board, Proskauer Rose LLP, Eleven Times
Square, New York, NY 10036, Attn: Martin J. Bienenstock, Esq.
(mbienenstock@proskauer.com)          and          Ehud
Barak, Esq. (ebarak@proskauer.com), Brian S. Rosen, Esq.
(brosen@proskauer.com), and Proskauer Rose LLP, 70 West
Madison Street, Chicago, IL 60602, Attn: Paul V. Possinger, Esq. (p
possinger@proskauer.com);

(c) the attorneys for the Board, O'Neill & Borges LLC, 250 Munoz
Rivera Ave., Suite 800, San Juan, PR 00918-1813, Attn: Herman D.

Bauer, Esq. (hermann.bauer@oneillborges.com);

(d) attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority, O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, NY 10036, Attn: John J. Rapisardi, Esq. (jrapisardi@omm.com), Peter Friedman, Esq. (pfriedman@omm.com), and Diana M. Perez, Esq. (dperez@omm.com);

(e) attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority, Marini Pietrantoni Muñiz LLC, Suite 900, 250 Ponce de León Ave, San Juan, PR 00918, Attn: Luis C. Marini-Biaggi, Esq. (lmarini@mpmlawpr.com) and Carolina Velaz-Rivero Esq. (cvelaz@mpmlawpr.com);

(f) the Office of the United States Trustee for the District of Puerto Rico, Edificio Ochoa, 500 Tanca Street, Suite 301, San Juan, PR 00901 (re: In re: Commonwealth of Puerto Rico);

(g) attorneys for the Official Committee of Unsecured Creditors, Paul Hastings LLP, 200 Park Ave., New York, NY 10166, Attn: Luc. A Despins, Esq. (lucdespins@paulhastings.com), James Bliss, Esq. (jamesbliss@paulhastings.com);

(h) attorneys for the Official Committee of Unsecured Creditors, Casillas, Santiago & Torres LLC, El Caribe Office Building, 53 Palmeras Street, Ste. 1601, San Juan, PR 00901, Attn: Juan J. Casillas Ayala, Esq. (jcasillas@cstlawpr.com) and Alberto J.E. Añeses Negrón, Esq. (aaneses@cstlawpr.com);

(i) attorneys for the Official Committee of Retired Employees, Jenner & Block LLP, 919 Third Ave., New York, NY 10022, Attn: Robert Gordon, Esq. (rgordon@jenner.com) and Richard Levin, Esq. (rlevin@jenner.com), and Jenner & Block LLP, 353 N. Clark Street, Chicago, IL 60654, Attn: Catherine Steege, Es q. (csteege@jenner.com) and Melissa Root, Esq. (mroot@jenner.com);

(j) attorneys for the Official Committee of Retired Employees, Bennazar, García & Milián, C.S.P., Edificio Union Plaza, PH-A, 416 Ave. Ponce de León, Hato Rey, PR 00918, Attn: A.J. Bennazar-Zequeira, Esq. (ajb@bennazar.org);

(k) the Puerto Rico Department of Treasury, PO Box 9024140, San Juan, PR 00902-4140, Attn: Reylam Guerra Goderich, Deputy Assistant of Central   Accounting (Reylam.Guerra@hacienda.pr.go v); Omar E. Rodríguez Pérez, CPA, Assistant Secretary of Central Accounting (Rodriguez.Omar@hacienda.pr.gov); Angel L. Pantoja Rodríguez, Deputy Assistant Secretary of Internal Revenue and Tax Policy (angel.pantoja@hacienda.pr.gov) ; Francisco Parés Alicea, Assistant Secretary of Internal Revenue

and Tax Policy (francisco.pares@hacienda.pr.gov); and Francisco Peña Montañez, CPA, Assistant Secretary of the Treasury (Francisco.Pena@hacienda.pr.gov);

(l) attorneys for the Fee Examiner, EDGE Legal Strategies, PSC, 252 Ponce de León Avenue, Citibank Tower, 12th Floor, San Juan, PR 00918, Attn: Eyck O. Lugo (elugo@edgelegalpr.com);

(m) attorneys for the Fee Examiner, Godfrey & Kahn, S.C., One East Main Street, Suite 500, Madison, WI 53703, Attn: Katherine Stadler, Esq. (KStadler@gklaw.com).

**WHEREFORE**, Kroll respectfully requests that the Court enter an order, consistent with the Reduced Fee Order (Dkt. No. 12157) (a) allowing final compensation for professional services rendered during the Compensation Period in the amount of $2,159,097.53 (including the 10% professional compensation holdback amount) and reimbursement for actual and necessary expenses Kroll incurred in connection with such services during the Compensation Period in the amount of $57,400.36; (b) directing the Debtor to pay promptly to Kroll the difference between (i) the total allowed amount of interim compensation for professional services rendered and reimbursement of expenses incurred during the Compensation Period ($2,122,478.53) and $36,619 earned during June and July, 2019) plus approved expenses of $57,400, [a grand total of $2,216.497.80], and (ii) the amounts for such compensation and expenses previously paid to and received by Kroll ($1,943,197.78) for a total outstanding request of $273,310.11; (c) allowing such compensation for professional services rendered and reimbursement of actual and necessary expenses incurred without prejudice to Kroll's right to seek additional compensation for services performed and expenses incurred during the Compensation Period, which may not have been processed at the time of this Application; and (d) granting Kroll such other and further relief as is just and proper.

Dated: August 30, 2022
        New York, New York

Respectfully submitted,

Ann Gittleman
**KROLL LLC**
55 East 52nd Street, 31st Floor
New York, New York 10055
Tel: (646) 867-7831

*Independent Forensic Analyst for the
Financial Oversight and
Management Board as representative
of The Commonwealth of Puerto Rico*

ANTONETTI MONTALVO & RAMIREZ-
COLL

By: _____
        José L Ramirez-Coll
        U.S.D.C. 221702
        P.O. Box 13128
        San Juan, Puerto Rico  00908
        (787) 977-0312
        email:  jramirez@amrclaw.com

SCHULTE ROTH & ZABEL LLP

By: _____
        Michael L. Cook

919 Third Avenue
New York, New York 10022
Tel: (212) 756-2000
email: michael.cook@srz.com

*Attorneys for Kroll, LLC*

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that on this same date we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record. We also hereby certify that the foregoing was served pursuant to the Sixteenth Amended Notice, Case Management and Administrative Procedures Order (Docket No. 20190-1).

Dated:  August 31, 2022

                                         **Respectfully submitted.**

San Juan, Puerto Rico                    s/José L. Ramirez-Coll
                                         José L Ramirez-Coll
                                         U.S.D.C. No. 221702
                                         ANTONETTI MONTALVO & RAMIREZ-COLL
                                         PO Box 13128
                                         San Juan, PR 00908
                                         (787) 977-0312
                                         email:  jramirez@amrclaw.com

23

**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

-------------------------------------------------------------------x

In re

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

     Debtors.[1]

-------------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

**CERTIFICATION UNDER GUIDELINES**
**FOR FEES AND DISBURSEMENTS FOR PROFESSIONALS - -**
**FINAL FEE APPLICATION OF KROLL, LLC, f/k/a DUFF & PHELPS LLC FOR**
**COMPENSATION**
**FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES**
**INCURRED AS FINANCIAL ADVISOR FOR THE FINANCIAL OVERSIGHT**
**AND MANAGEMENT BOARD**
**FOR THE PERIOD NOVEMBER 1, 2018 THROUGH JULY 31, 2019**

Pursuant to the *United States Trustee Guidelines for Reviewing Applications*

*for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330 by Attorneys*

*in Larger Chapter 11 Cases* issued by the Executive Office for the United States Trustee, 28 CFR

Part 58, Appendix B (the "Guidelines"), together with the Local Rule 2016-1, the undersigned, a

Managing Director of Kroll, LLC, f/k/a Duff & Phelps LLC ("Kroll"), financial advisor for the

Financial Oversight and Management Board for Puerto Rico (the "Board"), as representative

of the Commonwealth of Puerto Rico ("Commonwealth"), Puerto Rico Sales Tax Financing

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Corporation ("COFINA"), Puerto Rico Highways and Transportation Authority ("HTA"), Employees Retirement System for the Commonwealth of Puerto Rico ("ERS"), and Puerto Rico Electric Power Authority ("PREPA," jointly with the Commonwealth, COFINA, HTA and ERS referred to as "Debtors"), pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] hereby certifies with respect to Kroll's final application for allowance of compensation for services rendered and reimbursement of expenses incurred with respect to the Debtors' Title III case, dated June___, 2022 (the "Application"),[3] for the period from November 1, 2018 through and including July 31, 2019 (the "Compensation Period") as follows:

1.    I am the professional designated by D&P in respect of compliance with the Guidelines and Local Rule 2016-1.

2.    I make this certification in support of the Application for final compensation and reimbursement of expenses incurred during the Compensation Period in accordance with the Guidelines and Local Rule 2016-1.

3.    In respect of the Guidelines and Local Rule 2016-1, I certify that to the best of my knowledge, information, and belief formed after reasonable inquiry:

      a.  I have read the Application;

      b.  the fees and disbursements sought fall within the Guidelines;

      c.  except to the extent that fees or disbursements are prohibited by the Guidelines, the fees and disbursements sought are billed at an average discount of 44.6% from standard rates customarily employed by Kroll for its clients, further

---

[2] PROMESA has been codified in 48 U.S.C. §§ 2101-2241.

[3] Capitalized terms used but not defined herein have the meanings given to them in the Application.

reduced after negotiations with the fee examiner, and approved by the Court on March 6, 2020 (Dkt. No. 12157); and

d.  in providing a reimbursable service, Kroll does not make a profit on that service, where the service is performed by Kroll in house or through a third party.

4.     I hereby certify that no public servant of the Puerto Rico Department of Treasury is a party to or has any interest in the gains or benefits derived from the contract that is the basis of this invoice. The only consideration for providing services under the contract is the payment agreed upon with the authorized representatives of the Board. The amount sought by the Application is reasonable. The services were rendered, and we have received a total of $1,943.187.78 for the Compensation Period. To the best of my knowledge, Kroll does not have any debts owed to the Government of Puerto Rico or its instrumentalities because the Commonwealth has withheld $402,800.56 from Kroll's fees.

5.     I certify that Kroll has previously provided monthly statements of its fees and disbursements by filing and serving monthly statements in accordance with the Interim Compensation Order (as defined in the Application), except that completing reasonable and necessary internal accounting and review procedures may have, at times, precluded filing fee statements within the time periods specified in the Order.

Dated: August 30, 2022
         New York, New York

Respectfully submitted,

_____
Ann Gittleman
**KROLL, LLC**
55 East 52nd Street, 31st Floor
New York, New York 10055
Tel: (646) 867-7831

*Independent Forensic Analyst for the Financial Oversight and Management Board as representative of The Commonwealth of Puerto Rico*

DOC ID - 38089162.9

3

## Exhibit A

Engagement Letter dated January 31, 2018, as amended on March 31, 2018, August 16, 2018
and December 11, 2018.

DOC ID - 38089162.3

DUFF&PHELPS

**CONFIDENTIAL**

**VIA E-MAIL:** jaime.elkoury@promesa.gov

January 31, 2018

Jaime A. El Koury, Esq.
General Counsel
Financial Oversight and Management Board for Puerto Rico

**Subject:**    **Letter of Engagement for Duff & Phelps, LLC- Disputes & Investigations Engagement: <u>Independent Forensic Analysis Team for the Financial Oversight and Management Board for Puerto Rico</u>**

Dear Mr. El Koury:

This Letter of Engagement confirms that we, Duff & Phelps, LLC ("D&P" or "we"), have been retained as a consulting expert to assist the Financial Oversight and Management Board for Puerto Rico ("PROMESA" or "you" or "Client") with the services described below.

The purpose of our engagement is to provide advice and consultation in our field of expertise and to form expert opinions that may be presented in a legal forum. Although you will define the general scope of our work based on the issues in the above-referenced matter, at all times we will exercise our best independent and professional judgment with respect to all aspects of this engagement, and we will provide complete, accurate, and unbiased opinions to the best of our knowledge and ability. Initially, the scope of services shall be as set forth in Attachment I.

D&P is not rendering any legal advice in this matter, and all legal advice being provided to PROMESA shall be your sole responsibility.

Our work may include investigating, collecting and analyzing information, including but not limited to accounting records and other financial information, as well as performing various financial and accounting analyses, as needed and directed by you. However, our engagement does not include an audit in accordance with generally accepted auditing standards of existing business records.

To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) or any report or deliverable contemplated by this communication, whether draft or final, is not intended or

Duff & Phelps, LLC
55 E 52ⁿᵈ Street
New York, NY 10055

T   + 1 212-450-2854

James.Feltman@duffandphelps.com
www.duffandphelps.com

Jaime A. El Koury, Esq.
Oversight Board
Engagement Letter
January 31, 2018
Page 2

written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

## Confidentiality and Privilege

Our work is intended for your use and benefit and should not be used by any other party for any other purpose.

It is anticipated that all information or documents prepared by D&P and/or provided by D&P to you in the course of this engagement constitutes confidential communications protected from disclosure to third parties by the attorney-client privilege and/or constitute confidential work product protected from disclosure to third parties by the attorney work-product doctrine. As such, all documents, including but not limited to written reports, memoranda, financial analyses and summaries, that we prepare in connection with this engagement shall be prominently labeled "Attorney Work-Product; Privileged & Confidential" at your request. We will not prepare any written reports in this matter unless specifically requested to do so by you. Written reports which you request and are published will not be subject to the restrictions in this paragraph.

It is anticipated that all information or documents supplied to D&P by you in the course of this engagement constitute confidential communications protected from disclosure to third parties by the attorney-client privilege and/or constitute confidential work product protected from disclosure to third parties by the attorney work-product doctrine.

## Conflict Check

An internal search within D&P was performed for any potential client conflicts based on the names of the person(s)/entities that you provided. To the best of our knowledge and belief, client conflicts were not identified at that time. You agree that you will inform D&P of additional parties to this matter or of name changes of the person(s)/ entities that you initially provided.

Since D&P is presented with new client opportunities every day, we cannot ensure that, following the completion of our internal conflict search, an engagement on behalf of any of the person(s)/ entities in this matter will not be accepted by D&P. Should a conflict come to the attention of the Managing Director in charge of your engagement, he or she will advise you as soon as possible.

Jaime A. El Koury, Esq.
Oversight Board
Engagement Letter
January 31, 2018
Page 3

**Staffing**

The Services will be performed under the overall supervision of James Feltman, a Managing Director, who will be assisted by other D&P staff as needed.

**Fees and Expenses**

We understand this engagement would be part of the budgetary process, and we would work cooperatively with you to establish a level of fees that are appropriate for the given environment. These fees could include a blended hourly rate or a set monthly retainer, and we are happy to explore options that make the most sense. D&P agrees to use the rates published in Attachment II on this engagement throughout 2018.

D&P will bill PROMESA monthly directly via invoice with a copy to you. It is acknowledged that payment is the sole responsibility of PROMESA.

A non-refundable initial retainer to be determined by D&P and PROMESA is due upon execution of this engagement letter (amount to be determined). The retainer shall be applied to the final billing rendered hereunder, and any excess shall be promptly refunded to PROMESA, unless the total fees in the case are less than the initial non-refundable retainer, in which case the excess will be deemed earned by us and not subject to refund. We reserve the right to increase the retainer during the course of the engagement to better protect our ability to collect fees. Further, if invoices are outstanding for more than ninety (90) days, the retainer will be automatically applied against the outstanding balance and will need to be immediately replenished to restore the retainer to the amount of the initial retainer in order for any further work to be performed hereunder.

We do not warrant or predict results in this matter, and our fees are not contingent upon any outcome arising out of the provision of the Services.

If we do not receive payment of any invoice within thirty (30) days of the invoice date, we shall be entitled, without prejudice to any other rights that we may have, to suspend provision of the Services until all sums due are paid in full. Further, to safeguard against any assertion or allegation that our work may in some way be influenced by, or contingent upon, the outcome of our analyses, we require that all outstanding invoices be paid, in full, prior to us issuing any expert report and prior to us furnishing testimony in deposition or trial, should the services herein require such testimony. Accordingly, if testimony becomes necessary, we reserve the right to refuse to testify if we have not been paid in full at the time such testimony is required.

Jaime A. El Koury, Esq.
Oversight Board
Engagement Letter
January 31, 2018
Page 4

**Compliance with Laws, Regulations, and Vendor Code of Conduct.**

While providing services for the Board, D&P personnel assigned to this engagement shall comply with all applicable laws, rules and regulations, as well as all applicable Board policies and rules, including without limitation the Board's Vendor Code of Conduct and its Vendor Conflict of Interest Disclosure Certification.  For the avoidance of doubt, the Vendor Conflict of Interest Disclosure Certification is being provided with respect to D&P generally and not just with respect to its personnel assigned to this engagement.  A copy of the Vendor Code of Conduct and its Vendor Conflict of Interest Disclosure Certification is attached as Attachment IV hereto.

**Terms and Conditions**

The Terms and Conditions attached as Attachment III set forth the rights and responsibilities of the parties with respect to the Services.  By signing this Letter of Engagement, it is acknowledged that PROMESA understands and agrees to the Terms and Conditions.

Jaime A. El Koury, Esq.
Oversight Board
Engagement Letter
January 31, 2018
Page 5


*   *   *   *   *


D&P is committed to providing superior service to its clients.  If you have any questions or
require further information, please call me at +1 212-450-2854.  If the scope and terms of this
Letter of Engagement are acceptable, please acknowledge your acceptance by signing and
returning a copy of this letter to James Feltman at Duff & Phelps, LLC, 55 East 52nd Street,
New York, NY, 10055, along with the retainer payment to which we agree upon.

Yours sincerely,

James Feltman
Managing Director
Disputes & Investigations
Duff & Phelps, LLC

Jaime A. El Koury, Esq.
Oversight Board
Engagement Letter
January 31, 2018
Page 6


## Confirmation of Letter of Engagement

I declare that I have the authority to act on behalf of and bind PROMESA, and I have read, understand and accept the Letter of Engagement, and Terms and Conditions attached thereto, dated January 31, 2018.

Date: January 31, 2018

Signed: Natalie A. Jaresko
Title: Executive Director
On behalf of: Financial and Oversight Management Board for Puerto Rico

Jaime A. El Koury, Esq.
Oversight Board
Engagement Letter
January 31, 2018
Page 7

## I. PROPOSED SCOPE – Phase I

D&P's Phase I Scope of Services would be to perform, assess, recommend and/or report to the PROMESA board or its delegates on the following:

(1) Validate with a high level of certainty the completeness of the list of bank accounts in the AAFAF report of January 19, 2018 and the values of those bank accounts as of the reported date;

(2) Recommend additional procedures that need to be undertaken if the completeness of the list in the AAFAF report of January 19, 2018 is determined to be insufficient;

(3) For all materially sized accounts, and for a random selection of other accounts identified by the Government as restricted, identify the documented legal restrictions, e.g., federal, bond-related, local legislature, or local executive.

(4) D&P to provide periodic status updates and a report and recommendation to the PROMESA board regarding the above items, which will include D&P's estimates of time and fees to perform the agreed upon tasks, once commissioned by PROMESA.

D&P will bill the Client actual hours expended at the rates described on Attachment II in providing the services describe above.

In 30 days, the D&P and the Client will make reasonable best efforts to agree to a cap on the total fees plus reasonable out of pocket costs in connection with the services described herein.

Jaime A. El Koury, Esq.
Oversight Board
Engagement Letter
January 31, 2018
Page 8

II.    Schedule of Professional Fees for PROMESA 2018[1]

| Level | Hourly Rate |
|---|---|
| Managing Director | $650 |
| Director | $550 |
| Vice President | $425 |
| Senior Associate | $395 |
| Analyst | $225 |

---

[1] The fees on Attachment II were negotiated with the client to reflect substantial discounts from Duff & Phelps standard rates. These discounted rates take into account the unique financial conditions in Puerto Rico and Duff and Phelps' desire to demonstrate sensitivity to these highly unusual circumstances.

Attachment III to PROMESA Letter of Engagement dated January 4, 2019

### Terms and Conditions

The following are the terms and conditions (the "Terms and Conditions") on which we will provide the Services set forth in the attached Letter of Engagement. Together, the Terms and Conditions and the Letter of Engagement are referred to as the "Contract," which forms the entire agreement between D&P and you relating to the Services.

### General

1. Any variation to this Contract, notwithstanding any variation to the Services specified in the Letter of Engagement, shall be set forth in a letter or email communication deemed effective and made part of this Letter of Engagement upon written acknowledgement by the receiving party.

2. After we have delivered any work product in final form, we have no responsibility to update such work product to reflect, incorporate or otherwise consider any events or circumstances occurring subsequent to the date of provision of such work product. If such update is requested, a separate letter of engagement, subject to our then standard fees plus expenses, shall be required.

### Provision of Information

3. Our performance of the Services is dependent upon you providing us with accurate and timely information and assistance. You shall use reasonable skill, care and attention to ensure that all information we may reasonably require is provided on a timely basis and is accurate and complete. You shall notify us if you subsequently learn that the information provided is incorrect or inaccurate or otherwise should not be relied upon. Failure to comply with this provision in any manner will frustrate, delay and/or otherwise impede D&P's performance of the Services, and D&P shall not be held liable for any damage, sanction or penalty as a result thereof.

### Work Product and Property Rights

4. There may be differences between draft and final work product. During the course of our work, drafts of our report may be issued. You acknowledge that no reliance shall be placed on draft reports, conclusions or advice, whether oral or written, issued by us as the same may be subject to further work, revision, and other factors which may result in such drafts being substantially different from any final report or advice issued. Further, you acknowledge that issuance of draft reports may be discoverable and subject to us being forced to produce such drafts in discovery in this matter.

5. Any advice given or work product issued by us is provided solely for your use and benefit and only in connection with the Services. Unless required by law, you shall not provide such work product to any third party (except to other consultants or experts engaged by you in connection with this matter who you agree shall be subject to the confidentiality requirements and restrictions on use set forth herein) or refer to us or the Services without our prior written consent, and such consent shall not be unreasonably withheld by D&P. In no event, regardless of whether consent has been provided, shall we assume any responsibility to any third party to which any advice or work product is disclosed or otherwise made available.

6. Unless otherwise instructed by court order or other written instruction, upon conclusion of our services, all documents reviewed and work product prepared in connection with this engagement shall be handled in accordance with our document retention policy.

7. To the extent that D&P utilizes any of its property (including, but not limited to, our hardware or software) in connection with this engagement, such property shall remain the property of D&P, and you shall not acquire any right or interest in such property. We shall have ownership (including, but not limited to, copyright ownership) and all rights to use and disclose our ideas, concepts, know-how, methods, techniques, processes and skills, and adaptations thereof, in conducting our business.

### Preservation of Confidential Information

8. Information received from the other party for the purposes of providing or receiving the Services is deemed "Confidential" if it is either (a) marked confidential in tangible form; (b) otherwise confirmed in writing as being confidential; or (c) manifestly confidential in tangible form or otherwise. All parties agree that any Confidential information received from the other party shall only be used for the purposes of providing or receiving the Services under this or any other contract between us. In addition, neither party will disclose, without the prior written consent of the other party, any such Confidential information to any third party, except insofar as provided in sections 11 and 12.

9. Section 8 will not apply to any information which (a) is or becomes generally available to the public other than as a result of a breach of an obligation by the receiving party; (b) is acquired from a third party who owes no obligation of confidence with respect to the information; or (c) is or has been independently developed by the recipient.

10. Notwithstanding the foregoing, either D&P, or Oversight Board will be entitled to disclose Confidential information of the other (a) to our respective insurers or legal advisors, and (b) to a third party to the extent required by any court of competent jurisdiction, or by a governmental, administrative or regulatory authority, or where there is a legal right, duty or requirement to disclose, provided that, where reasonably practicable, and without breaching any legal or regulatory requirement, not less than two (2) business days' notice in writing is first given to the other party.

11. If, subsequent to the conclusion of our provision of services in this matter, we receive a subpoena for testimony or documents related to or arising from this engagement, the Client shall be liable for all of our expenses and our time in responding to such subpoena, including the time to testify at deposition and/or trial, regardless of whether the subpoena is served by your clients or a third party and regardless of whether the subpoena only seeks our testimony as a fact witness. Our time will be billed at our standard rates in place at that time for our services as an expert. D&P agrees to promptly notify PROMESA upon receipt of such request for information, subpoena or other legal process.

### Termination

12. If D&P is hired as a testifying expert witness, D&P may immediately, upon written notice, terminate services hereunder at any time should a disagreement arise between the parties with respect to any expert opinions to be offered at deposition and/or trial. Further, either party may terminate this Contract at will with 30 days' written notice to the other party.

13. Upon termination of this Contract for any reason, each party shall, upon written request from the other, return to the other all property and documentation of the other in its possession, except that we shall be entitled to retain one copy of such documents in order to maintain a professional record of our involvement.

14. If this Contract is terminated in accordance with paragraphs 12 or 13, all of the Terms and Conditions set forth herein shall survive such termination.

### Other Terms and Provisions

15. Within five (5) business days of your receipt of notice of any formal challenge to the testifying expert's qualifications or opinions (e.g., Daubert Motion, Motion in Limine etc.), you shall notify D&P in writing of the same. In the event of such challenge, D&P reserves the right to retain its own counsel in connection with the challenge, and you agree to reimburse D&P for reasonable legal fees and expenses incurred in connection therewith to the extent such exceed $3,000.00.

16. Except in the event of our (i) gross negligence, (ii) willful misconduct or (iii) fraud, in no event shall we be liable to Client or you (or any person claiming through either Client or you), under any legal theory, for any amount in excess of the total professional fees paid by you to us under this Contract or any addendum to which the claim relates. In no event shall we be liable to Client or you under this Letter of Engagement under any legal theory or for any consequential, indirect, lost profit or similar damages relating to or arising from the Services provided under this Contract.

17. Each of Client and you accept and acknowledge that any legal proceeding arising from or in connection with this Contract (or any variation or addition thereto) must be commenced within one (1) year from the date when you become aware of the facts giving rise to our alleged liability. Each of Client and you also agree that no action or claim will be brought against any D&P employee personally.

18. Client agrees to indemnify and hold harmless D&P, its affiliates and their respective employees from any and all third party claims, liabilities, losses, costs, demands and reasonable expenses, including but not limited to reasonable legal fees and expenses, relating to the Services rendered under this Contract or otherwise arising under this Contract The foregoing indemnification obligations shall not apply in the event that a court of competent jurisdiction finally determines that such claims resulted directly from gross negligence, willful misconduct or fraudulent acts of D&P.

19. You accept and acknowledge that we have not made any warranties or guarantees, whether express or implied, with respect to the Services or any outcome that may be obtained as a result of the provision of the Services.

20. Except for your payment obligations, neither of us will be liable to the other for any delay or failure to fulfill obligations caused by circumstances outside our reasonable control.

21. We reserve the right to use your name and a description of the nature of the Services in general marketing materials with Client's consent.

22. This Contract shall be governed by and interpreted in accordance with the laws of the State of New York and the courts of the State of New York shall have exclusive jurisdiction in relation to any claim arising out of this Contract.

Attachment IV

## VENDOR/CONSULTANT/REPRESENTATIVE CODE OF CONDUCT

The Financial Oversight and Management Board for Puerto Rico (the "Board") is committed to ethical and lawful behavior, and to acting professionally and fairly in all of its business dealings and relationships. The Board seeks to maintain high ethical standards and to comply with all applicable laws and regulations. The Board expects its vendors, consultants, and representatives to embrace this commitment to ethical and lawful behavior by complying with and training its employees on the Board's Vendor Code of Conduct. The Board also expects its vendors to have their own codes of conduct that ensure ethical business conduct and practices.

### I.    Compliance with the Vendor Code of Conduct

All vendors, consultants, and representatives and their employees, agents, and subcontractors (collectively referred to as "Vendors") must adhere to this Code of Conduct while conducting business with or on behalf of the Board. Vendors must promptly inform the Executive Director, the General Counsel, or a member of the Board when any situation develops that causes, or may cause, the Vendor to violate any provision of this Code of Conduct. Although Vendors are expected to self-monitor and demonstrate their compliance with this Code of Conduct, the Board may audit Vendors and/or inspect Vendors' facilities and records to confirm compliance.

The Board may require the immediate removal from any project or engagement of any Vendor representative(s) or personnel who behave in a manner that is unlawful or inconsistent with this Code of Conduct or any Board policy. Compliance with this Code of Conduct, as well as attendance at any training on this Code of Conduct as may be offered by the Board, is required in addition to any other contractual obligations a Vendor may have to the Board.

### II.   Legal and Regulatory Compliance Practices

Vendors must conduct their business activities on behalf of the Board in full compliance with the letter and spirit of all applicable laws and regulations.

- **Anti-Corruption**. The Board takes a zero-tolerance approach to bribery and corruption, and it requires its Vendors to do the same. Vendors must not participate in bribes or kickbacks of any kind, whether in dealings with the Board, government and public officials, or individuals in the private sector. Vendors must also comply with all applicable anti-corruption and anti-money laundering laws, as well as laws governing gifts and payments to public officials, political campaign contribution and lobbying laws, and other related regulations. In particular, Vendors must not:

  ○ Offer, promise, or allow anything of value (including travel, gifts, hospitality expenses, and charitable donations) to be given on behalf of the Board to influence a business or government decision, gain an improper advantage, or otherwise improperly promote the interests of the Board in any respect;

  ○ Offer, promise, or allow anything of value to be given to a Board member or employee to influence a Board decision or otherwise gain an improper advantage; or

- ○ Ask for or accept anything of value which the Vendor knows or suspects is being offered to influence a Board decision or otherwise obtain an improper advantage in connection with the Vendor's work with or on behalf of the Board.

- **Antitrust/Fair Business Practices**. Vendors must conduct their business in full compliance with antitrust and fair competition laws that govern the jurisdictions in which they conduct business. Vendors must also uphold all standards of fair dealing and abide by all fair business practices, including truthful and accurate advertising.

- **Trade**. Vendors shall comply with all applicable trade controls, as well as any applicable export, re-export, and import laws and regulations. Vendors must not knowingly employ or do business with anyone reasonably suspected of being connected with criminal or terrorist activities or who is otherwise subject to applicable trade sanctions.

- **Freedom from Unlawful Harassment and Discrimination.** Vendors shall provide a workplace free from harassment and/or discrimination in hiring, compensation, access to training, promotion, termination, and/or retirement on the basis of race, color, creed, religion, sex, gender identity or expression, sexual orientation, pregnancy, status as a parent, age, marital status, national origin, ancestry, citizenship status, physical or mental disability or serious medical condition, protected genetic information, political beliefs, status as a veteran, or any other characteristic protected by law. Vendors shall further prohibit any form of reprisal or retaliation against any employee for reporting harassment or discrimination in good faith or for participating in good faith in a harassment or discrimination investigation.

- **Wages, Benefits and Working Hours**. Vendors must comply with local applicable laws regarding wages, overtime hours and mandated benefits. Vendors must also communicate with workers about compensation, including any overtime pay, in a timely and honest manner.

- **Freely Chosen Employment**. No Vendor shall use any form of indentured, slave, or forced labor, including involuntary prison labor. Vendors are also prohibited from supporting or engaging in any form of human trafficking of involuntary labor through threat, force, fraudulent claims, or other coercion.

- **Child Labor**. Vendors shall comply with all local and national minimum working age laws or regulations and not use child labor. All employees shall be age 18 and over unless: (i) a country's legal age for employment or age for completing compulsory education is under 18; and (ii) the work is non-hazardous.

## III.   Business Practices and Ethics

Vendors must conduct their business interactions and activities with integrity.

- **Honesty and Integrity**. Vendors must at all times be honest, direct, and truthful in discussions with the Board, its staff and agents, regulatory agency representatives, and government officials.

- **Business and Financial Records**. The Board expects Vendors to timely, honestly, and accurately record and report all business information, including without limitation any invoices for payment, and comply with all applicable laws regarding their creation, completion, accuracy, retention, and disposal. All invoices must be (i) timely submitted, (ii) itemized, (iii) supported

by appropriate documentation, and (iv) must comply with all other requirements as set out in the relevant contract(s).

- **Conflicts of Interest**. Vendors shall scrupulously avoid any conflict, real or perceived, direct or indirect, between their own individual, professional, or business interests and the interests of the Board. Among other things, Vendors must not deal directly with any Board member or *ex officio* member or employee whose spouse, domestic partner, or other family member or relative is associated with and/or holds any ownership or other financial interest in the Vendor. In the course of negotiating the Vendor agreement or performing the Vendor's obligations, dealing directly with a Vendor personnel's spouse, domestic partner, or other family member or relative employed by the Board is also prohibited. Complying with this requirement includes, but is not limited to, each Vendor's completion of the Vendor Conflict of Interest Disclosure Certification attached as **Appendix A** hereto.

- **Gifts and Entertainment**. Vendors should avoid any actions with Board members or *ex officio* members or employees during any vendor selection or re-selection process that could give others the impression of favoritism or other improper advantage. Furthermore, Vendors should not offer, and Board members, *ex officio* members, and employees must not accept, gifts or entertainment that might compromise, or appear to compromise, the Board member or employee's judgment or independence. Even a well-intentioned gift might constitute or be perceived to be a bribe under certain circumstances, or create a conflict of interest or the appearance of a conflict of interest. Board employees are required to conduct all business and interactions with Vendors in strict compliance with the applicable provisions of the Board's business ethics and conflict of interest policies.

- **Confidentiality, Privacy and Data Security**. Vendors shall, at all times while they are engaged by the Board and thereafter, (i) hold all proprietary and confidential information of the Board in strictest confidence, (ii) not use or disclose for any purpose any proprietary and confidential information of the Board to any person, business or entity, except as specifically authorized in writing by the Board, and (iii) not disclose for any purpose any non-public information concerning their retention by the Board or their services for the Board, except as specifically authorized in writing by the Board. Vendors shall abide by all Board requirements and procedures for protecting the proprietary and confidential information of the Board, including signing and abiding by the Board's confidentiality agreements. Vendors who handle proprietary and confidential information on behalf of the Board or belonging to the Board must apply and maintain sufficient privacy and information security safeguards. Vendors shall also be subject to an information and data security assessment.

- **Media**. Vendors are prohibited from speaking to the press or making any public statements, oral or written, concerning their work for or on behalf of the Board without the express written authorization of the Board.

- **Reporting Concerns**. Vendors shall maintain a hotline or other reporting system for their workers to confidentially and anonymously report any information or concerns about suspected non-compliance or violations of law or improper conduct by any Vendor employee or agent without threat of reprisal, intimidation or harassment. If concerns are reported, Vendors shall promptly and thoroughly investigate any such report and take corrective action as necessary and appropriate.

I certify by my signature below that I have received and reviewed, and am authorized on Vendor's behalf to agree that Vendor shall abide by this Code of Conduct:

Vendor Name: _____ Duff & Phelps LLC _____

_____          1/31/18
Signature of Vendor Authorized Representative      Date

_____ James S. Feltman, Managing Director _____
Printed Name and Title of Vendor Authorized Representative

I certify that the information provided is true and correct by my signature below:

_____          1/31/18
Signature of Vendor Authorized Representative          _____
                                                                        Date


_____James S. Feltman, Managing Director_____
Printed Name of Vendor Authorized Representative

## SCHEDULE A

For purposes of the Financial Oversight and Management Board for Puerto Rico (the ("Board")'s
Vendor Conflict of Interest Disclosure Certification, the following entities and individuals are Interested
Parties:

Natalie Jaresko, Executive Director of the Board

Noel Zamot, Revitalization Coordinator

Jaime A. El Koury, General Counsel of the Board

Andrew G. Biggs, Member of the Board

Jose B. Carrión III, Member of the Board

Carlos M. Garcia, Member of the Board

Arthur J. Gonzalez, Member of the Board

José R. González, Member of the Board

Gov. Ricardo Rosselló Nevares, Ex-Officio Member of the Board

Ana J. Matosantos, Member of the Board

David A. Skeel Jr., Member of the Board

Elías Sánchez Sifonte, Former Ex-Officio Member of the Board as representative of the Governor

Christian Sobrino Vega, Ex-Officio Member of the Board as representative of the Governor

Commonwealth of Puerto Rico (Primary Government)

9-1-1 Service Governing Board

Additional (Electronic) Lottery

Agricultural Enterprises Development Administration

Automobile Accidents Compensation Administration

Cardiovascular Center Corporation of Puerto Rico and the Caribbean

Commonwealth of Puerto Rico Regional Center Corporation

Company for the Integral Development of the "Península de Cantera"

Corporation for the "Caño Martin Peña" Project (ENLACE)

Corporation of Industries for the Blind and Mentally Retarded and Incapacitated Persons of Puerto Rico

Culebra Conservation and Development Authority

Economic Development Bank for Puerto Rico

Employees' Retirement System (ERS)

Employment and Training Enterprises Corporation

Farm Insurance Corporation of Puerto Rico

Fine Arts Center Corporation

Fiscal Agency and Financial Advisory Authority (AAFAF)

Governmental Development Bank for PR (GDB)

Institute of Puerto Rican Culture

Institutional Trust of the National Guard of Puerto Rico

Judiciary Retirement System (JRS)

Land Authority of Puerto Rico

Local Redevelopment Authority of the Lands and Facilities of Naval Station Roosevelt Roads

Model Forest

Municipal Revenue Collection Center (CRIM)

Musical Arts Corporation

Port of the Americas Authority

PR Aqueduct and Sewer Authority (PRASA)

PR Electric Power Authority (PREPA)

PR Highways and Transportation Authority (HTA)

PR Infrastructure Finance Authority (PRIFA)

PR Maritime Shipping Authority

PR Medical Services Administration (ASEM)

PR Sales Tax Financing Corporation (COFINA)

Public Building Authority (PBA)

Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives (COSSEC)

Puerto Rico and Municipal Islands Transport Authority

Puerto Rico Conservatory of Music Corporation

Puerto Rico Convention Center District Authority (PRCCDA)

Puerto Rico Council on Education

Puerto Rico Health Insurance Administration (HIA / ASES)

Puerto Rico Industrial Development Company (PRIDCO)

Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority (AFICA)

Puerto Rico Integrated Transit Authority (PRITA)

Puerto Rico Land Administration

Puerto Rico Metropolitan Bus Authority (AMA)

Puerto Rico Municipal Finance Agency (MFA)

Puerto Rico Ports Authority

Puerto Rico Public Broadcasting Corporation

Puerto Rico Public Private Partnerships Authority (PPP)

Puerto Rico School of Plastic Arts

Puerto Rico Telephone Authority

Puerto Rico Tourism Company

Puerto Rico Trade and Export Company

Solid Waste Authority

Special Communities Perpetual Trust

State Insurance Fund Corporation (SIF)

Teachers' Retirement System (TRS)

The Children's Trust Fund (CTF)

Traditional Lottery

Unemployment Insurance Fund

University of Puerto Rico (UPR)

University of Puerto Rico Comprehensive Cancer Center

**CONFIDENTIAL**

**VIA E-MAIL**: jaime.elkoury@promesa.gov

March 31, 2018

Jaime A. El Koury, Esq.
General Counsel
Financial Oversight and Management Board for Puerto Rico

**Subject:**    **Amendment No. 1 to Letter of Engagement for Duff & Phelps, LLC-
Disputes & Investigations Engagement:    <u>Independent Forensic Analysis
Team for the Financial Oversight and Management Board for Puerto Rico</u>**

Dear Mr. El Koury:

This letter will serve to amend the Letter of Engagement dated January 31, 2018 between Duff &
Phelps, LLC ("D&P" or "we"), and the Financial Oversight and Management Board for Puerto
Rico ("PROMESA" or "you" or "Client") as follows:

1. Attachment I to the Letter of Engagement is hereby replaced by Appendix I hereto, provided
that Appendix I is subject to the following:

The total amounts therein are reduced to 1,658 hours and $722,500 in fees, the latter to serve as a
cap ("Fee Cap") for the accomplishment of the Objectives set forth in Appendix I.  The Fee Cap
does not include fees already incurred of approximately $100,000.

The Fee Cap is subject to the following general conditions;

(1) AAFAF promptly provides its work product as requested by D&P supporting the bank account
reports which AAFAF has published;

(2) AAFAF provides reasonable access to personnel knowledgeable about the bank account report
work product as and when requested by D&P;

(3) Other third parties, including Commonwealth Agencies and their public corporations make
commercially reasonable efforts to respond to inquiries and/or interview requests made by D&P;
and

(4) FOMB agrees to assist D&P to obtain information and cooperation, when requested, relating to
items 1 through 3 above as may arise from time to time.

2. D&P's expenses for accomplishing the Objectives in Appendix I are capped at $36,125 and are
subject to the PROMESA expense reimbursement policy attached hereto; provided, however, that
expenses incurred through February 28, 2018 as set forth in the attachment hereto are not subject to
such cap, are to be recomputed to comply with the meal expense limitations and no-alcohol

1

provision in the expense reimbursement policy and are exempted from the pre-approval requirements thereunder.

Yours sincerely,

James Feltman
Managing Director
Disputes & Investigations
Duff & Phelps, LLC

Natalie Jaresko/sp

(Jaime A. El Toury, General Counsel)                        Date:  March 31, 2018

Signed:          Natalie A. Jaresko
Title:            Executive Director
On behalf of:  Financial and Oversight Management Board for Puerto Rico

2

*DUFF & PHELPS*
*WORK PRODUCT*

*CONFIDENTIAL — ATTORNEY CLIENT PRIVILEGED COMMUNICATION*

**Draft Strategic Work Plan to Accomplish Scope**
**as Outlined in January 31, 2018 Engagement Letter**
*Prepared by Duff & Phelps*

## Critical Nature of Communications

*In order to efficiently and effectively execute on Objectives 1 and 2, it will be essential for Duff & Phelps to engage with the Client in scheduled updates and receive feedback from the Client regarding the procurement of data and potential unforeseen obstacles. Duff & Phelps commits to providing regularly scheduled status reports to the Client as well as a thorough review of Objectives 1 and 2 as they are completed but before reports are issued.*

## Objective 1

Validate with a high level of certainty the completeness of the list of bank accounts in the AAFAF report of January 19, 2018 ("AAFAF Liquidity Analysis") and the values of those bank accounts as of the reported date.

*Procedures to Accomplish Objective 1*

**Draft Report: Given Task 1.A-1.D outlined below, Duff & Phelps expects to prepare a draft report describing the forensic process and findings, including recommendations as per the D&P Engagement Letter scope.**

DUFF & PHELPS
WORK PRODUCT                                                    CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGED COMMUNICATION

## Task 1.A: Validate AAFAF-provided accounts

| | Estimated Time to Complete | Estimated D&P Hours to Complete |
|---|---|---|
| a) Obtain the work product and supporting analyses developed by AAFAF ("AAFAF Work Papers") in connection with the AAFAF Liquidity Analysis, including but not limited to copies or screenshots of bank names, titles, and related correspondence (together, the "AAFAF Supporting Documents"). | 1 day [1] | 1 |
| b) Reconcile AAFAF Work Papers to underlying AAFAF Supporting Documents:<br>○ Organize AAFAF requests and related correspondence by bank account and for each of the three information sources identified in AAFAF's publication, described by AAFAF as comprising approximately 10,000 documents;<br>○ Compare responses to requests (quantitative and qualitative) to the AAFAF Work Papers for all accounts with balances greater than $X and on a random basis for accounts with balances between $X-1 and $Z. | 14 days | 360 |

[1] Time to complete is dependent on ability of producing parties.

DUFF & PHELPS
WORK PRODUCT

CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGED COMMUNICATION

## Task 1.B: Ensure AAFAF provided accounts representative of the account universe

| | *Estimated Time to Complete* | *Estimated D&P Hours to Complete* |
|---|---|---|
| a) Obtain work product and supporting analyses developed by non-AAFAF parties (together, the "Supplemental Work Papers"), including:<br>  o Government agencies' and public corporations' ("Agencies and Public Corps") cash flow statements; produced in the regular course as of December 31, 2017;<br>  o OCIF reporting work papers;<br>  o Comprehensive Annual Financial Report ("CAFR") supporting work papers for the most current year, in draft;<br>  o CAFR supporting work papers for the most current year, finalized. | 3 days [2] | 50 |

---

[2] Time to complete is dependent on ability of producing parties.

CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGED COMMUNICATION

| | | |
|---|---|---|
| b) Develop master database of all bank accounts ("Comprehensive Account Database"), included those in the AAFAF Work Papers and those identified in the Supplemental Work Papers.<br>    o Include the source of the bank account information and, at minimum, the following fields: (a) Account Number, (b) Agency / Agency No., (c) Bank, (d) Bank Description, and (e) Account Classification;<br>    o Confirm all Agencies and Public Corps are represented on the Comprehensive Account Database; inquire with relevant Agencies and Public Cops as to the rationale for exclusion. | 8 days | 210 |
| c) Identify bank accounts not included in the AAFAF Liquidity Analysis.<br>    o Examine Agencies' and Public Corps' bank accounts excluded in the AAFAF Liquidity Analysis to confirm that such exclusions are appropriate and consistent with the objectives. | 5 days | 100 |

DUFF & PHELPS
WORK PRODUCT

CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGED COMMUNICATION

| | | |
|---|---|---|
| d) Where bank accounts agree between the AAFAF Work Papers and Supplemental Work Papers, compare for completeness and comparability relating to funds subject to this inquiry; supplemental information ("Supplemental Information") may include:<br>○ Financial information or statements for Commonwealth Agencies and Public Corps;<br>○ Financial disclosures;<br>○ Interviews (or written confirmation) of CFOs / Financial Controllers of the largest Commonwealth Agencies and Public Corps. | 8 days | 190 |

*DUFF & PHELPS*
*WORK PRODUCT*

*CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGED COMMUNICATION*

## Task 1.C: Confirm existence and inclusion of non-cash accounts

| | *Estimated Time to Complete* | *Estimated D&P Hours to Complete* |
|---|---|---|
| a) Investigate whether: (a) cash equivalent accounts, (b) invested funds including brokerage accounts, and (c) direct investments were or should have been included in the AAFAF Work Papers and AAFAF Liquidity Analysis through a review of Supplemental Work Papers and Supplemental Information, such as OCIF-reported financial documents and financial accounts, Agency or Public Corp-provided documentation, and/or CAFR supporting work papers; <br> o Update the Comprehensive Accounts Database with a field for account type (cash v. cash equivalents); <br> o Update the Comprehensive Accounts Database with all cash equivalent accounts not previously included. | 10 days [3] | 180 |

## Task 1.D: Investigation of asset disposition

| | *Estimated Time to Complete* | *Estimated D&P Hours to Complete* |
|---|---|---|
| a) Investigate the disposition of funds held in bank accounts closed during 2017 which held balances greater than $A. | 10 days | 200 |

---

[3] Time to complete is dependent on ability of producing parties.

DUFF & PHELPS
WORK PRODUCT                                          CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGED COMMUNICATION

## Objective 2

For all materially sized accounts, and for a random selection of other accounts identified by the Government as restricted, identify the documented legal restrictions, such as (a) federal, (b) bond-related, (c) local legislature, or (d) local executive.

### Procedures to Accomplish Objective 2

**Draft Report: Given Task 2.A-2.C outlined below, Duff & Phelps expects to prepare a draft report describing the forensic process and findings.**

**Task 2.A: Determine the accounts to be tested and receive relevant documentation**

|  | Estimated Time to Complete | Estimated D&P Hours to Complete |
|---|---|---|
| a) Utilize the Comprehensive Account Database developed in Tasks 1.A-1.C to find all materially sized accounts, a distinction to be made in collaboration with the Client.<br>○ Identify all materially sized accounts on the Comprehensive Account Database to be examined in this analysis;<br>○ Select a sample of non-material accounts, identified as restricted by the Government to be examined in this analysis. | 2 days | 30 |

*DUFF & PHELPS*
*WORK PRODUCT*

*CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGED COMMUNICATION*

| | | |
|---|---|---|
| b) Obtain copies of documents, agreements, or other forms of information utilized by AAFAF in determining the restricted and unrestricted nature of bank accounts, including all such information relied upon by AAFAF in making their determinations (together, the "AAFAF Restriction Documents").<br><br>○ Determine what, if any, additional information is required to satisfy the criteria to determine restrictions and the nature of restrictions in the bank accounts identified (together, the "Supplemental Restriction Documents") to be included in the subset of liquidity accounts and request the same from various counterparties. | 7 days | 180 |

**Task 2.B: Collaborate with relevant parties to determine key analysis assumptions**

| | Estimated Time to Complete | Estimated D&P Hours to Complete |
|---|---|---|
| a) Assist FOMB General Counsel in developing categories of restricted and unrestricted bank account designations. | 5 days | 50 |

DUFF & PHELPS
WORK PRODUCT                                   CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGED COMMUNICATION

| | | |
|---|---|---|
| b) Obtain agreement from AAFAF regarding categories of bank account restrictions and related conditions to be applied when performing review of banking database;<br><br>    o  Meet and confer with AAFAF to ascertain what, if any, restricted accounts titling does or does not match the assessment performed by AAFAF.[4] | 4 days | 60 |

## Task 2.C: Prepare findings

| | *Estimated Time to Complete* | *Estimated D&P Hours to Complete* |
|---|---|---|
| a) Develop a protocol for identifying exceptions and unique circumstances, such as commingled funds in accounts. | 5 days | 160 |
| b) Reconcile differences in the application of restrictions with the AAFAF Work Papers, where possible. | 8 days | 180 |

---

[4] Further; determine with FOMB how and when to address the additional forensic work required to determine potential restrictions or lack thereof for funds and bank accounts, which arises from analysis of the source(s) and use(s) of funds flow. Examples of such determinations would include funds received from federal grants, restrictions for earmarking, and required reserves and escrows. These additional factual analyses would supplement the determinations performed for Objective 2 arising from a forensic review of documentation only.

*DUFF & PHELPS*
*WORK PRODUCT*

*CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGED COMMUNICATION*

## Final Estimate to Complete Objectives 1 & 2

| Estimated Total Time to Completion | 90 days or 1,951 hours |
|---|---|
| Estimated Billable Time to Completion | $850,000 [5] |

---

[5] This estimate does not include the amount that has been billed by the IFAT ("Independent Forensic Analysis Team") through the date of this work plan, which is approximately $80,000.

**Financial Oversight and Management Board for Puerto Rico**
*June 30, 2017*

**Expense Reimbursement Policy**

## 1. Introduction

The Board of Members of the Financial Oversight and Management Board for Puerto Rico ("the Board") recognizes that board members, officers, staff, and contractors* of the Board may be required to travel or incur in other expenses from time to time to conduct Board business.

The Reimbursed Expenses Policy (the "Policy") is designed to govern the reimbursement of reasonable, defined expenses incurred on authorized Board activities. Consequently all reimbursed expenses must be consistent with a business objective and carried out in a timely and cost-effective manner.

This Policy applies to board members, officers, staff, and contractors* who incur authorized and approved travel and other expense items in the context of the Board's business. While exceptions are not normally permitted, there is clear recognition of certain special business needs. In any such exceptional situations, all board members, officers, staff, and contractors* are expected to apply a high degree of common sense and good judgment.

## 2. Purpose of the Policy

The purpose of this policy is to ensure that (a) adequate cost controls are in place, (b) travel and other expenditures are appropriate, and (c) to provide a uniform and consistent approach for the timely reimbursement of authorized expenses incurred by the Board. It is the policy of the Board to reimburse only reasonable and necessary expenses incurred by board members, officers, staff, and contractors.

## 3. Principles of the Policy

The Policy aims to provide a flexible framework for travel and other expenses based on the following principles:

3.1    This Policy applies to board members, officers, staff, and contractors* undertaking travel other expenses on Board business and for the purposes of this Policy, the term "staff" shall mean employees of the Board.

3.2    It is the responsibility of board members, officers, staff, and contractors* to ensure the selection of the most direct and economical travel options and that all expenses are attributable to a valid Board business purpose.

*Expense policy applies only to contractors whose contracts specify they will be able to reimburse listed expenses.

3.3   Board members, officers, staff, and contractors* shall be entitled to reimbursement of expenses on production of supporting vouchers and invoices meeting the requirements of an "Accountable Plan" provided under Regulation No. 8297 dated December 18, 2012 issued by the Puerto Rico Department of Treasury. No expense reimbursement will be allowed for amounts in excess of actual expenditures incurred. No expense reimbursement will be allowed for estimates of expenditures incurred. This includes coach-class airfare or train fare (or business class train fare if rates are comparable); and hotels and transportation (e.g. taxis).

3.4   It is the responsibility of the Board members, officers, staff, and contractors* to obtain travel authorization from the Chairman of the Board, the Executive Director or Authorized Representative prior to organizing or incurring any travel costs [See Appendix A for Authorization Authority]. Expense reimbursement is subject to having received prior authorization. Exceptions shall be made under the consideration of the Chairman, Executive Director or Authorized Representative.

3.5   The use of video and telephone conferencing instead of travel should always be considered to reduce travel expenses.

## 4.  Travel Expenses

### 4.1 Air Travel

4.1.1   Costs for air travel will be reimbursed on an actual cost incurred basis.

4.1.2   For all flights, board members, officers, staff, and contractors* are required to travel in a cabin class no higher than premium economy class and, when possible, the cheapest fare in this class.

4.1.3   Flights should be booked to provide the best value/lowest cost and fit between cost and convenience. Board staff shall book flights through the Board's Executive Assistant. Board members may book flights through the Board's Executive Assistant or independently. Board contractors must book flights independently, though they are allowed to consult the Board's Executive Assistant on fares the board members, officers, and staff are using.

4.1.4   The Board will not reimburse costs incurred due to deviations from the most direct routes taken for personal travel reasons.  In such cases, if the Board purchased the ticket, the traveler must reimburse the Board for any additional costs over and above the authorized travel.

4.1.5   Any alteration to original travel plans must be justified and approved in accordance with the Policy.

*Expense policy applies only to contractors whose contracts specify they will be able to reimburse listed expenses.

## 4.2 Train Travel

**4.2.1**  The Board may reimburse travelers for their economy train fares or business class train fares when those fares are comparable to the equivalent, economy class airfare on the same route.

**4.2.2**  Board staff shall book trains through the Board's Executive Assistant. Board Members may book trains through the Board's Executive Assistant or independently. Board contractors must book trains independently, though they are allowed to consult the Board's Executive Assistant on fares the board members, officers, and staff are using.

## 4.3 Hotels and Lodging

**4.3.1**  Accommodation costs may be reimbursed by the Board. Board members, officers, staff, and contractors should not exceed cost of accommodation per night published in the U.S. Government GSA Per Diem Rates (https://www.gsa.gov/perdiem), unless approved by the Chairman or his authorized representative.

**4.3.2**  Board staff shall book hotels through the Board's Executive Assistant. Board members may book hotels through the Board's Executive Assistant or independently. Board contractors must book hotels independently, though they are allowed to consult the Board's Executive Assistant on fares the Board members, officers, and staff are using.

## 4.4 Transportation

**4.4.1**  Transportation costs during trips associated to Board business will be reimbursed. Board members, officers, and staff* can expense the following transportation costs: 1) transportation to and from the airport / train station and 2) transportation to and from the meeting location. Transportation costs cover taxi services or equivalent (e.g. Uber, Lyft or any other transportation means).

## 4.5 Business Meals

**4.5.1**  When travelling to a location other than the Board members, officers, staff, and contractors'* local city, business meals are reimbursable based on the following limits:

- Breakfast: $15; Lunch: $25; Dinner: $40
- Snack expenses are reimbursable when they replace a meal.

**4.5.2**  If meals are provided during the meeting, only meals not provided can be expensed.

## 5. Other Expenses

**5.1**  Other expenses are reimbursable provided they are legitimate, necessary and reasonable expenses directly connected with or pertaining to the Board, such as office supplies, printing and reproduction, telephone calls, and messengers, among other.

*Expense policy applies only to contractors whose contracts specify they will be able to reimburse listed expenses.

## 6. Reimbursement of Expense

6.1 Travel arrangements are authorized in advance through the completion and approval of a travel authorization email and the validation of a travel plan between the traveler and the designated approver [See Appendix A].

6.2 Expenses are reimbursed through the completion, approval, and validation of expense report [See Appendix B] that the members, officers, and staff must submit to the designated approver [See Appendix C].

6.3 Expense claims should be submitted immediately following and, where possible, no more than 10 days after the completion of each trip, but at least a monthly.

6.4 In rare circumstances, and on an exceptional basis, reimbursement in excess of stated limits may be provided when lodging options are not available below. In such rare circumstances, the need for higher reimbursement shall be indicated on the attached reimbursement form and justified in writing by the members, officers, and staff. Reimbursement will be limited to the following:

- Lodging: average rate for available 3-star hotels listed for the applicable metropolitan area on Expedia;

The Chairman of the Board or his authorized representative will have sole discretion to approve or deny such expenditures.

6.5 Receipts are required for all expenditures billed, such as airfare and hotel charges. No expense in excess of $25.00 will be reimbursed to Board members, officers, staff and contractors unless the individual requesting reimbursement submits with the Expense Report written itemized receipts from each vendor (not a credit card receipt or statement) showing the vendor's name, a description of the services provided (if not otherwise obvious), the date, and the total expenses. If a receipt is not available, a full explanation of the expense and the reason for the missing receipt is required.

6.6 Alcoholic beverages will not be reimbursed under any circumstance.

*Expense policy applies only to contractors whose contracts specify they will be able to reimburse listed expenses.

## APPENDIX A: Authorization Authority

| Expense to be Incurred By: | Authorization From: |
|---|---|
| Board Member | Chairman or Authorized Representative |
| Board Staff | Executive Director or Authorized Representative |
| Board Contractors | Executive Director or Authorized Representative |
| Executive Director | Chairman or Authorized Representative |
| Chairman | N/A |

*Expense policy applies only to contractors whose contracts specify they will be able to reimburse listed expenses.

**APPENDIX B: Expense Report**

**Financial Management and Oversight Board for Puerto Rico**

*To be completed by* members, officers, and staff *and submitted to designated approver*

| DATE | DESCRIPTION | AIR FARE | GROUND FARE | HOTEL | MEALS | OTHER | TOTAL (1) |
|------|-------------|----------|-------------|-------|-------|-------|-----------|
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | $ - |
| TOTAL | | $ - | $ - | $ - | $ - | $ - | $ - |

Signature:_____                    Date:_____

Approved by:_____                  Date:_____

**(1) SUBMIT RECEIPTS FOR THE AMOUNTS TO BE REIMBURSED.**

*Expense policy applies only to contractors whose contracts specify they will be able to reimburse listed expenses.

**APPENDIX C: Expense Report Approval Authority**

| Expense Incurred By: | Expense Approved By: |
|---|---|
| Board Member | Chairman or Authorized Representative |
| Board Personnel | Executive Director or Authorized Representative |
| Board Advisors | Executive Director or Authorized Representative |
| Executive Director | Chairman or Authorized Representative |
| Chairman | Executive Director or Authorized Representative |

*Expense policy applies only to contractors whose contracts specify they will be able to reimburse listed expenses.

DUFF&PHELPS

**Summary of Individual Expenses**
*for the Period January 31, 2018 through February 28, 2018*

| Professional | Level | Date | Expense Category | Amount |
|---|---|---|---|---|
| Ciociura, Caroline | Analyst | 2/9/2018 | Airfare | $ 276.40 |
| Feltman, James | Managing Director | 2/10/2018 | Airfare | $ 325.09 |
| Ciociura, Caroline | Analyst | 2/10/2018 | Airfare | $ 280.90 |
| Gittleman, Ann | Managing Director | 2/11/2018 | Airfare | $ 218.40 |
| Hornung, Eric | Senior Associate | 2/12/2018 | Airfare | $ 218.40 |
| Ciociura, Caroline | Analyst | 2/12/2018 | Ground Transportation | $ 71.16 |
| Hornung, Eric | Senior Associate | 2/12/2018 | Ground Transportation | $ 66.86 |
| Hornung, Eric | Senior Associate | 2/12/2018 | Meals | $ 35.00 |
| Gittleman, Ann | Managing Director | 2/12/2018 | Meals | $ 26.84 |
| Feltman, James | Managing Director | 2/12/2018 | Ground Transportation | $ 25.00 |
| Ciociura, Caroline | Analyst | 2/12/2018 | Ground Transportation | $ 24.00 |
| Gittleman, Ann | Managing Director | 2/12/2018 | Meals | $ 18.00 |
| Gittleman, Ann | Managing Director | 2/12/2018 | Meals | $ 14.00 |
| Gittleman, Ann | Managing Director | 2/12/2018 | Meals | $ 11.99 |
| Ciociura, Caroline | Analyst | 2/12/2018 | Meals | $ 6.80 |
| Hornung, Eric | Senior Associate | 2/12/2018 | Meals | $ 3.97 |
| Ciociura, Caroline | Analyst | 2/13/2018 | Airfare | $ 276.40 |
| Gittleman, Ann | Managing Director | 2/13/2018 | Airfare | $ 262.40 |
| Feltman, James | Managing Director | 2/13/2018 | Airfare | $ 188.40 |
| Feltman, James | Managing Director | 2/13/2018 | Meals | $ 103.00 |
| Gittleman, Ann | Managing Director | 2/13/2018 | Meals | $ 74.75 |
| Feltman, James | Managing Director | 2/13/2018 | Ground Transportation | $ 20.00 |
| Gittleman, Ann | Managing Director | 2/13/2018 | Meals | $ 11.00 |
| Gittleman, Ann | Managing Director | 2/13/2018 | Meals | $ 9.60 |
| Gittleman, Ann | Managing Director | 2/13/2018 | Ground Transportation | $ 7.79 |
| Gittleman, Ann | Managing Director | 2/13/2018 | Meals | $ 6.00 |
| Gittleman, Ann | Managing Director | 2/13/2018 | Meals | $ 4.91 |
| Gittleman, Ann | Managing Director | 2/14/2018 | Meals | $ 222.15 |
| Feltman, James | Managing Director | 2/14/2018 | Meals | $ 215.00 |
| Hornung, Eric | Senior Associate | 2/14/2018 | Airfare | $ 242.40 |
| Gittleman, Ann | Managing Director | 2/14/2018 | Meals | $ 59.29 |
| Hornung, Eric | Senior Associate | 2/14/2018 | Meals | $ 59.00 |
| Ciociura, Caroline | Analyst | 2/14/2018 | Ground Transportation | $ 9.59 |
| Gittleman, Ann | Managing Director | 2/14/2018 | Meals | $ 9.53 |
| Ciociura, Caroline | Analyst | 2/14/2018 | Ground Transportation | $ 9.26 |
| Gittleman, Ann | Managing Director | 2/14/2018 | Meals | $ 2.00 |
| Hornung, Eric | Senior Associate | 2/15/2018 | Airfare | $ 218.40 |
| Feltman, James | Managing Director | 2/15/2018 | Ground Transportation | $ 51.00 |
| Ciociura, Caroline | Analyst | 2/15/2018 | Meals | $ 41.01 |
| Gittleman, Ann | Managing Director | 2/15/2018 | Ground Transportation | $ 40.96 |
| Gittleman, Ann | Managing Director | 2/15/2018 | Meals | $ 25.27 |
| Ciociura, Caroline | Analyst | 2/15/2018 | Meals | $ 24.99 |
| Feltman, James | Managing Director | 2/15/2018 | Ground Transportation | $ 20.00 |
| Ciociura, Caroline | Analyst | 2/15/2018 | Meals | $ 18.73 |
| Ciociura, Caroline | Analyst | 2/15/2018 | Ground Transportation | $ 9.24 |
| Hornung, Eric | Senior Associate | 2/15/2018 | Ground Transportation | $ 8.50 |
| Hornung, Eric | Senior Associate | 2/15/2018 | Airfare | $ 6.00 |
| Gittleman, Ann | Managing Director | 2/15/2018 | Ground Transportation | $ 3.39 |
| Gittleman, Ann | Managing Director | 2/16/2018 | Lodging | $ 1,262.46 |
| Hornung, Eric | Senior Associate | 2/16/2018 | Lodging | $ 915.21 |
| Ciociura, Caroline | Analyst | 2/16/2018 | Lodging | $ 868.32 |
| Feltman, James | Managing Director | 2/16/2018 | Lodging | $ 821.48 |
| Feltman, James | Managing Director | 2/16/2018 | Lodging | $ 536.63 |
| Ciociura, Caroline | Analyst | 2/16/2018 | Lodging | $ 449.37 |
| Hornung, Eric | Senior Associate | 2/16/2018 | Lodging | $ 449.37 |
| Ciociura, Caroline | Analyst | 2/16/2018 | Ground Transportation | $ 51.13 |
| Ciociura, Caroline | Analyst | 2/17/2018 | Ground Transportation | $ 7.46 |
| **TOTAL EXPENSES** | | | | $ 9,246.88 |

VIA E-MAIL: jaime.elkoury@promesa.gov

August 16, 2018

Jaime A. El Koury, Esq.
General Counsel
Financial Oversight and Management Board for Puerto Rico

**Subject:**      **Amendment No. 2 to Letter of Engagement for Duff & Phelps, LLC-
Disputes & Investigations Engagement: <u>Independent Forensic Analysis Team
for the Financial Oversight and Management Board for Puerto Rico</u>**

Dear Mr. El Koury:

This letter will serve to amend the Letter of Engagement dated January 31, 2018 between Duff &
Phelps, LLC ("D&P" or "we"), and the Financial Oversight and Management Board for Puerto
Rico ("FOMB" or "you" or "Client") as follows:

1.      Attachment I to the Letter of Engagement is hereby replaced by Appendix II attached
hereto.

2.      Attachment II contains a description of the revised Scope of Services whereby D&P will
provide the design of and supervision over Steps 1(a) through 5(b). The Scope of Services of
Appendix II contemplates that the FOMB and its staff will perform those Steps so identified.
Appendix II estimates that the FOMB and its staff will expend approximately 4,142 hours
performing the steps in Appendix II.

3.      D&P estimates the hours for design of and supervision over the FOMB staff will be
approximately 4,117 hours, including (steps 5(a) & (b)). Appendix II contemplates that D&P's
hours and rates for this revised Scope of Services will total $1,715,663. D&P will bill for the
actual hours incurred in connection with this Engagement. However, should D&P's hours
exceed the estimated hours for any of the Steps of Appendix II, D&P agrees to seek advance
approval for any such excess.

4.    In connection with performing work under Appendix II, D&P agrees to seek reimbursement for expenses accordance with the FOMB expense reimbursement policy as attached hereto.

Yours sincerely,

James Feltman
Managing Director
Disputes & Investigations
Duff & Phelps, LLC

Date:    August 17, 2018

Signed:        Natalie A. Jaresko
Title:         Executive Director
On Behalf of:  Financial and Oversight Management Board for Puerto Rico

2

**Financial Oversight and Management Board for Puerto Rico**
*June 30, 2017*

**Expense Reimbursement Policy**

## 1. Introduction

The Board of Members of the Financial Oversight and Management Board for Puerto Rico ("the Board") recognizes that board members, officers, staff, and contractors* of the Board may be required to travel or incur in other expenses from time to time to conduct Board business.

The Reimbursed Expenses Policy (the "Policy") is designed to govern the reimbursement of reasonable, defined expenses incurred on authorized Board activities. Consequently all reimbursed expenses must be consistent with a business objective and carried out in a timely and cost-effective manner.

This Policy applies to board members, officers, staff, and contractors* who incur authorized and approved travel and other expense items in the context of the Board's business. While exceptions are not normally permitted, there is clear recognition of certain special business needs. In any such exceptional situations, all board members, officers, staff, and contractors* are expected to apply a high degree of common sense and good judgment.

## 2. Purpose of the Policy

The purpose of this policy is to ensure that (a) adequate cost controls are in place, (b) travel and other expenditures are appropriate, and (c) to provide a uniform and consistent approach for the timely reimbursement of authorized expenses incurred by the Board. It is the policy of the Board to reimburse only reasonable and necessary expenses incurred by board members, officers, staff, and contractors.

## 3. Principles of the Policy

The Policy aims to provide a flexible framework for travel and other expenses based on the following principles:

3.1    This Policy applies to board members, officers, staff, and contractors* undertaking travel other expenses on Board business and for the purposes of this Policy, the term "staff" shall mean employees of the Board.

3.2    It is the responsibility of board members, officers, staff, and contractors* to ensure the selection of the most direct and economical travel options and that all expenses are attributable to a valid Board business purpose.

*Expense policy applies only to contractors whose contracts specify they will be able to reimburse listed expenses.

3.3  Board members, officers, staff, and contractors* shall be entitled to reimbursement of expenses on production of supporting vouchers and invoices meeting the requirements of an "Accountable Plan" provided under Regulation No. 8297 dated December 18, 2012 issued by the Puerto Rico Department of Treasury. No expense reimbursement will be allowed for amounts in excess of actual expenditures incurred. No expense reimbursement will be allowed for estimates of expenditures incurred. This includes coach-class airfare or train fare (or business class train fare if rates are comparable); and hotels and transportation (e.g. taxis).

3.4  It is the responsibility of the Board members, officers, staff, and contractors* to obtain travel authorization from the Chairman of the Board, the Executive Director or Authorized Representative prior to organizing or incurring any travel costs [See Appendix A for Authorization Authority]. Expense reimbursement is subject to having received prior authorization. Exceptions shall be made under the consideration of the Chairman, Executive Director or Authorized Representative.

3.5  The use of video and telephone conferencing instead of travel should always be considered to reduce travel expenses.

## 4.  Travel Expenses

### 4.1 Air Travel

4.1.1  Costs for air travel will be reimbursed on an actual cost incurred basis.

4.1.2  For all flights, board members, officers, staff, and contractors* are required to travel in a cabin class no higher than premium economy class and, when possible, the cheapest fare in this class.

4.1.3  Flights should be booked to provide the best value/lowest cost and fit between cost and convenience. Board staff shall book flights through the Board's Executive Assistant. Board members may book flights through the Board's Executive Assistant or independently. Board contractors must book flights independently, though they are allowed to consult the Board's Executive Assistant on fares the board members, officers, and staff are using.

4.1.4  The Board will not reimburse costs incurred due to deviations from the most direct routes taken for personal travel reasons. In such cases, if the Board purchased the ticket, the traveler must reimburse the Board for any additional costs over and above the authorized travel.

4.1.5  Any alteration to original travel plans must be justified and approved in accordance with the Policy.

*Expense policy applies only to contractors whose contracts specify they will be able to reimburse listed expenses.

### 4.2 Train Travel

**4.2.1** The Board may reimburse travelers for their economy train fares or business class train fares when those fares are comparable to the equivalent, economy class airfare on the same route.

**4.2.2** Board staff shall book trains through the Board's Executive Assistant. Board Members may book trains through the Board's Executive Assistant or independently. Board contractors must book trains independently, though they are allowed to consult the Board's Executive Assistant on fares the board members, officers, and staff are using.

### 4.3 Hotels and Lodging

**4.3.1** Accommodation costs may be reimbursed by the Board. Board members, officers, staff, and contractors should not exceed cost of accommodation per night published in the U.S. Government GSA Per Diem Rates (https://www.gsa.gov/perdiem), unless approved by the Chairman or his authorized representative.

**4.3.2** Board staff shall book hotels through the Board's Executive Assistant. Board members may book hotels through the Board's Executive Assistant or independently. Board contractors must book hotels independently, though they are allowed to consult the Board's Executive Assistant on fares the Board members, officers, and staff are using.

### 4.4 Transportation

**4.4.1** Transportation costs during trips associated to Board business will be reimbursed. Board members, officers, and staff* can expense the following transportation costs: 1) transportation to and from the airport / train station and 2) transportation to and from the meeting location. Transportation costs cover taxi services or equivalent (e.g. Uber, Lyft or any other transportation means).

### 4.5 Business Meals

**4.5.1** When travelling to a location other than the Board members, officers, staff, and contractors'* local city, business meals are reimbursable based on the following limits:

- Breakfast: $15; Lunch: $25; Dinner: $40
- Snack expenses are reimbursable when they replace a meal.

**4.5.2** If meals are provided during the meeting, only meals not provided can be expensed.

### 5. Other Expenses

**5.1** Other expenses are reimbursable provided they are legitimate, necessary and reasonable expenses directly connected with or pertaining to the Board, such as office supplies, printing and reproduction, telephone calls, and messengers, among other.

*Expense policy applies only to contractors whose contracts specify they will be able to reimburse listed expenses.

## 6. Reimbursement of Expense

**6.1** Travel arrangements are authorized in advance through the completion and approval of a travel authorization email and the validation of a travel plan between the traveler and the designated approver [See Appendix A].

**6.2** Expenses are reimbursed through the completion, approval, and validation of expense report [See Appendix B] that the members, officers, and staff must submit to the designated approver [See Appendix C].

**6.3** Expense claims should be submitted immediately following and, where possible, no more than 10 days after the completion of each trip, but at least a monthly.

**6.4** In rare circumstances, and on an exceptional basis, reimbursement in excess of stated limits may be provided when lodging options are not available below. In such rare circumstances, the need for higher reimbursement shall be indicated on the attached reimbursement form and justified in writing by the members, officers, and staff. Reimbursement will be limited to the following:

- Lodging: average rate for available 3-star hotels listed for the applicable metropolitan area on Expedia;

The Chairman of the Board or his authorized representative will have sole discretion to approve or deny such expenditures.

**6.5** Receipts are required for all expenditures billed, such as airfare and hotel charges. No expense in excess of $25.00 will be reimbursed to Board members, officers, staff and contractors unless the individual requesting reimbursement submits with the Expense Report written itemized receipts from each vendor (not a credit card receipt or statement) showing the vendor's name, a description of the services provided (if not otherwise obvious), the date, and the total expenses. If a receipt is not available, a full explanation of the expense and the reason for the missing receipt is required.

**6.6** Alcoholic beverages will not be reimbursed under any circumstance.

*Expense policy applies only to contractors whose contracts specify they will be able to reimburse listed expenses.

## APPENDIX A: Authorization Authority

| Expense to be Incurred By: | Authorization From: |
|---|---|
| Board Member | Chairman or Authorized Representative |
| Board Staff | Executive Director or Authorized Representative |
| Board Contractors | Executive Director or Authorized Representative |
| Executive Director | Chairman or Authorized Representative |
| Chairman | N/A |

*Expense policy applies only to contractors whose contracts specify they will be able to reimburse listed expenses.

**APPENDIX B: Expense Report**

**Financial Management and Oversight Board for Puerto Rico**

*To be completed by* members, officers, and staff *and submitted to designated approver*

| DATE | DESCRIPTION | AIR FARE | GROUND FARE | HOTEL | MEALS | OTHER | TOTAL (1) |
|------|-------------|----------|-------------|-------|-------|-------|-----------|
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
|      |             |          |             |       |       |       | $     -   |
| TOTAL |            | $    -   | $    -      | $  -  | $  -  | $  -  | $     -   |

Signature:_____          Date:_____

Approved by:_____          Date:_____

(1) SUBMIT RECEIPTS FOR THE AMOUNTS TO BE REIMBURSED.

*Expense policy applies only to contractors whose contracts specify they will be able to reimburse listed expenses.

**APPENDIX C: Expense Report Approval Authority**

| Expense Incurred By: | Expense Approved By: |
|---|---|
| Board Member | Chairman or Authorized Representative |
| Board Personnel | Executive Director or Authorized Representative |
| Board Advisors | Executive Director or Authorized Representative |
| Executive Director | Chairman or Authorized Representative |
| Chairman | Executive Director or Authorized Representative |

*Expense policy applies only to contractors whose contracts specify they will be able to reimburse listed expenses.

VIA E-MAIL: jaime.elkoury@promesa.gov

December 11, 2018

Jaime A. El Koury, Esq.
General Counsel
Financial Oversight and Management Board for Puerto Rico

Subject:    Amendment No. 3 to Letter of Engagement for Duff & Phelps, LLC-
            Disputes & Investigations Engagement: Independent Forensic Analysis Team
            for the Financial Oversight and Management Board for Puerto Rico

Dear Mr. El Koury:

This letter amends the Letter of Engagement dated January 31, 2018 (as amended by
Amendment No. 1 dated March 31, 2018 and Amendment No. 2 dated August 16, 2018, the
"Engagement") between Duff & Phelps, LLC ("D&P" or "we") and the Financial Oversight and
Management Board for Puerto Rico ("FOMB" or "you" or "Client") as follows:

1.    Amendment No. 2 includes an attachment that describes the financial and accounting
forensic analysis services that D&P must render under the Engagement (the "Scope of
Services").

2.    At the request of the FOMB, D&P will assume the role of Project Manager over the work
contemplated under the Scope of Services.  The assumption by D&P of the role of Project
Manager will supplement, but not replace, those enumerated responsibilities D&P currently has
under the Scope of Services.

      D&P agrees that it will provide the FOMB with the following Title III work product (the
"Work Product") in connection with the bank accounts of all the government entities included in
the list attached hereto (the "Priority List") on or before February 4, 2018 (the "Deadline"): the
bank account balances of cash and investment accounts as of June 30, 2018 (the "Measurement
Date") segregated by unrestricted and restricted designations, as to which D&P will effect
validation procedures such that D&P provides by the Deadline its professional opinion thereon,
subject to standard disclosures and exceptions.

      D&P acknowledges that the Work Product includes the Commonwealth of Puerto Rico,
including the Treasury Single Accounts ("TSA").  Title III entities have been identified for D&P
by the FOMB's attorneys.  D&P acknowledges and agrees that the Work Product is an essential
component for the creditor negotiations that FOMB and its advisors are engaged in.

00608531;2

The parties acknowledge that completion of the Work Product by the Deadline is contingent on the quality and timeliness of the responses of the Account Holders ("AH") and Financial Institutions ("FI") to the letters and other inquiries from the FOMB as well as the FOMB's continued ability to enter and process information in the TeamConnect database on a timely basis, provided that D&P will use its best commercial efforts, including the addition of personnel, to complete the Work Product by the Deadline. The parties also acknowledge that after the Deadline, D&P may continue to require additional Title III information and analysis, where responses from AH and FI material responses were incomplete.

3.     In its role as Project Manager, D&P agrees to:

    a.  have a continuing physical presence at the Clients' office in San Juan, Puerto Rico;

    b.  provide direct supervision to the Clients review and data entry staff assigned to the Project;

    c.  provide direct assistance by performing the review function for AH included in the Priority List, including assessment of the completeness and sufficiency of AH responses and develop an open item list and tracking of secondary AH responses;

    d.  coordinate Project Management activities with the Client staff, who will work with D&P and interface with the representatives of government entities and financial institutions;

    e.  D&P's role of Project Manager will also include the responsibility to initiate, manage and download for processing, the Financial Institution letters for the Account Holders;

    f.  provide weekly project status updates to the Client; and

    g.  provide other forms of services as requested and mutually agreed upon in writing.

4.     D&P's estimate of its incremental fees for its services hereunder is $50,000 per week effective the week beginning November 5, 2018 through the Deadline, provided that billings will be based on actual hours worked in accordance with the rates specified in Attachment II of the Engagement.

5.     D&P acknowledges and agrees that all fees and expenses payable under the Engagement (including this Amendment No. 3) as of November 1, 2018 will be paid through the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") Title III proceeding filed on behalf of the Commonwealth of Puerto Rico that is pending in the United States District Court for the District of Puerto Rico, No. 17 BK 3283-LTS.  Fees and expenses payable for work related to each of the other Title III debtors, that is, ERS (No. 17 BK 3283-LTS), HTA (No. 17 BK 3567 LTS) and PREPA (No. 17 BK 4780-LTS) shall paid through the PROMESA Title III

proceeding of the corresponding entity. We have familiarized ourselves with the currently applicable processes and guidelines relevant to submitting monthly statements and interim fee applications for payment of fees and expenses through the Title III proceeding, including the Court's orders addressing the procedures for interim compensation and reimbursement of expenses of professionals. We acknowledge and agree to be paid pursuant to such processes and guidelines

6.     Except as set forth herein the Engagement Letter remains in full force and effect in accordance with its terms.

[Signature page follows.]

Yours sincerely,

James Feltman
Managing Director
Disputes & Investigations
Duff & Phelps, LLC

Attachment

Agreed and Accepted by:

**Financial and Oversight Management
Board for Puerto Rico**

Signed:       Natalie A. Jaresko
Title:        Executive Director
Date:

In re: PROMESA Independent Forensic Analysis

**Exhibit A**
Prioritized Entity List
*As of November 16, 2018*

| Ag# | Entity Name (clean) | Priority Type |
|---|---|---|
| 8 | Oficina Contralor | Commonwealth |
| 10 | Tribunal General de Justicia | Commonwealth |
| 11 | Comision para la Seguridad en el Transito | Commonwealth |
| 12 | Oficina de Asuntos de la Juventud | Commonwealth |
| 14 | Junta de Calidad Ambiental | Commonwealth |
| 15 | Oficina Gobernador | Commonwealth |
| 16 | Oficina de Gerencia y Presupuesto | Commonwealth |
| 18 | Junta de Planificacion | Commonwealth |
| 19 | Junta Apel. sobre Const. y Lot | Commonwealth |
| 21 | Agencia Estatal para el Manejo de Emergencias y Administracion de Desastres | Commonwealth |
| 22 | Oficina Comisionado de Seguros | Commonwealth |
| 23 | Departamento de Estado | Commonwealth |
| 24 | Departamento de Hacienda | Commonwealth |
| 25 | Asignaciones bajo la Custodia de Hacienda | Commonwealth |
| 26 | Administracion Sis Ret Gob Y Jud | Commonwealth |
| 27 | Oficina Rec.Hum. de ELA (ORHELA) | Commonwealth |
| 28 | Comision Estatal de Elecciones | Commonwealth |
| 29 | Administracion de Asuntos Federales | Commonwealth |
| 30 | Oficina de Administracion y Transformacion de los Recursos Humanos | Commonwealth |
| 31 | Administracion de Servicios Generales | Commonwealth |
| 34 | Comision de Investigacion, Procesamiento y Apelacion | Commonwealth |
| 35 | Oficina de Exencion Contributiva Industrial | Commonwealth |
| 36 | Oficina Comisionado de Asuntos Municipales | Commonwealth |
| 37 | Comision Derechos Civiles | Commonwealth |
| 38 | Departamento de Justicia | Commonwealth |
| 40 | Departamento de Policia | Commonwealth |
| 42 | Cuerpo de Bomberos | Commonwealth |
| 43 | Guardia Nacional | Commonwealth |
| 45 | Departamento de Seguridad Publica | Commonwealth |
| 49 | Departamento de Transportacion y Obras Publicas | Commonwealth |
| 50 | Departamento de Recursos Naturales y Ambientales | Commonwealth |
| 55 | Departamento de Agricultura | Commonwealth |
| 60 | Oficina Procurador Ciudadano | Commonwealth |
| 62 | Comision de Desarrollo Cooperativo | Commonwealth |
| 65 | Comision de Servicio Publico | Commonwealth |
| 66 | Autoridad de Carreteras y Transportacion | HTA |
| 67 | Departamento Trabajo y Recursos Humanos | Commonwealth |
| 68 | Junta de Relaciones Trabajo | Commonwealth |
| 69 | Departamento de Asuntos Consumidor | Commonwealth |
| 70 | Corporacion Fondo Seguro Estado | Commonwealth |
| 71 | Departamento de Salud | Commonwealth |
| 75 | Oficina Comisionado de Instituciones Financieras | Commonwealth |
| 78 | Departamento de la Vivienda | Commonwealth |
| 79 | Administracion de Compensaciones por Accidentes de Automoviles | Commonwealth |
| 81 | Departamento de Educacion | Commonwealth |
| 82 | Instituto de Cultura Puertorriquena | Commonwealth |
| 87 | Departamento de Recreacion y Deportes | Commonwealth |
| 89 | Administracion de la Industria y el Deporte Hipico | Commonwealth |
| 90 | Administracion de Servicios Medicos | Commonwealth |
| 91 | Aportaciones para Pensiones y Seguridad Social – Sistema de Retiro de Maestros | ERS |
| 95 | Administracion de Servicios de Salud Mental y Contra la Adiccion | Commonwealth |

| | | |
|---|---|---|
| 96 | Oficina Procuradora de las Mujeres | Commonwealth |
| 100 | Asamblea Legislativa | Commonwealth |
| 105 | Comision Industrial | Commonwealth |
| 106 | Administracion de Vivienda Publica | Commonwealth |
| 109 | Escuela de Artes Plasticas y Diseno | Commonwealth |
| 119 | Departamento de Desarrollo Economico y Comercio | Commonwealth |
| 120 | Oficina Procurador Veterano | Commonwealth |
| 121 | Junta de Gobierno Servicio 9-1-1 | Commonwealth |
| 122 | Departamento de la Familia | Commonwealth |
| 123 | Administracion de Familias y Ninos | Commonwealth |
| 124 | Administracion de Sustento de Menores | Commonwealth |
| 126 | Administracion de Rehabilitacion Vocacional | Commonwealth |
| 127 | Administracion de Desarrollo Socioeconomico de la Familia | Commonwealth |
| 132 | Asuntos de Energia | Commonwealth |
| 133 | Administracion de Recursos Naturales | Commonwealth |
| 137 | Departamento de Correccion y Rehabilitacion | Commonwealth |
| 138 | Fideicomiso Institucional de la Guardia Nacional | Commonwealth |
| 139 | Junta de Libertad Bajo Palabra | Commonwealth |
| 141 | Junta Reglamentadora de Telecomunicaciones | Commonwealth |
| 152 | Oficina Procurador de las Personas de Edad Avanzada | Commonwealth |
| 153 | Oficina Producador Personas Impedimentos | Commonwealth |
| 155 | Oficina Estatal de Conservacion Historica | Commonwealth |
| 161 | Autoridad para el Financiamiento de la Infraestructura | Commonwealth |
| 162 | Autoridad de Edificios Publicos | Commonwealth |
| 165 | Autoridad de Tierras | Commonwealth |
| 166 | Compania de Fomento Industrial | Commonwealth |
| 167 | Compania para el Desarrollo Integral de la Peninsula de Cantera | Commonwealth |
| 168 | Autoridad de los Puertos | Commonwealth |
| 169 | Autoridad de Energia Electrica | PREPA |
| 172 | Banco Gubernamental de Fomento para Puerto Rico | Commonwealth |
| 174 | Autoridad Metropolitana de Autobuses | Other |
| 176 | Universidad de Puerto Rico | Commonwealth |
| 177 | Administracion de Terrenos | Commonwealth |
| 180 | Compania de Turismo | Commonwealth |
| 181 | Administracion Desarrollo Laboral | Commonwealth |
| 184 | Autoridad de Desperdicios Solidos | Commonwealth |
| 186 | Autoridad de Conservacion y Desarrollo de Culebra | Commonwealth |
| 187 | Administracion de Seguros de Salud | Commonwealth |
| 188 | Corporacion Centro Cardiovascular y el Caribe | Commonwealth |
| 189 | Instituto de Ciencias Forenses | Commonwealth |
| 191 | Corporacion de las Artes Musicales | Commonwealth |
| 192 | Corporacion de Centro de Bellas Artes | Commonwealth |
| 193 | Oficina de etica Gubernamental | Commonwealth |
| 195 | Banco de Desarrollo Economico para Puerto Rico | Commonwealth |
| 196 | Corporacion para la Difusion Publica | Commonwealth |
| 198 | Corporacion de Seguros Agricolas | Commonwealth |
| 200 | Panel sobre el Fiscal Especial Independiente | Commonwealth |
| 208 | Aportaciones a los Municipios | Commonwealth |
| 211 | Autoridad para el Financiamiento de Facilidades Industriales, Turisticas, Educativas, Medic | Commonwealth |
| 215 | Corporacion de Conservatorio de Musica | Commonwealth |
| 217 | Oficina de Servicios con Antelacion al Juicio | Commonwealth |
| 220 | Salud Correccional | Commonwealth |
| 221 | Negociado Cuerpo de Emergencias Medicas | Commonwealth |
| 224 | Comision Conjunta Sobre Informes Especiales Contralor | Commonwealth |
| 226 | Comision Especial Conjunta de Fondos Legislativos | Commonwealth |
| 229 | Oficina COORD GEN COM ESPECIALES PR | Commonwealth |
| 231 | Oficina Procurador Paciente | Commonwealth |
| 235 | Autoridad para el Financiamiento de la Vivienda | Commonwealth |
| 238 | Autoridad de Ponce | Commonwealth |

| | | |
|---|---|---|
| 241 | Administracion para el Cuidado y Desarrollo Integral de la Ninez | Commonwealth |
| 258 | Compania de Comercio y Exportacion | Commonwealth |
| 264 | Corporacion Proyecto ENLACE Cano Martin Pena | Commonwealth |
| 265 | Autoridad para el Redesarrollo de los Terrenos y Facilidades de la Estacion Naval Roosev | Commonwealth |
| 266 | Oficina Asuntos Seguridad Publica | Commonwealth |
| 268 | Instituto de Estadisticas | Commonwealth |
| 273 | Oficina de Gerencia de Permisos | Commonwealth |
| 274 | Oficina Inspector Gen. Permisos | Commonwealth |
| 276 | Autoridad para las Alianzas Publico Privadas | Commonwealth |
| 277 | Administracion para el Desarrollo de Empresas Agropecuarias | Commonwealth |
| 278 | Consejo de Educacion | Commonwealth |
| 279 | Comision Apelativa Servicio Publico | Commonwealth |
| 281 | Oficina Contralor Electoral | Commonwealth |
| 285 | Autoridad de Transporte Integrado | Commonwealth |
| 286 | Autoridad Puerto de Ponce | Commonwealth |
| 287 | Corporacion de Centro Regional ELA | Commonwealth |
| 288 | Centro Comprensivo de Cancer | Commonwealth |
| 289 | Comision de Energia | Commonwealth |
| 290 | Oficina Estatal de Politica Publica Energetica | Commonwealth |
| 292 | Oficina Independiente Proteccion al Consumidor | Commonwealth |
| 293 | Centro de Investigaciones Educacion y Servicios Medicos para la Diabetes | Commonwealth |
| 294 | Bosque Modelo | Commonwealth |
| 295 | Autoridad de Asesoria Financiera y Agencia Fiscal | Commonwealth |
| 303 | Autoridad Distrito Centro de Convenciones | Commonwealth |
| 329 | Oficina de Desarrollo Socioeconomico y Comunitario | Commonwealth |
| 928 | Administracion Sistema de Retiro de Empleados Gobierno y la Judicatura | ERS |
| 929 | Sistema de Retiro para Maestros | ERS |
| Alt 17 | Asignaciones bajo la Custodia de la Oficina de Gerencia y Presupuesto | Commonwealth |
| n/a | Corporacion de Fondo de Interes Apremiante | COFINA |
| n/a | Loteria Electronica | Commonwealth |
| n/a | Negociado de la Policia | Commonwealth |
| n/a | Maritime Shipping Authority | Commonwealth |
| n/a | Negociado de Sistemas de Emergencias 9-1-1 | Commonwealth |
| n/a | Fideicomiso Perpetuo para las Comunidades Especiales | Commonwealth |
| n/a | Interamerican Energy Sources | PREPA |
| n/a | PREPA Holdings | PREPA |
| n/a | PREPA Networks | PREPA |
| n/a | PREPA Retirement System | PREPA |
| n/a | Administracion Sistema de Retiro de Empleados Gobierno | ERS |
| n/a | Commonwealth Election Commission | Commonwealth |
| n/a | Court of Appeals | Commonwealth |
| n/a | Court of First Instance | Commonwealth |
| n/a | House of Representatives | Commonwealth |
| n/a | Traditional Lottery | Commonwealth |
| n/a | Unemployment Insurance Fund | Commonwealth |
| n/a | Musical Arts and Stagecraft Corporation | Commonwealth |
| n/a | Contributions to Municipalities (GRIM)' | Commonwealth |
| n/a | Energy Affairs Office | Commonwealth |
| n/a | Health Advocate Office | Commonwealth |
| n/a | Junta de Supervision y Administracion Financiera | Commonwealth |
| n/a | Negociado de Investigaciones Especiales | Commonwealth |
| n/a | Oficina Administracion Tribunales | Commonwealth |
| n/a | Oficina de Servicios Legislativos | Commonwealth |
| n/a | Oficina Procurador General | Commonwealth |
| n/a | Secretaria de la Gobernacion | Commonwealth |
| n/a | Sistemas de Informacion de Justicia Criminal | Commonwealth |
| n/a | Superintendencia Capitolio | Commonwealth |
| n/a | Tribunal Supremo | Commonwealth |
| n/a | Senado | Commonwealth |

| n/a | The Commonwealth of Puerto Rico | Commonwealth |
| n/a | Administracion Sistema de Retiro de la Judicatura | ERS |
| n/a | Corporacion de Industrias de Ciegos, Personas Mentalmente Retardadas y Otras Personal | Commonwealth |

## **Exhibit B**

Compensation Period Fee Statements

DOC ID - 38089162.3

**Exhibit [B]**
## Summary of Professional Services Rendered by
## Timekeeper for the Periods November 1, 2018 through May 31, 2019

| Professional | Position | Rate | 11/1/18-1/31/19 Hours | 11/1/18-1/31/19 Fee | 2/1-5/31/19 Hours | 2/1-5/31/19 Fee |
|---|---|---|---|---|---|---|
| Feltman, James | Managing Director | $650.00 | 316.3 | $205,595.00 | 83.3 | $54,145 |
| Jenkins, Carl | Managing Director | $650.00 | 3.5 | $2,275.00 | — | — |
| Gittleman, Ann | Managing Director | $650.00 | 435.7 | $283,205.00 | 111.7 | $72,605 |
| Lattner, Kathryn | Director | $550.00 | 437.0 | $240,350.00 | 58.6 | $32,230 |
| Ledwidge, Niall | Director | $550.00 | 353.9 | $194,645.00 | 34.8 | $19,140 |
| Levy, Rebecca | Director | $550.00 | 45.7 | $25,135.00 | 24.9 | $13,695 |
| Saeed, Zain | Director | $550.00 | 131.1 | $72,105.00 | 23.2 | $12,760 |
| Schulke, Douglas | Director | $550.00 | | | 1.0 | $550 |
| Ennis, Helen | Vice President | $425.00 | 45.3 | $19,252.50 | 2.1 | 892.50 |
| Hornung, Eric | Vice President | $425.00 | 686.9 | $291,932.50 | 159 | 67,575 |
| Houser, Harley | Vice President | $425.00 | 60.5 | $25,712.50 | 1.5 | 632.50 |
| Patino, Daniel | Vice President | $425.00 | 87.7 | $37,272.50 | | |
| Patterson, Nicole | Vice President | $425.00 | 55.7 | $23,672.50 | | |
| Chavira, Roger | Vice President | $425.00 | 19.5 | $8,287.50 | | |
| Jacobs, Debra | Vice President | $425.00 | 1.1 | $467.50 | | |
| Sablok, Sumeet | Vice President | $425.00 | 28.0 | $11,900.00 | | |
| Cristantiello, Joseph | Vice President | $425.00 | 12.6 | $5,355.00 | | |
| Damodaran, Brendan | Senior Associate | $395.00 | 88.1 | $34,799.50 | 9.6 | $3,792 |
| Dover, Austin | Senior Associate | $395.00 | 2.0 | $790.00 | | |
| Furman, David | Senior Associate | $395.00 | 3.3 | $1,303.50 | | |
| Hudson, Tremaine | Senior Associate | $395.00 | 38.7 | $15,286.50 | | |
| Klyman, Basyah | Senior Associate | $395.00 | 93.3 | $36,853.50 | | |
| Tocci, Dom | Senior Associate | $395.00 | 326.2 | $128,849.00 | 63.1 | $24,924.50 |
| Zuberi, Maliha | Senior Associate | $395.00 | 6.0 | $2,370.00 | | |
| McPherson, Deborah | Analyst | $225.00 | 12.5 | $2,812.50 | | |
| Albano, Juliana | Analyst | $225.00 | 11.8 | $2,655.00 | 1 | $225 |
| Cappelli, Alexander | Analyst | $225.00 | 22.6 | $5,085.00 | 3 | $675 |
| Cieciura, Caroline | Analyst | $225.00 | 203.8 | $45,855.00 | | |
| Jacobson, Jennifer L | Analyst | $225.00 | 496.3 | $111,667.50 | 173.4 | $39,015 |
| Kanto, John | Analyst | $225.00 | 134.7 | $30,307.50 | 8.2 | $1,845 |
| Lindquist, Brad | Analyst | $225.00 | 158.3 | $35,617.50 | 8.5 | $1,912.50 |
| Macmaster, Griffin | Analyst | $225.00 | 56.4 | $12,690.00 | 15.3 | $3,442.50 |
| **Total** | | | **4,374.5** | **$1,914,104.50** | **783** | **$350,401.50** |

| Role | Standard Rates | Oversight Board Rates | Discount Provided |
|---|---|---|---|
| Managing Director | $ 1,150 | $ 650 | 43% |
| Director | $ 1,040 | $ 550 | 47% |
| Vice President | $ 825 | $ 425 | 48% |
| Senior Associate | $ 625 | $ 395 | 37% |
| Analyst | $ 435 | $ 225 | 48% |

## Exhibit C

Time Detail by Category

**Exhibit [C]**
**Summary of Professional Services Rendered by Project**
**Category for the Periods November 1, 2018 through May 31, 2019**

| Category | 11/1/18-1/31/19 Hours | 11/1/18-1/31/19 Fee | 2/1-5/31/19 Hours | 2/1-5/31/19 Fee |
|---|---|---|---|---|
| 101 - Master List | 71.9 | $31,297.50 | — | — |
| 102 - Document Acquisition - Accounts | 3.9 | $1,540.50 | — | — |
| 201 - Account Holder Requests | 391.5 | $200,805.00 | 21.2 | $11,920 |
| 202 - Financial Institution Requests | 462.7 | $185,796.00 | 62.9 | $21,856 |
| 203 - Master Database Development | 359.0 | $133,103.00 | 13.8 | $5,977.50 |
| 204 - Request Follow Up | 26.2 | $10,745.00 | | |
| 205 - Discrepancy and Incompleteness Identification | 107.5 | $29,058.50 | | |
| 301 - Restriction Analysis | 18.0 | $8,277.50 | 10.2 | $3,845 |
| 302 - Included Account Comparison | 5.9 | $2,507.50 | | |
| 401 - Restriction Determination | 4.8 | $3,030.00 | 1.4 | $595 |
| 403 - Restriction Confirmation | 20.8 | $11,202.50 | | |
| 404 - Restriction Testing | 5.4 | $2,970.00 | | |
| 501 - Draft Report | 176.9 | $100,977.50 | 101.9 | $57,660 |
| 601 - Priority AH Review Process | 1101.2 | $460,240.50 | 58.2 | $25,059 |
| 801 - TeamConnect Database Maintenance & Development | 399.5 | $132,378.50 | 27.3 | $7,607.50 |
| 995 - Supplemental FOMB Requests | 62.0 | $26,352.50 | 3.5 | $1,487.50 |
| 997 - Fee Statement & Application Preparation | 88.2 | $36,730.50 | 168.5 | $54,610 |
| 998 - Case Administration | 499.1 | $238,489.50 | 125 | $55,560 |
| 999 - Case Status & Strategy | 570.0 | $298,602.50 | 189.1 | $104,224 |
| **Total** | **4374.5** | **$1,914,104.50** | **783** | **$350,401.50** |

DOC ID - 38089162.3

2

## **Exhibit D**

Line Item Expenses

Exhibit [D]

## Summary of Actual and Necessary Expenses Incurred
## for the Period November 1, 2018 through May 31, 2019

| Category | 11/1/18-1/31/19 | 2/1-5/31/19 |
|---|---|---|
| | Reimbursable Expense | |
| Ground Transportation | $3,970.16 | $405.38 |
| Meal | $7,759.48 | $767.61 |
| Airfare | $23,844.68 | $992.68 |
| Lodging | $31,241.15 | $4,548.19 |
| Database | $1,500.00 | $1,848.95 |
| Travel | $1,200.00 | |
| Supplies | $2,282.61 | $12.00 |
| Total | $71,798.08 | $8,574.81 |

## **Exhibit E**

Report on Title III Bank Accounts



# Financial Oversight and Management Board for Puerto Rico

## DUFF&PHELPS

### IFAT Report on Title III Bank Accounts

On Behalf of the FOMB

As of June 30, 2018

**March 13, 2019**

# TABLE OF CONTENTS

I.   Executive Summary ..................................................................................................... 3

   A.   Limiting Conditions ............................................................................................ 6

II.   Background............................................................................................................. 6

   A.   History of the Project ......................................................................................... 6

   B.   Procedures .......................................................................................................... 8

      1.   Information Gathering Process ..................................................................... 9

      2.   Inquiry and Data Collection Process............................................................ 11

      3.   Analytical Steps and Reporting.................................................................... 12

III.   Results................................................................................................................... 13

IV.   Next Steps............................................................................................................. 24

   A.   Additional Steps re: Report............................................................................... 25

   B.   New Assessments............................................................................................... 26

Appendix A: Glossary of Defined Terms ...................................................................

Appendix B: Retention and Related Documents .......................................................

   Appendix B-1 - RFP .............................................................................................

   Appendix B-2 - Engagement Letter......................................................................

   Appendix B-3 - Work Plan ...................................................................................

   Appendix B-4 - Amendment No. 1........................................................................

   Appendix B-5 - Amendment No. 2........................................................................

   Appendix B-6 - Amendment No. 3........................................................................

Appendix C: Project Information.................................................................................

   Appendix C-1- Title III Entities ...........................................................................

   Appendix C-2- List of Sources for MDB ..............................................................

   Appendix C-3- Sample Form of AH Request ........................................................

   Appendix C-4- Sample Form of FI Request ..........................................................

   Appendix C-5- Sample Form of AH Consent Letter .............................................

   Appendix C-6- Sample Forms of Follow Up Letters AH and FI............................

   Appendix C-7- List of Non-Puerto Rico Bank Accounts Contacted .....................

   Appendix C-8- Summary of Title III Values by Account Holder............................

1

Appendix C-9- Components of Table 1 Categories ...............................................................

Appendix C-10- Summary of Bank Accounts Eliminated as Duplicates by Category ...........................

Appendix C-11- O&B Legal Due Diligence Chart ...............................................................

## List of Report Tables

**Table 1:** Summary of Title III Bank Accounts by Category ......................................................... 14
**Table 2:** Summary of Title III Bank Accounts by Category – Reconciled Information .. ......................... 15
**Table 3:** Components of Table 1 Categories.......................................................................... 16
**Table 4:** Summary of Bank Accounts Eliminated as Duplicates by Category................ ........................ 17
**Table 5:** Comparison of FI and AH Responses in Excess of Absolute $5 million .......... ......................... 18
**Table 6:** Summary of FI Responses ................................................................................. 19
**Table 7:** Summary of O&B Legal Due Diligence by Category (ex. COFINA)............. ........................ 21
**Table 8:** Summary of Restricted-Selected Accounts Identified for Cash Tracing........... ........................ 22
**Table 9:** Accounts Held by GDB at the Measurement Date ....................................................... 23
**Table 10:** AH Claimed Values at GDB as of the Measurement Date .............................. ........................ 24

IFAT Report on Title III Bank Accounts
On Behalf of the FOMB
As of June 30, 2018

## I. Executive Summary

1. The Financial Oversight Management Board for Puerto Rico ("FOMB" or the "Board") was created by Congress as part of the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA").[1] The Board is tasked with providing a method for Puerto Rico "to achieve fiscal responsibility and access to the capital markets."[2]

2. Among its many responsibilities, the FOMB has the exclusive authority to propose PROMESA Title III plans of adjustment to restructure debt.[3]

3. Based on continuous and recurring questions and issues as to the Commonwealth of Puerto Rico (the "Commonwealth") and its instrumentalities and entities' cash position, the FOMB initiated the instant project to report and identify Commonwealth bank and investment accounts along with explanations of any restrictions on the resources they hold.[4] The FOMB included the following objectives in the development and publication of a report on Commonwealth bank and investment accounts:

    - improving transparency, accountability and the provision of relevant financial information regarding the Commonwealth Entities[5] liquidity position; and
    - participation in a factual information sharing process lead by an independent party, subject to vetting, to provide a clear cash baseline for all parties in the debt restructuring negotiations.

4. This process and the results derived therefrom, is referred to herein as the Commonwealth Bank Account Reporting Project ("Project").

5. The FOMB tasked an Independent Forensic Analysis Team ("IFAT"), through the retention of Duff and Phelps, LLC ("D&P") to develop and lead the Project. The Project includes the design

---

[1]  All capitalized terms in this Report are used consistent with the definitions set forth in the Glossary of Defined Terms found at **Appendix A.**

[2]  PROMESA Section 101(a).

[3]  PROMESA Section 312(a).

[4]  The full extent of the project is explained in Section II.A.

[5]  "Commonwealth Entities" is defined as the Commonwealth of Puerto Rico and its instrumentalities. Includes instrumentalities, agencies, funds and fiduciary funds, and public corporations and their subsidiaries or affiliates.

of appropriate procedures, gathering relevant information and performing various types of analysis on the information obtained, as of June 30, 2018 (the "Measurement Date").

6. A principal goal of the Project was the publication of a report that would include a description of the processes employed, the results obtained and an opinion from D&P on whether or not procedures performed validate, with a high degree of certainty, that Commonwealth bank and investment accounts were identified and account balances as of the Measurement Date were accurately disclosed (the "Report").[6]

7. The Project's outcome relied on the assumption that, among other things, a significant number of Commonwealth entities (and particularly those entities which held significant cash and investment account bank balances as of the Measurement Date) would voluntarily provide the FOMB with specific financial information. Voluntary cooperation was required of these Commonwealth entities to respond regarding targeted inquiries about their respective bank account(s). The Project's qualitative outcome also required receiving a substantial degree of cooperation from the financial institutions servicing Commonwealth entities. Financial institution cooperation included the provision of specified forms of corroborative information to the FOMB.

8. The Project design also included the collection and development of information regarding whether the bank accounts identified by Commonwealth entities contained unrestricted bank funds and how much, and explanations of the nature of any restrictions on funds that were not unrestricted.

9. Based on a classification (a "Classification") asserted by Commonwealth entity account holders regarding whether bank account funds were subject to certain types of restrictions, certain legal due diligence and financial analytical procedures were performed to identify the support for, nature of, and terms of such Classifications. As part of the Commonwealth bank account holders' ("AH") response, the entity was asked to provide supporting documentation

---

[6] The Project and related Report is not and should not be viewed as an audit, the expression of an audit opinion or auditing procedures performed in accordance with Generally Accepted Auditing Standards ("GAAS"). D&P is not a firm of Certified Public Accountants; D&P does not perform audits or express opinions as an auditor or as a firm of Certified Public Accountants.

for the Classification. The results of the legal due diligence and financial analytical procedures performed are set forth in Section III.

10. For purposes of this Report, the FOMB asked that D&P focus on those Commonwealth instrumentalities identified by counsel as Title III entities or covered by the Commonwealth Fiscal Plan certified by the FOMB as of October 23, 2018, and set March 13, 2019 as the Report issuance date. The University of Puerto Rico ("UPR") is also included in the Report because the UPR relies heavily on funds provided from the Commonwealth to sustain its operations.[7]

11. The Report is organized in the following format:

    (i)    Executive summary;
    (ii)   History of the Project;
    (iii)  Description of the Project design and procedures, including summaries of information received from inquiry procedures;
    (iv)  Results of procedures performed; and legal due diligence and analytical procedures performed related to Restricted-Selected Accounts;
    (v)   Next steps; and
    (vi)  Appendices and related documentation.

12. Based on the work performed and the information received and analyzed herein, and subject to the limiting conditions and exceptions described in the Report, it is D&P's opinion that, for the Title III entities and bank account balances presented in **Table 1** and **Table 2** at pages 14 and 15, the results obtained from the procedures performed validate, with a high degree of certainty, that the Commonwealth bank account and investment accounts were Identified and the account balances as of the Measurement Date were accurately disclosed.

13. The results of legal due diligence performed regarding AH claims about bank account restrictions reflected in **Table 7** at page 21, and as further supported by **Appendix C-11**, indicate that the majority of AH provided supporting documentation which was satisfactory to establish the Restriction.

---

[7]   UPR's retirement plan is not included as a Commonwealth Entity in the Report.

14. Analytical procedures performed on the Restricted-Selected accounts is ongoing. The work regarding analytical procedures is not sufficiently developed to indicate whether or not AH cash flows do or do not support the Restriction(s).

### A.     Limiting Conditions

15. An objective of the Project is the creation of a master database ("MDB," as defined below) sufficiently populated with verified and credible information about AH and their bank accounts. The MDB and this Report provide a foundation of information which is a necessary, but initial, step in the assessment of Title III entities' cash positions.

16. This Report does not purport to determine the working capital needs of the Commonwealth or its instrumentalities or to provide a liquidity analysis.

17. This report identifies how the Account Holders label their funds as restricted and unrestricted. This Report does not purport to determine whether any of such funds are restricted or contended to be restricted by litigants, such as in pending litigation regarding so-called "clawback" funds, and other current or prospective litigation.

18. Accounts subject to such litigation claims may not currently be reported by AH's records as restricted at all or restricted for the reasons asserted in the litigation. The *bona fides* of such asserted restrictions may have to be determined in litigation.  As a result, these limiting conditions and circumstances should be considered when reviewing this report.

19. Section IV, titled "Next Steps," addresses: (i) additional tasks and activities to more fully develop information referred to in the Report; and (ii) the preparation of a working capital and/or liquidity analysis.

## II. Background

### A.     History of the Project

20. In May 2017, the Commonwealth of Puerto Rico commenced a case under Title III of PROMESA in the United States District Court for the District of Puerto Rico.  For various reasons well documented by numerous other parties, with minor exceptions, the Commonwealth and its instrumentalities have not published audited financial statements for periods after the fiscal year ended June 30, 2015.

6

21. In the summer of 2017, AAFAF, the Commonwealth's fiscal agent, began publishing monthly liquidity and cash reports reflecting bank account balances of certain Commonwealth entities. At that time, these reports published by AAFAF were the sole source of information regarding the Commonwealth's liquidity.

22. On December 19, 2017, the FOMB issued a Request for Proposal ("RFP") titled "Independent Forensic Analysis Team" ("IFAT").[8] The RFP sought to retain the services of an independent forensic advisor to assist the FOMB "to obtain an accurate picture of the liquidity of Puerto Rico and all of its instrumentalities and its entities." The FOMB selected D&P as the IFAT. The FOMB and D&P agreed on the terms of D&P's retention as memorialized in the Engagement Letter signed on January 31, 2018 (the "EL").[9]

23. At the FOMB's request, D&P thereafter issued a work plan on February 23, 2018 (the "Work Plan").[10] The Work Plan set out specific objectives and procedures related to validating aspects of AAFAF's published cash balance reports as of November 30, 2017. Thereafter, at the request of the FOMB, on March 31, 2018, D&P issued Amendment No. 1, which established a cost structure for D&P's work associated with the Work Plan.[11]

24. D&P continued to operate under the Work Plan and Amendment No. 1 through the summer of 2018. During this time, it became apparent that the bank account balances reported by AAFAF could not be independently verified. After confirmatory meetings with AAFAF and following internal discussions within the FOMB, the Board determined that the approach of D&P's validating AAFAF reported bank account balances was no longer feasible.

25. As a result of the inability to validate AAFAF's bank account balance reports, and as directed by the Board, D&P provided the FOMB with Amendment No. 2.[12] Under Amendment No. 2, the FOMB staff, working with and led by D&P, would obtain bank account balances and other information directly from AH and their respective financial institutions ("FI").

---

[8]  *See* **Appendix B-1**.

[9]  *See* **Appendix B-2**.

[10]  *See* **Appendix B-3**.

[11]  *See* **Appendix B-4**.

[12]  *See* **Appendix B-5**.

26. Amendment No. 2 set out a revised work plan and budget for both the FOMB staff and D&P (previously referred to as "Project" in paragraph 4). Under Amendment No. 2, the FOMB staff would serve as Project Manager for its staff, perform preliminary AH reviews, serve as the primary interface with third parties and provide the data entry services for information sought and received in connection with the maintaining the database(s) created to support the Project and its activities.

27. D&P's responsibilities included: (i) design and oversight of the Project; (ii) provision of the operating software and a database ("Team Connect"); (iii) performance of qualitative analysis of information provided by AH and FI; (iv) retaining the ultimate responsibility for developing opinions based on the quantity and quality of factual data obtained under the Project, (v) providing of periodic status reporting to the FOMB and the preparation of a report setting forth D&P's findings.

28. To complete the Project, Amendment No. 2 budgeted that the Project would require 4,142 hours which were allocated to the FOMB and, separately, 4,117 hours to allocated D&P.

29. Effective November 5, 2018, at the FOMB's request, D&P provided the Board with Amendment No. 3.[13]  Amendment No. 3 contains a number of Project modifications from Amendment No. 2 including; (i) the creation of a subset of Commonwealth entities referred to as the Title III or Priority Entities; (ii) shifting a number of responsibilities from the FOMB staff to D&P, including the role of Project Manager; (iii) assumption by D&P of the AH review function; (iv) modification of D&P's fee estimate to take into account incremental responsibilities; and (v) identifying February 4, 2019 as the date for the issuance of the Priority Entities bank account balances report.[14]

### B.  Procedures

30. Amendment No. 2 is the focal point for the design of the Project and procedures which when performed, provide support and the basis for D&P's opinion regarding the identities of and

---

[13]  *See* **Appendix B-6**.

[14]  The issuance date was later changed to March 13, 2019.

*IFAT Report on Title III Bank Accounts*
On Behalf of the FOMB
As of June 30, 2018

values for Title III AH bank account balances as of the Measurement Date. The Project design also contemplated reporting the results of procedures performed for AH Classifications.

31. The Project design was intended to create a transparent and replicable process, which when performed, would provide a sufficient quantity of verifiable information about Commonwealth bank account balances as of the Measurement Date. The Project was organized as a process to be undertaken jointly between D&P and the FOMB staff, predicated on substantial voluntary cooperation from AH and their respective FI.

32. Project design includes three components:

    (i)   an information gathering process;
    (ii)  an inquiry and data collection process; and
    (iii) an analytical and reporting process.

33. The processes are fully described in the Scope of Services contained in Attachment II to Amendment No. 2 to the EL ("Attachment II"), which is included herein in as Appendix B.

34. Attachment II provides a description for each Step to be performed, as well as the estimated hours budgeted for each the D&P team and the FOMB staff to complete each Step. Overall, Attachment II contemplates that 8,259 hours would be expended to complete the Project. D&P estimates that it will have expended approximately 4,700 hours on the Project through the date of this Report.

### I.   Information Gathering Process

35. The information gathering process design was a sequenced process. The initial step was the creation of a master database ("MDB") of Commonwealth entities ("CE") and their bank accounts as of the Measurement Date. The CE include instrumentalities, agencies, funds, and public corporations and their subsidiaries and affiliates.

36. The primary sources of information about CE and their bank accounts originated from data provided by Hacienda, AAFAF, and publicly available government information.[15] D&P considered data from a broader range of information sources to create the MDB for the CE and

---

[15] Hacienda and its operations are explained in Section III and in the Glossary in **Appendix A**.

*IFAT Report on Title III Bank Accounts*
On Behalf of the FOMB
As of June 30, 2018

their bank accounts. The list of data sources considered by D&P to create the MDB can be found in **Appendix C-2**. Proskauer and O&B identified which government entities are under a Title III proceeding.[16] D&P regards the CE not identified by Counsel or not covered by the Report, as described in paragraph 10 of Section I, such as the Puerto Rico Aqueduct and Sewer Authority ("PRASA") and municipalities as outside the scope of this Report.

37. Each CE identified as having one or more bank accounts (each with a distinct EIN) are referred to as an AH. Some CE operate with multiple AH, each requiring identification and separate contacts in the MDB.

38. The second step in the information gathering process, after the creation of the MDB, was to contact each AH that was reported to maintain one or more bank accounts. Contact was made with each such AH seeking the information proscribed in Attachment II, using a standardized format, a copy of which can be found in **Appendix C-3**.

39. All AH identified in **Appendix C-1** were contacted to obtain their relevant bank account information. In addition to the standardized information request sent to each AH, AH were asked to complete a standardized authorization form ("Consent Form") allowing the FOMB to obtain bank account information directly from the AH FI. A standardized authorization form can be found at **Appendix C-5**.

40. The third and final step in the information gathering process was to contact the FI identified as maintaining bank accounts for AH. This procedure was performed after AH confirmed the FI and its respective account representative, and signed Consent Forms directing the FI to share bank account information as of the Measurement Date with the FOMB. Each such FI contact was performed seeking to verify the information provided by AH. A sample of the standardized request form for the FIs can be found at **Appendix C-4**.[17]

41. Employing this sequenced methodology created a triangulation of information about AH and their bank accounts. This triple sourced approach is the informational foundation for the MDB.

---

[16] *See* **Appendix C-1**.

[17] One FI, Consultiva Internacional, did not respond by January 28, 2019.

This design was created to provide reasonable assurance, in a voluntary disclosure environment, that the MDB would be populated with accurate and credible information.

42. Additionally, out of an abundance of caution, 40 "blind" FI inquiry requests were sent to banks which were not domiciled in Puerto Rico, referred to as "Non-Puerto Rico Banks." These 40 Non-Puerto Rico Banks were not specifically identified as holding AH bank accounts and the requested responses were voluntary. The list of Non-Puerto Rico Banks contacted as part of the Project can be found at **Appendix C-7**. No responses were received as a result of such inquiries.

### 2.   Inquiry and Data Collection Process

43. As responses were received back from AH and FI, including data received from Hacienda and AAFAF, FOMB staff and D&P performed the inquiry and data collection procedures. AH and FI responses were tracked and reviewed for completeness. Follow up procedures were performed, including tailored open issue or clarification requests where inadequate or incomplete information had been provided. On a number of occasions, multiple follow up inquiries were necessary to obtain all the required information.

44. AH and FI were also prioritized by materiality and monitored to identify non-responsive counterparties. Follow up inquiries were performed by both telephone calls and by email. On a number of occasions, in person meetings were conducted with AH to discuss remaining open items and to resolve questions.

45. FI were requested to provide the FOMB staff and D&P electronic access to AH account information through their respective organization. FI were also contacted by telephone to expedite the inquiry process. In person meetings also took place in those instances where a FI maintained a significant number of bank accounts for AH.

46. As a principal component of the data collections process, Team Connect files were created for each AH including inquiry, response and follow up activities, as well as uploading the content of responses received from AH and FI. AH and FI responses, once reviewed, were entered in the MDB. Both the FOMB and D&P conducted quality review procedures comparing responses received to the information entered in the MDB to minimize the risk of data entry errors, duplication or the inadvertent entry of mis-information.

### 3.   Analytical Steps and Reporting

47. First, AH data files were reviewed to compare information received from Hacienda or AAFAF to the AH response(s). Second, AHs were requested to provide certain underlying accounting records. Taken together, these procedures permitted a comparison of what Hacienda or AAFAF reported were AH bank accounts, and their balances, to what was reported by the AH. A third step in the analytical process occurred when the AH's FI responses were compared to AH bank accounts, balances, and other related information as of the Measurement Date. The comparison of Hacienda/AAFAF information to AH information and then to FI information was a core objective of the Report. Comparing AH provided books and records regarding bank account balances at the Measurement Date to the information in the MDB was intended as an additional form of corroboration that the MDB contained all AH bank accounts.

48. Under the plan for the Project, legal due diligence was required with respect to certain aspects of restrictions claimed by AH. Legal due diligence performed under the Project would be the responsibility of O'Neill & Borges LLC ("O&B").[18] O&B is a Puerto Rico law firm and local counsel to the FOMB.

49. A set of analytical procedures were performed regarding AH self-reported Classifications. The following types categories of legal restrictions were identified: (1) custodial accounts; (2) trust accounts; (3) restricted by federal or Puerto Rico law; (4) restricted by contract; (5) restricted by court order; (6) restricted by litigation; or (7) restricted accounts with pooled funds. All types of restriction classifications are referred to herein as "Restricted." One additional type of designation arose as a result of AH responses: No Representation. A No Representation designation arose when an AH declined to identify a bank account as either unrestricted or restricted or for which no AH provided a representation.

50. Using the MDB, D&P identified AH whose claimed Restrictions over bank account balances were in excess of $35 million ("Restricted-Selected Accounts"). This threshold was selected to identify and test the majority of the balance of asserted restricted accounts (69.0% of Restricted and Pooled accounts, exclusive of COFINA, were reviewed as part of the LDD - *see* **Table 7**). O&B, working in conjunction with D&P, performed the legal due diligence by

---

[18]   As detailed in Section III and as defined in the Glossary in **Appendix A**.

reviewing the supporting documentation provided by the AH regarding Classifications asserted with respect to the Restricted-Selected Accounts.

51. For the Restricted-Selected Accounts, O&B reviewed the MDB documentation provided by the AH, to determine: (i) the existence of the claimed restriction(s) and that the documentation was relevant in time as of the Measurement Date; (ii) the applicability of the claimed restriction(s), and (iii) where O&B deemed necessary, to seek additional information from the AH to support or clarify the claimed restriction(s).

52. A list of the Restricted-Selected Accounts analyzed by O&B is located at **Appendix C-11**.

53. On a test basis, D&P made inquiry of AH regarding the sources and uses of funds in the bank accounts tested by O&B for the list of Restricted-Selected Accounts. The purpose of such inquiries was to provide additional documentation that Restricted Accounts were, in fact, being used for the Restricted purpose(s) claimed by the AH.

54. The AH and bank accounts selected for these additional procedures are located in **Table 8** below.

### III. Results[19]

55. PROMESA Title III AH comprise the following five categories: (i) the Commonwealth; (ii) PREPA and its subsidiaries; (iii) COFINA;[20] (iv) HTA; and (v) ERS. In the case of the Commonwealth, all the entities covered by the New Fiscal Plan for Puerto Rico as certified by the FOMB on October 23, 2018, including those that are legally separate from the Commonwealth, plus the UPR, were included as part of the analysis of Commonwealth accounts.

56. The two captions for summarized bank account information are "Identified" and "Reconciled." These captions reflect differing stages of review performed as of the Report date. "Identified"

---

[19] Results are based on information received as of January 28, 2019.

[20] Project activities regarding COFINA bank accounts, including legal due diligence, were suspended when COFINA and its creditors entered into a settlement in October 2018.

refers to information about AHs obtained from any one of the bank account sources.[21] "Reconciled" refers to AH bank account information which has been reconciled to information received from a FI. As explained in ¶63 and ¶ 74 through 79, tables reflecting both Identified and Reconciled bank account information exclude approximately $2.6 billion of account values, which consists in approximately $737 million in duplicative accounts, approximately $517 million in funds disbursed in accordance with the GDB settlement, and approximately $1.3 billion in claims by AH who reported that GDB was holding funds for them as of the Measurement Date.

57. **Table 1** and **Table 2** present summarized bank account information obtained under the Project, as of June 30, 2018, organized by each of the five Title III AH categories.

### Table 1: Summary of Title III Bank Accounts by Category[22]

|  | Identified Value | | Unrestricted | No Representation | Restricted Representation | |
|---|---|---|---|---|---|---|
|  |  |  |  |  | Claimed | Pooled Account |
| COFINA | $ | 1,218,552,355 | $ - | $ 474,224 | $ 1,218,078,131 | $ - |
| Commonwealth |  | 8,589,813,585 | 4,337,301,016 | 820,450,166 | 3,265,126,456 | 166,935,947 |
| HTA |  | 552,718,740 | 51,073,670 | 207,328,759 | 294,316,311 | - |
| PREPA |  | 471,696,915 | 220,682,753 | 1,409,453 | 249,604,709 | - |
| Retirement |  | 742,407,640 | 197,298,893 | 215,936,354 | 329,172,393 | - |
| **Total** | $ | **11,575,189,236** | $ **4,806,356,332** | $ **1,245,598,957** | $ **5,356,298,000** | $ **166,935,947** |

|  | # of Accounts | Unrestricted | No Representation | Restricted Representation | |
|---|---|---|---|---|---|
|  |  |  |  | Claimed | Pooled Account |
| COFINA | 38 | - | 13 | 25 | - |
| Commonwealth | 1,650 | 390 | 408 | 845 | 7 |
| HTA | 91 | 8 | 36 | 47 | - |
| PREPA | 82 | 23 | 6 | 53 | - |
| Retirement | 62 | 22 | 14 | 26 | - |
| **Total** | **1,923** | **443** | **477** | **996** | **7** |

---

[21] Bank account sources include information received from Hacienda in response to the FOMB Letter Request re: Information Requested to Review Bank Account Balances of the Government of Puerto Rico and its Instrumentalities; information which comprised the June 30, 2018 AAFAF report (dated July 24, 2018); AH responses to requests for information from the FOMB; and FI bank account information produced in response to requests from the FOMB.

[22] As described in Section II.B, the Project's information gathering process relied on the Classifications reported by the Account Holders. Only Restricted-Selected Accounts (and not Unrestricted Accounts) were subject to certain forms of legal due diligence and financial analysis.

*IFAT Report on Title III Bank Accounts*
On Behalf of the FOMB
As of June 30, 2018

**Table 2: Summary of Title III Bank Accounts by Category – Reconciled Information**

| | Reconciled Value | Unrestricted | No Representation | Restricted Representation | |
| --- | --- | --- | --- | --- | --- |
| | | | | Claimed | Pooled Account |
| COFINA | $ 1,217,979,192 | $ - | $ - | $ 1,217,979,192 | $ - |
| Commonwealth | $ 7,369,115,376 | 4,186,435,409 | 724,797,893 | 2,297,525,102 | 160,356,972 |
| HTA | $ 546,701,247 | 51,073,670 | 207,328,759 | 288,298,818 | - |
| PREPA | $ 434,305,666 | 205,259,854 | 1,409,453 | 227,636,359 | - |
| Retirement | $ 660,142,763 | 177,567,800 | 208,423,965 | 274,150,998 | - |
| **Total** | **$ 10,228,244,244** | **$ 4,620,336,733** | **$ 1,141,960,070** | **$ 4,305,590,469** | **$ 160,356,972** |

| | # of Accounts | Unrestricted | No Representation | Restricted Representation | |
| --- | --- | --- | --- | --- | --- |
| | | | | Claimed | Pooled Account |
| COFINA | 30 | - | 6 | 24 | - |
| Commonwealth | 968 | 272 | 170 | 523 | 3 |
| HTA | 78 | 8 | 28 | 42 | - |
| PREPA | 42 | 12 | 6 | 24 | - |
| Retirement | 41 | 13 | 6 | 22 | - |
| **Total** | **1,159** | **305** | **216** | **635** | **3** |

58. For example, the category Commonwealth includes 152 priority AH identified in the MDB. **Table 1** reflects that these AH maintain 1,650 bank accounts with a value of $8,589,813,585 as of the Measurement Date.

59. Each of the 152 Commonwealth AH received inquiry requests and 149 of them provided responses. FI consent letters were sent to all Commonwealth AH's banks. 12 Title III AH FI replies were received, representing 86 percent of the Commonwealth identified bank account values as of the Measurement Date.

60. Overall, there were 164 Title III AH Identified.[23] These AH maintained a total of 1,923 bank accounts with an asserted combined value of $11,575,189,236 as of the Measurement Date.

---

As of or subsequent to the Report Date, there may be circumstances that result in Account Holders changing bank account Classifications.

[23] There were initially 172 Title III AH Identified; there are 164 after the removal of duplicates and merged entities.

61. As reflected in **Table 2**, Title III FI responses which were reconciled represent $10.2 billion of the total identified bank accounts. The reconciled FI responses represents 88 percent of the total identified bank account value.[24]

62. **Table 3** presents the identity(ies) of the instrumentalities comprising each of the five Title III AH categories. **Table 3** also provides the number of AH comprising each particular instrumentality.

Table 3: Components of Table 1 Categories[25]

| Category | Number of AH |
|---|---|
| COFINA | 1 |
| Commonwealth | 152 |
| HTA | 1 |
| PREPA | 5 |
| Retirement[26] | 5 |
| **Total** | **164** |

63. In some cases, duplicate bank account information was provided, either in error or where a bank account was managed by Hacienda, GDB, BDE, AAFAF or a Parent company and were reported by multiple information sources. Duplicate or erroneous bank account information was reviewed and vetted by D&P. A summary of bank account values eliminated from the summary totals as duplicative by D&P totals $738 million; as shown in **Table 4** below. A list of the bank accounts that comprise these values is contained in **Appendix C-10**.

---

[24] *See* Section IV titled Next Steps regarding additional analysis that could be performed to obtain additional responses from FI.

[25] *See* **Appendix C-9** for complete list.

[26] TRS and JRS are included under the Retirement category.

16

**Table 4: Summary of Bank Accounts Eliminated as Duplicates by Category**

| Category | Number of Accounts | $ Value Eliminated |
|---|---|---|
| Commonwealth | 31 | $ 235,953,488 |
| Retirement | 24 | $ 501,554,305 |
| **Total** | **55** | **$ 737,507,793** |

64. For the 164 Title III AH Identified, 74 AH provided copies of books and records regarding their respective bank accounts. D&P compared the books and records to AH responses as well as to bank account information received from the AH's respective FI. Differences between these sources of information, which individually exceeded $5 million, and are presented in **Table 5**.[27]

---

[27] *See* Section IV titled Next Steps regarding access by additional AHs to their books and records.

*IFAT Report on Title III Bank Accounts*
On Behalf of the FOMB
As of June 30, 2018

**Table 5: Comparison of FI and AH Responses in Excess of Absolute $5 million[28]**

| Account Holder | Financial Institution | Difference between FI and AH |
|---|---|---|
| Autoridad de Carreteras y Transportacion | BNY Mellon | 200,000,000.00 |
| Administracion Sistema de Retiro de Empleados Gobierno y la Judicatura | BNY Mellon | 105,012,824.05 |
| Administracion Sistema de Retiro de Empleados Gobierno y la Judicatura | BNY Mellon | 103,411,140.60 |
| Departamento de Hacienda | Banco Popular | 94,480,678.91 |
| Autoridad para el Financiamiento de la Vivienda | Banco Popular | 60,873,515.69 |
| Centro de Recaudacion de Ingresos Municipales | Banco Popular | 55,831,994.75 |
| Universidad de Puerto Rico | BNY Mellon | 51,000,188.97 |
| Autoridad para el Financiamiento de la Vivienda | Banco Popular | 46,079,651.69 |
| Autoridad para el Financiamiento de la Vivienda | Banco Popular | 28,589,212.14 |
| Administracion de Compensaciones por Accidentes de Automoviles | Northern Trust | 28,155,841.76 |
| Autoridad de Edificios Publicos | Banco Popular | 21,277,257.09 |
| Autoridad para el Financiamiento de la Vivienda | Banco Popular | 17,539,964.34 |
| Autoridad de Energia Electrica | Citibank | 17,421,098.03 |
| Autoridad para el Financiamiento de la Vivienda | Banco Popular | 16,513,116.89 |
| Autoridad para el Financiamiento de la Vivienda | Banco Popular | 13,485,538.45 |
| Autoridad para el Financiamiento de la Vivienda | Banco Popular | 12,983,927.50 |
| Autoridad para el Financiamiento de la Vivienda | Banco Popular | 10,069,885.85 |
| Banco de Desarrollo Economico para Puerto Rico | Banco Popular | 9,908,899.53 |
| Administracion de Compensaciones por Accidentes de Automoviles | Northern Trust | 9,644,677.11 |
| Administracion de Compensaciones por Accidentes de Automoviles | Northern Trust | 9,397,926.60 |
| Administracion de Compensaciones por Accidentes de Automoviles | Northern Trust | 9,217,464.29 |
| Administracion de Compensaciones por Accidentes de Automoviles | Northern Trust | 9,153,647.05 |
| Autoridad de Edificios Publicos | Banco Popular | 8,565,179.91 |
| Administracion de Compensaciones por Accidentes de Automoviles | Northern Trust | 8,323,818.14 |
| Administracion de Terrenos | Banco Popular | 7,850,776.95 |
| Administracion para el Desarrollo de Empresas Agropecuarias | First Bank | 7,258,906.20 |
| Autoridad de Edificios Publicos | Oriental Bank | 7,149,223.20 |
| Autoridad para el Financiamiento de la Vivienda | Banco Popular | 6,514,364.58 |
| Universidad de Puerto Rico | BNY Mellon | 6,107,355.58 |
| Administracion de Compensaciones por Accidentes de Automoviles | Northern Trust | 5,462,347.95 |
| Administracion para el Desarrollo de Empresas Agropecuarias | Banco Popular | 5,423,532.37 |
| Autoridad para el Financiamiento de la Vivienda | Banco Popular | 5,414,222.72 |
| Autoridad para el Financiamiento de la Vivienda | Banco Popular | 5,353,399.43 |
| Banco de Desarrollo Economico para Puerto Rico | Citibank | (5,447,216.00) |
| Autoridad para el Financiamiento de la Vivienda | Banco Popular | (12,538,303.91) |
| Autoridad de Energia Electrica | Citibank | (16,364,213.35) |
| Universidad de Puerto Rico | Voya | (16,715,217.46) |
| Compania de Fomento Industrial | Citibank | (19,574,460.02) |

65. FI responses were received and reviewed by D&P. The FI responses include Measurement
Date information for 1,159 AH bank accounts. These AH bank accounts represent 88 percent

---

[28] Reflects absolute differences greater than $5 million. Positive differences indicate that the amount disclosed by the FI was greater than the amount disclosed by the AH. Negative differences indicate that the amount disclosed by the FI was less than the amount disclosed by the AH.

of the total value identified as of the Measurement Date. **Table 6** presents a summary of the results of the procedures performed and the results obtained through FI.[29]

### Table 6: Summary of FI Responses[30]

| | Identified | | Reconciled | |
|---|---|---|---|---|
| | Value | Accounts | Value | Accounts |
| American Stock Transfer & Trust Company | $ 892,060 | 2 | $ - | - |
| Banco Bankia | 16,213 | 1 | - | - |
| Banco Popular | 6,785,870,872 | 1172 | 6,328,184,610 | 753 |
| Banco Santander | 640,763,330 | 241 | 307,972,236 | 42 |
| BCOOP | 2,084,215 | 8 | - | - |
| BDE | 96,880,818 | 14 | 96,880,818 | 14 |
| BNY Mellon | 1,826,018,574 | 140 | 1,790,551,553 | 94 |
| Citibank | 511,250,874 | 47 | 394,091,312 | 36 |
| COFINA | 268,824,885 | 1 | - | - |
| Consultiva Internacional | 2,531,285 | 1 | - | - |
| First Bank | 258,457,112 | 123 | 238,167,607 | 114 |
| Hacienda | 6,709,718 | 12 | - | - |
| Invesco | 74,198 | 2 | 37,099 | 1 |
| Northern Trust | 253,969,220 | 31 | 212,411,846 | 15 |
| Oriental Bank | 66,845,289 | 32 | 66,845,289 | 32 |
| PR Government Investment Trust Fund | 474,224 | 3 | - | - |
| PRIFAS | 306,679 | 1 | - | - |
| Scotiabank | 37,501,189 | 17 | 37,494,283 | 13 |
| UBS | 3,277,796 | 1 | - | - |
| UMB | 78,140 | 4 | 78,140 | 4 |
| US Bank | 162,049,240 | 67 | 105,216,146 | 38 |
| US Treasury | 581,471,311 | 1 | 581,471,311 | 1 |
| Voya | 68,841,995 | 2 | 68,841,995 | 2 |
| | $ 11,575,189,236 | 1,923 | $ 10,228,244,244 | 1,159 |

66. Hacienda provided responses for bank accounts it maintains on its own behalf and bank accounts managed on behalf of others. Hacienda has many responsibilities, including acting as the Treasury Department for the Commonwealth and as one of the Commonwealth's fiscal agencies. In this role, Hacienda collects and deposits receipts, and makes disbursements through a series of controlled accounts.

---

[29] *See* Section IV titled Next Steps regarding additional analysis that could be performed to obtain additional responses from FI.

[30] D&P obtained information from the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCIF"), which is the regulator of financial institutions operating in Puerto Rico. D&P confirmed that the Puerto Rican financial institutions were identified as FI licensed and supervised by OCIF, except for Hacienda and PRIFAS, which were identified by certain AH as their financial institution.

67. These controlled accounts include bank accounts designed by Hacienda as a general checking or operating account, a money market account and a reserve account. Collectively these three principal accounts are referred to as the Treasury Single Account or "TSA," which is the Commonwealth's main operational account and from which most expenses are disbursed. The principal sources of deposits into the TSA accounts are: General Fund Revenues, revenue sweep accounts, also known as Colectores; agency sweep accounts, also known as Recaudadores; Federal fund deposits; and Sales and Use Tax sweep accounts.

68. Funds deposited into the TSA are referred to as "pooled" funds by Hacienda. Disbursements funded out of the TSA account include payrolls and goods and services, and are made on behalf of various Commonwealth instrumentalities.

69. The aggregate value of the TSA accounts as of the Measurement Date was $2.7 billion. Hacienda AH responses indicate that the TSA bank accounts were Unrestricted. However, according to the Commonwealth Financial Information and Operating Data Report dated December 18, 2018, there are multiple flows of receipts deposited into the TSA, including federal funds, intergovernmental collections, charges for services, and amounts held in custody by the Secretary of the Treasury for the benefit of the Commonwealth's fiduciary funds.

70. At D&P's request, O&B performed legal due diligence ("LDD") for bank accounts with values greater than $35 million as of the Measurement Date. Restricted-Selected Accounts include Commonwealth bank accounts identified as either Restricted or Pooled, and HTA, PREPA, and Retirement Systems bank accounts identified as Restricted. COFINA's Restricted Accounts were not reviewed by O&B given the Settlement Agreement dated October 19, 2018, between the Oversight Board, on behalf of the Commonwealth, and the COFINA Agent, on behalf of COFINA.

71. The results of O&B's LDD are summarized in **Table 7**.

Table 7: Summary of O&B Legal Due Diligence by Category (ex. COFINA)

| Category | Number of O&B Accounts Reviewed | Value of O&B Accounts Reviewed | |
|---|---|---|---|
| Commonwealth | 27 | $ | 2,306,834,332 |
| HTA | 1 | $ | 175,168,714 |
| PREPA | 2 | $ | 199,294,118 |
| Retirement | 4 | $ | 288,627,950 |
| *TOTAL - O&B LDD* | 34 | $ | 2,969,925,115 |

| | | | |
|---|---|---|---|
| **Restricted & Pooled exclusive COFINA** | 978 | $ | 4,305,155,816 |
| *Percentage of Restricted & Pooled exclusive of COFINA* | *3.5%* | *69.0%* | |

72. **Table 7** includes 27 Commonwealth accounts. Of those 27 accounts, 7 accounts, totaling $497.8 million did not include supporting documents, and O&B reviewed the 20 accounts that included supporting documents. Of the 20 Commonwealth accounts that were reviewed: (i) the represented restrictions of 12 accounts, totaling $1.1 billion, were confirmed, and (ii) the review of 8 accounts, totaling $686.3 million, was inconclusive because additional supporting documents are needed to confirm the represented restriction. Note that the HTA account did not include supporting documentation and the restrictions of the PREPA and Retirement accounts were confirmed. **Appendix C-11** includes legal due diligence comments regarding Restricted-Selected Accounts, the validity of the AH Classification, and information that needs to be confirmed with the relevant government entity.

73. **Table 8** is a summary of Restricted-Selected Accounts identified by D&P for cash tracing.[31] No cash tracing work was completed by the Report Date.

---

[31] See paragraphs 53-54 for an explanation of cash tracing.

**Table 8: Summary of Restricted-Selected Accounts Identified for Cash Tracing**

| Account Holder | Financial Institution | Priority Type | Bank Balance |
|---|---|---|---|
| Departamento Trabajo y Recursos Humanos | US Treasury | Commonwealth | 578,744,062.00 |
| Compañia de Fomento Industrial de Puerto Rico | Citibank N. A.* | Commonwealth | 32,831,905.00 |
| Autoridad de Energia Electrica | Citibank | PREPA | 149,069,674.00 |
| Autoridad de Energia Electrica | Citibank | PREPA | 50,224,444.00 |
| Administracion de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura | Banco Popular | Retirement | 107,122,331.22 |
| Administracion de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura | Banco Popular | Retirement | 93,798,440.05 |
| Administracion de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura | Banco Popular | Retirement | 35,612,053.11 |

74. The Government Development Bank for Puerto Rico ("GDB"), operating since 1948, served three primary functions. Those functions included: serving as: (i) the Commonwealth's fiscal agent, financial advisor and reporting agent; (ii) a lender for CE; and (iii) depository agent for the Commonwealth and its instrumentalities.[32]

75. In 2016, the GDB began to wind down its activities.[33] GDB's wind down included transferring certain of its fiscal agent and advisory responsibilities to AAFAF.[34]

76. As part of the Project, GDB bank account information was solicited. The IFAT and O&B also met with representatives of the GDB. **Table 9** presents those GDB bank accounts which have been verified as of the Measurement Date. Pursuant to a Qualifying Modification under Title VI of PROMESA certified by the FOMB and the U.S. District Court for the District of Puerto Rico and Act 109-2017, effective as of November 29, 2018: (i) the funds identified in **Table 9** were disbursed to various claimants; (ii) the outstanding balance of any deposit, except for federal funds, was offset against the outstanding balance of any loan made to, or bond or note of, such entity held by GDB; and (iii) established the GDB Public Entity Trust for the benefit of non-municipal government entities that held deposit claims that were not extinguished in the setoff process.

---

[32]  P.R. Laws Ann. Tit. 7, § 552 (2018).

[33]  Commonwealth of P.R., *Financial Information and Operating Data Report,* 137 (Dec. 18, 2016); *See* Govt' Dev. Bank Website, http://www.gdb.pr.gov/index.html (last visited Jan. 11, 2019).

[34]  Commonwealth of P.R., *Financial Information and Operating Data Report,* 137 (Dec. 18, 2016); *See* Govt' Dev. Bank Website, http://www.gdb.pr.gov/index.html (last visited Jan. 11, 2019).

**Table 9**: Accounts Held by GDB at the Measurement Date

| AH | FI | Identified Value |
|----|----|----|
| GDB | Banco Popular | $ 199,701,170 |
| GDB | Citibank | $ 125,546,518 |
| GDB | Citibank | $   60,936,687 |
| GDB | Banco Popular | $   54,999,970 |
| GDB | BDE | $   39,353,226 |
| GDB | Banco Popular | $   18,245,543 |
| GDB | Citibank | $   12,792,607 |
| GDB | Banco Popular | $        129,307 |
| GDB | Banco Popular | $     5,102,398 |
| | | $ 516,807,427 |

77. **Table 9** reflects the funds identified by GDB, which were concentrated in one account and held for costs and mandatory distributions/payments due at closing, including GDB operating funds, pursuant to the Qualifying Modification, except for $18.245 million, which was held for employee benefit and retirement trust funds. Consequently, the $516.8 million identified in **Table 9** have been excluded from the values reflected in the **Table 1** and **Table 2**.

78. During the course of the Project, AH included information in their responses to the inquiry process reflecting bank account balances maintained at GDB as of the Measurement Date. A summary of AH bank accounts maintained at GDB as of the Measurement Date is presented at **Table 10**. The IFAT was unable to confirm the existence of the bank accounts presented in **Table 10** as of the Measurement Date through the inquiry and response procedures.

79. Information provided by GDB confirms that, as of the Measurement Date, GDB did not maintain bank accounts other than the bank accounts identified in **Table 9**. D&P has been unable to identify FI holding funds claimed by AH which were in existence as of the Measurement Date at GDB. Consequently, the IFAT cannot validate the claims of AH who reported that GDB was holding funds for them as of the Measurement Date. The sum of bank account balances (**Table 10**) which were reported as held at GDB cannot be validated, and therefore have been excluded from the values reflected in the **Table 1** and **Table 2**.

Table 10: AH Claimed Values at GDB as of the Measurement Date

| Category | Number of Accounts | Identified Value |
|---|---|---|
| Commonwealth | 230 | $ 1,195,232,060 |
| COFINA | 17 | $ 26,599,998 |
| HTA | 23 | $ 42,772,841 |
| PREPA | 6 | $ 4,136,951 |
| Retirement | 7 | $ 3,314,123 |
| **Total** | **283** | **$ 1,272,055,973** |

80. Certain entities and AH have been non-responsive[35] and as a consequence the FOMB has received no information regarding the number of accounts held or the value in those accounts as of the Measurement Date. The non-responsive entities and AH include:

   - Judiciary – The Judiciary acknowledged that it maintains approximately 7 thousand bank accounts, which aggregate approximately $137 million. This information does not comport with AAFAF's reports, which describe approximately 18 thousand escrow, child support and other accounts held for the benefit of third parties; [36] and

   - PREPA's retirement system provided limited responses which are deficient when compared to prior PREPA retirement system financial statements.

**IV. Next Steps**

81. This section describes additional steps or new assessments that could be taken based on the findings of this Report.

---

[35] Subsequent to January 28, 2019, the FOMB received information from the Senate of Puerto Rico regarding their bank accounts. D&P has reviewed, but not analyzed, this information. In any event, the bank account balances and amounts claimed as restricted by the Senate are immaterial and would not impact the results reflected in this Report.

[36] *AAFAF,* Summary of Bank Account Balances for the Government of Puerto Rico and its Instrumentalities, Information as of June 30, 2018, dated July 24, 2018.

### A.    Additional Steps re: Report

82. Additional tasks and activities to more fully develop information referred to in the Report may include any of the following:

- Decrease the review threshold for Restricted-Selected Accounts. For example, if the claims review threshold is reduced to $5 million, then the number of accounts subject to review would increase to approximately 122 accounts out of a total of approximately 978 claimed restricted accounts. The dollar value of claims reviewed would increase to $4.002 billion out of a total of $4.305 billion in claimed restricted accounts. That would result in the review of the bank accounts holding more than 90% of the deposits.

- Continue to gather documents and perform financial analysis for unrestricted or newly identified bank accounts. Perform more LDD with respect to Restricted-Selected Accounts in the case of AHs who did not previously respond or whose documentation was found to be inadequate.

- Continue developing analytical procedures for review of Restricted-Selected Accounts.

- Obtain answers from AH who responded with "No Representation" of restrictions and seek AAFAF's cooperation if necessary in order to obtain the assistance of such AH.

- Determine if federal funds are a part of AH bank balances and seek additional information from AH regarding classification of the relevant account.

- Obtain from AHs or AAFAF, and independently verify, bank accounts subject to "clawback" and other litigation.

- Determine why in some cases there were discrepancies between the amounts reported by the AHs and the amounts reported by the FIs for the same bank accounts as well as reconcile discrepancies between amounts reported by AHs and FIs and Hacienda or AAFAF's reported account balances.

- Obtain greater AH compliance in the provision of bank account general ledger's and/or books and records (to include among other things trial balances, balance sheets and draft financial statements).

**B.     New Assessments**

83. As mentioned in the Executive Summary, there are assessments beyond the scope of this Report that are essential in a debt restructuring.  In order to reach a holistic picture of the financial situation of the Commonwealth entities, the FOMB may consider the following steps, among others: (i) preparing a working capital and/or liquidity analysis, and (ii) identifying and quantifying any large or unusual financial factors (such as federal grants) that could impact working capital or liquidity.

Respectfully submitted,

_____

Duff & Phelps, LLC