# Exhibit 1

2017 Puerto Rico Laws Act 4 (H.B. 453)

PUERTO RICO 2017 SESSION LAWS

17TH LEGISLATURE

Additions and deletions are not identified in this document.
Vetoes are indicated by ~~Text~~ ;
stricken material by ~~**Text**~~ .

Act No. 4

H.B. No. 453

Approved January 26, 2017

Labor Transformation and Flexibility Act

17 LPR 4 (January 26, 2017)

LPRA SECTIONS AFFECTED BY THIS ACT

29 LPRA 271 et seq.; 29 LPRA 295 et seq.; 29 LPRA 301 et seq.;13 LPRA 30011 et seq.;29 LPRA 478, 478a & 478g; 29 LPRA 701 et seq.; 29 LPRA 185a et seq.;

To enact the "Labor Transformation and Flexibility Act," in order to establish the rules applicable to the employment contract; amend Sections 4, 5, 6, 7, and 8; repeal Sections 9 through 12; amend the first paragraph of Section 13 and renumber it as Section 9; amend the second paragraph of Section 14 and renumber it as Section 10; amend Section 15 and renumber it as Section 11; renumber Section 16 as Section 12; amend Section 17 and renumber it as Section 13; amend Section 18 and renumber it as Section 14; amend Section 19 and renumber it as Section 15; and amend Section 20 and renumber it as Section 16 of Act No. 379 of May 15, 1948 (29 LPRA 271 et seq.), as amended; amend Sections 4 and 5 of Act No. 289 of April 9, 1946 (29 LPRA 295 et seq.), as amended, and repeal any provision in a mandatory decree which refers to the payment of working hours or overtime; repeal Act No. 1 of December 1, 1989 (29 LPRA 301 et seq.), as amended; amend Subsection (b) of Section 5; amend subsection (a) of Section 6; add a second paragraph to subsection (d) of Section 6; add a subsection (c) to Section 8; amend Section 12; and repeal Section 17 of Act No. 180–1998 (29 LPRA 250 et seq.), as amended; amend Sections 1, 2, and 7 of Act No. 148 of June 30, 1969, as amended; add a paragraph eleven (11) to Section 1031.01(b); amend Sections 1032.06(d)(3) and 1062.01(a)(1)(G) of Act No. 1–2011 (13 LPRA 30011 et seq.), as amended, known as the "Internal Revenue Code for a New Puerto Rico"; amend Sections 2, 3, and 9 of Act No. 427–2000 (29 LPRA 478, 478a & 478g), as amended; amend the third paragraph of Section 3(b)(1); amend the third paragraph of Section 3(b)(2); add a paragraph (6) to Section 8(b) of Act No. 74 of June 21, 1956 (29 LPRA 701 et seq.), as amended; amend Sections 1, 2, 3, 5, 7, 8, 9, 10, 11, and 12; add a subsection 3–A, renumber Section 14 as Section 15; and add a new Section 14 to Act No. 80 of May 30, 1976 (29 LPRA 185a et seq.), as amended; amend Section 5–A of Act No. 45 of April 18, 1935 (11 LPRA 7), as amended; amend Section 3(q) of Act No. 139 of June 26, 1968 (11 LPRA 203), as amended; establish standards that shall apply uniformly to all laws related to discrimination and retaliation in the workplace; amend Section 3 of Act No. 100 of June 30, 1959 (29 LPRA 148), as amended, in order to create an environment that fosters job creation and retention; provide more certainty for employment contracts and labor relations; allow for more flexibility in the contracting, retention, schedules, and workplace; establish provisions on vacation leave, sick leave, and Christmas Bonus benefits; grant small employers more flexibility under certain laws; increase unemployment benefits; promote the voluntary offering of fringe benefits to workers; grant more rights to nursing mothers; conform our labor laws to analogous federal labor laws; and for other related purposes.

## STATEMENT OF MOTIVES

According to data provided by the U.S. Department of the Treasury, Puerto Rico is suffering a 14.6% economic contraction in the Gross State Product (actual GSP) with a forecast of an additional 3% contraction in the next two years. For years, the Government of Puerto Rico has operated with a structural deficit that has been financed with bond issues and loans from the Government Development Bank. The Government has been lacking liquidity for over a year, and the tax refunds, the payments to contractors, pensioners' funds, and intra-governmental loans have been used as a substitute for sources of liquidity.

Access to the Government's financial information as well as the making of adequate predictions have been affected by a divided government structure and obsolete government systems. Revenues are constantly overestimated and continue to decrease despite the imposition of many new taxes. The Government Development Bank has failed to meet its obligations to bondholders since May 1, 2016, and is no longer fulfilling its duty to provide liquidity. Puerto Rico's obligations portfolio amounts to $66 billion and includes 18 different issuers whose financial situation is precarious. Debt service amounts to an average of $3.5 billion and uses more than one-fourth of the sources of income. Retirement systems are practically insolvent with a $50 billion debt. All of the foregoing is worsened by a decrease in population caused by the emigration wave that began in 2006 and that has become one of the challenges to overcome on our path to recovery.

Taking into account this dismal state of affairs, it is time to leave behind the philosophy of "me vale" [I couldn't care less], roll up our sleeves, and work hard for the wellbeing of Puerto Rico. It is our duty to build a new Puerto Rico and to set in motion an administration that does not improvise on the implementation of public policy nor manages the Island's finances on a year-to-year basis, but that rather strikes a balance between the Government's income and expenses with a long-term goal. Our commitment under the "Plan for Puerto Rico" is to address these situations responsibly and restore the Island's credibility. We must look into the future and anticipate the challenges ahead, rather than simply survive one crisis after another. The leaders and officials of the Government of Puerto Rico should concentrate on balancing income and expenditures, reducing the level of government intervention in Puerto Rico's economy, and creating a competitive business environment governed by good faith, so that investors as well as local and foreign business people may lead the way towards an economic recovery.

The policies of the past led the United States Congress to adopt the Puerto Rico Oversight, Management, and Economic Stability Act of 2016, known as "PROMESA," delegating to a Fiscal Oversight Board (the FOB) the power to work with the Government of Puerto Rico to help Puerto Rico overcome the crisis it is currently facing. Our commitment is to work hand in hand with the FOB to push Puerto Rico forward. Thus, on December 20, 2016, the FOB requested that the priorities of the Government of Puerto Rico include a plan and a commitment to implement significant changes directed to:

o Restoring economic growth and creating a more competitive economy. In the short term, the labor market and social programs should be liberalized, energy costs should be lowered, taxation should be rationalized and optimized, and the permit process should be improved to promote investment.

o Restructuring the Government to achieve balanced budgets, while preserving essential services for the People of Puerto Rico.

o Restructuring the pension systems in accordance with PROMESA and reestablishing access to capital markets.

Taking into consideration the precipice in which we find ourselves, it is imperative that we make decisions that allow the Island to get out of this predicament as soon as possible in order to move towards a future of stability and development. Puerto Rico requires a clear and consistent public policy geared toward becoming an attractive jurisdiction for establishing businesses and creating job opportunities; promoting private sector employment level growth; and providing new job opportunities for unemployed persons.

Some aspects of our current labor laws adversely affect our ability to reach these goals; prevent the creation of job opportunities; or make it difficult for employers and employees to agree on working conditions that benefit them both. According to a report of the Bureau of Labor Statistics of the U.S. Department of Labor on Puerto Rico's wages and employment, the employment rate for the third quarter of 2015 (September) decreased by – 0.7% when compared to that same quarter in 2014, whereas the United States employment rate increased by 1.9%. This difference is also reflected in Puerto Rico's average weekly wage, which is $512.00 as opposed to the average weekly wage in the United States, which is $974.00. This represents a difference of $462.00 [1]. In fact, the average weekly wage of all of Puerto Rico's municipalities is lower than the average weekly wage of the United States. [2]

In November 2016, Puerto Rico's labor force was composed of 1,120,132 persons of which 986,633 were employed and 133,499 were unemployed. However, in November 2006, approximately ten years ago, the labor force was composed of 1,420,839 persons, of which 1,275,337 were employed and 145,502 were unemployed. [3] This means that, in ten years, the labor force has decreased by 400,000 persons with almost 300,000 less jobs, and the number of unemployed persons has increased by more than 12,000. The greatest concern is that even with a smaller population and workforce, the number of unemployed persons is higher.

This statistical dichotomy between the employment situation in Puerto Rico and the United States also affects the labor force participation rate. In October 2016, Puerto Rico's labor force participation rate was 39.8%, while the United States' labor force participation rate was 62.8%. [4] This reality contrasts dramatically with the reality of the 1950s, when labor force participation rates of Puerto Rico and the United States were at 57.9% and 60%, respectively. See, "Compendio de la Cámara de Comercio de Puerto Rico, Foro Gobierno y Empresa Privada: Socios para el Desarrollo Económico; Mesa Redonda #10: Leyes Laborales y Competitividad, 24 de septiembre de 2014, p. 1. See also, Department of Labor and Human Resources, Special Report E–78, "Serie Histórica de Empleo, Desempleo y Grupo Trabajador" (January 1993).

The issue of market and labor force participation was acknowledged by the Federal Reserve Bank of New York when it stated:

Puerto Rico's labor market is characterized by high unemployment and low labor force participation, particularly among the Island's young and less educated. Thus, creating jobs and encouraging active participation in the labor market, especially for this highly affected group, is among the most significant challenges facing Puerto Rico and a top priority for policymakers.

Federal Reserve Bank of New York, Report on the Competitiveness of Puerto Rico's Economy (2012), p. 21.

Puerto Rico was not included in the World Economic Forum's Global Competitiveness Index due to the lack of diligence of the previous Administration, which failed to provide the necessary data to be considered. Nonetheless, the World Economic Forum's Global Competitiveness Report 2014–2015 showed that, out of a total of 16 problematic factors taken into consideration, restrictive labor regulations was the second most problematic factor for doing business, according to business owners in Puerto Rico. See, World Economic Forum–Global Competitiveness Report (2014–2015), pp. 314, 378. The following table shows the results of such report by comparing the five most problematic factors for doing business according to business owners in Puerto Rico and the United States.

WORLD ECONOMIC FORUM- GLOBAL COMPETITIVENESS
REPORT (2014—15) Rank PUERTO RICO Rank UNITED STATES

| | |
|---|---|
| 1. Inefficient government bureaucracy 2. Restrictive labor regulations 3. Tax Regulations 4. Tax Rates 5. Access to financing | 1. Tax regulations 2. Tax rates 3. Inefficient government bureaucracy 4. Access to finance 5. Restrictive labor regulations |

Labor regulations in Puerto have long been considered an obstacle to business development. In 1975, Dr. James Tobin (1981 Nobel Prize in Economics) prepared the Tobin Report which was presented to the then-Governor of Puerto Rico for the

purpose of addressing the fiscal situation the Government was undergoing. Said report stated that is was necessary to revise labor laws that had an impact on the private sector since these provided for increases in labor force costs, the Christmas Bonus, the number of paid holidays, vacation and sick leaves, and overtime rates. See, "Informe al Gobernador de Comité para el Estudio de las Finanzas de Puerto Rico—Informe Tobin (1975)" [Report to the Governor by the Committee for the Study of Puerto Rico's Finances—Tobin Report (1975)] pp. 6, 10, 16, 31, 34. The reason for such revision was that these increases caused the total labor force costs to exceed the increased productivity thereof. Therefore, it was necessary to improve Puerto Rico's labor force competitiveness in terms of costs, skills, and productivity. See, id., pp. 7, 31–33.

By 2010, a survey conducted among business owners showed that 74.6% of the participants reported that labor laws had a significant impact on decisions regarding the expansion of operations and the hiring of new personnel. See, "Compendio de la Cámara de Comercio," [Chamber of Commerce Compendium] op. cit., p. 2; See also, "Estudios Técnicos, Inc., Estudio de la Reforma del Mercado Laboral en Puerto Rico (2010)" [Study of the Labor Market Reform in Puerto Rico (2010)], pp. ix-x, 66–71.

During the previous Administration, former Governor Alejandro García–Padilla issued Executive Order 2015–022 whereby the Working Group for the Fiscal and Economic Recovery of Puerto Rico (hereinafter the Working Group) was created and entrusted with the task of devising a "Puerto Rico Fiscal and Economic Adjustment Plan" [Our translation] to be submitted to the Governor. Said plan had to include the structural changes needed to promote Puerto Rico's economic growth and competitiveness, with specific proposals for a labor and social welfare reform, among others. See, Executive Order 2015–022, pp. 3, 5. On September 9, 2015, the Working Group published the "Puerto Rico Fiscal and Economic Growth Plan" (FEGP). Section 1.1 of the Plan is aimed at stimulating job creation in the private sector. The Plan also recommended reforming various labor laws applicable to the private sector. See, Puerto Rico Fiscal and Economic Growth Plan (September 9, 2015), pp. 21–23. [5] Among the proposals included in this plan were: the establishment of a uniform workday and enabling employers to provide flexible weekly work schedules; exemptions from the payment of the Christmas Bonus to employees age twenty-five (25) or younger; extending the probationary period; 8–hour workday based on calendar days, not consecutive 24–hour periods; provide an option to calculate overtime based on hours worked in excess of 40 hours per week, rather than in excess of 8 hours per day; simplify December bonus payment waiver process, etc. Id., p. 21.

Many important local economists who have commented on the negative impact of some of our labor regulations and advised on the need to amend our labor laws have joined this claim for labor reform. For example, Dr. Elías Gutierrez stated that "Puerto Rico's body of labor laws is inflexible, anachronistic, and costly. It is necessary to provide flexibility in the use of labor in order to provide companies with the ability to react quickly to the demands of the competition. Therefore, it is critical to modernize our labor laws promptly." [Our translation] See, Report- Estado de Situación Industrial de Puerto Rico, marzo 1994 [The State of Puerto Rico's Industry, March 1994] (Submitted to the Puerto Rico Manufacturers Association). He also stated that "labor laws require profound changes to eliminate the rigidity from the labor market and to further job positions at a competitive unit labor cost." [Our translation] See, Ensayos En Torno a Nuestra Compleja Realidad (2009) [Essays on our Complex Reality (2009)], pp. 276–277.

Moreover, economist Gustavo V€lez has noted that Puerto Rico has an excessive number of labor laws which has led to inefficiency in the job market thus discouraging companies from hiring new employees. He believes it necessary to work on a labor market reform that renders the job market more flexible, and he affirms that, in order to improve our competitiveness, the legal framework that regulates the job market has to be improved as to achieve a more efficient and flexible employee recruitment process. See, "Reinvención Boricua: Propuestas de Reactivación Económica (2011)" [Boricua Reinvention: Proposals for Economic Reactivation 2011], pp. 93, 94, and 130. He states that "the excessive regulation of the job market is resulting in inefficiency that translates into high costs for employers and high unemployment rates for the people who want to work." [Our translation] See, "Factores que afectan la competitividad de Puerto Rico" [Factors that Affect Puerto Rico's Competitiveness]- May 19, 2013, in Columnas- economíapr.com. See also, "Compendio de la Cámara de Comercio" [Chamber of Commerce Compendium], op. cit., p. 7. He suggests looking at models that provide the job market with greater flexibility and reduce the costs of hiring employees in Puerto Rico. Id.

Furthermore, the information furnished in the World Economic Forum Global Competitiveness Report and in the World Bank Doing Business Report compares the ranking of Puerto Rico's economy vis à vis the United States and other countries in terms of productivity, efficiency, and competitiveness. The table below shows the differences of regulatory bodies regarding the flexibility, competitiveness, and business environment of the states of the United States as opposed to Puerto Rico. The lower the ranking the better the business environment in the jurisdiction.

Competitiveness and Business Environment Rank Comparison:

United States vs. Puerto Rico (Private Sector)

| World Economic Forum Global Competitiveness Report (2011–12) (2014–15) | | World Bank Doing Business ( 2010) | |
|---|---|---|---|
| General Ranking | USA- 5 3 PR- 35 32 | General Ranking | USA- 4 PR- 35 |
| Labor Market Efficiency | USA- 4 4 PR- 48 46 | Employing Workers Ranking | USA- 0 PR- 22 |
| Rigidity of employment | USA- 1—PR- 35— | Difficulty of hiring | USA- 1 PR- 22 |
| Hiring & Firing | USA- 8 11 PR- 104 94 | Rigidity of hours | USA- 0 PR- 0 |
| Pay & Productivity | USA- 8 10 PR- 50 22 | Difficulty of redundancy | USA- 0 PR- 20 |

As shown in the table, Puerto Rico's business environment is less competitive and less attractive than business environments in the United States. Due to the fact that federal labor laws apply identically to both the states and Puerto Rico, except for the recently approved PROMESA –which establishes temporary modified stan dards regarding the minimum requirements for the weekly wage of exempt employees- it can be concluded that the difference in ranking between the United States and Puerto Rico is mainly due to existing differences in our local labor laws.

Recently, a group of prominent economists and economic development specialists headed by Anne Krueger, the former director of the International Monetary Fund (IMF) who also holds a PhD in Economics, submitted a report to the Government of Puerto Rico (hereinafter, the "Krueger Report") in which they stress the need to achieve an accelerated economic growth in order to confront the fiscal crisis. See, Puerto Rico—A Way Forward (June 29, 2015), pp. 1, 6. To achieve said growth, the report recommends reforms that render certain aspects of our labor laws more flexible. Id. pp. 1, 17. It also states that both labor laws that have a direct impact on labor costs and those that adversely affect the management's ability to administer a business pose structural obstacles in trying to maintain a company's competitiveness in a country, and limit the possibility of attracting investments that lead to job creation. Id., pp. 1, 8. Based on the foregoing, the report recommends a local labor law reform that closely resembles to the prevailing labor laws of the states. Id., pp. 1, 6, 16, 18. Among the recommendations made are: changing the accrual rate of vacation leave for new employees and increasing the rate according to service years; rendering the system used to compute daily overtime hours more flexible; authorizing alternative workweek schedules where overtime hours are calculated based on hours worked in excess of 40 hours per week; amending Act No. 80 to limit the application thereof to non-exempt employees; making labor laws more uniform including the statute of limitations, etc. Id., pp. 1, 6, 16, 18. These recommendations have been endorsed by various sectors of Puerto Rico's economy, such as the Chamber of Commerce. See, "Chamber of Commerce Compendium," op. cit.

On December 20, 2016, the Financial Oversight and Management Board issued a joint letter to former Governor, Alejandro García–Padilla, and then Governor-elect and current Governor, Dr. Ricardo Rosselló–Nevares, where the FOB commented on the connection that exists between excessive labor regulation and Puerto Rico's economic stagnation. The FOB recognized that Puerto Rico's economy is in decline and that rendering it more competitive should be a priority. For such reason, the FOB made the following recommendations to the Government, among others: returning Puerto Rico's economic performance to a

level consistent with that of a regional economy of the U.S.; increasing the labor participation rate; transitioning more citizens from welfare programs to self-sufficiency and work; creating a vibrant entrepreneurial sector; increasing middle-class income and reducing poverty; and restoring population growth in Puerto Rico. To achieve this, the FOB deems it necessary to restore economic growth through structural reforms that include liberalizing the labor market in the short term, among other factors.

Specifically, the FOB recommends a labor reform that should focus on: increasing Puerto Rico's labor force participation rate which stands at 40%, compared with 63% in the United States; lowering Puerto Rico's unemployment rate which is currently at 13%, compared with 4.5% in the rest of the United States; encouraging businesses to create job opportunities by conducting a comprehensive review of the labor regulations, specifically Act No. 80 of May 30, 1976 (wrongful termination). It stresses that Puerto Rico's labor regulations related to severance pay, flexible scheduling, employee retention, and mandatory vacation days and pensions are not consistent with those of the U.S. states with whom Puerto Rico competes for investment and talent. Lastly, the FOB urges that Puerto Rico's fiscal and economic problems need to be addressed promptly, otherwise, the consequences could become irreversible. See, Letter sent by the Board dated December 20, 2016.

In accordance with the foregoing and aware of the great challenges Puerto Rico faces, the "Plan para Puerto Rico" [Plan for Puerto Rico] acknowledges that the Island's economic development requires the modernization of our labor laws. See, "Plan para Puerto Rico (2017–2020)" [Plan for Puerto Rico (2017–2020)], pp. 15, 47. Such changes should be aimed at creating an environment suitable for investment; reducing operating costs; and increasing the competitiveness of our companies. Id., pp. 15, 32, 33, 47. To achieve these goals, the Plan proposes the establishment of a flexicurity model for jobs. Id., p. 47.

On January 4, 2017, the Puerto Rico Private Sector Coalition, through its coordinator, Francisco Montalvo–Fiol, requested by means of a letter addressed to the Governor of Puerto Rico and a Press Release that legislation and regulations be introduced and approved in order to establish a labor policy for the private sector that promotes job retention and creation in Puerto Rico and, thus, together with other measures, stimulate our economy. The letter stresses that, for existing employers, the current legal regulatory framework does not incentivize the creation of new jobs or innovation. Many of the rules impose an excessive burden on small- and medium-sized business owners hindering their ability to grow, compete, and contribute to job creation. The letter points out that it is extremely difficult to operate a business and compete at the international level when the government intervenes excessively in the way that the private sector conducts its business. This situation poses significant economic risks. In view of this, he introduces a series of proposals aimed at laying the foundation for a labor reform that shall promote an environment that fosters job creation and retention.

The Coalition proposes, among other things, amending the Internal Revenue Code for a New Puerto Rico in order to allow for the offering of all the fringe benefits included in the so-called "cafeteria plans" to Puerto Rico employees, as well as exempting severance pay from taxation. The purpose of these amendments is to incentivize the offering of more voluntary benefits to workers. In addition, it requests to render work schedules and meal periods more flexible; to provide by law that employees and employers may reach an agreement to authorize alternate and flexible weekly work schedules; to facilitate the use of temporary contracts; to repeal the Business Closing Act; to bring to an end the State Insurance Fund Corporation's absolute control over the administration of the insurance program for work-related accidents, and to modify the current system to allow private insurers. The Coallition believes that the prevailing system in most of the states of the United States, where there are private insurers, shall be able to provide coverage more efficiently and at a lower cost.

In accordance with the foregoing, the mechanisms to achieve the goal of transforming our labor system in a collaborative, sensible, and responsible manner are provided in this Act. At this juncture in history, we are compelled to seek actual solutions for the crisis in order to transform our economy, recover fiscal stability, and create prosperity for our People. Without a doubt, this shall inure to the benefit of the People of Puerto Rico. A joint effort from all of Puerto Rico's economic sectors, including the labor sector, is required to start on this path. As evidenced in the letter sent by the FOB, it is necessary to make significant changes to our labor laws in order to render our jurisdiction more competitive.

This historical juncture provides us with a precious opportunity to modify our labor laws and adapt them to the demands of the global markets so that we are able to promote our economic development and become more competitive. This shall attract foreign investment, help local business owners to create jobs, and allow thousands of Puerto Ricans to enter the workforce.

Case:17-03283-LTS Doc#:22031-1 Filed:09/01/22 Entered:09/01/22 18:52:54 Desc: Exhibit 1 Page 8 of 35

Firstly, a labor reform requires adopting clear rules to create a stable and reliable investment environment, while maintaining the basic protections of our main resource: the human capital. For such purposes, this Act promotes certainty in labor relations by providing clearer standards for the interpretation of the rights and obligations arising from any employment contract. It also conforms our laws to similar federal laws so that we may have a suitable theoretical framework with a broad source of case law that shall serve us in interpreting the scope and content of our local laws. This, in turn, shall prevent complaints from being initiated in court and allow for the swift and accurate resolution of existing ones.

Provisions relating to more flexible schedules and workplaces are hereby adopted, which shall better adjust to the needs, demands, and realities of the modern working world. This Act empowers employees and employers to agree on regular workdays of up to 10 hours, as well as alternate weekly work schedules. This tool affords both parties the possibility and the freedom to adjust to the needs of each other, if they so wish. An employee who wishes to work 10 hours per day may complete his 40 weekly hours in four days. This shall provide the employee with greater flexibility to tend to his personal or family affairs on his days off. If the employee agrees to work on an alternate workweek schedule, said agreement may be revoked if both parties come to a mutual agreement, or unilaterally by any of the parties after one year has elapsed from the execution thereof. In doing so, the right of both parties to voluntarily enter into and terminate a contract regarding the alternate workweek schedule is recognized and safeguarded.

This Act grants employees the right to request flexible work conditions relating to both their schedule and their workplace, and requires employers to consider such requests and state the basis for their decisions. Moreover, employers must give priority to requests made by heads of family who have the legal or sole custody of their minor children. Furthermore, this Act allows employees who take time off for personal reasons to be able to make up for the work hours lost in the same week. This Act also recognizes the consequences of imposing on small- and medium-sized business owners all the burdens and requirements that apply to larger companies. For such reason, regulations that provide small business owners with more flexibility regarding certain labor laws are hereby adopted. This Legislative Assembly joins in the effort to support small- and medium-sized businesses, which constitute a very important sector of our economy, in accordance with the recommendations made recently by the Congressional Task Force on Economic Growth in Puerto Rico to the United States Congress.

In order to incentivize job creation, lower vacation leave accrual rates than the current rates are hereby provided for new employees. Said accrual rate shall increase progressively with the employee's years of service until it reaches the current rate, which is 15 days per year. However, accrual rates of current employees shall not be affected.

Another measure furthered by this Act to encourage the hiring of employees is a more flexible probationary period and the use of temporary contracts. The reasonable offering of these two employment conditions shall incentivize the hiring of young people with little experience and the hiring of persons to fill positions that require extensive training and evaluation periods.

Aware of the fact that many of the jobs available to Puerto Ricans are on a part-time basis, this Act seeks to incentivize employers to offer more working hours to part-time employees, by increasing their monthly working hours from 115 to 130, which, in turn, shall be the minimum required to accrue sick leave and vacation leave benefits. This change shall further incentivize employers who use part-time employees to assign them more work hours per month, without increasing labor costs. This shall help employees receive higher compensation.

It is hereby provided that the Christmas Bonus required by law shall be a fixed 2% of the total wages earned. However, current caps which are three hundred dollars ($300) and six hundred dollars ($600), depending on the number of workers the company employs, shall be maintained. The application of the 2% shall be prospective for employees who are hired after the effective date of this Act. Therefore, such percentage shall not change for current employees. Moreover, the number of hours that an employee is required to work to be eligible for the Christmas Bonus is increased from 700 to 1,350 hours in order to encourage employers to increase the working hours of part-time employees.

To promote the voluntary offering of fringe benefits to our workers, the "Internal Revenue Code for a New Puerto Rico" is hereby amended to allow Flexible Benefits Plans (Cafeteria Plans) to include all the qualified benefits

authorized under the "Internal Revenue Code of the United States of America." This amendment enables employers to offer employees more fringe benefits voluntarily, without affecting the employee's tax liability. Among some of these benefits are health and dental plans, savings accounts, dependent care assistance programs, long-term disability benefits, accident insurance, including accidental death and dismemberment, adoption assistance, etc.

The Flexicurity policy is hereby adopted to reduce the risks of labor claims that may arise as a result of layoffs. Moreover, the current regular unemployment benefits shall be increased gradually from a minimum of $7.00 and a maximum of $133.00 per week to a minimum of $60.00 and a maximum of $240.00 per week. Such increase shall be made feasible by increasing, from $7,000 to $10,500, the annual base salary used to calculate employer contributions to the unemployment fund.

A new formula is hereby provided to compute the severance pay under Act No. 80, supra, and a maximum severance pay equal to nine (9) months of salary is established. Any payment made to an employee on account of severance pay shall be exempt from income taxes up to an amount equal to the severance payment in Act No. 80 of May 30, 1976, as amended. In doing so, any employee who is dismissed from work and receives payment from his employer for such a reason shall have more money in his pocket. In order to facilitate the resolution of complaints filed under Act No. 80, supra, and to prevent them from reaching the courts, a swifter process is hereby established. Such process shall include a court hearing to be held not later than sixty (60) days after the complaint has been answered, to assess the possibility of a settlement or to schedule the proceedings. Thus, we recognize that complaints on discharges may be settled after said discharge, which shall save the parties much time, money, and effort, because they shall be able to reach settlement agreements freely, if they so wish. Likewise, this Act reasserts that the right to severance pay under Act No. 80, supra, cannot be relinquished prospectively.

However, federal regulations pertaining to the caps on punitive damages arising from discrimination or retaliation complaints are hereby adopted; that is, employees shall be paid twice the amount of back pay for unearned wages and benefits. However, indemnity for emotional distress or compensatory damages shall be subject to the caps currently provided in Title VII of the "Civil Rights Act of 1964."

This Legislative Assembly recognizes Puerto Rico's new socioeconomic reality and believes that businesses and consumers should decide when to carry out their different activities. For such purpose, this Act facilitates business operations by eliminating the business hours and schedule restrictions that limited the economic activity, without impairing the right of the employee to participate in, or attend any religious service of their preference. In this manner, we shall contribute to improving the economic situation of the Island which shall set us on a path to collective progress.

To honor the commitment made in the Plan for Puerto Rico, Act No. 427–2000, as amended, known as the "Act to Regulate the Period to Breastfeed or to Express Breast Milk," is hereby amended for the purpose of extending the right to have a period to breastfeed or to express breast milk to mothers working on a part-time basis; to clarify the remedies available to tipped nursing mothers; to provide an alternative for statutory damages compensation; and to conform the law to the case law pertaining to the guarantee of the privacy, security, and hygiene of nursing mothers at the place devoted to breastfeeding or expressing breast milk. Breastfeeding is the natural and normal way of feeding babies and infants, and breast milk is a food that has an adequate balance of nutrients that even helps protect the infant from some common illnesses and infections. We recognize the importance of breast milk as the primary and preferable feeding method for babies and infants.

Although the local law is more comprehensive in terms of the rights granted to nursing mothers at a federal level under the Fair Labor Standards Act (FLSA), similar legislation has been approved in various countries as well as states of the United States. In most of these places, the right in question is granted to both full-time and part-time employees. Some jurisdictions are more specific than others regarding the time allotted, as are the cases of Oregon and New York. Likewise, this right is recognized by most developed countries with European countries being the most proactive.

At present, in Puerto Rico, part-time working mothers do not enjoy all the benefits granted by Act No. 427, supra, even though they are protected under the FLSA. This situation should be noted since many of the jobs currently available are part-time, contrary to how it used to be. We shall bear in

mind that expressing milk is a biological process that is difficult for a mother to control. Spending many hours without expressing milk can cause the mother pain and affect breast milk production.

According to data provided in the Save the Children State of the World's Mothers 2012 report, the percentage of nursing mothers at any given moment sits above 90% in countries such as Germany, Denmark, Sweden, Canada, Finland, Austria, and Norway. Moreover, breastfeeding is the only feeding method used for infants during the first three months in over 50% of cases. Only 72% of infants are breastfed at any given moment in Puerto Rico, according to the Department of Health. This percentage is even lower than the United States' average (75%).

Cells, hormones, and antibodies found in breast milk reduce the risk of suffering from asthma, child obesity, ear and respiratory infections, SIDS (crib death), and type 2 diabetes, among other conditions. Benefits for mothers include a reduced risk of suffering ovarian cancer, certain types of breast cancer, and type 2 diabetes. Also, breastfeeding has a social impact, because it has been shown that the healthcare costs for infants who have been exclusively breastfed are lower than for those who have not. These costs include doctor's visits, prescriptions, and hospitalizations. In addition, mothers of breastfed children shall miss fewer days from work due to their babies or infants being sick. Lastly, this situation also entails an environmental impact, because less trash and plastic waste is produced from containers and bottles used when children are breastfed.

In regards to the hygiene, safety, and privacy conditions required for the designated nursing area, this Act adjusts Act No. 427 to the case law of the Honorable Supreme Court of Puerto Rico on this issue. Recently, in Siaca v. Bahía Beach Resort, 2016 T.S.P.R. 11, our Supreme Court held that even though Act No. 427–2000 did not specifically list the conditions and characteristics of the place the employer is required to set up for the process of expressing breast milk, when conducting a comparative analysis of similar laws subsequently enacted with more specific language, one can only arrive at the conclusion that when Section 3 of Act No. 427–2000, supra, referred to "the place provided" it meant a place that was, at the very least: private, safe, and hygienic. Likewise, the Women's Advocate Office, on many occasions, has reasserted this standard in administrative cases brought against different employers. With these amendments, it is made clear to all employers that the designated place is required to have these characteristics.

These amendments provide a minimum compensation for nursing mothers whose rights were violated. For example, at present, in the event of a violation of this right for a five (5) working-day period, a woman working on minimum wage, upon damage calculation under this Act shall receive approximately eight hundred dollars ($800). We believe that, because of the importance of this public policy and the sacrifices that employees have to make in order to bring their complaints to the pertinent forums, the compensation paid to employees cannot convey the message that these violations have little importance.

It is necessary to point out that, during the previous Administration, a measure with provisions on nursing similar to those herein was introduced in the Senate by all the women who were members of said Body at the time, after the Women's Advocate voiced concerns regarding the nursing issue and the lack of protection some employees still suffered. In fact, said measure was introduced before our Honorable Supreme Court issued its judgment in Siaca v. Bahía Beach Resort, supra. However, without offering any explanation, and despite the fact that the measure received a positive report from the Senate committee that evaluated it, the previous Legislative Assembly never voted on the measure to grant these rights which are essential and beneficial to both Puerto Rican women and their babies.

Notwithstanding, this Legislative Assembly, as opposed to the previous one, believes that extending the right to breastfeed or express breast milk to part-time working mothers is necessary, and can no longer be ignored if we are to continue encouraging breastfeeding in Puerto Rico, which would result in healthier citizens.

These amendments also rectify the situation for tipped employees who earn wages that are much lower than the established minimum wage due to a legal exception. Currently, tipped employees, as defined in the Fair Labor Standards Act, may have a lower hourly wage because it is supplemented with tips. Because fines are based on the amount of salary, yet the salaries of these employees consist mostly of tips, the amount awarded as redress is substantially affected when computed based on the salary of the employee to the detriment of the nursing mother.

Case:17-03283-LTS Doc#:22031-1 Filed:09/01/22 Entered:09/01/22 18:52:54 Desc:
Exhibit 1 Page 11 of 35

In light of the foregoing, it is clear that our main objective with this legislation is to transform Puerto Rico into a more competitive jurisdiction without impairing the essential rights of workers. This Act strikes a fair balance between the needs of the business sector and those of the employees, thus showing our deference to Puerto Rico's labor sector. This shall undoubtedly result in a healthy, stable, and productive working environment. The challenge we face requires implementing a labor reform to promote a regulatory environm ent that improves our competitiveness while maintaining policies that are consistent with the necessary protection of our workers. This Legislative Assembly rises to the challenge and reformulates some aspects of our laws for the purpose of striking a balance between the interests of the employees and the employers and guaranteeing the wellbeing of both.

BE IT ENACTED BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO

Chapter I. Title and Prospective Application of this Act.-

Section 1.1- This Act shall be known as the "Labor Transformation and Flexibility Act."

Section 1.2.—Employees hired before the effective date of this Act shall continue to enjoy the same rights and benefits they enjoyed before, as expressly provided in the Sections thereof.

Chapter II. Employment Contract.-

Section 2.1.—Employment Contract

The employment contract is a contract by which a juridical or natural person, that is called the "employer," hires a natural person who is called the "employee" to render services voluntarily for the benefit of the employer or a third person in exchange for compensation for the services rendered, when the services are rendered for account of another, and within the scope of an organization and under the direct management of the employer. The term "employer," when used in a contract or in a law, includes any person that represents the employer or exercises authority on its behalf, but only for the purpose of identifying the person whose decision, action, or omission shall be attributable to the employer, except as otherwise expressly provided.

Section 2.2.—Exclusions

Independent contractor relationships; franchise relationships; government employees or public officials; mandatory services rendered in a penal or correctional institution; work performed voluntarily and free of charge, due to a mere friendship or benevolence for public service, religious, or humanitarian institutions; and work performed by an immediate family member, unless it is shown, in this last case, that the intent of the parties and the manner in which such relationship is to be maintained is that of an employer-employee, shall be excluded from employment relationships and from the definition of "employee," except as otherwise expressly provided in a special law. Persons who cohabitate with the employer, spouses, parents, and children (including adopted children) shall be considered immediate family members.

Section 2.3.—Presumptions: Independent Contractor

There shall be an irrebutable presumption that a person is an independent contractor if:

(a) he possesses or has requested an employer identification number or employer social security number;

(b) he has filed income tax returns claiming sole proprietorship;

(c) the relationship has been established through a written contract;

(d) he has been contractually obligated to hold licenses or permits required by the government to operate his business, as well as any license or authorization required by law to render the services agreed on; and

(e) he meets three (3) or more of the following criteria:

(1) He has control and discretion as to the manner in which the agreed on work shall be performed, except for the principal's exercise of necessary control to ensure compliance with any legal or contractual obligation.

(2) He has control over the moment in which the agreed upon work shall be performed, unless there is an agreement with the principal on the completion times of the agreed on work, the parameters for the schedule to perform the works, and, in the case of training, the moment in which the training shall be provided.

(3) He is not required to work exclusively for the principal, unless there is a law that prohibits him from rendering services to more than one principal, or the exclusivity agreement is for a limited time;

(4) He is free to hire employees to assist him in the rendering of the agreed on services;

(5) He has made an investment in his business to render the agreed on services including, among others:

(i) purchasing or leasing tools, equipment, or materials;

(ii) obtaining a license or permit from the principal to gain access to the principal's workplace to perform the agreed on work; and

(iii) leasing a work space or equipment from the principal in order to perform the agreed-on work.

If the presumption established in the preceding paragraphs of this Section does not apply, the common law test shall be used to determine whether a person is an employee or an independent contractor, recognizing the importance of maintaining certainty as to the relationship established based on what the parties state in the contract, and the extent of direct control exerted over how the work shall be done, except as otherwise provided in a special law. For the purpose of maintaining certainty regarding the nature of the relationship, and to promote performance and the entrepreneurial spirit, the economic reality test shall not be used, except in relationships where a law of Puerto Rico or an act of the United States Congress applicable to Puerto Rico, which governs the same issue, expressly requires the use of the economic reality test, or another test.

Section 2.4.—Employment contracts can be executed through a verbal or written agreement, except as otherwise provided in a special law.

Section 2.5.—Contract Language

Employment contracts may be executed in any language as long as the language used can be understood by the employee. It shall be presumed that an employment contract or document signed by an employee was signed having knowledge of the language used and the content thereof.

Section 2.6.—Electronic Documents and Signatures

Electronic acknowledgements of receipt, acceptances, or signatures in any employment contract or document shall have the same legal effect as those made in writing. Likewise, if a law requires the use of a written employment document or written notices, the use of an electronic version shall have the same legal effect. In the case of notifications or notices required by law, the electronic notification or disclosure shall be made in a manner that is effectively communicated to the employees.

Section 2.7.—Capacity to Contract

Any person older than eighteen (18) years of age, or who is authorized to operate a business or work in the United States of America, may contract as an employer or employee.

Section 2.8.—Intent of the Parties to the Contract

The parties to an employment contract may make the agreements and establish the clauses and conditions which they deem advisable, provided that they are not contrary to the law, morality, or public order. An express provision of law, or a mandate relating to morality or public order generally accepted in the business sector and labor regulations, shall be necessary to invalidate an agreement on these grounds.

Section 2.9.—Settlements: Void Contracts

If a contract, in which an employee waives a right granted by law beforehand, is declared void, such declaration shall not prevent any complaint from being settled subsequently; provided that all elements of a valid settlement agreement are present as well as any other requirement established by law.

Section 2.10.—Consent

The employment contract shall be perfected by mere consent, and shall thereafter be binding, not only with regards to the fulfilment of what has been expressly stipulated, but also with regards to all the consequences which, according to its character, are in accordance with the laws, good faith, and general practices and customs of the business sector, except as otherwise provided in a special law.

Section 2.11.—Law for the Parties

Obligations arising from a contract shall be legally binding for the contracting parties, and must be fulfilled in accordance with the stipulations thereof.

Section 2.12.—Interpretation: Ambiguous Provisions

If any provision of an employment contract is ambiguous, the interpretation should be based on what the parties have agreed upon, the purpose of the relationship, productivity, the nature of the work relationship, good faith, and the general practices and customs of the business sector.

The foregoing shall also apply when interpreting the policies or rules established by the employer. However, if the employer reserves the right to interpret such policies or rules, such a reservation shall be recognized, unless the interpretation is arbitrary or capricious, or as otherwise provided in a special law.

Section 2.13.—Rules of Interpretation

Any law or regulation of Puerto Rico that regulates employer-employee relationships and that refers to an issue that is similar to an issue regulated by an act of the United States Congress, or regulations issued thereunder, shall be interpreted consistently with said federal regulations, unless the Puerto Rico law expressly requires a different interpretation.

Section 2.14.—Employee Rights

An employee shall have the following rights:

(a) To be free from discrimination with regard to the terms and conditions of employment, and from retaliation by reason of criteria prohibited by law.

(b) To have protection against risks to his health or person.

(c) To have his privacy protected, subject to the legitimate interests of the employer to protect his business, property, and workplace; or as provided by law.

(d) To have his dignity respected, which includes protection against abusive attacks on his honor and reputation.

(e) The prompt payment of the agreed upon or legally required compensation pursuant to the time periods established.

(f) The individual or collective exercise of the actions arising out of the employment contract.

(g) All rights that originate from the employment contract.

Section 2.15.—Duties of the Employee

The employee shall have the following basic duties:

(a) To fulfill the responsibilities and obligations of his position pursuant to the rules of the employer, good faith and diligence.

(b) To follow the safety and hygiene measures established by the employer.

(c) To refrain from engaging in improper, disorderly, criminal, or immoral conduct that could reasonably impair the best interests of the employer.

(d) To comply with the orders and instructions of the employer during the regular exercise of his managerial duties.

(e) To refrain from competing with the business activity of the employer, except as otherwise provided by law or an employment contract.

(f) To contribute to improving the productivity and competitiveness of the employers' business.

(g) Any duties arising out of the employment contract or the rules and regulations established by the employer that are not contrary to the law, morality, or public order.

Section 2.16.—Termination of an Employment Contract

The employment contract, except as otherwise provided in a special law, shall be terminated:

(a) by a mutual agreement of the parties;

(b) on the grounds set forth in the contract;

(c) the expiration of the agreed on period or the completion of the work or services object of the contract;

(d) the employee's resignation or abandonment of the job;

(e) employee's death or disability beyond the job holding period established in a special law;

(f) employee's retirement;

(g) a change of employer, unless there is an agreement between the parties or a law that provides to the contrary;

(h) the employee's discharge, or;

(i) noncompliance with the rules of conduct.

Section 2.17.—Applicable Law; Employees from Another Jurisdiction

In the event that an employee from another jurisdiction is assigned to work in Puerto Rico for the benefit of another employer, but maintains his employment relationship with the employer located in the other jurisdiction and the performance of his duties in Puerto Rico does not exceed three (3) consecutive years, the contractual and legal rights and obligations shall be interpreted pursuant to the terms of the employment contract. In these cases, the employee shall be subject to the provisions of the laws of Puerto Rico relating to income tax, discrimination in the workplace, and work-related accidents or injuries. If the parties fail to choose the applicable law in the contract, it shall be subject to Puerto Rico's regulations.

Section 2.18.—Statute of Limitations

Actions arising from an employment contract or the benefits thereunder shall prescribe within one year as of the time action may be taken, except as otherwise expressly provided in a special law or in the employment contract. However, causes for action arising prior to the effective date of this Act shall have the limitation period established under the previously applicable code of laws.

Section 2.19.—Right to Participate in a Religious Service

After a potential employee notifies the employer, in writing, of his need for religious accommodation, the employer shall have the obligation to reasonably accommodate the religious practices of the individual. The denial of any reasonable accommodation shall only be justified when an employer can prove that, of all the alternative reasonable accommodation methods, the one chosen by the employee would result in undue hardship. The mere presumption that many more persons with the same religious practices as the person being reasonably accommodated, could also need reasonable accommodation, is not proof of undue hardship.

No employer may penalize or otherwise refuse to allow an employee to participate in or attend to any religious service. Any violation of the provisions of this Section shall entail an administrative fine of not less than one thousand dollars ($1,000) nor more than five thousand dollars ($5,000). The Secretary of the Department of Labor and Human Resources shall prescribe by regulations all that pertains to compliance with the provisions of this Section within ninety (90) days after the effective date of this Act.

Section 2.20.—Mediation and Arbitration

The public policy in favor of alternative dispute resolution procedures related to controversies that arise out of the application of this Act, such as the mediation and arbitration provided by the Department of Labor and Human Resources, including the Office of Mediation and Arbitration, is hereby ratified.

Section 2.21.—Periodic Reports to the Legislative Assembly

The Secretary of the Department of Labor and Human Resources is hereby required to submit periodic reports on the application of this Act every twelve (12) months to the offices of the Secretary and the Clerk of the two Houses of the Legislative Assembly.

Chapter III. Workplace and Flexible Benefits

Section 3.1.—Section 4 of Act No. 379 of May 15, 1948 (29 LPRA 273), as amended, is hereby amended to read as follows:

"Section 4.- Overtime is:

(a) Hours that an employee works for his employer in excess of eight (8) hours during any calendar day. Nonetheless, the employer may notify the employee of an alternate twenty-four (24)–hour cycle, provided, that the notification is made in writing and within a term not less than five (5) days prior to the start of the alternate cycle and that there are eight (8) hours between consecutive shifts.

(b) Hours that an employee works for his employer in excess of forty (40) hours during any workweek.

(c) Hours that an employee works for his employer during the days or hours in which the establishment should remain closed to the public by legal provision. However, hours worked on Sundays, when the establishment should remain closed to the public by provision of law, shall not be considered overtime hours for the mere reason of being worked during that period.

(d) Hours that an employee works for his employer during the weekly rest day, as provided by law.

(e) Hours that an employee works for his employer in excess of the maximum number of working hours a day fixed in a collective bargaining agreement."

Section 3.2.—Section 5 of Act No. 379 of May 15, 1948 (29 LPRA 274), as amended, is hereby amended to read as follows:

"Section 5.- For the purpose of computing the hours worked in excess of forty (40) hours, the workweek shall constitute a period of one hundred and sixty-eight (168) consecutive hours. The workweek shall begin on the day and time that the employer determines and notifies to the employee in writing. If there is no notice, the workweek shall begin every Monday at 12:01 a.m.. Once the employer establishes the beginning of the workweek, any change must be notified to the employee within at least five (5) calendar days in advance in order to be effective."

Section 3.3.—Section 6 of Act No. 379 of May 15, 1948 (29 LPRA 275), as amended, is hereby amended to read as follows:

"Section 6.- Rules and Requirements for Overtime Pay shall be the following:

(a) Any employer who employs or allows an employee to work overtime shall be required to pay such employee for each extra hour, at a rate of not less than one and one-half times the regular pay rate; provided, that the employees entitled to greater rights or benefits who were hired prior to the effective date of the "Labor Transformation and Flexibility Act' shall maintain said rights or benefits.

(b) An alternate weekly work schedule may be established, through a written agreement between the employee and the employer, which shall allow for the employee to complete a workweek not to exceed forty (40) hours, with daily shifts that shall not exceed ten (10) hours per work day. However, if the employee works more than ten (10) hours in a workday, the hours shall be paid at a rate of one and one-half times the regular pay rate.

(c) Voluntary or approved alternate weekly work schedule may be revoked by mutual agreement of the parties thereto at any time. Nonetheless, any of the parties could unilaterally terminate the voluntary agreement after one (1) year has elapsed since it was entered into.

(d) The alternate weekly work schedules adopted pursuant to this Section may be honored by a third party that acquires the business without the need to enter into a new agreement.

(e) The employer may approve an employee's request to make-up for work time lost in a week due to personal reasons. Hours thus worked shall not be considered overtime when these are worked during the same week of the absence, are not in excess of twelve (12) hours in a day, and are not in excess of forty (40) hours in a week."

Section 3.4.—Section 7 of Act No. 379 of May 15, 1948 (29 LPRA 276), as amended, is hereby amended to read as follows:

"Section 7.- For the purpose of determining the compensation for overtime pay when no regular pay rate has been agreed on, the daily, weekly, monthly, or otherwise agreed pay shall be divided by the total number of hours worked during that same period."

Section 3.5.—Section 8 of Act No. 379 of May 15, 1948 (29 LPRA 277), as amended is hereby amended to read as follows:

"Section 8.- An employee may request, in writing, a change of schedule, number of hours, or workplace. The employee's written request shall specify the change requested, the reason for the request, the effective date, and the duration of said change.

The employer shall be required to answer within a term of twenty (20) calendar days counted as of the receipt of said request. In the case of an employer with more than fifteen (15) employees, the answer shall be required in writing. If the employer meets with the employee within the term of twenty (20) calendar days after receipt of the request for a change, the notice of the answer may be issued within fourteen (14) calendar days after said meeting.

The employer may approve or deny the employee's request. The approval of a request may be subject to the conditions and requirements that the employer deems appropriate. The denial shall state the reasons for the decision and any alternative to the request submitted. The employer shall give priority to the requests made by heads of family who have legal or sole custody of their minor children.

The provisions of this Section shall only apply to employees who regularly work thirty (30) hours or more per week, and who have worked for the employer for at least one (1) year. In addition, the provisions herein shall not apply to a request submitted within a term of six (6) months after having received a written decision from the employer, or after approving the change, whichever is greater."

Section 3.6.—Sections 9 through 12 of Act No. 379 of May, 15, 1948 (29 LPRA 278–281), as amended, are hereby repealed.

Section 3.7.—The first paragraph of Section 13 is hereby amended, and said Section is hereby renumbered as Section 9 of Act No. 379 of May 15, 1948 (29 LPRA 271 et seq.), as amended, to read as follows:

"Section 9.- It is hereby declared that the additional compensation fixed by this Act as overtime pay may not be waived, except as authorized under Section 6 of this Act."

Section 3.8.—The second paragraph of Section 14 is hereby amended, and said Section is hereby renumbered as Section 10 of Act No. 379 of May 15, 1948 (29 LPRA 271 et seq.), as amended, to read as follows:

"Section 10.- ...

Case:17-03283-LTS Doc#:22031-1 Filed:09/01/22 Entered:09/01/22 18:52:54 Desc:
Exhibit 1 Page 18 of 35

No employer may retaliate against, discharge, suspend, or otherwise affect the employment or working conditions of any employee by reason of having refused to accept an alternate weekly work schedule as authorized in Section 6 of this Act or for having submitted a request for schedule, work hours, or workplace change as established in Section 8 of this Act. Any employer that engages in said conduct may be held liable for civil damages in an amount equal to the damages that said action has caused to the employee, and if it is proven that the employer engaged in such action with malice or reckless disregard for the employee's rights, punitive damages may be imposed in a maximum additional amount equal to the actual damages caused. The employer's financial situation, the reprehensibility of the employer's wrongdoing, the duration and frequency thereof, the sum of the damages caused, and the size of the company shall be taken into consideration, among other factors, in order to determine the sum to be imposed as punitive damages. The employer may also be required to reinstate the worker in his employment and to cease and desist of the act in question."

Section 3.9.—Section 15 is hereby amended and renumbered as Section 11 of Act No. 379 of May 15, 1948 (29 LPRA 271 et seq.), as amended, to read as follows:

"Section 11.- Every employer shall notify his employees, in writing, of the number of working hours required daily for each day of the week, the time work ends and begins, and the times the meal period begins and ends within the regular working hours. The work schedule notice shall constitute prima facie evidence that such working hours in each establishment constitute the division of the working day.

The employer who requires or allows an employee to work for a period longer than five (5) consecutive hours, without providing a meal period, must pay the employee an extraordinary compensation for the time worked as is provided in this Section. In the event that the total number of hours worked by the employee during the day does not exceed six (6) hours, the meal period may be waived.

The meal period shall not begin before the conclusion of the second hour, or after the sixth consecutive hour of work begins.

An employer shall not employ an employee for a work period that exceeds ten (10) hours per day without providing an employee a second meal period except when the total number of hours worked does not exceed twelve (12) hours. In cases in which the total of hours worked does not exceed twelve (12) hours, the second meal period may be waived provided that the employee took the first meal period.

Meal periods within or outside the regular work schedule may be reduced to a period of not less than thirty (30) minutes, provided, that there is a written agreement between the employer and the employee. In the case of croupiers, nurses, security guards, and those authorized by the Secretary of Labor and Human Resources, the meal period may be reduced up to twenty (20) minutes when there is a written agreement between the employer and the employee without requiring the approval of the Secretary. Nonetheless, all other provisions of this Act shall apply.

Agreements to reduce the meal period shall be valid indefinitely and neither party may withdraw his consent to what was stipulated, without the consent of the other, until one (1) year after the agreements' effectiveness. Such agreements shall continue in effect when a third party acquires the business from the employer.

Any employer that employs or allows an employee to work during the meal period shall be required to pay said period or fraction thereof at a pay rate equal to one and one-half times the regular pay rate agreed on, provided, that the employees who have the right to a pay rate higher than one and one-half times prior to the effective date of the "Labor Transformation and Flexibility Act' shall maintain the same."

Section 3.10.—Section 16 is hereby renumbered as Section 12 of Act No. 379 of May 15, 1948 (29 LPRA 271 et seq.), as amended.

Section 3.11.—Section 17 is hereby amended and renumbered as Section 13 in Act No. 379 of May 15, 1948 (29 LPRA 271 et seq.), as amended, to read as follows:

"Section 17.- The provisions of this Act shall not apply to:

(a) administrators, executives, and professionals as such terms are defined through regulations by the Secretary of Labor and Human Resources;

(b) travel agents, peddlers, and outside salesmen as such terms are defined through regulations by the Secretary of Labor and Human Resources;

(c) labor union officials or organizers when acting as such;

(d) chauffeurs and operators of public and private motor vehicles who work on commission, receive pay per rate, or get paid per route;

(e) persons employed in domestic service who, notwithstanding, shall be entitled to a rest day for every six (6) consecutive days of work pursuant to the provisions of Act No. 206–2016;

(f) employees, occupations, or trades exempt from the overtime provisions provided in the Fair Labor Standards Act, as amended, approved by the U.S. Congress on June 25, 1938;

(g) persons employed by the Government of the United States of America, including each of its three branches and their instrumentalities or public corporations;

(h) persons employed by the Government of Puerto Rico, including each of its three branches and their instrumentalities or public corporations;

(i) persons employed by the municipal governments and their agencies or instrumentalities;

(j) employees covered by a collective bargaining agreement negotiated by a labor union unless the same collective bargaining agreement establishes that the provisions of this Act shall apply to the relationship of the parties. However, all overtime provisions of the Fair Labor Standards Act, as amended, approved by the U.S. Congress on June 25, 1938, shall apply.

(k) persons exempt pursuant to the provision of a special law."

Section 3.12.—Section 18 is hereby amended and renumbered as Section 14 of Act No. 379 of May 15, 1948 (29 LPRA 271 et seq.), as amended, to read as follows:

"Section 14.- The Secretary of Labor and Human Resources is hereby empowered to adopt and promulgate regulations as are necessary to enforce the provisions of this Act. These regulations shall be consistent with the Fair Labor Standards Act, as amended, approved by the U.S. Congress on June 25, 1938, and the regulations approved thereunder, as they are applicable to Puerto Rico, except as otherwise expressly provided by this Act."

Section 3.13.—Section 19 is hereby renumbered as Section 15 of Act No. 379 of May 15, 1948 (29 LPRA 271 et seq.), as amended.

Section 3.14.—Section 20 is hereby amended and renumbered as Section 16 of Act No. 379 of May 15, 1948, as amended, to read as follows:

"Section 16.- The following terms and phrases shall have the meaning stated below, unless the context indicates otherwise:

(1) 'Employee'.- shall mean any natural person who works for an employer and is paid for his services. It shall not include independent contractors, nor labor union officials or organizers when acting as such.

(2) 'Employer'.- shall mean any natural or juridical person of any kind that hires and uses the services of an employee.

(3) 'Employ'. —shall mean to suffer or permit to work.

(4) 'Wage'.- shall include salary, day wages, payment, and any other form of monetary compensation. It shall not include any portion of tips received in excess of the amount used to comply with the payment of the legal minimum wage, nor the service charges.

(5) 'Tips'.- shall mean any gifts or gratuity that an employee receives directly or indirectly by a person other than the employer in recognition for the services received.

(6) 'Service Charge'.- any sum of money added to a bill, and required by an establishment, which is allocated between all or some of the employees. It shall also include the charges negotiated between an establishment and a customer."

Section 3.15.—Section 4 of Act No. 289 of April 9, 1946 (29 LPRA 298), as amended, is hereby amended to read as follows:

"Section 4.- Any employer who employs or allows an employee to work on the day of rest provided in this Act shall be required to pay said employee for the hours worked during such day of rest at a compensation rate equal to one and one-half times the regular rates of pay agreed on, provided, that employees entitled to greater benefits prior to the effective date of the "Labor Transformation and Flexibility Act,' shall keep said benefits."

Section 3.16.—Section 5 of Act No. 289 of April 9, 1946 (29 LPRA 299), as amended, is hereby amended to read as follows:

"Section 5.- The provisions of this Act shall not apply to employees who are exempt from the provisions of Act No. 379 of May 15, 1948, as amended."

Section 3.17.—Act No. 1 of December 1, 1989 (29 LPRA 301 et seq.), as amended, is hereby repealed.

Section 3.17a.—Business establishments that, before the effective date of this Act, were required to remain closed on Good Friday and on Easter Sunday, shall be required to remain closed.

Section 3.18.—Subsection (b) of Section 5 of Act No. 180–1998 (29 LPRA 250c), as amended, is hereby amended to read as follows:

"Section 5.- Industries that Provide Greater or Lesser Benefits.-

(a) ...

(b) Any employee who worked for an employer before the effective date of the 'Labor Transformation and Flexibility Act,' and who was entitled by law to monthly vacation and sick leave accrual rates higher than those provided in the 'Labor Transformation and Flexibility Act,' shall continue to enjoy such monthly leave accrual rates that applied to such employee before. This provision shall apply as long as he works for the same employer.

Case:17-03283-LTS   Doc#:22031-1   Filed:09/01/22   Entered:09/01/22 18:52:54   Desc:
Exhibit 1   Page 21 of 35

It shall constitute an unlawful employment practice for an employer to dismiss, discharge, or indefinitely suspend an employee who works for such employer before the effective date of the 'Labor Transformation and Flexibility Act' for the purpose of rehiring or substituting him for a new employee in order to avail himself of the sick or vacation leave accrual scheme provided under the "Labor Transformation and Flexibility Act.' Any employer who violates the provisions of this Section shall be guilty of a misdemeanor and be punished by a fine of not less than five hundred dollars ($500) nor more than five thousand dollars ($5,000) or by imprisonment for a term of not less than one hundred twenty (120) days nor more than one (1) year, or both penalties at the discretion of the Court. Such employer shall also be held liable for civil damages, for a penalty of twice the amount of the damages that his actions may have caused to the employee. If the person settling the dispute is unable to determine the amount of the damages caused to the employee, such person may, in his discretion, impose a penalty of not less than one thousand dollars ($1,000) nor more than five thousand dollars ($5,000)."

Section 3.19.—Subsection (a) is hereby amended and a second paragraph is hereby added to subsection (d) of Section 6 of Act No. 180–1998 (29 LPRA 250d), as amended, to read as follows:

"Section 6.- Provisions on Vacation and Sick Leave.-

(a) Every employee shall be entitled to a minimum vacation and sick leave accrual after working at least one hundred and thirty (130) hours a month. The minimum monthly vacation leave accrual rate shall be one-half ( ½ ) day during the first year of service; three–fourths ( ¾ ) of a day after the first year of service up to the fifth (5) year of service; one (1) day after the fifth year of service up to the fifteenth (15) year of service; and one and one-fourth (1 ¼ ) of a day after the fifteenth (15) year of service. The minimum monthly sick leave accrual rate shall be one (1) day for every month.

However, in the case of Puerto Rico resident employers who have less than twelve (12) employees, the minimum monthly vacation leave accrual rate shall be one-half ( ½ ) day. This exception shall be available for the employer insofar as he has less than twelve (12) employees, and shall cease in the calendar year following that in which the number of employees of such employer's payroll exceeds twelve (12) employees during twenty-six (26) weeks or more on each one of the two (2) consecutive calendar years. The minimum monthly sick leave accrual rate for the employees of said employer shall be one (1) day for every month.

The use of vacation and sick leaves shall be considered time worked for purposes of the accrual of these benefits.

(b) ...

(c) ...

(d) Vacation and sick leave shall be paid on the basis of an amount which is not less than the regular hourly wage earned by the employee in the month the leave was accrued. For employees who receive commissions or other incentives that are not at the full discretion of the employer, the total commissions or incentives earned for the year, can be divided by fifty-two (52) weeks, to compute the regular hourly wage.

If employees receive tips for their services or if the employer shares, in whole or in part, service charges with his employees, the payment of vacation or sick leave shall be made on the basis of the legal minimum wage or the regular hourly wage agreed on for such benefits, whichever is higher.

(e) ..."

Section 3.20.—Subsection (c) is hereby added to Section 8 of Act No. 180–1998 (29 LPRA 250f), as amended, to read as follows:

"Section 8.- Persons Excluded from the Act.-

(a) ...

(c) The provisions of this Act shall not apply to employees covered under a collective bargaining agreement executed between a labor union and an employer."

Section 3.21.—Section 12 of Act No. 180–1998 (29 LPRA 250j), as amended, is hereby amended, to read as follows:

"Section 12.-

(a) An employee's suit to claim wages against his employer under this Act, approved or to be approved pursuant to the provisions of this Act or under any contract or law, shall prescribe within a term of one (1) year. The statute of limitation of this action shall be counted from the time that the employee ceased to work for the employer. The above statute of limitation shall be interrupted and shall begin anew through the judicial or extrajudicial claim for the wage debt filed by the worker, his representative or an official of the Department empowered to do so, and by any act by the employer acknowledging the debt.

Wage claims filed before the effective date of the "Labor Transformation and Flexibility Act' shall be subject to the statute of limitations previously in effect.

(b) ..."

Section 3.22.— Section 17 of Act No. 180–1998 (29 LPRA 245–246m R [Repealed]), as amended, is hereby repealed.

Section 3.23.— Section 1 of Act No. 148 of June 30, 1969 (29 LPRA 501), as amended, is hereby amended to read as follows:

"Section 1.- Any employer who employs one or more workers or employees within the period of twelve (12) months comprised from October 1 $^{st}$ of any calendar year through September 30 $^{th}$ of the following calendar year shall be required to pay to each one of said employees, who has worked seven hundred (700) hours or more, or one hundred (100) hours or more in the case of dock workers, within the aforementioned period, a bonus equal to six percent (6%) of the total maximum wage of ten thousand dollars ($10,000) earned by the employee or worker within said period of time. It is hereby provided that every employer who employs fifteen (15) employees or less shall pay a bonus equal to three percent (3%) of the total maximum wage of ten thousand dollars ($10,000).

As for employees hired after the effective date of the 'Labor Transformation and Flexibility Act,' any employer who has more than twenty (20) employees during more than twenty-six (26) weeks within the twelve (12)–year period comprised from October 1 $^{st}$ of any year through September 30 $^{th}$, of the following calendar year, shall be required to pay each employee who has worked at least one thousand, three hundred fifty (1,350) hours or more during said period, a bonus equal to two percent (2%) of the total wage earned up to six hundred dollars ($600.00). If an employer has twenty (20) employees or less during more than twenty-six (26) weeks within the twelve (12)–year period comprised from October 1 $^{st}$ of any year through September 30 $^{th}$ of the following calendar year, such employer shall be required to pay each employee who has worked at least one thousand, three hundred fifty (1,350) hours or more during said period, a bonus equal to two percent (2%) of the total wage earned up to three hundred dollars ($300.00).

The total of the amounts paid on account of said bonus shall not exceed fifteen percent (15%) of the net annual profit of the employer, within the period comprised from September 30 $^{th}$ of the preceding year until September 30 $^{th}$ of the year to which the bonus corresponds. In computing the total hours worked by an employee to receive the benefits of this Act, those hours worked for the same employer, even if the services have been rendered in different businesses, trades, and other activities of

Case:17-03283-LTS  Doc#:22031-1  Filed:09/01/22  Entered:09/01/22 18:52:54  Desc:
Exhibit 1  Page 23 of 35

this employer, shall be counted. In order to determine net profits, the amount of the net loss carryover of previous years and account receivables that remain unpaid at the end of the period covered in the balance sheet as well as in the profits and loss statement shall not be included.

As for employees hired after the effective date of the 'Labor Transformation and Flexibility Act,' the bonus required shall be fifty percent (50%) of what is provided herein during their first year of employment.

This bonus shall constitute a compensation in addition to any other wages or benefits of any other kind to which the employee is entitled. The employer may credit against said obligation any other bonus previously paid to the employee during the year on any account; provided, that the employer has notified the employee in writing of his intent to apply such other bonus toward the payment of the bonus required under this Act."

Section 3.24.—Section 2 of Act No. 148 of June 30, 1969 (29 LPRA 502), as amended, is hereby amended to read as follows:

"Section 2.- The payment of the bonus herein established shall be made normally between November 15 and December 15 of each year.

If the payment of the bonus herein established is not made within the period stated above, the employer shall be required to pay, in addition to said bonus, a sum equal to one-half of the sum of the bonus by reason of additional compensation when the payment has been made within the first six (6) months of its noncompliance. If the payment is delayed more than six (6) months, the employer shall be required to pay another sum equal to said bonus, as additional compensation."

Section 3.25.—Section 7 of Act No. 148 of June 30, 1969 (29 LPRA 507), as amended, is hereby amended to read as follows:

"Section 7.- The Secretary of Labor and Human Resources is hereby authorized to adopt those rules and regulations as he may deem necessary for the best and due administration of this Act.

He is likewise authorized to request and require employers to furnish under oath, if required to do so, any available information with regard to the balance sheets, profit and loss statements, accounting books, payment schedules, wages, hours of work, statement of changes in the financial status, and the corresponding notations, and any other information he deems necessary, etc., for the best administration of this Act, and to such effects, the Secretary of Labor and Human Resources may prepare forms such as schedules which may be obtained by the employers through the Department of Labor and Human Resources and shall be completed and filed with the offices of the Department of Labor and Human Resources within the term prescribed by the Secretary.

He is also empowered to audit and examine the employer's books, accounts, files and other documents, on his own or through his subordinates, to determine their responsibility towards their employees under this Act.

In order for an employer to avail himself of the provisions of Section 1 of this Act, which exempts him from paying all or part of the bonus established therein when he has not obtained profits from his business, industry, trade, or firm or when the profits are not sufficient to cover the total amount of the bonus without exceeding the fifteen percent (15%) limit of the net annual profits, he shall submit to the Secretary of Labor and Human Resources not later than on November 30th of each year a general balance sheet and a profit and loss statement for the twelve (12)–month period from October 1st of the previous year to September 30th of the current year, duly certified by a certified public accountant, as evidence of said financial status. In those cases in which the fiscal year of the employer who requests the exemption provided in this Section does not end on September 30th of each year, the balance sheet and the profit and loss statement required may be that corresponding to the fiscal year of the business. The balance sheet and the profit and loss statement required herein may be drafted or reviewed by a certified public accountant. The preceding shall not be construed as to limit the powers of the Secretary of Labor and Human Resources to,

within his oversight duties, conduct an intervention by way of an audit, of any employer who requests the exemption and to verify the accuracy of the information furnished.

In the case of an employer that is a cooperative organized under the laws of Puerto Rico, it shall not be necessary for the general balance sheet and the profit and loss statement to be certified by a certified public accountant. In this case, the Secretary of Labor and Human Resources shall accept the profit and loss statement that has been audited by the Public Corporation for the Supervision and Insurance of Cooperatives in Puerto Rico (COSSEC) with its internal auditors, and that covers the period of time required in this Act.

If the employer fails to submit the balance sheet and the profit and loss statement required within the term and in the manner stated above, he shall be required to pay the bonus in its entirety, in accordance with the provisions of this Act, even when he has not made profit in his business or if such profits are insufficient to cover the total bonus.

When an employer who has met the requirements with regard to the term and manner indicated in the above paragraphs fails to pay the bonus established in this Act, in whole or in part, adducing that he has not made profits in his business, industry, trade, or firm, or that such profits are not sufficient to cover the total amount of the bonus without exceeding the fifteen percent (15%) limit fixed in Section 1 of this Act, the Department of Labor and Human Resources shall conduct an audit to verify the employer's accounts if, in the judgment of the Secretary of the Department of Labor and Human Resources, the general balance sheet does not fully justify the financial status of the business, industry, trade, or firm, or when a complaint is filed by a worker.

A copy of the auditor's report rendered as a result of said examination shall be handed to the respondent employer's workers or employees. Also, a copy of the report shall be sent to the Secretary of the Treasury. Except as provided above, the information obtained by the Secretary of the Department of Labor or his duly authorized agents, by virtue of the powers conferred on them by this Act, shall be of a confidential and privileged nature and shall only be disclosed upon authorization of the Secretary of the Department of Labor and Human Resources.

The Secretary of the Department of Labor and Human Resources shall also enjoy those faculties and general investigative powers which have been conferred upon him in connection with the administration of this Act for the best performance of his functions pursuant to the labor legislation administered by him."

Section 3.26.—A paragraph (11) is hereby added to subsection (b) of Section 1031.01 of Act No. 1–2011 (13 LPRA 30101), as amended, known as the "Internal Revenue Code for a New Puerto Rico," to read as follows:

"Section 1031.01.- Gross Income.-

(a) ...

(b) Exclusions from Gross Income.- The following items shall be excluded from the definition of gross income:

(1) ...

(2) ...

(11) Compensations or severance pay received by an employee by reason of dismissal, without the need to determine just cause thereof, up to a maximum amount equal to the severance pay that the employee may receive pursuant to Act No. 80 of May 30, 1976, as amended."

Section 3.27.—Paragraph (3) of subsection (d) of Section 1032.06 of Act No. 1–2011 (13 LPRA 30116), as amended, known as the "Internal Revenue Code for a New Puerto Rico," is hereby amended to read as follows:

"Section 1032.06.- Cafeteria Plan

(a) ...

(b) ...

(c) ...

(d) ...

(3) Qualified Benefits.- The term 'qualified benefit' means the cost or the value of any benefit which is not includible in the gross income of the employee by reason of an express provision of Section 1031.02 (a)(2). Such term includes any group term life insurance which, as provided in Section 1031.02 (a)(2)(A), is includible in gross income of the insured as well as any other benefit permitted under regulations. Said benefits shall include health insurance, including hospital indemnity plans, cancer insurance policies, and dental insurance; Health Savings Accounts; dependent care assistance programs, long-term disability benefits, accident insurance, including accidental death and dismemberment insurance; adoption assistance; and any other qualified benefit authorized under Section 125 of the U.S. Internal Revenue Code of 1986, Title 26 of the United States Code, as amended, except as otherwise provided in this Code. However, such term shall not include any product which is advertised, marketed, or offered as long-term care insurance."

Section 3.28.—Section 1062.01 (a)(1)(G) of Act No. 1–2011 (13 LPRA 30271), as amended, is hereby amended to read as follows:

"Section 1062.01.- Income Tax Withholding at Source in the Case of Wages.-

(a) Definitions.- As used in this Section:

(1) Wages.- The term 'wages' means any remuneration for services rendered by an employee for his employer, and every remuneration as pension for services rendered, including the cash value of all remuneration paid by any medium other than cash; except that said term shall not include remuneration paid:

(A) ...

(G) Compensations or severance pay received by an employee by reason of dismissal, without the need to determine just cause thereof, up to a maximum amount equal to the severance pay that the employee may receive pursuant to Act No. 80 of May 30, 1976, as amended, or under a settlement agreement for dismissal between the employer and the employee, or

(H) ...".

Section 3.29.—Section 2 of Act No. 427–2000 (, as amended, is hereby amended to read as follows:

"Section 2.-

(a) ...

...

(e) Full-time Working Day.- Means, for purposes of the application of this Act, the daily working period of a working mother consisting of at least seven (7) and a half (1/2) hours.

(f) Part-time Working Day.- Means, for purposes of the application of this Act, the daily working period of a working mother consisting of less than seven (7) and a half (1/2) hours.

(g) To breastfeed.- ...

(h) Nursing mother.- ...

(i) Municipality.- ...

(j) Employer.- ...”

Section 3.30.—Section 3 of Act No. 427–2000 (29 LPRA 478a), as amended, is hereby amended to read as follows:

“Section 3.-

The period granted to breastfeed or to express breast milk is hereby regulated by granting working mothers who return to work after enjoying maternity leave the opportunity to nurse their children for an hour during each full-time working day, a period which may be divided into two (2) thirty (30)–minute sessions or three (3) twenty (20)–minute sessions, to go where the child to be breastfed is being cared for, should the company or employer have a child care center in its facilities, or to express breast milk at the place provided for such purposes in the workplace. Said places shall guarantee nursing mothers privacy, safety and hygiene. Said place must have electrical outlets and ventilation. If the employee is working on a part-time basis and the working day exceeds four (4) hours, the period granted shall be thirty (30) minutes for every consecutive four (4)–hour working period.

In the case of businesses considered as small businesses in accordance with the size regulations of the U.S. Small Business Administration (SBA), these shall be required to provide breastfeeding mothers with a period of at least one-half ( ½ ) hour during each full-time working day to breastfeed or express breast milk, which period may be divided into two (2) fifteen (15)–minute periods each. If the employee is working on a part-time basis and the working day exceeds four (4) hours, the period granted shall be thirty (30) minutes for every consecutive four (4)–hour working period.”

Section 3.31.—Section 9 of Act No. 427–2000, as amended, is hereby amended to read as follows:

“Section 9.-

Any nursing mother denied by her employer the period granted by this Act to breastfeed or to express breast milk may resort to the pertinent forum to demand that her rights be upheld. The forum with jurisdiction may impose a fine on the employer who refuses to uphold the right herein established for the damages suffered by the employee. Said fine may be equal to: (1) three times the salary paid to said employee for each day she was denied the period to nurse or express breast milk; or (2) a sum of not less than three thousand dollars ($3,000), whichever is greater. If the salary is lower than the federal minimum wage, for being tipped employees, as defined in the Fair Labor Standards Act (FLSA), the tip shall be included in the computation of the salary for purposes of the fine, or in its default, the federal minimum wage shall be used as a basis for computing the fine, in lieu of the salary earned, whichever is of greater benefit for the nursing mother. Remedies provided in this Section shall be compatible with, and in addition to, the remedies provided under any other applicable statute.”

Chapter IV. Flexicurity

Case:17-03283-LTS   Doc#:22031-1   Filed:09/01/22   Entered:09/01/22 18:52:54   Desc:
Exhibit 1   Page 27 of 35

Section 4.1.—The third paragraph of subsection (b)(1) and the third paragraph of subsection (b)(2) of Section 3 of Act No. 74 of June 21, 195629 LPRA 703), as amended, is hereby amended to read as follows:

"Section 3.-

(a) ...

(b) Weekly Benefit Amount.-

(1) the weekly benefit amount of an insured worker other than an agricultural worker, except as stated in the Provided of Section 3(c)(2), fifty percent (50%) or more of whose salary in his basic period was paid for services specified in subsection (k)(1) (A), (B), (C), (D), (F), (G), or (H) of Section 2 shall be that benefit stated in the compensation schedule established by the Secretary through regulations.

The Secretary is authorized, beginning July 1 $^{st}$, 1987, and thereafter on July 1 $^{st}$ of each year, to adopt, through regulations, compensation schedules in addition to those hereby established. The maximum weekly benefit amount which the Secretary may establish shall not be less than fifty percent (50%) of the average weekly wage of the covered nonagricultural workers, according to the schedule which appears in said regulations.

The Secretary shall establish by regulations the formula for determining the average weekly wage. The regulations shall provide that, beginning July 1 $^{st}$, 2018, the minimum weekly benefit shall increase to thirty-three dollars ($33) and the maximum weekly benefit shall increase to one hundred ninety dollars ($190), and that, beginning July 1 $^{st}$, 2019, the minimum weekly benefit shall increase to sixty dollars ($60) and the maximum weekly benefit shall increase to two hundred forty dollars ($240). This increase shall apply only to workers or employees hired after the effective date of the "Labor Transformation and Flexibility Act.'

(2) The weekly benefit amount of an agricultural worker fifty percent (50%) or more of whose salary in his base period was paid for agricultural services specified in subsection (k)(1)(E) of Section 2, except as stated in the Provided of Section 3(c)(2), shall be that benefit stated in the compensation schedule established by the Secretary through regulations. The S ecretary is hereby authorized, beginning July 1 $^{st}$, 1987, and thenceforth, on July 1 $^{st}$ of each year, to adopt through regulations compensation schedules in addition to those established. The maximum amount of the weekly benefit to be established by the Secretary shall not be less than fifty percent (50%) of the average weekly salary of covered agricultural workers, following the table included in said regulations. The Secretary shall establish through regulations the formula to determine the average weekly salary. The regulations shall provide that beginning July 1 $^{st}$, 2018, the minimum weekly benefit shall increase to thirty-three dollars ($33) and the maximum weekly benefit shall increase to one hundred ninety dollars ($190), and that, beginning July 1 $^{st}$, 2019, the minimum weekly benefit shall increase to sixty dollars ($60) and the maximum weekly benefit shall increase to two hundred forty dollars ($240).

(c) e"

Section 4.2.—A paragraph (6) is hereby added to subsection (b) of Section 8 of Act No. 74 of June 21, 1956 (29 LPRA 708), as amended, to read as follows:

"Section 8.-

(a) Definitions.-...

(b) Payment of Taxes.-

(1) ...

(6) The Secretary of the Department of Labor and Human Resources shall determine any additional tax to be paid by every employer based on the experience system, as provided in subsection (f) of this Section, up to a maximum of the first ten thousand, five hundred dollars ($10,500) of wages paid to each employee during the taxable year. Said additional tax shall be applied gradually, at the discretion of the Secretary of Labor, taking into account the economic data of the Department of Economic Development and Commerce and the fiscal health of the unemployment fund. Said taxes shall be deposited in the Unemployment Fund established in Section 10 of this Act."

Section 4.3.—Section 1 of Act No. 80 of May 30, 1976 (29 LPRA 185a), as amended, is hereby amended to read as follows:

"Section 1.- Every employee who works for an employer for compensation, hired without a fixed term, who is wrongfully terminated shall be entitled to receive from his employer as severance pay, the following:

(a) An amount equal to three (3) months of salary as severance pay; provided, that he has completed the applicable probationary period as provided in this Act, or a different probationary period as agreed by the parties; and

(b) An amount equal to two (2) weeks of salary for every full year of service.

In no case the severance pay required under this Act shall exceed the salary corresponding to nine (9) months of salary. The nine (9)–month cap shall not apply to employees hired before the effective date of the 'Labor Transformation and Flexibility Act.' Severance pay for such employees in the event of wrongful termination shall be computed using the laws in effect prior to the effective date of the 'Labor Transformation and Flexibility Act.' For purposes of this Section, it shall be understood that one (1) month consists of four (4) weeks.

The severance pay provided in this Act, as well as any equivalent voluntary payment made by the employer to an employee by reason of said employee's discharge shall be exempt from income taxes, regardless of whether such payment is made at the time of the discharge or later, or whether it is made by reason of a settlement agreement or pursuant to a judgment or administrative order. Any amount paid in excess of the severance pay provided in this Act, shall be subject to income taxes.

If the severance pay is made pursuant to a judgment or administrative order, any payment previously made by the employer to the employee by reason of wrongful termination, shall be credited to the severance provided in this Act, regardless of whether the payment by reason of termination of employment is made pursuant to the terms of a contract between the parties, policy, plan, or practice of the employer.

Years of service shall be determined on the basis of all the preceding accrued work periods during which the employee worked for the same employer prior to his discharge; provided, that the employment relationship has not been interrupted for more than two (2) years and the services have been rendered in Puerto Rico. There shall also be excluded, years of service that by reason of discharge, separation or termination of employment, or transfer of business operations are compensated to an employee voluntarily or pursuant to an award by the court or an out of court settlement agreement.

The provisions of this Act shall not apply to persons who, at the time of their discharge, were rendering services to an employer under a temporary employment contract or fixed-term contract.

The provisions of this Section, as amended by the 'Labor Transformation and Flexibility Act,' shall take effect as of the date of approval of said Act."

Section 4.4.—Section 2 of Act No. 80 of May 30, 1976 (29 LPRA 185b), as amended, is hereby amended to read as follows:

Case:17-03283-LTS Doc#:22031-1 Filed:09/01/22 Entered:09/01/22 18:52:54 Desc: Exhibit 1 Page 29 of 35

"Section 2.- Just cause for discharge of an employee shall be understood to be that which is not based on legally prohibited reasons and on a whim of the employer. Moreover, it shall be understood as just cause such reasons that affect the proper and regular operations of an establishment, including, among others:

(a) That the employee engages in a pattern of improper or disorderly conduct.

(b) That the employee engages in a pattern of deficient, inefficient, unsatisfactory, poor, slow or negligent performance. This includes noncompliance with the employers' quality and safety rules and standards, low productivity, lack of competence or ability to perform the work at reasonable levels as required by the employer and repeated complaints from the employer's customers.

(c) The employee's repeated violations of the reasonable rules and regulations established for the operation of the establishment, provided, that a written copy thereof has been timely furnished to the employee.

(d) Full, temporary, or partial closing of the operations of the establishment.

In those cases in which the employer has more than one office, factory, branch or plant, the full, temporary or partial closing of operations of any of these establishments where the discharged employee works shall constitute just cause for discharge pursuant to this Section.

(e) Technological or reorganization changes as well as changes of style, design, or the nature of the product made or handled by the establishment, and changes in the services rendered to the public.

(f) Downsizing made necessary by a reduction in the foreseen or prevailing volume of production, sales, or profits at the time of the discharge or for the purpose of increasing the establishment's competitiveness or productivity.

An employee's collaboration or expressions relating to his employer's business in an investigation before any administrative, judicial or legislative forum in Puerto Rico shall not be considered just cause for discharge, if said expressions are not of a defamatory character nor constitute disclosure of privileged information according to law. In this last case, the employee thus discharged shall have the right to –in addition to any other award to which he may be entitled- immediate reinstatement of employment and to receive a compensation in an amount equal to the unearned salaries and benefits from the date of discharge until a court orders the reinstatement of employment."

Section 4.5.—Section 3 of Act No. 80 of May 30, 1976 (29 LPRA 185c), as amended, is hereby amended to read as follows:

"Section 3.- In any case where employees are discharged for the reasons indicated in subsections (d), (e) and (f) of Section 2 of this Act, it shall be the duty of the employer to retain those employees of greater seniority on the job with preference, provided there are positions vacant or filled by employees of less seniority in the job within their occupational classification which may be held by them, it being understood that preference shall be given to the employees discharged in the event that within the six (6) months following their layoff the employer needs to employ a person in like or similar work to that which said employees were doing at the time of their discharge, within their occupational classification, also following the order of seniority in their reinstatement. However, at the time of the discharge and the rehiring, if there is a reasonably clear or evident difference in favor of the capacity, productivity, performance, competence, efficiency or conduct record of the compared employees, the employer may make a selection based on such criteria."

Section 4.6.—Section 3–A is hereby added to Act No. 80 of May 30, 1976 (29 LPRA 185a et seq.), as amended, to read as follows:

"Section 3–A.- In the case of discharges by the reasons set forth in subsections (d), (e), and (f) of Section 2 of this Act, if the employer has several offices, factories, branches, or plants in Puerto Rico, the selection criteria set forth in Section 3 of this Act shall be applied only within the establishment affected by the downsizing of personnel. However, if during the year immediately preceding: (1) the employees of the affected job classifications were usually and frequently transferred from one establishment to another; and (2) the employees were under common direct supervision in the daily administration of personnel, the employees of the establishments so integrated shall be compared. The fact that employees shared common benefits or were governed by common standards and rules shall not be deemed pertinent for the application for the selection method set forth in this Section. Furthermore, in situations where said criteria apply by exception, the criteria shall be used solely with respect to job classifications and the establishments where said integrated operations characteristics are present."

Section 4.7.—Section 5 of Act No. 80 of May 30, 1976 (29 LPRA 185e), as amended, is hereby amended to read as follows:

"Section 5.- For purposes of this Act, discharge shall be understood to be, besides the employee's layoff, his indefinite suspension or for a term of over three (3) months, except in the case of employees of seasonal trades or businesses or the resignation of the employee caused by the actions of the employer directed to induce or compel him to resign, such as imposing or trying to impose on him more onerous work conditions, reducing his salary, demoting, or submitting him to derogatory criticisms or humiliations by deed or word.

Provided, that any actions taken to induce or compel an employee to resign shall only constitute discharge when the only reasonable option left to the employee was to abandon his job. A merely uncomfortable or unpleasant situation shall not suffice, but rather, it shall be the arbitrary, unreasonable, and capricious actions of the employer that cause a hostile work environment where it is so intolerable that the employee is unable to rationally stay. These actions shall be the result of motives, other than the legitimate interest of the employer of safeguarding the welfare of the business. In the case of derogatory criticisms or humiliations, the extent of these should be substantial.

The mere allegation of an employee that he was forced to resign shall not be sufficient to prove or establish that he was discharged. The employee shall show specific facts that establish that the actions of the employer were intended to impair or harm his condition as employee."

Section 4.8.—Section 7 of Act No. 80 of May 30, 1976 (29 LPRA 185g), as amended, is hereby amended to read as follows:

"Section 7.- The allowance for compensation and progressive severance pay for wrongful termination provided in Section 1 of this Act, shall be computed on the basis of the highest number of regular working hours of the employee during any period of thirty (30) consecutive calendar days within the year immediately preceding the discharge."

Section 4.9.—Section 8 of Act No. 80 of May 30, 1976 (29 LPRA 185h), as amended, is hereby amended to read as follows:

"Section 8.- Employees classified as executive, administrative or professional employees under the Federal Labor Standards Act and the regulations of the Department of Labor and Human Resources shall have an automatic probationary period of twelve (12) months. All other workers who are employees, shall have an automatic probationary period of nine (9) months. However, the employer and the employee may agree on a probationary period, should the probationary period be shorter than the automatic period provided in this Act. If the employee is represented by a labor union, the employer and the labor union shall agree on the applicable probationary period. The discharge of an employee on a probationary period shall not be subject to the severance requirements provided in this Act. The effect of the twelve (12)–month or nine (9)–month probationary period, as the case may be, shall be prospective to the approval of the 'Labor Transformation and Flexibility Act.'

The probationary period set forth in this Section shall not have the effect of limiting the accrual of vacation leave of the employees who are entitled thereto by law. These employees shall accrue vacation leave upon being employed for six (6) months and such accrual shall be retroactive to the starting date of employment.

The probationary period of an employee who avails himself of a leave authorized by law, shall be interrupted automatically and shall continue for the remainder of the probationary period once he returns to his job.

Any employer who retains the services of an employee hired through a temporary employment company or hired directly through a temporary or fixed-term contract or for a specific project, shall credit the time worked by a temporary employee up to a maximum of six (6) months; provided, that the work to be performed involves the same functions or duties he had when he was a temporary employee.

For purposes of the provisions of this Section, "month' shall be construed as a period of thirty (30) consecutive calendar days."

Section 4.10.—Section 9 of Act No. 80 of May 30, 1976 (29 LPRA 185j), as amended, is hereby amended to read as follows:

"Section 9.- It is hereby declared that the right of an employee who is wrongfully terminated from his employment without just cause, to receive the severance pay provided in Section 1 of this Act shall not be waived.

Any contract or part thereof in which the employee waives the severance to which he is entitled to, pursuant to this Act, shall be null and void. However, once the discharge has occurred or the notice of discharge has been issued, the right to severance pay provided in this Act may be settled, provided that all the requirements of a valid settlement agreement are met.

Any voluntary payment made by the employer to the employee solely by reason of termination of employment shall be credited to the severance pay provided in this Act."

Section 4.11.—Section 10 of Act No. 80 of May 30, 1976 (29 LPRA 183–185 R [Repealed]), as amended, is hereby amended to read as follows:

"Section 10.- No payroll deduction or withholding shall be made on the severance pay provided in this Act, except for such deductions or withholdings required by the laws approved by the Congress of the United States of America."

Section 4.12.—Section 11 of Act No. 80 of May 30, 1976 (29 LPRA 185k), as amended, is hereby amended to read as follows:

"Section 11.-

(a) In every suit based solely on this Act, the court shall hold a conference not later than sixty (60) days after the answer to the complaint is filed, to which the parties shall be compelled to appear or be represented by a person authorized to make decisions, including to settle the complaint." During said hearing, the pleadings of the parties shall be considered, the main disputes shall be identified, and the possibility of an immediate settlement of the complaint shall be discussed. If the complaint is not settled, the court shall order any pending discovery and shall expedite the scheduling of a pretrial conference."

Section 4.13.—Section 12 of Act No. 80 of May 30, 1976 (29 LPRA 185*l*), as amended, is hereby amended to read as follows:

"Section 12.-

The rights granted hereunder shall prescribe after one (1) year has elapsed from the effective date of the discharge. Complaints for discharges filed prior to the effective date of the "Labor Transformation and Flexibility Act' shall be subject to the statute of limitations previously in effect."

Section 4.14.—A new Section 14 is hereby added to Act No. 80 of May 30, 1976 (29 LPRA 185a et seq.), as amended, to read as follows:

"Section 14.-

For purposes of this Act, the following terms, words or phrases shall have the meaning expressed below:

(a) 'Misconduct'—an employee's willful violation of the employer's rules or standards that are not contrary to the law; unlawful or immoral acts; or actions or omissions that adversely and significantly affect the legitimate interests of the employer or the wellbeing of others, which violation is premeditated, deliberate, or in disregard of the adverse consequences thereof.

(b) 'Disorderly Conduct'—an employee's willful violation involving breach of the peace, tranquility, good order, and respect that must prevail in a healthy work environment.

(c) 'Temporary Employment Contract'—means a written or oral employment contract based on a working relationship that is established for carrying out a specific project, certain works, substituting an employee during any leave or absence, carrying out special or short-term tasks including, but not limited to, annual inventories, repair of equipment, business machinery or facilities, casual loading or unloading of cargo, jobs during certain seasons of the year such as Christmas, production increase temporary orders, and any other specific project or activity.

(d) 'Fixed-term Contract'—means a written or oral employment contract based on a working relationship that is established for a specific period of time or a specific project. Although the contract may be renewed, if the practice, circumstances, and frequency of the renewals were of such a nature as to create an expectation of continued indefinite employment, it shall be understood that the employment is established without definite term. Any fixed-term contract whose initial term or total renewals do not exceed three (3) years shall be considered a valid and bona fide contract. In addition, in the case of executive, administrative or professional employees, as such terms are defined by the Secretary of Labor and Human Resources through regulations, these shall be governed by the will of the parties as expressed in the fixed-term employment contract.

(e) "Employee'—means any person who works for an employer and receives compensation for his services. The term does not include independent contractors, government employees, employees covered under a collective bargaining agreement in effect, or employees who work under a temporary employment contract for a fixed term or project.

(f) 'Establishment'—means the geographic or physical site or location where an employer operates a business or company.

(g) 'Employer'—means any natural or juridical person that employs or allows any employee to work for compensation. This term does not include the Government of Puerto Rico and each one of the three branches thereof, its departments, agencies, instrumentalities, public corporations, and municipal governments as well as municipal instrumentalities or corporations. It does not include the Government of the United States of America either.

(h) 'Wage'—means the salary regularly earned by an employee for his services, including commissions and other incentives regularly paid. This term shall not include the value of fringe benefits, disability benefits, sick or vacation leaves, bonuses voluntarily paid or required by law, deferred compensation, stocks, stock options, the portion of tips earned in excess of the amount used to comply with the payment of the legal minimum wage, or service charges required by an employer that are subsequently shared, in whole or in part, with its employees.

(i) 'Transfer of Business Operations'—means the purchase of a business or company, whereby an employer sells to another employer a substantial portion of the assets and/or liabilities of a business, without interrupting or ceasing the operations thereof for longer than six (6) months and continues operating the same type of business in the same or a different establishment, with basically the same equipment, machinery, and inventory, producing basically the same products and/or rendering the same services, retaining the same name of the business and commercial brands or a similar name, provided, that most of the employees

Case:17-03283-LTS Doc#:22031-1 Filed:09/01/22 Entered:09/01/22 18:52:54 Desc:
Exhibit 1 Page 33 of 35

who work in the business at any time during the six (6) months following the transfer worked for the selling employer at the time of the transfer of the business."

Section 4.15.—Section 14 is hereby renumbered as Section 15 of Act No. 80 of May 30 (29 LPRA 185a et seq.), 1976, as amended, to read as follows:

Chapter V. Rules on Holding a Position Open by Reason of a Disability

Section 5.1.—Section 5–A of Act No 45 of April 18, 1935 (11 LPRA 7), as amended, is hereby amended to read as follows:

"Section 5–A.- In cases of disability for work pursuant to the provisions of this Act, the employer shall be compelled to hold the employment position held by the worker or employee at the time of the accident open and to reinstate him in the same position, subject to the following conditions:

(1) That the worker or employee petition the employer to be reinstated in his position within a term of fifteen (15) days, to be counted from the date on which the worker or employee was discharged from the hospital or was authorized to work while undergoing treatment; provided, that said petition is not made after twelve (12) months have elapsed from the date of the accident, or six (6) months in the case of employers that have fifteen (15) employees or less on the date of the accident;

(2) ..."

Section 5.2.—Subsection (q) of Section 3 of Act No. 139 of June 26, 1968 (11 LPRA 203), as amended, is hereby amended, to read as follows:

"Section 3.-

(a) ...

(q) Reinstatement After Disability.- In cases of disability for work pursuant to the provisions of this Act, the employer shall be required to hold the position held by the worker at the onset of the disability open and to reinstate him in the same position, subject to the following conditions:

(1) That the worker petition the employer to be reinstated in his position within a term of fifteen (15) days, to be counted from the date on which the worker or employee was discharged from the hospital; provided, that said petition is not made after twelve (12) months have elapsed from the onset of the disability, or six (6) months in the case of employers that have fifteen (15) employees or less as of the onset of the disability;

(2) ..."

Chapter VI. Discrimination in the Workplace.-

Section 6.1.— In all cases involving discrimination or retaliation in the workplace, should an employee prevail, said employee shall be entitled to receive compensation for the total unearned wages and benefits, and when appropriate, future wages and benefits. Any provision of law regarding unlawful discrimination or retaliation in the workplace requiring that an employee be awarded twice the damages suffered, shall remain in effect. Notwithstanding the provisions of any law regarding unlawful discrimination or retaliation in the workplace, the amount of recoverable damages for mental anguish or suffering, other compensatory damages, and punitive damages, if awarded, shall be subject to the following monetary limits, based on the number of employees of the employer:

Less than 101 employees: $50,000

101 to 200 employees: $100,000

201 to 500 employees: $200,000

501 or more employees: $300,000

Section 6.2.—When applying the provisions of any discrimination or retaliation in the workplace law, the provisions of federal legislation and regulations as well as the judicial interpretations thereof of courts with jurisdiction in Puerto Rico shall be recognized, in order to ensure consistency in interpretations regarding similar terms or provisions, unless the provisions of the local legislation require a different interpretation.

Section 6.3.—Section 3 of Act No. 100 of June 30, 1959 (29 LPRA 148), is hereby amended to read as follows:

"Section 3.-

It shall not be presumed that the employer had knowledge of the personal situation of any employee in cases of discrimination against victims or presumed victims of domestic violence, sexual assault or stalking, unless the employer was actually in a position to have such knowledge.

The employer shall make reasonable adjustments or accommodations in the workplace as are necessary to protect its employees from a potential aggressor, once he receives notice of the potential occurrence of a dangerous situation. Failure to do so shall be presumed to be discriminatory conduct."

Chapter VII. Final Provisions.-

Section 7.1.—Savings Clause.-

The right to reinstatement provided for in Act No. 45 of April 18, 1935, as amended, and Act No. 139 of June 26, 1968, as amended, due to a disability or incapacity for work that began prior to the effective date of this Act, shall be governed by the rules on holding a position open that apply after the effective date of the "Labor Transformation and Flexibility Act.'

Section 7.2.—Severability.-

If any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Act were held to be null or unconstitutional, the ruling, holding, or judgment to such effect shall not affect, impair, or invalidate the remainder of this Act. The effect of said holding shall be limited to the clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Act thus held to be null or unconstitutional. If the application to a person or a circumstance of any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Act were held to be null or unconstitutional, the ruling, holding, or judgment to such effect shall not affect or invalidate the application of the remainder of this Act to such persons or circumstances where it may be validly applied. It is the express and unequivocal will of this Legislative Assembly that the courts enforce the provisions and application thereof to the greatest extent possible, even if it renders ineffective, nullifies, invalidates, impairs, or holds to be unconstitutional any part thereof, or even if it renders ineffective, invalidates, or holds to be unconstitutional the application thereof to any person or circumstance. This Legislative Assembly would have approved this Act regardless of any determination of severability that the Court may make.

Section 7.3.— Effectiveness.-

This Act shall take effect immediately after its approval.

Act No. 4, approved January 26, 2017.

## Footnotes

1    See,                                    https://www.bls.gov/regions/new–york–new–jersey/news–release/pdf/
countyemploymentandwages_puertorico.pdf (December 27, 2016).

2    See, id.

3    See                          https://data.bls.gov/timeseries/LASST720000000000003?amp253bdatatool=XGta
ble&output_view=data&include_graphs=true (December 27, 2016).

4    See   http://www.tradingeconomics.com/puerto–rico/labor–force–participation–rate   (December   27,   2016);   http://
www.tradingeconomics.com/united–states/labor–force–participation–rate (December 27, 2016).

5    See also http://www.bgfpr.com/documents/PuertoRicoFiscalandEconomicGrowthPlan9.9.15.pdf

**End of Document**                                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.