# Exhibit 21



PUERTO RICO
**FISCAL AGENCY & FINANCIAL ADVISORY** AUTHORITY

# Section 204(a)
## CERTIFICATION
Act 41-2022
Enacted on June 20, 2022



# CONTENTS

**Introduction** …………………………………………..…………………….. 3

**Purpose of Legislation** ………………………………..………………… 3

**Analysis and Assumptions** ……………………………………………... 6

**Fiscal Impact** …………………………………………….………….…... 11

**Determination of Compliance or Non-Compliance with Fiscal Plan** …....... 11

**Reports** ……………………………………………………………….….. 11

# I.   INTRODUCTION

This certification is provided pursuant to Section 204(a) of PROMESA, 48 U.S.C. §2144(2)(B).

# II.   PURPOSE OF LEGISLATION

Act 41-2022 ("Act 41") amends various provisions of certain labor laws applicable to Puerto Rico's private sector industry.  For purposes of this certification, and the pertinent analysis required in connection therewith, a summary of the most relevant amendments and provisions of Act 41 is included below.

**Amendments to Act 4-2017**

Act 41 amends Act 4-2017 to require that *ambiguous* provisions in employment contracts must be interpreted in favor of the employee, the weaker party and presumably not the drafter of the contract.  Prior to Act 41, Art. 2.12 of Act 4-2017 provided that, if there is ambiguity, "the interpretation should be guided by what was agreed between the parties, the law, the purpose of the relationship, productivity, the nature of the relationship of employment, good faith, uses and customs of commerce generally observed".

Among other amendments to Act 4-2017, Article 2.18 therein is modified to increase the statute of limitations from 1 year to 3 years for actions arising from an employment contract or benefits thereunder.  Article 2.21 - *Periodic Reports to the Legislative Assembly* - of Act 4-2017 is also amended to require the Secretary of the Department of Labor and Human Resources ("DTRH" by its Spanish acronym) to submit its periodic reports on the implementation of the Act every 3 months, instead of the previous yearly requirement.

**Amendments to Act 379 enacted on May 15, 1948, as amended, known as the "Act to Establish the Working Day in Puerto Rico" ("Act 379")**

Act 41 amends Article 4(a) of Act 379, which establishes what will be considered as overtime work.  The amendment eliminates the provision that allowed the employer to give written notification to the employee 5 days prior to the start of an alternate cycle of 24 work hours, with at least 8 hours between consecutive shifts.  Other amendments to Act 379 include certain modifications to the procedure established in Article 8 regarding an employee's request to change the work schedule and the provisions established in Article 11 related to food intake periods.

**Amendments to Act 289 enacted on April 9, 1946, as amended, known as the "Act to Establish a Day of Rest" ("Act 289")**

Act 41 also amends various provisions of Act 289, which requires one day of rest for every six days of work.  Particularly, Article 4 of Act 289 is amended to provide double pay to a student

who works on the day of rest, that is, the seventh day, only if such student works for a company not considered a microenterprise or a small and medium-sized business (commonly known as "PYMES"), as defined in Act 62-2014.

**Amendments to Act 180-1998, as amended, known as the "Puerto Rico Vacation and Sick Leave Act" ("Act 180")**

Act 41 amends various provisions of Act 180 pertaining to the accrual rates of vacation and sick leave days, as well as the statute of limitations for wage claim actions.  In accordance with the foregoing, Article 4 (a) of Act 180 is amended to provide an accrual monthly rate of one and a quarter or 1.25 vacation leave days and a minimum sick leave accrual of one day per month for workers who work 115 hours per month or more.  This amendment modifies the minimum of 130 hours worked per month that was established by Act 4-2017, as well as the accrual rates for vacation leave days.

For workers that do not reach 115 work hours per month, vacation and sick leave accrual rates shall each be half-a-day per month.  In regards to businesses or companies with less than 12 employees, the monthly accrual for part-time workers (working at least 20 hours per week but no more than 115 hours per month) will be a quarter of a day or .25 of vacation leave and half a day of sick leave.  In the case of workers who work more than 115 hours per month in companies with less than 12 employees, the accrual rate per month will be half-a-day of vacation leave and one day of sick leave.  This exception will be available to the employer as long as the number of employees does not exceed 12 and will cease in the calendar year following that in which the employer's payroll exceeds 15 employees for more than 26 weeks in each of 2 consecutive calendar years.  The provisions described above represent new vacation and sick leave accrual rights available to part-time employees.

Article 4(k) of Act 180 is amended to provide that, at the written request of the employee, the employer may allow the partial or total liquidation of the accrued vacation leave.  Article 4(q) is amended to include that the provisions established therein in regards to the prohibition of using justified sick leave absences as an employee evaluation criteria (thus minimizing discrimination against employees who have health-related problems), but shall not limit that an employer may establish attendance incentive programs according to their operational needs.  Lastly, Article 10(a) of Act 180 is amended to increase the statute of limitations for wage claim actions to 3 years, from the previously provided one year term.

**Amendments to Act No. 148 of June 30, 1969, as amended, known as the "Puerto Rico Christmas Bonus for the Employees of Private Enterprise Act" ("Act 148")**

Act 41 also amends certain provisions related to the Christmas bonus.  Specifically, Act 41 amends Section 1 of Act 148 to establish the requirement of a minimum of 700 hours of work, or 900 hours of work for employers who are considered microenterprises or PYMES, so that employees hired as of the effective date of Act 4-2017 are entitled to receive the Christmas bonus.  Act 4-2017 previously required that an employee had to work a minimum of 1,350 hours in order to qualify for the Christmas bonus.

The total amount paid to employees for the Christmas bonus shall not exceed 15% of the employer's annual net income, earned within the period from October 1st of the previous year until September 30th of the year to which the bonus corresponds. It is also reiterated that, if there is ambiguity in any provision of said Section 1 of Act 148, it will be interpreted liberally in favor of the employee.

Article 7 of Act 148 is also modified to add that, in order for the employer to benefit from exemption of paying the bonus in whole or in part, the balance sheet and income and loss statement required under said Article 7 must be signed and sealed by the Puerto Rico State Society of Certified Public Accountants, in addition to the other requirements provided therein.

**Amendments to Act No. 80 of May 30, 1976, as amended ("Act 80")**

Act 41 also amends severance pay provisions related to employment discharge without just cause. Accordingly, Section 1 (a) and (b) of Act 80 are amended to provide, in summary, that if an employee's discharge without just cause occurs within 15 years of service, the severance pay will be the salary corresponding to 3 months of pay, plus an additional 2 weeks for each year of service. If the wrongful discharge occurs after the employee completed 15 years or more of service, the severance pay will be the salary corresponding to 6 months, plus 3 weeks for each year of service. In addition, contrary to what was previously provided in the 2017 Labor Reform, there shall be no caps for this compensation.

Article 2 of Act 80 is also amended to establish the situations to be considered as just cause for discharge as an exhaustive list. Furthermore, pursuant to the amendments made to Article 3 of Act 80, certain seniority rights of dismissed employees are restored.

Another key amendment to Act 80 is to the provisions related to the probationary period. Act 41 amends Article 8 of Act 80 to provide an automatic probationary period of 3 months, which may be extended automatically for an additional 3 months upon written notification from the employer to the DTRH. Prior to this amendment, the 2017 Labor Reform established an automatic probationary period of 9 months for non-exempt employees and 12 months for exempt employees, which could be reduced by agreement between the employer and the employee.

Regarding court proceedings pertaining to employee claims of severance pay for discharge without just cause, Act 41 amends Article 11 (a) and (b) of Act 80 to provide the express obligation for the employer to allege in its response the facts that gave rise to the employee's discharge and prove that it was justified, thus establishing a presumption against the employer. The amended language included by means of Act 41 is similar to the provisions that existed prior to the amendments made by the 2017 Labor Reform, which eliminated said text to provide that the plaintiff had the burden of proof in said cause of action.

Finally, Article 12 of Act 80 is amended to increase the statute of limitations for actions claiming unjustified discharge to 3 years from the date of such discharge, which had been reduced to one year under Act 4-2017.

**Amendments to Act No. 100 enacted on June 30, 1959, as amended, known as the "Employment Discrimination Act" ("Act 100")**

Act 41 amends Article 3 of Act 100 to establish a presumption that any of the discriminatory acts, enumerated in Act 100, were committed in violation of its provisions when discriminatory action was committed without just cause.  It also provides that the presumption is refutable.

**Amendments to Act 28-2018, as amended, known as the "Special Leave Act for Employees with Serious Illnesses of a Catastrophic Nature" ("Act 28")**

Act 41 amends Subsection (c) of Article 2 of Act 28 to include bleeding health conditions that are similar to hemophilia among the serious catastrophic illnesses that are covered by the special license granted under Act 28.

## III.   ANALYSIS AND ASSUMPTIONS

**Act 41 and its Limited Impact on Act 4-2017**

It is important to note that Act 41 only applies to private sector employment and mostly amends and modifies existing and pre-Act 41 employment-related statutory obligations (the "Act 41 Modifications").

The provisions of Act 41 do not impact payroll expenditures for the Government of Puerto Rico (the "Government"), its agencies, public corporations, instrumentalities, and municipalities.  As such, the impact of Act 41 should be evaluated in light of the marginal effects that the Act 41 Modifications will have on the economic behavior of private sector employers.

A close examination of Act 41 will demonstrate that the most important labor market reforms of Act 4-2017 were preserved and continue in effect post-Act 41 enactment.  Specifically, only 13 of the 72 substantive sections of Act 4-2017 were subject to any modification, with 9 of the total 13 modified sections dealing with Act 80-1976 governing unfair dismissal claims.

The following is a high-level summary of the Act 41 Modifications and their effect on Act 4-2017:

- Overtime Pay:  Act 41 did not materially affect any of Act 4-2017's overhaul of overtime pay, except for expanding overtime pay in limited instances including when depriving an employee of at least one day of rest during a 7-day period.

- Overtime Calculation Rules and Makeup Time:  Act 41 did not materially affect any of Act 4-2017's overhaul of how overtime pay is computed, including preserving employees' ability to make up the time missed for personal reasons.

- Vacation, Sick Leave, and Christmas Bonus:  As previously discussed in Section II above, Act 41 amends the marginal benefits of vacation, sick leave, and Christmas bonus (the "Modified Marginal Benefits") by both reducing the threshold of hours needed for an

employee to qualify for and the level of accrual of the Modified Marginal Benefits.  See below for a more detailed discussion.

- <u>Mealtime Rules:</u>  Act 41 did not materially affect any of Act 4-2017's mealtime rules, except to mandate one mealtime for employees working more than 6 hours and an employee-waivable second mealtime for people working more than 10 hours.

- <u>Flexi-time Rules:</u>  Act 41 did not affect any of Act 4-2017's flex-work rules.

- <u>Employment Contracts:</u>  Act 41 did not materially affect most of Act 4-2017's employment contract-related matters.

- <u>Probationary Period:</u>  As previously discussed in Section II above, Act 41 partially undoes Act 4-2017's extension of the probationary period for an employee to gain permanent employee status by reducing said period from 9 to 3 months but with an additional 3-month extension (for a total of 6 months), that is automatically granted upon written request by the employer.

- <u>Cap on Recoverable Damages:</u>  Act 41 did not affect Act 4-2017's caps to damages for mental anguish and suffering arising from discrimination and retaliation claims.

- <u>Unfair Dismissal Claims:</u>  As previously discussed in Section II above, Act 41 amends the statutory parameters of unfair dismissal claims under Act 80-1976.  See below for a more detailed discussion.

- <u>Interpretation of Laws, Rules, and Policies:</u>  Act 41 did not materially impact the requirement that federal and local laws regulating similar matters be consistently interpreted, the employers' non-arbitrary or non-capricious interpretation of its own rules or policies, or presumption covering independent contractor status.

- <u>Statute of Limitation and Presumptions:</u>  As previously discussed in Section II above, Act 41 extended the statute of limitation for Act 80-1976 claims and labor contract related claims, among others, from 1 to 3 years.  Act 41 modified certain employment-related legal presumptions to protect employees.  These particular Act 41 Modifications do not impose new incremental employment-related statutory liabilities, but rather provide private sector employees with improved conditions to pursue causes of action that were statutorily available regardless of enactment of Act 41.

Although Act 41 is consistent with the plain language included in Section 7.2.2 of the Fiscal Plan, in as much as it does not repeal Act 4-2017, an argument can be made that Act 41 "negatively impacts labor market flexibility".  A close examination of Act 41 shows that it continues to largely preserve Act 4-2017's structural reforms and when taking into consideration the analysis provided herein, one may conclude Act 41 is not significantly inconsistent with the Fiscal Plan.

In accordance with Part III of the Fiscal Plan, structural economic reforms are necessary to promote the transformation of Puerto Rico's economy and its workforce. As a change in public policy, Act 41 seeks to improve the labor markets in Puerto Rico by: a) increasing the labor supply through improvements in the compensation of private sector employees and integration of new entrants into the formal workforce; and b) promoting increased labor market participation. These dual objectives help lay the foundations for labor market reforms that should support future economic growth in Puerto Rico. In addition, an increase in the employment levels and labor participation rates should in turn translate into potential greater consumer spending and increased revenue for the Government.

### Impact of Act 41 on the Puerto Rico Labor Markets

Historically, Puerto Rico's employment-related legislation has always focused on ensuring a minimum level of employment benefits while providing employers with a generalized framework for the regulation of employee-employer relationship. The labor reforms of Act 4-2017 provided added flexibility in structuring the employer-employee relationship (the "Act 4 Structural Reforms") and addressed the statutory levels of employment benefits (the "Statutory Employment Benefits").

As discussed above, Act 41 largely preserved the Act 4 Structural Reforms, that liberalized the employee-employer relationship, which signals continued legislative support and commitment to ensuring a more flexible and adaptable labor market.

As to the Statutory Employment Benefits, Act 41 modifies the same by improving the same and adopting the Modified Marginal Benefits. Act 41 introduced the Modified Marginal Benefits with the hope that improved fringe benefits will increase the inducement of people to join the labor force and help alleviate Puerto Rico's tight labor supply, thus further spurring economic activity and production. It is important to also point out that the Modified Marginal Benefits are, in many instances, comparable to benefits (both in nature and magnitude) that are currently being offered in other U.S. jurisdictions whose economic performance has not been shown to be negatively impacted by these types of benefits. Furthermore, Puerto Rico continues to maintain its labor-cost competitive advantage vis-à-vis other U.S. jurisdictions even after factoring in the Modified Marginal Benefits of Act 41. See pages 6-9 of **Attachment C**.

Although Orthodox economic policy would typically argue against government interventions that increase employer costs, it is important to understand the role of labor supply constraints – a phenomenon that has not been observed in OECD economies in decades – on policy levers and the potential need for interventions. The current labor market indicators for Puerto Rico are consistent with binding constraints on the supply of labor. Labor market constraints in monopsonistically competitive labor markets (meaning the employer has market power to set wages that would be different under a competitive solution) can be a concern because a lack of labor market competition can hold back the broader macroeconomy while also lowering wages. Considering the high monopsonistically competitive pricing power of employers in Puerto Rico, Government intervention in the labor markets, along the lines of Act 41, can, given the right circumstances, act as a catalyst in augmenting labor supply and increasing labor

participation rates while potentially spurring higher economic output.  See pages 3-6 of **Attachment C**.

Finally, and notwithstanding Act 41's expected positive impact on the labor supply, the ultimate economic impact of Act 41 will need to be evaluated while considering broader and competing macroeconomic factors affecting the Puerto Rico economy, including: U.S. inflationary pressure, global supply-chain constraints, and the continuing energy crisis. Considering the limitations on economic and labor statistics in Puerto Rico, including long reporting lags and limitations around coverage and national comparability, it is difficult to perform current and reliable economic analysis geared towards accurately isolating and measuring Act 41's impact on the Puerto Rico Economy vis-à-vis competing macroeconomic supply and inflation shocks, whose size and scope are unprecedented in the last four decades of data in the United States.  Hence, a comprehensive economic analysis requires the design of Puerto Rico-specific empirical studies in order to capture the subtleties of Act 41's differing treatment of subclasses within the Puerto Rico labor market.  See pages 11-12 of **Attachment C**.

**<u>Impact of the Modified Marginal Benefits on Private Employers</u>**

The economic impact of the Modified Marginal Benefits on private employers is not uniform and needs to be examined on a case-by-case basis, considering the fact that their impact is limited to only part-time employees.  *Act 41 does not alter the statutory benefits of full-time employees or employees currently receiving benefits above the statutory mandates of Act 4-2017*.

Thus, several factors simultaneously drive private employers' decisions when evaluating the impact of the Modified Marginal Benefits on their operations:

- <u>Relative Proportion of Part-Time Employees:</u>  To the extent that the private employer's labor force consists of full-time employees, then the impact of the Modified Marginal Benefit will be immaterial, if any.

- <u>Market Wages and Benefits are Above the Act 41 Statutory Mandates:</u>  Most private employers in Puerto Rico (and the United States) are currently offering salaries and benefit packages that are above the current Puerto Rico minimum wage and the Modified Marginal Benefits considering the current tight labor market conditions.  This market-driven wage dynamic renders immaterial, or potentially irrelevant, much of the marginal impact of the Modified Marginal Benefits on private employers.

- <u>Prior Adoption of Act 4-2017 Statutory Mandates:</u>  Anecdotal evidence indicates that many private employers with part-time employees did not implement Act 4-2017's reduction in statutory marginal benefits because:

  a) private employers were already voluntarily providing benefits in excess of the statutory levels;
  b) the cost of maintaining internal procedures for a dual-benefit compensation structure (for pre- and post- Act 4-2017 employees) outweighed potential savings;

    c) the negative impact on employee morale of a dual-benefit compensation structure outweighed marginal savings; and

    d) the potential savings from the dual-benefit compensation structure were minimal due to the relatively small impact of the part-time employees' salary expense as a percentage of total salary expense.

## Impact of Amendments to Act 80-1976 on Private Employers

Unfair dismissal claims against private employers existed prior to enactment of Act 41 by virtue of Act 80-1976.  Act 41 provides for marginal amendments to some of Act 80-1976 statutory parameters.  The impact of any potential post-Act 41 costs related to modification to the unfair dismissal statutory mandates should consider that any potential unfair dismissal claims:

    a) do not apply to all employment terminations;

    b) only apply to employees hired post Act 4-2017 enactment, i.e. after January 26, 2017;

    c) are not automatic, requiring judicial determination of unfair dismissal and providing due process to the private employer; and

    d) do not apply to dismissals that fall into broad statutory dismissal safe-harbors, including dismissals for:

        i. Routine improper or disorderly conduct by employees;
        ii. Employees' failure to perform their jobs in an efficient manner or performing the work in a negligent or late manner in violation of the employers work rules;
        iii. Repeated violations of employers' reasonable written work rules;
        iv. Complete, temporary, or partial employer closure of operations;
        v. Reorganizations, technological changes, or product changes; and
        vi. Necessary layoffs due to anticipated or existing reductions in volumes of production, sales, or profits.

It is important to note that Act 41's incremental costs of the compensation for unfair dismissal claims will only affect dismissal of employees that: a) were hired after January 26, 2017 (as prior hire-date employees were grandfathered by Act 4-2017); and b) are not covered by any of Act 80's statutory termination safe-harbors.  **Moreover, Act 80-1976's compensation for unfair dismissal for employees with less than 12 years of employment tenure is the same pursuant to Act 4-2017 and Act 41** (See Exhibit 1).  Consequently, Act 41 will have **NO** short to medium term effect on the compensation for unfair dismissal costs until January 24, 2029, which is when employees hired after January 26, 2017 will achieve employment tenure of more than 12 years.

As to the impact of Act 41 on long-term dismissals, the impact of the removal of Act 4-2017's cap on the compensation levels for unfair dismissal claims will only apply to unfair dismissal of employees hired after January 26, 2017 and that have an employment tenure greater than 12 years (See Exhibit 1).  For employees that do not fall under any of Act 80's statutory termination

safe-harbors, private employers can mitigate potential Act 41's incremental compensation for unfair dismissal costs through: a) improving employee selection processes; b) closer scrutiny of employee performance prior to the 12-year employment anniversary; and c) more diligence in documenting dismissal basis and the applicability of one of Act 80's statutory termination safe-harbors.

Likewise, the extension of the statute of limitation for Act 80-1976 causes of action merely provides additional time for employees to pursue existing (pre-Act 41, not new) unfair dismissal claims.

## IV.    FISCAL IMPACT

The Office of Management and Budget certified that implementation of Act 41 will not have a fiscal impact on the Certified Budget.   See **Attachment A**.   In regards to revenues, the Department of Treasury certified that Act 41 does not have an impact on revenues.   See **Attachment B**.

## V.    DETERMINATION OF COMPLIANCE OR NON-COMPLIANCE WITH THE CERTIFIED FISCAL PLAN

In consideration of the above, one can conclude Act 41 is not significantly inconsistent with the Fiscal Plan[1].   In accordance with Part III of the Fiscal Plan, structural economic reforms are necessary to promote the transformation of Puerto Rico's economy and its workforce.   Act 41 seeks to improve the labor markets in Puerto Rico by: a) increasing the labor supply through improvements in the compensation of private sector employees and integration of new entrants into the formal workforce; and b) promoting increased labor market participation.   These dual objectives help lay the foundations for labor market reforms that should support future economic growth in Puerto Rico.   In addition, an increase in the employment levels and labor participation rates should in turn translate into potential greater consumer spending and increased revenue for the Government.

## VI.   REPORTS

- Attachment A (Office of Management and Budget)
- Attachment B (Department of the Treasury)
- Attachment C (Devtech Systems, Inc. Memorandum)

---

[1] The word "significant" conveys a degree of importance equal to or greater than "material."  *See Markel Am. Ins. Co. v. Veras*, 995 F. Supp. 2d 65, 75 n.5 (D.P.R. 2014) (noting that Black's Law Dictionary defines "material" as "significant"); MATERIAL, Black's Law Dictionary (11th ed. 2019). - Determining whether a misleading statement is material is a fact-specific inquiry.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988).

**GOVERNMENT OF PUERTO RICO**

OFFICE OF MANAGEMENT AND BUDGET

Director  I  Juan Carlos Blanco  I  juan.blanco@ogp.pr.gov

## FISCAL IMPACT CERTIFICATION
Act No. 41-2022

As required by the Federal Act entitled Puerto Rico Oversight, Management, and Economic Stability Act, known as PROMESA, Pub. L. 114-187, we have evaluated the recently passed law to determine whether it may have a potential fiscal impact on the Spending Budget of the Government of Puerto Rico. The Act included in this certification is the following:

***Act No. 41 – 2022 (House Bill 1244) –*** To amend Articles 2.12, 2.18 and 2.21 of Act 4- 2017, better known as the "Labor Transformation and Flexibility Act;" to amend Articles 4, 8, 10, 11 and 14 of Act No. 379 of May 15, 1948, as amended; to amend Sections 1 and 4 of Act No. 289 of April 09, 1946, as amended; to amend subsections (a), (k) and (q) of Article 4, subsection (b) of Article 3, as well as subsection (a) of Article 10 of Act No. 180-1998, as amended; to amend Articles 1 and 7 of Act No. 148 of June 30, 1969, as amended; to amend subsections (a) and (b) of Article 1, subsections (b), (d), (e) and (f) of Article 2, Articles 3, 5, 7 and 8, subsections (a) and (b) of Article 11 and Article 12, as well as to eliminate Article 3-A of Act No. 80 of May 30, 1976, as amended; to amend Article 3 of Act No. 100 of June 30, 1959, as amended; and to amend subsection (c) of Article 2 of Act 28-2018, as amended; in order to reinstate and expand the labor rights applicable to private enterprise; to decrease the probationary period, reestablish protections against unjustified termination, and [set] the formula for calculating vacation and sick leave accrual, while extending said benefit to part-time employees; to reestablish the prescriptive period to claim benefits derived from an employment contract; and for other related purposes.

After the corresponding evaluation and analysis, we conclude that the aforementioned piece of legislation should not entail a fiscal impact and, if any, it would be minimal for the approved budget for fiscal year **2021-2022**.

This Certification is issued in San Juan, Puerto Rico on June 23, 2022.

Cordially,
[Signature]
Juan Carlos Blanco Urrutia

Enclosure

Circular Letter No. 169-19, Circular Letter No. 024-19; Circular Letter No. 1300-070,
Office of Management and Budget, Fiscal Agency and Financial Advisory Authority
and Department of the Treasury
**Addendum I - UNIVERSAL FORM**
November 25, 2019
Page **1** of **2**

## UNIVERSAL FORM[1]
### Certification in Compliance with Section 204 (a) of PROMESA and Administrative Notice OE 2019-57

---

☒ **Prior to an Act or Resolution being passed**

☐ **Immediately once an Act or Resolution is passed (signed)**

---

### MANDATORY REQUIREMENT FOR ALL AGENCIES

As required by Section 204 (a) of the Federal Act entitled Puerto Rico Oversight, Management, and Economic Stability Act, known as PROMESA, Pub. L. 114-187, we have evaluated HB No. 1244, to determine whether it may have a potential fiscal impact on the Spending Budget of the Government of Puerto Rico.

After the corresponding evaluation and analysis of the referenced statute, we certify the following:

I certify that, if the referenced bill or resolution is signed, its implementation would have the following impact on the Agency: Department of Labor and Human Resources

1. That the statute before us for consideration:

    ☐ **entails no fiscal impact**
    ☒ **entails a fiscal impact** (If it entails an impact, please complete part 2)

2. That the statute before us for consideration entails

    a. an **increase in costs** of $__3,000__.
    b. a **decrease in costs** of $_____.
    c. an **increase in income** of $_____.
    d. a **decrease in income** of $_____.

I certify that, if the referenced bill or resolution is signed, the aforementioned impact ☐ is ☒ is not contemplated in the certified budget for **fiscal year 2021-2022** for the Agency: <u>Department of Labor and Human Resources</u>, therefore it ☐ would have ☒ would not have an incremental effect thereon.

In the case of a reallocation, I certify that the funds to be reallocated through this statute are from: _____ from Fiscal Year _____

---

[1] The original tax documents shall be retained for six (6) years or until an intervention by the Comptroller, whichever occurs first. See Article IV of Regulation 23-00-01, Retention of Tax Documents or Documents Needed for Examination and Verification of Fiscal Accounts and Operations.
*See the Comments.

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*5/JULY/2022 - Andreea I. Boscor ATA-certified Spanish-English #525556*
*By Targem Translations Inc.*

Circular Letter No. 169-19, Circular Letter No. 025-2015, Circular Letter No. 1300-070,
Office of Management and Budget, Fiscal Agency and Financial Advisory Authority
and Department of the Treasury
**Addendum I - UNIVERSAL FORM**
November 25, 2019
Page **2** of **2**

1. The funds to be reallocated:

    ☐ **are not available**
    ☐ **are available** (If available, please complete part 2 and 3)

2. The funds are in:

    ☐ PRIFAS (Amount of Account Number _____)
    for $_____.
    ☐ Account Outside of PRIFAS (Account Number _____)
    for $_____.
    ☐ Other _____

3. That the funds to be reallocated:

    ☐ **are committed for $_____.**
    ☐ **are not committed**

I certify that, if the referenced statute is signed, it:

    ☒ **is not significantly inconsistent with the Certified Fiscal Plan.**
    ☐ **is significantly inconsistent with the Certified Fiscal Plan.**

Comments: <u>The estimated cost is based on the publication of notices to comply with the review
of regulations pursuant to the Uniform Administrative Procedure Act.</u>

In light of the foregoing, this Certification is issued on June 08, 2022.

<u>Department of Labor and Human Resources</u>
Agency

<u>Gabriel Maldonado-González, Secretary</u>        _____[Signature]_____
Name and Position                                Signature

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*5/JULY/2022 - Andreea I. Boscor ATA-certified Spanish-English #525556*
*By Targem Translations Inc.*



T 718.384.8040
W TargemTranslations.com
E projects@targemtranslations.com
A 185 Clymer St. Brooklyn, NY 11211

**TRANSLATOR'S CERTIFICATE OF TRANSLATION**

Translation from: Spanish (Puerto Rico) into English (US)
TARGEM Translations Inc.

I, Andreea I. Boscor, ATA-certified Spanish-English #525556, acting as translator at TARGEM Translations Inc., a NEW YORK City corporation, with its principal office at 185 Clymer Street, Brooklyn, NY, 11211, USA, certify that:

the English translated document is a true and accurate translation of the original Spanish and has been translated to the best of my knowledge.

Original Document Name: **Attachment A**

Signed this 5th of July 2022



Verify at www.atanet.org/verify

_____
Andreea I. Boscor



Circular Letter No. 169-19, Circular Letter No. 2019-01; Circular Letter No. 1300-070,
Office of Management and Budget, Fiscal Agency and Financial Advisory Authority
and Department of the Treasury
**Addendum I - UNIVERSAL FORM**
November 25, 2019
Page **1** of **2**

# UNIVERSAL FORM[1]
## Certification in Compliance with Section 204 (a) of PROMESA and Administrative Notice OE 2019-57

_____

☐ **Prior to an Act or Resolution being passed**

☒ **Immediately once an Act or Resolution is passed (signed)**

_____
_____

## MANDATORY REQUIREMENT FOR ALL AGENCIES

As required by Section 204(a) of the Federal Act entitled Puerto Rico Oversight, Management, and Economic Stability Act, known as PROMESA, Pub. L. 114-187, we have evaluated **Act No. 41 of June 20, 2022**, to determine whether it may have a potential fiscal impact on the Spending Budget of the Government of Puerto Rico.

After the corresponding evaluation and analysis of the referenced statute, we certify the following:

I certify that, if the referenced bill or resolution is signed, its implementation would have the following impact on the Agency: Department of the Treasury

1. That the statute before us for consideration:

    ☒ **entails no fiscal impact**
    ☐ **entails a fiscal impact** (If it entails an impact, please complete part 2)

2. That the statute before us for consideration entails

    a. an **increase in costs** of $_____.
    b. a **decrease in costs** of $_____.
    c. an **increase in income** of $_____.
    d. a **decrease in income** of $_____.

I certify that, if the referenced bill or resolution is signed, the aforementioned impact ☐ is ☐ is not contemplated in the certified budget for **fiscal year 2021-2022** for the Agency: _____, therefore it ☐ would have ☒ would not have an incremental effect thereon.

In the case of a reallocation, I certify that the funds to be reallocated through this statute are from: _____ from Fiscal Year _____

_____

[1] The original tax documents shall be retained for six (6) years or until an intervention by the Comptroller, whichever occurs first. See Article IV of Regulation 23-00-01, Retention of Tax Documents or Documents Needed for Examination and Verification of Fiscal Accounts and Operations.

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*5/JULY/2022 - Andreea I. Boscor ATA-certified Spanish-English #525556*
*By Targem Translations Inc.*

Circular Letter No. 169-19, Circular Letter No. 2019-01; Circular Letter No. 1300-070,
Office of Management and Budget, Fiscal Agency and Financial Advisory Authority
and Department of the Treasury
**Addendum I - UNIVERSAL FORM**
November 25, 2019
Page **2** of **2**

1. The funds to be reallocated:

   ☐ **are not available**
   ☐ **are available** (If available, please complete part 2 and 3)

2. The funds are in:

   ☐ PRIFAS (Amount of Account Number _____)
   for $_____.
   ☐ Account Outside of PRIFAS (Account Number _____)
   for $_____.
   ☐ Other _____

3. That the funds to be reallocated:

   ☐ **are committed for $_____.**
   ☐ **are not committed**

I certify that, if the referenced statute is signed, it:

   ☐ **is not significantly inconsistent with the Certified Fiscal Plan.**
   ☐ **is significantly inconsistent with the Certified Fiscal Plan.**

1. **Comments:**

In light of the foregoing, this Certification is issued on June 29, 2022.

Department of the Treasury
         Agency

_____Aixa Cruz Pol_____                    _____[Signature]_____
Assistant Secretary                                  Signature
Office of Economic and
Financial Affairs
Department of the Treasury

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*5/JULY/2022 - Andreea I. Boscor ATA-certified Spanish-English #525556*
*By Targem Translations Inc.*



718.384.8040
TargemTranslations.com
projects@targemtranslations.com
185 Clymer St. Brooklyn, NY 11211

**TRANSLATOR'S CERTIFICATE OF TRANSLATION**

Translation from: Spanish (Puerto Rico) into English (US)
TARGEM Translations Inc.

I, Andreea I. Boscor, ATA-certified Spanish-English #525556, acting as translator at TARGEM Translations Inc., a NEW YORK City corporation, with its principal office at 185 Clymer Street, Brooklyn, NY, 11211, USA, certify that:

the English translated document is a true and accurate translation of the original Spanish and has been translated to the best of my knowledge.

Original Document Name: **Attachment B**

Signed this 5th of July 2022



Verify at www.atanet.org/verify

_____
Andreea I. Boscor





# ECONOMIC UNDERPINNING OF PUERTO RICO ACT 41-2022

Prepared by

Puerto Rico Economic Advisory Team

Dr. Rafael Romeu & Emily Forrest

# EXECUTIVE SUMMARY

The key rationale driving Employment Law Act 41-2022 is to address the current binding constraint on economic growth due to tight labor supply, which only compounds Puerto Rico's unique challenge in increasing labor participation. We present evidence of an acute conjunctural worker shortage of historic proportions. We then present a rationale for government intervention to help alleviate this constraint by mandating some increases in worker benefits and part-time flexibilization. These changes are expected to induce workers to enter the job market. We show that average labor costs in Puerto Rico would remain well-below those in mainland U.S., likely ameliorating the adverse long-run consequences of the increase in employment costs. Hence, the short-run labor shortage in Puerto Rico presents few alternatives to approaches such as Act 41-2022. Insofar as workers are scarce and supply constraints are binding at historical levels, it is reasonable to expect government action to help relieve this constraint on economic growth.

## TABLE OF CONTENTS

Introduction: A Tight Labor Market ..................................................................................................2

Puerto Rico's Unique Labor Participation Challenge.......................................................................2

A Simple Example of Government Intervention to Alleviate Labor Supply Constraints...................3

    Monopsonistically Competitive Labor Markets in Puerto Rico ......................................................5

Is the Benefits Package in Act 41-2022 "Too High"? ......................................................................6

    Paid Sick Leave in Act 41-2022 .....................................................................................................6

    Paid Vacation Leave and Christmas Bonus in Act 41-2022 ..........................................................7

    Compensation for Unfair Dismissal in Act 41-2022 ....................................................................10

Conclusion....................................................................................................................................11

## INTRODUCTION: A TIGHT LABOR MARKET

**Puerto Rico is currently experiencing important supply constraints (bottlenecks) affecting the labor market.** The unemployment rate in Puerto Rico is at the lowest point since at least 1990, despite an increase in the size of the labor force on the backdrop of strong economic activity. It is self-evident that, at the current time, there is a shortage of workers in Puerto Rico. The figures below show the rebound in the labor force, as well as the steadily declining unemployment.

**Figure 1. Tight Labor Supply Conditions in Puerto Rico**



Sources: Puerto Rico Department of Labor and Human Resources, Household Survey, and United States Bureau of Labor Statistics, Household Survey.

Notes: The left graph shows the labor force increasing annually since 2020. The right graph shows the historic decline in the unemployment rate in Puerto Rico.

## PUERTO RICO'S UNIQUE LABOR PARTICIPATION CHALLENGE

**Notwithstanding the recent observed increase, Puerto Rico has a uniquely low labor force participation rate that reflects a combination of short-term shocks and long-term structural challenges.** Participation is below the national average by 20 percentage points. Demographics of the civilian population that is work-eligible suggest the need for inducement to work, in addition to on-island jobs' competition for workers with jobs on the mainland that pay much higher wages. The island is in a "demographic winter" - fertility levels are low, migration from the island to the mainland United States continues, and deaths on the island exceed births. Figure 2 below presents data compiled by the Pew Research Center showing lower incomes and higher poverty and unemployment rates for Puerto Ricans than other Hispanics.

**Figure 2. Social and Economic Conditions of the Population**

| | All Hispanics | | | Puerto Ricans | | |
|---|---|---|---|---|---|---|
| Economic characteristics of the U.S. Puerto Rican population, 2017 | **All** | **U.S. born** | **Foreign born** | **All** | **Born in U.S. states or D.C.** | **Born in Puerto Rico** |
| MEDIAN ANNUAL HOUSEHOLD INCOME | 49,010 | 53,000 | 45,200 | 44,300 | 50,225 | 36,050 |
| MEDIAN ANNUAL PERSONAL EARNINGS (ages 16+ with positive earnings) | | | | | | |
| All | 25,000 | 26,000 | 25,000 | 28,600 | 28,000 | 29,000 |
| Full-time, year-round workers | 34,000 | 37,000 | 30,000 | 40,000 | 40,000 | 38,000 |
| EMPLOYMENT STATUS (civilians ages 16+) | | | | | | |
| Employed | 63% | 61% | 66% | 57% | 63% | 48% |
| Not employed | 4% | 5% | 3% | 5% | 6% | 3% |
| Not in labor force | 33% | 34% | 31% | 38% | 31% | 49% |
| UNEMPLOYMENT RATE (civilians ages 16+ in the labor force) | 6% | 7% | 5% | 8% | 9% | 7% |
| LIVING IN POVERTY | | | | | | |
| All ages | 19% | 20% | 18% | 23% | 22% | 24% |
| Younger than 18 | 27% | 26% | 31% | 29% | 28% | 41% |
| 18-64 | 16% | 15% | 17% | 19% | 18% | 23% |
| 65 and older | 18% | 15% | 20% | 21% | 16% | 22% |
| HOMEOWNERSHIP (households) | | | | | | |
| Owner-occupied | 47% | 49% | 46% | 38% | 39% | 36% |
| Renter-occupied | 53% | 51% | 54% | 62% | 61% | 64% |

Note: Hispanics are of any race. The household population excludes persons living in institutions, college dormitories and other group quarters. Households are classified by the detailed Hispanic origin group of the head of the household. "Full-time, year-round workers" are defined as people ages 16 and older who usually worked at least 35 hours per week and at least 48 weeks in the past year. The share of the population ages 16 and older who are not employed differs from the unemployment rate because the share not employed is based on the total population, while the unemployment rate is based on those who are in the labor force (i.e. working or looking for work.) Poverty status is determined for individuals in housing units and non-institutional group quarters. It is unavailable for children younger than 15 who are not related to the householder, people living in institutional group quarters and people living in college dormitories or military barracks. Due to the way in which IPUMS assigns poverty values, these data will differ from those provided by the U.S. Census Bureau. Figures may not sum to 100% due to rounding.

Source: Pew Research Center tabulations of 2017 American Community Surveys (1% IPUMS). https://www.pewresearch.org/fact-tank/2017/03/29/key-findings-about-puerto-rico/

# A SIMPLE EXAMPLE OF GOVERNMENT INTERVENTION TO ALLEVIATE LABOR SUPPLY CONSTRAINTS

Orthodox economic policy would typically argue against government interventions that increase employer costs as a strategy to ultimately deliver more jobs and more workers. Hence, it is important to understand the role of supply constraints – a phenomenon that has not been observed in OECD economies in decades – on policy levers and the potential need for interventions. In this case, we present below an example to simplify the labor market situation in Puerto Rico and illustrate the positive role that Act 41-2022 can potentially play.

Imagine Puerto Rico had just one restaurant with one chef, Pedro. Pedro has a reservation wage of $100, meaning he is not willing to work for less than $100. The restaurant is considering hiring a second new chef, Luis, who has a reservation wage of $300. If Luis is hired, Pedro (the infra-marginal unit) will want pay equity, so the restaurant must pay them each $300, increasing its labor costs by

$500 to employ Luis. The restaurant's total labor costs go from $100 for employing Pedro to $600 for employing both Pedro and Luis. Now imagine the restaurant is considering a third chef, Maria, and her reservation wage is $500. But all three will demand pay equity, implying that each chef will be paid $500, so the raise due to Pedro and Luis sums to $400. Hence, the total incremental cost of bringing on Maria is $900. Now imagine Pedro earns $600 in restaurant sales, Luis earns $400 in restaurant sales, and Maria earns $200 in restaurant sales. The reason for the diminishing billings (marginal revenue) could be because each new chef takes on the easiest night available, hence each subsequent chef gets nights with fewer customers, thereby lowering their productivity. From the table below, one can observe that the restaurant maximizes its profits by hiring only the first chef, Pedro, and earning profits of $500. It will not hire either Luis or Maria (see table).

**Figure 3. An Example of Intervention in a Monopsonistically Competitive Market**

| Labor Market | | | Costs, No Government Intervention | | | Revenue | | Profit, No Intervention | Costs With Minimum Benefit Package | | | Profit with Min. Ben. Package |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Employees | Chef | Reservation Wage | Wage Paid to Each Employee | Total Factor Cost | Marginal Factor Cost | Total Revenue | Marginal Revenue Product | Profits | Wage Paid to Each Employee | Total Factor Cost | Marginal Factor Cost | Profits |
| a | b | c | d | e = a *d | f | g | h | i = g - e | j (see note) | k = a *j | l | m = g - k |
| 1 | Pedro | 100 | 100 | 100 | 100 | 600 | 600 | 500* | 350 | 350 | 350 | 250 |
| 2 | Luis | 300 | 300 | 600 | 500 | 1000 | 400 | 400 | 350 | 700 | 350 | 300* |
| 3 | Maria | 500 | 500 | 1500 | 900 | 1200 | 200 | -300 | 500 | 1500 | 800 | -300 |

Note: Following the imposition of the minimum benefits package, the cost of the minimum benefits package replaces the reservation wage if the reservation wage is less than the cost of the minimum benefits package.

Note that in this example, while the restaurant could still hire the second chef, Luis, this would lower overall profitability from $500 to $400, so the restaurant will not offer wages that induce Luis to work. That is, the restaurant pays Pedro $100 and makes $500 in profit. If it hires Luis, the two chefs cost $600, but revenue is only $1000, so profit declines to $400. Of course, Maria's reservation wage of $500 would mean a $1500 wage bill for the firm for all three employees, and with revenue at $1200, they would lose $300 so she does not work.

Now assume the government imposes a minimum benefits package comprised of wages, vacation, sick leave, etc. The restaurant has no choice but to offer the minimum package worth $350. Both Pedro and Luis are willing to work for the minimum package, and they each now cost the firm the same. Hence, the minimum wage/package induces the restaurant to hire the second chef and the second chef to work. Finally, the third chef, Maria, has a reservation wage that is higher than the required package and she will not participate in the labor market. The restaurant will not pay her rate of $500, and if the government went too far in assigning a minimum package, the restaurant would shut down to avoid losses rather than hire her, so the level of benefits matters.

This is a simple example of a labor market characterized by one employer hiring workers (i.e., a monopsony) that illustrates how policy interventions along the lines of Act 41-2022 can induce both more employment and higher output[1]. In this example, the minimum benefits package induces the second chef to enter the work force, and it makes him profitable to the restaurant. The historic

---

[1] It is self-evident that this example is a heuristic constructed to contextualize the arguments and evidence below. An actual study of labor markets in Puerto Rico is beyond the scope of this memorandum, due among other reasons to limitations on economic and labor statistics in Puerto Rico, including long reporting lags and limitations on coverage and comparability.

challenge described above in finding new workers can be usefully described through this example if it is reasonable to believe that the underlying conditions that would render this example useful are present at the firm level in Puerto Rico. There are two fundamental conditions for this to be met:

1. Do firms have monopsonistically competitive pricing power in the labor market (do employers in Puerto Rico have at least some power to maintain low wages)?
2. Are the workers' benefits from the government intervention "too high", so that these induce less employment (i.e., the shut-down) rather than more?

## Monopsonistically Competitive Labor Markets in Puerto Rico

Monopsonistically Competitive Labor Markets are an increasingly important policy concern in Puerto Rico and more broadly in the rest of the United States because a lack of labor market competition can hold back the wider macroeconomy while also lowering wages[2]. An example of a monopsonistically competitive labor market might be a city with many restaurants. Though there might be many restaurants employing chefs, they are not identical.

A chef has skills that can be used in a multitude of restaurants, but this does not mean the chef is indifferent to where they are employed. Some restaurants may provide a more suitable menu, have better or more predictable work schedules, or be more conveniently located. In this case, the chef may be willing to accept a discounted wage to work at a particular restaurant, giving that restaurant some degree of market power. The ability to lower that chef's wage relative to what he/she could receive elsewhere is market power, which can come from some idiosyncratic factor or from structural market characteristics such as being the only restaurant in town, regulatory barriers, or licensing.

There are conditions where all employers, to varying degrees, possess market power from factors such as location or schedule flexibility. These examples illustrate that a friction is any factor that makes job searches or switches more difficult than the theoretical ideal of switching. The job search process is characterized by considerable information gaps. For example, consumers can easily compare airfare prices on travel aggregator websites, or between two identical consumer goods, such as pantry staples, but it is typically impossible for workers to learn the compensation associated with every potential employment opportunity. Hence, real-world labor markets feature significantly more frictions than consumer markets. Moreover, there is a special category of market frictions, which involve the time and considerable uncertainty from job searches, which give firms market power. Aware of these frictions, employers can discount wages while retaining their workforce and hiring new employees. A worker will sometimes prefer to accept a job with a discounted wage than to continue a job search that may not yield a better alternative quickly or at all. Many of these frictions involve geography, market size, and regulatory barriers to competition.

The following are prima facia evidence of Monopsonistically Competitive Labor Markets:

---

[2] The Biden Administration has prioritized the study of the ways in which insufficient labor market competition hurts workers, documents the proliferation of barriers to job mobility, etc. See, for example, "The State of Labor Market Competition", US Treasury Department, May 2022, from which we draw liberally.

1. Regulatory frameworks in Puerto Rico, licensing, and industry limitations stemming from these (e.g. professional or state licensing requirements limit entry of competitors)

2. Geographical isolation from other U.S. jurisdictions that impedes search across other U.S. labor markets

3. Other factors such as language barriers that impede search across other U.S. labor markets (e.g. professional documents in Puerto Rico are obviously managed in Spanish, the official language).

## IS THE BENEFITS PACKAGE IN ACT 41-2022 "TOO HIGH"?

This section turns to the question of whether it is reasonable to believe that the benefits package proposed under Act 41-2022 is reasonably supported by conditions in Puerto Rico. Hence, the fundamental question is whether the benefits package mandated by Act 41 is "too high," so as to induce less employment rather than more. There are two parts to Act 41, compensation and legal issues.

The compensation issue is a straight-forward increase in benefits. Compelling firms to increase benefits is necessary to combat the incentive structure discussed above. In order to induce new entrants, the government must compel firms to incur higher labor costs (in the form of increased benefits), but not so high that it causes them to back away from the market completely.

The below analysis is based on information about the detailed changes to sick leave, vacation leave, and Christmas bonus eligibility, accumulation, work hour requirements, etc included in Act 41 as interpreted and described by AAFAF and its advisors.

### Paid Sick Leave in Act 41-2022

The approach taken in this note is to simplify this constellation of factors into a simpler metric that is conservative (i.e. erring on the side of overestimating costs). Hence, we simplify Act 41 paid sick leave conditionality to assume that it broadly dictates 0.5 days of accumulated sick leave per month depending on conditions for minimum hours being met, and this includes part-time workers. We show below a selection of US states that also mandate sick leave.[3] The requirement of four hours per month for part-time workers is broadly in line with the benefits across a number of states and major cities in the mainland. Hence, this does not seem an onerous benefit to mandate to employers. In a situation where some employers in Puerto Rico were not including this in their offering, and with monopsonistically competitive labor markets, it could be compelling for the government to intervene so as to induce workers to enter the labor market.

---

[3] The selection of U.S. States here covers the top two states for Hispanics of Puerto Rican descent, as reported by Pew Center, Top three U.S. states by share of Puerto Rican population, 2017, Share of total Puerto Rican population in U.S. states/D.C. We note that Florida is the third highest state in this count, and while it does not require sick leave, there is statistical support suggesting it is widely offered by private employers despite no mandate.

**Figure 4. Paid Leave in HB 1244 Compared to States in the Mainland**

| Leave Requirements In Comparison to States | | | | |
|---|---|---|---|---|
| | Paid Sick Leave? | Part-time Paid Sick Leave? | Paid Vacation Leave? | Hours/ month |
| California | Y | 1 hour per 30 hours worked | N | 3.8 |
| Connecticut | Y | 1 hour per 40 hours worked | N | 2.9 |
| Illinois | Y* | 1 hour per 40 hours worked | N | 2.9 * |
| Massachusetts | Y | 1 hour per 30 hours worked | N | 3.8 |
| New Jersey | Y | 1 hour per 30 hours worked | N | 3.8 |
| New York | Y* | 1 hour per 30 hours worked | N | 3.8 * |
| Pennsylvania | Y* | 1 hour per 40 hours worked | N | 2.9 * |
| Rhode Island | Y | 1 hour per 35 hours worked | N | 3.3 |
| Washington | Y | 1 hour per 40 hours worked | N | 2.9 |
| Puerto Rico | Y | 4 hours/month, see law | Y | 4.0 |

* Sick Leave as documented for Chicago, Philadelphia and NY City for their respective states.

https://www.chicago.gov/city/en/depts, https://www1.nyc https://www.phila.gov/media/20200413150709/Paid-sick-leave-English-20200409-rev.pdf

Source: https://www.ncsl.org/research/labor-and-employment/paid-sick-leave.aspx

## Paid Vacation Leave and Christmas Bonus in Act 41-2022

As with the paid sick leave requirement above, the approach taken in this note is to simplify this constellation of factors into a simpler metric that is conservative (i.e. erring on the side of overestimating costs). To this end, we proceed assuming Act 41 broadly dictates 15 days a year of accumulated vacation leave depending on conditions for minimum hours being met, with standard formulas determining accumulation based on hours worked, minimum hours per year, limits on time taken at once, buy-outs, etc.

We present a table below comparing employment costs on the mainland by NAICS code (industry) with these same costs on Puerto Rico, before and after the reform. Hence, we show below the cost of adding vacation and Christmas bonus to the labor costs of all Puerto Rico employees in 16 NAICS categories covering over 700,000 jobs in Puerto Rico, as compared to the labor costs in U.S. States. The estimates for the net new benefits are necessarily crude given the absence of reliable data sources for the availability of private sector vacation benefits data, but we intended to use conservative estimates so as to not under-estimate the incremental cost associated with the law. Moreover, the salary data are likely reliable, as we are matching industry level data of average hourly and weekly earnings of all employees on private nonfarm payrolls by industry sector, seasonally adjusted, and for the time period available from Puerto Rico. This allows a closer apples-to-apples comparison of labor costs between mainland U.S. and Puerto Rico.

The purpose of the table below is not to present an exhaustive market comparison of the exact benefits mandated by the law and its equivalent compensation in the mainland, as that would be outside the scope of this memorandum. Nevertheless, the figure below matches salaries at the NAICS two-digit level for Puerto Rico and the mainland U.S. across more than a dozen industries. We show the average salaries of workers in each industry and do a cursory calculation of the cost of the additional vacation and Christmas bonus mandates based on available data. There are numerous caveats in order.

Firstly, the mandates for both vacation and the Christmas bonus are binding only for workers that do not have vacation or Christmas bonus provided in their employment agreements at the levels required by Act 41, where anecdotal evidence suggests that these benefits are already offered by many employers in Puerto Rico. Many employers have offered these and other marginal benefits to part-time employees already because they did not want to create a dual-benefit system (more costly and confusing to administer). Thus, Act 41 brings no incremental costs to those employers; and given how tight the labor markets are, some employers were already offering more than the minimum mandated benefits.

Vacation utilization data are notoriously difficult to get (and unused vacation could be lost), and the estimated data available are not based on Puerto Rico. The challenge of isolating which benefits already exist among private employers in Puerto Rico, as opposed to the new costs that will be incurred by employers is difficult to overcome due to data limitations. For paid vacation leave, this note employs national estimates of average vacation offered by employers in the United States for workers with one year of tenure, and this suggests Act 41 could add perhaps four days of paid leave per worker.[4] In addition, we assign all workers $300 in additional Christmas bonus. The same data caveats are true for the Christmas bonus. Hence, for the vacation Christmas bonus, we (conservatively) add $300 per worker.

The table shows the lower wages in Puerto Rico. While wages for accommodation and food services jobs are as high as 62 percent of mainland wages (note that many restaurant workers are subject to a lower minimum wage for tipped employees in most mainland states), in nearly all other sectors Puerto Ricans are earning less than half of their US counterparts, with an aggregate total of 45 percent across the private sector. Incorporating our estimates of the cost impact of Act 41, we see that the cost of the vacation and Christmas bonus benefits is estimated to increase the ratios to

---

[4] See U.S. Bureau of Labor Statistics, National Compensation Survey, https://bit.ly/3NvhkJ4. We calculate the midpoint of the range for Table 1. Percentage of private industry workers with number of annual paid vacation days by service requirement, March 2021, for a Service requirement of 1 year. Greater service requirements exceed 15 days using the same methodology. This yields just over 11 days of paid leave on average, so we assume 4 additional days provided to all workers in Puerto Rico through Act 41. This is a highly conservative estimate given that a broad swath of workers in Puerto Rico exceed one year of tenure or are already eligible for fifteen days of paid leave.

**Figure 5. The Cost of Vacation Leave and Christmas Bonus compared to U.S. Mainland Salaries**

### Employment and Salary by NAICS in Puerto Rico and United States, 2021

| NAICS | US NAICS Title | Jobs in Puerto Rico | PR Weekly Wage (avg.) | US Weekly Wage (avg.) | PR/US Weekly Wage | Vacation | Xmas Bonus | Subtotal Vacation & Xmas | Total Cost PR/US |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 4 days | $300 | | |
| 10 | Aggregate Total | 917,011 | $645 | $1,418 | 45% | $516 | 300 | 1% | 47% |
| 10 | Aggregate Private Sector | 721,907 | $622 | $1,435 | 43% | $498 | 300 | 1% | 44% |
| 11 | Agriculture, forestry, fishing and hunting | 8,394 | $289 | $890 | 32% | $231 | 300 | 1% | 34% |
| 21 | Mining, quarrying, and oil and gas extraction | 640 | $592 | $2,240 | 26% | $474 | 300 | 1% | 27% |
| 22 | Utilities | 2,318 | $1,337 | $2,273 | 59% | $1,070 | 300 | 1% | 60% |
| 23 | Construction | 31,803 | $547 | $1,527 | 36% | $438 | 300 | 1% | 37% |
| 42 | Wholesale trade | 32,855 | $928 | $1,931 | 48% | $742 | 300 | 1% | 49% |
| 51 | Information | 16,410 | $863 | $3,047 | 28% | $690 | 300 | 1% | 29% |
| 52 | Finance and insurance | 30,364 | $1,103 | $2,636 | 42% | $882 | 300 | 1% | 43% |
| 53 | Real estate and rental and leasing | 15,376 | $612 | $1,556 | 39% | $490 | 300 | 1% | 40% |
| 54 | Professional and technical services | 38,152 | $1,002 | $2,520 | 40% | $802 | 300 | 1% | 41% |
| 55 | Management of companies and enterprises | 16,273 | $1,114 | $2,860 | 39% | $891 | 300 | 1% | 40% |
| 56 | Administrative and waste services | 83,667 | $386 | $1,079 | 36% | $309 | 300 | 1% | 37% |
| 61 | Educational services | 27,316 | $511 | $1,157 | 44% | $409 | 300 | 1% | 45% |
| 62 | Health care and social assistance | 88,240 | $600 | $1,249 | 48% | $480 | 300 | 1% | 49% |
| 71 | Arts, entertainment, and recreation | 4,207 | $575 | $1,146 | 50% | $460 | 300 | 1% | 51% |
| 72 | Accommodation and food services | 78,459 | $336 | $540 | 62% | $269 | 300 | 2% | 64% |
| 721 | *Accommodation for travelers* | *12,162* | *$523* | *$829* | *63%* | *$418* | *300* | *2%* | *65%* |
| 722 | *Food Services and Drinking Places* | *66,297* | *$302* | *$498* | *61%* | *$242* | *300* | *2%* | *63%* |
| 81 | Other services, except public administration | 15,704 | $500 | $965 | 52% | $400 | 300 | 1% | 53% |
| 99 | Unclassified | 413 | $758 | $1,756 | 43% | $606 | 300 | 1% | 44% |

Sources: DevTech Systems, Inc. Calculations using quarterly (BLS Quarterly Census of Employment and Wages) monthly employment and average weekly wages for the United States and Puerto Rico by industry/ NAICS code. See https://data.bls.gov/cew/apps/data_views/data_views.htm#tab=Tables. Vacation calculated from BLS Employee Benefits Survey, Table 1. Percentage of private industry workers with number of annual paid vacation days by service requirement, March 2021, which shows an average of 11.5 days for private industry workers in the first year (https://www.bls.gov/ncs/ebs/factsheet/paid-vacations.htm).

mainland wages by 1 to 2 percentage points, indicating that Act 41 mandates are not expected to meaningfully increase labor costs relative to the mainland.

The table shows that the labor costs in Puerto Rico, even after including Act 41 mandates, remain well below the mainland US labor costs. Obviously, it is important to recognize that government mandate increases in employment costs are likely to have long-term costs in terms of job-creation, and Puerto Rico will likely be no exception. However, these figures suggest that the starting point for negotiating salaries on the island is a fraction of that in the mainland. Hence, it is difficult to ascertain if the long-run efficiency concerns are not trumped by the need to induce workers into the labor market, as suggested above. In a market where labor participation is 20 percent below the national average and salaries are 50 percent of the industry average on the mainland, and with geographic, legal and other barriers such as language stand as natural frictions for labor market efficiency, it seems reasonable to attempt interventions that induce an increase in labor supply by workers.

# Compensation for Unfair Dismissal in Act 41-2022

It is important to note that Act 41's incremental costs of the compensation for unfair dismissal claims will only affect dismissal of employees that: a) were hired after January 26, 2017 (as prior hire-date employees were grandfathered by Act 4-2017); and b) are not covered by any of Act 80's statutory termination safe-harbors. Moreover, Act 41 has no short to medium term effect on the compensation for unfair dismissal costs until January 24, 2029, which is when employees hired after January 26, 2017 will achieve employment tenure of more than 12 years.

Hence, we show in Figure 6 – for illustrative purposes only – we assume that the incremental cost of dismissal for employers from Act 41 amounts to additional six months of salary for employees that have at least twelve years of tenure. Note that we apply the additional six month cost to every employee in Puerto Rico. That is, Figure 6 assumes an additional six months of salary for every employee in Puerto Rico, but this incremental dismissal cost is a one-off (an employee can only be fired once). It should be, therefore, amortized over the twelve-year period. To summarize, for illustrative purposes we reduce the multiple conditions that govern the dismissal cost to an additional six months of salary for all employees of Puerto Rico averaged over twelve years. Even under this extreme assumption (i.e. that all employees in Puerto Rico are unfairly dismissed after twelve years), the total cost does not reach U.S. salary levels. It is important to underscore the illustrative nature of these figures with three points:

1.  Unfair dismissal is not a relevant cost in the short to medium term (this note asserts 2029 is neither short nor medium term, following International Monetary Fund financial programming conventions, which forecast five years out). Hence, it is not relevant to employers in the same way as paid leave, for example, which accrues annually.

2.  Unfair dismissal is a one-off, hence, it is amortized over the period of employment, similarly to severance costs in the mainland U.S. labor markets. In this case, the amortization period of twelve years lowers the annual burden on employers.

3.  The extreme position taken here is for illustrative purposes and reflects data limitations. Rather than attempt to estimate the expected cost from some probability of being unfairly dismissed, we take the extreme example here, which should represent an upper bound.

**Figure 6. Dismissal Costs compared to U.S. Mainland Salaries**

| | Employment and Salary by NAICS in Puerto Rico and United States, 2021 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| NAICS | US NAICS Title | Jobs in Puerto Rico | PR Weekly Wage (avg.) | US Weekly Wage (avg.) | PR/US Weekly Wage | Subtotal Vacation & Xmas | Cost with Vacation & Xmas PR/US | Dismissal costs (see notes) | Total with Dismissal |
| 10 | Aggregate Total | 917,011 | $645 | $1,418 | 45% | 1% | 47% | 2% | 48% |
| 10 | Aggregate Private Sector | 721,907 | $622 | $1,435 | 43% | 1% | 44% | 2% | 46% |
| 11 | Agriculture, forestry, fishing and hunting | 8,394 | $289 | $890 | 32% | 1% | 34% | 1% | 35% |
| 21 | Mining, quarrying, and oil and gas extraction | 640 | $592 | $2,240 | 26% | 1% | 27% | 1% | 28% |
| 22 | Utilities | 2,318 | $1,337 | $2,273 | 59% | 1% | 60% | 2% | 62% |
| 23 | Construction | 31,803 | $547 | $1,527 | 36% | 1% | 37% | 1% | 38% |
| 42 | Wholesale trade | 32,855 | $928 | $1,931 | 48% | 1% | 49% | 2% | 51% |
| 51 | Information | 16,410 | $863 | $3,047 | 28% | 1% | 29% | 1% | 30% |
| 52 | Finance and insurance | 30,364 | $1,103 | $2,636 | 42% | 1% | 43% | 2% | 44% |
| 53 | Real estate and rental and leasing | 15,376 | $612 | $1,556 | 39% | 1% | 40% | 2% | 42% |
| 54 | Professional and technical services | 38,152 | $1,002 | $2,520 | 40% | 1% | 41% | 2% | 42% |
| 55 | Management of companies and enterprises | 16,273 | $1,114 | $2,860 | 39% | 1% | 40% | 2% | 41% |
| 56 | Administrative and waste services | 83,667 | $386 | $1,079 | 36% | 1% | 37% | 1% | 38% |
| 61 | Educational services | 27,316 | $511 | $1,157 | 44% | 1% | 45% | 2% | 47% |
| 62 | Health care and social assistance | 88,240 | $600 | $1,249 | 48% | 1% | 49% | 2% | 51% |
| 71 | Arts, entertainment, and recreation | 4,207 | $575 | $1,146 | 50% | 1% | 51% | 2% | 54% |
| 72 | Accommodation and food services | 78,459 | $336 | $540 | 62% | 2% | 64% | 3% | 67% |
| 721 | *Accommodation for travelers* | *12,162* | *$523* | *$829* | *63%* | *2%* | *65%* | *3%* | *67%* |
| 722 | *Food Services and Drinking Places* | *66,297* | *$302* | *$498* | *61%* | *2%* | *63%* | *3%* | *65%* |
| 81 | Other services, except public administration | 15,704 | $500 | $965 | 52% | 1% | 53% | 2% | 55% |
| 99 | Unclassified | 413 | $758 | $1,756 | 43% | 1% | 44% | 2% | 46% |

Sources: DevTech Systems, Inc. Calculations using quarterly (BLS Quarterly Census of Employment and Wages) monthly employment and average weekly wages for the United States and Puerto Rico by industry/ NAICS code. See https://data.bls.gov/cew/apps/data_views/data_views.htm#tab=Tables. Vacation calculated from BLS Employee Benefits Survey, Table 1. Percentage of private industry workers with number of annual paid vacation days by service requirement, March 2021, which shows an average of 11.5 days for private industry workers in the first year (https://www.bls.gov/ncs/ebs/factsheet/paid-vacations.htm). Dismissal costs are 6 months cost amortized over 12 years.

## CONCLUSION

There are several caveats regarding these cost estimates, due largely to data quality, timeliness and reliability concerns. First, it is difficult to study the impact of a law on private sector employers' compensation decisions both because these are not generally readily available data as many employers protect this information as confidential, and decisions made while the prevailing legal framework changes are difficult to predict without a deep understanding of the firm-level drivers of costs. Also, many general surveys available in the United States do not isolate Puerto Rico (e.g. the BLS Employee Benefits Survey), and private sector firm-level data for Puerto Rico is difficult to collect within a short period of time. Nevertheless, the NAICS level wage data collected by the BLS and presented here deliver a reasonably reliable apples-to-apples comparison of wage costs. These wage data are reliably collected for all of the United States and Puerto Rico, they have long time-series, and provide a solid starting point for analysis. Nevertheless, with inflation at a four-decades high, the wage dynamics will be even more difficult to analyze in future years.

Against this backdrop, the data suggest that Act 41 is not generally over-burdensome on the job market in Puerto Rico. The starting point for wages in each of the industries is low compared to the mainland United States. This is consistent with the social and economic conditions for the population of the island, and in particular, the poverty metrics, and the marginal increase in labor costs expected following Act 41 is relatively small. Given the natural conditions for monopsonistically competitive markets (e.g. geographic isolation), it is not surprising to see either a policy such as Act 41 enacted to support higher wages in the current climate of tight labor supply and worker shortages.

Critical to this effort is the role of supply constraints. We reiterate the unique conjunctural challenge the United States and Puerto Rico facing in this regard, as we have not seen inflation rates at present levels for at least four decades, and it is furthermore worrisome that the high inflation rates we see today are not measured with the same methodology or comparable consumer baskets as four decades ago, so that may no longer be a reasonable benchmark. Hence, more work may be needed to understand fully the role of policy in spurring workers in low wage environments, against the backdrop of continued inflation.

As Puerto Rico converges in wages and income with the mainland and the current supply constraints loosen, this type of intervention is worth reviewing. It should likely be reviewed periodically as a matter of policy, as it is not in the government's interest to needlessly increase employer costs. However, under current economic conditions, we have reason to believe the market is not meeting workers' reservation wages and a policy to spur labor supply may ultimately benefit all stakeholders.



Founded in 1984, DevTech Systems, Inc. is an international consulting firm dedicated to data-driven, innovative solutions for development with expert capabilities in: public financial management and economic governance; monitoring, evaluation, research, and learning; data solutions; and education, gender, and youth.

**DevTech Systems, Inc.**
1700 N. Moore, Suite 1720
Arlington, VA 22209
703-312-6038
www.devtechsys.com