# Exhibit 23



**FINANCIAL OVERSIGHT & MANAGEMENT BOARD
FOR PUERTO RICO**

Members
Andrew G. Biggs
Arthur J. González
Antonio L. Medina
John E. Nixon
Justin M. Peterson
Betty A. Rosa

David A. Skeel, Jr.
Chair

**BY ELECTRONIC MAIL**

July 19, 2022

Hon. Omar J. Marrero Díaz
Executive Director
Puerto Rico Fiscal Agency and Financial Advisory Authority

Dear Mr. Marrero Díaz,

We write to you regarding Act 41-2022 ("Act 41" or the "Act"), formerly known as House Bill 1244 ("HB 1244" or the "Bill"). Act 41, among other things, repeals portions of the Puerto Rico Labor Transformation and Flexibility Act (the "LTFA" or "Act 4-2017") and other labor laws.

In so doing, Act 41 has a wide-ranging impact on the labor market, including reversing the presumption in unjustified dismissal cases such that the employer bears the burden to demonstrate an employee's dismissal was justified; shortening the probation period for new employees; increasing the length of the statute of limitations for certain actions against employers; and expanding mandated employer-provided sick leave, vacation leave, and Christmas bonus benefits.

On June 13, 2022, the Oversight Board sent a letter to the Governor and expressed its grave concerns about then-HB 1244 – specifically, its impact on the economy, Commonwealth revenues, and inconsistency with the certified 2022 Commonwealth Fiscal Plan (the "Fiscal Plan") – and notified the Government HB 1244 would impair and/or defeat the purposes of PROMESA in violation of PROMESA § 108(a)(2). Notwithstanding the Oversight Board's concerns, the Governor signed HB 1244 (which became Act 41) into law on June 20, 2022.

On June 29, 2022, the Oversight Board received the Government's PROMESA Section 204(a) submission for Act 41 (the "Submission"). The Submission included:

- A copy of Act 41; and

- A document entitled "Section 204(a) Certification, Act 41-2022, Enacted on June 20, 2022" prepared by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") (the "AAFAF Certification"), with three attachments:

- o Attachment A, which includes a "Fiscal Impact Certification" by the Office of Management and Budget ("OMB") and a certification by the Department of Labor and Human Resources ("DOL");

- o Attachment B, which includes a certification by the Department of the Treasury; and

- o Attachment C, which includes an undated report prepared by the consulting firm DevTech Systems, Inc. (the "DevTech Report").

As you know, PROMESA Section 204(a) requires the Governor to certify whether any new law is or is not significantly inconsistent with the certified Fiscal Plan as well as to provide a formal estimate of the impact "the law will have on expenditures and revenues" within seven business days of its enactment. After reviewing the Submission, it is evident the Government has not undertaken the necessary analysis (either before or after passage of Act 41) and, for reasons discussed below, has failed to provide the certification and formal estimate required by Section 204(a) of PROMESA.

As further explained below, the AAFAF Certification is premised on the contention that Act 41's purpose is to increase labor supply and participation, which is demonstrably untrue. Act 41 and its statement of motives nowhere mentions that purpose. Rather, it provides Act 41's purpose is to reverse recent labor reforms aimed at increasing employment and improving the economy, in order to enhance labor rights of private sector employees. In so doing, Act 41 recreates disincentives for investment and job-creation in Puerto Rico.

In contrast to the Government, the Oversight Board has retained a leading economist to perform an economic analysis of Act 41 and to examine the Submission. Based on that economic analysis as well as its own assessment, and pursuant to PROMESA Section 204(a)(3), the Oversight Board notifies you, as well as the Governor and Legislature, that the Governor has failed to submit the required certification and formal estimate for Act 41. Pursuant to PROMESA Section 204(a)(4), the Oversight Board directs the Governor to provide the missing formal estimate and certification.

Because of the impending effective date of the Act (July 20, 2022 for certain employers), we must request these missing documents be provided no later than **July 22, 2022**. If the Government certifies the law is not significantly inconsistent with the Fiscal Plan, we ask that you explain why that is so in light of the concerns raised below.

Further, given the Oversight Board's determination that the Act impairs and/or defeats the purposes of PROMESA, the Government must immediately suspend the law's implementation and enforcement – at least until the Government and the Oversight Board have fully exchanged their views concerning Act 41 and the Oversight Board changes its determination (which may not occur). We also urge the Government to issue a public statement confirming such suspension to avoid confusion for private employers preparing for implementation of the law.

Mr. Marrero Díaz
July 19, 2022
Page 3 of 10

### The Submission Fails to Comply with PROMESA Section 204(a)

As noted above, pursuant to Section 204(a) of PROMESA, the Governor is required to submit any new law to the Oversight Board not later than seven business days after the law is duly enacted. The Governor is required to include with the law a "formal estimate" of the impact the law will have on expenditures and revenues and a certification as to whether the law is, or is not, significantly inconsistent with the Fiscal Plan. The Submission fails to comply with both the formal estimate and certification requirements.

<u>The Submission Fails to Include a Compliant Formal Estimate</u>

In violation of PROMESA Section 204(a), the Submission does not include a compliant formal estimate of Act 41's fiscal impact. The Submission provides only one hard figure: $3,000 in administrative expenses the DOL projects it will incur in preparing "notices to comply with the review of regulations pursuant to the Uniform Administrative Procedure Act."[1] The OMB also provided a "fiscal impact certification," to which the DOL's projection is attached. The document states that OMB "evaluated the recently passed law to determine whether it may have a potential fiscal impact on the Spending Budget of the Government of Puerto Rico," and then states in conclusory terms: "[a]fter the corresponding evaluation and analysis, we conclude that the aforementioned piece of legislation should not entail a fiscal impact and, if any, it would be minimal for the approved budget for fiscal year **2021-2022**."[2]

Neither of these documents constitutes a compliant formal estimate as required by PROMESA Section 204. First, the "formal estimate" requirement "means a complete and accurate estimate covering revenue and expenditure effects of new legislation over the entire period of the fiscal plan." *Pierluisi v. Fin. Oversight & Mgmt. Bd. For P.R. (In re Fin. Oversight & Mgmt. Bd. For P.R.)*, 2022 WL 2232543, at *2 (1st Cir. June 22, 2022) (internal quotation marks and citations omitted). OMB provides only an assessment for a single fiscal year, not the five year duration of the Fiscal Plan. The DOL limits its analysis to the impact on that agency's expenses and does not purport to estimate the impact of the law on the Commonwealth's revenues and expenditures. Second, "[s]imply submitting a dollar estimate on official agency letterhead, no matter how conclusory or incomplete, does not suffice." *Id*. Rather, the Government must "show its work" and present its estimate "that is sufficiently informative and complete" to satisfy Section 204(a)'s formal estimate requirement. *Vázquez Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 511 F. Supp. 3d 90, 126-27 (D.P.R. 2020), aff'd, 37 F.4th 746 (1st Cir. 2022). OMB's single conclusory sentence is plainly insufficient to meet Section 204(a)'s requirements.

The inability to provide a compliant formal estimate makes plain that the Legislature passed, and the Governor signed HB 1244 into law, without assessing its impact on the economy and on the Commonwealth's revenues and expenditures, and has not done so since enacting the law.

---

[1] *See* Submission Attach. A.

[2] *See* Submission Attach. A (emphasis in original).

Mr. Marrero Díaz
July 19, 2022
Page 4 of 10

The Government's lack of economic analysis is deeply concerning. Prior to the law's enactment, the Oversight Board shared its concerns about then-HB 1244's impact on the economy and the Commonwealth's revenues and expenditures. In a letter responding to those concerns, the Governor "totally disagree[d]" with those concerns, but acknowledged "[d]etermining any indirect consequences of the Bill would require a comprehensive economic study to assess whether it would negatively impact revenues in a manner that would render it significantly inconsistent with the Certified Fiscal Plan." While the Governor shared his belief that the law would have positive economic impacts, that belief is not based on any economic analysis the Governor has provided and it is not the subject of a formal estimate.

Instead of a formal estimate or economic analysis, the AAFAF Certification concedes that Act 41 was created "*with the hope* that improved fringe benefits will increase the inducement of people to join the labor force and help alleviate Puerto Rico's tight labor supply, thus further spurring economic activity and production."[3] This after-the-fact justification for Act 41 lacks any support in the law itself or the legislative record, and it is devoid of any economic support or formal estimate. Making significant and wide-ranging changes to the labor market based on "hope" – without any economic analysis and in direct contravention of the Fiscal Plan – is reckless and a clear violation of PROMESA. Notably, the accompanying DevTech Report concedes "Orthodox economic policy would typically argue against governmental interventions that increase labor costs . . . ."[4] Simply opining that Puerto Rico nevertheless needs to increase its labor supply is not a formal estimate, especially in view of Puerto Rico's exorbitant unemployment rate and extraordinarily low labor-participation rate. The DevTech Report (at 2, 9) provides Puerto Rico's labor participation rate is twenty percent below the national average.

The undated DevTech Report provided with the Submission does not remedy the Government's failure to submit a formal estimate. The DevTech Report is not prepared by "an appropriate entity of the territorial government with expertise in budgets and financial management." PROMESA § 204(a)(2)(A). Further, the DevTech Report does not attempt to assess the impact of Act 41 on the Commonwealth's expenditures and revenues. *Id*. For instance, no effort is made to estimate how much Act 41 will increase employers' expenses, decrease their net incomes, and decrease their taxes payable to the Commonwealth. Despite admitting Act 41 will impose long-term costs that will stymie job creation due to the government-mandated increases in employment costs, the AAFAF Certification provides no estimate of the decrease in tax collections.

Moreover, the DevTech Report undermines the Government's position that Act 41 will have positive economic impact. As an initial matter, the DevTech Report admits that assessing the economic impact of Act 41 is difficult.[5] This admission in and of itself should have given the Government pause, as it passed a law impacting the entire private sector workforce without fully understanding the economic consequences. Sweeping legislation (like Act 41), justified by

---

[3] AAFAF Certification at 8 (emphasis added).

[4] Dev Tech Report at 3.

[5] DevTech Report at 11.

PO Box 192018 San Juan, PR 00919-2018; www.oversightboard.pr.gov; comments@promesa.gov

Mr. Marrero Díaz
July 19, 2022
Page 5 of 10

chimeric goals, not rigorous economic analysis, contributed to Puerto Rico's economic crisis and prompted Congress to enact PROMESA.  *See* PROMESA § 405(m).

Furthermore, the DevTech Report admits that Act 41 will reduce job creation over time.  The report states that "**[o]bviously, it is important to recognize that government mandate increases in employment costs are likely to have long-term costs in terms of job-creation, and Puerto Rico will likely be no exception**."[6]  Despite this, the DevTech Report attempts to justify Act 41 based on the premise that Puerto Rico currently faces a tight labor supply that demands Government intervention.  But the report itself shows that labor market participation has been *dramatically increasing* since 2020 without Government intervention,[7] and that the unemployment rate on the Island – while low by Puerto Rico's historical standards – is well above that of the United States.[8]  None of the materials provided with the Submission, including the DevTech Report, provides any basis for why Act 41 is needed to address labor market participation or a tight labor market or why that intervention was warranted at this time.  Indeed, as the DevTech Report concedes, any labor shortage in Puerto Rico is a "short-run" issue and one, given the recent spike in inflation, that is difficult to know how best to manage.[9]  The estimate nowhere acknowledges the macroeconomic improvements in Puerto Rico in unemployment and labor participation rates has been occurring while Puerto Rico is the recipient of massive federal aid due to the hurricanes and Covid.

The DevTech Report contains other deficiencies.  For example, like the AAFAF Certification, it inappropriately discounts the consequences of Act 41's unfair dismissal provisions.  By focusing exclusively on the compensation aspects of those provisions, the DevTech Report ignores the chilling effect their non-monetary aspects (*e.g.*, shortened probationary period, shifting burdens, increased statutes of limitations) have on employers' hiring.[10]

Finally, the DevTech Report contends employers enjoy monopsonistically competitive pricing power in Puerto Rico – *i.e.*, employers in Puerto Rico have disproportionate power to set wages – and therefore Act 41 is a legitimate effort to address this imbalance in the Puerto Rico labor market.  But the report assumes such an environment exists, without providing an analysis demonstrating that to be the case.  Moreover, it does not explain how increasing employee benefits will cause

---

[6] DevTech Report at 9 (emphasis added).

[7] Indeed, Figure 1 in the report suggests the LTFA's reforms contributed to the rapid growth in labor force participation, after an initial decline following the 2017 hurricanes.

[8] DevTech Report at 2 (Figure 1).

[9] DevTech Report at 1.  In fact, the Report suggests Act 41 should be "reviewed periodically," as "it is not in the government's interest to needlessly increase employer costs."  *Id.* at 12.

[10] Where the DevTech Report engages in economic analysis, it largely misses the mark.  DevTech's analysis focuses primarily on comparing post-Act 41 labor costs with those in US states.  *See* DevTech Report at 7-11.  But that analysis does not address the impact on hiring in Puerto Rico and the resulting impact on the Commonwealth's revenues and expenditures.  Moreover, while the report contends US jurisdictions with similar protections have not seen a decline in economic performance, the report fails to support this conclusion or assess whether Puerto Rico's economy is sufficiently similar to those of US states to make a meaningful comparison.

Mr. Marrero Díaz
July 19, 2022
Page 6 of 10

employers to hire more workers,[11] and acknowledges that if the benefits imposed are too high, employment will be reduced.[12]  And even while acknowledging the risk of increasing benefits by too much, it fails to address the fact the added costs to employers associated with Act 41's mandated benefits will be exacerbated by the recent and pending minimum wage increases in Puerto Rico.[13]  Approximately 40% of employees in Puerto Rico earned less than $9.50 per hour, and the median wage in 2021 was $10.93 per hour, barely over the minimum wage that will be effective as of July 2023.[14]  Therefore, the added costs to employers associated with Act 41 will be on top of the substantial increase in the minimum wage.  Given that a large proportion of employment is either at or barely above the minimum wage, it is not tenable that mandated benefit increases would increase employment.  In any event, the DevTech Report does not address or even mention this factor and its impact on employers and hiring.

As such, in addition to not meeting the "formal estimate" requirement, the DevTech Report is based on a faulty understanding of the purposes of Act 41, provides data suggesting no intervention was necessary to address the "short-run" tight labor market, admits Act 41 will negatively impact job creation (at least in the long term), and the current economic climate means "more work may be needed"[15] to understand how Governments can effectively increase labor force participation.

Accordingly, the Submission fails to provide a formal estimate as required by PROMESA Section 204(a)(1).  We look forward to receiving a complete formal estimate no later than **July 22, 2022**.

---

[11] The DevTech Report merely assumes that workers who are not participating in the labor market will be incentivized to change their behavior based on increased accrual rates for vacation and sick leave, but does not grapple with the likelihood Act 41's benefits will merely inure to the benefit of current employees, not encourage any new entrants into the labor market, and cause employers to reduce new hires.  The best the DevTech Report can do is provide a "simple" illustration of a theory of why increasing benefits "can" increase levels of employment while increasing benefits to those workers.  DevTech Report at 3-5.  But DevTech admits this example is merely "heuristic" and not based on "an actual study of labor markets in Puerto Rico." *Id*. at 4 n.1.

[12] DevTech Report at 6.  The report attempts to assess whether Act 41's benefits are too high by comparing its benefits to those available in various US states.  As noted above, the report does not explain how such comparisons are informative.  For example, the fact that wages and benefits are lower in Puerto Rico than on the US mainland does not necessarily mean Puerto Rico employers can afford to provide higher wages and benefits let alone absorb them and increase employee headcount.  In fact, the converse may be true.  The DevTech Report fails to consider that wages and benefits may be lower in Puerto Rico because it is not an 'employment at will' jurisdiction and already imposes increased employment costs which Act 41 raises higher still.

[13] The minimum wage in Puerto Rico increased from the federal level ($7.25) to $8.50 on January 1, 2022 (a 17% increase) for all employees covered by the Fair Labor Standards Act. A further increase to $9.50 is scheduled to take effect on July 1, 2023 (Puerto Rico Minimum Wage Act, Act No. 47-2021). Therefore, over the course of a year and a half the minimum wage in Puerto Rico will have increased by 31%.

[14] The Bureau of Labor Statistics May 2021 State Occupational Employment and Wage Estimates.

[15] DevTech Report at 12.

Mr. Marrero Díaz
July 19, 2022
Page 7 of 10

<u>The Submission Fails to Include a Proper Certification</u>

Pursuant to PROMESA Section 204(a)(2)(B) and (C), the Governor is required to submit a certification, prepared by the entity that prepared the cost estimate, finding that the new law either is or is not "significantly inconsistent with the Fiscal Plan." PROMESA Section 204(a)(2)(B)-(C).

The Submission fails to comply with this basic requirement.[16] Despite the formal title of the AAFAF Certification, AAFAF does not actually certify whether Act 41 is or is not significantly inconsistent with the Fiscal Plan. Instead, on page seven of the AAFAF Certification, AAFAF writes, "*One may conclude* Act 41 is not significantly inconsistent with the Fiscal Plan," and, on page eleven, "*one can* conclude Act 41 is not significantly inconsistent with the Fiscal Plan."[17] This carefully crafted language does not meet the certification requirement of Section 204(a)(1), as it fails to certify whether the Act is or is not significantly inconsistent with the Fiscal Plan, but instead notes it is possible "one" could reach such a conclusion,[18] strongly implying it is possible one could also reach the opposite conclusion.

This phrasing of the "certification" is curious and appears to be an attempt to evade the penalties set forth in PROMESA Section 104(l) for submitting a false or misleading certification. It is not surprising that AAFAF is concerned about certifying the Act is not significantly inconsistent with the Fiscal Plan – because it plainly is. As you are aware, the Fiscal Plan provides:

> The [LTFA] did not go nearly as far as needed to eliminate the most egregious elements of Act 80 of 1976, also known as the Unjust Dismissal Act. However, [the LTFA] did to some extent ease some restrictions on labor hiring. While some stakeholders have called for the repeal of [the LTFA], its elimination would likely reestablish onerous provisions related to probationary periods, overtime, and bonuses, which would all make the hiring environment more costly in the formal sector. Its repeal would discourage new hiring and reduce the labor market flexibility, thus limiting the effectiveness of the [Earned Income Tax Credit] expansion in promoting labor force participation, economic growth, and the revenues associated with that growth. **Therefore, the Government must refrain from repealing [the LTFA] or enacting new legislation that negatively impacts labor market flexibility**.[19]

---

[16] In addition, the absence of a proper formal estimate (discussed above) necessarily means that the certification is also deficient.

[17] AAFAF Certification at 7, 11 (emphases added).

[18] Attachment A contains a certification in Spanish by DOL certifying HB 1244 would not be significantly inconsistent with the Fiscal Plan, but this certification similarly fails to comply with Section 204(a)(1). As an initial matter, DOL is not an "appropriate entity" "with expertise in budgets and financial management," as required by PROMESA Section 204(a)(2)(A). DOL does not have responsibility for managing the Commonwealth's budgets and finances. Even if it were an appropriate entity to provide a Section 204(a) certification, its certification is by its own terms limited to the impact of Act 41 on DOL, not on the Commonwealth as a whole. As such, the Submission fails to contain a certification that meets the requirements of Section 204(a).

[19] 2022 Certified Fiscal Plan § 7.2.2 (emphasis added).

Mr. Marrero Díaz
July 19, 2022
Page 8 of 10

The AAFAF Certification engages in linguistic gymnastics to evade the clear meaning of the Fiscal Plan. AAFAF contends Act 41 is "consistent" with the Fiscal Plan because "it does not repeal" the LTFA.[20] This assertion is incorrect. It accomplishes by amendment and supplementation the equivalent of repeal. While Act 41 may not repeal the LTFA in its entirety, it restores pre-LTFA labor protections and benefits, including: reducing the number of hours required to accrue sick and vacation leave; reducing the number of hours to be eligible for a Christmas bonus; reversing the presumptions and burdens for proving unjustified dismissal (*i.e.*, returning them to the employer); reverting to three year statutes of limitations for certain employment law causes of action (up from one year under the LTFA); and reducing the probationary period (from 9 or 12 months, to 3 months with the possibility of a 3 month extension). In doing so, the Act reestablishes onerous, pre-LTFA provisions which will obviously "make the hiring environment more costly in the formal sector" and "discourage new hiring and reduce labor market flexibility," thereby limiting the effectiveness of the EITC expansion and associated revenues.[21] Regardless of the semantics, this is precisely the type of legislative activity the Fiscal Plan instructs the Government to "refrain" from conducting.

Next, AAFAF attempts to circumvent the Fiscal Plan's admonition not to "enact[] new legislation that negatively impacts labor market flexibility" by characterizing Act 41 as an effort to promote employment on the Island and spur economic growth. But in the next breath, AAFAF admits that "an argument can be made that Act 41 '*negatively impacts labor market flexibility*.'"[22] In reality, there is no question that the new employee protections introduced and reinstated by Act 41 by their very nature reduce labor market flexibility.[23]

As such, even if AAFAF's statement of Act 41's purposes were accurate, it would not change the fact the law has a negative impact on labor market flexibility and is, therefore, significantly inconsistent with the Fiscal Plan. But, Act 41 is not – as AAFAF contends – motivated by a desire to "increase[] labor supply" or "promote[] increased market participation." This mischaracterization of the motives behind Act 41 is at odds with the stated purpose of the law

---

[20] AAFAF Certification at 7.

[21] 2022 Certified Fiscal Plan § 7.2.2.

[22] AAFAF Certification at 7 (emphasis added).

[23] AAFAF attempts to minimize the repeal of the LTFA by contending "only" 13 of its 72 substantive sections are impacted by Act 41, and that 9 of those 13 provisions deal with unfair dismissal claims. But while the unfair dismissal claim provisions may not carry short-term cost consequences for employers, they clearly impact labor market flexibility. AAFAF Certification at 10-11. Act 41 reduces the time employers have to assess an employee before having to pay severance in the event of most dismissals, and then makes it easier for employees to bring (and harder for employers to defend) unfair dismissal claims. By minimizing the impact of these provisions, AAFAF reveals a fundamental misunderstanding of the chilling effect such worker protections can have on hiring practices. The Oversight Board believes it is obvious an employer is less likely to expand its workforce when the probationary period is shortened and the risks of an unfair dismissal claim increased. This fact is ignored in the Submission. Indeed, the Submission is plagued by a focus on the supply-side aspect of the employment equation, assuming Act 41's increased benefits and protections will encourage employees to enter the job market. But even if one accepts this questionable proposition, this argument ignores the demand-side of the equation; namely, how employers will react when faced with increased labor costs and risks.

Mr. Marrero Díaz
July 19, 2022
Page 9 of 10

which is to "restore and expand" labor rights of private employees.[24] Indeed, the preamble to Act 41 makes no mention of increasing labor supply. Rather, it reflects an open hostility to the LTFA and its "formula for making Puerto Rico 'a more attractive jurisdiction [to establish a business]' focused exclusively on persuading employers to create more jobs within a reduced structure of rights, protections and fringe benefits."[25] Act 41 is an effort, not to increase the labor supply, but instead to "restore and expand labor rights applicable to employees belonging to private enterprise" and a reflection of the Legislative Assembly's desire to "propose new protections for the benefit of the working class."[26] Indeed, in a letter to the Governor dated June 13, 2022, Speaker Rafael Hernández Montañez reiterated that HB 1244 reflected an effort by the Governor and Legislature to address these "two priority areas."[27] Accordingly, AAFAF's attempt to re-cast the law as one aimed at improving the economy and labor force participation is simply incorrect and appears to be a post-hoc effort to whitewash the law to create the totally inaccurate impression it is consistent with the Fiscal Plan.

We look forward to receiving a compliant Section 204(a) certification which addresses the issues raised above and provides a clear and unambiguous certification by the appropriate agency that the Act is, or is not, significantly inconsistent[28] with the Fiscal Plan no later than **July 22, 2022**.

\* \* \*

We look forward to receiving the requested information and materials. In the meantime, the Government must fully suspend the implementation and enforcement of Act 41 such that it has no applicability to any private employer at least until the Government and the Oversight Board have fully exchanged their views concerning Act 41 and the Oversight Board changes its determination regarding the Act's impact on the purposes of PROMESA. Further, we urge the Government to issue a public statement confirming such suspension to avoid confusion for private employers preparing for implementation of the law even though it has been determined to impair and/or defeat the purposes of PROMESA.

Please note the Oversight Board reserves the right to take such actions as it deems necessary, consistent with Sections 104(k), 108(a), and 204 of PROMESA, including seeking remedies to

---

[24] Act 41, Statement of Reasons.

[25] *Id.*

[26] *Id.*

[27] In that letter, the Speaker commented that HB 1244 reflected an effort by the Governor and Legislature to address "two priority areas: to restore the labor rights applicable to employees belonging to private enterprise and to recognize new protections for the benefit of the working class."

[28] In the Submission, AAFAF provides a discussion of the meaning of the word "significant" and observations concerning the manner in which a misleading statement can be deemed material, the relevance of which is unclear. AAFAF Certification at 11 n.1. These statements have appeared in prior submissions. To the extent AAFAF intended to articulate the standard for when a law is "significantly inconsistent" with the Fiscal Plan, the Oversight Board does not endorse that articulation which is both unclear and insufficient. The Oversight Board refers AAFAF to its prior briefing on this subject for the Oversight Board's views. *See* Memorandum of Law in Support of the Oversight Board's Motion for Summary Judgment, *Vázquez Garced v. Fin. Oversight & Mgmt. Bd.* (*In re Fin. Oversight and Mgmt. Bd. for Puerto Rico*), Case No. 20-0080, ECF No. 49 at 5–9 (D.P.R. 2020).

Mr. Marrero Díaz
July 19, 2022
Page 10 of 10

prevent implementation and enforcement of Act 41 as well as to have the law nullified. We hope such action will be unnecessary.

We look forward to continuing to work together for the benefit of the people of Puerto Rico.

Sincerely,

*David Skeel*

David A. Skeel, Jr.

CC: Hon. Pedro Pierluisi Urrutia
      Hon. José Luis Dalmau Santiago
      Hon. Rafael Hernández Montañez