## **Exhibit E**

Revised Proposed Findings of Fact and Conclusions of Law

# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA<br>Title III |
| as representative of | No. 17 BK-3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | (Jointly Administered) |
| Debtors.[1] | |
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA<br>Title III |
| as representative of | No. 17 BK-3567-LTS |
| THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY, | |
| Debtor. | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CONNECTION WITH
CONFIRMATION OF THE MODIFIED FIFTH AMENDED TITLE III PLAN OF ADJUSTMENT
OF THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801). Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.

LAURA TAYLOR SWAIN, United States District Judge

The motion of the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") for confirmation of a proposed plan of adjustment for the Puerto Rico Highways and Transportation Authority is now before the Court pursuant to Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").[2]  The Court has jurisdiction of this matter pursuant to Section 306(a) of PROMESA.  This Court hereby makes its findings of fact and conclusions of law, pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Federal Rules of Bankruptcy Procedure 7052 and 9014 and Section 310 of PROMESA, with respect to the confirmation motion.

## Introduction

In 2017, the Commonwealth of Puerto Rico (the "Commonwealth"), through the Oversight Board, initiated unprecedented proceedings pursuant to PROMESA to restructure the debts of the Commonwealth and certain of its instrumentalities, including the Puerto Rico Highways and Transportation Authority ("HTA" or the "Debtor"), and to find a path forward for Puerto Rico, its citizens, and other stakeholders.  (See May 22, 2017, Hr'g Tr. 6:9-8:12).  During the pendency of the Title III cases, Puerto Rico has endured the disastrous effects of hurricanes, earthquakes, and the COVID-19 pandemic.  These events have not only made day to day life far more challenging for the residents of Puerto Rico, but they have exacerbated the financial difficulties of the Commonwealth and its instrumentalities and made the already complex circumstances more challenging for those involved in the resolution of the Title III cases. Nonetheless, the Oversight Board, representatives of many creditor constituencies, the government

---

[2]  PROMESA is codified at 48 U.S.C. § 2101 et seq.  References to "PROMESA" section numbers in the remainder of this FFCL (defined below) are to the uncodified version of the legislation, unless otherwise indicated.

of Puerto Rico and other parties-in-interest have persevered, with the help and guidance of an extraordinary team of skilled judicial mediators (the "Mediation Team"), in working toward a resolution intended to allow HTA to exit its PROMESA Title III case (the "HTA Title III Case").

### Prior Restructurings under PROMESA

On November 7, 2018, this Court approved a qualifying modification for the Government Development Bank for Puerto Rico ("GDB"), which restructured approximately $4.5 billion of claims against GDB (Docket Entry No. 270 in Case No. 18-1561). On February 4, 2019, this Court confirmed the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated January 9, 2019 (Docket Entry Nos. 5047 and 5048 in Case No. 17-03283, as amended by Docket Entry Nos. 5053 and 5055 in Case No. 17-03283, on February 5, 2019), for the Puerto Rico Sales Tax Financing Corporation ("COFINA") and approved the settlement between the Commonwealth and COFINA (Docket Entry No. 5045 in Case No. 17-03283). The settlement divided rights to a significant flow of tax revenues between the two debtors that were involved in complex litigation regarding the ownership of such tax revenues.

On January 18, 2022, this Court confirmed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated January 14, 2022 [Docket Entry No. 19784 in Case No. 17-03283] (the "Commonwealth Plan") for the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority, which (i) reduced the Commonwealth's $30.5 billion of general obligation and guaranteed debt to approximately $7.4 billion, (ii) eliminated all of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico's and Puerto Rico Public Buildings Authority's debt, and (iii) is the largest debt restructuring in the history of the municipal bond market and the first restructuring

of a territory's debt in the history of the United States. On January 20, 2022, this Court (i) approved a qualifying modification for the Puerto Rico Infrastructure Financing Authority ("PRIFA") [Docket Entry No. 82 in Case No. 21-1492], which restructured approximately $1.9 billion of claims against PRIFA and (ii) approved a qualifying modification for the Puerto Rico Convention Center District Authority ("CCDA") [Docket Entry No. 72 in Case No. 21-1493], which restructured approximately $384 million of claims against CCDA. These restructurings are critical steps to restoring fiscal responsibility, access to capital markets, and economic prosperity and growth to Puerto Rico.

### Proposed Plan of Adjustment for the
### Puerto Rico Highways and Transportation Authority

The Debtor has now brought before the Court for confirmation the *Modified Fifth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority*, dated September 6, 2022 (Docket Entry No. 1404 in Case No. 17-3567)[3] (as amended, supplemented, or modified prior, at, or subsequent to the HTA Confirmation Hearing, including the Plan Supplement, and as may be amended, supplemented, or modified pursuant to Section 313 of PROMESA, the "HTA Plan").[4] The HTA Plan required extraordinary work over the course of several years to negotiate the terms of various plan support agreements and resolve disputes arising throughout the pendency of the HTA Title III Case. The Mediation Team served a critical role in facilitating navigation of complicated negotiations between parties-in-interest that have spanned several years and involved complex issues. In response to requests of this Court, the Mediation Team filed certifications of the good faith participation of parties in confidential negotiations at

---

[3]   All docket references are to entries in Case No. 17-3567 unless otherwise indicated.

[4]   Capitalized terms used but not defined herein shall have the meanings given to them in the HTA Plan.

key points during the Title III cases.  (See, e.g., Docket Entry Nos. 17314 and 18885).  The motion to confirm the HTA Plan before this Court constitutes a further step in the effort to achieve fiscal responsibility of the Commonwealth of Puerto Rico and its instrumentalities.

The HTA Plan has near universal support.  Objections by creditors, and the case put forward by the Debtor, are discussed in detail in the findings of fact and conclusion of law that follow (the "Findings of Fact and Conclusions of Law" or "FFCL").  For the reasons explained in the following Findings of Fact and Conclusions of Law, the Court finds that the HTA Plan proposed by the Oversight Board meets the confirmation requirements of PROMESA and does not violate the Constitution of the United States.

### The Motion and Submissions Considered

Before the Court is the HTA Plan filed by HTA, by and through the Oversight Board, as representative of HTA pursuant to Section 315(b) of PROMESA.[5]  The following documents have been filed by the Debtor in connection with confirmation of the HTA Plan:

(a) *Plan Supplement and Plan Related Documents of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1279) (Debtor's Ex. 22, Docket Entry No. 1300-2);

(b) *Amended Plan Supplement and Plan Related Documents of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1351) (Debtor's Ex. 60, Docket Entry No. 1354-8);

(c) *Debtor's Informative Motion Regarding (A) Modified Fifth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority, (B) HTA Plan*

---

[5]  The Court previously entered, pursuant to, inter alia, section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated June 22, 2022 (Docket Entry No. 1248) (the "HTA Disclosure Statement Order"), approving the HTA Disclosure Statement, establishing procedures for the solicitation, submission, and tabulation of votes and elections with respect to the HTA Plan, approving the forms of ballots, master ballots, and election notices in connection therewith, and approving the form of notice of the HTA Confirmation Hearing.  The Court also entered the *Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* (Docket Entry No. 1249).

*Resolution, (C) Revised Proposed HTA Confirmation Order (D) Revised Proposed Findings of Fact and Conclusions of Law, and (E) Plan Supplement* (Docket Entry No. 1405) (the Plan Supplement included therein, as the same may be amended, supplemented, or modified, the "Plan Supplement");

(d)  *Affidavit of Service of Solicitation Materials* (Docket Entry No. 1324) (Debtor's Ex. 56, Docket Entry No. 1354-3) (the "Mailing Affidavit");

(e)  *Affidavit of Publication and Radio Advertisements* (Docket Entry No. 1342) (Debtor's Ex. 57, Docket Entry Nos. 1354-4 and 1354-5) (the "Publication Affidavit" and, together with the Mailing Affidavit, the "Service Affidavits");

(f)  *Omnibus Reply of the Puerto Rico Highways and Transportation Authority to Objections to Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1361);

(g)  *Memorandum of Law in Support of Confirmation of Fourth Amended Title III Joint Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1360) (the "Memorandum of Law");

(h)  *Declaration of David Skeel in in Respect of Confirmation of Fourth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1357) (the "Skeel Decl.");

(i)  *Declaration of David M. Brownstein in Respect of Confirmation of Fourth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1358) (the "Brownstein Decl.");

(j)  *Declaration of Ojas N. Shah in Respect of Confirmation of Fourth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1359) (the "Shah Decl.");

(k)  *Declaration of Jay Herriman in Respect of Confirmation of Fourth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1355) (the "Herriman Decl.");

(l)  *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1356) (the "Pullo Decl." and, together with the declarations listed in (h) to (k) above, the "Debtor's Declarations");

(m)  *Debtor's Supplemental Reply to Limited Objection of the HTA Insured Bondholder Group to the Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1376);

Submissions in opposition to confirmation of the HTA Plan were filed by the following parties: (i) Mapfre PRAICO Insurance Company and Endurance Reinsurance Corporation of America (Docket Entry No. 1285) (the "Mapfre Objection);[6] (ii) the plaintiffs-appellants of case <u>Vazquez Velazquez v. Puerto Rico Highways Authority</u>, case number 21-1739 (Docket Entry No. 1287) (the "Velazquez Objection", and the objectors, the "Velazquez Group"); and (iii) Finca Matilde, Inc. (Docket Entry No. 1293) (the "Finca Objection).[7]

Reservations of rights, statements or replies in support of confirmation, or limited objections raising discrete issues but generally supporting the HTA Plan were filed by the following parties: (i) Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "Assured") (Docket Entry Nos. 1290, 1349, 1375); (ii) National Public Finance Guarantee Corporation (Docket Entry No. 1295); (iii) the Official Committee of Unsecured Creditors (Docket Entry No. 1296); (iv) Franklin Advisers, Inc. and Nuveen Asset Management (collectively, the "Insured Bondholder Group") (Docket Entry Nos. 1301, 1374); (v) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") (Docket Entry No. 1318), which was withdrawn pursuant to Docket Entry No. 1380; and (vi) AmeriNational Community Services, LLC (Docket Entry No. 1385).  The Court has also received and reviewed carefully submissions (Docket Entry Nos. 1381, 1382, 1383, 1384)[8] in connection with each version of the

---

[6]  The Mapfre Objection was resolved pursuant to revisions included in decretal paragraph 56 of the HTA Confirmation Order.  <u>See</u> Aug. 17, 2022 Hr'g Tr. 26:05-28:08.

[7]  The Finca Objection was resolved pursuant to revisions included in Section 1.10 of the HTA Plan.  <u>See</u> Aug. 17, 2022 Hr'g Tr. 87:09-89:19, 98:09-13, 114:21-115:12.

[8]  AAFAF's limited objection to the Proposed Findings of Facts and Conclusions of Law (Docket Entry No. 1384) was withdrawn as resolved pursuant to proposed revisions submitted by the Oversight Board in connection therewith (Docket Entry No. 1386).  <u>See</u> Aug. 17, 2022 Hr'g Tr. 16:09-17-05.

Oversight Board's submissions in connection with its Proposed Findings of Facts and Conclusions of Law.

The Court heard argument and statements by members of the public,[9] and received evidence,[10] in connection with confirmation of the HTA Plan at a hearing held on August 17, 2022 (the "HTA Confirmation Hearing").  The Court has carefully considered the HTA Plan, as well as the supporting and opposing submissions, and the witness testimony and voluminous briefing and written evidence submitted by the parties.  The Court has also listened carefully to the oral remarks made on the record at the HTA Confirmation Hearing by members of the public.

As indicated at the HTA Confirmation Hearing, in response to the limited objection filed by the Insured Bondholder Group (Docket Entry No. 1301) and the oral arguments presented at the HTA Confirmation Hearing, the Court entered the *Order to Meet and Confer* (Docket Entry No. 1389) (the "Meet and Confer Order"), directing Assured and the Insured Bondholder Group to, among other things, meet and confer in an effort to develop a resolution to the limited objection. Upon doing so, Assured and the Insured Bondholder Group filed the *Joint Response of Assured Guaranty Corp., Assured Guaranty Municipal Corp., and HTA Insured Bondholder Group to*

---

[9]  The Court heard statements from three members of the public.  See Aug. 17, 2022 Hr'g Tr. 74:08-86-01.

[10]  The Debtor's Declarations were admitted without objection, and original signature pages with respect thereto were submitted to the Court.  See Aug. 17, 2022 Hr'g Tr. 106:21-109:14; Docket Entry No. 1391.  The Debtor's exhibits (Docket Entry Nos. 1299, 1300, 1302, 1303, 1354, 1379) were admitted without objection subject to the limitations indicated under the exhibit list's column identified as "Use of Exhibit".  See Aug. 17, 2022 Hr'g Tr. 102:23-103:03; Docket Entry No. 1391.

Assured's exhibits (Docket Entry Nos. 1291, 1322), the Velazquez Group's exhibits (Docket Entry No. 1298) and declaration of Carlos Céspedes Gómez (Docket Entry No. 1287), and the Insured Bondholder Group's exhibit (Docket Entry No. 1303) were admitted without objection.  Docket Entry No. 1391; see Aug. 17, 2022 Hr'g Tr. 110:06-09, 110:17-21, 111:05-09, 113:04-08.

*Order to Meet and Confer (ECF No. 21863)* (Docket Entry No. 1394) (the "Joint Response"), setting forth their agreed upon resolution.

On August 24, 2022, the Court entered the *Order to Submit Revised Proposed Plan and Related Materials* (Docket Entry No. 1399) (the "Filing Order"). On August 31, 2022, the Court entered the *Order Granting the Urgent Motion for Extension of Deadline to Submit Revised Proposed Plan and Related Materials* (Docket Entry No. 1401) (the "Extension Order"), extending the deadline for the Oversight Board to submit a revised Fifth Amended HTA Plan and related materials. In response, the Oversight Board filed the HTA Plan (which included revisions agreed to by Assured and the Insured Bondholder Group resolving the limited objection filed by the Insured Bondholder Group (Docket Entry Nos. 1301, 1405)), proposed HTA Confirmation Order, proposed Findings of Fact and Conclusions of Law, and revised Plan Supplement (which included, among other documents, the New HTA Bonds Indenture with modifications consented to in accordance with the terms and provisions of the HTA/CCDA Plan Support Agreement (Docket Entry No. 1405-7)).

For the following reasons, the HTA Plan is hereby confirmed and any remaining objections are overruled. For the avoidance of doubt, to the extent that a particular objection or issue is not specifically addressed in these Findings of Fact and Conclusions of Law, it has been considered thoroughly and is overruled. The overruled objections and the Oversight Board's position as to the proper treatment of Eminent Domain/Inverse Condemnation Claims are preserved for appeal.

The Court turns now to its analysis and decision on the motion for confirmation of the HTA Plan, and the reasons for that decision.

## Findings of Fact and Conclusions of Law

1.     <u>Findings and Conclusions</u>.  The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Federal Rules of Bankruptcy Procedure 7052 and 9014 and Section 310 of PROMESA.  To the extent any of the findings of fact contained herein constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law contained herein constitute findings of fact, they are adopted as such.  Any headings or sub-headings used herein are for reference purposes only and shall not affect in any way the meaning or interpretation of the Findings of Fact and Conclusions of Law set forth herein or the HTA Plan.

2.     <u>Jurisdiction</u>.  This Court has exclusive jurisdiction over the HTA Title III Case pursuant to PROMESA Section 306(a).  Venue is proper before this Court pursuant to PROMESA Section 307(a).  Pursuant to Section 306(b) of PROMESA, upon commencement of the HTA Title III Case, the Title III Court exercised, and continues to exercise, exclusive jurisdiction over all property of the Debtor, wherever located.  To the extent necessary, pursuant to PROMESA Section 305, the Oversight Board has granted consent to, and the HTA Plan provides for, this Court's exercise of jurisdiction over the property and revenues of the Debtor as necessary to approve and authorize the implementation of the Findings of Fact and Conclusions of Law and the HTA Plan.

3.     <u>Judicial Notice</u>.  The Court takes judicial notice of the dockets of the HTA Title III Case, the appellate court dockets of any and all appeals taken from any order entered or opinion issued by the Court in the HTA Title III Case, and the following litigation and adversary proceedings, each as defined in the HTA Plan, including all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings related thereto: (a) the Debt Related Objections, (b) the Invalidity Actions, (c) the Lien Challenge Actions,

(d) the Lift Stay Motions, (e) the Clawback Actions, and (f) the Avoidance Actions listed in Exhibit A to the HTA Plan.

4.     <u>Burden of Proof</u>.   The Debtor has the burden of proving satisfaction of the requirements of Section 314 of PROMESA and by a preponderance of the evidence.  As explained below, the HTA Plan meets the applicable requirements of Section 314 of PROMESA.

<u>**General Background**</u>

A.     **The Oversight Board and the HTA Title III Case**

5.     For more than a decade, Puerto Rico has faced an unprecedented fiscal and economic crisis.  Actions taken in the past caused Puerto Rico to lose access to capital markets and precipitated the collapse of Puerto Rico's public finance system.  (<u>See</u> PROMESA § 405(m)).  Puerto Rico's fiscal and economic crisis has been further exacerbated by the devastation caused to Puerto Rico by Hurricanes Irma and Maria in 2017, the earthquakes that occurred in early 2020, and the COVID-19 pandemic.  (Skeel Decl. ¶¶ 21, 23-24).

6.     On June 30, 2016, the United States enacted PROMESA, and the Oversight Board was established pursuant to Section 101(b) of PROMESA.  (<u>Id.</u> at ¶ 10).  Pursuant to Section 4 of PROMESA and Article VI of the Constitution of the United States, the provisions of PROMESA prevail over any inconsistent general or specific provisions of territory law, State law, or regulation.  <u>See</u> PROMESA § 4.

7.     On August 31, 2016, President Obama appointed the Oversight Board's original seven voting members.  (Skeel Decl. ¶ 11).

8.     The Oversight Board designated HTA as a "covered territorial instrumentality" pursuant to PROMESA Section 101(d).  (<u>Id.</u> at ¶ 18).

9.     On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA Sections 104(j) and 206, and filed a voluntary petition for relief for the

Commonwealth pursuant to PROMESA Section 304(a), thereby commencing a case under Title

III of PROMESA (the "Commonwealth Title III Case").  (See Docket Entry No. 1 in Case No. 17-

03283).

10.     On May 21, 2017, the Oversight Board issued a restructuring certification pursuant

to PROMESA Sections 104(j) and 206, and filed a voluntary petition for relief for HTA pursuant

to PROMESA Section 304(a), thereby commencing the HTA Title III Case.  (See Docket Entry

No. 1).

11.     On June 15, 2017, the U.S. Trustee appointed the Creditors' Committee in the

Commonwealth Title III Case (Docket Entry No. 338 in Case No. 17-03283) and, on August 25,

2017, the U.S. Trustee amended that appointment to provide that the Creditors' Committee would

also serve in the HTA Title III Case (Docket Entry No. 1171 in Case No. 17-03283).

12.     On June 23, 2017, the Court entered an order appointing the Mediation Team, led

by Chief Bankruptcy Judge Barbara Houser.  (Docket Entry No. 430 in Case No. 17-03283).

13.     On June 29, 2017, the Court entered an order providing for the joint administration

of the Commonwealth Title III Case and the HTA Title III Case, for procedural purposes only.

(Docket Entry No. 168).

B.     **The Plan Support Agreements, HTA Plan, and HTA Disclosure Statement**

14.     The Oversight Board, either directly or through its advisors, engaged in extensive

mediation sessions under the guidance and direction of the Mediation Team, and continued to

negotiate directly with various constituencies, all in an effort to build support for the restructuring

of Commonwealth and HTA debt.  Those negotiations culminated in certain agreements with

various stakeholders in furtherance of the successful implementation of the HTA Plan.  (Skeel

Decl. ¶ 32; Debtor's Exs. 14–16, Docket Entry Nos. 1299-16 – 1299-18).

15.     On April 12, 2021, the Oversight Board announced it had reached an agreement in principle with Assured and National to settle, among other things, claims against the Commonwealth and HTA relating to HTA Allocable Revenues, and to restructure, among other things, the HTA Bonds.  (Skeel Decl. ¶ 33).  Thereafter, on May 5, 2021, the Oversight Board entered into an agreement with certain holders and insurers of HTA Bonds and certain holders and insurers of CCDA Bonds, regarding the proposed treatment and settlement of outstanding disputes between HTA, the Commonwealth and the other parties to the HTA/CCDA PSA, including certain "clawback claims" against the Commonwealth (the "HTA/CCDA PSA" or the "HTA/CCDA Plan Support Agreement").  (Debtor's Ex. 14, Docket Entry No. 1299-16).  The HTA/CCDA PSA, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, (ii) provided for the issuance of new bonds by HTA and Contingent Value Instruments ("CVIs") by the Commonwealth,  (iii) provided for $184.8 million in cash to holders of claims against HTA arising from or relating to the HTA 68 Bonds and $79.2 million in cash to holders of claims against HTA arising from or relating to HTA 98 Senior Bonds upon satisfaction of the HTA Distribution Conditions, (iv) provides for the bondholders and insurers to support the HTA Plan, and (v) provides an agreement regarding the structure of a potential plan of adjustment for HTA.  (Skeel Decl. ¶ 33; Debtor's Ex. 14, Docket Entry No. 1299-16).

16.     Following entry into the HTA/CCDA Plan Support Agreement, negotiations undertaken with the assistance and guidance of the Mediation Team between the Oversight Board and monoline insurers, Ambac Assurance Corporation ("Ambac") and Financial Guaranty Insurance Company ("FGIC"), continued.  (Skeel Decl. ¶ 34).  As a result of those negotiations, on July 15, 2021, Ambac and FGIC joined the HTA/CCDA Plan Support Agreement pursuant to

separate Joinder Agreements to the HTA/CCDA Plan Support Agreement, subject to a right to terminate the HTA/CCDA Plan Support Agreement solely as to themselves, which right expired on July 26, 2021.  (Id. at ¶ 34).

17.    On November 5, 2021, the Oversight Board reached an agreement with AmeriNational Community Services, LLC (as servicer for the GDB Debt Recovery Authority (the "DRA")), and Cantor-Katz Collateral Monitor LLC (a Delaware limited liability company and as collateral monitor for Wilmington Trust, N.A.) (collectively, the "DRA Parties"), regarding the proposed treatment and settlement of, among other things, the DRA's claims against HTA (the "DRA Stipulation").   (Id. at ¶ 36; Debtor's Ex. 16, Docket Entry No. 1299-18). The DRA Stipulation, among other things, provides for the DRA Parties to (i) support the HTA Plan and solicitation process, and (ii) vote to accept the HTA Plan.  (Skeel Decl. ¶ 36; Debtor's Ex. 16, Docket Entry No. 1299-18).

18.    On January 18, 2022, the Court entered the *Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* (Docket Entry No. 19813 in Case No. 17-3283) (the "Commonwealth Confirmation Order"), confirming the Commonwealth Plan.  (Skeel Decl. ¶ 37; Debtor's Ex. 29, Docket Entry No. 1300-9).  The Commonwealth Plan incorporated, among other things, the terms, provisions, and agreements for the settlement and compromise of various disputes relating to the Commonwealth as provided in the HTA/CCDA PSA and DRA Stipulation. (Skeel Decl. ¶ 37).  On March 15, 2022, the Commonwealth Plan became effective.  (See Docket Entry No. 20349 in Case No. 17-03283).

19.     Pursuant to the Commonwealth Plan and Commonwealth Confirmation Order, upon satisfaction of the HTA Distribution Conditions, (i) holders of Allowed CW/HTA Claims collectively received 68.6% of the Clawback CVI, a contingent value instrument that is based on sharing the potential outperformance of 5.5% of the Commonwealth's Sales and Use Taxes, relative to projections in the Commonwealth Fiscal Plan certified on May 27, 2020, and (ii) holders of claims against HTA arising from or relating to HTA 68 Bonds (as set forth in the HTA/CCDA Plan Support Agreement) (the "HTA 68 Bond Claims") received payment from HTA in the aggregate amount of $184.8 million in cash (the "HTA 68 Bond Cash"), and holders of claims against HTA arising from or relating to HTA 98 Senior Bonds (as set forth in the HTA/CCDA Plan Support Agreement) ("HTA 98 Senior Bond Claims" and, together with the HTA 68 Bond Claims, the "HTA Bond Claims") received payment from HTA in the aggregate amount of $79.2 million in cash (the "HTA 98 Senior Bond Cash" and, together with the HTA 68 Bond Cash, the "HTA Cash").  (Skeel Decl. ¶ 120).  The principal amount of the HTA 68 Bonds and HTA 98 Senior Bonds, and corresponding HTA Bond Claims, was reduced by the amount of HTA Cash. (Id.).  The HTA Distribution Conditions were satisfied on June 24, 2022 and the HTA Cash and Clawback CVIs were distributed pursuant to the terms of the Commonwealth Plan and Commonwealth Confirmation Order on or before July 11, 2022.  (Id.).

20.     On May 2, 2022, the Oversight Board filed the *Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1164) (the "Initial HTA Plan") and corresponding disclosure statement.  The Initial HTA Plan contained, among other things, the material terms outlined in the HTA/CCDA PSA and the DRA Stipulation as they relate to HTA.  (Skeel Decl. ¶ 38).

21.     Following the filing of the Initial HTA Plan, the Oversight Board continued to negotiate with various stakeholders, including the Creditors' Committee, to generate further support for a plan of adjustment.  (Id. at ¶ 39).  On May 9, 2022, the Oversight Board reached an agreement with the Creditors' Committee, which provided for the terms of a recommended global settlement regarding the treatment of HTA General Unsecured Claims, including, among other things, the increase of the HTA GUC Recovery from $25 million to $48 million (the "HTA Committee Agreement").  (Id.; Debtor's Ex. 15, Docket Entry No. 1299-17).

22.     On May 16, 2022, the Oversight Board filed the *Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1177) (the "First Amended HTA Plan") and corresponding disclosure statement.  The First Amended HTA Plan incorporated the material terms of the HTA Committee Agreement.  (Skeel Decl. ¶ 40).

23.     On June 7, 2022, the Oversight Board filed the *Second Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1202) (the "Second Amended HTA Plan") and corresponding disclosure statement.  The Second Amended HTA Plan reflects other comments received from various parties-in-interest.  (Skeel Decl. ¶ 41).

24.     On June 17, 2022, the Oversight Board filed the *Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1240) (the "Third Amended HTA Plan") and the *Disclosure Statement for the Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1241) (the "HTA Disclosure Statement") (Debtor's Ex. 2, Docket Entry No. 1299-2 and 1299-3). The HTA Plan reflects certain comments received from various parties-in-interest.  (Skeel Decl. ¶ 42).

25.     On June 22, 2022, the Court entered the HTA Disclosure Statement Order which, among other things (a) approved the HTA Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code, (b) established July 27, 2022 at 5:00 p.m. (Atlantic Standard Time) as the deadline by which (1) objections or responses to confirmation of the HTA Plan were required to be filed (the "Confirmation Objection Deadline"), (2) ballots to accept or reject the HTA Plan were required to be received by the Solicitation Agent (the "Voting Deadline"), and (3) elections regarding the form of distributions were required to be effectuated through the Automated Tender Offer Program ("ATOP") (the "Election Deadline"), and (c) scheduled a hearing to be held on August 17 and 18, 2022, to consider confirmation of the HTA Plan.  (Docket Entry No. 1248).

26.     Consistent with the HTA Disclosure Statement Order, the Debtor caused the Solicitation Agent to distribute Solicitation Packages to all holders of Claims entitled to vote. (Mailing Affidavit; Pullo Decl. ¶ 4).  The Solicitation Packages contained, among other things: (a) the HTA Confirmation Hearing Notice setting forth the time, date, and place of the HTA Confirmation Hearing, (b) the HTA Disclosure Statement Order (without the exhibits thereto) and the HTA Disclosure Statement (together with all exhibits thereto, including the HTA Plan), (c) the appropriate form of Ballot or Notice, if any, with instructions for voting and/or making any applicable election and, as applicable, a pre-addressed, pre-paid return envelope, and (d) with respect to Class 16, the Creditors' Committee Letter.  (Solicitation Affidavit ¶ 1).  The Debtor also caused the Solicitation Agent to publish the HTA Confirmation Hearing Notice and place radio advertisements providing, among other things, information regarding the solicitation of votes to accept or reject the HTA Plan and deadlines associated therewith.  (Pullo Decl. ¶ 7; Publication Affidavit).

27.     On August 7, 2022, the Oversight Board filed the *Fourth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1350) (the "Fourth Amended HTA Plan").

28.     On August 13, 2022, the Oversight Board filed the *Fifth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1377) (the "Fifth Amended HTA Plan").

29.     On August 18, 2022, the Court entered the Meet and Confer Order directing Assured and the Insured Bondholder Group to, among other things, meet and confer in an effort to develop a resolution to the limited objection.  On August 23, 2022, Assured and the Insured Bondholder Group filed the Joint Response, setting forth their agreed upon resolution to the Insured Bondholder Group's limited objection.

30.     On August 24, 2022, the Court entered the Filing Order directing the Oversight Board to submit a revised Fifth Amended HTA Plan and related materials with appropriate revisions to address, among other things, the proposed resolution in the Joint Response.  The deadline for the Oversight Board to submit such filings was extended to September 6, 2022 pursuant to the Extension Order.

31.     On September 6, 2022, in accordance with the Filing Order, the Oversight Board filed the HTA Plan (which included revisions agreed to by Assured and the Insured Bondholder Group resolving the limited objection filed by the Insured Bondholder Group), proposed HTA Confirmation Order, proposed Findings of Fact and Conclusions of Law, and revised Plan Supplement (which included, among other documents, the New HTA Bonds Indenture with modifications consented to in accordance with the terms and provisions of the HTA/CCDA Plan Support Agreement).

## Compliance with PROMESA Sections 104(j) and 313

32.     The Oversight Board must certify the submission or modification of a plan of adjustment on behalf of a debtor in a case under Title III of PROMESA before submitting or modifying such plan of adjustment.  See PROMESA § 104(j)(1)-(2).  The Oversight Board may certify a plan of adjustment only if it determines, in its sole discretion, that the plan is consistent with the applicable certified fiscal plan.  See id. § 104(j)(3).  The Oversight Board, after the issuance of a certification pursuant to PROMESA Section 104(j), may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of PROMESA Title III.  See id. § 313.  After the Oversight Board files a modification, "the plan as modified becomes the plan."  Id.

33.     The Oversight Board has complied with its obligations pursuant to PROMESA Sections 104(j) and 313.  On February 22, 2022, the Oversight Board certified HTA's current fiscal plan (the "HTA 2022 Fiscal Plan").  (Skeel Decl. ¶ 31; Debtor's Ex. 5, Docket Entry No. 1299-6).

34.     On April 28, 2022, the Oversight Board certified the submission of the Initial HTA Plan.  (Debtor's Ex. 18, Docket Entry No. 1299-20).  The Oversight Board subsequently filed the Initial HTA Plan.

35.     On May 13, 2022, the Oversight Board certified the submission of the First Amended HTA Plan.  (Debtor's Ex. 19, Docket Entry No. 1299-21).  The Oversight Board subsequently filed the First Amended HTA Plan.

36.     On June 7, 2022, the Oversight Board certified the submission of the Second Amended HTA Plan.  (Debtor's Ex. 20, Docket Entry No. 1299-22).  The Oversight Board subsequently filed the Second Amended HTA Plan.

37.     On June 17, 2022, the Oversight Board certified the submission of the Third Amended HTA Plan.   (Debtor's Ex. 21, Docket Entry No. 1300-1).   The Oversight Board subsequently filed the Third Amended HTA Plan.

38.     On August 5, 2022, the Oversight Board certified the submission of the Fourth Amended HTA Plan.   (Debtor's Ex. 59, Docket Entry No. 1354-7).   The Oversight Board subsequently filed the Fourth Amended HTA Plan.

39.     On August 12, 2022, the Oversight Board certified the submission of the Fifth Amended HTA Plan.   (Debtor's Ex. 64, Docket Entry No. 1379-2).   The Oversight Board subsequently filed the Fifth Amended HTA Plan.

40.     On August 26, 2022, the Oversight Board certified the submission of the HTA Plan. (Docket Entry No. 1405-2).  The Oversight Board subsequently filed the HTA Plan.

41.     The Oversight Board submitted the HTA Plan in accordance with Section 313 of PROMESA.  For the reasons explained herein, the Court confirms the HTA Plan and holds that it meets the requirements of PROMESA and that the Oversight Board has complied with all provisions of PROMESA applicable to confirmation of the HTA Plan.

## Compliance with PROMESA Section 314(b)

A.     **PROMESA § 314(b)(1):** *The Plan Fully Complies with the Provisions of the Bankruptcy Code Made Applicable by PROMESA § 301.*

42.     As required by Bankruptcy Rule 3016(a), the HTA Plan is dated and identifies the Debtor as the proponent.  (HTA Plan at 1).  In addition, as detailed below, the HTA Plan satisfies the requirements of sections 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5), 1123(b), and 1123(d) of the Bankruptcy Code.

i.      **Bankruptcy Code Section 1122(a)**

43.     With the exception of Administrative Expense Claims and Professional Claims, which need not be classified, Article IV of the HTA Plan designates the classification of Claims. The HTA Plan's classification of Claims complies with section 1122(a) of the Bankruptcy Code because each Class contains only claims that are either all unsecured Claims or are all secured Claims secured by the same collateral, or are otherwise substantially similar to the other claims in the class.  (Skeel Decl. ¶ 50).  The HTA Plan designates the following twenty (20) Classes of Claims:

| Claim | Class |
|-------|-------|
| HTA 68 Bond Claims | 1 |
| HTA 68 Bond Claims (Ambac) | 2 |
| HTA 68 Bond Claims (Assured) | 3 |
| HTA 68 Bond Claims (National) | 4 |
| HTA 98 Senior Bond Claims | 5 |
| HTA 98 Senior Bond Claims (Ambac) | 6 |
| HTA 98 Senior Bond Claims (Assured) | 7 |
| HTA 98 Senior Bond Claims (FGIC) | 8 |
| HTA 98 Senior Bond Claims (National) | 9 |
| HTA 98 Sub Bond Claims | 10 |
| HTA 98 Sub Bond Claims (Assured) | 11 |
| HTA 98 Sub Bond Claims (FGIC) | 12 |
| HTA 98 Sub Bond Claims (National) | 13 |
| HTA Moscoso Bond Claims | 14 |
| Eminent Domain/Inverse Condemnation Claims | 15 |
| HTA General Unsecured Claims | 16 |
| HTA/GDB Claims | 17 |
| Section 510(b) Subordinated Claims | 18 |
| Convenience Claims | 19 |
| Federal Claims | 20 |

(Id.).

44.     The classification of Claims set forth in the HTA Plan is reasonable and was not done to control the outcome of voting to accept or reject the HTA Plan, as the classification is based upon differences in the legal nature and/or priority of such Claims in accordance with applicable law.  Separate classification is used for governmental or business reasons usually requiring different treatment of separate Classes' Claims.  (Id. at ¶ 51).

45.     Bond claims against HTA in Classes 1-14 of the HTA Plan are classified separately based on the seniority, and security claimed by holders of, different bond issuances and whether the bonds are insured and, if so, the insurer, as follows: (a) bonds issued by HTA pursuant to Resolution No. 68-18, adopted June 13, 1968, as amended and supplemented thereafter (Classes 1-4), senior bonds issued by HTA pursuant to Resolution 98-06, adopted February 16, 1998 (Classes 5-9), subordinated bonds issued by HTA pursuant to Resolution 98-06, adopted February 16, 1998 (Classes 10-13), or Special Facility Revenue Refunding Bonds, 2003 Series A, issued by HTA pursuant to that certain Trust Agreement, dated as of October 1, 2003, between HTA and Banco Popular de Puerto Rico, as trustee (Class 14), and (b) whether the bonds are (i) uninsured (Classes 1, 5, 10, and 14), or (ii) insured by Assured Guaranty Corp. or Assured Guaranty Municipal Corp. (together, "Assured")  (Classes 3, 7, 11), National Public Finance Guarantee Corporation ("National") (Classes 4, 9, and 13), Financial Guaranty Insurance Company ("FGIC") (Classes 8 and 12), or Ambac Assurance Corporation ("Ambac") (Classes 2 and 6).  (Id.).

46.     Eminent Domain/Inverse Condemnation Claims are separately classified in Class 15 of the HTA Plan.  (Id. at ¶ 52).  The holders of such Claims assert that they hold prepetition constitutional Claims based on seizures or the inverse condemnation of real property pursuant to HTA's eminent domain power.  (Id.).  The Debtor alleges that the Eminent Domain/Inverse Condemnation Claims are partially secured by funds deposited by HTA with the Clerk of the Court

of First Instance in connection with condemnation proceedings underlying such Claims in accordance with Puerto Rico law, 32 L.P.R.A. § 2907. In accordance with applicable Puerto Rico law, upon commencement of a condemnation proceeding, title to a subject property is transferred to HTA and funds on deposit become available to the former title holder.[11]  32 L.P.R.A. § 2907. The HTA Plan treats the Eminent Domain/Inverse Condemnation Claims as secured Claims to the extent the Claims are allowable and there is cash on deposit for them.  The HTA Plan further provides that the amount of the Claim in excess of the deposit, if any, will be paid in full upon entry of separate Final Orders (i) setting the amount of Allowed Claims for just compensation, and (ii) determining that such claims may not be impaired or discharged.  (Skeel Decl. ¶ 52).  The Oversight Board filed an appeal from the portion of the Commonwealth Confirmation Order and the *Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment of  the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* (Docket Entry No. 19812 in Case No. 17-03283) (the "Commonwealth Findings of Fact and Conclusions of Law") holding that the Eminent Domain/Inverse Condemnation Claims against the Commonwealth may not be impaired or discharged.  On July 18, 2022, the United States Court of Appeals for the First Circuit (the "First Circuit") issued an opinion affirming the portion of the Commonwealth Confirmation Order and Commonwealth Findings of Fact and Conclusions of Law holding that the Eminent Domain/Inverse Condemnation Claims against the Commonwealth are nondischargeable.  This

---

[11]  If the Commonwealth does not initiate a condemnation proceeding following applicable eminent domain procedures, or if the taking is the result of the diminution of the property's use or value resulting from government conduct, the former owner of property may initiate a claim for inverse condemnation for the taking of property for public use without just compensation.  See, e.g., Filler v. United States, 116 Fed. Cl. 123, 127 n.2 (Fed. Cl. 2014).

opinion is not yet a Final Order, and the Oversight Board has advised the Court it intends to file a petition for writ of certiorari to the United States Supreme Court from the First Circuit's opinion affirming the portion of the Commonwealth Confirmation Order and Commonwealth Findings of Fact and Conclusions of Law holding that the Eminent Domain/Inverse Condemnation Claims against the Commonwealth are non-dischargeable.  If the United States Supreme Court reverses this portion of the Commonwealth Confirmation Order and Commonwealth Findings of Fact and Conclusions of Law, the HTA Plan provides that the Eminent Domain/Inverse Condemnation Claims will receive payments from HTA equal to, and on the same timeframe as, the payments to be made to holders of Allowed HTA General Unsecured Claims to the extent each allowable Claim exceeds the cash on deposit for it.

47.     Class 16 of the HTA Plan consists of Claims against HTA, other than those excluded pursuant to Section 1.198 of the HTA Plan, or otherwise treated in other Classes under the HTA Plan.  (Id. at ¶ 53).  The Claims in Class 16 of the HTA Plan are unsecured and substantially similar to the other Claims in this Class.  (Id.).

48.     Class 17 of the HTA Plan consists of Claims against HTA with respect to loans extended by GDB to HTA, other than any Claims in Classes 1-14.  (Id. at ¶ 54).  These Claims are classified separately because, pursuant to the terms and provisions of the DRA Stipulation, the DRA, as holder of the HTA/GDB Claims, has agreed to receive no distribution on account of its HTA/GDB Claims.  (Id.).  Accordingly, separate classification of such Claims is reasonable and justified.

49.     Class 18 of the HTA Plan consists of Claims determined pursuant to a Final Order to be subject to section 510(b) of the Bankruptcy Code.  (Id. at ¶ 55).  Section 510(b) of the Bankruptcy Code subordinates such Claims to other general unsecured claims, and provides that

such Claims are only eligible to receive a recovery pursuant to the HTA Plan once all other unsecured creditors have been paid in full.  Because these Claims have a lower priority than general unsecured claims, they are sufficiently dissimilar to general unsecured claims to warrant separate classification and treatment.  (Id.).

50.     Class 20 of the HTA Plan consists of Claims of the United States of America, its agencies, departments or agents, including, without limitation, the United States Department of Housing and Urban Development, the United States Department of Homeland Security, and the United States Department of Labor.   (Id. at ¶ 56).   Due to the unique relationship of the Commonwealth and its instrumentalities, including HTA, with the federal government and its instrumentalities, as well as the long-term nature of many federal programs, it is reasonable and justified to classify such Federal Claims separately.  (Id.).

51.     As each Class contains Claims substantially similar to each other, the HTA Plan satisfies the requirements of section 1122(a) of the Bankruptcy Code.

### ii.     Bankruptcy Code Section 1122(b)

52.     Class 19 consists of Convenience Claims, comprising Claims equal to or less than $20,000, or Claims which the holder elects to reduce to $20,000 pursuant to the HTA Plan.  (HTA Plan § 1.83).  Any holder of multiple Claims in an aggregate amount of $40,000 or more may elect to reduce all such Claims to an aggregate amount of $40,000 and be treated within Class 19.  (HTA Plan §1.83, Art. XX). The separate classification of Convenience Claims is reasonable and necessary to ease the administrative burden on the Debtor.  (See Skeel Decl. ¶ 57).

53.     The HTA Plan satisfies the requirements of section 1122(b) of the Bankruptcy Code.

### iii.      Bankruptcy Code Section 1123(a)(1)

54.      Section 4.1 of the HTA Plan designates twenty (20) separate Classes of Claims for the Debtor, other than Claims of the type described in section 507(a)(2) of the Bankruptcy Code. (See id. at ¶ 58).

55.      The HTA Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

### iv.      Bankruptcy Code Section 1123(a)(2)

56.      Section 33.1 of the HTA Plan specifies that Claims in Classes 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, 18, and 20 are impaired.  (Id. at ¶ 59).  Section 33.2 of the HTA Plan specifies that Claims in Classes 14 and 19 are unimpaired pursuant to the HTA Plan.  (Id. at ¶ 60).

57.      The HTA Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

### v.      Bankruptcy Code Section 1123(a)(3)

58.      Articles V through XXIV of the HTA Plan identify the treatment of each Class of Claims impaired by the HTA Plan.  (Id. at ¶ 61).

59.      The HTA Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### vi.      Bankruptcy Code Section 1123(a)(4)

60.      Articles V through XXIV of the HTA Plan provide that the treatment of each Claim in each particular Class is the same as the treatment of each other Claim in such Class, except to the extent a holder of an Allowed Claim has agreed to less favorable treatment of its Claim. (Id. at ¶ 62).

61.      Certain parties are receiving payment of the Consummation Costs, HTA PSA Restriction Fees, or DRA Restriction Fee pursuant to the HTA Plan and in accordance with the

HTA/CCDA Plan Support Agreement or the DRA Stipulation negotiated by the Oversight Board. (See id. at ¶ 63; Debtor's Exs. 14 and 16, Docket Entry Nos. 1299-16 and 1299-18). The Consummation Costs, HTA PSA Restriction Fees, and DRA Restriction Fee are not awarded on account of the respective creditors' Claims, but rather, (i) the Consummation Costs are provided in consideration of certain creditors' assistance in the formulation of the HTA Plan for all creditors and to compensate them for the reasonable fees and expenses incurred in connection with the negotiation and execution of the HTA/CCDA Plan Support Agreement benefitting classes of creditors, which made development of the HTA Plan possible; and (ii) the HTA PSA Restriction Fees and DRA Restriction Fee are provided in connection with certain parties' commitment to support the confirmation of the HTA Plan and, in connection therewith, to "lock up" their bonds pursuant to the terms of the HTA/CCDA Plan Support Agreement or the DRA Stipulation, as applicable. (See Skeel Decl. ¶ 63).

62. The Oversight Board has determined, and this Court finds that, it is reasonable for the HTA/CCDA PSA Creditors to be paid the Consummation Costs as consideration for their efforts in assisting in the formulation of the HTA Plan that has garnered significant creditor support, and to compensate the HTA/CCDA PSA Creditors for fees and expenses incurred in connection with the negotiation and execution of the HTA/CCDA PSA. (Id. at ¶ 143; Debtor's Ex. 14, Docket Entry No. 1299-16).

63. Additionally, in exchange for agreeing to support the HTA Plan and tender or "lock up" their HTA 68 Bonds and HTA 98 Senior Bonds in accordance with the HTA/CCDA PSA, the Oversight Board has determined, and this Court finds that, it is reasonable to make the HTA PSA Restriction Fees available to each applicable HTA bondholder party to the HTA/CCDA PSA. (Skeel Decl. ¶ 143; Debtor's Ex. 14, Docket Entry No. 1299-16).

64.     Similarly, in exchange for executing the DRA Stipulation and agreeing to all of its terms and conditions, including agreeing to support the HTA Plan and "lock up" their HTA 98 Senior Bonds and HTA/GDB Claims in connection with the DRA Stipulation, the Oversight Board has determined, and this Court finds that, it is reasonable to make the DRA Restriction Fee available to each DRA bondholder party to the DRA Stipulation. (Skeel Decl. ¶ 143; Debtor's Ex. 16, Docket Entry No. 1299-18).

65.     The provisions for payment of the Consummation Costs, HTA PSA Restriction Fees, and DRA Restriction Fee are critical components of the HTA/CCDA PSA and DRA Stipulation that made development of the HTA Plan possible.  (See Skeel Decl. ¶ 143).  The payment of the Consummation Costs, HTA PSA Restriction Fees, and DRA Restriction Fee to certain parties does not violate section 1123(a)(4) of the Bankruptcy Code, which mandates that "a plan shall . . . provide the same treatment for each claim or interest of a particular class . . . ." 11 U.S.C.A. § 1123(a)(4) (Westlaw through P.L. 117-80).  While it is true that all claims must be treated equally, the same is not true for all claimants.  See 7 Collier on Bankruptcy ¶ 1123.01 (16th ed. 2021) ("The equality addressed by Section 1123(a)(4) extends only to the treatment of members of the same class of claims and interests, and not to the plan's overall treatment of the creditors holding such claims or interests . . . . Creditors should not confuse 'equal treatment of claims with equal treatment of claimants.'"); see also Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.), 582 B.R. 771, 781 (E.D. Mo. 2017) (same); In re Adelphia Commc'ns Corp., 368 B.R. 140, 249-50 (Bankr. S.D.N.Y. 2007) ("[C]ourts have held that the statute does not require identical treatment for all class members in all respects under a plan, and that the requirements of Section 1123(a)(4) apply only to a plan's treatment *on account of particular claims* or interests in a specific class—not the treatment that members of the

class may separately receive under a plan on account of the class members' other rights or contributions.") (emphasis in original). Accordingly, the payment of the Consummation Costs, HTA PSA Restriction Fees, and DRA Restriction Fee is consistent with section 1123(a)(4) of the Bankruptcy Code.

### vii. Bankruptcy Code Section 1123(a)(5)

66. Various provisions of the HTA Plan provide adequate and proper means for its implementation:

- Article II of the HTA Plan provides for the terms of the operational restructuring of HTA consistent with the HTA 2022 Fiscal Plan;

- Article III of the HTA Plan provides for the payment of Administrative Expense Claims required to be paid on the later of the (i) HTA Effective Date or (ii) the date on which an Administrative Expense Claim shall become an Allowed Claim;

- Section 25.1 of the HTA Plan provides for the issuance and distribution of the New HTA Bonds;

- Section 25.3 of the HTA Plan ensures the feasibility of the present HTA Plan by providing for the adoption and maintenance of a debt management policy "designed to ensure that certain past Debt issuance practices of HTA are not repeated;"

- Section 27.1 of the HTA Plan provides, subject to Sections 27.5 and 27.7 of the HTA Plan, that "all Executory Contracts and Unexpired Leases that exist between the Debtor and any Entity, and which have not expired by their own terms on or prior to the HTA Effective Date, shall be deemed rejected by the Debtor as of the HTA Effective Date, except for any Executory Contract and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the HTA Effective Date, (b) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, or (g) by or between any Commonwealth agencies, departments, municipalities, public corporations or instrumentalities . . . ."

- Article XXVIII of the HTA Plan provides for distributions to be made to holders of all Allowed Claims under the HTA Plan;

- Sections 1.52 and 29.1 of the HTA Plan provide for the authority to litigate and compromise and settle the Avoidance Actions to be transferred to the Avoidance Actions Trust on the HTA Effective Date and to be administered pursuant to the Avoidance Actions Trust Agreement;

- Section 31.2 of the HTA Plan vests in the Disbursing Agent, among other things, the power to issue distributions contemplated by the HTA Plan;

- Article XXXII of the HTA Plan provides for the Debtor to reconcile, and to the extent ultimately allowed, pay, any and all Disputed Claims;

- Article XXXVII of the HTA Plan provides that, "[o]n the HTA Effective Date, all matters provided for under the HTA Plan that would otherwise require approval of the directors of the Debtor or Reorganized HTA, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New HTA Bonds, the authorization to enter into the Definitive Documents, the adoption of Reorganized HTA By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized HTA pursuant to the HTA Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New HTA Bonds Indenture, and the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule. Other matters provided under the HTA Plan involving the corporate structure of Reorganized HTA or corporate action by Reorganized HTA, as applicable, shall be deemed to have occurred, be authorized, and shall be in effect in accordance with the New HTA Bonds Indenture, and the new corporate governance documents, as applicable, and without requiring further action by any Entity under any other applicable law, regulation, order, or rule;" and

- Section 41.1 of the HTA Plan provides for the re-vesting of assets: "[e]xcept as provided in the HTA Confirmation Order, on the HTA Effective Date, title to all Assets and properties of the Debtor encompassed by the HTA Plan shall vest in Reorganized HTA, free and clear of all Liens, including, without limitation, any Lien upon or security interest in the SIB Account, but expressly excluding Liens granted pursuant to the HTA Plan and the HTA Confirmation Order."

(See Skeel Decl. ¶ 64; see generally HTA Plan).

67.    The Plan Supplement contains, among other things, the forms of (a) the New HTA Bonds Indenture, as supplemented, (b) the Amended and Restated Avoidance Actions Trust Agreement, (c) the Schedule of Executory Contracts and Unexpired Leases to be Assumed, (d) the Ambac Custodial Trust Documents, (e) the Assured Custodial Trust Documents, (f) the FGIC

Trust Agreement, and (g) Initial Board of Directors of Reorganized HTA.  (See generally Plan Supplement).  The HTA Plan, together with the documents and arrangements set forth in the Plan Supplement, provides adequate means for its implementation.

68.     The HTA Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

### viii.     **Bankruptcy Code Section 1123(b)(1)**

69.     Article XXXIII of the HTA Plan identifies which Classes of Claims are impaired and which Classes of Claims are left unimpaired.

70.     The HTA Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

### ix.     **Bankruptcy Code Section 1123(b)(2)**

71.     Article XXVII of the HTA Plan provides that, "all Executory Contracts and Unexpired Leases that exist between the Debtor and any Entity, and which have not expired by their own terms on or prior to the HTA Effective Date, shall be deemed rejected by the Debtor as of the HTA Effective Date, except for any Executory Contract and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the HTA Effective Date, (b) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, or (g) by or between any Commonwealth agencies, departments, municipalities, public corporations or instrumentalities; provided, however, that the Debtor reserves the right, on or prior to the HTA

Effective Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the HTA Effective Date." (HTA Plan § 27.1; see also Plan Sup. Ex. C).

72.     The HTA Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

### x.     **Bankruptcy Code Section 1123(b)(3)(A)**

73.     The Commonwealth Plan and the HTA Plan, as well as the related plan support agreements, set forth the terms and conditions for a global compromise and integrated settlement of, among other issues, asserted and unasserted disputes concerning the rights of holders of HTA 68 Bond Claims and HTA 98 Bond Claims including the disputes: (a) raised by certain holders of CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally appropriated to HTA, as applicable, and "clawed back" by the Commonwealth pursuant to the provisions of the Commonwealth Constitution, (b) relating to the validity, priority, secured status and related rights attendant to the GDB HTA Loans, and (c) raised by  the Lift Stay Motions and the Clawback Actions relating to the CW/HTA Claims and certain holders' asserted security interest in toll and fine revenues collected by HTA.  (Skeel Decl. ¶ 68). The settlement and compromise of such issues as they relate to the Commonwealth were approved pursuant to the Commonwealth Confirmation Order, and are in the best interests of HTA and its creditors, and well within the range of reasonableness.

74.     Accordingly, the HTA Plan is consistent with section 1123(b)(3)(A) of the Bankruptcy Code.

xi.     **Bankruptcy Code Section 1123(b)(3)(B)**

75.     Section 1.53 of the HTA Plan references the Avoidance Actions Trust Agreement, dated March 15, 2022, entered into by the Commonwealth in connection with the consummation of the Commonwealth Plan.  Section 1.52 of the HTA Plan provides that, on the HTA Effective Date, the authority to litigate or compromise and settle the Avoidance Actions, relating to HTA, will be transferred to the Avoidance Actions Trust, established by the Commonwealth Plan.

76.     Section 29.1 of the HTA Plan provides that: "[e]xcept as settled and released herein, from and after the HTA Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court."  (HTA Plan § 29.1).

77.     Further, Section 32.1(a) of the HTA Plan states: "[e]xcept with respect to Allowed Claims, and subject to the terms and conditions of the ADR Procedures and the ADR Order, Reorganized HTA, by and through the Oversight Board, and in consultation with AAFAF, shall object to, and shall assume any pending objection filed by the Debtor to, the allowance of Claims filed with the Title III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto.  All objections, affirmative defenses and counterclaims shall be litigated to Final Order; provided, however, that Reorganized HTA, by and through the Oversight Board, and in consultation with AAFAF, shall have the authority to file, settle, compromise or withdraw any objections to Claims, without approval of the Title III Court." (HTA Plan § 32.1(a)).

78.     The HTA Plan is consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

xii.    **Bankruptcy Code Section 1123(b)(4)**

79.     The HTA Plan does not provide for the sale of all or substantially all of the property of HTA, but instead, provides for HTA to undergo an operational restructuring.  (Skeel Decl. ¶ 73; HTA Plan § 2.4).

80.     The HTA Plan is consistent with section 1123(b)(4) of the Bankruptcy Code.

xiii.   **Bankruptcy Code Section 1123(b)(5)**

81.     Articles V through XXIV of the HTA Plan modify the rights of holders of Claims in the Impaired Classes, and leave unaffected the rights of holders of Claims in the Unimpaired Classes.  (Skeel Decl. ¶ 74).

82.     The HTA Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

xiv.    **Bankruptcy Code Section 1123(b)(6)**

83.     Article XLI of the HTA Plan provides for, among other things, (a) certain releases, injunctions, and exculpations described below in paragraphs 155–163, and (b) an exemption from registration pursuant to Bankruptcy Code section 1145 for the issuance and distribution of the New HTA Bonds.  (Id. at ¶ 75).

84.     The HTA Plan is consistent with section 1123(b)(6) of the Bankruptcy Code.

xv.     **Bankruptcy Code Section 1123(d)**

85.     Section 27.4 of the HTA Plan provides for the payment of cure amounts required to be paid to the counterparties of Executory Contracts and Unexpired Leases assumed, or assumed and assigned pursuant to the HTA Plan.  Any cure amounts will be determined in accordance with the underlying agreements and applicable non-bankruptcy law, and pursuant to the procedures established by the HTA Plan.  (Id. at ¶ 76).

86.     The HTA Plan is consistent with section 1123(d) of the Bankruptcy Code.

xvi.    **Bankruptcy Code Section 1129(a)(2)**

87.    The Debtor has (i) complied with provisions of the Bankruptcy Code and PROMESA applicable to confirmation of the HTA Plan, except as otherwise provided or permitted by orders of this Court, and (ii) complied with the applicable provisions of the Bankruptcy Code, PROMESA, the Bankruptcy Rules, the Local Rules, and the HTA Disclosure Statement Order in transmitting the HTA Disclosure Statement, the HTA Plan, the Ballots, the Election Notices, and related documents, and in soliciting and tabulating votes on the HTA Plan.

88.    The Oversight Board, with the assistance of its professionals, and in coordination with AAFAF, expended significant time and effort preparing the HTA Disclosure Statement (Debtor's Ex. 2, Docket Entry Nos. 1299-2 and 1299-3), and sought and received input and comment thereon from other parties in interest. (Skeel Decl. ¶ 77). This Court approved the HTA Disclosure Statement as containing adequate information and meeting the requirements of sections 1125 and 1126 of the Bankruptcy Code. (Id.). The Debtor has properly solicited and tabulated votes on the HTA Plan. (Id.; see generally Pullo Decl.).

89.    The Oversight Board, as proponent of the HTA Plan, is the duly-appointed representative of the Debtor in its Title III Case as provided pursuant to PROMESA and has acted in accordance with applicable law in proposing the HTA Plan.

90.    The Debtor has complied with section 1129(a)(2) of the Bankruptcy Code.

xvii.    **Bankruptcy Code Section 1129(a)(3)**

91.    The HTA Plan was proposed in good faith with the legitimate purpose to provide a means for the Debtor to achieve fiscal responsibility and access to capital markets, consistent with the purposes of PROMESA. (Skeel Decl. ¶ 78). In determining that the HTA Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the HTA Title III Case, the HTA Plan itself, the lengthy process leading to the HTA Plan's

formulation (including the compromises, settlements, and releases incorporated therein), and the process associated with the HTA Plan's prosecution. The Debtor's good faith is evident from the facts and records of the HTA Title III Case, the HTA Disclosure Statement and the hearing thereon, and the record of the HTA Confirmation Hearing and other proceedings held in the HTA Title III Case, including related adversary proceedings. The HTA Plan (including the settlements and compromises contained therein) is the result of extensive arm's length negotiations among the parties, including through mediation led by former Chief Bankruptcy Judge Barbara Houser.

92.     The Oversight Board has worked to develop consensus with creditors and to evaluate HTA's current and future financial circumstances. These circumstances have been subject to constant change as the Oversight Board, HTA, creditors, and the people of Puerto Rico have fought to address the Island's needs and develop a path to fiscal responsibility in the midst of multiple major hurricanes, earthquakes, and other natural disasters, as well as the impact of the global COVID-19 pandemic. (Id. at ¶ 79). The HTA Plan represents the culmination of those efforts and the substantial input of each key stakeholder. (Id. at ¶ 80).

93.     The HTA Plan (including all other agreements, documents, and instruments necessary to effectuate the HTA Plan) achieves a rational adjustment of the Debtor's debts, and properly distributes value to creditors, including through the implementation of (a) parties' elections with respect to distributions and/or (b) the settlements pursuant to the HTA Plan. The HTA Plan was proposed with the legitimate and honest purpose of implementing the settlements and compromises of numerous risky and costly disputes, while avoiding protracted litigation that could delay distributions to creditors. (Id.).

94.     The HTA Plan complies with section 1129(a)(3) of the Bankruptcy Code.

xviii.   **Bankruptcy Code Section 1129(a)(6)**

95.      The HTA Plan contemplates certain toll rate increases; however, such increases do

not require the approval of any governmental regulatory commission with jurisdiction over HTA

and such toll rate increases.  (Memorandum of Law ¶ 111; Skeel Decl. ¶ 81).  Accordingly, section

1129(a)(6) of the Bankruptcy Code does not apply.

xix.   **Bankruptcy Code Section 1129(a)(8)**

96.      Pursuant to the HTA Disclosure Statement Order, the Title III Court approved the

HTA Disclosure Statement (Debtor's Ex. 2, Docket Entry Nos. 1299-2 and 1299-3) and found,

among other things, that the HTA Disclosure Statement contained "adequate information" within

the meaning of section 1125 of the Bankruptcy Code and directed the Debtor to solicit acceptances

and rejections of the HTA Plan, as well as certain elections with respect thereto.  (HTA Disclosure

Statement Ord. ¶¶ B, 2-18).  Prior to the transmission of the HTA Disclosure Statement, the Debtor

did not solicit acceptances of the HTA Plan from any holders of Claims.

97.      The Solicitation Packages were served in compliance with the Bankruptcy Code,

Bankruptcy Rules, Local Rules, and the HTA Disclosure Statement Order.  (See generally Mailing

Affidavit).

98.      The (a) service of the Solicitation Packages, (b) publication of the HTA

Confirmation Hearing Notice, and (c) airing of radio advertisements regarding the approval of the

HTA Disclosure Statement, HTA Confirmation Hearing dates, Confirmation Objection Deadline,

Voting Deadline, and Election Deadline: (i) were adequate and sufficient under the circumstances

of the HTA Title III Case; (ii) provided adequate and sufficient notice of such deadlines, the

method of voting or making an election of distribution pursuant to the HTA Plan; and the date,

time, and location of the HTA Confirmation Hearing; (iii) provided holders of Claims with a

reasonable period of time to make an informed decision to accept or reject the HTA Plan and to

make any election provided thereunder; (iv) were in compliance with PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the HTA Disclosure Statement Order, and any other applicable orders and rulings of the Court; and (v) provided due process to all parties in interest in the HTA Title III Case. (See Service Affidavits; see also generally Pullo Decl).

99. No other or further notice with respect to the HTA Plan or the HTA Confirmation Hearing is required. Based upon the foregoing, the Debtor and its successors, predecessors, control persons, representatives, officers, directors, employees, agents, attorneys, financial advisors, investment bankers, accountants, and other retained professionals, and any and all affiliates, managers, employees, attorneys, and advisors of the foregoing (i) have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with all their activities relating to the solicitation of acceptances of the HTA Plan or elections thereunder and their participation in the activities described in section 1125 of the Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of PROMESA and the Bankruptcy Code in the offer and issuance of securities pursuant to the HTA Plan and, therefore, are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the HTA Plan or elections thereunder or the offer and issuance of securities pursuant to the HTA Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such parties are listed therein, the exculpation provisions set forth in Section 41.7 of the HTA Plan.

100.     Votes to accept or reject the HTA Plan were solicited and tabulated fairly, in good

faith, and in a manner consistent with the HTA Disclosure Statement Order, PROMESA, the

Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.  (See generally Pullo

Decl.).

101.     Certain Classes either voted to reject, or were deemed to reject, the HTA Plan (the

"Rejecting Classes").   (See Pullo Decl. Ex. A).  Notwithstanding such rejection and deemed

rejection, the HTA Plan satisfies sections 1129(b)(2)(A) and 1129(b)(2)(B) of the Bankruptcy

Code with respect to the Rejecting Classes.

xx.     **Bankruptcy Code Section 1129(a)(10)**

102.     At least one Class of impaired Claims has accepted the HTA Plan.  (See id.).

Accordingly, the HTA Plan complies with section 1129(a)(10) of the Bankruptcy Code.

xxi.     **Bankruptcy Code Section 1129(b)(1)**

103.     The HTA Plan's treatment of Claims in the Rejecting Classes is proper because, as

is described further below, the HTA Plan does not discriminate unfairly and is fair and equitable

with respect to such Claims.  (Skeel Decl. ¶ 84).  Unfair discrimination applies only to rejecting

classes of creditors, not individual creditors within a class.  See Bankruptcy Code §§ 1129(b)(1),

1123(a)(4).  "Thus, a disapproving creditor within a class that approves a plan cannot claim unfair

discrimination."  In re Nuverra Envtl. Sols., Inc., 834 F. App'x 729, 734-35 (3d Cir. 2021).  As a

preliminary matter, the Court notes that no Rejecting Class has objected to confirmation of the

HTA Plan on the basis that the HTA Plan discriminates unfairly.

104.     The HTA Plan does not unfairly discriminate against holders of Claims in Class 16

(HTA General Unsecured Claims).  For the reasons set forth above in paragraphs 47 to 50, certain

Classes of unsecured Claims have been separately classified to ensure that HTA is best able to

provide critical government services to Puerto Rico's residents.  For the reasons set forth above in

paragraph 46, separate classification and treatment of Claims in Class 15 (Eminent Domain/Inverse Condemnation Claims) is necessary because such claimants assert Fifth Amendment rights, and the HTA Plan does not discriminate unfairly with respect to that Class. Further, separate classification and treatment of Claims in Class 20 (Federal Claims) is necessary because of the unique relationship of the Commonwealth and its instrumentalities, including HTA, with the federal government and its instrumentalities, as well as the long-term nature of many federal programs. Separate classification and treatment of such Claims is reasonable and justified by a governmental purpose, and does not constitute unfair discrimination.

105. Accordingly, the HTA Plan complies with section 1129(b)(1) of the Bankruptcy Code.

### xxii. **Bankruptcy Code Section 1129(b)(2)**

106. The HTA Plan's treatment of Claims in the Rejecting Classes is proper because the HTA Plan provides all holders of Claims in the Rejecting Classes with what they can reasonably expect to receive under the circumstances of the HTA Title III Case. Because there are no equity holders in chapter 9 cases, the requirement under Bankruptcy Code section 1129(b)(2)(B) (incorporated by PROMESA Section 301(a)) that a plan be "fair and equitable" requires that, where a debtor seeks nonconsensual confirmation of a plan over one or more rejecting classes, no claim junior to any of the claims in the rejecting classes of the relevant debtor may receive any property. Under the HTA Plan, the Class holding Claims junior to the unsecured Rejecting Classes (Section 510(b) Subordinated Claims) receives no property.

107. The HTA Plan treats the Eminent Domain/Inverse Condemnation Claims as secured Claims to the extent the Claims are allowable and there is cash on deposit for them. The HTA Plan further provides that the amount of the Claim in excess of the deposit, if any, will be paid in full upon entry of separate Final Orders (i) setting the amount of Allowed Claims for just

compensation, and (ii) determining that such claims may not be impaired or discharged.  (Skeel
Decl. ¶ 52).  The Oversight Board filed an appeal from the portion of the Commonwealth
Confirmation Order and the Commonwealth Findings of Fact and Conclusions of Law holding
that the Eminent Domain/Inverse Condemnation Claims against the Commonwealth may not be
impaired or discharged.  On July 18, 2022, the First Circuit issued an opinion affirming the portion
of the Commonwealth Confirmation Order and Commonwealth Findings of Fact and Conclusions
of Law holding that the Eminent Domain/Inverse Condemnation Claims against the
Commonwealth are nondischargeable.  This opinion is not yet a Final Order, and the Oversight
Board has advised the Court it intends to file a petition for writ of certiorari to the United States
Supreme Court from the First Circuit's opinion affirming the portion of the Commonwealth
Confirmation Order and Commonwealth Findings of Fact and Conclusions of Law holding that
the Eminent Domain/Inverse Condemnation Claims against the Commonwealth are
nondischargeable.  If the United States Supreme Court reverses this portion of the Commonwealth
Confirmation Order and Commonwealth Findings of Fact and Conclusions of Law, the HTA Plan
provides that the Eminent Domain/Inverse Condemnation Claims will receive payments from
HTA equal to, and on the same timeframe as, the payments to be made to holders of Allowed HTA
General Unsecured Claims to the extent each allowable Claim exceeds the cash on deposit for it.

108.    Class 15 is the only Rejecting Class of Claims characterized as secured in the HTA
Plan, and section 1129(b)(2)(A) is satisfied with respect to such Class.  Consistent with these
Findings of Fact and Conclusions of Law, holders of Claims in Class 15 will receive payment in
full to the extent they are Allowed Claims and provided that the Commonwealth Confirmation
Order and the Commonwealth Findings of Fact and Conclusions of Law relating to the non-

dischargeability of Eminent Domain/Inverse Condemnation Claims against the Commonwealth is not otherwise vacated or reversed.

109.    Accordingly, the HTA Plan complies with section 1129(b)(2) of the Bankruptcy Code with respect to Claims in the Rejecting Classes.

B.    **PROMESA § 314(b)(2):** *The Plan Fully Complies with the Applicable Provisions of Title III of PROMESA.*

i.    **Solicitation**

110.    Except as otherwise provided for or permitted by orders of the Title III Court, the Oversight Board has complied with section 1125(b) of the Bankruptcy Code and Section 314(b)(2) of PROMESA, including the solicitation and tabulation of votes consistent with the HTA Disclosure Statement Order.  (See generally Skeel Decl. and Pullo Decl).

111.    The HTA Disclosure Statement Order established the procedures for the solicitation of votes on the HTA Plan.  The Solicitation Agent complied with the procedures established in the HTA Disclosure Statement Order.  (Mailing Affidavit; Pullo Decl. ¶ 4).   Specifically, the Solicitation Agent determined which creditors were entitled to vote on the HTA Plan by following the instructions in the HTA Disclosure Statement Order, by Class, and by applying the Voting Record Dates set forth in the HTA Disclosure Statement Order.  The Solicitation Agent then coordinated the distribution of solicitation materials to holders of Claims entitled to vote.  (Pullo Decl. ¶ 4).  The Solicitation Agent coordinated publication of the confirmation hearing notices as set forth in the HTA Disclosure Statement Order.  (Id. at ¶ 7; see also Publication Affidavit).  The solicitation materials were properly distributed to the appropriate parties, including brokers and nominees.  (See Mailing Affidavit).

112.    The Solicitation Agent received, reviewed, determined the validity of, and tabulated the Ballots submitted.  (Pullo Decl. ¶ 8).  The Solicitation Agent also worked with the

Depository Trust Company ("DTC") to count votes from the Bond Classes tendered through

DTC's ATOP.  (Id. at ¶ 9).

> ii.   **HTA/CCDA Plan Support Agreement, DRA Stipulation, and HTA Committee Agreement**

113.    Section 1125(b) of the Bankruptcy Code requires that "[a]n acceptance or rejection

of a plan may not be solicited after the commencement of the case under this title from a holder of

a claim or interest with respect to such claim or interest, unless, at the time of or before such

solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written

disclosure statement approved, after notice and a hearing, by the court as containing adequate

information." 11 U.S.C. § 1125(b).  Congress intended debtors and creditors be afforded flexibility

to resolve disputes, and where possible, reach a consensual resolution of issues in contemplation

of the development of a plan of adjustment.  See In re Indianapolis Downs, LLC., 486 B.R. 286,

295 (Bankr. D. Del. 2013) ("[A] narrow construction of 'solicitation' affords [] parties the

opportunity to memorialize their agreements in a way that allows a […] case to move forward.").

114.    Here, the HTA Plan was made possible by the Debtor's extensive negotiations with

numerous claimholder constituencies and the HTA/CCDA Plan Support Agreement, DRA

Stipulation, and HTA Committee Agreement that resulted from the negotiations.  (Skeel Decl.

¶ 16).  The process of negotiation and solicitation of assent to these agreements prior to the

approval and distribution of the HTA Disclosure Statement did not constitute improper solicitation

of votes with respect to the HTA Plan.  "An agreement to accept the Debtor's plan, made post-

petition but before approval of the disclosure statement, remained executory until [the creditor]

actually filed its accepting ballot . . . Neither the recitation in the disclosure statement, nor the

parties' execution of the written memorandum, constituted an acceptance of the plan as such." In

re Heritage Org., L.L.C., 376 B.R. 783, 793 (Bankr. N.D. Tex. 2007).

115.    The HTA Plan complies with PROMESA Section 314(b)(2).

C.    **PROMESA § 314(b)(3):** *The Debtors Are Not Prohibited by Law from Taking any Action Necessary to Carry Out the Plan*.

116.    The HTA Plan contains no provisions which would require the Debtor to violate the law, including Commonwealth law, that is not preempted.  Further, local legislation is not required to issue debt under the HTA Plan.

117.    The Debtor has sufficiently demonstrated that express recognition of the preemptive effect of Section 4 of PROMESA is crucial to accomplishing the HTA Plan's goals and ensuring its feasibility.  Provisions of Commonwealth laws that are inconsistent with PROMESA are preempted for the reasons, and solely to the extent, set forth in **Exhibit A** hereto. Such preempted provisions require or permit HTA to, among other things, (i) incur obligations, spend funds, repay in full its debts, and regulate the modification of toll rates fixed and charged for basic and essential services rendered by public corporations without regard to the fiscal plan and budget certified by the Oversight Board, HTA Plan, and Plan Supplement and (ii) issue debt without obtaining Oversight Board approval.  (Skeel Decl. ¶¶ 155–160).  These statutes are inconsistent with PROMESA to the extent the statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings and would undermine the restructuring contemplated by the HTA Plan and Puerto Rico's return to fiscal responsibility and access to capital markets.  (Id.). For the avoidance of doubt, actions authorized by the statutes identified on **Exhibit A** that are not otherwise preempted as provided therein remain authorized under the statute, and any and all rights of HTA and Reorganized HTA to receive and use federal funds for the implementation of federal programs is expressly reserved to the extent provided in PROMESA section 204(d).  The question of whether any particular conduct, action, or contract of HTA is unauthorized as a result of the preemption of

any law pursuant to these Findings of Fact and Conclusions of Law and the HTA Confirmation Order shall be reserved for future determination by (a) the Title III Court, or (b) if the Title III Court does not have, or declines to exercise, jurisdiction to make such determination, the United States District Court for the District of Puerto Rico.

118.    To the extent a statute identified on **Exhibit A** is preempted with respect to the Oversight Board's budget, contract review, or fiscal plan powers pursuant to Title II of PROMESA, (i) the duration of such preemption shall terminate upon the termination of the Oversight Board pursuant to PROMESA Section 209, and (ii) no party shall be permitted to enforce such preemption subsequent to the Oversight Board's termination pursuant to PROMESA Section 209; provided, however, that, for the avoidance of doubt, the foregoing shall not apply to the preemption of any statute preempted by provisions of PROMESA related to the discharge of debts or confirmation or implementation of the HTA Plan or the documents contained in the Plan Supplement (including, without limitation, the New HTA Bonds Indenture).

119.    For the avoidance of doubt, any provisions of Commonwealth laws that were preempted pursuant to the Commonwealth Plan, as identified on Exhibit A to the Commonwealth Findings of Fact and Conclusions of Law [Docket Entry No. 19812-1 in Case No. 17-03283], that relate to HTA, including, without limitation, Section 2021 of Act 9 approved on August 12, 1982 and Section 2.02 (Amended Section 34(h)) of Act 1 approved on January 15, 2015, remain preempted.

120.    The HTA Plan complies with PROMESA Section 314(b)(3).

D.    **PROMESA § 314(b)(4):** *The Plan Provides Each Holder of an Administrative Claim Cash, Equal to the Allowed Amount of Such Claim, on the Effective Date.*

121.    Section 3.1 of the HTA Plan provides that: "[o]n the later to occur of (a) the HTA Effective Date and (b) the date on which an Administrative Expense Claim shall become an

Allowed Claim, Reorganized HTA shall (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and Reorganized HTA; provided, however, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course prior to the HTA Effective Date by the Debtor shall be paid in full and performed by Reorganized HTA in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions, including, without limitation, all obligations of HTA and Reorganized HTA with respect to payment of the Commonwealth Loan; and, provided, further, that, with respect to the Commonwealth Loan, the repayment thereof shall be satisfied in accordance with the terms and provisions of the New HTA Bonds Indenture; and, provided, further, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within one hundred fifty (150) days after the HTA Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the HTA Plan."

122.    As provided for by the HTA Plan, certain Consummation Costs and Restriction Fees shall be paid in Cash on the HTA Effective Date.  All other Allowed Administrative Expense Claims, if any, will likewise be paid pursuant to the terms of Section 3.1 of the HTA Plan.

123.    The HTA Plan complies with Section 314(b)(4) of PROMESA.

E.    **PROMESA § 314(b)(5):** *The Plan Has Obtained all Necessary Legislative, Regulatory, and Electoral Approvals*.

124.    Legislative, regulatory, and electoral approvals are not required in order for HTA to raise toll rates and fares, or issue the New HTA Bonds.

125.    The HTA Plan complies with PROMESA Section 314(b)(5).

F.      **PROMESA § 314(b)(6):** *The Plan Is Feasible and in the Best Interests of Creditors.*

126.    The HTA Plan complies with Section 314(b)(6) of PROMESA because it is feasible and in the best interests of creditors.

### i.      Feasibility

127.    "[T]he Court has an independent duty to determine [feasibility] and to make specific findings of fact."   In re City of Detroit, 524 B.R. 147, 220 (Bankr. E.D. Mich. 2014). Under PROMESA, a plan of adjustment must be supported by financial projections that are "reasonable and demonstrate a probability that [the Debtor] will be able to satisfy its obligations under the Plan."   In re Fin. Oversight & Mgmt. Bd. for P.R., 361 F. Supp. 3d 203, 246 (D.P.R. 2019).  Additionally, as in chapter 9, a PROMESA debtor, as a government entity, must show that it is "probable that [the] debtor can both pay post-petition debt and provide future public services at the level necessary to its viability as a [territory]."   In re Mount Carbon Metro. Dist., 242 B.R. 18, 35 (Bank. D. Colo. 1999).  The core inquiry has been articulated as follows: "Is it likely that the [Debtor], after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of [the Debtor] and to meet the obligations contemplated in the Plan without the significant probability of a default?"   In re City of Detroit, 524 B.R. at 222.

128.    The HTA Plan is feasible.  The HTA Plan provides for the following payments by HTA: (1) cash on the HTA Effective Date to satisfy administrative expense claims, including approximately $140 million in Consummation Costs, HTA PSA Restriction Fees, and DRA Restriction Fee, and a $24 million payment to the GUC Reserve; and (2) payments over time, including (a) an additional $24 million payment to the GUC Reserve on the first anniversary of the HTA Effective Date, (b) an estimated $41.88 million in payments to holders of Eminent Domain/Inverse Condemnation Claims upon occurrence of a Final Order determining the validity and amount of just compensation attributable to such claims, (c) an estimated $20.79 million

payment to holders of Allowed Federal Claims in accordance with the terms of Section 24.1 of the HTA Plan allowing HTA to pay the total amount of such Allowed Federal Claims in equal installments over forty years, (d) payments pursuant to (y) New HTA Bonds issued by HTA in the form of New HTA CIBs, New HTA CABs, and New HTA Convertible CABs, and (z) Subordinated Indebtedness to be issued to the Commonwealth as a refinancing of HTA's obligations pursuant to the Commonwealth Loan, and (e) payments pursuant to the existing HTA Moscoso Bonds, which claims are unimpaired under the HTA Plan. (Brownstein Decl. ¶ 36–37).

129.   The HTA Plan provides Reorganized HTA will issue the New HTA Bonds on the HTA Effective Date with ten different maturity dates in an aggregate original principal amount of $1,245,000,465.70: (i) $600,000,000 in aggregate principal amount of New HTA CIBs (i.e., current interest bonds), (ii) $237,955,868.13 in aggregate principal amount of New HTA CABs (i.e., capital appreciation bonds), and (iii) $407,044,597.57 in aggregate principal amount of New HTA Convertible CABs.  (Id. at ¶ 40; HTA Plan § 25.1(a)–(c)).  The aggregate amount owed, including all principal and interest over the life of the New HTA Bonds from the Deemed Issuance Date of July 1, 2022, to the maturity of the final New HTA Bonds on July 1, 2062, is $3,107,435,797.24.  (Brownstein Decl. ¶ 41; HTA Plan § 25.1(e)).  The HTA Plan provides for a Debt Service Fund to be established and the monthly deposit of Toll Receipts.  (HTA Plan §§ 1.102, 25.1(i)).  On the first business day of each month after the HTA Effective Date, the New HTA Bonds Trustee shall withdraw the Toll Receipts from the Toll Receipts Fund and transfer and apply such amounts in accordance with the terms and provisions of the New HTA Bonds Indenture.  (Id. at § 25.1(i)).  The HTA Plan also provides that, on the HTA Effective Date, the Reorganized HTA shall deposit into the Toll Receipt Fund such additional amounts necessary to account for the New HTA Bonds being issued as of the Deemed Issuance Date.  (Id.).

130.    The HTA Plan also provides for the payment of up to $362,000,000 in principal amount of Subordinated Indebtedness, which is the obligation incurred by HTA to repay the Commonwealth Loan.  (Brownstein Decl. ¶ 45; HTA Plan § 25.1(d)).  Payments are to commence on July 1, 2023, and continue annually until fully extinguished on July 1, 2052, with interest at 2.5%.  (Brownstein Decl. ¶ 45; HTA Plan Ex. E-2).  A total of approximately $170 million in interest is projected to be paid with respect to the Subordinated Indebtedness, and aggregate payments in respect thereof will be approximately $530 million.  (Id.).  Repayment of the Subordinated Indebtedness is junior, inferior, and subordinate to repayment of the New HTA Bonds.  (Brownstein Decl. ¶ 45).

131.    The HTA Plan also provides that the HTA Moscoso Bonds, with an aggregate outstanding principal amount of $141,875,411.00, are unimpaired, and payments of principal and interest thereon be made in accordance with their terms until paid in full.  (Brownstein Decl. ¶ 47; HTA Plan §§ 1.201 and 18.1).

132.    The HTA Plan also provides that the Debtor shall transfer ACR-eligible claims pursuant to the ACR Order, which claims shall be reconciled and paid in the ordinary course of business.  (HTA Plan § 32.7).  The Commonwealth has reserved $229 million for payment of such claims.  (Herriman Decl. ¶ 16).  Accordingly, HTA does not need to provide any funds with respect to paying such claims.  (Id.).

133.    The HTA Plan, including each of these provisions, is feasible.[12]  (Brownstein Decl. ¶¶ 36–64).  Confirmation of the HTA Plan is not likely to be followed by the need for further

---

[12] The HTA Plan remains feasible even accounting for the payment in full of the total of Eminent Domain/Inverse Condemnation Claims asserted to arise out of the Takings Clause.  Based on a review and reconciliation of claims to date, the maximum cost of such Claims is currently estimated to be approximately $41.88 million.  (See Herriman Decl. ¶ 33).  The Debtor has proffered credible evidence to support the conclusion that the HTA Plan will still be feasible

financial reorganization not contemplated in the HTA Plan due to a number of factors, including the following: (i) HTA has the resources and liquidity necessary to make the payments on the HTA Effective Date it is required to make; (ii) the HTA Plan reduces HTA's debt to an amount which the HTA 2022 Fiscal Plan projects HTA will be able to pay; (iii) the HTA Plan and New HTA Bonds Indenture include multiple provisions, which, along with a significant cash reserve HTA will maintain for contingencies, are designed to ensure HTA can cover projected debt obligations; (iv) HTA will be able to pay the HTA Moscoso Bonds; and (v) HTA's operating revenues, as well as projected appropriations from the Commonwealth in accordance with the Commonwealth Fiscal Plan certified on April 23, 2021 (the "April 2021 Commonwealth Fiscal Plan") (Debtor's Ex. 8, Docket Entry No. 1299-9), are sufficient to cover HTA's maintenance and operating expenses and other required disbursements.  (Brownstein Decl. ¶ 49).

134.    HTA's liquidity is sufficient to satisfy the HTA Effective Date obligations and to pay the GUC Reserve.  The Commonwealth Loan was established in order for HTA to pay HTA Effective Date obligations required pursuant to the HTA Plan and to pay the balance of obligations into the GUC Reserve on the first anniversary thereof.  (Brownstein Decl. ¶ 51).  Accordingly, the proceeds of the Commonwealth Loan, on which HTA has $188 million remaining available to draw, will provide the cash required to be paid on the HTA Effective Date.  (Id.).  As such, HTA will be able to satisfy the HTA Effective Date obligations and pay the GUC Reserve as required by the HTA Plan.  (Id.).

---

because HTA will have sufficient cash remaining after fulfilling its HTA Effective Date obligations under the HTA Plan to pay such Eminent Domain/Inverse Condemnation Claims, to the extent they are Allowed, in full.  Additionally, not all Allowed Eminent Domain/Inverse Condemnation Claims will need to be paid out immediately on the HTA Effective Date, as some have not yet been adjudicated.  (See Brownstein Decl. ¶ 63).

135.     The HTA Plan significantly reduces the Debtor's debt.  On the HTA Effective Date, the aggregate principal amount of funded indebtedness will be approximately $1.6 billion, considerably lower than the $6.4 billion in such indebtedness that existed prior to the HTA Effective Date.  (Id. at ¶ 52).  Similarly, post–HTA Effective Date, the average annual debt service for HTA will be approximately $90 million, compared to $294 million prior to the commencement of the HTA Tile III Case.  (Id.).  Debt levels will continuously decline and remain low until full repayment of the New HTA Bonds, which is projected to occur in 2062.  (Id.).

136.     HTA will be able to satisfy its obligations pursuant to the New HTA Bonds and the Subordinated Indebtedness.  In accordance with the New HTA Bonds Indenture, the holders of the New HTA Bonds and Subordinated Indebtedness are granted a security interest in certain toll revenues and toll fines that HTA will receive, until such debts are extinguished.  (Id. at ¶ 53).  The protections of this security interest provide the holders of the New HTA Bonds and Subordinated Indebtedness with a property interest and lien in such revenues when they arise.  (Id.).  After implementing the fiscal reforms provided for in the HTA 2022 Fiscal Plan, HTA is projected to receive $8.196 billion in toll revenue and $1.480 billion in toll fines in Fiscal Years 2022 through 2051.  (Id.; Debtor's Ex. 5 at 66, Docket Entry No. 1299-6).  Based upon these projections and the protections of the Toll Rate Covenant discussed below, the projected toll and fine revenues against which the holders of the New HTA Bonds and Subordinated Indebtedness have a security interest will be sufficient to pay those obligations pursuant to the HTA Plan.  (Brownstein Decl. ¶ 53).

137.     The HTA Plan and the documents included in the Plan Supplement, including the New HTA Bonds Indenture, incorporate multiple provisions—namely, the Toll Rate Covenant and the Debt Management Policy—that were structured to mitigate the impact of potential financial underperformance and limit HTA's indebtedness following the HTA Effective Date.  (Id. at ¶ 54).

138.     The HTA Plan and the New HTA Bonds Indenture establish a Toll Rate Covenant to ensure that HTA Toll Receipts are sufficient to pay amounts due under the New HTA Bonds and the Subordinated Indebtedness.  (Id. at ¶ 55; New HTA Bonds Indenture §§ 7.1(a), (d)). Furthermore, the New HTA Bonds Indenture provides for reserve funds for both the New HTA Bonds and the Subordinated Indebtedness to support the debt payment obligations thereunder. (Brownstein Decl. ¶ 56; HTA Plan § 1.256).  The New HTA Bonds Indenture also provides that, if a payment default under the Subordinated Indebtedness shall have occurred, amounts required to pay all past due principal and interest thereon must be paid before HTA may deposit additional funds in its operating reserve account.  (Brownstein Decl. ¶ 56; New HTA Bonds Indenture § 5.05).

139.     The HTA Plan also requires HTA, during all times in which New HTA Bonds (or refinancings thereof) remain outstanding, to maintain and comply with a Debt Management Policy which imposes certain limitations on further borrowings after the HTA Effective Date. (Brownstein Decl. ¶ 57; see HTA Plan §§ 1.99, 1.100, 25.3).  Additionally, the budget for HTA for Fiscal Year 2023 provides for liquidity reserves of over $100 million.  (Debtor's Ex. 7 at 6, Docket Entry No. 1299-8).

140.     HTA will be able to satisfy its obligations with respect to the HTA Moscoso Bonds. The HTA Moscoso Bonds are paid by a third party pursuant to the Teodoro Moscoso Concession Agreement, as amended, and following the HTA Effective Date, it is expected that the concessionaire and the toll revenues securing the HTA Moscoso Bonds will be sufficient to satisfy payments in full.  (Brownstein Decl. ¶ 58; Debtor's Ex. 2 at 44, 61, Ex. F p.3 n.1, Docket Entry Nos. 1299-2 and 1299-3; Debtor's Exs. 26 and 27, Docket Entry Nos. 1300-6 and 1300-7). Furthermore, the concession agreement produces a surplus to HTA, as a percentage of such toll

revenues are paid to HTA each year, increasing from 5% through 2027 to 61.5% thereafter. (Brownstein Decl. ¶ 58; Debtor's Ex. 2 at  61, Docket Entry Nos. 1299-2 and 1299-3).

141.    The HTA 2022 Fiscal Plan provides for sufficient revenue to satisfy debt service to bondholders through modest increases in toll and fine revenue while maintaining significant cash reserves.  (Brownstein Decl. ¶ 59).  The HTA 2022 Fiscal Plan, among other things, (i) explains HTA should make a number of operational and structural improvements to increase operating revenue and (ii) lays the groundwork to optimize opportunities to receive infrastructure funding from the federal government, so that HTA can receive its fair share of discretionary federal grants. (Id. at ¶ 59; Debtor's Ex. 5 at 8–9, Docket Entry No. 1299-6).  The projected impact of these fiscal measures is approximately $6.0 billion over Fiscal Years 2022 through 2051, turning a forecasted $1.2 billion deficit if HTA does not implement any fiscal measures to a cumulative surplus of $4.8 billion.  (Brownstein Decl. ¶ 59).  If HTA fully and promptly implements the measures in the HTA 2022 Fiscal Plan, the HTA 2022 Fiscal Plan projects that HTA could achieve operational surpluses as early as Fiscal Year 2023.  (Id. at ¶ 61).  These fiscal measures will enable necessary investments, fiscal sustainability, and affordable restructuring of debt.  (Id. at ¶ 59; Debtor's Ex. 5 at 10, 64, Docket Entry No. 1299-6).

142.    In addition to fiscal and structural reforms, HTA is projected to receive appropriations each year to cover capital and operating expenses.  (Brownstein Decl. ¶ 62).  In accordance with Section 5.2.6 of the January 2022 Commonwealth Fiscal Plan over Fiscal Years 2022 through 2051, the HTA 2022 Fiscal Plan includes an average annual general unrestricted appropriation of $110 million and average capital appropriation of $68 million per year.  (Id. at ¶ 62; Debtor's Ex. 9, Docket Entry Nos. 1299-10 and 1299-11).  These appropriations are front-loaded, providing significant support in early years to maintain non toll roads and Tren Urbano

until such operations are transferred to other Commonwealth entities.  (Brownstein Decl. ¶ 62;
Debtor's Ex. 5 at 107, Docket Entry No. 1299-6).

143.    Accordingly, the HTA Plan is feasible and is not likely to result in the need for a
further restructuring of HTA.

ii.    **Best Interests Test**

144.    As in chapter 9 of the Bankruptcy Code, PROMESA's "best interests" test differs
substantially from the chapter 11 "best interests" requirement.  In chapter 11, the test requires a
court to determine whether an individual creditor would receive more if the chapter 11 debtor were
to liquidate its assets.  In contrast, the chapter 9 test is not a liquidation test (because municipalities
cannot be liquidated) and is focused on the ***collective*** recovery of creditors in the aggregate.  Cf.
In re City of Detroit, 524 B.R. at 212-13 (comparing the "best interests" tests in chapter 9 and
chapter 11 of the Bankruptcy Code); see also In re Fin. Oversight & Mgmt. Bd. for P.R., 361 F.
Supp. 3d 203, 250-51 (D.P.R. 2019).  The PROMESA best interests test additionally modifies the
chapter 9 best interests test, only requiring the Court "to ***consider*** whether available remedies
under the non-bankruptcy laws and constitution of the territory would result in a greater recovery
for the creditors than is provided by [the] plan."[13]  48 U.S.C.A. § 2174(b)(6) (Westlaw through
P.L. 117-80) (emphasis added).  Thus, the PROMESA best interests test does not impose a litmus
test or establish a floor for creditor recoveries.  See id.

145.    Accordingly, PROMESA's best interests test requires the Court only to ***consider***
whether creditors of the Debtor *in the aggregate* receive an equal or greater recovery on their
Claims pursuant to the HTA Plan than they would outside of Title III if the HTA Title III Case

---

[13]  Notably, Section 314(b)(6) speaks in terms of a single "recovery" for "creditors" (plural).  48
U.S.C.A. § 2174(b)(6) (Westlaw through P.L. 117-80).

were dismissed and creditors exercised their remedies.  An analysis of creditor recoveries in such hypothetical circumstances requires the application of a number of assumptions, including (i) estimates of the resources that would be available for debt service, which requires an assessment of the Debtor's available cash, revenues, and operating expenses in the absence of a confirmed plan of adjustment; (ii) the outstanding creditor obligations due and payable that would exist outside of Title III; and (iii) the priority in which creditor claims would be paid outside Title III, which in certain circumstances requires consideration of assumptions regarding the potential outcome of litigation matters.  (Shah Decl. ¶ 8).

146.    The Debtor has met its burden of showing that recoveries for claimholders of the Debtor pursuant to the HTA Plan, in the aggregate, are within the range of the projected recoveries for such claimholders in the aggregate if the HTA Title III Case was dismissed, as demonstrated by the best interest test report.  (Id. at ¶ 21).

147.    In the aggregate, excluding the payment of Consummation Costs, HTA PSA Restriction Fees, and DRA Restriction Fee (which are not being paid on account of Claims), there is an estimated $6.705 million in claims asserted against HTA being treated under the HTA Plan, which are projected to receive $1.630 million in distributions pursuant to the HTA Plan, for an aggregate recovery of 24% for all claimholders.  (Id. at ¶ 35).  When the payment of Consummation Costs, HTA PSA Restriction Fees, and DRA Restriction Fee are included, realized HTA creditor recoveries are even higher.  (Id.).  This compares favorably to the projected range of recoveries pursuant to the Oversight Board's best interest test analysis if the HTA Title III case is dismissed.  Outside of Title III, holders of claims against HTA receive an estimated recovery of $706 million to $1,847 million, which implies an aggregate recovery of 11% to 28% for all claims.  (Id. at ¶ 25).  Accordingly, creditors in the aggregate will receive a percentage recovery on their

Claims pursuant to the HTA Plan that is within the range of projected recoveries outside of Title III.  (Id. at ¶ 10).

148.    Absent a mechanism to restructure the Debtor's outstanding debt, HTA would face great uncertainty, financial instability, and significant lawsuits.  In such an environment, outside of Title III and without a confirmed plan of adjustment, creditors would race to the courthouse to recover on their claims.  "Clearly, such a result is chaos . . . ."  6 Collier on Bankruptcy § 943.03 (16th ed. 2021).

149.    Accordingly, the Court finds that the HTA Plan is in the best interests of creditors within the meaning of Section 314(b)(6) of PROMESA.

G.    **PROMESA § 314(b)(7):** *Fiscal Plan Consistency*.

150.    Section 314(b)(7) of PROMESA requires that the HTA Plan merely be consistent with, not identical to, the applicable certified fiscal plan.  (See Skeel Decl. ¶ 175).  The February 2022 HTA Fiscal Plan provides a blueprint for HTA to achieve, among other things, fiscal responsibility and access to capital markets.  The HTA Plan is consistent in all respects with the February 2022 HTA Fiscal Plan—nothing contained in the HTA Plan would violate or otherwise interfere with the February 2022 HTA Fiscal Plan.  (See id. at ¶ 175; see Debtor's Ex. 5, Docket Entry No. 1299-6).  Further, the HTA Plan is consistent with the February 2022 HTA Fiscal Plan. (Skeel Decl. ¶ 177; Brownstein Decl. ¶ 68).

151.    Additionally, the HTA Plan provides, to the extent the Commonwealth Confirmation Order and the Commonwealth Findings of Fact and Conclusions of Law relating to the non-dischargeability of Eminent Domain/Inverse Condemnation Claims against the Commonwealth are not otherwise vacated or reversed, payment in full for Eminent Domain/Inverse Condemnation Claims to the extent they are Allowed Claims for just

compensation, which does not vitiate the HTA Plan's compliance with PROMESA Section 314(b)(7) because there are sufficient uncommitted funds to satisfy such Claims without requiring modification of the February 2022 HTA Fiscal Plan.

152.     Accordingly, the HTA Plan complies with PROMESA Section 314(b)(7).

H.     **Bankruptcy Rule 3019:**  *The Plan Does Not Adversely Change the Treatment of Claims of Creditors*.

153.     The Oversight Board filed the HTA Plan after the Voting Deadline had passed.  The HTA Plan contains technical changes that do not adversely affect the treatment of any Claims. (Skeel Decl. ¶ 97).

154.     The modifications to the HTA Plan, as well as those contained in the Plan Supplement documents, do not materially or adversely modify the treatment to be afforded to creditors pursuant to the HTA Plan and do not require the resolicitation of acceptances or rejections thereof.  Accordingly, the HTA Plan can be confirmed without the filing of a new disclosure statement and resolicitation with respect to the HTA Plan.  See Bankr. R. 3019.

### The Releases, Exculpations, and Injunctions Pursuant to the HTA Plan

155.     The HTA Plan includes certain discharge, release, exculpation, and injunction provisions, which are essential to the Debtor's restructuring, and without which a consensual restructuring could not be successfully accomplished.  (Skeel Decl. ¶ 145).

A.     **Releases**

156.     A critical element of the HTA Plan is the complete resolution of the HTA Title III Case.  To achieve this, the Debtor and certain claimholders agreed to a mutual release of all Claims and Causes of Action arising, in whole or in part, prior to the HTA Effective Date.  (Id. at ¶ 146). The Debtor's releases incentivized claimholders to support, and undertake actions to support, the HTA Plan and its confirmation, without fear of lawsuits in the future.  (Id. at ¶ 147).  Certain

creditors would not have supported the HTA Plan absent its release provisions.  (Id.).  Further, the releases of claims by the Debtor affect only those parties that made a significant contribution to the negotiation and development of the HTA Plan and incurred cost and expense during their essential participation in negotiations.  (Id. at ¶ 149).  The HTA Plan's discharges and releases likewise provide the Debtor and Reorganized HTA with assurance that the restructuring balance struck by the HTA Plan will not be upset by further claims against the Reorganized HTA after the HTA Effective Date.  (Id. at ¶ 148).

157.    The HTA Plan does not provide for non-consensual third-party releases; the HTA Plan's releases are limited to those necessary to effectuate the Debtor's successful restructuring. Except as explicitly agreed to by the creditors in their respective plan support agreements, the HTA Plan does not release any claims of a creditor of the Debtor, in its capacity as such, against a party that is not a Debtor.  (Id. at ¶ 151).  Specifically, Section 41.2(a) of the HTA plan provides that "without prejudice to the exculpation rights set forth in Section 41.7 [of the HTA Plan], nothing contained in the HTA Plan or the HTA Confirmation Order is intended, nor shall it be construed, to be a grant of a non-consensual third party release of the HTA/CCDA PSA Creditors and their respective Related Persons by Creditors of the Debtor."  (HTA Plan § 41.2(a)).  Further, Sections 41.2(d), (e), and (f) of the HTA Plan carve out from the Released Claims certain claims, causes of action, or other rights or powers that are held by the Securities and Exchange Commission, the United States, and parties to certain Underwriter Actions.  Likewise, as confirmed by the definitions of Related Persons (HTA Plan § 1.266) and Released Claims (HTA Plan § 1.267), claims against the Commonwealth, AFICA, CCDA, COFINA, ERS, MBA, MFA, PBA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA, which are or may be subject to their own restructuring proceedings, are not released pursuant to the HTA Plan and such entities are not

"Related Persons" of the Released Parties or Releasing Parties.  Further, Avoidance Actions generally are not released under the HTA Plan.  (See HTA Plan § 1.267).  These carve-outs ensure that only those releases that are reasonable and necessary to HTA Plan confirmation are being provided.  (Skeel Decl. ¶ 152).

158.    For these reasons, the Court finds that the releases contemplated by the HTA Plan are reasonable, necessary, and appropriate to implementation of the HTA Plan and, therefore, the consensual releases are hereby approved.

## B.    **Exculpation**

159.    Section 41.7 of the HTA Plan provides for exculpation of the Government Parties, HTA/CCDA PSA Creditors, the Creditors' Committee, the DRA Parties and the Monolines for, among other things, any acts taken consistent with the HTA Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation or approval of the HTA Plan and the settlements contained therein.  (Id. at ¶ 153).  The expectation that parties would be exculpated incentivized them to participate in the negotiations and mediations, support, and undertake actions that support confirmation of the HTA Plan without fear of future lawsuits. (Id.).  Without the HTA Plan's exculpation provisions, parties would likely be exposed to litigation after extensive good-faith negotiations.  (Id.).  The HTA Plan's exculpation provisions are narrowly tailored to the exculpated parties' efforts related to the formulation of the HTA Plan. (Id.).  All of the parties being exculpated in the HTA Plan played key roles in the negotiation of the HTA Plan and the settlements that enabled the HTA Plan.  (Id.). The HTA Plan's exculpation provisions do not alter the liability of any entity that is determined to have acted or failed to act in a manner that constitutes intentional fraud or willful misconduct.  (Id.).  Exculpation provisions are appropriate for parties' acts or omissions in connection with or related to the "pursuit of confirmation of a plan."  See In re Montreal Me. & Atl. Ry, Ltd., Bk. No. 13-10670, 2015 WL

7431192, at *9 (Bankr. D. Me. Oct. 9, 2015) (approving exculpation provisions "as appropriate under applicable law because it is part of a Plan proposed in good faith, was vital to the Plan formulation process and is appropriately limited in scope . . ., including its carve-out for gross negligence and willful misconduct").

160.    For these reasons, the Court finds that the exculpation provisions contemplated by the HTA Plan are reasonable, necessary, and appropriate to implementation of the HTA Plan and, therefore, the exculpation provisions are hereby approved.

## C.    **Injunction**

161.    The HTA Plan's injunction provisions (HTA Plan §§ 41.3, 41.6, and 41.11) are necessary to the reorganization and are fair to those parties involved.  The injunctions ensure that the releases and exculpations discussed above are preserved and enforced by prohibiting legal action concerning the Released Claims, avoiding the time, burden and expense that could be incurred if parties were permitted to pursue Released Claims. (Skeel Decl. ¶ 154).  The HTA Plan's injunction provisions are narrowly-tailored to serve that purpose.  (Id.).

162.    The releases, exculpation provisions, and injunctions pursuant to the HTA Plan are integral and critical parts of the HTA Plan and the compromises and settlements implemented pursuant to the HTA Plan.  (HTA Plan §§ 2.3, 41.4).  The approval of such releases is a condition to the occurrence of the HTA Effective Date, and all Released Parties have relied on the efficacy and conclusive effects of such releases and injunctions and on the Title III Court's retention of jurisdiction to enforce such releases and injunctions when making concessions pursuant to the HTA Plan and by agreeing to, accepting, and supporting the settlement and treatment of their respective Claims, Causes of Action, and other rights pursuant to the HTA Plan.  (HTA Plan § 35.1).  Accordingly, such provisions are justified and warranted based upon the circumstances of

the HTA Title III Case and the consideration being provided by all Released Parties in connection with the HTA Plan.

163.    To maintain and protect the integrity and feasibility of the HTA Plan, while the Oversight Board is in existence, any and all governmental units and any officer or employee thereof shall neither recreate by statute, regulation, rule, policy, or executive order, nor repay by any means, any debt discharged by the HTA Plan without the Oversight Board's express prior written consent or except as may otherwise be provided by a certified fiscal plan or budget.

## **Validity of the New HTA Bonds**

164.    Pursuant to Section 4 of PROMESA, as well as sections 944[14] and 1123 of the Bankruptcy Code, and in accordance with the HTA Confirmation Order and the HTA Plan, the Court determines that the New HTA Bonds and the covenants by HTA, including, without limitation, the Toll Rate Covenant, for the benefit of the holders of the New HTA Bonds as provided in the New HTA Bonds Indenture, or the HTA Confirmation Order, as applicable, are legal, valid, binding, and enforceable obligations of Reorganized HTA benefitting from the

---

[14] Section 944(b)(3) of the Bankruptcy Code requires the Court, as a condition to providing a discharge, to determine the validity of obligations imposed under a plan of the debtor and of any provision made to pay or secure payment of such obligations. 11 U.S.C. § 944(b)(3). See generally In re City of Stockton, Cal., 526 B.R. 35, 49-50 (Bankr. E.D. Cal. 2015) ("The structure of the federal-state relationship . . . regarding restructuring of municipal debt is dictated by the U.S. Constitution. . . . [T]he Supremacy Clause operates to cause federal bankruptcy law to trump state laws, including state constitutional provisions, that are inconsistent with the exercise by Congress of its exclusive power to enact uniform bankruptcy laws" (citing Ass'n of Retired Emps. of the City of Stockton v. City of Stockton, Cal. (In re City of Stockton, Cal)., 478 B.R. 8, 14-16 (Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2; Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo, Cal. (In re City of Vallejo, Cal)., 432 B.R. 262, 268-70 (E.D. Cal. 2010) (additional citations omitted)). As set forth in the leading bankruptcy treatise, "[t]he requirement of a court determination of validity is extra assurance for those who might be skittish about the nature of the bonds being issued . . . . It has the added feature of removing any doubt concerning the matter, because the determination of the court on that issue should be binding in the future." 6 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy § 944.03[1][b] (16th ed. 2013).

following protections, each of which is legal, valid, binding, and enforceable against Reorganized

HTA and other persons and entities, as applicable, under Puerto Rico, New York, and federal law:

a. The HTA Confirmation Order is full, final, complete, conclusive, and binding and shall not be subject to collateral attack or other challenge in any court or other forum, except as permitted under applicable law.

b. The New HTA Bonds Indenture, upon the issuance of the Secured Obligations, including, without limitation, the Subordinated Indebtedness issued as a refinancing of the Commonwealth Loan, grants a first priority lien and first priority security interest on all of Reorganized HTA's legal and equitable right, title and interest in the Trust Estate, to the Secured Obligations, subject only to (1) Section 5.01(b) and 5.01(c) of the New HTA Bonds Indenture and (2) the senior lien and senior security interest granted in the Trust Estate for the benefit of holders of New HTA Bonds, which first-priority lien and first-priority security interest shall in all respects be senior and superior to the subordinate lien and subordinate security interest granted in the Trust Estate for the benefit of holders of Subordinated Indebtedness, in each case, as permitted by the HTA Enabling Act, and such first priority lien shall be deemed automatically attached and perfected as of the HTA Effective Date and shall in any event be valid, binding, perfected, and enforceable against all Entities having claims of any kind in tort, contract or otherwise against Reorganized HTA or its assets, irrespective of whether such Entities have notice of such lien or security interest, without any further act or agreement by any Entity, and shall remain in full force and effect until the Secured Obligations have been paid or satisfied in full in accordance with their terms.

c.   The Pledged Revenues do not and will not constitute, nor will they be deemed to be "available resources" or "available revenues" of the Commonwealth, as such term is used in the Commonwealth Constitution (whether construed pursuant to the Spanish or English version of the Commonwealth Constitution).

d.   The Secured Obligations are not "Tax Supported Debt," as defined and set forth in the Government of Puerto Rico's Debt Management Policy adopted pursuant to the Commonwealth Plan.

e.   Reorganized HTA's sole and exclusive ownership of the Pledged Revenues will not be affected in any way by the manner of or control over collection; any person who collects or holds Pledged Revenues shall do so on behalf of Reorganized HTA, and no Entity that collects or holds the Pledged Revenues shall have any legal or equitable right, title, or interest to the Pledged Revenues other than Reorganized HTA, for the benefit of the holders of the Secured Obligations.

f.   Upon the HTA Effective Date, Reorganized HTA shall have all legal and equitable right, title, and interest in the Pledged Revenues and, except to the extent provided in the express provisions of the HTA Plan, HTA Confirmation Order and the New HTA Bonds Indenture, shall be free and clear of all liens, claims, encumbrances, and other interests of any party.

g.   The covenants and agreements of Reorganized HTA and the Commonwealth under the New HTA Bonds Indenture and the HTA Act, as the case may be (including, but not limited to, that described in Section 7.17 of the New HTA Bonds Indenture) will constitute adequate protection for the property interests of Reorganized HTA and the holders of Secured Obligations in the Trust Estate.

h.  HTA has waived, and shall be deemed to have waived, the automatic stay in any future insolvency proceeding commenced on behalf of Reorganized HTA (whether under Title III of PROMESA or otherwise) with respect to Net Receipts held in the funds and accounts established in accordance with the New HTA Bonds Indenture (other than the Net Receipts in the Arbitrage Rebate Fund, established pursuant to the New HTA Bonds Indenture).

i.  Upon execution by all parties thereto, the New HTA Bonds Indenture shall (i) have been duly and lawfully authorized by Reorganized HTA, and (ii) be in full force and effect and valid and binding upon Reorganized HTA and enforceable in accordance with their terms, except that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy.

j.  At the time of issuance and delivery of the Secured Obligations, Reorganized HTA is hereby directed to cause to be stamped or written on each of the Secured Obligations a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE [____] DAY OF [_____], 2022.

### **Miscellaneous Provisions**

165.  <u>Plan Supplement</u>.  All materials contained in the Plan Supplement comply with the terms of the HTA Plan, and the filing, notice, and service of such documents were done in

accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice is or shall be required.

166.     Satisfaction of Confirmation Requirements.  Based on the foregoing, the HTA Plan satisfies the requirements for confirmation set forth in Section 314 of PROMESA.

167.     Oversight Board Certification.  For purposes of Section 209 of PROMESA, the discharge of debt to occur as of the HTA Effective Date pursuant to the HTA Plan and the HTA Confirmation Order is necessary for the Oversight Board to certify that expenditures do not exceed revenues for HTA, as determined in accordance with modified accrual accounting standards.

168.     Implementation.  All documents necessary to implement the HTA Plan, including those contained in the Plan Supplement and all other relevant and necessary documents, have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.  Without limiting the generality of the foregoing, the Debtor, prior to the HTA Effective Date, and Reorganized HTA, from and after the HTA Effective Date, are authorized to consummate the transactions contemplated in the HTA Plan and Plan Supplement.  The execution, delivery, or performance by the Debtor or Reorganized HTA, as the case may be, of any documents in connection with the Plan Supplement, and compliance by the Debtor or Reorganized HTA, as the case may be, with the terms thereof, is hereby authorized by, and will not conflict with, the terms of the HTA Plan or the HTA Confirmation Order.

169.     Good Faith.  The Debtor will be acting in good faith if it proceeds to (i) consummate the HTA Plan and the agreements, settlements, transactions, and transfers contemplated thereby and (ii) take the actions authorized and directed by the HTA Confirmation Order.

170.   <u>Retention of Jurisdiction</u>.  This Court may properly and, upon the HTA Effective
Date shall, subject to the terms and provisions of Article XL of the HTA Plan, and except as
otherwise provided in the HTA Plan or HTA Confirmation Order, pursuant to sections 105, 945(a),
and 1142(b) of the Bankruptcy Code, for the time necessary for the successful implementation of
the HTA Plan, retain exclusive jurisdiction to the extent it has exclusive subject matter jurisdiction,
and concurrent jurisdiction to the extent it has concurrent subject matter jurisdiction, over all
matters arising under PROMESA, arising out of, and related to, the HTA Title III Case to the
fullest extent legally permissible, including, but not limited to, subject matter jurisdiction over the
matters set forth in Article XL of the HTA Plan.

171.   Without limiting the generality of any of the foregoing, the Court shall retain
jurisdiction to (i) enter appropriate orders with respect to the payment, enforcement, and remedies
of the bonds and any other instruments issued pursuant to the HTA Plan, (ii) enter and implement
such orders as may be necessary or appropriate to execute, implement, or consummate the
provisions of the HTA Plan, (iii) adjudicate any and all controversies, suits, or issues that may
arise regarding the validity of any action taken by any entity pursuant to or in furtherance of the
HTA Plan or the HTA Confirmation Order including, without limitation, issuance of bonds, and
(iv) enforce prohibitions against any subsequent collateral attack on provisions contained in the
HTA Plan and the HTA Confirmation Order.

172.   <u>Governing Law</u>.  Except to the extent that other federal law is applicable, or to the
extent that an exhibit to the HTA Plan or any document entered into in connection with the HTA
Plan or Plan Supplement provides otherwise, the rights, duties, and obligations arising pursuant to
the HTA Plan shall be governed by, and construed in accordance with, PROMESA (including the
provisions of the Bankruptcy Code make applicable pursuant to Section 301 of PROMESA), and

to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

173.    <u>Enforceability</u>.  Pursuant to Bankruptcy Code sections 1123(a), 1123(b), and 944(a) as well as general principles of federal supremacy, the provisions of these Findings of Fact and Conclusion of Law, the HTA Confirmation Order, and the HTA Plan shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.  The documents contained in the Plan Supplement (as such documents may be further modified and filed with the Court prior to the HTA Effective Date) provide adequate means for implementation of the HTA Plan pursuant to section 1123(a)(5) of the Bankruptcy Code and, as of the occurrence of the HTA Effective Date, shall constitute valid legal obligations of the Debtor and valid provisions to pay or secure payment of the bonds pursuant to section 944(b)(3) of the Bankruptcy Code, and shall be enforceable in accordance with their terms.

174.    <u>No Precedential Effect</u>.  The findings of fact and conclusions of law herein concerning the separate classification of certain Claims from Class 15 HTA General Unsecured Claims, including the governmental or business reasons for such classifications, are made with respect to the HTA Title III Case, and shall not have any precedential effect for other Title III cases.

## **Conclusion**

For the foregoing reasons, the Debtor's motion to confirm the HTA Plan is granted

and the HTA Confirmation Order will be entered contemporaneously herewith.


SO ORDERED.

Dated: _____
          San Juan, Puerto Rico
                                          _____
                                          Laura Taylor Swain
                                          United States District Court Judge

**Exhibit A**

I.      **Puerto Rico Highway and Transportation Authority Act**

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| **Act 74, approved on June 23, 1965, 9 L.P.R.A. § 2004**<br><br>Empowers HTA to take various actions relating to incurrence of debt, expenditure of funds, and setting of toll rates. | **Section 2004(f) –** Authorizes HTA to control its expenditures without regard to laws governing the expenditure of public funds. | **Section 2004(f) –** This provision is preempted solely to the extent it is inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. | Certain Commonwealth statutes that otherwise require or permit spending inconsistent with the certified fiscal plan and budget (and with any confirmed Title III plan of adjustment as proposed by the Oversight Board) would significantly frustrate the carrying out of PROMESA by hampering the Oversight Board's ability to carry out its mission and threaten the Oversight Board's achievements.  Skeel Decl. ¶¶ 155, 157.<br><br>This provision authorizes expenditures without the Oversight Board's authorization, in conflict with the Oversight Board's sole power to approve a fiscal plan and budget.  (PROMESA §§ 201, 202). | **Section 2004(f) –** Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |
|  | **Section 2004(h) –** Authorizes HTA to | **Section 2004(h) –** This provision is preempted solely | These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, | **Section 2004(h) –** Until the later of (i) |

---

[1]  Actions authorized by the statutes identified on **Exhibit A** that are not otherwise preempted as provided therein remain authorized under the statute.  The question of whether any particular conduct, action, or contract of HTA is unauthorized as a result of the preemption of any law pursuant to these Findings of Fact and Conclusions of Law and the HTA Confirmation Order shall be reserved for future determination by (a) the Title III Court, or (b) if the Title III Court does not have, or declines to exercise, jurisdiction to make such determination, the United States District Court for the District of Puerto Rico.

[2]  Notwithstanding anything to the contrary provided herein, to the extent a statute identified below is preempted with respect to the Oversight Board's budget, contract review, or fiscal plan powers pursuant to Title II of PROMESA, (i) the duration of such preemption shall terminate upon the termination of the Oversight Board pursuant to PROMESA Section 209, and (ii) no party shall be permitted to enforce such preemption subsequent to the Oversight Board's termination pursuant to PROMESA Section 209; provided, however, that, for the avoidance of doubt, the foregoing shall not apply to the preemption of any statute preempted by provisions of PROMESA related to the discharge of debts or confirmation or implementation of the HTA Plan or the documents contained in the Plan Supplement (including, without limitation, the New HTA Bonds Indenture).

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | enter into contracts necessary or incident to the exercise of its powers. | to the extent it permits HTA to enter into financing agreements inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. (*See* PROMESA §§ 201, 202, 314). | and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157. If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims. Skeel Decl. ¶ 157. On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Skeel Decl. ¶ 157.<br><br>The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget. Skeel Decl. ¶ 159. | the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |
| | **Section 2004(j)** – Authorizes HTA to, among other things, set and impose toll rates. Establishes certain criteria and procedural requirements for altering toll rates. | **Section 2004(j)** –This provision is preempted solely to the extent the criteria and procedural requirements limit or frustrate the setting of toll rates inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. (*See* PROMESA §§ 201, 202, 314). | These statutes generally regulate the modification of toll rates fixed and charged for basic and essential services rendered by public corporations, outside the Oversight Board's Fiscal Plan, HTA Plan and Plan Supplement. These statutes are inconsistent with PROMESA's provisions, purposes and goals and, if they remain enforceable, would frustrate the setting of toll rates contemplated by the Oversight Board's proposed HTA Plan, Plan Supplement, or Fiscal Plan. Skeel Decl. ¶ 160. | **Section 2004(j)** – Until the debt issued pursuant to the HTA Plan has been paid in full. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | The continued application of these statutes would significantly hamper the Oversight Board's purpose to provide a method for Puerto Rico, including HTA, to achieve fiscal responsibility and access to capital markets, to the extent they provide a basis for HTA to set toll rates in contravention to the HTA Plan and Fiscal Plan.  Skeel Decl. ¶ 160. | |
| | **Section 2004(l) –** Authorizes HTA to borrow money for its corporate purposes and issue bonds for such indebtedness. | **Section 2004(l) –** This provision is preempted solely to the extent it is inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA.  (*See* PROMESA §§ 201, 202, 314). | This provision provides for the borrowing of money and issuance of bonds, and could be used to issue additional debt in the future not provided for in the HTA Plan, Plan Supplement, or Fiscal Plan.  Section 25.3 of the HTA Plan also provides limitations on future debt.  (PROMESA §§ 201, 202, 314).<br><br>These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board.  Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>Such statutes authorize HTA to issue debt without obtaining Oversight Board approval.  The continued operation of these statutes would significantly detract | **Section 2004(l) –** Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159. | |
| | **Section 2004(m)** – Authorizes HTA to issue bonds to, among other things, discharge outstanding bonds. | **Section 2004(m)** – This provision is preempted solely to the extent it authorizes HTA to issue bonds to, among other things, discharge outstanding bonds inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA, or relating to bonds discharged pursuant to the HTA Plan. | This provision provides for the issuance of bonds, and could be used to issue additional debt in the future not provided for in the HTA Plan, Plan Supplement, or Fiscal Plan.  Section 25.3 of the HTA Plan also provides limitations on future debt.  (PROMESA §§ 201, 202, 314).<br><br>These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board.  Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>Such statutes authorize HTA to issue debt without obtaining Oversight Board approval.  The continued operation of these statutes would significantly detract | **Section 2004(m)** – Permanent as relates to the payment of debts discharged pursuant to the HTA Plan, and otherwise, until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159. | |
| | **Section 2004(n)** – Authorizes HTA to, among other things, accept loans and expend the proceeds from such loans for its corporate purposes. | **Section 2004(n)** – This provision is preempted solely to the extent it authorizes HTA to accept loans and expense proceeds in a manner that is inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. | This provision permits HTA to accept loans, which may not be contemplated in the HTA Plan, Plan Supplement, or Fiscal Plan and authorizes expenditures without the Oversight Board's authorization, in conflict with the Oversight Board's sole power to approve a fiscal plan and budget. (PROMESA §§ 201, 202, 314).<br><br>These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157. On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Skeel Decl. ¶ 157.<br><br>Such statutes authorize HTA to issue debt without obtaining Oversight Board approval.  The continued | **Section 2004(n)** – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget. Skeel Decl. ¶ 159. | |
| | **Section 2004(q) (limited portion)** – Empowers HTA to take any act necessary or desirable to carry out its powers and limits the payment of principal of or interest on bonds issued by HTA to funds pledged for such payment by HTA. Specifically, the following language is preempted: "To do all acts or things necessary or desirable to the carrying out of the powers granted to the Authority by this chapter or by any other act of the Legislature of Puerto Rico" and "shall be payable only from the funds of the Authority pledged for such payment pursuant | **Section 2004(q) (limited portion)** – This provision is preempted solely to the extent it is inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA and to the extent it requires the use of funds for the payment of debt of HTA that is discharged pursuant to the HTA Plan. | This provision authorizes the use of funds for the payment of any debt of HTA, which may not be provided for in the Plan, Plan Supplement, or the Fiscal Plan, and may be discharged pursuant to the HTA Plan. (PROMESA §§ 201, 202, 314).<br><br>These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157. If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims. Skeel Decl. ¶ 157. On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Skeel Decl. ¶ 157.<br><br>Such statutes authorize HTA to issue debt without obtaining Oversight Board approval. The continued operation of these statutes would significantly detract | **Section 2004(q) (limited portion)** – Permanent as relates to the payment of debts discharged pursuant to the HTA Plan and other, until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | to subsection (l) of this section." | | from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159. | |
| **Act 74, approved on June 23, 1965, 9 L.P.R.A. § 2004a**

Authorizes HTA to, among other things, enter into contracts for the maintenance of roads, financing, and bond issuances. | **Section 2004a(3)** – Empowers HTA to enter into contracts to, among other things, finance or issue bonds to exercise its authority. | **Section 2004a(3)** – This provision is preempted solely to the extent it allows HTA to enter into financing agreements or issue debt that is inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. | This provision permits HTA to enter into financing agreements, which may not be contemplated in the HTA Plan, Plan Supplement, or Fiscal Plan and issue bonds, which could be used to issue additional debt in the future not provided for in the HTA Plan, Plan Supplement, or Fiscal Plan.  Section 25.3 of the HTA Plan also provides limitations on future debt. (PROMESA §§ 201, 202, 314).

These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board.  Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157. | **Section 2004a(3)** – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | Such statutes authorize HTA to issue debt without obtaining Oversight Board approval.  The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159. | |
| **Act 74, approved on June 23, 1965, 9 L.P.R.A. § 2006** | **Section 2006 –** Empowers the Secretary of Transportation and Public Works and HTA to enter into contracts for, among other things, maintenance and cost of repairs. | **Section 2006 –** This provision is preempted solely to the extent it authorizes HTA to enter into contracts or incur obligations inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. (PROMESA §§ 201, 202, 314). | These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board.  Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157. | **Section 2006 –** Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |
| **Act 74, approved on June 23, 1965, 9 L.P.R.A. § 2008** | **Section 2008 (paragraph 1) –** Provides the manner in which HTA's monies shall be deposited and that disbursements of HTA's monies shall be | **Section 2008 (paragraph 1) –** The first sentence of paragraph 1 is preempted solely to the extent it is inconsistent with the New HTA Bonds Indenture.  The second sentence of paragraph | The first sentence permits the deposit of moneys that may be inconsistent with the New HTA Bonds Indenture.  The second sentence of paragraph 1 authorizes disbursements of funds without the Oversight Board's authorization in conflict with the | **Section 2008 (limited portion) –** Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full, or (ii) |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| Describes the management of HTA's funds and accounts. | pursuant to regulations and budgets approved by HTA. | 1 is preempted to the extent inconsistent with PROMESA. | Oversight Board's sole power to approve a fiscal plan and budget. (PROMESA § 202).<br><br>These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157. If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims. Skeel Decl. ¶ 157. On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Skeel Decl. ¶ 157.<br><br>Certain Commonwealth statutes that otherwise require or permit spending inconsistent with the certified fiscal plan and budget (and with any confirmed Title III plan of adjustment as proposed by the Oversight Board) would significantly frustrate the carrying out of PROMESA by hampering the Oversight Board's ability to carry out its mission and threaten the Oversight Board's achievements. Skeel Decl. ¶¶ 155, 157. | the termination of the Oversight Board. |
| **Act 74, approved on June 23, 1965, 9 L.P.R.A. § 2010** | <u>**Section 2010**</u> – Permits HTA to transfer funds to, among others, instrumentalities for, among other things, the | <u>**Section 2010**</u> – This provision is preempted solely to the extent it is inconsistent with the HTA Plan, Plan | This provision authorizes expenditures without the Oversight Board's authorization, in conflict with the Oversight Board's sole power to approve a fiscal plan and budget. (PROMESA § 202). | <u>**Section 2010**</u> – Until the later of (i) the debt issued pursuant to the HTA Plan has been |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | operation of traffic or transportation facilities. | Supplement, Fiscal Plan, or PROMESA. | These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>Certain Commonwealth statutes that otherwise require or permit spending inconsistent with the certified fiscal plan and budget (and with any confirmed Title III plan of adjustment as proposed by the Oversight Board) would significantly frustrate the carrying out of PROMESA by hampering the Oversight Board's ability to carry out its mission and threaten the Oversight Board's achievements.  Skeel Decl¶ 155. | paid in full or (ii) the termination of the Oversight Board. |
| **Act 74, approved on June 23, 1965, 9 L.P.R.A. § 2012** | <u>**Section 2012(a)**</u> – Authorizes HTA to issue bonds and sell its bonds. | <u>**Section 2012(a)**</u> – This provision is preempted solely to the extent it authorizes the issuance of bonds in a manner inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. | This provision provides for the issuance of bonds, and could be used to issue additional debt in the future not provided for in the HTA Plan, Plan Supplement, or Fiscal Plan.  Section 25.3 of the HTA Plan also provides limitations on future debt.  (PROMESA §§ 201, 202, 314).<br><br>These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, | <u>**Section 2012(a)**</u> – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| Describes HTA's authority regarding its bond issuances. | | | and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>Such statutes authorize HTA to issue debt without obtaining Oversight Board approval.  The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159. | the Oversight Board. |
| | **Section 2012(b)** – Permits HTA to authorize bonds by resolutions and sets, among other things, limits on maturity dates and interest rates of any such bonds. | **Section 2012(b)** – This provision is preempted solely to the extent it authorizes the issuance of bonds inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. | This provision provides for the issuance of bonds, and could be used to issue additional debt in the future not provided for in the HTA Plan, Plan Supplement, or Fiscal Plan.  Section 25.3 of the HTA Plan also provides limitations on future debt.  (PROMESA §§ 201, 202, 314).<br><br>These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, | **Section 2012(b)** – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>Such statutes authorize HTA to issue debt without obtaining Oversight Board approval.  The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159. | the Oversight Board. |
| | **Section 2012(d)** – Authorizes HTA to issue temporary, or interim bonds, receipts or certificates pending the execution and delivery of definitive bonds. | **Section 2012(d)** – This provision is preempted solely to the extent it authorizes issuance of temporary, or interim bonds, receipts or certificates that would be inconsistent with the HTA | This provision provides for the issuance of temporary, or interim bonds, receipts or certificates, and could be used to issue additional debt in the future not provided for in the HTA Plan, Plan Supplement, or Fiscal Plan. Section 25.3 of the HTA Plan also provides limitations on future debt.  (PROMESA §§ 201, 202, 314). | **Section 2012(d)** – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | Plan, Plan Supplement, Fiscal Plan, or PROMESA. | These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157. <br><br>Such statutes authorize HTA to issue debt without obtaining Oversight Board approval.  The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159. | the Oversight Board. |
| **Section 2012(e)** – Authorizes HTA to include certain provisions in contracts with holders of bonds issued by HTA, including, among | **Section 2012(e)** –This provision is preempted solely to the extent the issuance of new debt is inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA, or to the extent | Section 25.3 of the HTA Plan provides limitations on future debt.  (PROMESA §§ 201, 202, 314). <br><br>These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. | **Section 2012(e)** – Permanent as relates to the payment of debts discharged pursuant to the HTA Plan and |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | others, pledging revenues to the payment of the principal of and interest on the bonds. | that the statute applies to debt discharged pursuant to the HTA Plan. | Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.  Such statutes authorize HTA to issue debt without obtaining Oversight Board approval.  The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159. | otherwise, until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |
| | **Section 2012(g)** – Authorizes HTA to purchase any outstanding bonds it has issued or assumed. | **Section 2012(g)** – This provision is preempted solely to the extent it authorizes HTA to purchase any outstanding bonds it has issued or assumed, which are discharged pursuant to the HTA Plan, or authorizes HTA to take action that is inconsistent with the HTA | This provision authorizes expenditures without the Oversight Board's authorization in conflict with the Oversight Board's sole power to approve a fiscal plan and budget.  (PROMESA §§ 201, 202).  These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board.  Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied | **Section 2012(g)** – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | Plan, Plan Supplement, Fiscal Plan, or PROMESA. | with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157. | |
| | | | The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159. | |
| | **Section 2012(h)** – Authorizes HTA to issue bonds. | **Section 2012(h)** – This provision is preempted solely to the extent it is inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. | This provision provides for the issuance of bonds, and could be used to issue additional debt in the future not provided for in the HTA Plan, Plan Supplement, or Fiscal Plan.  Section 25.3 of the HTA Plan also provides limitations on future debt.  (PROMESA §§ 201, 202, 314).<br><br>These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board.  Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's | **Section 2012(h)** – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>Such statutes authorize HTA to issue debt without obtaining Oversight Board approval.  The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159. | |
| **Act 74, approved on June 23, 1965, 9 L.P.R.A. § 2013**<br><br>Describes remedies of bondholders. | **Section 2013(a)** – Provides the rights of holders of bonds issued by HTA, including, among other things, to enforce their rights against HTA. | **Section 2013(a)** – This provision is preempted solely to the extent it applies to the bonds discharged pursuant to the HTA Plan.  (PROMESA §314). | These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight | **Section 2013(a)** – Permanent |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>Such statutes authorize HTA to issue debt without obtaining Oversight Board approval.  The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159. | |
| | **Section 2013(b)** – Explains the remedies of bondholders are not limited to those provided in § 2013(a). | **Section 2013(b)** – This provision is preempted solely to the extent it applies to the bonds discharged pursuant to the HTA Plan.  (PROMESA §314). | These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board.  Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>Such statutes authorize HTA to issue debt without obtaining Oversight Board approval.  The continued operation of these statutes would significantly detract | **Section 2013(b)** – Permanent |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159. | |
| **Act 74, approved on June 23, 1965, 9 L.P.R.A. § 2019**<br><br>Describes an agreement of the Commonwealth relating to HTA's authority. | <u>Section 2019</u> – Provides the pledge of the Commonwealth not to limit or restrict HTA's authority until any bonds issued by HTA are discharged. | <u>Section 2019</u> – This provision is preempted solely to the extent it is inconsistent with the discharge in the HTA Plan with respect to the existing HTA Bonds. (PROMESA §314).  Such preemption shall not apply to the New HTA Bonds or any other security issued pursuant to the HTA Plan. | These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157. | <u>Section 2019</u> – Permanent |
| **Act 74, approved on June 23, 1965, 9 L.P.R.A. § 2020**<br><br>Limits the application of injunctions. | <u>Section 2020</u> – Prohibits the grant of injunctions to prevent the application of 9 L.P.R.A. §§ 2001– 2021. | <u>Section 2020</u> – This provision is preempted solely to the extent it is inconsistent with the discharge in the HTA Plan.  (PROMESA §314). | If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157. On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the | <u>Section 2020</u> – Permanent |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Skeel Decl. ¶ 157. | |
| **Act 1, approved on January 15, 2015, 9 L.P.R.A. § 2024**<br><br>Describes an Improvement Agreement and the appointment of an Emergency Officer. | **Section 2024(a)** – Provides that the Oversight Committee may execute an "Improvement Agreement" with the Directors of HTA to implement any necessary corrective measures to address financial or operational problems of HTA. | **Section 2024(a)** – This provision is preempted solely to the extent it is inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. | This provision (i) could be used to authorize expenditures without the Oversight Board's authorization, in conflict with the Oversight Board's sole power to approve a fiscal plan and budget, (ii) could be used to issue additional debt in the future not provided for in the HTA Plan, Plan Supplement, or Fiscal Plan, (iii) could be used to permit HTA to enter into financing agreements not contemplated in the HTA Plan, Plan Supplement, or Fiscal Plan, and (iv) limits or frustrates the setting of toll rates contemplated in the HTA Plan, Plan Supplement, or Fiscal Plan.  (PROMESA §§ 201, 202, 314).<br><br>Certain Commonwealth statutes that otherwise require or permit spending inconsistent with the certified fiscal plan and budget (and with any confirmed Title III plan of adjustment as proposed by the Oversight Board) would significantly frustrate the carrying out of PROMESA by hampering the Oversight Board's ability to carry out its mission and threaten the Oversight Board's achievements.  Skeel Decl. ¶ 155.<br><br>These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those | **Section 2024(a)** – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159.<br><br>These statutes generally regulate the modification of toll rates fixed and charged for basic and essential services rendered by public corporations, outside the Oversight Board's Fiscal Plan, HTA Plan and Plan Supplement.  These statutes are inconsistent with PROMESA's provisions, purposes and goals and, if they remain enforceable, would frustrate the setting of toll rates contemplated by the Oversight Board's proposed HTA Plan, Plan Supplement, or Fiscal Plan.  Skeel Decl. ¶ 160.<br><br>The continued application of these statutes would significantly hamper the Oversight Board's purpose to provide a method for Puerto Rico, including HTA, to achieve fiscal responsibility and access to capital markets, to the extent they provide a basis for HTA to set toll rates in contravention to the Plan and Fiscal Plan.  Skeel Decl. ¶ 160. | |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| **Act 1, approved on January 15, 2015, 9 L.P.R.A. § 2026**<br><br>Describes the appointment of an Emergency Officer and the Emergency Officer's powers. | **Section 2026(b)** – Provides for the Emergency Officer's compensation. | **Section 2026(b)** – This provision is preempted solely to the extent it is inconsistent with PROMESA. | This provision authorizes an expenditure without the Oversight Board's authorization, in conflict with the Oversight Board's sole power to approve a fiscal plan and budget.  (PROMESA § 202).<br><br>These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board.  Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159.<br><br>Certain Commonwealth statutes that otherwise require or permit spending inconsistent with the certified fiscal plan and budget (and with any confirmed Title III plan of adjustment as proposed by the Oversight | **Section 2026(b)** – Until the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | Board) would significantly frustrate the carrying out of PROMESA by hampering the Oversight Board's ability to carry out its mission and threaten the Oversight Board's achievements.  Skeel Decl. ¶ 155. | |
| | **Section 2026(c)** – Permits the Emergency Officer to hire personnel. | **Section 2026(c)** – This provision is preempted solely to the extent it is inconsistent with PROMESA. | This provision authorizes an expenditure without the Oversight Board's authorization, in conflict with the Oversight Board's sole power to approve a fiscal plan and budget.  (PROMESA § 202).<br><br>These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board.  Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and | **Section 2026(c)** – Until the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159.<br><br>Certain Commonwealth statutes that otherwise require or permit spending inconsistent with the certified fiscal plan and budget (and with any confirmed Title III plan of adjustment as proposed by the Oversight Board) would significantly frustrate the carrying out of PROMESA by hampering the Oversight Board's ability to carry out its mission and threaten the Oversight Board's achievements.  Skeel Decl. ¶ 155. | |
| | **Section 2026(d)(first paragraph)** – Provides the Emergency Officer's powers, including, among others, to implement a restructuring plan. | **Section 2026(d) (first paragraph** – This provision is preempted solely to the extent it is inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. | This provision (i) could be used to authorize expenditures without the Oversight Board's authorization, in conflict with the Oversight Board's sole power to approve a fiscal plan and budget, (ii) could be used to issue additional debt in the future not provided for in the HTA Plan, Plan Supplement, or Fiscal Plan, (iii) could be used to permit HTA to enter into financing agreements not contemplated in the HTA Plan, Plan Supplement, or Fiscal Plan, and (iv) limits or frustrates the setting of toll rates contemplated in the HTA Plan, Plan Supplement, or Fiscal Plan.  (PROMESA §§ 201, 202, 314).<br><br>Certain Commonwealth statutes that otherwise require or permit spending inconsistent with the certified fiscal plan and budget (and with any confirmed Title III plan of adjustment as proposed by the Oversight Board) would significantly frustrate the carrying out of PROMESA by hampering the Oversight Board's ability to carry out its mission and threaten the Oversight Board's achievements.  Skeel Decl. ¶ 155.<br><br>These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal | **Section 2026(d) (first paragraph** – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159.<br><br>These statutes generally regulate the modification of toll rates fixed and charged for basic and essential services rendered by public corporations, outside the Oversight Board's Fiscal Plan, HTA Plan and Plan Supplement.  These statutes are inconsistent with PROMESA's provisions, purposes and goals and, if they remain enforceable, would frustrate the setting of toll rates contemplated by the Oversight Board's proposed HTA Plan, Plan Supplement, or Fiscal Plan. Skeel Decl. ¶ 160. | |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | The continued application of these statutes would significantly hamper the Oversight Board's purpose to provide a method for Puerto Rico, including HTA, to achieve fiscal responsibility and access to capital markets, to the extent they provide a basis for HTA to set toll rates in contravention to the Plan and Fiscal Plan.  Skeel Decl. ¶ 160. | |
| | **Section 2026(d)(1)** – Authorizes the Emergency Officer to take corrective actions to address HTA's financial and operational conditions. | **Section 2026(d)(1)** – This provision is preempted solely to the extent it is inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. | This provision (i) could be used to authorize expenditures without the Oversight Board's authorization, in conflict with the Oversight Board's sole power to approve a fiscal plan and budget, (ii) could be used to issue additional debt in the future not provided for in the HTA Plan, Plan Supplement, or Fiscal Plan, (iii) could be used to permit HTA to enter into financing agreements not contemplated in the HTA Plan, Plan Supplement, or Fiscal Plan, and (iv) limits or frustrates the setting of toll rates contemplated in the HTA Plan, Plan Supplement, or Fiscal Plan.  (PROMESA §§ 201, 202, 314).  Certain Commonwealth statutes that otherwise require or permit spending inconsistent with the certified fiscal plan and budget (and with any confirmed Title III plan of adjustment as proposed by the Oversight Board) would significantly frustrate the carrying out of PROMESA by hampering the Oversight Board's ability to carry out its mission and threaten the Oversight Board's achievements.  Skeel Decl. ¶ 155.  These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not | **Section 2026(d)(1)** – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159.<br><br>These statutes generally regulate the modification of toll rates fixed and charged for basic and essential services rendered by public corporations, outside the Oversight Board's Fiscal Plan, HTA Plan and Plan Supplement.  These statutes are inconsistent with PROMESA's provisions, purposes and goals and, if they remain enforceable, would frustrate the setting of toll rates contemplated by the Oversight Board's proposed HTA Plan, Plan Supplement, or Fiscal Plan. Skeel Decl. ¶ 160.<br><br>The continued application of these statutes would significantly hamper the Oversight Board's purpose to provide a method for Puerto Rico, including HTA, to achieve fiscal responsibility and access to capital markets, to the extent they provide a basis for HTA to | |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | set toll rates in contravention to the Plan and Fiscal Plan. Skeel Decl. ¶ 160. | |
| | **Section 2026(d)(2)** – Authorizes the Emergency Officer to amend, revise, approve, or deny HTA's budget. | **Section 2026(d)(2)** – This provision is preempted solely to the extent it is inconsistent with PROMESA | This provision authorizes control over HTA's budget, in conflict with the Oversight Board's sole power to approve a budget. (PROMESA § 202). | **Section 2026(d)(2)** – Until the termination of the Oversight Board. |
| | | | These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157. If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims. Skeel Decl. ¶ 157. On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Skeel Decl. ¶ 157. | |
| | | | The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget. Skeel Decl. ¶ 159. | |
| | | | Certain Commonwealth statutes that otherwise require or permit spending inconsistent with the certified | |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | fiscal plan and budget (and with any confirmed Title III plan of adjustment as proposed by the Oversight Board) would significantly frustrate the carrying out of PROMESA by hampering the Oversight Board's ability to carry out its mission and threaten the Oversight Board's achievements.  Skeel Decl. ¶ 155. | |
| | **Section 2026(d)(6)** – Authorizes the Emergency Officer to amend, revise, approve or deny, among other things, any contract or loan. | **Section 2026(d)(6)** – This provision is preempted solely to the extent it permits HTA to alter existing contracts or loans and enter into financing agreements inconsistent with the HTA Plan, Plan Supplement, or Fiscal Plan, or that is inconsistent with PROMESA.  (PROMESA §§ 201, 202, 314). | These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board.  Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>Such statutes authorize HTA to issue debt without obtaining Oversight Board approval.  The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159. | **Section 2026(d)(6)** – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | **Section 2026(d)(7)** – Authorizes the Emergency Officer to review and approve HTA's expenditures. | **Section 2026(d)(7)** – This provision is preempted solely to the extent it is inconsistent with PROMESA. | This provision authorizes control over HTA's expenditures, in conflict with the Oversight Board's sole power to approve a fiscal plan and budget. (PROMESA § 202).<br><br>These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>Certain Commonwealth statutes that otherwise require or permit spending inconsistent with the certified fiscal plan and budget (and with any confirmed Title III plan of adjustment as proposed by the Oversight Board) would significantly frustrate the carrying out of PROMESA by hampering the Oversight Board's ability to carry out its mission and threaten the Oversight Board's achievements.  Skeel Decl. ¶ 155. | **Section 2026(d)(7)** – Until the termination of the Oversight Board. |
| | **Section 2026(d)8** – Authorizes the Emergency Officer to renegotiate existing | **Section 2026(d)8** – This provision is preempted solely to the extent it authorizes HTA to enter into contracts | This provision could be used to allow HTA to (i) enter into contracts without the Oversight Board's approval to the extent such approval is required pursuant to the Oversight Board's contract review policy (PROMESA | **Section 2026(d)8** – Until the later of (i) the debt issued pursuant to the |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | collective bargaining agreements and requires the Emergency Officer to approve any HTA contracts and agreements. | that incur obligations inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. | § 204(b)(2)), or (ii) incur obligations inconsistent with the HTA Plan, Plan Supplement, or Fiscal Plan. (PROMESA §§ 201, 202, 314).<br><br>These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157. | HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |
| | **Section 2026(d)(9)** – Authorizes the Emergency Officer to restructure the operations of HTA. | **Section 2026(d)(9)** – This provision is preempted solely to the extent it authorizes operational restructurings inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. (PROMESA §§ 201, 202, 314). | These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or | **Section 2026(d)(9)** – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157. | |
| | **Section 2026(d)(11)** – Authorizes the Emergency Officer to sell, lease, or negotiate any of HTA's assets. | **Section 2026(d)(11)** – This provision is preempted solely to the extent it authorizes the sale or lease of HTA's assets inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA, and to the extent it authorizes HTA to enter into contracts inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. | This provision could be used to allow HTA to (i) enter into contracts without the Oversight Board's approval to the extent such approval is required pursuant to the Oversight Board's contract review policy (PROMESA § 204(b)(2)), or (ii) incur obligations inconsistent with the HTA Plan, Plan Supplement, or Fiscal Plan. (PROMESA §§ 201, 202, 314).<br><br>These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board.  Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157. | **Section 2026(d)(11)** – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |
| | **Section 2026(d)(12)** – Authorizes the Emergency Officer to | **Section 2026(d)(12)** – This provision is preempted solely to the extent it permits HTA to enter into financing agreements inconsistent with | These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board.  Skeel Decl. ¶ 157.  If these statutes continue to | **Section 2026(d)(12)** – Until the later of (i) the debt issued pursuant to the |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | seek financing from GDB. | the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA.  (PROMESA §§ 201, 202, 314). | operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>Such statutes authorize HTA to issue debt without obtaining Oversight Board approval.  The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159. | HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |
| | **Section 2026(d)(15)** – Authorizes the Emergency Officer to take any action deemed necessary by the Oversight Committee to address HTA's fiscal or operational emergency. | **Section 2026(d)(15)** – This provision is preempted solely to the extent it is inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. | This provision (i) could be used to authorize expenditures without the Oversight Board's authorization, in conflict with the Oversight Board's sole power to approve a fiscal plan and budget, (ii) could be used to issue additional debt in the future not provided for in the HTA Plan, Plan Supplement, or Fiscal Plan, (iii) could be used to permit HTA to enter into financing agreements not contemplated in the HTA Plan, Plan Supplement, or Fiscal Plan, and (iv) limits or frustrates the setting of toll rates | **Section 2026(d)(15)** – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | contemplated in the HTA Plan, Plan Supplement, or Fiscal Plan.  (PROMESA §§ 201, 202, 314).<br><br>These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board.  Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>Such statutes authorize HTA to issue debt without obtaining Oversight Board approval.  The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159.<br><br>Certain Commonwealth statutes that otherwise require or permit spending inconsistent with the certified fiscal plan and budget (and with any confirmed Title III plan of adjustment as proposed by the Oversight | |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | Board) would significantly frustrate the carrying out of PROMESA by hampering the Oversight Board's ability to carry out its mission and threaten the Oversight Board's achievements.  Skeel Decl. ¶ 155.<br><br>These statutes generally regulate the modification of toll rates fixed and charged for basic and essential services rendered by public corporations, outside the Oversight Board's Fiscal Plan, HTA Plan and Plan Supplement.  These statutes are inconsistent with PROMESA's provisions, purposes and goals and, if they remain enforceable, would frustrate the setting of toll rates contemplated by the Oversight Board's proposed HTA Plan, Plan Supplement, or Fiscal Plan.  Skeel Decl. ¶ 160.<br><br>The continued application of these statutes would significantly hamper the Oversight Board's purpose to provide a method for Puerto Rico, including HTA, to achieve fiscal responsibility and access to capital markets, to the extent they provide a basis for HTA to set toll rates in contravention to the Plan and Fiscal Plan.  Skeel Decl. ¶ 160. | |
| **Act 1, approved on January 15, 2015, 9 L.P.R.A. § 2027** | <u>Section 2027</u> – Provides that the Emergency Officer shall develop a financial and operation plan for HTA. | <u>Section 2027</u> – This provision is preempted solely to the extent it is inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. | This provision (i) could be used to authorize expenditures without the Oversight Board's authorization, in conflict with the Oversight Board's sole power to approve a fiscal plan and budget, and (ii) limits or frustrates the setting of toll rates contemplated in the HTA Plan, Plan Supplement, or Fiscal Plan.  (PROMESA §§ 201, 202, 314).<br><br>These statutes generally regulate the modification of toll rates fixed and charged for basic and essential services rendered by public corporations, outside the Oversight Board's Fiscal Plan, HTA Plan and Plan Supplement.  These statutes are inconsistent with | <u>Section 2027</u> – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | PROMESA's provisions, purposes and goals and, if they remain enforceable, would frustrate the setting of toll rates contemplated by the Oversight Board's proposed HTA Plan, Plan Supplement, or Fiscal Plan. Skeel Decl. ¶ 160.<br><br>The continued application of these statutes would significantly hamper the Oversight Board's purpose to provide a method for Puerto Rico, including HTA, to achieve fiscal responsibility and access to capital markets, to the extent they provide a basis for HTA to set toll rates in contravention to the Plan and Fiscal Plan. Skeel Decl. ¶ 160. *See also* Skeel Decl. ¶¶ 157, 159. | |
| **Act 1, approved on January 15, 2015, 9 L.P.R.A. § 2030** | <u>Section 2030</u> – Authorizes the Emergency Officer to use the provisions of the Puerto Rico Public Corporation Debt Enforcement and Recovery Act, §§ 13 L.P.R.A. 111 et seq. | <u>Section 2030</u> – This provision is preempted solely to the extent it is inconsistent with the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. (PROMESA §§ 201, 202, 314). | These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157. If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims. Skeel Decl. ¶ 157. On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Skeel Decl. ¶ 157.<br><br>The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by | <u>Section 2030</u> – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| | | | allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159. | |
| **Act 1, approved on January 15, 2015, 9 L.P.R.A. § 2032** | <u>Section 2032</u> – Provides that the Secretary or Director of HTA shall meet the requirements of the Oversight Committee and the Emergency Officer. | <u>Section 2032</u> – This provision is preempted solely to the extent that the Secretary or Director of HTA would be required to act in contravention of the HTA Plan, Plan Supplement, Fiscal Plan, or PROMESA. (PROMESA §§ 201, 202, 314). | These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board.  Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.

The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159. | <u>Section 2032</u> – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Scope of Preemption[1] | Basis and Record Evidence Supporting Preemption | Duration of Preemption[2] |
|---|---|---|---|---|
| **Act 1, approved on January 15, 2015, 9 L.P.R.A. § 2035**<br><br>Describes the use of surplus funds. | **Section 2035** – Provides that surplus funds shall be used to pay HTA's priority obligations and that any surplus available after debt payments shall be used to pay HTA's loans with GDB. | **Section 2035** – This provision provides for payment of debt service that is not provided for in the HTA Plan, Plan Supplement, or Fiscal Plan and may give certain bonds priority not otherwise provided for in the HTA Plan, Plan Supplement, the Fiscal Plan, or PROMESA that may require payment in full of prepetition obligations being discharged pursuant to the HTA Plan. (PROMESA §§ 201, 202, 314). | These statutes generally require or permit HTA to, among other things, incur obligations, spend funds, and repay in full its debts without regard to the fiscal plan and budget certified by the Oversight Board. Skeel Decl. ¶ 157.  If these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the HTA Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA, but also would undermine the restructuring contemplated by the HTA Plan, which proposes to pay those claimholders less than the full amounts of their respective claims.  Skeel Decl. ¶ 157.  On their face, the preempted statutes require or permit transfers or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.  Skeel Decl. ¶ 157.<br><br>The continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing HTA to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed HTA Plan, and potentially in an amount greater than is authorized by the certified fiscal plan or budget.  Skeel Decl. ¶ 159. | **Section 2035** – Permanent |

## II.    Uniform Rate Revision and Modification Act

| Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|
| **Act 21, approved on May 31, 1985, 27 L.P.R.A. § 261**<br><br>Regulates the modification of rates fixed and charged for basic and essential services rendered by public corporations. | **Section 261a** – Describes the applicability of Act 21-1985. | **Sections 261a** – These provisions are preempted solely to the extent applicable to HTA, and the criteria and procedural requirements limit or frustrate the setting of toll rates provided in the HTA Plan, Plan Supplement, or Fiscal Plan, or is inconsistent with PROMESA.  (PROMESA §§ 201, 202, 314). | These statutes generally regulate the modification of toll rates fixed and charged for basic and essential services rendered by public corporations, outside the Oversight Board's Fiscal Plan, HTA Plan and Plan Supplement.  These statutes are inconsistent with PROMESA's provisions, purposes and goals and, if they remain enforceable, would frustrate the setting of toll rates contemplated by the Oversight Board's proposed HTA Plan, Plan Supplement, or Fiscal Plan. Skeel Decl. ¶ 160.<br><br>The continued application of these statutes would significantly hamper the Oversight Board's purpose to provide a method for Puerto Rico, including HTA, to achieve fiscal responsibility and access to capital markets, to the extent they provide a basis for HTA to set toll rates in contravention to the Plan and Fiscal Plan.  Skeel Decl. ¶ 160. | **Sections 261a** – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |
| | **Section 261b** – Sets procedures for public corporations that render essential services to change their rates. | **Sections 261b** – These provisions are preempted to the extent applicable to HTA, and the criteria and procedural requirements limit or frustrate the setting of toll rates provided in the HTA Plan, Plan Supplement, or Fiscal Plan. (PROMESA §§ 201, 202, 314). | These statutes generally regulate the modification of toll rates fixed and charged for basic and essential services rendered by public corporations, outside the Oversight Board's Fiscal Plan, HTA Plan and Plan Supplement.  These statutes are inconsistent with PROMESA's provisions, purposes and goals and, if they remain enforceable, would frustrate the setting of toll rates contemplated by the Oversight Board's proposed HTA Plan, Plan Supplement, or Fiscal Plan. Skeel Decl. ¶ 160.<br><br>The continued application of these statutes would significantly hamper the Oversight Board's purpose to provide a method for Puerto Rico, including HTA, to achieve fiscal responsibility and access to capital markets, to the extent they provide a basis for HTA to | **Sections 261b** – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|
| | | | set toll rates in contravention to the Plan and Fiscal Plan.  Skeel Decl. ¶ 160. | |
| | **Section 261c** – Sets procedures for public corporations that render essential services to adopt temporary or emergency rates. | **Sections 261c** – These provisions are preempted to the extent applicable to HTA, and the criteria and procedural requirements limit or frustrate the setting of toll rates provided in the HTA Plan, Plan Supplement, or Fiscal Plan. (PROMESA §§ 201, 202, 314). | These statutes generally regulate the modification of toll rates fixed and charged for basic and essential services rendered by public corporations, outside the Oversight Board's Fiscal Plan, HTA Plan and Plan Supplement.  These statutes are inconsistent with PROMESA's provisions, purposes and goals and, if they remain enforceable, would frustrate the setting of toll rates contemplated by the Oversight Board's proposed HTA Plan, Plan Supplement, or Fiscal Plan. Skeel Decl. ¶ 160.  The continued application of these statutes would significantly hamper the Oversight Board's purpose to provide a method for Puerto Rico, including HTA, to achieve fiscal responsibility and access to capital markets, to the extent they provide a basis for HTA to set toll rates in contravention to the Plan and Fiscal Plan.  Skeel Decl. ¶ 160. | **Sections 261c** – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |
| | **Section 261d** – Provides that the Legislature may review changes to rates proposed by public corporations that render essential services. | **Sections 261d** – These provisions are preempted to the extent applicable to HTA, and the criteria and procedural requirements limit or frustrate the setting of toll rates provided in the HTA Plan, Plan Supplement, or Fiscal Plan. (PROMESA §§ 201, 202, 314). | These statutes generally regulate the modification of toll rates fixed and charged for basic and essential services rendered by public corporations, outside the Oversight Board's Fiscal Plan, HTA Plan and Plan Supplement.  These statutes are inconsistent with PROMESA's provisions, purposes and goals and, if they remain enforceable, would frustrate the setting of toll rates contemplated by the Oversight Board's proposed HTA Plan, Plan Supplement, or Fiscal Plan. Skeel Decl. ¶ 160.  The continued application of these statutes would significantly hamper the Oversight Board's purpose to provide a method for Puerto Rico, including HTA, to achieve fiscal responsibility and access to capital | **Sections 261d** – Until the later of (i) the debt issued pursuant to the HTA Plan has been paid in full or (ii) the termination of the Oversight Board. |

| Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|
| | | | markets, to the extent they provide a basis for HTA to set toll rates in contravention to the Plan and Fiscal Plan.  Skeel Decl. ¶ 160. | |