**Hearing Date: November 2, 2022, at 4:00 PM (Atlantic Standard Time)**
**Response Deadline: October 17, 2022, at 9:30 AM (Atlantic Standard Time)**

> **PLEASE CAREFULLY REVIEW THIS OBJECTION AND THE ATTACHMENTS HERETO TO DETERMINE WHETHER THE OBJECTION AFFECTS YOUR CLAIM(S).**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al*.,<br><br>                 Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered)<br><br>**This filing relates to the Commonwealth and ERS.** |

### FIVE HUNDRED THIRTIETH OMNIBUS OBJECTION (SUBSTANTIVE) OF THE COMMONWEALTH OF PUERTO RICO AND THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO TO PARTIAL DUPLICATE, DEFICIENT, NO LIABILITY, AND INCORRECT DEBTOR BOND CLAIMS

To the Honorable United States District Court Judge Laura Taylor Swain:

The Commonwealth of Puerto Rico (the "Commonwealth"), and the Employees

Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS," and together

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA", and together with the Commonwealth, COFINA, HTA, ERS, and PREPA, the "Debtors") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801)  (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

with the Commonwealth, the "Debtors"), by and through the Financial Oversight and Management

Board for Puerto Rico (the "Oversight Board"), as sole Title III representative pursuant to Section

315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2]

file this five hundred thirtieth omnibus objection (the "Five Hundred Thirtieth Omnibus

Objection") (a) to the proofs of claim listed on **Exhibit A** hereto, each of which is purportedly

based, in part, on (1) bonds issued by the Puerto Rico Sales Tax Financing Corporation

("COFINA"), (2) bond claims that are duplicative of one or more master proofs of claim filed

against the Debtors on behalf of the holders of certain bonds, (3) bond claims based on bonds

issued by Puerto Rico Highways and Transportation Authority ("HTA"), the Puerto Rico

Infrastructure Financing Corporation ("PRIFA"), or the Puerto Rico Convention Center District

Authority ("CCDA") which have been discharged pursuant to the Commonwealth Confirmation

Order (as defined below), (4) an ownership interest in bonds issued by the Government

Development Bank of Puerto Rico ("GDB"), for amounts for which the Debtors have not

guaranteed repayment, (5) an ownership interest in bonds issued by the Puerto Rico Aqueducts

and Sewers Authority ("PRASA"), which is not a Title III Debtor, for amounts for which the

Debtors have not guaranteed repayment, (6) bond claims that assert liabilities associated with

secondarily insured bonds, which, in turn, are duplicative of proofs of claim filed against the

Debtors on behalf of the holders of those bonds, and/or (7) investments in mutual funds, which in

turn may have invested in bonds issued by the Debtors, and (b) to certain of the proofs of claims

listed on **Exhibit A** hereto to partially reclassify a portion of the claim against the appropriate

Debtor, and, in support of the Five Hundred Thirtieth Omnibus Objection, the Debtors respectfully

represent as follows:

---

[2]       PROMESA is codified at 48 U.S.C. §§ 2101–2241.

## JURISDICTION

1.      The United States District Court for the District of Puerto Rico has subject matter jurisdiction to consider this matter and the relief requested herein pursuant to PROMESA section 306(a).

2.      Venue is proper in this district pursuant to PROMESA section 307(a).

## BACKGROUND

### A.      The Bar Date Orders

3.      On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA Sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA Section 304(a), commencing a case under Title III thereof (the "Commonwealth Title III Case").  On May 21, 2017 (the "Petition Date"), the Oversight Board issued restructuring certifications pursuant to PROMESA Sections 104(j) and 206 and filed a voluntary petition for relief for ERS, pursuant to PROMESA Section 304(a), commencing a case under Title III thereof (the "ERS Title III Case," and together with the Commonwealth Title III Case, the "Title III Cases").

4.      On January 16, 2018, the Debtors filed their *Motion for Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 2255] (the "Bar Date Motion")*.  Pursuant to the Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claims and (B) Approving Form and Manner of Notice Thereof* [ECF No. 2521] (the "Initial Bar Date Order"), the Court granted the relief requested in the Bar Date Motion and established deadlines and procedures for filing proofs of claim in the Title III Cases.  Upon the informative motion of certain creditors, and the support of the Debtors, the Court subsequently entered the *Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 3160] (together with

the Initial Bar Date Order, the "Bar Date Orders"), extending these deadlines to August 9, 2018 at

4:00 p.m. (Atlantic Time).

**B.     Confirmation of the Commonwealth, ERS, and PBA Title III Plan of Adjustment
         and the PRIFA and CCDA Qualifying Modifications**

5.      On November 3, 2021, on behalf of the Commonwealth, ERS, and PBA, the

Oversight Board filed the *Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth*

*of Puerto Rico, et al.* (as subsequently amended and modified, the "Plan") [ECF No. 19053].  The

Court considered confirmation of the Plan, and any objections thereto, at a hearing for

confirmation of the Plan on November 8-22, 2021.

6.      Pursuant to the Court's (1) *Order Regarding Certain Aspects of Motion for*

*Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth*

*of Puerto Rico, et al.* [ECF No. 19517] and (2) *Order Regarding Plan Modifications Necessary to*

*the Entry of an Order Confirming Plan of Adjustment for the Commonwealth of Puerto Rico, the*

*Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the*

*Puerto Rico Public Buildings Authority* [ECF No. 19721], on January 14, 2022, the Oversight

Board filed a further revised Plan in compliance with the Court's orders.  *See Modified Eighth*

*Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al., [ECF No.

19784].

7.      On January 18, 2022, the Court confirmed the Plan.  *See Order and Judgment*

*Confirming the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth*

*of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of*

*Puerto Rico, and the Puerto Rico Public Buildings Authority* [ECF No. 19813] (the

"Commonwealth Confirmation Order").

8.      On January 20, 2022, pursuant to Title VI of PROMESA, the Court approved, (a) the *Qualifying Modification for the Puerto Rico Convention Center District Authority* [Case No. 21-01493, ECF No. 72-1] (the "CCDA QM") and (b) the *Qualifying Modification for the Puerto Rico Infrastructure Financing Authority* [Case No. 21-01492, ECF No. 82-1] (the "PRIFA QM"), which complement the transactions contained in the Plan.

9.      The Plan became effective on March 15, 2022 (the "Effective Date") when the transactions contemplated therein were consummated.  *See Notice of (A) Entry of Order Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. pursuant to Title III of PROMESA and (B) Occurrence of the Effective Date* [ECF No. 20349].

10.     The CCDA QM and PRIFA QM also became effective on March 15, 2022.  *See* Case No. 21-01493, ECF No. 74; Case No. 21-01492, ECF No. 84.

## C.    Bond Debt Master Proofs of Claim – Commonwealth Title III Case

11.     Pursuant to the Initial Bar Date Order, indenture trustees, fiscal agents, or any similar agent or nominee for each respective series of bonds issued by one of the Debtors or a non-debtor may file a master proof of claim against the applicable debtor on behalf of themselves and all holders of bond claims for the respective series of bonds for obligations arising under the respective trust agreements, resolutions, or similar bond documents.  Initial Bar Date Order, ¶ 5(a). As explained below, master proofs of claim have been filed in the Commonwealth Title III Case on behalf of the holders of certain bonds or notes issued by PREPA, HTA, Puerto Rico Industrial Development Company ("PRIDCO"), PRIFA, the Puerto Rico Public Financing Corporation ("PRPFC"), ERS, CCDA, and PRASA.

12.    ***PRIFA***—PRIFA was created in 1988 by Act No. 44-1988 (the "PRIFA Enabling Act").    PRIFA  provides  financial,  administrative  and  other  types  of  assistance  to  the Commonwealth, its public corporations and other instrumentalities responsible for developing and operating infrastructure facilities.  On behalf of the holders of various bonds and notes issued by PRIFA (collectively,  the "PRIFA Bonds"),  master  proofs  of  claim  were  asserted  against  the Commonwealth (collectively, the "PRIFA Master Claims") by BNYM, US Bank, and UMB Bank, N.A.  First, BNYM asserted three master proofs of claim: Proof of Claim No. 16759, asserting, on behalf of holders of Dedicated Tax Fund Revenue Bond Anticipation Notes, Series 15 (the "PRIFA Notes"), a "contingent and unliquidated claim against the Commonwealth on account of any and all claims,  causes  of  action,  rights,  and/or  remedies  that  the  Trustee  or  the  Owners  may  have against  the  Commonwealth  arising  at  law  or  in  equity  based  upon  or  relating  to  the  Trust Agreement, the Noteholder Agreement, the Notes, or the Pledged Revenues . . . "; Proof of Claim No. 19814 asserting, on behalf of holders of PRIFA Notes, claims for principal and unpaid interest, in addition to fees and expenses of the trustee; and Proof of Claim No. 103718, asserting, on behalf of holders of revenue bonds issued by PRIFA, including Revenue Bonds (Port Authority Project), Series  2011A, "a  secured,  contingent  and  unliquidated  claim  against  the  Commonwealth  on account of any and all claims, causes of action, rights, and/or remedies that the Trustee or the holders of the Bonds has or may have against the Commonwealth arising at law or in equity . . . ."

13.    Additionally, US Bank filed a master proof of claim with respect to certain PRIFA Bonds, which was logged by Kroll (as defined below), as Proof of Claim No. 13386, on behalf of holders of PRIFA Rum Tax Bonds (Special Tax Revenue Bonds, Series 2005A, 2005B, 2005C, and Series 2006B), asserting

> claims for contingent, unliquidated amounts for interest payable in
> the future, interest accrued and accruing in the future as to past due

principal and interest, fees and costs and indemnity claims of the
Trustee to be incurred in the future under the Bond Documents, and
all other amounts owed on account of any and all claims the Trustee
has or may have relating to the outstanding Bond obligations, amount
not less than $249,099,446.17, which course of conduct continues . .
. .

Rider to Proof of Claim No. 13386, ¶ 26.

14.  **_PREPA_**— PREPA is a government-owned corporation founded in 1941.  *See* Act
No. 83-1941, as amended, § 3.  PREPA generates and distributes substantially all the electric
power used in the Commonwealth.  [Case No. 17 BK 4780, ECF No. 1 at 7].  PREPA is one of the
largest public power utilities in the U.S., serving approximately 1.5 million customers, and has the
capacity to borrow money and issue debt through the issuance of bonds and other obligations.  U.S.
Bank National Association serves as trustee for certain bonds issued by PREPA pursuant to that
certain Trust Agreement dated January 1, 1974 (the "PREPA Bonds").  On behalf of the holders
of the PREPA Bonds, U.S. Bank National Association filed a proof of claim against the
Commonwealth (the "PREPA Master Claim"), which was logged by Kroll as Proof of Claim No.
50049, asserting an unliquidated claim for the alleged value of statutory rights granted by the
Commonwealth to PREPA.

15.  **_HTA_**—HTA is a public corporation and instrumentality of the Commonwealth
constituting a corporate and political entity independent and separate from the Commonwealth,
created under Act No. 74-1965 of the Legislative Assembly of the Commonwealth ("HTA
Enabling Act").  HTA is responsible for the construction, operation, and maintenance of highways
and other transportation systems in the Commonwealth.  *See* 9 L.P.R.A § 2002.  The HTA
Enabling Act authorizes HTA to issue bonds. *See* 9 L.P.R.A. §§ 2004(g), (h), (l).  Pursuant thereto,
HTA issued several series of bonds under two different resolutions (the "HTA Bonds"): (*i*)
Resolution No. 68-18, adopted June 13, 1968 (the "1968 Resolution"), and (*ii*) Resolution No. 98-

06, adopted February 26, 1998 (the "1998 Resolution").  As of May 21, 2017, HTA's petition date, approximately $830 million in principal amount of bonds issued under the 1968 Resolution remain outstanding, and approximately $3.4 billion in principal amount of bonds issued under the 1998 Resolution remain outstanding.  BNYM serves as fiscal agent with respect to the HTA Bonds.

16.     On behalf of the holders of HTA Bonds, BNYM filed three master proofs of claim in the Commonwealth Title III Case (the "HTA-CW Master Claims"), each asserting a "secured, contingent and unliquidated claim against the Commonwealth on account of any and all claims, causes of action, rights, and/or remedies that the Fiscal Agent or the Owners may have against the Commonwealth arising at law or in equity . . . ."  *See* Addendum to Proof of Claim No. 121053, ¶ 15; Addendum to Proof of Claim No. 120982, ¶ 15; Addendum to Proof of Claim No. 115380, ¶ 15.[3]

17.     Certain bonds or notes issued by HTA have been insured by one of several municipal bond insurers, either on the primary market or on the secondary market.  Municipal bond insurance is obtained on the primary market when the municipality issuing the bonds engages an insurance company to underwrite an insurance policy for that series of bonds.  In the event that a bond is not insured on the primary market, holders of such uninsured bonds may elect to obtain insurance via the secondary market.  Holders of uninsured bonds who seek to obtain insurance in the secondary market contract directly with a municipal bond insurer and the original issuer is not part of this contract process.  When a holder of an uninsured bond obtains an insurance policy on the secondary market, a new CUSIP number is issued which corresponds to the original CUSIP numbers assigned to the bonds at the time of issuance.  Certain bonds issued by HTA have been

---

[3] While BNYM initially filed three proofs of claim logged by Kroll as Proofs of Claim Nos. 21286, 26541, and 35277, these were superseded and amended by Proofs of Claim Nos. 121053, 120982, and 115380.

insured on the secondary market and, accordingly, have been issued new CUSIP numbers which correspond to bonds issued by HTA bearing original CUSIP numbers (the "HTA Secondarily Insured Bonds").

18.     On August 13, 2022, the Oversight Board filed the *Fifth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [Case No. 17-bk-3567, ECF No. 1377] (the "Fifth Amended HTA Plan").  The Court considered confirmation of the Fifth Amended HTA Plan, and objections thereto, at a hearing on August 17, 2022, after which it took the proposed order to confirm the Fifth Amended HTA Plan under submission.  On September 6, 2022, in response to the Court's prior order requesting certain revisions to the Fifth Amended HTA Plan, the Oversight Board filed the *Modified Fifth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [ECF No. 1404] (the "HTA Plan"). Confirmation of the HTA Plan remains under consideration by the Court as of the date hereof.

19.     ***PRIDCO***—PRIDCO was created by Law No. 188 of 1942, codified as 23 L.P.R.A. §§ 271 *et seq.*, to promote economic development of Puerto Rico and provide industrial facilities for lease or sale to private manufacturing companies.  US Bank serves as trustee for certain General Purpose Revenue and Refunding Revenue Bonds Series 1997 A and Series 2003 (the "PRIDCO Bonds"), and on behalf of the holders of PRIDCO Bonds filed a master proof of claim against the Commonwealth, which was logged by Kroll as Proof of Claim No. 13445 (the "PRIDCO Master Claim").  The PRIDCO Master Claim asserts contingent, unliquidated claims against the Commonwealth, and seeks

> recovery of any and all other amounts owed on account of any and all claims the Trustee has or may have relating to the outstanding Bond obligations, whether known or unknown, against the Commonwealth and all those purporting to act on the Commonwealth's behalf, whether presently asserted or to be asserted, including without limitation claims for or based upon the

> breach or violation of the Bond Documents, lease agreements or other contractual obligations relating to the underlying collateral, any other covenants or other contractual obligations contained therein, or claims arising from the improper diversion of PRIDCO's revenues or any other property securing the payment of the Bonds under the Bond Documents, as a matter of relevant Commonwealth, state or federal law, including without limitation constructive trust, fraudulent conveyance or fraudulent transfer, failure to fulfill contractual and fiduciary obligations and duties, breach of implied covenants of good faith and fair dealing, or other legal or equitable claims.

Rider to PRIDCO Master Claim, ¶¶ 12-13.

20.     ***PRPFC***—PRPFC is a subsidiary corporation of GDB created pursuant to Resolution No. 5044 of the Board of Directors of GDB, as amended ("Resolution No. 5044"), adopted pursuant to the authority granted under Act No. 17 of the Legislature of Puerto Rico, approved September 23, 1948, as amended.  It provides government agencies, instrumentalities, municipalities and other subdivisions of the Commonwealth with alternative mechanisms to meet their financing needs.  PRPFC has the capacity to borrow money and issue debt through the issuance of bonds and other obligations.  U.S. Bank Trust serves as trustee for certain Series 2012A and Series 2011A and B bonds issued by the PRPFC (the "PRPFC Bonds").  On behalf of the holders of the PRPFC Bonds, US Bank Trust filed a proof of claim against the Commonwealth (the "PRPFC Master Claim"), which was logged by Kroll as Proof of Claim No. 13374.

21.     ***ERS***—ERS is an agency of the government, separate and apart from the Commonwealth government and its other instrumentalities.  *See* 3 L.P.R.A § 775.[4]  Purportedly pursuant to that certain Pension Funding Bond Resolution, adopted on January 24, 2008, and

---

[4] On May 21, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for ERS, pursuant to PROMESA section 304(a), commencing a case under Title III thereof.

certain supplemental resolutions, ERS issued senior and subordinate pension funding bonds (the "ERS Bonds"), in the aggregate original principal amount of approximately $2.9 billion.[5]  BNYM serves as the fiscal agent with respect to the ERS Bonds.  On behalf of the holders of ERS Bonds, BNYM filed a master proof of claim in the Commonwealth Title III Case (the "ERS Master Claim"), which was logged by Kroll, LLC, as Proof of Claim No. 32004.[6] As noted above, a plan of adjustment for ERS has been confirmed pursuant to the Commonwealth Confirmation Order and such plan of adjustment was consummated on March 15, 2022.

22. **_PRASA_**—PRASA owns and operates the island-wide public water and wastewater systems in Puerto Rico.  PRASA issued certain revenue bonds (the "PRASA Bonds"), under the Puerto Rico Aqueduct and Sewer Authority Resolution No. 1583, Authorizing and Securing Puerto Rico Aqueduct and Sewer Authority Bonds Guaranteed by the Commonwealth of Puerto Rico, and certain supplemental resolutions.  Banco Popular de Puerto Rico ("Banco Popular") serves as trustee for the PRASA Bonds and filed a master proof of claim against the Commonwealth on behalf of the holders of the PRASA Bonds, which was logged by Kroll as Proof of Claim No. 22620 (the "PRASA Master Claim").  The PRASA Master Claim asserts "a contingent claim

---

[5] On March 12, 2019, the Official Committee of Unsecured Creditors filed an _Omnibus Objection to Claims Asserted by Holders of Bonds Issued by ERS_ [Case No. 17-3566, ECF No. 381], on the ground that the bond issuance exceeded ERS's statutory authority and was thus _ultra vires_, rendering the ERS Bonds null and void.  On April 23, 2019, the Official Committee of Retired Employees of the Commonwealth of the Puerto Rico filed an _Omnibus Objection Of The Official Committee Of Retired Employees Of The Commonwealth Of Puerto Rico, Pursuant To Bankruptcy Code Section 502 And Bankruptcy Rule 3007, To Claims Filed Or Asserted By Holders Of ERS Bonds Against ERS And The Commonwealth_ [Case No. 17-3283, ECF No. 6482], on the ground, among others, that the bond issuance was _ultra vires_.  ERS reserves its rights to challenge the bond issuance on any grounds whatsoever, including on the ground that the ERS Bonds were _ultra vires_, and any other grounds set forth in the foregoing objections.

[6] On May 22, 2019, the Commonwealth filed an objection to the ERS Master Proof of Claim.  _See_ Objection of Financial Oversight and Management Board, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against the Commonwealth by the Bank of New York Mellon, As Fiscal Agent (Claim No. 16775) [ECF No. 7075].  For the avoidance of doubt, this Three Hundred Fifty Sixth Omnibus Objection is without prejudice to the parties' rights with respect to such objection, including any rights to intervene, which are reserved.

against the Commonwealth on account of the Bonds in an amount not less than $284,755,000, together with all interest, and premium accruing on the Bonds from and after the Petition Date, and all fees, costs, expenses and other charges accrued, accruing or chargeable with respect thereto." Addendum to PRASA Master Claim, ¶ 9.

23. ***PRCCDA***—Prior to the Effective Date, the Bank of New York Mellon ("BNYM") served as trustee for certain Hotel Occupancy Tax Revenue Bonds issued by PRCCDA (the "PRCCDA Bonds"), and on behalf of the holders of PRCCDA Bonds filed a master proof of claim against the Commonwealth, which was logged by Kroll as Proof of Claim No. 37319 (the "PRCCDA Master Proof of Claim"). The PRCCDA Master Claim asserts a "contingent and unliquidated claim against the Commonwealth on account of any and all claims, causes of action, rights, and/or remedies that the Trustee or the Owners may have against the Commonwealth arising at law or in equity." Addendum to PRCCDA Master Proof of Claim, ¶ 11.

## D. Bond Debt Issued by the Puerto Rico Aqueduct and Sewer Authority

24. PRASA was established pursuant to Act Number 40 of May 1, 1945. PRASA is a "public corporation and an autonomous government instrumentality" created for the purpose of providing water and sewer services on the island. 22 L.P.R.A. § 142, 144.

25. The PRASA Enabling Act authorizes PRASA to issue bonds. 22 L.P.R.A. § 144(g). Pursuant thereto, the PRASA governing board has adopted resolutions authorizing PRASA to issue bonds, including Resolution No. 1583, as amended and restated as of March 7, 2008 ("Resolution No. 1583"). In 2008, PRASA issued $1,316,204,456 principal amount of Series A revenue bonds (the "2008 Senior Series A Bonds") and $22,445,000 in principal amount of Series B revenue bonds (the "2008 Senior Series B Bonds" and, together with the 2008 Senior Series A Bonds, the "2008 Senior Bonds"). In 2008, PRASA also issued $159,055,000 in principal amount of Series

A revenue refunding bonds and $125,700,000 in principal amount of Series B revenue refunding

bonds (collectively, the "PRASA Refunding Bonds").  In 2012, PRASA issued $1,800,450,000 in

principal amount of Series 2012 A revenue bonds (the "2012 Senior Series A Bonds") and

$295,245,000 in principal amount of Series 2012 B revenue bonds (the "2012 Senior Series B

Bonds" and, together, with the 2012 Senior Series A Bonds, the "2012 Senior Bonds" and, together

with the 2008 Senior Bonds, the "PRASA Senior Lien Bonds").

26.     Holders of PRASA Senior Lien Bonds have received and continue to receive all

payments owed to holders of the PRASA Senior Lien Bonds in full as they become due and owing.

Accordingly, EMMA reflects that PRASA has not posted any notices of default with respect to the

PRASA Senior Lien Bonds.[7]  In addition, the Commonwealth has not guaranteed repayment of

the PRASA Senior Lien Bonds.  Accordingly, the offering statements for the PRASA Senior Lien

Bonds state that they are "not a debt of the Commonwealth of Puerto Rico or any of its

municipalities or other political subdivisions, other than [PRASA], and neither the Commonwealth

of Puerto Rico or any such municipalities or other political subdivisions, other than [PRASA],

shall be liable for the payment of the principal of or interest on said Bonds."[8]

27.     Holders of PRASA Refunding Bonds have received and continue to receive all

payments owed to holders of PRASA Refunding Bonds in full as they become due and owing.

Accordingly, EMMA reflects that PRASA has not posted any notices of default with respect to the

PRASA Refunding Bonds.[9]  Further, while, the offering statements for the PRASA Refunding

Bonds identify the Commonwealth as having guaranteed repayment thereon, that guaranteed was

---

[7] *See, e.g.*, https://emma.msrb.org/Security/Details/A6634BCA31A0801CF45190F8C461039A9.

[8] *See, e.g.*, Offering Statement for PRASA Revenue Bonds, Series A (Senior Lien), February 15, 2012, available at https://emma.msrb.org/ER584464-ER454075-ER856856.pdf.

[9] *See, e.g.*, https://emma.msrb.org/Security/Details/A5686687B583CA99BFDDA7BAE76F581A9.

eliminated in connection the refinancing of the PRASA Refunding Bonds and certain of the PRASA Senior Lien Bonds, as set forth in the offering statement dated December 9, 2020, in accordance with which PRASA issued a series of 2020A senior lien revenue refunding bonds and 2020B senior lien federally taxable revenue refunding bonds (the "PRASA 2020 Refinancing Transaction").[10]

28.     On July 20, 2021, the Oversight Board approved a proposed refunding transaction wherein PRASA would issue a series of 2021ABC and 2022A senior lien bonds to refinance $1.8 billion of PRASA's outstanding 2012 Senior Bonds (the "PRASA 2021 Refinancing Transaction").[11]   The PRASA 2021 Refinancing Transaction was consummated in accordance with the terms of the offering statement dated August 17, 2021, issued in connection therewith.[12]

E.     **The GDB Title VI Proceedings and Qualifying Modification**

29.     GDB is a public corporation and governmental instrumentality of the Commonwealth, which was created by the Legislative Assembly in 1948 to aid the government of the Commonwealth (the "Government") in performing its fiscal duties and in more effectively carrying out its responsibility to develop the economy of the Commonwealth.   On April 28, 2017, the Oversight Board unanimously certified that certain February 2017 GDB Fiscal Plan, which contemplated an orderly wind-down of the operations of GDB based upon the determination that

---

[10] *See* Offering Statement for PRASA Revenue Refunding Bonds, Series 2020A (Senior Lien) and Federally Taxable Revenue Refunding Bonds, Series 2020B (Senior Lien), December 9, 2020, available at https://emma.msrb.org/P31403866-P31091563-P31500360.pdf.

[11] *See* Letter from Financial Oversight & Management Board to AAFAF approving the PRASA Refinancing   Transaction,   July   20,   2021,   available   at https://drive.google.com/file/d/1YvDZHPXCQ4vWOARyVGrY_XFb_-HhZZdc/view

[12] *See* Offering Statement for PRASA Revenue Refunding Bonds, Series 2021ABC and 2022A  (Senior Lien), August 17, 2021, available at https://emma.msrb.org/P11521655-P11177130-P11593393.pdf.

there was no clear path for the long-term viability of GDB based on its then-current financial condition.

30.      On July 12, 2017, the Oversight Board issued a resolution authorizing GDB, pursuant to Section 601(e) of PROMESA, to avail itself of Title VI of PROMESA.  On August 10, 2018, GDB filed an application for approval of a qualifying modification, pursuant to PROMESA Section 601(m)(1)(D) (the "Qualifying Modification"), in the United States District Court for the District of Puerto Rico.

31.      On November 7, 2018, the Court approved the Qualifying Modification pursuant to PROMESA Section 601(m)(1)(D).  *See* ECF No. 270 in *Government Development Bank for Puerto Rico*, Case No. 18-1561 (D.P.R. Nov. 7, 2018).  The Qualifying Modification provides for, among other things, (i) the issuance of new bonds by the newly-created GDB Debt Recovery Authority in exchange for the cancellation of, among other things, certain participating bonds and guaranteed bond claims (collectively, the "GDB Bonds"); (ii) the extinguishment of the Commonwealth's guarantee of the guaranteed bonds upon the exchange and cancellation of the guaranteed bonds; and (iii) the release of claims of the holders of GDB Bonds against GDB and its affiliates relating to, among other things, any investment with GDB or the purchase, sale, or transfer of any security or interest of GDB, and any action or omission with respect to any indebtedness or loans to GDB (including any notes issued or deposits held by GDB) or from GDB. *Solicitation Statement*, at 57-60, ECF No. 1-15 in *Government Development Bank for Puerto Rico*, Case No. 18-1561 (D.P.R. Aug. 10, 2018).

32.      On November 29, 2018, GDB announced the consummation of the Qualifying Modification for GDB.  Press Release, *Government of Puerto Rico Announces Consummation of the GDB Qualifying Modification*, Governor of Puerto Rico (Nov. 29, 2018), *available at*

http://www.aafaf.pr.gov/assets/gov-pr-announces-consummation-gdb-qualifying-

modification.pdf.

**F.      The COFINA Title III Case and Resolution of the Commonwealth-COFINA Dispute**

33.      COFINA is a public corporation and instrumentality of the Commonwealth

constituting a corporate and political entity independent and separate from the Commonwealth,

created under Act No. 91 of the Legislative Assembly of the Commonwealth.  Pursuant to the

Amended and Restated Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as

amended on June 19, 2009, and pursuant to certain supplemental resolutions, COFINA issued a

series of bonds in aggregate approximate amount of $17 billion, to, among other things, defray

certain debt obligations of the Puerto Rico Government Development Bank ("GDB") and the

Puerto Rico Public Finance Corporation (the "COFINA Bonds").  Bank of New York Mellon

serves as Trustee with respect to the COFINA Bonds.

34.      The Oversight Board filed that certain *Third Amended Title III Plan of Adjustment

of the Puerto Rico Sales Tax Financing Corporation* (the "COFINA Plan") [ECF No. 4652] on

January 9, 2019.  The Court considered confirmation of the COFINA Plan and any objections

thereto at a hearing on January 16-17, 2019.

35.      On February 4, 2019, the Court confirmed the COFINA Plan, which incorporated

the compromise and settlement of the dispute over whether, after considering all procedural and

substantive defenses and counterclaims, including constitutional issues, the sales and use taxes

purportedly pledged by COFINA to secure debt are property of the Commonwealth or COFINA

under applicable law (the "Commonwealth-COFINA Dispute").  *See Order and Judgment

Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing

Corporation* [ECF No. 5048].  On the same day, the Court approved the compromise and

settlement of the Commonwealth-COFINA Dispute pursuant to the *Memorandum Opinion and Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* [ECF No. 5045] (the "COFINA Settlement Order").  On February 5, 2019, the Court issued an *Amended Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [ECF No. 5055] (the "COFINA Amended Confirmation Order").  The Plan became effective on February 12, 2019 (the "COFINA Effective Date"), when the transactions contemplated therein were consummated.  *See Notice of (A) Entry of Order Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation Pursuant to Title III of PROMESA and (B) Occurrence of the Effective Date* [Case No. 17 BK 3284-LTS, ECF No. 587].

### G.     Proofs of Claim, Omnibus Objection Procedures, and Claim Objections

36.     To date, approximately 179,034 proofs of claim have been filed against the Debtors and logged by Kroll Restructuring Administration LLC ("Kroll").  Such proofs of claim total approximately $43.6 trillion in asserted claims against the Debtors, in addition to unliquidated amounts asserted.

37.     Of the proofs of claim filed, approximately 118,239 have been filed in relation to, or reclassified to be asserted against, the Commonwealth.  Additionally approximately 53,555 proofs of claim have been filed in relation to, or reclassified to be asserted against, ERS.  In accordance with the terms of the Bar Date Orders, many of these claims need not have been filed at all, or suffer from some other flaw, such as being subsequently amended, not putting forth a claim for which the Debtors are liable, being partially or fully satisfied by one or more of the Debtors, being duplicative of other proofs of claim, or failing to provide information necessary for the Debtors to determine whether the claim is valid.

38.     In order to efficiently resolve as many of the unnecessary proofs of claim as possible, on October 16, 2018, the Debtors filed with this Court their *Motion for Entry of an Order (A) Approving Limited Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy Rule 3007(e)(6), and (C) Granting Related Relief* [ECF No. 4052] (the "Omnibus Procedures Motion").  The Court granted the relief requested in the Omnibus Procedures Motion by order dated November 14, 2018.  *See Order (A) Approving Limited Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy Rule 3007(e)(6), and (C) Granting Related Relief* [ECF No. 4230]; *Omnibus Objection Procedures* [ECF No. 4230-1] (collectively, the "Initial Omnibus Objection Procedures").  On November 29, 2018, the Court approved English and Spanish versions of the forms of notice for omnibus objections to be filed in accordance with the Initial Omnibus Objection Procedures.  *See Order Approving the English and Spanish Versions of the Form of Notice for Omnibus Objections* [ECF No. 4381] (the "Notice Order").

39.     In the continued interest of resolving any unnecessary proofs of claim in an efficient manner, on May 23, 2019, the Debtors filed an amended procedures motion seeking, among other things, to allow the Debtors to file omnibus objections on substantive bases, to further expand the number of claims that may be included on an objection, and to approve additional forms of notice. *Notice of Hearing with Respect to an Order (A) Approving Amended Omnibus Objection Procedures, (B) Waiving Requirements of Bankruptcy Rule 3007(e), (C) Approving Additional Forms of Notice, and (D) Granting Related Relief* [ECF No. 7091].  On June 14, 2019, the Court granted the requested relief, by the *Order (A) Approving Amended Omnibus Objection Procedures, (B) Waiving Requirements of Bankruptcy Rule 3007(e), (C) Approving Additional Forms of Notice, and (D) Granting Related Relief* [ECF No. 7440] (the "Amended Omnibus Objection Procedures").

40.     Pursuant to the Initial Omnibus Objection Procedures and Amended Omnibus Objection Procedures, to date the Court has held over 27 hearings and entered orders on over 315 omnibus objections filed by the Commonwealth, COFINA, HTA, PREPA, PBA, and/or ERS.  Based upon rulings and orders of the Court to date, as well as the expungement of certain claims pursuant to the Plan, approximately 102,630 claims asserting $43.6 trillion in liability against the Commonwealth, COFINA, HTA, PREPA, PBA, and ERS have been disallowed and expunged from the claims registry in the Title III proceedings.  In addition, approximately 45,193 claims have been transferred into the Administrative Claims Reconciliation process for resolution using the Debtors' ordinary-course administrative processes.

41.     This Five Hundred Thirtieth Omnibus Objection is filed in accordance with the Court's Amended Omnibus Objection Procedures.

## OBJECTIONS TO PROOFS OF CLAIM

42.     Claims that are "unenforceable against the debtor and property of the debtor, under any agreement or applicable law" should be disallowed.  11 U.S.C. § 502(b)(1).  While a properly executed and filed proof of claim constitutes *prima facie* evidence of the validity of the claim, *see* Fed. R. Bankr. P. 3001(f), made applicable to this case by PROMESA section 310, the objecting party may overcome this *prima facie* evidence with evidence which, if believed, would refute at least one of the allegations essential to the claim.  *In re Reilly*, 245 B.R. 768, 773 (B.A.P. 2d Cir.), *aff'd*, 242 F.3d 367 (2d Cir. 2000); *see also Factors Funding Co. v. Fili (In re Fili)*, 257 B.R. 370, 372 (1st Cir. B.A.P. 2001) ("[A] claim is presumed valid until an objecting party has introduced evidence sufficient to rebut the claimant's prima facie case." (citation omitted)).

43.     The Amended Omnibus Objection Procedures allow the Debtors to file an omnibus objection to multiple proofs of claim on any basis provided for in Federal Rule of Bankruptcy

Procedure 3007(d)(1)-(7), as well as on other substantive bases set forth in the Amended Omnibus
Objection Procedures.

44.    The Five Hundred Thirtieth Omnibus Objection seeks to disallow portions of the
proofs of claim listed on **Exhibit A** hereto (collectively, the "Claims to Be Partially Disallowed
and Partially Reclassified"), each of which purports to be based, in part, on (*a*) bonds issued by
COFINA, (*b*) bond claims that are duplicative of one or more master proofs of claim filed against
the Debtors on behalf of the holders of certain bonds, (*c*) bond claims based on bonds issued by
HTA, PRIFA, or CCDA which have been discharged pursuant to the Commonwealth
Confirmation Order, (*d*) an ownership interest in bonds issued by GDB, for amounts for which the
Debtors have not guaranteed repayment, (*e*) an ownership interest in bonds issued by PRASA,
which is not a Title III Debtor, for amounts for which the Debtors have not guaranteed repayment,
(*f*) bond claims that assert liabilities associated with secondarily insured bonds, which, in turn, are
duplicative of proofs of claim filed against the Debtors on behalf of the holders of those bonds,
and/or (*g*) investments in mutual funds, which in turn may have invested in bonds issued by the
Debtors.   Additionally, certain of the claims listed on **Exhibit A** hereto should be partially
reclassified because a portion of the claim identifies the Debtors as obligor, when that portion of
the claim is properly asserted, if at all, against PREPA.   **Exhibit A** hereto further specifies why
each of the Claims to Be Partially Disallowed and Partially Reclassified should be disallowed in
part.

### A.  No Liability for Duplicate Bond Claims

45.    As set forth in **Exhibit A** hereto, certain Claims to Be Partially Disallowed and
Partially Reclassified purport to assert liability, in part, on the basis of bonds issued by HTA,

PRIDCO, PREPA, PRPFC, PRIFA, and the Children's Trust (collectively, the "Partial Duplicate Bond Claims"). *See, e.g.*, Claim Nos. 65801 and 66514.

46. Each of the Partial Duplicate Bond Claims purport to assert, in whole or in part, liability against the Commonwealth associated with one or more bonds that is duplicative of one or more Master Claims, which as described above were filed in the Title III Cases on behalf of the holders of certain bonds issued by HTA, PREPA, PRIDCO, PRPFC, PRIFA, and the Children's Trust. For example, the PREPA Master Claim asserts it is "filed on behalf of *all holders of each series of power revenue bonds and power revenue refunding bonds* issued and outstanding under the Trust Agreement. PREPA Master Claim, Rider at 1 (emphasis added). Accordingly, any claim filed against the Commonwealth by an individual holder asserting a claim with respect to such holder's PREPA bonds is duplicative of the PREPA Master Claim. Moreover, certain of the Partial Duplicate Bond Claims do not provide a basis for asserting a claim against ERS for certain PRIFA Bonds or PRASA Bonds, which, as described above, were neither issued nor guaranteed by ERS.[13]

47. Any failure to disallow the Partial Duplicate Bond Claims will result in the applicable claimants potentially receiving an unwarranted double recovery against the Debtors, to the detriment of other stakeholders in the Debtors' Title III Cases. The holders of the Partial Duplicate Bond Claims will not be prejudiced by the disallowance of their claims because the liabilities associated with the Partial Duplicate Bond Claims are subsumed within one or more Master Claims.

---

[13] To the extent the holders of certain PRIFA Bonds or PRASA Bonds intended to assert these claims against the Commonwealth, such claims would be duplicative of the PRIFA Master Claim and the PRASA Master Claim, asserted against the Commonwealth on behalf of holders of the PRIFA Bonds and PRASA Bonds.

**B. No Liability for Bondholder Claims Discharged by the Commonwealth Confirmation Order**

48.     As set forth in **Exhibit A** hereto, certain of the Claims to Be Disallowed purport to assert liability, in part, based on the alleged ownership of bonds issued by HTA (the "HTA Bondholder Claims"), bonds issued by PRIFA (the "PRIFA Bondholder Claims"), and bonds issued by CCDA (the "CCDA Bondholder Claims"). *See, e.g.*, Claim Nos. 65801 and 66514.

49.     The HTA Bondholder Claims, PRIFA Bondholder Claims, and CCDA Bondholder Claims assert liabilities against the Commonwealth or ERS associated with various HTA, PRIFA, and/or CCDA Bonds issued by HTA, PRIFA, and/or CCDA. Claims asserted against the Debtors based on any bonds issued or guaranteed by or loans made to or guaranteed by HTA, PRIFA, and CCDA have been fully discharged pursuant to the Plan and the Debtors have no further liability on account of such Claims. *See* Commonwealth Confirmation Order ¶ 72 ("The Claims asserted against the Debtors or the Reorganized Debtors based on any bonds issued or guaranteed by or loans made to or guaranteed by HTA, CCDA, PRIFA, or MBA shall, to the extent allowed, be allowed as a Claim arising prior to the Petition Date and classified in Classes 59 through 62 (except Allowed ERS Bond Claims to the extent secured) and are hereby discharged and the Debtors and the Reorganized Debtors have no further liability on account of such Claims.").

50.     Any failure to disallow the HTA Bondholder Claims, PRIFA Bondholder Claims, and CCDA Claims will result in the applicable claimants potentially receiving an unwarranted double recovery against the Debtors, to the detriment of other stakeholders in the Debtors' Title III Cases.

**C. No Liability for COFINA Bondholder Claims**

50.     As identified in **Exhibit A** hereto, certain Claims to Be Partially Disallowed and Partially Reclassified purport to assert, in part, claims based on an alleged ownership interest in

22

bonds issued by COFINA (collectively the "Partial COFINA Bondholder Claims").  *See, e.g.*,
Claim No. 16715.

51.     As explained above, the Settlement Order resolved the Commonwealth-COFINA
Dispute, and, pursuant to Paragraph 55 of the Settlement Order, all claims against the
Commonwealth arising from or relating to the relationship of the Commonwealth and COFINA
have been released.  Additionally, pursuant to Paragraph 3(c) of the *Settlement Agreement* [ECF
No. 5045-1], dated October 19, 2018, and attached to the Settlement Order (the "Settlement
Agreement"), and Paragraph 7 of the COFINA Amended Confirmation Order, the adversary
proceeding between the Commonwealth and COFINA concerning the Commonwealth-COFINA
Dispute has been dismissed with prejudice following the approval of the compromise and
settlement of the Commonwealth-COFINA Dispute.  Furthermore, pursuant to Paragraph 29(f) of
the COFINA Amended Confirmation Order, claims, such as the Partial COFINA Bondholder
Claims, that arose from or relate to the relationship of the Commonwealth and COFINA were
released.  COFINA Amended Confirmation Order, ¶ 29(f).[14]  For all of these reasons, the Partial
COFINA Bondholder Claims should be disallowed because these claims, which are based on an
alleged ownership interest in COFINA Bonds, have been satisfied, released, and/or discharged
pursuant to the Settlement Order, Settlement Agreement, COFINA Amended Confirmation Order,
and Plan.

---

[14] Pursuant to the Plan, "Claim" is defined as "[a]ny right to payment or performance, whether or not such
right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,
undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any
right to an equitable remedy for breach or enforcement of performance, whether or not such right to an
equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed,
secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations,
judgments, actions, causes of action, demands, or claims of every kind or nature whatsoever, in law, at
equity, or otherwise."  Plan § 1.53.

### D. No Liability for GDB Bondholder Claims

52.     As identified in **Exhibit A** hereto, certain Claims to Be Partially Disallowed and Partially Reclassified purport to assert, in part, claims based on the alleged ownership of bonds issued by GDB (collectively, the "Partial GDB Bondholder Claims"). *See, e.g.*, Claim No. 16715.

53.     Each of the Partial GDB Bondholder Claims purports to be based, in part, on the ownership of GDB Bonds that were subject to the Qualifying Modification, which provided for the issuance of new securities in exchange for the cancellation of the GDB Bonds and the extinguishment of the Commonwealth's guarantee of certain GDB Bonds, and thus the Commonwealth is no longer liable for these claims. Accordingly, each of the Partial GDB Bondholder Claims has been released pursuant to the approval and consummation of the Qualifying Modification. As noted above, the Qualifying Modification provides, among other things, that holders of GDB Bonds shall release GDB and its affiliates from claims relating to the GDB Bonds and any action or omission of GDB and its affiliates with respect to any indebtedness of or loan to GDB. GDB is a public corporation and instrumentality of the Commonwealth. The Commonwealth, thus, is an affiliate of GDB within the scope of the release pursuant to the Qualifying Modification. Accordingly, the Partial GDB Bondholder Claims were released upon the consummation of the Qualifying Modification on November 29, 2018.

54.     Because the Partial GDB Bondholder Claims are unenforceable against the Commonwealth and its property pursuant to Bankruptcy Code § 502(b)(1), these claims should be disallowed, because they seek recovery of amounts for which the Commonwealth is not liable.

### E. No Liability for PRASA Senior Lien Bond Claims

55.     As set forth in **Exhibit A** hereto, certain of the Claims to Be Partially Disallowed and Partially Reclassified purport to assert liability, in part, based on the alleged ownership of

PRASA Senior Lien Bonds issued by PRASA (the "Partial PRASA Senior Lien Bond Claims") and 2008 Refunding Bonds issued by PRASA (the "Partial PRASA Refunding Bond Claims"). *See, e.g.*, Claim No. 53610.

56.   The Partial PRASA Senior Lien Bond Claims and Partial PRASA Refunding Bond Claims assert liabilities against the Commonwealth associated with bonds issued by PRASA, which is not a Title III Debtor, and is a separate, legally distinct entity from the Debtors.  The Commonwealth has not guaranteed repayment for the PRASA Senior Lien Bonds.  Additionally, the Partial PRASA Senior Lien Bond Claims do not assert a legally sufficient basis for asserting a claim against the Commonwealth for bonds issued by PRASA that are not guaranteed by the Commonwealth.

57.   Further, the PRASA Refunding Bonds, which at one point were guaranteed by the Commonwealth, had that guarantee extinguished in connection with the PRASA 2020 Refinancing Transaction.

58.   Because the Partial PRASA Senior Lien Bond Claims and the Partial PRASA Refunding Bond Claims are unenforceable against the Commonwealth and its property pursuant to Bankruptcy Code § 502(b)(1), these claims should be disallowed, because they seek recovery of amounts for which the Commonwealth is not liable..

**F.  No Liability for Claims Based on Investments in Mutual Funds**

59.   As identified in **Exhibit A** hereto, certain Claims to Be Partially Disallowed and Partially Reclassified purport to assert liability based in part on investment(s) in one or more mutual funds that, in turn, may have invested in bonds issued by the Commonwealth (collectively, the "Partial Mutual Funds Claims").  *See, e.g.*, Claim No. 16715.

60.     A claimant bears the burden of establishing standing to file a proof of claim.  *In re
Minbatiwalla*, 424 B.R. 104, 111 (Bankr. S.D.N.Y. 2010).  It is well-established that only a creditor
or the creditor's authorized agent has standing to assert a claim.  Fed. R. Bankr. P. 3001(b); 11
U.S.C. §§ 501(a) ("A creditor or an indenture trustee may file a proof of claim."); *In re Melillo*,
392 B.R. 1, 5 (B.A.P. 1st Cir. 2008) ("Only a creditor or indenture trustee may file a proof of
claim.").  Parties with merely derivative interests lack standing to assert a claim against a debtor's
estate.  *Matter of Goldman*, 82 B.R. 894, 896 (Bankr. S.D. Ohio 1988) (finding party with
"relationship with Debtor [that] is not direct, but rather derivative" was "a stranger to Debtor's
bankruptcy proceedings," with "no claim against the estate's assets," and "as a general rule has no
standing in Debtor's bankruptcy proceedings"); *see also In re Tower Park Properties, LLC*, 803
F.3d 450, 462-63 (9th Cir. 2015) (holding a trust beneficiary was not a party in interest); *In re
Refco Inc.*, 505 F.3d 109, 117 (2d Cir. 2007) ("To the extent that the rights of a party in interest
are asserted, those rights must be asserted by the party in interest, not someone else."); *In re Lopez*,
446 B.R. 12, 17 (Bankr. D. Mass. 2011) (to establish oneself as a party in interest "the moving
party must be asserting its own rights and not those belonging to or derivative of a third party");
*In re Hayes*, 393 B.R. 259, 267 (Bankr. D. Mass. 2008) (recognizing the "general principle that
'party in interest standing does not arise if a party seeks to assert some right that is purely derivative
of another party's rights in the bankruptcy proceeding'" (quoting *In re Refco*, 505 F.3d at 115 n.
10)).

61.     "A creditor, under the [Bankruptcy] Code, is one who has a claim *against the debtor*
or the estate," rather than "a creditor of one of the debtor's creditors."  *S. Blvd., Inc. v. Martin
Paint Stores*, 207 B.R. 57, 61 (S.D.N.Y. 1997).  Because, at most, the Partial Mutual Funds Claims
were filed based on the claimant's status as an alleged creditor of an alleged creditor of the

Commonwealth, the Partial Mutual Funds Claims were not filed by an actual creditor of the Commonwealth. *See In re Thalmann*, 469 B.R. 677, 683 (Bankr. S.D. Tex. 2012) (holding receiver lacked standing to file a proof of claim because it was not a creditor or an authorized agent of a creditor). Instead, the Partial Mutual Funds Claims are derivative of claims that must be asserted by the mutual funds directly for any claimed recovery to be considered by the Court. *See Matter of Goldman*, 82 B.R. at 896 (finding party with "derivative" relationship has "no claim against the estate's asset" and "as a general rule has no standing in Debtor's bankruptcy proceedings"). Moreover, it is unknown whether the mutual fund still retains ownership of the suspect bonds.

62.     Indeed, under nearly identical circumstances, this Court previously disallowed claims filed against COFINA by investors in mutual funds that in turn allegedly invested in COFINA bonds for "lack of an individual interest in COFINA securities." *Tr. of March 13, 2019 Hr'g Before the Hon. Laura Taylor Swain* [ECF No. 5969], at 64:01-10 ("THE COURT: So just so that I understand, his documentation shows that he is a mutual fund investor. To the extent any of those mutual funds actually holds COFINA bonds, the mutual fund would be the appropriate claimant, and so he has provided no evidence of a valid direct claim as against COFINA? MS. STAFFORD: Correct, your Honor. THE COURT: The objection to the claim is sustained and the claim is disallowed for lack of an individual interest in COFINA securities."); *see also Order Granting Sixty-Fourth Omnibus Objection (Substantive) of the Commonwealth of Puerto Rico to Claims Based on Investments in Mutual Funds* [ECF No. 9099]; *Memorandum Order Denying Motion to Alter or Amend Order Sustaining Objection (Dkt. 8297) to Claims No. 152470 & No. 152283* [ECF No. 9121]. Accordingly, the claimants are not creditors of the Commonwealth and lack standing to assert derivative claims. Because the Commonwealth cannot be held liable for the Partial Mutual Funds Claims, these claims should be disallowed in their entirety.

In addition, certain of the Partial Mutual Funds Claims are deficient because they fail to provide sufficient information to enable the Debtors to reconcile the proofs of claim.

### G. No Liability for Duplicate Secondarily Insured Bond Claims

63.    As set forth in **Exhibit A** hereto, certain Claims to Be Partially Disallowed and Partially Reclassified purport to assert, in part, liabilities against the Debtors associated with one or more HTA Secondarily Insured Bonds (the "Partial HTA Secondarily Insured Bond Claims"). *See, e.g.*, Claim No. 66514.

64.    The CUSIP numbers associated with such Partial HTA Secondarily Insured Bond Claims correspond to bonds issued by HTA bearing original CUSIP numbers. Those original CUSIP numbers, which reflect bond issuances in which the claimants hold ownership interests, are listed in one or more Master Claims. Therefore, the HTA Secondarily Insured Bonds Claims assert liabilities associated with bonds issued by HTA that are duplicative of liabilities asserted by one or more Master Claims. Any failure to disallow the Partial HTA Secondarily Insured Bond Claims will result in the applicable claimants potentially receiving an unwarranted double recovery against the Debtors, to the detriment of other stakeholders in the Title III Cases. The holders of the HTA Secondarily Insured Bond Claims will not be prejudiced by the partial disallowance of their claims because the liabilities associated with the Partial HTA Secondarily Insured Bond Claims are subsumed within one or more Master Claims.

### H. Partially Reclassified Bond Claims

65.    Finally, another portion of certain of the Claims to Be Partially Disallowed and Partially Reclassified identifies the Debtors as the obligor, when such portion is properly asserted, if at all, against PREPA, and asserts liability, in part, on the basis of bonds issued by PREPA (collectively, the "Partially Reclassified Bond Claims"). *See, e.g.*, Claim Nos. 7276 and 7787.

66.     In each of the Partially Reclassified Bond Claims, the claimant purported to assert, in part, liabilities associated with municipal bond(s), but the proof of claim, supporting documentation provided by the claimant, and/or CUSIP information show that the portions of the liabilities associated with the Partially Reclassified Bond Claims would appropriately be asserted, if at all, against PREPA.   Accordingly, the Partially Reclassified Bond Claims should be reclassified, in part, to be asserted against PREPA, the Title III debtor identified in the column titled "Corrected" in **Exhibit A** hereto. The Commonwealth reserves its right to object to any part of the Partially Reclassified Bond Claims on any other grounds whatsoever.

67.     In support of the foregoing, the Debtors rely on the *Declaration of Jay Herriman in Support of the Five Hundred Thirtieth Omnibus Objection (Substantive) of the Commonwealth of Puerto Rico and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico to Partially Duplicate, Deficient, No Liability, and Incorrect Debtor Bond Claims*, dated September 16, 2022, attached hereto as **Exhibit B**.

## NOTICE

68.     In accordance with the Amended Omnibus Objection Procedures and the Court's Notice Order, the Debtors are providing notice of this Five Hundred Thirtieth Omnibus Objection to (a) the individual creditors subject to this Five Hundred Thirtieth Omnibus Objection, (b) the U.S. Trustee, and (c) the Master Service List (as defined by the *Sixteenth Amended Case Management Procedures* [ECF No. 20190-1]), which is available on the Debtors' case website at https://cases.ra.kroll.com/puertorico.   The notice for this Five Hundred Thirtieth Omnibus Objection is attached hereto as Exhibit C.   Spanish translations of the Five Hundred Thirtieth Omnibus Objection and all of the exhibits attached hereto are being filed with this objection and will be served on the parties.   The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

69.     No prior request for the relief sought in this Five Hundred Thirtieth Omnibus Objection has been made to this or any other court.

## RESERVATION OF RIGHTS

70.     This Five Hundred Thirtieth Omnibus Objection is limited to the grounds stated herein.  Accordingly, it is without prejudice to the rights of the Debtors or the rights of any other party in interest in the Title III Cases to object to the Satisfied Claims or any other claims on any ground whatsoever.  The Debtors expressly reserve all further substantive or procedural objections. Nothing contained herein or any actions taken pursuant to such relief is intended or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the rights of the Debtors or any other party in interest in the Title III Cases to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (e) a waiver of the rights of the Debtors or any other party in interest in the Title III Cases under PROMESA, the Bankruptcy Code or any other applicable law.

[*Remainder of the page intentionally left blank*]

WHEREFORE the Debtors respectfully request entry of an order, substantially in the form of the proposed order attached hereto as **Exhibit D**, (1) granting the relief requested herein, and (2) granting the Debtors such other and further relief as is just.

Dated: September 16, 2022                Respectfully submitted,
San Juan, Puerto Rico

/s/ *Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
Carla García-Benítez
USDC No. 203708
Gabriel A. Miranda
USDC No. 306704
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

/s/ *Martin J. Bienenstock*
Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and Management Board for Puerto Rico, as representative for the Commonwealth of Puerto Rico and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico*

Fecha de la vista: 2 de noviembre de 2022, a las 4:00 p.m. (AST)
Fecha límite para responder: 17 de octubre de 2022, a las 9:30 a.m. (AST)

---

**REVISE DETENIDAMENTE ESTA OBJECIÓN Y LOS DOCUMENTOS ADJUNTOS PARA DETERMINAR SI LA OBJECIÓN AFECTA A SU(S) RECLAMACIÓN(ES).**

---

## TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
## PARA EL DISTRITO DE PUERTO RICO

| | |
|---|---|
| *In re*:<br><br>JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO,<br><br>    como representante del<br><br>ESTADO LIBRE ASOCIADO DE PUERTO RICO *et al.*,<br><br>                          Deudores.[1] | PROMESA<br>Título III<br><br>Número 17 BK 3283-LTS<br><br>(Administrado Conjuntamente)<br><br>**La presente radicación guarda relación con el ELA y el SRE.** |

---

**QUINGENTÉSIMA TRIGÉSIMA OBJECIÓN GLOBAL (SUSTANTIVA) DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO Y DEL SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO A RECLAMACIONES POR BONOS PARCIALMENTE DUPLICADAS, DEFICIENTES, EN LAS QUE NO EXISTE RESPONSABILIDAD Y RADICADAS CONTRA EL DEUDOR INCORRECTO**

---

[1]    Los Deudores en los presentes Casos de Título III, junto con el respectivo número de caso de Título III y los últimos cuatro (4) dígitos del número de identificación contributiva federal de cada Deudor, en su caso, son i) el Estado Libre Asociado de Puerto Rico (el "ELA") (Caso de Quiebra Número 17 BK 3283-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3481); ii) la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA") (Caso de Quiebra Número 17 BK 3284-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 8474); iii) la Autoridad de Carreteras y Transportación de Puerto Rico (la "ACT") (Caso de Quiebra Número 17 BK 3567-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3808); iv) el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "SRE") (Caso de Quiebra Número 17 BK 3566-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 9686); v) la Autoridad de Energía Eléctrica de Puerto Rico (la "AEE") (Caso de Quiebra Número 17 BK 4780-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3747); y vi) la Autoridad de Edificios Públicos de Puerto Rico (la "AEP", y junto con el ELA, COFINA, la ACT, el SRE y la AEE, los "Deudores") (Caso de Quiebra Número 19-BK-5523-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3801) (Los números de los casos de Título III están enumerados como números de Casos de Quiebra debido a ciertas limitaciones en el programa informático).

A la atención de su señoría, Juez del Tribunal de Distrito de los Estados Unidos, Laura Taylor Swain:

El Estado Libre Asociado de Puerto Rico (el "ELA") y el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "SRE", y junto con el ELA, los "Deudores"), a través de la Junta de Supervisión y Administración Financiera para Puerto Rico (la "Junta de Supervisión"), como el único representante de Título III conforme a la sección 315(b) de la *Ley para la Supervisión, Administración y Estabilidad Económica de Puerto Rico* ("PROMESA"),[2] radican esta Quingentésima trigésima objeción global (la "Quingentésima trigésima objeción global") a) a evidencias de reclamaciones que aparecen en el **Anexo A** del presente documento, cada una de las cuales supuestamente se basa en parte en 1) bonos emitidos por la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA"); 2) reclamaciones por bonos que constituyen duplicados con respecto a una o más evidencias de reclamaciones principales radicadas contra los Deudores en nombre de determinados bonistas; 3) reclamaciones por bonos basadas en bonos emitidos por la Autoridad de Carreteras y Transportación de Puerto Rico (la "ACT"), la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico (la "AFI") o la Autoridad del Distrito del Centro de Convenciones de Puerto Rico (la "ADCC"), que han sido liberadas conforme a la Orden de Confirmación (que se define abajo); 4) participación patrimonial en bonos emitidos por el Banco Gubernamental de Fomento para Puerto Rico (el "BGF"), por unos montos por los que los Deudores no han garantizado el reembolso; 5) participación patrimonial en bonos emitidos por la Autoridad de Acueductos y Alcantarillados de Puerto Rico (la "AAA"), que no es Deudor de Título III, por unos montos por los que los Deudores no han garantizado el reembolso; 6) reclamaciones por bonos

---

[2]      PROMESA ha sido codificada en el Título 48 U.S.C., §§ 2101–2241.

que alegan responsabilidades vinculadas con bonos asegurados en el mercado secundario que, a su vez, constituyen duplicados con respecto a evidencias de reclamaciones radicadas contra los Deudores en nombre de dichos bonistas; y/o 7) inversiones en fondos mutuos, que a su vez pudieron haber invertido en bonos emitidos por los Deudores, y b) a determinadas evidencias de reclamaciones que figuran en el **Anexo A** del presente documento para reclasificar parcialmente una parte de la reclamación contra el Deudor pertinente, y en apoyo de la Quingentésima trigésima objeción global, los Deudores manifiestan respetuosamente lo siguiente:

## JURISDICCIÓN

1.      El Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico tiene jurisdicción sobre la materia para atender la presente causa y el remedio en ella solicitado conforme a la sección 306(a) de PROMESA.

2.      La sede judicial de este distrito es la competente conforme a la sección 307(a) de PROMESA.

## ANTECEDENTES

**A.      Órdenes de Fecha Límite**

3.      El 3 de mayo de 2017, la Junta de Supervisión emitió una certificación de reestructuración conforme a las secciones 104(j) y 206 de PROMESA, y radicó una petición voluntaria de remedio para el ELA conforme a la sección 304(a) de PROMESA, iniciando un caso conforme al Título III de dicho cuerpo legal (el "Caso de Título III del ELA"). El 21 de mayo de 2017 (la "Fecha de Petición"), la Junta de Supervisión emitió certificaciones de reestructuración conforme a las secciones 104(j) y 206 de PROMESA, y radicó una petición voluntaria de remedio para el SRE conforme a la sección 304(a) de PROMESA, iniciando un caso conforme al Título III de dicho cuerpo legal (el "Caso de Título III del SRE", y junto con el Caso de Título III del ELA, los "Casos de Título III").

4.     El 16 de enero de 2018, los Deudores radicaron su *Moción de una orden que A) fije fechas límite y procedimientos para radicar evidencias de reclamaciones y B) apruebe la forma y la manera de su notificación* [ECF Número 2255] (la "Moción de Fecha Límite")*. Conforme a la Orden que A) fija fechas límite y procedimientos para radicar evidencias de reclamaciones y B) aprueba la forma y la manera de su notificación* [ECF. Número 2521] (la "Orden Inicial de Fecha Límite"), el Tribunal concedió el remedio solicitado en la Moción de Fecha Límite y fijó fechas límite y procedimientos para radicar evidencias de reclamaciones en el marco de los Casos de Título III. Luego de la moción informativa de determinados acreedores, y del apoyo de los Deudores, el Tribunal dictó a continuación la *Orden que A) extendió fechas límite para radicar Evidencias de reclamaciones y B) aprobó la forma y la manera de su notificación* [ECF Número 3160] (conjuntamente con la Orden Inicial de Fecha Límite, las "Órdenes de Fecha Límite"), extendiendo dichas fechas límite hasta el 9 de agosto de 2018, a las 4:00 p.m. (AST).

**B.     Confirmación del Plan de Ajuste del ELA, del SRE y de la AEP elaborado conforme al Título III y de las Modificaciones Calificadas de la AFI y de la ADCC**

5.     El 3 de noviembre de 2021, la Junta de Supervisión radicó (en nombre del ELA, del SRE y de la AEP), el *Octavo Plan de Ajuste Conjunto Enmendado del Estado Libre Asociado de Puerto Rico y otros elaborado conforme al Título III* (en su versión enmendada y modificada posteriormente, denominado el "Plan") [ECF Número 19053]. El Tribunal examinó la confirmación del Plan y las objeciones formuladas a este en una vista de confirmación del Plan celebrada los días 8 a 22 de noviembre de 2021.

6.     Conforme a la 1) *Orden del Tribunal relativa a determinados aspectos de la moción para la confirmación del Octavo Plan de Ajuste Conjunto Enmendado del Estado Libre Asociado de Puerto Rico y otros elaborado conforme al Título III* [ECF Número 19517] y 2) *Orden sobre las modificaciones del Plan necesarias para dictar una orden que confirme el Plan de Ajuste para*

*el Estado Libre Asociado de Puerto Rico, el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico y la Autoridad de Edificios Públicos de Puerto Rico* [ECF Número 19721], el 14 de enero de 2022, la Junta de Supervisión, en cumplimiento de las órdenes del Tribunal, radicó un Plan revisado posteriormente. *Véase el Octavo Plan de Ajuste Conjunto Enmendado del Estado Libre Asociado de Puerto Rico y otros elaborado conforme al Título III* [ECF Número 19784].

7.     El 18 de enero de 2022, el Tribunal confirmó el Plan. Véase la *Orden y la Sentencia que confirman el Octavo Plan de Ajuste Conjunto Enmendado del Estado Libre Asociado de Puerto Rico, del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico y de la Autoridad de Edificios Públicos de Puerto Rico, elaborado conforme al Título III* [ECF Número 19813] (la "Orden de Confirmación").

8.     El 20 de enero de 2022, conforme al Título VI de PROMESA, el Tribunal aprobó a) la *Modificación Calificada de la Autoridad del Distrito del Centro de Convenciones de Puerto Rico* [Caso Número 21-01493, ECF Número 72-1] (la "MC de la ADCC") y b) la *Modificación Calificada de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico* [Caso Número 21-01492, ECF Número 82-1] (la "MC de la AFI"), que complementan las transacciones contenidas en el Plan.

9.     El Plan entró en vigor el 15 de marzo de 2022 (la "Fecha de entrada en vigor"), una vez consumadas las transacciones en él contempladas. *Véase Notificación de A) emisión de orden por la que se confirma el Octavo plan modificado y enmendado de ajuste del Estado Libre Asociado de Puerto Rico y otros elaborado conforme al Título III, según el Título III de PROMESA, y B) acontecimiento de la Fecha de entrada en vigor* [ECF Número 20349].

10.     Tanto la CM de la ADCC como la CM de la AFI también entran en vigor el 15 de marzo de 2022. *Véase* Caso Número 21-01493, ECF Número 74; Caso Número 21-01492, ECF Número 84.

**C.     Evidencias de reclamaciones principales relativas a la deuda de los bonos: Caso de Título III del ELA**

11.     Conforme a la Orden Inicial de Fecha Límite, fiduciarios autorizados, agentes fiscales o cualquier otro agente o apoderado similar en relación con cada serie respectiva de bonos emitidos por uno de los Deudores o por un no deudor, podrán radicar una evidencia de reclamación principal contra el deudor pertinente, en su propio nombre y en el de todos los titulares de las reclamaciones por bonos relacionadas con la respectiva serie de bonos en relación con las obligaciones surgidas de los respectivos acuerdos de fideicomiso, resoluciones o documentos similares vinculados con los bonos. Orden Inicial de Fecha Límite, ¶ 5(a). Como se explica abajo, se han radicado evidencias de reclamaciones principales en el marco del Caso de Título III del ELA en nombre de los tenedores de determinados bonos o pagarés emitidos por la AEE, la Autoridad de Carreteras y Transportación de Puerto Rico (la "ACT"), la Compañía de Fomento Industrial de Puerto Rico (la "PRIDCO"), la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico (la "AFI"), la Corporación para el Financiamiento Público de Puerto Rico (la "CFP"), el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico ("SRE"), la Autoridad del Distrito del Centro de Convenciones de Puerto Rico (la "ADCC") y la AAA.

12.     *AFI*: la AFI fue creada en 1988 mediante la Ley Número 44-1988 (la "Ley para crear la AFI"). La AFI brinda asistencia financiera, administrativa y de otro tipo al ELA, a sus corporaciones públicas y a otras instrumentalidades encargadas del desarrollo y del

funcionamiento de las infraestructuras. En nombre de los tenedores de varios bonos y pagarés emitidos por la AFI (conjuntamente, los "Bonos de la AFI"), se radicaron evidencias de reclamaciones principales contra el ELA (conjuntamente, las "Reclamaciones Principales de la AFI") por parte de BNYM, US Bank y UMB Bank, N.A. En primer lugar, BNYM alegó tres evidencias de reclamaciones principales: la Evidencia de reclamación Número 16759 alegando, en nombre de los tenedores de los Pagarés de anticipación de bonos relativos a rentas de fondo de impuestos dedicado, serie 15 (los "Pagarés de la AFI"), una "reclamación contingente y no liquidada contra el ELA en razón de la totalidad de las reclamaciones, causas radicadas, derechos y/o remedios que el Fiduciario o los Propietarios puedan tener contra el ELA, en virtud de la ley o equidad, sobre la base del Acuerdo de fideicomiso (o en relación con este), el Acuerdo de tenedores de pagarés, los Pagarés o las Rentas pignoradas". . . "; la Evidencia de reclamación Número 19814 alegando, en nombre de los tenedores de los Pagarés de la AFI, reclamaciones por el principal y los intereses impagados, además de las tarifas y los gastos del fiduciario; y la Evidencia de reclamación Número 103718 alegando, en nombre de los tenedores de los bonos de renta emitidos por la AFI, incluidos Bonos de Renta (Proyecto de la Autoridad Portuaria), serie 2011A, "una reclamación garantizada, contingente y no liquidada contra el ELA en razón de la totalidad de las reclamaciones, causas radicadas, derechos y/o remedios que el Fiduciario o los tenedores de los Bonos tengan o puedan tener contra el ELA, en virtud de la ley o equidad". . . ."

13.    Además, US Bank radicó una evidencia de reclamación principal en relación con determinados Bonos de la AFI, que fue registrada por Kroll (que se define abajo), como Evidencia de reclamación Número 13386 en nombre de los tenedores de los Bonos de la AFI relativos a impuestos sobre el ron (Bonos relativos a rentas de impuestos especiales, series 2005A, 2005B, 2005C y serie 2006B), alegando

reclamaciones por montos contingentes y no liquidados en relación con los intereses pagaderos a futuro, intereses acumulados y que se acumulen en el futuro en lo referente al principal adeudado en el pasado y las reclamaciones por intereses, tarifas, costos e indemnización del Fiduciario en los que se incurra en el futuro en virtud de los Documentos de Bonos, así como por la totalidad de los montos adeudados en razón de todas las reclamaciones que tenga o pueda tener el Fiduciario en relación con las Obligaciones de Bonos pendientes, monto mínimo de $249,099,446.17, cuyo curso de conducta continúa. . . .

Cláusula Adicional de la Evidencia de reclamación Número 13386, ¶ 26.

14.     **_AEE_**: la AEE es una corporación del Gobierno creada en 1941. *Véase* la Ley Número 83-1941, en su versión enmendada, § 3.  La AEE genera y distribuye esencialmente la totalidad de la energía eléctrica consumida en el ELA. [Caso Número 17 BK 4780, ECF Número 1 en 7]. La AEE es una de las empresas más importantes de suministro público en los Estados Unidos, suministra servicios a aproximadamente 1.5 millones de clientes y tiene la facultad de tomar en préstamo fondos y emitir deuda a través de bonos y otras obligaciones. U.S. Bank National Association actúa como fiduciario en relación con determinados bonos emitidos por la AEE conforme al Acuerdo de Fideicomiso, de fecha 1 de enero de 1974 (los "Bonos de la AEE"). En nombre de los tenedores de los Bonos de la AEE, U.S. Bank National Association radicó una evidencia de reclamación contra el ELA (la "Reclamación Principal de la AEE"), que fue registrada por Kroll como Evidencia de reclamación Número 50049, alegando una reclamación no liquidada en relación con el supuesto valor de derechos legales que el ELA otorgó a la AEE.

15.     **_ACT_**: la ACT es una corporación pública e instrumentalidad del ELA, que constituye una entidad corporativa y política independiente y aparte del ELA, creada en virtud de la Ley Número 74-1965 de la Asamblea Legislativa del ELA (la "Ley para crear la ACT"). La ACT se encarga de la construcción, operación y mantenimiento de carreteras y otros sistemas de transporte en el ELA. *Véase* 9 L.P.R.A. § 2002. La Ley para crear la ACT autoriza a la ACT

a emitir bonos. *Véase* 9 L.P.R.A. §§ 2004(g), (h), (l). Conforme a dicha normativa legal, la ACT emitió varias series de bonos al amparo de dos resoluciones diferentes (los "Bonos de la ACT"): *i)* la Resolución Número 68-18, adoptada el 13 de junio de 1968 (la "Resolución de 1968"), y *ii)* la Resolución Número 98-06, adoptada el 26 de febrero de 1998 (la "Resolución de 1998"). Desde el 21 de mayo de 2017, la fecha de petición de la ACT, aproximadamente $830 millones del monto principal de los bonos emitidos conforme a la Resolución de 1968 quedan pendientes de pago, y aproximadamente $3400 millones del monto principal de los bonos emitidos conforme a la Resolución de 1998 quedan igualmente pendientes de pago. BNYM actúa como agente fiscal con respecto a los Bonos de la ACT.

16.     En nombre de los tenedores de los Bonos de la ACT, BNYM radicó tres evidencias de reclamaciones principales en el marco del Caso de Título III del ELA (las "Reclamaciones Principales ACT-ELA"), cada una de las cuales alegaba "una reclamación garantizada, contingente y no liquidada contra el ELA en razón de la totalidad de las reclamaciones, causas radicadas, derechos y/o remedios que el Agente Fiscal o los Propietarios puedan tener contra el ELA, en virtud de la ley o equidad. . . ." *Véase* Adenda de la Evidencia de reclamación Número 121053, ¶ 15; Adenda de la Evidencia de reclamación Número 120982, ¶ 15; Adenda de la Evidencia de reclamación Número 115380, ¶ 15.[3]

17.     Determinados bonos o pagarés emitidos por la ACT han sido asegurados por una o más aseguradoras de bonos municipales en el mercado primario o en el secundario. El seguro de bonos municipales se obtiene en el mercado primario cuando el municipio emisor de los bonos contrata una compañía de seguros para suscribir una póliza de seguro en relación con dicha serie

---

[3] Aunque BNYM radicó inicialmente tres evidencias de reclamaciones registradas por Kroll como Evidencias de reclamaciones núms. 21286, 26541 y 35277, estas fueron sustituidas y enmendadas por las Evidencias de reclamaciones núms. 121053, 120982 y 115380.

de bonos. En el caso de que un bono no se asegure en el mercado primario, los tenedores de tales bonos no asegurados podrían optar por obtener un seguro a través del mercado secundario. Los tenedores de los bonos no asegurados que busquen obtener un seguro en el mercado secundario entran en una relación contractual directamente con una aseguradora de bonos municipales, por lo que el emisor original no es parte en dicho proceso de contratación. Cuando un tenedor de un bono no asegurado obtiene una póliza de seguro en el mercado secundario, se emite un nuevo número CUSIP que corresponde a los números CUSIP originales asignados a los bonos en el momento de su emisión. Determinados bonos emitidos por la ACT han sido asegurados en el mercado secundario y, en consecuencia, se han emitido nuevos números CUSIP que corresponden a los bonos emitidos por la ACT que llevan números CUSIP originales (los "Bonos ACT asegurados en el mercado secundario").

18.     El 13 de agosto de 2022, la Junta de Supervisión radicó el *Quinto Plan de Ajuste Enmendado de la Autoridad de Carreteras y Transportación de Puerto Rico elaborado conforme al Título III* [Caso núm. 17-bk-3567, ECF núm. 1377] (el "Quinto Plan Enmendado de la ACT"). El Tribunal consideró la confirmación del Quinto Plan Enmendado de la ACT, así como sus correspondientes objeciones, en una vista celebrada el 17 de agosto de 2022, tras la cual permitió la orden propuesta por la que confirmó el Quinto Plan Enmendado de la ACT en cuestión. El 6 de septiembre de 2022, en respuesta a la orden anterior del Tribunal en la que se solicitaban determinadas revisiones del Quinto Plan Enmendado de la ACT, la Junta de Supervisión radicó la *Versión Modificada del Quinto Plan de Ajuste Enmendado de la Autoridad de Carreteras y Transportación de Puerto Rico elaborado conforme al Título III* [ECF núm. 1404] (el "Plan de la ACT").

19.    ___*PRIDCO*___: PRIDCO fue creada por la Ley Número 188 de 1942, codificada como

23 L.P.R.A. §§ 271 *et seq*., para fomentar el desarrollo económico de Puerto Rico y proporcionar

instalaciones industriales en arrendamiento o venta a empresas privadas fabricantes. US Bank

actúa como fideicomisario en relación con determinados Bonos relativos a rentas de fines

generales y rentas de refinanciamiento, series 1997 A series 2003 (los "Bonos de PRIDCO"), y en

nombre de los tenedores de los Bonos de PRIDCO radicó una evidencia de reclamaciones principal

contra el ELA, que fue registrada por Kroll como Evidencia de reclamaciones Número 13445 (la

"Reclamación Principal de PRIDCO"). La Reclamación Principal de PRIDCO alega

reclamaciones contingentes y no liquidadas contra el ELA, y busca

> recuperación de la totalidad de los montos adeudados en razón de
> todas las reclamaciones que el Fiduciario tenga o pueda tener en
> relación con las obligaciones pendientes por Bonos, conocidos o por
> conocer, contra el ELA y aquellos que pretendan actuar en nombre
> del ELA, alegadas en la actualidad o por alegar, lo que incluye, entre
> otras cosas, reclamaciones por o basadas en el incumplimiento o la
> violación de los Documentos de los bonos, acuerdos de
> arrendamiento u otras obligaciones contractuales relativas a la
> garantía subyacente, cualesquiera otros pactos u otras obligaciones
> contractuales derivadas del presente documento, o reclamaciones
> surgidas por el desvío indebido de las rentas de PRIDCO o de
> cualesquiera otros bienes que garanticen el pago de los Bonos en
> virtud de los Documentos de los bonos, conforme a la normativa
> legal pertinente del ELA, estatal o federal, lo que incluye, entre otras
> cosas, fideicomiso ficto, transmisión fraudulenta o transferencia
> fraudulenta, incumplimiento de deberes y obligaciones
> contractuales y fiduciarias, vulneración de pactos implícitos justos
> y de buena fe, u otras reclamaciones en ley o equidad.

Cláusula de la Reclamación Principal de PRIDCO, ¶¶ 12-13.

20.    ___*CFP*___: la CFP es una corporación subsidiaria del BGF creada conforme a la

Resolución Número 5044 de la Junta Directiva del BGF, en su versión enmendada (la "Resolución

Número 5044"), adoptada de conformidad con la autoridad concedida en virtud de la Ley Número

17 de la Asamblea Legislativa de Puerto Rico, aprobada el 23 de septiembre de 1948, en su versión

enmendada. Proporciona a las agencias públicas, instrumentalidades, municipios y a otras subdivisiones del ELA mecanismos alternativos para que puedan satisfacer sus necesidades de financiamiento. La CFP tiene la facultad de tomar en préstamo fondos y emitir deuda a través de bonos y otras obligaciones. U.S. Bank Trust actúa como fiduciario en relación con unos bonos, serie 2012A y series 2011A y B, emitidos por la CFP (los "Bonos de la CFP"). En nombre de los tenedores de los Bonos de la CFP, US Bank Trust radicó una evidencia de reclamaciones contra el ELA (la "Reclamación Principal de la CFP"), que fue registrada por Kroll como Evidencia de reclamación Número 13374.

21.   **_SRE_**: el SRE es una agencia gubernamental, aparte e independiente del Gobierno del ELA y de otras de sus instrumentalidades. _Véase_ 3 L.P.R.A § 775.[4] Supuestamente conforme a la Resolución sobre bonos para el financiamiento de pensiones, adoptada el 24 de enero de 2008, y las resoluciones complementarias, el SRE emitió unos bonos prioritarios y subordinados relativos al financiamiento de pensiones (los "Bonos del SRE"), por un monto total del principal de aproximadamente $2900 millones. [5] BNYM actúa como agente fiscal con respecto a los Bonos

---

[4] El 21 de mayo de 2017, la Junta de Supervisión emitió una certificación de reestructuración conforme a las secciones 104(j) y 206 de PROMESA, y radicó una petición voluntaria de remedio para SRE conforme a la sección 304(a) de PROMESA, iniciando un caso conforme al Título III de dicho cuerpo legal.

[5] El 12 de marzo de 2019, el Comité Oficial de Acreedores no Asegurados radicó una _Objeción Global a reclamaciones radicadas por los tenedores de los bonos emitidos por el SRE_ [Caso Número 17-3566, ECF Número 381], sobre el motivo de que la emisión de los bonos supuso un exceso de la potestad legal del SRE, por lo que era _ultra vires_, lo cual convertía los Bonos del SRE en nulos de pleno derecho. El 23 de abril de 2019, el Comité Oficial de Retirados del Estado Libre Asociado de Puerto Rico radicó una _Objeción Global del Comité Oficial de Retirados del Estado Libre Asociado de Puerto Rico, conforme al Código de Quiebras, artículo 502, y la regla 3007 de las Reglas de Quiebras, a reclamaciones radicadas o alegadas por los tenedores de los Bonos del SRE contra el SRE y el ELA_ [Caso Número 17-3283, ECF Número 6482], sobre el motivo, entre otros, de que la emisión de los bonos fue _ultra vires_. El SRE se reserva los derechos a impugnar la emisión de los bonos sobre cualquier motivo, también sobre el motivo de que los bonos del SRE eran _ultra vires_, y cualquier otro motivo recogido en las objeciones precedentes.

del SRE. En nombre de los tenedores de los Bonos del SRE, BNYM radicó una evidencia de reclamación principal en el marco del Caso de Título III del ELA (la "Reclamación Principal del SRE", que fue registrada por Kroll, LLC, como Evidencia de reclamación Número 32004.[6]  Como se ha señalado anteriormente, se ha confirmado un plan de ajuste para el SRE de conformidad con la Orden de Confirmación y dicho plan de ajuste se consumó el 15 de marzo de 2022.

22.    _AAA_: la AAA es propietaria y se encarga de los sistemas de suministro público de agua y de aguas residuales en Puerto Rico. La AAA emitió determinados bonos de renta (los "Bonos de la AAA"), conforme a la Resolución de la Autoridad de Acueductos y Alcantarillados de Puerto Rico Número 1583, por la que se garantizan los bonos de la Autoridad de Acueductos y Alcantarillados de Puerto Rico avalados por el Estado Libre Asociado de Puerto Rico, y algunas resoluciones complementarias. El Banco Popular de Puerto Rico (el "Banco Popular") actúa como fideicomisario en relación con los Bonos de la AAA, y radicó una evidencia de reclamaciones principal contra el ELA en nombre de los tenedores de los Bonos de la AAA, que fue registrada por Kroll como Evidencia de reclamaciones Número 22620 (la "Reclamación Principal de la AAA"). La Reclamación Principal de la AAA alega "una reclamación contingente contra el ELA en relación con los Bonos por un importe de al menos $284,755,000, además de todos los intereses y primas generados sobre los Bonos a partir de la Fecha de petición, así como la totalidad de las tasas, costos y gastos u otros cargos acumulados que hayan devengado o sean cobrables en relación de tales Bonos". Adenda de la Evidencia de Reclamación Principal de la AAA, ¶ 9.

---

[6]  El 22 de mayo de 2019, el ELA radicó una objeción a la Evidencia de Reclamación Principal del SRE. Véase Objeción de la Junta de Supervisión y Administración Financiera, conforme al artículo 502 del Código de Quiebras y la regla 3007 de las Reglas de Quiebras, a las reclamaciones radicadas o alegadas contra el ELA por el Bank of New York Mellon, como agente fiscal (Reclamación Número 16775) [ECF Número 7075]. En aras de la claridad, la presente Tricentésima quincuagésima sexta objeción global se radica sin perjuicio de los derechos de las partes en relación con dicha objeción, lo que incluye cualesquiera derechos a intervenir, que quedan reservados.

23.     ***ADCC***: antes de la Fecha de entrada en vigor, el Bank of New York Mellon ("BNYM") actuaba como fiduciario en relación con determinados Bonos de rentas de impuestos relativos a la ocupación de hoteles, emitidos por la ADCC (los "Bonos de la ADCC"), y en nombre de los tenedores de los Bonos de la ADCC radicó una evidencia de reclamaciones principal contra el ELA, que fue registrada por Kroll como Evidencia de reclamaciones Número 37319 (la "Evidencia de Reclamación Principal de la ADCC"). La Reclamación Principal de la ADCC reivindica una "reclamación contingente y no liquidada contra el ELA en razón de la totalidad de las reclamaciones, causas radicadas, derechos y/o remedios que el Fiduciario o los Propietarios puedan tener contra el ELA en virtud de la ley o equidad". Adenda de la Evidencia de Reclamación Principal de la ADCC, ¶ 11.

**D.     Deuda de los bonos emitidos por la Autoridad de Acueductos y Alcantarillados de Puerto Rico**

24.     La AAA fue creada de conformidad con la Ley Número 40, de 1 de mayo de 1945. La AAA es una "corporación pública e instrumentalidad gubernamental autónoma", creada para la prestación de los servicios de suministro de agua y alcantarillado en la isla. 22 L.P.R.A. § 142, 144.

25.     La Ley para crear la AAA autoriza a la AAA a emitir bonos. 22 L.P.R.A. § 144(g). Conforme a dicha Ley, la junta directiva de la AAA adoptó resoluciones que autorizan a la AAA emitir bonos, lo que incluye la Resolución Número 1583, en su versión enmendada y modificada el 7 de marzo de 2008 (la "Resolución Número 1583"). En 2008, la AAA emitió unos bonos de renta, Serie A, por un monto del principal de $1,316,204,456 (los "Bonos Prioritarios Serie A 2008"), y unos bonos de renta, Serie B, por un monto del principal de $22,445,000 (los "Bonos Prioritarios Serie B 2008", y junto con los Bonos Prioritarios Serie A 2008, los "Bonos Prioritarios

2008"). En 2008, la AAA también emitió unos bonos de renta de refinanciamiento, Serie A, por

un monto del principal de $159,055,000, y unos bonos de renta de refinanciamiento, Serie B, por

un monto del principal de $125,700,000 (conjuntamente, los "Bonos de Refinanciamiento"). En

2012, la AAA emitió unos bonos de renta, Serie 2012 A, por un monto del principal de

$1.800.450.000 (los "Bonos Prioritarios Serie A 2012"), y unos bonos de renta, Serie 2012 B, por

un monto del principal de $295,245,000 (los "Bonos Prioritarios Serie B 2012", y junto con los

Bonos Prioritarios Serie A 2012, los "Bonos Prioritarios 2012", y junto con los Bonos Prioritarios

2008, los "Bonos de Gravamen Prioritario de la AAA").

26.   Los tenedores de los Bonos de Gravamen Prioritario de la AAA han recibido, y

siguen recibiendo, la totalidad de los pagos íntegros adeudados a tales tenedores de los Bonos de

Gravamen Prioritario de la AAA, a medida que estos vencen y se vuelven pagaderos. En

consecuencia, el EMMA refleja que la AAA no ha publicado ninguna notificación de

incumplimiento en relación con los Bonos de Gravamen Prioritario de la AAA. [7] Además, el ELA

no ha garantizado el reembolso de los Bonos de Gravamen Prioritario de la AAA. En consecuencia,

las declaraciones de oferta relativas a los Bonos de Gravamen Prioritario de la AAA indican que

"no constituyen deuda del Estado Libre Asociado de Puerto Rico ni de ninguno de sus municipios

u otras subdivisiones políticas, con la excepción de [la AAA], por lo que ni el Estado Libre

Asociado de Puerto Rico ni ningunos de dichos municipios u otras subdivisiones políticas, con la

excepción de [la AAA], será responsable por el pago del principal o de los intereses sobre los

referidos Bonos". [8]

---

[7] *Véase, por ejemplo*,
https://emma.msrb.org/Security/Details/A6634BCA31A0801CF45190F8C461039A9.

[8] *Véase, por ejemplo*, Declaración de Oferta relativa a los Bonos de Renta de la AAA, Serie A (Gravamen
Prioritario), 15 de febrero de 2012, disponible en https://emma.msrb.org/ER584464-ER454075-
ER856856.pdf.

27.     Los tenedores de los Bonos de Refinanciamiento de la AAA han recibido, y siguen recibiendo, la totalidad de los pagos íntegros adeudados a tales tenedores de los Bonos de Refinanciamiento de la AAA, a medida que estos vencen y se vuelven pagaderos. En consecuencia, el EMMA refleja que la AAA no ha publicado ninguna notificación de incumplimiento en relación con los Bonos de Refinanciamiento de la AAA. [9]  Además, aunque las declaraciones de oferta relativas a los Bonos de Refinanciamiento de la AAA identifican al ELA como la entidad que ha garantizado el reembolso de dichos bonos, tal garantía ha sido eliminada en relación con el refinanciamiento de los Bonos de Refinanciamiento de la AAA y algunos de los Bonos de Gravamen Prioritario de la AAA, según se establece en la declaración de oferta de fecha 9 de diciembre de 2020, conforme a la cual la AAA emitió los bonos de renta de refinanciamiento de gravamen prioritario, serie 2020A, y los bonos de renta de refinanciamiento de gravamen prioritario sujetos a impuestos federales, serie 2020B (la "Transacción de Refinanciamiento de la AAA 2020"). [10]

28.     El 20 de julio de 2021, la Junta de Supervisión aprobó una transacción de reembolso propuesta, conforme a la cual la AAA emitiría las series 2021ABC y 2022A de Bonos de Gravamen Prioritario para refinanciar unos Bonos Prioritarios de la AAA pendientes de 2012 por un valor de $1800 millones (la "Transacción de Refinanciamiento de la AAA 2021"). [11]   La

---

[9] *Véase, por ejemplo,*
https://emma.msrb.org/Security/Details/A5686687B583CA99BFDDA7BAE76F581A9.

[10] *Véase* la Declaración de Oferta relativa a los Bonos de Renta de Refinanciamiento de la AAA, Serie 2020A (Gravamen Prioritario), y a los Bonos de Renta de Refinanciamiento Sujetos a Impuestos Federales, Serie 2020B (Gravamen Prioritario), de fecha 9 de diciembre de 2020, disponible en https://emma.msrb.org/P31403866-P31091563-P31500360.pdf.

[11] *Véase* Carta de la Junta de Supervisión y Administración Financiera dirigida a AAFAF en la que se aprueba la Transacción de Refinanciamiento de la AAA, de fecha 20 de julio de 2021, disponible en https://drive.google.com/file/d/1YvDZHPXCQ4vWOARyVGrY_XFb_-HhZZdc/view.

Transacción de Refinanciamiento de la AAA 2021 fue consumada conforme a los términos de la

declaración de oferta, de fecha 17 de agosto de 2021, emitida en relación con dicha Transacción.

[12]

**E.    Procedimientos conforme al Título VI del BGF y modificación calificada**

29.    El BGF es una corporación pública e instrumentalidad gubernamental del ELA,

creada por la Asamblea Legislativa en 1948 para ayudar al Gobierno del ELA (el "Gobierno") a

llevar a cabo sus tareas fiscales y a desempeñar su responsabilidad con mayor eficacia en relación

con el desarrollo de la economía del ELA. El 28 de abril de 2017, la Junta de Supervisión aprobó

por unanimidad el Plan Fiscal del BGF de febrero de 2017, que contemplaba una terminación

ordenada de las actividades del BGF sobre la base de la determinación de que el BGF no era viable

a largo plazo dadas sus condiciones financieras vigentes en ese momento.

30.    El 12 de julio de 2017, la Junta de Supervisión dictó una resolución por la que se

autorizaba al BGF, conforme a la sección 601(e) de PROMESA, a ampararse en el título VI de

PROMESA. El 10 de agosto de 2018, el BGF radicó una solicitud de aprobación de una

modificación calificada, conforme a la sección 601(m)(1)(D) de PROMESA (la "Modificación

Calificada"), ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico.

31.    El 7 de noviembre de 2018, el Tribunal aprobó la Modificación Calificada

conforme a la sección 601(m)(1)(D) de PROMESA. *Véase* ECF Número 270 en *Banco

Gubernamental de Fomento para Puerto Rico*, Caso Número 18-1561 (D.P.R. 7 de nov. de 2018).

La Modificación Calificada dispone, entre otras cosas, i) la emisión de nuevos bonos por la

Autoridad de Recuperación de Deuda del BGF (GDB Debt Recovery Authority) a cambio de la

---

[12] *Véase* Declaración de Oferta relativa a los Bonos de Renta de Refinanciamiento de la AAA, Series
2021ABC y 2022A (Gravamen Prioritario), de fecha 17 de agosto de 2021, disponible en
https://emma.msrb.org/P11521655-P11177130-P11593393.pdf.

cancelación (entre otras cosas) de determinados bonos de participación y reclamaciones de bonos garantizados (conjuntamente, "Bonos del BGF"). ii) la extinción de la garantía del ELA de los bonos garantizados tras el intercambio y cancelación de los bonos garantizados; y iii) la liberación de reclamaciones de los tenedores de Bonos del BGF contra el BGF y sus afiliados en relación con (entre otras cosas) cualquier inversión con el BGF o la compra, venta o transferencia de cualquier título valor o participación del BGF, y cualquier acción u omisión con respecto a un endeudamiento o préstamo al BGF (incluidos cualesquiera pagarés emitidos o mantenidos por el BGF) o del BGF. *Declaración de Solicitación*, en 57-60, ECF Número 1-15 en *Banco Gubernamental de Fomento para Puerto Rico*, Caso Número 18-1561 (D.P.R. 10 de ago. de 2018).

32.    El 29 de noviembre de 2018, el BGF anunció la consumación de la Modificación Calificada del BGF. Nota de prensa, *el Gobierno de Puerto Rico anuncia la consumación de la Modificación Calificada del BGF*, Gobernador de Puerto Rico (29 de nov. de 2018), *disponible en* http://www.aafaf.pr.gov/assets/gov-pr-announces-consummation-gdb-qualifying-modification.pdf.

**F.    Caso de Título III de COFINA y resolución de la controversia entre el ELA y COFINA**

33.    COFINA es una corporación pública e instrumentalidad del ELA, que constituye una entidad corporativa y política independiente y aparte del ELA, creada en virtud de la Ley Número 91 de la Asamblea Legislativa del ELA. Conforme a la Resolución enmendada y modificada sobre los bonos del fondo de interés apremiante, adoptada el 13 de julio de 2007, en su versión enmendada del 19 de junio de 2009, y de conformidad con otras resoluciones complementarias, COFINA emitió una serie de bonos por un monto total de aproximadamente $17,000 millones para, entre otras cosas, sufragar determinadas obligaciones de deuda del Banco Gubernamental de Fomento para Puerto Rico (el "BGF") y de la Corporación para el

Financiamiento Público de Puerto Rico (los "Bonos de COFINA"). Bank of New York Mellon actúa como fiduciario con respecto a los Bonos de COFINA.

34.    La Junta de Supervisión radicó el *Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III* (el "Plan de COFINA") [ECF Número 4652] el 9 de enero de 2019. El Tribunal examinó la confirmación del Plan de COFINA y las objeciones formuladas a este en una vista celebrada los días 16 y 17 de enero de 2019.

35.    El 4 de febrero de 2019, el Tribunal confirmó el Plan de COFINA que incorporaba el pacto y la conciliación de la controversia sobre si, luego de examinar todas las contestaciones y reconvenciones sustantivas y procesales, incluidas cuestiones constitucionales, los impuestos sobre la venta y uso supuestamente empeñados por COFINA para garantizar la deuda son propiedad del ELA o de COFINA conforme a la normativa legal aplicable (la "Controversia entre el ELA y COFINA"). *Véase la Orden y la Sentencia que confirman el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico* [ECF Número 5048]. Ese mismo día, el Tribunal aprobó el pacto y la conciliación de la Controversia entre el ELA y COFINA conforme al *Dictamen abreviado y orden que aprueba la conciliación entre el Estado Libre Asociado de Puerto Rico y la Corporación del Fondo de Interés Apremiante de Puerto Rico* [ECF Número 5045] (la "Orden de Conciliación de COFINA"). El 5 de febrero de 2019, el Tribunal dictó una *Orden y Sentencia enmendadas que confirman el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III* [ECF Número 5055] (la "Orden de Confirmación Enmendada de COFINA"). El Plan entró en vigor el 12 de febrero de 2019 (la "Fecha de entrada en vigor de COFINA"), una vez consumadas las transacciones en él contempladas. *Véase Notificación de A) emisión de orden por*

19

*la que se confirma el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés*

*Apremiante de Puerto Rico elaborado conforme al Título III, según el Título III de PROMESA, y*

*B) acontecimiento de la Fecha de entrada en vigor* [Caso Número 17 BK 3284-LTS, ECF Número

587].

**G.    Evidencias de reclamaciones, procedimientos relativos a objeciones globales y
objeciones a reclamaciones**

36.    Hasta la fecha, se han radicado aproximadamente 179,034 evidencias de
reclamaciones contra los Deudores, que han sido registradas por Kroll Restructuring
Administration, LLC ("Kroll"). Dichas evidencias de reclamaciones ascienden a un total
aproximado de $43.6 billones en reclamaciones radicadas contra los Deudores, además de los
montos no liquidados reclamados.

37.    De las evidencias de reclamaciones radicadas, aproximadamente 118,239 han sido
radicadas en relación con el ELA, o reclasificadas como radicadas contra el ELA. Además,
aproximadamente 53,555 evidencias de reclamaciones han sido radicadas en relación con el SRE,
o reclasificadas como radicadas contra el SRE. De conformidad con las condiciones de las Órdenes
de Fecha Límite, muchas de estas reclamaciones no tenían que haber sido radicadas en absoluto o
adolecen de otro tipo de vicios; por ejemplo, haber sido enmendadas posteriormente, no alegar una
reclamación por la que los Deudores sean responsables, haber sido satisfechas total o parcialmente
por uno o más Deudores, estar duplicadas en relación con otras evidencias de reclamaciones o no
aportar información necesaria para que los Deudores determinen si la reclamación es válida.

38.    Para resolver eficazmente el mayor número posible de las evidencias de
reclamaciones innecesarias, el 16 de octubre de 2018 los Deudores radicaron ante este Tribunal su
*Moción para que se dicte una orden que A) apruebe procedimientos limitados relativos a*

*objeciones globales, B) exima el requisito contenido en la regla 3007(e)(6) de las Reglas de Quiebras, y C) conceda el remedio relacionado* [ECF Número 4052] (la "<u>Moción de Procedimientos Globales</u>"). El Tribunal concedió el remedio solicitado en la Moción de Procedimientos Globales mediante la orden de fecha 14 de noviembre de 2018. *Véase la Orden que A) aprueba procedimientos limitados relativos a objeciones globales, B) exime el requisito contenido en la regla 3007(e)(6) de las Reglas de Quiebras, y C) concede el remedio relacionado* [ECF Número 4230]; *Procedimientos relativos a Objeciones Globales* [ECF Número 4230-1] (conjuntamente, los "<u>Procedimientos Iniciales relativos a Objeciones Globales</u>"). El 29 de noviembre de 2018, el Tribunal aprobó las versiones en inglés y en español de los formularios de notificación relativos a las objeciones globales a efectos de radicarlas de conformidad con los Procedimientos Iniciales relativos a Objeciones Globales. *Véase Orden por la que se aprobaron las versiones en inglés y en español de los formularios de notificación relativos a objeciones globales* [ECF Número 4381] (la "<u>Orden de Notificación</u>").

39.     En aras del interés constante por resolver eficazmente cualesquiera evidencias de reclamaciones innecesarias, el 23 de mayo de 2019 los Deudores radicaron una moción relativa a procedimientos enmendados en la que solicitaron, entre otras cosas, que se les permitiera radicar objeciones globales sobre unas bases sustantivas, aumentar el número de reclamaciones que pudieran incluirse en una objeción y aprobar formas de notificación adicionales. *Notificación de vista en relación con una Orden que A) apruebe Procedimientos Enmendados relativos a Objeciones Globales, B) exima los requisitos contenidos en la regla 3007(e) de las Reglas de Quiebras, C) apruebe formas de notificación adicionales y D) conceda el remedio relacionado* [ECF Número 7091]. El 14 de junio de 2019, el Tribunal concedió el remedio solicitado por medio de la *Orden que A) aprueba Procedimientos Enmendados relativos a Objeciones Globales, B)*

*exime los requisitos contenidos en la regla 3007(e) de las Reglas de Quiebras, C) aprueba formas de notificación adicionales y D) concede el remedio relacionado* [ECF Número 7440] (los "Procedimientos Enmendados relativos a Objeciones Globales").

40.    Conforme a los Procedimientos Iniciales relativos a Objeciones Globales y los Procedimientos Enmendados relativos a Objeciones Globales, el Tribunal ha celebrado hasta la fecha más de 27 vistas y ha dictado órdenes sobre más de 315 objeciones globales radicadas por el ELA, COFINA, la ACT, la AEE, la AEP y/o el SRE. Sobre la base de las resoluciones y órdenes del Tribunal dictadas hasta la fecha, y de la retirada de determinadas reclamaciones conforme al Plan, aproximadamente 102,630 reclamaciones que reivindicaban $43.6 billones en responsabilidad contra el ELA, COFINA, la ACT, la AEE, la AEP y el SRE fueron rechazadas y retiradas del registro de reclamaciones en el marco de los procedimientos radicados conforme al Título III. Además, aproximadamente 45,193 reclamaciones han sido transferidas al proceso de Reconciliación de Reclamaciones Administrativas para su resolución utilizando procesos administrativos habituales de los Deudores.

41.    Esta Quingentésima trigésima objeción global se radica de conformidad con los Procedimientos Enmendados relativos a Objeciones Globales del Tribunal.

## OBJECIONES A EVIDENCIAS DE RECLAMACIONES

42.    Las reclamaciones que sean "inejecutables contra el deudor y los bienes de este, en virtud de cualquier contrato o normativa legal aplicable" deben rechazarse. Título 11 U.S.C., § 502(b)(1). Aunque una evidencia de reclamación debidamente formalizada y radicada constituye una prueba *prima facie* de la validez de la reclamación, *véase* R. del Proc. de Quiebr. 3001(f), aplicable a este caso en virtud de la sección 310 de PROMESA, la parte objetante podrá superar dicha evidencia prima facie con pruebas que, de creerse, refutarían al menos una de las alegaciones esenciales para la reclamación. *In re Reilly*, 245 B.R. 768, 773 (B.A.P. 2d Cir.), *aff'd*, 242 F.3d

22

367 (2d Cir. 2000); *véase también Factors Funding Co. c. Fili (In re Fili)*, 257 B.R. 370, 372 (1st Cir. B.A.P. 2001) ("[S]e presume que una reclamación es válida hasta que una parte objetante haya introducido evidencias suficientes para refutar el caso *prima facie* del reclamante". (se omite cita)).

43. Los Procedimientos Enmendados relativos a Objeciones Globales permiten a los Deudores radicar una objeción global a varias evidencias de reclamaciones sobre cualquiera de las bases recogidas en las reglas 3007(d)(1) a (7) de las Reglas Federales del Procedimiento de Quiebra (*Federal Rule of Bankruptcy Procedure*), así como sobre otras bases sustantivas establecidas en los Procedimientos Enmendados relativos a Objeciones Globales.

44. La Quingentésima trigésima objeción global pretende que se rechacen partes de las evidencias de reclamaciones que figuran en el **Anexo A** del presente documento (conjuntamente, las "<u>Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente</u>"), cada una de las cuales pretende estar basada parcialmente en *a*) bonos emitidos por COFINA; *b*) reclamaciones por bonos que constituyen duplicados con respecto a una o más evidencias de reclamaciones principales radicadas contra los Deudores en nombre de determinados bonistas; *c*) reclamaciones por bonos basadas en bonos emitidos por la ACT, la AFI o la ADCC, que han sido liberados conforme a la Orden de Confirmación; *d*) participación patrimonial en bonos emitidos por el BGF, por unos montos por los que los Deudores no han garantizado el reembolso; *e*) participación patrimonial en bonos emitidos por la AAA, que no es Deudor de Título III, por unos montos por los que los Deudores no han garantizado el reembolso; *f*) reclamaciones por bonos que alegan responsabilidades vinculadas con bonos asegurados en el mercado secundario que, a su vez, constituyen duplicados con respecto a evidencias de reclamaciones radicadas contra los Deudores en nombre de dichos bonistas; y/o *g*) inversiones en fondos mutuos, que a su vez pudieren haber invertido en bonos emitidos por los Deudores. Además, algunas de las reclamaciones que figuran

23

en el **Anexo A** del presente documento deben reclasificarse parcialmente, ya que parte de la reclamación identifica a los Deudores como deudor, cuando en todo caso lo correcto sería que dichas partes de la reclamación se alegaran contra la AEE. El **Anexo A** del presente documento especifica además por qué cada una de las Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente debe ser rechazada parcialmente.

## A.  Ausencia de responsabilidad por Reclamaciones Duplicadas por Bonos

45.      Según se expone en el **Anexo A** del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente pretenden alegar responsabilidad, en parte, sobre la base de bonos emitidos por la ACT, PRIDCO, la AEE, la CFP, PRIDCO, la AFI y el Fideicomiso de los Niños (conjuntamente, las "Reclamaciones Parcialmente Duplicadas por Bonos"). *Véanse, por ejemplo*, Reclamaciones núms. 65801 y 66514.

46.      Cada una de las Reclamaciones Parcialmente Duplicadas por Bonos pretende alegar, total o parcialmente, responsabilidad contra el ELA vinculada con uno o más bonos que están duplicados en relación con una o más Reclamaciones Principales que, según se explicó anteriormente, fueron radicadas en el marco de los Casos de Título III en nombre de los tenedores de determinados bonos emitidos por el la ACT, la AEE, PRIDCO, la CFP, la AFI y el Fideicomiso de los Niños. Por ejemplo, la Reclamación Principal de la AEE alega que "ha sido radicada en nombre de *todos los tenedores de cada una de las series de los bonos de renta eléctrica y los bonos de renta de refinanciamiento eléctrica*, emitidos y pendientes en virtud del Acuerdo de Fideicomiso". Reclamación Principal de la AEE, Cláusula adicional en 1 (el resaltado es nuestro). En consecuencia, cualquier reclamación radicada contra el ELA por un tenedor individual, que alegue una reclamación con respecto a los bonos de la AEE de dicho tenedor, estará duplicada en relación con la Reclamación Principal de la AEE. Además, algunas de las Reclamaciones

Parcialmente Duplicadas por Bonos no proporcionan fundamento alguno para alegar una reclamación contra el SRE por determinados Bonos de la AFI o Bonos de la AAA que, como se explicó anteriormente, no han sido emitidos por el SRE, ni estaban garantizados por el SRE. [13]

47.      Si las Reclamaciones Parcialmente Duplicadas por Bonos no son rechazadas, ello resultaría en que los reclamantes en cuestión obtuvieran potencialmente una recuperación duplicada no justificada contra los Deudores en detrimento de otras partes interesadas en los Casos de Título III de los Deudores. Los titulares de las Reclamaciones Parcialmente Duplicadas por Bonos no se verán perjudicados por el hecho de que se rechacen sus reclamaciones, puesto que las responsabilidades relacionadas con las Reclamaciones Parcialmente Duplicadas por Bonos figuran en una o más Reclamaciones Principales.

**B.  Ausencia de responsabilidad por las Reclamaciones de los Bonistas, liberadas por la Orden de Confirmación**

48.      Conforme a lo expuesto en el **<u>Anexo A</u>** del presente documento, determinadas Reclamaciones que han de ser rechazadas pretenden alegar, en parte, responsabilidad basada en supuesta participación patrimonial en los bonos emitidos por la ACT (las "<u>Reclamaciones de los Bonistas de la ACT</u>"), bonos emitidos por la AFI (las "<u>Reclamaciones de los Bonistas de la AFI</u>") y bonos emitidos por la ADCC (las "<u>Reclamaciones de los Bonistas de la ADCC</u>"). *Véanse, por ejemplo*, Reclamaciones núms. 65801 y 66514.

49.      Las Reclamaciones de los Bonistas de la ACT, las Reclamaciones de los Bonistas de la AFI y las Reclamaciones de los Bonistas de la ADCC alegan responsabilidades contra el

---

[13] En la medida en que los tenedores de determinados Bonos de la AFI o Bonos de la AAA hayan tenido la intención de alegar dichas reclamaciones contra el ELA, tales reclamaciones constituirían duplicados con respecto a la Reclamación Principal de la AFI y la Reclamación Principal de la AAA, alegadas contra el ELA en nombre de los tenedores de los Bonos de la AFI y los Bonos de la AAA.

ELA o el SRE vinculadas con varios Bonos de la ACT, la AFI y/o la ADCC emitidos por la ACT, la AFI y/o la ADCC. Las Reclamaciones alegadas contra los Deudores basadas en cualquiera de los bonos emitidos o garantizados, o préstamos concedidos a o garantizados por la ACT, la AFI y la ADCC, han sido liberadas en su totalidad en virtud del Plan, por lo que los Deudores ya no son responsables por dichas reclamaciones. *Véase* Orden de Confirmación, ¶ 72 ("Las Reclamaciones alegadas contra los Deudores o los Deudores Reorganizados, emitidos o garantizados, o préstamos concedidos a o garantizados por la ACT, la ADCC, la AFI o la MBA se concederán (en la medida en que se concedan) como Reclamación que surgió antes de la Fecha de Petición, y se clasificarán en las Clases 59 a 62 (salvo las Reclamaciones por Bonos Concedidas del SRE, en la medida en que sean garantizadas) y, por medio de la presente, quedan liberadas, por lo que los Deudores y los Deudores Reorganizados ya no son responsables por dichas Reclamaciones").

50.     Si las Reclamaciones de los Bonistas de la ACT, las Reclamaciones de los Bonistas de la AFI y las Reclamaciones de los Bonistas de la ADCC no son rechazadas, ello resultaría en que los reclamantes en cuestión obtuvieran potencialmente una recuperación duplicada no justificada contra los Deudores en detrimento de otras partes interesadas en los Casos de Título III de los Deudores.

## C. Ausencia de responsabilidad por reclamaciones relativas a los bonistas de COFINA

50.     Conforme a lo identificado en el **Anexo A** del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente pretenden alegar reclamaciones basadas, en parte, en una supuesta participación patrimonial en los bonos

emitidos por COFINA (conjuntamente, las "Reclamaciones Parciales de los Bonistas de COFINA"). *Véase, por ejemplo,* Reclamación Número 16715.

51. Como se explicó anteriormente, la Orden de Conciliación resolvió la Controversia entre el ELA y COFINA y, conforme al párrafo 55 de la Orden de Conciliación, la totalidad de las reclamaciones contra el ELA, surgidas o vinculadas con la relación del ELA y COFINA, han sido liberadas. Además, conforme al párrafo 3(c) del Acuerdo de Conciliación [ECF Número 5045-1], de fecha 19 de octubre de 2018, que se adjunta a la Orden de Conciliación (el "Acuerdo de Conciliación"), y el párrafo 7 de la Orden de Confirmación Enmendada, el procedimiento contencioso entre el ELA y COFINA sobre la Controversia entre el ELA y COFINA ha sido rechazado de forma definitiva luego de la aprobación del pacto y la conciliación de la Controversia entre el ELA y COFINA. Además, conforme al párrafo 29(f) de la Orden de Confirmación Enmendada, reclamaciones (tales como las Reclamaciones parciales de los bonistas de COFINA) que surgieron de o están vinculadas con la relación entre el ELA y COFINA, fueron liberadas. Orden de Confirmación Enmendada, ¶ 29(f).[14] Por todos esos motivos, las Reclamaciones Parciales de los Bonistas de COFINA deben rechazarse porque dichas reclamaciones basadas en una presunta participación patrimonial en los Bonos COFINA han sido satisfechas, liberadas y/o liquidadas conforme a la Orden de Conciliación, el Acuerdo de Conciliación, la Orden de Confirmación Enmendada y el Plan.

---

[14] Conforme al Plan, una "Reclamación" se define como "[c]ualquier derecho a un pago o cumplimiento, independientemente de si tal derecho consta en una sentencia, es liquidado, no liquidado, fijo, accidental, vencido, no vencido, controvertido, no controvertido, legal, en equidad, garantizado o no garantizado, conocido o desconocido, reclamado o no reclamado; o cualquier derecho a un remedio en equidad por incumplimiento o ejecución de un cumplimiento, independientemente de si tal derecho a un remedio en equidad consta en una sentencia, es fijo, accidental, vencido, no vencido, controvertido, no controvertido, garantizado o no garantizado, y la totalidad de las deudas, procesos, indemnizaciones por daños y perjuicios, derechos, remedios, pérdidas, responsabilidades, obligaciones, sentencias, acciones, causas de acción, procedimientos o reclamaciones de cualquier tipo o naturaleza, en derecho, equidad o de cualquier otra forma". Plan § 1.53.

**D.  Ausencia de responsabilidad por las Reclamaciones de los Bonistas del BGF**

52.     Conforme a lo identificado en el **<u>Anexo A</u>** del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente pretenden alegar, en parte, reclamaciones basadas en la supuesta participación patrimonial en los bonos emitidos por el BGF (conjuntamente, las "<u>Reclamaciones Parciales de los Bonistas del BGF</u>"). *Véase, por ejemplo,* Reclamación Número 16715.

53.     La totalidad de las Reclamaciones Parciales de los Bonistas del BGF pretenden basarse, en parte, en la participación patrimonial en los Bonos del BGF objeto de la Modificación Calificada, que dispuso la emisión de nuevos títulos de valores a cambio de la cancelación de los Bonos del BGF y la extinción de la garantía del ELA relativa a determinados Bonos del BGF, por lo que el ELA ya no es responsable por dichas reclamaciones. En consecuencia, cada una de las Reclamaciones Parciales de los Bonistas del BGF ha sido liberada conforme a la aprobación y la consumación de la Modificación Calificada. Como se señaló anteriormente, la Modificación Calificada dispone, entre otras cosas, que los tenedores de los Bonos del BGF liberarán al BGF y sus afiliados de las reclamaciones relacionadas con los Bonos del BGF, y de cualquier acción u omisión del BGF y sus afiliados con respecto a todo endeudamiento del BGF o préstamo al BGF. El BGF es una corporación e instrumentalidad pública del ELA. En consecuencia, el ELA es un afiliado del BGF dentro del ámbito de la liberación conforme a la Modificación Calificada. Por tanto, las Reclamaciones Parciales de los Bonistas del BGF fueron liberadas tras la consumación de la Modificación Calificada el 29 de noviembre de 2018.

54.     Puesto que las Reclamaciones Parciales de los Bonistas del BGF son inejecutables contra el ELA y sus bienes conforme al § 502(b)(1) del Código de Quiebras, dichas reclamaciones

deben rechazarse puesto que solicitan la recuperación de montos por los que el ELA no tiene responsabilidad.

### E. Ausencia de responsabilidad por las Reclamaciones de Gravamen Prioritario de la AAA

55.     Conforme a lo expuesto en el **Anexo A** del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente pretenden alegar, en parte, responsabilidad basada en supuesta participación patrimonial en los Bonos de Gravamen Prioritario de la AAA emitidos por la AAA (las "Reclamaciones Parciales de Gravamen Prioritario de la AAA") y los Bonos de Refinanciamiento 2008 emitidos por la AAA (las "Reclamaciones Parciales por Bonos de Reembolso de la AAA"). *Véase, por ejemplo,* Reclamación Número 53610.

56.     Las Reclamaciones Parciales de Gravamen Prioritario de la AAA y las Reclamaciones Parciales por Bonos de Refinanciamiento de la AAA alegan responsabilidades contra el ELA vinculadas con los bonos emitidos por la AAA, que no es Deudor de Título III, y es una entidad aparte y jurídicamente independiente de los Deudores. El ELA no ha garantizado el reembolso de los Bonos de Gravamen Prioritario de la AAA. Además, las Reclamaciones Parciales de Gravamen Prioritario de la AAA no proporcionan ningún fundamento que sea suficiente desde el punto de vista legal para alegar una reclamación contra el ELA por los bonos emitidos por la AAA que no están garantizados por el ELA.

57.     Es más, los Bonos de Refinanciamiento de la AAA, que en algún momento estaban garantizados por el ELA, vieron dicha garantía extinguirse en relación con la Transacción de Refinanciamiento de la AAA 2020.

58.     Puesto que las Reclamaciones Parciales de Gravamen Prioritario de la AAA y las Reclamaciones Parciales por Bonos de Refinanciamiento de la AAA son inejecutables contra el ELA y sus bienes conforme al § 502(b)(1) del Código de Quiebras, dichas reclamaciones deben rechazarse puesto que solicitan la recuperación de montos por los que el ELA no es responsable.

## F.  Ausencia de responsabilidad relativa a reclamaciones basadas en inversiones en fondos mutuos

59.     Conforme a lo identificado en el **Anexo A** del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente pretenden alegar responsabilidad basada parcialmente en inversión(es) en uno o más fondos mutuos que, a su vez, pudieron haber invertido en bonos emitidos por el ELA (conjuntamente, las "Reclamaciones Parciales de los Fondos Mutuos"). *Véase, por ejemplo,* Reclamación Número 16715.

60.     Los reclamantes tienen la carga de la prueba para demostrar legitimación a efectos de radicar una evidencia de reclamación. *In re Minbatiwalla*, 424 B.R. 104, 111 (Bankr. S.D.N.Y. 2010). Es ampliamente aceptado que solo los acreedores o sus representantes autorizados están legitimados para radicar reclamaciones. Reg. Fed. del Proc. de Quiebr. 3001(b); Título 11 U.S.C., §§ 501(a) ("Los acreedores o fiduciarios autorizados podrán radicar evidencias de reclamaciones"); *In re Melillo*, 392 B.R. 1, 5 (B.A.P. 1st Cir. 2008) ("Solo los acreedores o fiduciarios autorizados podrán radicar evidencias de reclamaciones".). Las partes que solo tengan intereses derivados carecen de legitimación para radicar reclamaciones contra los bienes de un deudor. *Caso Goldman*, 82 B.R. 894, 896 (Bankr. S.D. Ohio 1988) (donde se concluyó que una parte con "una relación con el Deudor [que] no es directa, sino más bien derivada "era" persona ajena en relación con el procedimiento de quiebra del Deudor", sin "ninguna posibilidad de

reclamar contra los activos" y "como regla general, no tiene legitimación en relación con el procedimiento de quiebra del Deudor".); *véase también In re Tower Park Properties, LLC*, 803 F.3d 450, 462-63 (9th Cir. 2015) (donde se concluyó que un beneficiario de un fideicomiso no era parte interesada); *In re Refco Inc.*, 505 F.3d 109, 117 (2d Cir. 2007) ("En la medida en que se hagan valer los derechos de una parte interesada, esos derechos han de hacerse valer por dicha parte interesada, no por un tercero".); *In re López*, 446 B.R. 12, 17 (Bankr. D. Mass. 2011) (para constituirse como parte interesada "la parte solicitante deberá hacer valer sus propios derechos y no aquellos que asistan a un tercero o que se deriven en relación con tal tercero".); *In re Hayes*, 393 B.R. 259, 267 (Bankr. D. Mass. 2008) (donde se reconoce el "principio general de que 'no se da legitimación de una parte interesada si la parte pretende hacer valer un derecho que es puramente derivado de los derechos de otra parte en el procedimiento de quiebras'" (que cita *In re Refco*, 505 F.3d en 115 n. 10)).

61.      "Un acreedor, conforme al Código [de Quiebras], es el que tiene reclamación contra el deudor o los bienes", en lugar de "un acreedor de uno de los acreedores del deudor". *S. Blvd., Inc. c. Martin Paint Stores*, 207 B.R. 57, 61 (S.D.N.Y. 1997). Puesto que, a lo sumo, las Reclamaciones Parciales de Fondos Mutuos fueron radicados en virtud de la condición del reclamante como presunto acreedor de un presunto acreedor del ELA, las Reclamaciones Parciales de Fondos Mutuos no fueron radicadas por un acreedor real del ELA. *Véase In re Thalmann*, 469 B.R. 677, 683 (Bankr. S.D. Tex. 2012) (donde se concluye que el destinatario carecía de legitimación para radicar evidencias de reclamaciones porque no era acreedor ni agente autorizado de un acreedor). En cambio, las Reclamaciones Parciales de Fondos Mutuos se derivan de las reclamaciones que deben hacerse valer por los fondos mutuos directamente para que el Tribunal examine cualquier recuperación alegada. *Véase el caso Goldman*, 82 B.R. en 896 (donde se

concluye que una parte con una relación "derivada" no puede "reclamar los activos" y "como regla general, carece de legitimación en el procedimiento de quiebras del Deudor"). Es más, no se sabe si el fondo mutuo sigue reteniendo la propiedad de los bonos controvertidos.

62.    En efecto, en unas circunstancias casi idénticas, el Tribunal ya rechazó reclamaciones radicadas contra COFINA por unos inversores en los fondos mutuos que, a su vez, invirtieron presuntamente en los bonos de COFINA, por "carecer de interés individual en los títulos de valores de COFINA". *Tr. del 13 de marzo de 2019 de la vist. ante su señoría, Laura Taylor Swain* [ECF Número 5969], en 64:01-10 ("EL TRIBUNAL: De modo que, para que lo entienda, su documentación muestra que es inversor en un fondo mutuo. En la medida en que cualquiera de esos fondos mutuos posea realmente los bonos de COFINA, el fondo mutuo sería el reclamante pertinente, ¿así que no proporcionó ninguna evidencia de una reclamación directa válida contra COFINA? SRA. STAFFORD: Así es, señoría. EL TRIBUNAL: Se concede la objeción a la reclamación, y se rechaza la reclamación por falta de interés individual en títulos valores de COFINA."); *véase también la Orden por la que se concede la Sexagésima cuarta objeción global (sustantiva) del Estado Libre Asociado de Puerto Rico a Reclamaciones basadas en las inversiones en fondos mutuos* [ECF Número 9099]; *Orden de memorando por la que se rechaza la moción para alterar o enmendar la orden que concede la objeción (extr. 8297) a las Reclamaciones núms. 152470 y 152283* [ECF Número 9121]. En consecuencia, los reclamantes no son acreedores del ELA y carecen de legitimación para hacer valer reclamaciones derivadas. Puesto que al ELA no se le puede atribuir la responsabilidad por las Reclamaciones Parciales de Fondos Mutuos, dichas reclamaciones deben rechazarse en su totalidad.

Además, algunas de las Reclamaciones Parciales de Fondos Mutuos son deficiente porque no brindan información suficiente para que los Deudores puedan reconciliar las evidencias de reclamaciones.

### G. Ausencia de responsabilidad por reclamaciones duplicadas por bonos asegurados en el mercado secundario

63.      Según se expone en el **<u>Anexo A</u>** del presente documento, algunas de las Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente pretenden alegar, en parte, responsabilidades contra los Deudores vinculadas con uno o más Bonos ACT asegurados en el mercado secundario (las "<u>Reclamaciones parciales por bonos ACT asegurados en el mercado secundario</u>"). *Véase, por ejemplo,* Reclamación Número 66514.

64.      Los números CUSIP vinculados con dichas Reclamaciones parciales por bonos ACT asegurados en el mercado secundario corresponden a bonos emitidos por la ACT que llevan los números CUSIP originales. Dichos números CUSIP originales, que reflejan las emisiones de los bonos en los que los reclamantes tienen participación patrimonial, se mencionan en una o más Reclamaciones Principales. En consecuencia, en las Reclamaciones por bonos ACT asegurados en el mercado secundario se alegan responsabilidades vinculadas con bonos emitidos por la ACT que constituyen duplicados en relación las responsabilidades alegadas en una o más Reclamaciones Principales.  Si las Reclamaciones parciales por bonos ACT asegurados en el mercado secundario no son rechazadas, ello resultaría en que los reclamantes en cuestión obtuvieran potencialmente una recuperación duplicada no justificada contra los Deudores, en detrimento de otras partes interesadas en los Casos de Título III. Los titulares de las Reclamaciones por bonos ACT asegurados en el mercado secundario no se verán perjudicados por el hecho de que se rechacen parcialmente sus reclamaciones, puesto que las responsabilidades relacionadas con las

Reclamaciones parciales por bonos ACT asegurados en el mercado secundario figuran en una o varias Reclamaciones Principales.

### H. Reclamaciones por Bonos Parcialmente Reclasificadas

65.     Por último, otra parte de algunas de las Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente identifica a los Deudores como el deudor, cuando en todo caso lo correcto sería que dicha parte se alegara contra la AEE, y alega responsabilidad, en parte, sobre la base de bonos emitidos por la AEE (conjuntamente, las "Reclamaciones por Bonos Parcialmente Reclasificadas"). *Véanse, por ejemplo*, Reclamaciones núms. 7276 y 7787.

66.     En cada una de las Reclamaciones por Bonos Parcialmente Reclasificadas el reclamante pretendió alegar, en parte, responsabilidades vinculadas con bono(s) municipal(es), sin embargo la evidencia de reclamación, la documentación justificativa proporcionada por el reclamante y/o la información CUSIP muestran que en todo caso lo correcto sería alegar las responsabilidades vinculadas con las Reclamaciones por Bonos Parcialmente Reclasificadas contra la AEE. En consecuencia, las Reclamaciones por Bonos Parcialmente Reclasificadas deben reclasificarse, en parte, para alegarse contra la AEE, el deudor de Título III identificado en la columna titulada "Corregidas" en el **Anexo A** del presente documento. El ELA se reserva el derecho a objetar a cualquier parte de las Reclamaciones por Bonos Parcialmente Reclasificadas sobre cualquier otro motivo que fuere.

67.     En apoyo de lo anterior, los Deudores invocan la *Declaración de Jay Herriman en apoyo de la Quingentésima trigésima objeción global (sustantiva) del Estado Libre Asociado de Puerto Rico y del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico a Reclamaciones por bonos parcialmente duplicadas, deficientes, en las que no existe*

*responsabilidad y radicadas contra el deudor incorrecto*, de fecha 16 de septiembre de 2022, adjunta al presente como **Anexo B**.

## NOTIFICACIÓN

68.     De conformidad con los Procedimientos Enmendados relativos a Objeciones Globales y la Orden de Notificación del Tribunal, los Deudores notifican la presente Quingentésima trigésima objeción global a) a los acreedores individuales objeto de esta Quingentésima trigésima objeción global, b) al U.S. Trustee, y c) a la Lista maestra de notificaciones (según se define en los *Procedimientos de administración de casos enmendados Número 16* [ECF Número 20190-1]), disponibles en el sitio web de casos de los Deudores, en https://cases.ra.kroll.com/puertorico. La notificación de esta Quingentésima trigésima objeción global se adjunta al presente como Anexo C. Las traducciones al español de la Quingentésima trigésima objeción global y de la totalidad de los anexos adjuntos al presente se están radicando con la presente objeción y se trasladarán a las partes. Los Deudores sostienen que, dada la naturaleza del remedio solicitado, no es necesario enviar ninguna otra notificación.

## AUSENCIA DE SOLICITUDES PREVIAS

69.     No se ha radicado ninguna solicitud de remedio previa a la presente Quingentésima trigésima objeción global ni ante este Tribunal ni ante ningún otro órgano judicial.

## RESERVA DE DERECHOS

70.     Esta Quingentésima trigésima objeción global se limita a los motivos expuestos en este documento. En consecuencia, esta se radica sin perjuicio de los derechos de los Deudores, o de los derechos de cualesquiera otras partes interesadas de los Casos de Título III, a objetar a las Reclamaciones Satisfechas o a cualesquiera otras reclamaciones que fueren. Los Deudores se reservan expresamente el derecho a radicar toda otra objeción sustantiva o procesal. Ninguna

disposición contenida en el presente documento, ni ninguna acción adoptada conforme a tal remedio, tienen por objetivo, ni se interpretarán en el sentido de que: a) constituyan una admisión en cuanto a la validez de cualesquiera reclamaciones contra los Deudores; b) constituyan una renuncia a los derechos de los Deudores, o de cualesquiera otras partes interesadas en los Casos de Título III, a impugnar cualquier reclamación sobre la base de los motivos que fueren; c) constituyan una promesa o requisito para pagar cualquier reclamación; d) constituyan una solicitud o autorización a asumir cualquier acuerdo, contrato o arrendamiento anteriores a la petición conforme al artículo 365 del Código de Quiebras; o e) constituyan una renuncia a los derechos de los Deudores, o de cualesquiera otras partes interesadas en los Casos de Título III, conforme a PROMESA, el Código de Quiebras o cualquier otra normativa legal aplicable.

*[El resto de la página se deja en blanco intencionadamente]*

POR LO QUE los Deudores solicitan respetuosamente que se dicte una orden, esencialmente en la forma de la orden propuesta que se adjunta al presente como **Anexo D**, 1) que conceda el remedio solicitado en el presente documento, y 2) que conceda a los Deudores cualesquiera otros remedios que se consideren justos.

Fecha: 16 de septiembre de 2022
      San Juan (Puerto Rico)

Respetuosamente sometida,

*[Firma en la versión en inglés]*
Hermann D. Bauer
USDC Número 215205
Carla García-Benítez
USDC Número 203708
Gabriel A. Miranda
USDC Número 306704
**O'NEILL & BORGES LLC**
250 Avenida Muñoz Rivera, local 800
San Juan, PR 00918-1813
Tel.: (787) 764-8181
Fax: (787) 753-8944

*[Firma en la versión en inglés]*
Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
Nueva York, NY 10036
Tel.: (212) 969-3000
Fax: (212) 969-2900

*Abogados de la Junta de Supervisión y Administración Financiera para Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico y del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico.*

37