# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>        as representative of<br><br>The Commonwealth of Puerto Rico, *et al.*,<br><br>        Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS |
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>        as representative of<br><br>The Puerto Rico Electric Power Authority,<br><br>        Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 4780-LTS |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5523-LTS) (Last Four Digits of Federal Tax ID: 3801); and (vi) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

| | |
|---|---|
| CORTLAND CAPITAL MARKET SERVICES LLC, *et al.*, | Adv. Pro. No. 19-396-LTS |
| Plaintiffs, | |
| v. | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD OF PUERTO RICO, *et al.,* | |
| Defendants. | |
| SISTEMA DE RETIRO DE LOS EMPLEADOS DE LA AUTORIDAD DE ENERGIA ELECTRICA, | Adv. Pro. No. 19-00405-LTS |
| Plaintiff, | |
| v. | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD OF PUERTO RICO, et. al., | |
| Defendants. | |

**RESPONSE BY THE AD HOC GROUP OF PREPA BONDHOLDERS, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AND SYNCORA GUARANTEE INC. TO THE OVERSIGHT BOARD'S URGENT MOTION TO SET A LITIGATION SCHEDULE, AND URGENT CROSS-MOTION TO ESTABLISH A CASE SCHEDULE <u>AND IMPOSE DEADLINES FOR A PREPA PLAN OF ADJUSTMENT</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND .................................................................................................................... 8

    A.    PREPA's Title III Case and 2019 RSA ............................................................. 8

    B.    The Government Parties Renege on the 2019 RSA, Triggering Mediation ......... 11

    C.    Mediation Failed, and Is Unlikely to Succeed Without Plan-Confirmation Deadlines and Additional Requirements Requiring Principal Participation....... 122

RELIEF REQUESTED ........................................................................................................... 16

I.    The Motion to Dismiss/Lift-Stay Should Be Decided Before Any Other Proceedings ...................................................................................................................... 16

II.    In the Alternative, the PREPA Bondholders' Motion to Dismiss/Lift-Stay Should Proceed in Parallel With Meaningful Plan Deadlines and Litigation of the Bond Issues ................................................................................................................................. 17

III.    The Oversight Board's Strategy of Piecemeal Litigation Should Be Rejected ................ 19

CONCLUSION ....................................................................................................................... 233

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amerinational Cmty. Servs. v. Ambac Assurance Corp. (In re Fin. Oversight &*
*Mgmt. Bd. for P.R.)*,
635 B.R. 216 (D.P.R. 2021) ................................................................21

*In re City of Detroit*,
Case No. 13-53846 (Bankr. E.D. Mich.) .............................................19

*In re City of Stockton, California*,
Case No. 12-32118 (Bankr. E.D. Cal.) ................................................19

*In re Cnty. of Orange*,
219 B.R. 543 (Bankr. C.D. Cal. 1997) ................................................19

*Fano v. Newport Heights Irrigation Dist.*,
114 F.2d 563 (9th Cir. 1940) ..............................................................20

*In re Jefferson County, Ala.*,
Case No. 11-05736 (Bankr. N.D. Ala.) ...............................................19

**Statutes**

11 U.S.C. § 105(a) ........................................................................................17

11 U.S.C. § 927 .............................................................................................21

P.R. Laws Ann. Tit. 22 § 206 .......................................................................21

PROMESA § 301(a) ......................................................................................17

PROMESA § 312(b) ......................................................................................17

**Other Authorities**

15 McQuillin Mun. Corp. § 43:131 (3d ed. 2022) .......................................22

*AAFAF Chief Marrero Signals PREPA RSA 'Most Likely' Will Need*
*Renegotiation, Given Lack of Legislative Support*, REORG (Feb. 7, 2022),
https://app.reorg.com/v3#/items/intel/1869?item_id=168129 ............2, 18

AAFAF, Investor Presentation, Closing A Chapter Beginning A New Era (Feb.
28, 2022), https://www.aafaf.pr.gov/wp-content/uploads/AAFAF-Invest-Pres-
Closing-Chapter.pdf ............................................................................11

AAFAF, PRNOW Summit Presentation, Welcome to the Puerto Rico of Now
(June 6-7, 2022), https://www.aafaf.pr.gov/wp-content/uploads/WELCOME-
TO-THE-PR-OF-NOW-web.pdf; ...........................................................................11

Financial Oversight and Management Board for Puerto Rico, Fiscal Year 2022
Report, 6th Annual Report (July 31, 2022),
https://app.reorg.com/documents/20220801/62e7e4ca31cd6.pdf ..............................7

Gov't of Puerto Rico, Additional/Voluntary Event-Based Disclosure, Summary of
Materials Exchanged in Mediation (Sept. 16, 2022)
https://emma.msrb.org/P11622357-P11250316-P11674788.pdf.............................13

*Jaresko, Key Lawmakers Discuss With Reorg Prospects for Passage of PREPA
RSA Legislation, Acknowledge Real Risk of Creditor-Focused Receivership*,
REORG (Mar. 3, 2020),
https://app.reorg.com/v3#/items/intel/1869?item_id=97339. ..................................13

*Luma's Chief Regulatory Officer Says Pendency of PREPA's Title III Bankruptcy
Restricts Reconstruction of Electric System*, REORG (Aug. 30, 2022),
https://app.reorg.com/v3#/items/intel/1869?item_id=189029 .................................17

LUMA Quarterly Report: For the period ending March 31, 2022 (May 16, 2022),
*In re: Review of PREPA's System Remediation Plan*, PREB Case No. NEPR-
MI-2020-0019 ..........................................................................................................14

LUMA Quarterly Report: For the period ending December 31, 2021 (Feb. 15,
2022), *In re: Review of LUMA's Initial Budgets*, PREB Case No. NEPR-MI-
2021-0004 ...............................................................................................................14

Press Release, Financial Oversight and Management Board for Puerto Rico,
Statement (Mar. 8, 2022)
https://drive.google.com/file/d/1TQqI5kZTVeHX0BEmRLa6GSFShVSnEgG
9/view .......................................................................................................................13

Press Release, LUMA Highlights historical advances in renewable energies in a
report to PREB (Apr. 1, 2022), www.lumapr.com/news/luma-details-historic-
renewable-energy-advances-in-report-to-preb/?lang=en .......................................14

The Ad Hoc Group of PREPA Bondholders (the "Ad Hoc Group"), Assured Guaranty Corp. and Assured Guaranty Municipal Corp. ("Assured"), National Public Finance Guarantee Corporation ("National"), and Syncora Guarantee Inc. ("Syncora," and together with Assured, National, and the Ad Hoc Group, the "PREPA Bondholders") respectfully submit this response to the Financial Oversight and Management Board's (the "Oversight Board") urgent motion to establish a litigation schedule, and in support of their urgent cross-motion for approval of the PREPA Bondholders' proposed schedule for future proceedings in this case, including deadlines for the Oversight Board to respond to the motion to dismiss this case, and/or to file and seek confirmation of a PREPA plan of adjustment.[1]  In response to the Oversight Board's motion and in support of their cross-motion, the PREPA Bondholders respectfully state as follows:

## PRELIMINARY STATEMENT

1.      As Puerto Rico faces another blackout, it is time to acknowledge the serious costs that are being imposed on the island by the government parties' decision to keep PREPA in bankruptcy indefinitely.  Puerto Rico's residents are without power, in the wake of PREPA's struggles to launch the projects required to harden and enhance the grid while it languishes in bankruptcy.  This unacceptable state of affairs must come to an end.

2.      PREPA bonds were a vital source of capital used to support PREPA in its construction and renovation of Puerto Rico's utility grid.  Without access to this stable, low-cost form of financing, it is unclear how PREPA's electricity grid could have been constructed.

3.      Mindful of the island's financial challenges, in 2018, in the wake of Hurricane Maria, the PREPA Bondholders entered into the 2019 RSA to settle their claims and provide Puerto Rico with accommodations to the tune of a $2 billion reduction in debt.  Both the Oversight

---

[1] Syncora Guarantee Inc. joins this response and cross-motion through its owners, funds and accounts managed by GoldenTree Asset Management, LP, a member of the Ad Hoc Group.

Board and the government touted the benefits provided by the RSA for years, recognizing that the terms provided therein were reasonable and affordable for consumers on the island.  In fact, the Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF," and together with the Oversight Board and PREPA, the "Government Parties") noted that "it is not typical to achieve such a substantial reduction."[2] Moreover, the economy in Puerto Rico in general, and the consumers in Puerto Rico in particular, are in a significantly stronger position than they were when the parties entered into the RSA. Unemployment is at all-time lows, incomes are rising, consumption is booming, and tax collections are at all-time highs.  So when Governor Pierluisi abruptly announced the termination of the RSA with the Oversight Board's support, the PREPA Bondholders were stunned, as there was no apparent long-term justification for this sudden about-face.

4.      Consistent with their behavior over the last five years, the PREPA Bondholders agreed to go back to the table to see if the Oversight Board's concerns could be addressed. After six months of mediation, however, the Oversight Board has now decided, *according to one of its own members*, to "walk[] away from the table."  As that Oversight Board member put it, "[a] deal to end bankruptcy and avoid costly and lengthy litigation with PREPA's largest creditors was clearly in reach," and such a deal would have "catalyzed much-needed private sector investment to rebuild and modernize Puerto Rico's grid."  But now "all of this could be delayed for years," the member observed, "due to the FOMB's preference for litigation over making deals."[3]

5.      Whether or not all Oversight Board members agree with this statement, this frank assessment of the current situation shines a light on the Oversight Board's true strategy in the case:

---

[2] *AAFAF Chief Marrero Signals PREPA RSA 'Most Likely' Will Need Renegotiation, Given Lack of Legislative Support*, REORG (Feb. 7, 2022), https://app.reorg.com/v3#/items/intel/1869?item_id=168129.

[3] *See* Statement by Justin Peterson (Sept. 16, 2022), attached hereto as Exhibit C.

litigation and delay.  Instead of proposing to move forward with a plan, the Oversight Board has instead proposed to proceed with trial and appellate litigation of secondary issues that would take years to complete, and in the meantime to avoid addressing the fundamental affordability issue that is really at the heart of this case—what PREPA can afford to pay its creditors.  The PREPA bonds are valid, secured obligations, and PREPA can afford to, and must, pay these obligations in full.  Perhaps for that reason, the Oversight Board's scheduling proposal makes clear that its goal is to forestall indefinitely either reaching a final decision on the affordability issues, or proceeding with the politically difficult—but necessary—decisions that will allow PREPA and Puerto Rico to move forward with a fresh start and an overdue transformation of the electrical system.

6.      The Oversight Board's approach to PREPA's restructuring is evident in its attempt to join arms with the Official Committee of Unsecured Creditors (the "Committee") and belatedly incorporate a meritless theory the Committee has tried to advance for years: that bondholders have recourse to only about *$8 million* to pay their more than *$8 billion* in unpaid principal.  That facially implausible claim—which would give PREPA the power to wipe out billions in legitimate debt (and violate non-impairment covenants without any Takings or Contracts Clause implications) simply by reneging on its obligations and failing to deposit money into a designated account—is a road to nowhere and a giant leap backwards from the economic premise of the Oversight Board's prior restructuring agreements with bondholders.  Indeed, the Oversight Board has pointedly *declined* to pursue that baseless limited-recourse argument for the past five years.  But now the Oversight Board's strategy is to mire this case in years of litigation with no end in sight, no matter how expeditiously the Oversight Board contends this complex litigation can occur.

7.      While much has happened in Puerto Rico and in the world since 2017, very little has happened in PREPA's bankruptcy case.  The Oversight Board has never suggested, much less

filed, a plan for PREPA, and there has been virtually no movement forward on key claims.  PREPA
largely continues to do business as usual—declining to charge its customers an amount sufficient
to pay the debt service that it is contractually obligated to pay, not collecting from government
entities that are years overdue on their bills, failing to move forward with putting FEMA funds to
work, and faltering on improving its historically abysmal operational track record.  The Oversight
Board's two principal accomplishments during this five-years-and-counting case have been (1) the
2019 RSA, with its substantial reduction in PREPA's legacy debt and an extended, four-decade
period for repayment of the reduced sum, and (2) the arrangements the Oversight Board reached
with LUMA Energy to operate and transform PREPA's grid.  Now, AAFAF has filed a notice of
termination of the 2019 RSA, and the LUMA arrangement is at substantial risk of terminating
because the Oversight Board is unable to file and confirm a plan.

8.     Back in March 2022, shortly after the PREPA Bondholders moved for plan
deadlines and mediation on implementing the 2019 RSA, AAFAF asserted that it was terminating
the RSA.  This Court immediately recognized that the Government Parties' conduct had created
the "risk of a major setback" in this case.[4]  It ordered the Oversight Board to engage "in good faith,
in a focused manner, in efforts to negotiate and/or determine the parameters of an appropriate plan
of adjustment for PREPA,"[5] and it appointed a three-judge mediation team of Judge Shelley
Chapman, as lead mediator, together with Judge Robert Drain and Judge Brendan Shannon  (the
"Mediation Team").[6]

---

[4] *Order Denying Urgent Motion of the Ad Hoc Group of PREPA Bondholders to Appoint a Mediator and Impose
Deadlines for a PREPA Plan of Adjustment and Directing Additional Consultation and Filings* (the "March 8 Order")
at 10 [ECF No. 2748].

[5] *Id.* at 12.

[6] *See Order Appointing Mediation Team* [ECF No. 2772].

9.     The Court set a short, focused mediation period of approximately seven weeks and stated that "the prompt resolution of the Mediation Topics is of critical importance to this case."[7] But mediation was extended five times, and the parties ended up spending *six months* mediating. The Oversight Board's last offer to bondholders, which is now public, discarded the fundamental economic principles that the Oversight Board had agreed to in the RSA.  It proposed to cut *nearly in half* the transition charge that the Oversight Board had been willing (as recently as last January) to use to fund PREPA's debt service.  It is no surprise, then, that despite the Mediation Team's best efforts, numerous extensions, and hundreds of hours of judicial mediator assistance, the Oversight Board has failed to reach any agreement with bondholders on a new restructuring support agreement and the terms of a confirmable plan.  The parties are constrained from revealing the details of mediation, but it is clear that the Government Parties are no closer today than they were five years ago to proposing and moving forward with a confirmable plan.  This about-face is nonsensical in light of Puerto Rico's economic growth, which Puerto Rico officials have repeatedly touted, its continued outperformance of its own financial projections, and the $12.2 billion dollars of federal aid that have been committed to PREPA (out of more than $120 billion for the Commonwealth as a whole).

10.     In light of the Government Parties' record of failure, the PREPA Bondholders are filing, contemporaneously with this submission, a motion to dismiss PREPA's Title III case or to lift the stay, so that a receiver can be appointed to set affordable and sustainable electricity rates sufficient for PREPA to pay its debts and improve the quality of its service.  By contrast, the Oversight Board is proposing to add years of scorched-earth litigation onto its already extensive delay of progress in this case.  No debtor should be permitted to do what PREPA is doing—

---

[7] *Id.* at 3.

interminably hide behind the bankruptcy stay to avoid paying debt, while litigating with creditors at its leisure, and failing to address its many issues.  If this Court does not immediately grant the PREPA Bondholders' Motion to Dismiss/Lift-Stay to facilitate the installation of a receiver, then the Court should require the Oversight Board, no later than **November 1, 2022**, to propose a plan of adjustment and a timetable for obtaining confirmation of that plan at a hearing scheduled no later than **May 1, 2023**.

11.     Setting those plan deadlines is critical to making progress in this case (or in any further mediation).  The Oversight Board has made clear that it has no intention to file or prosecute a plan anytime soon.  Rather, the Oversight Board proposes to prolong this case with lengthy trial and appellate litigation over the PREPA Bondholders' recourse, liens, collateral, priority, and non-dischargeable constitutional claims (the "Bond Issues").  The Oversight Board presents these disputes as "gating issues," and insists that they be fully and finally adjudicated before the Oversight Board even *proposes* a plan.

12.     The PREPA Bondholders are confident of their position on each of the Bond Issues, but the path that the Oversight Board proposes would leave PREPA in Title III for years to come in protracted litigation.  As further described below and in the PREPA Bondholders' Motion to Dismiss/Lift-Stay, PREPA's long tenure in bankruptcy continues to impose high, insidious costs on PREPA and its ratepaying customers.

13.     These costs of inaction are politically acceptable only because they are pervasive and hidden.  They come in forms like higher fuel and purchased power costs and PREPA's inability to access financing to make the grid improvements necessary to obtain multi-billion-dollar FEMA reimbursements.  On just that last point, recent congressional testimony revealed that FEMA has been able to disburse only *$40 million* of the *$12.2 billion* in federal funds committed to upgrading

Puerto Rico's power grid, in part because a bankrupt PREPA has greater difficulty funding projects for which it could be entitled to obtain federal reimbursement. This record of delay in accessing federal funding raises the question of how much further along PREPA could be in its reconstruction had it exited bankruptcy years ago on the timeline contemplated in the RSA. In the meantime, PREPA continues to add to the hundreds of millions of dollars it has been billed by lawyers and advisors in these cases—totaling approximately $660 million for the Commonwealth's case and in excess of $200 million for PREPA—and plans to multiply those expenses going forward by bringing the Committee into the fold on its litigation-only strategy. [8] At the end of the day, PREPA passes all these expenses of bankruptcy along to its customers in the form of higher electricity rates.

14.    Moreover, litigation untethered to a plan process would serve only to further delay resolution of what in all events is the fundamental question in this case: What can PREPA afford to pay its bondholders and other creditors in order to fairly and equitably adjust its debts, exit bankruptcy, reduce expenses, and reemerge as a trusted financial counterparty? As the PREPA Bondholders are prepared to demonstrate the answer to that question is clear: PREPA can afford to pay all of its creditors in full given the substantial improvements in Puerto Rico's economic conditions since the 2019 RSA. Answering the affordability question (through consensual deals or litigation over a plan) is the true "gating" item to PREPA's exit from Title III.

15.    In sum, today—*more than five years after filing for Title III*—the Oversight Board is *further* away from such a plan now than it was in July 2017. If the Court decides not to dismiss this case immediately, the only alternative to another several years stuck in Title III is for this Court to set and enforce deadlines for the Oversight Board to propose and obtain confirmation of

---

[8] Financial Oversight and Management Board for Puerto Rico, Fiscal Year 2022 Report, 6th Annual Report at 151 (July 31, 2022), https://app.reorg.com/documents/20220801/62e7e4ca31cd6.pdf.

a plan.  The Oversight Board can propose and prosecute a plan that incorporates its views on the

status of the PREPA Bondholders' liens, recourse, and claims.  If it chooses, it can incorporate a

so-called "toggle" feature, in which it prescribes various treatment for PREPA's other creditors

based on a final adjudication of the extent and nature of the PREPA Bondholders' claims.  PREPA

Bondholders are prepared to litigate each of these issues, as well as the only issue that truly matters

with respect to paying claims in this case—the total amount PREPA can afford to pay its creditors

in total—in the context of a contested confirmation hearing.  But if the Oversight Board cannot

confirm such a plan over the PREPA Bondholders' objection, then it will finally be time for all

parties to this case to concede that Title III is simply not the appropriate venue to resolve PREPA's

issues.

16.     In considering these issues, the PREPA Bondholders also respectfully ask the Court

to invite the Mediation Team to provide its views on the most effective manner in which to address

the various contested legal and financial issues and to advance this case towards a timely

emergence from Title III.

## **BACKGROUND**

17.     As has been detailed before this Court in prior pleadings, PREPA has been in

restructuring negotiations with its creditors for eight years, including the five years it has spent in

Title III.  PREPA has not paid anything to its bondholders for seven years.[9]

### A.     **PREPA's Title III Case and 2019 RSA**

---

[9] *See, e.g., Urgent Motion of the Ad Hoc Group of PREPA Bondholders Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Appoint a Mediator and Impose Deadlines for a PREPA Plan of Adjustment* [ECF No. 2718]; *Motion of Ad Hoc Group of PREPA Bondholders, National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. for Relief From the Automatic Stay to Allow Movants to Enforce Their Statutory Right to Have a Receiver Appointed* [ECF No. 74].

18.     In July 2018, in the wake of prior restructuring efforts and agreements, the Oversight Board entered into a preliminary restructuring support agreement with the members of the Ad Hoc Group.  In May 2019, the Government Parties, the Ad Hoc Group, and Assured entered into the 2019 RSA—their third restructuring support agreement—with National and Syncora joining four months later.  The 2019 RSA *reduced PREPA's debt by more than $2 billion*, lowered interest rates, and extended payment periods.

19.     On May 10, 2019, the Oversight Board moved for this Court's approval of the 2019 RSA (the "9019 Motion").[10]  The Oversight Board explained that the "eminently reasonable" RSA would be "the foundation for a plan of adjustment for PREPA."[11]  It stressed the need for a prompt and consensual resolution of PREPA's debts.  "Delaying the debt restructuring," the Oversight Board said more than two years ago, "may thus delay PREPA's transformation, to the detriment of Puerto Rico, its people, its businesses, and its creditors."[12]  The 2019 RSA would prevent harmful delay, the Oversight Board explained, by setting out "fair and reasonable" terms on which bondholders would exchange their bonds at a significant discount.[13]  That "deal will send a message to potential transformation counterparties that PREPA has a clear framework for its exit from bankruptcy . . . that will help support the transformation transaction(s)."[14]

20.     After the global COVID-19 pandemic began spreading in Puerto Rico and the rest of the United States, the Government Parties informed bondholders and the Court that they would

---

[10] *Joint Motion of Puerto Rico Electric Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928, and Bankruptcy Rules 3012(a)(1) and 9019 for Order Approving Settlements Embodied in the Restructuring Support Agreement and Tolling Certain Limitations Periods* [ECF No. 1235].  The 2019 RSA was attached as an exhibit to the 9019 Motion.  *See* ECF No. 1235-1.

[11] *Id.* ¶¶ 50-51.

[12] *Id.* ¶ 1.

[13] *Id.* ¶¶ 1, 9.

[14] *Id.* ¶ 64.

move to adjourn all applicable deadlines for the 9019 Motion, to which bondholders did not object.[15] For the rest of 2020, all of 2021, and into early 2022, the Government Parties never stated any intention to terminate the 2019 RSA. Rather, they used that time to put the LUMA contract in place, focus on other Title III cases, move forward with the Commonwealth's Title III plan, and lobby for legislation to facilitate that plan. Meanwhile, PREPA's bondholders abided by the RSA and refrained from actions inconsistent with its terms, such as intervening in PREPA's privatization, prosecuting objections to the Commonwealth's plan, or re-asserting their right to install a receiver to raise rates in the face of continued non-payment, as the RSA promised the continued accrual of bondholder interest.

21. As recently as January 2022, the Oversight Board and its counsel reiterated support for the 2019 RSA and represented to this Court that the Oversight Board would file PREPA's plan during the first quarter of 2022.[16] The Oversight Board made it clear in its February 28, 2022 objection to the Ad Hoc Group's motion for mediation that the RSA provided Puerto Rico with "gargantuan benefits."[17]

22. This continued support for the fundamental tenets and economics of the RSA only made sense. By any objective measure, Puerto Rico's economy has significantly improved over

---

[15] *See Urgent Joint Motion of the Government Parties to Adjourn All Deadlines Applicable to the Joint Motion of Puerto Rico Electric Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928, and Bankruptcy Rules 3012(a)(1) and 9019 for Order Approving Settlements Embodied in the Restructuring Support Agreement [ECF No. 1235]* [ECF No. 1947]; *Order Granting Urgent Joint Motion of the Government Parties to Adjourn All Deadlines Applicable to the Joint Motion of Puerto Rico Electric Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928, and Bankruptcy Rules 3012(a)(1) and 9019 for Order Approving Settlements Embodied in the Restructuring Support Agreement [ECF No. 1235]* [ECF No. 1954] (motion granted).

[16] *Status Report of Government Parties Regarding COVID-19 Pandemic and 9019 Motion* ¶¶ 7, 8 [ECF No. 2691]

[17] *Objection of Financial Oversight and Management Board for Puerto Rico to Urgent Motion of Ad Hoc Group of PREPA Bondholders to Compel Mediation and Impose Deadlines for PREPA Plan of Adjustment* ("FOMB Objection to Mediation Motion") ¶ 4 [ECF No. 2735].

the past few years.  The Oversight Board has acknowledged Puerto Rico's "growing economy."[18]
As recognized by Puerto Rico officials, unemployment has decreased, sales and use tax collections
(a proxy for consumption) have increased, general fund revenues have boomed, federal Medicaid
funding has improved, population forecasts are up, and energy consumption has risen.[19]

### B.    The Government Parties Renege on the 2019 RSA, Triggering Mediation

23.    On March 8, 2022, after war began in Ukraine and fuel prices rose, Governor Pedro
Pierluisi abruptly asserted that he was terminating the 2019 RSA.   In the wake of that
announcement, this Court recognized that the Government Parties' action threatened to leave
PREPA in Title III for years to come, and with no exit in sight.  The Court observed that, right up
until the Governor's termination notice, "the Oversight Board and the government entities' words
and actions gave the Court reason to expect a plan of adjustment would be forthcoming promptly."
"The RSA termination announcement," the Court concluded, "presents the risk of a major setback
in progress toward readjustment of PREPA's liabilities."[20]

24.    In an effort to prevent that major setback, and to "ensure meaningful progress
towards the development of a consensual proposed plan of adjustment and the ultimate
confirmation of a PREPA Title III plan," the Court imposed a timetable on the Oversight Board to
move PREPA toward successful emergence from Title III.[21]  Specifically, it set a deadline (the
"Path Forward Deadline") by which the Oversight Board had to file (i) a plan of adjustment,

---

[18] *Urgent Motion of Financial Oversight and Management Board for Order (I) Establishing Schedule to Continue Negotiations During Litigation of Gating Issues Pursuant to Litigation Schedule and (II) Granting Related Relief* ("FOMB Urgent Motion") ¶ 1 [ECF No. 2956].

[19] AAFAF, PRNOW Summit Presentation, Welcome to the Puerto Rico of Now (June 6-7, 2022), https://www.aafaf.pr.gov/wp-content/uploads/WELCOME-TO-THE-PR-OF-NOW-web.pdf;   AAFAF,   Investor Presentation, Closing A Chapter Beginning A New Era (Feb. 28, 2022), https://www.aafaf.pr.gov/wp-content/uploads/AAFAF-Invest-Pres-Closing-Chapter.pdf.

[20] March 8 Order at 10.

[21] *Id.* at 12-13.

disclosure statement, and confirmation schedule; (ii) a detailed term sheet for a plan and timeline for submitting that plan and obtaining confirmation; (iii) a proposed litigation schedule on significant disputed issues; or (iv) a declaration and memorandum of law showing cause why this case should not be dismissed "for failure to demonstrate that a confirmable plan of adjustment can be formulated and filed within a time period consistent with the best interests of PREPA, the parties-in-interest and the people of Puerto Rico."[22]   The Court recognized—but at that time declined to exercise—its authority "to set a deadline for filing of a plan of adjustment."[23]

25.    Instead, the Court ordered the Oversight Board to engage "in good faith, in a focused manner, in efforts to negotiate and/or determine the parameters of an appropriate plan of adjustment for PREPA."[24]   Shortly thereafter, it appointed the Mediation Team, with the expectation that the parties would mediate to reach a new accommodation over a period of approximately seven weeks.   Ultimately, however, the Oversight Board and the PREPA Bondholders engaged in six months of mediation, which this Court facilitated with numerous extensions of the mediation's termination date and the Oversight Board's Path Forward Deadline. Mediation failed, however, and terminated without any deal on September 16, 2022.

## C.    Mediation Failed, and Is Unlikely to Succeed Without Plan-Confirmation Deadlines and Additional Requirements Requiring Principal Participation

26.    The PREPA Bondholders entered mediation believing that the parties would move quickly towards restructuring limited features of the 2019 RSA to provide certain structural accommodations to PREPA.  But the Oversight Board's last mediation proposal demonstrates that,

---

[22] *Id.* at 13.

[23] *Id.* at 11.

[24] *Id.* at 12.

in fact, the Oversight Board has abandoned the key economic principles that it, AAFAF, and PREPA had already agreed to under the RSA.

27.     Indeed, there has been a sea change over a few short months in the Oversight Board's views on any deal with bondholders.  In January 2022, the Oversight Board announced that it would be moving forward with a plan implementing the 2019 RSA—an acknowledgment that the agreement's average transition charge of approximately 5 cents per kilowatt hour was still reasonable and affordable.[25]  The Oversight Board had worked for years to get that rate approved through the legislature.[26]  It did so because the 2019 RSA, in its own words, "provides PREPA and all present and future ratepayers with gargantuan benefits."[27]

28.     Yet, in its publicly disclosed final offer to bondholders in mediation, the Oversight Board made a profound about-face.  It sought to impose a new repayment structure on bondholders and cut in half the implied debt-service charge in the 2019 RSA—to 2.6 cents per kilowatt hour.[28]  The Oversight Board's massive retreat from its prior agreement was allegedly based on "new" affordability concerns.  Those concerns, as the Governor had described them back in March, were assertedly based principally on "rising fuel prices because of Russia's attack on Ukraine."[29]  But that stated concern ignores the reality that PREPA's fiscal plan contemplates its near-total transition away from oil-based power generation, and that futures-market oil prices over the last

---

[25] *Declaration of David Brownstein in Support of Joint Motion of Puerto Rico Electric Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928, and Bankruptcy Rules 3012(a)(1) and 9019 for Order Approving Settlements Embodied in the Restructuring Support Agreement* at 21 [ECF No. 1426].

[26] *Jaresko, Key Lawmakers Discuss With Reorg Prospects for Passage of PREPA RSA Legislation, Acknowledge Real Risk of Creditor-Focused Receivership*, REORG (Mar. 3, 2020), https://app.reorg.com/v3#/items/intel/1869?item_id=97339.

[27] FOMB Objection to Mediation Motion ¶ 4.

[28] Gov't of Puerto Rico, Additional/Voluntary Event-Based Disclosure, Summary of Materials Exchanged in Mediation (Sept. 16, 2022), https://emma.msrb.org/P11622357-P11250316-P11674788.pdf.

[29] Press Release, Financial Oversight and Management Board for Puerto Rico, Statement (Mar. 8, 2022) https://drive.google.com/file/d/1TQqI5kZTVeHX0BEmRLa6GSFShVSnEgG9/view.

few months have projected a continued decline in spot-market oil prices.  It also ignores the reality that Puerto Rico's economy generally, and the Puerto Rican consumer in particular, have never been in a stronger position.

29.     In its most recent statement, the Oversight Board now points to concerns that customers' future adoption of solar-energy generation will reduce demand for electricity distributed by PREPA.  Those concerns are significantly overstated.  The recent uptick in solar-generation requests to which the Oversight Board points resulted largely from LUMA's fulfillment of PREPA's backlog of old requests.[30]

30.     Moreover, there are significant barriers to widespread rooftop-solar adoption in Puerto Rico, including higher costs than in the continental United States, the condition of the power grid, and consumers' need to buy expensive batteries if they plan to rely on solar power to go completely off the grid.  In any event, concerns about any effect of distributed solar generation on debt service can be solved.  For example, PREPA Bondholders have expressed their willingness to accept a portion of their recovery in the form of a contingent instrument that would pay only to the extent electricity consumption on the island increases above the Oversight Board's projections.  In addition, the Oversight Board's latest proposal to bondholders relies on a connectivity charge paid by all grid-connected customers, regardless of whether they also install solar panels.  The vast majority of solar-generating customers remain "dependent on PREPA for their daily electricity usage," especially at night and in periods of high demand, as well as for backup—contrary to the

---

[30] *See* FOMB Urgent Motion ¶ 13.  LUMA's announcement regarding 18,000 solar panels was not about installation of new panels but rather about connecting already-installed panels to PREPA's grid.  Press Release, LUMA Details Historic Renewable Energy Advances in Report to PREB (Apr. 1, 2022), www.lumapr.com/news/luma-details-historic-renewable-energy-advances-in-report-to-preb/?lang=en.  LUMA has repeatedly emphasized that it received a "serious backlog" of solar connection requests, many of which had been pending for over a year.  *See* LUMA Quarterly Report: For the period ending March 31, 2022 at 11 (May 16, 2022), *In re: Review of the Puerto Rico Electric Power Authority's System Remediation Plan*, PREB Case No. NEPR-MI-2020-0019; LUMA Quarterly Report: For the period ending December 31, 2021 at 9 (Feb. 15, 2022), *In re: Review of LUMA's Initial Budgets* at 17, PREB Case No. NEPR-MI-2021-0004.

Oversight Board's unsupported assertion otherwise.[31]  Those customers' continued reliance on PREPA means that they can and should help to pay the legacy bond debt that built the system they use.

31.     Coming out of its unsuccessful mediation, the Oversight Board has now filed an urgent motion to establish a litigation schedule focused solely on the Bond Issues, which it contends are the only "gating issues" in this case.  Although the Oversight Board acknowledges that these issues *could* "be litigated in the context of a confirmation hearing" on a proposed plan of adjustment, it rejects having to bring forward a plan so that these legal and factual issues (and others) can be resolved in that context.[32]

32.     The public disclosure of the terms under discussion in the mediation demonstrates the PREPA Bondholders' reasonable and constructive approach to resolving this case.  Simply put, the offers from the PREPA Bondholders would have imposed minimal additional costs on PREPA's customers, and much of the incremental cost would have been paid only in the event of outperformance relative to PREPA's fiscal plan.  Mediation nevertheless ended without a deal.

33.     While the PREPA Bondholders are appreciative and thankful of the Mediation Team's devotion to this case, unfortunately there is no reason to believe that further progress can be made in continued mediation with the Oversight Board at this time.  If this Court were nonetheless inclined to order mediation, the PREPA Bondholders believe such mediation is unlikely to be fruitful without a fundamental change in the landscape, including at a minimum setting deadlines for the confirmation of a Title III plan, scheduling a hearing on the Motion to Dismiss/Lift-Stay, and requiring mandatory participation by principals with settlement authority

---

[31] FOMB Urgent Motion ¶ 13.

[32] FOMB Urgent Motion ¶ 33.

at regularly scheduled mediation meetings.  As noted above, the PREPA Bondholders respectfully suggest that the Court ask the Mediation Team for its view on the effectiveness of restarting mediation, litigating the Bond Issues, and imposing plan deadlines, as well as what a fair path forward and schedule would look like.

## RELIEF REQUESTED

### I.  The Motion to Dismiss/Lift-Stay Should Be Decided Before Any Other Proceedings

34.     The PREPA Bondholders are moving to dismiss PREPA's Title III case or, in the alternative, to lift the stay.  Either form of relief will allow the PREPA Bondholders to obtain the appointment of a receiver for PREPA.  The PREPA Bondholders have been unable, since the petition date, to exercise their statutory and contractual right to the appointment of a receiver.  But the last five years demonstrates a level of undue delay, a failure to prosecute, and an inability to achieve PROMESA's aims that are cause to grant the PREPA Bondholders' motion and allow them to obtain a receiver now.

35.     A receiver will be able to cause PREPA to make the financial and operational changes that the Oversight Board has for years been unable or unwilling to obtain from PREPA's political leadership.  It is the most sure-fire way to get PREPA on track to the kind of fiscal stability and normalcy that the pendency of this case has delayed.  This Court can and should grant the PREPA Bondholders' motion to dismiss or to lift the stay forthwith, and before any other proceedings resume in this case.[33]

---

[33] As set forth in the contemporaneously filed motion to dismiss, Assured, National and Syncora recognize that their prior motion for appointment of a receiver remains on file, having been stayed by this Court.  Assured, National and Syncora assert that, in view of their newly filed motion, the prior motion should either remain stayed at this time or be dismissed without prejudice as superseded by the just filed motion to dismiss.

II.     **In the Alternative, the PREPA Bondholders' Motion to Dismiss/Lift-Stay Should
Proceed in Parallel With Meaningful Plan Deadlines and Litigation of the Bond
Issues**

36.     The PREPA Bondholders assert that the Court has the ability, based on the existing

and indisputable record, to grant the Motion to Dismiss/Lift Stay and do so expeditiously.

However, in the event that this Court decides to set a later evidentiary hearing on the PREPA

Bondholders' motion, then discovery should commence immediately and run in tandem with a

schedule for PREPA to propose and confirm a plan.  PROMESA authorizes the Court to impose a

plan-filing deadline on the Oversight Board.[34]   Section 105(a) of the Bankruptcy Code

supplements that deadline-setting authority and affords the Court broad discretion to manage its

docket by authorizing it to issue any other scheduling order and deadlines necessary or appropriate

to carry out the provisions of the Bankruptcy Code.[35]

37.     The Oversight Board's exclusive right to propose a plan of adjustment is not a

license for indefinite delay.  Neither the Bankruptcy Code nor PROMESA allows a debtor to

remain in bankruptcy for five years, litigating with creditors at its convenience, refusing to raise

revenues to avoid paying creditors for half a decade, dissipating creditors' recoveries through the

passage of time, and all the while leaving Puerto Rico and its residents to suffer the consequences

of a never-ending bankruptcy process and PREPA's lack of access to the capital markets.  After

five years, the Oversight Board is not close to proposing a viable path toward PREPA's emergence

from Title III, and at this point, its ongoing filibuster—with no end in sight—imposes substantial

continuing harm on Puerto Rico.[36]   It has become politically convenient for the Government

---

[34] PROMESA § 312(b).

[35] 11 U.S.C. § 105(a); *see also* PROMESA § 301(a) (incorporating 11 U.S.C. § 105(a) into PROMESA).

[36] *See Luma's Chief Regulatory Officer Says Pendency of PREPA's Title III Bankruptcy Restricts Reconstruction of
Electric System*, REORG (Aug. 30, 2022), https://app.reorg.com/v3#/items/intel/1869?item_id=189029 (LUMA
Energy's Chief Regulatory Officer stating that PREPA's Title III case "poses very serious restrictions on resources

Parties, including the Oversight Board, to leave PREPA languishing in bankruptcy, and to avoid proposing a confirmable Title III plan and engaging in a court proceeding about what PREPA can affordably pay its creditors. Establishing firm deadlines for the Oversight Board is the only way, absent dismissal or lifting of the stay, to move it forward. The Oversight Board should be ordered to propose a viable plan of adjustment, and to seek its confirmation on the schedule contained herein, to protect PREPA's creditors and customers from indefinite postponement of this case's resolution.

38.    In the Commonwealth's Title III case, this Court granted a similar request by bondholders to impose deadlines on the Oversight Board to file a Commonwealth and PBA plan of adjustment.[37] The result in that case demonstrates that imposing firm deadlines is effective in focusing the parties' attention on plan-related issues and facilitating a debtor's emergence from Title III.

39.    PREPA's creditors have waited long enough for real progress in this case. The PREPA Bondholders respectfully request that the Court order the following deadlines on the Oversight Board in connection with a PREPA plan of adjustment:

> By no later than **November 1, 2022**, the Oversight Board shall file a proposed plan of adjustment accompanied by a proposed detailed timetable for the consideration and approval of a disclosure statement, solicitation and tabulation of votes on the plan, and confirmation of the plan (the hearing on which shall be scheduled to take place no later than **May 1, 2023**).

---

and timing" and noting some of the challenges posed by PREPA's debtor status include: (i) the expense of bankruptcy, (ii) accounting limitations, and (iii) access to capital markets); *see also AAFAF Chief Marrero Signals PREPA RSA 'Most Likely' Will Need Renegotiation, Given Lack of Legislative Support,* REORG (Feb. 7, 2022), https://app.reorg.com/v3#/items/intel/1869?item_id=168129 (AAFAF's top official stating that PREPA's bankruptcy is the major obstacle thwarting the government's renewable energy goals and economic development initiatives).

[37] *See Order on Joint Motion of PSA Creditors Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan of Adjustment* at 3 [Case No. 17-03283, ECF No. 14987].

These are reasonable and achievable deadlines.  Other municipal bankruptcies involving even larger claims and at least as much complexity (if not more) have been resolved in far less time than the unprecedented number of years that this case has been pending.[38]  If the Oversight Board is not willing to propose a plan and obtain its confirmation on that schedule, then its continuing failures will be additional evidence that this case should be dismissed, or that the stay should be lifted, for the reasons addressed in the PREPA Bondholders' Motion to Dismiss/Lift-Stay.

40.    The plan process set out by these deadlines should run parallel with (and not wait for) whatever other litigation the Oversight Board contends is necessary—including the Oversight Board's planned litigation of the Bond Issues.  The Court therefore should set litigation deadlines by reference to the plan proposal and confirmation schedule described above.  As the Oversight Board has admitted, the Bond Issues could (and, we submit, should) "be litigated in the context of the confirmation hearing."[39]  The Oversight Board can also propose and prosecute a plan that toggles between alternative claim treatments depending on the final result of any remaining issues.

## III.    The Oversight Board's Strategy of Piecemeal Litigation Should Be Rejected

41.    The Oversight Board's scheduling proposal would require the parties to litigate the Bond Issues *without* simultaneously moving ahead with a meaningful plan process.  That approach to this long-running case would doom PREPA, its customers, and its many other stakeholders to years of continuing delay and expense.

---

[38] *See e.g., In re City of Detroit*, Case No. 13-53846 (Bankr. E.D. Mich.) (Detroit's bankruptcy moved quickly (482 days) in part because there was an external deadline, as the law appointing the city's emergency manager had a built-in expiration date. That deadline resulted in Detroit's filing, approximately one year after its petition date, of an almost entirely mediated, consensual plan covering $18 billion in claims.  Detroit's bankruptcy exemplifies how deadlines can help to move along a complex case); *In re Cnty. of Orange*, 219 B.R. 543, 548 (Bankr. C.D. Cal. 1997) (noting petition and confirmation dates – 582 days); *In re Jefferson County, Ala.*, Case No. 11-05736 (Bankr. N.D. Ala.) (744 days); *In re City of Stockton, California*, Case No. 12-32118 (Bankr. E.D. Cal.) (944 days).

[39] FOMB Urgent Motion ¶ 33.

42.     For starters, very little in this case actually turns on whether bondholders have perfected liens, or whether they are secured or unsecured.  The protracted, standalone litigation of that and other Bond Issues would not meaningfully resolve how PREPA must treat the PREPA Bondholders' claims in a confirmable plan of adjustment.  In all events, the key question will remain: What PREPA can afford to pay its creditors in order to comply with the fair-and-equitable and best-interests requirements of PROMESA and the Bankruptcy Code.  PREPA's bonds represent the largest claims asserted against PREPA by a wide margin, and are entitled to payment of whatever PREPA can afford to pay no matter their secured status.[40]

43.     In fact, overwhelming evidence shows that PREPA's access to years of future revenue streams make it a solvent debtor able to pay its debts and other expenses in full.  The PREPA Bondholders will therefore object to any non-consensual plan of adjustment that fails to provide them with such treatment, and the Oversight Board is mistaken if it believes it can confirm a plan without the supporting votes of the PREPA Bondholders and without this Court determining what PREPA can afford to pay its creditors.  The Oversight Board thus admits that bondholders "might be correct" that litigation over the existence and perfection of their liens "is a sideshow and a waste of time and resources" unless the bondholders lose on affordability.[41]  Fixating on litigation that avoids or delays answering that fundamental affordability question in the context of an actual proposed plan of adjustment for PREPA's debts would needlessly put this case on track for years of wasted effort that will not materially advance it.

---

[40] *See, e.g.*, *Fano v. Newport Heights Irrigation Dist.*, 114 F.2d 563, 565-66 (9th Cir. 1940) (reversing confirmation of reorganization plan that was not in bondholders' best interests without proof that the district could not raise funds sufficient to pay its bonds).

[41] FOMB Urgent Motion ¶¶ 38-39.

44.     Likewise, the Oversight Board's new-found strategy to attack the bondholders' recourse for the payment of their claim—which has not been raised by the Oversight Board in the five years since this case was filed, and which is directly contradicted by the Oversight Board's settlement reflected in the 2019 RSA—reflects a tactical gambit to stall this Court's decision on what PREPA can afford to pay its creditors.  Litigating this issue would almost certainly be a waste of the Court's time and resources for several reasons.

45.     First, the argument for limiting the bondholders' recourse on their unpaid claims is "fallacious," just as the Oversight Board itself stated when a similar question regarding section 927 of the Bankruptcy Code came up in HTA.[42]  PREPA's bonds are payable from its revenues— which is how all revenue bonds work—and bondholders' recourse is not limited solely to amounts that happen to be on deposit in a single account at any given moment in time.  The Trust Agreement is clear on this point, and any other reading of that document is absurd.  The Oversight Board misleadingly contends that the PREPA Bondholders have *conceded* that their bonds have only "limited recourse" for payment for purposes of the Oversight Board's anticipated new claims.  That falsely states bondholders' position.  The PREPA Bondholders have recourse to all of PREPA's revenues, and they have never suggested otherwise. They are not limited to some small sliver of those revenues, as the Oversight Board now intends to claim.  When the PREPA Bondholders have referred to the "limited recourse" nature of their bonds, they have been referring to the fact that PREPA, like most municipal issuers of debt, is prohibited by law from granting liens ***on physical assets***.[43]  Further, revenue bonds are "limited recourse" insofar as they are not general obligations

---

[42] *See* Brief for Defendants-Appellees at 33, *In re Fin. Oversight & Mgmt. Bd. for PR* [Case No. 18-1165, ECF No. 00117311702].  This Court previously expressed doubts about claims concerning bondholders' recourse with respect to the HTA bonds.  *Amerinational Cmty. Servs. v. Ambac Assurance Corp., et. al. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 635 B.R. 216, 231, n.11 (D.P.R. 2021).

[43] *See* P.R. Laws Ann. tit. 22, § 206.

of a sponsoring municipality and payable out of that municipality's ad valorem taxes.  Rather, "they are payable solely from the revenues of the utility or other undertaking."[44]  Second, even if PREPA's bonds had recourse as limited as the Oversight Board now plans to argue (and they do not), then bondholders would still have numerous claims for breaches of the Trust Agreement that would not be so limited.  Third, the PREPA Bondholders would be entitled to non-dischargeable constitutional claims for the full amount owed under the bonds.  Finally, if the Oversight Board's non-recourse argument is not rejected out of hand (and it should be), then fact and expert discovery, and evidence, would be needed on the transaction documents, disclosures, market conventions, and contemporary understandings surrounding the bonds' terms when they were purchased, and whether they could plausibly have been understood as limiting bondholders' recourse in the manner that the Oversight Board now (belatedly) asserts.  (Evidence would also be needed on the other Bond Issues the Oversight Board seeks to litigate.)

46.    This Court should not condone a litigation campaign that would take years to reach final, non-appealable judgments, with no real end in sight.  If discovery is allowed (as it must be), the Oversight Board's proposed litigation schedule does not set a hearing on summary judgment on its amended adversary complaint until *April 5, 2023*.  If the Court were to issue a decision a month later, it would be the subject of appeal (which the Oversight Board itself has noted could take up to one year), meaning that the proposed litigation schedule would add an additional almost two years to PREPA's case.[45]  The real "gating item" in this case that will address bondholders' claims and provide clarity to the parties is clear: a determination of what PREPA can and should pay its creditors under a Title III plan.  Absent imminent dismissal, moving forward with a plan

---

[44] 15 McQuillin Mun. Corp. § 43:131 (3d ed. 2022).

[45] 9019 Motion ¶ 61 (acknowledging that "regardless of who prevails on [the Bond issues], the results would likely be appealed to appellate courts, which, as demonstrated in other appeals, could take at least a year or more to resolve.").

process that addresses that issue is the only way to have PREPA exit Title III before it spends another five years in bankruptcy.  Without clear deadlines, under which a Title III plan process and the Motion to Dismiss/Lift-Stay are moving in tandem with all other litigation, PREPA will remain in bankruptcy for the foreseeable future, with all of the attendant costs to customers, creditors, and Puerto Rico that this delay entails.

## CONCLUSION

PREPA's five year bankruptcy odyssey—with no plan anywhere on the horizon—needs to end.  This Court should hear and grant the PREPA Bondholders' Motion to Dismiss/Lift-Stay before any other proceedings in this case.

In the alternative, if the Court chooses to hear the Motion to Dismiss/Lift-Stay at a later date, then the Court should require the Oversight Board, no later than **November 1, 2022**, to propose a plan of adjustment and timetable for obtaining confirmation of that plan at a hearing scheduled no later than **May 1, 2023**.  The litigation of any Bond Issues that the Oversight Board deems necessary to the plan process should run parallel with those deadlines.[46] The Motion to Dismiss/Lift-Stay can be set for an evidentiary hearing if the Oversight Board misses its plan deadlines, or otherwise at the request of the movants or in the Court's discretion.[47]

Accordingly, the PREPA Bondholders respectfully request that this Court enter an order substantially in the form attached hereto as Exhibit A granting the relief requested herein with respect to the PREPA Bondholders' Motion to Dismiss/Lift-Stay and granting such other relief as this Court deems just and proper, or alternatively, that the Court enter an order substantially in the

---

[46] The PREPA Bondholders (who are not currently parties to the Complaint) should also be allowed to participate fully in any adjudication of the Bond Issues without the need to intervene.

[47] The PREPA Bondholders do not agree with the Oversight Board's proposed litigation schedule, and therefore, once this Court provides guidance to the parties on how this case should now proceed, the PREPA Bondholders ask for leave to respond to the specific details of the Oversight Board's litigation schedule to the extent that it remains relevant.

form attached hereto as Exhibit B granting the relief requested herein with respect to fixing the requested plan-related deadlines, and granting such other relief as this Court deems just and proper.

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 9013-1 AND THE CASE MANAGEMENT PROCEDURES ORDER

Pursuant to Local Rule 9013-1 and ¶ I.H of the Sixteenth Amended Case Management Procedures Order, the PREPA Bondholders hereby certify that they have (a) carefully examined the matter and concluded that there is a true need for an urgent hearing; (b) not created the urgency through any lack of due diligence; and (c) made reasonable, good-faith communications in an effort to resolve or narrow the issues that are being brought to the Court with respect to its cross-motion and proposed litigation schedule. The Oversight Board, AAFAF, and the Committee have advised the PREPA Bondholders that they will not consent to the relief requested in this response and cross-motion.

We hereby certify that, on this same date, we electronically filed the foregoing with the clerk of the Court using the CM/ECF system, which will notify the attorneys of record.

Dated:  San Juan, Puerto Rico
       September 19, 2022

**TORO COLÓN MULLET P.S.C.**
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760

/s/*Manuel Fernández-Bared*
MANUEL FERNÁNDEZ-BARED
USDC-PR No. 204,204
E-mail: mfb@tcm.law

/s/ *Linette Figueroa-Torres*
LINETTE FIGUEROA-TORRES
USDC-PR No. 227,104
E-mail: lft@tcm.law

/s/ *Nayda Perez-Roman*
NAYDA PEREZ-ROMAN
USDC–PR No. 300,208
E-mail: nperez@tcm.law

*Counsel for the Ad Hoc Group of PREPA Bondholders*

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000

/s/ *Amy Caton*
AMY CATON*
THOMAS MOERS MAYER*
GARY A. ORSECK*
ALICE J. BYOWITZ*
MATTHEW M. MADDEN*
Email:  acaton@kramerlevin.com
       tmayer@kramerlevin.com
       gorseck@kramerlevin.com
       abyowitz@kramerlevin.com
       mmadden@kramerlevin.com

*Admitted Pro Hac Vice

*Counsel for the Ad Hoc Group of PREPA Bondholders*

25

**CASELLAS ALCOVER & BURGOS
P.S.C.**

By: /s/ *Heriberto Burgos Pérez*
Heriberto Burgos Pérez
USDC-PR 204809
Ricardo F. Casellas-Sánchez
USDC-PR 203114
Diana Pérez-Seda
USDC-PR 232014
P.O. Box 364924
San Juan, Puerto Rico 00936-4924
Telephone: (787) 756-1400
Facsimile:      (787) 756-1401
Email: hburgos@cabprlaw.com
          rcasellas@cabprlaw.com
          dperez@cabprlaw.com

*Attorneys for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

**CADWALADER, WICKERSHAM & TAFT
LLP**

By: /s/*Howard R. Hawkins, Jr.*
Howard R. Hawkins, Jr.*
Mark C. Ellenberg*
William J. Natbony*
Thomas J. Curtin*
Casey J. Servais*
200 Liberty Street
New York, New York 10281
Telephone:  (212) 504-6000
Facsimile:   (212) 504-6666
Email: howard.hawkins@cwt.com
          mark.ellenberg@cwt.com
          bill.natbony@cwt.com
          thomas.curtin@cwt.com
          casey.servais@cwt.com
* Admitted *pro hac vice*

*Attorneys for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

**ADSUAR MUÑIZ GOYCO
SEDA & PÉREZ-OCHOA, P.S.C.**

By:   */s/ Eric Pérez-Ochoa*
Eric Pérez-Ochoa
(USDC-PR No. 206314)
Luis Oliver-Fraticelli
(USDC-PR No. 209204)
Alexandra Casellas-Cabrera
(USDC-PR No. 301010)
PO BOX 70294
San Juan, PR 00936
Telephone: 787.756.9000
Facsimile:  787.756.9010
Email:  epo@amgprlaw.com
          loliver@amgprlaw.com
          acasellas@amgprlaw.com


*Attorneys for National Public Finance
Guarantee Corporation*

**WEIL, GOTSHAL & MANGES LLP**

By:   */s/ Robert Berezin*
Kelly DiBlasi (admitted *pro hac vice*)
Jonathan Polkes (admitted *pro hac vice*)
Gregory Silbert (admitted *pro hac vice*)
Robert Berezin (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007
Email: kelly.diblasi@weil.com
          jonathan.polkes@weil.com
          gregory.silbert@weil.com
          robert.berezin@weil.com

Gabriel A. Morgan (admitted *pro hac vice*)
700 Louisiana Street, Suite 1700
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email: gabriel.morgan@weil.com

*Attorneys for National Public Finance
Guarantee Corporation*