**Hearing date and objection deadlines to be determined by the Court.**
**Hearing on scheduling to be held September 21, 2022 at 9:30 a.m. (AST).**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.<br><br>Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | Case No. 17-BK-4780-LTS<br><br>**This Court Filing Relates Only to PREPA and Shall be Filed in Case No. 17-BK-4780-LTS and Main Docket 17-BK-3283-LTS**<br><br>**Evidentiary Hearing Requested** |

### MOTION OF THE AD HOC GROUP OF PREPA BONDHOLDERS, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AND SYNCORA GUARANTEE, INC. TO DISMISS PREPA'S TITLE III CASE, OR FOR RELIEF FROM THE AUTOMATIC STAY TO ENFORCE THEIR RIGHT TO A RECEIVER

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (*i*) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (*ii*) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (*iii*) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (*iv*) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (*v*) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND .................................................................................................................7

I.     THE PREPA BONDS AND RECEIVERSHIP RIGHT..................................................7

II.    THE FIRST YEARS OF THE PREPA CASE AND THE 2019 RSA .............................10

III.   THE GOVERNMENT PARTIES' POST-PANDEMIC PLEDGES TO
IMPLEMENT THE 2019 RSA .................................................................................12

IV.   AAFAF ARBITRARILY ASSERTS ITS TERMINATION OF THE 2019 RSA,
WITH THE OVERSIGHT BOARD'S SUPPORT, AND THIS COURT ORDERS
MEDIATION .......................................................................................................15

ARGUMENT ..................................................................................................................17

I.     THE COURT SHOULD DISMISS THIS CASE FOR CAUSE UNDER
SECTION 930(A) OF THE BANKRUPTCY CODE ......................................................17

     A.     This Court Is Able To Dismiss This Title III Proceeding For Cause ...................17

     B.     The Oversight Board's Unreasonable Delay, Failure To Prosecute, And
Inability To Fulfill PROMESA's Purposes Are All Causes For Dismissal..........18

          1.     The Board's Delay And Failure To Prosecute Are Inexcusable...............19

          2.     The Board's Delay And Failure To Prosecute Are Prejudicial.................22

          3.     This Title III Case Does Not Serve PROMESA's Purposes And
Goals ................................................................................................25

     C.     Dismissal Will Permit Appointment Of A Receiver Who Can Increase
Rates To The Benefit Of PREPA And All Its Creditors.......................................27

II.    IN THE ALTERNATIVE, THE COURT SHOULD LIFT THE STAY FOR
CAUSE UNDER SECTION 362(D)(1)......................................................................29

CONCLUSION................................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

<b><u>Page(s)</u></b>

**Cases**

*In re Abeinsa Holding, Inc.*,
  16-10790, 2016 WL 5867039 (Bankr. D. Del. Oct. 6, 2016) ..................................................30

*In re Accent Assocs., Inc.*,
  8 B.R. 933 (Bankr. D. Mass. 1981) .......................................................................................31

*Ambac Assurance Corp. v. Commonwealth of Puerto Rico*,
  927 F.3d 597 (1st Cir. 2019)..........................................................................................29, 33

*In re Armstrong & Guy L. Off., LLC*,
  No. 07-02459, 2007 WL 4571152 (Bankr. S.D. Miss. Dec. 21, 2007) .................................32

*In re Arnott*,
  512 B.R. 744 (Bankr. S.D.N.Y. 2014)....................................................................................32

*Aurelius Capital Master, Ltd. v. Commonwealth of Puerto Rico*,
  919 F.3d 638 (1st Cir. 2019)..........................................................................................29, 33

*In re Avianca Holdings S.A.*,
  Case No. 20-11133-mg, ECF No. 2384 (Bankr. S.D.N.Y. 2021)...........................................21

*In re Babayoff*,
  445 B.R. 64 (Bankr. E.D.N.Y. 2011)......................................................................................23

*In re Brooks*,
  488 B.R. 483 (Bankr. N.D. Ga. 2013) .......................................................................18, 19, 23

*In re Cicale*,
  No. 05-14463, 2007 WL 1893301 (Bankr. S.D.N.Y. June 29, 2007) ....................................34

*In re City of Detroit*,
  Case No. 13-53846 (Bankr. E.D. Mich.) ................................................................................20

*In re City of Stockton, California*,
  Case No. 12-32118 (Bankr. E.D. Cal.) ...................................................................................20

*In re Cnty. of Orange*,
  219 B.R. 543 (Bankr. C.D. Cal. 1997)....................................................................................20

*In re Coast Caribbean Recycling, Inc.*,
  No. 14-01133, 2014 WL 7359405 (Bankr. D.P.R. Dec. 23, 2014) ........................................33

### TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*In re Colon Martinez*,
  472 B.R. 137 (B.A.P. 1st Cir. 2012) ...................................................................20

*In re Connector 2000 Ass'n, Inc.*,
  447 B.R. 752 (Bankr. D.S.C. 2011) ...................................................................20

*In re Covia Holdings Corp.*,
  Case No. 20-33295, ECF No. 1069 (Bankr. S.D. Tex. 2020)................................21

*In re David X. Manners Co.*,
  No. 15-51490, 2018 WL 1997674 (Bankr. D. Conn. Apr. 26, 2018).....................34

*De Jounghe v. Mender*,
  334 B.R. 760 (B.A.P. 1st Cir. 2005) ..............................................................19, 20

*Fano v. Newport Heights Irrigation Dist.*,
  114 F. 2d 563 (9th Cir. 1940) ...........................................................................22

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  301 F. Supp. 3d 278 (D.P.R. 2017)..................................................10, 30, 31, 35

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  No. 22-1119, 2022 WL 2800724 (1st Cir. July 18, 2022).....................................33

*Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. of PREPA Bondholders (In
  re Fin. Oversight & Mgmt. Bd. for P.R.)*,
  899 F.3d 13 (1st Cir. 2018)............................................................................ *passim*

*In re FirstEnergy Solutions Corp.*,
  Case No. 18-50757, ECF No. 3773 (Bankr. N.D. Ohio Feb. 27, 2020) .................21

*In re Forum Health*,
  444 B.R. 848 (Bankr. N.D. Ohio 2011) ..............................................................26

*Franklin Cal. Tax-Free Tr. v. Commonwealth of Puerto Rico*,
  85 F. Supp. 3d 577 (D.P.R. 2015).....................................................................33

*In re General Motors Corporation*,
  Case No. 09-50026 (Bankr. S.D.N.Y.) ...............................................................21

*In re Gonic Realty Trust*,
  909 F.2d 624 (1st Cir. 1990).............................................................................18

*In re Grupo Aeromexico, S.A.B. de C.V.*,
  Case No. 20-11563, ECF No. 2816 (Bankr. S.D.N.Y. 2022).................................21

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*In re Gundrum*,
   509 B.R. 155 (Bankr. S.D. Ohio 2014) .................................................................................31

*In re Hardeman Cnty. Hosp. Dist.*,
   540 B.R. 229 (Bankr. N.D. Tex. 2015) ..................................................................................20

*In re Jefferson County, Ala.*,
   Case No. 11-05736 (Bankr. N.D. Ala.) ..................................................................................20

*In re Murray*,
   543 B.R. 484 (Bankr. S.D.N.Y. 2016) ..................................................................................30

*In re New York City Off-Track Betting Corp.*,
   No. 09-17121, 2011 WL 309594 (Bankr. S.D.N.Y. Jan. 25, 2011) ...........................18, 19, 26

*In re New York Med. Grp.*,
   265 B.R. 408 (Bankr. S.D.N.Y. 2001) ..................................................................................34

*In re Richmond Unified Sch. Dist.*,
   133 B.R. 221 (Bankr. N.D. Cal. 1991) .................................................................................18

*Samuels v. Wilmington Sav. Fund Soc'y*,
   No. 19-003, 2019 WL 6211209 (B.A.P. 1st Cir. Nov. 19, 2009) ...........................................19

*In re Sonnax Industries*,
   907 F.2d 1280 (2d Cir. 1990).........................................................................................31, 32

*Southerland v. Troy & Nichols, Inc.*,
   173 B.R. 432 (M.D. Fla. 1994) ...........................................................................................31

*In re Taberna Preferred Funding IV, Ltd.*,
   594 B.R. 576 (Bankr. S.D.N.Y. 2018) ..................................................................................18

*In re The Hertz Corp.*,
   Case No. 20-11218, ECF No. 5477 (Bankr. D. Del. 2021) ....................................................21

*In re Woodbrook Associates*,
   19 F.3d 312 (7th Cir. 1994) .................................................................................................18

**Statutes**

11 U.S.C. § 362(d)(1) .......................................................................................................29, 30, 31

11 U.S.C. § 930(a) ..........................................................................................................27, 29, 30

iv

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

11 U.S.C. § 930(a)(1)................................................................17, 18

11 U.S.C. § 930(a)(2)................................................................17, 18

48 U.S.C. § 2124(i)(3)...............................................................10

48 U.S.C. § 2231(g)..................................................................10

22 L.P.R. § 207(a)....................................................................28

22 L.P.R. § 207(b)................................................................28, 29

3 L.P.R.A. § 9142.....................................................................29

22 L.P.R.A. §§ 17-18...................................................................7

22 L.P.R.A. §§ 191-217.................................................................7

22 L.P.R.A. § 193......................................................................7

22 L.P.R.A. §§ 207-08..................................................................7

22 L.P.R.A. § 502......................................................................7

22 L.P.R.A. § 804..................................................................7, 28

22 L.P.R.A. § 808......................................................................7

PREPA Enabling Act § 5(*l*)............................................................7

PROMESA § 314(b)(6)...................................................................22

## Other Authorities

6 *Collier on Bankruptcy* (16th 2021)..................................................18

Fed. Reserve Bank of N.Y., *An Update on the Competitiveness of Puerto Rico's
Economy* (2014).......................................................................3

*Joint Stmt. in Lieu of Conf. Rep. on the Bankruptcy Code*, 124 Cong. Rec.
H11,100 (Sept. 28, 1978).............................................................22

The Ad Hoc Group of PREPA Bondholders (the "Ad Hoc Group"), Assured Guaranty Corp. and Assured Guaranty Municipal Corp. ("Assured"), National Public Finance Guarantee Corporation ("National"), and Syncora Guarantee Inc. ("Syncora," and together with Assured, National, and the Ad Hoc Group, the "PREPA Bondholders") respectfully submit this motion to dismiss PREPA's Title III case or, in the alternative, for limited relief from the automatic stay, and state as follows in support:

## PRELIMINARY STATEMENT

1.      PREPA has been trying to restructure its debt for over eight years, and has now lingered in Title III for more than five years.  The sad truth is that PREPA is further from confirming a plan of adjustment today than it was in July 2017, when the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or "Board") commenced this case on PREPA's behalf.  Indeed, even while Puerto Rico's economy has markedly improved in recent years, PREPA's reorganization has foundered.

2.      Movants, holders or insurers of 65% of $8.3 billion in outstanding PREPA bonds, have been patient, but the time has come to permit the PREPA Bondholders to exercise their statutory and contractual right to obtain the appointment of a receiver to set affordable and sustainable electricity rates sufficient for PREPA to pay its debts and improve its service.  To facilitate that appointment—and PREPA's long-overdue progress toward financial and operational stability—the Court should either dismiss the Title III case or grant limited relief from the stay.

3.      PREPA has now reneged on *three* carefully negotiated restructuring support agreements to reduce and repay its bond debt through a reasonable rate increase.  The Board is now perpetuating that dysfunction, despite Puerto Rico's growing economy and billions of dollars

in federal aid, by improvidently backing the government's decision to tear up PREPA's most recent consensual bondholder deal and forge ahead with value-depleting, futile litigation.

4.     In its third and most recent iteration, PREPA's 2019 Restructuring Support Agreement ("2019 RSA") provided a path for restructuring PREPA's bond debt, which represents the overwhelming majority of PREPA's prepetition obligations.  That agreement was struck with the full support of PREPA, the Oversight Board, and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF," and together the "Government Parties").  For nearly four years, PREPA's bondholders abided by the RSA's terms and refrained from seeking a receiver for PREPA or objecting to issues in this case and the Commonwealth's.  The Oversight Board used that peace and stability to solicit and maximize federal funding commitments, obtain and negotiate privatization proposals for PREPA's operations, and resolve the Commonwealth's Title III case. Along the way, the Government Parties repeatedly reiterated their continued support for the RSA, including just this February when the Board emphasized that "the RSA . . . provides PREPA and all present and future ratepayers with gargantuan benefits."  ECF No. 2735 ¶ 4.[2]

5.     A mere eight days later, with the Oversight Board's support, Governor Pierluisi abandoned that deal.  The Government Parties pointed to elevated oil prices and inflation as bases for the termination notice, but a temporary uptick in the price of oil and other goods, during a more than 40-year deal, was hardly unexpected.  Oil prices have since retreated to levels lower than at times when the Government Parties supported the deal.  The Government Parties have also vaguely pointed to post-pandemic affordability concerns, but Puerto Rico's economy is indisputably booming and in a far stronger position than it has been in for years.  With the resolution of Puerto Rico's other Title III cases, even the full payment of bondholders' claims would keep the island's

---

[2] "ECF No." refers to docket entries in PREPA's Title III Case No. 17-4780 unless otherwise indicated.

total obligations under a manageable debt-to-GNP ratio.[3]  So what is the real reason for the Government Parties' stunning about-face?  In a word, politics.  There is simply no other excuse for the Board's failure to restore a restructuring support agreement during mediation, nor for its proposal to fixate on litigation (that it will lose) instead of the plan that Puerto Rico needs.

6.      The Government Parties' wholly political maneuver now threatens even what halting progress PREPA *has* made in recent years.  That progress depended on PREPA's retention of a nonpolitical grid operator, LUMA Energy.  The Board's refusal to move forward with its bondholder deal, and PREPA's resulting failure to exit Title III, may well result in a $115 million termination event under LUMA's contract on November 30, 2022, and give politicians the option not to renew LUMA's contract—risking further service disruptions as LUMA exits, and further imperiling PREPA's transformation unless a receiver is appointed.

7.      Moreover, while PREPA remains in bankruptcy it has been stalled from moving forward with FEMA-reimbursable projects to improve its grid—delaying long-awaited progress on rebuilding and hardening PREPA's grid.[4]  To date, in fact, FEMA has disbursed only ***$40 million*** of the ***$12.2 billion*** available to fund projects to improve the grid.[5]  That lack of progress is a direct result of the Government Parties' decision to keep PREPA in bankruptcy.  Meanwhile, officials' resistance to taking the politically unpopular steps necessary to confirm a plan of

---

[3] *See* Fed. Reserve Bank of N.Y., *An Update on the Competitiveness of Puerto Rico's Economy* (2014) (prescribing a 60% debt-to-GNP goal for Puerto Rico's total governmental debt).

[4] Puerto Rico's measure of expected outages "is 88 times higher than the utility industry benchmark"—and significantly higher than even that of "similar islands." Ex. 1 (Mot. to Submit LUMA's Resource Adequacy Study, *In re: Resource Adequacy Study*, PREB Case No. NEPR-MI-2022-0002 (Aug. 30, 2022)).

[5] Ex. 2 (*Congressional Hearing Sheds Light on Puerto Rico Hurricane Rebuilding, Including More Than $12B in Unused Funds Allocated for PREPA's Electrical System,* REORG (Sept. 15, 2022); *see also* Ex. 3 (Resolution, *In re Review of the Puerto Rico Electric Power Authority's 10-Year Infrastructure Plan—December 2020*, PREB Case No. NEPR-MI-2021-0001 (Sept. 15, 2022), at 3 (PREPA's "lack of diligence" on two approved projects "will result in approximately one hundred million dollars ($100MM) less to transform the Puerto Rico Electrical System").

adjustment, make debt payments, and finally end this case imposes significant incremental costs that PREPA passes on to its customers through higher rates.

8.    Mediators spent more than five months trying to put the 2019 RSA's pieces back together, but to no avail.  As one member of the Oversight Board explained, the Board decided "to abandon global mediation" and "walked away" from a deal that "was clearly in reach."[6]  Instead, the Oversight Board has demanded to focus on protracted legal challenges to bondholders' recourse, liens, collateral, and priority.  But PREPA's bondholders hold the overwhelming majority of the claims in this proceeding, and so achieving a final, non-appealable judgment on their liens is beside the point.  The issue that matters here is what PREPA can afford to pay its creditors.  On that score, the data and record are clear: PREPA can honor its binding obligation to raise rates and pay its debts in full.

9.    The Government Parties have long been on record stating that the debt reduction and transition charge they agreed to in the 2019 RSA are reasonable, affordable, and beneficial to PREPA and its customers.  According to AAFAF's Executive Director, "it is not typical to achieve such a substantial reduction."[7]  Indeed, the 2019 RSA is even *more* affordable now than when it was struck.  The Oversight Board acknowledges that Puerto Rico's "growing economy" has markedly improved.[8]  Other officials recently touted the Commonwealth's "strong recovery"— pointing to substantial gains in labor participation, historically low unemployment, significant boosts to income and consumption, and record tourism performance.[9]  The Puerto Rico Economic

---

[6] Ex. 4 (Oversight Board, Statement by Justin Peterson (Sept. 16, 2022)).

[7] Ex. 5 (*AAFAF Chief Marrero Signals PREPA RSA 'Most Likely' Will Need Renegotiation, Given Lack of Legislative Support*, Reorg (Feb. 7, 2022)).

[8] ECF No. 2956 ¶ 1.

[9] Ex. 6 (AAFAF, PRNOW Summit Presentation, *Welcome to the Puerto Rico of Now* (June 6-7, 2022)); *see also* Ex. 7 (AAFAF, Investor Presentation, *Closing A Chapter Beginning A New Era* (Feb. 28, 2022); Ex. 8 (Jim Wyss and Michelle Kaske, *Puerto Rico Sees Lowest Unemployment Rate Since 1947*, Bloomberg (June

Development Bank has observed that economic activity now exceeds levels before the hurricanes and pandemic.[10]  In July, the Commonwealth announced that tax receipts had surged general-fund revenues to a whopping 12%—$1.3 billion—over budget projections.[11]  That caused one Oversight Board member to remark that "Puerto Rico is printing money" and to wonder, "When does Title 3 bankruptcy become unnecessary?"[12]  Meanwhile, an unprecedented sum of federal money is available—more than $12 billion to PREPA alone.[13]

10.     In the meantime, PREPA's customers are suffering concrete economic harms from its failure to exit bankruptcy.  AAFAF's Executive Director confirmed that bankruptcy is making "everything more expensive" for PREPA, including fuel and purchased power, and that this case is now Puerto Rico's "prime obstacle" to achieving its renewable energy goals and economic development initiatives.[14]  These hidden, insidious costs burden Puerto Rico more than would paying electricity rates sufficient to pay PREPA's debts and costs.

11.     Today, PREPA's only viable path forward is to bypass the current dysfunction and put the needs of its customers and creditors first.  Bondholders have an unequivocal statutory and contractual right to the appointment of a receiver who will make necessary changes at PREPA free of political constraints.  Once appointed, an independent receiver would be authorized to seek reasonable rates sufficient to pay PREPA's bond debt, other creditors, and necessary operating expenses.  And the receiver could support the ongoing modernization of PREPA's transmission-

---

6, 2022)) ("Puerto Rico's unemployment rate hit 6.4% in April, its lowest level since 1947, as the US territory is seeing a historic influx of federal reconstruction funds").

[10] Ex. 9 (*Index Exceeds Pre-Hurricane Levels*, NIMB (July 8, 2022)).

[11] Ex. 10 (Michelle Kaske, *Puerto Rico Tax – Revenue Pull Exceeds Budget By $1.3 Billion*, BLOOMBERG TAX (July 22, 2022)).

[12] Ex. 11 (Justin Peterson (@JPHusker), TWITTER (July 22, 2022)).

[13] *See, e.g.*, Ex. 34 (*PREPA obtains approval of USD 454.4m in FEMA allocations for grid modernization*, DEBTWIRE (Apr. 18, 2022)); Ex. 12 (*LUMA Quarterly Funding Report* (Sept. 7, 2022), at 6-7.

[14] Ex. 5 (*AAFAF Chief Marrero Signals PREPA RSA 'Most Likely' Will Need Renegotiation, Given Lack of Legislative Support,* REORG (Feb. 7, 2022)).

and-distribution system and other projects to enhance the reliability and efficiency of PREPA's
electricity service.

12.    Bondholders can exercise their receivership right if this Court either dismisses this
case or lifts the automatic stay for cause.  The cause is clear:  PREPA and the Oversight Board
have unduly delayed and unreasonably failed to prosecute this proceeding.  For *three years*, the
Government Parties told this Court and PREPA's creditors that they intended to implement the
2019 RSA, and that "a plan of adjustment would be forthcoming promptly."[15]  As recently as
January 2022, the Board had told this Court that it would file a plan of adjustment for PREPA by
this past March.[16]  Yet the Government Parties renounced the 2019 RSA just a few weeks later,
leaving PREPA without an agreement on which to premise a confirmable plan.  And now officials
are endeavoring to undermine the Board's only other notable progress at PREPA by threatening
not to renew LUMA's contract to modernize the grid.[17]  In short, the Board has failed to diligently
bring forward and prosecute a confirmable plan, and this delay is no longer acceptable.

13.    Bankruptcy is a privilege.  It grants debtors a temporary "breathing spell" through
the imposition of the automatic stay.  But PREPA, like any other debtor, may not shelter in
bankruptcy indefinitely while its creditors go unpaid.  The bankruptcy process is supposed to move
quickly.  Indeed, the Oversight Board's Executive Director once warned of the "risk that the
creditors get fed up" and seek either to "lift the stay or discharge the case" and "seek a receiver."[18]
And "the longer this [case] goes on," she explained, "the higher the risk there is of that

---

[15] *See* ECF No. 2748 at 10.

[16] ECF No. 2691 ¶ 8.

[17] Ex. 13 (Danica Coto, *Puerto Rico governor denounces power company amid outages*, AP (Aug. 18,
2022)); Ex. 14 (Danica Coto, *Company pledges to reduce Puerto Rico outages amid anger*, AP (Aug. 24,
2022)); Ex. 15 (Gloria Ruiz Kuilan, *Pedro Pierluisi: "LUMA will not have my support as governor unless
I see the changes I requested,"* EL NUEVO DIA (Aug. 24, 2022)).

[18] Ex. 16 (*Jaresko, Key Lawmakers Discuss With Reorg Prospects for Passage of PREPA RSA Legislation,
Acknowledge Real Risk of Creditor-Focused Receivership*, REORG (March 3, 2020)).

happening."[19]  *That was two-and-a half years ago.*  PREPA has now benefited from Title III's

protections for *more than five years*—ample opportunity to adjust its obligations.  It squandered

that opportunity, and enough is enough.  More than ever, a receiver is needed to put PREPA on a

course toward paying creditors and better serving customers.  PREPA's Title III case should be

dismissed, or the automatic stay should be lifted, so that such a receiver can be appointed.[20]

## BACKGROUND

### I.   THE PREPA BONDS AND RECEIVERSHIP RIGHT

14.   PREPA is a public corporation established by law (the "Enabling Act") to provide

electricity to the people of Puerto Rico.  *See generally* 22 L.P.R.A. §§ 191-217.  PREPA has a

"legal existence and personality separate and apart from" the Commonwealth.  *Id*. § 193.  The

Enabling Act authorizes PREPA to propose and collect rates and charges for the use of its system

and services.  PREPA Enabling Act § 5(*l*).

15.   The bulk of PREPA's $10 billion in prepetition liabilities consists of $8.3 billion in

principal of power revenue bonds that PREPA issued over the years.  ECF No. 2 ¶ 4.  The indenture

governing those bonds (the "Trust Agreement") requires PREPA to charge customers rates more

than sufficient to cover the utility's expenses, including debt service to bondholders.  *See, e.g.*,

Ex. 17 (Trust Agreement) § 502.  If PREPA fails to do so, then bondholders or their trustee have

a statutory and contractual right to appoint a receiver who will.  *See* 22 L.P.R.A. §§ 207-08 (Act

19-1942 §§ 17-18); Ex. 17 (Trust Agreement) §§ 502, 804, 808.

16.   In 2014, PREPA encountered liquidity problems.  Those problems stemmed, in

part, from PREPA's historical failure to set rates and collect revenues sufficient to pay its debt and

other expenses, including by providing free power to the Commonwealth and its instrumentalities.

---

[19] *Id.*

[20] No reference to "bankruptcy" is intended to concede that PROMESA qualifies as a bankruptcy law.

In 2014, for example, PREPA's consultants at FTI Consulting found that public corporations were past due on $212 million of accounts receivable.[21]  After PREPA offered payment plans to the delinquent public corporations, those entities still "refused to make even those payments."[22]  FTI concluded that "non-payment by the public corporations results in a *de facto* subsidy."[23]  The Oversight Board has not changed that dynamic.  In fact, a recent investigative news report determined that the governmental entities still owe $210 million to PREPA.[24]

17.      To assist PREPA in addressing its liquidity concerns, bondholders and certain lenders entered into forbearance agreements in July and August of 2014, under which PREPA's bondholders agreed to refrain from exercising remedies, to temporarily relieve PREPA of certain financial covenants, and to authorize PREPA's use of restricted funds to address its liquidity challenges.[25]  These bondholder concessions provided PREPA more than $1 billion of liquidity relief, and in exchange PREPA agreed to appoint an outside chief restructuring officer.

18.      In 2015, after months of negotiation and forbearance by bondholders, PREPA, certain bondholders, and other lenders executed a restructuring support agreement (the "Original RSA"), which would have significantly de-levered PREPA's capital structure by exchanging its legacy bonds for new securitization bonds at an exchange ratio equal to 85% of the legacy bonds' outstanding principal amount.

19.      After PROMESA's enactment, and the appointment of the first Oversight Board, Puerto Rico elected a new governor, Ricardo Rosselló, in November 2016.  Within days of taking office, in January 2017, Governor Rosselló signed Act 2-2017, which created AAFAF.  Governor

---

[21] *See* Ex. 18 (FTI Consulting Report), at 16; *see also id.* at 67-87.

[22] *Id.* at 16.

[23] *Id.* at 17 (emphasis added).

[24] *See* Ex. 19 (*Government Agencies Owe Millions to LUMA Energy*, TELEMUNDO PR (June 22, 2022)).

[25] *See* Ex. 20 (PREPA, Financial Statements for Year Ended June 30, 2014), at 6-7.

Rosselló then suggested that he would not renew the contract of PREPA's outside chief restructuring officer, who resigned.[26]   Governor Rosselló also signed Act 3-2017, which empowered him to remove any PREPA director who did not comply with his policies.[27]   Then Governor Rosselló signed Act 37-2017, which changed the composition of PREPA's board.  He replaced PREPA's directors with new, handpicked directors[28]—a majority of whom nevertheless later criticized PREPA's extreme politicization and resigned *en masse*.[29]  In 2018, PREPA's then-regulator (the Puerto Rico Energy Commission) became the Puerto Rico Energy Bureau ("PREB") and was consolidated with other governmental entities under the Public Service Regulatory Board. This reorganization gave the Governor the opportunity to appoint the new regulator's entire board, in a move derided as returning "PREPA to its days of virtual self-regulation."[30]

20.    Governor Rosselló also sought to extract more concessions from PREPA's bondholders.  Bondholders ultimately agreed to amend the Original RSA (in the "2017 RSA"), which the Commonwealth estimated would result in "$1.5 billion [in] additional savings" compared to the Original RSA, and would reduce the transition charge to PREPA's customers.[31] Despite these new concessions, the Oversight Board rendered the RSA ineffective by refusing to

---

[26] Lisa Donahue, PREPA's CRO since September 2014, resigned on February 1, 2017, effective February 15, 2017. *See* Ex. 21 (*Donahue's Handover Report Cites Continuing Challenges for PREPA*, REORG (Feb. 9, 2017)); Ex. 22 (Cynthia Cabán, *The Departure of AlixPartners is Near*, EL NUEVO DÍA (Feb. 2, 2017)).

[27] Act 3-2017, art. 29 (certified translation submitted pursuant to Local Rule 5(g), at ECF No. 139, Ex. 2); *see also* Ex. 23 (*House Passes Bill to Overhaul PREPA Board*, REORG (Feb. 14, 2017)) ("'We are giving Gov. Ricardo Rosselló the tools to be able to install people with the vision, interest and desire to take PREPA forward on a new path,' House Speaker Carlos 'Johnny' Méndez said during the debate.").

[28] *See* Act 37-2017 § 1. In June 2018, Governor Rosselló signed Act 120-2018, which changed the composition of PREPA's regulator so that all commissioners are appointed by the Governor.

[29] Ex. 24 (Robert Slavin, *Majority of PREPA's board resigns, criticizing the authority's politicization*, BOND BUYER (July 12, 2018)).

[30] *See* Ex. 25 (Robert Watson, *Puerto Rico Gov. Rosselló Proposes Overhaul of Energy Regulator*, UTILITY DIVE (Jan. 10, 2018)).

[31] *See* Ex. 26 (*Puerto Rico Announces New Deal With PREPA Creditors, Estimates $2.2B Savings in Debt Service for 2018 Through 2022*, REORG (Apr. 6, 2017)).

certify it,[32] even though PROMESA expressly provided for the RSA to be deemed compliant with the statute's certification requirement.[33]   PREPA then defaulted on its bond obligations and, through the Oversight Board, filed a Title III petition on July 2, 2017.

## II.    THE FIRST YEARS OF THE PREPA CASE AND THE 2019 RSA

21.    The Oversight Board acknowledged that it intended for PREPA's petition to prevent bondholders from exercising their right to appoint a receiver at PREPA.  ECF No. 2 ¶ 23. Bondholders sought relief from the automatic stay to enforce that right.  *See* ECF No. 74.  This Court denied that motion on the ground that it sought relief not authorized by PROMESA.  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 301 F. Supp. 3d 278 (D.P.R. 2017).  The First Circuit vacated and remanded, holding that the Title III court could lift the stay, for cause, to allow bondholders to obtain a receiver.  *Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 899 F.3d 13 (1st Cir. 2018).[34]

22.    Negotiations with some bondholders began in early 2018, after Hurricanes Irma and Maria struck Puerto Rico.  In July 2018, the Board entered into a preliminary restructuring support agreement with the members of the Ad Hoc Group.  In May 2019, the Government Parties, the Ad Hoc Group, and Assured entered into the 2019 RSA—their third restructuring support agreement.  National and Syncora joined that agreement four months later.

23.    The 2019 RSA was designed to resolve PREPA's legacy debt while keeping rates affordable. It did so, first and foremost, by reducing PREPA's debt ***by more than $2 billion*** and by lowering interest rates.  Each dollar of bondholders' legacy debt would be exchanged for 67.5 cents in tax-exempt "A" bonds and 10 cents in "B" bonds; the replacement bonds' payment period

---

[32] *See* ECF No. 2 ¶¶ 23-24.

[33] *See, e.g.*, 48 U.S.C. §§ 2124(i)(3), 2231(g).

[34] Assured, Syncora, and National filed a second receiver motion on grounds different from the prior receiver motion.  ECF No. 975.  That motion was stayed once the movants joined the 2019 RSA.

was lengthened; and a reliable revenue stream to service those bonds was assured through a transition charge denominated in cents per kilowatt-hour of electricity consumed.  Bondholders agreed to remove the transition charge's full, automatic "true up" component that, consistent with industry practice, would have increased the charge as needed to ensure PREPA's full payment of debt service.  ECF No. 1426 ¶ 47.  The RSA required the accrual and payment of postpetition interest on the bonds, but at the reduced accrual amount of the same exchange ratio to A and B bonds.  The Board also agreed to the allowance of administrative claims in favor of bondholders premised on unpaid interim and final rates in the 2019 RSA.  Ex. 27 (2019 RSA) §§ 2(d), 2(e)(iv).

24.     The 2019 RSA provided the Board and PREPA with significant flexibility over how to implement the contemplated restructuring transactions without legislation.  It provided that, if the Commonwealth failed to enact laws necessary to implement certain terms, then bondholders would be entitled to a "Stipulated Treatment" that fixed an agreed-upon reduced amount of their allowed claims (to be provided on terms to be negotiated in good faith).  *See id.* §§ 2(c), 9(b).

25.     On May 10, 2019, the Oversight Board moved for this Court's approval of the 2019 RSA.  ECF No. 1235 (the "9019 Motion").  The Board explained that the "eminently reasonable" RSA would be "the foundation for a plan of adjustment for PREPA."  *Id.* ¶¶ 50-51.  It stressed the need for a prompt and consensual resolution of PREPA's debts.  "Delaying the debt restructuring," the Board said more than two years ago, "may thus delay PREPA's transformation, to the detriment of Puerto Rico, its people, its businesses, and its creditors."  *See id.* ¶ 1.  The 2019 RSA would prevent harmful delay, the Board explained, by setting out "fair and reasonable" terms on which bondholders would exchange their bonds at a significant discount.  *Id.* ¶¶ 1, 9.  That "deal will send a message to potential transformation counterparties that PREPA has a clear framework for its exit from bankruptcy . . . that will help support the transformation transaction(s)."  *Id.* ¶ 64.

### III.   THE GOVERNMENT PARTIES' POST-PANDEMIC PLEDGES TO IMPLEMENT THE 2019 RSA

26.     The parties moved forward with dual-track efforts to have the 2019 RSA approved by this Court, and to seek legislation anticipated (but not required) by the agreement to implement the securitization charge and demand protections.  Governor Rosselló resigned in August 2019, but the path to approval of the RSA continued under Puerto Rico's new governor, Wanda Vázquez Garced, with the Board renewing its support.[35] On March 3, 2020, for example, the Board reiterated its strong support for the RSA, and emphasized that the costs to PREPA of remaining in bankruptcy were too high, and the RSA was too attractive a deal, for the Government Parties to walk away.[36]  PREPA, the Board explained, was forced to pay more for fuel because sellers demand "a risk premium because [PREPA is] a bankrupt entity." *Id.* And prospective grid operators would agree to provide services to PREPA only on more costly terms reflecting that such operators would be "managing it in bankruptcy versus out of bankruptcy" (*id.*)—a risk premium reflected in the terms of LUMA's operation and maintenance agreement.

27.     The global COVID-19 pandemic was declared in Puerto Rico and the rest of the United States in March 2020.  The Government Parties informed bondholders and the Court that, in light of the enormous economic upheaval and need to focus on public health issues, they would move to adjourn all applicable deadlines for the 9019 Motion, to which bondholders did not object. *See* ECF No. 1947 and ECF No. 1954 (motion granted).

28.     For the rest of 2020, all of 2021, and into early 2022, the Government Parties never stated an intent to terminate the 2019 RSA—including long after a September 30, 2019 deadline to obtain court approval of the 2019 RSA came and went while their approval motion was stayed

---

[35] *See, e.g.,* Ex. 28 (Financial Oversight and Management Board for Puerto Rico, Media Release, *Oversight Board Reaches Agreement with Bond Insurers over PREPA Restructuring*, REORG (Sept. 9, 2019)).

[36] Ex. 16 (*Jaresko, Key Lawmakers Discuss With Reorg Prospects for Passage of PREPA RSA Legislation, Acknowledge Real Risk of Creditor-Focused Receivership*, REORG (March 3, 2020)).

*at their own request.* Rather, they took advantage of the state of peace and predictability that the RSA brought to their negotiations with LUMA and others. They also used this time to focus on other Title III cases, move forward with the Commonwealth's Title III plan, and lobby for legislation to facilitate that plan. Meanwhile, PREPA's bondholders abided by the RSA and refrained from actions inconsistent with its terms, such as intervening in PREPA's privatization, prosecuting objections to the Commonwealth's plan, or re-asserting their receivership right.

29.  After confirmation of the Commonwealth plan, the Board once again publicly reaffirmed its support for the 2019 RSA. During a December 17, 2021 press conference, the Board's Executive Director, Natalie Jaresko, restated that commitment.[37] Ms. Jaresko did so again on January 18, 2022, explaining that "not proceeding" with the RSA would carry "risks and uncertainties."[38] In its January 19, 2022 status report to the Court, the Oversight Board reiterated that it had "determined at this point to move forward with the settlement set forth in the RSA."[39] The Oversight Board continued to support the 2019 RSA in January and February 2022. *See* ECF No. 2697 ¶ 2 ("The RSA would produce tremendous benefits."); ECF No. 2735 ¶ 4 ("[T]he RSA . . . provides PREPA and all present and future ratepayers with gargantuan benefits."). AAFAF also affirmed its commitment to the 2019 RSA as recently as January 2022.[40]

30.  The Oversight Board and its counsel also represented to this Court that the Board would file PREPA's plan during the first quarter of 2022, regardless of whether the Puerto Rico legislature agreed to support it. *See* ECF No. 2691 ¶¶ 7-8. In December 2021, the Board disclosed

---

[37] Ex. 29 (*Board Member Peterson Suggests Reconfiguring PREPA RSA to Quicken Bondholder Recovery,* REORG (Dec. 20, 2021)).

[38] Ex. 30 (*Oversight Board Outlines Next Steps for Taking Commonwealth Plan Effective by March 15 Deadline, Aims to Complete Restructuring of PREPA, HTA in 2022,* REORG (Jan. 18, 2022)).

[39] *See* ECF No. 2691 ¶ 7; *see also* ECF No. 2697 ¶ 3 ("The Oversight Board is focused on the RSA rather than alternative scenarios that may result in less favorable terms to PREPA, Bondholders and customers.").

[40] Ex. 31 (*AAFAF's Marrero Voices Support for Current PREPA RSA, Says Legislation Remains 'Biggest Concern' Based on Current Lack of Support in Legislature,* REORG (Jan. 20, 2022)).

its "further discussions with representatives for certain of the bondholders that are party to the RSA," and acknowledged, once again, that legislation to implement the 2019 RSA might not be forthcoming. *See* No. 17-3283, ECF No. 19514 ¶ 9. The Board noted that it was "evaluating alternatives . . . . if the Government does not cooperate." *Id.* ¶ 10. Even though alternative paths might present "difficult obstacles to overcome," the Board represented to this Court that it "anticipate[d] filing a plan of adjustment for PREPA by the end of March 2022." *Id.* ¶¶ 8-9.

31.     None of the Government Parties ever stated to the Court or other parties that they were going to terminate the RSA. And that made good sense. The 2019 RSA contemplated moving forward without legislation, and over time the 2019 RSA became an even better deal for PREPA than it was in 2018, when its terms were first agreed to. Since then, Puerto Rico's economy has strengthened by all measures. In fact, it has *outperformed* projections at the outset of this case and that the parties adopted at the time of the 2019 RSA. Unemployment is lower, tax collections are higher, federal funding has risen, population forecasts have grown, and electricity consumption has exceeded expectations.[41] And since Hurricane Maria, no less than $120 billion in federal funds have been committed to the Commonwealth, including $12.2 billion to PREPA.[42]

32.     Although Puerto Rico's economy is stronger than ever, this case has left PREPA stuck in the past. So long as PREPA remains in Title III, investors and suppliers continue to demand higher interest rates, higher fuel prices, and other expensive risk premiums.[43] PREPA's

---

[41] *See supra* nn.9-11 (citing sources, including AAFAF investor presentations).

[42] *See* Ex. 32 (2022 Commonwealth Fiscal Plan), at 36 ex. 11; Ex. 33 (2022 PREPA Fiscal Plan), at 86-87 & tbl. 5; Ex. 34 (*PREPA obtains approval of USD 454.4m in FEMA allocations for grid modernization*, DEBTWIRE (Apr. 18, 2022)); Ex. 35 (*Pierluisi Announces Assignment of $10.3M in CARES Act Funding to PREPA*, REORG (Mar. 30, 2022)).

[43] Ex. 5 (*AAFAF Chief Marrero Signals PREPA RSA 'Most Likely' Will Need Renegotiation, Given Lack of Legislative Support*, REORG (Feb. 7, 2022)) (quoting AAFAF Chief Omar Marrero saying "bad credit make[s] everything more expensive," including fuel and purchased power); Ex. 36 (*PREPA, LUMA have had 336 recovery projects approved by island's energy regulator*, DEBTWIRE (Apr. 19, 2022) (citing PREPA's executive director that lack of access to capital an obstacle to PREPA's grid improvement)).

grid operator, LUMA, has repeatedly urged officials to wrap up this Title III case so that PREPA

can obtain capital and hedge against volatile fuel costs.[44]  LUMA stressed the importance of ending

PREPA's Title III case because it is "quite expensive" and poses "very serious restrictions on

resources and timing."[45]  LUMA's contract itself is threatened by PREPA's failure to end its

bankruptcy; LUMA has the right to terminate its services and obtain a $115 million break-up fee

(in 2020 dollars) if PREPA has not exited bankruptcy by November 30, 2022.[46]  Losing LUMA

with no replacement to continue its efforts would make a confirmable plan all but impossible.[47]

## IV.   AAFAF ARBITRARILY ASSERTS ITS TERMINATION OF THE 2019 RSA, WITH THE OVERSIGHT BOARD'S SUPPORT, AND THIS COURT ORDERS MEDIATION

33.   To encourage the Board to move forward with a plan without further delays, the

Ad Hoc Group moved on February 18, 2022, to appoint a mediator to facilitate implementation of

the RSA and to set deadlines for PREPA to file a plan.  ECF No. 2718.  On February 28, 2022, in

response the Ad Hoc Group's motion, the Oversight Board reiterated its determination to "move

forward with the settlement set forth in the . . . RSA."  ECF No. 2735 ¶ 20.  AAFAF likewise

reaffirmed its support.  ECF No. 2733 ¶ 2 (legislative process to implement RSA should continue).

34.   Only eight days later, on March 8, 2022, Governor Pedro Pierluisi abruptly asserted

that he had terminated the 2019 RSA.[48]  The Governor claimed that termination was necessary

---

[44] Ex. 37 (*Luma's Chief Regulatory Officer Says Pendency of PREPA's Title III Bankruptcy Restricts Reconstruction of Electric System*, REORG (Aug. 30, 2022)).

[45] *Id.*

[46] ECF No. 2053-4 at 22; *id.* § 14.6.

[47] ECF No. 2111 ¶ 18 ("Execution of the Operation and Maintenance Agreement with LUMA Energy . . . marks a major step toward PREPA's exit from Title III."); Case No. 21-00041, ECF No. 19 ¶ 1 (in opposing motion to enjoin the LUMA agreement, the Government Parties wrote that motion "could lead to LUMA Energy terminating the O&M Agreement, halting PREPA's transformation.  The resulting prejudice to PREPA and its stakeholders would be unsustainable."); Ex. 38 (Annual Report, FOMB (July 31, 2022)), at 15-16, 76-77 ("LUMA is starting to improve staffing, response times, and service delivery.")

[48] Movants reserve all rights with respect to the Governor's purported termination of the 2019 RSA.  The validity of such alleged termination is not the subject of this Motion.

because of rising fuel costs following Russia's invasion of Ukraine—a political calculation that reneging on promised debt service charges would counterbalance the unpopular rate increases caused by short-term fuel-cost increases. The Governor also claimed that terminating the RSA's promises to pay bondholders would "protect PREPA's pensioners" with competing claims on PREPA. Finally, the Governor contended—without explanation—that terminating the RSA would encourage conversion of PREPA's generation facilities to renewable sources. *See* Case No. 17-3283, ECF No. 20277-2 at 2.

35.     In the wake of the Governor's notice to terminate the 2019 RSA, this Court recognized "the need for prompt and effective engagement in any actions necessary to bring PREPA's Title III case to a speedy, appropriate conclusion that is consistent with the law and that can provide for a better future for Puerto Rico." ECF No. 2748 at 10. The Court noted that, until recently, "the Oversight Board and the government entities' words and actions gave the Court reason to expect that a plan of adjustment would be forthcoming promptly and that no interruption of the Oversight Board's engagement or efforts would hinder the process." *Id.* It found the termination "disturbing," and emphasized that the "RSA termination announcement presents the risk of a major setback." *Id.* The Court ordered the Oversight Board to file a plan, a litigation plan and timetable, or a brief explaining why this case should not be dismissed.

36.     The Court then ordered Movants and other key constituencies into mediation to "facilitate confidential negotiations regarding the formulation of a plan of adjustment for PREPA." ECF No. 2767 at 3. It appointed the Honorable Shelley C. Chapman, the Honorable Robert D. Drain, and the Honorable Brendan L. Shannon as mediators, and later extended mediation and the Oversight Board's deadline to propose its path forward. Despite those mediators' best efforts, and more than five months of discussions, mediation failed and terminated on September 16, 2022. The Board filed its litigation plan, but has not explained why this case should not be dismissed.

## ARGUMENT

37.     Cause to dismiss this case exists based on the Oversight Board's undue delay, failure to prosecute, and inability (or unwillingness) to use this proceeding to serve PROMESA's goals and purposes.  Dismissal would allow bondholders to exercise their right—under Puerto Rico law and the Trust Agreement—to appoint a receiver who will take the steps necessary for PREPA to pay its debts and achieve financial stability.  In the alternative, the Court should lift the automatic stay so that bondholders can obtain a receiver.

38.     Without dismissal or stay relief—and thus without a receiver—PREPA's Title III case will remain a dark cloud over the Governor's proclaimed "new day" for Puerto Rico.  All of the other Title III cases have been resolved or are on their way to confirmation, and Puerto Rico's other debts have been successfully restructured.  Yet after five years, PREPA still lingers in Title III with no exit in sight, meanwhile imposing unnecessary costs on customers, delaying reliability improvements, and postponing Puerto Rico's overall recovery.

## I.    THE COURT SHOULD DISMISS THIS CASE FOR CAUSE UNDER SECTION 930(a) OF THE BANKRUPTCY CODE

39.     The Oversight Board's failure to prosecute this case, its unreasonable delay in proposing a plan, and this case's continuing failure to fulfill PROMESA's purposes and goals are cause for dismissal.  Dismissal is the most efficient and appropriate path to the appointment of a receiver who can pursue rates sufficient for PREPA to pay its debts and better serve its customers.

### A.    This Court Is Able To Dismiss This Title III Proceeding For Cause

40.     Section 930(a) of the Bankruptcy Code, as incorporated by PROMESA, allows a court to dismiss a Title III proceeding "for cause" following notice and a hearing.  It sets forth a list of such causes, including the debtor's "want of prosecution" and an "unreasonable delay by the debtor that is prejudicial to creditors."  11 U.S.C. § 930(a)(1), (2).  When a debtor "fails to prosecute the case or is responsible for unreasonable delays that are prejudicial to creditors, the

sole remedy provided is dismissal pursuant to section 930(a)(1) or (a)(2)." *In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991).

41.     Moreover, section 930(a)'s list of dismissal causes is illustrative, not exhaustive. *See* 6 *Collier on Bankruptcy* ¶ 930.01 (16th 2021) ("Each of the paragraphs of the subsections are examples of 'cause,' but the list is not exhaustive."). Courts may exercise a "general equitable power to dismiss" for any cause as determined "in the sound exercise of [the court's] discretion." *In re New York City Off-Track Betting Corp.*, No. 09-17121, 2011 WL 309594, at *2 (Bankr. S.D.N.Y. Jan. 25, 2011) (cleaned up); *see also In re Gonic Realty Trust*, 909 F.2d 624, 626-27 (1st Cir. 1990) (noting that courts are "not limited to the enumerated grounds" and are not "required to give exhaustive reasons for their decisions" to dismiss) (cleaned up).

42.     The Court should also consider PROMESA's "purpose and goals." *See In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576, 604 (Bankr. S.D.N.Y. 2018) (applying chapter 11). Dismissal is warranted when a case no longer serves the purpose of bankruptcy. Bankruptcy "provides a reasonable opportunity for . . . reorganization[;] it does not guarantee reorganization nor does it permit an indefinite suspension of creditors' rights and remedies pending the unsuccessful attempts of any party to effect a reorganization of debt . . . . [B]ankruptcy courts are given a great deal of discretion to say when enough is enough." *In re Woodbrook Associates*, 19 F.3d 312, 322 (7th Cir. 1994) (cleaned up). "[A] debtor cannot wallow in [bankruptcy] indefinitely." *In re Brooks*, 488 B.R. 483, 490 (Bankr. N.D. Ga. 2013) (cleaned up).

**B.      The Oversight Board's Unreasonable Delay, Failure To Prosecute, And Inability To Fulfill PROMESA's Purposes Are All Causes For Dismissal**

43.     Cause to dismiss is demonstrated by the Oversight Board's unreasonable delay and failure to prosecute. The Oversight Board and PREPA have refused to make the rate increases necessary to facilitate a plan. Assurances that a plan premised on the 2019 RSA was forthcoming

have been dashed by the Government Parties' decision to abandon that consensual deal and start from scratch.  This delay prejudices PREPA's customers and bondholders alike. Meanwhile, it has become obvious that this proceeding does not serve PROMESA's purposes without the kind of meaningful action toward sustainable rates and debt service that only a receiver can achieve.

### 1.   The Board's Delay And Failure To Prosecute Are Inexcusable

44.    The Oversight Board has repeatedly missed its own promised deadlines for submitting a plan and has no credible path to get PREPA out of bankruptcy.  The Board filed numerous status reports suggesting its continued commitment to the 2019 RSA, and proclaimed in one of them "that a plan of adjustment would be forthcoming promptly."  ECF No. 2748 at 10. It is now clear that the Board has no plan or path forward apart from protracted and costly litigation.

45.    The Governor's announced termination of the 2019 RSA disregarded the Government Parties' own warning that termination would "unravel the progress made to date," "cast the parties back into multi-front litigation," and "not advance the 'just, speedy, or inexpensive determination' of PREPA's Title III case."  ECF No. 2165 ¶ 16.  It risked, as the Court noted, "a major setback in progress toward readjustment of PREPA's liabilities."  ECF No. 2748 at 10.

46.    The filing and prosecution of a plan is at the heart of any chapter 9 or chapter 11 case.  *See, e.g.*, *Samuels v. Wilmington Sav. Fund Soc'y*, No. 19-003, 2019 WL 6211209 (B.A.P. 1st Cir. Nov. 19, 2009) ("[T]he filing of a disclosure statement and filing and confirmation of a plan is central to the progress of a . . . Chapter 11 case." (cleaned up)); *N.Y.C. Off-Track Betting*, 2011 WL 309594, at *2 (dismissing chapter 9 case after debtor's "failure to complete a plan [of] adjustment").  Courts have observed that a debtor's failure "to accomplish substantive progress toward confirmation inherently carries the risk of unreasonable and undue delay, which is nearly always prejudicial toward creditors."  *In re Brooks*, 488 B.R. at 490.  A debtor's lack of progress toward confirmation "is adequate justification, in and of itself, for dismissal."  *Id.*; *De Jounghe v.*

*Mender*, 334 B.R. 760, 770-71 (B.A.P. 1st Cir. 2005) (dismissing for unreasonable delay where

debtor failed to file plan after 14 months); *In re Colon Martinez*, 472 B.R. 137, 145 (B.A.P. 1st

Cir. 2012) (dismissal warranted where debtor "enjoyed a hiatus of over 13 months" since petition

date, during which plan was not timely submitted). "A debtor's failure to file a plan over a long

period of time can also be evidence that there is no prospect for reorganization and that the debtors

are unable to effectuate a plan . . . ." *Jounghe*, 334 B.R. at 771.

47.     That is the case here. Not only has the Board failed to propose a plan, but it is

nowhere near obtaining agreements with any major stakeholders to support a plan. The Board's

failures and delay in prosecuting this case are inexplicable, as illustrated by comparing this case

to the time from petition to confirmation in similarly (or more) complex municipal bankruptcies:

Detroit, MI (482 days)[49]; Orange County, CA (528 days)[50]; Jefferson County, AL (744 days)[51];

Stockton, CA (944 days).[52] Each of these debtors obtained plan confirmation in significantly less

time than this case has already been pending. Other chapter 9 cases involving municipal projects

and public corporations have likewise taken substantially less time to complete than this case—

generally exiting bankruptcy within two years.[53] The same is true for chapter 11 cases involving

large electric utilities.[54] Indeed, most of the largest and most complex chapter 11 cases wrapped

---

[49] *In re City of Detroit*, Case No. 13-53846 (Bankr. E.D. Mich.). Detroit's bankruptcy moved quickly in part because there was an external deadline, as the law appointing the city's emergency manager had a built-in expiration date. That deadline resulted Detroit's filing, approximately one year after its petition date, of an almost entirely mediated, consensual plan covering $18 billion in claims. Detroit's bankruptcy exemplifies how deadlines can help to move along a complex case.

[50] *In re Cnty. of Orange*, 219 B.R. 543, 548 (Bankr. C.D. Cal. 1997).

[51] *In re Jefferson County, Ala.*, Case No. 11-05736 (Bankr. N.D. Ala.).

[52] *In re City of Stockton, California*, Case No. 12-32118 (Bankr. E.D. Cal.).

[53] *See, e.g., In re Connector 2000 Ass'n, Inc.*, 447 B.R. 752 (Bankr. D.S.C. 2011) (chapter 9 debtor operating a toll highway system obtained plan confirmation less than one year after its petition date); *In re Hardeman Cnty. Hosp. Dist.*, 540 B.R. 229 (Bankr. N.D. Tex. 2015) (chapter 9 debtor operating hospital system obtained plan confirmation two years after petition date).

[54] *See, e.g.*, Ex. 39 (*PG&E Exits Bankruptcy as Newsom Approves Corporate Overhaul Option*, SAN FRANCISCO CHRONICLE (July 1, 2020)) (California's largest utility exited chapter 11 approximately one

up more quickly than this Title III.  General Motors, for example, took less than two years from

petition to plan confirmation.[55]  And PG&E, one of the nation's largest electric utility companies

with $51 billion in debt and billions of dollars of wildfire liability claims, completed its bankruptcy

case in 17 months.[56]  Yet PREPA's case has lasted *62 months and counting*, without so much as

a proposed plan.  There is simply no principled or justifiable reason why PREPA's case is taking

so substantially longer than those other cases and the Title III cases of the Commonwealth and

certain of its instrumentalities.

48.    The Oversight Board has repeatedly invoked the COVID-19 pandemic and the 2017

hurricanes as reasons for its substantial delay in prosecuting PREPA's case.  To be sure, those

events caused some parts of this case to take longer than they otherwise might have, and

bondholders remained patient during this case's many extensions and adjournments.  But the point

has long since passed when external forces explain the endless delay.  Many other debtors

commenced bankruptcy cases during the pandemic and yet still exited bankruptcy within a couple

of years.[57]  By contrast, PREPA is happy to shelter in bankruptcy *indefinitely* because proposing

and prosecuting a plan that would pay bondholders is politically unpopular—at least compared to

the perceived alternative of staying in bankruptcy and *not* doing so.  That political calculus would

---

year after filing chapter 11 petition); *In re FirstEnergy Solutions Corp.*, Case No. 18-50757, ECF No. 3773
(Bankr. N.D. Ohio Feb. 27, 2020) (notice of effective date filed less than two years after petition date).

[55] *In re General Motors Corporation*, Case No. 09-50026 (Bankr. S.D.N.Y.).

[56] Ex. 40 (Ivan Penn, *PG&E's Bankruptcy Filing Creates 'a Real Mess' for Rival Interests*, N.Y. TIMES
(Jan. 29, 2019)).

[57] *See, e.g.*, *In re Avianca Holdings S.A.*, Case No. 20-11133-mg, ECF No. 2384 (Bankr. S.D.N.Y. 2021)
(effective date 18 months after the petition date); *In re Grupo Aeromexico, S.A.B. de C.V.*, Case No. 20-
11563, ECF No. 2816 (Bankr. S.D.N.Y. 2022) (effective date less than two years after petition date); *In re
The Hertz Corp.*, Case No. 20-11218, ECF No. 5477 (Bankr. D. Del. 2021) (effective date one year after
chapter 11 petition date); *In re Covia Holdings Corp.*, Case No. 20-33295, ECF No. 1069 (Bankr. S.D. Tex.
2020) (effective date six months after petition date).

be different, however, if ratepayers appreciated that the substantial indirect and hidden costs they bear while this case remains pending.

49.     Given the Oversight Board's new-found penchant for scorched-earth litigation with bondholders, after years of proclaiming to this Court its readiness to move forward with a deal, it is not clear when, if ever, the Board will develop and propose a confirmable plan.  The Board has previously characterized its proposed litigation over recourse, liens, and other issues as "extraordinarily complex" and requiring "substantial discovery" in "lengthy and costly ongoing litigation" that, with the inevitable appeals, will take *years* more to complete.[58]

50.     There is simply no precedent for launching substantial and messy litigation battles like these in the sixth year of a bankruptcy case.  And much of that litigation would be as pointless as it would be expensive.  For instance, even if the Board prevailed, after trial and appeal, in challenging bondholders' liens (which it would not), bondholders would still account for 90% of PREPA's unsecured, non-pension debt and would therefore be entitled to receive whatever revenues PREPA can raise to pay them.  *See* PROMESA § 314(b)(6)*, see also Fano v. Newport Heights Irrigation Dist.*, 114 F. 2d 563, 565-66 (9th Cir. 1940) (reversing confirmation of reorganization plan as not in bondholders' best interests without proof that the district could not raise funds sufficient to pay the bonds); *Joint Stmt. in Lieu of Conf. Rep. on the Bankruptcy Code*, 124 Cong. Rec. H11,100 (Sept. 28, 1978) (application of the best-interests test is guided by *Fano*).

## 2.     The Board's Delay And Failure To Prosecute Are Prejudicial

51.     This case's continuing delay is highly prejudicial to PREPA's bondholders and other creditors.  "A debtor's failure to make meaningful and substantive progress toward the confirmation of a plan within the time periods fixed by the Bankruptcy Code and any court orders

---

[58] ECF No. 1235 ¶¶ 61, 65, 72; *see also id.* ¶61 (acknowledging that "regardless of who prevails on these issues, the results would likely be appealed to appellate courts, which, as demonstrated in other appeals, could take at least a year or more to resolve").

may lead to undue delay, *and such delay is nearly always prejudicial to creditors.*"  *In re Babayoff*, 445 B.R. 64, 79 (Bankr. E.D.N.Y. 2011) (emphasis added); *see also In re Brooks*, 488 B.R. at 490 (explaining that "unreasonable and undue delay" is "nearly always prejudicial toward creditors" and "adequate justification, in and of itself" for dismissal for cause).  That prejudice exists here.  Despite the Government Parties' promises to the contrary, bondholders have not been paid a dime throughout the five years of this proceeding.  In today's environment of rising inflation and interest rates, PREPA risks having to pay bondholders at higher and higher interest rates, and bondholders increasingly face the prospect of receiving less value in exchange for their claims, in real terms, than they are in fact entitled to receive.  AAFAF's Executive Director said it best when he emphasized, just earlier this year, that "the reality is debt has to be paid.  We haven't paid for the past seven years, and we need to get PREPA out of this restructuring process."[59]

52.  In addition, each time PREPA fails to make a payment on its bonds, monoline insurers Assured, National, and Syncora are obligated by their insurance policies to make those payments to their insured holders.  In total, these insurers have paid out over $1.123 billion in principal and interest on PREPA's bonds over the past five years.  If PREPA's Title III case were to go on for even just one more year, the insurers would have to pay an additional $310 million.

53.  Delay also prejudices all of PREPA's creditors because of the massive, ongoing fee burn.  Professionals representing the Oversight Board, AAFAF, PREPA, and the Committee have collectively billed PREPA in excess of $200 million in fees, and PREPA's current budget includes $75 million in Title III-related expenses.[60]  By contrast, in Detroit's (shorter) chapter 9 case, estate professional fees were $175 million to restructure $20 billion in obligations across all of the city's

---

[59] Ex. 5 (*AAFAF Chief Marrero Signals PREPA RSA 'Most Likely' Will Need Renegotiation, Given Lack of Legislative Support*, REORG (Feb. 7, 2022)).

[60] Ex. 37 (*Luma's Chief Regulatory Officer Says Pendency of PREPA's Title III Bankruptcy Restricts Reconstruction of Electric System*, REORG (Aug. 30, 2022)).

various debts (including its general obligation bonds, tax revenue bonds, water and sewer bonds, and pensions)—over twice the size of PREPA's capital structure.[61]  Professional fees will increase the longer PREPA remains in Title III, and will quickly multiply if the Oversight Board and the Committee move forward with protracted litigation.  These professional fees are ultimately passed onto and paid by PREPA's customers, and leave less cash available to satisfy claims under any eventual plan of adjustment.

54.    Other harms are also being inflicted on PREPA and its creditors due to the delay. As AAFAF stated only a few months ago, PREPA needs to exit bankruptcy because these proceedings make "everything more expensive," including fuel and purchased power.[62]  PREPA's inability to hedge against fuel-cost fluctuations while in bankruptcy has harmed its customers in recent months.  PREPA also needs to enter into long-term generation contracts and new financing arrangements to assure its transformation.  There can be no question that bankruptcy limits PREPA's options and makes those agreements more expensive.  And, as LUMA recently stated, PREPA's Title III case places "very serious restrictions on resources and timing," and imposes "accounting limitations" that inhibit PREPA's ability to improve its system.[63]  While PREPA delays these improvements, it cannot tap most of the billions of dollars that FEMA has committed to reimburse those projects.  Moreover, while PREPA remains in bankruptcy, it pays elevated rates to LUMA.  If PREPA fails to exit Title III by November 30, 2022, then LUMA will be entitled to terminate its agreement, which could give rise to a $115 million termination fee that would be

---

[61] *See* Ex. 41 (Christian Ramos Segarra, *$832 Million in Attorney Fees for Puerto Rico Bankruptcy Process*, THE WEEKLY JOURNAL (Jan. 27, 2021)).

[62] *See* Ex. 5 (*AAFAF Chief Marrero Signals PREPA RSA 'Most Likely' Will Need Renegotiation, Given Lack of Legislative Support*, REORG (Feb. 7, 2022)).

[63] Ex. 37 (*Luma's Chief Regulatory Officer Says Pendency of PREPA's Title III Bankruptcy Restricts Reconstruction of Electric System)*

payable as an administrative priority expense.[64]   And that's not to mention the harm that would

result from LUMA halting its work, whether because it terminates the contract, or the Government

Parties opt not to renew it.   *See supra* ¶¶ 6, 33.

### 3.   This Title III Case Does Not Serve PROMESA's Purposes And Goals

55.   Dismissal is also warranted because this case is unnecessary to further

PROMESA's purposes and goals.   PREPA is *able* to pay all of its debts and expenses; it is simply

*unwilling* to raise the revenues necessary to do so.   At the very least, the 4 to 6 cent per kilowatt-

hour transition charge provided for in the 2019 RSA is affordable for ratepayers.   The Board and

the Government Parties acknowledged as much every time they supported the 2019 RSA.   Indeed,

what was deemed affordable by the Board at the time of the 2019 RSA is plainly *more* affordable

now, given the improved macroeconomic and financial situation in Puerto Rico today.   This past

June, in fact, AAFAF heralded the Commonwealth's lower unemployment, higher labor force

participation, increased economic activity, robust tourism, and other encouraging performance to

extol Puerto Rico's "strong recovery" and "return to economic growth."[65]

56.   By any objective measure, Puerto Rico's economy has significantly improved over

the past few years.   The Oversight Board has acknowledged this "growing economy" (ECF No.

2956 ¶ 1), in which, according to Puerto Rico officials, unemployment has decreased, sales and

use tax collections (a proxy for consumption) have increased, general fund revenues have boomed,

federal Medicaid funding has improved, population forecasts are up, and energy consumption has

risen.[66]   PREPA's pessimistic projections, when deployed to make reasonable debt payments seem

---

[64] *See* ECF No. 2053-4 §§ 3.3, 4.2, 6.1, 7.1, 7.2.

[65] Ex. 6 (AAFAF, PRNOW Summit Presentation), at 38.

[66] *See supra* nn.9-11.

unaffordable, blinker this reality (and, as a result, PREPA's certified fiscal plans have dramatically

understated actual economic growth and electricity demand).

57. Against this overwhelming evidence of improved economic conditions and

affordability, the Governor's invocation of rising fuel and other costs, as a reason to abandon

PREPA's deal with bondholders, is especially perplexing. To be sure, a spike in oil prices

accompanied Russia's invasion of Ukraine two weeks earlier. But those prices have since

retreated, and the 2019 RSA contemplated the issuance of replacement bonds that would not

mature *for more than four decades*—a period over which fuel-price fluctuations were all but

assured (and assumed by the sophisticated parties).[67] What is more, PREPA's fiscal plan

contemplates its near-total transition away from oil-based power generation, and futures-market

oil prices project a significant decline in spot-market prices over that period. Other price inflation

is likewise expected to be temporary in the context of a 40-year deal, and in the meantime operates

to make bondholder recovery provided by the 2019 RSA even less expensive in real-dollar terms.

58. PREPA is effectively solvent because it "has the resources to pay all of its creditors

in full outside the protection of the Bankruptcy Code," and thus "continuation of a bankruptcy case

does not serve a bankruptcy purpose." *In re Forum Health*, 444 B.R. 848, 856 (Bankr. N.D. Ohio

2011) (granting chapter 11 debtor's motion to dismiss bankruptcy because debtor could pay

creditors). The political roadblocks to paying debts that PREPA *can* afford are no excuse for this

proceeding to continue, because it has ceased to serve a bankruptcy purpose. *See New York City

Off-Track Betting*, 2011 WL 309594, at *2 (dismissing municipal bankruptcy where legislature

---

[67] PREPA has adopted an "integrated resource plan" providing for its transition to renewable energy sources
and decommissioning of fossil-fuel-based generation assets. *See* Ex. 42 (Final Resolution and Order, *In re
Review of the Puerto Rico Electric Power Authority Integrated Resource Plan*, No. CEPR-AP-2018-0001
(Aug. 24, 2020)). This transition will significantly lessen the variability of PREPA's electricity rates
corresponding to fluctuations in energy prices, and reduce PREPA's operating costs.

refused to pass laws necessary for debtor to operate).  This case has not been a springboard for
PREPA to adjust its debts, but an excuse for its failure to do so.  The time for excuses must end.

### C.    Dismissal Will Permit Appointment Of A Receiver Who Can Increase Rates To The Benefit Of PREPA And All Its Creditors

59.    The existence of a better alternative to continuing this Title III case—the
appointment of a receiver to provide the proper management and rate increases to which PREPA's
creditors are entitled—is further and dispositive cause for dismissal under Section 930(a).

60.    PREPA's only viable path forward requires it to pay its bonds and other obligations
and thereby regain access to the capital markets on sound financial footing.  But PREPA's
management will not take the steps necessary to make that happen, and both Puerto Rico's
government and the Oversight Board are using bankruptcy to avoid making the necessary rate
changes to pay debt.  A court-appointed receiver, however, would be independent of short-term
political concerns, and would allow PREPA to raise the revenue to pay its debt and move forward
with rebuilding and transformation, all of which would create more reliable service for customers.

61.    As a result of PREPA's default on its bonds, its bondholders are entitled to obtain
such a receiver for PREPA.  A receiver could also tackle PREPA's subsidization of other
government entities through its continuing failure to collect at least $210 million in past due
receivables from them.  *See supra* ¶ 16.  Bondholders' exercise of their receivership right, after
this case is dismissed, will break the political logjam that is preventing PREPA from setting
reasonable rates and collecting amounts it is due to the benefit of all PREPA creditors.

62.    There is no dispute that, outside of bankruptcy, PREPA's bondholders have a
statutory and contractual right to seek appointment of a receiver.  Both the Enabling Act and Trust
Agreement give holders of at least 25 percent of the principal amount of bonds outstanding the
right to appoint a receiver following a default.  Section 17(a) of the Enabling Act provides:

27

> [I]n the event that [PREPA] shall default in any agreement made
> with the holders of the bonds, any holder or holders of the bonds . . .
> **shall have the right** to apply in an appropriate judicial proceeding
> to any court of competent jurisdiction in Puerto Rico for the
> appointment of a receiver . . . . Upon such application the court may
> appoint, and if the application is made by the holders of twenty-five
> (25%) per centum in principal amount of such bonds then
> outstanding, or by any trustee for holders of bonds in such principal
> amount, **shall appoint a receiver of such undertakings**.[68]

The appointment of a receiver is thus mandatory, not discretionary, upon an event of default and

qualifying bondholder application.  That receivership right is also expressly incorporated into the

bondholders' Trust Agreement with PREPA.[69]

63.    The prerequisites for mandatory appointment of a receiver are satisfied, and

bondholders would have long ago exercised their receivership right were it not for this five-year-

old case and its automatic stay.  Undisputed events of default occurred, at a minimum, when

PREPA failed to pay its debt service on scheduled payment dates from July 2017 to the present.

And Movants collectively hold or insure (with the right to control the insured bonds)

approximately 65% of the outstanding principal amount of the bonds that are in default.[70]

64.    Upon dismissal, therefore, a proceeding to appoint a receiver could move ahead,

following which a receiver would seek to adjust rates to the "necessary, proper and reasonable"

level,[71] while also working with whatever entity is operating PREPA's transmission-and-

distribution system—LUMA or its replacement—to right the ship.  Such a rate would allow

PREPA to pay its debts and to improve its operations. The receiver's authority would complement

---

[68] 22 L.P.R. § 207(a) (emphasis added).

[69] *See* Ex. 17 (Trust Agreement) § 804 (requiring Trustee to proceed for the appointment of a receiver upon
written request of the holders of 25% or more of the principal amount of Bonds outstanding).

[70] *See* Proof of Claim No. 18449, filed by the Trustee; *see also* Proofs of Claim Nos. 29020, 32829, and
31087 filed by Assured Guaranty Corp. and Assured Guaranty Municipal Corp.; Proofs of Claim Nos.
22078 and 23396 filed by National Public Finance Guarantee Corp.; Proof of Claim No. 49143 filed by
Syncora Guarantee Inc.

[71] 22 L.P.R. § 207(b).

efforts to restore operations, as the receiver is authorized to increase rates not only to pay debt, but also to pay expenses to "maintain, restore, insure, and keep insured" PREPA's infrastructure—something that LUMA has not yet done, instead constraining its budget to an outdated rate from 2017.[72]   And, if the Government or PREB purported to improperly reject the receiver's rate increase, the receiver (and bondholders) could challenge PREB's legal authority to do so.[73]

65.     Other creditors, representing only 10% of PREPA's debts, are principally fuel line lenders and other contract parties who could also be paid out of increased rates—a receiver has the statutory right to raise rates enough to provide that all valid claims are paid.   Nor would dismissal pose any risk of a "race to the court house," as PREPA's physical assets are not subject to seizure.[74]

66.     In sum: PREPA's need for higher rates, the interminable frustration of that need by the continuation of this Title III case, and a receiver's ability to obtain higher rates upon dismissal of this case constitute further cause for dismissal under Section 930(a).

## II.   IN THE ALTERNATIVE, THE COURT SHOULD LIFT THE STAY FOR CAUSE UNDER SECTION 362(d)(1)

67.     If this Court declines to dismiss this case, the same cause requires lifting the stay to allow Movants to obtain the appointment of a receiver.

68.     The Government Parties' notice to terminate the 2019 RSA, after three years of assurances that a plan based on that RSA was imminent, and PREPA's continuing failure to implement rate increases needed to pay its debt and expenses, show that continuing the automatic stay to preclude the appointment of a receiver harms PREPA and its creditors.   This is cause for relief from the stay under Section 362(d)(1), just as it is cause for dismissal under Section 930.

---

[72] 22 L.P.R. § 207(b).

[73] *See Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, 927 F.3d 597, 605 (1st Cir. 2019); *Aurelius Capital Master, Ltd. v. Commonwealth of Puerto Rico*, 919 F.3d 638, 648 (1st Cir. 2019).

[74] *See* 3 L.P.R.A. § 9142 (precluding levies upon property of governmental corporations).

*See In re Murray*, 543 B.R. 484, 490 & n.30 (Bankr. S.D.N.Y. 2016) (circumstances can be cause

both for dismissal and for relief from stay). However, whereas the burden to show cause is on the

*movant*, and dismissal is discretionary under Section 930(a), the burden is on the *debtor* under

section 362(d)(1), and a court "shall grant relief from the stay" for cause. *See In re Abeinsa*

*Holding, Inc.*, 16-10790 (KJC), 2016 WL 5867039, at *3 (Bankr. D. Del. Oct. 6, 2016) ("[T]he

burden to resist lifting of the stay rests entirely with the Debtor.").

69.     This is not the first time that Movants have sought relief from the automatic stay to

appoint a receiver. In 2017, Movants requested that relief on the different ground that a receiver

was necessary to provide adequate protection of their collateral, and this Court denied that motion

on the ground that section 305 of PROMESA precludes such relief. *In re Fin. Oversight & Mgmt.*

*Bd. for P.R.*, 301 F. Supp. 3d 278 (D.P.R. 2017) ("*2017 Opinion*"). The First Circuit reversed,

holding that section 305 of PROMESA does not preclude relief from the stay to appoint a receiver.

*Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight*

*& Mgmt. Bd. for P.R.),* 899 F.3d 13 (1st Cir. 2018) ("*First Circuit Opinion*").

70.     When the First Circuit remanded the receiver motion for further consideration, it

recognized that circumstances had by then already changed:

> The Title III court did observe in its order of September 14, 2017, that the
> bondholders only faced "temporary impediments." Much time has since passed,
> and the situation on the ground—and at PREPA—has changed greatly since last
> September in the wake of Hurricanes Irma and Maria. . . . [W]e think it best to allow
> the bondholders to file a new and updated request for relief from the automatic stay
> so that the parties and the Title III court can focus on the merits of that request free
> of any thought that the request is categorically precluded.[75]

---

[75] 899 F.3d at 23-24. In 2018, following the *First Circuit Opinion*, the monolines filed a renewed motion
to lift the automatic stay to appoint a receiver. ECF No. 975. That motion, like the original motion, was
premised on a lack of adequate protection. The Board did not respond to that lift-stay motion, which was
stayed by the 2019 RSA. *See* ECF Nos. 1230, 1233, 1638. Discovery obtained in support of the 2018 lift-
stay motion demonstrated PREPA's rampant mismanagement.

71.     This motion, unlike the prior receiver motions, is not premised on a lack of adequate

protection or the extent of bondholders' collateral—issues that can be addressed, if necessary, in

other proceedings.  Rather, this motion is premised on nearly five years of new developments, and

the same "want of prosecution" and "unreasonable delay by the debtor that is prejudicial to

creditors" that is also cause for dismissal.  "Cause under § 362(d)(1) is not limited to a lack of

adequate protection or a finding of bad faith and can exist when a debtor fails to propose a feasible

plan." *In re Gundrum*, 509 B.R. 155, 163 (Bankr. S.D. Ohio 2014) (collecting cases); *see also In

re Accent Assocs., Inc.*, 8 B.R. 933, 936-37 (Bankr. D. Mass. 1981) ("[T]he case law interpreting

Section 362(d) appears to consistently hold that there must be a reasonable possibility of an

*effective* reorganization within a reasonable time" (emphasis added)).  Moreover, "delay in paying

a creditor for an inordinate length of time has been recognized as cause for relief" from the stay

distinct from the lack of adequate protection.  *Southerland v. Troy & Nichols*, *Inc.*, 173 B.R. 432,

433-34 (M.D. Fla. 1994) (finding cause to lift the stay due to "unreasonable delay" prejudicial to

creditors where debtor failed to file a plan within a reasonable timeframe).

72.     The factors bearing on cause to lift the stay—as set forth in *In re Sonnax

Industries*,[76] adopted by this Court's *2017 Opinion*,[77] and approved by the *First Circuit

Opinion*[78]—overwhelmingly support granting bondholders stay relief so that they can appoint a

receiver.  The *Sonnax* factors are "(1) whether relief would result in a partial or complete resolution

of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether

the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the

necessary expertise has been established to hear the cause of action; (5) whether the debtor's

---

[76] 907 F.2d 1280, 1286 (2d Cir. 1990).

[77] 301 F. Supp. 3d at 283.

[78] 899 F. 3d at 23.

insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms."  Factors (3), (5), (8), (9) and (11) are not relevant here, and the other factors all weigh strongly in favor of relief from the stay.[79]

73.     Factor (1)—whether relief would result in a partial or complete resolution of the issues—supports relief from the stay because rate-setting is the issue that matters above all others. PREPA and the Board have shown themselves incapable of raising the base rate, and section 305 of PROMESA prevents this Court from setting rates without the Board's agreement.  The appointment of a receiver will allow resolution of this critical issue, without which no plan can be confirmed.  *In re Armstrong & Guy L. Off., LLC*, No. 07-02459, 2007 WL 4571152, at *2 (Bankr. S.D. Miss. Dec. 21, 2007) (lifting stay to allow a trial on claims that would "result in only a partial resolution" because it would resolve a "vital issue" necessary for bankruptcy to proceed); *In re Arnott*, 512 B.R. 744, 754-55 (Bankr. S.D.N.Y. 2014) (lifting stay where permitting an action to proceed outside bankruptcy would resolve important issues, even though dischargeability of resulting liability would need to be resolved in the bankruptcy case).

74.     Factor (2)—a lack of interference with the bankruptcy case—likewise supports stay relief.  The First Circuit recognized as much.  *See First Circuit Opinion*, 899 F.3d at 22 (observing

---

[79] The *Sonnax* factors are even more applicable to this motion than they were to the 2017 lift-stay motion, because the 2017 motion was premised on adequate protection, whereas the *Sonnax* factors (like this motion) focus on what constitutes "cause" for lifting the stay *other than* a lack of adequate protection.

that a receiver would not interfere with this Court's exclusive jurisdiction over PREPA's property). A receiver is needed for this case to make any meaningful progress and cannot be appointed by the Title III court. Indeed, the appointment of a receiver would *assist* the Title III case by increasing the available revenues for PREPA's use in a confirmable plan and releasing this proceeding from the constraint of shifting political whims.

75.     Factor (4)—whether a specialized tribunal exists for the relevant action—is also satisfied. Bondholders' right to a receiver arises under Puerto Rico law, and therefore a court in Puerto Rico would be better-suited to decide a receiver action. *Cf. In re Coast Caribbean Recycling, Inc.*, No. 14-01133, 2014 WL 7359405, at *2 (Bankr. D.P.R. Dec. 23, 2014) (Puerto Rico courts better-suited to resolve actions to pierce the corporate veil under Puerto Rico law). Once a receiver is in place, it can set affordable rates either by proceeding through PREB—PREPA's regulator—or by pursuing a legal challenge to interference by PREB.[80] In either case, the relief is not something that this Court can grant, and must be obtained from another court after relief from the stay. *See Ambac*, 927 F.3d at 605; *Aurelius*, 919 F.3d at 648.

76.     Factor (6)—whether the action primarily involves third parties—also supports stay relief. The rate issue undoubtedly concerns and involves third parties: PREPA's ratepayers. Customers and other interested parties can (and presumably will) appear in any PREB rate-setting proceeding, just as they did when PREPA sought a rate increase pursuant to the 2015 RSA.[81]

---

[80] *See Franklin Cal. Tax-Free Tr. v. Commonwealth of Puerto Rico*, 85 F. Supp. 3d 577, 611-12 (D.P.R. 2015), *aff'd*, 805 F.3d 322 (1st Cir. 2015), *aff'd*, 579 U.S. 115 (2016) (receiver with statutory authority to levy, maintain and collect rates is a property right conveyed to bondholders under the Trust Agreement and relevant law); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 22-1119, 2022 WL 2800724, at *5 (1st Cir. July 18, 2022) (holding that claims under the Takings Clause cannot be impaired under bankruptcy laws).

[81] *See* Ex. 43 (Restructuring Order, *In re Petition for Approval of Transition Order filed by the PREPA Revitalization Corp.*, PREC Case No. CEPR-AP-2016-0001 (June 21, 2016)).

77.     Factor (7)—whether litigation in another forum would prejudice the interests of other creditors—favors stay relief.  Appointment of a receiver will increase revenues for the benefit of every creditor, and prejudice none of them.  Movants are not seeking stay relief so that they can foreclose on any PREPA asset (which, again, is forbidden by Puerto Rico law).  Nor do Movants seek to assert any special entitlement to incremental revenues, which would be allocated among PREPA's creditors only under a confirmed plan.  *See In re David X. Manners Co.*, No. 15-51490, 2018 WL 1997674, at *6 (Bankr. D. Conn. Apr. 26, 2018) (finding no harm to other creditors in allowing lawsuit to reach judgment if enforcement proceedings not allowed).

78.     Factor (10)—judicial economy—weighs in favor of relief.  For starters, the Government Parties' broken agreements to restructure PREPA's bond debt, and their unfulfilled promises to produce a plan, have for too long taxed this Court's resources.  Five years in, the truth is that there is nothing to show for it.  Now they plan years of costly litigation, notwithstanding their failure to describe any discernible strategy and timetable for how that litigation will blaze a trail out of Title III—especially given that, in the end, PREPA will still have to pay its bondholders what it can afford.  For the reasons described above, judicial economy is best served by allowing appointment of a receiver to seek an adjustment of rates in Commonwealth fora.  *See, e.g.*, *In re New York Med. Grp.*, 265 B.R. 408, 413 (Bankr. S.D.N.Y. 2001) (lifting stay so parties could liquidate claim in state court promoted judicial economy because only state court could award complete relief); *In re Cicale*, No. 05-14463, 2007 WL 1893301, at *4 (Bankr. S.D.N.Y. June 29, 2007) (lifting stay to allow a creditor to resolve validity of mortgage in state court promoted judicial economy by potentially alleviating need for further proceedings in bankruptcy court).

79.     Finally, factor (12)—the balance of harms—favors granting relief.  As discussed above, there is no harm to PREPA or its creditors from obtaining a receiver empowered to raise

rates.  By contrast, there is substantial harm to bondholders if PREPA continues sheltering behind the automatic stay while refusing to raise rates or stick to its restructuring agreements.

80.    In sum, lifting the automatic stay would be consistent with the Court's *2017 Opinion*, given the striking changes in circumstances over the five intervening years.  In 2017, this Court denied relief from the stay partly out of concern that a receiver would set rates inconsistent with PREPA's Fiscal Plan.  *See* 301 F. Supp. 3d at 287.  But the Oversight Board has now approved three Fiscal Plans aware of the rate increases in the 2019 RSA.  Back in 2017, the Court also sought to prevent interference by a receiver with the Oversight Board's proposal of a plan, *see id.* at 286-87, but after three years of waiting and the Government Parties' purported termination of the 2019 RSA, the Board is farther away from making such a proposal than ever.  And as the First Circuit observed, this Court's *2017 Opinion* described bondholders' harms from the pendency of this case as mere "temporary impediments."  899 F.3d at 23-24.  Those harms are now anything but "temporary"—they are longstanding and continuing.  It is even more true now than when the First Circuit said it three years ago that "[m]uch time has since passed, and the situation on the ground—and at PREPA—has changed greatly."  *Id.* at 23.

## CONCLUSION

This case is stuck.  The Oversight Board has unreasonably delayed its effective prosecution because PREPA is incapable of making and keeping agreements to set affordable rates sufficient to repay its bondholders and other creditors.  The case should be dismissed outright, or the automatic stay should be lifted, so that bondholders can obtain a receiver for PREPA with the authority to set rates and make long-overdue progress toward PREPA's financial stability.

We hereby certify that, on this same date, we electronically filed the foregoing with the

clerk of the Court using the CM/ECF system, which will notify the attorneys of record.


Dated:  San Juan, Puerto Rico
         September 19, 2022

**TORO COLÓN MULLET P.S.C.**
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760

/s/ *Manuel Fernández-Bared*
MANUEL FERNÁNDEZ-BARED
USDC-PR No. 204,204
E-mail: mfb@tcm.law

/s/ *Linette Figueroa-Torres*
LINETTE FIGUEROA-TORRES
USDC-PR No. 227,104
E-mail: lft@tcm.law

/s/ *Nayda Perez-Roman*
NAYDA PEREZ-ROMAN
USDC–PR No. 300,208
E-mail: nperez@tcm.law

*Counsel for the Ad Hoc Group of PREPA
Bondholders*

**KRAMER LEVIN NAFTALIS &
FRANKEL LLP**
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000

/s/ *Amy Caton*
AMY CATON*
THOMAS MOERS MAYER*
GARY A. ORSECK*
MATTHEW M. MADDEN*
ALICE J. BYOWITZ*
Email:  acaton@kramerlevin.com
         tmayer@kramerlevin.com
         gorseck@kramerlevin.com
         mmadden@kramerlevin.com
         abyowitz@kramerlevin.com

*Admitted Pro Hac Vice

*Counsel for the Ad Hoc Group of PREPA
Bondholders*[82]

---

[82] Syncora Guarantee Inc. joins this motion through its owners, funds, and accounts managed by
GoldenTree Asset Management, LP, a member of the Ad Hoc Group.

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: /s/ *Heriberto Burgos Pérez*
     Heriberto Burgos Pérez
     USDC-PR No. 204,809
     Ricardo F. Casellas-Sánchez
     USDC-PR No. 203,114
     Diana Pérez-Seda
     USDC–PR No. 232,014
     P.O. Box 364924
     San Juan, PR 00936-4924
     Tel.: (787) 756-1400
     Fax: (787) 756-1401
     E-mail:  hburgos@cabprlaw.com
               rcasellas@cabprlaw.com
               dperez@cabprlaw.com

*Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

**CADWALADER, WICKERSHAM & TAFT LLP**

By: /s/ *Howard R. Hawkins, Jr.*
     Howard R. Hawkins, Jr.*
     Mark C. Ellenberg*
     Casey J. Servais*
     William J. Natbony*
     Thomas J. Curtin*
     200 Liberty Street
     New York, New York 10281
     Tel.: (212) 504-6000
     Fax: (212) 406-6666
     Email:  howard.hawkins@cwt.com
              mark.ellenberg@cwt.com
              casey.servais@cwt.com
              bill.natbony@cwt.com
              thomas.curtin@cwt.com

* Admitted pro hac vice

*Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

**ADSUAR MUÑIZ GOYCO
SEDA & PÉREZ-OCHOA, P.S.C.**

By:   */s/ Eric Pérez-Ochoa*
Eric Pérez-Ochoa
(USDC-PR No. 206314)
Luis Oliver-Fraticelli
(USDC-PR No. 209204)
Alexandra Casellas-Cabrera
(USDC-PR No. 301010)
PO BOX 70294
San Juan, PR 00936
Telephone: 787.756.9000
Facsimile:  787.756.9010
Email:  epo@amgprlaw.com
        loliver@amgprlaw.com
        acasellas@amgprlaw.com

*Attorneys for National Public Finance
Guarantee Corporation*

**WEIL, GOTSHAL & MANGES LLP**

By:   */s/ Robert Berezin*
Kelly DiBlasi (admitted *pro hac vice*)
Jonathan Polkes (admitted *pro hac vice*)
Gregory Silbert (admitted *pro hac vice*)
Robert Berezin (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007
Email: kelly.diblasi@weil.com
        jonathan.polkes@weil.com
        gregory.silbert@weil.com
        robert.berezin@weil.com

Gabriel A. Morgan (admitted *pro hac vice*)
700 Louisiana Street, Suite 1700
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email: gabriel.morgan@weil.com

*Attorneys for National Public Finance
Guarantee Corporation*