# EXHIBIT 16

**Puerto Rico**

# Jaresko, Key Lawmakers Discuss With Reorg Prospects for Passage of PREPA RSA Legislation, Acknowledge Real Risk of Creditor-Focused Receivership

Tue 03/03/2020 12:24 PM

Share this article:

Almost 10 months after the latest Puerto Rico Electric Power Authority restructuring support agreement was first announced in May 2019, legislation needed to execute the RSA remains a key sticking point between the PROMESA oversight board and the commonwealth as the debt deal's prospects remain clouded by government opposition to a contemplated transmission charge to back new securitized bonds.

In an exclusive interview with Reorg touching on a range of PREPA-related issues, PROMESA oversight board Executive Director Natalie Jaresko stressed that the failure to pass the RSA legislation raises the risk that the utility could be placed into a creditor-focused receivership, a development that could prolong a Title III bankruptcy process that already poses challenges to the aim of transforming the island's energy system. "There is a risk that the creditors get fed up and at some point go to the court and say either lift the stay or discharge the case and they seek a receiver. I think the longer this goes on the higher the risk there is of that happening," Jaresko warned, adding that receivership could also trigger a covenant around PREPA's legacy debt that could drive rates well above the transition charge contemplated in the RSA that has sparked the opposition among legislative leaders and Gov. Wanda Vázquez.

Jaresko's defense of the RSA comes amid evaporating support for the deal by Vázquez and the ongoing stance by Puerto Rico legislative leaders that they will not pass related legislation if it includes a transition charge to securitize new debt as contemplated. Lawmakers have also taken aim at a so-called sun tax provision in the RSA that would be levied on solar consumers who remain connected to PREPA's grid.

In separate interviews at the Capitol, the chairmen of the energy committees in both chambers - Senate Special Committee on Energy Affairs Chairman William Villafañe and House Economic Development, Planning, Telecommunications, Public-Private Partnerships and Energy Committee Chairman Victor Parés - acknowledged the receivership risk but reiterated to Reorg that the legislature will not pass any RSA-related bill that includes a transition charge.

Addressing the opposition to any legislation that would raise rates, Villafañe said, "Our concern as lawmakers is that we are not in a position to increase the cost of electricity right now because of the harm it would cause to the economy." He added, "If the RSA is based on the transition charge, then it has no possibility of being approved by the committee or the full Senate." Parés echoed this sentiment, explaining, "We've told them that any deal that includes an upward change in the cost per kilowatt-hour won't be approved." Parés stressed that "if the deal insists on including the transition charge and the sun tax, it won't pass."

Jareskio's comments on the rising risk of receivership were made in the broader context of the importance of getting PREPA out of the Title III process, and the role of the RSA in that aim, to spur progress toward the oversight board's "singular goal" of a transformed energy system that is more efficient, more resilient and ultimately less costly for consumers.

She also stressed that the pendency of the Title III bankruptcy affects the main pillars of the utility's transformation - lower costs, privatization and federal recovery funding. "All of these three will be more possible and more successful if we get through bankruptcy because while you are in bankruptcy everything is complicated," she said. "So, getting out of bankruptcy is a lynchpin to getting that transformation done. And that takes you to the RSA, which we think is the best way to get out of bankruptcy."

Reorg's interviews with Jaresko, Villafañe and Parés touched on a series of PREPA-related topics, which are set forth below.

<u>Proposed Legislation and RSA Support in Current Political Environment</u>

Jaresko pointed to an "extreme sensitivity" to raising rates in an election year and noted that the vote looming in November also represents another angle of political uncertainty heading into a new four-year governmental term. She noted that Vázquez was supportive of the RSA initially and presented the deal to majority New Progressive Party lawmakers but has "since decided they have no willingness to support this RSA." Jaresko has met with legislative leaders to pitch the RSA and plans to do so again.

"I'm still going to speak to the legislature about it and I still believe there are great benefits to the RSA as currently contemplated. But I don't believe they are going to change their position."

Sign up for Reorg on the Record

Jaresko said the focus of critics on the transition charge and so-called sun tax in the RSA is a case of "missing the forest for the trees."

"Nobody wants a rate increase," she said. "But the only way to get reduced rates is to get out of bankruptcy."

The Senate and House committee chiefs said it is their understanding that the Vázquez administration has drafted an RSA-related bill but that it has not been circulated in the Capitol. Both lawmakers expressed hope that a measure would be filed before the end of the current legislative session in June, which is the lone session of this election year and the last of the four-year political term, but acknowledged that a measure could be taken up by year's end in a special session before or after the November election.

"It may be hard to pass a bill in the midst of electoral campaigns. If you have to do it you have to do it," Parés said. "But the climate would be tough."

While the PROMESA oversight board continues to urge the commonwealth to approve the necessary RSA-related legislation, Jaresko reiterated that it is exploring "all" avenues to get the public corporation out of bankruptcy. "Right now we're just at the stage of trying to look at all options," she said.

Parés signaled an understanding that executive branch instrumentalities - referring to the Puerto Rico Fiscal Agency and Financial Advisory Authority, Public-Private Partnerships Authority and PREPA - have worked with the oversight board in "evaluating alternatives to bypass the legislature" and "go straight to Judge [Laura Taylor] Swain on their own for her approval to use as a bypass to not use the Senate and House to approve legislation."

"I think it requires legislation but that's the last I heard," he said, adding that the House would likely consider a resolution rejecting any such move "in the event they bypass the House and Senate."

Jaresko also downplayed any potential upside of taking PREPA's restructuring into mediation. "Right now we don't see any role for mediation because this is really an issue for the legislators. We don't have a problem with the bondholders or courts or anything like that right now," she said. "If there ever is a time we're always grateful for the role of mediators but right now it just doesn't seem like it would be particularly useful or necessary."

The oversight board executive director rejected the notion that a PREPA deal could be put on the backburner to allow a full focus on the new commonwealth plan support agreement and broader restructuring. "Puerto Rico needs to do these simultaneously. We've been here for three years. It has taken three years to get this far. It doesn't behoove us to put it off," she said. "Every day we're in bankruptcy we pay more for fuel and the people of Puerto Rico don't deserve to pay more for fuel every day."

Jaresko stressed the importance of exiting Title III to bring down financing costs at PREPA and across the commonwealth. "Every investor has a cost of capital, and their cost of capital is higher if they operate in Puerto Rico," she said. "It is the same reason the commonwealth plan is so important. Getting out of bankruptcy lowers the cost of investment."

Eyes on Energy Transformation

"The oversight board has one singular goal and that is to transform the electricity system," Jaresko said, outlining how PREPA's bankruptcy shapes the three major components of that drive: bringing down fuel costs; improving management through privatization; and sound use of federal grid funding.

"Whatever fuel they are buying, the sellers are selling it to them with a risk premium because they are a bankrupt entity, and you never know whether you're going to get paid or not," she said, adding: "The federal government can't not think about their investment into a bankrupt entity. A proponent taking on management of this grid cannot but think about what it means to be managing it in bankruptcy versus out of bankruptcy. It's just kind of a black and white thing."

Measures to bring down fuel costs, which account for 50% of PREPA's rate, include expanding the use of natural gas, pushing PREPA to move forward on shovel-ready solar power purchase and operating agreements, or PPOAs, and "delinking" the transmission and distribution grid from generation. "That's all aimed at bringing down the cost of fuel," Jaresko said.

The public-private partnerships process, which is centered on a long-term concession of PREPA's T&D and customer service operations, is intended to "yield a competent, experienced manager who is properly incentivized to run this as an efficient reliable grid," Jaresko said, touting progress on that front with the Puerto Rico Public-Private Partnership Authority's selection of a preferred proponent out of a pool of that was characterized by "experience, knowledge and credibility."

"That's really great for Puerto Rico because you don't always get that," she said.

Jaresko acknowledged that a T&D concession could get done before a PREPA bond restructuring: "Sure, but our preference is to do all of it. And our preference is to get the best possible terms," she said, adding that "time will tell" if the best terms can be had while still in Title III.

Jaresko cited the efficient receipt and deployment of federal funding as essential to lowering fuel costs and creating a reliable, cleaner grid. "You can't fix this without getting federal funds and putting them pointing to President Donald Trump's appointment of Coast Guard Rear Adm. Peter Brov

Sign up for Reorg on the Record

recovery to ensure that the money is put to work as quickly, effectively and efficiently as possible.

"All I'm saying is it is going to be more effective and efficient if we're out of bankruptcy," she said, adding: "It will be more efficient if we have a P3 operator in there who is incentivized to make good decisions. It's just common sense."

Villafañe, who replaced retired Sen. Larry Seilhamer at the head of the Senate committee in January, said Puerto Rico's focus should be on energy infrastructure that is resilient, does not stunt economic development and job creation, and is environmentally sound. "We should do everything we can to transform the infrastructure into one based on renewable generation," he said, pointing to Act 17's mandate of reaching 100% renewables by 2050. "I hope we get there. But we just have to go in that direction."

"Parallel to that we will be looking at the process of negotiation around the RSA that the oversight board and PREPA are trying to finish," Villafañe said.

Parés and Villafane said they have not heard that Title III bankruptcy has been a complicating factor in the T&D transaction and other P3s in terms of capital but acknowledged the logic behind the scenario.

Villafañe and Parés signaled that the plan to put PREPA's T&D system under a private operator is moving forward. One issue that remains to be ironed out, Parés indicated, is the timing for the T&D concession as it relates to the RSA and passage of related legislation. During a late January legislative conference with Vázquez and the heads of PREPA, AAFAF and the P3 Authority, the executive branch argued that the PREPA RSA bill would have to have to cleared by the Senate and House to complete the PREPA T&D transaction, according to Parés. The lawmaker said he subsequently raised that chronological issue in a Feb. 12 executive session of his committee and was told by utility and administration officials that they are in talks with the oversight board to see if the T&D deal can be adjudicated before passage of an RSA-related bill.

Villafañe cited conversations between the commonwealth's P3 Authority and the PROMESA oversight board to reach an agreement on the T&D concession, adding that PREPA retaining ownership is vital "because there is an expectation of federal investment" in the T&D system. "So the best equation is to bring in a private operator but keep government ownership," the senator said. "We're talking about more than $10 billion here."

Receivership Risks

Jaresko signaled that the oversight board is still aiming to head off a receivership threat that "for some reason people here don't really want to believe" is a real risk.

"Creditors aren't going to have patience forever and there is a risk that they go and they ask for a receiver, who will generally manage this for the creditors' interests not for the consumers' interests," Jaresko said. "So that combined with the rate covenant risk is something we'd all like to avoid."

Jaresko said a receiver could pursue a forced 7 cent rate increase to cover bond payments in accordance with the covenants of the 1974 trust agreement. "So while everyone is pondering whether a 2.7 cent transition charge is too much, what I'm telling you is they are missing the big picture. The big picture is the risk of 7 cents."

"We don't think this is the time to introduce a receiver. We think it could potentially delay the transformation," Jaresko said. "And we don't want to delay the transformation. That's kind of the singular focus of everything is to get that transformation done."

Jaresko said the oversight board sees a receiver "working primarily on behalf creditors" in a role that would not necessarily dovetail with that of a "proponent company being paid to improve" the reliability and efficiency of the energy system. "They would operate differently. They are not interchangeable," she said.

Asked whether the oversight board would push back against a potential renewed creditor push for a receiver, Jaresko said that is a hypothetical scenario. "I don't know where we are going to be at that time. Right now what we're trying to do is see how we can get this transformation done. How can we get out of bankruptcy," she said. "Going to a receiver is not getting out of bankruptcy, so that's not my primary goal right now."

Parés signaled that PREPA Executive Director José Ortiz has outlined risks of not passing RSA-related legislation that include a PREPA receivership bid by creditors and a potential move by the oversight board to simply pull the utility out of the Title III process and its bankruptcy protections. Both scenarios would expose to an immediate restart of payments on its full $9 billion in bonded debt, according to Parés.

Parés said it is unclear whether there would be "any interest in the market to take over a bankrupt corporation with a thousand problems," but allowed that a PREPA receivership would be disruptive to the island's energy transformation aims.

"Falling into a receivership would be worse for us," the House committee chief said. "It would mean chaos at a time when the public is hopeful for a reconstruction of the system."

Villafañe acknowledged those risks and weighed the need to restructure PREPA's debt ar̶ ̶ ̶ ̶ ̶ ̶i̶t̶ ̶ ̶ ̶ ̶ ̶ ̶d̶ infrastructure.

Sign up for Reorg on the Record

RSA Legislation, Terms

Jaresko said the PREPA RSA, which requires that Act 4 of 2016 be amended or other legislation enacted "to govern the Securitization Bonds and implement the transactions contemplated by the RSA, the Recovery Plan Term Sheet and this Securitization Term Sheet," requires legislation that basically accomplishes three things:

1. Creating the securitization vehicle that is contemplated in the RSA;
2. Implementing the transition charge in the amounts that are in the scheduled in the RSA; and
3. Implementing demand protection measures.

Jaresko defended the terms of the current RSA and pointed to pitfalls in trying to rework the deal. "Everyone keeps talking about redoing things, that they have another way. I have great respect for any and all ideas but this has been going on for years even before the oversight board and PROMESA," she said. "But it has to be negotiated. It has to work in a bankruptcy court. It has to work in the legal system. We have to get it done because we are still in bankruptcy."

Jaresko signaled the current RSA reflects public policy goals that were not fully incorporated into the previous PREPA restructuring agreement that was rejected and then subsequently renegotiated by the oversight board, pointing to the "fixed transition charge" and "demand guarantees" that avoid "putting the onus" of declining demand on consumers for whom getting off the grid is not an option due to lack of financial resources or other reasons.

"Those consumers would be left holding the bag if you don't have the fixed transition charge and demand guarantees that are in that RSA," she said.

Rather than a flat fee as contemplated in the rejected RSA, the staggered structure of the transition charge in the current RSA, which would start at about 2.7 cents per kilowatt-hour and rise gradually over the first 23 years to approximately 4.5 cents per kilowatt-hour for the remainder of the term of the bonds, is specifically designed to enable savings to occur. "Everything I described is about bringing rates down. Energy bills should come down over time. The whole goal is to do that but I can't time that," she said. "There have been discussions about why don't we wait until we get 2.7 cents of savings. But I don't know when that is going to happen."

As an example, Jaresko pointed to delays in converting units 5 and 6 at PREPA's San Juan plant to burn liquefied natural gas for reasons including issues with the port facilities and post-earthquake demand. "So how do you time these things if there are that many different factors affecting when you get the savings?" she said, adding: "Again, creditors aren't going to have patience forever."

Parés and Villafañe concurred that a possible alternative to the transition charge would be to use anticipated savings at the utility to provide the securitization sought by bondholders and monolines who have subscribed to the accord. "PREPA has told us that they have some expectation of reducing the cost of generation and the price of electricity. So the best solution would be to pay the debt that finally is set in an agreement from those savings, from that amount that would be reduced from the cost of generation," Villafañe said. "Why aren't they using the savings as a guarantee instead of the transition charge? I think what creditors really want is the securitization of that debt."

The senator said his committee is "beginning conversations" with PREPA, the Puerto Rico Energy Bureau, or PREB, which is the commonwealth energy market regulator, and other interested parties to catalog potential savings at the utility.

"One of the alternatives that could be evaluated is using those efficiency savings for the securitization charge. There is still no agreement on that but it is an alternative," Parés said.

The House committee chair said he raised the issue of securitization through savings with PREPA chief Ortiz during a Feb. 14 executive session, adding that the conversation touched on efficiencies including a reworked PPOA with private natural gas generator AES is being held by PREPA pending its consideration of PREPA's proposed new 20-year integrated resource plan.

Spotlight on 'Sun Tax'

Jaresko said the demand protection measures, which lawmakers and other RSA critics have seized on as a "sun tax," are "very important" to the oversight board as a matter of fairness and affordability for consumers who can't migrate to solar panels, adding that they represent a "minimal part" of overall power bills that for policy reasons is getting spread out through the "entire mass" of PREPA customers.

"This isn't a tax as it doesn't discriminate against anyone. You're simply paying the same as everyone else to the extent that you are on the grid," Jaresko said. "It is not a disincentive to solar in any way."

Jaresko said the RSA is "advanced" on an issue that every utility faces as alternative energy is introduced, noting that other states are looking at how to recover stranded costs from solar consumers who are still benefiting from connection to the grid. "You have legacy charges. Someone has to pay for building that grid," she said. "If you are still on the grid benefiting why are you exempt, which is what some people are suggesting. This is not unique to Puerto Rico."

Villafañe acknowledged that the demand protection measure is not a tax and said the leg[...] the T&D system from incorporating solar generation but believes that type of generation [...]

Sign up for Reorg on the Record

families and communities reduce costs and increase resilience. "In the end, that helps PREPA by providing low cost, clean distributed generation," he said.

Both committee chiefs said the sun tax may stem from creditor concerns that PREPA could bleed enough consumers to substantially narrow revenues.

"Bondholders probably project that will get too many consumers out of PREPA. I don't agree with that," Villafañe said, citing high financing costs for solar systems and limitations on feeders to accept that kind of generation as limiting factors. "So it won't be a transition where a majority of consumers become prosumers," he said. "But it will provide PREPA with a reasonable amount of prosumers that will ultimately help it become more efficient, especially in areas where resiliency is more difficult to attain."

RSA Recoveries

Jaresko pointed to a "significant decrease" in creditor bond recoveries compared with the previous RSA. "Even though it is a revenue bond and they claim to have a lien, challenging the lien in court helped to achieve what we achieved in the RSA," she said.

While Villafañe said he would like to see the RSA reworked to reduce recoveries for bondholders, Parés signaled that the House is not looking for further haircuts.

"I also think the amount of debt that would be paid under the RSA is too high," Villafañe said, citing lower recovery levels in other municipal bankruptcies and "some conditions" in the RSA "we think will not be achieved so recoveries would rise" to the high end.

"We're looking at the price of the bonds on the market and the real value of PREPA. It is based now on intangible prices based on the monopoly that PREPA has had for decades. Right now we have a corporation with like 100% negative equity and they are asking for that kind of recovery," Villafañe said. "I think it should be lower," he said, adding that he told PREPA and administration officials during the late January legislative conference "to use this as leverage" in a RSA-related negotiations.

Villafañe characterized as "great" the governor's public call for the RSA terms to be revisited, adding that the legislature does not have deep insight into negotiations that are kept confidential. "We don't know anything about it," he said. "We just tell them that they can use our position as leverage if at the end Senate and House approval is needed."

"I think there should be an agreement but it should be a reasonable agreement. That means one that is sustainable for PREPA now and in the future. And we look at it that way. That's the reason we advocate for bigger haircuts, more renewables and a deal that replaces a transition charge that would increase the cost of electricity to one based on reducing the cost of generation," Villafañe said. "We're open to anything that permits a transition toward lower the cost of electricity and the transformation at the end to a renewable system."

Parés, for his part, said the House is not concerned about reworking the RSA to pare creditor recoveries, noting that the proposed deal would reduce PREPA's bonded debt to $6 billion from roughly $9 billion. "Some sectors say the bondholders are getting too much given the prices at which they bought the bonds. But looking at it strictly from the standpoint of lowering $9 billion to $6 billion, there are real savings there," he said.

Looking Anew at Act 4

Jaresko and the two legislative committee chiefs all discussed aspects of Act 4 of 2016, which was approved based on the previous PREPA restructuring agreement that was rejected and then subsequently renegotiated by the oversight board.

Jaresko touched on reasons why Act 4 cannot simply be employed to execute the current RSA as some voices contend. "Act 4 was written for a very specific other deal and it doesn't fill the need as contemplated under this RSA and that's why new legislation is required," she said. "Our position is that Act 4 was written specifically for a different deal with different terms.

Unlike under Act 4, PREB, the government's energy industry regulator, would not have to sign off on the transition charge contemplated in the current RSA.

"As contemplated under the RSA, PREB would not have to approve the separate transition charge. It would be approved by the legislature on that schedule and PREB would not have to approve it because it's not part of the rate," she said. "That's the whole concept behind securitization."

Under Act 4, the special purpose vehicle, or SPV, created by the statute to issue new securitized bonds, imposed the transition charge but then ordered PREPA to submit that charge and validate it through a PREB order issued in June 2016. The regulator essentially validated a checklist for compliance of provisions of Act 4 and did not go into the amount of charge or how it was determined, simply gauging whether the submission and calculation complied with Act 4, and its role stemmed only from the way the previous RSA was written.

Jaresko said that while PREB understands it has no role over the current proposed transition charge, approving the RSA would "upend" the commonwealth's energy law, Act 17 of 2019, and the regulator Sign up for Reorg on the Record transition charge is not part of PREPA's rate and is not something that the utility pays.

"This isn't in any way trying to upend PREB. We were part of the major effort to make sure PREB existed, that it was properly funded, that they had an independent board and became less politicized because we understood very well that if we didn't have a credible PREB we couldn't have a credible proponent on the T&D," she said. "So we're not in any way in any form trying to upend PREB or the governance. It's just that this was something that was separate and required consistency."

Villafañe also shed additional light on his Senate Resolution 1331, a measure approved by the upper chamber last week that directs his committee to undertake a "comprehensive investigation" into the status of the Puerto Rico Electric Power Authority Revitalization Corp., created under Law 4 of 2016 and aimed at executing a restructuring of PREPA's debt through a securitization mechanism.

The Senate Special Committee on Energy Affairs will cite PREPA, PREB and other stakeholders to testify in public hearings on Act 4 to be held in March, April and maybe early May, according to Villafañe, adding that there will not be closed-door executive hearings on the matter unless confidentiality claims are raised.

"That resolution is aimed at evaluating whether the transition charge is the best way to provide the securitization. I think that our investigation will show that the best way to provide that securitization is using the amount that will be reduced in the cost of generation," the senator said.

Villafañe indicated that he understands Act 4 as enacted could be used to cement the PREPA RSA. "It could be used. As a lawyer I think it could be used," he said, adding he questioned PREPA and administration officials during the late January legislative conference on why they are asking the legislature to approve new legislation if Act 4 and a related transition charge approved by PREB in June 2016 are already on the books.

"What they are asking is not really to establish the transition charge but to approve the RSA securitization. We think that the RSA is based on that transition charge and the sun tax, and we are not in a position to approve that kind of agreement," he said. "But this committee is in the position to review Act 4 and review the way to supply that securitization."

Villafañe signaled the Senate would not seek to repeal Act 4. "I'm here to work responsibly based on what we have at hand," he said.

-- Kevin Mead, John Marino

Share this article:      

This article is an example of the content you may receive if you subscribe to a product of Reorg Research, Inc. or one of its affiliates (collectively, "Reorg"). The information contained herein should not be construed as legal, investment, accounting or other professional services advice on any subject. Reorg, its affiliates, officers, directors, partners and employees expressly disclaim all liability in respect to actions taken or not taken based on any or all the contents of this publication. Copyright © 2022 Reorg Research, Inc. All rights reserved.

Previous Story    Next Story

Interested in a Reorg subscription for your business?

Request A Trial

**Products**

Americas Core Credit
Americas Covenants
Americas Middle Market
Americas Municipals
Asia Core Credit
Credit Cloud
EMEA Core Credit
EMEA Covenants
EMEA Middle Market
Aggredium
First Day
M&A

**Solutions**

Reorg Solutions
Investment Management
Investment Banks
Law Firms
Professional Services
Corporates
Packaged Solutions

**Company**

About Us
Join Us
Our Commitment
Partnerships
Press & Awards
Contact Us

Sign up for Reorg on the Record

**Resources**

Intelligence

Events & Webinars

Podcasts

Training

Videos

Reorg on the Record

Reorg Blog

**Databases**

Database Overview

Advisors

BDC

CLO

DIP Financing

First Day Database

KEIP

Legal Billing Rates

Market Maker

Restructuring Data

Reorg's Restructuring Risk Index (RRRI™)

Unsecured Creditors

© 2022 Reorg

Reorg is a registered trademark of Reorg Research, Inc.

Submit A Tip

Terms & Conditions - Reorg

Terms & Conditions – API Services

Terms & Conditions - DX

Privacy Policy

Sign up for Reorg on the Record