# EXHIBIT 38



# Annual Report

# 2022



# Financial Oversight and Management Board for Puerto Rico

Annual Report submitted pursuant to Section 208 of the Puerto Rico Oversight, Management, and Economic Stability Act

**Board Members**
David A. Skeel, Jr. , Chairman
Andrew G. Biggs
Arthur J. González
Antonio L. Medina
John E. Nixon
Justin M. Peterson
Betty A. Rosa
Governor Pedro Pierluisi, ex officio member

**Executive Staff**
Jaime El Koury, General Counsel

**Fiscal Year 2022 Report**
6th Annual Report
July 31, 2022
San Juan, PR

# Table of Contents

David Skeel Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

**Oversight Board Achievements** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
The Oversight Board and PROMESA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
Civil Service Reform . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**
PRDE Leadership Innovation Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**
Pension Reform and Pension Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**
Thought Leadership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

**Fiscal Responsibility** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**
Financial Management Agenda . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**
Commonwealth of Puerto Rico . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **41**
    Plan of Adjustment for the Commonwealth . . . . . . . . . . . . . . . . . . . **41**
    Certified Fiscal Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **43**
    Implementation Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **53**
    Budget Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **65**
PREPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **75**
PRASA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **79**
HTA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **84**
UPR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **89**
CRIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **94**
COSSEC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **98**
Legislative Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **100**
Contracts Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **105**
Ease of Doing Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **109**

**Debt Restructuring** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **115**
Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **116**
Completed Debt Restructuring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **118**
Ongoing Debt Restructurings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **123**

**Title V** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **125**

**Oversight Board Activities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **128**
Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **129**
Stakeholder Outreach and Engagement . . . . . . . . . . . . . . . . . . . . . . . . . . . . **144**
Oversight Board Budget . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **149**

**Letter from the Ethics Advisor** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **153**

**Recommendations to the Federal Government** . . . . . . . . . . . . . . . . . . . . **162**



Letter from the Chair,
# David A. Skeel Jr.

## Fiscal year 2022 was a turning point for Puerto Rico.

The Oversight Board has reached many milestones in the six years since the Puerto Rico Oversight, Management, and Economic Stability Act of 2016 (PROMESA) was enacted, particularly in stabilizing Puerto Rico's finances and restructuring significant parts of the debt. No fiscal year, however, was as consequential as the year that ended on June 30, 2022.

First, the U.S. District Court for the District of Puerto Rico confirmed the Plan of Adjustment to reduce the Commonwealth's debt by 80%, resolving the largest part of Puerto Rico's enormous debt. This proceeding, under Title III of PROMESA, was the largest and most complex public-sector debt restructuring in U.S. history. On March 15, 2022, the Plan of Adjustment went into effect.

Second, the Oversight Board certified the first budget since PROMESA was enacted that includes debt payments. This budget could prove to be the first truly balanced budget

for the central government since Puerto Rico's fiscal crisis. We will know for certain when the audited financials are completed.

Finally, the Government and the Oversight Board worked together to begin changing the way government works for generations to come by implementing the Financial Management Agenda and Civil Service Reform, as defined in the updated Fiscal Plan for Puerto Rico that the Oversight Board certified in January 2022.

The Financial Management Agenda encompasses 12 initiatives critical to Puerto Rico's fiscal sustainability and economic renewal. These initiatives will ensure the stability necessary for projections to come to fruition, access to debt markets to be regained, and the termination of the Oversight Board under PROMESA to occur as soon as reasonably possible.

The Oversight Board and the Government have already started to implement the second component of the governmental reform: a comprehensive civil service reform, beginning with a pilot for financial management personnel to align the Government's workforce capabilities and better recruit and retain the right talent. The Oversight Board also has introduced the Education Leadership Program to strengthen the administration of the Puerto Rico Department of Education.

These initiatives exemplify what close cooperation between the Oversight Board and the Government can accomplish to improve public services and make government more effective. Governor Pedro R. Pierluisi, Secretary of State Omar J. Marrero Díaz, Treasury Secretary Francisco Parés Alicea, Education Secretary Eliezer Ramos Parés, and other members of the Government are partners in this truly ambitious change management process. I would like to thank Governor Pierluisi's administration for this very successful cooperation.

Many issues still divide the Oversight Board and the Government, and I do not minimize the considerable challenge for the Government to stay on this new course of fiscal responsibility and effective change to prevent Puerto Rico from falling back into the patterns of the past.

Too many laws that the Legislature passes are fiscally irresponsible, simply adding expenses without providing the funds to pay for the new promises made to the people or any assessment of what the true costs to taxpayers would be. Puerto Rico still does not have an equivalent institution to the Congressional Budget Office in Washington, D.C.

This is an area where our mandate under PROMESA to achieve fiscal responsibility is not completed. The Fiscal Plan includes an additional $3 million annually for the creation of a

non-partisan office within the Legislative Assembly to produce fiscal analysis and scoring of legislative measures, and the Oversight Board hopes House and Senate leadership will start creating this important office soon. The capacity to score legislation is essential for fiscal discipline and responsibility. But, for now, the Oversight Board remains the only institution scoring legislation.

Too often, the Government chooses to take the Oversight Board to court, or forces the Board to intervene, over the implementation of laws that are clearly violating the Fiscal Plan and PROMESA's mandate of fiscal responsibility. These unnecessary legal battles come at a great cost to the people of Puerto Rico.

The Oversight Board also remains concerned about the Government financing long-term financial commitments with one-time stimulus funds from the U.S. Government that, once spent, leave taxpayers with uncertain future responsibilities. A recent example is salary increases for government employees that significantly exceed the well-deserved adjustments already defined and financed in the certified Fiscal Plan. Fiscal responsibility dictates that recurring expenses must be covered by recurring revenue, not one-time stimulus funds.

It is my sincere hope that the new fiscal year 2023 will expand our cooperation with the Government to further bridge more of our differences, so the Oversight Board can continue to work on fulfilling its mandate to help Puerto Rico achieve fiscal responsibility and advance towards its own termination, and the day when the people of Puerto Rico will be able to experience the true benefits of responsible and effective government.

Fiscal year 2022 brought the Oversight Board closer than ever to fulfilling its mandate under PROMESA to help Puerto Rico regain access to capital markets. Restructuring the debt is the path to regaining market access. The U.S. District Court's confirmation of the Plan of Adjustment, thereby reducing the Commonwealth's total liabilities to affordable levels and saving Puerto Rico over $50 billion in debt service payments is a success not only for the Oversight Board's efforts to negotiate the best possible terms for Puerto Rico and all parties involved, but it is foremost a significant win for the people of Puerto Rico.

Bankruptcy has held Puerto Rico back. Completing the restructuring of the Commonwealth's debt, along with the restructurings already completed, is a crucial step toward ending Puerto Rico's fiscal crisis.

Fiscal year 2022 was a turning point on the fiscal side as well. After five years of fiscal crisis, bankruptcy, natural disasters, and an ongoing global pandemic, the updated Fiscal Plan for Puerto Rico is different in its focus on renewed and increased investment in Puerto Rico. Previous Fiscal Plans focused on stabilizing the Island's finances and bringing about

an end to deficit spending. Targeted expense cuts were necessary to balance budgets. The Financial Management Agenda and the Civil Service Reform, combined with significant increases of available resources from federal funding and the strong economic recovery helped by the federal stimulus funding, will bring the government into the future.

Now that we have restructured almost 90% of Puerto Rico's debt and ended more than a decade of deficit spending, the most important task remains the implementation of the Fiscal Plan reforms to create a stable fiscal foundation for sustainable economic growth— fiscal responsibility for the long haul, as envisioned by PROMESA. Detroit has shown that the economy responds well when government debt is restructured successfully.

But debt restructuring alone is not enough to ensure prosperity. The reforms defined in the Fiscal Plan must be implemented to secure Puerto Rico's future. Those reforms include the transformation of Puerto Rico's energy system to provide more reliable, more affordable, and cleaner electricity; comprehensive education reform to prepare the next generation for a stronger Puerto Rico able to withstand the challenges of a competitive world economy; efforts to provide the workforce with the skills and the labor market with the incentives to create true competitive advantages; making it easier for businesses to invest and grow in Puerto Rico; and improving Puerto Rico's infrastructure.

This fiscal year was also the year we started the transition to a new executive leadership. On April 1, 2022, Natalie Jaresko stepped down as the Executive Director of the Oversight Board. Ms. Jaresko's service to the Oversight Board and to Puerto Rico was exemplary – and, in many ways, defining. Under her leadership, the Oversight Board succeeded in ways few had thought possible. We all owe her an incredible debt of gratitude.



Financial Oversight Board of Puerto Rico



Ms. Jaresko was the Oversight Board's quarterback for five years. Her handwriting is visible in every Fiscal Plan and budget the Oversight Board certified, and the debt restructurings we have completed so far. She built a superb staff, many of whom will be key members of Puerto Rico's civil service for many years to come.

The Oversight Board is in the process of finding a new executive director to lead the organization and help the members of the Oversight Board to fulfill the mandates of PROMESA.

The Oversight Board's primary goals for the fiscal year 2023 are to complete the restructuring of the Puerto Rico Electric Power Authority's debt and to focus on the remaining goal of achieving fiscal responsibility for the long haul.

Since PROMESA was enacted, the Oversight Board and the Government have together stabilized Puerto Rico. But that is not enough. Puerto Rico needs to grow. Only growth will improve the lives of its residents.

That is why Puerto Rico must not fall back into fiscal disarray. We need to make sure the discipline of the last six years is institutionalized and becomes Puerto Rico's new tradition. The implementation of the Fiscal Plan reforms to create a foundation for

economic development and investment, the Financial Management Agenda to ensure transparency and fiscal responsibility, and the Civil Service Reform to ensure a capable and modern government workforce remain tasks as important as lowering Puerto Rico's debt burden.

Both mandates PROMESA set out – market access and fiscal responsibility through pro-growth reforms – will continue to define Puerto Rico's path towards a brighter future of sustainable economic growth and growing opportunities for its residents.



# Oversight Board Achievements





# The Oversight Board and PROMESA

---

### Six Years of PROMESA

Before PROMESA was adopted in 2016, Puerto Rico faced an unsustainable burden of more than $70 billion in debt and other liabilities, and more than $55 billion in unfunded pension liabilities, exacerbated by a decade of economic decline and significant outmigration. There was no viable path to stabilize Puerto Rico's finances or a coordinated strategy to deal with the debt. Puerto Rico had lost access to the debt markets to fund deficits.

Puerto Rico's debt crisis hampered its economy and affected the lives of every resident and the success of every business. Nonetheless, government spending remained bloated, government services were inefficient, liquidity shortfalls impaired strategic decision making, and no multi-year, coordinated strategy existed to restore growth and opportunity to the people of Puerto Rico.

In 2016, Congress through PROMESA provided a way forward for Puerto Rico.

Since then, the Oversight Board has been working extensively with the elected

Government of Puerto Rico to restructure the debt, stabilize finances, and create the necessary foundation for economic growth and restoring opportunity to the people of Puerto Rico.

The progress the Oversight Board made since PROMESA was enacted includes the completion of multiple debt restructurings, reducing the burden on the people of Puerto Rico in the future; breaking the cycle of public deficit spending; and creating multi-year Fiscal Plans to implement necessary reforms that would improve infrastructure, the energy system, education, the business climate, and the delivery of government services.

## Debt Restructuring

The January 2022 confirmation of the Plan of Adjustment for the central government's debt by the U.S. District Court for the District of Puerto Rico was a historic achievement for Puerto Rico. The Commonwealth Plan of Adjustment reduces Puerto Rico's central government debt by nearly 80% and saves over $50 billion in debt service payments, lifting an enormous burden off future generations.

The previous and contemporaneous debt restructurings at the Government Development Bank (GDB), the Puerto Rico Aqueduct and Sewer Authority (PRASA), the Puerto Rico Infrastructure Financing Authority (PRIFA), and the Puerto Rico Sale Tax Financing Corporation (COFINA) all laid the groundwork for the central government restructuring. Each of these restructurings contributed to the reduction of debt owed by the government – to be paid by the people of Puerto Rico – and helped set a foundation for the restoration of market access.

The COFINA restructuring reduced its debt by one third and annual debt service by $17.5 billion, generating critical capacity to pay other debts. COFINA's success is evidenced by the current active trading and liquidity levels of the new COFINA bonds.

The GDB restructuring reduced GDB's debt from $5 billion to $3 billion and saved the people of Puerto Rico about $2 billion. The restructuring also put an end to much of the shadow financing that historically happened across the government.

The PRASA debt reprofiling provided significant debt service relief through a consensual modification of the terms of almost $1 billion in outstanding loans previously made to PRASA under U.S. Government programs and enabled the public utility to unlock access to more than $400 million in federal funding. Since the reprofiling, two refinancings of the debt have been completed, reducing debt service by almost an additional $1 billion.

When combined with these previously completed debt restructurings, the Plan of

Adjustment for the Commonwealth drastically reduced the government's debt burden by over half.

Critically, the Commonwealth Plan of Adjustment includes a strict debt management policy to limit both the amount and purpose of future debt issuances. Future annual debt service payments are also structured as level and predictable amounts, enabling the government to plan and pay for them.

The process of resolving Puerto Rico's fiscal crisis depended in large measure upon ascertaining accurate information about the size and nature of the debt. Based upon those concerns and others, the Oversight Board commissioned an investigation of the massive debt.

The Oversight Board retained the independent investigations firm Kobre & Kim in September 2017 to conduct the investigation of the debt. After almost one year of detailed review, Kobre & Kim presented a more than 600-page report examining the debt issuance and selling practices; the range of debt instruments; how Puerto Rico's debt practices compare to those of U.S. states and large municipal jurisdictions; and how the debt is linked to Puerto Rico's past recurring budget deficits. The report also contains a number of recommendations that, if implemented, may reduce or eliminate a future financial crisis resulting from excessive borrowing.

## Pensions

Decades of financial mismanagement, underfunding, and borrowing from people's pensions had left the retirement systems for government employees, teachers, and judges with virtually no assets. Had the Commonwealth not started paying for pensions out of the general operating budget, pensioners would have stopped receiving pension checks. The budgetary discipline PROMESA mandates and the Oversight Board enforced enabled the Commonwealth to afford the continued payment of retirement benefits from current tax revenues.

The Oversight Board published a comprehensive report under Section 211 of PROMESA that provided a detailed and thorough look into past governmental actions that depleted the pension trust balances leading to their insolvency.

Preserving and protecting the ability to make pension payments in the future is a core element of the Commonwealth Plan of Adjustment. The Oversight Board insisted on the creation of a well-funded Pension Reserve Trust projected to be funded with more than $10 billion in contributions over the next decade.

The Oversight Board is currently working collaboratively with the Puerto Rico Government to implement a variety of requirements in the confirmed Commonwealth Plan of Adjustment, including the establishment of the Pension Reserve Trust. Pension trust board members have already been selected and their work has begun. Once funded, the pension trust is projected to manage and invest an estimated $10 billion in funds to be used to help the Government make pension payments in the future.

## Fiscal Stability & Balanced Budgets

One of the major successes of the Oversight Board has been the progress in stabilizing the budgets of the Commonwealth and the instrumentalities. The budgets the Oversight Board certified broke the cycle of deficit spending that harmed Puerto Rico's fiscal position and ultimately led to insolvency.

The amended FY2022 budget included the first payments on the significantly reduced debt since PROMESA was enacted, a meaningful step towards regaining access to the capital markets, as mandated by PROMESA.

The annual budgeting process has been overhauled under the Oversight Board's supervision. The Government must now make thoughtful and deliberate choices on spending priorities and budget for items that were previously unbudgeted, including an emergency reserve fund.

The emergency reserve fund defined in the Fiscal Plan ensures that the Government has the necessary funds to help the people of Puerto Rico fast and effectively in case of natural disasters and other emergencies. Since 2019, the Government has been required to set aside $130 million annually into an emergency reserve until $1.3 billion is accumulated. Restrictions placed on these funds ensure they are only used in case of an extraordinary event like natural disasters and not for other government expenses. When Hurricane Maria hit in 2017, Puerto Rico had no such reserve.

The Oversight Board also succeeded in improving fiscal transparency and budgetary controls. Accurate and consistent reporting allows the Commonwealth to monitor monthly performance and to adjust spend levels in a timely manner, and enhanced transparency enables taxpayers to understand better how their money is spent.

The Government is now tracking and consolidating balances from more than 2,000 bank accounts in a centralized manner – the result of a forensic analysis commissioned by the Oversight Board.

Today, the public has significantly more access to reporting on liquidity, budgets, and spending than before PROMESA was enacted. Many of those reports are published on

the website of the Puerto Rico Fiscal Agency and Financial Advisory Authority (AAFAF) for the general public to see and review – a key element to enable residents to demand accountability from their elected officials.

## Fiscal Responsibility, Fiscal Plans & Reforms

The debt restructuring gives the Government the fiscal space it needs to pay for critical services, invest in high priority areas, and lay the foundation for sustainable economic growth.

Debt restructuring alone, however, is insufficient to stimulate economic renewal and prosperity. The Government will still have to do its part in implementing the key structural reforms in critical areas like human capital and welfare, education, ease of doing business, and energy and infrastructure. These reforms are essential to create jobs, foster investment, and make Puerto Rico competitive in the world market.

The Fiscal Plans for the Commonwealth and the instrumentalities defined as covered entities are a core requirement of PROMESA. These Fiscal Plans provide roadmaps for institutional change, economic development, improved government services, long-term fiscal stability and ultimately, a better quality of life for all residents of Puerto Rico.

The Government has been broadly lagging in the implementation of the reforms defined in the Fiscal Plans and has not yet demonstrated the vigor necessary to speed up Puerto Rico's transformation to make it easier for businesses to grow. But in some areas, progress has been made, particularly in the energy transformation necessary to provide Puerto Rico residents and businesses with more reliable, more affordable, and cleaner electricity.

The Puerto Rico Electric Power Authority (PREPA), a behemoth government monopoly when PROMESA was enacted, is in the process of being broken up and having its business units managed by private operators while the assets remain in public ownership.

The Oversight Board and the Government ensured that the Puerto Rico Energy Bureau became an independent well-funded regulator able to oversee the power sector reform and electricity rates.

The Oversight Board and Government approved and oversaw the largest public-private partnership (P3) in U.S. history, transitioning Puerto Rico's electric grid to LUMA Energy. Luma is a Puerto Rico company whose U.S. and Canadian owners have experience in successfully managing transmission and distribution systems in the U.S. and abroad. The initial transition was not as smooth as it could have been, but LUMA is starting to improve staffing, response times, and service delivery. Once the $10 billion in federal

funding is deployed to further improve and strengthen the power transmission and distribution systems, service delivery will improve further.

PREPA is also in the process of transferring PREPA's legacy generation operations to a private operator. Further, the Oversight Board's requirement that PREPA implement a robust competitive procurement process for strategic projects achieved meaningful savings, including for several Power Purchase and Operating Agreements to accelerate the transition towards renewable energy.

The Highways and Transportation Authority (HTA) also began a major restructuring of its operations to eliminate its current fragmented structure and to enable better performance to improve roads and public transportation. The Oversight Board laid out a vision for Puerto Rico's transportation sector that enables better performance, system condition, and reduces congestion that will be the foundation for economic growth and citizen experience.

While the transportation sector reform blueprint laid out by the Oversight Board has not yet been enacted, the transformation is now in motion – including plans for clear separation of toll and non-toll assets.

HTA's debt restructuring process moved forward. In May 2022, the Oversight Board filed a Plan of Adjustment to restructure about $6.4 billion of claims against HTA. The plan cuts HTA's outstanding debt by more than 80%, to $1.2 billion, and saves Puerto Rico more than $3 billion in debt service payments. Hearings for the Plan of Adjustment's confirmation are expected to take place this summer.

PRASA has also made significant progress. The Certified Fiscal Plan and Certified Budget at PRASA provide the pathway for sustainable financial operation and delivery of a major new capital improvement plan. Modest rate adjustments since 2018 have yielded nearly $300 million in additional revenues, helping to stabilize and bolster PRASA's cash reserves and allowing PRASA to improve its overall liquidity position and solvency.

The Puerto Rico Industrial Development Company (PRIDCO) Certified Fiscal Plan established several initiatives to ensure PRIDCO can successfully manage its portfolio of 1,500 industrial units, to attract investment and foster job creation in a variety of industries including manufacturing, information technology, and life sciences.

The Oversight Board supported PRIDCO in its development of a comprehensive study to identify deferred maintenance for properties in the portfolio and is working with PRIDCO on a divestment plan to identify properties that are underutilized and could be sold.

More broadly, the Oversight Board is working closely with Department of Economic Development and Commerce (DDEC) to review and enhance DDEC's economic

incentive regulations, so they promote economic development in a targeted and clear way. This complements the Oversight Board's efforts to review a variety of government regulations for their consistency with applicable Fiscal Plans.

The goal for the University of Puerto Rico (UPR) is not only one of fiscal sustainability, but also of academic strength and leadership. UPR faces considerable challenges: falling enrollments, a woefully underfunded pension system at serious risk of insolvency, duplicative back office across 11 campuses, an aging infrastructure, a bloated cost base, and an overreliance on government funding. When PROMESA was enacted, almost 80% of UPR's budget came from the Puerto Rico Government, compared to less than 30% on average for U.S. public universities.

The UPR Certified Fiscal Plan reduces government appropriation to the university to make UPR more self-sufficient, but ensures funds are budgeted and available to increase support to faculty and students' services. The Oversight Board encourages UPR to redouble efforts to improve fiscal governance and controls, especially in back-office consolidation that would enable resources to be prioritized on teaching rather than bureaucracy.

Puerto Rico's property tax system is the lifeblood of municipal governments, providing the funding for critical services to the Island's residents. Over the past five years, the Oversight Board has worked closely with the Municipal Revenues Collection Center (CRIM) to enhance the property tax system and property tax compliance.

The CRIM Certified Fiscal Plan and the Oversight Board's recommendation under Section 205 of PROMESA provided the government with a detailed roadmap to develop and overhaul the property tax system into a tax system that will incentivize business development and level the playing field among the Island's residents – all while providing greater resources to municipalities critical to providing services to residents.

With the Oversight Board's direction, CRIM has acted in just the last year to collect on behalf of municipalities, nearly $200 million in past-due tax debts during FY2022, some dating back more than 20 years. CRIM is now well-positioned to develop and administer a more modern, more equitable, and fairer tax system for the benefit of the municipalities and residents.

The Oversight Board worked closely with the government and non-governmental organizations to refine and greatly expand the Earned Income Tax Credit (EITC). The EITC is a refundable tax credit for low- to moderate-income working individuals and couples. It is a very powerful tool to bring people into the formal workforce. The Oversight Board's work, in collaboration with many other parties, resulted in the passage of Act 41-2021, which implemented the vast expansion of the EITC.

Under the new expanded program, more than 400,000 families will receive a benefit of up to $6,500 annually, with most of the cost being covered by the federal government. This enhanced benefit is enacted into law and will be offered to all workers that qualify, lifting household income and stimulating economic growth going forward.

With the Oversight Board's encouragement, the Government published two tax expenditure reports designed to show all the government's foregone revenue. Annual tax expenditure reporting is a critical element of fiscal accountability. The Government's most recent tax expenditure report represents a considerable effort, showing the government offers at least 424 tax expenditures with total foregone revenue exceeding $21 billion.

The analysis also shows Puerto Rico's aggregate level of tax expenditures greatly exceeds the amount of federal tax expenditures and those offered by every other state. Tax expenditures can be an economic development tool but must be analyzed to eliminate nonproductive, inefficient, duplicative, distortionary, and unnecessary tax expenditures. Further, the tax expenditure reporting process must be completed on a timely basis and the review it provides must be integrated into the budget and fiscal planning process.

Finally, the Oversight Board has also been engaged with the executive and legislative branches on reforming regulations to make them consistent with the various Fiscal Plans and to provide initial scoring on dozens of proposed pieces of legislation.

These insights, drawn from the Oversight Board's expertise, and often drafted in collaboration with government agencies or committees in the Legislature, have helped maintain compliance with the Fiscal Plans and achieve the Government's public policy objectives.

In 2020, for example, the Oversight Board approved a set of rules that should substantially improve the Government's practices in purchasing goods and services and should prevent the irregularities and inefficiencies that have plagued Puerto Rico's procurement system for too long. This Uniform Regulation for Purchases and Bids of Goods, Works, and Nonprofessional Services of the General Services Administration was proposed by Puerto Rico's General Services Administration and revised by the Oversight Board to align with best practices and comply with the Certified Fiscal Plan and the fiscal responsibility mandated under PROMESA.

The approved regulation establishes a single, robust, and sound procedure for all procurement.

The Oversight Board identified weaknesses in the system of salary payment at the Department of Education (PRDE) and worked with PRDE to institute an automated time

and attendance system tied to payroll to put an end to the practices of paying people who had died, retired, moved, or otherwise left the Department. The previous lack of controls had enabled over $80 million in payments to individuals no longer employed from 2007 to 2020. The Oversight Board is currently working with the Department of Corrections and the Department of Health to implement the same automated systems to ensure resources are going to those public servants actually working.

## Investments

To improve the long-term economic output and productivity of Puerto Rico, the Oversight Board made deliberate, strategic investments, particularly with regard to the Civil Service Reform.

The Civil Service Reform combines enhancement in compensation with employee evaluations, organizational design, and the recruitment of new government personnel to equip the Government of Puerto Rico with a more comprehensive workforce.

The reform project reviews and adjusts compensation structures and ensures the Commonwealth has data-driven compensation models that lead to competitive, fair and justified salaries; it will build a robust employee evaluation system to support the development of existing and evolving skills and to develop clear paths to career advancement; it aims to improve the government's organizational structure to ensure people with the right skills are at the right place within the organization, and refresh and standardize recruiting processes to be merit-based to enable recruitment of talent with the right skills for each role.

The Oversight Board championed other investments included in the Government's Fiscal Plan, including:

- » $900 million to invest in healthcare, including critical areas such as repairs and maintenance of hospitals, opioid treatments, telehealth services, and additional staffing of healthcare professionals
- » $400 million to expand broadband access in underserved areas
- » $35 million - $50 million annually for a needs-based scholarship program for UPR students
- » Salary increases to over 90% of government employees, most recently for teachers and corrections officers and previously provided to police officers
- » $50 million to support an initiative through the 21st Century Technical and Business Education Fund to close the skills gap and ensure the people of Puerto Rico can compete in the global economy
- » Funding for social programs to support the fight against gender violence and legal representation, and for hiring more social workers

# Outlook

Going forward, the Oversight Board and the Government are working together to consolidate many of the financial reforms in the Fiscal Plan into a Financial Management Agenda that enables a path to institutionalize financial management best practices to support a financially sustainable Puerto Rico.

This effort consists of initiatives that will lay the foundation for improving financial management, providing a clear leadership structure, capable workforce, and modern technology essential to implementing the other initiatives. These actions will also help prevent waste, fraud, and abuse, make more effective use of Puerto Rico's assets, and professionalize the management of government resources.

In addition, the Financial Management Agenda will help the Government comply with PROMESA's conditions for the termination of the Oversight Board.



# Civil Service Reform

*Policy & Research Director **Arnaldo Cruz***

### From Research to Action (Case Study)

In July 2020, the Research and Policy Department initiated an investigation into the current state of human resource management in the Government of Puerto Rico. As a result of the investigative work, a series of reports were published to guide the discussion on civil service reform in Puerto Rico.

The first report examined the existing human resources policies and practices of the Government of Puerto Rico, including an analysis of Act 8-2017, formally known as the "Human Resources Administration and Transformation Act," and more commonly known as the Single Employer Act. The second report analyzed detailed statistical information of the roster of central government personnel, including information on salaries, years of service, academic preparation, age, and gender. Based on the findings of these reports, the Oversight Board recommended developing and implementing a civil service reform that takes an innovative, comprehensive, and holistic approach to strengthening human resource and talent management in the government.

Following the publication of these reports, the Oversight Board began conversations with Puerto Rico's government and human resources experts, including university professors, about the feasibility of implementing a civil service reform in Puerto Rico. This led to the Government and the Oversight Board including the Civil Service Reform (CSR) in the Commonwealth's Fiscal Plan certified by the Oversight Board on April 23, 2021, which tied broader reforms to the implementation of a new uniform compensation system for central government employees.

The CSR has four strategic components:

» **Organizational Design:** Redesign agency organizational structures to ensure employees with the right skills and competencies are assigned to the right position within each agency, and ensure functions and processes are performed efficiently.

» **Compensation:** Review and adjust salary scales to ensure that the government has compensation models based on market data that result in competitive, equitable, and justifiable salaries.

» **Recruitment:** Update, standardize, and digitize merit-based recruitment processes to recruit talent, internal and external to the government, with the appropriate skills and competencies for each position.

» **Evaluation and Development of Employees:** Develop an evaluation system that effectively measures the level of proficiency in key skills and competencies of public officials, to ensure that they have the necessary skills and competencies to fully perform their functions, can continue to develop professionally, and have real opportunities for growth and advancement in their career.



**Organizational Design**
Redesign the organizational structure to ensure people with the right skills are in the right place within the agency

**Compensation**
Review and adjust salary scales to ensure that the government has compensation models based on market data that result in competitive, fair, and justifiable salaries.

**Recruitment**
Update and standardize merit-based recruitment processes to hire talent with the right skills for each position

**Employee Evaluation**
Develop a robust employee evaluation system to support skill and competency development, and create opportunities for career advancement

**Objective: Reform the civil service to build a more efficient, effective, and accountable government**

Given the administrative challenge of implementing a reform as comprehensive and complex as the CSR, the Certified Fiscal Plan provides for a pilot program as the first step. Starting with a pilot program allows the Government to develop a solution based on consensus and best practices before carrying out a broader implementation to all government agencies. The CSR Pilot began by targeting central accounting and financial functions carried out by the Department of the Treasury and the Office of Management and Budget due to the human capital challenges in public financial management and the importance of the timely publication of audited financial reports.

## Civil Service Reform Implementation

The CSR Pilot work began in July 2021 with kickoff meetings between the Oversight Board project team and the executive teams of Treasury and OMB. The teams established a work plan that included reviewing the current organizational structures in scope for the CSR Pilot and analyzing all the job classifications of the employees who work at financial and accounting functions at Treasury and OMB. The simultaneous review of organizational structures and job classifications facilitates the process of redesigning Treasury and OMB. As a result of the close collaboration between top government officials and the Oversight Board, the CSR Pilot was prepared.

The CSR Pilot is the product of the continuous support and teamwork between the Oversight Board and the Government of Puerto Rico, which is and will continue to be key to meeting the objectives set forth in the Certified Fiscal Plan. One of the guiding principles regarding the development and implementation of the CSR Pilot is the inclusion and active participation of all employees. Therefore, a participatory, bottom-up approach has been adopted throughout all stages of the CSR Pilot.

Employees experience the organizational and administrative reality of agencies every day and know first-hand the challenges faced by their respective areas of work. That is why it is imperative to incorporate the active participation of employees in any process of human resources or organizational change. Qualitative data collection methods such as document review, interviews, focus groups, and surveys with in-scope pilot employees and supervisors were utilized to understand the current landscape of both Treasury and OMB. In this way, information was obtained directly from the employee about the needs and opportunities to improve their work areas.

Additionally, an Organizational Capability Excellence (OCX) survey was administered. The OCX survey is a self-assessment tool used to capture data on the employee's current workload and level of expertise on the competencies required to perform their role. With the input from the employees who filled the survey, the future-state organizational structures of Treasury and OMB were redesigned, and recommendations were made on investments and changes in human capital management.

## Collaboration work with agencies (working sessions)

As part of the CSR Pilot implementation, a change management plan was designed and executed by the executive team of each participating agency to ensure effective communication with all employees, supervisors, and other stakeholders. To achieve success in this type of reform, employees must be well-informed of the project progress, and understand the rationale behind the changes and the impacts on their work and functions. This often eases any initial apprehension or confusion employees may have about the changes and increases the likelihood of employee buy-in and project success. Organizational reforms that introduce new processes, technologies, and changes in human resources frequently fail because they do not set aside time and resources to design a change management plan and communicate with all stakeholders. While change is a fundamental part of organizational evolution and maturity (technological changes, processes, or organizational structure), achieving change successfully should include a well-designed change management strategy.

## Change Management Activities: Town halls with pilot agencies

 

## Pilot Implementation and Reform Rollout FY2023

The CSR focuses on transforming the experience of public servants, supporting their professional growth in a transparent and sustainable manner, to create a government that provides services of excellence and quality.

As of today, many pilot milestones have been achieved. Not only are pilot employees at Treasury and OMB earning market-based salaries for the first time, but the agencies will

now have the necessary human capital infrastructure to tackle the difficult challenges ahead through modernized organizational structures, updated job classifications and targeted new positions for recruitment.

## Pilot Milestones – Project Milestones (June 2022)



The objective is to implement the four components of the CSR, beginning with the new organizational structures and salary adjustments for the employees who were part of the Pilot. As shown in the next figure, the next phase of the CSR (Phase 2B) will focus on implementing a new recruitment process and a new employee evaluation system that supports career development.



Once the CSR Pilot is completed and it is determined by the Oversight Board that it met the objectives and critical milestones in a timely manner, the Certified Fiscal Plan provides support and funds for a larger-scale implementation and roll out of CSR. The lessons learned from the Pilot will guide the design parameters of the broader reform implementation across central government agencies during FY2023.



# Education Leadership Innovation Program

*Education Reform Director* **Karen Maldonado**

This year, the Oversight Board has collaborated with the Puerto Rico Department of Education (PRDE) on an Education Leadership Development Program to build leadership capacity within the PRDE. Professional development at the PRDE is essential for improved student outcomes, such as improved testing scores, improved student engagement and retention, and improved graduation rates. This program helps further PRDE's goal of developing its leaders to execute complex strategies in a challenging environment, as well as addressing persistent talent constraints and meeting Fiscal Plan milestones that span from family engagement to professional development.

The half-year program trains leaders on skills needed to effectively drive change within the system and establish a collaborative, professional community that will persist after the program's closure. The nine participants from across PRDE's regional and central offices were selected for their talent, dedication, and drive to transform education.

From April to June 2022, participants engaged with a range of high-impact topics in education through a series of workshops, readings, and discussions. In July, the group will take a capstone trip to Miami-Dade County Public Schools in the state of Florida.

Participants will visit exemplar schools, meet with district leaders, and discuss strategic priorities and goal setting.

The program, led by Karen Maldonado the Oversight Board's Director of Education Reform, promotes innovation from within PRDE through group-action learning projects, which address a priority from PRDE's five-year strategic plan. This exercise involves small groups working as a team to tackle real problems in the PRDE, such as improving the participation of parents in the learning process. This cohort's topics include family engagement, director mentorship and coaching, and data-driven decision-making.

Participants will incorporate session materials and content, as well as experiential lessons from the capstone trip to Florida, as they design and execute their projects. Their research will culminate in a project presentation to the PRDE Secretary of Education later this summer and implementation will begin during the 2022-2023 school year.

The program engaged speakers from the Oversight Board, including Antonio Medina, Board Member; Ginorly Maldonado, Director of the Commonwealth Fiscal Plan and Budget; and Arnaldo Cruz, Director of Policy and Research. The program also featured keynote speakers from the PRDE, including Eliezer Ramos, Secretary of Education, and Guillermo López, Chief Academic Officer. Additional sessions led by representatives of higher education, nonprofits, and other partners also helped broaden the scope of the program and build upon each session.

Initial feedback from participants has been resoundingly positive. Particularly, they note in their feedback that sessions have both expanded their conceptual knowledge and given them actionable strategies to use in their day-to-day responsibilities. For example, Ginorly Maldonado held a session on PRDE funding processes and equitable per-pupil allocations. For many, this was the first time they had heard about equitable funding. Participants left the session committed to looking for ways to integrate equitable funding principles into their work. In light of the group's discussion, one participant was inspired to meet with the region's budget director to examine Title I fund allocation for next fiscal year.

Furthermore, from Arnaldo Cruz's session on data-driven decision-making, participants gained a stronger understanding of the connection between information and action and felt better equipped to discover and use insights across their many different functional areas. The participants left the session knowing ways to identify and analyze the data required to implement a successful action learning project.

The inaugural Education Leadership Development Program cohort has had a meaningful professional development experience, thanks to the collaboration between

the Oversight Board and PRDE. In FY2023, the Oversight Board hopes to continue to work beside PRDE to develop a second cohort of high-achieving leaders at PRDE, further PRDE's capacity to accomplish Education Reform milestones, and improve student outcomes across the Island.





# Pension Reform and Pension Trust

*UPR, Pensions & COSSEC Director* **Maria Del C. López**

## Comprehensive Pension Reform

The Government's public-employee retirement systems cover over 300,000 former and current employees through three traditional defined benefit pension plans: The Employee Retirement System (ERS), the Teachers' Retirement System (TRS), and the Judiciary Retirement System (JRS). The benefits provided by these systems are not prefunded, but rather retiree benefits are paid directly on a pay-as-you-go basis (PayGo), with annual expenses of ~$2.6 billion (~20% of total General Fund expenditures).

Upon the effective date of the Plan of Adjustment on March 15, 2022, the Commonwealth implemented several key pension reforms consistent with those identified in the 2022 Certified Fiscal Plan that help restore both financial stability to the retirement systems and the promise for current and future retirees to safeguard their assets and their future pensions. These reforms are as follows:

**Freeze defined benefit plans for JRS/TRS (as was done in 2013 with the ERS plan) and enroll participant employees in a defined contribution plan with segregated accounts:**

To avoid creating future pension liabilities and to help ensure adequate funding of the pension benefits of current and future retirees, the JRS and remaining TRS[1] benefit accruals were frozen as of March 15, 2022. Provisions of the freeze were structured to be comparable to the ERS freeze in 2013, with members retaining the benefits they accrued up to the freeze date. Future benefits for all Government employees will be based on contributions and earnings in the new defined contribution retirement accounts created by Act 106-2017. Prior to the Plan of Adjustment, ERS employees and TRS employees hired after August 1, 2014, were already enrolled and were contributing to segregated accounts. Beginning March 15, 2022, the defined contribution retirement accounts were made available and mandatory to the remainder of those JRS and TRS employees who had not previously benefited in the defined contribution plan. As a result, there is now consistent treatment across ERS, TRS, and JRS. Going forward, employees should have certainty that their contributions and investment returns will be safeguarded for the future through managing their own segregated accounts.

**Cover more government workers under Social Security:**

As part of a comprehensive approach to the retirement of teachers and judges, the Plan of Adjustment provided for their coverage under Social Security, for which they had previously not been eligible. Enrollment in Social Security became mandatory for participants under age 45, and optional for participants ages 45 and older. Workers will typically earn greater retirement benefits under Social Security, based on a 6.2% employee contribution and a 6.2% employer (Government) match, than they would in a defined contribution plan funded only with a 6.2% contribution. Covering public school teachers and judges under Social Security further provides them with diversified sources of income in retirement, and Social Security's progressive benefit formula will provide a stronger safety net for lower-paid employees. With the help of the Fiscal Agency and Financial Advisory Authority, the Department of Education, the Retirement Board, the Department of the Treasury, the Office of Courts Administration, and representatives from the teachers' union, the Government began implementing the necessary payroll changes on March 15, 2022, to allow those teachers and judges under age 45 to begin receiving Social Security credits.

In addition, since Social Security is only payable to those who have at least 10 years of covered earnings, current teachers and judges over age 45 were provided a window to elect to "opt in" to participate in Social Security if they anticipated having enough years remaining to earn the necessary 10 years of covered earnings. Together with legislation

---

[1] The TRS pension plan was closed to new hires in 2014.

signed into law by the Governor on July 19, 2019 (Act 71-2019) and its subsequent implementation on January 1, 2020 (providing Social Security access to police officers), the Government now provides broad access to Social Security for all employees.

**Return employee contributions to System 2000 participants:**

Employees who joined ERS on or after January 1, 2000, were enrolled in a hybrid cash balance plan (called "System 2000"). The hybrid accounts were credited with the employee contributions made to the plan and interest that was connected to the overall ERS trust return. As a result of Act 106-2017, these accounts were frozen as of June 30, 2017, and were no longer credited with either employee contributions or interest. The hybrid plan was replaced with a new defined contribution benefit under Act 106-2017. Effective on March 15, 2022, employees who were hired after January 1, 2000, who had neither received the balance of their account nor begun receiving their benefit as an annuity received the value of their contributions with any interest through the Commonwealth petition date as a deposit into their Act 106-2017 defined contribution accounts.

For former employees who do not have a defined contribution account, the Government set funds aside in a separate trust equal to the value of the employee contributions with interest. These former employees can submit a claim to withdraw these funds. In total, ~$1.376 billion was segregated on March 15, 2022, for repayment of contributions by public employees into the former hybrid benefit plan most of which has been paid out to these employees.

For ERS participants hired prior to January 1, 2000, defined benefits accrued and payable under Act 1 and Act 447 were frozen as of June 30, 2013, by Act 3-2013. From July 1, 2013, through June 30, 2017, these employees accrued benefits under a separate hybrid plan funded by employee contributions accruing statutory interest similar to System 2000. The value of these hybrid accounts has been and will continue to be annuitized and paid out along with the defined benefits calculated under Act 1 and Act 447. In addition, such individuals who were employed on March 15, 2022, received a one-time contribution of $2,600 into their Act 106-2017 defined contribution accounts totaling ~$94 million.

**Pension Reserve Trust:**

The Plan of Adjustment established a Pension Reserve Trust that will be funded to ensure that future PayGo benefits can be supported regardless of the future economic or political situation in the Commonwealth. A Pension Benefits Council will oversee contributions to and withdrawals from the Pension Reserve Trust. Interim members have been appointed to the Pension Benefits Council by the Oversight Board, Government, American Federation of State, County and Municipal Employees and the Comité Oficial de Retirados until formal elections can be held. The Pension Reserve Trust will be independently managed by a Pension Reserve Board with members who meet

independence, professionalism, experience, and qualification standards set forth in the Pension Reserve Deed of Trust, to be appointed by the Oversight Board, Government, and Pension Benefits Council. The initial members of the Pension Reserve Board have been appointed and have commenced their first six-year term.

The funding of the Pension Reserve Trust is to be provided based on the Commonwealth's annual surpluses and is projected to be fully funded by FY2039. Withdrawals can be made to fund PayGo payments under certain conditions, beginning in 2032. The Oversight Board expects that the first contributions to the Pension Reserve Trust, beyond an initial $5 million allocation to cover expenses related to the initial administration of the Trust, will be received in October 2022.

In addition to the restructuring of the pension plans in accordance with the Plan of Adjustment, the Oversight Board has worked actively with the Government in compliance with the joint stipulation filed by the Government and the Oversight Board in December 2021 providing resolution to expressed concerns over the compliance of Acts 80-2020, 81-2020, and 82-2020. As a result, the Oversight Board and the Government have worked to provide increases in compensation to teachers, to provide an enhanced retirement benefit estimated to provide up to $850 million in benefits through the Act 106-2017 defined contribution plan for Act 1 and Act 447 police officers, and to continue to analyze the feasibility of providing an incentivized early retirement program for certain ERS participants, while creating the necessary savings for the Government.

Finally, the proper long-term health of the PayGo system requires constant compliance with and monitoring of the PayGo Fees payable by non-Commonwealth public employers (primarily municipalities) as set forth in Act 106-2017. Failure to ensure that these payments continue to be made would threaten the ability of the General Fund to sustain pension payments in the long-term and ultimately harm the welfare of Commonwealth retirees. To this end, there continues to be an effort to have delinquent agencies and municipalities enter payment plans to resolve their historical PayGo debts. Based on available data as of the date of this report, total PayGo debts through June 2022 are ~$253 million for 53 participating entities, including ~$139 million from 21 municipalities and $115.3 million of debt on behalf of 10 public corporations. There are currently 21 participating entities with active repayment plans.



# Thought Leadership

*Policy & Research Director* **Arnaldo Cruz**

In April 2020, the Oversight Board created a new Research and Policy Department to provide assistance with research services, public policy analysis and program evaluation in an effort to reduce costs and the use of third-party consultants on such matters. The aim of this initiative is to promote Research and Thought Leadership by improving how the Government conducts research, analysis, and evaluations. The staff is comprised of economists, attorneys, and experts in public policy and public administration with extensive knowledge and experience in local public policy issues.

Since the establishment of this new unit, the Oversight Board has expanded public policy analysis and provided Puerto Rico's policymakers with timely, targeted research and insight around various government areas, such as: small-business support programs, public-health surveillance systems, digitalization of procurement processes, and distance learning education. During FY2021, the Research and Policy Department also launched a new data section on the Oversight Board website with maps, charts, data sets, infographics, and other visual resources as part of its commitment to make complex research and data accessible to a wider audience.

## Research Data Tools



In September 2020, the Research and Policy Department launched a new webinar policy series that allowed the Oversight Board to have continuous policy discussions and engagement with numerous outside experts, including local university professors, analysts at think tanks, representatives of industry groups, and government officials.

## Webinars



During FY2023, the Research and Policy Department will conduct additional research projects in areas, such as: permitting, regional economic planning, government service delivery, and data governance.



# Fiscal Responsibility





# Financial Management Agenda

*Municipal Affairs & Legislative Review Director* **German Ojeda**

The Commonwealth's 2022 Certified Fiscal Plan introduced the Financial Management Agenda (Agenda), which aims to institutionalize public administration of financial-management best practices within the Government of Puerto Rico to enhance the Island's fiscal position and ensure long-term economic sustainability.

For decades, the Government of Puerto Rico has failed to implement sound financial management practices, promote financial transparency, and instill accountability to produce long-term growth and sustainability. The implementation of the Agenda underpins a fiscally responsible post-bankruptcy Government by addressing key factors that led to Puerto Rico's fiscal insolvency.

The Agenda provides the foundation for Puerto Rico to gain access to capital markets at reasonable interest rates, to develop structurally balanced operating budgets, and to ensure expenditures do not exceed revenues at the end of a fiscal year.

The initiatives included in the Agenda are not additional requirements for the termination of the Financial Oversight and Management Board, but rather steps towards achieving the termination requirements identified in Section 209 of PROMESA. Section 209 of PROMESA (Termination of the Oversight Board) provides for termination of the Oversight Board upon certification that:

1. the applicable territorial government has adequate access to short-term and long-term credit markets at reasonable interest rates to meet the borrowing needs of the territorial government; and

2. for at least four consecutive fiscal years—

   A. the territorial government has developed its Budgets in accordance with modified accrual accounting standards; and

   B. the expenditures made by the territorial government during each fiscal year did not exceed the revenues of the territorial government during that year, as determined in accordance with modified accrual accounting standards.

## Objectives

**The Agenda focuses on achieving:**

- » A fiscally responsible post-bankruptcy government;
- » Clear milestones that pave the path for success;
- » A framework of accountability to encourage participation and institutionalization; and
- » Immediate, concrete, and measurable results.

The Agenda contains an ambitious set of initiatives to improve financial management and deliver results that matter to the Puerto Rican people. Specifically, it:

- » Requires the Government's commitment to achieve immediate, concrete, and measurable results;
- » Focuses on remedies to serious problems and commits to implement them fully; and
- » Is being undertaken in advance of, not instead of, other needed management improvements.

## Initiatives

The Agenda initiatives provide actionable steps as a roadmap to restore Puerto Rico's financial sustainability. It focuses on specific initiatives the Commonwealth must take to achieve fiscal responsibility, sustainability, and economic growth.

## The 12 initiatives are grouped into three categories: Foundational, Central, and Supporting.

The Foundational initiatives are the Office of the Chief Financial Officer (OCFO) and Civil Service Reform (CSR). These initiatives will provide the Commonwealth with the clear leadership structure, capable workforce, and modern technology essential to implementing the other initiatives.

The four Central initiatives are specifically designed to meet the conditions for the termination of the Oversight Board. Timely Audited Financial Statements are a prerequisite for issuing bonds at reasonable interest rates. The Debt Management Policy Implementation is necessary to assure investors, safeguard against future overborrowing, and ensure future market access. Budget Best Practices and Federal Funds Management work together to help the Government more accurately forecast available revenue, prepare and adhere to responsible spending plans, and maximize the use of federal funding to supplement local revenue sources – all necessary components to enabling the certification of four years of balanced budgets of the territorial Government under PROMESA.



In addition, six Supporting initiatives represent actions needed to prevent waste, fraud, and abuse, make more effective use of the Island's assets, and professionalize the management of government resources:

- » Automated Time & Attendance (T&A)
- » Cash and Bank Accounts Oversight and Transparency
- » Procurement Best Practices
- » Non-Partisan Legislative Scoring
- » Real-Estate Best Practices
- » Real Property Registry

# Implementation

Successful implementation of the Agenda requires a deep-rooted change in the Government of Puerto Rico's approach to financial management. A collective commitment from Government leadership including the Governor, the CFO, the Legislature, and agency heads, has started to take place and is playing a critical role in the institutionalization process of the Agenda. The framework for implementation consists of:

**Actions Plans**
Detailed implementatiaon steps, timelines, and responsibilities.

**Financial Management Centers of Excellence**
Agencies designated to provide management services that meet high standards.

**A Management Council**
Consisting of the chief operating officers of major agencies, public corporations and private sector, which will serve as a steering committee for the Agenda's implementation.

**An Accountability Structure**
Must include government-wide and department status and progress updates and monthly review of action plans and key indicators led by OCFO.

Since the certification of the 2022 Certified Fiscal Plan on January 27, 2022, the Oversight Board has been collaborating with OCFO to establish a transparent and efficient implementation process that is based on clear guidelines, aligned timeline expectations, unified standards of work product, and defined roles and responsibilities for each party involved.

Progress has been made to-date on multiple fronts:

» Definition of roles assigned to the Steering Committee, Oversight Board, and project managers to set the foundation for a transparent and efficient process.
» Establishment of comprehensive Gantt charts has begun for each initiative to achieve the milestones presented in the 2022 Certified Fiscal Plan for each initiative.
» Design of an accountability structure utilizing initiative scorecard tracking to establish transparent reporting and alignment of implementation strategy.

» Close collaboration with the Puerto Rico Treasury to establish the Steering Committee.
» Issuance of the FY2019 audited financial statements.
» The Government's establishment of a comprehensive Debt Management Policy, approved by the Oversight Board, which follows guidelines and recommendations provided by the GFOA, the IMF, and the Commonwealth Plan of Adjustment.
» Establishment of a project management team, which will monitor and evaluate the progress and completion of the Enterprise Resources Management implementation.

## Expected Results

The Agenda will ensure Puerto Rico is able to access financial markets for long-term investments in better schools, transportation, energy transmission, clean water, broadband, and other initiatives that benefit the people of Puerto Rico. Creditors will have the assurance they need to invest in Puerto Rico. The combination of more complete and timely financial data and more efficient financial systems will enable leaders to make better use of available resources. The Agenda provides a pathway to the termination of the Oversight Board by establishing priorities for financial sustainability and fiscal responsibility.



# Commonwealth of Puerto Rico

*CW Fiscal Plan & Budget Director* **Ginorly Maldonado**

## Plan of Adjustment
## for the Commonwealth

The Oversight Board, upon confirmation of the Plan of Adjustment of the Commonwealth debt, completed restructuring a large majority of the more than $70 billion of crushing debt accumulated by Puerto Rico. The Plan of Adjustment cuts the debt burden from 25 cents of every dollar collected in taxes and fees to less than 7 cents. This reduction provides the Commonwealth an affordable and predictable level of debt service that remains unchanged at $1.15 billion every year. The Government can now focus on improving financial and operational management, as well as enacting important structural reforms to bring Puerto Rico on the road to economic development.

**The restructured debt service is more affordable and sustainable in the long-term.**



**REDUCTION IN ANNUAL DEBT SERVICE**
($ in millions)

1)   Excludes HTA debt service in both Pre-PROMESA and Post-Plan for purposes of comparability. HTA debt to be issued and structured pursuant to HTA Plan of Adjustment.

Ending the bankruptcy process for the Commonwealth's debt under Title III of PROMESA marks the beginning of a new chapter for Puerto Rico, in which improving financial management and operational capacity can bring stability, and investment in structural reforms can bring new growth and prosperity. This opportunity requires renewed commitment by the Government of Puerto Rico to practice prudent fiscal management in order to take full advantage of the opportunities created by the Commonwealth's Plan of Adjustment.

# Framework and Priorities in the Commonwealth's Certified Plan

The certification of Fiscal Plans is one key tool provided to the Oversight Board by PROMESA, pursuant to which the Oversight Board seeks to achieve three key goals:

1. A more efficient, manageable government that is affordable long term;
2. Improved delivery and quality of government services, including public safety, healthcare, and education; and
3. Mapping the necessary structural reforms to make the economy more competitive, attract investments, create jobs, and promote economic growth.

Over the past five years, the Oversight Board has worked closely with Puerto Rico's Government to develop and implement multi-year Certified Fiscal Plans that provide an actionable blueprint to restore fiscal responsibility, but more importantly, to restore growth, opportunity, and hope to the people of Puerto Rico.

The revised Fiscal Plan for the Commonwealth that the Oversight Board certified on January 26, 2022, is another step towards Puerto Rico's recovery, as it marks the culmination of this multi-year effort and a turning point in Puerto Rico's future.

In previous years, the Certified Fiscal Plan focused on stabilizing Puerto Rico's finances and bringing about an end to deficit spending. Targeted expense cuts were necessary to balance budgets. The revised Fiscal Plan focuses on renewed and increased investment in Puerto Rico and reinforces all the elements needed to move Puerto Rico towards a future of growth and prosperity:

» It incorporates the debt and pension provisions ratified in the Plan of Adjustment, yielding predictability for fiscal planning and budgeting by cutting the Commonwealth's debt to affordable and sustainable levels.
» It includes a broad and encompassing financial management agenda to coordinate 12 initiatives critical to Puerto Rico's fiscal sustainability and economic renewal and ensure the necessary stability, so projections come to fruition, access to debt markets is regained, and the termination of the Oversight Board under PROMESA occurs as soon as reasonably possible.
» Civil service reforms are broadened to the entire government to improve governance and operational capacity across all agencies. The aim will be to strengthen the Government's ability to provide services to the residents of Puerto Rico and to improve the way government works for the people.
» And finally, the Certified Fiscal Plan continues to include structural reforms that

strengthen Puerto Rico's competitiveness by bringing more residents into the labor force, improving education, transforming the energy system, developing the business climate, and improving the physical infrastructure of the Island. It is these structural reforms that ensure growth in the medium term.

The Certified Fiscal Plan greatly increases the amounts of available resources, largely attributable to increased federal funding and the effect of federal stimulus funding on economic growth on the Island. Recent guidance issued by the Centers for Medicare and Medicaid Services (CMS) substantially increased federal funding available for Puerto Rico's Medicaid program. Further, improved local revenue collections as a result of COVID-19 related income-support programs led to higher-than-previously expected economic growth.

The predictability of the restructured debt, the increase in federal funding, and the economic recovery provides the Government of Puerto Rico with the ability to fulfill its commitments to retirees and with unique opportunities to invest in its employees and the services it provides.

From its beginning, the Oversight Board has worked to protect pensions to the maximum extent possible and continues to make retirement security a top priority.

As a result:

» The Certified Fiscal Plan does not include cuts to currently accrued benefits.
» The Certified Fiscal Plan funds a pension reserve trust with more than $10 billion over the next 10 years so government retirees will not have to be concerned that the government cannot pay their pensions in the future, as was the case in the past.
» All government employees will now have access to Social Security and their own Act 106 defined-contribution retirement accounts with funding that they own and control.
» The Certified Fiscal Plan includes up to $1.5 billion to be contributed to employee retirement accounts to fully fund and reimburse past employee contributions, with interest, that the Government previously spent.
» The Certified Fiscal Plan includes $850 million in enhanced retirement benefits and $750 million in healthcare coverage for police officers.

The Certified Fiscal Plan provides for police officers to achieve total retirement income of 50% of salaries upon retirement, when combining their government pensions, access to Social Security, and defined contribution accounts. This means there will be more than $850 million in contributions over the next 15 years to the defined contribution accounts of police officers hired before the year 2000.

For FY2022 and the upcoming FY2023 alone, these officers would receive up to $47,500 per year into their retirement accounts, plus additional amounts in each year that they work until retirement.

The Oversight Board worked closely with the Government and representatives of the police force to address the additional challenges that all police officers have with medical expenses when they first retire. The Certified Fiscal Plan provides an additional $700 million to help all police officers access medical coverage in their first years of retirement.

One of the top priorities for the Oversight Board moving forward is to work with the Government to promote fiscal responsibility to ensure that the Plan of Adjustment is implemented and remains feasible. Fiscal responsibility that learns from the mistakes of the past and ensures they are not repeated. Fiscal responsibility that enables the Oversight Board to certify the requirements for its termination per PROMESA.

To that end, included within the Certified Fiscal Plan is a new financial management agenda with 12 specific initiatives to improve Puerto Rico's fiscal stewardship and helps set the stage for economic renewal. The agenda sets clear milestones for success and establishes a framework for accountability.

Beyond financial management, civil service reforms will enable the Government to be better positioned to attract and retain talented employees, streamline organizational structures, purge patronage jobs, and manage for results.

The Certified Fiscal Plan also provides significant increases in pay to civil servants, in some cases, the first raises since salaries were frozen in 2014. Implementation of the Uniform Remuneration Plan and increases in salaries of teachers, nurses, social workers, firefighters, correctional officers, and police officers will ensure the Commonwealth has more competitive, fair, and justified salaries to attract and retain the human capital needed to make sure government services are best delivered to the people of Puerto Rico.

While much more needs to be done, there has been progress on achieving the structural reforms laid out in previous Fiscal Plans.

- » On human capital reforms, the Government more than tripled the maximum earned-income tax credit, to $6,500, available to eligible workers.
- » On ease of doing business reform, the Government's permitting systems and processes have started to be reformed and simplified.
- » On power sector reform, the transmission and distribution system was transitioned to a public-private partnership operator.
- » And a path exists for the integration of transit assets over time.

The Certified Fiscal Plan continues to expand on those structural reforms needed to maximize the opportunities for long-term growth. If fully implemented by the Government, it will give Puerto Rico's children a better education that prepares them for the jobs of the future; make it easier for businesses to invent, invest, and grow; make electricity more reliable, more affordable, and cleaner; and provide better roads and infrastructure. Fully implementing this comprehensive agenda is essential to building a new economy for the medium and long term to counter Puerto Rico's historical negative growth trend.

## Commonwealth's FY2022 Certified Fiscal Plan Investments to revitalize Puerto Rico

The Certified Fiscal Plan continues to make incremental investments to support front line services and to change agency operations. The Government is set to deploy these investment funds efficiently and effectively to maximize their benefit for the Island's people and economy. These investments can be categorized as follows:

### Investments in operational capacity

» **Civil Service Reform (CSR) and Uniform Remuneration Plan (URP) related initiatives:** To ensure enough funds are available to bring all government positions to market rates, the Certified Fiscal Plan increased the CSR budget by 20%, or $16.6 million more than what was initially allocated in the 2021 Fiscal Plan. Also, the 2022 Certified Fiscal Plan includes an additional $33 million annually, increasing by inflation, in the CSR budget so that funds can be available to recruit new crucial positions across the government.

» **Investment ($170 million) in non-URP central government employees, including:**
  ► Teachers and other Puerto Rico Department of Education (PRDE) employees: $187 million beginning in FY2023.
  ► Firefighters: Incremental $1,500 a year salary increase.
  ► Correctional officers: 15% increase tied to milestones, with a base increase of 10% effective July 1, 2022, and the remaining 5% provided upon successful implementation of the time and attendance initiative.
  ► Judicial branch: $11 million in incremental funding, starting in FY2023 to cover 7% salary increases for all employees of the General Court of Justice (except judges).
  ► University of Puerto Rico (UPR) Medical Residents: ~$2.5 million for a 20% salary increase.

» **Funding for the Comprehensive Cancer Center:** The Certified Fiscal Plan provides for $10 million in incremental funding for a period of seven years, starting in FY2023 to support cancer research initiatives that will allow the Comprehensive Cancer Center of Puerto Rico to obtain formal federal

designation as a Cancer Center, which will in turn provide access to additional federal funds.

» **Increase capacity of oversight agencies:** The Certified Fiscal Plan includes $6 million for salary adjustments and funding for new positions in critical areas of oversight agencies. Employees at these agencies would get $2.5 million annually (reflecting a 5% salary increase) effective July 1, 2022, and $3.5 million for recruiting new staff.

  ‣ Institute of Statistics
  ‣ Office of the Comptroller of Puerto Rico
  ‣ Office of the Electoral Comptroller
  ‣ Office of Government Ethics
  ‣ Office of the Inspector General
  ‣ Special Independent Prosecutor's Panel

» **Funding for third-party case managers:** The Certified Fiscal Plan provides $7.5 million in FY2023 incremental funding for a period of one year to support the increase in caseload in the Family and Children Administration. These funds will provide participating families an assigned social worker.

## Investments in obligations to current and future retirees

In addition to the Plan of Adjustment, which provides a mechanism to set aside resources to fund the Commonwealth's pension obligations, the Oversight Board has approved the following initiatives aimed at prioritizing obligations to current and future retirees:

» **Police officer retirement:** The Oversight Board has acknowledged the difficult retirement situation for certain police officers due to the historical lack of pension funding, lack of prior Social Security enrollments, and a mandatory retirement age. Therefore, the Certified Fiscal Plan allocates over $850 million over the next 15 years, including over $500 million by the end of FY2023, towards these police officers' defined contribution accounts with the goal of bringing the average total retirement income from all sources (i.e., Employee Retirement System, Act 106 Defined Contribution accounts, and Social Security) to 50% of the compensation received at the time of retirement.

» **Accelerated contributions for police officers near mandatory retirement:** $30,000 special contribution in FY2022 for officers unable to work beyond June 30, 2022, either because they have applied for an extension and been denied or have exhausted the work extensions currently available ($77,500 for each officer).

- » **Current retirees:** $77,500 for sworn officers who were forced to retire in August 2020 by mandatory retirement.

- » **Plan Vital for current and future retired police officers:** ~$23 million to ensure that police officers have access to the Vital health insurance program. The initiative includes both currently retired police officers, as well as currently active police officers upon their expected retirement.

- » **Symphonic Orchestra Pension Fund:** ~$20 million in incremental funding to support the fulfillment of existing promises to current and future retirees under the Puerto Rico Symphonic Orchestra Retirement Plan, while Symphonic Orchestra continues to make its annual contributions.

## Investments in frontline services and agency operations

The Certified Fiscal Plan includes:

- » About $700 million to bolster healthcare infrastructure and services (e.g., capital improvements at public hospitals, public hospital IT, telehealth infrastructure, opioid treatments, education loan forgiveness for rural healthcare professionals, and funds to maintain nurse and health-professional staffing levels).
- » About $880 million for public safety (e.g., police salary raises, police equipment and capital, funds to hire Forensics Institute personnel, and funds for a Department of Corrections and Rehabilitation (DCR) assessment of facility footprint and consolidation potential).
- » About $640 million for educational outcomes (e.g., funds for school psychologists and nurses, better transportation for students, teacher time and attendance analysis, needs based scholarships, incentives for student attendance reporting, digitization, teacher and director salary raises, and innovation).
- » About $550 million for new Government programs and to enhance agency operations (e.g., funds to support Enterprise Resource Planning (ERP) implementation; hire staff to finalize centralized procurement initiatives; accelerate municipal service consolidations; create transparency into economic incentives; hire special prosecutors and agents for the Specialized Domestic Violence, Sexual Crimes and Child Abuse units; and enable the fourth phase of the Abriendo Caminos infrastructure improvement program for regular maintenance programs in road infrastructure, etc.).

## Strengthening the technology sector

To ensure Puerto Rico can compete in a global economy, the Certified Fiscal Plan includes critical funds for technology infrastructure and workforce development programs. These include:

» $400 million to boost universal broadband access through incentives to expanded broadband roll out and the provision of faster service; and

» $50 million to establish a 21st Century Technical and Business Education Fund, designed to develop technical and business skills that are aligned with the needs of the 21st century economy.

## Cultivating a high-performing public workforce in Puerto Rico

To support the Government's efforts to modernize and strengthen its human-resource management capabilities and be better positioned to provide quality services to Puerto Rico's residents for years to come, the Certified Fiscal Plan includes about $2.9 billion for the comprehensive civil service reform to align the Government's workforce capabilities and organizational structures to better meet mission objectives; update compensation structures in FY2023 to market rates, pending compliance with reform milestones that includes the time and attendance reporting project; and enable the Government to better recruit and retain the right talent through optimized human-resources technology processes, and procedures for recruitment and employee evaluations.

## Increased resources available to the Commonwealth

The Commonwealth has seen a surge in available resources, largely attributable to two major developments:

» Increased federal funding for Medicaid as a result of recent CMS guidance increasing the federal funding cap by more than $2 billion per year, along with a projected increase in prescription drug-rebate revenues that the Commonwealth will receive as a result of joining the federal Medicaid Drug Rebate Program.

» Improved local revenue collections as a result of higher-than-expected overall U.S. growth, increased local consumption and economic activity enabled by enhanced income support programs (such as an estimated $460 million increase in annual federal funding for the Nutrition Assistance Program), and sustained increase in revenues resulting from a change to the tax treatment of partnership entities.

## Changes to expenditures post-bankruptcy

The revised Certified Fiscal Plan includes expenditure projections that factor in the now-established debt service and other costs related to the Plan of Adjustment, as well as additional investments enabled by the increased resources available to the Commonwealth. These include:

» Debt service costs as included in the Plan of Adjustment;

» Costs related to Act 53-2021, which include additional funding for UPR for five

years, removing reductions to retiree pensions, and additional funding for municipalities;

» Costs related to the employees transferred from PREPA to the Commonwealth; and

» Incremental investments enabled by the increased resources available to the Commonwealth, including salary increases.

## Long-term challenges for Puerto Rico

The people of Puerto Rico need and deserve more than predictability and stability. They require plentiful good jobs, a dynamic and prosperous economy, affordable and reliable electricity, and an efficient and responsive public sector—but these things have been lacking for more than a decade. Since 2005, the economy has shrunk, the number of people living under the poverty line has increased, electricity has remained expensive and unreliable, labor market regulations have remained burdensome, the business environment has remained complicated and difficult, and the public sector has provided declining levels of service at a high cost to residents.

In recent years, the federal government has stepped in to provide significant, valuable financial support and temporarily slow some of the challenging trends Puerto Rico was facing. However, the Oversight Board and the Fiscal Plans remain focused on addressing the long-term trends to create the conditions for growth.

The Certified Fiscal Plan includes an updated macroeconomic forecast reflecting the abrupt impact of the COVID-induced recession at the end of FY2020, followed by a rebound and recovery in FY2021 and expected to continue into FY2022. The following graph shows the real gross national product (GNP) growth-rate projection and the adjusted growth rate with income effects, after the impact of measures, structural reforms, and disaster relief funding.



# Importance of structural reforms

The Certified Fiscal Plan incorporates a set of structural reforms that, if successfully implemented, will enable Puerto Rico to begin to grow again based on competitiveness, countering the negative growth trajectory that has plagued the Island for over a decade, and reducing the dependence on federal funds to stimulate economic development. Each of these are elements required for Puerto Rico to compete for investment within the United States and globally, and to stem outmigration from the Island:

» **Human capital and welfare reform:** Promoting participation in the formal labor force by creating incentives to work through Earned Income Tax Credit (EITC) benefits and Nutritional Assistance Program (NAP) reform, as well as providing comprehensive workforce development opportunities to improve skills and ensure the workforce is prepared for the jobs of tomorrow. The EITC and NAP reform are projected to increase the economic growth rate by 0.15% in FY2025.

» **K-12 education reform:** Transforming the K-12 public education system to dramatically improve student outcomes and contribute to an effective workforce in the long-term. Education reforms are projected to add 0.15% to the GNP growth rate between FY2037-FY2051.

» **Ease of doing business reform:** Improving the competitiveness and attractiveness of Puerto Rico's economy by (a) reducing obstacles to starting and sustaining a business through improvements to processes to obtain permits, register property, and pay taxes; and (b) establishing best-in-class entities to attract investment and increase tourism. These reforms are projected to drive a 0.30% uptick in overall growth by FY2026.

» **Power sector reform:** Providing affordable, cleaner, and more reliable energy through the transformation of PREPA, the establishment of an independent, expert, and well-funded energy regulator, and the development of renewable power generation. This reform is projected to increase growth by 0.30% by FY2026.

» **Infrastructure reform:** Integrating all transit assets under the Puerto Rico Integrated Transit Authority, so it can act as a unitary transit authority managing all transit assets on the Island (e.g., all buses, ferries, Tren Urbano), and reforming the public transportation sector more broadly.

The Certified Fiscal Plan is the roadmap to Puerto Rico's growth, based on building resilient infrastructure, investing in economic development, improving government operational capacity, and promoting fiscal responsibility and financial management.

Prudent use of both federal and local funds will allow Puerto Rico to rebound from the effect of the COVID-19 pandemic on residents, businesses, and the social sector. These investments can also unlock creativity, entrepreneurship, and private sector investment – especially when coupled with the much-needed civil service and ease of doing business reforms.

The Puerto Rico Government has a unique and historic opportunity to seize the current moment—emerging from Title III bankruptcy proceedings and receiving substantial federal funding support—to transform the Island's trajectory. The Oversight Board stands ready to work in partnership with the Government to achieve this vital outcome.

# Implementation Status

The fiscal and economic turnaround of Puerto Rico cannot be completed without the implementation of structural economic reforms that promote the transformation of the Island's economy and its workforce.

Puerto Rico struggles from an uncompetitive labor market, unreliable energy and infrastructure, regulatory and other burdens that hinder business productivity, and low educational outcomes and workforce support – all of which prevent it from competing in a global economy and from attaining positive economic growth. Structural reforms that seek to strengthen the fundamental drivers of economic growth to encourage job creation, investment, and increased productivity could transform Puerto Rico's future.

Years of successive natural disasters and health crises further underscore the need for comprehensive Government action, as outlined in the Certified Fiscal Plan, to reverse the economic challenges that have plagued the Island and its people for far too long. If implemented quickly and widely, structural reforms are projected to drive real economic growth, reversing decades-long economic challenges, and enabling the Island's economy and its people to flourish.

Unfortunately, while the Government has faced numerous unexpected disasters and crises that impeded implementation, it has also, at times, rejected the deadlines outlined in the Fiscal Plans. Together, this has resulted in delayed implementation on most of the identified structural reforms. For example, the Government has:

- » Implemented the EITC but without a robust campaign to raise awareness of the new benefit and encourage work in the formal sector;
- » Delayed implementation of the complementary NAP work requirement;
- » Made little progress in strengthening the Island's workforce development programs;
- » Increased on-island land freight charges and expanded the regulation across incremental sectors of the economy, rather than deregulating as outlined in this and previous Fiscal Plans;
- » Implemented very few of the required ease of doing business reforms with sufficient progress to make the Island substantially more competitive and attractive to investors; and
- » Undertaken almost no discernible efforts to reform the Island's K-12 education system, a situation that is partially explained but also exacerbated by the pandemic.

These delays have already diminished the projected economic uptick and revenues associated with structural reforms. Had the structural reforms above been implemented at the pace and scale forecasted in the Fiscal Plan the Oversight Board certified in 2018, the Government would have generated 1.09% in additional GNP worth $72 billion in tax revenues by FY2051. Not only have the residents of Puerto Rico lost opportunities to gain new skills, experiences, and education, but the Island has lost time in attracting incremental investment that would produce jobs and tax revenues to be reinvested again for the people of Puerto Rico.



The Certified Fiscal Plan requires the Government to submit implementation plans to outline timelines and Key Performance Indicators for all fiscal measures and structural reforms, and to provide monthly progress reports on implementation. These implementation plans and progress reports are essential to ensure the Government is operating within the fiscal envelope and making progress on structural reforms, and to afford the Oversight Board the opportunity to provide feedback on critical efforts to restore fiscal sustainability and balance to Puerto Rico.

To date, the Government has struggled with implementing reforms and reporting on this implementation in a timely manner. Progress has, as a result, been inconsistent and incomplete; many reforms are delayed or not occurring.

## Implementation Update: Structural Reforms

Ease of Doing Business Reform (EODB)
Please see page 109 of this 2022 Annual Report.

# Human Capital and Welfare Reform

As of March 2022, Puerto Rico's formal labor-force participation rate was on average 44.4%, among the lowest in the world and far below U.S. and Caribbean averages.[2] As the Congressional Budget Office states, labor force participation is an important component of economic growth since it allows firms to expand employment and increase production and has an important impact on fiscal and budget trends. Puerto Rico has an opportunity to increase this rate and must aspire to reach at least the rate of the lowest U.S. state (West Virginia, with 55%), to provide its economy with the dynamism it requires to foster growth.[3]

The Government has delayed the implementation of many human capital and welfare reforms intended to address structural challenges, reducing the potential economic uplift to the Island and delaying the opportunity for residents in need of this critical support. Given the very high levels of unemployment on the Island and the likely changes in key economic sectors like retail, hospitality, and leisure, the creation of new jobs will be critical to reemploying those who have suffered during this pandemic. Continued Government inaction will further jeopardize the development of Puerto Rico's human capital, the opportunities available to each resident of Puerto Rico for personal development and economic self-sufficiency, as well as projected GNP growth and its associated increases in tax revenues.

## Local Earned Income Tax Credit

Although the Government has implemented an EITC adhering to the design parameters for tax year 2019, it has not coupled the credit with a robust promotional campaign as required by the 2020 and 2021 Fiscal Plans. The Department of the Treasury's EITC outreach efforts have centered primarily on sending circular letters detailing the benefit to tax preparers and establishing a handful of outreach centers across the Island to discuss EITC with potential filers in-person.

The American Rescue Plan (ARP) Act included permanent additional funds to incentivize Puerto Rico to expand the local EITC program put in place for tax year 2019. The ARP Act provides for up to $600 million to be delivered to Puerto Rico in the form of a reimbursable grant, equivalent to three times the local spending, and indexed for U.S. inflation after the first year. The Government must amend the current EITC program to qualify for the additional federal funding provided in the ARP Act.

Under this amended regulation, the Government must make annual payments to EITC

---

[2] For comparison, the U.S. has a 61% labor force participation rate. In the Caribbean, the Dominican Republic's labor force participation rate was 62% in 2020. Jamaica and Haiti's rates were even higher (64% and 65%, respectively). See the World Bank Group via International Labor Organization, "Labor force participation rate, total (% of total population ages 15+)," 2020; and the P.R. Department of Labor and Human Resources, "Empleo y Desempleo en Puerto Rico," March 2022.
[3] U.S. Bureau of Labor Statistics, "Employment status of the civilian noninstitutional population 16 years of age and over by region, division, and state, 2019-2020 annual averages," 2020.

recipients of at least $800 million to ensure receipt of the full amount of the federal grant. The Certified Fiscal Plan has made available the local resources required to take advantage of the full federal funding available and to enable the permanent positive effect of such additional federal funding on Puerto Rico's residents and economy.

On top of the funding for the tax credit expansion, the ARP Act includes an additional payment of $1 million per year to pay for EITC outreach through 2025. Previous Fiscal Plans and the 2022 Certified Fiscal Plan establish that to effectively enhance labor force participation and reduce poverty through increased EITC benefits, the Government must promote the program more comprehensively.

## Nutritional Assistance Program (NAP) Work Requirement

To further support labor force participation, the Certified Fiscal Plan requires the Government to introduce a work/volunteer requirement for select adult NAP beneficiaries, with full implementation by the beginning of FY2024. The Government has made no meaningful progress, as of June 2022, in the implementation of this work/volunteer requirement. The Government has yet to meet any major milestones in the implementation of this reform, including designing the requirement itself. Recently, however, the Government committed to a two-year implementation timeline. Still, reaching full and timely implementation of this reform will require urgent and nimble action from the Government.

In August 2021, the Food and Nutrition Service at the U.S. Department of Agriculture announced an update to the Thrifty Food Plan, which is an important part of determining benefit amounts for NAP and other federal nutrition assistance programs. Due to this change, Puerto Rico is projected to receive an additional $464 million in annual funding for the program in FY2022; this amount is expected to increase with inflation in future years. These additional funds could help further incentivize labor force participation if a work/volunteer requirement is successfully implemented.

## Workforce Development

The Government's progress in overhauling the Island's worker training systems, unfortunately, has been limited to the centralization of oversight of Workforce Innovation and Opportunity Act (WIOA) funds under the Department of Economic Development and Commerce (DDEC) and some improvements in systems to track program data. Local boards, which administer WIOA-funded programming in their respective regions, continue to offer workforce programs of disparate and inconsistent quality, and many have delayed signing memorandums of understanding with Government agencies.

Moreover, while DDEC updated its WIOA State Plan in January 2021 and successfully incorporated labor market analysis, further analyses are still required to better understand barriers to employment and identify and propose solutions to existing talent gaps. As such, current initiatives may not be well-attuned to the current and future needs of the Island's employers and its economy and need to be adjusted.

## Power Sector Reform

Please see page 75 of this 2022 Annual Report.

## Implementation Update: Fiscal Measures

Creation of the Office of the Chief Financial Officer

The Office of the Chief Financial Officer (OCFO) comprises a properly structured and empowered body that pursues financial reporting, resource management, and planning objectives. The Government's efforts to create a high performing OCFO have been slow and disjointed. Progress has been made in providing bank account transparency, publishing weekly Emergency Reserve reports, monthly reporting of budget-to-actuals for select Government agencies, enhancing General Fund collections with technology, and publishing of the 2017 and 2018 tax expenditure report in September 2019 and May 2021, respectively.

However, there is a need for more detailed and timely reporting in several areas. For instance, detailed monthly budget to actuals on Special Revenue Funds and component units including revenues, expenditures, and encumbrances; and timely issuance of the Government's annual audited financial statements and the annual Tax Expenditure Report. In essence, each relevant financial agency has improved operational capacity and accountability somewhat, but there has been little centralization, and responsibilities remain unclear within the group.

The OCFO has been substantially delayed in the issuance of annual audits. As of June 2022, the FY2020 and FY2021 audits have not been issued, while the 2019 audit was issued in April 2022 and the 2018 audit was issued in June 2021 (three fiscal years later). The goal is to have a defined repeatable process where these reports are produced as required, in a timely fashion, without extraordinary intervention being required.

The Governor, through issuance of an Executive Order, provided for the creation of the Chief Financial Officer and for it to be the Treasury secretary. This was a positive step that is expected to begin to provide some movement toward centralization, nonetheless, it still falls short of the centralized authorities envisioned in the Certified Fiscal Plan.

Empowering the OCFO to effectively manage the Government's finances is more important than ever, considering the devastating COVID-19 crisis. As part of the

federal government's response to the pandemic, the OCFO will play a central role in administering and monitoring the use of over $45 billion in federal and Commonwealth funds meant to support the Island's recovery from the pandemic. To that end, the OCFO must be prepared to comply with enhanced reporting and oversight requirements governing the use of Coronavirus Aid, Relief, and Economic Security Act, the Coronavirus Response and Relief Supplemental Appropriations Act, the ARP Act and other federal funds earmarked for Puerto Rico.

A properly structured OCFO will constitute an important organizing entity for the pursuit of timely financial reporting, decision making, monthly budget-to-actual analysis, and for resource management and planning.

## Agency Efficiencies

Implementation progress and engagement has varied across Government agencies. The PRDE and the Department of Public Safety (DPS) made investments in teacher and police salaries to incentivize talent retention and productivity, and some agencies are developing meaningful tools and creative solutions to achieve savings.

However, there is a lack of structure and planning for reform. Many agencies have not planned implementation, resulting in slow progress to reach their targets. In addition, the lack of legislation for consolidations is hampering agencies from achieving savings, despite efforts to reduce personnel and non-personnel spending through diverse initiatives.

To date, the Government has unfortunately failed to demonstrate meaningful progress in implementing agency consolidations or otherwise improving operational efficiency, though it has generally met budget targets. The Government has also struggled to properly activate several investments provided by the Certified Fiscal Plan and Certified Budget. The Certified Fiscal Plan continues to outline savings the Government is expected to achieve through both agency-specific and Government-wide personnel and non-personnel measures, most lasting through FY2023.

>> **Department of Education** – The PRDE has struggled to improve educational outcomes for its students and to operate at a size commensurate to its student enrollment. The pandemic caused significant prolonged disruptions to the education system and PRDE was mainly able to focus on providing virtual education, which impacted the advancement of initiatives to proactively capture savings. To help the Government manage the COVID-19 pandemic and to progress implementation across key reforms, the Oversight Board allowed a one-year deferral on agency efficiency measures for FY2021.

However, in line with the Certified Fiscal Plan and the goal of transforming the Government of Puerto Rico into a sustainable and efficient one, the PRDE is required to further generate personnel and non-personnel efficiencies tied to a declining enrollment. The Certified Fiscal Plan requires the PRDE to:

- ▸ Improve student-teacher ratio in alignment with a steadily declining student enrollment;
- ▸ Capture savings from past school consolidations and invest in a smaller number of higher performing schools;
- ▸ Right size regional and central offices by defining the roles and responsibilities of functions and identifying capacity gaps;
- ▸ Achieve procurement savings through the implementation of procurement best practices;
- ▸ Optimize special-education professional services costs to increase service offering capacity and meet all special education student needs; and
- ▸ Improve financial processes by developing a long-term financial plan that aligns to PRDE's strategic plan and addressing challenges related to fiscal and operational practices.

The PRDE successfully launched a time and attendance project. This initiative involved the implementation of an effective automated time and attendance system that is linked directly to the payroll system to ensure that only active employees who are working get paid. The project continues to yield significant benefits and savings to the Government, from February 2021 through May 2022, the time and attendance initiative generated ~$39 million in payroll discounts to employees without recorded attendance.

The PRDE has made progress towards efficiency and other fiscal measures. In October 2021, the Department contracted a third-party vendor to develop a Facilities Master Plan the PRDE expects to publish in the summer of 2022. In January 2022, the PRDE submitted a draft of a long-term financial plan with a breakdown of revenues and expenses to further the ability to support strategic priorities at the Department. Revisions to this plan must continue to ensure resources are maximized and allocated towards achieving the strategic goals established.

In February 2022, the PRDE launched a platform to guide school-level staffing decisions based on its staffing policies guided by student-teacher ratios and document exceptions. In March 2022, a procurement assessment was initiated to identify areas of opportunity and barriers to improve procurement efficiency. The assessment is expected to be completed by July 2022 and the PRDE is

expected to work towards implementing the recommendations of this study during FY2023. Moreover, throughout 2022, the PRDE's Special Education program analyzed its capacity to serve special education students within the Department, including the "Remedio Provisional" program, and has contracted over 30 providers to increase capacity within its special education services.

» **Department of Public Safety (DPS)** – The DPS has made some progress towards consolidating back-office roles through the creation of a shared services structure, implemented a time and attendance system for its shared services structure and five of its six bureaus, including full implementation within the Police Bureau and digitized all forms to reduce manual processes and improve efficiencies. Additional progress in consolidation efforts occurred in FY2022 with the transfer of all remaining back-office positions from the Police and 911 Bureaus, establishing a grouping to perform centralized back-office functions with a direct reporting line and process integration across all bureaus. However, key processes within Procurement and Recruitment need to be improved and transformed to provide full visibility through the process, reduce administrative hurdles, and achieve additional savings, amongst others.

A combination of past high attrition rates, the agency's continued inability to hire additional civilian staff, and a push for headcount reductions through Voluntary Transition Programs has led to a shortage of field officers and increased overtime spending. To increase headcount, the Police Bureau graduated two academies with 255 cadets in FY2021 while only one academy was graduated (with 133 cadets) in FY2022. Currently, there is one ongoing academy with a class of 132 recruited cadets, which is set to graduate in November 2022.

Despite these efforts, the Police Bureau has struggled to hire civilians to be able to move cadets and sworn officers to field roles and continues struggling to reduce overtime hours, with a projected expense for FY2022 of ~$72 million. As of October 2021, the Police reported that ~2,400 of 11,473 sworn officers were still performing administrative roles. The Police Bureau must continue to reassign sworn officers performing administrative roles and transfer them into the field and contracting administrative personnel to continue fulfilling administrative roles.

Recruitment difficulties – for front and administrative roles - continues to be a major hurdle amongst other DPS bureaus as well. The Fire Bureau began their first academy since 2016 during May 2021, mainly due to delays throughout the entire fiscal year in candidate selection. The academy was scheduled to recruit 160 firefighters and graduate by December 2020, but a total of 140 new recruits were graduated during December 2021. The Emergency Medical Services Bureau only recruited 30 of the 44 vacant positions during

FY2022. As such, the Certified Fiscal Plan highlights the need to drive actual changes in processes and back-office efficiencies, as relying on retirement incentive programs to reduce frontline staff has the potential to negatively impact service levels. The currently unfolding COVID-19 crisis further necessitates DPS bureaus to resolve recruitment issues by utilizing payroll investments provided by the Certified Fiscal Plan to maintain service levels. Even though tracking time and attendance throughout the Police Bureau was on track for full implementation as of December 2020, a notable delay occurred due to COVID-19 and was fully implemented as of June 30, 2021. In addition to the Police Bureau, the Special Investigations Bureau, the Emergency and Disaster Management Bureau, the Government Board of the 911 Service, the Emergency Medical Services Bureau, and the DPS shared Services Structure have adopted the time and attendance system for front office and administrative roles. The Fire Bureau remains as the only agency within the grouping that has not been able to fully implement a digital time and attendance system.

» **Department of Economic Development and Commerce (DDEC)** – In FY2021, DDEC made substantial progress by consolidating 70% of its agencies. Seven agencies moved to a centralized accounting and payroll systems. However, DDEC has yet to finalize the physical and operational consolidation of the Puerto Rico Tourism Company and Planning Board. As of June 2022, no concrete plan has been established to complete the consolidation of the mentioned entities.

The Certified Fiscal Plan requires DDEC to conduct an operational needs assessment to identify excess resources and reduce superfluous front- and back-office personnel to achieve operational efficiency of the grouping moving forward. During FY2022, DDEC hired a third party to complete the operational needs assessment for all DDEC departments. However, they have prioritized the Incentive and Permits Office. DDEC is expected to complete the full assessment by FY2023 and share the results of the assessment with the Oversight Board.

» **Department of Corrections and Rehabilitation (DCR)** – The DCR has fully consolidated five correctional facilities since FY2018 and has partially consolidated three during FY2022; with most of them still being used for other purposes and no major savings reported. As of May 2022, the full-time equivalent headcount is 5,424 with an inmate population of 7,252 in 25 correctional facilities. Consolidation efforts will continue in FY2023 with existing facilities being improved to create more habitable spaces and thus require fewer facilities. DCR's system-wide utilization of space for adult prisons started to increase in FY2022 since the start of the pandemic, from 56% in February 2021 to 68% in June 2022. The adult incarcerated population in DCR declined by 19% from June 2020 to February 2021 and has maintained an average of ~7,200 inmates since.

» **Department of Health (DOH)** – The Certified Fiscal Plan requires the DOH to consolidate the following six healthcare agencies: Department of Health; Medical Services Administration (ASEM); Puerto Rico Health Insurance Administration (ASES); Mental Health and Anti-Addiction Services Administration (ASSMCA); Cardiovascular Center of Puerto Rico and the Caribbean; and Center for Research, Education, and Medical Services for Diabetes. To date, the Government has achieved no progress towards this requirement. Legislation presented in December 2019 that was needed to execute the first phase of consolidation (consolidation of ASES and DOH) was not recommended by the Senate Health Commission, and in April 2022, the Governor publicly stated he has never endorsed this proposal. However, the DOH has been working towards reorganizing the agency and modifying the internal structure of the units. The DOH expects to finalize and submit this proposal shortly.

In addition, during the past months, with the assistance of the Government and the Oversight Board, the DOH has been implementing a time and attendance system to ensure that only active employees who show up to work are paid. In February 2022, the DOH was able to successfully process its first payroll interface containing employee discounts for work time not recorded. This means that all DOH employees that did not record their attendance in accordance with the agency's time and attendance policy for the given pay period will receive an adjustment in their paychecks. While ASEM and ASSMCA made initial progress on the implementation of a time and attendance system, implementation must be expanded to the remaining Health agencies.

Although an Electronic Health Records (EHR) system had been deployed at several hospitals, the University of Puerto Rico Comprehensive Cancer Center (UPRCCC) lacked this system. During October 2021, however, the UPRCCC was able to implement the first phase of EHR and is working towards the implementation of Phase 2, which consists of integrating the financial module. Moreover, the Cardiovascular Center is also working towards updating its EHR to comply with the Joint Commission and the Centers for Medicare and Medicaid Services (CMS).

With regards to accreditations, ASSMCA has achieved significant progress towards receiving its CMS accreditation. ASSMCA has already requested the needed CMS certification number and paid the required annual fee. ASSMCA expects to request from CMS the unannounced audit visit and this visit is expected to occur on or before December 2022.

# Healthcare Reform

Puerto Rico's healthcare system has faced significant challenges from recent events. Unfavorable trends (e.g., provider shortages, outstanding infrastructure needs) instigated by natural disasters such as hurricanes and earthquakes persist and have been amplified by the COVID-19 pandemic. These circumstances have placed significant hurdles on the Commonwealth's aim to improve the quality of public health delivery on the Island; however, during this same period, the Island's public health insurance program (called Vital) has seen a considerable influx of new federal funding enabling historic expansions in the benefits, coverage, and reimbursement rates. Given the lack of long-term clarity on Puerto Rico's federal Medicaid funding, as well as the high proportion of the Island's population dependent on the public insurance system for health coverage, it is as crucial as ever that ASES and the Puerto Rico Medicaid Program within the DOH make meaningful progress on the required value-based reforms to manage the Island's escalating healthcare expenditures while ensuring high-quality care for Puerto Rico's citizens.

The goal of the Puerto Rico public health-insurance system is to fund high-quality healthcare services for all residents in need and, in doing so, cultivate a healthier population, especially as it relates to lowering outsized rates of chronic conditions. To ensure the system can continue to support the most vulnerable populations who rely on its services, Puerto Rico will need to improve the efficacy of its health insurance plan. Therefore, the Certified Fiscal Plan seeks to achieve better healthcare outcomes for beneficiaries by implementing reforms that will improve program integrity and quality relative to cost. Program integrity activities (e.g., conducting accurate enrollment verifications) are meant to ensure that funds are spent appropriately on delivering high quality, necessary care while also preventing fraud, waste, and abuse from taking place.

Moreover, under value-based care, the goal is for providers to be reimbursed based on their ability to improve quality of care in a cost-effective manner or lower costs while maintaining standards of care, rather than being compensated based on the volume of care they provide. These are opportunities to reduce wasteful healthcare spending and increase efficiency while simultaneously improving health outcomes.

Steps taken by the Government towards improving program integrity include the integration of ASES data with the Medicaid Management Information System. The Puerto Rico Medicaid Program is currently planning the implementation of Phase 3 of this integration, which involves the establishment of a financial management module. This module will be primarily focused on those business processes necessary to support the calculation, production, and distribution of capitated payments to carriers.

Other steps taken towards promoting program integrity include receiving approval from CMS of the compliance reports submitted by the Puerto Rico Medicaid Program

regarding the Payment Error Rate Measurement (PERM) and Medicaid Eligibility Quality Control (MEQC). The Puerto Rico Medicaid Program is currently in the process of finalizing the implementation phase of PERM preparatory activities to enter the execution phase of the formal PERM cycle, which is expected to kick-off in April 2025. The MEQC review process is also being established in coordination with the PERM cycle for Puerto Rico. The Island must continue to make progress to meet CMS's PERM and MEQC requirements pursuant to the 2020 Further Consolidated Appropriations Act.

In addition, per CMS Ruling, U.S. territories are required to join the federal Medicaid Drug Rebate Program (MDRP) on January 1, 2023. As such, the Certified Fiscal Plan supports Puerto Rico's entry into the MDRP since it is expected to yield higher gross rebates from drug manufacturers compared to those currently received from the local Commonwealth drug rebate program. ASES is working towards joining the MDRP program by January 2023 and has selected the Pharmacy Benefit Manager and Rebate Aggregator to comply with the implementation of the new pharmacy program. Moving forward, ASES should continue to focus on the necessary steps to achieve the successful implementation of the MDRP.

## Enhanced Tax Compliance and Optimized Taxes and Fees

Treasury has made important foundational progress toward deploying an integrated tax system, including collection of sales and use taxes (SUT), and corporate and income tax regimes, and has initiated new compliance techniques to better leverage data and analytics. The Government has made significant progress in its compliance efforts. The 2020 Certified Fiscal Plan included a ramp up of three years, meeting 100% of targets by FY2023, to achieve a target 5% net uplift in annual revenues due to enhanced compliance across the major tax lines (personal income tax, corporate income tax, and SUT) – inclusive of implementation costs. Given the collections seen for the previous year and because all the necessary activities to achieve this have been implemented (e.g., the implementation of the new digital portal known as SURI, and the collection of SUT on internet sales, among others) the April 2021 Fiscal Plan accelerated the full value of revenue measures from FY2023 to FY2051, which was maintained in the 2022 Certified Fiscal Plan.

Treasury should continue to use new systems and processes to identify and remediate non-compliance, reduce the complexity of the tax system and process of filing taxes, improve use of data and analytics to address non-compliance, and improve collections on online purchases expanding agreements with remote sellers on a regular basis.

## Comprehensive Pension Reform
Please see page 29 of this 2022 Annual Report.

# Budget Process

## The Commonwealth's Budget

The Oversight Board's budget process is thorough and grounded in data. The Office of Management and Budget (OMB) and agencies prepare their initial submissions, and the Oversight Board requests information to validate agency requests, understand how agencies spend their tax-payer dollars, and make better management decisions that allow prioritization of much-needed funds.

During FY2022, the Oversight Board engaged in a comprehensive and in-depth budget development process to enhance the level of due diligence at the agency level and on spending categories, provide additional transparency, and improve budgetary controls and reporting.

The FY2023 Certified Budget includes debt service payments that will drive Puerto Rico towards economic renewal and growth. The budget continues to enhance transparency in Government spending by incorporating program level detail for certain key agencies and additional reporting. The total Central Government budget, which totals $28 billion, is sourced from the following funds: General Fund ($12.426 billion), Special Revenue Funds ($4.5 billion), and federal funds ($11.236 billion).

The total Central Government General Fund budget is distributed in the following priority areas: 16% for education (K-12 and higher education), 16% for PayGo, 11% for health, 10% pension related, 9% debt related, 8% for public safety, 5% economic development, 3% courts, 3% corrections, 3% OCFO, 2% families, and 14% other. It is consistent with the Certified Fiscal Plan and provides funding for critical services



**FY23 Consolidated Certified Budget is $28 billion**

$ in millions

Federal Fund 11,236 40%

General Fund 12,426 44%

Special Revenue Fund 4,500 16%

Note: Due to rounding, numbers presented may not add up precisely to the totals provided
Source: FY23 Certified Budget and 2022 CW Fiscal Plan
1. Excludes individual municipality budgets
2. Includes General Fund PayGo for Employee Retirement System ("ERS"), Teacher Retirement System ("TRS"), and Judicial Retirement System ("JRS") systems. See appendix for a more detailed breakdown of PayGo

such as Health, Education, Public Safety and Economic Development, and adequately funds ongoing pension obligations as well as Social Security contributions for police officers and teachers. Critical investments included in FY2023 Certified Budget are:

- » Public employee salary increases,
- » Pension contributions,
- » Government capacity,
- » Healthcare investments in facilities,
- » Public safety investments,
- » Social programs, and
- » Infrastructure investments for dredging and road maintenance.



**General Fund: ~70% of the FY23 Certified Budget is allocated to Education, Health, Public Safety, Pension, and Debt**

## Budget Process

Section 202(c) of PROMESA establishes a multi-step procedure for the development, review, and approval of budgets for covered instrumentalities of the Commonwealth of Puerto Rico. As part of this process, the Oversight Board reviews the executive branch's proposed budget and then the Legislature's proposal to determine compliance with PROMESA. The Oversight Board also ensures that in addition to increasing transparency and efficient use of public funds, the budget serves as a tool to allow for efficient implementation of key priorities as outlined in the Commonwealth's Certified Fiscal Plan.

On March 16, 2022, the Governor submitted a proposed FY2023 budget for the Commonwealth. The Oversight Board and its advisors held extensive discussions with the Governor's representatives about the proposed budget and after substantial analyses and deliberations, on April 22, 2022, the Oversight Board issued a budget notice of violation.

On May 2, 2022, the Governor submitted a revised proposed FY2023 budget for the Commonwealth. The Governor's submission was inconsistent with the Commonwealth 2022 Fiscal Plan. Therefore, on May 10, 2022, the Oversight Board sent a compliant budget to the Legislature for its review. After several meetings to try to achieve consensus among the Oversight Board, the Governor, the Senate, and the House, the parties could not come to an agreement. The Legislature never submitted an official budget to the Oversight Board for its review. As such, the Oversight Board developed and certified, on June 30, 2022, a compliant FY2023 budget for the Commonwealth.

## Change Over Time

The FY2023 budget includes significant incremental funding to entities, including PRDE, UPR and municipalities, while reducing restructuring fees and other Plan of Adjustment related items.

Since FY2018, the Government's budget also includes PayGo pension costs, which did not exist in prior General Fund budgets. That cost fluctuates between $2.5 billion and $2.6 billion per year, prior to any pension reform proposed in the Plan of Adjustment. The FY2023 budget also includes the second contribution to the newly established pension trust and enhanced defined contribution payments for police.

Furthermore, the Certified Budget considers Puerto Rico's expenditures on Medicaid, which fluctuate dramatically based on federal funding legislated at the time of certification. Medicaid costs included in the FY2023 General Fund budget total $814.7 million.



# Highlights of the FY2023 Certified Budget and significant investment areas include:

1. The FY2023 Certified Budget is compliant with the Certified Fiscal Plan.
2. Central Government budget consists of the General Fund, which represents almost half of the budget, as well as the Special Revenue Fund and Federal Fund budgets.
3. Provides adequate funding for critical services such as Education, Health, Public Safety, Corrections, Economic Development, and Social Welfare.
4. Focuses on operational improvements through agency consolidation, creation of the OCFO, Medicaid reform, enhancing tax compliance, optimizing taxes and fees, and reforming the Island's pension systems.
5. Includes salary increases to public employees and incremental funding to hire additional personnel in the total amount of $387 million, which is composed of:
   A. $259 million in salary increases and Social Security across multiple agencies
   B. $71 million to implement the Civil Service Reform
   C. $40 million to provide government employees a Christmas Bonus of $600 per employee
   D. $7 million to the Fire Department to recruit an additional 300 firefighters
   E. $5 million to the Police Department to recruit an additional 200 cadets
   F. $3 million to the Family and Children Administration to hire social workers to manage caseload increase
   G. $2 million to the Department of Natural and Environmental Resources to hire and train 100 environmental rangers
6. Contributions to retirees in the total amount of $1.3 billion composed of:
   A. $1 billion contribution to the pension reserve trust for the protection of future pension payments
   B. $261 million contribution to the Act 106-2017 Defined Contribution program to supplement police retirement
   C. $2 million to fund pension obligations of the Puerto Rico Symphonic Orchestra Corporation
7. Investments in government capacity totaling $113 million distributed:
   A. $40 million one-time support the municipalities for inflationary cost pressures
   B. $22 million to incentivize the consolidation of municipal services and assist municipalities to achieve fiscal sustainability
   C. $22 million to renew contracts with key information technology vendors to upgrade existing systems
   D. $13 million to support implementation of an integrated and automated time and attendance system
   E. $10 million to support implementation of a centralized Enterprise Resource Planning system
   F. $3 million to support creation of an OCFO to enhance financial reporting, resource management and planning

G. $2 million to create a Grants Management Office to centralize the management, reporting, and pursuit of federal funds

8. Includes investments in infrastructure in the amount of $322 million composed of:
   A. $179 million to fund non-toll road and transit asset at the Highways and Transportation Authority
   B. $102 million to repair and maintain island roads
   C. $26 million for dredging and channeling of the Martín Peña Channel
   D. $15 million to the Department of Corrections to construct and repair correctional facilities

9. Improvements in public health totaling $77 million composed of:
   A. $41 million of relief to the municipalities for Medicaid contributions
   B. $14 million to the Medical Services Administration to fund medical professional services contracts, Attending doctors supporting Residency Programs and for surgical materials
   C. $11 million to ASSMCA for the Río Piedras Psychiatric Hospital, a drug observatory program, and post-clinic patient care homes
   D. $10 million to support cancer research initiatives at the Comprehensive Cancer Center

10. Investments in public safety in the amount of $28 million that include:
    A. $20 million to the Police Bureau to invest in police stations
    B. $8 million for materials and supplies, technology upgrades, and matching federal funds

11. Social programs totaling $43 million that include:
    A. $16 million to organizations that provide free legal aid to individuals and families
    B. $8 million to the Department of Justice for services to victims of crime and domestic violence and homeless shelters
    C. $8 million to hire third-party case managers to manage case backlogs at the Family and Children Administration
    D. $7 million to combat gender violence
    E. $5 million to support child and adolescent mental health initiatives

12. Includes budget incentives tied to the achievement of certain critical milestones.

13. Capital improvement projects: The FY2023 Certified Budget also allocates $690 million of capital expenditures (CapEx) across all funds: General Funds, Special Revenue Funds, and Federal Funds, and agency groupings. The FY2023 General Fund alone includes $332 million of CapEx, of which $54 million is to the Highways and Transportation Authority (HTA). Approximately 63% of the FY2023 CapEx is allocated for infrastructure construction. However, total CapEx available for spending is of $1.8 billion as a result of extending $1.1 billion of previously unspent CapEx appropriations.

# The FY23 Certified Budget includes $332m in capex in the General Fund

- 96% of the FY23 General Fund CapEx has been allocated across agencies while the remaining is unallocated under the Custody of OMB

**FY23 Capital Expenditures by Grouping**
$ in millions

| Grouping | GF | SRF | FF | Total |
|---|---|---|---|---|
| Housing | $0 | $0 | $174 | $174 |
| Public Works | 65 | - | 87 | 152 |
| Environmental | - | - | 70 | 70 |
| Public Safety | 48 | - | - | 48 |
| Independent Agencies | 32 | - | 4 | 36 |
| Courts and Legislature | 33 | - | - | 33 |
| Executive Office | 18 | 2 | - | 20 |
| Economic Development | 15 | - | - | 15 |
| Corrections | 15 | - | - | 15 |
| Other[2] | 40 | 3 | 2 | 44 |
| Unallocated | 12 | 17 | - | 29 |
| **Commonwealth CapEx** | **$278** | **$22** | **$336** | **$636** |
| HTA | 54 | - | - | 54 |
| **Total FY23 CapEx** | **$332** | **$22** | **$336** | **$690** |
| FY22 Rollover CapEx | 1,015 | 125 | - | 1,141 |
| **Total CapEx Available** | **$1,347** | **$147** | **$336** | **$1,831** |

Note: Due to rounding, numbers presented may not add up precisely to the totals provided
1. Other includes Labor, OCFO, Agriculture, Justice, Culture, Families & Children and Ombudsman
Source: FY23 Certified Budget



Capex by Type of Spend
$1,831 million

Construction Infrastructure 63%
Federal Fund 18%
Hardware Software 5%
Other 5%
Unallocated 2%
Vehicles 2%
Equipment 5%

---

The FY2023 Central Government budget is of $28 billion, of which $12.4 billion is General Fund spending. The FY2023 Certified Budget includes spending in the following core areas:



# The $28 billion FY23 Consolidated Certified Budget by agency grouping[1] and PayGo

| $5.5b Health | | | $4.6b Education | | |
|---|---|---|---|---|---|
| **$3.1b** Families & Children | **$2.6b** PayGo | **$1.8b** Housing | **$1.3b** Pension-related[2] | **$1.1b** Debt-related[3] | **$1.1b** OCFO |
| **$1.1b** Public Safety | **$1.0b** Economic Development | **$0.7b** Independent Agencies | **$0.5b** Public Works | **$0.5b** State Insurance | **$3.5b** Other groupings[4] |

1. Grouping categories exclude PayGo
2. Comprised of Pension Reserve Trust ($1.0b) and Police Retirement OC ($261m) contributions
3. Comprised of debt payments related to Capital Investment Bond ($665m), Sales and Use Tax Contingent Value Instrument (CVI) ($276m), Capital Appreciation Bond ($106m), and Rum Tax Cover Over CVI ($5m)

4. Other groupings include Custody Accounts ($563m), Courts ($438m), Labor ($424m), Corrections ($414m), Executive Office ($405m), Municipalities ($308m), Environmental ($218m), Instrumentalities ($202m), Justice ($133m), Automobiles Accident Compensation Administration ($78m), FOMB ($60m), Transparency and Control ($47m), Ombudsman ($43m), Utilities Commission ($35m), Land ($30m), Culture ($30m), Finance Commission ($20m), Closures ($20m), State ($16m) and Other ($32m)

## Budgetary Controls

The Certified Budget includes significant budget compliance mechanisms to control spending. Critical budgetary controls include:

» **Budget preservation levers:** The Certified Budget provides for restrictions on encumbrances and disbursements of General Fund appropriations, such that 2.5% is held back until the fourth quarter of the fiscal year. The Judicial Branch, PayGo appropriations, Consent Decree amounts, Housing and Transportation Authority appropriations, economic incentive funds and distributions, cigarette and rum distributions, allocations of SUT to the Municipal Administration Fund, agencies in the Department of Public Safety and in the Health groupings are not subject to this holdback.

» **Restriction on prior year budgeted funds:** the Certified Budget provides for restricted use of appropriations of prior fiscal years to a 60-day period after the end of the fiscal year, assuming such appropriations have been encumbered by June 30. Exceptions apply to:

> ► Capital expenditures that have been encumbered, accounted for, and kept on the books, but not exceeding two fiscal years on the books
> ► Appropriations in the Certified Budget for equipment with procurement cycles that extend beyond the end of the fiscal year, which are encumbered on or before June 30, 2022
> ► Programs financed in whole or in part with federal funds
> ► Certain amounts held under the custody of Treasury
> ► Orders by the United States district court with jurisdiction over all matters under Title III of PROMESA
> ► Matters pertaining to any consent decree or injunction, an administrative order, or settlement entered into with a federal agency, with respect to federal programs.
> ► For the full list of exceptions please refer to Section 7 of the FY2023 General Fund Certified Budget and Section 4 of the FY2023 Special Revenue Fund Certified Budget.

» **Reporting requirements:** the Certified Budget provides the nature and cadence of reporting, requiring quarterly certification that no prior year funds have been assigned to current year expenses, monthly and quarterly budget versus actual reporting, and other support for implementation. The Governor shall also submit to the Oversight Board a comprehensive reporting package in a similar format to that required and provided in accordance with Section 203 of PROMESA for the following specified programs and spending areas within different agencies:

(1) the PRDE's Special Education program; (2) the PRDE's Remedio Provisional program; (3) the DOH's Adult Hospital program; (4) the DOH's Pediatric Hospital program; (5) the DOH's HURRA Bayamón Hospital program; (6) the DOH's 330 Centers Payments; (7) the DOH's Intellectual Disability program, (8) ASSMCA's Río Piedras Hospital program, and (9) the DCR's Juvenile program. This program reporting must include and clearly detail budget to actuals on a concept level basis, any reprogramming of funds within the program, and any reprogramming of funds to and from other programs or agencies.

In addition, the Governor shall submit to the Oversight Board a monthly reporting package detailing capital expenditure spending by agency and by project including details for expenditures which have request for proposals issued, which contracts have been awarded, and which are in process.

Furthermore, the Governor shall submit to the Oversight Board a monthly reporting package detailing all of Department of Education's salary and other payroll expenses within four categories: (1) Central Administrative Personnel; (2) Regional Administrative Personnel; (3) Regional School Support Personnel; and (4) School Personnel as established in the FY2022 Certified Budget resolution. To assess compliance and guarantee accountability, the PRDE must submit such monthly reporting detailing salary and payroll expenses by the categories established herein along with a salaries and payroll reconciliation of funds disbursed and actual expenses recorded.

» **Prior year reprogramming:** the Certified Budget provides for the suspension of the ability of OMB, the Fiscal Agency & Financial Advisory Authority, and the Treasury to authorize reprogramming or extension of appropriations of prior fiscal years.

» **Quarterly budget:** the Certified Budget includes the provision of detailed quarterly budget projections, in compliance with PROMESA Section 203.

» **Budgetary controls for all concepts of spending:** the budget restricts any spending or encumbrance that exceeds authorized appropriations.

» **Responsible disbursement of budgetary allocations for operating and other expenses:** The OMB shall withhold from any of the allocations to the agencies of the executive branch the amounts necessary to pay for the PayGo contribution, unemployment insurance, or taxes withheld from their employees, when the OMB determines that such a withholding is necessary to ensure compliance with these obligations by the agencies concerned.

» **"Sabana File":** the Certified Budget requires the OMB to submit the Government's budget in an Excel format known as the "Sabana file," which identifies both the General Fund budget and non-General Fund budgets within the Government's accounting systems, including detailed budget appropriations and allocations by agency, instrumentality, public corporation, fund type, and concept of spend.

» **Budget reapportionments:** the Certified Budget provides that the Oversight Board must approve in writing, in advance, any reprogramming request for any appropriation approved in the budget.

» **Appropriations subject to actual collections:** Appropriations listed in the General Fund under (1) Allocation of SUT to the Municipal Administration Fund (excluding debt portion); (2) Outflow of the Special Fund for Economic Development portion of Corporate Income Taxes and Non-Resident Withholding as well as all Law 60 incentives; (3) cigarette and rum distributions are entirely dependent on the level of revenues collected therefrom and, as such, the disbursements of those appropriations will be gradual and subject the actual collections thereunder. No expenditure, pledge, or obligation of any such funds may be made until such time as the revenues are collected and received.

» **Reserve uses:** The Emergency Reserve, unallocated capital expenditures, healthcare investments reserve, technology reserve, milestones reserve, and economic incentive fund under the custody accounts of OMB and Treasury, respectively, as detailed in the FY2023 Certified Budget may not be used to cover any allocation or expense whatsoever without the prior, written approval of the Oversight Board.

» **The Emergency Reserve:** is intended to expedite response activities and, upon request, provide the Commonwealth agencies and affected local governments with capital in the event of an emergency of such severity and magnitude that effective response exceeds the capacity of current budget resources and federal disaster assistance is not available or not yet available to respond to the emergency. Moreover, the Emergency Reserve is intended for extraordinary events like natural disasters or as otherwise agree with the Oversight Board and that are generally outside of human control and unpreventable. The Emergency Fund is not intended to mitigate emergencies related to operational inefficiencies.

» **Contracts over $10 million:** the Oversight Board has enacted a policy that includes prior review of all contracts of $10 million or more, plus any others that the Oversight Board selects at any time. The objective of these reviews is to determine the extent to which the contracts promote market competition and comply with the applicable Fiscal Plan(s) and Certified Budget(s).

Financial Oversight Board of Puerto Rico

# Improving Fiscal Governance, Accountability, and Internal Controls

The Oversight Board has required reporting of the Government's financial and budgetary data to improve fiscal governance, accountability, and internal controls. The Certified Fiscal Plan outlines a comprehensive reporting framework, including reports that are required to be published or submitted by the Government.

A few highlights of the reporting requirements include, but are not limited to, the following:

- Monthly public reporting of Treasury Single Account liquidity, Component Unit liquidity, General Fund budget to actuals, PayGo balances, and public employee payroll, headcount, and attendance data
- Monthly and Quarterly budget to actual revenues, expenditures, and cash flows, together with a variance analysis of the Government during the preceding quarter
- Tax credits reporting, including a Tax Expenditure Report
- Measures and reforms monthly implementation reporting progress
- Quarterly reporting on budget variance consistent with modified accrual accounting
- Quarterly requirements to update revenue forecasts allowing for continual monitoring of performance and an ability to plan and react to changes in overall revenue sources
- Emergency Reserve monthly reporting including encumbered, expensed, and remaining balances
- Monthly CapEx budget to actuals, including encumbered, expensed, and projected CapEx expenditures as of year-end
- Monthly reporting of prior year General Fund approved Fund Extensions budget to actuals

The Oversight Board will continue working collaboratively with the Government to improve reporting, increase transparency, and enhance the public's access to information.



# PREPA

*Infrastructure Director **Alejandro Figueroa***

Fiscal year 2022 marked a pivotal year in the transformation of Puerto Rico's energy sector. It was the Island's first year in which LUMA Energy (LUMA), the transmission and distribution (T&D) system private operator, exercised full control of the T&D operation. The initial transition was not as smooth as it could have been. However, LUMA has brought about a number of improvements in its first year and is expected to continue to bring additional enhancements.

While LUMA has taken control of the T&D operation, the Puerto Rico Electric Power Authority (PREPA) remains a covered entity and continues to operate the legacy generation assets and oversee other legacy responsibilities (such as pensions). Until PREPA's generation operations are fully transferred to private operators, PREPA must continue to implement operational improvements to run a more sustainable and efficient system. PREPA has made modest improvements in its operational performance, driven mostly by the Oversight Board's continued and periodical oversight. PREPA has initiated procedures to improve workplace management and reduce overtime, conducted studies to identify obstacles preventing the optimal economic dispatch of its generation units, improved maintenance planning, and instituted policies aimed at promoting the use of competitive procurement processes for a majority of contracting needs (importantly, including fuel supply).

Notwithstanding, PREPA's main challenge continues to be an inability to execute on its operational improvement plans in a timely, coordinated, and cost-effective manner. PREPA also continues to struggle with excessive politicization and lacks the necessary impetus to diligently comply with its transformation responsibilities under Puerto Rico's public energy policy. PREPA needs to reduce its operational day-to-day footprint over time, as private operators step in to take control of the Puerto Rico energy sector. PREPA is also required to complete the segregation of its assets and remaining responsibilities. These initiatives, along oversight of a strong, independent regulator in the Puerto Rico Energy Bureau (PREB) form the backbone of the transformation of Puerto Rico's power sector. These critical shortcomings in the transformation efforts underscore the need to transition to experienced private operators.

## Areas in which PREPA made progress on some Fiscal Plan initiatives during FY2022:

» **Fuel Supply:** Completed a competitive procurement process to obtain the best available market prices for major fuel supply contracts (Diesel and Bunker C), which led to substantial savings in fuel adder costs as compared to prior contracts.

» **Generation P3:** Supported the procurement process for the Legacy Generation Public-Private Partnership (P3) by developing materials for and supporting the administration of the Request for Proposal (RFP) and bidder due diligence process for the Legacy Generation P3.

» **Renewables Procurement:** Completed the procurement of 18 solar Power Purchase Operating Agreements (PPOA) totaling approximately 845 megawatts (MW) of installed capacity from Tranche 1 of the Renewable RFP process established by PREB.

» **FEMA Funds:** Submitted over $200 million in generation projects to FEMA for approval.

## LUMA, as T&D System operator, made progress in the following areas:

» **Customer Service:** Reduced customer call-wait times by over 95% to less than one minute and increased customer accessibility to e-billing platforms with over a million customers registering on the electronic portal or downloading the LUMA app.

» **System Reliability:** Enhanced reliability over the last year, bringing outages down by 30%, according to the System Average Interruption Frequency Index.

» **Vegetation Management:** Cleared all substations of hazardous vegetation.

» **Pole Replacement:** Replaced over 3,000 failing utility poles.

» **Employee Safety:** Reduced OSHA DART Rate on safety issues and OSHA Injury Severity Rate by over 80%.

» **Distributed Generation (DG):** Addressed inherited backlog of DG project interconnection requests by approving over 30 MW of new rooftop solar and other DG systems.

» **Federal Funding:** Gained regulatory approval for 190 initial scopes of work representing $7.8 billion in federal funding.

Since the Oversight Board's inception, there have been a number of achievements marking progress in transforming Puerto Rico's energy sector. The Puerto Rico Power Sector Reform aims to provide Puerto Rico residents and businesses with access to sustainable, affordable, reliable, resilient, and customer-centric electric services. The Oversight Board has worked tirelessly to achieve this transformation and has been pivotal in a number of key achievements. Namely, the Oversight Board has ensured that regulatory reform takes place and has helped establish the presence of a professional and independent regulator (i.e., PREB) to oversee this power sector transformation and energy policy. Moreover, it has supported the transition of the T&D system to LUMA, continued to support the ongoing P3 process for the legacy generation operation, and strived to ensure the transition to renewable energy continues to progress through competitive procurement processes (including Fiscal Plan initiatives to that end and approving the first 18 renewable PPOAs during FY2022).

## Areas in which PREPA made limited progress during FY2022 include:

» **Power Sector Reform:** PREPA has failed to show substantive progress in completing the corporate reorganization and unbundling requirements as contemplated by Puerto Rico public policy and the Power Sector Reform. The reorganization, along with the creation of the unbundled subsidiaries and their respective operational plans, has not yet been completed. Following the conclusion of the legacy generation P3 and with additional Oversight Board support, the power sector reform and PREPA's transformation should continue to gain traction in the first half of FY2023.

» **Operations:** As Puerto Rico experienced generation shortfalls at some points during FY2022, PREPA should continue improving generation operations to ensure timely and on budget completion of key operational initiatives, including proactive maintenance programs.

» **Timely New Renewable Generation Procurement:** PREPA has been substantially delayed in conducting the procurement for and contracting with new generation. Doing so is necessary to meet Renewable Portfolio Standards target and comply with the PREB-approved Integrated Resource Plan to modernize power generation resources, ultimately increasing renewable energy generation. As a result, PREB designated an Independent Coordinator to conduct the following two tranches of renewable procurements.

» **Federal Funding:** While LUMA received a disbursement of the first FEMA monies of the award for Puerto Rico's electric system reconstruction, PREPA and LUMA were slow in effectively and efficiently deploying federal funds to enable the transformation of the generation portfolio and the T&D Systems.

» **Legacy Generation P3:** PREPA and other relevant stakeholders were also delayed substantially in completing the remaining procurement efforts to implement the transfer of operation and maintenance of PREPA's legacy generation assets to professional and independent private operators. The process is however slated to conclude in the first half of FY2023.

Despite the challenges and the growing complexity in the new energy sector environment, the Oversight Board engaged intensely with PREPA throughout FY2022, both to monitor compliance with transformation initiatives identified in the PREPA's Certified Fiscal Plan and to provide technical and substantive support in detecting problem areas, as well as identifying solutions and opportunities. This engagement involved, among other things, a series of quarterly reports that included budget-to-actuals, projected weekly cash flows, and Fiscal Plan measures implementation reports.

To supplement the quarterly reports, the Oversight Board holds periodic PREPA Fiscal Plan implementation meetings with PREPA's staff and advisors, which provide the opportunity to measure compliance with Fiscal Plan initiatives. Through these meetings, the Oversight Board's staff can work collaboratively with PREPA to identify the actions necessary to continue making progress towards PREPA's transformation and provide valuable feedback, based on expert knowledge and insight. Collaboration between the Oversight Board and PREPA was particularly effective during FY2022 in PREPA conducting a successful procurement process for fuel supply, among other notable achievements.



# PRASA

*Infrastructure Director* **Alejandro Figueroa**

Throughout FY2022, PRASA made marked progress in improving its fiscal position compared to its pre-hurricane (2017) and pre-financial crisis state. Since becoming a covered entity under PROMESA in 2016, PRASA has engaged in significant efforts to restructure its balance sheet by: (i) reprogramming its federal debt in July 2019, which reduced its annual debt service cost by approximately $373 million over the span of 10 years, (ii) settling a loan with the Government Development Bank Debt Recovery Authority in November 2020 for savings of $57.5 million, and (iii) refinancing $1.4 billion and $1.8 billion of PRASA's senior debt in December 2020 and August 2021, respectively. These events have resulted in total debt service savings of $918 million over the next 27 years. Collectively, these actions mark a major step forward in the transformation of PRASA's finances since becoming a covered territorial instrumentality under PROMESA.

A key focus of FY2022 was furthering collaboration between the Oversight Board and PRASA to continue PRASA's path of achieving fiscal responsibility and, equally important, to drive the much-needed operational improvements that PRASA requires, and Puerto Ricans deserve. As a result of such collaboration, on May 20, 2022, the Oversight Board recertified PRASA's Fiscal Plan that includes fiscal and operational reforms for the upcoming fiscal years FY2023-FY2027. The Certified Fiscal Plan expands on a path towards improving the quality, safety, and availability of water resources on the Island

by increasing the emphasis on PRASA's operational reforms, which in turn are expected to promote long term fiscal responsibility and long-awaited operational sustainability. Moreover, the Oversight Board worked in tandem with PRASA to certify its FY2023 Budget on June 8, 2022. During the FY2023 Budget process, PRASA accomplished a significant milestone in becoming the first covered entity to submit a balanced and compliant budget, without the need for the Oversight Board to issue a notice of violation.

PRASA made notable progress in key fiscal areas during FY2022, including:

» **Rate Adjustments:** During FY2022, PRASA implemented the last of five modest annual rate adjustments that started in 2018. This milestone was highlighted by rate increases across customer segments, which included modest increases of 2.5% for residential customers – representing less than a $1/month increase for small, residential PRASA customers (nearly 50% of all PRASA residential customers). In addition, during FY2022, PRASA completed a rate redesign study to assess the basis for the implementation of future, sustainable rate adjustments. As a result of the study, PRASA is undergoing a regulatory process that would allow PRASA to emulate top-tier water utilities by permitting the implementation of modest, annual rate increases that would enable the Authority to have adequate revenue levels to perform necessary investments in its system. Its Certified Fiscal Plan includes another set of preliminary rate adjustments based on the study's findings. The preliminary rate adjustments in the Certified Fiscal Plan are expected to generate $370 million in incremental revenues from FY2023 to FY2027.

» **Government Collections:** Improved collection rates from government accounts, which reached over 100% in FY2022. This high collection figure is a significant improvement in comparison to the start of the COVID-19 pandemic in mid-March 2020, when government collections dipped below 40%.

» **FEMA Funds:** PRASA has continued to make progress in successfully completing disaster recovery reimbursement applications, receiving an additional $37 million during FY2022 in FEMA funds in connection with the 2017 hurricanes. In January 2021, FEMA obligated $3.7 billion in Section 428 funds to cover large reconstruction and renewal of permanent works across PRASA's large system, bringing levels of investment and capital deployment to pre-Puerto Rico bankruptcy levels. To date, PRASA has been reimbursed with $16 million of the obligated Section 428 funds. While the receipt of Section 428 funds has been slower than expected, PRASA, FEMA, and Central Office for Recovery, Reconstruction and Resiliency, known as "COR3," expect to ramp up the reimbursement process in the upcoming fiscal year.

» **Other Federal Funds:** As a result of the federal debt reprogramming in 2019, PRASA has renewed access to low-interest loans and grants from its federal lenders (the U.S. Environmental Protection Agency and the U.S. Department of Agriculture) for qualifying regulatory capital works. Accordingly, to date (2019-2022), PRASA has received approximately $59 million in funds from the two aforementioned federal agencies.

While PRASA has recently stabilized its finances, and the debt restructuring procedures further promote fiscal sustainability by reducing debt service obligations, ensuring long-term fiscal responsibility will be dependent on PRASA achieving long-term operational sustainability. The majority of PRASA's efforts in the past have focused on addressing fiscal challenges with a low emphasis on operational deficiencies. PRASA's operational reforms require further attention as these reforms will promote long-term fiscal responsibility by improving the operational performance of the Authority. If the operational shortcomings are left unaddressed, PRASA's finances and operations will not be sustainable. Such a result would place an unnecessary burden on the well-being of Puerto Rico's residents and economy, both of which depend on reliable water supply and wastewater treatment.

The operational areas in which PRASA made limited progress during FY2022 and require further attention in upcoming fiscal years are the following:

» **Metering Optimization:** Prior Fiscal Plans (2019-2021) have called on PRASA to optimize its metering infrastructure. However, as a result of PRASA's improved financial situation and access to over $300 million in federal funds, in November 2021 (FY2022) the Public-Private Partnership Authority canceled its project for the optimization of PRASA's metering system and customer experience. As such, in January 2022 (FY2022) PRASA launched a two-phased procurement process to implement (1) metering pilot projects followed by (2) a five-year islandwide effort to replace the existing metering infrastructure. The metering pilot projects are scheduled to start in early FY2023. Once completed, the pilot project results will serve as the basis for the selection of the metering technology to be used in the five-year islandwide deployment. The metering optimization measure, as included in the Certified Fiscal Plan, is expected to improve the accuracy of customer billings, reduce water theft, and provide customers with real-time information on their water consumption patterns.

» **System Water Losses:** PRASA took meaningful steps in FY2022 regarding the physical water loss measure outlined in its Fiscal Plan. Specifically, in FY2022, PRASA was able to reduce overall water production by nearly 11%. This translates into increased water conservation efforts that yielded small

cost savings that were offset by other increased costs due to macroeconomic factors (i.e., inflation, supply chains, energy costs, etc.). Notwithstanding, the Certified Fiscal Plan requires PRASA to continue its efforts in ancillary activities, such as: (1) pressure management, (2) continuing with the calibration of the remaining water production meters, and (3) a more targeted leak detection program. These ancillary measures are expected to generate a cumulative reduction of 10% by FY2027 in PRASA's overall physical water losses that hinder the system's performance.

» **Electricity Expense Reduction:** Electricity represents the third largest operating expenditure (20% or $149 million/year) for PRASA. To mitigate its fiscal challenges, PRASA must pursue a more aggressive approach by reducing its system consumption and diversifying its energy resources. Doing so will allow PRASA to capitalize on the changing and more favorable conditions of Puerto Rico's transforming energy market. This approach may include, but is not limited to, non-capital-intensive measures and/or green energy co-generation alternatives that would both reduce operating costs and improve system resiliency. Specifically, its Certified Fiscal Plan requires the reduction of energy expenditures by increasing PRASA's share of low-cost renewable energy (e.g., solar) from nearly 2% to 6.7% of its total energy needs by FY2027.

To improve PRASA's operational performance going forward, its Certified Fiscal Plan calls on the Authority to implement key operational reforms on these items and more: (1) limiting physical water losses (non-revenue water), (2) metering infrastructure, (3) timely and on-budget capital delivery, (4) reducing electricity expenses, and (5) reducing chemical expenses. The last two operational reforms focus primarily on resource optimization (e.g., innovation of and more effective procurement of solutions). In addition, to make the necessary investments in maintenance and capital improvements, PRASA must focus on generating the incremental revenues through rate adjustments as included in its Certified Fiscal Plan. These reforms are critical to promote PRASA's solvency by achieving long-term operational success, protecting valuable water resources, and ensuring reliable and clean water and wastewater services for Puerto Rico residents – now and in the future.

Over the past fiscal year (FY2022), the Oversight Board worked closely with PRASA's management and its advisors to monitor PRASA's compliance with its Fiscal Plan and FY2022 Budget. This was achieved through a series of monthly reports that included budget-to-actuals, projected weekly cash flows, and Fiscal Plan measures implementation reports. These reports were supplemented by working sessions with PRASA's management to review and discuss the reported information. Since the beginning of the

COVID-19 pandemic (mid- March 2020), the Oversight Board has required PRASA to provide weekly updates on the state of its billing and collections.

For the upcoming fiscal year (FY2023), it will be critical for PRASA to implement the fiscal and operational reforms outlined in its Certified Fiscal Plan. Only by doing so will PRASA be able to operate within top-tier water utility standards in the provision of safe, reliable, and affordable water and wastewater services for the people of Puerto Rico.



# HTA

*Infrastructure Director* **Alejandro Figueroa**

Throughout FY2022, the Highways and Transportation Authority (HTA) made marginal progress on improving its fiscal position as the Authority seeks to finalize its exit from Title III through the restructuring of its current debt burden. Traffic volumes have recovered and exceeded pre-pandemic levels and the optimization of HTA's toll fare and fine collection system (through the introduction of electronic and mobile payments via the Auto-Expreso app) has led to significant improvements in HTA's ability to collect outstanding toll fares, while paving the way for HTA to restore toll fine collection.

During FY2022, HTA began addressing some of the key initiatives laid out in the Commonwealth's Certified Fiscal Plan in support of infrastructure reforms, and specifically with regards to transferring the Tren Urbano assets and operation to the Puerto Rico Integrated Transit Authority (PRITA). This includes the application of PRITA for the Federal Transit Authority (FTA) grantee status, and the transfer of transit asset and employees regarding the operation of PRITA. The Oversight Board acknowledges PRITA's efforts as the application to obtain the grantee status was formally submitted to the FTA on May 26, 2022. Obtaining FTA grantee status represents the initial step which paves the way for a unified and integrated public transportation system.

# HTA made some progress in key fiscal areas during FY2022, including:

» **Toll Fare and Fine Collection System**: HTA optimized its toll fare and fine collection system, with improvements to the Auto-Expreso mobile application. Although limited, these improvements have allowed HTA's FY2022 toll revenues to outperform budgeted levels by approximately 6% through the third quarter (Q3) of FY2022.

» **New Congestion Measures:** As of May 1, 2022, HTA introduced new congestion mechanisms that seek to motivate the public to ride-share or use public transport. For example, HTA constructed the dynamic toll lane (DTL) between Caguas and San Juan, along the PR-52 and PR-18 highways, which ultimately increases tolls for drivers during peak hours. While the DTL cost $130 million, HTA has observed the toll revenue generated by the DTL ($7.1 million) overperform target revenues of $4.0 million by over 75%, as of Q3 FY22. As laid out in the HTA Certified Fiscal Plan, the continued operation of this dynamic toll lane could generate – at a minimum – additional toll fare revenues of $22.6 million by FY2026 and $278.7 million by FY2051. The Oversight Board encourages these types of initiatives and will continue to support HTA as it plans to expand the existing DTL to the PR-30 and extend this route to the south of Caguas and Gurabo.

» **Toll Fine Collections:** With the ultimate goal of encouraging drivers to avoid penalties and comply with the payment of toll fares with early payment and other incentives, HTA has generated, as of Q3 FY22, $35.6 million in toll fine revenues, which surpasses forecasted levels in the HTA Fiscal Plan by over 20%.

» **Transportation Sector Reform:** PRITA's FTA grantee application and the transfer of transit asset and employees regarding the operation of PRITA is a significant step forward in the segregation and clear delineation of roles and responsibilities over transit assets, which should yield cost-saving and operational efficiencies.

» **Capital Disbursements:** HTA made notable progress in improving its rate of capital disbursements. HTA's capital performance to date in FY2022 (through Q3 FY2022) validates this progress, as hard cost spending for the Federal, Non-Federal, and Emergency Repair programs are 98%, 88%, and 103% complete when compared to planned hard cost disbursements.

These positives notwithstanding, on April 16, 2022, a cyberattack compromised HTA's toll system. This caused delays in toll fare collections for over a month and led the Authority, in an attempt to allow citizens to pay their outstanding toll fares in a timely manner, to suspend toll fine collections for the remainder of FY2022. The cyberattack has raised significant concerns regarding the vulnerability of HTA's toll system and its infrastructure, which has been operated by a temporary contractor since 2018. Although HTA intended

to appoint a temporary contractor only for an 18-month transition period while it initiated a process to select a permanent operator for all toll roads through a competitive procurement process, HTA has incurred in significant delays in the procurement process and has yet to contract a new permanent toll operator.

The non-implementation of this critical Fiscal Plan measure, despite the Oversight Board's insistence on its implementation, has exposed the toll system to external threats. Further, such an approach has delayed the installation of new, reliable systems by a new toll operator that would increase the reliability and speed of transaction processing, track toll violations more effectively, and ensure data collection complies with all relevant security protocols.

Meanwhile, as HTA's operations are normalized, the lack of implementation of other important revenue enhancement measures could undermine HTA's ability to maintain long-term operational sustainability, fulfill its debt obligations, and deliver much-needed capital improvement works for Puerto Rico's transportation system.

## The operational areas in which HTA made limited progress during FY2022 and require further attention in upcoming fiscal years are the following:

» **Toll Fares:** Most notably, HTA has not adjusted toll fares for HTA-owned toll roads since 2005. The HTA Certified Fiscal Plan calls for an 8.3% increase in toll fares, starting January 1, 2022, to catch-up with this 17-year gap as well as keep pace with inflation and the rising costs of maintaining roads and transportation assets. If HTA continues not to implement the measures for increasing toll fares, it would risk approximately $118 million in revenues by FY2026 and $3.2 billion in revenues by FY2051, as laid out in its Fiscal Plan. While the HTA Fiscal Plan supports scenarios where HTA may propose and implement alternate means or approaches for general toll revenues that would achieve the same level of aggregate revenue per year as those reflected in the Fiscal Plan, such scenarios would need to be validated and monitored for compliance with the HTA Certified Fiscal Plan and any requirements for debt service that may arise from an HTA restructuring agreement.

» **Other Revenue Fiscal Measures:** Other revenue fiscal measures that HTA continues to pursue but have experienced delays include (1) the maximization of ancillary revenues and (2) the competition for discretionary funding. The 2022 Certified Budget empowered HTA with the funds to pursue both by allocating resources for an ancillary revenues team, a grant management team, and soft costs necessary for competing for these funds. The Oversight Board will continue to support HTA throughout these efforts, as these funds will allow the Authority to make capital investments

in non-State of Good Repair projects to fulfill other strategic goals.

» **Toll Fine Supplementary Revenues:** The HTA Certified Fiscal Plan encourages a series of supplementary means that could additionally increase compliance with and the collection of toll fares. However, such measures have not been implemented by HTA. As laid out in its Fiscal Plan, HTA may increase toll fines in line with inflation and implement a tiered fine system that rewards early payment. Together, such an approach is projected to generate $41.4 million in additional fine revenue through FY2026. Fine optimization measures, along with the implementation of fine increases and a tiered fine system, are necessary to ensure operations are adequately funded, incentivize compliance and reward timely payment of fines.

» **Capital Projects Procurement:** HTA has experienced delays in its procurement processes of contractors and other providers to implement its capital program for future years, thereby slowing down its path to a State of Good Repair (SOGR) for all roads.

In addition to the above referenced fiscal measures, the HTA Fiscal Plan also highlights the enactment of the U.S. Bipartisan Infrastructure Law (BIL) (signed into law by President Biden on November 15, 2021). The federal law provides a historic and record amount of capital funding for the infrastructure network of Puerto Rico — both through increases to the Federal Highway Administration (FHWA) formula funding and through competitive, discretionary grant programs. As a result of BIL, FHWA funds for HTA will exceed the regular allocation, reaching an annual average of $232 million from FY2022 to FY2026. HTA's Capital Improvement Plan should prioritize investments to achieve and maintain a SOGR of roads and transit assets, instead of enhancements to existing road networks. HTA's willingness to deploy the full availability of its annual federal formula funding will be crucial in its role of bringing HTA's to a SOGR, as Puerto Rico is currently ranked 51 out of 52 for quality of roads in the United States.

Moreover, the HTA Certified Fiscal Plan importantly calls for HTA to lead and implement the necessary steps to transform Puerto Rico's transportation infrastructure, as laid out in the Commonwealth's Certified Fiscal Plan. Referred to as the Transportation Sector Reform (TSR), it places specific emphasis on the restructuring and separation of Puerto Rico's transportation assets, specifically transit assets already moving to PRITA and toll and non-toll roads. To achieve this objective, the HTA Fiscal Plan calls for the objective of maintaining toll roads and non-toll roads under HTA with a ring-fenced structure between these asset classes. Under this structure, HTA should assume construction and maintenance responsibility of toll- and non-toll roads with clear internal separation (legal, financial, and operational), by moving toll assets to a toll-road management office. The Oversight Board recognizes that the fulfillment of the TSR objectives will require a

joint effort from all parties and stakeholders to closely monitor progress and ensure full compliance with the established process.

During FY2022, the Oversight Board has taken numerous steps to support HTA in its implementation of the objectives laid out in the HTA Fiscal Plan. The Oversight Board expanded HTA's monthly implementation reporting to include more granular requests for information, providing numerous ways for HTA to share progress and raise concerns. Also, monthly implementation meetings were conducted, and included important stakeholders from other bodies such as FHWA, the Puerto Rico Fiscal Agency and Financial Advisory Authority, or third parties (e.g., operator of electronic tolling system), when necessary. These meetings provided a space for the Oversight Board and HTA to discuss implementation reports in detail and allowed the sharing of best practices and case studies with HTA to assist in implementation. Alongside these regular meetings, the Oversight Board was in constant communication with HTA. Staff members regularly responded to incoming reapportionment requests, monitored, and discussed toll collections and cash flows, reviewed contracts to ensure their compliance with applicable best practices, and worked proactively to identify potential liquidity issues at an early stage during the COVID-19 crisis and take preemptive steps to address them.



# UPR

*UPR, Pensions & COSSEC Director* **Maria Del C. López**

For the past century, the University of Puerto Rico (UPR) has built a rich legacy of education, research, and cultural contributions while serving as the Island's chief source of socioeconomic mobility. In the past fiscal year, UPR has continued to make some progress in the implementation of measures that are key to achieving fiscal balance. Some of these advancements include:

**Diversifying Revenue:** UPR made some progress by increasing the share of revenue represented by tuition and fees to 17% in FY2022. In addition, UPR reduced the share of revenue[4] from Commonwealth appropriations from 69% in 2017 to 44% in FY2022. Furthermore, Act 53-2021 provided UPR with additional funding for fiscal years 2023 through 2027, such that UPR's total funding each year is $500 million.

Additionally, the FY2023 Budget provides an additional $40 million in conditional funding tied to the achievement of two milestones. The first milestone requires the meeting of certain conditions regarding pension reforms:
>> Executing contract of Defined Contribution plan with service providers, and
>> Closing the Defined Benefit plan and implementation of a new Defined Contribution plan.

---

[4] Percentage of share of revenue from Commonwealth appropriations does not include one-time payments from federal funds (ARP, HEERF).

The second milestone – regarding administrative transformation – mandates UPR meet five requirements regarding the Pilot Program at the Aguadilla, Arecibo, and Utuado campuses. Specifically, the UPR Central Administration's Budget Office must:

» Certify the budgetary transfers between campuses, based on transferred, permanent-shared services participants and consolidated offices;
» Certify and execute the required transfers to achieve objectives defined in the "Exhibit I - UPR - Pilot Program - Master Summary - Unit Visit 021622" from 2022 104 data submission;
» Certify and execute permanent shared-services participants to achieve objectives defined in the "Exhibit I - UPR - Pilot Program - Master Summary - Unit Visit 021622" from 2022 104 data submission;
» Certify and execute consolidation of offices to achieve objectives defined in the "Exhibit I - UPR - Pilot Program - Master Summary - Unit Visit 021622" from 2022 104 data submission; and
» Submit a monthly implementation report with detailed progress on Key Performance Indicators by campus: transfers, shared-services participants, and consolidation of offices.

The achievement of these milestones will not only trigger the release of $40 million, but it will also have the positive effect of reducing costs which frees up cash for other priorities. Moreover, the funding related to the first milestone achieved must be dedicated towards accreditation needs.

**Improved Reporting and Communication:** The Oversight Board recognizes improvements in UPR's compliance with PROMESA reporting requirements and enhanced commitment to comply with the UPR Fiscal Plan. We recognize that the collaboration between UPR and the Oversight Board has improved substantially, and the results of these collaborations are seen through the provision of additional services to the Government as a result of Memoranda of Understanding (MOUs), additional identification of specific funding needs, and the allocation of resources where it is most needed. For example, priority to accreditation needs, funding for medical residents, improvements in student experience, and an increase in academic faculty and capital expenditures.

**Progress in Signing MOUs:** UPR has taken proactive measures to earn incremental self-generated revenue after signing several MOUs, which has benefitted UPR student experiences by allowing them to participate in and gain valuable experience in providing services to the Department of Education (PRDE) and other government agencies.
**Providing Services and Training to the Central Government:** The Oversight Board encourages the UPR to continue providing services and trainings to government agencies by ensuring an annual budget of $20 million. Accordingly, the UPR budget includes $10 million dedicated to servicing the PRDE and an additional $10 million to provide services to other government agencies.

UPR has provided services to PRDE consisting of tutoring services for students and training services for PRDE educators with the goals of improving student outcomes and expanding the skills and knowledge base of current employees.

Furthermore, the Oversight Board has agreed to other ad hoc partnerships with various other government agencies. UPR has provided trainings and technical services to other government agencies, including the Property Registry, where students and the Department of Justice worked to eliminate backlogs while also providing students with invaluable experience in the legal processes surrounding property registration. Additionally, UPR has partnered with the Department of State for the research and identification of all occupational licenses and to compare the requirements and process in Puerto Rico to the U.S. mainland. UPR has also partnered with the Permits Management Office to help improve the permit process. During FY2022, the Oversight Board supported the exploration of other initiatives, including potential services to the Planning Board, General Archive, the Puerto Rico Police Bureau, and the authority in charge of the local Re-Development of Roosevelt Roads and Puerto Rico Department of Transportation and Public Works.

**UPR Scholarship Funds:** During FY2022, Act 4-2022 was passed, also known as "the Scholarship Fund to Mitigate the Increase in Enrollment of the Fiscal Plan," which amends the Trust Agreement of the UPR Endowment funds to include the required articles for the transfer of the Commonwealth Scholarship Fund to the Endowment Fund. The first disbursement of $10 million is expected to be made during Academic Year 2022-2023.

Despite UPR's meaningful progress on some measures outlined above, there is still significant progress to be made in key areas (e.g., administrative shared-service implementation). The full implementation of all Fiscal Plan measures is required to achieve fiscal balance and are highly dependent on timely implementation. Indeed, UPR has already foregone some savings due to slow implementation (e.g., slow ramp up in graduate tuition increases and pension reform delays). The Oversight Board will continue to actively monitor progress and require UPR to submit regular reports on its progress toward full implementation.

Priorities outlined in the UPR Fiscal Plan focus on improving operations and increasing revenues, while maintaining the ability of all students to access and benefit from the improved university system.

**Administrative Transformation:** UPR's existing operating model creates unnecessary complexity and increases costs. UPR's existing system structure has led to high levels of duplication in administrative and academic leadership with redundant management structures (e.g., 11 separate chancellors, multiple academic department leaders per specialty) and overstaffed support functions due to separate offices for administrative functions on each campus (e.g., finance, HR). This has led to poor coordination among

campuses, making it challenging for students and staff to navigate the distinct campus bureaucracies. Similarly, UPR has long struggled with maintaining adequate central control of and transparency into campus finances.

UPR administrations dating back to 2014 have explored various models to achieve cross-campus synergies, though none have been implemented until now. UPR itself identified a number of specific organizational implications under consideration, including relocation of the faculty according to preparation and discipline of specialty; consolidation of faculties and academic departments within an enclosure; and relocation of faculties or schools and programs from one enclosure to another. Plans for administrative consolidation have most recently taken the form of a "hub" model, designed to accelerate use of shared services among campuses. The UPR Fiscal Plan explicitly encouraged scaling preexisting pilot initiatives - such as the shared category purchasing programs across the Arecibo and Aguadilla campuses - while also providing the UPR Administration time for internal management consideration to identify redundancies and create efficiency plans.

UPR is expected to conclude the implementation of its Shared-Services Model Pilot Program during FY2023, which contemplates the campuses of Aguadilla, Arecibo, and Utuado. The program establishes opportunities for collaboration between the units to maximize non-faculty resources across administrative offices, including economic incentives for participants. The Pilot Program is expected to be implemented by July 1, 2022, and completed by the end of FY2023. To complete the Pilot Program, it is necessary that UPR implements the objectives identified during FY2022 and establishes as action-items for the release of $20 million in conditional funding under the custody of the Office of Management and Budget. The milestones are designed to identify and cement the shared services between the campuses, including budgetary transfers from the campus receiving the services; ensure that the proper transfer is realized, and the consolidation of administrative offices are executed. The program is the first step towards a path of transparency and efficiency for the University.

**Pension Reform:** To avoid future insolvency and ensure pensions, UPR must choose between making the full amount of new required contributions and reducing the required contributions by implementing pension reform measures. During FY2022, UPR planned to implement pension reform by publishing Certification No. 106 2021-2022 to close the plan to new and non-vested members and to implement a Defined Contribution plan. The date of closing was extended from December 31, 2021, to October 31, 2022. Vested participants will continue to accrue benefits. This first step approved by UPR mitigates some of the increased insolvency and liability risk and is a step in the right direction. However, the funding of the plan remains at risk in the long-term considering that UPR would still be required to identify an approximately $62 million in new sources of revenue or a reduction in expenses to compensate for the incremental cost of required contributions for FY2022 until implementation.

The continued path to implementing the reforms will not be easy, but the Oversight Board will partner with all stakeholders to make this transition to a more efficient and effective operating model as seamless as possible for all who benefit from the institution. We have met and will continue to meet with students, professors, administrators, and the federal government on the aforementioned areas.

**Real Estate and Asset Mapping:** During FY2022, the Oversight Board has encouraged the UPR Asset Mapping Project by providing support, along with an Ernst & Young team, to help collect, assess, and document UPR's real estate inventory and data. In addition, these teams have developed data cleansing rules and methodologies with the goal of integrating the data into an interactive dashboard-visualization tool. This initiative will allow the UPR to have a uniform database that will allow for better reporting, visibility, and target optimization of its real estate throughout all campuses.



# CRIM

*Municipal Affairs & Legislative Review Director* **German Ojeda**

In 2016, the Municipal Revenue Collection Center (CRIM) was designated a covered territorial instrumentality pursuant to Section 101 of PROMESA. CRIM plays a vital role in supporting Puerto Rico's 78 municipalities in their economic and social development by ensuring an efficient process for collecting and distributing real and personal property taxes. The Oversight Board's goal in working with CRIM is to maximize property tax collections so that municipalities can fund essential services and meet their statutory and contractual obligations.

## Fiscal Plan Measures

To achieve its goal, the Oversight Board has been working with CRIM in the implementation of 11 measures contained in CRIM's 2022 Certified Fiscal Plan, certified on May 20, 2022, aimed at: (i) increasing tax revenues without increasing tax rates; (ii) broadening the tax base by adding previously untaxed properties; (iii) updating appraisals to reflect improvements to properties; and (iv) making it easier for property owners to pay taxes.

Although the implementation of some of these measures has been delayed, the Oversight Board and CRIM have developed remediation plans to address any obstacles and commence or expedite implementation.

## Act 29-2019

During FY2021, the Oversight Board worked closely with CRIM to ascertain compliance with the Title III Court's decision regarding Act 29-2019, pursuant to which the municipalities were ordered to repay $165.7 million to the Commonwealth in PayGo expenses and $31.6 million in healthcare costs. To pay off these debts, a repayment waterfall was developed and included in the CRIM and Commonwealth Certified Budgets Through the repayment waterfall's implementation, the debt was reduced to $20.2 million as of June 30, 2021. This debt reduction was achieved with minimal impact on the operational budgets of the municipalities, as the funds identified for the repayment waterfall were all unbudgeted nonrecurring revenues. CRIM prioritized monies collected through the implementation of its Tax Relief Program to settle the remaining Act 29-2019 debt. As of March 2022, the full amount of the Act 29-2019 debt had been paid off by the municipalities.

## Section 205 Recommendations

On August 26, 2020, the Oversight Board sent CRIM a letter under Section 205 of PROMESA providing broad recommendations to overhaul the Commonwealth's property tax system to improve its efficiency, effectiveness, and ultimately, tax collections. The Oversight Board will continue to work closely with CRIM in the development and implementation of these recommendations.

## CRIM's FY2022 Certified Fiscal Plan

FY2022 was a year of collaborative work between the Oversight Board and CRIM to ensure that both entities were aligned in the drafting of the Measures section of the 2022 Certified CRIM Fiscal Plan. CRIM requested the Oversight Board allow it to extend the deadline of the Measures, which will provide additional incremental revenues.

The FY2022 Certified CRIM Fiscal Plan included several additional Measures such as the development of a taxpayer Default Management Office (DMO) to assist taxpayers prior to default. The DMO will work with the regional offices, call center staff, and municipalities to improve collection efforts for the benefit of the municipalities, minimizing the buildup of their accounts receivable (A/R), accrued interest, and penalties.

## Tax Relief Program

The 2021 Certified CRIM Fiscal Plan required CRIM to valuate and sell its past due A/R Portfolio on or before June 30, 2022. After discussion between CRIM and the Oversight Board, CRIM implemented the project for the collection of past due debts in November 2021. CRIM implemented the project in accordance with the Regulation for the Benefit of the Taxpayer for the Payment of Debts (Tax Relief Program) approved by the Oversight Board for the purpose of collecting much of its past due debt without negatively

impacting its taxpayer base. The Tax Relief Program culminated on June 30, 2022. It allowed CRIM to successfully clean up its A/R and collect over $200 million in past due property taxes.

Proceeds from the Tax Relief Program have been set aside to first address prior debts held by municipalities such as the Act 29-2019 debt, and the 2001 and 2002 CRIM loans before disbursing the balance of the proceeds to the municipalities.

## Municipalities

On May 9, 2019, the Oversight Board designated all 78 municipalities of Puerto Rico as "covered territorial instrumentalities" under PROMESA.

The series of natural disasters that affected Puerto Rico since the fall of 2017 —including Hurricanes Irma and Maria, earthquakes, and the COVID-19 global pandemic— have had a significant impact on municipal finances by means of unexpected expenditures and reduced revenue streams. These events also affected the demographics of many municipalities, with younger, more productive people moving from inland municipalities to metropolitan areas or to the mainland United States. Such a dynamic prompts the need for municipalities to provide additional services to an older population while having less economic activity and revenues.

All 78 municipalities remain covered territorial instrumentalities under PROMESA, and the Oversight Board will continue to provide support to help improve the municipalities' fiscal responsibility, including through improved local revenue collection, more efficient spending measures, economic development, and maximization of federal funds through the launch of three municipal incentive funds supported in the 2021 Certified Fiscal Plan for Puerto Rico.

In FY2021, AAFAF launched the Municipal Services Consolidation Fund, which it continues to administer. This fund will support municipalities as they implement more efficient service models with a goal of reducing operational costs and/or increasing revenues. Two additional funds were created to support road and school maintenance services from Commonwealth agencies to municipalities. As of June 2, 2022, the Road Maintenance Fund has obligated approximately $9.3 million and disbursed $2.3 million of the $10 million of funds assigned.

Article 401 of Act 53-2021, known as the "Law to End Bankruptcy in Puerto Rico," established the Extraordinary Fund to address the collection and disposal of residuals and waste, and to implement recycling programs in municipalities. This new fund was created as a way for the Government to allocate some of the savings created from the Plan of Adjustment to municipalities. The Extraordinary Fund will be funded annually

from the equivalent of 42% of the amount collected during the prior fiscal year on the 1.03% State Redemption Fund Tax component to the property taxes for municipalities.

Act 53-2021 designated CRIM to establish the distribution formula of the Extraordinary Fund for municipalities, considering the following parameters: number of beneficiaries of the Nutritional Assistance Program per capita; functional budget per capita; appraised value of taxable property base per capita within territorial limits of municipalities; and the population of the municipality per square mile. For purposes of establishing a fair distribution, CRIM and its Governing Board agreed to incorporate the parameters, each with a weight of 25%. This appropriation may only be included in the budget for a fiscal year if the amount of Medicaid funds that were received during the prior fiscal year exceeded the projected amount of Medicaid funds for that prior fiscal year.



# COSSEC

*UPR, Pensions & COSSEC Director* **Maria Del C. López**

The cooperative banking system is an important part of the financial infrastructure of Puerto Rico. Co-ops provide access to financial services to more than 1 million cooperative members, mostly of the low-to-middle-income population.

To build a safe and resilient cooperative system aligned with regulatory best practices of the National Credit Union Administration and the Federal Deposit Insurance Corporation, the Corporation for the Supervision and Insurance of Cooperatives (COSSEC) needs stronger and independent governance. This, in turn, will allow COSSEC to responsibly exercise its dual role as a regulator and insurer of the cooperative system, as well as increase transparency in the cooperative system accounting and improve timely supervisory interventions.

The 2022 COSSEC Fiscal Plan highlights the history and contributions of the cooperative system and acknowledges COSSEC's progress in implementing certain elements of the earlier versions of its Fiscal Plan. This progress includes improving its supervisory interventions of insolvent cooperatives, deepening engagement with cooperatives' stakeholders, more proactively monitoring the systemic risk in the cooperative system by promoting routine exchange of reports and financial metrics and improving the management of COSSEC's budget. Although progress has been made, there is still

work to be done towards building a safe and resilient cooperative system aligned with regulatory best practices.

During FY2022, COSSEC worked collaboratively with the Oversight Board to align performance with its Fiscal Plan, leading COSSEC to successfully submit a compliant FY2023 budget pursuant to Section 202(e)(2) of PROMESA and reaching an important milestone.

In FY2023, the Oversight Board will continue to listen to and discuss with cooperatives all matters that are important to them. We look forward to COSSEC's continued implementation of the CCFP required milestones as it has been doing for the last three fiscal years, as these milestones are required to achieve the goal of a healthier and more sustainable cooperative system. We also look forward to COSSEC's advances in the area of digital and technological capabilities to protect cooperatives and to achieve the technological milestones that will enable the cooperative system to continue to reach all underserved communities.

Furthermore, the Oversight Board will continue to meet with stakeholders, including government representatives from COSSEC and other agencies, as well as groups and key entities from the cooperative system to receive input to further monitor COSSEC's Fiscal Plan progress and consider additional options to strengthen the cooperative system.



# Legislative Review

*Municipal Affairs & Legislative Review Director* **German Ojeda**

Section 204(a)(6) of PROMESA allows the Legislature to seek preliminary review from the Oversight Board regarding pending legislation. This, in turn, allows the Legislature to understand how legislative bills are measured against the Certified Fiscal Plan and Certified Budget and promotes knowledge transfer between the Oversight Board staff and the Legislature through written communications prior to a bill's enactment into law. During the review process, the Oversight Board and the Legislature have the opportunity to work collaboratively, and the Oversight Board provides recommendations on legislative bills in line with the Certified Fiscal Plan and Budget. For FY2022, over 75 legislative bills have been reviewed or are under review by the Oversight Board staff. Collectively, the impact of these bills exceeds $900 million annually, without offsetting savings or providing new revenues. In FY 2022 alone, approximately 85% of bills reviewed were inconsistent with the Certified Fiscal Plan.

## FY2022 Bills' Consistency with the Fiscal Plan



**Reviewed bills' consistency percentage with the Certified Fiscal Plan**

Senator Juan Zaragoza Gómez and his staff at the Senate Finance, Federal Affairs and Oversight Board Committee deserve immense credit for collaborating with the Oversight Board through their use of PROMESA's Section 204(a)(6) process. One major success includes working together to develop and enact local Earned Income Tax Credit legislation. The effort was truly collaborative and included various working sessions between multiple stakeholders over a period of two months. The Oversight Board seeks to expand these types of collaborations with all members of the Legislature for the benefit of Puerto Rico.

## Section 204(a) Review of Legislative Acts

On December 23, 2020, Judge Laura Taylor Swain ruled the Oversight Board properly challenged five laws (Act 82-2019, Act 138-2019, Act 176-2019, Act 181-2019, and Act 47-2020) under PROMESA, including Section 204(a). Judge Swain blocked the implementation of each of the five laws. After the Title III Court's decision, the Oversight Board and the Government reached an agreement on Act 181-2019. The Government also appealed Judge Swain's decision to the U.S. Court of Appeals for the First Circuit arguing that the Oversight Board acted "arbitrarily and capriciously" in objecting to the remaining four laws duly enacted by Puerto Rico's Legislature and signed into law by the Governor.

On June 22, 2022, the U.S. Court of Appeals for the First Circuit affirmed Judge Swain's decision blocking each of the laws. The First Circuit concluded that the Oversight Board acted within its authority under PROMESA in seeking to block the implementation of laws enacted by the Government.

In FY2022, the Oversight Board continued to engage vigorously in the review process pursuant to PROMESA Section 204(a), which requires the Governor to submit each law to the Oversight Board no later than seven business days after it is duly enacted by the territorial Government. The submission shall include a formal estimate of the impact, if any, that the law will have on expenditures and revenues, and a certification that the law is or is not significantly inconsistent with the applicable Certified Fiscal Plan.

The Oversight Board actively collaborated with the Government to ensure that the implementation of laws is consistent with the Certified Fiscal Plan. Recent examples include:

» **Act 136-2020:** Increases the base salary for public sector nurses and mandates that all eligible nursing personnel be compensated in accordance with the new salary scale established in the Act by July 1, 2022.

> ▸ The Oversight Board engaged in negotiations with the Government to find a fiscally responsible solution for the funding disparity affecting public-sector nursing personnel. As a result of such negotiations, sufficient funds were included in the FY2023 Commonwealth budget to cover the salary increases established in Act 136 during the six-month period prior to the inception of the Uniform Remuneration Plan on January 1, 2023.

» **JR 7-2022 and JR 18-2022:** Orders the Department of the Treasury to suspend for 45 days the Commonwealth excise tax on gasoline and diesel oil, up to $25 million. The Joint Resolutions also authorized the Joint Underwriters Association (ASC) to declare an extraordinary dividend of $50 million before June 15, 2022, subject to a one-time 50% tax on the dividend.

> ▸ The Oversight Board requested documentation showing that the $25 million tax payment from ASC was deposited in the General Fund. On June 30, 2022, the Treasury submitted to the Oversight Board the required documentation.

However, the Government continues to fail to comply with its obligations under PROMESA Section 204(a) to submit to the Oversight Board all laws together with a formal estimate of the impact of each law on expenditures and revenues, and a certification of compliance or non-compliance with the applicable Certified Fiscal Plan.

On July 2, 2021, the Oversight Board filed an action in Title III Court against the Governor, the Fiscal Agency and Financial Advisory Authority, the President of the Senate, and the Speaker of the House seeking to enjoin and nullify Act 7-2021 (Act 7).[6] Act 7 purported to consolidate the three primary public pension systems under one new entity, reinstate and preserve retirement benefits as defined benefit plans not subject to any reduction

---

[6] See Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi Urrutia et al., No. 21-ap-00072 (D.P.R. filed Jul. 2, 2021).

or freeze, and dictate the terms of a Plan of Adjustment for the Commonwealth. The Governor, in the Section 204(a) submission, admitted that Act 7 is significantly inconsistent with the Fiscal Plan. On October 13, 2021, the Title III Court declared Act 7 nullified, unenforceable and of no effect, and enjoined the defendants from implementing and enforcing the legislation.

## Section 204(b)(2) Review of Certain Rules, Regulations, Administrative, and Executive Orders

The Governor must also submit rules, regulations, administrative orders, and executive orders to the Oversight Board for review and approval prior to their issuance pursuant to the policy issued by the Oversight Board under Section 204(b)(4) of PROMESA. As contemplated by this section, the Oversight Board's policy is designed to ensure that no proposed rule, regulation, administrative order, or executive order is inconsistent with the applicable Certified Fiscal Plan. In FY2022 through the Legislative and Regulatory Review Office, the Oversight Board conducted a total of 54 reviews pursuant to its policy under PROMESA Section 204(b)(2), as follows: 29 regulations; 14 administrative orders; two executive orders; seven circular letters; and two rules. Of the total documents reviewed, 45 were approved, six were approved with conditions, and three were denied.



## FY2022 Regulatory Submissions

- Regulations 56%
- Administrative Orders 27%
- Executive Orders 4%
- Circular Letters 13%

**FY2022 reviews percentage following PROMESA Section 204(b)2**

# FY2022 Regulatory Determinations



**FY2022 determinations percentage following PROMESA Section 204(b)2**

The Oversight Board also collaborated closely with Government agencies in the review of regulations. For instance, it worked with the Department of Economic Development and Commerce in the review process for the approval of the Incentive Regulations, which adopt an administrative framework to implement Act 60-2019 – also known as the Puerto Rico Incentive Code – from initial application to the granting or denial of government incentives.

The Oversight Board also worked closely with Department of Natural and Environmental Resources in the review process for the approval of temporary tariffs for the processing and exportation of scrap tires, as the Government completes the statutorily mandated tariff study. Additionally, the Oversight Board participated in the review of the rules, policies and internal controls of numerous agencies – such as the Department of Education, the Department of Health, the Department of Justice and the Department of Labor and Human Resources – necessary for the adequate implementation of an automated time and attendance system linked to the payroll system as required in the Certified Fiscal Plan.



# Contracts Review

*General Counsel* **Jaime El Koury**

Through the Contract Review Office, the Financial Oversight and Management Board for Puerto Rico implements its Contract Review Policy, established pursuant to Section 204(b)(2) of PROMESA on November 6, 2017 (and as last modified on April 30, 2021). This Policy requires the Oversight Board to review and approve contracts with an aggregate value of $10 million or more that would be entered into by the Commonwealth or any covered instrumentality, as well as any other contract regardless of its value, at the Oversight Board's sole discretion, prior to execution. Accordingly, the Contract Review Office implements the Policy's objectives to ensure that proposed contracts: (i) promote market competition; and (ii) are not inconsistent with the approved Fiscal Plan.

Moreover, the Policy requires that contracting government entities submit to the Oversight Board a certification whereby their head or general counsel certifies that no person has unduly intervened, offered anything of value, or wielded any undue influence in connection with the awarding and execution of the contract. The Policy also requires that each contractor's Chief Executive Officer (or equivalent highest-ranking officer) submits a similar certification to the Oversight Board and discloses any sharing of compensation with any third party in connection with the same matters under penalty of perjury.

Finally, to comply with PROMESA's mandate of promoting fiscal responsibility, the Policy requires that government entities submit a fund availability certification for the

Oversight Board to verify whether the contracting government entity has sufficient funds in its Certified Budget to fully finance the proposed contract or amendment. After conducting its review, the Oversight Board issues a letter to the contracting government entity with its final determination. Letters are generally published on the Oversight Board's website to promote full transparency.

During FY2022, the Contract Review Office reviewed 285 contracts, with a total aggregate value of approximately $21.9 billion. Of the total contracts reviewed during this period, 274 were approved with observations, 10 were approved with conditions, and 1 was rejected due to its failure to promote market competition.

We highlight the following contract approvals as noteworthy achievements under the Policy: (i) the PREPA-PUMA Energy Caribe LLC Fuel Oil Purchase Contract (Puma Oil Purchase Contract); (ii) the Amendment to the Puerto Rico Innovation and Technology Service (PRITS)-Oracle Caribbean Inc. (Oracle) Technology Services Agreement (the PRITS Oracle Amendment); and (iii) the Puerto Rico Electric Power Authority (PREPA) Power Purchase and Operating Agreements (PPOAs).

On October 21, 2021, the Oversight Board approved the Puma Oil Purchase Contract after finding that it aligned with several objectives of PREPA's Certified Fiscal Plan and secured the supply of No. 6 Fuel Oil, which is necessary for the operation of the San Juan, Palo Seco, and Costa Sur steam plants. Notably, the Oversight Board required PREPA to conduct a market analysis and implement a competitive procurement process for the selection of a No. 6 Fuel Oil supplier. The Oversight Board found that the competitive procurement process, culminating in the Puma Oil Purchase Contract, produced an estimated 33% price reduction when compared to the previous supplier's fixed price differential, which is added to the commodity price. The Oversight Board's review also ensured that the contract was approved with language providing that it would not be binding upon a new operator, considering the ongoing request for proposals (RFP) process for the Operation and Maintenance of the Commonwealth's electricity generation assets required by PREPA's Certified Fiscal Plan.

Additionally, on December 14, 2021, the Oversight Board approved the PRITS Oracle Amendment to that certain agreement between PRITS and Oracle integrated and centralized Information and Technology (IT) infrastructures across various government entities. Before the centralization of IT infrastructures, 19 Government entities were independently negotiating contracts with Oracle for services related to purchasing processes, financial management, and human capital management. The consolidation of these agency contracts into a sole contract through the PRITS Oracle Amendment allowed PRITS to manage cloud service consumption and On-Premise licenses, while reallocating available resources, products, and subscriptions not used by participating agencies.

Through the PRITS Oracle Amendment, PRITS promoted compliance with Certified Fiscal Plan metrics by: (i) reducing expenses and improving reliability through data-center consolidation; (ii) rationalizing the application portfolio to ensure that government-wide resources are directed to the highest priority initiatives; (iii) improving transparency and accountability of IT expenditures across the Government and focusing on value for IT dollar spending; and (iv) developing a strategy to consolidate cloud services across the Government. In light of the centralization achieved through the PRITS Oracle Amendment and its role in promoting the Fiscal Plan objectives, the Contract Review Office recommended its approval.

More recently, on March 25, 2022, the Oversight Board approved 15 photovoltaic PPOAs, after finding that PREPA had conducted a competitive procurement process that incorporated recommendations from the Puerto Rico Energy Bureau and the Oversight Board. The Oversight Board also found that this competitive procurement process resulted in more favorable terms and savings of approximately $387 million over a period of 15 years, when compared to previous PPOAs that were directly negotiated. The approval of the PPOAs promoted compliance with PREPA's Certified Fiscal Plan's objective of procuring lower-cost renewables to replace fossil fuel generation and the legislative mandate which requires PREPA to increase its renewable energy portfolio to 100% by 2050.[7]

Moreover, as mentioned above, the Oversight Board conditionally approved several proposed contracts, or approved them with recommendations, to require the completion of new competitive procurement processes in compliance with PROMESA's mandate that the Oversight Board ensure proposed contracts promote market competition. Two prime examples of contracts that were approved with conditions are: (i) Amendment N to the Puerto Rico Highways and Transportation Authority's contract with Metric Engineering Inc.; and (ii) Amendment H to the Puerto Rico Aqueduct and Sewer Authority's contract with Insight Communications Corp. In both cases, the Oversight Board emphasized in its approval letters each government entity's failure to abide by procurement best practices and requested that they conduct and finalize a competitive process by a certain date. The Contract Review Office is committed to promoting procurement best practices in the Commonwealth and trusts that Puerto Rico will reap the benefits associated with observing them.

As to the contract that was rejected based on its failure to promote market competition, the Puerto Rico Department of Education (PRDE) and Camera Mundi LLC (Camera Mundi) intended to execute a purchase order for PRDE's acquisition of air purifiers for the Puerto Rico public school system at a value of $36.3 million. The PRDE identified the installation of air purifiers in classrooms as an urgent necessity for the process of

---

[7] Act 17-2019 requires the renewable portfolio to reach a minimum of twenty percent (20%) by 2022, forty percent (40%) by 2025, sixty percent (60%) by 2040, and one hundred percent (100%) by 2050.

reopening active public schools. However, the Oversight Board determined that PRDE's selection of Camera Mundi as the supplier of air purifiers for the Puerto Rico public school system was made through a deficient procurement process that failed to promote market competition. Specifically, the Contract Review Office found that the request for qualifications (RFQ) requirements established by PRDE were deficient, and that Camera Mundi's bid for the purchase order did not comply with all the specifications established in the RFQ. As such, upon determining the purchase order's failure to promote market competition, the Contract Review Office recommended its rejection on August 12, 2021.

In FY2023, the Contract Review Office has several objectives to further improve the Commonwealth's procurement policies and implement best practices in Government contracting. Such objectives include: (i) supporting the General Services Administration in assuming broad supervisory authority over all entities exempt of bidding processes under Act 72-2019; (ii) promoting centralized, systematic procurement processes for recurring municipal government services; (iii) promoting the adoption of standardized contract templates and the implementation of a uniform contracting policy applicable to all Government entities; and (iv) promoting transparency in the provision of recurring services by requiring clear and precise language in Government contracts. In furtherance of these objectives, the Oversight Board has proposed to the Commonwealth the creation of an office within agencies to monitor contracts after execution to ensure that services are provided in compliance with the contractual terms.

Finally, the Contract Review Office has the objective of promoting the implementation of Strategic Sourcing to optimize performance, minimize prices, and increase the achievement of socioeconomic procurement goals, which may result in significant savings to government spending.



# Ease of Doing Business

*Municipal Affairs & Legislative Review Director* **German Ojeda**

The Government of Puerto Rico has started to implement Ease of Doing Business (EODB) reforms in critical processes such as registering properties, obtaining permits and paying taxes. The pace has been slow, and progress has been too limited to achieve substantial improvements. A comprehensive plan has been developed to transform these processes from the end-user's perspective. However, these reforms will take several years to be completed.

Delayed implementation of these reforms has negatively affected the Island's forecasted Gross National Product (GNP). For example, permitting process and tax paying automation initiatives were equivalent to an expected growth of 0.1% of GNP by FY2023, while a 0.2% growth rate was estimated for the rest of the initiatives by FY2025. Tardy implementation of the initiatives has also delayed this impact by one year.

Progress on implementing the EODB reforms was previously measured through the World Bank Doing Business Report (WBDBR). Since the WBDBR for 2021 was not published, a report called Doing Business North America (DBNA) will be used to compare Puerto Rico with other jurisdictions. While data for Puerto Rico as a jurisdiction was unavailable, the necessary data from the Autonomous Municipality of San Juan was compiled for inclusion in the DBNA report. This report will be released in October 2022.

As economic activity slows, companies may look to shift supply chains back to the United States and other jurisdictions that have more proactively embraced rapid reforms to capture growth. Therefore, swift implementation of comprehensive reforms is particularly important to maintaining and improving Puerto Rico's ability to compete. In the aftermath of the COVID-19 pandemic, many businesses continue to face significant headwinds, underscoring the need to generate economic activity and attract new investments and new jobs across the Island. While delaying reforms will undermine Puerto Rico's ability to recover from the pandemic, failing to implement them fully will curtail the Island's ability to attract additional key investment that generates economic growth and development.

## Discover Puerto Rico

Discover Puerto Rico (DPR) became fully operational in early 2019, when it launched its first promotional campaign, and since then has played an important role in driving record tourism performance. DPR encountered one of its most difficult times in the aftermath of the COVID-19 pandemic, which had a massive impact on global tourism. Even though the leisure and hospitality industry was one of the hardest hit sectors in Puerto Rico, the tourism industry has been moving the needle of growth post-pandemic.

DPR has reported lodging revenues 35% higher than in 2019, with 16% higher demand and continuous growth in rental demand as per FY2022 data. In December 2021, DPR launched La Idea, a program designed to help tourism-related small and medium-sized enterprises (PYMEs) to create a stronger digital presence. This program could help more than 5,000 companies islandwide to increase their likelihood of consumer visits to their businesses.

## Invest Puerto Rico

During FY2022, Invest Puerto Rico (IPR) prepared to execute several strategies for attracting new investment to the Island. IPR developed and published its recurrent promotional plan, annual report and monthly Key Performance Indicators (KPIs) as required in the Commonwealth's Certified Fiscal Plan. Their efforts to attract investment generated a pipeline of approximately 4,988 in potential jobs and $270 million in capital investment. These potential jobs are considered high paying positions with an average annual payroll of $66,000 per person. Even though the agency has been able to reach its goals in leads and opportunities closed, the amount of investment attracted to date has not produced the expected jobs and capital investment.

In November 2021, IPR launched a national marketing campaign called "Game Changer, Welcome Home" using allocated federal CDBG-DR reconstruction funds. This initiative brought a higher flow of website visitors and several leads for the Commonwealth to work

on. Stronger investment promotions aligned with the Island's competitive advantages will also help ensure the Island can effectively compete with other jurisdictions for critical investment.

## Property Registry

Since the 2020 Fiscal Plan certification, the Property Registry (Registry) has averaged clearing 5,000 registered cases per month. This has helped reduce registry backlogs – the oldest dating back to the early 2000s – from 419,000 to 279,000 cases. In some sections of the Registry, the average time to complete a registration has been reduced to 15 days. These advances have been achieved through the support of performance dashboards, the establishment of performance goals for all employees, the creation of a new consolidated metropolitan office, and the deployment of a government internship program with students from the University of Puerto Rico (UPR) Law School. However, without systemic and procedural changes, work at this pace would require more than eight years to eliminate the backlog.

## Permits

As part of the efforts to reform the permitting process, a new front end platform was developed to make the Single Business Portal (SBP) more user-friendly and provide more interactive and intuitive ways to start the process of requesting a permit in the platform. The portal contains all the frequent tools needed by a proponent to request a permit (e.g., FEMA flood maps, digital real-estate registry, Planning Board zoning maps, the MiPR geodata program, and user manuals).

The Single Permit process, in effect since 2019, allows applicants to complete all documentation required in one permit process (provided the permit filing complies with all requirements, including zoning requirements). The implementation of this process was a significant improvement as it allows businesses to start operations while waiting for the required fire and health inspection to occur. Commencing in FY2022, renewal permits that are not attached to a business license requirement can be obtained automatically upon request. This improvement provides permit technicians and managers time to refocus their work on challenging cases.

In terms of construction permits, the Office of Permits Management (OGPe) has worked closely with the Puerto Rico Department of Natural and Environmental Resources to extend the scope of the classification list for the Environmental Categorical Exclusions. These changes have the potential to eliminate 90 days from the total permitting process timeline.

Despite the overall progress achieved, the permitting reform lacks substantial improvements. Transformative changes are required to create uniformity within islandwide permitting rules and estimated time to adjudicate permits. Creating a streamlined permitting system that allows businesses to start or restart activity quickly will be crucial to continued support of Puerto Rico's recovery.

## Tax Administration

The Puerto Rico Treasury Department (Treasury) has made important progress in digitizing and centralizing the tax filing process. Treasury has finalized a system upgrade focused on improving user experience to the latest version of the Internal Revenue Unified System (SURI). Treasury also improved the digitizing Sales and Use Tax (SUT) payments in SURI. These efforts have reduced the burden of tax filing and have helped filers reduce the time required to complete certain filings and payments (e.g., Form 480, SUT, corporate income taxes).

Other initiatives are still in preliminary stages, such as the establishment of a Tax Administration reform working group with a Private Sector task force and the implementation of a Tax Credit Management module. However, municipal and property tax filings and payments remain time-consuming and complex. Post-filing audit procedures are still particularly time-consuming and challenging to resolve, often involving multiple in-person visits to the Treasury Department or requiring filers to interface with multiple revenue agencies and mediums to comply with their tax obligation.

## Occupational Licensing

The Government has not enacted any professional licensing reforms to date. More than 140 professions are licensed by individual autonomous boards and supervised mainly by the Puerto Rico Department of Health (DOH), the Puerto Rico Department of State (DOS), the Puerto Rico Tourism Company, and the Puerto Rico Sports and Recreation Department. All licensing processing times vary and, even within single departments or agencies, procedures are not standardized.

Some actions have been taken to start improving the licensing process. The DOS has established a Collaborative Agreement with the Central Administration of the UPR, assisted by the DOH and 12 other agencies to research all the occupational licenses, requirements, and processes so the Island can (1) pursue simplification, consolidation, or elimination of licenses, and (2) create a basis for legislating a reduction in occupational license regulations.

Researchers joined the License to Work National Study of the West Virginia University, and the Knee Center for the Study of Occupational Regulations to compare and align Puerto Rico's licensing requirements with other jurisdictions. Continuing with these efforts could position the Island as an attractive relocation destination for offshore professionals.

## On-Island Freight

The deregulation of land freights would reduce transportation costs for Puerto Rico's business community. For nearly 100 years, the Federal Interstate Commerce Commission regulated land freights across the U.S., creating artificial price floors to support the railroad and trucking industries to protect them from competition. The elimination of those price floors reduced the cost of truckload-sized shipping costs by 25% between 1977 and 1982 alone.

On December 23, 2020, the Transportation and Public Services Bureau (TPSB) issued Circular Letter 2020-35 (Circular 2020-35), temporarily increasing the minimum inland transportation freights by 35% without identifying the impact to the economy. While Circular 2020-35 has been enjoined by the local Court of Appeals, the decision to enforce the increase in rates appears to have coincided with a new interpretation of Act 75-2017 that expanded TPSB's regulations across new segments of the economy, including manufacturing and retail. Indeed, this new interpretation of the law expanded regulation rather than deregulating land freights as required by the Certified Fiscal Plan.

The tariff rate in Puerto Rico, if widely applied and enforced, would result in an estimated per mile trucking rate between $5.55 and $7.51 per mile, based on the rate schedule contained in the recently nullified Circular 2020-35, more than double the U.S. mainland average per mile cost of $2.74. Indeed, the regulated rates in Puerto Rico are often at least twice as high as those in most U.S. regions. If Puerto Rico were to deregulate pricing within the trucking industry, it is expected that per mile rates would decline to a level more consistent with other U.S. regions.

The TPSB expanded its regulatory reach beyond the traditionally regulated segment of the market and started to enforce minimum tariffs for private carriers. The implementation of such tariffs to these carriers reduces Puerto Rico's competitiveness as a destination for investment, particularly for manufacturing companies considering relocation to the United States.

The Certified Fiscal Plan recommends the Government retract the extension of the tariff setting function of the TPSB to private contracts. The TPSB should maintain regulatory responsibilities over the previously covered segments of the economy that hauled cargo in spot transactions, without including private contracts. The competitive pricing

to transfer cargo on Island is ever more important in light of the U.S. Department of Transportation Air Transit Hub.

Puerto Rico is one of only two major U.S. jurisdictions that still regulates land freights and has no plans to eliminate this type of regulation. Regulated freights have reportedly decreased the quality of services rendered by carriers and shippers, and forced companies to hold additional inventory, all of which have increased the cost of doing business in Puerto Rico.[8]

---

[8] Advantage Business Consulting, "Progress Report on Deregulation of Land Freight Rates," 2016.



# Debt Restructuring



# Overview

The debt restructuring process under PROMESA reached a pivotal point in FY2022. For nearly six years, the Oversight Board has been working in good faith with all parties involved to end Puerto Rico's bankruptcy process and reduce its unaffordable debt to sustainable levels. By the end of FY2022, almost 90% of Puerto Rico's debt was restructured.

On January 18, 2022, the U.S. District Court for the District of Puerto Rico confirmed the Plan of Adjustment of the Commonwealth of Puerto Rico for about $33 billion in debt and other obligations, and about $55 billion in pension liabilities.

The confirmation concluded years of negotiations and mediation with various creditor groups and the Puerto Rico Government. The process was careful and deliberate, deeply affected by natural disasters in Puerto Rico and the global COVID-19 pandemic.

The Commonwealth's own obligations were the largest part of Puerto Rico's debt under Title III of PROMESA, the largest public sector bankruptcy in the history of the United States. Restructuring the Commonwealth debt was a significant accomplishment and a major step towards Puerto Rico's recovery from its fiscal crisis, bringing Puerto Rico closer to regaining access to capital markets, as mandated under PROMESA.
Further, the Oversight Board filed a proposed Plan of Adjustment in May 2022 to restructure about $6.4 billion of claims against the Puerto Rico Highways and Transportation Authority (HTA).

Working closely with the Commonwealth and consensually with creditors, the Oversight Board had already completed two restructurings involving more than $20 billion in public debt that had been issued by the Sales and Use Tax Financing Corporation (COFINA) and the Government Development Bank (GDB).

Meanwhile, the Government of Puerto Rico and the Puerto Rico Aqueduct and Sewer Authority (PRASA) had reached agreement in August 2019 with the U. S. Environmental Protection Agency (EPA) and the U.S. Department of Agriculture (USDA) to provide PRASA with significant debt service relief through a consensual modification of the terms of almost $1 billion in outstanding loans previously made to PRASA under U.S. Government programs.

PROMESA gives Puerto Rico an opportunity no U.S. state has: a formal process similar to municipal bankruptcy to reduce its debt to levels it can afford. The Oversight Board

and the supporting stakeholders have reached agreements that represent the best possible outcome given the difficult circumstances that Puerto Rico has had to manage for the past several years. Bankruptcy has been holding Puerto Rico back. The debt restructurings completed are critical steps towards ending Puerto Rico's fiscal crisis and providing stability, opportunity, and growth.

The Oversight Board will continue its work to complete Puerto Rico's bankruptcy process. By the end of the fiscal year, the Oversight Board was in active mediations to determine whether a consensual agreement can be reached with one or more classes of creditors of the Puerto Rico Electric Power Authority (PREPA) that could lead to a Plan of Adjustment for PREPA's $9 billion in liabilities.

# Completed Debt Restructuring

## Commonwealth Debt Restructuring

The Plan of Adjustment for the Commonwealth became effective on March 15, 2022, when the Puerto Rico Government completed the exchange of more than $33 billion of existing bonds and other claims into $7.4 billion of new bonds. The Plan of Adjustment further includes a $10 billion cash component paid on the effective date to financial creditors and to a multitude of Puerto Rico residents and other unsecured creditor groups.

The Plan of Adjustment was achieved only after significant litigation. The litigation was necessary and unsurprising because there were insufficient resources to pay creditors in full while also providing the Commonwealth and its residents a sustainable and worthwhile future. When creditors are asked to take material losses, litigation is normally required as it was here.

Eventually, the Oversight Board reached agreements with a diverse group of stakeholders – the Puerto Rico Government, its retirees, a group of public employees, and certain bondholders – to help Puerto Rico manage its debt in a sustainable fashion and to balance its budget. The Oversight Board and the stakeholders agreed it is time to heal, to build, and to grow this economy. Bankruptcy has taken a huge toll on the people of Puerto Rico, and the Plan of Adjustment allows Puerto Rico to turn the corner.

The Plan of Adjustment reduces the Commonwealth's outstanding debt by 80% and provides considerable security to future pension recipients by establishing a Pension Reserve Trust and allocating the largest part of any Commonwealth budget surplus in excess of the Certified Fiscal Plan for Puerto Rico projections to that trust.

The annual debt service declined from a maximum of $3.9 billion before the debt restructuring to a stable and affordable $1.15 billion after the effective date, saving the Puerto Rico Government more than $50 billion in debt service payments over the life of the restructured debt.

The Pension Trust is projected to be funded with more than $10 billion in contributions over the next 10 years to protect and preserve the Commonwealth's ability to pay retirement benefits to its current and future government retirees. The Pension Reserve Trust is designed to prevent Puerto Rico from repeating the mistakes of the past, when the Government ran out of funds to keep the promises it made to public employees.

The cash and debt consideration in the Plan of Adjustment provided a 27% average reduction for general obligation bondholders and a 21% average reduction for Public Building Authority (PBA) bondholders. The cash consideration for Employee Retirement System (ERS) bondholders provided an approximate 85% reduction. This Plan of Adjustment also includes a settlement with the holders of debt issued in 2011, 2012 and 2014, which the Oversight Board's Special Claims Committee had challenged in court.

The Plan of Adjustment includes a Contingent Value Instrument (CVI) that gives general obligation, PBA, and clawback bondholders incremental value only if Puerto Rico's economy grows more than projected in the Certified Fiscal Plan, based on potential outperformance of Puerto Rico's 5.5% Sales and Use Tax collections and, in the case of the Rum Tax CVI, additional outperformance on rum tax collections.

Incorporating the CVI into the Plan of Adjustment is one reason why the Oversight Board was ultimately able to reduce the debt by such a significant percentage. A major source of disagreement in the restructuring process was whether the Fiscal Plan projections were too conservative. The CVI provides creditors with the possibility of additional recovery if future results exceed projections.

Further, the Plan of Adjustment includes two sets of Capital Appreciation Bonds (CAB), which are bonds that pay no coupon. One set of payments to CABs are made from a fund the Certified Fiscal Plan set aside to pre-fund disaster recovery relief projects that will be reimbursed. Bondholders are paid once the Commonwealth no longer needs the disaster relief funds. The other CAB gets paid from amounts previously expected to be deposited in a debt service reserve fund that was removed from the final Plan of Adjustment.

The Plan of Adjustment provides a recovery of approximately 20% for the non-bond unsecured creditors' claims. They receive a lower recovery than bondholders because the bondholders had a claim to priority under their general obligation bonds, which claim was settled. The Plan of Adjustment also creates a mechanism for creditors below a certain claim threshold to receive a full recovery. Individual claims lower than $20,000, or if multiple claims are filed by the same claimant, below $40,000 in the aggregate, will receive payment in full as part of the "convenience class." Claimants holding claims above these thresholds also had the option to "opt in" to the convenience class and receive a recovery up to the thresholds, to the extent that doing so may result in a greater recovery.

After considerable negotiation, the Oversight Board agreed that the Plan of Adjustment would pay government pensions in full. However, it freezes the insolvent defined benefit plans of the Teachers Retirement System and the Judiciary Retirement System, shifts teachers and judges into defined contribution plans, and enables them to enroll in Social

Security for the first time. (The freeze provides a consistent retirement treatment for all active employees of the Commonwealth. Pension accruals for ERS participants were already frozen in 2013.)

The Plan of Adjustment includes nearly $10 million in $1,000 bonuses for government employees represented by the Public Servants United of Puerto Rico/AFSCME Council 95. Further, the Plan of Adjustment transfers more than $1.2 billion to restore employee contributions to Sistema 2000 that were used by previous governments and provides thousands of civil service employees up to $100 million in lieu of interest in their prior defined contribution accounts.

## COFINA Debt Restructuring

In February 2019, the Oversight Board completed the COFINA debt restructuring with the entry of the Title III confirmation order and the issuance of restructured new COFINA bonds. The COFINA restructuring resolved $18 billion in legacy bonded debt. Under the COFINA Plan of Adjustment, the par amount of legacy COFINA bonds was reduced by $6 billion and total debt service was reduced by 32%, saving approximately $17.5 billion that will now be available to the Commonwealth for delivering services to the people of Puerto Rico.

Moreover, almost 50% of COFINA revenues that previously belonged to creditors now goes to the Commonwealth's General Fund budget. The maximum annual debt service was reduced from $1.85 billion on the legacy COFINA bonds to $992.5 million on the new COFINA bonds. Even with these sharp reductions in debt payments compared to the legacy COFINA debt obligations, the COFINA plan had the support of all classes of COFINA creditors.

The new COFINA bonds are 100% fixed-rate debt and fully amortize over 40 years, which is the same term as the legacy COFINA bonds. The new COFINA bonds have no floating rate risk, nor do they require a future refinancing, thereby giving the government future budgetary certainty. In return, the new COFINA bonds have credit protections from ownership of a portion of the Commonwealth's islandwide Sales and Use Tax. The Oversight Board believed that creating a strong, but smaller and sustainable new COFINA sales tax credit would help restore Puerto Rico's access to the capital markets at reasonable interest rates.

Trading in the new COFINA bonds since their issuance suggests that the Oversight Board's restructuring of the COFINA bond credits achieved this goal. Dozens of the traditional municipal market investors whose investment will be crucial to Puerto Rico's future capital markets access have in fact re-entered the market for these new

COFINA bonds. All appeals of the COFINA confirmation order have been dismissed due to equitable mootness.

## GDB Debt Restructuring

The GDB debt restructuring was completed in November 2018 pursuant to PROMESA Title VI. The GDB had more than $4 billion in legacy bond debt and approximately $8 billion in total liabilities. These claims were resolved with the issuance of $2.6 billion in new bonds under PROMESA's Title VI procedure. Those bonds are mainly secured by the cash flow from loans GDB previously made to Puerto Rico municipalities and from other GDB assets.

The policy goals of the Oversight Board and the Government in the GDB restructuring were to ensure that these new bonds are payable solely from legacy GDB assets, without recourse to any future general government appropriations from the Commonwealth, and to cushion the financial effect of the GDB restructuring on the many Puerto Rico municipalities who also were creditors of GDB. Many municipalities had deposits at the GDB that were trapped in the agency's financial collapse.

As part of the restructuring, the municipalities were allowed to reduce their liabilities on their GDB loans by the full amount of their lost deposits. The new GDB bonds are only entitled to cash flow that the legacy GDB assets generate with no additional remedies.

There will be no "Event of Default" on the new GDB debt as long as future cash flows are applied to pay down the new bonds, even if that cash flow is insufficient to pay the new bonds' regularly scheduled principal and interest. GDB's legacy creditors agreed to a 45% reduction in face amount of their claim at par. Given the trading value of the new debt, the effective "haircut" to GDB creditors exceeded 60%.

## PRASA Debt Refinancing

In August 2019, the Oversight Board approved a consensual reprofiling of over $1 billion of existing State Revolving Funds with the EPA and Rural Development bonds with the USDA to PRASA.

This reprofiling saved PRASA nearly $400 million in the first 10 years, eliminated approximately $1 billion in guaranty claims against the Commonwealth, and restarted new federal funding from the EPA and USDA through various clean water programs over the next five years to support PRASA's ongoing effort to improve water quality and safety for the people of Puerto Rico. Moreover, this consensual reprofiling granted PRASA these significant benefits without putting PRASA through either Title III or Title VI.

In November 2020, the Oversight Board approved a refinancing of a portion of PRASA's outstanding indebtedness via a limited public offering that was priced and sold in December 2020. The refinancing generated gross savings of nearly $350 million or approximately $13 million per year. On a present value basis, savings were approximately $210 million.

Along with the same approval, the Oversight Board approved a resolution by PRASA and the Puerto Rico Fiscal Agency and Financial Advisory Authority with the Debt Recovery Authority (DRA), the successor-in-interest following the Government Development Bank's debt restructuring in 2018, to settle an outstanding loan for a $20.5 million payment. This represents a reduction of $57.5 million or 74% of the outstanding obligation inclusive of accrued interest.

In the summer of 2021, the Oversight Board approved a refinancing of a portion of PRASA's outstanding indebtedness via a limited public offering that was priced and sold in August 2021. The refinancing generated gross savings of approximately $570 million or approximately $21.9 million per year. On a present value basis, savings were approximately $360 million.

## PRIFA and CCDA Title VI Debt Refinancing

In January 2022, the U.S. District Court approved the Oversight Board's proposals for qualifying modifications of $1.9 billion of Puerto Rico Infrastructure Financing Authority (PRIFA) bonds and $384 million of Puerto Rico Convention Center District Authority (CCDA) bonds pursuant to Title VI of PROMESA.

The PRIFA modification reflects an estimated 90% reduction of claims and saves the people of Puerto Rico over $3 billion in principal and interest payments. The CCDA modification reflects an estimated 70% reduction of claims and saves over $500 million in principal and interest payments. If not for the Oversight Board's litigation, Commonwealth laws would have required the Commonwealth to transfer money to PRIFA and CCDA to pay all their debt in full with interest.

Bondholders of CCDA and PRIFA held certain asserted clawback claims against the Commonwealth for monies historically conditionally appropriated to CCDA and PRIFA. The debt modifications reflect the agreement CCDA and PRIFA bondholders reached with the Oversight Board to settle their asserted clawback claims in the Commonwealth Plan of Adjustment, which the court confirmed on January 18, 2022, and finalize terms of a restructuring of the PRIFA and CCDA bond indebtedness.

# Ongoing Debt Restructuring

## HTA Debt Restructuring

On May 2, 2022, the Oversight Board filed the proposed Plan of Adjustment to restructure about $6.4 billion of claims against the HTA.

The proposed Plan of Adjustment cuts HTA's outstanding debt by more than 80%, to $1.2 billion, saves Puerto Rico more than $3 billion in debt service payments and enables HTA to make the necessary investments to improve and maintain Puerto Rico's roads and other transportation infrastructure.

Holders of about $4.2 billion in HTA bonds had agreed in May 2021 to receive $1.2 billion in new bonds issued by HTA at 5% interest and $389 million in cash, inclusive of restriction fees and consummation costs – a cut of over 70%.

The Plan of Adjustment requires HTA to implement the comprehensive reorganization defined in the HTA Certified Fiscal Plan. HTA must separate construction and maintenance responsibility of toll- from non-toll roads by establishing a Toll Management Office exclusively responsible for toll-roads and transferring Tren Urbano to the Puerto Rico Integrated Transit Authority. Regular fare increases are necessary to ensure HTA's ability to cover its expenses and to provide adequate and continued maintenance.

The Plan of Adjustment further settles about $2.2 billion of outstanding loans held by the DRA, which receives no consideration under the HTA plan but receives a CVI issued under the Commonwealth Plan of Adjustment. The CVI is based on potential outperformance of Puerto Rico's 5.5% Sales and Use Tax collections relative to projections in the Certified Fiscal Plan for the Commonwealth of Puerto Rico.

In addition, the Plan of Adjustment reduces $265 million in unsecured claims to $25 million to be paid in cash. The plan includes a $314 million loan by the Government of Puerto Rico to HTA to facilitate the cash payments required by the plan, repayable over 30 years at 2.50% interest.

## PREPA Restructuring Support Agreement

In May 2019, the Oversight Board and the government entered into a Restructuring Support Agreement (RSA) with a substantial majority of PREPA's uninsured bondholders and all monoline insurers of PREPA's bonds to restructure PREPA's legacy debt.

Governor Pedro Pierluisi terminated the RSA on March 8, 2022. The Oversight Board supported the Governor's decision. The Oversight Board had its own contractual right to terminate the RSA if the Governor had not done so.

The implementation of the RSA through a Plan of Adjustment for PREPA required legislation. The Puerto Rico Legislature did not adopt the required legislation and stated it would require changes to the RSA. The Legislature unfortunately rejected some of the key terms of the RSA as unacceptable. The Oversight Board is now in mediation to determine if a new resolution with one or more stakeholders is possible.



# Title V



# Title V

Congress added Title V to PROMESA because Puerto Rico desperately needed a revitalized infrastructure. To facilitate private investment in infrastructure, Title V created the Revitalization Coordinator (RC) position to review private infrastructure projects for consideration as Critical Projects. If the Oversight Board agrees with the RC that a project is a Critical Project, it is entitled to expedited local permitting.

In 2017, the Government adopted accelerated permitting procedures independent of Title V. Then the devastation of Hurricane Maria made Puerto Rico's infrastructure needs all the more urgent. Not only did Puerto Rico's electric infrastructure collapse in the wake of the hurricane, but also its roads, aqueduct and sewers system, housing, and other infrastructure assets.

During this past year, the demand for expedited permitting pursuant to Title V has been minimal. Historically, projects that came into the pipeline were primarily related to the Puerto Rico Electric Power Authority (PREPA). However, all the PREPA contracts needed to first either be approved or rejected in the Title III court. It was only in early June 2020 that PREPA announced the next steps for the Power Purchase Operating Agreement (PPOA) contracts. Further, in early 2022, the first of six competitive procurement tranches ordered by the Puerto Rico Energy Bureau to reach compliance with Act 17-2019 concluded, resulting in the selection of 18 renewable generation projects, which were approved by the Oversight Board in March 2022.

The Oversight Board expects that the demand for Title V projects will grow as PPOA contracts and new renewable generation projects are put in place. The Oversight Board is hopeful that as the business environment continues to improve, there will be more private sector investment seeking to take advantage of Title V. To ensure the Oversight Board is prepared to manage the renewed demand, the Board is currently in the process of hiring a full-time RC.

## Current Oversight Board Policy for Critical Project Processing (CPP)

On July 31, 2018, the Oversight Board adopted a Title V Policy that helped further specify procedural requirements the RC must follow when considering potential critical projects. The Title V Policy clarifies requirements for projects that involve doing business with any government agency or public corporation, especially, energy-related projects that require a PPOA. All projects that require obtaining a contract or Request for Proposal (RFP) award from any government agencies or public corporations must obtain such contract or RFP award prior to the project submission through Title V. In the case of

energy-related projects, projects that require a PPOA must be validly assumed under Title III of PROMESA in order to satisfy the contract award requirement.

The Title V Policy of July 31, 2018, gave way for the RC to focus efforts on projects that had obtained valid contract awards or RFP awards, and other projects, such as private-to-private or with a municipal government.

## Critical Projects Process (CPP) Status Report

By the beginning of FY2019, the RC had evaluated 55 projects totaling an excess of approximately $9 billion. Upon adoption of the Oversight Board Title V Policy as of July 31, 2018, active projects had to be withdrawn from participation or placed on hold (at project sponsor's discretion) since approximately 80% were energy-related, requiring a valid PPOA assumed under Title III and the remaining 19% (approximate) required a government RFP or similar. One percent (1%) constituted a qualifying project (Viewpoint of Roosevelt Project), which was real-estate related, and a rejected project that did not meet initial requirements. Nevertheless, many energy-related project sponsors continued to negotiate their contracts with PREPA through the respective process and demonstrated interest in reactivating their project submission upon successfully complying with the Oversight Board Title V Policy.

Several factors have been cited by project sponsors and/or noted by the CPP team:

- » The expected flow of infrastructure projects under federal CDBG-DR program has not materialized.
- » The Government is still in the process of effectively managing proposals for infrastructure projects.
- » Most infrastructure projects are currently publicly funded via FEMA, CDBG or other funds, minimizing private sector projects.

## Revitalization Coordinator Vacancy

PROMESA appoints the RC as an intermediary, first line evaluator, and process driver of the CPP. Pursuant to Section 503(a)(1) of PROMESA, projects are submitted to the RC for consideration and review. As mentioned above, the Oversight Board is currently in the process of hiring a full-time RC.



# Oversight Board Activities



# Litigation

## Aurelius Litigation

On August 7, 2017, almost one year after Oversight Board members' appointments, Aurelius Investment, LLC (Aurelius), a hedge fund that invested heavily in distressed Puerto Rico bonds, moved to dismiss the Title III case the Oversight Board had initiated on behalf of the Commonwealth under PROMESA. Aurelius argued the Oversight Board members were appointed in a manner that violated the Constitution's Appointments Clause. Assured Guaranty Corporation (Assured), a municipal bond insurer, and the Electrical Industry and Irrigation Workers Union (UTIER), a labor organization that represents employees of the Government-owned Puerto Rico Electric Power Authority, also filed adversary complaints challenging Oversight Board members' appointments on the same grounds. The Oversight Board opposed the motions on the ground that Oversight Board members are territorial officers, not "Officers of the United States" subject to the Appointments Clause (U.S. Const. art. II, § 2, cl. 2). The United States joined the Oversight Board in defending the constitutionality of Oversight Board members' appointments, as did the Puerto Rico Fiscal Agency and Financial Advisory Authority (AAFAF), an independent fiscal entity within the Government of Puerto Rico, and several creditor groups and labor unions.

The district court, Judge Laura Taylor Swain presiding, denied Aurelius' motion to dismiss and dismissed Assured and UTIER's adversary complaints, holding that the Appointments Clause did not govern Oversight Board members' appointments because they were territorial officers, occupying offices created pursuant to Congress' Article IV authority over the territories (U.S. Const. art. IV, § 3, cl. 2) and exercising duties limited to Puerto Rico. Aurelius, Assured, and UTIER appealed to the First Circuit. That court (Judges Torruella, Kayatta, and Thompson on the panel) reversed, holding Oversight Board members were "Officers of the United States" requiring Senate confirmation under the Appointments Clause. Rather than dismissing the Title III case, however, the court of appeals accorded de facto validity to the Oversight Board's prior actions based on the de facto officer doctrine. The court also stayed its mandate pending final disposition in the Supreme Court. As a result, the Oversight Board was able to continue operating during the pendency of the proceedings in the Supreme Court.

Both the Oversight Board and the United States filed petitions for certiorari in the U.S. Supreme Court seeking review of the First Circuit's Appointments Clause holding. Aurelius, Assured, and UTIER also filed certiorari petitions, seeking review of the First Circuit's de facto officer holding. On June 20, 2019, the Supreme Court granted certiorari on both questions and expedited briefing and argument. Argument took place on

October 15. In an abundance of caution, on June 18, 2019, the President nominated the current Oversight Board members to serve in their current positions and requested Senate confirmation. The Senate did not act on the nominations.

On June 1, 2020, the Supreme Court, in an opinion by Justice Breyer, unanimously upheld the Oversight Board members' appointments. The Court held that the Oversight Board members are not "officers of the United States" whose appointments are governed by the Appointments Clause. Instead, Oversight Board members are territorial officers because their authority under PROMESA is "primarily local"—that is, the Oversight Board's responsibilities and authorities are focused on Puerto Rico, rather than the nation as a whole. Justice Thomas concurred in the judgment; he would have applied a slightly different test for territorial officer status, under which the Oversight Board members are also territorial officers. Justice Sotomayor also concurred in the judgment to address an argument that no party had made—namely, that Puerto Rico's status as a self-governing territory might limit Congress' authority to establish territorial officers for Puerto Rico.

The Supreme Court's decision puts to rest any Appointments Clause-related challenges to the validity of the Oversight Board's past actions, and also establishes that the Oversight Board members need not be nominated by the President and confirmed by the Senate.

## Ambac Litigation

On May 26, 2020, Ambac Assurance Corporation sued in the Title III court challenging the constitutionality of Title III of PROMESA, on the ground it violates the uniformity clause of Article I, Section 4 of the United States Constitution. The Oversight Board moved to dismiss the action. Ambac voluntarily dismissed the suit in March 2022.

## Act 29-2019

On July 3, 2019, the Oversight Board filed a complaint against then-Governor Ricardo Rosselló and AAFAF, challenging Act 29-2019 (which eliminates the obligation of municipalities to reimburse the Commonwealth for pension payments to municipal retirees and to make payments to the Commonwealth's health plan) as well as 23 joint resolutions. Specifically, the complaint alleges that Act 29-2019, including its enactment and enforcement, violates PROMESA Sections 204(a), 204(c) and 207. The Oversight Board further sought nullification of Act 29-2019 and the 23 joint resolutions as violations of PROMESA Section 108(a) because they impair and/or defeat the purposes of PROMESA, as determined by the Oversight Board. Finally, the Oversight Board sought permanent injunctions against the Governor and AAFAF compelling them to submit outstanding PROMESA Section 204(a) certifications and declaring the Governor's policy of not

providing timely certifications for newly passed legislation under PROMESA Section 204(a) as a violation of PROMESA Section 108(a)(2).

On August 22, 2019, the Title III court, Judge Swain presiding, denied Defendants' motion to dismiss in its entirety. On December 13, 2019, the Oversight Board moved for summary judgment on each of the counts in the complaint, and the Title III court heard oral argument on March 5, 2020.

On April 15, 2020, the Title III court granted the Oversight Board's motion for summary judgment on five of the eight counts. Specifically, the Title III court imposed permanent injunctions on the enforcement of Act 29-2019 and the 23 joint resolutions pursuant to PROMESA Sections 204(c), 204(a), and 108(a)(2). The court held Act 29-2019 and the 23 joint resolutions effectuate a reprogramming outside of the Certified Fiscal Plan and Certified Budget without the Oversight Board's approval, in violation of PROMESA Section 204(c). The court found that Act 29-2019 and the 23 joint resolutions are unenforceable and of no effect. The Title III court also held defendants did not comply with the procedures required by PROMESA Section 204(a) regarding the passage and enactment of new legislation and defendants' formal estimate, purporting to detail the cost of Act 29-2019, was facially noncompliant. Notably, the Title III court held Act 29-2019 and the 23 joint resolutions are also invalid under PROMESA Section 108(a)(2), finding that the Oversight Board's determination that the laws defeat and/or impair the purposes of PROMESA is entitled to deference under an arbitrary and capricious standard of review.

The Title III court denied summary judgment on the remaining counts. The court declined to address the Oversight Board's motion for summary judgment for its PROMESA Section 207 claim, finding it to be moot as the relief requested—a finding that Act 29-2019 was unenforceable and of no effect—had already been granted in connection with the Title III court's rulings on the other counts asserted by the Oversight Board in its complaint. The court found issues of fact precluded the entry of summary judgment for the Oversight Board on its claim that the Governor's failure to provide timely PROMESA Section 204(a) certifications constituted a policy that violated PROMESA Section 108(a)(2). The deadline for defendants to appeal the April 15, 2020 decision has passed, and this ruling is now final. Accordingly, in October 2021, the parties voluntarily dismissed the remaining claims in this proceeding.

## Act 80-2020

Act 80-2020, known as the Incentivized Retirement Program and Justice for Our Public Servants Act, was enacted in August 2020 and would allow eligible employees of the Government of Puerto Rico to voluntarily opt for incentivized separation from their employment before retirement age. Act 80-2020 is available to employees of the Government of Puerto Rico who entered the Employee Retirement System (the

"System" or ERS) under Act 447 of 1951, as amended, known as the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico Act ("Act 447-1951"), before April 1, 1990; did not opt to participate in the Retirement Savings Account Program; and have earned a minimum of 20 years under the System as of June 30, 2017. Similarly, the program offers an early retirement opportunity for employees of eligible agencies, pursuant to Article 4(b) of Act 80-2020, who entered the System under Act 1 of 1990, as amended, ("Act 1-1990"), between April 1, 1990, and December 31, 1999; had not opted to participate in the Retirement Savings Account Program; and have earned a minimum of 15 years under the System as of June 30, 2017.

The incentives, both for employees under Act 447-1951 and Act 1-1990, include a lifetime retirement pension equivalent to 50% of their highest yearly gross remuneration earned during any of the last three years prior to the time they enter the Act 80-2020 program; a monthly employer contribution of $100 to the medical plan selected by the participant until age 62; and the liquidation of sick leave and vacation leave accrued up to the date of separation from service to participate in the Act 80-2020 program, in accordance with the limits established by the applicable legislation and regulations, tax free. Likewise, the participants may apply for the disbursement of the benefits from the contributions they have made to the new Defined Contributions Plan, in accordance with the provisions of Article 8 of Act 106 of 2017 ("Act 106-2017"), as amended.

To pay for the new benefits, the Government proposed that it would freeze all positions vacated by retirees with the possible exception of "vacant positions that are determined to provide essential services for the operation of the agency." In conducting its own analysis, the Oversight Board determined that the Government's reports substantially overstated Act 80-2020's savings. In total, the Oversight Board estimates Act 80-2020 could potentially cost as much as $4.2 billion. The Oversight Board estimates the incremental cost on the Commonwealth's Certified Fiscal Plan alone could be as much as $2.2 billion. The Oversight Board's analysis shows Act 80-2020 will result in an overall cost increase unless the Government makes significant and permanent reductions in headcount and compensation for its workforce – above and beyond those required by the Commonwealth's Certified Fiscal Plan.

The Oversight Board advised the Government that if the Government wishes to proceed with implementation of Act 80-2020, it must present a substantive program, to which the Oversight Board can hold the Government accountable, by which Act 80-2020 (i) would not impose net costs incremental to the Fiscal Plan, and (ii) would be implemented in a fiscally responsible manner that ensures adequate essential services. The Government has advised that it will not implement Act 80-2020 until an agreement is reached with the Oversight Board.

The Government has since provided preliminary analysis demonstrating that the implementation of Act 80-2020 would increase costs in the vast majority of the agencies, public corporations, and municipalities but that some employers may be able to achieve savings. The Oversight Board subsequently reviewed the analysis and, in a letter dated June 22, 2021, identified conditions under which a selective application of Act 80-2020 could be implemented, although it noted that currently Act 80-2020 does not allow for selective implementation.

On December 20, 2021, the Oversight Board filed a complaint against the Governor of Puerto Rico, AAFAF, the ERS Administrator, the Executive Director of the Government of Puerto Rico Retirement Board, and the Office of Management and Budget (OMB) Director seeking to nullify and enjoin enforcement of Act 80-2020, Act 81-2020, Act 82-2020, and Joint Resolution 33, a measure requiring the Commonwealth to implement, at least partially, Act 80-2020. After the filing of the complaint, the parties entered into a stipulation invalidating Acts 80-2020, 81-2020, and 82-20202 and Joint Resolution 33 but agreeing to continue discussions with respect to implementation of possible alternatives to Acts 80, 81 and 82 that are consistent with the Fiscal Plan. On December 28, 2021, the Title III court entered the parties' Stipulation as an Order resolving the adversary proceeding. The Order provides a process for exploring whether Act 80-2020 can be salvaged, by agreement, to achieve real cost savings above and beyond the savings already required by the Certified Fiscal Plan.

On February 11, 2022—the deadline for the parties "to concur on a means of implementation"—the Government submitted some data to the Oversight Board, but that information was incomplete. In an effort to accommodate the Government's desire to continue exploring the possible implementation of some benefits provided by Act 80-2020, the Oversight Board agreed, on February 16, 2022, to file a joint informative motion with the Government requesting an additional 120 days to reach an agreement, if possible. In that motion, the Government stated, "it is still compiling the information and performing its analysis concerning the Proposed Eliminated Positions and Savings, as set forth in paragraph 3(a) of the Order."

On March 1, 2022, the Oversight Board sent a letter detailing the deficiencies in the Government's February 11 submission and proposing a timeline for the conferral process. The Oversight Board also requested that the Government advise the Oversight Board of its timeline for providing the necessary data and analysis. The Government's response, dated March 6, 2022, was not responsive to the Oversight Board's requests.

On March 14, 2022, the Oversight Board informed the Government that its March 6, 2022 submission failed "to provide a timeline for the Government to furnish the two data sets" required by the Order and that the Government has "not fulfilled its most basic obligations" under the Order. The Oversight Board notified the Government that if the

Government did not provide to the Oversight Board the information specified in the Order by March 28, 2022, the Oversight Board would have no choice but to conclude the Government is unwilling or unable to comply with the Order. The Government subsequently provided some—but not all—of the required information on March 28, 2022.

After reviewing the information, the Oversight Board sent a letter dated May 6, 2022 concluding the information continues to fall short of the requirements set forth in the Order to attempt to reach agreement on a method for implementing part of Act 80-2020. The Oversight Board sent a subsequent letter dated May 21, 2022, stating that, to the extent the Government wants the Oversight Board to consider additional information, the Government must provide all such information to the Oversight Board no later than May 24, 2022. The Oversight Board also informed that, if no further information is provided by such date, it would inform the Title III court no later than June 11, 2022 that no agreement was reached with the Government.

On May 24, 2022 the Government issued a letter with accompanying data. The Oversight Board responded via letter dated June 3, 2022, stating, among other things, that the government has not identified the "Proposed Eliminated Positions" as required by the Order. The Government subsequently asked the Oversight Board to extend the June 11, 2022 deadline to reach an agreement one more time for approximately 30 days. The Oversight Board agreed to the Government's request for an extension and asked the court to extend the deadline to July 14, 2022. The Court granted the parties' extension request on June 15, 2022.

## Act 81-2020

Act 81-2020, enacted on August 3, 2020, amends existing pension regimes for police officers, firefighters, correctional officers and emergency technicians, among others (collectively, "Public Emergency Employees"), who entered the System under Act 447-1951 before April 1, 1990 or under Act 1-1990 between April 1, 1990 and December 31, 1999. It allows Public Emergency Employees to retire early with 45% to 55% of their final salaries as of retirement date as pension benefits, as well as a $100 per month medical plan contribution from their employer.

The Government certified in October 2020 that Act 81-2020 will be implemented in a "budgetary neutral form" by limiting the hiring of new recruits or by hiring at lower rates. The Oversight Board's own independent analysis found the costs of providing enhanced benefits to the approximately 8,640 participants expected to meet Act 81-2020's eligibility requirements at retirement is $2.4 billion. The Oversight Board's analysis shows that Act 82-2020 will result in an overall cost increase unless the Government makes significant and permanent reductions in headcount and compensation that is not likely achievable

through reductions in public safety personnel and therefore inconsistent with the Commonwealth's Certified Fiscal Plan.

The Oversight Board advised the Government that if the Government wished to proceed with implementation of Act 81-2020, it must present a substantive program, to which the Oversight Board can hold the Government accountable, by which Act 81-2020 (i) would not impose net costs incremental to the Fiscal Plan, and (ii) would be implemented in a fiscally responsible manner that ensures adequate essential services. The Government has advised that it will not implement Act 81-2020 until an agreement is reached with the Oversight Board.

On December 20, 2021, the Oversight Board filed a complaint against the Governor of Puerto Rico, AAFAF, the ERS Administrator, the Executive Director of the Government of Puerto Rico Retirement Board, and the OMB Director seeking to nullify and enjoin enforcement of Act 80-2020, Act 81-2020, Act 82-2020, and Joint Resolution 33, a measure requiring the Commonwealth to implement, at least partially, Act 80-2020. After the filing of the complaint, the parties entered into a stipulation invalidating Acts 80-2020, 81-2020, and 82-2020 and Joint Resolution 33 but agreeing to continue discussions with respect to implementation of possible alternatives to Acts 80-2020, 81-2020 and 82-2020 that are consistent with the Fiscal Plan.

## Act 82-2020

Act 82-2020 enables participants of the Teachers Retirement System (TRS) to apply unused sick leave towards their retirement eligibility and pension benefit level. The enhanced pension benefits, as well as the likely and unplanned acceleration in the timing of teacher retirements, generate costs and staffing gaps not contemplated by the Fiscal Plan.

The Government certification for Act 82-2020 stated that Act 82-2020 has no cost because employees cannot liquidate their unused sick time. The Oversight Board's independent analysis showed that implementing Act 82-2020 will cost the Commonwealth between $635 million and $1.57 billion over the next 30 years, assuming that as a result, TRS participants receive between two and five years of additional service credit. Therefore, the Oversight Board has determined that Act 82-2020 is significantly inconsistent with the Fiscal Plan and is having ongoing dialogues with the Government to better understand the assertion that Act 82-2020 has no cost. The Government has advised that it will not implement Act 82-2020 until an agreement is reached with the Oversight Board.

On December 20, 2021, the Oversight Board filed a complaint against the Governor of Puerto Rico, AAFAF, the ERS Administrator, the Executive Director of the Government of Puerto Rico Retirement Board, and the OMB Director seeking to nullify and enjoin

enforcement of Act 80-2020, Act 81-2020, Act 82-2020, and Joint Resolution 33, a measure requiring the Commonwealth to implement, at least partially, Act 80-2020. After the filing of the complaint, the parties entered into a stipulation invalidating Acts 80-2020, 81-2020, and 82-2020 and Joint Resolution 33 but agreeing to continue discussions with respect to implementation of possible alternatives to Acts 80-2020, 81-2020 and 82-2020 that are consistent with the Fiscal Plan.

## Act 167-2020

Act 167-2020 called for a Special Election, to take place on May 16, 2021, to select a six-member delegation to be sent to Washington, D.C., in order to press for Puerto Rico's admission as a state. Because Puerto Rico's Certified Budget for the 2020-2021 fiscal year did not allocate funds for this Special Election, the Governor of Puerto Rico sought authorization from the Oversight Board to reprogram funds. The Oversight Board informed the Governor that, in the unique circumstances presented here, the reprogramming request must be submitted to both the Oversight Board and the Legislature. Subsequently, the Governor requested a budget amendment to appropriate funds for the Special Election and submitted a proposed amended budget to the Oversight Board pursuant to PROMESA Section 202. The Oversight Board determined the Governor's proposed amended budget was a compliant budget, as required by PROMESA Section 202(c)(1), and submitted it to the Legislature.

Thereafter, the Legislature informed the Oversight Board that a bill identical to the Governor's proposed amended budget was defeated during a markup session vote and that it would not comply with the budget amendment process. As a result, the Oversight Board issued a resolution stating, among other things, that (i) the Governor and the Legislature were at an impasse concerning the appropriation of funds to cover the cost of the Special Election; (ii) PROMESA Section 402 constrained the Oversight Board from adopting an interpretation of PROMESA that might restrict Puerto Rico's determination of its political status; (iii) the Oversight Board desired to allow the Commonwealth Government to adopt — or not — the proposed amended budget the same as would occur absent PROMESA; and (iv) therefore, the original Commonwealth budget would remain in effect without revision. Thereafter, AAFAF informed the Oversight Board that the Governor authorized the disbursement of funds to fund the Special Election.

On April 21, 2021, the Speaker of the Puerto Rico House of Representatives, acting on behalf of the Puerto Rico House of Representatives, filed a complaint against the Governor, AAFAF, the President of the Puerto Rico State Elections Commission, and the Secretary of the Puerto Rico Treasury Department (Executive Defendants) and the Oversight Board (together with the Executive Defendants, "Defendants"), seeking declaratory and injunctive relief prohibiting the Defendants from distributing certain election-related funds.

On April 22, 2021, the Speaker filed a motion seeking a temporary restraining order or preliminary injunction prohibiting the Defendants from distributing certain election-related funds pending resolution of the complaint, which the Defendants opposed. After hearing oral argument, the Title III court, Judge Swain presiding, issued an Order denying the Plaintiff's motion seeking a temporary restraining order or preliminary injunction.

On June 4, 2021, the Executive Defendants and the Oversight Board moved to dismiss the Speaker's complaint. On August 27, 2021, after receiving no opposition on the motion, the Title III court issued an Order granting Defendants' motions to dismiss, holding that any controversy over the validity of the actions of the Executive Defendants or the Oversight Board's role in supporting or funding the special election was moot because the special election had been held and the designated funds spent.

## Act 7-2021

Act 7-2021, known as the Law for a Dignified Retirement, previously known as House Bill 120, was signed into law by Governor Pedro Pierluisi on June 9, 2021. It has two primary components. First, it imposes restrictions on the Government of Puerto Rico designed to prevent confirmation and implementation of any plan of adjustment inconsistent with terms in Act 7-2021. This would undermine the Oversight Board's proposed Plan of Adjustment by compelling bondholders to receive a lower level of recovery than in the currently proposed settlement and restoring pension benefits to the benefits that existed immediately prior to the enactment of Act 106-2017, without any reduction. Second, it would create a new pension trust (FACSiR) funded by purported savings from the repayment of less bond debt, regardless of whether such savings materialize after litigation with the holders of such bonds. As a whole, Act 7-2021 is an attempt by the Government to unilaterally dictate the terms of the Plan of Adjustment, including the treatment of prepetition debt obligations, to eliminate all pension reforms contemplated by the 2021 Fiscal Plan along with essential reforms implemented under Act 106-2017, including the PayGo system, to reinstate all public pension systems as they existed prior to Act 106-2017, and to consolidate the source of funding of these unsustainable benefit obligations into one new entity.

In signing Act 7-2021, Governor Pierluisi acknowledged Act 7-2021 is "significantly inconsistent" with the 2021 Fiscal Plan. On June 18, 2021, the Governor provided the Oversight Board a PROMESA Section 204(a) certification (the "Certification") containing AAFAF's conclusion that Act 7-2021 is "significantly inconsistent" with the 2021 Fiscal Plan. The Certification further concluded "the reformulation of Puerto Rico's pension system, as stated in Act 7, is contrary to the provisions of the Fiscal Plan and the assumptions of the POA filed before the Title III court. Accordingly, its provisions could be interpreted as contrary to several provisions of PROMESA and to powers granted to the Oversight

Board. See, e.g., Section 108(a), 312 and 313 of PROMESA, 48 U.S.C. Sections 2128, 2172-73. In addition, Chapter 3 of Act 7-2021 seeks to have the debt of the Government of Puerto Rico issued, guaranteed and/or modified without the approval of the Oversight Board pursuant to Section 207 of PROMESA."

On June 22, 2021, in response to the Certification, the Oversight Board requested the Government confirm by June 25, 2021 that Act 7-2021 would not be implemented. The Oversight Board also requested the Legislature to confirm by the same date it would undertake to repeal Act 7-2021 in its entirety.

On June 25, 2021, AAFAF responded and confirmed again that Act 7-2021 is significantly inconsistent with the 2021 Fiscal Plan. AAFAF did not confirm that the Government will not implement the Act or support the repeal of the Act. Instead, AAFAF merely asserted that it will pursue alternatives to the Oversight Board's proposed Plan of Adjustment.

House Bill 120 (Act 7-2021's predecessor) has been the subject of numerous letters between and among the Commonwealth Government (the Governor, members of the Legislature, AAFAF) and the Oversight Board, including letters dated January 29, 2021, February 20, 2021, March 19, 2021, March 25, 2021, and April 28, 2021, among others. As set forth in the letters, the Oversight Board has determined Act 7-2021 impairs and defeats the purposes of PROMESA for the following reasons:

» First, Act 7-2021 attempts to dictate the treatment of billions of dollars of Commonwealth bond debt and would prevent the Commonwealth Government from taking any action to support a plan of adjustment that alters that treatment. Therefore, Act 7-2021 seeks to seize control over the Commonwealth's debt restructuring and usurp the exclusive power of the Oversight Board and the court to confirm a plan of adjustment under PROMESA section 312.

» Second, Act 7-2021 assumes the elimination of billions of dollars of bond obligations and would transfer every dollar of debt service on such hypothetically eliminated bond debt to the proposed new pension trust (FACSiR). The Commonwealth would thus achieve no debt relief.

» Third, even assuming that all assumptions made by Act 7-2021's proponents regarding the availability of funding sources were correct, the Oversight Board estimates that these sources will be insufficient to fund the retirement benefits Act 7-2021 would reinstate. As explained in the Oversight Board's letter dated March 25, 2021, detailing the discrepancies between the Oversight Board's analysis and that of the Act's proponents, the Oversight Board's analysis shows FACSiR will likely never reach a funding level of more than 18%

of the Commonwealth's pension obligations as established under the Act, and would be insolvent no later than 2053. And should any of the sources of proposed funding listed in Act 7-2021 become unavailable, such as those from reallocating debt service payments for bonds defined as "Contested Bonds" in Act 7-2021, FACSiR could become insolvent much sooner. Act 7-2021 does not specify what happens when FACSiR becomes insolvent.

»  Fourth, Act 7-2021 mortgages the Commonwealth's and its retirees' futures by establishing a vastly underfunded defined benefit plan: Act 7-2021 contemplates using contributions from current employees to fund the Government's obligations to current retirees. This policy eschews segregated and individually controlled accounts introduced by Act 106-2017 in favor of a pension trust that will be woefully underfunded and, like its predecessor ERS, become completely unfunded when today's employees eventually retire. Act 7-2021 would thus reinstate a failed policy that was a principal cause for the Island's deep financial distress and a critical problem PROMESA was enacted to fix. Additionally, Act 7-2021 reverses the proposed System 2000 settlement reflected in the Plan of Adjustment to fix these past mistakes and instead deposits that money into FACSiR.

»  Fifth, Act 7-2021 makes false promises to public pension system participants: Act 7-2021 falsely promises participants an "honorable retirement" via increased benefits that are highly unlikely to be fully provided. The Oversight Board's analysis indicates the fund balance will never exceed 18% of the aggregate actuarial pension obligation Act 7-2021 will establish, let alone the 120% funded status threshold necessary to trigger further increased benefits.

»  Sixth, as conceded by the Governor and AAFAF, Act 7-2021 is inconsistent with the 2021 Fiscal Plan: the 2021 Fiscal Plan requires that non-fiscal plan entities be responsible for PayGo costs for their retirees, whereas Act 7-2021 only holds non-fiscal plan entities responsible for their employer contribution of 10% of pay, resulting in the Commonwealth subsidizing non-fiscal plan entity benefit costs. Further, by requiring only a formulaic employer contribution to the trust, Act 7-2021 defies the Title III court's prior ruling nullifying Act 29-2019, which would have relieved municipalities of their obligations to compensate the Commonwealth for paying their retirees' pensions.

On June 28, 2021, the Oversight Board directed the Governor to confirm that Act 7-2021 will not be implemented and asked the Governor and Legislature to sign a stipulation and proposed order, no later than July 1, 2021, consenting to nullification of Act 7-2021 in its entirety. On July 1, 2021, the Governor responded without signing the stipulation as directed.

On July 2, 2021, the Oversight Board filed a complaint against the Governor and AAFAF, alleging that Act 7-2021, including its enactment and enforcement, violates PROMESA Sections 204(a), 204(c) and 207. In the complaint, the Oversight Board sought nullification of Act 7-2021 as a violation of PROMESA Section 108(a) because it impairs and/or defeats the purposes of PROMESA, as determined by the Oversight Board. Additionally, the Oversight Board argued that Act 7-2021 violated the Supremacy Clause of the U.S. Constitution and PROMESA Section 4.

The Oversight Board moved for summary judgment, and on October 13, 2021, the Title III court issued an Order granting, in part, the Oversight Board's motion for summary judgment. The Title III court found that (i) the Oversight Board had authority to seek judicial relief under PROMESA Section 204(a) because Act 7-2021 was significantly inconsistent with the Commonwealth Certified Fiscal Plan and the Governor failed to comply with the Oversight Board's directions to correct the inconsistency; and (ii) Act 7-2021 violated PROMESA Section 108(a) by impairing or defeating the purposes of PROMESA, as determined by the Oversight Board. Based on these rulings, the Title III court, pursuant to PROMESA Section 204(a)(5), nullified the entirety of Act 7-2021 and enjoined the implementation and enforcement of Act 7-2021. The Title III court also, pursuant to PROMESA Section 108(a)(2), declared certain sections of Act 7-2021 nullified, unenforceable, and of no effect, and enjoined Defendants from implementing or enforcing those provisions.

Thereafter, the parties filed a stipulation of voluntary dismissal without prejudice as to the remaining counts in the case, which the Title III court granted, closing the case.

## The Confirmation of the Title III Joint Plan of Adjustment of the Commonwealth, ERS and PBA

On November 3, 2021, on behalf of the Commonwealth, ERS, and the Puerto Rico Public Buildings Authority (PBA), the Oversight Board filed the Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., (the "Eighth Amended Plan," as subsequently amended and modified, the "Plan") [ECF No. 19053]. In total, 49 individuals and entities filed objections.

The Title III court considered confirmation of the Plan, and any objections thereto, at a hearing for confirmation of the Plan between November 8-22, 2021. After considering the parties' arguments at the hearing, on January 18, 2022, the Title III court confirmed the Plan. See Order and Judgment Confirming the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority. A summary of the material objections, and the Title III court's Orders with respect thereto, is detailed below.

## Constitutional Challenges to Confirmation of the Plan

Pro se bondholders Peter Hein and Arthur Samodovitz (the "Pro Se Bondholders") objected to the Plan on the grounds that PROMESA violates the Bankruptcy Clause of the U.S. Constitution because it is not uniform with Chapter 9, which requires, as a precondition to filing a petition for restructuring, a showing of insolvency. Peter Hein additionally argued that the retroactive application of PROMESA to pre-enactment debts violates substantive due process and the Ex Post Facto Clause. In its Confirmation Order, the Title III court overruled and denied the Pro Se Bondholders' objections, holding that PROMESA does not violate the uniformity requirement of the Bankruptcy Clause, since the uniformity requirement is not a generally applicable limitation restricting the exercise of legislative power where, as here, Congress unambiguously invoked its Article IV authority in enacting PROMESA. Further, with respect to Mr. Hein's additional objection, the Title III court held that he failed to demonstrate that substantive due process analysis is appropriate, that the Ex Post Facto Clause is applicable to PROMESA, or that PROMESA violates these constitutional principles.

Peter Hein also objected to the Plan on the grounds that it violates the Contracts Clause of the U.S. Constitution. The Title III court rejected those arguments also, concluding that (i) Congress has the power to impair contractual obligations through its power to establish uniform laws on the subject of bankruptcies throughout the United States, and (ii) a federal court's confirmation of a reorganization plan under federal law is not a legislative action violating the Contracts Clause. U.S. Const. art. I, § 8, cl. 4.

Numerous claimants objected to the Plan on the grounds that the Plan's treatment of their claims violates the Takings Clause of the Fifth Amendment of the U.S. Constitution because (i) they hold Eminent Domain/Inverse Condemnation Claims, or claims arising from either the Commonwealth's alleged taking of title to the claimants' real properties or its deprivation of the claimants' use of such properties, that cannot be impaired by the Plan because they are based on the Fifth Amendment of the U.S. Constitution, and (ii) the Plan takes bondholders' property interest in bonds without just compensation. With respect to the Eminent Domain/Inverse Condemnation Claims, the Title III court determined these takings were constitutionally entitled to just compensation and should be paid in full. With respect to the bondholders' objections, the Title III court held that (i) the value of claimants' liens were not destroyed; (ii) reasonable investment-backed expectations should have taken into account the general risk of a Government's higher priorities; and (iii) the character of the governmental action was a restructuring of relationships rather than a physical invasion.

Finally, Peter Hein objected to the Plan on the grounds that the Plan's different treatment of mainland investors from Puerto Rico-resident investors violates the Due Process, Equal Protection, and Privileges and Immunities Clauses of the U.S. Constitution (U.S. Const.

art. IV, § 2, cl.1; am. V; am. XIV). Overruling these objections, the Title III court held that the Plan's taxable bond election provision does not fall within the purview of the Privileges and Immunities Clause. Regarding the Due Process and Equal Protection Clauses, the Title III court held that Mr. Hein has not identified any fundamental right as being impaired, and he has not identified any discrimination based on any constitutionally protected class or status.

### Feasibility Challenges to Confirmation of the Plan

Claimants *Asociación de Maestros de Puerto Rico and the Asociación de Maestros de Puerto Rico-Local Sindical* (collectively, AMPR) and Peter Hein objected to the feasibility of various provisions of the Plan.

AMPR objected that the Plan may not be feasible because the Plan does not provide for damages claims for employees whose benefits are frozen. Since AMPR proffered no evidence concerning the potential cost of such claims to the Commonwealth while the Debtors proffered that the Plan already provides for the treatment of these claims, the Title III court found that the Plan anticipates and provides treatment for any such claim.

Mr. Hein argued that the Plan is not feasible because there is no evidence that the Commonwealth would adopt the Oversight Board's structural reforms. The Title III court found that the uncertainty of the Commonwealth's support for proposed structural changes does not render the Plan infeasible. In reaching that conclusion, the Title III court noted the potential increase in the Commonwealth's future liquidity, the Plan's incentives for the Commonwealth to ensure the Government pursues policies to achieve strong fiscal performance, and certain Plan mechanisms intended to ensure obligations are met, including as the Pension Reserve Trust, the structure of the contingent value instruments to be issued pursuant to the Plan, and the Debt Management Policy to ensure obligations are met.

## CPI Litigation

The Center for Investigative Journalism (CPI) has filed two complaints against the Oversight Board. The first complaint, filed on June 1, 2017, sought access to 16 categories of documents. Fourteen of those requests sought discrete documents, and two sought every communication between the Oversight Board and either the Commonwealth or the federal government.

The Oversight Board moved to dismiss CPI's first complaint on two grounds: (1) as a matter of sovereign immunity, the district court lacks jurisdiction under the Pennhurst doctrine to enforce Puerto Rico law against an entity of the Puerto Rico Government; and (2) PROMESA preempts Puerto Rico's disclosure laws because the disclosure laws

interfere with the Oversight Board's statutory mission. The Oversight Board's motion to dismiss was denied on May 4, 2018. Although the Oversight Board disagreed with the court's decision and reserved its rights, it did not take an immediate appeal of the order denying its motion to dismiss.

Instead, the Oversight Board produced more than 15,000 documents responsive to CPI's requests. The Oversight Board also sought a protective order with respect to several thousand documents protected from disclosure under Puerto Rico law. Magistrate Judge McGiverin issued a report and recommendation (R&R) granting the protective order for some of the documents but ordering the Oversight Board to produce a privilege log with respect to others. On August 14, 2019, the Oversight Board objected to the R&R.

CPI filed its second complaint against the Oversight Board on September 30, 2019. The second complaint contains the same broad requests for all communications between the Oversight Board and either the Commonwealth or the federal government but covers a later time period than the first complaint. The Oversight Board moved to dismiss CPI's second complaint on four grounds: (1) PROMESA Section 105 bars the relief CPI requests; (2) CPI's requests are overbroad; (3) as a matter of sovereign immunity, the district court lacks jurisdiction under the Pennhurst doctrine; and (4) PROMESA preempts Puerto Rico's disclosure law.[9]

On March 23, 2021, Judge García-Gregory overruled the Oversight Board's objections to the magistrate's R&R and adopted the R&R in its entirety. The next day, he denied the Oversight Board's motion to dismiss CPI's second complaint.

The Oversight Board sought appellate review of Judge García-Gregory's orders before the First Circuit, arguing (1) as a matter of sovereign immunity, the district court lacks jurisdiction under the Pennhurst doctrine; (2) PROMESA Section 105 shields the Oversight Board from any disclosure obligations imposed by Puerto Rico law; and (3) the disclosure obligations imposed by Puerto Rico law are preempted by PROMESA. After briefing and argument, in a 2-1 decision, the First Circuit affirmed Judge García-Gregory's ruling with respect to constitutional immunity but declined to exercise jurisdiction over the remaining issues. On June 21, 2022, the First Circuit granted a stay of the mandate pending U.S. Supreme Court review if the Oversight Board files its petition for a writ of certiorari on or before July 20, 2022.

---

[9] On August 26, 2020, CPI's second complaint was consolidated with its first.



# Stakeholder Outreach and Engagement

## Media Outreach

The general public in Puerto Rico and elsewhere is an important stakeholder for the Oversight Board and its Board members. The Oversight Board communicates through a variety of channels and media, including: formal media releases and statements; its comprehensive website with public documents, data, and informational content; commentary published in the news media and social media; media conferences; public speaking engagements by Board members; and interviews with representatives of the media. These are important ways to engage and inform the public of the Oversight Board's work in fulfilling the mandates of PROMESA.

The Oversight Board provides transparent and reliable information regarding the debt restructuring process and the Oversight Board's mandate to help Puerto Rico achieve fiscal responsibility and access to capital markets, including through certifying budgets and Fiscal Plans for Puerto Rico and certain instrumentalities. These Fiscal Plans and corresponding budgets help define the necessary reforms to provide stability and prosperity to all residents of Puerto Rico. The Oversight Board's website includes comprehensive information about the debt restructuring process, Fiscal Plans and budgets, structural reform implementation, the contract review process, regulation review process and the legislative review process. The website also publishes the financial disclosures of Board members and the conflict-of-interest policies and procedures.

The Oversight Board communications director and deputy communications director engage with the media daily, including print, television and radio, and online media interviews. Board members held regular media conferences and engaged in several one-on-one interviews with print, television and radio, and online media in FY2022, including:

» **August 13, 2021** – Telemundo interview with Executive Director Natalie Jaresko
» **August 25, 2021** – WALO Radio interview with and Board member Antonio Medina
» **August 25,2021** – Primera Hora interview with Chairman David Skeel
» **August 25, 2021** – Noti-Uno radio interview with Chairman David Skeel
» **September 15, 2021** – Noti-Uno Radio interview with Executive Director Natalie Jaresko
» **September 16,2021** – Caribbean Business, El Nuevo Día & El Vocero interviews with Board members Justin Peterson and John Nixon
» **September 16, 2021** – Metro PR interview with Board Members Antonio Medina and Andrew Biggs
» **September 16, 2021** – Noticel interview with Chairman David Skeel and Board member Andrew Biggs
» **September 28, 2021** – Noti-Uno interview with Board member Antonio Medina
» **October 11, 2021** – Noti-Uno Radio & Mega TV interviews with Board member Antonio Medina
» **October 11, 2021** – Jugando Pelota Dura TV interview with Board member Antonio Medina
» **October 12, 2021** – Telemundo & Lo Sé Todo TV interviews with Board member Antonio Medina
» **October 12, 2021** – Radio-Isla and WKAQ Radio interviews with Board member Antonio Medina
» **November 17, 2021** – Telemundo TV interview with Executive Director Natalie Jaresko
» **January 19, 2022** – Pulso Económico WKAQ – interview with Executive Director Natalie Jaresko
» **January 20, 2022** – WKAQ interview with Board member Antonio Medina
» **January 20, 2022** – Lo Sé Todo & Jugando Pelota Dura TV interview with Board member Antonio Medina
» **January 21, 2022** – Radio Isla interview with Board member Antonio Medina
» **January 21, 2022** – Teleonce TV interview with Executive Director Natalie Jaresko
» **January 26, 2022** – Media roundtable with Chairman David Skeel and Executive Director Natalie Jaresko
» **February 1, 2022** – Primera Hora interview with Executive Director Natalie Jaresko
» **February 11, 2022** – WIPR TV interview with Executive Director Natalie Jaresko
» **February 18, 2022** – EFE interview with Executive Director Natalie Jaresko
» **February 21, 2022** – Noti-Uno Radio interview with Executive Director Natalie Jaresko
» **February 22, 2022** – El Nuevo Día interview with Chairman David Skeel and Infrastructure Director Alejandro Figueroa
» **March 2, 2022** – Lo Sé Todo TV interview with Board member Antonio Medina
» **March 7, 2022** – Radio Isla interview with Board member Antonio Medina
» **March 9, 2022** – El Nuevo Día interview with Executive Director Natalie Jaresko
» **March 14, 2022** – Media roundtable with Chairman David Skeel and Executive Director Natalie Jaresko
» **March 15, 2022** – Telemundo TV interview with Board member Antonio Medina
» **March 15, 2022** – Noti-Uno Radio & Radio Isla interview with Board member Antonio Medina
» **March 15, 2022** – Primera Hora interview with Deputy Communications Director Sylvette Santiago
» **March 15, 2022** – TeleOnce TV interview with Board Member Antonio Medina
» **March 15, 2022** – Jugando Pelota Dura TV interview with Board Member Antonio Medina
» **March 16, 2022** – Telemundo TV interview with Executive Director Natalie Jaresko
» **March 18, 2022** – WIPR TV interview with Board member Antonio Medina
» **March 28, 2022** – El Nuevo Día interview with Executive Director Natalie Jaresko
» **March 30, 2022** – Washington Post interview with Executive Director Natalie Jaresko
» **May 2, 2022** – El Nuevo Día interview with Chairman David Skeel

The Oversight Board held several media conferences throughout FY2022, including:

» July 1, 2021
» September 17, 2021
» December 17, 2021
» January 18, 2022
» January 26, 2022
» January 27, 2022
» February 25, 2022
» March 25, 2022
» May 20, 2022

## Private Sector Outreach

The Oversight Board frequently engaged with private and nonprofit sector stakeholders to inform these stakeholders directly about the Oversight Board's work, and to listen to stakeholders' concerns and advice. Such outreach included meetings with local and national professional organizations, nonprofit institutions, think tanks, and with Puerto Ricans living in U.S. states.

Board members also participated at several speaking engagements at forums held by private and public sector groups. Further, the Oversight Board's Executive Director, Board members and staff met with nonprofit organizations, including Boys & Girls Club of Puerto Rico, SER de Puerto Rico, Foundation for Puerto Rico, Youth Development Institute, and the YMCA.

The Oversight Board's Executive Director and Board members participated in the following events as speakers in FY2022:

- » **Fiscal Responses in Times of Crisis:** Institute of Finance Basil Fuleihan (Natalie Jaresko)
- » **Lisa Ramirez-Branum of CBO:** Discussion on Puerto Rico (Natalie Jaresko)
- » **CIPAR Roundtable:** Infrastructure 2030 (Antonio Medina)
- » **SESA-PR 5th Annual Forum:** Solving PREPA's debt without Solar Taxes (Antonio Medina)
- » **Meeting with Princeton Graduate Policy Workshop** on Puerto Rico (Natalie Jaresko)
- » **GUIA Educa Event:** *Proyecciones económicas y herramientas de negocios para la industria en el 2022* (Antonio Medina)



» **Fourth International Congress of Surveying:** College of Engineers and Surveyors of PR (Antonio Medina)

» **CREF 2022:** 14th Caribbean Renewable Energy Forum (Alejandro Figueroa)

» **Pharmaceutical Industry Association:** 32nd Annual Meeting (Antonio Medina)

» **Puerto Rico Now 2022 Summit:** Puerto Rico and PROMESA Session (John Nixon)



## Stakeholder Outreach & Engagement (Government)

The Oversight Board regularly engaged with the leadership of Puerto Rico, including the Executive, Legislative, and Judicial branches, as well as municipalities. This outreach included informational meetings, budgetary analysis, legislative proposal discussions, visits to municipalities and other communications.

The Oversight Board's engagement with the leadership of Puerto Rico led to significant achievements, such as: 1) the certification on June 30, 2022 by the Oversight Board of the first compliant General Fund Budget submitted by the Government of Puerto Rico and developed jointly with the Governor and Legislature; and 2) the enactment of Act 53 of 2021, also known as the "Law to End the Bankruptcy of Puerto Rico," which paved the way for the largest restructuring of municipal debt in U.S. history.

Engagement with the Executive Branch is wide and constant. The Oversight Board leadership and staff teams engage with all the 138 executive agencies working on a wide array of projects. Furthermore, the Oversight Board leadership carries out periodic calls with the Governor and AAFAF (the Government's key financial agency). Engagement with the Executive Branch has led to, among other things, the implementation of a time & attendance system at the Department of Education and other agencies, and the implementation of the Civil Service Reform Pilot Program. Lastly, the Oversight Board staff has had direct communications with the Executive Branch's legislative advisors to gauge the Executive Branch's position on legislation.

The Oversight Board's engagement with legislative leadership has increased substantially with the arrival of a new Puerto Rico Legislature after the 2020 elections. The Oversight Board leadership began outreach efforts by meeting with House and Senate leadership and later branching out to other Representatives and Senators of all political parties. This has led to monthly, sometimes bi-weekly meetings with the Legislature. Board members have also been active in participating in meetings, calls, and presentations. These working relationships created a bridge of trust, allowing the Oversight Board staff and the Legislature to share and exchange information.



# Oversight Board Budget

Today, the Oversight Board is responsible for administering the largest municipal debt restructuring in U.S. history. As part of that process, the Oversight Board has been party to scores of lawsuits and contested proceedings. The nature of these actions falls on a spectrum, for example: many actions have been brought in opposition to Oversight Board-formulated debt restructurings for the Commonwealth and its various instrumentalities; others have been brought by parties challenging aspects of PROMESA; while in some instances the Oversight Board has initiated actions in furtherance of its mandate under PROMESA.

The Oversight Board's operating budget for FY2022 was $59.582 million, an increase of 3.4% compared to FY2021. As soon as the audit of the Oversight Board's financial statements is completed in the coming months, it will be sent to all parties that officially receive this Annual Report, as required by PROMESA. In the meantime, the Oversight Board's FY2022 detailed operating budget is included herein.

## Oversight Board FY2022 Budget

|  | | Budget<br>FY 2022-23 |
|---|---|---|
| **REVENUES:** | | |
| Government Contribution | $ | 59,582,000 |
| | | |
| **Total revenues** | $ | 59,582,000 |
| | | |
| **EXPENDITURES:** | | |
| **Payroll and other related costs** | $ | **10,806,400** |
| Salary and Benefits | | 9,848,005 |
| Payroll Taxes | | 958,395 |
| **Legal services** | | **4,013,563** |
| Legal Services | | 4,013,563 |
| **Professional services** | | **33,319,525** |
| Investment Banking | | 1,710,000 |
| Professional Services PROMESA Responsibilities | | 31,609,525 |
| **Purchased Administrative and Outreach Services** | | **4,388,562** |
| Insurance Expenditures | | 168,100 |
| Security Services | | 1,035,000 |
| Information Systems Services | | 143,600 |
| Accounting, Tax Advisory and Audit | | 265,100 |
| Communications Support | | 1,678,325 |
| Human Resources, Training and Recruitment Services | | 902,000 |
| Other Administrative Services | | 196,437 |
| **Transportation, travel costs and reimbursable expenses** | | **1,980,050** |
| Board Travel Expenditures | | 140,000 |
| Employee Travel Expenditures | | 141,000 |
| Contractor Reimbursable Expenditures | | 1,519,050 |
| Vehicle Rental or Lease | | 100,000 |
| Fuel and Maintenance | | 10,000 |
| **Rent and other office costs** | | **751,900** |
| Building Rent | | 485,000 |
| Utility - Telephone & Internet Services | | 68,500 |
| Office Recurrent Costs | | 130,000 |
| Office Materials and Supplies | | 62,000 |
| Postage & Delivery Costs | | 6,400 |
| **Equipment purchases** | | **160,000** |
| Office Furniture and Equipment | | 100,000 |
| Leasehold Improvement | | 25,000 |
| Computer Equipment | | 20,000 |
| Other | | 15,000 |
| **Other expenditures** | | **562,000** |
| Meeting Expenditures | | 387,000 |
| PRDE Leadership Development Program | | 150,000 |
| Miscellaneous Expenditures | | 25,000 |
| **Additional Contingencies** | | **3,600,000** |
| | | |
| **Total expenditures** | $ | 59,582,000 |
| | | |
| **EXCESS (DEFICIENCY) OF REVENUES OVER EXPENDITURES** | $ | - |

# Restructuring-Related Fees

Commonwealth restructuring-related expenditures are projected to be $620 million for the period FY2022 to FY2025, and are comprised of all professional fees, including those of the Unsecured Creditors' Committee, the Retiree Committee, the Government (mostly the Puerto Rico Fiscal Agency and Financial Advisory Authority), and the Oversight Board. Restructuring-related costs have continued following the Commonwealth Plan of Adjustment's effective date to support potential litigation and other Title III implementation costs. Fees for the period FY2022 to FY2025 were benchmarked against comparable restructurings, which yielded an average professional-fee-to-funded-debt ratio of 2.08% and median ratio of 2.33%, as compared to 2.48% projected for the Commonwealth.

In total, for the period from FY2018 to FY2026, the restructuring-related expenditures are projected to be approximately $1.6 billion. Uncertainty stemming from the series of recent natural disasters and ongoing COVID-19 pandemic has resulted in an extended restructuring process contributing to the overall estimate. For some perspective, the City of Detroit restructuring (the largest municipal restructuring prior to the Commonwealth of Puerto Rico) took 17 months (July 2013 to December 2014), compared to the nearly five years for the Commonwealth restructuring, which was extended by extraordinary natural disasters, including two major hurricanes, earthquakes, and the COVID-19 pandemic. Throughout, the Oversight Board and its partners in the Commonwealth Government persevered toward the goals of restructuring the Commonwealth's debts, returning the Commonwealth to fiscal responsibility, and restoring the Commonwealth's access to the capital markets.

Professionals for the Oversight Board, the Government, the Unsecured Creditors' Committee, the Retiree Committee, and the mediation team have requested approximately $1,217,617,367 in fees and expenses through the Title III compensation process through July 20, 2022. The breakdown is as follows:

- » The $1.217 billion figure includes:
  - ▶ Oversight Board: $660,406,273.24 (including the Special Claims Committee firms);
  - ▶ Government: $373,191,545.18;
  - ▶ COR/UCC: $160,280,544.39;
    - ▶ The total of those first three categories is $1,193,878,362.90
- » COFINA Agent and professionals: $20,700,188.03; and
- » Mediation Team: $3,038,816.01

Moreover, expenses specifically related to the Title III process under PROMESA are reviewed by a court-appointed fee examiner. For the Oversight Board's operating expenses, the Oversight Board has retained its own fee examiner.

## Projected Professional Fees Relative to Other Major Restructurings

Professional fees for restructuring

| | Date filed | Outstanding debt, $M | Total fees and expenses, $M | Fees to funded debt, % |
|---|---|---|---|---|
| City of Detroit, Michigan | Jul. 2013 | 6,400[1] | 178 | 2.8 |
| Residential Capital, LLC | May. 2012 | 15,000 | 409 | 2.7 |
| Sabine Oil & Gas Corp. | Jul. 2015 | 2,800 | 79 | 2.8 |
| Caesars Entertainment Operating Company | Jan. 2015 | 18,000 | 258 | 1.4 |
| Lehman Brothers Holdings Inc. | Sep. 2008 | 613,000 | 957 | 0.2 |
| Lyondell Chemical Company | Jan. 2009 | 22,000 | 206 | 0.9 |
| American Airlines | Nov. 2011 | 11,000 | 392 | 3.6 |
| Washington Mutual, Inc. | Sep. 2008 | 8,000 | 271 | 3.4 |
| Edison Mission Energy | Dec. 2012 | 5,000 | 96 | 1.9 |
| Energy Future Holdings Corp. | Apr. 2014 | 40,000 | 450 | 1.1 |
| Puerto Rico | 2017 | 60,785[2] | 1,236[3] | 2.0 |

**Summary Statistics**

| | |
|---|---|
| Avg. | 2.08% |
| Max | 3.56% |
| Min | 0.16% |
| Med | 2.33% |

Puerto Rico involves added complexity as the largest public sector restructuring in the history of the United States

1 Excludes pensions and other retirement liabilities
2 Excludes pension liabilities and debt issued by PREPA and HTA, for additional details refer to https://oversightboard.pr.gov/debt/
3 Estimated professional fees through FY22 related to Title III proceedings excluding those associated with the PREPA and HTA Title III proceedings.



# Letter from the Ethics Advisor



# Letter from the Ethics Advisor

**Prepared by Andrea-Bonime-Blanc,
Independent Ethics Advisor to the Oversight Board**

Over the past fiscal year, the Financial Oversight and Management Board has continued the implementation of a variety of ethics, financial reporting, conflicts of interest (COI) and transparency initiatives developed and operationalized under the requirements of applicable law and Oversight Board Bylaws with the assistance of the Board's Independent Ethics Advisor (IEA). The IEA is an independent third-party role created through PROMESA and the Oversight Board Bylaws adopted in late 2016. Since early 2017, the Oversight Board and senior management have worked closely with the IEA to oversee and manage a wide variety of ethics matters, COI, executive-level periodic financial reporting and related transparency matters.

This past fiscal year has seen the continuation of board director service after FY2021 when a number of personnel changes were made to the Oversight Board, as was detailed in the Ethics Section of the FY2021 Annual Report. FY2022 also saw the resignation of the Oversight Board's Executive Director since early 2017, Ms. Natalie A. Jaresko, as of April 1, 2022, and the beginning of the search for a new Executive Director.

The table below shows the members of the Oversight Board as of the beginning of this past fiscal year (July 1, 2021), all of whom continue to be members of the Board as of the end of this past fiscal year 2022, reflecting no changes in the composition of the Oversight Board during the past fiscal year.

# PRRADA/Vendor Disclosure

| TABLE 1 FOMB BOARD COMPOSITION AS OF JUNE 30, 2022 | |
|---|---|
| **BOARD MEMBER** | **APPOINTMENT DATE** |
| **Andrew Biggs** | First term: 08.31.16<br>Second term: 01.06.21 |
| **Arthur González** | First term: 08.31.16<br>Second term: 01.06.21 |
| **Antonio Medina** | Commenced first term: 12.30.20 |
| **John Nixon** | Commenced first term: 12.11.20 |
| **Justin Peterson** | Commenced first term: 10.08.20 |
| **Betty Rosa** | Commenced first term: 12.11.20 |
| **David Skeel, Chair** | First term: 08.31.16<br>Second term: 01.06.21 |
| **Governor Pedro Pierluisi,<br>Ex Officio** | Commenced first term: 01.02.21 |

## OVERSIGHT BOARD FINANCIAL DISCLOSURE MANAGEMENT 2021-2022

**THE 2021 ANNUAL FINANCIAL AND QUARTERLY 2021-2022 PERIODIC TRANSACTION DISCLOSURE REPORTS** were prepared or are still under preparation by members of the Oversight Board, and the two designated executive staff. As of June 30, 2022, a number of these Annual 2021 and Quarterly Periodic Transaction Reports were still pending or under IEA review prior to finalization, signature and posting on the Oversight Board website to be accomplished later in the summer of 2022.

## THE OVERSIGHT BOARD COI MANAGEMENT

» **ALLEGATIONS, REPORTS AND MEDIA REPORTS RAISING COI** questions, issues and concerns are managed as they arise. Whether an issue involves an individual, an Oversight Board member, executive or staff member or third parties doing business with the Oversight Board, upon learning of such matters, the General Counsel and IEA discuss and coordinate next steps.

» **IMPLEMENTED MOST RECENT OVERSIGHT BOARD COI POLICY AND FRAMEWORK** because of the departure of most of the original Oversight Board members due to the completion of their first presidential appointment and new presidential appointments being made in the final quarter of 2020, the Oversight Board COI team developed a COI Policy and Framework to assist with the in-depth analysis of new Oversight Board members' financial reporting requirements.

» **CONFLICT OF INTEREST MANAGEMENT** measures, questionnaires and policies were implemented in conjunction with the office of the General Counsel, Chief of Staff and Human Resources to step up COI management at pre-onboarding, onboarding, and employment lifecycle of Oversight Board staff.

## OVERSIGHT BOARD CODE OF CONDUCT, TRAINING & COMMUNICATIONS (INCLUDING OVERSIGHT BOARD ETHICS WEBSITE)

» **CODE OF CONDUCT TRAINING.** This past fiscal year the Oversight Board IEA conducted virtual ethics training sessions for the entire Oversight Board staff. Additionally, onboarding ethics video and materials including conflict of interest disclosures are provided to all new employees and throughout the year by the Oversight Board Human Resources Department.

» **CODE OF CONDUCT REVISIONS.** From time-to-time, revisions are made to the Oversight Board Code of Conduct when we receive relevant feedback from Oversight Board, staff or outside third parties including NGOs. Once a change is proposed, it is approved and adopted by the Oversight Board via resolution. We have had no such changes in 2021-2022.

» **OVERSIGHT BOARD AND EXECUTIVE ETHICS ISSUES ENGAGEMENT.** The IEA conducts annual formal Oversight Board and Executive Staff update and education sessions to provide the most important updates on Oversight Board ethics and transparency practices and program as well as receive their feedback on issues, concerns, and new requirements.

» **OVERSIGHT BOARD ETHICS MEDIA & OTHER COMMUNICATIONS.** These are also made from time to time to the press or to third parties that have made inquiries or posted ethics or transparency related statements on media or social media. Such engagement has also from time to time included press interviews and the writing of opinion pieces for the Puerto Rico press.

» **OVERSIGHT BOARD ETHICS WEBSITE MANAGEMENT.** Since 2019, the stand-alone ethics webpage on the Oversight Board website has provided in English and Spanish all of the Oversight Board ethics and transparency program's public documents including the Oversight Board and executive staff financial reports filed to date, letters from the Oversight Board Chair and the Executive Director, an introduction to the ethics program from the IEA, the Bylaws, Code of Conduct, public and media communications, among other resources.

## OVERSIGHT BOARD HUMAN RESOURCES DEPARTMENT ASSISTANCE

» Assistance to Human Resources, on ethics, COI and transparency related employee onboarding, management, policies, issues, and investigations that take place on an ongoing basis. Coordination of Employee Manual issues that relate to the Code of Conduct.

## OVERSIGHT BOARD ETHICS & TRANSPARENCY INQUIRIES & INVESTIGATIONS

» Any concerns or inquiries from the Oversight Board, staff, third parties, media, etc., are reviewed when warranted. A further inquiry is conducted by the General Counsel and IEA and, when required, Oversight Board Human Resources Department and outside counsel are engaged to conduct an investigation.

## OVERSIGHT BOARD THIRD PARTY CONTRACTOR ETHICS & TRANSPARENCY MANAGEMENT

» The Oversight Board third-party contractor agreement form was substantially revised in the 2020 fiscal year to include the recommendations of the Luskin McKinsey Report (the "McKinsey Report") based on the law firm Luskin Stern & Eisler LLP report on its investigation of COI allegations against McKinsey in 2018-2019. We continued to vigorously implement this third-party COI regime for all Oversight Board third parties in FY 2022.

» The McKinsey Report yielded a set of eight recommendations which the IEA, the Oversight Board's General Counsel and the Oversight Board staff have been implementing for the past 18 months requiring, inter alia, proactive, periodic and ongoing representations and covenants by Oversight Board third parties of stringent COI requirements and the analysis and resolution of any such COI as soon as practicable.

» During FY 2022, a major legal development took place regarding required COI disclosure by certain Oversight Board Third Parties. On January 20, 2022, President Joseph R. Biden, Jr. signed into law the Puerto Rico

Recovery Accuracy in Disclosures Act (PRRADA), which imposed disclosure requirements on professionals employed in connection with the ongoing Title III cases. Among other things, PRRADA required the Oversight Board to file a list of material interested parties (a "MIP List"), within thirty days of its enactment. PRRADA also requires all professionals to file verified statements conforming to the requirements of Federal Rule of Bankruptcy Procedure 2014(a) and setting forth the professional's connections with any entity identified on the MIP List. Each professional must file its verified statement prior to filing any additional fee applications in the Title III cases.

» PRRADA specifies that the following entities must be included on the MIP List: (1) the Debtor, (2) any creditor who meets a materiality threshold set by the court, (3) any other party in interest, (4) any attorney or accountant of the debtor, any creditor, or any other party in interest, (5) the U.S. Trustee and any person employed in the office of the U.S. Trustee, and (6) the Oversight Board, including its members, Executive Director, and its employees.

» The Oversight Board filed a proposed MIP List, which the Court approved, with certain modifications, on March 30, 2022. The approved MIP List includes all creditors who filed proofs of claim against the Commonwealth in amounts greater than $1 million, as well as all creditors who filed proofs of claim against HTA, ERS, PBA, PREPA, or COFINA in amounts greater than $500,000. It also includes additional parties in interest, such as parties that have played a key role in the Title III cases, including AAFAF, and members of statutory committees, including the Official Committee of Unsecured Creditors and the Official Committee of Retired Employees of Puerto Rico.

## OVERSIGHT BOARD STAKEHOLDER ENGAGEMENT ON ETHICS & TRANSPARENCY ISSUES

» The IEA, together with the Oversight Board staff, meets from time to time with stakeholders including NGOs and governmental representatives to discuss ethics and transparency matters of mutual concern and interest.

**Below is a summary overview of the Oversight Board ethics, COI and transparency program and activities for fiscal year 2021-2022.**

| TABLE 2 Summary Overview of FOMB Ethics, Conflict of Interest & Transparency Program & Activities 2021-2022 | | |
|---|---|---|
| **SUBJECT MATTER** | **RESPONSIBILITY** | **COMMENTS** |
| **Oversight Board Financial Disclosure Management** | • Oversight Board Members, Board Designated Executive Staff (Executive Director and General Counsel)<br><br>• IEA review & sign off | • Completed, reviewed, and signed routine Annual and Quarterly Financial Reports for public posting on the Oversight Board Documents & Ethics resources website pages<br><br>• Reviewed, analyzed and signed one combined Annual 2021 and Termination Financial Report for the Executive Director, Ms. Natalie A. Jaresko, upon her resignation as of April 1, 2022.<br><br>• One Annual Financial Report is still pending finalization or final review as of 6.30.22 (Governor Pedro Pierluisi) |
| **Oversight Board Conflict of Interest Management** | • Oversight Board, all Oversight Board staff<br><br>• Third party contractors<br><br>• Outside counsel, when required | • FOMB General Counsel, Chief of Staff and IEA proactively review any significant new issues raised; outside counsel engaged when necessary. |
| **Oversight Board Code of Conduct, Training & Communications (Including Ethics Website)** | • Oversight Board, Executive & Staff<br><br>• Third Party Contractors | • IEA manages Code of Conduct issues, revisions to regular Code and Contractor Code, staff queries, reporting issues, etc., periodic Oversight Board and staff ethics education & training, manage ethics website content. |

| TABLE 2 Summary Overview of FOMB Ethics, Conflict of Interest & Transparency Program & Activities 2021-2022 | | |
|---|---|---|
| **Oversight Board Third Party Contractor Ethics, COI & Transparency Management** | • General Counsel, Chief of Staff, IEA and other designated Oversight Board staff<br><br>• Sometimes U.S. or Puerto Rico outside counsel | • Oversight Third Party Contractors are subject to prior review, contractor agreement representations, covenants and commitments to high ethical standards, contractor code of conduct COI commitments on signing and periodically thereafter.<br><br>• General Counsel, IEA and outside counsel review material COI issues on an ongoing basis. |
| **Oversight Board Code of Conduct related policy review, revision, and creation when new ones are deemed necessary or desirable** | • General Counsel, IEA and other designated Oversight Board Staff<br><br>• U.S. or Puerto Rico specialized outside counsel when necessary | • When deemed necessary or desirable, new policies are created under the Code of Conduct. There were no new policies adopted in FY2022 relating to the Code of Conduct. |
| **Oversight Board Human Resources Coordination and Consultation** | • General Counsel and IEA<br><br>• Oversight Board Human Resources<br><br>• Sometimes U.S. or Puerto Rico outside Counsel | • The IEA works closely with the General Counsel and Human Resources to manage a wide variety of potential ethical, COI issues arising in employee lifecycle from onboarding through termination.<br><br>• Cooperation on Employee Manual and related policies and annual staff Code of Conduct training. |
| **Participation at the request of the Oversight Board's General Counsel on ethics and transparency related inquiries and investigations** | • General Counsel and IEA<br><br>• When required, U.S. or Puerto Rico outside counsel | • The IEA works closely with the General Counsel and sometimes outside counsel on inquiries and investigations, including those requiring attorney-client privilege. |

| TABLE 2 Summary Overview of FOMB Ethics, Conflict of Interest & Transparency Program & Activities 2021-2022 | | |
|---|---|---|
| **Oversight Board Contracts Review Team Coordination** | • General Counsel and IEA<br><br>• Oversight Board Contracts Management Team | • The IEA works with the General Counsel and the Contracts Review Team from time to time on ethics, COI and transparency issues.<br><br>• The IEA is a recipient of regular COI staff communications by the Contracts Review Team. |
| **Oversight Board Stakeholder Engagement on Ethics and Transparency Issues** | • IEA, General Counsel, Executive Director, Media Team and other Oversight Board Staff | • Meetings with various stakeholder groups including NGOs, government officials, advisors in Puerto Rico and in Washington,D.C., to discuss / resolve ethics and transparency matters. |



# Recommendations to the Federal Goverment



The Oversight Board seeks the active and long-term engagement of the Federal Government in the ongoing pursuit of fiscal responsibility and access to the capital markets for the Island as mandated by PROMESA. We can already point to significant milestones that place Puerto Rico on a clear path toward recovery, as seen most notably in the confirmation of the Commonwealth's Plan of Adjustment by the Title III Court. This new framework will not only help mitigate the Island's current debt and economic crisis, but also has the potential to unleash unprecedented levels of investment and job creation, which will generate benefits that will extend years into the future. We should not allow such momentum to slow down. Indeed, the Oversight Board believes now is the moment to accelerate the pace of federal action and to seek a firm commitment to implement the reforms called for in the Commonwealth Fiscal Plan and PROMESA.

We envision engagement by the Federal Government that is not limited to funding. The Island also requires support for key structural reforms. Bold, new approaches are required in many areas, including: (1) increased labor participation in the economy; (2) K-12 education; (3) workforce development; (4) increased efficiency and competitiveness across all commercial sectors; and (5) the development of new infrastructure improvements, including low cost, clean and reliable electricity. Additionally, residents receiving Medicaid on the Island deserve a long-term and sustainable solution for healthcare. In the absence of such reforms, Puerto Rico risks sliding back into economic and fiscal hardship. With these reforms in place, however, a robust economic future is within reach for Puerto Rico, its residents and communities.

## Economic Development

» Encourage proactive dialogue between the Government of Puerto Rico and Federal policymakers to find mutually acceptable solutions to enable and attract increased manufacturing of pharmaceuticals and medical products within the United States, and in particular Puerto Rico. The Oversight Board strongly believes that Puerto Rico can be a center of excellence within the nation and play a leading role in the national portfolio of locations where this manufacturing relocates. The physical infrastructure, human capital, and regulatory processes are already established and well positioned.

» Request that the Secretary of Commerce appoint at least one member to the United States Travel and Tourism Advisory Board who has special expertise on tourism in Puerto Rico.

» Establish a Manufacturing USA Institute in Puerto Rico to equip the Island with the partnerships and resources necessary for Puerto Rico to continue developing into a world-renowned pharmaceutical manufacturing center and a global biotech innovation hub.

» Grant a temporary Jones Act waiver for shipment of liquefied natural gas (LNG) within the U.S., allowing for a broader set of vessels to serve the Puerto

Rico market until American Jones Act-qualified carriers are built. Some U.S. jurisdictions, including Puerto Rico, are currently forced to buy LNG from foreign suppliers to meet their respective energy needs.

» Continue to move toward the elimination of the Electronic Export Information filing requirement for goods shipped between the mainland U.S. and Puerto Rico. Such a move would build on the U.S. Census Bureau's outstanding request for public comment.

» Direct relevant Federal agencies to support bankable infrastructure projects through reduced administrative red tape, targeted investments, and increased access to credit; e.g., supporting monetization of toll credits, and to keep Puerto Rico top-of-mind for infrastructure funding and improvements.

## Tax Issues

Recent efforts from the Federal Government to increase the minimum tax rate would significantly diminish the competitiveness of more than 300 U.S. multinational enterprises operating in Puerto Rico. During the 2018 tax year, those companies earned $113 billion in total revenue, employed more than 74,000 workers in Puerto Rico, and paid more than $2.5 billion in local income taxes and other assessments. The proposed changes in global taxation would erode Puerto Rico's economic competitiveness because it would increase the taxation of offshore income, both in absolute terms and as a percentage of Puerto Rico's domestic corporate tax rate. Such a tax increase would also have an indirect effect on the supply chain in Puerto Rico, which may have sizable impacts on employment in several key local industries (from administrative and support services to professional, scientific and technical services). The impact could be even further magnified as many of the jobs in the affected industries tend to be higher-wage positions in Puerto Rico. Such an effect could potentially cause a loss of labor income that would exceed the loss of employment.

Accordingly, the Oversight Board strongly supports all efforts by the Commonwealth Government to work with Congress on the development of a support mechanism that would provide Puerto Rico with the ability to protect the American jobs in Puerto Rico and adequately offset the negative consequences the proposed changes in global taxation would have on the Island.

## Medicaid and Medicare

In September 2021, the Centers for Medicare & Medicaid Services (CMS) announced an interpretation of the Medicaid funding cap provision for Puerto Rico under Section 1108(g) of the Social Security Act that increased the allotted cap for FY2022 to $2.943 billion. While the CMS interpretation potentially provides a long-term Medicaid funding solution for the Commonwealth, it still carries some risk. Congress should legislate a

long-term solution for the Medicaid program to mitigate the risk that CMS may alter its regulatory interpretation in the future, thereby reducing Puerto Rico's base level of federal funding. The CMS interpretation also does not address the issue of Puerto Rico's federal matching assistance percentage (FMAP), which could fall to historically low levels following the expiration of the current Public Health Emergency.

» Amend federal law so that Medicare beneficiaries in Puerto Rico are automatically enrolled in Medicare Part B with the option to opt out of coverage, mirroring the way their counterparts in every other state and territory are treated.

» Provide equitable treatment to residents of Puerto Rico in all Medicare programs. Puerto Rico has the 26th largest Medicare beneficiary population in the United States. Residents of Puerto Rico even pay the same level of Medicare taxes as mainland residents, but the Island receives substantially lower payments to healthcare providers. This affects the Island's ability to attract and keep healthcare providers in Puerto Rico.

## Labor Participation

» Collaborate with the Government of Puerto Rico to institute a work/ volunteer requirement to be implemented by July 1, 2023, for the Nutritional Assistance Program (NAP), Puerto Rico's largest welfare program. Such a requirement would be only for able-bodied participants aged 18-59 without dependent children in their households and would be in accordance with the Commonwealth's Certified Fiscal Plan. In general, working-age Supplemental Nutrition Assistance Program beneficiaries on the mainland must register for work, cannot turn down a job if offered, and may be required by the state to attend education or work training classes.

» Begin using the Department Health and Human Services (HSS) Poverty Guidelines to set the income limits that determine who is eligible for the U.S. Department of Housing and Urban Development's housing assistance in Puerto Rico, as it does in most mainland states. If this change were to be applied, more people could enter the formal labor market without the risk of losing housing assistance in the process. According to the Census Bureau, over 314,000 families in Puerto Rico live in poverty, approximately 54% of which include children. If income limits were to be appropriately adjusted, potentially thousands of low-income families could start to benefit from housing assistance. In other words, this would improve access to affordable housing, economic mobility, labor participation, and ultimately economic development in Puerto Rico.

» Ask the Department of Labor to partner with the Commonwealth to enable the expansion of apprenticeship programs to link education with marketable skills and employment, as well as ensure the workforce of Puerto Rico is prepared

for the jobs of the future.

» Encourage the Department of Homeland Security to carve out a lower investment floor for EB-5 visas relative to states to tailor visa programs to Puerto Rico's needs.

## Benefits Reform

» Address Puerto Rico's nutrition disparities by transitioning the Island into the Supplemental Nutrition Assistance Program (SNAP) to ensure equitable treatment in federal food nutrition assistance.

## Small Business

» Provide greater flexibility for Small Business Administration Programs to help Puerto Rico's small businessowners during the prolonged economic crisis. This includes many of the recommendations set forth in the Congressional Task Force Report, such as: (1) enact legislation to increase the guaranty rate and require a separate subsidy calculation for 7(a) loans made in Puerto Rico; (2) consider reducing the small business contribution and increasing the Certified Development Companies (CDC) contribution; (3) consider increasing that aggregate limit for the Microloan program in the case of intermediaries located in Puerto Rico; (4) authorize an intermediary in the Microloan program to use more than 25%of its SBA-provided technical assistance grants on pre-loan assistance if the intermediary provides at least 25%of its loans to small firms in Puerto Rico; (5) establish a contracting preference for small businesses in Puerto Rico with respect to federal contracts performed in Puerto Rico; and (6) require the SBA to make an annual Federal and State Technology Partnership Program (FAST) grant to a Puerto Rico grantee, and to waive the local matching requirement.

## Financial Institutions

» Request that the Community Development Financial Institutions Fund website update its maps to: (1) represent visually that Puerto Rico is eligible for its programs; (2) encourage it to increase the number of Community Development Financial Institutions in Puerto Rico; (3) ask that it assist FDIC-insured banks in Puerto Rico regarding the Bank Enterprise Award program; and (4) encourage it to appoint an individual with experience and expertise in Puerto Rico to the Community Development Advisory Board.

## Statistics

» Direct the Census Bureau, the Bureau of Labor Statistics, the Bureau of Justice Statistics, the Bureau of Economic Analysis, the National Center for Education Statistics, the National Center for Health Statistics, and the Substance Abuse and the Mental Health Services Administration to include Puerto Rico in their respective programs and to collect and publish data for Puerto Rico on the same basis as other states to the greatest extent possible.

» Assign funds to the Census Bureau to perform a Special Census of Governments for Puerto Rico for 2017, that would provide much needed up-to-date comparable financial information for credit markets.

## Support for Pending Legislation

FOMB supports in substance the following non-exhaustive list of pending legislation:

» **H.R. 2018** – To waive certain provisions in the case of an emergency declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act.

» **H.R. 2653, S. 1203** – MMEDS Act of 2021

» **H.R. 1740** – To designate all of Puerto Rico as an opportunity zone

» **H.R. 1824** – Puerto Rico Air Cargo Industry Empowerment Act

» **H.R. 1722** – Puerto Rico Health Care Fairness, Accountability, and Beneficiary Access Act of 2021

» **H.R. 1823** – To amend Title XIX of the Social Security Act to remove the matching requirement for a territory to use specially allocated Federal funds for Medicare covered Part D drugs for low-income individuals

» **H.R. 1826** – Fairness in Medicare Part B Enrollment Act of 2021

» **H.R. 3434** – Territories Health Care Improvement Act

» **H.R. 1825** – Territories Medicare Prescription Drug Assistance Equality Act of 2021

» **H.R. 537** – Supplemental Security Income Equality Act

» **H.R. 1822** – To amend title 10, United States Code, to ensure that certain TRICARE beneficiaries who reside in Puerto Rico may enroll in TRICARE Prime, and for other purposes

» **H.R. 1192, S. 375** – Puerto Rico Recovery Accuracy in Disclosures Act of 2021

» **H.R. 1968** – Puerto Rico Insurance Excise Tax Exemption Act of 2021

» **H.R. 1425** – To amend the Internal Revenue Code of 1986 to repeal the limitation on the cover over of distilled spirits taxes to Puerto Rico and Virgin Islands

» **H.R. 1742** – Real Estate Exchange Fairness Act of 2021

» **H.R. 1741** – Puerto Rico Film, Television, and Theatre Production Act of 2021

- » **H.R.329** – Puerto Rico Federal Judicial Improvement Act
- » **H.R. 4406** – Supporting Medicaid in the U.S. Territories Act of 2021
- » **H.R. 2791** – Renewable Energy for Puerto Rico and the U.S. Virgin Islands Act
- » **S. 1228 and H.R. 2713** – Territorial Equity Act of 2021
- » **S. 405 and H.R. 1126** – Vieques Recovery and Redevelopment Act 2021
- » **H.R. 2053** – Resiliency Enhancement Act of 2021
- » **H.R.1689** – Offshore Wind for Territories Act
- » **H.R. 2780** – Insular Area Climate Change Act
- » **H.R. 7997** – Achieving Equity in the Treatment of Dual Eligible Beneficiaries Act
- » **H.R. 8593** – Territories Statistics Collection Equity Act
- » **S. 2714** – A bill to amend the Internal Revenue Code of 1986 to provide funds for administration of the earned income tax credit in Puerto Rico.
- » **H.R. 5220** – Puerto Rico Nutrition Assistance Fairness Act of 2021
- » **S. 2485** – Territory Economic Development Tax Credit Act
- » **H.R. 2020** – The Post-Disaster Assistance Online Accountability Act"

The Oversight Board looks forward to working with the Federal Government on the aforementioned areas.

