# EXHIBIT 43



**COMMONWEALTH OF PUERTO RICO**
**PUERTO RICO ENERGY COMMISSION**



| | |
|---|---|
| IN RE: PETITION FOR APPROVAL OF TRANSITION ORDER FILED BY THE PREPA REVITALIZATION CORPORATION | **NO.**: CEPR-AP-2016-0001<br><br>**SUBJECT:** RESTRUCTURING ORDER |

<u>**RESTRUCTURING ORDER**</u>



## TABLE OF CONTENTS



**I.    INTRODUCTION** ................................................................................. 1

    A.    What is the "Transition Charge"? ......................................................... 1

    B.    What is the Commission approving? ...................................................... 5

    C.    Why must the Commission act now? ...................................................... 8

    D.    Explanation of the structure of this Order .......................................... 10

**II.    APPROVAL OF THE CORPORATION'S PETITION** ........................ 11

    A.    Summary of the Petition .................................................................... 11

    B.    Factual background and statutory overview ......................................... 13

    C.    Jurisdiction ...................................................................................... 19

    D.    Procedural Matters ........................................................................... 20

    E.    Satisfaction of the Criteria Requirements of Article 6.25A ................... 22

        1.    Calculation Methodology Criterion One: Transition Charges and
            the Adjustment Mechanism designed for full and timely payment. ......... 22

        2.    Calculation Methodology Criterion Two: Distribution of Financing
            Costs between Residential and Non-Residential Customers. .................. 26

        3.    Calculation Methodology Criterion Three: Calculation of
            Transition Charges for Customers. ...................................................... 27

        4.    Calculation Methodology Criterion Four: Adjusting for
            Delinquencies. ................................................................................. 28

        5.    Calculation Methodology Criterion Five: Methodology for
            Determining Estimated Load Served by Net-metering or
            Distributed Generation. ..................................................................... 29

        6.    The Petition and Restructuring Resolution Meet the Requirements
            of Article 6.25A(e) ........................................................................... 33

            a.    Article 6.25A(e)(1)(i)-(xii) – Requirements for the
                Restructuring Resolution .......................................................... 33

JHRM
da
Al

(i)     Resolution Requirement One: Upfront and Ongoing
        Financing Costs description and documentation. ............. 33

(ii)    Resolution Requirement Two: Determination of
        Customer classes. ................................................................ 34

(iii)   Resolution Requirement Three: Calculation of
        Transition Charges for Customers Other Than
        Residential Customers. ..................................................... 35

(iv)    Resolution Requirement Four: Calculation of
        Transition Charges for Residential Customers. ............... 36

(v)     Resolution Requirement Five: Distribution of
        Customer Delinquencies. ................................................... 36

(vi)    Resolution Requirement Six: Methodology for
        Determining Estimated Load Served by Net-
        metering or Distributed Generation. .............................. 37

(vii)   Resolution Requirement Seven: Distributions can
        be administered practicably and ensure full and
        timely payment ................................................................ 38

(viii)  Resolution Requirement Eight: Commitment to file
        Report on final terms of Bonds and estimates of
        Upfront and Ongoing Financing Costs. ........................... 38

(ix)    Resolution Requirement Nine: Commitment to
        provide any Successor Servicing Agreement and all
        Servicer Reports. ............................................................. 39

(x)     Resolution Requirement Ten: Commitment to
        provide any Reports Required by Bond Trustee. .............. 40

(xi)    Resolution Requirement Eleven: Commitment to
        provide any annual Reports and Final Accounting. .......... 40

(xii)   Resolution Requirement Twelve: Commitment to
        provide notice and data/work papers regarding any
        adjustments to Transition Charges. ................................... 41

b.      Article 6.25A(e)(2) – Transition Cost Calculation ...................... 42

c.      Article 6.25A(e)(3) – Financial Consultant Report ...................... 43

ii

   d.   Article 6.25A(e)(4) – Financing Costs...........................................44

   e.   Article 6.25A(e)(5) – Savings Test.................................................44

   f.   Article 6.25A(e)(6) – Servicer Costs .............................................45

   g.   Article 6.25A(e)(7) – Projections and Stress Tests.......................45

   h.   Article 6.25A(e)(8) – Other Documentary Support and
       Estimates........................................................................................46

   i.   Article 6.25A(e)(9) – Written Testimony .....................................46

   j.   Article 6.25A(e)(10) – Attachments and Other Documents .........47

  7.  Costs and Ongoing Financing Costs proposed to be recovered from
    the Bond proceeds or the Transition Charge Revenues are
    consistent with Article 6.25A and Chapter IV of the Revitalization
    Act....................................................................................................48

  8.  Article 6.25A(b)(3) requires that the servicing costs proposed to be
    recovered by PREPA in its role as the initial Servicer are
    necessary, reasonable and sufficient to compensate PREPA for the
    incremental costs of performing its functions as Servicer. .......................49

 F.  Conclusions of Law .................................................................................49

 G.  Formal Approval Orders ..........................................................................52

**III. COMMISSION COMMENTS ON SPECIFIC ELEMENTS OF
  THE PETITION ........................................................................... 54**

 A.  The Corporation's readiness, relationships and commitments.............................54

  1.  The Corporation's readiness to act ...........................................................54

  2.  The Corporation's relationship to PREPA .................................................55

  3.  Enforcing the Corporation's commitments ...............................................56

 B.  The Servicer Agreement .........................................................................57

  1.  The Servicer's role ....................................................................................57

  2.  The draft Servicer Agreement....................................................................59

  3.  The Servicer's cost and fee........................................................................59

4.    The Commission's authority over PREPA's performance as
Servicer ........................................................................................ 62

5.    The Commission's authority to replace PREPA as Servicer .................... 63

C.    The fees charged by contractors to the Corporation ................................. 66

1.    Contractor budgets .................................................................... 66

2.    Process by which existing contractors were chosen ................................ 68

3.    The risk of excess fees ................................................................ 68

4.    Roles of Corporation, PREPA and the Commission in preventing
excess fees ................................................................................ 69

D.    The treatment of net-metering customers ............................................. 71

1.    Understanding net-metering.......................................................... 71

2.    Treatment of non-grandfathered net-metering customers......................... 73

a.    Statutory background:  Section 29 of the Revitalization Act ....... 73

b.    Applying the Charge is "just"—to net-metering customers
and to all customers ......................................................... 75

c.    The charge is not "excessive" .............................................. 76

d.    The charge is not an "obstacle".............................................. 76

e.    Exempting non-grandfathered customers is not required by
Act 114-2007 .................................................................. 76

f.    Exempting net-metering customers undermines other
statutory purposes ............................................................ 77

g.    WindMar's Legal Brief ...................................................... 79

3.    Treatment of grandfathered net-metering customers............................... 82

4.    The future of net metering ........................................................... 84

E.    Some cautions about uncertainty ...................................................... 85

IV.    **INFORMATION REQUIREMENTS**...................................................... **86**

iv

**APPENDIX A –   CALCULATION METHODOLOGY AND
ADJUSTMENT MECHANISM TO  ESTABLISH AND ADJUST
THE TRANSITION CHARGE** ....................................................... 1

**APPENDIX B –   CORPORATION TESTIMONY RELATING TO
SECTION 6.25(E)(8)** ..................................................................... 1

**APPENDIX C –   CORPORATION TESTIMONY RELATING TO
SECTION 6.25A(E)(9)** ................................................................... 1

v

## RESTRUCTURING ORDER

In this Restructuring Order, the Puerto Rico Energy Commission ("PREC" or the "Commission") approves a Petition filed on April 07, 2016 by the Puerto Rico Electric Power Authority Revitalization Corporation (the "Corporation"). The Petition was filed under Article 6.25A of Act 57-2014, known as the Puerto Rico Energy Transformation and RELIEF Act ("Act 57-2014") as added by Article 20 of the PREPA Revitalization Act, Act 4-2016 ("Revitalization Act" or the "PRA").

## I.     INTRODUCTION

1. In its Petition, the Corporation seeks permission to place on the electric bills of all customers of the Puerto Rico Electric Power Authority ("PREPA") a "Transition Charge." In this Introduction, the Commission addresses three questions on the minds of the Commonwealth's citizens: What is the "Transition Charge"? What is the Commission approving? Why must the Commission act now?

### A.     What is the "Transition Charge"?

2. The Transition Charge is a mechanism designed to reduce costs for PREPA's customers. Bondholders holding approximately $7.170 billion of existing PREPA debt, with an estimated weighted average interest rate of 5.86 percent, have agreed to reduce that debt.[1] Known as the "Participating Bondholders," they are uninsured bondholders who have committed, or will commit, to reduce the value of their loans to 85 percent of the original amount, while accepting an average interest rate of approximately 5.22 percent They will also defer receiving principal payments for five years.[2]

3. In simple terms, a portion of PREPA's pre-existing debt (sometimes referred to as "legacy debt," to distinguish it from future debt PREPA will incur to finance new capital investments) will be exchanged for, and therefore replaced by, "Restructured Debt." The Restructured Debt will have a lower face value and lower interest rates, with principal payments

---

[1] This agreement is formalized in a Restructuring Support Agreement ("RSA") dated January 27, 2016, as amended. The signatories to the RSA include PREPA, the Corporation and the Participating Bondholders.

[2] Insurers of another smaller group of PREPA's bonds, while not accepting a reduced value for their debt investment or a lower interest rate, will assist the restructuring of PREPA's finances (and thereby lowering ratepayer costs) by providing surety bonds for debt reserves that will provide additional safety for the Restructured debt. The presence of surety bonds means that customers will not have to provide dollars for debt reserves through their electricity rates. Part II.B of this Restructuring Order will summarize the types of bonds and the dollar amounts associated with them.



deferred for five years. This action will reduce PREPA's capital costs—and therefore the costs that PREPA's customers would otherwise have to bear—by approximately $867 million.[3]

4. These savings are subject to a condition. Specifically, the bondholders are willing to reduce the payments they receive only if the Commission increases certainty that those payments will be made. The mechanism for increasing that certainty is the Transition Charge. The term "Transition Charge" has caused confusion. Although it will appear as a new line item on each customer's bill, the Transition Charge does not increase any customer's cost—beyond what the customer would pay if, once the Commission sets new rates in a rate proceeding, all of PREPA's debt is properly reflected in its rates.[4] Rather, the Transition Charge reflects that portion of the customer's total payment (about 12 percent in the first year) which PREPA must treat differently from the rest of the customer's payment. Specifically, PREPA must separate the Transition Charge payments (which are owned by the Corporation) from the rest of its revenues, then transfer those payments to the Restructuring Bondholders without delay. That is the purpose of the Transition Charge mechanism: to separate the dollars belonging to the Corporation and pledged to the Restructuring Bondholders from PREPA's general funds, and cause those dollars to be transferred to their rightful owners.

5. Included in the mechanism are complex calculations that produce the Charge. Those calculations are contained in a "Calculation Methodology" and "Adjustment Mechanism," the details of which the Commission has studied carefully and will discuss in Part II below.[5] Also supporting the mechanism are a variety of factual findings and legal conclusions, set forth in Commonwealth statutes and in this Restructuring Order. These findings and conclusions constitute strong government commitments—assurances to bondholders that the money will flow to them without interruption and without delay. Those government commitments make the money flow to bondholders securely—which is why this type of arrangement is called a "securitization."

---

[3] This $867 million figure is calculated in net present value dollars. Also, this figure is an estimate. The actual figure will be known (and reported to the Commission) when all Participating Bondholders have exchanged their bonds for Restructuring Bonds.

[4] Because PREPA has not increased its base rates since 1989, its current rates do not reflect debt incurred after 1989 and thus, do not reflect PREPA's real financial obligations.

[5] The full Calculation Methodology and Adjustment Mechanism is attached to this Restructuring Order as Appendix A.

6. To repeat: The Transition Charge does not recover costs exceeding those that PREPA must recover from its customers; nor does it cause PREPA to incur any additional debt. It is instead a means of assuring payment of current debt to the Participating Bondholders, in return for their agreement to accept a 15 percent reduction in the face value of their debt and a lower interest rate.[6]

7. Because PREPA incurred its debt to provide electric service, that debt will need to be reflected in the rates PREPA's customers pay. (Because PREPA is a government-owned, nonprofit utility, its debt-related costs must be recovered from its customers, unlike investor-owned utilities where a portion of its costs may be absorbed by the utility's shareholders.) The imposition of the Transition Charge by the Corporation will enable PREPA to reduce the cost to customers of paying the principal and interest associated with the legacy debt. Once we know the precise amount of legacy debt that will be exchanged for (and therefore replaced by) Restructured Debt, PREPA will remove the associated costs from its "base rate," shrink those costs to reflect the reduced face value and reduced interest cost of the Restructuring Bonds, calculate the level of the Transition Charge necessary to recover this reduced cost, then state the Transition Charge separately on customers' bills. When customers pay their bills, PREPA (or the Depository) will separate the payment portion associated with the Transition Charge and transmit those funds to the Corporation, which will transfer them to the Restructuring Bondholders. Customers will be better off with the Transition Charge than without it.

8. The Corporation projects the initial Transition Charge to be 3.10¢/kWh.[7] It will apply to the gross kWh consumption of all PREPA customers (residential, non-residential, governmental), with two exceptions:

a. For Fixed Block Public Housing Customers, the Transition Charge will apply only to kWh consumption exceeding their applicable consumption-based block of electricity usage.[8]

b. For "grandfathered" net-metering customers, the Transition Charge will apply only to their "net" consumption.[9]

---

[6] Participants in the transaction (PREPA and its bondholders) use the term "Transition Charge" because the Charge enables the financial "transition" PREPA is implementing to reduce its debt and attain solvency. Some readers may have seen the term "transition charge" in another context: the transition, implemented by some states on the mainland, from a historically monopoly market structure to a competitive market structure. Some of those transitions involved something called "stranded cost"—defined as capital expenditures made by a utility to serve its monopoly customers, which expenditures the utility will be unable to recover once those formerly monopoly customers purchase their services from new competitive suppliers. In that context, some states imposed "transition charges" on shopping customers to ensure recovery of that stranded cost. That concept of "transition charge" is unrelated to the charge proposed here.

[7] As calculated in Corporation Exhibit 11.01. The actual Transition Charge will be determined based upon the final debt service of the Restructuring Bonds.

[8] As defined and explained in Parts II.E.1 and II.E.3 below.

3



9. These adjustments protect low-income customers, as well as those existing net-metering customers who made investments in generation based on an expectation that certain PREPA charges would apply to their net consumption only.

10. Confusion could arise because at about the same time that the Commission is approving the Transition Charge mechanism, PREPA is proposing to increase its base rates—which it has not done since 1989.[10] Depending on how the Commission addresses PREPA's rate proposal, PREPA's customers could experience an increase in their base rates at the same time they see a new "Transition Charge" on their bills. But that increase in the total electric bill will be less than it would have been without the Transition Charge; *i.e.*, had the Participating Bondholders insisted on full payment. The increase in the customer bill will occur for two reasons: (1) PREPA's rates must reflect all debt costs, not only the amount of debt costs supported by the rates set in 1989; and (2) PREPA's rates must reflect all its prudent expenditures. The Transition Charge, as explained above, will reflect the debt associated with Participating Bondholders. That debt includes both pre-1989 and post-1989 debt. But the cost of that debt will be reduced as a result of those bondholders' willingness to forego full recovery in return for more certainty. The Transition Charge and the base rate increase are thus two different matters. The Transition Charge collects the costs associated with the debt held by Participating Bondholders. The base rate increase will address PREPA's remaining debt (*i.e.,* that portion of PREPA's legacy debt not included in the restructuring), along with PREPA's ongoing and prospective expenditures. In the rate proceeding, the Commission will ensure that the costs collected from customers by the Transition Charge are not duplicatively charged to the customers through PREPA's rates.

11. Perhaps this example will help. Imagine a scale holding 100 pounds of potatoes. If Mr. X removes 12 pounds from the scale but Mr. Y adds 25 pounds, the new weight will be 113 pounds. The total weight will be greater than before—but the increase will be less than it would have been had Mr. X not removed some of the potatoes. That is why there can be a cost reduction due to the Transition Charge (Mr. X), while at the same time a customer's total bill customer rises because of the increase in base rates (Mr. Y).[11]

---

[9] As defined and explained in Parts II.E.1, II.E.5 and III.D.3 below.

[10] PREPA submitted its Petition for new rates on May 27, 2016. The rate proceeding is entitled Review of Rates of the Puerto Rico Electric Power Authority, Case No. CEPR-AP-2015-0001. On June 13, 2016, the Commission issued a Resolution and Order finding that PREPA's Application was incomplete, because the Petition lacked critical information required by the Commission's Regulation No. 8720 on rate filing requirements. As of the date of this Restructuring Order, PREPA has not yet filed a completed Petition for new rates.

[11] The potato hypothetical is intentionally simplistic. It shows only the net increase in rates resulting from combining (a) a reduction in the customer's bill caused by the Transition Charge with (b) an increase in the bill caused by the increase in base rates. The actual Transition Charge situation is more complicated than the hypothetical. The reason is that the legacy debt recovered through the Transition Charge is larger than debt currently reflected in PREPA's rates. While current rates reflect only the debt PREPA had in 1989 (when PREPA last set its base rates), the debt reduced and recovered through the Transition Charge that as-of-1989 debt *plus* certain debt PREPA has added since 1989. That is because the Participating

12. The certainty contributed by a securitized Transition Charge is essential to the restructuring of PREPA's debt and to its overall financial health. Without this restructuring, it is likely that PREPA would be unable to access new capital funds. Without the ability to access these funds, system repairs would become less frequent, the probability of outages would increase, and rates would need to rise more rapidly (to pay upfront for the system upgrades that otherwise would be funded through long-term debt). PREPA would have less ability to build new infrastructure to accommodate more renewable energy, increase generation efficiency and transition into a modern utility. The Transition Charge, therefore, is more than a mechanism for ensuring payment to bondholders; it is an essential part of the path toward a modern, reliable electric system.

13. For all these reasons, the Commission in this Restructuring Order approves the Transition Charge mechanism.

## B.   What is the Commission approving?

14. A commission's powers are defined and limited by statute.[12] For this proceeding, the Commission's powers are defined and limited by Section 6.25A. This proceeding therefore has a discrete purpose:  to determine whether the Corporation's Petition satisfies the standards of Section 6.25A. That is what this Restructuring Order does:  It approves the Corporation's request for the approvals required by Section 6.25A, each of which we will explain in detail.

15. Section 6.25A does not require the Corporation to prove that the Transition Charge is as low as possible, or that PREPA obtained the maximum possible savings from its bondholders.[13] Conversely, Section 6.25A does not allow the Commission to reject the Petition merely because the Commission believes PREPA could have obtained greater savings from bondholders so as to produce a lower Transition Charge.

---

Bondholders include lenders of pre-1989 debt as well as lenders of post-1989 debt. With the Transition Charge, all of the Participating Debt will have a lower cost than it would have had without the Transition Charge. But the amount of debt recovered through the Transition Charge is larger than if the Transition Charge recovered only pre-1989 debt. This fact means that while the 12 pounds removed from the scale by Mr. X represents a reduction in the *cost* of debt caused by the Transition Charge, it does not represent an actual reduction in the *amount* of debt.

[12] DACo v. AFSCME, 185 D.P.R. 1 (2012); López Nieves v. Méndez Torres, 178 D.P.R. 803 (2010); Caribe Comms., Inc. v. P.R.T.Co., 157 D.P.R. 203 (2002).

[13] WindMar and ICSE-PR assert in their comments on the draft order that Act 57-2014 requires that PREPA must provide electricity at the "lowest cost possible." However, in a proceeding under Section 6.25A, the Commission has no power to regulate the price at which PREPA provides power. That is precisely the reason why the Commission stated, in the text above, that it has no power to reject this Petition because the Charge could be lower or the savings higher, under some other unknown scenario not identified by anyone.

5

16.  Nor is this proceeding a rate proceeding relating to PREPA's costs.  Section 6.25A grants the Commission no power to adjust PREPA's rates, or to modify the cost estimates associated with the restructuring, such as by excluding unreasonable costs.  The Commission does have that power in the rate proceeding known as Review of Rates of the Puerto Rico Electric Power Authority, CEPR-AP-2015-0001, but not in this Transition Charge proceeding. The Commission also has the general power, under Act 57-2014, to investigate PREPA's management and operations, to identify deficiencies and order improvements.  But again, the Commission does not have that power in this Transition Charge proceeding.  In this proceeding, the Commission is limited to addressing the questions posed by Section 6.25A.  Those questions are as follows:

### *General practicality and lawfulness of the proposed Transition Charge*

a.  Is the calculation methodology and the adjustment mechanism "designed to provide for the full and timely payment of the Restructuring Bonds in accordance with their terms and other Ongoing Financing Costs," as required by Section 6.25A(d)(i) of Act 57-2014?

b.  Is the Transition Charge "practicable to administer," as required by Section 6.25A(e)(1)(vii) of Act 57-2014?

c.  Are the Upfront Financing Costs and Ongoing Financing Costs [associated with the Restructuring Bonds] proposed to be recovered from the Bond proceeds or the Transition Charge Revenues consistent with Section 6.25A of Act 57-2014 and Chapter IV of the Revitalization Act?

d.  Does the Restructuring Resolution contain a "description and documentation supporting the proposed Upfront Financing Costs and the Ongoing Financing Costs, to be recovered from the Restructuring Bonds proceeds or Transition Charges," as required by Article 6.25A(e)(1) of Act 57-2014?

e.  Does the proposed transaction "satisfy the savings test set forth in Section 35 and Chapter IV of the PREPA Revitalization Act," as required by Section 6.25A(e)(5) of Act 57-2014?

f.  Are "the servicing costs proposed to be recovered by PREPA as Servicer ... sufficient to compensate PREPA for the reasonable incremental costs related to its servicing functions," as required by Section 6.25(e)(6) of Act 57-2014?

### *Allocation of Transition Charge among customers*

a.  Does the calculation methodology distribute the financing costs among classes of customers "based on historical kWh usage of each class of customers during the most recent twelve (12) months for which such information is reasonably available," as required by Section 6.25A(d)(1) of Act 57-2014?

b. Is the calculation methodology and adjustment mechanism for distributing the financing costs among classes of customers "practicable to administer," as required by Section 6.25A(d)(1) of Act 57-2014?

c. Once the financing costs have been distributed among classes of customers, is the calculation of Transition Charges, and the operation of the adjustment mechanism, "calculated in such manner which is practicable to administer and which ensures the full and timely payment of the Restructuring Bonds in accordance with their terms and other Ongoing Financing Costs," as required by Section 6.25A(d)(2) of Act 57-2014?

d. Does the calculation methodology and the adjustment mechanism address delinquencies of any class of customers in the payment of the transition charge by adding such delinquencies "to the revenue requirement of the next period and allocated among all Customers classes" in the manner used for the initial distribution and allocation, as required by Section 6.25A(d)(3) of Act 57-2014?

e. Does the allocation of responsibility for the Transition Charge among Customer classes and Customers not "limit the discretion of the Commission when evaluating the allocation of responsibility with respect to the PREPA revenue requirement in any PREPA rate case," as required by Section 6.25A(d)(2) of Act 57-2014?

### *Treatment of net-metering customers*

a. Is the Corporation's election to apply the Transition Charge to net-metering customers consistent with Section 29 of the Revitalization Act?

b. For Customers who are net metered or have other "behind the meter" generation, is it consistent with the Revitalization Act, and with the criteria in Article 4 of Act 114-2007, as amended by Article 29 of the Revitalization Act, when distributing Financing Costs among Customer classes and calculating those Transition Charges that are based on kWh usage, to calculate customer load based on estimated total electric consumption?

c. If the Corporation elects to use the "estimated load served by net-metering or distributed generation" when calculating customer usage, is "the methodology for such inclusion ... practical to administer," and will it "ensure the full and timely payment of the Restructuring Bonds in accordance with their terms and other Ongoing Financing Costs," as required by Article 6.25A(d)(4) of Act 57-2014?[14]

---

[14] In their comments on the draft order, WindMar and ICSE-PR argue that these questions—which are the only ones stated in Section 6.25A—omit "the fundamental question," namely, "[i]s the proposed Transition Charge economically viable for Puerto Rico within the context of both the current fiscal situation and what can be foreseen to occur throughout the next 25 years?" As important as this question is to Puerto Rico, it is emphatically not on the list of questions which Section 6.25A confines the Commission to addressing. The Commission must apply the statute as it is written. The pending rate case is subject to Act 57-2014, a statute whose breadth will enable intervenors to raise broader questions. We look forward to their participation.

17.    Each of the questions will be addressed in Parts II.C and II.D of this Restructuring Order.

18.    Following the issuance of this Restructuring Order, the Corporation will approve a Restructuring Resolution that includes the Corporation's own Findings of Fact and Conclusions of Law, as well as a series of "Resolved" clauses.   The legal responsibility for those Findings, Conclusions and Resolved clauses lies with the Corporation exclusively.   The Corporation submitted to the Commission a draft Resolution, which the Commission has reviewed.   But it is only a draft.   After the Commission issues this Restructuring Order, Section 6.25A of Act 57-2014 allows the Corporation to change the draft Resolution, and then approve it without Commission review.   Under these circumstances it is not possible, legally or logically, for the Commission to approve the Resolution itself.   Nor can any corporation's resolutions or conclusions of law diminish an agency's statutory powers.   In short, the Commission is approving only what this Restructuring Order states the Commission is approving.

### C.    Why must the Commission act now?

19.    The *Instituto de Competitividad y Sostenibilidad Económica de Puerto Rico* (ICSE-PR) argues that the Commission should not approve the Transition Charge until there is more clarity on PREPA's finances.   That clarity could result, ICSE-PR argues, from future actions by the U.S. Congress, the U.S. Supreme Court and the Puerto Rico Government's implementation of the Commonwealth's Emergency Moratorium and Financial Rehabilitation of Puerto Rico Act, Act 21-2016.   ICSE-PR also recommends we defer a decision until there are accurate demand forecasts and an approved integrated resource plan.

20.    The Commission does not have the power to adopt these suggestions.   Under Section 6.25A of Act 57-2014, if the Commission does not issue its decision within seventy-five (75) days of receiving a complete Petition, it loses its jurisdiction and the Petition is deemed approved.   The components of completeness are defined by Section 6.25A; the Commission has no power to require more.   Furthermore, the Commission may reject the Petition only for the reasons specified in Section 6.25A.   The reasons specified by Section 6.25A do not include the arguments made by ICSE-PR.   Thus the Commission has no choice but to act on the Petition now.

21.    It is possible that actions by Congress or the Puerto Rico Government could affect the amount and terms of PREPA's outstanding bonds.   But those events have not occurred.[15] Section 6.25A requires the Commission to act on the Petition that the Corporation has presented. That Petition is based on financial arrangements already negotiated and described in Part II.B of this Restructuring Order.   Section 6.25A does not allow the Commission to wait for some different Petition that might emerge from future unknown events.

---

[15]    On June 13, 2016, the U.S. Supreme Court issued its opinion finding that the Puerto Rico Public Corporation Debt Enforcement and Recovery Act, enacted by the Commonwealth in 2014, was preempted by federal bankruptcy law.   <u>Commonwealth of Puerto Rico v. Franklin California Tax-Free Trust</u>, No. 15-233 (U.S. June 13, 2016).

22.   Similarly, Section 6.25A does not authorize the Commission to reject this Petition for lack of accurate demand forecasts or an approved integrated resource plan.   ICSE-PR correctly asserts that with more information about kilowatt-hour (kWh) consumption, the Commission could better predict the size of a per-kWh Transition Charge and the ability of customers to pay that charge.   But the ability to make those predictions more precisely does not affect the reality: Consumption may decline, causing the effective per-kWh charge to rise.   Even if the Commission could predict demand precisely, it would face the same statutory questions Section 6.25A requires it to answer, most importantly this question:   Are the Calculation Methodology and the Adjustment Mechanism "designed to provide for full and timely payment of Restructuring Bonds"?   The statute asks about sufficiency of design, not certainty of result. The sufficiency of design does not depend on precision of the forecasts—especially since forecasting electricity demand is inherently uncertain.   Similar reasoning applies to the Integrated Resource Plan (IRP).[16]   The plan will affect the resource mix used to supply the Commonwealth's energy needs.   But the plan will not affect the question the Commission must address here:   whether the Calculation Methodology and Adjustment Mechanism are sufficiently "designed" to provide for timely payment of the Restructuring Bonds.

23.   In its brief, ICSE-PR urges that the Petition be rejected, but does not address the consequences of that rejection.   The Transition Charge is the foundation of PREPA's agreement with Participating Bondholders: an agreement that will reduce ratepayers' obligations to bondholders, since those bondholders agreed to reduce the value of their investment, and delay principal recovery for five years on certain bonds.   Rejecting the Transition Charge means sacrificing that benefit, and receiving in return complete uncertainty about PREPA's financial future.   If the Petition is rejected, PREPA will most likely default on its legacy debt, exposing it to lawsuits for the full amount of these bonds (without the benefit of an 85% reduction in principal of PREPA Uninsured Bonds), and a loss of trust by future bondholders.   It would be irresponsible for the Commission to reject the proposal without a suitable alternative.

24.   The concerns raised by ICSE-PR, in particular the risk of declining energy demand, *exist with or without a Transition Charge*.   PREPA must recover its reasonable costs, which include service for its legacy debt.   It must try to do so under circumstances of economic uncertainty, where future demand and future costs are unknown, even when guided by an IRP. Rejecting the Transition Charge does not eliminate these factors; approving the Transition Charge does not make them worse.   We have to emphasize that the Transition Charge recovers costs associated to legacy debt at a reduced value.   The IRP does not change the legacy costs. New forecasts do not change the legacy costs.   The pending rate case must address these legacy costs.   With or without Transition Charge, the legacy costs are with us.

25.   We emphasize that ICSE-PR's concerns are lessened by the Corporation's decision to substitute its original proposal of a per-kWh charge for non-residential customers and a fixed per-customer charge for residential customers with a uniform per-kWh charge for all customers.

---

[16] *See* In Re: Integrated Resource Plan of the Puerto Rico Electric Power Authority, CEPR-AP-2015-0002.

With a uniform per-kWh charge, the effect of our approval is narrow and simple: PREPA legacy costs—*costs that must be recovered anyway*—will be recovered in a manner that moves the funds more quickly and directly to bondholders than would be the case without the Transition Charge. That is the only change being made here. There is no rational reason to reject it.

26. Implicit in ICSE-PR's position is that the Commission should require —or hope— that PREPA renegotiate the Restructuring Support Agreement ("RSA") to reduce its debt further. *The Commission does not have that power.* The Commission is constrained by the facts it has. Indeed, even if the bondholders absorbed another 10 percent (along with the 15 percent they already have agreed to absorb), the reminder of the legacy debt would still need to be repaid through a similar Transition Charge in order to obtain that benefit; ICSE-PR's concerns would remain. The legal question for the Commission is whether—given the real-world facts about how much reduction the bondholders have agreed to absorb—the Transition Charge is "designed" to achieve its objectives. When compared to the complete uncertainty accompanying rejection— which itself would eliminate none of ICSE-PR's concerns—approval is unmistakably the correct decision.

27. Finally, ICSE-PR argued that approving the Corporation's proposal "binds the Commission to a specific securitization model and transition charges...." We respectfully disagree. Because the model recovers the entire Charge through a per-kWh charge (as distinct from a per-customer charge), the Commission has complete flexibility over rate design when it addresses PREPA's rates. Approving the Transition Charge as a per-kWh charge has one effect: It *reduces* the total amount that customers must pay.

### D.    Explanation of the structure of this Order



28. Along with its Petition, the Corporation submitted a detailed draft order, requesting that the Commission use that draft as the basis for its order. The Corporation's draft document contains technical language that has been used successfully in the contexts of other securitization charges. The Commission recognizes that its Restructuring Order will be read by many people with a stake in our decisions: not only citizens of Puerto Rico and the management and employees of PREPA, but also existing and future investors. These investors are crucial to PREPA's recovery. They are accustomed to seeing certain language whose technical phrasing has unique and significant meaning to them. To assist in creating certainty among investors, therefore, the Commission has retained most of the language presented in the Corporation's draft order. That material occupies Part II of this Restructuring Order. Our changes to the Corporation's draft order are few and, in our opinion, minor. In the rare situations where the Commission has a disagreement with the draft order, we have taken pains to limit the disagreement, and to present a solution that accommodates the legitimate concerns of investors with the statutory obligations of the Commission. In those rare situations, we expect that the Corporation will reconcile its Resolution and the Servicing Agreement with this Order to avoid confusion, recognizing that nothing in this Restructuring Order prevents the bondholders or the Corporation from asserting their rights under the Act.

29. While we understand the need to speak in a manner that investors understand, we must also speak to the Commonwealth's citizens with our own voice. Consequently, Part III of



this Restructuring Order presents our thoughts, in our words, on the following matters: (i) the Corporation's readiness, relationships and commitments; (ii) the Servicer Agreement; (iii) the fees charged by contractors to PREPA or the Corporation; (iv) the application of the Transition Charge to net-metering customers; (v) the inevitability of uncertainty; and (vi) Information Requirements for the Corporation.

## II.   APPROVAL OF THE CORPORATION'S PETITION

### A.     Summary of the Petition

30.  The Corporation is a special purpose public corporation and instrumentality of the Government of the Commonwealth of Puerto Rico (the "Commonwealth").  In its Petition, the Corporation describes the proposed issuance of certain Restructuring Bonds (hereinafter the "Bonds") and places before the Commission a proposed Restructuring Resolution[17] that creates Restructuring Property, provides for financing of Approved Restructuring Costs through the issuance of Bonds, imposes and provides for the collection of Transition Charges to fund Upfront Financing Costs and Ongoing Financing Costs, and describes how the Transition Charges will be calculated and adjusted through the Adjustment Mechanism.[18]  The Corporation requests that the Commission, as provided in Article 6.25A(f) of Act 57-2014, review the Petition and supporting testimony and attachments, and approve the Petition by issuing an order ("Restructuring Order") making the findings and determinations therein, including as set forth in Article 6.25A(b) of Act 57-2014:

31.  **First**, the provisions of the Restructuring Resolution proposed by the Corporation (the "Restructuring Resolution")[19] (submitted as Corporation Supplemental Exhibit ("Corp.

---

[17] "Restructuring Resolution" ["*Resolución de Reestructuración*"] means "a resolution of the Board adopted in accordance with [the Revitalization Act] which creates Restructuring Property, approves the imposition and collection of Transition Charges and the financing of "Approved Restructuring Costs" through the issuance of Restructuring Bonds, and contains a related Adjustment Mechanism, all as provided in Articles 34 and 35 of [the Revitalization Act.]" PRA, Art. 31 para. 29.

[18] Attachments to the Petition are designated as "Attachments" and testimony or documents attached to testimony are designated as "Exhibits" or "Ex."

[19] In order to avoid confusion, the Restructuring Resolution, Calculation Methodology, and Adjustment Mechanism referred to in this Order are the revised versions thereof submitted in response to the Commission's 5th Clarification Request via Resolution and Order of May 31, 2016 (the "5th Clarification Request") as revised pursuant to the Commission's 6th Clarification Request via Resolution and Order of June 9th, 2016.  This Revised Restructuring Resolution (including a revised Calculation Methodology and revised Adjustment Mechanism) incorporated certain changes to the Calculation Methodology in response to Commission and Intervenor suggestions and concerns.  These changes are discussed herein in the sections that address the allocation of costs to residential and net-metering customers.  Thus, the citation to these documents will be the Exhibit submitted by the Corporation as Corp. Supp. Ex. 10.01 – not the Restructuring Resolution attached to the Corporation's Petition as Attachment 1.00.  However, where the Restructuring Resolution (Attachment 1.00, Appendix 2), as filed is referenced in this Order, it is referred to as the "Original" Restructuring Resolution, "Original" Calculation Methodology, etc.

Supp. Ex.") 10.01 in response to the Commission's 5th Clarification Request via Resolution and Order of May 31, 2016 (the "5th Clarification Request") and the Commission's clarification conference of June 9, 2016, as well as the Commission's 6th Clarification Request issued via Resolution and Order of June 9th, 2016, including the revised Calculation Methodology for the Transition Charges[20] and revised Adjustment Mechanism[21] related to the Bonds, are consistent with the criteria set forth in Article 6.25A(d) of Act 57-2014 and are sufficient for, and provide for adequate protection of, the full and timely payment of the Bonds, in accordance with their terms, and other Ongoing Financing Costs;[22]

32. **Second**, the Upfront Financing Costs[23] and Ongoing Financing Costs proposed to be recovered from the Bond proceeds or the Transition Charge Revenues are consistent with Article 6.25A of Act 57-2014 and Chapter IV of the Revitalization Act; and

---

Accordingly, all references to the "Restructuring Resolution," "Calculation Methodology," and "Adjustment Mechanism" hereafter refer to revised versions submitted in response to the 5th and 6th Clarification Requests.

[20] "Transition Charges" ["*Cargos de Transición*"] means "those rates and charges that are separate from rates and charges of PREPA and that are imposed pursuant to a Restructuring Resolution on Customers to recover the Ongoing Financing Costs, and shall include a pro rata share of any late payment fee imposed in respect of any past-due bill for electric service that includes in such bill an amount for Transition Charges." PRA, Art. 31, para. 6 (citations are to the official version). "Transition Charge Revenues" ["*Ingresos de Cargos de Transición*"] means "all money and other property received or to be received, directly or indirectly, on account of the Transition Charges, and all proceeds of the investment thereof." *Id.*, para. 20.

[21] "Adjustment Mechanism" [*"Mecanismo de Ajuste"*] means "the formulaic adjustment mechanism contained in a Restructuring Resolution, as approved in a Restructuring Order pursuant to the terms of Article 35 and Chapter IV of this Act and 6.25A of Act 57-2014, as amended, to be applied by the Corporation periodically, but not less often than semi-annually, to adjust the Transition Charges to ensure the collection of Transition Charge Revenues sufficient to provide for the timely payment of Ongoing Financing Costs." PRA, Art. 31, para. 23.

[22] "Ongoing Financing Costs" means Financing Costs other than Upfront Financing Costs and any excess of actual Upfront Financing Costs incurred over the Corporation's estimate of Upfront Financing Costs that are payable from the proceeds of the issuance of Restructuring Bonds. PRA Art. 31(16).

[23] "Upfront Financing Costs" means the Financing Costs related to obtaining the Restructuring Order, the design, marketing, and issuance of Restructuring Bonds, except to the extent that the Corporation determines to pay said costs as Ongoing Financing Costs payable from Transition Charge Revenues. Upfront Financing Costs include, without limitation, Trustee (or similar fiduciary) fees and expenses, legal fees and expenses, accounting fees and expenses, Servicer set-up rates or expenses, calculation agent, depository or other manager or fiduciary placement fees and expenses, underwriting fees and expenses, printing and marketing fees, filing or listing and compliance fees, fees and expenses of the Corporation's other consultants, if any, credit rating agency fees, collateral fees and expenses, and any other cost approved by the Board of the Corporation as necessary or desirable to achieve the purposes of this Chapter and shall include reimbursement to any Person of amounts paid in advance to cover such costs. PRA, Art. 31(14).

33. **Third**, the servicing costs proposed to be recovered by PREPA in its role as the initial Servicer[24] (the "Initial Servicer") are necessary, reasonable, and sufficient to compensate PREPA for the incremental costs of performing its functions as the Initial Servicer.

34. In this Order, we approve the Petition and make the findings requested by the Corporation, subject to the clarifications stated in this Order. None of these clarifications are intended to affect, or will affect, the Calculation Methodology or the Adjustment Mechanism, or will in any way affect the value of the Restructuring Bonds.

### B.     Factual background and statutory overview

35. PREPA provides electric utility service to the vast majority of Puerto Rico. A sound financial structure is necessary for PREPA to fund its ongoing operating expenses and capital investment needs, meet its obligations to its creditors, and provide efficient, safe, and environmentally responsible electric service at just and reasonable rates, consistent with sound fiscal and operational practices which result in reliable service at the lowest reasonable cost.

36. During the past several decades, PREPA issued substantial debt to fund capital expenditures and, in the case of fuel related credit facilities, operating expenses. In total, PREPA has debt obligations of approximately $9 billion, including nearly $735 million currently due under its revolving fuel lines of credit and approximately $420 million in principal and interest that will be due on or before July 1, 2016 under its outstanding bonds. In adopting the Revitalization Act, the Legislative Assembly concluded that PREPA's financial situation requires immediate action in order to achieve financial solvency and meet its obligations in a manner that is orderly and appropriate.

37. In light of its financial situation, PREPA negotiated with major creditors to arrive at a broad, consensual financial settlement, and has entered into a Restructuring Support Agreement, dated as of January 27, 2016 (as amended or restated from time to time, the "RSA") with creditors holding or insuring approximately 70 percent of the face amount of PREPA's outstanding financial indebtedness including beneficial owners and insurers of existing PREPA bonds, banks (and their transferees) that previously provided revolving lines of credit used to pay for fuel and other expenses, the Government Development Bank for Puerto Rico (collectively, the "Supporting Creditors"), and others. The Corporation is now also a party to the RSA. The RSA sets forth material terms of PREPA's financial and operational restructuring. A cornerstone

---

[24] "Servicer" ["*Manejador*"] means "PREPA to the extent permitted by this Act, and if PREPA is replaced as Servicer pursuant to a Servicing Agreement or Act 57-2014, as amended, a Person or Persons authorized and required, by contract or otherwise, to impose, bill or collect Transition Charges, to prepare periodic reports regarding billings and collections of Transition Charges, to remit collections to or for the account of the Corporation or its assigns or pledgees, including a Financing Entity, and to provide other related services for the Corporation, which may include calculation of periodic adjustments to the Transition Charges or providing other services related to the Restructuring Property; and shall be deemed to include any subservicer, backup servicer (including if it becomes a Servicer under a Servicing Agreement), replacement servicer or the successors of any of the foregoing, authorized to act as such under a Restructuring Resolution." PRA, Art. 31, para. 22.

of the restructuring is the issuance by the Corporation of Bonds[25] authorized by the Restructuring Resolution to defease, exchange for, and/or effectively refinance certain debt of PREPA.

38. The RSA provides, in pertinent part and in summary,[26] that the Corporation will issue certain Bonds including Bonds to be exchanged for certain existing uninsured PREPA bonds having greater face value and that impose greater aggregate financial burdens on PREPA and, ultimately, on PREPA's customers. For the existing PREPA uninsured bondholders that participate, the RSA provides for an 85 percent exchange rate — or a 15 percent discount to principal owed under existing uninsured PREPA bonds — as well as a five-year principal holiday and an agreed-upon weighted-average interest rate pursuant to a pricing grid included in the RSA that the parties to the RSA project to be lower than the weighted-average interest rates on PREPA's existing bonds. In return for a commitment to defease certain insured PREPA bonds with Mirror Bonds (as defined in the Restructuring Resolution), the Monoline Insurers will provide an additional capital commitment in the form of one or more, debt service reserve fund surety policies (each, a "Surety Bond") to provide credit support for the Bonds. The scheduled maturity (including scheduled mandatory sinking fund redemptions), interest rate, principal amount, and other economic terms of the Mirror Bonds are the same as the legal maturity (including scheduled mandatory sinking fund redemptions), interest rate, principal amount, and other economic terms of the existing PREPA bonds insured by the monoline bond insurers that have signed, and are participating in the transactions set forth in Schedule II to Annex D to the RSA (the "Monoline Insurers"), provided that the parties may agree to alter certain interest payments on the Mirror Bonds to better match expected Transition Charge Revenue with debt service requirements.

39. The Legislative Assembly of Puerto Rico enacted, and the Governor on February 16, 2016 signed into law, the Revitalization Act. The Revitalization Act implements essential terms of the RSA, which is the "Agreement with Creditors"[27] referred to in the Revitalization Act, and

---

[25] "Restructuring Bonds" [*"Bonos de Reestructuración"*] means "bonds, notes, or other evidences of long term indebtedness that are issued by the Corporation pursuant to this Act, any Restructuring Resolution and the Trust Agreement related thereto (a) the payments on or proceeds of which are used, directly or indirectly, to finance or refinance Approved Restructuring Costs, (b) that are directly or indirectly secured by, or payable from, Restructuring Property, and (c) that have a term no less than one (1) year and no longer than thirty-five years." PRA, Art. 31 para. 3. The Bonds, as defined above, refer to those Restructuring Bonds that would be authorized by the proposed Restructuring Resolution.

[26] The terms of the RSA and the Restructuring Resolution speak for themselves. This summary identifies key features of the RSA and the Bonds that put the Commission's specific statutory duties and authority under the Revitalization Act into context. Additional details may also be found, without limitation, in the testimony of Lisa J. Donahue and Michael Mace (Corporation Exs. 1.00 and 4.00, respectively).

[27] "Agreement with Creditors" means "the agreement executed on January 27, 2016 (including all schedules and annexes and supporting documents) between PREPA and several of its main creditors, as it may be amended or supplemented, through which certain terms and conditions of PREPA's outstanding debt are modified and PREPA commits to (i) implement certain administrative, operational and governance reforms, (ii) optimize the transmission and distribution of electricity, (iii) modernize the generation of electricity and (iv) implement operational savings. Neither the Agreement with Creditors nor any future amendment or supplement thereto shall be contrary to the provisions of the PREPA

authorizes the Corporation to issue the Bonds. The Revitalization Act sets forth, among other things: characteristics of the Bonds and describes the Restructuring Property created to secure, satisfy, and support the payment of the Bonds; the Calculation Methodology under which Transition Charges are established and adjusted over time; and the Servicing Agreement[28] that provides for the administration, billing, and collection of the Transition Charges on behalf of the Corporation. By creating the Corporation and authorizing its issuance of the Bonds, the Revitalization Act furthers PREPA's ability to perform its obligations under the RSA.

40. The Restructuring Resolution (Corp. Supp. Ex. 10.01) authorizes the issuance of one or more series of Bonds that may be broadly grouped into two separate categories: the "Closing Date Bonds" and the "Post-Closing Date Bonds." The Closing Date Bonds are issued in the following amounts and for the following purposes on the date (the "Closing Date") on which the Exchange Offer Bonds, described below, are issued:

a.  Bonds, in an initial aggregate principal amount not to exceed $4.97 billion (the "Exchange Offer Bonds"), to be issued to the beneficial owners of PREPA Bonds that are not insured PREPA Bonds ("Uninsured PREPA Bonds"), in exchange for such Uninsured PREPA Bonds (i) at an exchange ratio (principal to principal) of 85 percent and (ii) may also be issued in an amount equal to and in satisfaction of any accrued and unpaid interest owing on such Uninsured PREPA Bonds at the time of such exchange;

b.  (i) Bonds, in an initial aggregate principal amount not to exceed $2.086 billion (the "Monoline Mirror Bonds"), to be deposited in an irrevocable escrow to solely legally or economically defease the PREPA Bonds insured by the monoline bond insurers (the "Insured PREPA Bonds") that have signed the RSA and are participating in the transactions set forth in Schedule II to Annex D to the RSA (the "Monoline Insurers"), and (ii) Bonds, in an initial aggregate principal amount not to exceed $750 million (the "Other Mirror Bonds" and together with the Monoline Mirror Bonds, the "Mirror Bonds") to be deposited in an irrevocable escrow to solely legally or economically defease the PREPA Bonds issued in 2016 or 2017 (the "2016 PREPA Bonds");[29]

---

Revitalization Act. Nothing in the Agreement with Creditors an entered into before the approval of this Act shall be understood to create ties or obligations between the Customers or the Commonwealth of Puerto Rico and the creditors of the Authority or the Corporation." *See* Art. 1.3(a) of Act 57-2014 and Section 2(a) of Act 83 of May 2nd, 1941, as amended by Articles 3 and 4, respectively, of the Revitalization Act.

[28] "Servicing Agreement" ["*Contrato de Manejo*"] means "the agreement or agreements between the Corporation and the Servicer providing for the administering and servicing of Restructuring Property, as the same may be amended from time to time by the parties thereto in a manner not prohibited by this Act." PRA, Art. 31, para. 11. A draft form of the initial Servicing Agreement is attached to the Restructuring Resolution as Appendix 4. *See* Attachment 1.00, Appendix 4.

[29] The Corporation in its explanation of comments to the Commission's Draft Order stated that it noticed a mistake in the Restructuring Resolution in that it called for "2016 Bonds" in an initial aggregate

15



c.  Bonds, in a principal amount not in excess of the sum of 6.25 percent of the Closing Date Bonds described in clauses (A), (B), (D), (E), (F) and (G) plus 6.25 percent of the Post-Closing Date Bonds, to fund or, in the case of (ii) to be provided in whole or in part as payment for, (i) one or more debt service reserve or operating funds or accounts to secure payment of all or a portion of the Bonds, and (ii) all Upfront Financing Costs incurred in connection with the issuance of all Closing Date Bonds or the Post-Closing Date Bonds, as the case may be; plus (iii) the costs of any payment to the IRS (as described further on in this Order);

d.  Bonds, in an initial aggregate principal amount not in excess of $50 million, to fund a deposit to the PREPA Self Insurance Fund as described further on in this Order (Bonds issued for purposes described in this clause (D) and the preceding clause (C) are collectively referred to as "New Money Bonds");

e.  Bonds, in an initial aggregate principal amount not exceeding $2.6 billion ("Cash Offer Bonds"), for the purpose of funding the costs to refund, redeem or purchase, directly or indirectly, Uninsured PREPA Bonds with the goal of increasing the exchange offer participation levels;

f.  Bonds, in an initial aggregate principal amount not exceeding $625 million (the "Lender Bonds"), issued to the Supporting Creditors (i) in exchange for the extinguishment of the obligations due and owing under the Credit Agreements (the "Credit Agreements") between such Supporting Creditors and PREPA, at an exchange ratio (principal to principal) of 85 percent and (ii) to reimburse such Supporting Creditors for certain fees and expenses in an amount not to exceed $1 million; and

g.  Bonds, in a principal amount not exceeding $240 million, to be issued to restructure, refund, redeem, defease (legally or economically through the issuance of additional mirror bonds or otherwise) or purchase PREPA Bonds insured by Syncora Guarantee Inc. and/or an affiliate thereof ("Syncora"), as required to implement the economic terms of the RSA, as it may be amended (the "Closing Date Syncora Bonds").

41.  In addition, one or more series of Post-Closing Date Bonds may be issued after the Closing Date in the following amounts and for the following purposes:

---

principal amount not to exceed $750 million issued to defease the PREPA Bonds issued in 2016. Due to the securitization not being anticipated to be completed in 2016 as originally contemplated, these bonds will defease debt issued in 2016 or 2017. The Corporation committed to making this correction in the Restructuring Resolution when it is submitted to the Commission. The Corporation also represents and commits to the Commission that, consistent with the Act's definition of "Approved Restructuring Costs" in PRA, Art. 31 para. 15, "[t]he Restructuring Resolution shall not include in any manner whatsoever, the cost of retiring a debt of the Authority that has not been included in the Creditors' Agreement, except for debt incurred in 2016 in an amount not to exceed five hundred thirty-five million dollars ($535,000,000)."

a.  One or more series of Bonds, in an initial aggregate principal amount not to exceed $750 million to one or more holders of 2016 PREPA Bonds, at an exchange ratio of 100 percent, in voluntary exchange for such 2016 PREPA Bonds. If any 2016 PREPA Bonds are exchanged for Post-Closing Date Bonds, the corresponding Mirror Bonds will be cancelled;

b.  One or more series of Bonds in a principal amount not exceeding $240 million, to be issued to restructure, refund, redeem, defease (legally or economically through the issuance of mirror bonds or otherwise) or purchase PREPA Bonds insured by Syncora, as required to implement the economic terms of the RSA, as it may be amended (the "Post-Closing Date Syncora Bonds" and, together with the Closing Date Bonds, the "Syncora Bonds"); provided that the total principal amount of Syncora Bonds issued shall not exceed $240 million; and

c.  New Money Bonds with respect to Post-Closing Date Bonds, as described in and to the extent not previously issued pursuant to clause 1(i)(C) above to pay the Upfront Financing Costs described therein.

42.  Post-Closing Date Bonds shall be payable, on a parity with all Closing Date Bonds, from, and secured, equally and ratably with all Closing Date Bonds, by, the Restructuring Property pledged to the payment of the Bonds in the Trust Agreement (as hereinafter defined). Absent exchange for Post-Closing Date Bonds, the 2016 PREPA Bonds would remain a liability of PREPA.

43.  In accordance with the RSA, the Petition and supporting materials contemplate a Closing Date of June 30, 2016. However, the Corporation has stated that if the Closing Date does not occur by June 30, 2016, it would seek to reach an agreement with other parties to the RSA to close on a later date. If agreed to by the parties and as authorized by the Restructuring Resolution, the Corporation states it could capitalize and securitize the incremental interest expense that PREPA would otherwise be obligated to pay on its bonds exchanged for Exchange Offer Bonds by reason of the later closing through the issuance of additional Exchange Offer Bonds and/or to defer initial interest payment dates on such Exchange Offer Bonds (or to capitalize such interest) to mitigate the short term effect on Transition Charges needed to collect revenues sufficient to make such a payment in less than one year. Although this may result in a short term increase in the required Transition Charge, the costs to PREPA (which PREPA would seek to recover through its own rates) would be lessened. If agreed to by the parties and as authorized by the Restructuring Resolution, the Mirror Bonds could be subject to additional terms that provide for additional sources of payment or defer the timing of payment of such interest for the purpose of better matching expected Transition Charge revenues with debt service requirements. The Corporation states that potential need to close after June 30, 2016 does not affect any of the findings enumerated in Article 6.25A(b) and, in particular, the Calculation Methodology remains consistent with the criteria set forth in Article 6.25A(d).

44. As described in the Restructuring Resolution and required by the Revitalization Act, the Bonds will be paid and certain other expenses will be funded through Transition Charges that Customers[30] will be obligated to pay. Those Transition Charges will adjust over time, up or down, in response to changes in the Ongoing Financing Costs and in response to changes in revenues that the Transition Charges generates. The imposition of the Transition Charges does not, however, increase the total aggregate cost or burden on PREPA customers (i.e., whether paid to PREPA or as a Transition Charge), relative to what customers would have to pay if the costs recovered through the Transition Charge were reflected in PREPA's normal rates. The Transition Charges support the Bonds and enable the transactions described in the Restructuring Resolution to achieve a reduction in PREPA's long-term costs and, in total and on balance, reduce the costs Customers ultimately bear as compared to the costs they would have borne in the absence of the issuance of the Bonds and the consummation of the restructuring. In particular, Exchange Offer Bonds paid by the Transition Charges are to be issued in a lower aggregate principal amount and, on average, are projected to require lower debt service than the debt exchanged for or refinanced by those Bonds. Monoline Mirror Bonds give the Corporation access to surety bonds that partially satisfy a debt service reserve requirement for the Bonds.

45. To make the restructuring possible and maximize the benefits to Puerto Rico from the securitization transaction that is the subject of the Petition, the RSA requires, among other things, that: (a) Transition Charges be non-bypassable for all PREPA Customers, except for the treatment of certain net-metering customers as discussed in Part III.D below; (b) the Adjustment Mechanism increase or decrease Transition Charges in response to changes in Ongoing Financing Costs and factors affecting the revenues generated by the Transition Charges, including, without limitation, the number of Customers paying Transition Charges, the Customers' electricity usage, and the timing and patterns of payment and collection of Transition Charges; and (c) there be a legislative and regulatory commitment, including the statutory covenants of the Commonwealth set forth in the Restructuring Resolution providing, among other things, that there be no amendment, modification, or termination of the Restructuring Resolution or the Restructuring Order and no reduction, impairment, postponement, termination, or adjustment to the Transition Charges authorized by this Order and established by the Restructuring Resolution except through the Adjustment Mechanism.

---

[30] Customer" ["*Cliente*"] means "any Person that is connected to or takes or receives electric service within the Commonwealth by means of the electric generation, transmission or distribution facilities constituting part of Electric System Assets, whether or not those electric generation, transmission, or distribution facilities are owned by PREPA. PREPA shall not be a Customer. Each municipality in the Commonwealth shall be a Customer to the extent that the dollar value of its usage of electric service (including in determining such dollar value of Transition Charges which would otherwise be imposed on such municipality and PREPA charges) in any fiscal year exceeds the dollar value owed by PREPA to such municipality as a contribution in lieu of taxes for such fiscal year." PRA, Article 31, para. 7. For the avoidance of doubt, previous Customers that completely disconnect from Electric System Assets, such that PREPA no longer has an obligation to serve them, shall no longer be considered "Customers" for all purposes under the Act, the Restructuring Resolution and this Order unless and until said Customers reconnect.

18

46.   The Revitalization Act provides that the Petition be evaluated on a defined timetable, under specific statutory criteria, and under statutory procedures that, among other things, provide notice to the public and permit the citizens of Puerto Rico to express their opinions in writing. Under Article 6.25A(f) of Act 57-2014, the Commission must approve the Petition by making certain findings in a Restructuring Order, or adopt a resolution rejecting the Petition and stating the reasons for such rejection, within seventy-five (75) days of the Corporation Petition Date (as defined therein). Failing that, Article 6.25A(f)(4) provides that the Petition "shall be deemed to be approved as a matter of law."

### C.   Jurisdiction

47.   The Corporation is a duly organized special purpose public corporation and governmental instrumentality of the Commonwealth of Puerto Rico exercising "essential governmental and public powers."[31]  It was created on February 16, 2016, pursuant to Article 32 of the Revitalization Act.  Its address is Roberto Sánchez Vilella (Minillas) Government Center, De Diego Avenue, Stop 22, San Juan, Puerto Rico 00907. Web sites have been created in English at prc.pr.gov and in Spanish at craee.pr.gov.

48.   The Corporation is empowered by law to, among other things, adopt Restructuring Resolutions, issue Bonds contemplated by a Restructuring Resolution, impose and collect non-bypassable Transition Charges, and approve an Adjustment Mechanism, subject to the Commission issuing a Restructuring Order.[32]  The Corporation may not operate "for the purpose of making a profit."[33]

49.   The Corporation has determined to adopt, in accordance with the provisions of Article 6.25A of Act 57-2014 and Chapter IV of the Revitalization Act, a Restructuring Resolution that meets the requirements of Article 6.25A authorizing the issuance of Bonds as described in Article 34 of the Revitalization Act.  The proposed Restructuring Resolution with certain Appendices and Schedules thereto, as revised, is Corp. Supp. Ex. 10.01. Appendix 2 to the Restructuring Resolution sets out the "Calculation Methodology and Adjustment Mechanism as revised to Establish and Adjust the Transition Charge" (the "Calculation Methodology").[34]

50.   The Revitalization Act defines the jurisdiction and authority of the Commission to review specific aspects of the Restructuring Resolution, the Calculation Methodology, and the agreement for servicing the Transition Charges.  That statutory review is the subject of the Petition.  Article 6.25A of Act 57-2014 defines requirements for the Corporation's Petition, the Restructuring Resolution, and the supporting materials and testimony filed with the Petition.  It also enumerates the specific criteria under which the Commission must evaluate the Petition and

---

[31] PRA, Art. 32(a).

[32] PRA, Art. 33(a).

[33] PRA, Art. 32(a).

[34] Certain technical terms, periods, and dates referred to in the Calculation Methodology are defined in the Restructuring Resolution (Corp. Supp. Ex. 10.01) and Appendices thereto.

the findings that the Commission must make to issue the Restructuring Order. The Revitalization Act provides, among other things, that "[t]he establishment and adjustment of the Transition Charges made by the Corporation in relation with the Adjustment Mechanism shall not be subject to legislative or any other governmental review or approval, except as provided in Article 34, regarding the review by the Commission to correct mathematical errors made by the Corporation, and Article 35(b) with respect to the approval of the Adjustment Mechanism in the Restructuring Order."[35]

### D.    Procedural Matters

51. As provided in Article 6.25A(f), a summary of the Petition, prepared by the Corporation in both English and Spanish, was published on the websites of the Commission, the Corporation, and the Authority.[36]

52. The "Corporation Petition Date" is defined as the date of filing of the Petition unless the Commission notifies the Corporation within five (5) days thereafter that under Article 6.25A(c) it is requiring the Corporation to provide any information it concludes is missing, in which case the Corporation Petition Date is seven (7) days after such request. On April 13, 2016, the Commission issued a Resolution and Order finding the Petition complete, identifying the Corporation Petition Date as April 07, 2016. Pursuant to Article 6.25A(f), the Commission established June 21, 2016 as the final date for issuing a final ruling regarding the Petition. Pursuant to Article 6.25A(f)(4) of Act 57-2014, failure to issue a final determination on or before June 21, 2016 would result in the Commission losing jurisdiction and the Petition being deemed approved as a matter of law.




53. The Commission recognized intervenor status to the Independent Consumer Protection Office ("ICPO") and the Commonwealth Energy Public Policy Office ("CEPPO") as a matter of statutory right.[37] The Commission granted intervenor status to the following parties upon petition: (1) the Puerto Rico Institute for Competitiveness and Sustainable Economy ("ICSE-PR"); (2) PV Properties, Inc., WindMar PV Energy, Inc., and Windmar Renewable Energy, Inc., (collectively referred to as "Windmar" or "Windmar Group"); and (3) Guillermo M. Riera, PE, CEM, GBE, CPQ, CMVP.

---

[35] PRA, Art. 31.

[36] ICPO argues that the Corporation's notice to the public about this proceeding was insufficient. It is the Commission's position that the public deserves comprehensible notification of matters that affect them. However, as a legal matter, Section 6.25A(f)(1) requires that the Corporation publish "a summary of the Corporation's request." The Commission has no reason to find that the document published by the Corporation is not a "summary of the Corporation's request." During the Technical Hearing, the Commission's Staff obtained agreements from the witnesses for CEPPO, PREPA and the Corporation that in future proceedings, these organizations would work with the Commission to make public notices more accessible.

[37] See Commission Resolution and Order of April 13, 2016.

54. From April 13th, 2016 to May 19th, 2016, the Commission issued four (4) clarification requests addressed to the Corporation seeking clarification with regards to various portions of the Petition and supporting documents. The Commission held two (2) public clarification conference calls on April 21st, 2016 and May 4th, 2016.

55. On May 9th, 2016, the Corporation filed a motion certifying that the notice regarding the Technical Haring and Public Comments Hearing was published on May 5th and May 6th, 2016, in compliance with Section 6.25A(f) of Act 57-2014.

56. On May 23rd, 2016, the Commission held a Pre-Hearing Conference where it addressed procedural and legal objections in preparation for the Technical Hearing.

57. On May 24th – 27th, the Commission held a Technical Hearing consisting of nine (9) separate panels.  In each of the first seven (7) panels, the Commission addressed specific issues through live examination of the Corporation's witnesses by Commission consultants and cross-examination by intervenors.  The eighth (8th) panel consisted of addressing substantive issues raised by Intervenors.  The ninth (9th) panel addressed legal issues and consisted of attorneys from both the Corporation and intervenors.  WindMar Group, ICPO, CEPPO and ICSE-PR submitted pre-filed written testimony, or some form of written comments, prior to the Technical Hearing.

58. On May 31st, 2016, the Commission held a Public Comments Hearing in the instant matter. The Commission received public comments, either orally or in electronic submission, from the following: (1) WindMar Group; (2) Maximo Solar Industries; (3) the Puerto Rico Manufacturers Association; and (4) Carlos Pares, Esq.

59. On June 1st, 2016, the Commission issued a Fifth Clarification Request, which the Corporation answered on June 6, 2016.

60. On June 3rd, the Corporation requested an extension of the deadline for filing legal briefs. The Commission issued a Resolution and Order granting all parties and the general public until June 10, 2016 to file legal briefs and written comments.

61. On June 9th, 2016, the Commission held two (2) public clarification conferences. On the same date, the Commission issued a 6th Clarification Request, which the Corporation responded on June 10, 2016, and granted the Corporation until June 14th, 2016 to file its legal brief, and intervenors and general public until June 16, 2016 to file legal briefs and public written comments, respectively.

62. On June 12th, 2016, the Commission received written comments filed by Maximo Solar Industries.

63. On June 14th, 2016, the Corporation filed their legal brief in support of their positions and supplemental testimony in support of the revised Transition Charge mechanism. On June 16th, 2016 Intervenors filed legal briefs in support of their positions.



64. On June 16th, 2016, the Commission received written comments filed by: AOR Solar, LLC; Sunnova Energy Corporation; ACONER; SOMOS SOLAR; La Mesa de Diálogo Energético; and the Asociación de Industriales de Puerto Rico.

**E.      Satisfaction of the Criteria Requirements of Article 6.25A.**

65. The Revitalization Act requires that Transition Charges be established and adjusted pursuant to a formulaic "Adjustment Mechanism" contained in a Restructuring Resolution, as approved in a Restructuring Order pursuant to the terms of Article 35 and Chapter IV of the Revitalization Act and Article 6.25A of Act 57-2014, to be applied by the Corporation periodically, but not less often than semi-annually, to adjust the Transition Charges to ensure the collection of Transition Charges Revenues sufficient to provide for the timely payment of Ongoing Financing Costs. The Act further requires that the establishment and adjustment of the Transition Charges made by the Corporation in relation with the Adjustment Mechanism in accordance with the Calculation Methodology approved by this Order shall not be subject to legislative or any other governmental review or approval, except as provided in Article 34 of the Revitalization Act, regarding the review by the Commission to correct mathematical errors made by the Corporation, and by a court as provided in Article 35(b)(ii) of the Act.

66. Article 6.25A(d) of Act 57-2014 requires that the calculation methodology for the Transition Charges and the Adjustment Mechanism (previously defined as the "Calculation Methodology") satisfy five criteria.  We address the satisfaction of these criteria separately in this Order.

**1.      Calculation Methodology Criterion One: Transition Charges and the Adjustment Mechanism designed for full and timely payment.**

67. Article 6.25A(d)(i) requires:

*The calculation methodology for the Transition Charges and the Adjustment Mechanism included in a Restructuring Resolution shall (i) be designed to provide for the full and timely payment of the Restructuring Bonds in accordance with their terms and other Ongoing Financing Costs.*

68. The Corporation has provided evidence to support that the Calculation Methodology established by the Restructuring Resolution, as revised, satisfies this criterion.  It is designed to provide for the full and timely payment of the Bonds along with other Ongoing Financing Costs.

69. As described in the following paragraphs, the Calculation Methodology is a self-adjustment mechanism to set and adjust Transition Charges mathematically in accordance with and in response to changes in the Ongoing Financing Costs to be recovered or in the revenues collected. It also incorporates features (among others) including quarterly true-up adjustments to address payment and usage variability and the reallocation and spreading of uncollectible Transition Charges among all Customer classes to avoid over-reliance on any one Customer class. Through these features, the Calculation Methodology is designed to ensure that Transition Charge Revenues are sufficient to provide for the timely payment of Ongoing Financing Costs. Each True-Up Adjustment will be designed (i) to correct for any over-collections or under-

collections of Transition Charges through the proposed True-Up Adjustment Date and (ii) to ensure that expected Transition Charge Revenues remitted or to be remitted to the Trustee, after taking into account assumed charge-offs and payment delays, are adequate (A) to pay timely principal of (in accordance with the scheduled maturity date or dates (including scheduled mandatory sinking fund redemption dates)) and interest on the Bonds on each of the Payment Dates that occurs during the related Annual Calculation Period (defined below), (B) to fund or replenish any debt service reserve fund or account or any other restricted accounts or subaccounts required to be established by the Trust Agreement or any Ancillary Agreement as an additional reserve fund) to its required level, as provided in the Trust Agreement or the Ancillary Agreement (as the case may be), and (C) to make timely payment of all other Ongoing Financing Costs during the related Annual Calculation Period.

70.   By its terms, the Calculation Methodology requires the Corporation, or the Servicer on its behalf, to make adjustments to the Transition Charges (a) quarterly, beginning no more than three (3) months from issuance of the Bonds and continuing until the Bonds and all Ongoing Financing Costs are paid or deemed paid in full, and (b) at any other time if the Servicer, the Calculation Agent, Trustee (as and to the extent permitted in the Trust Agreement) or any party to an Ancillary Agreement (as and to the extent permitted in the Ancillary Agreement) determine that such adjustment is required to assure the timely payment of the principal of and interest on the Bonds and all other Ongoing Financing Costs.  Such adjustments are referred to herein as Quarterly and Optional True-Up Adjustments, respectively, and, collectively, as "True-Up Adjustments."[38]

71.   The Calculation Methodology estimates the expected receipts of Transition Charges for any period the Servicer will apply a "collection curve" reflecting the most recent 12-month history of collections for which data are available. In connection with each True-Up Adjustment filing, the Servicer will develop one collection curve reflecting payment history for all Customers (the "Composite Collection Curve").  A collection curve is data reflecting the timing of payments of outstanding bills during a 12-month period, adjusted to assume that any Transition Charges which are not collected within one hundred twenty (120) days of billing are written off.  Each month's billings are divided into aging buckets based on the number of days for which such billings have been outstanding (e.g., 0 to 29 days, 30 to 59 days, 60 to 89 days, and 90 to 119 days outstanding).  The aging buckets are then used to estimate the dollar amount of each month's billings collected within 30, 60, 90 and 120 days, as well as the dollar amount not collected within 120 days (amount written off) for the 12-month period. For such 12-month period, the collection curve is calculated by dividing each of the total dollar amount of billings collected within 30, 60, 90, and 120 days by the total dollar amount of billings collected within 120 days.

72.   To initiate any True-Up Adjustment, the Servicer will make a preliminary calculation of the True-Up Adjustment and will prepare and submit to the Calculation Agent a

---

[38] See Restructuring Resolution, Appendix 2 (Corp. Supp. Ex. 10.01), Calculation Methodology and Adjustment Mechanism to Establish and Adjust the Transition Charge, and Appendix 4 thereto, Servicing Agreement, Section 4.01(a).



draft request for adjustment (a "True-Up Letter").  The Calculation Agent will review the draft True-Up Letter, including the mathematical calculations related to the proposed True-Up Adjustment, and forward any corrections or modifications to the Servicer.  The Servicer will then file the True-Up Letter, reflecting any such corrections or modifications, with the Corporation, the Commission and the Trustee, not later than thirty (30) days prior to the proposed effective date of the adjustment set forth in the True-Up Letter (such effective date being referred to as the "True-Up Adjustment Date").

73.  By its terms, the Calculation Methodology takes into account, over time, changes in the Revenue Requirements and variations and changes in other parameters influencing the calculation of the Transition Charges and their collection.[39]

74.  By its terms, the Calculation Methodology requires that the Servicer apply a "collection curve" reflecting the most recent 12-month history of payment collections for which data is available to the Servicer in order to more accurately predict future Transition Charge collections.[40]

75.  By its terms, the Calculation Methodology requires that uncollectible Transition Charges will be redistributed across all Customer classes in the same manner as Financing Costs are distributed.[41]

76.  By its terms, the Calculation Methodology requires the Servicer to confirm the accuracy of its calculation of any True-Up Adjustment with an independent Calculation Agent, to assure the accuracy of its calculations.[42]

77.  By its terms, the Calculation Methodology requires each True-Up Adjustment of the Transition Charges to be effective on the date specified in the True-Up Letter, so long as such effective date is at least thirty (30) days after the filing with the Commission of such True-Up Letter, subject only to the correction of any mathematical errors by the Commission, as set forth in the following paragraphs.  Any adjustment to correct the mathematical inaccuracy, if ordered by the Commission, shall be made by the Corporation (or the Servicer on its behalf) not later than the next succeeding application of the Adjustment Mechanism on which such adjustment can practically be implemented.  In no event shall such process or the implementation of a Commission order correcting any mathematical error result in the delay of the implementation of an adjustment to the Transition Charges from the effective date stated in the True-Up Letter.

78.  The Corporation has submitted the testimony of Corporation witness Gil-Olazábal (Corporation Ex. 3.00), who confirms that the original Restructuring Resolution includes the

---

[39] See Restructuring Resolution, Appendix 2 (Corp. Supp. Ex. 10.01), Calculation Methodology and Adjustment Mechanism to Establish and Adjust the Transition Charge.

[40] *Id.*

[41] *Id.*

[42] *Id.*



documents and information listed in Article 6.25A(e) of Act 57-2014. These commitments are documented in Corporation Resolution 2016-006 and further supported by Mr. Gil-Olazábal's supplemental testimony.[43]

79. The Corporation's Supplemental Testimony confirms that the Calculation Methodology, as revised, is designed to provide for the full and timely payment of the Bonds and other Ongoing Financing Costs.[44]

80. The Corporation has also submitted a report of Navigant Consulting Inc., in accordance with Article 6.25A(e)(3) of Act 57-2014, which requires a report prepared by an independent financial consultant with recognized expertise in financing public electric utilities, a representative of which appeared as a witness before the Commission to sponsor such report, in accordance with Article 6.25A(e)(9), setting forth historical energy (kWh) usage, a projection of Ongoing Financing Costs and Transition Charges during the term of the Restructuring Bonds and any other material assumptions used in the report, and concluding that such Transition Charge has been calculated as provided in clauses (ii), (iii), (iv) and (vi) of Article 6.25A(e)(1), as applicable, and in accordance with the assumptions included in such report, and will ensure the full and timely payment of the Restructuring Bonds in accordance with their terms and all other Ongoing Financing Costs during the term of the Restructuring Bonds. Based on issues and concerns raised by the Commission and Intervenors, the Corporation proposed a revised Calculation Methodology that: (1) calculates a uniform Transition Charge for Customers (Residential, Non-Residential and Governmental) based upon their historic energy usage (kWh) (instead of using a per servicing agreement charge for Residential Customers); and (2) exempts certain usage from the Transition Charge as follows: (a) Customers who under Article 3.9(b) of Act 22-2016 and under PREPA's tariffs implementing said Article 3.9(b), pay a fixed charge for its applicable consumption-based block of electricity, in each case as such blocks are established as of the date on which the Commission approves the Restructuring Order and as they may be adjusted from time to time as provided in Article 3.9(b)(4) of Act 22-2016, will pay the Transition Charge on consumption in excess of the block and (b) certain "grandfathered" net metered Customers (whether Residential, Non-Residential or Governmental, as specified) eligible under the Revitalization Act will pay the Transition Charge based upon net metered consumption.[45] The non-grandfathered customers will pay the Transition Charge calculated and adjusted based on gross usage (kWh) as set forth in further detail below. Based on these new Corporation determinations, a revised Navigant Report was filed containing a conclusion that such Calculation Methodology, as revised, meets the requirements of the Act.[46]

81. We find that the Calculation Methodology established by the Restructuring Resolution and Appendix 2 thereto satisfies the criterion required by Article 6.25A(d)(i)(2) of Act 57-2014.

---

[43] Corp. Supp. Ex. 10.03; Gil-Olazábal Supp. Dir., Corp. Supp. Ex. 10.00.

[44] Gil-Olazábal Supp. Dir., Corp. Supp. Ex. 10.00; Zarumba Supp. Dir., Corp. Supp. Ex. 11.00.

[45] See Restructuring Resolution, Appendix 2 (Corp. Supp. Ex. 10.01).

[46] Corp. Supp. Ex. 11.01.

## 2. Calculation Methodology Criterion Two: Distribution of Financing Costs between Residential and Non-Residential Customers.

82.   Article 6.25A(d)(ii)(1) of Act 57-2014 provides that the Calculation Methodology shall distribute Financing Costs among Customer classes and calculate and adjust the Transition Charges based on the following criterion:

> *The share of Financing Costs to be recovered from each Customer class shall be calculated based upon the historic energy (kWh) usage of each class of Customers during the most recent twelve (12) months for which such information is reasonably available, as such information is provided by PREPA to the Corporation and to the Commission, and in such manner which is practicable to administer and which ensures the full and timely payment of the Restructuring Bonds in accordance with their terms and other Ongoing Financing Costs.*

83.   The Calculation Methodology is designed so that all Customers are responsible for the payment of a uniform, per kWh Transition Charge on their "eligible usage" in an amount sufficient to recover all Financing Costs as they become due and owing. Subject to limited exemptions for usage previously described, the Transition Charge shall be applied to the gross kWh consumption, based upon the most recent 12-month historical energy usage (kWh) ending with the last day of the most recently completed calendar quarter for which data are available, without regard to any offset for net-metering and adjusted for estimated generation consumption "behind the meter" (whether or not metered, "behind the meter"). In accordance with Section 31 of the Revitalization Act, usage of municipal Customers will be included only to the extent that the dollar value of such usage for electric service, including in determining such dollar value both the Transition Charge which would otherwise be imposed on such municipality and PREPA charges, in any fiscal year exceeds the dollar value owed by PREPA to such municipality as a contribution in lieu of taxes for such fiscal year, as provided in the Act and the Restructuring Resolution[47]

84.   The Corporation has submitted the testimony of Corporation witness Ralph Zarumba (Corporation Ex. 6.00), who explains and supports the original filed Calculation Methodology and explains how Financing Costs are to be recovered from all Customer.[48] Mr. Zarumba further testifies that the Calculation Methodology is practicable to administer and ensures the full and timely payment of the Bonds in accordance with their terms and other Ongoing Financing Costs. In his supplemental testimony, Mr. Zarumba testified regarding the revised Calculation Methodology (provided as the Corporation's Response to the 5th Clarification Request and updated through the Corporation's response to the 6th Clarification Request) and provided

---

[47] See Restructuring Resolution, Appendix 2 (Corp. Supp. Ex. 10.01).

[48] The historic energy usage of each class supporting that calculation is provided in Attachment 5.00 to the Petition. Corporation witness Javier Quintana Méndez (Corporation Ex. 2.00) provides testimony attesting that the historical energy usage data contained in Attachment 5.00 is accurate and based on the business records of PREPA.



support that it is practicable to administer and ensures the full and timely payment of the Bonds in accordance with their terms and other Ongoing Financing Costs.[49]

85.  We find that Calculation Methodology meets the criterion required by Article 6.25A(d)(ii)(1) of Act 57-2014.

### 3.  Calculation Methodology Criterion Three: Calculation of Transition Charges for Customers.

86.  Article 6.25A(d)(ii)(2) of Act 57-2014 provides that Transition Charges will be calculated in accordance with the following criterion:

> *Once the share of Financing Costs to be recovered from each Customers class shall have been calculated, Transition Charges for Customers will be based upon historic energy usage (kWh) data for the most recent twelve (12) months for which such information is reasonably available, as provided by PREPA to the Corporation and to the Commission, provided that the Corporation may elect to calculate Transition Charges for residential Customers on a per service agreement basis, calculated in such manner which is practicable to administer and which ensures the full and timely payment of the Restructuring Bonds in accordance with their terms and other Ongoing Financing Costs, and provided further that the allocation of responsibility for the Transition Charge among Customers classes and Customers does not limit the discretion of the Commission when evaluating the allocation of responsibility with respect to the PREPA revenue requirement in any PREPA rate case.*

87.  In the Original Restructuring Resolution submitted with the Petition, the Corporation proposed that Transition Charges for Non-Residential Customers would be based upon historic energy usage (kWh) data for the most recent twelve (12) months for which such information is reasonably available, and that Transition Charges for Residential Customers would be calculated based upon a per service agreement basis.[50] The Corporation submitted that the resulting calculations were practicable to administer and would ensure the full and timely payment of the Bonds and other Ongoing Financing Costs.

88.  The Corporation submitted the testimony of Corporation witnesses Michael Mace and Ralph Zarumba (Corporation Exs. 4.00 and 6.00, respectively), who sought to explain and support the Original Calculation Methodology and how it was designed to ensure the full and timely payment of the Bonds and other Ongoing Financing Costs. Mr. Zarumba also sought to explain and support how Financing Costs were to be recovered from each Customer class. He also sought to explain and confirm how the allocation of responsibility for the Transition Charge did not limit the Commission's discretion to allocate revenue requirement in any PREPA rate case.

---

[49] Zarumba Supp. Dir., Corp. Supp. Ex. 11.00.

[50] Original Restructuring Resolution, Appendix 2.

89.   Upon concerns raised during the Technical Hearing, the Corporation submitted its Response to the Commission's 5th Clarification Request in support of the Calculation Methodology. This response contained the revised Restructuring Resolution, including a revised Calculation Methodology which would impose a Transition Charge on Residential Customers based upon their historic energy usage (kWh) instead of a per service agreement charge, provided (a) that Customers who under Article 3.9(b) of Act 22-2016[51] and under PREPA's tariffs, implementing said Article 3.9(b), pay a fixed charge for the applicable consumption-based block of electricity, will pay the Transition Charge only on their kWh usage beyond the Customer's permitted block of electricity under Article 3.9(b) of Act 22-2016 (as such blocks are established as of the date of this Restructuring Order and as they may be adjusted from time to time in accordance with Article 3.9(b)(4) of Act 22-2016).  These Customers are referred to in the revised Calculation Methodology as Fixed Block Public Housing Customers; and (b) as further described below, certain "grandfathered" net-metering Customers (whether Residential, Non-Residential or Governmental, as specified) eligible under the Revitalization Act will pay the Transition Charge based upon net metered consumption.

90.   We find that Calculation Methodology, as revised, established by the Restructuring Resolution and Appendix 2 thereto, satisfies the criterion required by Article 6.25A(d)(ii)(2) of Act 57-2014.

### 4.   Calculation Methodology Criterion Four: Adjusting for Delinquencies.

91.   Article 6.25A(d)(ii)(3) of Act 57-2014 provides that delinquencies shall be addressed in accordance with the following criterion:

> *Delinquencies of any class of Customers in any period will be added to the revenue requirement of the next period and allocated among all Customers classes as provided in clauses (1) and (2) of this paragraph (d).  The Commission shall require PREPA (or any other Servicer) to demonstrate that PREPA (or such other Servicer) has been prudent in addressing late payments, past-due bills and non-payments, provided that a finding of imprudence shall not affect the first sentence of this paragraph (3).*

92.   The Restructuring Resolution provides that delinquencies of any Customers (including Governmental Customers) will be distributed among all Customer classes as provided in 6.25A(d)(ii)(3) of Act 57-2014 and specified in the Adjustment Mechanism.[52]  Particularly, any charges that are not collected within one hundred twenty (120) days of billing are re-distributed across all Customer.[53]

---

[51] *Ley para la Reforma de Subsidios y Pago de Atrasos de Servicios de Energía Eléctrica y Acueductos y Alcantarillados del Estado Libre Asociado de Puerto Rico.*

[52] See Restructuring Resolution, Appendix 2 (Corp. Supp. Ex. 10.01).

[53] *Id.*

93.   The Corporation submitted the testimony of Corporation witness Ralph Zarumba (Corporation Ex. 6.00), who supported and explained this feature of the original Calculation Methodology and how delinquencies are added to the revenue requirements of the next period and allocated among all Customer.  The Restructuring Resolution, as revised, did not change with respect to this issue.

94.   We find the Calculation Methodology established by the Restructuring Resolution and Appendix 2 thereto satisfies the criterion required by Article 6.25A(d)(ii)(3) of Act 57-2014.

### 5.   Calculation Methodology Criterion Five: Methodology for Determining Estimated Load Served by Net-metering or Distributed Generation. [54]

95.   Article 6.25A(d)(ii)(4) of Act 57-2014 provides that the Calculation Methodology shall distribute Financing Costs among Customer classes and calculate and adjust the Transition Charges based on the following criterion:

> *When calculating Customer energy usage in clauses (1) and (2) of this paragraph (d), the Corporation may elect to include the estimated load served by net-metering or distributed generation ("behind the meter") if the methodology for such inclusion is practical to administer, and will ensure the full and timely payment of the Restructuring Bonds in accordance with their terms and other Ongoing Financing Costs.*

96.   The Original Calculation Methodology reflected the Corporation's determination that net-metering Customers and Customers using behind the meter generation should not be allowed to bypass Transition Charges to the extent their net load is less than their gross load and that, therefore behind the meter generation should not be an opportunity to bypass or avoid the applicability of Transition Charges.  Therefore, the original Calculation Methodology (Appendix 2 to Attachment 1.00) defined "Actual kWh Billed," for this purpose, "without regard to any offset for net-metering and adjusted for estimated distributed generation usage."  Initially, that amount would be measured without any subtraction for the amount of electricity generated "behind the meter" and exported to the grid, and would reflect electricity flowing to the customer on PREPA facilities.  As it becomes practicable, and as meter data measuring the output of the distributed generation itself becomes available, the load of such customers for these purposes would include the gross output of the distributed generation plus the net deliveries from PREPA. If the estimated load served by net-metering and distributed "behind the meter" generation were not included, a Customer could reduce its responsibility to pay Transition Charges, and the responsibility for those avoided charges would be transferred inequitably to other Customers. Further explanation and support for the Corporation's determination is provided by Corporation witness Ralph Zarumba (Corporation Ex. 6.00).

---

[54] The Commission's comments on this subject appear at Part III.D.

97. Article 35(i) of the Revitalization Act provides in pertinent part that:

*For so long as Restructuring Bonds are outstanding, and the Approved Restructuring Costs (including, any payments that have or are to become due under Ancillary Agreements) have not been paid in full, the Transition Charges authorized and imposed by this Act shall be obligatory, Non-bypassable and shall apply to all Customers.*

98. As Mr. Zarumba (Corporation Ex. 6.00) explained, the Transition Charges ultimately result from historical PREPA operating and fuel costs and investment expenditures, and that failing to include this load in its entirety would permit Customers to bypass those charges prospectively, effectively stranding their share of the costs to the detriment of Customers as a whole. This increase in other Customers' Transition Charges, Mr. Zarumba explained, would create still greater uneconomic incentives to bypass the PREPA system. As Mr. Zarumba also explained, if Customers could entirely bypass or reduce their share (or that of their class) of these historical costs based on installing generation behind the meter or by net-metering, it would distort the economic incentives to install and make use of behind the meter generation, send improper and inefficient price signals, waste resources and increase the total cost of energy production, and further exacerbate the shift in the responsibility for Transition Charges.

99. Article 29 of the Revitalization Act amends Section 4 of Act 114-2007 to provide that the Commission shall "… evaluate and determine which rates will be applied to the net-metering customers, the Contribution in lieu of Taxes, Grants, Securitization, and Subsidies." This provision must be interpreted and applied in the context of, and in harmony with, Article 6.25A of Act 57-2014 and Article 35(i) of the Revitalization Act.

100. The Corporation has asserted that the net-metering determination included in the Original Restructuring Resolution was reasonable and consistent with the requirements of the Revitalization Act and the criteria set out in Article 4 of Act 114-2007, as amended by Article 29 of the Revitalization Act. The Corporation also asserted that the Transition Charge resulting from the Original Calculation Methodology "will be just and … will cover operational and administrative costs of network services" received by a net-metering customer [that the Transition Charge represent,] and the Net-metering Agreement, and that the Transition Charge "never will be excessive or established in such a way that it becomes an obstacle to the deployment of renewable energy projects."[55] The Corporation noted further that the Commission retains authority, separate from the specification of the Transition Charges in the Calculation Methodology, over the design of PREPA's rates, including the charges applicable to net-metering customers. The Corporation has also asserted that the determination of how load is measured for the purposes of calculating the Transition Charge will not affect that authority or limit the design of the PREPA rate charged to such Customers when the time comes for the Commission to evaluate PREPA's rate request.

---

[55] Article 29 of the Revitalization Act.

101. In response to the Commission's 5th Clarification Request, the Corporation proposed a Calculation Methodology which imposed a Transition Charge on "grandfathered" Customers who have or are eligible to enter into net-metering agreements that satisfy the requirements of Article 29 of the Revitalization Act. These "Grandfathered Net Metered Customer" are Customers (whether Residential, Non-Residential or Governmental, as specified) who had a net-metering agreement with PREPA as of February 16, 2016, when the Revitalization Act became effective, that satisfies the conditions of Article 4 of Act 114-2007, as amended by Article 29 of the Revitalization Act (as enacted), or (2) who entered or enters with PREPA into a net-metering agreement for a new project after February 16, 2016, satisfying the conditions of Article 29 of the Revitalization Act (as enacted)], i.e., a Customer (a) who submitted or submits a net-metering application for a new project between February 16, 2016 and the date on which the Restructuring Bonds are issued,[56] (b) has submitted or submits the required deposit to PREPA in accordance with the Revitalization Act, and (c) completes the project and certifies its installation within the required two hundred seventy (270) days, and (d) otherwise complies with Article 29 of the Revitalization Act, all as provided in Article 29 of the Revitalization Act. For the avoidance of doubt, any Grandfathered net-metering Customer that increases the capacity of the renewable energy system beyond 20 percent of its original capacity, as provided in Article 29 of the Revitalization Act, shall cease to be considered a Grandfathered Net Metered Customer from the moment the increase in capacity to PREPA's system was completed, in conformity with the terms of Article 29 of the Revitalization Act.

102. In the Calculation Methodology, as revised, these Grandfathered Net Metered Customers would pay a Transition Charge only on their net energy kWh usage (i.e., *excluding* behind–the–meter output—whether consumed by the Customer or exported to PREPA). The non-Grandfathered Net Metered Customers (whether Residential, Non-Residential or Governmental) will pay a Transition Charge calculated and adjusted based on gross usage (kWh) as set forth in further detail below.

103. Finally, the Corporation has determined that, except as previously stated with respect to Fixed Block Public Housing Customers and Grandfathered Net Metered Customers, Customer usage for the purpose of calculating Transition Charges should reflect gross usage (without regard to net metered credits) and "behind the meter" usage, insofar as practical, and the Corporation proposes that Transition Charges be calculated and adjusted based on established usage (kWh) measured in that manner. Initially, that determination will remove any reduction in the Customers' load due to exports to the PREPA grid. Thereafter, as it becomes practical, the total output of "behind the meter" generation for which metering data is available, regardless of whether it is a PREPA meter, will be considered in the calculation of the Customers' load.[57] The Corporation has submitted the testimony of Corporation witness Ralph Zarumba, who provides explanation and support for this aspect of the Calculation Methodology is provided by (Corporation Ex. 6.00). The Corporation asserts that these limited exemptions with respect to Fixed Block Public Housing Customers and Grandfathered Net Metered Customers result in only

---

[56] The Commission further addresses in Part III.D.3 the "cut-off" date after which the benefits of the "grandfathering clause" set forth in Section 29 of the Revitalization Act are no longer available.

[57] See Appendix 4 to Attachment 1.00, Servicing Agreement, Annex 3, Section 3.

a limited shift of payment responsibility to other Customers to satisfy requirements of existing law. The Corporation has further determined that this approach, including these limited exemptions on usage subject to the Transition Charges, will not render the resulting Transition Charges impracticable to administer and that the resulting Transition Charges will ensure the full and timely payment of the Bonds in accordance with their terms and all other Ongoing Financing Costs. The Corporation asserts that PREPA can practically determine total load, including estimated load served by net-metering and distributed generation, in the calculation of Transition Charges, as described above and including such estimated load in the distribution of costs among Customer classes and the calculation of individual Customers' Transition Charges will not impair the collection of Transition Charges or the full and timely payment of the Bonds in accordance with their terms and all other Ongoing Financing Costs during the term of the Bonds.

104. The Corporation further requests that the Commission, in making the required findings concerning the calculation of the Transition Charge, take notice of the Corporation's treatment of Grandfathered Net Metered Customers and determine that the criteria of Article 4 of Act 114-2007, as amended by Article 29 of the Revitalization Act, are satisfied. The Corporation also requests that the Commission should accept the Corporation's proposal that load of Customers (other than Grandfathered Net Metered Customers) who are net metered or have other "behind the meter" generation, be based on estimated total electric consumption as described herein and in the Restructuring Resolution (initially determined or "estimated" by gross usage – without regard to net metered credits – and behind-the-meter usage, and in the future, as it becomes practical, metering the total output of behind-the-meter generation regardless of whether it is a PREPA meter).

105. We find that the Calculation Methodology established by the Restructuring Resolution and Appendix 2 thereto satisfies the criterion required by Article 6.25A(d)(ii)(4) of Act 57-2014. We further find that the Calculation Methodology followed by the Corporation for the Transition Charges, and Adjustment Mechanism to be applied to adjust the Transition Charges is consistent with the standards set forth in Article 6.25A of Act 57-2014 and is not arbitrary or capricious. We further take notice of the Corporation's determinations that the treatment of Grandfathered Net Metered Customers and Fixed Block Public Housing Customers, and the other provisions of the Calculation Methodology are consistent with Act 22-2016 and Article 4 of Act 114-2007, as amended by Article 29 of the Revitalization Act, and concur in such determination. We also approve the Corporation's proposal that load of Customers who are net metered or have other "behind the meter" generation, and calculating those Transition Charges that are based on kWh usage except for Grandfathered Net Metered and Fixed Public Housing Customers, are based on estimated total electric consumption as described in the Petition, the Revised Calculation Methodology and the Restructuring Resolution.

6.      **The Petition and Restructuring Resolution Meet the Requirements of Article 6.25A(e)**

106. Article 6.25A(e) of Act 57-2014 identifies information, determinations, commitments, and other features required of the Restructuring Resolution and the Corporation's Petition or attachments thereto.  Those commitments are each enforceable against the Corporation by the Commission under Article 6.25A through judicial action.  Below we address each of those requirements.

a.      **Article 6.25A(e)(1)(i)-(xii) – Requirements for the Restructuring Resolution**

107. Article 6.25A(e)(1) of Act 57-2014 lists descriptions, documentation, determinations, calculations, and other provisions and information that must be included in the proposed form of Restructuring Resolution attached to the Petition.

(i)      **Resolution Requirement One: Upfront and Ongoing Financing Costs description and documentation.**

108. Article 6.25A(e)(1)(i) of Act 57-2014 provides that the Restructuring Resolution must contain the following:

*A description and documentation supporting the proposed Upfront Financing Costs and the Ongoing Financing Costs, to be recovered from the Restructuring Bonds proceeds or Transition Charges, as applicable;*

109. Descriptions and documentation of Upfront Financing Costs and Ongoing Financing Costs proposed to be recovered were provided in the following sections of the original Restructuring Resolution (Appendix 2 to Attachment 1.00).  The Restructuring Resolution, as revised, did not change with respect to this issue:

- Finding of Fact 10 of the Restructuring Resolution sets forth each of the categories of the Upfront Financing Costs that require payment.

- Schedule D to the Restructuring Resolution, also attached to the Petition as Attachment 2.01, identifies and provides estimates of the Upfront Financing Costs.

- Finding of Fact 16 of the Restructuring Resolution sets forth each of the categories of Ongoing Financing Costs that require payment.

- Schedule E to the Restructuring Resolution, also attached to the Petition as Attachment 2.02, identifies and provides estimates of the Ongoing Financing Costs excluding debt service.  Attachment 2.03 identifies and estimates debt service.

110. The precise amount of all components of Upfront Financing Costs for the Closing Date Bonds and the Post-Closing Date Bonds (each, as defined and described in the Petition and in the Restructuring Resolution) cannot be ascertained with certainty until the Bonds have been

priced and issued.  The Corporation estimates at this time that the Upfront Financing Costs, as identified and itemized in Attachment 2.01, will total approximately $44.7 million.  The Corporation originally estimated that the annual Ongoing Financing Costs (exclusive of debt service), as identified and itemized in Attachment 2.02, will total approximately $15.6 million for the first 12 months that the Bonds are outstanding.  In his testimony, Mr. Mace updated this $15.6 million figure to $19.3 million.[58]

111.  Several of the components of the Upfront Financing Costs will vary depending upon the size of the final issuance of the Bonds.  Specifically, the underwriters' fees and the rating agencies' fees are typically proportional to the amount of a bond issuance.  Other Upfront Financing Costs, such as legal and accounting fees and expenses, printing expenses, and trustee costs will not be known until the issuance of the Bonds or even thereafter, when final invoices are submitted.  The costs of any credit enhancements or other mechanisms designed to promote the credit quality or marketability of the Bonds, if any, will not be known until near or at the time of issuance of the Bonds.  For those reasons, the Corporation anticipates that its current estimate of the Upfront Financing Costs set forth above, and in the attachments to the Petition, will be subject to updating and changes.  The Corporation commits that updated data concerning these costs will be provided to the Commission as called for by Article 6.25A(e) of Act 57-2014.

112.  Upfront Financing Costs shall be paid from the proceeds of the New Money Bonds or the Cash Offer Bonds (as the case may be), provided that any Upfront Financing Costs approved for recovery that cannot be paid from the proceeds of the sale of the Bonds shall be recoverable as Ongoing Financing Costs.

113.  The Corporation has submitted the testimony of Corporation witness Michael Mace (Corporation Ex. 4.00), who explains and estimates costs proposed to be recovered from the Bond proceeds and Transition Charges, and sponsors Attachments 2.01 and 2.03 that, respectively identify and estimate Upfront Financing Costs and Ongoing Financing Costs (excluding principal and interest).  Mr. Mace also provides descriptions and documentation of the Upfront Financing Costs and Ongoing Financing Cost estimates (pursuant to Article 6.25A(e)(4)).

114.  We find that Restructuring Resolution satisfies the criterion required by Article 6.25A(e)(1)(i) of Act 57-2014.

      (ii)      **Resolution Requirement Two: Determination of Customer classes.**

115.  Article 6.25A(e)(1)(ii) of Act 57-2014 provides that the Restructuring Resolution must contain the following:

---

[58] Corporation Ex. 4.00 at 31.



*The determination of Customers classes among which Ongoing Financing Costs are distributed and the distribution of Ongoing Financing Costs among the Customers classes;*

116. Appendix 2 attached to the Restructuring Resolution sets forth the Calculation Methodology that distributes the responsibility for Financing Costs among all Customers (Residential, Non-Residential and Governmental) on a uniform basis based upon "eligible" historic kWh consumption and calculates and adjusts from time to time the Transition Charge (collectively, the "Adjustment Mechanism"). The Corporation has submitted the testimony of Corporation witness Ralph Zarumba (Corporation Ex. 6.00),[59] who supports and explains how the Calculation Methodology distributes Ongoing Financing Costs to all Customers.

117. We find that Restructuring Resolution satisfies the criterion required by Article 6.25A(e)(1)(ii) of Act 57-2014.

### (iii)   Resolution Requirement Three: Calculation of Transition Charges for Customers Other Than Residential Customers.

118. Article 6.25A(e)(1)(iii) of Act 57-2014 provides that the Restructuring Resolution must contain the following:

*The calculation of Transition Charges for Customers (other than residential Customers) based upon historical energy usage (kWh) data, along with information sufficient to allow the Commission to replicate such Charges;*

119. The Restructuring Resolution describes the method for calculating a uniform Transition Charge for all Customers (Residential, Non-Residential and Governmental) based upon "eligible" historic kWh consumption.[60] The data required to replicate the initial calculations are provided in the Attachments to the Petition. The Corporation has submitted the testimony of Corporation witness Ralph Zarumba (Corporation Ex. 6.00), who explains and supports the Calculation Methodology applicable to Non-Residential Customers as well as all other Customers.

120. We find that Restructuring Resolution satisfies the criterion required by Article 6.25A(e)(1)(iii) of Act 57-2014. The Restructuring Resolution, as revised, did not change with respect to this issue.

---

[59] Zarumba Supp. Dir., Supp. Ex. 10.00.

[60] See Restructuring Resolution, Appendix 2 (Corp. Supp. Ex. 10.01).



**(iv)     Resolution Requirement Four: Calculation of Transition Charges for Residential Customers.**

121.  Article 6.25A(e)(1)(iv) of Act 57-2014 provides that the Restructuring Resolution must contain the following:

> *The calculation of Transition Charges for residential Customers based upon historical energy usage (kWh) data or, at the option of the Corporation, on a per service agreement basis, along with information sufficient to allow the Commission to replicate such Charges;*

122.  The Original Restructuring Resolution and Original Calculation Methodology calculated Transition Charges for residential based on a per service agreement basis as per the Corporation's determination.  Based on issues and concerns raised by the Commission and Intervenors, the Corporation submitted a Restructuring Resolution that no longer provides for a per service agreement charge for Residential Customers. Instead, the Restructuring Resolution describes a method for calculating a uniform Transition Charge for all Customers based upon their historical energy usage (kWh), provided, (a) that Customers who under Article 3.9(b) of Act 22-2016 and under PREPA's tariffs implementing said Article 3.9(b), pay a fixed charge for the applicable consumption-based block of electricity, and will pay the Transition Charge only on their kWh usage beyond the Customer's permitted block of electricity under Article 3.9(b) of Act 22-2016 (as such blocks are established as of the date of this Restructuring Order and as they may be adjusted from time to time in accordance with Article 3.9(b)(4) of Act 22-2016).  These Customers are referred to in the revised Calculation Methodology as Fixed Block Public Housing Customers; and (b) as previously described, Grandfathered Net-Metering Customers will pay Transition Charges based upon net metered consumption.[61]  The calculation of the Transition Charge applicable to Residential Customers (as well as to all other Customers) is supported by testimony elicited at the Technical Hearing and through information submitted by the Corporation in its Response to 5th Clarification Request, as well as the 6th Clarification Request, and its supplemental testimony filed on June 14, 2016, all of which supports the determination of the Corporation to calculate such Transition Charge on a historic energy usage (kWh) basis and discusses information provided that allows that calculation to be replicated by the Commission.

123.  We find that Restructuring Resolution satisfies the criterion required by Article 6.25A(e)(1)(iv) of Act 57-2014.

**(v)     Resolution Requirement Five: Distribution of Customer Delinquencies.**

124.  Article 6.25A(e)(1)(v) of Act 57-2014 provides that the Restructuring Resolution must contain the following:

---

[61] See Restructuring Resolution, Appendix 2 (Corp. Supp. Ex. 10.01).



> *A provision that delinquencies of any class of Customers will be distributed among all Customers classes as provided in this clause (ii) of this paragraph (e)(1) and included in the Adjustment Mechanism.*

125. The Adjustment Mechanism, set out in Appendix 2 attached to the original Restructuring Resolution, provides that delinquencies of any class of Customers will be distributed among all Customer classes. This characteristic of the Adjustment Mechanism is further confirmed by the testimony submitted by the Corporation of Corporation witness Ralph Zarumba (Corporation Ex. 6.00). The Restructuring Resolution, as revised, did not change with respect to this issue.

126. We find that Restructuring Resolution satisfies the criterion required by Article 6.25A(e)(1)(v) of Act 57-2014.

### (vi)    Resolution Requirement Six: Methodology for Determining Estimated Load Served by Net-metering or Distributed Generation.

127. Article 6.25A(e)(1)(vi) of Act 57-2014 provides that the Restructuring Resolution must contain the following:

> *A determination by the Corporation of whether the estimated load served by net-metering or estimated distributed generation ("behind the meter") will be included in its determination of energy usage pursuant to clauses (ii), (iii) and (iv) of this paragraph (e)(1) and in the Adjustment Mechanism. If the Corporation determines to include estimated net-metering or estimated distributed generation in determining energy usage in clauses (ii), (iii) and (iv) of paragraph (e)(1), an explanation of the reasons and a determination (with its corresponding explanation) that this will not render the resulting Transition Charges impracticable to administer and that the resulting Transition Charges will ensure the full and timely payment of the Restructuring Bonds in accordance with their terms and all other Ongoing Financing Costs during the term of the Restructuring Bonds;*

128. In response to the Commission's 5th Clarification Request, the Corporation proposed a revised Calculation Methodology which, as described above, imposed a Transition Charge on Grandfathered Net Metered Customer only on their net energy kWh usage (*i.e.*, ***excluding*** behind–the–meter output—whether consumed by the Customer or exported to PREPA). The non-Grandfathered Net Metered Customers (whether Residential, Non-Residential or Governmental) will pay a Transition Charge calculated and adjusted based on gross usage (kWh) as set forth in further detail below.

129. We find that the Restructuring Resolution satisfies the criterion required by Article 6.25A(e)(1)(vi) of Act 57-2014.



      (vii)     **Resolution Requirement Seven: Distributions can be administered practicably and ensure full and timely payment.**

130. Article 6.25A(e)(1)(vii) of Act 57-2014 provides that the Restructuring Resolution must contain the following:

> *A determination by the Corporation, with the corresponding explanations, that the distribution or calculation (as the case may be) in respect of the provisions in clauses (ii), (iii), (iv), (v) and (vi), as applicable, of this paragraph (e)(1) are practicable to administer and ensure the full and timely payment of the Restructuring Bonds in accordance with their terms and all other Ongoing Financing Costs during the term of the Restructuring Bonds;*

131. The Corporation has submitted testimony by Corporation witness Gerard Gil-Olazábal (Corporation Ex. 3.00), who confirms the Corporation's determination that the Calculation Methodology is practicable to administer and ensures the full and timely payment of the Bonds in accordance with their terms and all other Ongoing Financing Costs during the term of the Bonds. Corporation witness Mr. Zarumba (Corporation Ex. 6.00) explains and supports this determination, testifying that: (1) the Calculation Methodology and the manner in which Ongoing Financing Costs are distributed among all Customers is practicable to administer, and (2) ensures the full and timely payment of the Bonds in accordance with their terms and other Ongoing Financing Costs. Supplemental Testimony provided by Ralph Zarumba confirms that the Transition Charge as calculated in the Restructuring Resolution, as revised, is practicable to administer and ensure the full and timely payment of the Restructuring Bonds in accordance with their terms and all other Ongoing Financing Costs during the term of the Restructuring Bonds.[62]

132. We find that Restructuring Resolution satisfies the criterion required by Article 6.25A(e)(1)(vii) of Act 57-2014.

      (viii)     **Resolution Requirement Eight: Commitment to file Report on final terms of Bonds and estimates of Upfront and Ongoing Financing Costs.**

133. Article 6.25A(e)(1)(viii) of Act 57-2014 provides that the Restructuring Resolution must contain the following:

> *A commitment, enforceable by the Commission, that not later than ten (10) days following the issuance date of the Restructuring Bonds, the Corporation shall file, or cause the Servicer to file, with the Commission, for informational purposes only, a report detailing the final terms of the Restructuring Bonds, and setting forth a final estimate of the Upfront Financing Costs and the estimated Ongoing Financing Costs during the term of the Restructuring Bonds;*

---

[62] Zarumba Supp. Dir., Corp. Supp. Ex. 10.00.



134.  The Restructuring Resolution makes the following enforceable commitment by the Corporation to the Commission:

> Not later than ten (10) days following the issuance date of the Restructuring Bonds, the Corporation shall file, or cause the Servicer to file, with the Commission, for informational purposes only, a report detailing the final terms of the Restructuring Bonds, and setting forth a final estimate of the Upfront Financing Costs and the estimated Ongoing Financing Costs during the term of the Restructuring Bonds.[63]

135.  This commitment is confirmed by the testimony submitted by the Corporation of Corporation witness Gerard Gil-Olazábal.  (Corporation Ex. 3.00).  The Restructuring Resolution, as revised, did not change with respect to this issue.

136.  We find that Restructuring Resolution satisfies the criterion required by Article 6.25A(e)(1)(viii) of Act 57-2014.

### (ix)   Resolution Requirement Nine: Commitment to provide any Successor Servicing Agreement and all Servicer Reports.

137.  Article 6.25A(e)(1)(ix) of Act 57-2014 provides that the Restructuring Resolution must contain the following:

> *A commitment that (A) the Corporation shall provide to the Commission a copy of any successor Servicing Agreement, for informational purposes only, and (B) the Corporation shall file, or cause the Servicer to file, with the Commission, all Servicer reports, including any notice of any proposed adjustment of the Transition Charge, at the same time as such notice is submitted to the Corporation (such report to show in detail all Ongoing Financing Costs which are being paid from Transition Charges on an ongoing basis);*

138.   The Restructuring Resolution makes the following enforceable commitment by the Corporation to the Commission:

> (A) The Corporation shall provide to the Commission a copy of any successor Servicing Agreement, for informational purposes only, and (B) the Corporation shall file, or cause the Servicer to file, with the Commission, all Servicer reports, including any notice of any proposed adjustment of the Transition Charge, at the same time as such notice is submitted to the Corporation (such report to show in

---

[63] Restructuring Resolution, Attachment 1.00, at Resolution No. 19(i).



detail all Ongoing Financing Costs which are being paid from Transition Charges on an ongoing basis).[64]

139. This commitment is confirmed by the testimony submitted by the Corporation of Corporation witness Gerard Gil-Olazábal. (Corporation Ex. 3.00). The Restructuring Resolution, as revised, did not change with respect to this issue.

140. We find that Restructuring Resolution satisfies the criterion required by Article 6.25A(e)(1)(ix) of Act 57-2014.

**(x)    Resolution Requirement Ten: Commitment to provide any Reports Required by Bond Trustee.**

141. Article 6.25A(e)(1)(x) of Act 57-2014 provides that the Restructuring Resolution must contain the following:

> *A commitment, enforceable by the Commission, that any reports required to be filed with the Corporation by the bond trustee for the Restructuring Bonds shall also be filed with the Commission at the same time as such reports are filed with the Corporation;*




142. The Restructuring Resolution makes the following enforceable commitment by the Corporation to the Commission:

> Any reports required to be filed with the Corporation by the bond trustee for the Restructuring Bonds shall also be filed with the Commission at the same time as such reports are filed with the Corporation.[65]

143. This commitment is confirmed by the testimony submitted by the Corporation of Corporation witness Gerard Gil-Olazábal. (Corporation Ex. 3.00). The Restructuring Resolution, as revised, did not change with respect to this issue.

144. We find that Restructuring Resolution satisfies the criterion required by Article 6.25A(e)(1)(x) of Act 57-2014.

**(xi)    Resolution Requirement Eleven: Commitment to provide any annual Reports and Final Accounting.**

145. Article 6.25A(e)(1)(xi) of Act 57-2014 provides that the Restructuring Resolution must contain the following:

---

[64] Restructuring Resolution, Attachment 1.00, at Resolution No. 19(ii).

[65] Restructuring Resolution, Attachment 1.00, at Resolution No. 19(iii).



*A commitment, enforceable by the Commission, that (A) the Corporation and the Servicer shall jointly submit a report to the Commission, not later than March 1 of each year, setting forth with respect to the prior calendar year, the outstanding principal amount of the Restructuring Bonds, the amount paid on such Bonds in such calendar year and the remaining Ongoing Financing Costs payable in such calendar year; and (B) after final and full payment of the Restructuring Bonds and any Financing Costs, the Transition Charge Revenues on deposit with, or thereafter received by, the bond trustee will be credited back to Customers in a manner directed by the Commission, and the Corporation will issue such final accounting reports as directed by the Commission.*

146.    The Restructuring Resolution makes the following enforceable commitment by the Corporation to the Commission:

(A) The Corporation and the Servicer shall jointly submit a report to the Commission, not later than March 1 of each year, setting forth with respect to the prior calendar year, the outstanding principal amount of the Restructuring Bonds, the amount paid on such Bonds in such calendar year and the remaining Ongoing Financing Costs payable in such calendar year; and (B) after final payment of the Bonds and any associated Financing Costs in full, the Transition Charge Revenues on deposit with, or thereafter received by, the Trustee will be credited back to Customers in a manner directed by the Commission, and the Corporation will issue such final accounting reports as directed by the Commission.[66]

147.  This commitment is confirmed by the testimony submitted by the Corporation of Corporation witness Gerard Gil-Olazábal. (Corporation Ex. 3.00).  The Restructuring Resolution, as revised, did not change with respect to this issue.

148.  We find that Restructuring Resolution satisfies the criterion required by Article 6.25A(e)(1)(xi) of Act 57-2014.

(xii)    **Resolution Requirement Twelve: Commitment to provide notice and data/work papers regarding any adjustments to Transition Charges.**

149.    Article 6.25A(e)(1)(xii)  of Act  57-2014 provides that the Restructuring Resolution must contain the following:

*A commitment, enforceable by the Commission, that each notice of a proposed adjustment to the Transition Charges, including the data or work papers used to calculate the Transition Charges, will be delivered by the Corporation or the Servicer to the Commission at least thirty (30) days prior to the proposed effective date of such adjustment, provided that, (1) notwithstanding the thirty (30) day*

---

[66] Restructuring Resolution, Attachment 1.00, at Resolution No. 19(iv).



*obligation established by this paragraph, such information relating to the initial Transition Charges shall be provided not later than three (3) business days following the pricing or award of the Restructuring Bonds and such initial Transition Charges will be effective on the issuance date of the Restructuring Bonds…;*

150.  The Restructuring Resolution makes the following enforceable commitment by the Corporation to the Commission:

*The Corporation shall deliver to the Commission or cause the Servicer to deliver, notice of the proposed adjustment to the Transition Charge, including the data and work papers used to calculate the Transition Charge, at least thirty (30) days prior to the effective date of each proposed adjustment, provided that notwithstanding such thirty (30) day notice obligation, such information related to the initial Transition Charge shall be provided not later than three (3) business days following the pricing or award of the Restructuring Bonds and such initial Transition Charge shall be effective on the issuance date of the Restructuring Bonds.[67]*

151.  This commitment is confirmed by the testimony submitted by the Corporation of Corporation witness Gerard Gil-Olazábal. (Corporation Ex. 3.00). The Restructuring Resolution, as revised, did not change with respect to this issue.

152.  We find that Restructuring Resolution satisfies the criterion required by Article 6.25A(e)(1)(xii) of Act 57-2014.

## b.    Article 6.25A(e)(2) – Transition Cost Calculation

153.  Article 6.25A(e)(2) of Act 57-2014 requires that the Petition include or attach the following:

*The historic energy (kWh) usage of each class of Customers that serves as the basis of the distributions set forth in clauses (ii), (iii), (iv) and (vi) of paragraph (e)(1), as applicable, certified by an officer of PREPA.*

154.  Appendix 2 of the Restructuring Resolution as revised (Corp. Supp. Ex. 10.01), describes the Calculation Methodology including how the share of costs will be recovered from each class of customer. The Calculation Methodology sets forth the manner in which Financing Costs are distributed among all Customers based upon the "eligible" historic energy (kWh) usage. That data is in Attachment 5.00 to the Petition. The Restructuring Resolution, as revised, utilizes the same historic energy usage data to calculate the Transition Charge. Corporation witness Javier Quintana Méndez, PE (Corporation Ex. 2.00) certifies that the historical energy usage data contained in Attachment 5.00 is accurate and based on the records of PREPA.

---

[67] Restructuring Resolution, Attachment 1.00, at Finding of Fact No. 33 and Resolution No. 19(v).

155. We find that Petition satisfies the criterion required by Article 6.25A(e)(2) of Act 57-2014.

### c.        Article 6.25A(e)(3) – Financial Consultant Report

156. Article 6.25A(e)(3) of Act 57-2014 requires that the petition include or attach the following:

> *A report prepared by an independent financial consultant with recognized expertise in financing public electric utilities, a representative of which will appear to sponsor such report as a witness before the Commission in accordance with clause 9 of this paragraph (e), setting forth historical energy (kWh) usage, a projection of Ongoing Financing Costs and Transition Charges during the term of the Restructuring Bonds and any other material assumptions used in the report, and concluding that such Transition Charges have been calculated as provided in clauses (ii), (iii), (iv) and (vi) of paragraph (e)(1), as applicable, and in accordance with the assumptions included in such report, and will ensure the full and timely payment of the Restructuring Bonds in accordance with their terms and all other Ongoing Financing Costs during the term of the Restructuring Bonds.*

157. Attached to the Petition as Attachment 6.00 is a report sponsored and prepared by Corporation witness Mr. Zarumba, an independent financial consultant with recognized expertise in financing public electric utilities. Ralph Zarumba is a Director at Navigant Consulting Inc., an independent professional services firm that provides financial and strategic services to companies, legal counsel, and governmental agencies worldwide, and is a recognized expert in financing public electric utilities. (Corporation Ex. 6.00). Mr. Zarumba has personally served as a consultant to publicly-owned and investor-owned electric utilities in the United States (including Puerto Rico), Canada, and Europe. The Original Navigant report sets forth the material assumptions, historical energy (kWh) usage, per service agreement and net-metering determinations, a projection of Ongoing Financing Costs and Transition Charges during the term of the Bonds, and a conclusion that such Transition Charges meet the requirements of the Act. Based on issues and concerns raised by the Commission and Intervenors, the Corporation proposed a revised Calculation Methodology that: (1) calculates a uniform Transition Charge for Customers (Residential, Non-Residential and Governmental) based upon their "eligible" historic energy usage (kWh) (thus eliminating the use of a per servicing agreement charge for Residential Customers); and (2) imposes a Transition Charge on only the net usage of Grandfathered Net-Metering Customers who have or are eligible to enter into net-metering agreements that satisfy the requirements of Article 29 of the Revitalization Act and a Transition Charge on Fixed Block Public Housing Customers only on their kWh usage beyond the Customer's permitted block of electricity under Article 3.9(b) of Act 22-2016.[68]    Based on these new Corporation

---

[68] See Restructuring Resolution, Appendix 2 (Corp. Supp. Ex. 10.01).



determinations, the Corporation submitted a revised Navigant Report containing a conclusion that such Calculation Methodology, as revised, meets the requirements of the Act.[69]

158.   We find that Petition satisfies the criterion required by Article 6.25A(e)(3) of Act 57-2014.

### d.    Article 6.25A(e)(4) – Financing Costs

159.   Article 6.25A(e)(4) of Act 57-2014 requires that the Petition include or attach the following:

> *A[n] itemized breakdown of the estimates of (i) the Upfront Financing Cost in connection with the issuance of the Restructuring Bonds, and (ii) the Ongoing Financing Cost estimated to be incurred during the term of the Restructuring Bonds, together with any estimate of the resulting Transition Charges, and the estimated ratio of total Transition Charges to total charges to Customers.*

160.   The Corporation has submitted testimony from Corporation witness Michael Mace (Corporation Ex. 4.00), which supports, and Attachments 2.00 – 2.04 that set forth itemized estimates of the Upfront Financing Costs in connection with the issuance of the Bonds, the Ongoing Financing Costs estimated to be incurred during the term of the Bonds, and the Transition Charges.   Corporation witness Ralph Zarumba (Corporation Ex. 6.00) supports Attachment 3.02 that sets forth the estimated ratio of total Transition Charges to total charges to Customers.

161.   We find that Petition satisfies the criterion required by Article 6.25A(e)(4) of Act 57-2014. The Restructuring Resolution, as revised, did not change with respect to this issue.

### e.    Article 6.25A(e)(5) – Savings Test

162.   Article 6.25A(e)(5) of Act 57-2014 requires that the Petition include or attach the following:

> *A demonstration that the proposed transaction is anticipated to satisfy the savings test set forth in Article 35 and Chapter IV of the PREPA Revitalization Act.*

163.   Attachment 3.01 to the Petition demonstrates that the proposed transaction is anticipated to satisfy the Savings Test of Article 35(a)(iii) of the Revitalization Act.   This Attachment shows the calculation of the expected net present value savings based upon the scheduled payments on the Bonds, the expected Ongoing Financing Costs and debt service schedule on legacy PREPA bonds to be exchanged.   The testimony submitted by the Corporation of Corporation witness Michael Mace (Corporation Ex. 4.00) discusses the savings test and how the proposed transaction satisfies this test.

---

[69] Corp. Supp. Ex. 11.01.



164. We find that Petition satisfies the criterion required by Article 6.25A(e)(5) of Act 57-2014.

### f.      Article 6.25A(e)(6) – Servicer Costs[70]

165. Article 6.25A(e)(6) of Act 57-2014 requires that the Petition include or attach the following:

> *A determination, with support, that the servicing costs proposed to be recovered by PREPA as Servicer are sufficient to compensate PREPA for the reasonable incremental costs related to its servicing functions, including a copy of the proposed Servicing Agreement.*

166. A draft form of the Initial Servicing Agreement is attached to the Restructuring Resolution (Attachment 1.00) as Appendix 4 thereto. The Corporation has submitted testimony from Corporation witness Dan Stathos (Corporation Ex. 5.00) who identifies, explains, and supports the operations that PREPA must undertake to perform its duties as Initial Servicer and the incremental costs PREPA will incur to do so. He also confirms that the proposed payments to PREPA under the Initial Servicing Agreement are sufficient to compensate PREPA for the reasonable incremental costs of performing those servicing functions.

167. We find that Petition satisfies the criterion required by Article 6.25A(e)(6) of Act 57-2014.

### g.      Article 6.25A(e)(7) – Projections and Stress Tests

168. Article 6.25A(e)(7) of Act 57-2014 requires that the Petition include or attach the following:

> *All projections and stress test scenarios provided by PREPA or the Corporation to credit rating agencies relating to the Transition Charges;*

169. Attached to the Petition as Attachment 4.00 are all projections and stress test scenarios provided by the Corporation to credit rating agencies relating to the Transition Charges. Those scenarios are described by Corporation witness Michael Mace (Corporation Ex. 4.00). The Corporation has submitted testimony from Corporation witness Javier Quintana Méndez, PE (Corporation Ex. 2.00), who confirms that PREPA has not created or provided to any credit rating agencies any additional projections and stress test scenarios.[71]

170. We find that Petition satisfies the criterion required by Article 6.25A(e)(7) of Act 57-2014.

---

[70] The Commission comments on the Servicer costs at Parts III.A and III.B.

[71] The Commission comments on the submitted stress test at Part III.E.



**h.    Article 6.25A(e)(8) – Other Documentary Support and Estimates**

171.  Article 6.25(e)(8) of Act 57-2014 lists information that must be included with or attached to the Petition, to the extent not already provided.  It requires:

    i)    *documentary support for and non-binding estimates of:*

        (1)    *interest and principal payments [including amortization payments] on the Restructuring Bonds and the payment dates thereof,*

        (2)    *debt service coverage requirement, if any,*

        (3)    *issuance expenses (including legal fees, underwriting fees, defeasing costs, servicing fees, and other fees and costs),*

        (4)    *any payments to the United States to preserve or protect the tax-exempt status of PREPA's outstanding debt obligations or the Restructuring Bonds*

        (5)    *deposits to accounts (including amounts deposited in respect of capitalized interest, debt service reserve fund, or account, operating expense reserve or account, and PREPA's self-insurance deposits), and*

        (6)    *any costs, not included above, related to obtaining the Restructuring Order, protecting status of Restructuring Property, collecting Transition Charge, and administration costs, and*

    ii)    *an identification of the one-time costs (as distinct from ongoing costs), and an explanation of how such one-time costs will be included in the Transition Charge (for example, amortization vs. one-time recovery in a single repayment)*

172.  The Corporation has submitted testimony with respect to Article 6.25A(e)(8), as summarized in Appendix B.

173.  We find that Petition satisfies the criterion required by Article 6.25A(e)(8) of Act 57-2014.

**i.    Article 6.25A(e)(9) – Written Testimony**

174.  Article 6.25A(e)(9) of Act 57-2014 requires that the Petition include or attach the following:

    *Written forms of testimony with confirming Affidavits (which testimony shall incorporate attachments and the petition or other materials filed with it) of one or*

*more employees of the Corporation, or PREPA or any agents or consultants to the Corporation or PREPA, attesting to the statements of fact in the petition and the determinations required to be made in the materials required to be filed with it.  Such testimony shall:*

i)      *describe the Adjustment Mechanism and the manner of its calculation; and describe each Upfront and Ongoing Financing Cost estimated to be incurred;*

ii)     *present an estimation, together with corresponding explanations, of how the Transition Charge will change over the life of the Transition Charge;*

iii)    *describe the estimated ratio of total Transition Charges to total charges to Customers;*

iv)     *compare the debt service and other Ongoing Financing Costs associated with the Restructuring Bonds, to the debt service and other Ongoing Financing Costs of PREPA's outstanding debt to be financed by the Restructuring Bonds; and*

v)      *explain the projections and stress test scenarios provided by PREPA or the Corporation to the credit rating agencies relating to the Transition Charge.*

175.  Submitted with the Petition are written testimonies, with confirming Affidavits, of employees of, and agents and consultants to, the Corporation or PREPA that incorporate applicable attachments to the Petition and other materials filed with the Petition, attest to the statements of fact made in the Petition and the determinations required to be made in the materials filed with the Petition, and present, describe, compare, and explain the matters identified.   Appendix C table identifies the principal locations where the requirements enumerated in Article 6.25A(e)(9)(i) through (v) are met.

176.  We find that Petition satisfies the criterion required by Article 6.25A(e)(9) of Act 57-2014.

### j.      Article 6.25A(e)(10) – Attachments and Other Documents

177.  Article 6.25A(e)(10) of Act 57-2014 provides that:

*The draft Restructuring Resolution presented to the Commission need not contain forms of any other financing document referenced in the Resolution, except for the proposed form of the Servicing Agreement and any other document to support the information required in accordance with this Article 6.25A as requested by the Commission within five (5) days of filing of the petition.  The Commission shall not, by rule or otherwise, require additional materials or information to be submitted in support of the petition.*



178. Attached to the Petition is a draft form of the Initial Servicing Agreement (Appendix 4 to Attachment 1.00). The Corporation has presented testimony from Corporation witness Gerard Gil-Olazábal that the Corporation commits to providing to the Commission an executed copy of the Initial Servicing Agreement when available.[72] The Corporation has committed itself to timely provide any other documents and information required under Article 6.25A that are duly requested by the Commission within five (5) days of the filing of the Petition.

179. We find that Petition satisfies the criterion required by Article 6.25A(e)(10) of Act 57-2014.

### 7.   Costs and Ongoing Financing Costs proposed to be recovered from the Bond proceeds or the Transition Charge Revenues are consistent with Article 6.25A and Chapter IV of the Revitalization Act.

180. The requirements of Article 6.25A(e) of Act 57-2014, relating to the contents of the Petition and Restructuring Resolution, are described above in this Restructuring Order.

181. The Corporation has submitted testimony of Corporation witness Michael Mace itemizing by cost category in Attachment 2.01 the estimated Upfront Financing Costs and Ongoing Financing Costs. Mace testified that the Corporation and its advisors had exercised due diligence in making such estimates, and that the Corporation will update the actual costs pursuant to the Corporation's commitment under Article 6.25A(e)(1)(viii) of Act 57-2014.

182. The Corporation has also submitted testimony of Corporation witness Mace detailing the Upfront Financing Costs and Ongoing Financing Costs.

183. Mace testified that the Upfront Financing Costs proposed to be recovered from the Bond proceeds or the Transition Charge Revenues consistent with Article 6.25A of Act 57-2014 and Chapter IV of the Revitalization Act.

184. We find that the Upfront Financing Costs and Ongoing Financing Costs proposed to be recovered from the Bond proceeds or the Transition Charge Revenues are consistent with Article 6.25A of Act 57-2014 and Chapter IV of the Revitalization Act, in accordance with the requirements of Article 6.25A(b) of Act 57-2014.

---

[72] Corporation Ex. 3.00 (Gil-Olazábal).

8.    **Article 6.25A(b)(3) requires that the servicing costs proposed to be recovered by PREPA in its role as the initial Servicer are necessary, reasonable and sufficient to compensate PREPA for the incremental costs of performing its functions as Servicer.**

185.  The requirements of Article 6.25A(e) of Act 57-2014, relating to the contents of the Petition and Restructuring Resolution, are described above.

186.  The Corporation has submitted testimony from Corporation witness Gil-Olazábal that the Corporation has determined that the servicing costs proposed to be recovered by PREPA as Servicer are sufficient to compensate PREPA for the reasonable incremental costs of performing the servicing functions as set out in the proposed Servicing Agreement.

187.  The Corporation has also submitted testimony from Corporation witness Stathos that the servicing costs proposed to be recovered by PREPA in its role as the initial Servicer are necessary, reasonable and sufficient to compensate PREPA for the incremental costs of performing its functions as Servicer.

188.  We find that the servicing costs proposed to be recovered by PREPA in its role as the initial Servicer are necessary, reasonable and sufficient to compensate PREPA for the incremental costs of performing its functions as Servicer, in accordance with Article 6.25A(b)(3) of Act 57-2014.   In Part III.B of this Restructuring Order we describe our expectations concerning PREPA's performance as Servicer, along with its obligation to return to customers any excess of fees over costs.

F.    **Conclusions of Law**

189.  <u>Jurisdiction and Authority</u>.  The Commission has jurisdiction and authority to adopt this order pursuant to Article 6.25A of Act 57-2014 and Chapter VI of the Revitalization Act.

190.  <u>Petition</u>.  Through Resolution and Order dated April 13, 2016, the Commission determined the Petition to be complete pursuant to Article 6.25A.

191.  <u>Findings Required under Article 6.25A(b)</u>.  We find that:

a.    the provisions of the Restructuring Resolution, as revised in response to the Commission's 5th Clarification Request via Resolution and Order of May 31, 2016 (the "5th Clarification Request") and 6th Clarification Request issued via Resolution and Order of June 9th, 2016 (Corp. Supp. Ex. 10.01), including the Calculation Methodology, as revised, related to the Bonds are consistent with the criteria set forth in Article 6.25A(d) of Act 57-2014 and are sufficient for, and provide the proper protection for full and timely payment of the Bonds, in accordance with their terms, and other Ongoing Financing Costs;



    b.  the Upfront Financing Costs and Ongoing Financing Costs proposed to be recovered from the Bond proceeds or the Transition Charge Revenues are consistent with Article 6.25A of Act 57-2014 and Chapter IV of the Revitalization Act; and

    c.  the servicing costs proposed to be recovered by PREPA in its role as the Initial Servicer are necessary, reasonable, and sufficient to compensate PREPA for the incremental costs of performing its functions as the Initial Servicer.

192. <u>Commission Review of Transition Charge Calculations</u>.   The Commission acknowledges that, pursuant to Article 34 of the Revitalization Act and sub-section (e)(xii) of Article 6.25A of Act 57-2014, the Commission's review of the initial Transition Charges, or of any adjustment to the Transition Charges, shall be limited to verifying the mathematical accuracy of the calculation of the initial Transition Charges or subsequent adjustment of the Transition Charges resulting from the application of the Adjustment Mechanism (as the case may be).  As provided in sub-section (f)(5) of said Article 6.25A, except for the verification for mathematic accuracy as described in the preceding sentence, nothing in Chapter IV of the Revitalization Act shall authorize the Commission to approve, modify or alter any Transition Charge, or to approve, reduce, or alter any Upfront Financing Cost or Ongoing Financing Cost or interfere with the payment thereof.

193. <u>Replacement of Servicer</u>.   Pursuant to sub-section (g) of Article 6.25A, the Commission is authorized to direct the Corporation to replace PREPA as Servicer, *motu proprio*, pursuant to an order based on substantial evidence or at the request of the Trustee or the Bondholders, if PREPA fails to comply with its obligations under the Servicing Agreement, as long as the naming of said substitute Servicer complies with the requirements and other conditions of the Servicing Agreement.[73] No such Commission action shall diminish the rights of the Trustee, the Bondholders or any credit enhancer of the Bonds to replace the Servicer under the terms of any trust agreement or any other financing document relating to the Bonds.

194. <u>Enforceable Commitments</u>.   Resolution 19 of the Restructuring Resolution, this Restructuring Order and Article 6.25A of Act 57-2014 together set forth all commitments of the Corporation that are enforceable against the Corporation through judicial action by the Commission under such Article 6.25A.

195. <u>Transition Charges Obligatory, Non-bypassable and Applicable to All Customers</u>. As provided in Article 35(i) of the Revitalization Act, for so long as the Bonds are outstanding, and the Approved Restructuring Costs (including any payments that have or are to become due under Ancillary Agreements) have not been paid in full, the Transition Charges authorized and imposed by the Act shall be obligatory, Non-bypassable and shall apply to all Customers, provided that certain usage of Grandfathered Net Metered and Fixed Block Public Housing Customers will be exempted from the Transition Charge, to the extent provided herein.

---

[73] See Part III(B)(5) for the Commission's rejection of the Corporation's argument that the Commission's appointment of a Successor is subject to the prior consent of bondholders of their Trustee.

196. <u>Meaning of Non-bypassable</u>.  As provided in Article 31(19) of the Revitalization Act, Non-bypassable means that the Transition Charges shall be paid by all Customers, even if the Customer elects to purchase electricity in whole or in part from an alternative electric supplier, or obtain electricity from a generation source "behind the meter", provided that certain usage of Grandfathered Net Metered and Fixed Block Public Housing Customers will be exempted from the Transition Charge, to the extent provided herein.

197. <u>Partial Payments Allocated Pro Rata</u>.  As provided in Article 35(k)(1) of the Revitalization Act, to the extent that any Customer makes a partial payment of a bill containing both Transition Charge and any other charges, such payment shall be allocated *pro rata* between the Transition Charges and the other charges.

198. <u>Successor and Assigns Obligations</u>.  As provided in Article 35(l) of the Revitalization Act, PREPA, any successor or assign of PREPA or any other Person with any operational control of any portion of the Electric System Assets, whether as owner, lessee, licensee or otherwise and any Servicer successor, shall be bound by the requirements of the Revitalization Act and this Restructuring Order and shall perform and satisfy all obligations imposed pursuant thereto in the same manner and to the same extent as did its predecessor, including the obligation to bill, adjust and enforce the payment of Transition Charges.

199. <u>No Limitation, Alteration, Reduction, Impairment, Postponement or Termination of Rights</u>.  As provided in Article 41 of the Revitalization Act, the Commonwealth has covenanted, pledged and agreed with the holders of any Restructuring Bonds, including the Bonds, issued under the Act and with those Persons that enter into other contracts with the Corporation, pursuant to the provisions of the Act, that after the issuance of any Restructuring Bonds, including the Bonds, neither the Commonwealth nor any agency, public corporation, municipality or instrumentality thereof (including the Commission) shall take or permit any action to limit, alter, reduce, impair, postpone or terminate the rights conferred in any Restructuring Resolution, including those relating to Transition Charges and the related Adjustment Mechanism, as the same may be adjusted from time to time pursuant to the Restructuring Resolution in a manner that impairs the rights or remedies of the Corporation or the holders of any Restructuring Bonds, including the Bonds, parties to any Ancillary Agreement or any Financing Entity or the security for the Restructuring Bonds, including the Bonds, or Ancillary Agreements, or that impairs the Restructuring Property or the billing or collection of Transition Charge Revenues.  Nor shall the amount of revenues arising with respect to Restructuring Property be subject in any way to limitation, alteration, reduction, impairment, postponement or termination by the Commonwealth or any agency, public corporation, municipality or instrumentality thereof except as contemplated by the Adjustment Mechanism. As provided by Article 41 of the Revitalization Act, the Corporation is authorized and directed as agent of the Commonwealth to include this covenant as an agreement of the Commonwealth in the Bonds and in any contract with the Bondholders.  The Commission acknowledges that the covenants of the Commonwealth, as fully set forth in Article 41, are binding.



200. <u>Savings</u>. The Corporation has provided an analysis demonstrating that the proposed Bond transaction is anticipated to satisfy the savings test set forth in Article 35 of the Revitalization Act (the "Savings Test").

201. <u>Corporation and Authority Obligations under the Servicing Agreement</u>. Pursuant to sub-section (g) of Article 6.25A of Act 57-2014, the Commission shall ensure that the Corporation and PREPA perform their respective obligations under the Servicing Agreement, including the obligations to collect all late charges and delinquencies with care and diligence.

202. <u>Basic Documents</u>.   Pursuant to Article 6.25A(e)(10) of Act 57-2014, the Commission has not and shall not review or approve any Basic Document or any other financing document executed in connection with the issuance of the Bonds, provided that no change to the compensation payable to PREPA as Initial Servicer under the Servicing Agreement shall be made without the approval of the Commission.

203. <u>Projections, Estimates and Calculations Non-binding</u>. Pursuant to Article 6.25A(e)(8)(i) of Act 57-2014, any projections, estimates or calculations provided in the Petition or included in any document supporting such Petition are in all cases non-binding and any failure to realize any projections or estimates shall not affect the Restructuring Resolution or Restructuring Order.

204. <u>Net-metering</u>.  Article 4 of Act 114-2007 is consistent with and does not limit the ability to impose Transition Charges on net-metering or distributed generation Customers, other than, to the extent provided herein, Grandfathered Net-metering Customers, as proposed in the Petition.

## G.   Formal Approval Orders

205. <u>Approval Required by Section 6.25A(b)</u>.  We approve the Petition's request for the approvals required by Section 6.25A(b) of Act 57-2014; specifically,

a.   that the clauses of the Restructuring Resolution, including the calculation methodology for the Transition Charges and the Adjustment Mechanism, are consistent with the criteria provided in sub-section (d) of Section 6.25A of Act 57-2014, and are sufficient and provide the proper protection for full and timely payment of Restructuring Bonds, in accordance with the terms thereof, and other Ongoing Financing Costs;

b.   that the proposed Upfront Financial Costs and the Ongoing Financial Costs, to be recovered from the revenues of the Restructuring Bonds and from the revenues of the Transition Charge are consistent with Section 6.25A of Act 57-2014 and Chapter IV of the Revitalization Act; and

c.   that the proposed service charges, to be recovered by the Authority in its capacity as initial Servicer are necessary, reasonable, and sufficient to compensate the



Authority for the incremental costs of discharging its functions as Servicer, as more specifically discussed below.

206. <u>Approval of Calculation Methodology and Adjustment Mechanism</u>.  We approve the Calculation Methodology and the Adjustment Mechanism as revised in response to the Commission's 5th Clarification Request via Resolution and Order of May 31, 2016 (the "5th Clarification Request").[74]  The Commission's review of the initial Transition Charge or any adjustment to the Transition Charge shall be limited to verifying the mathematical accuracy of the calculation of the initial Transition Charge or subsequent Transition Charge resulting from the application of the Adjustment Mechanism (as the case may be).   If the Commission has reason to believe that there is a mathematical error in the calculation of the Transition Charge, before issuing an order requiring the Corporation to correct such error, the Commission will, to the extent it finds practical, provide a preliminary finding to the Servicer and the Calculation Agent.  Any adjustment to correct a mathematical error, if ordered by the Commission, shall be made by the Corporation (or the Servicer on its behalf) no later than the next succeeding application of the Adjustment Mechanism on which such adjustment can practically be implemented.  In no event shall the Commission's inquiries into any such mathematic error or the implementation of a Commission order correcting any mathematical error result in the delay of the implementation of an adjustment to the Transition Charge from the effective date stated in the True-Up Adjustment Letter.

207. <u>Depository; Calculation Agent</u>.    The Commission acknowledges that the Corporation, or the Trustee, as and to the extent provided in the Trust Agreement, may replace the Depository or the Calculation Agent without the approval of the Commission.

208. <u>Initial Servicing Fee</u>. The Commission approves the initial annual servicing fee to be paid to PREPA, in the amount of 0.05 percent of the initial principal amount of the Bonds, subject to annual adjustment as described in the Petition, provided that the entire excess of the servicing fee over PREPA's servicing cost shall be credited by PREPA to ratepayers when PREPA establishes its revenue requirement.[75]

209. <u>Successor Servicer</u>. In the event a successor Servicer must be appointed by the Corporation, or by the Trustee on behalf of the Bondholders in accordance with the terms of the Servicing Agreement, Trust Agreement or any Ancillary Agreement, the annual fee of a successor Servicer may not exceed one (1) percent of the initial principal amount of the Bonds; provided, however, that this paragraph shall not be understood to mean that the Commission deems a one (1) percent fee to be reasonable; and provided further that the Corporation must select any successor Servicer in a manner consistent with the expectations set forth in this Restructuring Order.   Any fee in excess of such one (1) percent amount is subject to the prior approval of the Commission.  The the Commission will expeditiously review any request for such an adjustment.

---

[74] As further revised in response to the Commission's 6th Clarification Request issued via Resolution and Order of May 9th, 2016.

[75] The Commission's concerns about this paragraph are discussed in Part III.B.3 below.

210. <u>Restructuring Resolution</u>. The Restructuring Resolution may be amended by the Corporation prior to the issuance of any Bonds; provided, however, that no such amendment may alter in any material respect the calculation methodology for the initial Transition Charge or the Adjustment Mechanism, or diminish in any respect the powers and rights of the Commission under this Order, or alter the fee of the Initial Servicer or increase the maximum fee of any successor Servicer from the amounts stated in this Order. The Corporation shall file with the Commission a final copy of the Restructuring Resolution, marked to show changes from the proposed Restructuring Resolution, as revised, and submitted to this Commission at the same time as the Corporation files such resolution with its Board for approval, and in any event no less than two (2) business days' prior to approval by the Corporation Board.

211. <u>Delivery of Initial Transition Charge Information</u>. Pursuant to Article 34 of the Revitalization Act, we hereby **ORDER** the Corporation deliver to the Commission or cause the Servicer to deliver, not later than three (3) business days following the pricing or award of the Restructuring Bonds, the information relating to the initial Transition Charges described in such Article, which initial Transition Charge shall be effective on the issuance date of the Bonds.

212. <u>Effectiveness</u>. This Order shall be effective upon its approval and shall be irrevocable and not subject to further review or amendment by the Commission.



## III.  COMMISSION COMMENTS ON SPECIFIC ELEMENTS OF THE PETITION

### A.  The Corporation's readiness, relationships and commitments

213. The Transition Charge will be imposed and administered by the Corporation, acting on behalf of the Participating Bondholders. In this section we address three (3) issues relating to the Corporation: (i) its readiness to carry out its functions; (ii) its relationship to PREPA; and (iii) the Commission's ability to enforce the Corporation's commitments.

#### 1.  The Corporation's readiness to act

214. The Corporation's responsibilities are large. Over a 25-year period, it must calculate and impose hundreds of millions of dollars in Transition Charge payments, and collect those payments from PREPA's customers. It must pay those funds over to the Participating Bondholders according to the payment schedules dictated by various other agreements. Where it has excess funds it must place those funds prudently in interest-bearing accounts. When it has insufficient funds it must seek advances from PREPA, then repay PREPA timely. It must hire contractors, negotiate their fees and monitor their performance. It must continuously assess the PREPA's performance as Servicer, and replace it if necessary.

215. Despite these numerous responsibilities, the Corporation does not intend to perform any of its delegable functions through employees hired by the Corporation. For the function of servicing Restructuring Property and the Restructuring Bonds, the Corporation will contract with

PREPA under a servicing agreement (discussed at Part III.B below). For its remaining agreements and obligations, the Corporation anticipates contracting with a public or private entity (the "Administrator"). Mr. Mace estimated the annual cost of the Administrator at $400,000. To the extent necessary, the Administrator (or the Corporation) intends to enter into contracts with third party advisors to supplement any required expertise. The Commission expects the Corporation not to incur costs unnecessarily or imprudently; and is committed to exposing such costs through its investigative authority granted by Section 6.25A(j).

216. Mr. Gil-Olazábal, Secretary of the Corporation, acknowledged that the Corporation will have no employees and no physical presence, and that it would act as a "conduit." That description does not change the fact that the Corporation will have contractual commitments to Bondholders, advisors and consultants; and statutory obligations to the Commission. It is the Commission's responsibility to use its investigative powers to determine whether the Corporation is satisfying those obligations, and to report on the Corporation's performance to the Legislature, as required by Section 6.25A(j) of act 57-2014:

> Beginning in 2017, on April 15th of each year, the Commission shall file with the Legislative Assembly a report whereby it shall evaluate the Authority and the Corporation's compliance with their respective obligations under this Section 6.25A. The Commission shall have investigative powers to fulfill its obligation to ascertain compliance by the Corporation and the Authority with such obligations during the previous calendar year.

217. As of this date, the Corporation has neither appointed an Administrator nor defined the Administrator's responsibilities. Consequently, the Commission is concerned about the Corporation's readiness to carry out its responsibilities. When the Commission conducts its investigation under Section 6.25A(j), there must be someone ready and able to respond to the Commission's requests for documents, or for interviews with the Corporation's officers, employees or advisors. The Commission therefore will require that (a) the Corporation provide to the Commission a copy of the Administration Agreement promptly upon its execution, (b) identify to the Commission specifically those employees of the Administrator (or other advisors) who will be responsible for responding to such requests of the Commission, (c) include in its contracts with the Administrator and any other advisors a clause requiring their cooperation with the Commission on any such investigation conducted under Section 6.25A(j); and (d) provide to the Commission, on or before January 31 of each year, a list of contracts copies with third parties, other than the servicing agreement, that are in effect.

## 2.   The Corporation's relationship to PREPA

218. Between businesses, an arm's-length relationship provides competitive discipline, professional rigor, economic efficiency and ultimately consumer protection. To have an arm's-length relationship between two entities, each entity must have distinct, active decision makers. The Corporation has asserted that there is, and the Commission expects there to be, an arm's-length relationship between PREPA and the Corporation. The necessity and benefit of such a relationship is made clear on consideration of two contexts: the advisory fees relating to the Transition Charge, and PREPA's role as Servicer.



219. *Advisory fees:*  As discussed in Part III.C.4 below, both PREPA and the Corporation must actively monitor fees to prevent unreasonable costs to PREPA's electricity customers.  The Corporation's witnesses explained, however, that the advisors who serve the Corporation were hired by PREPA, with the Corporation then obligated to reimburse PREPA for those costs.  These contracts relate to the Upfront Costs to be incurred by the Corporation. PREPA must exercise its fiduciary obligations when negotiating and monitoring these Upfront Costs.  The Corporation, furthermore, is required to report all Upfront Costs to this Commission following the issuance of the Restructuring Bonds.  The Corporation must also negotiate and monitor contracts with third parties relating to Ongoing Costs (such as the rating agencies, or its other advisors)—and like PREPA, exercising its fiduciary obligations in doing so.   The Corporation is required to report all Ongoing Costs to this Commission as part of the True-Up Adjustment process.

220. *Servicer:*  Separate from fees is the buyer-seller relationship regarding the servicer function.  The Corporation will hire PREPA as Servicer, and pay PREPA for its servicing activities.[76]  Furthermore, the Servicer Agreement authorizes PREPA, when acting as Servicer, to make advances to the Corporation, "provided that such advances are made on an arm's length basis...."[77]   In both these situations (paying fees and requiring advances), the arm's-length relationship between PREPA and the Corporation will be crucial in protecting consumers from excess costs.  Also crucial will be the Corporation's compliance with the Requirements described in Part IV of this Restructuring Order.

### 3.    Enforcing the Corporation's commitments

221. Section 6.25A(e) of Act 57-2014 requires that the Corporation's Resolution make certain commitments, explicitly enforceable by the Commission.  Those commitments include submitting to the Commission, among other things,

a.     *"a report stating in detail the final terms and conditions of the Restructuring Bonds, and establishing the final estimate of the Upfront Financing Costs and the estimate of the Ongoing Financing Costs during the effective term of the Restructuring Bonds," Section 6.25A(e)(viii);*

b.     *a copy of any "successor Servicing Agreement," Section 6.25A(e)(ix)(A);*

c.     *any report prepared by the Servicer, Section 6.25A(e)(ix)(B);*

d.     *any report that must be filed with the Corporation by the Trustee, Section 6.25A(e)(x);*

---

[76] We discuss the Servicer function in detail at Part III.B below.

[77] Servicer Agreement at Section 5.10 states: "PREPA, in its capacity as Servicer hereunder, shall have the option to make advances to the Issuer, upon request by the Issuer or the Trustee, with respect to Transition Charge Revenues, provided that such advances are made on an arm's length basis...."

e.      by March 1 of each year a joint report, from the Servicer and the
        Corporation, relating to the previous year's costs and payments, Section
        6.25A(e)(xi)(A); and

f.      advance notice of any proposed adjustment to the Transition Charges,
        Section 6.25A(e)(xii).

222.  Under the statute, if the Corporation fails to comply with any of its obligations
under Section 6.25A of Act 57-2014, the Commission may enforce those obligations in court.

223.  The Corporation's draft order would have the Commission limit its judicial
remedies to "specific performance"; that is, court orders requiring the Corporation to undertake
the actions specified by the statute.  The Commission will not accept this limitation.  First, the
Commission cannot legally restrict the court's powers.  Those powers derive from other statutes
and from the Commonwealth's Constitution.  At the evidentiary hearing, representatives of the
Corporation recognized this, instead requesting that the Commission apply this limitation to
itself, i.e., that Commission agree to ask the Court only for specific performance.  The
Commission will not limit its judicial remedies.  In this setting, where the Corporation has yet to
arrange for an Administrator, and where the Commission has no power to regulate the
Corporation as a public utility, the Commission will not cede legal options that may prove
necessary or helpful in protecting the public interest.

**B.      The Servicer Agreement**

224.  Appendix 4 to the Corporation's Resolution is a draft "Form of Initial Servicing
Agreement" (hereinafter, "Servicer Agreement").  The signatories to this agreement will be the
Corporation (as purchaser of services) and PREPA (as provider of services).  Under Section
6.25A of Act 57-2014, the Commission does not approve the Servicer Agreement.  Rather, under
Section 6.25A(b)(3), the Commission must determine whether "the proposed service charges, to
be recovered by the Authority in its capacity as initial Servicer are necessary, reasonable, and
sufficient to compensate the Authority for the incremental costs of discharging its functions as
Servicer."  Because service charges cannot be understood except in reference to the services to
be provided, the Commission explored the draft Servicer Agreement at the evidentiary hearing.

**1.      The Servicer's role**

225.  Mr. Mace and Mr. Stathos explained that the Servicer role has two components:  (a)
all the activities PREPA currently conducts to bill customers and collect payments; and (b) the
incremental activities PREPA must conduct to ensure that the designated portion of customer
payments attributable to the Transition Charge are paid promptly to the participating
bondholders.

226.  Section 3.01 of the Servicer Agreement lists the full set of servicing duties:

a.      impose the Transition Charges on all Customers and adjust them as more fully set
        forth herein;

b. exercise all the collection rights of the holders or pledgees of the Restructuring Property for the benefit of such holders or pledgees as more fully set forth herein;

c. transfer any Transition Charge Revenues to the holders or pledgees of Restructuring Property as more fully set forth herein;

d. obtain meter reads, calculate electricity usage, maintain record of service agreements, calculate the periodic adjustments to the Transition Charges, bill the Transition Charges to the Customers as a separate line item on PREPA's bills and collect (from Customers and Third Party Billers, as applicable) all Transition Charge Collections, all in accordance with the Restructuring Resolution, the Trust Agreement and this Agreement;

e. estimate the energy use of Customers for the purpose of calculating Transition Charges in a manner that includes load served by net-metering or estimated distributed generation (behind the meter) in accordance with the terms of the Restructuring Resolution and Annex 3 herein;

f. respond to inquiries by Customers, Third Party Billers, the Commission, the Trustee, the Bondholders, any party to an Ancillary Agreement or inquiries by any federal, local or other Commonwealth governmental authority, with respect to the Transition Charges;

g. deliver Bills to Customers and Third Party Billers, account for Transition Charge Collections, investigate and resolve delinquencies, process and deposit collections, make periodic remittances and furnish periodic reports to the Issuer, the Commission, the Calculation Agent, the Trustee and the Rating Agencies;

h. sell, as the agent for the Issuer, as its interest may appear, defaulted or written off accounts in accordance with the Servicers usual and customary practices for accounts of Customers for Rates;

i. take action in connection with True-Up Adjustments as is set forth herein;

j. take any action necessary to direct (a) all Customers that do not pay their Bills in person, and (b) Third Party Billers or any other Person that hold Transition Charge Collections and PREPA Charges, to remit their payments or turn over all such Transition Charge Collections and PREPA Charges directly to the Depository [this may be Depositories] for deposit into the Allocation Account;

k. promptly, and in any event as soon as reasonably possible after receipt of the same, cause all Transition Charge Collections and all PREPA Charges not otherwise deposited with or paid to the Depository to be paid to the Depository for deposit into the Allocation Account held thereunder, as further provided in Sections 3.03 and 5.11;

l. include charges for the Transition Charges as separate line items on all Customer bills separate from all other PREPA Charges;

58

m.      take any actions permitted by the law to collect unpaid bills and terminate service to Customers who are delinquent in the payment of their Transition Charge on the same basis as termination of service is permitted for nonpayment of electric or other rates by PREPA, and which would otherwise be consistent with Best Efforts, but none of the Issuer, the Trustee, the Bondholders or any party to an Ancillary Agreement may directly terminate service to any Customer; and

n.      administer Transition Charge Revenues mingled with other funds of the Servicer in a manner that allows for the distinct identification of the Transition Charge Revenues and such other funds, respectively.

227.  Items (ii), (iv), (vi), (vii), (viii), (x) and (xiii) describe PREPA's current activities. The remaining activities are the incremental duties associated with PREPA obligation to move Transition Charge payments from its customers to its bondholders.

## 2.      The draft Servicer Agreement

228.   The Servicer Agreement presented to the Commission is a draft created by one of the Corporation's external law firms, based on contracts used in other securitization transactions.

229.   The Agreement is central to the bondholders' willingness to accept a reduction in their bonds' value. As Mr. Mace explained:  The terms of the Servicing Agreement are critical to the Rating Agency analysis of the Bonds and the ability to achieve the highest possible credit ratings.   The terms of the Servicing Agreement are also critical to PREPA's creditors and investors. Accordingly, the terms of the Servicing Agreement will be subject to change to reflect the input from the Rating Agencies, as well as input from creditors and investors. However, we expect that the final Servicing Agreement will be largely as described in the draft presented with the Petition.[78]

230.   The Corporation has committed that there will be no change to PREPA's servicer fee (discussed further below) without the Commission's permission; and that it will inform the Commission of any other changes to the draft Agreement before they go into effect.[79] The Commission has no power over any terms in the agreement other than the fee.

## 3.      The Servicer's cost and fee

231.  Mr. Stathos divided the Servicer cost into implementation cost and ongoing cost. He estimated the implementation cost to be $1.65 million, consisting of defining requirements, setting up and upgrading hardware and software, creating a new billing format to reflect the new Transition Charge, designing the forms for daily monitoring reports, testing and revising procedures, and revising internal processes.  This implementation process will involve, among

---

[78] Direct Testimony at 55.

[79] See Quintana Direct Testimony at 10 ("The final Initial Servicing Agreement may vary from this form, but not as to the fees to compensate PREPA for its incremental costs.").



other things, creating a "test environment" to test the changes to PREPA's billing system, and providing "data warehousing capabilities that will support the monthly and daily reporting required for the servicing activities."[80]   The $1.65 million cost would be recovered as an Upfront Financing Cost.[81]

232. Mr. Stathos then estimated the ongoing cost, *i.e.*, the incremental cost to maintain the Transition Charge process, to be $184,830 annually.   These ongoing costs reflect two full time employees to monitor the accounts and transactions and to make cash transfers; as well as information technology personnel to maintain reports and adjust charges.   The sum also includes bank charges.[82]

233. The annual fee prescribed by the draft Servicer agreement greatly exceeds the ongoing cost identified by Mr. Stathos.   While the estimated $1.65 million implementation cost will be recovered through the Transition Charge in the amount incurred, for the ongoing cost, the Servicing Agreement establishes a "negotiated" fee equal to 0.05 percent of the initial aggregate principal amount of the Bonds whose cost is recovered through the Transition Charge.[83]   That fee is escalated annually by the Consumer Price Index for all Urban Consumers, regardless of whether the actual costs rise by the same amount.

234. This 0.05 percent fee amounts to $3.4 million (Attachment 2.02)—more than *18 times* the ongoing costs estimated by Mr. Stathos.   And according to Mr. Mace (Direct Testimony at 60), the Servicer "will also be entitled to recover its out-of-pocket expenses."[84] This fee could not have been "negotiated" since, as explained in the section of this Order relating to the Corporation's readiness, at the time the fee was determined, the Corporation had only a three-person Board of Directors and no Administrator. At the technical hearing, Corporation witnesses stated that the language concerning the 0.05 percent fee is comparable to other servicer agreements in securitization contexts.   But there is no evidence that PREPA's performance on bill collections is comparable to the performance of the utilities that are parties to these other transactions, or that these other contexts have anything in common with Puerto Rico's situation.

235. Despite these concerns, the Commission finds that the excess will not harm ratepayers, provided that PREPA (a) does not view this margin as a reason to perform inefficiently, thus wasting the money it earns, and (b) uses the excess revenue to reduce the rates it charges its customers. In each future rate proceeding, therefore, the Commission will require PREPA to account for its excess Servicer revenues as a credit against the expenses it charges to

---

[80] Stathos Direct Testimony at 10-11.

[81] See Attachment 2.01.

[82] Stathos Direct Testimony at 11-13.

[83] Mace Direct Testimony at 60. See also Servicer Agreement section 5.07 ("For so long as PREPA is the Servicer, the initial Servicing Fee shall be 0.05 percent of the initial principal amount of the Bonds.").

[84] See also Servicer Agreement section 5.08 (providing that "the Issuer shall pay all reasonable [third party] expenses incurred by the Servicer").



its customers.  The Commission also will address in the rate case PREPA's performance of its billing and collection activities, for its own charges for its charges as Servicer.

236.  The problem of Servicer fee does not end with PREPA.  According to the Servicer Agreement, if a successor to PREPA is appointed (an unlikely event, according to Corporation witnesses), that entity can receive a fee up to one (1) percent without approval by the Corporation or the Commission.[85]  *A one (1) percent fee is 20 times PREPA's 0.05 percent fee—which itself was 18 times the estimated ongoing cost* (remember that this seemingly small percentage is multiplied by a very large $6 billion in Restructuring Bonds).  Furthermore, if the successor's fee exceeds its costs, it keeps the excess (unlike PREPA), because the successor (unlike PREPA) will not be a utility whose electricity rates are regulated by the Commission. We recognize that the successor's fee will need to recover its start-up cost.  But under the draft agreement the successor will earn its fee (again:  20 x 18 x actual ongoing cost) every year throughout the life of the agreement (*i.e.*, until the bonds are paid off, according to Section 8.10), long after start-up costs are recovered.  The statute does not give the Commission authority over the fees in the Servicer Agreement (unless they exceed that stated percentage); and the Commission could not prudently reject the entire Transition Charge proposal over this one excess.  But the Commission will use its investigative authority under Section 6.25A(j) of Act 57-2014 to make transparent to the public any decision the Corporation makes in selecting and negotiating with a successor.  The Commission here puts the Corporation on notice that the Commission, and the public, expects the Corporation to make effective use of competition in the market for successor servicers, and to avoid paying an excess fee.

237.  The Commission recognizes that under Puerto Rico laws and regulations, the selection of professional, technical or expert services such as those provided by a Servicer need not follow a formal bid or a request for proposals process.  Nonetheless, the Commission expects the Corporation (and the Administrator if involved in this selection process) to evaluate multiple candidates and require from them quotes and qualifications. While price need not be the sole criteria for selection, the Commission expects the Corporation to evaluate and negotiate with candidates in a manner that produces the result most beneficial to PREPA's customers, consistent with the Corporation's obligations to the Bondholders.

238.  Our examination of the successor's fee also revealed a legal gap.  The Servicer Agreement is an agreement between the Corporation and PREPA.  They are the signatories. There is no successor currently—and we hope one will never be necessary—so no successor is a signatory to the agreement.  And the agreement does not bind the Commission because the Commission is not a signatory.  Therefore, as a legal matter, the provision in the draft Servicer Agreement for a successor fee binds no one.

239.  Some Servicer fee is necessary, of course, because the Servicer will incur real costs to perform real functions.  But the levels stated in this draft agreement are not mandated by Section 6.25A of Act 57-2014.  Mr. Gil-Olazábal testified that the "Corporation has determined

---

[85] See Section 5.07 of the Servicer Agreement.

that the servicing costs proposed to be recovered by PREPA as Servicer are reasonable...."[86]  The Commission questions how the Corporation could make such a determination when the fee is more than 18 times (and in the case of a successor, possibly 20 times that 18 times level) the estimated cost.  Furthermore, the draft agreement fixes the fee without regard for performance, so that the only remedy for suboptimal performance is the expensive and disruptive process of replacing the Servicer.

240.  The Commission recognizes that basing the fee on actual cost (which is customary for public utilities) is not a solution because costs could change over time, while the Transition Charge must be established with certainty now.  The basis for the Transition Charge is the money owed to bondholders, not the costs of acting as Servicer.  That is why the Servicer fee must be determined now.  But nothing in the record suggests there is a causal or logical relationship between the amount of bonds and the Servicer's incremental ongoing costs.  The Commission expects the Corporation to negotiate more alertly and actively, to produce final terms more reflective of its obligations to the Commission and the Commonwealth.  In short, if a successor Servicer becomes necessary, the Commission expects the Corporation to contract with such successor Servicer based upon the following criteria:  (i) financial, technical and managerial ability to perform the duties and obligations set forth in the Servicing Agreement, and (ii) reasonableness of the fee.  Otherwise, the Corporation will risk a court challenge by this Commission to any successor Servicer.

241.  Despite these concerns, the Commission here determines that the proposed service charges are, as required by Section 6.25A(b)(3) of Act 57-2014, "necessary, reasonable, and sufficient to compensate the Authority for the incremental costs of discharging its functions as Servicer."  We have no choice but to find that the charges are "necessary" and "sufficient" because the Corporation has made clear that the charges will be *higher* than "necessary" (because the charge exceeds the estimated costs) and thus, "sufficient".  The Commission is able, however, to find that they are "reasonable" because PREPA will be obligated, by virtue of the "just and reasonable" standard in Act 57-2014, to return the excess amounts to its customers through its rates.  Therefore, the Commission also determines, as required by Section 6.25A(e)(6) of Act 57-2014, that the Petition contains a "duly grounded determination that the proposed servicing costs, to be recovered by the Authority as Servicer, shall be sufficient to compensate the Authority for the incremental costs reasonably associated with its functions as servicer, including a copy of the proposed Servicing Agreement."  In making these positive findings, however, the Commission calls attention to multiple concerns addressed next.

**4.      The Commission's authority over PREPA's performance as Servicer**

242.  As explained in Part III.B.1 above, PREPA's contractual obligations as Servicer include all the billing and collection activities it undertakes today, along with the incremental activities necessary to administer the Transition Charge on behalf of the Corporation.  Despite this overlap between PREPA's existing duties and its Servicer duties, there will be no reduction of the Commission's authority.  Neither the agreement, nor the Corporation's resolution, nor the

---

[86] Direct at 14.

Commission's approval granted by this Restructuring Order, constrains the Commission's pre-existing legal authority to regulate PREPA's performance in billing and collection activities. The Corporation's witnesses acknowledged this fact at the evidentiary hearing. Moreover, Section 6.25A(d)(3) of Act 57-2014 states:  "The Commission shall require the Authority (or any other Servicer) to show that the Authority (or any other Servicer) has been prudent in addressing late payment, overdue bills, and non-payment issues; provided, that it is determined that the finding of imprudence does not affect the first sentence of this paragraph (3)" (relating to allocation of undercollections due to delinquency). The Commission intends to give PREPA's performance in this area special attention. In doing so, the Commission will be serving the interests of PREPA's customers and its bondholders.

### 5.      The Commission's authority to replace PREPA as Servicer

243.  Section 6.25A(g) of Act 57-2014 provides:

(g) In both instances, when the Commission issues a Restructuring Order or when a request is deemed to be approved, the Commission shall ensure that the Corporation and the Authority fulfill their obligations under the Servicing Agreement, including the obligation to collect carefully and diligently all late fees and charges. *The Commission shall be empowered to direct the Corporation to replace the Authority as Servicer, motu proprio, through an order based on substantial evidence, or at the request of the trustee of the bonds or the bondholders, if the Authority fails to comply with its obligations under the Servicing Agreement; provided, that the appointment of the substitute Servicer meets the requirements and other conditions of the Servicing Agreement.* None of the provisions herein shall impair the rights of the bond trustee, the bondholders, or any credit enhancement provider of the Restructuring Bonds **to replace the Servicer** under the terms of any trust agreement or any other financing document related to the Restructuring Bonds. (emphases added).

244.  The italicized sentence unambiguously authorizes the Commission to direct the Corporation to replace the Servicer in either of two circumstances:  (a) the Commission issues a Restructuring Order based on substantial evidence, or (b) the trustee or the bondholders *request* the Commission to act.  To reiterate:  With respect to desires of the trustee or bondholders, the Commission is "empowered" to replace the Service if they "request."  This sentence contains no mandate; it grants the bondholders discretion and it grants the Commission discretion.

245.  The final sentence of this passage then preserves whatever rights are held by the bond trustee, the bondholders or any credit enhancement provider; specifically, their rights to *replace the Servicer*.  In other words, replacement of the Servicer can occur either through a discretionary decision of the Commission; or through a decision of the trustee, bondholders or credit enhancers.  The first of these two sentences addresses the Commission's discretion to replace the Servicer; the second of the two sentences addresses the trustee's and bondholder's discretion to replace the Servicer.  The two sentences neither intersect nor contradict.  Put more directly, a Commission decision to retain the Servicer does not preclude the others from replacing the Servicer; and the others' decision to retain the Servicer does not preclude the Commission from replacing the Servicer.  That is the plain meaning of this language.

246. Notwithstanding this clarity of this language, the Corporation now asks the Commission to accept different language, as follows:

> "4. Action with respect to Servicer. The Commission acknowledges that any action taken by the Corporation, at the direction of the Commission, with respect to the Servicer, including the replacement of the Servicer, *is subject to the prior consent or contrary direction of the Trustee on behalf of or as directed by the Bondholders and/or parties to an Ancillary Agreement*, in accordance with the terms of the Trust Agreement or any Ancillary Agreement." (emphasis added).[87]

247. This requested language conflicts with the statutory language.   As we just explained, the statutory language declares two independent paths to replacing the Servicer:  a discretionary decision by the Commission, and a discretionary decision by the bondholders (or their trustee).   The requested language eliminates the Commission's independent path, by subordinating the Commission's discretion to the bondholders' consent.   The statute creates Commission authority; the requested language diminishes that authority.   The statute does not allow the Commission to grant the Corporation's request.

248. A similar problem arises from this sentence in the draft Servicer Agreement (at Section 6.01, after clause (e)):  "In the event of any conflict between the direction of the Commission and the designation of the Trustee, the holders of the Bonds or a party to any Ancillary Agreement, the designation of the Trustee, holders or such party, as the case may be, shall control."[88]   To the extent that this sentence would have the same effect as the previously quoted one, it cannot bind.  In any event, two parties cannot contract to reduce the Commission's authority.  The sentence is in direct conflict with the Revitalization Act and cannot be enforced.

249.  The Commission readily acknowledges that if the bondholders appoint a Successor, the Commission has no power to prevent that result.    And under the statute, that acknowledgement must go both ways.

250.  The Corporation has argued that statutory authority for its request exists in Section 6.25A(f)(5) and Section 6.25A(g) of Act 57-2014.  But neither of these provisions supports the Corporation's proposal to diminish the Commission's authority.  Section 6.25A(f)(5) states:

> Except as provided in paragraph (2)[sic] of subparagraph (xii) of subsection (e)(1) with respect to the mathematical accuracy of the Transition Charges, none of the provisions of this Chapter shall authorize the Commission to approve, modify, or alter any Transition Payment[sic], or to approve, reduce, or alter any Upfront Financing Costs or Ongoing Financing Costs or to interfere with the payment thereof.

---

[87]  Draft Order, Finding of Fact 47. See also Donahue Direct Testimony at 24 (requesting the Commission "acknowledge that any action taken by the Commission with respect to the replacement of PREPA, as Servicer, is subject to the prior consent and contrary direction of the Trustee or any Ancillary Party….").

[88]  Servicing Agreement, Section 6.01, after sub-section (e).

251. A Commission decision to replace the Servicer, without bondholder agreement, would not change Upfront Financing Costs or Ongoing Financing Costs, nor would it interfere with payments to bondholders. The Financing Costs are calculated by the Corporation based on the participating bonds. Other than verifying mathematical accuracy, the Commission has no role in determining Financing Costs. Nor could the Commission's appointment of a successor Servicer interfere with the payment of those costs, because the payment is controlled by the Corporation, whose contract with the successor Servicer would determine how dollars flow from PREPA's customer to the Corporation.

252. As for Section 6.25A(g), the Commission explained above that the literal language creates a path for Commission appointment of a successor servicer independently of the path by which the bondholders or their Trustee can appoint a successor servicer. The impairment clause in this provision addresses the bondholders' right to select a new servicer. It does not create a bondholder right to retain an existing servicer, should the Commission use its discretion to make the necessary findings and appoint a successor.

253. The Corporation also has argued that its position is supported by the non-impairment clauses contained in Article 41 of the Revitalization Act. Those clauses state:

> The Commonwealth further covenants, pledges and agrees with the holders of any Restructuring Bonds issued under this Act and with those Persons that enter into other contracts with the Corporation, including parties to any Ancillary Agreement, pursuant to the provisions of this Act, that it shall not limit, alter, impair, postpone or terminate the rights conferred in this Act, any Restructuring Resolution and related agreements, including the requirements in Sections 34 and 35 as well as Chapter IV of this Act, until such Restructuring Bonds and the interest thereon are paid or legally defeased in accordance with their terms and such other contracts are fully performed and honored on the part of the Corporation. The Corporation is authorized and directed as agent of the Commonwealth to include this covenant as an agreement of the Commonwealth in any contract with the holders of Restructuring Bonds.

> The Commonwealth also covenants, pledges and agrees with the holders of any Restructuring Bonds issued under this Act and with those Persons that enter into other contracts with the Corporation, pursuant to the provisions of this Act, that after the issuance of Restructuring Bonds, neither the Commonwealth nor any agency, public corporation, municipality or instrumentality thereof (including the Commission) shall take or permit any action to limit, alter, reduce, impair, postpone or terminate the rights conferred in any Restructuring Resolution, including those relating to Transition Charges and the related Adjustment Mechanism, as the same may be adjusted from time to time pursuant to the applicable Restructuring Resolution in a manner that impairs the rights or remedies of the Corporation or the holders of the Restructuring Bonds, parties to any Ancillary Agreement or any Financing Entity or the security for the

*Restructuring Bonds or Ancillary Agreements, or that impairs the Restructuring Property or the billing or collection of Transition Charges Revenues. ...*

254. Neither of these paragraphs diminishes the Commission's discretion, granted in Section 6.25A(g) of Act 57-2014, to replace the Servicer. The "right" referred to in the above-quoted language from Article 41 is the bondholders' right to replace the Servicer. We repeat what we said above: A Commission preference to *retain* PREPA as servicer does not supersede the bondholders' right to *replace* PREPA as servicer. On the other hand, the Commission's power to replace the Servicer does not affect the bondholders' right to replace the Servicer, *because a right to replace the Servicer is not the same thing as a right to retain the Servicer.* There is, therefore, no possibility of impairment by the Commission of any bondholder right created by statute. And while the above-quoted language refers to other rights, such as rights granted by a Resolution or other agreements, no unilateral actions by the Corporation, or agreements between the Corporation and others, can diminish powers granted to the Commission by statute.

255. In short, the Corporation's position, that the Commission may not replace the Servicer without bondholder consent, has no legal basis. The Commission recognizes that replacing PREPA as the official Servicer would involve expense, inconvenience and uncertainty. The Commission also understands, based on statements made at the evidentiary hearing, that in no other securitization situation has the incumbent servicer been replaced. In the extremely unlikely event that the Commission determines that PREPA should not continue as Servicer, the Commission will act as required by the statute: It will not impair the rights of bondholders or their trustee. Before taking action it will describe the action it proposes, and offer the Corporation and anyone else the opportunity to argue that such action is outside the Commission's authority or somehow damaging to bondholder interests. The Commission will be sure to obtain full information from the bondholders about their concerns. That protection is sufficient protection.

256. But the best protection for all is to ensure that PREPA performs. On that point, the interests of the Commission, the Corporation, bondholders, PREPA and its customers are fully aligned. The Commission will work with all interested entities to ensure that this alignment of interests causes PREPA to perform its Servicer functions consistent not only with the Servicer Agreement but also with its obligations to its bondholders and its customers.

## C.     The fees charged by contractors to the Corporation

### 1.     Contractor budgets

257. The Transition Charge recovers two categories of costs: Upfront Financing Costs and Ongoing Financing Costs. Fees charged by contractors to the Corporation enter one of those two categories. Both categories will be recovered from customers through the Transition Charge, which is periodically adjusted through the Adjustment Mechanism. The contractors receiving these fees include law firms (local counsel, regulatory counsel and bond counsel), financial advisors and underwriters.

258. The Corporation estimates the Upfront Financing Costs (which consist mostly of fees) to be $44.7 million.[89] Mr. Mace estimates the Ongoing Financing Costs (which consists mostly of fees and does not include debt service or deposits required to replenish reserves) to be $19.3 million.[90] These estimates are not binding on anyone. Neither Section 6.25A of Act 57-2014 nor the Corporation's draft Restructuring Resolution imposes a cap on the Transition Charge calculated pursuant to the Adjustment Mechanism.[91]

259. The following table lists information from the evidentiary record concerning the consultants, their current contract amounts and for some, the maximum hourly rate. Where the table lists multiple contract amounts, the amounts are not additive; the different amounts indicate how the contract cap has been increased.[92]

| | |
|---|---|
| **Sidley Austin** | $1,000,000 |
| | $3,500,000 |
| | $4,000,000 |
| **Navigant** | $225,000 |
| | Hourly rates up to $430 |
| **Millstein** | $9,000,000 |
| **R3 Law Firm** | $1,500,000 |
| | Hourly rates up to $450 |
| **Quiñones & Arbona Law Firm** | $100,000 |
| **Public Financial Management** | $650,000 |
| | $50,000 per month |
| **Cleary Gottlieb** | $5,000,000 |
| | $10,000,000 |
| | $16,500,000 |
| | Hourly rates     Up to $1,050/hour |

---

[89] Attachment 2.01.

[90] Attachment 2.02; Mace Direct Testimony at 31.

[91] Proposed Restructuring Resolution at Conclusion of Law #7.

[92] The source for this information is the Corporation's response to the Commission's third information request. These amounts relate only to work in the Transition Charge. Some of these organizations are receiving additional fees for assisting PREPA in the rate case. In addition, some of these fees reflect services unrelated to the securitization which will not be reimbursed by the Corporation or included in the Transition Charge as Upfront Financing Costs or Ongoing Financing Costs. For example, the fees due under the R3 legal services contract also cover work on PREPA's pending Integrated Resource Plan and Rate Case.

67



260. For some of the contractors, the contractual purchaser is PREPA; for others the purchaser is the Corporation. Where PREPA is the purchaser, the Corporation will reimburse PREPA. The Corporation then will recover the reimbursement cost from PREPA's customers through the Transition Charge (except for the Cleary Gottlieb costs, which do not flow through the Transition Charge but instead are recovered by PREPA through its normal rates).

261. The Commission, along with the Independent Consumer Protection Office ("ICPO") has concerns about the amount spent so far, the absence of effective limits on the fees, the lack of competitive bidding in the selection of the contractors, the quality of oversight of those fees, and the possibility of duplicative effort among the companies charging the fees.[93] While the Commission has no regulatory power to limit the fees, it will use its investigative power to monitor the fees and to expose any breach of the Corporation's fiduciary duties, which breach can trigger judicial action.

## 2. Process by which existing contractors were chosen

262. In the technical hearing, witnesses acknowledged that in selecting these contractors and determining their fees, neither PREPA nor the Corporation used competitive bidding. The Corporation has asserted, however, that the contracts "have been, or are expected to be, selected based on factors including their qualifications and their cost. The providers already selected were chosen under factual procurement processes and, in many cases, were already selected to work with Commonwealth government entities. While the engagements relating to this project were not … subject to competitive bidding given the nature of their professional and highly technical services, the rates and charges were evaluated and were negotiated with competitive market costs in mind."[94]

263. Furthermore, Mr. Mace testified that the Corporation would use a competitive process to select the underwriter—the entity that purchases the bonds from the Corporation and resells them to investors. Dr. Quintana testified that in the past, his staff has questioned and disallowed fees (fees in general; not necessarily Transition Charge fees, as we understood him).

## 3. The risk of excess fees

264. The services provided by these contractors are essential services. Neither the Corporation nor PREPA can do without them. And both the Corporation and PREPA have the legal power (and in PREPA's case, the market power) to make PREPA's electricity customers to pay the fees—the Corporation through the Transition Charge and PREPA through electric rates. Consequently, neither entity has as strong an incentive to limit the fees as would a company operating in a competitive market. Finally, the Corporation's witnesses argued, credibly, that

---

[93] We emphasize that the issue here concerns only the fees to contractors; not the payments to bondholders. The payments to bondholders are fixed by the terms of the Restructuring Support Agreement.

[94] Corporation's Submission of Information in Compliance with the Commission's Resolution and Order of April 18, 2016, Question I.B.



establishing maximum budgets is difficult because the process of negotiating bond issuances is especially unpredictable under Puerto Rico's unique and complex circumstances. Thus, while contracts have budget maximums, for some contracts those maximums have been raised several times.

265. The Commission finds that Mr. Mace and Dr. Quintana demonstrated appropriate concern about contractor costs. In particular, Dr. Quintana described his internal procedures for reviewing costs. He requires his senior executives to prepare periodic reports and examines these reports himself. We are less confident in the Corporation's procedures. As already noted, Mr. Gil-Olazábal described the Corporation as merely a "conduit." He did not describe any procedure by which the Corporation manages the costs.[95]

266. These factors give the Commission concern that PREPA's customers will be exposed to fees without limit. As Mr. Mace testified at the evidentiary hearing, while the fees represent only a small portion of PREPA's total cost, anything over $1 million will and should attract attention.

### 4. Roles of Corporation, PREPA and the Commission in preventing excess fees

267. Total fees are the product of hourly rates and hours spent. It is a source of discomfort that advisors and attorneys are earning over $400 an hour when so many citizens of the Commonwealth are enduring the pain of the current economic crisis. But the Commission recognizes that these rates are consistent with market prices for these types of advisors. There is no breach of Section 6.25A of Act 57-2014 for the Corporation and PREPA to pay market prices for necessary advice.

268. Hours spent is another matter. To have no limit on the fees, and no accountability for them, is unwise and unacceptable. No responsible business incurs costs without limit. A responsible business operates with budgets that align costs with benefits. This Commission, along with the consumers and citizens of Puerto Rico, expects the Corporation and PREPA to act accordingly. The question is how to ensure that they do so.

269. In the context of this Transition Charge proceeding, the Commission has no legal power to determine whether the fees are reasonable, or to reduce the fees if they are unreasonable. Under Section 6.25A of Act 57-2014, the Corporation is not a utility; nor is the Commission the Corporation's regulator. Section 6.25A does not give the Commission power to establish the Corporation's budgets or to cut its costs. Nor can the Commission responsibly reject the entire Transition Charge mechanism based on the fees, because the fees represent too small a percentage of the total cost to trigger any of the bases for rejection listed in Section 6.25A.[96]

---

[95] Dr. Quintana agreed to share his procedure with the Corporation.

[96] Section 6.25A(e)(5) requires the Corporation to demonstrate that the savings "are anticipated" to satisfy the savings test set forth in Article 35 and Chapter IV of the PREPA Revitalization Act." The statutory

270.  Unlike the Commission, the Corporation and PREPA do have the power to limit the fees.  They are the contractors' customers.  They shop for and hire the contractors, negotiate the contracts and monitor the spending.  At the evidentiary hearing, Mr. Quiñones, one of the Corporation's outside counsel, asserted that both PREPA and the Corporation had an obligation, as corporations created under Puerto Rico law, to protect consumers from unreasonable fees.  No witness or representative from PREPA or the Corporation disagreed with him.

271.  The question is whether PREPA and the Corporation are prepared to carry out their obligation to keep the fees reasonable. The Commission views the Corporation as insufficiently prepared for this role.  That the Corporation has no personnel or infrastructure of its own, sheds doubts on whether it is able to protect consumers through the establishment of procedures designed to keep costs reasonable or engage in arm's-length bargaining with its contractors and with PREPA.   As described by Mr. Gill-Olazábal during the Technical Hearing, the Corporation's "decisions" will be made by "the team," meaning the restructuring team—which includes the very advisors whose fees are in question. If the decision-makers for the Corporation are the same as the decision-makers for PREPA and if those decision-makers are the same people who are charging the very fees at issue, that is not the arm's-length relationship necessary to protect consumers from excess fees.   The Commission expects the Corporation's Administrator to be alert to this concern and to keep the fees reasonable.

272.  The Commission has the right to challenge PREPA or the Corporation in court if the fees they pay are not reasonable.  The court, in turn, can discipline PREPA, the Corporation or its officers if they fail to act consistently with their obligations under Commonwealth law. While the Commission has no authority to regulate the fees (to the extent those fees enter the Transition Charge), it does have the expertise to state what fee levels are reasonable.   The Commission stands ready to challenge both PREPA and the Corporation in court should either entity violate its obligations to limit fees to reasonable levels.

273.  It is better, of course, to avoid legal violations.  Accordingly, the Commission calls upon the Corporation and PREPA to require contractors to obey all Puerto Rico government guidelines on contractor fees and costs and consider imposing limits on fees.  In addition, PREPA and the Corporation shall present to the Commission an annual report summarizing the amounts invoice (relating to the Transition Charge) and the payments made on those invoices. The Commission will publish this information as appropriate, so that any citizen and any member of the media may study and act as they wish.  Furthermore, when the Commission conducts its investigation of the Corporation (under Section 6.25A(j) of Act 57-2014) and of PREPA (in the current and future rate cases and other proceedings), the Commission will use this information to assess these entities' vigilance in protecting consumers.

---

savings requirement is $750 million, calculated on a net present value basis.  See PRA, Section 35(a)(iii). In his questioning of the Corporation's witnesses, Mr. Gonzalez of WindMar demonstrated that the fees were almost high enough to bring the estimated "savings" from this transaction below the $750 million. The Commission appreciates his efforts.  However, under the Revitalization Act the savings test is to be calculated without regard to the fees.

274. Finally, the limitation on the Commission's authority over fees applies only in the context of the Transition Charge, which initially will represent about 12 percent of the customer's bill. The remainder of each customer's bill arises from charges directly from PREPA—over which the Commission has broad jurisdiction under Act 57-2014. The Commission will use that power to ensure that future fees paid by PREPA for its operations, *i.e.*, outside of the Transition Charge context, are reasonable.

### D.        The treatment of net-metering customers

275. To determine the proper application of the Transition Charge to net-metering customers, the Commission must take into account the provisions of Section 29 of the Revitalization Act, which amended Section 4 of Act 114-2007. Section 29 distinguishes two categories of net-metering customers: so-called "grandfathered" net-metering customers, and "non-grandfathered" net-metering customers.

276. Application of the Transition Charge to net-metering customers has been a source of controversy in this proceeding. Some participants have argued that the Commission must exempt from the Transition Charge all of the consumption of all net-metering customers. The Corporation, in contrast, has proposed the following: For non-grandfathered net-metering customers, the Transition Charge should apply to "gross" consumption; for grandfathered net-metering customers, the Transition Charge should apply to only "net" consumption.

277. The Commission will address each category separately, starting with the non-grandfathered customers. Before doing so, it will be helpful to explain the concept of net-metering, the concepts of "gross consumption" and "net consumption" and the role of today's and tomorrow's meters in measuring consumption.

### 1.        Understanding net-metering

278. A full-service electricity customer, meaning a customer who does not net-meter, has a simple relationship with PREPA: PREPA delivers power, customer consumes power, customer pays for the power consumed. This full-service customer experiences one flow of energy, **inflow** from PREPA, through the meter, to the customer. The customer's monthly energy bill is the retail rate times the sum of the hourly inflows over the month. Since the customer has no other source of supply, the inflow for that month is the same as the customer's consumption in that month. This amount of consumption is called **gross consumption**.

279. A net-metering customer's situation is more complicated. Such customers can have, in addition to inflow, two other hourly energy flows:

a.   Sometimes energy flows from the customer's generator (e.g., solar panels, a biogas generator, etc.) to power the customer's appliances and equipment (**self-supply**).

71

b.  If the customer generates more than it uses, power flows from the customer's generation back through the meter to PREPA (**outflow**). PREPA's meters can separately register both the inflow and the outflow of the net-metering customer.

280.  If the net-metering customer generates more than she consumes in every hour, there is always self-supply and always outflow. Conversely, a customer with consumption that is higher than its generation output in every hour will always have inflow even while the generation is providing some self-supply. For most renewable technologies, generation production varies (with the sun or wind); therefore, the typical net-metering customer will experience inflow, outflow and self-supply in various amounts throughout the month.

281.  The net-metering customer's energy consumption is made possible by, and therefore equals, inflow from the utility plus self-supply. The energy generated behind the meter (i.e., by the customer's owned generation) is the amount that it is self-supplied, plus the outflow. Stated differently, self-supply equals energy generated minus outflow.

282.  The net-metering customer's **net consumption** from PREPA over a billing month equals inflow minus outflow, which also equals consumption minus energy generated. For example, a net-metering customer in one month might have consumption of 600 kWh, generation 400 kWh, inflow of 300 kWh, and outflow of 100 kWh. Therefore, the customer's net consumption = 600 –400 = 300 –100 = 200 kWh.

283.  In the net-metering arrangements currently in place in Puerto Rico, the customer pays the retail rate for her net consumption. That arrangement will continue for the Transition Charges to grandfathered net-metering customers. That is, for grandfathered net-metering customers, the Transition Charge will apply to net consumption. Consider a pair of grandfathered net-metering customers. Each customer consumes 600 kWh in a month; each customer generates 400 kWh in the same month. Each customer would pay the Transition Charge on 200 kWh, representing net purchased energy. Depending on how much the times of consumption and generation overlap within a particular month, customer A might have, for that month, total inflow of 300 kWh, total self-supply of 300 kWh, and total outflow of 100 kWh (the 300 kWh plus 100 kWh comprising the generation of 400 kWh); while customer B might have total inflow of 400 kWh, total self-supply of 200 kWh, and total outflow of 200 kWh (the 200 kWh plus 200 kWh comprising the generation of 400 kWh); but each customer would have net consumption of 200 kWh.

284.  For the non-grandfathered net-metering customers, with the Transition Charge the net-metering arrangement will change from current practice in two steps. First, as soon as administratively feasible, the Transition Charge will be applied to total inflow, without any offset for outflow. If our customer A above were a *non-grandfathered* net-metering customer, it would pay the Transition Charge on its 300 kWh inflow, while a non-grandfathered customer B would pay the Transition Charge on its 400 kWh inflow. While inflow is not a perfect measure of consumption, it is likely to be a better approximation than the only other immediately available option, net consumption. For example, Inflow is 300 kWh for our customer A and 400 kWh for customer B; compared to their net consumption of 200 kWh, the inflow values are better proxies for their 600 kWh consumption.

72



285.    Second, as sufficient metering becomes available for the non-grandfathered net-metering customers, those customers will be charged the Transition Charge for their consumption, by:

    a.    directly metering consumption at a point that captures both inflow and self-supply,

    b.    adding a meter for self-supply and computing consumption as self-supply plus inflow, or

    c.    metering generation and computing consumption as inflow plus generation minus outflow.

286.    In this second step, both customer A and customer B would pay the Transition Charge on 600 kWh, just as if they had no generation.[97]

## 2.    Treatment of non-grandfathered net-metering customers

### a.    Statutory background:  Section 29 of the Revitalization Act

287.    For non-grandfathered net-metering customers, the Corporation has proposed to apply the Transition Charge to gross consumption.  Some participants urged the Commission to reject the proposal.  They argued that Section 29 of the Revitalization Act (as well as Act 114-2007) requires the Corporation (and the Commission) to exempt all net-metering customers from all of the Transition Charge.  They cited these provisions from Section 29:

> *The Electric Power Authority may propose, as part of its rates, just and reasonable charges to its net-metering customers. The Energy Commission shall evaluate said charges as part of the rate proposal of the Authority.*

> *The Energy Commission shall evaluate and determine which charges shall apply to net-metering customers, such as the Contribution In Lieu of Taxes, Securitization, Subsidies, and Grants. Both the Authority and the Commission*

JHRM
¼ ᵃ
⅄¹

---

[97] For the algebraically inclined, the reasoning in this subsection can be reflected in the following equations, where G = generation, C = consumption, S = self-supply, I = inflow, O = outflow and N = net consumption.  For grandfathered net-metering customers:

$$C = S + I$$
$$G = S + O$$
$$N = I - O$$
$$N = C - G = (S + I) - (S + O) = I - O$$

And for non-grandfathered net-metering customers:

$$C = S + I = G - O + I$$



*shall take into account the following criteria when proposing and evaluating the net-metering customer charges:*

> *i. The charge to be billed shall be just and shall have the purpose of covering the operating and administrative expenses of the grid services that receives any customer that entered into a Net-metering Agreement. The grid services received by a net-metering customer shall be clearly differentiated from the services that the Authority bills on a regular basis to all of its customers.*
>
> *ii. The charge shall never be excessive or established in such a manner as to constitute an obstacle to the implementation of renewable energy projects.*

288.    Note that the first quoted paragraph applies to "charges" imposed by the "Electric Power Authority," *i.e.*, PREPA.  Since the Transition Charge is imposed by the Corporation, not PREPA, this first paragraph does not apply here.[98]   The second paragraph, by referencing "charges" involving "Securitization," grants the Commission discretion whether to apply the Transition Charge to net-metering customers.  The Commission must "evaluate and determine" whether to apply the Transition Charge to these customers, by applying the criteria stated in clauses (i) and (ii).   The Commission does so here, and determines that non-grandfathered customers should pay the charge on their gross consumption.

289.    At the outset, one might argue that clauses (i) and (ii) apply only to rates charged by PREPA (the subject of the first paragraph), but not to the Transition Charge imposed by the Corporation.  We need not decide that issue here, because we determine below that even if the clauses do apply to the Transition Charge, an exemption for non-grandfathered net-metering customers is not appropriate.  We will address each clause in turn.

---

[98]   In their comments on the draft order, WindMar and ICSE-PR argue that we should substitute "Corporation" for "Electric Power Authority" and therefore treat this paragraph as applying to the Transition Charge.  We cannot do so; no principle of statutory interpretation allows an agency to change the entity that is the subject of a statutory command.  Contrary to WindMar's and ICSE-PR's argument, the Corporation is not the "alter ego" of PREPA and it is not "acting on PREPA's behalf."  These statements reflect a fundamental misunderstanding of the Corporation's purpose.  The Corporation is not the "alter ego" of any entity.  It is an independent instrumentality, created by statute.  It will have a contractual relationship with PREPA in which PREPA acts as Servicer, collecting money from ratepayers and turning that money over to the Corporation for payment to bondholders.  If the Corporation is acting on anyone's behalf, it is acting on the bondholders' behalf.  Also, WindMar and ICSE-PR seek to justify substituting "Corporation" for "Electric Power Authority" by asserting that when Act 114-2007 was enacted, there was no "Corporation" to reference.  That is not relevant.  In 2016, when the Revitalization Act was enacted, there *was* a Corporation to reference.  When the Legislature drafted the Revitalization Act to amend Act 114, chose to reference "Electric Power Authority," not "Corporation."  Citizens are free to seek a change in the statute, but the Commission has no power to change it unilaterally.

**b.     Applying the Charge is "just"—to net-metering customers and to all customers**

290.   In determining whether applying the Transition Charge to net-metering customers is "just," the Commission first must answer this question:   "Just" to whom—net-metering customers only, or all customers?  Regardless of how that preliminary question is answered, the Commission finds that applying the Transition Charge to net-metering customers is just.

291.   We will first assume that the term "just" applies only to net-metering customers. Utility rates must recover the costs of utility service.   Under the principles of "just and reasonable" ratemaking, the rates must recover those costs from those who cause the costs or those who benefit from them.  If the rates deviate from that principle, some customers will escape their responsibilities, at the expense of other customers.

292.   The purpose of the Transition Charge is to recover costs related to PREPA's legacy debt, and to enable PREPA to refinance that debt through new bonds at lower cost.  The expenditures made possible by that legacy debt were incurred to benefit all customers, including customers who later become net-metering customers.  There is nothing "unjust" about requiring all customers to pay for costs historically incurred to serve them.  The fact that new generation technologies allow some customers to serve themselves does not change the key fact:  that PREPA incurred the legacy debt to serve those customers.  Requiring them to pay their proportional share of the cost associated with that legacy debt is just.  Furthermore, "justness" to net-metering customers does not require making non-net-metering customers pay more so that net-metering customers can pay less.  What is "just" to net-metering customers must consider context.  A rate treatment cannot be "just" to net-metering customers if it is unjust to others.

293.   Therefore, the Commission's interpretation of this provision is that the term "just" applies to all customers, not only net-metering customers.  To apply the term "just" only to the net-metering customers would mean that the other customers are subject to some standard other than "just", a result contrary to the basic tenets of Act 57-2014.  In utility regulation there is no hierarchy of "justness," with some customers receiving treatment somehow more or less "just" than others.   Regardless of whether they net-meter, all customers are beneficiaries of the infrastructure made possible by PREPA's legacy debt.   That some customers net-meter and others do not does not trigger a differential in "justness."   In this specific context of Section 29 of the Revitalization Act, it would be less than "just"—indeed it would be "unjust"—to make other customers pay more so that net-metering customers can pay less.  This "unjustness" would be wrong enough if the Transition Charge represented a new cost, with non-net-metering customers paying more so that net-metering customers can pay less.  But here, the non-net-metering customers would be paying for costs that the net-metering customers have always paid for, and properly so, before they had net-metering capability. The fact that current rates did not fully reflect all of PREPA's legacy debt does not limit the aforementioned.

### c.    The charge is not "excessive"

294. The term "excessive" means "going beyond what is usual, normal, or proper."[99]  A charge is not "excessive" if it does no more than recover costs legitimately applied to a customer. As already explained, the Transition Charge reduces, then recovers, legacy costs caused by, or incurred for the benefit of, all customers including net-metering customers.  These costs are usual, normal and proper because they are the type of costs typically recovered from all customers.  They do not suddenly become "excessive" merely because they are recovered through a Transition Charge—especially when the effect of the Transition Charge is to reduce the cost burden.

### d.    The charge is not an "obstacle"

295. An "obstacle" is "something that impedes progress or achievement.".[100]  One must understand the term "obstacle" in context.  An obstacle is a change to what is normal—a barrier that impedes normal progress.  It is a change to the *status quo* that makes progress more difficult than before.  The Transition Charge reduces legacy debt costs.  Requiring the customer to continue to bear those reduced costs is not an obstacle.  The term "obstacle" cannot logically refer to the normal costs of interacting with society.  That is all that the Transition Charge is: a means of recovering from all customers those costs legitimately and equitably allocated to all customers.

296. If the Commission were imposing on net-metering customers a new, unjustified cost, that would be an "obstacle."  The Transition Charge is not a new cost; it is a mechanism for reducing existing costs for which all customers, including net-metering customers, should be responsible.  A charge whose purpose is to reduce costs cannot logically be viewed as increasing costs.  A charge that is the same for all customers cannot logically create an obstacle for net-metering customers.  It takes nothing away from the good cause of renewable energy to reject this reasoning.

### e.    Exempting non-grandfathered customers is not required by Act 114-2007

297. Some intervenors also argued that the Commission must consider their request for exemption in the context of Act 114-2007.  Act 114-2007 required PREPA to establish a net-metering program.  Act 114 nowhere addresses, let alone authorizes, the unfair and destabilizing effect of allowing some customers to shift their costs to others.  Nor does it address, let alone authorize, the distortion to economic decision-making that occurs when a person's choice to become a net-metering customer is based not on the inherent benefits of customer-owned generation, but on the opportunity to escape legacy costs incurred on that customer's behalf.  Act 114-2007 does not require the Commission to grant an exemption to the Transition Charge.

---

[99]  See http://www.merriam-webster.com/dictionary/excessive.

[100]  See http://www.merriam-webster.com/dictionary/obstacle.

298. Finally, insisting Act 114-2007 allows non-grandfathered net-metering customers to avoid the Transition Charge conflicts directly with the nonbypassability requirement of the later-enacted Chapter IV of the Revitalization Act.  Section 31(19) of the Revitalization Act states: "'Non-bypassable' means that Transition Charges shall be paid by all Customers, even if the Customer elects to purchase electricity, in whole or in part, from an alternative energy provider." Section 33(a)(2) of the Revitalization Act authorizes the Corporation to make the Transition Charge "Mandatory or Non-bypassable" to Customers.  Section 35(i) of the Revitalization Act states what while the Restructuring Bonds are outstanding, the Transition Charges shall be "non-bypassable and mandatory and shall apply to all Customers."  Because these provisions in the Revitalization Act were enacted after Act 114-2007, and are specific to the Transition Charge, they must be interpreted as superseding conflicting language from prior statutes, especially where that language had a more general purpose.  The Transition Charge cannot be bypassed by "Customers."  Section 31(7) of the Revitalization Act defines "Customer" as "any Person that is connected to or takes or receives electric power service within the Commonwealth of Puerto Rico, from the electric power generation, transmission, or distribution facilities that are part of the System Assets, *whether or not those electric power generation, transmission, or distribution facilities are owned by the Authority…*" (emphasis added).   A net-metering customer is a "Customer" by definition. The Revitalization Act does not allow "bypass" by any customer, net-metering or otherwise.  The exception, of course, is for grandfathered customers, which the Revitalization Act deals with separately (and which we address in Part III.D.3 below).  Indeed, had the Legislature intended that all net-metering customers be allowed to bypass the charge, the provision on grandfathering would be redundant.

### f.   Exempting net-metering customers undermines other statutory purposes

299. Section 29 of the Revitalization Act gives the Commission discretion.  In exercising that discretion, the Commission must consider other statutes.  The Commission does so here.

300. Exempting non-grandfathered net-metering customers from the Transition Charge undermines the purposes of Section 6.25A of Act 57-2014.  The purpose of Section 6.25A is to create certainty that Participating Bondholders will receive their expected payments.  That certainty is the condition required by the bondholders in return for their agreement to reduce PREPA's debt by 15 percent and to receive a lower interest rate, thereby reducing costs for all PREPA customers.  In enacting Section 29 of the Revitalization Act the Legislature could not have meant to reduce the certainty of recovery.

301. Exempting net-metering customers from the Transition Charge would reduce the certainty of recovery.  And as importantly, it would harm non-net-metering customers.  In any particular quarter, the movement of customers to net-metering would reduce Transition Charge revenues.  In the next quarter, the Charge would rise, both to compensate for the prior quarter's under-recovery and to reflect the now-lower number of customers.   Facing this higher charge, the still non-net-metering customers would find net-metering more attractive—not because net-metering would be inherently more economical, but because it offered a way to escape the escalating Transition Charge.  As additional customers adopt net-metering, the fixed costs they avoid would become the responsibility of the remaining customers, and so on.  We would face a



continuing cycle of cost avoidance and cost-shifting—resulting not from the superior economics of net-metering but from the opportunity to gain exemption from the charge, eventually causing low-income customers who are unable to purchase residential net-metering systems and customers who are unable to physically install renewable energy systems (such as, apartment building residents) to bear the entire costs avoided by the ever increasing number of new net-metering customers. The combination of projects undisciplined by economic logic and non-net-metering customers bearing growing costs is not one required by or consistent with Section 6.25A of Act 57-2014.

302. The Commission also must consider an exemption for non-grandfathered net-metering customers in the context of the broad purpose of Act 57-2014. The paramount purpose of Act 57-2014 is just and reasonable rates. Rates are not just and reasonable if some customers can shift their responsibility for legacy costs to others. Allowing—indeed facilitating—such cost-shifting by exempting non-grandfathered net-metering customers will force some customers to bear costs incurred to the benefit of other customers. That result directly contradicts the just and reasonable rate purpose of Act 57-2014.

303. Also contradicting Act 57-2014 is a failure to distinguish economical actions from uneconomical actions. At the technical hearing, those arguing for exemption made no persuasive distinction between behind-the-meter projects that are economic and those that are uneconomic. An economic project is a project whose ratio of benefits to costs, considered over the life of the project and calculated on a net present value basis, is more favorable than other feasible projects. An uneconomic project is a project whose ratio is less favorable than other feasible projects. Economic projects save resources: Either everyone is better off, or some people are better off and no one is worse off. Uneconomic projects waste resources: their beneficiaries receive benefits at the expense of someone else. To interpret Section 29 of the Revitalization Act as authorizing an exemption regardless of whether a project is economic or uneconomic conflicts with Act 57-2014's requirement that rates be just and reasonable and, more broadly, that the Commission act for the overall good of the Commonwealth. Puerto Rico and its citizens have limited resources. The Legislature did not intend to waste those resources by offering exemptions to projects regardless of their economic merits.[101]

---

[101] In their comments on the draft order, WindMar and ICSE-PR argue that by stressing the distinction between "economic" and "uneconomic," the Commission improperly imposed on them the burden of proof in this proceeding. That is not correct. The Commission well understands that the burden of proof to show that the Calculation Methodology and Adjustment Mechanism satisfies Section 6.25A lies with the Corporation. The Commission's point was different—that WindMar and ICSE-PR were advancing an *interpretation of the statute* that assumed the Legislature, in enacting the statutes on which they rely, was indifferent to whether the projects it was incentivizing were economic or uneconomic. Counsel for WindMar said as much at the evidentiary hearing. We do not find that statutory interpretation credible. One reason is common sense. Legislatures are deemed to act rationally. Legislative indifference to wastefulness (which is what "uneconomic" means) is not rational. But the second reason is statutory. WindMar and ICSE-PR have asserted that we should remain conscious of other statutes. Act 57-2014 requires that rates be "just and reasonable." Rates to consumers will not be just and reasonable if they reflect costs shifted to them because other customers are investing in projects that are uneconomic.



304. Yet that is what the proponents of exemption propose.   Despite multiple opportunities presented by the Commission's questions, they insisted at the evidentiary hearing that Section 29 of the Revitalization Act authorizes exemption to net-metering customers regardless of whether their projects were economic or not.   They failed to offer any boundary between projects that deserved an exemption and projects that did not.   The Commission finds these arguments unpersuasive.

305. Finally, we agree with the argument made by the Corporation in its Brief (at 40), that "the Revitalization Act would not [have] give[n] the Corporation a choice in Article 6.25A(d)(ii)(4) to include the estimated load served by net-metering or estimated distributed generation ('behind the meter') in determining energy usage for the calculation of Transition Charges if the Legislature had meant to also create an exemption, without discretion to the Corporation, elsewhere."

## g.      WindMar's Legal Brief

306. On June 16, 2016, WindMar filed a brief asserting that the Corporation's proposed treatment of net-metering customers did not satisfy Section 6.25A.   We address here each of WindMar's arguments.

307. *"Explanation"*:      Section 6.25A(e)(1)(vi) requires an "explanation" of the Corporation's reasons for including "the estimated load served by net-metering or estimated distribution generation … in determining energy usage."   The same provision requires the Corporation to show that with such inclusion, the Transition Charge will not be rendered impracticable to administer and will ensure full and timely payment of the Restructuring Bonds. WindMar argues[102] that the Corporation failed to provide the required explanation.   The Corporation explained (and the Commission has found, as explained throughout this Part III.D) that to exclude such load would allow some customers to bypass the charge, shifting the underlying costs— incurred by PREPA to serve all customers, including net-metering customers—to others.   This explanation accords with the requirement of "just and reasonable" rates—a foundational principle of ratemaking and an explicit requirement of Act 57-2014— which Section 6.25A does not amend.   Nothing in Section 6.25A authorizes the Commission to depart from Act 57-2014's requirement of just and reasonable rates.

308. *Practicability:*   WindMar argues[103] that because the Corporation acknowledged that "initially," *measuring the output of distributed generation* was not "practicable," the Corporation could not meet the requirement that the *Transition Charge* be "practicable."   Windmar applies the term "practicable" to the wrong concept.   In Section 6.25A(e)(1)(vi), the term "practicable" applies to the Transition Charge, not to the measurement of distributed generation output.   The Corporation has explained, and this Commission has determined, based on the reasons stated previously in this Order, that the inclusion of estimated self generation, or estimated distributed

---

[102] Brief at 5.

[103] Id. at 4-5, 7.



generation, to determine energy consumption will not render the Transition Charge impracticable to administer.

309. *Data and studies:*   As part of its argument, WindMar stated[104] the absence of "analysis," "data" and "studies".   However, Section 6.25A(e)(1)(vi) does not require data or studies; it requires an "explanation of the reasons."   The Corporation's Petition includes an "explanation of the reasons", as required by statue.  Based on the detailed discussion above, the Commission has determined that the Corporation demonstrated that its approach is not arbitrary, capricious, unreasonable or illogical.   The Corporation's approach is in fact logical, because it places responsibility for costs on those who caused, or who benefit from, these costs, as required by statue.   WindMar asserts[105] that the only "support" the Corporation gave was a "fairness" argument; specifically, that "...[i]f the estimated load served by net-metering and distributed 'behind the meter' generation were not included, a Customer could reduce its responsibility to pay Transition Charges, and the responsibility for those avoided charges would be transferred inequitably to other Customers."[106].   WindMar does not dispute the logic of this explanation, nor its premise—that the Commission may reasonably determine that each customer should be responsible of paying for costs incurred on its behalf.   This reasoning constitutes the "explanation" required by the statute.

310. *Inequity:*   The Corporation stated that not charging all customers for costs incurred on their behalf would transfer costs to others "inequitably."   WindMar argues[107] that the Corporation's reliance on the term "inequitably" is "irrelevant because public policy has determined to encourage renewable energy integration through incentives ranging from net-metering to cash rebates and renewable energy certificates, all of which represent a cost to one sector and an incentive to renewables."   WindMar's argument is overreaching.  The Commission recognizes that the Commonwealth's public policy is to incentivize renewable energy.   However, Articles 29 and 30 of the Revitalization Act gives the Commission discretion to determine which charges will be applied to net-metering customers, including the Transition Charge. As a consequence, we conclude that the "inequitable" treatment granted to renewable energy in other contexts, does not extend to Transition Charge.   As already noted, Section 6.25A requires an explanation.   The Corporation explained that relieving renewables of costs incurred to meet customers' needs is inequitable.   That explanation is logical, fact-based and rational— characteristics that exist regardless of how renewable energy is treated outside Section 6.25A.

311. WindMar also argues[108] that the law "does not address whether the Transition Charges are inequitable."   The law does not have to address inequity for inequity to be part of an "explanation."   The statute does not restrict the factors that can be part of the explanation.   As long as the explanation is rational, it is acceptable.

---

[104] Id. at 5.

[105] Id. at 5-6.

[106] Windmar quoting the Corporation.

[107] Id. at 6.

[108] Id. at 5.

312. *Full and timely payment:*  WindMar argues[109] that "[n]ot including charges to net-metering ... doesn't impair the full and timely payment of the Restructuring Bonds...."  This statement aims at the wrong question.  The actual question is: if the Corporation includes the charges, will the statutory standards of practicability and timeliness be met?  The answer to this question is yes.

313. *Testimonial support:*  WindMar argues[110] that Mr. Zarumba's testimony that he was "*required* to include behind the meter generation", provided insufficient support for the Corporation's treatment of net-metering customers (emphasis by Windmar).  WindMar does not address the source of this purported requirement, but that has no impact on this discussion.  Mr. Zarumba is an expert witness with long experience in utility rates.  His explanation is rational and clear, and consistent with the requirement of just and reasonable rates.  No more is necessary for the Commission to credit his testimony.

314. *Reading meter load:*  WindMar stated[111] that Dr. Quintana and other witnesses did not sufficiently "explain how behind the meter load could be read" by PREPA.  Notwithstanding WindMar's statement, the Corporation did explain how it would determine kWh consumption for such customers, as discussed in Part II.E.5 above.  Whether the Corporation uses estimates or actual readings, the statutory requirements applicable to the Transition Charge, that it will be practicable to administer and will ensure full and timely payment of the Restructuring Bonds, will be met.

315. *Act 114-2007:*  WindMar argues[112] that the Transition Charge, when applied to net-metering customers, violates Act 114 because it recovers legacy debt.  Legacy debt, according to WindMar, does not "cover[] the operating and administrative expenses of the grid services"—the phrase that WindMar reads as the sole type of expense that net-metering customers may be required to bear.  This argument has two problems.  First, money being fungible, there is no basis for stating that legacy debt did not include costs associated with such expenses.  Second, WindMar appears to be arguing that such expenses can be the *only* basis of rates charged to a net-metering customer.  That cannot be true.  For purposes of consumption not supplied by its own generation, a net-metering customer is a normal customer.  Under just and reasonable ratemaking, it can be required to pay the normal charges associated with that status.  As explained throughout this subsection, that is all that the Transition Charge does.

316. WindMar states[113] that the "Transition Charge represents a 20% [sic] on the cost of renewable energy." The Transition Charge is not a charge on renewable energy; it is a charge on consumption, just as the normal kWh rate is a charge on consumption.  Net-metering customers,

---

[109] Id. at 5.

[110] Id. at 7.

[111] Id. at 8.

[112] Id. at 12.

[113] Id. at 13.

just like all customers, receive benefits from the system PREPA has built; now, like all other customers, they must help pay for the costs that produce those benefits.

### 3. Treatment of grandfathered net-metering customers

317. The second-to-last paragraph in Section 29 of the Revitalization Act contains the so-called "grandfathering" provision. This provision defines a category of customers: those who are already net-metering customers, or are in the process of attaining and will attain that status very soon. The provision further provides that during 20-year grace period, "the charges approved by the Commission shall not be billed." The Commission must determine what are the specific "charges" that, during the grace period, "shall not be billed."

318. In this specific statutory context, the term "charges" can logically refer only to *charges that recover a category of costs not recovered from the grandfathered customers previously.* We reach this result in three distinct ways.

319. First, our interpretation carries out the legislative purpose of grandfathering: to ensure that those who made investments in reliance on the law as it existed before a statutory change are treated the same after the statutory change. Before enactment of the Revitalization Act, net-metered customers paid rates based on net consumption only. During the grace period, the Transition Charge as proposed by the Corporation will apply to net consumption only. This result exemplifies grandfathering.[114]

320. Second, our interpretation is the only logical interpretation because allowing a complete exemption (so that no charge was applied to gross consumption) would give these customers electric service for free. Section 29 of the Revitalization Act applies not only to the Transition Charge ("Securitization"), but also more generally (as stated in the first paragraph of Section 29) to "just and reasonable charges to its net-metering customers." Those charges are charges reflecting costs PREPA must incur to accommodate net-metering customers—costs for infrastructure and operations without which net-metering would not be physically possible. It is one thing to avoid disrupting investment expectations, by not imposing, after an investment is made, charges which did not apply before the investment was made. It is another thing entirely to expect PREPA to build infrastructure to serve net-metering customers but then allow those customers to use that infrastructure for free—with other customers bearing the costs. That is a

---

[114] In its comments to the draft Restructuring Order, CEPPO argues that Section 29 of the Revitalization Act prevents the Commission from authorizing any charge on grandfathered net-metering customers. However, that assertion fails to grasp the purpose of the grandfathering provision. Prior to being amended by the Revitalization Act, Section 5 of Act 114-2007 provided that net-metering customers would pay PREPA's rates on their net consumption. Those rates include the service for the legacy debt, which is now being transferred to the Transition Charge. It is the same responsibility, although now is going to be collected through a different mechanism. Article 30 of the Revitalization Act amended Article 5 of Act 114-2007 to establish, among other things, that grandfathered net-metering customers will continue to be subject to the existing provisions of Article 5 before it was amended. Therefore, it is only logical that grandfathered net-metering customers continue to be responsible for the costs they have always been responsible for, regardless of whether they are now collected through a Transition Charge rather than through PREPA's rates. Applying the Transition Charge to their net consumption produces the same effect as an increase in PREPA's rates. That is the correct and logical result of the grandfathering provision.

benefit not granted even to our low-income citizens.  We see nothing in Section 29 suggesting, let alone requiring, such a result.  Our interpretation reconciles the intent of grandfathering with the economic logic of net-metering.  It also avoids cost-shifting and produces a result that is "just."

321.  Third, our result is supported by Clauses (i) and (ii) of Section 29.  It is not clear from Section 29 whether the criteria in Clauses (i) and (ii) apply to the analysis of charges to grandfathered customers.  But if those Clauses did apply, they would support the Commission's conclusion.  As already explained, prior to the Revitalization Act the grandfathered net-metering customers paid PREPA's rates based on their net consumption.  Applying the Transition Charge to net consumption merely continues this treatment.   This treatment is not unjust, because net consumption is the portion of gross consumption to which PREPA's charges historically applied.  Grandfathering protects these customers from new charges, not from all charges.  Nor is applying the Charge to net consumption "excessive," for all the reasons that the Commission explained above, in determining that the Transition Charge should apply to gross consumption for non-grandfathered customers:  These costs were incurred for the benefit of all customers, and therefore should be paid by all customers. The Transition Charge replaces (and reduces) a portion of the costs that would otherwise have been charged through retail rates, including rates applied to the net consumption of net-metering customers.  Finally, the application of the Transition Charge to grandfathered customers' net consumption cannot be an "obstacle" because by definition these customers' projects already exist.

322.  Section 29 of the Revitalization Act provides that "[f]or projects submitted from the period after the date of approval of this Act to the *time the final charge for net metering projects is determined and published by the Commission,* petitioners shall submit to the Authority, when filing the interconnection evaluation, a deposit in an amount equal to five cents ($0.05) per watt of proposed AC capacity or two thousand dollars ($2,000) for industrial customers, one thousand dollars ($1,000) for commercial customers, and two hundred fifty dollars ($250) for residential customers, whichever is less."  (emphasis added) The purpose of the aforementioned is to allow certain customers who enter into net-metering agreements after the approval of the Revitalization Act to become "grandfathered" for purposes of Section 29.

323.  With respect to the application of the Transition Charge to grandfathered net-metering customers, this language has produced a disagreement.  The Corporation argues that the "cut-off" date is the date on which the Commission issues this Restructuring Order.  CEPPO argues that the "cut-off" date is the date on which the actual numerical charge is "determined and published by the Commission."  The ambiguity arises because each interpretation is unsatisfactory on its face.  First, on the date the Commission issues this Restructuring Order, it is not "determining" or "publishing" a charge; the Commission is approving a Calculation Methodology and an Adjustment Mechanism.   Secondly, the Commission has no power to "determine" or "publish" the charge; its role is only to confirm its mathematical accuracy.  It is the Corporation that ultimately determines, publishes and imposes, the charge.  Furthermore, there is no "final" charge; there will be an initial charge that can change quarterly.  Assuming that the passage applies to the Transition Charge, neither interpretation is comfortable.   The provision is ambiguous on the question of the cut-off date:  what is the date after which no net-metering customer will be eligible to benefit from the "grandfathering" clause set forth in



Section 29? And because it is ambiguous, it is the Commission's responsibility to provide clarity to its meaning and purpose.[115]

324. Section 6.25A(e)(1)(xii) states that the "initial Transition Charge shall take effect on the date of issue (sic) of the Restructuring Bonds." This is the date most closely associated with a date on which the Corporation (although not the Commission) will have "determined" and "published" the Charge. It is the date on which the Transition Charge and its economic effect will be finally known. Therefore, we determine that the "cut-off" date after which the grace period described in Section 29 of the Revitalization Act will no longer be available for new net-metering customers is the date on which the Restructuring Bonds are issued. That is the more natural reading of the provision. Supporting this reading is our understanding of the Legislature's intent. The Legislature established a "cut-off" date to prevent customers from using their knowledge of the actual charge as the reason to install generation, thereby becoming grandfathered and avoiding the charge. The issuance of the Restructuring Order today does not have that effect, because it adds no information about the charge that has not been known since the day the Corporation filed its Petition. Finally, only a few months will pass between the date of the Restructuring Order and the date that the first charge is "determined" and "published". We do not expect the volume of project development to occur during that period to be so large as to endanger the recovery of bondholder costs.

325. CEPPO provided an analysis of how the Transition Charge would affect investment. See Appendix A to their brief. The Commission appreciates this type of contribution. But as discussed, the Transition Charge recovers costs that must be recovered from customers, including customers who caused or who benefit from the costs. All the Transition Charge mechanism does is make more certain the recovery for customers. In no way is it a special charge on distributed generation generally or net-metering customers specifically. In any event, all questions about how to allocate costs among customers can be addressed in the rate case.

### 4.    The future of net metering

326. In this subsection, the Commission has reached two conclusions. First, the Revitalization Act does not require an exemption from the Transition Charge for all consumption by net-metering customers. Second, economic efficiency and fairness require that customers pay for the costs—both past and future—incurred to serve them.

327. *We wish to stress, as emphatically as possible, that these two conclusions are not the Commission's final words* on this subject. In the pending rate case and in other proceedings, the Commission will explore, fully and deeply, all feasible ways to ensure that the maximum amount of cost-effective renewable energy is developed in Puerto Rico. And we will explore, just as fully and deeply, how to allocate the benefits and costs of that renewable energy consistently with elementary (and statutorily mandated) principles of economic efficiency,

---

[115] <u>Rebollo v. Yiyi Motors</u>, 161 D.P.R. 69 (2004); <u>Martínez v. Rosado</u>, 165 D.P.R. 582 (2005); <u>Procuradora Paciente v. MCS</u>, 163 D.P.R. 21 (2004).

justness and reasonableness and nondiscrimination.  For example, if distributed generation bears its fair share of infrastructure costs, it is entitled to consideration of the value it contributes (such as the "capacity value" created by reducing future load or producing output at peak periods).  We look forward to inviting and assessing this type of analysis.

328.  Our point is this:  The proper place to measure and allocate the benefits and costs of renewable energy is not in a proceeding established by the Revitalization Act—a statute whose essential purpose is to create the bondholder confidence necessary to preserve $750 million in cost concessions while attracting more investment in our energy infrastructure.  The proper place for such discussions is in the rate case and other investigations that we hereby commit to hold.

E.     Some cautions about uncertainty

329.  As required by Section 6.25A(d) of Act 57-2014, the Commission has found that the Transition Charge is "designed" to "provide for full and timely payment of Restructuring Bonds, in accordance with the terms thereof, and other Ongoing Financing Costs."   The Commission does not find—nor could any responsible agency find—that as a matter of *certainty* the Transition Charge will fulfill this purpose.  As a matter of simple arithmetic, a decline of sufficient magnitude, in the number of customers connected to PREPA or of the number of kWhs consumed, could result in the bondholders not recovering all their dollars.  So, too, would a decline in collections from those consumers who remain PREPA customers and consume kWhs. While the prospectuses and other materials published by the Corporation will detail the risks of the Restructuring Bonds, it is the separate responsibility of the Commission to make clear that, while we believe this Transition Charge satisfies Section 6.25A, there are no guarantees.

330.  Two features of the Transition Charge, each mandated by Section 6.25A, reduce the risk that the Participating Bondholders will not receive the full payments on the Restructuring Bonds.  First, when customers pay their PREPA bills, the dollars associated with the Transition Charge goes to the Participating Bondholders, not to PREPA.  The Participating Bondholders have a constitutionally protected property interest in those dollars.  PREPA has no right to those dollars; indeed, PREPA as Servicer has an obligation to move those dollars to the Participating Bondholders.  Second, any amounts of the Transition Charge not collected from any customer group in a quarter are collected from all customer groups in the next quarter.  The risk that less than all of PREPA's costs will be recovered from ratepayers is not unique to the Participating Bondholders; it applies to PREPA generally.  But these two factors ensure that the Participating Bondholders' risk of nonpayment is lower than anyone else's.

331.  Related to concerns about uncertainty is the question of "stress tests."  Credit rating agencies use stress tests to assess a company's ability to pay its debts timely.  These tests design scenarios that cause the company financial stress, then assess whether the company can still meet its debt obligations.  A credit rating must be forward-looking.  It must consider the entity's projected financial condition (as portrayed in its income statement, balance sheet and cash flow statement).  Most of the analytical emphasis is on the cash flow projections, since it is cash flow that pays bondholders. The analysis must take into account the corporation's operations, the characteristics of the markets in which it operates, and the broader economy that includes those markets.

332. For example, a utility's financial forecast might reasonably assume that, in the near-term future, all current generating plants will be available at system-average availability rates. A stress test might ask this question: What would be the financial outcome if a large generating facility experienced an unexpected, long-term outage? To what extent would the purchase of replacement power—presumably at a cost exceeding the expected operating cost of the plant suffering the outage—reduce the utility's ability to meet its future debt requirements? With that type of analysis, a credit rating agency evaluates the long-term risk of the utility.

333. In Attachment 4.00, the Corporation provided what it called a stress test. But that document is not a stress test in the sense just described. Attachment 4.00 posits a major reduction in electricity consumption, then examines the degree to which the Transition Charge would need to rise to provide the interest and principal required by the Restructuring Bonds. Specifically, it shows how the Transition Charge would rise if the number of residential customers declined by 50 percent. As such, Attachment 4.00 merely displays an arithmetic tautology: When consumption declines a lot, the Transition Charge rises a lot. Attachment 4.00 assumes that monies necessary to pay off the Restructuring Bonds will be available; it merely calculates the new charge. Under that simple reasoning, a "stress test" could show that if only one residential customer remained on PREPA's system, he or she would be paying monthly the entire residential portion of the Transition Charge; *i.e.*, many millions of dollars.

334. Mr. Mace properly recognized (Direct Testimony at 75) that the value of this document is "extremely limited." Attachment 4.00 does not do what a stress test is supposed to do: examine how a major reduction in customers or consumption will affect both PREPA's future financial position, including the likelihood that Participating Bondholders will receive their money. Neither Attachment 4.00 nor any other submission by the Corporation in this proceeding provides that analytical insight. For that reason, the Commission will require periodic stress tests, as described in Part IV below.

## IV.   INFORMATION REQUIREMENTS

335. Pursuant to the investigative authority established by Section 6.25A(j) of Act 57-2014, the Commission hereby **ORDERS** the Corporation to comply with the requirements listed below. The Corporation shall notify the Commission, no later than five (5) days after the issuance of this Restructuring Order, of its intent to comply with each Requirement. These requirements are not to the exclusion of requirements established in Section 6.25A. Compliance with these Requirements is not a condition of the approval granted by the Commission in this Restructuring Order.

   a.   Provide, within two (2) days of its issuance, a copy of the final Resolution approved by the Corporation, redlined to show changes from the draft submitted in this proceeding.

b.   Provide, within two (2) days of its execution, a copy of the Servicer Agreement entered into by the Corporation and PREPA, redlined to show changes from the draft submitted in this proceeding.

c.   If PREPA makes any advance to the Corporation, provide the Commission notice as early as feasible, along with an explanation of the reasons for the advance, the documentation evidencing the Corporation's obligation to repay PREPA and the deadline for such repayment.    Notify the Commission when repayment has occurred.

d.   On August 15th of each year, provide an updated stress test.  Each stress test should provide projections of the expected financial condition of PREPA (income statement, balance sheet, cash flow statements, debt service coverage ratio) under the following assumptions:   (a) the continuation of current rates and (b) a reduction of both a 5 percent and a 10 percent of total kWh sales during the next fiscal year.

e.   By August 15th of each year, for the fiscal year ending the immediately preceding June 30, provide a full report on the fees paid to contractors relating to the Transition Charge, whether the payor is the Corporation or PREPA.  Such report shall state hourly rates, total spending in the prior calendar year and over the life of the contract, and any amendments to the contract.

f.   Provide to the Commission, as soon as practicable after the actual terms of the Restructuring Bonds are known by the Corporation, a demonstration that the savings test of Section 35(a)(iii) of the Revitalization Act has been met.[116]

g.   Identify those persons who will responsible for responding to such requests from the Commission to the Corporation in any investigation under Section 6.25A(j) of Act 57-2014.

h.   Include in all contracts between the Corporation and its advisors a clause requiring their cooperation with the Commission in any investigation conducted under Section 6.25A(j) of Act 57-2014.  Confirm that such a clause has been placed into existing contracts.

i.   Fulfill the following obligations imposed by Section 6.25A of Act 57-2014:

i.   Submit a report on the final terms of the bonds, and estimates of Upfront and Ongoing Financing Costs.  Section 6.25A(e)(1)(viii).

---

[116] Satisfying the savings test is a statutory condition for issuing the bonds.   The Commission here is requiring the Corporation to inform the Commission of the Corporation's calculations.

ii.      Submit any successor Servicing Agreement and all servicer reports. Section 6.25A(e)(1)(ix).

iii.     Submit any reports required by Bond Trustee.  Section 6.25A(e)(1)(x).

iv.     Submit the annual reports and final report required by Article 6.25A(e)(1)(xi).

v.      Provide timely notice of, and data or work papers relating to, any proposed adjustment to the Transition Charge.  Section 6.25A(e)(1)(xii).

j.      Provide the names and contact information for those individuals who, on behalf of the Corporation, will be responsible for responding to the Commission's requests for information.

336.  **Judicial Review**: After the approval by the Commission of this Restructuring Order and the approval by the Corporation of the Restructuring Resolution, and prior to issuing any Restructuring Bonds, the Corporation will publish, pursuant to Article 35(d)(2), a public notice inviting any Interested Person[117] to bring an action in the Court of First Instance of the Commonwealth of Puerto Rico in San Juan to make the determinations set forth in sub-section (d)(1)(A) through (d)(1)(D) of Article 35. Article 35(d)(3) provides that any Interested Person shall have forty-five (45) days, from the date in which the public notice is first published pursuant to sub-section (d)(2) and (d)(3) of Article 35, to file an action challenging the validity of the Restructuring Order and Restructuring Resolution, as provided in sub-section (d)(1) of Article 35.

---

[117] Article 31 of the Revitalization Act defines Interested Person as:

"(a) the trustee representing the holders of PREPA's outstanding bonds, (b) the securities depositary, if any, at which any of such bonds shall be deposited, (c) any holders of PREPA's outstanding debt obligations or any Person that provides credit or liquidity support, including financial guaranty insurance, to any or all of such obligations, (d) any financial institution to which PREPA is indebted (other than through the securities depositary) or is otherwise obligated, (e) the Secretary of Justice of the Commonwealth of Puerto Rico, (f) any Customer, (g) any vendor of PREPA that is not a Customer of PREPA as defined in this law, (h) any Person who has filed with the secretary of the Board and PREPA a request to receive the notice set forth in Section 35 and Chapter IV of this Act, (i) any Person who would otherwise be entitled to receive notice with respect to the adjustment of PREPA rates and charges and (j) any other Person interested in the matters raised in the proceedings provided for in Section 35 or Chapter IV of this Act."

337.  For the benefit of all the parties involved, the Commission issues this Restructuring Resolution in both Spanish and English languages. Should any conflict between each version arise, the English version shall prevail.

Be it notified and published.

_____
Agustín F. Carbó Lugo
Chairman

_____
Ángel R. Rivera de la Cruz
Associate Commissioner

_____
José H. Román Morales
Associate Commissioner

I certify that the Puerto Rico Energy Commission has so agreed on June __21__, 2016. I also certify that on this date a copy of this Restructuring Order was notified via email to: guillermo.m.riera@gmail.com, mgrpcorp@gmail.com, agraitfe@agraitlawpr.com, edwin.quinones@aae.pr.gov, codiot@oipc.pr.gov, equinones@qalawpr.com, glenn.rippie@r3law.com and michael.guerra@r3law.com.

_____
Brenda Liz Mulero Montes
Interim Clerk

CERTIFICATION

I certify that the foregoing is a true and exact copy of the Restructuring Order issued by the Puerto Rico Energy Commission. I further certify that on June __21__, 2016 I have proceeded with the filing of this Restructuring Order and I have sent a copy thereof to:

**Corporación para la Revitalización de la Autoridad de Energía Eléctrica**
Quiñones & Arbona, PSC
Edwin Quiñones
Víctor D. Candelario-Vega
Giselle M. Martínez-Velázquez
Richard Hemphill Cabrera
PR Box 10906
San Juan, PR 00902

**Dr. Guillermo M. Riera, P.E.**
Urb. Estancias Reales
C/ Príncipe Guillermo 147
Guaynabo, PR 00969



**Rooney Rippie & Ratnaswamy, LLP**
E. Glenn Rippie
Michael Guerra
Mario E. Domínguez
Kingsbury Center, Suite 600
350 West Hubbard Street
Chicago, Illinois 60654

**Instituto de Competitividad y Sostenibilidad Económica de Puerto Rico**
p/c Lcdo. Fernando A. Agrait
701 Ave. Ponce de León, Oficina 414
San Juan, PR 00907

**Oficina Estatal de Política Pública Energética**
Lcdo. Edwin J. Quiñones Porrata
PO Box 41314
San Juan, PR 00940

**Oficina Independiente de Protección al Consumidor**
Lcda. Coral M. Odiot Rivera
268 Hato Rey Center, Suite 504
San Juan, PR 00918

**Grupo WindMar**
Roumain & Associates, PSC
Lcdo. Marc G. Roumain Prieto
1702 Ave. Ponce de León, 2do Piso
San Juan, PR 00909

For the record, I sign this in San Juan, Puerto Rico, today, June ___21___, 2016.

Rafael O. García Santiago
Clerk of the Puerto Rico
Telecommunications Regulatory Board

## Appendix A –
## Calculation Methodology and Adjustment Mechanism to Establish and Adjust the Transition Charge

The Corporation will, or will cause the Servicer on behalf of the Corporation to, calculate the initial Transition Charge and to adjust the Transition Charge in accordance with the following procedure. PREPA, as the initial Servicer pursuant to the Servicing Agreement, or any successor Servicer will make adjustments to the Transition Charge (a) quarterly, beginning no more than three (3) months from issuance of the Bonds and continuing until the Bonds and all Ongoing Financing Costs are paid or deemed paid in full, and (b) at any other time if the Servicer, the Calculation Agent, the Trustee or Requisite Bondholders (as and to the extent provided in the Trust Agreement) or any party to an Ancillary Agreement (as and to the extent provided in an Ancillary Agreement) determines that such adjustment is required to assure the timely payment of the principal of and interest on the Bonds and all other Ongoing Financing Costs. Such adjustments are referred to herein as Quarterly and Optional True-Up Adjustments, respectively, and, collectively, as "True-Up Adjustments." Capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Restructuring Resolution.

To initiate any True-Up Adjustment, the Servicer will make a preliminary calculation of the True-Up Adjustment and will prepare and submit to the Calculation Agent a draft request for adjustment (a "True-Up Letter"). The Calculation Agent will review the draft True-Up Letter, including the mathematical calculations related to the proposed True-Up Adjustment, and forward any corrections or modifications to the Servicer. The Servicer will then file the True-Up Letter, reflecting any such corrections or modifications, with the Corporation, the Commission and the Trustee, not later than 30 days prior to the proposed effective date of the adjustment set forth in the True-Up Letter (such effective date being referred to as the "True-Up Adjustment Date").

Each True-Up Adjustment will be designed (i) to correct for any over-collections or under-collections of the Transition Charge through the proposed True-Up Adjustment Date and (ii) to ensure that expected Transition Charge Revenues remitted or to be remitted to the Trustee, after taking into account assumed charge-offs and payment delays, are adequate (A) to pay timely principal of (in accordance with the scheduled maturity date or dates (including scheduled mandatory sinking fund redemption dates)) and interest on the Bonds on each of the Payment Dates that occurs during the related Annual Calculation Period (defined below), (B) to fund or replenish any debt service reserve fund or account (or any other restricted accounts or subaccounts required to be established by the Trust Agreement or any Ancillary Agreement as an additional reserve fund) to its required level, as provided in the Trust Agreement or the Ancillary Agreement (as the case may be), and (C) to make timely payment of all other Ongoing Financing Costs during the related Annual Calculation Period.

In estimating the expected receipts of Transition Charge Revenues for any period the Servicer will apply a "collection curve" reflecting the most recent 12-month history of collections for which data are available. In connection with each True-Up Adjustment filing, the Servicer will develop one collection curve reflecting payment history for all Customers (the



"Composite Collection Curve"). A collection curve is data reflecting the timing of payments of outstanding bills during a 12-month period, adjusted to assume that any Transition Charges which are not collected within 120 days of billing are written off. Each month's billings are divided into aging buckets based on the number of days for which such billings have been outstanding (e.g., 0 to 29 days, 30 to 59 days, 60 to 89 days, and 90 to 119 days outstanding). The aging buckets are then used to estimate the dollar amount of each month's billings collected within 30, 60, 90 and 120 days, as well as the dollar amount not collected within 120 days (amount written off) for the 12-month period. For such 12-month period, the collection curve is calculated by dividing each of the total dollar amount of billings collected within 30, 60, 90, and 120 days by the total dollar amount of billings collected within 120 days. The Composite Collection Curve will also be used to calculate the Days Sales Outstanding referred to in Annex 3 to the Servicing Agreement.

As used herein, unless otherwise defined, capitalized terms shall have the following meanings:

"Actual kWh Usage" means, for any period and for any Customer, Class or Classes, the gross kWh consumption, measured, as and to the extent provided in the Restructuring Resolution, without regard to any offset for net-metering and adjusted for estimated generation consumption "behind the meter" (whether or not metered, "behind the meter"). Usage of municipal Customers will be included only to the extent that the dollar value of such usage for electric service, including in determining such dollar value both Transition Charges which would otherwise be imposed on such municipality and PREPA charges, in any fiscal year exceeds the dollar value owed by PREPA to such municipality as a contribution in lieu of taxes for such fiscal year, as provided in the Act and the Restructuring Resolution.

"Aggregated Actual kWh Usage" means, for any period, the sum of the Actual kWh Usage for all Customers.

"Annual Calculation Period" means the 12-month period beginning on (but not including) a True-Up Adjustment Date and ending on (and including) a date which is 12-months later.

"Base Residential Customers" means all Residential Customers except Grandfathered Net Metered Customers and Fixed Block Public Housing Customers.

"Base Non-Residential and Governmental Customers" means all Non-Residential or Governmental Customers except Grandfathered Net Metered Non-Residential and Grandfathered Net Metered Governmental Customers.

"Bond Payment Date" means each consecutive Bond payment date (whether for principal or interest) following a True-Up Adjustment Date. As an illustration, the "First Bond Payment Date" means the first Bond Payment Date following a True-Up Adjustment Date; the "Second Bond Payment Date" means the second Bond Payment Date following the True-Up Adjustment Date; etc.

"Class" means each of the Residential Customers, the Non-Residential Customers and the Government Customers, respectively, and, collectively, the "Classes." For the avoidance of

A-2

doubt, the Non-Residential Customers and the Government Customers together constitute a single Class.

"Collection Period" means, for the purposes of any True-Up Adjustment, the period which commences on a True-Up Adjustment Date and which ends five (5) Business Days prior to a designated Bond Payment Date.  As an illustration, the "First Collection Period" means the period which commences on a True-Up Adjustment Date and which ends five (5) Business Days prior to the First Bond Payment Date following such True-Up Adjustment Date; the "Second Collection Period" means the period which commences on the same True-Up Adjustment Date and which ends five (5) Business Days prior to the Second Bond Payment Date following such True-Up Adjustment Date; etc.

"Eligible kWh Usage" means, for any period, the sum of the Eligible Non-Residential and Governmental kWh Usage and the Eligible Residential kWh Usage.

"Eligible Residential kWh Usage" means, for any period, the sum of the (i) Actual kWh Usage for Base Residential Customers, (ii) the Grandfathered Net Metered Customer Usage for Residential Customers and (iii) the Fixed Block Public Housing Customer Usage.

"Eligible Non-Residential and Governmental kWh Usage" means, for any period, the sum of the (i) Actual kWh Usage for Base Non-Residential and Governmental Customers and (ii) the Grandfathered Net Metered Customer Usage for Non-Residential and Governmental Customers.

"Fixed Block Public Housing Customer" means a Customer who under Article 3.9(b) of Law 22-2016 and under PREPA's tariffs implementing said Article 3.9(b), pays a fixed charge for its applicable consumption-based block of electricity, in each case as such blocks are established as of the date on which the Commission approves the Restructuring Order and as they may be adjusted from time to time as provided in Article 3.9(b) of Law 22-2016.

"Fixed Block Public Housing Customer Usage" means the kWh usage beyond the Fixed Block Public Housing Customer's permitted block of electricity pursuant to Article 3.9(b)(4) of Law 22-2016.

"Government Customers" means any Customer that is an agency, public corporation, office, municipality, or instrumentality of the Commonwealth of Puerto Rico, or an agency, public corporation, office, department or instrumentality of the United States.

"Grandfathered Net Metered Customer" is (1) a Customer (whether Residential, Non-Residential or Governmental, as specified) who had a net-metering agreement that satisfies the requirements of Law 4-2016 with PREPA as of February 16, 2016 when Law 4-2016 became effective, or (2) a Customer who enters with PREPA into a net-metering agreement for a new project after February 16, 2016 satisfying the conditions of Article 4 of Act 114-2007 as amended by Article 29 of Law 4-2016 (as enacted), i.e., a Customer (a) who submitted or submits a net-metering application for a new project between February 16, 2016 and the date on which the Restructuring Bonds are issued, (b) has submitted or submits the required deposit to PREPA in accordance with Law 4-2016, (c) completes the project and certifies its installation within the required 270 days, all as provided in Article 29 of the Law 4-2016 and (d) otherwise

A-3



complies with Article 29 of Act 4-2016. For the avoidance of doubt, any customer that increases the capacity of the renewable energy system by more than 20 percent, as provided in Law 4-2016, shall cease to be considered a Grandfathered Net Metered Customer from the moment the increase in capacity to PREPA's system was completed, in conformity with the terms of Article 29 Act 4-2016.

"Grandfathered Net Metered Customer Usage" means the net energy kWh usage (*i.e.*, excluding behind–the–meter output—whether consumed by the Customer or exported to PREPA) of the Grandfathered Net Metered Customer (whether Residential, Non-Residential or Governmental, as specified).

"Gross Billing Requirement" shall have the meaning set forth in clause (4) below.

"Net Revenue Requirement" shall have the meaning set forth in clause (3) below.

"Non-Residential Customers" means the rate classes identified in the Tariff Class column in Corporation Exhibit 6.02 as classes other than "Residential" or "PREPA Use" classes, as such rate classes may be changed from time to time based upon Customer characteristics.

"Residential Customers" means the rate classes identified in the Tariff Class column in Corporation Exhibit 6.02 as the "Residential" classes, as such rate classes may be changed from time to time based upon Customer characteristics.

The calculation methodology and adjustment mechanism to establish and adjust the Transition Charge shall be as follows:

(1)     Project the Transition Charge Revenues (including any interest earnings on such amounts) expected to be held by the Trustee on the proposed True-Up Adjustment Date after payment of Ongoing Financing Costs due on or prior to such date (but excluding amounts held or to be held on such date by the Trustee in any debt service reserve fund or account, or in any other restricted accounts or subaccounts required to be established by the Trust Agreement or any Ancillary Agreement as an additional reserve fund), and add to that amount the Transition Charge Revenues expected to be received by the Trustee after the True-Up Adjustment Date and during the First Collection Period from bills rendered prior to the True-Up Adjustment Date based on the Transition Charges then or previously in effect, including projected interest earnings on such amounts.

(2)     Calculate the sum of (a) principal of (in accordance with the scheduled maturity date or dates (including scheduled mandatory sinking fund redemption dates)) and interest on the Bonds when due and as accruing through and including the First Bond Payment Date, (b) any amount necessary or expected to be necessary to fund or replenish any debt service reserve fund or account, or any other restricted accounts or subaccounts required to be established by the Trust Agreement or any Ancillary Agreement as an additional reserve fund, to their required level, as and to the extent such funding or replenishment is required by the Trust Agreement or any Ancillary Agreement (as the case may be) on or prior to the First Bond

213537800 45977/00050

Payment Date, and (c) all other Ongoing Financing Costs required to be paid or deposited on or prior to the First Bond Payment Date.

(3)     Subtract the amount in clause (1) from the amount in clause (2) to determine the "Net Revenue Requirement" for the First Collection Period.

(4)     Adjust (or gross up) the Net Revenue Requirement to give effect to the number of billing cycles, the Composite Collection Curve and the write-off assumption, to ensure that the Transition Charge Revenues expected to be remitted to the Trustee during the First Collection Period will satisfy the Net Revenue Requirement for the First Collection Period on a timely basis and will result in the Excess Funds Account held under the Trust Agreement to be zero by the First Bond Payment Date.  The result will be the "Gross Billing Requirement" for the First Collection Period.

(5)     Divide the Gross Billing Requirement by the Eligible kWh Usage in the prior 12-month period for which data are available (i.e., the calendar dates one year prior to the calendar dates in the First Collection Period), to produce a $/kWh Transition Charge. Subject to clause (7) below, the result will be the first possible Transition Charge to be imposed upon all Customers using Eligible kWh Usage, on a per kWh basis, commencing on the True-Up Adjustment Date.

(6)     Repeat the calculations described in clauses (1) through (5), inclusive, to determine the Transition Charge necessary to satisfy the revenue requirement for each consecutive Collection Period which ends during the Annual Calculation Period, replacing "First Bond Payment Date" with "Second Bond Payment Date" and "First Collection Period" with "Second Collection Period," etc. through the Third and Fourth Collection Periods (if any), respectively.

(7)     The highest Transition Charge resulting from the calculations in clause (5) or (6) will be the Transition Charge to be effective on the True-Up Adjustment Date.

The Corporation will adjust the Transition Charge as requested in each True-Up Letter, and such Transition Charge will be effective on the date specified in the True-Up Letter, so long as such effective date is at least 30 days after the filing with the Commission of such True-Up Letter, subject only to the correction of any mathematical errors by the Commission as set forth in the next sentence.  Any adjustment to correct the mathematical inaccuracy, if ordered by the Commission, shall be made by the Servicer no later than the next succeeding True-Up Adjustment on which such adjustment can practically be made without delaying the effective date set forth in the True-Up Letter.

A-5

**Appendix B –**
**Corporation Testimony Relating to Section 6.25(e)(8)**

| Article | Witness/attachment | Description |
|---|---|---|
| 6.25A(e)(8)(i)(1) | Mace Ex. 4.00<br>Attachment 1.00<br>Attachment 2.03 | Mace discusses the current estimates of the various components of the Restructuring Bonds and their respective principal and interest requirements (including amortization payments) (and dates) that are included in Attachment 2.03. |
| 6.25A(e)(8)(i)(2) | Mace Ex. 4.00<br>Attachment 3.03 | Mace discusses PREPA debt service coverage and the fact that there is no debt service coverage requirement on the Bonds. |
| 6.25A(e)(8)(i)(3) | Mace Ex. 4.00<br>Attachment 1.00<br>Attachment 2.01 | Mace discusses the estimated Upfront Financing Costs contained in Attachment 2.01 including issuance expenses (including legal fees, underwriting fees, defeasing costs, servicing fees, and other fees and costs). |
| 6.25A(e)(8)(i)(4) | Mace Ex. 4.00 | Mace discusses potential payments to protect the tax-exempt status of PREPA's outstanding debt obligations or the Restructuring Bonds. |
| 6.25A(e)(8)(i)(5) | Mace Ex. 4.00<br>Attachment 1.00<br>Attachment 2.01 | Mace discusses deposits to reserves and self-insurance funds and deposits required to replenish draws on reserves (including deposits to fund or replenish any debt service reserve fund or account or any other restricted accounts or subaccounts required to be established by the Trust Agreement and, to the extent permitted in the Trust Agreement, any Ancillary Agreement as an additional reserve fund to their required level, as provided in the Trust Agreement and, to the extent permitted in the Trust Agreement,  and, to the extent permitted in the Trust Agreement,  Ancillary Agreement (as the case may be) to secure payment of all or a portion of the Bonds). Deposits to reserve funds are included in the estimates of Upfront Financing Charges in Attachment 2.01. |
| 6.25A(e)(8)(i)(6) | Mace Ex. 4.00<br>Attachment 2.01<br>Attachment 2.02 | Mace discusses costs related to obtaining the Restructuring Order, protecting status of Restructuring Property, collecting Transition Charge, and administration costs.  He supports estimates of Upfront and Ongoing Financing Charges in Attachments 2.01 and 2.02. |
| 6.25A(e)(8)(ii) | Mace Ex. 4.00 | Mace discusses estimated one-time costs and |

| | Attachment 1.00<br>Attachment 2.01 | an explanation of how such estimated one-time costs will be included in the Transition Charge (for example, amortization vs. one-time recovery). He supports estimates of Upfront and Financing Charges in Attachment 2.01. |
|---|---|---|



B-2

**Appendix C –**
**Corporation Testimony Relating to Section 6.25A(e)(9)**

| Article | Witness/Attachment | Description |
|---|---|---|
| 6.25A(e)(9)(i) | Zarumba Ex. 6.00, 9.00, 11.00 Mace Ex. 4.00 Attachment 1.00 Attachment 2.01 Attachment 2.02 | Mr. Zarumba describes the Adjustment Mechanism and the manner of its calculation; Mr. Mace describes each Upfront and Ongoing Financing Cost estimated to be incurred and provides a description of each Upfront and Ongoing Financing Cost estimated to be incurred. |
| 6.25A(e)(9)(ii) | Zarumba Ex. 6.00 Attachment 3.02 Corp. Supp. Ex. 10.01, 10.03 | Estimates of Transition Charges by class and a comparison of Transition Charges to total charges to customers, each over the life of the Transition Charges. |
| 6.25A(e)(9)(iii) | Zarumba Ex. 6.00 Attachment 3.02 Corp. Supp. Ex. 10.01, 10.03 | Describes the estimated ratio of total Transition Charges to total charges to Customers. |
| 6.25A(e)(9)(iv) | Mace Ex. 4.00 Attachment 3.01 Attachment 3.03 | Compares the debt service and other Ongoing Financing Costs associated with the Bonds, to the debt service and other costs of PREPA's outstanding debt to be refinanced by the Restructuring Bonds. |
| 6.25A(e)(9)(v) | Mace Ex. 4.00 Quintana Ex. 2.00 Attachment 4.00 | Mr. Mace explains the projections and stress test scenarios provided by PREPA or the Corporation to the credit rating agencies relating to the Transition Charge. Mr. Quintana confirms that PREPA did not provide any such estimates to rating agencies. |

C-1