# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 4780-LTS |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY, | PROMESA<br>Title III<br><br>Adv. Pro. No. 19-391 (LTS) |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

And

THE PUERTO TICO FISCAL AGENCY AND
FINANCIAL ADVISORY AUTHORITY,

As Section 926 co-trustee of

PUERTO RICO ELECTRIC POWER
AUTHORITY,

Plaintiffs,

v.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

Defendant

| | |
|---|---|
| CORTLAND CAPITAL MARKET SERVICES LLC, *et al.,* | PROMESA Title III |
| Plaintiffs | Adv. Proc. No. 19-396 (LTS) |
| v. | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, *et al.*, | |
| Defendants | |

| | |
|---|---|
| SISTEMA DE RETIRO DE LOS EMPLEADOS DE LA AUTORIDAD DE ENERGIA ELECTRICA, | PROMESA Title III |
| Plaintiff, | Adv. Pro. No. 19-405 (LTS) |
| v. | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, *et al.*, | |
| Defendants | |

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER<br>AUTHORITY,<br><br>    Movant. | PROMESA<br>Title III<br><br>No. 17 BK 4780-LTS |

**OMNIBUS REPLY OF FINANCIAL OVERSIGHT
AND MANAGEMENT BOARD IN SUPPORT OF URGENT
MOTION FOR ORDER (I) ESTABLISHING SCHEDULE TO CONTINUE
NEGOTIATIONS DURING LITIGATION OF GATING ISSUES PURSUANT
TO LITIGATION SCHEDULE AND (II) GRANTING RELATED RELIEF**

## **<u>TABLE OF CONTENTS</u>**

Page

PRELIMINARY STATEMENT ................................................................................ 1

OMNIBUS REPLY .............................................................................................. 3

    I.    The Proposed Litigation Schedule is the Best Path Forward for PREPA and
the People of Puerto Rico Because It Resolves the Claim Disputes Separating
the Parties ................................................................................................... 3

        a.    The Threshold Issues are Predicate to the Bondholders' Alternative
Requests for Relief and Can be Swiftly Adjudicated ............................... 5

        b.    Filing a Plan is Premature, Impractical, and Costly ........................... 10

    II.    The Current Expense Adversaries are Ripe for Adjudication .................... 10

    III.    Replies to Specific Contentions ............................................................. 11

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    631 B.R. 596 (D.P.R. 2021)..................................................................................11

*In re Fin. Oversight & Mgmt. Bd. for P.R..*,
    899 F.3d 13 (1st Cir. 2018)..............................................................................7, 8

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    432 F. Supp. 3d 25 (D.P.R.), *aff'd.*, 954 F.3d 1 (1st Cir. 2020) ...............................3

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    989 F. 3d 170 (1st Cir. 2021)...............................................................................7

*Town of Barnstable v. O'Connor*,
    786 F.3d 130 (1st Cir. 2015)..............................................................................11

STATUTES

11 U.S.C. § 101(5) ...............................................................................................15

11 U.S.C. § 927 ....................................................................................................15

48 U.S.C. §§ 2101–2241 .......................................................................................iv

22 L.P.R.A. § 196 ..................................................................................................3

OTHER AUTHORITIES

*PREB Declines Request to Raise Energy Rates Raise Energy Rates*, The Weekly
    Journal, October 1, 2021. *Available at*
    www.theweeklyjournal.com/business/preb-declines-request-to-raise-energy-
    rate/article_2c2439f6-22ce-11ec-a9d8-1f0fee1d92f0.html .....................................14

To The Honorable United States District Court Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"),

as sole Title III representative of the Puerto Rico Electric Power Authority ("PREPA" or the

"Debtor") in this Title III case pursuant to section 315(b) of the *Puerto Rico Oversight,*

*Management and Economic Stability Act* ("PROMESA"),[1] respectfully submits this omnibus reply

("Reply") to:

- *Response by the Ad Hoc Group of PREPA Bondholders, Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation, and Syncora Guarantee Inc. to the Oversight Board's Urgent Motion to Set a Litigation Schedule, and Urgent Cross-Motion to Establish a Case Schedule and Impose Deadlines for a PREPA Plan of Adjustment* [ECF No. 2966][2] (the "Bondholder Objection");

- *Objection of U.S. Bank National Association as PREPA Bond Trustee to Urgent Motion of Financial Oversight and Management Board for Order (I) Establishing Schedule to Continue Negotiations During Litigation of Gating Issues Pursuant to Litigation Schedule and (II) Granting Related Relief (ECF No. 2956)* [ECF No. 2965] (the "U.S. Bank Objection");

- *Response and Objection of Fuel Line Lenders to Urgent Motion of Financial Oversight and Management Board for Order (I) Establishing Schedule to Continue Negotiations During Litigation of Gating Issues Pursuant to Litigation Schedule and (II) Granting Related Relief* [ECF No. 2963] (the "FLL Objection");

- *Response of the Puerto Rico Fiscal Agency and Financial Advisory Authority to Urgent Motion of Financial Oversight and Management Board for Order (I) Establishing the Schedule to Continue Negotiations During Litigation of Gating Issues Pursuant to Litigation Schedule, and (II) Granting Related Relief* [ECF No. 2967] ("AAFAF Response");

- *Limited Response of Official Committee of Unsecured Creditors With Respect to Urgent Motion of Financial Oversight and Management Board for Order (I) Establishing Schedule to Continue Negotiations During Litigation of Gating Issues Pursuant to Litigation Schedule and (II) Granting Related Relief* [ECF No. 2968] (the "UCC Response");

- *Response and Objection of SREAEE to Urgent Motion of Financial Oversight and Management Board for Order (I) Establishing Schedule to Continue Negotiations*

---

[1]  PROMESA is codified at 48 U.S.C §§ 2101–2241.

[2]  Unless otherwise stated, all ECF references shall refer to Case No. 17-4780.

*During Litigation of Gating Issues Pursuant to Litigation Schedule and (II) Granting Related Relief* [ECF No. 2983] (the "SREAEE Response");

- *Limited Joinder to SREAEE's Response and Objection and UTIER's Reservation of Rights* [ECF No. 2984] (the "UTIER Joinder" and together with the Bondholder Objection, the U.S. Bank Objection, the FLL Objection, the AAFAF Response, the UCC Response, and the SREAEE Response, the "Responses")

and in support of the *Urgent Motion of Financial Oversight and Management Board for Order (I) Establishing Schedule to Continue Negotiations During Litigation of Gating Issues Pursuant to Litigation Schedule and (II) Granting Related Relief* (ECF No. 2269 in Case No. 17-3283; ECF No. 2956 in Case No. 17-4780; ECF No. 11 in Adv. Pro. No. 19-391; ECF No. 98 in Adv. Pro. No. 19-396; and ECF No. 70 in Adv. Pro. No. 19-405, the "Urgent Motion")[3] and respectfully states:

---

[3] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Urgent Motion.

## PRELIMINARY STATEMENT

1.    The Court's Path Forward Order required the Oversight Board to file either a plan, a plan term sheet, a proposed litigation schedule, or an explanation why PREPA's Title III case should not be dismissed.  The Oversight Board chose the only path to a confirmable plan.  In the absence of a deal to serve as the cornerstone of a plan that could be proposed, it determined that ongoing negotiations in parallel with a litigation schedule embracing solely the fundamental disputes over the claims the plan must restructure is the most practical way to advance PREPA's Title III case to achieve the purposes of PROMESA.  Conversely, dismissal would eliminate the ability to discharge debt necessary to regain market access and would result in chaos that would threaten the reliable generation and delivery of power, thus endangering all residents and businesses of Puerto Rico, and undermining all restructurings the Oversight Board has accomplished to-date by putting the present and future economy of Puerto Rico at risk.

2.    In contrast to the litigation proposed by the Oversight Board to resolve the fundamental disputes between the parties as to the claims that must be treated in any PREPA plan of adjustment, the oppositions to the Urgent Motion assume the allowability and other attributes of their respective claims and request litigation of issues extraneous to the plan of adjustment. Only determinations of the allowability and attributes of the disputed claims can lead to a confirmed plan of adjustment, whether consensual or not. Multiple parties, including AAFAF and the Committee, support the Oversight Board's approach.

3.    The Bondholder Objection also collaterally attacks the Path Forward Order, which granted the Oversight Board the right to choose which option to pursue.  By contending dismissal, stay relief, or the filing of a plan come *first* and final determinations on their claims should be stayed indefinitely, the Bondholders effectively challenge the provisions of that order.  Of course,

the Bondholders' vehement opposition to having their claims determined speaks volumes. These proposals seek to delay adjudication of creditors' rights at all costs or move those determinations to courts not familiar with PROMESA or allowability. They are transparently designed *not* to advance PREPA's case, but to terminate it altogether; stripping PREPA of the ability to adjust its debts or attain capital market access. PROMESA's purposes would be defeated—an unacceptable result. Moreover, PREPA is not itself an island—it is an integral part of the territory of Puerto Rico. Actions that threaten Puerto Rico's sole electric utility jeopardize the entire territory, including its residents and businesses. The Bondholders' position imperils all Title III and Title VI restructurings accomplished to date.

4.      As this Court declared at the first omnibus hearing in these cases, failure is not an option. We submit that holds true no matter how hard the Bondholders try to make it one. Congress has provided Puerto Rico with a once-in-a-lifetime opportunity to restructure and transform the utility serving almost the entirety of the Island's populace, and this opportunity cannot be squandered at the behest of a single group of creditors opposing determinations of their own claims. Because the Threshold Issues (as defined below) are predicate to determination of any of their desired relief, as the Bondholders' own pleadings admit (see below), the Oversight Board believes its Proposed Litigation Schedule is the best and correct path forward to make progress for the benefit of all parties in interest. As a practical matter, no other party has proposed litigation designed to deal with the claims entitled to participate in a plan of adjustment. The Oversight Board, therefore, respectfully requests the Court grant the Urgent Motion. The Oversight Board also submits the issues it has raised are issues the First Circuit asked to be resolved in any opinion granting or denying stay relief. Therefore, proceeding to determine these issues furthers the Bondholders' stay relief request.

5.      The Oversight Board also appreciates the commitment by the Mediation Team in the *Mediation Team's Notice and Report* [ECF No. 2975] (the "Mediation Report") to, among other things, "continue to assist the Mediation Parties in efforts to achieve a global consensus and to do so before the end of the calendar year."  Mediation Report, ¶ 3.  The Oversight Board is grateful to them for their efforts to-date, and welcomes their continued participation.  Because the Oversight Board is proposing its litigation schedule to crystallize and trigger settlement or judicial determination of the gating issues as quickly as possible, it does not believe any pauses will be helpful.  It is the risk of imminent decision that prods all litigants to settle, not delays of decisions. Indeed, it is this exact type of litigation that produced successful and consensual restructurings in HTA, CCDA, PRIFA, and other debtors.  For the same reasons, the Oversight Board does not believe the Court should defer to the Mediation Team on the critical issue of sequencing litigation.

## OMNIBUS REPLY

### I.      The Proposed Litigation Schedule is the Best Path Forward for PREPA and the People of Puerto Rico Because It Resolves the Claim Disputes Separating the Parties

6.      As this Court has repeatedly recognized, "[t]he goal of these PROMESA cases . . . is not merely to maximize creditors' recoveries"; instead, they "require a more holistic approach that focuses on the continuation and future of a government and its instrumentalities and their ability to meet the needs of the Commonwealth's residents as well as provide proper recompense of creditors."  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 432 F. Supp. 3d 25, 30 (D.P.R.), *aff'd.*, 954 F.3d 1 (1st Cir. 2020).  All Bond purchasers knew from public statutes that PREPA, as an instrumentality of the Commonwealth, is "responsible for providing reliable electric power, contributing to the general wellbeing and sustainable future of the People of Puerto Rico, maximizing benefits, and minimizing the social, environmental, and economic impact." 22 L.P.R.A. § 196.  Failure of PREPA to restructure and discharge its debts would impair PREPA's

transformation and ability to make necessary investments, which would jeopardize PREPA's ability to provide power to 3.2 million people and the commercial sector.

7.     The Bondholders argue a deal to end PREPA's Title III case "was clearly in reach," Bond. Obj. ¶ 4, although their proposal is not remotely designed to close the gap.  Perhaps that is because, as the blown-out materials from mediation show, the gap remained huge after much negotiation.  The Oversight Board's latest offer would have provided for restructured bonds worth approximately 73.9% of the bondholders' prepetition claims, plus a contingent value instrument to be structured to provide additional value from outperformance in the coming decades. *Mediation Proposal Materials*, Ex. B, available at https://emma.msrb.org/P11622357-P11250316-P11674788.pdf (last accessed September 19, 2022).[5]  The Bondholders' latest proposal, however, provided for a recovery that, according to the Oversight Board's calculations, would have exceeded 100% recovery on the bondholders' prepetition claims.  *Id.*, Ex. A.  The parties' positions differed dramatically on what would constitute a reasonable settlement,[6] and even on the

---

[5]   Moreover, the Oversight Board had significant concerns that even this offer provided greater recovery to the Bondholders than the people should bear, particularly given the serious issues with the extent and validity of the Bondholders' liens and the allowability of their claim.  Every time the Oversight Board supported an extension of mediation over the UCC's objection, the Oversight Board emphasized the UCC's claim objection had to be and would be taken into account in the mediation.

[6]   The Bondholders' allegations suggesting that the Oversight Board engaged in a "sea change," altering the "Transition Charge" it offered to bondholders from approximately 5 cents to 2.6 cents between January 2022 and today are intentionally deceptive. (*Id.* ¶¶ 27–28).  Under the 2019 RSA, the Transition Charge was a volumetric charge that would have started at 2.768 c/kWh for the first three years and escalated over time to 4.552 c/kWh, pursuant to a fixed schedule that did not vary based on any unanticipated decline in demand.  The RSA required legislation to implement "Demand Protections" that would have ensured that customers that relied on solar energy would still contribute to debt service.  Despite the Government Parties' attempts to obtain legislation that would have allowed for the implementation of the 2019 RSA, such legislation was not forthcoming.

In its latest proposal in mediation, the Oversight Board proposed instituting a "connectivity charge"—a flat fee charged to all customers connected to the electric grid in an amount anticipated to raise the equivalent of approximately 2.6 c/kWh on average for residential customers —as opposed to a "volumetric charge" that fluctuates based on usage, to attempt to solve the issue of a forecasted decline in demand a different way than occurred under the 2019 RSA.  The bondholders' comparison between the size of the RSA Transition Charge and the latest proposed connectivity charge is therefore not a comparison of "apples" to "apples."  The consideration provided bondholders on this connectivity charge vastly exceeds the consideration that would be provided on a 2.6 c/kWh volumetric charge, and, indeed, would have funded a recovery of 73.9% under the Oversight Board's latest proposal.

considerations that would inform the reasonableness of a settlement.  The Oversight Board, subject to carrying out its statutory duties, strives to pay creditors.  Yet the Oversight Board's statutory duties to achieve fiscal responsibility and market access for PREPA require it to consider at least two major issues.  First, it must consider the vulnerability of the Bondholders' claim, and must factor such consideration into any settlement for it to be approved.  Second, the settlement must impose a burden on all rate payers they can pay, while providing for PREPA's modernization.  Because any settlement requires extra power charges on Puerto Rico's people and businesses for many years, the Oversight Board was cognizant that the payment of legacy debt would fall on fewer customers over time as more people with resources resort to alternative energy sources.

8.     The Oversight Board understands the Bondholders' statement that "mediation is unlikely to be fruitful without a fundamental change in the landscape."  Streamlined and expedited litigation of the Threshold Issues, as well as rulings in the Current Expense Adversary Proceedings, is the only way to achieve that change in landscape.  This targeted litigation will clarify the Bondholders' allowable claims and rights, and as a result inform any future potential settlement.  It is the most appropriate and efficient path forward.  Finally, determining the Bondholders' allowed secured and unsecured claims is a necessary prerequisite to the Bondholders' request for either stay relief to seek a receiver or dismissal of the Title III case.  As a result, Bondholders are not prejudiced by the proposed schedule.

**a.  The Threshold Issues are Predicate to the Bondholders' Alternative Requests for Relief and Can be Swiftly Adjudicated**

9.     Paragraph 5 of the Bondholder Objection, in pertinent part provides:  "The PREPA bonds are valid, secured obligations, and PREPA can afford to, and must, pay these obligations in full."  That allegation underpins all the Bondholders' requests.  But no one else agrees with them.  That's why there is no settlement.  The Bondholders' premise is what must be litigated and is all

we ask to litigate.  Thus, the Threshold Issues (i) are predicate to the relief the Bondholders seek, (ii) have been known to the parties for years and can be adjudicated based on the Bond documents, and (iii) their adjudication will advance negotiations with or without the Mediation Team.  The Bondholders' alternative schedule in which they seek to indefinitely stay a determination of their own fundamental premise speaks for itself.  They would mire PREPA in discovery, expert testimony, and evidentiary hearings on relief contingent on the validity of the Bondholders' claims, but not litigate them.  Because an adjudication of the validity of the Bondholders' claims is predicate to the relief they seek, they are not prejudiced by the Proposed Litigation Schedule.

10.     The Amended Lien Challenge Complaint would resolve, on a final basis, key issues regarding, among others, (i) whether Bondholders have a security interest in PREPA's Revenues other than its monies deposited in the Sinking Fund; (ii) whether Bondholders' collateral includes a "rate covenant" or such covenants are liabilities of PREPA that cannot be pledged; (iii) whether Bondholders' asserted security interest is perfected; and, most critically, (iv) whether Bondholders have any allowable unsecured claim to PREPA's assets beyond the Sinking Fund (the "Threshold Issues").  All legal issues have been in the record for years, including in the Lien Challenge Complaint, the UCC Claim Objection, and in briefing regarding the 9019 Motion.  While the Bondholders make a conclusory assertion that "fact, and expert discovery, and evidence would be needed on the transaction documents" (Bondholder Obj. ¶ 45), the Oversight Board believes the governing documents are clear and unambiguous, there are no material facts in dispute, and determinations can be made as a matter of law.

11.     The Bondholders' requested procedure is in direct opposition to the instructions of the First Circuit.  In similar litigation with holders of HTA bonds seeking stay relief, the First Circuit affirmed this Court's denial of stay relief because litigation regarding a final determination

of the scope of their claims was pending, and stay relief would 'interfere with the bankruptcy case'
and would not serve 'the interest of judicial economy and the expeditious and economical
resolution of litigation." *See In re Fin. Oversight & Mgmt. Bd. for P.R.,* 989 F. 3d 170, 176 (1st
Cir. 2021).  The First Circuit has made clear in the context of PREPA's Title III case that any
request for stay relief to appoint a receiver is premature without first determining, among other
things, "whether the bondholders face a threat of uncompensated diminution in such value,
whether the bondholders are seeking the protection of existing collateral or, instead, the creation
of new collateral, and what, if any, adequate protection PREPA can offer short of a receiver being
appointed to manage it if protection is warranted." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899
F.3d 13, 23 (1st Cir. 2018).  To determine diminution of value, the collateral itself must first be
identified and compared to the allowable claim.  The thrust of these decisions is undeniable: it
would be absurd to grant such extreme relief as offloading PREPA to other courts before defining
the rights of the creditors asking for such relief.  The Oversight Board's proposed schedule carries
out the directives of the First Circuit by providing rulings necessary for stay relief.

12.     Further, the parties' and Court's experience in these Title III cases shows
prioritizing actions to conclusively determine the parties' actual legal rights will drive reasonable
settlements.  In connection with ERS, COFINA, the Commonwealth, HTA, and PBA, each time
the Court has gone forward in hearing challenges to bondholder or creditor rights, settlement has
resulted either shortly before decision or shortly after the Court's determinations on significant
issues.  Teeing up the Threshold Issues now will likely do the same.

13.     Therefore, it makes no sense for dismissal to be entertained before a determination
of the Threshold Issues (and the Oversight Board interprets the Court's Path Forward Order as
ruling it out while the Oversight Board pursues another option).  If the Bonds are determined to be

unsecured and/or non-recourse, it would provide significant clarity as to the relative rights of creditors and the overall size of the claims pool. Such clarity would pave the way for formulation and swift confirmation of a plan of adjustment. Moreover, the issues the Court would need to determine as part of a dismissal motion or confirmation of a contested plan rely on resolution of Bondholders' rights. Fundamentally, if the Bondholders are determined to be unsecured and non-recourse, it would be highly prejudicial to other claimants holding billions of dollars of claims in the aggregate to dismiss the case at the request of a party whose claims are largely unallowable.

14. The Bondholders attempt to turn the First Circuit's directives on their head by arguing the "affordability issue [] is really at the heart of this case." Bondholder Obj., ¶ 5. But in their next charge, they show this issue is only relevant if the validity of their claims is assumed: "The PREPA bonds are valid, secured obligations, and PREPA can afford to, and must, pay these obligations in full." *Id.* PREPA must first determine the extent of *allowed* claims against it, and their relative priorities, before proposing a plan that meets the confirmation requirements and policy directives of PROMESA. Creditors lacking allowed claims have no basis to litigate PREPA's ability to pay. It is inappropriate and a violation of the Bankruptcy Rules for confirmation issues such as feasibility to be litigated or decided in the abstract outside the context of a proposed plan.[7] Such issues are highly fact-specific, have nothing to do with the claimholders' entitlements—which are based on their legal rights—and are unlikely to result in meaningful progress in the Title III cases. Litigating affordability involves fact-intensive considerations of how various trends in, among other things, solar generation, electric efficiency, adoption of electric vehicles, fuel prices, and technological innovation could affect demand over the next 30 to 50

---

[7] *See, e.g.*, Case No. 17-3283, ECF No. 17379 at 17 (declining to decide arguments asserted, including that more money is available for distribution to creditors, until the plan confirmation hearing as such arguments "did not frame fundamental and patent unconfirmability of a plan").

years.  Further, it is affected by scientific, economic, and political considerations of how long

modernization of PREPA should be delayed or slowed to the detriment of all the territory's people

and businesses and economic future.

15.     The Bondholders' argument that PREPA could be solvent if it increases rates—

while belied by common sense and the experience of any customer who has relied on PREPA—is

speculative and self-defeating.  First, if the Bondholders want to prove PREPA is solvent, they

will, again, have to deal with the amount of their allowable claims.  Second, solvency is a

confirmation issue.  Third, it wholly depends on the extent rates are raised without encouraging

more outmigration and less investment.  It is folly and counterproductive to dismiss the case to

allow a rush to the courthouse with hundreds of creditors suing PREPA to enforce their various

rights, when the Bondholders leading the charge contend PREPA is solvent.  This would only

serve to take litigation outside the purview of the Court and into the hands of Courts unfamiliar

with PROMESA and the laws governing allowability.  Such litigation, including the potential

installation of a receiver, would disrupt LUMA's operations of the T&D System, leading to

potential termination of the operating contract, and leaving PREPA without any operator for the

grid.  It would also disrupt the ongoing efforts to transform PREPA's generation assets.

16.     As this Court and the First Circuit have held several times, municipal bankruptcies

are different from corporate reorganizations—they are not primarily engineered to benefit

creditors, but rather to give municipalities a breathing spell and to allow them to continue to

perform their public duties.  *See supra*, ¶ 6.  Dismissing this case at the behest of one group of

creditors (against whom strong challenges have been made), or permitting those creditors to avoid

determinations of their own claims, would wrongly allow creditors to hijack PROMESA as a

creditor enforcement mechanism, rather than a specially-crafted statute designed to allow the

Oversight Board to solve Puerto Rico's longstanding and complex governmental and economic problems.

### b. Filing a Plan is Premature, Impractical, and Costly

17.   The Bondholders also request that the Court compel the Oversight Board to file a plan by November 1, 2022 prior to any adjudication of their claims.  Bondholder Obj., ¶ 10.  The Oversight Board, however, determined that filing a plan or plan term sheet at this juncture is premature and impractical, and a poor use of time until one or more deals are locked in.  Plainly, the Bondholders' strategy, rather than to foster consensus and a confirmable plan, is to have a plan filed without creditor support and then to argue any plan confirmation is hopeless.  Conversely, when the Bondholders' claims are determined, PREPA will know how much it can pay all other constituencies, and will garner much support.

## II.   The Current Expense Adversaries are Ripe for Adjudication

18.   The Fuel Line Lenders[8] filed the FLL Objection to the Oversight Board's litigation schedule that notably, does not oppose the Oversight Board's requested relief in most respects. Instead, the Fuel Line Lenders argue the current expense litigation they filed [Case No. 19-ap-396, ECF No. 36] (the "FLL Priority Litigation") should not go forward immediately, in part because the Fuel Line Lenders now contend their action is moot based on the termination of the 2019 RSA and the Oversight Board's determination to go forward with challenges to the extent and validity of the Bondholders' claims.  *See* FLL Obj. ¶¶ 7–10.

19.   While the Oversight Board believes the issue of whether the Fuel Line Lenders claims are senior to Bond claims is not moot, if the Fuel Line Lenders desire to withdraw their

---

[8]   The "Fuel Line Lenders' are: Cortland Capital Market Services LLC, as successor administrative agent under a Credit Agreement, dated May 4, 2012, among PREPA, Scotiabank de Puerto Rico, and certain lenders, and certain lenders under a Trade Finance Facility Agreement, dated July 20, 2012, between PREPA and Citibank, N.A.

complaint the Oversight Board will not object.  But, the Fuel Line Lenders should not be allowed in the future to slow down confirmation by claiming seniority.  Thus, the withdrawal should be with prejudice.

20.     That the Bondholders' claims are likely to be disallowed means the dispute possibly may become moot in the future, not that it is moot now.  *Town of Barnstable v. O'Connor*, 786 F.3d 130, 143 (1st Cir. 2015).[9]  The Oversight Board is not opposed, however, to meeting and conferring with the Fuel Line Lenders on the issues raised in their response to see if they can agree on a deal that would avoid litigation over seniority.  In the meantime, absent withdrawal, the Oversight Board hopes the Court will set a date for the matter to be determined on the papers.

21.     Moreover, in connection with the SREAEE Response, the Oversight Board shares the Court's sincere concerns for the people of Puerto Rico and the devastation wrought by Hurricane Fiona.  The Oversight Board hopes for their safety and speedy recovery from the storm.  Having considered SREAEE's response, the Oversight Board proposes to meet and confer with UTIER and SREAEE to discuss disposition of the SREAEE's adversary proceeding.

## III.   Replies to Specific Contentions

22.     The Bondholder Objection makes a number of false assertions.  But, they are irrelevant to the narrow question before the Court regarding approval of the Proposed Litigation Schedule.  While the Oversight Board reserves all rights to respond to all these assertions at the appropriate time, it responds to the below for the benefit of the record.

---

[9]  The Fuel Line Lenders argue that the FLL Priority Litigation was only ripe for adjudication when the 9019 Motion was pending.  The Fuel Line Lenders, however, had objected to the 9019 Motion. By their logic, the possibility that the 9019 Motion could be defeated would have rendered the FLL Priority Litigation moot even upon its filing.  Such a rule is not and cannot be the law.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 631 B.R. 596, 603 (D.P.R. 2021) (quoting *O'Connor*) ("the First Circuit has made clear that the 'possibility of future mootness' is not the 'type of contingency that would create a lack of ripeness.'").

23.     <u>Delay was not unreasonable</u>.  The Bondholders allege surprise and prejudice at the delay and ultimate termination of the 2019 RSA, but their posture is unsupportable.  As the Bondholders readily admit, they did not object to the adjournment of the 9019 Motion deadlines following the onset of the COVID-19 pandemic.  Bondholder Obj., ¶ 20.  Indeed, the Oversight Board moved to adjourn consideration of the 9019 Motion seven times during that span, and the Bondholders did not object to any of those requests.  *See* ECF Nos. 1992, 2111, 2220, 2330, 2394, 2544, and 2691.  The Court granted these extensions over the objections of the Committee, which sought to prosecute challenges to the bond claims in the interim.

24.     Since the adjournment of the 9019 Motion, the Oversight Board consistently asserted it was reevaluating the providence of the 2019 RSA and was conducting analyses to determine the feasibility of the transactions contemplated thereby and any amendments to or renegotiations of the 2019 RSA that may be required to preserve the settlement thereunder.[10]  The Bondholders knew legislation required to implement the RSA might not be forthcoming, and changes in the economic landscape could arise due to the pandemic, among other things.  Absent legislation the Oversight Board was concerned that "[a]lternatives are likely to be more expensive" ECF No. 19514 ¶ 3 in Case No. 17-3283.  Similarly the Oversight Board also stated that it "will assess the feasibility of implementing the RSA based on the result of its discussions with the Legislature . . . in the event necessary legislation is not enacted to implement the RSA, the Government Parties will evaluate alternatives without new legislation."  ECF No. 2697 ¶ 3.  That the Government ultimately exercised its unilateral termination right under the RSA once it

---

[10] *See, e.g.*, ECF No. 2220 ("Since the last status report, the Oversight Board, continues to conduct diligence into the RSA and the affordability and sustainability of electricity rates on the island given the still changing economic landscape and the effects of the COVID-19 pandemic, as well as to analyze the optimal means of implementing the RSA transactions.  This diligence and analysis will help inform the Government Parties' determination regarding whether the RSA should be renegotiated and the parameters for doing so.").

determined it was no longer workable and legislation would not be possible could not have surprised the Bondholders.

25.      The Bondholders themselves, just like the Government, had a right to terminate the 2019 RSA at any time if they believed they were being prejudiced by its delayed adjudication. 2019 RSA § 9(d).  Instead, the Bondholders declined to do so, despite the risk the RSA might need to be renegotiated.  From the date of its execution, the Bondholders benefited from the RSA as they were insulated from the immense downside risk of litigating their claims in both the Lien Challenge Adversary Proceeding and the UCC's claim objection, and received millions of dollars in reimbursement of professional fees from PREPA under the terms of the 2019 RSA.  *See* RSA § 22.  The Bondholders also complain the Oversight Board utilized the adjournment period to "put the LUMA contract in place, focus on other Title III cases, move forward with the Commonwealth's Title III plan, and lobby for legislation to facilitate that plan."  Bondholder Obj., ¶ 20.  LUMA's operation of PREPA is for the benefit of all stakeholders, and the Bondholders enjoy these benefits as well.  Likewise, the stay of the 9019 Motion enabled the Oversight Board to complete the restructuring of the Commonwealth and other instrumentalities.  The Bondholders rely on these positive developments to argue their entitlement to ever-higher returns, yet conveniently ignore this progress in arguing they have been prejudiced by delay.

26.      <u>Significant Changes to Political, Legal, and Economic Landscape.</u>   The Bondholders falsely accuse the Oversight Board of engaging in a tactic to delay filing a plan and allowing PREPA to languish in bankruptcy.  As the Court's own experience with the Oversight Board in other Title III cases has demonstrated, nothing could be further from the truth.  The Oversight Board has gone out of its way to try and reach a deal with the Bondholders, and dedicated incredible resources to negotiating and entering into the 2019 RSA and prosecuting the

13

9019 Motion, which was vigorously opposed by every non-bondholder creditor constituency during the nine months after it was filed through the date it was stayed.

27.     While the Government, and not the Oversight Board, determined to terminate the 2019 RSA, significant changes in the political, economic, and legal landscape since the time of its execution rendered the 2019 RSA too costly for PREPA and its customers, too difficult to implement, and warranted renegotiation of its terms.  First, the Oversight Board's support of the RSA was largely predicated on key structural benefits to be effectuated through legislation.  These unique and unprecedented benefits included, among other things, (i) a non-default securitization structure that reduced the risk of PREPA reentering Title III, (ii) the establishment of a fixed, predictable, long-term transition charge to fund the debt that would not be subject to regulatory approval or modification, and (iii) "demand protections" that would slow the loss of PREPA's revenue (and its economic survival) due to residents transitioning to solar energy.  Indeed, the Oversight Board repeatedly indicated that not attaining legislation may result in further negotiations.  *See, e.g.,* ECF No. 2627 ¶ 14.  Shifting control and party dynamics in the Legislative Assembly, however, made it all but certain the needed legislation would not be obtained, thus compromising the ability to achieve structural benefits that made the RSA attractive.  Within the last six months, the Legislative Assembly has put forth several bills attempting to limit or prevent any rate increases for debt service.  Almost daily, local media and local political action and consumer groups rail against putting creditor recoveries on the backs of ratepayers.  Meanwhile, PREB has refused to allow PREPA to pass the full amount of its rising fuel costs on to ratepayers, causing PREPA to operate at a substantial deficit.[11]   The political pressure against any rate

---

[11] *See, e.g.*, *PREB Declines Request to Raise Energy Rates*, The Weekly Journal, October 1, 2021.  *Available at* www.theweeklyjournal.com/business/preb-declines-request-to-raise-energy-rate/article_2c2439f6-22ce-11ec-a9d8-1f0fee1d92f0.html.

increases to fund a PREPA plan is enormous.  While the Oversight Board has not been and will

not be bashful to request nullification of laws impairing or defeating PROMESA's purposes, we

mention these latest laws simply to convey the political climate and sensitivities associated with

any rate increase.

28.     Second, the legal landscape has also changed.  Prior to entering into the 2019 RSA

the Oversight Board was concerned with the risk PREPA would face if the Oversight Board were

to litigate the Lien Challenge and lose.  As mentioned above, the Court's denial of the HTA

bondholders' stay relief motion determined that very similar HTA bond documents limited the

subject collateral to monies deposited in specified accounts.  The PREPA bond structure is even

weaker than the HTA bonds due to issues with perfection and their non-recourse provisions.[12]

29.     Third, the global COVID-19 pandemic, rising fuel prices, and rising inflation have

left Puerto Rico with a different economic reality than existed in 2019.  PREPA is highly

dependent on fossil fuels for its electricity generation, and the recent rapid rise in oil prices has

raised the average electricity price in Puerto Rico from ~21c/kwh in 2019 to ~33 c/kwh.  To satisfy

the Oversight Board's mandate under PROMESA, a PREPA plan must account for these elevated

prices and changing economic conditions.

---

[12] This is magnified by the Bonds' vulnerability under Bankruptcy Code section 927 to lacking an allowable unsecured claim.  The Bondholders attempt to belittle that vulnerability.  If that is their true belief, they should not object to a prompt testing of their claim's allowability.  They argue they have an allowable claim for over $9 billion because while they have limited recourse, their limited recourse includes recourse to future revenues not put in the Sinking Fund.  The litigation will show the documents do not support that claim.  Moreover, it would not matter if they did. The Trust Agreement says clearly the Bonds can only be paid from monies in the Sinking Fund.  *See* Trust Agreement § 701 (providing that the bonds "will be payable solely from the Revenues" that are "pledged to the payment thereof" – funds in the Sinking Fund).  Under Bankruptcy Code § 101(5), a claim is a right to payment.  Therefore, the Bondholders have no right to payment other than from the Sinking Fund.  This is why the Oversight Board must take the Bondholders' lack of allowable unsecured claims very seriously in negotiating any settlement.

WHEREFORE the Oversight Board requests the Court enter the Proposed Order and

grant it such other relief as it deems just and proper.

Dated:  September 20, 2022
      San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*
Martin J. Bienenstock
Paul V. Possinger
Ehud Barak
Margaret A. Dale
Michael T. Mervis
Daniel S. Desatnik
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
Email: mbienenstock@proskauer.com
      ppossinger@proskauer.com
      ebarak@proskauer.com
      ddesatnik@proskauer.com

*Attorneys for the Financial*
*Oversight and Management Board*
*as representative for PREPA*

*/s/ Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944
Email: hermann.bauer@oneillborges.com

*Co-Attorney for the Financial Oversight and*
*Management Board as representative for*
*PREPA*

16