# EXHIBIT 3

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
CENTRO JUDICIAL DE SAN JUAN
SALA SUPERIOR

| | |
|---|---|
| ADMINISTRACIÓN DE LOS SISTEMAS DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO Y LA JUDICATURA DE PUERTO RICO ("SISTEMA"); LA SUCESIÓN DE PEDRO JOSÉ NAZARIO SERRANO; LA SUCESIÓN DE JUANITA SOSA PÉREZ; JOEL RIVERA MORALES; MARÍA DE LOURDES GÓMEZ PÉREZ; HÉCTOR CRUZ VILLANUEVA; LOURDES RODRÍGUEZ; Y LUIS M. JORDÁN RIVERA, POR SÍ Y COMO REPRESENTANTES DE LA CLASE DEMANDANTE COMPUESTA POR LOS BENEFICIARIOS DEL SISTEMA | CIVIL NÚMERO: K AC2011-1067 (803) SOBRE: INCUMPLIMIENTO DE CONTRATO DAÑOS Y PERJUICIOS |
| Demandantes v. UBS FINANCIAL SERVICES INCORPORATED; UBS TRUST COMPANY OF PUERTO RICO ("UBS TRUST") Y UBS CONSULTING SERVICES OF PUERTO RICO COMO SUBDIVISIÓN DE UBS TRUST; ABC INSURANCE COMPANY, INC.; XYZ INSURANCE COMPANY, INC. Demandados | RADICADO EN SECRETARIA HOY DIA 23 DE Septiembre 2022 2:23 p.m Secretaria |

## QUINTA DEMANDA *ENMENDADA*[1]

**AL HONORABLE TRIBUNAL:**

**COMPARECE** la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico (el "Sistema") por sí; los miembros de la Sucesión de Pedro José Nazario Serrano y los miembros de la Sucesión de su cónyuge, Juanita Sosa Pérez; Joel Rivera Morales; María De Lourdes Gómez Pérez; Héctor Cruz Villanueva; Lourdes Rodríguez; y Luis M. Jordán Rivera (en conjunto, "los Demandantes Individuales"), por sí y en representación de los miembros de la clase compuesta por los demás beneficiarios/pensionados del Sistema, por conducto de sus abogados que suscriben, y muy respetuosamente **EXPONEN, ALEGAN Y SOLICITAN:**

### I. NATURALEZA Y RESUMEN DEL CASO

1.1    Durante la primera mitad del año 2008, el Sistema hizo tres (3) emisiones de bonos a largo plazo (los "Bonos") por un importe total de aproximadamente tres mil millones de dólares ($3 mil millones) y los colocó en el mercado de Puerto Rico a través de un grupo

---

[1] Los Anejos de la Quinta Demanda Enmendada son los mismos anejos de la Cuarta Demanda Enmendada, los cuales se incorporan por referencia para evitar abultar innecesariamente el expediente del Tribunal.

de "underwriters" dirigido por UBS Financial Services of Puerto Rico Inc., ahora conocido como UBS Financial Services, Inc. ("UBS")[2].

1.2    El supuesto propósito de dicha transacción era que el Sistema obtuviera fondos a tasas de interés bajas, para re-invertir los mismos a rendimientos más altos, y producir así una ganancia recurrente para el Sistema ("positive arbitrage") durante el término de los Bonos.  Lo anterior no se logró.  Los Bonos fueron colocados en el mercado local a tasas de interés tan altas que el Sistema ha perdido, pierde y continuará perdiendo multimillonarias sumas de dinero, porque no ha podido colocar los fondos producto de los Bonos a rendimientos suficientemente altos como para producir una ganancia y amortizar el costo de emisión y venta de los Bonos.

1.3    Antes de llevarse a cabo la emisión y venta de los Bonos, en el año 2008, UBS como suscriptor líder ("lead underwriter"), le representó al Sistema que UBS era experto en asesoría financiera y tenía la capacidad para colocar los Bonos, a los fines de convencer al Sistema para que contratara a UBS para llevar a cabo la referida emisión.

1.4    Entre las representaciones que hizo UBS para convencer al Sistema de que la emisión y la venta de los Bonos serían beneficiosas y ayudarían a solventar las arcas del mismo, estaba que el producto de las mismas iba a generar un diferencial positivo en rendimiento ("positive arbitrage"), el cual redundaría en ganancias para el Sistema. Esas representaciones no sólo eran falsas, sino que se hicieron para que UBS se pudiese lucrar y cobrar honorarios y comisiones, como los que en efecto cobró, los cuales sobrepasaron los $35 millones.

1.5    El 4 de abril de 2013, se aprobó la Ley Núm. 3-2013, para reformar de manera integral el Sistema de Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "Sistema"). La aprobación de esta Ley fue un intento de mitigar la grave crisis financiera en la que se encuentran dicho Sistema y el Estado Libre Asociado de Puerto Rico ("ELA"). La propia Asamblea Legislativa de Puerto Rico concluyó que la emisión de los Bonos fue una de las causas de esta grave crisis y así fue señalado en la exposición de motivos de dicha Ley. Como dato significativo, expresaron allí los legisladores que los Bonos le costarán al Sistema alrededor de $6,000 millones en intereses, más el repago del principal.

---

[2] En la Cuarta Demanda Enmendada se incluyó a UBS Financial Services Incorporated of Puerto Rico, pero UBS Financial Services, Inc. (en adelante, UBS") es la entidad que sobrevivió como resultado de la fusión habida entre esas dos entidades, ocurrida el 14 de julio de 2021.

1.6    Además, según se explica más adelante, la emisión y la venta de los Bonos fueron ilícitas, pues (i) violaron la política pública establecida por la Asamblea Legislativa de Puerto Rico, la cual denegó su aprobación a las mismas cuando éstas se contemplaban a través del Gobierno; y (ii) los Bonos se garantizaron mediante la pignoración o enajenación de las aportaciones patronales al Sistema, lo cual no está permitido por la Ley de Retiro.

1.7    Esta Quinta Demanda Enmendada se presenta para beneficio del Sistema y de los Demandantes Individuales identificados más adelante, por sí y como representantes de una clase compuesta por los demás beneficiarios/pensionados del Sistema ("la "Clase"), para recobrar los graves daños continuados sufridos y a ser sufridos tanto por el Sistema, como por los Demandantes Individuales y por los miembros de la Clase, causados por la conducta crasamente negligente de las codemandadas UBS, incluyendo violación de deberes contractuales y fiduciarios para con el Sistema y daños a los Demandantes Individuales, los miembros de la Clase y al propio Sistema, en virtud del Artículo 1802 del Código Civil de Puerto Rico.

## II. LAS PARTES

### Demandantes:

2.1    El Sistema es un fideicomiso creado mediante la Ley Número 447, del 15 de mayo de 1951, según enmendada (la "Ley de Retiro"). Los fiduciarios del Sistema son los miembros de su Junta de Síndicos y los fideicomisarios/beneficiarios del mismo son los empleados activos y los empleados retirados del Gobierno de Puerto Rico y sus subdivisiones políticas e instrumentalidades (en adelante, en conjunto, el "Gobierno"). Como consecuencia de los actos y omisiones de la parte demandada que se describen con particularidades más adelante, el Sistema ha sufrido pérdidas en exceso de 800 millones de dólares.

2.2    Los miembros de las sucesiones de Pedro José Nazario Serrano y Juanita Sosa Pérez comparecen en representación de éstas y de los causantes, quienes eran demandantes originalmente y a la fecha de la presentación de esta Quinta Demanda Enmendada habían muerto. Tanto Pedro José Nazario Serrano como Juanita Sosa Pérez habían comparecido por sí y como representantes de la extinta Sociedad Legal de Gananciales compuesta por ambos, eran mayores de edad, casados entre sí, jubilado él del Departamento de Hacienda de Puerto Rico y ella del Municipio de Carolina, Puerto Rico. Entre los daños continuados que la conducta negligente de los demandados le causó y continúa causando a estos Demandantes

y a los miembros aplicables de la Clase están que éstos perdieron sus bonos de verano y el derecho a recibir reembolsos por el costo de medicamentos, el derecho a tomar préstamos personales e hipotecarios, etc. Esta situación también les causó intensas angustias y sufrimientos.

2.3    El Co-Demandante Joel Rivera Morales, quien comparece por sí y como representante de la Clase, es mayor de edad, casado, empleado en la Autoridad de los Puertos de Puerto Rico y vecino de Carolina, Puerto Rico.  Su dirección es Villa Fontana Park 5DD24. Calle Muñoz Rivera, Carolina, Puerto Rico 00982 y su teléfono es el (787) 390-5242.  Entre los daños continuados que la conducta negligente de los demandados le ha causado y causará al Sr. Rivera Morales y a los miembros aplicables de la Clase están que, en vez de poderse retirar a los 65 años con un 65% de su salario, ahora tendrá que esperar hasta los 67 años y recibirá solo un 34% de su salario, lo cual no será suficiente para sufragar sus gastos. Además, posibles pérdidas del derecho a recibir reembolsos por el costo de medicamentos, el derecho a tomar préstamos personales e hipotecarios, etc. Esta situación también le ha causado y continuará causando intensas angustias y sufrimientos.

2.4    La Co-Demandante María de Lourdes Gómez Pérez, quien comparece por sí y como representante de la Clase, es mayor de edad, casada, empleada en el Departamento de la Familia y vecina de Carolina, Puerto Rico.  Su dirección es Calle 9 M-14, Urb. Mountain View, Carolina, Puerto Rico y su teléfono es el (787) 390-5242. Entre los daños continuados que la conducta negligente de los demandados le ha causado y causará a la Sra. Gómez Pérez y a los miembros aplicables de la Clase están que, tras haber laborado durante 28 años en el Departamento de la Familia, en lugar de poder retirarse dentro de un año y medio, ahora tendrá que trabajar 6 años adicionales y recibirá solo el 38% de su salario, lo cual no será suficiente para sufragar sus gastos. Además, la posible pérdida del derecho a recibir reembolsos por el costo de medicamentos, el derecho a tomar préstamos personales e hipotecarios, etc. Esta situación también le causó y continuará causando intensas angustias y sufrimientos.

2.5    El Co-Demandante Héctor Cruz Villanueva, quien comparece por sí y como representante de la Clase es mayor de edad, casado, empleado civil en la Guardia Nacional de Puerto Rico y vecino de Vega Baja, Puerto Rico. Su dirección es Chalets de la Playa, Apartamento 487, Vega Baja, Puerto Rico 00693 y su teléfono es (787) 647-4584. Entre los

daños continuados que la conducta negligente de los demandados le ha causado y causará al Sr. Cruz Villanueva y a los miembros aplicables de la Clase están que, después de haber laborado durante 24 años como empleado civil de la Guardia Nacional de Puerto Rico, al momento de su retiro va a recibir una cantidad muy inferior al 75% de su salario, lo cual no será suficiente para sufragar sus gastos. Además, la posible pérdida del derecho a recibir reembolsos por el costo de medicamentos, el derecho a tomar préstamos personales e hipotecarios, etc. Esta situación también le ha causado y le continuará causando intensas angustias y sufrimientos.

2.6    La Co-Demandante Lourdes Rodríguez, quien comparece por sí y como representante de la Clase es mayor de edad, casada, empleada en el Centro de Recaudación de Ingresos Municipales (CRIM) y vecina de Guaynabo, Puerto Rico. Su dirección es Guácima O-1, Urb. Santa Clara, Guaynabo, Puerto Rico 00969 y su teléfono es el (787) 632-2697. Entre los daños continuados que la conducta negligente de los demandados le ha causado y causará a la Sra. Rodríguez y a los miembros aplicables de la Clase están que, en lugar de poder retirarse en dos años al cumplir 57 años y recibir el 40% de su salario, ahora no podrá retirarse hasta dentro de unos 10 años, cuando cumpla la edad de 65. Además, la posible pérdida del derecho a recibir reembolsos por el costo de medicamentos, el derecho a tomar préstamos personales e hipotecarios, etc. Aun así, solo recibirá un porciento mucho menor de su salario, lo cual no será suficiente para sufragar sus gastos. Esta situación también le ha causado y le continuará causando intensas angustias y sufrimientos.

2.7    El Co-Demandante Luis M. Jordán Rivera, quien comparece por sí y como representante de la Clase, mayor de edad, casado, empleado en el Centro de Recaudación de Ingresos Municipales (CRIM) y vecino de San Juan, Puerto Rico. Su dirección es Condominio Miramar Tower, Apartamento 5-I, #721 Calle Hernández, San Juan, Puerto Rico 00907 y su teléfono es (787) 632-7543. Entre los daños continuados que la conducta negligente de los demandados le ha causado y continúa causando al Sr. Jordán Rivera y a los miembros aplicables de la Clase están que, tras haber laborado durante 28 años en el CRIM, en el Municipio de San Juan, en el Departamento de Hacienda y el Instituto de Cultura, en lugar de poder retirarse dentro de un año recibiendo un 75% de su salario, ahora solo va a recibir el 46% de su salario, lo cual no será suficiente para sufragar sus gastos. Además, la posible pérdida del derecho a recibir reembolsos por el costo de medicamentos, el derecho a tomar

préstamos personales e hipotecarios, etc. Esta situación también le ha causado y le continuará causando intensas angustias y sufrimientos.

2.8    Originalmente, este pleito fue instado por los Demandantes Individuales como una acción derivativa para beneficio del Sistema y sus fideicomisarios/beneficiarios. A tales efectos, en la Demanda se incluyó al Sistema como parte demandada. Posteriormente, en la Tercera Demanda Enmendada el Sistema ejerció su deber fiduciario y compareció como demandante por sí y para beneficio de sus fideicomisarios/beneficiarios. Por lo tanto, al comparecer el Sistema como parte demandante, la presente acción dejó de ser derivativa y se convirtió en una acción directa por parte del Sistema y para beneficio de sus fideicomisarios. A partir de entonces, los fideicomisarios/beneficiarios del Sistema que habían estado representados en la acción derivativa, han estado representados por el Sistema. Cabe señalar, que según el Artículo 517 de la Ley Núm. 53-2021, "las transacciones del Plan de Ajuste no se pueden utilizar para mitigar causas de acción al amparo de la Ley Núm. 3-2013".

2.9    Recientemente, se ha creado una incertidumbre respecto a la continuidad del Sistema como persona jurídica, ante la posible liquidación de sus activos y eventual posible disolución, en relación con el Plan de Ajuste para el Pago de la Deuda del Gobierno de Puerto Rico, bajo el Título III de la Ley Promesa. Los daños continuados que dicha liquidación y posible disolución cause al Sistema y a sus fideicomisarios, incluyendo a los Demandantes Individuales y a los miembros de la Clase, no se podrá determinar definitivamente, mientras que dicho proceso de liquidación y/o no concluya. Dichos daños continuados serán consecuencia directa de la conducta de las demandadas UBS. Por ello, y para garantizar que sus intereses continúen representados en este caso, comparecen los miembros de la Clase representados por los Demandantes Individuales. A tales efectos, se propone la Clase sea definida según a continuación:

> La clase está compuesta por todos los pensionados y empleados activos del Gobierno y la Judicatura de Puerto Rico **participantes** del Sistema de Retiro de los Empleados del Gobierno y la Judicatura del Estado Libre Asociado de Puerto Rico.

Véase, Párrafo 3.3 de esta Demanda y siguientes.

**Demandados:**

2.10   UBS Financial Services Incorporated of Puerto Rico, ahora UBS Financial Services, Inc. ("UBS"), era a la fecha de los hechos alegados en esta Demanda una corporación organizada y existente al amparo de las leyes de Puerto Rico, la cual se dedicaba al negocio de banca de inversiones, asesoramiento financiero y corretaje de valores. Su dirección y su teléfono son: Penthouse – American International Plaza, 250 Avenida Muñoz Rivera, Hato Rey, San Juan, Puerto Rico 00918, Teléfono: (787) 284-3445. Esta corporación desapareció al ser fusionada con UBS Financial Services Incorporated, la cual permanece como demandada.

2.11   La Demandada UBS Consulting Services of Puerto Rico ("UBS Consulting"), una subdivisión de UBS Trust Company of Puerto Rico, es una corporación o persona jurídica cuyo lugar de formación o incorporación se desconocen en este momento. Es una afiliada o subsidiaria de UBS Financial Services Incorporated of Puerto Rico, ahora UBS Financial Services, Inc., o una entidad relacionada a ésta y, durante el período de tiempo relevante a esta Quinta Demanda Enmendada, prestaba servicios de asesoramiento financiero al Sistema. Su dirección y teléfono conocidos son: Penthouse–American International Plaza, 250 Avenida Muñoz Rivera, Hato Rey, San Juan, PR  00918, Teléfono (787) 284-3435.

2.12   La Demandada desconocida ABC Insurance Company, Inc. es la compañía de seguro, si alguna, que emitió la póliza, si alguna, que, durante el tiempo relevante a esta Quinta Demanda Enmendada aseguró la responsabilidad por daños ocasionados por actos, omisiones, o conducta negligente y/o ilícita por parte de funcionarios de UBS cuando se negoció y/o culminó la emisión y venta de los Bonos o parte(s) de los mismos. Se desconocen en este momento su nombre correcto, su lugar de incorporación, su teléfono y su número de fax.

2.13   La Demandada desconocida XYZ Insurance Company, Inc. es la compañía de seguro, si alguna, que emitió la póliza, si alguna, que, durante el tiempo relevante a esta Quinta Demanda Enmendada aseguró la responsabilidad por daños ocasionados por actos, omisiones, o conducta negligente y/o ilícita por parte de UBS Consulting.  Se desconoce en este momento su nombre correcto, su lugar de incorporación, su teléfono y su número de fax.

## III. LEGITIMACIÓN ACTIVA DE LOS DEMANDANTES Y CERTIFICACIÓN DE LA CLASE

3.1     El Sistema es un fideicomiso creado por la Ley de Retiro. El Administrador administra el Sistema y es nombrado por la Junta de Síndicos. Los miembros de la Junta de Síndicos son los fiduciarios del fideicomiso constituido por el Sistema. Los empleados activos y empleados retirados del Gobierno son los fideicomisarios o beneficiarios del fideicomiso constituido por el Sistema. Los aquí Demandantes Individuales y los miembros de la Clase son empleados activos o retirados del Gobierno o sucesores de éstos y, por tanto, beneficiarios/fideicomisarios del fideicomiso constituido por el Sistema.

3.2     Por su parte, la Ley Núm. 3 del 4 de abril 2013, en su Sección 40, también confiere legitimación activa a los aquí Demandantes, al disponer taxativamente:

> *"Se le reconoce una causa de acción por virtud de esta Ley, a los participantes y pensionados del Sistema de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico para demandar, <u>por sí mismos,</u> a los asesores de inversión no gubernamentales y suscriptores en cualquier transacción en la que el Sistema de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico haya emitido bonos (pension obligation bonds), por cualquier daño causado <u>al Sistema o a sus beneficiarios.</u>"*

(Subrayado añadido).

3.3     De otro lado, las reclamaciones de los Demandantes Individuales que aquí comparecen por sí y como representantes de la Clase, son comunes y típicas entre todos los miembros de la Clase, según definida ésta el párrafo 2.9 de esta Quinta Demanda Enmendada, por lo que se favorece la certificación del pleito como uno de clase. En ese sentido, la Regla 20.1 de las de Procedimiento Civil permite la presentación de este pleito como uno de clase al disponer lo siguiente:

> Regla 20.1. Requisitos para un pleito de clase Uno o más miembros de una clase podrán demandar o ser demandados como representantes de todos los miembros de la clase solamente si (1) la clase es tan numerosa que la acumulación de todos los miembros resulta impracticable; (2) existen cuestiones de hecho o de derecho comunes a la clase; (3) las reclamaciones o defensas de los representantes son típicas de las reclamaciones o defensas de la clase, y (4) los representantes protegerían los intereses de la clase de manera justa y adecuada.

32 LPRA Ap. V, R. 20.1.

3.4     La Clase está compuesta por todos los pensionados y empleados activos del gobierno y la Judicatura de Puerto Rico participantes del Sistema, según se define en el párrafo 2.9 de esta Demanda.

3.5      Existen decenas de miles de miembros de la Clase en similares circunstancias a través de todo Puerto Rico.  Por tanto, resultaría impráctico sino imposible nombrarlos a todos, uno por uno, como demandantes en el presente caso.

3.6      Del mismo modo, el presente caso expone unas claras **cuestiones de hecho y de derecho** que aplican a todos los miembros de la Clase.  Las reclamaciones aquí presentadas surgen de la conducta de las demandadas UBS, incluyendo violación de sus deberes contractuales y fiduciarios para con el Sistema, que causó y continuará causando daños a los demandantes.

3.7      Todas las cuestiones comunes de hecho y de derecho señaladas afectan a los Demandantes Individuales y a los demás miembros de la Clase, por lo que se cumple con el requisito de **"comunidad"**, requerido para certificar una acción de clase de conformidad con la Regla 20.1, *supra*. Éstas, a su vez, predominan sobre otras cuestiones que afecten separadamente a los Demandantes Individuales y demás miembros de la Clase.  La presente acción de clase es el medio adecuado y superior disponible para adjudicar la presente controversia. Véase *Juarbe v. Vaquería Tres Monjitas*, 169 D.P.R. 705 (2006).

3.8      Se cumple con el requisito de **numerosidad** para certificar una acción de clase compuesta por decenas de miles de pensionados y empleados del Gobierno y la Judicatura de Puerto Rico participantes del Sistema. No es necesario demostrar que resulta imposible la acumulación de todos los demandantes.  Basta demostrar que tal acumulación crearía serios obstáculos en la tramitación del caso, como es evidente en el presente.

      3.8.1   Además, los miembros de la Clase están diseminados por todo Puerto Rico.

      3.8.2   Resulta difícil en este momento identificar a todos los miembros de la Clase.

      3.8.3   La naturaleza del presente caso permite que se hagan alegaciones comunes que prevalecen sobre detalles aplicables a los miembros de la Clase individualmente.

      3.8.4   Las costas de un litigio individual de esta naturaleza serían demasiado cuantiosas para la mayor parte de los miembros de la Clase y estos costos menoscabarían la habilidad de cada miembro de hacer valer sus derechos de forma individual.

3.9    La **tipicidad** de la reclamación surge ya que no existe interés antagónico alguno entre los Demandantes y los demás miembros de la Clase. Su interés típico y común es recobrar los daños continuados causados por la conducta de los demandados.

3.10    Se cumple, además, en este caso el requisito de **adecuada representación**, debido a que:

3.10.1 No existe conflicto entre los intereses de los demás miembros de la Clase y los Demandantes Individuales, ya que las reclamaciones que aparecen en la demanda son típicas para todos ellos; y

3.10.2 Todos los demandantes y sus abogados litigarán el pleito agresiva, competente y vigorosamente. Los abogados que suscriben cuentan con experiencia en este tipo de litigio de Clase y servirán los mejores intereses de todos y cada uno de los miembros de la Clase, así como de la sana administración de la justicia.

3.11    Por otra parte, se cumplen los requisitos que imponen las Reglas 20.2(a) y (b) de las de Procedimiento Civil, 32 L.P.R.A, Ap. V, R. 20.2 (a) (b), por las siguientes razones:

3.11.1 La tramitación de pleitos separados por o en contra de miembros individuales de la Clase crearía un riesgo de (1) adjudicaciones inconsistentes o variadas con respecto a los miembros individuales de la Clase, que podrían establecer normas de conducta incompatibles para la parte que se opone a la Clase; o (2) adjudicaciones con respecto a miembros individuales de la Clase, quienes para todos los fines prácticos dispondrían de los intereses de los otros miembros que no sean partes en las adjudicaciones o empeorarían o impedirían sustancialmente su habilidad para proteger sus intereses;

3.11.2 Según se ha expresado anteriormente, las cuestiones de hecho o de derecho comunes a los miembros de la Clase predominan sobre cualesquiera cuestiones que afecten solamente a miembros individuales, y el pleito de clase es superior a otros métodos disponibles para la justa y eficiente adjudicación de la presente controversia, teniendo en consideración (1) el interés de los miembros de la Clase en controlar individualmente la tramitación o defensa de

pleitos separados; (2) el hecho de que no existe otro litigio relativo a la controversia ya comenzado por o en contra de miembros de la Clase; (3) la deseabilidad de concentrar todo el trámite de las reclamaciones en este Honorable Tribunal; y (4) el hecho de que la tramitación de este pleito como uno de clase no conlleva dificultades significativas.

3.12    De igual manera, un pleito de Clase resulta mecanismo idóneo y superior a cualquier otro método para conducir la presente reclamación.

**3.13    En el presente caso se solicita la certificación de la Clase a los efectos de la responsabilidad de los demandados para con los miembros de la Clase, así como que la determinación de los daños correspondientes a los miembros de la Clase se haga posteriormente, a tenor con la prueba documental, testifical y pericial que se someta.**

## IV.  <u>HECHOS</u>

### <u>La Emisión de Bonos del 2008</u>

4.1    Durante el año 2007, la firma de banqueros de inversiones y corredores de valores Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") propuso al entonces Administrador y a la Junta de Síndicos del Sistema una emisión de bonos a largo plazo por la suma principal de por lo menos  siete mil millones de dólares ($7 mil millones), para colocarlos fuera de Puerto Rico, a tasas de interés que permitieran al Sistema (i) utilizar aproximadamente setecientos millones de dólares ($700,000,000) para gastos y obligaciones corrientes del Sistema, inyectándole liquidez al mismo; y (ii) invertir los restantes seis mil trescientos millones de dólares ($6,300 millones) en valores o instrumentos que generaren ingresos por intereses o dividendos en exceso de los intereses pagaderos por el Sistema en los bonos. Dicho exceso o diferencial positivo ("positive arbitrage") produciría una ganancia para el Sistema, la cual le permitiría mitigar su crónica falta de liquidez.

4.2    El alto importe de principal agregado total de los propuestos bonos del Sistema era crucial, porque las ganancias proyectadas serían menores o hasta insignificantes en volúmenes menores de principal y podrían ser insuficientes para cubrir los costos inherentes a la emisión, distribución y venta de los propuestos bonos.

4.3     Después de algunos meses, Merrill Lynch no logró culminar la referida transacción, pues no identificó en el mercado fuera de Puerto Rico una demanda razonable para colocar allí los propuestos bonos del Sistema, a tasas de interés suficientemente bajas como para producir el diferencial positivo en rendimiento ("positive arbitrage") que el Sistema necesitaba.

4.4     Durante el período en que el Sistema negociaba con Merrill Lynch la referida posible emisión de bonos de por los menos siete mil millones de dólares ($7 mil millones), la demandada UBS Consulting, directamente o a través de su(s) afiliada(s), en virtud de un contrato, actuaba como asesora de inversiones del Sistema y/o la Junta de Síndicos del Sistema y le representó falsamente al Sistema y a dicha Junta que podría invertir el producto de la venta de los Bonos a tasas de rendimiento mucho más altas que los intereses que pagaría el Sistema por los Bonos.

4.5     Al percatarse UBS de que Merrill Lynch no podría colocar fuera de Puerto Rico los siete mil millones de dólares ($7 mil millones) de los propuestos bonos, UBS le propuso al Sistema que éste contratase a la propia UBS como "underwriter", para emitir y vender los propuestos bonos. El 14 de febrero de 2007, UBS y UBS Consulting, en su intento de convencer al Sistema para que los contratara para asesorarlo y llevar a cabo la referida emisión, le hicieron una presentación en "Power Point" a la Junta de Síndicos del Sistema (véase **ANEJO 1**). En esa presentación UBS y UBS Consulting le representaron a los miembros de la Junta de Síndicos del Sistema que UBS su firma estaba entre los primeros diez (10) bancos de inversión a nivel global (**ANEJO 1**, página 3).  UBS le ofreció al Sistema de Retiro proveerle una impresionante combinación de experiencia ("*expertise*") y fuerza global, al igual que una sociedad ("*partnership*"), que le garantizaba ejecución superlativa, soluciones noveles y el máximo conocimiento en términos de asesoría de inversiones. (**ANEJO 1**, páginas 5, 7 y 10).  UBS se obligó, además, a reconocer y aceptar responsabilidad fiduciaria y que eso es lo que podía esperar de su "*Consultor*".  (**ANEJO 1**, página 26).  En cuanto a los problemas y retos particulares del Sistema de Pensiones de Puerto Rico, UBS recalcó que tenía amplia experiencia en reconciliar las condiciones del mercado y las expectativas de resultados. (**ANEJO 1**, páginas 29, 40, 47 y 48).

4.6     UBS representó, además, que podría lograr exitosamente la colocación de los propuestos bonos por su importante presencia en Puerto Rico y por el alto monto de la cartera de inversiones locales a su cargo, así como invertir el producto de dicha venta con un rendimiento que produciría ganancias para el Sistema.

4.7     Eventualmente, la Junta de Directores del Sistema contrató a UBS como la firma que estuvo a cargo de la emisión ("*underwriting*") de Bonos del Sistema por la cantidad de aproximadamente tres mil millones de dólares. Éstos fueron emitidos el 29 de enero de 2008 (Series A); el 28 de mayo de 2008 (Series B); y el 26 de junio de 2008 (Series C) (en adelante, en conjunto, los "Bonos de Retiro").

4.8     Entre las representaciones que hicieron UBS y UBS Consulting a los miembros de la Junta de Síndicos del Sistema para convencer al Sistema de que esta emisión sería beneficiosa y ayudaría a solventar las arcas del Sistema, estaba que el producto de la emisión iba a generar un arbitraje positivo ("positive arbitrage"), el cual redundaría en ingresos netos para el Sistema y que, si parte de la emisión se hacía en el mercado local, resultaría más económica y producía un mayor rendimiento. Esas representaciones no sólo eran falsas, sino que se hicieron para que UBS y las demás firmas que participaron en la emisión se pudiesen lucrar y lograsen ganarse comisiones y honorarios, como los que en efecto se ganaron, los cuales sobrepasaron los $35 millones.

4.9     UBS, por conducto de su entonces principal oficial ejecutivo, Miguel A. Ferrer, le representó no sólo al Sistema, sino al país en general, a través de comunicaciones a la prensa, que la emisión y venta de los Bonos, según recomendada por UBS Consulting y UBS, iba a resultar en una ganancia ("positive arbitrage") para el Sistema desde el mismo momento en que dichas transacciones fueren efectivas.

4.10    La propuesta de UBS fue aceptada por el Sistema descansando en las representaciones de UBS y UBS Consulting. Tanto UBS y UBS Consulting sabían o debían saber que los siguientes puntos eran cruciales para que la referida operación financiera fuera exitosa y cumpliera con los objetivos del Sistema:

    4.10.1 Que el monto de la emisión de los Bonos fuera suficientemente alto (al menos $7 mil millones) para (i) sufragar los costos de su originación, emisión, distribución y venta; y (ii) producir una ganancia para el Sistema mediante la inversión

por el Sistema de la mayor parte del producto neto de la venta de los Bonos a rendimientos más altos que el costo de los Bonos al Sistema.

4.10.2  Que los intereses de los Bonos fueran a tasas suficientemente bajas como para permitir al Sistema lograr una razonable ganancia recurrente al invertir el producto de su venta.

4.10.3  Que los valores en los que el Sistema invirtiera el producto de la venta de los Bonos fueran sumamente estables y con un mínimo riesgo de crédito y/o mercado, pues el Sistema no podía permitirse la posibilidad de perder todo o parte de su principal o de incurrir en una pérdida en intereses y/o dividendos ("negative arbitrage").

4.10.4  Que la proporción del producto de la venta de los Bonos que el Sistema usara para solventar sus necesidades inmediatas fuera la menor posible (no más de aproximadamente el diez por ciento (10%) del producto de la venta), pues la gran mayoría de dicho producto tendría que ser colocado por el Sistema en inversiones para lograr la ganancia ("positive arbitrage") recurrente que necesitaba el Sistema y que era la principal razón de ser de la propuesta emisión y venta de los Bonos.

4.11   Con conocimiento de todo lo anterior, el Sistema y UBS otorgaron contratos para la emisión y venta de los Bonos, pero no por la cantidad completa originalmente contemplada de siete mil millones de dólares ($7 mil millones), sino por cantidades mucho menores e insuficientes para lograr los antes mencionados objetivos del Sistema y sin disposición alguna que requiriera (i) la venta de la totalidad necesaria para que funcionara el referido plan original concebido por Merrill Lynch y bien conocido por UBS y UBS Consulting; o (ii), en su defecto, la cancelación de las emisiones y ventas parciales de Bonos si no se conseguía llegar al monto total necesario para que el plan funcionara. Es decir, no hubo el "all or nothing provision" que era prudente y necesario para proteger al Sistema y sus pensionados de las posibles consecuencias negativas de que no se lograra la emisión por el monto total contemplado.

4.12   Tampoco investigó UBS si el mercado local tenía la profundidad suficiente para absorber siete mil millones de dólares ($7 mil millones) en bonos del Sistema, en fechas en que (i) ya la economía local llevaba meses contrayéndose, (ii) los inversionistas locales estaban sufriendo cuantiosas pérdidas en sus inversiones inmobiliarias y en valores,

incluyendo, sin limitación, acciones de bancos y/o instrumentos de deuda garantizados por

bancos u otras instituciones financieras; (iii) la población de Puerto Rico estaba envejeciendo

y disminuyendo; y (iv) el desempleo en Puerto Rico estaba aumentando.

4.13    A tenor con dicha contratación de UBS con el Sistema, durante el primer

semestre del año 2008, UBS actuó como suscriptor u "underwriter" principal en las

siguientes tres emisiones, distribuciones y ventas en el mercado local de bonos del Sistema

(en adelante los "Bonos"), por la suma principal agregada total de aproximadamente tres mil

millones de dólares ($3 mil millones), o sea, menos de la mitad de los siete mil millones de

dólares ($7 mil millones) originalmente contemplados:

4.13.1    "Senior Pension Funding Bonds, Serie A", por mil quinientos
cincuenta y ocho millones ochocientos diez mil setecientos noventa y
nueve dólares con sesenta centavos ($1,558,810,795.60), del 29 de
enero de 2008.

4.13.2    "Senior Pension Funding Bonds, Serie B", por mil cincuenta y ocho
millones seiscientos treinta y cuatro mil seiscientos trece dólares con
cinco centavos ($1,058,634,613.05), del 28 de mayo de 2008.

4.13.3    "Senior Pension Funding Bonds, Serie C", por trescientos millones
doscientos dos mil novecientos treinta dólares ($300,202,930), del
26 de junio de 2008.

4.14    El vencimiento de los Bonos fluctúa entre el 1 de julio de 2023 y el 1 de julio

de 2058, y sus tasas de interés fluctúan entre el 5.85% y el 6.55% anual.  Dichos intereses

son exentos de contribución sobre ingresos para residentes en Puerto Rico.

4.15    En cada uno de los "Official Statements" de los Bonos se expresa que, si las

futuras condiciones del mercado fueren favorables, el Sistema contemplaría emitir bonos

adicionales durante el año 2008.  Obviamente, como era lógico y prudente suponer, tales

condiciones favorables del mercado no se produjeron y el Sistema no ha podido emitir bonos

después de la emisión de los referidos Bonos Series C, el 26 de junio de 2008.  En el "Official

Statement" de los Bonos Serie A se representó que los Bonos Serie B no se venderían en

Puerto Rico bajo ninguna circunstancia.  Sin embargo, tanto los Bonos Serie B como los Bonos

Serie C se vendieron exclusivamente en Puerto Rico[3].

4.16    El uso de los fondos producto de la venta de los Bonos, según unas tablas que

aparecen en los "Official Statement" de cada emisión, en la sección titulada "Use of

Proceeds"), se representó como sigue:

---

[3] Véase Sección 6.5, *infra*, en torno a las falsas representaciones en los "Official Statements" acerca de este tema.

| Uso | Importe |
|-----|---------|
| Descuento inicial | $ 7,889,350 |
| Transferencia al Sistema para solventar beneficios de retiro | 2,728,354,898 |
| Descuento de "underwriters" y costos de emisión | 35,744,191 |
| Depósitos en cuentas de intereses capitalizados | 93,737,392 |
| Depósitos en cuentas de servicio de deuda de bonos "senior" | 81,922,512 |
| Total | $2,947,648,343 |

4.17 Según se puede apreciar, el propuesto uso del producto de la venta de los Bonos, según representado en dichas tablas, las cuales aparecen en la página 17 de cada uno de los "Official Statements" y se resumen en 4.16, *supra*, era distinto al que se había contemplado cuando se proponía hacer la emisión de bonos por siete mil millones de dólares ($7 mil millones) a través de Merrill Lynch, y no era cónsono con el modelo originalmente propuesto por Merrill Lynch y posteriormente por UBS, para crear un ingreso recurrente para el Sistema mediante diferenciales positivos entre ingresos por dividendos e intereses, por una parte y costo de intereses, por otra parte ("positive arbitrage"). Cabe señalar que en dichos "Offering Statements" se presenta información contradictoria acerca del uso de los fondos producto de la venta de los Bonos, pues en sus páginas introductorias y en la página 17 de cada uno de ellos se dice que el Sistema invertiría el producto de la venta de los Bonos y usaría dichas inversiones y las ganancias que éstas produjeren para pagar beneficios de pensiones a sus beneficiarios, lo cual no es cónsono con lo que se resume en 4.16, *supra*.

4.18 De hecho, según se explica más adelante, el producto de la venta de los Bonos no se usó como se representó en los "Offering Statements" ni como se le había propuesto a la Junta de Síndicos del Sistema, y los Bonos han causado, causan y continuarán causando pérdidas significativas y graves daños financieros al Sistema. En realidad, dicho producto se usó aproximadamente como sigue y las cifras exactas de su uso surgirán del descubrimiento de prueba en el caso de autos.

4.18.1 De la suma de aproximadamente $1,600 millones procedente de la emisión y venta de los Bonos Series A, se invirtieron aproximadamente $937 millones de bonos y acciones a través de Citibank, N.A. y/o su(s) afiliada(s) (en adelante, en conjunto

"Citi"). Dichos $937 millones invertidos a través de Citi están produciendo un rendimiento anual de aproximadamente un 4.11%, significativamente menor que el interés que pagan los Bonos, el cual fluctúa entre el 5.85% y el 6.55% anual. El balance restante del producto de la emisión de los Bonos Series A, ascendente a $642 millones aproximadamente, se utilizó para el pago de gastos y descuentos relacionados con la emisión y venta de los Bonos, reserva para servicio de deuda y pago de gastos del Sistema y pensiones y no genera, por tanto, ingreso alguno para el Sistema.

4.18.2 De la suma agregada total de aproximadamente $1.4 mil millones, producto de la emisión y venta de los Bonos Serie B y Serie C, se usaron aproximadamente $564 millones para cubrir necesidades de caja del Sistema y obligaciones por pensiones, lo cual no genera ingreso alguno para el Sistema. Los $836 millones restantes se depositaron en el Banco Gubernamental de Fomento para Puerto Rico ("GDB"), ganando intereses sólo al 2% anual (a pesar de que la tasa de interés pagadera por los Bonos fluctúa entre el 5.85% y el 6.55% anual), pero al 30 de junio de 2010 sólo quedaban allí depositados $737 millones, pues se habían usado aproximadamente $99 millones para cubrir necesidades de fondos del Sistema.

4.19 Lo anterior quiere decir que, de los aproximadamente $3 mil millones de principal de los Bonos, por los que el Sistema paga y pagará intereses, hasta el vencimiento de los mismos, a entre el 5.85% y el 6.55% anual, al 30 de junio de 2010 lo único invertido y no gastado ascendía a $1,674 millones, de los cuales los aproximadamente $937 millones invertidos a través de Citi rendían al Sistema aproximadamente un 4.11% anual, mientras que los $737 millones invertidos en depósitos en el GDB rendían al Sistema sólo el 2% anual.

4.20 Los aproximadamente $1,326 millones recibidos por el Sistema y gastados y no invertidos rinden absolutamente nada y le cuestan al Sistema entre el 5.85% y el 6.55% anual. Sin contar el costo de esos aproximadamente $1,326 millones recibidos y gastados (no invertidos) por el Sistema, se calcula que los aproximadamente $1,674 millones recibidos e invertidos por el Sistema le han costado, le cuestan y le costarán al Sistema aproximadamente $55 millones anuales por diferenciales negativos en intereses ("negative arbitrage"). Esto no incluye los casi $36 millones de costos de descuento, emisión y venta de los Bonos incurridos y pagados por el Sistema cuando éstos se emitieron y vendieron, ni los

honorarios de asesoramiento financiero pagados por el Sistema a UBS, ni los honorarios que le ha pagado y le continúa pagando el Sistema a UBS Consulting.

4.21     Dichas pérdidas comenzaron cuando se emitieron y vendieron los Bonos Serie A, el 29 de enero de 2008, y terminarán cuando venzan los Bonos, entre los años 2023 y 2058.  El monto exacto de las pérdidas al Sistema causadas por la emisión y venta de los Bonos se computará con más exactitud según se consignen los documentos que se requerirán en el descubrimiento de prueba en este caso, pero se estima preliminarmente que el valor presente de estas pérdidas es de aproximadamente ochocientos millones de dólares ($800 millones).  Increíblemente, cuando se emitieron los Bonos Serie B y Serie C, ya los Bonos Serie A habían generado millonarias pérdidas al Sistema, lo cual no se tomó en consideración al emitirse los Bonos Serie B y Serie C.

4.22     Como puede apreciarse, los Bonos en realidad han creado un diferencial negativo en rendimiento ("negative arbitrage") para el Sistema, que es exactamente lo opuesto a la ganancia neta ("positive arbitrage") que era el principal objetivo que el Sistema perseguía al emitir los Bonos. **Esto ha afectado muy negativamente la liquidez del Sistema, ha debilitado significativamente su condición financiera, ha causado la degradación crediticia de los bonos del Gobierno en general y ha causado graves daños a los aquí Demandantes (Ley Núm. 3 del 4 de abril de 2013, *supra*).**

4.23     Las aportaciones al Sistema por parte del Gobierno, como patrono, son la única fuente de pago y colateral de los Bonos y, siguiendo las recomendaciones de UBS, el Sistema las gravó o pignoró a favor de los bonistas, como garantía y fuente de pago de los Bonos. Mediante la emisión de los Bonos y dicho gravamen o pignoración, la deuda evidenciada por los Bonos acrecentó, de facto, la deuda total del Sistema y ha afectado negativamente la clasificación crediticia ("rating") de las obligaciones del Gobierno, causando un grave daño no sólo al Sistema sino también a Puerto Rico en general. Dicho gravamen o pignoración de las aportaciones patronales del Sistema viola las disposiciones de los Artículos 2-116 y 3-105 de la Ley de Retiro, donde taxativamente se dispone el uso permitido de dichas aportaciones, ninguno de los cuales es el pago de bonos o deudas del Sistema[4]. El derecho al

---

[4] El Artículo 2-166 Aportación patronal dispone, en su parte pertinente: "(a) Las aportaciones del patrono deberán cubrir la diferencia entre el costo total de proveer todos los beneficios que provee el Sistema más los gastos de administración, reducido por aquella parte de dicho costo total que aporten los participantes.

cobro de dichas aportaciones es claramente un activo del Sistema y, si el Sistema ahora no las recibe porque se usan para el servicio de deuda de los Bonos, se menoscaban así los activos del Sistema y su capacidad para pagar beneficios a sus pensionados y futuros pensionados, como lamentablemente ha ocurrido y continúa ocurriendo.

4.24   Además, la degradación del crédito del Gobierno aumentará significativamente los costos de intereses al Sistema, ya que las aportaciones del Gobierno son la principal fuente con la que el Sistema cuenta para el pago de sus obligaciones y el costo de intereses al Sistema depende del costo de intereses al Gobierno, pues, repetimos, el pago de las deudas del Sistema depende en gran parte de los pagos que recibe el Sistema del Gobierno.

4.25   A fines del año 2006 y durante el año 2007, cuando se conducían las negociaciones para la posible emisión de los Bonos, se había propuesto que éstos se emitieran como obligaciones directas del Gobierno, para que éste facilitara al Sistema los fondos producto de su venta y se mejorara así el patrimonio neto ("net worth") y la condición financiera, así como el llamado "funding ratio", del Sistema.  Se proponía aumentar los activos del Sistema por el importe neto del producto de la venta de los Bonos y también se proponía aumentar el patrimonio neto ("net worth") del Sistema, pues los Bonos no serían deudas o pasivos del Sistema, sino del Gobierno. Esto mejoraría considerablemente el "funded o funding ratio" del Sistema.  Sin embargo, lamentablemente eso no ocurrió.

4.26   Para que la emisión de los Bonos fuera hecha por el Gobierno se necesitaba, la aprobación de la Asamblea Legislativa. Dicha aprobación fue solicitada a la Asamblea Legislativa y denegada por ésta.  A pesar de dicha denegatoria de la Asamblea Legislativa y de la política pública que tal denegatoria estableció, el Sistema (cuya existencia y poderes emanan de la Ley de Retiro, o sea, de legislación aprobada por la Asamblea Legislativa) violó dicha política pública y, descansando en las representaciones y el asesoramiento y recomendaciones de UBS y UBS Consulting, soslayó la denegatoria de la Asamblea Legislativa

---

(b)..............................................................................................................................................................................
..............(c)............................................................................................................................................"El   Artículo   3-105
Programa de Ahorro para el Retiro – Aportaciones del patrono dispone:
"Todo patrono aportará compulsoriamente al Sistema una suma equivalente al nueve punto doscientos setenta y cinco por ciento (.275%) de la retribución de cada participante del Programa mientras el participante sea un empleado. Estas aportaciones se depositarán en el Sistema para aumentar el nivel de activos del Sistema, reducir su déficit actuarial y viabilizar la capacidad del Sistema para cumplir sin obligaciones futuras". (Este Artículo fue recientemente enmendado por la Ley Núm. 116 del 6 de julio de 2011, pero dicha enmienda no dispone un uso distinto para las aportaciones patronales).

y temerariamente procedió con la emisión y venta de los Bonos como obligaciones directas y pasivos del Sistema (aunque comprometiendo de todas formas el crédito del Gobierno, mediante el mencionado gravamen o pignoración a los bonistas de las aportaciones patronales del Gobierno al Sistema, en violación de lo dispuesto en la Ley de Retiro). Con estas violaciones se afectó negativamente el "funded o funding ratio" del Sistema, pues sus pasivos aumentaron más que sus activos, con la consiguiente reducción en su patrimonio neto ("net worth").

4.27    El Sistema está impedido de mitigar las futuras pérdidas recurrentes que le causarán los Bonos, porque las tasas de interés que paga por los mismos no le permiten ni le permitirán en el futuro previsible realizar un arbitraje positivo o ganancia neta en la inversión de los fondos que aún conserva, si alguno, del producto de la venta de los Bonos. Al monto de los mencionados daños hay que añadir el costo adicional al Sistema de futuros financiamientos, causado por la degradación crediticia de las obligaciones del Gobierno, causada, a su vez, por la emisión y venta de los Bonos.

### Las Minutas de las Juntas de Directores

4.28    Según la página 6 de la Minuta de la Junta de Síndicos del Sistema correspondiente a la Reunión Extraordinaria del 27 de febrero de 2007, oficiales del Banco Gubernamental de Fomento para Puerto Rico ("BGF") le representaron a los miembros de la Junta de Síndicos del Sistema lo siguiente, refiriéndose a la susodicha emisión de Bonos de Retiro:

> "...esta solución *alargaría la vida de los recursos del Sistema hasta el 2027 y mejoraría notablemente el "funding ratio" del 19% que está actualmente hasta un 72%.* Si además se aprobara el aumento en aportaciones propuesto en el proyecto de ley al 12.5%, utilizando este esquema, se podría cubrir la obligación del Sistema hasta el 2042" (Énfasis suplido).

4.29    En esa misma reunión, el entonces Administrador del Sistema de Retiro le representó a la Junta de Síndicos del Sistema lo siguiente, según surge de la página 7 de la minuta de dicha reunión:

> "...ya los **consultores financieros** están trabajando en los distintos escenarios para la distribución de inversiones que se presentará ante la consideración de la Junta próximamente. Añadió el señor Cancel Alegría que las conversaciones sobre esta transacción van dirigidas a que se pueda ejecutar para junio de 2007, esto es, <u>antes del cierre del presente año fiscal</u>".

(Énfasis y subrayado nuestro).

4.30    En reunión conjunta de la Junta de Síndicos del Sistema y la Junta de Directores de BGF, del 24 de enero de 2008, en la cual se aprobó la emisión de los Bonos de Retiro por ambas Juntas, también se le representó a ambas Juntas que *"Las expectativas de la emisión es que los mercados sean favorables y haya un rendimiento positivo de la cartera, lo que aliviaría la deuda"*.

4.31    En la misma reunión conjunta, el entonces Presidente de la Junta de Directores del Banco Gubernamental de Fomento, Sr. Rafael Martínez Margarida, preguntó sí la Administración del Sistema de Retiro contaba con los mecanismos para asegurar que, cuando entrara el dinero de la emisión, se podría poner a producir el rendimiento promedio que se espera.  El Sr. Jorge Irizarry Herrans, (entonces Presidente de BGF), manifestó que, junto a los consultores, se ha diseñado una estrategia para la distribución de dichos fondos, que incluye la contratación de dieciocho (18) manejadores además de los ocho (8) que ya existen y que están listos para recibir el dinero.

4.32    También en dicha reunión conjunta se expresó lo siguiente, según surge de la página 9 de la minuta de la misma:

> *"Señala el Sr. Luis Alfaro Martínez, Vicepresidente de Financiamiento del Banco Gubernamental de Fomento para Puerto Rico que no se está aumentando la deuda del fondo general **porque la obligación está en el Sistema de Retiro**, lo que se está haciendo es cambiar la fuente de repago de las obligaciones"*.

(Énfasis suplido).

4.33    Finalmente, en la página 13 de la Minuta de esa reunión, se expone lo siguiente:

> *"...El Sr. Luis Alfaro Martínez expresó que la política pública del Banco Gubernamental de Fomento es maximizar los recursos y las condiciones del mercado local, es por esa razón que la emisión se hace primero en el mercado local para luego ir al mercado global.  Añadió que el mercado local tiene unas ventajas frente al mercado global, como por ejemplo, que los bonos locales son redimibles antes de su vencimiento ("callable") en el término de diez (10) años, lo que permite que si al cabo de los diez (10) años las tasas han bajado, se pueden llamar esos bonos y refinanciarlos, esto no se puede hacer con los bonos globales porque estos son "non-callable". Manifiesta el señor Alfaro que originalmente se fue al mercado con un ofrecimiento de $750 millones, a medida que fueron pasando los días el interés aumentó y finalizaron con una demanda de $1.4 millardo ($1,456,247,368.95) y continúan entrando órdenes, por lo que se hizo un **compromiso con UBS** para brindar espacio y enmendar la transacción, para lo cual la Junta de Síndicos y la Junta de Directores del Banco tendrían que reunirse nuevamente para aprobar la nueva cantidad.  Los miembros de la Junta de Directores recomendaron establecer la cláusula que permita el aumento de la cantidad hasta un 15% sin tener que acudir a las juntas para nueva aprobación. El Presidente de la Junta de Síndicos vio favorable la recomendación para el futuro..."*.  (Énfasis suplido)

4.34    De acuerdo con lo expresado en la Minuta de la Junta de Síndicos del Sistema del 27 de febrero de 2007, a la página 6, se dijo lo siguiente:

"...> El costo de la deuda se estima en 6%, lo cual permite un _arbitraje positivo en vista de que las inversiones del Sistema deben rendir un 8.5%...".  (Subrayado nuestro).

4.35    En la Minuta de la Reunión Extraordinaria de la Junta de Síndicos del Sistema del 10 de enero de 2008, a la página 2, surge lo siguiente:

"...Con mucho entusiasmo y satisfacción el Presidente informó a la Junta de Síndicos, que hoy se lanza al mercado la primera fase de la emisión de bonos de los Sistemas de Retiro, en la parte local que corresponde a Puerto Rico. Indicó que en la próxima hora, el equipo de financiamiento de la transacción se estaría reuniendo con los 'brokers', para hacerles la presentación de la estructura..".

4.36    En la Minuta correspondiente al 13 mayo 2008, a la página 20, se dice lo siguiente:

"...C. Comité de Inversiones de la Junta de Síndicos

El Sr. Jorge Irizarry Herrans, Presidente del Comité de Inversiones de la Junta de Síndicos informó a los Miembros de la Junta, que el Comité se ha estado reuniendo para trabajar con la estrategia de inversiones conocida como 'liability driven investment' a fin de asegurar el flujo de efectivo de las inversiones por los próximos seis (6) o siete (7) años. Explica el señor Irizarry Herrans que el Comité ha examinado un gran número de propuestas sobre esta estrategia y sigue elaborando estrategias, para luego presentar una recomendación ante la Junta de Síndicos...".

4.37    Según la Minuta del 13 junio 2008, los señores Juan G. Herrans Barrera y John Thomas Engfer, ambos funcionarios de UBS, comparecieron como invitados a la Junta de Directores del Sistema de Retiro.

4.38    En esa reunión del 13 de junio de 2008, el Presidente de la Junta de Síndicos del Sistema de Retiro, dice lo siguiente a la página 3:

"...El Presidente de la Junta de Síndicos, Sr. Jorge Irizarry Herrans presentó ante los Miembros de la Junta para su discusión y aprobación las recomendaciones del Comité de Inversiones de la Junta de Síndicos y el **Consultor Financiero de la Agencia: UBS, sobre la estrategia de inversión** denominada 'Liability Driven Investment'. Para la presentación de este asunto, los Miembros de la Junta contaron con los representantes de **UBS**: Juan G. Herrans Barrera y John Thomas Engfer, así como el Tesorero Interino del Banco Gubernamental de Fomento para Puerto Rico, el Sr. René Van Noort...". (Énfasis y subrayado nuestro).

4.39    Más adelante, en esa misma Minuta del 13 junio de 2008, a la página 3, se dice lo siguiente:

"...Indica el señor Irizarry Herrans que el Comité de Inversiones de la Junta y el grupo de trabajo del Banco Gubernamental han trabajado arduamente durante los pasados meses con el _análisis y evaluación de estrategias de inversión que permitan al Sistema de Retiro cumplir sus obligaciones con los pensionados_. Señala el Presidente de la Junta que ambos grupos en unión al _Consultor

*Financiero han venido estudiando cuidadosamente la estrategia* conocida como
*'LDI' o 'liability driven investment...'*". (Subrayado nuestro).

4.40    Más adelante, en esa misma Minuta del 13 de junio de 2008, a las páginas 3 y
4, se dice lo siguiente:

"*...Explica el señor Irizarry Herrans que la estrategia de inversión 'LDI' es una
relativamente nueva y por ende muchas de las alternativas presentadas por los
manejadores son nuevas en el mundo de las inversiones, por lo que requirió
mucho estudio y análisis de las personas que estuvieron trabajando en este
ejercicio. Añade que el enfoque del grupo iba dirigido a seleccionar una
combinación de inversión que ofreciera mucho rendimiento con el menor riesgo
posible...*".

(Subrayado nuestro).

4.41    En esa misma Minuta del 13 de junio de 2008, a la página 4, se dice lo siguiente:

"*...El Sr. Juan G. Herrans Barrera [de UBS] inició su presentación explicando a los
Miembros de la Junta los aspectos a ser presentados ante su consideración que son:
las recomendaciones de distribución de activos sobre las cuales la Junta deberá
deliberar; la explicación de la estrategia del 'LDI'; y la recomendación de selección
de manejadores para implementar la estrategia de inversión y las cantidades que se
les han de asignar...*". (Subrayado nuestro).

4.42    Además, en la página 5, se dice lo siguiente:

"*...Los invitados [de UBS] comenzaron por presentarle a la Junta la distribución
actual de los activos del Sistema asumiendo que se levantan $400 millones
adicionales a los $1,000 millones que se levantaron el 2 de junio de 2008 como
resultado de la emisión de bonos del Sistema de Retiro, para un gran total de activos
de $5,015,200,557; de los cuales 27.28% sería efectivo. La asignación del Consultor
es recomendar la forma en que se ha de distribuir ese efectivo...*".

4.43    También en la Minuta del 13 de junio de 2008, a la página 5, se dice siguiente,
sin hacer mención al aumento en pasivos del Sistema de Retiro, resultante de la emisión de los
Bonos:

"*...El Sr. Jorge Irizarry Herrans intervino en este punto para indicar que los $1,000
millones aprobados en la Junta de Síndicos para emitir el 2 de junio de 2008 eran
bonos institucionales y que queda una demanda de cuentas individuales que son las
que se van a ofrecer para la venta próximamente. Informó que los $1,000 millones
ya se recibieron y se estiman $400 millones adicionales. Resaltó como un logro
importante para el Sistema que se haya alcanzado un total de $5 millardos en
activos, cuando hace sólo un año el Sistema contaba con $2.5 millardos, lo que
significa que se han duplicado los activos gracias a la estrategia que se ha estado
ejecutando. Añadió que el 'funding ratio' del Sistema que para el 2005 se
encontraba en un 19%, a junio de 2008 se encuentra en un 40% con un plan trazado
para alcanzar un 70 u 80% si se logra culminar la estrategia...*".

4.44    Más adelante, en esa misma Minuta del 13 de junio de 2008, a las páginas 5 y 6, se
dice lo siguiente:

"*...El Sr. Juan G. Herrans Barrera continuó la presentación mostrando la distribución
de activos propuesta a tenor con la estrategia recomendada, sobre la cual la Junta
de Síndicos deberá tomar una determinación. La misma propone asignar $1.7
millardos a la estrategia del 'LDI', lo que equivale a un 34.10% del total de activos
considerando los $5 millardos antes mencionados, esto es igual a una tercera parte
de la cartera del Sistema en 'LDI'. La propuesta contempla asignar los $1.4*

*millardos del efectivo (27.28%) a la estrategia de 'LDI' y añadir a la misma, mediante redistribución, $3 millones asignados actualmente en acciones...'".* (Subrayado nuestro).

4.45    Según esa Minuta del 13 de junio de 2008, aparece una presentación en *"power point"* con el logo de UBS.

### PRERS Proposed Asset Allocation

| Asset Type | | | % Allocation |
|---|---|---|---|
| LDI Strategies | $ | 1,710,000,000 | 34.10% |
| | | | 35.80% |
| | | | 18.03% |
| Fixed Income | $ | 552,519,494 | 11.02% |
| Private Equity | $ | 53,365,000 | 1.06% |
| Total Portfolio | $ | 5,015,200,557 | 100.00% |

UBS

4.46    En esa misma reunión y, según la Minuta del 13 de junio de 2008, a las páginas 6 y 7, se dice lo siguiente:

> *...Para que la Junta de Síndicos pueda considerar esta <u>recomendación</u>, el Consultor presentó las dos (2) caras de las inversiones: riesgo versus rendimiento. El diagrama <u>presentado por el Consultor identifica la estrategia actual del Sistema</u> ("current"), sin considerar el efectivo. Esta estrategia mantiene una distribución del 40% de su cartera en bonos o préstamos que se comportan como bonos y 60% de la misma en acciones. Explica el señor Herrans Barrera que esta distribución está a la par con el promedio de todos los planes de pensión de los Estados Unidos. A preguntas del CPA Roberto E. Aquino García, <u>el señor Herrans Barrera [de UBS] señaló que esta estrategia se ajusta a las políticas de inversión aprobadas</u> por la Junta de Síndicos. Como resultado de la misma, <u>el Sistema obtiene un rendimiento aproximado de 9.52% versus una desviación de riesgo equivalente a 5.5%</u>...".* (Subrayado nuestro).

4.47    En esa Minuta del 13 de junio de 2008, a las páginas 7 y 8, se dice lo siguiente y se adjunta la tabla que aparece a continuación:

> *"...Por esta razón, el <u>Consultor propone una estrategia</u> intermedia que ofrezca un rendimiento de 10.44% y una desviación de riesgo de 3.74%. Señala el señor Herrans Barrera [de UBS] que tiene conocimiento que hay muchos planes y fundaciones de pensiones que utilizan esta estrategia con mucho éxito. Sin embargo, tomando en consideración el criterio de la prudencia su <u>recomendación</u> va dirigida a una estrategia intermedia que permita durante el proceso en que se utiliza la misma, evaluar sus resultados con cautela, considerando un movimiento hacia dicha estrategia basado en los resultados que se van obteniendo...".* (Subrayado nuestro).



PRERS Portfolio Risk Reward Analysis

4.48    En esa Minuta del 13 de junio de 2008, a las páginas 8 y 9, se dice lo siguiente:

"...*El señor Herrans Barrera [de UBS] continuó su exposición, presentando promedios de probabilidad de ganancias y rendimientos de la cartera del Sistema de Retiro tomando en consideración las alternativas de distribución de la cartera según las estrategias presentadas para los $1.7 millardos de activos a uno, tres, cinco y diez años. Del análisis de las mismas se desprende que la diversificación de la cartera reduce el riesgo y mejora el rendimiento, razón por la cual se recomienda la estrategia del 'LDI' y la combinación de estrategias que la sostienen por un ciclo económico completo de siete (7) años...*".  (Subrayado nuestro).

4.49    En esa misma Minuta del 13 de junio de 2008, a la página 12, se dice lo siguiente:

"...*Por lo tanto, el Consultor señala que esta estrategia no se puede trabajar como una estrategia convencional, ni se puede usar data histórica sobre ello porque es 'sui generis'. Es necesario entonces estructurar la estrategia...*". (Subrayado nuestro).

4.50    En esa misma Minuta del 13 de junio de 2008, a la página 12, se dice lo siguiente y se incluye la siguiente tabla:

"...*A tales fines, el Consultor Financiero presentó una propuesta para el rebalanceo y redistribución de los nuevos activos del Sistema, que no incluye la Firma Wellington porque sus alternativas no eran muy diferentes de las estrategias con las cuentas del Sistema, no agrega diversidad, no presentó cohesión, etc. La propuesta de distribución de activos presentada por UBS es la siguiente:* (Subrayado nuestro).

## Proposed Rebalancing and Distribution of New Assets

| Money Managers | Investment Style | Balance as of March 31, 2008 | Rebalancing | New Money | Balance after Distribution |
|---|---|---|---|---|---|
| Taplin | Core Fixed Income | $ 185,603,114 | $ (35,000,000) | $ - | $ 150,603,114 |
| State Street | Indexed US Equity | $ 679,873,114 | $ (275,000,000) | $ - | $ 404,873,114 |
| Morgan Stanley Intl | International Equity | $ 619,663,458 | $ (200,000,000) | $ - | $ 319,663,458 |
| Wellington | US LCC | $ 210,083,797 | $ (100,000,000) | $ - | $ 110,083,797 |
| Neuberger Intl | International Equity | $ - | $ 75,000,000 | $ - | $ 75,000,000 |
| Evergreen Intl | International Equity | $ - | $ 75,000,000 | $ - | $ 75,000,000 |
| Goldman Sachs Intl | International Equity | $ - | $ 60,000,000 | $ - | $ 60,000,000 |
| Emerging Managers | | $ - | $ 100,000,000 | $ - | $ 100,000,000 |
| Evergreen | Credit Driven | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Eaton Vance | Credit Driven | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| PIMCO | Credit Driven | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Invesco | GTAA | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Putnam | GTAA | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Morgan Stanley | Hedge Fund of Funds | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Credit Suisse | Hedge Fund of Funds | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Calyon | Hedge Fund of Funds | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| | Total | $ 1,695,303,483 | $ - | $ 1,400,000,000 | $ 2,095,303,483 |
| | | Rebalancing Total | $ 610,000,000 | | |

✷ **UBS**                                                                       23

4.51   En esa misma Minuta del 13 de junio de 2008, a la página 13, se dice lo
siguiente:

> "...Los Miembros de la Junta discutieron las propuestas presentadas, en la misma
> se discutieron las expectativas que podría tener el Sistema de Retiro al aprobar
> las estrategias propuestas. El Presidente de la Junta se mostró muy esperanzado,
> entendiendo que tales estrategias pueden alargar la vida útil del Sistema de
> Retiro, haciendo referencia a las siguientes proyecciones incluidas en la
> presentación de los consultores...". (Subrayado nuestro).



✷ **UBS**                                                                       24

4.52  En esa misma Minuta del 13 de junio de 2008, a la página 15, se dice lo siguiente:

> "...Discutidos estos aspectos, el CPA Roberto E. Aquino García presentó moción para que se aprueben las _propuestas y recomendaciones del Consultor Financiero: UBS, en cuanto a la estrategia de inversión_ considerando el 'LDI', el rebalanceo y la distribución de los activos del Sistema de Retiro, así como la selección de los manejadoras propuestos en la presentación. El Lcdo. Juan José Zamora Santos secundó la moción.  No habiendo objeciones, se aprueba la misma.  A tales fines, el Presidente de la Junta de Síndicos, Sr. Jorge Irizarry Herrans impartió instrucciones a la Administradora de los Sistemas de Retiro, Lcda. Minia González Álvarez para que realice trámites correspondientes para ejecutar esta determinación de la Junta de Síndicos...".  (Énfasis y subrayado nuestro)

## El Informe Conway MacKenzie

4.53  El 30 de junio de 2010, la firma independiente Conway Mackenzie (en adelante "CM") fue contratada por el BGF para estudiar las causas y origen de la crisis por la cual atravesaba el Sistema de Retiro. Específicamente, CM se enfocó en varias áreas, incluyendo el análisis llevado a cabo para apoyar la decisión de emitir tres mil millones de dólares en Bonos de obligación de pensión durante el año 2008. CM es una firma prestigiosa de Consultores Financieros, especializados en evaluaciones y análisis forense, con una extensa carrera de investigaciones. Son examinadores de fraude certificado "Certified Fraud Examiners" y especialistas en finanzas forenses certificados "Certified Financial Forensic Specialists". El estudio concluyó que la emisión de Bonos de Retiro de 2008, fue detrimental y contribuyó a la crisis actual del Sistema de Retiro, así como que se trató de una estrategia riesgosa, mal concebida y especulativa.

4.54  Del Informe rendido por CM, se desprende que encontraron que la Junta de Síndicos del Sistema fue inducida a ejecutar esta riesgosa transacción, que fue mal calculada. Originalmente, el Sistema de Retiro, con el aval del Banco Gubernamental de Fomento, consideró emitir $7.0 mil millones en Bonos de obligación, que serían pagados por las contribuciones recibidas de los miembros y patronos.  Debido a la magnitud de la transacción, ésta no se pudo concretar de acuerdo a los parámetros originales, y sólo se pudieron emitir aproximadamente $2.9 mil millones; todos en el mercado local, a través de UBS.  Esa menor cantidad no fue suficiente para llevar a cabo la estrategia trazada originalmente y el producto de los Bonos no fue reinvertido con un rendimiento suficiente para sufragar los intereses de los Bonos y, además, producir un margen positivo para el

Sistema de Retiro, por lo que nunca se generaron los resultados esperados para ayudar a mejorar la condición financiera del Sistema de Retiro. Era evidente que las condiciones del mercado revelaban que esta transacción era muy riesgosa y no existía apetito de inversionistas para participar en la misma. De hecho, en la reunión extraordinaria de la Junta de Síndicos del Sistema de 27 de mayo de 2008, se levantó el siguiente punto: *"Señaló el señor Alfaro Martínez que desde enero [2008] cuando se emitió la primera serie de bonos hasta el presente, el mercado se ha deteriorado alrededor de 35 puntos base, lo que representa una diferencia sustancial en las tasas de interés de los bonos, por lo que resulta más oneroso obtener financiamiento hoy que en enero de 2008...Señaló el señor Alfonso Martínez que estos bonos solamente se vendieron a los fondos de UBS, Santander y una pequeña orden de $5 millones a los fondos de Triple S".* La estrategia de crear una oportunidad de arbitraje (*"arbitrage"*) para el Sistema de Retiro, a través de la emisión de Bonos, fue mal concebida desde un principio. En realidad la emisión de Bonos de obligaciones de pensión es y será una carga adicional para el Sistema de Retiro, que no brindó una solución para el problema y empeoró (en vez de mejorar) el *"funded ratio"* del mismo.

    4.55   Conway MacKenzie sometió al Sistema y al GDB su Informe en octubre de 2010, con el título, en inglés, <u>"Review of the Events and Decisions That Have Lead to the Current Financial Crisis of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico"</u>. Véase *ANEJO III* de la *Demanda* original. En la página 12 del Informe Conway MacKenzie se indica, en inglés:

> As discussed in greater detail below, the POB[5] transaction **was subject to significant risks which do not appear to have been fully understood or vetted by the Board of Trustee prior to undertaking the bond issuance** strategy. In addition, several early warning signs which existed prior to the issuance of the POBs appear to have been ignored by the ERS's Board of Trustees[6] **Therefore it is our opinion that given the risks inherent in the transactions, several of which appear to have increased significantly in probability prior to the issuance of these bonds, the decisions to pursue and enter into Series A, Series B and Series C transactions were not prudent and may not comply with the general standards of fiduciary responsibilities of a Board of Trustees.** Furthermore, our analyses indicate that a significant portion of the POB proceeds were not invested as originally anticipated and as a result, the System has not achieved its targeted arbitrage strategy. (Footnotes and emphasis added).

---

[5] "POB" se refiere a "Pension Obligation Bonds", es decir, los Bonos objeto de este caso.
[6] "ERS" Board of Trustees significa Junta de Síndicos del Sistema.

4.56    Las conclusiones del Informe Conway MacKenzie acerca de la emisión y venta de los Bonos en el mercado local a través de UBS, entre otros, son devastadoras, evidencian la crasa negligencia de las aquí demandadas y se transcriben a continuación en inglés, tal y como aparecen en el mismo:

> *In analyzing management's decision to enter into the POB transaction, we found no basis for the initial assumption made that such a strategy would improve the funded status of the ERS. The treatment of bond obligations in the calculation of the UAAL by the System's actuarial consultants appears to support the practical reality that the incurrence of additional debt to increase plan assets should have little effect on the funded status of a pension plan in the short term. If the bond obligations could be excluded from the calculation of net assets or otherwise in the UAAL, we would have expected the ERS to oppose the calculation by Milliman in the System's June 30, 2009 actuarial valuation report. We did not come across any information to suggest there was a disagreement. This could imply a lack of understanding of the true impacts of the bond transaction on the ERS by ERS management, the Board of Trustees and GDB Board of Directors when they made the decision to enter into the POB transaction.*

> *Perhaps even more concerning in our analysis of the decision to enter into the POB transaction is the decision to move forward with the transaction in light of the many warning signs that existed, which suggested full implementation of the strategy would be difficult, if not impossible.*

> *The successful execution of the POB transaction was dependent on certain risks not materializing, primarily the risk that the market would be unable to absorb the full $7.0 billion issuance. Consummating a transaction of significantly less than $7.0 billion would merely serve as an expensive, temporary measure to address the System's liquidity issues, postponing for some period of time the date of the ERS's eventual insolvency. For this reason, the POB transaction resulted in the flawed execution of a failed strategy.*

> *The POB transaction has negatively impacted the ERS and the Government, in general. Rather than addressing the System's long-term funding problems, the $3.0 billion POB transaction merely provided a short-term temporary measure to address the System's liquidity needs, as it was not large enough to create arbitrage opportunities. It did nothing to improve the funded position of the System and due to the negative arbitrage realized and fees paid as part of the POB transaction, actually worsened the funded position of the System. The short-term liquidity fix is costly and these costs may be realized for decades to come. In our opinion, the POB transaction accomplished little more than passing on, and increasing the complexity of, the burden of fixing the System's fundamental structural problems to future administrations of the ERS. (Énfasis añadido).*

4.57    La emisión, venta y uso del producto de la venta de los Bonos, en violación a la Ley de Retiro y a la política pública promulgada por la Asamblea Legislativa, constituyó conducta crasamente negligente e ilícita por parte de UBS Consulting y UBS.

4.58    Según la documentación y los informes revisados por CM, se concluyó que la Administración del Sistema de Retiro nunca fue puesta en conocimiento total y cabal de las posibles repercusiones que tendría esta emisión de Bonos, a todas luces riesgosa y totalmente especulativa. A la página 4 de su informe, CM señala lo siguiente:

"...Lastly, we believe that the <u>POB transactions</u> may have negatively impacted the ERS and the Government, in general. In analyzing management's decision to enter into the POB transaction, <u>we found no basis for the initial assumption made that such a strategy would immediately improve the funded status of the ERS</u>. In fact, the strategy <u>has not improved the funded position of the System and, due to the negative arbitrage realized and fees paid as part of the POB transaction, actually, worsened the funded position of the System</u>. The short-term <u>liquidity fix is costly and these costs may be realized for decades to come</u>. In our opinion, the POB transaction accomplished little more than passing on, and increasing the complexity of, the burden of fixing the System's fundamental structural problems to future administrations of the ERS. <u>In addition, several warning signs, which suggested that the full implementation of the POB strategy would be difficult, if not impossible</u>, were identified but ultimately downplayed or ignored by those responsible for making the decisions to enter into the POB transactions (ERS management, the ERS Board of Trustees, and the GDB Board of Directors in 2008). For these reasons, we believe the decision-makers may have failed to meet the standard of due care and other important fiduciary duties in approving such a transaction...".

(Subrayado nuestro).

4.59    A la página 10 del Informe CM, se señala lo siguiente:

"...The POBs were issued by the ERS with the intent of providing the System with increased assets to pay benefit obligations, reduce the unfunded accrued actuarial liability and generate additional revenue to the System through speculative arbitrage...".

4.60    A la página 11 del Informe CM, se señala lo siguiente:

"...As discussed in greater detail below, <u>the POB transaction was speculative and subject to significant risks</u> which do not appear to have been fully understood or vetted by the Board of Trustee's prior to undertaking the bond issuance strategy in 2008. In addition, several early warning signs which existed prior to the issuance of the POBs appear to have been ignored by the ERS's Board of Trustees. Therefore it is our opinion that <u>given the risks inherent in the transactions</u>, several of which appear to have increased significantly in probability prior to the issuance of these bonds, <u>the decisions to pursue and enter into Series A, Series B and Series C transactions were not prudent and may not comply with the general standards of fiduciary responsibilities of a Board of Trustees</u>. Furthermore, our analyses indicate that a significant portion of the POB proceeds were not invested as originally anticipated..." (Subrayado nuestro).

4.61    A la página 11 del Informe CM, se añade lo siguiente:

"...Based on analysis and advice from its lead underwriter, Merrill Lynch, it appears that the GDB and ERS had reason to believe that the proposed $7.0 billion POB transaction would be sufficient to resolve the System's short term liquidity crisis and meet the System's long-term cash flow requirements but the ERS and GDB should have known the $3.0 billion of proceeds issued would not solve the long-term cash flow requirements...".

4.62    A la página 12 del Informe CM, se señala lo siguiente:

"...Given the treatment by the System's actuarial consultants, we do not believe it was reasonable to conclude that the POB transactions would positively impact the funded ratio immediately, as was originally communicated. We further question how those responsible for making the decision to enter into the POB transaction could have overlooked this <u>fundamental flaw</u> in the forecasted funding ratio's computation methodology...". (Subrayado nuestro).

4.63    A la página 12 del Informe CM, se añade lo siguiente:

"...*It appears that <u>numerous warning signs existed, foretelling difficulties with placing the bonds and realizing the returns required, yet action</u> plans were not altered...*" (Subrayado nuestro).

4.64    A la página 12 del Informe CM, esta firma llega a la siguiente conclusion:

"...<u>*Conclusion*</u>

*Based upon Merrill Lynch's analyses, the ERS had the capacity to issue $7.0 billion of pension obligation bonds. While it was a reasonable strategy to help address near term liquidity requirements, it was not likely to significantly improve the System's funding status when calculated consistently with prior methodologies. In addition, <u>the transaction was subject to significant risks</u> among others, the risk of a failed or undersubscribed offering <u>and the System's potential inability to generate arbitrage on the POB proceeds</u>. Based upon our review of supporting documents, it appears that <u>these risks were not fully understood or vetted by the decision-makers</u> prior to undertaking the bond issuance strategy and several of these risks actually materialized. Given the importance, magnitude and potential risks associated with a failed strategy, by not understanding or vetting the risks associated with the POB transaction, it appears the ERS management, the Board of Trustees and GDB Board of Directors did not exercise due care...*". (Subrayado nuestro).*

4.65    Basado en los hechos anteriores, UBS estaba obligada a identificar, para beneficio de los miembros de la Junta de Síndicos del Sistema, los riesgos significativos que conllevaba la emisión de Bonos. Es decir, UBS, como Asesor Financiero, tenía la obligación de asegurarse que los miembros de la Junta de Síndicos del Sistema entendían y validaron plenamente la estrategia antes de aprobar la emisión. Sobre si fue prudente llevar a cabo esta emisión, el Informe CM, a la página 12, concluye lo siguiente:

"...*2. Was it prudent to issue the Pension Obligation Bonds?*

*The ERS and then lead underwriter, Merrill Lynch, pursued a $7.0 billion POB issuance during 2007 but Merrill Lynch was unable to consummate the transaction due to a lackluster demand in the global market. UBS then replaced Merrill Lynch as underwriter and placed approximately $3.0 billion of the bonds in the local Puerto Rico market. Given the System's significant current and projected annual net cash flow shortfalls, the transaction was not large enough to create arbitrage opportunities since a significant portion of the proceeds have been (and will continue to be) utilized to address annual cash flow shortfalls, as opposed to being invested for the long term. This means that the transaction has also resulted in costly annual interest expense for the ERS...*".*

4.66    El Informe CM concluye lo siguiente acerca de las condiciones del mercado:

"...*c.    In an ERS Board meeting held in May of 2008, an issue was raised that the "market has deteriorated around 35 basis points since January 2008" (when the first series of bonds were placed) and that "this represented a substantial difference in interest rates of the bonds, making it more expensive to obtain financing."*[12]...

---

[12] *Based on the ERS Board of Trustees meeting minutes dated May 27, 2008.*"

"...*d.    By June 2008 there were also signs that the <u>stock market was deteriorating, which should have signaled to the ERS that its arbitrage goals were jeopardized</u>...*". (Subrayado nuestro).*

4.67   UBS, como Asesor Financiero, debió haberse percatado de ese deterioro del mercado y alertar a los miembros de la Junta de Síndicos del Sistema y recomendarles de conformidad.

### Violación a Deber de Fiducia de UBS Y UBS Consulting

4.68   El Reglamento de la Ley Uniforme de Valores de Puerto Rico, Ley Núm. 60-1963, 10 L.P.R.A. §851, *et seq.*, en su sección pertinente, lee como sigue:

"...*Sección 25.1.  Estándar de negocios y **deberes fiduciarios** hacia los clientes.*

*Todo    corredor-traficante,    emisor,  **asesor    de    inversiones**, representante de asesor de inversiones, asesor bajo cubierta federal, representante del asesor bajo cubierta federal, agente o cualquier otra persona sujeta a las disposiciones de la Ley, observará los <u>más altos estándares de deberes fiduciarios hacia sus clientes e inversionistas</u>...*". (Énfasis y subrayado nuestro).

4.69   UBS, en su capacidad de Consultor Financiero y asesor de inversiones, tenía la obligación y el deber fiduciario de alertar a los miembros de la Junta de Síndicos del Sistema sobre los riesgos inherentes a la emisión.  No hay duda que la emisión de Bonos recomendada por UBS fue imprudente.  UBS debió haber alertado a los miembros de la Junta de Síndicos del Sistema.  Las siguientes conclusiones del Informe CM, a las páginas 14 y 16, así lo reflejan.

"...<u>Conclusion</u>

<u>The notion that the POB transaction would generate arbitrage opportunities for the System was inherently flawed</u> based on the current liquidity needs of the System. In fact, <u>the POB transaction has and will continue to cost the System money,</u> as short-term cash flow problems continue to require the use of the POB proceeds to fund current expenses of the System.    Simply put, the ERS cannot generate investment returns on POB proceeds that are used to fund System expenses, as opposed to being invested. For this reason, the POB issuance is currently costing the ERS more than what it is actually earning on invested proceeds.  Our findings indicate this occurred because ERS management and Board of Trustees ignored market conditions and were subsequently constrained and blinded by the necessity to utilize cash proceeds to fund cash requirements of the System.  This lack of understanding is not reasonable any may not fall within the general standards of fiduciary responsibilities expected by a Board of Trustees...".  (Subrayado nuestro).

"...Perhaps even more concerning in our analysis of the decision to enter into the POB transaction is the decision to move forward with the transaction in light of the <u>many warning signs that existed suggesting</u> full implementation of the strategy would be difficult if not impossible.   The successful execution of the POB transaction was dependent on the assumption that the market would be able to absorb the full $7.0 billion issuance, since consummating a transaction of significantly less than $7.0 billion would merely serve as an expensive, temporary solution to the System's liquidity issues, further postponing the date of the ERS's eventual insolvency...".  (Subrayado nuestro).

4.70   Tal y como se había anticipado en los estudios e informes anteriormente mencionados, el Sistema se ha visto en la necesidad de reducir significativamente los beneficios a sus fideicomisarios, incluyendo los Demandantes Individuales y los miembros

de la Clase, como resultado de la conducta de las demandadas UBS, incluyendo sin limitación violación de sus deberes fiduciarios, negligencia e incumplimiento de contrato. Esto ha causado y continuará causando daños continuados al Sistema, los Demandantes Individuales y los miembros de la Clase. El importe de esos daños continuados no se ha podido determinar de manera definitiva.

4.71    Recientemente, como parte de los procedimientos del Plan de Ajuste para el Pago de la Deuda del Gobierno de Puerto Rico, y a tenor con la Ley Promesa, surge que el Sistema está atravesando o atravesará un proceso de liquidación y/o traspaso de sus activos y eventual posible disolución y no está clara la posición en que quedarán sus fideicomisarios, es decir, sus beneficiarios/pensionados. Los daños continuados a los Demandantes Individuales y a los demás fideicomisarios/beneficiarios del Sistema, como consecuencia de las pérdidas generadas al Sistema por la conducta de las demandadas UBS y de la resultante liquidación y traspaso de los activos del Sistema, no podrá determinarse de manera definitiva mientras dicho proceso de liquidación y traspaso no se concluya.

## V. <u>JURISDICCIÓN Y COMPETENCIA</u>

5.1    Este Honorable Tribunal tiene la jurisdicción y competencia necesarias para juzgar el presente caso, porque los hechos aquí descritos ocurrieron en San Juan, Puerto Rico, además de por ser San Juan, Puerto Rico el municipio donde tiene su lugar de hacer negocios las Demandadas UBS y UBS Consulting.

## VI. <u>PRIMERA CAUSA DE ACCIÓN/VIOLACIÓN DE DEBERES CONTRACTUALES Y FIDUCIARIOS POR UBS Y UBS CONSULTING</u>

6.1    El Sistema y los Demandantes Individuales, por sí y en representación de la Clase, repiten e incorporan por referencia al presente apartado todo lo previamente alegado en la presente Quinta Demanda Enmendada.

6.2    Antes de llevarse a cabo la emisión de los Bonos, UBS y UBS Consulting le hicieron varias presentaciones y representaciones al Sistema de que ellos eran expertos en asesoría financiera y tenían la capacidad para colocar los Bonos, a los fines de convencer al Sistema para que los contratara para llevar a cabo la referida emisión.

6.3    Entre las representaciones que hicieron UBS y UBS Consulting, para convencer al Sistema de que la emisión de los Bonos sería beneficiosa y ayudaría a solventar las arcas del Sistema, estaba que la inversión del  producto de la emisión iba a generar un arbitraje

positivo, el cual redundaría en ingresos netos para el Sistema. Esas representaciones no sólo eran falsas, sino que se hicieron para que UBS y UBS Consulting se pudiesen lucrar y cobrar sus comisiones y honorarios, como los que en efecto cobraron, los cuales sobrepasaron los $35 millones.

6.4    UBS, por conducto de su entonces Presidente, Miguel Ferrer, le representó falsamente no sólo al Sistema, sino al país en general, a través de comunicaciones a la prensa, que la emisión de los Bonos, recomendada por UBS Consulting y UBS, iba a resultar en ganancias mediante un arbitraje positivo para el Sistema desde el mismo momento de su efectividad.

6.5    En el *"Official Statement"* fechado 29 de enero de 2008, para los Bonos Serie A, UBS y los demás "underwriters" hicieron las siguientes falsas representaciones, entre otras, acerca del uso del producto de la venta de los Bonos Serie A:

a.    El producto de la venta de los Bonos sería invertido y dichas inversiones y las ganancias que éstas produjeren serían utilizadas para pagar beneficios de pensiones a los beneficiarios del Sistema (*"invest the proceeds of the Bonds and use these investments and the earnings thereon to provide such pension benefits to its beneficiaries"*) (Primera página o cubierta del *"Official Statement"* del 29 de enero de 2008).

b.    El producto de la venta de los Bonos, después de deducir gastos de emisión, comisiones y reservas, se añadirá a los activos invertidos del Sistema (*"will be added to the System's pool of invested assets"*) (Página 17 del *"Official Statement"* del 29 de enero de 2008).

6.6    En el *"Official Statement"* fechado 29 de enero de 2008, para los Bonos Serie A, UBS y los demás "underwriters" hicieron las siguientes falsas representaciones, entre otras, acerca de la proyectada futura emisión de Bonos Serie B, los cuales importaron $1,058,634,613.05 y, al igual que los Bonos Series A y los Bonos Serie C, se vendieron exclusivamente en Puerto Rico:

> *"The System currently contemplates offering additional parity Bonds (the "Series B Bonds") in other jurisdictions. The Series B Bonds would be Offered by means of one or more separate Official Statements and may not under any circumstances, be purchased by residents of Puerto Rico."* (Énfasis añadido).

6.7     Sin embargo, en el "*Official Statement*" del 28 de mayo de 2008, para los Bonos Serie B, UBS hizo las siguientes falsas representaciones, entre otras, acerca del uso del producto de la venta de los Bonos Serie B, <u>los cuales, al igual que los Bonos Serie C, se ofrecieron y vendieron únicamente a inversionistas en Puerto Rico, en contravención a lo citado en la Sección 6.6, *supra*:</u>

a.     El producto de la venta de los Bonos sería invertido y dichas inversiones y las ganancias que éstas produjeren serían utilizadas para pagar beneficios de pensiones a los beneficiarios del Sistema ("*invest the proceeds of the Bonds and use these investments and the earnings thereon to provide such pension benefits to its beneficiaries*") (Primera página o cubierta del "*Official Statement*" del 28 de mayo de 2008).

b.     El producto de la venta de los Bonos, después de deducir gastos de emisión, comisiones y reservas, se añadirá a los activos invertidos del Sistema ("*will be added to the System's pool of invested assets*") (Página 17 del "*Official Statement*" del 28 de mayo de 2008).

6.8     En el "*Official Statement*" del 26 de junio de 2008, para los Bonos Serie C, UBS hizo las siguientes falsas representaciones, entre otras, acerca del uso del producto de la venta de los Bonos Serie C, <u>los cuales se ofrecieron y vendieron únicamente a inversionistas en Puerto Rico, en contravención a lo citado en la Sección 6.6, *supra*:</u>

a.     El producto de la venta de los Bonos sería invertido y dichas inversiones y las ganancias que éstas produjeren serían utilizadas para pagar beneficios de pensiones a los beneficiarios del Sistema ("*invest the proceeds of the Bonds and use these investments and the earnings thereon to provide such pension benefits to its beneficiaries*") (Primera página o cubierta del "*Official Statement*" del 26 de junio de 2008).

b.     El producto de la venta de los Bonos, después de deducir gastos de emisión, comisiones y reservas, se añadirá a los activos invertidos del Sistema ("*will be added to the System's pool of invested assets*") (Página 17 del "*Official Statement*" del 26 de junio de 2008).

6.9    Cuando se hicieron las emisiones de los Bonos, la Co-Demandada UBS Consulting actuaba como asesora financiera del Sistema y, tanto ésta como su afiliada UBS, sabían o debían saber que al Sistema se le haría imposible invertir prudentemente el producto de la venta de los Bonos a un rendimiento suficiente para cubrir el costo de sus intereses al Sistema y generar ganancias ("*positive arbitrage*"). A pesar de ello, y a sabiendas de las pérdidas que ocasionarían al Sistema la emisión y venta de los Bonos, UBS procedió con la transacción, con el propósito de lucrarse y con absoluto menosprecio a los mejores intereses del Sistema.

6.10    Mientras el Sistema negociaba con Merrill Lynch la posible emisión y venta fuera de Puerto Rico de bonos del Sistema por la suma principal de por lo menos siete mil millones de dólares ($7 mil millones) y posteriormente, cuando se hizo la emisión y venta de los Bonos en el mercado local a través de UBS, por un importe de aproximadamente tres mil millones de dólares ($3 mil millones), UBS, directamente y/o a través de su(s) afiliada(s), incluyendo, sin limitación, a UBS Consulting, tenía un contrato de asesoramiento financiero con el Sistema. Además, UBS y UBS Consulting estaban entonces al tanto de la precaria condición financiera del Sistema y conocían la necesidad que tenía el Sistema de mejorar su liquidez y de crear fuentes de ingresos y generar ganancias para mitigar su crónica insuficiencia de fondos.

6.11    Es obligación ineludible de asesores financieros como UBS Consulting y UBS defender los mejores intereses de sus clientes (en este caso el Sistema) y proveer al mismo asesoramiento correcto en beneficio del cliente y por encima del propio. Al no sólo respaldar, sino participar como principal "underwriter" en la ilícita y crasamente negligente emisión de los Bonos, UBS violó sus obligaciones contractuales, extracontractuales y fiduciarias para con el Sistema, pues les aconsejaron y participaron, para lucrarse, en una transacción ilícita, imprudente y a todas luces perdidosa y ajena a los objetivos y mejores intereses del Sistema y, por ende, de sus fideicomisarios/beneficiarios Demandantes Individuales y miembros de la Clase.

6.12    UBS y UBS Consulting sabían o debían saber que la emisión y la venta de los Bonos violaba la política pública establecida por la Asamblea Legislativa de Puerto Rico al denegar su aprobación a las mismas cuando éstas se propusieron a través del Gobierno y que violaban la Ley de Retiro. También sabían o debían saber entonces dichos codemandados

que la pignoración o gravamen de las aportaciones patronales del Gobierno al Sistema, como

garantía y fuente de pago de los Bonos, comprometía el crédito del Gobierno, lo cual era

precisamente lo que había denegado la Asamblea Legislativa y lo cual violaba la política

pública establecida mediante tal denegación y violaba también las disposiciones de la Ley de

Retiro acerca del uso permitido por dicha Ley para las aportaciones patronales al Sistema.

6.13   También sabían o debían saber entonces UBS y UBS Consulting, que el

producto de la ilícita y crasamente negligente venta de los Bonos no se podría invertir

prudentemente en vehículos seguros de inversión que produjeran rendimientos suficientes

para amortizar los costos de la emisión e intereses de los Bonos y producir la ganancia

("positive arbitrage") que necesitaba el Sistema y que, por el contrario, la inversión del

producto de la venta de los Bonos provocaría una pérdida recurrente al Sistema y, por ende,

a sus fideicomisarios/beneficiarios, ya que los intereses pagaderos por los Bonos excedían

el rendimiento que el Sistema podía razonablemente obtener de la inversión de los fondos

netos recibidos de la venta de los mismos.

6.14   Igualmente sabían o debían saber UBS y UBS Consulting, que los Bonos no

mejorarían, sino que empeorarían, el "funding o funded ratio" del Sistema, puesto que, al

completarse su emisión, disminuiría el patrimonio neto o "net worth" del Sistema por los

gastos de la emisión y la venta de los Bonos y aumentarían los pasivos del Sistema en una

cantidad mayor al aumento en sus activos, debido a dichos costos de emisión y venta de los

Bonos. A pesar de saber o deber haber sabido todo lo anterior, dichos codemandados no solo

recomendaron la emisión y venta de los Bonos, sino que, para lucrarse aún más de la misma,

UBS actuó como su principal "underwriter" y colocó gran parte de los Bonos en fondos

mutuos cerrados ("closed end mutual funds") creados y administrados por la propia UBS y/o

afiliadas a UBS y/o UBS Consulting. Esto produjo grandes ganancias a UBS y/o UBS

Consulting  en la venta de los Bonos y le continúa produciendo a UBS y/o sus afiliadas

pingües ganancias anuales por concepto de la administración de los fondos mutuos cerrados

que invirtieron en los Bonos, cuyos activos aún incluyen gran parte de los Bonos y los cuales

son administrados por UBS y/o UBS Consulting y/o sus afiliadas.

6.15   UBS y UBS Consulting, sabían o debían saber que las proyecciones y estimados

usados para respaldar la emisión y venta de los Bonos eran claramente erróneos y

conducentes a error, pero no se lo advirtieron al Sistema y prosiguieron con la emisión y

venta de los Bonos, para lucrarse y sin darle consideración ni importancia a las predecibles nefastas consecuencias para el Sistema de dicha emisión y venta de los Bonos.

6.16    También sabían o debían saber UBS y UBS Consulting, que el mercado local no tenía capacidad suficiente para absorber los por lo menos siete mil millones de dólares ($7 mil millones) en bonos que se contemplaban según el modelo propuesto por Merrill Lynch y que eran necesarios para que el Sistema obtuviera los beneficios que necesitaba, así como que no había demanda en el mercado internacional para dichos bonos.

6.17    No condujeron UBS, ni UBS Consulting, un estudio adecuado acerca de la viabilidad de la emisión y venta de los Bonos, de sus posibles consecuencias nefastas para el Sistema y de los riesgos que tal transacción acarrearía para el Sistema y para el crédito del mismo y del Gobierno.

6.18    Dicha conducta de UBS y UBS Consulting, fue crasamente negligente e ilícita y constituyó (i) una violación a sus obligaciones contractuales  en virtud de sus contratos con el Sistema; (ii)  una violación a los contratos de "underwriting" de UBS con el Sistema para la emisión y venta de los Bonos, mediante los cuales UBS venía obligada a actuar de buena fe y a proteger los intereses del Sistema; (iii) una violación de los deberes fiduciarios contractuales y extracontractuales de dichos codemandados para con el Sistema; (iv) y conducta ilícita por parte de dichos codemandados  en la medida en que fueron responsables de violar la política pública establecida por la Asamblea Legislativa de Puerto Rico cuando ésta denegó la propuesta de emitir los Bonos a través del Gobierno y de la violación a la Ley de Retiro cuando se pignoraron o gravaron las aportaciones patronales del Sistema para garantizar el pago de los Bonos.

6.19    De hecho, la ilícita y crasamente negligente emisión y venta de los Bonos no sólo comprometió el crédito del Gobierno, sino que ha causado la degradación del "rating" de todos los bonos del Gobierno. UBS y UBS Consulting, deben responder a los aquí Demandantes Individuales, quienes comparecen por sí y como representantes de los miembros de la Clase, por los daños que les han causado y continúan causando, así como al Sistema por todos los daños que su susodicha conducta ha causado al mismo y que incluyen, entre otros, (i) los costos de emisión y venta de los Bonos; (ii) la pérdidas recurrentes ("negative arbitrage") que ha sufrido, sufre y sufrirá el Sistema desde la emisión y venta de los Bonos hasta el vencimiento de los mismos, debido a que los intereses que paga el Sistema

por los Bonos exceden el rendimiento que el Sistema recibe por la inversión del producto de su venta; y (iii) el aumento en costos de futuras obligaciones del Sistema, debido a la degradación del crédito del Gobierno causada por la emisión y venta de los Bonos.

6.20   UBS y UBS Consulting, le hicieron al Sistema recomendaciones a todas luces negligentes e imprudentes, ya que, como antes expresamos,  no llevaron a cabo un análisis adecuado del riego en que se colocó el Sistema como consecuencia de la emisión y venta de los Bonos y de las posibles consecuencias de dichas transacciones.

6.21   UBS y/o UBS Consulting, directamente y/o a través de una de sus afiliadas, mantenían un contrato de asesoramiento financiero con el Sistema y UBS, además, actuó como banquero de inversiones y principal "underwriter" en la emisión de los Bonos en virtud de contratos con el Sistema.

6.22   UBS y UBS Consulting, cobraron ilegalmente cuantiosas comisiones y honorarios y descuentos relacionados con la imprudente, ilícita y crasamente negligente emisión y venta de los Bonos y deben devolverlos al Sistema o a sus fideicomisarios/beneficiarios.

6.23   La conducta de UBS y UBS Consulting, según referida anteriormente en la presente Quinta Demanda Enmendada, fue ilícita, imprudente, crasamente negligente, violó sus referidas obligaciones para con el Sistema y por ello ha causado, causa y causará daños al Sistema y sus fideicomisarios/beneficiarios por importes multimillonarios, así como daños a los aquí Demandantes Individuales y a los miembros de la Clase.

**POR TODO LO CUAL,** se solicita en esta *Primera Causa de Acción* que se ordene solidariamente a los Demandados UBS y UBS Consulting, al pago al Sistema de las sumas que más adelante se detallan, para resarcir los daños continuados causados por dichos demandados al Sistema, y el pago a los Demandantes Individuales y a los miembros de la Clase de los daños continuados causados y a causarse a éstos y las costas y gastos legales del presente litigio.

## VII.  SEGUNDA CAUSA DE ACCION/ARTÍCULO 1802 DEL CÓDIGO CIVIL DE PUERTO RICO/UBS Y UBS CONSULTING

7.1   El Sistema y los Demandantes Individuales, por sí y como representantes de los miembros de la Clase, repiten e incorporan por referencia al presente apartado todo lo previamente alegado en la presente Quinta Demanda Enmendada.

7.2     La referida conducta crasamente negligente e ilícita de UBS y UBS Consulting, en la prestación de los servicios que se obligaron a rendir al Sistema y violación por dichos demandados de sus deberes contractuales, extracontractuales y fiduciarios para con el Sistema causaron y causarán al Sistema, a los Demandantes Individuales y a los miembros de la Clase daños multimillonarios, según se ha explicado anteriormente en la presente Quinta Demanda Enmendada, por todos los cuales dichos demandados deben responder, según, entre otros, el Artículo 1802 del Código Civil de Puerto Rico.

**POR TODO LO CUAL**, se solicita en esta *Segunda Causa de Acción* que se ordene solidariamente a los Demandados UBS y UBS Consulting, al pago al Sistema de las sumas que más adelante se detallan, para resarcir los daños causados por ellos al Sistema, y el pago a los Demandantes Individuales y a los miembros de la Clase de los daños continuados causados y a causarse a éstos por los demandados, más las costas y gastos del presente litigio.

## VIII. <u>TERCERA CAUSA DE ACCIÓN – RESPONSABILIDAD DE LA ASEGURADORA ABC INSURANCE COMPANY, INC.:</u>

8.1     El Sistema y los Demandantes Individuales, por sí y en representación de los miembros de la Clase, repiten e incorporan por referencia al presente apartado todo lo previamente alegado en la presente Quinta Demanda Enmendada.

8.2     La Demandada ABC Insurance Company, Inc., cuyo nombre correcto se desconoce en este momento, emitió póliza(s) cubriendo daños causados por actos u omisiones imprudentes, irrazonables, crasamente negligentes o ilícitos de UBS y UBS Consulting, durante el período de tiempo pertinente a la presente Quinta Demanda Enmendada.

8.3     Los actos u omisiones imprudentes, irrazonables, crasamente negligentes o ilícitos atribuidos a las Demandadas UBS y UBS Consulting en la presente Quinta Demanda Enmendada, fueron cometidos o incurridos a través de oficiales de UBS y los daños causados al Sistema, a los aquí Demandantes Individuales y a los miembros de la Clase, por dichos actos u omisiones están asegurados y cubiertos por dicha(s) póliza(s) emitidas por ABC Insurance Company, Inc., a la que los Demandantes reclaman resarcir dichos daños a ellos, a los demás miembros de la clase y al Sistema  en la presente causa de acción, en virtud de dichas pólizas.

**POR TODO LO CUAL**, se solicita en esta *Tercera Causa de Acción* que se ordene solidariamente a la Demandada ABC Insurance Company, Inc., al pago al Sistema y a los aquí Demandantes Individuales y a los miembros de la Clase de los daños continuados causados y a causarse a éstos, más las costas y gastos del presente litigio.

## IX. CUARTA CAUSA DE ACCION
## RESPONSABILIDAD DE XYZ INSURANCE COMPANY, INC.

9.1     El Sistema y los Demandantes Individuales, por sí y en representación de los miembros de la clase, repiten o incorporan por referencia al presente apartado todo lo previamente alegado en la presente Quinta Demanda Enmendada.

9.2     La Demandada XYZ Insurance Company, Inc., cuyo nombre correcto se desconoce en este momento, emitió póliza(s), si alguna, cubriendo los daños causados por los actos u omisiones imprudentes, irrazonables, crasamente negligentes o ilícitos que aquí se imputan a UBS Consulting y/o sus funcionarios.

**POR TODO LO CUAL**, se solicita en esta *Cuarta Causa de Acción* que se ordene solidariamente a la Demandada XYZ Insurance Company, Inc., al pago al Sistema, a los Demandantes Individuales y a los miembros de la Clase de los daños continuados causados y a causarse a éstos, más las costas y gastos del presente litigio.

## X. QUINTA CAUSA DE ACCIÓN
## COSTAS Y GASTOS Y HONORARIOS DEL ABOGADO

10.1     El Sistema y los Demandantes Individuales, quienes comparecen por sí y en representación de los demás miembros de la Clase, repiten e incorporan por referencia al presente apartado todo lo previamente alegado en la presente Quinta Demanda Enmendada.

10.2     Las leyes de Puerto Rico autorizan a este Honorable Tribunal ordenar a la parte demandada el pago de las costas y gastos del presente litigio, incluyendo honorarios contingentes de abogados de los Demandantes por hasta un treinta y tres por ciento (33%) de cualquier suma que se ordene a los Demandados pagar al Sistema, a los Demandantes Individuales y a los miembros de la Clase, en cualquier sentencia favorable.

**POR TODO LO CUAL**, se solicita en esta *Quinta Causa de Acción* que se ordene solidariamente a los Demandados pagar las sumas detalladas más adelante en el presente, más las costas y gastos en que incurran e incurrirán los Demandantes en el presente litigio, más una cantidad equivalente al treinta y tres por ciento (33%) de dichas sumas para

honorarios de abogados del Sistema, de los Demandantes Individuales y de los miembros de la Clase, más intereses y cualquier otro remedio que fuere procedente conforme a derecho.

## XI. SÚPLICA

A tenor con lo antes expresado, los Demandantes muy respetuosamente solicitan que este Honorable Tribunal declare CON LUGAR la presente Quinta Demanda Enmendada y en su virtud (a) condene solidariamente a los Demandados UBS y UBS Consulting y a sus respectivas aseguradoras, (i) al pago al Sistema de $800 millones; (ii) el pago a los aquí Demandantes Individuales y a cada uno de los miembros de la Clase de una suma no menor de $50 mil para cada uno de ellos; y (iii) el pago de las costas, gastos y honorarios de abogados del Sistema, de los Demandantes Individuales y de los miembros de la Clase en el presente litigio; y (b) conceda al Sistema, a los Demandantes Individuales y a los miembros de la Clase cualquier otro remedio en ley o equidad que este Honorable Tribunal considere adecuado.

**CERTIFICAMOS:** Que en el día de hoy se enviará copia fiel y exacta del presente escrito por correo electrónico al: **LCDO. PAUL J. LOCKWOOD** – paul.lockwood@skadden.com; **LCDA. NICOLE A DISALVO** – Nicole.DiSalvo@skadden.com; y **LCDA. ELISA M.C. KLEIN** – Elisa.Klein@skadden.com; – **LCDO. ROBERTO C. QUIÑONES RIVERA** – rcq@mcvpr.com; **LCDA. MYRGIA M. PALACIOS CABRERA** – mpc@mcvpr.com.

**RESPETUOSAMENTE SOMETIDA.**

En San Juan, Puerto Rico, hoy 23 de septiembre de 2022.

**VICENTE & CUEBAS**
P.O. Box 11609
San Juan, PR 00910-1609
Teléfono (787) 751-8000
Facsímil (787) 756-5250

*Harold D. Vicente*
*por*

**HAROLD D. VICENTE**
TSPR Número 3966
E-Mail: hvicente@vclawpr.com

*Harold D Vicente-Colon*
*por*

**HAROLD D. VICENTE COLÓN**
TSPR Número 11303
E-Mail: hdvc@vclawpr.com

**IVELISSE M. ORTIZ MOREAU**
TSPR Número 18640
E-Mail: iortiz@vclawpr.com

**PUJOL LAW OFFICE, PSC**
P.O. Box 363042
San Juan, PR 00936-3042
Teléfono: (787) 724-0900
Facsímil: (787) 724-1196

**FRANCISCO PUJOL MENESES**
TSPR Número 11883
E-Mail: fpujol@pujollawpr.com

*ABOGADOS DE LA ADMINISTRACIÓN DE LOS SISTEMAS DE RETIRO DE LOS EMPLEADOS DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO Y DE LOS DEMANDANTES INDIVIDUALES*

**FEDERICO HERNÁNDEZ DENTON**
P.O. Box 9021279
San Juan, PR 00902-1279
Teléfono (787) 758-3542

*Federico Hernandez-Denton*

*por él*

**FEDERICO HERNÁNDEZ DENTON**
TSPR Número 3846
E-Mails: *fhd@vclawpr.com*
        *f.hernandezdenton@gmail.com*

**PUERTO RICO ATTORNEYS & COUNSELORS AT LAW**
P.O. Box 362122
San Juan, PR 00936-2122
Teléfono (787) 767-1919
Facsímil  (787) 764-9120

*José Cháves Caraballo*

*por él*

**JOSÉ CHÁVES CARABALLO**
TSPR Número 7953
E-Mail: *chaves@fc-law.com*

**WOLF POPPER LAW OFFICES, PSC**
654 Plaza
654 Avenida Muñoz Rivera, Suite 1001
San Juan, PR 00918
Teléfono (787) 522-0200
Facsímil (787) 522-0201

*Carlos López López*

*por él*

**CARLOS LÓPEZ LÓPEZ**
TSPR Número 10526
E-Mail: *clopez@wolfpopperpr.com*

*ABOGADOS DE LA ADMINISTRACIÓN DE LOS SISTEMAS DE RETIRO
DE LOS EMPLEADOS DEL GOBIERNO Y LA JUDICATURA DE PUERTO RICO*

**ANDRÉU & SAGARDÍA**
Avenida Domenech #261
Hato Rey, PR 00918-3518
Teléfono (787) 754-1777
Facsímil (787) 763-8045

*José A. Andréu Fuentes*

*por él*

**JOSÉ A. ANDRÉU FUENTES**
TSPR Número 9088
E-Mail: *jaf@andreu-sagardia.com*

*ABOGADO DE LOS DEMANDANTES INDIVIDUALES, PENSIONADOS DEL SISTEMA DE RETIRO DE LOS
EMPLEADOS DEL GOBIERNO Y LA JUDICATURA DE PUERTO RICO –
PEDRO JOSÉ NAZARIO SERRANO, SU CÓNYUGE, JUANITA SOSA PÉREZ
Y LA SOCIEDAD LEGAL DE BIENES GANANCIALES COMPUESTA POR AMBOS;
JOEL RIVERA MORALES; MARÍA DE LOURDES GÓMEZ PÉREZ; HÉCTOR CRUZ VILLANUEVA; LOURDES
RODRÍGUEZ; Y, LUIS M. JORDÁN RIVERA*