# EXHIBIT 4

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
CENTRO JUDICIAL DE SAN JUAN
SALA SUPERIOR

| | |
|---|---|
| ADMINISTRACIÓN DE LOS SISTEMAS DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO Y LA JUDICATURA DE PUERTO RICO ("SISTEMA"); LA SUCESIÓN DE PEDRO JOSÉ NAZARIO SERRANO; LA SUCESIÓN DE JUANITA SOSA PÉREZ; JOEL RIVERA MORALES; MARÍA DE LOURDES GÓMEZ PÉREZ; HÉCTOR CRUZ VILLANUEVA; LOURDES RODRÍGUEZ; Y LUIS M. JORDÁN RIVERA, POR SÍ Y COMO REPRESENTANTES DE LA CLASE DEMANDANTE COMPUESTA POR LOS BENEFICIARIOS DEL SISTEMA | CIVIL NÚMERO: KAC2011-1067 (803)<br><br>SOBRE:<br><br>INCUMPLIMIENTO DE CONTRATO DAÑOS Y PERJUICIOS |

Demandantes

v.

UBS FINANCIAL SERVICES INCORPORATED; UBS TRUST COMPANY OF PUERTO RICO ("UBS TRUST") Y UBS CONSULTING SERVICES OF PUERTO RICO COMO SUBDIVISION I)E UBS TRUST; ABC INSURANCE COMPANY, INC.; XYZ INSURANCE COMPANY, INC.

Demandados

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

# FIFTH AMENDED LAWSUIT[1]

**TO THE HONORABLE COURT:**

APPEARS the Government Employees Retirement Systems Administration and the Judiciary of Puerto Rico (the "System") per se; the members of the Estate of Pedro Jose Nazario Serrano and the members of the Estate of his spouse, Juanita Sosa Perez; Joel Rivera Morales; Maria De Lourdes Gomez Perez; Hector Cruz Villanueva; Lourdes Rodriguez; and Luis M. Jordan Rivera (collectively, "the Individual Plaintiffs"), for themselves and on behalf of the members of the class composed of the other beneficiaries/pensioners of the System, through their undersigned attorneys, and very respectfully STATE , CLAIM AND REQUEST:

## I.   NATURE AND SUMMARY OF THE CASE

1.1   During the first half of 2008, the System made three (3) long-term bond issues (the "Bonds") for a total amount of approximately three billion dollars ($3 billion) and placed them on the market of Puerto Rico through a group of "underwriters" led by UBS Financial Services of Puerto Rico Inc., now known as UBS Financial Services, Inc. ("UBS").[2]

---

[1]   The Schedules of the Fifth Amended Complaint are the same schedules of the Fourth Amended Complaint, which are incorporated by reference to avoid unnecessarily bulking the Court's record.

[2]   In the Fourth Amended Complaint, UBS Financial Services Incorporated of Puerto Rico was included, but UBS Financial Services, Inc. (hereinafter, UBS) is the entity that survived as a result of the merger between the two entities, which occurred on

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

1.2     The alleged purpose of said transaction was for the System to obtain

funds at low interest rates, to re-invest them at higher yields, and thus produce a

recurring profit for the System ("positive arbitrage") during the term of the Bonds.

The above was not achieved. The Bonds were placed in the local market at such

high interest rates that the System has lost, is losing and will continue to lose

multimillion-dollar sums of money, because it has not been able to place the funds

resulting from the Bonds at yields high enough to produce a profit and amortize the

cost of issuing and selling the Bonds.

1.3     Before the issue and sale of the Bonds took place, in 2008, UBS as

lead underwriter, represented to the System that UBS was an expert in financial

advice and had the capacity to place the Bonds, in order to convince the System to

hire UBS to carry out the aforementioned issue.

1.4     Among the representations made by UBS to convince the System that

the issue and sale of the Bonds would be beneficial and would help solve the areas

of the System, was that their product would generate a positive differential in yield

("positive arbitrage"), which would result in profits for the System. Those

representations were not only false, but they were made so that UBS could profit

and collect fees and commissions, such as those it actually charges, which

exceeded $35 million.

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

1.5     On April 4, 2013, Law No. 3-2013 was approved to comprehensively reform the Employee System of the Government of the Commonwealth of Puerto Rico (the "System"). The approval of this Act was an attempt to mitigate the serious financial crisis in which said System and the Commonwealth of Puerto Rico ("ELA") find themselves. The Legislative Assembly of Puerto Rico itself concluded that the issuance of the Bonds was one of the causes of this serious crisis and this was indicated in the statement of reasons for said Law. As a significant fact, the legislators expressed there that the Bonds will cost the System around $6,000 million in interest, plus the repayment of the principal.

1.6     In addition, as explained below, the issue and sale of the Bonds they were unlawful, because (i) they violated the public policy established by the Legislative Assembly of Puerto Rico, which denied its approval to them when they were contemplated to; through the Government; and (ii) the Bonds were guaranteed through the pledge or transfer of employer contributions to the System, which is not permitted by the Retirement Law.

1.7     This Fifth Amended Complaint is filed for the benefit of the System and of the Individual Plaintiffs identified below, by themselves and as representatives of a class composed of the other beneficiaries/pensioners of the System ("the "Class"), to recover serious ongoing damages suffered and to be suffered by both the System and the Individual Plaintiffs and by Class members,

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

caused by the grossly negligent conduct of the UBS co-defendants, including

breaches of contractual and fiduciary duties to the System and damages to the

Individual Plaintiffs, the 11 members of the Class and the System itself, by virtue

of Article 1802 of the Civil Code of Puerto Rico.

## II. THE PARTIES

**Claimants:**

2.1     The System is a trust created by Law No. 447, dated January 15, May

1951, as amended (the "Retirement Law"). The trustees of the System are the

members of its Board of Trustees and the trustees/beneficiaries thereof are the

active employees and retired employees of the Government of Puerto Rico and its

political subdivisions and instrumentalities (hereinafter, collectively, the

"Government" ). As a result of the acts and omissions of the defendant that are

described in detail below, the System has suffered losses in excess of 800 million

&Mares.

2.2     The members of the estates of Pedro Jose Nazario Serrano and Juanita

Sosa Perez appear on their behalf and the deceased, who were originally plaintiffs

and as of the date of the filing of this Fifth Amended Complaint had died. Both

Pedro Jose Nazario Serrano and Juanita Sosa Perez had appeared on their own

behalf and as representatives of the defunct Sociedad Legal de Gananciales made

up of both of them, they were of legal age, married to each other, retired from the

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

Puerto Treasury Department. Rico and her from the Municipality of Carolina, Puerto Rico. Among the ongoing damages that defendants' negligent conduct caused and continues to cause to these Plaintiffs and the applicable Class members are that they lost their summer bonuses and the right to be reimbursed for the cost of medications, the right to take personal and mortgage loans, etc. This situation also caused them intense anguish and suffering.

2.3     Co-Claimant Joel Rivera Morales, who appears for himself and as Class representative, he is of legal age, married, employed by the Puerto Rico Ports Authority and a resident of Carolina, Puerto Rico. His address is Villa Fontana Park 5DD24. Calle Munoz Rivera, Carolina, Puerto Rico 00982 and his phone number is (787) 390-5242. Among the continuing harms that defendants' negligent conduct has caused and will cause to Mr. Rivera Morales and the applicable members of the Class is that, instead of being able to retire at age 65 on 65% of his salary, he will now have to wait until age 67 and receive only 34% of his salary, which will not be enough to cover his expenses. In addition, possible loss of the right to receive reimbursement for the cost of medicines, the right to take out personal and mortgage loans, etc. This situation has also caused and will continue to cause intense anguish and suffering.

2.4     Co-Claimant Maria de Lourdes Gomez Perez, who appears on her own and as a Class representative, is of legal age, married, employed by the

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

Department of the Family, and a resident of Carolina, Puerto Rico. Her address is Calle 9 M-14, Urb. Mountain View, Carolina, Puerto Rico and her telephone number is (787) 390-5242. Among the ongoing harms that the defendants' negligent conduct has caused and will cause to Ms. Gomez Perez and the applicable Class members is that, after having worked for 28 years in the Department of the Family, instead of being able to retire In a year and a half, he will now have to work an additional 6 years and will receive only 38% of his salary, which will not be enough to cover his expenses. In addition, the possible loss of the right to receive reimbursement for the cost of medicines, the right to take out personal and mortgage loans, etc. This situation also caused and will continue to cause intense anguish and suffering.

    2.5    Co-Plaintiff Hector Cruz Villanueva, who appears on his own and as a Class representative, is of legal age, married, a civilian employee of the Puerto Rico National Guard and a resident of Vega Baja, Puerto Rico. His address is Chalets de la Playa, Apartment 487, Vega Baja, Puerto Rico 00693 and his phone number is (787) 647-4584. Among the ongoing damages that the negligent conduct of the defendants has caused and will cause to Mr. Cruz Villanueva and the applicable members of the Class are that, after having worked for 24 months as a civilian employee of the Puerto Rico National Guard, At the time of his retirement, he will receive an amount much less than 75% of his salary, which will not be

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

enough to cover his expenses. In addition, the possible loss of the right to receive

reimbursement for the cost of medicines, the right to take out personal and

mortgage loans, etc. This situation has also caused and will continue to cause

intense anguish and suffering.

2.6     Co-Plaintiff Lourdes Rodriguez, who appears on her own and as a

Class representative, is of legal age, married, employed at the Municipal Revenue

Collection Center (CRIM) and a resident of Guaynabo, Puerto Rico. Her address is

Guacima 0-1, Urb. Santa Clara, Guaynabo, Puerto Rico 00969 and her telephone

number is (787) 632-2697. Among the ongoing damages that defendants' negligent

conduct has caused and will cause to Ms. Rodriguez and the applicable members

of the Class is that, instead of being able to retire in two years upon turning 57 and

receive 40% of her salary, now he will not be able to retire for another 10 years,

when he reaches the age of 65. In addition, the possible loss of the right to receive

reimbursement for the cost of medicines, the right to take out personal and

mortgage loans, etc. Even so, she will only receive a much smaller percentage of

her salary, which will not be enough to cover her expenses. This situation has also

caused and will continue to cause intense anguish and suffering.

2.7     Co-Plaintiff Luis M. Jordan Rivera, who appears on his own and as a

Class representative, of legal age, married, employed at the Municipal Revenue

Collection Center (CRIM) and a resident of San Juan, Puerto Rico. His address is

8

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

Miramar Tower Condominium, Apartment 5-I, # 721 Calle Hernandez, San Juan, Puerto Rico 00907 and his telephone number is (787) 632-7543. Among the ongoing damages that the defendants' negligent conduct has caused and continues to cause to Mr. Jordan Rivera and the applicable members of the Class are that, after having worked for 28 years in the CRIM, in the Municipality of San Juan, in the Department of the Treasury and the Institute of Culture, instead of being able to retire within a year receiving 75% of his salary, now he will only receive the; 46% of his salary, which will not be enough to cover his expenses. In addition, the possible loss of the right to receive reimbursement for the cost of medicines, the right to take out personal and mortgage loans, etc. This situation has also caused you and will continue to cause you intense anguish and suffering.

2.8    Originally, this lawsuit was brought by the Individual Plaintiffs as a derivative action for the benefit of the System and its trustees/beneficiaries. For such purposes, the Complaint included the System as a defendant. Subsequently, in the Third Amended Complaint, the System exercised its fiduciary duty and compared() as plaintiff for itself and for the benefit of its trustees/beneficiaries. Therefore, when the System appeared as a plaintiff, this action ceased to be derivative and became a direct action by the System and for the benefit of its trustees. Since then, the trustees/beneficiaries of the System that had been represented in the derivative action have been represented by the System. It should

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

be noted that according to Article 517 of Law No. 53-2021, "the transactions of the Adjustment Plan cannot be used to mitigate causes of action under Law No. 3-2013."

2.9     Recently, uncertainty has been created regarding the continuity of the System as a legal entity, in the face of the possible liquidation of its assets and possible eventual dissolution, in relation to the Plan of Adjustment for the Payment of the Debt of the Government of Puerto Rico, under Title III of the PROMESA Law. The continuing damages that said liquidation and possible dissolution cause to the System and its trustees, including the Individual Plaintiffs and the members of the Class, cannot be definitively determined, while said liquidation process and/or does not conclude. Said continuing damages will be a direct consequence of the conduct of the UBS defendants. For this reason, and to ensure that their interests continue to be represented in this case, the members of the Class appear represented by the Individual Plaintiffs. For such purposes, it is proposed that the Class be defined as follows:

> The class is made up of all pensioners and active employees of the Government and the Judiciary of Puerto Rico who participate in the Retirement System for Employees of the Government and the Judiciary of the Commonwealth of Puerto Rico.

See, Paragraph 3.3 of this Lawsuit and following.

**<u>Defendants</u>:**

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

2.10   UBS Financial Services Incorporated of Puerto Rico, now UBS

Financial Services, Inc. ("UBS"), was at the date of the facts alleged in this

Lawsuit a corporation organized and existing under the laws of Puerto Rico, which

was engaged in the business of investment banking, financial advice and securities

brokerage. His address and telephone number are: Penthouse - American

International Plaza, 250 Avenida Munoz Rivera, Hato Rey, San Juan, Puerto Rico

00918, Telephone: (787) 284-3445. This corporation disappeared when it was

merged with UBS Financial Services Incorporated, which remains as a defendant.

2.11   Defendant UBS Consulting Services of Puerto Rico ("UBS

Consulting"), a subdivision of UBS Trust Company of Puerto Rico, is a

corporation or legal person whose place of formation or incorporation is unknown

at this time. It is an affiliate or subsidiary of UBS Financial Services Incorporated

of Puerto Rico, now UBS Financial Services, Inc., or a related entity and, during

the period of time relevant to this Fifth Amended Complaint, provided financial

advisory services to the System . His known address and telephone number are:

Penthouse-American International Plaza, 250 Avenida Mulioz Rivera, Hato Rey,

San Juan, PR 00918, Telephone (787) 284-3435.

2.12   Unknown Defendant ABC Insurance Company, Inc. is the insurance

company, if any, that issued the policy, if any, that, during the time relevant to this

Fifth Amended Complaint, insured liability for damages caused by acts, omissions,

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

or Negligent and/or illicit conduct on the part of UBS officials when the issue and sale of the Bonds or part(s) thereof was negotiated and/or completed. His correct name, place of incorporation, telephone and fax number are unknown at this time.

2.13   Unknown Defendant XYZ Insurance Company, Inc. is the insurance company, if any, that issued the policy, if any, that, during the time relevant to this Fifth Amended Complaint, insures liability for damages caused by acts, omissions, or negligent and/or illicit conduct on the part of UBS Consulting. His correct name, place of incorporation, telephone and fax number are unknown at this time.

## III.   ACTIVE LEGITIMATION OF THE PLAINTIFFS AND CERTIFICATION OF THE CLASS

3.1   The System is a trust created by the Retirement Law. The Administrator administers the System and is appointed by the Board of Trustees. The members of the Board of Trustees are the trustees of the trust constituted by the System. The active employees and retired employees of the Government are the trustees or beneficiaries of the trust constituted by the System. The Individual Plaintiffs here and the members of the Class are active or retired employees of the Government or their successors and, therefore, beneficiaries/trustees of the trust constituted by the System.

3.2   For its part, Law No. 3 of April 4, 2013, in its Section 40, also confers active legitimacy to the Claimants here, by specifically providing:

> *"A cause of action is recognized by virtue of this Act, to the participants and pensioners of the Government Employees Retirement System and the Judiciary of Puerto Rico to sue, <u>by themselves</u>, the non-governmental investment advisers and subscribers in any transaction in which the Government Employees Retirement System and the Judiciary of Puerto Rico have issued bonds (pension obligation bonds), for any damage caused <u>to the System or its beneficiaries</u>."*

(Heavy underlining).

3.3    On the other hand, the claims of the Individual Plaintiffs who appear here by themselves and as representatives of the Class, are common and typical among all the members of the Class, as defined in paragraph 2.9 of this Fifth Amended Complaint, therefore certification of the lawsuit as one of class is favored. In that sense, Rule 20.1 of the Civil Procedure allows the presentation of this lawsuit as a class action by providing the following:

> Rule 20.1. Requirements for a class action One or more members of a class may sue or be sued as representatives of all members of the class only if (1) the class is so large that consolidation of all members is impracticable; (2) there are questions of fact or law common to the class; (3) the claims or defenses of the representatives are typical of the claims or defenses of the class, and (4) the representatives would fairly and adequately protect the interests of the class.

32 LPRA App. V, R. 20.1.

3.4    The Class is made up of all pensioners and active employees of the government and the Judiciary of Puerto Rico participating in the System, as defined in paragraph 2.9 of this Lawsuit.

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

3.5     There are tens of thousands of Class members in similar

circumstances throughout Puerto Rico. Therefore, it would be impractical if not

impossible to name them all, one by one, as plaintiffs in the present case.

3.6     Similarly, this case sets forth clear **questions of fact and law** that

apply to all members of the Class. The claims presented herein arise from the

conduct of the UBS defendants, including breach of their contractual and fiduciary

duties to the System, which caused and will continue to cause harm to the

plaintiffs.

3.7     All of the common issues of fact and law involved affect the

Individual Plaintiffs and the other members of the Class, thus meeting the

"**community**" requirement required to certify a class action under Rule 20.1. ,

above. These, in turn, prevail over other issues that separately affect the Individual

Plaintiffs and other members of the Class. This class action is the proper and

superior means available to adjudicate this dispute. See *Juarbe v. Vagueria Tres*

*Monjitas*, 169 D.P.R. 705 (2006).

3.8     The **numerous** requirement is met to certify a class action composed

of tens of thousands of pensioners and employees of the Government and the

Judiciary of Puerto Rico participating in the System. It is not necessary to show

that the accumulation of all the plaintiffs is impossible. It is enough to demonstrate

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

that such an accumulation would create serious obstacles in the processing of the case, as is evident in the present.

3.8.1   In addition, the members of the Class are scattered throughout Puerto Rico.

3.8.2   It is difficult at this time to identify all the members of the Class.

3.8.3   The nature of this case allows common claims to be made that prevail over details applicable to individual Class members.

3.8.4   The costs of individual litigation of this nature would be too great for most Class members and these costs would undermine each member's ability to assert their rights individually.

3.9   The typicity of the claim arises since there is no antagemic interest: any between the Plaintiffs and the other members of the Class. Their typical and common interest is to recover the continuing clan-0s caused by the conduct of the defendants.

3.10   In addition, the requirement of adequate representation is met in this case, because:

3.10.1   There is no conflict between the interests of the other members of the Class and the Individual Plaintiffs, since the

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

claims that appear in the lawsuit are typical for all of them; and

3.10.2   All plaintiffs and their attorneys will aggressively, competently, and vigorously litigate the lawsuit. The undersigned attorneys have experience in this type of Class litigation and will serve the best interests of each and every one of the members of the Class, as well as the sound administration of justice.

3.11 On the other hand, the requirements imposed by Rules 20.2(a) and (b) of the Civil Procedure Rules, 32 L.P.R.A, Ap. V, R. 20.2 (a) (b), are met for the following reasons:

3.11.1   Pursuing separate lawsuits by or against individual Class members would create a risk of (1) inconsistent or varied adjudications with respect to individual Class members, which could establish conflicting standards of conduct for the party being opposes the Class; or (2) awards with respect to individual Class members, who for all practical purposes would dispose of the interests of other members who are not parties to the awards or would substantially impair or impair their ability to protect their interests;

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

3.11.2   As stated above, questions of law or fact common to members of the Class take precedence over any questions affecting only individual members, and class action is superior to other available methods for the fair and efficient adjudication of this controversy, taking into consideration (1) the interest of the members of the Class in individually controlling the processing or defense of separate lawsuits; (2) the fact that there is no other litigation relating to the controversy already commenced by or against members of the Class; (3) the desirability of concentrating all claims processing in this Honorable Court; and (4) the fact that the prosecution of this lawsuit as a class action does not entail significant difficulties.

3.12   In the same way, a Class lawsuit is a suitable mechanism and superior to any other method to conduct this claim.

3.13   In the present case, the certification of the Class is requested for the purposes of the liability of the defendants towards the members of the Class, as well as that the determination of the damages corresponding to the members of the Class be made later, in accordance with with the documentary, testimonial and expert evidence that is submitted.

## IV. FACTS

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

## The 2008 Bond Issue

4.1     During the year 2007, the firm of investment bankers and securities

brokers Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") proposed to

the then Administrator and to the Board of Trustees of the System an issuance of

long-term bonds term for the principal amount of at least seven billion dollars ($7

billion), to place them outside of Puerto Rico, at interest rates that would allow the

System (i) to use approximately seven hundred million dollars ($700,000,000) for

expenses and current obligations of the System, injecting liquidity into it; and (ii)

invest the remaining six thousand three hundred million Mares ($6.3 billion) in

securities or instruments that generate income from interest or dividends in excess

of the interest payable by the System on the bonds. Said excess or positive spread

("positive arbitrage") would produce a profit for the System, which would allow it

to mitigate its chronic lack of liquidity.

4.2     The high total aggregate principal amount of the proposed System

bonds was crucial, because the projected earnings would be lower or even

insignificant on smaller volumes of principal and could be insufficient to cover the

costs inherent in the issuance, distribution and sale of the proposed bonds. bonds.

4.3     After a few months, Merrill Lynch was unable to complete the

aforementioned transaction, since it did not identify a reasonable demand in the

market outside of Puerto Rico to place the proposed System bonds there, at interest

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

rates low enough to produce the positive differential in performance ("positive arbitrage") that the System needed.

4.4     During the period in which the System was negotiating with Merrill Lynch the aforementioned possible bond issue of at least seven billion Mares ($7 billion), the defendant UBS Consulting, directly or through its affiliate(s) , by virtue of a contract, acted as an investment adviser to the System and/or the Board of Trustees of the System and falsely represented to the System and said Board that it could invest the proceeds from the sale of the Bonds at much higher rates of return than the interest that the System would pay for the Bonds.

4.5     When UBS realized that Merrill Lynch would not be able to place the seven billion dollars ($7 billion) of the proposed bonds outside of Puerto Rico, UBS proposed to the System that it hire UBS itself as "underwriter" to issue and sell the proposed bonds. On February 14, 2007, UBS and UBS Consulting, in their attempt to convince the System to hire them to advise it and carry out the aforementioned issue, made a "Power Point" presentation to the System's Board of Trustees ( see **ANNEX 1**). In that presentation UBS and UBS Consulting represented to the members of the Board of Trustees of the System that UBS their firm was among the first ten (10); investment banks globally (**ANNEX 1**, page 3). UBS offered to provide the Retirement System with an impressive combination of experience ("*expertise*") and global strength, as well as a partnership

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

("*partnership*"), which guaranteed superlative execution, solutions; novices and the maximum knowledge in terms of investment advice. (**ANNEX 1**, · ; pages 5, 7 and 10). UBS is also obliged to recognize and accept fiduciary responsibility and that this is what it could expect from its "*Consultant*". (**ANNEX 1**, page 26). Regarding the particular problems and challenges of the Puerto Rico Pension System, UBS emphasized that it had extensive experience in reconciling market conditions and results expectations. (**ANNEX 1**, pages 29, 40, 47 and 48).

4.6     UBS also represented that it could successfully achieve the placement of the proposed bonds due to its significant presence in Puerto Rico and the large amount of the local investment portfolio under its charge, as well as investing the product of said sale with a yield that would produce profits for the System.

4.7     Eventually, the Board of Directors of the System contracted UBS as the firm that was in charge of the issuance ("*underwriting*") of Bonds of the System for the amount of approximately three billion dollars. These were issued on January 29, 2008 (Series A); on May 28, 2008 (Series B); and June 26, 2008 (Series C) (hereinafter, collectively, the "Retirement Bonds").

4.8     Among the representations that UBS and UBS Consulting made to the members of the Board of Trustees of the System to convince the System that this issue would be beneficial and would help solve the areas of the System, was that the product of the issue would generate a positive arbitrage ("positive arbitrage"),

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

which would result in net income for the System and that, if part of the issue was made in the local market, would be cheaper and would produce a higher yield. These representations were not only false, but they were made so that UBS and the other firms that participated in the issue could profit and earn commissions and fees, such as those that were actually earned, which exceeded $35 million.

4.9    UBS, through its then main executive officer, Miguel A. Ferrer, represented not only the System, but also the country in general, through communications to the press, that the issuance and sale of the Bonds continue to be recommended by UBS Consulting and UBS, was going to result in a profit ("positive arbitrage") for the System from the moment that said transactions were effective.

4.10   The UBS proposal was accepted by the System relying on the representatives of UBS and UBS Consulting. Both UBS and UBS Consulting knew or should have known that the following points were crucial for the aforementioned financial operation to be successful and to meet the objectives of the System:

4.10.1        That the amount of the issue of the Bonds be high enough (at least $7 billion) to (i) cover the costs of their origination, issue, distribution and sale; and (ii) produce a profit for the System through the

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

investment by the System of the majority of the net proceeds from the sale of the Bonds at returns higher than the cost of the Bonds to the System.

4.10.2      That the interest on the Bonds be at rates low enough to allow the System to achieve a reasonable recurring profit by investing the product of their sale.

4.10.3      That the securities in which the System invested the proceeds from the sale of the Bonds were extremely stable and with minimal credit and/or market risk, since the System could not afford the possibility of losing all or part of the its principal or incurring a loss in interest and/or dividends ("negative arbitrage").

4.10.4      That the proportion of the proceeds from the sale of the Bonds that the System will use to meet its immediate needs be as small as possible (no more than approximately ten percent (10%) of the proceeds from the sale), since the great Most of said product would have to be placed by the System in investments to achieve the recurring profit ("positive arbitrage") that the System <u>needed and that was the main reason for the proposed issue and sale of the Bonds</u>.

4.11   Knowing all of the above, the System and UBS granted contracts for the issuance and sale of the Bonuses, but not for the full amount of seven billion dollars ($7 billion) originally contemplated, but for much smaller and insufficient

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

amounts. to achieve the aforementioned objectives of the System and without any

provision that would require (i) the sale of the <u>totality</u> necessary for the

aforementioned original plan conceived by Merrill Lynch and well known by UBS

and UBS Consulting to work; or (ii), failing that, the cancellation of the partial

Bond issues and sales if the total amount necessary for the plan to function was not

reached. In other words, there was no "all or nothing provision" that was prudent

and necessary to protect the System and its pensioners from the possible negative

consequences of not being able to issue the total amount contemplated.

4.12   Nor did UBS investigate whether the local market was deep enough to

absorb seven billion dollars ($7 billion) in System bonds, on dates when (i) the

local economy had already been contracting for months, (ii) local investors were

suffering substantial losses on their real estate investments and securities,

including, without limitation, bank stocks and/or debt instruments guaranteed by

banks or other financial institutions; (iii) the population of Puerto Rico was aging

and declining; and (iv) unemployment in Puerto Rico was increasing.

4.13   Pursuant to said contract between UBS and the System, during the

first half of 2008, UBS acted as main subscriber or "underwriter" in the following

three issues, distributions, and sales in the System's local bond market (hereinafter

referred to as "Bonds"), for the total aggregate principal sum of approximately

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

three billion Mares ($3 billion), that is, less than half of the seven billion Mares ($7

billion) originally contemplated:

> 4.13.1   "Senior Pension Funding Bonds, Series A", for one thousand
> five hundred and fifty-eight million, eight hundred and ten
> thousand, seven hundred and ninety-nine Mares and sixty cents
> ($1,558,810,795.60), dated January 29, 2008.
>
> 4.13.2   "Senior Pension Funding Bonds, Series B", for one thousand
> fifty-eight million six hundred and thirty-four thousand six
> hundred and thirteen Mares and five cents ($1,058,634,613.05),
> dated May 28, 2008.
>
> 4.13.3   "Senior Pension Funding Bonds, Series C", for three hundred
> million two hundred two thousand nine hundred and thirty
> Mares ($300,202,930), dated June 26, 2008.

4.14   The maturity of the Bonds fluctuates between July 1, 2023 and July 1,

2058, and their interest rates fluctuate between 5.85% and 6.55% per year. Said

interests are exempt from income tax for residents of Puerto Rico.

4.15   In each of the "Official Statements" of the Bonds it is stated that, if

future market conditions were favourable, the System would contemplate issuing

additional bonds during the year 2008. Obviously, as was logical() and prudent to

suppose, such conditions favorable market conditions did not occur and the System

has not been able to issue bonds after the issuance of the aforementioned Series C

Bonds, on June 26, 2008. In the "Official Statement" of the Series A Bonds it was

represented() that the Series C Bonds B would not be sold in Puerto Rico under

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

any circumstances. However, both the Series B Bonds and the Series C Bonds

were sold exclusively in Puerto Rico.[3]

4.16   The use of the proceeds from the sale of the Bonds, according to some

tables that appear in the "Official Statement" of each issue, in the section entitled

"Use of Proceeds"), is represented as follows:

| Use | Amount |
|---|---|
| initial discount | $       7,889,350 |
| Transfer to the System for settle retirement benefits | 2,728,354,898 |
| Underwriters discount and issuance costs | 35,744,191 |
| Deposits in interest accounts Capitalized | 93,737,392 |
| Deposits in senior bond debt service accounts | 81,922,512 |
| **Total** | **$ 2,947,648,343** |

4.17   It seems that the proposed use of the proceeds from the sale of the

Bonds, as represented in said tables, which appear on page 17 of each of the

"Official Statements" and are summarized in 4.16, *supra*, was different. which had

been contemplated when it was proposed to issue bonds for seven billion dollars

---

[3]   See Section 6.5, infra, regarding the misrepresentations in the "Official Statements" on this subject.

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

($7 billion) through Merrill Lynch, and was not consistent with the model

originally proposed by Merrill Lynch and later by UBS, to create a recurring

income for the System through positive spreads between dividend and interest

income, on the one hand, and interest costs, on the other ("positive arbitrage"). It

should be noted that in said "Offering Statements" there is contradictory

information about the use of the proceeds from the sale of the Bonds, since in their

introductory pages and on page 17 of each one of them it is said that the System

would invest the proceeds from the sale of the Bonds and would use said

investments and the profits they produce to pay pensioner benefits to their

beneficiaries, which is not consistent with what is summarized in 4.16, *supra*.

4.18   In fact, as explained below, the proceeds from the sale of the Bonds

were not used as represented in the "Offering Statements" or as had been proposed

to the Board of Trustees of the System, and the Bonds have caused, cause and will

continue to cause significant losses and serious financial damage to the System.

Actually, said product is . use approximately as follows and the exact figures for its

use will emerge from the discovery of evidence in the present case.

4.18.1   Of the amount of approximately $1,600 million from the

issuance and sale of the Series A Bonds, approximately $937 million of bonds and

shares were invested through Citibank, N.A. and/or its affiliate(s) (hereinafter

collectively

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

"city"). Said $937 million invested through Citi are producing an annual return of approximately 4.11%, significantly less than the interest paid by the Bonds, which fluctuates between 5.85% and 6.55% per year. The remaining balance of the proceeds from the issuance of the Series A Bonds, amounting to approximately $642 million, was used to pay expenses and discounts related to the issuance and sale of the Bonds, reserve 4, for debt service and payment of expenses of the System and pensions and therefore does not generate any income for the System.

4.18.2     Of the total aggregate sum of approximately $1.4 billion, product of the issuance and sale of the Series B and Series C Bonds, approximately $564 million were used to cover the cash needs of the System and pension obligations, which does not generate any income to the system. The remaining $836 million was deposited in the Government Development Bank for Puerto Rico ("GDB"), earning interest at only 2% per annum (although the interest rate payable on the Bonds fluctuates between 5.85% and 6.55% annual), but as of June 30, 2010, only $737 million remained deposited there, since approximately $99 million had been used to cover the System's fund needs.

4.19   The foregoing means that, of the approximately $3 billion principal of the Bonds, for which the System pays and pays"' interest, until their maturity, at between 5.85% and 6.55% per year, at As of June 30, 2010, the only amount

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

invested and not spent amounted to $1,674 million, of which the approximately $937 million invested through Citi returned approximately 4.11% annually to the System, while the $737 million invested in deposits in the GDB yielded to the System only 2% annually.

4.20   The approximately $1,326 million received by the System and spent and not invested yield absolutely nothing and cost the System between 5.85% and 6.55% annually. Without counting the cost of those approximately $1,326 million received and spent (not invested) by the System, it is estimated that the approximately $1,674 million received and invested by the System have cost, cost, and will cost the System approximately $55 million annually for differentials negative interest ("negative arbitrage"). This does not include the nearly $36 million in discount, issuance and sale costs of the Bonds incurred and paid by the System when they were issued and sold, nor the financial advisory fees paid by the System to UBS, nor the fees it has paid and continues to pay the System to UBS Consulting.

4.21   Said losses began when the Series A Bonds were issued and sold, on January 29, 2008, and will end when the Bonds mature, between the years 2023 and 2058. The exact amount of the losses to the System caused by the envision and sale of the Bonds will be computed more accurately as the documents that will be required in the discovery of evidence in this case are obtained, but it is

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

preliminarily estimated that the value present of these losses is approximately eight hundred million seas ($800 million). Incredibly, when the Series B and Series C Bonds were issued, the Series A Bonds had already generated millionaire losses for the System, which was not taken into consideration when the Series B and Series C Bonds were issued.

4.22   As can be seen, the Bonds have actually created a negative yield differential ("negative arbitrage") for the System, which is exactly the opposite of the net profit ("positive arbitrage") that was the main objective pursued by the System. when issuing the Bonds. **This has very negatively affected the liquidity of the System, has significantly weakened its financial condition, has caused the credit deterioration of Government bonds in general and has caused serious damage to the Claimants here (Law No. 3 of April 4, 2013, *supra*).**

4.23   Contributions to the System by the Government, as employer, are the only source of payment and collateral for the Bonds and, following the recommendations of UBS, the System levied or pledged them in favor of the bondholders, as a guarantee and source of payment. of the Bonds. Through the issuance of the Bonds and said encumbrance or pledge, the debt evidenced by the Bonds increased, de facto, the total debt of the System and has negatively affected the credit rating ("rating") of the Government's obligations, causing a serious () not only to the System but also to Puerto Rico in general. Said encumbrance or pledge

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

of the System's employer contributions violates the provisions of Articles 2-116 and 3-105 of the Retirement Law, where the permitted use of said contributions is strictly provided, none of which is the payment of bonuses or debts of the System.[4] The right to collect said contributions is clearly an asset of the System and, if the System does not receive them now because they are used to service the debt of the Bonds, the assets of the System and its ability to pay benefits to its pensioners are thus undermined. and future pensioners, as unfortunately has happened and continues to happen.

4.24   In addition, the downgrading of the Government's credit() will increase interest costs to the System significantly, since the Government's contributions are the main Bridge with which the System relies for the payment of its obligations and the cost of interest to the System depends on the cost of interest

---

[4]   Article 2-166 Employer Contribution provides, in its pertinent part: "(a) The employer's contributions() must cover the difference between the total cost of providing all the benefits provided by the Ina System plus the administration expenses, reduced by that Part of said total cost is contributed by the participants.

(b)……………………………………………………………………………………………… ……(c)………………………………………………………………… "Section 3-105 Retirement Savings Program - Employer Contributions provides:
"Every employer will compulsorily contribute to the System an amount equivalent to nine point two hundred and seventy-five percent (.275%) of the compensation of each Program participant while the participant is an employee. These contributions will be deposited in the System to increase the level of assets of the System, reduce its actuarial deficit and enable the System's capacity to comply without future obligations". (This Article was recently amended by Law Wm. 116 of July 6, 2011, but said amendment does not provide a different use for employer contributions).

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

to the Government, since, we repeat, the payment of the debts of the System

depends largely on the payments received by the System from the Government.

4.25   At the end of 2006 and during 2007, when the negotiations for the

possible issuance of the Bonds were being conducted, it had been proposed that

they be issued as direct obligations of the Government, so that it would provide the

System with the Tondos product of its It sells and thus improves the net worth

("net worth") and the financial condition, as well as the so-called "funding ratio",

of the System. It was proposed to increase the assets of the System by the net

amount of the proceeds from the sale of the Bonds and it was also proposed to

increase the net worth ("net worth") of the System, since the Bonds would not be

debts or liabilities of the System, but of the Government. . This would considerably

improve the "funded or funding ratio" of the System. However, unfortunately that

did not happen.

4.26   In order for the Bonds to be issued by the Government, the approval

of the Legislative Assembly was required. Said approval was requested to the

Legislative Assembly and denied by it. Despite said refusal by the Legislative

Assembly and the public policy that said refusal established, the System (whose

existence and powers emanate from the Retirement Law, that is, from legislation

approved by the Legislative Assembly) violated said public policy and, relying on

representations and advice and . recommendations of UBS and UBS Consulting,

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

avoided the denial of the Legislative Assembly.  In order for the Bonds to be issued by the Government, the approval of the Legislative Assembly was required. Said approval was requested to the Legislative Assembly and denied by it. Despite said refusal by the Legislative Assembly and the public policy that said refusal established, the System (whose existence and powers emanate from the Retirement Law, that is, from legislation approved by the Legislative Assembly) violated said public policy and, relying on representations and advice and . recommendations of UBS and UBS Consulting, avoided the denial of the Legislative Assembly and recklessly proceeded with the issuance and sale of the Bonds as direct obligations and liabilities of the System (although compromising in any way the credit of the Government, through the aforementioned lien or pledge to the bondholders of the Government's employer contributions to the System, in violation of the provisions of the Retirement Law). With these violations, the "funded or funding ratio" of the System was negatively affected, since its liabilities increased more than its assets, with the consequent reduction in its net worth ("net worth").

4.27   The System is prevented from mitigating future recurring losses caused by the Bonds, because the interest rates it pays for them do not allow it and will not allow it in the foreseeable future to make a positive arbitrage or net profit on the investment of the Tondos that still retains, if any, from the proceeds of the sale of the Bonds. To the amount of the aforementioned damages must be added

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

the additional cost to the System of future financing, caused by the credit

degradation of the Government's obligations, caused, in turn, by the issuance and

sale of the Bonds.

## The Minutes of the Board of Directors

4.28   According to page 6 of the Minutes of the Board of Trustees of the

System corresponding to the Special Meeting of February 27, 2007, officials of the

Government Development Bank for Puerto Rico ("GDB") The following

represented the members of the Board of Trustees of the System, referring to the

aforementioned issue of Retirement Bonds:

> *"...this solution would **extend the life of the System's resources
> until 2027 and would notably improve the "funding ratio" of 19%,
> which is currently up to 72%.** If, in addition, the increase in
> contributions proposed in the bill to 12.5% were approved, using this
> scheme, the obligation of the System could be covered until 2042"*
> (Emphasis added).

4.29   In that same meeting, the then Administrator of the Retirement

System represented to the Board of Trustees of the System the following, it

appears from page 7 of the minutes of said meeting:

> *...the **financial consultants** are already working on the different
> scenarios for the distribution of investments that will be presented for
> consideration by the Board soon. Mr. Cancel Alegria added that the
> talks on this transaction are aimed at executing it by June 2007, that is,
> before the close of the current fiscal year."*

(Emphasis and underlining ours).

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

4.30   In a joint meeting of the Board of Trustees of the System and the Board of Directors of BGF, on January 24, 2008, in which the issuance of the Retirement Bonds by both Boards was approved, both Boards were also represented Together that "*The expectations of the issue is that the markets are favorable and there is a positive return on the portfolio, which would alleviate the debt*."

4.31   At the same joint meeting, the then Chairman of the Board of Directors of the Government Development Bank, Mr. Rafael Martinez Margarida, asked if the Retirement System Administration had the mechanisms to ensure that, when the money from the issue came in, it could start to produce the expected average yield. Mr. Jorge Irizarry Herrans, (then President of BGF), stated that, together with the consultants, a strategy has been designed for the distribution of said funds, which includes the hiring of eighteen (18) managers in addition to the eight (8 ) that already exist and are ready to receive the money.

4.32   Also in said joint meeting, the following was expressed, as appears from page 9 of the minutes of the same:

> *"Mr. Luis Alfaro Martinez, Vice President of Financing of the Government Development Bank for Puerto Rico, points out that the debt of the general fund* **is not being increased because the obligation is in the Retirement System***, what is being done is to change the Bond repayment bridge".*

(Emphasis supplied).

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

4.33   Finally, on page 13 of the Minutes of that meeting, the following is stated:

> "...Mr. Luis Alfaro Martinez stated that the public policy of the Government Development Bank is to maximize the resources and conditions of the local market, it is for this reason that the issue is made first () in the local market and then it to the global market. At-ladle) that the local market has some advantages over the global market, such as, for example, that the local Bonds are redeemable before their expiration ("callable") in the term of ten (10) aliases, which that allows that if after ten (10) years the rates have dropped, those bonds can be called and refinanced, this cannot be done with the global bonds because they are "non-callable". Mr. Alfaro states that originally went to the market with an offer of $750 million, as the days went by the interest increased and ended with a demand of $1.4 billion ($1,456,247,368.95) and Orders continue to come in, for which a **commitment was made with UBS** to provide space and amend the transaction, for which the Bank's Board of Trustees and Board of Directors would have to meet again to approve the new amount. The members of the Board of Directors recommended establishing the clause that allows the amount to be increased by up to 15% without having to go to the meetings for new approval. The President of the Board of Trustees approved the recommendation for the future..." (Emphasis supplied)

4.34   In accordance with what was expressed in the Minutes of the Board of Trustees of the System of February 27, 2007, on page 6, the following was stated:

> "...> The cost of the debt is estimated at 6%, which allows a <u>positive arbitrage</u> in view of the fact that the System's investments must yield 8.5%...". (Underlining ours).

4.35   In the Minutes of the Extraordinary Meeting of the Board of Trustees of the System of January 10, 2008, on page 2, the following appears:

> "...With great enthusiasm and satisfaction, the President informs the Board of Trustees that today the first Phase of the Retirement

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

> *System bond issue is launched on the market, in the local part that corresponds to Puerto Rico. He indicated that In the next hour, the financing team of the transaction would be meeting with the 'brokers, to make them the presentation of the structure...".*

4.36   In the Minutes corresponding to May 13, 2008, on page 20, it is said to

Next:

> *"...C. Investment Committee of the Board of Trustees*
>
> *Mr. Jorge Irizarry Ilerrans, Chairman of the Investment Committee of the Board of Trustees informed the Board Members that the Committee has been meeting to work on the investment strategy known as 'liability driven investment' in order to ensure the cash flow from investments for the next six (6) or seven (7) years. Mr. Irizarry Herrans explains that the Committee has examined a large number of proposals on this strategy and continues to develop strategies, to later present a recommendation to the Board of Trustees...".*

4.37   According to the Minutes of June 13, 2008, Messrs. Juan G. Ilerrans Barrera

and John Thomas Engfer, both officials of UBS, appeared as guests at the Board of

Directors of the Retirement System.

4.38   In that meeting of June 13, 2008, the President of the Board of Trustees of

the Retirement System, says the following on page 3:

> *"...The President of the Board of Trustees, Mr. Jorge Irizarry Herrans, presented before the Members of the Board for their discussion and approval the recommendations of the Investment Committee of the Board of Trustees and the <u>Financial Consultant of the Agency: UBS , on the investment strategy</u> called 'Liability Driven Investment.' For the presentation of this matter, the Members of the Board had the representatives of* ***UBS****: Juan G. Herrans Barrera and John Thomas Engfer, as well as the interim Treasurer of the Government Bank of Foment() for Puerto Rico, Mr. Rene Van Noort...". (Emphasis and underlining ours).*

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

4.39   Later, in that same Minute of June 13, 2008, on page 3, the following is

stated:

> *"...Mr. Irizarry Herrans indicates that the Board's Investment Committee and the Government Bank's working group have worked hard during the past months with the analysis and evaluation of investment strategies that allow the Retirement System to meet its obligations with pensioners. The Chairman of the Board points out that both groups, together with the Financial Consultant, have been carefully studying the strategy known as 'LDI' or 'liability driven investment...'" (emphasis added).*

4.40   Later, in that same Minute of June 13, 2008, on pages 3 and 4, the following

is stated:

> *"...Mr. <u>Irizarry Herrans</u> explains that the 'LDI' investment strategy is a relatively new one and therefore many of the alternatives presented by the managers are <u>new in the world</u> of investments, so it <u>required a lot of study and analysis of The people who were working on this exercise</u> That made the group's focus to select an investment mix that <u>offered a lot of return with as little risk as possible</u>...".*

(Underlining ours).

4.41   In that same Minute of June 13, 2008, on page 4, the following is stated:

> *"...Mr. Juan G. Herrans Barrera [of UBS] began his presentation by explaining to the Board Members the aspects to be presented for their consideration, which are: the asset distribution recommendations on which the Board must deliberate , <u>the explanation of the 'LDI' strategy, and the recommendation for the selection of managers to implement the investment strategy</u> and the amounts to be assigned to them... m.(Underlining ours).*

4.42   In addition, on page 5, the following is stated:

> *"...The guests [of UBS] began by presenting to the Board the current distribution of the assets of the System assuming that an additional $400 million is raised to the $1,000 million raised on June 2, 2008 as*

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

*a result of the issuance of Retirement System bonds, for a grand total of assets of $5,015,200,557, of which 27.28% would be cash. The Consultant's assignment is to recommend the farina in which that cash is to be distributed...'".*

4.43 Also in the Minutes of June 13, 2008, on page 5, the following is stated, without mentioning the increase in liabilities of the Retirement System, resulting from the issuance of the Bones:

*" Mr. Jorge Irizarry Herrans intervened at this point to point out that the $1,000 million approved by the Board of Trustees to be issued on June 2, 2008 were institutional bonds and that there remains a demand for individual accounts, which are the ones that are going to be offered for sale soon. He reported that the $1,000 million has already been received and an additional $400 million is estimated. He highlighted as an important achievement for the System that a total of $5 billion in assets has been reached, when only a year ago the System had with $2.5 billion, which means that the assets have doubled thanks to the strategy that has been executed, since the System's `funding ratio', which for 2005 was 19%, as of June 2008 is at 40% with a plan outlined to reach 70 or 80% if the strategy is completed...'".*

4.44 Later, in that same Minute of June 13, 2008, on pages 5 and 6, the following is stated:

*"...Mr. Juan G. Herrans Barrera continued the presentation showing the distribution of assets proposed in accordance with the recommended strategy, on which the Board of Trustees must make a determination. It proposes to allocate $1.7 billion to the strategy of the 'LDI,' which is equivalent to 34.10% of the total assets considering the aforementioned $5 billion, this is equal to a third of the System's portfolio in LD1' The proposal contemplates assigning the $1.4 billion of cash (27.28%) to the strategy of '1,D1' and to add to it, through redistribution, $3 million currently allocated in shares...'".*
(Underlining ours).

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

4.45   According to this Minute of June 13, 2008, a power point presentation appears with the UBS logo.



PRERS Proposed Asset Allocation

| Asset Type | | | % Allocation |
|---|---|---|---|
| LDI Strategies | $ | 1,710,000,000 | 34.10% |
| | | | 35.80% |
| | | | 18.03% |
| Fixed Income | | 552,519,494 | 11.02% |
| Private Equity | $ | 53,365,000 | 1.06% |
| Total Portfolio | $ | 5,015,200,557 | 100.00% |

4.46 In that same meeting and, according to the Minutes of June 13, 2008, on Pages 6 and 7, the following is stated:

> ...In order for the Board of Trustees to consider this recommendation, the Consultant presented the two (2) faces of investments: risk versus return. The diagram presented by the Consultant identifies the current strategy of the System ("current'), without considering cash. This strategy maintains a distribution of 40% of its portfolio in bonds or loans that behave like bonds and 60% of it in stocks. Mr. Herrans Barrera explains that this distribution is on a par with the average of all pension plans in the United States To questions from CPA Roberto E. Aquino Garcia, Mr. Herrans Barrera [of UB.S7 set-kilo that This strategy is adjusted to the investment policies approved by the Board of Trustees. As a result of it, the System obtains an approximate return of 9.52% versus a risk deviation equivalent to 5.5%...". (Underlining ours).

4.47   In that Minute of June 13, 2008, on pages 7 and 8, the following is stated and the following table is attached:

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

*"...For this reason, the Consultant proposes an intermediate strategy that offers a return of 10.44% and a risk deviation of 3.74%. Mr. Herrans Barrera [of UBS] points out that he is aware that there are many pension plans and foundations that use this strategy with great success.  However, taking into account the criterion of prudence, its recommendation is aimed at an intermediate strategy that allows, during the process in which it is used, to evaluate its results with caution, considering a movement towards said strategy. strategy based on the results that are obtained...".* (Underlining ours).



4.48 In that Minute of June 13, 2008, on pages 8 and 9, the following is

stated:

*"...Mr. Herrans Barrera [of UBS] continued his presentation, presenting average probability of profits and yields of the Retirement System portfolio, taking into account the portfolio distribution alternatives according to the strategies presented for the $1.7 billion of*

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

*assets at one, three, five and ten years.The analysis of the same shows that the diversification of the portfolio reduces the risk and improves the slow return, razor) for which the 'LDI' strategy is recommended and the combination of strategies that sustain it for a complete economic cycle of seven (7) years...".* (Underlining ours).

4.49   In that same Minute of June 13, 2008, on page 12, it is said that Next:

*"...Therefore, the Consultant points out that this strategy cannot be worked like a conventional strategy, nor can historical data be used on it because it is 'sui generis'. It is then necessary to structure the strategy...".* (Underlining ours).

4.50   In that same Minute of June 13, 2008, on page 12, it is said that

following and the following table is included:

*"...For such purposes, the Financial Consultant presented a proposal for the rebalancing and redistribution of the System's new assets, which does not include the Wellington Firm because its alternatives were not very different from the strategies with the System accounts, it does not add diversity, does not present() cohesion, etc. The asset distribution proposal presented by UBS is as follows:* (Underlining ours).

### Proposed Rebalancing and Distribution of New Assets

| Money Managers | Style | Balance before Rebalancing as of May 31, 2008 | Rebalancing Total | New Money | Balance after Distribution |
|---|---|---|---|---|---|
| Taplin | Core Fixed Income | $ 185,603,114 | $ (35,000,000) | $ - | $ 150,603,114 |
| State Street | Indexed US Equity | $ 679,673,114 | $ (275,000,000) | $ - | $ 404,673,114 |
| Morgan Stanley Intl | International Equity | $ 519,683,458 | $ (200,000,000) | $ - | $ 319,683,458 |
| Wellington | US LCC | $ 210,083,797 | $ (100,000,000) | $ - | $ 110,083,797 |
| Neuberger Intl | International Equity | $ - | $ 75,000,000 | $ - | $ 75,000,000 |
| Evergreen Intl | International Equity | $ - | $ 75,000,000 | $ - | $ 75,000,000 |
| Goldman Sachs Intl | International Equity | $ - | $ 50,000,000 | $ - | $ 50,000,000 |
| Emerging Managers | | $ - | $ 100,000,000 | $ - | $ 100,000,000 |
| Evergreen | Credit Driven | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Eaton Vance | Credit Driven | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| PIMCO | Credit Driven | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Invesco | GTAA | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Putnam | GTAA | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Morgan Stanley | Hedge Fund of Funds | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Credit Suisse | Hedge Fund of Funds | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| Canyon | Hedge Fund of Funds | $ - | $ 38,750,000 | $ 175,000,000 | $ 213,750,000 |
| **Totals** | | **$ 1,595,303,483** | **$ -** | **$ 1,400,000,000** | **$ 2,995,303,483** |
| | | Rebalancing Total *$ 610,000,000 | | | |

UBS

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

4.51    In that same Minute of June 13, 2008, on page 13, it is said that Next:

*"...The Members of the Board discussed the proposals presented, in the same they discussed the expectations that the Retirement System could have when approving the proposed strategies. The President of the Board was very hopeful, understanding that such strategies can lengthen the useful life of the Retirement System, referring to the following projections included in the consultants' presentation...".* (Underlining ours).



4.52   In that same Minute of June 13, 2008, on page 15, the following is

stated:

*"...Discussed these aspects, the CPA Roberto E. Aquino Garcia presented ()*

*motion for the approval of the proposals and recommendations of the Financial*

*Consultant: UBS, regarding the investment strategy considering the 2DI, the*

*rebalancing and the distribution of the assets of the Retirement System, as well as*

*the selection of the managers proposed in the presentation. The attorney Juan Jose*

*Zamora Santos seconded the motion. There being no objections, it is approved. To*

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

*such ends, the President of the Board of Trustees, Mr. Jorge Irizarry 1-lerrans*

*gave instructions to the Administrator of the Retirement Systems, Attorney Minia*

*Gonzalez Alvarez to carry out the corresponding procedures to execute this*

*determination of the Board of Trustees...".* (Emphasis and underlining ours)

### The Conway MacKenzie Report

4.53   On June 30, 2010, the independent firm Conway Mackenzie

(hereinafter "CM") was contracted by the GDB to study the causes and origin of

the crisis that the Retirement System was going through. Specifically, CM focused

on several areas, including the analysis carried out to support the decision to issue

three billion Mares in Pension Obligation Bonds during the year 2008. CM is a

prestigious firm of Financial Consultants, specialized in evaluations and forensic

analysis, with an extensive research career. They are certified fraud examiners

"*Certified Fraud 'Examiners*" and certified forensic finance specialists "*Certified*

*Financial Forensic Specialists*". The study concluded that the issuance of

Retirement Bonds in 2008 was detrimental and contributed to the current crisis of

the Retirement System, as well as that it is a strategy risky, ill-conceived and

speculative.

4.54   From the report submitted by CM, it can be deduced that they found

that the Board of : Trustees of the System was induced to execute this risky

transaction, which was miscalculated. Originally, the Retirement System, with the

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

endorsement of the Government Development Bank, considered issuing $7.0 billion in Obligation Bonds, which would be paid by contributions received from members and employers. Due to the magnitude of the transaction, it could not be completed according to the original parameters, and only approximately $2.9 billion could be issued; all in the local market, through ' UBS. That smaller amount was not enough to carry out the strategy originally outlined and the product of the Bonds was not reinvested with a sufficient return to pay the interest on the Bonds and, in addition, produce a positive margin for the Retirement System, so the expected results were never generated to help improve the financial condition of the Retirement System. It was evident that market conditions revealed that this transaction was very risky and there was no investor appetite to participate in it. In fact, at the extraordinary meeting of the Board of Trustees of the System on May 27, 2008, the following point was raised: "*Mr. Alfaro Martinez stated that since January [2008] when the first series of bonds was issued, the present, the market has deteriorated around 35 base points, which represents a substantial difference in the interest rates of the bonds, for which it is more expensive to obtain financing today than in January 2008...Serial() el Mr. Alfonso Martinez that these bonds were only sold to the funds of UBS, Santander and a small order of $5 million to the funds of Triple S*". The strategy of creating an arbitrage opportunity ("arbitrage") for the Retirement System, through the issuance of Bonds, was poorly

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

conceived from the beginning. In reality, the issuance of pension obligation bonds is and will be an additional burden for the Retirement System, which did not provide a solution to the problem and worsened (instead of improving) its "*funded ratio*".

4.55   Conway MacKenzie submitted to the System and the GDB his Report in October 2010, with the title, in English, "Review of the Events and Decisions That Have Lead to the Current Financial Crisis of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico". See SCHEDULE III of the original Complaint. On page 12 of the Conway MacKenzie Report it is stated, in English:

> *As discussed in greater detail below, the POB[5] transaction was subject to significant risks which do not appear to have been fully understood or vetoed by the Board of Trustee prior to undertaking the bond issuance strategy. In addition, several early warning signs which existed prior to the issue of the POBs appear to have been ignored by the ERS's Board of Trustees6 Therefore it is our opinion that given the risks inherent in the transactions, several of which appear to have increased significantly in probability prior to the issuance of these bonds, the decisions to pursue and enter into Series A, Series B and Series C transactions were not prudent and may not comply with the general standards of fiduciary responsibilities of a Board of Trustees.[6] Furthermore, our analyzes indicate that a significant portion of the POB proceeds were not invested as originally anticipated and as a*

---

[5]   "POB" refers to "Pension Obligation Bonds", that is, the Bonds that are the subject of this case.

[6]   "ERS" Board of Trustees means Board of Trustees of the System.

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

*result, the System has not achieved its targeted arbitrage strategy.*
(Footnotes and emphasis added).

4.56   The conclusions of the Conway MacKenzie report on the issuance and

sale of the Bonds in the local market through UBS, among others, are devastating,

they show the gross negligence of the defendants here and are transcribed below in

English, as appear in it:

> *In analyzing management's decision to enter into the POB transaction, we found no basis for the initial assumption made that such a strategy would improve the funded status of the ERS. The treatment of bond obligations in the calculation of the UAAL by the System's actuarial consultants appears to support the practical reality that the incurrence of additional debt to increase plan assets should have little effect on the funded status of a pension plan in the short term. If the bond obligations could be excluded from the calculation of net assets or otherwise in the UAAL, we would have expected the ERS to oppose the calculation by Milliman in the System's June 30, 2009 actuarial valuation report. We did not come across any information to suggest there was a disagreement. This could imply a lack of understanding of the true impacts of the bond transaction on the ERS by ERS management, the Board of Trustees and GDB Board of Directors when they made the decision to enter into the POB transaction.*

> ***Perhaps even more concerning in our analysis of the decision to enter into the POB transaction is the decision to move forward with the transaction in light of the many warning signs that existed, which suggested full implementation of the strategy would be difficult, if not impossible.***

> *The successful execution of the POB transaction was dependent on certain risks not materializing, primarily the risk that the market would be unable to absorb the full $7.0 billion issuance. **Consummating a transaction of significantly less than $7.0 billion would merely serve as an expensive, temporary measure to address the System's liquidity issues, postponing for some period of time the date of the ERS's eventual insolvency. For this reason, the POB transaction resulted in the flawed execution of a failed strategy.***

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

*__The POB transaction has negatively impacted the ERS and the Government, in general.__ Rather than addressing the System's long-term funding problems, the $3.0 billion POB transaction merely provided a short-term temporary measure to address the System's liquidity needs, as it was not large enough to create arbitrage opportunities. It did nothing to improve the funded position of the System and due to the negative arbitrage realized and fees paid as part of the POB transaction, actually worsened the funded position of the System. The short-term liquidity fix is costly and these costs may be realized for decades to come. In our opinion, the POB transaction accomplished little more than passing on, and increasing the complexity of the burden of fixing the System's fundamental structural problems to future administrations of the ERS.* (Emphasis to liadido).

4.57   The issuance, sale and use of the proceeds from the sale of the Bonds, in violation of the Retirement Law and the public policy promulgated by the Legislative Assembly, constituted grossly negligent and illicit conduct on the part of UBS Consulting and UBS.

4.58   According to the documentation and reports reviewed by CM, it was concluded that the Retirement System Administration was never made fully aware of the possible repercussions that this Bond issue would have, which is clearly risky and totally speculative. On page 4 of his report, CM states the following:

*"...Lastly, we believe that the POB transactions may have negatively impacted the ERS and the Government, in general. In analyzing management's decision to enter into the POB transaction, we found no basis for the initial assumption made that such a strategy would In fact, the strategy has not improved the funded position of the System and, due to the negative arbitrage realized and fees paid as part of the POB transaction, actually worsened the funded position of the System.The short-term liquidity fix is costly and these costs may be realized for decades to come.In our opinion, the POB transaction accomplished little more than passing on, and increasing the complexity of the burden*

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

*of fixing the System's fundamental structural problems to future administrations of the ERS. In addition, several warning signs, which suggested that the full implementation of the POB strategy would be difficult, if not impossible, were identified but ultimately downplayed or ignored by those responsible for making the decisions to enter into the POB transactions (ERS management, the ERS Board of Trustees, and the GDB Board of Directors in 2008). For these reasons, we believe the decision-makers may have failed to meet the standard of due care and other important fiduciary duties in approving such a transaction...".*

(Underlining ours).

4.59   On page 10 of the CM Report, the following is stated:

*"...The POBs were issued by the ERS with the intent of providing the System with increased assets to pay benefit obligations, reduce the unfunded accrued actuarial liability and generate additional revenue to the System through speculative arbitrage...".*

4.60   On page 11 of the CM Report, the following is stated:

*"...As discussed in greater detail below, the POB transaction was speculative and subject to significant risks which do not appear to have been fully understood or-vetted by the Board of Trustee's prior to undertaking the bond issuance strategy in 2008. In addition , several early warning signs which existed prior to the issuance of the POBs appear to have been ignored by the ERS's Board of Trustees. prior to the issuance of these bonds, the decisions to pursue and enter into Series A, Series 13 and Series C transactions were not prudent and may not comply with the general standards of fiduciary responsibilities of a Board of Trustees. Furthermore, our analyzes indicate that a significant portion of the POB proceeds were not invested as originally anticipated..."* (emphasis added).

4.61   Add the following to page 11 of the CM Report:

*"...Based on analysis and advice from its lead underwriter, Merrill Lynch, it appears that the GDB and ERS had reason to believe that the proposed $7.0 billion POB transaction would be sufficient to resolve the System's short term liquidity crisis and meet the System's long-term*

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

*cash flow requirements but the ERS and GDB should have known the $3.0 billion of proceeds issued would not solve the long-term cash flow requirements...".*

4.62   On page 12 of the CM Report, the following is stated:

*"...Given the treatment by the System's actuarial consultants, we do not believe it was reasonable to conclude that the POB transactions would positively impact the funded ratio immediately, as was originally communicated. We further question how those responsible for making the decision to enter into the POB transaction could have overlooked this fundamental flaw in the forecasted funding ratio's computation methodology...".* (Underlining ours).

4.63   On page 12 of the CM Report, the following is added:

*"...It appears that numerous warning signs existed, foretelling difficulties with placing the bonds and realizing the returns required. yet action plans were not altered..."* (Underlining ours).

4.64 On page 12 of the CM Report, this firm reaches the following

conclusion:

*"...Conclusion*

*Based upon Merrill Lynch's analyses, the ERS had the capacity to issue $7.0 billion of pension obligation bonds. While it was a reasonable strategy to help address near term liquidity requirements, it was not likely to significantly improve the System's funding status when calculated consistently with prior methodologies. In addition, the transaction was subject to significant risks among others, the risk of a failed or undersubscribed offering and the System's potential inability to generate arbitrage on the POB proceeds. Based upon our review of supporting documents, it appears that these risks were not fully understood or vetoed by the decision-makers prior to undertaking the bond issuance strategy and several of these risks actually materialized. Given the importance, magnitude and potential risks associated with a failed strategy, by not understanding or vetting the risks associated with the POB transaction, it appears the ERS management, the Board*

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

*of Trustees and GDB Board of Directors did not exercise due care... ".*
(Underlining ours).

4.65   Based on the above facts, UBS was required to klentify, for the benefit of of the members of the Board of Trustees of the System, the significant risks involved in the issue of Bonds. In other words, UBS, as Financial Advisor, had the obligation to ensure that the members of the System's Board of Trustees fully understood and validated the strategy before approving the issue. On whether it was prudent to carry out this emission, the CM Report, page 12, concludes the following:

*"...2. **Was it prudent to issue the Pension Obligation Bonds?***

*The ERS and then lead underwriter, Merrill Lynch, pursued a $7.0 billion POB issuance during 2007 but Merrill Lynch was unable to consummate the transaction due to a lackluster demand in the global market UBS then replaced Merrill Lynch as underwriter and placed approximately $3.0 billion of the bonds in the local Puerto Rico market. Given the System's significant current and projected annual net cash flow shortfalls, the transaction was not large enough to create arbitrage opportunities since a significant portion of the proceeds have been (and will continue to be) utilized to address annual cash flow shortfalls, as opposed to being invested for the long term. This means that the transaction has also resulted in costly annual interest expense for the ERS...".*

4.66   The CM Report concludes the following about market conditions:

*"...c. In an ERS Board meeting held in May of 2008, an issue was raised that the "market has deteriorated around 35 basis points since January 2008" (when the first series of bonds were placed) and that "this represented a substantial difference in interest rates of the bonds, making it more expensive to obtain financing. "12._*

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

[12] *Based on the ERS Board of Trustees meeting minutes dated May 27, 2008."*

*"...d. By June 2008 there were also signs that the stock market was deteriorating, which should have signaled to the ERS that its arbitrage goals were jeopardized...".* (Underlining ours).

4.67   UBS, as Financial Advisor, should have been aware of this

deterioration of the market and alert the members of the Board of Trustees of the

System and recommend them accordance.

## Violation of Fiduciary Duty of UBS and UBS Consulting

4.68 The Regulations of the Uniform Securities Act of Puerto Rico, Nilm

Act. 60-1963, 10 L.P.R.A. §851, et seq., in its pertinent section, reads as follows:

*"...Section 25.1. Standard of business and **fiduciary duties** to clients.*

*Every broker-dealer, issuer, investment adviser, investment adviser representative, federally covered adviser, federally covered adviser representative, agent, or any other person subject to the provisions of the Act, shall observe the highest standards of fiduciary duties. towards its clients and investors..."* (Emphasis and underlining ours).

4.69   UBS, in its capacity as Financial Consultant and investment adviser,

had the obligation and fiduciary duty to alert the members of the System's Board of

Trustees about the risks inherent in the envision. There is no doubt that the

issuance of l3ons recommended by UBS was unwise. UBS should have alerted the

members of the System's Board of Trustees. The following conclusions of the CM

Report, on pages 14 and 16, reflect this.

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

*"...Conclusion*

*The notion that the POB transaction would generate arbitrage opportunities for the System was inherently flawed based on the current liquidity needs of the System. In fact, the POB transaction has and will continue to cost the System money, as short-term cash flow problems continue to require the use of the POB proceeds to fund current expenses of the System. Simply put, the ERS cannot generate investment returns on POB proceeds that are used to fund System expenses, as opposed to being invested. For this reason, the POB issuance is currently costing the ERS more than what it is actually earning on invested proceeds. Our findings indicate this occurred because ERS management and Board of Trustees ignored market conditions and were subsequently constrained and blinded by the necessity to utilize cash proceeds to fund cash requirements of the System. This lack of understanding is not reasonable any may not fall within the general standards of fiduciary responsibilities expected by a Board of Trustees..." (emphasis added).*

*"...Perhaps even more concerning in our analysis of the decision to enter into the POB transaction is the decision to move forward with the transaction in light of the many warning signs that existed suggesting full implementation of the strategy would be difficult if not impossible The successful execution of the POB transaction was dependent on the assumption that the market would be able to absorb the full $7.0 billion issuance, since consummating a transaction of significantly less than $7.0 billion would merely serve as an expensive, temporary solution to the System's liquidity issues, further postponing the date of the ERS's eventual insolvency...". (Underlining ours).*

4.70   As anticipated in the aforementioned studies and reports, the System has found it necessary to significantly reduce the benefits to its trustees, including the Individual Plaintiffs and the members of the Class, as a result of the conduct of the UBS defendants, including, without limitation, breach of fiduciary duties, negligence, and breach of contract. This has! caused and will continue to cause continued harm to the System, the Individual Plaintiffs, and the members of the

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

Class. The amount of these continuous datios has not been able to be definitively determined.

4.71     Recently, as part of the procedures of the Plan of Adjustment for the Payment of the Debt of the Government of Puerto Rico, and in accordance with the PROMESA Law, it emerged that the System is going through or will go through a process of liquidation and/or transfer of its assets. and eventual possible dissolution and it is not clear the position in which their trustees will remain, that is, their beneficiaries/pensioners. The continued damages to the Plaintiffs, Individuals and the other trustees/beneficiaries of the System, as a consequence of the losses generated to the System by the conduct of the UBS defendants and the resulting liquidation and transfer of the assets of the System, cannot be determined in an accurate manner. definitive while said liquidation and transfer process is not concluded.

## V. JURISDICTION AND COMPETENCE

5.1     This Honorable Court has the necessary jurisdiction and competence to judge this case, because the events described here occurred in San Juan, Puerto Rico, in addition to San Juan, Puerto Rico being the municipality where Defendants UBS and UBS Consulting have their place of business.

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

## VI.  FIRST CAUSE OF ACTION/VIOLATION OF CONTRACT DUTIES AND TRUSTEE FOR UBS AND UBS CONSULTING

6.1     The System and the Individual Claimants, by themselves and on behalf of the Class, repeat and incorporate by reference to this section everything previously alleged in this Fifth Amended Complaint.

6.2     Before the issue of the Bonds is carried out, UBS and UBS Consulting they made several presentations and representations to the System that they were experts in financial advice and had the capacity to place the Bonds, in order to convince the System to hire them to carry out the aforementioned issue.

6.3     Between the representations made by UBS and UBS Consulting, to convince to the System that the issue of the Bonds would be beneficial and would help solve the System's coffers, was that the investment of the proceeds of the issue would generate an arbitration positive, which would result in net income for the System. Those representations were not only false, but they were made so that UBS and UBS Consulting could profit and collect their commissions and fees, such as those they actually received, which exceeded $35 million.

6.4     UBS, through its then President, Miguel Ferrer, represented him falsely not only to the System, but to the country in general, through communications to the press, that the issuance of the Bonds, recommended by UBS Consulting and UBS, would result in; profits through positive arbitrage for the System from the moment of its effectiveness.

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

6.5    In the "Official Statement" dated January 29, 2008, for Series A

Bonds, UBS and the other underwriters made the following false representations,

among others, about the use of the proceeds from the sale of the Series A Bonds:

a.    The proceeds from the sale of the Bonds would be invested and said

investments and the earnings that they produced would be used to pay

pension benefits to the beneficiaries of the System ("invest the

proceeds of the Bonds and use these investments and the earnings

thereon to provide such pension benefits to its beneficiaries") (First

page or cover of the "Official Statement" of January 29, 2008).

b.    The proceeds from the sale of the Bonds, after deducting issuance

expenses, commissions and reserves, will be added to the System's

pool of invested assets ("will be added to the System's pool of

invested assets") (Page 17 of the "Official Statement" of January 29,

2008).

6.6    In the "*Official Statement*" dated January 29, 2008, for Series A

Bonds, UBS and the other "underwriters" made the following false representations,

among others, about the projected future issuance of Series B Bonds, which

amounted to $1,058,634,613.05 and, like the Series A Bonds and the Series C

Bonds, were sold exclusively in Puerto Rico:

*"The System currently contemplates offering additional parity
Bonds (the "Series B Bonds") in other jurisdictions. The Series B Bonds*

55

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

*would be Offered by means of one or more separate Official Statements
and may not under any circumstances, be purchased by residents of
Puerto Rich."* (Emphasis added).

6.7     However, in the "Official Statement" of May 28, 2008, for the Bonds

Series B, UBS made the following misrepresentations, among others, about the use

of the! product of the sale of Series B Bonds, which. as well as the Scrie C. Bonds,

they were offered and sold only to investors in Puerto Rico, contrary to the

provisions of Section 6.6, *supra*:

a.     The proceeds from the sale of the Bonds would be invested and said

investments and the earnings that they produced would be used to pay

pension benefits to the beneficiaries of the System ("*invest the*

*proceeds of the Bonds and; use these investments and the earnings*

*thereon to provide such pension benefits to its beneficiaries*") (First

page or cover of the "*Official Statement*" of May 28, 2008).

b.     The proceeds from the sale of the Bonds, after deducting issuance

expenses, commissions and reserves, will be added to the System's

pool of invested assets ("*will be added to the System's pool of invested*

*assets*") (Page 17 of the "*Official Statement* " of May 28, 2008).

6.8     In the "*Official Statement*" of June 26, 2008, for Series C Bonds, UBS

made the following false representations, among others, about the use of the

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

proceeds from the sale of the Series C Bonds, <u>which were offered and sold only to
investors in Puerto Rico, in violation of the provisions of Section 6.6</u>, *supra*:

a.    The proceeds from the sale of the Bonds would be invested and said
investments and the earnings that they produced would be used to pay
pension benefits to the beneficiaries of the System ("*invest the
proceeds of the Bonds and use these investments and the earnings
thereon to provide such pension benefits to its beneficiaries*") (First
page or cover of the "*Official Statement*" of June 26, 2008).

b.    The proceeds from the sale of the Bonds, after deducting issuance
expenses, commissions and reserves, will be added to the System's
pool of invested assets ("*will be added to the System's pool of invested
assets*") (Page 17 of the "*Official Statement*" of June 26, 2008).

6.9    When the Bond issues were made, the Co-Defendant UBS Consulting
acted as financial advisor to the System and both it and its affiliate UBS knew or
should have known that the System would find it impossible to prudently invest the
proceeds of the sale of the Bonds. the Bonds at a yield sufficient to cover the cost()
of their interest to the System and generate profits ("*positive arbitrage*"). Despite
this, and knowing of the losses that the issue and sale of the Bonds would cause to
the System, UBS proceeded with the transaction, with the purpose of making a
profit and with absolute disregard for the best interests of the System.

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

6.10    While the System was negotiating with Merrill Lynch the possible issuance and sale outside of Puerto Rico of System bonds for the principal sum of at least seven billion dollars ($7 billion) and later, when the issuance and sale of the Bonds in the local market through UBS, in an amount of approximately three billion dollars ($3 billion), UBS, directly and/or through its affiliate(s), including, without limitation, UBS Consulting had a financial advisory contract with the System. In addition, UBS and UBS Consulting were then aware of the System's precarious financial condition and the System's need to improve its liquidity and to create revenue streams and generate profits to mitigate its chronic underfunding.

6.11    It is the inescapable obligation of financial advisors such as UBS Consulting and UBS to defend the best interests of their clients (in this case the System) and to provide the same correct advice() for the benefit of the client and above their own. By not only endorsing, but also participating as the main "underwriter" in the illicit and grossly negligent issue of the Bonds, UBS violated its contractual, non-contractual and fiduciary obligations towards the System, since they advised them and participated, for profit, in an illicit transaction. , reckless and clearly losing and alien to the objectives and best interests of the System and, therefore, of its trustees/beneficiaries Individual Plaintiffs and members of the Class.

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

6.12   UBS and UBS Consulting knew or should have known that the issuance and sale of the Bonds violated the public policy established by the Legislative Assembly of Puerto Rico by denying their approval when they were proposed through the Government and that they violated the Law Retirement. Said co-defendants also knew or should have known then that the pledging or encumbrance of the Government's employer contributions to the System, such as: guarantee and Bond payment bridge, compromised the Government's credit, which was precisely what the Assembly had denied. Legislative and which violated the policy established through such denial and also violated the provisions of the Retirement Law regarding the use permitted by said Law for employer contributions to the System.

6.13   UBS and UBS Consulting also knew, or should have known then, that the proceeds of the illicit and grossly negligent sale of the Bonds could not be prudently invested in safe investment vehicles that would produce sufficient returns to amortize the costs of issuance and interest on the Bonds. Bonds and produce the profit ("positive arbitrage") that the System needed and that, on the contrary, the investment of the proceeds from the sale of the Bonds would cause a recurring loss to the System and, therefore, to its trustees/beneficiaries, since that the interest payable on the Bonds exceeded the yield that the System could reasonably obtain from the investment of the net funds received from their sale.

59

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

6.14   Likewise, did UBS and UBS Consulting know or should have known that the Bonds would not improve, but would worsen, the "funding or funded ratio" of the System, since, upon completion of their issue, the net worth or "net worth" of the System would decrease. for the expenses of the issue and sale of the Bonds and would increase the liabilities of the System in an amount greater than the increase in its assets, due to said costs of the issue and sale of the Bonds. Despite knowing or should have known all of the foregoing, said co-defendants not only recommended the issue and sale of the Bonds, but also, in order to profit even more from it, UBS acted as their main "underwriter" and placed a large part of the Bonds in closed-end mutual funds created and managed by UBS itself and/or affiliated with UBS and/or UBS Consulting. This produced large profits for UBS and/or UBS Consulting on the sale of the Bonds and continues to produce UBS and/or its affiliates small annual profits from the management of the closed-end mutual funds that invested in the Bonds, whose assets still include a large part of the Bonds and which are managed by UBS and/or UBS Consulting and/or their affiliates.

6.15   UBS and UBS Consulting knew or should have known that the projections and estimates used to support the issuance and sale of the Bonds were clearly erroneous and misleading, but they did not warn the System and continued with the issuance and sale of the Bonds, for profit and without giving consideration

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

or importance to the predictable dire consequences for the System of said issuance and sale of the Bonds.

6.16   UBS and UBS Consulting also knew or should have known that the local market did not have sufficient capacity to absorb the at least seven billion dollars ($7 billion) in bonds contemplated according to the model proposed by Merrill Lynch and that they were necessary for the System to obtain the benefits it needed, as well as the fact that there was no demand in the international market for said bonds.

6.17   Neither UBS nor UBS Consulting conducted an adequate study on the viability of the issue and sale of the Bonds, their possible disastrous consequences for the System and the risks that such a transaction would entail for the System and for the credit of the himself and the government.

6.18   Such conduct by UBS and UBS Consulting was grossly negligent and unlawful and constituted (i) a breach of their contractual obligations under their contracts with the System; (ii) a violation of the underwriting agreements between UBS and the System for the issuance and sale of the Bonds, through which UBS was obliged to act in good faith and to protect the interests of the System; (iii) a violation of the contractual and non-contractual fiduciary duties of said co-defendants towards the System; (iv) and illicit conduct on the part of said co-defendants to the extent that they were responsible for violating the public policy

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

established by the Legislative Assembly of Puerto Rico when it denied the

proposal to issue the Bonds through the Government and the violation of the

Retirement Law when the employer contributions of the System were pledged or

encumbered to guarantee the payment of the Bonds.

6.19   In fact, the illicit and grossly negligent issuance and sale of the Bonds

not only compromised the Government's credit, but has also caused the rating of all

Government bonds to be downgraded. UBS and UBS Consulting, must answer to

the Individual Plaintiffs here, who appear on their own and as representatives of

the members of the Class, for the claims they have caused and continue to cause, as

well as to the System for all the damages that their aforementioned conduct has

caused to it and which include, among others, (i) the costs of issuing and selling

the Bonds; (ii) the recurring losses ("negative arbitrage") that the System has

suffered, is suffering and will suffer from the issue and sale of the Bonds until their

maturity, due to the fact that the interest paid by the System for the Bonds exceed

the yield that the System receives for the investment of the product of its sale; and

(iii) the increase in costs of future obligations of the System, due to the degradation

of the Government's credit caused by the issuance and sale of the Bonds.

6.20   UBS and UBS Consulting made recommendations to the System that

were clearly negligent and reckless, since, as we stated before, they did not carry

out an analysis; of the irrigation in which the System was placed as a consequence

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

of the issuance and sale of the Bonds and of the possible consequences of said transactions.

6.21    UBS and/or UBS Consulting, directly and/or through one of its affiliates, had a financial advisory contract with the System and UBS, in addition, acted as investment banker and main "underwriter" in the envisioning of the Bonds in under contracts with the System.

6.22    UBS and UBS Consulting illegally charged large commissions and fees and discounts related to the reckless, illicit and grossly negligent issue and sale of the Bonds and must return them to the System or to their trustees/beneficiaries.

6.23    The conduct of UBS and UBS Consulting, as referred to above in the this Fifth Amended Lawsuit, was unlawful, reckless, grossly negligent, violated its aforementioned obligations to the System and therefore has caused, causes and will cause damages to the System and its trustees/beneficiaries for multimillion-dollar amounts, as well as damages to the Individual Plaintiffs here and the members of the Class.

FOR ALL WHICH, it is requested in this *First Cause of Action* that Defendants UBS and UBS Consulting be ordered jointly and severally, to pay the System the sums detailed below, to compensate the continued damages caused by said defendants to the System, and the payment to the Individual Plaintiffs and the

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

members of the Class of the continuing damages caused and to be caused to them
and the costs and legal expenses of this litigation.

## VII.  SECOND CAUSE OF ACTION/SECTION 1802 OF THE CIVIL CODE OF PUERTO RICO/UBS AND UBS CONSULTING

7.1    The System and the Individual Claimants, by themselves and as
representatives of the members of the Class, repeat and incorporate by reference to
this section everything previously alleged in this Fifth Amended Complaint.

7.2 The aforementioned grossly negligent and illicit conduct of UBS and
UBS Consulting,

in the provision of the services that they were forced to render to the System
and violation by said defendants of their contractual, non-contractual and fiduciary
duties to the System caused and will cause the System, the Individual Plaintiffs and
the members of the billionaire Dating Class, it seems has been explained
previously in this Fifth Amended Complaint, for all of which said defendants must
respond, according to, among others, Article 1802 of the Civil Code of Puerto
Rico.

**FOR ALL WHICH**, it is requested in this Second Cause of Action that the
Defendants UBS and UBS Consulting be ordered jointly and severally, to pay the
System the sums that are detailed below, to compensate the damages caused by
them to the System, and the payment to the Individual Plaintiffs and to the

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

members of the Class of the continuing Chinese caused and to be caused to them by the defendants, plus the costs and expenses of this litigation.

## VIII.  THIRD CAUSE OF ACTION - LIABILITY OF THE INSURER ABC INSURANCE COMPANY, INC.:

8.1    The System and the Individual Claimants, by themselves and on behalf of the Class members, repeat and incorporate by reference to this section everything previously alleged in this Fifth Amended Complaint.

8.2    The Defendant ABC Insurance Company, Inc., whose correct name is unknown at this time:), issued policy(s) covering damages caused by reckless, unreasonable, grossly negligent or unlawful acts or omissions of UBS and UBS Consulting, during the period of time relevant to this Fifth Amended Complaint.

8.3    The reckless, unreasonable, grossly negligent or illicit acts or omissions attributed to the Defendants UBS and UBS Consulting in this Fifth Amended Lawsuit, were committed or incurred through UBS officials and the damage caused to the System, to the Plaintiffs here Individuals and members of the Class, for said acts or omissions are insured and covered by said policy(ies) issued by ABC Insurance Company, Inc., to which the Plaintiffs claim to indemnify said damages to them, to the others class members and the System in this cause of action, pursuant to ! these policies.

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

FOR ALL WHICH, it is requested in this Third Cause of Action that the Defendant ABC Insurance Company, Inc. be jointly and severally ordered to pay the System and those here! Individual Plaintiffs and Class members for continuing damages caused: and to be caused to them, plus the costs and expenses of this litigation.

## IX.   FOURTH CAUSE OF ACTION LIABILITY OF XYZ INSURANCE COMPANY, INC.

9.1     The System and the Individual Plaintiffs, for themselves and on behalf of the class members, repeat or incorporate by reference to this section everything previously alleged in this Fifth Amended Lawsuit.

9.2     The Defendant XYZ Insurance Company, Inc., whose correct name is unknown at this time, issued policy(s), if any, covering damage caused by'; the reckless, unreasonable, grossly negligent or illicit acts or omissions imputed here to UBS Consulting and/or its officials.

FOR ALL WHICH, it is requested in this Fourth Cause of Action that the Defendant XYZ Insurance Company, Inc. be ordered jointly and severally, to pay the System, the Individual Plaintiffs and the members of the Class of the continued damages caused and to be caused to these, plus the costs and expenses of this litigation.

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

## X.  FIFTH CAUSE OF ACTION
## COSTS AND EXPENSES AND ATTORNEY'S FEES

10.1   The System and the Individual Plaintiffs, who appear for themselves and on behalf of the other members of the Class, repeat and incorporate by reference to this section everything previously alleged in this Fifth Amended Lawsuit.

10.2   The laws of Puerto Rico authorize this Honorable Court to order the defendant to pay the costs and expenses of this litigation, including contingency fees for the Plaintiffs' attorneys for up to thirty-three percent (33%) of any sum that Defendants be ordered to pay the System, Individual Plaintiffs, and Class members, in any favorable judgment.

**FOR ALL WHICH**, it is requested in this Fifth Cause of Action that the Defendants be ordered jointly and severally to pay the sums detailed hereinafter, plus the costs and expenses that the Plaintiffs incur and will incur in this litigation, plus an amount equivalent to thirty-three percent (33%) of said sums for attorneys' fees of the System, of the Individual Plaintiffs and of the members of the Class, as well as interest and any other remedy that may be appropriate by law.

## XI.  APPEAL

Pursuant to the foregoing, the Plaintiffs very respectfully request that this Honorable Court declare this Fifth Amended Complaint ADMITTED and by virtue thereof (a) jointly and severally order the Defendants UBS and UBS Consulting

67

COMPUTER-GENERATED TRANSLATION
NON-CERTIFIED

and their respective insurers, (i) to pay to the $800 million System; (ii) the payment to the Individual Plaintiffs here and to each of the members of the Class of a sum of not less than $50 thousand for each of them; and (iii) payment of the costs, expenses, and attorneys' fees of the System, the Individual Plaintiffs, and the members of the Class in this litigation; and (b) grant the System, the Individual Plaintiffs, and the members of the Class any other remedy at law or in equity that this Honorable Court deems appropriate.

WE CERTIFY: That today a true and exact copy of this document will be sent by email to: LCDO. PAUL J. LOCKWOOD paul.lockwood@skadden.com; LCDA. NICOLE A DISALVO Nicole.DiSalvo@skadden.com; and LCDA. ELISA MC KLEIN - Elisa.Klein@skadden.com; - LCD. ROBERTO C. QUINIONES RIVERA — rcq@mcvpr.com; LCDA. MYRGIA M. PALACIOS CABRERA — mpc@mcvpr.com.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, today September 23, 2022.