UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO<br>RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| COMMUNITY HEALTH FOUNDATION OF P.R.<br>INC.,<br><br>Movant<br><br>v.<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br>as representative of THE COMMONWEALTH OF<br>PUERTO RICO,<br><br>Respondent. | Re: ECF Nos. 18602, 21005, 21006 |

**REPLY TO OBJECTION OF THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO TO THE MOTION OF COMMUNITY HEALTH
FOUNDATION OF P.R. INC. FOR ALLOWANCE AND PAYMENT OF
ADMINISTRATIVE EXPENSE**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

RELEVANT PROCEDURAL BACKGROUND ........................................................................... 1

ARGUMENT ........................................................................................................................... 2-11

   A. Methodology to Calculate PPS rate ................................................................................ 2-5

   B. CHF's Visits for Calculation of Wraparound Payment ....................................................... 5-7

   C. Capitation and Fee-for-Service Payments received by CHF ............................................ 8-11

CONCLUSION ....................................................................................................................... 11-12

To the Honorable United States District Court Judge Laura Taylor Swain:

**COMES NOW**, Community Health Foundation of P.R. Inc. (hereinafter "Movant" or "CHF"), through the undersigned attorney and very respectfully states and prays as follows:

### RELEVANT PROCEDURAL BACKGROUND

1. On October 19, 2021, CHF filed the *Community Health Foundation of P.R. Inc.'s Motion for Allowance and Payment of Administrative Expense* [ECF No. 18602] (the "Motion") seeking, among other things, (i) allowance and payment of certain post-petition wraparound payments and (ii) an order requiring the Commonwealth to prospectively make all wraparound payments to Movant.

2. On May 25, 2022, the Oversight Board filed the *Objection of the Financial Oversight and Management Board for Puerto Rico to the Motion of Community Health Foundation of P.R. Inc. for Allowance and Payment of Administrative Expense* [ECF No. 21005] (the "Objection") and a separate supporting *Declaration of Felmarie Cruz Morales in Respect of Objection of the Financial Oversight and Management Board for Puerto Rico* [ECF No. 21006] (the "Cruz Declaration").

3. In the Objection, the Oversight Board does not challenge Movant's entitlement to administrative expense priority as a legal matter. See Objection at p. 2, ¶ 2. Instead, the Oversight Board claims that CHF has failed to sustain its claims and/or it is owed less than the amount asserted in the Motion.

4. The Oversight Board's objection is premised on three grounds, namely: (1) CHF uses an incorrect methodology to calculate its PPS rate; (2) the motion does not provide any visit data; and (3) CHF has not provided any data regarding its receipt of fee-for service payments. We address the arguments in the same order.

1

## ARGUMENT

### A. Methodology to Calculate PPS rate

5. The Oversight Board claims that according to the State Plan Amendment and the Puerto Rico Department of Health PPS Manual (the "Manual"), an interim PPS rate based on a neighboring, similarly situated Federal Qualified Health Center ("FQHC") in the same region is used to determine CHF's PPS rate for the 4th quarter of 2017. It further contends that for the year 2018 and the first two quarters of 2019 (1Q and 2Q of 2019), the borrowed interim rate is adjusted by the Medicaid Economic Index ("MEI"). To this end, the Puerto Rico Department of Health ("PRDOH") borrowed the PPS rate of Centro Health Pro Med (Facility: Belaval), which as of 2017 was $146.72. It then adjusted said PPS rate by the MEI to $149.51 for 2018 and to $155.25 for the first two quarters of 2019.

6. The Oversight Board asserts that CHF's PPS rate for the subsequent periods/years is calculated based on its own costs and visits for the prior two years, adjusted annually by the MEI. It argues that based on CHF's costs, as reported by CHF in its audited financial statements, and the reported visits, the PRDOH established a PPS base rate of $44.52 for the third and fourth quarter of 2019.

7. For purposes of the claim asserted in the Motion, CHF accepts the methodology used by the PRDOH to establish CHF's interim PPS rate and PPS base rate. CHF accepts the established interim PPS rate for the 4th quarter of 2017, 2018 and first two quarters of 2019 and the PPS rate established for the last two quarters of 2019.

8. However, CHF claims that a PPS base rate of $44.52 should not be used prospectively for the years 2020 and 2021. CHF's PPS base rate should be increased for 2020 and 2021, as its total costs increased significantly since 2017, due to a change in the type, duration,

2

intensity and/or amount of the services it provides to Medicaid beneficiaries.

9. During 2019 and 2021, CHF submitted multiple requests for changes in scope of services, which were approved by the Health Resources and Services Administration ("HRSA"). The changes in scope of services included, among others, an update in the arrangements of mental health services, an update of payment arrangements of translation services for its patients, an update of arrangements for immunization services, health fairs in communities within several municipalities, an update in the total hours of operation to 55 hours per week, the addition of a new location (annexed building) to its existing facilities and a modified agreement to cover additional services, such as diagnostic laboratory, eligibility assistance, coverage for emergencies during and after hours, pharmaceutical services and transportation. See Declaration of Nilda Santiago, p. 2, at ¶ 5. As a result of these updated services, CHF's total costs increased significantly throughout these years. Id.

10. As per CHF's audited financial statements for the years 2017 to 2020 and unaudited financial statement for the year 2021, CHF's yearly total costs were as follows: $1,487,658 in 2017; $1,896,480 in 2018; $2,589,218 in 2019; $3,709,301 in 2020; and $4,712.419 in 2021. See Declaration of Thelmary Benitez Torres, at pp. 4-5, ¶ 15 and **Exhibit 2** attached thereto. As noted, CHF's total costs increased by more than 200% from 2017 to 2021.

11. Accordingly, based on the total costs and visits for the years 2019, 2020 and 2021, CHF submits that a reasonable PPS base rate for 2020 should be $69.59, a reasonable PPS base rate for 2021 should be $111.30 and a reasonable PPS rate for 2022 should be $134.66. Id.

12. Section 7 of the Manual provides that "Puerto Rico will adjust the PPS rate for any changes in services that qualify as scope of service changes. A scope of service change is defined as a change in the type, intensity, duration and/or amount of services provided by the

FQHC."

13. The Manual also provides that "the interim rate will be effective on either the date the new/deleted service began or sixty (60) days prior to the date the PR Medicaid Program received written notice of the scope of service change, whichever is later."

14. Section 7 of the Manual also provides that "[w]ithin eighteen (18) months of approval of the effective date, the Center must submit twelve (12) months of cost and visit information reflecting actual costs of the new/deleted service and the impact to overall FQHC costs and total visits. The PR Medicaid Program will review the information to determine if the costs are reasonable and necessary, and adjust the interim rate by the allowable cost-per-visit to establish a final visit rate. The final new visit rate will be implemented retroactively back to the effective date."

15. Since CHF became a FQHC Look Alike, beginning on the 4th quarter of 2017, it submitted to the PRDOH on a quarterly basis a request for wraparound payment with, among other things, a certification on the total number of visits attended by its primary care providers during the relevant quarters and the total payments received from the managed care organizations ("MCOs"). See Declaration of Thelmary Benitez Torres, at p. 3, ¶ 10. In addition, CHF has submitted audited financial statements and cost reports to CMS on a yearly basis.

16. However, to this date, the PR Medicaid Program has yet to establish a PPS rate for CHF. As CHF's PPS base rate has not been established and there is data available on its total costs for the years 2019, 2020 and 2021, CHF submits that these costs must be considered to establish a reasonable PPS rate for the years 2020, 2021 and 2022. Otherwise, CHF would receive less than the cost incurred in providing the services to the underserved

4

communities during those years.

### B. CHF's Visits for Calculation of Wraparound Payment

17. The Oversight Board claims that the Motion lacks any data regarding the number of visits for which CHF is seeking compensation.

18. The Motion contains a chart which reflects the total number of visits for each quarter. The total number of visits by quarter was reported in the chart in a column identified as "estimated % total visits by Medicaid enrollees". The visits reported in the Motion are not "estimated visits" as suggested by the Oversight Board. Actual visits are reported in said column.[2]

19. The number of visits reported in the chart included with the Motion is based on certifications issued by Triple S Salud for the fourth quarter of 2017 and first three quarters of 2018, and on similar certifications subsequently issued by CHF.

20. From the fourth quarter of 2017 to the third quarter of 2018, Triple S-Salud issued quarterly certifications to CHF with a breakdown of the monthly encounters and the monthly net capitation payment by primary care provider for each quarter ("Triple S Quarterly Certifications of Medicaid Visits"). See Declaration of Thelmary Benitez Torres, p. 2 ¶ 5. CHF relied on this information as it submitted the related invoices to the PRDOH for the wraparound payment claimed for each quarter from the third quarter of 2017 to the third quarter of 2018. Id.

21. As Triple S did not issue quarterly certifications after the third quarter of 2018, CHF began to prepare similar certifications based on the primary health care services provided by

---

[2] The chart used in the Motion is based on a chart that had been produced by the PRDOH as part of early negotiations between the parties and wherein the PRDOH had included actual visits in the same column. The same chart was used in the Motion for ease of reference.

CHF's primary care providers during each quarter. Id., p. 3 ¶ 6.

22. In accordance with Sections 4.1.5 and 4.1.2 of the Manual, on a quarterly basis, CHF prepared a billing report which detailed all eligible services billed as filtered MCO, primary care provider and Current Procedural Terminology ("CPT"). With this information CHF prepared a quarterly certification which contained the actual visits of Medicaid beneficiaries by MCO and primary care provider ("CHF Quarterly Certifications of Medicaid Visits"). Id., p. 3, ¶ 7.

23. The Quarterly Certifications of Medicaid Visits are based on the actual visits of Medicaid beneficiaries attended by CHF's primary care providers during the relevant quarter. The visits are documented in the patients' files. Id., p. 3, ¶ 8.

24. On or before the 15th day of the month following the closing of each quarter, CHF submitted the Quarterly Certifications of Medicaid Visits to the PRDOH with an invoice for the wraparound payment claimed for the relevant quarter. Id, p. 3 ¶ 9 and **Exhibit 1** attached thereto.

25. CHF did not submit supporting documentation with the Motion, as on a quarterly basis it had submitted to the PRDOH the Quarterly Certifications of Medicaid Visits. Moreover, this information was submitted again to the PRDOH through the Oversight Board after the Motion was filed and before the Objection was filed.

26. Section 4.1.5 of the Manual provides that "the FQHC will provide the number of visits from Medicaid beneficiaries during the period under analysis. For verification purposes, the PR Medicaid Program requests the same information to the MCO."

27. Section 5 of the Manual also provides that the "FQHCs shall submit their reconciliation request and supporting information within 15 calendar days following the end of each

calendar quarter. The PR Medicaid Program will review the information and request any clarification within thirty (30) days of receipt of the information."

28. CHF has complied with said obligation as it has submitted to the PRDOH a reconciliation request containing the total visits by primary care provider per quarter, the total payments received from the MCOs during the quarter and the wraparound payment it understands it is entitled to receive. See **Exhibit 1** attached to Declaration of Thelmary Benitez Torres.

29. CHF has not received a formal or informal notice of the PRDOH either disputing or requesting clarification as to the visits reported since the third quarter of 2017, either in the Triple S Quarterly Certifications of Medicaid Visits or in the CHF Quarterly Certifications of Medicaid Visits. See Declaration of Thelmary Benitez Torres, at pp. 3-4, ¶ 10.

30. For the first time, in the Objection, the PRDOH, through the Oversight Board, claims that CHF has not provided sufficient information in support of its claim. Id., p. 4 ¶ 11. The Oversight Board, however, does not explain why the information provided by CHF to the PRDOH on a quarterly basis is insufficient or what further clarification is required from said information. The PRDOH can and is in fact required by the Manual to promptly verify the information provided by the FQHCs through the MCOs.

31. The Oversight Board accuses CHF of bad faith in seeking a windfall from the Commonwealth of Puerto Rico, yet it is the PRDOH which has failed to comply with its obligations as set forth in its own Manual. CHF claims the wraparound payments it is entitled to based on the actual visits of Medicaid beneficiaries and the actual cost of providing health care services to these patients.

32. The allegations raised in the Objection are yet another attempt of the PRDOH to evade and/or delay its obligation to make the required wraparound payments to CHF.

### C. Capitation and Fee-for-Service Payments received by CHF

33. Section 4.3 of the Manual provides that "any amount paid by the MCO or any other entity, related to Medicaid beneficiaries, has to be deducted from the wraparound computation. These payments could be made in the form of net capitation payments, fee for services and other concepts."

34. The Oversight Board claims that in the Motion, CHF failed to include the fee-for-service payments it received from the MCOs related to Medicaid beneficiaries. According to the Oversight Board this omission has the effect of overstating the wraparound payment allegedly due to CHF.

35. The Oversight Board alleges that CHF received significant amounts in fee-for-service payments during the relevant period. For example, it states that "in the fourth quarter of 2019, CHF received $499,740.31 from First Medical Health Plan". See Objection at p. 16, ¶ 37. The Oversight Board's allegation is based on certain documents identified as Schedule 6.E which were allegedly issued by the MCOs.

36. The Oversight Board contends that the Motion should be denied altogether based on these documents. However, the Oversight Board does not provide a clear explanation of what the documents stand for and/or whether there exists any back up data supporting the amounts shown in the documents.

37. For example, the Oversight Board does not explain or clarify whether the amounts shown in the Schedule 6.E documents are exclusively related to Medicaid beneficiaries. In addition, the Schedule 6.E documents reflect two employer identification numbers (CHF's EIN and presumably Anchor Health Management Corp.'s EIN) and in some cases no employer identification number is referenced. In short, the documents are insufficient to

8

make the inferences sought by the Oversight Board. Moreover, as discussed below, the amounts reflected in the documents are at odds with the data collected by CHF from the MCOs.

38. CHF and Anchor Health Management Corp. ("Anchor") are two separate and independent corporate entities. Anchor has a contract for the provision of primary health care services under the Government's Health Program and a contract for the provision of said primary health care services with the following MCOs: Triple S, MMM and First Medical Corporation. See Declaration of Jampierre Legrand Lopez, p. 2, ¶ 4.

39. In turn, Anchor has a professional services agreement with CHF ("Anchor-CHF Agreement") pursuant to which Anchor subcontracts CHF's primary health care services for eligible members under Plan Vital ("Medicaid beneficiaries"). Id., p. 2 ¶ 5.

40. Anchor receives from the MCOs the budget assignments and the capitation payments related to the Medicaid beneficiaries under each contract with the MCOs. Then, under the Anchor-CHF Agreement, Anchor proceeds to pay CHF for the Medicaid beneficiaries identified by each primary care provider under CHF's network of providers. Id., p. 2 ¶ 6.

41. Of Anchor's network of providers, approximately 75% of the primary care providers are contracted directly by Anchor and approximately 25% of the primary care providers provide their services through the Anchor-CHF Agreement. Id., p. 2 ¶ 7.

42. The amounts reflected in the Schedule 6.E documents attached as Exhibit F of the Cruz Declaration could not be validated as amounts received by Anchor or CHF for services provided to Medicaid beneficiaries.

43. CHF obtained information from the MCOs with which Anchor has a services agreement (i.e., Triple S Salud, MMM and First Medical) to document transactions of services to

9

patients enrolled in the government's health program that qualify under the federal standards and the CHIPS program for children below the poverty level. Id., p. 3 ¶ 10.

44. The data collected from the MCOs reveals that from the fourth quarter of 2018 up to and including the third quarter of 2021, Anchor received a total of $104,869 in fee-for-service payments related to services provided to Medicaid beneficiaries. See **Exhibit 4** attached to the Declaration of Jampierre Legrand Lopez.

45. For the same period, CHF received a total of $108,240.78 in fee-for-service payments associated with services provided to Medicaid beneficiaries by CHF's network of providers.[3] See **Exhibit 5** attached to the Declaration of Jampierre Legrand Lopez. This amount is almost five times less than the $499,740.31 the Oversight Board claims CHF received just from one MCO (First Medical) during just the fourth quarter of 2019.

46. On the other hand, the data collected from the MCOs shows that for the same period, CHF received $5,992,058.84 as the capitation payment for services provided to Medicaid beneficiaries by CHF's network of providers.[4] Id.

47. Based on the above, from the fourth quarter of 2018 up to the third quarter of 2021, CHF received a total of $6,100,299.62 ($5,992,058.84 + $108,240.78 = $6,100,299.62) for capitation and fee-for-service payments related to services provided to Medicaid beneficiaries by CHF's primary care providers.

---

[3] Fee-for-service payments received from Triple S up to May 2022 total $90,402.39, of which $72,239.54 were received up to and including the third quarter of 2021. Fee-for-service payments received from MMM up to May 2022 total $27,795.76, of which $13,963.10 were received up to and including the third quarter of 2021. Fee-for-service payments received from First Medical up to May 2022 total $26,541.82, of which $22,038.14 were received up to and including the third quarter of 2021.

[4] Capitation payments received from Triple S up to May 2022 total $6,275,355.81, of which $4,914,812.94 were received up to and including the third quarter of 2021. Capitation payments received from MMM up to May 2022 total $965,037.04 of which $820,923.31 were received up to and including the third quarter of 2021. Capitation payments received from First Medical up to May 2022 total $396,731.61, of which $256,322.59 were received up to and including the third quarter of 2021.

48. As the data obtained by CHF from the MCOs also shows, the amount of fee-for-service payments CHF received from the fourth quarter of 2018 up to the third quarter of 2021 related to Medicaid beneficiaries is *de minimis*. It represents less than 2% of the total payments received from the MCOs for the services provided to Medicaid beneficiaries ($108,240.78 / $6,100,299.62 = 1.77%).

49. Accordingly, the total amount in fee-for-service payments to be deducted for purposes of calculating the wraparound payments due to CHF is insignificant as opposed to what the Oversight Board claims.

## **CONCLUSION**

50. CHF has submitted to the PRDOH quarterly certifications of eligible visits of Medicaid beneficiaries attended by its primary care providers. To this date, the PRDOH has not validly disputed or questioned the actual visits reported by CHF with any contradicting evidence.

51. CHF has also documented with financial statements and other accounting reports the cost associated with the provision of health services to its assigned Medicaid beneficiaries on a yearly basis. The same methodology used by the PRDOH to establish a PPS rate for CHF for the year 2019 has been used by CHF to establish a reasonable PPS rate for 2020, 2021 and 2022, which considers a significant increase in the total cost of providing the services to CHF's assigned Medicaid beneficiaries.

52. Finally, CHF has documented the total capitation and fee for service payments it has received from the MCOs for the provision of said services. There are certifications issued by the MCO (*i.e.*, Triple S) from the fourth quarter of 2017 to the third quarter of 2018. In addition, CHF has provided the amounts it has received from the fourth quarter of 2018 to

the second quarter of 2022, as per data collected from the three MCOs.

53. These are all the components required to determine the wraparound payment due to CHF. There is no reason to deny the relief requested by CHF simply because the wraparound payment due to CHF since the fourth quarter of 2017 is less that the amount claimed in the Motion. Even using the methodology to calculate the PPS rate as established in the Manual and as per the data certified by and/or collected from the MCOs, CHF is entitled to the corresponding wraparound payment as an administrative claim. The amount owed continues to increase quarterly to the extent prospective payments are not timely made.

54. CHF is willing and prepared to resolve in good faith any outstanding issues or concerns with respect to the components of the wraparound payment formula and to reconcile its data with the PRDOH.

WHEREFORE, Community Health Foundation of P.R. Inc. respectfully requests the Court to grant administrative expense priority to its claim for wraparound payment, to order the payment of the amount owed and prospective payments as per the wraparound payment formula and supporting evidence, and to grant any further relief as is just and proper.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, on this 27th day of September 2022.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will notify all parties registered through their attorneys of record, including the Standard Parties and the Affected Parties; and have served a copy of the foregoing to the U.S. Trustee by U.S. mail.

**CORDOVA-AYUSO LAW OFFICE LLC**
P.O. BOX 194021
SAN JUAN, PR 00919-4021
TEL.: (787) 230-0463
EMAIL: lac@calawpr.com

*s/ Lucas A. Córdova-Ayuso*
Lucas A. Córdova-Ayuso, Esq.
USDC-PR No. 226805