1

```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF PUERTO RICO

 3
    In re:                    )      Docket No. 3:17-BK-3283(LTS)
 4                            )
                              )      PROMESA Title III
 5  The Financial Oversight and )
    Management Board for        )
 6  Puerto Rico,              )      (Jointly Administered)
                              )
 7  as representative of       )
                              )
 8  The Commonwealth of        )
    Puerto Rico et al.        )      September 28, 2022
 9                            )
              Debtors,        )
10
    _____
11
    In re:                    )      Docket No. :17-BK-3566(LTS)
12                            )
                              )      PROMESA Title III
13  The Financial Oversight and )
    Management Board for        )
14  Puerto Rico,              )      (Jointly Administered)
                              )
15  as representative of       )
                              )
16  Employees Retirement System )
    of the Government of the   )
17  Commonwealth of Puerto Rico )
                              )
18              Debtor,        )
    _____
19

20

21

22

23

24

25
```

```
 1  _____

 2  In re:                         )      Docket No. 3:17-BK-4780(LTS)
                                    )
 3                                  )      PROMESA Title III
    The Financial Oversight and     )
 4  Management Board for            )
    Puerto Rico,                    )      (Jointly Administered)
 5                                  )
    as representative of            )
 6                                  )
    The Puerto Rico Electric        )
 7  Power Authority,                )
                                    )
 8              Debtors,            )

 9  _____

10  The Financial Oversight and     )      Adv. Proc. No. 19-391-LTS
    Management Board for            )
11  Puerto Rico,                    )
                                    )
12  as representative of            )
                                    )
13  The Puerto Rico Electric        )
    Power Authority et al.,         )
14                                  )
                Plaintiffs,         )
15                                  )
                        v.          )
16  U.S. Bank National              )
    Association,                    )
17                                  )
                Defendants.         )
18  _____

19  Cortland Capital Market         )      Adv. Proc. No. 19-396-LTS
    Services, LLC et al.,           )
20                                  )
                Plaintiffs,         )
21                                  )
                        v.          )
22                                  )
    The Financial Oversight and     )
23  Management Board for            )
    Puerto Rico et al.,             )
24                                  )
                Defendants.         )
25  _____
```

```
 1  _____

 2  Sistema de Retiro de los    )      Adv. Proc. No. 19-405-LTS
    Empleados de la Autoridad,  )
 3  de Energia Electrica,       )
                                )
 4          Plaintiffs,         )
                                )
 5              v.              )
                                )
 6  The Financial Oversight and )
    Management Board for        )
 7  Puerto Rico et al.,         )
                                )
 8          Defendants.         )
    _____

 9

10                      OMNIBUS HEARING

11   BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

12               UNITED STATES DISTRICT COURT JUDGE

13      AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

14               UNITED STATES DISTRICT COURT JUDGE

15  _____

16

    APPEARANCES:
17

    For The Commonwealth
18  of Puerto Rico, et al.:   Mr. Martin J. Bienenstock, PHV
                              Mr. Brian S. Rosen, PHV
19
    For Puerto Rico Fiscal
20  Agency and Financial
    Advisory Authority:       Mr. Luis Marini-Biaggi, Esq.
21                            Mr. Peter Friedman, PHV

22  For the Ad Hoc Group
    of PREPA Bondholders:     Ms. Amy Caton, PHV
23
    For National Public
24  Finance Guarantee
    Corporation:              Mr. Robert Berezin, PHV
25
```

```
 1   APPEARANCES, Continued:

 2   For the Official
     Committee of Unsecured
 3   Creditors:                Mr. Luc A. Despins, PHV

 4   For UBS Financial
     Services, Inc.:           Mr. Paul J. Lockwood, PHV
 5
     For U.S. Bank National
 6   Association:              Mr. Clark Whitmore, PHV

 7   For Fuel Line Lenders:    Mr. Richard G. Mason, PHV

 8   For Assured Guaranty
     Corporation and Assured
 9   Guaranty Municipal
     Corporation:              Mr. Mark C. Ellenberg, PHV
10
     For UTIER and SREAEE:     Ms. Jessica Mendez-Colberg, Esq.
11
     For Individual
12   Plaintiffs,
     Beneficiaries of the
13   Retirement System of the
     Commonwealth of
14   Puerto Rico:              Mr. Harold Vicente-Colon, Esq.

15   For Drivetrain, LLC:      Mr. John Arrastia, Esq.

16   For Pablo Melani-Curra
     and Diana Velez-Martinez: Mr. Alexis Fuentes, Esq.
17

18   ALSO PRESENT:             Judge Shelley C. Chapman

19

20

21

22

23

24
     Proceedings recorded by stenography.  Transcript produced by
25   CAT.
```

```
 1                          I N D E X

 2  WITNESSES:                                        PAGE

 3        None.

 4

 5  EXHIBITS:

 6        None.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                    San Juan, Puerto Rico

 2                                    September 28, 2022

 3                                    At or about 9:48 AM

 4                            *     *     *

 5        THE COURT:  Good morning.  It's Judge Swain again.  I

 6   understand all systems are go.

 7        Would the courtroom deputy please call the case?

 8        COURTROOM DEPUTY:  Good morning, Your Honor.  Good

 9   morning, Counsel.

10        The United States District Court for the District of

11   Puerto Rico is now in session.  The Honorable Laura Taylor

12   Swain presiding.  Also present, the Honorable Magistrate Judge

13   Judith Dein.  God save the United States and this Honorable

14   Court.

15        In re: The Financial Oversight and Management Board

16   for Puerto Rico, as representative of the Commonwealth for

17   Puerto Rico et al., Bankruptcy Case No. 2017-3283; In re:  The

18   Financial Oversight and Management Board for Puerto Rico, as

19   representative of the Puerto Rico Electric Power Authority,

20   Bankruptcy Case No. 2017-4780 for Omnibus Hearing.

21        THE COURT:  Thank you, Ms. Tacoronte.

22        Buenos dias.  Everyone, please turn your cameras on

23   for these introductory remarks and instructions, but keep your

24   microphones muted.

25        Welcome counsel, parties in interest, and members of
```

1    the public, and press.  We come together today in the wake of
2    another terrible natural disaster.  The Court's thoughts
3    continue to be with the people of Puerto Rico and the
4    challenges that they face in the hurricane's aftermath.
5         Hurricane Fiona has wrought, by some estimates, over
6    three billion dollars in damage, with extensive damage to the
7    power grid.  Some have lost everything.  Many are still
8    without power or water.  We must keep those who are struggling
9    in our thoughts as we work in these Title III proceedings to
10   find a pathway to economic stability, resiliency, and growth
11   for the island.
12        I recognize that some counsel and court personnel who
13   are participating in this hearing today are among those who
14   are struggling to obtain and use basic services.  I thank them
15   for their dedication, and I wish them and all of the people of
16   Puerto Rico a rapid return to better circumstances.
17        To ensure the orderly operation of today's virtual
18   hearing once we turn to our agenda items, all parties
19   appearing by Zoom must mute their microphones when they are
20   not speaking and turn off their video cameras if they are not
21   directly involved in the presentation or argument.  When you
22   need to speak, you must turn your camera on and unmute your
23   microphone on the Zoom screen.
24        I remind everyone that consistent with court and
25   judicial conference policies, and the orders that have been

1  issued, no recording or retransmission of the hearing is

2  permitted by anyone, including but not limited to the parties,

3  members of the public, and the press.  Violations of this rule

4  may be punished with sanctions.

5       I will be calling on each speaker during the

6  proceedings.  When I do, please turn your camera on, unmute

7  yourself, and identify yourself by name for clarity of the

8  record.  After the speakers listed on the agenda for each of

9  today's matters have spoken, I may permit other parties in

10  interest to address briefly any issues raised during the

11  presentations that require further remarks.  If you wish to be

12  heard under these circumstances, please use the "raise hand"

13  feature at the appropriate time.  The "raise hand" feature can

14  be accessed by selecting the reactions icon in the tool bar at

15  the bottom of the Zoom screen.  I will call on any speakers

16  who raise their hands one by one.  If you've raised your hand

17  after you're done speaking, please lower your hand by using

18  that reactions icon again.

19       I ask that people do not interrupt each other or me

20  during the hearing.  Interruptions make it difficult to create

21  an accurate transcript of the proceedings.  But, having said

22  that, and as usual, I apologize in advance for breaking the

23  rule, because I may interrupt if I have questions or if you go

24  beyond your allotted time.  If anyone has any trouble hearing

25  me or another participant, please use the "raise hand" feature

1   immediately.

2          The agenda, which was filed as Docket Entry No. 22398

3   in Case No. 17-3283, is available to the public at no cost on

4   the Kroll Restructuring website, previously known as Prime

5   Clerk, for those interested.  Although the company has been

6   renamed Kroll Restructuring, the Prime Clerk website addresses

7   and telephone numbers are still operational.

8          The Court will be keeping track of the time, and will

9   alert each speaker when there are two minutes remaining with

10  one buzz and, when time is up, with two buzzes.  If you're

11  speaking for three minutes or less, you will only hear the

12  final two buzzes.  Here's an example of the buzz sound.

13          (Sound played.)

14          THE COURT:  When we take a break, the people who are

15  on the AT&T listen-only line should just put their phones on

16  hold.  Don't hang up during the break.

17          We will go until ten of 1:00, that is, 12:50 PM this

18  morning, take a lunch break, and resume, if necessary, from

19  2:10 this afternoon until 5:00.  I will aim to call a break at

20  about 11 o'clock.  That will be a ten-minute break.  Again,

21  during that break, the listen-in participants should just put

22  their lines on hold and not hang up.

23          The first agenda item is, as usual, status reports

24  from AAFAF and the Oversight Board.  As requested in the

25  procedures order, these reports have been made in writing in

1   advance of this hearing and are available on the public docket

2   at Docket Entry Nos. 22330, 22333, and 22402 in Case No.

3   17-3283.

4           So I'd now like to ask everyone other than the

5   representatives of AAFAF and the Oversight Board to mute

6   themselves and shut down their cameras.  I thank the Oversight

7   Board and AAFAF for the care and detail reflected in their

8   reports, which, as always, cover important matters.

9           Would counsel for the Oversight Board like to make

10  any additional comments?

11          MR. BIENENSTOCK:  Good morning, Judge Swain.  Martin

12  Bienenstock of Proskauer Rose for the Oversight Board.

13          This time I think perhaps is the first I would like

14  to supplement our report on two different issues, but very

15  briefly and trying not to say anything in a way that would

16  provoke the need for lots more statements.  First, we're

17  grateful that AAFAF filed its supplemental report about the

18  aftermath of the hurricane.  For those people who still don't

19  have power or water, obviously it is still a disaster, but the

20  recovery amount and rate is far better than it was for

21  Hurricane Maria.  And we know from -- what I wanted to add to

22  their report is we know from the Oversight Board's staff and

23  some of its members that, unlike in Hurricane Maria, somehow

24  telephone service and WIFI, for the most part, was preserved

25  and enabled people to communicate, which is critical.  So any

1  damage and hardship is too much, but we think they're on the

2  right track.

3        Second, and this is where I'm going to be very

4  guarded in what I say, but I just want to supplement our

5  report so Your Honor can factor it into things that follow

6  this morning.  Since the various pleadings from the mediators,

7  and the responses, there have been a lot of communications

8  among Oversight Board members and advisors and the mediators

9  themselves.  And, as I said, I don't want to provoke further

10  discussions, but I would say in our judgment they were good

11  discussions.  Depending on how Your Honor handles those

12  matters later, we can expand, but I just wanted to alert the

13  Court and all the parties that there were useful

14  communications afterwards.

15        I know Judge Chapman does want to address that, if it

16  comes up.  I wanted to say that on her behalf, because she's

17  suffering from something that makes it difficult for her to

18  speak, so she may or may not want to add something.  But I

19  just wanted to alert the Court that she was hoping to say

20  something if the issue comes up later.

21        THE COURT:  Thank you, Mr. Bienenstock.

22        My plan had been to invite the mediation team to make

23  some remarks when we get to the contested matter in connection

24  with the Oversight Board's application, but, Judge Chapman, if

25  you'd like to say something now, rather than waiting for that,

1   you'd be welcome to do that.  Would you put up your electronic

2   hand if you want to be recognized now?

3               Yes.  Judge Chapman.

4               JUDGE CHAPMAN:  Good morning, Judge Swain.  I

5   apologize in advance for the croakiness of my voice.  I'll do

6   my best not to cough.

7               I would prefer to make my remarks in the context of

8   your consideration of the contested matter later today, and I

9   would be grateful if you would afford me some time on behalf

10  of the mediation team to do so when you get to that agenda

11  item.

12              THE COURT:  Thank you.  I will do that.

13              Thank you, Mr. Bienenstock.  I do not have any

14  questions for the Oversight Board arising from its report.

15              So I will ask now whether AAFAF's representative

16  would like to make any additional comments, and I do thank

17  AAFAF for providing both an initial status and an updated

18  status report.

19              MR. MARINI-BIAGGI:  Good morning, Your Honor.  Luis

20  Marini for AAFAF.

21              Your Honor, I don't have anything else to add.

22              THE COURT:  All right.  Thank you, Mr. Marini.

23              If any other counsel have any comments in respect of

24  the two reports, please raise your electronic hand now.

25              Thank you.  I don't see any raised hands.

1          So we will now go on to the contested matters, which

2    are Agenda Item II.  Contested matter one is the urgent motion

3    of the Financial Oversight and Management Board for an order

4    establishing a schedule to continue negotiations during

5    litigation of gating issues pursuant to litigation schedule,

6    and also granting related relief.  That motion is at Docket

7    Entry No. 22269 in Case No. 17-3283, and Docket Entry No. 2956

8    in Case No. 17-4780.

9          Judge Chapman, this is the time that I had planned to

10   call on you.  Are you comfortable making the remarks as an

11   opening to this contested matter?

12         JUDGE CHAPMAN:  Yes.  Thank you, Judge Swain.  Thank

13   you for affording the mediation team an opportunity to address

14   the Court and the parties.

15         As I indicated earlier, I'm speaking on behalf of the

16   mediation team, which, as you know and the parties know,

17   Judge Drain, Judge Shannon, and I have been working together,

18   appointed by Your Honor, in order to mediate PREPA and assist

19   the parties in coming to a resolution of this most important

20   matter.

21         Let us add our good wishes for the people of Puerto

22   Rico as they make their way through yet another hurricane

23   disaster.  Our thoughts are with them every day.

24         Your Honor, as you know, the mediation team made two

25   filings, one at the Court's direction.  We proposed a modified

1    mediation terms and conditions order.  In addition, we filed a

2    notice thereof that addressed the proposed parallel litigation

3    schedule from the perspective -- our perspective of what we

4    believe best promotes the possibility of a negotiated

5    settlement and PREPA's prompt emergence from this proceeding.

6         We have since had an opportunity and the benefit of

7    reviewing the mediation parties' filings on these points.  I

8    do not intend to respond point by point to each of the points

9    made in the parties' filings, but I would like to offer a few

10   observations and clarifications.

11        First and foremost, we are encouraged by the

12   Oversight Board's commitment, shall I say renewed commitment

13   to share information, projections, analyses, data, thoughts

14   informing its positions.  We believe that this sharing of

15   information is and will continue to be critical in the context

16   of this confidential mediation, and we will -- we have and we

17   will continue to call on the Board and the other mediation

18   parties to do the same.

19        Secondly, we continue to believe that it is

20   absolutely critical to have clear lines of communication

21   between the Oversight Board and the mediation team, and,

22   whenever warranted, with the other mediation parties.  It is

23   challenging to be sure, and we recognize that it is

24   challenging to communicate with the Board and for the Board to

25   communicate with us given that the Board is comprised of seven

1    individuals who, of course, have other responsibilities, and

2    we understand that.  And we have endeavored to be sensitive to

3    that at every turn, while at the same time we believe we were

4    given a mandate by Your Honor to move this mediation and this

5    proceeding along with all deliberate speed.

6           So we can at times be pushy and we can at times

7    perhaps lose patience with the pace.  We would like this to

8    move along quickly, and we ask the parties' indulgence for our

9    insistence that it do so.  We believe that this is

10   an-all-hands-on-deck moment.  It had become an

11   all-hands-on-deck moment before Fiona bore down on the island.

12   It is more so now.

13          THE COURT:  Pardon me, Judge Chapman.  For some

14   reason your voice is coming through in a choppy way on the

15   AT&T line.  I don't quite know why that is or how it exactly

16   sounds, but I would just ask that you slow down a little bit

17   more and that may help to address the choppiness.

18          JUDGE CHAPMAN:  Very well.  Thank you, Your Honor.

19   I'm almost finished with my remarks.

20          Finally, I have one more point that I would like to

21   make.  The mediation team's suggestion to the Court that the

22   Oversight Board consider the appointment of an additional

23   financial advisor was prompted solely by our observation that

24   what we were proposing was three parallel work streams:

25   Number one, mediation; number two, litigation; and number

1   three, plan confirmation, with perhaps even planning for exit

2   financing.

3          It was our observation that any team, one financial

4   advisor, more than one financial advisor, one team of lawyers,

5   more than one team of lawyers would be stretched quite thin by

6   what we were proposing.  The last few months of mediation have

7   demonstrated that negotiating alone requires intensive

8   day-to-day, virtually round-the-clock involvement.  And I can

9   represent to the Court that the mediation team has been in

10  virtually daily contact with key advisors to the Oversight

11  Board and the -- certain of the other mediation parties

12  probably sometimes much to their chagrin when my name or one

13  of their co-mediators' names pops up on their screen.

14         Our suggestion was not intended as a criticism, and

15  to the extent it was read that way or interpreted that way,

16  let the record now be clear it was not.  In this

17  all-hands-on-deck moment, we simply thought that it may be

18  helpful for the Oversight Board and, indeed, for the success

19  of the mediation to enlist additional assistance.  That is

20  very obviously for the Oversight Board to decide for itself.

21         We look forward to continuing to work with the

22  Board's advisors, as I said, with whom we have communicated

23  rather constantly over the last six months.  They and we are

24  committed to getting this done.  It sounds trite, but failure

25  is not an option, and with this Court's blessing and guidance,

1  we will continue to work to move towards getting PREPA out of

2  this bankruptcy proceeding as soon as humanly possible.

3         I would be happy to answer any questions Your Honor

4  has, and thank you for the time for letting the mediation team

5  update the Court.  Thank you.

6         THE COURT:  Thank you, Judge Chapman.  I don't have

7  questions for you at this time.

8         I would like now, before calling on counsel for

9  their -- just one moment.

10        All right.  We're going to have to pause, because the

11 AT&T line needs to be restarted.  So everyone just hold tight

12 again.  Thank you.

13        (Pause taken.)

14        THE COURT:  Thank you again for your patience.  The

15 AT&T line has been restored.

16        So first I want to express the Court's sincere thanks

17 to Judge Chapman for her candid remarks, and to the mediation

18 team for their incredibly dedicated, intensive work with the

19 parties since they stepped into this case in April, and also

20 for their willingness to continue that work.  I also wish

21 Judge Chapman a quick return to good health.

22        The parties' equally dedicated, candid, and

23 respectful continued work with the mediation team is also

24 essential in the Court's view.  The people of Puerto Rico

25 literally need light and water immediately, and they need a

1    prompt resolution of the financial issues that are

2    complicating an unprecedented challenge of creating a renewed

3    grid system for the island that will be resilient and well

4    managed.  That is one of the reasons why, although I will

5    adopt a targeted litigation schedule for key gating issues, I

6    will not delay the process of commencing work toward

7    confirmation of a plan of adjustment.

8         So before we hear from the parties concerning the

9    PREPA litigation scheduling matters, I have some preliminary

10   remarks about where I'm inclined to go with respect to the

11   matters addressed by the Oversight Board's September 16th,

12   2022, urgent motion, and the many filings from other

13   interested parties that have followed.  I will lay out my

14   current inclinations now so that the parties can tailor their

15   remarks appropriately.

16        To begin with, I think that it is essential that we

17   make progress toward resolving, whether through consensual

18   resolution or judicial adjudication, the lien scope and

19   non-recourse issues.  While I was hopeful that mediated

20   negotiation would be a path to do that, obviously that hasn't

21   happened yet.  I'm, thus, inclined to order the Oversight

22   Board to amend its Complaint in Adversary Proceeding No.

23   19-391, which I'll refer to as the lien challenge adversary

24   proceeding, and to implement a schedule for briefing and

25   hearing summary judgment motion practice concerning, one, the

1   existence and scope of the bondholders' perfected security

2   interest, if any, in PREPA's revenues versus whether the

3   security interest is limited to monies already deposited into

4   the sinking fund or subordinate funds.  And, two, whether the

5   bond obligations are non-recourse as to PREPA's general assets

6   to the extent those assets are not subject to any bondholders'

7   security interest, whether under the governing documents or

8   statutes or under § 927 of the Bankruptcy Code.

9          Obviously several parties with stakes in the outcome

10   of those issues are not parties to that adversary proceeding,

11   so I would intend to permit those interested parties to

12   intervene such that they can weigh in shortly after the

13   parties' briefs are filed to make non-duplicative arguments.

14          There is someone who is not muted, and so I would ask

15   that they mute themselves.  Thank you.

16          So briefing on the summary judgment motion practice

17   would begin promptly after the Complaint is amended, and

18   parties would be able to seek relief under Rule 56(d) to the

19   extent that they contend that further discovery is required.

20   I'm not inclined, however, to proceed with resolving the

21   pending motion practice in Adversary Proceeding Nos. 19-396,

22   and 19-405, which I'll refer to as the current expense

23   adversary proceedings.

24          As noted by the plaintiffs in those adversary

25   proceedings, the amended complaints in the current expense

1   adversary proceedings focus substantially on the treatment of

2   claims contemplated by the 2019 RSA, and, therefore, it is not

3   clear that, as a matter of fitness for judicial resolution,

4   the Court can or should resolve the pending motions to

5   dismiss.  In any event, the issue of ripeness in the current

6   circumstances has not been briefed, and it doesn't seem like

7   an efficient use of party or judicial resources to focus on

8   such questions at this juncture.

9          I'm also not persuaded that the parallel adjudication

10  of the bondholders' motion to dismiss or, in the alternative,

11  motion for relief from the automatic stay is a productive use

12  of resources at this juncture.  I'm inclined to stay

13  consideration of the motion to dismiss and the associated

14  motion requesting to file it as a combined motion to dismiss

15  and lift stay motion under this Court's "inherent power to

16  stay proceedings for prudential reasons." *See Microfinancial,*

17  *Inc., v. Premier Holidays International, Inc.*, 385 F.3d 72, 77

18  (1st Cir. 2004), as well as section 105(d) of the Bankruptcy

19  Code, as incorporated via section 301(a) of PROMESA, which

20  authorizes this Court to issue any order not inconsistent with

21  the Bankruptcy Code or Bankruptcy Rules "appropriate to the

22  expeditious and economical handling of this case." *See* 6

23  Collier on Bankruptcy, paragraph 930.02[2][a] n.7.

24          The motion to dismiss is premised on arguments based

25  upon delay and the alleged bad faith of the debtor.  However,

1    mere delay combined with efforts to move forward with the plan

2    of reorganization does not warrant a dismissal for bad faith.

3    *In re New York City Off-Track Betting Corporation*, 427 B.R.

4    256, 280 (Bankr. S.D.N.Y. 2010).

5            The bondholders' arguments do not warrant destruction

6    of the potential for reorganization and restructuring by

7    dismissal.  To the extent the motion seeks relief from the

8    stay to appoint a receiver to race to pay the bondholders, it

9    would again disrupt an already complex process, all based on

10   an assertion of a right whose enforceability and factual

11   foundation are questionable in the absence of the security

12   interest and recourse rights.  Thus, litigation of the

13   security issues should go first, and we can streamline the

14   process by dealing with them in the context of case management

15   and sequencing rather than having the motion to dismiss

16   briefed in the current circumstances.

17           The bondholders recognize that the Court may stay

18   consideration of their dismissal and stay relief motions, and

19   in their response to the Oversight Board's scheduling

20   proposals and a later filed counter proposal, they put forth

21   as an alternative that the Court should establish meaningful

22   deadlines for litigation and require a plan proposal.  It is

23   this alternative that the Court elects at this juncture, but

24   the litigation schedule that I establish may not precisely

25   resemble the bondholders' counter proposal.  For instance, the

1   bondholders' counter proposal contemplates a period of

2   discovery in advance of merits motion practice.  Based on the

3   Oversight Board's representations that it will raise only

4   legal and non-contested factual issues in its motion, the

5   Court will not open a general discovery period, but will

6   instead entertain Rule 56(d) motions as necessary.

7          That said, the Court will consider the parties'

8   arguments at this hearing as to what issues of material fact,

9   in the bondholders' opinion, require discovery with respect to

10  the disputes that the Oversight Board seeks to prosecute

11  before it makes a final determination as to whether to provide

12  for discovery prior to summary judgment motion practice.  And,

13  in addition, to the extent necessary, Judge Dein will work

14  with the parties on resolving discovery issues, and

15  particularly Rule 56(d) discovery issues, while any such

16  motion is being briefed or is under advisement, and in the

17  context of any required production.

18         Returning to the subject of a plan proposal, I'm not

19  inclined to permit the lien-related litigation to move forward

20  on its own.  In that respect, I agree with the mediation team,

21  and I believe that the Oversight Board should begin down the

22  path of confirmation of a plan of adjustment.  While in an

23  ideal world that would occur with unanimous or substantially

24  unanimous support from stakeholders, that's just not where we

25  are.

1    I think that it would make sense to set a deadline of

2    December 1, 2022, for the Oversight Board to file a disclosure

3    statement and proposed plan of adjustment that it believes

4    could be confirmable taking into account the litigation risks

5    and economic issues that are in dispute, and including, if

6    appropriate, the toggle concept referenced in the mediation

7    team's filings.  Thus, the plan may, but is not required to,

8    include alternative provisions addressing the proposed

9    resolutions contingent on different outcomes of one or more of

10   the disputed issues being addressed in the summary judgment

11   motion practice.  The Oversight Board's proposed plan and

12   disclosure statement would be accompanied by a motion seeking

13   approval of the disclosure statement and related relief,

14   including adoption of a proposed schedule that contemplates a

15   confirmation hearing in June of 2023.

16       Finally, although certain parties have disagreed with

17   this proposition in their filings, I have confidence in the

18   mediation team's assessment that a workable compromise is

19   within the parties' reach, and that further negotiations and

20   the guidance of the mediation team could be fruitful and

21   obviate the need for substantial litigation.  I, thus, think

22   it is essential that the term of the mediation be extended.

23       In that connection, I would require that the

24   Oversight Board designate a lead mediator, and would expect

25   that this lead mediator can and would consistently appear for

1   mediations informed, prepared, and empowered to the greatest

2   extent of the Oversight Board's capabilities, although I would

3   not attempt to tell the Oversight Board who that you should

4   be.

5        I would also empower the mediation team to direct the

6   parties to disclose data and non-privileged analysis

7   underlying positions.  The terms and extent of the disclosures

8   would, in the first instance, be specified by the mediation

9   team, and any disputes regarding the disclosure should be

10  resolved within the mediation context.  If any such disputes

11  are truly intractable, I would entertain requests to refer

12  them to Judge Dein, or perhaps to one of the evaluative

13  mediators.

14       As to timing, I expect substantially to adopt the

15  Oversight Board's litigation timetable, with additional time

16  built in for targeted non-repetitive briefings from the

17  intervenors.  Parties in interest who want to participate in

18  the summary judgment motion practice would need to file a

19  motion to intervene by October 6.  Furthermore, as I said

20  earlier, I would require the Board to propose a plan by

21  December 1, with a disclosure statement litigation timetable

22  designed to get us to confirmation hearings by June of 2023.

23       I know that's a lot of information, but I hope that

24  that will inform the parties sufficiently to make the

25  arguments that are about to begin more useful for all of us.

1    Thank you.

2         Now, in terms of argument, I have the Oversight

3    Board, as represented by Mr. Bienenstock, as the first speaker

4    for 15 minutes.

5         So, Mr. Bienenstock, when you're ready, would you

6    please open your camera.

7         MR. BIENENSTOCK:  Thank you, Judge Swain.  Martin

8    Bienenstock of Proskauer Rose, LLP, for the Oversight Board.

9    And thank you for the preview of potential rulings that may

10   well have cut in half the time I need.

11        A few points.  The Oversight Board, and I think this

12   is clear from the motion it filed, has one goal:  To succeed

13   in a restructuring so that PREPA can be viable going forward.

14   And I couldn't help but remember when we drafted the motion,

15   and then based on something Judge Chapman said this morning,

16   at the very first Omnibus Hearing in this case, if I remember

17   correctly, Your Honor said "failure is not an option," and

18   that could not be more true.

19        And in that vein, the only method of achieving

20   success for the people of Puerto Rico and the stakeholders,

21   including all the creditors, is a successful restructuring of

22   the sole power supplier in the Commonwealth.  And I want to

23   emphasize that while we do these restructurings somewhat

24   sequentially, as everyone here knows, you know, we started

25   with COFINA, got to the Commonwealth, HTA, GDB, et cetera.

1    They are not separate.  It's more akin to a human body.  One

2    part needs all the others.

3         And that could not be more true than with respect to

4    PREPA, because if PREPA doesn't reorganize, none of the other

5    plans are likely going to be carried out, because if

6    there's -- if we can't supply power at rates consumers and

7    businesses are willing to pay, then everything else fails.

8    And that's the reason why the Oversight Board's motion asks

9    solely to litigate the issues, to get us to a successful

10   confirmable plan, hopefully consensual, but one way or the

11   other a confirmable plan.

12        And what Your Honor said this morning, I think it

13   didn't -- it didn't grant everything we asked for, but the

14   critical issues, the scope of the security interest, and the

15   non-recourse issue, absolutely have to be determined, if not

16   settled first, because that's the dividing part.  We've

17   mediated a long time.  The parties are far apart, based on the

18   publicly disclosed last offers.  These are the issues.  So one

19   way or the other, getting to the bottom of them is the answer

20   here.

21        And I'd also like to provide some insight into where

22   the Oversight Board has been and will continue to be coming

23   from in terms of solving these issues.  It definitely wants a

24   consensual plan, but the Oversight Board does not treat this

25   as a Chapter 11 reorganization case wherein, for the most

1    part, they get to somewhat of horse trading.  You know, pay a

2    little more; pay a little less.  Go to the mediation thinking,

3    well, I'm willing to pay seven, but maybe I can get away with

4    five, maybe we'll settle on six.  That is the opposite of the

5    mindset and mission of the Oversight Board.

6            I want to explain carefully what it is.  There has

7    never been a intent of the Oversight Board, to my knowledge,

8    to be able to pay X but to see if it can get away with paying

9    less than X.  Instead, the intent of the Oversight Board is to

10   carry out its twin statutory missions of fiscal responsibility

11   and market access, and subject to carrying those out, to pay

12   creditors as much as possible, so it doesn't negotiate in the

13   traditional way.  It puts on the table what it determines it

14   can pay consistent with satisfying those statutory missions,

15   and it does that based on advice it gets from numerous experts

16   and advisors, whether it's McKinsey, economists, Dr. Triest,

17   where relevant, lawyers, financial advisors, et cetera, but it

18   tries to figure those things out to the best of its ability.

19   It adjusts whenever facts change or it finds it made a

20   mistake, and then it puts on the table the best it can.

21           And, Your Honor, frankly, this is frustrating to a

22   lot of parties and possibly sometimes the mediators, because

23   the Chapter 11 expectation is if you offered X, you're going

24   to go to the mediation to make it X plus something.  That's

25   just not the way the mediators -- the Oversight Board has

1    worked for these five years, and, as Your Honor knows, we've

2    been successful in the prior restructurings that are far more

3    indepth than PREPA, and we hope will be successful with PREPA.

4    And there's no reason we shouldn't be.

5           The other reason why we were so determined in our ask

6    of the Court to let these key litigation issues go forward is

7    that -- and we've said this before in numerous pleadings.  I'm

8    not sure, perhaps it had the significance to the other parties

9    that we intended it to have, but whatever settlement is made

10   has to be able to pass muster in front of Your Honor as a

11   settlement in the plan.

12          Now, the Committee has made crystal clear that it

13   thinks that the bondholders have no recourse claim against

14   PREPA's general essence.  We have looked into that

15   extensively, and just as a for instance, Your Honor, the very

16   bond the bondholders bought, the key document says in no

17   uncertain terms they can only be paid from the special fund

18   Your Honor alluded to earlier.

19          So it's not as if this is some sort of wacky claim

20   objection from left field.  This is a very serious objection,

21   and it requires a serious settlement or outcome in litigation.

22   And it can't be ignored.  I know this is frustrating to anyone

23   who wishes we could just skate by it, but you can't skate by

24   it.  The documents are pretty clear.

25          And in terms of mediation, as we said in our last

1    pleading, if the Oversight Board ever has a need for more
2    advisors, whether financial or otherwise, it will not be
3    bashful and has not been throughout the case.  But it has a
4    track record the Court and everyone else is aware of in the
5    prior restructurings.  It has not sensed and doesn't know, at
6    this time, that it needs any additional help; and, also, that
7    the advisors it has, whether financial, legal, or consulting,
8    economic, these are not, for the most part, individuals.
9    These are massive companies.  Probably Proskauer is the
10   smallest, and we're a pretty large law firm.  But these other
11   institutions are behemoths, and they have lots of expertise
12   and can add or subtract based on the Oversight Board's needs.
13        So, as I said, if the Oversight -- the Oversight
14   Board has committed that it will retain additional advisors
15   promptly if it ever needs them, but given the situation that
16   I've just explained, it has not believed it's needed them to
17   date and doesn't foresee the need.  But it's open minded.
18   It's going to get the job done.
19        So, Your Honor, subject to any -- and, finally, I
20   know Your Honor made a point of saying, based on our
21   representations, there would not be discovery up front, and
22   we're going to hold to those representations, Your Honor.  Our
23   summary judgment pleadings will be based on the documents, on
24   the recourse issue.  You don't have to go a lot further than
25   what the bond says, but the trust agreement corroborates it.

1              And on the security interest issue, as we said

2    before, the Court has decided very similar documents in

3    connection with HTA, and, again, it was a documentary

4    exercise.  So we're going to abide by our representation, Your

5    Honor, and I'm sure it will be pointed out to us if we don't.

6    But we don't see why we shouldn't be able to, and our intent

7    is to do that.

8              The last thing I'd like to address, subject to any of

9    the Court's objections, is the filing of the plan.  The

10   Oversight Board would certainly like to confirm sooner rather

11   than later, and after this hearing, Your Honor, I'm going to

12   obviously discuss with the Board and its financial advisors

13   what we can do by December 1, which is basically two months

14   and a week perhaps away.  Given where we are, and we explained

15   and I think the mediators also explained the mediation has

16   focused on the largest claimant, and so, because what other

17   parties get is dependant in large part as to what goes to the

18   largest claimant.  Now, if their claim is resolved at a small

19   amount because of non-recourse, other parties may well be paid

20   in full.  If their claim is resolved at the other extreme,

21   that they have a full recourse claim, there's a lot less for

22   other parties based on a settlement.

23             And so, as we explained in our motion, there may have

24   to be several toggles in any plan that we file, but I think we

25   can make a good -- we can clearly do it.  We might have to ask

1   the Court for leave to amend several times.  I guess in view

2   of the fact that we've had the Eighth Amended Commonwealth

3   Plan of Adjustment, perhaps that's not too much of a stretch,

4   but at this -- we're going to need some flexibility, because I

5   don't think, unless we're very fortunate, that by teeing up

6   issues, to the extent they can be, between now and December 1,

7   that it leads to a settlement.  There will be a lot of

8   toggles, and we're going to have to make a lot of adjustments,

9   and I doubt our first shot is going to be the best shot we can

10  take at a confirmable plan, but it gets to the -- I think if

11  I'm inferring the right things from the Court's guidance,

12  we're definitely going to go in the right direction and get

13  things done sooner than later.

14          (Sound played.)

15          MR. BIENENSTOCK:  And we're all in favor.

16          I guess maybe I did take the full time, Your Honor.

17  I have nothing more unless Your Honor has questions.

18          THE COURT:  Actually, you have two more minutes if

19  you have more to say.  That was the warning buzzer.

20          I don't have questions for you at this point.

21          MR. BIENENSTOCK:  Okay.  The one additional item I

22  would just mention briefly is when it comes to PREPA, LUMA,

23  and the -- as operator, and all of the issues surrounding that

24  -- and the legislative issues are complications.  I just want

25  to put that on the table.  It doesn't come as a surprise to

1  anyone, but it will also probably be a factor that will lead

2  to the need for several adjustments to whatever we file by

3  December 1.

4          THE COURT:  Thank you.

5          I expect a process, and that process has to start

6  with good faith laying out a view of potential outcomes and

7  what would be proposed in relation to those, and so I thank

8  the Oversight Board for its undertaking through you to engage

9  in that process.

10          Now I will turn to Mr. Despins for the UCC for five

11  minutes.

12          MR. DESPINS:  Thank you, Your Honor, and good

13  morning.  Luc Despins with Paul Hastings for the Committee.

14          Very briefly, Your Honor, the first point we want to

15  make sure is on the table, and you've already alluded to it,

16  which is we're having discussions with the Oversight Board

17  counsel at this point regarding our participation rights with

18  the Oversight Board in respect of the challenge of the liens

19  and claims.  And those discussions are ongoing.  We don't have

20  a final resolution, but we are hopeful that we'll have

21  something consensual to submit, Your Honor, promptly.

22          The next item, and more important item is the

23  Committee wants to -- wishes to restate in the strongest

24  possible terms its disagreement as to how the mediation

25  process has unfolded to date.  That was already in our

1    response, Your Honor, but, basically, the Committee, based on

2    so-called sequencing concepts that we need to sequence in

3    mediation, is being treated -- is being sidelined and treated

4    as if it's the most junior group in the capital structure,

5    when, in fact, it is either senior to the bondholders, if they

6    have no claims, or *pari-passu* with them.

7            And as Mr. Bienenstock just said, you know,

8    bankruptcy is a zero sum game.  He didn't use that term, but

9    it's a zero sum game.

10           THE COURT:  I'm sorry.  I didn't -- you got sort of

11   muddy, so I didn't hear.  Bankruptcy is what?

12           MR. DESPINS:  Is a zero sum game.

13           THE COURT:  Thank you.  Zero sum game.

14           MR. DESPINS:  As Mr. Bienenstock alluded to, without

15   using those terms, but, basically, what one gets, the other

16   one cannot.

17           And, basically, we are not involved in the mediation.

18   We've attempted, by submitting various presentations, et

19   cetera, and in contacting the mediation team, but we're not

20   involved in the mediation.  And, Your Honor, you know, it's

21   fundamental that there has to be a change in that process.

22           I'll give you an example, and what I want to point

23   out is that there seems to be an implicit assumption that the

24   Committee, its constituents have no claims.  That is a replay

25   of what happened in the Commonwealth case, that we were told

1   for the longest period of time that our group had probably 500

2   million or so in claims.  It turns out, bit of a misstatement,

3   that the claims estimated by the Board are 2.75 billion

4   dollars, not 500 million dollars.

5          So, in this case, the assumption is "we don't need to

6   deal with you because you have no claims," but, Your Honor,

7   just to put an example that's fresh in your mind, Vitol.  You

8   ruled for them 41 million dollars.  The appeal has not been

9   prosecuted.  So the question is -- and, by the way, there are

10  many Vitols.  I'm using it as an example, not to say that it's

11  41 million dollars of claims for unsecured creditors.  But

12  this is a claim that's real.  That's definite.  What's the

13  percentage recovery that Vitol will get, 73 percent proposed

14  by the Board to the bondholders?  The point is --

15         (Sound played.)

16         MR. DESPINS:  -- there has to be -- that issue needs

17  to be addressed.  Your Honor, it's fundamental, and we don't

18  believe that the mediation can be truly successful unless that

19  issue is being addressed.

20         Thank you, Your Honor.

21         THE COURT:  Thank you, Mr. Despins.

22         Now I have Mr. Friedman for AAFAF for six minutes.

23         MR. FRIEDMAN:  Thank you, Your Honor.  Peter Friedman

24  of O'Melveny & Myers on behalf of AAFAF.

25         I think we also intend to intervene.  Currently, I

1    believe we are actually a co-plaintiff in the adversary

2    proceeding, but we are working with the Board to be

3    co-plaintiffs -- I'm sorry, not to be co-plaintiffs, but to be

4    intervenors in a similar fashion to the Committee.

5           Your Honor, we appreciate the tone both that

6    Mr. Bienenstock evinced as to what the Board is working for,

7    and we also appreciate the Court's tone and remarks about

8    sympathies and remarks about the people of Puerto Rico.  I

9    think substantively, Your Honor, AAFAF will, as it has always

10   done, work with the Board on putting together a plan to the

11   extent necessary.

12          And in terms of what the Board needs, its advisors

13   have always been helpful in creating an infrastructure and

14   planning with respect to plans.  Obviously, we agree with what

15   Mr. Bienenstock said with respect to what's motivating the

16   Board in getting to a specific result.  I would add, on top of

17   that, those issues, with respect to the economics that the

18   Board is focused on, the government is focused on the public

19   policy implications of moving towards a renewable economic

20   future for Puerto Rico, resiliency of the grid and provision

21   of service on top of just the economic indicators.  And we

22   will always keep those front in mind in assessing whatever

23   proposals are made and whatever assistance is asked of the

24   government to make this a truly consensual process.

25          Other than that, Your Honor, we believe that

1    substantive negotiations should continue.  We wish to continue

2    to be an important part of that process, and we believe that

3    the gating issues of litigation should be teed up first.  We

4    think, obviously, December 1st for a plan proposal clearly is

5    designed to get momentum going.  We understand some of the

6    challenges that Mr. Bienenstock referenced.  To the extent,

7    again, that AAFAF can be helpful in that process and its

8    advisors, they will be.

9          I don't really have any other substantive remarks

10   given what this Court has laid out as its priority in seeing

11   resolution of legal issues that are going to move forward and

12   those that won't.  So thank you, Your Honor.

13         THE COURT:  Thank you, Mr. Friedman.

14         Now I turn to the responding parties.  First up is

15   Ms. Wolf for the fuel line lenders.

16         MR. MASON:  Good morning, Your Honor.

17         THE COURT:  Good morning.

18         MR. MASON:  I'm sorry, Your Honor.  Richard Mason of

19   Wachtell, Lipton for the Fuel Line Lenders.

20         THE COURT:  Good morning, and sorry for

21   misidentifying you.

22         MR. MASON:  No problem, Your Honor.  I'm honored to

23   be identified as Ms. Wolf.

24         Your Honor, and in 2015, and again in 2017, after

25   difficult negotiations and against all odds, the Fuel Lines,

1    PREPA, the Puerto Rico Government, the bondholders and the

2    monolines, all of the relevant parties reached a global deal.

3    Under that deal -- all the relevant financial parties.  Under

4    that deal, UTIER'S contract and pensions would ride through

5    untouched.  Arm and arm with the government, all of the

6    creditors asked the Oversight Board for approval.

7           Then, to our shock, and contrary to the guidance that

8    they had given us, the Board threw out the deal and threw

9    PREPA into bankruptcy where it has languished over five years.

10   During that time, Your Honor, we have received nothing, no

11   payments whatsoever, not a thing except with the now

12   terminated RSA.  The Hiesman, to use a phrase.

13          Fuel Line Lenders do believe the case must come to a

14   conclusion so  thatPREPA can emerge, begin to pay its

15   creditors, and perhaps one day return to the financial

16   markets.  Paying all debt is not popular.  No one is going to

17   cheer when rates go up, even by a fraction, to send money to

18   the debtors.  Even the government cannot stay in bankruptcy

19   forever waiting for the right time to emerge and forcing

20   creditors as well, because there is no right time to ask rate

21   payers to repay debt from years ago and creditors will,

22   therefore, be waiting for the first day of never.

23          The Court appointed the mediators to see if this

24   Gordian Knot could be untied.  They are of course your

25   appointees, and we agree Your Honor should carefully consider

1    their views on how to reshape the mediation.  On a few

2    specific points, we support extending the mediation through

3    December 31st with potential future extensions.

4          We agree there should be a deadline in a near term to

5    file a plan.  Your Honor said December 1st.  We think that's

6    appropriate.  This would provide context to both the

7    litigation and the negotiation.  Any litigation is to proceed

8    outside of the plan context.

9          We agree with the Court's preliminary view, that it

10   should not be the adversary proceedings that were filed by the

11   Fuel Lines and UTIER to challenge the treatment of our current

12   expense claims as a result of the RSA.  Certainly Your Honor

13   should not be asked to wade through a pile of motion papers

14   that are bound up in a defunct deal.

15         Obviously the big nut to crack regarding legal rights

16   is the scope of the bond, liens, and claims, but it is also

17   clear to us that to achieve agreement between the Oversight

18   Board and the creditors, a disagreement about affordability

19   must be addressed fully in the mediation.  The question is how

20   much PREPA can afford to pay not during a pandemic, not in the

21   awful aftermath of last week's hurricane, and not in the face

22   of a spike in fuel prices where, over the coming decades,

23   after receiving 12 billion dollars or more in federal

24   reconstruction funding, and after moving away from high cost

25   and polluting oil to renewable generation as the government

1 | has mandated.

2 | 　　　　The mediators believe that the Board must be

3 | transparent with financial information supporting its views on

4 | affordability.  We agree.  In fact, when the RSA was signed,

5 | the Board believed that repaying PREPA's debt over a period of

6 | almost 50 years was affordable.  If the reason for the Board's

7 | current view is, for example, the legislature's refusal to

8 | pass a securitization bill, the blown out proposals make it

9 | clear the parties have developed a workaround.

10 | 　　　　If the reason is fuel prices, well, yes, they had

11 | shot up around the time the RSA terminated, but even more

12 | recently they've come back down, almost to the RSA level.  And

13 | of course fuel prices will go up and down, but five years from

14 | now PREPA's use of coal and heavy oil is supposed to be

15 | virtually eliminated, so the prices of those commodities, very

16 | significant in the current mix, will be irrelevant.  And if

17 | the reason is political opposition, Your Honor, that is a

18 | constant feature of the landscape, and not a change.

19 | 　　　　Without transparency, Your Honor, without a detailed

20 | backing up of the views that they have recently expressed, it

21 | will remain a mystery to the creditors why the Board thinks

22 | what it now seems to think, and mysteries on such an important

23 | issues are antithetical to reaching agreement.

24 | 　　　　Lastly, to go without saying, Your Honor, but I'll

25 | say it, if the mediation does restart, and it seems like it

1  will, we expect to be an active part of it, with full rights

2  of participation.  Thank you.

3          THE COURT:  Thank you, Mr. Mason.

4          Next, counsel for the Ad Hoc Group of PREPA

5  bondholders for 13 minutes.

6          MS. CATON:  Thank you, Your Honor.  Good morning.

7  This is Amy Caton from Kramer Levin on behalf of the Ad Hoc

8  Bondholder Group.

9          I do want to start my remarks by noting we hope

10  everybody from Puerto Rico are recovering from the damage of

11  Fiona, and we hope your power continues to be restored to all

12  of PREPA's customers.  And a lot of that work will hopefully

13  take place later this week.

14          So today, particularly in light of Fiona's impact, I

15  want to first briefly address the harm that's being caused to

16  PREPA and its customers by PREPA remaining in bankruptcy, so

17  Your Honor can see why we think it's important to see the

18  motion to dismiss.  Next I'm going to talk about what we see

19  as the best plan going forward in this case and the litigation

20  Your Honor has suggested.  And, finally, I want to briefly

21  address the mediation process.

22          So why do we think it's important for the motion to

23  dismiss move forward and not be stayed?  The simple fact is

24  that PREPA is harmed by continuing the stay in bankruptcy.  As

25  we said in our pleading, and Mr. Mason just said, we believed

1   PREPA can afford to pay all of its creditors in full, but,

2   unfortunately, PREPA is being left to linger inside a

3   bankruptcy indefinitely, with costs not ready seen by

4   customers as that is the political easier path.

5        And we think the motion to dismiss, moving forward,

6   that Your Honor could hear more about these issues and

7   consider them when she is considering what happens when

8   inevitably the Oversight Board potentially misses a deadline

9   with respect to filing the plan, or Mr. Bienenstock's

10  statements that he plans to eventually amend that plan several

11  times.

12       So what do we mean by these hidden costs?  Let's

13  start with the FEMA money that could have been spent to

14  prevent some of the outages of Fiona that customers are

15  dealing with right now.  FEMA awarded --

16       THE COURT:  It looks like she's frozen, so -- I think

17  she's coming back in.

18       MS. CATON:  Your Honor, my apologies.  I'm not sure

19  what happened to my connection, but I'm back on.

20       THE COURT:  Welcome back.  We don't have your visual

21  yet, but I do hear your voice, so I think you're coming back

22  in.

23       MS. CATON:  If you could just give me one moment.

24  And, again, I apologize.

25       THE COURT:  Certainly.

```
 1          MS. CATON:  Here we go.  Thank you, and thank you for

 2   indulging my technical difficulty there.

 3          THE COURT:  I don't think your camera is on.  Do you

 4   want it on?  I can hear you is the most important thing.

 5          MS. CATON:  Yes.

 6          THE COURT:  Now I can see you.

 7          MS. CATON:  Thank you, Your Honor.  I apologize for

 8   that.

 9          THE COURT:  You were talking about the hidden costs

10   of bankruptcy.

11          MS. CATON:  Yes, I was.  Thank you.

12          So I was talking about the fact that FEMA has awarded

13   10.5 billion dollars to PREPA for permanent projects to

14   upgrade PREPA's grid, but as of this August, Puerto Rico has

15   only used about 180 million dollars of that.  That's

16   approximately 1.8 percent of the free federal funds that have

17   been allocated to PREPA that have been used for permanent

18   projects in the five years since Hurricane Maria.

19          There is no doubt that the PREPA grid would have been

20   better prepared and in better shape when Fiona came on save

21   that it had even used two billion dollars of FEMA money on

22   grid hardening and capital improvements over the past several

23   years, instead of 180 million.  And yes, it does take a long

24   time potentially to spend ten billion dollars, but if you look

25   at what happened in New York after Hurricane Sandy, Long
```

1   Island Power had spent approximately 86 percent of its almost
2   800 million dollar allocation for permanent projects compared,
3   again, to 1.8 percent that's been spent today.

4        So why is this process moving so slowly when PREPA's
5   grid clearly needs to put these funds to work?  Well, we think
6   that there are three answers here, all of which would improve
7   if PREPA were out of bankruptcy.

8        First, PREPA has no real access to capital markets
9   today.  It can't access funds to finance up-front construction
10  costs for reimbursement by FEMA tomorrow.  This has
11  substantially slowed down reconstruction, as AAFAF has
12  testified in front of Congress.

13       In the past few months, to help solve this problem,
14  PREPA has started diverting aid from other federal aid
15  programs to satisfy the FEMA cost-sharing requirements, but
16  even PREPA'S fiscal plan notes this is not an ideal long-term
17  solution.  So with access to long-term capital, means that
18  several projects, including more power generation around San
19  Juan, were put on hold, and these delays continue to put
20  PREPA'S system and customers at greater risk of severe,
21  sustained outages.

22       Number two, there is substantial counter-party risk
23  of dealing with a bankrupt party perceived by suppliers, fuel
24  suppliers, and suppliers of manpower to PREPA.  They charge
25  more because PREPA'S in bankruptcy, and the pool of available

1    providers is not as wide as it could be.  And, again, AAFAF'S

2    director has testified to this fact in the past.

3           Number three, we think that the political situation

4    here is just getting harder and harder.  The longer this case

5    lingers on, the more expensive it becomes, because rates

6    haven't been raised over the past five years to pay debt.

7           So you also have the situation of a LUMA contract,

8    which had a very long dated two-year term to get PREPA through

9    its bankruptcy process.  Well, that term is about to expire,

10   and there's political pressure to terminate that contract

11   without doing a full examination of what losing LUMA looks

12   like.

13          The simple fact is these political issues and

14   political pressure on PREPA are not aging well during this

15   bankruptcy, and five years in and counting is not helping the

16   system produce stable, reliable, affordable electricity that

17   Puerto Rico deserves.  So what do we think the path forward

18   should look like?  This is part of why we filed our motion to

19   dismiss or, in the alternative, to seek a receiver that could

20   actually help to stabilize PREPA's businesses.  Not only is it

21   bad for PREPA'S customers and the people of Puerto Rico to

22   stay in bankruptcy indefinitely, it's also a fundamental abuse

23   of the bankruptcy system to allow a debtor to shelter

24   indefinitely behind the automatic stay while paying creditors

25   nothing.

 1          So we do think it's very important for the motion to

 2    dismiss to proceed alongside a confirmation process, and if

 3    Your Honor chooses to stay the motion to dismiss, we think it

 4    should be ready to be heard, and Your Honor should be ready to

 5    move forward with it when the Oversight Board misses a

 6    deadline with respect to plan confirmation.  So the misuse of

 7    this -- of the bankruptcy process is close to unprecedented

 8    here, and it really, truly needs to stop.

 9          You've already heard --

10          THE COURT:  I'm sorry to interrupt, but do you really

11    think that things would go more smoothly, there'd be immediate

12    access to the credit markets, and management would improve if

13    you were -- if the government were fighting you in state court

14    regarding the appointment of a receiver, and even if you won,

15    if eventually a receiver to raise rates was put in place,

16    that's going to cure all of those other problems you've just

17    laid out?

18          MS. CATON:  I don't think, Your Honor, there's any

19    magic silver bullet here for solving all of PREPA'S problems,

20    but I do think maintaining the status quo has not worked to

21    date.  And a receiver actually has powers beyond what the

22    Oversight Board does and beyond what LUMA does, because it can

23    actually operate the system for the benefit of Puerto Rican

24    rate payers, and yet it can pay debt.  It can approve capital

25    expenses.  And I'm sure we would have to argue with the

1   Commonwealth about what the scope of that receiver would look

2   like, but I'm sure that we could find a path forward that

3   would actually benefit rate payers and creditors alike.

4         So what do we think the best scheduling order is

5   here, Your Honor?  We do think that there has to be an order

6   that sets a deadline for confirmation of a plan, and I'm very

7   happy to hear that Your Honor is seriously considering that in

8   the order that she is putting forward today.

9         The Court needs the Oversight Board and PREPA to file

10  and prosecute a plan that it believes it can confirm.  And I

11  understand that Mr. Bienenstock is concerned about the various

12  toggles that it's going to have to put into a plan but,

13  frankly, this is something that bankruptcy lawyers do all the

14  time.  And I am confident that it can be done here and we can

15  start moving forward to confirmation.

16        Number two, we need to -- I've already expressed my

17  interest in moving forward with the motion to dismiss and the

18  fact that we think this is a critical alternative path that

19  this Court should consider.  And while Mr. Bienenstock has

20  argued that dismissal of the PREPA case means chaos for the

21  Commonwealth and that PREPA is really a gating item for all of

22  these other plans that they have confirmed to actually

23  succeed, I'm really surprised to hear that given these

24  gentlemen were just in front of you a few short months ago

25  asking you to confirm the Commonwealth Plan, and I don't

1    believe they said anything at that point about the risk of the

2    PREPA RSA terminating and this case potentially being

3    dismissed having any impact on the feasibility of the

4    Commonwealth Plan, that really should have been disclosed to

5    the Court at that point in time.  And it begs the question of

6    whether an appropriate record was made to this Court when the

7    parties moved forward with the confirmation of the

8    Commonwealth Plan.

9         Third, we have argued that discovery needs to

10   commence right away.  Why did we ask for that?  That is

11   because many of the litigations, as we come to a potentially

12   contested confirmation hearing in June, are going to be

13   overlapping discovery requests.  So there really isn't any

14   purpose in delaying and doing discovery one issue at a time.

15   And if there's one gating item in litigation, we've generally

16   seen that it's discovery.  And discovery disputes can take

17   time to resolve, and we believe we should start that issue

18   across the Board so it doesn't hold the case up.

19        With respect to discovery on bondholders' issues,

20   I'll defer to the Rule 56 briefing Your Honor has suggested to

21   us, but I do want to note that the -- we will need the

22   opportunity to join the adversary proceeding on the bond

23   litigation which was filed, and immediately stayed, and now

24   has to be amended.  So that's another item that we will have

25   to deal with.

1    THE COURT:  So, as I told you, I'm contemplating an

2    intervenor application process, and, at minimum, intervenors

3    will have the opportunity to file supplemental briefs, and you

4    can set out the scope of the intervenor rights that you're

5    seeking.

6    Do you have a problem with that mechanism for cueing

7    up that issue in the first instance?

8    MS. CATON:  No, I don't, Your Honor, but our

9    intervention rights as bondholders probably go beyond what

10   some of the other parties might need in other contexts,

11   because we are actually the monetary party in interest.  And

12   so assuming that that wide scope is met, that -- that doesn't

13   seem to be a problem with us, again, so long as some of these

14   preliminary issues with respect to discovery and

15   counter-claims are not moving forward before we have an

16   opportunity to intervene.

17   THE COURT:  I intend to allow the amendment of the

18   Complaint and not cue up, you know, counter-claims and the

19   full scope of that litigation.

20   MS. CATON:  Thank you, Your Honor.

21   Fourth, I do want to briefly address the lien issues

22   that the Board is contemplating --

23   (Sound played.)

24   MS. CATON:  -- pursuing, and the fact that they just

25   now brought up these arguments with respect to the

1   non-recourse claim.  We believe that given that this is the

2   first time that the Board has raised these arguments in the

3   three years since the Committee has started to raise these

4   points, these arguments are merely a distraction and a delay

5   tactic.  We fully expect to win on these arguments, but,

6   again, we think that the Oversight Board's failure to even

7   file a complaint on these points years ago shows how little

8   they value them.  And, therefore, litigating these issues up

9   front are not going to bring the parties together.

10          So, finally, with my couple of minutes, I want to

11  address what we think should happen with mediation at this

12  point.  So we suggested mediation to this Court several months

13  ago so we could avoid lengthy and potentially pointless

14  litigation, even though we think that our claims can and

15  should be paid in full.

16          Independently, this Court appointed a team of three

17  well-respected bankruptcy judges with decades of restructuring

18  experience between them.  And I want to note for the record

19  and thank them for their dedication that they've spent over

20  the past several months.  I think they've each spent hundreds,

21  if not thousands of hours learning about PREPA, this

22  bankruptcy process, and Puerto Rico.  And their dedication

23  truly should be applauded.

24          I just want to briefly address the Committee's

25  unfounded and bizarre accusation of these mediators being a

1    quasi party.  I'm not sure where to start with that, except

2    Mr. Despins does not like the message they're delivering and

3    so chose to attack them personally.  And I think the Court

4    should -- that says far more about the Committee than it does

5    about the mediators.

6         And I also want to note that in their pleading, the

7    Oversight Board rejected virtually all of the suggestions made

8    by the mediation team.  I'm glad to hear they've made progress

9    since, but their gut reaction to do that and tell this Court

10   the Oversight Board can't be told to do any of the things the

11   mediators suggested should speak volumes about where we are

12   today.

13        So, in sum, the most important thing we think the

14   Court should do --

15        (Sound played.)

16        MS. CATON:  -- is to set deadlines, and we look

17   forward to seeing those deadlines in a Court order shortly,

18   Your Honor.

19        So with that, I will turn the podium back over.

20        THE COURT:  Thank you, Ms. Caton.

21        It is now just about ten past 11:00, and so we will

22   take a ten-minute break, and then recommence with the argument

23   for National.  The people on the AT&T line should put their

24   phones on hold rather than hanging up, and we will recommence

25   at 11:20.

1          Thank you.

2              (At 11:10 AM, recess taken.)

3              (At 11:21 AM, proceedings reconvened.)

4          THE COURT:  Good morning again.  We'll now continue

5    with the arguments with respect to --

6              (Pause taken.)

7          THE COURT:  We are having another technical

8    difficulty.  Okay.  Now we're back.  We're resetting your five

9    minutes.  We're good to go.

10         MR. BEREZIN:  Okay.  Robert Berezin of Weil, Gotshal

11   & Manges for National Public Finance Guarantee Corporation.

12             Your Honor, four years ago there were two viable

13   paths for PREPA to transform into the utility Puerto Rico

14   deserves.  One was to lift the stay and appoint a professional

15   receiver, and the other was the RSA.  National chose the RSA

16   because it would lead to a quick Title III exit and a wave of

17   progress.  It was not to be.

18             After four years, PREPA still has not privatized

19   generation.  PREPA remains addicted to diesel and bunker oil,

20   dirty, expensive, volatile.  It should be much closer to

21   achieving solar power on an utility scale, solar energy for

22   all Puerto Ricans, not just the lucky few.  And after four

23   years, rates include absolutely nothing to pay the debt or

24   fund a plan.

25             We can't change the last four years, but we can learn

1  from them.  We should not choose between fruitful negotiations

2  and a professional receiver.  PREPA needs both urgently, and

3  it should be a matter of consensual agreement, not necessarily

4  litigation.  We should do more than hope that settlement

5  agreements will be honored, do more than hope for a consensual

6  plan.  Instead, the Court can set a firm deadline to file a

7  plan, and National and the other bondholders support the

8  Court's inclinations as articulated this morning.

9       Instead, the Court can set a dismissal and receiver

10  lift stay schedule, so that we may prove to the Court that a

11  professional receiver, at the helm of PREPA, can pay its

12  creditors and provide reliable and affordable power outside of

13  bankruptcy.  That's a case we can prove and will prove if

14  given the opportunity, and we urge the Court to consider the

15  schedule we have proposed.  At a minimum, the bondholders'

16  motion will create conditions for success too long in coming.

17       And then there's the Board's proposed course of

18  action.  The progress the Board promises is to determine how

19  much is owed to the bondholders, but, Your Honor, that

20  progress is elusory.  The Board claims its litigation schedule

21  will resolve whether bondholders have no recourse beyond some

22  money sitting in the sinking fund.  This is the UCC's

23  contractual argument, that PREPA is entitled to intentionally

24  default in order to pay bondholders nothing.  This is the

25  UCC's statutory argument, that a lien on a bank account --

```
 1            (Sound played.)

 2            MR. BEREZIN:  -- stagnant in bankruptcy should be

 3  treated as if it were an ongoing, post-petition lien on

 4  special revenues.  It should not.

 5            The point, Your Honor, is that for purposes of today,

 6  in setting a schedule, even if these arguments succeed, they

 7  will not resolve the bondholders' claims against PREPA.  The

 8  Fifth Amendment takings claim will of course remain.

 9            Outside of bankruptcy, the bondholders lent eight

10  billion based upon liens and other property interests of equal

11  value in PREPA's current and future revenues.  In bankruptcy,

12  the Board now claims PREPA can take 99 percent and leave

13  actually less than one percent recovery for bondholders.  That

14  amounts to an enormous Takings claim, and additional

15  litigation, nowhere accounted for in the Board's schedule.

16            That is why we urge the Court to permit the

17  bondholders to file an answer and counterclaim, so that the

18  Court can fairly frame -- the issues can be fairly framed for

19  the Court, and allow a fair resolution of them, and it's also

20  the reason, one of the reasons why discovery should be

21  permitted.

22            Mr. Bienenstock, in describing his non-recourse

23  argument today, referred to what bondholders were told and

24  what their expectations were.  We can think of no other

25  question that would require more discovery than that.  We
```

1    shouldn't wait until next year, as the Board proposes, to take

2    that discovery.  It needs to start, and it needs to start now.

3            Your Honor, what we propose is to mediate urgently.

4    What we propose is that a plan be filed urgently.  And what we

5    propose will help PREPA complete its transformation and exit

6    bankruptcy urgently.  Thank you, Your Honor.

7            THE COURT:  Thank you, Mr. Berezin.

8            Now, Mr. Natbony for Assured for five minutes.

9            MR. ELLENBERG:  If the Court please, it is Mark

10   Ellenberg, and I will be speaking today on behalf of Assured.

11           THE COURT:  Hello, Mr. Ellenberg.

12           MR. ELLENBERG:  Thank you, Your Honor.  If the Court

13   please.

14           Our hearts go out to the people of Puerto Rico.

15   Their suffering is unspeakable, but let's be clear, the mess

16   that PREPA and the mess in this case happened on the watch of

17   the Board and on the watch of the Commonwealth.  They've had

18   five years to straighten this out, and, indeed, we are not

19   going forward.  We are going backwards.

20           Just a few short months ago, in early 2022, we had an

21   RSA, originally struck in 2018.  That RSA fully settled the

22   issues the Board now wants to litigate, and it provided a path

23   to confirmation, and, indeed, in status reports filed in

24   January and February, the Board told you that a plan could be

25   confirmed by the end of this year.  Now the Board has

1    flip-flopped and treats the RSA as if it never existed.

2         The Board's papers talk about how far apart the

3    parties' respective offers were in mediation. What they don't

4    talk about is how far their offer was from the RSA that they

5    were supporting in front of the legislature and in front of

6    this Court just earlier this year.

7         In fact, as their blown-out offer shows, they were

8    offering us approximately 50 percent of what the RSA would

9    have given us, and even that was only 60 percent of full debt

10   service. And so they've yet to offer a cogent explanation for

11   the wholesale abandonment of the RSA, and that affects and

12   infects the entirety of this case.

13        Just a minute here to address Your Honor's earlier

14   comments. Your Honor, the mediation team, whose efforts were

15   heroic and with whom we gladly will continue to work, suggest

16   today, Your Honor, that the dismissal motion proceed in

17   concert with the so-called gating issues raised by the Board.

18   Dismissal is not ideal, but it is the only way to end this

19   case and bring order to PREPA in a reasonable period of time.

20        The Board is effectively asking you for another five

21   years, because that's how long this litigation will take. And

22   at the end of that five years, we will still be nowhere. The

23   dismissal will bring professional management, who is not

24   subject to political whims and machinations, and it will do

25   for PREPA what an emergency manager did for Detroit. If

1    dismissal is kicked to the back of the line, the Board will

2    never come to the table, and this case will linger for years.

3    And if that were to happen, we all lose.  It doesn't matter

4    who wins the litigation.  We all lose in that effect, because

5    this litigation will take forever, and we all know that.

6         In HTA, we filed motions for relief from the stay,

7    and the Board said, we can handle these on motions to dismiss.

8    And what happened?  We filed our Rule 56(d) statements, and

9    the Court granted them.  And after a year of litigation, Your

10   Honor still had not rendered a final judgment on our motions

11   for relief from the stay.  It will be no different here, Your

12   Honor.

13        Now, Your Honor mentioned that one reason for

14   delaying the motion to dismiss is that our -- the scope and

15   extent of our lien is a threshold issue.  That's respectfully

16   incorrect, Your Honor.  Our right to a receiver is

17   contractual, and it exists without regard to whether our

18   claims are -- I would note that even the Board and Committee

19   concede that we have at least eight million dollars' claim in

20   this case, if that were even necessary.  So there is no gating

21   issues to our motion to dismiss in this case.

22        Also, Your Honor, assuming that the receivership

23   motion would be in state court, actually, Your Honor, if the

24   Board is a party, then exclusive jurisdiction exists in the

25   United States District Court for the District of Puerto Rico.

1   It would not be the PROMESA court, but it would be a Federal

2   Court in the District of Puerto Rico.

3          Again, Your Honor, the mediator suggested that this

4   motion proceed simultaneously with the other litigation, and

5   we urge the Court to reconsider that recommendation and

6   consider why the mediators might have made it.

7          Finally, Your Honor, with respect to the litigation,

8   only the Trustee is currently a defendant in the lien

9   litigation --

10         (Sound played.)

11         MR. ELLENBERG:  The lien litigation was stayed.

12         THE COURT:  You may wrap up your remarks.

13         MR. ELLENBERG:  Thank you.

14         THE COURT:  You can make your final point.

15         MR. ELLENBERG:  Okay.  I don't recall hearing the

16   warning beep.

17         Only the Trustee is the defendant in that litigation

18   that was stayed before we could intervene.  Your Honor, we

19   need to intervene as full party defendants.  We should be on

20   the same briefing schedule with the Trustee, not some

21   supplemental afterthought, because we are, as Ms. Caton said,

22   the real parties in interest.  And we have a right and we will

23   need to file answers to counterclaims.

24         Your Honor can decide when you see them how to treat

25   them, whether to stay it or not, but we have an absolute right

1    to file them.  And I think that's really necessary to give

2    Your Honor a full case for the litigation in front of it, and

3    to fully rule on the issues that the Board seeks to pursue.

4           Thank you, Your Honor.

5           THE COURT:  Thank you.

6           Next is counsel for the PREPA Bond Trustee for two

7    minutes.

8           MR. WHITMORE:  Thank you, Your Honor.  Clark Whitmore

9    for Maslon, LLP, appearing on behalf of the U.S. Bank National

10   Association in its capacity as the PREPA bond trustee.

11          Your Honor, just underscoring the last point that was

12   made, U.S. Bank is an indenture trustee.  We have an organized

13   majority bondholder group here consisting of the monolines and

14   ad hoc group who have taken the lead in the negotiations.  The

15   indenture trustee is not a mediation party.  Whereas they

16   were, and for the last number of years they've been very, very

17   active and organized.

18          It would be our expectation that they would be taking

19   the lead in this litigation, and we would ask that, consistent

20   with Judge Dein's ruling in the Fuel Line Lender case, I

21   believe, that they be made full parties without the

22   requirement of motion practice or some sort of scheduling

23   difficulties that might result in confusion and complication

24   and uncertainty about the briefing.  It's an unnecessary

25   sideshow that we would ask the Court to help us avoid.

1          Secondly, to the extent that the Court orders the

2    continued mediation, we would ask that U.S. Bank be permitted

3    to talk to our constituents about the mediation subject to the

4    confidentiality rules in the mediation process.

5          With respect to discovery, we believe that discovery

6    is important, and there are -- there is discovery that should

7    be taken at this time.  I think all I have time to say is that

8    U.S. Bank, as a defendant in the adversary proceeding 391, is

9    really not in a position to concede or waive any of its

10   procedural rights or protections in connection with this

11   proceeding, and would reserve all of those rights.

12         Thank you, Your Honor.

13         THE COURT:  Thank you, Mr. Whitmore.

14         Next I have counsel for UTIER and SREAEE for five

15   minutes.  Ms. Mendez-Colberg.

16         MS. MENDEZ-COLBERG:  Yes.  Good morning, Your Honor.

17   Can you hear me?

18         THE COURT:  Yes, I can hear you, and I can see you.

19   Good morning.

20         MS. MENDEZ-COLBERG:  Good morning.  Buenos dias.

21   Jessica Mendez-Colberg on behalf of PREPA'S Employee

22   Retirement System and UTIER.

23         Again, I apologize.  Before I begin, I would like to

24   apologize if connection is cut off, because I am in Puerto

25   Rico right now.  But to start in with respect to the

1  mediation, we respectfully state for the record that the

2  proposal to continue the mediation's unwarranted.  The focus

3  of the mediation has been negotiations with the bondholders,

4  leaving throughout most of the process other important

5  stakeholders mostly on the sidelines, like UTIER and the

6  retirement system.

7         Despite looking at the mediation team's report, it is

8  clear from the exhibits regarding the in-person mediation

9  session, whose concerns have been addressed.  Nothing in the

10  proposed order gives us confidence that this situation will

11  change, and, thus, the extension of mediation in our view will

12  lead to the same dead ends as the prior negotiations.  After

13  all, the Board has constantly stated in its papers that it can

14  negotiate with or without the process -- the mediation process

15  that's in place.

16         We are concerned about the waste of resources,

17  particularly in financial advisors, which alone should be

18  enough to not extend the mediation, Morales has charged over

19  $400,000 just in their first bill, and now the mediation team

20  even recommends that the Board obtain a new financial advisor.

21  These costs double the burden of Puerto Rico's taxpayers, who

22  must rely on an already bankrupt entity.

23         Also, we respectfully disagree with the mediation

24  team's contention the Oversight Board provide a toggle plan

25  and litigate this issue in the context of confirmation.

1    Considering the amount of time and amendments this process

2    takes, allowing for a tentative plan to be debated exposes the

3    parties to an undue burden of costs and can be a wasted

4    effort.  This path would not only create confusion but it can

5    unfairly influence negotiations and litigations.

6         We believe three parallel proceedings, mediation,

7    litigation, and confirmation of a plan can be burdensome and

8    extremely expensive.  Pursuant to the Oversight Board's

9    statement, the most -- the main point of conflict with the

10   bondholders is the bondholders' argument that PREPA'S

11   financial capacity to pay the debt service is the only

12   relevant information.  Therefore, submitting a plan that

13   caters to that idea before resolving the legal issue at hand,

14   would play directly in favor of the bondholders.  That is why

15   we submit that a plan of adjustment should not be proposed

16   until the issue of the lien challenge complaint is resolved.

17   Any other approach ignores how vital it is for PREPA'S

18   restructuring the bondholders' status be verified first.

19        The Court has already stated it would allow in the

20   schedule a term to file motions to intervene, and we will

21   confer and advise our clients in that regard.

22        Now, with respect to the litigation, we agree with

23   the Court's initial statement on this matter, and once the

24   Oversight Board files the amended complaint in the lien

25   challenge adversary proceeding, we will review it and inform

 1   the Court of the course of action as a possible amendment to

 2   our complaint or request for voluntary dismissal. But, in any

 3   case, the Board has already stated in its filings it will meet

 4   and confer with us and discuss this matter.

 5          And as a final remark, with respect to the

 6   bondholders' request to dismiss the Title III case or lift the

 7   stay to allow receiver appointment, a motion filed just hours

 8   after the hurricane hit Puerto Rico, we agree with the Court's

 9   decision to stay the motion or we urge this Court to deny it.

10   Up until now, what we have witnessed is constant negotiation

11   with just one party, the bondholders, so now the real case can

12   begin.

13          Those are my remarks for this morning, Your Honor.

14   If you have no further -- no questions, I thank you for the

15   time.

16          THE COURT:  Thank you, Ms. Mendez-Colberg.

17          Now, nine minutes have been allotted for reply or

18   rebuttal comments by the movants and the supporting parties.

19   How have you divided that time up?

20          MR. BIENENSTOCK:  Your Honor, Martin Bienenstock.

21   There hadn't been a formal division, but the Committee asked

22   me for two minutes, so I propose two minutes for the

23   Committee, two minutes for AAFAF, and I'll take five minutes.

24          MR. DESPINS:  Your Honor, sorry to interrupt, but

25   I'll waive my time so it can be allocated to the other

1  parties.  Thank you.

2        THE COURT:  Thank you, Mr. Despins.

3        So, Mr. Friedman, do you want to start?

4        MR. FRIEDMAN:  Your Honor, I think from our

5  perspective what you heard really emphasizes why dismissal is

6  not appropriate.  There are obviously so many parties that

7  remain engaged and have differing views on where this case

8  should go and what the ramifications should be, that if

9  adhering to the whims of just the financial creditors to move

10  forward with dismissal doesn't make any sense.

11        The other two points I think I would just make

12  briefly, Your Honor, are that in response to Mr. Ellenberg and

13  Assured's point, all the discovery that was taken in

14  connection with the HTA, PRIFA, and CCDA lift stay motions

15  ultimately prove nothing.  And while the Court indulged

16  discovery in that case, we don't believe that would be

17  predictive of what would occur here where the documents are

18  directly relevant and determinative on their face in the

19  context of the Board's forthcoming amended complaint and

20  summary judgment motion.

21        And, Your Honor, we also think that in connection

22  with moving forward with the stay, even if the matter of a

23  lien is not germane, I think the highly salient point in

24  analyzing any of the *Sonnax* factors for a receiver motion are

25  the monolines and bondholders pounding the table with a fist

1    or with a pinky, and that can only be determined when you

2    understand the size of their claims and the bundle of rights

3    they actually have.  And so moving forward on a lift stay

4    motion without understanding what their rights are and how --

5    what kinds of things they have, doesn't make sense.

6              I have nothing further, Your Honor, and would just

7    cede the lectern to Mr. Bienenstock.

8              THE COURT:  Thank you, Mr. Friedman.

9              Mr. Bienenstock.

10             MR. BIENENSTOCK:  Thank you, Your Honor.  Martin

11   Bienenstock of Proskauer Rose, LLP, for the Oversight Board.

12   I'm going to go in the order of the presentations.

13             I think, as Your Honor's question showed, there was

14   no connection in the bondholders' argument between their

15   stated objectives, access to the debt markets, avoiding

16   counter-party risk, and easing the political situation.

17   There's no connection between achieving any of those and

18   dismissal of the case.  In fact, dismissing the case would

19   make each of those worse.

20             As far as the bankruptcy being bad for PREPA and

21   abuse of the bankruptcy process, the Title III is the only

22   method for PREPA to discharge debt and gain market access and

23   to rehabilitate.  And if -- I think the Court and the -- we're

24   loaded here on the screen with brilliant and experienced

25   bankruptcy lawyers for many decades.  One only has to go to

1    the Supreme Court's decisions in cases like *Continental Rock*

2    *Island Railway*, *Penn Central Transportation*, and on and on and

3    on to see that large, complex reorganizations sometimes last

4    five to ten years.  And the Supreme Court in all of those

5    decisions didn't bring a word of abuse of process.

6           On the receiver order I want to point out to Your

7    Honor that when we did the stay litigation with the PREPA

8    bondholders some years ago, the receivership statute was in

9    all of both parties' pleadings, and it gives total power over

10   PREPA to a receiver, total power over the Board, the officers,

11   the employees, what it does with the rate making authority, et

12   cetera.  All of the suggestions Your Honor is hearing are

13   based on the unwarranted, unsubstantiated premise that there

14   can be an order that tells the Commonwealth Court or even

15   Federal Court, if it ends up in Federal Court, that the

16   receivership statute can be amended.  That is pure

17   speculation.

18          THE COURT:  I'm sorry.  I don't quite follow that.

19          MR. BIENENSTOCK:  The parties would ask to go forward

20   with the stay motion to prosecute a receivership motion, said

21   that there can be a receiver order that will be good for

22   everybody, and my point is there's a receivership statute that

23   tells the receiver what to do.  Get rates up to pay the bonds.

24   It doesn't say anything about doing anything good for anyone

25   else or even anything that will work long-term or gain market

1   access or anything else.

2       So my point is that they're all counting on some --

3   the Court being able to change the Puerto Rico receivership

4   statute, and it's not at all clear to us that that can be

5   done.  And no examples have been given that that can be done.

6   So it's not a solution for all parties.

7       And on that theme, Your Honor, several parties

8   started their presentations by saying their hearts were with

9   the people of Puerto Rico, but they're totally against the

10  Oversight Board's having waived the rate increase's impact on

11  the consumers and businesses in Puerto Rico.  When it gets to

12  dollars and cents, their hearts aren't there.  The Oversight

13  Board is trying to accommodate the people and the businesses,

14  so there's a secure financial future.

15      On the lien issues, we were accused of not raising it

16  in our complaint, the recourse issue in our complaint we filed

17  previously.  Well, we only filed that complaint, as the

18  parties know, because of the potential application of the

19  two-year statute of limitations in the Bankruptcy Code.  We

20  didn't file in that complaint claim objections for which there

21  is no statute of limitations, and that's the only reason why

22  it wasn't in there.

23      As far as the request again to go forward with stay

24  litigation, as our pleading mentioned, and I think inherent in

25  the Court's earlier remarks is the fact that determining the

1   allowability of the claim and the extent of the lien is really

2   the first step in the stay relief litigation, even if they ask

3   for stay relief under 362(d)(2) and not 362(d)(1).

4        No court has held that the disallowance of the claim

5   or determination that there is no recourse claim is a Fifth

6   Amendment taking.  We think there's just no basis for such a

7   legal claim.

8        (Sound played.)

9        MR. BIENENSTOCK:  The RSA gave the government and

10  Oversight Board the contractual right to terminate under

11  certain facts which did exist, so to say that the RSA was

12  taken away is simply not correct.

13       As far as the arguments as to which party should

14  intervene and what rights, we'll reserve until that issue

15  arises.

16       And as for the union's contentions, as Your Honor can

17  imagine, we're somewhat sympathetic with them.  We've made

18  offers to the unions.  They have responded.  They have --

19  there are really two issues, work rules and a grossly

20  underfunded pension plan.  Those claims, the treatment of

21  those claims can change remarkably depending on what happens

22  with the bond claims.  And, you know, it's just another reason

23  why the toggle will have to deal with things like that, which

24  it may not be ideal, but we will do it.  And that will be the

25  reason why we may have to make adjustments as we go along.

1          Your Honor, I think that's all I had.

2          THE COURT:  Thank you, Mr. Bienenstock.

3          There is a hand up.  Ad Hoc Bondholders.  Ms. Caton.

4          MS. CATON:  Yes, Your Honor.  Thank you.  Amy Caton

5     on behalf of the Ad Hoc Bondholders adversary group.

6          I just wanted to address one point that

7     Mr. Bienenstock made, and that was his suggestion that we were

8     looking for amendment to the receiver statute.  Nothing could

9     be farther from the truth.  Mr. Bienenstock is absolutely

10    right that the receiver statute grants receiver broad powers

11    and does allow the receiver to operate and run PREPA and raise

12    rates in an amount sufficient to pay PREPA's costs.  It also

13    would be able to deal with the union's claims, deal with the

14    pension claims, and it would be able to negotiate with

15    bondholders to come up with a resolution that pays its debts

16    over a long-term basis.

17         That said, what we are seeking there is not in

18    fact -- if we were to seek a receiver, we would not be seeking

19    to amend the statute.  Rather, we would be seeking an order

20    appointing a receiver, which, if you looked at the case of

21    Jefferson County, there is a receiver order entered there with

22    a similar receiver statute.  So this is not an amendment to a

23    statute.  It's what the statute requires as a Court order

24    appointing the receiver.

25         So I just wanted to make that one simple point in

1    response to what Mr. Bienenstock said.  Thank you.

2              THE COURT:  Thank you, Ms. Caton.

3              There is another hand up.  Judge Chapman.

4              JUDGE CHAPMAN:  Thank you, Your Honor.  Briefly, I

5    wanted to address the concerns of the parties who have not

6    been included to the extent that they would like to be

7    included in the mediation process.  I'm entirely sympathetic

8    to their concerns.  As the mediation team has stated

9    repeatedly, it made the most sense to us to proceed as we did

10   over the last five to six months.  I would like to assure the

11   Court and the parties who have voiced their concerns to you

12   today about their lack of participation that the mediation

13   team will redouble its efforts to engage in discussions with

14   those parties if the mediation team is empowered to continue

15   to move forward.

16             One thing that's been made abundantly clear to me by

17   this hearing, it's fairly obvious, these are complicated

18   issues, they're time consuming, but the path forward to us is

19   clear.  We must, must, must try to achieve a settlement, and,

20   ultimately, that settlement can and should include all

21   interested parties.

22             So I simply wanted to take a moment to assure the

23   Court that we take those, I'll call them criticisms, to heart,

24   and we will do our very best to do better.  Thank you, Your

25   Honor.

1              THE COURT:  Thank you, Judge Chapman.

2         I thank everyone for these very thoughtful and very

3    clear arguments.  Having heard them, my intention is to enter

4    an order substantially as described.  I will go back and

5    revisit my intentions and firm up some of the issues.

6         As to intervention, the order will include a deadline

7    for motions to intervene, but I do encourage the parties to

8    meet and confer and seek to propose stipulations regarding

9    intervention authority on or about the date for motion

10   practice.  And perhaps we can deal with some of this without

11   motion practice.

12        The order will also permit the filing of an answer to

13   the amended complaint, but no further litigation as to the

14   answer or counterclaims absent further order of the Court.

15   So, again, thank you all, and the matter is under submission

16   in contemplation of entry of an order embodying the principles

17   that I have described.

18        The next contested matter is the motion of UBS

19   Financial to enforce the plan of adjustment.  Before I call on

20   counsel for UBS, I would ask whether Mr. Vicente-Colon or any

21   other representative of the Retirees has been able to join,

22   because I understand that that was in question.

23        MR. VICENTE-COLON:  We are here, Your Honor.  This is

24   Harold Vicente.

25             THE COURT:  Oh, terrific.  All right then.  We will

1   then begin with counsel for UBS, who I understand is

2   represented today by Mr. Lockwood.

3        MR. LOCKWOOD:  Thank you, Your Honor, and I guess

4   with a couple minutes left, good morning.  On behalf of UBS,

5   can I preserve one minute of my time for rebuttal?

6        THE COURT:  That's what I was going to ask you.  So

7   you want to reserve one minute out of your 20?

8        MR. LOCKWOOD:  Yes.

9        THE COURT:  All right.  We'll set your clock for 19

10  minutes.  You may proceed.

11       MR. LOCKWOOD:  Thank you.

12       Your Honor, this matter concerns the bonds that were

13  issued by the Employees Retirement System of Puerto Rico in

14  2008.  There was three offerings that totaled three billion

15  dollars, and UBS was the lead underwriter for each of those

16  offerings.

17       In 2011, two government employees filed a lawsuit in

18  the Commonwealth Court in Puerto Rico seeking to pursue

19  derivative claims on behalf of the ERS against UBS for breach

20  of the underwriting contract between UBS in the system and for

21  negligent and breaches of fiduciary duty related to

22  obligations created by the contracts.

23       The plaintiffs in the Commonwealth case have amended

24  their complaint six times, most recently last week, but also

25  last week each of their complaints were expressly pleaded as

```
 1    derivative claims.  Then in 2017, the ERS itself intervened in
 2    their lawsuit and took over as the primary plaintiff.  ERS
 3    subsequently was reorganizing itself pursuant to these
 4    proceedings, which Your Honor is very familiar with, but that
 5    resulted in the plan that was confirmed by this Court earlier
 6    this year.
 7         UBS has filed this motion to enforce the plan and to
 8    bar further prosecution of the Commonwealth action, because it
 9    is inconsistent with the terms of the plan.  And,
10    specifically, the ERS claims in the Commonwealth action no
11    longer belong to the ERS under the terms of the plan, and,
12    therefore, they cannot be litigated by the ERS itself and they
13    cannot be litigated adversarialy by its former beneficiaries.
14         Your Honor, I'm going to attempt to share a screen.
15    I'm going to see if I can pull that off.
16         THE COURT:  I take it in the course of your remarks
17    you'll explain why any derivative rights wouldn't follow a
18    transfer of the claim -- transfer of ERS' rights to somebody
19    else?
20         MR. LOCKWOOD:  Well, they would, Your Honor.  The
21    derivative claims would go with the transfer of the claims.
22    And, Your Honor, I may even skip the slide to get to the
23    essential of this.  There's -- under the plan, under the terms
24    of the plan, there's a couple things that happen.  The first
25    is that an avoidance action trustee is created by the plan,
```

1   and there were certain assets transferred to the avoidance

2   action trustee.

3          One of those -- and no one disputes this, this is

4   pursuant to section 1.108 of the plan -- is a *Special Claims*

5   *Committee v. Barclays Capital* lawsuit, a lawsuit that the

6   parties in the PROMESA matters have referred to as the

7   underwriter action.  And the underwriter action and the

8   Commonwealth action are duplicative actions.  The claims

9   aren't 100 percent identical, and we do not contend that

10  they're a hundred percent identical, but they relate to the

11  same claims transactions and contracts.  In fact, many of the

12  claims are exactly overlapping.  There are claims for the

13  breaches of the same contract, and there's some stylistic

14  differences.

15         The trustee under 78.6 of the plan has the rights,

16  powers, and duties to hold the avoidance action trust assets

17  for the benefit of the beneficiaries and to investigate,

18  prosecute, settle, or abandon the causes of action or

19  litigation.  So they have the right to style the case as they

20  see fit.

21         They haven't followed a prescription that's 100

22  percent aligned with the Commonwealth case, but it is seeking

23  the same ends.  It's seeking damages for breaches of that

24  contract, and it's seeking to recover or recoup fees that were

25  paid by the system to UBS.  And, as I understand the

1   opposition, from the beneficiaries' counsel, they say, well,

2   it's really not exactly the same.  We have some different

3   claims, we have some negligence and fiduciary duty claims that

4   arise out of the contracts instead of just the contract

5   claims.  And that point is irrelevant legally and I think

6   incorrect in terms of whether it's the same claims or not.

7           The reason why it's irrelevant legally, Your Honor,

8   is that if they're right and the claim didn't get transferred

9   to the avoidance trustee, then it got transferred to the

10  Commonwealth.  Nothing stayed with the ERS.  The ERS was

11  dissolved, or is in the process of being dissolved, and in

12  exchange for 370 million dollars, its assets, including all

13  causes of action, and this section 1.83 of the plan, were

14  transferred from the ERS to the Commonwealth.

15          So neither the ERS or its derivative beneficiaries

16  have any financial interest in the assets of the ERS any

17  longer, including its causes of action.  And, in fact, those

18  beneficiaries, they got something completely different in the

19  plan.  Right.  A new trust was created for them, and different

20  rights flow into that trust.  And their right to payment going

21  forward comes from that new trust created by the plan, not by

22  the old trust that was the ERS that's being dissolved.

23          THE COURT:  So let me just explore this with you a

24  bit more.  One reason I asked you whether a derivative right

25  against -- a derivative right in respect of an asset of

1    someone who is an obligor to you could follow a transfer of

2    that asset is that if there were no change in the rights of

3    the retirees, the obligees, then that would seem arguably to

4    be an assertion that the ERS could just offload assets, make

5    them for the benefit of someone else, and leave the retirees

6    here in a worse position.

7         So it sounds to me as though, in addition to saying,

8    well, there's a different holder of this claim and that holder

9    has different priorities and different obligations, you're

10   also saying that the plan effected a novation, so that the

11   retirees no longer have rights directly against the now

12   dissolved ERS or any of its assets, and there's been a

13   substitution by way of the Court approval of the plan's

14   provisions for payments of pensions in certain amounts and by

15   a certain source.  Is that correct?

16        MR. LOCKWOOD:  I agree with that 100 percent, Your

17   Honor.  What I would say is that the rights went with -- the

18   derivative rights went with the claim, right?  If that wasn't

19   a fair exchange, could you see -- if it was a situation

20   outside of the Title III process, if it was a company trying

21   to avoid a claim by transferring it, the rights may be gone

22   but you'd have a new claim against the fiduciary who

23   deceptively transferred the claim away.  But here this was a

24   court overseen process.  No one challenged it.

25        There was a pension reserve trust created by the

1    plan.  It's in section 1.389 of the plan, and section 83.2 of

2    the plan, and the Confirmation Order at paragraph 23

3    specifically references it.  And this new system is set up to

4    pay the retirees, and that's their source of payment.  And

5    this was all part of a -- an exchange, a negotiation.  The

6    retirees had counsel in the PROMESA proceedings, and they

7    negotiated hard.  And I think everyone thinks they got a good

8    deal for themselves, but here, now you have another set of

9    lawyers and a small subset of retirees purporting to act on

10   all the retirees who now want to double-dip.

11          And if you allow them to double-dip and take the

12   asset that was transferred to other creditors as part of this

13   exchange and negotiation of assets, the whole plan starts to

14   fall apart.  And the reason my client cares about this -- I

15   mean, we're not representing those other creditors who are

16   suing us, but we don't want to be sued twice and we don't want

17   to face a double recovery.  And, in fact, we're not going to

18   be able to cut a settlement with the avoidance trustee if the

19   avoidance trustee doesn't have clear title to the assets and

20   someone else is double dipping and saying, pay us, too.

21          At the very least, if we settle with them, it would

22   have to be a very significant haircut to face the risk that

23   we're still going face litigation and face the risk of paying

24   out claims to another party who contends that they own the

25   same assets.  And the plan is clear here that they don't.

1          Your Honor, with respect to one other wrinkle of

2    this, I think it's very clear, the claims are derivative from

3    the face of the complaints.  As I said, the first five

4    complaints that they filed, they acknowledged that they were

5    derivative complaints, and all of the injuries are injuries to

6    the system.  The contention is that there was contracts with

7    the system, not with the retirees themselves, that were

8    breached, that there was alleged advice -- it's disputed

9    whether there was advice, but there's alleged advice given to

10   the system, not to the retirees themselves, and that the

11   injury -- the injury was one that was suffered by the --

12   indirectly by the retirees.

13         And, Your Honor, I would refer to the *Madoff* case

14   from the Second Circuit that we cited in our papers, which

15   stands for the proposition that there is secondary injury, it

16   is an derivative claim and not a direct claim.  If you can't

17   trace the injury directly to yourself, then that claim is a

18   derivative claim, not a direct claim.

19         There's another wrinkle to this that is raised by

20   counsel for the beneficiaries, which is that there is a law

21   passed in 2013, in Puerto Rico, and it is Law 3 of 2013.  And

22   section 40 of that law is the one that comes into play.  And

23   to give context as to why this law was passed, at that time we

24   had successfully moved to dismiss the Complaint and we won, we

25   got an order from the trial court saying that beneficiaries of

1    the system could not sue adversarialy on

2    behalf of the system.

3         That was being appealed, and then the legislature

4    passed a law to clarify they could have derivative standing

5    and they could pursue that claim.  And section 40 says, cause

6    for action -- this is a translation -- cause for action is

7    hereby recognized to the participants and pensioners of the

8    Employees Retirement System of the Government of Puerto Rico

9    and the judiciary to sue pro se non-government investment

10   advisors and underwriters in any transaction in which the

11   pension obligation bonds have been issued by the ERS for

12   damages caused to the system or its beneficiaries.

13        Now, here the only -- the points that they're seeking

14   are for damages to the system.  This law doesn't change the

15   nature of the claim.  It doesn't transform a derivative claim

16   into a direct claim.  It merely -- and doesn't create a

17   separate and independent set of liabilities.  It merely

18   extends the standing, the ability to litigate that claim to

19   the retirees, and not just the Board of Trustees.

20        Now, I would submit that's a fair reading of the

21   text.  It's also consistent with the fact that, otherwise, the

22   statute would be retroactive, and there is, in Puerto Rico,

23   Civil Law No. 3 of 1930 states that courts should not view

24   laws as retroactive unless there is express intent to do so.

25   And further, further reason why the retroactive nature of the

1   law would be improper is we submit it would render it

2   unconstitutional.  And we briefed this issue and got no

3   response from it in the opposition, but I will go over it

4   again.

5        There's three ways in which the law would be

6   unconstitutional if it retroactively created these new

7   obligations on UBS five years after the bond issuances.  The

8   first is that there is a prohibition on -- prohibition on

9   effecting contracts, both under the U.S. Constitution that

10  applies to states and, therefore, would apply to Puerto Rico,

11  but I think the Puerto Rico Constitution provision would also

12  apply here.  And we cite the *Warner-Lambert* case from the

13  Puerto Rico Supreme Court that emphasizes that its

14  Constitution does not allow for impairment of contracts.

15       There are exceptions to that, Your Honor, because the

16  police power can always affect certain egregious

17  circumstances.  What the Court -- the Puerto Rico Supreme

18  Court said, if there's a solid foundation to do this -- one

19  example would be a contract for sale of illegal drugs, for

20  example.  But the contractual provision in particular that

21  would be eliminated by the reading, that they proposed of the

22  Complaint, is section 13 of the underwriting contract that

23  states that the agreements were made solely for the benefit of

24  the system, and no other person shall acquire or have any

25  right hereunder or by virtue hereof.

 1              So it's a complete disclaimer that anyone has any

 2     rights in these transactions that UBS provided other than the

 3     system itself.  Right.  Now they're saying a law passed five

 4     years after the fact creates duplicative liability for, you

 5     know, thousands and thousands of beneficiaries of this trust,

 6     who were a stranger to UBS at the time.  That would be

 7     inconsistent with Puerto Rico constitutional law under

 8     *Warner-Lambert*.  It would also be under the *Eastern* --

 9              THE COURT:  I'm sorry, but it wouldn't be

10     inconsistent if this were just a matter of someone else being

11     able to contract, prosecute the derivative claim if, for

12     instance, the plan itself hadn't brought it, that claim, as a

13     principal?

14              MR. LOCKWOOD:  A hundred percent, Your Honor.  That

15     would be in my view, fully consistent with -- that would not

16     impair the contract, because they are -- the contracting

17     part -- the party in interest would still be the system or

18     successor of the system.  It's just who can stand in the shoes

19     of the system and litigation on its path.

20              We wouldn't dispute that, and we wouldn't see that as

21     eviscerating the contract.  What would eviscerate the contract

22     is saying there's no separate set of direct rights that create

23     duplicative liability, right, it could double the liability

24     that UBS faces for this transaction.  And that would be our

25     primary concern.

1            And not only would that violate the Contracts Clause,

2    it would also violate due process and result in a taking.  And

3    the *Eastern Enterprises v. Apfel* case from the U.S. Supreme

4    Court that we cite in our papers supports that position, and

5    they propose a three-part test with respect to economic

6    regulation of this respect.  And that was -- let me give you

7    the facts of that case.

8            THE COURT:  You only have about three minutes left,

9    so choose what you want to talk about carefully.

10           MR. LOCKWOOD:  I think this is what I want to talk

11    about, Your Honor.

12           THE COURT:  Okay.

13           MR. LOCKWOOD:  So the facts of that case was a mining

14    company was given retroactive pension liabilities for its

15    employees from decades earlier, so sort of like this where

16    there's a retroactive pension liability imposed.  The

17    three-part test related to, is it significant economic impact,

18    did it interfere with reasonable investment-backed

19    expectations, and what was the character of the government

20    action.

21           You apply that test here.  It's a very significant

22    impact.  It doubles liability, millions in extra liability.

23    It interferes with the reasonable expectations at the time

24    from the business perspective, because we had a contract, we

25    knew who we were contracting with, now they're expanding the

1       group of the contract.  And the character of the government

2       action isn't necessary to protect the interests of the

3       retirees.

4              I think, as Your Honor noted, if derivative standing

5       is extended, well, then a claim can be brought, remedies can

6       be obtained, and there is no duplicative liability.  Instead,

7       if there's direct ability to bring the claims on behalf of the

8       creditors themselves, that doubles the liability.

9              (Sound played.)

10             MR. LOCKWOOD:  It doesn't further the remedies or any

11      even remedial aspect or sort of attaining UBS' behavior if

12      that was the goal of the legislature, because you don't need

13      duplicative punitive liability to that.  You can just make

14      sure the claim is brought.

15             The last thing I'd like to say, Your Honor, is they

16      cite Article 517 of Law 53-2021.  This is a law that the

17      Puerto Rico legislature passed to support a plan, and there's

18      a provision in that that states "adjustment plan transactions

19      cannot be used to mitigate causes of action under Article No.

20      3213," the law we were just talking about.  And they said,

21      well, it would break that law, but it doesn't, Your Honor,

22      because it doesn't eliminate or mitigate that law.

23             Our motion is about who owns the claim.  We're not

24      asking you to bar the claim.  We're not moving to dismiss the

25      claim.  We're not saying the claim is dead.  We're saying two

1    parties can't litigate the claim against us at the same time.

2    So saying it belongs to the avoidance trustee is not

3    inconsistent with our rights.

4           Thank you, Your Honor.  I'll reserve the rest for my

5    one minute.  Thank you.

6           THE COURT:  Thank you, Mr. Lockwood.

7           So, for supporting parties, we have first the UCC.

8           MR. ARRASTIA:  Thank you, Your Honor.  Good

9    afternoon.  John Arrastia on behalf of the Committee for

10   Unsecured Creditors.

11          The Committee supports UBS' motion to enforce,

12   because the claims the ERS plaintiffs seek to pursue have

13   already been transferred by the plan of adjustment exclusive

14   to the avoidance action trust for the benefit of the general

15   unsecured creditors.

16          As part of the largely consensual plan, ERS and other

17   debtors propose that certain litigation claims would be

18   designated for the benefit of these general unsecured

19   creditors, and to effect this, the debtors, including ERS,

20   transferred its litigation claims, which were property of the

21   estate, to a post-confirmation litigation trust.

22          Any net recoveries by the avoidance action trust is

23   for the benefit of the general unsecured creditors.  Thus, the

24   creation of this avoidance action trust was a material element

25   of the treatment that was afforded to the general unsecured

1   creditors under the plan.

2          These transferred litigation claims include the

3   claims set forth in this -- what's called the underwriter

4   adversary complaint, of which UBS, those parties are

5   defendants.  And these causes of action, including those

6   arising from UBS' role in the issuance of the ERS bonds, were

7   property of the estate.

8          Now, on the other hand, you had a group of seven

9   individuals that want to unilaterally rewrite the plan, so

10  that they can continue pursuing these same UBS defendants from

11  claims arising from the same operative facts that are being

12  pursued by the avoidance action trustee.  Now, before the

13  hearing -- it seems that the ERS plaintiffs now hope to

14  proceed as a class, but whether it's seven plaintiffs or a

15  class, the analysis is the same.

16         This is not a case of particularized damage, which

17  would allow an individual defendant, such as the ERS

18  defendants, to pursue the claim.  That would be harm that is

19  directed specifically to those plaintiffs.  This is a

20  derivative claim.  The ERS plaintiffs' right to claim any

21  damages from UBS arise from the UBS' breaches of duty to ERS

22  that arise from the same bond issuances.

23         This is a derivative injury, because it's based on a

24  secondary effect from the harm done to ERS.  The reasoning is

25  straight forward.  And as Mr. Lockwood talked about, *In re*

1     *Madoff*, there it set forward a test, and the touchstone of

2     that analysis is whether the ERS plaintiffs' claims might have

3     any conceivable effect on the bankruptcy estate.

4          The claim based on rights that are derivative of or

5     derived from the debtor involves property of the estate, and

6     that property, it was transferred, it was transferred

7     pursuant to the operation of the plan.  So now, whether it's

8     ERS or its representative, or now its assignee is the only

9     proper party to assert it.

10          So applying this rule, it's apparent that ERS retain

11     the right to assert the claims arising from UBS' role in the

12     issuance of the ERS bonds, and those rights were then

13     transferred to the avoidance action trust.  Now, the ERS

14     plaintiffs seek to rewrite the law of derivative claims and

15     have a negative impact on the Committee and its constituency

16     of unsecured creditors.  Instead of the full breath of claims

17     against UBS and other underwriter defendants, it would mean

18     that the treatment of the class of creditors would be left

19     with something less than what the plan delivered, the rights

20     to these claims would now be limited by whatever claims the

21     ERS plaintiffs wanted to assert if you were to follow their

22     logic.

23          Now, on the one hand, ERS plaintiffs are part of a

24     class that, after extensive negotiations, received very fair

25     treatment.  Now that same class, those same class

1    participants, either individually or as a class, want to take

2    the matters outside of the plan and increase their recovery

3    through the separate litigation.  And none of this is

4    happening in a vacuum.  It's coming at the expense of the plan

5    treatment provided to the general unsecured creditors.

6            So for these legal and equitable reasons, the

7    Committee of Unsecured Creditors joins in the motion by UBS.

8            THE COURT:  Thank you, Mr. Arrastia.

9            The next appearance is on behalf of the avoidance

10   actions trustee.  Is that you again, Mr. Arrastia?

11           MR. ARRASTIA:  Yes, ma'am.  I have that good

12   fortune.

13           THE COURT:  All right.

14           MR. ARRASTIA:  So, fundamentally, the Trustee's

15   underwriter adversary complaint alleges the same operative

16   facts that give rise to ERS plaintiffs' complaint.  They are

17   both based on UBS' role in the issuance of the ERS bonds.

18   They are both based on UBS' relationship with ERS.  Further,

19   both of the complaints, the crux of both complaints alleges

20   the unlawful nature of the ERS bonds and UBS prompting ERS to

21   employ disastrous arbitration -- arbitrage strategy.

22           Now, faced with these same operative facts, the ERS

23   plaintiffs, they try to justify the existence of these claims

24   by arguing that they don't seek damages arising from the

25   issuance of the bonds, which is what the trustee seeks.  But

1   instead, they sue for the advice that UBS provided that let

2   lead to issuance of the bonds.  Respectfully, we submit that

3   that's a distinction without a difference.

4        Any claims asserted for the advice that UBS provided

5   is subsumed by the fact that that advice resulted in the

6   issuance of the bonds that were unlawful and harmed ERS.

7   That's the basis of the underwriting adversary complaint, the

8   actual harm which was the issuance of the ERS bonds, the

9   payment of fees and commissions, and the resulting financial

10  crisis.  Despite the labels, these are the same claims for the

11  same facts.

12        If one were to accept the ERS plaintiffs' position,

13  any plaintiff could always mount parallel litigation on the

14  same operative facts against the same defendant, without

15  regard for the fact that only one plaintiff, in this case the

16  avoidance action trustee, has the right to pursue those

17  claims.  All they would need to do is make an allegation as to

18  a discrete element of a claim, in this case breach, and say

19  it's different, it's different litigation.

20        The Trustee, who can pursue the claims, has done --

21  he's pursued claims also that can't be asserted by a

22  derivative plaintiff.  And he is elected to -- has elected to

23  pursue causes of action that reflect the current strategy

24  designed to produce the best result for the trust

25  beneficiaries.

```
 1              Now, the plaintiffs, the ERS plaintiffs shouldn't be
 2   given a free pass to plead around the Trustee's sole right to
 3   pursue the claims.  Mr. Lockwood was right.  This is an issue
 4   of who controlled the litigation rights against UBS for its
 5   relationship with ERS and the issuance of the bonds.  The plan
 6   of adjustment made it clear, the Trustee would close those
 7   claims, but now, instead of streamlining the process, the ERS
 8   plaintiffs without the Trustee froze --
 9              (Sound played.)
10              THE COURT:  You can go on.  That was the warning.
11              MR. ARRASTIA:  Thank you.
12              Litigate the Trustee's rights in the Commonwealth
13   court as well as this Court potentially litigating against
14   UBS, turning one litigation into three.  And as a practical
15   impact, instead of encouraging settlement, this would create
16   impediments to settlement, because of the confusion as to the
17   ownership of these claims.
18              THE COURT:  May I ask you a question?
19              MR. ARRASTIA:  Of course.
20              THE COURT:  Does the Trustee agree with Mr. Lockwood
21   that the confirmation of the plan cut off any rights that the
22   beneficiaries would have had against ERS and, therefore, any
23   standing of the beneficiaries to sue derivatively on behalf of
24   ERS?
25              MR. ARRASTIA:  Thank you, Your Honor.  We never
```

1    reached that question, because our position is that these were

2    always derivative claims that were an asset of the estate, and

3    those claims, all of the claims, all of the right and title

4    arising from those, were transferred to the avoidance action

5    trustee.  So we never got to the question of whether there's a

6    novation.

7         We would submit that the Confirmation Order did

8    recognize that all these claims were transferred to the

9    Trustee.

10        THE COURT:  So they were transferred for no

11   consideration by an ERS that was still liable for the

12   benefits.  Would your analysis as to standing to sue on a

13   derivative basis to ensure that the value of those claims is

14   realized for the beneficiaries would not exist?

15        MR. ARRASTIA:  We see it differently, Your Honor, in

16   the sense that these derivative claims, and I think that

17   *Madoff* is clear, the derivative claims do belong to the

18   estate.  These claims, we don't believe that these derivative

19   claims are independent.  These are, however they're styled,

20   the claims, whether breach of contract or breach of fiduciary

21   duty, the ERS plaintiffs are suing for the harms that were

22   imposed or suffered by ERS.

23        They say in their motion --

24        (Sound played.)

25        MR. ARRASTIA:  -- that it is an derivative claim.

1            THE COURT:  And they care about the derivative claim

2    because they think that they're entitled to get paid from the

3    proceeds of the derivative claim?

4            MR. ARRASTIA:  Ostensibly --

5            THE COURT:  But you say they're wrong about that?

6            MR. ARRASTIA:  Yes.

7            THE COURT:  They're not entitled to get paid from the

8    proceeds of the derivative claim, because their original

9    obligor decided to transfer the asset to somebody else.  So

10   I'm just asking, to put it another way, is there some other

11   synapse that is broken or a piece in the analysis that I'm not

12   seeing?

13           MR. ARRASTIA:  No.  All -- but, fundamentally, we

14   would submit that the ownership of that claim, which was never

15   resolved in the Commonwealth Court, despite the argument, that

16   the ownership of the claim always belonged, was always part of

17   the estate and could be transferred pursuant to the operation

18   of the plan.

19           THE COURT:  Thank you.

20           MR. ARRASTIA:  Thank you.

21           THE COURT:  All right.  So we turn to counsel for the

22   retirees, Mr. Vicente-Colon.

23           MR. VICENTE-COLON:  Yes, Your Honor.  Thank you.

24   Good afternoon.  I am Harold Vicente.  I represent, together

25   with Mr. Francisco Corolla and Ms. Ivelisse Ortiz, who are

1  here with me, the ERS beneficiaries named in our recent

2  filings.

3        Your Honor, first I would like to thank you for your

4  time and consideration you will give to this matter.  It is of

5  utmost importance to those beneficiaries.  Those beneficiaries

6  are here again, before this Court, to oppose what is now UBS'

7  fourth attempt to circumvent their cause of action and the

8  Commonwealth action.

9        Really, after so many years of litigation, it's been

10  11 now, UBS' positions does not surprise me anymore.  The

11  other three attempts which UBS has raised before this Court to

12  circumvent that Commonwealth action, are detailed in our

13  opposition that's at docket 22175.  I will not restate that.

14  The Court can take judicial notice of those other attempts.

15        However, Your Honor, in all attempts, in all

16  attempts, UBS continued to mischaracterize the beneficiaries'

17  cause of action as derivative in nature, and let me clarify

18  this.  They have also attempt -- continued to attempt to say

19  that those are duplicative to the actions contained in the

20  adversary proceeding of the avoidance action.  And to say that

21  those -- that the beneficiaries causes of action are only

22  derivative is just plain false.  It hasn't been a derivative

23  nature -- there hasn't been a derivative nature for the past

24  five years.  Like Mr. Lockwood said, in 2017, I believe it was

25  January of 2017, that ERS joined that case.  And although that

1  Commonwealth proceeding included a derivative action from the

2  beneficiaries, because the ERS had not been part of the

3  proceedings, as soon as the ERS joined as a plaintiff, the

4  beneficiaries ceased to prosecute those derivative claims.

5  That doesn't mean that they ceased to prosecute their own

6  damages claim, which is clearly established in that complaint.

7  It's an action under Article 1802 of the Puerto Rico Civil

8  Code.

9          Now, notwithstanding UBS' insistence to have this

10  Court intervene with the beneficiaries' cause of action, or

11  the beneficiaries' rights, the reality is that the

12  beneficiaries are not a party to these proceedings, and they

13  are no longer prosecuting those derivative claims.  Those

14  derivative claims are being prosecuted by the ERS.  And a

15  simple review, Your Honor, of that fourth amended Complaint,

16  which is in your docket at 88232, which is I believe Exhibit

17  Two, will clearly show that there is an independent personal

18  cause of action of the beneficiaries under Article 1802 of the

19  civil code.

20          And I move the Court's attention to paragraph 1.7 of

21  that fourth amended complaint, which states, "this fourth

22  amended complaint is filed for the benefit of the system and

23  the individual claimants' identified below, to recover the

24  serious damages suffered by both the system and by said

25  individual plaintiffs caused by the gross and negligent

1    conduct of UBS."

2         THE COURT:  But what damage did the individuals

3    suffer other than that they were not able to get from the

4    system what they believed they were entitled to under the

5    system, because of the system's financial problems?

6         MR. VICENTE-COLON:  Well, Your Honor, they are

7    definitely not going to have the pensions they used to have.

8    Those pensions have been reduced benefits.  They are no

9    longer -- all of those benefits, they don't no longer have.

10         THE COURT:  Because ERS was crippled, and now there's

11    a plan that's changed it, but they never had a direct

12    relationship with UBS.  UBS wasn't investing their individual

13    money.  So how is their claim against UBS any different from

14    saying, UBS, you hurt -- you crippled, you rendered

15    dysfunctional the entity that owed me money?

16         MR. VICENTE-COLON:  It is, Your Honor, by nature of

17    Article 1802.  They're not -- it does not need to have privy

18    of contract.  It's an extra-contractual cause of action.

19         THE COURT:  But 1802 has been construed to you just

20    embody a traditional tort cause of action.  For a traditional

21    tort cause of action, you need to have a duty to the person

22    who is suing.  That person who is suing needs to show that

23    there's a duty -- that person who was suing needs to show

24    there is a breach of that duty to that person and that that

25    person was damaged by the breach.

1           And here we have a relationship between UBS and ERS,

2     not a direct relationship with the beneficiaries, and I

3     haven't heard you talk about a duty that UBS had to the

4     beneficiaries individually.

5           MR. VICENTE-COLON:  Well, the beneficiaries are also

6     always the ultimate beneficiaries of the plan, so I think

7     there's a thin line on the duty aspect, Your Honor.  However,

8     I do not agree with the interpretation of Article 1802.  If a

9     person acts negligently and that negligence causes damages, it

10    doesn't matter if it's a direct or -- a direct damage or a

11    third party.  It is still an action -- it's actionable under

12    1802.

13          THE COURT:  But a negligence cause of action requires

14    a duty of care to the plaintiff, so where's the direct duty of

15    care to the plaintiff?

16          MR. VICENTE-COLON:  Because they're the

17    beneficiaries, they are the --

18          THE COURT:  Of a contract with somebody else?

19          MR. VICENTE-COLON:  No.  Of the plan, Your Honor.

20          THE COURT:  That's what I mean, the plan.  Their

21    contract is the plan.  It's a contract with ERS.  And so why

22    does someone who's dealing with ERS have a duty that runs

23    directly to the beneficiaries of the plan?

24          MR. VICENTE-COLON:  Your Honor, because they are the

25    beneficiaries of their pension, not just of ERS.  The pension,

1    the money that they are entitled to receive in their pension.

2             THE COURT:  All right.  You can go on.

3             MR. VICENTE-COLON:  Okay.  So, Your Honor, just a

4    plain review of that report that clearly shows that my clients

5    have an independent cause of action other than a derivative

6    cause of action should be enough for you to deny that motion,

7    but there are other arguments, Your Honor.  This issue has

8    been looked at by the Commonwealth Court, including the Court

9    of Appeals, I'm sorry, and the Court of Appeals -- the

10   Commonwealth Court already determined that the individual

11   beneficiaries, those people of flesh and bones, are entitled

12   to the rights they are claiming.

13           So that issue has already been ruled upon by the

14   Commonwealth, and I think it should be the Commonwealth who

15   rules on that issue.  The Court of Appeals went on to say in

16   that judgment that they are -- that the ERS individual

17   plaintiffs are protecting and ensuring their pension for which

18   they worked all their productive lives.

19           And, Your Honor, the third point is the Law 3 of

20   April 4, 2013, at section 40, which Mr. Lockwood cited, and it

21   says, "a cause of action is hereby recognized to the

22   participant and pensioners of the ERS of the Government of

23   Puerto Rico and the judiciary to, on their own behalf,

24   non-government investment advisors and underwriters in any

25   transaction in which the pension obligations have been issued

1    by the ERS for damages caused to the system for its

2    beneficiaries.

3          So they are entitled to sue on their own behalf for

4    damages caused to the beneficiaries.

5          THE COURT:  But that's why I keep trying to ask you

6    where the damage is that's caused by UBS to the beneficiaries.

7    The system has not paid the beneficiaries the money that they

8    were entitled to UBS would argue because the system suffered

9    damages allegedly caused by UBS, but UBS never owed the

10   pension directly to the beneficiaries.

11         MR. VICENTE-COLON:  Right, Your Honor, and of course

12   I disagree.  I don't think there needs to be a direct duty to

13   the beneficiaries.  Their pensions are being reduced, okay?

14   Their benefits are being reduced because of the actions of

15   UBS, and that is all that's needed under Article 1802.

16         So let me argue, Your Honor, or comment on the five

17   arguments that UBS has raised in their brief or their motions.

18   UBS -- I think the bottom line here is, Your Honor, UBS not

19   only wants you to enjoin the ERS cause of action, but they

20   want you to enjoin the individual beneficiaries' cause of

21   action, the personal cause of action.

22         The first argument they raised is ERS no longer owns

23   the claims asserted in the Commonwealth action, and that would

24   apply only to the derivative nature of the original causes of

25   action that were raised prior to 2017.  But that's not the

1   case anymore.  The ERS is a party to that proceeding, and

2   they're entitled to move that case forward, also.  Now --

3           THE COURT:  You're saying ERS currently is entitled

4   to move the case forward?  ERS doesn't exist anymore.

5           MR. VICENTE-COLON:  I'm sorry.  Say that again, Your

6   Honor.

7           THE COURT:  I may have misheard you.  I thought you

8   just said that ERS is still entitled to move the Commonwealth

9   case forward, but ERS has been dissolved and the plan provides

10  that somebody else holds this cause of action, someone else is

11  the proper plaintiff, that being the avoidance action trust.

12          MR. VICENTE-COLON:  Well, Your Honor, the ERS has

13  not, as of today, been dissolved.  The ERS, as of today, the

14  ERS has not been dissolved.

15          THE COURT:  But ERS has transferred its assets to the

16  avoidance action trust and to the Commonwealth.

17          MR. VICENTE-COLON:  I'm not sure all of them have

18  been transferred, Your Honor, and I don't agree with

19  Mr. Lockwood's or Mr. Arrastia's position that the prosecuting

20  of those actions has been transferred to the avoidance action

21  trust.  But the fact is the beneficiaries are no longer, since

22  2017, no longer prosecuting those derivative claims.

23          But Your Honor, even if that were correct, let's put

24  it this way, even if the ERS no longer had the right -- those

25  rights, it doesn't mean that my clients are not entitled to

1    prosecute their personal cause of action.  Those actions

2    should not be dismissed in the state court.

3         And, by the way, whether or not the state court

4    dismisses my client's cause of action should be close -- to

5    the state court, not in this proceeding, Your Honor.  We

6    respectfully submit that.

7         The second argument, Your Honor, is that the ERS

8    beneficiaries have no remaining interests in the derivative

9    claims, and that, again, is what I have been saying.  They

10   continue to mischaracterize my client's cause of action as

11   only derivative nature, and that's not correct.  It's there.

12   It's in the complaint.

13        And, by the way, we filed an informative motion, Your

14   Honor, last week, because the beneficiaries have moved to

15   amend the Complaint in order to include class action

16   certification allegations.

17        The third argument, Your Honor, is that the

18   beneficiaries do not have any direct personal claims against

19   UBS, and again, Your Honor, we've been discussing that a

20   little bit, and I -- I guess I don't agree with your

21   interpretation of Article 1802.  I respectfully submit, Your

22   Honor, that Article 1802 of the Puerto Rico Civil Code only

23   requires -- does not require obviously a privity of contract,

24   and it only requires a negligent act or omission that causes

25   damages.  That's it.  That is the nature of Article 1802.  And

1    we are -- and the beneficiaries clearly can establish that in

2    the Commonwealth action, and if they can't, then they can go

3    and defend that over there, Your Honor.

4         The fourth argument, Your Honor, is that Law 3 does

5    not provide a basis to recognize individual claims separate

6    from the ERS claims.  Your Honor, again, I submit that

7    argument should also be submitted to the Commonwealth Court.

8    It is a Commonwealth law.  I believe that the language clearly

9    does recognize that individual cause of action to the

10   beneficiaries, and it's just a plain fact that that law does

11   not affect any party before -- under your proceedings, in your

12   proceedings, Your Honor.  It's UBS and the beneficiaries.

13        And the final argument that UBS has raised is the

14   equities argument that, you know, double dipped -- or damages,

15   duplicative damages argument.  And, Your Honor, those

16   arguments have never been cause for a dismissal of an action.

17   It's a defense.  It's a -- it's a damages defense.

18        In that part of their brief they cite no case law for

19   that argument.  And, in the end of the day, that argument can

20   be raised in the Commonwealth Court, also.

21        I'm sorry.  I lost a paper here.

22        You know, let's assume, Your Honor, for the sake of

23   argument, that in the adversary proceeding handled by the

24   trust, it ends up that they compensate all damages to the ERS,

25   and that, in turn, all of the pension benefits of the

1    individual beneficiaries are reinstated.  They go back to the

2    way they were before UBS' intervention with ERS.  Then they

3    can prove that at trial.  And if that is the case, well,

4    there's no damages to be compensated.  They've already been

5    compensated.  But that's something, that's a defense to be

6    presented at trial and not a defense to dismiss or enjoin

7    their case, Your Honor.

8             They should be entitled to prosecute their case.

9    They've been doing that for the past 11 years.  There's no

10   doubt that their pensions have been reduced, their benefits

11   have been reduced, and they have suffered damages as a

12   consequence of the acts perpetrated by UBS.  As a matter of

13   fact, I believe both cases can be litigated simultaneously,

14   and, if UBS doesn't want a -- I heard Mr. Lockwood saying that

15   it will be unfair for them to litigate, you know, in two

16   fronts at the same time.  Well, stay the adversary proceeding.

17   My clients have been litigating this case for 11 years.

18            I think that's all I have, Your Honor.  I know

19   there's some time left.  If you have any further questions,

20   I'll be glad to address them.

21            THE COURT:  Thank you.  I have a question to put to

22   you that I would also like Mr. Lockwood to address, but we

23   also need to finish up this within the next five minutes,

24   because of my timing.

25            So the question is, what -- the UBS is looking for an

1   injunction here, and this relates to the argument you were

2   just making, Mr. Vicente.  What is the standard that would

3   have to be met for this Court to enjoin?  Would this Court

4   actually effectively have to make a decision that under the

5   plan and Puerto Rico law, the beneficiaries can't state a

6   viable cause of action in the Commonwealth case because of the

7   operation of the plan, or is there some other standard?

8          For a preliminary injunction, you look for likelihood

9   of success on the merits.  For a permanent injunction, you

10  typically decide on the merits.  So what is the decision that

11  this Court would need to make to justify an injunction?

12         MR. VICENTE-COLON:  I think, Your Honor, the answer

13  is maybe different.  I frankly don't think Your Honor has

14  jurisdiction to enjoin my clients' cause of action.  It is a

15  private cause of action under 1802, and that is for the

16  Commonwealth Court to determine.  That is my position.

17         THE COURT:  Thank you.

18         Mr. Lockwood?

19         MR. LOCKWOOD:  Your Honor, to address your question,

20  I would commend to Your Honor the Second Circuit's decision *In

21  re Bernard L. Madoff Securities, LLC*, 740 F.3d 81.  And in

22  that case, it affirmed an injunction of class actions that

23  were brought in state court that were asserting claims that

24  the plaintiffs argued were direct claims that they could bring

25  as separate class actions, but what the Second Circuit found

1    is they were actually derivative claims, because of the nature

2    of the claim and the relief sought, just like here.  And

3    because they couldn't articulate any injury that was separate

4    from the injury to the entity, they were derivative claims,

5    and because they were derivative claims, they were property of

6    the estate.

7         The Court's touchstone for bankruptcy jurisdiction

8    over a non-debtor's claim remains whether it's outcome might

9    have any conceivable effect on the bankruptcy estate.  So

10   there is jurisdiction over the case in the Commonwealth Court

11   because what they are doing is abusing an asset of the Title

12   III PROMESA estate here, so that gives you jurisdiction.  And

13   if they are taking actions inconsistent with the plan, then

14   they should be enjoined, otherwise the plan is going to fall

15   apart.  Your Honor has an obligation to enforce your orders.

16        Thank you, Your Honor.

17        THE COURT:  Thank you very much.

18        I take this motion under advisement, and you will be

19   notified when a decision has been reached.

20        We will now take our break for lunch and resume at

21   ten minutes past 2:00 Atlantic Standard Time, which is the

22   same as ten minutes past 2:00 Eastern Standard Time.  I

23   believe that the people on the AT&T line need to put their

24   lines on hold rather than hanging them up during this lunch

25   period.  Sorry that we have your phones tied up, but that's

1   the way the technology works.

2          Thank you all.  I'll see you in an hour and 20

3   minutes.  We are adjourned.

4          (At 12:50 PM, recess taken.)

5          (At 2:18 PM, proceedings reconvened.)

6          THE COURT:  Good afternoon.  We are resuming the

7   Omnibus Hearing in *In re:  The Financial Oversight and*

8   *Management Board for Puerto Rico.*

9          We have now reached Item II.3 on our agenda, which is

10  the contested matter concerning the administrative expense

11  claim motion of Pablo Melani-Curra and Diana Velez-Martinez,

12  which is Docket Entry No. 21229 in Case No. 17-3283.  I have

13  first counsel for the movants for four minutes.

14         Would counsel for the movants please open your

15  camera?  Alexis Fuentes.

16         MR. FUENTES:  Yes.  I'm here.

17         THE COURT:  Very good.  Good afternoon.

18         MR. FUENTES:  Good afternoon.

19         THE COURT:  Would you identify yourself and then

20  proceed?

21         MR. FUENTES:  Yes, Your Honor.  Alexis Fuentes on

22  behalf of the movant.

23         THE COURT:  Thank you.

24         We'll start the four minute clock.

25         MR. FUENTES:  Very well.  Thank you.

1          Your Honor, basically, I'm going to be short.  I

2    don't think I need the four minutes.  I think the matter has

3    been fully briefed.  I just want to underscore certain facts.

4          We are here basically because the debtor filed notice

5    and an injunction staying litigation in the local court,

6    basically admitting or saying that this was an administrative

7    expense claim and that we needed to file something in this

8    court.  So that's why we filed the motion.

9          We filed the proof of claim requesting the

10   administrative expense claim, but this is a torts claim.  And,

11   again, we filed a motion and we tried to basically go with the

12   flow with them saying that this is an administrative expense

13   claim.  However, Your Honor, as you well know, torts claim are

14   rarely deemed administrative expense claims.  I think that

15   this is just a maneuver that the debtor has done in local

16   courts.

17         They filed this not only in this case, in all tort

18   cases, in order to stay litigation, and basically trying to

19   get away with murder, literally, because in some cases,

20   obviously, it has been fatal.  So what they're doing is

21   basically saying, you have to go to bankruptcy court; file an

22   administrative claim; and then, when we go there, then say,

23   oh, no, it's not an administrative expense claim.

24         So either it is or it isn't.  If it isn't, they

25   shouldn't have filed the motion to begin with, and the cases

1   should have gone forward in the local court up until the

2   judgment is issued.  So I think that they're just playing

3   games trying to basically, for this plaintiff, not only my

4   clients, but other plaintiffs, to get lost in all of the

5   shuffle of filing motions in bankruptcy court when they

6   definitely shouldn't be filing anything, because this is a

7   post-petition issue, a torts claim that's outside of the scope

8   of the plan of reorganization.

9           However, if they do say that it is an administrative

10   claim, then they should just raise their hands and say, okay,

11   it is, and we're going to pay.  But, obviously, that's not

12   what they're doing here.

13           So, Your Honor, we basically submitted everything in

14   writing.  So if you have any further questions, I'm here to

15   answer.

16           THE COURT:  Thank you.  I do have a question or two.

17           The Oversight Board says in its response to the

18   motion that it will process your administrative proof of claim

19   within the time period that they have to object to claims,

20   which is now through early March of 2023, and they say that in

21   any event, right now your claim hasn't been resolved, so --

22   your client's claim hasn't been resolved, so it can't be paid

23   right now, but they may settle it; they may queue it up for

24   adjudication within the system; but, in any event, they will

25   do that quickly.

1              Do you have a problem with that?

2              MR. FUENTES:  Well, I am anticipating that what

3     they're going to say is that we need to have a final judgment

4     before actually engaging in any type of negotiation.  So,

5     again, what they did is to stay the proceedings to then now,

6     months or a year later, because we have to wait for next year,

7     then say, oh, you need to go back and get a judgment.

8              So this really is hurting only the claimants, not

9     only my clients, but any other plaintiff.  They're just

10    sitting down waiting for time to pass, and then, at the end,

11    they will say, go back to the local court.

12             THE COURT:  So you see it as just a stalling

13    technique?

14             MR. FUENTES:  That's what it is.

15             THE COURT:  Thank you for being clear on that.

16             So I will now turn to Mr. Rosen, who has six minutes,

17    on behalf of the Oversight Board.

18             Mr. Rosen, will you explain why this is happening and

19    what the point of the exercise is?

20             I need you to unmute, Mr. Rosen.

21             MR. ROSEN:  Your Honor, Brian Rosen on behalf of the

22    Oversight Board.  Can you hear me now?

23             THE COURT:  Yes, I can.  Thank you.

24             MR. ROSEN:  I apologize.  It sounds like my internet

25    connection is a bit unstable, so I will try to go slowly.

1          Your Honor, through your question, you hit upon a

2   very important issue and one that we obviously focus on.  And

3   counsel, in his response, while he threw out some things and

4   talked about a year waiting here, or waiting there, what he

5   failed to say is that this accident, which he claims occurred,

6   took place in January of 2021.  And he filed -- he waited over

7   a year to file an action in the Commonwealth Court of First

8   Instance.  He filed it, Your Honor, just a few days prior --

9   excuse me, subsequent -- prior to this Court entering the

10  Confirmation Order approving the Modified Eighth Amended Plan.

11         Your Honor, what happened subsequently was that there

12  was an effective date on March 15th, and roughly two weeks

13  after that there was a notice filed in the Court of First

14  Instance, which was the notice filed by the Commonwealth

15  informing the Court of the discharge injunction that was

16  included in the plan and in the Confirmation Order.  And

17  attached to it was the notice of the Effective Date.

18         There was no acknowledgment of an administrative

19  expense claim as counsel claims.  Rather, there was just mere

20  information that if, in fact, an administrative expense claim

21  exists, there was a requirement to file a proof of claim in

22  accordance with the terms of the confirmation order.  Counsel

23  actually did that in compliance by the date certain by filing

24  two proofs of claim, first one on June 6 and then one on June

25  13, and, by doing so, submitted to the jurisdiction of the

1  Title III court for a claims reconciliation process, Your

2  Honor.  But unlike what counsel thinks, this is not a Monopoly

3  game, by the mere filing of a claim you get to pass go and

4  collect $200 or, in this case, counsel's looking for a payment

5  of $150,000, Your Honor.  Rather, this Court has established

6  the claims reconciliation process.

7          We've been going through it.  If, in fact, we just

8  accepted every claim that was filed, Your Honor, we would have

9  over 43 trillion dollars of claims allowed in these cases, and

10  we know that is not the case.  Every proof of claim that is

11  filed requires a reconciliation, and, in certain instances,

12  Your Honor, adjudication.  Whether it is by this Court, or

13  whether it is pursuant to the ADR procedures that this Court

14  directed, and that may include -- can you hear me, Your Honor?

15          THE COURT:  Yes, I can.

16          MR. ROSEN:  Okay.  My system was --

17          THE COURT:  I'm hearing you quite clearly actually.

18  I hear you clearly, so you can go on.

19          MR. ROSEN:  Can you hear me, Your Honor?

20          THE COURT:  I'm hearing you fine, but it sounds like

21  you don't hear me.

22          MR. ROSEN:  I'll do my best, Your Honor.  I

23  apologize.

24          All I would like to say, in conclusion, Your Honor,

25  is that we are taking all proofs of claim seriously.  We are

1   undergoing with the Commonwealth and the related entities and

2   Alvarez & Marsal the claims reconciliation processes.  The

3   deadline to consider those or to object to those at this point

4   in time, unless further extended, is March 8 of 2023.  We are

5   hoping that they will not need a further extension.

6        If in fact, Your Honor, it does not require an

7   objection, it may require a transfer to the ADR procedures,

8   which is the Court's way of saying, let's try and resolve

9   this, whether it be through negotiation, arbitration, or

10  mediation.  Your Honor, that is what we're trying to

11  accomplish here.

12       Just by filing a proof of claim it does not mean that

13  you get paid $150,000.  There's a claims process, and this

14  movant should not be entitled to jump in front of every other

15  party that has claims filed, Your Honor.

16       (Sound played.)

17       MR. ROSEN:  And they are subject to the claims

18  reconciliation processes.  So for those reasons, as well as

19  those set forth in our papers, Your Honor, we ask the Court to

20  deny the relief that is requested in movants' motion.  Thank

21  you.

22       THE COURT:  Thank you.

23       I have some questions for you.  Can you hear me?

24       MR. ROSEN:  I --

25       THE COURT:  It doesn't sound like you can hear me.

1              MR. ROSEN:  I will try to hear, Your Honor.  It is a

2     little bit sketchy on my part, but, please.

3              THE COURT:  I'll go slowly.  You refer to using the

4     ADR process for these post-petition claims, but the ADR order

5     that is currently in place only seems to apply to pre-petition

6     general unsecured claims.  So are you going to be applying for

7     a change in the process, in the scope?

8              MR. ROSEN:  Your Honor, I apologize.  I could not get

9     any word of that.  If you like, I'll log back in right away.

10             THE COURT:  Yes.  Please log back in.

11             MR. ROSEN:  I apologize.  Let me do that.

12             Your Honor?

13             THE COURT:  Yes, Mr. Rosen.

14             MR. ROSEN:  Hello, Your Honor.  I apologize.  My

15    system was great for three hours this morning, but -- I

16    apologize.  So I'm on the phone.

17             THE COURT:  That's great.  I was just trying to think

18    of how I could get somebody to suggest to you to just call in

19    on the phone.  So we're on the same wavelength there.

20             So the question that I was asking when you couldn't

21    hear me has to do with the use of the ADR process to which

22    you've referred.  As I read our current ADR order, it only

23    would appear to apply to pre-petition unsecured claims.  So do

24    you believe that the current order permits channeling

25    post-petition claims into ADR, or are you intending to request

1  modification of the ADR procedures?

2          MR. ROSEN:  Your Honor, obviously, when it was

3  entered, it was only designed to handle general unsecured

4  claims, because that's all we had at that time; but with the

5  filing of administrative expense claims, it is our hope that

6  we will file a motion to augment the ADR procedures to include

7  those which are done on an administrative claims basis, yes.

8          THE COURT:  All right.  Because it does seem that, at

9  a minimum, some clarification of the process the debtor

10 intends to use in resolving the administrative claims that are

11 being invited now would be helpful to the Court and also

12 helpful to people whose litigation is being stayed and who are

13 receiving the suggestion that they file an administrative

14 claim.

15         Now, to a more substantive question, you briefly

16 argue in the opposition to the motion that the movants had

17 failed to establish a prima facie administrative claim,

18 because they hadn't attempted to demonstrate benefit to the

19 debtor.  Is the debtor taking the position that benefit to the

20 debtor has to be shown in respect of every post-petition

21 pre-effective date claim?

22         MR. ROSEN:  Your Honor, usually, as you know, the law

23 is that you would have to show the benefit to the estate.  We

24 obviously know that in the torts situation it is different.

25 We are just reserving our argument with respect to that, and

1    we will possibly raise that in the future.  But at this time

2    we are not, with respect to tort claimants.

3            THE COURT:  So you accept that the Fundamental

4    Fairness Doctrine may properly apply in determining

5    administrative status as to certain claims?

6            MR. ROSEN:  What I'm saying, Your Honor, is that in

7    connection with tort claims, we're not going to be arguing the

8    benefit to the estate.

9            THE COURT:  Can you give me a sense of how many of

10   these notices have been filed in Commonwealth cases?

11           MR. ROSEN:  I believe there have been hundreds, Your

12   Honor, because there have been -- we have not been doing them.

13   The Puerto Rico Department of Justice has been filing them.

14   We, actually, the Oversight Board, do not know the amount of

15   litigation that is out at this time, but it is our

16   understanding that there are several hundred that have been

17   filed.

18           THE COURT:  You and the Commonwealth take the

19   position that any post-petition transactions or tort claims

20   that you're not just paying voluntarily and taking care of

21   have to be filed and examined as administrative claims in

22   order to be paid; is that correct?

23           MR. ROSEN:  Your Honor, in accordance with the terms

24   of the Plan and the Confirmation Order, that is correct.  You

25   know, it is our hope, Your Honor, that we can go through

1    these, and, if necessary, have them ultimately handled

2    pursuant to ADR.  And, as you know, the ADR process allows for

3    us even to send it back to the Court of First Instance, in

4    this particular situation, or such other courts as may be

5    applicable.

6          At this point in time, Your Honor, we understand that

7    the Commonwealth disputes the liability associated with this,

8    so it is a situation where there will need to be some tribunal

9    that will consider this; but we're hoping that it can be done

10   short of that through the ADR process.

11         THE COURT:  So in that process there are some phases.

12   So the first phase is for you to request whatever information

13   there is substantiating the claim, and then you can choose to

14   make an offer to resolve it, and there can be some back and

15   forth on offers, and then if that's not resolved, then the

16   submissions are sent to a magistrate judge who would make a

17   recommendation as to the value of the claim in an evaluative

18   process; am I right so far?

19         MR. ROSEN:  You are absolutely correct, Your Honor.

20         THE COURT:  Then, if the parties don't accept or come

21   to a settlement over the amount that is recommended by the

22   evaluator, then there is a choice as to whether it goes back

23   to the Commonwealth court, goes into binding arbitration, or

24   is litigated as a claim objection in this Court, in the Title

25   III court; is that correct?

 1           MR. ROSEN:  It is, Your Honor.  And as reflected in

 2    the status report that we filed in connection with the Omnibus

 3    Hearing, we've been extremely successful in the ADR

 4    procedures, with offers being accepted, more offers being now

 5    fully documented, and hundreds of offers that are still

 6    outstanding to claimants.  So, you know, we're very happy with

 7    the process that's unfolded, because we believe it's yielded a

 8    tremendous amount of success and taken a significant burden

 9    away from the Court.

10           THE COURT:  Thank you.

11           I'll go back to Mr. Fuentes.  Would you like to offer

12    any further argument?

13           MR. FUENTES:  Well, yes, Your Honor.  First of all,

14    we filed a motion that the Commonwealth filed in the local

15    court, a certified translation of the same, and it is not like

16    brother counsel is saying.  I mean, what they say in there is

17    that this claim is stayed, that it's part basically of the

18    claims, of the administrative claims in the -- in the Plan,

19    and that it needs to be filed as a proof of claim.  So they do

20    admit in there that this is an administrative claim.  Now

21    they're saying that they're not admitting that, that they have

22    to -- that they reserve the right to fight it.

23           Secondly, what Your Honor just said, as to all of the

24    things that have to happen before an actual adjudication or,

25    you know, payment is made, goes back to my point:  We've got

1   to wait more than a year before all of that is said and done,

2   while this case continues to be stayed.  I mean, the case in

3   the local court should continue.  It should not be stayed,

4   because it's -- at the end of the day, a final adjudication

5   needs to happen.

6           Now, as to the -- what they have done, what the

7   debtor has done in the ADR, those are pre-petition claims that

8   are not -- that do not have to be paid in full.  I mean, the

9   success that they could have had in making offers is -- will

10  never be the same when we are talking about an administrative

11  claim that has to be paid in full.  If they're not going to

12  pay the full amount, they have to -- better have, you know,

13  good reason for it.

14          It's different with a pre-petition claim, where the

15  claimant knows that he will not be paid in full regardless,

16  and probably will have to wait years for that payment.  In

17  here, no, they have to pay it by the effective date.  So, you

18  know, it's completely different.  And again, this is just a

19  delay tactic that they're using before basically having to pay

20  anything --

21          (Sound played.)

22          MR. FUENTES:  -- to all of the tort claimants.

23          So my point really stands that all of the tort

24  claimants should continue up until the point of judgment.

25  Now, if after judgment they want to say that they have to file

1   a proof of claim, I don't know.  To me, I don't see it.  I

2   think this is a post-petition issue that they have to pay it

3   regardless.

4          THE COURT:  Thank you.

5          Anything further, Mr. Rosen?

6          MR. ROSEN:  No, Your Honor.  Thank you very much.

7          THE COURT:  Okay.  Thank you.

8          I am going to render my decision on the record.

9          Before the Court is the Motion Requesting Allowance

10  and Payment of Administrative Expense Claim Filed by Pablo

11  Melani-Curra and Diana Velez-Martinez, which is Docket Entry

12  No. 21229 in Case No. 17-3283.  I'll refer to that as the

13  "Motion," and to Mr. Melani-Curra and Ms. Velez-Martinez as

14  the "Movants."  The Financial Oversight and Management Board

15  has objected to the Motion, which is Docket Entry No. 21932.

16         The Court has carefully reviewed the relevant

17  pleadings and listened to the arguments today.  The Court now

18  makes its oral ruling as to the Motion, and reserves the right

19  to make non-substantive corrections in the transcript of this

20  ruling.

21         For the reasons that follow, the Court denies the

22  motion for immediate allowance and payment of movants'

23  asserted administrative expense claim.  The Court also denies

24  the Motion to the extent it seeks relief from the stay that

25  has been imposed on the underlying litigation in the

1    Commonwealth Court of First Instance by the injunctive

2    provisions of the confirmed Commonwealth Plan.  Specifically,

3    paragraph 92.3 of the Modified Eighth Amended Title III Joint

4    Plan of Adjustment of the Commonwealth of Puerto Rico et al.,

5    filed at Docket Entry 19784, and paragraph 59 of the related

6    Confirmation Order filed at Docket Entry 19813 is the Plan

7    injunction provision, and I will refer to it as such.

8            The Movants seek immediate allowance and payment of

9    their asserted administrative expense claim.  Movants have

10   filed a timely administrative expense claim, which is Proof of

11   Claim No. 179970, seeking $150,000 from the Department of

12   Transportation and Public Works, which I'll refer to as

13   "DTOP," an agency of the Commonwealth debtor.  Movants also

14   filed this Motion as a separate claim with Proof of Claim No.

15   180378.

16           Movants argue that they are entitled to payment of

17   their claim, which is based on alleged injuries suffered as a

18   result of a car crash, under the "Fundamental Fairness

19   Doctrine".  The Fundamental Fairness Doctrine is an exception

20   to the requirements for payment of an administrative expense

21   that are established by section 503(b) of the Bankruptcy Code,

22   which is made applicable here by section 301(c) of PROMESA.

23           Generally, allowable administrative expense claims do

24   arise from a post-petition transaction with the debtor, in

25   this case the Commonwealth, and a benefit to the estate of the

1  debtor.  *In re Hemingway Transportation, Inc.*, 954 F.2d 1, 5

2  (1st Cir. 1992).

3       The Fundamental Fairness Doctrine, which originated

4  in *Reading Company v. Brown*, 391 U.S. 471, a 1968 Supreme

5  Court decision, provides for an exception.  Payment of an

6  administrative expense claim arising when the debtors'

7  post-petition operations occasion tortious injuries to third

8  parties.  However, and without expressing any opinion as to

9  its potential application here, the Fundamental Fairness

10  Doctrine does not relieve an administrative expense claimant

11  of its burden of demonstrating entitlement to priority

12  payment.

13       "'The burden of proving entitlement to priority

14  payment as an administrative expense, rests with the party

15  requesting it,' and the Court has broad discretion in

16  determining whether to grant a request for such priority

17  treatment." *See In re  Financial Oversight and Management

18  Board for Puerto Rico*, 621 B.R. 289, 296 (D.P.R. 2020), which

19  was affirmed at 7 F.4th 31  (1st Cir. 2021).

20       The Court's discretion is broad, but it still falls

21  to the claimant to establish the liability of the debtor under

22  applicable law. *See, e.g., Grogan v. Garner*, 498 U.S. 279,

23  283,  a 1991 Supreme Court decision in which the Court said

24  "The validity of a creditors' claim is determined by rules of

25  state law."

1              Movants argument is as follows:   When the Puerto

2    Rico Department of Justice sought to stay Movants' case in the

3    Commonwealth Court of First Instance, it filed a notification

4    of injunction, which referred to provisions of the confirmed

5    Commonwealth Plan and related Confirmation Order that enjoined

6    causes of action filed before the Plan's March 15, 2022,

7    Effective Date and advised claimants of the requirement to

8    file an administrative expense proof of claim before the

9    relevant bar date.   Movants thereafter filed their

10   administrative expense proof of claim.   Movants argue that the

11   burden of establishing that administrative expense status is

12   improper is on the Commonwealth, and that the notification

13   constituted consent to administrative status treatment and

14   immediate payment of Movants' claim.   Movants are incorrect on

15   both points, and the Oversight Board rightly objected to this

16   motion, explaining that the Movants bear the burden of proving

17   the allowability of their claim, their administrative claim

18   remains contingent, and stating that the Oversight Board plans

19   to address the claim in due course before its deadline to

20   object to claims, which the Court recently extended to March

21   2023.

22              In their reply, Movants concede that their claim

23   remains contingent.   They have not established the liability

24   of DTOP, and they are not entitled at this time to allowance

25   and immediate payment of their administrative expense claim.

1   Accordingly, the Motion, as originally interposed as a claim

2   for immediate allowance and payment, is denied.

3        Movants raised two new issues in the reply.  They

4   argue that the administrative expense claim is contingent only

5   because of the stay imposed pursuant to the Plan Injunction,

6   and so they request stay relief.  They further argue that

7   their due process rights under the 5th and 14th Amendments to

8   the United States Constitution are being violated because they

9   did not have actual knowledge and notice of the Plan

10  Injunction, and so the injunction should not apply to them.

11       The Court is not obliged to entertain new arguments

12  raised only in a reply.  *See Peaje Investments, LLC, v. Puerto*

13  *Rico Highways and Transportation Authority*, Adversary

14  Proceeding No. 17-151-LTS, District of Puerto Rico, August 3,

15  2017, Docket Entry No. 185, at page 6.  Rather, under

16  well-established law and this court's local rules, a reply

17  brief "shall be strictly confined to replying to new matters

18  raised in the objection or opposing memorandum."  Puerto Rico

19  Local Civil Rule 7(c), made applicable in this case by Local

20  Bankruptcy Rule 1001-1(b).  *See also Huongsten Products Import*

21  *and Export Company v. Sanco Metals, LLC*, 810 F. Supp. 2nd 418,

22  421, note 10 (D.P.R. 2011).  But in this instance, addressing

23  these arguments briefly and in reverse order will provide

24  useful guidance to the parties.

25       First, Movants' argument that subjecting them to the

1   Plan Injunction is violative of their due process rights is
2   meritless.  Movants' contingent claims are properly subject to
3   the Plan Injunction.  Advance notice of the confirmation
4   hearing, at which objections to confirmation by any party in
5   interest were heard, was properly published and broadcast in a
6   manner that constituted adequate and sufficient notice to all
7   parties in interest in compliance with Federal Rule of
8   Bankruptcy Procedure 2002, pursuant to the order approving the
9   Commonwealth's Disclosure Statement, which is Docket Entry No.
10  17639, at paragraphs 22 to 23.
11         The publicly filed Plan and Disclosure Statement,
12  included the Plan Injunction and administrative claim
13  provisions.  As unknown creditors at that time, Movants were
14  entitled only to constructive notice.  *See e.g., In re XO*
15  *Communications, Inc.,* 301 B.R. 782, 792 (Bankr. S.D.N.Y.
16  2003).  Nor have movants suffered a due process violation with
17  respect to their underlying claim.  They received the DOJ
18  injunction notice and filed an administrative expense proof of
19  claim which will now be resolved through litigation of any
20  timely objection to the claim, unless the claim is resolved
21  consensually without litigation or the Court lifts the Plan
22  Injunction at a later date to permit the continuation of the
23  litigation of Movants' action in the Commonwealth court.
24         Movants have not carried their burden of
25  demonstrating that relief from the Plan Injunction is

1   warranted at this point.  To determine whether cause exists to

2   lift the automatic stay under section 362 of the Bankruptcy

3   Code, this Court has regularly analyzed the factors set out by

4   the Second Circuit in *Sonnax Industries v. Tri Component*

5   *Products Corp.*, *In re Sonnax Industries*, 907 F.2d 1280, 1286

6   (2nd Cir. 1990).

7           Some courts have used the same *Sonnax* factors to

8   determine whether cause exists to modify a plan injunction and

9   lift a post-confirmation stay.  *See e.g., In re SquareTwo*

10  *Financial Services Corporation*, Case No. 17-10659-JLG,

11  reported at 2017 WL4012818, page 4 (Bankr. S.D.N.Y. Sept. 11,

12  2017).

13          Of principal relevance in this instance are *Sonnax*

14  factor two, connection with or interference with the

15  bankruptcy case, and *Sonnax* factor seven, whether litigation

16  in another forum would prejudice the interests of other

17  creditors.  Here, although the Commonwealth's Title III Plan

18  has been confirmed, its claims reconciliation process is

19  ongoing.

20          The Plan Injunction was instituted to permit the

21  Commonwealth, within the deadlines and other parameters set by

22  the Court, to achieve the orderly resolution of thousands upon

23  thousands of claims.  The Commonwealth may, in its discretion,

24  as noted in the Oversight Board's objection, agree to lift the

25  stay to allow the claim to proceed to judgment at a later

1   time, or it may seek settlement, but if the Court modified the

2   Plan Injunction with respect to the Movants' state court

3   action now, without any showing of cause or urgency, it would

4   encourage multiple similar motions by similarly-situated

5   claimants, diverting resources and upending the orderly claims

6   reconciliation process.  Accordingly, neither factor favors

7   stay relief, and to the extent stay relief or any other relief

8   is requested by the motion or reply, such request is denied.

9        That said, the stay remains in effect in this

10  instance, but the Court expects that Movants' claim and all

11  administrative claims will be dealt with expeditiously, and

12  that the Oversight Board will give serious consideration to

13  whether post-petition claims might efficiently be liquidated

14  through adjudication in the Commonwealth courts.  To the

15  extent there are particular Title III specific issues to

16  resolve, for example, whether a claim in fact arose pre or

17  post petition or otherwise is a claim that deserves

18  administrative expense treatment, then it is understandable

19  that such issue should be presented in an orderly manner to

20  this Court.  The Court will enter an order denying the motion.

21       So just to be clear, because I said a lot, the

22  Movants' underlying administrative claims have not been

23  resolved, and they will be addressed in due course.  Thank

24  you.

25       MR. ROSEN:  Thank you, Your Honor.

 1          MR. FUENTES:  Thank you, Your Honor.

 2          THE COURT:  Are there any other matters that need to

 3     be addressed today?  If you believe so, please raise your

 4     electronic hand and open your electronic window.

 5          All right.  We've gotten through our prepared agenda

 6     and there are no further matters to be addressed today.  The

 7     adjourned matters are all identified in the agenda that has

 8     been filed by the Oversight Board.

 9          This concludes the hearing agenda for this Omnibus

10     Hearing.  The next scheduled Omnibus Hearing is November 2nd,

11     2022.  As always, I thank the court staff in Puerto Rico in

12     particular for their hard work and composure in the face of

13     Hurricane Fiona and its aftermath, and I also thank the staff

14     in Boston and New York for their efforts in preparing for and

15     conducting today's hearing and their outstanding, ongoing

16     support of the administration of these very complex cases.

17          To our friends of the Jewish faith, *shana tova*, and

18     to those on the island, we wish you continued strength under

19     difficult circumstances and a swift recovery.  Stay safe and

20     keep well, everyone.  We are adjourned.

21          (At 2:58 PM, proceedings concluded.)

22                        *     *     *

23

24

25

```
 1    U.S. DISTRICT COURT    )

 2    DISTRICT OF PUERTO RICO)

 3

 4        I certify that this transcript consisting of 125 pages is

 5    a true and accurate transcription to the best of my ability of

 6    the proceedings in this case before the Honorable United

 7    States District Court Judge Laura Taylor Swain, and the

 8    Honorable United States Magistrate Judge Judith Gail Dein on

 9    September 28, 2022.

10

11

12

13    S/ Amy Walker

14    Amy Walker, CSR 3799

15    Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```