Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **KEILA GARCÍA COLÓN**, | CIVIL NO. 21- |
| Plaintiff | |
| | INJUNCTIVE RELIEF; |
| v. | SEXUAL HARASSMENT; |
| | RETALIATION |
| **CORPORATION OF THE STATE INSURANCE FUND ("CSIF"); INSURANCE COMPANY A, B and C,** | |
| | TRIAL BY JURY DEMANDED |
| Defendants | |

## VERIFIED COMPLAINT AND REQUEST
## FOR INJUNCTIVE RELIEF

**TO THE HONORABLE COURT:**

Plaintiff, through the undersigned attorney, very respectfully states and prays:

### NATURE OF THE ACTION AND JURISDICTION

1.     The instant action is brought pursuant to Title VII, 42 U.S.C. §§ 2000e *et seq*; the

Civil Rights Act of 1991, 42 U.S.C. §§ 1981a and 1988; Puerto Rico's Law No. 17 of April 22,

1988; Puerto Rico Law No. 115 of December 20, 1991 and Puerto Rico's Law No. 69 of July 6,

1985; to seek redress for defendants' sexual harassment and retaliation against Ms. Keila García

Colón (hereinafter "García") while in the course of their employment relationship. García seeks

equitable and injunctive relief, compensatory, and punitive damages, costs, pre-judgment interests

and reasonable attorneys' fees.

2.      This court has jurisdiction to entertain this action pursuant to §706 of the Civil
Rights Act, 42 U.S.C. §2000e-5; 28 U.S.C. §§1331 and 1343 (3) and (4). The court's supplemental
jurisdiction is also invoked pursuant to 28 U.S.C. § 1367 to hear the Commonwealth law claims
because these are so related to the claims over which this court has original jurisdiction that they
form part of the same case or controversy under Article III of the United States Constitution.

3.      Venue is proper in this district pursuant to 28 U.S.C. 1391 (b)(1) and (2).

## ADMINISTRATIVE PROCEEDINGS

4.      On October 15, 2020, García filed an administrative charge before the Equal
Employment Opportunity Commission ("EEOC") against the Corporation of the State Insurance
Fund ("CSIF"), alleging sex discrimination and retaliation.

5.      At all relevant times, the CSIF has been García's employer within the meaning of
§701(b) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b).

6.      At all relevant times, the CSIF has had more than 500 employees.

7.      On March 24, 2021 the EEOC issued its Notice of Dismissal and Right to Sue at
García's request.

8.      García received the Notice of Dismissal and Right to Sue on March 29, 2021.

9.      The instant complaint is being filed within 90 days of García's receipt of EEOC's
Notice of Dismissal and Right to Sue.

## PARTIES

10.      García is of legal age, a resident of Vega Baja, Puerto Rico and an employee of the
CSIF.

2

11.     The CSIF is a public corporation and a distinct and separate entity from the central government of the Commonwealth of Puerto Rico and an employer for Title VII's purposes. The CSIF has the capacity to sue and be sued. The CSIF was created pursuant to Law No. 45 of April 18, 1935, as amended.

## RELEVANT FACTS

12.     García repeats and realleges each and every preceding allegation as if fully set herein.

13.     García was recruited by the CSIF in 2004 as a General Nurse.

14.     García was assigned to perform her duties at the Industrial Hospital of the CSIF.

15.     In 2014, García was reassigned to the Arecibo Region of the CSIF.

16.     At all relevant times, García has held the position of General Nurse IV.

17.     At all relevant times to the instant action, García has been performing her duties at the Arecibo Regional Office of the CSIF.

18.     In 2018, the Arecibo Regional Director of the CSIF was Magalis Soto Pagán ("Soto").

19.     Soto was a friend of Wanda Toledo ("Toledo"), a National University College ("NUC") Professor, who was in charge of NUC's Nursing Program.

20.     Through Toledo, Soto became aware that the NUC had a nursing program whereby its students could fulfill their practice requirements at different private and public employers through collaborative agreements.

21.     Soto facilitated matters to have the CSIF serve as a facility where the NUC nursing program students could be exposed to training.

3

22.     Toledo became responsible for the coordination of NUC's Nursing Program at the Arecibo Regional Office of the CSIF.

23.     García's Supervisor at the time, Marilyn Gerena Cáceres ("Gerena"), assigned García to supervise nursing students from NUC's Nursing Program.

24.     Gerena was also a professor at NUC and knew Toledo.

25.     Once the program began, García noticed that Toledo was frequently in her area and trying to start conversations with her.

26.     García began to feel uncomfortable as a result of Toledo's nearness and frequent visits to her work area.

27.     García became wary of Toledo's frequent visits to her work area because there was no need for Toledo to be continuously there.

28.     Toledo insistently stared at García when she came to García's workspace. When present Toledo would stare at García in a personal and intimate nature.

29.     García even heard rumors from students of NUC's nursing program that Toledo was making remarks regarding her fondness for García. One student told García that Toledo was saying that she was "very beautiful and turned her wild."

30.     García's fellow workers were also aware of Toledo's frequent visits to the area where García was stationed.

31.     Pedro Marrero ("Marrero"), a fellow worker, told García to beware of Toledo because she was in love with her and expressed that she liked women like García who had a temper ("bravitas").

4

32.     García's alleged "temper" was, in reality, the result of her rejections of Toledo's unwelcome advances.

33.     Toledo's unwelcome approaches towards García were starting to affect her peace at work.

34.     García went to Gerena, her supervisor, and told her about Toledo's frequent visits to her work area and about the rumors that were being heard by García.

35.     Contrary to Toledo's intentions, her sexually harassing advances to García were not fruitful.

36.     Rather, García's rejections were becoming more direct.

37.     García categorically told Toledo to leave her alone and that she did not welcome her continuous visits to García's work area because they were not necessary.

38.     Because García's rejection of Toledo's advances were becoming more emphatic and terse, Toledo wrote a Memorandum about García and gave it to Gerena and Nora Rosario ("Rosario"), her other supervisor. In it, she alleged that García was disrespectful to her, had attitude problems and had told her that she was not her supervisor, hence could not give her orders.

39.     The allegations in Toledo's Memorandum were false and a sham to cover up her unlawful conduct.

40.     Gerena and Rosario met with García and discussed Toledo's memorandum to determine whether the matter should be referred to the Labor Relations Office of the CSIF.

41.     García was not aware of the existence of the Memorandum by Toledo, but it was obvious that she wrote it to prejudice her.

5

42.     During the meeting, Gerena and Rosario told her about Toledo's memorandum and her accusations.

43.     García was not given a copy of Toledo's memorandum.

44.     In response, García spared no details and explained to Gerena and Rosario that since the beginning of her supervision of one of NUC's nursing students, Toledo began to approach García under the subterfuge of having to monitor the student's progress.

45.     García narrated that soon after Toledo began coming to the CSIF, she began to bring candy to García.

46.     On another occasion, Toledo came with a pen with the NUC's emblem and gave it to García.

47.     This pattern continued for a few more days and caused García to feel uncomfortable in her work environment.

48.     García told her supervisors about the comments Toledo was making in front of students and CSIF employees and how they interpreted these as sexual in nature, to the point they felt Toledo was in love with García.

49.     García also explained that her efforts to let Toledo know that her advances were unwelcome, no matter how stern these were, were fruitless and did not make Toledo cease.

50.     In sum, García explained to them all of the details of her ordeal with Toledo. Moreover, that Toledo's complaints about García's attitude were nothing more than García's efforts to let Toledo know that her advances were not welcome and were disrupting her concentration at work.

6

51.     García also mentioned Toledo's friendship with the Regional Director and that she felt at a disadvantage.

52.     García told Gerena how the conditions at work continued to deteriorate.

53.     García reminded Gerena that she was a single mother, the principal breadwinner at home and responsible for her twin adolescent sons.

54.     García feared for the stability of her employment as her work environment was progressively turning hostile because of Toledo's accusations and Soto's complicity to discredit García.

55.     García made it clear that, if the situation was not corrected, she was going to report it to NUC because Toledo was its employee and, if the CSIF did not correct the situation, NUC should.

56.     After listening to García, Gerena and Rosario concluded that there was no basis to make the referral of García to Labor Relations.

57.     In response to García's intention to report Toledo at NUC, Gerena asked her not to report Toledo and allow her to negotiate a solution with NUC's Director.

58.     Sometime after Gerena's request, Toledo was removed from the CSIF.

59.     Toledo kept Soto informed of all developments, particularly, that as a result of García's revelations to Gerena and Rosario, Toledo was removed from managing NUC's nursing program at the CSIF.

60.     Rather than activating the CSIF's sexual harassment protocol, Soto began a retaliatory persecution of García.

61.     She began to personally follow García to different areas of the CSIF, make frequent visits to García's work area and spy on her through some of her "allies" at the Arecibo Region of the "CSIF".

62.     At all relevant times, Migdalia Baerga ("Baerga") has been one of Soto's most faithful "collaborators" at the CSIF.

63.     Baerga, like Toledo, is from Utuado and they know each other since childhood.

64.     Though Baerga is assigned to the Filing Section ("Radicaciones"), she was constantly roaming around the CSIF in Arecibo; she was frequently visiting Soto in her office; they were together in the parking lot; and would frequently have lunch together.

65.     The close relationship between them was well known at the Arecibo CSIF Office.

66.     Baerga is perceived as one of Soto's "right hands" in Arecibo and someone upon whom Soto could count to get things done.

67.     Soto utilized Baerga and other of her "puppets" at the CSIF to fabricate complaints against García, to portray her as "homophobic" to discredit her allegations of sexual harassment and to persecute García.

68.     Despite her removal from the CSIF in 2019, Toledo returned to the CSIF in early 2020 to bring more nursing students to do their practice requirements.

69.     García immediately went to Rosario, her immediate supervisor, and asked her why Toledo was at the CSIF managing the nursing program collaborative agreement.

70.     By then, Gerena had retired from the CSIF and no longer supervised García.

71.     Rosario told García that she was going to find out because Toledo was not supposed to return.

8

72.    Rosario admitted to García that she did not know why Toledo returned.

73.    While she investigated, Rosario instructed Toledo not to go to García's workplace.

74.    Rosario also told Toledo that García was not going to have any nursing students assigned for her supervision.

75.    Toledo disregarded the instructions from Rosario and began her usual visits to García's workplace.

76.    Toledo's visits and encounters were constant and unwelcome.

77.    Rosario spoke with Ms. Madeline Batista ("Batista"), Toledo's supervisor at NUC, who manifested not being aware of the details of Toledo's situation.

78.    Batista came to the CSIF and told Toledo to go back to NUC and that she would substitute her.

79.    During Toledo's second round at the CSIF, she went further in her advances towards García.

80.    On one particular instance, she surprised García by caressing her, sliding her hand from García's hair down to her lower back.

81.    García was petrified. She could not believe it and practically froze.

82.    Meanwhile, Toledo grinned at García and left the area.

83.    After regaining her composure, García went to Rosario and told her what had happened and that the situation with Toledo was serious, completely unacceptable, disrupting the performance of her duties and emotionally disturbing.

84.    Now García had the cumulative pressure from Toledo's unauthorized physical contact and the retaliatory practices at the CSIF.

9

85.     On the day of Toledo's unauthorized contact with García, she was going to visit the Medical Director's office. As García was nearing the entrance, she overheard Soto inside inquiring whether García had had any problem with Toledo on that day.

86.     Because García knew of Toledo's friendship with Soto, she went to Rosario and demanded that an immediate meeting be held with Rosario and the Regional Director.

87.     The meeting was held on the same day.

88.     Present were Soto, Rosario, García and Dr. Luis H. Padró, the CSIF's Arecibo Medical Director.

89.     Soto received them in her office and asked García why she wanted to meet with her.

90.     García told Soto that she knew what was going on, but García wanted Soto to know her version of the facts.

91.     Among other things, García told Soto that she knew Soto was looking for information about the incident that day between García and Toledo.

92.     That Soto was aware about the problems that García had encountered before that led to Toledo's removal from the program at the CSIF; about the deteriorating conditions of García's work environment; and that García knew of Soto's close friendship with Toledo; and that she was a victim of retaliation for having denounced Toledo's sexually harassing conduct.

93.     García wanted Soto to have the information first-hand because Toledo was not going to admit her sexual advances towards García or the true reasons why García had to instruct Toledo to stop and not get close to her.

10

94.    García reiterated her complaint of sexual harassment by Toledo and the inaction on the part of the CSIF to correct the situation.

95.    Soto reassured García that she would be protected as required by the sexual harassment protocol at the CSIF.

96.    Soto also stated that the matter needed to be escalated to the Labor Relations Office of the CSIF because of its seriousness, it was required by the sexual harassment protocol.

97.    Despite Soto's assurances that she would be protected, nothing happened.

98.    Instead of helping, Soto increased her retaliation against García for formally denouncing Toledo's sexual harassment towards her and having forced Soto to refer the matter to the Labor Relations office at the CSIF's Headquarters.

99.    After the meeting, Soto was left with no alternative but to draft a formal referral as required by the CSIF's sexual harassment protocol and send it to the Office of Labor Relations at the CSIF's Headquarters.

100.    García was not provided with a copy of the referral.

101.    Soto continued to closely supervise García, to monitor her in the hallways and in the area where García performed her duties.

102.    As part of defendant's retaliation against García, Soto began to tell Rosario that she had personally received complaints from patients complaining of mistreatment by García.

103.    These allegations were never substantiated to García's supervisors. Soto happened to be the sole source of the information regarding the mistreatment complaints attributed to García.

11

104.    None of these alleged complaints related to García's performance of her duties as General Nurse IV was ever presented by any of the patients complaining of having been mistreated by García while receiving medical treatment at the CSIF.

105.    Soto's concoction of a false record in an effort to document García's alleged unsatisfactory performance of her duties as General Nurse IV was an unlawful attempt to fabricate a reason to justify the application of unwarranted disciplinary measures.

106.    Such actions by Soto form part of the pattern of retaliation by defendant against García for having opposed Toledo's sexual harassment.

107.    In early March 2020, García was informed by Gladys Gisela Meléndez ("Meléndez"), the Director of Labor Relations at the CSIF, that she would meet García to discuss her sexual harassment allegations.

108.    On March 11, 2020, Meléndez met with García and union steward, María Lebrón Lebrón.

109.    Meléndez interviewed García and obtained a Sworn Statement from her.

110.    Meléndez told García that she would conduct a full investigation and let her know about the result.

111.    García does not know if others were interviewed as part of the investigation and, if so, who provided information to Meléndez in addition to García.

112.    Due to the COVID-19 pandemic, the CSIF closed its facilities from March 16, 2020.

113.    On June 29, 2020, García returned to work at the CSIF.

114.    Shortly thereafter, there were three baseless complaints lodged against García.

12

115. García was referred by Soto to the Labor Relations Office for investigation.

116. The Labor Relations Office, through Carlos Ríos ("Ríos"), conducted an investigation into one of the three (3) complaints lodged against García.

117. The other two (2) were not even investigated.

118. The complaint that was investigated by Ríos was initiated by Roberto Rosado ("Rosado"), another ally of Soto and the X-Rays Supervisor at the CSIF.

119. Rosado complained against García because he was not wearing a mask and she told him that its use in the area where García worked was mandatory. Rosado got upset and left abruptly and filed a complaint because she had allegedly addressed him in a disrespectful manner and called him "dirty faggot" ("pato sucio").

120. García was interviewed by Ríos as part of the investigation, in the presence of Lisbeth Mercado Cordero, the union's President.

121. The complaint stemmed from García's orientation to Rosado that, due to the pandemic restrictions, he could not be in her work area without wearing a facemask.

122. Rosado had a surgical mask on, but lowered below his chin.

123. García also told him that his working area was elsewhere and that he should not be present with the nurses, much less talking about personal matters during working hours.

124. Rosado became visibly upset, told García she was not his supervisor and could not give her orders. As he left, he threw the door shut behind him.

125. Various employees were in the area when the incident happened and were interviewed as part of the investigation.

126. Sworn Statements about their knowledge were obtained by Ríos.

13

127.    During the interview by Ríos, he asked García if Baerga was present at the time of the incident.

128.    García was left with the impression that Baerga had given a Statement attributing to García having referred to Rosado as a dirty faggot ("pato sucio").

129.    This was not the first time that Baerga would have referred to García as a homophobic to undermine the thrust of her allegations about Toledo's sexual harassment.

130.    Baerga has repeated this accusation against García on repeated occasions.

131.    Baerga's work area is different from where the incident under investigation occurred.

132.    Several employees who were interviewed corroborated García's version during the investigation and denied having heard García address Rosado in a disrespectful manner or calling him a "dirty faggot" ("pato sucio").

133.    Though the investigation did not support Rosado's complaint, García was still admonished in writing and urged to cease any discriminatory name-calling.

134.    This written warning should have been included in and forms part of García's personnel file.

135.    This written admonition against García when she was the victim of the baseless accusation constitutes further evidence of retaliation by defendant for García having engaged in protected conduct.

136.    While this investigation was taking place, García had yet to hear from Meléndez about the results of the investigation concerning Toledo's sexual harassment.

14

137. García asked Rosario to contact Meléndez and inquire as to its status in early October 2020.

138. On October 6, 2020, Rosario followed up and called Meléndez.

139. On October 9, 2020, Meléndez informed Rosario that the investigation had been concluded.

140. When Rosario asked about the results of Meléndez's inquiry she limited her response to a mere "we have proceeded to take the corrective measures" ("hemos procedido a tomar las medidas correctivas").

141. Rosario informed García about her conversation with Meléndez.

142. García could not believe Meléndez's response to Rosario. She decided to find out about the supposed "corrective measures" that were taken.

143. After insisting, Meléndez told García that she did not have to tell her what corrective measures were taken to address her complaint of sexual harassment.

144. Though García, as the victim of the sexual harassment, had a right to know the results of the investigation, no explanation was provided to her by Meléndez nor in her letter informing the conclusion.

145. It was clear that García's sexual harassment complaint had not been properly investigated and would never be properly resolved within the CSIF.

146. Since she felt that she had a right to work in a discrimination and harassment free work environment, she decided to exercise her rights under the federal and local statutes that guaranteed such rights.

15

147.    On October 15, 2020, García filed an administrative charge with the EEOC, alleging sex discrimination and retaliation against her employer, the CSIF.

148.    When Meléndez found out about García's charge, she was upset and called Rosario. Meléndez questioned Rosario as to García's decision to seek relief in another forum outside of the CSIF.

149.    Contemporaneously, García had requested a meeting with the Dean at NUC.

150.    The Dean told García that they were handling the situation ("esto se está trabajando") and promised to call García to let her know the measures taken in response.

151.    The Dean never called García to inform her of how the situation was handled.

152.    Upon the return of the employees to the CSIF after the lockdown, some of them have been required to physically attend the Regional Office on some days of the week and to work remotely from home on the others.

153.    García, as a General Nurse IV is required to work every day at the CSIF because she provides medical services directly to patients.

154.    Although Baerga is assigned to work in a different area than García, after the pandemic, they coincide a few days a week at the Regional Office in Arecibo.

155.    The days in which Baerga physically reports to work at the CSIF, have turned into a nightmare for García.

156.    Baerga psychologically harasses García by making constant derogatory and inciting remarks about her. Baerga will avoid referring to García by her name and instead uses phrases such as "the one who came from the Industrial Hospital," where she worked until 2014; "the beautiful girl" ("la nena linda"), that clearly refer to her.

157. Baerga constantly and freely roams around García's workspace during working hours when she should be in her assigned station and work area and makes pejorative remarks such as those described above.

158. Baerga will sometimes "stand guard" in front of the elevator located in García's work area, without performing any duties.

159. Her superiors at the CSIF are aware of this situation and permit it to continue without making any attempt to correct the situation.

160. Some supervisors have witnessed disturbing incidents against García involving Baerga and have refused to take any action.

161. García's and Baerga's co-workers have also witnessed this type of incidents by Baerga but prefer not to get involved.

162. Baerga constantly engages in harassment against García for having complained of sexual harassment by Toledo.

163. Despite García's efforts to seek protection from her superiors and regain her peace at work, no one seems to dare deal with Baerga and the unacceptable work environment she creates.

164. García, however, has reported numerous incidents regarding Baerga's threatening and intimidating tactics and tantrums to Rosario, without any results.

165. The import of these incidents is so clearly directed at García that, in addition to Rosario, other supervisors, including the Medical Director, Dr. Luis H. Padró, are aware of the disturbing situation and have not taken effective measures to correct it.

166. Instead, they have decided to isolate García when Baerga is physically at the CSIF in order to protect her.

167. Some co-workers have taken it upon themselves not to let García be alone in her work area when Baerga is around because they believe she is not safe.

168. Medical Director Padró is aware that García has been relocated in a private room to work when Baerga is physically at the office.

169. A fellow worker, José Colón, will not let García alone when Baerga is around.

170. Colón will accompany García to the pantry, up to the bathroom door and to the parking lot.

171. Colón will "stand guard" outside the bathroom door and walk García back to safety when she is ready to return to her "temporary workspace" at the CSIF.

172. Lately, there have been occasions in which García has had to exit the building with the help of her co-workers through the back door and escorted all the way to her car, to avoid running into Baerga.

173. This situation is emotionally injuring García and nothing is being done to correct it.

174. García fears for her safety and the lack of protection provided to her.

175. The harassment by Baerga is of such nature that it includes reference to death.

176. On more than one occasion, Baerga has ushered comments near García about having to buy "coronas" (funeral floral arrangements).

177.   At one point, Baerga threatened García with the infliction of grave bodily harm. She got close to García and whispered "would love to have you alone, to stab you" ("tan bueno tenerte cerca para fisgarte").

178.   García immediately told Rosario about García's threat and told Rosario "this is serious" and getting out of control.

179.   Rosario immediately warned Dr. Padró of the threat by Baerga.

180.   But García's complaints to her superiors at the CSIF have not produced any solution and Baerga is allowed to continue her harassing behavior.

181.   This state of affairs is severely disturbing García's emotional stability.

182.   García suffered and continues to suffer emotionally as a result of defendant's sexually harassing, intimidating and retaliating conduct.

183.   García takes Baerga's threats very seriously and fears for her physical well-being and emotional safety at the CSIF.

184.   As a result of her complaints and García's exposure to this illegal conduct, she has been adversely and emotionally affected.

185.   Defendant is liable for all damages caused to García.

**FIRST CAUSE OF ACTION**
**INJUNCTIVE RELIEF**

186.   García repeats and realleges each and every preceding allegation as if fully set herein.

187.   Defendant's conduct in the instant case warrants the issuance of preliminary injunctive relief to enjoin defendant from continuing to retaliate against García and to avoid the prospect of her suffering grave bodily harm and continued psychological attacks.

19

188. The threat of suffering physical injury constitutes irreparable harm.

189. For purposes of injunctive relief, García's allegations establish that she is likely to succeed in her retaliation claims brought under 42 USC 2000e, *et seq*.

190. García opposed unlawful sexual harassment and, as a result of engaging in protected conduct, has become the target of unlawful retaliation to the extent of being exposed to physical injury if defendant and its officers, agents, supervisors and employees are not preliminarily and permanently enjoined from correcting and eliminating these unlawful practices.

191. The threat of bodily harm is serious enough risk of irreparable injury to warrant mandatory injunctive relief. *García v. Google, Inc.*, 766 F.3d 929, 938 (9th Cir. 2014) (holding that threats of bodily harm can constitute irreparable injury).

192. The positive effects of granting the injunction versus the absence of any harm on the public clearly favors the protection of García and the avoidance of irreparable injury. Moreover, the injunction is consonant with the enforcement of Title VII's provisions and goals. 42 U.S.C. §2000e-5(g).

193. Hence, the requested preliminary and permanent injunction should be granted.

## SECOND CAUSE OF ACTION

194. García repeats and realleges each and every preceding allegation as if fully set herein.

195. Defendant's conduct constitutes sexual harassment and sex discrimination against plaintiff in violation of Title VII and the Civil Rights Act of 1991's express mandate to eradicate any type of discrimination on the basis of sex from the workplace.

196.     Despite defendant's knowledge that this conduct was taking place, it has not effectively investigated and curbed this unlawful behavior.

197.     Defendant participated in and/or condoned by its inaction this unlawful practice.

198.     As a proximate result of defendants' conduct, García is entitled to compensation for all damages proximately caused by said illegal and/or unlawful conduct. Hence, defendant is liable to plaintiff for compensatory and punitive damages because its conduct constitutes a blatant and callous disregard for García's federally protected rights.

199.     Defendant is liable to García in amount not less than $300,000.00 in compensatory and punitive damages under Title VII and 42 U.S.C. 1981a.

### THIRD CAUSE OF ACTION

200.     García repeats and realleges each and every preceding allegation as is fully set herein.

201.     Defendant's conduct constitutes a violation of Law No. 17 of April 22, 1988, which prohibits sexual harassment in the workplace. Under Law No. 17, defendant is strictly liable to García for the acts of its agents and supervisors in permitting that the retaliatory conduct against García continue.

202.     As a result of defendant's conduct, García has suffered damages for which defendant is fully liable.

203.     Pursuant to Law No. 17, García is entitled to reasonable attorney's fees, including litigation expenses, and the costs of this action.

## FOURTH CAUSE OF ACTION

204.    García repeats and realleges each and every preceding allegation as if fully set herein.

205.    Defendant's conduct constitutes a violation of Law No. 69 of July 6, 1985, which prohibits gender discrimination and retaliation in the workplace. Under Law No. 69 Defendants are liable for damages suffered by García as a result of its sexual harassment and retaliation of García.

206.    Pursuant to Law No. 69, García is also entitled to reasonable attorney's fees, including litigation expenses, and the costs of this action.

## FIFTH CAUSE OF ACTION

207.    García incorporates each and every preceding allegation as if fully set herein.

208.    García has been retaliated against for having opposed unlawful conduct under Title VII, Law No. 17 and Law No. 115.

209.    Defendant is liable to García for all damages proximately caused as a result of the retaliatory conduct.

## TRIAL BY JURY

210.    García demands that the instant action be tried before a jury.

**WHEREFORE**, premises considered, plaintiff prays from this Honorable Court for the following relief:

1.    A preliminary and permanent injunction prohibiting defendant from engaging in any further acts of sex discrimination and retaliation. Said injunction should be extensive to all of defendant's officers, agents,

22

supervisors, attorneys and employees;

2.      Compensatory damages in an amount not less than $300,000.00;

3.      Punitive damages in an amount not less than $300,000.00;

4.      Compensatory damages pursuant to Puerto Rico Laws No. 17, No. 115, and/or No. 69;

5.      Costs and reasonable attorney's fees pursuant to 42 U.S.C. §1988 and all Commonwealth statutes under which García claims relief; and,

6.      Any other relief which this Court may deem just and proper.

[SPACE INTENTIONALLY LEFT BLANK]

## VERIFICATION

I, **Keila García Colón**, of legal age, single, and resident of Vega Baja, Puerto Rico declare under penalty of perjury pursuant to 28 U.S.C. 1746 that the foregoing is true and correct.

In Vega Baja, Puerto Rico, this 5th day of May, 2021.

**KEILA GARCÍA COLÓN**

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 5th day of May, 2021.

**GONZÁLEZ MUÑOZ LAW OFFICES, P.S.C.**
P.O. Box 9024055
San Juan, PR 00902-4055
Tel.: (787) 766-5052
info@gonzalezmunozlaw.com

*s/ Juan Rafael González Muñoz*
Juan Rafael González Muñoz
USDC-PR No. 202312