UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO,
et al.,

    Debtors.[1]

------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

NOTICE OF CORRESPONDENCE RECEIVED BY THE COURT

The Court has received and reviewed the attached correspondence, described below, from interested persons in the above-captioned cases. Although the Court cannot respond individually to all of those who have expressed their thoughts or concerns, the Court is deeply mindful of the impact of the fiscal crisis on lives, institutions, and expectations, and of the importance of the issues that are raised in these unprecedented cases.

1.     Email dated August 9, 2022 from Javier Mandry
2.     Letter dated August 24, 2022 from Mildred Batista De León
3.     Letter dated August 25, 2022 from Glenn E. Ryhanych

---

[1]     The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801).

4. Email dated August 27, 2022 from Andrea Fabre Reyes
5. Email dated September 9, 2022 from Ana Quiñones

Dated: October 7, 2022

| | |
|---|---|
| From: | Javier Mandry |
| Sent: | Tuesday, August 9, 2022 5:58 PM |
| To: | SwainDPRCorresp NYSD |
| Subject: | Letter of Inquiry re: automatic stay of third parties |

**CAUTION - EXTERNAL:**

This letter is a formal inquiry to the Promesa Court regarding the state of affairs of hundreds of cases that either were stayed by the Commonwealth of PR.

I have two cases (17-1921, 17-1230) that the First Circuit Court stayed as a result of the fact that officers of the Commonwealth of PR were included, notwithstanding the fact that the officers were included due to allegations of unconstitutional statutes. These two appeals have been stayed for five years. The Appelate Court will not resolve any motions. I claim that this is a taking of property, as Puerto Ricans have the right to pursue judicial action against the state against constitutional violations.

I humbly request this Court to issue a guidance with respect to this issue, especially since the automatic stay was never meant as an absolute immunity against officers of a state, or worse, an absolute denial to grant a judgement.

On behalf of all veterans and us citizens whose residence is Puerto Rico, I ask for an update on this incredibly unjust situation. I am considering to ask the first Circuit to remove the Commonwealth and its officers, just to allow the case to move on. It is demeaning to be forgotten, leaving us between a rock and a hard place. In one of the first cases of automatic stay, judge besosa determined that the fiscal control board was not allowed to oppose.

Please issue a guidance or a blanket remedy against all cases that have been unjustly stayed, either at courts in Puerto Rico, or at the federal court level.

Thank you,
Javier Mandry

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

*Mildred Batista De León* (signature)
Mildred Batista De León

To the Honorable Laura Taylor Swain

On June 29, 2022; the Governor of Puerto Rico, Pedro R. Pierluisi, together with the Executive Director of the Retirement Board, Luis M. Collazo, announced the implementation of the new Enhanced Retirement Plan for members of the Puerto Rico Police, Laws 447-(1951) and 1-(1990).

According to the governor, he explained that the Enhanced Retirement Plan will apply to all active police officers as of June 30, 2022, as well as those members who opted for retirement, who belong to Law 447 or Law 1.

The Fiscal Oversight Board, reached an agreement with the Government to improve retirement benefits. Which will receive the deposit in their retirement accounts, as established in the Certified Fiscal Plan.

Which will be disbursed to those of Law 447 and Law 1 in your Plan 106 account, adding what you have accumulated in Plan 106 for your individual contributions.

It is unfair that the police improve their retirement system and I, as a Public Employee (Health Department) of Law 1, do not consider us like them. That just like them we are Public Employees. Being discriminatory.

For me it would be fair that those of Law 1 be considered as the Police. Since we are the same or worse than them. Since we have to wait until age 65, to give us a pension of 38 % or less to.

Waiting for you Honorable Judge Laura Taylor Swain, take into consideration those of Law 1. In order to have a well deserved retirement, which I have worked for 28 years.

P.D. Announces Implementation of Enhanced Police Retirement Plan of Laws 447 and 1.

# Governor Pierluisi Announces Implementation of Enhanced Police Retirement Plan of Laws 447 and 1

6/29/2022

Public safety

*(It will impact and benefit over six thousand active and retired police officers)*

**June 29, 2022** – Puerto Rico Governor Pedro R. Pierluisi, along with Retirement Board Executive Director Luis M. Collazo, Department of Public Safety (DSP) Secretary Alexis Torres, and Police Commissioner Antonio López Figueroa, today announced the beginning and implementation of the new Enhanced Retirement Plan for members of the Police Bureau rank system belonging to Laws 447-1951 and 1-1990.

The governor explained that the Enhanced Retirement Plan will apply to all those police officers active as of June 30, 2022, as well as those members who took retirement with at least 58 years and 30 years of service, from August 3, 2020 to the present, who belong to Law 447-1951 or Law 1-1990.

"The public policy of our Administration has always been to protect all public service pensioners and improve the retirement of our police officers, who daily risk their lives to protect and safeguard the

### Governor Announces Start of Program Granting Funding for Mitigation Projects

8/10/2022

Read more >

### Governor delivers school supplies in Las Marías

8/10/2022

Read more >

### Governor Allocates $17 Million for Research, Development and Evolution of Puerto Rico's Bioscience Industry

8/9/2022

Read more >

### Governor Announces $4,000 Incentive for Employees of Care Centers and Homes Licensed through ACUDEN

8/8/2022

Read more >

### Government announces more incentives for the island's agricultural sector

8/7/2022

Read more >

safety of all of us. We have managed to improve the retirement of our police officers in times of unprecedented fiscal challenges, but my Administration has always been there for you and rest assured that we will continue working to continue doing justice to those who with pride, dignity, courage and commitment wear the uniform of the Puerto Rico Police, "said the governor at the event in which Senator Gregorio Matías Rosario participated.

For his part, the executive director of the Retirement Board, Luis Collazo, said that after the annulment of Law 81-2020 that created the *Dignified Retirement Law*, they were given the task of working together with the Financial Supervision and Administration Board (JSAF), the Financial Advisory Authority and Fiscal Agency (AAFAF) and the DSP to reach an agreement that would do justice to the police, and in turn that it complied with the Fiscal Plan certified under PROMESA.

Pierluisi explained that, as a result of these conversations with the fiscal entity, it was agreed and endorsed to deposit in the accounts of Plan 106, about $850 million distributed over a period of 15 years. In this way, the benefits already acquired will be complemented so that, at the time of retirement, the police officer who was affected by his retirement benefits with Law 3-2013, has additional resources for his retirement.

"Today the dignified retirement of the police is a reality. The Enhanced Retirement Plan is a claim that the police have been making for a long time and having been able to comply with such a fair claim fills us with satisfaction," Collazo added.

Meanwhile, JSAF Member Andrew Biggs said the Board "fully understands the difficult retirement situation of police officers hired before the year

2000, as they did not have access to Social Security benefits for many years. The agreement reached by the Supervisory Board with the Government will improve the retirement benefits of these officers, and the Supervisory Board is pleased that the police will soon receive deposits in their retirement accounts, as set out in the Certified Fiscal Plan."

As part of the $850 million earmarked, about $250 million was included for the June budget to make the first disbursement. On average, each Law 447 and Law 1 police officer will receive over $110,000 in their Plan 106 account and some will receive up to $152,000 in employer contributions. This is in addition to what they accumulate in the Plan for their individual contributions.

Employer contributions to Plan 106 will be divided into two special contributions and annual contributions. The two special contributions, $30 thousand, will be deposited in two payments; one deposit of $30 thousand in June 2022 and the other deposit of $30 thousand in June 2023 for a total of $60 thousand.

Similarly, annual contributions will be made whose amount will depend on the fiscal year in which the police officer turns 58 years and 30 years of service. In addition, any member of the Police, who has taken retirement from August 3, 2020 to June 30, 2022 with 58 years and 30 years of service, will be entitled to a single payment of $ 77,500.

In the Fortress, the following active police officers received their check: Héctor Monge Sanjurjo (lieutenant colonel), Nivea E. Collazo Calderón (lieutenant colonel), José D. González Montannez (captain), María La Luz Rentas (sergeant), Iván Rodríguez Chacón (agent), Walter A. García Luna (agent). Also, former retired agents Iván A. López Marrero, Eddie M. Marchanny Contreras and Angelo Carrión López.

Given this, the secretary of the DSP said that "our commitment in the Department is to improve the conditions of retirement for all our police brothers and provide them with better working and economic conditions. This new Enhanced Retirement Plan is in addition to the salary increases granted, the inclusion of police officers to contribute to Social Security, the improvement in disability benefits, the payment of overtime among other initiatives that we have promoted in favor of the well-being of our police officers. "

For his part, Commissioner López Figueroa added that "I assure all my police officers that, this servant, the governor and the Secretary of Public Security, we remain focused on achieving the marginal benefits that each one deserves in frank recognition of the contribution that, with their work, they make to Puerto Rico."

Employer contributions to Plan 106 for members of the Police force will be deposited in the New Defined Contributions Plan on or before the last day of each fiscal year, understood as June 30 of the corresponding period.

For additional information and details on the parameters set forth in the Enhanced Retirement Plan for eligible Police Members, please visit the www.retiro.pr.gov website.

###

La Fortaleza
Information Officers Rosemarie Vizcarrondo,

Contact us

  

oficialdeinformacion@fortaleza.pr.gov

(787) 721-7000

PR.gov

Accessibility PRITS-073021-FTLZ
Pursuant to Law 229 of 2003



August 25, 2022

Hon. Laura Taylor Swain
Title III Court, Puerto Rico Settlement
Daniel Patrick Moynihan Bldg
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

With respect to the Puerto Rico HTA settlement confirmation hearings, I provide a copy of a letter sent to the court in 2021. The substance of the letter is reinforced by the recent objection submitted by a HTA Insured Bondholder Group (Franklin & Nuveen).

In summary, HTA bonds issued at a premium have unamortized principal that is not being paid if the Assured Guaranty accelerates the payment of bonds before their stated maturity. As a result, bonds of the same issue (CABS and Bonds issued at Par) are treated differently. Assured must pay premium bondholders a price reflecting the stated yield at issue, as of any acceleration date, thus paying such bond holders amortized and unamortized principal.

This matter should be settled before confirmation and should not take the path of setting up separate trusts for institutional investors at the expense of retail holders of insured bonds. All policy holders should be treated the same not just the ones with unlimited expense accounts.

Thanking you for your attention to this matter.

Sincerely,

Glenn E. Ryhanych, President
BlueList Partners, LLC



September 16, 2021

## "Non-Callable", Insured Puerto Rico Bonds: Yield-To-Worst?

### Introduction and Bonds used for Explanation Purposes:

I wish to inform the Title III court and other relevant parties that certain **insured** Puerto Rico bonds, **originally** issued as non-callable and at a premium price to par, are being treated unfairly relative to other bond types or structures. This assertion is in respect to the acceleration provision for insured bonds, at an *acceleration price of 100% of principal.* The provision is found in the proposed GO/PBA/HTA & PRIFA Support Agreements (PSAs).

To illustrate, I will use a Puerto Rico Highway & Transportation (HTA), series CC bond, dated 3/06/07 (745181C70). The bond has a stated coupon rate of 5.25% maturing 7/1/2034 and was originally priced at a premium of 116.602 or $1,166.02 per $1,000 par. The stated yield to maturity and **yield to worst** was 4.22%. In addition, the bond was issued as non-callable and insured by FSA insurance, which was subsequently purchased by Assured Guaranty Corp.

For comparison purposes, the 2007 series CC bonds also included a Capital Appreciation Bond (CAB) maturing 7/1/27 (745181B89), issued as non-callable. This bond was priced at 39.846 to yield 4.58%. This CAB was not insured as of the original issue date, but a portion was subsequently re-insured by National and AMBAC insurance (745181E78, 745181F93).

### Defining "Principal":

The term principal does not have a specific definition, and it is not clear how it is defined in the PSAs. Most commonly, it is defined as *the amount of money originally invested or loaned,* **on which basis** *interest and returns are calculated.*

**Equal Treatment:**

*Regarding insured bonds, the respective PSAs state that such plans will include a provision providing that payment of principal on the insured bonds is accelerated at an "acceleration price" of 100% of the principal thereof plus accrued interest (or, in the case of any capital appreciation bonds (CABs), the compounded amount thereof) to the date of payment.*

Let's review three bond structures. While bond A is for illustration purposes only, bonds B and C, as I mentioned, are actual HTA 2007 series CC bonds.

A. Bond originally issued at par to yield 4.22%. **Principal amount equals par or face value.** On the PSA effective date, the bonds are accelerated at 100% of principal, which in this example is the same as the par or face amount, and the bondholder is kept "whole" gaining their 4.22% yield which was the original yield and the yield earned up to the date of acceleration.

B. Capital Appreciation Bond originally issued at a discount to yield 4.58%. This bond, per the PSA acceleration language, is compounded at the 4.58% stated rate over the holding period up to the acceleration or PSA effective date. The bondholder is kept "whole" as the yield to the date of acceleration is 4.58%, as originally stated.

C. Bond originally issued at a premium to par or face value. Puerto Rico HTA 5.25% 7/1/34 issued at 116.602 to yield 4.22% and non-callable. If we assume a HTA PSA effective or acceleration date of 6/1/22 and an acceleration price of 100% of principal (**where principal equals face amount or par**) then the yield on this bond would be 3.81%, not the original yield of 4.22% – an annual yield reduction of 40 basis points! In this case the bondholder is not kept "whole". As currently written, the PSA's acceleration language appears to discriminate against the premium bond by altering the yield to worst, which is not the case with bond A or B. For A & B to equal C, the acceleration price on this premium bond, as of 6/1/22, would need to be 111.53 which produces the 4.22% yield up to the date of acceleration. Alternatively, for bond A to equal C, with respect to yield at acceleration, the holder of the par bond would receive 91.625, not par, to produce the same 3.81% yield earned on the premium bond. Over the premium bond's life, the principal is being amortized downward. This reduction can be viewed as interest expense reducing the 5.25% interest income, and the interplay of these figures provides the bondholder the net 4.22% yield. The 4.22% yield is only achieved if the non-callable bond goes to maturity at which time the premium paid to acquire that coupon is fully amortized. The acceleration provision, as written, in effect truncates the present value sum of these annual values as calculated through the original maturity and thus truncates principal. In the end, it does not appear that the insurer is fully indemnifying this bondholder – keeping them whole, which is not the case with bonds issued at par or CABs. That is why commonly accepted definitions of principal include basis and yield, because funds invested or borrowed do not always equal the face amount of a loan.

**Tax Cost:**

This assertion is consistent with how a bondholder's tax basis is calculated. Again, using an effective or acceleration date of 6/1/22 at a price of 100% of principal or face/par, bond A's tax basis is par. In example B, the CAB, the bondholder's tax basis is the initial principal plus accretion at the 4.58% original compounding rate. For bonds A & B, there is no gain or loss because the bondholder is kept "whole" as the original quoted and insured yield is realized up to the acceleration date. In example C, however, the bondholder would have a capital loss of $115.30 per $1,000, representing the unamortized principal. Again, this assumes that the PSAs are defining principal as a bond's par or face value.

**Anecdote:**

In thinking about the definition of "principal", I note that the *insured portion* of the 2007 Series CC bonds (cited example included) had a total par/face or "principal" value of approximately $238 Million. In turn, that $238 Million *purchased $277 Million* of face/par/principal of government bonds to pre-refund HTA 1996 series Y bonds. But $238 Million does not equal $277 Million, so how does one reconcile this for the purposes of defining principal – only by correctly defining principal as the amount invested or borrowed. At the time of issue, the HTA could have easily priced the $277 Million bonds at par, to yield a 4.22%, and with respect to the PSA acceleration provision the investor would receive all their principal back and the 4.22% stated yield up to the acceleration date – just like the CABS. But the premium bonds do not seem like they will be treated this way with respect to the acceleration provision. To reiterate, the bonds were initially priced at a premium to par because the bond coupon of 5.25% exceeded the market rate of 4.22%. The principal or premium paid in effect buys up the coupon rate and the price level reflects not only the extent of that buy up, but the number of years that the bought up coupon pays – length to maturity. As the acceleration provision appears to eliminate the remaining years that the higher coupon is paid, it also shortchanges the amount of principal invested. Put another way, a portion of the above market 5.25% coupon payment represents a return of capital or principal. If acceleration eliminates the coupon payments due over the remaining life of this non-callable bond, then an investors capital or principal is not repaid, and a large capital loss occurs. This is not the case with bonds originally issued at par or as CABs which are both kept "whole".

In conclusion, I hope this paper prompts a review of the acceleration provision for insured bonds that is found in various PSAs. And, that beneficial holders of non-callable bonds, originally issued at a premium to par, are made whole and receive treatment equal to that of par bonds and CABS.

Glenn E Ryhanych, CFA
President, BlueList Partners, LLC

**SwainDPRCorresp NYSD**

| | |
|---|---|
| **From:** | Andrea Fabre Reyes |
| **Sent:** | Saturday, August 27, 2022 3:05 PM |
| **To:** | NYSD Swain Corresp |
| **Subject:** | Luma contract / translate |

**CAUTION - EXTERNAL:**

De manera respetuosa me dirijo a el Honorable tribuno de el primer circuito de boston, a la Hon. Juez Laura Taylor Swain, y demas miembros.

La misiva responde, para informarle de manera voluntaria y sin animo de lucro lo que realmente esta ocurriendo con el gobierno, y la situaciòn de la compañia " Luma Energy ".

Comenzemos por que en Puerto Rico siempre se ha ido a luz, NO es una situaciòn nueva por que este esta nueva compañia (1) en ese entonces a la autoridad ser una pùblica, existian gremios, QUE SEGÙN ELLOS, les representaban, pero era un mecanimos de negocio redondo, donde solo se lucraba el directivo de estas organizaciones el Sr. Jaramillo, cabe mencionar que durante todos esos años, estas personas no invirtieron en la autoridad para reestructurarla, al igual que ni en sus empleados (2). Nuestra constituciòn establece que la luz es un bien activo de el pueblo que no se podia vender, y que el actual gobierno a sabiendas lo hizo, y se comenta que se lucro en primera persona de esta transacciòn (3) Hon., honestamente estamos en quiebra, hay muchas personas en la calle, y si disuelven ese contrato, ellos pueden irse con el dinero , lo cual seria un doble gasto para el paìs, gastan el dinero en todo menos en mantenimientos de estas utilidades, y es por eso que el sistema es tan fragil, y deficiente.

Yo le pide sea usted quien tome la desiciòn de lo que pueda ocurrir con esta situaciòn, por que ya se ha salido de control y el gobierno es uno inepto, que solo piensa en su bien comùn como politico.

De manera coordial me despido
Quedo a su entera orden y disponibilidad

Atte:
Andrea Victoria Fabre Reyes

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**SwainDPRCorresp NYSD**

| | |
|---|---|
| **From:** | Ana Quiñones |
| **Sent:** | Friday, September 09, 2022 9:12 AM |
| **To:** | NYSD Swain Corresp |
| **Subject:** | P DE LA C 1449 |

CAUTION - EXTERNAL:

Buenos días:
Recientemente laJSF y el Gobierno de PR por instrucciones suya llegó al acuerdo de permitimos el retiro a 1700 empleados que el mismo gobierno determinó que no éramos esenciales.
Para cumplir de manera cosmética con sus instrucciones nos entregaron la carta donde se nos indicaba que éramos elegibles y cumplíamos con la ley 80 Sin embargo, no ha habido ningún otro pronunciamiento al respecto, peor aún, ahora existe el proyecto de ley descrito en el asunto y sentimos que el mismo propone atrasar o anular nuestro proceso de retiro que fue avalado por todas las partes.
¿Puede un proyecto de ley detener la implementación de una ley?
¿Puede el gobierno utilizar este proyecto para incumplir con la determinación de usted como jueza?
¿Violenta esto nuestro derecho a un retiro digno y que fue confirmado por todas las partes?
¿ No se presta esto para que se entienda que aunque se llegaron a unos acuerdos, el gobierno puede cambiar las reglas de juego?
Son mis interrogantes

Gracias por la atención a este asunto


Ana M. Quiñones Medina
CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.