UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO et al.,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK-3567-LTS |

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801.) Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.

APPEARANCES:

O'NEILL & BORGES LLC
By:     Hermann D. Bauer
250 Muñoz Rivera Avenue, Suite 800
San Juan, PR 00918-1813

PROSKAUER ROSE LLP
By:     Martin J. Bienenstock
        Brian S. Rosen
Eleven Times Square
New York, NY 10036

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, as
representative of the Debtor*

MARINI PIETRANTONI MUÑIZ LLC
By:     Luis C. Marini-Biaggi
        Carolina Velaz-Rivero
MCS Plaza, Suite 500
255 Ponce de León Ave.
San Juan, Puerto Rico 00917

O'MELVENY & MYERS LLP
By:     John J. Rapisardi
        Maria J. DiConza
7 Times Square
New York, New York 10036

        *and*

        Peter Friedman
1625 Eye Street, NW
Washington, DC 20006

*Attorneys for Hon. Pedro R. Pierluisi and the
Puerto Rico Fiscal Agency and Financial
Advisory Authority*

CASELLAS ALCOVER & BURGOS P.S.C.
By:     Heriberto Burgos Pérez
        Ricardo F. Casellas-Sánchez
        Diana Pérez-Seda
P.O. Box 364924
San Juan, PR 00936-4924

ISABEL FULLANA-FRATICELLI &
ASSOCS., P.S.C.
By:     Isabel M. Fullana
        Eduardo J. Capdevila
The Hato Rey Center Bldg.
268 Ave. Ponce de León Ste. 1002
San Juan, Puerto Rico 00918

*Counsel to Finca Matilde, Inc.*

SALDAÑA, CARVAJAL, & VÉLEZ-RIVÉ,
P.S.C.
By:     José A. Sánchez Girona
166 Avenida de la Constitución
San Juan, Puerto Rico 00901

*Counsel for Mapfre PRAICO Insurance Company*

LAW OFFICES OF JOHN E. MUDD
By:     John E. Mudd
P.O. Box 194134
San Juan, PR 00919

*Attorneys for Plaintiffs-Appellants of First
Circuit Case No. 21-1739*

TORO COLÓN MULLET P.S.C.
By:     Manuel Fernández-Bared
        Linette Figueroa-Torres
        Nayda Perez-Roman
P.O. Box 195383
San Juan, PR 00919

KRAMER LEVIN NAFTALIS & FRANKEL
LLP
By:     Matthew M. Madden
2000 K Street NW, 4th Floor
Washington, D.C. 20006

        *and*

        Douglas Buckley
1177 Avenue of the Americas
New York, NY 10036

CADWALADER, WICKERSHAM &
TAFT LLP
By:    Howard R. Hawkins, Jr.
        Mark C. Ellenberg
        Casey J. Servais
        William J. Natbony
        Thomas J. Curtin
200 Liberty Street
New York, New York 10281

*Counsel for Assured Guaranty Corp. and*
*Assured Guaranty Municipal Corp.*

ADSUAR MUNIZ GOYCO SEDA &
PEREZ-OCHOA PSC
By:    Eric Pérez-Ochoa
        Luis A. Oliver-Fraticelli
        Alexandra Casellas-Cabrera
208 Ponce de Leon Ave, Ste 1600
San Juan, PR 00936

WEIL, GOTSHAL &MANGES LLP
By:    Jonathan D. Polkes
        Gregory Silbert
        Robert S. Berezin
        Kelly DiBlasi
        Gabriel A. Morgan
767 Fifth Avenue
New York, NY 10153

*Attorneys for National Public Finance*
*Guarantee Corp.*

CASILLAS, SANTIAGO & TORRES LLC
By:    Juan J. Casillas Ayala
        Israel Fernández Rodríguez
        Juan C. Nieves González
        Cristina B. Fernández Niggemann
PO Box 195075
San Juan, Puerto Rico 00919-5075

PAUL HASTINGS LLP
By:    Luc A. Despins
        G. Alexander Bongartz
200 Park Avenue
New York, New York 10166

*Counsel for the HTA Insured Bondholder*
*Group*

*Counsel to the Official Committee of
Unsecured Creditors*

REXACH & PICÓ, CSP
By:    María E. Picó
802 Ave. Fernández Juncos
San Juan, PR 00907-4315

BUTLER SNOW LLP
By:    Martin A. Sosland
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219

       *and*

       James E. Bailey III
       Adam M. Langley
6075 Poplar Ave., Suite 500
Memphis, TN 38119

*Counsel for Financial Guaranty Insurance
Company*

FERRAIUOLI LLC
By:    Roberto Cámara-Fuertes
       Sonia Colón
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917

MILBANK LLP
By:    Dennis F. Dunne
       Atara Miller
       Grant R. Mainland
       John J. Hughes, III
       Jonathan Ohring
55 Hudson Yards
New York, NY 10001

*Attorneys for Ambac Assurance
Corporation*

MCCONNELL VALDÉS LLC
By:    Arturo J. García-Solá
       Nayuan Zouairabani
270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918
P.O. Box 364225

San Juan, PR 00936-4225

*Attorneys for AmeriNational Community Services,*
*LLC, as Servicer for the GDB Debt Recovery*
*Authority*

C. CONDE & ASSOC. LAW OFFICES
By:      Carmen D. Conde Torres
           Luisa S. Valle Castro
254 San José Street
Suite 5
San Juan, PR 00901-1523

*Counsel for Santander Securities LLC*

SCHULTE ROTH & ZABEL LLP
By:      Douglas S. Mintz
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005

           *and*

           Douglas Koff
           Taleah Jennings
           Abbey Walsh
           Peter J. Amend
           Kelly V. Knight
919 Third Avenue
New York, NY 10022

*Attorneys for Cantor-Katz Collateral*
*Monitor LLC, as Collateral Monitor*
*for the GDB Debt Recovery Authority*

FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CONNECTION WITH
CONFIRMATION OF THE MODIFIED FIFTH AMENDED TITLE III PLAN OF ADJUSTMENT
OF THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY

LAURA TAYLOR SWAIN, United States District Judge

The motion of the Financial Oversight and Management Board for Puerto Rico

(the "Oversight Board") for confirmation of a proposed plan of adjustment for the Puerto Rico

Highways and Transportation Authority ("HTA" or the "Debtor") is now before the Court

pursuant to Title III of the Puerto Rico Oversight, Management, and Economic Stability Act

("PROMESA").[2]  The Court has jurisdiction of this matter pursuant to section 306(a) of

PROMESA.  This Court hereby makes its findings of fact and conclusions of law, pursuant to

Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Federal Rules of

Bankruptcy Procedure 7052 and 9014 and section 310 of PROMESA, with respect to the motion

for confirmation.

### Introduction

In 2017, the Commonwealth of Puerto Rico (the "Commonwealth"), through the

Oversight Board, initiated unprecedented proceedings pursuant to PROMESA to restructure the

debts of the Commonwealth and certain of its instrumentalities, including HTA, and to find a

path forward for Puerto Rico, its citizens, and other stakeholders.  (See May 17, 2017 Hr'g

Tr. 6:9-8:12.)  During the pendency of the Title III cases, Puerto Rico has endured the disastrous

effects of hurricanes, earthquakes, and the COVID-19 pandemic.  These events have not only

made day to day life far more challenging for the residents of Puerto Rico, but they have

exacerbated the financial difficulties of the Commonwealth and its instrumentalities and made

---

[2]     PROMESA is codified at 48 U.S.C. § 2101 et seq.  References to "PROMESA" section
numbers in the remainder of this FFCL (defined below) are to the uncodified version of
the legislation, unless otherwise indicated.

the already complex circumstances more challenging for those involved in the resolution of the Title III cases.  Nonetheless, the Oversight Board, representatives of many creditor constituencies, the government of Puerto Rico, and other parties in interest have persevered, with the help and guidance of an extraordinary team of skilled judicial mediators (the "Mediation Team"), in working toward a resolution intended to allow HTA to exit its PROMESA Title III case (the "HTA Title III Case").

### Prior Restructurings under PROMESA

On November 7, 2018, this Court approved a qualifying modification for the Government Development Bank for Puerto Rico ("GDB"), which restructured approximately $4.5 billion of claims against GDB.  (Docket Entry No. 270 in Case No. 18-1561.)  On February 4, 2019, this Court confirmed the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated January 9, 2019 (Docket Entry Nos. 5047, 5048 in Case No. 17-3283, as amended by Docket Entry Nos. 5053 and 5055 in Case No. 17-3283), for the Puerto Rico Sales Tax Financing Corporation ("COFINA") and approved the settlement between the Commonwealth and COFINA.  (Docket Entry No. 5045 in Case No. 17-3283.)  The settlement divided rights to a significant flow of tax revenues between the two debtors that were involved in complex litigation regarding the ownership of such tax revenues.

On January 18, 2022, this Court confirmed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated January 14, 2022 (Docket Entry No. 19784 in Case No. 17-3283) (the "Commonwealth Plan"), for the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority, which (i) reduced the Commonwealth's $30.5 billion of general obligation and guaranteed debt to

approximately $7.4 billion, and (ii) eliminated all of the Employees Retirement System of the

Government of the Commonwealth of Puerto Rico's and the Puerto Rico Public Buildings

Authority's debt in the largest debt restructuring in the history of the municipal bond market and

the first restructuring of a territory's debt in the history of the United States.  On January 20,

2022, this Court (i) approved a qualifying modification for the Puerto Rico Infrastructure

Financing Authority ("PRIFA") (Docket Entry No. 82 in Case No. 21-1492), which restructured

approximately $1.9 billion of claims against PRIFA and (ii) approved a qualifying modification

for the Puerto Rico Convention Center District Authority ("CCDA") (Docket Entry No. 72 in

Case No. 21-1493), which restructured approximately $384 million of claims against CCDA.

These restructurings are critical steps to restoring fiscal responsibility, access to capital markets,

and economic prosperity and growth to Puerto Rico.

### Proposed Plan of Adjustment for the
### Puerto Rico Highways and Transportation Authority

The Debtor has now requested confirmation of the *Modified Fifth Amended

Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority*, dated

September 6, 2022 (Docket Entry No. 1404 in Case No. 17-3567)[3] (as amended, supplemented,

or modified prior, at, or subsequent to the HTA Confirmation Hearing, including the Plan

Supplement, and as may be amended, supplemented, or modified pursuant to section 313 of

PROMESA, the "HTA Plan").[4]  The HTA Plan required extensive work over the course of

several years to negotiate the terms of various plan support agreements and resolve disputes

arising throughout the pendency of the HTA Title III Case.  The Mediation Team served a

---

[3]      All docket references are to entries in Case No. 17-3567 unless otherwise indicated.

[4]      Capitalized terms used but not defined herein shall have the meanings given to them in
the HTA Plan.

critical role in facilitating navigation of complicated negotiations between parties in interest that have spanned several years and involved complex issues. In response to requests of this Court, the Mediation Team filed certifications of the good faith participation of parties in confidential negotiations at key points during the Title III cases. (See, e.g., Docket Entry Nos. 17314,18885 in Case No. 17-3283.) The motion to confirm the HTA Plan before this Court constitutes a further step in the effort to achieve fiscal responsibility of the Commonwealth of Puerto Rico and its instrumentalities.

The HTA Plan has broad but not universal support. Objections by creditors, and the case put forward by the Debtor, are discussed in detail in the findings of fact and conclusion of law that follow (the "Findings of Fact and Conclusions of Law" or "FFCL"). In addition to the formal filings by parties, the Court has received hundreds of letters and email communications from citizens and others who live in Puerto Rico and are concerned about the future of Puerto Rico's infrastructure. The Court also invited members of the public to participate in the HTA Confirmation Hearing and speak directly to the Court, the Oversight Board, the government, and other parties in interest. Speakers expressed concerns and frustrations with the impact of tolls, road conditions, major highways, and mass transportation facilities. The Court carefully considered these statements and thanks each of the public speakers who participated in the confirmation process for their unwavering commitment to the future of Puerto Rico.

In evaluating whether the proposed plan of adjustment should be confirmed, the Court considered the legal and evidentiary submissions of the parties in interest, and was deeply mindful of the larger context of progress and impediments within which Puerto Rico continues to move forward. The Court's authority is significant but is exercised within the boundaries set by

the United States Constitution and the laws of the United States.  In this connection, Congress has conferred powers on the Oversight Board to develop fiscal plans and budgets in collaboration with the elected government, and has given the Oversight Board the sole power to formulate and propose plans of adjustment.  The Court must determine whether the proposed plan of adjustment meets the requirements of the laws passed by Congress and, where objections based on the Constitution of the United States have been raised, the requirements of the Constitution. It is not for the Court to determine whether particular infrastructure policies, asset and resource allocations, or settlements of disputed issues are optimal; the Court determines whether the proposed HTA Plan meets the legal requirements for confirmation of a plan of adjustment.  This process is largely forward-looking as to whether the proposed plan of adjustment reduces the debt burden of HTA and places Puerto Rico on a sustainable path forward.  For the reasons explained in the following Findings of Fact and Conclusions of Law, the Court finds that the HTA Plan proposed by the Oversight Board meets the confirmation requirements set forth in PROMESA and does not violate the Constitution of the United States.

### The Motion and Submissions Considered

Before the Court is the HTA Plan filed by HTA, by and through the Oversight Board, as representative of HTA pursuant to section 315(b) of PROMESA.[5]  The following documents have been filed by the Debtor in connection with confirmation of the HTA Plan:

---

[5]     The Court previously entered, pursuant to, inter alia, section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), and after due notice and a hearing, an order, dated June 22, 2022 (Docket Entry No. 1248) (the "HTA Disclosure Statement Order"), approving the HTA Disclosure Statement, establishing procedures for the solicitation, submission, and tabulation of votes and elections with respect to the HTA Plan, approving the forms of ballots, master ballots, and election notices in connection therewith, and approving the form of notice of the HTA Confirmation Hearing.  The Court also entered the *Order Establishing, Among Other Things, Procedures and*

(a) *Plan Supplement and Plan Related Documents of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1279) (Debtor's Ex. 22, Docket Entry No. 1300-2);

(b) *Amended Plan Supplement and Plan Related Documents of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1351) (Debtor's Ex. 60, Docket Entry No. 1354-8);

(c) *Debtor's Informative Motion Regarding (A) Modified Fifth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority, (B) HTA Plan Resolution, (C) Revised Proposed HTA Confirmation Order, (D) Revised Proposed Findings of Fact and Conclusions of Law, and (E) Plan Supplement* (Docket Entry No. 1405) (the Plan Supplement included therein, as the same may be amended, supplemented, or modified, the "Plan Supplement");

(d) *Affidavit of Service of Solicitation Materials* (Docket Entry No. 1324) (Debtor's Ex. 56, Docket Entry No. 1354-3) (the "Mailing Affidavit");

(e) *Affidavit of Publication and Radio Advertisements* (Docket Entry No. 1342) (Debtor's Ex. 57, Docket Entry Nos. 1354-4,1354-5) (the "Publication Affidavit" and, together with the Mailing Affidavit, the "Service Affidavits");

(f) *Omnibus Reply of the Puerto Rico Highways and Transportation Authority to Objections to Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1361);

(g) *Memorandum of Law in Support of Confirmation of Fourth Amended Title III Joint Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1360) (the "Memorandum of Law");

(h) *Declaration of David Skeel in Respect of Confirmation of Fourth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1357) (the "Skeel Decl.");

(i) *Declaration of David M. Brownstein in Respect of Confirmation of Fourth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1358) (the "Brownstein Decl.");

(j) *Declaration of Ojas N. Shah in Respect of Confirmation of Fourth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1359) (the "Shah Decl.");

---

*Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* (Docket Entry No. 1249).

(k) *Declaration of Jay Herriman in Respect of Confirmation of Fourth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1355) (the "Herriman Decl.");

(l) *Declaration of Christina Pullo of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1356) (the "Pullo Decl." and, together with the declarations listed in (h) to (k) above, the "Debtor's Declarations"); and

(m) *Debtor's Supplemental Reply to Limited Objection of the HTA Insured Bondholder Group to the Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1376).

Submissions in opposition to confirmation of the HTA Plan were filed by the following parties: (i) Mapfre PRAICO Insurance Company and Endurance Reinsurance Corporation of America (Docket Entry No. 1285) (the "Mapfre Objection");[6] (ii) the plaintiffs-appellants in Vazquez Velazquez v. P.R. Highways & Transp. Auth., Case No. 21-1739 (Docket Entry No. 1287) (the "Vazquez Velazquez Objection," and the objectors, the "Vazquez Velazquez Group"); and (iii) Finca Matilde, Inc. (Docket Entry No. 1293) (the "Finca Objection").[7]

Reservations of rights, statements or replies in support of confirmation, or limited objections raising discrete issues but generally supporting the HTA Plan were filed by the following parties: (i) Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "Assured") (Docket Entry Nos. 1290, 1349, 1375); (ii) National Public Finance Guarantee Corporation ("National") (Docket Entry No. 1295); (iii) the Official Committee of Unsecured Creditors (Docket Entry No. 1296); (iv) Franklin Advisers, Inc. and Nuveen Asset

---

[6]     The Mapfre Objection was resolved through the inclusion of revisions in decretal paragraph 56 of the HTA Confirmation Order.  (See Aug. 17, 2022 Hr'g Tr. 26:5-28:8.)

[7]     The Finca Objection was resolved through the inclusion of p revisions in Section 1.10 of the HTA Plan.  (See Aug. 17, 2022 Hr'g Tr. 87:9-89:19, 98:9-13, 114:21-115:12.)

Management (collectively, the "Insured Bondholder Group") (Docket Entry Nos. 1301, 1374); (v) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") (Docket Entry No. 1318), which was withdrawn pursuant to Docket Entry No. 1380; and (vi) AmeriNational Community Services, LLC (Docket Entry No. 1385). The Court has also received and reviewed carefully submissions in connection with each version of the Oversight Board's Proposed Findings of Facts and Conclusions of Law. (Docket Entry Nos. 1381, 1382, 1383, 1384.)[8]

The Court heard argument and statements by members of the public,[9] and received evidence,[10] in connection with confirmation of the HTA Plan at a hearing held on August 17, 2022 (the "HTA Confirmation Hearing"). The Court has carefully considered the HTA Plan, as well as the supporting and opposing submissions, and the witness testimony and briefing and written evidence submitted by the parties. The Court has also listened carefully to the oral remarks made on the record at the HTA Confirmation Hearing by members of the public.

---

[8] AAFAF's limited objection to the Proposed Findings of Facts and Conclusions of Law (Docket Entry No. 1384) was withdrawn as resolved pursuant to proposed revisions submitted by the Oversight Board in connection therewith (Docket Entry No. 1386). (See Aug. 17, 2022 Hr'g Tr. 16:9-17:1.)

[9] The Court heard statements from three members of the public. (See Aug. 17, 2022 Hr'g Tr. 74:8-86:1.)

[10] The Debtor's Declarations were admitted without objection, and original signature pages with respect thereto were submitted to the Court. (See Aug. 17, 2022 Hr'g Tr. 106:21-109:14; Docket Entry No. 1391.) The Debtor's exhibits (Docket Entry Nos. 1299, 1300, 1302, 1303, 1354, 1379) were admitted without objection subject to the limitations indicated under the exhibit list's column identified as "Use of Exhibit." (See Aug. 17, 2022 Hr'g Tr. 102:23-103:3; Docket Entry No. 1391.)

Assured's exhibits (Docket Entry Nos. 1291, 1322), the Vazquez Velazquez Group's exhibits (Docket Entry No. 1298) and declaration of Carlos Céspedes Gómez (Docket Entry No. 1287), and the Insured Bondholder Group's exhibit (Docket Entry No. 1303) were admitted without objection. (Docket Entry No. 1391; see Aug. 17, 2022 Hr'g Tr. 110:6-9, 110:17-21, 111:5-9, 113:48.)

In response to the limited objection filed by the Insured Bondholder Group (Docket Entry No. 1301) and following the oral arguments presented at the HTA Confirmation Hearing, the Court entered the *Order to Meet and Confer* (Docket Entry No. 1389) (the "Meet and Confer Order"), directing Assured and the Insured Bondholder Group to, among other things, meet and confer in an effort to develop a resolution to the limited objection. Upon doing so, Assured and the Insured Bondholder Group filed the *Joint Response of Assured Guaranty Corp., Assured Guaranty Municipal Corp., and HTA Insured Bondholder Group to Order to Meet and Confer (ECF No. 21863)* (Docket Entry No. 1394) (the "Joint Response"), setting forth their agreed upon resolution.

On August 24, 2022, the Court entered the *Order to Submit Revised Proposed Plan and Related Materials* (Docket Entry No. 1399) (the "Filing Order"). On August 31, 2022, the Court entered the *Order Granting the Urgent Motion for Extension of Deadline to Submit Revised Proposed Plan and Related Materials* (Docket Entry No. 1401) (the "Extension Order"), extending the deadline for the Oversight Board to submit a revised Fifth Amended HTA Plan and related materials. In response, the Oversight Board filed the HTA Plan (which included revisions agreed to by Assured and the Insured Bondholder Group resolving the limited objection filed by the Insured Bondholder Group (Docket Entry Nos. 1301, 1405)), proposed HTA Confirmation Order, proposed Findings of Fact and Conclusions of Law, and revised Plan Supplement (which included, among other documents, the New HTA Bonds Indenture with modifications consented to in accordance with the terms and provisions of the HTA/CCDA Plan Support Agreement (Docket Entry No. 1405-7)).

For the following reasons, the HTA Plan is hereby confirmed and any remaining objections are overruled. For the avoidance of doubt, to the extent that a particular objection or

issue is not specifically addressed in these Findings of Fact and Conclusions of Law, it has been considered thoroughly and is overruled. The overruled objections and the Oversight Board's position as to the proper treatment of Eminent Domain/Inverse Condemnation Claims are preserved for appeal.

The Court turns now to its analysis and decision on the motion for confirmation of the HTA Plan, and the reasons for that decision.

## Findings of Fact and Conclusions of Law

1. <u>Findings and Conclusions</u>. The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Federal Rules of Bankruptcy Procedure 7052 and 9014 and section 310 of PROMESA. To the extent any of the findings of fact contained herein constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law contained herein constitute findings of fact, they are adopted as such. Any headings or sub-headings used herein are for reference purposes only and shall not affect in any way the meaning or interpretation of the Findings of Fact and Conclusions of Law set forth herein or the HTA Plan.

2. <u>Jurisdiction</u>. This Court has exclusive jurisdiction of the HTA Title III Case pursuant to section 306(a) of PROMESA. Venue is proper before this Court pursuant to section 307(a) of PROMESA. Pursuant to section 306(b) of PROMESA, upon commencement of the HTA Title III Case, the Title III Court exercised, and continues to exercise, exclusive jurisdiction over all property of the Debtor, wherever located. To the extent necessary, pursuant to section 305 of PROMESA, the Oversight Board has granted consent to, and the HTA Plan provides for, this Court's exercise of jurisdiction over the property and revenues of the Debtor as necessary to approve and authorize the implementation of the Findings of Fact and Conclusions

of Law and the HTA Plan.

3.   _Judicial Notice_.  The Court takes judicial notice of the dockets of the Commonwealth Title III Case (as defined below), the HTA Title III Case, the appellate court dockets of any and all appeals taken from any order entered or opinion issued by the Court in the HTA Title III Case, and the following litigation and adversary proceedings, each as defined in the HTA Plan, including all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings related thereto: (a) the Debt Related Objections, (b) the Invalidity Actions, (c) the Lien Challenge Actions, (d) the Lift Stay Motions, (e) the Clawback Actions, and (f) the Avoidance Actions listed in Exhibit A to the HTA Plan.

4.   _Burden of Proof_.  The Debtor has the burden of proving satisfaction of the requirements of section 314 of PROMESA and by a preponderance of the evidence.  As explained below, the HTA Plan meets the applicable requirements of section 314 of PROMESA.

## **General Background**

### **A.   The Oversight Board and the HTA Title III Case**

5.   For more than a decade, Puerto Rico has faced an unprecedented fiscal and economic crisis.  Actions taken in the past caused Puerto Rico to lose access to capital markets and precipitated the collapse of Puerto Rico's public finance system.  See PROMESA § 405(m). Puerto Rico's fiscal and economic crisis has been further exacerbated by the devastation caused to Puerto Rico by Hurricanes Irma and Maria in 2017, the earthquakes that occurred in early 2020, and the COVID-19 pandemic.  (Skeel Decl. ¶¶ 21, 23-24.)  Puerto Rico was hit by a further destructive hurricane in September 2022.

6.   On June 30, 2016, the United States enacted PROMESA, and the Oversight Board was established pursuant to section 101(b) of PROMESA.  (Id. ¶ 10.)  Pursuant to section 4 of

PROMESA and Article VI of the Constitution of the United States, the provisions of PROMESA prevail over any inconsistent general or specific provisions of territory law, State law, or regulation.  See PROMESA § 4.

7.    On August 31, 2016, President Obama appointed the Oversight Board's original seven voting members.  (Skeel Decl. ¶ 11.)

8.    The Oversight Board designated HTA as a "covered territorial instrumentality" pursuant to section 101(d) of PROMESA.  (Id. ¶ 18.)

9.    On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to sections 104(j) and 206 of PROMESA, and filed a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA, thereby commencing a case under Title III of PROMESA (the "Commonwealth Title III Case").  (See Docket Entry No. 1 in Case No. 17-3283.)

10.    On May 21, 2017, the Oversight Board issued a restructuring certification pursuant to sections 104(j) and 206 of PROMESA, and filed a voluntary petition for relief for HTA pursuant to section 304(a) of PROMESA, thereby commencing the HTA Title III Case. (See Docket Entry No. 1.)

11.    On June 15, 2017, the U.S. Trustee filed a notice appointing the Official Committee of Unsecured Creditors (the "Creditors' Committee") in the Commonwealth Title III Case (Docket Entry No. 338 in Case No. 17-3283) and, on August 25, 2017, the U.S. Trustee amended that notice of appointment to provide that the Creditors' Committee would also serve in the HTA Title III Case (Docket Entry No. 1171 in Case No. 17-3283).

12.    On June 23, 2017, the Court entered an *Order Appointing Mediation Team*, to be led by Chief Bankruptcy Judge Barbara Houser.  (Docket Entry No. 430 in Case No. 17-3283.)

13.     On June 29, 2017, the Court entered an order providing for the joint administration of the Commonwealth Title III Case and the HTA Title III Case, for procedural purposes only.  (Docket Entry No. 168.)

**B.     The Plan Support Agreements, HTA Plan, and HTA Disclosure Statement**

14.     The Oversight Board, either directly or through its advisors, engaged in extensive mediation sessions under the guidance and direction of the Mediation Team, and continued to negotiate directly with various constituencies, all in an effort to build support for the restructuring of Commonwealth and HTA debt.  (Skeel Decl. ¶ 32.)  Those negotiations culminated in certain agreements with various stakeholders in furtherance of the successful implementation of the HTA Plan.  (Id.; see also Debtor's Exs. 14-16, Docket Entry Nos. 1299-16-1299-18.)

15.     On April 12, 2021, the Oversight Board announced it had reached an agreement in principle with Assured and National to settle, among other things, claims against the Commonwealth and HTA related to HTA Allocable Revenues, and to restructure, among other things, the HTA Bonds.  (Skeel Decl. ¶ 118.)  Thereafter, on May 5, 2021, the Oversight Board entered into an agreement with certain holders and insurers of HTA Bonds and certain holders and insurers of CCDA Bonds, regarding the proposed treatment and settlement of outstanding disputes between HTA, the Commonwealth, and the other parties to the HTA/CCDA PSA, including certain "clawback claims" against the Commonwealth (the "HTA/CCDA PSA" or the "HTA/CCDA Plan Support Agreement").  (Debtor's Ex. 14, Docket Entry No. 1299-16.)  The HTA/CCDA PSA, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, (ii) provided for the issuance of new bonds by HTA and Contingent Value Instruments ("CVIs") by the Commonwealth,  (iii) provided for $184.8 million

in cash to holders of claims against HTA arising from or relating to the HTA 68 Bonds and

$79.2 million in cash to holders of claims against HTA arising from or relating to HTA 98 Senior

Bonds upon satisfaction of the HTA Distribution Conditions, (iv) provides for the bondholders

and insurers to support the HTA Plan, and (v) provides an agreement regarding the structure of a

potential plan of adjustment for HTA.  (Skeel Decl. ¶¶ 33, 118; Debtor's Ex. 14, Docket Entry

No. 1299-16.)

16.     Following entry into the HTA/CCDA Plan Support Agreement, negotiations

continued between the Oversight Board and monoline insurers, Ambac Assurance Corporation

("Ambac"), and Financial Guaranty Insurance Company ("FGIC") under the guidance of the

Mediation Team.  (Skeel Decl. ¶ 34.)  As a result of those negotiations, on July 15, 2021, Ambac

and FGIC joined the HTA/CCDA Plan Support Agreement pursuant to separate Joinder

Agreements to the HTA/CCDA Plan Support Agreement, subject to a right to terminate the

HTA/CCDA Plan Support Agreement solely as to themselves, which right expired on July 26,

2021.  (Id.)

17.     On November 5, 2021, the Oversight Board reached an agreement with

AmeriNational Community Services, LLC (as servicer for the GDB Debt Recovery Authority

(the "DRA")), and Cantor-Katz Collateral Monitor LLC (a Delaware limited liability company

and as collateral monitor for Wilmington Trust, N.A.) (collectively, the "DRA Parties"),

regarding the proposed treatment and settlement of, among other things, the DRA's claims

against HTA (the "DRA Stipulation").  (Id. ¶ 36; Debtor's Ex. 16, Docket Entry No. 1299-18.)

The DRA Stipulation, among other things, provides for the DRA Parties to (i) support the HTA

Plan and solicitation process, and (ii) vote to accept the HTA Plan.  (Skeel Decl. ¶¶ 36, 131-32;

Debtor's Ex. 16, Docket Entry No. 1299-18.)

18.     On January 18, 2022, the Court entered the *Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* (Docket Entry No. 19813 in Case No. 17-3283) (the "Commonwealth Confirmation Order"), confirming the Commonwealth Plan.  (Skeel Decl. ¶ 37; Debtor's Ex. 29, Docket Entry No. 1300-9.)  The Commonwealth Plan incorporated, among other things, the terms, provisions, and agreements for the settlement and compromise of various disputes relating to the Commonwealth as provided in the HTA/CCDA PSA and DRA Stipulation.  (Skeel Decl. ¶ 37.)  On March 15, 2022, the Commonwealth Plan became effective. (See Docket Entry No. 20349 in Case No. 17-3283.)

19.     Pursuant to the Commonwealth Plan and Commonwealth Confirmation Order, upon satisfaction of the HTA Distribution Conditions, (i) holders of Allowed CW/HTA Claims collectively received 68.6% of the Clawback CVI, a contingent value instrument that is based on sharing the potential outperformance of 5.5% of the Commonwealth's Sales and Use Taxes, relative to projections in the Commonwealth Fiscal Plan certified on May 27, 2020, and (ii) holders of claims against HTA arising from or relating to HTA 68 Bonds (as set forth in the HTA/CCDA Plan Support Agreement) (the "HTA 68 Bond Claims") received payment from HTA in the aggregate amount of $184.8 million in cash (the "HTA 68 Bond Cash"), and holders of claims against HTA arising from or relating to HTA 98 Senior Bonds (as set forth in the HTA/CCDA Plan Support Agreement) ("HTA 98 Senior Bond Claims" and, together with the HTA 68 Bond Claims, the "HTA Bond Claims") received payment from HTA in the aggregate amount of $79.2 million in cash (the "HTA 98 Senior Bond Cash" and, together with the HTA 68 Bond Cash, the "HTA Cash").  (Skeel Decl. ¶ 120.)  The principal amount of the HTA 68

Bonds and HTA 98 Senior Bonds, and corresponding HTA Bond Claims, was reduced by the amount of HTA Cash.  (Id.)  The HTA Distribution Conditions were satisfied on June 24, 2022 and the HTA Cash and Clawback CVIs were distributed pursuant to the terms of the Commonwealth Plan and Commonwealth Confirmation Order on or before July 11, 2022.  (Id.)

20.     On May 2, 2022, the Oversight Board filed the *Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1164) (the "Initial HTA Plan") and corresponding disclosure statement.  The Initial HTA Plan contained, among other things, the material terms outlined in the HTA/CCDA PSA and the DRA Stipulation as they relate to HTA.  (Skeel Decl. ¶ 38.)

21.     Following the filing of the Initial HTA Plan, the Oversight Board continued to negotiate with various stakeholders, including the Creditors' Committee, to generate further support for a plan of adjustment.  (Id. ¶ 39.)  On May 9, 2022, the Oversight Board reached an agreement with the Creditors' Committee, which provided for the terms of a recommended global settlement regarding the treatment of HTA General Unsecured Claims, including, among other things, the increase of the HTA GUC Recovery from $25 million to $48 million (the "HTA Committee Agreement").  (Id.; Debtor's Ex. 15, Docket Entry No. 1299-17.)

22.     On May 16, 2022, the Oversight Board filed the *Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1177) (the "First Amended HTA Plan") and corresponding disclosure statement.  The First Amended HTA Plan incorporated the material terms of the HTA Committee Agreement.  (Skeel Decl. ¶ 40.)

23.     On June 7, 2022, the Oversight Board filed the *Second Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1202)

(the "Second Amended HTA Plan") and corresponding disclosure statement.  The Second

Amended HTA Plan reflects other comments received from various parties in interest.  (Skeel

Decl. ¶ 41.)

24.     On June 17, 2022, the Oversight Board filed the *Third Amended Title III Plan of*

*Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1240)

(the "Third Amended HTA Plan") and the *Disclosure Statement for the Third Amended Title III*

*Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry

No. 1241) (the "HTA Disclosure Statement") (Debtor's Ex. 2, Docket Entry Nos. 1299-2,

1299-3.)  The HTA Plan reflects certain comments received from various parties in interest.

(Skeel Decl. ¶ 42.)

25.     On June 22, 2022, the Court entered the HTA Disclosure Statement Order which,

among other things, (a) approved the HTA Disclosure Statement as containing adequate

information within the meaning of section 1125 of the Bankruptcy Code, (b) established July 27,

2022, at 5:00 p.m. (Atlantic Standard Time) as the deadline by which (1) objections or responses

to confirmation of the HTA Plan were required to be filed (the "Confirmation Objection

Deadline"), (2) ballots to accept or reject the HTA Plan were required to be received by the

Solicitation Agent (the "Voting Deadline"), and (3) elections regarding the form of distributions

were required to be effectuated through the Automated Tender Offer Program ("ATOP") (the

"Election Deadline"), and (c) scheduled a hearing to be held on August 17 and 18, 2022, to

consider confirmation of the HTA Plan.  (Docket Entry No. 1248.)

26.     Consistent with the HTA Disclosure Statement Order, the Debtor caused the

Solicitation Agent to distribute Solicitation Packages to all holders of Claims entitled to vote.

(Mailing Aff.; Pullo Decl. ¶ 4.)  The Solicitation Packages contained, among other things: (a) the

HTA Confirmation Hearing Notice setting forth the time, date, and place of the HTA

Confirmation Hearing, (b) the HTA Disclosure Statement Order (without the exhibits thereto)

and the HTA Disclosure Statement (together with all exhibits thereto, including the HTA Plan),

(c) the appropriate form of Ballot or Notice, if any, with instructions for voting and/or making

any applicable election and, as applicable, a pre-addressed, pre-paid return envelope, and (d)

with respect to Class 16, the Creditors' Committee Letter.  (Solicitation Aff. ¶ 1.)  The Debtor

also caused the Solicitation Agent to publish the HTA Confirmation Hearing Notice and place

radio advertisements providing, among other things, information regarding the solicitation of

votes to accept or reject the HTA Plan and deadlines associated therewith.  (Pullo Decl. ¶ 7;

Publication Aff.)

27.     On August 7, 2022, the Oversight Board filed the *Fourth Amended Title III Plan*

*of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry

No. 1350) (the "Fourth Amended HTA Plan").

28.     On August 13, 2022, the Oversight Board filed the *Fifth Amended Title III Plan of*

*Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1377)

(the "Fifth Amended HTA Plan").

29.     On August 18, 2022, the Court entered the Meet and Confer Order directing

Assured and the Insured Bondholder Group to, among other things, meet and confer in an effort

to develop a resolution to the limited objection.  On August 23, 2022, Assured and the Insured

Bondholder Group filed the Joint Response, setting forth their agreed upon resolution to the

Insured Bondholder Group's limited objection.

30.     On August 24, 2022, the Court entered the Filing Order directing the Oversight

Board to submit a revised Fifth Amended HTA Plan and related materials with appropriate

revisions to address, among other things, the proposed resolution in the Joint Response.  The

deadline for the Oversight Board to submit such filings was extended to September 6, 2022

pursuant to the Extension Order.

31.     On September 6, 2022, in accordance with the Filing Order, the Oversight Board

filed the HTA Plan (which included revisions agreed to by Assured and the Insured Bondholder

Group resolving the limited objection filed by the Insured Bondholder Group), proposed HTA

Confirmation Order, proposed Findings of Fact and Conclusions of Law, and revised Plan

Supplement (which included, among other documents, the New HTA Bonds Indenture with

modifications consented to in accordance with the terms and provisions of the HTA/CCDA Plan

Support Agreement).

## Compliance with Sections 104(j) and 313 of PROMESA

32.     The Oversight Board must certify the submission or modification of a plan of

adjustment on behalf of a debtor in a case under Title III of PROMESA before submitting or

modifying such plan of adjustment.  See PROMESA § 104(j)(1)-(2).  The Oversight Board may

certify a plan of adjustment only if it determines, in its sole discretion, that the plan is consistent

with the applicable certified fiscal plan.  See id. § 104(j)(3).  The Oversight Board, after the

issuance of a certification pursuant to section 104(j) of PROMESA, may modify the plan at any

time before confirmation, but may not modify the plan so that the plan as modified fails to meet

the requirements of PROMESA Title III.  See id. § 313.  After the Oversight Board files a

modification, "the plan as modified becomes the plan."  Id.

33.     The Oversight Board has complied with its obligations pursuant to sections 104(j)

and 313 of PROMESA.  On February 22, 2022, the Oversight Board certified HTA's current

fiscal plan (the "HTA 2022 Fiscal Plan").  (Skeel Decl. ¶ 31; Debtor's Ex. 5, Docket Entry

No. 1299-6.)

34.     On April 28, 2022, the Oversight Board certified the submission of the Initial

HTA Plan.  (Debtor's Ex. 18, Docket Entry No. 1299-20.)  The Oversight Board subsequently

filed the Initial HTA Plan.

35.     On May 13, 2022, the Oversight Board certified the submission of the First

Amended HTA Plan.  (Debtor's Ex. 19, Docket Entry No. 1299-21.)  The Oversight Board

subsequently filed the First Amended HTA Plan.

36.     On June 7, 2022, the Oversight Board certified the submission of the Second

Amended HTA Plan.  (Debtor's Ex. 20, Docket Entry No. 1299-22.)  The Oversight Board

subsequently filed the Second Amended HTA Plan.

37.     On June 17, 2022, the Oversight Board certified the submission of the Third

Amended HTA Plan.  (Debtor's Ex. 21, Docket Entry No. 1300-1.)  The Oversight Board

subsequently filed the Third Amended HTA Plan.

38.     On August 5, 2022, the Oversight Board certified the submission of the Fourth

Amended HTA Plan.  (Debtor's Ex. 59, Docket Entry No. 1354-7.)  The Oversight Board

subsequently filed the Fourth Amended HTA Plan.

39.     On August 12, 2022, the Oversight Board certified the submission of the Fifth

Amended HTA Plan.  (Debtor's Ex. 64, Docket Entry No. 1379-2.)  The Oversight Board

subsequently filed the Fifth Amended HTA Plan.

40.     On August 26, 2022, the Oversight Board certified the submission of the HTA

Plan.  (Docket Entry No. 1405-2.)  The Oversight Board subsequently filed the HTA Plan.

41.     The Oversight Board submitted the HTA Plan in accordance with section 313 of

PROMESA.  For the reasons explained herein, the Court confirms the HTA Plan and holds that it

meets the requirements of PROMESA and that the Oversight Board has complied with all

provisions of PROMESA applicable to confirmation of the HTA Plan.

**Compliance with Section 314(b) of PROMESA**

A.      **PROMESA § 314(b)(1):** *The Plan Fully Complies with the Provisions of the Bankruptcy Code Made Applicable by PROMESA § 301.*

42.      As required by Bankruptcy Rule 3016(a), the HTA Plan is dated and it identifies

the Debtor as the proponent.  (HTA Plan at 1.)  In addition, as detailed below, the HTA Plan

satisfies the requirements of sections 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4),

1123(a)(5), 1123(b), and 1123(d) of the Bankruptcy Code.

i.      **Bankruptcy Code Section 1122(a)**

43.      With the exception of Administrative Expense Claims and Professional Claims,

which need not be classified, Article IV of the HTA Plan designates the classification of Claims.

The HTA Plan's classification of Claims complies with section 1122(a) of the Bankruptcy Code

because each Class contains only claims that are either all unsecured Claims or are all secured

Claims secured by the same collateral, or are otherwise substantially similar to the other claims

in the class.  (Skeel Decl. ¶ 50.)  The HTA Plan designates the following twenty (20) Classes of

Claims:

| Claim | Class |
|-------|-------|
| HTA 68 Bond Claims | 1 |
| HTA 68 Bond Claims (Ambac) | 2 |
| HTA 68 Bond Claims (Assured) | 3 |
| HTA 68 Bond Claims (National) | 4 |
| HTA 98 Senior Bond Claims | 5 |
| HTA 98 Senior Bond Claims (Ambac) | 6 |
| HTA 98 Senior Bond Claims (Assured) | 7 |
| HTA 98 Senior Bond Claims (FGIC) | 8 |
| HTA 98 Senior Bond Claims (National) | 9 |

| Claim | Class |
|-------|-------|
| HTA 98 Sub Bond Claims | 10 |
| HTA 98 Sub Bond Claims (Assured) | 11 |
| HTA 98 Sub Bond Claims (FGIC) | 12 |
| HTA 98 Sub Bond Claims (National) | 13 |
| HTA Moscoso Bond Claims | 14 |
| Eminent Domain/Inverse Condemnation Claims | 15 |
| HTA General Unsecured Claims | 16 |
| HTA/GDB Claims | 17 |
| Section 510(b) Subordinated Claims | 18 |
| Convenience Claims | 19 |
| Federal Claims | 20 |

(Id.)

44.     The classification of Claims set forth in the HTA Plan is reasonable and was not done to control the outcome of voting to accept or reject the HTA Plan, as the classification is based upon differences in the legal nature and/or priority of such Claims in accordance with applicable law.  Separate classification is used for governmental or business reasons usually requiring different treatment of separate Classes' Claims.  (Id. ¶ 51.)

45.     Bond claims against HTA in Classes 1-14 of the HTA Plan are classified separately based on the seniority, and security claimed by holders of, different bond issuances and whether the bonds are insured and, if so, the insurer, as follows: (a) bonds issued by HTA pursuant to Resolution No. 68-18, adopted June 13, 1968, as amended and supplemented thereafter (Classes 1-4), senior bonds issued by HTA pursuant to Resolution 98-06, adopted February 16, 1998 (Classes 5-9), subordinated bonds issued by HTA pursuant to Resolution 98-06, adopted February 16, 1998 (Classes 10-13), or Special Facility Revenue Refunding Bonds, 2003 Series A, issued by HTA pursuant to that certain Trust Agreement, dated as of October 1, 2003, between HTA and Banco Popular de Puerto Rico, as trustee (Class 14), and (b) whether

the bonds are (i) uninsured (Classes 1, 5, 10, and 14), or (ii) insured by Assured (Classes 3, 7, and 11), National (Classes 4, 9, and 13), FGIC (Classes 8 and 12), or Ambac (Classes 2 and 6). (Id.)

46.     Eminent Domain/Inverse Condemnation Claims are separately classified in Class 15 of the HTA Plan.  (Id. ¶ 52.)  The holders of such Claims assert that they hold prepetition constitutional Claims based on seizures or the inverse condemnation of real property pursuant to HTA's eminent domain power.  (Id.)  The Debtor alleges that the Eminent Domain/Inverse Condemnation Claims are partially secured by funds deposited by HTA with the Clerk of the Court of First Instance in connection with condemnation proceedings underlying such Claims in accordance with Puerto Rico law, 32 L.P.R.A. § 2907.  In accordance with applicable Puerto Rico law, upon commencement of a condemnation proceeding, title to a subject property is transferred to HTA and funds on deposit become available to the former title holder.[11]  32 L.P.R.A. § 2907.  The HTA Plan treats the Eminent Domain/Inverse Condemnation Claims as secured Claims to the extent the Claims are allowable and there is cash on deposit for them.  The HTA Plan further provides that the amount of the Claim in excess of the deposit, if any, will be paid in full upon entry of separate Final Orders (i) setting the amount of Allowed Claims for just compensation, and (ii) determining that such claims may not be impaired or discharged.  (Skeel Decl. ¶ 52.)  The Oversight Board filed an appeal from the portion of the Commonwealth Confirmation Order and the *Findings of Fact and Conclusions of Law in*

---

[11]     If the Commonwealth does not initiate a condemnation proceeding following applicable eminent domain procedures, or if the taking is the result of the diminution of the property's use or value resulting from government conduct, the former owner of property may initiate a claim for inverse condemnation for the taking of property for public use without just compensation.  See, e.g., Filler v. United States, 116 Fed. Cl. 123, 127 n.2 (Fed. Cl. 2014).

*Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment*
*of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of*
*the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* (Docket
Entry No. 19812 in Case No. 17-3283) (the "Commonwealth Findings of Fact and Conclusions
of Law") holding that the Eminent Domain/Inverse Condemnation Claims against the
Commonwealth may not be impaired or discharged.  On July 18, 2022, the United States Court
of Appeals for the First Circuit (the "First Circuit") issued an opinion affirming the portion of the
Commonwealth Confirmation Order and Commonwealth Findings of Fact and Conclusions of
Law holding that the Eminent Domain/Inverse Condemnation Claims against the
Commonwealth are nondischargeable.  See Fin. Oversight & Mgmt. Bd. for P.R. v. Cooperativa
de Ahorro y Credito Abraham Rosa (In re Fin. Oversight & Mgmt. Bd. for P.R.), 41 F.4th 29, 46
(1st Cir. 2022).  The First Circuit's decision is not yet a Final Order, and the Oversight Board has
advised the Court that it intends to file a petition for writ of certiorari with the Supreme Court of
the United States for review of the First Circuit's opinion affirming the portion of the
Commonwealth Confirmation Order and Commonwealth Findings of Fact and Conclusions of
Law holding that the Eminent Domain/Inverse Condemnation Claims against the
Commonwealth are nondischargeable.  If the Supreme Court reverses this portion of the
Commonwealth Confirmation Order and Commonwealth Findings of Fact and Conclusions of
Law, the HTA Plan provides, the Eminent Domain/Inverse Condemnation Claims will receive
payments from HTA equal to, and on the same timeframe as, the payments to be made to holders
of Allowed HTA General Unsecured Claims to the extent each allowable Claim exceeds the cash
on deposit for it.

47.     Class 16 of the HTA Plan consists of Claims against HTA, other than those

excluded pursuant to section 1.198 of the HTA Plan, or otherwise treated in other Classes under

the HTA Plan.  (Skeel Decl. ¶ 53.)  The Claims in Class 16 of the HTA Plan are unsecured and

substantially similar to the other Claims in this Class.[12]  (Id.)

48.     Class 17 of the HTA Plan consists of Claims against HTA with respect to loans

extended by GDB to HTA, other than any Claims in Classes 1-14.  (Id. ¶ 54.)  These Claims are

classified separately because, pursuant to the terms and provisions of the DRA Stipulation, the

DRA, as holder of the HTA/GDB Claims, has agreed to receive no distribution on account of its

HTA/GDB Claims.  (Id.)  Accordingly, separate classification of such Claims is reasonable and

justified.

49.     Class 18 of the HTA Plan consists of Claims determined pursuant to a Final Order

to be subject to section 510(b) of the Bankruptcy Code.  (Id. ¶ 55.)  Section 510(b) of the

Bankruptcy Code subordinates such Claims to other general unsecured claims, and provides that

such Claims are only eligible to receive a recovery pursuant to the HTA Plan once all other

unsecured creditors have been paid in full.  Because these Claims have a lower priority than

general unsecured claims, they are sufficiently dissimilar to general unsecured claims to warrant

separate classification and treatment.  (Id.)

50.     Class 20 of the HTA Plan consists of Claims of the United States of America, its

agencies, departments or agents, including, without limitation, the United States Department of

Housing and Urban Development, the United States Department of Homeland Security, and the

---

[12]     The Vazquez Velazquez Group contends that their claim against HTA is
nondischargeable and therefore it is improper to treat them as regular unsecured creditors
pursuant to Class 16 and their claim merits its own class in the HTA Plan.  (See Vazquez
Velazquez Obj. ¶ 11.)  For the reasons explained below, the Court finds that the Vazquez
Velazquez Group's claim is not exempt from discharge and the Vazquez Velazquez
Objection is overruled.  Accordingly, the Vazquez Velazquez Group's claim is not
substantially dissimilar to the other Claims in Class 16.   See infra note 14.

United States Department of Labor.  (Id. ¶ 56.)  Due to the unique relationship of the
Commonwealth and its instrumentalities, including HTA, with the federal government and its
instrumentalities, as well as the long-term nature of many federal programs, it is reasonable and
justified to classify such Federal Claims separately.  (Id.)

51.     As each Class contains Claims substantially similar to each other, the HTA Plan
satisfies the requirements of section 1122(a) of the Bankruptcy Code.

### ii.     Bankruptcy Code Section 1122(b)

52.     Class 19 consists of Convenience Claims, comprising Claims equal to or less than
$20,000, or Claims which the holder elects to reduce to $20,000 pursuant to the HTA Plan.
(HTA Plan § 1.83.)  Any holder of multiple Claims in an aggregate amount of $40,000 or more
may elect to reduce all such Claims to an aggregate amount of $40,000 and be treated within
Class 19.  (HTA Plan § 1.83, Art. XX.) The separate classification of Convenience Claims is
reasonable and necessary to ease the administrative burden on the Debtor.  (See Skeel Decl.
¶ 57.)

53.     The HTA Plan satisfies the requirements of section 1122(b) of the
Bankruptcy Code.

### iii.     Bankruptcy Code Section 1123(a)(1)

54.     Section 4.1 of the HTA Plan designates twenty (20) separate Classes of Claims
for the Debtor, other than Claims of the type described in section 507(a)(2) of the Bankruptcy
Code.  (See id. ¶ 58.)

55.     The HTA Plan satisfies the requirements of section 1123(a)(1) of the
Bankruptcy Code.

### iv.     Bankruptcy Code Section 1123(a)(2)

56.     Section 33.1 of the HTA Plan specifies that Claims in Classes 1, 2, 3, 4, 5, 6, 7, 8,

9, 10, 11, 12, 13, 15, 16, 17, 18, and 20 are impaired.  (<u>Id.</u> ¶ 59.)  Section 33.2 of the HTA Plan

specifies that Claims in Classes 14 and 19 are unimpaired pursuant to the HTA Plan.  (<u>Id.</u> ¶ 60.)

57.     The HTA Plan satisfies the requirements of section 1123(a)(2) of the

Bankruptcy Code.

### v.     Bankruptcy Code Section 1123(a)(3)

58.     Articles V through XXIV of the HTA Plan identify the treatment of each Class of

Claims impaired by the HTA Plan.  (<u>Id.</u> ¶ 61.)

59.     The HTA Plan satisfies the requirements of section 1123(a)(3) of the

Bankruptcy Code.

### vi.     Bankruptcy Code Section 1123(a)(4)

60.     Articles V through XXIV of the HTA Plan provide that the treatment of each

Claim in each particular Class is the same as the treatment of each other Claim in such Class,

except to the extent a holder of an Allowed Claim has agreed to less favorable treatment of its

Claim.  (<u>Id.</u> ¶ 62.)

61.     Certain parties are receiving payment of the Consummation Costs, HTA PSA

Restriction Fees, or DRA Restriction Fee pursuant to the HTA Plan and in accordance with the

HTA/CCDA Plan Support Agreement or the DRA Stipulation negotiated by the Oversight

Board.  (<u>See</u> <u>id.</u> ¶ 63; Debtor's Exs. 14, 16, Docket Entry Nos. 1299-16, 1299-18.)  The

Consummation Costs, HTA PSA Restriction Fees, and DRA Restriction Fee are not awarded on

account of the respective creditors' Claims, but rather, (i) the Consummation Costs are provided

in consideration of certain creditors' assistance in the formulation of the HTA Plan for all

creditors and to compensate them for the reasonable fees and expenses incurred in connection

with the negotiation and execution of the HTA/CCDA Plan Support Agreement benefitting

classes of creditors, which made development of the HTA Plan possible; and (ii) the HTA PSA

Restriction Fees and DRA Restriction Fee are provided in connection with certain parties'
commitment to support the confirmation of the HTA Plan and, in connection therewith, to "lock
up" their bonds pursuant to the terms of the HTA/CCDA Plan Support Agreement or the DRA
Stipulation, as applicable. (See Skeel Decl. ¶ 63.)

62.    The Oversight Board has determined, and this Court finds, that it is reasonable for
the HTA/CCDA PSA Creditors to be paid the Consummation Costs as consideration for their
efforts in assisting in the formulation of the HTA Plan that has garnered significant creditor
support, and to compensate the HTA/CCDA PSA Creditors for fees and expenses incurred in
connection with the negotiation and execution of the HTA/CCDA PSA. (Id. ¶ 143; Debtor's
Ex. 14, Docket Entry No. 1299-16.)

63.    Additionally, in exchange for agreeing to support the HTA Plan and tender or
"lock up" their HTA 68 Bonds and HTA 98 Senior Bonds in accordance with the HTA/CCDA
PSA, the Oversight Board has determined, and this Court finds that, it is reasonable to make the
HTA PSA Restriction Fees available to each applicable HTA bondholder party to the
HTA/CCDA PSA. (Skeel Decl. ¶ 143; Debtor's Ex. 14, Docket Entry No. 1299-16.)

64.    Similarly, in exchange for executing the DRA Stipulation and agreeing to all of its
terms and conditions, including agreeing to support the HTA Plan and "lock up" their HTA 98
Senior Bonds and HTA/GDB Claims in connection with the DRA Stipulation, the Oversight
Board has determined, and this Court finds that, it is reasonable to make the DRA Restriction
Fee available to each DRA bondholder party to the DRA Stipulation. (Skeel Decl. ¶ 143;
Debtor's Ex. 16, Docket Entry No. 1299-18.)

65.    The provisions for payment of the Consummation Costs, HTA PSA Restriction
Fees, and DRA Restriction Fee are critical components of the HTA/CCDA PSA and DRA

Stipulation that made development of the HTA Plan possible.  (See Skeel Decl. ¶ 143.)  The

payment of the Consummation Costs, HTA PSA Restriction Fees, and DRA Restriction Fee to

certain parties does not violate section 1123(a)(4) of the Bankruptcy Code, which mandates that

"a plan shall . . . provide the same treatment for each claim or interest of a particular class . . . ."

11 U.S.C.A. § 1123(a)(4) (Westlaw through P.L. 117-166).  While it is true that all claims must

be treated equally, the same is not true for all claimants.  See 7 Collier on Bankruptcy

¶ 1123.01[4][b] (16th ed. 2022) ("The equality addressed by section 1123(a)(4) extends only to

the treatment of members of the same class of claims and interests, and not to the plan's overall

treatment of the creditors holding such claims or interests . . . . Creditors should not confuse

'equal treatment of claims with equal treatment of claimants.'"); see also Ad Hoc Comm. of

Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.), 582 B.R.

771, 781 (E.D. Mo. 2017) (same); In re Adelphia Commc'ns Corp., 368 B.R. 140, 249-50

(Bankr. S.D.N.Y. 2007) ("[C]ourts have held that the statute does not require identical treatment

for all class members in all respects under a plan, and that the requirements of section 1123(a)(4)

apply only to a plan's treatment *on account of particular claims* or interests in a specific class—

not the treatment that members of the class may separately receive under a plan on account of the

class members' other rights or contributions.") (emphasis in original).  Accordingly, the payment

of the Consummation Costs, HTA PSA Restriction Fees, and DRA Restriction Fee is consistent

with section 1123(a)(4) of the Bankruptcy Code.[13]

---

[13]    In resolution of the Limited Objection of the HTA Insured Bondholder Group to the
Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and
Transportation Authority (Docket Entry No. 1301) (the "IBG Objection"), Assured
Guaranty Corp. and Assured Guaranty Municipal Corp. (together, "Assured") and
Franklin Advisers, Inc. and Nuveen Asset Management (collectively, the "Insured
Bondholder Group") proposed revisions to the HTA Plan and related materials preserving
the Insured Bondholder Group's ability to challenge whether certain bonds held by the

### vii.    Bankruptcy Code Section 1123(a)(5)

66.    Various provisions of the HTA Plan provide adequate and proper means for its

implementation:

- Article II of the HTA Plan provides for the terms of the operational restructuring of HTA consistent with the HTA 2022 Fiscal Plan;

- Article III of the HTA Plan provides for the payment of Administrative Expense Claims required to be paid on the later of the (i) HTA Effective Date or (ii) the date on which an Administrative Expense Claim shall become an Allowed Claim;

- Section 25.1 of the HTA Plan provides for the issuance and distribution of the New HTA Bonds;

- Section 25.3 of the HTA Plan ensures the feasibility of the present HTA Plan by providing for the adoption and maintenance of a debt management policy "designed to ensure that certain past Debt issuance practices of HTA are not repeated;"

- Section 27.1 of the HTA Plan provides, subject to sections 27.5 and 27.7 of the HTA Plan, that "all Executory Contracts and Unexpired Leases that exist between the Debtor and any Entity, and which have not expired by their own terms on or

---

Insured Bondholder Group could be subject to acceleration upon notice per section 26 of the HTA Plan.  (See, e.g., HTA Plan § 26.2.)  Although the resolution raises concerns under 11 U.S.C. § 1123(a)(4) because only the Insured Bondholder Group will retain challenge rights, the Court finds that: (1) the treatment of the claims in Class 7 is in all other aspects identical; (2) it is not clear that the Insured Bondholder Group's claims are receiving any additional benefit or more favorable treatment than the rest of Class 7, and that is clearly not the intent of preserving the Insured Bondholder Group's ability to challenge acceleration—Assured has stated in good faith its belief that any challenge, if ever brought, will be unsuccessful (see, e.g., Aug. 17, 2022 Hr'g Tr. 46:15-24); (3) the objection concerns an intercreditor dispute that is not ripe for the Court to decide presently, and may never ripen as the objection concerns an option to accelerate bonds upon notice and right to challenge that option both of which  may never be exercised; (4) to the extent that any challenge is successful and results, at some future date, in more favorable treatment of the Insured Bondholder Group's claims, the other claimants in Class 7 made their elections under the HTA Plan on a fully-informed basis and declined to object to the HTA Disclosure Statement, to the voting provisions approved by the Court in the HTA Disclosure Statement Order, or to confirmation of the HTA Plan— thus, the claimants have agreed to the proposed treatment.  Accordingly, the treatment of Class 7 is consistent with section 1123(a)(4) of the Bankruptcy Code and, as a result of the resolution incorporated into the HTA Plan and related materials, the IBG Objection is moot.

prior to the HTA Effective Date, shall be deemed rejected by the Debtor as of the HTA Effective Date, except for any Executory Contract and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the HTA Effective Date, (b) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, or (g) by or between any Commonwealth agencies, departments, municipalities, public corporations or instrumentalities . . . ."

- Article XXVIII of the HTA Plan provides for distributions to be made to holders of all Allowed Claims under the HTA Plan;

- Sections 1.52 and 29.1 of the HTA Plan provide for the authority to litigate and compromise and settle the Avoidance Actions to be transferred to the Avoidance Actions Trust on the HTA Effective Date and to be administered pursuant to the Avoidance Actions Trust Agreement;

- Section 31.2 of the HTA Plan vests in the Disbursing Agent, among other things, the power to issue distributions contemplated by the HTA Plan;

- Article XXXII of the HTA Plan provides for the Debtor to reconcile, and to the extent ultimately allowed, pay, any and all Disputed Claims;

- Article XXXVII of the HTA Plan provides that, "[o]n the HTA Effective Date, all matters provided for under the HTA Plan that would otherwise require approval of the directors of the Debtor or Reorganized HTA, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New HTA Bonds, the authorization to enter into the Definitive Documents, the adoption of Reorganized HTA By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized HTA pursuant to the HTA Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New HTA Bonds Indenture, and the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule. Other matters provided under the HTA Plan involving the corporate structure of Reorganized HTA or corporate action by Reorganized HTA, as applicable, shall be deemed to have occurred, be authorized, and shall be in effect in accordance with the New HTA Bonds Indenture, and the new corporate governance documents, as applicable, and without requiring further action by any Entity under any other applicable law, regulation, order, or rule"; and

- Section 41.1 of the HTA Plan provides for the re-vesting of assets: "[e]xcept as provided in the HTA Confirmation Order, on the HTA Effective Date, title to all Assets and properties of the Debtor encompassed by the HTA Plan shall vest in Reorganized HTA, free and clear of all Liens, including, without limitation, any Lien upon or security interest in the SIB Account, but expressly excluding Liens granted pursuant to the HTA Plan and the HTA Confirmation Order."

(See Skeel Decl. ¶ 64; see generally HTA Plan.)

67.     The Plan Supplement contains, among other things, the forms of (a) the New HTA Bonds Indenture, as supplemented, (b) the Amended and Restated Avoidance Actions Trust Agreement, (c) the Schedule of Executory Contracts and Unexpired Leases to be Assumed, (d) the Ambac Custodial Trust Documents, (e) the Assured Custodial Trust Documents, (f) the FGIC Trust Agreement, and (g) Initial Board of Directors of Reorganized HTA.  (See generally Plan Supplement.)  The HTA Plan, together with the documents and arrangements set forth in the Plan Supplement, provides adequate means for its implementation.

68.     The HTA Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

### viii.     Bankruptcy Code Section 1123(b)(1)

69.     Article XXXIII of the HTA Plan identifies which Classes of Claims are impaired and which Classes of Claims are left unimpaired.

70.     The HTA Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

### ix.     Bankruptcy Code Section 1123(b)(2)

71.     Article XXVII of the HTA Plan provides that, "all Executory Contracts and Unexpired Leases that exist between the Debtor and any Entity, and which have not expired by their own terms on or prior to the HTA Effective Date, shall be deemed rejected by the Debtor as of the HTA Effective Date, except for any Executory Contract and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to

the HTA Effective Date, (b) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, or (g) by or between any Commonwealth agencies, departments, municipalities, public corporations or instrumentalities; provided, however, that the Debtor reserves the right, on or prior to the HTA Effective Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the HTA Effective Date." (HTA Plan § 27.1; see also Plan Suppl. Ex. C.)

72.     The HTA Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

### x.     Bankruptcy Code Section 1123(b)(3)(A)

73.     The Commonwealth Plan and the HTA Plan, as well as the related plan support agreements, set forth the terms and conditions for a global compromise and integrated settlement of, among other issues, asserted and unasserted disputes concerning the rights of holders of HTA 68 Bond Claims and HTA 98 Bond Claims including the disputes: (a) raised by certain holders of CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally appropriated to HTA, as applicable, and "clawed back" by the Commonwealth pursuant to the provisions of the Commonwealth Constitution, (b) relating to the validity, priority, secured status and related rights attendant to the GDB HTA

Loans, and (c) raised by the Lift Stay Motions and the Clawback Actions relating to the

CW/HTA Claims and certain holders' asserted security interest in toll and fine revenues

collected by HTA.  (Skeel Decl. ¶ 68.)  The settlement and compromise of such issues as they

relate to the Commonwealth were approved pursuant to the Commonwealth Confirmation Order,

and they are in the best interests of HTA and its creditors and well within the range of

reasonableness.

74.     Accordingly, the HTA Plan is consistent with section 1123(b)(3)(A) of the

Bankruptcy Code.

### xi.     Bankruptcy Code Section 1123(b)(3)(B)

75.     Section 1.53 of the HTA Plan references the Avoidance Actions Trust Agreement,

dated March 15, 2022, entered into by the Commonwealth in connection with the consummation

of the Commonwealth Plan.  Section 1.52 of the HTA Plan provides that, on the HTA Effective

Date, the authority to litigate or compromise and settle the Avoidance Actions, relating to HTA,

will be transferred to the Avoidance Actions Trust, established by the Commonwealth Plan.

76.     Section 29.1 of the HTA Plan provides that: "[e]xcept as settled and released

herein, from and after the HTA Effective Date, the Avoidance Actions Trustee shall have the

exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b)

compromise and settle such Avoidance Actions, upon approval of the Title III Court."  (HTA

Plan § 29.1.)

77.     Further, section 32.1(a) of the HTA Plan states: "[e]xcept with respect to Allowed

Claims, and subject to the terms and conditions of the ADR Procedures and the ADR Order,

Reorganized HTA, by and through the Oversight Board, and in consultation with AAFAF, shall

object to, and shall assume any pending objection filed by the Debtor to, the allowance of Claims

filed with the Title III Court with respect to which it disputes liability, priority or amount,

including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto.  All objections, affirmative defenses and counterclaims shall be litigated to Final Order; provided, however, that Reorganized HTA, by and through the Oversight Board, and in consultation with AAFAF, shall have the authority to file, settle, compromise or withdraw any objections to Claims, without approval of the Title III Court."  (HTA Plan § 32.1(a).)

78.    The HTA Plan is consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

### xii.    Bankruptcy Code Section 1123(b)(4)

79.    The HTA Plan does not provide for the sale of all or substantially all of the property of HTA, but instead, provides for HTA to undergo an operational restructuring.  (Skeel Decl. ¶ 73; HTA Plan § 2.4.)

80.    The HTA Plan is consistent with section 1123(b)(4) of the Bankruptcy Code.

### xiii.    Bankruptcy Code Section 1123(b)(5)

81.    Articles V through XXIV of the HTA Plan modify the rights of holders of Claims in the Impaired Classes, and leave unaffected the rights of holders of Claims in the Unimpaired Classes.  (Skeel Decl. ¶ 74.)

82.    The HTA Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

### xiv.    Bankruptcy Code Section 1123(b)(6)

83.    Article XLI of the HTA Plan provides for, among other things, (a) certain releases, injunctions, and exculpations described below in paragraphs 155-163, and (b) an exemption from registration pursuant to section 1145 of the Bankruptcy Code for the issuance and distribution of the New HTA Bonds.  (Id. ¶ 75.)

84.    The HTA Plan is consistent with section 1123(b)(6) of the Bankruptcy Code.

### xv.    Bankruptcy Code Section 1123(d)

85.    Section 27.4 of the HTA Plan provides for the payment of cure amounts required to be paid to the counterparties of Executory Contracts and Unexpired Leases assumed, or assumed and assigned pursuant to the HTA Plan.  Any cure amounts will be determined in accordance with the underlying agreements and applicable non-bankruptcy law, and pursuant to the procedures established by the HTA Plan.  (Id. ¶ 76.)

86.    The HTA Plan is consistent with section 1123(d) of the Bankruptcy Code.

### xvi.    Bankruptcy Code Section 1129(a)(2)

87.    The Debtor has (i) complied with provisions of the Bankruptcy Code and PROMESA applicable to confirmation of the HTA Plan, except as otherwise provided or permitted by orders of this Court, and (ii) complied with the applicable provisions of the Bankruptcy Code, PROMESA, the Bankruptcy Rules, the Local Rules, and the HTA Disclosure Statement Order in transmitting the HTA Disclosure Statement, the HTA Plan, the Ballots, the Election Notices, and related documents, and in soliciting and tabulating votes on the HTA Plan.

88.    The Oversight Board, with the assistance of its professionals, and in coordination with AAFAF, expended significant time and effort preparing the HTA Disclosure Statement (Debtor's Ex. 2, Docket Entry Nos. 1299-2, 1299-3), and sought and received input and comment thereon from other parties in interest.  (Skeel Decl. ¶ 77.)  This Court approved the HTA Disclosure Statement as containing adequate information and meeting the requirements of sections 1125 and 1126 of the Bankruptcy Code.  (Id.)  The Debtor has properly solicited and tabulated votes on the HTA Plan.  (Id.; see generally Pullo Decl.)

89.    The Oversight Board, as proponent of the HTA Plan, is the duly-appointed representative of the Debtor in its Title III Case as provided pursuant to PROMESA and has acted in accordance with applicable law in proposing the HTA Plan.

90.     The Debtor has complied with section 1129(a)(2) of the Bankruptcy Code.

### xvii.    Bankruptcy Code Section 1129(a)(3)

91.     The HTA Plan was proposed in good faith with the legitimate purpose to provide a means for the Debtor to achieve fiscal responsibility and access to capital markets, consistent with the purposes of PROMESA.  (Skeel Decl. ¶ 78.)  In determining that the HTA Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the HTA Title III Case, the HTA Plan itself, the lengthy process leading to the HTA Plan's formulation (including the compromises, settlements, and releases incorporated therein), and the process associated with the HTA Plan's prosecution.  The Debtor's good faith is evident from the facts and records of the HTA Title III Case, the HTA Disclosure Statement and the hearing thereon, and the record of the HTA Confirmation Hearing and other proceedings held in the HTA Title III Case, including related adversary proceedings.  The HTA Plan (including the settlements and compromises contained therein) is the result of extensive arm's length negotiations among the parties, including through mediation led by former Chief Bankruptcy Judge Barbara Houser.

92.     The Oversight Board has worked to develop consensus with creditors and to evaluate HTA's current and future financial circumstances.  These circumstances have been subject to constant change as the Oversight Board, HTA, creditors, and the people of Puerto Rico have fought to address the Island's needs and develop a path to fiscal responsibility in the midst of multiple major hurricanes, earthquakes, and other natural disasters, as well as the impact of the global COVID-19 pandemic.  (Id. ¶ 79.)  The HTA Plan represents the culmination of those efforts and the substantial input of each key stakeholder.  (Id. ¶ 80.)

93.     The HTA Plan (including all other agreements, documents, and instruments necessary to effectuate the HTA Plan) achieves a rational adjustment of the Debtor's debts, and

properly distributes value to creditors, including through the implementation of (a) parties' elections with respect to distributions and/or (b) the settlements pursuant to the HTA Plan. The HTA Plan was proposed with the legitimate and honest purpose of implementing the settlements and compromises of numerous risky and costly disputes, while avoiding protracted litigation that could delay distributions to creditors. (Id.)

94.     The HTA Plan complies with section 1129(a)(3) of the Bankruptcy Code.

### xviii.    Bankruptcy Code Section 1129(a)(6)

95.      The HTA Plan contemplates certain toll rate increases; however, such increases do not require the approval of any governmental regulatory commission with jurisdiction over HTA and such toll rate increases. (Mem. of Law ¶ 110; Skeel Decl. ¶ 81.) Accordingly, section 1129(a)(6) of the Bankruptcy Code does not apply.

### xix.    Bankruptcy Code Section 1129(a)(8)

96.     Pursuant to the HTA Disclosure Statement Order, the Title III Court approved the HTA Disclosure Statement (Debtor's Ex. 2, Docket Entry Nos. 1299-2, 1299-3) and found, among other things, that the HTA Disclosure Statement contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code and directed the Debtor to solicit acceptances and rejections of the HTA Plan, as well as certain elections with respect thereto. (HTA Disclosure Statement Ord. ¶¶ B, 2-18.) Prior to the transmission of the HTA Disclosure Statement, the Debtor did not solicit acceptances of the HTA Plan from any holders of Claims. (See infra ¶¶ 111-14.)

97.     The Solicitation Packages were served in compliance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and the HTA Disclosure Statement Order. (See generally Mailing Aff.)

98.     The (a) service of the Solicitation Packages, (b) publication of the HTA

Confirmation Hearing Notice, and (c) airing of radio advertisements regarding the approval of

the HTA Disclosure Statement, HTA Confirmation Hearing dates, Confirmation Objection

Deadline, Voting Deadline, and Election Deadline: (i) were adequate and sufficient under the

circumstances of the HTA Title III Case; (ii) provided adequate and sufficient notice of such

deadlines, the method of voting or making an election of distribution pursuant to the HTA Plan,

and the date, time, and location of the HTA Confirmation Hearing; (iii) provided holders of

Claims with a reasonable period of time to make an informed decision to accept or reject the

HTA Plan and to make any election provided thereunder; (iv) were in compliance with

PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the HTA Disclosure

Statement Order, and any other applicable orders and rulings of the Court; and (v) provided due

process to all parties in interest in the HTA Title III Case.  (See Service Affs.; see also generally

Pullo Decl.)

99.     No other or further notice with respect to the HTA Plan or the HTA Confirmation

Hearing is required.  Based upon the foregoing, the Debtor and its successors, predecessors,

control persons, representatives, officers, directors, employees, agents, attorneys, financial

advisors, investment bankers, accountants, and other retained professionals, and any and all

affiliates, managers, employees, attorneys, and advisors of the foregoing (i) have acted in "good

faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the

applicable provisions of PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local

Rules, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of

disclosure in connection with all their activities relating to the solicitation of acceptances of the

HTA Plan or elections thereunder and their participation in the activities described in

section 1125 of the Bankruptcy Code and (ii) shall be deemed to have participated in good faith

and in compliance with the applicable provisions of PROMESA and the Bankruptcy Code in the offer and issuance of securities pursuant to the HTA Plan and, therefore, are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the HTA Plan or elections thereunder or the offer and issuance of securities pursuant to the HTA Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such parties are listed therein, the exculpation provisions set forth in section 41.7 of the HTA Plan.

100.    Votes to accept or reject the HTA Plan were solicited and tabulated fairly, in good faith, and in a manner consistent with the HTA Disclosure Statement Order, PROMESA, the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.  (See generally Pullo Decl.)

101.    Certain Classes either voted to reject, or were deemed to reject, the HTA Plan (the "Rejecting Classes").  (See Pullo Decl. Ex. A.)  Notwithstanding such rejection and deemed rejection, the HTA Plan satisfies sections 1129(b)(2)(A) and 1129(b)(2)(B) of the Bankruptcy Code with respect to the Rejecting Classes.

### xx.    Bankruptcy Code Section 1129(a)(10)

102.    At least one Class of impaired Claims has accepted the HTA Plan.  (See id.) Accordingly, the HTA Plan complies with section 1129(a)(10) of the Bankruptcy Code.

### xxi.    Bankruptcy Code Section 1129(b)(1)

103.    The HTA Plan's treatment of Claims in the Rejecting Classes is proper because, as is described further below, the HTA Plan does not discriminate unfairly and is fair and equitable with respect to such Claims.  (Skeel Decl. ¶ 84.)  Unfair discrimination applies only to rejecting classes of creditors, not individual creditors within a class.  See 11 U.S.C.

§§ 1129(b)(1), 1123(a)(4). "Thus, a disapproving creditor within a class that approves a plan cannot claim unfair discrimination." In re Nuverra Envtl. Sols., Inc., 834 F. App'x 729, 734-35 (3d Cir. 2021). As a preliminary matter, the Court notes that no Rejecting Class has objected to confirmation of the HTA Plan on the basis that the HTA Plan discriminates unfairly.

104.    The HTA Plan does not unfairly discriminate against holders of Claims in Class 16 (HTA General Unsecured Claims). For the reasons set forth above in paragraphs 47 to 50, certain Classes of unsecured Claims have been separately classified to ensure that HTA is best able to provide critical government services to Puerto Rico's residents. For the reasons set forth above in paragraph 46, separate classification and treatment of Claims in Class 15 (Eminent Domain/Inverse Condemnation Claims) is necessary because such claimants assert Fifth Amendment rights, and the HTA Plan does not discriminate unfairly with respect to that Class. (Skeel Decl. ¶ 52.) Further, separate classification and treatment of Claims in Class 20 (Federal Claims) is necessary because of the unique relationship of the Commonwealth and its instrumentalities, including HTA, with the federal government and its instrumentalities, as well as the long-term nature of many federal programs. (Id. ¶ 56.) Separate classification and treatment of such Claims is reasonable and justified by a governmental purpose, and does not constitute unfair discrimination.

105.    Accordingly, the HTA Plan complies with section 1129(b)(1) of the Bankruptcy Code.

### xxii.    Bankruptcy Code Section 1129(b)(2)

106.    The HTA Plan's treatment of Claims in the Rejecting Classes is proper because the HTA Plan provides all holders of Claims in the Rejecting Classes with what they can reasonably expect to receive under the circumstances of the HTA Title III Case. Because there are no equity holders in chapter 9 cases, the requirement under section 1129(b)(2)(B) of the

Bankruptcy Code (incorporated by section 301(a) of PROMESA) that a plan be "fair and
equitable" requires that, where a debtor seeks nonconsensual confirmation of a plan over one or
more rejecting classes, no claim junior to any of the claims in the rejecting classes of the relevant
debtor may receive any property.  Under the HTA Plan, the Class holding Claims junior to the
unsecured Rejecting Classes (Section 510(b) Subordinated Claims) receives no property.

107.    The HTA Plan treats the Eminent Domain/Inverse Condemnation Claims as
secured Claims to the extent the Claims are allowable and there is cash on deposit for them.  The
HTA Plan further provides that the amount of the Claim in excess of the deposit, if any, will be
paid in full upon entry of separate Final Orders (i) setting the amount of Allowed Claims for just
compensation, and (ii) determining that such claims may not be impaired or discharged.  (Id.
¶ 52.)  The Oversight Board filed an appeal from the portion of the Commonwealth Confirmation
Order and the Commonwealth Findings of Fact and Conclusions of Law holding that the
Eminent Domain/Inverse Condemnation Claims against the Commonwealth may not be impaired
or discharged.  On July 18, 2022, the First Circuit issued an opinion affirming the portion of the
Commonwealth Confirmation Order and Commonwealth Findings of Fact and Conclusions of
Law holding that the Eminent Domain/Inverse Condemnation Claims against the
Commonwealth are nondischargeable.  This opinion is not yet a Final Order, and the Oversight
Board has advised the Court it intends to file a petition for writ of certiorari to the United States
Supreme Court from the First Circuit's opinion affirming the portion of the Commonwealth
Confirmation Order and Commonwealth Findings of Fact and Conclusions of Law holding that
the Eminent Domain/Inverse Condemnation Claims against the Commonwealth are
nondischargeable.  (See Aug. 17, 2022 Hr'g Tr. 86:18-25.)  If the Supreme Court reverses this
portion of the Commonwealth Confirmation Order and Commonwealth Findings of Fact and

Conclusions of Law, the HTA Plan provides that the Eminent Domain/Inverse Condemnation

Claims will receive payments from HTA equal to, and on the same timeframe as, the payments

to be made to holders of Allowed HTA General Unsecured Claims to the extent each allowable

Claim exceeds the cash on deposit for it.

108.    Class 15 is the only Rejecting Class of Claims characterized as secured in the

HTA Plan, and section 1129(b)(2)(A) is satisfied with respect to such Class.  Consistent with

these Findings of Fact and Conclusions of Law, holders of Claims in Class 15 will receive

payment in full to the extent they are Allowed Claims and provided that the Commonwealth

Confirmation Order and the Commonwealth Findings of Fact and Conclusions of Law relating to

the nondischargeability of Eminent Domain/Inverse Condemnation Claims against the

Commonwealth is not otherwise vacated or reversed.

109.    Accordingly, the HTA Plan complies with section 1129(b)(2) of the Bankruptcy

Code with respect to Claims in the Rejecting Classes.

**B.      PROMESA § 314(b)(2):** *The Plan Fully Complies with the Applicable Provisions of Title III of PROMESA.*

### i.      Solicitation

110.    Except as otherwise provided for or permitted by orders of the Title III Court, the

Oversight Board has complied with section 1125(b) of the Bankruptcy Code and

section 314(b)(2) of PROMESA, including the solicitation and tabulation of votes consistent

with the HTA Disclosure Statement Order.  (See generally Skeel Decl.; Pullo Decl.)

111.    The HTA Disclosure Statement Order established the procedures for the

solicitation of votes on the HTA Plan.  The Solicitation Agent complied with the procedures

established in the HTA Disclosure Statement Order.  (Mailing Aff.; Pullo Decl. ¶ 4.)

Specifically, the Solicitation Agent determined which creditors were entitled to vote on the HTA

Plan by following the instructions in the HTA Disclosure Statement Order, by Class, and by

applying the Voting Record Dates set forth in the HTA Disclosure Statement Order.  The

Solicitation Agent then coordinated the distribution of solicitation materials to holders of Claims

entitled to vote.  (Pullo Decl. ¶ 4.)  The Solicitation Agent coordinated publication of the

confirmation hearing notices as set forth in the HTA Disclosure Statement Order.  (Id. ¶ 7; see

also Publication Aff.)  The solicitation materials were properly distributed to the appropriate

parties, including brokers and nominees.  (See Mailing Aff.)

112.    The Solicitation Agent received, reviewed, determined the validity of, and

tabulated the Ballots submitted.  (Pullo Decl. ¶ 8.)  The Solicitation Agent also worked with the

Depository Trust Company ("DTC") to count votes from the Bond Classes tendered through

DTC's ATOP.  (Id. ¶ 9.)

### ii.    HTA/CCDA Plan Support Agreement, DRA Stipulation, and HTA Committee Agreement

113.    Section 1125(b) of the Bankruptcy Code requires that "[a]n acceptance or

rejection of a plan may not be solicited after the commencement of the case under this title from

a holder of a claim or interest with respect to such claim or interest, unless, at the time of or

before such solicitation, there is transmitted to such holder the plan or a summary of the plan,

and a written disclosure statement approved, after notice and a hearing, by the court as

containing adequate information."  11 U.S.C.A. § 1125(b) (Westlaw through P.L. 117-166).

Congress intended debtors and creditors be afforded flexibility to resolve disputes, and where

possible, reach a consensual resolution of issues in contemplation of the development of a plan

of adjustment.  See In re Indianapolis Downs, LLC., 486 B.R. 286, 295 (Bankr. D. Del. 2013)

("[A] narrow construction of 'solicitation' affords [] parties the opportunity to memorialize their

agreements in a way that allows a […] case to move forward.").

114.   Here, the HTA Plan was made possible by the Debtor's extensive negotiations with numerous claimholder constituencies and the HTA/CCDA Plan Support Agreement, DRA Stipulation, and HTA Committee Agreement that resulted from the negotiations.  (Skeel Decl. ¶ 16.)  The process of negotiation and solicitation of assent to these agreements prior to the approval and distribution of the HTA Disclosure Statement did not constitute improper solicitation of votes with respect to the HTA Plan.  "An agreement to accept the Debtor's plan, made post-petition but before approval of the disclosure statement, remained executory until [the creditor] actually filed its accepting ballot . . . Neither the recitation in the disclosure statement, nor the parties' execution of the written memorandum, constituted an acceptance of the plan as such."  In re Heritage Org., L.L.C., 376 B.R. 783, 793 (Bankr. N.D. Tex. 2007) (quoting In re Kellogg Square P'ship, 160 B.R. 336, 339-40 (Bankr. D. Minn. 1993)).[14]

---

[14]   The Vazquez Velazquez Group contends that their claim against HTA, based on litigation concerning a discontinued HTA compensation program, is nondischargeable pursuant to certain sections of PROMESA, and thus, the HTA Plan, which seeks to discharge their claim, does not comply with PROMESA.  The Vazquez Velazquez Group argues that sections 7, 204(d), and 304(h) of PROMESA prohibit the discharge of their claim.  (Vazquez Velazquez Obj. ¶¶ 8-10.)  These sections each concern Puerto Rico's compliance with or implementation of federal laws and obligations.  The Vazquez Velazquez Group maintains that, because their work and compensation was indispensable to HTA's compliance with certain federal health and safety regulations, these sections bar the discharge of claims related to their compensation.  (See Vazquez Velazquez Obj. ¶ 11.)  Assuming, for present purposes, that each of these sections of PROMESA could serve as a vehicle for an exception to discharge, the nature of the Vazquez Velazquez Group's claim does not fall with the scope of the purported exceptions.

"As the U.S. Court of Appeals for the First Circuit recently noted, in keeping with the Bankruptcy Code's fresh start policy, exceptions to discharge must be narrowly construed and, for that reason, a creditor seeking to exclude a debt from discharge must show that her claim comes squarely within an exception" enumerated in the Bankruptcy Code.  Casper v. O'Sullivan (In re O'Sullivan), 617 B.R. 1, 5 (D. Mass. 2020) (citing Stewart v. Stewart (In re Stewart), 948 F.3d 509, 520 (1st Cir. 2020)).  "Given the serious nature of a discharge denial, the reasons for denying a discharge must be real and substantial, not merely technical and conjectural."  Warchol v. Barry (In re Barry), 451 B.R. 654, 659

115.     The HTA Plan complies with section 314(b)(2) of PROMESA.

**C.     PROMESA § 314(b)(3):** *The Debtor Is Not Prohibited by Law from Taking any Action Necessary to Carry Out the Plan.*

116.     The HTA Plan contains no provisions which would require the Debtor to violate the law, including Commonwealth law, that is not preempted.  Further, local legislation is not required to issue debt under the HTA Plan.

117.     The Debtor has sufficiently demonstrated that express recognition of the preemptive effect of section 4 of PROMESA is crucial to accomplishing the HTA Plan's goals and ensuring its feasibility.  Provisions of Commonwealth laws that are inconsistent with PROMESA are preempted for the reasons, and solely to the extent, set forth in **Exhibit A** hereto. Such preempted provisions require or permit HTA to, among other things, (i) incur obligations, spend funds, repay in full its debts, and regulate the modification of toll rates fixed and charged

---

(B.A.P. 1st Cir. 2011).  The special compensation at the heart of the Vazquez Velazquez Group's claim does not fall squarely within the language of sections 7, 204(d), or 304(h) of PROMESA.  Nor has the Vazquez Velazquez Group shown plausibly that it is sufficiently connected to a Commonwealth or HTA obligation that is protected by the cited provisions to support a viable argument that those sections protect the particular compensation claims from discharge.  The Vazquez Velazquez Group concedes that the compensation was based on a Commonwealth regulation promulgated by HTA and was not required under any federal law, regulation, or program.  (See Aug. 17, 2022 Hr'g Tr. 67:25-68:16.)  Further, there has been no suggestion that, by discharging the Vazquez Velazquez Group's claim, HTA will be discharging or foregoing any of its current or future responsibilities under federal law.  HTA's ongoing compliance with federal laws and regulations is no doubt implemented through the diligent work of its employees, but the purported exceptions cannot be credibly construed so broadly as to require that all compensation related to such work is exempt from discharge.  Such construction would severely undermine the ability of Puerto Rico to restructure and discharge its debts and achieve fiscal responsibility.  Accordingly, the Vazquez Velazquez Group's claim is not sufficiently connected to an HTA obligation that is purportedly protected from discharge to demonstrate plausibly that those sections of PROMESA protect this claim from discharge.  The Vazquez Velazquez Objection is overruled.  To the extent the Vazquez Velazquez Group is ultimately successful in their underlying litigation, their claim may be treated as provided for by the HTA Plan and discharged.

for basic and essential services rendered by public corporations without regard to the fiscal plan

and budget certified by the Oversight Board, HTA Plan, and Plan Supplement and (ii) issue debt

without obtaining Oversight Board approval.  (Skeel Decl. ¶¶ 155-60.)  These statutes are

inconsistent with PROMESA to the extent the statutes require or permit transfers or debt

payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal

plans, budgets, and debt restructurings and would undermine the restructuring contemplated by

the HTA Plan and Puerto Rico's return to fiscal responsibility and access to capital markets.

(Id.)  For the avoidance of doubt, actions authorized by the statutes identified on **Exhibit A** that

are not otherwise preempted as provided therein remain authorized under the statute, and any and

all rights of HTA and Reorganized HTA to receive and use federal funds for the implementation

of federal programs is expressly reserved to the extent provided in section 204(d) of PROMESA.

The question of whether any particular conduct, action, or contract of HTA is unauthorized as a

result of the preemption of any law pursuant to these Findings of Fact and Conclusions of Law

and the HTA Confirmation Order shall be reserved for future determination by (a) the Title III

Court, or (b) if the Title III Court does not have, or declines to exercise, jurisdiction to make

such determination, the United States District Court for the District of Puerto Rico.

118.    To the extent a statute identified on **Exhibit A** is preempted with respect to the

Oversight Board's budget, contract review, or fiscal plan powers pursuant to Title II of

PROMESA, (i) the duration of such preemption shall terminate upon the termination of the

Oversight Board pursuant to section 209 of PROMESA, and (ii) no party shall be permitted to

enforce such preemption subsequent to the Oversight Board's termination pursuant to

section 209 of PROMESA; provided, however, that, for the avoidance of doubt, the foregoing

shall not apply to the preemption of any statute preempted by provisions of PROMESA related

to the discharge of debts or confirmation or implementation of the HTA Plan or the documents

contained in the Plan Supplement (including, without limitation, the New HTA Bonds

Indenture).

119.   For the avoidance of doubt, any provisions of Commonwealth laws that were

preempted pursuant to the Commonwealth Plan, as identified on Exhibit A to the

Commonwealth Findings of Fact and Conclusions of Law (Docket Entry No. 19812-1 in Case

No. 17-3283), that relate to HTA, including, without limitation, section 2021 of Act 9 approved

on August 12, 1982 and section 2.02 (amended section 34(h)) of Act 1 approved on January 15,

2015, remain preempted.

120.   The HTA Plan complies with section 314(b)(3) of PROMESA.

**D.**   **PROMESA § 314(b)(4):** *The Plan Provides Each Holder of an Administrative Claim Cash, Equal to the Allowed Amount of Such Claim, on the Effective Date.*

121.   Section 3.1 of the HTA Plan provides that: "[o]n the later to occur of (a) the HTA

Effective Date and (b) the date on which an Administrative Expense Claim shall become an

Allowed Claim, Reorganized HTA shall (i) pay to each holder of an Allowed Administrative

Expense Claim, in Cash, the full amount of such Administrative Expense Claim or (ii) satisfy

and discharge such Allowed Administrative Expense Claim in accordance with such other terms

no more favorable to the claimant than as may be agreed upon by and between the holder thereof

and Reorganized HTA; provided, however, that Allowed Administrative Expense Claims

representing indebtedness incurred in the ordinary course prior to the HTA Effective Date by the

Debtor shall be paid in full and performed by Reorganized HTA in accordance with the terms

and subject to the conditions of any agreement governing, investment evidencing, or other

document relating to such transactions, including, without limitation, all obligations of HTA and

Reorganized HTA with respect to payment of the Commonwealth Loan; and, provided, further,

that, with respect to the Commonwealth Loan, the repayment thereof shall be satisfied in

accordance with the terms and provisions of the New HTA Bonds Indenture; and, provided,

further, that, if any such ordinary course expense is not billed, or a written request for payment is

not made, within one hundred fifty (150) days after the HTA Effective Date, such ordinary

course expense shall be barred and the holder thereof shall not be entitled to, or receive, a

distribution pursuant to the HTA Plan."

122.     As provided for by the HTA Plan, certain Consummation Costs and Restriction

Fees shall be paid in Cash on the HTA Effective Date.  All other Allowed Administrative

Expense Claims, if any, will likewise be paid pursuant to the terms of section 3.1 of the

HTA Plan.

123.     The HTA Plan complies with section 314(b)(4) of PROMESA.

**E.     PROMESA § 314(b)(5):** *The Plan Has Obtained all Necessary Legislative, Regulatory, and Electoral Approvals.*

124.     Legislative, regulatory, and electoral approvals are not required in order for HTA

to raise toll rates and fares, or issue the New HTA Bonds.

125.     The HTA Plan complies with section 314(b)(5) of PROMESA.

**F.     PROMESA § 314(b)(6):** *The Plan Is Feasible and in the Best Interests of Creditors.*

126.     The HTA Plan complies with section 314(b)(6) of PROMESA because it is

feasible and in the best interests of creditors.

### i.     Feasibility

127.     "[T]he Court has an independent duty to determine [feasibility] and to make

specific findings of fact." In re City of Detroit, 524 B.R. 147, 220 (Bankr. E.D. Mich. 2014).

Under PROMESA, a plan of adjustment must be supported by financial projections that are

"reasonable and demonstrate a probability that [the Debtor] will be able to satisfy its obligations

under the Plan." In re Fin. Oversight & Mgmt. Bd. for P.R., 361 F. Supp. 3d 203, 246 (D.P.R.

2019).  Additionally, as in chapter 9, a PROMESA debtor, as a government entity, must show

that it is "probable that [the] debtor can both pay post-petition debt and provide future public

services at the level necessary to its viability as a [territory]." In re Mount Carbon Metro. Dist.,

242 B.R. 18, 35 (Bank. D. Colo. 1999).  The core inquiry has been articulated as follows: "Is it

likely that the [debtor], after the confirmation of the Plan of Adjustment, will be able to

sustainably provide basic municipal services to the citizens of [the debtor] and to meet the

obligations contemplated in the Plan without the significant probability of a default?" In re City

of Detroit, 524 B.R. at 222.

128.    The HTA Plan is feasible.  The HTA Plan provides for the following payments by

HTA: (1) cash on the HTA Effective Date to satisfy administrative expense claims, including

approximately $140 million in Consummation Costs, HTA PSA Restriction Fees, and DRA

Restriction Fee, and a $24 million payment to the GUC Reserve; and (2) payments over time,

including (a) an additional $24 million payment to the GUC Reserve on the first anniversary of

the HTA Effective Date, (b) an estimated $41.88 million in payments to holders of Eminent

Domain/Inverse Condemnation Claims upon occurrence of a Final Order determining the

validity and amount of just compensation attributable to such claims, (c) an estimated $20.79

million payment to holders of Allowed Federal Claims in accordance with the terms of

section 24.1 of the HTA Plan allowing HTA to pay the total amount of such Allowed Federal

Claims in equal installments over forty years, (d) payments pursuant to (y) New HTA Bonds

issued by HTA in the form of New HTA CIBs, New HTA CABs, and New HTA Convertible

CABs, and (z) Subordinated Indebtedness to be issued to the Commonwealth as a refinancing of

HTA's obligations pursuant to the Commonwealth Loan, and (e) payments pursuant to the

existing HTA Moscoso Bonds, which claims are unimpaired under the HTA Plan.  (Brownstein Decl. ¶¶ 36-37.)

129.    The HTA Plan provides that Reorganized HTA will issue the New HTA Bonds on the HTA Effective Date with ten different maturity dates in an aggregate original principal amount of $1,245,000,465.70: (i) $600,000,000 in aggregate principal amount of New HTA CIBs (i.e., current interest bonds), (ii) $237,955,868.13 in aggregate principal amount of New HTA CABs (i.e., capital appreciation bonds), and (iii) $407,044,597.57 in aggregate principal amount of New HTA Convertible CABs.  (Id. ¶ 40; HTA Plan § 25.1(a)-(c).)  The aggregate amount owed, including all principal and interest over the life of the New HTA Bonds from the Deemed Issuance Date of July 1, 2022, to the maturity of the final New HTA Bonds on July 1, 2062, is $3,107,435,797.24.  (Brownstein Decl. ¶ 41; HTA Plan § 25.1(e).)  The HTA Plan provides for a Debt Service Fund to be established and the monthly deposit of Toll Receipts. (HTA Plan §§ 1.102, 25.1(i).)  On the first business day of each month after the HTA Effective Date, the New HTA Bonds Trustee shall withdraw the Toll Receipts from the Toll Receipts Fund and transfer and apply such amounts in accordance with the terms and provisions of the New HTA Bonds Indenture.  (Id. § 25.1(i).)  The HTA Plan also provides that, on the HTA Effective Date, the Reorganized HTA shall deposit into the Toll Receipt Fund such additional amounts necessary to account for the New HTA Bonds being issued as of the Deemed Issuance Date. (Id.; see also id. § 25.1(e).)

130.    The HTA Plan also provides for the payment of up to $362,000,000 in principal amount of Subordinated Indebtedness, which is the obligation incurred by HTA to repay the Commonwealth Loan.  (Brownstein Decl. ¶ 45; HTA Plan § 25.1(d).)  Payments are to commence on July 1, 2023, and continue annually until fully extinguished on July 1, 2052, with

interest at 2.5%.  (Brownstein Decl. ¶ 45; HTA Plan Ex. E-2.)  A total of approximately $170

million in interest is projected to be paid with respect to the Subordinated Indebtedness, and

aggregate payments in respect thereof will be approximately $530 million.  (Id.)  Repayment of

the Subordinated Indebtedness is junior, inferior, and subordinate to repayment of the New HTA

Bonds.  (Brownstein Decl. ¶ 45.)

131.    The HTA Plan also provides that the HTA Moscoso Bonds, with an aggregate

outstanding principal amount of $141,875,411.00, are unimpaired, and payments of principal and

interest thereon be made in accordance with their terms until paid in full.  (Brownstein Decl.

¶ 47; HTA Plan §§ 1.201 and 18.1.)

132.    The HTA Plan also provides that the Debtor shall transfer ACR-eligible claims

pursuant to the ACR Order, which claims shall be reconciled and paid in the ordinary course of

business.  (HTA Plan § 32.7.)  The Commonwealth has reserved $229 million for payment of

such claims.  (Herriman Decl. ¶ 16.)  Accordingly, HTA does not need to provide any funds with

respect to paying such claims.  (Id.)

133.    The HTA Plan, including each of these provisions, is feasible.[15]  (Brownstein

Decl. ¶¶ 36-64.)  Confirmation of the HTA Plan is not likely to be followed by the need for

---

[15]    The HTA Plan remains feasible even accounting for the payment in full of the total of
Eminent Domain/Inverse Condemnation Claims asserted to arise out of the Takings
Clause.  (See Brownstein Decl. ¶ 63.)  Based on a review and reconciliation of claims to
date, the maximum cost of such Claims is currently estimated to be approximately
$41.88 million.  (Herriman Decl. ¶ 33.)  The Debtor has proffered credible evidence to
support the conclusion that the HTA Plan will still be feasible because HTA will have
sufficient cash remaining after fulfilling its HTA Effective Date obligations under the
HTA Plan to pay such Eminent Domain/Inverse Condemnation Claims, to the extent they
are Allowed, in full.  (See Brownstein Decl. ¶ 63; see also HTA Plan § 19.1.)
Additionally, not all Allowed Eminent Domain/Inverse Condemnation Claims will need
to be paid out immediately on the HTA Effective Date, as some have not yet been
adjudicated.  (Brownstein Decl. ¶ 63.)

further financial reorganization not contemplated in the HTA Plan due to a number of factors, including the following: (i) HTA has the resources and liquidity necessary to make the payments on the HTA Effective Date it is required to make; (ii) the HTA Plan reduces HTA's debt to an amount which the HTA 2022 Fiscal Plan projects HTA will be able to pay; (iii) the HTA Plan and New HTA Bonds Indenture include multiple provisions, which, along with a significant cash reserve HTA will maintain for contingencies, are designed to ensure HTA can cover projected debt obligations; (iv) HTA will be able to pay the HTA Moscoso Bonds; and (v) HTA's operating revenues, as well as projected appropriations from the Commonwealth in accordance with the Commonwealth Fiscal Plan certified on April 23, 2021 (the "April 2021 Commonwealth Fiscal Plan") (Debtor's Ex. 8, Docket Entry No. 1299-9), are sufficient to cover HTA's maintenance and operating expenses and other required disbursements.  (Brownstein Decl. ¶ 49.)

134.    HTA's liquidity is sufficient to satisfy the HTA Effective Date obligations and to pay the GUC Reserve.  The Commonwealth Loan was established in order for HTA to pay HTA Effective Date obligations required pursuant to the HTA Plan and to pay the balance of obligations into the GUC Reserve on the first anniversary thereof.  (Id. ¶ 51.)  Accordingly, the proceeds of the Commonwealth Loan, on which HTA has $188 million remaining available to draw, will provide the cash required to be paid on the HTA Effective Date.  (Id.)  Thus, HTA will be able to satisfy the HTA Effective Date obligations and pay the GUC Reserve as required by the HTA Plan.  (Id.)

135.    The HTA Plan significantly reduces the Debtor's debt.  On the HTA Effective Date, the aggregate principal amount of funded indebtedness will be approximately $1.6 billion, considerably lower than the $6.4 billion in such indebtedness that existed prior to the HTA Effective Date.  (Id. ¶ 52.)  Similarly, post-HTA Effective Date, the average annual debt service

for HTA will be approximately $90 million, compared to $294 million prior to the

commencement of the HTA Tile III Case.  (Id.)  Debt levels will continuously decline and

remain low until full repayment of the New HTA Bonds, which is projected to occur in 2062.

(Id.)

136.    HTA will be able to satisfy its obligations pursuant to the New HTA Bonds and

the Subordinated Indebtedness.  In accordance with the New HTA Bonds Indenture, the holders

of the New HTA Bonds and Subordinated Indebtedness are granted a security interest in certain

toll revenues and toll fines that HTA will receive, until such debts are extinguished.  (Id. ¶ 53.)

The protections of this security interest provide the holders of the New HTA Bonds and

Subordinated Indebtedness with a property interest and lien in such revenues when they arise.

(Id.)  After implementing the fiscal reforms provided for in the HTA 2022 Fiscal Plan, HTA is

projected to receive $8.196 billion in toll revenue and $1.480 billion in toll fines in Fiscal Years

2022 through 2051.  (Id.; Debtor's Ex. 5 at 66, Docket Entry No. 1299-6.)  Based upon these

projections and the protections of the Toll Rate Covenant discussed below, the projected toll and

fine revenues against which the holders of the New HTA Bonds and Subordinated Indebtedness

have a security interest will be sufficient to pay those obligations pursuant to the HTA Plan.

(Brownstein Decl. ¶ 53.)

137.    The HTA Plan and the documents included in the Plan Supplement, including the

New HTA Bonds Indenture, incorporate multiple provisions—namely, the Toll Rate Covenant

and the Debt Management Policy—that were structured to mitigate the impact of potential

financial underperformance and limit HTA's indebtedness following the HTA Effective Date.

(Id. ¶ 54.)

138.    The HTA Plan and the New HTA Bonds Indenture establish a Toll Rate Covenant

to ensure that HTA Toll Receipts are sufficient to pay amounts due under the New HTA Bonds and the Subordinated Indebtedness.  (Id. ¶ 55; Debtor's Ex. 23 at 42, Docket Entry No. 1300-3, New HTA Bonds Indenture §§ 7.01(a), (d).)  Furthermore, the New HTA Bonds Indenture provides for reserve funds for both the New HTA Bonds and the Subordinated Indebtedness to support the debt payment obligations thereunder.  (Brownstein Decl. ¶ 56; HTA Plan § 1.256.)  The New HTA Bonds Indenture also provides that, if a payment default under the Subordinated Indebtedness shall have occurred, amounts required to pay all past due principal and interest thereon must be paid before HTA may deposit additional funds in its operating reserve account.  (Brownstein Decl. ¶ 56; Debtor's Ex. 23 at 36, Docket Entry No. 1300-3, New HTA Bonds Indenture § 5.05.)

139.    The HTA Plan also requires HTA, during all times in which New HTA Bonds (or refinancings thereof) remain outstanding, to maintain and comply with a Debt Management Policy which imposes certain limitations on further borrowings after the HTA Effective Date.  (Brownstein Decl. ¶ 57; see HTA Plan §§ 1.99, 1.100, 25.3.)  Additionally, the budget for HTA for Fiscal Year 2023 provides for liquidity reserves of over $100 million.  (Debtor's Ex. 7 at 6, Docket Entry No. 1299-8.)

140.    HTA will be able to satisfy its obligations with respect to the HTA Moscoso Bonds.  The HTA Moscoso Bonds are paid by a third party pursuant to the Teodoro Moscoso Concession Agreement, as amended, and following the HTA Effective Date, it is expected that the concessionaire and the toll revenues securing the HTA Moscoso Bonds will be sufficient to satisfy payments in full.  (Brownstein Decl. ¶ 58; Debtor's Ex. 2 at 44, 61, Ex. F at 2 n.1, Docket Entry Nos. 1299-2, 1299-3; Debtor's Exs. 26, 27, Docket Entry Nos. 1300-6, 1300-7.)  Furthermore, the concession agreement produces a surplus to HTA, as a percentage of such toll

revenues are paid to HTA each year, increasing from 5% through 2027 to 61.5% thereafter. (Brownstein Decl. ¶ 58; Debtor's Ex. 2 at 61, Docket Entry Nos. 1299-2, 1299-3.)

141.    The HTA 2022 Fiscal Plan provides for sufficient revenue to satisfy debt service to bondholders through modest increases in toll and fine revenue while maintaining significant cash reserves.  (Brownstein Decl. ¶ 59.)  The HTA 2022 Fiscal Plan, among other things, (i) explains HTA should make a number of operational and structural improvements to increase operating revenue and (ii) lays the groundwork to optimize opportunities to receive infrastructure funding from the federal government, so that HTA can receive its fair share of discretionary federal grants.  (Id. ¶ 59; Debtor's Ex. 5 at 8-9, Docket Entry No. 1299-6.)  The projected impact of these fiscal measures is approximately $6.0 billion over Fiscal Years 2022 through 2051, turning a forecasted $1.2 billion deficit if HTA does not implement any fiscal measures to a cumulative surplus of $4.8 billion.  (Brownstein Decl. ¶ 59.)  If HTA fully and promptly implements the measures in the HTA 2022 Fiscal Plan, the HTA 2022 Fiscal Plan projects that HTA could achieve operational surpluses as early as Fiscal Year 2023.  (Id. ¶ 61.)  These fiscal measures will enable necessary investments, fiscal sustainability, and affordable restructuring of debt.  (Id. ¶ 59; Debtor's Ex. 5 at 10, 64, Docket Entry No. 1299-6.)

142.    In addition to fiscal and structural reforms, HTA is projected to receive appropriations each year to cover capital and operating expenses.  (Brownstein Decl. ¶ 62.)  In accordance with section 5.2.6 of the January 2022 Commonwealth Fiscal Plan, for Fiscal Years 2022 through 2051, the HTA 2022 Fiscal Plan includes an average annual general unrestricted appropriation of $110 million and average capital appropriation of $68 million per year.  (Id. ¶ 62; Debtor's Ex. 9, Docket Entry Nos. 1299-10, 1299-11.)  These appropriations are front-loaded, providing significant support in early years to maintain non toll roads and Tren Urbano

until such operations are transferred to other Commonwealth entities.  (Brownstein Decl. ¶ 62;

Debtor's Ex. 5 at 107, Docket Entry No. 1299-6.)

143.    Accordingly, the HTA Plan is feasible and is not likely to result in the need for a

further restructuring of HTA.

### ii.    Best Interests Test

144.    As in chapter 9 of the Bankruptcy Code, PROMESA's "best interests" test differs

substantially from the chapter 11 "best interests" requirement.  In chapter 11, the test requires a

court to determine whether an individual creditor would receive more if the chapter 11 debtor

were to liquidate its assets.  In contrast, the chapter 9 test is not a liquidation test (because

municipalities cannot be liquidated) and is focused on the ***collective*** recovery of creditors in the

aggregate.  Cf. In re City of Detroit, 524 B.R. at 212-13 (comparing the "best interests" tests in

chapter 9 and chapter 11 of the Bankruptcy Code); see also In re Fin. Oversight & Mgmt. Bd. for

P.R., 361 F. Supp. 3d 203, 250-51 (D.P.R. 2019).  The PROMESA best interests test additionally

modifies the chapter 9 best interests test, only requiring the Court "to ***consider*** whether available

remedies under the non-bankruptcy laws and constitution of the territory would result in a greater

recovery for the creditors than is provided by [the] plan."[16]  48 U.S.C.A. § 2174(b)(6) (Westlaw

through P.L. 117-166) (emphasis added).  Thus, the PROMESA best interests test does not

impose a litmus test or establish a floor for creditor recoveries.  See id.

145.    Accordingly, PROMESA's best interests test requires the Court only to *consider*

whether creditors of the Debtor *in the aggregate* receive an equal or greater recovery on their

Claims pursuant to the HTA Plan than they would outside of Title III if the HTA Title III Case

---

[16]    Notably, section 314(b)(6) of PROMESA speaks in terms of a single "recovery" for
"creditors" (plural).  48 U.S.C.A. § 2174(b)(6) (Westlaw through P.L. 117-166).

were dismissed and creditors exercised their remedies.  An analysis of creditor recoveries in such

hypothetical circumstances requires the application of a number of assumptions, including

(i) estimates of the resources that would be available for debt service, which requires an

assessment of the Debtor's available cash, revenues, and operating expenses in the absence of a

confirmed plan of adjustment; (ii) the outstanding creditor obligations due and payable that

would exist outside of Title III; and (iii) the priority in which creditor claims would be paid

outside Title III, which in certain circumstances requires consideration of assumptions regarding

the potential outcome of litigation matters.  (Shah Decl. ¶ 8.)

146.    The Debtor has met its burden of showing that recoveries for claimholders of the

Debtor pursuant to the HTA Plan, in the aggregate, are within the range of the projected

recoveries for such claimholders in the aggregate if the HTA Title III Case was dismissed, as

demonstrated by the best interest test report.  (Id. ¶ 21.)

147.    In the aggregate, excluding the payment of Consummation Costs, HTA PSA

Restriction Fees, and DRA Restriction Fee (which are not being paid on account of Claims),

there is an estimated $6.705 million in claims asserted against HTA being treated under the HTA

Plan, which are projected to receive $1.630 million in distributions pursuant to the HTA Plan, for

an aggregate recovery of 24% for all claimholders.  (Id. ¶ 35.)  When the payment of

Consummation Costs, HTA PSA Restriction Fees, and DRA Restriction Fee are included,

realized HTA creditor recoveries are even higher.  (Id.)  This compares favorably to the

projected range of recoveries pursuant to the Oversight Board's best interest test analysis if the

HTA Title III case is dismissed.  Outside of Title III, holders of claims against HTA receive an

estimated recovery of $706 million to $1.847 million, which implies an aggregate recovery of

11% to 28% for all claims.  (Id. ¶ 25.)  Accordingly, creditors in the aggregate will receive a

percentage recovery on their Claims pursuant to the HTA Plan that is within the range of

projected recoveries outside of Title III.  (Id. ¶ 10.)

148.    Absent a mechanism to restructure the Debtor's outstanding debt, HTA would

face great uncertainty, financial instability, and significant lawsuits.  In such an environment,

outside of Title III and without a confirmed plan of adjustment, creditors would race to the

courthouse to recover on their claims.  "Clearly, such a result is chaos . . . ."  6 Collier on

Bankruptcy ¶ 943.03[7][a] (16th ed. 2022).

149.    Accordingly, the Court finds that the HTA Plan is in the best interests of creditors

within the meaning of section 314(b)(6) of PROMESA.

**G.     PROMESA § 314(b)(7):** *Fiscal Plan Consistency*.

150.    Section 314(b)(7) of PROMESA requires that the HTA Plan merely be consistent

with, not identical to, the applicable certified fiscal plan.  (See Skeel Decl. ¶ 96.)  The February

2022 HTA Fiscal Plan provides a blueprint for HTA to achieve, among other things, fiscal

responsibility and access to capital markets.  The HTA Plan is consistent in all respects with the

February 2022 HTA Fiscal Plan—nothing contained in the HTA Plan would violate or otherwise

interfere with the February 2022 HTA Fiscal Plan.  (See id. ¶ 96; see Debtor's Ex. 5, Docket

Entry No. 1299-6.)  Further, the HTA Plan is consistent with the February 2022 HTA Fiscal

Plan.  (Skeel Decl. ¶ 96; Brownstein Decl. ¶ 68.)

151.    Additionally, the HTA Plan provides, to the extent the Commonwealth

Confirmation Order and the Commonwealth Findings of Fact and Conclusions of Law relating to

the nondischargeability of Eminent Domain/Inverse Condemnation Claims against the

Commonwealth are not otherwise vacated or reversed, payment in full for Eminent

Domain/Inverse Condemnation Claims to the extent they are Allowed Claims for just

compensation, which does not vitiate the HTA Plan's compliance with section 314(b)(7) of PROMESA because there are sufficient uncommitted funds to satisfy such Claims without requiring modification of the February 2022 HTA Fiscal Plan.  (See supra ¶ 133 n.12.)

152.    Accordingly, the HTA Plan complies with section 314(b)(7) of PROMESA.

H.    **Bankruptcy Rule 3019:** *The Plan Does Not Adversely Change the Treatment of Claims of Creditors*.

153.    The Oversight Board filed the HTA Plan after the Voting Deadline had passed. (Skeel Decl. ¶ 97.)  The HTA Plan contains technical changes that do not adversely affect the treatment of any Claims.  (Id.)

154.    The modifications to the HTA Plan, as well as those contained in the Plan Supplement documents, do not materially or adversely modify the treatment to be afforded to creditors pursuant to the HTA Plan and do not require the resolicitation of acceptances or rejections thereof.  Accordingly, the HTA Plan can be confirmed without the filing of a new disclosure statement and resolicitation with respect to the HTA Plan.  See Fed. R. Bankr. P. 3019.

## The Releases, Exculpations, and Injunctions Pursuant to the HTA Plan

155.    The HTA Plan includes certain discharge, release, exculpation, and injunction provisions, which are essential to the Debtor's restructuring, and without which a consensual restructuring could not be successfully accomplished.  (Skeel Decl. ¶ 145.)

A.    **Releases**

156.    A critical element of the HTA Plan is the complete resolution of the HTA Title III Case.  To achieve this, the Debtor and certain claimholders agreed to a mutual release of all Claims and Causes of Action arising, in whole or in part, prior to the HTA Effective Date.  (Id. ¶ 146.)  The Debtor's releases incentivized claimholders to support, and undertake actions to

support, the HTA Plan and its confirmation, without fear of lawsuits in the future.  (Id. ¶ 147.)
Certain creditors would not have supported the HTA Plan absent its release provisions.  (Id.)
Further, the releases of claims by the Debtor affect only those parties that made a significant
contribution to the negotiation and development of the HTA Plan and incurred cost and expense
during their essential participation in negotiations.  (Id. ¶ 149.)  The HTA Plan's discharges and
releases likewise provide the Debtor and Reorganized HTA with assurance that the restructuring
balance struck by the HTA Plan will not be upset by further claims against the Reorganized HTA
after the HTA Effective Date.  (Id. ¶ 148.)

     157.    The HTA Plan does not provide for non-consensual third-party releases, and the
HTA Plan's releases are limited to those necessary to effectuate the Debtor's successful
restructuring.  Except as explicitly agreed to by the creditors in their respective plan support
agreements, the HTA Plan does not release any claims of a creditor of the Debtor, in its capacity
as such, against a party that is not a Debtor.  (Id. ¶ 151.)  Specifically, section 41.2(a) of the HTA
plan provides that "without prejudice to the exculpation rights set forth in section 41.7 [of the
HTA Plan], nothing contained in the HTA Plan or the HTA Confirmation Order is intended, nor
shall it be construed, to be a grant of a non-consensual third-party release of the HTA/CCDA
PSA Creditors and their respective Related Persons by Creditors of the Debtor."  (HTA Plan
§ 41.2(a).)  Further, sections 41.2(d), (e), and (f) of the HTA Plan carve out from the Released
Claims certain claims, causes of action, or other rights or powers that are held by the Securities
and Exchange Commission, the United States, and parties to certain Underwriter Actions.  (Skeel
Decl. ¶ 152.)  Likewise, as confirmed by the definitions of Related Persons (HTA Plan § 1.266)
and Released Claims (HTA Plan § 1.267), claims against the Commonwealth, AFICA, CCDA,
COFINA, ERS, MBA, MFA, PBA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA, which

are or may be subject to their own restructuring proceedings, are not released pursuant to the

HTA Plan and such entities are not "Related Persons" of the Released Parties or Releasing

Parties.  Further, Avoidance Actions generally are not released under the HTA Plan.  (See HTA

Plan § 1.267.)  These carve-outs ensure that only those releases that are reasonable and necessary

to HTA Plan confirmation are being provided.  (Skeel Decl. ¶ 152.)

158.    For these reasons, the Court finds that the releases contemplated by the HTA Plan

are reasonable, necessary, and appropriate to implementation of the HTA Plan and, therefore, the

consensual releases are hereby approved.

**B.    Exculpation**

159.    Section 41.7 of the HTA Plan provides for exculpation of the Government Parties,

HTA/CCDA PSA Creditors, the Creditors' Committee, the DRA Parties and the Monolines for,

among other things, any acts taken consistent with the HTA Plan or in connection with the

formulation, preparation, dissemination, implementation, acceptance, confirmation or approval

of the HTA Plan and the settlements contained therein.  (Id. ¶ 153.)  The expectation that parties

would be exculpated incentivized them to participate in the negotiations and mediations, support,

and undertake actions that support confirmation of the HTA Plan without fear of future lawsuits.

(Id.)  Without the HTA Plan's exculpation provisions, parties would likely be exposed to

litigation after extensive good-faith negotiations.  (Id.)  The HTA Plan's exculpation provisions

are narrowly tailored to the exculpated parties' efforts related to the formulation of the HTA

Plan.  (Id.)  All of the parties being exculpated in the HTA Plan played key roles in the

negotiation of the HTA Plan and the settlements that enabled the HTA Plan.  (Id.)  The HTA

Plan's exculpation provisions do not alter the liability of any entity that is determined to have

acted or failed to act in a manner that constitutes intentional fraud or willful misconduct.  (Id.)

Exculpation provisions are appropriate for parties' acts or omissions in connection with or

related to the pursuit of confirmation of a plan.  See In re Montreal Me. & Atl. Ry, Ltd., Case

No. 13-10670, 2015 WL 7431192, at *9 (Bankr. D. Me. Oct. 9, 2015) (approving an exculpation

provision "as appropriate under applicable law because it is part of a Plan proposed in good faith,

was vital to the Plan formulation process and is appropriately limited in scope[,] . . . including its

carve-out for gross negligence and willful misconduct").

160.    For these reasons, the Court finds that the exculpation provisions contemplated by

the HTA Plan are reasonable, necessary, and appropriate to implementation of the HTA Plan

and, therefore, the exculpation provisions are hereby approved.

## C.    Injunction

161.    The HTA Plan's injunction provisions (HTA Plan sections 41.3, 41.6, and 41.11)

are necessary to the reorganization and are fair to those parties involved.  The injunctions ensure

that the releases and exculpations discussed above are preserved and enforced by prohibiting

legal action concerning the Released Claims, avoiding the time, burden and expense that could

be incurred if parties were permitted to pursue Released Claims.  (Skeel Decl. ¶ 154.)  The HTA

Plan's injunction provisions are narrowly-tailored to serve that purpose.  (Id.)

162.    The releases, exculpation provisions, and injunctions pursuant to the HTA Plan

are integral and critical parts of the HTA Plan and the compromises and settlements implemented

pursuant to the HTA Plan.  (HTA Plan §§ 2.3, 41.4.)  The approval of such releases is a

condition to the occurrence of the HTA Effective Date, and all Released Parties have relied on

the efficacy and conclusive effects of such releases and injunctions and on the Title III Court's

retention of jurisdiction to enforce such releases and injunctions when making concessions

pursuant to the HTA Plan and by agreeing to, accepting, and supporting the settlement and

treatment of their respective Claims, Causes of Action, and other rights pursuant to the HTA

Plan.  (See, e.g., Skeel Decl. ¶ 145; HTA Plan § 35.1.)  Accordingly, such provisions are

justified and warranted based upon the circumstances of the HTA Title III Case and the

consideration being provided by all Released Parties in connection with the HTA Plan.

163.    To maintain and protect the integrity and feasibility of the HTA Plan, while the

Oversight Board is in existence, any and all governmental units and any officer or employee

thereof shall neither recreate by statute, regulation, rule, policy, or executive order, nor repay by

any means, any debt discharged by the HTA Plan without the Oversight Board's express prior

written consent or except as may otherwise be provided by a certified fiscal plan or budget.

### **Validity of the New HTA Bonds**

164.    Pursuant to section 4 of PROMESA, as well as sections 944[17] and 1123 of the

Bankruptcy Code, and in accordance with the HTA Confirmation Order and the HTA Plan, the

Court determines that the New HTA Bonds and the covenants by HTA, including, without

limitation, the Toll Rate Covenant, for the benefit of the holders of the New HTA Bonds as

provided in the New HTA Bonds Indenture, or the HTA Confirmation Order, as applicable, are

---

[17]    Section 944(b)(3) of the Bankruptcy Code requires the Court, as a condition to providing
a discharge, to determine the validity of obligations imposed under a plan of the debtor
and of any provision made to pay or secure payment of such obligations.  11 U.S.C.
§ 944(b)(3). See generally In re City of Stockton, Cal., 526 B.R. 35, 49-50 (Bankr. E.D.
Cal. 2015) ("The structure of the federal-state relationship . . . regarding restructuring of
municipal debt is dictated by the U.S. Constitution . . . .  [T]he Supremacy Clause
operates to cause federal bankruptcy law to trump state laws, including state
constitutional provisions, that are inconsistent with the exercise by Congress of its
exclusive power to enact uniform bankruptcy laws" (citing Ass'n of Retired Emps. of the
City of Stockton v. City of Stockton, Cal. (In re City of Stockton, Cal.), 478 B.R. 8, 14-
16 (Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2; Int'l Bhd. of Elec. Workers,
Local 2376 v. City of Vallejo, Cal. (In re City of Vallejo, Cal.), 432 B.R. 262, 268-70
(E.D. Cal. 2010) (additional citations omitted)).  As set forth in the leading bankruptcy
treatise, "[t]he requirement of a court determination of validity is extra assurance for
those who might be skittish about the nature of the bonds being issued . . . .  It has the
added feature of removing any doubt concerning the matter, because the determination of
the court on that issue should be binding in the future."  6 Alan N. Resnick & Henry J.
Sommer, Collier on Bankruptcy ¶ 944.03[1][b] (16th ed. 2022).

legal, valid, binding, and enforceable obligations of Reorganized HTA benefitting from the

following protections, each of which is legal, valid, binding, and enforceable against

Reorganized HTA and other persons and entities, as applicable, under Puerto Rico, New York,

and federal law:

 a. The HTA Confirmation Order is full, final, complete, conclusive, and binding and

  shall not be subject to collateral attack or other challenge in any court or other

  forum, except as permitted under applicable law.

 b. The New HTA Bonds Indenture, upon the issuance of the Secured Obligations,

  including, without limitation, the Subordinated Indebtedness issued as a

  refinancing of the Commonwealth Loan, grants a first priority lien and first

  priority security interest on all of Reorganized HTA's legal and equitable right,

  title and interest in the Trust Estate, to the Secured Obligations, subject only to

  (1) sections 5.01(b) and 5.01(c) of the New HTA Bonds Indenture and (2) the

  senior lien and senior security interest granted in the Trust Estate for the benefit of

  holders of New HTA Bonds, which first-priority lien and first-priority security

  interest shall in all respects be senior and superior to the subordinate lien and

  subordinate security interest granted in the Trust Estate for the benefit of holders

  of Subordinated Indebtedness, in each case, as permitted by the HTA Enabling

  Act, and such first priority lien shall be deemed automatically attached and

  perfected as of the HTA Effective Date and shall in any event be valid, binding,

  perfected, and enforceable against all Entities having claims of any kind in tort,

  contract or otherwise against Reorganized HTA or its assets, irrespective of

  whether such Entities have notice of such lien or security interest, without any

further act or agreement by any Entity, and shall remain in full force and effect

until the Secured Obligations have been paid or satisfied in full in accordance

with their terms.

c.  The Pledged Revenues do not and will not constitute, nor will they be deemed to

be "available resources" or "available revenues" of the Commonwealth, as such

term is used in the Commonwealth Constitution (whether construed pursuant to

the Spanish or English version of the Commonwealth Constitution).

d.  The Secured Obligations are not "Tax Supported Debt," as defined and set forth

in the Government of Puerto Rico's Debt Management Policy adopted pursuant to

the Commonwealth Plan.

e.  Reorganized HTA's sole and exclusive ownership of the Pledged Revenues will

not be affected in any way by the manner of or control over collection; any person

who collects or holds Pledged Revenues shall do so on behalf of Reorganized

HTA, and no Entity that collects or holds the Pledged Revenues shall have any

legal or equitable right, title, or interest to the Pledged Revenues other than

Reorganized HTA, for the benefit of the holders of the Secured Obligations.

f.  Upon the HTA Effective Date, Reorganized HTA shall have all legal and

equitable right, title, and interest in the Pledged Revenues and, except to the

extent provided in the express provisions of the HTA Plan, HTA Confirmation

Order, and the New HTA Bonds Indenture, shall be free and clear of all liens,

claims, encumbrances, and other interests of any party.

g.  The covenants and agreements of Reorganized HTA and the Commonwealth

under the New HTA Bonds Indenture and the HTA Act, as the case may be

(including, but not limited to, that described in section 7.17 of the New HTA Bonds Indenture) will constitute adequate protection for the property interests of Reorganized HTA and the holders of Secured Obligations in the Trust Estate.

h.  HTA has waived, and shall be deemed to have waived, the automatic stay in any future insolvency proceeding commenced on behalf of Reorganized HTA (whether under Title III of PROMESA or otherwise) with respect to Net Receipts held in the funds and accounts established in accordance with the New HTA Bonds Indenture (other than the Net Receipts in the Arbitrage Rebate Fund, established pursuant to the New HTA Bonds Indenture).

i.  Upon execution by all parties thereto, the New HTA Bonds Indenture shall (i) have been duly and lawfully authorized by Reorganized HTA, and (ii) be in full force and effect and valid and binding upon Reorganized HTA and enforceable in accordance with their terms, except that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy.

j.  At the time of issuance and delivery of the Secured Obligations, Reorganized HTA is hereby directed to cause to be stamped or written on each of the Secured Obligations a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE 12TH DAY OF OCTOBER, 2022.

**Miscellaneous Provisions**

165.    <u>Plan Supplement</u>.  All materials contained in the Plan Supplement comply with the terms of the HTA Plan, and the filing, notice, and service of such documents were done in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice is or shall be required.

166.    <u>Satisfaction of Confirmation Requirements</u>.  Based on the foregoing, the HTA Plan satisfies the requirements for confirmation set forth in section 314 of PROMESA.

167.    <u>Oversight Board Certification</u>.  For purposes of section 209 of PROMESA, the discharge of debt to occur as of the HTA Effective Date pursuant to the HTA Plan and the HTA Confirmation Order is necessary for the Oversight Board to certify that expenditures do not exceed revenues for HTA, as determined in accordance with modified accrual accounting standards.

168.    <u>Implementation</u>.  All documents necessary to implement the HTA Plan, including those contained in the Plan Supplement and all other relevant and necessary documents, have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.  Without limiting the generality of the foregoing, the Debtor, prior to the HTA Effective Date, and Reorganized HTA, from and after the HTA Effective Date, are authorized to consummate the transactions contemplated in the HTA Plan and Plan Supplement. The execution, delivery, or performance by the Debtor or Reorganized HTA, as the case may be, of any documents in connection with the Plan Supplement, and compliance by the Debtor or Reorganized HTA, as the case may be, with the terms thereof, is hereby authorized by, and will not conflict with, the terms of the HTA Plan or the HTA Confirmation Order.

169.    <u>Good Faith</u>.  The Debtor will be acting in good faith if it proceeds to
(i) consummate the HTA Plan and the agreements, settlements, transactions, and transfers
contemplated thereby and (ii) take the actions authorized and directed by the HTA Confirmation
Order.

170.    <u>Retention of Jurisdiction</u>.  This Court may properly and, upon the HTA Effective
Date shall, subject to the terms and provisions of Article XL of the HTA Plan, and except as
otherwise provided in the HTA Plan or HTA Confirmation Order, pursuant to sections 105,
945(a), and 1142(b) of the Bankruptcy Code, for the time necessary for the successful
implementation of the HTA Plan, retain exclusive jurisdiction to the extent it has exclusive
subject matter jurisdiction, and concurrent jurisdiction to the extent it has concurrent subject
matter jurisdiction, over all matters arising under PROMESA, arising out of, and related to, the
HTA Title III Case to the fullest extent legally permissible, including, but not limited to, subject
matter jurisdiction over the matters set forth in Article XL of the HTA Plan.

171.    Without limiting the generality of any of the foregoing, the Court shall retain
jurisdiction to (i) enter appropriate orders with respect to the payment, enforcement, and
remedies of the bonds and any other instruments issued pursuant to the HTA Plan, (ii) enter and
implement such orders as may be necessary or appropriate to execute, implement, or
consummate the provisions of the HTA Plan, (iii) adjudicate any and all controversies, suits, or
issues that may arise regarding the validity of any action taken by any entity pursuant to or in
furtherance of the HTA Plan or the HTA Confirmation Order including, without limitation,
issuance of bonds, and (iv) enforce prohibitions against any subsequent collateral attack on
provisions contained in the HTA Plan and the HTA Confirmation Order.

172.    <u>Governing Law</u>.  Except to the extent that other federal law is applicable, or to the

extent that an exhibit to the HTA Plan or any document entered into in connection with the HTA Plan or Plan Supplement provides otherwise, the rights, duties, and obligations arising pursuant to the HTA Plan shall be governed by, and construed in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable pursuant to section 301 of PROMESA), and to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

173.   <u>Enforceability</u>.  Pursuant to sections 1123(a), 1123(b), and 944(a) of the Bankruptcy Code as well as general principles of federal supremacy, the provisions of these Findings of Fact and Conclusion of Law, the HTA Confirmation Order, and the HTA Plan shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.  The documents contained in the Plan Supplement (as such documents may be further modified and filed with the Court prior to the HTA Effective Date) provide adequate means for implementation of the HTA Plan pursuant to section 1123(a)(5) of the Bankruptcy Code and, as of the occurrence of the HTA Effective Date, shall constitute valid legal obligations of the Debtor and valid provisions to pay or secure payment of the bonds pursuant to section 944(b)(3) of the Bankruptcy Code, and shall be enforceable in accordance with their terms.

174.   <u>No Precedential Effect</u>.  The findings of fact and conclusions of law herein concerning the separate classification of certain Claims from Class 15 HTA General Unsecured Claims, including the governmental or business reasons for such classifications, are made with respect to the HTA Title III Case, and shall not have any precedential effect for other Title III cases.

## <u>Conclusion</u>

For the foregoing reasons, the Debtor's motion to confirm the HTA Plan is

granted and the HTA Confirmation Order will be entered contemporaneously herewith.


SO ORDERED.

Dated: October 12, 2022

/s/ Laura Taylor Swain
Laura Taylor Swain
United States District Court Judge