## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA Title III |
| as representative of | No. 17 BK-3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | (Jointly Administered) |
| Debtors.[1] | |
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA Title III |
| as representative of | No. 17 BK-3567-LTS |
| THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY, | |
| Debtor. | |
| VAZQUEZ-VELAZQUEZ, *et al.*, | **Re: ECF No. 1424** |
| Movants, | |
| v. | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | |
| as representative of | |
| THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY, | |
| Respondent. | |

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801). Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.

**OPPOSITION OF THE PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY TO THE VAZQUEZ-VELAZQUEZ
GROUP'S REQUEST FOR STAY PENDING APPEAL OF THE ORDER
AND JUDGMENT APPROVING THE PLAN OF ADJUSTMENT OF
<u>THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................. 1

RELEVANT BACKGROUND ................................................................................................. 4
    A.    PROMESA and the Oversight Board ..................................................... 4
    B.    The Vazquez-Velazquez Wage Claims ................................................. 5
    C.    The HTA Plan of Adjustment ............................................................... 5

ARGUMENT ........................................................................................................................... 7
I.    THE VELAZQUEZ GROUP DOES NOT SATISFY ANY OF THE CRITERIA
FOR A STAY PENDING APPEAL.......................................................................... 7
    A.    The Velazquez Group is Exceedingly Unlikely to Prevail on Their Appeal......... 8
    B.    The Velazquez Group Fails to Establish Irreparable Harm Absent a Stay.......... 12
    C.    A Stay Would Substantially Harm HTA and Other Interested Parties................. 13
    D.    The Public Interest Strongly Disfavors a Stay..................................................... 15
II.    ANY STAY MUST BE CONDITIONED ON A SUBSTANTIAL APPELLATE
BOND. ....................................................................................................................... 15

CONCLUSION....................................................................................................................... 19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*ACC Bondholder Grp. V. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.),*
  361 B.R. 337 (Bankr. S.D.N.Y. 2007) .........................................................................14, 16, 17

*Al Otro Lado v. Wolf,*
  952 F.3d 999 (9th Cir. 2020) .......................................................................................13

*Asociacion de Salud Primaria de P.R. v. Commonwealth of P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.),*
  330 F. Supp. 3d 667 (D.P.R. 2018).............................................................................11

*BDC Cap., Inc. v. Thoburn Ltd. P'ship,*
  508 B.R. 633 (E.D. Va. 2014).....................................................................................12

*Betterecycling Corp. v. Firstbank P.R. (In re Betteroads Asphalt, LLC),*
  2020 WL 3125274 (D.P.R. Jun. 12, 2020) .................................................................12

*Chevron Corp. v. Donziger,*
  37 F. Supp. 3d 653 (S.D.N.Y. 2014)...........................................................................13

*Common Cause R.I. v. Gorbea,*
  970 F.3d 11 (1st Cir. 2020)...........................................................................................8

*Doe v. Trump,*
  957 F.3d 1050 (9th Cir. 2020) .....................................................................................12

*Fraterfood Serv. v. DDR Del Sol, LLC (In re Fraterfood Serv.),*
  2015 Bankr. LEXIS 3081 (Bankr. D.P.R. Sept. 11, 2015) ........................................14

*In re 203 N. LaSalle St. P'ship,*
  190 B.R. 595 (N.D. Ill. 1995) .....................................................................................12

*In re Abengoa Bioenergy Biomass of Kan., LLC,*
  2018 WL 1613667 (D. Kan. Mar. 29, 2018) ..............................................................14

*In re Betteroads Asphalt, LLC,*
  610 B.R. 28 (Bankr. D.P.R. 2019) ..............................................................................12

*In re Calpine Corp.,*
  2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008).........................................13, 16, 17

*In re Convenience USA, Inc.,*
  290 B.R. 558 (Bankr. M.D.N.C. 2003)........................................................................12

ii

*In re Fin. Oversight & Mgmt. Bd.*,
2021 U.S. Dist. LEXIS 254163 (D.P.R. Dec. 27, 2021)....................................................11

*In re Gen. Motors*,
409 B.R. 24 (Bankr. S.D.N.Y. 2009) .................................................................................17

*In re Great Barrington Fair & Amusement, Inc.*,
53 B.R. 237 (Bankr. D. Mass. 1985) .................................................................................14

*In re Int'l Home Prods.*,
2012 WL 6708431 (Bankr. D.P.R. Dec. 26, 2012)............................................................12

*In re Miraj & Sons, Inc.*,
201 B.R. 23 (Bankr. D. Mass. 1996) .................................................................................16

*In re MJS Las Croabas Props.*,
2015 Bankr. LEXIS 2147 (Bankr. D.P.R. Jun. 30, 2015)..................................................13

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
187 F.R.D. 124 (S.D.N.Y. 1999) ......................................................................................18

*In re Pub. Serv. Co.*,
116 B.R. 347 (Bankr. D.N.H. 1990) ..................................................................................14

*In re Revel AC, Inc.*,
802 F.3d 558 (3d Cir. 2015)..............................................................................................12

*In re Roussos*,
2017 WL 766897 (Bankr. C.D. Cal. Feb. 27, 2017)..........................................................16

*In re Sabine Oil & Gas Corp.*,
548 B.R. 674 (Bankr. S.D.N.Y. 2016) ...............................................................................12

*In re Scrub Island Dev. Grp. Ltd.*,
523 B.R. 862 (Bankr. M.D. Fla. 2015) ..............................................................................13

*In re Texas Equip. Co., Inc.*,
283 B.R. 222 (Bankr. N.D. Tex. 2002)..............................................................................18

*In re Tribune*,
477 B.R. 465 (Bankr. D. Del. 2012) ........................................................................16, 17, 18

*In re VVF Comms. Corp.*,
41 B.R. 546 (Bankr. D.D.C. 1984) ....................................................................................16

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012) ........................................................................................13, 16

*In re Weinhold*,
    389 B.R. 783 (Bankr. M.D. Fla. 2008) ................................................................16

*MEDSCI Diagnostics, Inc. v. State Ins. Fund Corp (In re MEDSCI Diagnostics, Inc.)*,
    2011 WL 280866 (Bankr. D.P.R. Jan. 25, 2011) ..............................................7

*Mun. of San Juan v. Puerto Rico*,
    919 F.3d 565 (1st Cir. 2019). Bankruptcy ..................................................10, 11

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*,
    287 F.3d 1 (1st Cir. 2002) ...............................................................................11

*Nken v. Holder*,
    556 U.S. 418 (2009) .............................................................................7, 8, 12

*Ohanian v. Irwin (In re Irwin)*,
    338 B.R. 839 (E.D. Cal. 2006) .........................................................................12

*Porter v. NationsCredit Consumer Discount Co.*,
    2007 WL 674709 (E.D. Pa. Feb. 28, 2007), *aff'd Porter v. NationsCredit Consumer Discount Co.*, 285 F. App'x 871 (3d Cir. 2008) ..........................19

*Ratcliff v. Rancher's Legacy Meat Co.*,
    2020 WL 4048509 (D. Minn. July 20, 2020) ....................................................16

*Respect Maine PAC v. McKee*,
    622 F.3d 13 (1st Cir. 2010) ...............................................................................8

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*,
    699 F.3d 1 (1st Cir. 2012) ...............................................................................8

*Triple Net Invs. IX, LP v. DJK Residential, LLC (In re DJK Residential, LLC)*,
    2008 WL 650389 (S.D.N.Y. Mar. 7, 2008) .............................................16, 19

*Turner v. Frascella Enters., Inc. (In re Frascella Enters., Inc.)*,
    388 B.R. 619 (Bankr. E.D. Pa. 2008) ............................................................12

*Vazquez Velazquez v. P.R. Highways & Transp. Auth.*,
    Case No. 15-1727 (D.P.R.) ..........................................................................3, 5

*Vazquez-Velazquez, et al. v. Puerto Rico Highways and Transportation Authority, et al.*,
    Case No. 21-1739 (1st Cir.) ...........................................................................1, 5

**STATUTES & RULES**

48 U.S.C. §§ 2101–2241 ......................................................................................1

iv

PROMESA § 101(a) ....................................................................................................4, 15

PROMESA § 104(j) ..........................................................................................................5

PROMESA § 204(d) .........................................................................................6, 9, 10, 11

PROMESA § 206 ..............................................................................................................5

PROMESA § 301(a) ........................................................................................................10

PROMESA § 304(a) ..........................................................................................................5

PROMESA § 304(h) .........................................................................................6, 9, 10, 11

PROMESA § 315 ..............................................................................................................5

PROMESA § 405(m)(1) ....................................................................................................4

PROMESA § 944(b) ........................................................................................................10

Fed. R. Bankr. P. 8007(c) ...........................................................................................4, 15

## OTHER AUTHORITIES

23 CFR § 635.103 .............................................................................................................9

23 CFR § 635.105 .............................................................................................................9

23 CFR § 635.108 .............................................................................................................9

United States Courts for the First Circuit 2018 Annual Report at 18,
    https://www.ca1.uscourts.gov/ sites/ca1/files/2018%20Annual%20Report.pd.....................18

To the Honorable United States District Court Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as sole Title III representative of the Puerto Rico Highways and Transportation Authority ("HTA" or the "Debtor"), pursuant to Section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[1] respectfully submits this opposition to the motion for a stay pending appeal [ECF No. 1424][2] (the "Stay Motion"), filed by the plaintiffs-appellants in the First Circuit appeal captioned *Vazquez-Velazquez, et al. v. Puerto Rico Highways and Transportation Authority, et al.*, Case No. 21-1739 (the "Velazquez Group"). The Velazquez Group asks the Court to stay the Order and Judgment [ECF No. 1415] (the "HTA Confirmation Order"), confirming the *Modified Fifth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [ECF No. 1404] (as it may be amended, modified, or supplemented, the "HTA Plan") and, thereby, enjoin the consummation of the transactions contemplated therein.[3]

## PRELIMINARY STATEMENT

1. The HTA Plan is the culmination of (and final step in effectuating) settlements reached relating to, among other things, inter-debtor issues between HTA and the Commonwealth. After nearly five years of extraordinary effort by countless stakeholders and decisions from this Court determining a myriad of legal issues, on October 12, 2022, the Court confirmed the HTA Plan and authorized and directed the consummation of a restructuring of over $6.4 Billion of funded indebtedness and hundreds of millions dollars of asserted general unsecured claims. This was not a one-off restructuring. Rather, it was a component of a well-structured, step-by-step

---

[1]  PROMESA is codified at 48 U.S.C. §§ 2101–2241.

[2]  All ECF No. references are to Case No. 17-bk-3567-LTS, unless otherwise indicated.

[3]  All capitalized terms not defined herein shall have the meaning ascribed to them in the HTA Plan.

approach, implemented by the Court-appointed mediation team led by former Chief Bankruptcy Judge Barbara J. Houser.  Specifically, on January 18, 2022, the Court confirmed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* [Case No. 17-bk-3283-LTS, ECF No. 19784] (the "Commonwealth Plan"), approving consensual agreements relating to (i) the "clawback claims" asserted against the Commonwealth relating to bonds issued by HTA, as provided in the HTA/CCDA PSA, and (ii) disputes regarding, among other things, the priority of certain claims held by the DRA Parties, as provided in the DRA Stipulation.  Confirmation of the Commonwealth Plan, and the settlements approved thereby, was a momentous step towards restoring fiscal stability and access to capital markets for Puerto Rico.

2.      Further carrying out the settlements contemplated by the HTA/CCDA PSA and DRA Stipulation, and carrying out the Oversight Board's mandate under PROMESA, the Oversight Board sought confirmation of the HTA Plan.  On August 17, 2022, the Oversight Board presented the HTA Plan for confirmation and, in doing so, illustrated the overwhelming support of the confirmation by HTA's creditors.  Indeed, only a handful of creditors voiced any opposition, with the Velazquez Group being one of them.

3.      Having its objection overruled summarily, the Velazquez Group now asks the Court to stay the HTA Plan's implementation for the duration of its appeal of the HTA Confirmation Order without true regard of the interests of HTA and the thousands of creditors who will be prejudiced by such stay.  Moreover, any delay in the implementation of the HTA Plan could imperil HTA's successful restructuring, an indispensable piece to Puerto Rico's fiscal recovery and access

2

to capital markets.  Perhaps, most importantly, the HTA Plan creates a solid financial foundation designed to ensure Puerto Rico's roads and public transportation are safe and well-maintained.

4.      The Stay Motion and the relief should be denied because the Velazquez Group has not established, and cannot satisfy, any of the four prerequisites for such extraordinary relief.

5.      First, the Velazquez Group has not shown it is likely to succeed on appeal.  The Velazquez Group challenges the HTA Plan's discharge of its asserted wage claims allegedly relating to the implementation of federal law.  This Court previously considered and rejected each of the arguments the Velazquez Group intends to press on appeal.  The Court's prior rulings and reasoning were correct and demonstrated there are no serious questions raised by the Velazquez Group's position.

6.      Further, the Velazquez Group has no valid claim, let alone a non-dischargeable claim, against HTA.  On August 9, 2021, the United States District Court for the District of Puerto Rico (the "District Court") issued an opinion and order (the "Dismissal Order") dismissing, with prejudice, the Velazquez Group's federal constitutional, Law 180, and Law 100 claims [Case No. 15-1727, ECF No. 211] ), and entered judgment against the Velazquez Group [Case No. 15-1727, ECF No. 212].  In light of the dismissal of the federal constitutional claims, the District Court also declined to exercise supplemental jurisdiction over the Velazquez Group's Article 1802 claims and dismissed such claims without prejudice.  *Id.* at 27.  On September 3, 2021, the Velazquez Group appealed the Dismissal Order to the United States Court of Appeals for the First Circuit, which appeal remains pending.  [Case No. 15-1727, ECF No. 213].

7.      Second, the Velazquez Group fails to show it would be irreparably harmed absent a stay.  Pursuant to the Stay Motion, the Velazquez Group contends that, without a stay, the

Velazquez Group's appeal might become moot before it is resolved.  It is well established, however, that a potential for mootness alone does not constitute irreparable harm.

8.      Third, a stay would substantially harm HTA, its creditors, and other stakeholders. A stay would needlessly delay HTA's economic recovery and the benefits the residents of Puerto Rico receive from the HTA Plan's implementation.  Likewise, delaying the HTA Plan's Effective Date and implementation would impose monetary harms on many stakeholders, with creditors unable to invest or use the Cash due to be distributed in accordance with the HTA Plan.

9.      Fourth, the public interest strongly disfavors a stay because the stay would (i) undermine Puerto Rico's path to fiscal recovery and access to capital markets, (ii) cost HTA and its creditors hundreds of millions of dollars by delaying the HTA Plan's Effective Date, and (iii) would further delay new investments and developments in Puerto Rico's transportation sector.

10.     For all those reasons, a stay is not warranted.  But, should the Court determine otherwise, it should require the Velazquez Group to post a substantial supersedeas bond in accordance with Federal Rule of Bankruptcy Procedure 8007(c).  As explained below, the initial bond would need to be set at no less than $12.94 million in order to compensate the Debtor and its creditors for the losses created by delay.

## RELEVANT BACKGROUND

### A.      PROMESA and the Oversight Board

11.     Congress found that Puerto Rico is in the midst of a "fiscal emergency" resulting from a "combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing."  PROMESA § 405(m)(1).  To address that emergency, Congress enacted PROMESA and created the Oversight Board to help the Commonwealth "achieve fiscal responsibility and access to the capital markets."  *Id.* § 101(a).  Pursuant to Title III of PROMESA, the Oversight Board is authorized to file debt-

4

restructuring cases on behalf of the Commonwealth and its covered instrumentalities, including HTA. *Id.* § 315. On May 21, 2017, the Oversight Board issued a restructuring certification for HTA pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for HTA pursuant to PROMESA section 304(a) with the Title III Court, commencing a case under Title III of PROMESA,

### B.   The Vazquez-Velazquez Wage Claims

12.   The Velazquez Group consists of current and former employees of HTA. It sued HTA in the District Court, alleging that the elimination of certain compensation paid to HTA's workers violated various provisions of the United States Constitution and Puerto Rico law. *See Vazquez Velazquez v. P.R. Highways & Transp. Auth.*, Case No. 15-1727 (D.P.R.).

13.   On August 9, 2021, the District Court dismissed the Velazquez Group's federal constitutional claims with prejudice for failure to state a claim. [Case No. 15-1727, ECF No. 211]. It then declined to exercise supplemental jurisdiction over the claims brought under Puerto Rico law and dismissed those claims without prejudice. *Id.* at 27.

14.   The Velazquez Group appealed the District Court's order of dismissal to the First Circuit, which remains pending. *See Vazquez-Velazquez, et al. v. Puerto Rico Highways and Transportation Authority, et al.*, Case No. 21-1739 (1st Cir).

### C.   The HTA Plan of Adjustment

15.   After several years of mediation and negotiations, the Oversight Board and relevant stakeholders, including bondholders, monoline insurers, and the Creditors Committee, reached a comprehensive agreement concerning a plan of adjustment that would restructure a significant portion of HTA's debt. *See* ECF No. 1299-16. The terms of such agreements are incorporated into the HTA Plan, which provides for the restructuring and discharge of all of HTA's indebtedness, including, without limitation, approximately $6.4 Billion of funded debt and

5

hundreds of millions of asserted general unsecured claims. The HTA Plan also provides that allowed general unsecured claims against HTA, which would include any wage claim asserted by the Velazquez Group, would share in the HTA GUC Recovery, consisting of, among other things, $48 million. HTA Plan §§ 1.198, 1.199, 20.1.

16.     The Velazquez Group objected to confirmation of the HTA Plan, arguing that its asserted wage claims are excepted from discharge by Sections 7, 204(d), and 304(h) of PROMESA. According to the Velazquez Group, those sections bar the discharge of claims related to their compensation because their work and compensation were indispensable to HTA's compliance with certain federal health and safety regulations. Thus, the Velazquez Group argues that HTA is required by federal law to pay the wage claims, and the claims therefore fall within the scope of Sections 7, 204(d), and 304(h).

17.     On October 12, 2022, this Court overruled all objections to the HTA Plan— including those asserted by the Velazquez Group—and confirmed the HTA Plan. *See* HTA Confirmation Order at 4; *see also Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Fifth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [ECF No. 1416] ("HTA Findings of Fact").

18.     Assuming that PROMESA Sections 7, 204(d), and 304(h) set forth exceptions to discharge, the Court found that the Velazquez Group's asserted wage claims do not fall within the scope of those purported exceptions to discharge because the special compensation at the heart of the Velazquez Group's claim does not fall squarely within the language of sections 7, 204(d), or 304(h) of PROMESA, nor has the Velazquez Group otherwise plausibly shown that it is sufficiently connected to a Commonwealth or HTA obligation that is protected by the cited federal laws and regulations to support a viable argument that those sections protect the particular

6

compensation claims from discharge. HTA Findings of Fact ¶ 114 n.14.  The Court further found

that, if the Velazquez Group ultimately prevails in the Velazquez Litigation, its claims would

correctly be treated as an HTA General Unsecured Claim and discharged pursuant to the HTA

Plan.  *Id.*

19.     The Court also found that confirmation constitutes "a further step in the effort to

achieve fiscal responsibility of the Commonwealth of Puerto Rico and its instrumentalities."  *Id.*

at 9.  It further found that, absent the HTA Plan, HTA would "face great uncertainty, financial

instability, and significant lawsuits."  *Id.* ¶ 148.  The Velazquez Group does not challenge these

findings as clearly erroneous.

20.     On October 24, 2022, the Velazquez Group appealed from the HTA Confirmation

Order and the HTA Findings of Fact [ECF No. 1424].  The Velazquez Group now seeks a stay of

the HTA Confirmation Order and implementation of the HTA Plan pending the outcome of its

appeal.

## ARGUMENT

I.      **THE VELAZQUEZ GROUP DOES NOT SATISFY ANY OF THE CRITERIA
        FOR A STAY PENDING APPEAL.**

21.     A stay pending appeal is an "extraordinary remedy" that "requires a substantial

showing."  *MEDSCI Diagnostics, Inc. v. State Ins. Fund Corp (In re MEDSCI Diagnostics, Inc.)*,

2011 WL 280866, at *3 (Bankr. D.P.R. Jan. 25, 2011).  Because a stay pending appeal is "an

intrusion into the ordinary processes of administration and judicial review," it is "not a matter of

right, even if irreparable injury might otherwise result to the appellant."  *Nken v. Holder*, 556 U.S.

418, 427 (2009) (citations omitted).

22.     A party seeking a stay pending appeal must demonstrate:  (*i*) a "strong showing" of

likelihood of success on the merits on appeal; (*ii*) irreparable injury absent a stay; (*iii*) the issuance

of a stay will not injure other interested parties; and (*iv*) a stay is in the public interest. *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020). The first two factors are the most critical and require more than a "mere possibility" of success and irreparable injury. *Nken*, 556 U.S. at 434; *see also Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010) ("[Movants] must show a strong likelihood of success, and they must demonstrate that irreparable injury will be likely . . . ."). Both factors are independent, necessary predicates for a stay, and a strong showing on one "cannot dispense with the required showing of" the other. *Nken*, 556 U.S. at 438 (Kennedy, J., concurring).

23.     Here, the Velazquez Group has not established, and cannot establish, any of the prerequisites for the extraordinary relief it seeks. *First*, it is exceedingly unlikely to succeed on appeal for the reasons already identified by this Court. *Second*, it has not shown that it would be irreparably harmed absent a stay. *Third*, a stay would imperil HTA's successful restructuring, thereby inflicting immeasurable harm on HTA, its creditors, and residents of Puerto Rico. *Fourth*, the significant public interest in furthering Puerto Rico's path to fiscal recovery disfavors any delay in the HTA Plan's implementation. Because all four factors strongly militate against a stay, the Stay Motion and the relief requested therein should be denied.

### A.     The Velazquez Group is Exceedingly Unlikely to Prevail on Their Appeal.

24.     The Stay Motion fails at step one because the Velazquez Group has not shown that it is likely to succeed in its appeal of the HTA Confirmation Order. "To demonstrate likelihood of success on the merits, [a movant] must show 'more than mere possibility' of success." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012). "[R]ather, they must establish a 'strong likelihood' that they will ultimately prevail." *Id.*

25.     The Velazquez Group has not demonstrated the strong likelihood of success on appeal necessary for a stay. To the contrary, the Stay Motion merely recycles arguments from the

8

Velazquez Group's objection to confirmation that this Court has already rejected. Nothing in the Stay Motion suggests that the Court's cogent analysis was wrong.

26.     The Court correctly determined that the Velazquez Group's asserted (and previously dismissed) claims do not fall within the scope of Sections 7, 204(d), or 304(h) of PROMESA and, as such, the asserted claims are not exempt from discharge. The Velazquez Group broadly asserts that certain federal regulations, including 23 CFR § 635.103, 23 CFR § 635.105, and 23 CFR § 635.108, require that "HTA do certain things and in order for these employees to do the extra work, they were compensated via Regulation 02-017" and that the compensation scheme "was the way to comply" with the regulations. Stay Motion ¶ 11–12. The federal laws and regulations the Velazquez Group cites do not require the payment of the Velazquez Group's asserted wage claims, however, but merely require HTA to take certain actions in connection with federal highway projects, such as including certain terms in contracts. *See* 23 C.F.R. § 635.108. The compensation scheme, if anything, is a function or creation of HTA's regulations—not federal law, and the Velazquez Group concedes as much. *See* Aug. 17, 2022 Hr'g Tr. 67:25-68:16. As the Court correctly held, the Velazquez Group's claims are "not sufficiently connected to an HTA obligation that is purportedly protected from discharge to demonstrate plausibly that those [Sections 7, 204(d), or 304(h) of PROMESA] protect this claim from discharge." HTA Findings of Fact ¶ 114 n.14. The Velazquez Group's continued "bolding" of the word "safety" fails to change the result.

27.     Though the Velazquez Group expresses general disagreement with the Court's determinations by insisting that its claims are non-dischargeable and deserve separate classification in the HTA Plan, nothing in the Stay Motion challenges any of the Court's reasoning, and the Velazquez Group's position is meritless.

9

28.     Further, the Velazquez Group fails to address how Sections 7, 204(d), and 304(h) even provide for an exception to discharge.  For purposes of disposing of the Velazquez Group's objection, the Court only assumed that these sections of PROMESA could be a basis for an exception for discharge.  HTA Findings of Fact at 50 n.14 ("Assuming, for present purposes, that each of these sections of PROMESA could serve as a vehicle for an exception to discharge, the nature of the Vazquez Velazquez Group's claim does not fall with the scope of the purported exceptions.").

29.     PROMESA Section 7 provides that, "*[e]xcept as otherwise provided in this chapter*, nothing in this chapter shall be *construed* as impairing or in any manner relieving a territorial government, or a territorial instrumentality thereof, from compliance with Federal laws or requirements or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory."  (emphasis added).  The Velazquez Group ignores the opening words of the provision ("[e]xcept as otherwise provided in this chapter").  As the First Circuit noted, this text provides that, where PROMESA expressly includes a provision that, by its plain terms, operates to impair compliance with federal laws or requirements, then PROMESA controls.  *Mun. of San Juan v. Puerto Rico*, 919 F.3d 565, 580 (1st Cir. 2019).  Bankruptcy Code section 944(b), made applicable to this Title III case pursuant to PROMESA Section 301(a), clearly provides for a discharge of debts, *except as provided in Bankruptcy Code section 944(c)*—limited only to debts excepted from discharged by the plan or confirmation order, or an entity that had no notice nor actual knowledge of the case.  These specific exceptions do not apply to the Velazquez Group's claims.  Furthermore, this Court has noted that PROMESA Section 7 merely provides interpretive direction and does not

confer new rights or causes of action.  *Asociacion de Salud Primaria de Puerto Rico v. Commonwealth (In re Fin. Oversight & Mgmt. Bd.)*, 330 F. Supp. 3d 667, 674 (D.P.R. 2018).

30.      Similarly, this Court has held that PROMESA Section 304(h), which uses the same "construed" language, does not provide an independent right to non-discharge.  *In re Fin. Oversight & Mgmt. Bd.*, 2021 U.S. Dist. LEXIS 254163, at *41–42 (D.P.R. Dec. 27, 2021).

31.      The plain terms of PROMESA Section 204(d) also do not provide a basis for an exception to discharge.  Such section provides that, "[i]n taking actions under this Act, the Oversight Board shall not exercise applicable authority to *impede territorial actions* taken to . . . ."  (emphasis added).  A discharge in bankruptcy permanently enjoins *creditor actions* to collect discharged debts, rather than territorial actions.  *Mun. of San Juan*, 919 F.3d at 578.

32.      Moreover, even if the Velazquez Group were to succeed on the questions regarding (i) whether PROMESA Sections 7, 204(d), and 304(h) provide an exception to discharge, and (ii) whether the type of claims asserted by the Velazquez Group fall within the ambit of such sections, the Velazquez Group would need to demonstrate that it has a valid claim.  As previously noted, the Velazquez Group's asserted claim was dismissed, with prejudice.

33.      The Velazquez Group therefore fails to carry its burden of demonstrating a strong likelihood of success, and accordingly, the Stay Motion should be denied.  *See New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) (citation omitted) ("The sine qua non of this four-part inquiry is likelihood of success on the merits:  if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.").  To the extent the Court considers the other stay factors, they likewise strongly militate against the requested stay.

11

**B.    The Velazquez Group Fails to Establish Irreparable Harm Absent a Stay.**

34.    A movant seeking the extraordinary remedy of a stay pending appeal bears the

burden of establishing "irreparable injury is likely to occur during the period before the appeal is

decided." *Doe v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020).  A mere "possibility of irreparable

injury" pending review is insufficient.  *See Nken*, 556 U.S. at 434–35 (citation omitted).  The risk

of irreparable injury must be "neither remote nor speculative, but actual and imminent."  *In re

Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015) (citation omitted).  The Velazquez Group has

made no showing that it will be irreparably harmed absent a stay.

35.    The Velazquez Group argues that, absent a stay, it would be irreparably harmed

because their appeal might become equitably moot before being resolved.  *See* Stay Motion ¶ 14.

That argument fails as a matter of law because "the potential mootness of matters on appeal is not

sufficient to demonstrate 'irreparable harm.'"  *Betterecycling Corp. v. Firstbank P.R. (In re

Betteroads Asphalt, LLC)*, 2020 WL 3125274, at *10 (D.P.R. Jun. 12, 2020); *see also In re

Betteroads Asphalt, LLC*, 610 B.R. 28, 38 (Bankr. D.P.R. 2019) (siding with the "majority of

courts" that find "a risk of mootness" insufficient to justify a stay); *In re Int'l Home Prods.*, 2012

WL 6708431, at *7 (Bankr. D.P.R. Dec. 26, 2012) ("[I]nvoking that an appeal will turn moot by

the denial of a stay[] is not sufficient by itself to demonstrate irreparable harm.").[4]  That rule makes

eminent sense because the risk of equitable mootness is "present in any post-confirmation appeal

---

[4]    The overwhelming weight of authority outside this district is in accord.  *See, e.g.*, *In re Sabine Oil & Gas Corp.*,
548 B.R. 674, 682 (Bankr. S.D.N.Y. 2016) ("A majority of courts have held that a risk of mootness, standing alone,
does not constitute irreparable harm."); *BDC Cap., Inc. v. Thoburn Ltd. P'ship*, 508 B.R. 633, 639 (E.D. Va. 2014)
("[T]he possibility that the appeal would become equitably moot does not constitute irreparable injury."); *Turner
v. Frascella Enters., Inc. (In re Frascella Enters., Inc.)*, 388 B.R. 619, 627 (Bankr. E.D. Pa. 2008) (finding
"potential of mootness insufficient"); *Ohanian v. Irwin (In re Irwin)*, 338 B.R. 839, 853 (E.D. Cal. 2006) ("It is
well settled that an appeal being rendered moot does not itself constitute irreparable harm."); *In re Convenience
USA, Inc.*, 290 B.R. 558, 563 (Bankr. M.D.N.C. 2003) ("[A] majority of the cases . . . have found that the risk that
an appeal may become moot does not, standing alone, constitute irreparable injury."); *In re 203 N. LaSalle St.
P'ship*, 190 B.R. 595, 598 (N.D. Ill. 1995) (finding the issue "well settled").

of a [reorganization] plan." *In re Calpine Corp.*, 2008 WL 207841, at *4 (Bankr. S.D.N.Y. Jan. 24, 2008). If the risk that an appeal could become moot were itself sufficient to justify a stay pending appeal, "a stay would be issued in every case." *In re W.R. Grace & Co.*, 475 B.R. 34, 207 (D. Del. 2012). Such a rule would transform a stay pending appeal from "extraordinary" to commonplace. *In re MJS Las Croabas Props.*, 2015 Bankr. LEXIS 2147, at *2 (Bankr. D.P.R. Jun. 30, 2015).

36.    Finally, the Vazquez Group admits that, if it were successful on appeal, its recovery will not "derail" the HTA Plan and that HTA would be able to pay its asserted claim. *See* Stay Motion ¶¶ 15-16. Accordingly, by the Vazquez Group's own admission, it would suffer no harm if it succeeds in overcoming the substantial hurdle of successfully appealing the Confirmation Order and succeeding on its appeal of the Dismissal Order.

### C.    A Stay Would Substantially Harm HTA and Other Interested Parties.

37.    Because the Velazquez Group fails to satisfy either of the first two factors of the test for a stay, the Court "need not dwell on the final two factors—harm to the opposing party and the public interest." *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1014 (9th Cir. 2020) (citation omitted); *see also Chevron Corp. v. Donziger*, 37 F. Supp. 3d 653, 671 (S.D.N.Y. 2014). Nevertheless, the final two factors likewise strongly militate against the imposition of a stay.

38.    The harm a stay would inflict on HTA, its creditors, and other stakeholders cannot be overstated. For one thing, a stay would be potentially catastrophic to the Debtor's reorganization efforts, which took years to negotiate and has the overwhelming support of HTA's creditors. Delaying the HTA Plan's implementation by imposing a stay that would likely persist for months while an appeal is litigated creates a significant risk of undermining the HTA Plan and the benefits the residents of Puerto Rico will receive thereunder. *Cf. In re Scrub Island Dev. Grp. Ltd.*, 523 B.R. 862, 878–79 (Bankr. M.D. Fla. 2015) (denying stay because "every day that passes

without the Debtors being able to" obtain capital "materially diminishes the likelihood that the Debtors' reorganization efforts will be successful"); *In re Pub. Serv. Co.*, 116 B.R. 347, 350 (Bankr. D.N.H. 1990) ("[T]he huge financing required by this plan would be severely jeopardized by a stay . . . [, and] the possible failure of any plan of reorganization as a consequence of a stay [is] a significant injury."). Critically, the stay would delay HTA from utilizing the fresh start provided by the HTA Plan to move forward with projects and improvements that would ultimately benefit the people of Puerto Rico and further the Commonwealth's revitalization.

39.     In addition to putting the HTA's restructuring at risk, a stay would impose significant financial harms on HTA, its creditors, and other stakeholders. For example, a stay would delay the distribution of hundreds of millions of dollars to creditors under the HTA Plan, causing creditors to lose the ability to invest or utilize such monies and generate significant value.[5] "Delay caused to creditors receiving their payment is . . . a significant harm warranting denial of a stay" pending appeal. *Fraterfood Serv. v. DDR Del Sol, LLC (In re Fraterfood Serv.)*, 2015 Bankr. LEXIS 3081, at *6 (Bankr. D.P.R. Sept. 11, 2015); *see also In re Abengoa Bioenergy Biomass of Kan., LLC*, 2018 WL 1613667, at *9 (D. Kan. Mar. 29, 2018) ("Significant delay in the distribution to creditors under a plan constitutes substantial harm."); *ACC Bondholder Grp. V. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 342 (Bankr. S.D.N.Y. 2007) (noting the "weighty interest[]" of "the right of the majority of creditors to receive their distributions"); *In re Great Barrington Fair & Amusement, Inc.*, 53 B.R. 237, 240 (Bankr. D. Mass. 1985) ("The chief harm which will be caused by a stay is the delay which will be suffered by the other creditors.").

---

[5] *See infra* paras. 48-51.

40.     The Velazquez Group dismisses the financial impact of the stay, arguing that the amount of its claims "would not derail the [HTA Plan]. It would simply postpone for a short period of time when [HTA's creditors] would receive payment." Stay Motion ¶ 15. That argument is non-responsive because the financial harms resulting from halting implementation of the HTA Plan in no way depend on the amount of the Velazquez Group's claims. Those financial harms are significant and counsel strongly against the imposition of a stay.

**D.     The Public Interest Strongly Disfavors a Stay.**

41.     The Velazquez Group does not even attempt to argue that the public interest favors a stay. Nor could it. There is a strong public interest disfavoring a stay of the implementation of the HTA Plan, which will set HTA (and the Commonwealth at large) towards the path to financial recovery. The HTA Plan will allow for safe, well-maintained roads and an efficient and accessible transportation system for Puerto Rico's residents. The HTA Plan also further advances Puerto Rico's path to "fiscal responsibility and access to the capital markets." See PROMESA § 101(a). Putting aside the Velazquez Group, substantially all of HTA's creditors endorsed the HTA Plan and want to see it implemented expeditiously. *See* HTA Findings of Fact at 9 ("The HTA Plan has broad but not universal support."). Any delay to the consummation of the HTA Plan would weigh strongly against the public interest and the will of creditors holding billions of dollars of allowed claims.

**II.     ANY STAY MUST BE CONDITIONED ON A SUBSTANTIAL APPELLATE BOND.**

42.     If the Court were to grant a stay, it should order the Velazquez Group to post an initial supersedeas bond in the amount of at least $12.94 million in accordance with Federal Rule of Bankruptcy Procedure 8007(c).

15

43.     A bond is a "standard requirement of granting a stay." *In re Adelphia Commc'ns Corp.*, 361 B.R. at 350.  It protects the prevailing party from any losses resulting from the stay in the event the appeal is unsuccessful, including interest on amounts withheld during the stay period. *See In re Roussos*, 2017 WL 766897, at *1 (Bankr. C.D. Cal. Feb. 27, 2017); *In re Miraj & Sons, Inc.*, 201 B.R. 23, 28 (Bankr. D. Mass. 1996); 10 Collier on Bankruptcy ¶ 8007.09[1] (16th ed. 2020).  A bond may also protect third parties, including creditors and other stakeholders, from losses they may incur as a result of the stay.  *In re Tribune*, 477 B.R. 465, 478 (Bankr. D. Del. 2012); *In re Calpine*, 2008 WL 207841, at *7.

44.     There is a strong policy in favor of securing a prevailing party against losses arising during a stay pending appeal.  *Ratcliff v. Rancher's Legacy Meat Co.*, 2020 WL 4048509, at *14 (D. Minn. July 20, 2020).  Accordingly, any departure from the bond requirement would represent "a truly extraordinary exercise of discretion," *In re VVF Comms. Corp.*, 41 B.R. 546, 550 (Bankr. D.D.C. 1984), warranted only where there are "exceptional circumstances" and an alternative means of securing the prevailing party's interests, *In re Weinhold*, 389 B.R. 783, 788–89 (Bankr. M.D. Fla. 2008).  A movant seeking a stay without posting a bond bears "the burden of demonstrating why the court should deviate from the ordinary full security requirement."  *In re W.R. Grace & Co.*, 475 B.R. at 209.

45.     The Velazquez Group makes no attempt in the Stay Motion to show extraordinary circumstances warranting a departure from the requirement that it post a bond in support of any stay that might issue.

46.     With respect to the bond amount, "the court should set a bond at or near the full amount of the potential harm to the non-moving parties."  *In re Adelphia Commc'ns Corp.*, 361 B.R. at 368; *see also Triple Net Invs. IX, LP v. DJK Residential, LLC (In re DJK Residential, LLC)*,

2008 WL 650389, at *5 (S.D.N.Y. Mar. 7, 2008) (a bond should be "commensurate with the threatened loss to the non-moving parties").  To determine an appropriate bond amount in a bankruptcy case, courts consider the cash distributions creditors would have received but for the stay, incremental administrative expense costs including payments to professional advisors, and other foreseeable costs arising from a delay in implementing the restructuring.  *See, e.g.*, *In re Tribune Co.*, 477 B.R. at 480–81.  Because the stay of an order confirming a reorganization plan typically affects many parties, courts have imposed sizable bonds in the rare bankruptcy cases where a stay has been granted.  *See, e.g.*, *In re Gen. Motors*, 409 B.R. 24, 34 (Bankr. S.D.N.Y. 2009) (denying stay but noting that stay would have required $7.4 billion bond); *In re Tribune Co.*, 477 B.R. at 483 ($1.5 billion bond); *In re Adelphia Commc'ns Corp.*, 361 B.R. at 368 (bond set at $1.3 billion, later reduced); *In re Calpine*, 2008 WL 207841, at *7 ($900 million bond).

47.      Here, a bond should be set at an amount that covers the enormous harm that a stay would inflict on the non-moving parties.  If the HTA Plan's Effective Date were delayed, HTA, its creditors, and other stakeholders stand to lose millions of dollars.  Those potential losses fall within at least two categories.

48.      *First*, a stay would cost the Debtor millions of dollars in administrative fees. During the Title III case, the Debtor incurred, on average, approximately more than $1.4 million per month in professionals' fees, including fees paid to the legal and financial advisors of the Debtor, and the Creditors' Committee.[6]  The Debtor will need to retain most of those professionals through the HTA Plan's implementation.  Any delay in the HTA Plan's implementation would

---

[6]      *See e.g., Corrected Opposition of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Motion Dated February 1, 2022 for Stay Pending Appeal* ¶ 72 [Case No. 17-3283, ECF No. 20085]; *Omnibus Order Awarding: Interim Allowance of Compensation for Professional Services Rendered and Reimbursement of Expenses for the Fifteenth Interim (February 1, 2022 – May 31, 2022) and Prior Compensation Periods* [ECF No. 1410].

17

only prolong such retentions.  *See In re Tribune Co.*, 477 B.R. at 480 (factoring into bond amount the incremental administrative and professional costs of stay); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 124, 129 (S.D.N.Y. 1999) (requiring a bond to include "damages resulting from the delay and/or disruption of settlement administration caused by his appeal").

49.  *Second*, delaying the HTA Plan's implementation would deprive creditors of the ability to invest or otherwise use cash distributions to be made on the HTA Effective Date. Pursuant to the HTA Plan, HTA Confirmation Order, and the HTA/CCDA PSA, up to approximately $183.6 million in cash is to be distributed to creditors after the HTA Effective Date. *Id.* ¶ 21.  Assuming a conservative rate of return of 5%[7], creditors would lose at least $756,000.00 per month in investment earnings if those distributions were delayed.  *See In re Texas Equip. Co., Inc.*, 283 B.R. 222, 230 (Bankr. N.D. Tex. 2002) (including in an appeal bond "the time value of the money"); *In re Tribune*, 447 B.R. at 480–81 (same).

50.  The median time for an appeal to be resolved by the First Circuit is 13.6 months.[8] Even if the Velazquez Group's appeal were expedited, it is unlikely to be resolved in less than six months.  Accordingly, as a prerequisite to any stay, the Velazquez Group should at a minimum be required to post a bond covering the harm to HTA and other parties if a stay of the HTA Plan's implementation were to remain in place for six months.

51.  A six-month stay would cost creditors approximately $4.54 million in interest and result in the Debtor incurring approximately $8.4 million in additional professional fees.  An initial appellate bond should therefore be set at no less than $12.94 million, pending a further evidentiary

---

[7]   The Debtor used an assumed discount rate of 5.00% as the rate of return on investment in the best interests of creditors tests report.  *See* ECF No. 1354-1.

[8]   *See* United States Courts for the First Circuit 2018 Annual Report at 18, https://www.ca1.uscourts.gov/ sites/ca1/files/2018%20Annual%20Report.pdf.  Notably, this data is pre-pandemic, and administrative delays associated COVID-19 have likely extended the time for appeals to be resolved.

hearing to set the final amount of such bond, and subject to increase if delays are longer.  That amount is in addition to, and does ***not*** account for, the risk that the stay might undermine HTA's entire restructuring or lost opportunity costs for creditors receiving New HTA Bonds.

52.     To the extent that the Velazquez Group complains that it cannot afford to post a bond in that amount or any amount, it is not a reason for lifting the bond requirement.  To the contrary, an inability "to post a bond commensurate with the threatened loss to the non-moving parties . . . only serves to highlight the substantial risk of dramatic injury to Debtors and other creditors if the Bankruptcy Court's orders [are] erroneously stayed."  *In re DJK Residential, LLC*, 2008 WL 650389, at \*5; *cf. Porter v. NationsCredit Consumer Discount Co.*, 2007 WL 674709, at \*1–2 (E.D. Pa. Feb. 28, 2007) (holding, under Fed. R. Civ. P. 62(b), that inability to post a supersedeas bond without alternative proposal to secure judgment is insufficient to justify departure from bond requirement), *aff'd Porter v. NationsCredit Consumer Discount Co.*, 285 F. App'x 871 (3d Cir. 2008).

## CONCLUSION

**WHEREFORE** the Debtor respectfully requests the Court (*i*) deny the Stay Motion (or, in the alternative, condition the issuance of a stay on the Velazquez Group's posting of an initial supersedeas bond in the amount of $12.94 million, subject to increase and further evidentiary hearing to set the final amount of such bond, and (*ii*) grant the Debtor such other and further relief as is just and proper.

*[Remainder of page intentionally left blank]*

Dated: October 28, 2022
     San Juan, Puerto Rico

Respectfully submitted,

*/s/ Brian S. Rosen*

Martin J. Bienenstock (*Pro Hac Vice*)
Brian S. Rosen (*Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

John E. Roberts (*Pro Hac Vice*)
**PROSKAUER ROSE LLP**
One International Place
Boston, MA 02110
Tel:  (617) 526-9600
Fax:  (617) 526-9899

Steve Y. Ma (*Pro Hac Vice*)
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Tel:  (310) 557-2900
Fax:  (310) 557-2193

*Attorneys for the Financial Oversight and Management Board for Puerto Rico as representative for the Debtor*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944
Email: hermann.bauer@oneillborges.com

*Co-Attorneys for the Financial Oversight and Management Board for Puerto Rico as representative for the Debtor*