# **Exhibit A**

66157944.v6

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>　　as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>　　　　　　　　Debtors.[1] | PROMESA<br><br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>　　as representative of<br><br>THE PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY,<br><br>　　　　　　　　Debtor. | PROMESA<br><br>Title III<br><br>No. 17 BK 3567-LTS |

**DECLARATION OF CHRISTINE SONG IN SUPPORT
OF OPPOSITION OF HTA/CCDA PSA CREDITORS TO VAZQUEZ
VELAZQUEZ GROUP'S MOTION FOR STAY PENDING APPEAL**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

I, Christine Song, declare as follows:

1. I am a Director at Miller Buckfire, an advisory firm that has been retained by National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, and Financial Guaranty Insurance Company (together, the "**Monolines**") to file a declaration in support of their opposition to the Vazquez Velazquez Group's motion for a stay pending appeal. Prior to its retention by the Monolines, Miller Buckfire (a) served as financial advisor to a group of holders of COFINA's senior secured bonds in connection with COFINA's restructuring, (b) served as financial advisor to the Lawful Constitutional Debt Coalition in connection with the restructuring of the Commonwealth and certain of its instrumentalities, (c) was retained by the Ad Hoc Group of FGIC-Insured Noteholders in connection with the creation of the Puerto Rico FGIC Trust Certificates and other FGIC-related matters, and (d) was retained by National Public Finance Guarantee Corporation in connection with the restructuring of the Puerto Rico Electric Power Authority debt.

2. I am familiar with HTA's financial affairs, the terms of the proposed restructuring of HTA's debt obligations, the general market for trading of HTA's securities, and other matters that concern HTA's restructuring. Including my work on COFINA, I have been involved for approximately seven years with the efforts of the Commonwealth and certain of its instrumentalities to address their fiscal situation and restructure their obligations.

3. I have extensive experience in providing financial restructuring services to companies, governments, and creditors in connection with both in-court and out-of-court restructurings, including the City of Detroit in its reorganization under chapter 9 of the United States Bankruptcy Code, and creditors of COFINA and the Commonwealth in connection with their successful reorganizations pursuant to Title III of PROMESA. Before joining Miller Buckfire in 2014, I was Vice President of Alternative Investments Research from 2009 to 2012 at

2

Morgan Stanley Smith Barney. Before that I was a research associate at Citi Global Wealth Management from 2006 to 2009 and an analyst at Goldman Sachs from 2004 to 2006. I earned a B.A. in economics from Georgetown University and an M.B.A. from the NYU Stern School of Business. I am also a CFA charterholder.

4. I submit this declaration (the "Declaration") in support of the *Opposition of HTA/CCDA PSA Creditors to Vazquez Velazquez Group's Motion for Stay Pending Appeal* (the "Opposition"),[2] filed contemporaneously herewith. I have reviewed the Motion and the Opposition, and am familiar with the Plan, the Confirmation Order, the FFCL, and other filings relating thereto.

5. All matters set forth in this Declaration are based on: (a) my personal knowledge; (b) my review of relevant documents; (c) my experience with and knowledge of HTA's financial affairs and HTA's Title III case; (d) my knowledge of the Plan and filings relating thereto; (e) information supplied to me by the Monolines and their counsel; and (f) analysis prepared by Miller Buckfire in support of this Declaration. If called upon to testify, I could and would testify to the facts set forth herein.

6. The Debtors, the holders of bonds issued by HTA (such holders, collectively, "HTA Creditors"), the Monolines, and other stakeholders would incur substantial harm if the Court were to grant the Vazquez Velazquez Group's Motion for a stay pending appeal. In this Declaration, I focus particularly on quantifying three types of discrete harms to the Monolines, the HTA/CCDA PSA Creditors, and the HTA Creditors generally, consisting of: (a) approximately $35 million of lost opportunity cost incurred by HTA Creditors due to a delay in receiving the New HTA Bonds

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Opposition or the Plan, as applicable.

beyond December 1, 2022, the currently assumed Effective Date of the Plan; (b) approximately $18 million of lost opportunity cost incurred by certain HTA/CCDA PSA Creditors due to a delay in receiving the HTA PSA Restriction Fees, Consummation Costs, and HTA/CCDA Clawback Structuring Fees[3] (the "PSA Fees") beyond December 1, 2022; and (c) the incurrence of approximately $1 million in incremental professional fees by the Monolines. These amounts total, in the aggregate, $55 million of harm to HTA Creditors, including the Monolines.

7. These totals are based on a hypothetical delay in the occurrence of the HTA Effective Date of 13 months (the "Stay Period"), which I understand from counsel to be the median time period for the resolution of an appeal of a district court order to the United States Court of Appeals for the First Circuit (the "First Circuit"). I have also provided a sensitivity analysis showing the potential harm to HTA Creditors based on a Stay Period of six months, which I understand to be the time period in which recent expedited appeals to the First Circuit (including prior appeals in connection with the Title III Cases) have been resolved, and twenty months, as set forth throughout the Declaration and in Table 1 below.[4]

**Table 1**

| Summary Table of Impact to HTA Creditors ($MM) | | | |
|---|---|---|---|
| | 6 Mo. Delay 6/1/2023 | 13 Mo. Delay 1/1/2024 | 20 Mo. Delay 8/1/2024 |
| Opportunity Cost of Inability to Reinvest Sale Proceeds | $17 | $35 | $53 |
| Impact of Delayed PSA Fees | 8 | 18 | 28 |
| Cost of Additional Professional Fees for Monolines | 1 | 1 | 2 |
| **Total Impact to HTA Creditors** | **$26** | **$55** | **$83** |

8. In addition to the foregoing harms to HTA Creditors in particular, there are a number of additional harms the Monolines may suffer as a result of the stay, including: (a) a higher opportunity cost and higher discount rate relative to other bondholders due to the continued lack

---

[3] See Commonwealth Confirmation Order, ECF No. 19813, ¶ 54.
[4] Unless otherwise indicated, all dollar amounts in Tables 1–4 herein are stated in millions of dollars. Further, any discrepancies between the individual line items and the sum totals set forth in Tables 1–4 herein are due to rounding.

4

of liquidity on unmatured policy claims; and (b) additional interest payments that the Monolines would have to make as a result of the delayed Effective Date without the benefit of the treatment of the Monoline bond claims under the Plan. Although this Declaration does not attempt to quantify the dollar value of such additional harm with any particularity, I understand that such harm is likely to be substantial.

### A. Lost Opportunity Cost for New HTA Bonds

9. During the Stay Period, HTA Creditors will be unable to access or sell roughly $1.245 billion original principal amount[5] of New HTA Bonds to be distributed to HTA Creditors under the Plan and reinvest the sales proceeds. Assuming that the HTA Creditors would reinvest the $1.051 million[6] of sale proceeds, a 13 month delay in reinvesting such proceeds would potentially harm HTA Creditors in an additional amount of $35 million.

10. Accordingly, the amount of lost opportunity costs associated with a Stay Period can be estimated conservatively by calculating the difference between (a) anticipated rates of return that could reasonably be earned with respect to sales proceeds of the New HTA Bonds if such consideration were distributed in accordance with the terms of the Plan on the currently-anticipated timeline (which in the case of the New HTA Bonds would be on an assumed Effective Date of December 1, 2022) and then sold and (b) the 5% interest accrual on the New HTA Bonds.

---

[5] Consists of $600 million of Current Interest Bonds, $407 million original principal amount of Convertible Capital Appreciation Bonds and $238 million original principal amount of Capital Appreciation Bonds.

[6] To estimate sale proceeds of the New HTA CIBs, the future cash flows of the New HTA CIBs are discounted at 6.1%, the yield of the 4.00% GO current interest bond due 2046 (CUSIP 74514L3P0). All accrued and unpaid cash interest payments are assumed to be paid on an assumed Effective Date of December 1, 2022. To estimate sale proceeds of the New HTA CABs and New HTA Convertible CABs, the future cash flows are discounted at 6.8%, the sum of the 6.5% yield on the 0% COFINA CAB due 2046 (CUSIP 74529JQG3) plus a 30 basis point spread (based on the spread between the GO curve and COFINA curve), to the assumed Effective Date.

11.     I believe that a reasonable and conservative estimate of the potential rate of return on the sales proceeds of the New HTA Bonds is represented by the yield to worst[7] on the ICE Bank of America U.S. High Yield Index, a commonly used index to analyze the high yield market.[8] As of October 26, 2022, the yield to worst for the index was 9.13%.  This rate of return is conservative when compared to the tax-effected yield of like-duration Commonwealth General Obligation Bonds.[9]  I believe it is appropriate to use a taxable yield in this case because, while the payment of interest on all of the New HTA Bonds will likely be excluded from gross income for federal income tax purposes under section 103 of the Internal Revenue Code, the yield on proceeds reinvested in an otherwise equivalent instrument that is not structured as tax-exempt would need to be considerably higher than that on the New HTA Bonds in order to provide an economically equivalent return on investment.  In addition, in the event the Vazquez Velazquez Group's appeal is unsuccessful and the proceeds of a supersedeas bond are distributed to HTA Creditors (the vast majority of which I understand to be directly or indirectly subject to U.S. income taxes), I am advised by counsel that such proceeds would be taxed at ordinary income tax levels.

---

[7] "Yield to Worst" typically means the lowest yield that can be received on a bond without the issuer defaulting.  The HTA Creditors have different costs of capital and investment return targets.  For purposes of this analysis, we have conservatively used a yield from a commonly-quoted high yield bond index, which is likely lower than many of the creditors' cost of capital.

[8] The HTA Creditors have different costs of capital and investment return targets.  For purposes of this analysis, we have conservatively used a yield from a commonly-quoted high yield bond index, which is likely lower than many of the creditors' cost of capital.

[9] The yield of the Commonwealth General Obligation Bond due 2046 is 6.1%. Tax-adjusting the 6.1% by applying the Bloomberg Municipal YAS screen default tax rate as of October 25, 2022 provides a taxable equivalent yield of 10.3%.

**Table 2**

| | Opportunity Cost of Inability to Sell New HTA Bonds ($MM) | | | |
|---|---|---|---|---|
| | Today 12/1/2022 | 6 Mo. Delay 6/1/2023 | 13 Mo. Delay 1/1/2024 | 20 Mo. Delay 8/1/2024 |
| Rate of Return on Sale Proceeds[1] | | $48 | $104 | $160 |
| Accrued Interest on New HTA Bonds | | (31) | (69) | (106) |
| **Opportunity Cost of Inability to Reinvest Sale Proceeds** | | **$17** | **$35** | **$53** |

(1) Assumes interest rate of 9.13% per the ICE BofA US High Yield Index as of October 26, 2022.

### B.   Lost Opportunity Cost for the PSA Fees

12.   During the Stay Period, certain HTA/CCDA PSA Creditors will be unable to access or reinvest the roughly $183.6 million of PSA Fees to be distributed to certain HTA/CCDA PSA Creditors under the Plan.

13.   Like with the sales proceeds of the New HTA Bonds, the amount of lost opportunity costs associated with a Stay Period can be estimated conservatively by calculating the anticipated rates of return that could reasonably be earned with respect to the PSA Fees if such consideration were distributed in accordance with the terms of the Plan on the currently-anticipated timeline (which would be on an assumed Effective Date of December 1, 2022).

14.   Similar to the rate of return on the sales proceeds of the New HTA Bonds, I believe that a reasonable and conservative estimate of the potential rate of return on the PSA Fees is represented by the yield to worst on the ICE Bank of America U.S. High Yield Index, which was 9.13% as of October 26, 2022.  The Plan does not provide for the accrual or payment to creditors of any interest on the PSA Fees during the Stay Period.

15.   Based upon these assumptions, HTA/CCDA PSA Creditors entitled to PSA Fees would likely be able to earn approximately $18 million of additional investment income on the foregone PSA Fees during a Stay Period of 13 months.

7

Table 3

| Impact of Delayed PSA Fees ($MM) | | | |
|---|---|---|---|
| | 6 Mo. Delay<br>6/1/2023 | 13 Mo. Delay<br>1/1/2024 | 20 Mo. Delay<br>8/1/2024 |
| Delayed PSA Fees | $184 | $184 | $184 |
| Interest on Delayed Fees[1] | 9.13% | 9.13% | 9.13% |
| **Impact of Delayed PSA Fees** | **$8** | **$18** | **$28** |

(1) Assumes interest rate of 9.13% per the ICE BofA US High Yield Index as of October 26, 2022.

### C.  Additional Professional Fees to Be Incurred by the Monolines

16. Further, the Monolines will continue to incur substantial additional professional fees and expenses during the Stay Period. Based upon information provided by counsel, I have assumed for the purposes of this Declaration that the Monolines will collectively incur approximately $1 million in professional fees during the Stay Period that would not otherwise have been incurred if the Effective Date were to occur on December 1, 2022. This is, in my view, a conservative estimate. In reality, the amount of professional fees may be significantly higher.

Table 4

| Cost of Additional Professional Fees for Monolines ($MM) | | | |
|---|---|---|---|
| | 6 Mo. Delay<br>6/1/2023 | 13 Mo. Delay<br>1/1/2024 | 20 Mo. Delay<br>8/1/2024 |
| **Total Additional Professional Fees** | **$0.9** | **$1.2** | **$1.5** |

### D.  Other Harms

17. As noted above, in addition to the specific, quantifiable harms to HTA Creditors discussed herein, a Stay Period is likely to cause additional harm to the Debtor, HTA/CCDA PSA Creditors, the Monolines, and other stakeholders. Such risks include but are not limited to the following:

> (a) uncertainty relating to (i) the FOMB's ability to engage in any additional negotiations regarding the Plan necessitated by the delay introduced by a Stay Period, (ii) its ability to execute in a timely manner the transactions underlying the Plan, and (iii) the timing and feasibility of proposed restructurings for PREPA;

(b) increased costs relating to the HTA restructuring, as well as the ongoing PREPA Title III case, including both (i) the imposition of additional professional fees to be paid by the Title III Debtors as well as (ii) increased foregone opportunity costs to HTA and its respective creditors;

(c) a delay in the market's acceptance of the New HTA Bonds;

(d) a higher opportunity cost and higher discount rate suffered by the Monolines relative to other bondholders due to the continued lack of liquidity on their unmatured policy claims; and

(e) the additional interest payments the Monolines will be required to make without the establishment of Trusts, commutation, or payment of bonds in an accelerated amount that would occur on Effective Date

18. Although I do not endeavor to quantify such risks in terms of dollar value, I understand such risks to be real and substantial.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 28, 2022

/s/ Christine Song
Christine Song
Director
Miller Buckfire

9