**Hearing Date: December 14, 2022 at 9:30AM (Atlantic Standard Time)**
**Response Deadline: November 28, 2022 at 4:00PM (Atlantic Standard Time)**

---

> **PLEASE CAREFULLY REVIEW THIS OBJECTION AND THE ATTACHMENTS HERETO TO DETERMINE WHETHER THE OBJECTION AFFECTS YOUR CLAIM(S).**

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al*.,<br><br>                         Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered)<br><br>**This filing relates to the Commonwealth.** |

---

## FIVE HUNDRED THIRTY-SIXTH OMNIBUS OBJECTION (SUBSTANTIVE) OF THE COMMONWEALTH OF PUERTO RICO TO (I) PARTIAL DUPLICATE, DEFICIENT, AND NO LIABILITY BOND CLAIMS AND (II) SATISFIED CLAIMS

To the Honorable United States District Court Judge Laura Taylor Swain:

    The Commonwealth of Puerto Rico (the "<u>Commonwealth</u>"), by and through the Financial Oversight and Management Board for Puerto Rico (the "<u>Oversight Board</u>"), as sole Title III representative of the Commonwealth pursuant to Section 315(b) of the *Puerto Rico Oversight,*

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "<u>Commonwealth</u>") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("<u>PBA</u>", and together with the Commonwealth, COFINA, HTA, ERS, and PREPA, the "<u>Debtors</u>") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

*Management, and Economic Stability Act* ("PROMESA"),[2] files this five hundred thirty-sixth omnibus objection (the "Five Hundred Thirty-Sixth Omnibus Objection") objecting to the proofs of claim listed on **Exhibit A** hereto, each of which is purportedly based, in part, on (1) bonds issued by the Puerto Rico Sales Tax Financing Corporation ("COFINA"), (2) bond claims that are duplicative of one or more master proofs of claim filed against the Commonwealth on behalf of the holders of certain bonds, (3) bond claims based on bonds issued by the Puerto Rico Highways and Transportation Authority ("HTA"), the Puerto Rico Infrastructure Financing Corporation ("PRIFA"), or the Puerto Rico Convention Center District Authority ("CCDA"), which claims have been discharged pursuant to the Commonwealth Confirmation Order (as defined below), (4) an ownership interest in bonds issued by the Government Development Bank of Puerto Rico ("GDB"), for amounts for which the Commonwealth has not guaranteed repayment, (5) an ownership interest in bonds issued by the Puerto Rico Aqueducts and Sewers Authority ("PRASA"), the Puerto Rico Public Finance Corporation ("PRPFC"), the Puerto Rico Industrial Development Corporation ("PRIDCO"), the Puerto Rico Housing Finance Authority ("PRHFA"), or the Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are not Title III Debtors, for amounts for which the Commonwealth has not guaranteed repayment, (6) investments in mutual funds, which in turn may have invested in bonds issued by the Debtors, and/or (7) invoices submitted by claimant that have been satisfied by the Commonwealth.  In addition, certain portions of the proofs of claim listed on **Exhibit A** hereto are deficient because claimant failed to provide any basis or supporting documentation for asserting a claim against the Commonwealth such that the Commonwealth is

---

[2]     PROMESA is codified at 48 U.S.C. §§ 2101-2241.

unable to determine whether claimant has a valid claim.  In support of the Five Hundred Thirty-Sixth Omnibus Objection, the Commonwealth respectfully represents as follows:

## JURISDICTION

1.      The United States District Court for the District of Puerto Rico has subject matter jurisdiction to consider this matter and the relief requested herein pursuant to PROMESA Section 306(a).

2.      Venue is proper in this district pursuant to PROMESA Section 307(a).

## BACKGROUND

**A.      The Bar Date Orders**

3.      On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA Sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA Section 304(a), commencing a case under Title III thereof (the "Commonwealth Title III Case" and, together with the Title III cases of the remaining Debtors, the "Title III Cases").

4.      On January 16, 2018, the Debtors filed their *Motion for Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 2255] (the "Bar Date Motion").  Pursuant to the *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claims and (B) Approving Form and Manner of Notice Thereof* [ECF No. 2521] (the "Initial Bar Date Order"), the Court granted the relief requested in the Bar Date Motion and established deadlines and procedures for filing proofs of claim in the Title III Cases.  Upon the informative motion of certain creditors, and the support of the Debtors, the Court subsequently entered the *Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 3160] (together with

the Initial Bar Date Order, the "Bar Date Orders"), extending these deadlines to June 29, 2018 at 4:00 p.m. (Atlantic Time).

**B.      Confirmation of the Commonwealth, ERS, and PBA Title III Plan of Adjustment**

5.      On November 3, 2021, on behalf of the Commonwealth, Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA"), the Oversight Board filed that certain *Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (as subsequently amended and modified, the "Plan") [ECF No. 19053].  The Court considered confirmation of the Plan, and any objections thereto, at a hearing for confirmation of the Plan on November 8-22, 2021.

6.      Pursuant to the Court's (1) *Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 19517] and (2) *Order Regarding Plan Modifications Necessary to the Entry of an Order Confirming Plan of Adjustment for the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* [ECF No. 19721], on January 14, 2022, the Oversight Board filed a further revised Plan in compliance with the Court's orders.  *See Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al., [ECF No. 19784].

7.      On January 18, 2022, the Court confirmed the Plan.  *See Order and Judgment Confirming the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* [ECF No. 19813] (the "Confirmation Order").

8.      On January 20, 2022, pursuant to Title VI of PROMESA, the Court approved, (a) the *Qualifying Modification for the Puerto Rico Convention Center District Authority* [Case No. 21-01493, ECF No. 72-1] (the "CCDA QM") and (b) the *Qualifying Modification for the Puerto Rico Infrastructure Financing Authority* [Case No. 21-01492, ECF No. 82-1] (the "PRIFA QM"), which complement the transactions contained in the Plan.

9.      The Plan became effective on March 15, 2022, when the transactions contemplated therein were consummated. *See Notice of (A) Entry of Order Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. pursuant to Title III of PROMESA and (B) Occurrence of the Effective Date* [ECF No. 20349].

10.     The CCDA QM and PRIFA QM also became effective on March 15, 2022. *See* Case No. 21-01493, ECF No. 74; Case No. 21-01492, ECF No. 84.

**C.      Bond Debt Issued by Various Puerto Rico Instrumentalities & Bond Debt Master Proofs of Claim Filed in the Title III Cases**

11.     Pursuant to the Initial Bar Date Order, indenture trustees, fiscal agents, or any similar agent or nominee for each respective series of bonds issued by one of the Debtors or a non-debtor may file a master proof of claim against the applicable debtor on behalf of themselves and all holders of bond claims for the respective series of bonds for obligations arising under the respective trust agreements, resolutions, or similar bond documents. Initial Bar Date Order, ¶ 5(a). As explained below, master proofs of claim have been filed in the Commonwealth Title III Case on behalf of the holders of certain bonds or notes issued by HTA, PRIDCO, PRIFA, PRPFC, PRMFA, PRASA, CCDA, AFICA, and the Puerto Rico Electric Power Authority ("PREPA," collectively the "Commonwealth Master Claims").

12.     **_HTA_**—HTA is a public corporation and instrumentality of the Commonwealth constituting a corporate and political entity independent and separate from the Commonwealth,

created under Act No. 74-1965 of the Legislative Assembly of the Commonwealth ("HTA
Enabling Act").  HTA is responsible for the construction, operation, and maintenance of highways
and other transportation systems in the Commonwealth.  *See* 9 L.P.R.A § 2002.  The HTA
Enabling Act authorizes HTA to issue bonds. *See* 9 L.P.R.A. §§ 2004(g), (h), (l).  Pursuant thereto,
HTA issued several series of bonds under two different resolutions (the "HTA Bonds"):
(*i*) Resolution No. 68-18, adopted June 13, 1968 (the "1968 Resolution"); and (*ii*) Resolution No.
98-06, adopted February 26, 1998 (the "1998 Resolution").  As of May 21, 2017, HTA's petition
date, approximately $830 million in principal amount of bonds issued under the 1968 Resolution
remain outstanding, and approximately $3.4 billion in principal amount of bonds issued under the
1998 Resolution remain outstanding.  BNYM serves as fiscal agent with respect to the HTA Bonds.

13.     On behalf of the holders of HTA Bonds, BNYM filed three master proofs of claim
in the Commonwealth Title III Case (the "HTA-CW Master Claims"), each asserting a "secured,
contingent and unliquidated claim against the Commonwealth on account of any and all claims,
causes of action, rights, and/or remedies that the Fiscal Agent or the Owners may have against the
Commonwealth arising at law or in equity . . . ."  *See* Addendum to Proof of Claim No. 121053,
¶ 15; Addendum to Proof of Claim No. 120982, ¶ 15; Addendum to Proof of Claim No.
115380, ¶ 15.[3]

14.     On behalf of the holders of the HTA Bonds, BNYM filed three master proofs of
claim in the HTA Title III Case (collectively, the "HTA Title III Master Claims," and together
with the Commonwealth Master Claims, the "Master Claims"): Proof of Claim No. 37245,
asserting on behalf of holders of bonds issued under the 1968 Resolution approximately $847

---

[3]     While BNYM initially filed three proofs of claim logged by Kroll as Proofs of Claim Nos.
21286, 26541, and 35277, these were superseded and amended by Proofs of Claim Nos. 121053,
120982, and 115380.

million in liabilities plus unliquidated amounts; Proof of Claim No. 38574, asserting on behalf of

holders of bonds issued under the 1998 Resolution approximately $3.2 billion in liabilities plus

unliquidated amounts; and Proof of Claim No. 32622, asserting on behalf of holders of

subordinated bonds issued under the 1998 Resolution approximately $279 million in liabilities

plus unliquidated amounts.

15.     On August 13, 2022, the Oversight Board filed the *Fifth Amended Title III Plan of

Adjustment of the Puerto Rico Highways and Transportation Authority* [Case No. 17-bk-3567,

ECF No. 1377] (the "Fifth Amended HTA Plan").  The Court considered confirmation of the Fifth

Amended HTA Plan, and objections thereto, at a hearing on August 17, 2022, after which it took

the proposed order to confirm the Fifth Amended HTA Plan under submission.  On September 6,

2022, in response to the Court's prior order requesting certain revisions to the Fifth Amended HTA

Plan, the Oversight Board filed the *Modified Fifth Amended Title III Plan of Adjustment of the

Puerto Rico Highways and Transportation Authority* [ECF No. 1404] (the "HTA Plan").  On

October 12, 2022, the Court confirmed the HTA Plan.  [ECF No. 1415].  The Oversight Board

anticipates that the HTA Plan shall become effective shortly.

16.     ***PREPA***—PREPA is a government-owned corporation founded in 1941.  *See* Act

No. 83-1941, as amended (the "Authority Act") § 3.  PREPA generates and distributes

substantially all the electric power used in the Commonwealth.  [Case No. 17 BK 4780, ECF No.

1 at 7].  PREPA is one of the largest public power utilities in the U.S., serving approximately 1.5

million customers, and has the capacity to borrow money and issue debt through the issuance of

bonds and other obligations.  U.S. Bank National Association ("U.S. Bank") serves as trustee for

certain bonds issued by PREPA pursuant to that certain Trust Agreement dated January 1, 1974

(the "PREPA Bonds").  On behalf of the holders of the PREPA Bonds, U.S. Bank filed a proof of

claim against the Commonwealth (the "PREPA Master Claim"), which was logged by Kroll as Proof of Claim No. 50049, asserting an unliquidated claim for the alleged value of statutory rights granted by the Commonwealth to PREPA.

17.     ***PRIFA***—PRIFA is an affiliate of GDB and is a government instrumentality of the Commonwealth.  PRIFA was created in 1988 by Act No. 44-1988 (the "PRIFA Enabling Act"). PRIFA provides financial, administrative and other types of assistance to the Commonwealth, its public corporations and other instrumentalities responsible for developing and operating infrastructure facilities.  On behalf of the holders of various bonds and notes issued by PRIFA (collectively, the "PRIFA Bonds"), master proofs of claim were asserted against the Commonwealth (collectively, the "PRIFA Master Claims") by BNYM, US Bank, and UMB Bank, N.A.  US Bank filed a master proof of claim with respect to certain PRIFA Bonds, which was logged by Prime Clerk as Proof of Claim No. 13386, on behalf of holders of PRIFA Rum Tax Bonds (Special Tax Revenue Bonds, Series 2005A, 2005B, 2005C, and Series 2006B), asserting "claims for contingent, unliquidated amounts for interest payable in the future, interest accrued and accruing in the future as to past due principal and interest, fees and costs and indemnity claims of the Trustee to be incurred in the future under the Bond Documents, and all other amounts owed on account of any and all claims the Trustee has or may have relating to the outstanding Bond obligations, amount not less than $249,099,446.17 . . . ."  Rider to Proof of Claim No. 13386, ¶ 26.  As noted above, the PRIFA QM was approved by the Court and has been consummated, with all PRIFA Bonds and related claims having been discharged.

18.     ***PRPFC***—PRPFC is a subsidiary corporation of GDB created pursuant to Resolution No. 5044 of the Board of Directors of GDB, as amended ("Resolution No. 5044"), adopted pursuant to the authority granted under Act No. 17 of the Legislature of Puerto Rico,

approved September 23, 1948, as amended.  It provides government agencies, instrumentalities, municipalities and other subdivisions of the Commonwealth with alternative mechanisms to meet their financing needs.  PRPFC has the capacity to borrow money and issue debt through the issuance of bonds and other obligations.

19.     PRPFC is not a Title III debtor, and is a separate, legally distinct entity from the Commonwealth, and its liabilities are not guaranteed by the Commonwealth or any of the other Debtors.  *See, e.g.*, 3 L.P.R.A. § 9081(c) (referring to PRPFC as an "independent juridical entity" separate from the Commonwealth).

20.     In 1999, PRPFC issued certain Series A Commonwealth Appropriation Bonds (the "1999 Series A Bonds"), in the aggregate amount of $30,910,000, which have already matured. For example, certain 1999 Series A Bonds issued by PRPFC bearing CUSIP No. 745291UF9 matured on August 1, 2015.[4]

21.     In 2000, PRPFC issued certain 2000 Series B Commonwealth Appropriation Bonds Refunding Bonds (the "2000 Series B Refunding Bonds"), in the aggregate amount of $120,000,000, in order to, in part, provide funds necessary to purchase a promissory note issued by the Health Facilities and Services Administration ("AFASS").  The 2000 Series B Refunding Bonds are payable solely from interest on the AFASS promissory note and other amounts deposited to the credit of the sinking fund established under the trust agreement pursuant to which the Series B Bonds were issued.  The offering statement issued in connection with the 2000 Series B Refunding Bonds states that the bonds "will not constitute an obligation of the Commonwealth of Puerto Rico or any of its political subdivisions (other than [AFICA]), and neither the Commonwealth of Puerto Rico nor any of its political subdivisions or public instrumentalities

---

[4]     https://emma.msrb.org/Security/Details/A5FC439F9772449378D11ABF69C978F95.

(other than [AFICA]) will be liable thereon." *See, e.g.*, Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, Offering Statement, 2000 Series B Refunding Bonds (Commonwealth Appropriation Bonds), *available at* https://emma.msrb.org/Security/Details/A9FC3F0775B154C39E3EF2A7DCF134C3F.

22.     In 2001, PRPFC issued certain 2001 Series A Commonwealth Appropriation Bonds (the "2001 Series A Commonwealth Appropriation Bonds"), in the aggregate amount of $356,680,000, in order to, in part, provide funds necessary to purchase a promissory note issued by PRASA.  The 2001 Series A Commonwealth Appropriation Bonds are payable solely from payments of principal and interest on the PRASA promissory note.  The offering statement issued in connection with the 2001 Series A Commonwealth Appropriation Bonds states that the bonds "will not constitute an obligation of the Commonwealth of Puerto Rico or any of its political subdivisions (other than [AFICA]), and neither the Commonwealth of Puerto Rico nor any of its political subdivisions or public instrumentalities (other than [AFICA]) will be liable thereon." *See, e.g.*, Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, Offering Statement, 2001 Series A (Commonwealth Appropriation Bonds), *available                                                                                     at* https://emma.msrb.org/Security/Details/A5FC439F9772449378D11ABF69C978F95.

23.     Also in 2001, PRPFC issued certain 2001 Series C Commonwealth Appropriation Bonds (the "2001 Series C Commonwealth Appropriation Bonds"), in the aggregate amount of $771,274,288.85, in order to, in part, provide funds necessary to purchase certain promissory notes in connection with the restructuring of certain outstanding loans made by GDB to certain Commonwealth agencies, instrumentalities, and public corporations.  The 2001 Series C Commonwealth Appropriation Bonds are payable solely from payments of principal and interest

on the GDB promissory notes.  The offering statement issued in connection with the 2001 Series C Commonwealth Appropriation Bonds states that the bonds "will not constitute an obligation of the Commonwealth of Puerto Rico or any of its political subdivisions (other than [AFICA]), and neither the Commonwealth of Puerto Rico nor any of its political subdivisions or public instrumentalities (other than [AFICA]) will be liable thereon." *See, e.g.*, Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, Offering Statement, 2001 Series C (Commonwealth Appropriation Bonds), *available at* https://emma.msrb.org/Security/Details/AD2539D6108597A3FE0565CD904A73215.

24.     U.S. Bank and U.S. Bank Trust National Association ("U.S. Bank Trust" and, together with U.S. Bank, the "PRPFC Bond Trustee") serve as trustee for certain Series 2011A, Series 2011B, and Series 2012A Commonwealth Appropriation Bonds issued by the PRPFC (together with the 1999 Series A Bonds, 2001 Series A Commonwealth Appropriation Bonds, and the 2001 Series C Commonwealth Appropriation Bonds, the "PRPFC Bonds").  On behalf of the holders of the Series 2011A, Series 2011B, and Series 2012A Commonwealth Appropriation Bonds issued by the PRPFC, the PRPFC Bond Trustee filed a proof of claim against the Commonwealth (the "PRPFC Master Claim"), which was logged by Kroll as Proof of Claim No. 13374.

25.     The PRPFC Bond Trustee also filed an objection to confirmation of the Plan [Case No. 17-3203, ECF No. 18631] relating to the 2011A, Series 2011B, and Series 2012A Commonwealth Appropriation Bonds issued by the PRPFC (the "PFC Bond Trustee Objection").  At the hearing to consider confirmation of the Plan, the Oversight Board announced that an agreement, subject to certain approvals and definitive documentation, had been reached (*i*) to resolve the PFC Bond Trustee Objection and (*ii*) for the terms for the restructuring of the 2011A,

Series 2011B, and Series 2012A Commonwealth Appropriation Bonds issued by the PRPFC pursuant to Title VI of PROMESA.  Pursuant to such agreement, and in exchange for the compromises and settlements provided therein, the PFC Bond Trustee Objection was resolved.  On October 25, 2022, in accordance with the agreement and definitive documentation, solicitation was commenced seeking acceptance of the *Qualifying Modification Pursuant to PROMESA Title VI for the Puerto Rico Public Finance Corporation* (the " PRPFC QM").  The PRPFC QM proposes to discharge the 2011A, Series 2011B, and Series 2012A Commonwealth Appropriation Bonds issued by the PRPFC and the related claims. The Oversight Board anticipates commencing a Title VI proceeding regarding the PRPFC QM no later than October 28, 2022.

26.   ***PRMFA***—BNYM and U.S. Bank Trust each serve as trustee for certain bonds issued by PRMFA. On behalf of the holders of certain Puerto Rico Municipal Finance Agency 2005 Series A Bonds, BNYM filed a master proof of claim against the Commonwealth, which was logged by Prime Clerk, LLC, as Proof of Claim No. 30168.  On behalf of holders of certain Puerto Rico Municipal Finance Agency Series 2005 C Bonds, U.S. Bank Trust filed a master proof of claim filed, which was logged by Prime Clerk, LLC, as Proof of Claim No. 13364.

27.   ***PRASA***— PRASA was established pursuant to Act Number 40 of May 1, 1945. PRASA is a "public corporation and an autonomous government instrumentality" created for the purpose of providing water and sewer services on the island.  22 L.P.R.A. § 142, 144.  PRASA owns and operates the island-wide public water and wastewater systems in Puerto Rico.

28.   PRASA issued certain revenue bonds (the "PRASA Bonds"), under the Puerto Rico Aqueduct and Sewer Authority Resolution No. 1583, Authorizing and Securing Puerto Rico Aqueduct and Sewer Authority Bonds Guaranteed by the Commonwealth of Puerto Rico, and certain supplemental resolutions.  Banco Popular de Puerto Rico ("Banco Popular") serves as

trustee for the PRASA Bonds and filed a master proof of claim against the Commonwealth on behalf of the holders of the PRASA Bonds, which was logged by Kroll as Proof of Claim No. 22620 (the "PRASA Master Claim").  The PRASA Master Claim asserts "a contingent claim against the Commonwealth on account of the Bonds in an amount not less than $284,755,000, together with all interest, and premium accruing on the Bonds from and after the Petition Date, and all fees, costs, expenses and other charges accrued, accruing or chargeable with respect thereto."  Addendum to PRASA Master Claim, ¶ 9.

29.     The PRASA Enabling Act authorizes PRASA to issue bonds. 22 L.P.R.A. § 144(g). Pursuant thereto, the PRASA governing board has adopted resolutions authorizing PRASA to issue bonds, including Resolution No. 1583, as amended and restated as of March 7, 2008 ("Resolution No. 1583").  In 2008, PRASA issued $1,316,204,456 principal amount of Series A revenue bonds (the "2008 Senior Series A Bonds") and $22,445,000 in principal amount of Series B revenue bonds (the "2008 Senior Series B Bonds" and, together with the 2008 Senior Series A Bonds, the "2008 Senior Bonds").  In 2008, PRASA also issued $159,055,000 in principal amount of Series A revenue refunding bonds and $125,700,000 in principal amount of Series B revenue refunding bonds (collectively, the "PRASA Refunding Bonds").  In 2012, PRASA issued $1,800,450,000 in principal amount of Series 2012 A revenue bonds (the "2012 Senior Series A Bonds") and $295,245,000 in principal amount of Series 2012 B revenue bonds (the "2012 Senior Series B Bonds" and, together, with the 2012 Senior Series A Bonds, the "2012 Senior Bonds" and, together with the 2008 Senior Bonds, the "PRASA Senior Lien Bonds").

30.     Holders of PRASA Senior Lien Bonds have received and continue to receive all payments owed to holders of the PRASA Senior Lien Bonds in full as they become due and owing. Accordingly, EMMA reflects that PRASA has not posted any notices of default with respect to the

PRASA Senior Lien Bonds.[5]  In addition, the Commonwealth has not guaranteed repayment of the PRASA Senior Lien Bonds.  Accordingly, the offering statements for the PRASA Senior Lien Bonds state that they are "not a debt of the Commonwealth of Puerto Rico or any of its municipalities or other political subdivisions, other than [PRASA], and neither the Commonwealth of Puerto Rico or any such municipalities or other political subdivisions, other than [PRASA], shall be liable for the payment of the principal of or interest on said Bonds."[6]

31.    Holders of PRASA Refunding Bonds have received and continue to receive all payments owed to holders of PRASA Refunding Bonds in full as they become due and owing. Accordingly, EMMA reflects that PRASA has not posted any notices of default with respect to the PRASA Refunding Bonds.[7]  Further, while, the offering statements for the PRASA Refunding Bonds identify the Commonwealth as having guaranteed repayment thereon, that guaranteed was eliminated in connection the refinancing of the PRASA Refunding Bonds and certain of the PRASA Senior Lien Bonds, as set forth in the offering statement dated December 9, 2020, in accordance with which PRASA issued a series of 2020A senior lien revenue refunding bonds and 2020B senior lien federally taxable revenue refunding bonds (the "PRASA 2020 Refinancing Transaction").[8]

---

[5] *See, e.g.*, https://emma.msrb.org/Security/Details/AC36D3844A362D61AB88CADFC75BE5FE7.

[6] *See, e.g.*, Offering Statement for PRASA Revenue Bonds, Series A (Senior Lien), February 15, 2012, available at https://emma.msrb.org/ER584464-ER454075-ER856856.pdf.

[7] *See, e.g.*, https://emma.msrb.org/Security/Details/A5686687B583CA99BFDDA7BAE76F581A9.

[8] *See* Offering Statement for PRASA Revenue Refunding Bonds, Series 2020A (Senior Lien) and Federally Taxable Revenue Refunding Bonds, Series 2020B (Senior Lien), December 9, 2020, available at https://emma.msrb.org/P31403866-P31091563-P31500360.pdf.

14

32.     On July 20, 2021, the Oversight Board approved a proposed refunding transaction wherein PRASA would issue a series of 2021ABC and 2022A senior lien bonds to refinance $1.8 billion of PRASA's outstanding 2012 Senior Bonds (the "PRASA 2021 Refinancing Transaction").[9]  The PRASA 2021 Refinancing Transaction was consummated in accordance with the terms of the offering statement dated August 17, 2021, issued in connection therewith.[10]

33.     ***CCDA***—Prior to the Effective Date, the Bank of New York Mellon ("BNYM") served as trustee for certain Hotel Occupancy Tax Revenue Bonds issued by PRCCDA (the "CCDA Bonds"), and on behalf of the holders of CCDA Bonds filed a master proof of claim against the Commonwealth, which was logged by Kroll as Proof of Claim No. 37319 (the "CCDA Master Proof of Claim").  The CCDA Master Claim asserts a "contingent and unliquidated claim against the Commonwealth on account of any and all claims, causes of action, rights, and/or remedies that the Trustee or the Owners may have against the Commonwealth arising at law or in equity."  Addendum to CCDA Master Proof of Claim, ¶ 11.  As noted above, the CCDA QM was approved by the Court and has been consummated, with all CCDA Bonds and related claims having been discharged.

34.     ***AFICA***—AFICA is a public corporation and government instrumentality of the Commonwealth created by Act No. 121 of the Legislative Assembly of Puerto Rico, approved June 27, 1977 (as amended and supplemented and codified as P.R. Laws Ann. tit. 12, § 1251 *et seq.*). P.R. Laws Ann. tit. 12, § 1254.  AFICA facilitates project financing in order to promote the

---

[9] *See* Letter from Financial Oversight & Management Board to AAFAF approving the PRASA Refinancing Transaction, July 20, 2021, available at https://drive.google.com/file/d/1YvDZHPXCQ4vWOARyVGrY_XFb_-HhZZdc/view.

[10] *See* Offering Statement for PRASA Revenue Refunding Bonds, Series 2021ABC and 2022A (Senior Lien), August 17, 2021, available at https://emma.msrb.org/P11521655-P11177130-P11593393.pdf.

economic development of the Commonwealth, including through the development and construction of new industrial, commercial, tourist, agricultural, educational, medical and environmental control facilities.

35.    In 2002, AFICA issued certain Higher Education Revenue and Revenue Refunding Bonds, 2002 Series A (the "Series 2002 A University Bonds"), in the aggregate amount of $34,330,000.00, in order to provide financing, in part, for (*i*) the construction of certain educational facilities owned or to be owned by the Polytechnic University of Puerto Rico (the "University"), (*ii*) the refunding of certain prior bond issuances, and (*iii*) certain costs incurred in insuring and issuing the 2002 Series A University Bonds.  The Series 2002 A University Bonds are payable solely from repayment of a loan agreement entered into between AFICA and the University.  The offering statement issued in connection with the Series 2002 A University Bonds states that the bonds "shall not constitute an indebtedness of the Commonwealth or of any of its political subdivisions, other than [AFICA], and neither the Commonwealth nor any of its political subdivisions, other than [AFICA], shall be liable thereon."  *See, e.g.*, Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, Offering Statement, Higher Education Revenue and Revenue Refunding Bonds, Series 2002 A (Polytechnic University of Puerto Rico Project), *available at* https://emma.msrb.org/Security/Details/AA9A902D905B8AF8265EDFE55EEC98D6E.

36.    In 2011, AFICA issued Tourism Revenue Refunding Bonds, 2011 Series A (the "2011 Series A Trump Golf Club Bonds," and, together with the Series 2002 A University Bonds, the "AFICA Bonds"), in the aggregate amount of $26,355,000.00, in order to, in part, to refinance a portion of the construction of the Trump International Golf Club Puerto Rico.  The 2011 Series A Trump Golf Club Bonds are payable solely from repayment of a loan agreement entered into

between AFICA and Coco Beach Golf & Country Club, S.E.  The offering statement issued in connection with the 2011 Series A Galeria Bonds states that the bonds "do not constitute an indebtedness of the Commonwealth or of any of its political subdivisions, other than [AFICA], and neither the Commonwealth nor any of its political subdivisions, other than [AFICA], shall be liable thereon."  *See, e.g.*, Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, Offering Statement, Tourism Revenue Refunding Bonds, 2011 Series A (Trump International Golf Club Puerto Rico Project), *available at* https://emma.msrb.org/Security/Details/A1A77B5F6CEF57494504C49A90359E23A.

37.    BNYM serves as trustee for certain Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority Educational Facilities Revenue Bonds (Plaza Universitaria Project) (the "Plaza Universitaria Bonds"), allegedly issued by AFICA. On behalf of the holders of the Plaza Universitaria Bonds, BNYM filed a master proof of claim, which was logged by Prime Clerk, LLC, as Proof of Claim No. 68271.  Additionally, U.S. Bank and U.S. Bank Trust serve as trustees for certain Higher Education Refunding Revenue Bonds (the "Higher Education Bonds").  On behalf of holders of Higher Education Bonds, U.S. Bank and U.S. Bank Trust filed a master proof of claim, which was logged by Prime Clerk, LLC, as Proof of Claim No. 13391.

38.    ***PRHFA***—PRHFA is a subsidiary of GDB and is an independent governmental instrumentality of the Commonwealth.  PRHFA promotes the development of low-income housing and provides financing, subsidies, and incentives to home owners.

39.    PRHFA is not a Title III debtor, and is a separate, legally distinct entity from the Commonwealth, and its liabilities are not guaranteed by the Commonwealth or any of the other Debtors.  *See, e.g.*, 7 L.P.R.A. § 924(c) (referring to PRHFA as a "public corporation subsidiary

17

of [GDB] created by Resolution No. 4023 of November 16, 1977, as amended, of the Board of Directors of the Government Development Bank for Puerto Rico, redenominated following the merger as the Puerto Rico Housing Financing Authority.").

40.    In 1998, PRHFA issued certain Series A 1998 Homeownership Mortgage Revenue Bonds (GNMA-Guaranteed Mortgage Loans) (the "1998 Series A Mortgage Bonds"), in the aggregate amount of $93,460,000, in order to, in part, fund a program under which PRHFA would purchase, and transfer to Banco Popular, as trustee, certain mortgage backed securities guaranteed by the Government National Mortgage Association ("GNMA" and the "GNMA Certificates"). The 1998 Series A Mortgage Bonds are payable solely from the proceeds of the GNMA Certificates. The offering statement issued in connection with the 1998 Series A Mortgage Bonds states that the bonds "do not constitute a debt, obligation or pledge of the credit of the Commonwealth or any of its municipalities or political subdivisions or of [GDB] or any other public instrumentality of the Commonwealth (other than [PRHFA]), and neither the Commonwealth nor any of its municipalities or political subdivisions nor [GDB] or any other public instrumentality of the Commonwealth (other than [PRHFA]) shall be liable for the payment thereof." *See, e.g.*, Puerto Rico Housing Finance Corporation, Offering Statement, Series A 1998 Homeownership Mortgage Revenue Bonds (GNMA-Guaranteed Mortgage Loans), *available at* https://emma.msrb.org/Security/Details/A645E8ADB07527F8A6CAAA18BA7D80D57.

41.    ***PRIDCO***—PRIDCO was created by Law No. 188 of 1942, codified as 23 L.P.R.A. §§ 271 *et seq.*, to promote economic development of Puerto Rico and provide industrial facilities for lease or sale to private manufacturing companies.

42.    In 1999, PRIDCO issued certain Industrial Revenue Bonds, 1999 Series A (the "1999 Series A Bonds" or the "PRIDCO Bonds"), in the aggregate amount of $200,003,601.20, in

order to provide financing, in part, for the Plaza Las Américas project.  The 1999 Series A Bonds

are payable solely from payments made by Plaza Las Américas under a loan agreement between

PRIDCO and Plaza Las Américas.  The offering statement issued in connection with the 1999

Series A Bonds states that the bonds "are not an indebtedness of Puerto Rico or any of its political

subdivisions or instrumentalities, other than PRIDCO, and neither Puerto Rico nor any of its

political subdivisions or instrumentalities, other than PRIDCO, shall be liable thereon.  [PRIDCO]

has no taxing power.  The  [1999 Series A] Bonds are payable solely from the revenues and other

funds provided therefor in the Trust Agreement and the Loan Agreement."  *See, e.g.*, PRIDCO,

Offering   Statement,   Industrial   Revenue   Bonds,   1999   Series   A,   *available   at*

https://emma.msrb.org/Security/Details/AFBB4AE84A289D637D9582D4D38B910A0.

43.    US Bank serves as trustee for certain General Purpose Revenue and Refunding

Revenue Bonds Series 1997 A and Series 2003 (the "PRIDCO Bonds"), and on behalf of the

holders of PRIDCO Bonds filed a master proof of claim against the Commonwealth, which was

logged by Kroll as Proof of Claim No. 13445 (the "PRIDCO Master Claim").  The PRIDCO

Master Claim asserts contingent, unliquidated claims against the Commonwealth, and seeks:

> recovery of any and all other amounts owed on account of any and
> all claims the Trustee has or may have relating to the outstanding
> Bond   obligations,   whether   known   or   unknown,   against   the
> Commonwealth   and   all   those   purporting   to   act   on   the
> Commonwealth's behalf, whether presently asserted or to be
> asserted, including without limitation claims for or based upon the
> breach or violation of the Bond Documents, lease agreements or
> other contractual obligations relating to the underlying collateral,
> any other covenants or other contractual obligations contained
> therein, or claims arising from the improper diversion of PRIDCO's
> revenues or any other property securing the payment of the Bonds
> under the Bond Documents, as a matter of relevant Commonwealth,
> state or federal law, including without limitation constructive trust,
> fraudulent conveyance or fraudulent transfer, failure to fulfill
> contractual and fiduciary obligations and duties, breach of implied

covenants of good faith and fair dealing, or other legal or equitable
claims.

Rider to PRIDCO Master Claim, ¶¶ 12–13.

**D.      The GDB Title VI Proceedings and Qualifying Modification**

44.      GDB is a public corporation and governmental instrumentality of the
Commonwealth, which was created by the Legislative Assembly in 1948 to aid the government of
the Commonwealth (the "Government") in performing its fiscal duties and in more effectively
carrying out its responsibility to develop the economy of the Commonwealth.  On April 28, 2017,
the Oversight Board unanimously certified that certain February 2017 GDB Fiscal Plan, which
contemplated an orderly wind-down of the operations of GDB based upon the determination that
there was no clear path for the long-term viability of GDB based on its then-current financial
condition.

45.      On July 12, 2017, the Oversight Board issued a resolution authorizing GDB,
pursuant to Section 601(e) of PROMESA, to avail itself of Title VI of PROMESA.  On August
10, 2018, GDB filed an application for approval of a qualifying modification, pursuant to
PROMESA Section 601(m)(1)(D) (the "Qualifying Modification"), in the United States District
Court for the District of Puerto Rico.

46.      On November 7, 2018, the Court approved the Qualifying Modification pursuant
to PROMESA Section 601(m)(1)(D).  *See* ECF No. 270 in *Government Development Bank for
Puerto Rico*, Case No. 18-1561 (D.P.R. Nov. 7, 2018).  The Qualifying Modification provides for,
among other things, (i) the issuance of new bonds by the newly-created GDB Debt Recovery
Authority in exchange for the cancellation of, among other things, certain participating bonds and
guaranteed bond claims (collectively, the "GDB Bonds"); (ii) the extinguishment of the
Commonwealth's guarantee of the guaranteed bonds upon the exchange and cancellation of the

20

guaranteed bonds; and (iii) the release of claims of the holders of GDB Bonds against GDB and its affiliates relating to, among other things, any investment with GDB or the purchase, sale, or transfer of any security or interest of GDB, and any action or omission with respect to any indebtedness or loans to GDB (including any notes issued or deposits held by GDB) or from GDB. *Solicitation Statement*, at 57-60, ECF No. 1-15 in *Government Development Bank for Puerto Rico*, Case No. 18-1561 (D.P.R. Aug. 10, 2018).

47.     On November 29, 2018, GDB announced the consummation of the Qualifying Modification for GDB.  Press Release, *Government of Puerto Rico Announces Consummation of the GDB Qualifying Modification*, Governor of Puerto Rico (Nov. 29, 2018), *available at* http://www.aafaf.pr.gov/assets/gov-pr-announces-consummation-gdb-qualifying-modification.pdf.

**E.     The COFINA Title III Case and Resolution of the Commonwealth-COFINA Dispute**

48.     COFINA is a public corporation and instrumentality of the Commonwealth constituting a corporate and political entity independent and separate from the Commonwealth, created under Act No. 91 of the Legislative Assembly of the Commonwealth.  Pursuant to the Amended and Restated Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as amended on June 19, 2009, and pursuant to certain supplemental resolutions, COFINA issued a series of bonds in aggregate approximate amount of $17 billion, to, among other things, defray certain debt obligations of GDB and the Puerto Rico Public Finance Corporation (the "COFINA Bonds").  Bank of New York Mellon serves as Trustee with respect to the COFINA Bonds.

49.     The Oversight Board filed that certain *Third Amended Title III Plan of Adjustment of the Puerto Rico Sales Tax Financing Corporation* (the "COFINA Plan") [ECF No. 4652] on

January 9, 2019.  The Court considered confirmation of the COFINA Plan and any objections thereto at a hearing on January 16-17, 2019.

50.     On February 4, 2019, the Court confirmed the COFINA Plan, which incorporated the compromise and settlement of the dispute over whether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use taxes purportedly pledged by COFINA to secure debt are property of the Commonwealth or COFINA under applicable law (the "Commonwealth-COFINA Dispute").  *See Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [ECF No. 5048].  On the same day, the Court approved the compromise and settlement of the Commonwealth-COFINA Dispute pursuant to the *Memorandum Opinion and Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* [ECF No. 5045] (the "COFINA Settlement Order").  On February 5, 2019, the Court issued an *Amended Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [ECF No. 5055] (the "COFINA Amended Confirmation Order").  The Plan became effective on February 12, 2019 (the "COFINA Effective Date"), when the transactions contemplated therein were consummated.  *See Notice of (A) Entry of Order Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation Pursuant to Title III of PROMESA and (B) Occurrence of the Effective Date* [Case No. 17 BK 3284-LTS, ECF No. 587].

**F.      Proofs of Claim, Omnibus Objection Procedures, and Claim Objections**

51.     To date, approximately 179,313 proofs of claim have been filed against the Debtors and logged by Kroll Restructuring Administration LLC ("Kroll").  Such proofs of claim total

approximately $43.6 trillion in asserted claims against the Debtors, in addition to unliquidated amounts asserted.

52.     Of the proofs of claim filed, approximately 118,703 have been filed in relation to, or reclassified to be asserted against, Commonwealth.  In accordance with the terms of the Bar Date Orders, many of these claims need not have been filed at all, or suffer from some other flaw, such as being subsequently amended, not putting forth a claim for which the Debtors are liable, being duplicative of other proofs of claim, or failing to provide information necessary for the Debtors to determine whether the claim is valid.

53.     To efficiently resolve as many of the unnecessary proofs of claim as possible, on October 16, 2018, the Debtors filed with this Court their *Motion for Entry of an Order (A) Approving Limited Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy Rule 3007(e)(6), and (C) Granting Related Relief* [ECF No. 4052] (the "Omnibus Procedures Motion").  The Court granted the relief requested in the Omnibus Procedures Motion by order dated November 14, 2018.  *See Order (A) Approving Limited Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy Rule 3007(e)(6), and (C) Granting Related Relief* [ECF No. 4230]; *Omnibus Objection Procedures* [ECF No. 4230-1] (collectively, the "Initial Omnibus Objection Procedures").  On November 29, 2018, the Court approved English and Spanish versions of the forms of notice for omnibus objections to be filed in accordance with the Initial Omnibus Objection Procedures.  *See Order Approving the English and Spanish Versions of the Form of Notice for Omnibus Objections* [ECF No. 4381] (the "Notice Order").

54.     In the continued interest of resolving any unnecessary proofs of claims in an efficient manner, on May 23, 2019, the Debtors filed an amended procedures motion seeking, among other things, to allow the Debtors to file omnibus objections on substantive bases, to further

23

expand the number of claims that may be included on an objection, and to approve additional forms of notice. *Notice of Hearing with Respect to an Order (A) Approving Amended Omnibus Objection Procedures, (B) Waiving Requirements of Bankruptcy Rule 3007(e), (C) Approving Additional Forms of Notice, and (D) Granting Related Relief* [ECF No. 7091]. On June 14, 2019, the Court granted the requested relief, by the *Order (A) Approving Amended Omnibus Objection Procedures, (B) Waiving Requirements of Bankruptcy Rule 3007(e), (C) Approving Additional Forms of Notice, and (D) Granting Related Relief* [ECF No. 7440] (the "Amended Omnibus Objection Procedures").

55.    Pursuant to the Initial Omnibus Objection Procedures and Amended Omnibus Objection Procedures, to date the Court has held 27 hearings related to over 500 omnibus objections filed by the Commonwealth, the Puerto Rico Sales Tax Financing Corporation ("COFINA"), HTA, PREPA, PBA, and/or ERS. Based upon rulings and orders of the Court to date, as well as the expungement of certain claims pursuant to the Plan, approximately 105,359 claims asserting $43.6 trillion in liability against the Commonwealth, COFINA, HTA, PREPA, ERS, and PBA have been disallowed and expunged from the claims registry in the Title III proceedings. In addition, approximately 45,193 claims have been transferred into the Administrative Claims Reconciliation process for resolution using the Debtors' ordinary-course administrative processes.

56.    This Five Hundred Thirty-Sixth Omnibus Objection is filed in accordance with the Court's Amended Omnibus Objection Procedures.

## OBJECTIONS TO PROOFS OF CLAIM

57.    Claims that are "unenforceable against the debtor and property of the debtor, under any agreement or applicable law" should be disallowed. 11 U.S.C. § 502(b)(1). While a properly executed and filed proof of claim constitutes *prima facie* evidence of the validity of the claim, *see*

Fed. R. Bankr. P. 3001(f), made applicable to this case by PROMESA Section 310, the objecting

party may overcome this *prima facie* evidence with evidence which, if believed, would refute at

least one of the allegations essential to the claim. *In re Reilly*, 245 B.R. 768, 773 (B.A.P. 2d Cir.),

*aff'd*, 242 F.3d 367 (2d Cir. 2000); *see also Factors Funding Co. v. Fili (In re Fili)*, 257 B.R. 370,

372 (1st Cir. B.A.P. 2001) ("[A] claim is presumed valid until an objecting party has introduced

evidence sufficient to rebut the claimant's prima facie case." (citation omitted)).

58.     The Amended Omnibus Objection Procedures allow the Commonwealth to file an

omnibus objection to multiple proofs of claim on any basis provided for in Federal Rule of

Bankruptcy Procedure 3007(d)(1)-(7), as well as on other substantive bases set forth in the

Amended Omnibus Objection Procedures.

59.     This Five Hundred Thirty-Sixth Omnibus Objection seeks to disallow portions of

the proofs of claim listed on **Exhibit A** hereto (collectively, the "Claims to Be Partially

Disallowed"), each of which purports to be based, in part, on (1) bonds issued by COFINA, (2)

bond claims that are duplicative of one or more master proofs of claim filed against the

Commonwealth on behalf of the holders of certain bonds, (3) bond claims based on bonds issued

by HTA, PRIFA, or CCDA, which have been discharged pursuant to the Commonwealth

Confirmation Order, (4) an ownership interest in bonds issued by GDB, for amounts for which the

Commonwealth has not guaranteed repayment, (5) an ownership interest in bonds issued by the

PRASA, PRPFC, PRIDCO, PRHFA, or AFICA, which are not Title III Debtors, for amounts for

which the Commonwealth has not guaranteed repayment, (6) investments in mutual funds, which

in turn may have invested in bonds issued by the Commonwealth , and/or (7) invoices submitted

by claimant that have been satisfied by the Commonwealth .  Additionally, certain portions of the

Claims to Be Partially Disallowed should be disallowed as are deficient because claimant failed to

provide any basis or supporting documentation for asserting a claim against the Commonwealth such that the Commonwealth is unable to determine whether claimant has a valid claim.  **Exhibit A** hereto further specifies why each of the Claims to Be Partially Disallowed should be disallowed in part.

### A.  No Liability for Duplicate Bond Claims

60.     As set forth in **Exhibit A** hereto, certain Claims to Be Partially Disallowed purport to assert liability, in part, on the basis of bonds issued by HTA, PRIDCO, PRIFA, PRPFC, PRMFA, PRASA, CCDA, AFICA, and PREPA (collectively, the "Partial Duplicate Bond Claims").  *See, e.g.*, Claim Nos. 50049, 2891, and 168037.

61.     Each of the Partial Duplicate Bond Claims purports to assert, in part, liability against the Commonwealth associated with one or more bonds that is duplicative of one or more Master Claims, which as described above were filed in the Title III Cases on behalf of the holders of certain bonds issued by HTA, PRIDCO, PRIFA, PRPFC, PRMFA, PRASA, CCDA, AFICA, and PREPA.  For example, the PREPA Master Claim asserts it is "filed on behalf of *all holders of each series of power revenue bonds and power revenue refunding bonds* issued and outstanding under the Trust Agreement.  PREPA Master Claim, Rider at 1 (emphasis added).  Accordingly, any claim filed against the Commonwealth by an individual holder asserting a claim with respect to such holder's PREPA bonds is duplicative of the PREPA Master Claim.

62.     Accordingly, any failure to disallow the Partial Duplicate Bond Claims will result in the applicable claimants potentially receiving an unwarranted double recovery against the Commonwealth, to the detriment of other stakeholders in the Title III Cases.  The holders of the Partial Duplicate Bond Claims will not be prejudiced by the disallowance of their claims because

the liabilities associated with the Partial Duplicate Bond Claims are subsumed within one or more Master Claims.

**B.  No Liability for Bondholder Claims Discharged by the Confirmation Order**

63.     As set forth in **Exhibit A** hereto, certain of the Claims to Be Partially Disallowed purport to assert liability, in part, based on the alleged ownership of bonds issued by HTA, CCDA, or PRIFA (the "Discharged Bondholder Claims").  *See, e.g.*, Claim Nos. 757, 40179, and 155376.

64.     The Discharged Bondholder Claims assert liabilities against the Commonwealth associated with various HTA Bonds issued by HTA, CCDA Bonds issued by CCDA, or PRIFA Bonds issued by PRIFA.  Claims asserted against the Commonwealth based on any bonds issued or guaranteed by or loans made to or guaranteed by HTA, CCDA, or PRIFA have been fully discharged pursuant to the Plan and the Commonwealth has no further liability on account of such Claims.  *See* Confirmation Order ¶ 72 ("The Claims asserted against the Debtors or the Reorganized Debtors based on any bonds issued or guaranteed by or loans made to or guaranteed by HTA, CCDA, PRIFA, or MBA shall, to the extent allowed, be allowed as a Claim arising prior to the Petition Date and classified in Classes 59 through 62 (except Allowed ERS Bond Claims to the extent secured) and are hereby discharged and the Debtors and the Reorganized Debtors have no further liability on account of such Claims.").

65.     Any failure to disallow the Discharged Bondholder Claims will result in the applicable claimants potentially receiving an unwarranted recovery against the Commonwealth, to the detriment of other stakeholders in the Debtors' Title III Cases.

**C.  No Liability for Claims Based on Investments in Mutual Funds**

66.     As identified in **Exhibit A** hereto, certain Claims to Be Partially Disallowed purport to assert liability based in part on investment(s) in one or more mutual funds that, in turn, may

have invested in bonds issued by the Commonwealth (collectively, the "Partial Mutual Funds Claims"). *See, e.g.*, Claim No. 5526.

67. A claimant bears the burden of establishing standing to file a proof of claim. *In re Minbatiwalla*, 424 B.R. 104, 111 (Bankr. S.D.N.Y. 2010). It is well-established that only a creditor or the creditor's authorized agent has standing to assert a claim. Fed. R. Bankr. P. 3001(b); 11 U.S.C. §§ 501(a) ("A creditor or an indenture trustee may file a proof of claim."); *In re Melillo*, 392 B.R. 1, 5 (B.A.P. 1st Cir. 2008) ("Only a creditor or indenture trustee may file a proof of claim."). Parties with merely derivative interests lack standing to assert a claim against a debtor's estate. *Matter of Goldman*, 82 B.R. 894, 896 (Bankr. S.D. Ohio 1988) (finding party with "relationship with Debtor [that] is not direct, but rather derivative" was "a stranger to Debtor's bankruptcy proceedings," with "no claim against the estate's assets," and "as a general rule has no standing in Debtor's bankruptcy proceedings"); *see also In re Tower Park Properties, LLC*, 803 F.3d 450, 462-63 (9th Cir. 2015) (holding a trust beneficiary was not a party in interest); *In re Refco Inc.*, 505 F.3d 109, 117 (2d Cir. 2007) ("To the extent that the rights of a party in interest are asserted, those rights must be asserted by the party in interest, not someone else."); *In re Lopez*, 446 B.R. 12, 17 (Bankr. D. Mass. 2011) (to establish oneself as a party in interest "the moving party must be asserting its own rights and not those belonging to or derivative of a third party"); *In re Hayes*, 393 B.R. 259, 267 (Bankr. D. Mass. 2008) (recognizing the "general principle that 'party in interest standing does not arise if a party seeks to assert some right that is purely derivative of another party's rights in the bankruptcy proceeding'" (quoting *In re Refco*, 505 F.3d at 115 n. 10)).

68. "A creditor, under the [Bankruptcy] Code, is one who has a claim *against the debtor* or the estate," rather than "a creditor of one of the debtor's creditors." *S. Blvd., Inc. v. Martin*

*Paint Stores*, 207 B.R. 57, 61 (S.D.N.Y. 1997). Because, at most, the Partial Mutual Funds Claims were filed based on the claimant's status as an alleged creditor of an alleged creditor of the Commonwealth, the Partial Mutual Funds Claims were not filed by an actual creditor of the Commonwealth. *See In re Thalmann*, 469 B.R. 677, 683 (Bankr. S.D. Tex. 2012) (holding receiver lacked standing to file a proof of claim because it was not a creditor or an authorized agent of a creditor). Instead, the Partial Mutual Funds Claims are derivative of claims that must be asserted by the mutual funds directly for any claimed recovery to be considered by the Court. *See Matter of Goldman*, 82 B.R. at 896 (finding party with "derivative" relationship has "no claim against the estate's asset" and "as a general rule has no standing in Debtor's bankruptcy proceedings"). Moreover, it is unknown whether the mutual fund still retains ownership of the suspect bonds.

Indeed, under nearly identical circumstances, this Court previously disallowed claims filed against COFINA by investors in mutual funds that in turn allegedly invested in COFINA bonds for "lack of an individual interest in COFINA securities." *Tr. of March 13, 2019 Hr'g Before the Hon. Laura Taylor Swain* [ECF No. 5969], at 64:01-10 ("THE COURT: So just so that I understand, his documentation shows that he is a mutual fund investor. To the extent any of those mutual funds actually holds COFINA bonds, the mutual fund would be the appropriate claimant, and so he has provided no evidence of a valid direct claim as against COFINA? MS. STAFFORD: Correct, your Honor. THE COURT: The objection to the claim is sustained and the claim is disallowed for lack of an individual interest in COFINA securities."); *see also Order Granting Sixty-Fourth Omnibus Objection (Substantive) of the Commonwealth of Puerto Rico to Claims Based on Investments in Mutual Funds* [ECF No. 9099]; *Memorandum Order Denying Motion to Alter or Amend Order Sustaining Objection (Dkt. 8297) to Claims No. 152470 & No. 152283* [ECF No. 9121]. Accordingly, the claimants are not creditors of the Commonwealth and lack standing

29

to assert derivative claims.  Because the Commonwealth cannot be held liable for the Partial Mutual Funds Claims, these claims should be disallowed in their entirety.

### D.  No Liability for Claims Based on PRPFC, PRHFA, PRIDCO, or AFICA Bonds

69.     As identified in **<u>Exhibit A</u>** hereto, certain portions of the Claims to Be Partially Disallowed purport to assert claims based on an alleged ownership interest in (1) PRPFC Bonds issued by PRPFC, (2) PRHFA Bonds issued by PRHFA, (3) PRIDCO Bonds issued by PRIDCO, or (4) AFICA Bonds issued by AFICA (collectively the  "<u>Partial No Liability Bondholder Claims</u>").  *See, e.g.*, Claim Nos. 757, 16448, and 27009.

70.     As established above, PRPFC, PRHFA, PRIDCO, and AFICA are not Title III Debtors, and their liabilities not guaranteed by the Commonwealth or any other the Title III Debtor.

71.     Each of the Partial PRPFC Bondholder Claims purports to assert, in part, liabilities against the Commonwealth associated with PRPFC Bonds not guaranteed by the Commonwealth, or any other Debtors.  PRPFC is not a Title III debtor, and is a separate, legally distinct entity from the Debtors.  *See, e.g.*, 3 L.P.R.A. § 9081(c) (referring to PRPFC as an "independent juridical entity" separate from the Commonwealth).  On October 25, 2022, in accordance with the agreement and definitive documentation, solicitation was commenced seeking acceptance of the PRPFC QM.  The PRPFC QM proposes to discharge the 2011A, Series 2011B, and Series 2012A Commonwealth Appropriation Bonds issued by the PRPFC and the related claims. The Oversight Board anticipates commencing a Title VI proceeding regarding the PRPFC QM no later than October 28, 2022.

72.     Likewise, each of the Partial PRHFA Bondholder Claims purports to assert, in part, liabilities against the Commonwealth associated with PRHFA Bonds not guaranteed by the

Commonwealth, or any other Debtors.  PRHFC is not a Title III debtor, and is a separate, legally distinct entity from the Debtors.

73.    In addition, certain of the PRPFC Bonds have matured.  *See, e.g.*, Claim No. 155376 (asserting a claim based on CUSIP No. 745291UF9).  Accordingly, because the PRPFC Bonds and the PRHFA Bonds have already matured, and claimants associated with the Partial PRHFA Bondholder Claims have not alleged that they have not received their payments in full, or that the Commonwealth is liable for any alleged non-payment, holders of these bonds no longer have a valid claim, and the Partial No Liability Bondholder Claims should be disallowed in their entirety.

**E.  No Liability for PRASA Senior Lien Bond Claims**

74.    As set forth in **Exhibit A** hereto, certain of the Claims to Be Partially Disallowed purport to assert liability, in part, based on the alleged ownership of PRASA Senior Lien Bonds issued by PRASA (the "Partial PRASA Senior Lien Bond Claims") and 2008 Refunding Bonds issued by PRASA (the "Partial PRASA Refunding Bond Claims"). *See, e.g.*, Claim No. 27009.

75.    The Partial PRASA Senior Lien Bond Claims and Partial PRASA Refunding Bond Claims assert liabilities against the Commonwealth associated with bonds issued by PRASA, which is not a Title III Debtor, and is a separate, legally distinct entity from the Debtors.  The Commonwealth has not guaranteed repayment for the PRASA Senior Lien Bonds.  Additionally, the Partial PRASA Senior Lien Bond Claims do not assert a legally sufficient basis for asserting a claim against the Commonwealth for bonds issued by PRASA that are not guaranteed by the Commonwealth.

76.    Further, the PRASA Refunding Bonds, which at one point were guaranteed by the Commonwealth, had that guarantee extinguished in connection with the PRASA 2020 Refinancing Transaction.

77.     Because the Partial PRASA Senior Lien Bond Claims and the Partial PRASA Refunding Bond Claims are unenforceable against the Commonwealth and its property pursuant to Bankruptcy Code § 502(b)(1), these claims should be disallowed, because they seek recovery of amounts for which the Commonwealth is not liable..

**F.  No Liability for GDB Bondholder Claims**

78.     As identified in **<u>Exhibit A</u>** hereto, certain Claims to Be Partially Disallowed purport to assert, in part, claims based on the alleged ownership of bonds issued by GDB (collectively, the "<u>Partial GDB Bondholder Claims</u>").  *See, e.g.*, Claim No. 16715.

79.     Each of the Partial GDB Bondholder Claims purports to be based, in part, on the ownership of GDB Bonds that were subject to the Qualifying Modification, which provided for the issuance of new securities in exchange for the cancellation of the GDB Bonds and the extinguishment of the Commonwealth's guarantee of certain GDB Bonds, and thus the Commonwealth is no longer liable for these claims.  Accordingly, each of the Partial GDB Bondholder Claims has been released pursuant to the approval and consummation of the Qualifying Modification.  As noted above, the Qualifying Modification provides, among other things, that holders of GDB Bonds shall release GDB and its affiliates from claims relating to the GDB Bonds and any action or omission of GDB and its affiliates with respect to any indebtedness of or loan to GDB.  GDB is a public corporation and instrumentality of the Commonwealth.  The Commonwealth, thus, is an affiliate of GDB within the scope of the release pursuant to the Qualifying Modification.  Accordingly, the Partial GDB Bondholder Claims were released upon the consummation of the Qualifying Modification on November 29, 2018.

80.     Because the Partial GDB Bondholder Claims are unenforceable against the Commonwealth and its property pursuant to Bankruptcy Code § 502(b)(1), these claims should be disallowed, because they seek recovery of amounts for which the Commonwealth is not liable.

### G. No Liability for COFINA Bondholder Claims

81.     As identified in **Exhibit A** hereto, certain Claims to Be Partially Disallowed purport to assert, in part, claims based on an alleged ownership interest in bonds issued by COFINA (collectively the "Partial COFINA Bondholder Claims"). *See, e.g.*, Claim No. 16715.

82.     As explained above, the Settlement Order resolved the Commonwealth-COFINA Dispute, and, pursuant to Paragraph 55 of the Settlement Order, all claims against the Commonwealth arising from or relating to the relationship of the Commonwealth and COFINA have been released.  Additionally, pursuant to Paragraph 3(c) of the *Settlement Agreement* [ECF No. 5045-1], dated October 19, 2018, and attached to the Settlement Order (the "Settlement Agreement"), and Paragraph 7 of the COFINA Amended Confirmation Order, the adversary proceeding between the Commonwealth and COFINA concerning the Commonwealth-COFINA Dispute has been dismissed with prejudice following the approval of the compromise and settlement of the Commonwealth-COFINA Dispute.  Furthermore, pursuant to Paragraph 29(f) of the COFINA Amended Confirmation Order, claims, such as the Partial COFINA Bondholder Claims, that arose from or relate to the relationship of the Commonwealth and COFINA were released.  COFINA Amended Confirmation Order, ¶ 29(f).[11]  For all of these reasons, the Partial

---

[11] Pursuant to the Plan, "Claim" is defined as "[a]ny right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, causes of action,

COFINA Bondholder Claims should be disallowed because these claims, which are based on an alleged ownership interest in COFINA Bonds, have been satisfied, released, and/or discharged pursuant to the Settlement Order, Settlement Agreement, COFINA Amended Confirmation Order, and Plan.

### H.  No Liability for Partially Satisfied Claims

83.     Additionally, portions of certain of the Claims to Be Partially Disallowed purport to assert liabilities based on allegedly unpaid invoices to the Commonwealth (collectively, the "Partially Satisfied Claims").  *See* Claim No. 10072.  The Commonwealth's records, however, show that any invoices asserted in the Partially Satisfied Claims have already been paid.

84.     As a result, any failure to disallow the Partially Satisfied Claims will result in the applicable claimants potentially receiving an unwarranted excess recovery against the Commonwealth , to the detriment of other stakeholders in the Title III Cases.  The holders of the Partially Satisfied Claims will not be prejudiced by the disallowance of their claims because their claims have already been fully satisfied.

### I.  No Liability for Deficient Claims

85.     As identified in **Exhibit A** hereto, other portions of certain of the Claims to Be Partially Disallowed are deficient because claimant failed to provide any basis or supporting documentation for asserting a claim against the Commonwealth such that the Commonwealth is unable to determine whether claimant has a valid claim (collectively, the "Partially Deficient Claims").  *See, e.g.*, Claim Nos. 168037 and 27009.

---

demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise."  Plan § 1.53.

86.     Specifically, certain of the Partially Deficient Claims assert liabilities arising out of bonds or certain monies owed in connection with the Puerto Rico Conservation Trust, however, claimant fails to provide any basis or supporting documentation for asserting such a claim against the Commonwealth.  As such, the Commonwealth is unable to determine whether claimant has a valid claim against the Commonwealth, or any other Title III Debtor.  Therefore the Partially Deficient Claims should be disallowed.

87.     In support of the foregoing, the Commonwealth relies on the *Declaration of Jay Herriman in Support of the Five Hundred Thirty-Sixth Omnibus Objection (Substantive) of the Commonwealth of Puerto Rico to Duplicate, Deficient, and No Liability Bond Claims*, dated October 28, 2022, attached hereto as **Exhibit B**.

## NOTICE

88.     In accordance with the Amended Omnibus Objection Procedures and the Court's Notice Order, the Commonwealth is providing notice of this Five Hundred Thirty-Sixth Omnibus Objection to (a) the individual creditors subject to this Five Hundred Thirty-Sixth Omnibus Objection, (b) the U.S. Trustee, and (c) the Master Service List (as defined by the *Sixteenth Amended Case Management Procedures* [ECF No. 20190-1]), which is available on the Debtors' case website at https://cases.ra.kroll.com/puertorico.  The notice for this Five Hundred Thirty-Sixth Omnibus Objection is attached hereto as **Exhibit C**.  Spanish translations of the Five Hundred Thirty-Sixth Omnibus Objection and all of the exhibits attached hereto are being filed and served with this objection.  The Commonwealth submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE the Commonwealth respectfully requests entry of an order, substantially in the form of the proposed order attached hereto as **Exhibit D**, (1) granting the relief requested herein, and (2) granting the Commonwealth such other and further relief as is just.

Dated: October 28, 2022
    San Juan, Puerto Rico

Respectfully submitted,

/s/ *Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
Carla García-Benítez
USDC No. 203708
Gabriel A. Miranda
USDC No. 306704
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

/s/ *Martin J. Bienenstock*
Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial
Oversight and Management Board
for Puerto Rico, as representative for
the Commonwealth of Puerto Rico*

**Fecha de la vista: 14 de diciembre de 2022, a las 9:30 a.m. (AST)**
**Fecha límite para responder: 28 de noviembre de 2022, a las 4:00 p.m. (AST)**

---

> **REVISE DETENIDAMENTE ESTA OBJECIÓN Y LOS DOCUMENTOS ADJUNTOS PARA DETERMINAR SI LA OBJECIÓN AFECTA A SU(S) RECLAMACIÓN(ES).**

---

## TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
## PARA EL DISTRITO DE PUERTO RICO

| | |
|---|---|
| *In re*:<br><br>JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO,<br><br>　　como representante del<br><br>ESTADO LIBRE ASOCIADO DE PUERTO RICO *et al.*,<br><br>　　　　　　　　　　　　Deudores.[1] | PROMESA<br>Título III<br><br>Número 17 BK 3283-LTS<br><br>(Administrado Conjuntamente)<br><br>**La presente radicación guarda relación con el ELA.** |

---

### QUINGENTÉSIMA TRIGÉSIMA SEXTA OBJECIÓN GLOBAL (SUSTANTIVA) DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO A I) RECLAMACIONES POR BONOS PARCIALMENTE DUPLICADAS, DEFICIENTES Y/O EN LAS QUE NO EXISTE RESPONSABILIDAD Y II) RECLAMACIONES SATISFECHAS

---

[1]　　Los Deudores en los presentes Casos de Título III, junto con el respectivo número de caso de Título III y los últimos cuatro (4) dígitos del número de identificación contributiva federal de cada Deudor, en su caso, son i) el Estado Libre Asociado de Puerto Rico (el "ELA") (Caso de Quiebra Núm. 17 BK 3283-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3481); ii) la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA") (Caso de Quiebra Núm. 17 BK 3284-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 8474); iii) la Autoridad de Carreteras y Transportación de Puerto Rico (la "ACT") (Caso de Quiebra Núm. 17 BK 3567-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3808); iv) el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "SRE") (Caso de Quiebra Núm. 17 BK 3566-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 9686); v) la Autoridad de Energía Eléctrica de Puerto Rico (la "AEE") (Caso de Quiebra Núm. 17 BK 4780-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3747); y vi) la Autoridad de Edificios Públicos de Puerto Rico (la "AEP", y junto con el ELA, COFINA, la ACT, el SRE y la AEE, los "Deudores") (Caso de Quiebra Núm. 19-BK-5523-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3801) (Los números de los casos de Título III están enumerados como números de casos de quiebra debido a ciertas limitaciones en el programa informático).

A la atención de su señoría, Juez del Tribunal de Distrito de los Estados Unidos, Laura Taylor Swain:

El Estado Libre Asociado de Puerto Rico (el "ELA"), a través de la Junta de Supervisión y Administración Financiera para Puerto Rico (la "Junta de Supervisión"), como el único representante de Título III del ELA conforme a la sección 315(b) de la *Ley para la Supervisión, Administración y Estabilidad Económica de Puerto Rico* ("PROMESA"),[2] radica esta quingentésima trigésima sexta objeción global (la "Quingentésima trigésima sexta objeción global") en la que objeta a evidencias de reclamaciones mencionadas en el **Anexo A** del presente documento, cada una de las cuales supuestamente se basa en parte 1) en bonos emitidos por la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA"), 2) en reclamaciones por bonos que constituyen duplicados con respecto a una o más evidencias de reclamaciones principales radicadas contra el ELA en nombre de determinados bonistas, 3) en reclamaciones por bonos basadas en unos bonos emitidos por la Autoridad de Carreteras y Transportación de Puerto Rico (la "ACT"), la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico (la "AFI") o la Autoridad del Distrito del Centro de Convenciones de Puerto Rico (la "ADCC"), reclamaciones que han sido liberadas conforme a la Orden de Confirmación del ELA (según se define abajo), 4) en una participación patrimonial en bonos emitidos por el Banco Gubernamental de Fomento para Puerto Rico (el "BGF"), por unos montos por los que el ELA no ha garantizado el reembolso, 5) en una participación patrimonial en bonos emitidos por la Autoridad de Acueductos y Alcantarillados de Puerto Rico (la "AAA"), la Corporación para el Financiamiento Público de Puerto Rico (la "CFP"), la Compañía de Fomento Industrial de Puerto Rico (la "PRIDCO"), la Autoridad para el Financiamiento de la Vivienda de Puerto Rico (la "AFV") o la

---

[2]     PROMESA ha sido codificada en el Título 48 U.S.C., §§ 2101 a 2241.

Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental (la "AFICA"), 6) en inversiones en fondos mutuos que a su vez pudieron haber invertido en bonos emitidos por los Deudores y/o 7) en facturas sometidas por el reclamante que han sido satisfechas por el ELA. Además, determinadas partes de las evidencias de reclamaciones que aparecen en el **Anexo A** del presente documento son deficientes porque el reclamante no ha proporcionado ningún fundamento ni documentación justificativa para alegar una reclamación contra el ELA, de manera que el ELA no puede determinar si el reclamante tiene una reclamación válida. En apoyo de la Quingentésima trigésima sexta objeción global, el ELA manifiesta respetuosamente lo siguiente:

## JURISDICCIÓN

1.      El Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico tiene jurisdicción sobre la materia para atender la presente causa y el remedio en ella solicitado conforme a la sección 306(a) de PROMESA.

2.      La sede judicial de este distrito es la competente conforme a la sección 307(a) de PROMESA.

## ANTECEDENTES

**A.      Órdenes de Fecha Límite**

3.      El 3 de mayo de 2017, la Junta de Supervisión emitió una certificación de reestructuración conforme a las secciones 104(j) y 206 de PROMESA, y radicó una petición voluntaria de remedio para el ELA conforme a la sección 304(a) de PROMESA, iniciando un caso conforme al Título III de dicho cuerpo legal (el "Caso de Título III del ELA", y junto con los casos de Título III de los demás Deudores, los "Casos de Título III").

4.      El 16 de enero de 2018, los Deudores radicaron su *Moción de una orden que A) fije fechas límite y procedimientos para radicar evidencias de reclamaciones y B) apruebe la forma y*

*la manera de su notificación* [ECF Número 2255] (la "Moción de Fecha Límite"). Conforme a la
*Orden que A) fija fechas límite y procedimientos para radicar evidencias de reclamaciones y B)
aprueba la forma y la manera de su notificación* [ECF Número 2521] (la "Orden Inicial de Fecha
Límite"), el Tribunal concedió el remedio solicitado en la Moción de Fecha Límite y fijó fechas
límite y procedimientos para radicar evidencias de reclamaciones en el marco de los Casos de
Título III. Luego de la moción informativa de determinados acreedores, y del apoyo de los
Deudores, el Tribunal dictó a continuación la *Orden que A) extendió fechas límite para radicar
evidencias de reclamaciones y B) aprobó la forma y la manera de su notificación* [ECF Número
3160] (conjuntamente con la Orden Inicial de Fecha Límite, las "Órdenes de Fecha Límite"),
extendiendo dichas fechas límite hasta el 29 de junio de 2018, a las 04:00 p.m. (AST).

**B.    Confirmación del Plan de Ajuste del ELA, del SRE y de la AEP elaborado conforme
al Título III**

5.       El 3 de noviembre de 2021, en nombre del ELA, el Sistema de Retiro de los
Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "SRE") y la Autoridad de
Edificios Públicos de Puerto Rico (la "AEP"), la Junta de Supervisión radicó el *Octavo Plan de
Ajuste Conjunto Enmendado del Estado Libre Asociado de Puerto Rico y otros elaborado
conforme al Título III* (en su versión enmendada y modificada posteriormente, denominado el
"Plan") [ECF Número 19053]. El Tribunal examinó la confirmación del Plan y las objeciones
formuladas a este en una vista de confirmación del Plan celebrada los días 8 a 22 de noviembre de
2021.

6.       Conforme a la 1) *Orden del Tribunal relativa a determinados aspectos de la moción
para la confirmación del Octavo Plan de Ajuste Conjunto Enmendado del Estado Libre Asociado
de Puerto Rico y otros elaborado conforme al Título III* [ECF Número 19517] y 2) *Orden sobre*

las modificaciones del Plan necesarias para dictar una orden que confirme el Plan de Ajuste para el Estado Libre Asociado de Puerto Rico, el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico y la Autoridad de Edificios Públicos de Puerto Rico [ECF Número 19721], el 14 de enero de 2022, la Junta de Supervisión, en cumplimiento de las órdenes del Tribunal, radicó un Plan revisado posteriormente. *Véase el Octavo Plan de Ajuste Conjunto Enmendado del Estado Libre Asociado de Puerto Rico y otros elaborado conforme al Título III* [ECF Número 19784].

7.    El 18 de enero de 2022, el Tribunal confirmó el Plan. *Véase la Orden y la Sentencia que confirman el Octavo Plan de Ajuste Conjunto Enmendado del Estado Libre Asociado de Puerto Rico, del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico y de la Autoridad de Edificios Públicos de Puerto Rico, elaborado conforme al Título III* [ECF Número 19813] (la "Orden de Confirmación").

8.    El 20 de enero de 2022, conforme al Título VI de PROMESA, el Tribunal aprobó a) la *Modificación Calificada de la Autoridad del Distrito del Centro de Convenciones de Puerto Rico* [Caso Número 21-01493, ECF Número 72-1] (la "MC de la ADCC") y b) la *Modificación Calificada de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico* [Caso Número 21-01492, ECF Número 82-1] (la "MC de la AFI"), que complementan las transacciones contenidas en el Plan.

9.    El Plan entró en vigor el 15 de marzo de 2022, una vez consumadas las transacciones en él contempladas. *Véase Notificación de A) emisión de orden por la que se confirma la versión modificada del Octavo plan modificado y enmendado de ajuste del Estado Libre Asociado de Puerto Rico y otros elaborado conforme al Título III, según el Título III de PROMESA, y B) acontecimiento de la Fecha de entrada en vigor* [ECF Número 20349].

10. Tanto la CM de la ADCC como la CM de la AFI también entran en vigor el 15 de marzo de 2022. *Véase* Caso Número 21-01493, ECF Número 74; Caso Número 21-01492, ECF Número 84.

**C. Deuda de los bonos emitidos por varias instrumentalidades de Puerto Rico y Evidencias de reclamaciones principales relativas a la deuda de los bonos, radicadas en el marco de los Casos de Título III**

11. Conforme a la Orden Inicial de Fecha Límite, fiduciarios autorizados, agentes fiscales o cualquier otro agente o apoderado similar en relación con cada serie respectiva de bonos emitidos por uno de los Deudores o por un no deudor, podrán radicar una evidencia de reclamación principal contra el deudor pertinente, en su propio nombre y en el de todos los titulares de las reclamaciones por bonos relacionadas con la respectiva serie de bonos en relación con las obligaciones surgidas de los respectivos acuerdos de fideicomiso, resoluciones o documentos similares vinculados con los bonos. Orden Inicial de Fecha Límite, ¶ 5(a). Como se explica más adelante, en el marco del Caso de Título III del ELA se aportaron evidencias de reclamaciones principales en nombre de los tenedores de determinados bonos o pagarés emitidos por la ACT, PRIDCO, la AFI, la CFP, la AFM, la AAA, la ADCC, AFICA y la Autoridad de Energía Eléctrica de Puerto Rico (la "AEE", y conjuntamente, las "Reclamaciones Principales del ELA").

12. *ACT*: la ACT es una corporación pública e instrumentalidad del ELA, que constituye una entidad corporativa y política independiente y aparte del ELA, creada en virtud de la Ley Número 74-1965 de la Asamblea Legislativa del ELA (la "Ley para crear la ACT"). La ACT se encarga de la construcción, operación y mantenimiento de carreteras y otros sistemas de transportación en el ELA. *Véase* 9 L.P.R.A. § 2002. La Ley para crear la ACT autoriza a la ACT a emitir bonos. *V*éase 9 L.P.R.A. §§ 2004(g), (h), (l). Conforme a dicha normativa legal, la ACT emitió varias series de bonos al amparo de dos resoluciones diferentes (los "Bonos de la ACT"): *i*) la Resolución Número 68-18, adoptada el 13 de junio de 1968 (la "Resolución de 1968"); y *ii*)

la Resolución Número 98-06, adoptada el 26 de febrero de 1998 (la "Resolución de 1998"). Desde
el 21 de mayo de 2017, la fecha de petición de la ACT, aproximadamente $830 millones del monto
principal de los bonos emitidos conforme a la Resolución de 1968 quedan pendientes de pago, y
aproximadamente $3400 millones del monto principal de los bonos emitidos conforme a la
Resolución de 1998 quedan igualmente pendientes de pago. BNYM actúa como agente fiscal con
respecto a los Bonos de la ACT.

13.     En nombre de los tenedores de los Bonos de la ACT, BNYM radicó tres evidencias
de reclamaciones principales en el marco del Caso de Título III del ELA (las "Reclamaciones
Principales ACT-ELA"), cada una de las cuales alegaba "una reclamación garantizada, contingente
y no liquidada contra el ELA en razón de la totalidad de las reclamaciones, causas radicadas,
derechos y/o remedios que el Agente Fiscal o los Propietarios puedan tener contra el ELA, en
virtud de la ley o equidad. . . ." *Véase* Adenda de la Evidencia de reclamación Número 121053,
¶ 15; Adenda de la Evidencia de reclamación Número 120982, ¶ 15; Adenda de la Evidencia de
reclamación Número 115380, ¶ 15.[3]

14.     En nombre de los tenedores de los Bonos de la ACT, BNYM radicó tres evidencias
de reclamaciones principales en el marco del Caso de Título III de la ACT (conjuntamente, las
"Reclamaciones Principales de Título III de la ACT", y junto con las Reclamaciones Principales
del ELA, las "Reclamaciones Principales"): la Evidencia de reclamación Número 37245, por la
que se reclama, en nombre de los tenedores de los bonos emitidos conforme a la Resolución de
1968, aproximadamente $847 millones en concepto de responsabilidad más montos no liquidados;
la Evidencia de reclamación Número 38574, por la que se reclama, en nombre de los tenedores de

---

[3]     Aunque BNYM radicó inicialmente tres evidencias de reclamaciones registradas por Kroll
como Evidencias de reclamaciones números 21286, 26541 y 35277, estas fueron sustituidas y
enmendadas por las Evidencias de reclamaciones números 121053, 120982 y 115380.

los bonos emitidos conforme a la Resolución de 1998, aproximadamente $3200 millones en concepto de responsabilidad más montos no liquidados; y la Evidencia de reclamación Número 32622, por la que se reclama, en nombre de los tenedores de los bonos subordinados emitidos conforme a la Resolución de 1998, aproximadamente $279 millones en concepto de responsabilidad más montos no liquidados.

15.   El 13 de agosto de 2022, la Junta de Supervisión radicó el *Quinto plan enmendado de ajuste de la Autoridad de Carreteras y Transportación de Puerto Rico elaborado conforme al Título III* [Caso Número 17-BK-3567, ECF Número 1377] (el "Quinto Plan Enmendado de la ACT"). El Tribunal tuvo en consideración la confirmación del Quinto Plan Enmendado de la ACT, así como las objeciones al mismo, en una vista celebrada el 17 de agosto de 2022, tras lo cual la orden propuesta para confirmar el Quinto Plan Enmendado de la ACT quedó pendiente de resolución. El 6 de septiembre de 2022, en respuesta a la orden anterior del Tribunal en la que se solicitaban determinadas revisiones del Quinto Plan Enmendado de la ACT, la Junta de Supervisión radicó el *Quinto plan enmendado de ajuste de la Autoridad de Carreteras y Transportación de Puerto Rico modificado elaborado conforme al Título III* [ECF Número 1404] (el "Plan de la ACT"). El 12 de octubre de 2022, el Tribunal confirmó el Plan de la ACT. [ECF Número 1415]. La Junta de Supervisión prevé que el Plan de la ACT entrará en vigor próximamente.

16.   ***AEE***: la AEE es una corporación del Gobierno creada en 1941. *Véase* la Ley Número 83-1941, en su versión enmendada (la "Ley sobre la Autoridad") § 3. La  AEE genera y distribuye esencialmente la totalidad de la energía eléctrica consumida en el ELA. [Caso Número 17 BK 4780, ECF Número 1 en 7]. La AEE es una de las empresas más importantes de suministro público en los Estados Unidos; suministra servicios a aproximadamente 1.5 millones de clientes y

tiene la facultad de tomar en préstamo fondos y emitir deuda a través de bonos y otras obligaciones.

U.S. Bank National Association ("U.S. Bank") actúa como fiduciario en relación con determinados

bonos emitidos por la AEE conforme al Acuerdo de Fideicomiso, de fecha 1 de enero de 1974 (los

"Bonos de la AEE"). En nombre de los tenedores de los Bonos de la AEE, U.S. Bank radicó una

evidencia de reclamación contra el ELA (la "Reclamación Principal de la AEE"), que fue

registrada por Kroll como Evidencia de reclamación Número 50049, alegando una reclamación no

liquidada en relación con el supuesto valor de derechos legales que el ELA otorgó a la AEE.

17.    *AFI*: la AFI es una filial del BGF y constituye una instrumentalidad del Gobierno

del ELA. La AFI fue creada en 1988 mediante la Ley Número 44-1988 (la "Ley para crear la

AFI"). La AFI brinda asistencia financiera, administrativa y de otro tipo al ELA, a sus

corporaciones públicas y a otras instrumentalidades encargadas del desarrollo y del

funcionamiento de las infraestructuras. En nombre de los tenedores de varios bonos y pagarés

emitidos por la AFI (conjuntamente, los "Bonos de la AFI"), se radicaron evidencias de

reclamaciones principales contra el ELA (conjuntamente, las "Reclamaciones Principales de la

AFI") por parte de BNYM, US Bank y UMB Bank, N.A. US Bank radicó una evidencia de

reclamación principal en relación con determinados Bonos de la AFI, que fue registrada por Prime

Clerk como Evidencia de reclamación Número 13386, en nombre de los tenedores de los Bonos

de la AFI relativos a impuestos sobre el ron (Bonos relativos a rentas de impuestos especiales,

series 2005A, 2005B, 2005C y serie 2006B), alegando "reclamaciones por montos contingentes y

no liquidados en relación con los intereses pagaderos a futuro, intereses acumulados y que se

acumulen en el futuro en lo referente al principal adeudado en el pasado y las reclamaciones por

intereses, tarifas, costos e indemnización del Fiduciario en los que se incurra en el futuro en virtud

de los Documentos de bonos, así como por la totalidad de los montos adeudados en razón de todas

las reclamaciones que tenga o pueda tener el Fiduciario en relación con las Obligaciones de bonos pendientes, monto mínimo de $249,099,446.17. . . ."  Cláusula Adicional de la Evidencia de reclamación Número 13386, ¶ 26. Como se explicó anteriormente, el Tribunal aprobó la MC de la AFI que ha sido consumada, y la totalidad de los Bonos de la AFI, así como las reclamaciones relacionadas, han sido liberados.

18.     *CFP*: la CFP es una corporación subsidiaria del BGF creada conforme a la Resolución Número 5044 de la Junta Directiva del BGF, en su versión enmendada (la "Resolución Número 5044"), adoptada de conformidad con la autoridad concedida en virtud de la Ley Número 17 de la Asamblea Legislativa de Puerto Rico, aprobada el 23 de septiembre de 1948, en su versión enmendada. Proporciona a las agencias públicas, instrumentalidades, municipios y a otras subdivisiones del ELA mecanismos alternativos para que puedan satisfacer sus necesidades de financiamiento. La CFP tiene la facultad de tomar en préstamo fondos y emitir deuda a través de bonos y otras obligaciones.

19.     La CFP no es deudor de Título III y es una entidad aparte y jurídicamente independiente del ELA, por lo que sus responsabilidades no están garantizadas por el ELA ni por ninguno de los demás Deudores. *Véase, por ejemplo,* 3 L.P.R.A. § 9081(c) (que se refiere a la CFP como una "entidad jurídica independiente", separada del ELA).

20.     En 1999, la CFP emitió determinados Bonos de Asignación del ELA, Serie A (los "Bonos de la Serie A de 1999"), por el monto total de $30,910,000, que ya han vencido. Por ejemplo, determinados Bonos de la Serie A de 1999 emitidos por la CFP, con el Número CUSIP 745291UF9, vencieron el 1 de agosto de 2015.[4]

---

[4]     https://emma.msrb.org/Security/Details/A5FC439F9772449378D11ABF69C978F95.

21.     En 2000, la CFP emitió determinados Bonos de Asignación de Refinanciamiento del ELA, Serie B, de 2000 (los "Bonos de la Serie B de Refinanciamiento de 2000"), por un monto total de $120,000,000, para, en parte, proporcionar los fondos necesarios para la compra de un pagaré emitido por la Administración de Facilidades y Servicios de Salud de Puerto Rico (la "AFASS"). Los Bonos de la Serie B de Refinanciamiento de 2000 son pagaderos únicamente desde los intereses sobre el pagaré de la AFASS y otros montos depositados en el saldo del fondo de amortización creado en virtud del acuerdo de fideicomiso conforme al cual se emitieron los Bonos de la Serie B.  La declaración de oferta emitida en relación con los Bonos de la Serie B de Refinanciamiento de 2000 dispone que los bonos "no constituirán una obligación del Estado Libre Asociado de Puerto Rico ni de ninguna de sus subdivisiones políticas (salvo [la AFICA]), por lo que ni el Estado Libre Asociado de Puerto Rico ni ninguna de sus subdivisiones políticas (salvo [la AFICA]) será responsable de su pago". *Véase, por ejemplo*, Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental, Declaración de Oferta, Bonos de la Serie B de Refinanciamiento de 2000 (Bonos de Asignación del ELA), *disponible                                                                                                                en* https://emma.msrb.org/Security/Details/A9FC3F0775B154C39E3EF2A7DCF134C3F.

22.     En 2001, la CFP emitió determinados Bonos de Asignación del ELA, Serie A, de 2001 (los "Bonos de la Serie A de Asignación del ELA de 2001"), por un monto total de $356,680,000, para, en parte, proporcionar los fondos necesarios para la compra de un pagaré emitido por la AAA. Los Bonos de la Serie A de Asignación del ELA de 2001 son pagaderos únicamente desde los pagos del principal y los intereses sobre el pagaré de la AAA. La declaración de oferta emitida en relación con los Bonos de la Serie A de Asignación del ELA de 2001 dispone que los bonos "no constituirán una obligación del Estado Libre Asociado de Puerto Rico ni de

ninguna de sus subdivisiones políticas (salvo [la AFICA]), por lo que ni el Estado Libre Asociado de Puerto Rico ni ninguna de sus subdivisiones políticas (salvo [la AFICA]) será responsable de su pago". *Véase, por ejemplo,* Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental, Declaración de Oferta, Serie A de 2001 (Bonos de Asignación del ELA), *disponible en* https://emma.msrb.org/Security/Details/A5FC439F9772449378D11ABF69C978F95.

23.     Además, en 2001 la CFP emitió determinados Bonos de Asignación del ELA, Serie C (los "Bonos de la Serie C de Asignación del ELA de 2001"), por un monto total de $771,274,288.85, para, en parte, proporcionar fondos necesarios para la compra de determinados pagarés en relación con la reestructuración de ciertos préstamos pendientes de pago concedidos por el BGF a algunas agencias del ELA, sus instrumentalidades y corporaciones públicas. Los Bonos de la Serie C de Asignación del ELA de 2001 son pagaderos únicamente desde los pagos del principal y los intereses sobre los pagarés del BGF. La declaración de oferta emitida en relación con los Bonos de la Serie C de Asignación del ELA de 2001 dispone que los bonos "no constituirán una obligación del Estado Libre Asociado de Puerto Rico ni de ninguna de sus subdivisiones políticas (salvo [la AFICA]), por lo que ni el Estado Libre Asociado de Puerto Rico ni ninguna de sus subdivisiones políticas (salvo [la AFICA]) será responsable de su pago". *Véase, por ejemplo*, Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental, Declaración de Oferta, Serie C de 2001 (Bonos de Asignación del ELA), *disponible en https://emma.msrb.org/Security/Details/AD2539D6108597A3FE0565CD904A73215*.

24.     U.S. Bank y U.S. Bank Trust National Association ("U.S. Bank Trust" y junto con U.S. Bank, el "Fiduciario de los Bonos de la CFP") actúan como fiduciarios en relación con

determinados Bonos de Asignación del ELA, Serie 2011A, Serie 2011B y Serie 2012A, emitidos por la CFP (junto con los Bonos de la Serie A de 1999, los Bonos de Asignación del ELA de la Serie A de 2001 y los Bonos de Asignación del ELA de la Serie C de 2001, los "Bonos de la CFP"). En nombre de los tenedores de los Bonos de Asignación del ELA, Serie 2011A, Serie 2011B y Serie 2012A, emitidos por la CFP, el Fiduciario de los Bonos de la CFP radicó una evidencia de reclamaciones contra el ELA (la "Reclamación Principal de la CFP"), que fue registrada por Kroll como Evidencia de reclamación Número 13374.

25.    El Fiduciario de los Bonos de la CFP también radicó una objeción a la confirmación del Plan [Caso Número 17-3203, ECF Número 18631] en relación con los Bonos de Asignación del ELA, Serie 2011A, Serie 2011B y Serie 2012A, emitidos por la CFP (la "Objeción del "Fiduciario de los Bonos de la CFP"). En la vista para estudiar la confirmación del Plan, la Junta de Supervisión anunció que, con sujeción a determinadas aprobaciones y documentación definitiva, se había alcanzado un acuerdo *i*) para resolver la objeción del Fiduciario de los Bonos de la CFP y *ii*) en cuanto a las condiciones de la reestructuración de los Bonos de Asignación del ELA, Serie 2011A, Serie 2011B y Serie 2012A, emitidos por la CFP, conforme al Título VI de PROMESA. Conforme a dicho acuerdo, y en virtud de los compromisos y conciliaciones en él contenidos, la Objeción del Fiduciario de los Bonos de la CFP fue resuelta. El 25 de octubre de 2022, de conformidad con el acuerdo y documentación definitiva, se inició una solicitación que buscaba la aceptación de la *Modificación Cualificada conforme al Título VI de PROMESA en relación con la Corporación para el Financiamiento Público de Puerto Rico* (la "CM de la CFP"). La CFP propone liberar los Bonos de Asignación del ELA, Serie 2011A, Serie 2011B y Serie 2012A, emitidos por la CFP, así como las reclamaciones relacionadas. La Junta de Supervisión

prevé que el procedimiento de Título VI sobre la CM de la CFP comience el 28 de octubre de 2022 a más tardar.

26.    *AFM*: BNYM y U.S. Bank Trust actúan como fiduciarios en relación con determinados bonos emitidos por la AFM. En nombre de los tenedores de determinados bonos de la Agencia para el Financiamiento Municipal de Puerto Rico, 2005, Serie A, BNYM radicó una evidencia de reclamación principal contra el ELA, que fue registrada por Prime Clerk, LLC, como Evidencia de reclamación Número 30168. En nombre de los tenedores de determinados bonos de la Agencia para el Financiamiento Municipal de Puerto Rico, Serie 2005 C, U.S. Bank Trust radicó una evidencia de reclamación principal, que fue registrada por Prime Clerk, LLC, como Evidencia de reclamación Número 13364.

27.    *AAA*: la AAA fue creada de conformidad con la Ley Número 40, de 1 de mayo de 1945. La AAA es una "corporación pública e instrumentalidad gubernamental autónoma", creada para la prestación de los servicios de suministro de agua y alcantarillado en la isla. 22 L.P.R.A. § 142, 144. La AAA es propietaria y se encarga de los sistemas de suministro público de agua y de aguas residuales en Puerto Rico.

28.    La AAA emitió determinados bonos de renta (los "Bonos de la AAA"), conforme a la Resolución de la Autoridad de Acueductos y Alcantarillados de Puerto Rico Número 1583, por la que se garantizan los bonos de la Autoridad de Acueductos y Alcantarillados de Puerto Rico avalados por el Estado Libre Asociado de Puerto Rico, y algunas resoluciones complementarias. El Banco Popular de Puerto Rico (el "Banco Popular") actúa como fiduciario en relación con los Bonos de la AAA, y radicó una evidencia de reclamaciones principal contra el ELA en nombre de los tenedores de los Bonos de la AAA, que fue registrada por Kroll como Evidencia de reclamaciones Número 22620 (la "Reclamación Principal de la AAA"). La Reclamación principal

de la AAA alega "una reclamación contingente contra el ELA en relación con los Bonos por un importe de al menos $284,755,000, además de todos los intereses y primas generados sobre los Bonos a partir de la Fecha de petición, así como la totalidad de las tasas, costos y gastos u otros cargos acumulados que hayan devengado o sean cobrables en relación de tales Bonos". Adenda de la Evidencia de Reclamación Principal de la AAA, ¶ 9.

29.     La Ley para crear la AAA autoriza a la AAA a emitir bonos. 22 L.P.R.A. § 144(g). Conforme a dicha Ley, la junta directiva de la AAA adoptó resoluciones que autorizan a la AAA emitir bonos, lo que incluye la Resolución Número 1583, en su versión enmendada y modificada el 7 de marzo de 2008 (la "Resolución Número 1583"). En 2008, la AAA emitió unos bonos de renta, Serie A, por un monto del principal de $1,316,204,456 (los "Bonos Prioritarios Serie A 2008"), y unos bonos de renta, Serie B, por un monto del principal de $22,445,000 (los "Bonos Prioritarios Serie B 2008", y junto con los Bonos Prioritarios Serie A 2008, los "Bonos Prioritarios 2008"). En 2008, la AAA también emitió unos bonos de renta de refinanciamiento, Serie A, por un monto del principal de $159,055,000, y unos bonos de renta de refinanciamiento, Serie B, por un monto del principal de $125,700,000 (conjuntamente, los "Bonos de Refinanciamiento de la AAA"). En 2012, la AAA emitió unos bonos de renta, Serie 2012 A, por un monto del principal de $1.800.450.000 (los "Bonos Prioritarios Serie A 2012"), y unos bonos de renta, Serie 2012 B, por un monto del principal de $295,245,000 (los "Bonos Prioritarios Serie B 2012", y junto con los Bonos Prioritarios Serie A 2012, los "Bonos Prioritarios 2012", y junto con los Bonos Prioritarios 2008, los "Bonos de Gravamen Prioritario de la AAA").

30.     Los tenedores de los Bonos de Gravamen Prioritario de la AAA han recibido, y siguen recibiendo, la totalidad de los pagos íntegros adeudados a tales tenedores de los Bonos de Gravamen Prioritario de la AAA, a medida que estos vencen y se vuelven pagaderos. En

consecuencia, el EMMA refleja que la AAA no ha publicado ninguna notificación de incumplimiento en relación con los Bonos de Gravamen Prioritario de la AAA.[5]  Además, el ELA no ha garantizado el reembolso de los Bonos de Gravamen Prioritario de la AAA. En consecuencia, las declaraciones de oferta relativas a los Bonos de Gravamen Prioritario de la AAA indican que "no constituyen deuda del Estado Libre Asociado de Puerto Rico ni de ninguno de sus municipios u otras subdivisiones políticas, con la excepción de [la AAA], por lo que ni el Estado Libre Asociado de Puerto Rico ni ningunos de dichos municipios u otras subdivisiones políticas, con la excepción de [la AAA], será responsable por el pago del principal o de los intereses sobre los referidos Bonos".[6]

31.    Los tenedores de los Bonos de Refinanciamiento de la AAA han recibido, y siguen recibiendo, la totalidad de los pagos íntegros adeudados a tales tenedores de los Bonos de Refinanciamiento de la AAA, a medida que estos vencen y se vuelven pagaderos. En consecuencia, el EMMA refleja que la AAA no ha publicado ninguna notificación de incumplimiento en relación con los Bonos de Refinanciamiento de la AAA.[7]  Además, aunque las declaraciones de oferta relativas a los Bonos de Refinanciamiento de la AAA identifican al ELA como la entidad que ha garantizado el reembolso de dichos bonos, tal garantía ha sido eliminada en relación con el refinanciamiento de los Bonos de Refinanciamiento de la AAA y algunos de los Bonos de Gravamen Prioritario de la AAA, según se establece en la declaración de oferta de fecha 9 de

---

[5]*Véase, por ejemplo,*
https://emma.msrb.org/Security/Details/AC36D3844A362D61AB88CADFC75BE5FE7.

[6] *Véase, por ejemplo*, Declaración de Oferta relativa a los Bonos de Renta de la AAA, Serie A (Gravamen Prioritario), 15 de febrero de 2012, disponible en https://emma.msrb.org/ER584464-ER454075-ER856856.pdf.

[7]*Véase, por ejemplo*,
https://emma.msrb.org/Security/Details/A5686687B583CA99BFDDA7BAE76F581A9.

diciembre de 2020, conforme a la cual la AAA emitió los bonos de renta de refinanciamiento de gravamen prioritario, serie 2020A, y los bonos de renta de refinanciamiento de gravamen prioritario sujetos a impuestos federales, serie 2020B (la "<u>Transacción de Refinanciamiento de la AAA 2020</u>").[8]

32.    El 20 de julio de 2021, la Junta de Supervisión aprobó una transacción de reembolso propuesta, conforme a la cual la AAA emitiría las series 2021ABC y 2022A de Bonos de Gravamen Prioritario para refinanciar unos Bonos Prioritarios de la AAA pendientes de 2012 por un valor de $1800 millones (la "<u>Transacción de Refinanciamiento de la AAA 2021</u>").[9]   La Transacción de Refinanciamiento de la AAA 2021 fue consumada conforme a los términos de la declaración de oferta, de fecha 17 de agosto de 2021, emitida en relación con dicha Transacción.[10]

33.    ***ADCC***: antes de la Fecha de entrada en vigor, Bank of New York Mellon ("<u>BNYM</u>") actuaba como fiduciario en relación con determinados Bonos de rentas de impuestos relativos a la ocupación de hoteles, emitidos por la ADCC (los "<u>Bonos de la ADCC</u>"), y en nombre de los tenedores de los Bonos de la ADCC radicó una evidencia de reclamaciones principal contra el ELA, que fue registrada por Kroll como Evidencia de reclamaciones Número 37319 (la "<u>Evidencia de Reclamación Principal de la ADCC</u>"). La Reclamación Principal de la ADCC reivindica una "reclamación contingente y no liquidada contra el ELA en razón de la totalidad de

---

[8] *Véase* la Declaración de Oferta relativa a los Bonos de Renta de Refinanciamiento de la AAA, Serie 2020A (Gravamen Prioritario), y a los Bonos de Renta de Refinanciamiento Sujetos a Impuestos Federales, Serie 2020B (Gravamen Prioritario), de fecha 9 de diciembre de 2020, disponible en https://emma.msrb.org/P31403866-P31091563-P31500360.pdf.

[9] *Véase* Carta de la Junta de Supervisión y Administración Financiera dirigida a AAFAF en la que se aprueba la Transacción de Refinanciamiento de la AAA, de fecha 20 de julio de 2021, disponible en https://drive.google.com/file/d/1YvDZHPXCQ4vWOARyVGrY_XFb_-HhZZdc/view.

[10] *Véase* Declaración de Oferta relativa a los Bonos de Renta de Refinanciamiento de la AAA, Series 2021ABC y 2022A (Gravamen Prioritario), de fecha 17 de agosto de 2021, disponible en https://emma.msrb.org/P11521655-P11177130-P11593393.pdf.

las reclamaciones, causas radicadas, derechos y/o remedios que el Fiduciario o los Propietarios puedan tener contra el ELA en virtud de la ley o equidad". Adenda de la Evidencia de Reclamación Principal de la ADCC, ¶ 11. Como se explicó anteriormente, el Tribunal aprobó la MC de la ADCC que ha sido consumada, y la totalidad de los Bonos de la ADCC, así como las reclamaciones relacionadas, han sido liberados.

34.    ___*AFICA*___: la AFICA es una corporación pública e instrumentalidad gubernamental del ELA creada por la Ley Número 121 de la Asamblea Legislativa de Puerto Rico, aprobada el 27 de junio de 1977 (en su versión enmendada, complementada y codificada en las Leyes de Puerto Rico, título 12, § 1251 *et seq*.) P.R. Leyes de Puerto Rico, título 12, § 1254. La AFICA facilita el financiamiento de los proyectos para fomentar el desarrollo económico del ELA, lo que incluye medidas para la promoción y construcción de nuevas infraestructuras industriales, comerciales, turísticas, agrícolas, educativas, médicas y de control medioambiental.

35.    En 2002, la AFICA emitió determinados Bonos de Renta y de Renta de Refinanciamiento de Educación Superior, 2002 Serie A (los "Bonos de la Universidad Serie 2002 A"), por un monto total de $34,330,000.00, para proporcionar, en parte, financiamiento para *i*) la construcción de determinados centros educativos pertenecientes, o que pertenecerían, a la Universidad Politécnica de Puerto Rico (la "Universidad"), *ii*) el reembolso de determinados bonos emitidos anteriormente y *iii*) determinados costos relativos al seguro y a la emisión de los Bonos de la Universidad 2002 Serie A. Los Bonos de la Universidad Serie 2002 A son pagaderos únicamente a través del reembolso de un acuerdo de préstamo celebrado entre la AFICA y la Universidad. La declaración de oferta emitida en relación con los Bonos de la Universidad Serie 2002 A dispone que los bonos "no constituirán endeudamiento del ELA ni de ninguna de sus subdivisiones políticas, salvo [la AFICA], por lo que ni el ELA ni ninguna de sus subdivisiones

políticas, salvo [la AFICA], será responsable de su pago". Véase, por ejemplo, Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental, Declaración de Oferta, Bonos de Renta y de Renta de Refinanciamiento de Educación Superior Serie 2002 A (Proyecto Universidad Politécnica de Puerto Rico), *disponible en* https://emma.msrb.org/Security/Details/AA9A902D905B8AF8265EDFE55EEC98D6E.

36.     En 2011, la AFICA emitió Bonos de Renta de Refinanciamiento Turístico, Serie A, de 2011 (los "Bonos Trump Golf Club 2011 Serie A", y junto con los Bonos de la Universidad Serie 2002 A, los "Bonos de la AFICA"), por un monto total de $26,355,000.00, para refinanciar parcialmente parte de la construcción de Trump International Golf Club Puerto Rico. Los Bonos Trump Golf Club 2011 Serie A son pagaderos únicamente a través del reembolso de un acuerdo de préstamo celebrado entre la AFICA y Coco Beach Golf & Country Club, S.E. La declaración de oferta emitida en relación con los Bonos Galería 2011 Serie A dispone que los bonos "no constituyen endeudamiento del ELA ni de ninguna de sus subdivisiones políticas, salvo [la AFICA], por lo que ni el ELA ni ninguna de sus subdivisiones políticas, salvo [la AFICA], será responsable de su pago". Véase, por ejemplo, Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental, Declaración de Oferta, Bonos de Renta de Refinanciamiento Turístico 2011 Serie A (Proyecto Trump International Golf Club                     Puerto                     Rico),                     *disponible                     en* https://emma.msrb.org/Security/Details/A1A77B5F6CEF57494504C49A90359E23A.

37.     BNYM actúa como fideicomisario en relación con ciertos bonos relativos a rentas de la Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental de Puerto Rico (Proyecto Plaza Universitaria) (los "Bonos de Plaza Universitaria"), emitidos presuntamente por la AFICA. En nombre de los tenedores de los

Bonos de Plaza Universitaria, BNYM radicó una evidencia de reclamación principal, que fue registrada por Prime Clerk, LLC, como Evidencia de reclamación Número 68271. Además, U.S. Bank y U.S. Bank Trust actúan como fiduciarios en relación con determinados Bonos relativos a la renta de refinanciamiento de educación superior (los "Bonos de Educación Superior"). En nombre de los tenedores de los Bonos de educación superior, U.S. Bank y U.S. Bank Trust radicaron una evidencia de reclamación principal, que fue registrada por Prime Clerk, LLC, como Evidencia de reclamación Número 13391.

38.     *AFV*: la AFV es una subsidiaria del BGF y constituye una instrumentalidad gubernamental independiente del ELA. La AFV promueve la construcción de viviendas para personas con bajo nivel de ingresos y ofrece financiamiento, subsidios e incentivos a los propietarios de las viviendas.

39.     La AFV no es deudor de Título III y es una entidad aparte y jurídicamente independiente del ELA, por lo que sus responsabilidades no están garantizadas por el ELA ni por ninguno de los demás Deudores. *Véase, por ejemplo*, 7 L.P.R.A. § 924(c) (que se refiere a la AFV como una "corporación pública, subsidiaria del [BGF], creada por la Resolución Número 4023, de 16 de noviembre de 1977, en su versión enmendada, de la Junta Directiva del Banco Gubernamental de Fomento para Puerto Rico, cuyo nuevo nombre, tras la fusión, es la 'Autoridad para el Financiamiento de la Vivienda de Puerto Rico'").

40.     En 1998, la AFV emitió determinados Bonos, de la Serie A, de Renta de Hipoteca relativa a la Propiedad de Viviendas de 1998 (Préstamos Hipotecarios Garantizados por la GNMA) (los "Bonos de la Serie A de Hipoteca de 1998"), por un monto total de $93,460,000, para, en parte, financiar un programa en virtud del cual la AFV compraría, y transferiría al Banco Popular, como fiduciario, determinados títulos valores avalados por la hipoteca y garantizados por la

Asociación Nacional Gubernamental Hipotecaria (la "<u>GNMA</u>" y los "<u>Certificados de la GNMA</u>").

Los Bonos de la Serie A de Hipoteca de 1998 son pagaderos únicamente desde los frutos de los

Certificados de la GNMA. La declaración de oferta emitida en relación con los Bonos de la Serie

A de Hipoteca de 1998 afirma que los bonos "no constituyen deuda, obligación o prenda del crédito

del ELA ni de ninguna de sus municipios o subdivisiones políticas, ni del [BGF] o cualquier otra

instrumentalidad pública del ELA (salvo la [AFV]), por lo que ni el ELA ni ninguno de sus

municipios o subdivisiones políticas, ni el [BGF] o ninguno de sus instrumentalidades públicas del

ELA (salvo la [AFV]) serán responsables de su pago". *Véase, por ejemplo,* la Corporación para el

Financiamiento de la Vivienda, Declaración de Oferta, Serie A, Bonos, de la Serie A, de Renta de

Hipoteca relativa a la Propiedad de Viviendas de 1998 (Préstamos Hipotecarios Garantizados por

la                    GNMA),                    *disponible                    en*

https://emma.msrb.org/Security/Details/A645E8ADB07527F8A6CAAA18BA7D80D57.

41.      ***PRIDCO***: PRIDCO fue creada por la Ley Número 188 de 1942, codificada como

23 L.P.R.A. §§ 271 *et seq*., para fomentar el desarrollo económico de Puerto Rico y proporcionar

instalaciones industriales en arrendamiento o venta a empresas privadas fabricantes.

42.      En 1999, PRIDCO emitió determinados Bonos de Renta Industrial de 1999, de la

Serie A (los "<u>Bonos de la Serie A de 1999</u>" o los "<u>Bonos de PRIDCO</u>"), por el monto total de

$200,003,601.20, para proporcionar, en parte, financiamiento para el proyecto Plaza Las

Américas. Los Bonos de la Serie A de 1999 son pagaderos únicamente desde los pagos realizados

por Plaza Las Américas en virtud de un acuerdo de préstamo entre PRIDCO y Plaza Las Américas.

La declaración de oferta emitida en relación con los Bonos de la Serie A de 1999 dispone que los

bonos "no constituyen endeudamiento del Estado Libre Asociado de Puerto Rico ni de ninguna de

sus subdivisiones políticas o instrumentalidades, salvo PRIDCO, y ni el ELA ni ninguna de sus

subdivisiones políticas o instrumentalidades, salvo PRIDCO, será responsable de su pago. [PRIDCO] no tiene poder impositivo. Los Bonos [de la Serie A de 1999] son pagaderos únicamente de las rentas y otros fondos destinados a tal fin en el Acuerdo de Fideicomiso y en el Acuerdo de Préstamo". *Véase, por ejemplo,* Declaración de Oferta, Bonos de Renta Industrial, Serie A, de 1999, *disponible en* https://emma.msrb.org/Security/Details/AFBB4AE84A289D637D9582D4D38B910A0.

43.    US Bank actúa como fideicomisario en relación con determinados Bonos relativos a rentas de fines generales y rentas de refinanciamiento, series 1997 A series 2003 (los "<u>Bonos de PRIDCO</u>"), y en nombre de los tenedores de los Bonos de PRIDCO radicó una evidencia de reclamaciones principal contra el ELA, que fue registrada por Kroll como Evidencia de reclamaciones Número 13445 (la "<u>Reclamación Principal de PRIDCO</u>"). La Reclamación Principal de PRIDCO alega reclamaciones contingentes y no liquidadas contra el ELA, y busca:

> recuperación de la totalidad de los montos adeudados en razón de todas las reclamaciones que el Fiduciario tenga o pueda tener en relación con las obligaciones pendientes por Bonos, conocidos o por conocer, contra el ELA y aquellos que pretendan actuar en nombre del ELA, alegadas en la actualidad o por alegar, lo que incluye, entre otras cosas, reclamaciones por o basadas en el incumplimiento o la violación de los Documentos de los bonos, acuerdos de arrendamiento u otras obligaciones contractuales relativas a la garantía subyacente, cualesquiera otros pactos u otras obligaciones contractuales derivadas del presente documento, o reclamaciones surgidas por el desvío indebido de las rentas de PRIDCO o de cualesquiera otros bienes que garanticen el pago de los Bonos en virtud de los Documentos de los bonos, conforme a la normativa legal pertinente del ELA, estatal o federal, lo que incluye, entre otras cosas, fideicomiso ficto, transmisión fraudulenta o transferencia fraudulenta, incumplimiento de deberes y obligaciones contractuales y fiduciarias, vulneración de pactos implícitos justos y de buena fe, u otras reclamaciones en ley o equidad.

Cláusula de la Reclamación Principal de PRIDCO, ¶¶ 12-13.

**D.    Procedimientos conforme al Título VI del BGF y modificación calificada**

44.    El BGF es una corporación pública e instrumentalidad gubernamental del ELA, creada por la Asamblea Legislativa en 1948 para ayudar al Gobierno del ELA (el "Gobierno") a llevar a cabo sus tareas fiscales y a desempeñar su responsabilidad con mayor eficacia en relación con el desarrollo de la economía del ELA. El 28 de abril de 2017, la Junta de Supervisión aprobó por unanimidad el Plan fiscal del BGF de febrero de 2017, que contemplaba una terminación ordenada de las actividades del BGF sobre la base de la determinación de que el BGF no era viable a largo plazo dadas sus condiciones financieras vigentes en ese momento.

45.    El 12 de julio de 2017, la Junta de Supervisión dictó una resolución por la que se autorizaba al BGF, conforme a la sección 601(e) de PROMESA, a ampararse en el Título VI de PROMESA. El 10 de agosto de 2018, el BGF radicó una solicitud de aprobación de una modificación calificada, conforme a la sección 601(m)(1)(D) de PROMESA (la "Modificación Calificada"), ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico.

46.    El 7 de noviembre de 2018, el Tribunal aprobó la Modificación Calificada conforme a la sección 601(m)(1)(D) de PROMESA. *Véase* ECF Número 270 en *Banco Gubernamental de Fomento para Puerto Rico*, Caso Número 18-1561 (D.P.R. 7 de nov. de 2018). La Modificación Calificada dispone, entre otras cosas, i) la emisión de nuevos bonos por la Autoridad de Recuperación de Deuda del BGF (*GDB Debt Recovery Authority*) a cambio de la cancelación (entre otras cosas) de determinados bonos de participación y reclamaciones de bonos garantizados (conjuntamente, "Bonos del BGF"). ii) la extinción de la garantía del ELA de los bonos garantizados tras el intercambio y cancelación de los bonos garantizados; y iii) la liberación de reclamaciones de los tenedores de Bonos del BGF contra el BGF y sus afiliados en relación con (entre otras cosas) cualquier inversión con el BGF o la compra, venta o transferencia de cualquier título valor o participación del BGF, y cualquier acción u omisión con respecto a un endeudamiento

23

o préstamo al BGF (incluidos cualesquiera pagarés emitidos o mantenidos por el BGF) o del BGF. *Declaración de Solicitación,* en 57-60, ECF Número 1-15 en *Banco Gubernamental de Fomento para Puerto Rico*, Caso Número 18-1561 (D.P.R. 10 de ago. de 2018).

47.    El 29 de noviembre de 2018, el BGF anunció la consumación de la Modificación Calificada del BGF. Nota de prensa, *el Gobierno de Puerto Rico anuncia la consumación de la Modificación Calificada del BGF*, Gobernador de Puerto Rico (29 de nov. de 2018), *disponible en* http://www.aafaf.pr.gov/assets/gov-pr-announces-consummation-gdb-qualifying-modification.pdf.

**E.    Caso de Título III de COFINA y resolución de la controversia entre el ELA y COFINA**

48.    COFINA es una corporación pública e instrumentalidad del ELA, que constituye una entidad corporativa y política independiente y aparte del ELA, creada en virtud de la Ley Número 91 de la Asamblea Legislativa del ELA. Conforme a la Resolución enmendada y modificada sobre los bonos del fondo de interés apremiante, adoptada el 13 de julio de 2007, en su versión enmendada del 19 de junio de 2009, y de conformidad con otras resoluciones complementarias, COFINA emitió una serie de bonos por un monto total de aproximadamente $17,000 millones para, entre otras cosas, sufragar determinadas obligaciones de deuda del BGF y de la Corporación para el Financiamiento Público de Puerto Rico (los "Bonos de COFINA"). Bank of New York Mellon actúa como fiduciario con respecto a los Bonos de COFINA.

49.    La Junta de Supervisión radicó el *Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III* (el "Plan de COFINA") [ECF Número 4652] el 9 de enero de 2019. El Tribunal examinó la confirmación del Plan de COFINA y las objeciones formuladas a este en una vista celebrada los días 16 y 17 de enero de 2019.

50.    El 4 de febrero de 2019, el Tribunal confirmó el Plan de COFINA que incorporaba el pacto y la conciliación de la controversia sobre si, luego de examinar todas las contestaciones y reconvenciones sustantivas y procesales, incluidas cuestiones constitucionales, los impuestos sobre la venta y uso supuestamente empeñados por COFINA para garantizar la deuda son propiedad del ELA o de COFINA conforme a la normativa legal aplicable (la "Controversia entre el ELA y COFINA"). *Véase la Orden y la Sentencia que confirman el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III* [ECF Número 5048]. Ese mismo día, el Tribunal aprobó el pacto y la conciliación de la Controversia entre el ELA y COFINA conforme al *Dictamen abreviado y orden que aprueba la conciliación entre el Estado Libre Asociado de Puerto Rico y la Corporación del Fondo de Interés Apremiante de Puerto Rico* [ECF Número 5045] (la "Orden de Conciliación de COFINA"). El 5 de febrero de 2019, el Tribunal dictó una *Orden y Sentencia enmendadas que confirman el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III* [ECF Número 5055] (la "Orden de Confirmación Enmendada de COFINA"). El Plan entró en vigor el 12 de febrero de 2019 (la "Fecha de entrada en vigor de COFINA"), una vez consumadas las transacciones en él contempladas. *Véase Notificación de A) emisión de orden por la que se confirma el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III, según el Título III de PROMESA, y B) acontecimiento de la Fecha de entrada en vigor* [Caso Número 17 BK 3284-LTS, ECF Número 587].

**F.**     **Evidencias de reclamaciones, procedimientos relativos a objeciones globales y**
**objeciones a reclamaciones**

51.     Hasta la fecha, se han radicado aproximadamente 179,313 evidencias de
reclamaciones contra los Deudores, que han sido registradas por Kroll Restructuring
Administration, LLC ("Kroll"). Dichas evidencias de reclamaciones ascienden a un total
aproximado de $43.6 billones en reclamaciones radicadas contra los Deudores, además de los
montos no liquidados reclamados.

52.     De las evidencias de reclamaciones radicadas, aproximadamente 118,703 han sido
radicadas en relación con el ELA, o reclasificadas como radicadas contra el ELA. De conformidad
con las condiciones de las Órdenes de Fecha Límite, muchas de estas reclamaciones no deberían
haber sido radicadas en absoluto o adolecen de otro tipo de vicios; por ejemplo, haber sido
enmendadas posteriormente, no alegar una reclamación por la que los Deudores sean responsables,
estar duplicadas en relación con otras evidencias de reclamaciones o no aportar información
necesaria para que los Deudores determinen si la reclamación es válida.

53.     Para resolver eficazmente el mayor número posible de las evidencias de
reclamaciones innecesarias, el 16 de octubre de 2018 los Deudores radicaron ante este Tribunal su
*Moción para que se dicte una orden que A) apruebe procedimientos limitados relativos a
objeciones globales, B) exima el requisito contenido en la regla 3007(e)(6) de las Reglas de
Quiebras, y C) conceda el remedio relacionado* [ECF Número 4052] (la "Moción de
Procedimientos Globales"). El Tribunal concedió el remedio solicitado en la Moción de
Procedimientos Globales mediante la orden de fecha 14 de noviembre de 2018. *Véase la Orden
que A) aprueba procedimientos limitados relativos a objeciones globales, B) exime el requisito
contenido en la regla 3007(e)(6) de las Reglas de Quiebras, y C) concede el remedio relacionado*

[ECF Número 4230]; *Procedimientos relativos a Objeciones Globales* [ECF Número 4230-1] (conjuntamente, los "Procedimientos Iniciales relativos a Objeciones Globales"). El 29 de noviembre de 2018, el Tribunal aprobó las versiones en inglés y en español de los formularios de notificación relativos a las objeciones globales a efectos de radicarlas de conformidad con los Procedimientos Iniciales relativos a Objeciones Globales. *Véase Orden por la que se aprobaron las versiones en inglés y en español de los formularios de notificación relativos a objeciones globales* [ECF Número 4381] (la "Orden de Notificación").

54.     En aras del interés constante por resolver eficazmente cualquier evidencia de reclamación innecesaria, el 23 de mayo de 2019 los Deudores radicaron una moción relativa a procedimientos enmendados en la que solicitaron, entre otras cosas, que se les permitiera radicar objeciones globales sobre unas bases sustantivas, aumentar el número de reclamaciones que pudieran incluirse en una objeción y aprobar formas de notificación adicionales. *Notificación de vista en relación con una Orden que A) apruebe Procedimientos Enmendados relativos a Objeciones Globales, B) exima los requisitos contenidos en la regla 3007(e) de las Reglas de Quiebras, C) apruebe formas de notificación adicionales y D) conceda el remedio relacionado* [ECF Número 7091]. El 14 de junio de 2019, el Tribunal concedió el remedio solicitado por medio de la *Orden que A) aprueba Procedimientos Enmendados relativos a Objeciones Globales, B) exime los requisitos contenidos en la regla 3007(e) de las Reglas de Quiebras, C) aprueba formas de notificación adicionales y D) concede el remedio relacionado* [ECF Número 7440] (los "Procedimientos Enmendados relativos a Objeciones Globales").

55.     Conforme a los Procedimientos Iniciales relativos a Objeciones Globales y los Procedimientos Enmendados relativos a Objeciones Globales, el Tribunal ha celebrado hasta la fecha 27 vistas vinculadas con más de 500 objeciones globales radicadas por el ELA, la

Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA"), la ACT, la AEE, la AEP y/o el SRE. Sobre la base de las resoluciones y órdenes del Tribunal dictadas hasta la fecha, y de la retirada de determinadas reclamaciones conforme al Plan, aproximadamente 105,359 reclamaciones que reivindicaban $43.6 billones en responsabilidad contra el ELA, COFINA, la ACT, la AEE, el SRE y la AEP fueron rechazadas y retiradas del registro de reclamaciones en el marco de los procedimientos radicados conforme al Título III. Además, aproximadamente 45,193 reclamaciones han sido transferidas al proceso de Reconciliación de Reclamaciones Administrativas para su resolución utilizando procesos administrativos habituales de los Deudores.

56.     Esta Quingentésima trigésima sexta objeción global se radica de conformidad con los Procedimientos Enmendados relativos a Objeciones Globales del Tribunal.

## OBJECIONES A EVIDENCIAS DE RECLAMACIONES

57.     Las reclamaciones que sean "inejecutables contra el deudor y los bienes de este, en virtud de cualquier contrato o normativa legal aplicable" deben rechazarse. Título 11 U.S.C., § 502(b)(1). Aunque una evidencia de reclamación debidamente formalizada y radicada constituye una prueba *prima facie* de la validez de la reclamación, véase R. del Proc. de Quiebr. 3001(f), aplicable a este caso en virtud de la sección 310 de PROMESA, la parte objetante podrá superar dicha evidencia *prima facie* con pruebas que, de creerse, refutarían al menos una de las alegaciones esenciales para la reclamación. *In re Reilly*, 245 B.R. 768, 773 (B.A.P. 2d Cir.), *aff'd*, 242 F.3d 367 (2d Cir. 2000); *véase también Factors Funding Co. c. Fili (In re Fili)*, 257 B.R. 370, 372 (1st Cir. B.A.P. 2001) ("[S]e presume que una reclamación es válida hasta que una parte objetante haya introducido evidencias suficientes para refutar el caso prima facie del reclamante". (se omite cita)).

58.     Los Procedimientos Enmendados relativos a Objeciones Globales permiten al ELA radicar una objeción global a varias evidencias de reclamaciones sobre cualquiera de las bases recogidas en las reglas 3007(d)(1) a (7) de las Reglas Federales del Procedimiento de Quiebra

(*Federal Rule of Bankruptcy Procedure*), así como sobre otras bases sustantivas establecidas en los Procedimientos Enmendados relativos a Objeciones Globales.

59.     La Quingentésima trigésima sexta objeción global busca que se rechacen partes de las evidencias de reclamaciones que aparecen en el **Anexo A** del presente documento (conjuntamente, las "Reclamaciones que han de ser rechazadas parcialmente"), cada una de las cuales pretender estar basada parcialmente en 1) bonos emitidos por COFINA, 2) reclamaciones por bonos que constituyen duplicados con respecto a una o más evidencias de reclamaciones principales radicadas contra el ELA en nombre de los tenedores de determinados bonos, 3) reclamaciones por bonos basadas en bonos emitidos por la ACT, la AFI o la ADCC que han sido liberadas en virtud de la Orden de Confirmación del ELA, 4) participación patrimonial en bonos emitidos por el BGF, por unos montos por los que el ELA no ha garantizado el reembolso, 5) participación patrimonial en bonos emitidos por la AAA, la CFP, PRIDCO, la AFV o la AFICA, que no son Deudores de Título III, por unos montos por los que el ELA no ha garantizado el reembolso, 6) inversiones en fondos mutuos que a su vez pudieron haber invertido en bonos emitidos por el ELA, y/o 7) facturas sometidas por el reclamante que han sido satisfechas por el ELA. Además, algunas partes de las Reclamaciones que han de ser rechazadas parcialmente deben rechazarse por ser deficientes porque el reclamante no ha proporcionado ningún fundamento ni documentación justificativa para alegar una reclamación contra el ELA, de manera que el ELA no puede determinar si el reclamante tiene una reclamación válida. El **Anexo A** del presente documento especifica además por qué cada una de las Reclamaciones que han de ser rechazadas parcialmente debe ser rechazada en parte.

### A.  Ausencia de responsabilidad por Reclamaciones Duplicadas por Bonos

60.     Según se expone en el **<u>Anexo A</u>** del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente pretenden alegar responsabilidad, en parte, sobre la base de bonos emitidos por la ACT, PRIDCO, la AFI, la CFP, la AFM, la AAA, la ADCC, la AFICA y la AEE (conjuntamente, las "<u>Reclamaciones Parcialmente Duplicadas por Bonos</u>"). *Véanse, por ejemplo*, Reclamaciones números 50049, 2891 y 168037.

61.     Cada una de las Reclamaciones Parcialmente Duplicadas por Bonos pretende alegar, en parte, responsabilidad contra el ELA vinculada con uno o más bonos que están duplicados en relación con una o más Reclamaciones Principales que, según se explicó anteriormente, fueron radicadas en el marco de los Casos de Título III en nombre de los tenedores de determinados bonos emitidos por la ACT, PRIDCO, la AFI, la CFP, la AFM, la AAA, la ADCC, la AFICA y la AEE. Por ejemplo, la Reclamación Principal de la AEE alega que "ha sido radicada en nombre de *todos los tenedores de cada una de las series de los bonos de renta eléctrica y los bonos de renta de refinanciamiento eléctrica*, emitidos y pendientes en virtud del Acuerdo de Fideicomiso". Reclamación Principal de la AEE, Cláusula adicional en 1 (el resaltado es nuestro). En consecuencia, cualquier reclamación radicada contra el ELA por un tenedor individual, que alegue una reclamación con respecto a los bonos de la AEE de dicho tenedor, estará duplicada en relación con la Reclamación Principal de la AEE.

62.     En consecuencia, si las Reclamaciones Parcialmente Duplicadas por Bonos no son rechazadas, ello resultaría en que los reclamantes en cuestión obtuvieran potencialmente una recuperación duplicada no justificada contra el ELA en detrimento de otras partes interesadas en los Casos de Título III. Los titulares de las Reclamaciones Parcialmente Duplicadas por Bonos no se verán perjudicados por el hecho de que se rechacen sus reclamaciones, puesto que las

responsabilidades relacionadas con las Reclamaciones Parcialmente Duplicadas por Bonos figuran en una o más Reclamaciones Principales.

**B.  Ausencia de responsabilidad por las Reclamaciones de los Bonistas, liberadas por la Orden de Confirmación**

63.    Conforme a lo expuesto en el **Anexo A** del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente pretenden alegar, en parte, responsabilidad basada en supuesta participación patrimonial en los bonos emitidos la ACT, la ADCC o la AFI (las "Reclamaciones Liberadas de los Bonistas"). *Véanse, por ejemplo*, Reclamaciones números 757, 40179 y 155376.

64.    Las Reclamaciones Liberadas de los Bonistas alegan responsabilidades contra el ELA vinculadas con varias Bonos de la ACT emitidos por la ACT, Bonos de la ADCC emitidos por la ADCC o Bonos de la AFI emitidos por la AFI. Las Reclamaciones alegadas contra el ELA basadas en cualquiera de los bonos emitidos o garantizados, o préstamos concedidos a o garantizados por la ACT, la ADCC o la AFI, han sido liberadas en su totalidad en virtud del Plan, por lo que el ELA ya no es responsable por dichas reclamaciones. *Véase* Orden de Confirmación, ¶ 72 ("Las Reclamaciones alegadas contra los Deudores o los Deudores Reorganizados, emitidos o garantizados, o préstamos concedidos a o garantizados por la ACT, la ADCC, la AFI o la MBA se concederán (en la medida en que se concedan) como Reclamación que surgió antes de la Fecha de Petición, y se clasificarán en las Clases 59 a 62 (salvo las Reclamaciones por Bonos Concedidas del SRE, en la medida en que sean garantizadas) y, por medio de la presente, quedan liberadas, por lo que los Deudores y los Deudores Reorganizados ya no son responsables por dichas Reclamaciones").

65.     Si las Reclamaciones Liberadas de los Bonistas no son rechazadas, ello resultaría
en que los reclamantes en cuestión obtuvieran potencialmente una recuperación no justificada
contra el ELA en detrimento de otras partes interesadas en los Casos de Título III de los Deudores.

### C. Ausencia de responsabilidad relativa a reclamaciones basadas en inversiones en fondos mutuos

66.     Conforme a lo identificado en el **<u>Anexo A</u>** del presente documento, determinadas
Reclamaciones que han de ser rechazadas parcialmente pretenden alegar responsabilidad basada
parcialmente en inversión(es) en uno o más fondos mutuos que, a su vez, pudieron haber invertido
en bonos emitidos por el ELA (conjuntamente, las "<u>Reclamaciones Parciales de los Fondos
Mutuos</u>"). *Véase, por ejemplo,* Reclamación Número 5526.

67.     Los reclamantes tienen la carga de la prueba para demostrar legitimación a efectos
de radicar una evidencia de reclamación. *In re Minbatiwalla*, 424 B.R. 104, 111 (Bankr. S.D.N.Y.
2010). Es ampliamente aceptado que solo los acreedores o sus representantes autorizados están
legitimados para radicar reclamaciones. Reg. Fed. del Proc. de Quiebr. 3001(b); Título 11 U.S.C.,
§§ 501(a) ("Los acreedores o fiduciarios autorizados podrán radicar evidencias de
reclamaciones"); *In re Melillo*, 392 B.R. 1, 5 (B.A.P. 1st Cir. 2008) ("Solo los acreedores o
fiduciarios autorizados podrán radicar evidencias de reclamaciones".). Las partes que solo tengan
intereses derivados carecen de legitimación para radicar reclamaciones contra los bienes de un
deudor. *Caso Goldman*, 82 B.R. 894, 896 (Bankr. S.D. Ohio 1988) (donde se concluyó que una
parte con "una relación con el Deudor [que] no es directa, sino más bien derivada "era" persona
ajena en relación con el procedimiento de quiebra del Deudor", sin "ninguna posibilidad de
reclamar contra los activos" y "como regla general, no tiene legitimación en relación con el
procedimiento de quiebra del Deudor".); *véase también In re Tower Park Properties, LLC*, 803

F.3d 450, 462-63 (9th Cir. 2015) (donde se concluyó que un beneficiario de un fideicomiso no era

parte interesada); *In re Refco Inc.*, 505 F.3d 109, 117 (2d Cir. 2007) ("En la medida en que se

hagan valer los derechos de una parte interesada, esos derechos han de hacerse valer por dicha

parte interesada, no por un tercero".); *In re López*, 446 B.R. 12, 17 (Bankr. D. Mass. 2011) (para

constituirse como parte interesada "la parte solicitante deberá hacer valer sus propios derechos y

no aquellos que asistan a un tercero o que se deriven en relación con tal tercero".); *In re Hayes*,

393 B.R. 259, 267 (Bankr. D. Mass. 2008) (donde se reconoce el "principio general de que 'no se

da legitimación de una parte interesada si la parte pretende hacer valer un derecho que es

puramente derivado de los derechos de otra parte en el procedimiento de quiebras'" (que cita In re

Refco, 505 F.3d en 115 n. 10)).

      68.     "Un acreedor, conforme al Código [de Quiebras], es el que tiene reclamación contra

el deudor o los bienes", en lugar de "un acreedor de uno de los acreedores del deudor". *S. Blvd.,*

*Inc. c. Martin Paint Stores*, 207 B.R. 57, 61 (S.D.N.Y. 1997). Puesto que, a lo sumo, las

Reclamaciones Parciales de Fondos Mutuos fueron radicados en virtud de la condición del

reclamante como presunto acreedor de un presunto acreedor del ELA, las Reclamaciones Parciales

de Fondos Mutuos no fueron radicadas por un acreedor real del ELA. *Véase In re Thalmann*, 469

B.R. 677, 683 (Bankr. S.D. Tex. 2012) (donde se concluye que el destinatario carecía de

legitimación para radicar evidencias de reclamaciones porque no era acreedor ni agente autorizado

de un acreedor). En cambio, las Reclamaciones Parciales de Fondos Mutuos se derivan de las

reclamaciones que deben hacerse valer por los fondos mutuos directamente para que el Tribunal

examine cualquier recuperación alegada. Véase el *caso Goldman*, 82 B.R. en 896 (donde se

concluye que una parte con una relación "derivada" no puede "reclamar los activos" y "como regla

general, carece de legitimación en el procedimiento de quiebras del Deudor"). Es más, no se sabe

si el fondo mutuo sigue reteniendo la propiedad de los bonos controvertidos.

En efecto, en unas circunstancias casi idénticas, el Tribunal ya rechazó reclamaciones radicadas

contra COFINA por unos inversores en los fondos mutuos que, a su vez, invirtieron presuntamente

en los bonos de COFINA, por "carecer de interés individual en los títulos de valores de COFINA".

*Tr. del 13 de marzo de 2019 de la vist. ante su señoría, Laura Taylor Swain* [ECF Número 5969],

en 64:01-10 ("EL TRIBUNAL: De modo que, para que lo entienda, su documentación muestra

que es inversor en un fondo mutuo. En la medida en que cualquiera de esos fondos mutuos posea

realmente los bonos de COFINA, el fondo mutuo sería el reclamante pertinente, ¿así que no

proporcionó ninguna evidencia de una reclamación directa válida contra COFINA? SRA.

STAFFORD: Así es, señoría. EL TRIBUNAL: Se concede la objeción a la reclamación, y se

rechaza la reclamación por falta de interés individual en títulos valores de COFINA."); *véase*

*también la Orden por la que se concede la Sexagésima cuarta objeción global (sustantiva) del*

*estado Libre Asociado de Puerto Rico a Reclamaciones basadas en las inversiones en fondos*

*mutuos* [ECF Número 9099]; *Orden de memorando por la que se rechaza la moción para alterar*

*o enmendar la orden que concede la objeción (extr. 8297) a las Reclamaciones números 152470*

*y 152283* [ECF Número 9121]. En consecuencia, los reclamantes no son acreedores del ELA y

carecen de legitimación para hacer valer reclamaciones derivadas. Puesto que al ELA no se le

puede atribuir la responsabilidad por las Reclamaciones Parciales de Fondos Mutuos, dichas

reclamaciones deben rechazarse en su totalidad.

**D. Ausencia de responsabilidad relativa a reclamaciones basadas en los Bonos de la CFP, de la AFV, de PRIDCO o de la AFICA**

69.      Conforme a lo identificado en el **<u>Anexo A</u>** del presente documento, determinadas partes de las Reclamaciones que han de ser rechazadas parcialmente pretenden alegar reclamaciones basadas en una presunta participación patrimonial en 1) Bonos de la CFP emitidos por la CFP, 2) Bonos de la AFV emitidos por la AFV, 3) Bonos de PRIDCO emitidos por PRIDCO o 4) Bonos de la AFICA emitidos por la AFICA (conjuntamente, las "<u>Reclamaciones parciales de los bonistas en las que no existe responsabilidad</u>"). *Véanse, por ejemplo*, Reclamaciones números 757, 16448 y 27009.

70.      Como se explicó anteriormente, ni la CFP, ni la AFV, ni PRIDCO ni la AFICA son Deudores de Título III, y sus responsabilidades no están garantizadas por el ELA ni por ningún otro Deudor de Título III.

71.      Cada una de las Reclamaciones Parciales de los Bonistas de la CFP pretende alegar, en parte, responsabilidades contra el ELA vinculadas con los Bonos de la CFP que no están garantizados por el ELA ni por ninguno de los demás Deudores. La CFP no es deudor de Título III y es una entidad aparte y jurídicamente independiente de los Deudores. *Véase, por ejemplo*, 3 L.P.R.A. § 9081(c) (que se refiere a la CFP como una "entidad jurídica independiente", separada del ELA). El 25 de octubre de 2022, de conformidad con el acuerdo y documentación definitiva, se inició una solicitación que buscaba la aceptación de la MC de la CFP. La CFP propone liberar los Bonos de Asignación del ELA, Serie 2011A, Serie 2011B y Serie 2012A, emitidos por la CFP, así como las reclamaciones relacionadas. La Junta de Supervisión prevé que el procedimiento de Título VI sobre la CM de la CFP comience el 28 de octubre de 2022 a más tardar.

72.     Del mismo modo, cada una de las Reclamaciones Parciales de los Bonistas de la AFV pretende alegar, en parte, responsabilidades contra el ELA vinculadas con los Bonos de la AFV que no están garantizados por el ELA ni por ninguno de los demás Deudores. La AFV no es deudor de Título III y es una entidad aparte y jurídicamente independiente de los Deudores.

73.     Además, algunos de los Bonos de la CFP han vencido. *Véase, por ejemplo,* Reclamación Número 155376 (en la que se alega una reclamación basada en el Número CUSIP 745291UF9). En consecuencia, puesto que los Bonos de la CFP y los Bonos de la AFV ya han vencido, y los reclamantes vinculados con las Reclamaciones Parciales de los Bonistas de la AFV no han alegado que no hayan recibido la totalidad de sus pagos o que el ELA sea responsable de un supuesto impago, los tenedores de dichos bonos ya no tienen una reclamación válida, por lo que las Reclamaciones parciales de los bonistas en las que no existe responsabilidad deben rechazarse en su totalidad.

**E.  Ausencia de responsabilidad por las Reclamaciones de Gravamen Prioritario de la AAA**

74.     Conforme a lo expuesto en el **Anexo A** del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente pretenden alegar, en parte, responsabilidad basada en supuesta participación patrimonial en los Bonos de Gravamen Prioritario de la AAA emitidos por la AAA (las "Reclamaciones Parciales de Gravamen Prioritario de la AAA") y los Bonos de Refinanciamiento de 2008 emitidos por la AAA (las "Reclamaciones Parciales por Bonos de Refinanciamiento de la AAA"). *Véase, por ejemplo,* Reclamación Número 27009.

75.     Las Reclamaciones Parciales de Gravamen Prioritario de la AAA y las Reclamaciones Parciales por Bonos de Refinanciamiento de la AAA alegan responsabilidades contra el ELA vinculadas con los bonos emitidos por la AAA, que no es Deudor de Título III, y es

36

una entidad aparte y jurídicamente independiente de los Deudores. El ELA no ha garantizado el reembolso de los Bonos de Gravamen Prioritario de la AAA. Además, las Reclamaciones Parciales de Gravamen Prioritario de la AAA no proporcionan ningún fundamento que sea suficiente desde el punto de vista legal para alegar una reclamación contra el ELA por los bonos emitidos por la AAA que no están garantizados por el ELA.

76. Es más, los Bonos de Refinanciamiento de la AAA, que en algún momento estaban garantizados por el ELA, vieron dicha garantía extinguirse en relación con la Transacción de Refinanciamiento de la AAA 2020.

77. Puesto que las Reclamaciones Parciales de Gravamen Prioritario de la AAA y las Reclamaciones Parciales por Bonos de Refinanciamiento de la AAA son inejecutables contra el ELA y sus bienes conforme al § 502(b)(1) del Código de Quiebras, dichas reclamaciones deben rechazarse puesto que solicitan la recuperación de montos por los que el ELA no es responsable.

**F. Ausencia de responsabilidad por las Reclamaciones de los Bonistas del BGF**

78. Conforme a lo identificado en el **<u>Anexo A</u>** del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente pretenden alegar reclamaciones basadas, en parte, en supuesta participación patrimonial en bonos emitidos por el BGF (conjuntamente, las "<u>Reclamaciones Parciales de los Bonistas del BGF</u>"). *Véase, por ejemplo,* Reclamación Número 16715.

79. La totalidad de las Reclamaciones Parciales de los Bonistas del BGF pretenden basarse, en parte, en la participación patrimonial en los Bonos del BGF objeto de la Modificación Calificada, que dispuso la emisión de nuevos títulos de valores a cambio de la cancelación de los Bonos del BGF y la extinción de la garantía del ELA relativa a determinados Bonos del BGF, por lo que el ELA ya no es responsable por dichas reclamaciones. En consecuencia, cada una de las

Reclamaciones Parciales de los Bonistas del BGF ha sido liberada conforme a la aprobación y la consumación de la Modificación Calificada. Como se señaló anteriormente, la Modificación Calificada dispone, entre otras cosas, que los tenedores de los Bonos del BGF liberarán al BGF y sus afiliados de las reclamaciones relacionadas con los Bonos del BGF, y de cualquier acción u omisión del BGF y sus afiliados con respecto a todo endeudamiento del BGF o préstamo al BGF. El BGF es una corporación e instrumentalidad pública del ELA. En consecuencia, el ELA es un afiliado del BGF dentro del ámbito de la liberación conforme a la Modificación Calificada. Por tanto, las Reclamaciones Parciales de los Bonistas del BGF fueron liberadas tras la consumación de la Modificación Calificada el 29 de noviembre de 2018.

80.     Puesto que las Reclamaciones Parciales de los Bonistas del BGF son inejecutables contra el ELA y sus bienes conforme al § 502(b)(1) del Código de Quiebras, dichas reclamaciones deben rechazarse puesto que solicitan la recuperación de montos por los que el ELA no tiene responsabilidad.

## G. Ausencia de responsabilidad por reclamaciones relativas a los bonistas de COFINA

81.     Conforme a lo identificado en el **Anexo A** del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente pretenden alegar reclamaciones basadas parcialmente en supuesta participación patrimonial en los bonos emitidos por COFINA (conjuntamente, las "Reclamaciones Parciales de los Bonistas de COFINA"). *Véase, por ejemplo,* Reclamación Número 16715.

82.     Como se explicó anteriormente, la Orden de Conciliación resolvió la Controversia entre el ELA y COFINA y, conforme al párrafo 55 de la Orden de Conciliación, la totalidad de las reclamaciones contra el ELA, surgidas o vinculadas con la relación del ELA y COFINA, han sido

liberadas. Además, conforme al párrafo 3(c) del *Acuerdo de Conciliación* [ECF Número 5045-1], de fecha 19 de octubre de 2018, que se adjunta a la Orden de Conciliación (el "Acuerdo de Conciliación"), y el párrafo 7 de la Orden de Confirmación Enmendada de COFINA, el procedimiento contencioso entre el ELA y COFINA sobre la Controversia entre el ELA y COFINA ha sido rechazado de forma definitiva luego de la aprobación del pacto y la conciliación de la Controversia entre el ELA y COFINA. Además, conforme al párrafo 29(f) de la Orden de Confirmación Enmendada de COFINA, reclamaciones (tales como las Reclamaciones Parciales de los Bonistas de COFINA) que surgieron de o están vinculadas con la relación entre el ELA y COFINA, fueron liberadas. Orden de Confirmación Enmendada de COFINA, ¶ 29(f).[11]  Por todos esos motivos, las Reclamaciones Parciales de los Bonistas de COFINA deben rechazarse porque dichas reclamaciones basadas en una presunta participación patrimonial en los Bonos COFINA han sido satisfechas, liberadas y/o liquidadas conforme a la Orden de Conciliación, el Acuerdo de Conciliación, la Orden de Confirmación Enmendada de COFINA y el Plan.

### H.  Ausencia de responsabilidad por las Reclamaciones Parcialmente Satisfechas

83.     Además, partes de determinadas Reclamaciones que han de ser rechazadas parcialmente pretenden alegar responsabilidades basadas en unas facturas supuestamente no pagadas al ELA (conjuntamente, las "Reclamaciones Parcialmente Satisfechas"). *Véase*

---

[11] Conforme al Plan, una "Reclamación" se define como "[c]ualquier derecho a un pago o cumplimiento, independientemente de si tal derecho consta en una sentencia, es liquidado, no liquidado, fijo, accidental, vencido, no vencido, controvertido, no controvertido, legal, en equidad, garantizado o no garantizado, conocido o desconocido, reclamado o no reclamado; o cualquier derecho a un remedio en equidad por incumplimiento o ejecución de un cumplimiento, independientemente de si tal derecho a un remedio en equidad consta en una sentencia, es fijo, accidental, vencido, no vencido, controvertido, no controvertido, garantizado o no garantizado, y la totalidad de las deudas, procesos, indemnizaciones por daños y perjuicios, derechos, remedios, pérdidas, responsabilidades, obligaciones, sentencias, acciones, causas de acción, procedimientos o reclamaciones de cualquier tipo o naturaleza, en derecho, equidad o de cualquier otra forma". Plan § 1.53.

39

Reclamación Número 10072. Sin embargo, los registros del ELA muestran que todas las facturas alegadas en las Reclamaciones Parcialmente Satisfechas ya han sido pagadas.

84.     En consecuencia, si las Reclamaciones Parcialmente Satisfechas no son rechazadas, ello resultaría en que los correspondientes reclamantes obtuvieran potencialmente una recuperación excesiva no justificada contra el ELA en detrimento de otras partes interesadas en los Casos de Título III. Los titulares de las Reclamaciones Parcialmente Satisfechas no se verán perjudicados por el hecho de que se rechacen tales reclamaciones, puesto que estas ya han sido plenamente satisfechas.

### I.   Ausencia de responsabilidad por las Reclamaciones Deficientes

85.     Conforme a lo identificado el **<u>Anexo A</u>** del presente documento, otras partes de las Reclamaciones que han de ser rechazadas parcialmente son deficientes porque el reclamante no ha proporcionado ningún fundamento ni documentación justificativa para alegar una reclamación contra el ELA, de manera que el ELA no puede determinar si el reclamante tiene una reclamación válida (conjuntamente, las "<u>Reclamaciones Parcialmente Deficientes</u>"). *Véanse, por ejemplo*, Reclamaciones números 168037 y 27009.

86.     Más concretamente, algunas de las Reclamaciones Parcialmente Deficientes alegan responsabilidades que surgen de uno bonos o determinados fondos adeudados en relación con el Fondo Fiduciario de Conservación de Puerto Rico. Sin embargo, el reclamante no proporciona ningún fundamento ni documentación justificativa para alegar dicha reclamación contra el ELA. En este sentido, el ELA no puede determinar si el reclamante tiene una reclamación válida contra el ELA o cualquier otro Deudor de Título III. En consecuencia, las Reclamaciones Parcialmente Deficientes deben rechazarse.

87.     En apoyo de lo anterior, el ELA invoca la *Declaración de Jay Herriman en apoyo de la Quingentésima trigésima sexta objeción global (sustantiva) del Estado Libre Asociado de Puerto Rico a Reclamaciones por bonos duplicadas, deficientes y en las que no existe responsabilidad*, de fecha 28 de octubre de 2022, adjunta al presente como **Anexo B**.

## NOTIFICACIÓN

88.     De conformidad con los Procedimientos Enmendados Relativos a Objeciones Globales y la Orden de Notificación del Tribunal, el ELA notifica la presente Quingentésima trigésima sexta objeción global a) a los acreedores individuales objeto de esta Quingentésima trigésima sexta objeción global, b) al U.S. Trustee, y c) a la Lista Maestra de Notificaciones (según se define en los *Procedimientos de administración de casos enmendados Número 16* [ECF Número 20190-1]), disponibles en el sitio web de casos de los Deudores, en https://cases.ra.kroll.com/puertorico. La notificación de esta Quingentésima trigésima sexta objeción global se adjunta al presente como **Anexo C**. Las traducciones al español de la Quingentésima trigésima sexta objeción global y de la totalidad de los anexos que se adjuntan al presente se radican y envían con la presente objeción. El ELA sostiene que, dada la naturaleza del remedio solicitado, no es necesario enviar ninguna otra notificación.

POR LO QUE el ELA solicita respetuosamente que se dicte una orden, esencialmente en la forma de la orden propuesta que se adjunta al presente como **Anexo D**, 1) que conceda el remedio solicitado en el presente documento, y 2) que conceda al ELA cualesquiera otros remedios que se consideren justos.

Fecha: 28 de octubre de 2022
       San Juan (Puerto Rico)

Respetuosamente sometida,


*[Firma en la versión en inglés]*
Hermann D. Bauer
USDC Número 215205
Carla García-Benítez
USDC Número 203708
Gabriel A. Miranda
USDC Número 306704
**O'NEILL & BORGES LLC**
250 Avenida Muñoz Rivera, local 800
San Juan, PR 00918-1813
Tel.:  (787) 764-8181
Fax:  (787) 753-8944


*[Firma en la versión en inglés]*
Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
Nueva York, NY 10036
Tel.:  (212) 969-3000
Fax:  (212) 969-2900


*Abogados de la Junta de Supervisión y Administración Financiera para Puerto Rico como representante del Estado Libre Asociado de Puerto Rico.*