MB2DPROH

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF PUERTO RICO
 2      ------------------------------------x
        In re:
 3
        THE FINANCIAL OVERSIGHT AND          PROMESA
 4      MANAGEMENT BOARD FOR PUERTO RICO,    Title III

 5          as representative of            Case No. 17 BK 3283 (LTS)

 6      THE COMMONWEALTH OF PUERTO RICO,
        et al.,                              (Jointly Administered)
 7
            Debtors.
 8      ------------------------------------x
                                             New York, N.Y.
 9                                            November 2, 2022
                                              9:00 a.m.
10

11      Before:

12                      HON. LAURA TAYLOR SWAIN,

13                                      Chief U.S. District Judge

14      APPEARANCES:
        For the Financial
15      Oversight and Management
        Board for Puerto Rico:       Martin J. Bienenstock, Esq.
16                                    Brian S. Rosen, Esq.
                                      Joshua A. Esses, Esq.
17                                    Matthew A. Skrzynski, Esq.

18      For the Official Committee
        of Unsecured Creditors
19      (the "Committee"):           Luc A. Despins, Esq.

20      For Assured Guaranty
        Corp. and Assured
21      Guaranty Municipal Corp:     William J. Natbony, Esq.

22      For Lilia Molina Ruiz:       Jose Luis Novas-Debien, Esq.

23      For National Public
        Finance Guarantee
24      Corporation:                 Robert Berezin, Esq.

25
```

MB2DPROH

1   APPEARANCES, Continued:

2

3   For The Puerto Rico
    Fiscal Agency and
4   Financial Advisory
    Authority:              Peter Friedman, Esq.

5

6   For Fuel Line Lenders:    Richard G. Mason, Esq.

7

8   Also present:  Judge Shelley Chapman, Mediation Team Leader

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by stenography.  Transcript produced by

25   CAT.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1         THE COURT:  Ms. Tacoronte, would you please call the

2    case?

3         THE DEPUTY CLERK:  The United States District Court

4    for the District of Puerto Rico is now in session.  The

5    Honorable Laura Taylor Swain presiding.  Also present, the

6    Honorable Magistrate Judge Judith Dein.  God save the United

7    States of America and this Honorable Court.

8         *In Re:  The Financial Oversight --*

9         THE COURT:  Ms. Tacoronte, we are getting a lot of

10   interference.  I don't know whether it was something rubbing

11   the microphone or static.  It was starting to get clearer, so

12   would you mind doing the proclamations again?  I mean the

13   calling the case again, from the beginning.

14        THE DEPUTY CLERK:  No problem, your Honor.  Thank you.

15        The United States District Court for the District of

16   Puerto Rico is now in session.  The Honorable Laura Taylor

17   Swain presiding.

18        THE COURT:  That's much better, except now we've lost

19   you.

20        So would you do the *In Re:  Financial Oversight Board*

21   part.  So we've lost you.

22        Okay.  Is somebody texting somebody to check this?

23        Alright.  So those who are listening in, we're having

24   a little technical difficulty, so please be patient with us.

25   This happens when we connect across 1500 miles, and Court

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MB2DPROH

1   Solutions, and AT&T lines so that we maximize access.

2           Are they checking things on the Puerto Rico end?

3           THE DEPUTY CLERK:  They disconnected, and they're

4   going to come back in.

5           THE COURT:  Alright.  It is being worked on, everyone.

6           THE DEPUTY CLERK:  Testing.

7           THE COURT:  We can hear you.

8           THE DEPUTY CLERK:  Can you hear us now?

9           THE COURT:  Yes.

10          THE DEPUTY CLERK:  Our apologies, your Honor.

11          THE COURT:  Thank you for coming back in.

12          So if you'd start with the caption of the case, that

13   would be great.

14          THE DEPUTY CLERK:  Absolutely, your Honor.

15          *In Re:  The Financial Oversight and Management Board*

16   *for Puerto Rico, as representative of the Commonwealth of*

17   *Puerto Rico, et al.*, PROMESA, Title III, Case No. 2017-BK-3283

18   for Omnibus Hearing.

19          THE COURT:  Thank you.

20          Welcome counsel, parties in interest, and members of

21   the public and press here in New York, those appearing or

22   observing here and in San Juan, and the telephonic

23   participants.  It is good that we can now use both courtrooms

24   again for personal appearances and for observation of the

25   proceedings.  I thank you for complying with the instructions

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MB2DPROH

1    of the court staff and encourage you to continue to comply with

2    all of the COVID-19 protocols so that we can stay safe.

3           I remind those present in the courtrooms and listening

4    on the phone lines that consistent with court and judicial

5    conference policies and the orders that have been issued, there

6    is to be no use of electronic devices in the courtroom to

7    communicate with any person, source, or outside repository of

8    information, nor to record any part of the proceedings.  Thus,

9    all electronic devices must be turned off unless you are using

10   it to take notes, or refer to notes or documents already loaded

11   on the device, or you have prior Court permission to use the

12   device to communicate with others, and nobody's asked me for

13   that permission, so I trust you'll turn it off.  All audible

14   signals, including vibration features must be turned off.

15          I'll be calling on each speaker during the

16   proceedings, and when I do, please identify yourself by name

17   for clarity of the record.  After the speakers listed on the

18   agenda for particular matters have spoken, I'll provide an

19   opportunity for other parties in interest to address briefly

20   any issues raised during the course of the argument that

21   require further remarks.  If you wish to be heard under these

22   circumstances, please raise your hand and, if you're in the

23   Puerto Rico courtroom, come to the podium, or if you're on

24   Court Solutions, state your name clearly so I'll call on people

25   in an orderly way if more than one person wants to be heard.

MB2DPROH

1          Please don't interrupt each other or me during the

2    hearing.  If we interrupt each other, it's difficult to create

3    an accurate transcript.  But, as usual, having said that, I

4    apologize in advance, because I may interrupt you if you go

5    beyond your allotted time or if I have a question.  And, of

6    course, if anybody has trouble hearing me or another

7    participant, please say something right away.

8          The agenda, which was filed as Docket Entry No. 22765

9    in Case No. 17-3283 is available to the public at no cost on

10   the Kroll Restructuring website, previously known as Prime

11   Clerk, for those interested.  Although the company has been

12   renamed Kroll Restructuring, the Prime Clerk website addresses

13   and phone numbers are still operational.

14         I encourage each speaker to keep track of his or her

15   own time.  The Court will also be keeping track of the time,

16   and speakers appearing here in New York will see a yellow light

17   at the podium when two minutes are remaining, and when time is

18   up, they'll see a red light and hear two buzzes.  The speakers

19   appearing via Court Solutions will just hear two buzzes when

20   time is up.  Here's an example of the buzzer sound.

21         Do we have an example of the buzzer sound?

22         THE LAW CLERK:  One moment.  I apologize.  It's

23   counting up instead of counting down.

24         THE COURT:  So should we skip the example of the

25   buzzer sound?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE LAW CLERK:  Sorry, Judge.  One moment.  I guess

2     for now.  Sorry.

3          THE COURT:  Alright.  So you'll either hear two buzzes

4     or I'll say thank you and you'll get the hint.

5          So if we need to take a break, the people who are on

6     the AT&T listen-only line should put their phones on hold

7     rather than hang up.  Our timing is until 12:50 this morning,

8     if we need that much time, and, if necessary to resume, we

9     would resume from 2:10 and end at 5:00.

10          I may call a break this morning in the area of 11:00

11     or 11:30.  During that break, people who are on the AT&T line

12     should put their lines on hold, not hang up and try to dial

13     back in, because they won't be able to.

14          As usual, our first item is status reports from AAFAF

15     and the Oversight Board, and as requested in the procedures

16     order, these reports have been made in writing in advance of

17     the hearing.  They are available on the public docket at Docket

18     Entry Nos. 22773 and 22775 respectively in Case No. 17-3283.  I

19     thank both the Oversight Board and AAFAF for the care and

20     detail reflected in their reports.

21          We'll begin by discussing the Oversight Board's

22     report.

23          Mr. Bienenstock, do you have additional comments?

24          MR. BIENENSTOCK:  Good morning, Judge Swain.  Martin

25     Bienenstock of Proskauer Rose, LLP, for the Oversight Board.  I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MB2DPROH

1   don't have additional comments in respect to the status report,

2   but of course I'd be happy to answer any questions the Court

3   has.

4           THE COURT:  Thank you.  I do have some questions.

5           So I see from the report that it was some two weeks

6   after the issuance of the Court order that the Board designated

7   its pre-existing municipal bond advisor as lead negotiator, and

8   your report says that there were consultations among the Board

9   and the attorneys and all that, but this must have been

10  something that you all saw coming, because the request had been

11  made.  The time is short from the order until the deadline.

12          So I'd just like you to give me some more insight into

13  why it took so long to get someone from the home team, and I'm

14  going to ask you to go to the podium, because I think that's

15  the way the cameras are set up.

16          Thank you.

17          MR. BIENENSTOCK:  Sure, your Honor.

18          A couple things that I hope will be responsive to the

19  Court's concerns that I'm inferring.  First, no time was wasted

20  whatsoever in respect of the Oversight Board's efforts to put

21  together new proposals for the new situation created by the

22  existence of litigation on very significant issues and

23  determining how to negotiate them, et cetera.

24          Citibank functioned as it had been functioning, and as

25  far as the Board's processes towards the plan, there was no

MB2DPROH

1    time wasted whatsoever.  It was only the official designation

2    of Citibank that occurred, as your Honor pointed out, two weeks

3    later, and really that was because there were several, or least

4    a few people or entities who wanted to be considered for that.

5         The Board did what boards are supposed to do.  They

6    considered the request and the options on an informal basis,

7    and then made the decision.  But in terms of wasting time, no

8    time was wasted.  Citibank continued functioning as it had

9    always been functioning, as did the Board in respect of the

10   PREPA restructuring.

11        THE COURT:  Thank you.

12        Is the lead mediator empowered consistent with the

13   September 29 order?

14        MR. BIENENSTOCK:  Absolutely, your Honor.

15        THE COURT:  Now, have there been any substantive

16   communications with the mediation team since the September 29

17   order regarding plan terms to be proposed on December 1?

18        MR. BIENENSTOCK:  Your Honor, I know there are some.

19   I don't have complete knowledge of all, but the mediation team

20   is in regular contact, to my understanding, with the chairman

21   of the Oversight Board, with some members of the Oversight

22   Board, as well as with Citibank, and sometimes with me.  So the

23   communications have definitely continued.

24        I don't want to minimize, and I don't think we

25   minimize that in our status report, but just to be certain, I

MB2DPROH

1    don't want to minimize the task that confronts everyone

2    involved, because, based on the outcome of the litigation,

3    there could be 8.3 billion, more or less, claims to deal with.

4    And so we have to take into account a lot of potential

5    outcomes.

6          We also, as we explained in the status report, we want

7    to provide bondholders who want to settle and eliminate the

8    uncertainty the opportunity to do so even if others want to

9    litigate.  As your Honor knows and can imagine, some

10   bondholders have a low basis in their debt, some have a high

11   basis, some are the monolines, who simply signed on, and they

12   all have different risk tolerances.  So it's complicated, but

13   it's been proceeding.

14         THE COURT:  I certainly know and understand, not in as

15   granular detail, of course, as you and the Board and your

16   advisors do and the mediation team does, but I know how

17   complicated it is, which is why I took steps to keep the

18   continuity of the availability of the mediation team.  I

19   expected that this would not be a process wholly internal to

20   the Board.  I am glad to hear that you all are thinking about

21   different scenarios, but it was my expectation and intention

22   that there would be real substantive work with the mediation

23   team and intermediate communications with other parties in

24   interest going on in October, and now it's November 2nd.

25         The deadline is December 1, and certainly, from the

MB2DPROH

1   outside, that looks like a potential problem in terms of the

2   Board's ability to comply with my direction to file a plan

3   that, in a realistic scenario or scenarios, could be

4   confirmable.

5       MR. BIENENSTOCK:  Your Honor, in terms of filing a

6   plan with a lot of consensus, that will be very difficult, and

7   may not happen on December 1.  But in terms of filing a

8   confirmable plan, that can happen, and we hope -- we hope

9   obviously, as things progress, that the briefing is completed

10  on the key summary judgment motions, that the parties will be

11  getting together formally, rather than the informal

12  communications that have taken place, that we will garner

13  support and deals as we go.

14      But to have it happen by December 1, I think no matter

15  how much activity there has been to date, and there has been a

16  lot, which I'll get into a slight bit, your Honor, is not very

17  plausible, because of what I said at the outset.  We may have

18  8.3 billion, more or less, of liabilities to deal with.  And

19  that sort of has to sink in, and more things have to happen

20  before deals can be cut.

21      But in terms of activity that's happened, I know on

22  a -- from my personal knowledge, I've had discussions with

23  counsel for the Committee, counsel for the Fuel Line Lenders,

24  others in my shop have had discussions with counsel for the

25  bondholders.  And more importantly than the lawyers, frankly,

MB2DPROH

1    City has been having discussions both with the mediators and

2    with different stakeholders on a regular basis.

3        Now, I don't want to give a false impression that

4    they're onto some type of deal and working out the details.

5    They're not.  But all of the communications and whatnot that

6    have occurred were simply necessary predicates to get to the

7    next step.

8        THE COURT:  I am monitoring the filings on the bond

9    rights issues, and of course we're also on top of Law 41 --

10   there are a lot of moving pieces on my side as well -- and the

11   other outstanding issues.  It continues to puzzle me why the

12   Oversight Board now is focusing so much time and effort on

13   promoting a position in motion practice that's directly

14   contrary to the risk analysis that must have underlane the

15   Board's prior advocacy for the RSA and the prior proposals that

16   offered significant recovery to the bondholders.

17       Can you give me any insight into why there is such a

18   dramatic flip of the switch?

19       MR. BIENENSTOCK:  Well, I can -- I certainly will give

20   your Honor the facts I am aware of, and I hope the Court finds

21   them to explain the issue your Honor has come up with.  When

22   the case started, there had been a pre-PROMESA RSA that

23   provided for full or nearly full payment to all of the

24   bondholders and monolines.  And the first thing that the Board

25   did was investigate that to see if it was either mandatory to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    go forward with it or appropriate to go forward with it, even

2    if it was not mandatory.

3          Then there was stay litigation that your Honor is

4    aware of, the request for the receiver, et cetera.  Then came

5    the hurricane, and the First Circuit remanded if the

6    bondholders wanted to retry that in light of new circumstances,

7    and throughout the process of the Board -- first and foremost,

8    it wanted a deal.  It wanted a consensual arrangement.  And

9    obviously that cost more than a deal procured by litigating

10   claims.

11         Then when it made the RSA that your Honor is referring

12   to, what doesn't get any play in the papers, your Honor, in the

13   pleadings, is that that RSA had determination events that the

14   government was not entitled to deploy and the Board was

15   entitled to deploy.  Those termination events were there from

16   the outset, and they actually could be triggered almost from

17   the outset, because there was a date by which there was a

18   deadline that we had to procure this Court's approval of

19   certain aspects of that RSA.  And if that deadline was missed,

20   either party or almost any party could terminate the RSA, and

21   the bondholders knew that.

22         As your Honor will recall, at about the time of the

23   hurricanes, the Board did a study of whether the damage, et

24   cetera, to the business community, to the physical structure,

25   should change what PREPA could afford.  It then proceeded from

1    its findings at that point, and then, when the government

2    exercised the termination right, the Board looked both at the

3    facts it knew and new facts, and one of the new facts was the

4    ease with which both consumers and businesses in Puerto Rico

5    can convert from the electric power grid to solar.  And that is

6    a real issue.

7              On the one hand, you want people to have the benefit

8    of solar, because it's -- the sun is free.  On the other hand,

9    the more people and businesses who take the benefit of solar,

10   the more you have to charge everyone else to use the electric

11   power grid to cover the fixed costs.  And it became more and

12   more apparent to the Board that, in the reality we're now

13   living with, where Tesla and everyone else is coming out with

14   solar roofs, et cetera, for business and for consumers, that

15   the economics that the Board had relied on previously were not

16   necessarily affordable.

17             And to that end, the Board looked to real experts --

18   I'm not talking about lawyers.  I'm talking about real

19   experts -- to delve into what price can you charge before

20   you'll encourage too many people to convert to solar and things

21   of that sort, and how much of an additional burden are you

22   putting on the large portion of the population in Puerto Rico

23   that's very poor.

24             And we also, shifting gears, your Honor, we looked

25   very seriously at the issue the Committee raised that the debt

1   wasn't valid.  And as we've previously explained, with -- I

2   don't want to start an oral argument here on that debt, but

3   suffice it to say that we found that the Committee had a very

4   serious claim objection, and the Board, like any debtor, based

5   on the Bankruptcy Code, as incorporated into PROMESA, has a

6   duty to review claims and object to claims that should not be

7   allowed.

8           So I would say the answer to your question boils down

9   to a combination of changing circumstances on the ground,

10  especially the danger of converting to solar, and giving credit

11  to the Committee's issue on the recourse issue caused the Board

12  to take the position it's taking.  And it believes it's right.

13          I should also say that, as your Honor knows, I think

14  it's four of the Board's seven members are new.  And while that

15  is sort of an internal thing, the fact is the four members at

16  least, you know, each felt that they didn't want to be bound by

17  a prior board unless they thought that it was doing the right

18  thing.  But in this case, I think all seven members want to

19  deal with the facts as they are now, and that really has lead

20  to the emphasis on the claim objection and the economics that

21  the Board is prepared to negotiate.

22          THE COURT:  Thank you.  That concludes the questions

23  that I wanted to put to you.

24          I am going to ask the lead mediator, Judge Chapman,

25  who's here to speak, but I'd just like to make a few contextual

MB2DPROH

1  comments before I do that.  And after Judge Chapman has spoken,

2  anyone else who wishes to speak should indicate they want to be

3  recognized.

4          So in order to hold a confirmation hearing in June,

5  which remains my goal, in order to extricate PREPA from these

6  Title III proceedings for the benefit of the people of Puerto

7  Rico, which should continue to be all of our focus, I do expect

8  to see a confirmable plan by December 1.  I'm glad to see in

9  the report that the Board recognizes that it has to contemplate

10  multiple scenarios, because what I mean by a confirmable plan

11  is one that meaningfully and realistically contemplates

12  scenarios in which each party fails to prevail on their claims

13  in litigation to the extent that they expect to in order that,

14  on resolution of issues in the litigation, no matter what the

15  outcome is, we can move forward toward confirmation with

16  alacrity.

17          I see that and I hear again today that one of the

18  approaches you're thinking about is settle now, litigate later.

19  To the extent that means you might ask me not to move forward

20  with resolving the issues that are put before me in litigation,

21  that would not be consistent with my plan.

22          MR. BIENENSTOCK:  Your Honor, is it okay if I respond

23  to that?

24          THE COURT:  Yes, please.

25          MR. BIENENSTOCK:  The Board could not agree more with

MB2DPROH                                                                    17

1   what your Honor just said.  I did not mean in any way to

2   suggest that we would ask the Court to pause.  What the status

3   report means, when it says provide an opportunity for people to

4   settle short of a litigation outcome, is when the briefing is

5   finished, we anticipate the Court will set an oral argument.

6        I don't know that it's likely to be in December

7   anymore, because that might be too close to Christmas, but it

8   could be, or else it will probably be in January I would think,

9   or somewhere around there.  But whatever it is, and since it's

10   possible, certainly plausible the Court may not decide it at

11   the hearing, these are complicated motions requiring, you

12   know -- your Honor knows better than I do what they require to

13   resolve.

14        So what we meant in the status report is we'll provide

15   bondholders, and maybe other creditors, Fuel Line Lenders maybe

16   as well, but there are so few of them, they're probably going

17   to all act together, but, in any event, we'll provide

18   settlement opportunities calculated to have people opt in

19   before the Court would rule.  That's what we meant.  Not that

20   we would ask the Court to defer ruling, because, frankly, I

21   mean, the quickest way to a confirmable plan is to get rulings

22   on this.

23        We just want to give people the opportunity to settle,

24   because the Board has always taken the position that it would

25   rather have a settlement, and we see no reason not to.  But we

1    do not intend to use it to delay the litigation or the plan.

2    That's for sure.

3          THE COURT:  I thank you for that clarification, and in

4    the same vein, I don't expect to see a place holder filed on

5    December 1.  I want to see something that the Oversight Board

6    believes in good faith should move toward approval of a

7    disclosure statement.

8          I did expect, as I suggested before in my questions,

9    that mediation would be employed to facilitate substantive

10   engagement among the parties in the formulation of the plan

11   that will be filed on December 1, and if the requirement to

12   file a confirmable plan is, you've fleshed out my understanding

13   and my understanding of a confirmable plan isn't met every

14   possible way of reacting to that will be on the table.

15         But having said that, I don't know that the

16   responsibilities for achieving the goals and making the

17   compromises necessary to create the plan is solely the problem

18   of the Oversight Board.  All of the stakeholders need to come

19   together and remain focused on the goal of a fair and legally

20   compliant resolution of the disputed claims that leaves the

21   people of Puerto Rico in a stronger position to go forward

22   toward a responsible future of growth and access to the credit

23   markets.

24         Mr. Bienenstock.

25         MR. BIENENSTOCK:  Yes, your Honor.  I think the Board

19

1   has been attempting to proceed I think consistent with the

2   expectations your Honor just put on the record, but I can go a

3   step further on the plan, even though currently it's obviously

4   not been -- no plan has been -- no proposed plan has been

5   approved by the Board.  But I can tell the Court this.  Simply,

6   it's sort of more in the nature of a law of nature than

7   anything the Board has approved.

8          Since the plan has to take into account different

9   outcomes, I can tell the Court initially one -- we have an

10  impaired accepting class.  This Court rendered a ruling in

11  favor of Vitol, where it assigned Vitol a 41 million-dollar

12  claim, and Vitol has agreed to take half of what the general

13  unsecured creditor class gets in satisfaction of its

14  41 million-dollar claim, so there's an impaired accepting

15  class.

16         Whether we have additional accepting classes will

17  depend, one, on whether and when some creditors decide to --

18  they're risk adverse and they want to settle at less than they

19  were originally asking for, but, two, the plan is then going to

20  have to say if the bondholders not only have an allowable claim

21  for their full amount but are also secured by all present and

22  future revenues.  Then they get virtually everything, and they

23  will accept the plan, and the other parties may not, but it

24  will be confirmable.  And if they don't have an allowable

25  claim, then, as you've said, everyone else will be paid so much

MB2DPROH

1      it's hard to imagine it won't be very consensual confirmable,

2      and if they have an allowable claim but it's not secured, then

3      we're really looking more or less to treat everyone the same.

4      They'll all be unsecured claim holders.

5           Now, I realize that the Fuel Line Lenders and some

6      other stakeholders assert a seniority claim, so there may have

7      to be adjustments to settle this or a ruling on it.  It's

8      briefed, but it's not currently one of the things that's in

9      play.

10          So I hope what I've described is consistent with what

11     your Honor was contemplating.  I'm not sure there's another way

12     of doing it, but it's very serious.  It follows the rules.  And

13     I think it's, along the lines of what I described, I think is

14     the best the Board is going to be able to do at the end of the

15     day by December 1.

16          THE COURT:  I appreciate your sharing that.

17          I would just add a law of nature overlay to that which

18     I trust is a part of the Board's consideration here.  Even a

19     zero sum outcome on positions as to recourse and security, and

20     even though I know and expect you all respect my rulings,

21     there's always been a great deal of appellate activity in these

22     cases.  So a win in the trial court isn't necessarily a win

23     that sticks, and, therefore, and you know it, even if you think

24     you've got the best argument in the world, there's always the

25     possibility for any player here of the aberrant result.  And so

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MB2DPROH

1    I should think that both as a matter of realism and as a matter

2    of, well, risk analysis, which is related I hope to real,

3    simple, different scenarios -- would need to incorporate

4    compromise one way or another.  So if one wins, everybody will

5    be happy and they'll consent to that, and if the other wins

6    everybody will be happy.  That's true, but that's also not

7    super likely that you can get something that sticks.

8         So all of it is a question of negotiation, which is

9    probably restating the obvious, but I want to see momentum

10   here.  I want to see real engagement, and I want to be in

11   momentum toward June, which will be early in the next hurricane

12   season.  Here we are.

13        Mr. Bienenstock.

14        MR. BIENENSTOCK:  Well, we have been considering

15   obviously what to do about the prospect of appeals, because we

16   know if -- when and if the Court has to rule on the summary

17   judgment motions, obviously the losing party, especially if

18   it's the bondholder, is going to appeal.

19        So in one sense that's another opportunity to settle,

20   but it hasn't been lost on us that it's not all over, and, you

21   know, whether we deal with it by delaying the effective date of

22   a plan or, better yet, settling the appeal, we're conscious of

23   that and we obviously want to settle it if we could.  Also, I

24   think it's implicit in what I was saying earlier, but just to

25   make it clear, as I explained earlier, the Board has put a lot

1    of the time and effort into trying to determine the right

2    amount it can increase rates, both in view of the people who

3    have to pay them and the solar issue of not to -- not to get

4    everyone off the grid.  However that comes out, there's going

5    to be what the consultants call a resource envelope, which is

6    just all of the money we have, all of the debt we can issue to

7    pay -- to pay creditors.

8           The Board is really agnostic as to how that is

9    distributed.  It's not trying to save money.  It's not trying

10   to pay less than it can pay to creditors who are absorbing some

11   amount of losses.  That's never been the Board's objective.

12   It's just to pay it all out.  It's just a matter of how to

13   allocate it.  And it doesn't have any favorites.

14           THE COURT:  Thank you, Mr. Bienenstock.

15           So, Judge Chapman, would you go to the podium, please?

16           JUDGE CHAPMAN:  Good morning, Your Honor.  Can you

17   hear me?

18           THE COURT:  Yes, I can.

19           JUDGE CHAPMAN:  Alright.  Your Honor, as you're aware,

20   Shelley Chapman, Willkie Farr & Gallagher, acting as the lead

21   mediator of the mediation team appointed by your Honor

22   April 25, 2022.  I'm appearing on behalf of the entire

23   mediation team.

24           I have had an opportunity to talk to Judge Drain and

25   Judge Shannon about the report that was filed by the Board last

MB2DPROH

1  evening, and have had additional conversations with the other

2  two mediators in preparation for today.  As is usually the

3  case, your Honor, I have prepared remarks.  Between

4  Mr. Bienenstock and your Honor's comments, most of what I had

5  to say has been covered.  But I think it's important for me to

6  give you some of my thoughts on some of the things that

7  Mr. Bienenstock mentioned, and also some of the thoughts that I

8  had before this morning's hearing.

9        Let me say this at the outset.  Nothing about this is

10  personal, but everything about it is personal.  It's personal

11  in the sense that front of mind for the mediators every day is

12  getting this case to a resolution and achieving the goals as

13  your Honor outlined for the citizens of Puerto Rico.  That's

14  front of mind for us every single day.  So at times when things

15  aren't going swimmingly, it can appear that things are getting

16  personal, but they're not.  We pride ourselves on being

17  professionals.  So anything I say today I don't mean

18  personally.

19        Mr. Bienenstock started by talking to your Honor about

20  that the Board wasted no time in turning to new proposals for

21  the situation, and that was in response to your Honor's

22  question about what took two weeks to designate whom the

23  mediators felt was the obvious party to act as the lead

24  negotiator.  Your Honor, we were frozen during that period of

25  time.  There were no communications whatsoever.

1       So while I have no doubt that members of the Board

2  were working hard, we had nothing to do.  We had no one to talk

3  to.  And two weeks in the grand scheme of things doesn't sound

4  like a long period of time, but suddenly two weeks has become

5  six weeks, and at this point there have been virtually no

6  substantive communications, virtually no substantive

7  communications.

8       The impaired consenting class plan that

9  Mr. Bienenstock mentioned to you was mentioned to us, and I'll

10  be blunt, your Honor.  I did not believe that that was how the

11  Board intended to proceed.  And I don't want to get into the

12  merits.  I don't want to get into anything that would violate

13  mediation confidentiality.

14       THE COURT:  I expect that you will avoid --

15       JUDGE CHAPMAN:  I will avoid that at all costs, and if

16  anyone listening or your Honor thinks that I'm wandering too

17  close to that line, I trust you will turn this red light on

18  somehow.  But there are many other constituents, I see some in

19  the room, others on the line, and they can talk more about

20  that.  Primary concern to us is the looming December 1st

21  deadline.

22       Now, the various toggles based on litigation outcomes,

23  they've been known for a long time.  This litigation has been

24  looming out there for a long time.  So that's something that

25  smart bankruptcy restructuring practitioners can deal with, and

1   I include Mr. Bienenstock very much in that category.  So I

2   have no doubt that that work is going on.

3          I could sit down in a room with Judge Drain and Judge

4   Shannon.  We could sketch that all out.  We have seen no

5   proposals.  If there is a proposal that has been shared with

6   any of the parties, as I stand here today, I am unaware of

7   that.  So, therefore, I find it concerning as to how the Board

8   will indeed comply with the December 1st deadline.

9          I was glad, actually, to hear Mr. Bienenstock talk

10  about affordability, because however this litigation comes

11  out -- and we were also glad to hear general agreement that the

12  sooner your Honor rules on certain issues the better.  And I

13  hate to put the burden on the Court, but there it is.

14         Yes, we need to talk about affordability, because we

15  believe -- the mediation team, that is, believes that however

16  the litigation comes out on the various issues that have been

17  identified, at bottom, this case may well turn on the issue of

18  affordability.  We feel -- we've come to feel over the last

19  month that -- and, again, it's our feeling.  It may not be the

20  reality, but we feel that we are being treated in some

21  circumstances as an adversary.  We are no one's adversary.  We

22  are seeking to be every mediation party's potential ally.  We

23  have admittedly talked more to some than to others.  We are the

24  only ones who know the things that we are told.  We don't share

25  them with the other mediation parties.  Those are the rules of

1    the road.

2              So we had thought we were going to hit the ground

3    running and begin mediating.  We asked a long list of

4    questions.  We identified a long list of topics we believe

5    needed to be addressed in order to get at the question of

6    affordability and some other issues that would relate to plan

7    formulation.

8              We tried to have a meeting.  We asked for a meeting to

9    be held yesterday.  No go.  We asked for a meeting to be held

10   next Tuesday.  We hope that's a go, but we don't know for sure.

11   So everyone can look at the calendar.  If we do have that

12   meeting next week, that's November 8th, then there's

13   Thanksgiving, and then it's my birthday on November 30th, but

14   December 1st is the following day.

15             So we're very concerned about how this is going to

16   play out.  We're very anxious to have all the parties reengage.

17   Mr. Bienenstock himself said in pleadings that were filed

18   months ago "we can mediate and litigate at the same time."  So

19   I see the litigation filings, and I've read them.  We're here

20   to mediate.  We're continuing to try to engage.

21             We don't feel much coming back from the Board.  We're

22   hoping that will change dramatically, perhaps after today.  You

23   asked Mr. Bienenstock some questions about, you know, how far

24   we've gotten here in terms of the litigation and what changed.

25   I'm not going to get into that, but I would say the following:

MB2DPROH

```
1    The creditors have been kept waiting, but, more importantly,

2    the people of Puerto Rico have been kept waiting.  And it's

3    just gone on too long.

4         Yes, certain facts changed in the wake of the natural

5    disaster that befell Puerto Rico, but many of the data sets,

6    issues, potential solutions have been well known for a long

7    time, and we just need to -- we need to get some traction here.

8    And I hope after today's hearings my phone will be ringing off

9    the hook.

10        Unless your Honor has any other questions, I think

11   I'll leave it there.

12        THE COURT:  Thank you, Judge Chapman.

13        Mr. Bienenstock, did you wish to say anything before I

14   call on others?

15        MR. BIENENSTOCK:  Your Honor --

16        THE COURT:  I need you to go to the podium.  Thank

17   you.

18        MR. BIENENSTOCK:  Okay.  Your Honor, to really respond

19   with -- I would have to weigh into the mediation privilege, so

20   I'd rather not.  I'll just leave it at what I said earlier.

21        The Board is very proud of the way it's proceeded

22   doing everything the Board is supposed to do, and I don't want

23   get into the issues that Judge Chapman raised.

24        THE COURT:  I will again reiterate that I expect the

25   facilities and abilities, talents and perspectives of the
```

MB2DPROH

1   mediation team to be used meaningfully in the process of

2   getting to December 1, and I think that I am hearing accurately

3   from your remarks and from Judge Chapman's remarks that that

4   hasn't happened yet.  I expect that to happen in the

5   formulation of a plan for December 1.

6           Thank you.

7           Now, sir, you raised your hand.  So the person behind

8   Mr. Natbony.  I'm sorry.

9           MR. MASON:  Richard Mason, Your Honor.

10          THE COURT:  Thank you, Mr. Mason.

11          MR. MASON:  Richard Mason, Wachtell, Lipton, Rosen &

12  Katz for the Fuel Line Lenders.

13          Just very, very briefly, your Honor, so that the

14  record is clear, I did have a couple of conversations with my

15  friend Mr. Bienenstock, which I always appreciate, but the Fuel

16  Line Lenders have as yet received no proposal.  Candidly, and I

17  appreciate the internal activity that the Board has undertaken,

18  the lack of activity externally, and just focusing on us, if

19  you will, during the month of October, given the tightness of

20  time, has been somewhat surprising.

21          Mr. Bienenstock spoke about economic issues, electric

22  rates, affordability.  I think he used the phrase "resource

23  envelope."  Your Honor might recall that in my remarks at our

24  last hearing I tried to emphasize that our group, and I presume

25  other creditor groups, needed to see analysis on those issues

1   so that we could understand factually and deeply where the

2   Board was coming from.  We have seen nothing since that hearing

3   in that respect.  Hopefully, that will change.

4           And, lastly, just to mention, Mr. Bienenstock referred

5   to Vitol, which I think is a small creditor in the scheme of

6   things, as potentially being an impaired accepting class.  I

7   think we would meet that with some pretty severe skepticism,

8   but, obviously, if that's the road he is going to go down,

9   we'll address it at the time.

10          Thank you, your Honor.  That's all I have.

11          THE COURT:  Mr. Natbony.

12          MR. NATBONY:  Thank you, and good morning, your Honor.

13          THE COURT:  Good morning.

14          MR. NATBONY:  William Natbony from Cadwalader

15   Wickersham & Taft, on behalf of Assured.

16          On behalf of Assured, I just want to share and support

17   Judge Chapman's concerns and comments about timing and the

18   process that has been engaged in since your Honor amended the

19   order continuing the mediation.  With respect to the timing

20   comments of both your Honor and Judge Chapman, Assured has been

21   standing by, and continues to stand by, and is ready and

22   willing to participate in good faith, continued negotiations,

23   as your Honor had contemplated.  And, of course, with the

24   assistance of the mediation team.

25          As to the recourse arguments talked about by

MB2DPROH

1    Mr. Bienenstock, we're going to leave those arguments obviously

2    to the papers that have been filed and will be filed, and we'll

3    address those in due course, and obviously have disagreement

4    with the Board on those issues.

5              Thank you, your Honor.

6              THE COURT:  Thank you.

7              Mr. Friedman.

8              MR. FRIEDMAN:  Your Honor, Peter Friedman from

9    O'Melveny & Myers on behalf of AAFAF.

10             The only thing we want to emphasize is one of the

11   things you said, which is getting this right, and we recognize

12   that there is a tremendous desire for consensus and expedition,

13   but we also recognize that this -- the result of this process

14   will cost money that will tax the people of Puerto Rico, who

15   have a 56 percent poverty rate I believe, is twice as poor as

16   Mississippi, already has high consumer rates -- commercial

17   rates compared to retail rates, which is the inverse of

18   virtually every state in the country.

19             The consequences are profound, and I think just from

20   public material the differences of what may be affordable, what

21   people's legal rights are are vast.  And so while we understand

22   that everybody wants to get to consensus, it has to be a deal

23   that works for the realities of Puerto Rico.  And that's

24   difficult and that's expensive.

25             And all the talking in the world in mediation and good

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MB2DPROH

1    intentions to get to a deal may get people closer but may not

2    actually be able to bridge that gap, at least from the

3    government's perspective as to what truly is in the best

4    interest of Puerto Rico, so that's where we stand.

5           We have tremendous respect for all the professionals,

6    particularly the mediation panel, and certainly don't view them

7    as our adversary, but where we stand comes not from a place of

8    wanting to be obstreperous or difficult but to see the best

9    interest of the future of Puerto Rico served.  And our

10   viewpoint may be different, and it's only meant to serve that

11   interest.

12          Thank you, your Honor.

13          THE COURT:  Thank you, Mr. Friedman.

14          Mr. Berezin.

15          MR. BEREZIN:  Yes, your Honor.

16          THE COURT:  Thank you.

17          MR. BEREZIN:  Your Honor, excuse me, Robert Berezin,

18   Weil, Gotshal & Manges, LLP, on behalf of National Public

19   Finance Guarantee Corporation.

20          Your Honor, I understand what it's like to fall in

21   love with arguments.  The Board seems to have fallen hard for

22   the Committee's non-recourse argument, as if it's some kind of

23   alchemy transforming eight billion dollars in lawful debt into

24   thin air.  This is indeed a sudden and new development, and we

25   fear the mediation will lay fallow absent some change.

1          In that regard, your Honor, we remind the Court of the

2     pending but stayed motion to lift the stay to appoint a

3     receiver.  We agree with Mr. Friedman that the people of Puerto

4     Rico must remain at the center of these proceedings, and we

5     believe a receiver will drive lower costs and more reliable

6     power for the people of Puerto Rico.  So it is urgent for that

7     reason alone, but in addition, to resolve these Title III

8     cases, the receiver litigation will put front and center

9     whether a receiver has a right to assume and exercise PREPA's

10    property rights until all defaults are cured.  Whether PREPA

11    granted bondholders an interest in property through the

12    receiver company, whether that right is binding on all PREPA

13    creditors due to the Authority Act's codification of the

14    receiver right granted to bondholders.

15         Your Honor, make no mistake, National wants a

16    consensual resolution.  National is committed to mediation.

17    National has stood and will stand ready to engage with the

18    Board and AAFAF in mediation.  But the receiver litigation

19    would be a wake-up call required, in our view, to realize the

20    promise of mediation.

21         Thank you, your Honor.

22         THE COURT:  Thank you.

23         Anyone else in this courtroom?  I don't see anyone at

24    the podium in San Juan.

25         Is there anyone who's on the phone who wanted to be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MB2DPROH

1    heard?  If so, unmute and state your name.  You have to unmute

2    on both the Court Solutions dashboard and on your phone to be

3    heard.

4              Alright.  Thank you.  I hear no further --

5              MR. DESPINS:  Your Honor.

6              THE COURT:  Oh, yes.

7              MR. DESPINS:  I'm sorry.  This is Luc Despins for the

8    Committee.  I apologize.

9              May I be heard at this time?

10             THE COURT:  Yes.  Good morning, Mr. Despins.

11             MR. DESPINS:  Good morning, your Honor.  I apologize

12   for not being there in person.  I certainly didn't expect the

13   hearing to take the turn it has taken, so obviously my

14   apologies for not being there.  But very briefly, your Honor,

15   the Committee is really concerned about -- when we hear issues

16   of expediting in the sense that everyone has to be in favor of

17   expediting an exit from these Chapter -- Title III cases.

18   That's apple pie.

19             But from the Committee's perspective, we've been

20   asking, we've been pushing this issue for three years plus, so

21   we're really concerned about the fact that expedition could

22   take precedence over a ruling on the merits, because we believe

23   obviously in the merits of our claims that we've articulated

24   three years ago.  So that's the first point.

25             The second point is the Committee objects in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MB2DPROH

1    strongest terms possible to the turn that the mediation has

2    taken here where you have mediators showing up in court,

3    reporting to the Court on the behavior of some parties.  Not us

4    by the way, but I'm fearing that I'll be next.  But not us, but

5    the Board.  The Board refused to have a meeting this week.  The

6    Board didn't do that.  The Board didn't do that.

7         I just don't understand how that is possible, and the

8    question I have is, is that a two-way street?  Meaning, can the

9    Committee raise the engagement or no engagement of the

10   mediation team with respect to some issues?  I expect not,

11   because that would be breeching the mediation privilege.

12        On the other hand, it seems that it's fair game for

13   the mediation team to appear and to criticize the position in

14   mediation of some parties, and I'm really concerned about that.

15   The Board can fend for itself.  I don't care about the Board,

16   but I care about the fact from a process point of the view.

17   This could be the Committee next.  So we are really concerned

18   about that.

19        And the last point is that, you know, the people of

20   Puerto Rico, and of course the creditors in our group, deserve

21   an answer to an issue that is fundamental here, because this is

22   not a decimal point impact on them.  This could have a huge

23   impact on the people of Puerto Rico.  And, therefore, when

24   people say that that should be the primary concern, we agree,

25   but that turns on -- it's not necessarily that expedition is

MB2DPROH

1   what they need.  They need to know whether they indirectly

2   should be repaying this debt that is a non-recourse claim.

3          So I'm not going to argue the merits of this, but I

4   wanted to express these concerns to your Honor.  Thank you very

5   much.

6          THE COURT:  Thank you, Mr. Despins.

7          Judge Chapman wishes to be heard again, and as she

8   walks to the podium, I will reiterate that the Court's

9   intention is to decide what is placed before the Court and to

10  do that carefully and as intelligently as the Court can and as

11  fairly and accurately as the Court can until and unless the

12  issues are taken off the table or superseded by events.

13         Judge Chapman.

14         JUDGE CHAPMAN:  Your Honor, thank you for giving me

15  some additional time.  I said at the outset of my remarks that

16  nothing that I was about to say was personal, but unfortunately

17  Mr. Despins made it personal and directed some pretty sharp

18  criticism at the mediation team, which I have to tell you I

19  believe is entirely unfounded.  I did not mention the

20  Committee.

21         I can report to the Court that there has been

22  communication between Mr. Despins and a member of the mediation

23  team.  I did not view any of my remarks as overstepping the

24  appropriate line and breeching mediation confidentiality.  Your

25  Honor asked the Oversight Board to file a status report on the

MB2DPROH                                                                36

1  status of the mediation.  They did so.  Mr. Bienenstock gave

2  you additional details.  I came to the podium and I provided

3  you with our version of those same facts.

4        Mr. Despins can speculate that somehow we're going to

5  have him next on a list.  Nothing could be farther from the

6  truth.  I have in my brief case right now an analysis of the

7  unsecured claims.  We're very aware of the important role that

8  he and his constituents play.  And I just could not remain

9  seated in the face of what I viewed as a troubling and personal

10 attack on the manner in which the mediation team has been

11 proceeding.

12       To the extent that your Honor believes that we have

13 done anything inappropriate, I trust and expect that your Honor

14 will advise us, but we intend to soldier on and not sacrifice

15 anyone's interests in the interest of expedition.

16       Thank you, your Honor.

17       THE COURT:  Thank you, Judge Chapman.

18       I believe that Judge Chapman and the others who have

19 spoken today have been careful not to go to the substance of

20 any communications in mediation.  My mediation order does

21 contemplate reporting by the mediation team on non-substantive

22 issues as the mediation team believes necessary.  It is no

23 secret that certain parties are not happy with the sequencing

24 of mediation.  That's not a secret, and it is a procedural

25 point.

MB2DPROH

1              Judge Chapman said that she didn't intend anything to

2      be personal, and we all need to make sure that things are not

3      personal but, rather, are directed towards a proper resolution

4      of the very, very serious issues that are before the parties in

5      interest and ultimately before the Court as to legal issues,

6      particularly on rights of credits.  But, ultimately, the Court

7      is looking forward to having the very weighty responsibility of

8      determining whether a plan is consistent with the requirements

9      of law and can be confirmed as one that is legal under PROMESA

10     and structured so as to improve the situation of the people of

11     Puerto Rico and allow Puerto Rico to go forward.

12             So I thank you all for your serious engagement with my

13     questions about the status of plan formulation and of

14     mediation.  I hope that everyone has heard things that will be

15     significant in their determinations as to how to proceed

16     between now and December 1, and that there will offline be

17     meaningful and substantive work and communications on the

18     mediation front.

19             So now I will turn to the AAFAF report.

20             Mr. Friedman, is there anything further from AAFAF to

21     that report?

22             MR. FRIEDMAN:  No, your Honor.  Nothing further.

23             Peter Friedman from O'Melveny & Myers on behalf of

24     AAFAF.  We have nothing further.

25             THE COURT:  Thank you.  I had no questions for AAFAF.

1          Is there anyone with comments on AAFAF's report?  I

2     don't see anyone at the podium in San Juan.  No one has raised

3     hands here.  I'll wait a couple of seconds for any comments

4     from the phone line.

5          Alright.  I believe that there are no further comments

6     with respect to AAFAF's report, and so we will now proceed to

7     the contested matters.

8          The first agenda item II.1 is the administrative

9     expense claim motions by the various litigation plaintiffs.  So

10    there is a group of five administrative expense claims in which

11    the claimants are represented by Ivonne Gonzalez-Morales.  The

12    first of which is the Carmen Socorro Cruz-Hernandez litigation.

13    The motion is Docket Entry No. 21195 in Case No. 17-3283.  The

14    second arises from the Madeline Acevedo-Camacho litigation, and

15    was filed as Docket Entry No. 21194.  The third is arising from

16    the Francisco Beltran-Cintron litigation, which is Docket Entry

17    No. 21224.  The fourth arises from the Abraham Gimenez

18    litigation, which is Docket Entry No. 21227; and the fifth

19    arises from the Acevedo Arocho litigation, which is Docket

20    Entry No. 21230.

21         So we have an allocation of 15 minutes for the opening

22    argument by Ms. Gonzalez-Morales.

23         Ms. Gonzalez-Morales, are you there?

24         MS. GONZALEZ-MORALES:  Yes.  Good morning, Your Honor.

25         THE COURT:  Good morning.

MB2DPROH

1        MS. GONZALEZ-MORALES:  I address the Court, Ivonne

2    Gonzalez-Morales, on behalf of the group of employees stated.

3        Can I start?

4        THE COURT:  Yes, please.

5        MS. GONZALEZ-MORALES:  Okay.  Before entering to the

6    merits, we must briefly highlight the fact that all claimants,

7    as regular and former government employees, hold back wage

8    claims accrued during the ordinary course of employment.  Of

9    the five cases identified in these different motions, only one

10   have a judgment.  That is the case of Carmen Socorro

11   Cruz-Hernandez.

12       And in that judgment, it was determined that the

13   Commonwealth, Family Department and other instrumentalities

14   broke the salary -- violated the federal and state wage laws

15   when implemented the minimum wage and disregarded the uniform

16   retribution -- regulation, which the employees confronted the

17   situation that they were paid up to the 19 pay scale the same

18   salary of the laborers and workmen, to the extreme that in

19   1996, 19 -- the first -- the employees assigned to the first 19

20   pay scales were receiving the same salary of laborers and

21   workers.

22       In addition, is important to bring to the

23   consideration of the Court that in the -- in the petition of

24   bankruptcy, the government of Puerto Rico made clear that it

25   was going to continue paying employees the -- in the regular

MB2DPROH

1    course of employment the pertinent wages.  Also, there is --

2    the claimants confront the situation that although they qualify

3    for the transferring of the claims to the administrative claim

4    reconciliation procedures, they have been discriminated, and,

5    to this day, they have not -- their claims have not been

6    considered in those procedures, which contradicts the very

7    purpose of the claim review and process of the Title III cases.

8         With this conduct, the Oversight Board is failing to

9    take affirmative action and denies claimants the opportunity of

10   settling their claims and obtain full payments of the

11   meritorious employee wage disputes and prevent frivolous

12   litigations.  Once is that clarified, in the case of Carmen

13   Socorro Cruz-Hernandez, although most of the judgment have been

14   paid, there are some outstanding payments that have not been

15   done and are identified in Exhibit Three.

16        Since claimants have not provided service to the

17   employment contract, the service rendered by the Family

18   Department would have been substantially effected.  Therefore,

19   under section 503(b)(1)(A) of the Bankruptcy Code, they submit

20   that they are -- they should be granted administrative expense

21   for the wages earned and not paid, especially because they have

22   established that the Commonwealth, although they have

23   reasonable problems, they submitted to the Court evidence that

24   -- of the bank accounts, and that permits the employees to have

25   their wages paid, plus have established that by paying the

MB2DPROH

1    amount that they claim, the government can continue operations.

2    Therefore, we cannot imagine why Congress would amend section

3    503(b)(A) to authorize priority claims and avoid a statutory

4    interpretation that would lead to an absurd result.

5        The Bankruptcy Code clearly responds to the public

6    outcry of terminating abuses by the -- of the bankrupt

7    employers and does not make reference to the judgment entered

8    prior or before the rule, also, since they have sufficient

9    funds to continue operating.  Most notably, the Commonwealth in

10   its opposition does not consent that movants provided

11   pre-petition services and the Commonwealth received substantial

12   benefits for the services.  Neither contests that -- the fact

13   of the Commonwealth's obtained unjust enrichment, they seek the

14   payment of the administrative expenses applications.

15       In regards the four cases that are pending

16   determination, is important to bring to the Court's

17   consideration that although the administrative expense claims

18   stem from identical litigation claims with final judgment, in

19   the case of Carmen Socorro, Nilda Agosto, Juan Perez-Colon, and

20   Janet Abrams, which are pending determination from this Court.

21       THE COURT:  Ms. Gonzalez Morales, pardon me.  I'd like

22   to ask you a question.

23       Do you agree that an administrative expense claim must

24   be based on something where liability has already been

25   determined?  You've just said that in four of these cases, the

MB2DPROH

```
 1    arguments and the claims would be the same as in Carmen
 2    Socorro, but you've also I think just acknowledged that there
 3    hasn't been a determination of liability or a judgment in any
 4    of those four cases yet.  So doesn't that fact alone mean that
 5    I cannot recognize the claims in those four cases as
 6    administrative claims at this point?
 7         MS. GONZALEZ-MORALES:  Your Honor, we have to make a
 8    clarification.  The claims have been bifurcated in pre-petition
 9    claims and post-petition claims.  The post-petition claims,
10    since they address the practice of unpayment violations of law
11    and is a fact that is not in controversy that the Governor of
12    Puerto Rico have not paid claimants the just, regular rate that
13    they deserve for the post-petition claims, they are entitled
14    for payment, because they have not been paid the wages that the
15    Puerto Rican law requires.  So --
16         THE COURT:  So has there been --
17         MS. GONZALEZ-MORALES:  -- with that said --
18         THE COURT:  Has there been a determination by a court
19    that the wages paid post-petition are insufficient?
20         MS. GONZALEZ-MORALES:  Well, we refer to the four
21    judgments that we have just addressed:  Carmen Socorro, Nilda
22    Agosto, Juan Perez-Colon.  There are four cases, four judgments
23    that have addressed the issue of the Commonwealth violations on
24    salaries of the claimants.  So, for the post-petition claim,
25    there is no obstacles to concede and grant movants their
```

MB2DPROH

1    request for administrative expenses, because their work has

2    produced benefits to the state.

3            In regards the pre-petition claim that all together

4    around $200 million, when you add up the claims, movants --

5    since there's not a judgment, movants reserve the right to

6    litigate these cases, and if succeed, to come again and claim

7    the administrative expenses.  It's important to clarify that

8    movants are also requesting this Court to order to -- a

9    creation of a special fund to guarantee these administrative

10   expenses if granted by a court.  However, movants also request

11   this Court to order a mediation process or some kind of

12   procedures where the Oversight Board will meet with claimants

13   in order to resolve this controversy about the wages.

14           We have a real concern, your Honor, because when you

15   see the result of the wage violations incurred by the

16   Commonwealth of Puerto Rico, and if you notice the amount of

17   claimants originally accumulated in -- for instance, in the two

18   cases from the Family Department, Madeline Acevedo and

19   Francisco Beltran, they were originally about 7,000 employees.

20   However, to this date, only 2,000 employees are still working.

21   That means that over 70 percent have left the government.  This

22   will -- this is creating a severe administrative problem for

23   the government agencies and services that the government should

24   bring to the Commonwealth of Puerto Rico citizens, and that is

25   why we are -- have bifurcated the administrative expense --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MB2DPROH

```
 1          (Sound played)

 2          MS. GONZALEZ-MORALES:  -- petition in a pre-petition

 3   and post-petition in order to solve the problem of wage theft

 4   that the Government of Puerto Rico have been incurring.

 5          I don't know whether the judge have another question.

 6          THE COURT:  Well, the time has run out.  We heard the

 7   two buzzes.

 8          (Sound played)

 9          THE COURT:  So if you want to wind up in a sentence

10   your remarks, then I will turn to the speaker for the Oversight

11   Board.

12          MS. GONZALEZ-MORALES:  Well, we pray for the granting

13   of the administrative explained -- as we have expressed in our

14   prior memorandums.  Thank you, your Honor.

15          THE COURT:  Thank you, Ms. Gonzalez Morales, and I

16   will call on you for a reply argument after Mr. Rosen speaks

17   for the Oversight Board.

18          MR. ROSEN:  Good morning, Your Honor.  Brian Rosen of

19   Proskauer Rose on behalf of the Oversight Board, as the

20   representative of the Commonwealth of Puerto Rico, pursuant to

21   Section 315 of PROMESA.

22          Your Honor, simply stated, this hearing is a lot like

23   Ground Hog Day.  As you are keenly aware, you have addressed

24   these litigations and the asserted claims twice before, once on

25   August 4th of 2021 in connection with the 345th Omnibus
```

1    Objection, and then again on Ms. Gonzalez' motion for

2    reconsideration of your order sustaining the 345th Omnibus

3    Objection.  And while these arguments that Ms. Morales is

4    raising today are repackaged, the arguments raised in these

5    five motions are essentially the same.  And to take what Yogi

6    Berra once said, your Honor, this is like deja vu all over

7    again.

8          These five motions, your Honor, are seeking the same

9    relief in a slightly different form as she came before you

10   before.  The first motion on the agenda, your Honor, is the one

11   that Ms. Morales was referring to as the one that maintains a

12   judgment and asserts liability only for pre-petition services

13   for some of the plaintiff employees.

14         The remaining four motions, your Honor, are filed by

15   the moving groups in four litigations in which the movants

16   acknowledge that they do not have a final judgment of liability

17   against the Commonwealth.  Rather, movants assert that they are

18   similarly situated to plaintiffs in other litigations in which

19   a judgment has been entered.  These motions and the

20   corresponding litigations contend that they are both pre- and

21   post-petition amounts owed.

22         Your Honor, you caught that -- excuse me.  You raised

23   that question very clearly, and you got the answer from

24   Ms. Morales that there really isn't a judgment entered.  And as

25   I'll go later on, your Honor, the Commonwealth very adamantly

1     contests the liability associated with those litigations.  As

2     asserted in those, your Honor, the Commonwealth has raised

3     certain affirmative defenses, and the issues are on appeal to

4     the Puerto Rico Supreme Court.  They relate to, among other

5     things, whether the claims asserted by the plaintiffs are

6     barred by laches or by a three-year statute of limitations and

7     whether the lower court erred in denying the motion for summary

8     judgment related to the cause of action.

9           It must be noted, your Honor, that the Commonwealth

10    considers any dispositive judgment to be issued by the Puerto

11    Rico Supreme Court in favor of the Commonwealth on those issues

12    to similarly apply to the other pending actions.  In fact, this

13    was one of the reasons, your Honor, that the Commonwealth

14    opposed the lifting of the stay with respect to those actions.

15          Your Honor, as I said, with respect to all the motions

16    asserting that pre-petition services are entitled to admin

17    expenses, we have seen this before.  Movants are making the

18    same or similar arguments previously made in connection with

19    the 345th Omnibus Objection, and it's the same arguments, your

20    Honor, that you addressed in your motion -- or, excuse me, in

21    the motion for reconsideration and your order wherein you

22    denied the motion for reconsideration, addressing the issues

23    under 503(b)(1)(A)(ii), your Honor.

24          In ruling that in the denial of the reconsideration,

25    your Honor, the Court recognized that movants had not put forth

MB2DPROH

1    a theory in which expenses had accrued and continued to accrue

2    post-petition, and that they had failed to persuade the Court

3    that 11 U.S.C. 503(b)(1)(A) applied to their claims.  Your

4    Honor, the movants here again argue that pre-petition portions

5    are allowable as admin expenses pursuant to section 503(b).

6    And the theory they espouse now is that they provided a benefit

7    to the Commonwealth through their services, making it possible

8    for the agencies to continue uninterrupted service, but they go

9    farther, your Honor.

10            In connection with the most recent application, they

11   again stress section -- or subsection (A)(ii), which the Court

12   did address briefly in the motion for reconsideration order.

13   And they're claiming that there's an exception to the

14   post-petition benefit rule.

15            But, your Honor, the theories that they put forward

16   ignore the plane statutory language of the Bankruptcy Code

17   requiring that the payment be, quote, attributable to the

18   post-petition period.  The law is clear that without a

19   post-petition nexus or a connection entitlement to payment does

20   not qualify for admin expense priority.

21            So what do they do?  What does Ms. Morales attempt to

22   do?  She provides an admin expense claim motion and she deletes

23   a piece of the statute.  She deletes the portion where it talks

24   about being attributable to that activity.

25            Your Honor, she tries to claim that there is an

MB2DPROH

1    exception to the rule and -- by citing cases which focus on

2    WARN Act or severance liability, but that's not the situation

3    here.  Those causes where there might have been some

4    responsibility, some admin expense claim, your Honor, were in

5    the context of WARN Act or severance where there might have

6    about been an obligation which actually accrued post-petition,

7    not pre-petition.  Your Honor, here there is no such

8    obligation.

9         So, your Honor, for the same reasons that the Court

10   ruled in the 345th Omnibus Objection that they should be

11   reclassified to general unsecured claims, for the same reason

12   that the Court denied the motion for reconsideration, the Court

13   should deny the request for the administrative expense claim

14   status here with respect to those which were pre-petition

15   activity.

16        With respect to the post-petition periods, your Honor,

17   that are asserted in the motion, the Commonwealth has

18   acknowledged that services provided during those periods may be

19   entitled to admin expense priority, but the liability and the

20   quantification is in bona fide dispute, as the Court recognized

21   earlier.  And it rests, your Honor, on the ruling that is

22   hopefully to come down by the Puerto Rico Supreme Court in the

23   Acevedo-Arocho action to which I referred before.

24        And as I said, your Honor, unlike the other cases

25   where there is a judgment, the Commonwealth courts have not

MB2DPROH

```
1    determined there to be any liability as to the movants

2    asserting post-petition liability.  Movants in those motions

3    consider themselves similarly situated to plaintiffs in other

4    cases that do have a judgment, but that is a big difference,

5    your Honor.

6          Furthermore, your Honor, the four groups of plaintiffs

7    that assert post-petition services are from those cases.

8    They're related to defenses -- the Commonwealth's defenses of

9    laches and statute of limitations, and if the Commonwealth were

10   to be successful in those defenses before the Supreme Court and

11   then possibly on remand, it would consider those issues to be

12   similarly dispositive in all the other actions and there would

13   be no liability at all, your Honor.

14         THE COURT:  Now, the Commonwealth would consider it

15   that way, but that wouldn't necessarily preclude the plaintiffs

16   from trying to litigate it and obtain a different result.

17         MR. ROSEN:  Absolutely, your Honor.  I agree.

18         Your Honor, Ms. Morales has also raised in her

19   comments something about either the ACR or the ADR processes

20   that the Court has authorized in these cases, and, your Honor,

21   we have always held major litigation cases to the side.

22         In this case, Ms. Morales is seeking, as she says,

23   hundreds of millions of dollars of liabilities.  And it's not

24   something which is the run of the mill type of claim where

25   someone says, my pension benefit should be $100, not $60 like
```

MB2DPROH

1    you say.  Those are the types of things that we've been dealing

2    with, your Honor, in the ACR processes.

3            Likewise, in the ADR, your Honor, these claims are so

4    sizable, and they are along the -- significantly along the path

5    in litigation in connection with the Puerto Rico Supreme Court

6    action that we would wait until there were some sort of

7    determination by the court, the Puerto Rico Supreme Court, so

8    we could, if in fact it's doable, proceed to ADR or proceed to

9    mediation.  But until Ms. Morales moves off of her position as

10   she stated here that she demands full payment, I don't think

11   there's something that anyone can do, whether the Commonwealth

12   or the Oversight Board, until we have that determination by the

13   Puerto Rico Supreme Court.

14           So, your Honor, for the same reasons the Court has

15   ruled in connection with the 345th Omnibus Objection and in the

16   motion for reconsideration, we ask the Court to again deny the

17   five motions which are before the Court.  Unless the Court has

18   any further questions, I don't have anything more.

19           THE COURT:  I have a couple of questions for you

20   before you step away.  The movants assert that claims totaling

21   about two-thirds, or 635,000 of the slightly over one million

22   dollar Socorro Cruz-Hernandez judgment qualify as convenience

23   claims in class 68 under the Commonwealth Plan, and do you

24   agree?  And to the extent that you agree, are those claims

25   being processed and paid in accordance with the Commonwealth

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MB2DPROH

1    Plan?

2         MR. ROSEN:  Your Honor, we have not had an opportunity

3    to determine whether or not those are, in fact, convenience

4    class claims.  We will try to do that with Alvarez & Marsal.

5    But I would point out that the Commonwealth also disputes that

6    that judgment, which gave rise to the claim itself, is final,

7    and that they do assert that they do have additional rights

8    that they may pursue.

9         So we will endeavor, your Honor, to get an answer to

10   your question about the convenience class, but I will say that

11   the Commonwealth is still reserving its rights with respect to

12   the balance of the money that is owed.

13        THE COURT:  So does this implicate the dispute as to

14   whether the automatic stay stayed the deadline to appeal the

15   judgment in Socorro Cruz-Hernandez?

16        MR. ROSEN:  Your Honor, the Commonwealth is taking the

17   position, as reported to us, that the automatic stay is still

18   in effect, and that's why they have not pursued any additional

19   appellate rights right now.

20        THE COURT:  Alright.  Some of the -- well, the motions

21   were filed as proofs of claim.  Are you going to stand on

22   procedure or will you treat the motions as proofs of claim to

23   which you'll react appropriately on the claims processing side?

24        MR. ROSEN:  Your Honor, if it is easier for the Court,

25   I will not stand on procedure or ceremony here.  We still do

1    have these motions pending -- excuse me, these proofs of claim

2    pending as, of course, general unsecured claims based on the

3    classifications earlier.  We still will object to those claims.

4    But on the admin expense claims, your Honor, if the Court were

5    to rule on those today without further objection being

6    interposed, we would accept that.

7               THE COURT:  Thank you.

8          So now I'll call Ms. Gonzalez-Morales back.

9               MR. ROSEN:  Thank you, your Honor.

10              THE COURT:  Thank you.

11              MS. GONZALEZ-MORALES:  First of all, we have to object

12   the Oversight representative when mention that the claims of

13   administrative expenses filed are subject to review by the

14   Puerto Rico Supreme Court.  For that purpose, we included in

15   our -- as Exhibit B, the answer to the denial of the legal sale

16   given by the Commonwealth where does not inform the theory that

17   is informing this Court today.

18         The injunction is requested to be maintained because

19   of the complexity, because the cases are in an initial state,

20   and, second, because of the complexity of the action, and the

21   cause associated with litigating those claims.  Nowhere in the

22   answer to the request of lift of stay that is pending before

23   the Court arises the argument -- the new argument that the

24   Commonwealth is presenting to this Court.

25         The Acevedo-Arocho claim refers to a special action

MB2DPROH

1     that some auditors and tax specialists of the Treasury

2     Department had, not -- that special claim was not stayed by the

3     Court of First Instance.  Therefore, is misrepresenting this

4     Court about the pending Supreme Court decision will affect the

5     administrative expense petition.  So we request this Court to

6     dismiss that argument, because it's not faithful because of the

7     record of the case, and we submit our petition of

8     administrative expense as we previously requested.

9          Thank you, your Honor.

10         THE COURT:  Thank you.

11         We will now take a ten-minute break.  So we will

12    resume the proceeding -- actually, it will be a 13-minute

13    break, so we'll resume the proceeding at 11:30 a.m.

14         People who are listening on the AT&T line, don't hang

15    up.  Put it on hold or just put the phone down on the table.

16         Mr. Friedman, before we go.

17         MR. FRIEDMAN:  Your Honor, may I be excused?  I don't

18    think AAFAF has anything further to say.  I don't believe any

19    of the other matters require AAFAF to speak.

20         THE COURT:  Just in case anyone did not hear

21    Mr. Friedman on the speaker, he asked to be excused because

22    AAFAF doesn't need to appear in connection with any of the

23    other motions, and that request is granted.

24         MR. FRIEDMAN:  Thank you, your Honor.

25         THE COURT:  Good to see you, Mr. Friedman.

MB2DPROH

54

1        MR. FRIEDMAN:  Thank you, your Honor.

2        THE COURT:  Alright.  We are adjourned to 11:30.

3   Thank you.

4        (Recess)

5        THE COURT:  Please be seated, and thank you for your

6   patience.

7        I have one more question for Mr. Rosen in connection

8   with the previous agenda item, and that's a follow-up to your

9   response, Mr. Rosen, to my question as to whether the Oversight

10  Board would treat the motions filed on behalf of these wage

11  claimant groups as the administrative claims rather than

12  raising an objection that they were filed as motions, rather

13  than as claims.  And you said yes, but then your response

14  seemed to suggest that you would consider a denial of the

15  relief sought today as a complete resolution or expungement of

16  those claims as administrative claims.

17       Is that what you meant?

18       MR. ROSEN:  Your Honor, I thought what you were asking

19  was in as much as these were requested to be treated as admin

20  expense claims, a determination by you would be dispositive of

21  that.  That would still leave, however, what we always perceive

22  to be the general unsecured proofs of claim that we would still

23  be dealing with.

24       THE COURT:  Thank you for making that clear.

25       Alright.  I will now make my oral ruling with respect

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MB2DPROH

1   to these applications.

2           Before the Court are five separate motions seeking

3   allowance in payment of administrative expense claims, which

4   are at Docket Entry Nos. 21194, 21195, 21224, 21227, and 21230

5   in Case No. 17-3283.  I will call these docket entries the

6   "Motions," and the various movants thereto I'll refer to as the

7   "Movants."  The Financial Oversight and Management Board of

8   Puerto Rico has objected to each of the motions, see Docket

9   Entry Nos. 21640 through 21644.

10          The Court has carefully reviewed the relevant

11  pleadings and listened to the arguments today.  The Court now

12  makes its oral ruling as to the motions and reserves the right

13  to make non-substantive corrections in the transcript of the

14  ruling.

15          Movants seek immediate payment of certain prepetition

16  wage claims as administrative expenses, as well as "comfort

17  orders" that over $200 million in asserted pre- and

18  postpetition claims that are the subject of pending actions

19  will be given administrative expense priority.  And they ask

20  the Court to order the Commonwealth to create a reserve of

21  those funds to be available for immediate payment when final

22  judgments are rendered in those cases.  Movants have also filed

23  the instant motions as proofs of claim.  For the reasons that

24  follow, the Court denies each of the Motions for allowance of

25  Movants' asserted administrative expense claims at this

1    juncture, as well as all of the requested ancillary relief.

2         The Movants' asserted claims are based upon multiple

3    underlying actions in which they seek damages from several

4    departments of the Commonwealth, including the Treasury

5    Department, and the Department of Transportation and Public

6    Works.  All but one of the underlying actions are currently

7    pending before the Commission for Appeals for Public Service,

8    or CASP, before the Puerto Rico Court of First Instance or

9    before the Puerto Rico Supreme Court.  The gravamen of the

10   several actions is that the Movants allege that they are owed

11   back pay due to a salary shortfall caused by the Commonwealth

12   not properly adjusting wages following its implementation of

13   the federal minimum wage laws.

14        Addressing the pending actions first, Movants argue

15   that they are "similarly situated" to other plaintiffs who have

16   prevailed on similar claims.  However, the potential merit of

17   the claims in the underlying actions is irrelevant with respect

18   to the Motions before this Court today, because administrative

19   expense claimants have the burden of conclusively establishing

20   the liability of the debtor before seeking a ruling on

21   entitlement to priority treatment.

22        "The burden of proving entitlement to priority payment

23   as an administrative expense . . . rests with the party

24   requesting it[.]"  That is a quote from In re Fin. Oversight &

25   Mgmt. Bd. for P.R., 621 B.R. 289, 296 (D.P.R. 2020), aff'd, 7

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    F.4th 31 (1st Cir. 2021).  It falls to the claimant to

2    establish the liability of the debtor under applicable law.

3    See, e.g., Gorgan v. Garner, 498 U.S. 279, 283 (1991).

4            With respect to the pending actions, Movants do not

5    appear to argue that they are entitled to immediate payment or

6    that they hold final judgments.  Instead, in the Motion

7    pertaining to the Acevedo-Camacho action, they state that

8    "Movants are not the beneficiaries of a judgment from a

9    Commonwealth Court since their litigation claim[s] have not yet

10   been resolved on the merits, [they] request [for] this court[]

11   to take judicial notice that by filing the present Motion,

12   Movants are not requesting[] the immediate payment of the back

13   pay accrued pre-petition[.]"  (Docket Entry No. 21194 paragraph

14   22(A).) Similarly, Movants cannot request immediate payment of

15   their back pay claims in any of the other pending actions.

16           Instead of immediate payment, Movants ask for a

17   comfort order that their postpetition wage claims will be

18   administrative expenses, as well as for the Court to order the

19   Commonwealth to set aside hundreds of millions of dollars into

20   a reserve to pay the judgments when the cases are won and

21   finalized, and Movants don't believe that that final result is

22   in any doubt.

23           However, Movants are not entitled to such a comfort

24   order or to any reserve.  Their claims are contingent.  Any

25   comfort orders with respect to the future treatment of Movants'

MB2DPROH

1   potential post postpetition claims would be a premature and

2   improper advisory opinion, because the Commonwealth's liability

3   has not yet been established.  Further, Movants' request that

4   the Court order the Commonwealth to set aside funds to satisfy

5   potential future rulings is unsupported by any basis in law or

6   in fact.

7         Accordingly, the Motions for allowance and payment of

8   any wage claims deriving from the pending actions are denied at

9   this juncture, along with any ancillary requested relief.

10  Movants have filed their Motions as administrative claims in

11  advance of the administrative claims bar date, and they will be

12  addressed by the Debtor in due course.

13        So the separate claims that have been filed will be

14  argued by the Debtor.  Is that your intention, Mr. Rosen?

15        MR. ROSEN:  Do you want me to --

16        THE COURT:  Just speak into your microphone.

17        MR. ROSEN:  Your Honor, I thought what you were going

18  to do was -- based upon your questioning, was address them as

19  admin expense claims now, but if we can reserve that and deal

20  with them subsequently -- what I was saying was we will deal

21  with the prepetition when we deal with the general unsecured

22  claims.  We'll object to those proofs of claim as we would

23  normally do, your Honor.

24        To the extent that there is a postpetition piece, your

25  Honor, we will -- we will deal with that, as we said, in our

MB2DPROH

1   papers, your Honor.  The Commonwealth does not dispute that

2   there might be something on a postpetition basis.  It just

3   wants to deal with the litigation that is out there with the

4   Puerto Rico Supreme Court, or CASP, as you referred to already,

5   so --

6              THE COURT:  Alright.  So I think now I'm getting a

7   little confused as to what I believe they filed --

8              MR. ROSEN:  Yes.

9              THE COURT:  -- and whether there are parallel claims

10  filed as well as these motions, but I am ruling today on -- as

11  to the postpetition claims -- the request that they be paid

12  immediately or be secured.  That is being denied.

13             MR. ROSEN:  Yes.

14             THE COURT:  To the extent there remains an underlying

15  timely filed claim for treatment of finally determined

16  liability for postpetition wages, as an administrative expense,

17  I'm not ruling on that today, and I'm leaving it to the Debtor

18  to handle liquidation and any payment of that claim or

19  objection to that claim in the ordinary course of resolution of

20  claims.

21             MR. ROSEN:  We are in complete agreement, your Honor.

22             THE COURT:  Alright.  Thank you.  This is complicated.

23             So going on now, only one of the Motions pertains to

24  an action in which the respective Movants have obtained a final

25  judgment.  This is Docket Entry No. 21195 relating to the case

MB2DPROH

1   Carmen Socorro Cruz-Hernandez, et al., v. Family Department,

2   ARV, and AIJ, which is Case No. K AC 1991-0665, (which I'll

3   refer to that as the "Socorro Cruz Hernandez Action"). Movants'

4   request that the portion of the judgment pertaining solely to

5   prepetition wages be paid immediately in full as

6   "administrative back pay."

7           Movants contend their prepetition wage claims merit

8   administrative expense status under section 503(b)(1)(A)(ii) of

9   the Bankruptcy Code, as incorporated through Section 301(a) of

10  PROMESA, which provides for a category of administrative

11  expenses consisting of "wages and benefits awarded pursuant to

12  a judicial proceeding . . . as back pay attributable to any

13  period of time occurring after commencement of the case under

14  this title as a result of a violation of Federal or State law

15  by the debtor, without regard to the time of the occurrence of

16  unlawful conduct on which such award is based or as to whether

17  any services were rendered[.]"  With respect to wages earned

18  prepetition, Movants argue that because this provision refers

19  to "back pay," it makes all prepetition wages an administrative

20  expense of the Debtor.

21          At a hearing held on August 4, 2021, the Court

22  rejected Movants' counsel's arguments regarding section

23  503(b)(1)(A)(ii) in connection with similar claims.  In the

24  course of opposing the reclassification of several claims as

25  general unsecured claims, counsel had made this same argument

1    that wage claims for back pay earned prepetition are

2    administrative expenses.  At the August 2021 hearing, I

3    considered and rejected that argument, saying that "the

4    claimant's asserted basis for administra[tive] expense priority

5    under section 503(b)(1)(A) of Title 11 only extends to claims

6    arising from events that occur after the commencement of a

7    bankruptcy case, and all of these claimants are asserting

8    claims that long predate the debtors' Title III petitions."

9    (Aug. 4, 2021, Hr'g Tr., Docket Entry No. 17705, at 113:19-24.)

10   I reaffirmed this ruling in the course of denying Movants'

11   counsel's motion for reconsideration of the reclassification

12   ruling.  The ruling denying reconsideration cited the August 4,

13   2021, hearing transcript, and stated that the claimants "failed

14   to persuade the Court that 11 U.S.C. [section] 503(b)(1)(A)

15   applied to their claims." (Docket Entry No. 20569 at 4.)

16          The argument remains meritless.  To the extent to

17   which res judicata does not render making the same ruling yet

18   again unnecessary, I am now reaffirming my prior interpretation

19   of the plain language of 11 U.S.C. section 503(b)(1)(A)(ii).

20   It applies only to "back pay attributable to any period of time

21   occurring after commencement of the case under this title[.]"

22   Accordingly, none of the claims asserted here for wages

23   attributable to the prepetition period qualify for

24   administrative expense priority and the Motion (Docket Entry

25   No. 21195) is denied.  I am not likely to come to a different

1    conclusion should this argument be presented to me again.  The

2    Court will enter an order denying each of the administrative

3    expense motions.  And, again, that is denying these motions

4    which are seeking immediate payment, the provision of a comfort

5    order, or the putting aside of security for these putative

6    administrative expense claims.

7           The Court will enter an order denying the motions

8    consistent with these oral remarks, and the movants' underlying

9    administrative claims and their filed prepetition proofs of

10   claim that are not yet the subject of disallowance by a final

11   order of the Court have not been resolved and will be addressed

12   in due course before the Oversight Board's time to object to

13   proofs of claim elapses.

14          I thank both counsel for their help and guidance to me

15   and for their arguments.

16          MR. ROSEN:  Thank you, your Honor.

17          THE COURT:  So now the next contested matter is Agenda

18   Item II.2, which is Molina-Ruiz stay relief motion.

19          Mr. Rosen.

20          MR. ROSEN:  Your Honor, the screens are black here.  I

21   don't know if they'll go back on.

22          THE COURT:  Okay.  Let's see if we can get those to

23   work.

24          MR. ROSEN:  Oh, they're on now.  Thank you.

25          THE COURT:  Alright.  So counsel Jose Luis

MB2DPROH

1  Novas-Debien is speaking on behalf of the movants, and I have

2  him down for five minutes for his opening remarks.

3        Good morning, Mr. Novas-Debien.

4        MR. NOVAS-DEBIEN:  Good morning, Your Honor.  It's a

5  pleasure to be here this morning.

6        We will be brief, your Honor, as all matters have been

7  briefed already in the various pleadings before the Court.  I'm

8  just going to focus, your Honor, on the matters that remain

9  contested per the joint report that the parties filed on the

10  31st, and it boils down to three items where we are in

11  disagreement, upon which or related to the Court had already

12  directed us to confer and had posed some relevant questions.

13        So those three matters that remain contested or that

14  merit some further clarification for your Honor are, number

15  one, the status of the litigation over at the Puerto Rico State

16  Court in Bayamon Park; a second matter that remains contested

17  is whether movants' claim is actually a claim within the

18  purview of the Bankruptcy Code, and, thus, subject to the

19  automatic stay; and lastly, your Honor had directed the parties

20  to expound upon the impact of the *Gracia-Gracia* case upon the

21  case at bar.  And so those are the three items that I'm just

22  going to touch upon as quickly as I can.

23        The most important, your Honor, that's where we will

24  start, the status of the litigation.  Your Honor, before us we

25  have a judgment that is long, final, firm, and unappealable.

MB2DPROH

1    It's a non-monetary judgment ordering the return of certain

2    animals to Ms. Lilia Molina.  It's final, firm, an

3    unappealable, because as of November 17, 2017, all motions to

4    reconsider that had been filed by the Commonwealth had been

5    denied.

6           In fact, when the Court actually moved later on to

7    stay the proceedings based on Title III, PROMESA, that was on

8    an order dated August 28, 2018, the Bayamon Court itself

9    recognized that it was a final and firm judgment, executable.

10   It recognized that the case was at the post judgment execution

11   of judgment stage, where Ms. Molina had been seeking a return

12   of the animals for a while.  And not only that, your Honor, and

13   what makes it final and firm, also, is that -- and contrary to

14   what the Commonwealth states or posits, the automatic stay

15   under Title III, PROMESA, perhaps dating back all the way to

16   May 3rd, 2017, is really not self-executing, your Honor.

17          There's a number of federal courts that have

18   recognized a state court's ability or authority to decide

19   whether automatic stays apply to the proceedings -- to

20   proceedings before them or not, most specially when the

21   proceedings are proceedings that relate -- that don't relate to

22   monetary judgments, that really have no impact on a debtor's

23   estate in a bankruptcy case.  So the state court, just to wrap

24   up this point, issued a judgment back on August 18, 2016, that

25   became final and firm December 30th -- or 31st, actually, 2017,

1    when the final motion to reconsider -- the Commonwealth's

2    motion to reconsider was denied.

3            So that brings us to the second point, and that's the

4    nature of, you know, whether movants' claim, which -- in the

5    meaning of the Bankruptcy Code is a claim under section 101(5).

6    It really is not, your Honor, because it's a claim per the

7    state court judgment.  It provides for return of certain

8    animals.  There are no money damages to speak of or any right

9    to payment at this stage.

10           There's also no issue of the Commonwealth's ability to

11   perform and comply with the judgment at this stage.  We're

12   going to get into that in a moment.  It is a judgment that is

13   perfectly executable regarding the delivery of those animals.

14           We do know that the Commonwealth attempts to create a

15   factual issue regarding its ability to deliver the animals at

16   this stage, and upon that would hinge what the Commonwealth

17   advances as possible monetary claims, but that's -- it's really

18   a non-issue, because the horses, your Honor, the animals --

19           (Sound played)

20           MR. NOVAS-DEBIEN:  -- were received by a third-party

21   receiver, which is the Bayamon Municipality.  In Puerto Rico, a

22   receivership is a contract like any other, and it provides for

23   very simple obligations.  And it's basically when the

24   depositor, which is the Commonwealth, turns over the property

25   to the receiver, the receiver is simply bound to keep the

MB2DPROH

```
 1    property safe, save normal wear and tear, that kind of thing,

 2    keep it, safe keep it, and return it back to the depositor,

 3    which is the Commonwealth, upon the depositor's request.  Those

 4    are the basic elements of the receivership under the Puerto

 5    Rico Civil Code.  In Spanish it's titled (Remarks in Spanish.)

 6            So the Commonwealth cannot now claim that these

 7    animals are not in its possession, that they are -- they would

 8    be in a tenuous situation now before claimant, who could sue

 9    them for damages.  That's not the case.  The Commonwealth is

10    perfectly able to now, within the Bayamon case, to produce

11    those animals simply by claiming that the Municipality, which

12    is a receiver, turn them over, because that's the

13    Municipality's legal duty and that's -- and that's the matter

14    with that.

15            To conclude, Your Honor --

16            THE COURT:  Yes.  I was going to ask you --

17            MR. NOVAS-DEBIEN:  Yes.

18            THE COURT:  -- to conclude the remarks, because you

19    did run over your time about a minute and a half ago.

20            MR. NOVAS-DEBIEN:  Yes.  And so we leave it submitted

21    as it is, your Honor.  Under *Gracia-Gracia*, your Honor, of

22    course the Court needs to, at a threshold level, make a

23    determination, number one, whether there's any equity that the

24    Commonwealth has on these animals, which it does not; and the

25    second, that a threshold issue is whether the animals are in
```

MB2DPROH

1    any way important or necessary for the structuring of the

2    Commonwealth's finances, which obviously they are not.

3              So that's what we have for the Court, your Honor, in

4    terms of argument.

5              THE COURT:  Thank you very much.

6              I'll now call Mr. Rosen to the podium here in New

7    York.

8              MR. ROSEN:  Thank you very much, your Honor.  Brian

9    Rosen of Proskauer Rose on behalf of the Oversight Board.

10             Your Honor, this really comes down to what I perceive

11   it to be, which is a simple argument, is there a claim or is

12   there not a claim against the Commonwealth.  And counsel, he

13   hedges all the time, and he carefully used the words "at this

14   stage" in his remarks today.

15             We have been trying to understand what the magnitude,

16   if any, of the issue might be back against the Commonwealth.

17   There is no dispute.  The Commonwealth does not have these

18   animals.  Several of the animals were donated.  The balance of

19   those are with the Municipality of Bayamon.  But the

20   Commonwealth --

21             THE COURT:  Donated by whom to what?

22             MR. ROSEN:  Your Honor, I don't know if they were

23   actually donated by the Commonwealth directly or by Bayamon

24   directly to this third party, to a parks organization I believe

25   it was, your Honor.  I'm not exactly sure who made the

MB2DPROH

1    donation.

2              These animals were taken away, your Honor.  They were

3    in a horrible state.  Animals had to have -- actually,

4    corrective vision surgery.  I understand one of them had

5    cataracts.  Your Honor, the Municipality of Bayamon has

6    invested over $60,000 to maintain the upkeep of these animals

7    and bring them back to health, but, your Honor, that's not the

8    issue I think here.  The issue is the judgment seeks for the

9    Commonwealth, and it's solely against the Commonwealth, to have

10   the Commonwealth turn over these animals.

11             THE COURT:  Yes.

12             MR. ROSEN:  The Commonwealth does not have them.  I do

13   not understand the Puerto Rico law reference that counsel made

14   for the first time today that it is a receivership and they

15   could, merely by asking, have them turned over.  That is not my

16   understanding as to what the status is.

17             But, your Honor, what we have tried to lay out in the

18   joint status report, as well as in our other pleadings, is that

19   in the event that the Commonwealth is unable to return the

20   animals, under Puerto Rico law, there is a right, nunc pro

21   tunc, to request a claim back against the Commonwealth.

22   Counsel, on the one hand, says we're not seeking any monetary

23   relief.  On the other hand, he says, as he did today, "at this

24   stage."  We would like to know if, in fact, there is a waiver

25   of the monetary claim, if any, back against the Commonwealth.

MB2DPROH

1    That might change the result of what we're trying to do here.

2    But the fact is they are still reserving their rights to assert

3    a monetary claim back against the Commonwealth.

4            THE COURT:  Well, whether you give them any surviving

5    animals back today or not, there's still that looming potential

6    for a monetary claim against the Commonwealth, correct?  If, in

7    fact, these animals have been, you know, lost, donated, stolen,

8    or whatever.  And maybe Bayamon has a claim back against the

9    Commonwealth.  Who knows.

10           But I think what I'm hearing today, and we'll ask

11   Mr. Novas-Debien to correct me if I'm wrong, is that they are

12   looking for an order that allows them to go to the Commonwealth

13   and say, give me my dogs and ponies.  And the Commonwealth

14   might say, I don't have them, I cannot give them to you, so the

15   answer is no; and since all I've asked them to do -- all I've

16   authorized them to do is go and ask for them and get them, if

17   the Commonwealth has them and will give them back, then

18   everybody will have to figure out what the next stage is.

19   Perhaps I would be asked for further relief from the automatic

20   stay, or maybe they will simply have this claim against the

21   Commonwealth, which would be for noncompliance with the

22   judgment, breach of a bailment, something like that.

23           So, Mr. Novas-Debien, are you asking me today for

24   permission to do anything other than go and physically get the

25   animals?

MB2DPROH

1          MR. ROSEN:  Your Honor, before he makes that answer,

2     if I could just interject.

3          THE COURT:  Yes.

4          MR. ROSEN:  It was included in the joint status

5     report, and counsel started off with this with regard to the

6     status of the litigation itself.  There's still a dispute as to

7     whether or not the judgment is final.

8          The Commonwealth disagrees with counsel's recitation

9     of the facts.  It still believes that this is not final and it

10    can appeal the issue.  So I don't think it's as simple as

11    saying, I want to go back and enforce a judgment in another

12    court and ask the Commonwealth to turn over animals which it

13    does not have.  If anything, your Honor, it would be that the

14    party should go back and continue the litigation until they get

15    to a judgment that might be final and firm under Puerto Rico

16    law.

17         MR. NOVAS-DEBIEN:  Your Honor, I'm sorry.

18         THE COURT:  Just before you speak, Mr. Novas Debien,

19    how about I lift the stay to permit the movant to enforce the

20    existing judgment in so far as the movant seeks to obtain

21    possession of the animals?

22         MR. ROSEN:  And to the extent that the judgment is not

23    firm and final, your Honor --

24         MR. NOVAS-DEBIEN:  May I speak?  May I answer the

25    question, your Honor, or will Mr. Rosen continue answering my

1    questions?

2            THE COURT:  Okay.  I'm going to let Mr. Rosen continue

3    making this one statement, and then you have the podium after

4    that.

5            Mr. Rosen.

6            MR. ROSEN:  Your Honor, I would suggest that if your

7    Honor were prepared to lift the stay in any regard, it would be

8    to allow the litigation to continue and to allow the

9    Commonwealth to assert its rights.  And if, in the event that

10   there is no appellate action or further appellate action taken

11   by the Commonwealth and the judgment would be firm and final,

12   then -- then Ms. Molina-Ruiz could assert whatever rights that

13   she might have with respect to that firm and final judgment.

14           THE COURT:  Thank you.

15           Now, thank you for your patience, Mr. Novas-Debien.

16   Please speak.

17           MR. NOVAS-DEBIEN:  Thank you, ma'am.  Thank you, your

18   Honor.

19           To answer your question, your Honor, that's all the

20   claimant or movant seeks is to lift the stay so she can go back

21   to the Bayamon Court and request return of animals that the

22   Commonwealth has conceded are available, including their

23   offspring.

24           That's another civil code obligation of the receiver.

25   If he has animals, the receiver has animals that have two

MB2DPROH

1    turned into four, he has to return all four.  That's all,

2    nothing more.

3            At this stage, it is impossible under the Puerto Rico

4    Rules of Civil Procedure and the status of litigation for Ms.

5    Molina to seek anything else.  She never intended to seek

6    anything else but her animals, and that's all she's asking, to

7    -- right now, to be allowed to go back to Bayamon and ask for

8    her animals to be given back, as the Court had ordered back in

9    August, 2016.

10           This cannot become perpetual and now be continued

11   under the PROMESA Act, because, in Puerto Rico, judgments

12   become final and firm, your Honor.  And that's what we're

13   trying to establish here.  We have a final, firm, and

14   unappealable judgment that now must be complied with.  That's

15   it.  And it involves no money and no issue for the Commonwealth

16   money wise within the purview of Title III, PROMESA.  It just

17   doesn't belong here is our view, your Honor.  Never belonged

18   here.

19           MR. ROSEN:  Your Honor, counsel I don't think answered

20   the question.  He said that he wants to go back and go get the

21   animals.  My point is, to the extent that there are still

22   appellate rights, those rights should be allowed to be asserted

23   by the Commonwealth in that proceeding.  That's all I'm

24   suggesting, your Honor.  And if they're not, and counsel is

25   correct that it is firm and final, then it is firm and final,

MB2DPROH

1   but the Commonwealth feels differently.

2            THE COURT:  So I would think some language that says,

3   permitting them to enforce and/or litigate to the extent

4   necessary the judgment for possession of the animals.

5            MR. ROSEN:  The parties' rights are reserved and can

6   be reserved --

7            MR. NOVAS-DEBIEN:  The state court --

8            THE COURT:  One at a time, Mr. Debien.

9            MR. NOVAS-DEBIEN:  Yes.

10           THE COURT:  So I'm going to let Mr. Rosen finish his

11   sentence.

12           MR. NOVAS-DEBIEN:  Yes.

13           MR. ROSEN:  Your Honor, I think words to the effect,

14   that all parties reserve their rights in connection with the

15   judgment, including, without limitation, any appellate rights.

16   That would be fine with us.

17           THE COURT:  Mr. Novas-Debien?

18           MR. NOVAS-DEBIEN:  Yes, your Honor.  We don't -- we're

19   not asking the Court to curtail or to shut down any appellate

20   rights that the Commonwealth may have.  The state court judge

21   in Bayamon knows exactly what those rights are and ELA sure

22   knows what they are, and they can assert them there.

23           So it's really besides the point what they can do.

24   The Bayamon Court is -- it's grist of the mill of the Bayamon

25   Court, not your Honor's -- it should not -- I mean, if the

MB2DPROH

1    Commonwealth feels more comfortable with an order that

2    indicates that they are not waiving any rights to continue the

3    litigation on appeal, that's fine by us.  It's their right.  We

4    don't want to infringe their rights.

5        THE COURT:  Thank you.

6        So, Mr. Rosen, anything further?

7        MR. ROSEN:  No.  I guess I wish counsel would go as

8    far as to represent to the Court that they will not seek any

9    monetary recovery, although he said it several times, but he

10   doesn't want to go hard and fast on it, but I have nothing

11   further, your Honor.

12       THE COURT:  Yes.  Well, why should he have to now if

13   all he's going to do is try to get the horses --

14       MR. ROSEN:  I know.  It's the second half of the

15   problem we've always focused on.

16       THE COURT:  Mr. Novas-Debien, Mr. Rosen says the

17   Commonwealth, when you come for the horses, is going to say

18   they don't have the horses.  And so are you asking me for any

19   relief in that regard right now?

20       MR. NOVAS-DEBIEN:  I'm sorry, your Honor.  I missed

21   with regard to what exactly.

22       THE COURT:  Mr. Rosen is saying that the Commonwealth

23   is going to say they don't have the horses, they can't give you

24   the horses whenever it is that the judgment is determined to be

25   final, because he doesn't agree with you that Bayamon is

1    obliged to give you the horses if the Commonwealth tells them

2    to.   So he's concerned that then your client will say, give me

3    the value of the horses in money.

4              So I'll put it this way.   Are you asking me for

5    permission to pursue that sort of claim right now, or do you

6    accept that you would have to come back to this Court to seek

7    to pursue that kind of claim?

8              MR. NOVAS-DEBIEN:   Yes, absolutely not.   It's not the

9    intent to seek monetary damages within that case, because that

10   is -- it's a judgment precluded by the stage of where

11   proceedings are.   There's never been a recommend -- at this

12   stage, your Honor, it's not claimant's -- it's not claimant's

13   intent to go to the Bayamon Court and seek money, a money award

14   of any kind.   She's just going to move for the return of the

15   animals.   That is what we have been stating all along.

16             MR. ROSEN:   I don't think we can get anything further

17   out of counsel at this point, your Honor.   I don't know what

18   else to do.   But you understand my concerns.

19             THE COURT:   I understand the concern.   I think that

20   that concern may well ripen into something real if you don't

21   come up with some animals, but counsel is not asking me to make

22   any sort of -- make or authorize any sort of damages

23   determination right now.

24             MR. ROSEN:   Thank you, your Honor.

25             MR. NOVAS-DEBIEN:   That's correct, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MB2DPROH

1        THE COURT:  Okay.  Thank you.

2        So give me just a moment.  Actually, Mr. Rosen, why

3    don't you go back there for a moment.

4        MR. ROSEN:  Yes, your Honor.

5        THE COURT:  Okay.  So are you claiming in any way that

6    the animals are property of the Commonwealth or are necessary

7    to an effective reorganization of the Commonwealth?

8        MR. ROSEN:  No, your Honor.  We do not maintain that

9    the Commonwealth has any equity in these animals, nor is the

10   property necessary for an effective reorganization.

11       THE COURT:  Thank you.

12       MR. ROSEN:  Our only point, your Honor, is that the

13   parties to whom he needs to get appropriate relief are not

14   parties to the judgment.  We've tried to maintain that all

15   along.  We don't have the animals.  That's all we say, Your

16   Honor.

17       THE COURT:  Okay.  So --

18       MR. ROSEN:  There's no effective relief in other

19   words.

20       THE COURT:  Alright.  Having listened carefully to the

21   statements in court here today, and having read the

22   submissions, and in light of the limited relief that is sought

23   by the movant, and the Commonwealth's acknowledgement that it

24   does not claim any right of ownership in the animals in

25   question, and that they are not necessary for its

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MB2DPROH

1    reorganization, the Court grants the motion from relief from

2    the stay to the extent that it is necessary to permit the

3    movant to seek to enforce the judgment ordering return of the

4    animals to the movant.  This relief is without prejudice to the

5    parties' positions and any rights that they may have with

6    respect to further appellate litigation of the judgment.

7            Is that language acceptable to the Commonwealth?

8            MR. ROSEN:  It is, Your Honor.

9            THE COURT:  Is that language acceptable to you,

10   Mr. Novas-Debien?

11           MR. NOVAS-DEBIEN:  Absolutely.

12           THE COURT:  Thank you.  The Court will enter an order

13   accordingly.  Thank you both very much.

14           MR. NOVAS-DEBIEN:  Thank you, your Honor.  Permission

15   to withdraw.

16           THE COURT:  Yes.  Thank you.  You may.

17           So the next and final set of contested matters are

18   Omnibus Objections to claims, beginning with the 453rd Omnibus

19   Objection to claim.

20           I understand that Mr. -- is it Mr. Esses?

21           MR. ESSES:  Esses.

22           THE COURT:  Mr. Esses will be speaking on behalf of

23   the Commonwealth.

24           Is the counsel for the objecting parties,

25   Ms. Hernandez-Rodriguez, here or in the San Juan courtroom?

MB2DPROH

1           Ms. Hernandez-Rodriguez, are you on the Court

2    Solutions line?  If you are, I'd like you to acknowledge that

3    and unmute and speak.

4           I will also note for the record that I do not see her

5    registered on the Court Solutions line.  So is there anyone in

6    either courtroom or on the Court Solutions line intending to

7    speak in opposition to the 453rd Omnibus Objection to claim?

8           Alright.  I hear no one.

9           Please go ahead, Mr. Esses.

10          MR. ESSES:  Thank you, your Honor.  For the record,

11   Joshua Esses of Proskauer Rose for the Oversight Board.

12          On the 453rd objection, I'll just explain what

13   happened, what's going on here, and the limited relief that

14   we're seeking.  The claimant Ms. Maria Figueroa-Torres filed

15   Proof of Claim No. 179281 asserting unpaid wages of

16   approximately $63,000 owed by the Department of Health, which

17   is an agency of the Commonwealth, and also against the Ponce

18   District Hospital, which is not a part of the Commonwealth for

19   these Title III cases.

20          The Oversight Board transferred that claim to ACR, and

21   after further review, bifurcated the claim into a claim against

22   the Department of Health and a claim against the Ponce District

23   Hospital, which we denoted as 179281-1.

24          The Board withdrew that claim, the new bifurcated

25   claim against the Ponce District Hospital from ACR, and the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1   453rd Omnibus Objection objected to it on the grounds it

2   doesn't assert liability against the Commonwealth.  The

3   claimant filed a response in essence saying it does assert a

4   liability against the Commonwealth, because the Ponce District

5   Hospital was, at the time of the contract and at the time of

6   the claimant's employment, a part of the Department of Health.

7        And what the other Oversight -- what the Oversight

8   Board intended to do is to allow that claim to proceed and fall

9   against the Commonwealth in the ACR process.  So, you know, I

10  want to emphasize to both your Honor and to the claimant that

11  every dollar the Commonwealth owes the claimant under

12  Commonwealth law in connection with her wage claim will be paid

13  as determined through the ACR process and this Court's ACR

14  order, but the proof of claim which we are asking you to

15  disallow in connection with this Omnibus Objection is simply

16  with respect to the claim asserted against the Ponce District

17  Hospital, which is not a part of these Title III cases.

18        So that's the relief that we're looking for today.

19        THE COURT:  So have you offered any proof -- I haven't

20  seen anything in the record that indicates that the Ponce

21  District Hospital at some point separated from the

22  Commonwealth.  My understanding of the objection was that you

23  were saying that, at some point, working for the Ponce District

24  Hospital was not the same as working for the Commonwealth.  I

25  didn't see anything in the record that explained when that
```

MB2DPROH

1   happened, what happened to the liabilities of the Ponce

2   District Hospital, and so I was not prepared to sustain this

3   objection.

4          It sounds today as though you may be saying something

5   different, which would be that the -- if you're working for the

6   Ponce District Hospital, you're working for the Commonwealth,

7   and so the claim should be against the Commonwealth and not the

8   Ponce District Hospital; and any compensation for that work

9   that is found to be owing would be a liability of the

10  Commonwealth.

11         MR. ESSES:  Yes, your Honor, to the extent that at the

12  time the claimant was working for the Ponce District Hospital,

13  the hospital was a part of the Department of Health and the

14  Commonwealth.

15         THE COURT:  So do you have anything that would

16  establish that at some point, some relevant point in time, the

17  Ponce District Hospital was not part of the Department of

18  Health of the Commonwealth?

19         MR. ESSES:  There's nothing that I could point to,

20  your Honor.  I would think that the burden would be on the

21  claimant to establish that the Ponce District Hospital was a

22  part of the Commonwealth at the relevant time.  But in either

23  case, we are prepared to allow every cent that the claimant is

24  owed under Puerto Rico law to -- by the Commonwealth for work

25  performed for the Ponce District Hospital in full through the

MB2DPROH

```
1    ACR process.
2              THE COURT:  Give me just one moment.
3              MR. ESSES:  Alternatively, your Honor, we're happy to
4    adjourn this to hopefully be resolved just through the
5    submission of papers that we can provide, the documentary
6    evidence with respect to whether or not the Ponce District
7    Hospital was a part of the Commonwealth at the relevant times.
8              THE COURT:  That would be a clearer and better way to
9    resolve this, and so this is adjourned pending supplementation
10   of the objection.
11             MR. ESSES:  Thank you, your Honor.
12             THE COURT:  If I establish a deadline of November 30th
13   for filing and service of the supplement, is that sufficient
14   time?
15             MR. ESSES:  Certainly.
16             THE COURT:  That is what we will do.  Supplemental
17   papers to be filed by November 30th.
18             So the next objection is the 492nd Omnibus Objection.
19             MR. ESSES:  Thank you, Your Honor.
20             I can report that the claimant -- claimant's counsel
21   confirmed to me via email this morning that they'll no longer
22   be pursuing that objection, so unless you have any questions
23   with respect to that, I have nothing further to add.
24             THE COURT:  So they're no longer opposing the
25   objection.
```

MB2DPROH

1          MR. ESSES:  Yes, your Honor.

2          THE COURT:  Alright.  So you're content to have me

3     rule on the papers on that?

4          MR. ESSES:  Yes, your Honor.

5          THE COURT:  Alright.  Before the Court is the 492nd

6     Omnibus Objection (Substantive) of the Commonwealth of Puerto

7     Rico, the Employees Retirement System of the Government of the

8     Commonwealth of Puerto Rico, and the Puerto Rico Highways and

9     Transportation Authority to Claims for which the Debtors are

10    Not Liable (Docket Entry No. 21741 in case 17-3283.  I'll call

11    it the "Omnibus Objection"), which is filed by the Oversight

12    Board.  This objection seeks disallowance of several proofs of

13    claim, including Proof of Claim No. 27270 filed by Downtown

14    Development Corporation, which I will sometimes refer to as

15    "DDC".

16          In opposition to the Omnibus Objection, DDC argues

17    that its claim is a valid obligation incurred by the

18    Commonwealth in connection with a lease dated September 5,

19    2014, which was referred to in a letter attached to DDC's proof

20    of claim, and which DDC filed with an amended proof of claim

21    and with its opposition to the Omnibus Objection.

22          The Court has carefully considered the pleadings

23    submitted by the Oversight Board and the DDC concerning the

24    Omnibus Objection, and, for the reasons that follow, the

25    Omnibus Objection is sustained and the proof of claim is

1    disallowed in its entirety.

2            Before I finish with this oral ruling, Mr. Esses, are

3    you saying that the response to the objection is being

4    withdrawn or that -- is there something in the record

5    withdrawing it, or they're just not showing up today and

6    they're resting on their papers?

7            MR. ESSES:  I think the latter is a fair description.

8            THE COURT:  Then I'll finish my ruling.

9            To begin with, the Court will not reject out of hand

10   all consideration of the September 5, 2014, lease agreement

11   submitted by DDC in response to the Omnibus Objection.  Case

12   law in this Circuit instructs courts to provide leave to amend

13   proofs of claim "freely . . . when justice so requires," taking

14   into consideration whether the amendment (i) is "a veiled

15   attempt to assert a distinctly new right to payment as to which

16   the debtor estate was not fairly alerted by the original proof

17   of claim," (ii) would result in unfair prejudice to other

18   holders of unsecured claims, and (iii) is "the product of bad

19   faith or dilatory tactics on the part of the claimant."  Gens

20   v. Resolution Trust Corporation, 112 F.3d 569, 575 (1st Cir.

21   1997).  Here, DDC does not seem to be asserting a new claim,

22   but rather further supporting and clarifying the basis of its

23   timely proof of claim.  The supplementation does not appear to

24   be the result of bad faith or dilatory tactics, and no creditor

25   would be unfairly prejudiced by the supplementation.  As such,

MB2DPROH

1    the Court will next consider the Omnibus Objection and the

2    validity of the Proof of Claim as supplemented by DDC.

3            "A proof of claim which comports with the requirements

4    of Bankruptcy Rule 3001(f) constitutes prima facie evidence of

5    the validity and amount of the claim."  In re Hemingway

6    Transport, Inc., 993 F.2d 915, 925 (1st Cir. 1993).  However,

7    if a debtor interposes an objection supported by "substantial

8    evidence," the burden of demonstrating the validity of the

9    claim shifts to the claimant.  Id.  And the Court stated "once

10   the trustee manages the initial burden of producing substantial

11   evidence, the ultimate risks of nonpersuasion as to the

12   allowability of the claim rests with the party asserting the

13   claim."

14           DDC's Proof of Claim asserts a claim for $38,385.19

15   against the Commonwealth.  According to DDC's response to the

16   Omnibus Objection, that amount allegedly represents the balance

17   of rent outstanding under the lease agreement between DDC and

18   the government dated September 5, 2014.  As evidence of the

19   amount of debt owed by the government, a "Tenant Ledger" is

20   annexed to the Proof of Claim.

21           Through the Omnibus Objection and the annexed

22   declaration of Jay Herriman, the Oversight Board has rebutted

23   the initial prima facie validity of the Proof of Claim, thereby

24   causing the burdens of proving the validity of the claim to

25   revert to DDC.  Specifically, the Oversight Board has

1    convincingly demonstrated that the Tenant Ledger does not

2    accurately represent the government's outstanding rent

3    obligations to DDC.

4            Apparently our AT&T line has gotten disconnected, so

5    we'll pause for a minute.  So they're going to try to reconnect

6    it, and I'll finish the ruling after that.

7            Mr. Esses, if you want to have a seat or continue to

8    stand, it's up to you.

9            (Pause taken)

10           THE COURT:  Okay.  I understand it is back up, so I

11   will finish making my ruling.

12           Commonwealth law is clear that no valid claim may be

13   asserted against the government for the use of leased premises

14   during a period when a written lease is not in effect.  See

15   Vicar Buildings v. Commonwealth of Puerto Rico, 192 D.P.R. 256

16   (P.R. 2015.)

17           A review of the Tenant Ledger shows that as of the end

18   of the 2009 lease between DDC and the government in June of

19   2014, the balance of rent owed by the government was zero.

20   (See page 15 of 26 of the Proof of Claim.)  Then, on each of

21   July 1, 2014, August 1, 2014, and September 1, 2014, the Tenant

22   Ledger added $17,993.33 to the balance allegedly owed by the

23   government.  Notwithstanding that, DDC has not alleged, much

24   less demonstrated that a lease agreement was in place at any of

25   those points.  Rather, it appears that a lease was executed on

MB2DPROH

1   September 5, 2014.  Thus, the Tenant Ledger appears to

2   incorrectly add approximately $38,385 to the balance of rent

3   owed by the government.  That amount represents $17,993.33 for

4   each of July and August of 2014, plus a prorated amount for

5   four days of September 2014.  Moreover, the Tenant Ledger

6   appears to demonstrate that the government paid rent in a

7   manner consistent with that state of affairs.  Page 5 of 26 of

8   the Proof of Claim, which is another page of the Tenant Ledger,

9   shows that check number 3253866 was in the amount of

10  $15,594.80, an amount that almost exactly corresponds to the

11  prorated amount that would have been due for the month of

12  September 2014, excluding the first four days of that month

13  when no lease was in effect.

14         DDC has submitted no evidence tying the outstanding

15  balance of rent allegedly owed to any period of time in which a

16  lease was in effect between DDC and the government.  Rather, it

17  appears that the most logical interpretation of the document

18  submitted by DDC is that the asserted debt corresponds to the

19  period when no lease was in effect, and DDC's Proof of Claim

20  attempts to carry forward that invalid debt.

21         Accordingly, DDC has not met its burden of

22  establishing the validity of its claim, and the Oversight

23  Board's objection is sustained in its entirety.  DDC's Proof of

24  Claim is therefore disallowed in its entirety.

25         Now, Mr. Esses, does this resolve the only pending

MB2DPROH                                                                    87

1    response to the Omnibus Objection?

2              MR. ESSES:  I believe that's right, and so we'll file

3    a notice of presentment with the Court -- or I should say we'll

4    submit a notice of presentment to your chambers.

5              THE COURT:  Yes.  So what I'll need is -- to the

6    extent that there's nothing else outstanding in the Omnibus

7    Objection, it's sustained in its entirety, and I ask that you

8    submit a Word version of the proposed order resolving the

9    Omnibus Objection to chambers.

10             MR. ESSES:  Certainly.  Thank you, your Honor.

11             THE COURT:  Thank you.

12             So that takes us to the 526th Omnibus Objection, which

13   is number 22259 in case 17-3283.

14             I am informed that Ms. Gonzalez-Morales left the

15   courtroom in San Juan.

16             MR. SKRZYNSKI:  Good afternoon, Your Honor.

17             THE COURT:  Good afternoon.

18             MR. SKRZYNSKI:  Matthew Skrzynski on behalf of

19   Proskauer Rose for the Oversight Board.

20             The 526th objection at ECF No. 22259 objected to

21   claims that assert liability in connection with the prepetition

22   case captioned Nilda Agosto-Maldonado, et al., v. The Puerto

23   Rico Family Department, et al., Case No. KPE 2005-0608.  I'll

24   refer to this as the Augusto-Maldonado litigation.

25             Plaintiffs' counsel has failed a master proof of claim

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MB2DPROH

1  on behalf of all plaintiffs in the litigation, and other

2  documents that identify the names of those plaintiffs.  This

3  objection identified claimants whose names did not appear on

4  the plaintiffs' list.

5        We did receive one response filed at ECF No. 22624

6  filed by two claimants, claimant Rivera-Garcia and claimant

7  Valle-Valdivieso.  As to claimant Rivera, which corresponds to

8  Proof of Claim No. 32127, we saw that counsel filed a request

9  to amend that proof of claim to change the name of the

10 claimant.  As noted in our reply, we did not object to that

11 name change and the Court has approved the claimant's request

12 for leave to amend at ECF 22771.  With that change to the proof

13 of claim, our objection is resolved as to Claim No. 32127.

14       As to claimant Valle, the corresponding Proof of Claim

15 No. 113154, counsel in their reply stated that the name Luz

16 Valle Valdivieso appears in the plaintiff list, but such name

17 still does not appear to be included.  For this reason, we ask

18 that the objection be sustained as to Proof of Claim No.

19 113154.

20       THE COURT:  Thank you.

21       Just to be clear, is there anyone appearing in San

22 Juan or on Court Solutions to speak in opposition to this

23 objection to claim?  If you're in San Juan, come to the podium.

24 If you are on Court Solutions, please unmute on your phone and

25 the Court Solutions dashboard and state your name.

1          I see no one at the podium or approaching the podium

2     in San Juan, and I hear no one speaking on Court Solutions, so

3     I will rule.

4          Before the Court is the 526th Omnibus Objection

5     (Substantive) of the Commonwealth of Puerto Rico and the

6     Employees Retirement System of the Government of the

7     Commonwealth of Puerto Rico to Claims for which the Debtors are

8     Not Liable (Docket Entry No. 22259 in Case No. 17-3283) filed

9     by the Oversight Board.  The Omnibus Objection seeks

10    disallowance of several proofs of claim, including the Proof of

11    Claim No. 113154 (the "Valle-Valdivieso Claim").  It had also

12    objected to the "Rivera-Garcia Claim," but with the amendment

13    of that claim, am I to understand correctly that the Oversight

14    Board withdraws that aspect of the 526th objection?

15         MR. SKRZYNSKI:  That's right.

16         THE COURT:  Thank you.

17         The Court has carefully considered the pleading

18    submitted by the Oversight Board and the claimant concerning

19    the Omnibus Objection and the arguments today.  And the Court

20    does expect that the order ultimately submitted concerning the

21    objection will reflect the withdrawal of the objection to the

22    Rivera-Garcia Claim.

23         So as to the Valle-Valdivieso Claim, the proof of

24    claim which comports with the requirements of 3001(f) of the

25    Bankruptcy Rules constitutes prima facie evidence of the

1    validity and amount of the claim, but if the Debtor proffers an

2    objection supported by substantial evidence, the burden of

3    demonstrating the validity of the claim shifts to the claimant.

4    In re Hemingway Transport, Inc., 993 F.2d 915, 925 (1st Cir.

5    1993).

6            The Valle-Valdivieso claim appears to be based upon

7    Ms. Valle-Valdivieso's status as a plaintiff who has obtained a

8    judgment against the government in the lawsuit captioned Nilda

9    Agosto-Maldonado, et al., v. Commonwealth of Puerto Rico Family

10   Department, et al. or the Agosto-Maldonado litigation.  But as

11   set forth in the Omnibus Objection and the Reply, and as

12   confirmed by the Court's own review of the exhibit to the

13   judgment submitted by Ms. Valle-Valdivieso in support of the

14   claim, her name does not appear among those of the plaintiffs

15   in the Agosto-Maldonado litigation.

16           The Oversight Board has, therefore, rebutted the

17   Valle-Valdivieso Claim's validity, and the claimant has not

18   proffered evidence that she has a valid claim against the Title

19   III debtors arising out of the Agosto-Maldonado litigation.

20   Accordingly, the Oversight Board's Omnibus Objection is

21   sustained as to the Valle-Valdivieso Claim, and that Claim,

22   which is number 113154, is disallowed in its entirety.

23           Does this resolve all of the outstanding matters with

24   respect to the 526th Omnibus Objection?

25           MR. SKRZYNSKI:  Yes, your Honor.  We are not aware of

MB2DPROH

1    any other responses.

2           THE COURT:  Very well then.  With the exception of the

3    withdrawn objection to the Rivera-Garcia claim, the Omnibus

4    Objection is sustained in its entirety and the Oversight Board

5    is directed to submit a Word version of a revised proposed

6    order resolving the Omnibus Objection to chambers.

7           MR. SKRZYNSKI:  We will.

8           THE COURT:  Thank you.

9           Now we have the 527th Omnibus Objection.

10          MR. SKRZYNSKI:  Your Honor, Matthew Skrzynski again

11   for the Oversight Board.

12          The last item on the agenda is the 527th objection to

13   claims at ECF No. 22261.  This objection partially objects to

14   claims to the extent that they assert liability in connection

15   with the *Agosto-Maldonado* litigation.  As with the prior

16   objection, the claimant's name does not appear on the

17   plaintiffs' list associated with such litigation that has been

18   filed by counsel.

19          THE COURT:  I need you to speak a little louder.

20          MR. SKRZYNSKI:  I will.

21          We received one response from claimant Sara

22   Cruz-Lorenzana, Proof of Claim No. 83256, filed at ECF No.

23   222429.  The claimant states that the proof of claim does not

24   state that the claimant is a plaintiff but rather the plaintiff

25   in another case.  As we pointed out in the reply however, the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MB2DPROH

1   debtors did have a concern that the proof of claim attaches a

2   debt certificate, and in the certificate of debt the claimant

3   lists two case numbers, one of those being KPE 20050008, which

4   has been identified by the debtors' advisors as being used in

5   other proofs of claim to reference the *Agosto Maldonado*

6   litigation.

7           So, in sum, the debtors do believe that the proof of

8   claim purports to assert some liability in connection with the

9   *Agosto Maldonado* litigation, and for this reason, we ask the

10  objection be sustained as to Proof of Claim No. 83256.

11          THE COURT:  So am I correct that you're asking me to

12  disallow Proof of Claim 83256 solely to the extent it asserts a

13  claim arising out of the *Agosto Maldonado* litigation?

14          MR. SKRZYNSKI:  That's correct.

15          THE COURT:  The objection is sustained in that limited

16  context, and so the objection is sustained as to the Sara Cruz

17  Lorenzana proof of claim to the extent that proof of claim

18  asserts any liability arising out of the *Agosto Maldonado*

19  litigation.

20          So I direct you, when the 527th Objection to Claims,

21  Omnibus Objection, is resolved in its entirety, to submit a

22  proper Word version of the order to chambers.

23          MR. SKRZYNSKI:  We will.

24          THE COURT:  Thank you.

25          MR. SKRZYNSKI:  Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MB2DPROH

1          THE COURT:  I think that concludes all of the matters

2     that were lined up to be addressed today.  Is there anything

3     further for the Court to take up?

4          Seeing no one volunteering to add anything, I thank

5     everyone who has appeared today for their arguments and

6     preparations to the Court.  This concludes the hearing agenda

7     for this to Omnibus Hearing.

8          The next scheduled Omnibus Hearing is December 14,

9     2022.  That hearing will begin at 9:30 a.m. Atlantic Standard

10    Time, which will by then be 8:30 Eastern Standard Time.  I will

11    notify the parties in advance of the hearing as to where I

12    intend to preside for that hearing.

13         As always, I thank the court staff in Puerto Rico,

14    Boston, and New York, who consistently do wonderful work in

15    support of all of these complex cases.  Stay safe and keep

16    well.  We are adjourned.

17         (Adjourned)

18

19

20

21

22

23

24

25