IN THE UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, ET AL.<br>Debtor.<br>_____<br><br>Maria Judith Diaz Castro<br>PLAINTIFF<br><br>V.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, COMMONWEALTH OF PUERTO RICO; JUAN J. COLON BAEZ; MARIO RIVERA GIEGEL, Esq; LUIS RIOS DIAZ, Esq.; LUIS NAVAS DE LEON, Esq.; LEILANY CARRION DEL TORO, Esq., **Sergio Rubio Paredes, Esq., Emilio Aril Garcia, Esq.,** SHARON PLACERES SAENZ, John Does 1-10<br><br>DEFENDANTS | PROMESA Title III<br><br>Case No.: 3:17-BK-3283 (LTS)<br><br>Adversary No. 22-00054-LTS<br><br>**FIRST AMENDED**<br>**COMPLAINT TO LIQUIDATE CLAIM AND/OR TO DETERMINE DISCHARGEABILITY OF DISPUTED UNLIQUIDATED CLAIM**<br>**And/Or Lifting the Automatic Stay** |

I.    **ADVERSARY PROCEEDING COMPLAINT**
II.   **JURISDICTION AND VENUE**
III.  **INTRODUCTION / MEDIA COVERAGE**
IV.  **THE PARTIES TO THE CIVIL RIGHTS LAWSUIT**

V.    **FACTS:** Plaintiff's Wrongful Felony Conviction in 2003 & Over Ten Years of Unlawful Incarceration

   **A.** APRIL 1999 ROOSTER FIGHTING COMPETITION & DOUBLE HOMICIDE

1

B. INVESTIGATION BY LEAD DETECTIVE FIGUEROA:   MULTIPLE
EYEWITNESSES CREDIBLY IDENTIFY A PRIMARY SUSPECT; WITNESSES
FEAR TESTIFYING OUT OF RETALIATION; **REASSIGNMENT OF
INVESTIGATION TO DETECTIVE COLON BAEZ AND HIS TWO
PREVIOUSLY UNKNOWN PURPORTED WITNESSES**

C. DETECTIVE FIGUEROA'S TESTIMONY AT THE 2003 TRIAL – PREVIOUSLY
UNDISCLOSED EXCULPATORY EVIDENCE

D. THE COMMONWEALTH'S NEW SURPRISE WITNESS SHARON PLACERES
FALSELY ALLEGES, AT THE 2003 TRIAL, A PURPORTED CONSPIRACY
INVOLVING PLAINTIFF; WITNESS YAHAIRA SOTO, WHO WOULD LATER
RECANT, CORROBORATES THE TESTIMONY

## VI.   The APPEALS, HABEAS CORPUS, & POST-TRIAL MOTIONS

A. 2005 STATE COURT APPELLATE REVIEW AND FINDINGS
**B.** 2010 FEDERAL HABEAS CORPUS
**C.** 2013 MOTION FOR A NEW TRIAL IN STATE COURT
D. LOWER COURT GRANTS NEW TRIAL IN 2015, FINDS VIOLATIONS OF
PLAINTIFF'S CONSTITUTIONAL RIGHTS

## VII.   2016 RETRIAL – COMMONWEALTH WITNESS YAHIRA SOTO RECANTS, ALL CHARGES DROPPED

## VIII.   CIPA ADMINISTRATIVE HEARINGS & LEAD DETECTIVE FIGUEROA'S AFFIDAVIT INCULPATING DEFENDANTS HEREIN; AFFIDAVIT OF DEFENDANT COLON BAEZ

## IX.   PLAINTIFF'S SUBSEQUENT 42 USC §1983 CIVIL RIGHTS ACTION of 2016 & THE AUTOMATIC STAY

**A.** Causes of Action Averred
**B.** Filings in The District Court of Puerto Rico

2

**C.** Automatic Stay

**X.    THIS COURT'S RULING IN 2017 DENYING THE MOTION TO
       LIFT THE AUTOMATIC STAY, AND REQUIRING THAT THE
       CLAIM BE LIQUIDATED IN THIS FORUM**

**COUNT I - <span style="color:red">LIQUIDATION OF DISPUTED CLAIM</span>**

**COUNT II – <span style="color:red">EQUITABLE NON-DISCHARGEABILITY OF
INTENTIONAL TORT</span>**

**COUNT III – <span style="color:red">JOHN DOES 1-10</span>**

# I.
## ADVERSARY PROCEEDING COMPLAINT

Plaintiff, Maria Judith Diaz Castro, brings this adversary proceeding seeking liquidation of her disputed claim, an order determining that the claim(s) by the Plaintiffs against Defendants in Action 3:16-cv-02873-SCC ("civil rights action of 2016", **Exhibit A,** Oct. 25, 2016 Complaint) are excepted from discharge, and/or an order lifting the automatic stay.

## II. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. § 523. This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

2. Venue in the District of Puerto Rico is proper under 28 U.S.C. § 1409(a).

3. This Adversary Proceeding relates to *In re Commonwealth of Puerto Rico*, No. 3:17-BK-3283 (LTS) now pending in this Court (the "Bankruptcy Case"). Plaintiffs hold a general unsecured, unliquidated, and disputed claim against the Debtor pursuant to a case styled *Maria Judith Diaz Castro v. Commonwealth*, et al, Docket No. 3:16-cv-02873-SCC (the "Civil Rights Lawsuit"). A copy of the Civil Rights Lawsuit is attached and incorporated as **Exhibit A**.

4. A Proof of Claim in this matter was filed on May 24, 2018 in the amount of $**30,000,000.00 dollars**. **Exhibit B**.

5. A motion to lift the automatic stay was filed in August of 2017, and denied on August 29, 2017. **Exhibit C**. (Order Denying Lifting of Stay)

4

### III.  INTRODUCTION

### Plaintiff's Wrongful Incarceration in the Media

6. This matter stems from the reckless and/or intentional wrongful prosecution and decade-long incarceration of plaintiff from 2003 to 2016 for a heinous crime Commonwealth of Puerto Rico prosecutors knew she did not commit.

7. Plaintiff's case received widespread media attention from 2003 to 2016.[1]

8. Upon her release in 2016, plaintiff was hailed throughout the Commonwealth as having overcome a grave injustice:



Source: https://www.pressreader.com/puerto-rico/primera-hora/20160120/281921657054313 :

---

[1] See, e.g, https://www.primerahora.com/opinion/jay-fonseca/columnas/gatilleros-el-caso-de-maria-judith-diaz-castro/ and https://www.elnuevodia.com/noticias/tribunales/videos/maria-judith-diaz-castro-sale-de-la-carcel-192453/.

9.  Commonwealth media praised her for her courage, and celebrated her freedom:



Source: https://www.pressreader.com/puerto-rico/primera-hora/20160119/282059096005796

10. Upon her release in late 2016, plaintiff filed suit in the District Court for the District of Puerto Rico, *infra*, and she now seeks to have her rights adjudicated in light of Puerto Rico's PROMESA proceedings.

### IV.  THE PARTIES TO THE CIVIL RIGHTS LAWSUIT

11. Plaintiff,  **Maria Judith Diaz Castro**, is a resident of Puerto Rico and a plaintiff in the federal civil rights lawsuit of 2016, which entails a 2003 wrongful conviction and a one hundred-year sentence, followed by nearly 13 years of incarceration  and her subsequent release from prison in 2016, after a retrial involving a recanting

witness which forced Commonwealth prosecutors to dismiss all charges against her.   During her wrongful incarceration, she suffered physical and emotional trauma.

12. The **Commonwealth of Puerto Rico** was at all times material to the facts alleged in the civil rights complaint, the employer of the Puerto Rico police agents and prosecutors who negligently and/or maliciously instigated a   criminal action against plaintiff Maria J. Diaz Castro in 2003 for a crime she did not commit.

13. Detective  **Juan J. Colon Baez ("Juan Colon")**, a **defendant** in the civil rights lawsuit of 2016, is a former homicide detective who in 1999 investigated a double murder and wrongfully prosecuted plaintiff herein, despite compelling proofs depicting her innocence, as depicted in an affidavit executed by lead detective **Hector Figueroa**, who was the first to investigate the crime.    Mr. Baez based his wrongful prosecution on the testimony of two previously unknown "surprise" witnesses, one of whom was under a plea deal as part of a separate prosecution.

14. **Mario Rivera Giegel**, **Esq.** ("**Mario Rivera**")  a **defendant** in the civil rights lawsuit of 2016, is a State Prosecutor for the Commonwealth of Puerto Rico, who investigated and wrongfully prosecuted plaintiff Maria J. Diaz Castro in 2003 while acting under color of state law.

15. **Luis Rios Diaz**, **Esq.** ("**Luis Rios**")  a **defendant** in the civil rights lawsuit of 2016,  is a State Prosecutor for the Commonwealth of Puerto Rico, who investigated and wrongfully prosecuted plaintiff Maria J. Diaz Castro in 2003 while acting under color of state law.   *More specifically, prosecutor Luis Rios was directly responsible for the suppression of exculpatory evidence which may have resulted in a not guilty verdict had it been presented to the 2003 jury.*

**16.**     **Luis Navas De Leon**, Esq. ("**Luis Navas**")  a **defendant** in the civil rights lawsuit of 2016,  is a State Prosecutor for the Commonwealth of Puerto Rico, who investigated and wrongfully prosecuted plaintiff Maria J. Diaz Castro in 2003 while acting under color of state law.

17. **Leilany Carrion Del Toro, Esq.  ("Leilany Carrion")**, a defendant in the civil rights lawsuit,  is a State Prosecutor for the Commonwealth of Puerto Rico, who investigated and wrongfully prosecuted plaintiff Maria J. Diaz Castro in 2003 while acting under color of state law.

*18.***Sergio Rubio Paredes, Esq. ("Sergio Rubio")** a defendant in the civil rights lawsuit of 2016,  is a State Prosecutor for the Commonwealth of Puerto Rico, who investigated and wrongfully prosecuted plaintiff Maria J. Diaz Castro in 2003 while  acting  under  color  of  state  law  and  *who received specific credible information from various sources and in various occasions that the double murder of April 1999 was likely committed by another suspect known as "Pijuan."* **Per an affidavit of July 15, 2010, defendant (detective) Colon Baez specifically indicated that Prosecutor Paredes was responsible for the selection of the trial witnesses.**

*19.***Emilio Aril Garcia, Esq. ("Emilio Aril")** a defendant in the civil rights lawsuit of 2016,   is a State Prosecutor for the Commonwealth of Puerto Rico, who investigated and prosecuted plaintiff Maria J. Diaz Castro acting under color of state  law and who received specific information from various sources and in various occasions that the murder of Efrain Pena Dieppa and Julio Luyando was committed by individuals known as "Pijuan" and "Falo." **Per an affidavit of July**

8

15, 2010, defendant (detective) Colon Baez specifically indicated that Prosecutor Garcia was also responsible for the selection of the trial witnesses.

20. **Sharon Pláceres Sáenz ("Sharon Placers")** was the Commonwealth's "surprise" witness at plaintiff's 2003 trial, who fabricated a murder conspiracy against plaintiff and her siblings in an effort to secure her own plea deal in a separate prosecution.

## V. BACKGROUND/FACTS
### Plaintiff's Wrongful Felony Conviction in 2003 Followed by Over Ten Years of Unlawful Incarceration

### A.
### APRIL 1999 ROOSTER FIGHTING COMPETITION & DOUBLE HOMICIDE

21. On April 7, 1999, one "Efrain Dieppa AKA Pito Bracer" and one "Julio Luyando" were both fatally gunned down in a rooster fighting establishment in the township/municipality of "Naguabo" in the Commonwealth of Puerto Rico.

22. The two victims were spectators in a gambling establishment which was hosting a rooster fighting sports betting venue, a traditional albeit controversial Puerto Rican pastime, when one or more assailants entered and fired the fatal shots.[2]

---

[2] See https://www.primerahora.com/opinion/jay-fonseca/columnas/gatilleros-el-caso-de-maria-judith-diaz-castro/. (Spanish Media Website *Primera Hora*, January 17, 2016). See also *PR v. Castro el al*, 2005 PR App. LEXIS 3891 (2005).

23. Per the trial testimony of the *first* detective at the crime scene, *to wit* detective Jose Rodriguez, the manager of the sports-gambling venue observed *multiple* assailants entering the premises. See <u>PR v. Castro et al</u>, 2005 PR App. LEXIS 3891 (2005), none of whom were ever identified as being plaintiff herein.

24. Detectives **José David**, Detective **Julio Sánchez ,** Sargent Orlando Arroyo, detective Juan García, Detective Ramón Ortiz, and *lead* detective **Héctor Figueroa** – a **whistleblower** who authored an affidavit incriminating defendants herein - constituted the first group of detectives assigned to investigate the horrendous assault. <u>Ibid.</u>

25. A Commonwealth **prosecutor,  Ms. Cruz Oquendo,** was also present at the crime scene on the first day,  and took charge of the investigation along with lead Detective Hector Figueroa. <u>Ibid</u>.

**B**.

Investigation by Lead Detective Figueroa: Multiple Eyewitnesses Credibly Identify a Primary Suspect; Witnesses Fear Testifying out of Retaliation**; Reassignment of Investigation to Detective Colon Baez And His Two Previously Unknown Purported Witnesses**

26. Lead homicide detective **Hector Figueroa – a whistleblower who authored an affidavit on plaintiff's behalf -** initially investigated the crime *for over six months* and, based on credible first-hand eyewitness accounts, identified one "Pijuan" as the prime suspect, and one "Falo" as a potential suspect or a "person of interest".

27. In his sworn affidavit dated **October 19, 2016**, **the contents of which are hereby adopted as allegations herein unless otherwise stated**, resulting from his interview in connection with a "CIPA" administrative proceeding[3], lead detective and whistleblower Hector Figueroa asserted under oath that on the date of the crime, he visited the crime scene accompanied by detectives Julio Sanchez and Garcia Cepeda.

28. Per his affidavit, he then interviewed numerous eye witnesses, including the owner of the gambling venue, a minor later identified as **Julio Santiago** who had witnessed the shooting, and one **Juan Luquis Rosario,** who sat between the two victims and had also suffered a bullet wound.

---

[3] CIPA is a Commonwealth administrative agency charged with adjudicating complaints against law enforcement personnel. Website: https://agencias.pr.gov/agencias/cipa/Pages/default.aspx

29. As per detective Figueroa's affidavit, the minor Julio Santiago  identified the shooter as one "Pijuan", someone Santiago knew from prior interactions.

30.    **In his own affidavit of July 16, 2013 used in a collateral attack to request a retrial– Mr. Santiago stated he saw Pijuan enter the premises, and then begin shooting,  alongside <u>multiple</u> assailants with firearms**, a statement which is **hereby adopted as an allegation herein.**

31.    **Mr. Santiago in his affidavit further stated, and plaintiff hereby adopts as an allegation herein, that murder victim** Efrain Dieppa AKA Pito Bracer **identified "Pijuan" as his  sworn enemy and that,  having observed plaintiff's siblings, made no such reference to them and seemingly did not recognize them.**

32. In fact, Detective Figueroa's whistleblower affidavit asserts that most of the people interviewed that day also identified "Pijuan"  - a person known in the community - as the culprit or shooter.

33. However, these potential witnesses initially feared making formal statements out of  concern the assailant would  seek retaliation.

34. Mr. Figueroa in his affidavit thus stated that he eventually met with the minor, Julio Santiago, at the prosecutor's office, and was informed by his step-father that Mr. Santiago would not be involved in this case.

35. As "Pijuan" would eventually perish in an unrelated incident, both Julio Santiago, *supra*, as well as Juan Luis Rosario would eventually author affidavits on behalf of plaintiff.

36. Juan Luquis Rosario - who sat between two of the victims and also suffered bullet wounds – in his 2009 affidavit in fact claimed that he was *never* called as a witness at the 2003 trial, despite being a prominent eye witness and victim of the shooting.

### Reassignment of Investigation to New Detective Juan Colon Baez

37. Mr. Figueroa in his whistleblower "CIPA" affidavit further stated that he was removed from the case six months after beginning his investigation (having identified "Pijuan" as the prime culprit), because of some *unrelated* "incident", and that the case was reassigned to Detective **Juan Colon Baez**, defendant herein.

38. Mr. Figueroa then asserted that he visited the crime scene with prosecutors **Emilio Aril & Sergio Rubio Paredes**, defendants herein, and newly-assigned lead detective Juan Colon Baez, **as well as <u>a new "mystery" witness who had her face covered</u>**.

39. Mr. Figueroa then informed the new detective (Juan Colon Baez) and the prosecutors that the minor he had interviewed at the crime scene on the date of the murderers, Julio Santiago, was now willing to testify.

40. Mr. Figueroa further asserted in his affidavit that the prosecutors and/or detective **Juan Colon Baez advised him to "forget about" the eye witnesses** identifying "Pijuan"  - discarding altogether known, credible,  leads.

41. The anonymous witness who visited the crime scene, upon information and belief was defendant **Sharon Placeres,** who would provide  the new prosecuting team and the new detective with a new version of the events – an alleged conspiracy involving plaintiff, her siblings, and a triggerman purportedly named "Cas".

42. This new (false) account of the crime as per recently-identified witness Sharon Placeres was corroborated at the 2003 trial by Yahaira Soto, also previously unknown, who would recant at the re-trial in 2016.

43. In return for this false testimony, this new witness  (Sharon Placeres) would, upon information and belief, get leniency in an unrelated prosecution in which she was the primary defendant.

**C.**
**2003 Trial**
Detective Figueroa's Testimony &
Previously Undisclosed Exculpatory Evidence

44. At plaintiff's 2003 trial, Detective Figueroa testified that he had prepared a **Supplementary Report  setting forth** the interview with the minor witness – Julio Santiago,  who had credibly identified "Pijuan" as the assailant.

**45.Unless otherwise stated, Figueroa's trial testimony as set forth in this complaint is hereby adopted in its entirety as allegations herein.**

46. Detective Figueroa further testified that Mr. Santiago was able to identify the culprits … and that Santiago did not inculpate plaintiff or her siblings as having committed the crime.

47.Detective Figueroa then testified at the 2003 trial that Mr. Santiago had identified one "Pijuán" as the assailant, a person known in his community.

48.Per the Figueroa affidavit, Mr. Santiago was then  interviewed at the CIC, the Puerto Rico Police Headquarters,  and his stepfather advised Mr. Figueroa that Santiago was a minor and would not cooperate with the investigation.

49.This fact was then communicated to Commonwealth Prosecutor Oquendo.

50. Mr. Figueroa then testified that the **report** he had prepared in connection with Julio Santiago was submitted to the Humacao CIC  (Commonwealth Police).

**51.This testimony, upon information and belief, marked the first time plaintiff's defense team became aware of the Julio Santiago exculpatory evidence, which exculpatory evidence had been previously generally requested and denied by the Commonwealth.**

52. Mr. Figueroa further testified at trial that he investigated the matter for over six (6) months,  and the investigation was then reassigned to detective Colón Báez.

53. The report he prepared was not produced as exculpatory evidence which had been requested by plaintiff's lawyer (Huertas), the appellate division in 2005 having found that the report was not in the possession of the Commonwealth prosecutors, *infra*.

54. In addition, plaintiff's attorney (Huertas) authored a subsequent affidavit on October 30, 2015, *infra*, in which he stated that an exculpatory statement by decedent's mother, to wit **Yolanda Dieppa**, in which she adamantly claimed "Pijuan's" involvement in the murder, while **specifically exonerating plaintiff**, was never provided to plaintiff and was therefore not referenced at trial.

## D.
### 2003 Trial –Commonwealth's New Star Witness, Sharon Placeres, Falsely Alleges A Conspiracy Involving Plaintiff; Witness Yahaira Soto, Who Would Later Recant, Corroborates Testimony

55. Sharon Placeres, the Commonwealth's "star" witness, testified at trial that she was allegedly privy to a purported discussion between plaintiff's sibling and one of the victims, "Pito Bracer", regarding an illicit narcotics distribution point.

56. Per Ms. Placeres, the victim "Pito Bracer" was then told by plaintiff's siblings that he was not permitted to transact business at a location he had suggested, and the victim, Mr. Bracer expressed agreement.

57. Notwithstanding, per the testimony of Ms. Placeres,  plaintiff's siblings allegedly conspired to  assassinate Mr. Bracer at the rooster fighting establishment.

58. Ms. Placeres testified that on the day of the crime, plaintiff's siblings visited the rooster sports fighting venue (crime scene) along with plaintiff.

59. This was followed by interactions with the purported hitman, one "Cas", and subsequently the shootings.

60. The following is a verbatim translation or interpretation of the appellate division's 2005 recitation of Sharon Placere's trial testimony:

> *Sharon… stated that she was present when the victim Pito Bracer told [plaintiff's] brothers Edwin, David (Fito) and Raúl Díaz Castro, that he was going to set up a drug store in the El Rincón de La Paz, territory already occupied for the transfer of drugs by the Díaz Castro brothers. ...That they told Pito that he was not going to set up a drug store in [\*18] that place. After **Pito Bracer agreed** that he would not and left the scene, the Díaz Castro brothers conspired to "get him out of the way or kill him." They agreed that they would invite Pito to the galley, since he was a fan of that sport. ...She asserted that a few weeks later David told her that she was going to the galley, that he had invited Pito to the galley and that together with his brothers he had planned Pito's execution....On the day of the events, he went to the [crime scene] in David's car with him. [plaintiff] María Judith and Edna got into another car with Raúl. Upon reaching the [crime scene] they met Edwin and his cousin Yahaira. The women went to the upper seats.*

> *Then he went down to the hall, David told him that he will stay in the hall that he would make a call. David told him that he had called his friend and that he was on his way. Then Cas came in with another [man]. ...When he arrived he greeted them and María Judith and Edna pointed to Cas, Pito Bracer as the person to be executed. .... David (Fito) ... gave Cas the weapon (a nickel-plated pistol with wooden handles) with the Díaz Castro brothers and the witness present. .... That gun was David's, he had seen it before. Cas backed away and David pulled her over and told her not to go get shot because they were going to do the job, he took her by the hand and she heard the first shot. He left with David outside and Judith, Ñeca and Raúl came out after him.*

*When he was outside he heard several shots. The shouting was heard..and people began to leave. She, David, Raúl, María Judith and Edna Iris met outside. Then Cas and his friend came out. The first told David and Raúl that he had done the work, that they get paid. María Judith took out $2,000 from a black bundle and counted it together with Edna in bales of a hundred and gave them to her .... Cas asked David for the gift he had been offered, referring to a gun. They told him that they would give it to him later. Cas and his friend left in a Kia car. ..*

*Edwin was in the "bleachers" with Yahaira. She left with David and Ñeca, María Judith and Raúl left in another car. Then Edwin arrived and told David and Raúl that Cas had done [\*20] the job, but that an innocent person, a merchant, had died. The witness admitted that she told the authorities what happened because an innocent person died and **because she was caught in connection with some murder cases in Caguas**. ... In the cross-examination, she asserted that she did not say anything until 2002 because the appellant David had threatened her, although she admitted that she did not say anything about the threats in one of the sworn statements she gave on the facts. She asserted that the appellant threatened to take "the fucking boy" out of her, since she was pregnant at that time. ....*

*PR v. Castro el al*, 2005 PR App. LEXIS 3891 (2005).

61. One **Yahaira Soto**, another "surprise" star witness who would later recant in 2016, corroborated the foregoing testimony of Sharon Placeres at the 2003 trial.

**62.     As a result of this testimony, plaintiff was found guilty and sentenced to over 99 years of incarceration, and proofs regarding her innocence, e.g. testimony regarding "Pijuan", including the Dieppa statement and Julio Santiago's testimony, was not considered by the jury.**

## VI. The APPEALS, HABEAS CORPUS, & POST-TRIAL MOTIONS –

### A. 2005 Appellate Review and Findings

63. The Commonwealth appellate court in 2005, *PR v. Castro el al*, 2005 PR App. LEXIS 3891 (2005), reviewed plaintiff's challenges to the guilty verdict, and specifically commented on the exculpatory evidence which first came to light during the trial – the Hector Figueroa report and/or his knowledge regarding credible eyewitnesses who had identified "Pijuan" as the primary culprit.

64. At the time of the 2005 appeal, plaintiff was not aware of the exculpatory Dieppa statement, which was the subject of the 2015 motion for a new trial, *infra*.

65. The appellate court, *PR v. Castro el al*, 2005 PR App. LEXIS 3891 (2005), thus considered whether a new trial was warranted in light of the recently acknowledged exculpatory report by detective Hector Figueroa, and/or in light of the recently revealed exculpatory statement obtained by detective Figueroa regarding minor Julio Santiago, who had identified another shooter.

66. In finding that the concealment of these items did not warrant a new trial, the Court held as follows (translated or interpreted from Spanish to English):

> *The appellants argue that certain vague, imprecise and uncorroborated information provided by agent Figueroa Torres, regarding the fact that a minor who was[at the crime scene] next to the deceased Julio Luyando Carmona, told him that a certain Pijuán was the one who murdered Pito Bracer due to personal quarrels and Mr. Luyando Carmona....... turned out to be **exculpatory evidence**; that he knew because he lived in the same sector as this Pijuán. ................*

> *We have reviewed the testimony of agent Figueroa Torres, in light of the appellants' request for exculpatory evidence referred to under Rule 95 of Criminal Procedure, 34 L.P.R.A. Ap. II R. 95.* ***We determined that such evidence was not in the possession of the Public Ministry, nor did it exist, it came to light during the testimony of agent Figueroa Torres*** *… The testimony of agent Figueroa Torres was approved by the jury together with the other testimonies and the evidence presented and admitted, producing the aforementioned verdict. In consideration of which the error was not committed.*

<u>*Ibid*</u>.

67. Notably, the Commonwealth appellate court in 2005 found that the exculpatory evidence was not in the possession of the Commonwealth prosecutors prior to the 2003 trial.

68. Upon information and belief, the numerous other affidavits authored after this 2005 appeal, as well as other new evidence, depicts that in fact Commonwealth prosecutors were in the possession, or had knowledge of, the exculpatory Figueroa report, as well as the "Dieppa" statement, *infra*.

69. In fact, in his 2016 affidavit, detective Figueroa asserted that the prosecution was specifically made aware of the Julio Santiago exculpatory evidence, *supra*, a statement which is hereby incorporated as an allegation herein.

## B. 2010 Habeas Corpus

70. Plaintiff in 2010 filed a *pro se* habeas corpus petition with the District Court of
Puerto Rico.   The District Court, however, found that plaintiff had not:

> exhausted all state remedies, depriving this Court of jurisdiction over the present
> case. Moreover, Petitioner has not opposed Defendants' motion to dismiss nor
> shown any reason for exempting her from the exhaustion requirement.[1] As such, this
> Court must dismiss her habeas corpus petition for failure to exhaust state court
> remedies.

> *Diaz-Castro v. Roman-Roman*, 683 F Supp 2d 189 (Dist. PR, 2010).

71. The District Court then set forth the procedural posture of the case, and collaterally
also found that the **habeas petition was time-barred,** *to wit*:

> Petitioner was sentenced on June 23, 2003. She then filed an appeal to the Puerto
> Rico Court of Appeals which was denied on December 12, 2005. Her subsequent
> motion for reconsideration to the appeals court was denied on March 3, 2006.
> Petitioner's writ of certiorari to the Puerto Rico Supreme Court was also denied on
> June 2, 2006. Finally, Petitioner sought reconsideration, and was denied such relief
> on July 21, 2006, and once again on August 21, 2006. Therefore, the State court's
> final judgment was final as on or around August 21, 2006. Since there is no evidence
> that Petitioner initiated any other post-conviction or collateral review of her
> conviction, the one-year period of limitations began on or around August 22, 2006.
> As such, Petitioner should have filed the instant petition on or around August 22,
> 2007.

> Ibid.

## C. July 19, 2013 MOTION FOR A NEW TRIAL

72. While incarcerated, plaintiff on July 19 2013, filed a second motion for a new trial, the first one having been filed immediately after the 2003 trial and denied on appeal.

73. The following witnesses provided new certifications on behalf of plaintiff, which supported the proposition that Commonwealth prosecutors did not disclose exculpatory evidence and selectively and wrongfully prosecuted plaintiff based solely on a purported conspiracy set forth by the testimony of Sharon Placeres, who had been under indictment and a plea deal to testify, along with Yahaira Soto, who had been threatened or coerced to testify, to wit:

    i.  **Nilsa Dieppa**, mother victim Efrain Dieppa– stated under oath that the culprit was likely "Pijuan", an adversary of the victim, and <u>not</u> plaintiff.

    ii.  **Nancy Dieppa**, sister of victim Dieppa – stated that the culprit was likely "Pijuan", since victim Efrain Dieppa had an altercation with him one week prior to the shooting. She was not called as a witness at trial, and detective/defendant Juan Colon Baez was aware of her potential testimony.

    iii.  **Miguel Rivera Serrano**, Eyewitness – declared under oath that he saw the Diaz brothers (e.g. plaintiff) leave the rooster establishment at 8pm, and at 10pm saw 8 to 10 armed people, some with face coverings, storm into the building. He did not see plaintiff or her siblings among the assailants.

iv.  **Harry Ocasio**, Eyewitness- one of the managers of the rooster fighting/gambling establishment, declared under oath  that he was not interviewed by the police and that the Diaz brothers (e.g. plaintiff) left at 8pm and never came back.  He further asserted that his testimony contradicts the Commonwealth's star witness, *Sharon Placeres*, who had  placed plaintiff at the scene at 10pm.

v.  **Hermes Castro (minor)**, a patron,  Mr. Castro asserted under oath that the purported triggerman "Cas," identified by star witness Sharon Placeres, was not present at the crime scene.   He further asserted that plaintiff and siblings left at 8pm, and  never returned. He was not interviewed by police.

vi.  **Adaberto Gonzalez**, Eyewitness.  A patron,  Mr. Gonzalez was interviewed by police but was never called as a witness.   Mr. Gonzalez firmly asserted that  plaintiff was not at the crime scene at the time of the shooting.

vii.  **Victor Delgado**, a patron,  asserted that  plaintiff left at 8pm.  He then asserted that  he and plaintiff's siblings went to play billiards elsewhere  prior to the shooting,  thus constituting **an alibi** the jury was not made aware of.

viii.  **Julio Santiago** (Minor) –  He was near the two deceased victims, and also in the vicinity of witness-victim Juan Luquis Rosario. One of the victims (Efrain, aka "Pito Bracer") uttered that "there goes my enemy"  - referring to "Pijuan".  That "Pijuan" then fired… and then left… That the Diaz brothers were not there as they had left at 8pm.. That he's certain the culprit was "Pijuan" (who was never investigated)…That he did not testify previously as he was afraid for his life…

23

**74.** **In addition to the foregoing,  plaintiff's defense counsel, Luis Huerta, Esq., authored an affidavit  dated October 30, 2015  in which he stated inter alia that he (generally) requested, and was denied, exculpatory evidence.**

**75.** **He would later discover that such evidence did in fact exist, and that the Commonwealth never provided same to defense counsel Huerta.**

76.   Specifically,  defense counsel in his affidavit stated that he did not receive a sworn statement dated Feb 6, 2003,  made by one of the victim's progenitors prior to trial, to wit Nilsa Yolanda Dieppa, in which she had stated that she was convinced of plaintiff's innocence, as the likely culprit was an individual known as "Pijuan" - who had also been identified by eyewitnesses to the crime as per lead Detective Hector Figueroa.

**77.**   **Further, defense counsel Mr. Huerta had *specifically* requested exculpatory evidence (in general terms), and Commonwealth prosecutor Emilio Garcia in responded by claiming that they had no such exculpatory evidence in their possession.**

78.   Mr. Huerta further set forth in his affidavit that the first time he became aware that prosecutors had withheld this exculpatory evidence was at a meeting on September 16, 2014.

79.   Defense counsel Mr. Huerta then asserted that the nondisclosure or concealment of this significant exculpatory evidence constituted a violation of plaintiff's substantive and procedural Due Process rights.

### D. LOWER COURT GRANTS NEW TRIAL IN 2015, FINDS VIOLATIONS OF PLAINTIFF'S CONSTITUTIONAL RIGHTS

80. On May 29, 2015 the lower trial Court granted plaintiff a new trial as per plaintiff's July 19 , 2013 motion.

81.     **In doing so, the lower Court in its May 29, 2015 order explicitly found that plaintiff's constitutional rights had been violated, *to wit* (translated or interpreted from English to Spanish):**

> *We must consider the issue regarding witness Julio Santiago Medina.... This witness was **a minor** on the date of the crime, and was interviewed by lead Detective Hector Figueroa before the trial.. Detective Figueroa at the trial testified that, not only did he interview Mr. Santiago (as part of his investigation), but he also **placed Commonwealth Prosecutor Cruz Oquendo on Notice of same**...When detective Figueroa was asked regarding Mr. Santiago's statements at the 2003 trial, Commonwealth Prosecutor Rios objected, thus preventing the defense from [hearing]  Mr. Santiago's exculpatory testimony. Even more damaging to defendants, prior to trial the Commonwealth prosecutors had first-hand evidence from Detective Hector Figueroa regarding Mr. Santiago's exculpatory testimony,  and they did not give this evidence the due attention it merited in a case of this magnitude, and this evidence was withheld from the defense in violation of Rule 95 and **in violation of [plaintiff's] procedural and substantive due process rights**. Detective Figueroa further testified at trial that he had prepared a **supplementary report** setting forth this exculpatory testimony, and this report mysteriously disappeared.*
> *......*
> *Having considered the proofs proffered  by the defense, particularly the **testimony of Nilsa Yolanda Dieppa and Julio Santiago Medina,** and having considered the parties' arguments,  and the moving papers in light of Criminal Procedure Rule 95... this Court finds that there exists a sufficient basis for a new trial, given the Commonwealth's obvious violation of [plaintiff's] due process rights, as it did not disclose exculpatory evidence which could have*

*given rise to reasonable doubt... a new trial will be scheduled for July 6, 2015...”*

**82. Plaintiff hereby adopts these trial court findings as allegations herein.**

## VII. 2016 Retrial
## Commonwealth Primary Witness Yahaira Soto Recants, All Charges Dropped

83. Plaintiff's re-trial, originally set for July 6, 2015, began in January of 2016.

84. One of the Commonwealth's primary witnesses, who had been identified by detective (defendant) Colon-Baez, to wit, Yahaira Soto, <u>recanted</u> her prior testimony from the 2003 trial, and now claimed that she had been threatened and coerced by "star" witness Sharon Placeres - who had been indicted in a separate murder investigation- into testifying against the plaintiff herein in 2003.

85. Ms. Yahaira Soto was thus now (in 2016) unable to testify that plaintiff had conspired with anyone to commit the crimes.

86. As a result, all charges against plaintiff were dropped on **January 15, 2016** and she was formally released from prison shortly thereafter.

## VIII. CIPA ADMINISTRATIVE HEARINGS & LEAD DETECTIVE FIGUEROA'S AFFIDAVIT INCULPATING DEFENDANTS HEREIN; AFFIDAVIT OF DEFENDANT COLON BAEZ

87. Plaintiff after her unlawful incarceration commenced administrative proceedings before the Commonwealth's CIPA, or the *"Comisión de Investigación, Procesamiento y Apelación"*, an administrative agency charged with investigating and prosecuting law enforcement wrongdoing, potentially suspending or discharging officers found to have committed infractions.

88. Subsequently, as part of its investigation, CIPA interviewed lead detective Hector Figueroa under oath, resulting in his October 19, 2016 Affidavit, in which he inculpated defendants herein, **statements which are hereby adopted as allegations herein**.

89. Defendant Colon Baez authored a similar CIPA affidavit, in which he expressly stated that defendants and Commonwealth Prosecutors Sergio Rubio Paredes and Amilio Arrill Garcia made the determination as to which witnesses to use at trial, statements which are **hereby adopted as allegations herein.**

## IX. Filing of the Civil Rights Action and The Automatic Stay

### A. Causes of Action Averred

90. On October 25, 2016, plaintiff commenced the underlying 42 USC §1983 civil rights action, **Docket 3:16-cv-02873-SCC**, which has been stayed since 2017 by virtue of the PROMESA automatic stay.

91. Plaintiff averred the following 42 USC §1983 causes of action: malicious prosecution, intentional infliction of emotional distress, abuse of process, and wrongful conviction.

### B. Filings In the District Court of Puerto Rico

92. Plaintiff filed her District Court civil rights complaint on October 25, 2016 naming the following parties as defendants: Commonwealth of Puerto Rico, Detective Juan Colon Baez, Prosecutor Mario Rivera-Giegel, Prosecutor Luis Rios Diaz, Prosecutor Luis Navas de Leon, and Prosecutor Leilany Carrion Del Toro. **Exhibit A.**

93. On January 11, 2017 Defendants Commonwealth of Puerto Rico and Mario Rivera-Giegel filed a R. 12(b)(6) Motion to Dismiss the Complaint, **Exhibit D.**

94. On February 14, 2017, plaintiff filed her Opposition or "Response" to the Motion to Dismiss **Exhibit E.**

95. On March 16, 2017, defendant Juan Colon Baez filed a Motion to Dismiss, also joining in the Commonwealth's motion. **Exhibit F.**

96.     On March 28, 2017,   the District Court issued a  scheduling order which required all defendants to file an answer notwithstanding that the dispositive orders had not been ruled upon.  **Exhibit G.**

97.     Accordingly on May 1, 2017,  defendant Juan J Colon Baez  filed an answer to plaintiff's complaint. **Exhibit H.**

98.     On May 2, 2017, the Commonwealth and defendant Mario Rivera-Geigel similarly filed an answer to plaintiff's complaint. **Exhibit I.**

99. On June 5, 2017, plaintiff then filed a  Motion For Leave to Amend Complaint to join prosecutors Sergio Rubio Paredes and Emilio Aril Garcia as defendants, as these parties had recently became known as a result of a sworn statement by whistleblower Detective Hector Figueroa as part of the administrative hearings before "CIPA", or the "Comision de Investigacion, Procesamiento y Apelacion", charged with investigating and prosecuting wrongdoing by law enforcement. **Exhibit J.**

## C. Automatic Stay

100.     On June 19, 2017, defendants filed a  PROMESA  motion to stay **Exhibit K.**

101.     On June 30, 2017, the District Court granted the    Stay Order sought by defendants. **Exhibit L.**

102.     On May 8, 2018, the District Court issued an order vacating a jury trial which had been scheduled for May 11, 2018.

103.     This Court on August 29, 2017 denied the lifting of the automatic stay, and as such this claim remains **disputed and unliquidated**.  **Exhibit C**.

# COUNT I
# Liquidation of Disputed Claim

1.  Plaintiff incorporates all preceding paragraphs  in this complaint as if fully set forth herein.

2. These foregoing allegations amend and/or supplement the allegations in **Exhibit A**, the October 25, 2016 complaint, allegations which are hereby made of part of the allegations herein.

3. These counts in the October 25, 2016 complaint, as amended by the foregoing allegation, constitute plaintiff's "claims".

4. In its August 29, 2017 order, this Court stated that "***Movant's unsecured claims for monetary relief can be liquidated and addressed through the  claims process in <u>this</u> district court proceeding***." **<u>Exhibit C</u>**

5.  Accordingly, plaintiff requests that her disputed claims be liquidated in this forum, and/or that the stay be lifted so that she may liquidate the <u>disputed</u> claim in action 3:16-cv-02873-SCC.

**WHEREFORE, the Plaintiff requests and prays that this Honorable Court commence proceedings to resolve the disputed and unliquidated nature of this debt or claim, or that the automatic stay be lifted such that this claim may be resolved in the Civil Rights Action  with Docket 3:16-cv-02873-SCC.**

# COUNT II
# Dischargeability

1.   Plaintiff incorporates all preceding paragraphs  in this complaint as if fully set forth herein.

2.  Plaintiff's civil rights complaint (as amended herein) alleged, *inter alia*, the following intentional non-dischargeable torts: malicious prosecution, intentional infliction of emotional distress, abuse of process, and wrongful conviction. **Exhibit A.**

3.  These debts are not dischargeable under **11 U.S.C. § 523(a)(6)**.

4.   Although the foregoing statute may not be applicable in PROMESA proceedings, this Court retains discretion to declare these claims **non-dischargeable** as a matter of common law, equitable principles, and/or as per applicable Bankruptcy, Supreme Court, or First Circuit jurisprudence.

**WHEREFORE, the Plaintiff requests and prays that this Honorable Court declare this claim non-dischargeable, having been the result of a "willful and malicious injury by the debtor" and/or Fraud.**

# COUNT III
# Liability of John Does 1-10

1. Plaintiff incorporates all preceding paragraphs in this complaint as if fully set forth herein.

2. John Does 1-10 are unidentified defendants who knowingly acted in concert with the named defendants herein, as principal and/or agent, thus causing plaintiff injury.

**WHEREFORE, the Plaintiff requests and prays that this Honorable Court commence proceedings to resolve the disputed and unliquidated nature of this debt or claim, or that the automatic stay be lifted such that this claim may be resolved in the Civil Rights Action with Docket 3:16-cv-02873-SCC.**

RESPECTFULLY SUBMITTED

**Dated: November 10, 2022**

I HEREBY CERTIFY that on November 10, 2022 I electronically filed the foregoing amended complaint with the clerk of the court using the CM/ECF electronic filing system, which will send notification of such filing to the attorneys of record.

Santos A. Perez /s/____
Lcdo. Santos A. Perez-Mercado
USDC-PR 308105
Bufete PerezMPR
150 Speedwell,
Morristown, NJ, 07960
(787)773-1477
(973)910-1647
www.PerezMPR.Com
www.NJLawCounsel.Com
sperez@njlawcounsel.com