UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO et al.,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>    Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3567-LTS |

MEMORANDUM ORDER DENYING VAZQUEZ VELAZQUEZ GROUP REQUEST FOR STAY PENDING APPEAL OF THE ORDER AND JUDGMENT APPROVING THE PLAN OF ADJUSTMENT OF THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY

Before the Court is the *Vazquez-Velazquez Group Request for Stay Pending*

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

*Appeal of the Order and Judgment Approving the Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 1424 in Case No. 17-3567) (the "Motion"), filed by the plaintiffs-appellants (the "Vazquez Velazquez Group," or the "Movants") in the appeal captioned <u>Vazquez-Velazquez et al. v. Puerto Rico Highways and Transportation Authority et al.</u>, Case No. 21-1739 (the "2021 Appeal"), pending before the United States Court of Appeals for the First Circuit (the "First Circuit"). The Motion requests entry of an order staying the *Order and Judgment Confirming Modified Fifth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 22581 in Case No. 17-3283 and Docket Entry No. 1415 in Case No. 17-3567) (the "Confirmation Order"),[2] pursuant to which the Court confirmed the *Modified Fifth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 22065 in Case No. 17-3283 and Docket Entry No. 1404 in Case No. 17-3567) (the "Plan of Adjustment" or "HTA Plan"), pending Movants' appeal of the Confirmation Order (the "Confirmation Appeal").

Papers in opposition to the Motion have been filed by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") as the sole Title III representative of the Puerto Rico Highways and Transportation Authority ("HTA" or the "Debtor") under section 315(b) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA")[3] (Docket Entry No. 22729 in Case No. 17-3283 and Docket Entry No. 1432 in

---

[2] The Confirmation Order incorporates by reference the *Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Fifth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (Docket Entry No. 22582 in Case No. 17-3283 and Docket Entry No. 1416 in Case No. 17-3567) (the "Findings of Fact and Conclusions of Law" or "FFCL"), entered contemporaneously with the Confirmation Order. (<u>See</u> Confirmation Ord. ¶ 3.)

[3] PROMESA is codified at 48 U.S.C. § 2101 <u>et</u> <u>seq.</u> References to "PROMESA" section

Case No. 17-3567) (the "FOMB Response") and by the HTA/CCDA PSA Creditors[4] (Docket Entry No. 22735 in Case No. 17-3283 and Docket Entry No. 1434 in Case No. 17-3567) (the "PSA Creditors Response"). A reply in further support of the Motion was filed by the Vazquez Velazquez Group (Docket Entry No. 1435 in Case No. 17-3567) (the "Reply") on October 31, 2022.

The Court has jurisdiction of these matters pursuant to section 306 of PROMESA, and has considered carefully all of the arguments and submissions made in connection with the Motion. For the following reasons, the Motion is denied.

I.

BACKGROUND[5]

A. The Plan of Adjustment

On October 12, 2022, the Court approved the HTA Plan. Finalizing the HTA Plan required extensive work over the course of several years by numerous parties in interest to litigate significant issues, negotiate the terms of various plan support agreements, and otherwise resolve disputes arising throughout the pendency of the HTA Title III Case, partly due to the interrelationship between the settlements achieved in the HTA Plan and those reflected in the

---

numbers in the remainder of this Confirmation Order are to the uncodified version of the legislation.

[4] The "HTA/CCDA PSA Creditors," as that term is defined in their opposition brief, refers collectively to the Financial Guaranty Insurance Company, Assured Guaranty Corp. ("AGC"), Assured Guaranty Municipal Corp. ("AGM," and together with AGC, "Assured"), Ambac Assurance Corporation, and National Public Finance Guarantee Corporation.

[5] The Court assumes general familiarity with the factual and procedural background leading up to confirmation of the Plan of Adjustment. (See generally FFCL.) Capitalized terms used but not defined herein have the meanings assigned to them in the FFCL, or in the HTA Plan.

plan of adjustment for the Commonwealth of Puerto Rico. (See FFCL ¶¶ 14-15 & at 8; FOMB Resp. ¶ 1; PSA Creditors Resp. ¶ 5.) The HTA Plan addresses twenty separate classes of claims including, inter alia, claims based on bonds, claims stemming from various lawsuits against HTA, and claims arising under federal law. (See, e.g., FFCL ¶ 43.) Further, the HTA Plan reflects agreements reached in resolution of a broad range of disputes. (See, e.g., FFCL ¶¶ 14-15, 21 & at 12 n.6.) If the HTA Plan is implemented, it will reduce $6.4 billion in debt to approximately $1.6 billion, and reduce annual debt service from $294 million down to approximately $90 million. (FFCL ¶ 135.)

    B.    The Court's Ruling Concerning the Vazquez Velazquez Group

        a.    The 2015 Action

On July 27, 2022, Movants filed their *Objection of a Group of Plaintiffs-Appellants in First Circuit Court Appeal Case to the Plan of Adjustment* (Docket Entry No. 1287 in Case No. 17-3567) (the "Plan Objection").[6] In the Plan Objection, Movants explained that their claim against HTA is detailed in a prepetition action against HTA and its Executive Director (the "2015 Action") filed in the United States District Court for the District of Puerto Rico (the "District Court"). Civil Action No. 15-1727 (D.P.R.). (Plan Obj. ¶ 1.)

The 2015 Action stems from a special compensation program, implemented by HTA Regulation 02-017, "Compensation Program for Management of Construction Projects,"

---

[6] Movants' objection was previously asserted in opposition to approval of HTA's disclosure statement. (Docket Entry No. 1208 in Case No. 17-3567.) In that context, the objection was overruled at the June 17, 2022 hearing on approval of the disclosure statement because Movants did not demonstrate that the proposed HTA Plan was patently unconfirmable—therefore the Court held that the objection would be more appropriately addressed in connection with confirmation of the HTA Plan of Adjustment. (See June 17, 2022 Hr'g Tr. (Docket Entry No. 21274 in Case No. 17-3283 (the "HTA DS Hearing Transcript") 25:19-28:23).)

adopted in recognition of certain management employees' "extraordinary efforts" to ensure that contractors carry out their projects effectively and efficiently, and in acknowledgment of how such work "causes an adverse effect on their family relationships, risking their safety and health." See 2015 Action, ECF No. 211 at 6-7. (Mot. ¶¶ 2, 8.) HTA ended the program in 2014. See 2015 Action, ECF No. 211 at 8. Movants brought suit and alleged that, by ending the special compensation program, HTA violated multiple state statutes and federal and state constitutional provisions, and Movants sought declaratory and injunctive relief and damages. See 2015 Action, ECF No. 21 ¶ 1.[7]

The District Court dismissed all of Movants' constitutional claims with prejudice, and, after declining to exercise supplemental jurisdiction over the single remaining state law claim that Movants had not previously voluntarily dismissed, dismissed that claim without prejudice. See 2015 Action, ECF Nos. 56, 211, 212. Judgment was entered on August 9, 2021. 2015 Action, ECF No. 212. Appeal of that final judgment (the "2021 Appeal") is now fully briefed and pending oral argument before the First Circuit. Case No. 21-1739 (1st Cir.). (Mot. ¶ 2.)

b. The Plan Objection

Movants' Plan Objection argued that, because their work and the special compensation they received under HTA Regulation 02-017 were "indispensable" to compliance with certain federal laws and regulations (noting specifically the following regulations, 23 C.F.R. § 635, 23 C.F.R. § 635.105, 23 C.F.R. § 635.108, 29 C.F.R. § 1926.20(a-f), and form FHWA-1273),[8] PROMESA prevents HTA from discharging any part of their claim through a plan of

---

[7] See, e.g., Proof of Claim No. 162573.

[8] 23 C.F.R. § 635 concerns the Federal Highway Administration, Department of Transportation. Section 635.103 applies the policies, requirements, and procedures of

adjustment. (Plan Obj. ¶¶ 7, 11.) Movants argued that the following provisions of PROMESA prevent discharge of their claim: (i) section 7, requiring that PROMESA's provisions be construed in a manner that will not impair federally authorized or delegated programs protecting the safety of persons in Puerto Rico (48 U.S.C. § 2106)); (ii) section 204(d), providing that the Oversight Board shall not impede actions taken by the Commonwealth to implement a federally authorized or federally delegated program (48 U.S.C. § 2144(d)); and (iii) section 304(h), providing that PROMESA may not be construed to permit the discharge of obligations under federal police or regulatory laws, including federal laws relating to safety (48 U.S.C. § 2164(h)). (See Plan Obj. ¶¶ 1, 8-10.)

In sum, Movants argued that sections 7, 204(d), and 304(h) of PROMESA provide exceptions to discharge that apply to their claim because their claim arises from HTA's obligations under federal law and relates to HTA's implementation of safety requirements. (Plan Obj. ¶¶ 7-11.) Accordingly, Movants contended that classification of their claim in Class 16 as a general unsecured claim—and therefore subject to impairment—was inappropriate, and

---

this subpart to all federal-aid highways projects. Section 635.105 describes the responsibilities of the state departments of transportation with respect to all federal-aid projects and requires that all such projects will be supervised and inspected to ensure that they are completed in conformance with approved plans and specifications, including all federal requirements. Section 635.108 requires that contracts for all federal-aid highway projects include provisions to ensure compliance with federal, state and local laws concerning safety, health and sanitation and provide safeguards, safety devices, and protective equipment to protect the life and health of persons working on the projects.

29 C.F.R § 1926.20(a-f) sets forth requirements from the Occupational Safety and Health Administration concerning health and safety standards applicable to workplace employment.

FHWA-1273 is a form issued by the U.S. Department of Transportation Federal Highway Administration. The form must be included with all contracts for construction projects that receive federal aid and references certain safety provisions applicable to such projects, including 23 C.F.R. § 635 and 29 C.F.R. § 1926.

requested that the Court order that the HTA Plan be amended to create a distinct unimpaired class for their purportedly nondischargeable claim. (Plan Obj. ¶ 11 & at 9.)

The Court ultimately overruled the Plan Objection, holding the following:

> The Vazquez Velazquez Group contends that their claim against HTA, based on litigation concerning a discontinued HTA compensation program, is nondischargeable pursuant to certain sections of PROMESA, and thus, the HTA Plan, which seeks to discharge their claim, does not comply with PROMESA. The Vazquez Velazquez Group argues that sections 7, 204(d), and 304(h) of PROMESA prohibit the discharge of their claim. (Vazquez Velazquez Obj. ¶¶ 8-10.) These sections each concern Puerto Rico's compliance with or implementation of federal laws and obligations. The Vazquez Velazquez Group maintains that, because their work and compensation was indispensable to HTA's compliance with certain federal health and safety regulations, these sections bar the discharge of claims related to their compensation. (See Vazquez Velazquez Obj. ¶ 11.) Assuming, for present purposes, that each of these sections of PROMESA could serve as a vehicle for an exception to discharge, the nature of the Vazquez Velazquez Group's claim does not fall with the scope of the purported exceptions.
>
> "As the U.S. Court of Appeals for the First Circuit recently noted, in keeping with the Bankruptcy Code's fresh start policy, exceptions to discharge must be narrowly construed and, for that reason, a creditor seeking to exclude a debt from discharge must show that her claim comes squarely within an exception" enumerated in the Bankruptcy Code. Casper v. O'Sullivan (In re O'Sullivan), 617 B.R. 1, 5 (D. Mass. 2020) (citing Stewart v. Stewart (In re Stewart), 948 F.3d 509, 520 (1st Cir. 2020)). "Given the serious nature of a discharge denial, the reasons for denying a discharge must be real and substantial, not merely technical and conjectural." Warchol v. Barry (In re Barry), 451 B.R. 654, 659 (B.A.P. 1st Cir. 2011). The special compensation at the heart of the Vazquez Velazquez Group's claim does not fall squarely within the language of sections 7, 204(d), or 304(h) of PROMESA. Nor has the Vazquez Velazquez Group shown plausibly that it is sufficiently connected to a Commonwealth or HTA obligation that is protected by the cited provisions to support a viable argument that those sections protect the particular compensation claims from discharge. The Vazquez Velazquez Group concedes that the compensation was based on a Commonwealth regulation promulgated by HTA and was not required under any federal law, regulation, or program. (See

> Aug. 17, 2022 Hr'g Tr. 67:25-68:16.) Further, there has been no suggestion that, by discharging the Vazquez Velazquez Group's claim, HTA will be discharging or foregoing any of its current or future responsibilities under federal law. HTA's ongoing compliance with federal laws and regulations is no doubt implemented through the diligent work of its employees, but the purported exceptions cannot be credibly construed so broadly as to require that all compensation related to such work is exempt from discharge. Such construction would severely undermine the ability of Puerto Rico to restructure and discharge its debts and achieve fiscal responsibility. Accordingly, the Vazquez Velazquez Group's claim is not sufficiently connected to an HTA obligation that is purportedly protected from discharge to demonstrate plausibly that those sections of PROMESA protect this claim from discharge. The Vazquez Velazquez Objection is overruled. To the extent the Vazquez Velazquez Group is ultimately successful in their underlying litigation, their claim may be treated as provided for by the HTA Plan and discharged.

(FFCL ¶ 114 n.14.) Accordingly, the Court declined to require that the Debtor create a new class in the HTA Plan for Movants' claim.

II.

DISCUSSION

The Motion requests entry of an order staying the effectiveness of the Confirmation Order pending resolution of Movants' Confirmation Appeal. In reviewing an application for a stay pending appeal, a court must consider the following four factors:

> (1) [W]hether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos., 996 F.3d 37, 44 (1st Cir. 2021) (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." Nken v. Holder, 556 U.S. 418, 433-34 (2009) (citations omitted). The first two of the applicable

factors are the "most critical." Id. at 434-35 ("It is not enough that the chance of success on the merits be 'better than negligible.' . . . By the same token, simply showing some 'possibility of irreparable injury,' . . . fails to satisfy the second factor." (citations omitted)). However, "[t]he *sine qua non* [of the applicable standard] is whether the [movants] are likely to succeed on the merits." Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993).

1. Whether Movants Are Likely to Succeed on Appeal of the Confirmation Order

The Motion identifies a single basis for the Confirmation Appeal: Movants contend that the Court erred in determining that sections 7, 204(d), and 304(h) of PROMESA do not provide exceptions to discharge that apply to their claim and discharge thereof under the HTA Plan (and, as a result, erred in declining to require the Debtor to create a separate, protected, class in the HTA Plan for Movants' claim).

The Court addressed Movants' argument thoroughly in the Findings of Fact and Conclusions of Law issued in connection with the Confirmation Order. (See FFCL ¶ 114 n.14.) In their Motion, Movants merely repeat the argument made in the Plan Objection verbatim. (Compare Plan Obj. ¶¶ 4-7 to Mot. ¶¶ 8-11.) Movants contend that they are reiterating their argument because the Court has "misconstrued" it. (Mot. ¶ 12.) The Court respectfully disagrees.

In brief, as reproduced supra, the Court held that "[t]he special compensation at the heart of the Vazquez Velazquez Group's claim does not fall squarely within the language of sections 7, 204(d), or 304(h) of PROMESA[,]" as well as that, "the Vazquez Velazquez Group's claim is not sufficiently connected to an HTA obligation that is purportedly protected from discharge to demonstrate plausibly that those sections of PROMESA protect this claim from discharge." (FFCL ¶ 114 n.14.) Further, the Court held that to adopt Movants' implausibly

broad construction of nondischargeability would "severely undermine the ability of Puerto Rico to restructure and discharge its debts and achieve fiscal responsibility." (FFCL ¶ 114 n.14.)

The fact that Movants disagree with and have appealed the Court's determination does not in and of itself improve materially their chance of success on the merits of the Confirmation Appeal, nor does the pending Confirmation Appeal render wrongful the Court's reliance on its reasoning as set forth in the Findings of Fact and Conclusions of Law. Further, Movants have advanced no new arguments that lead the Court to conclude that there is more than a negligible likelihood that they will prevail in their Confirmation Appeal. Accordingly, Movants have failed to make the requisite strong showing that their Confirmation Appeal is likely to succeed on the merits, and this factor weighs against granting their Motion.

2. Whether Movants Have Established Irreparable Injury

i. Implementation of the HTA Plan will not Cause Movants to Suffer Irreparable Harm

Movants' primary claim of irreparable harm arising from implementation of the HTA Plan is pecuniary in nature: Movants argue that their claim should not be impaired (paid at less than 100%) by the HTA Plan. Grievances that are clearly remediable through payment of money do not, in and of themselves, support a finding of irreparable harm. See CoxCom, Inc. v. Chaffee, 536 F.3d 101, 112 (1st Cir. 2008). Accordingly, Movants would at least have to make a showing that implementation of the HTA Plan would likely prevent Movants from being made whole if they eventually prevail in the 2021 Appeal (of the 2015 Action). However, Movants have foreclosed this argument through their assertion that, even after the Effective Date of the HTA Plan, the Debtor will be able to pay their claim in the event that they prevail on the 2021 Appeal. (See Mot. ¶ 16; Reply ¶ 4.) Counsel for the Debtor confirmed this fact at the June 17, 2022 hearing on approval of the HTA disclosure statement. (See HTA DS Hr'g

Tr. 24:22-25:3 (counsel to the Oversight Board confirming that even if Movants' claim was eventually held to be nondischargeable and in the amount of $16.9 million—increased from the $217,917.08 currently asserted in Proof of Claim No. 162573—it would not render the HTA Plan unfeasible).) The Oversight Board cites to Movants' assertion as evidence that the Vazquez Velazquez Group "would suffer no harm if it succeeds in overcoming the substantial hurdle of successfully appealing the Confirmation Order" as well as prevailing in the 2021 Appeal. (FOMB Resp. ¶ 36; see also PSA Creditors Resp ¶ 16.) The Oversight Board's statement reconfirms that Movants' newly asserted claim amount of "no more than $50 million" (Mot. ¶ 15) would also not render the HTA Plan unfeasible. (FOMB Resp. ¶ 36.) Accordingly, Movants have failed, and did not even attempt, to demonstrate any direct harm should the HTA Plan implementation proceed simultaneously with the Confirmation Appeal (and any subsequent litigation).

> ii. The Confirmation Appeal is Unlikely to be Dismissed due to Equitable Mootness

Because they cannot establish that direct harm would result from implementation of the HTA Plan, Movants argue that, absent a stay, their Confirmation Appeal is likely to be dismissed due to equitable mootness. (Mot. ¶ 14.) Movants argue that a determination of equitable mootness is likely because the Confirmation Appeal will "very likely" not be resolved until the "point of no return" of consummation of the Plan of Adjustment "to a point well beyond practical appellate annulment." (See Mot. ¶ 14 (citations omitted).) The Motion does not, however, provide any analysis of the application of the doctrine of equitable mootness to their Confirmation Appeal to explain why, in the case of a discrete claim that can be satisfied regardless of substantial plan consummation, the First Circuit would be likely to find the appeal to be equitably moot.

In brief, Movants' assertion that their claim can be paid in full, along with the Oversight Board's substantiation thereof, provides grounds for a court to rule that success on the 2021 Appeal would not require the unwinding of complex transactions or otherwise affect reliance interests created by confirmation and implementation of the HTA Plan. Cf. Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.), 293 B.R. 489, 494 (B.A.P. 9th Cir. 2003) ("Even assuming that debtor's plan is substantially consummated, debtor has not demonstrated that we cannot provide effective relief if the confirmation order were to be reversed. . . . [The] debtor [does not] assert that the plan would be infeasible if it were required to pay [the appellant]."). I.e., if funds will remain to pay Movants' claim even if the HTA Plan is consummated, it weighs against the likelihood that the First Circuit will dismiss the Confirmation Appeal as equitably moot because a court could instead "craft relief short of annulling the whole Plan while avoiding harm to innocent third parties." See Pinto-Lugo v. Fin. Oversight & Mgmt. Bd. for P.R (In re Fin. Oversight & Mgmt. Bd. for P.R.), 987 F.3d 173, 186 (1st Cir. 2021) ("Pinto-Lugo") (citing Prudential Ins. Co. of Am. v. S.W. Bos. Hotel Venture, LLC (In re S.W. Bos. Hotel Venture, LLC), 748 F.3d 393, 403 (1st Cir. 2014)).

Accordingly, Movants have not demonstrated a substantial risk that the First Circuit would determine the Confirmation Appeal to be equitably moot on this basis.

In the absence of any detailed discussion of equitable mootness by Movants, it suffices to say that Movants have relied upon the mere concept of equitable mootness as a basis for finding that denial of the Motion presents an "actual and imminent" risk of irreparable injury, P.R. Asphalt, LLC v. Betteroads Asphalt, LLC, Civ. 19-1661 (ADC), 2020 WL 698249, at *7 (D.P.R. Feb. 11, 2020), without providing any reasoned analysis as to the likelihood that the

doctrine would apply.[9] Their effort is unavailing.

                iii.    Movants have not Established Irreparable Injury in the Absence of a Stay of HTA Plan Implementation

It is Movants' burden to demonstrate that there is more than "some possibility of irreparable injury[.]" Nken, 556 U.S. at 43 (citation omitted). Their failure to do so, in combination with their low probability of success on the merits, counsels strongly against imposing the "extraordinary remedy" that they have requested. See MEDSCI Diagnostics, Inc. v. State Ins. Fund Corp. (In re MEDSCI Diagnostics, Inc.), Case No. 10-0094, Adv. No. 10-0094, 2011 WL 280866, at *3 (Bankr. D.P.R. Jan. 25, 2011); Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004) ("A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.").

---

[9] The Court finds it worth noting that, while the First Circuit, some years ago, denied certain appeals of this Court's confirmation of a plan of adjustment for the Puerto Rico Sales Tax Financing Corporation ("COFINA") on the basis of equitable mootness, the procedural history and facts of those cases are easily distinguishable from the instant circumstances. There, the First Circuit repeatedly emphasized that the appellants had failed to be diligent in pursuing available remedies at practically every opportunity. See Pinto-Lugo, 987 F.3d at 183, 185 ("The Pinto-Lugo objectors . . . have done anything but diligently seek to prevent third parties from building reliance interests in the confirmation of the Plan. . . . Like the Pinto-Lugo objectors, the Elliott objectors failed to object to the waiver of the automatic stay of confirmation, did not seek any stay pending appeal, neither sought to expedite the appeal nor objected to requests for extension, and in fact sought to extend the briefing schedule themselves."). Moreover, the COFINA appellants requested relief they themselves described as "apocalyptic," including undoing the exchange of billions of dollars in bonds that had since changed hands on the open market for over a year. Id. at 184.

Here, Movants asserted their objection at both the disclosure statement and confirmation stages, and have specifically complied with the First Circuit's directive that they must seek a stay to prevent their Confirmation Appeal from being denied for equitable mootness. (Mot. ¶ 4 (citing Pinto-Lugo).) Movants' relative diligence, along with the availability of relief rendering annulment of the HTA Plan unnecessary, significantly decrease the likelihood that the Confirmation Appeal will be dismissed due to equitable mootness, and therefore the prospect of irreparable injury.

Accordingly, Movants have not established that they will suffer injury absent a stay of the Confirmation Order, and this factor weighs against granting their Motion.

### 3. Whether Granting the Stay Will Substantially Injure Other Interested Parties

Regarding the effect of a stay on other interested parties, Movants' full argument with respect to this factor is as follows:

> Creditors in the HTA case have not been paid in over 5 years. If Movants in this case are successful, the moneys that they can recover[] would be no more than $50 million, an amount that would not derail the Plan of Adjustment. It would simply postpone for a short period of time when they would receive payment.

(Mot. ¶ 15.)

Movants' interests are, however, outweighed by the potential harm resulting from a delay in the Effective Date, which could, in the worst case, undermine the HTA Plan and cause it to unravel, undoing years of extensive negotiations. ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 361 B.R. 337, 354 (S.D.N.Y. 2007) ("[T]here are additional harms that are substantial but not easily quantifiable, such as the risk that the Plan will fall apart and that the parties will fail to reach a new agreement given the uncertainty associated with what could be a [several]-month stay."); In re Sabine Oil & Gas Corp., 548 B.R. 674, 683 (Bankr. S.D.N.Y. 2016) ("Courts have recognized numerous harms resulting from the postponement of reorganization proceedings, including . . . placing plan settlements in jeopardy[.]"). (See FOMB Resp. ¶¶ 38-39; PSA Creditor Resp. ¶¶ 21-23.)

Even a simple delay in the implementation of the HTA Plan would not be inconsequential: courts have recognized "incurrence of administrative and professional expenses" and "lost strategic opportunities" as significant harms. See, e.g., Sabine Oil & Gas Corp., 548 B.R. at 683. Here, it is undeniable, and requires no expert testimony to establish, that further delay will cost millions of dollars in administrative and professional expenses, as the

Debtor will need to retain many professionals throughout the implementation of the HTA Plan. (See FOMB Resp. ¶ 48 ("During the Title III case, the Debtor incurred, on average, approximately more than $1.4 million per month in professionals' fees, including fees paid to the legal and financial advisors of the Debtor, and the Creditors' Committee.").)

Moreover, the Oversight Board notes that a stay would delay the distribution of hundreds of millions of dollars to creditors under the HTA Plan, causing creditors to lose the ability to invest or utilize such monies and generate significant value. (FOMB Resp. ¶ 39.) Numerous courts have held that the loss of significant expected interest at stake in any further delay constitutes a harm that may outweigh the benefit gained by a movant or discrete group of movants from the stay of an entire plan pending appeal. See In re Efron, 535 B.R. 516, 520 (Bankr. D.P.R. 2014) ("Delay caused to creditors receiving their payment is also a significant harm warranting denial of a stay.") (citation omitted); see also In re Adelphia Commc'ns Corp., 361 B.R. at 342 (noting the "weighty interest[]" of "the right of the majority of creditors to receive their distributions"); In re Great Barrington Fair & Amusement, Inc., 53 B.R. 237, 240 (Bankr. D. Mass. 1985) ("The chief harm which will be caused by a stay is the delay which will be suffered by the other creditors.").

In their Reply, Movants note that they were not able to supply an expert declaration, due to time and economic restraints, to respond to the data on prospective losses proffered in the declaration appended to the HTA/CCDA PSA Creditors' Response. (Reply ¶¶ 6-7.) Again, Movants bear the burden of justifying the extraordinary remedy of a stay, but Movants' argument that a delay will "simply postpone" payment is legally insufficient even without regard to any information proffered in the declarations. Immediate distributions to creditors upon the Effective Date will exceed $100,000,000. (See, e.g., Confirmation Ord.

Document Page 16 of 17

¶¶ 33-34.) That delay in receipt of such an amount will result in a significant loss of investment opportunity for creditors is inevitable.

As the Court held earlier this year: "That it has taken five years from the date of the Debtors' petition for them to be in a position to pay financial creditors accentuates (rather than minimizes) the harm of additional delay[.]" See In re Fin. Oversight and Mgmt. Bd. for P.R., 588 F. Supp. 3d 191, 208 (D.P.R. 2022) (denying stay of Commonwealth plan of adjustment). This Debtor, as well, and its creditors have been subject to delay for long enough.

Accordingly, Movants have failed to make the requisite showing that staying implementation of the HTA Plan pending their Confirmation Appeal will not substantially injure the other parties interested in the proceeding, and this factor weighs against granting their Motion.

4. Where the Public Interest Lies

Movants do not address whether the public interest weighs in favor of a stay. Because they have failed to meet their burden, this final factor also weighs against granting their Motion.

The Court notes that achieving a $4.8 billion reduction in indebtedness, and a $204 million reduction in annual debt service, as contemplated in the HTA Plan, represents a significant step towards achieving the goal set out in section 101(a) of PROMESA of "fiscal responsibility and access to the capital markets." 48 U.S.C.A. § 2121(a) (Westlaw through P.L. 114-214). To stay implementation of the HTA Plan, and imperil or even merely delay both the significant work and sacrifices it represents, and the good it stands to achieve, would result in significant additional and unnecessary costs both to the Debtor and to other parties. This conclusion is underscored by the unlikelihood of success of Movants' Confirmation Appeal.

Accordingly, the relevant considerations overwhelmingly weigh against granting Movants the extraordinary remedy of a stay of the HTA Plan pending the outcome of their Confirmation Appeal.[10]

### III.

### CONCLUSION

For the foregoing reasons, the Motion is denied. This Order resolves Docket Entry No. 1424 in Case No. 17-3567.

SO ORDERED.

Dated: November 15, 2022

                                                    /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge

---

[10] It is unnecessary to determine whether a supersedeas bond would be appropriate because Movants have failed to carry their burden of demonstrating that a stay is justified. The Oversight Board and the HTA/CCDA PSA Creditors have pointed to the same considerations relevant to the "significant harm" factor, supra, as relevant to consideration of an appropriate bond amount—i.e., administrative and professional fees and deprivation of investment opportunity—and the Court agrees. (FOMB Resp. ¶¶ 47-49; PSA Creditors Resp. ¶ 27.) The Court is familiar enough with the costs of maintaining the case and the timing of payments contemplated under the HTA Plan (as well as the fact that creditors have waited years to receive any recovery on their claims) to conclude that, regardless of the precise figures, the dollar amounts involved would be substantial.