**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA Title III |
| as representative of | No. 17 BK-3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | (Jointly Administered) |
| Debtors.[1] | |
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA Title III |
| as representative of | No. 17 BK-3567-LTS |
| THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY, | |
| Debtor. | |

**NOTICE OF SUBMISSION OF THIRD AMENDED PLAN**
**SUPPLEMENT AND PLAN RELATED DOCUMENTS BY THE**
**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

**PLEASE TAKE NOTICE** that, on July 20, 2022, the Financial Oversight and

Management Board for Puerto Rico (the "Oversight Board"), as sole Title III representative of the

Puerto Rico Highways and Transportation Authority ("HTA" or the "Debtor") pursuant to section

315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2]

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801). Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.

[2]   PROMESA is codified at 48 U.S.C. §§ 2101-2241.

filed the *Plan Supplement and Plan Related Documents of the Puerto Rico Highways and Transportation Authority* (the "Original Plan Supplement") [Case No. 17-03567, ECF No. 1279], containing documents listed on Schedule 1 thereto.

**PLEASE TAKE FURTHER NOTICE** that, on August 7, 2022, the Oversight Board filed the *Amended Plan Supplement and Plan Related Documents of the Puerto Rico Highways and Transportation Authority* (the "Amended HTA Plan Supplement") [Case No. 17-03567, ECF No. 1351].

**PLEASE TAKE FURTHER NOTICE** that, on September 6, 2022, the Oversight Board filed the *Second Amended Plan Supplement and Plan Related Documents of the Puerto Rico Highways and Transportation Authority* (the "Second Amended HTA Plan Supplement") [Case No. 17-03567, ECF No. 1405-7].

**PLEASE TAKE FURTHER NOTICE** that, on October 12, 2022, the United States District Court for the District of Puerto Rico entered an order [ECF No. 1415 in Case No. 17-3567] (the "Confirmation Order") confirming the *Modified Fifth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority,* dated September 6, 2022 (as amended, supplemented, or modified, the "Plan").[3]

**PLEASE TAKE FURTHER NOTICE** that, on December 2, 2022, the Oversight Board has filed the *Third Amended Plan Supplement and Plan Related Documents of the Puerto Rico Highways and Transportation Authority* (the "Third Amended HTA Plan Supplement"), which includes additional documents, and revisions to certain documents contained in the Second Amended HTA Plan Supplement. The Third Amended HTA Plan Supplement is attached hereto as **Exhibit A**, containing documents listed on **Schedule 1** hereto (collectively, the "HTA Plan

---

[3]   Unless otherwise defined in this Notice, capitalized terms used herein shall have the meanings ascribed to them in the Plan.

Related Documents"), and redlines of the exhibits compared against the versions filed as part of the Second Amended HTA Plan Supplement, where appropriate.

**PLEASE TAKE FURTHER NOTICE** that the HTA Plan Related Documents remain subject to negotiations with parties in interest, and the Oversight Board and HTA reserve the right to amend, modify, or supplement any of the HTA Plan Related Documents up to and including the occurrence of the effective date of the Plan.

**PLEASE TAKE FURTHER NOTICE** that the rights of all parties in interest, including, but not limited to, the Oversight Board, HTA, the other parties to the HTA/CCDA Plan Support Agreement, and the Creditors' Committee, with respect to the form of the HTA Plan Related Documents are expressly preserved and the exercise or waiver of any consent rights are expressly preserved.

**PLEASE TAKE FURTHER NOTICE** that all documents filed in these Title III cases are available (a) free of charge by visiting https://cases.ra.kroll.com/puertorico/ or by calling +1 (844) 822-9231, and (b) on the Court's website at http://www.prd.uscourts.gov, subject to the procedures and fees set forth therein.

*[Remainder of Page Left Intentionally Blank]*

Dated: December 2, 2022
       San Juan, Puerto Rico

Respectfully submitted,

*/s/ Brian S. Rosen*

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtor*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtor*

## Schedule 1

### List of Exhibits in the Third Amended HTA Plan Supplement[4]

| Exhibit A: | New HTA Bonds Indenture |
|---|---|
| Exhibit B: | Amended and Restated Avoidance Actions Trust Agreement |
| Exhibit C: | Schedule of Executory Contracts and Unexpired Leases to be Assumed |
| Exhibit D: | Ambac Custodial Trust Documents |
| Exhibit E: | Assured Custodial Trust Documents |
| Exhibit F: | FGIC Trust Agreement |
| Exhibit G: | Initial Board of Directors of Reorganized HTA |
| Exhibit H: | First Supplemental Trust Agreement (New HTA Bonds) |
| Exhibit I: | Second Supplemental Trust Agreement (Subordinated Indebtedness) |
| Exhibit J: | HTA Debt Management Policy |

---

[4] The HTA Plan Related Documents remain subject to negotiation with parties in interest and the rights of all parties in interest, including, but not limited to, the Oversight Board, HTA, the other parties to the HTA/CCDA Plan Support Agreement, and the Creditors' Committee, with respect to the form of documents contained in the HTA Plan Supplement are expressly reserved and the exercise or waiver of any consent rights are expressly preserved.

## <u>Exhibit A</u>

**Third Amended HTA Plan Supplement**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA<br>Title III |
| as representative of | No. 17 BK-3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | (Jointly Administered) |
| Debtors.[1] | |
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA<br>Title III |
| as representative of | No. 17 BK-3567-LTS |
| THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY, | |
| Debtor. | |

**THIRD AMENDED PLAN SUPPLEMENT AND PLAN RELATED DOCUMENTS OF THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801). Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.

## Table of Contents [2]

| | |
|---|---|
| Exhibit A: | New HTA Bonds Indenture |
| Exhibit B: | Amended and Restated Avoidance Actions Trust Agreement |
| Exhibit C: | Schedule of Executory Contracts and Unexpired Leases to be Assumed |
| Exhibit D: | Ambac Custodial Trust Documents |
| Exhibit E: | Assured Custodial Trust Documents |
| Exhibit F: | FGIC Trust Agreement |
| Exhibit G: | Initial Board of Directors of Reorganized HTA |
| Exhibit H: | First Supplemental Trust Agreement (New HTA Bonds) |
| Exhibit I: | Second Supplemental Trust Agreement (Subordinated Indebtedness) |
| Exhibit J: | HTA Debt Management Policy |

---

[2] The HTA Plan Related Documents remain subject to negotiation with parties in interest and the rights of all parties in interest, including, but not limited to, the Oversight Board, HTA, the other parties to the HTA/CCDA Plan Support Agreement, and the Creditors' Committee, with respect to the form of documents contained in the HTA Plan Supplement are expressly reserved and the exercise or waiver of any consent rights are expressly preserved.

# **EXHIBIT A**

New HTA Bonds Indenture

Draft 12/2/2022

# SUBJECT TO THE REVIEW AND COMMENT OF AAFAF AND HTA

---

**MASTER TRUST AGREEMENT**

**by and between**

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

**and**

**THE BANK OF NEW YORK MELLON, as Trustee**

_____

***Dated as of December 6, 2022***

_____

---

## <u>TABLE OF CONTENTS</u>

**Page**

ARTICLE I  DEFINITIONS AND INTERPRETATION ..............................................................6

    Section 1.01   Definitions ................................................................................6
    Section 1.02   Rules of Construction ................................................................21

ARTICLE II. AUTHORIZATION AND ISSUANCE OF SECURED OBLIGATIONS ............22

    Section 2.01   Authorization of Secured Obligations ........................................22
    Section 2.02   Provisions for Issuance of Secured Obligations .........................23
    Section 2.03   Supplemental Trust Agreements ................................................24
    Section 2.04   Additional Indebtedness .............................................................25

ARTICLE III. GENERAL TERMS AND PROVISIONS OF BONDS ....................................27

    Section 3.01   Place and Medium of Payment .................................................27
    Section 3.02   Legends .....................................................................................28
    Section 3.03   CUSIP Numbers ........................................................................28
    Section 3.04   Execution and Authentication ...................................................28
    Section 3.05   Interchangeability of Bonds ......................................................28
    Section 3.06   Transfer and Registry ................................................................29
    Section 3.07   Transfer of Bonds .....................................................................29
    Section 3.08   Regulations with Respect to Exchanges and Transfers .............29
    Section 3.09   Bonds Mutilated, Destroyed, Lost or Stolen .............................30
    Section 3.10   Book Entry Bonds .....................................................................30
    Section 3.11   Preparation of Definitive Bonds; Temporary Bonds .................31

ARTICLE IV. REDEMPTION OF BONDS .............................................................................32

    Section 4.01   Authorization of Redemption ....................................................32
    Section 4.02   Redemption at the Election of the Authority .............................32
    Section 4.03   Redemption Other Than at Authority's Election .......................33
    Section 4.04   Selection of Bonds to be Redeemed ..........................................33
    Section 4.05   Notice of Redemption ...............................................................34
    Section 4.06   Payment of Redeemed Bonds ...................................................34

ARTICLE V. FUNDS AND ACCOUNTS;  PLEDGED REVENUES AND APPLICATION
THEREOF ................................................................................................................................35

    Section 5.01   Establishment of Funds and Accounts ......................................35
    Section 5.02   Application of Secured Obligation Proceeds .............................36
    Section 5.03   Application of Money in the Costs of Issuance Fund .................36
    Section 5.04   Deposit of Toll Receipts in the Toll Receipts Fund ...................37
    Section 5.05   Application of Toll Receipts ......................................................37
    Section 5.06   Debt Service Fund .....................................................................39
    Section 5.07   Operating Reserve Fund ............................................................40
    Section 5.08   Renewal and Replacement Fund ...............................................41
    Section 5.09   Subordinated Indebtedness Fund ...............................................41
    Section 5.10   General Reserve Fund ................................................................42
    Section 5.11   Arbitrage Rebate Fund ..............................................................42

**Table of Contents (continued)**

**Page**

Section 5.12   Transfer of Investments ...................................................................43

ARTICLE VI. SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS .....................43

Section 6.01   Security for Deposits...............................................................................43
Section 6.02   Investment of Funds and Accounts Held by the Trustee ..........................43
Section 6.03   Liability for Investments ........................................................................44

ARTICLE VII. PARTICULAR COVENANTS .............................................................44

Section 7.01   Rate Covenant .......................................................................................45
Section 7.02   Annual Budget and Disbursement Schedule.............................................47
Section 7.03   Operation and Maintenance Covenants ....................................................52
Section 7.04   Retention of Consulting Engineer, Traffic Consultant and Other
Consultants...........................................................................................52
Section 7.05   Payment of Principal, Redemption Price and Interest ...............................53
Section 7.06   Extension of Payment of Secured Obligations ..........................................53
Section 7.07   Powers as to Secured Obligations ...........................................................53
Section 7.08   Further Assurance ..................................................................................54
Section 7.09   Accounts and Audits ...............................................................................54
Section 7.10   Creation of Liens and Indebtedness ........................................................54
Section 7.11   Restricted Payments ...............................................................................55
Section 7.12   Offices for Payment and Registration of Secured Obligations.................55
Section 7.13   Payment of Lawful Charges.....................................................................55
Section 7.14   General ..................................................................................................55
Section 7.15   Tax Exemption Covenant ........................................................................55
Section 7.16   Enforcement of Commonwealth Covenant.................................................55
Section 7.17   Corporate Existence ...............................................................................55
Section 7.18   Covenant Against Sale or Encumbrance; Exception .................................56
Section 7.19   Separateness ..........................................................................................56
Section 7.20   Insurance ...............................................................................................57
Section 7.21   Compliance.............................................................................................57
Section 7.22   Continuing Disclosure ............................................................................57
Section 7.23   Non-Impairment .....................................................................................58

ARTICLE VIII. CONCERNING THE TRUSTEE AND THE PAYING AGENT .....................58

Section 8.01   Appointment and Acceptance of Trustee...................................................58
Section 8.02   Appointment and Acceptance of Paying Agents .......................................58
Section 8.03   Responsibilities of Trustee and Paying Agents .......................................58
Section 8.04   Property Held in Trust ............................................................................59
Section 8.05   Rights of the Trustee and the Paying Agent .............................................59
Section 8.06   Compensation and Indemnification ..........................................................61
Section 8.07   Permitted Acts........................................................................................61
Section 8.08   Resignation of Trustee ...........................................................................62
Section 8.09   Removal of Trustee .................................................................................62
Section 8.10   Successor Trustee and/or Paying Agent ...................................................62
Section 8.11   Transfer of Rights and Property to Successor Trustee..............................63
Section 8.12   Merger or Consolidation of the Trustee....................................................63

**Table of Contents** (continued)

<div align="right"><u>Page</u></div>

Section 8.13    Ancillary Agreements ...............................................................63

ARTICLE IX. SUPPLEMENTAL TRUST AGREEMENTS ...................................................64

Section 9.01    Modification and Amendment without Consent.......................................64
Section 9.02    Supplemental Trust Agreements Effective with Consent of Bondholders 65
Section 9.03    General Provisions Relating to Supplemental Trust Agreements.............66

ARTICLE X. AMENDMENTS OF TRUST AGREEMENT ...................................................66

Section 10.01   Powers of Amendment....................................................................66
Section 10.02   Consent of Holders of Secured Obligations.....................................67
Section 10.03   Modifications by Unanimous Consent.............................................68
Section 10.04   Mailing.........................................................................................68
Section 10.05   Exclusion of Secured Obligations..................................................68
Section 10.06   Notation on Secured Obligations....................................................68

ARTICLE XI. DEFAULTS AND REMEDIES ...................................................................69

Section 11.01   Events of Default..........................................................................69
Section 11.02   No Acceleration with Respect to the Secured Obligations.....................70
Section 11.03   Enforcement of Remedies..............................................................70
Section 11.04   Priority of Payments after Default..................................................72
Section 11.05   Termination of Proceedings...........................................................73
Section 11.06   Bondholders' Direction of Proceedings............................................73
Section 11.07   Control by Holders of Bonds; Limitations.......................................74
Section 11.08   Actions by Trustee; Possession of Secured Obligations by Trustee Not
                Required.......................................................................................74
Section 11.09   Waiver and Non–Waiver of Default................................................74
Section 11.10   Notice of Event of Default.............................................................75
Section 11.11   Remedies Not Exclusive................................................................75

ARTICLE XII. SUBORDINATION ...............................................................................75

Section 12.01   Agreement to Subordinate .............................................................75
Section 12.02   Distributions in Bankruptcy Proceedings.........................................76
Section 12.03   Prohibition on Contesting Liens and Claims.....................................77
Section 12.04   Post-Petition Interest....................................................................77

ARTICLE XIII. DEFEASANCE ...................................................................................77

Section 13.01   Defeasance...................................................................................77

ARTICLE XIV. EXECUTION OF INSTRUMENTS BY BONDHOLDERS  AND PROOF OF
OWNERSHIP OF SECURED OBLIGATIONS ...................................................................79

Section 14.01   Evidence of Signatures of Bondholders and Ownership of Secured
                Obligations..................................................................................79

ARTICLE XV. MISCELLANEOUS...............................................................................80

Section 15.01   Preservation and Inspection of Documents.......................................80
Section 15.02   Money and Funds Held for Particular Secured Obligations ...................80
Section 15.03   Cancellation of Secured Obligations ..............................................81

<div align="center">iii</div>

**Table of Contents (continued)**

<div align="right"><u>**Page**</u></div>

Section 15.04  No Recourse under Trust Agreement or on the Secured Obligations........81
Section 15.05  Severability of Invalid Provision ...............................................................81
Section 15.06  Parties of Interest ....................................................................................81
Section 15.07  Certain Provisions Relating to Capital Appreciation Bonds or Convertible
                         Capital Appreciation Bonds....................................................................81
Section 15.08  Notices ....................................................................................................82
Section 15.09  Headings .................................................................................................82
Section 15.10  Governing Laws......................................................................................82
Section 15.11  Retention of Jurisdiction of Title III Court...............................................82
Section 15.12  Signatures and Counterparts ..................................................................83
Section 15.13  Successors and Assigns.........................................................................83
Section 15.14  Conflicts..................................................................................................83

EXHIBIT A - CONFIRMATION ORDER

C:\ND\torresrodriguezs6812\ndOffice\VAULT-2NOR0MND\Toll
Revenue Master Trust Agreement 4838-1565-0039 v.34.docx

# MASTER TRUST AGREEMENT

THIS MASTER TRUST AGREEMENT, dated as of December 6, 2022, by and between the **PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY** (the "**Authority**"), a body both corporate and politic of the Commonwealth of Puerto Rico (the "**Commonwealth**") performing essential governmental functions of the Commonwealth, duly created and existing under and by virtue of the laws of the Commonwealth and **THE BANK OF NEW YORK MELLON** (the "**Trustee**"), a banking corporation organized and existing under and by virtue of the laws of New York and authorized to exercise corporate trust powers in the Commonwealth, with a place of business located in New York, as Trustee, under the circumstances summarized in the following recitals (the capitalized terms not defined in the recitals and granting clauses being used therein as defined in Section 1.01).

# R E C I T A L S

Pursuant to the authority granted pursuant to Act No. 74-1965, 9 L.P.R.A §§2001-2035, as amended (the "**Act**"), the Authority was created for the purpose of, among other things, the construction, operation, and maintenance of the Commonwealth's transportation system.

On June 30, 2016, the United States of America enacted the Puerto Rico Oversight, Management and Economic Stability Act, Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq. ("**PROMESA**"); pursuant to Section 4 of PROMESA, the provisions thereof prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith.

On May 3, 2017 and May 21, 2017, respectively, the Financial Oversight and Management Board for Puerto Rico (together with any successors thereto, the "**Oversight Board**"), established by the United States of America pursuant to Section 101(b) of PROMESA, filed petitions for relief for the Commonwealth of Puerto Rico and the Authority pursuant to Section 304(a) of PROMESA in the United States District Court for the District of Puerto Rico (the "**Title III Court**"), commencing debt adjustment cases under title III of PROMESA (the "**Title III Cases**").

Pursuant to Section 306(b) of PROMESA, upon commencement of the Title III Cases, the Title III Court exercises exclusive jurisdiction over all property of the Commonwealth of Puerto Rico and the Authority, wherever located.

By entry of the order attached hereto as Exhibit A (the "**Confirmation Order**"), the Title III Court confirmed the Authority's Plan of Adjustment (as defined below).

*[DETERMINATIONS SET FORTH BELOW ARE SUBJECT TO REVISION TO REFLECT FINAL ORDER]*

Pursuant to PROMESA, and in accordance with the Confirmation Order, the Plan of Adjustment, and the Act, the Title III Court made a binding determination that the Secured Obligations are valid obligations of the Authority benefiting from the following protections, which were determined to be valid, binding, legal, and enforceable against the Authority, the Commonwealth of Puerto Rico, and other persons and entities:

(i)      The Authority is an independent public corporation and instrumentality of the Commonwealth, separate from the Commonwealth and any other instrumentality thereof;

(ii)      Upon the Effective Date, the Authority shall have all legal and equitable right, title, and interest in the Pledged Revenues which, except as granted herein and in the Confirmation Order, shall be free and clear of all liens, claims, encumbrances, and other interests of any party;

(iii)      The Trust Agreement grants a first-priority lien and first-priority security interest on all of the Authority's legal and equitable right, title, and interest in the Trust Estate (as defined in Article I of this Trust Agreement) to the Secured Obligations, subject only to (A) Sections 5.01(b) and 5.01(c) herein and (B) the senior lien and senior security interest granted hereby in the Trust Estate for the benefit of Holders of Bonds, which first-priority lien and first-priority security interest shall in all respects be senior and superior to the subordinate lien and subordinate security interest granted hereby in the Trust Estate for the benefit of the Holders of Subordinated Indebtedness, in each case, as permitted by the Act, and such first priority lien shall be deemed automatically perfected as of the Effective Date and shall in any event be valid, binding, perfected, and enforceable against all entities having claims of any kind in tort, contract or otherwise against the Authority or its assets, irrespective of whether such entities have notice of such lien or security interest, without any further act or agreement by any entity, and will be "closed" and shall remain in full force and effect until the Secured Obligations have been paid or satisfied in full in accordance with their terms;

(iv)      The Pledged Revenues do not and will not constitute, nor will they be deemed to be "available resources" or "available revenues" of the Commonwealth, as that term is used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or English version of the Puerto Rico Constitution);

(v)      The Authority's sole and exclusive ownership of the Pledged Revenues will not be affected in any way by the manner of or control over collection; any person who collects or holds Pledged Revenues shall do so on behalf of the Authority, and no entity that collects or holds the Pledged Revenues shall have any legal or equitable right, title, or interest to the Pledged Revenues other than the Authority, for the benefit of the Holders of the Secured Obligations;

(vi)      The covenants and agreements of the Authority and the Commonwealth, as the case may be, (including, but not limited to, that described in Section 7.18 of this Trust Agreement) will constitute adequate protection for the property interests of the Authority and the Holders of Secured Obligations in the Trust Estate;

(vii)      The Authority has waived, and shall be deemed to have waived, the automatic stay in any future insolvency proceeding commenced on behalf of the Authority (whether under Title III of PROMESA or otherwise) with respect to Net Receipts held in the funds and accounts established herein (other than the Net Receipts in the Arbitrage Rebate Fund);

(viii)    The Secured Obligations are not "tax supported debt," as defined and set forth in the Government of Puerto Rico's Debt Management Policy adopted pursuant to the Commonwealth Plan; and

(ix)    The Confirmation Order is full, final, complete, conclusive, and binding upon and will not be subject to collateral attack or other challenge in any court or other forum, and the Title III Court has retained jurisdiction for the life of the Secured Obligations to ensure compliance with the Plan of Adjustment, including through specific performance if necessary.

All things have been done which are necessary to make the Secured Obligations, when executed by the Authority and authenticated and delivered by the Trustee hereunder, the valid obligations of the Authority, and to constitute this Trust Agreement a valid trust for the security of the Secured Obligations, in accordance with the terms of this Trust Agreement.

## NOW, THEREFORE, THIS TRUST AGREEMENT WITNESSETH:

It is hereby covenanted and declared that all the Secured Obligations are to be authenticated and delivered and the property subject to this Trust Agreement is to be held and applied by the Trustee, subject to the covenants, conditions and trusts hereinafter set forth, and the Authority does hereby covenant and agree to and with the Trustee as follows:

This Trust Agreement provides for the following transactions:

(a)    Issuance by the Authority of its obligations to (i) settle certain claims made by the Authority's creditors, including claims relating to indebtedness previously issued by the Authority under its (x) Resolution No.  68-18, adopted June 13, 1968, as amended and supplemented thereafter and (y) Resolution No. 98-06, adopted February 26, 1998, as amended and supplemented and (ii) to fund new capital projects of the Authority relating to the Toll Facilities or, to refund, refinance or defease any obligations issued hereunder;

(b)    To establish that Secured Obligations issued by the Authority hereunder, in accordance with the Act and this Trust Agreement, are secured by a valid, binding and perfected first-priority lien on, and first-priority security interest in, the following, which shall be enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Authority of its assets, irrespective of whether such Persons have notice of such first-priority lien or first-priority security interest (the "**Trust Estate**"):

(i)    All right, title and interest of the Authority in and to the Pledged Revenues and the right to receive the same, including, without limitation, any moneys, income, revenues, accounts, contract rights or general intangibles derived therefrom, subject only to (A) Sections 5.01(b), 5.01(c) and Section 5.01(d) herein and (B) the senior lien and senior security interest granted hereby in the Trust Estate for the Holders of Bonds, which shall in all respects be senior and superior to the subordinate lien and subordinate security interest granted hereby in the Trust Estate for the benefit of Holders of Subordinated Indebtedness; and

- 3 -

(ii)     Except for the Priority Authority Expense Fund, the Shared Authority Expense Fund and the Arbitrage Rebate Fund, all of the Authority's right, title and interest in the funds and accounts created pursuant to this Trust Agreement and any Supplemental Trust Agreement and the money, securities and other assets on deposit with the Trustee in such funds and accounts created pursuant to this Trust Agreement and any Supplemental Trust Agreement and permitted by the Act; *provided, however*, that the priority in which such money and securities are applied to the repayment of the Secured Obligations shall be as expressly specified herein; and

(c)     Application of proceeds of such Secured Obligations, if any; and

(d)     The rights and remedies of the Holders from time to time of the Authority's obligations.

**IN TRUST**, that in accordance with the Confirmation Order, such first-priority lien and first-priority security interest in the Trust Estate for the benefit of the Holders of the Secured Obligations granted hereby shall be deemed automatically perfected as of the Effective Date and shall in any event be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Authority or its assets irrespective of whether such Persons have notice of such lien or security interest;

**IN TRUST**, that in order to secure the payment of principal of, redemption premium (if any), and interest on all Bonds issued and to be issued under this Trust Agreement, and the performance and observance of each and every covenant and condition contained herein and in the Bonds, and for the consideration of the premises and of the acceptance by the Trustee of all trusts hereby created, and of the acceptance of the Bonds by the respective Holders thereof, and for other good valuable consideration, the sufficiency of which is hereby acknowledged, and for the purpose of fixing and declaring the terms and conditions upon which the Bonds shall be issued, authenticated, delivered, secured, and accepted by all Persons who shall from time to time be or become Holders thereof, the Authority does hereby assign, pledge and grant a senior lien upon and a senior security interest in all of its right, title, and interest in the Trust Estate to the Trustee and its successors and assigns for the benefit of the Holders of Bonds, which shall in all respects be senior and superior to the subordinate lien and subordinate security interest pledged herein to the Holders of Subordinated Indebtedness;

**IN TRUST**, that in order to secure the payment of principal of, redemption premium (if any), and interest on all Subordinated Indebtedness issued and to be issued under this Trust Agreement, and the performance and observance of each and every covenant and condition contained herein and in the Subordinated Indebtedness, and for the consideration of the premises and of the acceptance by the Trustee of all trusts hereby created, and of the acceptance of the Subordinated Indebtedness by the respective Holders (as hereinafter defined) thereof, and for other good valuable consideration, the sufficiency of which is hereby acknowledged, and for the purpose of fixing and declaring the terms and conditions upon which the Subordinated Indebtedness shall be issued, authenticated, delivered, secured, and accepted by all Persons (as defined herein) who shall from time to time be or become Holders thereof, the Authority does hereby assign, pledge and grant a subordinate lien upon and a subordinate security interest in all of its right, title, and interest in the Trust Estate to the Trustee and its successors and assigns for the benefit of the

- 4 -

Holders of Subordinated Indebtedness, ***provided, however***,  that the lien and interest granted hereby for the benefit of Holders of Subordinated Indebtedness shall in all respects be junior, inferior and subordinate to and expressly subject to the senior lien and senior security interest in the Trust Estate pledged herein to the payment of the Bonds.

**IN TRUST**, that upon execution of this Trust Agreement, the first-priority lien and first-priority security interest securing the Secured Obligations shall immediately attach to the Trust Estate (including, without limitation, all Pledged Revenues and to the right to receive Toll Receipts) and shall thus immediately attach to any Toll Receipts, whether collected now or at any other time in the future by or on behalf of the Authority;

**IN TRUST**, no diversion, application, or misappropriation of the Trust Estate (including, without limitation, the Toll Receipts) shall limit, impair, defeat, or interfere with the first-priority lien and first-priority security interest securing the Secured Obligations;

**IN TRUST**, other than with respect to moneys in the Priority Authority Expense Fund, the Shared Authority Expense Fund and Arbitrage Rebate Fund, which are specifically identified herein as not constituting the Trust Estate, the liens on Toll Receipts and the Trust Estate securing the Secured Obligations shall continue to remain in full force and effect with respect to such property that is deposited in any deposit account or other type of account or fund of the Authority, any successor of the Authority, or other Person, bank, or institution (including the Trustee) where Toll Receipts, the Trust Estate, or other proceeds have been commingled with other funds;

**IN TRUST**, the liens securing the Secured Obligations shall not be affected or impaired by, among other things, the commingling of Toll Receipts, the Trust Estate, or any proceeds thereof with other amounts regardless of the Person, bank, or institution holding such amounts (including the Trustee);

**IN TRUST**, upon the terms and trusts herein set forth, the Trust Estate shall be held and applied for the equal and *pro rata* benefit and security of each and every owner of the Bonds issued and to be issued hereunder, without preference, priority or distinction as to participation in the senior lien and senior security interest granted by this Trust Agreement, and the benefit and protection thereof of one Bond over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except as herein otherwise expressly provided, so that each of such Bonds shall have the same right, lien and privilege hereunder and shall be equally secured hereby with the same effect as if the same shall have been made, issued and negotiated simultaneously with the delivery hereof and were expressed to mature on one and the same date;

**IN TRUST**, subject in all respects to the senior lien and senior security interest in the Trust Estate pledged to the payment of the Bonds, the Trust Estate shall be held and applied for the equal *and pro rata* benefit and security of each and every owner of Subordinated Indebtedness issued and to be issued hereunder, without preference, priority or distinction as to participation in the subordinate lien and subordinate security interest granted by this Trust Agreement, and the benefit and protection thereof of any Subordinated Indebtedness over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except as herein otherwise expressly provided, so that each of such Subordinated Indebtedness shall have

the same right, lien and privilege under this Trust Agreement and shall be equally secured hereby with the same effect as if the same shall have been made, issued and negotiated simultaneously with the delivery hereof and were expressed to mature on one and the same date;

**IN TRUST,** that these presents are upon the express condition that if the Authority or its successors or assigns shall well and truly pay or cause to be paid (i) the Principal of Bonds with interest, according to the provisions set forth in this Trust Agreement and in the Bonds, respectively and each of them or shall provide for the payment of Bonds by depositing or causing to be deposited with the Trustee the funds and/or securities required by Section 13.01 of this Trust Agreement, when and as authorized by the provisions of Section 13.01 of this Trust Agreement, (ii) the Principal of Subordinated Indebtedness with interest, according to the provisions set forth in this Trust Agreement and in the Subordinated Indebtedness, respectively and each of them or shall provide for the payment of Subordinated Indebtedness by depositing or causing to be deposited with the Trustee the funds and/or securities required by Section 13.01 of this Trust Agreement, when and as authorized by the provisions of Section 13.01 of this Trust Agreement and (iii) shall also pay or cause to be paid all other sums payable hereunder by the Authority, then, provided no Secured Obligations remain Outstanding hereunder, these presents and the estate and rights granted hereby and by the Act shall cease and be terminated, and thereupon the Trustee, on payment of its lawful charges and disbursements then unpaid, on demand of the Authority and upon the payment of the cost and expenses thereof, shall duly execute, acknowledge and deliver to the Authority such instruments of satisfaction or release as may be specified by the Authority as necessary or proper to discharge this Trust Agreement, including, if appropriate, any required discharge of record, and, subject to the provisions of the Act and the Plan of Adjustment, if necessary shall grant, reassign and deliver to the Authority, its successors or assigns, all and singular the property, rights, privileges and interest by it granted, conveyed and assigned by the Act, and all substitutes therefor, or any part thereof, not previously disposed of or released as herein provided; otherwise this Trust Agreement shall be and remain in full force.

**IT IS HEREBY COVENANTED, DECLARED AND AGREED** by and between the parties hereto that all Secured Obligations are to be issued, authenticated and delivered, and that the Trust Estate and any other property or amounts subject to the lien of this Trust Agreement and pledged to the payment of the Secured Obligations are to be held and applied, subject to the further covenants, conditions, releases, uses and trusts hereinafter set forth, and the Authority, for itself and its successors, does hereby covenant and agree to and with the Trustee and its respective successors in said trust as follows:

<u>**ARTICLE I**</u>

<u>**DEFINITIONS AND INTERPRETATION**</u>

**Section 1.01   Definitions.**  As used in this Trust Agreement the following terms have the following meanings, unless a different meaning clearly appears from the context:

**"AAFAF"** means the Puerto Rico Fiscal Agency and Financial Advisory Authority and any successors thereto.

"**Accreted Value**" means, with respect to the Capital Appreciation Bonds and Convertible Capital Appreciation Bonds (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bonds), as of the date of calculation, the Principal amount at initial issuance thereof, plus interest thereon to such date of calculation, capitalized semiannually on each Valuation Date at the accretion rate stated within the applicable Supplemental Trust Agreement until paid at stated maturity, or prior redemption permitted by the terms of the applicable Supplemental Trust Agreement or after stated maturity following payment default by the Authority, assuming that between Valuation Dates such Accreted Value increases in equal daily amounts on the basis of a 360-day year of twelve 30-day months; *provided, however*, that Accreted Value shall be, as of the time of the Authority actually makes a Sinking Fund Installment payment or other payment required or permitted to be made on such Capital Appreciation Bond or Convertible Capital Appreciation Bond, reduced by the amount, if any, that such payment exceeds accrued interest on such Capital Appreciation Bond or Convertible Capital Appreciation Bond (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bond) from the prior Valuation Date.

"**Act**" has the meaning given to such term in the Recitals.

"**Additional Bonds**" means Bonds issued by the Authority in accordance with Section 2.04(b).

"**Additional Subordinated Indebtedness**" means Subordinated Indebtedness issued by the Authority in accordance with Section 2.04(c) or Section 2.04(d).

"**Ancillary Agreements**" means this Trust Agreement, the Confirmation Order, the Plan of Adjustment and any other agreement or instrument entered into by the Authority or the Trustee in connection with, or in furtherance of, the Restructuring Transaction and in accordance with, or in furtherance of, the Plan of Adjustment.

"**Annual Budget**" means, for each Fiscal Year, the Authority's budget for the Toll Facilities, which shall be adopted pursuant to Section 7.02 of this Trust Agreement.

"**Annual Debt Service**" shall mean for any Fiscal Year, (i) an amount equal to the sum of the Principal due on all Outstanding Bonds or Subordinated Indebtedness, as applicable, in such Fiscal Year and on the next succeeding Principal Payment Date, excluding Principal actually paid on the first day of such Fiscal Year and including any Principal unpaid in prior Fiscal Years plus (ii) an amount equal to 100% of the interest due and payable on all Outstanding Bonds or Outstanding Subordinated Indebtedness, as applicable, in such Fiscal Year and on the next succeeding July 1, excluding interest actually paid on the first day of such Fiscal Year and including any interest unpaid in prior Fiscal Years (and, for the avoidance of doubt, interest on any overdue interest) calculated based on a 360-day year consisting of twelve (12) 30-day months for such Fiscal Year. For purposes of calculating such Annual Debt Service, the following assumptions are to be used:

(a) For all Secured Obligations other than Capital Appreciation Bonds or Convertible Capital Appreciation Bonds (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bonds), in determining the Annual Debt Service for Secured

Obligations in a Fiscal Year, payments shall be assumed to be made in accordance with the amortization schedule then in effect for such Secured Obligations, including any Sinking Fund Installments on of such Secured Obligations;

(b)     With respect to Capital Appreciation Bonds or Convertible Capital Appreciation Bonds (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bonds), the Accreted Value of Capital Appreciation Bonds or Convertible Capital Appreciation Bonds becoming due at maturity or by virtue of a Sinking Fund Installment shall be included in the calculation of Annual Debt Service only from and after the Valuation Date that is one year prior to the date on which such Accreted Value becomes so due, and the Principal and interest portions of such Accreted Value shall be deemed to accrue in equal daily installments from such Valuation Date to such due date.

"**Arbitrage Rebate Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof.

"**Authority**" has the meaning given to such term in the Recitals.

"**Authority By-Laws**" means the by-laws adopted by the Authority's board of directors and in effect on the Effective Date.

"**Authorized Officer**" means (a) in the case of the Authority, the Executive Director, and when used with reference to any act or document also means any other person authorized by a resolution or the Authority By-Laws to perform such act or execute such document and (b) in the case of the Trustee, any vice president, assistant vice president, senior associate, associate or other officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Trust Agreement, and when used with reference to any act or document also means any other person authorized to perform any act or sign any document by or pursuant to a resolution of the Board of Directors of the Trustee or the by-laws of the Trustee.

"**Bankruptcy Laws**" has the meaning given to such term in Section 11.01(d).

"**Bankruptcy Proceeding**" means any voluntary or involuntary insolvency, debt adjustment, any other proceeding under Bankruptcy Laws, any reorganization, receivership, liquidation, or any other similar case with respect to the Authority or with respect to a material portion of the Authority's assets.  For the avoidance of doubt, a Bankruptcy Proceeding shall include any and all of the actions listed in Section 11.01(d) of this Trust Agreement.

"**Bond**" means the Initial Bonds and any bond of the Authority authorized and issued pursuant to Section 2.01 hereof and the applicable Supplemental Trust Agreement, including Refunding Bonds and Additional Bonds issued in compliance with Section 2.02 and Section 2.04(a) or 2.04(b), as applicable; ***provided, however,*** that in no event shall Bonds include Subordinated Indebtedness.

**"Bondholder", "Holder of Bonds"** or **"Holder"** or any similar term, when used with reference to a Secured Obligation, means the registered owner thereof; **_provided, however_**, that for purposes of this Trust Agreement, in the case of any Insured Bonds, the applicable Bond Insurer shall be treated as (a) the sole Holder of the Insured Bonds insured by such Bond Insurer for the purpose of consenting to any modification or amendment, exercising any voting right or privilege, giving any consent or direction, or taking any action that the Holders of such Insured Bonds are entitled to take pursuant to the provisions of this Trust Agreement pertaining to defaults and remedies and the duties and obligations of the Trustee, and (b) an additional Holder of the Insured Bonds insured by such Bond Insurer for purposes of receiving any notices or exercising any rights to inspect documents provided for under this Trust Agreement.

**"Bond Insurance Policy"** means a municipal bond insurance policy, if any, issued by a Bond Insurer that guarantees payment of Principal of and interest on Insured Bonds.

**"Bond Insurer"** means the provider of a Bond Insurance Policy, if any, specified in a Supplemental Trust Agreement.

**"Book Entry Bond"** means a Secured Obligation issued to and registered in the name of a Depository for the participants in such Depository.

**"Business Day"** means any day other than (a) a Saturday or a Sunday or a legal holiday or (b) a day on which banking institutions in San Juan, Puerto Rico or New York, New York, are required or authorized by law, regulation or executive order to be closed.

**"Capital Appreciation Bond"** means any Secured Obligation as to which interest is capitalized on each Valuation Date therefor and is stated to be payable only at the maturity or prior redemption thereof.

**"Code"** means the Internal Revenue Code of 1986, as amended, and the applicable regulations thereunder.

"**Commonwealth**" means the Commonwealth of Puerto Rico.

**"Commonwealth Note"** means the Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Subordinated Indebtedness, Series 2022-1, as authorized to be issued by the Second Supplemental Trust Agreement, dated as of even date herewith, by and between the Authority and the Trustee.

**"Confirmation Order"** has the meaning given to such term in the Recitals.

**"Consulting Engineer"** means an independent engineer or engineering firm, or an affiliate thereof selected by the Authority that (a) is nationally recognized as being experienced with determining the costs of construction, operation, maintenance, repair, and/or replacement of facilities similar to the Toll Facilities and (b) has at least ten (10) years of experience in the field; provided, however, that for so long as the Oversight Board remains in existence, the Authority shall select the Consulting Engineer from a list of at least three (3) candidates provided to the Authority by the Oversight Board.

"**Convertible Capital Appreciation Bonds**" means Secured Obligations the interest in which is not paid prior to a specified Interest Commencement Date and is compounded periodically on certain designated dates prior to the Interest Commencement Date.

"**Corporate Trust Office**" means the principal office of the Trustee at which at any time its corporate trust business shall be administered, which office at the date hereof is located at 240 Greenwich Street, Floor 7 West, New York, New York 10286, Attention: Global Corporate Trust, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Holders and the Company).

"**Costs of Issuance**" means the items of expense to be paid by the Authority which are incurred prior to, upon and during a reasonable period of time after issuance of the Secured Obligations of a Series, in each case in connection with the authorization, sale and issuance of the Secured Obligations, which items of expense may include, but not be limited to, underwriting discount or fees, structuring fees, placement fees, document printing and reproduction costs, filing and recording fees, costs of credit ratings, initial fees and charges of a Depository or the Trustee and its counsel, other legal fees and charges, professional consultants' fees, fees and charges for execution, transportation and safekeeping of the Secured Obligations, premiums, fees and charges for insurance on the Secured Obligations, and other costs, charges and fees in connection with the foregoing.

"**Costs of Issuance Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof

"**Costs of Operation, Maintenance and Administration**" means all costs and expenses of operating, maintaining and administering the Toll Facilities as determined by the Consulting Engineer to keep the Toll Facilities open to public travel or which are otherwise attributable to the Toll Facilities and includes, without limitation, reasonable expenses of administration of the employees of the Authority solely with respect to the Toll Facilities (including nineteen percent (19%) of the monthly paygo invoices received by the Authority), costs of collecting and accounting for Tolls, insurance, employee bond premiums, fees of the Traffic Consultant, Consulting Engineer, accountants and legal fees, and, with respect to Toll Facilities, all other expenses determined by the Consulting Engineer to be required for the operation, maintenance and administration of the Toll Facilities; ***provided, however***, that the costs and expenses of the Trustee do not constitute Costs of Operation, Maintenance and Administration and shall be paid solely from amounts on deposit in the Trustee Expense Fund. Costs of Operation, Maintenance and Administration does not include (x) costs with respect to other facilities of the Authority that do not constitute Toll Facilities, (y) Renewal and Replacement Expenses or (z) any other capitalized expenditures. For the sake of clarity, (a) if a Consulting Engineer is then engaged by the Authority, all Costs of Operation, Maintenance and Administration are paid from the Priority Authority Expense Fund and (ii) if a Consulting Engineer is not then engaged by the Authority, Costs of Operation, Maintenance and Administration will be allocated by the Authority between Priority Costs of Operation, Maintenance and Administration paid from the Priority Authority Expense Fund and Shared Costs of Operation, Maintenance and Administration paid from the Shared Authority Expense Fund.

- 10 -

"**Current Interest Bonds**" means Secured Obligations on which the interest is payable on the Interest Payment Dates provided therefor in a Supplemental Trust Agreement, which Supplemental Trust Agreement may also provide that Secured Obligations initially issued as Convertible Capital Appreciation Bonds may become Current Interest Bonds on the date specified therein.

"**Debt Service Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof.

"**Defeasance Security**" means:

(a)      a direct obligation of, or any obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America;

(b)      any other US Government Obligation (including the interest component of Resolution Funding Corporation bonds for which the separation of principal and interest is made by request of the Federal Reserve Bank of New York in book-entry form), that is not subject to redemption prior to maturity other than at the option of the holder thereof or that has been irrevocably called for redemption on a stated future date; **provided** that at the time an investment therein is made such US Government Obligation is rated in the highest senior unsecured rating category by at least two Rating Services; and

(c)      a Municipal Obligation (i) that is not subject to redemption prior to maturity other than at the option of the holder thereof or as to which irrevocable instructions have been given to the trustee or paying agent of such Municipal Obligation by the obligor thereof to give due notice of redemption and to call such Municipal Obligation for redemption on the date or dates specified in such instructions and such Municipal Obligation is not otherwise subject to redemption prior to such specified date other than at the option of the holder thereof, (ii) the timely payment of the principal or redemption price thereof and interest thereon is fully secured by a fund consisting only of cash or obligations described in clause (a) above, which fund may be applied only to the payment of such principal of and interest and redemption premium, if any, on such Municipal Obligation on the maturity date thereof or the redemption date specified in the irrevocable instructions referred to in clause (i) above, and (iii) that at the time an investment therein is made is rated in the highest senior unsecured rating category by at least two Rating Services; *provided, however,* that such term shall not mean any interest in a unit investment trust or mutual fund or in "CATS," "TIGRS" or "TRS".

"**Depository**" means The Depository Trust Company, New York, New York, a limited purpose trust company organized under the laws of the State of New York (or its nominee), any other person, firm, association or corporation designated in the Supplemental Trust Agreement authorizing a Series of Secured Obligations to serve as securities depository for Secured Obligations of such Series, or any successor of any of the foregoing, as applicable.

"**Disbursement Schedule**" means a monthly schedule of Required Deposits and Annual Debt Service on Subordinated Indebtedness for a Fiscal Year, as provided in Section 7.02.

"**Effective Date**" means the date that the Plan of Adjustment becomes effective in accordance with its terms and the Confirmation Order.

- 11 -

"**Electronic Means**" means facsimile transmission, email transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another electronic method or system specified by the Trustee as available for use in connection with its services hereunder.

"**Eligible Investments**" means any of the following obligations or securities that the Authority is permitted to hold as an investment under the laws of the Commonwealth:

(a)      Defeasance Securities;

(b)      interest-bearing general obligations of the United States of America;

(c)      United States treasury bills and other non-interest bearing general obligations of the United States of America when offered for sale in the open market at a price below the face value of same, so as to afford the Authority a return on such investment in lieu of interest;

(d)      short-term discount US Government Obligations;

(e)      certificates of deposit of a Qualified Financial Institution which are (i) fully collateralized at least one hundred and ten percent (110%) by marketable US Government Obligations marked to market at least monthly, or (ii) insured by the Federal Deposit Insurance Corporation;

(f)      banker's acceptances of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(g)      commercial paper of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(h)      tax-exempt securities exempt from federal arbitrage provisions applicable to investments of proceeds of the Authority's tax-exempt debt obligations, provided that such securities must be rated by at least two Rating Services (with one such Rating Service being S&P or Moody's) no less than AA (or equivalent) and no less than the rating on the Bonds, and provided, further, that any such securities must be in book-entry form through The Depository Trust Company or a comparable depository;

(i)      domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission and rated in one of the highest two short-term rating categories by at least two Rating Services, including any such fund for which the Trustee or any of its affiliates provides any service including any service for which a fee may be paid;

(j)      Investment Agreements that are fully collateralized by Eligible Investments; and

(k)      domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission that invest solely in investments of the types described in clauses (a), (b), (c) and/or (d) of this definition.

C:\ND\torresrodriguezs6812\ndOffice\VAULT-2NOR0MND\Toll
Revenue Master Trust Agreement 4838-1565-0039 v.34.docx

"**EMMA**" means the Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board or any successor nationally recognized municipal securities information repositories recognized by the Securities and Exchange Commission for the purposes referred to in Rule 15c2-12, as promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended.

"**Event of Default**" has the meaning given to such term in Section 11.01 hereof.

"**Fiscal Year**" means a period of twelve (12) consecutive months beginning July 1 of a calendar year and ending on June 30 of the next subsequent calendar year.

"**Fitch**" means Fitch Ratings Inc. and its successors.

"**Force Majeure Event**" shall mean any of the following events. to the extent that such event is beyond the reasonable control of the Authority; an act of God, riot, war, terrorist act, epidemic, pandemic, quarantine, civil commotion, earthquake or natural catastrophe.

"**General Reserve Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof.

"**Government Entity**" means any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority or municipality of the Commonwealth.

"**Initial Bonds**" means collectively (i) the Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Bonds, Series 2022A, (ii) the Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Bonds, Series 2022B, and (iii) the Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Bonds, Series 2022C, each as authorized to be issued by the First Supplemental Trust Agreement, dated as of even date herewith, by and between the Authority and the Trustee.

"**Instructions**" has the meaning given to such term in Section 8.05.

"**Insured Bond**" means a Bond issued hereunder and designated as an Insured Bond in the Supplemental Trust Agreement authorizing the issuance thereof.

"**Interest Account**" means the account within the Debt Service Fund so designated, created and established pursuant to Section 5.01 hereof.

"**Interest Commencement Date**" means, with respect to any particular Convertible Capital Appreciation Bonds, the date specified in the Supplemental Trust Agreement providing for the issuance of such Convertible Capital Appreciation Bonds (which date must be prior to the maturity date for such Convertible Capital Appreciation Bonds) after which interest accruing on such Convertible Capital Appreciation Bonds shall thereafter be payable on Interest Payment Dates, with the first such payment being the applicable Interest Payment Date immediately succeeding such Interest Commencement Date.

- 13 -

"**Interest Payment Date**" means each January 1 and July 1; **provided, however,** that with respect to the Initial Bonds that are not issued as Capital Appreciation Bonds or Convertible Capital Appreciation Bonds (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bonds), such term also includes the Effective Date.

"**Investment Agreement**" means a repurchase agreement or other agreement for the investment of money with a Qualified Financial Institution.

"**KBRA**" means Kroll Bond Rating Agency Inc. and its successors.

"**Majority in Interest**" means as of any particular date of calculation, the Holders of a majority of the Outstanding Bonds eligible to act on a matter, measured by (a) with respect to Bonds, including Convertible Capital Appreciation Bonds after the applicable Interest Commencement Date with respect thereto and excluding Capital Appreciation Bonds and Convertible Capital Appreciation Bonds prior to the applicable Interest Commencement Date with respect thereto, the Principal amount thereof and (b) with respect to Capital Appreciation Bonds or Convertible Capital Appreciation Bonds (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bonds), the Accreted Value of such Bonds as of such date; **provided, however,** that in the event there are no Bonds Outstanding hereunder, "Majority in Interest" means as of any particular date of calculation, the Holders of a majority of the Outstanding Subordinated Indebtedness eligible to act on a matter.

"**Maximum Annual Debt Service**" means the maximum Annual Debt Service with respect to any specified indebtedness for any Fiscal Year during the term of such indebtedness.

"**Monthly Disbursement Date**" means the first Business Day of each calendar month.

"**Moody's**" means Moody's Investor Service, Inc. and its successors.

"**Municipal Obligation**" means an obligation of any state or territory of the United States of America, any political subdivision of any state or territory of the United States of America, or any agency, authority, public benefit corporation or instrumentality of such state, territory or political subdivision.

"**Net Receipts**" means, for any particular period required to be calculated herein, the amount of Toll Receipts less the Costs of Operation, Maintenance and Administration of the Toll Facilities for such period.

"**Operating Reserve Fund**" shall mean the Operating Reserve Fund established in Section 5.01.

"**Operating Reserve Requirement**" shall mean the amount set forth in the Disbursement Schedule delivered with respect to any Monthly Disbursement Date to pay Priority Costs of Operation, Maintenance and Administration of the Toll Facilities for the third and fourth months immediately succeeding such Monthly Disbursement Date.

"**Outstanding**", when used in reference to Secured Obligations, means, as of a particular date (which may be a date on or after the final maturity date of such Secured Obligations), all such

- 14 -

Secured Obligations authenticated and delivered hereunder and under any applicable Supplemental Trust Agreement except:

(a)     any Secured Obligations canceled by the Trustee at or before such date;

(b)     any Secured Obligations deemed to have been paid in accordance with Section 13.01 hereof;

(c)     any Bond canceled or paid pursuant to Section 3.09 and Section 4.06 hereof or any Bond in lieu of or in substitution for which another Bond, as applicable, shall have been authenticated and delivered pursuant to Article III, Section 4.06 or Section 10.06 hereof; and

(d)     for the purpose of calculating a Majority in Interest or a Quarter in Interest of Outstanding Secured Obligations hereunder, any Secured Obligation deemed to not be Outstanding in accordance with Section 10.05 hereof; and

(f) any Subordinated Indebtedness in lieu of or in substitution for which another Subordinated Indebtedness shall have been authenticated and delivered in accordance with the provisions of the Supplemental Trust Agreement pursuant to which such Subordinated Indebtedness was issued.

"**Oversight Board**" has the meaning given to such term in the Recitals.

"**Paying Agent**" means, with respect to the Secured Obligations of any Series, the Trustee and any other bank or trust company and its successor or successors, appointed pursuant to the provisions hereof or of a Supplemental Trust Agreement.

"**Person**" includes corporations, firms, associations, partnerships, joint ventures, joint stock companies, trusts, unincorporated organizations, or any government or any agency, instrumentality, or political subdivision thereof, as well as natural persons.

"**Plan of Adjustment**" means the plan of adjustment consummated in connection with the Authority's case under Title III of PROMESA, including the Confirmation Order entered by the Title III Court.

"**Pledged Revenues**" means (1) the Toll Receipts, (2) the right of the Authority to receive the Toll Receipts, (3) except for purposes of Section 7.01 of this Agreement, the proceeds derived from or related to any sale or disposition of, or any concession arrangement relating to all or any part of the Toll Facilities, and (4) investment income received on any amounts held in the Toll Receipts Fund, the Debt Service Fund, the Operating Reserve Fund, the Renewal and Replacement Fund, the Subordinated Indebtedness Fund and the General Reserve Fund. "Pledged Revenues" shall not include the proceeds of any gifts, grants, or other payments to the Authority from the United States of America, any state, territory, municipality or any public or private instrumentality, individual or entity that are not in the nature of a Toll.

"**Principal**" means collectively, the principal payment required to be made on a Secured Obligation on its final maturity date and each Sinking Fund Installment of a Secured Obligation due on a Principal Payment Date.

"**Principal Account**" means the account within the Debt Service Fund so designated, created and established pursuant to Section 5.01 hereof.

"**Principal Payment Date**" means each July 1.

"**Priority Authority Expense Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof.

"**Priority Costs of Operation, Maintenance and Administration**" means all Costs of Operation, Maintenance and Administration that are direct costs and expenses of the Authority that relate solely to the Toll Facilities and that are not Shared Costs of Operation, Maintenance and Administration; ***provided, however***, the nineteen percent (19%) of the monthly paygo invoices received by the Authority shall be deemed to be Priority Costs of Operation, Maintenance and Administration. For the sake of clarity, (a) if a Consulting Engineer is then engaged by the Authority, all Costs of Operation, Maintenance and Administration are paid from the Priority Authority Expense Fund and (ii) if a Consulting Engineer is not then engaged by the Authority, Costs of Operation, Maintenance and Administration will be allocated by the Authority between Priority Costs of Operation, Maintenance and Administration paid from the Priority Authority Expense Fund and the Shared Costs of Operation, Maintenance and Administration paid from the Shared Authority Expense Fund.

"**Proceeding**" means any suit in equity, action at law or other judicial or administrative proceeding.

"**PROMESA**" has the meaning given to such term in the Recitals.

"**Qualified Financial Institution**" means any of the following entities that has an equity capital of at least $125,000,000 or whose obligations are unconditionally guaranteed by an affiliate or parent having an equity capital of at least $125,000,000:

(a)     a securities dealer, the liquidation of which is subject to the Securities Investors Protection Corporation or other similar corporation, and (i) that is on the Federal Reserve Bank of New York list of primary government securities dealers and (ii) whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(b)     a bank, a trust company, a national banking association, a corporation subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a domestic branch or agency of a foreign bank which branch or agency is duly licensed or authorized to do business under the laws of any state or territory of the United States of America, a savings bank, a savings and loan association, an insurance company or association chartered or organized under the laws of any state of the United States of America, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest

- 16 -

rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(c)  a corporation affiliated with or which is a subsidiary of any entity described in (a) or (b) above or which is affiliated with or a subsidiary of a corporation which controls or wholly owns any such entity, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(d)  the Government National Mortgage Association or any successor thereto, the Federal National Mortgage Association or any successor thereto, or any other federal agency or instrumentality approved by the Authority; or

(e)  a corporation whose obligations, including any investments of any money held hereunder purchased from such corporation, are insured by an insurer that meets the applicable rating requirements set forth above.

"**Quarter in Interest**" means as of any particular date of calculation, the Holders of 25% or more of the Outstanding Bonds eligible to act on a matter, measured by (a) with respect to Bonds, including Convertible Capital Appreciation Bonds after the applicable Interest Commencement Date with respect thereto and excluding Capital Appreciation Bonds and Convertible Capital Appreciation Bonds prior to the applicable Interest Commencement Date with respect thereto, the Principal amount thereof and (b) with respect to Capital Appreciation Bonds or Convertible Capital Appreciation Bonds (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bonds), the Accreted Value of such Bonds as of such date; ***provided, however,*** that in the event there are no Bonds Outstanding hereunder, "Quarter in Interest" means as of any particular date of calculation, the Holders of 25% or more of Outstanding Subordinated Indebtedness eligible to act on a matter.

"**Rating Confirmation**" means the written confirmation of each Rating Service to the effect that the rating assigned, without regard to any insurance or other credit enhancement, to each of the Secured Obligations rated by such Rating Service will remain unchanged (without regard to changes in any rating outlook) and will not be withdrawn, suspended or reduced as a consequence of some act or occurrence.

"**Rating Service**" means as of any particular date of determination each of Fitch, KBRA, Moody's and S&P, or their respective successors, or any other nationally recognized statistical rating organization identified as such by the Securities and Exchange Commission.

"**Record Date**" means, when used in relation to the Bonds of a Series, the date specified as the record date for such Bonds in the Supplemental Trust Agreement authorizing such Bonds.

"**Redemption Price**" when used with respect to a Bond, means the Principal amount of such Bond plus the applicable premium, if any, payable upon redemption prior to maturity thereof pursuant hereto or to the applicable Supplemental Trust Agreement.

"**Refunding Bonds**" means any of the Bonds issued to refund, refinance or defease other Bonds in compliance with the provisions of Section 2.04(a) hereof.

"**Refunding Subordinated Indebtedness**" means any Subordinated Indebtedness issued to refund, refinance or defease Secured Obligations in compliance with the provisions of Section 2.04(c) hereof.

"**Renewal and Replacement Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof.

"**Renewal and Replacement Expenses**" means the costs of any replacement or renewal of capital assets or facilities of the Toll Facilities or unusual or extraordinary maintenance or repairs of the Toll Facilities.

"**Renewal and Replacement Requirement**" means the amount, if any, for the then-current Fiscal Year as set forth in the Annual Budget.

"**Reporting Agreement**" means the reporting agreement entered into on or around the date hereof substantially in the form attached hereto.

"**Required Deposits**" means for any Fiscal Year, an amount equal to the sum of (i) Costs of Operation, Maintenance and Administration of the Toll Facilities for such Fiscal Year; (ii) Annual Debt Service on Bonds for such Fiscal Year; (iii) Trustee Expenses Cap; (iv) deposit to Arbitrage Rebate Fund, if any, for such Fiscal Year; and (v) Toll Receipts required to be deposited in the Renewal and Replacement Fund in order to satisfy the Renewal and Replacement Requirement for such Fiscal Year.

"**Restructuring Transaction**" means the transactions contemplated by, or in furtherance of, the Plan of Adjustment.

"**S&P**" means S&P Global Ratings and its successors.

"**Secretary of Treasury**" means the Secretary of the Treasury of the Puerto Rico Department of Treasury.

"**Secured Obligations**" means collectively, all Bonds and Subordinated Indebtedness.

"**Serial Bonds**" means the Secured Obligations so designated in a Supplemental Trust Agreement.

"**Series**" means (i) with respect to Bonds, all of the Bonds authenticated and delivered on original issuance and pursuant hereto and to the Supplemental Trust Agreement authorizing such Bonds as a separate Series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution for such Bonds pursuant to Article III, Section 4.06 or Section 10.06 hereof, regardless of variations in maturity, interest rate, Sinking Fund Installments or other provisions, and (ii) with respect to Subordinated Indebtedness, all of the Subordinated Indebtedness authenticated and delivered on original issuance and pursuant hereto and to the Supplemental Trust Agreement authorizing such Subordinated Indebtedness as a separate Series of Subordinated

- 18 -

Indebtedness, and any Subordinated Indebtedness thereafter authenticated and delivered in lieu of or in substitution for such Subordinated Indebtedness pursuant to the Supplemental Trust Agreement authorizing such Subordinated Indebtedness, regardless of variations in maturity, interest rate, Sinking Fund Installments or other provisions.

**"Shared Authority Expense Fund"** means the fund so designated, created and established pursuant to Section 5.01 hereof.

"**Shared Costs of Operation, Maintenance and Administration**" means, with respect to Costs of Operation, Maintenance and Administration that are common to both the Toll Facilities and other facilities of the Authority, the share of such Costs of Operation, Maintenance and Administration allocated by the Authority to the Toll Facilities.  For the sake of clarity, (a) if a Consulting Engineer is then engaged by the Authority, all Costs of Operation, Maintenance and Administration are paid from the Priority Authority Expense Fund and (ii) if a Consulting Engineer is not then engaged by the Authority, Costs of Operation, Maintenance and Administration will be allocated by the Authority between Priority Costs of Operation, Maintenance and Administration paid from the Priority Authority Expense Fund and the Shared Costs of Operation, Maintenance and Administration paid from the Shared Authority Expense Fund.

**"Sinking Fund Installment"** means, as of any date of computation, the amount of money required to be paid on a single future July 1 for the retirement of any Secured Obligations which mature after said future July 1, but does not include any amount payable by the Authority by reason only of the maturity of a Secured Obligation.

**"Subordinated Indebtedness"** means the Commonwealth Note and any indebtedness of the Authority authorized and issued as Subordinated Indebtedness pursuant to Section 2.01 and the applicable Supplemental Trust Agreement, including indebtedness issued in compliance with Section 2.02 and 2.04(c) or 2.04(d); **_provided, however,_** that in no event shall Subordinated Indebtedness include Bonds.  Notwithstanding any contrary provision in this Trust Agreement, any Subordinated Indebtedness shall be governed in all respects by Article XII of this Trust Agreement.

**"Subordinated Indebtedness Fund"** means the fund so designated, created and established pursuant to Section 5.01 hereof.

**"Subordinated Payment Default"** means a failure by the Authority to pay when due, the principal of or interest on Subordinated Indebtedness.

**"Supplemental Trust Agreement"** means any Trust Agreement of the Authority amending or supplementing this Trust Agreement or any prior Supplemental Trust Agreement executed and becoming effective in accordance with the terms and provisions of Article IX hereof.

**"Tax Exempt Bond"** means any Secured Obligation as to which Transaction Counsel has rendered an opinion to the effect that interest on it is excluded from gross income for purposes of federal income taxation.

**"Term Bond"** means a Secured Obligation Bond so designated in a Supplemental Trust Agreement and payable from Sinking Fund Installments.

- 19 -

"**Testing Period**" has the meaning given to such term in Section 2.01(b)(i).

"**Title III Cases**" has the meaning given to such term in the Recitals.

"**Title III Court**" has the meaning given to such term in the Recitals.

"**Toll Facilities**" means collectively, PR-20, PR-52, PR-53 and PR-66.

"**Tolls**" means tolls, fares, incomes, receipts, special fees or permit fees, or other charges imposed by or on behalf of the Authority on the owners, lessors, lessees or operators of motor vehicles for the operation of or the right to operate those vehicles on the Toll Facilities, and fines and penalties and interest thereon collected as a result of a failure to pay any such amount.

"**Toll Receipts**" means (i) all cash receipts and automated or electric payments or credits from Tolls (including by way of the Auto-Expresso system) and (ii) the proceeds of any business interruption insurance relating to the Toll Facilities and of any other insurance which insures against loss of Toll Receipts.

"**Toll Receipts Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof.

"**Toll Schedule**" has the meaning given to such term in Section 7.01(d) of this Trust Agreement.

"**Traffic Consultant**" means any traffic and revenue consultant or firm of traffic and revenue consultants of national recognition with expertise and experience regarding the operation, management and financing of, and the collection of revenues from, bridges and toll roads, selected and employed by the Authority from time to time, provided, however, that for so long as the Oversight Board remains in existence, the Authority shall select the Traffic Consultant from a list of at least three (3) candidates provided to the Authority by the Financial Oversight and Management Board.

"**Traffic Consultant Study**" has the meaning given to such term in Section 7.01(d) of this Trust Agreement.

"**Transaction Counsel**" means a nationally recognized bond counsel as may be selected by the Authority for a specific purpose hereunder.

"**Trust Agreement**" means this Master Trust Agreement as amended or supplemented from time to time by Supplemental Trust Agreements in accordance with the terms and provisions hereof.

"**Trust Estate**" has the meaning given to such term in the granting clause of this Trust Agreement.

"**Trustee**" means the bank or trust company appointed as Trustee for the Secured Obligations pursuant to Section 8.01 hereof and having the duties, responsibilities and rights

provided for herein, and its successor or successors and any other bank or trust company which may at any time be substituted in its place pursuant hereto.

"**Trustee Expenses**" means the permitted costs, fees and expenses of the Trustee arising out of or incurred in connection with carrying out and administering its duties hereunder, but excludes the Trustee's rights to indemnification, including the fees and expenses incurred in connection with any indemnified claim.

"**Trustee Expense Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof.

"**Trustee Expenses Cap**" means an amount not to exceed $100,000.00.

"**US Government Obligation**" means (a) a direct obligation of, or an obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America, the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, Federal Home Loan Banks, the Government National Mortgage Association, or the Federal Farm Credit System and (b) an obligation of the United States of America which has been stripped by the United States Department of the Treasury itself or by any Federal Reserve Bank (not including "CATS," "TIGRS" and "TRS").

"**Valuation Date**" means with respect to any Capital Appreciation Bond or Convertible Capital Appreciation Bond (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bond), each January 1 and July 1; **provided, however,** that with respect to the Initial Bonds that are issued as Capital Appreciation Bonds or Convertible Capital Appreciation Bonds, such term also includes the Effective Date.

**Section 1.02   Rules of Construction.**  Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.  Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing persons shall include firms, associations and corporations, including public bodies as well as natural persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in this Trust Agreement, refer to this Trust Agreement.  All references to Articles and Sections in this Trust Agreement refer to the Articles and Sections hereof unless otherwise expressly stated.  All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

"**$**" and "**dollars**" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

# ARTICLE II.

## AUTHORIZATION AND ISSUANCE OF SECURED OBLIGATIONS

**Section 2.01   Authorization of Secured Obligations.**  The Secured Obligations hereby authorized to be issued and, in accordance with, and as provided by Section 3 of the Confirmation Order are secured by a first-priority lien on and first-priority security interest in the Trust Estate for the payment of the Principal and Redemption Price of and interest on all Outstanding Secured Obligations and, which Section 3 of the Confirmation Order provides shall be deemed automatically perfected as of the Effective Date and shall be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Authority or its assets irrespective of whether such Persons have notice of such first-priority  lien or first-priority security interest.

There are hereby authorized to be issued Bonds of the Authority to be designated as "Restructured Toll Revenue Senior Bonds," which, in accordance with, and as provided by Section 3 of the Confirmation Order are secured by a senior lien on and senior security interest in the Trust Estate for the payment of the Principal and Redemption Price of and interest on all Outstanding Bonds, which lien and security interest shall in all respects be senior and superior to the subordinate lien and security interest granted to the Holders of the Subordinated Indebtedness. The Bonds shall be special obligations of the Authority payable solely from the Trust Estate in the manner provided herein.

There is further hereby authorized to be issued Subordinated Indebtedness of the Authority to be designated as "Restructured Toll Revenue Subordinated Indebtedness," which, in accordance with, and as provided by Section 3 of the Confirmation Order are secured by a subordinate lien on and subordinate security interest in the Trust Estate for the payment of the Principal and Redemption Price of and interest on all Outstanding Subordinated Indebtedness, which lien and security interest shall in all respects be subject to and subordinate to the senior lien and senior security interest on the Trust Estate granted to the Holders of Outstanding Bonds.   The Subordinated Indebtedness shall be special obligations of the Authority payable solely from the Trust Estate in the manner provided herein.  Notwithstanding any contrary provision in this Trust Agreement, any Subordinated Indebtedness shall be governed in all respects by Article XII of this Trust Agreement

The aggregate principal amount of Secured Obligations which may be executed, authenticated and delivered is not limited except as provided hereby and the terms and conditions authorized by the Authority and set forth in the Ancillary Agreements.

The Secured Obligations may, if and when authorized by the Authority pursuant hereto and to one or more Supplemental Trust Agreements, be issued in one or more Series and the Secured Obligations of each Series shall contain an appropriate Series designation.

The Secured Obligations shall not constitute a debt of the Commonwealth or of any Government Entity other than the Authority.   The Secured Obligations shall not constitute indebtedness or an obligation of the Commonwealth or any subdivision thereof within the purview of any constitutional or statutory limitation or provision or a charge against the general credit or

- 22 -

taxing powers, if any, of any of them but shall be payable solely from the Trust Estate, including, particularly, the Pledged Revenues, as set forth herein.  The Authority has no taxing power.

**Section 2.02   Provisions for Issuance of Secured Obligations.**  The Authority shall issue Secured Obligations under this Trust Agreement in accordance with the terms of this Trust Agreement.  The Secured Obligations are permitted to be issued as provided herein. The issuance of the Initial Bonds, the Commonwealth Note and each Series of Additional Bonds, Refunding Bonds and Subordinated Indebtedness permitted to be issued hereunder shall be authorized by a Supplemental Trust Agreement or Supplemental Trust Agreements.  The Secured Obligations of a Series authorized to be issued shall be executed by the Authority and delivered to the Trustee. Such Secured Obligations shall from time to time and in such amounts as directed by the Authority be authenticated by the Trustee and by it delivered to or upon the order of the Authority upon receipt of the consideration therefor and upon delivery to the Trustee of:

(a)     A copy of this Trust Agreement and the Supplemental Trust Agreement authorizing such Secured Obligations, certified by an Authorized Officer of the Authority;

(b)     A written order as to the delivery of such Secured Obligations, signed by an Authorized Officer of the Authority, describing the Secured Obligations to be delivered and the purpose or purposes for which the Secured Obligations are being issued, designating the person(s) to whom such Secured Obligations are to be delivered and stating the consideration for such Secured Obligations (other than with respect to the Initial Bonds and the Commonwealth Note);

(c)     A certificate of an Authorized Officer of the Authority stating that the Authority is not, and, as a result of the issuance of such Secured Obligations, will not:

(i)      be, in default in the performance of any of the covenants, conditions, agreements or provisions contained herein or in the Ancillary Agreements (to the extent affecting the issuance of the Secured Obligations), or stating that after the issuance thereof the Authority shall no longer be in default in the performance of any of the covenants, conditions, agreements or provisions contained herein; and

(ii)     violate the restrictions on the issuance of Secured Obligations contained in the Ancillary Agreements;

(d)     A certificate of an Authorized Officer of the Authority demonstrating compliance with applicable provision of Section 2.04 of this Trust Agreement (other than with respect to the Initial Bonds and the Commonwealth Note);

(e)     A certified copy of the resolution of the board of AAFAF approving the issuance of the Series of Secured Obligations by the Authority; ***provided, however***, that if AAFAF is no longer in existence and has no successor, or if its successor is not required to approve the issuance of the applicable Series of Secured Obligations, then no such resolution shall be required; and

(f)     An opinion of Transaction Counsel to the effect that (i) this Trust Agreement and the applicable Supplemental Trust Agreement authorizing the Series of Secured Obligations have been duly and lawfully authorized, executed and delivered by the Authority; (ii) this Trust Agreement and the applicable Supplemental Trust Agreement are in full force and effect and are

- 23 -

valid and binding upon the Authority and enforceable in accordance with their terms; and (iii) the Authority is duly authorized and entitled to issue such Series of Secured Obligations and, upon the execution and delivery thereof and upon authentication by the Trustee, such Series of Secured Obligations will be duly and validly issued and will constitute valid and binding special obligations of the Authority entitled to the benefits of this Trust Agreement; ***provided, however,*** that such opinion of Transaction Counsel may rely on the determinations of the Title III Court as set forth in the Confirmation Order; ***provided, further***, that such opinion of Transaction Counsel may be qualified to the extent that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of equitable remedies or any particular remedy.

**Section 2.03   Supplemental Trust Agreements.**   Each Supplemental Trust Agreement authorizing the issuance of a Series of Secured Obligations shall specify the following:

(a)      The authorized principal amount of such Series of Secured Obligations;

(b)      The date or dates of the Secured Obligations, the maturity date or dates and principal amounts of each maturity of the Secured Obligations of such Series, the amount and date of each Sinking Fund Installment, as applicable, and which Secured Obligations of such Series are Serial Bonds or Term Bonds, if any, and the Record Date or Record Dates of the Secured Obligations of such Series;

(c)      The interest rate or rates, if any, on the Secured Obligations of such Series, which may include Capital Appreciation Bonds, Convertible Capital Appreciation Bonds or Current Interest Bonds, and the first date on which interest on the Secured Obligations of such Series shall be payable; ***provided, however,*** in no event shall a Holder of Secured Obligations be entitled to the payment of a penalty for a payment default (including, without limitation, penalty interest and any interest or other amounts due thereon) other than overdue interest that accrues at the regular non-penalty rate of the applicable Secured Obligation or interest accruing on such overdue interest at the regular non-penalty rate of the applicable Secured Obligation;

(d)      If all or a portion of the Secured Obligations of such Series are Capital Appreciation Bonds or Convertible Capital Appreciation Bonds, the Valuation Dates for such Secured Obligations and the Accreted Value on each such Valuation Date;

(e)      The denomination or denominations of and the manner of numbering and lettering of the Secured Obligations of such Series;

(f)      The Redemption Price or Redemption Prices, if any, and, subject to Article IV hereof, the redemption terms, if any, for the Secured Obligations of such Series;

(g)      Provisions for the sale or exchange of the Secured Obligations of such Series and for the delivery thereof;

(h)      The form of the Secured Obligations of such Series and the form of the Trustee's certificate of authentication thereon, and whether any Secured Obligations of such Series are to be issued as Book Entry Bonds and the Depository therefor;

(i)      Directions for the application of the proceeds of the Secured Obligations of such Series, including the amount of proceeds expected to be applied to each specific Toll Facility;

(j)      If all or a portion of such Secured Obligations will be issued as Insured Bonds, the terms and conditions for payment of such Insured Bonds under the applicable Bond Insurance Policy; *provided, however,* in no event shall the Holder of Insured Bonds or the Bond Insurer be entitled to the payment of a penalty for a payment default (including, without limitation, penalty interest and any interest or other amounts due thereon);

(k)      If Subordinated Indebtedness, the general terms and provisions of such Subordinated Indebtedness, including provisions relating to the redemption thereof; and

(l)      Any other provisions deemed advisable by an Authorized Officer of the Authority not in conflict with the provisions hereof or of any Ancillary Agreement.

**Section 2.04   Additional Indebtedness.** Following the issuance of the Initial Bonds and the incurrence of the Commonwealth Note, the Authority may not incur any additional indebtedness secured by a lien on the Trust Estate, except that the Authority may issue or incur:

(a)      Refunding Bonds, provided that there is delivered to the Trustee a certificate of an Authorized Officer of the Authority dated the date of issuance of such Refunding Bonds demonstrating that upon the issuance of such Series of Refunding Bonds, the Annual Debt Service on Outstanding Bonds in the then-current and each future Fiscal Year immediately after the issuance of the Refunding Bonds shall be equal to or less than the Annual Debt Service due on Outstanding Bonds in the then-current and each future Fiscal Year immediately prior to such issuance;

(b)      Additional Bonds to fund new capital projects of the Authority relating to the Toll Facilities, or to refund, refinance or defease Secured Obligations Outstanding hereunder, provided that there is delivered to the Trustee a certificate dated the date of initial issuance of such Additional Bonds, signed by an Authorized Officer of the Authority and approved by the Consulting Engineer and Traffic Consultant, setting forth:

(i)      (A) the amount of the Net Receipts for any twelve (12) consecutive calendar months out of the eighteen (18) calendar months immediately preceding the date of issuance of such Additional Bonds; provided that such amount shall be adjusted to give effect for such twelve (12) month period to any increases or decreases in Toll rates for which all legal conditions to effectiveness have been met on the date of issuance of such Additional Bonds; (B) the Maximum Annual Debt Service on the Bonds to remain Outstanding after the issuance of such Additional Bonds (including the Additional Bonds to be issued); (C) the Maximum Annual Debt Service on the Secured Obligations to remain Outstanding after the issuance of such Additional Bonds (including the additional Secured Obligations to be issued); (D) the percentage derived by dividing the amount in item (A) above by the amount shown in item (B) above, which percentage shall not be less than 120%; and (E) the percentage derived by dividing the amount in item (A) above by the amount shown in item (C) above, which percentage shall not be less than 115%; and

(ii)     (A) the amount of Net Receipts projected by the Traffic Consultant to be received by the Authority during the current Fiscal Year and each of the next succeeding five full Fiscal Years (the "**Testing Period**") following the issuance of such Additional Bonds (including the Secured Obligations to be issued); (B) the Annual Debt Service on the Additional Bonds to remain Outstanding after the issuance of such Additional Bonds (including the Additional Bonds to be issued) for the Testing Period; (C) the Annual Debt Service on the Secured Obligations to remain Outstanding after the issuance of such additional Secured Obligations (including the Secured Obligations to be issued) for the Testing Period; (D) the percentages derived by dividing the amount in item (A) above by the amounts shown in item (B) above, which percentages shall not be less than 120% in any Fiscal Year within the Testing Period; and (E) the percentages derived by dividing the amount in item (A) above by the amounts shown in item (C) above, which percentages shall not be less than 115% in any Fiscal Year within the Testing Period.

(c)     Refunding Subordinated Indebtedness, provided that there is delivered to the Trustee a certificate of an Authorized Officer of the Authority dated the date of issuance of such Refunding Subordinated Indebtedness demonstrating that upon the issuance of such Series of Refunding Subordinated Indebtedness, the Annual Debt Service on Outstanding Subordinated Indebtedness in the then-current and each future Fiscal Year immediately after the issuance of the Refunding Subordinated Indebtedness shall be equal to or less than the Annual Debt Service due on Outstanding Subordinated Indebtedness in the then-current and each future Fiscal Year immediately prior to such issuance; and

(d)     Subordinated Indebtedness to fund new capital projects of the Authority relating to the Toll Facilities, or to refund, refinance or defease Secured Obligations Outstanding hereunder, provided that there is delivered to the Trustee a certificate dated the date of initial issuance of such additional Subordinated Indebtedness, signed by an Authorized Officer of the Authority and approved by the Consulting Engineer and Traffic Consultant, setting forth:

(i)     (A) the amount of the Net Receipts for any twelve (12) consecutive calendar months out of the eighteen (18) calendar months immediately preceding the date of issuance of such additional Subordinated Indebtedness; provided that such amount shall be adjusted to give effect for such twelve (12) month period to any increases or decreases in Toll rates for which all legal conditions to effectiveness have been met on the date of issuance of such Subordinated Indebtedness; (B) the Maximum Annual Debt Service on the Secured Obligations to remain Outstanding after the issuance of such additional Subordinated Indebtedness (including Secured Obligations to be issued); and (C) the percentage derived by dividing the amount in item (A) above by the amount shown in item (B) above, which percentage shall not be less than 115%; and

(ii)     (A) the amount of Net Receipts projected by the Traffic Consultant to be received by the Authority during the Testing Period following the issuance of such additional Subordinated Indebtedness (including the Secured Obligations to be issued); (B) the Annual Debt Service on the Secured Obligations to remain Outstanding after the issuance of such additional Subordinated Indebtedness (including Secured Obligations to be issued) for the Testing Period and (C) the percentages derived by dividing the amount

- 26 -

in item (A) above by the amounts shown in item (B) above, which percentages shall not be less than 115% in any Fiscal Year within the Testing Period.

## ARTICLE III.

## GENERAL TERMS AND PROVISIONS OF BONDS

**Section 3.01  Place and Medium of Payment.**  The Bonds shall be payable, with respect to interest, Principal and Redemption Price, in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Except in the case of Book Entry Bonds (as provided in Section 3.10 hereof) or as otherwise provided in Section 4.06 hereof, upon presentation and surrender of Bonds, the Principal or Redemption Price of such Bonds that is due and payable shall be payable at the designated Corporate Trust Office of the Trustee. Payments on the Bonds shall be paid by check mailed to the registered owner thereof at the address thereof as it appears on the registry books of the Authority or if authorized by the Supplemental Trust Agreement authorizing a Series of Bonds by wire transfer to such registered owner of the Bonds of such Series.  For purposes of this Section, interest is payable on an Interest Payment Date to the registered owner of a Bond at the close of business on the Record Date for such Bond.  All payments of Principal or Redemption Price of or interest on Bonds shall specify the CUSIP number or numbers of the Bonds in connection with which such payment is made.

The Bonds of each Series shall be issued in the form of fully registered Bonds without coupons.

Bonds of each Series issued prior to the first Interest Payment Date thereof shall be dated as of the date specified in the Supplemental Trust Agreement authorizing the issuance thereof. Bonds of each Series issued on or subsequent to the first Interest Payment Date thereof shall be dated as of the Interest Payment Date immediately preceding the date of authentication thereof by the Trustee, unless such date of authentication shall be an Interest Payment Date, in which case they shall be dated as of such date of authentication; *provided, however,* that if, as shown by the records of the Trustee, interest on the Bonds of any Series has not been paid as of the Interest Payment Date immediately preceding the date of authentication thereof by the Trustee, the Bonds of such Series issued in lieu of Bonds surrendered for transfer or exchange shall be dated as of the date through which interest has been paid in full on the Bonds surrendered or, if no interest has been paid on the Bonds surrendered since their authentication, as of the date of authentication of the surrendered Bonds.  Bonds of each Series shall bear interest from (and including) their date and shall bear interest on overdue interest at the interest rate of such Bonds.  For the avoidance of doubt, if any Principal of, Redemption Price or accrued interest on, a Bond is not paid when due, such Principal, Redemption Price and interest shall remain due and payable until paid.

All Bonds of each Series shall mature and/or have Sinking Fund Installments on July 1 of the year or years fixed by the Supplemental Trust Agreement authorizing the issuance of such Bonds.  Interest on all Bonds (other than Capital Appreciation Bonds or Convertible Capital Appreciation Bonds) shall be payable on each Interest Payment Date of each year.  The first installment of interest due on the Bonds of a Series may be for such period as the Authority shall fix in the Supplemental Trust Agreement authorizing the issuance thereof.

- 27 -

**Section 3.02   Legends.**   The Bonds may contain, or have endorsed thereon, such provisions, specifications and descriptive words not inconsistent herewith or with any Supplemental Trust Agreement authorizing the same, as may be necessary or desirable and as may be determined by the Authority prior to their delivery.  The Initial Bonds shall distinctively bear the following legend: "DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE 12TH DAY OF OCTOBER, 2022."

**Section 3.03   CUSIP Numbers.**   The Authority shall provide for the assignment of CUSIP numbers for all Bonds and cause such CUSIP numbers to be printed thereon, and the Trustee shall use such CUSIP numbers in notices of redemption and on all checks payable to Bondholders as a convenience to Bondholders; *provided, however,* that any such notice may state that no representation is made as to the correctness of such number either as printed on such Bonds or as contained in any notice of redemption, and that an error in a CUSIP number as printed on such Bond or as contained in any notice of redemption shall not affect the validity of the proceedings for redemption.  The Authority shall promptly notify the Trustee of any change in the CUSIP numbers assigned to any Bond of which the Authority has knowledge.  The Trustee shall deliver a copy of the foregoing notice to the Holders promptly following its receipt thereof.

**Section 3.04   Execution and Authentication.**   The Bonds shall be executed in the name of the Authority by the manual or facsimile signature of an Authorized Officer thereof, and attested by the manual or facsimile signature of the Secretary or an Assistant Secretary of the board of the Authority or other Authorized Officer of the Authority, or in such other manner as may be permitted by law.  In case any one or more of the officers or employees who shall have signed any of the Bonds shall cease to be such officer or employee before the Bonds so signed shall have been actually authenticated and delivered by the Trustee, such Bonds may, nevertheless, be delivered as provided herein, and may be issued as if the persons who signed such Bonds had not ceased to hold such offices or be so employed.  Any Bond may be signed on behalf of the Authority by such persons as at the actual time of the execution of such Bond shall be duly authorized or hold the proper office in or be employed by, the Authority, although at the date of the Bonds such persons may not have been so authorized or have held such office or employment.

The Bonds of each Series shall bear thereon a certificate of authentication, in the form set forth in the Supplemental Trust Agreement authorizing the issuance of such Bonds, executed manually by the Trustee.  Only such Bonds as shall bear thereon such executed certificate of authentication shall be entitled to any right or benefit hereunder and no Bond shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee.  Such certificate of the Trustee upon any Bond executed on behalf of the Authority shall be conclusive evidence that the Bond so authenticated has been duly authenticated and delivered hereunder and that the Holder thereof is entitled to the benefits hereof.

**Section 3.05   Interchangeability of Bonds.**   Bonds, upon surrender thereof at the designated Corporate Trust Office of the Trustee with a written instrument of transfer satisfactory to the Trustee, duly executed by the registered owner or his attorney duly authorized in writing, may, at the option of the registered owner thereof, be exchanged for an equal aggregate principal amount of Bonds of the same Series, maturity and tenor of any other authorized denominations.

- 28 -

**Section 3.06    Transfer and Registry.**  So long as any of the Bonds remain Outstanding, the Authority shall maintain and keep, or cause to be maintained and kept, at the designated Corporate Trust Office of the Trustee, books for the registration and transfer of Bonds; and, upon presentation thereof for such purpose at said office, the Authority shall register or cause to be registered therein, and permit to be transferred thereon, under such reasonable regulations as it or the Trustee may prescribe, any Bond entitled to registration or transfer.  So long as any of the Bonds remain Outstanding, the Authority shall make all necessary provisions to permit the exchange of Bonds at the designated Corporate Trust Office of the Trustee.

**Section 3.07    Transfer of Bonds.**  Each Bond shall be transferable only upon the books of the Authority, which shall be kept for that purpose at the designated Corporate Trust Office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Authority or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer.  Upon the transfer of any such Bond, the Authority shall cause to be issued in the name of the transferee a new Bond or Bonds of the same aggregate principal amount, Series, maturity and tenor as the surrendered Bond.

The transferor shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code.  The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

The Authority and the Trustee may deem and treat the person in whose name any Outstanding Bond shall be registered upon the books of the Authority as the absolute owner of such Bond, whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the Principal or Redemption Price of and, subject to the provisions of Section 3.01 hereof with respect to Record Dates, interest on such Bond and for all other purposes whatsoever, and all such payments so made to any such registered owner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums paid, and neither the Authority nor the Trustee shall be affected by any notice to the contrary.  The Authority agrees to indemnify and save the Trustee harmless from and against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting in good faith and without negligence hereunder, in so treating such registered owner.

**Section 3.08    Regulations with Respect to Exchanges and Transfers.**  In all cases in which the privilege of exchanging Bonds or transferring Bonds is exercised, the Authority shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions hereof.  All Bonds surrendered in any such exchanges or transfers shall forthwith be canceled by the Trustee.  For every such exchange or transfer of Bonds, whether temporary or definitive, the Authority or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, which sum or sums shall be paid by the person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.  Notwithstanding any other provisions hereof, the cost of preparing each new Bond upon each exchange or transfer, and any

- 29 -

other expenses of the Authority or the Trustee incurred in connection therewith, shall be paid by the person requesting such exchange or transfer.  The Authority shall not be obliged to make, or cause to be made, any exchange or transfer of Bonds of any Series during the period beginning on the Record Date for such Bonds immediately preceding an Interest Payment Date on such Bonds and ending on such Interest Payment Date, or, in the case of any proposed redemption of Bonds of such Series, after the date immediately preceding the date notice of redemption has been mailed.

**Section 3.09   Bonds Mutilated, Destroyed, Lost or Stolen.**  In case any Bond shall become mutilated or be destroyed, lost or stolen, the Authority in its discretion may execute, and upon its request the Trustee shall authenticate and deliver, a new Bond of like Series, maturity, tenor and principal amount as the Bond so mutilated, destroyed, lost or stolen, in exchange and substitution for the mutilated, destroyed, lost or stolen Bond, upon surrender and cancellation of such mutilated Bond or in lieu of and substitution for such Bond so destroyed, lost or stolen, upon filing with the Authority evidence satisfactory to the Authority and the Trustee that such Bond has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Authority and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Authority and the Trustee may prescribe and paying such expenses as the Authority and the Trustee may incur in connection therewith.  All Bonds so surrendered to the Trustee shall be canceled by it and evidence of such cancellation shall be given to the Authority. In case any Bond which has matured or is about to mature shall have become mutilated or have been destroyed, lost or stolen, the Authority may, instead of issuing a Bond in exchange or substitution therefor, pay or authorize the payment of such mutilated Bond upon the surrender on or after the maturity date thereof, or authorize the payment of such destroyed, lost or stolen Bond, upon the Holder thereof filing evidence satisfactory to the Authority and the Trustee that such Bond has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Authority and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Authority and the Trustee may prescribe and paying such expenses as the Authority and the Trustee may incur in connection therewith.

**Section 3.10   Book Entry Bonds.**  Anything herein to the contrary notwithstanding, Bonds may be authorized and issued as Book Entry Bonds in accordance with the Supplemental Trust Agreement authorizing such Bonds.

For all purposes of this Trust Agreement the Holder of a Book Entry Bond shall be the Depository therefor and neither the Authority nor the Trustee shall have responsibility or any obligation to the beneficial owner of such Bond or to any direct or indirect participant in such Depository. Without limiting the generality of the foregoing, neither the Authority nor the Trustee shall have any responsibility or obligation to any such participant or to the beneficial owner of a Book Entry Bond with respect to (a) the accuracy of the records of the Depository or any participant with respect to any beneficial ownership interest in such Bond, (b) the delivery to any participant of the Depository, the beneficial owner of such Bond or any other person, other than the Depository, of any notice with respect to such Bond, including any notice of the redemption thereof, or (c) the payment to any participant of the Depository, the beneficial owner of such Bond or any other person, other than the Depository, of any amount with respect to the Principal or Redemption Price of, or interest on, such Bond.  The Authority and the Trustee may treat the Depository therefor as the absolute owner of a Book Entry Bond for the purpose of (x) payment of the Principal or Redemption Price of and interest on such Bond, (y) giving notices of redemption

- 30 -

and of other matters with respect to such Bond, (z) registering transfers with respect to such Bond, and for all other purposes whatsoever.  The Trustee shall pay all Principal or Redemption Price of and interest on such Bond only to or upon the order of the Depository, and all such payments shall be valid and effective to fully satisfy and discharge the Authority's obligations with respect to such Principal or Redemption Price and interest to the extent of the sum or sums so paid.  No person other than the Depository shall receive a Bond or other instrument evidencing the Authority's obligation to make payments of the principal or Redemption Price thereof and interest thereon.

Anything herein to the contrary notwithstanding, payment of the Redemption Price of a Book Entry Bond which is redeemed in part prior to maturity may be paid to the Depository by wire transfer without surrender of such Bond to the Trustee; *provided, however,* that the Trustee shall maintain records as to each such payment and of the principal amount of such Bond Outstanding, which shall be binding on the Authority and the Holders from time to time of such Bond.

The Authority, without the consent of the Trustee, the beneficial owner of a Book Entry Bond or any other person, may terminate the services of the Depository with respect to a Book Entry Bond if the Authority reasonably determines in good faith following consultation with the Trustee that (a) the Depository is unable to discharge its responsibilities with respect to such Bonds or (b) a continuation of the requirement that all of the Outstanding Bonds of like Series issued in book entry form be registered in the registration books of the Authority in the name of the Depository, is not in the best interest of the beneficial owners of such Bonds, and the Authority shall terminate the services of the Depository upon receipt by the Authority and the Trustee of written notice from the Depository that it has received written requests that such Depository be removed from its participants having beneficial interests, as shown in the records of the Depository, in an aggregate amount of not less than a Majority in Interest of the then Outstanding Bonds for which the Depository is serving as Depository.

Upon the termination of the services of a Depository with respect to a Book Entry Bond, or upon the resignation of a Depository with respect to a Book Entry Bond, after which no substitute securities depository willing to undertake the functions of such Depository can be found which, in the reasonable opinion of the Authority following consultation with the Trustee, is able to undertake such functions upon reasonable and customary terms, such Bonds shall no longer be registered in the registration books kept by the Trustee in the name of a Depository, but shall be registered in the name or names of the Bondholders transferring or exchanging such Bonds shall designate, in accordance with the provisions of Article III hereof.

In connection with any proposed transfer outside the book-entry system, the Authority or the Depository shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code.  The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

**Section 3.11   Preparation of Definitive Bonds; Temporary Bonds.**   The definitive Bonds of each Series shall be lithographed or printed on steel engraved borders, except that Book Entry Bonds may be typewritten.  Until the definitive Bonds of any Series are prepared, the

- 31 -

Authority may execute, in the same manner as is provided in Section 3.04 hereof, and deliver, in lieu of definitive Bonds, but subject to the same provisions, limitations and conditions as the definitive Bonds, except as to the denominations thereof and as to exchangeability for registered Bonds, one or more temporary Bonds, substantially of the tenor of the definitive Bonds in lieu of which such temporary Bond or Bonds are issued, in authorized denominations or any whole multiples thereof authorized by the Authority, and with such omissions, insertions and variations as may be appropriate to such temporary Bonds.  The Authority at its own expense shall prepare and execute and, upon the surrender at the designated Corporate Trust Office of the Trustee of such temporary Bonds for exchange and the cancellation of such surrendered temporary Bonds the Trustee shall authenticate and, without charge to the Holder thereof, deliver in exchange therefor, at the designated Corporate Trust Office of the Trustee, definitive Bonds of the same aggregate principal amount, Series and maturity as the temporary Bonds surrendered.  Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits and security as definitive Bonds issued pursuant hereto.

All temporary Bonds surrendered in exchange for a definitive Bond or Bonds shall be forthwith canceled by the Trustee.

## ARTICLE IV.

## REDEMPTION OF BONDS

**Section 4.01   Authorization of Redemption.**   Bonds subject to redemption prior to maturity pursuant hereto or to a Supplemental Trust Agreement shall be redeemable, in accordance with this Article IV, at such times, at such Redemption Prices and upon such terms as may otherwise be specified herein or in the Supplemental Trust Agreement authorizing such Series.

**Section 4.02   Redemption at the Election of the Authority.**

(a)      In the case of any redemption of Bonds other than as provided in Section 4.03 hereof, the Authority shall give written notice to the Trustee of its election to redeem, of the Series and of the principal amounts and Redemption Prices of the Bonds of each maturity of such Series to be redeemed.  Such notice shall be given not less than thirty (30) days prior to the redemption date.  The Series, maturities and principal amounts thereof to be so redeemed shall be determined by the Authority in its sole discretion, subject to, in the case of the redemption of less than all of any maturity of Bonds, any limitations with respect thereto contained herein (including, without limitation, Section 4.04 below) or in the Supplemental Trust Agreement authorizing such Series. The Authority shall pay to the Trustee, for the benefit of the Holders of the Bonds to be redeemed, on or prior to the redemption date an amount which, in addition to other amounts available therefor held by the Trustee in the Debt Service Fund, is sufficient to redeem on the redemption date at the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, all of the Bonds to be so redeemed.

(b)      In the case of a Partial Disposition pursuant to Section 7.18, the Bonds shall be subject to redemption, at a Redemption Price equal to the par amount thereof, plus accrued interest to the date of redemption, in an amount no less than (i) the allocable portion of Bonds related to the Toll Facilities subject to the disposition and (ii) the amount required to be redeemed in order

- 32 -

to maintain for the Tax-Exempt Bonds that will remain Outstanding after such Partial Disposition, the exclusion of interest on such Tax Exempt Bonds from gross income for purposes of federal income taxation, all as provided in the Supplemental Trust Agreement.

Section 4.03   **Redemption Other Than at Authority's Election.**   Whenever by the terms hereof or of a Supplemental Trust Agreement the Trustee is required to redeem Bonds through the application of mandatory Sinking Fund Installments, the Trustee shall select the Bonds of the Series and maturities to be redeemed in the manner provided in Section 4.04 hereof, give the notice of redemption and pay out of money available therefor the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, to the appropriate Paying Agents in accordance with the terms of this Article IV.

Section 4.04   **Selection of Bonds to be Redeemed.**   Unless otherwise provided in the Supplemental Trust Agreement authorizing the issuance of Bonds of a Series, in the event of redemption of less than all of the Outstanding Bonds of like Series, maturity and tenor, the Trustee shall assign to each Outstanding Bond of the Series, maturity and tenor to be redeemed a distinctive number for each unit of the principal amount of such Bond equal to the lowest denomination in which the Bonds of such Series are authorized to be issued and shall select by lot, using such method of selection as it shall deem proper in its discretion, from the numbers assigned to such Bonds as many numbers as, at such unit amount equal to the lowest denomination in which the Bonds of such Series are authorized to be issued for each number, shall equal the principal amount of such Bonds to be redeemed.  In making such selections the Trustee may draw the Bonds by lot (i) individually or (ii) by one or more groups, the grouping for the purpose of such drawing to be by serial numbers (or, in the case of Bonds of a denomination of more than the lowest denomination in which the Bonds of such Series are authorized to be issued, by the numbers assigned thereto as in this Section 4.04 provided) which end in the same digit or in the same two digits.  In case, upon any drawing by groups, the total principal amount of Bonds drawn shall exceed the amount to be redeemed, the excess may be deducted from any group or groups so drawn in such manner as the Trustee may reasonably determine.  The Trustee may in its discretion assign numbers to aliquot portions of Bonds and select part of any Bond for redemption.  The Bonds to be redeemed shall be the Bonds to which were assigned numbers so selected; ***provided, however,*** that only so much of the principal amount of each such Bond of a denomination of more than the lowest denomination in which the Bonds of such Series are authorized to be issued shall be redeemed as shall equal the lowest denomination in which the Bonds of such Series are authorized to be issued for each number assigned to it and so selected.

For purposes of this Section 4.04, the lowest denomination in which a Capital Appreciation Bond or Convertible Capital Appreciation Bond is authorized to be issued shall be the lowest Accreted Value authorized to be due at maturity on such Bonds.

Notwithstanding the foregoing, in the event that a Depository shall be the registered owner of all of such Bonds of the Series being redeemed, if less than all of the Bonds of a particular Series are called for redemption, the Authority shall select the maturity or maturities of such Series to be redeemed and the Depository, on behalf of the Trustee, shall select the Bonds within the same maturity of such Series to be redeemed by means of a random lottery and in any event in accordance with the applicable practices of the Depository.

- 33 -

**Section 4.05   Notice of Redemption.**   Whenever Bonds are to be redeemed, the Trustee shall give notice of the redemption of the Bonds in the name of the Authority which notice shall specify:  (a) the Bonds to be redeemed which shall be identified by the designation of the Bonds given in accordance with Article II hereof; (b) the maturity dates and interest rates or Accreted Value of the Bonds to be redeemed and the date of such Bonds; (c) the numbers and other distinguishing marks of the Bonds to be redeemed, including CUSIP numbers; (d) the redemption date; (e) the Redemption Price, if then known; (f) with respect to each such Bond, the principal amount thereof to be redeemed; (g) that, except in the case of Book Entry Bonds, such Bonds will be redeemed at the designated Corporate Trust Office of the Trustee giving the address thereof and the telephone number of the Trustee to which inquiries may be directed; (h) that no representation is made as to the correctness of the CUSIP number either as printed on the Bonds or as contained in such notice and that an error in a CUSIP number as printed on a Bond or as contained in such notice shall not affect the validity of the proceedings for redemption; and (i) if the Authority's obligation to redeem the Bonds is subject to conditions, a statement to that effect and of the conditions to such redemption.  Such notice shall further state that, if on such date all conditions to redemption have been satisfied, there shall become due and payable on such date upon each Bond to be redeemed the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, and that, from and after such date, payment having been made or provided for, interest thereon shall cease to accrue.  Such notice shall be given by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption date.  Such notice shall be sent by first class mail, postage prepaid (i) to the registered owners of the Bonds which are to be redeemed, at their last known addresses, if any, appearing on the registration books, and (ii) to the Bond Insurer (if any) insuring the Bonds to be redeemed, at the Bond Insurer's last known address, not more than ten (10) Business Days prior to the date such notice is given.  Upon giving such notice, the Trustee shall promptly certify to the Authority that it has mailed or caused to be mailed such notice to the Holders of the Bonds to be redeemed in the manner provided herein.  Such certificate shall be conclusive evidence that such notice was given in the manner required hereby.  The failure of any Holder of a Bond to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Bonds.

The Trustee shall, if any of the Bonds to be redeemed are Book Entry Bonds, transmit a copy of the notice of redemption to the Depository for such Book Entry Bonds not less than thirty (30) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Bonds are held by the Depository, such notice shall be given in accordance with the procedures of the Depository).  Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Bond and no such notice shall be required to be transmitted by the Authority directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Authority be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Bonds.  This paragraph shall not alter the Trustee's obligation to transmit a notice of redemption to the Bond Insurer as provided in the preceding paragraph.

**Section 4.06   Payment of Redeemed Bonds.**   Notice having been given in the manner provided in Section 4.05 hereof, the Bonds or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, plus interest accrued and unpaid to the redemption date, except as otherwise provided in Section 3.10

- 34 -

hereof, upon presentation and surrender of such Bonds, at the office or offices specified in such notice, and, in the case of Bonds presented by other than the registered owner, together with a written instrument of transfer duly executed by the registered owner or his duly authorized attorney, such Bonds, or portions thereof, shall be paid at the Redemption Price plus interest accrued and unpaid to the redemption date; *provided, however,* that payment of the Redemption Price may be paid by wire transfer to such registered owner if so authorized in the Supplemental Trust Agreement that authorized the Bonds of the Series to be redeemed.  If there shall be called for redemption less than all of the principal amount of a registered Bond, the Authority shall execute and the Trustee shall authenticate and deliver, upon the surrender of such Bond, without charge to the owner thereof, for the unredeemed balance of the principal amount of the registered Bond so surrendered, Bonds of like Series, maturity and tenor in any of the authorized denominations.  If, on the redemption date, money for the redemption of all Bonds or portions thereof of any like Series, maturity and tenor to be redeemed, together with interest accrued and unpaid thereon to the redemption date, shall be held by the Trustee and Paying Agents so as to be available therefor on such date and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, interest on the Bonds or portions thereof so called for redemption shall cease to accrue and such Bonds shall no longer be considered to be Outstanding hereunder.  If such money shall not be so available on the redemption date, such Bonds or portions thereof shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

## ARTICLE V.

### FUNDS AND ACCOUNTS;
### PLEDGED REVENUES AND APPLICATION THEREOF

**Section 5.01   Establishment of Funds and Accounts.**   (a) The following funds and separate accounts within funds constituting a portion of the Trust Estate are hereby established and shall be held, in trust, and maintained by the Trustee:

> Costs of Issuance Fund;
> Tolls Receipts Fund;
> Trustee Expense Fund;
> Debt Service Fund;
> > Interest Account; and
> > Principal Account;
> Operating Reserve Fund;
> Renewal and Replacement Fund
> Subordinated Indebtedness Fund; and
> General Reserve Fund

(b)     The Priority Authority Expense Fund shall be established and maintained by the Authority in a bank or trust company which is eligible under the laws of the Commonwealth to receive deposits of public funds. If a Consulting Engineer is then engaged by the Authority and has remained under such engagement for at least thirty (30) days, the Authority shall use amounts in the Priority Authority Expense Fund to pay Costs of Operation, Maintenance and

- 35 -

Administration of the Toll Facilities.  Moneys deposited in the Priority Authority Expense Fund or the Shared Authority Expense Fund in accordance with, and solely in the amounts provided for in this Trust Agreement, shall be released from, and no longer subject to, the lien of this Trust Agreement and shall no longer constitute part of the Trust Estate.

(c)     The Shared Authority Expense Fund shall be established and maintained by the Authority in a bank or trust company which is eligible under the laws of the Commonwealth to receive deposits of public funds.  If no Consulting Engineer is then engaged by the Authority, the Authority shall use amounts (i) in the Priority Authority Expense Fund to pay Priority Costs of Operation, Maintenance and Administration of the Toll Facilities and (ii) in the Shared Authority Expense Fund to pay Shared Costs of Operation, Maintenance and Administration of the Toll Facilities.  Moneys deposited in the Shared Authority Expense Fund in accordance with, and solely in the amounts provided for in this Trust Agreement, shall be released from, and no longer subject to, the lien of this Trust Agreement and shall no longer constitute part of the Trust Estate.

(d)     The Arbitrage Rebate Fund is hereby established and created and shall be held by the Trustee for the benefit of the Authority.  Moneys deposited in the Arbitrage Rebate Fund in accordance with, and solely in the amounts provided for in this Trust Agreement, shall be released from, and no longer subject to, the lien of this Trust Agreement and shall not longer constitute part of the Trust Estate.

(e)     Each such fund may contain one or more accounts or subaccounts, for purposes of internal accounting, as necessary for arbitrage calculations or as the Authority may otherwise deem proper.  All money at any time deposited in any fund, account or subaccount created hereby or by any Supplemental Trust Agreement or required hereby or thereby (other than the Priority Authority Expense Fund, the Shared Authority Expense Fund and the Arbitrage Rebate Fund) to be created shall be held in trust for the benefit of the Holders of Bonds, but shall nevertheless be disbursed, allocated and applied solely for the uses and purposes provided herein.

**Section 5.02** **Application of Secured Obligation Proceeds.**  Upon the receipt of proceeds from the sale of a Series of Secured Obligations (other than the Initial Bonds and the Commonwealth Note), the Authority shall apply such proceeds as specified in the Supplemental Trust Agreement authorizing such Series.

Accrued interest, if any, received upon the delivery of a Series of Secured Obligations shall be deposited in the Debt Service Fund unless all or any portion of such amount is to be otherwise applied as specified in the Supplemental Trust Agreement authorizing such Series.

**Section 5.03** **Application of Money in the Costs of Issuance Fund.**  (a) As soon as practicable after the delivery of each Series of Secured Obligations, there shall be deposited by the Authority into each account within the Costs of Issuance Fund the amount, if any, required to be deposited therein pursuant to the Supplemental Trust Agreement authorizing such Series.

(b)     Except as otherwise provided in this Article V and in any applicable Supplemental Trust Agreement, money in the Costs of Issuance Fund shall be used only to pay the Costs of Issuance of the Secured Obligations payable by the Authority.  Such payments shall be made by the Trustee upon the direction of an Authorized Officer of the Authority that sets forth in

- 36 -

reasonable detail the purpose of the payment, the amount of such payment and the name of the payee.  If such payment is to be made by bank wire, such direction shall include the routing and account numbers of the payee.  If such payment is to be made by check, such direction shall include the address of the payee.  The Trustee shall rely fully on any such written direction delivered pursuant to this Section and shall not be required to make any investigation in connection therewith.

(c)     The money remaining in the Costs of Issuance Fund after paying or making provision in accordance with the direction of an Authorized Officer of the Authority for the payments required to be made pursuant to paragraph (b) of this Section, including any Costs of Issuance then unpaid, shall be applied by the Trustee in the following order of priority:

First, to the Arbitrage Rebate Fund, the amount determined by the Authority to be required to be deposited therein; and

Second, to the Debt Service Fund, any balance remaining therein.

**Section 5.04   Deposit of Toll Receipts in the Toll Receipts Fund.**  (a)  Effective on the date of issuance of the Initial Bonds, the Authority has directed that all Toll Receipts be deposited with the Trustee in the Toll Receipts Fund on behalf of the Authority, until all Secured Obligations are fully paid or defeased in accordance with Section 13.01 below.  The Authority shall take all necessary actions to cause the prompt deposit of the Toll Receipts directly into the Toll Receipts Fund.

(b)     In the event that the Authority receives any Toll Receipts, the Authority shall promptly (and in no event later than three (3) Business Days) following the receipt thereof transfer all such Toll Receipts to the Trustee for deposit in the Toll Receipts Fund.  All Toll Receipts received by the Trustee shall be deposited as soon as practicable and in no event more than two (2) Business Days after receipt thereof by the Trustee, into the Toll Receipts Fund.  Amounts held in the Toll Receipts Fund shall be applied by the Trustee to fund the deposits in the priority set forth in Section 5.05 below.

**Section 5.05   Application of Toll Receipts**.  (a) On each Monthly Disbursement Date, the Trustee shall withdraw Toll Receipts from the Toll Receipts Fund and transfer and apply such amounts as follows and in the following order of priority:

*First*:  To the Trustee Expense Fund, Toll Receipts in an amount sufficient to fund the Trustee Expense Fund at the Trustee Expenses Cap; ***provided***, ***however***, in no event shall the deposits to the Trustee Expense Fund exceed the Trustee Expenses Cap for the Fiscal Year.  Amounts on deposit shall be applied, subject to the approval of an Authorized Officer of the Authority (which approval shall not be unreasonably withheld), to the payment of the reasonable costs and expenses of the Trustee;

*Second*: If a Consulting Engineer is then engaged by the Authority, to the Authority for deposit into the Priority Authority Expense Fund, Toll Receipts in an amount such that the amount on deposit in the Priority Authority Expense Fund equals the amount set forth in the Disbursement Schedules delivered with respect to such Monthly Disbursement Date to pay Costs of Operation, Maintenance and Administration of the Toll Facilities for the two months immediately succeeding

- 37 -

such Monthly Disbursement Date.  The monthly payments shall be increased or decreased, as necessary, to reflect amendments to the Disbursement Schedule, provided that any increase in Costs of Operation, Maintenance and Administration of the Toll Facilities effectuated by such amendment shall comply with the requirements of Section 7.02 herein.  If a Consulting Engineer is then engaged by the Authority and has remained under such engagement for at least thirty (30) days, Toll Receipts on deposit in the Priority Authority Expense Fund shall be applied by the Authority from time to time solely to pay the Costs of Operation, Maintenance and Administration of the Toll Facilities;

*Third*: If no Consulting Engineer is then engaged by the Authority, to the Authority for deposit into the Priority Authority Expense Fund, Toll Receipts in an amount such that the amount on deposit in the Priority Authority Expense Fund equals the amount set forth in the Disbursement Schedules delivered with respect to such Monthly Disbursement Date to pay Priority Costs of Operation, Maintenance and Administration of the Toll Facilities for the two months immediately succeeding such Monthly Disbursement Date.  The monthly payments shall be increased or decreased, as necessary, to reflect amendments to the Disbursement Schedule, provided that any increase in Priority Costs of Operation, Maintenance and Administration of the Toll Facilities effectuated by such amendment shall comply with the requirements of Section 7.02 herein.  If no Consulting Engineer is then engaged by the Authority, Toll Receipts on deposit in the Priority Authority Expense Fund shall be applied by the Authority from time to time solely to pay the Priority Costs of Operation, Maintenance and Administration of the Toll Facilities;

*Fourth:* To the following accounts in the following order of priority:

(i)     the Interest Account of the Debt Service Fund, Toll Receipts in an amount equal to one-sixth (1/6) of the amount of interest due and payable on the Bonds on the next Interest Payment Date, plus an amount equal to any shortfall from prior periods; and

(ii)    the Principal Account of the Debt Service Fund, Toll Receipts in an amount equal to one-twelfth (1/12) of the Principal amount of the Bonds due and payable on the next Principal Payment Date, including Sinking Fund Installments and Accreted Value, if applicable, plus an amount equal to any shortfall from prior periods;

In making such deposits, the Trustee shall reduce the amount of the Required Deposits by any investment earnings which have accrued in such Account.

*Fifth*:  If a Subordinated Payment Default shall have occurred and be continuing, Toll Receipts in an amount sufficient to pay all past due principal of and interest on the Subordinated Indebtedness;

*Sixth*: If no Consulting Engineer is then engaged by the Authority, to the Authority for deposit into the Shared Authority Expense Fund, Toll Receipts in an amount such that the amount on deposit in the Shared Authority Expense Fund equals the amount set forth in the Disbursement Schedules delivered with respect to such Monthly Disbursement Date to pay Shared Costs of Operation, Maintenance and Administration of the Toll Facilities for the two months immediately succeeding such Monthly Disbursement Date.  The monthly payments shall be increased or decreased, as necessary, to reflect amendments to the Disbursement Schedule, provided that any

- 38 -

increase in Shared Costs of Operation, Maintenance and Administration of the Toll Facilities effectuated by such amendment shall comply with the requirements of Section 7.02 herein.  If no Consulting Engineer is then engaged by the Authority, Toll Receipts on deposit in the Shared Authority Expense Fund shall be applied by the Authority from time to time solely to pay the Shared Costs of Operation, Maintenance and Administration of the Toll Facilities.  In the event a Consulting Engineer is thereafter serving in such role for at least thirty (30) days, amounts on deposit in the Shared Authority Expense Fund shall be transferred to the Priority Authority Expense Fund;

*Seventh*: To the Trustee for deposit into the Operating Reserve Fund, Toll Receipts to maintain a balance therein equal to the Operating Reserve Requirement;

*Eighth*:  Upon the written direction of an Authorized Officer of the Authority, to the extent Toll Receipts are available therefor, to the Arbitrage Rebate Fund, Toll Receipts in the amount set forth in such direction;

*Ninth*:  To the Renewal and Replacement Fund, Toll Receipts in an amount equal to one-twelfth (1/12) of the Renewal and Replacement Requirement budgeted to be funded from Toll Receipts as set forth in the applicable Annual Budget  for such Fiscal Year; ***provided, however***, that in the event the Authority shall determine that the amounts on deposit therein are excessive for the purpose of the Renewal and Replacement Fund, the Authority shall amend the Annual Budget to decrease the Renewal and Replacement Requirement solely to the extent such amendment is accompanied by a certificate by the Consulting Engineer that supports any decrease in the Renewal and Replacement Requirement and such excess amount may be withdrawn from the Renewal and Replacement Fund by the Authority and transferred to and deposited in the General Reserve Fund and used as provided herein;

*Tenth*: To the Subordinated Indebtedness Fund, to the extent Toll Receipts are available to pay (i) interest on Subordinated Indebtedness due on the next succeeding Interest Payment Date, and (ii) principal on Subordinated Indebtedness on the next succeeding Principal Payment Date; and

*Eleventh*: To the General Reserve Fund, any remaining balance.

**Section 5.06  <u>Debt Service Fund.</u>**  (a)  The Trustee shall pay out of the Debt Service Fund, the Principal of and interest on all Outstanding Bonds as the same is due and payable. Amounts paid to a Paying Agent for payments pursuant to this Section shall be irrevocably held in trust for Holders of Bonds and applied to such payments.

(b)      Notwithstanding the provisions of this Section, the Authority may, at any time but in no event less than thirty-five (35) days prior to the succeeding date on which a Sinking Fund Installment is scheduled to be due, direct the Trustee to purchase, with money on deposit in the Debt Service Fund, at a price not in excess of the Principal amount (with respect to Bonds that are not Capital Appreciation Bonds or Convertible Capital Appreciation Bonds) or the Accreted Value (with respect to Capital Appreciation Bonds or Convertible Capital Appreciation Bonds (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bonds)) thereof plus interest accrued and unpaid to the date of such purchase, Term Bonds to be

redeemed from such Sinking Fund Installment; *provided, however*, that the portion of such purchase price funded from the Principal Account shall not exceed the amount of the upcoming Sinking Fund Installment due on such purchased bond and the portion of such purchase price funded from the Interest Account shall not exceed the amount of interest accrued and unpaid on such purchased bond to the date of such purchase; *provided, further,* that in the case of Capital Appreciation Bonds or Convertible Capital Appreciation Bonds (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bonds), no portion of the purchase price may be funded from the Interest Account.  Any Term Bond so purchased or otherwise purchased and delivered to the Trustee shall be canceled upon receipt thereof by the Trustee and evidence of such cancellation shall be given to the Authority.  The Principal amount or Accreted Value, as applicable, of each Term Bond so canceled shall be credited against the Sinking Fund Installment due on such date.

(c)     If at the time the Trustee is required to make a withdrawal from the Debt Service Fund the moneys therein shall not be sufficient for such purpose, the Trustee shall withdraw the amount of such deficiency *first*, from moneys on deposit in the General Reserve Fund in accordance with Section 5.10(b) of this Trust Agreement; *second*, from the Toll Receipts on deposit in the Renewal and Replacement Fund; *third,* from the moneys on deposit in the Operating Reserve Fund; and *fourth*, from the moneys on deposit in the Subordinated Indebtedness Fund; and, in each instance, transfer the same to the Debt Service Fund.

(d)     In the case of a Partial Disposition pursuant to Section 7.18, the proceeds of such Partial Disposition shall be deposited in the Debt Service Fund and applied to the payment of the Redemption Price of Bonds to be redeemed, if any.

**Section 5.07    Operating Reserve Fund**.  (a) If a Consulting Engineer is then engaged by the Authority, the moneys in the Operating Reserve Fund shall be used, when necessary, to pay Costs of Operation, Maintenance and Administration of the Toll Facilities to the extent that the monies on deposit in the Priority Authority Expense Fund are insufficient therefor; provided any requisition by the Authority for funds from the Operating Reserve Fund to pay Costs of Operation, Maintenance and Administration of the Toll Facilities shall be accompanied by a certificate of the Consulting Engineer, which certificate shall set forth an explanation of the reason such monies are required and shall be subject to the requirements of Section 7.02(a)(v) and (vi) herein.

(b)     If no Consulting Engineer is then engaged by the Authority, the moneys in the Operating Reserve Fund shall be used, when necessary, to pay the following payments in the following priority; *first*, Priority Costs of Operation, Maintenance and Administration of the Toll Facilities to the extent that the monies on deposit in the Priority Authority Expense Fund are insufficient therefor and *second*, Shared Costs of Operation, Maintenance and Administration of the Toll Facilities to the extent that the monies on deposit in the Shared Authority Expense Fund are insufficient therefor; provided any requisition by the Authority for funds from the Operating Reserve Fund to pay Costs of Operation, Maintenance and Administration of the Toll Facilities, Priority Costs of Operation, Maintenance and Administration of the Toll Facilities or Shared Costs of Operation, Maintenance and Administration of the Toll Facilities shall be accompanied by a certificate of the Authority, which certificate shall set forth an explanation of the reason such monies are required and shall be subject to the requirements of Section 7.02(a)(v) and (vi) herein

(c)      Amounts on deposit in the Operating Reserve Fund shall be transferred, to the
extent required to the following funds, in the following order of priority (i) in accordance with
Section 5.06(c), to the Debt Service Fund, if at the time the Trustee is required to make a
withdrawal from the Debt Service Fund, the moneys therein shall not be sufficient therefor and
after the amounts, if any, transferred from the General Reserve Fund and the Toll Receipts, if any,
transferred from the Renewal and Replacement Fund are not sufficient for such purpose and (ii) in
accordance with Section 5.11(a), to the Arbitrage Rebate Fund, if at the time the Trustee is required
to make a withdrawal from the Arbitrage Rebate Fund, the moneys therein, the amounts, if any,
transferred from the General Reserve Fund and the Toll Receipts, if any, transferred from the
Renewal and Replacement Fund are not sufficient for such purpose.

**Section 5.08   Renewal and Replacement Fund**.  (a) The Authority shall cause to be
deposited in the Renewal and Replacement Fund, the proceeds of all gifts, grants, or other
payments to the Authority from the United States of America, any state, territory, municipality or
any public or private instrumentality, individual or entity, which proceeds are required to be
applied to the payment of Renewal and Replacement Expenses of the Toll Facilities.  Except as
provided in subsection (b), the moneys in the Renewal and Replacement Fund shall be used, when
necessary, for the purpose of paying Renewal and Replacement Expenses.  Improvements funded
from moneys in the Renewal and Replacement Fund are deemed to be part of the Toll Facilities.

(b)      Toll Receipts on deposit in the Renewal and Replacement Fund shall be transferred
to the following funds and accounts in the following order of priority (i) in accordance with
Section 5.06(c), to the Debt Service Fund, if at the time the Trustee is required to make a
withdrawal from the Debt Service Fund the moneys therein shall not be sufficient therefor and
after the amounts, if any, transferred from the General Reserve Fund are not sufficient for such
purpose and (ii) in accordance with Section 5.11(a), to the Arbitrage Rebate Fund, if at the time
the Trustee is required to make a withdrawal from the Arbitrage Rebate Fund the moneys therein
and the amounts, if any, transferred from the General Reserve Fund are not sufficient for such
purpose.

**Section 5.09   Subordinated Indebtedness Fund.**  (a) The Trustee shall pay out of the
Subordinated Indebtedness Fund, the Principal of and interest on Outstanding Subordinated
Indebtedness as the same is due and payable.  Amounts paid to a Paying Agent for payments
pursuant to this Section shall be irrevocably held in trust for Holders of Subordinated Indebtedness
and applied to such payments.

(b)      Amounts on deposit in the Subordinated Indebtedness Fund shall be transferred to
the Debt Service Fund in accordance with Section 5.06(c), if at the time the Trustee is required to
make a withdrawal from the Debt Service Fund the moneys therein shall not be sufficient therefor
and after the amounts, if any, transferred from the General Reserve Fund, the Toll Receipts, if any,
transferred from the Renewal and Replacement Fund, and the amounts, if any, transferred from
the Operating Reserve Fund are not sufficient for such purpose.

(c)      Money in the Subordinated Indebtedness Fund that on the last day of each Fiscal
Year is in excess of the amount then required by Section 5.05 hereof to be therein may at the
direction of the Authority either be retained therein or transferred to any other fund or account
established pursuant hereto; ***provided, however***, that if no direction has been given by the

- 41 -

Authority, the excess on the last day of each Fiscal Year shall be transferred by the Trustee to the General Reserve Fund.

(d)      In the case of a Partial Disposition pursuant to Section 7.18, the proceeds of such Partial Disposition remaining after the deposit made pursuant to Section 5.06(d) shall be deposited in the Subordinated Indebtedness Fund and applied to the payment of the Redemption Price of the Subordinated Indebtedness to be redeemed, if any.

**Section 5.10   General Reserve Fund.**  (a) Unless an Event of Default has occurred and is continuing, amounts deposited in the General Reserve Fund shall be applied by the Trustee at the direction of the Authority, in such manner, in such priority, and at such times as the Authority shall determine (i) to the purchase or redemption of Bonds, or (ii) for any Toll Facility-related lawful purpose of the Authority; ***provided, however***, that no moneys on deposit in the General Reserve Fund shall be used in any Fiscal Year for the purposes provided in this subsection unless all payments required in clauses *first* through *tenth* of Section 5.05(a), including any deficiencies for prior payments, have been made in full for such Fiscal Year, the Operating Reserve Fund and Renewal and Replacement Fund are each funded at their applicable requirements and the Authority shall have fully complied in all material respects with all covenants and agreements contained in this Trust Agreement.

(b)      Amounts on deposit in the General Reserve Fund shall be transferred to the following funds and accounts in the following order of priority (i) in accordance with Section 5.06(c), to the Debt Service Fund, if at the time the Trustee is required to make a withdrawal from the Debt Service Fund the moneys therein are not sufficient for such purpose  and (ii) in accordance with Section 5.11(a), to the Arbitrage Rebate Fund at any time money is required for such purpose.

**Section 5.11   Arbitrage Rebate Fund**.  (a) The Trustee shall deposit to the Arbitrage Rebate Fund any money delivered to it by the Authority for deposit therein and, in accordance with the provisions of this Article V, shall transfer to the Arbitrage Rebate Fund from the following funds, in the following order of priority in accordance with the written direction of the Authority (i) moneys on deposit in the General Reserve Fund, (ii) Toll Receipts on deposit in the Renewal and Replacement Fund, and (iii) moneys on deposit in the Operating Reserve Fund, at such times and in such amounts as shall be set forth in such written directions of the Authority.

(b)      Money on deposit in the Arbitrage Rebate Fund shall be applied by the Trustee in accordance with the direction of an Authorized Officer of the Authority only for the purpose of making payments to the Department of the Treasury of the United States of America at such times and in such amounts as the Authority shall determine, based on an opinion of Transaction Counsel, to be required by the Code to be rebated to the Department of the Treasury of the United States of America.  Money which an Authorized Officer of the Authority determines to be in excess of the amount required to be so rebated, shall, at the direction of the Authority, either be retained therein or transferred to any other fund or account established pursuant hereto.

(c)      If and to the extent required by the Code, the Authority shall periodically, at such times as may be required to comply with the Code, determine the amount required by the Code to be rebated to the Department of the Treasury of the United States of America with respect to Tax

- 42 -

Exempt Bonds and (i) transfer or direct the Trustee to transfer from any other of the funds and accounts held hereunder (excluding any funds or accounts earmarked for the payment of the Secured Obligations pursuant to Article V hereof) and deposit to the Arbitrage Rebate Fund, such amount as the Authority shall have determined to be necessary in order to enable it to comply with its obligation to rebate money to the Department of the Treasury of the United States of America with respect to Tax Exempt Bonds and (ii) pay out of the Arbitrage Rebate Fund to the Department of the Treasury of the United States of America the amount, if any, required by the Code to be rebated thereto.

    **Section 5.12   Transfer of Investments.**   Whenever money in any fund or account established hereunder is to be paid in accordance herewith to another such fund or account, such payment may be made, in whole or in part, by transferring to such other fund or account investments held as part of the fund or account from which such payment is to be made, whose value, together with the money, if any, to be transferred, is equal to the amount of the payment then to be made; ***provided, however,*** that no such transfer of investments would result in a violation of any investment standard or guideline applicable to such fund.

### ARTICLE VI.

### SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

    **Section 6.01   Security for Deposits**.  All moneys held hereunder by the Trustee shall be continuously and fully secured, for the benefit of the Holders of the Bonds, and solely to the extent of any moneys held by the Trustee for the benefit of the Authority pursuant to the terms of this Trust Agreement, for the benefit of the Authority, in such manner as may then be required by applicable federal or Commonwealth laws and regulations regarding security, by Eligible Investments of a market value at least equal at all times to the amount of the deposit so held by the Trustee.  The Trustee shall have no obligation for the payment of interest on moneys properly held by it that are uninvested hereunder.

    **Section 6.02   Investment of Funds and Accounts Held by the Trustee**.  (a) Subject to the limitations set forth in this paragraph, money held hereunder, if permitted by law, shall, as nearly as may be practicable, be invested by the Trustee in any Eligible Investments in accordance with the direction of an Authorized Officer of the Authority given in writing.  Money in the Toll Receipts Fund shall only be invested in Eligible Investments of the type described in clause (a), (b), (c) or (d) of the definition of the term "Eligible Investments" set forth in Section 1.01 hereof and such investments shall mature no later than the next succeeding Monthly Disbursement Date. Money in the Debt Service Fund shall only be invested in Eligible Investments of the type described in clause (a), (b), (c) or (d) of the definition of the term "Eligible Investments" set forth in Section 1.01 hereof and such investments shall mature no later than the date on which such moneys are required to be used to pay Principal of and interest on Bonds when due.

    (b)    The Trustee may conclusively rely upon the Authority's written instructions as to both the suitability and legality of the directed investments.  Ratings of Eligible Investments shall be determined at the time of purchase of such Eligible Investments. The Trustee may make any and all such investments through its own investment department or that of its affiliates or

subsidiaries, and may charge its ordinary and customary fees for such trades, including investment maintenance fees.

(c)     Obligations purchased or other investments made as an investment of money in any fund or account held under the provisions hereof shall be deemed at all times to be a part of such fund or account and the income or interest earned, profits realized or losses suffered by a fund or account due to the investment thereof shall be credited or charged, as the case may be, to such fund or account.

(d)     In computing the amount in any fund or account held by the Trustee under the provisions hereof, obligations purchased as an investment of money therein or held therein shall be valued at the market value thereof, inclusive of accrued interest to the date of valuation.

(e)     Subject to the provisions hereof, the Authority, in its discretion, may, and the Trustee at the direction of an Authorized Officer of the Authority, shall sell, present for redemption or exchange any investment held pursuant hereto and the proceeds thereof may be reinvested as provided in this Section.  Except as otherwise provided herein, such investments shall be sold by the Authority or by the Trustee at the direction of an Authorized Officer of the Authority at the best price reasonably obtainable by it, or presented for redemption or exchange, whenever it shall be necessary in order to provide money to meet any payment or transfer from the fund or account in which such investment is held.  The Trustee shall advise the Authority in writing, on or before the fifteenth (15th) day of each calendar month, of the amounts required to be on deposit in each fund and account hereunder and of the details of all investments held for the credit of each fund and account in its custody under the provisions hereof as of the end of the preceding month and as to whether such investments comply with the provisions of paragraphs (a) and (b) of this Section. The details of such investments shall include the par value, if any, the cost and the current market value of such investments as of the end of the preceding month.  The Trustee shall also describe all withdrawals, substitutions and other transactions occurring in each such fund and account in the previous month.

(f)     Although the Authority recognizes that it may obtain a broker confirmation or written statement containing comparable information at no additional cost, the Authority hereby agrees that confirmations of Eligible Investments are not required to be issued by the Trustee for each month in which a monthly statement is rendered.

     **Section 6.03   Liability for Investments.**  Neither the Authority nor the Trustee shall have any liability arising out of or in connection with the making of any investment authorized by the provisions of this Article VI, in the manner provided in this Article VI, for any depreciation in value of any such investment, or for any loss, fee, tax or other charge, direct or indirect, resulting from any such investment, reinvestment or liquidation of an investment.

# ARTICLE VII.

# PARTICULAR COVENANTS

     The Authority (and, as authorized by the Act, the Commonwealth with respect to Section 7.16 hereof) covenants and agrees with the Holders of the Bonds as follows:

**Section 7.01    Rate Covenant**.

(a)    The Authority covenants (the "**Rate Covenant**") that, except as provided in subsection (d) of this Section, it will at all times charge and collect or cause to be charged and collected Tolls for the use of the Toll Facilities at rates not less than those set forth in the schedule of such Tolls then in effect and as shall be required in order that Toll Receipts in each Fiscal Year shall equal at least the aggregate of (i) one hundred ten percent (110%) of the aggregate of the Required Deposits for such Fiscal Year and (ii) one hundred percent (100%) of Annual Debt Service on Subordinated Indebtedness.

(b)    No later than December 31 of each year, the Authority shall  perform the calculations to determine compliance with the Rate Covenant for the previous Fiscal Year based upon (x) the audited financial statements for such Fiscal Year or (y) if no audited financial statements for such Fiscal Year are then available, a certificate of an Authorized Officer of Authority setting forth (A) the Toll Receipts for such Fiscal Year, (B) the Required Deposits for such Fiscal Year and (C) Annual Debt Service on Subordinated Indebtedness for such Fiscal Year. A certificate of an Authorized Officer of the Authority setting forth such calculations will be delivered to the Trustee and posted on EMMA under the CUSIPs for the Outstanding Bonds.

(c)    Additionally, on or before July 1 of each year the Authority shall deliver to the Trustee and AAFAF:

(i)    a certificate of the Traffic Consultant setting forth a reasonably detailed projection of the Toll Receipts to be received in the Fiscal Year commencing on such July 1 and for the next succeeding Fiscal Year; provided that such projection shall take into account any increases or decreases in Toll rates for which all legal conditions to effectiveness have been satisfied;

(ii)    a certificate of the Consulting Engineer setting forth a reasonably detailed projection of (A) the Required Deposits and (B) Annual Debt Service on Subordinated Indebtedness, in each case, for the Fiscal Year commencing on such July 1 and for the next succeeding Fiscal Year, and

(iii)    a certificate of an Authorized Officer of the Authority calculating, based on the certificates delivered pursuant to clauses (i) and (ii) of this paragraph (c), the Rate Covenant for the Fiscal Year commencing on such July 1 and for the next succeeding Fiscal Year.

A certificate of an Authorized Officer of the Authority setting forth the calculations required by this subsection (c) will be delivered to the Trustee and posted on EMMA under the CUSIPs for the Outstanding Bonds.

(d)    If a certificate of the Authority delivered pursuant to either paragraph (b) or (c) above demonstrates that the Toll Receipts were not or will not be sufficient to satisfy the Rate Covenant, the Authority will cause the Traffic Consultant to make a study (a "**Traffic Consultant Study**") and to recommend a schedule of Tolls ("**Toll Schedule**") which will provide sufficient Toll Receipts in the then current or next succeeding Fiscal Year to comply with the Rate Covenant above and will cause additional Pledged Revenues to be collected in the following and later Fiscal

- 45 -

Years sufficient to eliminate any deficiency at the earliest practicable time; **provided, however**, that the Authority will not be required to obtain a Traffic Consultant Study as required by this subsection (d) if (x) the Authority has obtained a Traffic Consultant Study pursuant to this subsection (d) in any of the previous two Fiscal Years and the Authority is in material compliance with the recommendations of the Traffic Consultant set forth therein or (y) the Traffic Consultant determines that such noncompliance is directly attributable to the occurrence of a Force Majeure Event.  The Authority shall promptly (i) implement the Toll Schedule set forth in the Traffic Consultant Study and other recommendations of the Traffic Consultant or (ii) undertake an alternative course of action designed to ensure the Authority's ability to satisfy the Rate Covenant, to the extent approved by the Traffic Consultant.

(e)       Except as described in the next sentence, failure to comply with the Rate Covenant in any Fiscal Year will not constitute an Event of Default under this Trust Agreement if either (i) the Authority complies with the covenant described in paragraph (d) above or (ii) the Authority's Traffic Consultant is of the opinion that a Toll Schedule which will comply with the Rate Covenant is impracticable at that time, and the Authority therefore cannot comply with the Rate Covenant, and the Authority establishes a Toll Schedule that is recommended by the Traffic Consultant to comply as nearly as practicable with the Rate Covenant, which shall in any event yield, in any Fiscal Year, Toll Receipts in an amount at least equal to the Required Deposits plus Annual Debt Service on Subordinated Indebtedness for such Fiscal Year.  Notwithstanding the first sentence of this subsection (e), failure to comply with the Rate Covenant shall be an Event of Default hereunder if (x) for four consecutive Fiscal Years, the certificate delivered by the Authority as required by subsection (b) above demonstrates that the Authority has failed to comply with the Rate Covenant in each such Fiscal Year or (y) the certificate delivered by the Authority as required by subsection (b) above demonstrates that the Authority has failed to comply with the Rate Covenant at the end of the second full Fiscal Year after which a Traffic Consultant delivered a Traffic Consultant Study in accordance with subsection (d) above and the Toll Receipts as set forth in such certificate are less than 100% of the Required Deposits plus Annual Debt Service on Subordinated Indebtedness for such Fiscal Year.

(f)       The Authority will not reduce any toll (except by way of certain adjustments or reclassifications of toll rates as referred to below) unless the following conditions and tests shall be met:

(i)       The Authority has retained a Consulting Engineer and Traffic Consultant and

(ii)       Either:

(a) There shall have been delivered to the Trustee a certificate of an Authorized Officer of the Authority to the effect that the cumulative reductions in the immediately preceding twelve (12) months, including the proposed and all other reductions as if they had been in effect for such  period, would not reduce Net Receipts for such period by more than one percent (1%), with Toll Schedules demonstrating such conclusion and that, taking into account such reductions, the Authority would have met the Rate Covenant for such period; or

- 46 -

(b) There shall have been delivered to the Trustee a certificate of an Authorized Officer of the Authority to the effect (A) the Rate Covenant for the preceding Fiscal Year after taking into account such Toll reductions, would have been satisfied; (B) after giving effect to such Toll reductions, the estimated Toll Receipts (as set forth in a report of the Traffic Consultant) and the estimated Required Deposits and Annual Debt Service on Subordinated Indebtedness (as set forth in a report of the Consulting Engineer) for the then current and each future Fiscal Year to and including the latest maturity of the Bonds shall equal at least the amount necessary to satisfy the Rate Covenant for each such Fiscal Year; and (C) the Authority is not in default in the performance of any of the provisions of the Secured Obligations or this Trust Agreement.

(g) The Authority may increase Tolls from time to time and may make any other adjustments or reclassifications of Tolls or establish special Tolls, introductory Tolls or temporary Tolls (but no reductions other than those permitted by subsection (f) of this Section 7.01), provided that, in the opinion of the Traffic Consultant, such action will not cause the Authority to fail to comply with the Rate Covenant as set forth in subsection (a) of this Section 7.01.

(h) The Authority covenants that it will continue in effect the schedule of Tolls for traffic using the Toll Facilities until such schedule is increased or otherwise modified or reconfigured as provided herein.

(i) The Authority covenants that all Tolls will be classified in a reasonable manner to cover all Traffic, and that no free vehicular passage on the Toll Facilities will be permitted except as permitted under current reference rules, regulations, resolutions and orders.

(j) Unless a Traffic Consultant has been engaged by the Authority and has been serving in such role for at least thirty (30) days, on each September 15, December 15, March 15 and June 15, the Trustee will deliver a report to the Authority and AAFAF, and post such report on EMMA under the CUSIPs for the Outstanding Bonds, as to whether the required deposits were made to the Priority Authority Expense Fund and the Debt Service Fund on each Monthly Disbursement Date for the previous quarter.  In the event that any such report establishes that there were insufficient Toll Receipts to make the required deposits to the Priority Authority Expense Fund and the Debt Service Fund in such quarter, the Authority shall increase Tolls in an amount sufficient to fully fund the required deposits to the Priority Authority Expense Fund and the Debt Service Fund on each Monthly Disbursement Date, plus any deficiencies therein.  Following the delivery of such report by the Trustee, the Authority shall increase Tolls as soon as practicable, but in all events such increase shall be effectuated within sixty (60) days.

**Section 7.02   Annual Budget and Disbursement Schedule**.

(a) The Authority covenants that, so long as a Consulting Engineer and a Traffic Consultant are engaged by the Authority:

(i)      On or before April 15 in each year it shall (A) prepare (1) a preliminary Annual Budget for the next three Fiscal Years and (2) a preliminary Disbursement Schedule for the next succeeding Fiscal Year and (B) deliver copies of such preliminary Annual Budget and Disbursement Schedule to the Traffic Consultant, the Consulting Engineer, the Trustee and AAFAF.  Within forty-five (45) days of receipt of the preliminary Annual Budget and Disbursement Schedule, the Traffic Consultant and the Consulting Engineer shall deliver to the Authority and AAFAF any comments thereon, as contemplated under Sections 7.04(b) and (c).

(ii)      On or before the first day of each Fiscal Year the Authority shall adopt the Annual Budget and Disbursement Schedule for that Fiscal Year reasonably incorporating the comments of the Traffic Consultant and the Consulting Engineer.  The Authority shall file copies of the Annual Budget and Disbursement Schedule with the Traffic Consultant, the Consulting Engineer, the Trustee and AAFAF and shall post the same on the Authority's website and on EMMA linked to the CUSIPs for the Outstanding Bonds.

(iii)      Each Annual Budget prepared and delivered in accordance with subsection (a)(i) above, shall show in reasonable detail (A) the Toll Receipts that the Traffic Consultant projects to be received for such Fiscal Year and other Pledged Revenues estimated by the Authority to be received during each Fiscal Year provided that such projection shall take into account any increases or decreases in Toll rates for which all legal conditions to effectiveness have been satisfied, (B) the amount of Annual Debt Service for each Fiscal Year, (C) the Costs of Operation, Maintenance and Administration of the Toll Facilities that the Consulting Engineer expects to be incurred during such Fiscal Year (calculated on an accrual basis), (D) the Toll Receipts and the total amount required to be deposited in the Renewal and Replacement Fund, if any, to make the amount on deposit therein equal to the amount of the Renewal and Replacement Requirement for such Fiscal Year and (E) the amount of Toll Receipts that will be sufficient to meet the Rate Covenant required pursuant to Section 7.01(a) for such Fiscal Year.  The Annual Budget shall be prepared in sufficient detail to show also the amounts to be deposited in the various funds, accounts and subaccounts created by or under this Trust Agreement.

(iv)      Each annual Disbursement Schedule prepared and delivered in accordance with subsection (a)(i) above, shall show in reasonable detail, the Required Deposits and Annual Debt Service on the Subordinated Indebtedness that the Consulting Engineer expects to be incurred during such Fiscal Year (calculated on a cash basis), including (A) all cash disbursements contained in the Annual Budget for the Fiscal Year, (B) expenses that may have accrued in prior years and are expected to be paid in the current Fiscal Year, (C) amounts that are necessary to pay for or result from an emergency condition, (D) amounts that are necessary to pay judgments or otherwise result from the settlement of litigation, and (E) other similar disbursements.

(v)      On or before each Monthly Disbursement Date or any date on which the Authority submits a requisition for the withdrawal of funds from the Operating Reserve Fund for the payment of Costs of Operation, Maintenance and Administration of the Toll Facilities, an Authorized Officer of the Authority shall revise the Disbursement Schedule and deliver a certified copy of such revised Disbursement Schedule to the Trustee, the

- 48 -

Traffic Consultant, the Consulting Engineer and AAFAF, which schedule shall include the information required by Section 7.02(a)(iv) *provided, however*, no such revision will be effective if such revision, together with any previous revisions in the same Fiscal Year, result in a decrease of Net Receipts by more than 5%, unless the report required by clause (vi) is so provided.

(vi)     The Authority may amend the Annual Budget at any time during the Fiscal Year and any amendment which decreases Net Receipts by 5% or more in the aggregate for such Fiscal Year shall be accompanied by (i) a report of the Traffic Consultant and (b) a report of the Consulting Engineer, which reports collectively shall set forth an explanation of the amendments made to the Annual Budget (including, to the extent requested by the Consulting Engineer, with respect to Costs of Operation, Maintenance and Administration, and what actions, if any, the Authority should undertake to decrease Costs of Operation, Maintenance and Administration) and what actions, if any, the Authority should undertake to increase Net Receipts to the level set forth in such Annual Budget.  A copy of each amendment to the Annual Budget shall be filed promptly with the Trustee, the Traffic Consultant. the Consulting Engineer and AAFAF and shall be posted on EMMA linked to the CUSIPs for the Outstanding Bonds.

(vii)     The Costs of Operation, Maintenance and Administration of the Toll Facilities incurred in any Fiscal Year shall not exceed the amount of Costs of Operation, Maintenance and Administration of the Toll Facilities determined by the Consulting Engineer and set forth in the Annual Budget, as amended as provided in this Section 7.02. However, nothing in this Section shall limit the amount which the Authority may expend for Costs of Operation, Maintenance and Administration expenditures of the Toll Facilities in any year provided any amounts expended therefor in excess of the Annual Budget shall be received by the Authority from a source other than the Pledged Revenues and the Authority shall not make any reimbursement therefor from the Pledged Revenues.

(b)     The Authority covenants that, if no Consulting Engineer or no Traffic Consultant is engaged by the Authority:

(i)     On or before April 15 in each year it shall (A) prepare (1) a preliminary Annual Budget for the next three Fiscal Years and (2) a preliminary Disbursement Schedule for the next succeeding Fiscal Year and (B) deliver copies of such preliminary Annual Budget and Disbursement Schedule to the Traffic Consultant, if any, the Consulting Engineer, if any, the Trustee and AAFAF.  Within forty-five (45) days of receipt of the preliminary Annual Budget and Disbursement Schedule, the Traffic Consultant, if any, and the Consulting Engineer, if any, shall deliver to the Authority and AAFAF any comments thereon, as contemplated under Sections 7.04(b) and (c).

(ii)     On or before the first day of each Fiscal Year the Authority shall adopt the Annual Budget and Disbursement Schedule for that Fiscal Year reasonably incorporating the comments of the Traffic Consultant, if any, and the Consulting Engineer, if any.  The Authority shall file copies of the Annual Budget and Disbursement Schedule with the Traffic Consultant, if any, the Consulting Engineer, if any, the Trustee and AAFAF and

- 49 -

shall post the same on the Authority's website and on EMMA linked to the CUSIPs for the Outstanding Bonds.

(iii)     Each Annual Budget prepared and delivered in accordance with subsection (a)(i) above, shall show in reasonable detail (A) the Toll Receipts that (1) the Traffic Consultant or (2) if no Traffic Consultant is then engaged by the Authority, the Authority projects to be received for such Fiscal Year and other Pledged Revenues estimated by the Authority to be received during each Fiscal Year provided that such projection shall take into account any increases or decreases in Toll rates for which all legal conditions to effectiveness have been satisfied, (B) the amount of Annual Debt Service for each Fiscal Year, (C) the Costs of Operation, Maintenance and Administration of the Toll Facilities that the Consulting Engineer expects to be incurred during such Fiscal Year (calculated on an accrual basis) or if no Consulting Engineer shall then be engaged by the Authority, the Priority Costs of Operation, Maintenance and Administration of the Toll Facilities and Shared Costs of Operation, Maintenance and Administration of the Toll Facilities, (D) the Toll Receipts and the total amount required to be deposited in the Renewal and Replacement Fund, if any, to make the amount on deposit therein equal to the amount of the Renewal and Replacement Requirement for such Fiscal Year and (E) the amount of Toll Receipts that will be sufficient to meet the Rate Covenant required pursuant to Section 7.01(a) for such Fiscal Year.  The Annual Budget shall be prepared in sufficient detail to show also the amounts to be deposited in the various funds, accounts and subaccounts created by or under this Trust Agreement.

(iv)     Each annual Disbursement Schedule prepared and delivered in accordance with subsection (a)(i) above, shall show in reasonable detail, the Required Deposits and Annual Debt Service on the Subordinated Indebtedness that the Consulting Engineer, or if no Consulting Engineer is then engaged by the Authority, that the Authority expects to be incurred during such Fiscal Year (calculated on a cash basis), including (A) all cash disbursements contained in the Annual Budget for the Fiscal Year, (B) expenses that may have accrued in prior years and are expected to be paid in the current Fiscal Year, (C) amounts that are necessary to pay for or result from an emergency condition, (D) amounts that are necessary to pay judgments or otherwise result from the settlement of litigation, and (E) other similar disbursements.

(v)     On or before each Monthly Disbursement Date or any date on which the Authority submits a requisition for the withdrawal of funds from the Operating Reserve Fund for the payment of Costs of Operation, Maintenance and Administration of the Toll Facilities, an Authorized Officer of the Authority shall revise the Disbursement Schedule and deliver a certified copy of such revised Disbursement Schedule to the Trustee, the Traffic Consultant, if any, the Consulting Engineer, if any, and AAFAF, which schedule shall include the information required by Section 7.02(b)(iv) *provided, however*, no such revision will be effective if such revision, together with any previous revisions in the same Fiscal Year, result in a decrease of Net Receipts by more than 5%, unless the report required by clause (vi) is so provided.

(vi)     The Authority may amend the Annual Budget at any time during the Fiscal Year and any amendment which decreases Net Receipts by 5% or more in the aggregate

- 50 -

for such Fiscal Year shall be accompanied by (i) a report of the Traffic Consultant, if any, (b) a report of the Consulting Engineer, if any, and (c) a report of the Authority, which reports collectively shall set forth an explanation of the amendments made to the Annual Budget (including, to the extent requested by the Consulting Engineer, if any, with respect to Costs of Operation, Maintenance and Administration, and what actions, if any, the Authority should undertake to decrease Costs of Operation, Maintenance and Administration) and what actions, if any, the Authority should undertake to increase Net Receipts to the level set forth in such Annual Budget. A copy of each amendment to the Annual Budget shall be filed promptly with the Trustee, the Traffic Consultant, if any, the Consulting Engineer, if any, and AAFAF and shall be posted on EMMA linked to the CUSIPs for the Outstanding Bonds.

(vii) The Priority Costs of Operation, Maintenance and Administration of the Toll Facilities incurred in any Fiscal Year shall not exceed the amount of Priority Costs of Operation, Maintenance and Administration of the Toll Facilities set forth in the Annual Budget, as amended as provided in this Section 7.02. However, nothing in this Section shall limit the amount which the Authority may expend for Shared Costs of Operation, Maintenance and Administration expenditures of the Toll Facilities in any year provided any amounts expended therefor in excess of the Annual Budget shall be received by the Authority from a source other than the Pledged Revenues and the Authority shall not make any reimbursement therefor from the Pledged Revenues.

(c) If for any reason the Authority has not adopted the Annual Budget before the first day of any Fiscal Year, the Annual Budget for the preceding Fiscal Year shall be deemed to be in force and shall be treated as the Annual Budget for the then-current Fiscal Year under the provisions of this Trust Agreement until the adoption of the Annual Budget for that Fiscal Year. Such Annual Budget will be adjusted upward or downward to reflect any changes in Annual Debt Service for such then-current Fiscal Year from the preceding Fiscal Year and to take into account any increases or decreases in Toll rates for which all legal conditions to effectiveness have been satisfied. However, notwithstanding the foregoing, the failure to adopt an Annual Budget for two (2) successive Fiscal Years shall constitute an Event of Default hereunder.

(d) If for any reason the Authority has not adopted the Disbursement Schedule before the first day of any Fiscal Year, the Disbursement Schedule for the preceding Fiscal Year shall be deemed to be in force and shall be treated as the Disbursement Schedule for the then-current Fiscal Year under the provisions of this Trust Agreement until the adoption of the Disbursement Schedule for that Fiscal Year; provided, however, that the Disbursement Schedule for the preceding Fiscal Year shall be revised to reflect Annual Debt Service for such new Fiscal Year. However, notwithstanding the foregoing, the failure to adopt the Disbursement Schedule for two (2) successive Fiscal Years shall constitute an Event of Default hereunder.

(e) Upon the occurrence and continuance of an Event of Default (other than an Event of Default specified in 11.01(c)), the Authority shall prepare and deliver to the Trustee a Disbursement Schedule which sets forth on a monthly cash basis the Costs of Operation, Maintenance and Administration of the Toll Facilities, which Disbursement Schedule must be approved by the Consulting Engineer.

**Section 7.03   Operation and Maintenance Covenants**.  The Authority covenants that:

(a)   it will operate and maintain the Toll Facilities in conformity with law and all requirements of all governmental authorities having jurisdiction thereover, and modifications or alterations of the Toll Facilities, including changes in design, alignment or location as may be approved by the Authority, shall not substantially increase the cost of operating the Toll Facilities or substantially affect adversely the volume or character of the traffic using the Toll Facilities; and

(b)   (i) it will establish and enforce reasonable rules and regulations governing the use and the operation of the Toll Facilities, (ii) all compensation, salaries, fees and wages paid by it in connection with the maintenance, repair and operation of the Toll Facilities will be reasonable, (iii) no more persons will be employed by it than are necessary, (iv) it will maintain and operate the Toll Facilities in an efficient and economical manner, (v) from the revenues of the Toll Facilities it will at all times maintain the Toll Facilities in good repair and in sound operating condition and will make all necessary repairs, renewals, improvements and replacements, and (vi) it will comply with all valid applicable acts, rules, regulations, orders and directions of any legislative, executive, administrative or judicial body applicable to the Toll Facilities or the Authority.

**Section 7.04   Retention of Consulting Engineer, Traffic Consultant and Other Consultants**.

(a)   The Authority covenants and agrees that it will, for the purpose of performing and carrying out the duties imposed on the Consulting Engineer, the Traffic Consultant and other consultants by this Section 7.04, use its best efforts to engage as soon as practicable and will thereafter retain the Consulting Engineer, the Traffic Consultant and other consultants; ***provided, however***, that the termination of the engagement of any Consulting Engineer or Traffic Consultant by the Authority or the resignation of any Consulting Engineer or Traffic Consultant shall not be effective, unless and until a successor Consulting Engineer or Traffic Consultant, as applicable, shall have been appointed by the Authority and such consultant shall have accepted such appointment.  Except for fees and expenses incurred in connection with the issuance of Bonds, the cost of retaining the Consulting Engineer, the Traffic Consultant and other consultants shall be treated as a part of the Costs of Operation, Maintenance and Administration of the Toll Facilities.  If no Consulting Engineer is then engaged by the Authority, except for fees and expenses incurred in connection with the issuance of Bonds, the cost of retaining the Traffic Consultant and other consultants shall be treated as a part of the Priority Costs of Operation, Maintenance and Administration of the Toll Facilities.

(b)   It shall be the duty of the Consulting Engineer to prepare and file reports with the Authority and AAFAF, no later than forty-five (45) days after receipt of the Annual Budget, setting forth the following:

(i)   the recommendations of the Consulting Engineer as to the proper maintenance, repair and operation of the Toll Facilities during each of the next three succeeding Fiscal Years, and an estimate of the amounts of money necessary for such purposes;

(ii) the recommendations of the Consulting Engineer as to the amount that should be deposited during each of the next three succeeding Fiscal Years to the credit of the Renewal and Replacement Fund; and

(iii) the findings of the Consulting Engineer whether the Toll Facilities have been maintained in good repair and sound operating condition, and their estimate of the amount, if any, required to be expended to place such properties in such condition and the details of such expenditures and the approximate time required therefor.

(c) It shall be the duty of the Traffic Consultant to prepare and file reports with the Authority and AAFAF, no later than forty-five (45) days after receipt of the Annual Budget, setting forth the recommendations of the Traffic Consultant as to the adequacy of the existing Toll schedule for purposes of the Rate Covenant contained in Section 7.01 hereof for the then current Fiscal Year to date and recommendations as to any necessary or advisable revisions of the Toll schedule and such other advices and recommendations as they may deem desirable.

(d) The Authority further covenants that the Consulting Engineer, Traffic Consultant and other consultants shall at all times have free access to the Toll Facilities and every part thereof for the purposes of inspection and examination, and that its books, records and accounts may be examined by the Consulting Engineer, the Traffic Consultant and other consultants at all reasonable times.

**Section 7.05 Payment of Principal, Redemption Price and Interest.** The Authority shall pay or cause to be paid every Secured Obligation, including Redemption Price and interest thereon, on the dates and at the places and in the manner provided herein and in the Secured Obligations according to the true intent and meaning thereof.

**Section 7.06 Extension of Payment of Secured Obligations.** The Authority shall not directly or indirectly extend or assent to the extension of the maturity of any of the Secured Obligations or claims for interest by the purchase or funding of such Secured Obligations or claims for interest on Secured Obligations or by any other arrangement and, in case the maturity of any of such Secured Obligations or the time for payment of any such claims for interest on Secured Obligations shall be extended only with the written consent of the Holders of such Secured Obligations, such Secured Obligations, or claims for interest shall not be entitled, in case of any default hereunder, to the benefit hereof or of any Supplemental Trust Agreement or to any payment out of any assets of the Authority or the funds (except funds held in trust for the payment of particular Secured Obligations or claims for interest pursuant hereto and to any Supplemental Trust Agreement) held by the Trustee, except subject to the prior payment of the principal of all Outstanding Secured Obligations the maturity of which has not been extended and of such portion of the interest on such Secured Obligations as shall not be represented by such extended claims for interest.

**Section 7.07 Powers as to Secured Obligations.** Pursuant to the Act, the Plan of Adjustment and the Confirmation Order, the Authority is duly authorized to create, issue, execute and deliver the Secured Obligations and to execute this Trust Agreement and each Supplemental Trust Agreement. The Authority further covenants that the Trust Estate is and shall be free and clear of any pledge, lien, charge or encumbrance thereon or with respect thereto, prior to, or of

- 53 -

equal rank with, or junior to (other than as provided in Article XII), the first-priority lien on and first-priority security interest in the Trust Estate granted hereby.  The Authority further covenants that all corporate action on the part of the Authority to that end has been duly and validly taken. The Authority further covenants that the Secured Obligations and the provisions hereof and of each Supplemental Trust Agreement are and shall be the valid and legally enforceable obligations of the Authority in accordance with their terms and the terms hereof and of each Supplemental Trust Agreement.  The Authority further covenants that it shall not fail to at all times, to the extent permitted by law, defend, preserve and protect, or cause to be defended, preserved and protected, the lien and all of the rights of the Trustee for the benefit of the Holders of Secured Obligations under this Trust Agreement and each Supplemental Trust Agreement including, but not limited to, the first-priority lien and first-priority security interest in the Trust Estate created by this Trust Agreement against all claims and demands of all persons whomsoever.

Section 7.08   **Further Assurance.**  The Authority, at any and all times, shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the first-priority lien on and first-priority security interest in Pledged Revenues and other assets of the Trust Estate, the priority in all respects of the lien and security interest in the Trust Estate of the Bonds over the lien and security interest in the Trust Estate of the Subordinated Indebtedness and the validity, perfection and enforceability of such lien  against all Persons having claims of any kind in tort, contract or otherwise against the Authority or its assets irrespective of whether such Persons have notice of such first-priority lien or first-priority security interest of the same, or which the Authority may hereafter become bound to pledge or assign.

Section 7.09   **Accounts and Audits.**  The Authority shall keep proper books of records and accounts (separate from all other records and accounts of the Commonwealth and other Government Entities), which may be kept on behalf of the Authority by the Trustee, in which complete and correct entries shall be made of the accounts and its transactions relating to each Series of Bonds, which books and accounts, at reasonable hours and subject to the reasonable rules and regulations of the Authority, shall be subject to the inspection of the Secretary of Treasury, the Trustee or of any Holder of a Secured Obligation or a representative of any of the foregoing duly authorized in writing.  The Authority shall cause such books and accounts to be audited annually after the end of each Fiscal Year by a nationally recognized independent certified public accounting firm selected by the Authority.  Annually within thirty (30) days after receipt by the Authority of the report of such audit, a copy of such report, signed by an Authorized Officer of the Authority, shall be furnished to the Trustee, the Oversight Board, and the Commonwealth and posted on EMMA, cross-referenced to each original issuance CUSIP number applicable to the Secured Obligations of which the Authority has knowledge.

Section 7.10   **Creation of Liens and Indebtedness.**  The Authority shall not create or cause to be created any lien, pledge, or charge on the Trust Estate other than the lien, pledge and charge on the Trust Estate created by this Trust Agreement; ***provided, however,*** that nothing contained herein shall prevent the Authority from issuing Additional Bonds in accordance with Section 2.04(a) or 2.04(b) of this Trust Agreement or additional Subordinated Indebtedness in accordance with Section 2.04(c) or 2.04(d) of this Trust Agreement; ***provided, however***, that any agreements governing Subordinated Indebtedness shall provide that any right to payment, liens, or

- 54 -

enforcement of such claims shall be junior, inferior, and subordinate in all respects to the Bonds, and shall be subject in all respects to Article XII of this Trust Agreement.

Section 7.11  **Restricted Payments.**  The Authority shall not, directly or indirectly, make any payments or distributions of the Pledged Revenues or money in the funds and accounts established hereunder except in accordance with this Trust Agreement.

Section 7.12  **Offices for Payment and Registration of Secured Obligations.**  Unless all of the Bonds are Book Entry Bonds, the Authority shall at all times maintain an office or agency in the Borough of Manhattan, in The City of New York where Bonds may be presented for payment, which office or agency may be at or through the designated Corporate Trust Office of the Trustee.  The Authority may, pursuant to a Supplemental Trust Agreement, designate an additional Paying Agent or Paying Agents where Secured Obligations of the Series authorized thereby or referred to therein may be presented for payment.  The Authority shall at all times maintain an office or agency in the Borough of Manhattan in The City of New York where Secured Obligations may be presented for registration, transfer or exchange and the Trustee is hereby appointed as its agent to maintain such office or agency for the registration, transfer or exchange of Secured Obligations.  The provisions of this Section shall be subject to the provisions of Section 3.01 hereof.

Section 7.13  **Payment of Lawful Charges.**  The Authority shall pay all taxes and assessments or other municipal or governmental charges, if any, lawfully levied or assessed upon the Trust Estate, when the same shall become due.

Section 7.14  **General.**  The Authority shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Authority under the provisions hereof in accordance with the terms of such provisions.

Section 7.15  **Tax Exemption Covenant.**  The Authority covenants that it shall not take any action that would, or fail to take any action, if such failure would, (a) cause the Authority to lose its status as an issuer of municipal obligations for federal income tax purposes or (b) cause interest on the Tax Exempt Bonds to become includable in gross income for federal income tax purposes and that it will do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the Holders of any Tax Exempt Bonds shall be and remain excludable from gross income for federal income tax purposes.

Section 7.16  **Enforcement of Commonwealth Covenant.**  The Authority covenants to enforce the covenant of the Commonwealth set forth in §2019 of the Act, that the Commonwealth will not limit or restrict the rights or powers vested in the Authority under the Act until all Secured Obligations, together with the interest thereon, are fully met and discharged.

Section 7.17  **Corporate Existence.**  To the extent permitted by law, the Authority shall not take any action, or fail to take any action, the result of which would be the Authority failing to keep in full effect its existence, rights, duties, obligations and franchises as a public corporation and governmental instrumentality of the Commonwealth under the laws of the Commonwealth, including, without limitation, the Act.  Without limiting the generality of the immediately

preceding sentence, the Authority shall not merge or consolidate, directly or indirectly, with any other legal person.

**Section 7.18   <u>Covenant Against Sale or Encumbrance; Exception</u>**.

No part of the Toll Facilities shall be sold, mortgaged, leased or otherwise disposed of or encumbered; provided, that:

(a)      the Authority may from time to time, sell, exchange or otherwise dispose of any machinery, fixtures, apparatus, tools, instruments or other movable property constituting a portion of the Toll Facilities, if the Authority determines that such articles are no longer needed or are no longer useful in connection with the construction or operation and maintenance of the Toll Facilities, and the proceeds thereof are applied to the replacement of the properties so sold or disposed of or are paid to be deposited in the Toll Receipts Fund and applied in accordance with Section 5.05 hereof.  The Authority may from time to time sell, exchange or otherwise dispose of any real property or release, relinquish or extinguish any interest therein as the Consulting Engineer certifies is not needed or serves no useful purpose in connection with the maintenance and operation of the Toll Facilities, and the proceeds thereof, if any, are required to be deposited in the Toll Receipts Fund and applied in accordance with Section 5.05 hereof; and

(b)      the Authority will not enter into a lease, long-term concession or other public-private partnership arrangement with respect to any real estate or personal property comprising a portion of the Toll Facilities (a "**Partial Disposition**"), unless there is delivered to the Trustee a certificate dated not earlier than thirty (30) days prior to the financial closing of any such arrangement, by an Authorized Officer of the Authority and approved by the Traffic Consultant and Consulting Engineer, setting forth (i) the amount of Net Receipts that would have been collected in the most recently completed Fiscal Year had such Partial Disposition occurred prior to the first day of such Fiscal Year provided that such projection shall take into account any increases or decreases in Toll rates for which all legal conditions to effectiveness have been satisfied; (ii) Maximum Annual Debt Service on the Secured Obligations that will remain Outstanding after such agreement become effective in accordance with its terms; and (iii) the percentages derived by dividing the amount in item (i) above by the amounts shown in item (ii) above, which percentage shall not be less than 120%.  Proceeds from a Partial Disposition remaining after the repayment of (x) Bonds in accordance with Section 4.02(b), (y) any other Secured Obligations to the extent required to be redeemed in order to maintain for the Tax-Exempt Bonds that will remain Outstanding after such Partial Disposition, the exclusion of interest on such Tax Exempt Bonds from gross income for purposes of federal income taxation and (z) if no Bonds are then Outstanding, Subordinated Indebtedness in accordance with the applicable Supplement Trust Agreement, shall be deposited in the Toll Receipts Fund and applied in accordance with Section 5.05 of this Trust Agreement.

**Section 7.19   <u>Separateness</u>**.  The Authority shall operate as a legally separate entity from the Commonwealth (including all public corporations, agencies, and instrumentalities thereof) and all other legal persons and as a bankruptcy remote, single purpose entity (limited to the activities authorized in the Act).  The Authority shall (a) avoid commingling the Pledged Revenues and other assets of the Authority with those of the Commonwealth or any Governmental Entity or other legal person; (b) keep the Authority By-Laws separate and in full force and effect; (c) maintain

- 56 -

separate financial statements, bank accounts, and books and records; (d) observe separate corporate governance, management and other formalities of the Authority; (e) otherwise operate as an entity that is separate and distinct from all other legal persons, including, without limitation, the Commonwealth and its other public corporations, agencies and instrumentalities; and (f) comply with the separateness covenants contained in the Authority By-Laws.

**Section 7.20   Insurance**.  The Authority covenants that it will at all times maintain, to the extent reasonably obtainable, the following kinds and the following amounts of insurance, or otherwise make provision for the payment of claims against the Authority, with such variations as shall be reasonable to be required to conform to the applicable standard or customary insurance practice including by AM Best insurers with ratings of "A+" or better , to the extent available and subject to exceptions and permissible deductions as are ordinarily required, all to be determined by the Authority in its sole discretion after consultation with its insurance consultants:

(a)     Property insurance on all real and personal property, including bridges and viaducts owned by the Authority as part of the Toll Facilities in sufficient amounts to cover direct physical loss or damage from causes normally insured against;

(b)     Liability insurance to cover injury to Persons or damage to property for claims arising out of the construction, maintenance, reconstruction, or operation of the Toll Facilities;

(c)     Business interruption insurance covering loss of Pledged Revenues for a period of at least two (2) years, due to any interruption in the use of the Toll Facilities which cause a loss of revenue to the Authority;

(d)     Any coverage which is customarily required to be maintained by any Commonwealth or federal law, including, but not limited to, workers' compensation coverage, and motor vehicle liability coverage; and

(e)     Any additional insurance which may be necessary or advisable to protect the interests of the Authority.

**Section 7.21   Compliance**.  The Authority is required to deliver to the Trustee, within one hundred-twenty (120) days after the end of each Fiscal Year or within fourteen (14) days of request, a certificate of the Authority signed by the Authorized Officer thereof indicating whether the signers thereof know of any Event of Default that occurred during the period from and including the last such certificate of the Authority or, if none, to the date hereof.  The Authority is required to deliver to the Trustee, as soon as practicable after the occurrence thereof, a certificate of the Authority signed by the Authorized Officer thereof indicating any default of which it has actual knowledge and any Events of Default, the status thereof and what action the Authority is taking or proposes to take in respect thereof.

**Section 7.22   Continuing Disclosure.**  The Authority covenants that, in connection with the delivery of the Initial Bonds hereunder, it will enter into a Reporting Agreement.  An event of default under such Reporting Agreement, including the failure to timely provide the notices or information described therein shall not be an Event of Default hereunder and the exclusive remedies available to any Person shall be as described in the Reporting Agreement.

- 57 -

**Section 7.23 Non-Impairment**. As required by the Confirmation Order, the Authority shall take no action under this Trust Agreement or otherwise that would (i) impair the first-priority lien and first-priority security interest on the Trust Estate, (ii) impair the senior lien and senior security interest on the Trust Estate granted to the Holders of Outstanding Bonds, which shall in all respects be senior and superior to the subordinate lien and subordinate security interest on the Trust Estate granted to the Holders of Outstanding Subordinated Indebtedness, (iii) impair or prevent the monthly deposits under Section 5.05, (iv) limit or alter the rights vested in the Authority in accordance with the Plan of Adjustment and the Confirmation Order in connection with the Secured Obligations, or (v) impair the rights and remedies of the Trustee or the Bondholders under this Trust Agreement and, in particular, Article XI.

<center>

**ARTICLE VIII.**

**CONCERNING THE TRUSTEE AND THE PAYING AGENT**

</center>

**Section 8.01 Appointment and Acceptance of Trustee**. The Trustee, by its execution and delivery of this Trust Agreement, does signify its acceptance of its appointment as and of the duties and obligations of Trustee and Paying Agent imposed upon it hereby.

**Section 8.02 Appointment and Acceptance of Paying Agents**. In addition to the Trustee, the Authority may appoint one or more Paying Agents for the Secured Obligations of any Series in the Supplemental Trust Agreement authorizing such Secured Obligations or in the manner provided herein or in such Supplemental Trust Agreement or shall appoint such Paying Agent or Paying Agents prior to the authentication and delivery of the Secured Obligations so long as any such Paying Agents satisfy the requirements set forth in Section 8.10 hereof, and may at any time or from time to time appoint one or more other Paying Agents in the manner and subject to the conditions set forth in Section 8.10 hereof for the appointment of a successor Paying Agent. Each Paying Agent shall signify its acceptance of the duties and obligations imposed upon it hereby by written instrument of acceptance deposited with the Authority and the Trustee.

**Section 8.03 Responsibilities of Trustee and Paying Agents**. The recitals of fact contained herein and in each Supplemental Trust Agreement and in the Secured Obligations shall be taken as the statements of the Authority and neither the Trustee nor any Paying Agent assumes any responsibility for the correctness of the same. Neither the Trustee nor any Paying Agent makes any representations as to the validity or sufficiency hereof, of any Supplemental Trust Agreement or of any Secured Obligations, or in respect of the security afforded hereby or by each Supplemental Trust Agreement, and neither the Trustee nor any Paying Agent shall incur any responsibility in respect thereof. Neither the Trustee nor any Paying Agent shall be under any responsibility or duty with respect to: (i) the issuance of the Secured Obligations for value; (ii) the application of the proceeds thereof except to the extent that such proceeds are received by it in its capacity as Trustee or Paying Agent; or (iii) the application of any money paid to the Authority or others in accordance herewith and with each Supplemental Trust Agreement except as to the application of any money paid to it in its capacity as Trustee or Paying Agent. Neither the Trustee nor any Paying Agent shall be liable in connection with the performance of or failure to perform its duties hereunder and under each Supplemental Trust Agreement except for its own negligence or willful misconduct.

<center>- 58 -</center>

The duties and obligations of the Trustee and any Paying Agent shall be determined by the express provisions hereof and of each Supplemental Trust Agreement and neither the Trustee nor any Paying Agent shall be liable except for the performance of or failure to perform such duties and obligations as are specifically set forth herein and in each Supplemental Trust Agreement, and no implied covenants or obligations should be read into this Trust Agreement against the Trustee. If any Event of Default under this Trust Agreement shall have occurred and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Trust Agreement and shall use the same degree of care as a prudent person, as a trustee under a trust agreement, would exercise or use in the circumstances in the conduct of such prudent person's own affairs.

Section 8.04   **Property Held in Trust.**   All money and securities conveyed to or held by the Trustee and Paying Agent at any time pursuant to the terms hereof and of each Supplemental Trust Agreement shall be and hereby are assigned, transferred and set over unto the Trustee in trust for the purposes and under the terms and conditions hereof and of each Supplemental Trust Agreement.

Section 8.05   **Rights of the Trustee and the Paying Agent.**   The Trustee and any Paying Agent shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper or document reasonably believed by it in good faith to be genuine, and to have been signed or presented by the proper party or parties.  The Trustee and any Paying Agent may consult with counsel of its selection, who may or may not be of counsel to the Authority, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it in good faith and in accordance therewith.

Whenever the Trustee or any Paying Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder and under any Supplemental Trust Agreement, such matter (unless other evidence in respect thereof be specifically prescribed hereby) may be deemed to be conclusively proved and established by a certificate signed by an Authorized Officer of the Authority.  Such certificate shall be full warrant for any action taken or suffered in good faith under the provisions hereof and of the Supplemental Trust Agreement upon the faith thereof, but in its discretion the Trustee or any Paying Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as it may deem reasonable.  Except as otherwise expressly provided herein and in each Supplemental Trust Agreement, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof and of any Supplemental Trust Agreement by the Authority to the Trustee or any Paying Agent shall be sufficiently executed if executed in the name of the Authority by an Authorized Officer thereof.

The Trustee and Paying Agent shall not be deemed to have notice of any Event of Default hereunder unless an Authorized Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Trustee at the designated Corporate Trust Office of the Trustee and such notice references the Secured Obligations relative to which an Event of Default has occurred.

The Trustee and Paying Agent may request that the Authority deliver a certificate of an Authorized Officer of the Authority setting forth the names of individuals and their respective titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement and

- 59 -

any Supplemental Trust Agreement, which certificate may be signed by any person specified as so authorized in any such certificate previously delivered and not superseded.

Neither the Trustee nor any Paying Agent shall be under any liability for interest on any moneys received hereunder except as may be otherwise agreed upon.

Notwithstanding the effective date of this Trust Agreement or anything to the contrary in this Trust Agreement, the Trustee shall have no liability or responsibility for any act or event relating to this Trust Agreement which occurs prior to the date the Trustee formally executes this Trust Agreement and commences acting as Trustee hereunder.

The Trustee shall have no responsibility with respect to any information, statement or recital in any official statement, offering memorandum or any other disclosure material prepared or distributed with respect to the Secured Obligations, except for any information provided by the Trustee, and shall have no responsibility for compliance with any state or federal securities laws in connection with the Secured Obligations.

The Trustee shall have no liability for any action or failure to act in good faith in accordance with a direction of the Holders of a Quarter in Interest of Outstanding Bonds or Majority in Interest of Outstanding Bonds, as applicable, pursuant to the terms hereof in respect of such action or failure to act, except to the extent of its negligence or willful misconduct in connection therewith.

The Trustee and any Paying Agent shall have the right to accept and act upon instructions, including funds transfer instructions given pursuant to this Trust Agreement and delivered using Electronic Means ("**Instructions**"); *provided, however*, that the Authority shall provide to the Trustee and each Paying Agent an incumbency certificate listing officers with the authority to provide such Instructions and containing specimen signatures of such officers, which incumbency certificate shall be amended by the Authority whenever a person is to be added or deleted from the listing.  If the Authority elects to give the Trustee or a Paying Agent Instructions using Electronic Means and the Trustee or such Paying Agent in its discretion elects to act upon such Instructions, the Trustee's or such Paying Agent's understanding of such Instructions shall be deemed controlling.  The Authority understands and agrees that the Trustee or a Paying Agent cannot determine the identity of the actual sender of such Instructions and that the Trustee and such Paying Agent shall conclusively presume that directions that purport to have been sent by an Authorized Officer of the Authority listed on the incumbency certificate provided to the Trustee or such Paying Agent have been sent by such Authorized Officer.  The Authority shall be responsible for ensuring that only Authorized Officers thereof transmit such Instructions to the Trustee or any Paying Agent and that the Authority and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords or authentication keys upon receipt by the Authority.  Neither the Trustee nor any Paying Agent shall be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's or such Paying Agent's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction unless due to gross negligence or willful misconduct of the Trustee.  The Authority agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee or any Paying Agent, including without limitation the risk of the Trustee or such Paying Agent acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections

- 60 -

and risks associated with the various methods of transmitting Instructions to the Trustee or any Paying Agent and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Authority; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee and any Paying Agent immediately upon learning of any breach, compromise or unauthorized use of the security procedures.

**Section 8.06   Compensation and Indemnification.**   Unless otherwise provided, the Authority shall pay to the Trustee and to each Paying Agent, from time to time, such compensation as shall be agreed in writing for all services rendered by it hereunder and under the applicable Supplemental Trust Agreement, and also all reasonable and necessary expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, required to be incurred in the performance of their powers and duties hereunder and under the applicable Supplemental Trust Agreement.  The Authority shall indemnify and save the Trustee and each Paying Agent harmless against any liabilities which it may incur in the acceptance, exercise and performance of its powers and duties hereunder and under the applicable Supplemental Trust Agreement and which are not due to its negligence or willful misconduct. None of the provisions contained herein or in any Supplemental Trust Agreement shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers, if there is reasonable ground for believing that the repayment of such funds or liability is not reasonably assured to it.  The Trustee Expenses Cap does not apply to or limit the Authority's liability under this Section for the fees, expense and indemnification of the Trustee and each Paying Agent.

The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other person employed to act hereunder.

The provisions of this Section shall survive termination of this Trust Agreement and the resignation and removal of the Trustee.

**Section 8.07   Permitted Acts.**   The Trustee may become the owner of or may deal in Bonds as fully and with the same rights as if it were not such Trustee or a Paying Agent. The Trustee may act as depository for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, the Authority or any committee formed to protect the rights of Holders of Secured Obligations or to effect or aid in any reorganization growing out of the enforcement hereof or of the Secured Obligations or any Supplemental Trust Agreement whether or not such committee shall represent the Holders of a Majority in Interest of the then Outstanding Bonds in respect of which any such action is taken.

The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys appointed with due care.

The permissive rights of the Trustee to do things enumerated in this Trust Agreement shall not be constructed as a duty unless so specified herein.

- 61 -

**Section 8.08    Resignation of Trustee.**  The Trustee, or any successor thereof, may at any time resign and be discharged of its duties and obligations hereunder and under each Supplemental Trust Agreement by giving not less than sixty (60) days' written notice to: (a) the Authority, and (b) the Holders of the Secured Obligations by first class mail, postage prepaid, at their last known addresses, if any, appearing on the registration books or, in the case of a Bond Insurer, at such Bond Insurer's last known address.  Such resignation shall take effect upon the date specified in such notice (which shall be no sooner than the date specified in the immediately preceding sentence) unless previously a successor shall have been appointed as provided in Section 8.10 hereof, in which event such resignation shall take effect immediately on the appointment of such successor; *provided, however,* that such resignation shall not take effect until a successor Trustee has been appointed and has accepted such appointment pursuant to Section 8.10 hereof.

**Section 8.09    Removal of Trustee.**  The Trustee and/or Paying Agent, or any successor thereof, may be removed at any time upon thirty (30) day's written notice by the Authority (provided no Event of Default has occurred or is continuing) or the Holders of a Quarter in Interest of the Outstanding Bonds, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondholders or by their attorneys-in-fact duly authorized and delivered to the Authority.  The Trustee and/or Paying Agent, or any successor thereof, may also be removed at any time for cause or any breach of trust or for acting or proceeding in violation of, or failing to act or proceed in accordance with, any provisions hereof or of any Supplemental Trust Agreement with respect to the duties and obligations of the Trustee, as applicable, by any court of competent jurisdiction upon application by the Holders of a Quarter in Interest of the Outstanding Bonds.  No removal hereunder shall take effect until a successor Trustee has been appointed and has accepted such appointment.  A copy of each instrument or order providing for the removal of the Trustee, or any successor thereof, shall be delivered by the applicable Holders to the Trustee or such successor thereof and to the Authority.

**Section 8.10    Successor Trustee and/or Paying Agent.**  In case the Trustee and/or Paying Agent, or any successor thereof, shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee and/or Paying Agent or of its property shall be appointed, or if any public officer shall take charge or control of the Trustee and/or Paying Agent or of its property or affairs, a successor may be appointed by the Holders of a Quarter in Interest of the Outstanding Bonds, by an instrument or concurrent instruments in writing signed and acknowledged by such Holders or by their attorneys-in-fact duly authorized and delivered to such successor Trustee and/or Paying Agent, notification thereof being given to the Authority and the predecessor Trustee and/or Paying Agent; **provided, nevertheless,** that unless a successor Trustee and/or Paying Agent shall have been appointed by the Holders as aforesaid, the Authority by a duly executed written instrument signed by an Authorized Officer of the Authority shall forthwith appoint a Trustee and/or Paying Agent to fill such vacancy until a successor Trustee and/or Paying Agent shall be appointed by the Holders as authorized in this Section.  The Trustee and/or Paying Agent shall mail a copy of the notice of any such appointment, postage prepaid, to the Holders of any Secured Obligations, at their last addresses appearing on the registry books or, in the case of a Bond Insurer, at such Bond Insurer's last known address.  Any successor Trustee and/or Paying Agent appointed by the Authority shall, immediately and without further act, be superseded by a Trustee and/or Paying Agent appointed by the Holders of a Quarter in Interest of the Outstanding Bonds.

If in a proper case no appointment of a successor shall be made within forty–five (45) days after the giving of written notice in accordance with Section 8.08 hereof or after the occurrence of any other event requiring or authorizing such appointment, the Trustee and/or Paying Agent or any Holder may apply, at the expense of the Authority, to any court of competent jurisdiction for the appointment of such a successor, and such court may thereupon, after such notice, if any, as such court may deem proper, appoint such successor.  Any successor appointed under the provisions of this Section shall be a bank having trust powers, a trust company or national banking association, in each case located in the State of New York and having a capital and surplus aggregating at least $50,000,000, if there be such a bank having trust powers or trust company or national banking association willing and able to accept the appointment on reasonable and customary terms and authorized by law to perform all the duties required hereby and by each Supplemental Trust Agreement.

Neither the Authority, the Commonwealth, any Government Entity nor any public corporation, agency or instrumentality of the foregoing nor any entity or person affiliated with the foregoing may be appointed as Trustee or Paying Agent hereunder.

**Section 8.11    Transfer of Rights and Property to Successor Trustee.**  Any successor appointed under the provisions of Section 8.10 hereof shall execute, acknowledge and deliver to its predecessor, and also to the Authority, an instrument accepting such appointment, and thereupon such successor, without any further act, deed or conveyance shall become fully vested with all money, estates, properties, rights, powers, duties and obligations of its predecessor hereunder and under each Supplemental Trust Agreement, with like effect as if originally appointed as Trustee.  However, the Trustee then ceasing to act shall nevertheless, on request by the Authority or of such successor, and upon payment of all amounts owed to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor all the right, title and interest of such Trustee in and to any property held by it hereunder, and shall pay over, assign and deliver to such successor any money or other properties subject to the trusts and conditions set forth herein.  Should any deed, conveyance or instrument in writing from the Authority be required by such successor for more fully and certainly vesting in and confirming to it any such money, estates, properties, rights, powers, duties or obligations, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Authority.

**Section 8.12    Merger or Consolidation of the Trustee.**  Any company into which the Trustee may be merged or with which it may be consolidated or any company resulting from any merger or consolidation to which it shall be a party or any company to which such Trustee may sell or transfer all or substantially all of its corporate trust business, provided such company shall be a bank having trust powers or trust company or national banking association qualified to be a successor to such Trustee under the provisions of Section 8.10 hereof, shall be the successor to such Trustee, without any further act, deed or conveyance.  In the event that such entity is not so qualified, such entity shall nevertheless continue to serve as Trustee until a successor Trustee is appointed by the Holders of a Quarter in Interest of the Outstanding Bonds.

**Section 8.13    Ancillary Agreements.**  The Trustee is authorized to enter into and perform its obligations under the any Ancillary Agreement to which it is a party.

# ARTICLE IX.

## SUPPLEMENTAL TRUST AGREEMENTS

**Section 9.01   Modification and Amendment without Consent.**  Notwithstanding any other provisions of this Article IX or Article X hereof, the Authority and the Trustee may execute and deliver at any time or from time to time Supplemental Trust Agreements for any one or more of the following purposes, and each such Supplemental Trust Agreement shall become effective in accordance with its terms:

(a)      To provide for the issuance of a Series of Bonds under and in accordance with (and, for the avoidance of doubt, not in any way contrary to or inconsistent with) the provisions hereof and to prescribe the terms and conditions pursuant to which such Bonds may be issued, paid or redeemed;

(b)      To provide for the issuance of Subordinated Indebtedness and to prescribe the terms and conditions pursuant to which such Subordinated Indebtedness may be issued, paid or redeemed, the creation of any additional funds and accounts required for the payment or security thereof, and the provision of any additional rights and remedies applicable thereto; ***provided, however***, that in no event shall the provisions of such Supplemental Trust Agreement provide for any additional rights or remedies that are inconsistent with the provisions of this Trust Agreement relating to the senior lien and senior security interest on the Trust Estate granted to the Holders of Bonds, the priority of payment of such Bonds, the provisions of Article XII of this Trust Agreement and the rights and remedies applicable thereto for so long as any such Bonds remain Outstanding

(c)      To add additional covenants and agreements of the Authority for the purpose of further securing the payment of the Bonds or Subordinated Indebtedness, provided such additional covenants and agreements are not contrary to or inconsistent with the covenants and agreements of the Authority or the Commonwealth contained herein, in the Ancillary Agreements or in the Act; provided that, in respect of the Bonds, such additional covenants and agreements shall be for the equal benefit and security of all Bonds, without discrimination or preference and, in respect of any Subordinated Indebtedness, in no event shall such covenants or agreements provide for any additional rights or remedies that are inconsistent with the provisions of this Trust Agreement relating to the senior lien and senior security interest in the Trust Estate granted to the Holders of Bonds, the priority of payment of such Bonds, the provisions of Article XII of this Trust Agreement and the rights and remedies applicable thereto for so long as any such Bonds remain Outstanding;

(d)      To prescribe further limitations and restrictions upon the issuance of Refunding Bonds, Additional Bonds and Subordinated Indebtedness by the Authority which are not contrary to or inconsistent with the limitations and restrictions thereon theretofore in effect including the limitations and restrictions set forth in the Act and the Plan of Adjustment;

(e)      To surrender any right, power or privilege reserved to or conferred upon the Authority by the terms hereof, provided that the surrender of such right, power or privilege is not contrary to or inconsistent with the covenants and agreements of the Authority or the Commonwealth contained herein, in the Ancillary Agreements or in the Act; provided that same

shall be for the benefit and security of all Secured Obligations, without discrimination or preference except as otherwise provided herein;

(f)    To confirm, as further assurance to secure the repayment of the Secured Obligations, the first-priority lien and first-priority security interest, and the subjection to the first-priority lien and first-priority security interest, of the Authority's right title and interest in the Pledged Revenues and other assets of the Trust Estate, or any other money, investments thereof or funds, provided that such further assurance shall be for the benefit and security of all Secured Obligations, without discrimination or preference except as otherwise provided herein;

(g)    To modify any of the provisions hereof or any previously adopted Supplemental Trust Agreement to accommodate the issuance of Subordinated Indebtedness provided that such modifications do not materially and adversely affect the rights of any of the Holders of Bonds, and provided that such modifications may not conflict with Article XII of this Trust Agreement;

(h)    To modify any of the provisions hereof or of any previously adopted Supplemental Trust Agreement in any other respects, provided that such modifications shall not be effective until after all Secured Obligations of any Series of Secured Obligations Outstanding as of the effective date of such Supplemental Trust Agreement shall cease to be Outstanding, and all Secured Obligations issued under such Supplemental Trust Agreements shall contain a specific reference to the modifications contained in such subsequent Supplemental Trust Agreement;

(i)    With the consent of the Trustee, to cure any ambiguity or defect or inconsistent provision herein or to insert such provisions clarifying matters or questions arising hereunder as are necessary or desirable, provided that such modification shall not, in the opinion of Transaction Counsel to be provided in accordance with the last paragraph of this Section 9.01, materially adversely affect the interests of the Bondholders or holders of Subordinated Indebtedness in any respect.

Notwithstanding the above, no Supplemental Trust Agreement authorized by this Section 9.01 shall be effective unless and until it is executed by both the Trustee and the Authority and the Authority has delivered to the Trustee an opinion of Transaction Counsel to the effect that the execution of the Supplemental Trust Agreement will not adversely affect: (i) the excludability of interest on the Tax Exempt Bonds from gross income of the Holders for federal income tax purposes, and (ii) with respect to a modification or amendment made pursuant to paragraphs (b) – (f) above, the rights of the Holders of the Secured Obligations in any other materially adverse respect.

For the avoidance of doubt, no Supplemental Trust Agreement shall be permitted pursuant to this Section 9.01 to the extent it would effectuate a modification or amendment that is only permitted under Section 10.01 with the consent of each affected Holder.

**Section 9.02 Supplemental Trust Agreements Effective with Consent of Bondholders.** The provisions hereof may also be modified or amended at any time or from time to time by a Supplemental Trust Agreement, subject to compliance with Section 10.01 of this Trust Agreement, such Supplemental Trust Agreement to become effective upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Authority.

**Section 9.03   General Provisions Relating to Supplemental Trust Agreements.**  This Trust Agreement shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article IX, Article X or Section 7.08 hereof.  Nothing contained in this Article IX or Article X hereof shall affect or limit the rights or obligations of the Authority to make, do, execute or deliver any Supplemental Trust Agreement, act or other instrument pursuant to the provisions of Section 7.08 hereof or the right or obligation of the Authority to execute and deliver to the Trustee or any Paying Agent any instrument elsewhere herein provided or permitted to be delivered to the Trustee or any Paying Agent.

A copy of every Supplemental Trust Agreement, when filed with the Trustee for the Trustee's execution, shall be accompanied by the opinion of Transaction Counsel required by Section 9.01, the Rating Confirmation, if any is required by Section 9.01(j), and an opinion of Transaction Counsel stating that such Supplemental Trust Agreement has been duly and lawfully adopted in accordance with the provisions hereof, is authorized or permitted hereby and is valid and binding upon the Authority and enforceable in accordance with its terms.  The Trustee shall be fully protected in relying on such an opinion of Transaction Counsel.

Notwithstanding anything to the contrary herein, no Supplemental Trust Agreement shall become effective without the written consent of the Trustee.

The Authority, as soon as practicable after a Supplemental Trust Agreement changing, amending or modifying any provisions of this Trust Agreement has become effective, shall give written notice thereof to each Rating Service then providing a rating on the Outstanding Bonds at the request of the Authority and shall post a copy of such Supplemental Trust Agreement on the Authority's website and EMMA under the CUSIPs for the Outstanding Bonds.

## ARTICLE X.

## AMENDMENTS OF TRUST AGREEMENT

### Section 10.01  Powers of Amendment.

(a)     Except as provided in Section 9.01 hereof, any modification or amendment hereof and of the rights and obligations of the Authority and of the Holders of the Secured Obligations hereunder may only be made by a Supplemental Trust Agreement, with the written consent given as hereinafter provided in Section 10.02 hereof, (i) of the Holders of at least a Majority in Interest of the Bonds Outstanding at the time such consent is given, or (ii) in case less than all of the Series of Secured Obligations then Outstanding are affected by the modification or amendment, of the Holders of at least a Majority in Interest of the Bonds of each Series so affected and Outstanding at the time such consent is given; ***provided, however,*** that if such modification or amendment will, by its terms, not take effect so long as any Secured Obligations of any specified like Series, maturity and tenor remain Outstanding, the consent of the Holders of such Secured Obligations shall not be required and such Secured Obligations shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under the definition of Majority in Interest for purposes of this Section.

(b)      No such modification or amendment shall, without the prior written consent of the Holder of such Secured Obligation, permit a change in the provisions related to the timing or amount of any payment on the Secured Obligations, including, without limitation, any change in the currency to be used to pay Principal of and interest on the Secured Obligations, any change in the amount or date of any Sinking Fund Installment, payment of Principal or any other payment, the terms of redemption or maturity of the principal of any Outstanding Secured Obligations or of any installment of interest thereon or a reduction in the principal amount or the Redemption Price thereof or in the rate of interest thereon.  Further, no such modification or amendment shall (i), without the prior written consent of the Holder of such Secured Obligation, reduce the percentages or otherwise affect the classes of Secured Obligations the consent of the Holders of which is required to effect any such modification or amendment, create a lien upon or pledge of the Trust Estate (other than the liens created under this Trust Agreement), create a preference of priority of any Bond or Bonds over any other Bond or Bonds, to create a preference or priority of any Subordinated Indebtedness over any Bond or Bonds, or to otherwise modify the covenant in section 7.10 and (ii) materially adversely affect the rights of any holder of Bonds or Subordinated Indebtedness without the prior written consent of such holder of Bonds or Subordinated Indebtedness. Further, no waiver of any default or compliance with any provision of this Section 10.01(b) shall be granted without the prior written consent of the Holder of such Secured Obligation.

(c)      For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment hereof if the same adversely affects or diminishes the rights of the Holders of Secured Obligations of such Series in any respect.  The Trustee may in its discretion reasonably determine whether or not, in accordance with the foregoing provisions, the Secured Obligations of any particular Series or maturity would be affected by any modification or amendment hereof and any such determination shall be binding and conclusive on the Authority and all Holders of Secured Obligations.  If the Trustee does not make such a determination, the Trustee shall obtain an opinion of Transaction Counsel as to whether the Secured Obligations of any particular Series or maturity would be so affected by any such modification or amendment hereof, which such opinion shall be binding and conclusive on the Authority and all Holders of Secured Obligations.

**Section 10.02  Consent of Holders of Secured Obligations.**  The Authority may at any time execute and deliver a Supplemental Trust Agreement making a modification or amendment permitted by the provisions of Section 10.01 hereof to take effect when and as provided in this Section.  Upon the adoption of such Supplemental Trust Agreement, a copy thereof, certified by an Authorized Officer of the Authority shall be filed with the Trustee for the inspection of the Holders of Secured Obligations.  A copy of such Supplemental Trust Agreement (or summary thereof or reference thereto in form approved in writing by the Trustee) together with a request to Holders of Secured Obligations, to the extent required hereby, for their consent thereto in form satisfactory to the Trustee, shall be mailed or distributed by Electronic Means by the Authority to each affected Holder of Secured Obligations.  Such Supplemental Trust Agreement shall not become effective until (a) there shall have been filed with the Trustee (i) the written consent of the Holders of the percentages of Outstanding Secured Obligations specified in Section 10.01 hereof and (ii) the opinions of Transaction Counsel required by Section 9.03 and (b) a notice shall have been mailed or distributed by Electronic Means as hereinafter in this Section provided.  Any such consent shall be binding upon the Holder of the Secured Obligations giving such consent and on

- 67 -

any subsequent Holder of such Secured Obligations (whether or not such subsequent Holder has notice thereof). At any time after the Holders of the required percentages of Secured Obligations shall have filed their consent to the Supplemental Trust Agreement, notice, stating in substance that the Supplemental Trust Agreement has been consented to by the Holders of the required percentages of Bonds and will be effective as provided in this Section, shall be given by the Trustee to the Holders of Secured Obligations by mailing such notice to Holders of Secured Obligations or by Electronic Means. The Authority shall file with the Trustee proof of giving such notice. Such Supplemental Trust Agreement shall be deemed conclusively binding upon the Authority and the Holders of all Secured Obligations at the expiration of sixty (60) days after the filing with the Trustee of the proof of the giving of such notice, except in the event of a final decree of a court of competent jurisdiction setting aside such consent in legal action or equitable proceeding commenced for such purpose within such sixty (60) day period; ***provided, however***, that the Authority during such sixty (60) day period and any such further period during which any such action or proceeding may be pending shall be entitled in its absolute discretion to take such action, or to refrain from taking such action, with respect to such Supplemental Trust Agreement as it may deem advisable.

**Section 10.03 <u>Modifications by Unanimous Consent</u>.** The terms and provisions hereof and the rights and obligations of the Authority and of the Holders of the Secured Obligations may be modified or amended in any respect upon the execution, delivery and filing with the Trustee by the Authority of a copy of a Supplemental Trust Agreement certified by an Authorized Officer of the Authority and the consent of the Holders of all of the Secured Obligations then Outstanding, such consent to be given as provided in Section 10.02.

**Section 10.04 <u>Mailing</u>.** Any provision in this Agreement for the mailing of a notice or other document to Holders of Secured Obligations shall be fully complied with if it is mailed postage prepaid or distributed by Electronic Means only (a) to each registered owner of Secured Obligations then Outstanding at such person's address, if any, appearing upon the registry books of the Authority, (b) to the Trustee, and (c) to the Bond Insurer at its last known address.

**Section 10.05 <u>Exclusion of Secured Obligations</u>.** Secured Obligations owned or held by or for the account of the Authority shall not be deemed Outstanding for the purpose of consent or other action provided for herein, and the Authority shall not be entitled with respect to such Bonds to give any consent or take any other action provided for herein. At the time of any consent or other action taken hereunder, the Authority shall furnish the Trustee a certificate of an Authorized Officer of the Authority, upon which the Trustee may rely, describing all Secured Obligations so to be excluded.

**Section 10.06 <u>Notation on Secured Obligations</u>.** Secured Obligations delivered after the effective date of any action taken as provided in Article IX hereof or this Article X may, and if the Trustee so determines, shall, bear a notation by endorsement or otherwise in form approved by the Authority and the Trustee as to such action, and in that case upon demand of the Holder of any Bond Outstanding at such effective date and upon presentation of his Secured Obligation for such purpose at the designated Corporate Trust Office of the Trustee suitable notation shall be made on such Secured Obligation by the Trustee as to any such action. If the Authority or the Trustee shall so determine, new Secured Obligations so modified as, in the opinion of the Trustee and the Authority, conform to such action shall be prepared and delivered, and upon demand of the Holder

of any Secured Obligations then Outstanding shall be exchanged, without cost to such Holder, for Secured Obligations of the same Series and maturity then Outstanding, upon surrender of such Secured Obligations.

## ARTICLE XI.

## DEFAULTS AND REMEDIES

**Section 11.01 <u>Events of Default</u>.**  An Event of Default shall exist hereunder and under each Supplemental Trust Agreement (herein called "**Event of Default**") if:

(a)     Payment of the Principal or Redemption Price of any Bond shall not be made by the Authority when the same shall become due and payable, either at maturity or by proceedings for redemption or otherwise; or

(b)     Payment of an installment of interest on any Bond shall not be made by the Authority when the same shall become due and payable; or

(c)     Except under Sections 11.01(f), (g) and (h), the Authority shall default in the due and punctual performance of any of the covenants, conditions, agreements and provisions contained herein or in the Bonds or in any Supplemental Trust Agreement on the part of the Authority to be performed and such default shall continue for sixty (60) days after written notice specifying such default and requiring same to be remedied shall have been given to the Authority by the Trustee, which may give such notice in its discretion and shall give such notice at the written request of the Holders of not less than a Quarter in Interest of the Outstanding Bonds, unless, if such default is capable of being cured but is not capable of being cured within sixty (60) days, the Authority has commenced to cure such default within sixty (60) days and does cure such default within ninety (90) days of the date the default initially occurred, ***provided, however***, that the cure period for non-compliance with the Rate Covenant shall be the periods established in Section 7.01 (e) of this Trust Agreement; or

(d)     The Authority, pursuant to or within the meaning of any U.S., federal or Commonwealth insolvency, bankruptcy, reorganization, restructuring receivership or any other form of debtor relief law, including without limitation, PROMESA (collectively, "**Bankruptcy Laws**"):

(i)     commences Bankruptcy Proceedings to be adjudicated bankrupt or insolvent;

(ii)     consents to the institution of Bankruptcy Proceedings against it;

(iii)     files, or consents to the filing of, a petition or answer or consent seeking an arrangement of debt, reorganization, dissolution, winding up or relief under applicable Bankruptcy Law;

(iv)     consents to the appointment of a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of it or for all or any substantial part of its property;

- 69 -

(v)      makes a general assignment for the benefit of its creditors;

(vi)      takes any corporate or similar action in furtherance of any of the foregoing; or

(vii)      admits in writing the inability to pay its debts as they mature or is otherwise insolvent;

(e)      a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i)      is for relief against the Authority in a proceeding in which the Authority is to be adjudicated bankrupt or insolvent;

(ii)      approves as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Authority under any Bankruptcy Law;

(iii)      appoints a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of the Authority for all or any substantial part of the property of the Authority;

(iv)      orders the liquidation, dissolution or winding up of the Authority and the order or decree remains unstayed and in effect for 60 consecutive days; or

(f)      the Authority permits the validity or effectiveness of this Trust Agreement or the Bonds to be impaired, and such impairment affects the enforceability of or payments on the Bonds, or the Authority or the Commonwealth to be released from any covenants or obligations with respect to the Bonds; or

(g)      the Authority shall default in the due and punctual performance of any of its covenants contained in Sections 7.01(e) (subject to the cure period therein) and 7.06 hereof;

(h)      the first-priority lien on the Trust Estate shall at any time and for any reason cease to be in full force and effect or a final judgment shall be rendered which shall declare such first-priority lien to be null and void or shall declare that such first-priority lien on the Trust Estate does not establish in any material respect the lien it purports to establish; or

(i)      the occurrence of a Subordinated Payment Default; ***provided, however,*** that such Subordinated Payment Default shall not be an Event of Default under this Agreement for so long as any Bonds remain Outstanding hereunder.

**Section 11.02  <u>No Acceleration with Respect to the Secured Obligations</u>.**  There shall be no right of acceleration with respect to the Secured Obligations.

**Section 11.03  <u>Enforcement of Remedies</u>.**

(a)      If an Event of Default occurs and is continuing, the Trustee shall make payments in accordance with Section 11.04 below.

- 70 -

(b)      If an Event of Default described in clauses (d) or (e) of Section 11.01, occurs the automatic stay is deemed waived with respect to Net Receipts held in the funds and accounts established in this Trust Agreement (other than Net Receipts on deposit in the Arbitrage Rebate Fund).

(c)      If an Event of Default occurs and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Bonds shall proceed to protect and enforce its rights and the rights of the Holders by such of the following remedies as the Trustee shall deem most effective to protect and enforce such rights or such of the following remedies as Holders holding not less than a Quarter in Interest of the Outstanding Bonds shall instruct:

(i)      initiation of Proceedings to (A) collect all amounts due in respect of the Bonds limited, upon recovery thereunder, to the Trust Estate; (B) enforce any and all rights of the Holders, (C) enforce any covenant or agreement in this Trust Agreement, or (D) enforce any other remedy or legal or equitable right vested in the Trustee or the Holders by this Trust Agreement, the Act or other applicable law;

(ii)      enforcement of the lien of this Trust Agreement and enforcement of the Authority's rights or remedies in respect of the Trust Estate to the same extent as the Authority;

(iii)      by action or suit in law or in equity for specific performance of any covenant or agreement contained in this Trust Agreement or in aid or execution of any power granted in this Trust Agreement or for the enforcement of any proper legal or equitable remedy, as the Trustee shall deem to be most effectual to protect and enforce such rights; or

(iv)      by action or suit in law or in equity or to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondholders.

(d)      In any Proceedings brought by the Trustee (and also any Proceedings involving the interpretation of any provision of this Trust Agreement to which the Trustee shall be a party), the Trustee shall be held to represent all the Holders, and it shall not be necessary to make any Holder a party to any such Proceedings.

(e)      If an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under this Trust Agreement at the request or direction of any of the Holders if the Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities which might be incurred by it in complying with such request.

In the enforcement of any remedy hereunder and under each Supplemental Trust Agreement the Trustee shall be entitled to sue for, enforce payment of, and receive any and all amounts then, or during any default becoming, and at any time remaining, due from the Authority for Principal or interest or otherwise under any of the provisions of this Trust Agreement or of any Supplemental Trust Agreement or of the Secured Obligations, with interest on overdue payments of the Principal of or interest on the Secured Obligations at the rate or rates of interest specified in such Secured Obligations, together with any and all costs and expenses of collection and of all

- 71 -

proceedings hereunder and under any Supplemental Trust Agreement and under such Secured Obligations, including the fees and expenses of the Trustee and its attorneys and other agents, without prejudice to any other right or remedy of the Trustee or of the Holders of such Secured Obligations, and to recover and enforce judgment or decree against the Authority but solely as provided herein, in any Supplemental Trust Agreement and in such Secured Obligations, for any portion of such amounts remaining unpaid, with interest, costs and expenses, and to collect in any manner provided by law, the money adjudged or decreed to be payable.

**Section 11.04 <u>Priority of Payments after Default</u>.**   Notwithstanding anything in this Trust Agreement to the contrary, following the occurrence and continuance of an Event of Default, if at any time the moneys in the Debt Service Fund, the General Reserve Fund, the Renewal and Replacement Fund, the Operating Reserve Fund and the Subordinated Indebtedness Fund shall not be sufficient to pay the principal of, the redemption premium (if any), or the interest on the Bonds as the same are then due and payable, such money, together with any money then available or thereafter becoming available for such purposes (including all Toll Receipts), whether through the exercise of remedies provided for this Article XI or otherwise, shall be applied, as follows:

*First*:  To the payment of reasonable amounts due to the Trustee and Paying Agents under Section 8.06;

*Second*:  To the Authority, in each month, an amount equal to the amount set forth in the Disbursement Schedule prepared in accordance with Section 7.02(e) to pay Costs of Operation, Maintenance and Administration of the Toll Facilities for the next succeeding two months, to the extent not paid pursuant to clause First above;

*Third*, *Pro rata*:

  (A)   To the payment to the Bondholders of all installments of interest on the Bonds then due (including amounts previously due but not yet paid) in the order of the maturity of the installments of such interest, and, if the amount available shall not be sufficient to pay in full any installment, then to the payment thereof ratably, according to the amounts due on such installment, to the Bondholders, without any discrimination or preference; and

  (B)   To the payment to the persons entitled thereto of the unpaid Principal or Redemption Price of any Bonds which shall have become due whether at maturity or by call for redemption in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such amounts due on any such due date, then to the payment thereof ratably, according to the amount of Principal or Redemption Price due on such date, to the persons entitled thereto, without any discrimination or preference.

*Fourth*, *Pro rata*:

  (A)   To the payment to the Holders of Subordinated Indebtedness, all installments of interest on the Subordinated Indebtedness then due (including amounts previously due but not yet paid) in the order of the maturity of the installments of such interest, and, if the amount available shall not be sufficient to pay in full any installment,

- 72 -

then to the payment thereof ratably, according to the amounts due on such installment, to the Holders of Subordinated Indebtedness without any discrimination or preference; and

(B)     To the payment to the persons entitled thereto of the unpaid Principal or Redemption Price of any Subordinated Indebtedness which shall have become due whether at maturity or by call for redemption in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such amounts due on any such due date, then to the payment thereof ratably, according to the amount of Principal or Redemption Price due on such date, to the persons entitled thereto, without any discrimination or preference.

Whenever money is to be applied by the Trustee pursuant to the provisions of this Section, such money shall be applied by the Trustee at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such money available for application and the likelihood of additional money becoming available for such application in the future.  The setting aside of such money in trust for application in accordance with the provisions of this Section shall constitute proper application by the Trustee, and the Trustee shall incur no liability whatsoever to the Authority, to any Holder of Secured Obligations or to any other person for any delay in applying any such money so long as the Trustee acts with reasonable diligence, having due regard to the circumstances, and ultimately applies the same in accordance with such provisions hereof as may be applicable at the time of application by the Trustee.  Whenever the Trustee shall exercise such discretion in applying such money, it shall fix the date (which shall be on an Interest Payment Date unless the Trustee shall deem another date more suitable) upon which such application is to be made, and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue.  The Trustee shall give such notice as it may deem appropriate of the fixing of any such date.

Amounts held by the Trustee after payments to be made pursuant to this Section 11.04 have been made and no Secured Obligations are Outstanding and unpaid shall be paid and applied in accordance with Section 5.05 hereof.

**Section 11.05  Termination of Proceedings.**  In case any proceedings commenced by the Trustee on account of any default shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee, then and in every such case the Authority, the Trustee and the Bondholders shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no such proceeding had been commenced.

**Section 11.06  Bondholders' Direction of Proceedings.**  Anything herein to the contrary notwithstanding, the Holders of a Quarter in Interest of the Outstanding Bonds shall have the right by an instrument in writing executed and delivered to the Trustee, to direct the choice of remedies and the time, method and place of conducting any proceeding for any remedy available to the Trustee hereunder, under each Supplemental Trust Agreement or otherwise, or exercising any trust or power conferred upon the Trustee, including the power to direct or withhold directions with respect to any remedy available pursuant to Section 11.03, provided, (i) such direction shall not be otherwise than in accordance with law and the provisions hereof and of each Supplemental Trust Agreement, (ii) that the Trustee may take any other action deemed proper by the Trustee which is

- 73 -

not inconsistent with such direction, and (iii) that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondholders not parties to such direction.

**Section 11.07** <u>Control by Holders of Bonds; Limitations</u>.  No Holder of any of the Secured Obligations shall have any right to institute any suit, action or proceeding in equity or at law for the execution of any trust hereunder, or for any other remedy hereunder unless such Holder previously shall have given to the Trustee written notice of the Event of Default on account of which such suit, action or proceeding is to be instituted, and unless also the Holders of not less than a Quarter in Interest of the Outstanding Bonds, shall have made written request to the Trustee after the right to exercise such powers or right of action, as the case may be, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted hereby or to institute such action, suit or proceeding in its or their name, and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time (and in no event shall a delay of more than thirty (30) days be deemed reasonable for such purposes) after receipt thereof.  Such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts hereof or for any other remedy hereunder and in equity or at law.  Notwithstanding the right of the Holders to direct proceedings in accordance with Section 11.06 above, it is understood and intended that, no one or more Holders of the Secured Obligations secured hereby shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security hereof, and that all proceedings at law or in equity shall be instituted and maintained for the benefit of all Holders of the Outstanding Secured Obligations. Notwithstanding any other provision hereof and subject in all respects to Article XII of this Trust Agreement, the Holder of any Secured Obligation shall have the right which is absolute and unconditional to receive payment of the Principal of (and redemption premium, if any) and interest on such Bond on the stated maturity expressed in such Secured Obligation (or, in the case of redemption, on the redemption date or, in the case of interest, on the Interest Payment Date on which such interest is due) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

**Section 11.08** <u>Actions by Trustee; Possession of Secured Obligations by Trustee Not Required.</u>  All rights of action hereunder or under any of the Secured Obligations secured hereby and thereby, enforceable by the Trustee, may be enforced by it without the possession of any of such Secured Obligations or the production thereof at the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of the Secured Obligations to which such action relates, subject to the provisions hereof.

**Section 11.09** <u>Waiver and Non–Waiver of Default</u>.  No delay or omission of the Trustee or any Bondholder to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein. Every power and remedy given by this Article XI to the Trustee and the Bondholders, respectively, may be exercised from time to time and as often as may be deemed expedient.

The Trustee may, and upon written request of the Holders of not less than a Majority in Interest of the Outstanding Bonds, shall waive any default which in its opinion shall have been remedied before the entry of final judgment or decree in any suit, action or proceeding instituted by it under the provisions hereof or before the completion of the enforcement of any other remedy hereunder; *provided, however,* the Trustee may not waive any default if it has received a direction from not less than a Majority in Interest of the Outstanding Bonds that such default may not be waived by the Trustee; *provided, further,* that no such waiver shall extend to or affect any other existing or any subsequent default or defaults or impair any rights or remedies consequent thereon.

Section 11.10  **Notice of Event of Default**.  The Trustee shall give notice of each Event of Default or Subordinated Payment Default hereunder known to the Trustee to the Authority and AAFAF, within ten (10) days after knowledge of the occurrence thereof and to the Holders of Secured Obligations within thirty (30) days after knowledge of the occurrence thereof, unless such Event of Default or Subordinated Payment Default shall have been remedied or cured before the giving of such notice; *provided, however*, that failure to provide notice to the AAFAF of any Event of Default shall in no way limit the exercise of remedies by the Trustee or Bondholders.  In the case of the Holders of the Secured Obligations, each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof to all registered Holders of Secured Obligations, as the names and addresses of such Holders appear on the books for registration and transfer of Secured Obligations as kept by the Trustee and to the Bond Insurer at its last known address. The Trustee shall not be deemed to have knowledge of an Event of Default unless the Trustee receives notice of the Event of Default from the Authority or any of the Holders.

Section 11.11  **Remedies Not Exclusive**.  No remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity, by statute or by contract.

## ARTICLE XII.

## SUBORDINATION

Section 12.01  **Agreement to Subordinate**.  The indebtedness evidenced by all Subordinated Indebtedness, and any liens or property interests securing such Subordinated Indebtedness, shall be junior, inferior, and expressly subordinate in all respects to and subject in all respects to the prior payment in full of the Bonds and to any liens securing the Bonds, except as set forth below, and the holder of any Subordinated Indebtedness whether upon original issue or upon transfer or assignment thereof accepts and agrees to be bound by such provision.  Notwithstanding any defect or deficiencies in, or failure to perfect or lapse in perfection of, or avoidance as a fraudulent conveyance or otherwise of, any liens securing the Bonds, and regardless of any Bankruptcy Proceeding, any liens securing the Subordinated Indebtedness shall be junior and subordinate in all respects to any liens securing the Bonds. Subject in all respects to the provisions of this Article XII and to the express subordination of the Subordinated Indebtedness to the senior lien and senior security interest in the Trust Estate pledged to the payment of the Bonds provided for in this Trust Agreement, holders of Subordinated Indebtedness shall be entitled to receive payments of principal and interest with respect to the Subordinated Indebtedness and to seek

- 75 -

specific performance thereof.  Each provision in this Article XII shall constitute a subordination agreement for purposes of section 510(a) of the Bankruptcy Code.

Section 12.02   **Distributions in Bankruptcy Proceedings**.   Upon any payment or distribution of any kind in any Bankruptcy Proceeding (including, without limitation, any plan distributions, interim distributions, or adequate protection), or otherwise:

(a)     All Bonds (including principal, interest, premiums, and fees on such Bonds due or to become due, absolute or contingent, now existing or hereafter arising, and including interest, premiums, and fees that accrue after the commencement of any Bankruptcy Proceeding, regardless of whether such interest, premiums, and fees are allowed claims in such proceeding) shall first be paid or duly provided for to the extent of such payment or  distribution before any payment or distribution of any kind is made upon the indebtedness evidenced by the Subordinated Indebtedness;

(b)     Any payment or distribution of assets of the Authority of any kind or character, whether in cash, property, securities, or any other form of consideration to which the Holders of the Subordinated Indebtedness would be entitled except for the provisions of this Article, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other indebtedness of the Authority being subordinated to the payment of the Subordinated Indebtedness, shall be paid by the liquidating trustee or agent or other person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the holders of the Bonds, to the extent necessary to provide for the payment of all Bonds in full before any payment is made upon the indebtedness evidenced by the Subordinated Indebtedness;

(c)     In the event that, any payment or distribution of any kind shall be received by the Trustee or by the holders of the Subordinated Indebtedness in respect of any Subordinated Indebtedness before all Bonds are paid or duly provided for in full, such payment or distribution shall be segregated and held in trust and forthwith shall be paid over to the holders of the Bonds for application to the payment thereof until such Bonds shall have been paid or provision for such payment shall have been made in full;

(d)     For purposes of this Article XII, all references to payment of Bonds in full shall include all principal, interest, premiums, and fees on such Bonds due or to become due, absolute or contingent, now existing or hereafter arising, and including interest, premiums, and fees that accrue after the commencement of any Bankruptcy Proceeding, regardless of whether such interest, premiums, and fees are allowed claims in such proceeding; and

(e)     Notwithstanding any other provision to the contrary herein, if an Event of Default described in clauses (a) through (h) of Section 11.01 of this Trust Agreement has occurred and is continuing, all Holders of the Subordinated Indebtedness and any representatives for such Subordinated Indebtedness hereby agree that unless and until the Bonds have been paid in full, they shall not exercise any rights or remedies or take any action or proceeding to collect or enforce any of the Subordinated Indebtedness or any liens securing such Subordinated Indebtedness.

**Section 12.03** __Prohibition on Contesting Liens and Claims.__   Each Holder of Subordinated Indebtedness and each representative of the Holders of such Subordinated Indebtedness, agrees that it will not (and hereby waives any right to) directly or indirectly contest or support any other Person in contesting, in any proceeding (including any Bankruptcy Proceeding), the priority, validity, perfection, extent or enforceability of any claims of the Holders of Bonds or the Trustee or any lien held, or purported to be held, by or on behalf of any of the Trustee or the Holders of the Bonds in the Trust Estate pursuant to this Trust Agreement.   Until the Bonds have been discharged and paid in full, so long as an Event of Default (other than an Event of Default described in Section 11.01(i), provided that no other Events of Default described in Section 11.01 have occurred and be continuing) shall have occurred and be continuing, no Holder of Subordinated Indebtedness or any representative of the Holders of such Subordinated Indebtedness will assert any marshaling, appraisal, valuation or other similar right that may otherwise be available to a junior secured creditor; *__provided, however,__* that if an Event of Default (other than an Event of Default described in Section 11.01(i)) has occurred and is continuing and the Trustee (on behalf of the Holders of Bonds) or the Holders of Bonds (to the extent permitted by Section 11.07) exercise remedies, the Holders of Subordinated Indebtedness may join in such actions, but only if their participation is not in opposition to, and does not otherwise conflict with, the relief sought by the Holders of the Bonds or the Trustee, as applicable.

**Section 12.04** __Post-Petition Interest__.   Each of the parties hereto hereby acknowledges and agrees that the Holders of Bonds shall be entitled to receive, in addition to amounts distributed to them in respect of principal, prepetition interest and other claims, all amounts owing in respect of post-petition interest regardless of whether such amounts are allowed in any Bankruptcy Proceeding (including, without limitation, any additional interest payable pursuant to this Trust Agreement, the Bonds, or any Ancillary Agreements, arising from or related to a default, which is disallowed as a claim in any Bankruptcy Proceeding), if any, before any distribution is made in respect of the claims held by the Holders of Subordinated Indebtedness with respect to the Trust Estate, with Holders of Subordinated Indebtedness or any representative thereof hereby acknowledging and agreeing to turn over to the Trustee, for itself and on behalf of each other Holder of Bonds, any portion of the Trust Estate otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Holders of Subordinated Indebtedness.

<div align="center">

**ARTICLE XIII.**

__DEFEASANCE__

</div>

**Section 13.01** __Defeasance.__  (a) If the Authority shall pay or cause to be paid to the Holder of a Secured Obligation the Principal or Redemption Price of and interest thereon, at the times and in the manner stipulated therein, herein, and in the applicable Supplemental Trust Agreement, then all rights granted hereby and by the Act to such Secured Obligation shall be discharged and satisfied.   In such event, the Trustee shall, upon the request of the Authority, execute and deliver such documents to evidence such discharge and satisfaction as may be reasonably required by the Authority, and all money or investments thereof held by it pursuant hereto and to the applicable Supplemental Trust Agreement which are being held for the sole benefit of such Secured Obligations and which are not required for the payment or redemption of Secured Obligations of the same Series as such Secured Obligation shall be applied by the Trustee as follows: first, to the

<div align="center">- 77 -</div>

Arbitrage Rebate Fund, the amount required to be deposited therein in accordance with the direction of an Authorized Officer of the Authority, second, to the Debt Service Fund, to the extent the amount then on deposit therein is less than Annual Debt Service for the then current Fiscal Year, and third, to the extent not required to be deposited in the Arbitrage Rebate Fund or the Debt Service Fund, at the direction of the Authority, shall be transferred to any other fund or account established pursuant hereto.

(b)     Secured Obligations for the payment or redemption of which money shall have been set aside and shall be held in trust by the Trustee (through deposit of money for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section. All Outstanding Secured Obligations of any Series or any maturity within a Series or a portion of a maturity within a Series shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section if:

(i)     in case any of said Secured Obligations are to be redeemed on any date prior to their maturity, the Authority shall have given to the Trustee, in form satisfactory to it, irrevocable instructions to give as provided in Article IV hereof notice of redemption on said date of redemption of such Secured Obligations; and

(ii)     there shall have been deposited with the Trustee either money in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due will provide money which, together with the money, if any, deposited with the Trustee at the same time, shall be sufficient in the judgment of a nationally recognized verification agent to pay when due the Principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be; and

(iii)     in the event said Secured Obligations are not by their terms subject to redemption within the next succeeding sixty (60) days, the Authority shall have given the Trustee, in form satisfactory to it, irrevocable instructions to give, as soon as practicable, by first class mail, postage prepaid, to the Holders of said Secured Obligations at their last known addresses appearing on the registration books, a notice to the Holders of such Secured Obligations that the deposit required by (II) above has been made with the Trustee and that said Secured Obligations are deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which money is to be available for the payment of the Principal or Redemption Price, if applicable, of and interest on said Secured Obligations; and

(iv)     the Authority shall have delivered to the Trustee an opinion of Transaction Counsel to the effect that (A) any Secured Obligation having been deemed to have been paid as provided in this Section is no longer Outstanding hereunder and is no longer secured by or entitled to the benefits of this Trust Agreement, (B) such defeasance is in accordance with the terms hereof and (C) with respect to a Tax Exempt Bond, such defeasance will not adversely affect the exclusion of interest on such Tax Exempt Bond from gross income for purposes of federal income taxation.

The Authority shall give written notice to the Trustee of its selection of the Series and maturity payment of which shall be made in accordance with this Section. The Trustee shall select the Secured Obligations of like Series and maturity payment of which shall be made in accordance with this Section in the manner provided in Section 4.04 hereof. Neither the Defeasance Securities nor money deposited with the Trustee pursuant to this Section nor principal or interest payments on any such Defeasance Securities shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the Principal or Redemption Price, if applicable, of and interest on said Bonds; *provided, however,* that any money received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose in the judgment of a nationally recognized verification agent, shall, to the extent practicable, be reinvested in Defeasance Securities maturing at times and in amounts sufficient to pay when due the Principal or Redemption Price, if applicable, of and interest to become due on said Secured Obligations on and prior to such redemption date or maturity date hereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such money so deposited, shall, to the extent certified by the Trustee to be in excess of the amounts required hereinabove to pay the Principal or Redemption Price, if applicable, of and interest on such Secured Obligations, as realized, shall be applied by the Trustee as follows: first, to the Arbitrage Rebate Fund, the amount required to be deposited therein in accordance with the direction of an Authorized Officer of the Authority, second, to the Debt Service Fund, to the extent the amount then on deposit therein is less than the sum of the Interest Funding Requirement for the then current Fiscal Year and the Principal Funding Requirement for the then current Fiscal Year, and third, to the extent not required to be deposited in the Arbitrage Rebate Fund or the Debt Service Fund, at the direction of the Authority, shall be retained therein or transferred to any other fund or account established pursuant hereto.

(c)    Anything herein to the contrary notwithstanding, any money held by the Trustee or a Paying Agent in trust for the payment and discharge of any of the Secured Obligations of a Series or the interest thereon which remain unclaimed for three (3) years after the date when all of the Secured Obligations of such Series have become due and payable, either at their stated maturity dates or by call for earlier redemption, if such money was held by the Trustee or Paying Agent at such date, or for three (3) years after the date of deposit of such money if deposited with the Trustee or Paying Agent after said date when all of the Secured Obligations of such Series become due and payable, or three (3) years after the date when the Principal or Redemption Price of or interest on the Secured Obligations for which said money is held was due and payable, shall, at the written request of the Authority, be repaid by the Trustee or Paying Agent to the Authority as its absolute property and free from trust, and the Trustee or Paying Agent shall thereupon be released and discharged with respect thereto and the Holders of Secured Obligations shall look only to the Authority for the payment of such Secured Obligations.

## ARTICLE XIV.

## EXECUTION OF INSTRUMENTS BY BONDHOLDERS
## AND PROOF OF OWNERSHIP OF SECURED OBLIGATIONS

**Section 14.01  Evidence of Signatures of Bondholders and Ownership of Secured Obligations.**  Any request, consent or other instrument which this Trust Agreement may require or permit to be signed and executed by a Holder or Holders of Secured Obligations may be in one

or more instruments of similar tenor, and shall be signed or executed by such Holder or Holders of Secured Obligations in person or by his or their attorneys duly appointed in writing.  Proof of the execution of any such instrument, or of an instrument appointing any such attorney, or the holding or owning by any person of such Secured Obligations, shall be sufficient for any purpose hereof (except as otherwise herein expressly provided) if made in the manner set forth below, but the Trustee may nevertheless in its discretion require further or other proof in cases where it deems the same desirable.

The fact and date of the execution by any Bondholder or his attorney of such instrument may be proved by the certificate, which need not be acknowledged or verified, of any officer of a bank or trust company satisfactory to the Trustee or of any notary public or other officer authorized to take acknowledgments of deeds to be recorded in the state in which he purports to act, that the person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer. The corporation of the person or persons executing any such instrument on behalf of a corporate Bondholder may be established without further proof if such instrument is signed by a person purporting to be the president or a vice–president of such corporation with a corporate seal affixed and attested by a person purporting to be its secretary or an assistant secretary.

The ownership of Secured Obligations and the amount, numbers and other identification, and date of holding or owning the same shall be proved by the registry books.  Any request, consent or vote of the owner of any Secured Obligations shall bind all future owners of such Secured Obligation in respect of anything done or suffered to be done or omitted to be done by the Authority or the Trustee in accordance therewith.  The Authority or the Trustee may fix a record date in connection with any such request, consent or vote.

## ARTICLE XV.

## MISCELLANEOUS

**Section 15.01  Preservation and Inspection of Documents.**  All documents received by the Trustee from the Authority or from Bondholders under the provisions hereof or of any Supplemental Trust Agreement shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Authority any Bondholder and their agents and their representatives, any of whom may make copies thereof; *provided, however,* that with respect to inspection by a Bondholder a written request of such Bondholder must have been received by the Trustee at least five (5) Business Days prior to the date of inspection.  The Trustee shall provide to the Authority account balances and other information reasonably requested by the Authority.

**Section 15.02  Money and Funds Held for Particular Secured Obligations.**  The amounts held by the Trustee or any Paying Agent for the payment of the Principal or Redemption Price of and interest on the Secured Obligations due on any date with respect to particular Bonds shall, pending such payment, be set aside and validly and irrevocably held in trust by it for the Holders of such Secured Obligations entitled thereto, and for the purposes hereof such Principal or Redemption Price of and interest on such Secured Obligations, due after such date thereof, shall no longer be considered to be unpaid.

**Section 15.03  Cancellation of Secured Obligations.**  The Trustee or any Paying Agent shall forthwith cancel all Secured Obligations which have been redeemed or paid and shall dispose of such Bonds in accordance with its customary procedures.  No such Secured Obligations shall be deemed Outstanding Secured Obligations hereunder and no Secured Obligations shall be issued in lieu thereof.

**Section 15.04  No Recourse under Trust Agreement or on the Secured Obligations.**  All covenants, stipulations, promises, agreements and obligations of the Authority contained herein shall be deemed to be the covenants, stipulations, promises, agreements and obligations of the Authority and not of any member, officer or employee of the Authority, and no recourse shall be had for the payment of the Principal or Redemption Price of or interest on the Secured Obligations or for any claims based thereon, hereon or on the Supplemental Trust Agreement against any member, officer or employee of the Authority or any person executing the Secured Obligations, all such liability, if any, being expressly waived and released by every Holder of Secured Obligations by the acceptance of the Secured Obligations.

**Section 15.05  Severability of Invalid Provision.**  If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein or in any Supplemental Trust Agreement on the part of the Authority or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions hereof or of such Supplemental Trust Agreement or of the Secured Obligations.

**Section 15.06  Parties of Interest.**  Nothing herein or in any Supplemental Trust Agreement adopted pursuant to the provisions hereof, expressed or implied, is intended to or shall be construed to confer upon or to give to any person or party other than the Authority, the Trustee, the Paying Agents and the Holders and, to the extent provided in this Trust Agreement and any Supplemental Trust Agreement, any Bond Insurer any rights, remedies or claims hereunder or by reason hereof or of any Supplemental Trust Agreement or any covenant, condition or stipulation thereof.  All covenants, stipulations, promises and agreements herein or in any Supplemental Trust Agreement contained by or on behalf of the Authority shall be for the sole and exclusive benefit of the Authority, the Trustee, the Paying Agents, the Holders and the Bond Insurer.  Any Bond Insurer of any Insured Bonds issued under this Trust Agreement is an express third party beneficiary of this Trust Agreement and of any applicable Supplemental Trust Agreement.

**Section 15.07  Certain Provisions Relating to Capital Appreciation Bonds or Convertible Capital Appreciation Bonds.**  For the purposes of receiving payment of the Redemption Price of a Capital Appreciation Bond or Convertible Capital Appreciation Bond (prior to the applicable Interest Commencement Date with respect to such Convertible Capital Appreciation Bond) redeemed prior to maturity, the then current Accreted Value of such Bond shall be deemed to be its principal amount.  In computing the principal amount of Bonds held by the registered owner of a Capital Appreciation Bond or Convertible Capital Appreciation Bond (prior to the applicable Interest Commencement Date with respect to such Convertible Capital Appreciation Bond) in giving to the Authority or the Trustee any notice, consent, request, or demand pursuant hereto for any purpose whatsoever, the Accreted Value of such Bond as at the

- 81 -

immediately preceding Valuation Date shall be deemed to be its principal amount. Notwithstanding any other provision hereof, the amount payable at any time with respect to the Principal of and interest on any Capital Appreciation Bond or Convertible Capital Appreciation Bond (prior to the applicable Interest Commencement Date with respect to such Convertible Capital Appreciation Bond) shall be equal to its Accreted Value thereof at such time plus redemption premium, if any.

Section 15.08 **Notices.** Except as otherwise provided herein, any notices, directions or other instruments required to be given or delivered pursuant hereto or to any Supplemental Trust Agreement shall be in writing and shall be delivered by hand against the written receipt therefor or sent by registered or certified mail addressed: in the case of the Authority, to it to the attention of the Authority's Executive Director with a copy to the Secretary of the Authority's board, at Roberto Sanchez Vilella (Minillas) Government Center, de Diego Ave No. 100, San Juan, PR 00907; and in the case of the Trustee, addressed to it at the designated Corporate Trust Office of the Trustee at The Bank of New York Mellon, 240 Greenwich Street, Floor 7 East, New York, New York 10286, Attention: Corporate Trust; in the case of the Commonwealth or the Secretary of the Treasury, to the attention of the Secretary of Treasury at 10 Paseo Covadonga, San Juan, Puerto Rico, 00901, or, in each case, to such other individual and at such other address as the person to be notified shall have specified by notice to the other persons. Any such communication may also be sent by Electronic Means, receipt of which shall be confirmed.

In the event the Trustee sends a notice to the Holders of any series of Secured Obligations, the Trustee shall also provide such notice in electronic format, accompanied by such identifying information as is prescribed by the Municipal Securities Rulemaking Board, including the CUSIP numbers for the Secured Obligations of the series to the Authority's dissemination agent for distribution through the EMMA system. The Authority shall cooperate with the Trustee to the extent necessary to facilitate the foregoing. The Trustee shall not be liable under any circumstances for monetary damages to any person for any breach of the provisions of this paragraph. The sole remedy for failure of the Trustee to perform is specific performance.

Section 15.09 **Headings.** Any headings preceding the text of the several Articles and Sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience of reference and shall not constitute a part hereof nor shall they affect its meaning, construction or effect.

Section 15.10 **Governing Laws.** This Trust Agreement and the Bonds shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under this Trust Agreement and the Bonds; ***provided, however***, that the authorization of this Trust Agreement and the issuance of the Secured Obligations by the Authority shall be governed by the laws of the Commonwealth.

Section 15.11 **Retention of Jurisdiction of Title III Court.** The Title III Court shall retain jurisdiction from and after the Effective Date of all matters arising from or related to the Plan of Adjustment, the Confirmation Order and this Trust Agreement, including, without limitation, with respect to the payment of the Secured Obligations and the enforcement of the remedies set forth herein to the fullest extent permitted by law. Any disputes, legal action, suit, or

- 82 -

proceeding arising from or related to this Trust Agreement or the Secured Obligations (a) shall be brought in accordance with the terms of this Trust Agreement in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**Section 15.12 <u>Signatures and Counterparts</u>.** This Trust Agreement and each Supplemental Trust Agreement may be executed and delivered in any number of counterparts, each of which shall be deemed to be an original, but such counterparts together shall constitute one and the same instrument.

**Section 15.13 <u>Successors and Assigns</u>.** Whenever in this Trust Agreement the Authority is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in this Trust Agreement contained by or on behalf of the Authority shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

**Section 15.14 <u>Conflicts</u>.** All resolutions or other proceedings of the Authority or parts thereof in conflict herewith are repealed insofar as such conflict exists.

[Remainder of page intentionally left blank; signature page follows]

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement as of the date first written above.

**PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY**


By:_____
Name:
Title:


**THE BANK OF NEW YORK MELLON,** as Trustee


By:_____
Name:
Title:

**Redline of Exhibit A**

Draft ~~9/6/22~~12/2/2022

# SUBJECT TO THE REVIEW AND COMMENT OF AAFAF AND HTA

---

**MASTER TRUST AGREEMENT**


**by and between**


**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**


**and**


**THE BANK OF NEW YORK MELLON, as Trustee**

---

*Dated as of* ~~_____,~~*December 6,* *2022*

---

## **TABLE OF CONTENTS**

**Page**

ARTICLE I  DEFINITIONS AND INTERPRETATION .................................................. 6

    Section 1.01   Definitions ............................................................................. 6
    Section 1.02   Rules of Construction .................................................... ~~20~~21

ARTICLE II. AUTHORIZATION AND ISSUANCE OF SECURED OBLIGATIONS ...... ~~21~~22

    Section 2.01   Authorization of Secured Obligations ........................ ~~21~~22
    Section 2.02   Provisions for Issuance of Secured Obligations ......... ~~22~~23
    Section 2.03   Supplemental Trust Agreements ................................. ~~23~~24
    Section 2.04   Additional Indebtedness ............................................. ~~24~~25

ARTICLE III. GENERAL TERMS AND PROVISIONS OF BONDS ........................... ~~26~~27

    Section 3.01   Place and Medium of Payment ................................... ~~26~~27
    Section 3.02   Legends ...................................................................... ~~27~~28
    Section 3.03   CUSIP Numbers .......................................................... ~~27~~28
    Section 3.04   Execution and Authentication ..................................... ~~27~~28
    Section 3.05   Interchangeability of Bonds ....................................... ~~27~~28
    Section 3.06   Transfer and Registry ................................................. ~~28~~29
    Section 3.07   Transfer of Bonds ....................................................... ~~28~~29
    Section 3.08   Regulations with Respect to Exchanges and Transfers ...... ~~28~~29
    Section 3.09   Bonds Mutilated, Destroyed, Lost or Stolen .............. ~~29~~30
    Section 3.10   Book Entry Bonds ....................................................... ~~29~~30
    Section 3.11   Preparation of Definitive Bonds; Temporary Bonds ... ~~30~~31

ARTICLE IV. REDEMPTION OF BONDS ............................................................. ~~31~~32

    Section 4.01   Authorization of Redemption .................................... ~~31~~32
    Section 4.02   Redemption at the Election of the Authority ............. ~~31~~32
    Section 4.03   Redemption Other Than at Authority's Election ........ ~~32~~33
    Section 4.04   Selection of Bonds to be Redeemed ........................... ~~32~~33
    Section 4.05   Notice of Redemption ................................................ ~~33~~34
    Section 4.06   Payment of Redeemed Bonds ..................................... ~~33~~34

ARTICLE V. FUNDS AND ACCOUNTS;  PLEDGED REVENUES AND APPLICATION
THEREOF ........................................................................................................ ~~34~~35

    Section 5.01   Establishment of Funds and Accounts ....................... ~~34~~35
    Section 5.02   Application of Secured Obligation Proceeds .............. ~~35~~36
    Section 5.03   Application of Money in the Costs of Issuance Fund .. ~~35~~36
    Section 5.04   Deposit of Toll Receipts in the Toll Receipts Fund ..... ~~36~~37
    Section 5.05   Application of Toll Receipts ....................................... ~~36~~37
    Section 5.06   Debt Service Fund ...................................................... ~~37~~39
    Section 5.07   Operating Reserve Fund ............................................. ~~38~~40
    Section 5.08   Renewal and Replacement Fund ................................. ~~38~~41
    Section 5.09   Subordinated Indebtedness Fund ................................ ~~39~~41
    Section 5.10   General Reserve Fund ................................................. ~~39~~42
    Section 5.11   Arbitrage Rebate Fund ............................................... ~~40~~42

**Table of Contents (continued)**

|  |  | **Page** |
|---|---|---|
| Section 5.12 | Transfer of Investments | ~~40~~43 |
| **ARTICLE VI. SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS** | | ~~41~~43 |
| Section 6.01 | Security for Deposits | ~~41~~43 |
| Section 6.02 | Investment of Funds and Accounts Held by the Trustee | ~~41~~43 |
| Section 6.03 | Liability for Investments | ~~42~~44 |
| **ARTICLE VII. PARTICULAR COVENANTS** | | ~~42~~44 |
| Section 7.01 | Rate Covenant | ~~42~~45 |
| Section 7.02 | Annual Budget and Disbursement Schedule | ~~45~~47 |
| Section 7.03 | Operation and Maintenance Covenants | ~~47~~52 |
| Section 7.04 | Retention of Consulting Engineer, Traffic Consultant and Other Consultants | ~~47~~52 |
| Section 7.05 | Payment of Principal, Redemption Price and Interest | ~~48~~53 |
| Section 7.06 | Extension of Payment of Secured Obligations | ~~48~~53 |
| Section 7.07 | Powers as to Secured Obligations | ~~49~~53 |
| Section 7.08 | Further Assurance | ~~49~~54 |
| Section 7.09 | Accounts and Audits | ~~49~~54 |
| Section 7.10 | Creation of Liens and Indebtedness | ~~50~~54 |
| Section 7.11 | Restricted Payments | ~~50~~55 |
| Section 7.12 | Offices for Payment and Registration of Secured Obligations | ~~50~~55 |
| Section 7.13 | Payment of Lawful Charges | ~~50~~55 |
| Section 7.14 | General | ~~50~~55 |
| Section 7.15 | Tax Exemption Covenant | ~~50~~55 |
| Section 7.16 | Enforcement of Commonwealth Covenant | ~~51~~55 |
| Section 7.17 | Corporate Existence | ~~51~~55 |
| Section 7.18 | Covenant Against Sale or Encumbrance; Exception | ~~51~~56 |
| Section 7.19 | Separateness | ~~52~~56 |
| Section 7.20 | Insurance | ~~52~~57 |
| Section 7.21 | Compliance | ~~52~~57 |
| Section 7.22 | Continuing Disclosure | ~~53~~57 |
| Section 7.23 | Non-Impairment | ~~53~~58 |
| **ARTICLE VIII. CONCERNING THE TRUSTEE AND THE PAYING AGENT** | | ~~53~~58 |
| Section 8.01 | Appointment and Acceptance of Trustee | ~~53~~58 |
| Section 8.02 | Appointment and Acceptance of Paying Agents | ~~53~~58 |
| Section 8.03 | Responsibilities of Trustee and Paying Agents | ~~53~~58 |
| Section 8.04 | Property Held in Trust | ~~54~~59 |
| Section 8.05 | Rights of the Trustee and the Paying Agent | ~~54~~59 |
| Section 8.06 | Compensation and Indemnification | ~~56~~61 |
| Section 8.07 | Permitted Acts | ~~57~~61 |
| Section 8.08 | Resignation of Trustee | ~~57~~62 |
| Section 8.09 | Removal of Trustee | ~~57~~62 |
| Section 8.10 | Successor Trustee and/or Paying Agent | ~~57~~62 |
| Section 8.11 | Transfer of Rights and Property to Successor Trustee | ~~58~~63 |
| Section 8.12 | Merger or Consolidation of the Trustee | ~~59~~63 |

C:\ND\torresrodriguezs6812\ndOffice\VAULT-2NOR0MND\Toll Revenue Master Trust Agreement 4838-1565-0039 v.34.docx

**Page**

Section 8.13   Ancillary Agreements ................................................ ~~59~~63

ARTICLE IX. SUPPLEMENTAL TRUST AGREEMENTS ................................ ~~59~~64

Section 9.01   Modification and Amendment without Consent ................... ~~59~~64
Section 9.02   Supplemental Trust Agreements Effective with Consent of Bondholders ~~61~~65
Section 9.03   General Provisions Relating to Supplemental Trust Agreements ... ~~61~~66

ARTICLE X. AMENDMENTS OF TRUST AGREEMENT ............................... ~~61~~66

Section 10.01  Powers of Amendment ............................................ ~~61~~66
Section 10.02  Consent of Holders of Secured Obligations ...................... ~~63~~67
Section 10.03  Modifications by Unanimous Consent ............................ ~~63~~68
Section 10.04  Mailing ......................................................... ~~63~~68
Section 10.05  Exclusion of Secured Obligations ................................ ~~63~~68
Section 10.06  Notation on Secured Obligations ................................. ~~64~~68

ARTICLE XI. DEFAULTS AND REMEDIES ........................................ ~~64~~69

Section 11.01  Events of Default ................................................ ~~64~~69
Section 11.02  No Acceleration with Respect to the Secured Obligations ......... ~~66~~70
Section 11.03  Enforcement of Remedies ........................................ ~~66~~70
Section 11.04  Priority of Payments after Default ............................... ~~67~~72
Section 11.05  Termination of Proceedings ...................................... ~~69~~73
Section 11.06  Bondholders' Direction of Proceedings ........................... ~~69~~73
Section 11.07  Control by Holders of Bonds; Limitations ........................ ~~69~~74
Section 11.08  Actions by Trustee; Possession of Secured Obligations by Trustee Not
               Required ....................................................... ~~70~~74
Section 11.09  Waiver and Non–Waiver of Default ............................... ~~70~~74
Section 11.10  Notice of Event of Default ....................................... ~~70~~75
Section 11.11  Remedies Not Exclusive ......................................... ~~70~~75

ARTICLE XII. SUBORDINATION ................................................ ~~71~~75

Section 12.01  Agreement to Subordinate ....................................... ~~71~~75
Section 12.02  Distributions in Bankruptcy Proceedings ......................... ~~71~~76
Section 12.03  Prohibition on Contesting Liens and Claims ...................... ~~72~~77
Section 12.04  Post-Petition Interest ........................................... ~~72~~77

ARTICLE XIII. DEFEASANCE .................................................. ~~73~~77

Section 13.01  Defeasance ...................................................... ~~73~~77

ARTICLE XIV. EXECUTION OF INSTRUMENTS BY BONDHOLDERS  AND PROOF OF
OWNERSHIP OF SECURED OBLIGATIONS ....................................... ~~75~~79

Section 14.01  Evidence of Signatures of Bondholders and Ownership of Secured
               Obligations ..................................................... ~~75~~79

ARTICLE XV. MISCELLANEOUS ................................................ ~~76~~80

Section 15.01  Preservation and Inspection of Documents ........................ ~~76~~80
Section 15.02  Money and Funds Held for Particular Secured Obligations ........ ~~76~~80

C:\ND\torresrodriguezs6812\ndOffice\VAULT-2NOR0MND\Toll
Revenue Master Trust Agreement 4838-1565-0039 v.34.docx

**Table of Contents (continued)**

|  |  | **Page** |
|---|---|---|
| Section 15.03 | Cancellation of Secured Obligations | ~~76~~81 |
| Section 15.04 | No Recourse under Trust Agreement or on the Secured Obligations | ~~76~~81 |
| Section 15.05 | Severability of Invalid Provision | ~~76~~81 |
| Section 15.06 | Parties of Interest | ~~77~~81 |
| Section 15.07 | Certain Provisions Relating to Capital Appreciation Bonds or Convertible Capital Appreciation Bonds | ~~77~~81 |
| Section 15.08 | Notices | ~~77~~82 |
| Section 15.09 | Headings | ~~78~~82 |
| Section 15.10 | Governing Laws | ~~78~~82 |
| Section 15.11 | Retention of Jurisdiction of Title III Court | ~~78~~82 |
| Section 15.12 | Signatures and Counterparts | ~~78~~83 |
| Section 15.13 | Successors and Assigns | ~~78~~83 |
| Section 15.14 | Conflicts | ~~78~~83 |

EXHIBIT A - CONFIRMATION ORDER

# MASTER TRUST AGREEMENT

THIS MASTER TRUST AGREEMENT, dated as of ―――――――――,December 6, 2022, by and between the **PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY** (the "**Authority**"), a body both corporate and politic of the Commonwealth of Puerto Rico (the "**Commonwealth**") performing essential governmental functions of the Commonwealth, duly created and existing under and by virtue of the laws of the Commonwealth and **THE BANK OF NEW YORK MELLON** (the "**Trustee**"), a banking corporation organized and existing under and by virtue of the laws of New York and authorized to exercise corporate trust powers in the Commonwealth, with a place of business located in New York, as Trustee, under the circumstances summarized in the following recitals (the capitalized terms not defined in the recitals and granting clauses being used therein as defined in Section 1.01).

## R E C I T A L S

Pursuant to the authority granted pursuant to Act No. 74-1965, 9 L.P.R.A §§2001-2035, as amended (the "**Act**"), the Authority was created for the purpose of, among other things, the construction, operation, and maintenance of the Commonwealth's transportation system.

On June 30, 2016, the United States of America enacted the Puerto Rico Oversight, Management and Economic Stability Act, Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq. ("**PROMESA**"); pursuant to Section 4 of PROMESA, the provisions thereof prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith.

On May 3, 2017 and May 21, 2017, respectively, the Financial Oversight and Management Board for Puerto Rico (together with any successors thereto, the "**Oversight Board**"), established by the United States of America pursuant to Section 101(b) of PROMESA, filed petitions for relief for the Commonwealth of Puerto Rico and the Authority pursuant to Section 304(a) of PROMESA in the United States District Court for the District of Puerto Rico (the "**Title III Court**"), commencing debt adjustment cases under title III of PROMESA (the "**Title III Cases**").

Pursuant to Section 306(b) of PROMESA, upon commencement of the Title III Cases, the Title III Court exercises exclusive jurisdiction over all property of the Commonwealth of Puerto Rico and the Authority, wherever located.

By entry of the order attached hereto as Exhibit A (the "**Confirmation Order**"), the Title III Court confirmed the Authority's Plan of Adjustment (as defined below).

*[DETERMINATIONS SET FORTH BELOW ARE SUBJECT TO REVISION TO REFLECT FINAL ORDER]*

Pursuant to PROMESA, and in accordance with the Confirmation Order, the Plan of Adjustment, and the Act, the Title III Court made a binding determination that the Secured Obligations are valid obligations of the Authority benefiting from the following protections,

which were determined to be valid, binding, legal, and enforceable against the Authority, the Commonwealth of Puerto Rico, and other persons and entities:

(i)        The Authority is an independent public corporation and instrumentality of the Commonwealth, separate from the Commonwealth and any other instrumentality thereof;

(ii)        Upon the Effective Date, the Authority shall have all legal and equitable right, title, and interest in the Pledged Revenues which, except as granted herein and in the Confirmation Order, shall be free and clear of all liens, claims, encumbrances, and other interests of any party;

(iii)        The Trust Agreement grants a first-priority lien and first-priority security interest on all of the Authority's legal and equitable right, title, and interest in the Trust Estate (as defined in Article I of this Trust Agreement) to the Secured Obligations, subject only to (A) Sections 5.01(b) and 5.01(c) herein and (B) the senior lien and senior security interest granted hereby in the Trust Estate for the benefit of Holders of Bonds, which first-priority lien and first-priority security interest shall in all respects be senior and superior to the subordinate lien and subordinate security interest granted hereby in the Trust Estate for the benefit of the Holders of Subordinated Indebtedness, in each case, as permitted by the Act, and such first priority lien shall be deemed automatically perfected as of the Effective Date and shall in any event be valid, binding, perfected, and enforceable against all entities having claims of any kind in tort, contract or otherwise against the Authority or its assets, irrespective of whether such entities have notice of such lien or security interest, without any further act or agreement by any entity, and will be "closed" and shall remain in full force and effect until the Secured Obligations have been paid or satisfied in full in accordance with their terms;

(iv)        The Pledged Revenues do not and will not constitute, nor will they be deemed to be "available resources" or "available revenues" of the Commonwealth, as that term is used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or English version of the Puerto Rico Constitution);

(v)        The Authority's sole and exclusive ownership of the Pledged Revenues will not be affected in any way by the manner of or control over collection; any person who collects or holds Pledged Revenues shall do so on behalf of the Authority, and no entity that collects or holds the Pledged Revenues shall have any legal or equitable right, title, or interest to the Pledged Revenues other than the Authority, for the benefit of the Holders of the Secured Obligations;

(vi)        The covenants and agreements of the Authority and the Commonwealth, as the case may be, (including, but not limited to, that described in Section 7.177.18 of this Trust Agreement) will constitute adequate protection for the property interests of the Authority and the Holders of Secured Obligations in the Trust Estate;

(vii)        The Authority has waived, and shall be deemed to have waived, the automatic stay in any future insolvency proceeding commenced on behalf of the

- 2 -

Authority (whether under Title III of PROMESA or otherwise) with respect to Net Receipts held in the funds and accounts established herein (other than the Net Receipts in the Arbitrage Rebate Fund);

(viii)    The Secured Obligations are not "~~Tax Supported Debt~~tax supported debt," as defined and set forth in the Government of Puerto Rico's Debt Management Policy adopted pursuant to the Commonwealth Plan; and

(ix)    The Confirmation Order is full, final, complete, conclusive, and binding upon and will not be subject to collateral attack or other challenge in any court or other forum, and the Title III Court has retained jurisdiction for the life of the Secured Obligations to ensure compliance with the Plan of Adjustment, including through specific performance if necessary.

All things have been done which are necessary to make the Secured Obligations, when executed by the Authority and authenticated and delivered by the Trustee hereunder, the valid obligations of the Authority, and to constitute this Trust Agreement a valid trust for the security of the Secured Obligations, in accordance with the terms of this Trust Agreement.

**NOW, THEREFORE, THIS TRUST AGREEMENT WITNESSETH:**

It is hereby covenanted and declared that all the Secured Obligations are to be authenticated and delivered and the property subject to this Trust Agreement is to be held and applied by the Trustee, subject to the covenants, conditions and trusts hereinafter set forth, and the Authority does hereby covenant and agree to and with the Trustee as follows:

This Trust Agreement provides for the following transactions:

(a)    Issuance by the Authority of its obligations to (i) settle certain claims made by the Authority's creditors, including claims relating to indebtedness previously issued by the Authority under its (x) Resolution No.  68-18, adopted June 13, 1968, as amended and supplemented thereafter and (y) Resolution No. 98-06, adopted February 26, 1998, as amended and supplemented and (ii) to fund new capital projects of the Authority relating to the Toll Facilities or, to refund, refinance or defease any obligations issued hereunder;

(b)    To establish that Secured Obligations issued by the Authority hereunder, in accordance with the Act and this Trust Agreement, are secured by a valid, binding and perfected first-priority lien on, and first-priority security interest in, the following, which shall be enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Authority of its assets, irrespective of whether such Persons have notice of such first-priority lien or first-priority security interest (the "**Trust Estate**"):

(i)    All right, title and interest of the Authority in and to the Pledged Revenues and the right to receive the same, including, without limitation, any moneys, income, revenues, accounts, contract rights or general intangibles derived therefrom, subject only to (A) Sections 5.01(b) ~~and~~, 5.01(c) and Section 5.01(d) herein and (B) the senior lien and senior security interest granted hereby in the Trust Estate for the Holders of Bonds, which shall in all respects be senior and superior to the subordinate lien and subordinate security

- 3 -

interest granted hereby in the Trust Estate for the benefit of Holders of Subordinated Indebtedness; and

(ii)    Except for the Priority Authority Expense Fund, the Shared Authority Expense Fund and the Arbitrage Rebate Fund, all of the Authority's right, title and interest in the funds and accounts created pursuant to this Trust Agreement and any Supplemental Trust Agreement and the money, securities and other assets on deposit with the Trustee in such funds and accounts created pursuant to this Trust Agreement and any Supplemental Trust Agreement and permitted by the Act; *provided, however*, that the priority in which such money and securities are applied to the repayment of the Secured Obligations shall be as expressly specified herein; and

(c)    Application of proceeds of such Secured Obligations, if any; and

(d)    The rights and remedies of the Holders from time to time of the Authority's obligations.

**IN TRUST**, that in accordance with the Confirmation Order, such first-priority lien and first-priority security interest in the Trust Estate for the benefit of the Holders of the Secured Obligations granted hereby shall be deemed automatically perfected as of the Effective Date and shall in any event be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Authority or its assets irrespective of whether such Persons have notice of such lien or security interest;

**IN TRUST**, that in order to secure the payment of principal of, redemption premium (if any), and interest on all Bonds issued and to be issued under this Trust Agreement, and the performance and observance of each and every covenant and condition contained herein and in the Bonds, and for the consideration of the premises and of the acceptance by the Trustee of all trusts hereby created, and of the acceptance of the Bonds by the respective Holders thereof, and for other good valuable consideration, the sufficiency of which is hereby acknowledged, and for the purpose of fixing and declaring the terms and conditions upon which the Bonds shall be issued, authenticated, delivered, secured, and accepted by all Persons who shall from time to time be or become Holders thereof, the Authority does hereby assign, pledge and grant a senior lien upon and a senior security interest in all of its right, title, and interest in the Trust Estate to the Trustee and its successors and assigns for the benefit of the Holders of Bonds, which shall in all respects be senior and superior to the subordinate lien and subordinate security interest pledged herein to the Holders of Subordinated Indebtedness;

**IN TRUST**, that in order to secure the payment of principal of, redemption premium (if any), and interest on all Subordinated Indebtedness issued and to be issued under this Trust Agreement, and the performance and observance of each and every covenant and condition contained herein and in the Subordinated Indebtedness, and for the consideration of the premises and of the acceptance by the Trustee of all trusts hereby created, and of the acceptance of the Subordinated Indebtedness by the respective Holders (as hereinafter defined) thereof, and for other good valuable consideration, the sufficiency of which is hereby acknowledged, and for the purpose of fixing and declaring the terms and conditions upon which the Subordinated Indebtedness shall be issued, authenticated, delivered, secured, and accepted by all Persons (as

- 4 -

defined herein) who shall from time to time be or become Holders thereof, the Authority does hereby assign, pledge and grant a subordinate lien upon and a subordinate security interest in all of its right, title, and interest in the Trust Estate to the Trustee and its successors and assigns for the benefit of the Holders of Subordinated Indebtedness, ***provided, however***,  that the lien and interest granted hereby for the benefit of Holders of Subordinated Indebtedness shall in all respects be junior, inferior and subordinate to and expressly subject to the senior lien and senior security interest in the Trust Estate pledged herein to the payment of the Bonds.

IN TRUST, that upon execution of this Trust Agreement, the first-priority lien and first-priority security interest securing the Secured Obligations shall immediately attach to the Trust Estate (including, without limitation, all Pledged Revenues and to the right to receive Toll Receipts) and shall thus immediately attach to any Toll Receipts, whether collected now or at any other time in the future by or on behalf of the Authority;

IN TRUST, no diversion, application, or misappropriation of the Trust Estate (including, without limitation, the Toll Receipts) shall limit, impair, defeat, or interfere with the first-priority lien and first-priority security interest securing the Secured Obligations;

IN TRUST, other than with respect to moneys in the Priority Authority Expense Fund, the Shared Authority Expense Fund and Arbitrage Rebate Fund, which are specifically identified herein as not constituting the Trust Estate, the liens on Toll Receipts and the Trust Estate securing the Secured Obligations shall continue to remain in full force and effect with respect to such property that is deposited in any deposit account or other type of account or fund of the Authority, any successor of the Authority, or other Person, bank, or institution (including the Trustee) where Toll Receipts, the Trust Estate, or other proceeds have been commingled with other funds;

IN TRUST, the liens securing the Secured Obligations shall not be affected or impaired by, among other things, the commingling of Toll Receipts, the Trust Estate, or any proceeds thereof with other amounts regardless of the Person, bank, or institution holding such amounts (including the Trustee);

IN TRUST, upon the terms and trusts herein set forth, the Trust Estate shall be held and applied for the equal and *pro rata* benefit and security of each and every owner of the Bonds issued and to be issued hereunder, without preference, priority or distinction as to participation in the senior lien and senior security interest granted by this Trust Agreement, and the benefit and protection thereof of one Bond over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except as herein otherwise expressly provided, so that each of such Bonds shall have the same right, lien and privilege hereunder and shall be equally secured hereby with the same effect as if the same shall have been made, issued and negotiated simultaneously with the delivery hereof and were expressed to mature on one and the same date;

IN TRUST, subject in all respects to the senior lien and senior security interest in the Trust Estate pledged to the payment of the Bonds, the Trust Estate shall be held and applied for the equal *and pro rata*  benefit and security of each and every owner of Subordinated Indebtedness issued and to be issued hereunder, without preference, priority or distinction as to

- 5 -

participation in the subordinate lien and subordinate security interest granted by this Trust Agreement, and the benefit and protection thereof of any Subordinated Indebtedness over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except as herein otherwise expressly provided, so that each of such Subordinated Indebtedness shall have the same right, lien and privilege under this Trust Agreement and shall be equally secured hereby with the same effect as if the same shall have been made, issued and negotiated simultaneously with the delivery hereof and were expressed to mature on one and the same date;

**IN TRUST,** that these presents are upon the express condition that if the Authority or its successors or assigns shall well and truly pay or cause to be paid (i) the Principal of Bonds with interest, according to the provisions set forth in this Trust Agreement and in the Bonds, respectively and each of them or shall provide for the payment of Bonds by depositing or causing to be deposited with the Trustee the funds and/or securities required by Section 13.01 of this Trust Agreement, when and as authorized by the provisions of Section 13.01 of this Trust Agreement, (ii) the Principal of Subordinated Indebtedness with interest, according to the provisions set forth in this Trust Agreement and in the Subordinated Indebtedness, respectively and each of them or shall provide for the payment of Subordinated Indebtedness by depositing or causing to be deposited with the Trustee the funds and/or securities required by Section 13.01 of this Trust Agreement, when and as authorized by the provisions of Section 13.01 of this Trust Agreement and (iii) shall also pay or cause to be paid all other sums payable hereunder by the Authority, then, provided no Secured Obligations remain Outstanding hereunder, these presents and the estate and rights granted hereby and by the Act shall cease and be terminated, and thereupon the Trustee, on payment of its lawful charges and disbursements then unpaid, on demand of the Authority and upon the payment of the cost and expenses thereof, shall duly execute, acknowledge and deliver to the Authority such instruments of satisfaction or release as may be specified by the Authority as necessary or proper to discharge this Trust Agreement, including, if appropriate, any required discharge of record, and, subject to the provisions of the Act and the Plan of Adjustment, if necessary shall grant, reassign and deliver to the Authority, its successors or assigns, all and singular the property, rights, privileges and interest by it granted, conveyed and assigned by the Act, and all substitutes therefor, or any part thereof, not previously disposed of or released as herein provided; otherwise this Trust Agreement shall be and remain in full force.

**IT IS HEREBY COVENANTED, DECLARED AND AGREED** by and between the parties hereto that all Secured Obligations are to be issued, authenticated and delivered, and that the Trust Estate and any other property or amounts subject to the lien of this Trust Agreement and pledged to the payment of the Secured Obligations are to be held and applied, subject to the further covenants, conditions, releases, uses and trusts hereinafter set forth, and the Authority, for itself and its successors, does hereby covenant and agree to and with the Trustee and its respective successors in said trust as follows:

# ARTICLE I

## DEFINITIONS AND INTERPRETATION

**Section 1.01   Definitions.**   As used in this Trust Agreement the following terms have the following meanings, unless a different meaning clearly appears from the context:

"**AAFAF**" means the Puerto Rico Fiscal Agency and Financial Advisory Authority and any successors thereto.

"**Accreted Value**" means, with respect to the Capital Appreciation Bonds and Convertible Capital Appreciation Bonds (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bonds), as of the date of calculation, the Principal amount at initial issuance thereof, plus interest thereon to such date of calculation, capitalized semiannually on each Valuation Date at the accretion rate stated within the applicable Supplemental Trust Agreement until paid at stated maturity, or prior redemption permitted by the terms of the applicable Supplemental Trust Agreement or after stated maturity following payment default by the Authority, assuming that between Valuation Dates such Accreted Value increases in equal daily amounts on the basis of a 360-day year of twelve 30-day months; **provided, however**, that Accreted Value shall be, as of the time of the Authority actually makes a Sinking Fund Installment payment or other payment required or permitted to be made on such Capital Appreciation Bond or Convertible Capital Appreciation Bond, reduced by the amount, if any, that such payment exceeds accrued interest on such Capital Appreciation Bond or Convertible Capital Appreciation Bond (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bond) from the prior Valuation Date.

"**Act**" has the meaning given to such term in the Recitals.

"**Additional Bonds**" means Bonds issued by the Authority in accordance with Section 2.04(b).

"**Additional Subordinated Indebtedness**" means Subordinated Indebtedness issued by the Authority in accordance with Section 2.04(c) or Section 2.04(d).

"**Ancillary Agreements**" means this Trust Agreement, the Confirmation Order, the Plan of Adjustment and any other agreement or instrument entered into by the Authority or the Trustee in connection with, or in furtherance of, the Restructuring Transaction and in accordance with, or in furtherance of, the Plan of Adjustment.

"**Annual Budget**" means, for each Fiscal Year, the Authority's budget for the Toll Facilities, which shall be adopted pursuant to Section 7.02 of this Trust Agreement.

"**Annual Debt Service**" shall mean for any Fiscal Year, (i) an amount equal to the sum of the Principal due on all Outstanding Bonds or Subordinated Indebtedness, as applicable, in such Fiscal Year and on the next succeeding Principal Payment Date, excluding Principal actually paid on the first day of such Fiscal Year and including any Principal unpaid in prior Fiscal Years plus (ii) an amount equal to 100% of the interest due and payable on all Outstanding

- 7 -

Bonds or Outstanding Subordinated Indebtedness, as applicable, in such Fiscal Year and on the next succeeding July 1, excluding interest actually paid on the first day of such Fiscal Year and including any interest unpaid in prior Fiscal Years (and, for the avoidance of doubt, interest on any overdue interest) calculated based on a 360-day year consisting of twelve (12) 30-day months for such Fiscal Year.  For purposes of calculating such Annual Debt Service, the following assumptions are to be used:

(a)    For all Secured Obligations other than Capital Appreciation Bonds or Convertible Capital Appreciation Bonds (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bonds), in determining the Annual Debt Service for Secured Obligations in a Fiscal Year, payments shall be assumed to be made in accordance with the amortization schedule then in effect for such Secured Obligations, including any Sinking Fund Installments on of such Secured Obligations;

(b)    With respect to Capital Appreciation Bonds or Convertible Capital Appreciation Bonds (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bonds), the Accreted Value of Capital Appreciation Bonds or Convertible Capital Appreciation Bonds becoming due at maturity or by virtue of a Sinking Fund Installment shall be included in the calculation of Annual Debt Service only from and after the Valuation Date that is one year prior to the date on which such Accreted Value becomes so due, and the Principal and interest portions of such Accreted Value shall be deemed to accrue in equal daily installments from such Valuation Date to such due date.

"**Arbitrage Rebate Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof.

"**Authority**" has the meaning given to such term in the Recitals.

"**Authority By-Laws**" means the by-laws adopted by the Authority's board of directors and in effect on the Effective Date.

"**Authorized Officer**" means (a) in the case of the Authority, the Executive Director, and when used with reference to any act or document also means any other person authorized by a resolution or the Authority By-Laws to perform such act or execute such document and (b) in the case of the Trustee, any vice president, assistant vice president, senior associate, associate or other officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Trust Agreement, and when used with reference to any act or document also means any other person authorized to perform any act or sign any document by or pursuant to a resolution of the Board of Directors of the Trustee or the by-laws of the Trustee.

"**Bankruptcy Laws**" has the meaning given to such term in Section 11.01(d).

"**Bankruptcy Proceeding**" means any voluntary or involuntary insolvency, debt adjustment, any other proceeding under Bankruptcy Laws, any reorganization, receivership,

- 8 -

liquidation, or any other similar case with respect to the Authority or with respect to a material portion of the Authority's assets.  For the avoidance of doubt, a Bankruptcy Proceeding shall include any and all of the actions listed in Section 11.01(d) of this Trust Agreement.

**"Bond"** means the Initial Bonds and any bond of the Authority authorized and issued pursuant to Section 2.01 hereof and the applicable Supplemental Trust Agreement, including Refunding Bonds and Additional Bonds issued in compliance with Section 2.02 and Section 2.04(a) or 2.04(b), as applicable; ***provided, however,*** that in no event shall Bonds include Subordinated Indebtedness.

**"Bondholder"**, **"Holder of Bonds"** or **"Holder"** or any similar term, when used with reference to a Secured Obligation, means the registered owner thereof; ***provided, however***, that for purposes of this Trust Agreement, in the case of any Insured Bonds, the applicable Bond Insurer shall be treated as (a) the sole Holder of the Insured Bonds insured by such Bond Insurer for the purpose of consenting to any modification or amendment, exercising any voting right or privilege, giving any consent or direction, or taking any action that the Holders of such Insured Bonds are entitled to take pursuant to the provisions of this Trust Agreement pertaining to defaults and remedies and the duties and obligations of the Trustee, and (b) an additional Holder of the Insured Bonds insured by such Bond Insurer for purposes of receiving any notices or exercising any rights to inspect documents provided for under this Trust Agreement.

**"Bond Insurance Policy"** means a municipal bond insurance policy, if any, issued by a Bond Insurer that guarantees payment of Principal of and interest on Insured Bonds.

**"Bond Insurer"** means the provider of a Bond Insurance Policy, if any, specified in a Supplemental Trust Agreement.

**"Book Entry Bond"** means a Secured Obligation issued to and registered in the name of a Depository for the participants in such Depository.

**"Business Day"** means any day other than (a) a Saturday or a Sunday or a legal holiday or (b) a day on which banking institutions in San Juan, Puerto Rico or New York, New York, are required or authorized by law, regulation or executive order to be closed.

**"Capital Appreciation Bond"** means any Secured Obligation as to which interest is capitalized on each Valuation Date therefor and is stated to be payable only at the maturity or prior redemption thereof.

**"Code"** means the Internal Revenue Code of 1986, as amended, and the applicable regulations thereunder.

**"Commonwealth"** means the Commonwealth of Puerto Rico.

**"Commonwealth Note"** means the Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Subordinated Indebtedness, Series 2022-1, as authorized to be issued by the Second Supplemental Trust Agreement, dated as of even date herewith, by and between the Authority and the Trustee.

- 9 -

"**Confirmation Order**" has the meaning given to such term in the Recitals.

"**Consulting Engineer**" means an independent engineer or engineering firm, or an affiliate thereof selected by the Authority that (a) is nationally recognized as being experienced with determining the costs of construction, operation, maintenance, repair, and/or replacement of facilities similar to the Toll Facilities and (b) has at least ten (10) years of experience in the field; provided, however, that for so long as the ~~Financial~~ Oversight ~~and Management~~ Board ~~for Puerto Rico~~ remains in existence, the Authority shall select the Consulting Engineer from a list of at least three (3) candidates provided to the Authority by the ~~Financial~~ Oversight ~~and Management~~ Board.

"**Convertible Capital Appreciation Bonds**" means Secured Obligations the interest in which is not paid prior to a specified Interest Commencement Date and is compounded periodically on certain designated dates prior to the Interest Commencement Date.

"**Corporate Trust Office**" means the principal office of the Trustee at which at any time its corporate trust business shall be administered, which office at the date hereof is located at 240 Greenwich Street, Floor 7 West, New York, New York 10286, Attention:  Global Corporate Trust, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Holders and the Company).

"**Costs of Issuance**" means the items of expense to be paid by the Authority which are incurred prior to, upon and during a reasonable period of time after issuance of the Secured Obligations of a Series, in each case in connection with the authorization, sale and issuance of the Secured Obligations, which items of expense may include, but not be limited to, underwriting discount or fees, structuring fees, placement fees, document printing and reproduction costs, filing and recording fees, costs of credit ratings, initial fees and charges of a Depository or the Trustee and its counsel, other legal fees and charges, professional consultants' fees, fees and charges for execution, transportation and safekeeping of the Secured Obligations, premiums, fees and charges for insurance on the Secured Obligations, and other costs, charges and fees in connection with the foregoing.

"**Costs of Issuance Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof

"**Costs of Operation, Maintenance and Administration**" means all costs and expenses of operating, maintaining and administering the Toll Facilities as determined by the Consulting Engineer to keep the Toll Facilities open to public travel or which are otherwise attributable to the Toll Facilities and includes, without limitation, reasonable expenses of administration of the employees of the Authority solely with respect to the Toll Facilities (including nineteen percent (19%) of the monthly paygo invoices received by the Authority), costs of collecting and accounting for Tolls, insurance, employee bond premiums, fees of the Traffic Consultant, Consulting Engineer, accountants and legal fees, and, with respect to Toll Facilities, all other expenses determined by the Consulting Engineer to be required for the operation, maintenance and administration of the Toll Facilities; *provided, however*, that the costs and expenses of the

- 10 -

Trustee do not constitute Costs of Operation, Maintenance and Administration and shall be paid solely from amounts on deposit in the Trustee Expense Fund. Costs of Operation, Maintenance and Administration does not include (x) costs with respect to other facilities of the Authority that do not constitute Toll Facilities, (y) Renewal and Replacement Expenses or (z) any other capitalized expenditures. For the sake of clarity, (a) if a Consulting Engineer is then engaged by the Authority, all Costs of Operation, Maintenance and Administration are paid from the Priority Authority Expense Fund and (ii) if a Consulting Engineer is not then engaged by the Authority, Costs of Operation, Maintenance and Administration will be allocated by the Authority between Priority Costs of Operation, Maintenance and Administration paid from the Priority Authority Expense Fund and Shared Costs of Operation, Maintenance and Administration paid from the Shared Authority Expense Fund.

"**Current Interest Bonds**" means Secured Obligations on which the interest is payable on the Interest Payment Dates provided therefor in a Supplemental Trust Agreement, which Supplemental Trust Agreement may also provide that Secured Obligations initially issued as Convertible Capital Appreciation Bonds may become Current Interest Bonds on the date specified therein.

"**Debt Service Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof.

"**Defeasance Security**" means:

(a)     a direct obligation of, or any obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America;

(b)     any other US Government Obligation (including the interest component of Resolution Funding Corporation bonds for which the separation of principal and interest is made by request of the Federal Reserve Bank of New York in book-entry form), that is not subject to redemption prior to maturity other than at the option of the holder thereof or that has been irrevocably called for redemption on a stated future date; **provided** that at the time an investment therein is made such US Government Obligation is rated in the highest senior unsecured rating category by at least two Rating Services; and

(c)     a Municipal Obligation (i) that is not subject to redemption prior to maturity other than at the option of the holder thereof or as to which irrevocable instructions have been given to the trustee or paying agent of such Municipal Obligation by the obligor thereof to give due notice of redemption and to call such Municipal Obligation for redemption on the date or dates specified in such instructions and such Municipal Obligation is not otherwise subject to redemption prior to such specified date other than at the option of the holder thereof, (ii) the timely payment of the principal or redemption price thereof and interest thereon is fully secured by a fund consisting only of cash or obligations described in clause (a) above, which fund may be applied only to the payment of such principal of and interest and redemption premium, if any, on such Municipal Obligation on the maturity date thereof or the redemption date specified in the irrevocable instructions referred to in clause (i) above, and (iii) that at the time an investment therein is made is rated in the highest senior unsecured rating category by at least two Rating

Services; ***provided, however,*** that such term shall not mean any interest in a unit investment trust or mutual fund or in "CATS," "TIGRS" or "TRS".

**"Depository"** means The Depository Trust Company, New York, New York, a limited purpose trust company organized under the laws of the State of New York (or its nominee), any other person, firm, association or corporation designated in the Supplemental Trust Agreement authorizing a Series of Secured Obligations to serve as securities depository for Secured Obligations of such Series, or any successor of any of the foregoing, as applicable.

**"Disbursement Schedule"** means a monthly schedule of Required Deposits and Annual Debt Service on Subordinated Indebtedness for a Fiscal Year, as provided in Section 7.02.

**"Effective Date"** means the date that the Plan of Adjustment becomes effective in accordance with its terms and the Confirmation Order.

**"Electronic Means"** means facsimile transmission, email transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another electronic method or system specified by the Trustee as available for use in connection with its services hereunder.

**"Eligible Investments"** means any of the following obligations or securities that the Authority is permitted to hold as an investment under the laws of the Commonwealth:

(a)       Defeasance Securities;

(b)       interest-bearing general obligations of the United States of America;

(c)       United States treasury bills and other non-interest bearing general obligations of the United States of America when offered for sale in the open market at a price below the face value of same, so as to afford the Authority a return on such investment in lieu of interest;

(d)       short-term discount US Government Obligations;

(e)       certificates of deposit of a Qualified Financial Institution which are (i) fully collateralized at least one hundred and ten percent (110%) by marketable US Government Obligations marked to market at least monthly, or (ii) insured by the Federal Deposit Insurance Corporation;

(f)       banker's acceptances of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(g)       commercial paper of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(h)       tax-exempt securities exempt from federal arbitrage provisions applicable to investments of proceeds of the Authority's tax-exempt debt obligations, provided that such

- 12 -

securities must be rated by at least two Rating Services (with one such Rating Service being S&P or Moody's) no less than AA (or equivalent) and no less than the rating on the Bonds, and provided, further, that any such securities must be in book-entry form through The Depository Trust Company or a comparable depository;

(i)      domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission and rated in one of the highest two short-term rating categories by at least two Rating Services, including any such fund for which the Trustee or any of its affiliates provides any service including any service for which a fee may be paid;

(j)      Investment Agreements that are fully collateralized by Eligible Investments; and

(k)      domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission that invest solely in investments of the types described in clauses (a), (b), (c) and/or (d) of this definition.

"**EMMA**" means the Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board or any successor nationally recognized municipal securities information repositories recognized by the Securities and Exchange Commission for the purposes referred to in Rule 15c2-12, as promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended.

"**Event of Default**" has the meaning given to such term in Section 11.01 hereof.

"**Fiscal Year**" means a period of twelve (12) consecutive months beginning July 1 of a calendar year and ending on June 30 of the next subsequent calendar year.

"**Fitch**" means Fitch Ratings Inc. and its successors.

"**Force Majeure Event**" shall mean any of the following events. to the extent that such event is beyond the reasonable control of the Authority; an act of God, riot, war, terrorist act, epidemic, pandemic, quarantine, civil commotion, earthquake or natural catastrophe.

"**General Reserve Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof.

"**Government Entity**" means any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority or municipality of the Commonwealth.

"**Initial Bonds**" means collectively (i) the Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Bonds, Series 2022A, (ii) the Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Bonds, Series 2022B, and (iii) the Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Bonds, Series 2022C, each as authorized to be issued by the First Supplemental Trust Agreement, dated as of even date herewith, by and between the Authority and the Trustee.

"**Instructions**" has the meaning given to such term in Section 8.05.

- 13 -

"**Insured Bond**" means a Bond issued hereunder and designated as an Insured Bond in the Supplemental Trust Agreement authorizing the issuance thereof.

"**Interest Account**" means the account within the Debt Service Fund so designated, created and established pursuant to Section 5.01 hereof.

"**Interest Commencement Date**" means, with respect to any particular Convertible Capital Appreciation Bonds, the date specified in the Supplemental Trust Agreement providing for the issuance of such Convertible Capital Appreciation Bonds (which date must be prior to the maturity date for such Convertible Capital Appreciation Bonds) after which interest accruing on such Convertible Capital Appreciation Bonds shall thereafter be payable on Interest Payment Dates, with the first such payment being the applicable Interest Payment Date immediately succeeding such Interest Commencement Date.

"**Interest Payment Date**" means each January 1 and July 1; **provided, however,** that with respect to the Initial Bonds that are not issued as Capital Appreciation Bonds or Convertible Capital Appreciation Bonds (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bonds), such term also includes the Effective Date.

"**Investment Agreement**" means a repurchase agreement or other agreement for the investment of money with a Qualified Financial Institution.

"**KBRA**" means Kroll Bond Rating Agency Inc.  and its successors.

"**Majority in Interest**" means as of any particular date of calculation, the Holders of a majority of the Outstanding Bonds eligible to act on a matter, measured by (a) with respect to Bonds, including Convertible Capital Appreciation Bonds after the applicable Interest Commencement Date with respect thereto and excluding Capital Appreciation Bonds and Convertible Capital Appreciation Bonds prior to the applicable Interest Commencement Date with respect thereto, the Principal amount thereof and (b) with respect to Capital Appreciation Bonds or Convertible Capital Appreciation Bonds (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bonds), the Accreted Value of such Bonds as of such date; **provided, however,** that in the event there are no Bonds Outstanding hereunder, "Majority in Interest" means as of any particular date of calculation, the Holders of a majority of the Outstanding Subordinated Indebtedness eligible to act on a matter.

"**Maximum Annual Debt Service**" means the maximum Annual Debt Service with respect to any specified indebtedness for any Fiscal Year during the term of such indebtedness.

"**Monthly Disbursement Date**" means the first Business Day of each calendar month.

"**Moody's**" means Moody's Investor Service, Inc.  and its successors.

"**Municipal Obligation**" means an obligation of any state or territory of the United States of America, any political subdivision of any state or territory of the United States of America, or any agency, authority, public benefit corporation or instrumentality of such state, territory or political subdivision.

"**Net Receipts**" means, for any particular period required to be calculated herein, the amount of Toll Receipts less the Costs of Operation, Maintenance and Administration of the Toll Facilities for such period.

"**Operating Reserve Fund**" shall mean the Operating Reserve Fund established in Section 5.01.

"**Operating Reserve Requirement**" shall mean the amount set forth in the Disbursement Schedule delivered with respect to any Monthly Disbursement Date to pay Priority Costs of Operation, Maintenance and Administration of the Toll Facilities for the third and fourth months immediately succeeding such Monthly Disbursement Date.

"**Outstanding**", when used in reference to Secured Obligations, means, as of a particular date (which may be a date on or after the final maturity date of such Secured Obligations), all such Secured Obligations authenticated and delivered hereunder and under any applicable Supplemental Trust Agreement except:

(a)      any Secured Obligations canceled by the Trustee at or before such date;

(b)      any Secured Obligations deemed to have been paid in accordance with Section 13.01 hereof;

(c)      any Bond canceled or paid pursuant to Section 3.09 and Section 4.06 hereof or any Bond in lieu of or in substitution for which another Bond, as applicable, shall have been authenticated and delivered pursuant to Article III, Section 4.06 or Section 10.06 hereof; and

(d)      for the purpose of calculating a Majority in Interest or a Quarter in Interest of Outstanding Secured Obligations hereunder, any Secured Obligation deemed to not be Outstanding in accordance with Section 10.05 hereof; and

(f) any Subordinated Indebtedness in lieu of or in substitution for which another Subordinated Indebtedness shall have been authenticated and delivered in accordance with the provisions of the Supplemental Trust Agreement pursuant to which such Subordinated Indebtedness was issued.

"**Oversight Board**" has the meaning given to such term in the Recitals.

"**Paying Agent**" means, with respect to the Secured Obligations of any Series, the Trustee and any other bank or trust company and its successor or successors, appointed pursuant to the provisions hereof or of a Supplemental Trust Agreement.

"**Person**" includes corporations, firms, associations, partnerships, joint ventures, joint stock companies, trusts, unincorporated organizations, or any government or any agency, instrumentality, or political subdivision thereof, as well as natural persons.

"**Plan of Adjustment**" means the plan of adjustment consummated in connection with the Authority's case under Title III of PROMESA, including the Confirmation Order entered by the Title III Court.

- 15 -

"**Pledged Revenues**" means (1) the Toll Receipts, (2) the right of the Authority to receive the Toll Receipts, (3) except for purposes of Section 7.01 of this Agreement, the proceeds derived from or related to any sale or disposition of, or any concession arrangement relating to all or any part of the Toll Facilities, and (4) investment income received on any amounts held in the Toll Receipts Fund, the Debt Service Fund, the Operating Reserve Fund, the Renewal and Replacement Fund, the Subordinated Indebtedness Fund and the General Reserve Fund. "Pledged Revenues" shall not include the proceeds of any gifts, grants, or other payments to the Authority from the United States of America, any state, territory, municipality or any public or private instrumentality, individual or entity that are not in the nature of a Toll.

"**Principal**" means collectively, the principal payment required to be made on a Secured Obligation on its final maturity date and each Sinking Fund Installment of a Secured Obligation due on a Principal Payment Date.

"**Principal Account**" means the account within the Debt Service Fund so designated, created and established pursuant to Section 5.01 hereof.

"**Principal Payment Date**" means each July 1.

"**Priority Authority Expense Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof.

"**Priority Costs of Operation, Maintenance and Administration**" means all Costs of Operation, Maintenance and Administration that are direct costs and expenses of the Authority that relate solely to the Toll Facilities and that are not Shared Costs of Operation, Maintenance and Administration; ***provided, however***, the nineteen percent (19%) of the monthly paygo invoices received by the Authority shall be deemed to be Priority Costs of Operation, Maintenance and Administration.  For the sake of clarity, (a) if a Consulting Engineer is then engaged by the Authority, all Costs of Operation, Maintenance and Administration are paid from the Priority Authority Expense Fund and (ii) if a Consulting Engineer is not then engaged by the Authority, Costs of Operation, Maintenance and Administration will be allocated by the Authority between Priority Costs of Operation, Maintenance and Administration paid from the Priority Authority Expense Fund and the Shared Costs of Operation, Maintenance and Administration paid from the Shared Authority Expense Fund.

"**Proceeding**" means any suit in equity, action at law or other judicial or administrative proceeding.

"**PROMESA**" has the meaning given to such term in the Recitals.

"**Qualified Financial Institution**" means any of the following entities that has an equity capital of at least $125,000,000 or whose obligations are unconditionally guaranteed by an affiliate or parent having an equity capital of at least $125,000,000:

(a)      a securities dealer, the liquidation of which is subject to the Securities Investors Protection Corporation or other similar corporation, and (i) that is on the Federal Reserve Bank of New York list of primary government securities dealers and (ii) whose senior unsecured long

- 16 -

term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(b)      a bank, a trust company, a national banking association, a corporation subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a domestic branch or agency of a foreign bank which branch or agency is duly licensed or authorized to do business under the laws of any state or territory of the United States of America, a savings bank, a savings and loan association, an insurance company or association chartered or organized under the laws of any state of the United States of America, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(c)      a corporation affiliated with or which is a subsidiary of any entity described in (a) or (b) above or which is affiliated with or a subsidiary of a corporation which controls or wholly owns any such entity, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(d)      the Government National Mortgage Association or any successor thereto, the Federal National Mortgage Association or any successor thereto, or any other federal agency or instrumentality approved by the Authority; or

(e)      a corporation whose obligations, including any investments of any money held hereunder purchased from such corporation, are insured by an insurer that meets the applicable rating requirements set forth above.

"**Quarter in Interest**" means as of any particular date of calculation, the Holders of 25% or more of the Outstanding Bonds eligible to act on a matter, measured by (a) with respect to Bonds, including Convertible Capital Appreciation Bonds after the applicable Interest Commencement Date with respect thereto and excluding Capital Appreciation Bonds and Convertible Capital Appreciation Bonds prior to the applicable Interest Commencement Date with respect thereto, the Principal amount thereof and (b) with respect to Capital Appreciation Bonds or Convertible Capital Appreciation Bonds (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bonds), the Accreted Value of such Bonds as of such date; *provided, however,* that in the event there are no Bonds Outstanding hereunder, "Quarter in Interest" means as of any particular date of calculation, the Holders of 25% or more of Outstanding Subordinated Indebtedness eligible to act on a matter.

"**Rating Confirmation**" means the written confirmation of each Rating Service to the effect that the rating assigned, without regard to any insurance or other credit enhancement, to

- 17 -

each of the Secured Obligations rated by such Rating Service will remain unchanged (without regard to changes in any rating outlook) and will not be withdrawn, suspended or reduced as a consequence of some act or occurrence.

"**Rating Service**" means as of any particular date of determination each of Fitch, KBRA, Moody's and S&P, or their respective successors, or any other nationally recognized statistical rating organization identified as such by the Securities and Exchange Commission.

"**Record Date**" means, when used in relation to the Bonds of a Series, the date specified as the record date for such Bonds in the Supplemental Trust Agreement authorizing such Bonds.

"**Redemption Price**" when used with respect to a Bond, means the Principal amount of such Bond plus the applicable premium, if any, payable upon redemption prior to maturity thereof pursuant hereto or to the applicable Supplemental Trust Agreement.

"**Refunding Bonds**" means any of the Bonds issued to refund, refinance or defease other Bonds in compliance with the provisions of Section 2.04(a) hereof.

"**Refunding Subordinated Indebtedness**" means any Subordinated Indebtedness issued to refund, refinance or defease Secured Obligations in compliance with the provisions of Section 2.04(c) hereof.

"**Renewal and Replacement Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof.

"**Renewal and Replacement Expenses**" means the costs of any replacement or renewal of capital assets or facilities of the Toll Facilities or unusual or extraordinary maintenance or repairs of the Toll Facilities.

"**Renewal and Replacement Requirement**" means the amount, if any, for the then-current Fiscal Year as set forth in the Annual Budget.

"**Reporting Agreement**" means the reporting agreement entered into on or around the date hereof substantially in the form attached hereto.

"**Required Deposits**" means for any Fiscal Year, an amount equal to the sum of (i) Costs of Operation, Maintenance and Administration of the Toll Facilities for such Fiscal Year; (ii) Annual Debt Service on Bonds for such Fiscal Year; (iii) Trustee Expenses Cap; (iv) deposit to Arbitrage Rebate Fund, if any, for such Fiscal Year; and (v) Toll Receipts required to be deposited in the Renewal and Replacement Fund in order to satisfy the Renewal and Replacement Requirement for such Fiscal Year.

"**Restructuring Transaction**" means the transactions contemplated by, or in furtherance of, the Plan of Adjustment.

"**S&P**" means S&P Global Ratings and its successors.

- 18 -

"**Secretary of Treasury**" means the Secretary of the Treasury of the Puerto Rico Department of Treasury.

"**Secured Obligations**" means collectively, all Bonds and Subordinated Indebtedness.

"**Serial Bonds**" means the Secured Obligations so designated in a Supplemental Trust Agreement.

"**Series**" means (i) with respect to Bonds, all of the Bonds authenticated and delivered on original issuance and pursuant hereto and to the Supplemental Trust Agreement authorizing such Bonds as a separate Series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution for such Bonds pursuant to Article III, Section 4.06 or Section 10.06 hereof, regardless of variations in maturity, interest rate, Sinking Fund Installments or other provisions, and (ii) with respect to Subordinated Indebtedness, all of the Subordinated Indebtedness authenticated and delivered on original issuance and pursuant hereto and to the Supplemental Trust Agreement authorizing such Subordinated Indebtedness as a separate Series of Subordinated Indebtedness, and any Subordinated Indebtedness thereafter authenticated and delivered in lieu of or in substitution for such Subordinated Indebtedness pursuant to the Supplemental Trust Agreement authorizing such Subordinated Indebtedness, regardless of variations in maturity, interest rate, Sinking Fund Installments or other provisions.

"**Shared Authority Expense Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof.

"**Shared Costs of Operation, Maintenance and Administration**" means, with respect to Costs of Operation, Maintenance and Administration that are common to both the Toll Facilities and other facilities of the Authority, the share of such Costs of Operation, Maintenance and Administration allocated by the Authority to the Toll Facilities.  For the sake of clarity, (a) if a Consulting Engineer is then engaged by the Authority, all Costs of Operation, Maintenance and Administration are paid from the Priority Authority Expense Fund and (ii) if a Consulting Engineer is not then engaged by the Authority, Costs of Operation, Maintenance and Administration will be allocated by the Authority between Priority Costs of Operation, Maintenance and Administration paid from the Priority Authority Expense Fund and the Shared Costs of Operation, Maintenance and Administration paid from the Shared Authority Expense Fund.

"**Sinking Fund Installment**" means, as of any date of computation, the amount of money required to be paid on a single future July 1 for the retirement of any Secured Obligations which mature after said future July 1, but does not include any amount payable by the Authority by reason only of the maturity of a Secured Obligation.

"**Subordinated Indebtedness**" means the Commonwealth Note and any indebtedness of the Authority authorized and issued as Subordinated Indebtedness pursuant to Section 2.01 and the applicable Supplemental Trust Agreement, including indebtedness issued in compliance with Section 2.02 and 2.04(c) or 2.04(d); ***provided, however,*** that in no event shall Subordinated Indebtedness include Bonds.  Notwithstanding any contrary provision in this Trust Agreement,

- 19 -

any Subordinated Indebtedness shall be governed in all respects by Article XII of this Trust Agreement.

"**Subordinated Indebtedness Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof.

"**Subordinated Payment Default**" means a failure by the Authority to pay when due, the principal of or interest on Subordinated Indebtedness.

"**Supplemental Trust Agreement**" means any Trust Agreement of the Authority amending or supplementing this Trust Agreement or any prior Supplemental Trust Agreement executed and becoming effective in accordance with the terms and provisions of Article IX hereof.

"**Tax Exempt Bond**" means any Secured Obligation as to which Transaction Counsel has rendered an opinion to the effect that interest on it is excluded from gross income for purposes of federal income taxation.

"**Term Bond**" means a Secured Obligation Bond so designated in a Supplemental Trust Agreement and payable from Sinking Fund Installments.

"**Testing Period**" has the meaning given to such term in Section 2.01(b)(i).

"**Title III Cases**" has the meaning given to such term in the Recitals.

"**Title III Court**" has the meaning given to such term in the Recitals.

"**Toll Facilities**" means collectively, PR-20, PR-52, PR-53 and PR-66.

"**Tolls**" means tolls, fares, incomes, receipts, special fees or permit fees, or other charges imposed by or on behalf of the Authority on the owners, lessors, lessees or operators of motor vehicles for the operation of or the right to operate those vehicles on the Toll Facilities, and fines and penalties and interest thereon collected as a result of a failure to pay any such amount.

"**Toll Receipts**" means (i) all cash receipts and automated or electric payments or credits from Tolls (including by way of the Auto-Expresso system) and (ii) the proceeds of any business interruption insurance relating to the Toll Facilities and of any other insurance which insures against loss of Toll Receipts.

"**Toll Receipts Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof.

"**Toll Schedule**" has the meaning given to such term in Section 7.01(d) of this Trust Agreement.

"**Traffic Consultant**" means any traffic and revenue consultant or firm of traffic and revenue consultants of national recognition with expertise and experience regarding the operation, management and financing of, and the collection of revenues from, bridges and toll

roads, selected and employed by the Authority from time to time, provided, however, that for so long as the ~~Financial~~ Oversight ~~and Management~~ Board ~~for Puerto Rico~~ remains in existence, the Authority shall select the Traffic Consultant from a list of at least three (3) candidates provided to the Authority by the Financial Oversight and Management Board.

"**Traffic Consultant Study**" has the meaning given to such term in Section 7.01(d) of this Trust Agreement.

"**Transaction Counsel**" means a nationally recognized bond counsel as may be selected by the Authority for a specific purpose hereunder.

"**Trust Agreement**" means this Master Trust Agreement as amended or supplemented from time to time by Supplemental Trust Agreements in accordance with the terms and provisions hereof.

"**Trust Estate**" has the meaning given to such term in the granting clause of this Trust Agreement.

"**Trustee**" means the bank or trust company appointed as Trustee for the Secured Obligations pursuant to Section 8.01 hereof and having the duties, responsibilities and rights provided for herein, and its successor or successors and any other bank or trust company which may at any time be substituted in its place pursuant hereto.

"**Trustee Expenses**" means the permitted costs, fees and expenses of the Trustee arising out of or incurred in connection with carrying out and administering its duties hereunder, but excludes the Trustee's rights to indemnification, including the fees and expenses incurred in connection with any indemnified claim.

"**Trustee Expense Fund**" means the fund so designated, created and established pursuant to Section 5.01 hereof.

"**Trustee Expenses Cap**" means an amount not to exceed $100,000.00.

"**US Government Obligation**" means (a) a direct obligation of, or an obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America, the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, Federal Home Loan Banks, the Government National Mortgage Association, or the Federal Farm Credit System and (b) an obligation of the United States of America which has been stripped by the United States Department of the Treasury itself or by any Federal Reserve Bank (not including "CATS," "TIGRS" and "TRS").

"**Valuation Date**" means with respect to any Capital Appreciation Bond or Convertible Capital Appreciation Bond (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bond), each January 1 and July 1; **provided, however,** that with respect to the Initial Bonds that are issued as Capital Appreciation Bonds or Convertible Capital Appreciation Bonds, such term also includes the Effective Date.

- 21 -

**Section 1.02   Rules of Construction.**  Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.  Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing persons shall include firms, associations and corporations, including public bodies as well as natural persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in this Trust Agreement, refer to this Trust Agreement.  All references to Articles and Sections in this Trust Agreement refer to the Articles and Sections hereof unless otherwise expressly stated.  All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

"**$**" and "**dollars**" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

## ARTICLE II.

## AUTHORIZATION AND ISSUANCE OF SECURED OBLIGATIONS

**Section 2.01   Authorization of Secured Obligations.**  The Secured Obligations hereby authorized to be issued and, in accordance with, and as provided by Section ——3 of the Confirmation Order are secured by a first-priority lien on and first-priority security interest in the Trust Estate for the payment of the Principal and Redemption Price of and interest on all Outstanding Secured Obligations and, which Section ——3 of the Confirmation Order provides shall be deemed automatically perfected as of the Effective Date and shall be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Authority or its assets irrespective of whether such Persons have notice of such first-priority lien or first-priority security interest.

There are hereby authorized to be issued Bonds of the Authority to be designated as "Restructured Toll Revenue Senior Bonds," which, in accordance with, and as provided by Section ——3 of the Confirmation Order are secured by a senior lien on and senior security interest in the Trust Estate for the payment of the Principal and Redemption Price of and interest on all Outstanding Bonds, which lien and security interest shall in all respects be senior and superior to the subordinate lien and security interest granted to the Holders of the Subordinated Indebtedness. The Bonds shall be special obligations of the Authority payable solely from the Trust Estate in the manner provided herein.

There is further hereby authorized to be issued Subordinated Indebtedness of the Authority to be designated as "Restructured Toll Revenue Subordinated Indebtedness," which, in accordance with, and as provided by Section ——3 of the Confirmation Order are secured by a subordinate lien on and subordinate security interest in the Trust Estate for the payment of the Principal and Redemption Price of and interest on all Outstanding Subordinated Indebtedness, which lien and security interest shall in all respects be subject to and subordinate to the senior lien and senior security interest on the Trust Estate granted to the Holders of Outstanding Bonds.

- 22 -

The Subordinated Indebtedness shall be special obligations of the Authority payable solely from the Trust Estate in the manner provided herein.  Notwithstanding any contrary provision in this Trust Agreement, any Subordinated Indebtedness shall be governed in all respects by Article XII of this Trust Agreement

The aggregate principal amount of Secured Obligations which may be executed, authenticated and delivered is not limited except as provided hereby and the terms and conditions authorized by the Authority and set forth in the Ancillary Agreements.

The Secured Obligations may, if and when authorized by the Authority pursuant hereto and to one or more Supplemental Trust Agreements, be issued in one or more Series and the Secured Obligations of each Series shall contain an appropriate Series designation.

The Secured Obligations shall not constitute a debt of the Commonwealth or of any Government Entity other than the Authority.  The Secured Obligations shall not constitute indebtedness or an obligation of the Commonwealth or any subdivision thereof within the purview of any constitutional or statutory limitation or provision or a charge against the general credit or taxing powers, if any, of any of them but shall be payable solely from the Trust Estate, including, particularly, the Pledged Revenues, as set forth herein.  The Authority has no taxing power.

**Section 2.02   Provisions for Issuance of Secured Obligations.**  The Authority shall issue Secured Obligations under this Trust Agreement in accordance with the terms of this Trust Agreement.  The Secured Obligations are permitted to be issued as provided herein. The issuance of the Initial Bonds, the Commonwealth Note and each Series of Additional Bonds, Refunding Bonds and Subordinated Indebtedness permitted to be issued hereunder shall be authorized by a Supplemental Trust Agreement or Supplemental Trust Agreements.  The Secured Obligations of a Series authorized to be issued shall be executed by the Authority and delivered to the Trustee.  Such Secured Obligations shall from time to time and in such amounts as directed by the Authority be authenticated by the Trustee and by it delivered to or upon the order of the Authority upon receipt of the consideration therefor and upon delivery to the Trustee of:

(a)    A copy of this Trust Agreement and the Supplemental Trust Agreement authorizing such Secured Obligations, certified by an Authorized Officer of the Authority;

(b)    A written order as to the delivery of such Secured Obligations, signed by an Authorized Officer of the Authority, describing the Secured Obligations to be delivered and the purpose or purposes for which the Secured Obligations are being issued, designating the person(s) to whom such Secured Obligations are to be delivered and stating the consideration for such Secured Obligations (other than with respect to the Initial Bonds and the Commonwealth Note);

(c)    A certificate of an Authorized Officer of the Authority stating that the Authority is not, and, as a result of the issuance of such Secured Obligations, will not:

(i)    be, in default in the performance of any of the covenants, conditions, agreements or provisions contained herein or in the Ancillary Agreements (to the extent

- 23 -

affecting the issuance of the Secured Obligations), or stating that after the issuance thereof the Authority shall no longer be in default in the performance of any of the covenants, conditions, agreements or provisions contained herein; and

(ii)     violate the restrictions on the issuance of Secured Obligations contained in the Ancillary Agreements;

(d)     A certificate of an Authorized Officer of the Authority demonstrating compliance with applicable provision of Section 2.04 of this Trust Agreement (other than with respect to the Initial Bonds and the Commonwealth Note);

(e)     A certified copy of the resolution of the board of AAFAF approving the issuance of the Series of Secured Obligations by the Authority; ***provided, however***, that if AAFAF is no longer in existence and has no successor, or if its successor is not required to approve the issuance of the applicable Series of Secured Obligations, then no such resolution shall be required; and

(f)     An opinion of Transaction Counsel to the effect that (i) this Trust Agreement and the applicable Supplemental Trust Agreement authorizing the Series of Secured Obligations have been duly and lawfully authorized, executed and delivered by the Authority; (ii) this Trust Agreement and the applicable Supplemental Trust Agreement are in full force and effect and are valid and binding upon the Authority and enforceable in accordance with their terms; and (iii) the Authority is duly authorized and entitled to issue such Series of Secured Obligations and, upon the execution and delivery thereof and upon authentication by the Trustee, such Series of Secured Obligations will be duly and validly issued and will constitute valid and binding special obligations of the Authority entitled to the benefits of this Trust Agreement; ***provided, however,*** that such opinion of Transaction Counsel may rely on the determinations of the Title III Court as set forth in the Confirmation Order; ***provided, further***, that such opinion of Transaction Counsel may be qualified to the extent that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of equitable remedies or any particular remedy.

**Section 2.03   Supplemental Trust Agreements.**   Each Supplemental Trust Agreement authorizing the issuance of a Series of Secured Obligations shall specify the following:

(a)     The authorized principal amount of such Series of Secured Obligations;

(b)     The date or dates of the Secured Obligations, the maturity date or dates and principal amounts of each maturity of the Secured Obligations of such Series, the amount and date of each Sinking Fund Installment, as applicable, and which Secured Obligations of such Series are Serial Bonds or Term Bonds, if any, and the Record Date or Record Dates of the Secured Obligations of such Series;

(c)     The interest rate or rates, if any, on the Secured Obligations of such Series, which may include Capital Appreciation Bonds, Convertible Capital Appreciation Bonds or Current Interest Bonds, and the first date on which interest on the Secured Obligations of such Series shall be payable; ***provided, however,*** in no event shall a Holder of Secured Obligations be

- 24 -

entitled to the payment of a penalty for a payment default (including, without limitation, penalty interest and any interest or other amounts due thereon) other than overdue interest that accrues at the regular non-penalty rate of the applicable Secured Obligation or interest accruing on such overdue interest at the regular non-penalty rate of the applicable Secured Obligation;

(d)    If all or a portion of the Secured Obligations of such Series are Capital Appreciation Bonds or Convertible Capital Appreciation Bonds, the Valuation Dates for such Secured Obligations and the Accreted Value on each such Valuation Date;

(e)    The denomination or denominations of and the manner of numbering and lettering of the Secured Obligations of such Series;

(f)    The Redemption Price or Redemption Prices, if any, and, subject to Article IV hereof, the redemption terms, if any, for the Secured Obligations of such Series;

(g)    Provisions for the sale or exchange of the Secured Obligations of such Series and for the delivery thereof;

(h)    The form of the Secured Obligations of such Series and the form of the Trustee's certificate of authentication thereon, and whether any Secured Obligations of such Series are to be issued as Book Entry Bonds and the Depository therefor;

(i)    Directions for the application of the proceeds of the Secured Obligations of such Series, including the amount of proceeds expected to be applied to each specific Toll Facility;

(j)    If all or a portion of such Secured Obligations will be issued as Insured Bonds, the terms and conditions for payment of such Insured Bonds under the applicable Bond Insurance Policy; *provided, however,* in no event shall the Holder of Insured Bonds or the Bond Insurer be entitled to the payment of a penalty for a payment default (including, without limitation, penalty interest and any interest or other amounts due thereon);

(k)    If Subordinated Indebtedness, the general terms and provisions of such Subordinated Indebtedness, including provisions relating to the redemption thereof; and

(l)    Any other provisions deemed advisable by an Authorized Officer of the Authority not in conflict with the provisions hereof or of any Ancillary Agreement.

**Section 2.04    Additional Indebtedness.**    Following the issuance of the Initial Bonds and the incurrence of the Commonwealth Note, the Authority may not incur any additional indebtedness secured by a lien on the Trust Estate, except that the Authority may issue or incur:

(a)    Refunding Bonds, provided that there is delivered to the Trustee a certificate of an Authorized Officer of the Authority dated the date of issuance of such Refunding Bonds demonstrating that upon the issuance of such Series of Refunding Bonds, the Annual Debt Service on Outstanding Bonds in the then-current and each future Fiscal Year immediately after the issuance of the Refunding Bonds shall be equal to or less than the Annual Debt Service due on Outstanding Bonds in the then-current and each future Fiscal Year immediately prior to such issuance;

- 25 -

(b)     Additional Bonds to fund new capital projects of the Authority relating to the Toll Facilities, or to refund, refinance or defease Secured Obligations Outstanding hereunder, provided that there is delivered to the Trustee a certificate dated the date of initial issuance of such Additional Bonds, signed by an Authorized Officer of the Authority and approved by the Consulting Engineer and Traffic Consultant, setting forth:

(i)     (A) the amount of the Net Receipts for any twelve (12) consecutive calendar months out of the eighteen (18) calendar months immediately preceding the date of issuance of such Additional Bonds; provided that such amount shall be adjusted to give effect for such twelve (12) month period to any increases or decreases in Toll rates for which all legal conditions to effectiveness have been met on the date of issuance of such Additional Bonds; (B) the Maximum Annual Debt Service on the Bonds to remain Outstanding after the issuance of such Additional Bonds (including the Additional Bonds to be issued); (C) the Maximum Annual Debt Service on the Secured Obligations to remain Outstanding after the issuance of such Additional Bonds (including the additional Secured Obligations to be issued); (D) the percentage derived by dividing the amount in item (A) above by the amount shown in item (B) above, which percentage shall not be less than 120%; and (E) the percentage derived by dividing the amount in item (A) above by the amount shown in item (C) above, which percentage shall not be less than 115%; and

(ii)     (A) the amount of Net Receipts projected by the Traffic Consultant to be received by the Authority during the current Fiscal Year and each of the next succeeding five full Fiscal Years (the "**Testing Period**") following the issuance of such Additional Bonds (including the Secured Obligations to be issued); (B) the Annual Debt Service on the Additional Bonds to remain Outstanding after the issuance of such Additional Bonds (including the Additional Bonds to be issued) for the Testing Period; (C) the Annual Debt Service on the Secured Obligations to remain Outstanding after the issuance of such additional Secured Obligations (including the Secured Obligations to be issued) for the Testing Period; (D) the percentages derived by dividing the amount in item (A) above by the amounts shown in item (B) above, which percentages shall not be less than 120% in any Fiscal Year within the Testing Period; and (E) the percentages derived by dividing the amount in item (A) above by the amounts shown in item (C) above, which percentages shall not be less than 115% in any Fiscal Year within the Testing Period.

(c)     Refunding Subordinated Indebtedness, provided that there is delivered to the Trustee a certificate of an Authorized Officer of the Authority dated the date of issuance of such Refunding Subordinated Indebtedness demonstrating that upon the issuance of such Series of Refunding Subordinated Indebtedness, the Annual Debt Service on Outstanding Subordinated Indebtedness in the then-current and each future Fiscal Year immediately after the issuance of the Refunding Subordinated Indebtedness shall be equal to or less than the Annual Debt Service due on Outstanding Subordinated Indebtedness in the then-current and each future Fiscal Year immediately prior to such issuance; and

(d)     Subordinated Indebtedness to fund new capital projects of the Authority relating to the Toll Facilities, or to refund, refinance or defease Secured Obligations Outstanding hereunder, provided that there is delivered to the Trustee a certificate dated the date of initial

- 26 -

issuance of such additional Subordinated Indebtedness, signed by an Authorized Officer of the Authority and approved by the Consulting Engineer and Traffic Consultant, setting forth:

> (i)      (A) the amount of the Net Receipts for any twelve (12) consecutive calendar months out of the eighteen (18) calendar months immediately preceding the date of issuance of such additional Subordinated Indebtedness; provided that such amount shall be adjusted to give effect for such twelve (12) month period to any increases or decreases in Toll rates for which all legal conditions to effectiveness have been met on the date of issuance of such Subordinated Indebtedness; (B) the Maximum Annual Debt Service on the Secured Obligations to remain Outstanding after the issuance of such additional Subordinated Indebtedness (including Secured Obligations to be issued); and (C) the percentage derived by dividing the amount in item (A) above by the amount shown in item (B) above, which percentage shall not be less than 115%; and

> (ii)      (A) the amount of Net Receipts projected by the Traffic Consultant to be received by the Authority during the Testing Period following the issuance of such additional Subordinated Indebtedness (including the Secured Obligations to be issued); (B) the Annual Debt Service on the Secured Obligations to remain Outstanding after the issuance of such additional Subordinated Indebtedness (including Secured Obligations to be issued) for the Testing Period and (C) the percentages derived by dividing the amount in item (A) above by the amounts shown in item (B) above, which percentages shall not be less than 115% in any Fiscal Year within the Testing Period.

## ARTICLE III.

## GENERAL TERMS AND PROVISIONS OF BONDS

    Section 3.01 **Place and Medium of Payment.**  The Bonds shall be payable, with respect to interest, Principal and Redemption Price, in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts.  Except in the case of Book Entry Bonds (as provided in Section 3.10 hereof) or as otherwise provided in Section 4.06 hereof, upon presentation and surrender of Bonds, the Principal or Redemption Price of such Bonds that is due and payable shall be payable at the designated corporate trust officeCorporate Trust Office of the Trustee.  Payments on the Bonds shall be paid by check mailed to the registered owner thereof at the address thereof as it appears on the registry books of the Authority or if authorized by the Supplemental Trust Agreement authorizing a Series of Bonds by wire transfer to such registered owner of the Bonds of such Series.  For purposes of this Section, interest is payable on an Interest Payment Date to the registered owner of a Bond at the close of business on the Record Date for such Bond.  All payments of Principal or Redemption Price of or interest on Bonds shall specify the CUSIP number or numbers of the Bonds in connection with which such payment is made.

    The Bonds of each Series shall be issued in the form of fully registered Bonds without coupons.

    Bonds of each Series issued prior to the first Interest Payment Date thereof shall be dated as of the date specified in the Supplemental Trust Agreement authorizing the issuance thereof.

Bonds of each Series issued on or subsequent to the first Interest Payment Date thereof shall be dated as of the Interest Payment Date immediately preceding the date of authentication thereof by the Trustee, unless such date of authentication shall be an Interest Payment Date, in which case they shall be dated as of such date of authentication; ***provided, however,*** that if, as shown by the records of the Trustee, interest on the Bonds of any Series has not been paid as of the Interest Payment Date immediately preceding the date of authentication thereof by the Trustee, the Bonds of such Series issued in lieu of Bonds surrendered for transfer or exchange shall be dated as of the date through which interest has been paid in full on the Bonds surrendered or, if no interest has been paid on the Bonds surrendered since their authentication, as of the date of authentication of the surrendered Bonds.  Bonds of each Series shall bear interest from (and including) their date and shall bear interest on overdue interest at the interest rate of such Bonds.  For the avoidance of doubt, if any Principal of, Redemption Price or accrued interest on, a Bond is not paid when due, such Principal, Redemption Price and interest shall remain due and payable until paid.

All Bonds of each Series shall mature and/or have Sinking Fund Installments on July 1 of the year or years fixed by the Supplemental Trust Agreement authorizing the issuance of such Bonds.  Interest on all Bonds (other than Capital Appreciation Bonds or Convertible Capital Appreciation Bonds) shall be payable on each Interest Payment Date of each year.  The first installment of interest due on the Bonds of a Series may be for such period as the Authority shall fix in the Supplemental Trust Agreement authorizing the issuance thereof.

**Section 3.02   Legends.**   The Bonds may contain, or have endorsed thereon, such provisions, specifications and descriptive words not inconsistent herewith or with any Supplemental Trust Agreement authorizing the same, as may be necessary or desirable and as may be determined by the Authority prior to their delivery.  The Initial Bonds shall distinctively bear the following legend: "DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE ——12TH DAY OF ——————OCTOBER, 2022."

**Section 3.03   CUSIP Numbers.**   The Authority shall provide for the assignment of CUSIP numbers for all Bonds and cause such CUSIP numbers to be printed thereon, and the Trustee shall use such CUSIP numbers in notices of redemption and on all checks payable to Bondholders as a convenience to Bondholders; ***provided, however,*** that any such notice may state that no representation is made as to the correctness of such number either as printed on such Bonds or as contained in any notice of redemption, and that an error in a CUSIP number as printed on such Bond or as contained in any notice of redemption shall not affect the validity of the proceedings for redemption.  The Authority shall promptly notify the Trustee of any change in the CUSIP numbers assigned to any Bond of which the Authority has knowledge.  The Trustee shall deliver a copy of the foregoing notice to the Holders promptly following its receipt thereof.

**Section 3.04   Execution and Authentication.**   The Bonds shall be executed in the name of the Authority by the manual or facsimile signature of an Authorized Officer thereof, and attested by the manual or facsimile signature of the Secretary or an Assistant Secretary of the board of the Authority or other Authorized Officer of the Authority, or in such other manner as

- 28 -

may be permitted by law. In case any one or more of the officers or employees who shall have signed any of the Bonds shall cease to be such officer or employee before the Bonds so signed shall have been actually authenticated and delivered by the Trustee, such Bonds may, nevertheless, be delivered as provided herein, and may be issued as if the persons who signed such Bonds had not ceased to hold such offices or be so employed. Any Bond may be signed on behalf of the Authority by such persons as at the actual time of the execution of such Bond shall be duly authorized or hold the proper office in or be employed by, the Authority, although at the date of the Bonds such persons may not have been so authorized or have held such office or employment.

The Bonds of each Series shall bear thereon a certificate of authentication, in the form set forth in the Supplemental Trust Agreement authorizing the issuance of such Bonds, executed manually by the Trustee. Only such Bonds as shall bear thereon such executed certificate of authentication shall be entitled to any right or benefit hereunder and no Bond shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee. Such certificate of the Trustee upon any Bond executed on behalf of the Authority shall be conclusive evidence that the Bond so authenticated has been duly authenticated and delivered hereunder and that the Holder thereof is entitled to the benefits hereof.

**Section 3.05    Interchangeability of Bonds.**    Bonds, upon surrender thereof at the designated ~~corporate trust office~~Corporate Trust Office of the Trustee with a written instrument of transfer satisfactory to the Trustee, duly executed by the registered owner or his attorney duly authorized in writing, may, at the option of the registered owner thereof, be exchanged for an equal aggregate principal amount of Bonds of the same Series, maturity and tenor of any other authorized denominations.

**Section 3.06    Transfer and Registry.**    So long as any of the Bonds remain Outstanding, the Authority shall maintain and keep, or cause to be maintained and kept, at the designated ~~corporate trust office~~Corporate Trust Office of the Trustee, books for the registration and transfer of Bonds; and, upon presentation thereof for such purpose at said office, the Authority shall register or cause to be registered therein, and permit to be transferred thereon, under such reasonable regulations as it or the Trustee may prescribe, any Bond entitled to registration or transfer. So long as any of the Bonds remain Outstanding, the Authority shall make all necessary provisions to permit the exchange of Bonds at the designated ~~corporate trust office~~Corporate Trust Office of the Trustee.

**Section 3.07    Transfer of Bonds.**    Each Bond shall be transferable only upon the books of the Authority, which shall be kept for that purpose at the designated ~~corporate trust office~~Corporate Trust Office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Authority or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer. Upon the transfer of any such Bond, the Authority shall cause to be issued in the name of the transferee a new Bond or Bonds of the same aggregate principal amount, Series, maturity and tenor as the surrendered Bond.

- 29 -

The transferor shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code.  The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

The Authority and the Trustee may deem and treat the person in whose name any Outstanding Bond shall be registered upon the books of the Authority as the absolute owner of such Bond, whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the Principal or Redemption Price of and, subject to the provisions of Section 3.01 hereof with respect to Record Dates, interest on such Bond and for all other purposes whatsoever, and all such payments so made to any such registered owner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums paid, and neither the Authority nor the Trustee shall be affected by any notice to the contrary.  The Authority agrees to indemnify and save the Trustee harmless from and against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting in good faith and without negligence hereunder, in so treating such registered owner.

**Section 3.08   Regulations with Respect to Exchanges and Transfers.**  In all cases in which the privilege of exchanging Bonds or transferring Bonds is exercised, the Authority shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions hereof.  All Bonds surrendered in any such exchanges or transfers shall forthwith be canceled by the Trustee.  For every such exchange or transfer of Bonds, whether temporary or definitive, the Authority or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, which sum or sums shall be paid by the person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.  Notwithstanding any other provisions hereof, the cost of preparing each new Bond upon each exchange or transfer, and any other expenses of the Authority or the Trustee incurred in connection therewith, shall be paid by the person requesting such exchange or transfer.  The Authority shall not be obliged to make, or cause to be made, any exchange or transfer of Bonds of any Series during the period beginning on the Record Date for such Bonds immediately preceding an Interest Payment Date on such Bonds and ending on such Interest Payment Date, or, in the case of any proposed redemption of Bonds of such Series, after the date immediately preceding the date notice of redemption has been mailed.

**Section 3.09   Bonds Mutilated, Destroyed, Lost or Stolen.**  In case any Bond shall become mutilated or be destroyed, lost or stolen, the Authority in its discretion may execute, and upon its request the Trustee shall authenticate and deliver, a new Bond of like Series, maturity, tenor and principal amount as the Bond so mutilated, destroyed, lost or stolen, in exchange and substitution for the mutilated, destroyed, lost or stolen Bond, upon surrender and cancellation of such mutilated Bond or in lieu of and substitution for such Bond so destroyed, lost or stolen, upon filing with the Authority evidence satisfactory to the Authority and the Trustee that such Bond has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Authority and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Authority and the Trustee may prescribe and paying such expenses as the Authority and the Trustee may incur in connection therewith.  All Bonds so surrendered to

- 30 -

the Trustee shall be canceled by it and evidence of such cancellation shall be given to the Authority. In case any Bond which has matured or is about to mature shall have become mutilated or have been destroyed, lost or stolen, the Authority may, instead of issuing a Bond in exchange or substitution therefor, pay or authorize the payment of such mutilated Bond upon the surrender on or after the maturity date thereof, or authorize the payment of such destroyed, lost or stolen Bond, upon the Holder thereof filing evidence satisfactory to the Authority and the Trustee that such Bond has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Authority and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Authority and the Trustee may prescribe and paying such expenses as the Authority and the Trustee may incur in connection therewith.

**Section 3.10   Book Entry Bonds.** Anything herein to the contrary notwithstanding, Bonds may be authorized and issued as Book Entry Bonds in accordance with the Supplemental Trust Agreement authorizing such Bonds.

For all purposes of this Trust Agreement the Holder of a Book Entry Bond shall be the Depository therefor and neither the Authority nor the Trustee shall have responsibility or any obligation to the beneficial owner of such Bond or to any direct or indirect participant in such Depository. Without limiting the generality of the foregoing, neither the Authority nor the Trustee shall have any responsibility or obligation to any such participant or to the beneficial owner of a Book Entry Bond with respect to (a) the accuracy of the records of the Depository or any participant with respect to any beneficial ownership interest in such Bond, (b) the delivery to any participant of the Depository, the beneficial owner of such Bond or any other person, other than the Depository, of any notice with respect to such Bond, including any notice of the redemption thereof, or (c) the payment to any participant of the Depository, the beneficial owner of such Bond or any other person, other than the Depository, of any amount with respect to the Principal or Redemption Price of, or interest on, such Bond. The Authority and the Trustee may treat the Depository therefor as the absolute owner of a Book Entry Bond for the purpose of (x) payment of the Principal or Redemption Price of and interest on such Bond, (y) giving notices of redemption and of other matters with respect to such Bond, (z) registering transfers with respect to such Bond, and for all other purposes whatsoever. The Trustee shall pay all Principal or Redemption Price of and interest on such Bond only to or upon the order of the Depository, and all such payments shall be valid and effective to fully satisfy and discharge the Authority's obligations with respect to such Principal or Redemption Price and interest to the extent of the sum or sums so paid. No person other than the Depository shall receive a Bond or other instrument evidencing the Authority's obligation to make payments of the principal or Redemption Price thereof and interest thereon.

Anything herein to the contrary notwithstanding, payment of the Redemption Price of a Book Entry Bond which is redeemed in part prior to maturity may be paid to the Depository by wire transfer without surrender of such Bond to the Trustee; *provided, however,* that the Trustee shall maintain records as to each such payment and of the principal amount of such Bond Outstanding, which shall be binding on the Authority and the Holders from time to time of such Bond.

The Authority, without the consent of the Trustee, the beneficial owner of a Book Entry Bond or any other person, may terminate the services of the Depository with respect to a Book

- 31 -

Entry Bond if the Authority reasonably determines in good faith following consultation with the Trustee that (a) the Depository is unable to discharge its responsibilities with respect to such Bonds or (b) a continuation of the requirement that all of the Outstanding Bonds of like Series issued in book entry form be registered in the registration books of the Authority in the name of the Depository, is not in the best interest of the beneficial owners of such Bonds, and the Authority shall terminate the services of the Depository upon receipt by the Authority and the Trustee of written notice from the Depository that it has received written requests that such Depository be removed from its participants having beneficial interests, as shown in the records of the Depository, in an aggregate amount of not less than a Majority in Interest of the then Outstanding Bonds for which the Depository is serving as Depository.

Upon the termination of the services of a Depository with respect to a Book Entry Bond, or upon the resignation of a Depository with respect to a Book Entry Bond, after which no substitute securities depository willing to undertake the functions of such Depository can be found which, in the reasonable opinion of the Authority following consultation with the Trustee, is able to undertake such functions upon reasonable and customary terms, such Bonds shall no longer be registered in the registration books kept by the Trustee in the name of a Depository, but shall be registered in the name or names of the Bondholders transferring or exchanging such Bonds shall designate, in accordance with the provisions of Article III hereof.

In connection with any proposed transfer outside the book-entry system, the Authority or the Depository shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code.  The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

**Section 3.11   Preparation of Definitive Bonds; Temporary Bonds.**  The definitive Bonds of each Series shall be lithographed or printed on steel engraved borders, except that Book Entry Bonds may be typewritten.  Until the definitive Bonds of any Series are prepared, the Authority may execute, in the same manner as is provided in Section 3.04 hereof, and deliver, in lieu of definitive Bonds, but subject to the same provisions, limitations and conditions as the definitive Bonds, except as to the denominations thereof and as to exchangeability for registered Bonds, one or more temporary Bonds, substantially of the tenor of the definitive Bonds in lieu of which such temporary Bond or Bonds are issued, in authorized denominations or any whole multiples thereof authorized by the Authority, and with such omissions, insertions and variations as may be appropriate to such temporary Bonds.  The Authority at its own expense shall prepare and execute and, upon the surrender at the designated ~~corporate trust office~~Corporate Trust Office of the Trustee of such temporary Bonds for exchange and the cancellation of such surrendered temporary Bonds the Trustee shall authenticate and, without charge to the Holder thereof, deliver in exchange therefor, at the designated ~~corporate trust office~~Corporate Trust Office of the Trustee, definitive Bonds of the same aggregate principal amount, Series and maturity as the temporary Bonds surrendered.  Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits and security as definitive Bonds issued pursuant hereto.

All temporary Bonds surrendered in exchange for a definitive Bond or Bonds shall be forthwith canceled by the Trustee.

## ARTICLE IV.

### REDEMPTION OF BONDS

**Section 4.01   Authorization of Redemption.**   Bonds subject to redemption prior to maturity pursuant hereto or to a Supplemental Trust Agreement shall be redeemable, in accordance with this Article IV, at such times, at such Redemption Prices and upon such terms as may otherwise be specified herein or in the Supplemental Trust Agreement authorizing such Series.

**Section 4.02   Redemption at the Election of the Authority.**

(a)      In the case of any redemption of Bonds other than as provided in Section 4.03 hereof, the Authority shall give written notice to the Trustee of its election to redeem, of the Series and of the principal amounts and Redemption Prices of the Bonds of each maturity of such Series to be redeemed.  Such notice shall be given not less than thirty (30) days prior to the redemption date.  The Series, maturities and principal amounts thereof to be so redeemed shall be determined by the Authority in its sole discretion, subject to, in the case of the redemption of less than all of any maturity of Bonds, any limitations with respect thereto contained herein (including, without limitation, Section 4.04 below) or in the Supplemental Trust Agreement authorizing such Series.  The Authority shall pay to the Trustee, for the benefit of the Holders of the Bonds to be redeemed, on or prior by the redemption date an amount which, in addition to other amounts available therefor held by the Trustee in the Debt Service Fund, is sufficient to redeem on the redemption date at the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, all of the Bonds to be so redeemed.

(b)      In the case of a Partial Disposition pursuant to Section 7.18, the Bonds shall be subject to redemption, at a Redemption Price equal to the par amount thereof, plus accrued interest to the date of redemption, in an amount no less than (i) the allocable portion of Bonds related to the Toll Facilities subject to the disposition and (ii) the amount required to be redeemed in order to maintain for the Tax-Exempt Bonds that will remain Outstanding after such Partial Disposition, the exclusion of interest on such Tax Exempt Bonds from gross income for purposes of federal income taxation, all as provided in the Supplemental Trust Agreement.

**Section 4.03   Redemption Other Than at Authority's Election.**   Whenever by the terms hereof or of a Supplemental Trust Agreement the Trustee is required to redeem Bonds through the application of mandatory Sinking Fund Installments, the Trustee shall select the Bonds of the Series and maturities to be redeemed in the manner provided in Section 4.04 hereof, give the notice of redemption and pay out of money available therefor the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, to the appropriate Paying Agents in accordance with the terms of this Article IV.

**Section 4.04   Selection of Bonds to be Redeemed.**   Unless otherwise provided in the Supplemental Trust Agreement authorizing the issuance of Bonds of a Series, in the event of

- 33 -

redemption of less than all of the Outstanding Bonds of like Series, maturity and tenor, the Trustee shall assign to each Outstanding Bond of the Series, maturity and tenor to be redeemed a distinctive number for each unit of the principal amount of such Bond equal to the lowest denomination in which the Bonds of such Series are authorized to be issued and shall select by lot, using such method of selection as it shall deem proper in its discretion, from the numbers assigned to such Bonds as many numbers as, at such unit amount equal to the lowest denomination in which the Bonds of such Series are authorized to be issued for each number, shall equal the principal amount of such Bonds to be redeemed. In making such selections the Trustee may draw the Bonds by lot (i) individually or (ii) by one or more groups, the grouping for the purpose of such drawing to be by serial numbers (or, in the case of Bonds of a denomination of more than the lowest denomination in which the Bonds of such Series are authorized to be issued, by the numbers assigned thereto as in this Section 4.04 provided) which end in the same digit or in the same two digits. In case, upon any drawing by groups, the total principal amount of Bonds drawn shall exceed the amount to be redeemed, the excess may be deducted from any group or groups so drawn in such manner as the Trustee may reasonably determine. The Trustee may in its discretion assign numbers to aliquot portions of Bonds and select part of any Bond for redemption. The Bonds to be redeemed shall be the Bonds to which were assigned numbers so selected; ***provided, however,*** that only so much of the principal amount of each such Bond of a denomination of more than the lowest denomination in which the Bonds of such Series are authorized to be issued shall be redeemed as shall equal the lowest denomination in which the Bonds of such Series are authorized to be issued for each number assigned to it and so selected.

For purposes of this Section 4.04, the lowest denomination in which a Capital Appreciation Bond or Convertible Capital Appreciation Bond is authorized to be issued shall be the lowest Accreted Value authorized to be due at maturity on such Bonds.

Notwithstanding the foregoing, in the event that a Depository shall be the registered owner of all of such Bonds of the Series being redeemed, if less than all of the Bonds of a particular Series are called for redemption, the Authority shall select the maturity or maturities of such Series to be redeemed and the Depository, on behalf of the Trustee, shall select the Bonds within the same maturity of such Series to be redeemed by means of a random lottery and in any event in accordance with the applicable practices of the Depository.

**Section 4.05   Notice of Redemption.** Whenever Bonds are to be redeemed, the Trustee shall give notice of the redemption of the Bonds in the name of the Authority which notice shall specify: (a) the Bonds to be redeemed which shall be identified by the designation of the Bonds given in accordance with Article II hereof; (b) the maturity dates and interest rates or Accreted Value of the Bonds to be redeemed and the date of such Bonds; (c) the numbers and other distinguishing marks of the Bonds to be redeemed, including CUSIP numbers; (d) the redemption date; (e) the Redemption Price, if then known; (f) with respect to each such Bond, the principal amount thereof to be redeemed; (g) that, except in the case of Book Entry Bonds, such Bonds will be redeemed at the designated ~~corporate trust office~~Corporate Trust Office of the Trustee giving the address thereof and the telephone number of the Trustee to which inquiries may be directed; (h) that no representation is made as to the correctness of the CUSIP number either as printed on the Bonds or as contained in such notice and that an error in a CUSIP number as printed on a Bond or as contained in such notice shall not affect the validity of the proceedings for redemption; and (i) if the Authority's obligation to redeem the Bonds is subject to conditions,

- 34 -

a statement to that effect and of the conditions to such redemption.  Such notice shall further state that, if on such date all conditions to redemption have been satisfied, there shall become due and payable on such date upon each Bond to be redeemed the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, and that, from and after such date, payment having been made or provided for, interest thereon shall cease to accrue.  Such notice shall be given by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption date.  Such notice shall be sent by first class mail, postage prepaid (i) to the registered owners of the Bonds which are to be redeemed, at their last known addresses, if any, appearing on the registration books, and (ii) to the Bond Insurer (if any) insuring the Bonds to be redeemed, at the Bond Insurer's last known address, not more than ten (10) Business Days prior to the date such notice is given.  Upon giving such notice, the Trustee shall promptly certify to the Authority that it has mailed or caused to be mailed such notice to the Holders of the Bonds to be redeemed in the manner provided herein.  Such certificate shall be conclusive evidence that such notice was given in the manner required hereby.  The failure of any Holder of a Bond to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Bonds.

The Trustee shall, if any of the Bonds to be redeemed are Book Entry Bonds, transmit a copy of the notice of redemption to the Depository for such Book Entry Bonds not less than thirty (30) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Bonds are held by the Depository, such notice shall be given in accordance with the procedures of the Depository).  Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Bond and no such notice shall be required to be transmitted by the Authority directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Authority be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Bonds.  This paragraph shall not alter the Trustee's obligation to transmit a notice of redemption to the Bond Insurer as provided in the preceding paragraph.

**Section 4.06   Payment of Redeemed Bonds.**  Notice having been given in the manner provided in Section 4.05 hereof, the Bonds or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, plus interest accrued and unpaid to the redemption date, except as otherwise provided in Section 3.10 hereof, upon presentation and surrender of such Bonds, at the office or offices specified in such notice, and, in the case of Bonds presented by other than the registered owner, together with a written instrument of transfer duly executed by the registered owner or his duly authorized attorney, such Bonds, or portions thereof, shall be paid at the Redemption Price plus interest accrued and unpaid to the redemption date; ***provided, however,*** that payment of the Redemption Price may be paid by wire transfer to such registered owner if so authorized in the Supplemental Trust Agreement that authorized the Bonds of the Series to be redeemed.  If there shall be called for redemption less than all of the principal amount of a registered Bond, the Authority shall execute and the Trustee shall authenticate and deliver, upon the surrender of such Bond, without charge to the owner thereof, for the unredeemed balance of the principal amount of the registered Bond so surrendered, Bonds of like Series, maturity and tenor in any of the authorized denominations.  If, on the redemption date, money for the redemption of all Bonds or portions thereof of any like Series, maturity and tenor to be redeemed, together with interest accrued and

- 35 -

unpaid thereon to the redemption date, shall be held by the Trustee and Paying Agents so as to be available therefor on such date and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, interest on the Bonds or portions thereof so called for redemption shall cease to accrue and such Bonds shall no longer be considered to be Outstanding hereunder.  If such money shall not be so available on the redemption date, such Bonds or portions thereof shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

## ARTICLE V.

## FUNDS AND ACCOUNTS;
## PLEDGED REVENUES AND APPLICATION THEREOF

**Section 5.01   Establishment of Funds and Accounts.**  (a) The following funds and separate accounts within funds constituting a portion of the Trust Estate are hereby established and shall be held, in trust, and maintained by the Trustee:

> Costs of Issuance Fund;
> Tolls Receipts Fund;
> Trustee Expense Fund;
> Debt Service Fund;
>> Interest Account; and
>> Principal Account;
> Operating Reserve Fund;
> Renewal and Replacement Fund
> Subordinated Indebtedness Fund; and
> General Reserve Fund

(b)      The Priority Authority Expense Fund shall be established and maintained by the Authority in a bank or trust company which is eligible under the laws of the Commonwealth to receive deposits of public funds. If a Consulting Engineer is then engaged by the Authority and has remained under such engagement for at least thirty (30) days, the Authority shall use amounts in the Priority Authority Expense Fund to pay Costs of Operation, Maintenance and Administration of the Toll Facilities.  Moneys deposited in the Priority Authority Expense Fund or the Shared Authority Expense Fund in accordance with, and solely in the amounts provided for in this Trust Agreement, shall be released from, and no longer subject to, the lien of this Trust Agreement and shall no longer constitute part of the Trust Estate.

(c)      The Shared Authority Expense Fund shall be established and maintained by the Authority in a bank or trust company which is eligible under the laws of the Commonwealth to receive deposits of public funds.  If no Consulting Engineer is then engaged by the Authority, the Authority shall use amounts (i) in the Priority Authority Expense Fund to pay Priority Costs of Operation, Maintenance and Administration of the Toll Facilities and (ii) in the Shared Authority Expense Fund to pay Shared Costs of Operation, Maintenance and Administration of the Toll Facilities.  Moneys deposited in the Shared Authority Expense Fund in accordance with, and

solely in the amounts provided for in this Trust Agreement, shall be released from, and no longer subject to, the lien of this Trust Agreement and shall no longer constitute part of the Trust Estate.

(d)     The Arbitrage Rebate Fund is hereby established and created and shall be held by the Trustee for the benefit of the Authority.  Moneys deposited in the Arbitrage Rebate Fund in accordance with, and solely in the amounts provided for in this Trust Agreement, shall be released from, and no longer subject to, the lien of this Trust Agreement and shall not constitute part of the Trust Estate.

(e)     Each such fund may contain one or more accounts or subaccounts, for purposes of internal accounting, as necessary for arbitrage calculations or as the Authority may otherwise deem proper.  All money at any time deposited in any fund, account or subaccount created hereby or by any Supplemental Trust Agreement or required hereby or thereby (other than the Priority Authority Expense Fund, the Shared Authority Expense Fund and the Arbitrage Rebate Fund) to be created shall be held in trust for the benefit of the Holders of Bonds, but shall nevertheless be disbursed, allocated and applied solely for the uses and purposes provided herein.

**Section 5.02   Application of Secured Obligation Proceeds.**   Upon the receipt of proceeds from the sale of a Series of Secured Obligations (other than the Initial Bonds and the Commonwealth Note), the Authority shall apply such proceeds as specified in the Supplemental Trust Agreement authorizing such Series.

Accrued interest, if any, received upon the delivery of a Series of Secured Obligations shall be deposited in the Debt Service Fund unless all or any portion of such amount is to be otherwise applied as specified in the Supplemental Trust Agreement authorizing such Series.

**Section 5.03   Application of Money in the Costs of Issuance Fund.**  (a) As soon as practicable after the delivery of each Series of Secured Obligations, there shall be deposited by the Authority into each account within the Costs of Issuance Fund the amount, if any, required to be deposited therein pursuant to the Supplemental Trust Agreement authorizing such Series.

(b)     Except as otherwise provided in this Article V and in any applicable Supplemental Trust Agreement, money in the Costs of Issuance Fund shall be used only to pay the Costs of Issuance of the Secured Obligations payable by the Authority.  Such payments shall be made by the Trustee upon the direction of an Authorized Officer of the Authority that sets forth in reasonable detail the purpose of the payment, the amount of such payment and the name of the payee.  If such payment is to be made by bank wire, such direction shall include the routing and account numbers of the payee.  If such payment is to be made by check, such direction shall include the address of the payee.  The Trustee shall rely fully on any such written direction delivered pursuant to this Section and shall not be required to make any investigation in connection therewith.

(c)     The money remaining in the Costs of Issuance Fund after paying or making provision in accordance with the direction of an Authorized Officer of the Authority for the payments required to be made pursuant to paragraph (b) of this Section, including any Costs of Issuance then unpaid, shall be applied by the Trustee in the following order of priority:

- 37 -

First, to the Arbitrage Rebate Fund, the amount determined by the Authority to be required to be deposited therein; and

Second, to the Debt Service Fund, any balance remaining therein.

**Section 5.04   Deposit of Toll Receipts in the Toll Receipts Fund.**  (a)   Effective on the date of issuance of the Initial Bonds, the Authority has directed that all Toll Receipts be deposited with the Trustee in the Toll Receipts Fund on behalf of the Authority, until all Secured Obligations are fully paid or defeased in accordance with Section 13.01 below.  The Authority shall take all necessary actions to cause the prompt deposit of the Toll Receipts directly into the Toll Receipts Fund.

(b)     In the event that the Authority receives any Toll Receipts, the Authority shall promptly (and in no event later than three (3) Business Days) following the receipt thereof transfer all such Toll Receipts to the Trustee for deposit in the Toll Receipts Fund.  All Toll Receipts received by the Trustee shall be deposited as soon as practicable and in no event more than two (2) Business Days after receipt thereof by the Trustee, into the Toll Receipts Fund.  Amounts held in the Toll Receipts Fund shall be applied by the Trustee to fund the deposits in the priority set forth in Section 5.05 below.

**Section 5.05   Application of Toll Receipts**.  (a) On each Monthly Disbursement Date, the Trustee shall withdraw Toll Receipts from the Toll Receipts Fund and transfer and apply such amounts as follows and in the following order of priority:

*First*:  To the Trustee Expense Fund, Toll Receipts in an amount sufficient to fund the Trustee Expense Fund at the Trustee Expenses Cap; ***provided***, ***however***, in no event shall the deposits to the Trustee Expense Fund exceed the Trustee Expenses Cap for the Fiscal Year. Amounts on deposit shall be applied, subject to the approval of an Authorized Officer of the Authority (which approval shall not be unreasonably withheld), to the payment of the reasonable costs and expenses of the Trustee;

*Second*: If a Consulting Engineer is then engaged by the Authority, to the Authority for deposit into the Priority Authority Expense Fund, Toll Receipts in an amount such that the amount on deposit in the Priority Authority Expense Fund equals the amount set forth in the Disbursement Schedules delivered with respect to such Monthly Disbursement Date to pay Costs of Operation, Maintenance and Administration of the Toll Facilities for the two months immediately succeeding such Monthly Disbursement Date.  The monthly payments shall be increased or decreased, as necessary, to reflect amendments to the Disbursement Schedule, provided that any increase in Costs of Operation, Maintenance and Administration of the Toll Facilities effectuated by such amendment shall comply with the requirements of Section 7.02 herein.  If a Consulting Engineer is then engaged by the Authority and has remained under such engagement for at least thirty (30) days, Toll Receipts on deposit in the Priority Authority Expense Fund shall be applied by the Authority from time to time solely to pay the Costs of Operation, Maintenance and Administration of the Toll Facilities;

*Third*: If no Consulting Engineer is then engaged by the Authority, to the Authority for deposit into the Priority Authority Expense Fund, Toll Receipts in an amount such that the

- 38 -

amount on deposit in the Priority Authority Expense Fund equals the amount set forth in the Disbursement Schedules delivered with respect to such Monthly Disbursement Date to pay Priority Costs of Operation, Maintenance and Administration of the Toll Facilities for the two months immediately succeeding such Monthly Disbursement Date.  The monthly payments shall be increased or decreased, as necessary, to reflect amendments to the Disbursement Schedule, provided that any increase in Priority Costs of Operation, Maintenance and Administration of the Toll Facilities effectuated by such amendment shall comply with the requirements of Section 7.02 herein.  If no Consulting Engineer is then engaged by the Authority, Toll Receipts on deposit in the Priority Authority Expense Fund shall be applied by the Authority from time to time solely to pay the Priority Costs of Operation, Maintenance and Administration of the Toll Facilities;

*Fourth:* To the following accounts in the following order of priority:

(i)    the Interest Account of the Debt Service Fund, Toll Receipts in an amount equal to one-sixth (1/6) of the amount of interest due and payable on the Bonds on the next Interest Payment Date, plus an amount equal to any shortfall from prior periods; and

(ii)    the Principal Account of the Debt Service Fund, Toll Receipts in an amount equal to one-twelfth (1/12) of the Principal amount of the Bonds due and payable on the next Principal Payment Date, including Sinking Fund Installments and Accreted Value, if applicable, plus an amount equal to any shortfall from prior periods;

In making such deposits, the Trustee shall reduce the amount of the Required Deposits by any investment earnings which have accrued in such Account.

*Fifth*:  If a Subordinated Payment Default shall have occurred and be continuing, Toll Receipts in an amount sufficient to pay all past due principal of and interest on the Subordinated Indebtedness;

*Sixth*: If no Consulting Engineer is then engaged by the Authority, to the Authority for deposit into the Shared Authority Expense Fund, Toll Receipts in an amount such that the amount on deposit in the Shared Authority Expense Fund equals the amount set forth in the Disbursement Schedules delivered with respect to such Monthly Disbursement Date to pay Shared Costs of Operation, Maintenance and Administration of the Toll Facilities for the two months immediately succeeding such Monthly Disbursement Date.  The monthly payments shall be increased or decreased, as necessary, to reflect amendments to the Disbursement Schedule, provided that any increase in Shared Costs of Operation, Maintenance and Administration of the Toll Facilities effectuated by such amendment shall comply with the requirements of Section 7.02 herein.  If no Consulting Engineer is then engaged by the Authority, Toll Receipts on deposit in the Shared Authority Expense Fund shall be applied by the Authority from time to time solely to pay the Shared Costs of Operation, Maintenance and Administration of the Toll Facilities.  In the event a Consulting Engineer is thereafter serving in such role for at least thirty (30) days, amounts on deposit in the Shared Authority Expense Fund shall be transferred to the Priority Authority Expense Fund;

C:\ND\torresrodriguezs6812\ndOffice\VAULT-2NOR0MND\Toll
Revenue Master Trust Agreement 4838-1565-0039 v.34.docx

*Seventh*: To the Trustee for deposit into the Operating Reserve Fund, Toll Receipts to maintain a balance therein equal to the Operating Reserve Requirement;

*Eighth*:  Upon the written direction of an Authorized Officer of the Authority, to the extent Toll Receipts are available therefor, to the Arbitrage Rebate Fund, Toll Receipts in the amount set forth in such direction;

*Ninth*:  To the Renewal and Replacement Fund, Toll Receipts in an  amount equal to one-twelfth (1/12) of the Renewal and Replacement Requirement budgeted to be funded from Toll Receipts as set forth in the applicable Annual Budget  for such Fiscal Year; ***provided, however***, that in the event the Authority shall determine that the amounts on deposit therein are excessive for the purpose of the Renewal and Replacement Fund, the Authority shall amend the Annual Budget to decrease the Renewal and Replacement Requirement solely to the extent such amendment is accompanied by a certificate by the Consulting Engineer that supports any decrease in the Renewal and Replacement Requirement and such excess amount may be withdrawn from the Renewal and Replacement Fund by the Authority and transferred to and deposited in the General Reserve Fund and used as provided herein;

*Tenth*: To the Subordinated Indebtedness Fund, to the extent Toll Receipts are available to pay (i) interest on Subordinated Indebtedness due on the next succeeding Interest Payment Date, and (ii) principal on Subordinated Indebtedness on the next succeeding Principal Payment Date; and

*Eleventh*: To the General Reserve Fund, any remaining balance.

**Section 5.06   Debt Service Fund.**  (a)  The Trustee shall pay out of the Debt Service Fund, the Principal of and interest on all Outstanding Bonds as the same is due and payable. Amounts paid to a Paying Agent for payments pursuant to this Section shall be irrevocably held in trust for Holders of Bonds and applied to such payments.

(b)      Notwithstanding the provisions of this Section, the Authority may, at any time but in no event less than thirty-five (35) days prior to the succeeding date on which a Sinking Fund Installment is scheduled to be due, direct the Trustee to purchase, with money on deposit in the Debt Service Fund, at a price not in excess of the Principal amount (with respect to Bonds that are not Capital Appreciation Bonds or Convertible Capital Appreciation Bonds) or the Accreted Value (with respect to Capital Appreciation Bonds or Convertible Capital Appreciation Bonds (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bonds)) thereof plus interest accrued and unpaid to the date of such purchase, Term Bonds to be redeemed from such Sinking Fund Installment; ***provided, however***, that the portion of such purchase price funded from the Principal Account shall not exceed the amount of the upcoming Sinking Fund Installment due on such purchased bond and the portion of such purchase price funded from the Interest Account shall not exceed the amount of interest accrued and unpaid on such purchased bond to the date of such purchase; ***provided, further,*** that in the case of Capital Appreciation Bonds or Convertible Capital Appreciation Bonds (prior to the applicable Interest Commencement Date with respect to Convertible Capital Appreciation Bonds), no portion of the purchase price may be funded from the Interest Account.  Any Term Bond so purchased or otherwise purchased and delivered to the Trustee shall be canceled upon

- 40 -

receipt thereof by the Trustee and evidence of such cancellation shall be given to the Authority. The Principal amount or Accreted Value, as applicable, of each Term Bond so canceled shall be credited against the Sinking Fund Installment due on such date.

(c)     If at the time the Trustee is required to make a withdrawal from the Debt Service Fund the moneys therein shall not be sufficient for such purpose, the Trustee shall withdraw the amount of such deficiency *first*, from moneys on deposit in the General Reserve Fund in accordance with Section 5.10(b) of this Trust Agreement; *second*, from the Toll Receipts on deposit in the Renewal and Replacement Fund; *third,* from the moneys on deposit in the Operating Reserve Fund; and *fourth*, from the moneys on deposit in the Subordinated Indebtedness Fund; and, in each instance, transfer the same to the Debt Service Fund.

(d)     In the case of a Partial Disposition pursuant to Section 7.18, the proceeds of such Partial Disposition shall be deposited in the Debt Service Fund and applied to the payment of the Redemption Price of Bonds to be redeemed, if any.

**Section 5.07   Operating Reserve Fund**.  (a) If a Consulting Engineer is then engaged by the Authority, the moneys in the Operating Reserve Fund shall be used, when necessary, to pay Costs of Operation, Maintenance and Administration of the Toll Facilities to the extent that the monies on deposit in the Priority Authority Expense Fund are insufficient therefor; provided any requisition by the Authority for funds from the Operating Reserve Fund to pay Costs of Operation, Maintenance and Administration of the Toll Facilities shall be accompanied by a certificate of the Consulting Engineer, which certificate shall set forth an explanation of the reason such monies are required and shall be subject to the requirements of Section 7.02(a)(v) and (vi) herein.

(b)     If no Consulting Engineer is then engaged by the Authority, the moneys in the Operating Reserve Fund shall be used, when necessary, to pay the following payments in the following priority; *first*, Priority Costs of Operation, Maintenance and Administration of the Toll Facilities to the extent that the monies on deposit in the Priority Authority Expense Fund are insufficient therefor and *second*, Shared Costs of Operation, Maintenance and Administration of the Toll Facilities to the extent that the monies on deposit in the Shared Authority Expense Fund are insufficient therefor; provided any requisition by the Authority for funds from the Operating Reserve Fund to pay Costs of Operation, Maintenance and Administration of the Toll Facilities, Priority Costs of Operation, Maintenance and Administration of the Toll Facilities or Shared Costs of Operation, Maintenance and Administration of the Toll Facilities shall be accompanied by a certificate of the Authority, which certificate shall set forth an explanation of the reason such monies are required and shall be subject to the requirements of Section 7.02(a)(v) and (vi) herein

(c)     Amounts on deposit in the Operating Reserve Fund shall be transferred, to the extent required to the following funds, in the following order of priority (i) in accordance with Section 5.06(c), to the Debt Service Fund, if at the time the Trustee is required to make a withdrawal from the Debt Service Fund, the moneys therein shall not be sufficient therefor and after the amounts, if any, transferred from the General Reserve Fund and the Toll Receipts, if any, transferred from the Renewal and Replacement Fund are not sufficient for such purpose and (ii) in accordance with Section 5.11(a), to the Arbitrage Rebate Fund, if at the time the Trustee is required to make a withdrawal from the Arbitrage Rebate Fund, the moneys therein, the amounts,

- 41 -

if any, transferred from the General Reserve Fund and the Toll Receipts, if any, transferred from the Renewal and Replacement Fund are not sufficient for such purpose.

**Section 5.08   Renewal and Replacement Fund**.  (a) The Authority shall cause to be deposited in the Renewal and Replacement Fund, the proceeds of all gifts, grants, or other payments to the Authority from the United States of America, any state, territory, municipality or any public or private instrumentality, individual or entity, which proceeds are required to be applied to the payment of Renewal and Replacement Expenses of the Toll Facilities.  Except as provided in subsection (b), the moneys in the Renewal and Replacement Fund shall be used, when necessary, for the purpose of paying Renewal and Replacement Expenses.  Improvements funded from moneys in the Renewal and Replacement Fund are deemed to be part of the Toll Facilities.

(b)    Toll Receipts on deposit in the Renewal and Replacement Fund shall be transferred to the following funds and accounts in the following order of priority (i) in accordance with Section 5.06(c), to the Debt Service Fund, if at the time the Trustee is required to make a withdrawal from the Debt Service Fund the moneys therein shall not be sufficient therefor and after the amounts, if any, transferred from the General Reserve Fund are not sufficient for such purpose and (ii) in accordance with Section 5.11(a), to the Arbitrage Rebate Fund, if at the time the Trustee is required to make a withdrawal from the Arbitrage Rebate Fund the moneys therein and the amounts, if any, transferred from the General Reserve Fund are not sufficient for such purpose.

**Section 5.09   Subordinated Indebtedness Fund.**  (a) The Trustee shall pay out of the Subordinated Indebtedness Fund, the Principal of and interest on Outstanding Subordinated Indebtedness as the same is due and payable.  Amounts paid to a Paying Agent for payments pursuant to this Section shall be irrevocably held in trust for Holders of Subordinated Indebtedness and applied to such payments.

(b)    Amounts on deposit in the Subordinated Indebtedness Fund shall be transferred to the Debt Service Fund in accordance with Section 5.06(c), if at the time the Trustee is required to make a withdrawal from the Debt Service Fund the moneys therein shall not be sufficient therefor and after the amounts, if any, transferred from the General Reserve Fund, the Toll Receipts, if any, transferred from the Renewal and Replacement Fund, and the amounts, if any, transferred from the Operating Reserve Fund are not sufficient for such purpose.

(c)    Money in the Subordinated Indebtedness Fund that on the last day of each Fiscal Year is in excess of the amount then required by Section 5.05 hereof to be therein may at the direction of the Authority either be retained therein or transferred to any other fund or account established pursuant hereto; ***provided, however***, that if no direction has been given by the Authority, the excess on the last day of each Fiscal Year shall be transferred by the Trustee to the General Reserve Fund.

(d)    In the case of a Partial Disposition pursuant to Section 7.18, the proceeds of such Partial Disposition remaining after the deposit made pursuant to Section 5.06(d) shall be deposited in the Subordinated Indebtedness Fund and applied to the payment of the Redemption Price of the Subordinated Indebtedness to be redeemed, if any.

- 42 -

**Section 5.10   General Reserve Fund.**  (a) Unless an Event of Default has occurred and is continuing, amounts deposited in the General Reserve Fund shall be applied by the Trustee at the direction of the Authority, in such manner, in such priority, and at such times as the Authority shall determine (i) to the purchase or redemption of Bonds, or (ii) for any Toll Facility-related lawful purpose of the Authority; ***provided, however***, that no moneys on deposit in the General Reserve Fund shall be used in any Fiscal Year for the purposes provided in this subsection unless all payments required in clauses *first* through *tenth* of Section 5.05(a), including any deficiencies for prior payments, have been made in full for such Fiscal Year, the Operating Reserve Fund and Renewal and Replacement Fund are each funded at their applicable requirements and the Authority shall have fully complied in all material respects with all covenants and agreements contained in this Trust Agreement.

(b)     Amounts on deposit in the General Reserve Fund shall be transferred to the following funds and accounts in the following order of priority (i) in accordance with Section 5.06(c), to the Debt Service Fund, if at the time the Trustee is required to make a withdrawal from the Debt Service Fund the moneys therein are not sufficient for such purpose  and (ii) in accordance with Section 5.11(a), to the Arbitrage Rebate Fund at any time money is required for such purpose.

**Section 5.11   Arbitrage Rebate Fund**.  (a) The Trustee shall deposit to the Arbitrage Rebate Fund any money delivered to it by the Authority for deposit therein and, in accordance with the provisions of this Article V, shall transfer to the Arbitrage Rebate Fund from the following funds, in the following order of priority in accordance with the written direction of the Authority (i) moneys on deposit in the General Reserve Fund, (ii) Toll Receipts on deposit in the Renewal and Replacement Fund, and (iii) moneys on deposit in the Operating Reserve Fund, at such times and in such amounts as shall be set forth in such written directions of the Authority.

(b)     Money on deposit in the Arbitrage Rebate Fund shall be applied by the Trustee in accordance with the direction of an Authorized Officer of the Authority only for the purpose of making payments to the Department of the Treasury of the United States of America at such times and in such amounts as the Authority shall determine, based on an opinion of Transaction Counsel, to be required by the Code to be rebated to the Department of the Treasury of the United States of America.  Money which an Authorized Officer of the Authority determines to be in excess of the amount required to be so rebated, shall, at the direction of the Authority, either be retained therein or transferred to any other fund or account established pursuant hereto.

(c)     If and to the extent required by the Code, the Authority shall periodically, at such times as may be required to comply with the Code, determine the amount required by the Code to be rebated to the Department of the Treasury of the United States of America with respect to Tax Exempt Bonds and (i) transfer or direct the Trustee to transfer from any other of the funds and accounts held hereunder (excluding any funds or accounts earmarked for the payment of the Secured Obligations pursuant to Article V hereof) and deposit to the Arbitrage Rebate Fund, such amount as the Authority shall have determined to be necessary in order to enable it to comply with its obligation to rebate money to the Department of the Treasury of the United States of America with respect to Tax Exempt Bonds and (ii) pay out of the Arbitrage Rebate Fund to the Department of the Treasury of the United States of America the amount, if any, required by the Code to be rebated thereto.

**Section 5.12   Transfer of Investments.**   Whenever money in any fund or account established hereunder is to be paid in accordance herewith to another such fund or account, such payment may be made, in whole or in part, by transferring to such other fund or account investments held as part of the fund or account from which such payment is to be made, whose value, together with the money, if any, to be transferred, is equal to the amount of the payment then to be made; *provided, however,* that no such transfer of investments would result in a violation of any investment standard or guideline applicable to such fund.

## ARTICLE VI.

## SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

**Section 6.01   Security for Deposits**.  All moneys held hereunder by the Trustee shall be continuously and fully secured, for the benefit of the Holders of the Bonds, and solely to the extent of any moneys held by the Trustee for the benefit of the Authority pursuant to the terms of this Trust Agreement, for the benefit of the Authority, in such manner as may then be required by applicable federal or Commonwealth laws and regulations regarding security, by Eligible Investments of a market value at least equal at all times to the amount of the deposit so held by the Trustee.  The Trustee shall have no obligation for the payment of interest on moneys properly held by it that are uninvested hereunder.

**Section 6.02   Investment of Funds and Accounts Held by the Trustee**.  (a) Subject to the limitations set forth in this paragraph, money held hereunder, if permitted by law, shall, as nearly as may be practicable, be invested by the Trustee in any Eligible Investments in accordance with the direction of an Authorized Officer of the Authority given in writing.  Money in the Toll Receipts Fund shall only be invested in Eligible Investments of the type described in clause (a), (b), (c) or (d) of the definition of the term "Eligible Investments" set forth in Section 1.01 hereof and such investments shall mature no later than the next succeeding Monthly Disbursement Date.   Money in the Debt Service Fund shall only be invested in Eligible Investments of the type described in clause (a), (b), (c) or (d) of the definition of the term "Eligible Investments" set forth in Section 1.01 hereof and such investments shall mature no later than the date on which such moneys are required to be used to pay Principal of and interest on Bonds when due.

(b)     The Trustee may conclusively rely upon the Authority's written instructions as to both the suitability and legality of the directed investments.  Ratings of Eligible Investments shall be determined at the time of purchase of such Eligible Investments. The Trustee may make any and all such investments through its own investment department or that of its affiliates or subsidiaries, and may charge its ordinary and customary fees for such trades, including investment maintenance fees.

(c)     Obligations purchased or other investments made as an investment of money in any fund or account held under the provisions hereof shall be deemed at all times to be a part of such fund or account and the income or interest earned, profits realized or losses suffered by a fund or account due to the investment thereof shall be credited or charged, as the case may be, to such fund or account.

- 44 -

(d)     In computing the amount in any fund or account held by the Trustee under the provisions hereof, obligations purchased as an investment of money therein or held therein shall be valued at the market value thereof, inclusive of accrued interest to the date of valuation.

(e)     Subject to the provisions hereof, the Authority, in its discretion, may, and the Trustee at the direction of an Authorized Officer of the Authority, shall sell, present for redemption or exchange any investment held pursuant hereto and the proceeds thereof may be reinvested as provided in this Section.  Except as otherwise provided herein, such investments shall be sold by the Authority or by the Trustee at the direction of an Authorized Officer of the Authority at the best price reasonably obtainable by it, or presented for redemption or exchange, whenever it shall be necessary in order to provide money to meet any payment or transfer from the fund or account in which such investment is held.  The Trustee shall advise the Authority in writing, on or before the fifteenth (15th) day of each calendar month, of the amounts required to be on deposit in each fund and account hereunder and of the details of all investments held for the credit of each fund and account in its custody under the provisions hereof as of the end of the preceding month and as to whether such investments comply with the provisions of paragraphs (a) and (b) of this Section.  The details of such investments shall include the par value, if any, the cost and the current market value of such investments as of the end of the preceding month.  The Trustee shall also describe all withdrawals, substitutions and other transactions occurring in each such fund and account in the previous month.

(f)     Although the Authority recognizes that it may obtain a broker confirmation or written statement containing comparable information at no additional cost, the Authority hereby agrees that confirmations of Eligible Investments are not required to be issued by the Trustee for each month in which a monthly statement is rendered.

**Section 6.03   Liability for Investments.**   Neither the Authority nor the Trustee shall have any liability arising out of or in connection with the making of any investment authorized by the provisions of this Article VI, in the manner provided in this Article VI, for any depreciation in value of any such investment, or for any loss, fee, tax or other charge, direct or indirect, resulting from any such investment, reinvestment or liquidation of an investment.

## ARTICLE VII.

## PARTICULAR COVENANTS

The Authority (and, as authorized by the Act, the Commonwealth with respect to Section 7.16 hereof) covenants and agrees with the Holders of the Bonds as follows:

**Section 7.01   Rate Covenant**.

(a)     The Authority covenants (the "**Rate Covenant**") that, except as provided in subsection (d) of this Section, it will at all times charge and collect or cause to be charged and collected Tolls for the use of the Toll Facilities at rates not less than those set forth in the schedule of such Tolls then in effect and as shall be required in order that Toll Receipts in each Fiscal Year shall equal at least the aggregate of (i) one hundred ten percent (110%) of the

- 45 -

aggregate of the Required Deposits for such Fiscal Year and (ii) one hundred percent (100%) of Annual Debt Service on Subordinated Indebtedness.

(b)      No later than December 31 of each year, the Authority shall  perform the calculations to determine compliance with the Rate Covenant for the previous Fiscal Year based upon (x) the audited financial statements for such Fiscal Year or (y) if no audited financial statements for such Fiscal Year are then available, a certificate of an Authorized Officer of Authority setting forth (A) the Toll Receipts for such Fiscal Year, (B) the Required Deposits for such Fiscal Year and (C) Annual Debt Service on Subordinated Indebtedness for such Fiscal Year. A certificate of an Authorized Officer of the Authority setting forth such calculations will be delivered to the Trustee and posted on EMMA under the CUSIPs for the Outstanding Bonds.

(c)      Additionally, on or before July 1 of each year the Authority shall deliver to the Trustee and AAFAF:

(i)      a certificate of the Traffic Consultant setting forth a reasonably detailed projection of the Toll Receipts to be received in the Fiscal Year commencing on such July 1 and for the next succeeding Fiscal Year; provided that such projection shall take into account any increases or decreases in Toll rates for which all legal conditions to effectiveness have been satisfied;

(ii)      a certificate of the Consulting Engineer setting forth a reasonably detailed projection of (A) the Required Deposits and (B) Annual Debt Service on Subordinated Indebtedness, in each case, for the Fiscal Year commencing on such July 1 and for the next succeeding Fiscal Year, and

(iii)      a certificate of an Authorized Officer of the Authority calculating, based on the certificates delivered pursuant to clauses (i) and (ii) of this paragraph (c), the Rate Covenant for the Fiscal Year commencing on such July 1 and for the next succeeding Fiscal Year.

A certificate of an Authorized Officer of the Authority setting forth the calculations required by this subsection (c) will be delivered to the Trustee and posted on EMMA under the CUSIPs for the Outstanding Bonds.

(d)      If a certificate of the Authority delivered pursuant to either paragraph (b) or (c) above demonstrates that the Toll Receipts were not or will not be sufficient to satisfy the Rate Covenant, the Authority will cause the Traffic Consultant to make a study (a "**Traffic Consultant Study**") and to recommend a schedule of Tolls ("**Toll Schedule**") which will provide sufficient Toll Receipts in the then current or next succeeding Fiscal Year to comply with the Rate Covenant above and will cause additional Pledged Revenues to be collected in the following and later Fiscal Years sufficient to eliminate any deficiency at the earliest practicable time; ***provided, however***, that the Authority will not be required to obtain a Traffic Consultant Study as required by this subsection (d) if (x) the Authority has obtained a Traffic Consultant Study pursuant to this subsection (d) in any of the previous two Fiscal Years and the Authority is in material compliance with the recommendations of the Traffic Consultant set forth therein or (y) the Traffic Consultant determines that such noncompliance is directly attributable to the

- 46 -

occurrence of a Force Majeure Event.  The Authority shall promptly (i) implement the Toll Schedule set forth in the Traffic Consultant Study and other recommendations of the Traffic Consultant or (ii) undertake an alternative course of action designed to ensure the Authority's ability to satisfy the Rate Covenant, to the extent approved by the Traffic Consultant.

(e)     Except as described in the next sentence, failure to comply with the Rate Covenant in any Fiscal Year will not constitute an ~~event~~Event of ~~default~~Default under this Trust Agreement if either (i) the Authority complies with the covenant described in paragraph (d) above or (ii) the Authority's Traffic Consultant is of the opinion that a Toll Schedule which will comply with the Rate Covenant is impracticable at that time, and the Authority therefore cannot comply with the Rate Covenant, and the Authority establishes a Toll Schedule that is recommended by the Traffic Consultant to comply as nearly as practicable with the Rate Covenant, which shall in any event yield, in any Fiscal Year, Toll Receipts in an amount at least equal to the Required Deposits plus Annual Debt Service on Subordinated Indebtedness for such Fiscal Year.  Notwithstanding the first sentence of this subsection (e), failure to comply with the Rate Covenant shall be an Event of Default hereunder if (x) for four consecutive Fiscal Years, the certificate delivered by the Authority as required by subsection (b) above demonstrates that the Authority has failed to comply with the Rate Covenant in each such Fiscal Year or (y) the certificate delivered by the Authority as required by subsection (b) above demonstrates that the Authority has failed to comply with the Rate Covenant at the end of the second full Fiscal Year after which a Traffic Consultant delivered a Traffic Consultant Study in accordance with subsection (d) above and the Toll Receipts as set forth in such certificate are less than 100% of the Required Deposits plus Annual Debt Service on Subordinated Indebtedness for such Fiscal Year.

(f)     The Authority will not reduce any toll (except by way of certain adjustments or reclassifications of toll rates as referred to below) unless the following conditions and tests shall be met:

(i)     The Authority has retained a Consulting Engineer and Traffic Consultant and

(ii)    Either:

(a) There shall have been delivered to the Trustee a certificate of an Authorized Officer of the Authority to the effect that the cumulative reductions in the immediately preceding twelve (12) months, including the proposed and all other reductions as if they had been in effect for such period, would not reduce Net Receipts for such period by more than one percent (1%), with Toll Schedules demonstrating such conclusion and that, taking into account such reductions, the Authority would have met the Rate Covenant for such period; or

(b) There shall have been delivered to the Trustee a certificate of an Authorized Officer of the Authority to the effect (A) the Rate Covenant for the preceding Fiscal Year after taking into account such Toll reductions, would have been satisfied; (B) after giving effect to such Toll reductions, the estimated Toll Receipts (as set forth in a

- 47 -

report of the Traffic Consultant) and the estimated Required Deposits and Annual Debt Service on Subordinated Indebtedness (as set forth in a report of the Consulting Engineer) for the then current and each future Fiscal Year to and including the latest maturity of the Bonds shall equal at least the amount necessary to satisfy the Rate Covenant for each such Fiscal Year; and (C) the Authority is not in default in the performance of any of the provisions of the Secured Obligations or this Trust Agreement.

(g)     The Authority may increase Tolls from time to time and may make any other adjustments or reclassifications of Tolls or establish special Tolls, introductory Tolls or temporary Tolls (but no reductions other than those permitted by subsection (f) of this Section 7.01), provided that, in the opinion of the Traffic Consultant, such action will not cause the Authority to fail to comply with the Rate Covenant as set forth in subsection (a) of this Section 7.01.

(h)     The Authority covenants that it will continue in effect the schedule of Tolls for traffic using the Toll Facilities until such schedule is increased or otherwise modified or reconfigured as provided herein.

(i)     The Authority covenants that all Tolls will be classified in a reasonable manner to cover all Traffic, and that no free vehicular passage on the Toll Facilities will be permitted except as permitted under current reference rules, regulations, resolutions and orders.

(j)     Unless a Traffic Consultant has been engaged by the Authority and has been serving in such role for at least thirty (30) days, on each September 15, December 15, March 15 and June 15, the Trustee will deliver a report to the Authority and AAFAF, and post such report on EMMA under the CUSIPs for the Outstanding Bonds, as to whether the required deposits were made to the Priority Authority Expense Fund and the Debt Service Fund on each Monthly Disbursement Date for the previous quarter.  In the event that any such report establishes that there were insufficient Toll Receipts to make the required deposits to the Priority Authority Expense Fund and the Debt Service Fund in such quarter, the Authority shall increase Tolls in an amount sufficient to fully fund the required deposits to the Priority Authority Expense Fund and the Debt Service Fund on each Monthly Disbursement Date, plus any deficiencies therein. Following the delivery of such report by the Trustee, the Authority shall increase Tolls as soon as practicable, but in all events such increase shall be effectuated within sixty (60) days.

**Section 7.02    Annual Budget and Disbursement Schedule**.

(a)     The Authority covenants that, so long as a Consulting Engineer and a Traffic Consultant are engaged by the Authority:

(i)     On or before April 15 in each year it shall (A) prepare (1) a preliminary Annual Budget for the next three Fiscal Years and (2) a preliminary Disbursement Schedule for the next succeeding Fiscal Year and (B) deliver copies of such preliminary Annual Budget and Disbursement Schedule to the Traffic Consultant, the Consulting Engineer, the Trustee and AAFAF.   Within forty-five (45) days of receipt of the

- 48 -

preliminary Annual Budget and Disbursement Schedule, the Traffic Consultant and the Consulting Engineer shall deliver to the Authority and AAFAF any comments thereon, as contemplated under Sections 7.04(b) and (c).

(ii)     On or before the first day of each Fiscal Year the Authority shall adopt the Annual Budget and Disbursement Schedule for that Fiscal Year reasonably incorporating the comments of the Traffic Consultant and the Consulting Engineer. The Authority shall file copies of the Annual Budget and Disbursement Schedule with the Traffic Consultant, the Consulting Engineer, the Trustee and AAFAF and shall post the same on the Authority's website and on EMMA linked to the CUSIPs for the Outstanding Bonds.

(iii)     Each Annual Budget prepared and delivered in accordance with subsection (a)(i) above, shall show in reasonable detail (A) the Toll Receipts that the Traffic Consultant projects to be received for such Fiscal Year and other Pledged Revenues estimated by the Authority to be received during each Fiscal Year provided that such projection shall take into account any increases or decreases in Toll rates for which all legal conditions to effectiveness have been satisfied, (B) the amount of Annual Debt Service for each Fiscal Year, (C) the Costs of Operation, Maintenance and Administration of the Toll Facilities that the Consulting Engineer expects to be incurred during such Fiscal Year (calculated on an accrual basis), (D) the Toll Receipts and the total amount required to be deposited in the Renewal and Replacement Fund, if any, to make the amount on deposit therein equal to the amount of the Renewal and Replacement Requirement for such Fiscal Year and (E) the amount of Toll Receipts that will be sufficient to meet the Rate Covenant required pursuant to Section 7.01(a) for such Fiscal Year. The Annual Budget shall be prepared in sufficient detail to show also the amounts to be deposited in the various funds, accounts and subaccounts created by or under this Trust Agreement.

(iv)     Each annual Disbursement Schedule prepared and delivered in accordance with subsection (a)(i) above, shall show in reasonable detail, the Required Deposits and Annual Debt Service on the Subordinated Indebtedness that the Consulting Engineer expects to be incurred during such Fiscal Year (calculated on a cash basis), including (A) all cash disbursements contained in the Annual Budget for the Fiscal Year, (B) expenses that may have accrued in prior years and are expected to be paid in the current Fiscal Year, (C) amounts that are necessary to pay for or result from an emergency condition, (D) amounts that are necessary to pay judgments or otherwise result from the settlement of litigation, and (E) other similar disbursements.

(v)     On or before each Monthly Disbursement Date or any date on which the Authority submits a requisition for the withdrawal of funds from the Operating Reserve Fund for the payment of Costs of Operation, Maintenance and Administration of the Toll Facilities, an Authorized Officer of the Authority shall revise the Disbursement Schedule and deliver a certified copy of such revised Disbursement Schedule to the Trustee, the Traffic Consultant, the Consulting Engineer and AAFAF, which schedule shall include the information required by Section 7.02(a)(iv) ***provided, however***, no such revision will be effective if such revision, together with any previous revisions in the same Fiscal Year,

- 49 -

result in a decrease of Net Receipts by more than 5%, unless the report required by clause (vi) is so provided.

(vi)     The Authority may amend the Annual Budget at any time during the Fiscal Year and any amendment which decreases Net Receipts by 5% or more in the aggregate for such Fiscal Year shall be accompanied by (i) a report of the Traffic Consultant and (b) a report of the Consulting Engineer, which reports collectively shall set forth an explanation of the amendments made to the Annual Budget (including, to the extent requested by the Consulting Engineer, with respect to Costs of Operation, Maintenance and Administration, and what actions, if any, the Authority should undertake to decrease Costs of Operation, Maintenance and Administration) and what actions, if any, the Authority should undertake to increase Net Receipts to the level set forth in such Annual Budget.  A copy of each amendment to the Annual Budget shall be filed promptly with the Trustee, the Traffic Consultant. the Consulting Engineer and AAFAF and shall be posted on EMMA linked to the CUSIPs for the Outstanding Bonds.

(vii)     The Costs of Operation, Maintenance and Administration of the Toll Facilities incurred in any Fiscal Year shall not exceed the amount of Costs of Operation, Maintenance and Administration of the Toll Facilities determined by the Consulting Engineer and set forth in the Annual Budget, as amended as provided in this Section 7.02. However, nothing in this Section shall limit the amount which the Authority may expend for Costs of Operation, Maintenance and Administration expenditures of the Toll Facilities in any year provided any amounts expended therefor in excess of the Annual Budget shall be received by the Authority from a source other than the Pledged Revenues and the Authority shall not make any reimbursement therefor from the Pledged Revenues.

(b)     The Authority covenants that, if no Consulting Engineer or no Traffic Consultant is engaged by the Authority:

(i)     On or before April 15 in each year it shall (A) prepare (1) a preliminary Annual Budget for the next three Fiscal Years and (2) a preliminary Disbursement Schedule for the next succeeding Fiscal Year and (B) deliver copies of such preliminary Annual Budget and Disbursement Schedule to the Traffic Consultant, if any, the Consulting Engineer, if any, the Trustee and AAFAF.  Within forty-five (45) days of receipt of the preliminary Annual Budget and Disbursement Schedule, the Traffic Consultant, if any, and the Consulting Engineer, if any, shall deliver to the Authority and AAFAF any comments thereon, as contemplated under Sections 7.04(b) and (c).

(ii)     On or before the first day of each Fiscal Year the Authority shall adopt the Annual Budget and Disbursement Schedule for that Fiscal Year reasonably incorporating the comments of the Traffic Consultant, if any, and the Consulting Engineer, if any.  The Authority shall file copies of the Annual Budget and Disbursement Schedule with the Traffic Consultant, if any, the Consulting Engineer, if any, the Trustee and AAFAF and shall post the same on the Authority's website and on EMMA linked to the CUSIPs for the Outstanding Bonds.

- 50 -

(iii)    Each Annual Budget prepared and delivered in accordance with subsection (a)(i) above, shall show in reasonable detail (A) the Toll Receipts that (1) the Traffic Consultant or (2) if no Traffic Consultant is then engaged by the Authority, the Authority projects to be received for such Fiscal Year and other Pledged Revenues estimated by the Authority to be received during each Fiscal Year provided that such projection shall take into account any increases or decreases in Toll rates for which all legal conditions to effectiveness have been satisfied, (B) the amount of Annual Debt Service for each Fiscal Year, (C) the Costs of Operation, Maintenance and Administration of the Toll Facilities that the Consulting Engineer expects to be incurred during such Fiscal Year (calculated on an accrual basis) or if no Consulting Engineer shall then be engaged by the Authority, the Priority Costs of Operation, Maintenance and Administration of the Toll Facilities and Shared Costs of Operation, Maintenance and Administration of the Toll Facilities, (D) the Toll Receipts and the total amount required to be deposited in the Renewal and Replacement Fund, if any, to make the amount on deposit therein equal to the amount of the Renewal and Replacement Requirement for such Fiscal Year and (E) the amount of Toll Receipts that will be sufficient to meet the Rate Covenant required pursuant to Section 7.01(a) for such Fiscal Year.  The Annual Budget shall be prepared in sufficient detail to show also the amounts to be deposited in the various funds, accounts and subaccounts created by or under this Trust Agreement.

(iv)    Each annual Disbursement Schedule prepared and delivered in accordance with subsection (a)(i) above, shall show in reasonable detail, the Required Deposits and Annual Debt Service on the Subordinated Indebtedness that the Consulting Engineer, or if no Consulting Engineer is then engaged by the Authority, that the Authority expects to be incurred during such Fiscal Year (calculated on a cash basis), including (A) all cash disbursements contained in the Annual Budget for the Fiscal Year, (B) expenses that may have accrued in prior years and are expected to be paid in the current Fiscal Year, (C) amounts that are necessary to pay for or result from an emergency condition, (D) amounts that are necessary to pay judgments or otherwise result from the settlement of litigation, and (E) other similar disbursements.

(v)    On or before each Monthly Disbursement Date or any date on which the Authority submits a requisition for the withdrawal of funds from the Operating Reserve Fund for the payment of Costs of Operation, Maintenance and Administration of the Toll Facilities, an Authorized Officer of the Authority shall revise the Disbursement Schedule and deliver a certified copy of such revised Disbursement Schedule to the Trustee, the Traffic Consultant, if any, the Consulting Engineer, if any, and AAFAF, which schedule shall include the information required by Section 7.02(b)(iv) *provided, however*, no such revision will be effective if such revision, together with any previous revisions in the same Fiscal Year, result in a decrease of Net Receipts by more than 5%, unless the report required by clause (vi) is so provided.

(vi)    The Authority may amend the Annual Budget at any time during the Fiscal Year and any amendment which decreases Net Receipts by 5% or more in the aggregate for such Fiscal Year shall be accompanied by (i) a report of the Traffic Consultant, if any, (b) a report of the Consulting Engineer, if any, and (c) a report of the Authority, which reports collectively shall set forth an explanation of the amendments made to the Annual

- 51 -

Budget (including, to the extent requested by the Consulting Engineer, if any, with respect to Costs of Operation, Maintenance and Administration, and what actions, if any, the Authority should undertake to decrease Costs of Operation, Maintenance and Administration) and what actions, if any, the Authority should undertake to increase Net Receipts to the level set forth in such Annual Budget.  A copy of each amendment to the Annual Budget shall be filed promptly with the Trustee, the Traffic Consultant, if any, the Consulting Engineer, if any, and AAFAF and shall be posted on EMMA linked to the CUSIPs for the Outstanding Bonds.

(vii)    The Priority Costs of Operation, Maintenance and Administration of the Toll Facilities incurred in any Fiscal Year shall not exceed the amount of Priority Costs of Operation, Maintenance and Administration of the Toll Facilities set forth in the Annual Budget, as amended as provided in this Section 7.02.  However, nothing in this Section shall limit the amount which the Authority may expend for Shared Costs of Operation, Maintenance and Administration expenditures of the Toll Facilities in any year provided any amounts expended therefor in excess of the Annual Budget shall be received by the Authority from a source other than the Pledged Revenues and the Authority shall not make any reimbursement therefor from the Pledged Revenues.

(c)    If for any reason the Authority has not adopted the Annual Budget before the first day of any Fiscal Year, the Annual Budget for the preceding Fiscal Year shall be deemed to be in force and shall be treated as the Annual Budget for the then-current Fiscal Year under the provisions of this Trust Agreement until the adoption of the Annual Budget for that Fiscal Year.  Such Annual Budget will be adjusted upward or downward to reflect any changes in Annual Debt Service for such then-current Fiscal Year from the preceding Fiscal Year and to take into account any increases or decreases in Toll rates for which all legal conditions to effectiveness have been satisfied.  However, notwithstanding the foregoing, the failure to adopt an Annual Budget for two (2) successive Fiscal Years shall constitute an Event of Default hereunder.

(d)    If for any reason the Authority has not adopted the Disbursement Schedule before the first day of any Fiscal Year, the Disbursement Schedule for the preceding Fiscal Year shall be deemed to be in force and shall be treated as the Disbursement Schedule for the then-current Fiscal Year under the provisions of this Trust Agreement until the adoption of the Disbursement Schedule for that Fiscal Year; provided, however, that the Disbursement Schedule for the preceding Fiscal Year shall be revised to reflect Annual Debt Service for such new Fiscal Year. However, notwithstanding the foregoing, the failure to adopt the Disbursement Schedule for two (2) successive Fiscal Years shall constitute an Event of Default hereunder.

(e)    Upon the occurrence and continuance of an Event of Default (other than an Event of Default specified in 11.01(c)), the Authority shall prepare and deliver to the Trustee a Disbursement Schedule which sets forth on a monthly cash basis the Costs of Operation, Maintenance and Administration of the Toll Facilities, which Disbursement Schedule must be approved by the Consulting Engineer.

**Section 7.03   Operation and Maintenance Covenants**.  The Authority covenants that:

(a)      it will operate and maintain the Toll Facilities in conformity with law and all requirements of all governmental authorities having jurisdiction thereover, and modifications or alterations of the Toll Facilities, including changes in design, alignment or location as may be approved by the Authority, shall not substantially increase the cost of operating the Toll Facilities or substantially affect adversely the volume or character of the traffic using the Toll Facilities; and

(b)      (i) it will establish and enforce reasonable rules and regulations governing the use and the operation of the Toll Facilities, (ii) all compensation, salaries, fees and wages paid by it in connection with the maintenance, repair and operation of the Toll Facilities will be reasonable, (iii) no more persons will be employed by it than are necessary, (iv) it will maintain and operate the Toll Facilities in an efficient and economical manner, (v) from the revenues of the Toll Facilities it will at all times maintain the Toll Facilities in good repair and in sound operating condition and will make all necessary repairs, renewals, improvements and replacements, and (vi) it will comply with all valid applicable acts, rules, regulations, orders and directions of any legislative, executive, administrative or judicial body applicable to the Toll Facilities or the Authority.

**Section 7.04   Retention of Consulting Engineer, Traffic Consultant and Other Consultants**.

(a)      The Authority covenants and agrees that it will, for the purpose of performing and carrying out the duties imposed on the Consulting Engineer, the Traffic Consultant and other consultants by this Section 7.04, use its best efforts to engage as soon as practicable and will thereafter retain the Consulting Engineer, the Traffic Consultant and other consultants; ***provided, however***, that the termination of the engagement of any  Consulting Engineer or Traffic Consultant by the Authority or the resignation of any Consulting Engineer or Traffic Consultant shall not be effective, unless and until a successor Consulting Engineer or Traffic Consultant, as applicable, shall have been appointed by the Authority and such consultant shall have accepted such appointment.  Except for fees and expenses incurred in connection with the issuance of Bonds, the cost of retaining the Consulting Engineer, the Traffic Consultant and other consultants shall be treated as a part of the Costs of Operation, Maintenance and Administration of the Toll Facilities.  If no Consulting Engineer is then engaged by the Authority, except for fees and expenses incurred in connection with the issuance of Bonds, the cost of retaining the Traffic Consultant and other consultants shall be treated as a part of the Priority Costs of Operation, Maintenance and Administration of the Toll Facilities.

(b)      It shall be the duty of the Consulting Engineer to prepare and file reports with the Authority and AAFAF, no later than forty-five (45) days after receipt of the Annual Budget, setting forth the following:

(i)      the recommendations of the Consulting Engineer as to the proper maintenance, repair and operation of the Toll Facilities during each of the next three succeeding Fiscal Years, and an estimate of the amounts of money necessary for such purposes;

- 53 -

(ii)     the recommendations of the Consulting Engineer as to the amount that should be deposited during each of the next three succeeding Fiscal Years to the credit of the Renewal and Replacement Fund; and

(iii)     the findings of the Consulting Engineer whether the Toll Facilities have been maintained in good repair and sound operating condition, and their estimate of the amount, if any, required to be expended to place such properties in such condition and the details of such expenditures and the approximate time required therefor.

(c)     It shall be the duty of the Traffic Consultant to prepare and file reports with the Authority and AAFAF, no later than forty-five (45) days after receipt of the Annual Budget, setting forth the recommendations of the Traffic Consultant as to the adequacy of the existing Toll schedule for purposes of the Rate Covenant contained in Section 7.01 hereof for the then current Fiscal Year to date and recommendations as to any necessary or advisable revisions of the Toll schedule and such other advices and recommendations as they may deem desirable.

(d)     The Authority further covenants that the Consulting Engineer, Traffic Consultant and other consultants shall at all times have free access to the Toll Facilities and every part thereof for the purposes of inspection and examination, and that its books, records and accounts may be examined by the Consulting Engineer, the Traffic Consultant and other consultants at all reasonable times.

**Section 7.05   Payment of Principal, Redemption Price and Interest.**   The Authority shall pay or cause to be paid every Secured Obligation, including Redemption Price and interest thereon, on the dates and at the places and in the manner provided herein and in the Secured Obligations according to the true intent and meaning thereof.

**Section 7.06   Extension of Payment of Secured Obligations.**   The Authority shall not directly or indirectly extend or assent to the extension of the maturity of any of the Secured Obligations or claims for interest by the purchase or funding of such Secured Obligations or claims for interest on Secured Obligations or by any other arrangement and, in case the maturity of any of such Secured Obligations or the time for payment of any such claims for interest on Secured Obligations shall be extended only with the written consent of the Holders of such Secured Obligations, such Secured Obligations, or claims for interest shall not be entitled, in case of any default hereunder, to the benefit hereof or of any Supplemental Trust Agreement or to any payment out of any assets of the Authority or the funds (except funds held in trust for the payment of particular Secured Obligations  or claims for interest pursuant hereto and to any Supplemental Trust Agreement) held by the Trustee, except subject to the prior payment of the principal of all Outstanding Secured Obligations the maturity of which has not been extended and of such portion of the interest on such Secured Obligations  as shall not be represented by such extended claims for interest.

**Section 7.07   Powers as to Secured Obligations.**   Pursuant to the Act, the Plan of Adjustment and the Confirmation Order, the Authority is duly authorized to create, issue, execute and deliver the Secured Obligations and to execute this Trust Agreement and each Supplemental Trust Agreement.  The Authority further covenants that the Trust Estate is and shall be free and clear of any pledge, lien, charge or encumbrance thereon or with respect thereto, prior to, or of

- 54 -

equal rank with, or junior to (other than as provided in Article XII), the first-priority lien on and first-priority security interest in the Trust Estate granted hereby. The Authority further covenants that all corporate action on the part of the Authority to that end has been duly and validly taken. The Authority further covenants that the Secured Obligations and the provisions hereof and of each Supplemental Trust Agreement are and shall be the valid and legally enforceable obligations of the Authority in accordance with their terms and the terms hereof and of each Supplemental Trust Agreement. The Authority further covenants that it shall not fail to at all times, to the extent permitted by law, defend, preserve and protect, or cause to be defended, preserved and protected, the lien and all of the rights of the Trustee for the benefit of the Holders of Secured Obligations under this Trust Agreement and each Supplemental Trust Agreement including, but not limited to, the first-priority lien and first-priority security interest in the Trust Estate created by this Trust Agreement against all claims and demands of all persons whomsoever.

Section 7.08  **Further Assurance.**  The Authority, at any and all times, shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the first-priority lien on and first-priority security interest in Pledged Revenues and other assets of the Trust Estate, the priority in all respects of the lien and security interest in the Trust Estate of the Bonds over the lien and security interest in the Trust Estate of the Subordinated Indebtedness and the validity, perfection and enforceability of such lien against all Persons having claims of any kind in tort, contract or otherwise against the Authority or its assets irrespective of whether such Persons have notice of such first-priority lien or first-priority security interest of the same, or which the Authority may hereafter become bound to pledge or assign.

Section 7.09  **Accounts and Audits.**  The Authority shall keep proper books of records and accounts (separate from all other records and accounts of the Commonwealth and other Government Entities), which may be kept on behalf of the Authority by the Trustee, in which complete and correct entries shall be made of the accounts and its transactions relating to each Series of Bonds, which books and accounts, at reasonable hours and subject to the reasonable rules and regulations of the Authority, shall be subject to the inspection of the Secretary of Treasury, the Trustee or of any Holder of a Secured Obligation or a representative of any of the foregoing duly authorized in writing. The Authority shall cause such books and accounts to be audited annually after the end of each Fiscal Year by a nationally recognized independent certified public accounting firm selected by the Authority. Annually within thirty (30) days after receipt by the Authority of the report of such audit, a copy of such report, signed by an Authorized Officer of the Authority, shall be furnished to the Trustee, the Oversight Board, and the Commonwealth and posted on EMMA, cross-referenced to each original issuance CUSIP number applicable to the Secured Obligations of which the Authority has knowledge.

Section 7.10  **Creation of Liens and Indebtedness.**  The Authority shall not create or cause to be created any lien, pledge, or charge on the Trust Estate other than the lien, pledge and charge on the Trust Estate created by this Trust Agreement; ***provided, however,*** that nothing contained herein shall prevent the Authority from issuing Additional Bonds in accordance with Section 2.04(a) or 2.04(b) of this Trust Agreement or additional Subordinated Indebtedness in accordance with Section 2.04(c) or 2.04(d) of this Trust Agreement; ***provided, however***, that any

- 55 -

agreements governing Subordinated Indebtedness shall provide that any right to payment, liens, or enforcement of such claims shall be junior, inferior, and subordinate in all respects to the Bonds, and shall be subject in all respects to Article XII of this Trust Agreement.

Section 7.11   **Restricted Payments.**   The Authority shall not, directly or indirectly, make any payments or distributions of the Pledged Revenues or money in the funds and accounts established hereunder except in accordance with this Trust Agreement.

Section 7.12   **Offices for Payment and Registration of Secured Obligations.**   Unless all of the Bonds are Book Entry Bonds, the Authority shall at all times maintain an office or agency in the Borough of Manhattan, in The City of New York where Bonds may be presented for payment, which office or agency may be at or through the designated ~~corporate trust office~~Corporate Trust Office of the Trustee.  The Authority may, pursuant to a Supplemental Trust Agreement, designate an additional Paying Agent or Paying Agents where Secured Obligations of the Series authorized thereby or referred to therein may be presented for payment. The Authority shall at all times maintain an office or agency in the Borough of Manhattan in The City of New York where Secured Obligations may be presented for registration, transfer or exchange and the Trustee is hereby appointed as its agent to maintain such office or agency for the registration, transfer or exchange of Secured Obligations.  The provisions of this Section shall be subject to the provisions of Section 3.01 hereof.

Section 7.13   **Payment of Lawful Charges.**   The Authority shall pay all taxes and assessments or other municipal or governmental charges, if any, lawfully levied or assessed upon the Trust Estate, when the same shall become due.

Section 7.14   **General**.   The Authority shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Authority under the provisions hereof in accordance with the terms of such provisions.

Section 7.15   **Tax Exemption Covenant**.  The Authority covenants that it shall not take any action that would, or fail to take any action, if such failure would, (a) cause the Authority to lose its status as an issuer of municipal obligations for federal income tax purposes or (b) cause interest on the Tax Exempt Bonds to become includable in gross income for federal income tax purposes and that it will do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the Holders of any Tax Exempt Bonds shall be and remain excludable from gross income for federal income tax purposes.

Section 7.16   **Enforcement of Commonwealth Covenant**.  The Authority covenants to enforce the covenant of the Commonwealth set forth in §2019 of the Act, that the Commonwealth will not limit or restrict the rights or powers vested in the Authority under the Act until all Secured Obligations, together with the interest thereon, are fully met and discharged.

Section 7.17   **Corporate Existence**.  To the extent permitted by law, the Authority shall not take any action, or fail to take any action, the result of which would be the Authority failing to keep in full effect its existence, rights, duties, obligations and franchises as a public corporation and governmental instrumentality of the Commonwealth under the laws of the Commonwealth, including, without limitation, the Act.  Without limiting the generality of the

- 56 -

immediately preceding sentence, the Authority shall not merge or consolidate, directly or indirectly, with any other legal person.

**Section 7.18    Covenant Against Sale or Encumbrance; Exception**.

No part of the Toll Facilities shall be sold, mortgaged, leased or otherwise disposed of or encumbered; provided, that:

(a)    the Authority may from time to time, sell, exchange or otherwise dispose of any machinery, fixtures, apparatus, tools, instruments or other movable property constituting a portion of the Toll Facilities, if the Authority determines that such articles are no longer needed or are no longer useful in connection with the construction or operation and maintenance of the Toll Facilities, and the proceeds thereof are applied to the replacement of the properties so sold or disposed of or are paid to be deposited in the Toll Receipts Fund and applied in accordance with Section 5.05 hereof.  The Authority may from time to time sell, exchange or otherwise dispose of any real property or release, relinquish or extinguish any interest therein as the Consulting Engineer certifies is not needed or serves no useful purpose in connection with the maintenance and operation of the Toll Facilities, and the proceeds thereof, if any, are required to be deposited in the Toll Receipts Fund and applied in accordance with Section 5.05 hereof; and

(b)    the Authority will not enter into a lease, long-term concession or other public-private partnership arrangement with respect to any real estate or personal property comprising a portion of the Toll Facilities (a "**Partial Disposition**"), unless there is delivered to the Trustee a certificate dated not earlier than thirty (30) days prior to the financial closing of any such arrangement, by an Authorized Officer of the Authority and approved by the Traffic Consultant and Consulting Engineer, setting forth (i) the amount of Net Receipts that would have been collected in the most recently completed Fiscal Year had such Partial Disposition occurred prior to the first day of such Fiscal Year provided that such projection shall take into account any increases or decreases in Toll rates for which all legal conditions to effectiveness have been satisfied; (ii) Maximum Annual Debt Service on the Secured Obligations that will remain Outstanding after such agreement become effective in accordance with its terms; and (iii) the percentages derived by dividing the amount in item (i) above by the amounts shown in item (ii) above, which percentage shall not be less than 120%.  Proceeds from a Partial Disposition remaining after the repayment of (x) Bonds in accordance with Section 4.02(b), (y) any other Secured Obligations to the extent required to be redeemed in order to maintain for the Tax-Exempt Bonds that will remain Outstanding after such Partial Disposition, the exclusion of interest on such Tax Exempt Bonds from gross income for purposes of federal income taxation and (z) if no Bonds are then Outstanding, Subordinated Indebtedness in accordance with the applicable Supplement Trust Agreement, shall be deposited in the Toll Receipts Fund and applied in accordance with Section 5.05 of this Trust Agreement.

**Section 7.19    Separateness**.  The Authority shall operate as a legally separate entity from the Commonwealth (including all public corporations, agencies, and instrumentalities thereof) and all other legal persons and as a bankruptcy remote, single purpose entity (limited to the activities authorized in the Act).  The Authority shall (a) avoid commingling the Pledged Revenues and other assets of the Authority with those of the Commonwealth or any Governmental Entity or other legal person; (b) keep the Authority By-Laws separate and in full

- 57 -

force and effect; (c) maintain separate financial statements, bank accounts, and books and records; (d) observe separate corporate governance, management and other formalities of the Authority; (e) otherwise operate as an entity that is separate and distinct from all other legal persons, including, without limitation, the Commonwealth and its other public corporations, agencies and instrumentalities; and (f) comply with the separateness covenants contained in the Authority By-Laws.

**Section 7.20   Insurance**.  The Authority covenants that it will at all times maintain, to the extent reasonably obtainable, the following kinds and the following amounts of insurance, or otherwise make provision for the payment of claims against the Authority, with such variations as shall be reasonable to be required to conform to the applicable standard or customary insurance practice including by AM Best insurers with ratings of "A+" or better , to the extent available and subject to exceptions and permissible deductions as are ordinarily required, all to be determined by the Authority in its sole discretion after consultation with its insurance consultants:

(a)      Property insurance on all real and personal property, including bridges and viaducts owned by the Authority as part of the Toll Facilities in sufficient amounts to cover direct physical loss or damage from causes normally insured against;

(b)      Liability insurance to cover injury to Persons or damage to property for claims arising out of the construction, maintenance, reconstruction, or operation of the Toll Facilities;

(c)      Business interruption insurance covering loss of Pledged Revenues for a period of at least two (2) years, due to any interruption in the use of the Toll Facilities which cause a loss of revenue to the Authority;

(d)      Any coverage which is customarily required to be maintained by any Commonwealth or federal law, including, but not limited to, workers' compensation coverage, and motor vehicle liability coverage; and

(e)      Any additional insurance which may be necessary or advisable to protect the interests of the Authority.

**Section 7.21   Compliance**.  The Authority is required to deliver to the Trustee, within one hundred-twenty (120) days after the end of each Fiscal Year or within fourteen (14) days of request, a certificate of the Authority signed by the Authorized Officer thereof indicating whether the signers thereof know of any Event of Default that occurred during the period from and including the last such certificate of the Authority or, if none, to the date hereof.  The Authority is required to deliver to the Trustee, as soon as practicable after the occurrence thereof, a certificate of the Authority signed by the Authorized Officer thereof indicating any default of which it has actual knowledge and any Events of Default, the status thereof and what action the Authority is taking or proposes to take in respect thereof.

**Section 7.22   Continuing Disclosure.**  The Authority covenants that, in connection with the delivery of the Initial Bonds hereunder, it will enter into a Reporting Agreement.  An event of

- 58 -

default under such Reporting Agreement, including the failure to timely provide the notices or information described therein shall not be an Event of Default hereunder and the exclusive remedies available to any Person shall be as described in the Reporting Agreement.

Section 7.23  **Non-Impairment**.  As required by the Confirmation Order, the Authority shall take no action under this Trust Agreement or otherwise that would (i) impair the first-priority lien and first-priority security interest on the Trust Estate, (ii) impair the senior lien and senior security interest on the Trust Estate granted to the Holders of Outstanding Bonds, which shall in all respects be senior and superior to the subordinate lien and subordinate security interest on the Trust Estate granted to the Holders of Outstanding Subordinated Indebtedness, (iii) impair or prevent the monthly deposits under Section 5.05, (iv) limit or alter the rights vested in the Authority in accordance with the Plan of Adjustment and the Confirmation Order in connection with the Secured Obligations, or (v) impair the rights and remedies of the Trustee or the Bondholders under this Trust Agreement and, in particular, Article XI.

## ARTICLE VIII.

## CONCERNING THE TRUSTEE AND THE PAYING AGENT

Section 8.01  **Appointment and Acceptance of Trustee**.  The Trustee, by its execution and delivery of this Trust Agreement, does signify its acceptance of its appointment as and of the duties and obligations of Trustee and Paying Agent imposed upon it hereby.

Section 8.02  **Appointment and Acceptance of Paying Agents**.  In addition to the Trustee, the Authority may appoint one or more Paying Agents for the Secured Obligations of any Series in the Supplemental Trust Agreement authorizing such Secured Obligations or in the manner provided herein or in such Supplemental Trust Agreement or shall appoint such Paying Agent or Paying Agents prior to the authentication and delivery of the Secured Obligations so long as any such Paying Agents satisfy the requirements set forth in Section 8.10 hereof, and may at any time or from time to time appoint one or more other Paying Agents in the manner and subject to the conditions set forth in Section 8.10 hereof for the appointment of a successor Paying Agent.  Each Paying Agent shall signify its acceptance of the duties and obligations imposed upon it hereby by written instrument of acceptance deposited with the Authority and the Trustee.

Section 8.03  **Responsibilities of Trustee and Paying Agents**.  The recitals of fact contained herein and in each Supplemental Trust Agreement and in the Secured Obligations shall be taken as the statements of the Authority and neither the Trustee nor any Paying Agent assumes any responsibility for the correctness of the same.  Neither the Trustee nor any Paying Agent makes any representations as to the validity or sufficiency hereof, of any Supplemental Trust Agreement or of any Secured Obligations, or in respect of the security afforded hereby or by each Supplemental Trust Agreement, and neither the Trustee nor any Paying Agent shall incur any responsibility in respect thereof.  Neither the Trustee nor any Paying Agent shall be under any responsibility or duty with respect to: (i) the issuance of the Secured Obligations for value; (ii) the application of the proceeds thereof except to the extent that such proceeds are received by it in its capacity as Trustee or Paying Agent; or (iii) the application of any money paid to the Authority or others in accordance herewith and with each Supplemental Trust Agreement except

- 59 -

as to the application of any money paid to it in its capacity as Trustee or Paying Agent.  Neither the Trustee nor any Paying Agent shall be liable in connection with the performance of or failure to perform its duties hereunder and under each Supplemental Trust Agreement except for its own negligence or willful misconduct.

The duties and obligations of the Trustee and any Paying Agent shall be determined by the express provisions hereof and of each Supplemental Trust Agreement and neither the Trustee nor any Paying Agent shall be liable except for the performance of or failure to perform such duties and obligations as are specifically set forth herein and in each Supplemental Trust Agreement, and no implied covenants or obligations should be read into this Trust Agreement against the Trustee.  If any Event of Default under this Trust Agreement shall have occurred and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Trust Agreement and shall use the same degree of care as a prudent person, as a trustee under a trust agreement, would exercise or use in the circumstances in the conduct of such prudent person's own affairs.

**Section 8.04   <u>Property Held in Trust</u>.**  All money and securities conveyed to or held by the Trustee <u>and Paying Agent</u> at any time pursuant to the terms hereof and of each Supplemental Trust Agreement shall be and hereby are assigned, transferred and set over unto the Trustee in trust for the purposes and under the terms and conditions hereof and of each Supplemental Trust Agreement.

**Section 8.05   <u>Rights of the Trustee and the Paying Agent</u>.**  The Trustee and any Paying Agent shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper or document reasonably believed by it in good faith to be genuine, and to have been signed or presented by the proper party or parties.  The Trustee and any Paying Agent may consult with counsel of its selection, who may or may not be of counsel to the Authority, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it in good faith and in accordance therewith.

Whenever the Trustee or any Paying Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder and under any Supplemental Trust Agreement, such matter (unless other evidence in respect thereof be specifically prescribed hereby) may be deemed to be conclusively proved and established by a certificate signed by an Authorized Officer of the Authority.  Such certificate shall be full warrant for any action taken or suffered in good faith under the provisions hereof and of the Supplemental Trust Agreement upon the faith thereof, but in its discretion the Trustee or any Paying Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as it may deem reasonable.  Except as otherwise expressly provided herein and in each Supplemental Trust Agreement, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof and of any Supplemental Trust Agreement by the Authority to the Trustee or any Paying Agent shall be sufficiently executed if executed in the name of the Authority by an Authorized Officer thereof.

The Trustee <u>and Paying Agent</u> shall not be deemed to have notice of any Event of Default hereunder unless an Authorized Officer of the Trustee has actual knowledge thereof or unless

- 60 -

written notice of any event which is in fact such an Event of Default is received by the Trustee at the designated ~~corporate trust office~~Corporate Trust Office of the Trustee and such notice references the Secured Obligations relative to which an Event of Default has occurred.

The Trustee and Paying Agent may request that the Authority deliver a certificate of an Authorized Officer of the Authority setting forth the names of individuals and their respective titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement and any Supplemental Trust Agreement, which certificate may be signed by ~~any person authorized to sign an officer's certificate, including~~ any person specified as so authorized in any such certificate previously delivered and not superseded.

Neither the Trustee nor any Paying Agent shall be under any liability for interest on any moneys received hereunder except as may be otherwise agreed upon.

Notwithstanding the effective date of this Trust Agreement or anything to the contrary in this Trust Agreement, the Trustee shall have no liability or responsibility for any act or event relating to this Trust Agreement which occurs prior to the date the Trustee formally executes this Trust Agreement and commences acting as Trustee hereunder.

The Trustee shall have no responsibility with respect to any information, statement or recital in any official statement, offering memorandum or any other disclosure material prepared or distributed with respect to the Secured Obligations, except for any information provided by the Trustee, and shall have no responsibility for compliance with any state or federal securities laws in connection with the Secured Obligations.

The Trustee shall have no liability for any action or failure to act in good faith in accordance with a direction of the Holders of a Quarter in Interest of Outstanding Bonds or Majority in Interest of Outstanding Bonds, as applicable, pursuant to the terms hereof in respect of such action or failure to act, except to the extent of its negligence or willful misconduct in connection therewith.

The Trustee and any Paying Agent shall have the right to accept and act upon instructions, including funds transfer instructions given pursuant to this Trust Agreement and delivered using Electronic Means ("**Instructions**"); *provided, however*, that the Authority shall provide to the Trustee and each Paying Agent an incumbency certificate listing officers with the authority to provide such Instructions and containing specimen signatures of such officers, which incumbency certificate shall be amended by the Authority whenever a person is to be added or deleted from the listing. If the Authority elects to give the Trustee or a Paying Agent Instructions using Electronic Means and the Trustee or such Paying Agent in its discretion elects to act upon such Instructions, the Trustee's or such Paying Agent's understanding of such Instructions shall be deemed controlling. The Authority understands and agrees that the Trustee or a Paying Agent cannot determine the identity of the actual sender of such Instructions and that the Trustee and such Paying Agent shall conclusively presume that directions that purport to have been sent by an Authorized Officer of the Authority listed on the incumbency certificate provided to the Trustee or such Paying Agent have been sent by such Authorized Officer. The Authority shall be responsible for ensuring that only Authorized Officers thereof transmit such Instructions to the Trustee or any Paying Agent and that the Authority and all Authorized Officers are solely

- 61 -

responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords or authentication keys upon receipt by the Authority. Neither the Trustee nor any Paying Agent shall be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's or such Paying Agent's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction unless due to gross negligence or willful misconduct of the Trustee. The Authority agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee or any Paying Agent, including without limitation the risk of the Trustee or such Paying Agent acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee or any Paying Agent and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Authority; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee and any Paying Agent immediately upon learning of any breach, compromise or unauthorized use of the security procedures.

**Section 8.06  Compensation and Indemnification.**  Unless otherwise provided, the Authority shall pay to the Trustee and to each Paying Agent, from time to time, such compensation as shall be agreed in writing for all services rendered by it hereunder and under the applicable Supplemental Trust Agreement, and also all reasonable and necessary expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, required to be incurred in the performance of their powers and duties hereunder and under the applicable Supplemental Trust Agreement.  The Authority shall indemnify and save the Trustee and each Paying Agent harmless against any liabilities which it may incur in the acceptance, exercise and performance of its powers and duties hereunder and under the applicable Supplemental Trust Agreement and which are not due to its negligence or willful misconduct.  None of the provisions contained herein or in any Supplemental Trust Agreement shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers, if there is reasonable ground for believing that the repayment of such funds or liability is not reasonably assured to it.  The Trustee Expenses Cap does not apply to or limit the Authority's liability under this Section for the fees, expense and indemnification of the Trustee and each Paying Agent.

The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other person employed to act hereunder.

The provisions of this Section shall survive termination of this Trust Agreement and the resignation and removal of the Trustee.

**Section 8.07  Permitted Acts.**  The Trustee may become the owner of or may deal in Bonds as fully and with the same rights as if it were not such Trustee or a Paying Agent.  The Trustee may act as depository for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, the Authority or any committee formed to protect the

- 62 -

rights of Holders of Secured Obligations or to effect or aid in any reorganization growing out of the enforcement hereof or of the Secured Obligations or any Supplemental Trust Agreement whether or not such committee shall represent the Holders of a Majority in Interest of the then Outstanding Bonds in respect of which any such action is taken.

The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys appointed with due care.

The permissive rights of the Trustee to do things enumerated in this Trust Agreement shall not be constructed as a duty unless so specified herein.

**Section 8.08  Resignation of Trustee.**  The Trustee, or any successor thereof, may at any time resign and be discharged of its duties and obligations hereunder and under each Supplemental Trust Agreement by giving not less than sixty (60) days' written notice to: (a) the Authority, and (b) the Holders of the Secured Obligations by first class mail, postage prepaid, at their last known addresses, if any, appearing on the registration books or, in the case of a Bond Insurer, at such Bond Insurer's last known address.  Such resignation shall take effect upon the date specified in such notice (which shall be no sooner than the date specified in the immediately preceding sentence) unless previously a successor shall have been appointed as provided in Section 8.10 hereof, in which event such resignation shall take effect immediately on the appointment of such successor; *provided, however,* that such resignation shall not take effect until a successor Trustee has been appointed and has accepted such appointment pursuant to Section 8.10 hereof.

**Section 8.09  Removal of Trustee.**  The Trustee and/or Paying Agent, or any successor thereof, may be removed at any time upon thirty (30) day's written notice by the Authority (provided no Event of Default has occurred or is continuing) or the Holders of a Quarter in Interest of the Outstanding Bonds, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondholders or by their attorneys-in-fact duly authorized and delivered to the Authority.  The Trustee and/or Paying Agent, or any successor thereof, may also be removed at any time for cause or any breach of trust or for acting or proceeding in violation of, or failing to act or proceed in accordance with, any provisions hereof or of any Supplemental Trust Agreement with respect to the duties and obligations of the Trustee, as applicable, by any court of competent jurisdiction upon application by the Holders of a Quarter in Interest of the Outstanding Bonds.  No removal hereunder shall take effect until a successor Trustee has been appointed and has accepted such appointment.  A copy of each instrument or order providing for the removal of the Trustee, or any successor thereof, shall be delivered by the applicable Holders to the Trustee or such successor thereof and to the Authority.

**Section 8.10  Successor Trustee and/or Paying Agent.**  In case the Trustee and/or Paying Agent, or any successor thereof, shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee and/or Paying Agent or of its property shall be appointed, or if any public officer shall take charge or control of the Trustee and/or Paying Agent or of its property or affairs, a successor may be appointed by the Holders of a Quarter in Interest of the Outstanding Bonds, by an instrument or concurrent instruments in writing signed and acknowledged by such Holders or by their attorneys-in-fact duly authorized and delivered to such successor Trustee

- 63 -

and/or Paying Agent, notification thereof being given to the Authority and the predecessor Trustee and/or Paying Agent; **provided, nevertheless,** that unless a successor Trustee and/or Paying Agent shall have been appointed by the Holders as aforesaid, the Authority by a duly executed written instrument signed by an Authorized Officer of the Authority shall forthwith appoint a Trustee and/or Paying Agent to fill such vacancy until a successor Trustee and/or Paying Agent shall be appointed by the Holders as authorized in this Section. The Trustee and/or Paying Agent shall mail a copy of the notice of any such appointment, postage prepaid, to the Holders of any Secured Obligations, at their last addresses appearing on the registry books or, in the case of a Bond Insurer, at such Bond Insurer's last known address. Any successor Trustee and/or Paying Agent appointed by the Authority shall, immediately and without further act, be superseded by a Trustee and/or Paying Agent appointed by the Holders of a Quarter in Interest of the Outstanding Bonds.

If in a proper case no appointment of a successor shall be made within forty–five (45) days after the giving of written notice in accordance with Section 8.08 hereof or after the occurrence of any other event requiring or authorizing such appointment, the Trustee and/or Paying Agent or any Holder may apply, at the expense of the Authority, to any court of competent jurisdiction for the appointment of such a successor, and such court may thereupon, after such notice, if any, as such court may deem proper, appoint such successor. Any successor appointed under the provisions of this Section shall be a bank having trust powers, a trust company or national banking association, in each case located in the State of New York and having a capital and surplus aggregating at least $50,000,000, if there be such a bank having trust powers or trust company or national banking association willing and able to accept the appointment on reasonable and customary terms and authorized by law to perform all the duties required hereby and by each Supplemental Trust Agreement.

Neither the Authority, the Commonwealth, any Government Entity nor any public corporation, agency or instrumentality of the foregoing nor any entity or person affiliated with the foregoing may be appointed as Trustee or Paying Agent hereunder.

**Section 8.11   Transfer of Rights and Property to Successor Trustee.**   Any successor appointed under the provisions of Section 8.10 hereof shall execute, acknowledge and deliver to its predecessor, and also to the Authority, an instrument accepting such appointment, and thereupon such successor, without any further act, deed or conveyance shall become fully vested with all money, estates, properties, rights, powers, duties and obligations of its predecessor hereunder and under each Supplemental Trust Agreement, with like effect as if originally appointed as Trustee. However, the Trustee then ceasing to act shall nevertheless, on request by the Authority or of such successor, and upon payment of all amounts owed to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor all the right, title and interest of such Trustee in and to any property held by it hereunder, and shall pay over, assign and deliver to such successor any money or other properties subject to the trusts and conditions set forth herein. Should any deed, conveyance or instrument in writing from the Authority be required by such successor for more fully and certainly vesting in and confirming to it any such money, estates, properties, rights, powers, duties or obligations, any and all such deeds, conveyances and instruments in writing shall, on

- 64 -

request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Authority.

**Section 8.12   Merger or Consolidation of the Trustee.**  Any company into which the Trustee may be merged or with which it may be consolidated or any company resulting from any merger or consolidation to which it shall be a party or any company to which such Trustee may sell or transfer all or substantially all of its corporate trust business, provided such company shall be a bank having trust powers or trust company or national banking association qualified to be a successor to such Trustee under the provisions of Section 8.10 hereof, shall be the successor to such Trustee, without any further act, deed or conveyance.  In the event that such entity is not so qualified, such entity shall nevertheless continue to serve as Trustee until a successor Trustee is appointed by the Holders of a Quarter in Interest of the Outstanding Bonds.

**Section 8.13   Ancillary Agreements.**   The Trustee is authorized to enter into and perform its obligations under the any Ancillary Agreement to which it is a party.

## ARTICLE IX.

## SUPPLEMENTAL TRUST AGREEMENTS

**Section 9.01   Modification and Amendment without Consent.**  Notwithstanding any other provisions of this Article IX or Article X hereof, the Authority and the Trustee may execute and deliver at any time or from time to time Supplemental Trust Agreements for any one or more of the following purposes, and each such Supplemental Trust Agreement shall become effective in accordance with its terms:

(a)   To provide for the issuance of a Series of Bonds under and in accordance with (and, for the avoidance of doubt, not in any way contrary to or inconsistent with) the provisions hereof and to prescribe the terms and conditions pursuant to which such Bonds may be issued, paid or redeemed;

(b)   To provide for the issuance of Subordinated Indebtedness and to prescribe the terms and conditions pursuant to which such Subordinated Indebtedness may be issued, paid or redeemed, the creation of any additional funds and accounts required for the payment or security thereof, and the provision of any additional rights and remedies applicable thereto; ***provided, however***, that in no event shall the provisions of such Supplemental Trust Agreement provide for any additional rights or remedies that are inconsistent with the provisions of this Trust Agreement relating to the senior lien and senior security interest on the Trust Estate granted to the Holders of Bonds, the priority of payment of such Bonds, the provisions of Article XII of this Trust Agreement and the rights and remedies applicable thereto for so long as any such Bonds remain Outstanding

(c)   To add additional covenants and agreements of the Authority for the purpose of further securing the payment of the Bonds or Subordinated Indebtedness, provided such additional covenants and agreements are not contrary to or inconsistent with the covenants and agreements of the Authority or the Commonwealth contained herein, in the Ancillary Agreements or in the Act; provided that, in respect of the Bonds, such additional covenants and

- 65 -

agreements shall be for the equal benefit and security of all Bonds, without discrimination or preference and, in respect of any Subordinated Indebtedness, in no event shall such covenants or agreements provide for any additional rights or remedies that are inconsistent with the provisions of this Trust Agreement relating to the senior lien and senior security interest in the Trust Estate granted to the Holders of Bonds, the priority of payment of such Bonds, the provisions of Article XII of this Trust Agreement and the rights and remedies applicable thereto for so long as any such Bonds remain Outstanding;

(d)     To prescribe further limitations and restrictions upon the issuance of Refunding Bonds, Additional Bonds and Subordinated Indebtedness by the Authority which are not contrary to or inconsistent with the limitations and restrictions thereon theretofore in effect including the limitations and restrictions set forth in the Act and the Plan of Adjustment;

(e)     To surrender any right, power or privilege reserved to or conferred upon the Authority by the terms hereof, provided that the surrender of such right, power or privilege is not contrary to or inconsistent with the covenants and agreements of the Authority or the Commonwealth contained herein, in the Ancillary Agreements or in the Act; provided that same shall be for the benefit and security of all Secured Obligations, without discrimination or preference except as otherwise provided herein;

(f)     To confirm, as further assurance to secure the repayment of the Secured Obligations, the first-priority lien and first-priority security interest, and the subjection to the first-priority lien and first-priority security interest, of the Authority's right title and interest in the Pledged Revenues and other assets of the Trust Estate, or any other money, investments thereof or funds, provided that such further assurance shall be for the benefit and security of all Secured Obligations, without discrimination or preference except as otherwise provided herein;

(g)     To modify any of the provisions hereof or any previously adopted Supplemental Trust Agreement to accommodate the issuance of Subordinated Indebtedness provided that such modifications do not materially and adversely affect the rights of any of the Holders of Bonds, and provided that such modifications may not conflict with Article XII of this Trust Agreement;

(h)     To modify any of the provisions hereof or of any previously adopted Supplemental Trust Agreement in any other respects, provided that such modifications shall not be effective until after all Secured Obligations of any Series of Secured Obligations Outstanding as of the effective date of such Supplemental Trust Agreement shall cease to be Outstanding, and all Secured Obligations issued under such Supplemental Trust Agreements shall contain a specific reference to the modifications contained in such subsequent Supplemental Trust Agreement;

(i)     With the consent of the Trustee, to cure any ambiguity or defect or inconsistent provision herein or to insert such provisions clarifying matters or questions arising hereunder as are necessary or desirable, provided that such modification shall not, in the opinion of Transaction Counsel to be provided in accordance with the last paragraph of this Section 9.01, materially adversely affect the interests of the Bondholders or holders of Subordinated Indebtedness in any respect.

- 66 -

Notwithstanding the above, no Supplemental Trust Agreement authorized by this Section 9.01 shall be effective unless and until it is executed by both the Trustee and the Authority and the Authority has delivered to the Trustee an opinion of Transaction Counsel to the effect that the execution of the Supplemental Trust Agreement will not adversely affect: (i) the excludability of interest on the Tax Exempt Bonds from gross income of the Holders for federal income tax purposes, and (ii) with respect to a modification or amendment made pursuant to paragraphs (b) – (f) above, the rights of the Holders of the Secured Obligations in any other materially adverse respect.

For the avoidance of doubt, no Supplemental Trust Agreement shall be permitted pursuant to this Section 9.01 to the extent it would effectuate a modification or amendment that is only permitted under Section 10.01 with the consent of each affected Holder.

**Section 9.02  Supplemental Trust Agreements Effective with Consent of Bondholders.**  The provisions hereof may also be modified or amended at any time or from time to time by a Supplemental Trust Agreement, subject to compliance with Section 10.01 of this Trust Agreement, such Supplemental Trust Agreement to become effective upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Authority.

**Section 9.03  General Provisions Relating to Supplemental Trust Agreements.**  This Trust Agreement shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article IX, Article X or Section 7.08 hereof.  Nothing contained in this Article IX or Article X hereof shall affect or limit the rights or obligations of the Authority to make, do, execute or deliver any Supplemental Trust Agreement, act or other instrument pursuant to the provisions of Section 7.08 hereof or the right or obligation of the Authority to execute and deliver to the Trustee or any Paying Agent any instrument elsewhere herein provided or permitted to be delivered to the Trustee or any Paying Agent.

A copy of every Supplemental Trust Agreement, when filed with the Trustee for the Trustee's execution, shall be accompanied by the opinion of Transaction Counsel required by Section 9.01, the Rating Confirmation, if any is required by Section 9.01(j), and an opinion of Transaction Counsel stating that such Supplemental Trust Agreement has been duly and lawfully adopted in accordance with the provisions hereof, is authorized or permitted hereby and is valid and binding upon the Authority and enforceable in accordance with its terms.  The Trustee shall be fully protected in relying on such an opinion of Transaction Counsel.

Notwithstanding anything to the contrary herein, no Supplemental Trust Agreement shall become effective without the written consent of the Trustee.

The Authority, as soon as practicable after a Supplemental Trust Agreement changing, amending or modifying any provisions of this Trust Agreement has become effective, shall give written notice thereof to each Rating Service then providing a rating on the Outstanding Bonds at the request of the Authority and shall post a copy of such Supplemental Trust Agreement on the Authority's website and EMMA under the CUSIPs for the Outstanding Bonds.

## ARTICLE X.

## AMENDMENTS OF TRUST AGREEMENT

**Section 10.01  Powers of Amendment.**

(a)      Except as provided in Section 9.01 hereof, any modification or amendment hereof and of the rights and obligations of the Authority and of the Holders of the Secured Obligations hereunder may only be made by a Supplemental Trust Agreement, with the written consent given as hereinafter provided in Section 10.02 hereof, (i) of the Holders of at least a Majority in Interest of the Bonds Outstanding at the time such consent is given, or (ii) in case less than all of the Series of Secured Obligations then Outstanding are affected by the modification or amendment, of the Holders of at least a Majority in Interest of the Bonds of each Series so affected and Outstanding at the time such consent is given; ***provided, however,*** that if such modification or amendment will, by its terms, not take effect so long as any Secured Obligations of any specified like Series, maturity and tenor remain Outstanding, the consent of the Holders of such Secured Obligations shall not be required and such Secured Obligations shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under the definition of Majority in Interest for purposes of this Section.

(b)      No such modification or amendment shall, without the prior written consent of the Holder of such Secured Obligation, permit a change in the provisions related to the timing or amount of any payment on the Secured Obligations, including, without limitation, any change in the currency to be used to pay Principal of and interest on the Secured Obligations, any change in the amount or date of any Sinking Fund Installment, payment of Principal or any other payment, the terms of redemption or maturity of the principal of any Outstanding Secured Obligations or of any installment of interest thereon or a reduction in the principal amount or the Redemption Price thereof or in the rate of interest thereon.  Further, no such modification or amendment shall (i), without the prior written consent of the Holder of such Secured Obligation, reduce the percentages or otherwise affect the classes of Secured Obligations the consent of the Holders of which is required to effect any such modification or amendment, create a lien upon or pledge of the Trust Estate (other than the liens created under this Trust Agreement), create a preference of priority of any Bond or Bonds over any other Bond or Bonds, to create a preference or priority of any Subordinated Indebtedness over any Bond or Bonds, or to otherwise modify the covenant in section 7.10 and (ii) materially adversely affect the rights of any holder of Bonds or Subordinated Indebtedness without the prior written consent of such holder of Bonds or Subordinated Indebtedness. Further, no waiver of any default or compliance with any provision of this Section 10.01(b) shall be granted without the prior written consent of the Holder of such Secured Obligation.

(c)      For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment hereof if the same adversely affects or diminishes the rights of the Holders of Secured Obligations of such Series in any respect.  The Trustee may in its discretion reasonably determine whether or not, in accordance with the foregoing provisions, the Secured Obligations of any particular Series or maturity would be affected by any modification or amendment hereof and any such determination shall be binding and conclusive on the Authority and all Holders of Secured Obligations.  If the Trustee does not make such a determination, the

- 68 -

Trustee shall obtain an opinion of Transaction Counsel as to whether the Secured Obligations of any particular Series or maturity would be so affected by any such modification or amendment hereof, which such opinion shall be binding and conclusive on the Authority and all Holders of Secured Obligations.

**Section 10.02  Consent of Holders of Secured Obligations.**  The Authority may at any time execute and deliver a Supplemental Trust Agreement making a modification or amendment permitted by the provisions of Section 10.01 hereof to take effect when and as provided in this Section.  Upon the adoption of such Supplemental Trust Agreement, a copy thereof, certified by an Authorized Officer of the Authority shall be filed with the Trustee for the inspection of the Holders of Secured Obligations.  A copy of such Supplemental Trust Agreement (or summary thereof or reference thereto in form approved in writing by the Trustee) together with a request to Holders of Secured Obligations, to the extent required hereby, for their consent thereto in form satisfactory to the Trustee, shall be mailed or distributed by Electronic Means by the Authority to each affected Holder of Secured Obligations.  Such Supplemental Trust Agreement shall not become effective until (a) there shall have been filed with the Trustee (i) the written consent of the Holders of the percentages of Outstanding Secured Obligations specified in Section 10.01 hereof and (ii) the opinions of Transaction Counsel required by Section 9.03 and (b) a notice shall have been mailed or distributed by Electronic Means as hereinafter in this Section provided.  Any such consent shall be binding upon the Holder of the Secured Obligations giving such consent and on any subsequent Holder of such Secured Obligations (whether or not such subsequent Holder has notice thereof).  At any time after the Holders of the required percentages of Secured Obligations shall have filed their consent to the Supplemental Trust Agreement, notice, stating in substance that the Supplemental Trust Agreement has been consented to by the Holders of the required percentages of Bonds and will be effective as provided in this Section, shall be given by the Trustee to the Holders of Secured Obligations by mailing such notice to Holders of Secured Obligations or by Electronic Means.  The Authority shall file with the Trustee proof of giving such notice.  Such Supplemental Trust Agreement shall be deemed conclusively binding upon the Authority and the Holders of all Secured Obligations at the expiration of sixty (60) days after the filing with the Trustee of the proof of the giving of such notice, except in the event of a final decree of a court of competent jurisdiction setting aside such consent in legal action or equitable proceeding commenced for such purpose within such sixty (60) day period; *provided, however*, that the Authority during such sixty (60) day period and any such further period during which any such action or proceeding may be pending shall be entitled in its absolute discretion to take such action, or to refrain from taking such action, with respect to such Supplemental Trust Agreement as it may deem expedient.

**Section 10.03  Modifications by Unanimous Consent.**  The terms and provisions hereof and the rights and obligations of the Authority and of the Holders of the Secured Obligations may be modified or amended in any respect upon the execution, delivery and filing with the Trustee by the Authority of a copy of a Supplemental Trust Agreement certified by an Authorized Officer of the Authority and the consent of the Holders of all of the Secured Obligations then Outstanding, such consent to be given as provided in Section 10.02.

**Section 10.04  Mailing**.  Any provision in this ~~Article X~~Agreement for the mailing of a notice or other document to Holders of Secured Obligations shall be fully complied with if it is mailed postage prepaid or distributed by Electronic Means only (a) to each registered owner of

- 69 -

Secured Obligations then Outstanding at such person's address, if any, appearing upon the registry books of the Authority, (b) to the Trustee, and (c) to the Bond Insurer at its last known address.

Section 10.05 **Exclusion of Secured Obligations**.  Secured Obligations owned or held by or for the account of the Authority shall not be deemed Outstanding for the purpose of consent or other action provided for herein, and the Authority shall not be entitled with respect to such Bonds to give any consent or take any other action provided for herein.  At the time of any consent or other action taken hereunder, the Authority shall furnish the Trustee a certificate of an Authorized Officer of the Authority, upon which the Trustee may rely, describing all Secured Obligations so to be excluded.

Section 10.06 **Notation on Secured Obligations**.  Secured Obligations delivered after the effective date of any action taken as provided in Article IX hereof or this Article X may, if the Trustee so determines, shall, bear a notation by endorsement or otherwise in form approved by the Authority and the Trustee as to such action, and in that case upon demand of the Holder of any Bond Outstanding at such effective date and upon presentation of his Secured Obligation for such purpose at the designated ~~corporate trust office~~Corporate Trust Office of the Trustee suitable notation shall be made on such Secured Obligation by the Trustee as to any such action. If the Authority or the Trustee shall so determine, new Secured Obligations so modified as, in the opinion of the Trustee and the Authority, conform to such action shall be prepared and delivered, and upon demand of the Holder of any Secured Obligations then Outstanding shall be exchanged, without cost to such Holder, for Secured Obligations of the same Series and maturity then Outstanding, upon surrender of such Secured Obligations.

## ARTICLE XI.

## DEFAULTS AND REMEDIES

Section 11.01 **Events of Default**.  An Event of Default shall exist hereunder and under each Supplemental Trust Agreement (herein called "**Event of Default**") if:

(a)    Payment of the Principal or Redemption Price of any Bond shall not be made by the Authority when the same shall become due and payable, either at maturity or by proceedings for redemption or otherwise; or

(b)    Payment of an installment of interest on any Bond shall not be made by the Authority when the same shall become due and payable; or

(c)    Except under Sections 11.01(f), (g) and (h), the Authority shall default in the due and punctual performance of any of the covenants, conditions, agreements and provisions contained herein or in the Bonds or in any Supplemental Trust Agreement on the part of the Authority to be performed and such default shall continue for sixty (60) days after written notice specifying such default and requiring same to be remedied shall have been given to the Authority by the Trustee, which may give such notice in its discretion and shall give such notice at the written request of the Holders of not less than a Quarter in Interest of the Outstanding Bonds, unless, if such default is capable of being cured but is not capable of being cured within sixty

- 70 -

(60) days, the Authority has commenced to cure such default within sixty (60) days and does cure such default within ninety (90) days of the date the default initially occurred, ***provided, however***, that the cure period for non-compliance with the Rate Covenant shall be the periods established in Section 7.01 (e) of this Trust Agreement; or

(d)    The Authority, pursuant to or within the meaning of any U.S., federal or Commonwealth insolvency, bankruptcy, reorganization, restructuring receivership or any other form of debtor relief law, including without limitation, PROMESA (collectively, "**Bankruptcy Laws**"):

(i)    commences Bankruptcy Proceedings to be adjudicated bankrupt or insolvent;

(ii)    consents to the institution of Bankruptcy Proceedings against it;

(iii)    files, or consents to the filing of, a petition or answer or consent seeking an arrangement of debt, reorganization, dissolution, winding up or relief under applicable Bankruptcy Law;

(iv)    consents to the appointment of a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of it or for all or any substantial part of its property;

(v)    makes a general assignment for the benefit of its creditors;

(vi)    takes any corporate or similar action in furtherance of any of the foregoing; or

(vii)    admits in writing the inability to pay its debts as they mature or is otherwise insolvent;

(e)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i)    is for relief against the Authority in a proceeding in which the Authority is to be adjudicated bankrupt or insolvent;

(ii)    approves as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Authority under any Bankruptcy Law;

(iii)    appoints a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of the Authority for all or any substantial part of the property of the Authority;

(iv)    orders the liquidation, dissolution or winding up of the Authority and the order or decree remains unstayed and in effect for 60 consecutive days; or

- 71 -

(f)      the Authority permits the validity or effectiveness of this Trust Agreement or the Bonds to be impaired, and such impairment affects the enforceability of or payments on the Bonds, or the Authority or the Commonwealth to be released from any covenants or obligations with respect to the Bonds; or

(g)      the Authority shall default in the due and punctual performance of any of its covenants contained in Sections 7.01(e) (subject to the cure period therein) and 7.06 hereof;

(h)      the first-priority lien on the Trust Estate shall at any time and for any reason cease to be in full force and effect or a final judgment shall be rendered which shall declare such first-priority lien to be null and void or shall declare that such first-priority lien on the Trust Estate does not establish in any material respect the lien it purports to establish; or

(i)      the occurrence of a Subordinated Payment Default; ***provided, however,*** that such Subordinated Payment Default shall not be an Event of Default under this Agreement for so long as any Bonds remain Outstanding hereunder.

**Section 11.02  <u>No Acceleration with Respect to the Secured Obligations</u>.**  There shall be no right of acceleration with respect to the Secured Obligations.

**Section 11.03  <u>Enforcement of Remedies</u>.**

(a)      If an Event of Default occurs and is continuing, the Trustee shall make payments in accordance with Section 11.04 below.

(b)      If an Event of Default described in clauses (d) or (e) of Section 11.01, occurs the automatic stay is deemed waived with respect to Net Receipts held in the funds and accounts established in this Trust Agreement (other than Net Receipts on deposit in the Arbitrage Rebate Fund).

(c)      If an Event of Default occurs and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Bonds shall proceed to protect and enforce its rights and the rights of the Holders by such of the following remedies as the Trustee shall deem most effective to protect and enforce such rights or such of the following remedies as Holders holding not less than a Quarter in Interest of the Outstanding Bonds shall instruct:

(i)      initiation of Proceedings to (A) collect all amounts due in respect of the Bonds limited, upon recovery thereunder, to the Trust Estate; (B) enforce any and all rights of the Holders, (C) enforce any covenant or agreement in this Trust Agreement, or (D) enforce any other remedy or legal or equitable right vested in the Trustee or the Holders by this Trust Agreement, the Act or other applicable law;

(ii)      enforcement of the lien of this Trust Agreement and enforcement of the Authority's rights or remedies in respect of the Trust Estate to the same extent as the Authority;

- 72 -

(iii)    by action or suit in law or in equity for specific performance of any covenant or agreement contained in this Trust Agreement or in aid or execution of any power granted in this Trust Agreement or for the enforcement of any proper legal or equitable remedy, as the Trustee shall deem to be most effectual to protect and enforce such rights; or

(iv)    by action or suit in law or in equity or to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondholders.

(d)    In any Proceedings brought by the Trustee (and also any Proceedings involving the interpretation of any provision of this Trust Agreement to which the Trustee shall be a party), the Trustee shall be held to represent all the Holders, and it shall not be necessary to make any Holder a party to any such Proceedings.

(e)    If an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under this Trust Agreement at the request or direction of any of the Holders if the Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities which might be incurred by it in complying with such request.

In the enforcement of any remedy hereunder and under each Supplemental Trust Agreement the Trustee shall be entitled to sue for, enforce payment of, and receive any and all amounts then, or during any default becoming, and at any time remaining, due from the Authority for Principal or interest or otherwise under any of the provisions of this Trust Agreement or of any Supplemental Trust Agreement or of the Secured Obligations, with interest on overdue payments of the Principal of or interest on the Secured Obligations at the rate or rates of interest specified in such Secured Obligations, together with any and all costs and expenses of collection and of all proceedings hereunder and under any Supplemental Trust Agreement and under such Secured Obligations, including the fees and expenses of the Trustee and its attorneys and other agents, without prejudice to any other right or remedy of the Trustee or of the Holders of such Secured Obligations, and to recover and enforce judgment or decree against the Authority but solely as provided herein, in any Supplemental Trust Agreement and in such Secured Obligations, for any portion of such amounts remaining unpaid, with interest, costs and expenses, and to collect in any manner provided by law, the money adjudged or decreed to be payable.

**Section 11.04 <u>Priority of Payments after Default</u>.** Notwithstanding anything in this Trust Agreement to the contrary, following the occurrence and continuance of an Event of Default, if at any time the moneys in the Debt Service Fund, the General Reserve Fund, the Renewal and Replacement Fund, the Operating Reserve Fund and the Subordinated Indebtedness Fund shall not be sufficient to pay the principal of, the redemption premium (if any), or the interest on the Bonds as the same are then due and payable, such money, together with any money then available or thereafter becoming available for such purposes (including all Toll Receipts), whether through the exercise of remedies provided for this Article XI or otherwise, shall be applied, as follows:

*First*:  To the payment of reasonable amounts due to the Trustee and Paying Agents under Section 8.06;

- 73 -

*Second*:  To the Authority, in each month, an amount equal to the amount set forth in the Disbursement Schedule prepared in accordance with Section 7.02(e) to pay Costs of Operation, Maintenance and Administration of the Toll Facilities for the next succeeding two months, to the extent not paid pursuant to clause First above;

*Third*, *Pro rata*:

(A)    To the payment to the Bondholders of all installments of interest on the Bonds then due (including amounts previously due but not yet paid) in the order of the maturity of the installments of such interest, and, if the amount available shall not be sufficient to pay in full any installment, then to the payment thereof ratably, according to the amounts due on such installment, to the Bondholders, without any discrimination or preference; and

(B)    To the payment to the persons entitled thereto of the unpaid Principal or Redemption Price of any Bonds which shall have become due whether at maturity or by call for redemption in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such amounts due on any such due date, then to the payment thereof ratably, according to the amount of Principal or Redemption Price due on such date, to the persons entitled thereto, without any discrimination or preference.

*Fourth*, *Pro rata*:

(A)    To the payment to the Holders of Subordinated Indebtedness, all installments of interest on the Subordinated Indebtedness then due (including amounts previously due but not yet paid) in the order of the maturity of the installments of such interest, and, if the amount available shall not be sufficient to pay in full any installment, then to the payment thereof ratably, according to the amounts due on such installment, to the Holders of Subordinated Indebtedness without any discrimination or preference; and

(B)    To the payment to the persons entitled thereto of the unpaid Principal or Redemption Price of any Subordinated Indebtedness which shall have become due whether at maturity or by call for redemption in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such amounts due on any such due date, then to the payment thereof ratably, according to the amount of Principal or Redemption Price due on such date, to the persons entitled thereto, without any discrimination or preference.

Whenever money is to be applied by the Trustee pursuant to the provisions of this Section, such money shall be applied by the Trustee at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such money available for application and the likelihood of additional money becoming available for such application in the future.  The setting aside of such money in trust for application in accordance with the provisions of this Section shall constitute proper application by the Trustee, and the Trustee shall incur no liability whatsoever to the Authority, to any Holder of Secured Obligations or to any other person for any delay in applying any such money so long as the Trustee acts with reasonable diligence, having due regard to the circumstances, and ultimately applies the same in

- 74 -

accordance with such provisions hereof as may be applicable at the time of application by the Trustee.  Whenever the Trustee shall exercise such discretion in applying such money, it shall fix the date (which shall be on an Interest Payment Date unless the Trustee shall deem another date more suitable) upon which such application is to be made, and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue.  The Trustee shall give such notice as it may deem appropriate of the fixing of any such date.

Amounts held by the Trustee after payments to be made pursuant to this Section 11.04 have been made and no Secured Obligations are Outstanding and unpaid shall be paid and applied in accordance with Section 5.05 hereof.

Section 11.05  **Termination of Proceedings.**  In case any proceedings commenced by the Trustee on account of any default shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee, then and in every such case the Authority, the Trustee and the Bondholders shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no such proceeding had been commenced.

Section 11.06  **Bondholders' Direction of Proceedings.**  Anything herein to the contrary notwithstanding, the Holders of a Quarter in Interest of the Outstanding Bonds shall have the right by an instrument in writing executed and delivered to the Trustee, to direct the choice of remedies and the time, method and place of conducting any proceeding for any remedy available to the Trustee hereunder, under each Supplemental Trust Agreement or otherwise, or exercising any trust or power conferred upon the Trustee, including the power to direct or withhold directions with respect to any remedy available pursuant to Section 11.03, provided, (i) such direction shall not be otherwise than in accordance with law and the provisions hereof and of each Supplemental Trust Agreement, (ii) that the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction, and (iii) that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondholders not parties to such direction.

Section 11.07  **Control by Holders of Bonds; Limitations**.  No Holder of any of the Secured Obligations shall have any right to institute any suit, action or proceeding in equity or at law for the execution of any trust hereunder, or for any other remedy hereunder unless such Holder previously shall have given to the Trustee written notice of the Event of Default on account of which such suit, action or proceeding is to be instituted, and unless also the Holders of not less than a Quarter in Interest of the Outstanding Bonds, shall have made written request to the Trustee after the right to exercise such powers or right of action, as the case may be, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted hereby or to institute such action, suit or proceeding in its or their name, and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time (and in no event shall a delay of more than thirty (30) days be deemed reasonable for such purposes) after receipt thereof.  Such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts hereof or for any other remedy hereunder and in equity or at law.  Notwithstanding the right of the Holders to

- 75 -

direct proceedings in accordance with Section 11.06 above, it is understood and intended that, no one or more Holders of the Secured Obligations secured hereby shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security hereof, and that all proceedings at law or in equity shall be instituted and maintained for the benefit of all Holders of the Outstanding Secured Obligations. Notwithstanding any other provision hereof and subject in all respects to Article XII of this Trust Agreement, the Holder of any Secured Obligation shall have the right which is absolute and unconditional to receive payment of the Principal of (and redemption premium, if any) and interest on such Bond on the stated maturity expressed in such Secured Obligation (or, in the case of redemption, on the redemption date or, in the case of interest, on the Interest Payment Date on which such interest is due) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

**Section 11.08** **Actions by Trustee; Possession of Secured Obligations by Trustee Not Required.** All rights of action hereunder or under any of the Secured Obligations secured hereby and thereby, enforceable by the Trustee, may be enforced by it without the possession of any of such Secured Obligations or the production thereof at the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of the Secured Obligations to which such action relates, subject to the provisions hereof.

**Section 11.09** **Waiver and Non–Waiver of Default**. No delay or omission of the Trustee or any Bondholder to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein. Every power and remedy given by this Article XI to the Trustee and the Bondholders, respectively, may be exercised from time to time and as often as may be deemed expedient.

The Trustee may, and upon written request of the Holders of not less than a Majority in Interest of the Outstanding Bonds, shall waive any default which in its opinion shall have been remedied before the entry of final judgment or decree in any suit, action or proceeding instituted by it under the provisions hereof or before the completion of the enforcement of any other remedy hereunder; *provided, however,* the Trustee may not waive any default if it has received a direction from not less than a Majority in Interest of the Outstanding Bonds that such default may not be waived by the Trustee; *provided, further,* that no such waiver shall extend to or affect any other existing or any subsequent default or defaults or impair any rights or remedies consequent thereon.

**Section 11.10** **Notice of Event of Default**. The Trustee shall give notice of each Event of Default or Subordinated Payment Default hereunder known to the Trustee to the Authority and AAFAF, within ten (10) days after knowledge of the occurrence thereof and to the Holders of Secured Obligations within thirty (30) days after knowledge of the occurrence thereof, unless such Event of Default or Subordinated Payment Default shall have been remedied or cured before the giving of such notice; *provided, however*, that failure to provide notice to the AAFAF of any Event of Default shall in no way limit the exercise of remedies by the Trustee or Bondholders. In the case of the Holders of the Secured Obligations, each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof to all registered Holders

- 76 -

of Secured Obligations, as the names and addresses of such Holders appear on the books for registration and transfer of Secured Obligations as kept by the Trustee and to the Bond Insurer at its last known address.  The Trustee shall not be deemed to have knowledge of an Event of Default unless the Trustee receives notice of the Event of Default from the Authority or any of the Holders.

Section 11.11 **Remedies Not Exclusive**.  No remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity, by statute or by contract.

## ARTICLE XII.

## SUBORDINATION

Section 12.01 **Agreement to Subordinate**.  The indebtedness evidenced by all Subordinated Indebtedness, and any liens or property interests securing such Subordinated Indebtedness, shall be junior, inferior, and expressly subordinate in all respects to and subject in all respects to the prior payment in full of the Bonds and to any liens securing the Bonds, except as set forth below, and the holder of any Subordinated Indebtedness whether upon original issue or upon transfer or assignment thereof accepts and agrees to be bound by such provision. Notwithstanding any defect or deficiencies in, or failure to perfect or lapse in perfection of, or avoidance as a fraudulent conveyance or otherwise of, any liens securing the Bonds, and regardless of any Bankruptcy Proceeding, any liens securing the Subordinated Indebtedness shall be junior and subordinate in all respects to any liens securing the Bonds. Subject in all respects to the provisions of this Article XII and to the express subordination of the Subordinated Indebtedness to the senior lien and senior security interest in the Trust Estate pledged to the payment of the Bonds provided for in this Trust Agreement, holders of Subordinated Indebtedness shall be entitled to receive payments of principal and interest with respect to the Subordinated Indebtedness and to seek specific performance thereof.  Each provision in this Article XII shall constitute a subordination agreement for purposes of section 510(a) of the Bankruptcy Code.

Section 12.02 **Distributions in Bankruptcy Proceedings**.  Upon any payment or distribution of any kind in any Bankruptcy Proceeding (including, without limitation, any plan distributions, interim distributions, or adequate protection), or otherwise:

(a)	All Bonds (including principal, interest, premiums, and fees on such Bonds due or to become due, absolute or contingent, now existing or hereafter arising, and including interest, premiums, and fees that accrue after the commencement of any Bankruptcy Proceeding, regardless of whether such interest, premiums, and fees are allowed claims in such proceeding) shall first be paid or duly provided for to the extent of such payment or  distribution before any payment or distribution of any kind is made upon the indebtedness evidenced by the Subordinated Indebtedness;

(b)	Any payment or distribution of assets of the Authority of any kind or character, whether in cash, property, securities, or any other form of consideration to which the Holders of the Subordinated Indebtedness would be entitled except for the provisions of this Article,

- 77 -

including any such payment or distribution which may be payable or deliverable by reason of the payment of any other indebtedness of the Authority being subordinated to the payment of the Subordinated Indebtedness, shall be paid by the liquidating trustee or agent or other person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the holders of the Bonds, to the extent necessary to provide for the payment of all Bonds in full before any payment is made upon the indebtedness evidenced by the Subordinated Indebtedness;

(c)     In the event that, any payment or distribution of any kind shall be received by the Trustee or by the holders of the Subordinated Indebtedness in respect of any Subordinated Indebtedness before all Bonds are paid or duly provided for in full, such payment or distribution shall be segregated and held in trust and forthwith shall be paid over to the holders of the Bonds for application to the payment thereof until such Bonds shall have been paid or provision for such payment shall have been made in full;

(d)     For purposes of this Article XII, all references to payment of Bonds in full shall include all principal, interest, premiums, and fees on such Bonds due or to become due, absolute or contingent, now existing or hereafter arising, and including interest, premiums, and fees that accrue after the commencement of any Bankruptcy Proceeding, regardless of whether such interest, premiums, and fees are allowed claims in such proceeding; and

(e)     Notwithstanding any other provision to the contrary herein, if an Event of Default described in clauses (a) through (h) of Section 11.01 of this Trust Agreement has occurred and is continuing, all Holders of the Subordinated Indebtedness and any representatives for such Subordinated Indebtedness hereby agree that unless and until the Bonds have been paid in full, they shall not exercise any rights or remedies or take any action or proceeding to collect or enforce any of the Subordinated Indebtedness or any liens securing such Subordinated Indebtedness.

**Section 12.03 Prohibition on Contesting Liens and Claims.**     Each Holder of Subordinated Indebtedness and each representative of the Holders of such Subordinated Indebtedness, agrees that it will not (and hereby waives any right to) directly or indirectly contest or support any other Person in contesting, in any proceeding (including any Bankruptcy Proceeding), the priority, validity, perfection, extent or enforceability of any claims of the ~~holders~~Holders of Bonds or the Trustee or any lien held, or purported to be held, by or on behalf of any of the Trustee or the ~~holders~~Holders of the Bonds in the Trust Estate pursuant to this Trust Agreement.  Until the Bonds have been discharged and paid in full, so long as an Event of Default (other than an Event of Default described in Section 11.01(i), provided that no other Events of Default described in Section 11.01 have occurred and be continuing) shall have occurred and be continuing, no Holder of Subordinated Indebtedness or any representative of the Holders of such Subordinated Indebtedness will assert any marshaling, appraisal, valuation or other similar right that may otherwise be available to a junior secured creditor; ***provided, however,*** that if an Event of Default (other than an Event of Default described in Section 11.01(i)) has occurred and is continuing and the Trustee (on behalf of the Holders of Bonds) or the Holders of Bonds (to the extent permitted by Section 11.07) exercise remedies, the Holders of Subordinated Indebtedness may join in such actions, but only if their participation is not in

- 78 -

opposition to, and does not otherwise conflict with, the relief sought by the Holders of the Bonds or the Trustee, as applicable.

**Section 12.04  Post-Petition Interest**.  Each of the parties hereto hereby acknowledges and agrees that the Holders of Bonds shall be entitled to receive, in addition to amounts distributed to them in respect of principal, prepetition interest and other claims, all amounts owing in respect of post-petition interest regardless of whether such amounts are allowed in any Bankruptcy Proceeding (including, without limitation, any additional interest payable pursuant to this Trust Agreement, the Bonds, or any Ancillary Agreements, arising from or related to a default, which is disallowed as a claim in any Bankruptcy Proceeding), if any, before any distribution is made in respect of the claims held by the Holders of Subordinated Indebtedness with respect to the Trust Estate, with Holders of Subordinated Indebtedness or any representative thereof hereby acknowledging and agreeing to turn over to the Trustee, for itself and on behalf of each other Holder of Bonds, any portion of the Trust Estate otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Holders of Subordinated Indebtedness.

## ARTICLE XIII.

## DEFEASANCE

**Section 13.01  Defeasance.**  (a) If the Authority shall pay or cause to be paid to the Holder of a Secured Obligation the Principal or Redemption Price of and interest thereon, at the times and in the manner stipulated therein, herein, and in the applicable Supplemental Trust Agreement, then all rights granted hereby and by the Act to such Secured Obligation shall be discharged and satisfied.  In such event, the Trustee shall, upon the request of the Authority, execute and deliver such documents to evidence such discharge and satisfaction as may be reasonably required by the Authority, and all money or investments thereof held by it pursuant hereto and to the applicable Supplemental Trust Agreement which are being held for the sole benefit of such Secured Obligations and which are not required for the payment or redemption of Secured Obligations of the same Series as such Secured Obligation shall be applied by the Trustee as follows: first, to the Arbitrage Rebate Fund, the amount required to be deposited therein in accordance with the direction of an Authorized Officer of the Authority, second, to the Debt Service Fund, to the extent the amount then on deposit therein is less than Annual Debt Service for the then current Fiscal Year, and third, to the extent not required to be deposited in the Arbitrage Rebate Fund or the Debt Service Fund, at the direction of the Authority, shall be transferred to any other fund or account established pursuant hereto.

(b)     Secured Obligations for the payment or redemption of which money shall have been set aside and shall be held in trust by the Trustee (through deposit of money for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section.  All Outstanding Secured Obligations of any Series or any maturity within a Series or a portion of a maturity within a Series shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section if:

- 79 -

(i)       in case any of said Secured Obligations are to be redeemed on any date prior to their maturity, the Authority shall have given to the Trustee, in form satisfactory to it, irrevocable instructions to give as provided in Article IV hereof notice of redemption on said date of redemption of such Secured Obligations; and

(ii)      there shall have been deposited with the Trustee either money in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due will provide money which, together with the money, if any, deposited with the Trustee at the same time, shall be sufficient in the judgment of a nationally recognized verification agent to pay when due the Principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be; and

(iii)     in the event said Secured Obligations are not by their terms subject to redemption within the next succeeding sixty (60) days, the Authority shall have given the Trustee, in form satisfactory to it, irrevocable instructions to give, as soon as practicable, by first class mail, postage prepaid, to the Holders of said Secured Obligations at their last known addresses appearing on the registration books, a notice to the Holders of such Secured Obligations that the deposit required by (II) above has been made with the Trustee and that said Secured Obligations are deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which money is to be available for the payment of the Principal or Redemption Price, if applicable, of and interest on said Secured Obligations; and

(iv)      the Authority shall have delivered to the Trustee an opinion of Transaction Counsel to the effect that (A) any Secured Obligation having been deemed to have been paid as provided in this Section is no longer Outstanding hereunder and is no longer secured by or entitled to the benefits of this Trust Agreement, (B)  such defeasance is in accordance with the terms hereof and (C) with respect to a Tax Exempt Bond, such defeasance will not adversely affect the exclusion of interest on such Tax Exempt Bond from gross income for purposes of federal income taxation.

The Authority shall give written notice to the Trustee of its selection of the Series and maturity payment of which shall be made in accordance with this Section.  The Trustee shall select the Secured Obligations of like Series and maturity payment of which shall be made in accordance with this Section in the manner provided in Section 4.04 hereof.   Neither the Defeasance Securities nor money deposited with the Trustee pursuant to this Section nor principal or interest payments on any such Defeasance Securities shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the Principal or Redemption Price, if applicable, of and interest on said Bonds; ***provided, however,*** that any money received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose in the judgment of a nationally recognized verification agent, shall, to the extent practicable, be reinvested in Defeasance Securities maturing at times and in amounts sufficient to pay when due the Principal or Redemption Price, if applicable, of and interest to become due on said Secured Obligations on and prior to such redemption date or maturity date hereof, as the case may be.  Any income or interest earned by, or increment to, the investment of any such money so deposited, shall, to the extent certified by

- 80 -

the Trustee to be in excess of the amounts required hereinabove to pay the Principal or Redemption Price, if applicable, of and interest on such Secured Obligations, as realized, shall be applied by the Trustee as follows:  first, to the Arbitrage Rebate Fund, the amount required to be deposited therein in accordance with the direction of an Authorized Officer of the Authority, second, to the Debt Service Fund, to the extent the amount then on deposit therein is less than the sum of the Interest Funding Requirement for the then current Fiscal Year and the Principal Funding Requirement for the then current Fiscal Year, and third, to the extent not required to be deposited in the Arbitrage Rebate Fund or the Debt Service Fund, at the direction of the Authority, shall be retained therein or transferred to any other fund or account established pursuant hereto.

(c)    Anything herein to the contrary notwithstanding, any money held by the Trustee or a Paying Agent in trust for the payment and discharge of any of the Secured Obligations of a Series or the interest thereon which remain unclaimed for three (3) years after the date when all of the Secured Obligations of such Series have become due and payable, either at their stated maturity dates or by call for earlier redemption, if such money was held by the Trustee or Paying Agent at such date, or for three (3) years after the date of deposit of such money if deposited with the Trustee or Paying Agent after said date when all of the Secured Obligations of such Series become due and payable, or three (3) years after the date when the Principal or Redemption Price of or interest on the Secured Obligations for which said money is held was due and payable, shall, at the written request of the Authority, be repaid by the Trustee or Paying Agent to the Authority as its absolute property and free from trust, and the Trustee or Paying Agent shall thereupon be released and discharged with respect thereto and the Holders of Secured Obligations shall look only to the Authority for the payment of such Secured Obligations.

## ARTICLE XIV.

## EXECUTION OF INSTRUMENTS BY BONDHOLDERS AND PROOF OF OWNERSHIP OF SECURED OBLIGATIONS

**Section 14.01** **Evidence of Signatures of Bondholders and Ownership of Secured Obligations.**  Any request, consent or other instrument which this Trust Agreement may require or permit to be signed and executed by a Holder or Holders of Secured Obligations may be in one or more instruments of similar tenor, and shall be signed or executed by such Holder or Holders of Secured Obligations in person or by his or their attorneys duly appointed in writing.  Proof of the execution of any such instrument, or of an instrument appointing any such attorney, or the holding or owning by any person of such Secured Obligations, shall be sufficient for any purpose hereof (except as otherwise herein expressly provided) if made in the manner set forth below, but the Trustee may nevertheless in its discretion require further or other proof in cases where it deems the same desirable.

The fact and date of the execution by any Bondholder or his attorney of such instrument may be proved by the certificate, which need not be acknowledged or verified, of any officer of a bank or trust company satisfactory to the Trustee or of any notary public or other officer authorized to take acknowledgments of deeds to be recorded in the state in which he purports to act, that the person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public

- 81 -

or other officer.  The corporation of the person or persons executing any such instrument on behalf of a corporate Bondholder may be established without further proof if such instrument is signed by a person purporting to be the president or a vice–president of such corporation with a corporate seal affixed and attested by a person purporting to be its secretary or an assistant secretary.

The ownership of Secured Obligations and the amount, numbers and other identification, and date of holding or owning the same shall be proved by the registry books.  Any request, consent or vote of the owner of any Secured Obligations shall bind all future owners of such Secured Obligation in respect of anything done or suffered to be done or omitted to be done by the Authority or the Trustee in accordance therewith.  The Authority or the Trustee may fix a record date in connection with any such request, consent or vote.

## ARTICLE XV.

## MISCELLANEOUS

**Section 15.01  Preservation and Inspection of Documents.**  All documents received by the Trustee from the Authority or from Bondholders under the provisions hereof or of any Supplemental Trust Agreement shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Authority any Bondholder and their agents and their representatives, any of whom may make copies thereof; ***provided, however,*** that with respect to inspection by a Bondholder a written request of such Bondholder must have been received by the Trustee at least five (5) Business Days prior to the date of inspection.  The Trustee shall provide to the Authority account balances and other information reasonably requested by the Authority.

**Section 15.02  Money and Funds Held for Particular Secured Obligations.**  The amounts held by the Trustee or any Paying Agent for the payment of the Principal or Redemption Price of and interest on the Secured Obligations due on any date with respect to particular Bonds shall, pending such payment, be set aside and validly and irrevocably held in trust by it for the Holders of such Secured Obligations entitled thereto, and for the purposes hereof such Principal or Redemption Price of and interest on such Secured Obligations, due after such date thereof, shall no longer be considered to be unpaid.

**Section 15.03  Cancellation of Secured Obligations.**  The Trustee or any Paying Agent shall forthwith cancel all Secured Obligations which have been redeemed or paid and shall dispose of such Bonds in accordance with its customary procedures.  No such Secured Obligations shall be deemed Outstanding Secured Obligations hereunder and no Secured Obligations shall be issued in lieu thereof.

**Section 15.04  No Recourse under Trust Agreement or on the Secured Obligations.**  All covenants, stipulations, promises, agreements and obligations of the Authority contained herein shall be deemed to be the covenants, stipulations, promises, agreements and obligations of the Authority and not of any member, officer or employee of the Authority, and no recourse shall be had for the payment of the Principal or Redemption Price of or interest on the Secured Obligations or for any claims based thereon, hereon or on the Supplemental Trust Agreement against any member, officer or employee of the Authority or any person executing the Secured

Obligations, all such liability, if any, being expressly waived and released by every Holder of Secured Obligations by the acceptance of the Secured Obligations.

**Section 15.05 <u>Severability of Invalid Provision</u>.** If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein or in any Supplemental Trust Agreement on the part of the Authority or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions hereof or of such Supplemental Trust Agreement or of the Secured Obligations.

**Section 15.06 <u>Parties of Interest</u>.** Nothing herein or in any Supplemental Trust Agreement adopted pursuant to the provisions hereof, expressed or implied, is intended to or shall be construed to confer upon or to give to any person or party other than the Authority, the Trustee, the Paying Agents and the Holders and, to the extent provided in this Trust Agreement and any Supplemental Trust Agreement, any Bond Insurer any rights, remedies or claims hereunder or by reason hereof or of any Supplemental Trust Agreement or any covenant, condition or stipulation thereof. All covenants, stipulations, promises and agreements herein or in any Supplemental Trust Agreement contained by or on behalf of the Authority shall be for the sole and exclusive benefit of the Authority, the Trustee, the Paying Agents, the Holders and the Bond Insurer. Any Bond Insurer of any Insured Bonds issued under this Trust Agreement is an express third party beneficiary of this Trust Agreement and of any applicable Supplemental Trust Agreement.

**Section 15.07 <u>Certain Provisions Relating to Capital Appreciation Bonds or Convertible Capital Appreciation Bonds</u>**. For the purposes of receiving payment of the Redemption Price of a Capital Appreciation Bond or Convertible Capital Appreciation Bond (prior to the applicable Interest Commencement Date with respect to such Convertible Capital Appreciation Bond) redeemed prior to maturity, the then current Accreted Value of such Bond shall be deemed to be its principal amount. In computing the principal amount of Bonds held by the registered owner of a Capital Appreciation Bond or Convertible Capital Appreciation Bond (prior to the applicable Interest Commencement Date with respect to such Convertible Capital Appreciation Bond) in giving to the Authority or the Trustee any notice, consent, request, or demand pursuant hereto for any purpose whatsoever, the Accreted Value of such Bond as at the immediately preceding Valuation Date shall be deemed to be its principal amount. Notwithstanding any other provision hereof, the amount payable at any time with respect to the Principal of and interest on any Capital Appreciation Bond or Convertible Capital Appreciation Bond (prior to the applicable Interest Commencement Date with respect to such Convertible Capital Appreciation Bond) shall be equal to its Accreted Value thereof at such time plus redemption premium, if any.

**Section 15.08 <u>Notices</u>.** Except as otherwise provided herein, any notices, directions or other instruments required to be given or delivered pursuant hereto or to any Supplemental Trust Agreement shall be in writing and shall be delivered by hand against the written receipt therefor or sent by registered or certified mail addressed: in the case of the Authority, to it to the attention of the Authority's Executive Director with a copy to the Secretary of the Authority's board, at

Roberto Sanchez Vilella (Minillas) Government Center, de Diego Ave No. 100, San Juan, PR 00907; and in the case of the Trustee, addressed to it at the designated ~~corporate trust office~~Corporate Trust Office of the Trustee at The Bank of New York Mellon, 240 Greenwich Street, Floor 7 East, New York, New York 10286, Attention: Corporate Trust; in the case of the Commonwealth or the Secretary of the Treasury, to the attention of the Secretary of Treasury at 10 Paseo Covadonga, San Juan, Puerto Rico, 00901, or, in each case, to such other individual and at such other address as the person to be notified shall have specified by notice to the other persons. Any such communication may also be sent by Electronic Means, receipt of which shall be confirmed.

In the event the Trustee sends a notice to the Holders of any series of Secured Obligations, the Trustee shall also provide such notice in electronic format, accompanied by such identifying information as is prescribed by the Municipal Securities Rulemaking Board, including the CUSIP numbers for the Secured Obligations of the series to the Authority's dissemination agent for distribution through the EMMA system. The Authority shall cooperate with the Trustee to the extent necessary to facilitate the foregoing. The Trustee shall not be liable under any circumstances for monetary damages to any person for any breach of the provisions of this paragraph. The sole remedy for failure of the Trustee to perform is specific performance.

**Section 15.09 Headings.** Any headings preceding the text of the several Articles and Sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience of reference and shall not constitute a part hereof nor shall they affect its meaning, construction or effect.

**Section 15.10 Governing Laws.** This Trust Agreement and the Bonds shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under this Trust Agreement and the Bonds; ***provided, however***, that the authorization of this Trust Agreement and the issuance of the Secured Obligations by the Authority shall be governed by the laws of the Commonwealth.

**Section 15.11 Retention of Jurisdiction of Title III Court.** The Title III Court shall retain jurisdiction from and after the Effective Date of all matters arising from or related to the Plan of Adjustment, the Confirmation Order and this Trust Agreement, including, without limitation, with respect to the payment of the Secured Obligations and the enforcement of the remedies set forth herein to the fullest extent permitted by law. Any disputes, legal action, suit, or proceeding arising from or related to this Trust Agreement or the Secured Obligations (a) shall be brought in accordance with the terms of this Trust Agreement in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**Section 15.12 Signatures and Counterparts.** This Trust Agreement and each Supplemental Trust Agreement may be executed and delivered in any number of counterparts,

each of which shall be deemed to be an original, but such counterparts together shall constitute one and the same instrument.

**Section 15.13 <u>Successors and Assigns</u>.**   Whenever in this Trust Agreement the Authority is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in this Trust Agreement contained by or on behalf of the Authority shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

**Section 15.14 <u>Conflicts</u>.**   All resolutions or other proceedings of the Authority or parts thereof in conflict herewith are repealed insofar as such conflict exists.

[Remainder of page intentionally left blank; signature page follows]

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement as of the date first written above.

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

By:_____
Name:
Title:

**THE BANK OF NEW YORK MELLON,** as Trustee

By:_____
Name:
Title:

# **EXHIBIT B**

Amended and Restated Avoidance Actions Trust Agreement

**AMENDED AND RESTATED**
**AVOIDANCE ACTION TRUST AGREEMENT**

**AMENDED AND RESTATED AVOIDANCE ACTIONS TRUST AGREEMENT**
dated as of December 6, 2022 (this "Trust Agreement"), by and among the Commonwealth of
Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of
the Commonwealth ("ERS"), the Puerto Rico Highways and Transportation Authority (the
"HTA"), and the Puerto Rico Public Buildings Authority ("PBA" and, together with the
Commonwealth, ERS and HTA, the "Debtors"); Drivetrain, LLC, as trustee (together with any
successor or additional Trustee appointed under the terms hereof, the "Trustee") of the
Commonwealth Avoidance Actions Trust (the "Avoidance Actions Trust"); and, solely with
respect to Sections 1.3 and 9.11, the Financial Oversight and Management Board for Puerto Rico
on behalf of itself and its committees (the "FOMB").

Section 9.17 hereof contains a list of capitalized terms used herein.  Capitalized terms
used but not otherwise defined herein shall have the meanings ascribed to such terms in the
Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto
Rico, et al., dated January 14, 2022 (including all exhibits thereto, as the same may be further
amended, modified, or supplemented from time to time, the "Plan") or the Third Amended Title
III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority (the "HTA
Plan"), as applicable.

## RECITALS

1.      On June 30, 2016, the President of the United States signed into law legislation
passed by Congress, the Puerto Rico Oversight, Management, and Economic Stability Act
("PROMESA"), 48 U.S.C. § 2101 *et seq.*. Titles III and VI of PROMESA provide for debt
restructurings for Puerto Rico and its instrumentalities.

2.      The FOMB commenced Title III cases for the Commonwealth, ERS, and PBA on
May 3, 2017, May 5, 2017, and September 27, 2019, respectively (the "Title III Cases").

3.      On January 18, 2022, the Court entered the Order and Judgment Confirming
Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto
Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico,
and the Puerto Rico Public Buildings Authority (the "Confirmation Order"), which, among other
things, confirmed the Plan and the transactions contemplated thereby.

4.      The Plan provided for the creation of the Avoidance Actions Trust on or before the
Effective Date to hold, manage and administer the Avoidance Actions Trust Assets and distribute
the proceeds thereof, if any, to the Avoidance Actions Trust Beneficiaries, in accordance with the
terms of the Avoidance Actions Trust Agreement dated as of March 15, 2022 (the "Original Trust
Agreement"), the Plan and the Confirmation Order.

5.      The Avoidance Actions Trust was created on behalf of, and for the benefit of, the
Avoidance Actions Trust Beneficiaries.

6.      On May 21, 2017, the FOMB commenced a Title III Case for the HTA.

7.      On July 17, 2022, the FOMB filed the HTA Plan, and on October 12, 2022, the Court entered the Order and Judgment Confirming the HTA Plan (the "HTA Confirmation Order"), which, among other things, confirmed the HTA Plan and the transactions contemplated thereby.

8.      Under the HTA Plan, all "Avoidance Actions" as defined in the HTA Plan (hereinafter, the "HTA Avoidance Actions") will be transferred to the Avoidance Actions Trust to be pursued by the Trustee for the benefit of the Holders of HTA General Unsecured Claim (hereinafter, the "HTA Trust Beneficiaries", and each such Holder, a "HTA Trust Beneficiary").

9.      The Trustee shall have all powers necessary to implement the provisions of this Trust Agreement and administer the Avoidance Actions Trust, including the power to: (i) prosecute for the benefit of the Avoidance Actions Trust Beneficiaries through Trust Professionals any Avoidance Action or other causes of action that may from time to time be held by the Avoidance Actions Trust; (ii) prosecute for the benefit of the HTA Trust Beneficiaries through Trust Professionals any HTA Avoidance Action; (iii) preserve, maintain and liquidate the Avoidance Actions Trust Assets and the HTA Avoidance Actions; (iv) distribute the Avoidance Actions Trust proceeds to the Avoidance Actions Trust Beneficiaries; (v) distribute the proceeds of the HTA Avoidance Actions to the HTA Trust Beneficiaries; and (vi) otherwise perform the functions and take the actions provided for in this Trust Agreement or permitted in the Plan, the HTA Plan, the Confirmation Order and/or the HTA Confirmation Order or in any other agreement executed pursuant to the Plan or the HTA Plan, in each case subject to the provisions of Sections 6.3, 6.4, and 6.5 hereof regarding limitation on the Trustee and the oversight and consent rights of the Trust Advisory Board and the Title III Court as provided for herein;

10.     The Avoidance Actions Trust is organized for the sole purpose of liquidating and distributing the Avoidance Actions Trust Assets and the HTA Avoidance Actions, with no objective to conduct a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Avoidance Actions Trust.

11.     The Avoidance Actions Trust is intended to qualify as a "Liquidating Trust" under the Internal Revenue Code of 1986, as amended (the "IRC") and the regulations promulgated thereunder (the "Treasury Regulations"), specifically Treasury Regulations section 301.7701-4(d) and, as such, as a "grantor trust" for United States federal income tax purposes with the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries treated as the grantors and owners of the Avoidance Actions Trust.

12.     Pursuant to the Plan and the HTA Plan, the Trust is intended to be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.

13.     In accordance with the Plan and the HTA Plan, the Trust is further intended to be exempt from the requirements of (i) the Securities Exchange Act of 1934, as amended, and any applicable state and local laws requiring registration of securities, pursuant to section 1145 of the Bankruptcy Code, and (ii) the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

2

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements contained herein, the Debtors and the Trustee hereby agree to amend and restate the Original Trust Agreement in its entirety as follows:

## AGREEMENT

## ARTICLE I

## <u>DECLARATION OF TRUST</u>

1.1     <u>Creation of Trust</u>.  The Debtors and the Trustee, pursuant to the Plan and the Confirmation Order, hereby constitute and create the Avoidance Actions Trust, which shall bear the name "Commonwealth Avoidance Actions Trust." In connection with the exercise of the Trustee's power hereunder, the Trustee may use this name or such variation thereof as the Trustee sees fit.

1.2     <u>Purpose of Avoidance Actions Trust</u>.  The sole purpose of the Avoidance Actions Trust is to implement the Plan and the HTA Plan on behalf, and for the benefit, of the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries, and to serve as a mechanism for liquidating, converting to Cash and distributing the Avoidance Actions Trust Assets and the HTA Avoidance Actions in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Avoidance Actions Trust.

1.3     <u>Transfer of Avoidance Actions Trust Assets</u>.

(a)     The Debtors previously transferred, for the sole benefit of the Avoidance Actions Trust Beneficiaries, and in accordance with the Plan and the Confirmation Order, all of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other Persons to the maximum extent contemplated by and permissible pursuant to the Plan and Confirmation Order. Such transfer occurred on the Effective Date for all Avoidance Actions Trust Assets other than the settlement funds residing in the account at Banco Popular de Puerto Rico with account number 75-0277-01-4 (the "<u>Escrow Account Funds</u>").  On or after the Effective Date, upon the written request of the Trustee, the Debtors or the Reorganized Debtors, as the case may be, with the assistance of the FOMB and its Special Claims Committee, shall take actions necessary to cause the Escrow Account Funds to be disbursed to the Avoidance Actions Trust in accordance with that certain Escrow Agreement dated as of March 11, 2021, by and among the Special Claims Committee, the Official Committee of Unsecured Creditors for all Title III Debtors (other than PBA and COFINA), and Banco Popular de Puerto Rico.  In addition, the Commonwealth shall fund the Avoidance Actions Trust, on a one time basis, in the amount of Fifteen Million U.S. Dollars ($15,000,000) (the "<u>Administrative Funding</u>") by transferring such funds to the Avoidance Actions Trust within two business days of receiving written transfer instructions for such purpose from the Trustee.  Any portion of the Administrative Funding that is not used to fund the activities of the Avoidance Actions Trust shall be distributed in accordance with <u>Section 4.2</u>.  The FOMB shall

3

reasonably cooperate with the reasonable requests of the Trustee in connection with the transfer by the Debtors of the Avoidance Actions Trust Assets pursuant to this <u>Section 1.3(a)</u>.

(b)    On the effective date of the HTA Plan (the "<u>HTA Effective Date</u>"), HTA shall transfer, for the sole benefit of the HTA Trust Beneficiaries, and in accordance with the HTA Plan and the HTA Confirmation Order, all of the HTA Avoidance Actions to the Avoidance Actions Trust, free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other Persons to the maximum extent contemplated by and permissible pursuant to the HTA Plan and HTA Confirmation Order. The FOMB shall reasonably cooperate with the reasonable requests of the Trustee in connection with the transfer by HTA of the HTA Avoidance Actions pursuant to this Section 1.3(b).

1.4    <u>No Rights of Debtors</u>.   Following the Effective Date and the transfer of the Avoidance Actions Trust Assets and the HTA Avoidance Actions to the Avoidance Actions Trust, the Debtors shall have no authority or control over the Avoidance Actions Trust Assets or the HTA Avoidance Actions, including no rights to appear in, prosecute, compromise, or otherwise direct the litigation or settlement of the Avoidance Actions or the HTA Avoidance Actions, except as may be necessary to ensure, and for the sole purpose of ensuring, the full transfer of control and authority over the Avoidance Actions Trust Assets and the HTA Avoidance Actions to the Avoidance Actions Trust. The Debtors agree to take whatever actions may be reasonably necessary, including seeking the amendment of complaints or the restatement of tolling agreements, to ensure that all such authority and control over the Avoidance Actions, the HTA Avoidance Actions and other Trust Assets is so transferred to the Trust. The limitations on the Debtors' rights in this subsections shall not prejudice the ability of any of the Debtors to appear in or provide testimony in Avoidance Actions, HTA Avoidance Actions or other litigation in order to fulfil the Debtors' cooperation obligations set forth in <u>Section 9.11</u> hereof.

1.5    <u>Appointment and Acceptance of Trustee</u>.   As set forth in the Confirmation Order, the members of the Trust Advisory Board hereby ratify the designation of Drivetrain, LLC to serve as the initial Trustee under the Plan, and HTA hereby designates the Drivetrain, LLC to serve as the initial Trustee under the HTA Plan. The Trustee accepts the Avoidance Actions Trust created by this Trust Agreement and the grant, assignment, transfer, conveyance and delivery to the Trustee, on behalf, and for the benefit, of the Avoidance Actions Trust Beneficiaries, by the Debtors of all of their respective right, title and interest in the Avoidance Actions Trust Assets and the HTA Avoidance Actions, upon the terms and subject to the conditions set forth herein, in the Plan, the Confirmation Order, the HTA Plan and the HTA Confirmation Order. The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the Avoidance Actions Trust and not otherwise. The Trustee shall have the authority to bind the Avoidance Actions Trust within the limitations set forth herein, but shall for all purposes hereunder be acting in the capacity as Trustee, and not individually.

1.6    <u>Liquidation of Avoidance Actions Trust Assets and HTA Avoidance Actions</u>.   The Trustee shall, in an expeditious but commercially reasonable manner and subject to the provisions of the Plan (including Article LXXVIII of the Plan), the Confirmation Order, the HTA Plan, the HTA Confirmation Order and the other provisions of this Trust Agreement, liquidate and convert to Cash the Avoidance Actions Trust Assets and the HTA Avoidance Actions, make timely

4

distributions in accordance with the terms hereof and the Plan and not unduly prolong the existence of the Avoidance Actions Trust.  The Trustee shall exercise reasonable business judgment and liquidate the Avoidance Actions Trust Assets and the HTA Avoidance Actions to maximize net recoveries; provided, however, that the Trustee shall be entitled to take into consideration the risks, timing, and costs of potential actions in making determinations as to the maximization of recoveries and the determinations and actions of the Trustee shall in all cases be subject to the limitations provided elsewhere herein.  Subject to the terms of this Trust Agreement, such liquidations may be accomplished through the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action of the Avoidance Actions Trust or through the sale or other disposition of the Avoidance Actions Trust Assets and the HTA Avoidance Actions (in whole or in combination, and including the sale of any claims, rights or causes of action of the Avoidance Actions Trust).  The Trustee may incur any reasonable and necessary expenses in connection with the liquidation or conversion into Cash of the Avoidance Actions Trust Assets and HTA Avoidance Actions, or in connection with the administration of the Avoidance Actions Trust and HTA Avoidance Actions, and, to the extent that any Administrative Funding is available, such expenses shall first be deducted from the Administrative Funding; provided, however, that any expenses incurred solely in connection with the administration, liquidation and conversion into Cash of the HTA Avoidance Actions shall be paid or reimbursed from the Cash proceeds of the HTA Avoidance Actions to the extent such Cash proceeds are or become available.  Incurrence of expenses requiring funding from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

1.7     No Reversion to Debtors.  In no event shall any part of the Avoidance Actions Trust Assets or the HTA Avoidance Actions revert to or be distributed to any Debtor or Reorganized Debtor.

1.8     Incidents of Ownership.  The Avoidance Actions Trust Beneficiaries shall be the sole beneficiaries of the Avoidance Actions Trust Assets, the HTA Trust Beneficiaries shall be the sole beneficiaries of the HTA Avoidance Actions, and the Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein, in the Plan, the Confirmation Order, the HTA Plan and the HTA Confirmation Order, including those powers set forth in Section 6.2 hereof.

1.9     Privileges and Obligation to Respond to Ongoing Investigations.

(a)     All attorney-client privileges, work product protections and other immunities or protections from disclosure held by the Debtors ("Privileges") shall be transferred, assigned and delivered to the Avoidance Actions Trust, without waiver and in recognition of the joint and/or successory interest in prosecuting claims on behalf of the Debtors, and shall vest in the Trustee solely in its capacity as such (and any other Person whom the Trustee, with the consent of the Trust Advisory Board, may designate; it being understood that, as of the date of this Trust Agreement, the Trustee shall designate the Trust Advisory Board, solely in its capacity as such, as well as any other Person designated in this Trust Agreement).  The FOMB, the Debtors, as the case may be, and the Trustee are authorized to take all necessary actions to effectuate the sharing and vesting of such Privileges.

5

(b)      Pursuant to Federal Rule of Evidence 502(d) (to the extent Rule 502(d) is relevant, notwithstanding the fact that the FOMB, the Debtors and the Trustee are joint holders of certain attorney-client privileges, work product protections or other immunities or protections from disclosure), no Privileges shall be waived by disclosure to the Trustee, the Avoidance Actions Trust's professionals, or the Trust Advisory Board of the FOMB's or the Debtors' information subject to attorney-client privileges, work product protections or other immunities or protections from disclosure, or by disclosure among the FOMB, the Debtors, the Trustee and/or the Trust Advisory Board of information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure jointly held by the FOMB, the Debtors, the Trustee and/or the Trust Advisory Board.  The Trustee shall be obligated to respond, on behalf of the Debtors, and with their reasonable cooperation, to all information demands with respect to the Avoidance Actions or the HTA Avoidance Actions.  The Trustee may waive, and/or disclose documents subject to, Privileges that are held by the FOMB and/or the Debtors (including the deliberative process privilege) only with the prior written consent of (i) the applicable holder(s) of such Privilege (*i.e.*, the FOMB and/or the Debtors, as the case may be), and (ii) the Trust Advisory Board, and only to the extent the Trustee determines in good faith that doing so is in the best interests of the Avoidance Actions Trust and its beneficiaries.

(c)      Notwithstanding anything in Section 1.9(b) to the contrary, the Trustee may disclose information that is subject to attorney-client privileges, work product protections or other immunities held by the FOMB or the Debtors (i) pursuant to an order of a court of competent jurisdiction, subject to the procedure described in the next sentence insofar as it applies, or (ii) as otherwise required by law.  If the Trustee or the Trust Advisory Board receives a request from a third party to disclose information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure that are jointly held with the Trustee and/or the Trust Advisory Board, the party or parties who receives such request will (A) pursue all reasonable steps to maintain the applicable privileges, protections or immunities from disclosure, including, if necessary, to maintain the privileges, protections or immunities from disclosure by seeking a protective order against and/or otherwise objecting to the production of such material, (B) notify the Trustee or the Trust Advisory Board, as the case may be, (C) notify AAFAF, (D) allow the Trustee or the Trust Advisory Board, as the case may be, reasonable time under the circumstances to seek a protective order against and/or otherwise object to the production of such material, and (E) unless required by law, not disclose the materials in question unless and until any objection raised by the Trustee or the Trust Advisory Board is resolved in favor of disclosure.  For the avoidance of doubt, this Section 1.9(c) does not limit the Trustee's obligations under Section 1.9(b) to seek, and be granted, AAFAF and Trust Advisory Board consent prior to waiving Privileges held by the Debtors or Avoidance Action Trust.

# ARTICLE II

## AVOIDANCE ACTIONS TRUST BENEFICIARIES

2.1     Conflicting Claims.  If any conflicting claims or demands are made or asserted with respect to an Avoidance Actions Trust Interest or HTA Trust Interest (as defined below), the Trustee shall be entitled, in its sole and absolute discretion, to refuse to comply with any such conflicting claims or demands.  In so refusing, the Trustee, at its sole election, may elect to make no payment or distribution with respect to the Avoidance Actions Trust Interest or HTA Trust Interest subject to the claims or demands involved, or any part thereof, and the Trustee shall refer such conflicting claims or demands to the Title III Court, which shall have exclusive jurisdiction over resolution of such conflicting claims or demands.  In so doing, the Trustee shall not be or become liable to any party for its refusal to comply with any of such conflicting claims or demands. The Trustee shall be entitled to refuse to act until either (a) the rights of the adverse claimants have been adjudicated by a Final Order of the Title III Court (or such other court of proper jurisdiction) or (b) all differences have been resolved by a written agreement among all of such parties and the Trustee, which agreement shall include a complete release of the Avoidance Actions Trust and the Trustee (the occurrence of either (a) or (b) in this Section 2.1 being referred to as a "Dispute Resolution").  Promptly after a Dispute Resolution is reached, the Trustee shall transfer the payments and distributions, if any, in accordance with the terms of such Dispute Resolution.  Any payment of any interest or income should be net of any taxes attributable thereto in accordance with Section 5.3.

As used in this Agreement, "HTA Trust Interests" means the tranche of beneficial interests in the Avoidance Actions Trust allocated in accordance with the terms and provisions of the HTA Plan to the HTA GUC Recovery and relating only to net recoveries attributable to HTA Avoidance Actions

2.2     Rights of Avoidance Actions Trust Beneficiaries.  Each Avoidance Actions Trust Beneficiary and each HTA Trust Beneficiary shall be entitled to participate in the respective rights and benefits due hereunder to an Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary, as applicable, according to the terms of its Avoidance Actions Trust Interest or HTA Trust Interest. The interest of an Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary is hereby declared and shall be in all respects personal property.  Except as expressly provided hereunder, each Avoidance Actions Trust Beneficiary and each HTA Trust Beneficiary shall have no title to, right to, possession of, management of or control of the Avoidance Actions Trust, the Avoidance Actions Trust Assets, or the HTA Avoidance Actions, or to any right to call for a partition or division of such assets or to require an accounting.  No surviving spouse, heir or devisee of any deceased Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary shall have any right of dower, homestead or inheritance, or of partition, or any other right, statutory or otherwise, in the Avoidance Actions Trust Assets or the HTA Avoidance Actions, but the whole title to the Avoidance Actions Trust Assets and the HTA Avoidance Actions shall be vested in the Trustee and the sole interest of each Avoidance Actions Trust Beneficiary and each HTA Trust Beneficiary shall be the rights and benefits given to such Person under this Trust Agreement,  the Plan, and the HTA Plan.

7

2.3    Evidence of Avoidance Actions Trust Interest and HTA Trust Interest. Ownership of an Avoidance Actions Trust Interest or HTA Trust Interest in the Avoidance Actions Trust will be evidenced by the recording of such ownership in an electronic book-entry system (the "Book Entry System") maintained either by the Avoidance Actions Trust or an agent of the Avoidance Actions Trust and containing information provided by the Debtors or an agent of the Debtors. For the avoidance of doubt, the Avoidance Actions Trust or an agent thereof shall maintain a separate register as part of the Book Entry System to record ownership of the HTA Trust Interests. An Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary shall be deemed the "holder of record" (hereinafter "holder") of such Avoidance Actions Trust Beneficiary's Avoidance Actions Trust Interest(s) or such HTA Trust Beneficiary's HTA Trust Interest(s), as the case may be, for purposes of all applicable United States federal and state laws, rules and regulations, including all applicable Commonwealth laws, rules and regulations. The Trustee shall, upon the written request of a holder of an Avoidance Actions Trust Interest or a HTA Trust Interest, provide reasonably adequate documentary evidence of such holder's Avoidance Actions Trust Interest or HTA Trust Interest, as applicable, as indicated in the Book Entry System. The expense of providing such documentation shall be borne by the requesting holder.

2.4    Claims Reports. Within sixty (60) days after the Effective Date, the Debtors shall arrange for the Trustee to receive a report (the "Initial Claims Report") regarding Avoidance Actions Trust Interests containing (a) an updated claims register for General Unsecured Claims, and (b) a written report of the status of any previously filed objections to General Unsecured Claims and the status of any reconciliations of General Unsecured Claims, showing which General Unsecured Claims are Allowed Claims, which are Disputed Claims (as defined below), and which are still being evaluated for possible objection. Further, the Debtors shall arrange for the Trustee to receive a monthly report within ten (10) days of the end of each month (the "Monthly Claims Report"), which report shall include all material updates to information contained in the Initial Claims Report or a previous Monthly Claims Report, as applicable, as well as any material information omitted from such prior reports. In addition, the Debtors shall, upon reasonable request, periodically supply the Trustee with any other reports or information the Avoidance Actions Trust may reasonably request related to the reconciliation of General Unsecured Claims and the payment of distributions to Avoidance Actions Trust Beneficiaries.

2.5    Reliance on Debtors for Information. It is the responsibility of the Debtors, pursuant to, among other things, their cooperation obligations established herein, to provide to the Avoidance Actions Trust reasonably complete and accurate information regarding Avoidance Actions Trust Interests and to provide periodic updates regarding such information as set forth in Section 2.4 hereof. The (a) Trustee, (b) individual(s) comprising the Trustee, as the case may be, (c) Trust Advisory Board, and (d) members of the Trust Advisory Board (each, a "Trust Party" and, collectively, the "Trust Parties") shall be entitled to rely on information supplied by the Debtors and their agents (including the Disbursing Agent) concerning the Avoidance Actions Trust Interests, and shall not be held liable to any party for any incompleteness or inaccuracy of such information.

8

2.6     Transfers of Avoidance Actions Trust Interests.

(a)     General.  Avoidance Actions Trust Interests shall not be transferable or assignable except by will, intestate succession or operation of law.

(b)     Book Entry System.  The Book Entry System shall include a register (which may be electronic) setting forth the names and addresses of the Avoidance Actions Trust Beneficiaries, and the amount and class of their Avoidance Actions Trust Interests from time to time.  Any transfer or assignment of an Avoidance Actions Trust Interest by will, intestate succession or operation of law shall not be effective unless and until such transfer or assignment is recorded in the Book Entry System, which shall be completed as soon as practicable.  Subject to Section 2.4(d) hereof, the entries in the Book Entry System shall be conclusive absent manifest error, and the Avoidance Actions Trust and the Trustee shall treat each Person whose name is recorded in the Book Entry System pursuant to the terms hereof as the owner of Avoidance Actions Trust Interests indicated therein for all purposes of this Trust Agreement, notwithstanding notice to the contrary.

(c)     Registration.  In accordance with the Plan, the Trust is intended to be exempt from the requirements of (i) the Securities Exchange Act of 1934, as amended, and any applicable state and local laws requiring registration of securities, pursuant to section 1145 of the Bankruptcy Code, and (ii) the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.  If the Trustee, with the consent of the Trust Advisory Board and upon advice of counsel, determines that any class of Avoidance Actions Trust Interests may be subject to registration pursuant to Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Trustee shall pursue relief from such registration by obtaining either an exemptive order, a no-action letter or an interpretive letter from the Securities and Exchange Commission (the "SEC") or its staff or, absent its ability to achieve that objective or in lieu thereof, shall register such class pursuant to Section 12 of such statute (it being understood and agreed that the Trustee with the consent of the Trust Advisory Board shall be authorized, among other things, to register such class and to seek relief from one or more of the requirements then applicable subsequent to such registration and to de-register such class).  To the extent that any Administrative Funding is available, any expenses that are associated with such application for relief and/or registration shall first be deducted from the Administrative Funding.  Incurrence of expenses requiring funding from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

(d)     Further Limitations on Transfer.  Notwithstanding any other provision to the contrary, the Trustee may disregard any purported transfer or assignment of Avoidance Actions Trust Interests by will, intestate succession or operation of law if sufficient necessary information (as reasonably determined by the Trustee), including applicable tax-related information, is not provided by such purported transferee or assignee to the Trustee.

2.7     Limited Liability.   No provision of this Trust Agreement, the Plan, the Confirmation Order, the HTA Plan or the HTA Confirmation Order, and no mere enumeration herein of the rights or privileges of any Avoidance Actions Trust Beneficiary or any HTA Trust Beneficiary, shall give rise to any liability of such Avoidance Actions Trust Beneficiary or HTA

9

Trust Beneficiary solely in its capacity as such, whether such liability is asserted by any Debtor, by creditors, employees, or equity interest holders of any Debtor, or by any other Person (except to the extent of the Avoidance Actions Trust Beneficiary's or the HTA Trust Beneficiary's fraud, gross negligence or willful misconduct). Avoidance Actions Trust Beneficiaries and HTA Trust Beneficiaries are deemed to receive the Avoidance Actions Trust Assets and the HTA Avoidance Actions, as applicable, in accordance with the provisions of this Trust Agreement, the Plan, the Confirmation Order, the HTA Plan and the HTA Confirmation Order in exchange for their Allowed Claims, without further obligation or liability of any kind (except to the extent of the Avoidance Actions Trust Beneficiary's or the HTA Trust Beneficiary's fraud, gross negligence or willful misconduct), but subject to the provisions of this Trust Agreement.

## ARTICLE III

## DURATION AND TERMINATION OF AVOIDANCE ACTIONS TRUST

3.1     Duration.  The Avoidance Actions Trust became effective upon the Effective Date of the Plan, and the amendments set forth in this Trust Agreement shall become effective on the HTA Effective Date.  The Avoidance Actions Trust shall remain and continue in full force and effect until dissolved as provided for in Section 78.14(d) of the Plan.

3.2     Dissolution of the Avoidance Actions Trust.

(a)     The Trustee and the Avoidance Actions Trust shall be discharged or dissolved, as the case may be, on the earlier to occur of (i) all the Avoidance Actions Trust Assets and all the proceeds of the HTA Avoidance Actions having been distributed pursuant to the Plan, the HTA Plan and this Trust Agreement and (ii) following the reconciliation of all General Unsecured Claims, the Trustee having determined, with the consent of the Trust Advisory Board, that the administration of any remaining Avoidance Actions Trust Assets and any remaining HTA Avoidance Actions is not likely to yield sufficient additional Avoidance Actions Trust proceeds to justify further pursuit; provided, however, that in no event shall the Avoidance Actions Trust be dissolved later than five (5) years from the Effective Date unless the Title III Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of any extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Trustee and the Trust Advisory Board that any further extension would not adversely affect the status of the trust as a "Liquidating Trust" for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Avoidance Actions Trust Assets and the HTA Avoidance Actions.

(b)     If at any time the Trustee determines, in reliance upon such Trust Professionals as the Trustee may retain, that the expense of administering the Avoidance Actions Trust so as to make a final distribution to the Avoidance Actions Trust Beneficiaries or the HTA Trust Beneficiaries is likely to exceed the value of the assets remaining in the Avoidance Actions Trust, the Trustee may apply to the Title III Court for authority to (i) reserve any amount necessary to dissolve the Avoidance Actions Trust, (ii) donate any balance to a charitable organization (A) of the type described in Section 501(c)(3) of the IRC, (B) exempt from United States federal income

10

tax under Section 501(a) of the IRC, and (C) that is unrelated to the Debtors, the Reorganized Debtors, the Avoidance Actions Trust, and any insider of the Trustee, and (iii) dissolve the Avoidance Actions Trust.  Upon receipt of such authority from the Title III Court, the Trustee shall notify each Avoidance Actions Trust Beneficiary and each HTA Trust Beneficiary.

      3.3    <u>Continuance of Avoidance Actions Trust for Winding Up</u>.  After the dissolution of the Avoidance Actions Trust and solely for the purpose of liquidating and winding up the affairs of the Avoidance Actions Trust, the Trustee shall continue to act as such until its duties have been fully performed.  Upon distribution of all the Avoidance Actions Trust Assets and the proceeds, if any, of the HTA Avoidance Actions, the Trustee shall retain the books, records and files that shall have been delivered to or created by the Trustee.  At the Trustee's discretion, all of such records and documents may be destroyed at any time following the date that is six (6) years after the final distribution of the Avoidance Actions Trust Assets and the proceeds of the HTA Avoidance Actions, subject to any joint prosecution and common interest agreement(s) to which the Trustee may be party.  Provisions with respect to the destruction of documents in this <u>Section 3.3</u> shall not limit the Trustee's right, prior to the dissolution of the Avoidance Actions Trust, to destroy documents that the Trustee considers no longer necessary to retain, subject to applicable law, the Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order and this Trust Agreement.

<div align="center">

**ARTICLE IV**

**<u>ADMINISTRATION OF AVOIDANCE ACTIONS TRUST</u>**

</div>

      4.1    <u>Payment of Claims, Expenses and Liabilities</u>.  Subject to the Budget from time to time approved by the Trust Advisory Board in accordance with <u>Section 4.13(b)</u>, and in accordance with <u>Sections 6.7(j)</u>, <u>6.9(b)</u>, and <u>7.6</u> hereof, and except as otherwise provided herein, the Trustee shall use the Avoidance Actions Trust Assets: (a) to pay reasonable costs and expenses of the Avoidance Actions Trust (including any taxes imposed on the Avoidance Actions Trust, the actual reasonable out-of-pocket fees and expenses incurred by Trust Professionals in connection with the administration and liquidation of the Avoidance Actions Trust Assets and the HTA Avoidance Actions, as provided in <u>Section 6.7</u> hereof, and the preservation of books and records of the Avoidance Actions Trust); (b) to satisfy other obligations or other liabilities incurred or assumed by the Avoidance Actions Trust (or to which the Avoidance Actions Trust Assets are otherwise subject) in accordance with the Plan, the Confirmation Order or this Trust Agreement, including reasonable fees and costs incurred in connection with the protection, preservation, liquidation and distribution of the Avoidance Actions Trust Assets and the HTA Avoidance Actions, and the reasonable costs of investigating, prosecuting, resolving and/or settling any Claims; (c) as reasonably necessary to meet contingent liabilities and to maintain the value of the Avoidance Actions Trust Assets and the HTA Avoidance Actions during liquidation; and (d) to satisfy any other obligations of the Avoidance Actions Trust expressly set forth in the Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order and this Trust Agreement.  The costs, expenses and other obligations or other liabilities set forth in this <u>Section 4.1</u> shall first be deducted from the Administrative Funding; <u>provided</u>, <u>however</u>, that any costs, expenses and other obligations incurred solely in connection with the administration, liquidation and conversion into Cash of the

<div align="center">11</div>

HTA Avoidance Actions shall be paid or reimbursed from the Cash proceeds of the HTA Avoidance Actions to the extent such Cash proceeds are or become available.  Incurrence of any such costs, expenses and other obligations or other liabilities requiring funding from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

       4.2    <u>Distributions</u>.

       (a)    <u>Generally</u>.  All distributions to the Avoidance Actions Trust Beneficiaries on account of their Avoidance Actions Trust Interests or the HTA Avoidance Actions shall be made, at the election and direction of the Trustee with notice to the Debtors and AAFAF, by either (i) the Disbursing Agent selected by the Debtors under the Plan or (ii) such other disbursing agent as may be selected by the Trustee (the disbursing agent selected by the Trustee under either (i) or (ii) being the "<u>Trust Disbursing Agent</u>"), in either case in accordance with the terms and provisions of Article LXXVII of the Plan and Article XXVIII of the HTA Plan, except as otherwise provided herein.  The Trust Disbursing Agent shall be deemed to hold all property to be distributed hereunder in trust for the Entities entitled to receive the same.  The Trust Disbursing Agent shall not hold an economic or beneficial interest in such property.  The Debtors will direct the Disbursing Agent to share information with and otherwise reasonably cooperate with the Trustee to generate administrative efficiencies and reduce duplication of effort in the distribution processes contemplated hereunder and under the Plan, including by sharing claimant tax information with the Trustee and providing access to the Debtors' Claims register.

       (b)    <u>Distributions by the Trust Disbursing Agent</u>.  The Trust Disbursing Agent is required to distribute to the Avoidance Actions Trust Beneficiaries on account of their Avoidance Actions Trust Interests, and to the HTA Trust Beneficiaries on account of their HTA Trust Interests, on a semi-annual basis (each such date, a "<u>Distribution Date</u>"), in accordance with the terms of the Plan and the HTA Plan, all unrestricted Cash then on hand (including any Cash received from the Debtors on the Effective Date, and treating any permissible investment as Cash for purposes of this <u>Section 4.2</u>), except (i) Cash reserved pursuant to this Trust Agreement to fund the activities of the Avoidance Actions Trust, and (ii) such amounts as are allocable to or retained on account of Disputed Claims in accordance with Section 82.3 of the Plan to pay reasonable incurred or anticipated expenses (including any taxes imposed on or payable by the Avoidance Actions Trust in respect of the Avoidance Actions Trust Assets and the HTA Avoidance Actions); provided, however, that the Trust Disbursing Agent shall not be required to make a distribution pursuant to this <u>Section 4.3</u> if the aggregate net amount of unrestricted Cash available for distribution (taking into account the above listed exclusions) is such as would make the distribution impracticable as reasonably determined by the Trustee, with the consent of the Trust Advisory Board, in accordance with applicable law, and so long as such aggregate net amount is less than Twenty-Five Million Dollars ($25,000,000.00); provided further, however, that the Trustee, with consent of the Trust Advisory Board, may decide to direct the Trust Disbursing Agent to forego the first distribution to those Avoidance Actions Trust Beneficiaries or HTA Trust Beneficiaries with respect to which the Trustee, in its reasonable judgment, is not administratively prepared to direct such distribution, in which case, such distribution shall be made to such holders as soon as practicable after the Trustee is administratively prepared to do so, not to exceed three (3) months from the date of the first semi- annual distribution.

(c)      Payment of Distributions.  Each Avoidance Actions Trust Beneficiary's share of the Avoidance Actions Trust Interests as determined pursuant to the Plan (including any Cash to be received on account of any Avoidance Actions Trust Interests) shall be allocated and distributed, and the Avoidance Actions Trust Assets shall be allocated and distributed, in accordance with Article LXXVII of the Plan.  Each HTA Trust Beneficiary's share of the proceeds of the HTA Avoidance Actions as determined pursuant to the HTA Plan shall be allocated and distributed in accordance with Article XXVIII of the HTA Plan.

4.3      De Minimis Distributions.  No Cash payment shall be made to any holder of an Avoidance Actions Trust Interest or a HTA Trust Interest until such time, if ever, as the amount payable thereto, in any distribution from the Avoidance Actions Trust, is equal to or greater than Ten Dollars ($10.00).  Any holder of an Avoidance Actions Trust Interest or HTA Trust Interest on account of which the amount of Cash to be distributed pursuant to any distribution from the Avoidance Actions Trust is less than Ten Dollars ($10.00) shall be deemed to have no claim for such distribution against the Debtors, the Reorganized Debtors, the Avoidance Actions Trust, the Avoidance Actions Trust Assets or the proceeds of the HTA Avoidance Actions.  Subject to Section 4.6, any Cash not distributed pursuant to this Section 4.3 hereof shall be the property of the Avoidance Actions Trust free of any restrictions thereon, and shall be available for distribution to the other Avoidance Actions Trust Beneficiaries or the HTA Trust Beneficiaries, in accordance with the Plan, the HTA Plan and this Trust Agreement.

4.4      Undeliverable Distributions.   For purposes of this Trust Agreement, an "undeliverable" distribution shall include a check that is sent to a holder in respect of a distribution to such holder, which check has not been negotiated within six (6) months following the date on which such check was issued.  If any distribution to the holder of an Avoidance Actions Trust Interest or a HTA Trust Interest is undeliverable, no further distribution shall be made to such holder unless and until the Trustee (or its duly authorized agent) is notified, in writing, of such holder's then-current address.  Undeliverable distributions shall remain in the possession of the Trustee (or its duly authorized agent) until such time as a distribution becomes deliverable.  All Persons ultimately receiving an undeliverable distribution shall not be entitled to any interest or other accruals of any kind on account of the delay in payment resulting from the undeliverable status of such distribution.  Except as required by law, the Trustee (or its duly authorized agent) shall not be required to attempt to locate any holder of an Avoidance Actions Trust Interest or HTA Trust Interest.

4.5      Interest on Avoidance Actions Trust Interests and HTA Trust Interests.  As set forth in the Plan and the HTA Plan, interest shall not accrue and be paid on the Avoidance Actions Trust Interests or HTA Trust Interests.

4.6      Distributions After the Effective Date.  Distributions made after the Effective Date to holders of Avoidance Actions Trust Interests or HTA Trust Interests on account of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Article LXXVII of the Plan or Article XXVIII of the HTA Plan, as applicable.

13

4.7     Compliance with Laws.  Any and all distributions of Avoidance Actions Trust Assets shall be in compliance with applicable laws, including applicable federal and state tax and securities laws.

4.8     Fiscal Year.  Except for the first and last years of the Avoidance Actions Trust, the fiscal year of the Avoidance Actions Trust shall be the calendar year.  For the first and last years of the Avoidance Actions Trust, the fiscal year of the Avoidance Actions Trust shall be such portion of the calendar year that the Avoidance Actions Trust is in existence.

4.9     Books and Records.  The Trustee shall retain and preserve the Debtors' books, records and files that shall have been delivered to or created by the Trustee.  Subject to Section 3.3, the Trustee shall maintain, in respect of the Avoidance Actions Trust, the Avoidance Actions Trust Beneficiaries, the HTA Trust Beneficiaries and all others to receive distributions under this Trust Agreement, books and records relating to the assets and the income of the Avoidance Actions Trust and the payment of expenses of, liabilities of, and claims against or assumed by, the Avoidance Actions Trust and the Trustee, in such detail and for such period of time as may be necessary to enable it to make full and proper reports in respect thereof in accordance with the provisions of this Trust Agreement and applicable provisions of law, including applicable tax, securities and other federal and state laws.  Except as otherwise provided herein or in the Plan, nothing in this Trust Agreement requires the Trustee to file any accounting or seek approval of any court with respect to the administration of the Avoidance Actions Trust, or as a condition for making any payment or distribution out of the Avoidance Actions Trust Assets.  The Trustee shall provide AAFAF and any member of the Trust Advisory Board with access to such books and records during normal business hours as may be reasonably requested with three (3) Business Days' advance notice.  Avoidance Actions Trust Beneficiaries and HTA Trust Beneficiaries holding Allowed Claims shall have the right upon thirty (30) days' prior written notice delivered to the Trustee to inspect such books and records; provided, however, that if so requested, all costs associated with such inspection shall be paid in advance by such requesting Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary and such Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary shall have entered into a confidentiality agreement reasonably satisfactory in form and substance to the Trustee.

4.10    Cash Payments.  All distributions required to be made to the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries shall be made in Cash denominated in United States dollars by checks drawn on a domestic bank selected by the Trustee or, at the option of the Trustee, by wire transfer from a domestic bank selected by the Trustee or as otherwise required or provided in applicable agreements; provided, however, that Cash payments to foreign holders of Avoidance Actions Trust Interests or HTA Trust Interests may be made, at the option of the Trustee, in such funds as and by such means as are necessary or customary in a particular foreign jurisdiction.

4.11    Insurance.  The Avoidance Actions Trust shall maintain customary insurance coverage for the protection of the Trustee, the members of the Trust Advisory Board, employees and any such other persons serving as administrators and overseers of the Avoidance Actions Trust on and after the Effective Date.  The Trustee also may obtain insurance coverage it deems

14

necessary and appropriate with respect to real and personal property that may become Avoidance Actions Trust Assets or the proceeds of HTA Avoidance Actions.

4.12    <u>Disputes</u>.  To the extent a dispute arises between the Trustee and the Trust Advisory Board concerning the performance of any of the powers, duties, and/or obligations herein, the Trustee or the Trust Advisory Board may file a motion and/or other pleadings with the Title III Court and obtain advice and guidance or such other relief as may be appropriate concerning a resolution of the matter(s) in dispute between the parties.  In the event of a dispute, the Trustee and the Trust Advisory Board, as applicable, shall have the right to engage legal counsel to advise it with respect to the matter(s) in dispute and the reasonable fees and expenses of such legal counsel shall be reimbursed by the Trustee from the Administrative Funding or, if the Administrative Funding has been spent, any other unrestricted Cash in the Avoidance Actions Trust, subject to the approval of a majority of the Trust Advisory Board and subject to <u>Section 7.5</u>.  A motion and/or other pleading described in this <u>Section 4.12</u> filed by the Trust Advisory Board may only be filed upon the consent of a majority of its members.

4.13    <u>Reports from the Trustee</u>

(a)     The Trustee shall deliver reports to members of the Trust Advisory Board and AAFAF not later than thirty (30) days following the end of each fiscal quarter, or less frequently as may be agreed upon between the Trustee and the Trust Advisory Board.  Such reports shall specify in reasonable detail (i) the status of any Causes of Action, Claims and litigation involving the Avoidance Actions Trust or the Avoidance Actions Trust Assets, including Avoidance Actions, including any settlements entered into by the Avoidance Actions Trust, (ii) the costs and expenses of the Avoidance Actions Trust that are incurred (including any taxes imposed on the Avoidance Actions Trust or actual reasonable out-of-pocket fees and expenses incurred by Trust Professionals in connection with the administration and liquidation of the Avoidance Actions Trust Assets and the HTA Avoidance Actions, allocated between the Avoidance Actions Trust Assets and the HTA Avoidance Actions, and preservation of books and records as provided in <u>Section 4.8</u>) during the preceding fiscal quarter and the remaining amount (if any) of the Administrative Funding, (iii) the amounts listed in clause (ii) incurred since the Effective Date, (iv) the amount of Cash and other assets received by the Avoidance Actions Trust during the prior fiscal quarter, allocated between the Avoidance Actions Trust Assets and the HTA Avoidance Actions, (v) the aggregate amount of Cash and other assets received by the Avoidance Actions Trust since the Effective Date, allocated between the Avoidance Actions Trust Assets and the HTA Avoidance Actions, (vi) the calculation of the estimated amount of the Cash and other assets to be distributed on the next Distribution Date, including any Cash on hand that is not to be distributed pursuant to <u>Section 4.2(a)</u> above, (vii) the aggregate amount of distributions from the Avoidance Actions Trust to the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries since the Effective Date, allocated between the Avoidance Actions Trust Assets and the HTA Avoidance Actions, and (viii) such other information as the Trust Advisory Board may reasonably request from time to time.  All allocations referred to above shall be reasonably made by the Trustee.  The Trustee also shall timely prepare, file and distribute such additional statements, reports and submissions (A) as may be necessary to cause the Avoidance Actions Trust and the Trustee to be

15

in compliance with applicable law or (B) as may be otherwise reasonably requested from time to time by the Trust Advisory Board.

(b)     The Trustee shall prepare and submit to the Trust Advisory Board for approval an annual plan and budget at least thirty (30) days prior to the commencement of each fiscal year of the Avoidance Actions Trust; provided, however, that the first such annual plan and budget shall be submitted no later than forty-five (45) days after the Effective Date of the Plan. Such annual plan and budget shall set forth in reasonable detail: (i) the Trustee's anticipated actions to administer and liquidate the Avoidance Actions Trust Assets and the HTA Avoidance Actions; and (ii) the anticipated expenses, including the expenses of Trust Professionals, associated with conducting the affairs of the Avoidance Actions Trust. Such annual plan and budget shall be updated and submitted to the Trust Advisory Board for review and approval on a quarterly basis, and each such quarterly update shall reflect the differences between the anticipated actions described in the annual report and actual operations of the Avoidance Actions Trust to date. Any such annual plan and budget as approved by the Trust Advisory Board is referred to herein as the "Budget". All actions by the Trustee must be substantially consistent with the then current Budget, provided that the Trustee may take action outside the Budget with the prior approval of the Trust Advisory Board.

(c)     In accordance with the Plan and the HTA Plan, the Avoidance Actions Trust is intended to be exempt from the requirements of (i) the Securities Exchange Act of 1934, as amended, and any applicable state and local laws requiring registration of securities, pursuant to section 1145 of the Bankruptcy Code, and (ii) the Investment Company Act of 1940, as amended, pursuant to Sections 7(a) and 7(b) of that Investment Company Act of 1940, as amended, and section 1145 of the Bankruptcy Code. Notwithstanding the forgoing, if required to do so, and until such time as the Avoidance Actions Trust is dissolved in accordance with Section 78.14(d) of the Plan (or otherwise in accordance with this Trust Agreement), the Avoidance Actions Trust shall file with (or furnish to, as the case may be) the SEC such periodic reports as the Avoidance Actions Trust is required to file pursuant to the Exchange Act.

**ARTICLE V**

**TAX MATTERS**

5.1     Avoidance Actions Trust Assets and HTA Avoidance Actions Treated as Owned by Avoidance Actions Trust Beneficiaries and HTA Trust Beneficiaries. For all United States federal income tax purposes, all parties (including the Debtors, the Trustee, the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries) shall treat the transfer of the Avoidance Actions Trust Assets and the HTA Avoidance Actions to the Avoidance Actions Trust as (a) a transfer of the Avoidance Actions Trust Assets (subject to any obligations relating to those assets) and the HTA Avoidance Actions directly to the Avoidance Actions Trust Beneficiaries and HTA Trust Beneficiaries (as applicable), and, to the extent Avoidance Actions Trust Assets or HTA Avoidance Actions are allocable to Disputed Claims, to the reserve for such claims, *followed by* (b) the transfer by the Avoidance Actions Trust Beneficiaries of the Avoidance Actions Trust Assets (other than the Avoidance Actions Trust Assets allocable to a reserve for disputed claims) in exchange for Avoidance Actions Trust Interests, and the transfer by the HTA Trust Beneficiaries

16

of the HTA Avoidance Actions in exchange for the HTA Trust Interests. Accordingly, the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Avoidance Actions Trust Assets (other than such Avoidance Actions Trust Assets as are allocable to a reserve for disputed claims) and the HTA Avoidance Actions, respectively. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. The establishment of the Avoidance Actions Trust under United States law shall not, by itself, be deemed to subject the Avoidance Actions Trust Beneficiaries or the HTA Trust Beneficiaries to United States federal income taxes.

5.2   Tax Reporting.

(a)   The Trustee shall prepare and file (or cause to be prepared and filed) tax returns for the Avoidance Actions Trust treating the Avoidance Actions Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Article V. To the extent and in the manner required by applicable law, the Trustee also will annually send to each holder of an Avoidance Actions Trust Interest and each holder of an HTA Trust Interest a separate statement regarding the receipts and expenditures of the Avoidance Actions Trust as relevant for United States federal income tax purposes (with such receipts and expenditures reasonably allocated by the Trustee between the Avoidance Actions Trust Assets and the HTA Avoidance Actions) and will instruct all such holders to use such information in preparing their United States federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their United States federal income tax returns. The Trustee also shall file (or cause to be filed) any other statement, return or disclosure relating to the Avoidance Actions Trust that is required by any governmental unit.

(b)   To the extent and in the manner required by applicable law, allocations of Avoidance Actions Trust taxable income among the Avoidance Actions Trust Beneficiaries (other than taxable income allocable to a reserve for disputed claims) and among HTA Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Avoidance Actions Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to a reserve for disputed claims) to the holders of the Avoidance Actions Trust Interests and HTA Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Avoidance Actions Trust. Similarly, to the extent an in the manner required by applicable law, taxable loss of the Avoidance Actions Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Avoidance Actions Trust Assets and the HTA Avoidance Actions. To the extent and in the manner required by applicable law, the tax book value of the Avoidance Actions Trust Assets and the HTA Avoidance Actions for purposes of this Section 5.2(b) shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

17

(c)      Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Trustee of a private letter ruling if the Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Trustee), the Trustee shall (i) timely elect to treat any reserve for disputed claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Trustee, the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

(d)      The Trustee shall be responsible for payment, out of the Avoidance Actions Trust Assets, of any taxes imposed on the Avoidance Actions Trust or its assets, including any reserve for disputed claims, and for payment, out of the HTA Avoidance Actions, of any taxes imposed on the Avoidance Actions Trust directly related to the HTA Avoidance Actions.  If, and to the extent, any Cash retained on account of Disputed Claims in the reserve for such claims is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims (including any income that may arise upon the distribution of the assets from such reserve), such taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Trustee as a result of the resolution of such Disputed Claims.

5.3      Tax Withholdings by Trustee.  The Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of Avoidance Actions Trust Interests and HTA Trust Interests.  All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of Avoidance Actions Trust Interests and HTA Trust Interests for all purposes of the Trust Agreement, it being understood that any such amount withheld shall reduce the amount actually realized by the applicable holder upon distribution.  The Trustee shall be authorized to collect such tax information from the holders of Avoidance Actions Trust Interests and HTA Trust Interests (including social security numbers or other tax identification numbers) as in its sole discretion the Trustee deems necessary to effectuate the Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order and this Trust Agreement.  In order to receive distributions under the Plan or the HTA Plan, all holders of Avoidance Actions Trust Interests and HTA Trust Interests shall be required to identify themselves to the Trustee and provide tax information and the specifics of their holdings, to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes.  To the extent the Disbursing Agent collects such tax information in performance of its duties under the Plan, the Debtors agree to direct the Disbursing Agent to provide such tax information concerning Avoidance Action Trust Beneficiaries and the HTA Trust Beneficiaries to the Trust Disbursing Agent for use in accordance with this Trust Agreement.  This identification requirement generally applies to all holders of Avoidance Actions Trust Interests and HTA Trust Interests, including those who hold their Claims in "street name." The Trustee may refuse to make a distribution to any holder of a Avoidance

18

Actions Trust Interest or HTA Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered may treat such holder's Avoidance Actions Trust Interests or HTA Trust Interests as disputed; provided, however, that if such information is not furnished to the Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to the holder of such Avoidance Actions Trust Interest or HTA Trust Interest; and, provided further, however, that, upon the delivery of such information by a holder of a Avoidance Actions Trust Interest or a HTA Trust Interest, the Trustee shall make such distribution to which the holder of the Avoidance Actions Trust Interest or HTA Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; provided further, however, that if the Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Trustee for such liability (to the extent such amounts were actually distributed to such holder).

Notwithstanding the above, and without limiting any of the other obligations of the Debtors or rights of the Trustee described herein, (a) the Debtors shall be required to supply to the Trustee such tax information of the holders of Avoidance Actions Trust Interests and HTA Trust Interests that is in the possession or control of the Debtors or any of their agents, representatives or professionals, including the Disbursing Agent and that the Trustee may reasonably request be provided to it by the Debtors, and (b) the Trust Parties shall be entitled to rely on, and shall not be held liable for any omission or inaccuracy with respect to, such tax information so supplied to the Trustee.

## ARTICLE VI

## POWERS OF AND LIMITATIONS ON THE TRUSTEE

6.1     Trustee.

(a)     "Trustee" means Drivetrain, LLC so long as it continues in office, and all other Person(s) who have been duly elected and qualify as Trustee of the Avoidance Actions Trust hereunder pursuant to Section 1.4 or Article VIII.  Subject to Article VIII, the Trustee shall hold office until disability, death, resignation, or the termination of the Avoidance Actions Trust in accordance with the terms set forth herein.  References herein to the Trustee shall refer to the Person or Persons serving as the Trustee solely in its capacity as Trustee hereunder.  The Trustee shall be subject to Puerto Rico laws governing ethics, anti-corruption and conflicts of interest.

(b)     Subject to the express limitations set forth herein, any actions of the Trustee contemplated by this Trust Agreement shall be decided and conducted by the Trustee only.

6.2     Powers of the Trustee.

(a)     Pursuant to the terms of the Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order and this Trust Agreement, the Trustee shall have various powers, duties and responsibilities concerning the prosecution of certain litigation claims, the disposition of assets, the resolution of claims, and numerous other obligations relating to maximizing the

proceeds of the Avoidance Actions Trust Assets and the HTA Avoidance Actions and the administration of the Avoidance Actions Trust.

(b)     Nothing in this Trust Agreement shall be deemed to limit the Trust Parties' protections and benefits under the Plan or the HTA Plan or to prevent a Trust Party from taking or refraining to take any action on behalf of the Trust that, based upon the advice of counsel or other professionals, the Trust Party determines it is obligated to take or to refrain from taking in the performance of any duty that the Trust Party may owe the Avoidance Actions Trust Beneficiaries, the HTA Trust Beneficiaries or any other Person under the Plan, Confirmation Order, the HTA Plan, the HTA Confirmation Order or this Agreement.

(c)     The Trustee shall have only such rights, powers and privileges expressly set forth in the Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order and this Trust Agreement and as otherwise provided by applicable law.   Subject to the Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order and the provisions of this Trust Agreement, including the oversight and approvals by and of the Trust Advisory Board and the Title III Court provided herein, the Trustee shall be expressly authorized to undertake the following actions:

(i)     to hold, manage, convert to Cash, and timely distribute the Avoidance Actions Trust Assets and the HTA Avoidance Actions, including prosecuting and resolving the Claims belonging to the Avoidance Actions Trust;

(ii)     to hold the Avoidance Actions Trust Assets and the HTA Avoidance Actions for the benefit of the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries, whether their Claims or Interests are Allowed on or after the Effective Date;

(iii)     in the Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, Causes of Action or litigation of the Avoidance Actions Trust;

(iv)     to prepare and file (or cause to be prepared and filed), from and after the Effective Date, all tax and regulatory forms, returns, reports, and other documents required, or that the Trustee otherwise deems appropriate with respect to the Avoidance Actions Trust;

(v)     in the Trustee's reasonable business judgment, to control, prosecute, and/or settle on behalf of the Avoidance Actions Trust, objections to Claims on account of which the Trustee will be responsible;

(vi)     to hold, manage, and timely distribute Cash or non-Cash Avoidance Actions Trust Assets and proceeds of HTA Avoidance Actions obtained through the exercise of its power and authority;

(vii)     to enter into any agreements binding the Avoidance Actions Trust, and to execute, acknowledge and deliver any and all instruments that are necessary or

20

deemed by the Trustee to be consistent with and advisable in furthering the purpose of the Avoidance Actions Trust;

(viii)   to open and maintain bank accounts on behalf of or in the name of the Avoidance Actions Trust;

(ix)   to cause the Avoidance Actions Trust to employ and pay professionals, claims agents, disbursing agents, and other agents and third parties, in accordance with the terms and limitations set forth herein;

(x)   to cause the Avoidance Actions Trust to pay all of its lawful expenses, debts, charges, taxes and other liabilities, and make all other payments;

(xi)   to cause the Avoidance Actions Trust to withhold from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Trustee has determined, based upon the advice of its agents and/or professionals, may be required to be withheld from such distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

(xii)   to cause the Avoidance Actions Trust to seek a determination of tax liability or refund under section 505 of the Bankruptcy Code;

(xiii)   to cause the Avoidance Actions Trust to establish out of all Avoidance Actions Trust Assets such reserves for taxes, assessments and other expenses of administration of the Trust as may be necessary and appropriate for the proper operation of the Avoidance Actions Trust;

(xiv)   to establish and maintain a website, to the extent the Trustee deems necessary, to provide notice of the Avoidance Actions Trust's activities to Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries, provided that the Trustee determines, on the advice of counsel, that establishing such website does not implicate any securities or other applicable law;

(xv)   to undertake all administrative functions of the Avoidance Actions Trust, including overseeing the winding down and termination of the Avoidance Actions Trust;

(xvi)   to exercise, implement, enforce, and discharge all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order and this Agreement; and

(xvii)   to take all other actions consistent with the provisions of the Plan and the HTA Plan that the Trustee deems reasonably necessary or desirable to administer the Trust.

21

(d)    In all circumstances, the Trustee shall act in the best interests of all Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries and in furtherance of the purpose of the Avoidance Actions Trust.

6.3    <u>Title III Court</u>.  Except as otherwise provided in this Trust Agreement, the Trustee will not be required to obtain the order or approval of the Title III Court, or any other court of competent jurisdiction in, or account to the Title III Court or any other court of competent jurisdiction for, the exercise of any right, power or privilege conferred hereunder.  Notwithstanding the foregoing, where the Trustee determines, in its reasonable discretion, that it is necessary, appropriate or desirable, the Trustee will have the right to submit to the Title III Court any question or questions regarding any specific action proposed to be taken by the Trustee with respect to this Trust Agreement, the Avoidance Actions Trust, the Avoidance Actions Trust Assets or the HTA Avoidance Actions, including the administration and distribution of the Avoidance Actions Trust Assets and the HTA Avoidance Actions, and the termination of the Avoidance Actions Trust.  Pursuant to the Plan, the Title III Court has retained jurisdiction for such purposes and may approve or disapprove any such proposed action upon motion by the Trustee.

6.4    <u>Exclusive Authority to Pursue Avoidance Actions and HTA Avoidance Actions</u>.  The Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and the HTA Avoidance Actions and (b) compromise and settle such Avoidance Actions and HTA Avoidance Actions, upon approval of the Title III Court.  The Trustee shall be the sole representative of the Debtors under section 1123(b)(3) of the Bankruptcy Code with respect to the Avoidance Actions and the HTA Avoidance Actions.  The Trustee shall be vested with and entitled to assert all setoffs and defenses of the Debtors or the Trust to any counterclaims that may be asserted by any defendant in an Avoidance Action or a HTA Avoidance Action.  The Trustee also shall be vested with and entitled to assert all of the Debtors' rights with respect to any such counterclaims under section 558 of the Bankruptcy Code.

6.5    <u>Limitations on Trustee</u>.  The Trustee shall, on behalf of the Avoidance Actions Trust, hold the Avoidance Actions Trust out as a trust in the process of liquidation and not as an investment company.  The Trustee shall be restricted to the liquidation of the Avoidance Actions Trust Assets and the HTA Avoidance Actions on behalf, and for the benefit, of the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries, as applicable, and the distribution and application of Avoidance Actions Trust Assets and the proceeds of the HTA Avoidance Actions for the purposes set forth in, and the conservation and protection of the Avoidance Actions Trust Assets and the HTA Avoidance Actions, and the administration thereof in accordance with, the provisions of this Trust Agreement, the Plan, the Confirmation Order, the HTA Plan and the HTA Confirmation Order.

6.6    <u>Conflicts of Interest</u>.  The Trustee will appoint a disinterested Person to handle any matter where the Trustee has identified it has a conflict of interest or the Title III Court, on motion of the any party in interest, determines one exists.  If the Trustee is unwilling or unable to appoint a disinterested Person to handle any such matter, the Title III Court, on notice and hearing, may do so.

6.7    <u>Establishment of Trust Advisory Board</u>.

22

(a)     The "Trust Advisory Board" means the board to be appointed in accordance with, and to exercise the duties set forth in, this Trust Agreement, which duties shall be (i) to oversee the liquidation and distribution of the Avoidance Actions Trust Assets and the HTA Avoidance Actions by the Trustee in accordance with this Trust Agreement, the Plan, the Confirmation Order, the HTA Plan and the HTA Confirmation Order, (ii) to approve (or withhold approval) of those matters submitted to it for approval in accordance with the terms of this Trust Agreement, and (iii) to remove and appoint any successor to the Trustee as provided for in this Trust Agreement.  Notwithstanding anything that may be to the contrary contained herein, the initial OB Director need not be selected by the FOMB on the date hereof, but may be selected at any time after the date hereof.

(b)     The Trust Advisory Board initially shall be comprised of (i) two (2) directors selected by the Creditors' Committee (the "Creditor Directors"), and (ii) one (1) director selected by the FOMB (the "OB Director").  The initial members of the Trust Advisory Board are set forth on Annex A hereto.  Each member of the Trust Advisory Board shall have a fiduciary duty to act in the best interests of the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries as a whole.  The Trust Advisory Board shall be subject to provisions consistent with Puerto Rico laws governing ethics, anti-corruption and conflicts of interest, and such laws shall be, and shall be deemed to be, incorporated into the Trust Advisory Board's bylaws.

(c)     The authority of the members of the Trust Advisory Board shall be effective as of the Effective Date and shall remain and continue in full force and effect until the Avoidance Actions Trust is dissolved in accordance with Section 3.2.  The service of the members of the Trust Advisory Board shall be subject to the following:

(i)     the members of the Trust Advisory Board shall serve until disability, death, or resignation pursuant to clause (ii) below, or removal pursuant to clause (iii) below;

(ii)     a member of the Trust Advisory Board may resign at any time by providing a written notice of resignation to the remaining members of the Trust Advisory Board.  Such resignation shall be effective when a successor is appointed as provided herein;

(iii)     a member of the Trust Advisory Board may be removed by the unanimous vote of the other members for (a) fraud, gross negligence or willful misconduct in connection with the affairs of the Avoidance Actions Trust, or (b) cause, which shall include a breach of fiduciary duty other than as specified in the foregoing clause (a).  Such removal shall be effective immediately upon such vote;

(iv)     in the event of a vacancy in a member's position (whether by removal, death or resignation), a new member may be appointed, (A) in the case of a Creditor Director, (i) by the Creditors' Committee, as notified in writing to the Trust Advisory Board and the Trustee within ten (10) Business Days, or (ii) if the Creditors' Committee has been dissolved, the remaining Creditor Director, as notified in writing to

23

the Trust Advisory Board and the Trustee within ten (10) Business Days, or (B) in the case
of the OB Director (i) by the FOMB, as notified in writing to the Trust Advisory Board
within ten (10) Business Days, or (ii) if the FOMB has been dissolved, by AAFAF, as
notified in writing to the Trust Advisory Board and the Trustee within ten (10) Business
Days.  In each case, the appointment of a successor member of the Trust Advisory Board
shall be evidenced by the filing with the Title III Court by the Trustee of a notice of
appointment, which notice shall include the name, address, and telephone number of the
successor member of the Trust Advisory Board; and

(v)    immediately upon appointment of any successor member of the
Trust Advisory Board, all rights, powers, duties, authority, and privileges of the
predecessor member of the Trust Advisory Board hereunder shall be vested in and
undertaken by the successor member of the Trust Advisory Board without any further act;
and the successor member of the Trust Advisory Board shall not be liable personally for
any act or omission of the predecessor member of the Trust Advisory Board.

(d)    Each member of the Trust Advisory Board shall designate (i) one or more
representatives who shall attend meetings of and participate in other activities of the Trust
Advisory Board, and (ii) an alternate representative to attend meetings and participate in other
activities of the Trust Advisory Board when the representatives designated pursuant to clause (i)
above are unavailable.

(e)    Notwithstanding anything in this Trust Agreement to the contrary, the Trust
Advisory Board shall not take any action which will cause the Avoidance Actions Trust to fail to
qualify as a "Liquidating Trust" for United States federal income tax purposes.

(f)    A quorum for meetings of the Trust Advisory Board shall consist of a
majority of the non-recused, voting members of the Trust Advisory Board then serving; provided,
however, that, for purposes of determining whether a quorum is present at such a meeting, a voting
member of the Trust Advisory Board shall be deemed present if a representative of the member is
attending in Person, by telephone or by proxy.

(g)    Except as expressly provided herein, the affirmative vote of a majority of
the non-recused, voting members of the Trust Advisory Board shall be the act of the Trust
Advisory Board with respect to any matter that requires the determination, consent, approval or
agreement of such board.  If an equal number of the non-recused voting members of the Trust
Advisory Board vote for and against a particular matter, the Trustee shall only in such
circumstances have the authority to cast a vote with respect to such matter.  Any of or all the
members of the Trust Advisory Board may participate in a regular or special meeting by, or
conduct the meeting through the use of, conference telephone or similar communications
equipment by means of which all persons participating in the meeting may hear each other, in
which case any required notice of such meeting may generally describe the arrangements (rather
than or in addition to the place) for the holding thereof.  Any member of the Trust Advisory Board
participating in a meeting by this means is deemed to be present in Person at the meeting.  In all
matters submitted to a vote of the Trust Advisory Board, each Trust Advisory Board member shall
be entitled to cast one vote, which vote shall be cast personally by such Trust Advisory Board

24

member or by proxy.  In a matter in which the Trustee cannot obtain direction or authority from the Trust Advisory Board, the Trustee may file a motion requesting such direction or authority from the Title III Court; provided, however, that any member of the Trust Advisory Board may oppose such motion.

(h)     A Trust Advisory Board member and its representative shall be recused from the Trust Advisory Board's deliberations and votes on any and all matters as to which such member has a conflicting interest.  If a Trust Advisory Board member or its representative does not recuse itself from any such matter, that Trust Advisory Board member and its representative may be recused from such matter by the unanimous vote of the remaining, voting members of the Trust Advisory Board that are not recused from the matter.

(i)     Any action required or permitted to be taken by the Trust Advisory Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Trust Advisory Board as evidenced by one or more written consents describing the action taken, signed by the Trust Advisory Board and filed with the minutes or proceedings of the Trust Advisory Board.

(j)     The members of the Trust Advisory Board shall be compensated as the Trust Advisory Board shall determine in an amount not to exceed $75,000 per board member per year.  Any member of the Trust Advisory Board shall also be reimbursed by the Trustee for its actual, reasonable out-of-pocket expenses, not to include outside counsel fees, incurred for serving on such board in the same manner and priority as the compensation and expenses of the Trustee under this Trust Agreement, in accordance with the Budget, after submission of reasonably detailed receipts or invoices evidencing such expenses and the approval of such expenses by the Title III Court.  Except as provided for in this Section 6.7, the members of the Trust Advisory Board shall not be entitled to receive any other form of compensation for their services provided as such members.  The Budget shall include a reserve for the fees and expenses of the Trust Advisory Board.  Payment of the compensation and expenses set forth in this Section 6.7(j) shall first be deducted from the Administrative Funding.  Payment of amounts from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

6.8     Cooperation with Respect to Claim Allowance: The Trustee and the Debtors shall cooperate and consult each other with respect to the disallowance or allowance of claims in connection with the litigation and/or resolution of Avoidance Actions, including with respect to any issues arising under sections 502(d) or 502(h) of the Bankruptcy Code.

6.9     Agents, Employees and Professionals.

(a)     The Avoidance Actions Trust may, but shall not be required to, from time to time enter into contracts with, consult with and retain members, managers, agents, representatives, employees, officers and independent contractors, including attorneys, accountants, appraisers, disbursing agents or other parties deemed by the Trustee to have qualifications necessary or desirable to assist in the proper administration of the Avoidance Actions Trust (collectively, the "Trust Professionals"), on such terms as the Trustee deems appropriate, including counsel retained on a contingency-fee basis, subject to the approval of the

25

Trust Advisory Board.  The Debtors agree that the Avoidance Actions Trust may (but shall not be obligated to) retain as disbursing agent the same disbursing agent as retained by one or more of the Debtors, on terms and conditions to facilitate timely and efficient distributions of the Cash proceeds of Avoidance Actions.  None of the professionals that represented parties-in-interest in the Title III Cases shall be precluded from being engaged by the Trustee solely on account of their service as a professional for such parties-in-interest prior to the Effective Date.

(b)      After the Effective Date, Trust Professionals shall be required to submit reasonably detailed invoices on a monthly basis to the Trustee and the Trust Advisory Board, including in such invoices a description of the work performed, who performed such work, and if billing on an hourly basis, the hourly rate of such Person, plus an itemized statement of expenses. The Trustee shall pay such invoices thirty (30) days after such invoices are approved by the Trustee.  In the event of any dispute concerning the entitlement to, or the reasonableness of any compensation and/or expenses of any Trust Professionals, either the Trustee or the affected party may ask the Title III Court to resolve the dispute.

(c)      All payments to Trust Professionals shall be paid out of the Administrative Funding or, if all of the Administrative Funding has been spent, any remaining Avoidance Actions Trust Assets, subject to the approval of the Trust Advisory Board; provided, however, that payments to Trust Professionals for services related solely to the HTA Avoidance Actions shall be paid or reimbursed from the proceeds of the HTA Avoidance Actions prior to the distribution of such proceeds to HTA Trust Beneficiaries.

(d)      Nothing in this Agreement shall prevent the Trustee, subject to the approval of the Trust Advisory Board, from seeking and obtaining outside credit or other funding for the prosecution of the Avoidance Actions or the HTA Avoidance Actions.

6.10      Investment of Avoidance Actions Trust Monies.  All monies and other assets received by the Trustee as Avoidance Actions Trust Assets (including the proceeds thereof as a result of investment in accordance with this Section 6.10) or as proceeds of the HTA Avoidance Actions shall, until distributed or paid over as herein provided, be held in trust for the benefit of the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries (as applicable), and shall not be segregated from other Avoidance Actions Trust Assets, unless and to the extent required by the Plan or the HTA Plan.  The Trustee may invest any Cash (including any earnings thereon or proceeds thereof) as permitted by section 345 of the Bankruptcy Code, in the manner set forth in this Section 6.10, but shall otherwise be under no liability for interest or income on any monies received by the Avoidance Actions Trust hereunder and held for distribution or payment to the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries, except as such interest shall actually be received.  Investment of any monies held by the Avoidance Actions Trust shall be administered in accordance with the general duties and obligations hereunder.  The right and power of the Trustee to invest the Avoidance Actions Trust Assets, the proceeds thereof, the proceeds of the HTA Avoidance Actions or any income earned by the Avoidance Actions Trust, shall be limited to the right and power to: (a) invest such Avoidance Actions Trust Assets or proceeds of HTA Avoidance Actions (pending distributions in accordance with the Plan, the HTA Plan or this Trust Agreement) in either (i) short-term direct obligations of, or obligations guaranteed by, the United States of America or (ii) short-term obligations of any agency or

26

corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof; or (b) deposit such assets in demand deposits at any bank or trust company, which has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000 (collectively, the "Permissible Investments"); provided, however, that the scope of any Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulations section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

6.11   Termination.  The duties, responsibilities and powers of the Trustee shall terminate on the date the Avoidance Actions Trust is wound up and dissolved in accordance with New York law pursuant to Section 3.2 hereof, under applicable law in accordance with the Plan, by an order of the Title III Court or by entry of a final decree closing the Debtors' Title III Cases; provided, that Sections 7.1, 7.2, 7.3, 7.4 and 7.5 hereof shall survive such termination, dissolution and entry.

## ARTICLE VII

## LIABILITY AND INDEMNITY

7.1   Liability to Third Persons.  No Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person in connection with the Avoidance Actions Trust Assets, the HTA Avoidance Actions or the affairs of the Trustee (except to the extent of the Avoidance Actions Trust Beneficiary's or HTA Trust Beneficiary's fraud, gross negligence or willful misconduct).  Notwithstanding anything herein to the contrary and without limitation of section 78.15 of the Plan, neither the Trust Parties nor the Trust Parties' firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents or agents, or any of such Person's successors and assigns shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person (including, in the case of the Trustee and members of the Trust Advisory Board, to any Trust Professionals retained by the Trustee in accordance with this Trust Agreement) in connection with the Avoidance Actions Trust Assets, the HTA Avoidance Actions or the affairs of the Avoidance Actions Trust and shall not be liable with respect to any action taken or omitted to be taken in good faith, except for actions and omissions determined by a final order of the Title III Court to be due to their respective gross negligence, fraud, criminal conduct or willful misconduct, and all such persons shall look solely to the Avoidance Actions Trust Assets and the HTA Avoidance Actions (as applicable) for satisfaction of claims of any nature arising in connection with affairs of the Avoidance Actions Trust.  Other than as set forth in the Plan or in the Confirmation Order, nothing in this Section 7.1 shall be deemed to release any Avoidance Actions Trust Beneficiary or any HTA Trust Beneficiary from any actions or omissions occurring prior to the Effective Date.

7.2   Nonliability for Acts of Others.  Except as provided herein, nothing contained in this Trust Agreement, the Plan, the Confirmation Order, the HTA Plan or the HTA Confirmation Order shall be deemed to be an assumption by Trustee, the Trust Advisory Board (or its members) or the Trust Professionals of any of the liabilities, obligations or duties of the Debtors or shall be deemed to be or contain a covenant or agreement by the such persons to assume or accept any such

27

liability, obligation or duty.  Any successor Trustee or Trust Advisory Board member may accept and rely upon any accounting made by or on behalf of any predecessor Trustee or Trust Advisory Board hereunder, and any statement or representation made as to the assets comprising the Avoidance Actions Trust Assets or the HTA Avoidance Actions, or as to any other fact bearing upon the prior administration of the Avoidance Actions Trust, so long as it has a good faith basis to do so.  The Trustee and the Trust Advisory Board members shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue (except to the extent of the Trustee's, or the Trust Advisory Board members', fraud, gross negligence or willful misconduct).  The Trustee or any successor Trustee and the Trust Advisory Board members or any successor Trust Advisory Board member shall not be liable for any act or omission of any predecessor Trustee or Trust Advisory Board member.  No provision of this Trust Agreement shall require the Trustee or any Trust Advisory Board member to expend or risk his personal funds or otherwise incur any financial liability in the performance of his rights or powers hereunder if the Trustee or Trust Advisory Board member has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to him.

7.3    Exculpation.  As of the Effective Date, the Trust Parties, the Trust Parties' firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents and agents, and any of such Person's successors and assigns shall be and hereby are exculpated by all Persons, including Avoidance Actions Trust Beneficiaries, HTA Trust Beneficiaries, holders of Claims, holders of Equity interests, and other parties-in-interest, from any and all claims, causes of action and other assertions of liability arising out of or related to the discharge of their respective powers and duties conferred by the Plan, the HTA Plan, this Trust Agreement or any order of the Title III Court entered pursuant to or in furtherance of the Plan or the HTA Plan, or applicable law or otherwise, except for actions or omissions to act that are determined by final order of the Title III Court to have arisen out of their own respective fraud, criminal conduct, gross negligence or willful misconduct.  No Avoidance Actions Trust Beneficiary, HTA Trust Beneficiary, holder of a Claim, or other party-in-interest shall have or be permitted to pursue any claim or cause of action against the Trust Parties, their employees, professionals, or representatives, for making payments in accordance with, or for implementing, the provisions of the Plan, the Confirmation Order and this Trust Agreement.  Any action taken or omitted to be taken with the express approval of the Title III Court or the Trust Advisory Board shall conclusively be deemed not to constitute gross negligence or willful misconduct; provided, however, that, notwithstanding any provision herein to the contrary, the Trustee shall not be obligated to comply with a direction of the Trust Advisory Board, whether or not express, that would result in a change to the distribution provisions of this Trust Agreement and the Plan.  In such instance, the Trustee shall request, within fourteen (14) days, the Title III Court's ratification of its determination not to comply with a direction of the Trust Advisory Board.

7.4    Limitation of Liability.  The Trustee, the members of the Trust Advisory Board, and the Trust Professionals will not be liable for punitive, exemplary, consequential, special or other damages for a breach of this Trust Agreement under any circumstances, except for those resulting from acts arising out of their own fraud, willful misconduct, or gross negligence.

7.5    <u>Indemnity</u>.  The Trust Parties and their respective firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents and agents, and any of such Person's successors and assigns (each, an "<u>Indemnified Party</u>"), shall not be liable to the Avoidance Actions Trust Beneficiaries or the HTA Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the Trustee or the Trust Advisory Board, as applicable, except those acts arising out of their own fraud, willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Trustee or the Trust Advisory Board, as applicable, except for any actions or inactions involving fraud, willful misconduct or gross negligence.  Any indemnification claim of an Indemnified Party under this <u>Section 7.5</u> shall be satisfied solely from the Avoidance Actions Trust Assets or the proceeds of the HTA Avoidance Actions (as applicable) and shall be entitled to a priority distribution therefrom, ahead of the Avoidance Actions Trust Interests and the HTA Trust Interests (as applicable), and any other claim to or interest in such assets.  The Indemnified Parties shall be entitled to rely, in good faith, on the advice of their retained professionals.  The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which they are indemnified.

7.6    <u>Compensation and Expenses</u>.  The Trustee (including the Person(s) serving as or comprising the Trustee) shall receive compensation for its services, to be paid out of the Avoidance Actions Trust Assets and the proceeds of the HTA Avoidance Actions, in the manner and amount determined by the Trust Advisory Board, subject to the approval of the Title III Court.  In addition, the Trustee shall be entitled, with the consent of the Trust Advisory Board, and subject to the approval of the Title III Court, to reimburse itself from the Avoidance Actions Trust Assets on a monthly basis for all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement and the Plan so long as it falls within the amounts provided for in the Budget; otherwise, approval of the Trust Advisory Board is required.  Payment of the compensation and expenses set forth in this <u>Section 7.6</u> shall first be deducted from the Administrative Funding; <u>provided</u>, <u>however</u>, that to the extent any compensation and expenses hereunder relate solely to the administration, liquidation and conversion into Cash of the HTA Avoidance Actions, such compensation and expenses shall be paid or reimbursed from the Cash proceeds of the HTA Avoidance Actions to the extent such Cash proceeds are or become available.  Payment of amounts from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

## ARTICLE VIII

## <u>SUCCESSOR TRUSTEE</u>

8.1    <u>Resignation</u>.  The Trustee may resign from the Avoidance Actions Trust by giving at least sixty (60) days' prior written notice thereof to each member of the Trust Advisory Board.  Such resignation shall become effective on the later to occur of (a) the date specified in such written notice and (b) the effective date of the appointment of a successor Trustee in accordance

29

with <u>Section 8.4</u> hereof and such successor's acceptance of such appointment in accordance with <u>Section 8.5</u> hereof.

    8.2   <u>Removal</u>.  The Trustee may be removed by a majority vote of the members of the Trust Advisory Board.  Such removal shall become effective on the date specified in such action by the Trust Advisory Board.

    8.3   <u>Effect of Resignation or Removal</u>.  The resignation, removal, incompetency, bankruptcy or insolvency of the Trustee shall not operate to terminate the Avoidance Actions Trust or to revoke any existing agency created pursuant to the terms of this Trust Agreement, the Plan, the Confirmation Order, the HTA Plan or the HTA Confirmation Order, or invalidate any action theretofore taken by the Trustee.  All fees and expenses properly incurred by the Trustee prior to the resignation, incompetency or removal of the Trustee shall be paid from the Avoidance Actions Trust Assets, unless such fees and expenses are disputed by (a) the Trust Advisory Board, or (b) the successor Trustee, in which case the Title III Court shall resolve the dispute and any disputed fees and expenses of the predecessor Trustee that are subsequently allowed by the Title III Court shall be paid from the Avoidance Actions Trust Assets; <u>provided</u>, <u>however</u>, that, to the extent any fees and expenses incurred by the Trustee prior to resignation or removal relate solely to the administration, liquidation and conversion into Cash of the HTA Avoidance Actions, such fees and expenses shall be paid or reimbursed from the Cash proceeds of the HTA Avoidance Actions to the extent such Cash proceeds are or become available.  In the event of the resignation or removal of the Trustee, such Trustee shall: (i) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Trustee or directed by the Title III Court to effect the termination of such Trustee's capacity under this Trust Agreement; (ii) promptly deliver to the successor Trustee all documents, instruments, records and other writings related to the Avoidance Actions Trust as may be in the possession of such Trustee; and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Trustee.

    8.4   <u>Appointment of Successor</u>.  In the event of the death, resignation, removal, incompetency, bankruptcy or insolvency of the Trustee, a vacancy shall be deemed to exist and a successor shall be appointed by a majority of the Trust Advisory Board; <u>provided</u>, <u>however</u>, that under no circumstance shall the successor Trustee be a director or officer of any Affiliate of the Avoidance Actions Trust.

    8.5   <u>Acceptance of Appointment by Successor Trustee</u>.  Any successor Trustee appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Title III Court for filing and to the Trust Advisory Board and, in case of the Trustee's resignation, to the resigning Trustee.  Thereupon, such successor Trustee shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor in the Avoidance Actions Trust with like effect as if originally named Trustee.  The resigning or removed Trustee shall duly assign, transfer and deliver to such successor Trustee all property and money held by such resigning or removed Trustee hereunder and shall, as directed by the Title III Court or reasonably requested by such successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor

Trustee upon the trusts herein expressed, all the liabilities, duties, powers, rights, title, discretion and privileges of such resigning or removed Trustee.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

9.1     <u>Binding on the Debtors</u>.  This Trust Agreement shall be binding on the Debtors and shall remain binding on the Debtors notwithstanding any dissolution of the FOMB or any other event that may cause the FOMB to cease to exist or to cease serving as a representative of the Debtors.

9.2     <u>Governing Law</u>.  This Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to principles of conflicts of laws; <u>provided</u>, <u>however</u>, that the Trust Advisory Board shall be subject to Puerto Rico laws governing ethics, anti-corruption and conflicts of interest, and such laws shall be, and shall be deemed to be, incorporated into the Trust Advisory Board's bylaws.

9.3     <u>Jurisdiction</u>.  Subject to the proviso below, the parties agree that the Title III Court shall have exclusive jurisdiction over the Avoidance Actions Trust and the Trustee, including the administration and activities of the Avoidance Actions Trust and the Trustee, and, pursuant to the Plan, the Title III Court has retained such jurisdiction; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, the Trustee shall have power and authority to bring any action in any court of competent jurisdiction (including the Title III Court) to prosecute any Claims or Causes of Action assigned to the Avoidance Actions Trust.

9.4     <u>Severability</u>.  If any provision of this Trust Agreement or the application thereof to any Person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforceable to the full extent permitted by law.

9.5     <u>Notices</u>.  Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, sent by facsimile transmission or e-mail, sent by nationally recognized overnight delivery service or mailed by first-class mail:

(i)     if to the Trustee, to:

Drivetrain LLC
410 Park Avenue, Suite 900
New York, NY 10022
dmack@drivetrainllc.com
sleduc@drivetrainllc.com
tdaileader@drivetrainllc.com

31

with a copy to counsel to be identified by the Trustee.

(ii)     if to members of the Trust Advisory Board, then to each of;

Carol Flaton
Hamlin Partners LLC
39 Bank Street
New York, NY 10014
carol.flaton@hamlinpartners.com

Ramon Ortiz
Urb. Sabanera
40 Camino de la Cascada
Cidra, Puerto Rico 00739
ruoc1958@hotmail.com

(iii)     if to any Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary, to the last known address of such Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary according to the Debtors' Schedules, such Avoidance Actions Trust Beneficiary's or HTA Trust Beneficiary's proof of claim or the lists of record holders provided to the Trustee; and

(iv)     if to the FOMB

Financial Oversight and Management Board for Puerto Rico
268 Muñoz Rivera Ave,
Suite 1107 San Juan, PR 00918-1813
Attn:  Executive Director

With a copy to:

Proskauer Rose LLP
Eleven Times Square
New York, NY  10036
Attn: Martin J. Bienenstock, Esq.
Brian S. Rosen, Esq.
James P. Gerkis, Esq.
Tel: (212) 969-3000
Fax: (212) 969-2900

AND

32

O'Neill & Borges LLC
250 Muñoz Rivera Ave,
Suite 800
San Juan, PR 00918-1813
Attn: Hermann Bauer, Esq.
Tel: (787) 764-8181
Fax: (212) 753-8944

(v)    if to each of the Debtors or the Post-Effective Date Debtors:

The Commonwealth of Puerto Rico
c/o Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn:  Executive Director

AND

The Employees Retirement System of the Government of the
Commonwealth of Puerto Rico
PO Box 42003
San Juan, PR 00940-2203
Attn: Executive Director

AND

The Puerto Rico Public Buildings Authority
PO Box 41029
San Juan, PR 00940-1029
Attn: Executive Director

AND

The Puerto Rico Highways and Transportation Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Avenue Stop 10
San Juan, PR 00907
Attn: Executive Director

33

With a copy to:

> Proskauer Rose LLP
> Eleven Times Square
> New York, NY  10036
> Attn: Martin J. Bienenstock, Esq.
> Brian S. Rosen, Esq.
> James P. Gerkis, Esq.
> Tel: (212) 969-3000
> Fax: (212) 969-2900

AND

Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn: Executive Director

With a copy to:

> O'Melveny & Myers LLP
> Seven Times Square
> New York, NY 10036
> Attn:   John Rapisardi, Esq.
>         Peter Friedman, Esq.
>         Maria J. DiConza, Esq.
> Tel: (212) 326-2000
> Fax: (212) 326-2061

9.6     <u>Deemed Delivery</u>.  All notices shall be effective and shall be deemed delivered : (a) if by personal delivery, delivery service or courier, on the date of delivery; (b) if by electronic mail or facsimile communication, on the date of receipt or confirmed transmission of the communication; and (c) if by mail, on the date of receipt.  Any party from time to time may change its address, facsimile number or other information for the purpose of notices to that party by giving notice specifying such change to the other parties hereto.

9.7     <u>Headings</u>.   The headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

9.8     <u>Actions Taken on a Date Other Than a Business Day</u>.  If any payment or act under the Plan, the HTA Plan or this Trust Agreement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

9.9     Relationship to the Plan and the HTA Plan.  The terms of this Trust Agreement are intended to supplement the terms provided by the Plan, the Confirmation Order, the HTA Plan and the HTA Confirmation Order, and therefore this Trust Agreement incorporates the provisions of the Plan, the Confirmation Order (which may amend or supplement the Plan), the HTA Plan and the HTA Confirmation Order (which may amend or supplement the HTA Plan).  Additionally, the Trustee and the Trust Advisory Board may seek any orders from the Title III Court, upon notice and a hearing in furtherance of implementation of the Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order and this Trust Agreement.  However, to the extent that there is conflict between the provisions of this Trust Agreement, and the provisions of the Plan, the Confirmation Order, the HTA Plan or the HTA Confirmation Order, each document shall have controlling effect in the following rank order: (a) *first*, this Trust Agreement; (b) *second*, the Confirmation Order or HTA Confirmation Order (as applicable); and (c) *third*, the Plan or HTA Plan (as applicable).

9.10     Entire Trust Agreement.  This Trust Agreement (including the recitals and annexes hereto), the Plan, the Confirmation Order, the HTA Plan and the HTA Confirmation Order constitute the entire agreement and understanding by and among the parties and supersede all prior and contemporaneous agreements or understandings, statements, or exchanges by and among the parties or any other person with respect to the subject matter hereof.

9.11     Cooperation.  Each of the Debtors and the FOMB shall turn over or otherwise make available to the Trustee at no cost to the Avoidance Actions Trust or the Trustee, all books and records (or copies thereof) and other information, in each as may be reasonably requested by the Trustee, including (a) all communications by and between the FOMB and its professionals and the Avoidance Action defendants, and (b) all data and documents the FOMB and its professionals have received from the Avoidance Action defendants and the HTA Avoidance Action defendants through the "information exchange" process contemplated by the *Order Granting Omnibus Motion by the Financial Oversight and Management Board for Puerto Rico, Acting by and through the Members of the Special Claims Committee and the Official Committee of Unsecured Creditors to (i) Establish Litigation Case Management Procedures and (ii) Establish Procedures for Approval of Settlements* [Docket No. 7941].  The Debtors and the FOMB further agree to reasonably cooperate with the Trustee in carrying out its duties hereunder, including by, among other things: (i) delivering to the Trustee work product developed by their respective professionals in connection with the prosecution of the Avoidance Actions and the HTA Avoidance Actions, subject to the confidentiality provisions herein to preserve the confidential nature of the Debtors' and the FOMB's books and records; (ii) following the Effective Date, participating in meetings with the Trustee, at the Trustee's reasonable request and at such times and upon such notice as does not unreasonably interfere with the operations of such party, for purposes of coordinating the transition of the Avoidance Actions Trust Assets and the HTA Avoidance Actions; (iii) providing assistance in discovery responses and witness testimony as is reasonably necessary for the resolution of the Avoidance Actions and the HTA Avoidance Actions; and (iv) maintaining all data rooms, hard drives and other media containing information and/or documents related to the Avoidance Actions and the HTA Avoidance Actions, as reasonably requested by the Trustee, to facilitate access to such information and/or documents.  Notwithstanding the foregoing or anything else that may be to the contrary herein, the FOMB shall not be required to disclose any information

or work product if the same constitutes or relates to communications between a committee of the FOMB and another part or a member of the FOMB; provided, however, that the FOMB shall provide to the Trustee the relevant portion of any memoranda or other documents containing research or analysis concerning legal or factual issues arising in proceedings related to the Avoidance Actions or HTA Avoidance Actions, regardless of whether such memoranda or other documents were shared between a committee of the FOMB and another part or a member of the FOMB. The Trustee agrees to give the Debtors and/or their designated counsel reasonable access to attend (A) witness preparations related to the Avoidance Actions and the HTA Avoidance Actions for any witness who will be providing testimony in his or her capacity as a current or former employee of any of the Debtors, and (B) the depositions of any witness who provides testimony related to the Avoidance Actions or the HTA Avoidance Actions in his or her capacity as a current or former employee of any of the Debtors; provided, however, that such attendance (1) will be solely as an observer, and (2) shall not constitute a waiver of any privileges.

   9.12    Amendment and Waiver. Any provision of this Trust Agreement may be amended or waived by the Trustee with the unanimous consent of all voting members of the Trust Advisory Board. Notwithstanding this Section 9.12, any amendment to this Trust Agreement shall not be inconsistent with the purpose and intention of the Avoidance Actions Trust to liquidate in an expeditious but orderly manner the Avoidance Actions Trust Assets and the HTA Avoidance Actions in accordance with Treasury Regulations section 301.7701-4(d) and Section 1.2.

   9.13    Confidentiality.   The Trust Parties and their advisors, including the Trust Professionals (each a "Confidential Party" and, collectively, the "Confidential Parties") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Debtor or the FOMB to which any of the Avoidance Actions Trust Assets or HTA Avoidance Actions relates; provided, however, that such information may be disclosed if: (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties; or (b) such disclosure is required of the Confidential Parties pursuant to legal process, including subpoena or other court order or other applicable laws or regulations. If any Confidential Party is requested to divulge confidential information pursuant to clause (b) above, such Confidential Party shall promptly, in advance of making such disclosure, provide reasonable notice of such required disclosure to the Trustee (or the Trust Advisory Board in case the Trustee is the disclosing party) to allow sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the Trustee (or the Trust Advisory Board, as applicable) in making any such objection, including appearing in any judicial or administrative proceeding in support of any objection to such disclosure.

   9.14    Rules of Construction. Except where the context otherwise may require, (a) words of any gender include the other gender, and (b) words importing the singular number shall include the plural number and vice versa.   All references herein to Articles, Sections and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Trust Agreement. The terms "hereof", "hereto", "herein" and words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section

36

or subdivision of this Trust Agreement.  The terms "include", "includes" and "including" shall be construed as if followed by the words "without limitation".

9.15   Counterparts.  This Trust Agreement may be executed with counterpart signature pages or in any number of counterparts, each of which counterparts shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument.  A facsimile, portable document file (PDF) or other electronic transmission signature of any party shall be considered to have the same binding legal effect as an original signature.

9.16   Intention of Parties to Establish Avoidance Actions Trust.  This Trust Agreement is intended to create a Avoidance Actions Trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Trust Agreement may be amended to comply with such United States federal income tax laws, which amendments may apply retroactively.

9.17   Definitions.

"**AAFAF**" shall have the meaning ascribed to such term in the Plan.

"**Administrative Funding**" shall have the meaning ascribed to such term in Section 1.3 hereof.

"**Affiliate**" shall have the meaning ascribed to such term in the Plan.

"**Allowed**" shall have the meaning ascribed to such term in the Plan.

"**Allowed Claim**" shall have the meaning ascribed to such term in the Plan.

"**Avoidance Actions**" shall have the meaning ascribed to such term in the Plan.

"**Avoidance Actions Trust**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**Avoidance Actions Trust Assets**" shall have the meaning ascribed to such term in the Plan and, for the avoidance of doubt, shall include the account at Banco Popular with account number 75-0277-01-4.

"**Avoidance Actions Trust Beneficiaries**" shall have the meaning ascribed to such term in the Plan.

"**Avoidance Actions Trust Interests**" shall have the meaning ascribed to such term in the Plan.

"**Bankruptcy Code**" shall have the meaning ascribed to such term in the Plan.

"**Bankruptcy Rules**" shall have the meaning ascribed to such term in the Plan.

37

"**Book Entry System**" shall have the meaning ascribed to such term in <u>Section 2.3</u> hereof.

"**Budget**" shall have the meaning ascribed to such term in <u>Section 4.13</u> hereof.

"**Business Day**" shall have the meaning ascribed to such term in the Plan.

"**Cash**" shall have the meaning ascribed to such term in the Plan.

"**Causes of Action**" shall have the meaning ascribed to such term in the Plan.

"**Claims**" shall have the meaning ascribed to such term in the Plan.

"**Commonwealth**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**Commonwealth Avoidance Actions Trust**" shall have the meaning ascribed to such term in <u>Section 1.1</u> hereof.

"**Confidential Party**" shall have the meaning ascribed to such term in <u>Section 9.13</u> hereof.

"**Confirmation Order**" shall have the meaning ascribed to such term in the Recitals.

"**Creditors' Committee**" shall have the meaning ascribed to such term in the Plan.

"**Creditor Directors**" shall have the meaning ascribed to such term in <u>Section 6.7(b)</u> hereof.

"**Debtors**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**Disbursing Agent**" shall have the meaning ascribed to such term in the Plan.

"**Dispute Resolution**" shall have the meaning ascribed to such term in <u>Section 2.1</u> hereof.

"**Disputed Claim**" shall have the meaning ascribed to such term in the Plan but shall include, in the period prior to the Debtors' deadline to object to claims, all Claims that have not been Allowed.

"**Distribution Date**" shall have the meaning ascribed to such term in <u>Section 4.2(b)</u> hereof.

"**Effective Date**" shall have the meaning ascribed to such term in the Plan.

"**Eminent Domain Claim**" shall have the meaning ascribed to such term in the Plan.

38

"**Entities**" shall have the meaning ascribed to such term in the Plan.

"**Equity**" shall have the meaning ascribed to such term in the Plan.

"**ERS**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**ERS General Unsecured Claim**" shall have the meaning ascribed to such term in the Plan.

"**Exchange Act**" shall have the meaning ascribed to such term in Section 2.6(c) hereof.

"**Final Order**" shall have the meaning ascribed to such term in the Plan.

"**FOMB**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**General Unsecured Claims**" shall have the meaning ascribed to such term in the Plan.

"**HTA**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**HTA Avoidance Actions**" shall have the meaning ascribed to such term in the Recitals.

"**HTA Confirmation Order**" shall have the meaning ascribed to such term in the Recitals.

"**HTA Effective Date**" shall have the meaning ascribed to such term in Section 1.3(b) hereof.

"**HTA Plan**" shall have the meaning ascribed to such term in the Recitals.

"**HTA Trust Beneficiaries**" shall have the meaning ascribed to such term in the Recitals.

"**HTA Trust Interests**" shall have the meaning ascribed to such term in Section 2.1 hereof.

"**Indemnified Party**" shall have the meaning ascribed to such term in Section 7.5 hereof.

"**Initial Claims Report**" shall have the meaning ascribed to such term in Section 2.4 hereof.

"**IRC**" shall have the meaning ascribed to such term in the Recitals.

"**IRS**" shall have the meaning ascribed to such term in the Plan.

"**Liquidating Trust**" shall have the meaning ascribed to such term in Recitals.

"**Monthly Claims Report**" shall have the meaning ascribed to such term in Section 2.4 hereof.

39

"**OB Director**" shall have the meaning ascribed to such term in Section 6.7(b) hereof.

"**PBA**" shall have the meaning ascribed to such term in the Recitals.

"**Permissible Investments**" shall have the meaning ascribed to such term in Section 6.10 hereof.

"**Person**" shall have the meaning ascribed to such term in the Plan.

"**Plan**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**Privileges**" shall have the meaning ascribed to such term in Section 1.9 hereof.

"**PROMESA**" shall have the meaning ascribed to such term in the Recitals.

"**Reorganized Debtors**" shall have the meaning ascribed to such term in the Plan.

"**SEC**" shall have the meaning ascribed to such term in Section 2.6(c) hereof.

"**Title III Cases**" shall have the meaning ascribed to such term in the Recitals.

"**Title III Court**" shall have the meaning ascribed to such term in the Plan.

"**Treasury Regulations**" shall have the meaning ascribed to such term in the Recitals.

"**Trust Advisory Board**" shall have the meaning ascribed to such term in Section 6.7(a) hereof.

"**Trust Agreement**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**Trust Disbursing Agent**" shall have the meaning ascribed to such term in Section 4.2 hereof.

"**Trust Parties**" shall have the meaning ascribed to such term in Section 2.5 hereof.

"**Trust Professionals**" shall have the meaning ascribed to such term in Section 6.9 hereof.

"**Trustee**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

[Remainder of Page Blank — Signature Page Follows]

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

**THE COMMONWEALTH OF PUERTO RICO**, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/_____
    Name: _____
    Title:

**EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/_____
    Name: _____
    Title:

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/_____
    Name: _____
    Title:

**PUERTO RICO PUBLIC BUILDINGS AUTHORITY**, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/_____
    Name: _____
    Title:

**DRIVETRAIN LLC, AS TRUSTEE**

By: /s/‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
    Name:  David Mack
             Timothy Daileader
    Title:   Authorized Signatory

*And, solely with respect to* <u>*Sections 1.3*</u> *and* <u>*9.11*</u>
*hereof*:

**FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO**

By: /s/ _____

    Name: _____

    Title:

**Annex A**

<u>Initial Trust Advisory Board Members</u>

*Creditor Directors*:

1.      Carol Flaton

2.      Ramon Ortiz Carro

*OB Director*:

3.      None

**<u>Redline of Exhibit B</u>**

**AMENDED AND RESTATED
AVOIDANCE ACTION TRUST AGREEMENT**

**AMENDED AND RESTATED AVOIDANCE ACTIONS TRUST AGREEMENT**
dated as of ~~————~~,December 6, 2022 (this "Trust Agreement"), by and among the
Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of
the Government of the Commonwealth ("ERS"), the Puerto Rico Highways and Transportation
Authority (the "HTA"), and the Puerto Rico Public Buildings Authority ("PBA" and, together with
the Commonwealth, ERS and HTA, the "Debtors"); Drivetrain, LLC, as trustee (together with any
successor or additional Trustee appointed under the terms hereof, the "Trustee") of the
Commonwealth Avoidance Actions Trust (the "Avoidance Actions Trust"); and, solely with
respect to Sections 1.3 and 9.11, the Financial Oversight and Management Board for Puerto Rico
on behalf of itself and its committees (the "FOMB").

Section 9.17 hereof contains a list of capitalized terms used herein.  Capitalized terms used
but not otherwise defined herein shall have the meanings ascribed to such terms in the Modified
Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.,
dated January 14, 2022 (including all exhibits thereto, as the same may be further amended,
modified, or supplemented from time to time, the "Plan") or the Third Amended Title III Plan of
Adjustment of the Puerto Rico Highways and Transportation Authority (the "HTA Plan"), as
applicable.

## RECITALS

1.      On June 30, 2016, the President of the United States signed into law legislation
passed by Congress, the Puerto Rico Oversight, Management, and Economic Stability Act
("PROMESA"), 48 U.S.C. § 2101 *et seq.*. Titles III and VI of PROMESA provide for debt
restructurings for Puerto Rico and its instrumentalities.

2.      The FOMB commenced Title III cases for the Commonwealth, ERS, and PBA on
May 3, 2017, May 5, 2017, and September 27, 2019, respectively (the "Title III Cases").

3.      On January 18, 2022, the Court entered the Order and Judgment Confirming
Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto
Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico,
and the Puerto Rico Public Buildings Authority (the "Confirmation Order"), which, among other
things, confirmed the Plan and the transactions contemplated thereby.

4.      The Plan provided for the creation of the Avoidance Actions Trust on or before the
Effective Date to hold, manage and administer the Avoidance Actions Trust Assets and distribute
the proceeds thereof, if any, to the Avoidance Actions Trust Beneficiaries, in accordance with the
terms of the Avoidance Actions Trust Agreement dated as of March 15, 2022 (the "Original Trust
Agreement"), the Plan and the Confirmation Order.

5.      The Avoidance Actions Trust was created on behalf of, and for the benefit of, the
Avoidance Actions Trust Beneficiaries.

6.      On May 21, 2017, the FOMB commenced a Title III Case for the HTA.

7.     On July 17, 2022, the FOMB filed the HTA Plan, and on ~~_____~~, October 12, 2022, the Court entered the Order and Judgment Confirming the HTA Plan (the "HTA Confirmation Order"), which, among other things, confirmed the HTA Plan and the transactions contemplated thereby.

8.     Under the HTA Plan, all "Avoidance Actions" as defined in the HTA Plan (hereinafter, the "HTA Avoidance Actions") will be transferred to the Avoidance Actions Trust to be pursued by the Trustee for the benefit of the Holders of HTA General Unsecured Claim (hereinafter, the "HTA Trust Beneficiaries", and each such Holder, a "HTA Trust Beneficiary").

9.     The Trustee shall have all powers necessary to implement the provisions of this Trust Agreement and administer the Avoidance Actions Trust, including the power to: (i) prosecute for the benefit of the Avoidance Actions Trust Beneficiaries through Trust Professionals any Avoidance Action or other causes of action that may from time to time be held by the Avoidance Actions Trust; (ii) prosecute for the benefit of the HTA Trust Beneficiaries through Trust Professionals any HTA Avoidance Action; (iii) preserve, maintain and liquidate the Avoidance Actions Trust Assets and the HTA Avoidance Actions; (iv) distribute the Avoidance Actions Trust proceeds to the Avoidance Actions Trust Beneficiaries; (v) distribute the proceeds of the HTA Avoidance Actions to the HTA Trust Beneficiaries; and (vi) otherwise perform the functions and take the actions provided for in this Trust Agreement or permitted in the Plan, the HTA Plan, the Confirmation Order and/or the HTA Confirmation Order or in any other agreement executed pursuant to the Plan or the HTA Plan, in each case subject to the provisions of Sections 6.3, 6.4, and 6.5 hereof regarding limitation on the Trustee and the oversight and consent rights of the Trust Advisory Board and the Title III Court as provided for herein;

10.    The Avoidance Actions Trust is organized for the sole purpose of liquidating and distributing the Avoidance Actions Trust Assets and the HTA Avoidance Actions, with no objective to conduct a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Avoidance Actions Trust.

11.    The Avoidance Actions Trust is intended to qualify as a "Liquidating Trust" under the Internal Revenue Code of 1986, as amended (the "IRC") and the regulations promulgated thereunder (the "Treasury Regulations"), specifically Treasury Regulations section 301.7701-4(d) and, as such, as a "grantor trust" for United States federal income tax purposes with the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries treated as the grantors and owners of the Avoidance Actions Trust.

12.    Pursuant to the Plan and the HTA Plan, the Trust is intended to be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.

13.    In accordance with the Plan and the HTA Plan, the Trust is further intended to be exempt from the requirements of (i) the Securities Exchange Act of 1934, as amended, and any applicable state and local laws requiring registration of securities, pursuant to section 1145 of the Bankruptcy Code, and (ii) the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements contained herein, the Debtors and the Trustee hereby agree to amend and restate the Original Trust Agreement in its entirety as follows:

<div align="center">

**AGREEMENT**

**ARTICLE I**

**<u>DECLARATION OF TRUST</u>**

</div>

1.1    <u>Creation of Trust</u>.  The Debtors and the Trustee, pursuant to the Plan and the Confirmation Order, hereby constitute and create the Avoidance Actions Trust, which shall bear the name "Commonwealth Avoidance Actions Trust." In connection with the exercise of the Trustee's power hereunder, the Trustee may use this name or such variation thereof as the Trustee sees fit.

1.2    <u>Purpose of Avoidance Actions Trust</u>.  The sole purpose of the Avoidance Actions Trust is to implement the Plan and the HTA Plan on behalf, and for the benefit, of the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries, and to serve as a mechanism for liquidating, converting to Cash and distributing the Avoidance Actions Trust Assets and the HTA Avoidance Actions in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Avoidance Actions Trust.

1.3    <u>Transfer of Avoidance Actions Trust Assets</u>.

(a)    The Debtors previously transferred, for the sole benefit of the Avoidance Actions Trust Beneficiaries, and in accordance with the Plan and the Confirmation Order, all of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other Persons to the maximum extent contemplated by and permissible pursuant to the Plan and Confirmation Order. Such transfer occurred on the Effective Date for all Avoidance Actions Trust Assets other than the settlement funds residing in the account at Banco Popular de Puerto Rico with account number 75-0277-01-4 (the "<u>Escrow Account Funds</u>"). On or after the Effective Date, upon the written request of the Trustee, the Debtors or the Reorganized Debtors, as the case may be, with the assistance of the FOMB and its Special Claims Committee, shall take actions necessary to cause the Escrow Account Funds to be disbursed to the Avoidance Actions Trust in accordance with that certain Escrow Agreement dated as of March 11, 2021, by and among the Special Claims Committee, the Official Committee of Unsecured Creditors for all Title III Debtors (other than PBA and COFINA), and Banco Popular de Puerto Rico. In addition, the Commonwealth shall fund the Avoidance Actions Trust, on a one time basis, in the amount of Fifteen Million U.S. Dollars ($15,000,000) (the "<u>Administrative Funding</u>") by transferring such funds to the Avoidance Actions Trust within two business days of receiving written transfer instructions for such purpose from the Trustee. Any portion of the Administrative Funding that is not used to fund the activities of the Avoidance Actions Trust shall be distributed in accordance with <u>Section 4.2</u>. The FOMB

<div align="center">3</div>

shall reasonably cooperate with the reasonable requests of the Trustee in connection with the transfer by the Debtors of the Avoidance Actions Trust Assets pursuant to this <u>Section 1.3(a)</u>.

(b)     On the effective date of the HTA Plan (the "<u>HTA Effective Date</u>"), HTA shall transfer, for the sole benefit of the HTA Trust Beneficiaries, and in accordance with the HTA Plan and the HTA Confirmation Order, all of the HTA Avoidance Actions to the Avoidance Actions Trust, free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other Persons to the maximum extent contemplated by and permissible pursuant to the HTA Plan and HTA Confirmation Order.  The FOMB shall reasonably cooperate with the reasonable requests of the Trustee in connection with the transfer by HTA of the HTA Avoidance Actions pursuant to this Section 1.3(b).

1.4     <u>No Rights of Debtors</u>.   Following the Effective Date and the transfer of the Avoidance Actions Trust Assets and the HTA Avoidance Actions to the Avoidance Actions Trust, the Debtors shall have no authority or control over the Avoidance Actions Trust Assets or the HTA Avoidance Actions, including no rights to appear in, prosecute, compromise, or otherwise direct the litigation or settlement of the Avoidance Actions or the HTA Avoidance Actions, except as may be necessary to ensure, and for the sole purpose of ensuring, the full transfer of control and authority over the Avoidance Actions Trust Assets and the HTA Avoidance Actions to the Avoidance Actions Trust.   The Debtors agree to take whatever actions may be reasonably necessary, including seeking the amendment of complaints or the restatement of tolling agreements, to ensure that all such authority and control over the Avoidance Actions, the HTA Avoidance Actions and other Trust Assets is so transferred to the Trust.  The limitations on the Debtors' rights in this subsections shall not prejudice the ability of any of the Debtors to appear in or provide testimony in Avoidance Actions, HTA Avoidance Actions or other litigation in order to fulfil the Debtors' cooperation obligations set forth in <u>Section 9.11</u> hereof.

1.5     <u>Appointment and Acceptance of Trustee</u>.   As set forth in the Confirmation Order, the members of the Trust Advisory Board hereby ratify the designation of Drivetrain, LLC to serve as the initial Trustee under the Plan, and HTA hereby designates the Drivetrain, LLC to serve as the initial Trustee under the HTA Plan.  The Trustee accepts the Avoidance Actions Trust created by this Trust Agreement and the grant, assignment, transfer, conveyance and delivery to the Trustee, on behalf, and for the benefit, of the Avoidance Actions Trust Beneficiaries, by the Debtors of all of their respective right, title and interest in the Avoidance Actions Trust Assets and the HTA Avoidance Actions, upon the terms and subject to the conditions set forth herein, in the Plan, the Confirmation Order, the HTA Plan and the HTA Confirmation Order.  The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the Avoidance Actions Trust and not otherwise.  The Trustee shall have the authority to bind the Avoidance Actions Trust within the limitations set forth herein, but shall for all purposes hereunder be acting in the capacity as Trustee, and not individually.

1.6     <u>Liquidation of Avoidance Actions Trust Assets and HTA Avoidance Actions</u>.  The Trustee shall, in an expeditious but commercially reasonable manner and subject to the provisions of the Plan (including Article LXXVIII of the Plan), the Confirmation Order, the HTA Plan, the HTA Confirmation Order and the other provisions of this Trust Agreement, liquidate and convert to Cash the Avoidance Actions Trust Assets and the HTA Avoidance Actions, make timely

4

distributions in accordance with the terms hereof and the Plan and not unduly prolong the existence of the Avoidance Actions Trust. The Trustee shall exercise reasonable business judgment and liquidate the Avoidance Actions Trust Assets and the HTA Avoidance Actions to maximize net recoveries; provided, however, that the Trustee shall be entitled to take into consideration the risks, timing, and costs of potential actions in making determinations as to the maximization of recoveries and the determinations and actions of the Trustee shall in all cases be subject to the limitations provided elsewhere herein. Subject to the terms of this Trust Agreement, such liquidations may be accomplished through the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action of the Avoidance Actions Trust or through the sale or other disposition of the Avoidance Actions Trust Assets and the HTA Avoidance Actions (in whole or in combination, and including the sale of any claims, rights or causes of action of the Avoidance Actions Trust). The Trustee may incur any reasonable and necessary expenses in connection with the liquidation or conversion into Cash of the Avoidance Actions Trust Assets and HTA Avoidance Actions, or in connection with the administration of the Avoidance Actions Trust and HTA Avoidance Actions, and, to the extent that any Administrative Funding is available, such expenses shall first be deducted from the Administrative Funding; provided, however, that any expenses incurred solely in connection with the administration, liquidation and conversion into Cash of the HTA Avoidance Actions shall be paid or reimbursed from the Cash proceeds of the HTA Avoidance Actions to the extent such Cash proceeds are or become available. Incurrence of expenses requiring funding from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

1.7     No Reversion to Debtors. In no event shall any part of the Avoidance Actions Trust Assets or the HTA Avoidance Actions revert to or be distributed to any Debtor or Reorganized Debtor.

1.8     Incidents of Ownership. The Avoidance Actions Trust Beneficiaries shall be the sole beneficiaries of the Avoidance Actions Trust Assets, the HTA Trust Beneficiaries shall be the sole beneficiaries of the HTA Avoidance Actions, and the Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein, in the Plan, the Confirmation Order, the HTA Plan and the HTA Confirmation Order, including those powers set forth in Section 6.2 hereof.

1.9     Privileges and Obligation to Respond to Ongoing Investigations.

(a)     All attorney-client privileges, work product protections and other immunities or protections from disclosure held by the Debtors ("Privileges") shall be transferred, assigned and delivered to the Avoidance Actions Trust, without waiver and in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors, and shall vest in the Trustee solely in its capacity as such (and any other Person whom the Trustee, with the consent of the Trust Advisory Board, may designate; it being understood that, as of the date of this Trust Agreement, the Trustee shall designate the Trust Advisory Board, solely in its capacity as such, as well as any other Person designated in this Trust Agreement). The FOMB, the Debtors, as the case may be, and the Trustee are authorized to take all necessary actions to effectuate the sharing and vesting of such Privileges.

5

(b)     Pursuant to Federal Rule of Evidence 502(d) (to the extent Rule 502(d) is relevant, notwithstanding the fact that the FOMB, the Debtors and the Trustee are joint holders of certain attorney-client privileges, work product protections or other immunities or protections from disclosure), no Privileges shall be waived by disclosure to the Trustee, the Avoidance Actions Trust's professionals, or the Trust Advisory Board of the FOMB's or the Debtors' information subject to attorney-client privileges, work product protections or other immunities or protections from disclosure, or by disclosure among the FOMB, the Debtors, the Trustee and/or the Trust Advisory Board of information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure jointly held by the FOMB, the Debtors, the Trustee and/or the Trust Advisory Board. The Trustee shall be obligated to respond, on behalf of the Debtors, and with their reasonable cooperation, to all information demands with respect to the Avoidance Actions or the HTA Avoidance Actions. The Trustee may waive, and/or disclose documents subject to, Privileges that are held by the FOMB and/or the Debtors (including the deliberative process privilege) only with the prior written consent of (i) the applicable holder(s) of such Privilege (*i.e.*, the FOMB and/or the Debtors, as the case may be), and (ii) the Trust Advisory Board, and only to the extent the Trustee determines in good faith that doing so is in the best interests of the Avoidance Actions Trust and its beneficiaries.

(c)     Notwithstanding anything in Section 1.9(b) to the contrary, the Trustee may disclose information that is subject to attorney-client privileges, work product protections or other immunities held by the FOMB or the Debtors (i) pursuant to an order of a court of competent jurisdiction, subject to the procedure described in the next sentence insofar as it applies, or (ii) as otherwise required by law. If the Trustee or the Trust Advisory Board receives a request from a third party to disclose information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure that are jointly held with the Trustee and/or the Trust Advisory Board, the party or parties who receives such request will (A) pursue all reasonable steps to maintain the applicable privileges, protections or immunities from disclosure, including, if necessary, to maintain the privileges, protections or immunities from disclosure by seeking a protective order against and/or otherwise objecting to the production of such material, (B) notify the Trustee or the Trust Advisory Board, as the case may be, (C) notify AAFAF, (D) allow the Trustee or the Trust Advisory Board, as the case may be, reasonable time under the circumstances to seek a protective order against and/or otherwise object to the production of such material, and (E) unless required by law, not disclose the materials in question unless and until any objection raised by the Trustee or the Trust Advisory Board is resolved in favor of disclosure. For the avoidance of doubt, this Section 1.9(c) does not limit the Trustee's obligations under Section 1.9(b) to seek, and be granted, AAFAF and Trust Advisory Board consent prior to waiving Privileges held by the Debtors or Avoidance Action Trust.

# ARTICLE II

## AVOIDANCE ACTIONS TRUST BENEFICIARIES

2.1    Conflicting Claims.  If any conflicting claims or demands are made or asserted with respect to an Avoidance Actions Trust Interest or HTA Trust Interest (as defined below), the Trustee shall be entitled, in its sole and absolute discretion, to refuse to comply with any such conflicting claims or demands.  In so refusing, the Trustee, at its sole election, may elect to make no payment or distribution with respect to the Avoidance Actions Trust Interest or HTA Trust Interest subject to the claims or demands involved, or any part thereof, and the Trustee shall refer such conflicting claims or demands to the Title III Court, which shall have exclusive jurisdiction over resolution of such conflicting claims or demands.  In so doing, the Trustee shall not be or become liable to any party for its refusal to comply with any of such conflicting claims or demands.  The Trustee shall be entitled to refuse to act until either (a) the rights of the adverse claimants have been adjudicated by a Final Order of the Title III Court (or such other court of proper jurisdiction) or (b) all differences have been resolved by a written agreement among all of such parties and the Trustee, which agreement shall include a complete release of the Avoidance Actions Trust (the occurrence of either (a) or (b) in this Section 2.1 being referred to as a "Dispute Resolution").  Promptly after a Dispute Resolution is reached, the Trustee shall transfer the payments and distributions, if any, in accordance with the terms of such Dispute Resolution.  Any payment of any interest or income should be net of any taxes attributable thereto in accordance with Section 5.3.

As used in this Agreement, "HTA Trust Interests" means the tranche of beneficial interests in the Avoidance Actions Trust allocated in accordance with the terms and provisions of the HTA Plan to the HTA GUC Recovery and relating only to net recoveries attributable to HTA Avoidance Actions

2.2    Rights of Avoidance Actions Trust Beneficiaries.  Each Avoidance Actions Trust Beneficiary and each HTA Trust Beneficiary shall be entitled to participate in the respective rights and benefits due hereunder to an Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary, as applicable, according to the terms of its Avoidance Actions Trust Interest or HTA Trust Interest. The interest of an Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary is hereby declared and shall be in all respects personal property.  Except as expressly provided hereunder, each Avoidance Actions Trust Beneficiary and each HTA Trust Beneficiary shall have no title to, right to, possession of, management of or control of the Avoidance Actions Trust, the Avoidance Actions Trust Assets, or the HTA Avoidance Actions, or to any right to call for a partition or division of such assets or to require an accounting.  No surviving spouse, heir or devisee of any deceased Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary shall have any right of dower, homestead or inheritance, or of partition, or any other right, statutory or otherwise, in the Avoidance Actions Trust Assets or the HTA Avoidance Actions, but the whole title to the Avoidance Actions Trust Assets and the HTA Avoidance Actions shall be vested in the Trustee and the sole interest of each Avoidance Actions Trust Beneficiary and each HTA Trust Beneficiary shall be the rights and benefits given to such Person under this Trust Agreement,  the Plan, and the HTA Plan.

7

2.3     <u>Evidence of Avoidance Actions Trust Interest and HTA Trust Interest</u>.  Ownership of an Avoidance Actions Trust Interest or HTA Trust Interest in the Avoidance Actions Trust will be evidenced by the recording of such ownership in an electronic book-entry system (the "<u>Book Entry System</u>") maintained either by the Avoidance Actions Trust or an agent of the Avoidance Actions Trust and containing information provided by the Debtors or an agent of the Debtors.  For the avoidance of doubt, the Avoidance Actions Trust or an agent thereof shall maintain a separate register as part of the Book Entry System to record ownership of the HTA Trust Interests.  An Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary shall be deemed the "holder of record" (hereinafter "<u>holder</u>") of such Avoidance Actions Trust Beneficiary's Avoidance Actions Trust Interest(s) or such HTA Trust Beneficiary's HTA Trust Interest(s), as the case may be, for purposes of all applicable United States federal and state laws, rules and regulations, including all applicable Commonwealth laws, rules and regulations.  The Trustee shall, upon the written request of a holder of an Avoidance Actions Trust Interest or a HTA Trust Interest, provide reasonably adequate documentary evidence of such holder's Avoidance Actions Trust Interest or HTA Trust Interest, as applicable, as indicated in the Book Entry System.  The expense of providing such documentation shall be borne by the requesting holder.

2.4     <u>Claims Reports</u>.  Within sixty (60) days after the Effective Date, the Debtors shall arrange for the Trustee to receive a report (the "<u>Initial Claims Report</u>") regarding Avoidance Actions Trust Interests containing (a) an updated claims register for General Unsecured Claims, and (b) a written report of the status of any previously filed objections to General Unsecured Claims and the status of any reconciliations of General Unsecured Claims, showing which General Unsecured Claims are Allowed Claims, which are Disputed Claims (as defined below), and which are still being evaluated for possible objection.  Further, the Debtors shall arrange for the Trustee to receive a monthly report within ten (10) days of the end of each month (the "<u>Monthly Claims Report</u>"), which report shall include all material updates to information contained in the Initial Claims Report or a previous Monthly Claims Report, as applicable, as well as any material information omitted from such prior reports.  In addition, the Debtors shall, upon reasonable request, periodically supply the Trustee with any other reports or information the Avoidance Actions Trust may reasonably request related to the reconciliation of General Unsecured Claims and the payment of distributions to Avoidance Actions Trust Beneficiaries.

2.5     <u>Reliance on Debtors for Information</u>.  It is the responsibility of the Debtors, pursuant to, among other things, their cooperation obligations established herein, to provide to the Avoidance Actions Trust reasonably complete and accurate information regarding Avoidance Actions Trust Interests and to provide periodic updates regarding such information as set forth in <u>Section 2.4</u> hereof.  The (a) Trustee, (b) individual(s) comprising the Trustee, as the case may be, (c) Trust Advisory Board, and (d) members of the Trust Advisory Board (each, a "<u>Trust Party</u>" and, collectively, the "<u>Trust Parties</u>") shall be entitled to rely on information supplied by the Debtors and their agents (including the Disbursing Agent) concerning the Avoidance Actions Trust Interests, and shall not be held liable to any party for any incompleteness or inaccuracy of such information.

2.6    Transfers of Avoidance Actions Trust Interests.

(a)    General.  Avoidance Actions Trust Interests shall not be transferable or assignable except by will, intestate succession or operation of law.

(b)    Book Entry System.  The Book Entry System shall include a register (which may be electronic) setting forth the names and addresses of the Avoidance Actions Trust Beneficiaries, and the amount and class of their Avoidance Actions Trust Interests from time to time.  Any transfer or assignment of an Avoidance Actions Trust Interest by will, intestate succession or operation of law shall not be effective unless and until such transfer or assignment is recorded in the Book Entry System, which shall be completed as soon as practicable.  Subject to Section 2.4(d) hereof, the entries in the Book Entry System shall be conclusive absent manifest error, and the Avoidance Actions Trust and the Trustee shall treat each Person whose name is recorded in the Book Entry System pursuant to the terms hereof as the owner of Avoidance Actions Trust Interests indicated therein for all purposes of this Trust Agreement, notwithstanding notice to the contrary.

(c)    Registration.  In accordance with the Plan, the Trust is intended to be exempt from the requirements of (i) the Securities Exchange Act of 1934, as amended, and any applicable state and local laws requiring registration of securities, pursuant to section 1145 of the Bankruptcy Code, and (ii) the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.  If the Trustee, with the consent of the Trust Advisory Board and upon advice of counsel, determines that any class of Avoidance Actions Trust Interests may be subject to registration pursuant to Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Trustee shall pursue relief from such registration by obtaining either an exemptive order, a no-action letter or an interpretive letter from the Securities and Exchange Commission (the "SEC") or its staff or, absent its ability to achieve that objective or in lieu thereof, shall register such class pursuant to Section 12 of such statute (it being understood and agreed that the Trustee with the consent of the Trust Advisory Board shall be authorized, among other things, to register such class and to seek relief from one or more of the requirements then applicable subsequent to such registration and to de-register such class).  To the extent that any Administrative Funding is available, any expenses that are associated with such application for relief and/or registration shall first be deducted from the Administrative Funding. Incurrence of expenses requiring funding from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

(d)    Further Limitations on Transfer.  Notwithstanding any other provision to the contrary, the Trustee may disregard any purported transfer or assignment of Avoidance Actions Trust Interests by will, intestate succession or operation of law if sufficient necessary information (as reasonably determined by the Trustee), including applicable tax-related information, is not provided by such purported transferee or assignee to the Trustee.

2.7    Limited Liability.  No provision of this Trust Agreement, the Plan, the Confirmation Order, the HTA Plan or the HTA Confirmation Order, and no mere enumeration herein of the rights or privileges of any Avoidance Actions Trust Beneficiary or any HTA Trust Beneficiary, shall give rise to any liability of such Avoidance Actions Trust Beneficiary or HTA

9

Trust Beneficiary solely in its capacity as such, whether such liability is asserted by any Debtor, by creditors, employees, or equity interest holders of any Debtor, or by any other Person (except to the extent of the Avoidance Actions Trust Beneficiary's or the HTA Trust Beneficiary's fraud, gross negligence or willful misconduct). Avoidance Actions Trust Beneficiaries and HTA Trust Beneficiaries are deemed to receive the Avoidance Actions Trust Assets and the HTA Avoidance Actions, as applicable, in accordance with the provisions of this Trust Agreement, the Plan, the Confirmation Order, the HTA Plan and the HTA Confirmation Order in exchange for their Allowed Claims, without further obligation or liability of any kind (except to the extent of the Avoidance Actions Trust Beneficiary's or the HTA Trust Beneficiary's fraud, gross negligence or willful misconduct), but subject to the provisions of this Trust Agreement.

## ARTICLE III

## DURATION AND TERMINATION OF AVOIDANCE ACTIONS TRUST

3.1     Duration.  The Avoidance Actions Trust became effective upon the Effective Date of the Plan, and the amendments set forth in this Trust Agreement shall become effective on the HTA Effective Date.  The Avoidance Actions Trust shall remain and continue in full force and effect until dissolved as provided for in Section 78.14(d) of the Plan.

3.2     Dissolution of the Avoidance Actions Trust.

(a)     The Trustee and the Avoidance Actions Trust shall be discharged or dissolved, as the case may be, on the earlier to occur of (i) all the Avoidance Actions Trust Assets and all the proceeds of the HTA Avoidance Actions having been distributed pursuant to the Plan, the HTA Plan and this Trust Agreement and (ii) following the reconciliation of all General Unsecured Claims, the Trustee having determined, with the consent of the Trust Advisory Board, that the administration of any remaining Avoidance Actions Trust Assets and any remaining HTA Avoidance Actions is not likely to yield sufficient additional Avoidance Actions Trust proceeds to justify further pursuit; provided, however, that in no event shall the Avoidance Actions Trust be dissolved later than five (5) years from the Effective Date unless the Title III Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of any extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Trustee and the Trust Advisory Board that any further extension would not adversely affect the status of the trust as a "Liquidating Trust" for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Avoidance Actions Trust Assets and the HTA Avoidance Actions.

(b)     If at any time the Trustee determines, in reliance upon such Trust Professionals as the Trustee may retain, that the expense of administering the Avoidance Actions Trust so as to make a final distribution to the Avoidance Actions Trust Beneficiaries or the HTA Trust Beneficiaries is likely to exceed the value of the assets remaining in the Avoidance Actions Trust, the Trustee may apply to the Title III Court for authority to (i) reserve any amount necessary to dissolve the Avoidance Actions Trust, (ii) donate any balance to a charitable organization (A) of the type described in Section 501(c)(3) of the IRC, (B) exempt from United States federal income

10

tax under Section 501(a) of the IRC, and (C) that is unrelated to the Debtors, the Reorganized Debtors, the Avoidance Actions Trust, and any insider of the Trustee, and (iii) dissolve the Avoidance Actions Trust.  Upon receipt of such authority from the Title III Court, the Trustee shall notify each Avoidance Actions Trust Beneficiary and each HTA Trust Beneficiary.

3.3     <u>Continuance of Avoidance Actions Trust for Winding Up</u>.  After the dissolution of the Avoidance Actions Trust and solely for the purpose of liquidating and winding up the affairs of the Avoidance Actions Trust, the Trustee shall continue to act as such until its duties have been fully performed.  Upon distribution of all the Avoidance Actions Trust Assets and the proceeds, if any, of the HTA Avoidance Actions, the Trustee shall retain the books, records and files that shall have been delivered to or created by the Trustee.  At the Trustee's discretion, all of such records and documents may be destroyed at any time following the date that is six (6) years after the final distribution of the Avoidance Actions Trust Assets and the proceeds of the HTA Avoidance Actions, subject to any joint prosecution and common interest agreement(s) to which the Trustee may be party.  Provisions with respect to the destruction of documents in this <u>Section 3.3</u> shall not limit the Trustee's right, prior to the dissolution of the Avoidance Actions Trust, to destroy documents that the Trustee considers no longer necessary to retain, subject to applicable law, the Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order and this Trust Agreement.

## ARTICLE IV

## ADMINISTRATION OF AVOIDANCE ACTIONS TRUST

4.1     <u>Payment of Claims, Expenses and Liabilities</u>.  Subject to the Budget from time to time approved by the Trust Advisory Board in accordance with <u>Section 4.13(b)</u>, and in accordance with <u>Sections 6.7(j)</u>, <u>6.9(b)</u>, and <u>7.6</u> hereof, and except as otherwise provided herein, the Trustee shall use the Avoidance Actions Trust Assets: (a) to pay reasonable costs and expenses of the Avoidance Actions Trust (including any taxes imposed on the Avoidance Actions Trust, the actual reasonable out-of-pocket fees and expenses incurred by Trust Professionals in connection with the administration and liquidation of the Avoidance Actions Trust Assets and the HTA Avoidance Actions, as provided in <u>Section 6.7</u> hereof, and the preservation of books and records of the Avoidance Actions Trust); (b) to satisfy other obligations or other liabilities incurred or assumed by the Avoidance Actions Trust (or to which the Avoidance Actions Trust Assets are otherwise subject) in accordance with the Plan, the Confirmation Order or this Trust Agreement, including reasonable fees and costs incurred in connection with the protection, preservation, liquidation and distribution of the Avoidance Actions Trust Assets and the HTA Avoidance Actions, and the reasonable costs of investigating, prosecuting, resolving and/or settling any Claims; (c) as reasonably necessary to meet contingent liabilities and to maintain the value of the Avoidance Actions Trust Assets and the HTA Avoidance Actions during liquidation; and (d) to satisfy any other obligations of the Avoidance Actions Trust expressly set forth in the Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order and this Trust Agreement.  The costs, expenses and other obligations or other liabilities set forth in this <u>Section 4.1</u> shall first be deducted from the Administrative Funding; <u>provided</u>, <u>however</u>, that any costs, expenses and other obligations incurred solely in connection with the administration, liquidation and conversion into Cash of the

HTA Avoidance Actions shall be paid or reimbursed from the Cash proceeds of the HTA Avoidance Actions to the extent such Cash proceeds are or become available.  Incurrence of any such costs, expenses and other obligations or other liabilities requiring funding from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

   4.2 <u>Distributions</u>.

     (a) <u>Generally</u>.  All distributions to the Avoidance Actions Trust Beneficiaries on account of their Avoidance Actions Trust Interests or the HTA Avoidance Actions shall be made, at the election and direction of the Trustee with notice to the Debtors and AAFAF, by either (i) the Disbursing Agent selected by the Debtors under the Plan or (ii) such other disbursing agent as may be selected by the Trustee (the disbursing agent selected by the Trustee under either (i) or (ii) being the "<u>Trust Disbursing Agent</u>"), in either case in accordance with the terms and provisions of Article LXXVII of the Plan and Article XXVIII of the HTA Plan, except as otherwise provided herein.  The Trust Disbursing Agent shall be deemed to hold all property to be distributed hereunder in trust for the Entities entitled to receive the same.  The Trust Disbursing Agent shall not hold an economic or beneficial interest in such property.  The Debtors will direct the Disbursing Agent to share information with and otherwise reasonably cooperate with the Trustee to generate administrative efficiencies and reduce duplication of effort in the distribution processes contemplated hereunder and under the Plan, including by sharing claimant tax information with the Trustee and providing access to the Debtors' Claims register.

     (b) <u>Distributions by the Trust Disbursing Agent</u>.  The Trust Disbursing Agent is required to distribute to the Avoidance Actions Trust Beneficiaries on account of their Avoidance Actions Trust Interests, and to the HTA Trust Beneficiaries on account of their HTA Trust Interests, on a semi-annual basis (each such date, a "<u>Distribution Date</u>"), in accordance with the terms of the Plan and the HTA Plan, all unrestricted Cash then on hand (including any Cash received from the Debtors on the Effective Date, and treating any permissible investment as Cash for purposes of this <u>Section 4.2</u>), except (i) Cash reserved pursuant to this Trust Agreement to fund the activities of the Avoidance Actions Trust, and (ii) such amounts as are allocable to or retained on account of Disputed Claims in accordance with Section 82.3 of the Plan to pay reasonable incurred or anticipated expenses (including any taxes imposed on or payable by the Avoidance Actions Trust in respect of the Avoidance Actions Trust Assets and the HTA Avoidance Actions); <u>provided</u>, <u>however</u>, that the Trust Disbursing Agent shall not be required to make a distribution pursuant to this <u>Section 4.3</u> if the aggregate net amount of unrestricted Cash available for distribution (taking into account the above listed exclusions) is such as would make the distribution impracticable as reasonably determined by the Trustee, with the consent of the Trust Advisory Board, in accordance with applicable law, and so long as such aggregate net amount is less than Twenty-Five Million Dollars ($25,000,000.00); <u>provided</u> <u>further</u>, <u>however</u>, that the Trustee, with consent of the Trust Advisory Board, may decide to direct the Trust Disbursing Agent to forego the first distribution to those Avoidance Actions Trust Beneficiaries or HTA Trust Beneficiaries with respect to which the Trustee, in its reasonable judgment, is not administratively prepared to direct such distribution, in which case, such distribution shall be made to such holders as soon as practicable after the Trustee is administratively prepared to do so, not to exceed three (3) months from the date of the first semi- annual distribution.

(c)     <u>Payment of Distributions</u>.  Each Avoidance Actions Trust Beneficiary's share of the Avoidance Actions Trust Interests as determined pursuant to the Plan (including any Cash to be received on account of any Avoidance Actions Trust Interests) shall be allocated and distributed, and the Avoidance Actions Trust Assets shall be allocated and distributed, in accordance with Article LXXVII of the Plan.  Each HTA Trust Beneficiary's share of the proceeds of the HTA Avoidance Actions as determined pursuant to the HTA Plan shall be allocated and distributed in accordance with Article XXVIII of the HTA Plan.

4.3     <u>De Minimis Distributions</u>.  No Cash payment shall be made to any holder of an Avoidance Actions Trust Interest or a HTA Trust Interest until such time, if ever, as the amount payable thereto, in any distribution from the Avoidance Actions Trust, is equal to or greater than Ten Dollars ($10.00).  Any holder of an Avoidance Actions Trust Interest or HTA Trust Interest on account of which the amount of Cash to be distributed pursuant to any distribution from the Avoidance Actions Trust is less than Ten Dollars ($10.00) shall be deemed to have no claim for such distribution against the Debtors, the Reorganized Debtors, the Avoidance Actions Trust, the Avoidance Actions Trust Assets or the proceeds of the HTA Avoidance Actions.  Subject to <u>Section 4.6</u>, any Cash not distributed pursuant to this <u>Section 4.3</u> hereof shall be the property of the Avoidance Actions Trust free of any restrictions thereon, and shall be available for distribution to the other Avoidance Actions Trust Beneficiaries or the HTA Trust Beneficiaries, in accordance with the Plan, the HTA Plan and this Trust Agreement.

4.4     <u>Undeliverable Distributions</u>.   For purposes of this Trust Agreement, an "undeliverable" distribution shall include a check that is sent to a holder in respect of a distribution to such holder, which check has not been negotiated within six (6) months following the date on which such check was issued.  If any distribution to the holder of an Avoidance Actions Trust Interest or a HTA Trust Interest is undeliverable, no further distribution shall be made to such holder unless and until the Trustee (or its duly authorized agent) is notified, in writing, of such holder's then-current address.  Undeliverable distributions shall remain in the possession of the Trustee (or its duly authorized agent) until such time as a distribution becomes deliverable.  All Persons ultimately receiving an undeliverable distribution shall not be entitled to any interest or other accruals of any kind on account of the delay in payment resulting from the undeliverable status of such distribution.  Except as required by law, the Trustee (or its duly authorized agent) shall not be required to attempt to locate any holder of an Avoidance Actions Trust Interest or HTA Trust Interest.

4.5     <u>Interest on Avoidance Actions Trust Interests and HTA Trust Interests</u>.  As set forth in the Plan and the HTA Plan, interest shall not accrue and be paid on the Avoidance Actions Trust Interests or HTA Trust Interests.

4.6     <u>Distributions After the Effective Date</u>.  Distributions made after the Effective Date to holders of Avoidance Actions Trust Interests or HTA Trust Interests on account of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Article LXXVII of the Plan or Article XXVIII of the HTA Plan, as applicable.

13

4.7     Compliance with Laws.  Any and all distributions of Avoidance Actions Trust Assets shall be in compliance with applicable laws, including applicable federal and state tax and securities laws.

4.8     Fiscal Year.  Except for the first and last years of the Avoidance Actions Trust, the fiscal year of the Avoidance Actions Trust shall be the calendar year.  For the first and last years of the Avoidance Actions Trust, the fiscal year of the Avoidance Actions Trust shall be such portion of the calendar year that the Avoidance Actions Trust is in existence.

4.9     Books and Records.  The Trustee shall retain and preserve the Debtors' books, records and files that shall have been delivered to or created by the Trustee.  Subject to Section 3.3, the Trustee shall maintain, in respect of the Avoidance Actions Trust, the Avoidance Actions Trust Beneficiaries, the HTA Trust Beneficiaries and all others to receive distributions under this Trust Agreement, books and records relating to the assets and the income of the Avoidance Actions Trust and the payment of expenses of, liabilities of, and claims against or assumed by, the Avoidance Actions Trust and the Trustee, in such detail and for such period of time as may be necessary to enable it to make full and proper reports in respect thereof in accordance with the provisions of this Trust Agreement and applicable provisions of law, including applicable tax, securities and other federal and state laws.  Except as otherwise provided herein or in the Plan, nothing in this Trust Agreement requires the Trustee to file any accounting or seek approval of any court with respect to the administration of the Avoidance Actions Trust, or as a condition for making any payment or distribution out of the Avoidance Actions Trust Assets.  The Trustee shall provide AAFAF and any member of the Trust Advisory Board with access to such books and records during normal business hours as may be reasonably requested with three (3) Business Days' advance notice.  Avoidance Actions Trust Beneficiaries and HTA Trust Beneficiaries holding Allowed Claims shall have the right upon thirty (30) days' prior written notice delivered to the Trustee to inspect such books and records; provided, however, that if so requested, all costs associated with such inspection shall be paid in advance by such requesting Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary and such Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary shall have entered into a confidentiality agreement reasonably satisfactory in form and substance to the Trustee.

4.10    Cash Payments.  All distributions required to be made to the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries shall be made in Cash denominated in United States dollars by checks drawn on a domestic bank selected by the Trustee or, at the option of the Trustee, by wire transfer from a domestic bank selected by the Trustee or as otherwise required or provided in applicable agreements; provided, however, that Cash payments to foreign holders of Avoidance Actions Trust Interests or HTA Trust Interests may be made, at the option of the Trustee, in such funds as and by such means as are necessary or customary in a particular foreign jurisdiction.

4.11    Insurance.  The Avoidance Actions Trust shall maintain customary insurance coverage for the protection of the Trustee, the members of the Trust Advisory Board, employees and any such other persons serving as administrators and overseers of the Avoidance Actions Trust on and after the Effective Date.  The Trustee also may obtain insurance coverage it deems

necessary and appropriate with respect to real and personal property that may become Avoidance Actions Trust Assets or the proceeds of HTA Avoidance Actions.

4.12   Disputes.  To the extent a dispute arises between the Trustee and the Trust Advisory Board concerning the performance of any of the powers, duties, and/or obligations herein, the Trustee or the Trust Advisory Board may file a motion and/or other pleadings with the Title III Court and obtain advice and guidance or such other relief as may be appropriate concerning a resolution of the matter(s) in dispute between the parties.  In the event of a dispute, the Trustee and the Trust Advisory Board, as applicable, shall have the right to engage legal counsel to advise it with respect to the matter(s) in dispute and the reasonable fees and expenses of such legal counsel shall be reimbursed by the Trustee from the Administrative Funding or, if the Administrative Funding has been spent, any other unrestricted Cash in the Avoidance Actions Trust, subject to the approval of a majority of the Trust Advisory Board and subject to Section 7.5.  A motion and/or other pleading described in this Section 4.12 filed by the Trust Advisory Board may only be filed upon the consent of a majority of its members.

4.13   Reports from the Trustee

(a)   The Trustee shall deliver reports to members of the Trust Advisory Board and AAFAF not later than thirty (30) days following the end of each fiscal quarter, or less frequently as may be agreed upon between the Trustee and the Trust Advisory Board.  Such reports shall specify in reasonable detail (i) the status of any Causes of Action, Claims and litigation involving the Avoidance Actions Trust or the Avoidance Actions Trust Assets, including Avoidance Actions, including any settlements entered into by the Avoidance Actions Trust, (ii) the costs and expenses of the Avoidance Actions Trust that are incurred (including any taxes imposed on the Avoidance Actions Trust or actual reasonable out-of-pocket fees and expenses incurred by Trust Professionals in connection with the administration and liquidation of the Avoidance Actions Trust Assets and the HTA Avoidance Actions, allocated between the Avoidance Actions Trust Assets and the HTA Avoidance Actions, and preservation of books and records as provided in Section 4.8) during the preceding fiscal quarter and the remaining amount (if any) of the Administrative Funding, (iii) the amounts listed in clause (ii) incurred since the Effective Date, (iv) the amount of Cash and other assets received by the Avoidance Actions Trust during the prior fiscal quarter, allocated between the Avoidance Actions Trust Assets and the HTA Avoidance Actions, (v) the aggregate amount of Cash and other assets received by the Avoidance Actions Trust since the Effective Date, allocated between the Avoidance Actions Trust Assets and the HTA Avoidance Actions, (vi) the calculation of the estimated amount of the Cash and other assets to be distributed on the next Distribution Date, including any Cash on hand that is not to be distributed pursuant to Section 4.2(a) above, (vii) the aggregate amount of distributions from the Avoidance Actions Trust to the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries since the Effective Date, allocated between the Avoidance Actions Trust Assets and the HTA Avoidance Actions, and (viii) such other information as the Trust Advisory Board may reasonably request from time to time.  All allocations referred to above shall be reasonably made by the Trustee.  The Trustee also shall timely prepare, file and distribute such additional statements, reports and submissions (A) as may be necessary to cause the Avoidance Actions Trust

15

and the Trustee to be in compliance with applicable law or (B) as may be otherwise reasonably requested from time to time by the Trust Advisory Board.

(b)     The Trustee shall prepare and submit to the Trust Advisory Board for approval an annual plan and budget at least thirty (30) days prior to the commencement of each fiscal year of the Avoidance Actions Trust; provided, however, that the first such annual plan and budget shall be submitted no later than forty-five (45) days after the Effective Date of the Plan. Such annual plan and budget shall set forth in reasonable detail: (i) the Trustee's anticipated actions to administer and liquidate the Avoidance Actions Trust Assets and the HTA Avoidance Actions; and (ii) the anticipated expenses, including the expenses of Trust Professionals, associated with conducting the affairs of the Avoidance Actions Trust. Such annual plan and budget shall be updated and submitted to the Trust Advisory Board for review and approval on a quarterly basis, and each such quarterly update shall reflect the differences between the anticipated actions described in the annual report and actual operations of the Avoidance Actions Trust to date. Any such annual plan and budget as approved by the Trust Advisory Board is referred to herein as the "Budget". All actions by the Trustee must be substantially consistent with the then current Budget, provided that the Trustee may take action outside the Budget with the prior approval of the Trust Advisory Board.

(c)     In accordance with the Plan and the HTA Plan, the Avoidance Actions Trust is intended to be exempt from the requirements of (i) the Securities Exchange Act of 1934, as amended, and any applicable state and local laws requiring registration of securities, pursuant to section 1145 of the Bankruptcy Code, and (ii) the Investment Company Act of 1940, as amended, pursuant to Sections 7(a) and 7(b) of that Investment Company Act of 1940, as amended, and section 1145 of the Bankruptcy Code. Notwithstanding the forgoing, if required to do so, and until such time as the Avoidance Actions Trust is dissolved in accordance with Section 78.14(d) of the Plan (or otherwise in accordance with this Trust Agreement), the Avoidance Actions Trust shall file with (or furnish to, as the case may be) the SEC such periodic reports as the Avoidance Actions Trust is required to file pursuant to the Exchange Act.

## ARTICLE V

## TAX MATTERS

5.1     Avoidance Actions Trust Assets and HTA Avoidance Actions Treated as Owned by Avoidance Actions Trust Beneficiaries and HTA Trust Beneficiaries. For all United States federal income tax purposes, all parties (including the Debtors, the Trustee, the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries) shall treat the transfer of the Avoidance Actions Trust Assets and the HTA Avoidance Actions to the Avoidance Actions Trust as (a) a transfer of the Avoidance Actions Trust Assets (subject to any obligations relating to those assets) and the HTA Avoidance Actions directly to the Avoidance Actions Trust Beneficiaries and HTA Trust Beneficiaries (as applicable), and, to the extent Avoidance Actions Trust Assets or HTA Avoidance Actions are allocable to Disputed Claims, to the reserve for such claims, *followed by* (b) the transfer by the Avoidance Actions Trust Beneficiaries of the Avoidance Actions Trust Assets (other than the Avoidance Actions Trust Assets allocable to a reserve for disputed claims) in exchange for Avoidance Actions Trust Interests, and the transfer by the HTA Trust

16

Beneficiaries of the HTA Avoidance Actions in exchange for the HTA Trust Interests. Accordingly, the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Avoidance Actions Trust Assets (other than such Avoidance Actions Trust Assets as are allocable to a reserve for disputed claims) and the HTA Avoidance Actions, respectively. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. The establishment of the Avoidance Actions Trust under United States law shall not, by itself, be deemed to subject the Avoidance Actions Trust Beneficiaries or the HTA Trust Beneficiaries to United States federal income taxes.

      5.2    <u>Tax Reporting</u>.

      (a)    The Trustee shall prepare and file (or cause to be prepared and filed) tax returns for the Avoidance Actions Trust treating the Avoidance Actions Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this <u>Article V</u>. To the extent and in the manner required by applicable law, the Trustee also will annually send to each holder of an Avoidance Actions Trust Interest and each holder of an HTA Trust Interest a separate statement regarding the receipts and expenditures of the Avoidance Actions Trust as relevant for United States federal income tax purposes (with such receipts and expenditures reasonably allocated by the Trustee between the Avoidance Actions Trust Assets and the HTA Avoidance Actions) and will instruct all such holders to use such information in preparing their United States federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their United States federal income tax returns. The Trustee also shall file (or cause to be filed) any other statement, return or disclosure relating to the Avoidance Actions Trust that is required by any governmental unit.

      (b)    To the extent and in the manner required by applicable law, allocations of Avoidance Actions Trust taxable income among the Avoidance Actions Trust Beneficiaries (other than taxable income allocable to a reserve for disputed claims) and among HTA Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Avoidance Actions Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to a reserve for disputed claims) to the holders of the Avoidance Actions Trust Interests and HTA Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Avoidance Actions Trust. Similarly, to the extent an in the manner required by applicable law, taxable loss of the Avoidance Actions Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Avoidance Actions Trust Assets and the HTA Avoidance Actions. To the extent and in the manner required by applicable law, the tax book value of the Avoidance Actions Trust Assets and the HTA Avoidance Actions for purposes of this <u>Section 5.2(b)</u> shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

<div align="center">17</div>

(c)     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Trustee of a private letter ruling if the Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Trustee), the Trustee shall (i) timely elect to treat any reserve for disputed claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.    All parties (including the Trustee, the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

(d)     The Trustee shall be responsible for payment, out of the Avoidance Actions Trust Assets, of any taxes imposed on the Avoidance Actions Trust or its assets, including any reserve for disputed claims, and for payment, out of the HTA Avoidance Actions, of any taxes imposed on the Avoidance Actions Trust directly related to the HTA Avoidance Actions.   If, and to the extent, any Cash retained on account of Disputed Claims in the reserve for such claims is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims (including any income that may arise upon the distribution of the assets from such reserve), such taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Trustee as a result of the resolution of such Disputed Claims.

5.3     <u>Tax Withholdings by Trustee</u>.   The Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of Avoidance Actions Trust Interests and HTA Trust Interests.   All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of Avoidance Actions Trust Interests and HTA Trust Interests for all purposes of the Trust Agreement, it being understood that any such amount withheld shall reduce the amount actually realized by the applicable holder upon distribution.   The Trustee shall be authorized to collect such tax information from the holders of Avoidance Actions Trust Interests and HTA Trust Interests (including social security numbers or other tax identification numbers) as in its sole discretion the Trustee deems necessary to effectuate the Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order and this Trust Agreement.   In order to receive distributions under the Plan or the HTA Plan, all holders of Avoidance Actions Trust Interests and HTA Trust Interests shall be required to identify themselves to the Trustee and provide tax information and the specifics of their holdings, to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes.   To the extent the Disbursing Agent collects such tax information in performance of its duties under the Plan, the Debtors agree to direct the Disbursing Agent to provide such tax information concerning Avoidance Action Trust Beneficiaries and the HTA Trust Beneficiaries to the Trust Disbursing Agent for use in accordance with this Trust Agreement.   This identification requirement generally applies to all holders of Avoidance Actions Trust Interests and HTA Trust Interests, including those who hold their Claims in "street name." The Trustee may refuse to make a distribution to any holder of a Avoidance

18

Actions Trust Interest or HTA Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered may treat such holder's Avoidance Actions Trust Interests or HTA Trust Interests as disputed; provided, however, that if such information is not furnished to the Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to the holder of such Avoidance Actions Trust Interest or HTA Trust Interest; and, provided further, however, that, upon the delivery of such information by a holder of a Avoidance Actions Trust Interest or a HTA Trust Interest, the Trustee shall make such distribution to which the holder of the Avoidance Actions Trust Interest or HTA Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; provided further, however, that if the Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Trustee for such liability (to the extent such amounts were actually distributed to such holder).

Notwithstanding the above, and without limiting any of the other obligations of the Debtors or rights of the Trustee described herein, (a) the Debtors shall be required to supply to the Trustee such tax information of the holders of Avoidance Actions Trust Interests and HTA Trust Interests that is in the possession or control of the Debtors or any of their agents, representatives or professionals, including the Disbursing Agent and that the Trustee may reasonably request be provided to it by the Debtors, and (b) the Trust Parties shall be entitled to rely on, and shall not be held liable for any omission or inaccuracy with respect to, such tax information so supplied to the Trustee.

## ARTICLE VI

## POWERS OF AND LIMITATIONS ON THE TRUSTEE

6.1     Trustee.

(a)     "Trustee" means Drivetrain, LLC so long as it continues in office, and all other Person(s) who have been duly elected and qualify as Trustee of the Avoidance Actions Trust hereunder pursuant to Section 1.4 or Article VIII.  Subject to Article VIII, the Trustee shall hold office until disability, death, resignation, or the termination of the Avoidance Actions Trust in accordance with the terms set forth herein.  References herein to the Trustee shall refer to the Person or Persons serving as the Trustee solely in its capacity as Trustee hereunder.  The Trustee shall be subject to Puerto Rico laws governing ethics, anti-corruption and conflicts of interest.

(b)     Subject to the express limitations set forth herein, any actions of the Trustee contemplated by this Trust Agreement shall be decided and conducted by the Trustee only.

6.2     Powers of the Trustee.

(a)     Pursuant to the terms of the Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order and this Trust Agreement, the Trustee shall have various powers, duties and responsibilities concerning the prosecution of certain litigation claims, the disposition of assets, the resolution of claims, and numerous other obligations relating to maximizing the

19

proceeds of the Avoidance Actions Trust Assets and the HTA Avoidance Actions and the administration of the Avoidance Actions Trust.

(b)     Nothing in this Trust Agreement shall be deemed to limit the Trust Parties' protections and benefits under the Plan or the HTA Plan or to prevent a Trust Party from taking or refraining to take any action on behalf of the Trust that, based upon the advice of counsel or other professionals, the Trust Party determines it is obligated to take or to refrain from taking in the performance of any duty that the Trust Party may owe the Avoidance Actions Trust Beneficiaries, the HTA Trust Beneficiaries or any other Person under the Plan, Confirmation Order, the HTA Plan, the HTA Confirmation Order or this Agreement.

(c)     The Trustee shall have only such rights, powers and privileges expressly set forth in the Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order and this Trust Agreement and as otherwise provided by applicable law.   Subject to the Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order and the provisions of this Trust Agreement, including the oversight and approvals by and of the Trust Advisory Board and the Title III Court provided herein, the Trustee shall be expressly authorized to undertake the following actions:

(i)     to hold, manage, convert to Cash, and timely distribute the Avoidance Actions Trust Assets and the HTA Avoidance Actions, including prosecuting and resolving the Claims belonging to the Avoidance Actions Trust;

(ii)     to hold the Avoidance Actions Trust Assets and the HTA Avoidance Actions for the benefit of the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries, whether their Claims or Interests are Allowed on or after the Effective Date;

(iii)     in the Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, Causes of Action or litigation of the Avoidance Actions Trust;

(iv)     to prepare and file (or cause to be prepared and filed), from and after the Effective Date, all tax and regulatory forms, returns, reports, and other documents required, or that the Trustee otherwise deems appropriate with respect to the Avoidance Actions Trust;

(v)     in the Trustee's reasonable business judgment, to control, prosecute, and/or settle on behalf of the Avoidance Actions Trust, objections to Claims on account of which the Trustee will be responsible;

(vi)     to hold, manage, and timely distribute Cash or non-Cash Avoidance Actions Trust Assets and proceeds of HTA Avoidance Actions obtained through the exercise of its power and authority;

(vii)     to enter into any agreements binding the Avoidance Actions Trust, and to execute, acknowledge and deliver any and all instruments that are necessary or

20

deemed by the Trustee to be consistent with and advisable in furthering the purpose of the Avoidance Actions Trust;

(viii)  to open and maintain bank accounts on behalf of or in the name of the Avoidance Actions Trust;

(ix)  to cause the Avoidance Actions Trust to employ and pay professionals, claims agents, disbursing agents, and other agents and third parties, in accordance with the terms and limitations set forth herein;

(x)  to cause the Avoidance Actions Trust to pay all of its lawful expenses, debts, charges, taxes and other liabilities, and make all other payments;

(xi)  to cause the Avoidance Actions Trust to withhold from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Trustee has determined, based upon the advice of its agents and/or professionals, may be required to be withheld from such distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

(xii)  to cause the Avoidance Actions Trust to seek a determination of tax liability or refund under section 505 of the Bankruptcy Code;

(xiii)  to cause the Avoidance Actions Trust to establish out of all Avoidance Actions Trust Assets such reserves for taxes, assessments and other expenses of administration of the Trust as may be necessary and appropriate for the proper operation of the Avoidance Actions Trust;

(xiv)  to establish and maintain a website, to the extent the Trustee deems necessary, to provide notice of the Avoidance Actions Trust's activities to Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries, provided that the Trustee determines, on the advice of counsel, that establishing such website does not implicate any securities or other applicable law;

(xv)  to undertake all administrative functions of the Avoidance Actions Trust, including overseeing the winding down and termination of the Avoidance Actions Trust;

(xvi)  to exercise, implement, enforce, and discharge all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order and this Agreement; and

(xvii)  to take all other actions consistent with the provisions of the Plan and the HTA Plan that the Trustee deems reasonably necessary or desirable to administer the Trust.

21

(d)     In all circumstances, the Trustee shall act in the best interests of all Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries and in furtherance of the purpose of the Avoidance Actions Trust.

6.3    <u>Title III Court</u>.  Except as otherwise provided in this Trust Agreement, the Trustee will not be required to obtain the order or approval of the Title III Court, or any other court of competent jurisdiction in, or account to the Title III Court or any other court of competent jurisdiction for, the exercise of any right, power or privilege conferred hereunder. Notwithstanding the foregoing, where the Trustee determines, in its reasonable discretion, that it is necessary, appropriate or desirable, the Trustee will have the right to submit to the Title III Court any question or questions regarding any specific action proposed to be taken by the Trustee with respect to this Trust Agreement, the Avoidance Actions Trust, the Avoidance Actions Trust Assets or the HTA Avoidance Actions, including the administration and distribution of the Avoidance Actions Trust Assets and the HTA Avoidance Actions, and the termination of the Avoidance Actions Trust.  Pursuant to the Plan, the Title III Court has retained jurisdiction for such purposes and may approve or disapprove any such proposed action upon motion by the Trustee.

6.4    <u>Exclusive Authority to Pursue Avoidance Actions and HTA Avoidance Actions</u>. The Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and the HTA Avoidance Actions and (b) compromise and settle such Avoidance Actions and HTA Avoidance Actions, upon approval of the Title III Court.  The Trustee shall be the sole representative of the Debtors under section 1123(b)(3) of the Bankruptcy Code with respect to the Avoidance Actions and the HTA Avoidance Actions.  The Trustee shall be vested with and entitled to assert all setoffs and defenses of the Debtors or the Trust to any counterclaims that may be asserted by any defendant in an Avoidance Action or a HTA Avoidance Action.  The Trustee also shall be vested with and entitled to assert all of the Debtors' rights with respect to any such counterclaims under section 558 of the Bankruptcy Code.

6.5    <u>Limitations on Trustee</u>.  The Trustee shall, on behalf of the Avoidance Actions Trust, hold the Avoidance Actions Trust out as a trust in the process of liquidation and not as an investment company.  The Trustee shall be restricted to the liquidation of the Avoidance Actions Trust Assets and the HTA Avoidance Actions on behalf, and for the benefit, of the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries, as applicable, and the distribution and application of Avoidance Actions Trust Assets and the proceeds of the HTA Avoidance Actions for the purposes set forth in, and the conservation and protection of the Avoidance Actions Trust Assets and the HTA Avoidance Actions, and the administration thereof in accordance with, the provisions of this Trust Agreement, the Plan, the Confirmation Order, the HTA Plan and the HTA Confirmation Order.

6.6    <u>Conflicts of Interest</u>.  The Trustee will appoint a disinterested Person to handle any matter where the Trustee has identified it has a conflict of interest or the Title III Court, on motion of the any party in interest, determines one exists.  If the Trustee is unwilling or unable to appoint a disinterested Person to handle any such matter, the Title III Court, on notice and hearing, may do so.

6.7    <u>Establishment of Trust Advisory Board</u>.

22

(a)     The "Trust Advisory Board" means the board to be appointed in accordance with, and to exercise the duties set forth in, this Trust Agreement, which duties shall be (i) to oversee the liquidation and distribution of the Avoidance Actions Trust Assets and the HTA Avoidance Actions by the Trustee in accordance with this Trust Agreement, the Plan, the Confirmation Order, the HTA Plan and the HTA Confirmation Order, (ii) to approve (or withhold approval) of those matters submitted to it for approval in accordance with the terms of this Trust Agreement, and (iii) to remove and appoint any successor to the Trustee as provided for in this Trust Agreement.  Notwithstanding anything that may be to the contrary contained herein, the initial OB Director need not be selected by the FOMB on the date hereof, but may be selected at any time after the date hereof.

(b)     The Trust Advisory Board initially shall be comprised of (i) two (2) directors selected by the Creditors' Committee (the "Creditor Directors"), and (ii) one (1) director selected by the FOMB (the "OB Director").  The initial members of the Trust Advisory Board are set forth on Annex A hereto.  Each member of the Trust Advisory Board shall have a fiduciary duty to act in the best interests of the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries as a whole.  The Trust Advisory Board shall be subject to provisions consistent with Puerto Rico laws governing ethics, anti-corruption and conflicts of interest, and such laws shall be, and shall be deemed to be, incorporated into the Trust Advisory Board's bylaws.

(c)     The authority of the members of the Trust Advisory Board shall be effective as of the Effective Date and shall remain and continue in full force and effect until the Avoidance Actions Trust is dissolved in accordance with Section 3.2.  The service of the members of the Trust Advisory Board shall be subject to the following:

(i)     the members of the Trust Advisory Board shall serve until disability, death, or resignation pursuant to clause (ii) below, or removal pursuant to clause (iii) below;

(ii)     a member of the Trust Advisory Board may resign at any time by providing a written notice of resignation to the remaining members of the Trust Advisory Board.  Such resignation shall be effective when a successor is appointed as provided herein;

(iii)     a member of the Trust Advisory Board may be removed by the unanimous vote of the other members for (a) fraud, gross negligence or willful misconduct in connection with the affairs of the Avoidance Actions Trust, or (b) cause, which shall include a breach of fiduciary duty other than as specified in the foregoing clause (a).  Such removal shall be effective immediately upon such vote;

(iv)     in the event of a vacancy in a member's position (whether by removal, death or resignation), a new member may be appointed, (A) in the case of a Creditor Director, (i) by the Creditors' Committee, as notified in writing to the Trust Advisory Board and the Trustee within ten (10) Business Days, or (ii) if the Creditors' Committee has been dissolved, the remaining Creditor Director, as notified in writing to the Trust Advisory Board and the Trustee within ten (10) Business Days, or (B) in the case

23

of the OB Director (i) by the FOMB, as notified in writing to the Trust Advisory Board within ten (10) Business Days, or (ii) if the FOMB has been dissolved, by AAFAF, as notified in writing to the Trust Advisory Board and the Trustee within ten (10) Business Days.  In each case, the appointment of a successor member of the Trust Advisory Board shall be evidenced by the filing with the Title III Court by the Trustee of a notice of appointment, which notice shall include the name, address, and telephone number of the successor member of the Trust Advisory Board; and

(v)     immediately upon appointment of any successor member of the Trust Advisory Board, all rights, powers, duties, authority, and privileges of the predecessor member of the Trust Advisory Board hereunder shall be vested in and undertaken by the successor member of the Trust Advisory Board without any further act; and the successor member of the Trust Advisory Board shall not be liable personally for any act or omission of the predecessor member of the Trust Advisory Board.

(d)     Each member of the Trust Advisory Board shall designate (i) one or more representatives who shall attend meetings of and participate in other activities of the Trust Advisory Board, and (ii) an alternate representative to attend meetings and participate in other activities of the Trust Advisory Board when the representatives designated pursuant to clause (i) above are unavailable.

(e)     Notwithstanding anything in this Trust Agreement to the contrary, the Trust Advisory Board shall not take any action which will cause the Avoidance Actions Trust to fail to qualify as a "Liquidating Trust" for United States federal income tax purposes.

(f)     A quorum for meetings of the Trust Advisory Board shall consist of a majority of the non-recused, voting members of the Trust Advisory Board then serving; provided, however, that, for purposes of determining whether a quorum is present at such a meeting, a voting member of the Trust Advisory Board shall be deemed present if a representative of the member is attending in Person, by telephone or by proxy.

(g)     Except as expressly provided herein, the affirmative vote of a majority of the non-recused, voting members of the Trust Advisory Board shall be the act of the Trust Advisory Board with respect to any matter that requires the determination, consent, approval or agreement of such board.  If an equal number of the non-recused voting members of the Trust Advisory Board vote for and against a particular matter, the Trustee shall only in such circumstances have the authority to cast a vote with respect to such matter.  Any of or all the members of the Trust Advisory Board may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof.  Any member of the Trust Advisory Board participating in a meeting by this means is deemed to be present in Person at the meeting.  In all matters submitted to a vote of the Trust Advisory Board, each Trust Advisory Board member shall be entitled to cast one vote, which vote shall be cast personally by such Trust Advisory Board member or by proxy.  In a matter in which the Trustee cannot obtain direction or authority from the

24

Trust Advisory Board, the Trustee may file a motion requesting such direction or authority from the Title III Court; provided, however, that any member of the Trust Advisory Board may oppose such motion.

(h)      A Trust Advisory Board member and its representative shall be recused from the Trust Advisory Board's deliberations and votes on any and all matters as to which such member has a conflicting interest.  If a Trust Advisory Board member or its representative does not recuse itself from any such matter, that Trust Advisory Board member and its representative may be recused from such matter by the unanimous vote of the remaining, voting members of the Trust Advisory Board that are not recused from the matter.

(i)      Any action required or permitted to be taken by the Trust Advisory Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Trust Advisory Board as evidenced by one or more written consents describing the action taken, signed by the Trust Advisory Board and filed with the minutes or proceedings of the Trust Advisory Board.

(j)      The members of the Trust Advisory Board shall be compensated as the Trust Advisory Board shall determine in an amount not to exceed $75,000 per board member per year.  Any member of the Trust Advisory Board shall also be reimbursed by the Trustee for its actual, reasonable out-of-pocket expenses, not to include outside counsel fees, incurred for serving on such board in the same manner and priority as the compensation and expenses of the Trustee under this Trust Agreement, in accordance with the Budget, after submission of reasonably detailed receipts or invoices evidencing such expenses and the approval of such expenses by the Title III Court.  Except as provided for in this Section 6.7, the members of the Trust Advisory Board shall not be entitled to receive any other form of compensation for their services provided by such members.  The Budget shall include a reserve for the fees and expenses of the Trust Advisory Board.  Payment of the compensation and expenses set forth in this Section 6.7(j) shall first be deducted from the Administrative Funding.  Payment of amounts from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

6.8      Cooperation with Respect to Claim Allowance: The Trustee and the Debtors shall cooperate and consult each other with respect to the disallowance or allowance of claims in connection with the litigation and/or resolution of Avoidance Actions, including with respect to any issues arising under sections 502(d) or 502(h) of the Bankruptcy Code.

6.9      Agents, Employees and Professionals.

(a)      The Avoidance Actions Trust may, but shall not be required to, from time to time enter into contracts with, consult with and retain members, managers, agents, representatives, employees, officers and independent contractors, including attorneys, accountants, appraisers, disbursing agents or other parties deemed by the Trustee to have qualifications necessary or desirable to assist in the proper administration of the Avoidance Actions Trust (collectively, the "Trust Professionals"), on such terms as the Trustee deems appropriate, including counsel retained on a contingency-fee basis, subject to the approval of the Trust Advisory Board.  The Debtors agree that the Avoidance Actions Trust may (but shall not be obligated to) retain as disbursing

25

agent the same disbursing agent as retained by one or more of the Debtors, on terms and conditions to facilitate timely and efficient distributions of the Cash proceeds of Avoidance Actions. None of the professionals that represented parties-in-interest in the Title III Cases shall be precluded from being engaged by the Trustee solely on account of their service as a professional for such parties-in-interest prior to the Effective Date.

(b)     After the Effective Date, Trust Professionals shall be required to submit reasonably detailed invoices on a monthly basis to the Trustee and the Trust Advisory Board, including in such invoices a description of the work performed, who performed such work, and if billing on an hourly basis, the hourly rate of such Person, plus an itemized statement of expenses. The Trustee shall pay such invoices thirty (30) days after such invoices are approved by the Trustee. In the event of any dispute concerning the entitlement to, or the reasonableness of any compensation and/or expenses of any Trust Professionals, either the Trustee or the affected party may ask the Title III Court to resolve the dispute.

(c)     All payments to Trust Professionals shall be paid out of the Administrative Funding or, if all of the Administrative Funding has been spent, any remaining Avoidance Actions Trust Assets, subject to the approval of the Trust Advisory Board; provided, however, that payments to Trust Professionals for services related solely to the HTA Avoidance Actions shall be paid or reimbursed from the proceeds of the HTA Avoidance Actions prior to the distribution of such proceeds to HTA Trust Beneficiaries.

(d)     Nothing in this Agreement shall prevent the Trustee, subject to the approval of the Trust Advisory Board, from seeking and obtaining outside credit or other funding for the prosecution of the Avoidance Actions or the HTA Avoidance Actions.

6.10     Investment of Avoidance Actions Trust Monies. All monies and other assets received by the Trustee as Avoidance Actions Trust Assets (including the proceeds thereof as a result of investment in accordance with this Section 6.10) or as proceeds of the HTA Avoidance Actions shall, until distributed or paid over as herein provided, be held in trust for the benefit of the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries (as applicable), and shall not be segregated from other Avoidance Actions Trust Assets, unless and to the extent required by the Plan or the HTA Plan. The Trustee may invest any Cash (including any earnings thereon or proceeds thereof) as permitted by section 345 of the Bankruptcy Code, in the manner set forth in this Section 6.10, but shall otherwise be under no liability for interest or income on any monies received by the Avoidance Actions Trust hereunder and held for distribution or payment to the Avoidance Actions Trust Beneficiaries and the HTA Trust Beneficiaries, except as such interest shall actually be received. Investment of any monies held by the Avoidance Actions Trust shall be administered in accordance with the general duties and obligations hereunder. The right and power of the Trustee to invest the Avoidance Actions Trust Assets, the proceeds thereof, the proceeds of the HTA Avoidance Actions or any income earned by the Avoidance Actions Trust, shall be limited to the right and power to: (a) invest such Avoidance Actions Trust Assets or proceeds of HTA Avoidance Actions (pending distributions in accordance with the Plan, the HTA Plan or this Trust Agreement) in either (i) short-term direct obligations of, or obligations guaranteed by, the United States of America or (ii) short-term obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the

26

United States as an agency or instrumentality thereof; or (b) deposit such assets in demand deposits at any bank or trust company, which has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000 (collectively, the "Permissible Investments"); provided, however, that the scope of any Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulations section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

6.11    Termination.  The duties, responsibilities and powers of the Trustee shall terminate on the date the Avoidance Actions Trust is wound up and dissolved in accordance with New York law pursuant to Section 3.2 hereof, under applicable law in accordance with the Plan, by an order of the Title III Court or by entry of a final decree closing the Debtors' Title III Cases; provided, that Sections 7.1, 7.2, 7.3, 7.4 and 7.5 hereof shall survive such termination, dissolution and entry.

## ARTICLE VII

## LIABILITY AND INDEMNITY

7.1    Liability to Third Persons.  No Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person in connection with the Avoidance Actions Trust Assets, the HTA Avoidance Actions or the affairs of the Trustee (except to the extent of the Avoidance Actions Trust Beneficiary's or HTA Trust Beneficiary's fraud, gross negligence or willful misconduct).  Notwithstanding anything herein to the contrary and without limitation of section 78.15 of the Plan, neither the Trust Parties nor the Trust Parties' firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents or agents, or any of such Person's successors and assigns shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person (including, in the case of the Trustee and members of the Trust Advisory Board, to any Trust Professionals retained by the Trustee in accordance with this Trust Agreement) in connection with the Avoidance Actions Trust Assets, the HTA Avoidance Actions or the affairs of the Avoidance Actions Trust and shall not be liable with respect to any action taken or omitted to be taken in good faith, except for actions and omissions determined by a final order of the Title III Court to be due to their respective gross negligence, fraud, criminal conduct or willful misconduct, and all such persons shall look solely to the Avoidance Actions Trust Assets and the HTA Avoidance Actions (as applicable) for satisfaction of claims of any nature arising in connection with affairs of the Avoidance Actions Trust.  Other than as set forth in the Plan or in the Confirmation Order, nothing in this Section 7.1 shall be deemed to release any Avoidance Actions Trust Beneficiary or any HTA Trust Beneficiary from any actions or omissions occurring prior to the Effective Date.

7.2    Nonliability for Acts of Others.  Except as provided herein, nothing contained in this Trust Agreement, the Plan, the Confirmation Order, the HTA Plan or the HTA Confirmation Order shall be deemed to be an assumption by Trustee, the Trust Advisory Board (or its members) or the Trust Professionals of any of the liabilities, obligations or duties of the Debtors or shall be deemed to be or contain a covenant or agreement by the such persons to assume or accept any such

27

liability, obligation or duty.  Any successor Trustee or Trust Advisory Board member may accept and rely upon any accounting made by or on behalf of any predecessor Trustee or Trust Advisory Board hereunder, and any statement or representation made as to the assets comprising the Avoidance Actions Trust Assets or the HTA Avoidance Actions, or as to any other fact bearing upon the prior administration of the Avoidance Actions Trust, so long as it has a good faith basis to do so.  The Trustee and the Trust Advisory Board members shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue (except to the extent of the Trustee's, or the Trust Advisory Board members', fraud, gross negligence or willful misconduct).  The Trustee or any successor Trustee and the Trust Advisory Board members or any successor Trust Advisory Board member shall not be liable for any act or omission of any predecessor Trustee or Trust Advisory Board member.  No provision of this Trust Agreement shall require the Trustee or any Trust Advisory Board member to expend or risk his personal funds or otherwise incur any financial liability in the performance of his rights or powers hereunder if the Trustee or Trust Advisory Board member has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to him.

7.3    Exculpation.  As of the Effective Date, the Trust Parties, the Trust Parties' firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents and agents, and any of such Person's successors and assigns shall be and hereby are exculpated by all Persons, including Avoidance Actions Trust Beneficiaries, HTA Trust Beneficiaries, holders of Claims, holders of Equity interests, and other parties-in-interest, from any and all claims, causes of action and other assertions of liability arising out of or related to the discharge of their respective powers and duties conferred by the Plan, the HTA Plan, this Trust Agreement or any order of the Title III Court entered pursuant to or in furtherance of the Plan or the HTA Plan, or applicable law or otherwise, except for actions or omissions to act that are determined by final order of the Title III Court to have arisen out of their own respective fraud, criminal conduct, gross negligence or willful misconduct.  No Avoidance Actions Trust Beneficiary, HTA Trust Beneficiary, holder of a Claim, or other party-in-interest shall have or be permitted to pursue any claim or cause of action against the Trust Parties, their employees, professionals, or representatives, for making payments in accordance with, or for implementing, the provisions of the Plan, the Confirmation Order and this Trust Agreement.  Any action taken or omitted to be taken with the express approval of the Title III Court or the Trust Advisory Board shall conclusively be deemed not to constitute gross negligence or willful misconduct; provided, however, that, notwithstanding any provision herein to the contrary, the Trustee shall not be obligated to comply with a direction of the Trust Advisory Board, whether or not express, that would result in a change to the distribution provisions of this Trust Agreement and the Plan.  In such instance, the Trustee shall request, within fourteen (14) days, the Title III Court's ratification of its determination not to comply with a direction of the Trust Advisory Board.

7.4    Limitation of Liability.  The Trustee, the members of the Trust Advisory Board, and the Trust Professionals will not be liable for punitive, exemplary, consequential, special or other damages for a breach of this Trust Agreement under any circumstances, except for those resulting from acts arising out of their own fraud, willful misconduct, or gross negligence.

28

7.5    Indemnity.  The Trust Parties and their respective firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents and agents, and any of such Person's successors and assigns (each, an "Indemnified Party"), shall not be liable to the Avoidance Actions Trust Beneficiaries or the HTA Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the Trustee or the Trust Advisory Board, as applicable, except those acts arising out of their own fraud, willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Trustee or the Trust Advisory Board, as applicable, except for any actions or inactions involving fraud, willful misconduct or gross negligence.  Any indemnification claim of an Indemnified Party under this Section 7.5 shall be satisfied solely from the Avoidance Actions Trust Assets or the proceeds of the HTA Avoidance Actions (as applicable) and shall be entitled to a priority distribution therefrom, ahead of the Avoidance Actions Trust Interests and the HTA Trust Interests (as applicable), and any other claim to or interest in such assets.  The Indemnified Parties shall be entitled to rely, in good faith, on the advice of their retained professionals.  The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which they are indemnified.

7.6    Compensation and Expenses.  The Trustee (including the Person(s) serving as or comprising the Trustee) shall receive compensation for its services, to be paid out of the Avoidance Actions Trust Assets and the proceeds of the HTA Avoidance Actions, in the manner and amount determined by the Trust Advisory Board, subject to the approval of the Title III Court. In addition, the Trustee shall be entitled, with the consent of the Trust Advisory Board, and subject to the approval of the Title III Court, to reimburse itself from the Avoidance Actions Trust Assets on a monthly basis for all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement and the Plan so long as it falls within the amounts provided for in the Budget; otherwise, approval of the Trust Advisory Board is required. Payment of the compensation and expenses set forth in this Section 7.6 shall first be deducted from the Administrative Funding; provided, however, that to the extent any compensation and expenses hereunder relate solely to the administration, liquidation and conversion into Cash of the HTA Avoidance Actions, such compensation and expenses shall be paid or reimbursed from the Cash proceeds of the HTA Avoidance Actions to the extent such Cash proceeds are or become available. Payment of amounts from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

## ARTICLE VIII

## SUCCESSOR TRUSTEE

8.1    Resignation.  The Trustee may resign from the Avoidance Actions Trust by giving at least sixty (60) days' prior written notice thereof to each member of the Trust Advisory Board. Such resignation shall become effective on the later to occur of (a) the date specified in such written notice and (b) the effective date of the appointment of a successor Trustee in accordance

with Section 8.4 hereof and such successor's acceptance of such appointment in accordance with Section 8.5 hereof.

8.2    Removal.  The Trustee may be removed by a majority vote of the members of the Trust Advisory Board.  Such removal shall become effective on the date specified in such action by the Trust Advisory Board.

8.3    Effect of Resignation or Removal.  The resignation, removal, incompetency, bankruptcy or insolvency of the Trustee shall not operate to terminate the Avoidance Actions Trust or to revoke any existing agency created pursuant to the terms of this Trust Agreement, the Plan, the Confirmation Order, the HTA Plan or the HTA Confirmation Order, or invalidate any action theretofore taken by the Trustee.  All fees and expenses properly incurred by the Trustee prior to the resignation, incompetency or removal of the Trustee shall be paid from the Avoidance Actions Trust Assets, unless such fees and expenses are disputed by (a) the Trust Advisory Board, or (b) the successor Trustee, in which case the Title III Court shall resolve the dispute and any disputed fees and expenses of the predecessor Trustee that are subsequently allowed by the Title III Court shall be paid from the Avoidance Actions Trust Assets; provided, however, that, to the extent any fees and expenses incurred by the Trustee prior to resignation or removal relate solely to the administration, liquidation and conversion into Cash of the HTA Avoidance Actions, such fees and expenses shall be paid or reimbursed from the Cash proceeds of the HTA Avoidance Actions to the extent such Cash proceeds are or become available.  In the event of the resignation or removal of the Trustee, such Trustee shall: (i) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Trustee or directed by the Title III Court to effect the termination of such Trustee's capacity under this Trust Agreement; (ii) promptly deliver to the successor Trustee all documents, instruments, records and other writings related to the Avoidance Actions Trust as may be in the possession of such Trustee; and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Trustee.

8.4    Appointment of Successor.  In the event of the death, resignation, removal, incompetency, bankruptcy or insolvency of the Trustee, a vacancy shall be deemed to exist and a successor shall be appointed by a majority of the Trust Advisory Board; provided, however, that under no circumstance shall the successor Trustee be a director or officer of any Affiliate of the Avoidance Actions Trust.

8.5    Acceptance of Appointment by Successor Trustee.  Any successor Trustee appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Title III Court for filing and to the Trust Advisory Board and, in case of the Trustee's resignation, to the resigning Trustee.  Thereupon, such successor Trustee shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor in the Avoidance Actions Trust with like effect as if originally named Trustee.  The resigning or removed Trustee shall duly assign, transfer and deliver to such successor Trustee all property and money held by such resigning or removed Trustee hereunder and shall, as directed by the Title III Court or reasonably requested by such successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such

30

successor Trustee upon the trusts herein expressed, all the liabilities, duties, powers, rights, title, discretion and privileges of such resigning or removed Trustee.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

9.1     <u>Binding on the Debtors</u>.  This Trust Agreement shall be binding on the Debtors and shall remain binding on the Debtors notwithstanding any dissolution of the FOMB or any other event that may cause the FOMB to cease to exist or to cease serving as a representative of the Debtors.

9.2     <u>Governing Law</u>.  This Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to principles of conflicts of laws; <u>provided</u>, <u>however</u>, that the Trust Advisory Board shall be subject to Puerto Rico laws governing ethics, anti-corruption and conflicts of interest, and such laws shall be, and shall be deemed to be, incorporated into the Trust Advisory Board's bylaws.

9.3     <u>Jurisdiction</u>.  Subject to the proviso below, the parties agree that the Title III Court shall have exclusive jurisdiction over the Avoidance Actions Trust and the Trustee, including the administration and activities of the Avoidance Actions Trust and the Trustee, and, pursuant to the Plan, the Title III Court has retained such jurisdiction; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, the Trustee shall have power and authority to bring any action in any court of competent jurisdiction (including the Title III Court) to prosecute any Claims or Causes of Action assigned to the Avoidance Actions Trust.

9.4     <u>Severability</u>.  If any provision of this Trust Agreement or the application thereof to any Person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforceable to the full extent permitted by law.

9.5     <u>Notices</u>.  Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, sent by facsimile transmission or e-mail, sent by nationally recognized overnight delivery service or mailed by first-class mail:

> (i)     if to the Trustee, to:
>
> Drivetrain LLC
> 410 Park Avenue, Suite 900
> New York, NY 10022
> dmack@drivetrainllc.com
> sleduc@drivetrainllc.com
> tdaileader@drivetrainllc.com

31

with a copy to counsel to be identified by the Trustee.

(ii)    if to members of the Trust Advisory Board, then to each of;

Carol Flaton
Hamlin Partners LLC
39 Bank Street
New York, NY 10014
carol.flaton@hamlinpartners.com

Ramon Ortiz
Urb. Sabanera
40 Camino de la Cascada
Cidra, Puerto Rico 00739
ruoc1958@hotmail.com

(iii)   if to any Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary, to the last known address of such Avoidance Actions Trust Beneficiary or HTA Trust Beneficiary according to the Debtors' Schedules, such Avoidance Actions Trust Beneficiary's or HTA Trust Beneficiary's proof of claim or the lists of record holders provided to the Trustee; and

(iv)    if to the FOMB

Financial Oversight and Management Board for Puerto Rico
268 Muñoz Rivera Ave,
Suite 1107 San Juan, PR 00918-1813
Attn:  Executive Director

With a copy to:

Proskauer Rose LLP
Eleven Times Square
New York, NY  10036
Attn: Martin J. Bienenstock, Esq.
Brian S. Rosen, Esq.
James P. Gerkis, Esq.
Tel: (212) 969-3000
Fax: (212) 969-2900

AND

O'Neill & Borges LLC
250 Muñoz Rivera Ave,
Suite 800
San Juan, PR 00918-1813
Attn: Hermann Bauer, Esq.
Tel: (787) 764-8181
Fax: (212) 753-8944

(v)     if to each of the Debtors or the Post-Effective Date Debtors:

The Commonwealth of Puerto Rico
c/o Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn:  Executive Director

AND

The Employees Retirement System of the Government of the
Commonwealth of Puerto Rico
PO Box 42003
San Juan, PR 00940-2203
Attn: Executive Director

AND

The Puerto Rico Public Buildings Authority
PO Box 41029
San Juan, PR 00940-1029
Attn: Executive Director

AND

The Puerto Rico Highways and Transportation Authority
~~PO Box _____~~
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Avenue Stop 10
San Juan, PR ~~00940-2203~~00907
Attn: Executive Director

33

With a copy to:

> Proskauer Rose LLP
> Eleven Times Square
> New York, NY 10036
> Attn: Martin J. Bienenstock, Esq.
> Brian S. Rosen, Esq.
> James P. Gerkis, Esq.
> Tel: (212) 969-3000
> Fax: (212) 969-2900

AND

Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn: Executive Director

With a copy to:

> O'Melveny & Myers LLP
> Seven Times Square
> New York, NY 10036
> Attn:   John Rapisardi, Esq.
>         Peter Friedman, Esq.
>         Maria J. DiConza, Esq.
> Tel: (212) 326-2000
> Fax: (212) 326-2061

9.6     <u>Deemed Delivery</u>.  All notices shall be effective and shall be deemed delivered : (a) if by personal delivery, delivery service or courier, on the date of delivery; (b) if by electronic mail or facsimile communication, on the date of receipt or confirmed transmission of the communication; and (c) if by mail, on the date of receipt.  Any party from time to time may change its address, facsimile number or other information for the purpose of notices to that party by giving notice specifying such change to the other parties hereto.

9.7     <u>Headings</u>.   The headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

9.8     <u>Actions Taken on a Date Other Than a Business Day</u>.  If any payment or act under the Plan, the HTA Plan or this Trust Agreement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

34

9.9     Relationship to the Plan and the HTA Plan.  The terms of this Trust Agreement are intended to supplement the terms provided by the Plan, the Confirmation Order, the HTA Plan and the HTA Confirmation Order, and therefore this Trust Agreement incorporates the provisions of the Plan, the Confirmation Order (which may amend or supplement the Plan), the HTA Plan and the HTA Confirmation Order (which may amend or supplement the HTA Plan).  Additionally, the Trustee and the Trust Advisory Board may seek any orders from the Title III Court, upon notice and a hearing in furtherance of implementation of the Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order and this Trust Agreement.  However, to the extent that there is conflict between the provisions of this Trust Agreement, and the provisions of the Plan, the Confirmation Order, the HTA Plan or the HTA Confirmation Order, each document shall have controlling effect in the following rank order: (a) *first*, this Trust Agreement; (b) *second*, the Confirmation Order or HTA Confirmation Order (as applicable); and (c) *third*, the Plan or HTA Plan (as applicable).

9.10     Entire Trust Agreement.  This Trust Agreement (including the recitals and annexes hereto), the Plan, the Confirmation Order, the HTA Plan and the HTA Confirmation Order constitute the entire agreement and understanding by and among the parties and supersede all prior and contemporaneous agreements or understandings, statements, or exchanges by and among the parties or any other person with respect to the subject matter hereof.

9.11     Cooperation.  Each of the Debtors and the FOMB shall turn over or otherwise make available to the Trustee at no cost to the Avoidance Actions Trust or the Trustee, all books and records (or copies thereof) and other information, in each as may be reasonably requested by the Trustee, including (a) all communications by and between the FOMB and its professionals and the Avoidance Action defendants, and (b) all data and documents the FOMB and its professionals have received from the Avoidance Action defendants and the HTA Avoidance Action defendants through the "information exchange" process contemplated by the *Order Granting Omnibus Motion by the Financial Oversight and Management Board for Puerto Rico, Acting by and through the Members of the Special Claims Committee and the Official Committee of Unsecured Creditors to (i) Establish Litigation Case Management Procedures and (ii) Establish Procedures for Approval of Settlements* [Docket No. 7941].  The Debtors and the FOMB further agree to reasonably cooperate with the Trustee in carrying out its duties hereunder, including by, among other things: (i) delivering to the Trustee work product developed by their respective professionals in connection with the prosecution of the Avoidance Actions and the HTA Avoidance Actions, subject to the confidentiality provisions herein to preserve the confidential nature of the Debtors' and the FOMB's books and records; (ii) following the Effective Date, participating in meetings with the Trustee, at the Trustee's reasonable request and at such times and upon such notice as does not unreasonably interfere with the operations of such party, for purposes of coordinating the transition of the Avoidance Actions Trust Assets and the HTA Avoidance Actions; (iii) providing assistance in discovery responses and witness testimony as is reasonably necessary for the resolution of the Avoidance Actions and the HTA Avoidance Actions; and (iv) maintaining all data rooms, hard drives and other media containing information and/or documents related to the Avoidance Actions and the HTA Avoidance Actions, as reasonably requested by the Trustee, to facilitate access to such information and/or documents.  Notwithstanding the foregoing or anything else that may be to the contrary herein, the FOMB shall not be required to disclose any

35

information or work product if the same constitutes or relates to communications between a committee of the FOMB and another part or a member of the FOMB; provided, however, that the FOMB shall provide to the Trustee the relevant portion of any memoranda or other documents containing research or analysis concerning legal or factual issues arising in proceedings related to the Avoidance Actions or HTA Avoidance Actions, regardless of whether such memoranda or other documents were shared between a committee of the FOMB and another part or a member of the FOMB. The Trustee agrees to give the Debtors and/or their designated counsel reasonable access to attend (A) witness preparations related to the Avoidance Actions and the HTA Avoidance Actions for any witness who will be providing testimony in his or her capacity as a current or former employee of any of the Debtors, and (B) the depositions of any witness who provides testimony related to the Avoidance Actions or the HTA Avoidance Actions in his or her capacity as a current or former employee of any of the Debtors; provided, however, that such attendance (1) will be solely as an observer, and (2) shall not constitute a waiver of any privileges.

9.12   Amendment and Waiver. Any provision of this Trust Agreement may be amended or waived by the Trustee with the unanimous consent of all voting members of the Trust Advisory Board. Notwithstanding this Section 9.12, any amendment to this Trust Agreement shall not be inconsistent with the purpose and intention of the Avoidance Actions Trust to liquidate in an expeditious but orderly manner the Avoidance Actions Trust Assets and the HTA Avoidance Actions in accordance with Treasury Regulations section 301.7701-4(d) and Section 1.2.

9.13   Confidentiality.   The Trust Parties and their advisors, including the Trust Professionals (each a "Confidential Party" and, collectively, the "Confidential Parties") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Debtor or the FOMB to which any of the Avoidance Actions Trust Assets or HTA Avoidance Actions relates; provided, however, that such information may be disclosed if: (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties; or (b) such disclosure is required of the Confidential Parties pursuant to legal process, including subpoena or other court order or other applicable laws or regulations.   If any Confidential Party is requested to divulge confidential information pursuant to clause (b) above, such Confidential Party shall promptly, in advance of making such disclosure, provide reasonable notice of such required disclosure to the Trustee (or the Trust Advisory Board in case the Trustee is the disclosing party) to allow sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the Trustee (or the Trust Advisory Board, as applicable) in making any such objection, including appearing in any judicial or administrative proceeding in support of any objection to such disclosure.

9.14   Rules of Construction. Except where the context otherwise may require, (a) words of any gender include the other gender, and (b) words importing the singular number shall include the plural number and *vice versa*.   All references herein to Articles, Sections and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Trust Agreement. The terms "hereof", "hereto", "herein" and words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section

36

or subdivision of this Trust Agreement.  The terms "include", "includes" and "including" shall be construed as if followed by the words "without limitation".

9.15    <u>Counterparts</u>.  This Trust Agreement may be executed with counterpart signature pages or in any number of counterparts, each of which counterparts shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument.  A facsimile, portable document file (PDF) or other electronic transmission signature of any party shall be considered to have the same binding legal effect as an original signature.

9.16    <u>Intention of Parties to Establish Avoidance Actions Trust</u>.  This Trust Agreement is intended to create a Avoidance Actions Trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Trust Agreement may be amended to comply with such United States federal income tax laws, which amendments may apply retroactively.

9.17    <u>Definitions</u>.

"**AAFAF**" shall have the meaning ascribed to such term in the Plan.

"**Administrative Funding**" shall have the meaning ascribed to such term in <u>Section 1.3</u> hereof.

"**Affiliate**" shall have the meaning ascribed to such term in the Plan.

"**Allowed**" shall have the meaning ascribed to such term in the Plan.

"**Allowed Claim**" shall have the meaning ascribed to such term in the Plan.

"**Avoidance Actions**" shall have the meaning ascribed to such term in the Plan.

"**Avoidance Actions Trust**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**Avoidance Actions Trust Assets**" shall have the meaning ascribed to such term in the Plan and, for the avoidance of doubt, shall include the account at Banco Popular with account number 75-0277-01-4.

"**Avoidance Actions Trust Beneficiaries**" shall have the meaning ascribed to such term in the Plan.

"**Avoidance Actions Trust Interests**" shall have the meaning ascribed to such term in the Plan.

"**Bankruptcy Code**" shall have the meaning ascribed to such term in the Plan.

"**Bankruptcy Rules**" shall have the meaning ascribed to such term in the Plan.

37

"**Book Entry System**" shall have the meaning ascribed to such term in <u>Section 2.3</u> hereof.

"**Budget**" shall have the meaning ascribed to such term in <u>Section 4.13</u> hereof.

"**Business Day**" shall have the meaning ascribed to such term in the Plan.

"**Cash**" shall have the meaning ascribed to such term in the Plan.

"**Causes of Action**" shall have the meaning ascribed to such term in the Plan.

"**Claims**" shall have the meaning ascribed to such term in the Plan.

"**Commonwealth**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**Commonwealth Avoidance Actions Trust**" shall have the meaning ascribed to such term in <u>Section 1.1</u> hereof.

"**Confidential Party**" shall have the meaning ascribed to such term in <u>Section 9.13</u> hereof.

"**Confirmation Order**" shall have the meaning ascribed to such term in the Recitals.

"**Creditors' Committee**" shall have the meaning ascribed to such term in the Plan.

"**Creditor Directors**" shall have the meaning ascribed to such term in <u>Section 6.7(b)</u> hereof.

"**Debtors**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**Disbursing Agent**" shall have the meaning ascribed to such term in the Plan.

"**Dispute Resolution**" shall have the meaning ascribed to such term in <u>Section 2.1</u> hereof.

"**Disputed Claim**" shall have the meaning ascribed to such term in the Plan but shall include, in the period prior to the Debtors' deadline to object to claims, all Claims that have not been Allowed.

"**Distribution Date**" shall have the meaning ascribed to such term in <u>Section 4.2(b)</u> hereof.

"**Effective Date**" shall have the meaning ascribed to such term in the Plan.

"**Eminent Domain Claim**" shall have the meaning ascribed to such term in the Plan.

"**Entities**" shall have the meaning ascribed to such term in the Plan.

"**Equity**" shall have the meaning ascribed to such term in the Plan.

"**ERS**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**ERS General Unsecured Claim**" shall have the meaning ascribed to such term in the Plan.

"**Exchange Act**" shall have the meaning ascribed to such term in Section 2.6(c) hereof.

"**Final Order**" shall have the meaning ascribed to such term in the Plan.

"**FOMB**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**General Unsecured Claims**" shall have the meaning ascribed to such term in the Plan.

"**HTA**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**HTA Avoidance Actions**" shall have the meaning ascribed to such term in the Recitals.

"**HTA Confirmation Order**" shall have the meaning ascribed to such term in the Recitals.

"**HTA Effective Date**" shall have the meaning ascribed to such term in Section 1.3(b) hereof.

"**HTA Plan**" shall have the meaning ascribed to such term in the Recitals.

"**HTA Trust Beneficiaries**" shall have the meaning ascribed to such term in the Recitals.

"**HTA Trust Interests**" shall have the meaning ascribed to such term in Section 2.1 hereof.

"**Indemnified Party**" shall have the meaning ascribed to such term in Section 7.5 hereof.

"**Initial Claims Report**" shall have the meaning ascribed to such term in Section 2.4 hereof.

"**IRC**" shall have the meaning ascribed to such term in the Recitals.

"**IRS**" shall have the meaning ascribed to such term in the Plan.

"**Liquidating Trust**" shall have the meaning ascribed to such term in Recitals.

"**Monthly Claims Report**" shall have the meaning ascribed to such term in Section 2.4 hereof.

"**OB Director**" shall have the meaning ascribed to such term in Section 6.7(b) hereof.

"**PBA**" shall have the meaning ascribed to such term in the Recitals.

39

"**Permissible Investments**" shall have the meaning ascribed to such term in Section 6.10 hereof.

"**Person**" shall have the meaning ascribed to such term in the Plan.

"**Plan**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**Privileges**" shall have the meaning ascribed to such term in Section 1.9 hereof.

"**PROMESA**" shall have the meaning ascribed to such term in the Recitals.

"**Reorganized Debtors**" shall have the meaning ascribed to such term in the Plan.

"**SEC**" shall have the meaning ascribed to such term in Section 2.6(c) hereof.

"**Title III Cases**" shall have the meaning ascribed to such term in the Recitals.

"**Title III Court**" shall have the meaning ascribed to such term in the Plan.

"**Treasury Regulations**" shall have the meaning ascribed to such term in the Recitals.

"**Trust Advisory Board**" shall have the meaning ascribed to such term in Section 6.7(a) hereof.

"**Trust Agreement**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**Trust Disbursing Agent**" shall have the meaning ascribed to such term in Section 4.2 hereof.

"**Trust Parties**" shall have the meaning ascribed to such term in Section 2.5 hereof.

"**Trust Professionals**" shall have the meaning ascribed to such term in Section 6.9 hereof.

"**Trustee**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

[Remainder of Page Blank — Signature Page Follows]

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

THE COMMONWEALTH OF PUERTO RICO, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/

Name: _____

Title: ~~Executive Director~~

EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/

Name: _____

Title: ~~Executive Director~~

PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/

Name: _____

Title: ~~Executive Director~~

PUERTO RICO PUBLIC BUILDINGS AUTHORITY, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/

Name: _____

Title: ~~Executive Director~~

**DriveTrain LLC, as Trustee**

By: /s/
    Name:  David Mack
               Timothy Daileader
    Title:   Authorized Signatory

*And, solely with respect to <u>Sections 1.3</u> and <u>9.11</u>
hereof*:

**FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO**

By: <u>/s/</u>
    Name: _____
    Title:   ~~Executive Director~~

43

**Annex A**

<u>Initial Trust Advisory Board Members</u>

*Creditor Directors*:

1.      Carol Flaton

2.      Ramon Ortiz Carro

*OB Director*:

3.      None

# **EXHIBIT C**

Schedule of Executory Contracts and Unexpired Leases to be Assumed

# **EXHIBIT C**

Schedule of Executory Contracts and Unexpired Leases to be Assumed

## Schedule of Executory Contracts to be Assumed

The Debtor reserves the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Description of Executory Contract | Counterparty(ies) | Cure Amount |
|---|---|---|
| Toll Roads Concession Agreement between Autopistas Metropolitanas de Puerto Rico, LLC and the Puerto Rico Highways and Transportation Authority, as amended. <br><br> Waiver and Amendment Agreement to Toll Roads Concession Agreement between Autopistas Metropolitanas de Puerto Rico, LLC and the Puerto Rico Highways and Transportation Authority. <br><br> Amendment and Consent Agreement No. 2 to Toll Roads Concession Agreement between Autopistas Metropolitanas de Puerto Rico, LLC and the Puerto Rico Highways and Transportation Authority. <br><br> Amendment Agreement No. 3 to Toll Roads Concession Agreement between Autopistas Metropolitanas de Puerto Rico, LLC and the Puerto Rico Highways and Transportation Authority. <br><br> Amendment Agreement No. 4 to Toll Roads Concession Agreement between Autopistas Metropolitanas de Puerto Rico, LLC and the Puerto Rico Highways and Transportation Authority. <br><br> Agreed Modifications and Amendment Agreement No. 5 to Toll Roads Concession Agreement between Autopistas Metropolitanas de Puerto Rico, LLC and the Puerto Rico Highways and Transportation Authority. <br><br> Amendment Agreement No. 6 to Toll Roads Concession Agreement between Autopistas Metropolitanas de Puerto Rico, LLC and the Puerto Rico Highways and Transportation Authority. | Autopistas Metropolitanas de Puerto Rico, LLC | $0.00 |

| Description of Executory Contract | Counterparty(ies) | Cure Amount |
|---|---|---|
| Escrow Agreement by and among Autopistas Metropolitanas de Puerto Rico, LLC, the Puerto Rico Highways and Transportation Authority, and Banco Popular de Puerto Rico, as amended.<br><br>    Amendment Agreement No. 1 to the Original Escrow Agreement and Disbursement Instructions by and among Autopistas Metropolitanas de Puerto Rico, LLC, the Puerto Rico Highways and Transportation Authority, and Banco Popular de Puerto Rico.<br><br>    Exhibit A to Amendment No. 1 to the Original Escrow Agreement and Disbursement Instructions by and among Autopistas Metropolitanas de Puerto Rico, LLC, the Puerto Rico Highways and Transportation Authority and Banco Popular de Puerto Rico. | Autopistas Metropolitanas de Puerto Rico, LLC<br><br>Banco Popular de Puerto Rico | $0.00 |
| New Escrow Agreement by and among Autopistas Metropolitanas de Puerto Rico, LLC, the Puerto Rico Highways and Transportation Authority and Banco Popular de Puerto Rico. | Autopistas Metropolitanas de Puerto Rico, LLC<br><br>Banco Popular de Puerto Rico | $0.00 |

# **EXHIBIT D**

Ambac Custodial Trust Documents

HTA CLASS 6 TRUST


Wilmington Trust, N.A.
(as Trustee),

and

Wilmington Trust, N.A.
(as Delaware Trustee),

and

Puerto Rico Highways and Transportation Authority
(as Depositor)

and

Acknowledged and agreed to by:

Ambac Assurance Corporation
(as Credit Support Provider)

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS; CONSTRUCTION ........................................................ 2

    SECTION 1.01.   Definitions......................................................................... 2

    SECTION 1.02.   Rules of Construction. ..................................................... 42

    SECTION 1.03.   Article and Section References. ....................................... 43

ARTICLE II DECLARATION OF TRUST;  ISSUANCE OF UNITS ..................... 43

    SECTION 2.01.   Creation of Trust; Assignment of Trust Property. ........... 43

    SECTION 2.02.   Acceptance by Trustee....................................................... 45

    SECTION 2.03.   Agreement to Authenticate and Deliver Units.................. 46

ARTICLE III TRUST POWERS; ADMINISTRATION OF THE TRUST PROPERTY ......... 46

    SECTION 3.01.   Trust Property. ................................................................. 46

    SECTION 3.02.   Administration of the Trust.............................................. 47

    SECTION 3.03.   Collection Account. ......................................................... 48

    SECTION 3.04.   Investment of Funds in the Taxable Collection Account................. 50

ARTICLE IV DISTRIBUTIONS AND REPORTS TO CREDIT SUPPORT PROVIDER AND UNITHOLDERS .................................................... 50

    SECTION 4.01.   Distributions.................................................................... 50

    SECTION 4.02.   Reports to Credit Support Provider and Unitholders....................... 54

    SECTION 4.03.   Compliance with Tax Reporting and Withholding Requirements. ............................................................... 55

    SECTION 4.04.   Preservation of Information, Communications to Unitholders.......... 55

ARTICLE V THE UNITS .......................................................................... 56

    SECTION 5.01.   The Units.......................................................................... 56

    SECTION 5.02.   Execution, Authentication and Delivery........................... 57

    SECTION 5.03.   Registration; Registration of Transfer and Exchange....................... 57

    SECTION 5.04.   Mutilated, Destroyed, Lost and Stolen Certificates. ......................... 58

    SECTION 5.05.   Persons Deemed Owners. ................................................. 59

    SECTION 5.06.   Cancellation. ................................................................... 59

    SECTION 5.07.   Appointment of Paying Agent. ......................................... 60

    SECTION 5.08.   [Reserved]........................................................................ 60

    SECTION 5.09.   Issuance and Transfer Restrictions. ................................. 60

ARTICLE VI RIGHTS OF UNITHOLDERS AND CREDIT SUPPORT PROVIDER ........... 62

## TABLE OF CONTENTS

(continued)

**Page**

SECTION 6.01.   Voting Rights with Respect to HTA Clawback CVIs and New HTA Bonds. ................................................... 62

SECTION 6.02.   HTA Clawback CVI and New HTA Bond Sales. ............................. 62

SECTION 6.03.   Distribution of HTA Clawback CVIs and New HTA Bonds. ........... 64

SECTION 6.04.   Electing Ambac Prepetition Insured Bonds. ................................... 66

ARTICLE VII DEFAULT ON HTA CLAWBACK CVIS AND NEW HTA BONDS
AND PERMITTED INVESTMENTS ................................................... 67

SECTION 7.01.   Realization Upon Default. ............................................................. 67

ARTICLE VIII TRUST WIND-UP EVENTS; TERMINATION ................................................. 67

SECTION 8.01.   Trust Wind-Up Events. ................................................................. 67

SECTION 8.02.   Trust Property Made Available ...................................................... 67

ARTICLE IX CONCERNING THE TRUSTEE ................................................................. 68

SECTION 9.01.   Duties of Trustee. ......................................................................... 68

SECTION 9.02.   Certain Matters Affecting the Trustee. ........................................... 69

SECTION 9.03.   Limitation on Liability of Trustee .................................................. 71

SECTION 9.04.   Trustee Fees and Expenses; Limited Indemnification. ..................... 71

SECTION 9.05.   Eligibility Requirements for Trustee; Delaware Trustee. .................. 71

SECTION 9.06.   Resignation or Removal of the Trustee, Delaware Trustee. .............. 72

SECTION 9.07.   Successor Trustee. ......................................................................... 73

SECTION 9.08.   Merger or Consolidation of Trustee. ............................................... 73

SECTION 9.09.   Appointment of Co-Trustee. .......................................................... 73

SECTION 9.10.   Appointment of Office or Agency. ................................................. 74

SECTION 9.11.   Representations and Warranties of Trustee and Delaware Trustee. ................................................................................... 74

SECTION 9.12.   Limitation of Powers and Duties. ................................................... 77

SECTION 9.13.   Power and Authority of the Delaware Trustee. ................................ 78

SECTION 9.14.   Delaware Trustee May Request Direction. ...................................... 79

SECTION 9.15.   Delaware Trustee's Capacity. ......................................................... 79

SECTION 9.16.   Duties. .......................................................................................... 79

SECTION 9.17.   Trustee. ......................................................................................... 80

ARTICLE X MISCELLANEOUS TERMS ................................................................. 80

-ii-

# TABLE OF CONTENTS
(continued)

**Page**

SECTION 10.01.  Amendment of Trust Agreement. ........................................................ 80

SECTION 10.02.  Counterparts. ....................................................................................... 81

SECTION 10.03.  Limitation on Rights of Unitholders. ................................................... 81

SECTION 10.04.  Governing Law. ................................................................................... 81

SECTION 10.05.  Notices. ................................................................................................ 82

SECTION 10.06.  Severability of Terms. ......................................................................... 83

SECTION 10.07.  Notice to Credit Support Provider. ..................................................... 83

SECTION 10.08.  No Recourse. ....................................................................................... 84

SECTION 10.09.  Third Party Beneficiary. ...................................................................... 84

| EXHIBIT A1 | Class A-2028 Unit Sinking Fund Schedule |
| EXHIBIT A2 | Class L-2038 Unit Sinking Fund Schedule |
| EXHIBIT A3 | Class N-2045 Unit Sinking Fund Schedule |
| EXHIBIT B1 | Form of Class A-2028 Unit |
| EXHIBIT B2 | Form of Class L-2038 Unit |
| EXHIBIT B3 | Form of Class M-2023 Unit |
| EXHIBIT B4 | Form of Class N-2026 Unit |
| EXHIBIT B5 | Form of Class N-2027 Unit |
| EXHIBIT B6 | Form of Class N-2028 Unit |
| EXHIBIT B7 | Form of Class N-2029 Unit |
| EXHIBIT B8 | Form of Class N-2030 Unit |
| EXHIBIT B9 | Form of Class N-2031 Unit |
| EXHIBIT B10 | Form of Class N-2045 Unit |
| EXHIBIT C1 | Form of Class A-2028 Unit Global Security |
| EXHIBIT C2 | Form of Class L-2038 Unit Global Security |
| EXHIBIT C3 | Form of Class M-2023 Unit Global Security |
| EXHIBIT C4 | Form of Class N-2026 Unit Global Security |
| EXHIBIT C5 | Form of Class N-2027 Unit Global Security |
| EXHIBIT C6 | Form of Class N-2028 Unit Global Security |
| EXHIBIT C7 | Form of Class N-2029 Unit Global Security |
| EXHIBIT C8 | Form of Class N-2030 Unit Global Security |
| EXHIBIT C9 | Form of Class N-2031  Unit Global Security |
| EXHIBIT C10 | Form of Class N-2045 Unit Global Security |
| EXHIBIT D | Form of Transfer Certificate |
| EXHIBIT E | Notice of Non-Taxable HTA CVIs/Bonds and New HTA Bonds Permitted Distribution Event |

EXHIBIT F          Certificate of Trust

EXHIBIT G          Policy Claim Forms
                   •   Interests Payments
                   •   Sinking Fund Payments
                   •   Scheduled Final Redemptions

EXHIBIT H          Provisions Applicable to CPI Certificates

EXHIBIT I          Provisions Applicable to LIBOR Certificate

SCHEDULE  1        Non-Taxable HTA Clawback CVIs and New HTA Bond Threshold Amounts

TRUST AGREEMENT

THIS TRUST AGREEMENT made as of December 6, 2022 (this "Trust Agreement") with respect to the HTA CLASS 6 TRUST (the "Trust"), by and among the Puerto Rico Highways and Transportation Authority (the "Depositor"), Wilmington Trust, N.A., a national banking corporation, not individually, but solely in its capacity as Trustee ("Wilmington" or the "Trustee") and Wilmington Trust, N.A., not individually, but solely in its capacity as Delaware Trustee ("Delaware Trustee" and together with the Trustee, collectively, the "Trustees"), and acknowledged and agreed to, with respect to the Calculation Agent obligations and the provisions relating to the Credit Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support Provider (the "Credit Support Provider").

WHEREAS, on October 12, 2022, the Title III Court entered an order (the "Confirmation Order") confirming the Plan of Adjustment, which went effective on December 6, 2022 (the "Effective Date");

WHEREAS, the Plan of Adjustment provides for the creation of the HTA Class 6 Trust, and contemplates, together with the Confirmation Order, that the HTA Class 6 Trust will hold and administer, on behalf of Electing Holders;  (i) the Electing Ambac Prepetition Insured Bonds; (ii) the New HTA Bonds allocable to the holders of Allowed HTA 98 Senior Bond Claims (Ambac); (iii) the cash and HTA Clawback CVIs allocable to the holders of Allowed HTA 98 Senior Bond Claims (Ambac) and (iv) the benefit of the Credit Support;

WHEREAS, the cash and HTA Clawback CVIs allocable to the holders of Allowed HTA 98 Senior Bond Claims (Ambac) are being held in escrow pursuant to an escrow agreement, dated May 25, 2022, between Wilmington Trust, N.A., as escrow agent, and the Credit Support Provider, as the Plan of Adjustment party and the Commonwealth Plan of Adjustment party, pending elections by Electing Holders and the Effective Date.

WHEREAS, the Trust has been formed by the Depositor pursuant to the Plan of Adjustment and this Trust Agreement, and on behalf of the Electing Holders, for the purposes of (i) holding the Electing Ambac Prepetition Insured Bonds, (ii) receiving the New HTA Bonds pursuant to the Plan of Adjustment from the Electing Holders, (iii) receiving, pursuant to the Commonwealth Plan of Adjustment, the HTA CVI Distributions (including the HTA Clawback CVIs) from the Electing Holders, (iv) being the beneficiary of the Credit Support and (v) issuing the Class A-2028 Units, Class L-2038 Units, Class M-2023 Units, Class N-2026 Units, Class N-2027 Units, Class N-2028 Units, Class N-2029 Units, Class N-2030 Units, Class N-2031 Units and Class N-2045 Units;

WHEREAS, pursuant to the terms of the Plan of Adjustment, the Electing Holders have elected to deposit their New HTA Bonds into the Trust;

WHEREAS, pursuant to the terms of the Plan of Adjustment, the Electing Holders have elected to deposit their HTA CVI Distributions, including their HTA Clawback CVIs, into the Trust;

WHEREAS, on the date hereof the Trust will issue Global Securities to evidence the Units of the Electing Holders on the terms and conditions specified herein;

WHEREAS, except for the establishment of the Trust and as may otherwise be expressly provided in this Trust Agreement, the Depositor shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof;

WHEREAS, the Trustee shall have only the powers and obligations specifically enumerated in this Trust Agreement and shall not exercise discretion with regard to any matters;

WHEREAS, the Trust, and each Sub-Trust thereof, are intended to be classified as grantor trusts under subtitle A, chapter 1, subchapter J, Part I, subpart E of the Code; and

NOW THEREFORE, the Trustee for itself and its successors and assigns, hereby declares that it shall hold all the estate, right, title and interest in any property contributed to the Trust established hereunder in trust for the benefit of the Unitholders and the Credit Support Provider as provided herein and subject to the terms and provisions hereof.

ARTICLE I

Definitions; Construction

SECTION 1.01.   Definitions.

Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below:

"Accountant":  An independent public accountant of recognized national standing appointed by the Credit Support Provider and approved by the Trustee, it being understood and agreed that each of the firms in the 'top 10' accounting firms shall be deemed approved.

"Affiliate":  With respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control", when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Aggregate Unit Balance":  With respect to a particular Class and as of any date of determination the aggregate amount required to redeem such Class in full as of such date.  For the avoidance of doubt, the "Aggregate Unit Balance," with respect to a particular Class and as of any date of determination, is intended to be the aggregate of the Notional Amount of each Unit in such Class.

"Allocation Schedule":  The schedule(s) provided by the Credit Support Provider to the Trustee in connection with the Closing Date so as to allocate among the Class A-2028 Units, Class L-2038 Units, Class M-2023 Units, Class N-2026 Units, Class N-2027 Units, Class N-2028 Units, Class

-2-

N-2029 Units, Class N-2030 Units, Class N-2031 Units and Class N-2045 Units (i) those HTA Clawback CVIs indicated as "Non-Taxable," (ii) those HTA Clawback CVIs indicated as "Taxable," (iii) those New HTA Bonds indicated as "Non-Taxable" and (iv) those New HTA Bonds indicated as "Taxable."  The foregoing schedule(s) may be adjusted from time to time as a result of redemptions, sales, distributions and re-characterizations as more fully described in this Trust Agreement.

"Allowed":  The meaning specified in the Plan of Adjustment.

"Ambac Prepetition Insured Bonds":  The six (6) issues of HTA identified as the: (i) Transportation Revenue Bonds, Series A due July 1, 2028, (ii) Transportation Revenue Refunding Bonds, Series L due July 1, 2038, (iii) Transportation Revenue Bonds, Series M due July 1, 2023, (iv) Transportation Revenue Refunding Bonds, Series N due July 1, 2026, July 1, 2029, July 1, 2030, July 1, 2031, (v) Transportation Revenue Refunding Bonds, Series N (CPI Bonds) due July 1, 2027 and July 1, 2028 and (vi) Transportation Revenue Refunding Bonds, Series N (LIBOR Bonds) due July 1, 2045.

"Applicable Procedures":  With respect to any transfer or exchange of a beneficial interest in any Global Security, the rules and procedures of the Depositary that apply to such transfer or exchange.

"Available Funds":  As the context may require, the Class A-2028 Available Funds, Class L-2038 Available Funds, Class M-2023 Available Funds, Class N-2026 Available Funds, Class N-2027 Available Funds, Class N-2028 Available Funds, Class N-2029 Available Funds, Class N-2030 Available Funds, Class N-2031 Available Funds and Class N-2045 Available Funds. In addition, solely upon the occurrence of a Trust Termination Event, the amounts remaining in the Fee Reserve.

"Bond Counsel":  Nationally-recognized bond counsel as selected by HTA.

"Bond Resolution":  That certain Resolution No. 98-06, adopted by HTA on February 26, 1998, as amended and restated and as supplemented pursuant to certain supplemental resolutions entered into thereunder or adopted pursuant thereto.

"Business Day":  Any day excluding Saturday, Sunday and any day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in San Juan, Puerto Rico or New York, New York are authorized or required by law or other governmental action to close.

"Calculation Agent":  The agent making calculations as to (A) the fair market value of the HTA Clawback CVIs or New HTA Bonds, as applicable, pursuant to (i) Section 6.02(a) relating to Taxable HTA CVIs or Taxable New HTA Bonds, (ii) Section 6.02(b) relating to Non-Taxable HTA CVIs or Non-Taxable New HTA Bonds and (c) Section 8.02(b) relating to Non-Taxable HTA CVIs or Taxable New HTA Bonds and (B) the value of the HTA Clawback CVIs or New HTA Bonds pursuant to Section 6.03(a) to the extent relating to Non-Taxable HTA CVIs or Non-Taxable New HTA Bonds.  The Calculation Agent shall be Ambac Assurance Corporation or, upon resignation of Ambac Assurance Corporation as Calculation Agent, the Credit Support Provider shall appoint another person to be the Calculation Agent.

"Certificate":  A definitive certificate in the form attached as <u>Exhibit B1</u> evidencing a Class A-2028 Unit,  <u>Exhibit B2</u> evidencing a Class M-2024 Unit, <u>Exhibit B3</u> evidencing a Class L-2038 Unit, <u>Exhibit B4</u> evidencing a Class N-2026 Unit, <u>Exhibit B5</u> evidencing a Class N-2027 Unit, <u>Exhibit B6</u> evidencing a Class N-2028 Unit, <u>Exhibit B7</u> evidencing a Class N-2029 Unit, <u>Exhibit B8</u> evidencing a Class N-2030 Unit, <u>Exhibit B9</u> evidencing a Class N-2031 Unit or <u>Exhibit B10</u> evidencing a Class N-2045 Unit, in each case registered in the name of the holder thereof.

"Certificate of Trust": The meaning specified in Section 2.01(a).

"Class" or "Classes":  As the context may require, the Class A-2028 Units, Class L-2038 Units, Class M-2023 Units, Class N-2026 Units, Class N-2027 Units, Class N-2028 Units, Class N-2029 Units, Class N-2030 Units, Class N-2031 Units or Class N-2045 Units.

"Class A-2028 Available Funds": With respect to a Class A-2028 Scheduled Final Redemption Date, a Class A-2028 Sinking Fund Distribution Date, a Class A-2028 Interest Payment Date or a Class A-2028 Sinking Fund Distribution Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class A-2028 Trust Property other than any amount deposited in the Class A-2028 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class A-2028 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class A-2028 Taxable Collection Account or Class A-2028 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class A-2028 Units (in the case of the Class A-2028 Scheduled Final Redemption Date).

"Class A-2028 Credit Support":  The Ambac Financial Guaranty Insurance Policy No. 15011BE effective March 19, 1998 with respect to the Electing Ambac Prepetition Insured Bonds that are Class A-2028 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class A-2028 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class A-2028 Units other than those made from the Class A-2028 Credit Support Collection Account, (iii) payments made on the Class A-2028 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class A-2028 Units pursuant to Sections 4.01 and 6.03.

"Class A-2028 Credit Support Collection Account":  The meaning specified in Section 3.03(a).

"Class A-2028 Global Security":  One or more global certificates representing Class A-2028 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of <u>Exhibit C1</u> attached hereto.

"Class A-2028 Interest Distribution": 5.00% per annum payable on the outstanding Class A-2028 Units, reflecting the rate on the applicable Ambac Prepetition Insured Bonds.

"Class A-2028 Interest Payment Date": January 1 and July 1, provided that if such date is not a Business Day, the next Business Day.

"Class A-2028 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class A-2028 Non-Taxable Funds": All amounts received by the Trustee on or with respect to the Class A-2028 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class A-2028 Non-Taxable HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class A-2028 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class A-2028 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class A-2028 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class A-2028 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class A-2028 Non-Taxable HTA CVIs/Bonds": Collectively, the Class A-2028 Non-Taxable HTA CVIs and the Class A-2028 Non-Taxable New HTA Bonds.

"Class A-2028 Non-Taxable New HTA Bonds": Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class A-2028 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class A-2028 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class A-2028 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class A-2028 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class A-2028 Scheduled Final Redemption Date": July 1, 2028.

"Class A-2028 Sinking Fund Distribution Date": Means July 1, 2023, July 1, 2024, July 1, 2025, July 1, 2026, July 1, 2027 and July 1, 2028.

"Class A-2028 Sinking Fund Distributions:" With respect to each Class A-2028 Sinking Fund Distribution Date, the amount set forth on Exhibit A1 hereto, as it may be amended from time to time in accordance with the terms hereof.

"Class A-2028 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class A-2028 Taxable Funds": All amounts received by the Trustee on or with respect to the Class A-2028 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class A-2028 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class A-2028 Taxable HTA CVIs": Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class A-2028 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class A-2028 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class A-2028 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class A-2028 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class A-2028 Taxable HTA CVIs/Bonds":  Collectively, the Class A-2028 Taxable HTA CVIs and the Class A-2028 Taxable New HTA Bonds.

"Class A-2028 Taxable New HTA Bonds":  Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01and Section 6.03, (iv) a re-characterization of Class A-2028 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class A-2028 Taxable New HTA Bonds from the effective date going forward), and (v) a re-characterization of Class A-2028 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class A-2028 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class A-2028 Trust Property": (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Bonds, Series A, due July 1, 2028; (ii) the Class A-2028 Taxable HTA CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class A-2028 Non-Taxable HTA CVIs/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class A-2028 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class A-2028 Taxable Collection Account; (vi) all funds from time to time deposited in the Class A-2028 Non-Taxable Collection Account and the Class A-2028 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class A-2028 Trust Property.

"Class A-2028 Units":  The meaning specified in Section 5.01(b) designated as "Non-Taxable" and "Taxable".

"Class L-2038 Available Funds":  With respect to a Class L-2038 Scheduled Final Redemption Date, a Class L-2038 Interest Payment Date or a Class L-2038 Sinking Fund Distribution Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class L-2038 Trust Property other than any amount deposited in the Class L-2038 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class L-2038 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class L-2038 Taxable Collection Account or Class L-2038 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class L-2038 Units (in the case of the Class L-2038 Scheduled Final Redemption Date).

"Class L-2038 Credit Support":  The Ambac Financial Guaranty Insurance Policy No. 24623BE effective October 4, 2005 with respect to the Electing Ambac Prepetition Insured Bonds that are Class L-2038 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class L-2038 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class L-2038 Units other than those made from the Class L-2038 Credit Support Collection Account, (iii) payments made on the Class L-2038 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class L-2038 Units pursuant to Sections 4.01 and 6.03.

"Class L-2038 Credit Support Collection Account":  The meaning specified in Section 3.03(a).

"Class L-2038 Global Security":  One or more global certificates representing Class L-2038 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C3 attached hereto.

"Class L-2038 Interest Distribution": 5.25% per annum payable on the outstanding Class L-2038 Units, reflecting the rate on the applicable Ambac Prepetition Insured Bonds.

"Class L-2038 Interest Payment Date": January 1 and July 1, provided that if such date is not a Business Day, the next Business Day.

"Class L-2038 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class L-2038 Non-Taxable Funds": All amounts received by the Trustee on or with respect to the Class L-2038 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class L-2038 Non-Taxable HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class L-2038 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in

-7-

which case such re-characterized HTA Clawback CVIs shall be considered Class L-2038 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class L-2038 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class L-2038 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date.  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class L-2038 Non-Taxable HTA CVIs/Bonds":  Collectively, the Class L-2038 Non-Taxable HTA CVIs and the Class L-2038 Non-Taxable New HTA Bonds.

"Class L-2038 Non-Taxable New HTA Bonds":  Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class L-2038 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class L-2038 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class L-2038 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class L-2038 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward).  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class L-2038 Scheduled Final Redemption Date":  July 1, 2038.

"Class L-2038 Sinking Fund Distribution Date":  Means July 1, 2036, July 1, 2037 and July 1, 2038.

"Class L-2038 Sinking Fund Distributions":  With respect to each Class L-2038 Sinking Fund Distribution Date, the amount set forth on Exhibit A2 hereto, as it may be amended from time to time in accordance with the terms hereof.

"Class L-2038  Taxable Collection Account":  The meaning specified in Section 3.03(a).

"Class L-2038 Taxable Funds":  All amounts received by the Trustee on or with respect to the L-2038 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class L-2038 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class L-2038 Taxable HTA CVIs":  Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class L-2038 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class L-2038 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class L-2038 Taxable HTA CVIs as tax-exempt by Bond Counsel or the

Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class L-2038 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class L-2038 Taxable New HTA CVIs/Bonds": Collectively, the Class L-2038 Taxable HTA CVIs and the Class L-2038 Taxable New HTA Bonds.

"Class L-2038 Taxable New HTA Bonds": Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class L-2038 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized Bonds from the effective date of such re-characterization going forward) , and (v) a re-characterization of Class L-2038 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class L-2038 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class L-2038 Trust Property": (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Refunding Bonds, Series L, due July 1, 2038; (ii) the Class L-2038 Taxable HTA CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class L-2038 Non-Taxable HTA CVIs/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class L-2038 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class L-2038 Taxable Collection Account; (vi) all funds from time to time deposited in the Class L-2038 Non-Taxable Collection Account and the Class L-2038 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class L-2038  Trust Property.

"Class L-2038 Units":  The meaning specified in Section 5.01(b) designated as "Non-Taxable and "Taxable".

"Class M-2023 Available Funds":  With respect to a Class M-2023 Scheduled Final Redemption Date or a Class M-2023 Interest Payment Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class M-2023 Trust Property other than any amount deposited in the Class M-2023 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class M-2023 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class M-2023 Taxable Collection Account or Class M-2023 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class M-2023 Units (in the case of the Class M-2023 Scheduled Final Redemption Date).

"Class M-2023 Credit Support":  The Ambac Financial Guaranty Insurance Policy No. SP26300BE effective March 6, 2007 with respect to the Electing Ambac Prepetition Insured Bonds

-9-

that are Class M-2023 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class M-2023 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class M-2023 Units other than those made from the Class M-2023 Credit Support Collection Account, (iii) payments made on the Class M-2023 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class M-2023 Units pursuant to Sections 4.01 and 6.03.

"Class M-2023 Credit Support Collection Account":  The meaning specified in Section 3.03(a).

"Class M-2023 Global Security":  One or more global certificates representing Class M-2023 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C2  attached hereto.

"Class M-2023 Interest Distribution": 4.25% per annum payable on the outstanding Class M-2023 Units, reflecting the rate on the applicable Ambac Prepetition Insured Bonds.

"Class M-2023 Interest Payment Date": January 1 and July 1, provided that if such date is not a Business Day, the next Business Day.

"Class M-2023 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class M-2023 Non-Taxable Funds": All amounts received by the Trustee on or with respect to the Class M-2023 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class M-2023 Non-Taxable HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class M-2023 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class M-2023 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class M-2023 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class M-2023 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date.  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class M-2023 Non-Taxable HTA CVIs/Bonds": Collectively, the Class M-2023 Non-Taxable New HTA CVIs and the Class M-2023 Non-Taxable New HTA Bonds.

-10-

"Class M-2023 Non-Taxable New HTA Bonds":  Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class M-2023 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class M-2023 Taxable New HTA Bonds from the effective date of such re-characterization going forward) , and (v) a re-characterization of Class M-2023 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class M-2023 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward).  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class M-2023 Scheduled Final Redemption Date":  July 1, 2023.

"Class M-2023 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class M-2023 Taxable Funds": All amounts received by the Trustee on or with respect to the M-2023 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class M-2023 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class M-2023 Taxable HTA CVIs":  Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class M-2023 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class M-2023 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class M-2023 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class M-2023 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class M-2023 Taxable HTA CVIs/Bonds": Collectively, the Class M-2023 Taxable New HTA CVIs and the Class M-2023 Taxable New HTA Bonds.

"Class M-2023 Taxable New HTA Bonds":  Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class M-2023 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class M-2023 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class M-2023 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class M-2023

Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class M-2023 Trust Property": (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Bonds, Series M, due July 1, 2023; (ii) the Class M-2023 Taxable HTA CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class M-2023 Non-Taxable HTA CVIs/Bonds and all payments on or collections in respect thereof; (iv) the benefit of the Class M-2023 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class M-2023 Taxable Collection Account; (vi) all funds from time to time deposited in the Class M-2023 Non-Taxable Collection Account and the Class M-2023 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class M-2023 Trust Property.

"Class M-2023 Units": The meaning specified in Section 5.01(b) designated as "Non-Taxable" and Taxable".

"Class N-2026 Available Funds": With respect to a Class N-2026 Scheduled Final Redemption Date or a Class N-2026 Interest Payment Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class N-2026 Trust Property other than any amount deposited in the Class N-2026 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class N-2026 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class N-2026 Taxable Collection Account or Class N-2026 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class N-2026 Units (in the case of the Class N-2026 Scheduled Final Redemption Date).

"Class N-2026 Credit Support": The Ambac Financial Guaranty Insurance Policy No. SP26314BE effective March 6, 2007 and the Ambac Financial Guaranty Insurance Policy No. SP27362BE with respect to the Electing Ambac Prepetition Insured Bonds that are Class N-2026 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class N-2026 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class N-2026 Units other than those made from the Class N-2026 Credit Support Collection Account, (iii) payments made on the Class N-2026 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class N-2026 Units pursuant to Sections 4.01 and 6.03.

"Class N-2026 Credit Support Collection Account": The meaning specified in Section 3.03(a).

"Class N-2026 Global Security": One or more global certificates representing Class N-2026 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security

-12-

Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C4 attached hereto.

"Class N-2026 Interest Distribution": 5.50% per annum payable on the outstanding Class N-2026 Units, reflecting the rate on the applicable Ambac Prepetition Insured Bonds.

"Class N-2026 Interest Payment Date": January 1 and July 1, provided that if such date is not a Business Day, the next Business Day.

"Class N-2026 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2026 Non-Taxable Funds": All amounts received by the Trustee on or with respect to the Class N-2026 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class N-2026 Non-Taxable HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2026 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2026 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2026 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2026 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2026 Non-Taxable HTA CVIs/Bonds": Collectively, the Class N-2026 Non-Taxable HTA CVIs and the Class N-2026 Non-Taxable New HTA Bonds.

"Class N-2026 Non-Taxable New HTA Bonds": Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2026 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2026 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2026 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2026 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2026 Scheduled Final Redemption Date": July 1, 2026.

"Class N-2026 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2026 Taxable Funds": All amounts received by the Trustee on or with respect to the Class N-2026 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class N-2026 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class N-2026 Taxable HTA CVIs": Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2026 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2026 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2026 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2026 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2026 Taxable HTA CVIs/Bonds": Collectively, the Class N-2026 Taxable HTA CVIs and the Class N-2026 Taxable New HTA Bonds.

"Class N-2026 Taxable New HTA Bonds": Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2026 Non-Taxable New Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2026 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2026 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2026 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2026 Trust Property": (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Refunding Bonds, Series N due July 1, 2026; (ii) the Class N-2026 Taxable HTA CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2026 Non-Taxable HTA CVIs/Bonds and all payments on or collections in respect  thereof; (iv) the benefit of the Class N-2026 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2026 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2026 Non-Taxable Collection Account and the Class N-2026 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2026 Trust Property.

"Class N-2026 Units":  The meaning specified in Section 5.01(b) designated as "Non-Taxable" and "Taxable".

-14-

"Class N-2027 Available Funds": With respect to a Class N-2027 Scheduled Final Redemption Date or a Class N-2027 Interest Payment Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class N-2027 Trust Property other than any amount deposited in the Class N-2027 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class N-2027 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class N-2027 Taxable Collection Account or Class N-2027 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class N-2027 Units (in the case of the Class N-2027 Scheduled Final Redemption Date).

"Class N-2027 Credit Support": The Ambac Financial Guaranty Insurance Policy No. 26270BE effective March 6, 2007 with respect to the Electing Ambac Prepetition Insured Bonds that are Class N-2027 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class N-2027 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class N-2027 Units other than those made from the Class N-2027 Credit Support Collection Account, (iii) payments made on the Class N-2027 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class N-2027 Units pursuant to Sections 4.01 and 6.03.

"Class N-2027 Credit Support Collection Account": The meaning specified in Section 3.03(a).

"Class N-2027 Global Security": One or more global certificates representing Class N-2027 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C5 attached hereto.

"Class N-2027 Interest Distribution": A rate based on the Consumer Price Index plus a per annum spread equal to 1.12% payable monthly, but not to exceed the maximum rate under Puerto Rico law (currently 12%), payable on the outstanding Class N-2027 Units, reflecting the rate on the applicable Ambac Prepetition Insured Bonds. There will be no adjustment to the notional amount of the CPI Certificate evidencing a Class N-2027 Unit at the Scheduled Final Redemption Date or at any other time during the term of said CPI Certificate unless there have been distributions pursuant to Sections 4.01(b) and Section 6.03. The amount that holders of said CPI Certificate will receive at the Scheduled Final Redemption Date is equal to the notional amount of said CPI Certificate issued to such holders unless otherwise so adjusted.

"Class N-2027 Interest Payment Date": The first Business Day of each month.

"Class N-2027 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2027 Non-Taxable Funds": All amounts received by the Trustee on or with respect to the Class N-2027 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class N-2027 Non-Taxable HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2027 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2027 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2027 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2027 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2027 Non-Taxable HTA CVIs/Bonds": Collectively, the Class N-2027 Non-Taxable HTA CVIs and the Class N-2027 Non-Taxable New HTA Bonds.

"Class N-2027 Non-Taxable New HTA Bonds": Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2027 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2027 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2027 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2027 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2027 Scheduled Final Redemption Date":  July 1, 2027.

"Class N-2027 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2027 Taxable Funds": All amounts received by the Trustee on or with respect to the Class N-2027 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class N-2027 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class N-2027 Taxable HTA CVIs":  Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2027 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in

-16-

which case such re-characterized HTA Clawback CVIs shall be considered Class N-2027 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2027 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2027 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2027 Taxable HTA CVIs/Bonds": Collectively, the Class N-2027 Taxable HTA CVIs and the Class N-2027 Taxable New HTA Bonds.

"Class N-2027 Taxable New HTA Bonds":  Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2027 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2027 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2027 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2027 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2027 Trust Property": (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Refunding Bonds, Series N (CPI Bonds) due July 1, 2027; (ii) the Class N-2027 Taxable HTA CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2027 Non-Taxable HTA CVIs/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class N-2027 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2027 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2027 Non-Taxable Collection Account and the Class N-2027 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2027 Trust Property.

"Class N-2027 Units":  The meaning specified in Section 5.01(b) designated as "Non-Taxable" and "Taxable".

"Class N-2028 Available Funds": With respect to a Class N-2028 Scheduled Final Redemption Date or a Class N-2028 Interest Payment Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class N-2028 Trust Property other than any amount deposited in the Class N-2028 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class N-2028 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class N-2028 Taxable Collection Account or Class N-2028 Non-Taxable Collection Account on such date up to the Aggregate Unit

Balance for such Class N-2028 Units (in the case of the Class  N-2028 Scheduled Final Redemption Date).

"Class N-2028 Credit Support": The Ambac Financial Guaranty Insurance Policy No. 26270BE effective March 6, 2007 with respect to the Electing Ambac Prepetition Insured Bonds that are Class N-2028 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class N-2028 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class N-2028 Units other than those made from the Class N-2028 Credit Support Collection Account, (iii) payments made on the Class N-2028 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class N-2028 Units pursuant to Sections 4.01 and 6.03.

"Class N-2028 Credit Support Collection Account": The meaning specified in Section 3.03(a).

"Class N-2028 Global Security": One or more global certificates representing Class N-2028 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C6  attached hereto.

"Class N-2028 Interest Distribution": A rate based on the Consumer Price Index plus a per annum spread equal to 1.12% payable monthly, but not to exceed the maximum rate under Puerto Rico law (currently 12%), payable on the outstanding Class N-2028 Units, reflecting the rate on the applicable Ambac Prepetition Insured Bonds.  There will be no adjustment to the notional amount of the CPI Certificate evidencing a Class N-2028 Unit at the Scheduled Final Redemption Date or at any other time during the term of said CPI Certificate unless there have been distributions pursuant to Section 4.01(b) and Section 6.03.  The amount that holders of said CPI Certificate will receive at the Scheduled Final Redemption Date is equal to the notional amount of said CPI Certificate issued to such holders unless otherwise so adjusted.

"Class N-2028 Interest Payment Date": The first Business Day of each month.

"Class N-2028 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2028 Non-Taxable Funds": All amounts received by the Trustee on or with respect to the Class N-2028 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class N-2028 Non-Taxable HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2028 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2028 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-

-18-

characterization of Class N-2028 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2028 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date.  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2028 Non-Taxable HTA CVIs/Bonds":  Collectively, the Class N-2028 Non-Taxable HTA CVIs and the Class N-2028 Non-Taxable New HTA Bonds.

"Class N-2028 Non-Taxable New HTA Bonds": Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2028 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2028 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2028 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2028 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable Bond Determination Date.  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2028 Scheduled Final Redemption Date":  July 1, 2028.

"Class N-2028 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2028 Taxable Funds": All amounts received by the Trustee on or with respect to the Class N-2028 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class N-2028 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class N-2028 Taxable HTA CVIs":  Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2028 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2028 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2028 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2028 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

-19-

"Class N-2028 Taxable HTA CVIs/Bonds": Collectively, the Class N-2028 Taxable HTA CVIs and the Class N-2028 Taxable New HTA Bonds.

"Class N-2028 Taxable New HTA Bonds":  Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2028 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2028 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2028 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2028 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2028 Trust Property": (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Refunding Bonds, Series N (CPI Bonds) due July 1, 2028; (ii) the Class N-2028 Taxable HTA CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2028 Non-Taxable HTA CVIs/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class N-2028 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2028 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2028 Non-Taxable Collection Account and the Class N-2028 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2028 Trust Property.

"Class N-2028 Units":  The meaning specified in Section 5.01(b) designated as "Non-Taxable" and "Taxable".

"Class N-2029 Available Funds": With respect to a Class N-2029 Scheduled Final Redemption Date or a Class N-2029 Interest Payment Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class N-2029 Trust Property other than any amount deposited in the Class N-2029 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class N-2029 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class N-2029 Taxable Collection Account or Class N-2029 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class N-2029 Units (in the case of the Class N-2029 Scheduled Final Redemption Date).

"Class N-2029 Credit Support":  The Ambac Financial Guaranty Insurance Policy No. SP26280BE effective March 6, 2007 with respect to the Electing Ambac Prepetition Insured Bonds that are Class N-2029 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the

-20-

HTA Clawback CVIs and/or New HTA Bonds that are Class N-2029 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class N-2029 Units other than those made from the Class N-2029 Credit Support Collection Account, (iii) payments made on the Class N-2029 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class N-2029 Units pursuant to Sections 4.01 and 6.03.

"Class N-2029 Credit Support Collection Account":  The meaning specified in Section 3.03(a).

"Class N-2029 Global Security":  One or more global certificates representing Class N-2029 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C7 attached hereto.

"Class N-2029 Interest Distribution": 5.50% per annum payable on the outstanding Class N-2029 Units, reflecting the rate on the applicable Ambac Prepetition Insured Bonds.

"Class N-2029 Interest Payment Date": January 1 and July 1, provided that if such date is not a Business Day, the next Business Day.

"Class N-2029 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2029 Non-Taxable Funds": All amounts received by the Trustee on or with respect to the Class N-2029 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class N-2029 Non-Taxable HTA CVI": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2029 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2029 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2029 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2029 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date.  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2029 Non-Taxable HTA CVIs/Bonds":  Collectively, the Class N-2029 Non-Taxable HTA CVIs and the Class N-2029 Non-Taxable New HTA Bonds.

"Class N-2029 Non-Taxable New HTA Bonds": Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2029 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2029 Taxable New

-21-

HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2029 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2029 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward).   Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2029 Scheduled Final Redemption Date":  July 1, 2029.

"Class N-2029 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2029 Taxable Funds": All amounts received by the Trustee on or with respect to the Class N-2029 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class N-2029 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class N-2029 Taxable HTA CVI":  Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2029 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2029 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2029 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2029 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2029 Taxable HTA CVIs/Bonds": Collectively, the Class N-2029 Taxable HTA CVIs and the Class N-2029 Taxable New HTA Bonds.

"Class N-2029 Taxable New HTA Bonds": Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2029 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2029 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2029 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2029 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

-22-

"Class N-2029 Trust Property": (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Refunding Bonds, Series N due July 1, 2029; (ii) the Class N-2029 Taxable HTA CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2029 Non-Taxable HTA CVIs/Bonds and all payments on or collections in respect thereof; (iv) the benefit of the Class N-2029 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2029 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2029 Non-Taxable Collection Account and the Class N-2029 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2029 Trust Property.

"Class N-2029 Units":  The meaning specified in Section 5.01(b) designated as "Non-Taxable" and "Taxable".

"Class N-2030 Available Funds":  With respect to a Class N-2030 Scheduled Final Redemption Date or a Class N-2030 Interest Payment Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class N-2030 Trust Property other than any amount deposited in the Class N-2030 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class N-2030 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class N-2030 Taxable Collection Account or Class N-2030 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class N-2030 Units (in the case of the Class N-2030 Scheduled Final Redemption Date).

"Class N-2030 Credit Support":  The Ambac Financial Guaranty Insurance Policy No. 26270BE effective March 6, 2007 with respect to the Electing Ambac Prepetition Insured Bonds that are Class N-2030 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class N-2030 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class N-2030 Units other than those made from the Class N-2030 Credit Support Collection Account, (iii) payments made on the Class N-2030 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class N-2030 Units pursuant to Sections 4.01 and 6.03.

"Class N-2030 Credit Support Collection Account":  The meaning specified in Section 3.03(a).

"Class N-2030 Global Security":  One or more global certificates representing Class N-2030 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C8 attached hereto.

"Class N-2030 Interest Distribution": 5.25% per annum payable on the outstanding Class N-2030 Units, reflecting the rate on the applicable Ambac Prepetition Insured Bonds.

-23-

"Class N-2030 Interest Payment Date": January 1 and July 1, provided that if such date is not a Business Day, the next Business Day.

"Class N-2030 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2030 Non-Taxable Funds": All amounts received by the Trustee on or with respect to the Class N-2030 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class N-2030 Non-Taxable HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2030 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2030 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2030 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2030 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date.  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2030 Non-Taxable HTA CVIs/Bonds":  Collectively, the Class N-2030 Non-Taxable HTA CVIs and the Class N-2030 Non-Taxable New HTA Bonds.

"Class N-2030 Non-Taxable New HTA Bonds": Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2030 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2030 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2030 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2030 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward).  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2030 Scheduled Final Redemption Date":  July 1, 2030.

"Class N-2030 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2030 Taxable Funds": All amounts received by the Trustee on or with respect to the Class N-2030 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class N-2030 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class N-2030 Taxable HTA CVIs":  Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2030 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2030 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2030 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2030 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2030 Taxable HTA CVIs/Bonds": Collectively, the Class N-2030 Taxable HTA CVIs and the Class N-2030 Taxable New HTA Bonds.

"Class N-2030 Taxable New HTA Bonds":  Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2030 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2030 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2030 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2030 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2030 Trust Property": (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Refunding Bonds, Series N due July 1, 2030; (ii) the Class N-2030 Taxable HTA CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2030 Non-Taxable HTA CVIs/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class N-2030 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2030 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2030 Non-Taxable Collection Account and the Class N-2030 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2030 Trust Property.

"Class N-2030 Units":  The meaning specified in Section 5.01(b) designated as "Non-Taxable" and "Taxable".

"Class N-2031 Available Funds":  With respect to a Class N-2031 Scheduled Final Redemption Date or a Class N-2031 Interest Payment Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class N-2031 Trust Property other than any amount deposited in the Class N-2031 Credit

Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class N-2031 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class N-2031 Taxable Collection Account or Class N-2031 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class N-2031 Units (in the case of the Class N-2031 Scheduled Final Redemption Date).

"Class N-2031 Credit Support": The Ambac Financial Guaranty Insurance Policy No. 26270BE effective March 6, 2007 with respect to the Electing Ambac Prepetition Insured Bonds that are Class N-2031 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class N-2031 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class N-2031 Units other than those made from the Class N-2031 Credit Support Collection Account, (iii) payments made on the Class N-2031 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class N-2031 Units pursuant to Sections 4.01 and 6.03.

"Class N-2031 Credit Support Collection Account":  The meaning specified in Section 3.03(a).

"Class N-2031 Global Security":  One or more global certificates representing Class N-2031 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C9  attached hereto.

"Class N-2031 Interest Distribution": 5.25% per annum payable on the outstanding Class N-2031 Units, reflecting the rate on the applicable Ambac Prepetition Insured Bonds.

"Class N-2031 Interest Payment Date": January 1 and July 1, provided that if such date is not a Business Day, the next Business Day.

"Class N-2031 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2031 Non-Taxable Funds": All amounts received by the Trustee on or with respect to the Class N-2031 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class N-2031 Non-Taxable HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2031 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2031 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2031 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be

considered Class N-2031 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date.  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2031 Non-Taxable HTA CVIs/Bonds":  Collectively, the Class N-2031 Non-Taxable HTA CVIs and the Class N-2031 Non-Taxable New HTA Bonds.

"Class N-2031 Non-Taxable New HTA Bonds":  Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2031 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2031 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2031 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2031 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward).  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2031 Scheduled Final Redemption Date":  July 1, 2031.

"Class N-2031 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2031 Taxable Funds": All amounts received by the Trustee on or with respect to the Class N-2031 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class N-2031 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class N-2031 Taxable HTA CVIs":  Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2031 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2031 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2031 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2031 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2031 Taxable HTA CVIs/Bonds": Collectively, the Class N-2031 Taxable HTA CVIs and the Class N-2031 Taxable New HTA Bonds.

"Class N-2031 Taxable New HTA Bonds": Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2031 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2031 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2031 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2031 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2031 Trust Property": (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Refunding Bonds, Series N, due July 1, 2031; (ii) the Class N-2031 Taxable HTA CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2031 Non-Taxable HTA CVIs/Bonds and all payments on or collections in respect thereof; (iv) the benefit of the Class N-2031 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2031 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2031 Non-Taxable Collection Account and the Class N-2031 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2031 Trust Property.

"Class N-2031 Units": The meaning specified in Section 5.01(b) designated as "Non-Taxable" and "Taxable".

"Class N-2045 Available Funds": With respect to a Class N-2045 Scheduled Final Redemption Date, a Class N-2045 Interest Payment Date or a Class N-2045 Sinking Fund Distribution Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class N-2045 Trust Property other than any amount deposited in the Class N-2045 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class N-2045 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class N-2045 Taxable Collection Account or Class N-2045 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class N-2045 Units (in the case of the Class N-2045 Scheduled Final Redemption Date).

"Class N-2045 Credit Support": The Ambac Financial Guaranty Insurance Policy No. 26270BE effective March 6, 2007 with respect to the Electing Ambac Prepetition Insured Bonds that are Class N-2045 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class N-2045 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class N-2045 Units other than those made from the Class N-2045 Credit Support Collection Account, (iii) payments made

on the Class N-2045 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class N-2045 Units pursuant to Sections 4.01 and 6.03.

"Class N-2045 Credit Support Collection Account":  The meaning specified in Section 3.03(a).

"Class N-2045 Global Security":  One or more global certificates representing Class N-2045 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C10  attached hereto.

"Class N-2045 Interest Distribution": 67% of the Three-Month LIBOR Rate (as such term is defined in Exhibit I hereto) plus 0.53%, but not to exceed a maximum rate under Puerto Rico law (currently 12%), payable on the outstanding Class N-2045 Units, reflecting the rate on the applicable Ambac Prepetition Insured Bonds.  In addition, it had been previously announced that publication of LIBOR is expected to cease subsequent to June 30, 2023; recently, it has been proposed that cessation of LIBOR be delayed until subsequent to September 30, 2024.

"Class N-2045 Interest Payment Date": Each January 1, April 1, July 1 and October 1, provided that if such date is not a Business Day, the next Business Day.

"Class N-2045 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2045 Non-Taxable Funds": All amounts received by the Trustee on or with respect to the Class N-2045 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class N-2045 Non-Taxable HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2045 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2045 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2045 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2045 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date.  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2045 Non-Taxable HTA CVIs/Bonds":  Collectively, the Class N-2045 Non-Taxable HTA CVIs and the Class N-2045 Non-Taxable New HTA Bonds.

"Class N-2045 Non-Taxable New HTA Bonds": Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2045 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue

-29-

Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2045 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2045 New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2045 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward).   Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2045 Scheduled Final Redemption Date": July 1, 2042.

"Class N-2045 Sinking Fund Distribution Date": July 1, 2042.

"Class N-2045 Sinking Fund Distributions": With respect to the N-2045 Sinking Fund Distribution Date, the amount set forth on Exhibit A2 hereto, as it may be amended from time to time in accordance with the terms hereof.

"Class N-2045 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2045 Taxable Funds": All amounts received by the Trustee on or with respect to the Class N-2045 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class N-2045 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class N-2045 Taxable HTA CVIs":  Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2045 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2045 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2045 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2045 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2045 Taxable HTA CVIs/Bonds": Collectively, the Class N-2045 Taxable HTA CVIs and the Class N-2045 Taxable New HTA Bonds.

"Class N-2045 Taxable New HTA Bonds":  Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2045 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2045 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2045 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue

Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2045 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2045 Trust Property": (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Refunding Bonds, Series N (LIBOR Bonds) due July 1, 2045; (ii) the Class N-2045 Taxable HTA CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2045 Non-Taxable HTA CVIs/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class N-2045 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2045 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2045 Non-Taxable Collection Account and the Class N-2045 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2045 Trust Property.

"Class N-2045 Units":  The meaning specified in Section 5.01(b) designated as "Non-Taxable" and "Taxable".

"Clawback CVIs":  Collectively, the general obligation securities, the payment for which the CVI Issuer has pledged its full faith, credit and taxing power as further described in the Plan of Adjustment, the Commonwealth Plan of Adjustment and the CVI Trist Agreement.

"Closing Date":  December 6, 2022.

"Code":   The Internal Revenue Code of 1986, as amended, and Treasury Regulations promulgated thereunder.

"Collection Account":  Collectively, or individually, as the context may require, the Taxable Collection Accounts, the Non-Taxable Collection Accounts and the Credit Support Collection Accounts.

"Commonwealth": The Commonwealth of Puerto Rico.

"Commonwealth Plan of Adjustment":  That certain Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth, et al., filed on November 25, 2021 with the Title III Court by the Oversight Board in the Commonwealth Title III case, as amended, modified or supplemented from time to time.

"Confirmation Order":  The order of the Title III Court confirming the Plan of Adjustment in accordance with Section 314(b) of PROMESA and Sections 944, 1123 and 1125 of the Bankruptcy Code, applicable to the Title III Case pursuant to Sections 301 and 314 of PROMESA.

"Consumer Price Index":  Such Consumer Price Index and related calculations are more fully described in Exhibit H.

"Corporate Trust Office":  The Trustee's offices at 350 Park Avenue, 9th Floor, New York, NY 10022 or such other addresses as the Trustee may designate from time to time by notice to the Unitholders and the Credit Support Provider.

"CPI Certificate(s)":  Collectively, or individually as the context may require, the Certificates evidencing Class N-2027 Units and the Certificates evidencing Class N-2028 Units.

"CPI Interest Distributions":  Collectively, or individually as the context may require, the Class N-2027 Interest Distribution and the Class N-2028 Interest Distribution.

"CPI Rate" The meaning specified in Exhibit H.

"Credit Support":  As the context may require, the Class A-2028 Credit Support, the Class L-2038 Credit Support, the Class M-2023 Credit Support, the Class N-2026 Credit Support, the Class N-2027 Credit Support, the Class N-2028 Credit Support, the Class N-2029 Credit Support, the Class N-2030 Credit Support, the Class N-2031 Credit Support and the Class N-2045 Credit Support. For the avoidance of doubt, the foregoing Credit Support insures the underlying Electing Ambac Prepetition Insured Bonds of each Class of Units, and not the Units themselves.

"Credit Support Collection Account":  Collectively, or individually, either through the establishment of separate accounts or through book-entry allocations (at the discretion of the Trustee) as the context may require, the Class A-2028 Credit Support Collection Account, the Class L-2038 Credit Support Collection Account, the Class M-2023 Credit Support Collection Account, the Class N-2026 Credit Support Collection Account, the Class N-2027 Credit Support Collection Account, the Class N-2028 Credit Support Collection Account, the Class N-2029 Credit Support Collection Account, the Class N-2030 Credit Support Collection Account, the Class N-2031 Credit Support Collection Account and the Class N-2045 Credit Support Collection Account.

"Credit Support Provider":  Ambac Assurance Corporation.

"Credit Support Provider Request":  A written order or request signed in the name of the Credit Support Provider and delivered to the Trustee.

"Custodian":  The Trustee, as custodian with respect to the Global Securities, or any successor entity thereto.

"CVI Issuer": The Commonwealth of Puerto Rico.

"CVI Trust Agreement": The Trust Agreement (relating to CVIs), dated as of March 15, 2022, by and between the CVI Issuer and The Bank of New York Mellon, as trustee, as the same may be amended and supplemented.

"Deemed HTA Clawback CVI Valuation Amount":  In connection with any distribution of underlying HTA Clawback CVIs pursuant to Section 6.03(a) hereof, the value to be attributed to such HTA Clawback CVIs determined by the Credit Support Provider and delivered to the Trustee based on either of the following methods as the Credit Support Provider may elect (i) assuming there has been no disruption in trading in the relevant time period as determined by the Credit Support Provider, the volume-weighted average trading price of the particular type of HTA

-32-

Clawback CVI to be distributed for the twenty (20) Business Day period immediately prior to the date the written notice from the Credit Support Provider is delivered (or if no volume-weighted average trading price is available for such period, a reasonable determination thereof made by the Calculation Agent) or (ii) the average price quoted by two or more brokers of national standing for a firm bid to purchase such type of HTA Clawback CVI in an aggregate principal amount of $500,000, or is otherwise acceptable to the Credit Support Provider in its sole discretion.

"Deemed New HTA Bond Valuation Amount":  In connection with any distribution of underlying New HTA Bonds pursuant to Section 6.03(a) hereof, the value to be attributed to such New HTA Bonds determined by the Credit Support Provider and delivered to the Trustee based on either of the following methods as the Credit Support Provider may elect (i) assuming there has been no disruption in trading in the relevant time period as determined by the Credit Support Provider, the volume-weighted average trading price of the particular type of New HTA Bond to be distributed for the twenty (20) Business Day period immediately prior to the date the written notice from the Credit Support Provider is delivered (or if no volume-weighted average trading price is available for such period, a reasonable determination thereof made by the Calculation Agent) or (ii) the average price quoted by two or more brokers of national standing for a firm bid to purchase such type of New HTA Bond in an aggregate principal amount of $500,000, or is otherwise acceptable to the Credit Support Provider in its sole discretion.

"Delaware Statutory Trust Act":  Chapter 38 of Title 12 of the Delaware Code.

"Delaware Trustee":  The meaning specified in the preamble hereto.

"Delaware Trustee Fee":  The amount set forth in the Trustee Fee Letter.

"Depositary":  DTC or such other clearing agency as selected by the Trustee in accordance with Section 5.09.

"Depositor":  The meaning specified in the preamble hereto.

"Directing Unitholders": The meaning specified in Section 4.01(h).

"Discretionary Distribution":  The meaning specified in Section 4.01(b).

"Discretionary Distribution Date":  Each date on which the Trustee is directed to make a Discretionary Distribution pursuant to Section 4.01 hereof between Distribution Dates, which date shall be a Business Day that is at least ten (10) days following the notice of such Discretionary Distribution.

"Distribution Date":  A Non-Taxable Distribution Date, a Discretionary Distribution Date, an Interest Payment Date or a Sinking Fund Distribution Date.

"Dollar" or "$":  Such currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

"DTC":  The Depository Trust Company, a limited purpose trust company organized under the laws of the State of New York, its successors and assigns.

-33-

"DTC Participant":  With respect to the Depositary, a Person who has an account with the Depositary or clears through or maintains a custodial relationship with a Person who has an account with the Depositary.

"Effective Date":  With respect to the Plan of Adjustment, December 6, 2022.

"Electing Ambac Prepetition Insured Bonds":  The Ambac Prepetition Insured Bonds beneficially owned by the Electing Holders.

"Electing Holder":  Each holder of the Ambac Prepetition Insured Bonds who has elected to receive Units pursuant to the non-commutation option set forth in Section 26.4(b)(ii) of the Plan of Adjustment and associated Ballot (as such term is defined the Plan of Adjustment).

"Eligible Account":  A non-interest bearing account, held in the United States in the name of the Trustee for the benefit of the Trust that is either a segregated account or segregated accounts maintained with (1) a Federal or State chartered depository institution that has (x) a long-term deposit rating (or, if a deposit rating is unavailable, senior unsecured debt rating) of at least "A" by S&P and a short-term rating of at least "A-1" by S&P, and (y) a long-term deposit rating (or, if a deposit rating is unavailable, senior unsecured debt rating) of at least "A2" by Moody's and a short-term rating of at least "P-1" by Moody's, or (2)  with the corporate trust department of a Federal or State-chartered deposit institution having a CR Assessment of at least "Baa1(cr)" by Moody's (or, if such institution does not have a CR Assessment, with (x) a long-term unsecured credit rating of at least "Baa1" by Moody's and (y) a short-term rating of "P-1" by Moody's (and if rated "Baa1" by Moody's, such rating is not on watch for possible downgrade)).  Such institution shall have a combined capital and surplus of at least U.S.$200,000,000 (or the equivalent in any other currency), or is otherwise acceptable to the Credit Support Provider in its sole discretion.

"EMMA":  The Electronic Municipal Marketplace Access (EMMA®), an electronic repository for municipal securities data and disclosure documents, provided and administered by MSRB.

"Exchange Act":  The U.S. Securities Exchange Act of 1934, as amended, or any successor statute, and the rules and regulations promulgated by the United States Securities and Exchange Commission thereunder.

"Executive Officer":  With respect to any corporation, the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, any Vice President, the Secretary, any Assistant Secretary, the Treasurer or any Assistant Treasurer of such corporation and with respect to any partnership, any general partner thereof and, as applicable, an authorized signatory.

"Extraordinary Trust Expense":  The meaning specified in Section 9.04(b).

"Fee Reserve": The Initial Fee Reserve and thereafter an amount equal to at least the Fee Reserve Threshold Amount established by the Trustee to cover payments of fees and expenses of the Trust including, without limitation, the Trustee Fees, the Delaware Trustee Fees, Extraordinary Trust Expenses, and fees and expenses of the Accountant, the CPI Calculation Agent and the LIBOR Calculation Agent, and any other fees and expenses of the Trust in connection with tax obligations.

"Fee Reserve Threshold Amount": An amount equal to $200,000.

"Funds":  The meaning specified in Section 4.01(i).

"Global Securities":  Individually and collectively, each of the Class A-2028 Global Security, Class L-2038 Global Security, Class M-2023 Global Security, Class N-2026 Global Security, Class N-2027 Global Security, Class N-2028 Global Security, Class N-2029 Global Security, Class N-2030 Global Security, Class N-2031 Global Security or Class N-2045 Global Security.

"Global Security Legend":  The legend set forth in Section 5.09(c)(iv).

"Grantor Trust":  The meaning provided under Sections 671 through 679 of the Code.

"HTA":  The Puerto Rico Highways and Transportation Authority.

"HTA Clawback CVIs":  The Clawback CVIs issued on account of the Allowed HTA 98 Senior Bond Claims (Ambac) constituting a portion of the HTA Clawback Recovery, all as further described and issued under the Plan of Adjustment.

"HTA Clawback Recovery":  The aggregate recovery by holders of Allowed CW/HTA Claims, consisting of HTA Clawback CVIs distributed to holders of such claims pursuant to the Commonwealth Plan of Adjustment, constituting 68.6% of the Clawback CVI allocation.

"HTA CVI Distributions":  The cash and HTA Clawback CVIs that Electing Holders of an Allowed HTA 98 Senior Bond Claim (Ambac) have elected pursuant to the Plan of Adjustment to deposit into the Trust.

"HTA 98 Senior Bond Claims (Ambac)":  The meaning specified in the Plan of Adjustment.

"Initial Adjusted Non-Taxable HTA CVIs/Bond Notional": An amount equal to the  Initial Non-Taxable HTA CVIs/Bond Notional in the Trust Property for each Class of Units minus the amount corresponding to the initial percentage of Non-Taxable HTA CVIs/Bonds of Ambac Prepetition Insured Bonds that are not Electing Ambac Prepetition Insured Bonds for each Class of Units and further reduced for each subsequent disposal of Non-Taxable HTA CVIs/Bonds pursuant to Sections 4.01(a) and 6.02(b).

"Initial Adjusted Notional Threshold Amount":  An amount equal to the Initial Notional Threshold Amount minus the amount corresponding to the initial percentage of Non-Taxable HTA CVIs/Bonds of Ambac Prepetition Insured Bonds that are not Electing Ambac Prepetition Insured Bonds for each Class of Units and further reduced for each subsequent redemption of Non-Taxable HTA CVIs/Bonds pursuant to Sections 4.01(a), 6.02(b) and 6.03.

"Initial Fee Reserve": The Fee Reserve on the Closing Date in an amount equal to $400,000.

"Initial Non-Taxable HTA CVIs/Bond Notional": The initial maximum notional amount of the Non-Taxable HTA CVIs/Bonds attributed to the Electing Ambac Prepetition Insured Bonds that have been deposited into the Trust Property for each Class of Units and as set forth on Schedule 1 for each Class of Units, as adjusted as described below.  The Initial Non-Taxable HTA CVIs/Bond

Notional is equal to $81,859,612, to be adjusted to reflect the initial maximum notional amount of the Non-Taxable HTA CVIs/Bond determined upon formation of the initial Non-Taxable Sub-Trust on or before the Outside Non-Taxable CVI Determination Date, pursuant to Section 3.01(d) and (e), as reduced for each redemption of the Non-Taxable HTA CVIs to be done on a pro rata basis (by Notional Amount), on each subsequent redemption, distribution or purchase of Non-Taxable HTA CVIs pursuant to Section 4.01(a), 6.02 and 6.03.

"Initial Notional Threshold Amount": The amounts set forth on Schedule 1 for each Class of Units as reduced for each redemption of the Non-Taxable HTA CVIs to be done on a pro rata basis (by Notional Amount), on each subsequent redemption, distribution or purchase of Non-Taxable HTA CVIs pursuant to Section 4.01(a), 6.02 and 6.03.  The aggregate amount for all Classes of Units is $321,583,500.

"Interest Distribution": Individually, or collectively as context requires, the Class A-2028 Interest Distribution, Class L-2038 Interest Distribution, Class M-2023 Interest Distribution, Class N-2026 Interest Distribution, Class N-2027 Interest Distribution, Class N-2028 Interest Distribution, Class N-2029 Interest Distribution, Class N-2030 Interest Distribution and Class N-2031 Interest Distribution, each computed on the basis of a 360-day year consisting of twelve (12) months of thirty (30) days, and the Class N-2045 Interest Distribution computed on the basis of a 365 or 366-day year, as applicable, and the actual number of days elapsed.

"Interest Payment Date": The Class A-2028 Interest Payment Date, Class L-2038 Interest Payment Date, Class M-2023 Interest Payment Date, Class N-2026 Interest Payment Date, Class N-2027 Interest Payment Date, Class N-2028 Interest Payment Date, Class N-2029 Interest Payment Date, Class N-2030 Interest Payment Date, Class N-2031 Interest Payment Date and Class N-2045 Interest Payment Date.

"IRS Non-Taxable HTA CVIs/Bond Determination Date": With respect to each series of Non-Taxable HTA CVIs/Bonds, the date on which the Internal Revenue Service makes a final determination as to whether such series of HTA Clawback CVIs is non-taxable or taxable, which date shall be no later than the Outside Non-Taxable HTA CVI Determination Date.

"LIBOR":  The London InterBank Offered Rate.

"LIBOR-Based Interest Distribution": The Class N-2045 Interest Distribution.

"LIBOR-Based Interest Rate": The meaning specified in Exhibit I.

"LIBOR Certificate(s)": The Certificates evidencing Class N-2045 Units.

"Modification":  The meaning specified in Section 9.12(c).

"Moody's":  Moody's Investors Service, Inc.

"MSRB":  The Municipal Securities Rulemaking Board, a self-regulatory organization, governed by public and regulated entity representatives, and overseen by the Securities and Exchange Commission.

-36-

"New HTA Bond": The bonds issued by HTA pursuant to the Plan of Adjustment, the Confirmation Order and the New HTA Bond Indenture that Electing Holders have elected pursuant to the Plan of Adjustment to deposit into the Trust.

"New HTA Bond Indenture":  The Master Trust Agreement, dated as of the Effective Date, by and between HTA and The Bank of New York Mellon, as trustee, as it may be amended, supplemented or modified from time to time.

"Non-Taxable Collection Account":  The meaning specified in Section 3.03.

"Non-Taxable Distribution Date": Each date on which a distribution is made from the Non-Taxable Collection Account, which date shall be a Business Day that is at least ten (10) days following the notice of such Non-Taxable Distribution Date.

"Non-Taxable Funds":  All amounts received by the Trustee on or with respect to the Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Non-Taxable HTA CVIs":  The (i) Class A-2028 Non-Taxable HTA CVIs, (ii) Class L-2038 Non-Taxable HTA CVIs, (iii) Class M-2023 Non-Taxable HTA CVIs, (iv) Class N-2026 Non-Taxable HTA CVIs, (v) Class N-2027 Non-Taxable HTA CVIs, (vi) Class N-2028 Non-Taxable HTA CVIs, (vii) Class N-2029 Non-Taxable HTA CVIs, (viii) Class N-2030 Non-Taxable HTA CVIs, (ix) Class N-2031 Non-Taxable HTA CVIs and (x) Class N-2045 Non-Taxable HTA CVIs.

"Non-Taxable HTA CVIs/Bonds":  Collectively, the Non-Taxable HTA CVIs and the Non-Taxable New HTA Bonds.

"Non-Taxable New HTA Bonds":  The (i) Class A-2028 Non-Taxable New HTA Bonds, (ii) Class L-2038 Non-Taxable New HTA Bonds, (iii) Class M-2023 Non-Taxable New HTA Bonds, (iv) Class N-2026 Non-Taxable New HTA Bonds, (v) Class N-2027 Non-Taxable New HTA Bonds, (vi) Class N-2028 Non-Taxable New HTA Bonds, (vii) Class N-2029 Non-Taxable New HTA Bonds, (viii) Class N-2030 Non-Taxable New HTA Bonds, (ix) Class N-2031 Non Taxable New HTA Bonds and (x) Class N-2045 Non-Taxable New HTA Bonds.

"Non-Taxable HTA CVIs/Bond Permitted Disposition Event":  With respect to any series of Non-Taxable HTA CVIs or Non-Taxable New HTA Bonds, as the case may be, the satisfaction of all of the following requirements:

(i) the Trustee shall have provided notice to the applicable Class of Unitholders in accordance with the notice requirements set forth in Section 10.05 hereof (a) notifying such Class of Unitholders of the instruction of the Credit Support Provider described in Section 6.02(b) and (b) requesting that any Unitholders in the Class objecting to such proposed disposition provide written notice of such objection to Trustee; and

(ii)  the Trustee shall not have received written objections with respect to such proposed disposition representing ten percent (10%) or more of the amount of outstanding Units of the Class (determined as of the date of the notice described in clause (i) above) within seven (7) Business Days of the date the notice provided in clause (i) above is provided.

"Non-Taxable HTA CVI/Bond Sale Event":  With respect to any series of Non-Taxable HTA CVIs or Non-Taxable New HTA Bonds for any Class of Units, the occurrence of either (i) a Non-Taxable HTA CVI/Bond Threshold Event or (ii) a Non-Taxable HTA CVI/Bond Permitted Disposition Event applicable thereto.

"Non-Taxable HTA CVI/Bond Threshold Amount":  With respect to each series of Non-Taxable HTA CVIs or Non-Taxable New HTA Bonds, as the case may be, and as of any applicable determination date, (i) the price equivalent to the Initial Adjusted Notional Threshold Amount set forth opposite such series of Non-Taxable HTA CVIs/Bonds on Schedule 1 hereto, as adjusted (pursuant to the "Initial Non-Taxable HTA CVIs/Bond Notional" definition), or (ii) the price that equates to twenty-five percent (25%) above the volume-weighted average trading price of the Non-Taxable HTA CVIs/Bonds for a 20-Business Day period beginning on the IRS Non-Taxable HTA CVIs/Bond Determination Date (provided that if no volume-weighted average trading price is available for such period, the Calculation Agent shall make a reasonable determination thereof). The Calculation Agent shall select either (i) or (ii) above as the applicable methodology for calculating the Non-Taxable HTA CVI/Bond Threshold Amount on or prior to the Outside Non-Taxable HTA CVI Determination Date.

"Non-Taxable HTA CVI/Bond Threshold Event":  With respect to any series of Non-Taxable HTA CVIs or Non-Taxable New HTA Bonds, as the case may be, the receipt by the Trustee of a notice by the Calculation Agent that the sum of (A) the Pro Forma Proceeds plus (B) the Prior Payments with respect to such Non-Taxable HTA CVIs/Bonds exceeds the Non-Taxable HTA CVI/Bond Threshold Amount for such Non-Taxable HTA CVIs/Bonds, coupled with a written instruction from the Credit Support Provider in the form of Exhibit E-2 attached hereto.

"Non-Taxable Sub-Trust":  The meaning specified in Section 3.01(d).

"Notional Amount":  With respect to a particular Class and as of any date of determination, the amount required to redeem the Units of such Class as of such date.  As of the Closing Date, (i) the aggregate "Notional Amount" of the Class A-2028 Units shall be $2,251,000, (ii) the aggregate "Notional Amount" of the Class L-2038 Units shall be $154,012,500, (iii) the aggregate "Notional Amount" of the Class M-2023 Units shall be $470,000, (iv) the aggregate "Notional Amount" of the Class N-2026 Units shall be $880,000, (v) the aggregate "Notional Amount" of the Class N-2027 Units shall be $6,040,000, (vi) the aggregate "Notional Amount" of the N-2028 Units shall be $13,491,000, (vii) the aggregate "Notional Amount" of the N-2029 Units shall be $25,895,000, (viii) the aggregate "Notional Amount" of the N-2030 Units shall be $49,220,000, (ix) the aggregate "Notional Amount" of the Class N-2031 Units shall be $69,124,000 and (x) the aggregate "Notional Amount" of the Class N-2045 Units shall be $200,000.

"Officers' Certificate":  A certificate signed by an Executive Officer of the applicable Person, and delivered to the Trustee.

"Opinion of Counsel":  A written opinion of competent counsel, who may be counsel to the Credit Support Provider.

"Outside Non-Taxable CVI Determination Date":  March 31, 2023.

-38-

"Outstanding":  As of any date of determination, all Units theretofore authenticated and delivered under this Trust Agreement, except Units delivered to the Trustee for cancellation.

"Oversight Board":  Financial Oversight and Management Board of Puerto Rico.

"Paying Agent":  The meaning specified in Section 5.07(a).

"Permitted Investments":  All investments made by the Trustee at the direction of the Credit Support Provider for amounts in a Taxable Collection Account pursuant to Section 3.04 in any one or more of the following; provided, however, that each such obligation or security shall be held in the name of the Trustee on behalf of the Trust and, provided further, that each such investment must have a maturity date that is prior to the Distribution Date (other than a Discretionary Distribution Date that has not been set at the time such investment is made):

> (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States government or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States;

> (ii) marketable direct obligations issued by any State, or any political subdivision or any agency, authority, public benefit corporation or instrumentality thereof, at the time of the acquisition thereof, a short-term rating of at least 'A-1' from S&P or at least 'P-1' from Moody's;

> (iii) an obligation of any State, or any political subdivision or any agency, authority, public benefit corporation or instrumentality thereof;

> (iv) debt obligations issued, assumed, or guaranteed by legal entities organized under the laws of the United States or any State;

> (v) shares of any United States money market fund that (a) has substantially all of its assets invested continuously in the types of investments referred to in clause (i) or (ii), (b) has net assets in excess of $500,000,000 and (c) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; and

> (vi)   tax-exempt securities exempt from Federal arbitrage provisions applicable to investments of tax-exempt bonds including, but not limited to, tax-exempt bonds of the Commonwealth of Puerto Rico or any agency, authority, public benefit corporation or instrumentality thereof and, if available, State and Local Government Series (SLGS) issued by the United States Department of Treasury.

"Person":  Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government, or any agency or political subdivision thereof.

"Plan of Adjustment":  That certain Modified Fifth Amended Title III Plan of Adjustment of HTA filed September 6, 2022 with the Title III Court by the Oversight Board in the Title III Case, as amended, modified or supplemented from time to time.

-39-

"Prior Payments": Cumulative payments received by the Trust on account of Non-Taxable HTA CVI Distributions and New HTA Bonds pursuant to Sections 4.01(a) and 6.02(b).

"Pro Forma Proceeds": The cash proceeds projected by the disposal of the Sale Notional.

"Proceeding":  Any suit in equity, action at law or other judicial or administrative proceeding.

"Purchase Offer Notice": The meaning specified in Section 6.03(c).

"Record Date": The fifteenth day of the month (whether or not a Business Day) preceding the month in which the applicable Interest Payment Date occurs.

"Reimbursement Rate": The lesser of (a) the maximum rate permissible under applicable usury or similar laws limiting interest rates and (b) the annual interest rate on the applicable Electing Ambac Prepetition Insured Bond.  The Reimbursement Rate shall be computed on the basis of a 360-day year consisting of twelve (12) months of thirty (30) days each.

"Responsible Officer":  With respect to the Trustee, any officer within the Corporate Trust Office of the Trustee, including any Vice President, Assistant Vice President, Secretary, Assistant Secretary, Executive Director or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject and, as applicable, an authorized signatory.

"S&P":  S&P Global Ratings.

"Sale Notional": The notional amount of Non-Taxable HTA CVIs/Bonds for sale.

"Scheduled Final Redemption Date":  The Class A-2028 Scheduled Final Redemption Date, Class L-2038 Scheduled Final Redemption Date, Class M-2023 Scheduled Final Redemption Date, Class N-2026 Scheduled Final Redemption Date, Class N-2027 Scheduled Final Redemption Date, Class N-2028 Scheduled Final Redemption Date, Class N-2029 Scheduled Final Redemption Date, Class N-2030 Scheduled Final Redemption Date, Class N-2031 Scheduled Final Redemption Date and Class N-2045 Scheduled Final Redemption Date, as applicable, or such earlier redemption date as determined by the Credit Support Provider so long as the Credit Support Provider pays (or has paid) all amounts due under the Credit Support as provided in Sections 3.02(b)(iv), and 4.01(e) and (h).

"Secretary of State":  The meaning specified in Section 2.01(a).

"Security Issuer":  HTA.

"Sinking Fund Distribution Date": Individually or collectively, as the context may require, the Class A-2028 Sinking Fund Distribution Date, the Class L-2038 Sinking Fund Distribution Date and the Class N-2045 Sinking Fund Distribution Date.

"Sinking Fund Distributions":  Individually or collectively, as the context may require, the Class A-2028 Sinking Fund Distributions, the Class L-2038 Sinking Fund Distributions and the Class N-2045 Sinking Fund Distributions.

"Sinking Fund Schedule": The schedules set forth on Exhibit A1, Exhibit A2 and Exhibit A3, initially adjusted to reflect exclusions of non-Electing Holders' Ambac Prepetition Insured Bonds, as it may be amended from time to time in accordance with the terms hereof.

"State":  Any one of the 50 states of the United States, the District of Columbia or its territories, including the Commonwealth.

"Sub-Trust":  Each Taxable Sub-Trust and Non-Taxable Sub-Trust described in Section 3.01(c) and (d).

"Taxable Collection Account" or "Taxable Collection Accounts": Collectively, or individually, as the context may require, the Class A-2028 Taxable Collection Account, Class L-2038 Taxable Collection Account, Class M-2023 Taxable Collection Account, Class N-2026 Taxable Collection Account, Class N-2027 Taxable Collection Account, Class N-2028 Taxable Collection Account, Class N-2029 Taxable Collection Account, Class N-2030 Taxable Collection Account, Class N-2031 Taxable Collection Account and the Class N-2045 Taxable Collection Account.

"Taxable Funds":  All amounts received by the Trustee on or with respect to the Taxable HTA CVIs/Bonds and any Permitted Investments made with proceeds of such Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Taxable HTA CVIs":  The (i) Class A-2028 Taxable HTA CVIs, (ii) Class L-2038 Taxable HTA CVIs, (iii) Class M-2023 Taxable HTA CVIs, (iv) Class N-2026 Taxable HTA CVIs, (v) Class N-2027 Taxable HTA CVIs, (vi) Class N-2028 Taxable HTA CVIs, (vii) Class N-2029 Taxable HTA CVIs, (viii) Class N-2030 Taxable HTA CVIs, (ix) Class N-2031 Taxable HTA CVIs and (x) Class N-2045 Taxable HTA CVIs.

"Taxable HTA CVIs/Bonds":  Collectively, the Taxable HTA CVIs and the Taxable New HTA Bonds.

"Taxable New HTA Bonds":  The (i) Class A-2028 Taxable New HTA Bonds, (ii) Class L-2038 Taxable New HTA Bonds, (iii) Class M-2023 Taxable New HTA Bonds, (iv) (a) Class N-2026 Taxable New HTA Bonds, (v) Class N-2027 Taxable New HTA Bonds, (vi) Class N-2028 Taxable New HTA Bonds, (vii) Class N-2029 Taxable New HTA Bonds, (viii) Class N-2030 Taxable New HTA Bonds, (ix) Class N-2031 Taxable New HTA Bonds and (x) Class N-2045 Taxable New HTA Bonds.

"Officers' Certificate":  A certificate signed by an Executive Officer of the applicable Person, and delivered to the Trustee.

"Taxable Sub-Trust":  The meaning specified in Section 3.01(c).

"Title III Case":  The meaning given to such term under the Plan of Adjustment.

-41-

"Title III Court":  The meaning given to such term under the Plan of Adjustment.

"Trust":  The trust created by this Trust Agreement.

"Trust Agreement":  The meaning specified in the preamble hereto.

"Trust Property":  The meaning specified in Section 3.01.

"Trust Termination Event":  The meaning specified in Section 8.01.

"Trustee":  Wilmington Trust, N.A., any successor trustee appointed pursuant to Section 9.06, or any co-trustee appointed pursuant to Section 9.09, until a successor Person shall have become the Trustee pursuant to the applicable terms of this Trust Agreement, and thereafter "Trustee" shall mean such successor Person.

"Trustee Fee Letter":  A letter agreement dated on or before the Closing Date setting forth the fees and expenses of the Trustee.

"Trustee Fees":  The amount or amounts set forth in the Trustee Fee Letter.

"Unit Register": The meaning specified in Section 5.03(a).

"Unit Registrar":  The meaning specified in Section 5.03(a).

"United States":  The United States of America (which includes the States and the District of Columbia), its territories (including the Commonwealth), its possessions and other areas subject to its jurisdiction.

"Unitholder":  The Person in whose name a Unit is registered in the Unit Register on any date of determination.

"Units":  The securities authorized by, and authenticated and delivered under, this Trust Agreement and evidenced by a Certificate or a Global Security with respect to the Class A-2028 Units, Class L-2038 Units, Class M-2023 Units, Class N-2026 Units, Class N-2027 Units, Class N-2028 Units, Class N-2029 Units, Class N-2030 Units, Class N-2031 Units and Class N-2045 Units, as applicable.

Certain additional defined terms have the meanings assigned thereto in other terms hereof.

SECTION 1.02.    Rules of Construction.

Unless the context otherwise requires:

(i)  a term has the meaning assigned to it;

(ii) an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect in the United States from time to time;

-42-

(iii) "or" is not exclusive;

(iv) the words "herein", "hereof", "hereunder" and other words of similar import refer to this Trust Agreement as a whole and not to any particular Article, section or other subdivision;

(v) "including" means including without limitation; and

(vi) words in the singular include the plural and words in the plural include the singular.

SECTION 1.03.    Article and Section References.

All article and section references used in this Trust Agreement, unless otherwise provided, are to articles and sections in this Trust Agreement.  Any reference to "this Section" appearing within a particular paragraph of a section is a reference to such section as a whole.

ARTICLE II

Declaration of Trust;
Issuance of Units

SECTION 2.01.    Creation of Trust; Assignment of Trust Property.

(a) The Trust is being created by the Depositor on the date hereof on behalf of the Electing Holders pursuant to the execution of this Trust Agreement.  The Executive Director of the Depositor shall be the natural person and controlling person for purposes of Trust intake documentation for the Trustee and the Delaware Trustee.  The Delaware Trustee is hereby authorized and directed to file a Certificate of Trust for the HTA Class 6 Trust in the form of Exhibit F attached hereto (the "Certificate of Trust") with the Office of the Secretary of State of the State of Delaware (the "Secretary of State"), under the name "HTA Class 6 Trust" in which name the Trust shall have power and authority, and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the business of the Trust.  It is the intention of the parties hereto that the Trust hereby created constitute a statutory trust under the Delaware Statutory Trust Act and that this document constitutes the governing instrument of the Trust.  It is the intention of the parties hereto that, solely for U.S. federal income or state and local income, franchise and value added tax purposes, the Trust and each Sub-Trust will be a Grantor Trust.  The parties agree that, unless otherwise required by appropriate tax authorities, neither the Trust nor any Sub-Trust will file or cause to be filed annual or other necessary returns (including information returns), reports or other forms inconsistent with the characterization of the Trust and each Sub-Trust as other than a Grantor Trust.  The parties further agree, unless otherwise required by appropriate taxing authorities or by law, not to take any action, or direct any other party to take any action, inconsistent therewith.  In furtherance of the foregoing, (i) the purpose of the Trust and each Sub-Trust shall be to protect and conserve the assets of the Trust or the relevant Sub-Trust, as applicable, and neither the Trust nor any Sub-Trust shall at any time engage in or carry out any kind of business for U.S. federal income tax purposes or any kind of commercial activity and (ii) the Trust, each Sub-Trust, the Trustee and the Credit Support Provider (and any agent of such Person) shall each take, or refrain from taking, all such action (other than pursuant to the specific

-43-

provisions of this Trust Agreement) as is necessary to maintain the status of the Trust and each Sub-Trust as a Grantor Trust.  Notwithstanding anything to the contrary in this Trust Agreement or otherwise, none of the Trust, any Sub-Trust, the Trustee nor the Credit Support Provider (nor any agent of such Person) shall (1) acquire any assets or dispose of any portion of the Trust or such Sub-Trust, as the case may be, other than pursuant to the specific provisions of the Commonwealth Plan of Adjustment or this Trust Agreement, (2) vary the investment of the Trust or any Sub-Trust within the meaning of Treasury Regulation Section 301.7701-4(c), or (3) substitute new investments or reinvest so as to enable the Trust or any Sub-Trust to take advantage of variations in the market to improve the investment of any Unitholder.  The provisions of this Trust Agreement shall be interpreted consistently with and to further the intention of the parties.  No election will be made by or on behalf of the Trust or any Sub-Trust to be classified as an association taxable as a corporation for U.S. federal income tax purposes.

(b) On the Closing Date, or as soon thereafter as is reasonably practicable, the Trust shall receive (i) the Electing Ambac Prepetition Insured Bonds, (ii) the New HTA Bonds, (iii) the HTA CVI Distributions (including the HTA Clawback CVIs) pursuant to the Commonwealth Plan of Adjustment and (iv) the benefit of the Credit Support.  In addition, the Trustee has established on or prior to the date hereof (x) the applicable Taxable Collection Account, (y) the applicable Non-Taxable Collection Account, and (z) the applicable Credit Support Collection Account.  Each Unitholder (which term shall for purposes hereof include any holder of a beneficial interest in a Global Security), by electing to receive Units (which constitute beneficial interests) in the Trust, and any assignee thereof, agrees to treat, for U.S. federal, state and local income tax purposes, the HTA CVI Distributions (including the HTA Clawback CVIs) as having been received by such Unitholder prior to the formation of the Trust in a transaction that does not constitute a "recapitalization" of any of the outstanding debt obligations of HTA pursuant to Section 368(a)(1)(E) of the Code.

(c) The Trustee shall have power and authority, and is hereby authorized and empowered to execute and file with the Secretary of State any certificate required or permitted under the Delaware Statutory Trust Act to be filed with the Secretary of State.  The office of the Trust shall be in care of the Trustee at the Corporate Trust Office or at such other address as the Trustee may designate by written notice to the Unitholders and the Depositor.

(d) Notwithstanding anything appearing herein or elsewhere to the contrary, the obligations of the Trust under each Class of Units and this Trust Agreement are non-recourse obligations of the Trust payable with respect to each Class of Units solely from the Trust Property applicable to such Class, and following any realization of any Trust Property of such Class and its respective reduction to zero, any claims of the applicable Unitholders shall be extinguished.  The Units are not obligations of, and are not guaranteed by, the Depositor, the CVI Issuer or the Trustee, and no recourse shall be had against the Depositor or the CVI Issuer, against any officer, director, manager or employee of the Depositor or the CVI Issuer, or against any of their respective successors or assigns, for the payment of any amounts payable under the Units or the payment or performance of any obligation of the Trust, the Trustee or the Credit Support Provider under or pursuant to this Trust Agreement.

(e) The recitals contained in this Trust Agreement and in the Units shall be taken as the statements of the Trust, and the Depositor does not assume any responsibility for their correctness.

-44-

The Depositor does not make any representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Units.

(f) In purchasing (or otherwise receiving) an interest in the Units represented by a Global Security, the purchaser shall be deemed to acknowledge, represent and agree, and, if applicable, in purchasing any Units in certificated form, the purchaser shall be required to acknowledge, represent and agree, (i) that none of the Depositor, any of its respective Affiliates nor the Calculation Agent, is acting as a fiduciary or financial or investment advisor for purchaser, and such purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, representations or recommendations (in each case whether written or oral) of the Depositor or any of its Affiliates or the Calculation Agent (or any representative of any of the foregoing), (ii) it has received a copy of this Trust Agreement, the Plan of Adjustment, related disclosure statement and such other related documents, court orders and information as it deems necessary to make its decision to purchase (or otherwise receive) any Units and (iii) the Credit Support Provider has the option to prepay in whole or in part at any time and from time to time the accelerated principal of the Electing Ambac Prepetition Insured Bonds, together with the accrued interest as of such date, and upon any such payment on account of accelerated principal under the Electing Ambac Prepetition Insured Bonds, such bonds shall be deemed terminated, and the Credit Support and Credit Support Provider's obligations shall be satisfied and discharged.

(g) The Depositor shall not be accountable for the use or application by the Trust of the Units or the proceeds thereof or any moneys paid to the Trust pursuant to the provisions of this Trust Agreement.

(h) None of the Depositor nor any of its respective Affiliates will have the authority to act for, or to assume any obligation or responsibility on behalf of, the Trust.

(i) General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to the Depositor or any of its respective Affiliates.

(j) The Trust will not (A) operate or purport to operate as an integrated, single economic unit with respect to the Depositor or any other affiliated or unaffiliated entity of the Depositor; (B) seek or obtain credit or incur any obligation to any third party based upon the assets of the Depositor or any of its respective Affiliates; or (C) induce any such third party to reasonably rely on the creditworthiness of the Depositor or any affiliated or unaffiliated entity of the Depositor in its dealings with the Trust.

SECTION 2.02.   Acceptance by Trustee.

The Trustee acknowledges it expects to receive (i) the Electing Ambac Prepetition Insured Bonds, (ii) the New HTA Bonds and documents relating to the issuance of the New HTA Bonds, (iii) the HTA CVI Distributions (including the HTA Clawback CVIs) and documents relating to the issuance of the HTA Clawback CVIs and (iv) the benefit of the Credit Support, and declares that it will hold such assets and all other assets comprising the Trust Property in trust, for the benefit of all present and future Unitholders and the Credit Support Provider, in each case as provided herein, and for the purposes and subject to the terms and conditions set forth in this Trust Agreement, including the Trustee's obligations, as and when they may arise.

-45-

SECTION 2.03.    Agreement to Authenticate and Deliver Units.

The Trustee agrees and acknowledges that it will, concurrently with the deposit to and receipt by it of the property described in Section 2.02, cause to be executed, authenticated and delivered, as applicable, to each Electing Holder its Units in the form of a beneficial interest in the applicable Global Security.

ARTICLE III

Trust Powers; Administration of the Trust Property

SECTION 3.01.    Trust Property.

(a) The "Trust Property" with respect to the Trust will consist of: (i) the Class A-2028 Trust Property, (ii) the Class L-2038 Trust Property, (iii) the Class M-2023 Trust Property, (iv) the Class N-2026 Trust Property, (v) the Class N-2027 Trust Property, (vi) the Class N-2028 Trust Property, (vii) the Class N-2029 Trust Property, (viii) the Class N-2030 Trust Property, (ix) the Class N-2031 Trust Property, (x) the Class N-2045 Trust Property, (xi) the Fee Reserve and (xii) any other asset constituting a portion or proceeds of the foregoing.

(b) For the avoidance of doubt, for purposes of this Trust Agreement, the Global Securities and the Certificates, the assets identified or determined (i) as "Non-Taxable" shall only be the "Trust Property" of the applicable Unit labelled "(Non-Taxable)" and the applicable Global Security and (ii) as "Taxable" shall only be the "Trust Property" of the applicable Unit labelled "(Taxable)" and the applicable Global Security.

(c) On the date hereof, all Trust Property shall be held by one Sub-Trust (a "Taxable Sub-Trust").

(d) Upon a determination by Bond Counsel or the Internal Revenue Service by the Outside Non-Taxable CVI Determination Date, a new Sub-Trust will be formed to be the beneficiary of all assets identified or determined to be "Non-Taxable" as the "Trust Property" of newly-issued Units labelled "("Non-Taxable" and applicable newly-issued Global Securities, and shall be held in a new Sub-Trust (a "Non-Taxable Sub-Trust").  Upon such a determination, the assets identified or determined as "Non-Taxable" will no longer constitute Trust Property for the benefit of Units labelled "(Taxable)" and the applicable Global Security but will then constitute Trust Property for the benefit of the newly-issued Units labelled "(Non-Taxable)" and the applicable newly-issued Global Security.  All such Non-Taxable HTA CVIs shall then constitute Non-Taxable Funds and will be transferred from the Taxable Collection Account to the Non-Taxable Collection Account.

(e) Upon such re-characterization, the notional amount of the applicable Units labelled "(Taxable)", if any, and the applicable Global Security will be reduced accordingly, and the Units labeled "(Non-Taxable)" and the applicable Global Security will be increased accordingly, with the aggregate notional amount to remain unchanged.  For the avoidance of doubt, in the event of such a re-characterization, the benefit of the Credit Support will be allocated pro rata (by Notional Amount) between the Taxable Sub-Trust, if any, and the Non-Taxable Sub-Trust.  The foregoing in respect of re-characterization set forth in Section 3.01(d) and in this Section 3.01(e) will be

-46-

undertaken by the Trustee (i) solely to the extent permitted by the Depositary and (ii) at the direction of the Credit Support Provider.

(f) If such determination pursuant to paragraph (d) above and such re-characterization pursuant to paragraph (e) above results in the conversion of all of the outstanding notional amount of Taxable CVIs to Non-Taxable CVIs, then the Taxable Sub-Trust shall be redesignated as "Non Taxable," constituting "Non-Taxable" Trust Property for the benefit of Units and the applicable Global Security without the creation of a new Sub-Trust, new Units or new applicable Global Securities.  The Trustee shall reflect the foregoing in newly-issued Certificates and, to the extent required by the Depositary, newly-issued Global Securities.

(g) If, on any date subsequent to the formation of the Non-Taxable Sub-Trust, any Taxable CVIs are re-characterized as Taxable CVIs, the HTA CVIs re-characterized on such date shall be transferred to a new Sub-Trust which shall be an additional Taxable Sub-Trust.  If, on any date subsequent to the date hereof (other than covered by paragraphs (d) and (e) above), any Taxable CVIs are re-characterized as Non-Taxable CVIs, the HTA CVIs re-characterized on such date shall be transferred to a new Sub-Trust which shall be an additional Non-Taxable Sub-Trust.  For the avoidance of doubt, in the event of such a transfer, the benefit of the Credit Support will be allocated pro rata (by Notional Amount) with the transferred HTA CVIs.  The foregoing will be undertaken by the Trustee at the direction of the Credit Support Provider consistent with paragraphs (d), (e) and (f) above and, for the avoidance of doubt, solely to the extent permitted by the Depositary.  The Trustee shall perform the duties imposed upon it by this paragraph (g) by such supplemental agreement to be agreed to between the Credit Support Provider and the Trustee in accordance therewith and in exchange for such supplemental fee (if any) as agreed by such parties with respect thereto.

SECTION 3.02.   Administration of the Trust.

(a) The Trustee shall take such actions with respect to the Trust Property as directed by the Credit Support Provider pursuant to Article VI hereof and as otherwise expressly provided herein.  Each Electing Holder (by its election under Section 26.4(b)(ii) of the Plan of Adjustment and receipt of Units) and each other assignee thereof, consents to the provisions of this Trust Agreement and authorizes the Trustee to follow any direction of the Credit Support Provider delivered under the terms of this Trust Agreement.

(b) Subject to Article IX, the Trustee is hereby authorized to perform, and from time to time hereafter, shall perform only those acts which are described in this Trust Agreement as obligations of the Trustee.  Notwithstanding the generality of the foregoing, the Trustee is hereby specifically authorized to, and shall, do the following on behalf of the Trust:  (i) to issue the Global Securities and, if applicable, Certificates, evidencing Units; (ii) to establish and maintain the Taxable Collection Accounts, the Non-Taxable Collection Accounts and the Credit Support Collection Accounts hereunder; (iii) to accept delivery of the Electing Ambac Prepetition Insured Bonds, the New HTA Bonds, the HTA CVI Distributions including the HTA Clawback CVIs, and the benefit of the Credit Support; (iv) to the extent the Available Funds for any Class of Units are insufficient to pay in full the Aggregate Unit Balance of the outstanding Units of such Class on the applicable Scheduled Final Redemption Date, to draw on the applicable Credit Support to the extent available on such Scheduled Final Redemption Date in the amount of such insufficiency; (v) to

the extent Available Funds are insufficient to pay the Sinking Fund Distribution on the Sinking Fund Distribution Date, to draw on the Credit Support to the extent available on such Sinking Fund Distribution Date in the amount of such insufficiency; (vi) to the extent available funds are insufficient to pay the Interest Distribution on the applicable Interest Payment Date for such Class of Units, to draw on the Credit Support to the extent available on such Interest Payment Date in the amount of such insufficiency; (vii) to make and dispose of Permitted Investments pursuant to Section 3.04 and in accordance with Section 2.01(a) and Sections 9.12(b), (c) and (d); (viii) to liquidate the Trust pursuant to Article VIII; (viii) to make distributions pursuant to Articles IV and VI; including, without limitation, Discretionary Distributions which result in the redemption and cancellation of Units, and (ix) to accept payments from the Credit Support Provider in satisfaction of its obligations under the Credit Support, or otherwise, including, for the avoidance of doubt, on dates other than an Interest Payment Date or a Scheduled Final Redemption Date, to be applied as designated by the Credit Support Provider and reduce the amount available under, or otherwise satisfy its obligations under the Credit Support, and a deemed corresponding reduction of the Credit Support.

(c) The Trustee shall not sell, assign, pledge or otherwise transfer the HTA Clawback CVIs, New HTA Bonds or any other Trust Property to any Person or Persons, except to a successor trustee as provided in Section 9.07 or as otherwise expressly permitted hereunder (including, without limitation, Sections 6.02 and 6.03 hereto). This section shall not be construed to prohibit transfers of the Units, or sale or substitution of Permitted Investments.

(d) For purposes of the preparation of any statement that the Trustee forwards or causes to be forwarded to the Credit Support Provider and each Unitholder pursuant to Section 4.02(a), the Trustee shall separately track each class of Taxable Funds and each class of Non-Taxable Funds including, without limitation, interest on the applicable Taxable HTA CVIs/Bonds and the applicable Non-Taxable HTA CVIs/Bonds.

SECTION 3.03.   Collection Account.

(a) The Trustee has established Eligible Accounts, either through the establishment of separate accounts or through book-entry allocations, (1) to hold Class A-2028 Taxable Funds (the "Class A-2028 Taxable Collection Account"), (2) to hold Class L-2038 Taxable Funds (the "Class L-2038 Taxable Collection Account"), (3) to hold Class M-2023 Taxable Funds (the "Class M-2023 Taxable Collection Account"), (4) to hold Class N-2026 Taxable Funds (the "Class N-2026 Taxable Collection Account"), (5) to hold Class N-2027 Taxable Funds (the "Class N-2027 Taxable Collection Account"), (6) to hold Class N-2028 Taxable Funds (the "Class N-2028 Taxable Collection Account"), (7) to hold Class N-2029 Taxable Funds (the "Class N-2029 Taxable Collection Account"), (8) to hold Class N-2030 Taxable Funds (the "Class N-2030 Taxable Collection Account"), (9) to hold Class N-2031 Taxable Funds (the "Class N-2031 Taxable Collection Account"), (10) to hold Class N-2045 Taxable Funds (the "Class N-2045 Taxable Collection Account"), (11) to hold Class A-2028 Non-Taxable Funds (the "Class A-2028 Non-Taxable Collection Account"), (12) to hold Class L-2038 Non-Taxable Funds (the "Class L-2038 Non-Taxable Collection Account"), (13) to hold Class M-2023 Non-Taxable Funds (the "Class M-2023 Non-Taxable Collection Account"), (14) to hold Class N-2026 Non-Taxable Funds (the "Class N-2026 Non-Taxable Collection Account"), (15) to hold Class N-2027 Non-Taxable Funds (the "Class N-2027 Non-Taxable Collection Account"), (16) to hold Class N-2028 Non-

Taxable Funds (the "Class N-2028 Non-Taxable Collection Account"), (17) to hold Class N-2029 Non-Taxable Funds (the "Class N-2029 Non-Taxable Collection Account"), (18) to hold Class N-2030 Non-Taxable Funds (the "Class N-2030 Non-Taxable Collection Account"), (19) to hold Class N-2031 Non-Taxable Funds (the "Class N-2031 Non-Taxable Collection Account"), (20) to hold Class N-2045 Non-Taxable Funds (the "Class N-2045 Non-Taxable Collection Account"), (21) to hold amounts received on account of the Class A-2028 Credit Support (the "Class A-2028 Credit Support Collection Account"), (22) to hold amounts received on account of the Class L-2038 Credit Support (the "Class L-2038 Credit Support Collection Account"), (23) to hold amounts received on account of the Class M-2023 Credit Support (the "Class M-2023 Credit Support Collection Account"), (24) to hold amounts received on account of the Class N-2026 Credit Support (the "Class N-2026 Credit Support Collection Account"), (25) to hold amounts received on account of the Class N-2027 Credit Support (the "Class N-2027 Credit Support Collection Account"), (26) to hold amounts received on account of the Class N-2028 Credit Support (the "Class N-2028 Credit Support Collection Account"), (27) to hold amounts received on account of the Class N-2029 Credit Support (the "Class N-2029 Credit Support Collection Account"), (28) to hold amounts received on account of the Class N-2030 Credit Support (the "Class N-2030 Credit Support Collection Account"), (29) to hold amounts received on account of the Class N-2031 Credit Support (the "Class N-2031 Credit Support Collection Account") and (30) to hold amounts received on account of the Class N-2045 Credit Support (the "Class N-2045 Credit Support Collection Account"), each held in trust for the benefit of the Unitholders and the Credit Support Provider, subject to the obligation of the Trust to pay the fees and expenses of the Trust, including, without limitation, the Trustee Fee Letter and Extraordinary Trust Expenses, all from proceeds held in the Collection Accounts listed above.  Each Taxable Collection Account, Non-Taxable Collection Account and Credit Support Collection Account shall be under the sole dominion and control of the Trustee, and the Trustee is entitled to look to the Taxable Collection Accounts or the Non-Taxable Collection Accounts, on a pro rata basis, for payment of its fees and expenses, funding the Fee Reserve from time to time, and the other fees and expenses of the Trust.

(b) If, at any time, a formerly Eligible Account no longer fulfills the definition of "Eligible Account", the Trustee shall within five (5) Business Days establish a new Taxable Collection Account, Non-Taxable Collection Account or Credit Support Collection Account, as applicable, meeting the conditions specified above and transfer any cash and any investments on deposit in the applicable Taxable Collection Account, Non-Taxable Collection Account or Credit Support Collection Account to such new Taxable Collection Account, Non-Taxable Collection Account or Credit Support Collection Account, and from the date such new Taxable Collection Account, Non-Taxable Collection Account or Credit Support Collection Account is established, it shall be the Taxable Collection Account, Non-Taxable Collection Account or Credit Support Collection Account under this Trust Agreement.

(c) The Trustee shall give notice to the Credit Support Provider of the location of each Eligible Account constituting a Taxable Collection Account, a Non-Taxable Collection Account and a Credit Support Collection Account prior to any change thereof.

(d) After payment of fees and expenses of the Trust, the cash portion of the HTA CVI Distributions received on the Closing Date, shall be deposited into the applicable Taxable Collection Account and be distributed pursuant to Section 4.01(b) (without the requirement of a Credit Support Provider Request or other direction, the direction set forth in Section 4.01(b) being

-49-

deemed made hereunder).  The Credit Support Provider shall be entitled to receive reimbursement of any amounts paid by the Credit Support Provider pursuant to escrow arrangements governing the cash portion of HTA CVI Distributions.

SECTION 3.04.    Investment of Funds in the Taxable Collection Account.

(a) The Credit Support Provider may direct in writing the Trustee to (i) direct any depositary institution maintaining a Taxable Collection Account to invest the funds therein in one or more Permitted Investments or (ii) use funds on deposit in a Taxable Collection Account to purchase Units through open market purchases (and the Trustee shall cancel all such purchased Units and the applicable Aggregate Unit Balance for the Class or Classes purchased shall be reduced and the Sinking Fund Schedule, if applicable, for the Class or Classes subject to the purchase shall be revised accordingly by the Trustee pursuant to the provisions of Section 5.01(b) in the amount specified by the Credit Support Provider). If the Credit Support Provider does not provide any investment directions to the Trustee, then the funds shall be held un-invested, without interest, in the applicable Taxable Collection Account. Unless maturing or otherwise directed by the Credit Support Provider to be sold sooner, all Permitted Investments held by the Trust shall be liquidated on the earliest of (i) the Business Day prior to the next applicable Distribution Date,, (ii) the Business Day prior to the Class N-2045 Scheduled Final Redemption Date or (iii) upon a Trust Termination Event.  Amounts in the Non-Taxable Collection Accounts and the Credit Support Collection Accounts shall not be invested.

(b) Notwithstanding the provisions of paragraph (a) above, there shall be no investment of funds in a Taxable Collection Account on or before the Outside Non-Taxable HTA CVI Determination Date other than the Credit Support Provider may direct in writing the Trustee to invest the funds in a Taxable Collection Account pursuant to clause (vi) in the definition of Permitted Investments.

ARTICLE IV

Distributions and Reports to Credit Support Provider and Unitholders

SECTION 4.01.    Distributions.

(a) Distributions from Non-Taxable Collection Accounts.  Within three (3) Business Days of receiving any amount with respect to any series of Non-Taxable HTA CVIs/Bonds in the applicable Non-Taxable Collection Account, including HTA Clawback CVIs  or New HTA Bond sale proceeds received with respect to a Non-Taxable HTA CVI/Bond pursuant to Section 6.02, the Trustee shall establish a Distribution Date and send notice to the applicable Unitholders of such Class, pursuant to the provisions in Section 10.05, of such Distribution Date, and the Trustee shall distribute the Non-Taxable Funds in the applicable Non-Taxable Collection Account on a pro rata basis or as close to a pro rata basis as practicable (based on the aggregate sum of the Notional Amounts of all applicable Units held by such Unitholder on such Distribution Date) to each applicable Unitholder in such Class of Units, by way of a redemption or otherwise, and in the case of Global Securities, subject to and in accordance with the applicable procedures of the Depositary.  Following any such redemption, the Trustee shall cancel all Units redeemed and there shall be a corresponding reduction to the Credit Support.  For the avoidance off doubt, amounts

-50-

received with respect to any series of Non-Taxable HTA CVIs/Bonds in the applicable Non-Taxable Collection Account shall be used to make the foregoing redemptions and shall not be utilized to make Interest Distributions pursuant to clause (c) below.

(b) Discretionary Distributions.  Within three (3) Business Days of receiving a Credit Support Provider Request for a Discretionary Distribution (which must be made by the Credit Support Provider at least fifteen (15) days prior to the immediately following applicable Interest Payment Date) for a specific Class of Units, the Trustee shall establish a Discretionary Distribution Date for such Class of Units and send notice to the Unitholders of such Class pursuant to the provisions in Section 10.05, of such Discretionary Distribution Date.  On each Discretionary Distribution Date, the Trustee shall distribute amounts directed by the Credit Support Provider in a Credit Support Provider Request (which Credit Support Provider Request shall be deemed a claim for payment from the Trustee under the Credit Support), from (1) proceeds received with respect to Taxable HTA Clawback CVIs/Bonds consisting of Trust Property of such Class of Units and from any related Permitted Investments, (2) sales of the Taxable HTA Clawback CVIs/Bonds consisting of Trust Property of such Class of Units pursuant to Section 6.02 or (3) any early payment made on the Credit Support of such Class of Units by the Credit Support Provider in its sole discretion, including, for the avoidance of doubt, payment in whole or in part of the accelerated Obligations (as defined in the Credit Support for such Class of Units) in satisfaction of its obligations under the Credit Support, and the Trustee shall accept such payments (and the Unitholders of such Class are deemed to have accepted and agreed that the Credit Support Provider's obligations under the Credit Support applicable to such Class shall be deemed satisfied and reduced by such payments (each, a "Discretionary Distribution")) and shall distribute such payments to Unitholders of the affected Class first, the applicable Interest Distribution and second, pro rata or on an as close to a pro rata basis as practicable (based on the aggregate sum of the Notional Amounts of all outstanding Units of such Class held by such Unitholder on such Discretionary Distribution Date) by way of a redemption or otherwise or, with respect to amounts under clause (3) of this Section 4.01(b), as otherwise directed by the Credit Support Provider, and in the case of Global Securities, subject to and in accordance with the applicable procedures of the Depositary. Following any such redemption, the Trustee shall cancel all such Units redeemed and there shall be a deemed corresponding reduction to the Credit Support.

(c) Interest Payments. On each Interest Payment Date for any Class of Units, the Trustee shall distribute the Available Funds applicable to such Class of Units in the amount of the Interest Distribution on the applicable Units then outstanding to each holder of record of such Units on the Record Date.  To the extent the amounts available to be distributed from Available Funds would be insufficient to pay the Interest Distribution for such Class of Units on the applicable Interest Payment Date, five (5) Business Days prior to the Interest Payment Date, the Trustee shall make a claim on the Credit Support applicable to such Class of Units by delivering the form included in Exhibit G entitled hereto 'Policy Claim Form (Interests Payments)' to the extent available in the amount of such insufficiency and, to the extent received, deposit such cash into the applicable Credit Support Collection Account to make up any shortfall between the amount of Available Funds and the Interest Distribution to be made on such Interest Payment Date and upon receipt thereof, which proceeds shall be received on the Business Day prior to such Interest Payment Date, distribute such amounts pro rata (by Notional Amount) to each Unitholder of such Class of applicable Units then outstanding.

-51-

(d) <u>Sinking Fund Payments.</u> On each Sinking Fund Distribution Date, the Trustee shall distribute the Available Funds applicable to such Class of Units in the amount of the Sinking Fund Distribution on the applicable Units.  To the extent the amounts available to be distributed from Available Funds applicable to such Class of Units would be insufficient to pay the Sinking Fund Distribution for such Class of Units on the applicable Sinking Fund Distribution Date, five (5) Business Days prior to such Sinking Fund Distribution Date, the Trustee shall make a claim on the Credit Support applicable to such Class of Units by delivering the form included in <u>Exhibit G</u> hereto entitled 'Policy Claim Form (Sinking Fund Payments)' to the extent available in the amount of such insufficiency and, to the extent received, deposit such cash into the applicable Credit Support Collection Account to make up any shortfall between the amount of Available Funds and the Sinking Fund Distribution to be made on such Sinking Fund Distribution Date, which proceeds shall be received on the Business Day prior to the Sinking Fund Distribution Date, and distribute such amounts pro rata or on as close to a pro rata basis as practicable, by way of redemption or otherwise, to each Unitholder of such Class of applicable Units then outstanding.

(e) <u>Final Payments.</u> On each Scheduled Final Redemption Date for each Class of Units, the Trustee shall distribute to each Unitholder of the related Class presenting and surrendering its applicable Units, directly or through its DTC Participant, its ratable share of the Available Funds applicable to such Class of Units.  Any funds not distributed on such Scheduled Final Redemption Date shall be set aside and held in trust for the benefit of Unitholders not presenting and surrendering their Units in the aforesaid manner.   To the extent the amounts available to be distributed from such Available Funds are insufficient to pay <u>first</u>, applicable Interest Distributions and <u>second</u>, the Aggregate Unit Balance of such Units on the  Scheduled Final Redemption Date, five (5) Business Days prior to the applicable Scheduled Final Redemption Date, the Trustee shall make a claim on the Credit Support applicable to such Class of Units by delivering the form included in <u>Exhibit G</u> hereto entitled 'Policy Claim Form (Scheduled Final Redemptions)' to the extent available in the amount of such insufficiency and, to the extent received, deposit such cash into the applicable Credit Support Collection Account to make up any shortfall between the amount of Available Funds and the Aggregate Unit Balance of such Class of Units to be redeemed on such Scheduled Final Redemption Date and upon receipt thereof, which proceeds shall be received on the Business Day prior to such Scheduled Final Redemption Date, distribute such amounts upon payment thereof, the Electing Ambac Prepetition Insured Bonds and the applicable Credit Support shall be released and cancelled and the Credit Support Provider's obligations thereunder shall be deemed satisfied in full.

(f) Any distribution to Unitholders shall be made to the Person in whose name such Unit is registered at the close of business on the related Record Date, if applicable, or on the Business Day prior to the Distribution Date, and in the case of the Global Securities, in accordance with the procedures of the Depositary.

(g) All interest payments on each Class of Units (whether or not such distributions are subject to any tax payable by or on behalf of the Trust or such Unitholder (as holder of a beneficial interest in a Global Security)) shall reduce the Aggregate Unit Balance of such Class by the gross amount (determined prior to giving effect to any reduction for such tax or withholding with respect thereto) of such distribution to such Class.  Each reduction in the schedule of Interest Distributions for such Class shall reduce the obligation of the Credit Support Provider under the Credit Support with respect to such Class.  On any date in which a Class of Units receive the amount required to be

-52-

paid under Section 8.02 (or, if earlier, the Scheduled Final Redemption Date for such Class), such Class shall be deemed to be redeemed in full and no longer Outstanding hereunder and no further amounts shall be distributable on such Units from and after such time.

(h)  In the event the Trustee makes a valid claim against the Credit Support Provider as set forth in Section 4.01(c), (d) and (e) above and the Credit Support Provider fails to distribute sufficient funds to the Trustee, then the Trustee shall provide notice to the applicable Unitholders and the Credit Support Provider within five (5) Business Days, pursuant to the provisions in Section 10.05, of the Credit Support Provider's failure.  Upon the occurrence and continuation of such Credit Support Provider failure, the Trustee may solicit the direction of the Unitholders representing more than 50% of the outstanding Aggregate Unit Balance of the Units (the "Directing Unitholders") to obtain a determination of such Credit Support Provider failure by a final, non-appealable order of a court of competent jurisdiction.  Once such final, non-appealable order is obtained by the Trustee, the Directing Unitholders may (i) direct the Trustee to exercise any and all remedies available at law or in equity with respect to the Credit Support and (ii) exercise all voting, election and other rights of the Credit Support Provider enumerated throughout this Trust Agreement (and the Credit Support Provider shall have all of its voting, election and other rights under Sections 6.01(b) and 6.04(a), and other direction rights of the Credit Support Provider enumerated throughout this Trust Agreement suspended during the occurrence and continuation of such failure (other than those set forth in Section 10.01(c)); provided that, the Trustee shall be under no obligation to take any action in the event of a Credit Support Provider failure to pay a valid claim, other than providing notice of such failure to the applicable Unitholders unless, upon demand, the Trustee receives indemnification or security satisfactory to it from the applicable Unitholders against all liabilities, costs and expenses that, by reason of such action may be imposed on, incurred by or asserted against the Trustee.  For the avoidance of doubt, the Trustee shall continue to take direction from the Credit Support Provider as provided throughout this Trust Agreement unless and until a final, non-appealable order as described above is entered.

(i) If, prior to a Trust Termination Event, the Credit Support Provider has made a payment in respect of any Credit Support, the Credit Support Provider shall be entitled to receive, upon its written direction, which written direction, if in respect of available Non-Taxable Funds, shall be delivered to the Trustee in accordance with Section 10.05 within two (2) Business Days of receipt of any amount with respect to the Non-Taxable HTA CVIs/Bonds, reimbursement of such amounts together with interest thereon at the Reimbursement Rate out of proceeds that would otherwise be paid by the Trust to Unitholders pursuant to this Section 4.01.  Such reimbursement shall be made out of all available Non-Taxable Funds and Taxable Funds (in the aggregate, the "Funds") in pro rata amounts (calculated based upon the Aggregate Unit Balance of each Class attributable to proceeds received from Taxable HTA CVIs/Bonds and Non-Taxable HTA CVIs/Bonds) to the extent of available Non-Taxable Funds and available Taxable Funds (and, if not available from the Non-Taxable Funds, then from other available Taxable Funds), or as otherwise provided in such direction, with the Funds being first applied to such reimbursement prior to making any distribution to Unitholders or making any reinvestment of the Funds. With respect to any such reimbursement, the Trustee shall (i) rely on the information provided by the Credit Support Provider; and (ii) be under no obligation to determine the Reimbursement Rate or the calculation of the pro rata allocation of available Non-Taxable Funds and Taxable Funds in satisfaction thereof. For the avoidance of doubt, the Trustee shall have no obligation at any time to determine whether the Credit Support Provider is entitled to receive reimbursement out of available Funds

-53-

and shall rely solely on the information provided by the Credit Support Provider in its written direction with respect thereto.

(j) As a Credit Support Provider Request, the Credit Support Provider hereby directs that each Discretionary Distribution Date shall be no later than the immediately following applicable Interest Payment Date. Each Distribution Date shall be no later than the immediately following applicable Interest Payment Date unless HTA CVI Distributions are received by the Trustee within two (2) Business Days of such Interest Payment Date, whereby the Distribution Date shall be within three (3) Business Days of receipt of such HTA CVI Distributions by the Trustee.

SECTION 4.02.   Reports to Credit Support Provider and Unitholders.

(a) On each Distribution Date (other than an Interest Payment Date), the Trustee shall forward or cause to be forwarded to the Credit Support Provider and each Unitholder a statement (a "Distribution Date Statement") setting forth:

(i)  the aggregate amount and type of such distribution to be made to the Unitholders of each Class on such date;

(ii) the Aggregate Unit Balance of each Class, as applicable, after giving effect to the distribution to be made on such Distribution Date;

(iii) the amount of Extraordinary Trust Expense and other Trust fees and expenses paid or owing since the date of the immediately prior Distribution Date Statement, if any, on such Distribution Date, as well as the cumulative amount of such fees and expenses for the calendar year to date;

(iv) the cumulative amount of proceeds received in the applicable Collection Account since the date of the immediately prior Distribution Date Statement including an itemization of the amounts received from each source, based upon the itemization provided by the Credit Support Provider;

(v) the portion of each distribution made on such Distribution Date attributable to proceeds received from the applicable Taxable HTA CVIs/Bonds and applicable Non-Taxable HTA CVIs/Bonds, and from the applicable Credit Support; and

(vi) the information required to be reported pursuant to Section 3.02(d).

Notwithstanding the foregoing and for the avoidance of doubt, no Distribution Date Statement shall set forth or include any information in respect of any Interest Distribution.

(b) Within a reasonable period of time after the end of each calendar year, the Accountant shall furnish to each Person who at any time during such calendar year was a Unitholder a statement containing the information set forth in the above clause (a) with each such amount aggregated for such calendar year or the applicable portion thereof during which such Person was a Unitholder, which statement shall provide information to allow Unitholders to calculate their U.S. federal income tax liability with respect to their Units.

(c) The Trustee will deliver to Unitholders and the Credit Support Provider copies of all notices and communications it receives from the Security Issuer as they relate to the HTA Clawback CVIs or New HTA Bonds unless otherwise provided by the Security Issuer through EMMA as administered by the MSRB.

SECTION 4.03.   Compliance with Tax Reporting and Withholding Requirements.

(a) Unitholders (including for this purpose, the holders of beneficial interests in the Global Securities) (i) of Class A-2028 Units will be responsible for payment of all taxes with respect to the Class A-2028 Trust Property, (ii) of Class L-2038 Units will be responsible for payment of all taxes with respect to the Class L-2038 Trust Property, (iii) of Class M-2023 Units will be responsible for payment of all taxes with respect to the Class M-2023 Trust Property, (iv) of Class N-2026 Units will be responsible for payment of all taxes with respect to the Class N-2026 Trust Property, (v) of Class N-2027 Units will be responsible for payment of all taxes with respect to the Class N-2027 Trust Property, (vi) of Class N-2028 Units will be responsible for payment of all taxes with respect to the Class N-2028 Trust Property, (vii) of Class N-2029 Units will be responsible for payment of all taxes with respect to the Class N-2029 Trust Property, (viii) of Class N-2030 Units will be responsible for payment of all taxes with respect to the Class N-2030 Trust Property, (ix) of Class N-2031 Units will be responsible for payment of all taxes with respect to the Class N-2031 Trust Property and (x) of the Class N-2045 Units will be responsible for payment of all taxes with respect to the Class N-2045 Trust Property.  Each Electing Holder receiving Units on the Closing Date (and each assignee thereof) and, to the extent required, each holder of a beneficial interest in a Global Security, will be responsible for providing the Trustee such information reasonably requested by the Trustee or the Accountant, on behalf of the Trust, as may be deemed necessary or advisable in order for the Trustee or the Accountant to provide tax reporting for applicable federal and state tax purposes.  None of the Depositor, the Credit Support Provider nor the Trustee will be responsible for making any tax payments or tax reporting other than as set forth in this Trust Agreement.   The Trust and each Sub-Trust, through its Accountant, shall be responsible for all tax reporting obligations and withholding (if any) for the Trust, each Sub-Trust and Unitholders as required by law and consistent with the treatment of the Trust and each Sub-Trust as a Grantor Trust and the Unitholders as beneficial owners of a pro rata share of the applicable Trust Property (but subject further to the tax characterization described in Section 2.01(b)), for purposes of U.S. federal income tax, and any state and local taxes.  Such obligations shall include:  the timely filing of completed tax returns (if any) and the information returns (if any), including any extensions, and any filings or information as required by the Accountant.  To assure the foregoing, the Trustee shall utilize the Accountant, with fees and expenses of the Accountant being a cost of the applicable Sub-Trust.  For the avoidance of doubt, the Trustee, on behalf of the Trust, shall have no individual obligation or duty to review the tax returns or information returns for accuracy.

SECTION 4.04.   Preservation of Information, Communications to Unitholders.

The Trust shall cause the Accountant to (i) preserve, in as current a form as is reasonably practicable, the names and addresses of the Unitholders contained in the most recent list furnished to the Accountant by the Unitholders and (ii) upon request, provide the Credit Support Provider and the Trustee (but not any Unitholder) with a copy of the list.  The Accountant shall be allowed to destroy any list furnished to it as provided upon receipt of a new list.

ARTICLE V

The Units

SECTION 5.01.    <u>The Units</u>.

(a) The Units shall be issued in the form of and be represented by one or more Global Securities in the form of <u>Exhibit C1</u> through <u>Exhibit C10</u> and, as provided by the terms hereof and subject to Section 5.09, by definitive Certificates substantially in the form of <u>Exhibit B1</u> through <u>Exhibit B10</u>.  The aggregate amount of the Units that may be executed and delivered under this Trust Agreement is limited to the amount of Ambac Prepetition Insured Bonds deposited into the Trust. The aggregate number of Units shall be allocated among Classes in the same proportion of the Ambac Prepetition Insured Bonds deposited into the Trust on the Closing Date.  All Units of the same Class shall be identical in all respects.  The Units of each Class will be transferable in denominations of the current Notional Amount of the applicable Class and integral multiples thereof which, for the avoidance of doubt, shall be a denomination of $1.00 of par value at the applicable Scheduled Final Redemption Date.  All Units of a Class issued under this Trust Agreement shall be in all respects equally and ratably entitled to the benefits to which such Class are entitled hereunder without preference, priority or distinction on account of the actual time or times of authentication and delivery.  No additional interests in the Trust other than the Units shall be issued hereunder, except in accordance with Sections 5.03 and 5.04.

(b) The Units issued under this Trust Agreement shall be in the form of separate Classes: a class of Units with a mandatory redemption date of the Class A-2028 Scheduled Final Redemption Date (the "Class A-2028 Units"), a class of Units with a mandatory redemption date of the Class L-2038 Scheduled Final Redemption Date (the "Class L-2038 Units"), a class of Units with a mandatory redemption date of the Class M-2023 Scheduled Final Redemption Date (the "Class M-2023 Units"), a class of Units with a mandatory redemption date of the Class N-2026 Scheduled Final Redemption Date (the "Class N-2026 Units"), a class of Units with a mandatory redemption date of the Class N-2027 Scheduled Final Redemption Date (the "Class N-2027 Units"), a class of Units with a mandatory redemption date of the Class N-2028 Scheduled Final Redemption Date (the "Class N-2028 Units"), a class of Units with a mandatory redemption date of the Class N-2029 Scheduled Final Redemption Date (the "Class N-2029 Units"), a class of Units with a mandatory redemption date of the Class N-2030 Scheduled Final Redemption Date (the "Class N-2030 Units"), a class of Units with a mandatory redemption date of the Class N-2031 Scheduled Final Redemption Date (the "Class N-2031 Units") and a class of Units with a mandatory redemption date of the Class N-2045 Scheduled Final Redemption Date (the "Class N-2045 Units").  The Sinking Fund Schedule for any applicable Class shall be adjusted from time to time in connection with each distribution made on such Class.  Such adjustment shall be based on the gross amount of each distribution and shall not take into account taxes, if any, which may be required to be withheld by the Trust or paid by any Unitholder.  In connection with each distribution on a Class of Units for which there is a Sinking Fund Schedule, the Trustee shall provide to the Credit Support Provider a revised Sinking Fund Schedule for such Class which gives effect, in accordance with the foregoing, to receipt of such distribution by such Class and calculates the remaining Sinking Fund Schedule for such Class from and after the date of such distribution.  Any such revised Sinking Fund Schedule shall become effective hereunder upon written reasonable approval thereof by the Credit Support Provider.

-56-

(c) Unless and until it is exchanged in whole or in part for Certificates representing the individual Units represented thereby (as described in Section 5.09), a Global Security may not be transferred except as a whole by the Depositary for such Global Security to a nominee of such Depositary or by a nominee of such Depositary to such Depositary or another nominee of such Depositary or by such Depositary or any such nominee to a successor of such Depositary or a nominee of such successor.

SECTION 5.02.   Execution, Authentication and Delivery.

(a) Global Securities and/or Certificates evidencing Units shall be executed on behalf of the Trust by a Responsible Officer of the Trustee.  The signature of any of these officers may be manual or facsimile.  Certificates and Global Securities bearing the manual or facsimile signature of individuals who were at the time of execution and authentication the proper officers of the Trustee shall be binding, notwithstanding that such individuals or any of them have ceased to hold such offices subsequent to the authentication and delivery of such Certificates and/or Global Securities or did not hold such offices at the date of such Certificates and/or Global Securities.

(b) The Trustee shall not be required to authenticate any Certificates or Global Securities if the issuance of such Certificates or Global Securities pursuant to this Trust Agreement will adversely affect the Trustee's own rights, duties or immunities under this Trust Agreement.

(c) Each Certificate and Global Security shall be dated as of the date of its authentication.

(d) No Unit shall be entitled to any benefit under this Trust Agreement or be valid or obligatory for any purpose, unless there appears on the applicable Certificate or Global Security a certificate of authentication substantially in the form as contained in the form of Certificate or Global Security attached to this Trust Agreement as Exhibit B1, through Exhibit B10 and Exhibit C1 through Exhibit C10 executed by the Trustee by the manual or facsimile signature of a Responsible Officer, and such certificate upon any of the foregoing shall be conclusive evidence, and the only evidence, that the Unit represented thereby has been duly authenticated and delivered under this Trust Agreement and is entitled to the benefits of this Trust Agreement.

SECTION 5.03.   Registration; Registration of Transfer and Exchange.

(a) The Trustee shall cause to be kept a register for Units (the registers maintained in such office and in any other office or agency of the Trustee from which distributions are made being herein sometimes collectively referred to as the "Unit Register") in which, subject to such reasonable regulations as it may prescribe, a transfer agent and registrar (which initially shall be the Trustee but may be another entity) (the "Unit Registrar") shall provide for the registration of Units and the registration of transfers and exchanges of Units.  The Trustee is hereby initially appointed Unit Registrar for the purpose of registering Units and transfers and exchanges of Units as herein provided, and the Trustee shall remain Unit Registrar for such purposes until the earlier to occur of (i) the resignation or termination of the Trustee and appointment of a successor trustee in accordance with Section 9.07, in which case such successor trustee shall assume the duties of Unit Registrar, and (ii) the termination of the Trust and discharge of the Trustee's obligations under this Trust Agreement in accordance with the applicable terms of Article VIII; provided, however,

-57-

that the Trustee may appoint one or more co-Unit Registrars upon notice to the Credit Support Provider and the Unitholders.

With respect to Units represented by Certificates (if applicable), upon surrender for registration of transfer of any Unit at the office or agency of the Unit Registrar, if the requirements of Section 8-401(1) of the Uniform Commercial Code are met to the Unit Registrar's satisfaction, and subject to the transfer restrictions set forth in Section 5.09 hereof, the Trustee shall execute, authenticate and deliver, in the name of the designated transferee or transferees, one or more new Units of the same Class of any authorized denominations, of a like aggregate Notional Amount.  All transfers of Units are subject to the approval of the Unit Registrar and the Unit Registrar shall not register any transfer of Units if such transfer would violate any provision of this Trust Agreement. Notwithstanding the foregoing, beneficial interests in a Global Security shall be transferable in accordance with the Applicable Procedures, as further described in Section 5.09(c) hereof.

(b) At the option of the Unitholder and at such Unitholder's expense, Certificates representing Units may be exchanged for other Certificates of the same Class of any authorized denomination or denominations of like tenor and aggregate Notional Amount upon surrender of the Certificates to be exchanged at the office or agency of the Trustee maintained for such purpose.  Whenever any Certificates are so surrendered for exchange, the Trustee shall execute, authenticate and deliver the Certificates representing the Units that the Unitholder making the exchange is entitled to receive.

All Units issued upon any registration of transfer or exchange of Units shall be entitled to the same benefits under this Trust Agreement as the Units surrendered upon such registration of transfer or exchange.

(c) Every Unit represented by a Certificate presented or surrendered for registration of transfer or exchange shall be duly endorsed (and in the case of a transfer, accompanied by a written instrument of transfer substantially in the form of Exhibit D hereto), duly executed, by the Unitholder thereof or his/her attorney duly authorized in writing, or by a member firm of a national securities exchange, and such other documents as the Unit Registrar may require.

The Trustee may require payment by the Unitholders of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Units.

SECTION 5.04.   Mutilated, Destroyed, Lost and Stolen Certificates.

If (i) any mutilated Certificate is presented to the Unit Registrar or (ii) the Unit Registrar receives evidence to its satisfaction of the destruction, loss or theft of any Certificate, and there is delivered to the Unit Registrar such security or indemnity as it may require to save it and any Paying Agent harmless, and the Unit Registrar has not received notice that such Certificate (and the Units represented thereby) has been acquired by a bona fide purchaser, then, in each case, the Trustee shall execute, authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like Class, tenor, form, terms and principal amount, bearing an identifying number not used by any contemporaneously existing Certificate, so that neither gain nor loss in interest shall result from such exchange or substitution.

Upon the issuance of any new Certificate under this Section, the Trustee may require the payment by the Unitholder of a sum sufficient to cover any tax or other governmental charge that may be imposed in respect thereto and any other expenses (including the fees and expenses of the Trustee or Unit Registrar) connected therewith.

Every new Certificate issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the applicable Trust Property to the extent provided herein, unless the destroyed, lost or stolen Certificate shall be legally enforceable as determined by a final court order at any time enforceable by anyone, and the Units represented thereby shall be entitled to all the benefits of this Trust Agreement equally and proportionately with any and all other Units of the related Class, if any, duly issued thereunder.

The terms of this Section shall apply, *mutatis mutandis*, with respect to the certificates representing the Global Securities, provided that any costs, taxes or expenses in connection therewith or with respect to a required indemnity, to the extent not paid or provided by a Unitholder, shall be borne by the Trustee and deemed an Extraordinary Trust Expense.

The terms of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Units.

SECTION 5.05.    Persons Deemed Owners.

Subject to Section 5.04 and except for the final distribution, the Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered as the owner of such Unit on the related Record Date, if applicable, or Distribution Date for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.  All distributions made to any such Unitholder, or upon his/her order, shall be valid and, to the extent of the sum or sums paid, effectual to satisfy and discharge the liability for moneys distributable upon such Unit.

SECTION 5.06.    Cancellation.

(a) All Units evidenced by Certificates surrendered for payment, redemption, replacement, transfer or exchange shall be delivered to the Trustee and shall be promptly cancelled by the Trustee.  The Trustee (or, if different, the Unit Registrar) and no one else will cancel all such Units surrendered for registration of transfer, exchange, payment, replacement or cancellation and will dispose of such cancelled Units and the related Certificates in accordance with its customary procedures.  No Certificates evidencing Units shall be authenticated in lieu of or in exchange for any Units cancelled as provided in this Section, except as expressly permitted by this Trust Agreement.

(b) At such time as all beneficial interests in a particular Global Security have been exchanged for HTA Clawback CVIs and/or New HTA Bonds pursuant to Section 6.03 hereof or for Certificates representing Units, or a Trust Termination Event has occurred with respect to all Units represented by a particular Global Security, such Global Security will be cancelled and destroyed by the Trustee in accordance with Section 5.06(a).

SECTION 5.07.   Appointment of Paying Agent.

(a) The Trustee may appoint one or more paying agents (each, a "Paying Agent") with respect to the Units.  Any such Paying Agent shall be authorized to make distributions to Unitholders pursuant to this Trust Agreement and shall report the amounts of such distributions to the Trustee. The Trustee may remove the Paying Agent if the Trustee determines in its sole discretion that the Paying Agent shall have failed to perform its obligations under this Trust Agreement in any material respect or if the Paying Agent fails to satisfy the eligibility requirements set forth in paragraph (b) of this Section.  The Paying Agent shall initially be the Trustee.  Any Paying Agent shall be permitted to resign as Paying Agent upon 30 days' written notice to the Trustee.  In the event that the Trustee shall no longer be the Paying Agent, the Trustee shall appoint a successor or additional Paying Agent and shall provide written notice of such appointment to the Credit Support Provider and the Unitholders.  The Trustee shall cause each such Paying Agent to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee that it will hold all sums, if any, held by it for distribution to the Unitholders in an Eligible Account in trust for the benefit of the Unitholders entitled thereto until such sums shall be distributed to such Unitholders.  The Paying Agent shall return all unclaimed funds to the Trustee within two years from the time such funds were first eligible to be claimed and promptly upon removal shall also return all funds in its possession to the Trustee or a successor Paying Agent.

(b) The Paying Agent shall at all times be a bank or trust company, the combined capital and surplus of which is at least $200,000,000 and the long-term debt obligations of which are rated in one of the four highest categories assigned long-term debt obligations by each of S&P and Moody's or, notwithstanding such capital and surplus and rating requirements, is otherwise acceptable to the Credit Support Provider in its sole discretion, and is subject to supervision of examination by Federal or State authority.  If such bank or trust company publishes reports of conditions at least annually, pursuant to combined capital and surplus of such bank or trust company shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published.  In the event that at any time the Paying Agent shall cease to be eligible in accordance with the terms of this paragraph, the Paying Agent shall release all funds held by the Paying Agent to the Trustee and then resign immediately.  Upon such resignation, the Trustee shall act as Paying Agent until the appointment of a successor Paying Agent in accordance with paragraph (a) of this Section.

(c)  The terms of Sections 9.01, 9.02, 9.03, 9.05 and 9.06 shall be applicable to any Paying Agent, *mutatis mutandis*.

(d)  Any reference in this Trust Agreement to the Paying Agent shall include any co-paying agent unless the context requires otherwise.

SECTION 5.08.   [Reserved].

SECTION 5.09.   Issuance and Transfer Restrictions.

(a) The Units shall be issued on the Closing Date upon deposit of the Electing Ambac Prepetition Insured Bonds, the New HTA Bonds, the benefit of the Credit Support and the HTA CVI Distributions (and related cash) into the Trust pursuant to the Plan of Adjustment and the due

-60-

authentication by the Trustee of the Units in the form set forth in <u>Exhibit C1</u> through <u>Exhibit C10</u> attached hereto as applicable.

(b) No Unit shall be transferred except in accordance with the terms of Section 5.03 and this Section 5.09(b) or, if applicable, Section 5.09(c). Each proposed transfer of a Unit shall not be effective until the transferor and transferee have provided the Trustee with a certificate of transfer in substantially the form of <u>Exhibit D</u> hereof and the acknowledgement of such certificate by the Trustee. If, at any time, the Trustee learns that (i) a transfer of a beneficial interest in a Global Security shall have been made without the transferor complying with its obligations under Section 5.03 hereof or (ii) any of the representations or warranties provided by a potential transferee of any Certificate is false or that any agreement made therein has been violated, any transfer of such Unit (or beneficial interest therein) to such potential transferee shall be null and void ab initio. The Trustee shall have such other powers to effect compliance with the terms of this Section 5.09 as it deems appropriate.

(c) With respect to any Units represented by Global Securities, the following terms shall apply:

(i) The Units will be represented by one or more Global Securities registered in the name of the Depositary or its nominee. The Trustee initially appoints DTC to act as Depositary with respect to the Global Securities.

(ii) Any Global Security shall be exchangeable for Certificates registered in the name of Persons other than the Depositary or its nominee *only* if (A)(x) the Depositary is no longer willing or able to continue to act as a depositary *or* (y) the Depositary ceases to be an Exchange Act registered clearing agency *and* (B) the Trustee is unable to appoint a qualified successor within 120 days. Upon the occurrence of (1) either event described in subclause (A) of the previous sentence *and* (2) the event described in subclause (B) of the previous sentence, Certificates representing Units shall be issued in exchange for any applicable Units represented by Global Securities in such names as the Depositary shall instruct the Trustee. Upon such issuance, the Trustee shall register such Certificates in the name of, and cause the same to be delivered to, such Person or Persons (or the nominee thereof) consistent with Section 5.02. In addition, the Trustee may (and at the direction of the Credit Support Provider shall) cause the entire beneficial interest in a Global Security held by a Person that is in breach of its obligations under Section 5.03 hereof to be converted into a definitive Certificate. For the avoidance of doubt, any Unit authenticated and delivered in exchange for a Global Security or any portion thereof pursuant to this Section 5.09(c)(ii) shall be authenticated and delivered in the form of, and shall be, a Certificate. A Global Security may not be exchanged for a Certificate other than as provided in this Section 5.09(c)(ii); provided, however, that Units may be transferred and exchanged as provided in Section 5.09(c)(iii).

(iii) The transfer and exchange of Units will be effected through the Depositary, in accordance with the provisions of this Trust Agreement and the Applicable Procedures. Units may be transferred to Persons who take delivery thereof only in the form of a beneficial interest in the same Global Security. No written orders or instructions shall be required to be delivered to the Unit Registrar to effect the transfers of beneficial interests in a Global Security described in this Section 5.09(c)(iii).

(iv) Any Global Security shall bear a legend in substantially the following form:

"This certificate is a Global Security (within the meaning of the Trust Agreement hereinafter referred to) and is registered in the name of a Depositary or a nominee of a Depositary. This Global Security is exchangeable for Certificates registered in the name of a person other than the Depositary or its nominee only in the limited circumstances described in the Trust Agreement, and may not be transferred except as a whole by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary. Unless this Global Security is presented by an authorized representative of The Depository Trust Company ("DTC") to the Trustee (as defined in the Trust Agreement) or its agent for registration of transfer, exchange or payment, and any Global Security issued is registered in the name of Cede & Co. or such other name as may be requested by an authorized representative of DTC (and any payment is made to Cede & Co. or such other entity as may be requested by an authorized representative of DTC), any transfer, pledge or other use of this Global Security (rather than the underlying Units which may be transferred pursuant to the Trust Agreement and which may be pledged) for value or otherwise by or to any person is wrongful inasmuch as the registered owner hereof, Cede & Co., has an interest therein."

## ARTICLE VI

### Rights of Unitholders and Credit Support Provider

SECTION 6.01.   <u>Voting Rights with Respect to HTA Clawback CVIs and New HTA Bonds</u>.

(a) Within two (2) Business Days after receipt of notice of any meeting of, or other occasion for the exercise of voting rights, the giving of consents or any other election right by, owners of any of the HTA Clawback CVIs or New HTA Bonds, the Trustee shall deliver a copy of such notice to the Credit Support Provider.

(b) The voting, election and direction rights allocable to the owners of the HTA Clawback CVIs and New HTA Bonds pursuant to the terms thereof (including, without limitation, voting, election and direction rights in respect of remedies) will be allocated solely to the Credit Support Provider and no Unitholder shall have any right to direct the Trustee as to any voting, election or direction rights allocable to owners of the HTA Clawback CVIs and New HTA Bonds except as described in Section 4.01(h). Upon the written request of the Credit Support Provider, the Trustee shall vote, elect or act in accordance with any instruction set forth in such written request. The Credit Support Provider may exercise its rights hereunder in its sole discretion.

SECTION 6.02.   <u>HTA Clawback CVI and New HTA Bond Sales</u>.

(a) <u>Taxable HTA CVIs/Bonds</u>. The Credit Support Provider may, in its sole discretion at any time and from time to time, direct the Trustee to sell all or any portion of the Taxable HTA CVIs/Bonds that are Trust Property (except for the Non-Taxable Funds and the Non-Taxable

HTA CVIs/Bonds set forth in Section 6.02(b)) attributed to such Class; provided that (i) any such sale is made for fair market value (as evidenced by one or more bids provided by brokers of national standing or such other information as to current market prices as the Credit Support Provider shall deem appropriate and delivered to the Trustee), and (ii) the proceeds of any such sale of Taxable HTA CVIs/Bonds from the Trust Property of a Class of Units shall be deposited into the Taxable Collection Account of such Class of Units for the benefit of the Unitholders of such Class.  The Trustee shall have no obligation to determine whether the requirements of the foregoing clause (i) are satisfied and shall be entitled to rely on the information provided by the Credit Support Provider.  In the case of any sale of Taxable HTA CVIs/Bonds, the Credit Support Provider shall direct the Trustee to, and the Trustee shall, in consultation with the Credit Support Provider, sell all or a portion of the applicable Taxable HTA CVIs/Bonds, to the extent possible, at a fair price in the context of the market at such time.  Each Unitholder (which term shall for purposes hereof include any holder of a beneficial interest in a Global Security), by electing to receive Units hereunder and any assignee thereof, shall be deemed to have consented to the sale of the applicable Taxable HTA CVIs/Bonds as directed by the Credit Support Provider from time to time as provided in this Section 6.02(a).  Notwithstanding the foregoing, there shall be no sales of Taxable HTA CVIs/Bonds on or before the Outside Non-Taxable HTA CVI Determination Date.

(b) Non-Taxable HTA CVIs/Bonds.  The Trustee shall not sell any Non-Taxable HTA CVIs/Bonds except upon a Non-Taxable HTA CVI/Bond Sale Event.  Upon the occurrence of a Non-Taxable HTA CVI/Bond Sale Event with respect to one or more series of Non-Taxable HTA CVIs/Bonds, the Trustee shall sell such portion of the Non-Taxable HTA CVIs/Bonds to the extent subject to such Non-Taxable HTA CVI/Bond Sale Event; provided that, (i) any such sale is made for fair market value (as evidenced by one or more bids provided by brokers of national standing or such other information as to current market prices), (ii) the proceeds of any such sale of Non-Taxable HTA CVIs/Bonds from the Trust Property of a Class of Units shall be deposited into the Non-Taxable Collection Account of such Class of Units for the benefit of the Unitholders of such Class, and (iii) solely if the Calculation Agent selects clause (i) of the definition of Non-Taxable HTA CVI/Bond Threshold Amount, after the sale of the Non-Taxable HTA CVIs/Bonds, the notional amount of such HTA Clawback CVIs and New HTA Bonds and the amount of the proceeds from such sale shall be deducted from the Initial Adjusted Non-Taxable HTA CVI/Bond Notional, and the Initial Adjusted Notional Threshold Amount shall be ratably reduced.  The Trustee shall have no obligation to determine whether the requirements of the foregoing clause (i) are satisfied and shall be entitled to rely on the information provided by the Calculation Agent. In the case of any permitted sale of Non-Taxable HTA CVIs/Bonds hereunder, the Trustee shall, in consultation with the Credit Support Provider, sell all or a portion such Non-Taxable HTA CVIs/Bonds, to the extent possible, at a fair price in the context of the market at such time; provided, however, the Trustee shall rely on the information provided by the Calculation Agent and shall be under no obligation to determine the price.

(c) To effectuate the sales set forth in Sections 6.02(a) or 6.02(b) above, the Credit Support Provider must instruct the Trustee, by delivering a direction and notice in the form of Exhibit E-1

or Exhibit E-2 hereto, as applicable, to dispose of some or all of the applicable Non-Taxable HTA CVIs/Bonds.

(d)  The Calculation Agent shall monitor on at least a monthly basis (or more frequently as the Calculation Agent may determine) the fair market value of the Non-Taxable HTA CVIs/Bonds to determine whether the fair market value of any series of Non-Taxable HTA CVIs/Bonds exceeds the applicable Non-Taxable HTA CVI/Bond Threshold Amount for such Non-Taxable HTA CVIs/Bonds.  The Calculation Agent shall promptly notify the Trustee and the Credit Support Provider if the fair market value of any series of Non-Taxable HTA CVIs/Bonds (as evidenced by one or more bids provided by brokers of national standing or such other information as to current market prices) exceeds the applicable Non-Taxable HTA CVI/Bond Threshold Amount for such series of Non-Taxable HTA CVIs/Bonds.

(e)  Upon distribution pursuant to Section 4.01(a) of the proceeds of any sale of Non-Taxable HTA CVIs/Bonds, the applicable Aggregate Unit Balance shall be reduced, and the Sinking Fund Schedule for all applicable Classes shall be reduced by the Trustee pursuant to the provisions of Section 5.01(b).

(f)  Upon any Discretionary Distribution pursuant to Section 4.01(b) of the proceeds of any sale of Taxable HTA CVIs/Bonds, the applicable Aggregate Unit Balance shall be reduced, and the Sinking Fund Schedule for all applicable Classes shall be reduced by the Trustee pursuant to the provisions of Section 5.01(b).


SECTION 6.03.    Distribution of HTA Clawback CVIs and New HTA Bonds.

(a)  As part of the payment in full of the Aggregate Unit Balance of any Class of Units, the Credit Support Provider may direct the Trustee to distribute all of the remaining underlying HTA Clawback CVIs and New HTA Bonds that are Trust Property attributable to such Class to the applicable Unitholders, upon written notice from the Credit Support Provider to the Trustee and the applicable Unitholders indicating that all HTA Clawback CVIs and New HTA Bonds shall be distributed via mandatory exchange in exchange for all remaining Units, and the Trustee shall distribute such amount and type of HTA Clawback CVIs and New HTA Bonds indicated in such notice to the applicable Unitholders of such Class on a pro rata basis or as close to a pro rata basis as practicable (based on the aggregate sum of the Notional Amounts of all Units of each Class held by such Unitholder) to the applicable Unitholders, and in the case of Global Securities, subject to and in accordance with the applicable procedures of the Depositary.  At any time, solely to the extent permitted by the Depositary, the Credit Support Provider may direct the Trustee to distribute a portion of the underlying HTA Clawback CVIs and New HTA Bonds that are Trust Property of a Class of Units to the applicable Unitholders of such Class of Units, upon written notice from the Credit Support Provider to the Trustee and the applicable Unitholders of such Class of Units indicating the HTA Clawback CVIs and New HTA Bonds to be distributed, and the Trustee shall distribute such amount and type of HTA Clawback CVIs and New HTA Bonds indicated in such notice on a pro rata basis within such Class or as close to a pro rata basis as practicable (based on the aggregate sum of the Notional Amounts of all applicable Units held by such Unitholder) to the applicable Unitholders of such Class of Units, by way of redemption or otherwise, and in the case

-64-

of Global Securities, subject to and in accordance with the applicable procedures of the Depositary. Upon any such distribution described in the preceding sentence, any Units so redeemed or exchanged shall be cancelled by the Trustee, the applicable Aggregate Unit Balance for the Class or Classes receiving such distribution shall be reduced by the Deemed HTA Clawback CVI Valuation Amount or the Deemed New HTA Bond Valuation Amount, and the Sinking Fund Schedule for the Class or Classes, if applicable, receiving such distribution shall be revised by the Trustee accordingly in the amount specified in Section 5.01(b) and Section 6.04(c) and there shall be a deemed corresponding reduction to the Credit Support.

(b)  The Credit Support Provider may, at its sole discretion, at any time and from time to time, agree with any Unitholder (which term for purposes of this clause (b) shall include any holder of a beneficial interest in a Global Security) to exchange such Unitholder's Units for a proportional percentage of any portion of the underlying applicable Trust Property (including HTA Clawback CVIs, New HTA Bonds, Ambac Prepetition Insured Bonds, Credit Support, cash and/or proceeds of Permitted Investments then held by the Trust) and upon (i) delivery of such Units through DTC via DWAC, and (ii) written notice from the Credit Support Provider to the Trustee indicating the amount of such HTA Clawback CVIs (if any), New HTA Bonds (if any), Ambac Prepetition Insured Bonds (if any), Credit Support (if any), cash (if any) and proceeds of Permitted Investments (if any) to be released, the Trustee shall release such amount of, if applicable, HTA Clawback CVIs, New HTA Bonds Ambac Prepetition Insured Bonds, Credit Support, cash and/or proceeds of Permitted Investments to such Unitholder.  In such event, such Unitholder shall execute a release, in form and substance satisfactory to the Credit Support Provider, releasing all rights and obligations owing to such Unitholder against the Trust and under the Credit Support (if applicable).  The exchange with such Unitholder shall not give rise to any right of any other Unitholder to request such an exchange or to receive any other consideration with respect to its Units.  Upon any such exchange the applicable Aggregate Unit Balance for such Class or Classes shall be reduced and the Sinking Fund Schedule, if applicable, for the Class or Classes subject to such exchange shall be revised by the Trustee in an amount specified by the Credit Support Provider, and the Trustee shall cancel all such exchanged Units (which cancellation, in the case of any Units represented by a Global Security, shall be effectuated by the Trustee by reducing the aggregate balance of Units comprising such Global Security).

(c) The Credit Support Provider may, at its sole discretion, at any time and from time to time, offer to purchase all or a portion of any Class of Units by providing the Trustee with a notice (the "Purchase Offer Notice").  The Purchase Offer Notice shall specify (i) the purchase price for such Units, (ii) the Class and number of available Units the Credit Support Provider is offering to purchase, (iii) the contact information and terms for acceptance of such purchase offer and (iv) the length of time such offer shall remain outstanding.  The Trustee shall promptly provide the Purchase Offer Notice to the applicable Unitholders, in the case of Global Securities, by transmitting such notice to the Depositary in accordance with its procedures and in the case of Certificates, if applicable, by transmitting such notice by facsimile to such number or by electronic mail at such address as may be provided to the Trustee.  In the event any Unitholder (which term for purposes of this clause (c) shall include any holder of a beneficial interest in a Global Security) agrees to such terms, such Unitholder shall execute a release, in form and substance satisfactory to the Credit Support Provider, releasing all rights and obligations owing to such Unitholder against the Trust and under the Credit Support, and thereafter the Credit Support Provider shall have all rights associated with ownership of such Units equivalent to any other Unitholder

(including for the avoidance of doubt, the right set forth in Section 6.03(b) above). In the event that Unitholders having a greater number of Units than are available for purchase accept the purchase offer, the Credit Support Provider shall purchase Units in the order the countersigned Purchase Offer Notices were received. For the avoidance of doubt, nothing in this Section 6.03(c) shall obligate the Trustee to act as tender agent in connection with any Purchase Offer Notice. To the extent that (i) the Credit Support Provider determines to appoint a tender agent in connection with any Purchase Offer Notice and (ii) the Trustee determines to accept such appointment, the Trustee shall perform the duties imposed upon the tender agent by such supplemental agreement to be agreed upon by the Credit Support Provider and the Trustee in accordance therewith and in exchange for such supplemental fee (if any) as agreed by such parties with respect thereto.

(d) In the event the Credit Support Provider makes an election under Sections 6.03(a), (b) or (c) above or Section 8.02(b) and the Depositary requests indemnification from the Trustee in order to effectuate the transaction, the Credit Support Provider shall provide matching indemnification to the Trustee, in writing, in order to effectuate the transaction.

SECTION 6.04.   Electing Ambac Prepetition Insured Bonds.

(a) Notwithstanding the deposit of the Electing Ambac Prepetition Insured Bonds in the Trust, the Electing Ambac Prepetition Insured Bonds shall not be cancelled (other than for tax purposes with respect to the Electing Ambac Prepetition Insured Bonds) and all rights and remedies under and in accordance with the Ambac Prepetition Insured Bonds, the Bond Resolution (other than with respect to the payment and other obligations of HTA (including any lien granted as security under such Bond Resolution)) and the applicable Credit Support shall be preserved and remain in full force and effect with respect to the Electing Ambac Prepetition Insured Bonds, including, without limitation, the option of the Credit Support Provider in its sole discretion to satisfy its obligations thereunder, in whole or in part, by providing for payment of all or part of the accelerated principal of the Electing Ambac Prepetition Insured Bonds, together with accrued interest. The Credit Support Provider shall be deemed the sole holder of the Electing Ambac Prepetition Insured Bonds deposited in the Trust, including, without limitation, with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies subject to the provisions of Section 4.01(h).

(b) For the avoidance of doubt, the Ambac Prepetition Insured Bonds not beneficially owned by an Electing Holder shall be cancelled on the Closing Date and shall be deemed no longer outstanding for all purposes of the Bond Resolution.

(c) Each reference in this Trust Agreement to the Sinking Fund Schedule for a Class of Units being reduced shall be deemed to include a corresponding reduction to the Sinking Fund Schedule for the related Electing Ambac Prepetition Insured Bonds and a corresponding reduction (without duplication) in the Credit Support as a result thereof. Each reference in this Trust Agreement to an Interest Distribution when paid on an Interest Payment Date shall be deemed a corresponding reduction for the related Electing Ambac Prepetition Insured Bonds and a corresponding reduction (without duplication) in the Credit Support as a result thereof.

ARTICLE VII

Default on HTA Clawback CVIs and New HTA Bonds and Permitted Investments

SECTION 7.01.   Realization Upon Default.

(a) The Trustee shall assert claims under the HTA Clawback CVIs, the New HTA Bonds, the Permitted Investments, the applicable Credit Support and the other applicable Trust Property, and shall take such reasonable steps as are necessary to receive payment or to permit recovery thereunder with respect to any default, only at the direction of the Credit Support Provider with respect to the HTA Clawback CVIs, the New HTA Bonds and the Permitted Investments in accordance with the applicable document pursuant to which the Permitted Investment was issued or by which it is governed and Article VI hereof.

(b) If there is a breach, a default or an event of default (as defined in the CVI Trust Agreement) with respect to any HTA Clawback CVI or New HTA Bond, or a breach, a default or an event of default (as defined in the applicable document pursuant to which the Permitted Investment was issued or by which it is governed) with respect to any Permitted Investment, and such breach, default or event of default is known to the Trustee, the Trustee shall give notice thereof to the Unitholders and the Credit Support Provider as promptly as practicable and, in any event, within two (2) Business Days after such event of default becomes known to the Trustee. However, if the Trustee receives notice of an anticipated payment default with respect to any HTA Clawback CVI or New HTA Bond, the Trustee shall promptly give notice thereof to the Unitholders and the Credit Support Provider within two (2) Business Days after receipt of such notice.

ARTICLE VIII

Trust Wind-Up Events; Termination

SECTION 8.01.   Trust Wind-Up Events.

The Trust shall dissolve and wind-up upon the earlier of (a) the Class N-2045 Scheduled Final Redemption Date or (b) payment in full of the Aggregate Unit Balance for each Class of Units (a "Trust Termination Event"). Upon the completion of the dissolution and winding-up of the Trust in accordance with this Article VIII and Section 3808 of the Delaware Statutory Trust Act, a certificate of cancellation of the Certificate of Trust shall be filed with the Secretary of State. Upon the effectiveness of such filing, this Trust and this Trust Agreement, and the obligations and responsibilities of the Trustee hereunder, shall terminate.

SECTION 8.02.   Trust Property Made Available.

(a) Except with respect to a Trust Termination Event occurring on the Class N-2045 Scheduled Final Redemption Date, the Trustee shall provide notice to the Unitholders and the Credit Support Provider of the intent to effect a Trust Termination Event and that Unitholders should surrender their Units to the Trustee, for the greater of (x) their respective portion of the Aggregate Unit Balance of such Class or (y) their respective portion of any amount remaining in

-67-

the Trust after making reimbursement payments required to be made to the Credit Support Provider for the amounts described in Section 8.02(b). Such notice to the Unitholders shall also specify (i) the location and hours of the Corporate Trust Office at which Units should be presented and surrendered, and (ii) that each Unitholder must supply wire instructions in writing with respect to any cash distribution.

(b) Upon the occurrence of payment in full of the Aggregate Unit Balance on any Class of Units on account of the Credit Support Provider making a payment with respect to the Credit Support (whether upon a Trust Termination Event or earlier), the Credit Support Provider shall be entitled to receive reimbursement of any amounts paid by the Credit Support Provider pursuant to the Credit Support to the extent not previously reimbursed, in accordance with the manner set forth in Section 4.01. Upon written direction to the Trustee from the Credit Support Provider, the amount required to be reimbursed to the Credit Support Provider shall be paid from the proceeds of a sale of the remaining Trust Property of a Class of Units (including upon the occurrence of a Trust Termination Event amounts remaining in the Fee Reserve) or, at the election of the Credit Support Provider, may be made in the form of HTA Clawback CVIs or New HTA Bonds that are Trust Property of a Class of Units having a fair market value (as evidenced by one or more bids provided by brokers of national standing or such other information as to current market prices) equal to the amount required to be paid to the Credit Support Provider pursuant to this Section 8.02(b). Any excess proceeds in the Trust Property of a Class of Units with respect to the HTA Clawback CVIs and New HTA Bonds remaining after the reimbursement to the Credit Support Provider pursuant to this Section 8.02(b) shall be distributed pro rata within such Class or on an as close to a pro rata basis as practicable (based on the aggregate sum of the Notional Amounts of all applicable Units held by such Unitholder) to applicable Unitholders of such Class of Units as of the date of the Trust Termination Event, and in the case of Global Securities, subject to and in accordance with the applicable procedures of the Depositary.

(c) On the date on which all Classes of Units and the Credit Support Provider have received the amounts due them pursuant to Section 8.02(b), the Electing Ambac Prepetition Insured Bonds and the Credit Support shall be released and cancelled, and the Credit Support Provider's obligations thereunder shall be deemed satisfied in full.

ARTICLE IX

Concerning the Trustee

SECTION 9.01.   Duties of Trustee.

(a) The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Trust Agreement. Any permissive right of the Trustee enumerated in this Trust Agreement shall not be construed as a duty.

(b) The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee which are specifically required to be furnished pursuant to any provision of this Trust Agreement, shall examine them to determine whether they conform to the requirements of this Trust Agreement. If any such instrument is found not to conform to the requirements of this Trust Agreement, the Trustee shall

take action as it deems appropriate to have the instrument corrected, and if the instrument is not corrected to the Trustee's satisfaction, the Trustee will provide notice thereof to the Unitholders and the Credit Support Provider.

(c) No provision of this Trust Agreement shall be construed to relieve the Trustee from liability for its own gross negligent action or its own gross negligent failure to act or its own misconduct; provided, however, that:

(i) the duties and obligations of the Trustee shall be determined solely by the express terms of this Trust Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Trust Agreement, no implied covenants or obligations shall be read into this Trust Agreement against the Trustee and, in the absence of gross negligence or willful misconduct on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee that conform to the requirements of this Trust Agreement;

(ii) the Trustee shall not be personally liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts; and

(iii) the Trustee shall not be required to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers under this Trust Agreement.

SECTION 9.02.   <u>Certain Matters Affecting the Trustee</u>.

(a) Except as otherwise provided in Section 9.01:

(i) the Trustee may request and rely upon and shall be protected in acting or refraining from acting upon any resolution, Officers' Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document reasonably believed by it to be genuine and to have been signed by the proper party or parties;

(ii) the Trustee may consult with counsel and any advice or Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it under this Trust Agreement in good faith and in accordance with such advice or Opinion of Counsel;

(iii) except for the duties and obligations of the Trustee expressly created by this Trust Agreement (which for avoidance of doubt shall include matters for which the Credit Support Provider is entitled to direct the Trustee hereunder and for which this Section 9.02(a)(iii) shall not apply) and under the Delaware Statutory Trust Act, the Trustee shall be under no obligation to exercise any of the discretionary trusts or powers vested in it by this Trust Agreement or to institute, conduct or defend any litigation thereunder or in relation thereto, at the request, order or direction of any of the Unitholders or the Credit Support Provider, pursuant to the terms of this Trust Agreement;

-69-

(iv) the Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized, or within the discretion, rights or powers conferred upon it by this Trust Agreement;

(v)  the Trustee shall not be bound to make any investigation into the facts of matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, approval, bond or other paper or document believed by it to be genuine;

(vi) the Trustee may execute any of the trusts or powers or perform any duties under this Trust Agreement either directly or by or through agents or attorneys or a custodian or administrative agent;

(vii)    the Trustee shall not be personally liable for any loss resulting from the investment of funds held in any Collection Account pursuant to Section 3.03 and in investments directed pursuant to Section 3.04;

(viii)    the Trustee shall not be deemed to have notice or knowledge of any matter unless a Responsible Officer assigned to and working in the Corporate Trust Office has actual knowledge thereof or unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the Units generally or this Trust Agreement;

(ix)    the Trustee shall have the power to reimburse itself for any unpaid Extraordinary Trust Expense actually incurred in accordance with the terms and conditions of this Trust Agreement prior to the distribution of funds or Trust Property to applicable Unitholders, and shall have a charging lien upon the Taxable Collection Account and Non-Taxable Collection Account to secure payment of its fees and expenses, including the reasonable fees and expenses of its counsel; provided, however, that in the event that it has been finally adjudicated by a court of competent jurisdiction, evidenced by a final non-appealable order that the Trustee engaged in gross negligence, material breach or willful misconduct, the Trustee shall not be entitled to reimbursement of any fees and expenses incurred in defending against such suits brought by the Credit Support Provider or the Unitholders; and

(x) the Trustee shall establish a Fee Reserve, which Fee Reserve shall be replenished up to the Fee Reserve Threshold Amount pro rata from the amounts in the Collection Account on each Distribution Date, and the Trustee shall be permitted to apply the amounts therein to pay fees and expenses of the Trust, including, without limitation the Trustee Fees, the Delaware Trustee Fees, Extraordinary Trust Expenses, and fees and expenses of the Accountant, and any other fees and expenses of the Trust in connection with tax obligations, as and when due.

(b) All rights of action under this Trust Agreement or under any of the Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Units, or the production thereof at the trial or other Proceeding relating thereto, and any such suit, action or proceeding

instituted by the Trustee shall be brought in its name for the benefit of all the Unitholders, subject to the terms of this Trust Agreement.

SECTION 9.03.   Limitation on Liability of Trustee.

The Trustee assumes no responsibility for the correctness of the recitals contained in this Trust Agreement, the Units, or in any document issued in connection with the sale of the Units (other than the signature and authentication on the Units if done by Trustee).  Except as set forth in Section 9.11, the Trustee makes no representations or warranties as to the validity or sufficiency of this Trust Agreement, the Units (other than the signature and authentication on the Units if done by Trustee), any security or of any related document.  The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in this Trust Agreement.

SECTION 9.04.   Trustee Fees and Expenses; Limited Indemnification.

(a) As compensation for its services and in payment of its expenses under this Trust Agreement (including the reasonable compensation, expenses and disbursements of its counsel for services hereunder) the Trustee shall be entitled to the Trustee Fees and the Delaware Trustee shall be entitled to the Delaware Trustee Fee (which shall not be limited by any provision of law in regard to compensation or payment of a trustee of an express trust).  For avoidance of doubt, the Depositor shall not be responsible for the Trustee Fees or the Delaware Trustee Fee.

(b) The Trustee, the Delaware Trustee, the Calculation Agent and any director, officer, employee or agent of the Trustee, the Delaware Trustee, or the Calculation Agent shall be indemnified and held harmless by the Trust against any loss, liability or expense incurred in connection with any Proceeding relating to this Trust Agreement or the Units or the performance of any of the Trustee's duties, Delaware Trustee's duties, or the Calculation Agent's duties (as applicable) under this Trust Agreement, other than, (w) with respect to the Trustee, any loss, liability or expense (i) that constitutes a specific liability of the Trustee under this Trust Agreement or (ii) incurred by reason of willful misfeasance or gross negligence in the performance of the Trustee's duties hereunder, (x) with respect to the Delaware Trustee, any loss, liability or expense (i) that constitutes a specific liability of the Delaware Trustee under this Trust Agreement or (ii) incurred by reason of willful misfeasance or gross negligence in the performance of the Delaware Trustee's duties hereunder (such loss, liability or expense, other than as described in clauses (w)(i) and (ii) and (x)(i) and (ii) of this sentence, "Extraordinary Trust Expense"), and (y) with respect to the Calculation Agent, any loss, liability or expense incurred by reason of willful misfeasance or gross negligence in the performance of the Calculation Agent's duties hereunder.

SECTION 9.05.   Eligibility Requirements for Trustee; Delaware Trustee.

(a) The Trustee hereunder shall at all times be a bank or other financial institution organized and doing business under the laws of any State or the United States, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $200,000,000 and subject to supervision or examination by Federal or State authority, and the long-term debt

-71-

obligations of which are rated in one of the four highest categories assigned long-term debt obligations by each of S&P and Moody's or, notwithstanding such capital and surplus and rating requirements, is otherwise acceptable to the Credit Support Provider in its sole discretion. If such bank or trust company publishes reports of conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such bank or trust company shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published. In the event that at any time the Trustee shall cease to be eligible in accordance with the terms of this Section, the Trustee shall resign immediately in the manner and with the effect specified in Section 9.06.

(b) Any successor Delaware Trustee, however appointed, shall be a bank or trust company satisfying the requirements of Section 3807(a) of the Delaware Statutory Trust Act. Any bank or trust company into which the Delaware Trustee may be merged or converted or with which it may be consolidated, or any bank or trust company resulting from any merger, conversion or consolidation to which such Delaware Trustee shall be a party, or any bank or trust company to which substantially all the corporate trust business of the Delaware Trustee may be transferred, shall, subject to the preceding sentence, be the Delaware Trustee under this Trust Agreement without further act.

SECTION 9.06.   Resignation or Removal of the Trustee, Delaware Trustee.

(a) The Trustee or the Delaware Trustee may at any time resign and be discharged from the Trust by giving written notice thereof to the Credit Support Provider, the Depositor and to all Unitholders. The Trustee or the Delaware Trustee may be removed and be discharged from the Trust upon the Credit Support Provider's written notice of removal to the Trustee, Delaware Trustee, Depositor and all Unitholders, or upon approval of the Directing Unitholders and written notice of removal to the Credit Support Provider to effectuate such removal on behalf of the Unitholders. Upon receiving such notice of resignation or removal, the Credit Support Provider shall as promptly as practicable (and in any event within 30 days after the date of such notice of resignation or removal) appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the resigning or removed Trustee and to the successor trustee. A copy of such instrument shall be delivered to the Depositor and the Unitholders by the Credit Support Provider. If no such successor trustee shall have been so appointed and have accepted appointment within 30 days after the giving of such notice of resignation or removal, the resigning or removed Trustee or Delaware Trustee (as applicable) may petition any court of competent jurisdiction for the appointment of a successor trustee for the Units. If at any time the Trustee shall cease to be eligible in accordance with the terms of Section 9.05 and shall fail to resign after written request therefor by the Credit Support Provider, or if at any time the Trustee shall become incapable of acting, shall have breached its obligations hereunder, or shall be adjudged bankrupt or insolvent, or a receiver or a conservator of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, or for any other reason as determined in the sole discretion of the Credit Support Provider, then the Credit Support Provider may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall

be delivered to the Trustee so removed and to the successor trustee. A copy of such instrument shall be delivered to the Depositor and the Unitholders by the Credit Support Provider.

(b) Any resignation or removal of the Trustee and appointment of a successor trustee pursuant to any of the terms of this Section shall not become effective until acceptance of appointment by the successor trustee as provided in Section 9.07.

SECTION 9.07.   Successor Trustee.

(a) Any successor trustee appointed as provided in Section 9.06 shall execute, acknowledge and deliver to its predecessor trustee and the Credit Support Provider, with a copy to the Depositor, an instrument accepting such appointment under this Trust Agreement, and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor under this Trust Agreement, with the like effect as if originally named as trustee in this Trust Agreement. The predecessor trustee shall deliver to the successor trustee the Trust Property and all documents and statements held by it under this Trust Agreement, and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations. No successor trustee shall accept appointment as provided in this Section unless, at the time of such acceptance, such successor trustee shall be eligible under the terms of Section 9.05.

(b) Upon acceptance of appointment by a successor trustee as provided in this Section, the Trustee shall transmit notice of the succession of such trustee under this Trust Agreement to the Depositor and all Unitholders in the manner provided pursuant to Section 10.05.

SECTION 9.08.   Merger or Consolidation of Trustee.

Any bank or trust company into which the Trustee may be merged or converted or with which it may be consolidated or any bank or trust company resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any bank or trust company succeeding to the business of the Trustee, shall be the successor of the Trustee under this Trust Agreement, provided such bank or trust company shall be eligible under the terms of Section 9.05, without the execution or filing of any paper or any further act on the part of any of the parties to this Trust Agreement, anything in this Trust Agreement to the contrary notwithstanding.

SECTION 9.09.   Appointment of Co-Trustee.

(a) Notwithstanding any other terms of this Trust Agreement, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any party of the Trust Property may at the time be located, the Trustee shall have the power and shall execute and deliver all instruments to appoint one or more Persons approved by the Trustee to act as co-trustee or co-trustees, jointly with the Trustee, of all or any part of the Trust Property, and to vest in such Person or Persons, in such capacity, such title to the Trust Property, or any part thereof, and, subject to the other terms of this Section, such powers, duties, obligations, rights and trusts as the Trustee and the Credit Support Provider may consider necessary or desirable. The Trustee shall remain liable for the actions and omissions of the co-trustee unless and until such co-trustee under this Trust Agreement

-73-

shall (1) meet the terms of eligibility as a successor trustee under Section 9.05 and (2) provide notice to the Depositor, the Unitholders and the Credit Support Provider of the appointment of a co-trustee or co-trustees in the manner provided pursuant to Section 10.05.

(b) In the case of any appointment of a co-trustee pursuant to this Section, all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such co-trustee jointly, except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed by the Trustee, the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to such Trust Property or any portion thereof in any such jurisdiction) shall be exercised and performed by such co-trustee at the direction of the Trustee.

(c) Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the co-trustees, as effectively as if given to each of them.  Every instrument appointing any co-trustee shall refer to this Trust Agreement and the conditions of this Article IX. Each co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, jointly with the Trustee subject to all the terms of this Trust Agreement, specifically including every provision of this Trust Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee.  Every such instrument shall be filed with the Trustee.

(d) Any co-trustee may, at any time, constitute the Trustee, its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Trust Agreement delegated pursuant to Section 9.09(c) to such co-trustee on its behalf and in its name.  If any co-trustee shall become incapable of acting, resign or be removed by the Trustee, the Credit Support Provider or the Directing Unitholders, all its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

SECTION 9.10.   Appointment of Office or Agency.

The Units may be surrendered for registration of transfer or exchange, and presented for the final distribution with respect thereto, and notices and demands to or upon the Trustee in respect of the Units and this Trust Agreement, shall be served at the Corporate Trust Office.

SECTION 9.11.   Representations and Warranties of Trustee and Delaware Trustee.

(a) The Trustee represents and warrants that:

(i)  the Trustee is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or association;

(ii) the Trustee has full power, authority and right to execute, deliver and perform its duties and obligations under this Trust Agreement, and the Global Securities and the Certificates, and has taken all necessary action to authorize the execution, delivery and performance by it of this Trust Agreement, and the Global Securities and the Certificates;

-74-

(iii) the execution and delivery of this Trust Agreement, and the Global Securities and the Certificates by the Trustee and its performance of and compliance with the terms of this Trust Agreement, and the Global Securities and the Certificates will not violate the Trustee's articles of incorporation, association or other constitutive documents or by-laws or constitute a default under, or result in the breach or acceleration of, any material contract, agreement or other instrument to which the Trustee is a party or which may be applicable to the Trustee or any of its assets;

(iv) as of the Closing Date, each of this Trust Agreement, and the Global Securities and the Certificates, has been duly executed and delivered by the Trustee, and this Trust Agreement constitutes the legal, valid and binding obligation of the Trustee, enforceable in accordance with its terms, except as enforcement may be limited by the applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and general principles of equity;

(v) the Trustee is not in violation, and the execution and delivery of this Trust Agreement, and the Global Securities and the Certificates, by the Trustee and its performance and compliance with respective terms of this Trust Agreement, and the Global Securities and the Certificates, will not constitute a violation, of any order or decree of any court or any order or regulation of any Federal, State, municipal or governmental agency having jurisdiction over the Trustee or its properties, which violation would reasonably be expected to have a material adverse effect on the condition (financial or otherwise) or operations of the Trustee or its properties, or on the performance of its duties thereunder;

(vi) there are no actions or proceedings against, or investigations of, the Trustee pending, or, to the knowledge of the Trustee, threatened, before any court, administrative agency or other tribunal (A) that could reasonably be expected to prohibit its entering into this Trust Agreement or to render the Units invalid, (B) seeking to prevent the issuance of the Global Securities and the Certificates, or the consummation of any of the transactions contemplated by this Trust Agreement or (C) that could reasonably be expected to prohibit or materially and adversely affect the performance by the Trustee of its obligations under, or the validity or enforceability of, this Trust Agreement, or the Global Securities and the Certificates; and

(vii)   no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Trustee of, or compliance by the Trustee with, this Trust Agreement, or the Global Securities and the Certificates, or for the consummation of the transactions contemplated by this Trust Agreement, except for such consents, approvals, authorizations and orders, if any, that have been obtained prior to the Closing Date.

(b) The Delaware Trustee represents and warrants that:

(i)  the Delaware Trustee is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or association;

(ii) the Delaware Trustee has full power, authority and right to execute, deliver and perform its duties and obligations under this Trust Agreement, and has taken all necessary action to authorize the execution, delivery and performance by it of this Trust Agreement;

(iii) the execution and delivery of this Trust Agreement, by the Delaware Trustee and its performance of and compliance with the terms of this Trust Agreement, will not violate the Delaware Trustee's articles of incorporation, association or other constitutive documents or by-laws or constitute a default under, or result in the breach or acceleration of, any material contract, agreement or other instrument to which the Delaware Trustee is a party or which may be applicable to the Delaware Trustee or any of its assets;

(iv) as of the Closing Date, this Trust Agreement has been duly executed and delivered by the Delaware Trustee, and this Trust Agreement constitutes the legal, valid and binding obligation of the Delaware Trustee, enforceable in accordance with its terms, except as enforcement may be limited by the applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and general principles of equity;

(v) the Delaware Trustee is not in violation, and the execution and delivery of this Trust Agreement by the Delaware Trustee and its performance and compliance with respective terms of this Trust Agreement, and the Global Securities and the Certificates, will not constitute a violation, of any order or decree of any court or any order or regulation of any Federal, State, municipal or governmental agency having jurisdiction over the Delaware Trustee or its properties, which violation would reasonably be expected to have a material adverse effect on the condition (financial or otherwise) or operations of the Delaware Trustee or its properties, or on the performance of its duties thereunder;

(vi) there are no actions or proceedings against, or investigations of, the Delaware Trustee pending, or, to the knowledge of the Delaware Trustee, threatened, before any court, administrative agency or other tribunal (A) that could reasonably be expected to prohibit its entering into this Trust Agreement or to render the Units invalid, (B) seeking to prevent the issuance of the Global Securities and the Certificates, or the consummation of any of the transactions contemplated by this Trust Agreement or (C) that could reasonably be expected to prohibit or materially and adversely affect the performance by the Delaware Trustee of its obligations under, or the validity or enforceability of, this Trust Agreement, or the Global Securities and the Certificates; and

(vii)   no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Delaware Trustee of, or compliance by the Delaware Trustee with, this Trust Agreement, or for the consummation of the transactions contemplated by this Trust Agreement, except for such consents, approvals, authorizations and orders, if any, that have been obtained prior to the Closing Date.

(c)  Within thirty (30) days of the earlier of discovery by the Trustee or Delaware Trustee, or receipt of notice by the Trustee or Delaware Trustee from the Credit Support Provider or the Unitholders, of a breach of any representation or warranty of the Trustee  or Delaware Trustee set

forth in this Section 9.11 that materially and adversely affects the interests of the Unitholders, the Trustee or the Delaware Trustee, as the case may be, shall promptly cure such breach in all material respects or resign.

SECTION 9.12.    Limitation of Powers and Duties.

(a) The Trust is constituted solely for the purposes of acquiring and holding the Trust Property and issuing the Global Securities and the Certificates. The Trust shall not incur any debt and may not issue additional Units except in accordance with Sections 5.03 and 5.04 hereof. The Trustee is not authorized to acquire any other investments or engage in any activities not authorized in this Trust Agreement and, in particular, the Trustee is not authorized to sell, assign, transfer, exchange, pledge, set-off or otherwise dispose of any of the HTA Clawback CVIs, New HTA Bonds or interests therein, including to Unitholders (except upon termination of the Trust in accordance with Article VIII of this Trust Agreement and at the direction of the Credit Support Provider (including in accordance with Sections 6.02 and 6.03 hereof)).

(b) Without first obtaining an Opinion of Counsel to the effect that such action will not, for U.S. federal income tax purposes, cause any Sub-Trust to be taxable as other than a Grantor Trust with respect to any Units labelled "(Taxable)", or to be subject to entity level taxation with respect to any Units labelled "(Non-Taxable)", and none of the Trust, any Sub-Trust, nor anyone acting on behalf of the Trust or any Sub-Trust (including, but not limited to, the Trustee and the Credit Support Provider) shall have the power or authority to, cause the Trust to:

(i) exchange any portion of the Trust Property for other property following the date hereof, except as explicitly permitted by this Trust Agreement;

(ii) acquire any other property with, or otherwise reinvest, any distributions, income or proceeds received with respect to the Trust's investments, including any proceeds from the sale of any such investment, except as explicitly permitted by this Trust Agreement;

(iii) accept any contributions of cash or property following the date hereof, except as explicitly permitted by this Trust Agreement;

(iv) agree to receive, or negotiate for, any financing with which to acquire any investments, except as explicitly permitted by this Trust Agreement;

(v) exercise any rights or otherwise take any action that could vary the Trust's investments including the Trust Property; or

(vi) otherwise acquire or agree to acquire, by contribution, purchase, exchange, borrowing, or otherwise, any cash or property following the date hereof.

For the avoidance of doubt, when acting pursuant to written direction provided under the provisions of this Trust Agreement, the Trustee shall be under no obligation to determine whether the action prescribed by such written direction satisfies the requirements of this Section 9.12(b) and shall rely solely on the information provided in the written direction with respect to such action.

(c) Notwithstanding anything to the contrary in Section 9.12(b), the Trust may exchange a certificate representing a Taxable Clawback CVI for a certificate representing a Non-Taxable Clawback CVI in connection with a re-characterization of Taxable Clawback CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service, together with an Opinion of Counsel, provided that there are no other changes to the terms of such previously Taxable Clawback CVI.  In the event of such an exchange, the Trust and each Unitholder, by electing to receive Units (which constitute beneficial interests) in the Trust, and any assignee thereof, agree to treat such exchange as a nonrealization event for U.S. federal, state and local income tax purposes.

(d) [Reserved].

(e) Consistent with the terms of this Trust Agreement, the Trustee or the Credit Support Provider may amend, waive, consent to the departure from or modify any term of any Trust Property (a "Modification"), provided either (i) such Modification will not result in a "significant modification" (within the meaning of Treasury Regulation §1.1001-3) or otherwise results in the receipt of property or a change in legal rights that differs materially either in kind or in extent from such Trust Property for U.S. federal income tax purposes or (ii) the Trust obtains an Opinion of Counsel to the effect that such action will not, for U.S. federal income tax purposes, cause any Sub-Trust holding such Trust Property to be subject to entity level taxation. Without limiting the generality of the foregoing, Trustee shall continue, and is hereby authorized and empowered, to execute and deliver on behalf of itself, the Trust and any Sub-Trust, all instruments of satisfaction or cancellation, or of partial or full release, discharge and all other comparable instruments, with respect to the Trust Property.  The Trust shall, as necessary, promptly furnish Trustee with such powers of attorney as are necessary and appropriate and with such other documents as are necessary or appropriate to enable Trustee to carry out its duties under this Trust Agreement.

(f) Sections 9.12(b) and (c) are intended to ensure that none of the Trust, any Sub-Trust nor anyone acting on behalf of the Trust or any Sub-Trust (including, but not limited to, the Trustee and the Credit Support Provider) has the power to vary any Sub-Trust's investments and Trust Property within the meaning of Treasury Regulations § 301.7701-4(c) unless such action would not cause the Sub-Trust to be subject to entity level taxation and shall be interpreted and applied consistently with such intent.

SECTION 9.13.   Power and Authority of the Delaware Trustee.

The Delaware Trustee shall have the power and authority, and is hereby authorized and empowered, to (a) accept legal process served on the Trust in the State of Delaware and (b) execute any certificates that are required to be executed under the Delaware Statutory Trust Act and file such certificates in the office of the Secretary of State, and take such action or refrain from taking such action under this Trust Agreement as may be directed in a writing delivered to the Delaware Trustee by the Credit Support Provider; provided, however, that the Delaware Trustee shall not be required to take or to refrain from taking any such action if the Delaware Trustee shall reasonably believe, or shall have been advised by competent counsel, that such performance is likely to involve the Delaware Trustee in personal liability or to result in personal liability to the Delaware Trustee, or is contrary to the terms of this Trust Agreement or of any document contemplated hereby to which the Trust or the Delaware Trustee is or becomes a party or is otherwise contrary to law.  The Credit Support Provider agrees not to instruct the Delaware Trustee to take any action

-78-

or to refrain from taking any action that is contrary to the terms of this Trust Agreement or of any document contemplated hereby to which the Trust or the Delaware Trustee is or becomes party or that is otherwise contrary to law. Other than as expressly provided for in this Trust Agreement, the Delaware Trustee shall have no duty to take any action for or on behalf of the Trust.

SECTION 9.14.   Delaware Trustee May Request Direction.

If at any time the Delaware Trustee determines that it requires or desires guidance regarding the application of any provision of this Trust Agreement or any other document, or regarding action that must or may be taken in connection herewith or therewith, or regarding compliance with any direction it received under this Trust Agreement, then the Delaware Trustee may deliver a notice to a court of applicable jurisdiction requesting written instructions as to the desired course of action, and such instructions from the court shall constitute full and complete authorization and protection for actions taken and other performance by the Delaware Trustee in reliance thereon. Until the Delaware Trustee has received such instructions after delivering such notice, it shall be fully protected in refraining from taking any action with respect to the matters described in such notice.

SECTION 9.15.   Delaware Trustee's Capacity.

In accepting the trust hereby created, Wilmington Trust, N.A. acts solely as Delaware Trustee under this Trust Agreement and not in its individual capacity, serves the Trust solely to fulfill the Trust's obligation pursuant to Section 3807(a) of the Delaware Statutory Trust Act to have at least one trustee who has its principal place of business in the State of Delaware, and all Persons having any claim against the Delaware Trustee by reason of the transactions contemplated by this Trust Agreement or any other document shall look only to the Trust Property for payment or satisfaction thereof. Notwithstanding any provision of this Trust Agreement or any other document to the contrary, under no circumstances shall Wilmington Trust, N.A., in its individual capacity or in its capacity as Delaware Trustee, (a) have any duty to choose or supervise, nor shall it have any liability for the actions or inactions of, the Trustee or any officer, manager, employee, or other Person (other than Wilmington Trust, N.A. and its own employees), or (b) be liable or responsible for, or obligated to perform, any contract, representation, warranty, obligation or liability of the Trust, the Trustee, or any officer, manager, employee, or other Person (other than Wilmington Trust, N.A. and its own employees); provided, however, that this limitation shall not protect Wilmington Trust, N.A. against any liability to the Credit Support Provider or the Unitholders to which it would otherwise be subject by reason of its bad faith, willful misconduct, fraud, gross negligence in the performance of its duties under this Trust Agreement.

SECTION 9.16.   Duties.

Neither of the Delaware Trustee, or any successor Delaware Trustee shall have any duty or obligation under or in connection with this Trust Agreement, the Trust, or any transaction or document contemplated by this Trust Agreement, except as expressly provided by the terms of this Trust Agreement and, except as set forth in the Delaware Statutory Trust Act, no implied duties or obligations shall be read into this Trust Agreement against the Delaware Trustee, Wilmington Trust, N.A. or any successor Delaware Trustee. The right of the Delaware Trustee to perform any discretionary act enumerated in this Trust Agreement shall not be construed as a duty. To the

-79-

fullest extent permitted by applicable law including, without limitation Section 3806 of the Delaware Statutory Trust Act, the Delaware Trustee's, Wilmington Trust, N.A.'s or any successor Delaware Trustee's duties (including fiduciary duties) and liabilities relating thereto to the Trust and the Unitholders shall be restricted to those duties (including fiduciary duties) expressly set forth in this Trust Agreement and liabilities relating thereto, or enumerated in the Delaware Statutory Trust Act.

SECTION 9.17.   Trustee.

There shall be, at all times, a trustee, which trustee initially shall be the Trustee (and may include any co-trustee appointed pursuant to Section 9.09), to serve with the Delaware Trustee for the purpose of performing all obligations and duties other than fulfilling the Trust's obligations pursuant to Section 3807(a) of the Delaware Statutory Trust Act including, but not limited to, executing any documentation that may require the signature of more than one trustee of the Trust. The Trust hereby grants the Trustee the power to act and sign documents on behalf of the Trust pursuant to the terms of the Trust Agreement.

ARTICLE X

Miscellaneous Terms

SECTION 10.01.   Amendment of Trust Agreement.

(a) This Trust Agreement may be amended from time to time by the Credit Support Provider and the Trustee without the consent of any of the Unitholders or any other Person, for any of the following purposes:  (i) to cure any ambiguity or to correct, clarify or supplement any provision in this Trust Agreement which may be defective or inconsistent with any other provision in this Trust Agreement; (ii) to evidence and provide for the acceptance of appointment under this Trust Agreement by a successor Trustee; (iii) to add or change any of the terms of this Trust Agreement as shall be necessary to provide for or facilitate the administration of the Trust; or (iv) upon delivery of an Officers' Certificate of the Credit Support Provider or an Opinion of Counsel, to the effect that such amendment will not adversely affect the interests of any Unitholder. Any amendment pursuant to clause (iii) above in connection with implementation of Section 3.01(d), (e) and (f) that includes creation of a new trust rather than a Sub-Trust requires delivery of an Opinion of Counsel that any resulting new trust should be classified as a Grantor Trust or should not be subject to entity level taxation.  In addition, any Unitholder may, with the consent of the Credit Support Provider and notice to the Trustee, subdivide any Class of Units into sub-classes without the consent of any other Unitholder, with such information to be provided from each Unitholder electing to receive such sub-class to the Trustee as it may require to facilitate such subdivision. For avoidance of doubt, nothing in this Section 10.01(a) shall obligate the Trustee to act as Trustee with respect to any Class of Units that have been sub-divided hereunder, unless and until the Trustee agrees, and the Credit Support Provider and the Trustee agree to a supplemental fee (if any) with respect thereto.   Notwithstanding anything herein to the contrary, no amendment shall be made to this Trust Agreement that would cause any Sub-Trust to be classified as other than a Grantor Trust for U.S. federal income tax purposes unless such amendment would not cause the Sub-Trust to be subject to entity level taxation.

-80-

(b) Promptly after the execution of any such amendment or modification, the Trustee shall furnish a copy of such amendment or modification to each Unitholder and the Depositor.

(c) This Trust Agreement may also be amended from time to time by the Credit Support Provider and the Trustee (in the case of the Trustee, acting with the consent of the Directing Unitholders) for any purpose not set forth in Section 10.01(a); provided, however, that no amendment shall, without the written consent of the Depositor, amend provisions of this Trust Agreement relating to the rights and obligations of the Depositor, and the obligations of the CVI Issuer; provided however, that no amendment shall, without the written consent of the Credit Support Provider, amend provisions of this Trust Agreement relating to the rights and obligations of the Credit Support Provider (including upon an occurrence and continuation of the Credit Support Provider's failure to pay under Section 4.01(h) hereof); provided further, that no amendment shall, without the written consent of the Calculation Agent, amend provisions of this Trust Agreement relating to the obligations of the Calculation Agent; provided further, that no amendment shall be made pursuant to this Section 10.01(c) unless the Trust receives an Opinion of Counsel that such amendment should not cause any Sub-Trust to be subject to entity level taxation.

SECTION 10.02.  Counterparts.

This Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

SECTION 10.03.  Limitation on Rights of Unitholders.

(a) The death or incapacity of any Unitholder shall not operate to dissolve or terminate this Trust Agreement or affect the Trust Property, nor entitle such Unitholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust Property, nor otherwise affect the rights, obligations and liabilities of the parties thereto or any of them.

(b) No Unitholder shall have any right to control the operation and management of the Trust or any Trust Property, or the obligations of the parties thereto, nor shall anything in this Trust Agreement set forth, or contained in the terms of the Units, be construed so as to constitute the Unitholders from time to time as anything other than beneficial owners in the Trust; nor shall any Unitholder be under any liability to any third person by reason of any action taken by the parties to this Trust Agreement pursuant to any provision thereof.

(c) No Unitholder shall have any right by virtue of any provision of this Trust Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Trust Agreement.

SECTION 10.04.  Governing Law.

This Trust Agreement and each Unit issued thereunder shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely therein without reference to such State's principles of conflicts of law to the

extent that the application of the laws of another jurisdiction would be required thereby, and the obligations, rights and remedies of the parties thereunder shall be determined in accordance with such laws. Notwithstanding the foregoing, there shall not be applicable to the Trust, the parties hereunder, or this Trust Agreement any provision of the laws (common or statutory) of the State of Delaware pertaining to trusts (other than the Delaware Statutory Trust Act) that relate to or regulate, in a manner inconsistent with the terms hereof, (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding or investing trust assets, or (g) the establishment of fiduciary or other standards of responsibility or limitations on the acts or powers of trustees that are inconsistent with the limitations or authorities and powers set  forth in this Trust Agreement. Section 3540 of title 12 of the Delaware Code shall not apply to the Trust.

SECTION 10.05.  Notices.

All directions, demands and notices under this Trust Agreement shall be in writing and shall be delivered to the offices of the Trustee and the Delaware Trustee specified below.  Any notice required to be given to a Unitholder, in the case of Global Securities, will be transmitted to the Depositary in accordance with its procedures and in the case of Certificates, if applicable, will be given by facsimile to such number or by electronic mail at such address as may be provided to the Trustee.  Any notice so mailed within the time prescribed in this Trust Agreement shall be conclusively presumed to have been duly given when given or mailed, whether or not the Unitholder receives such notice.  Notices given by e-mail will be effective upon confirmation (including electronic confirmation) of effective transmission.

**Trustee:**

Wilmington Trust, N.A.
350 Park Avenue, 9th Floor
New York, NY 10022
Attention: Joseph Clark, Vice President
Telephone: (212) 941-4439
E-mail: jhclark@wilmingtontrust.com

**Delaware Trustee:**

Wilmington Trust, N.A.
1100 North Market Street
Wilmington, DE 19890
Attention: David B. Young, Vice President
Telephone: (302) 636-5216
E-mail: dyoung@wilmingtontrust.com

SECTION 10.06.  <u>Severability of Terms</u>.

If any one or more of the covenants, agreements or terms of this Trust Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements or terms shall be deemed severable from the remaining covenants, agreements or terms of this Trust Agreement and shall in no way affect the validity or enforceability of the other terms of this Trust Agreement or of the Units, or the rights of the Unitholders thereof or the parties hereto.

SECTION 10.07.  <u>Notice to Credit Support Provider</u>.

(a) In addition to notices required to be provided elsewhere under this Trust Agreement, the Trustee shall promptly provide notice to the Credit Support Provider with respect to each of the following of which it has actual knowledge:

(i)  the resignation or termination of the Trustee;

(ii) all payments to Unitholders; and

(iii) any change in the location of the Collection Account.

In addition, the Trustee shall promptly furnish to the Credit Support Provider copies of each report to Unitholders described in Section 4.02.  Any notices to be given to the Credit Support Provider pursuant to this Trust Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, emailed or mailed by first class mail, postage prepaid, return receipt requested, or by express delivery service to the Credit Support Provider as specified below, or at such other address as the Credit Support Provider shall have most recently specified to the Trustee in writing.

**Credit Support Provider:**

Ambac Assurance Corporation
One World Trade Center, 41st Floor
New York, NY 10007
Attention: Chief Risk Officer
Telephone: (212) 658-7470
E-mail:  dbarranco@ambac.com

With a copy to General Counsel
Email: sksenak@ambac.com
With a copy to: notices@ambac.com

(b) The Trustee shall promptly provide the Credit Support Provider with any additional information requested by the Credit Support Provider with respect to the Trust or the Trust Property.  Further, as necessary, the Trustee shall request from HTA such information as the Credit Support Provider reasonably requests related to the HTA Clawback CVIs, the New HTA Bonds and HTA, and shall thereafter provide such information to the Credit Support Provider.  The

Trustee shall, upon request of the Credit Support Provider, provide an accounting of the Trust Property.

SECTION 10.08.  <u>No Recourse</u>.

Each Unitholder by accepting a Unit acknowledges that such Unitholder's Units represent interests in the Trust only and do not represent interests in or obligations of the Trustee, the Credit Support Provider, other than the Credit Support, the Depositor or any Affiliate of the foregoing Persons and no recourse may be had against such Persons or their respective assets, except as may be expressly set forth in this Trust Agreement, the Credit Support or the Units.

SECTION 10.09.  <u>Third Party Beneficiary</u>.

Each party hereto hereby acknowledges that the Credit Support Provider shall be a third-party beneficiary of this Trust Agreement, entitled to enforce the provisions hereof as if a party hereto.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed by their respective officers thereunto duly authorized as of the date first above written.

Wilmington Trust, N.A., not individually, but solely in its capacity as Trustee

By _____
    Name: Joseph Clark
    Title:  Vice President

Wilmington Trust, N.A., not individually, but solely in its capacity as Delaware Trustee

By _____
    Name:  David B. Young
    Title:   Vice President

Puerto Rico Highways and Transportation Authority, as Depositor

By _____
    Name:  Edwin E. Gonzalez-Montalvo
    Title:  Executive Director

Acknowledging and Agreeing to the Calculation Agent obligations and to provisions related to the Credit Support by Ambac Assurance Corporation

By _____
    Name:  David P. Barranco
    Title:  Senior Managing Director

EXHIBIT A1

Class A-2028 Unit Sinking Fund Schedule[1]

Class A-2028 Scheduled Final Redemption Date:     7/1/2028

| Date | Original Sinking Fund Payment on Ambac Prepetition Insured Bonds (US$) | Sinking Fund Payment Reduction Prior to Trust Formation (US$)[2] | Adjusted Sinking Fund Payment on Ambac Prepetition Insured Bonds Prior to Trust Formation (US$) | Sinking Fund Payment Schedule for Electing Holders and Related Class A-2028 Units (US$) |
|---|---|---|---|---|
| July 1, 2023 | 11,065,000 | 10,535,000 | 530,000 | 330,479 |
| July 1, 2024 | 11,600,000 | 11,040,000 | 560,000 | 349,186 |
| July 1, 2025 | 12,165,000 | 11,580,000 | 585,000 | 364,774 |
| July 1, 2026 | 12,755,000 | 12,140,000 | 615,000 | 383,481 |
| July 1, 2027 | 13,375,000 | 12,730,000 | 645,000 | 402,187 |
| July 1, 2028 | 14,025,000 | 13,350,000 | 675,000 | 420,893 |

---

[1] The schedule assumes no distributions have been made prior to the Class A-2028 Scheduled Final Redemption Date.

[2] Significant reductions pursuant to a tender offer by HTA in 2011.

EXHIBIT A2

Class L-2038 Unit Sinking Fund Schedule[1]

Class L-2038 Scheduled Final Redemption Date:     7/1/2038

| Date | Original Sinking Fund Payment on Ambac Prepetition Insured Bonds (US$) | Sinking Fund Payment Reduction Prior to Trust Formation (US$)[2] | Adjusted Sinking Fund Payment on Ambac Prepetition Insured Bonds Prior to Trust Formation (US$) | Sinking Fund Payment Schedule for Electing Holders and Related Class L-2038 Units (US$) |
|---|---|---|---|---|
| July 1, 2036 | 60,680,000 | 14,600,000 | 46,080,000 | 42,727,933 |
| July 1, 2037 | 63,860,000 | 11,060,000 | 52,800,000 | 48,959,090 |
| July 1, 2038 | 67,215,000 | N/A | 67,215,000 | 62,325,478 |

---

[1] The schedule assumes no distributions have been made prior to the Class L-2038 Scheduled Final Redemption Date.
[2] Significant reductions in 2036 and 2037 pursuant to a tender offer by HTA in 2011.

EXHIBIT A3

Class N-2045 Unit Sinking Fund Schedule[1]

Class N-2045 Scheduled Final Redemption Date:      7/1/2042[2]

| Date | Original Sinking Fund Payment on Ambac Prepetition Insured Bonds (US$) | Sinking Fund Payment Reduction Prior to Trust Formation (US$)[3] | Adjusted Sinking Fund Payment on Ambac Prepetition Insured Bonds Prior to Trust Formation (US$) | Sinking Fund Payment Schedule for Electing Holders and Related Class N-2045 Units (US$) |
|---|---|---|---|---|
| July 1, 2042 | 82,640,000 | 82,440,000 | 200,000 | 200,000 |
| July 1, 2043 | 64,150,000 | 64,150,000 | N/A | N/A |
| July 1, 2044 | 42,450,000 | 42,450,000 | N/A | N/A |
| July 1, 2045 | 44,200,000 | 44,200,000 | N/A | N/A |

---

[1] The schedule assumes no distributions have been made prior to the Class N-2045 Scheduled Final Redemption Date.
[2] Original maturity date had been July 1, 2045 but Class N-2045 Scheduled Final Redemption Date reflects the Class N-2045 Unit Sinking Fund Schedule.
[3] Significant reductions pursuant to a direction by HTA in 2015.

EXHIBIT B1

FORM OF CLASS A-2028 UNIT

HTA CLASS 6 TRUST

CLASS A-2028 UNIT

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-TRUSTS TO WHICH THIS UNIT RELATES.

REGISTERED INITIAL OVERALL AMOUNT:                    $2,251,000

<div align="center">HTA CLASS 6 TRUST</div>

<div align="center">CLASS A-2028 UNIT</div>

This certifies that _____ is
the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been
created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth
therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington
Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways
and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to,
with respect to the Calculation Agent obligations and the provisions relating to the Credit
Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support
Provider (the "Credit Support Provider.

To the extent not defined herein, all capitalized terms shall have the meanings assigned to
such terms in the Trust Agreement.  This Unit is one of the Units described in the Trust
Agreement and is issued under and subject to the terms, provisions and conditions of the Trust
Agreement.  By acceptance of this Unit, the Unitholder assents to and becomes bound by the
Trust Agreement.

The Trust Property consists of:  (i) the portion of Electing Ambac Prepetition Insured Bonds
composed of the bond issue identified as Puerto Rico Highways and Transportation Authority
Transportation Revenue Bonds, Series A, due July 1, 2028; (ii) the Class A-2028 Taxable HTA
CVI/Bonds and all payments on or collections in respect thereof; (iii) the Class A-2028 Non-
Taxable HTA CVI/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit
of the Class A-2028 Credit Support; (v) all Permitted Investments and all funds from time to
time deposited in the Class A-2028 Taxable Collection Account; (vi) all funds from time to time
deposited in the Class A-2028 Non-Taxable Collection Account and the Class A-2028 Credit
Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such
Class A-2028 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the
Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees
and expenses of the Accountant and any other fees and expenses of the Trust in connection with
tax obligations, and until the obligations created by the Trust Agreement shall have terminated in
accordance therewith, any distributions shall be distributed on each Distribution Date, to the
Person in whose name this Unit is registered at the close of business on the related Record Date,
if applicable, and in the case of the Global Securities, in accordance with the procedures of the
Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class A-2028
Scheduled Final Redemption Date.

Distributions on this Certificate will be made by wire transfer of immediately available funds to an account designated in writing by a Unitholder to the Trustee. If no such notice has been given, distributions will be made by the Trustee by check mailed to the Unitholder of record at its address as it appears in the Unit Register without the presentation or surrender of this Certificate or the making of any notation hereon. Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class A-2028 Scheduled Final Redemption Date for this Certificate will be made only upon presentation and surrender of this Certificate at the office or agency maintained for that purpose by the Trustee.

This Certificate does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby. A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request. In addition, the Trustee will furnish to any Unitholder, upon written request and without charge, a copy of the Trust Agreement.

Reference is hereby made to the further terms of this Certificate set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Certificate shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of the page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Certificate to be duly executed.

HTA CLASS 6 TRUST

CLASS A-2028 UNIT NO. _____

By:    Wilmington Trust, N.A., as Trustee

By:    _____
       Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:    Wilmington Trust, N.A., as Trustee

By:    _____
       Authorized Signatory

[REVERSE OF UNIT CERTIFICATE]

HTA CLASS 6 TRUST

CLASS A-2028 UNIT

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, at the option of the Unitholder and at such Unitholder's expense, the transfer of this Certificate is registerable in the Unit Register upon surrender of this Certificate for registration of transfer at the office or agency maintained for such purpose, accompanied by a certificate of transfer substantially in the form of Exhibit D of the Trust Agreement, and thereupon the Unit Registrar shall execute, authenticate and deliver, in the name of the designated transferee or transferees, one or more new Certificates of any authorized denominations, of a like aggregate Notional Amount.  All transfers of Units are subject to the approval of the Unit Registrar and the Unit Registrar shall not register any transfer of Units if such transfer would violate any provision of the Trust Agreement.  All Units issued upon any registration of transfer or exchange of Units shall be entitled to the same benefits under the Trust Agreement as the Units surrendered upon such registration of transfer or exchange.  The Trustee may require payment by the Unitholder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Units.

As provided in the Trust Agreement and subject to certain limitations therein set forth, each Unit presented or surrendered for registration of transfer or exchange shall be duly endorsed (and in the case of a transfer, accompanied by a certificate of transfer in substantially the form of Exhibit D of the Trust Agreement), duly executed by the Unitholder thereof or its attorney duly authorized in writing or by a member firm of a national securities exchange, and surrendered along with such other documents as the Unit Registrar may require.  If, at any time, the Trustee learns that any of the representations or warranties provided by a potential transferee of any Certificate is false or that any agreement made therein has been violated, any transfer of such Unit to such potential transferee shall be null and void ab initio.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Unitholders will be responsible for the payment of all taxes with respect to the Trust Property.  Each Electing Holder receiving the Units on the Closing Date (and each assignee thereof) will be responsible for providing the Trust such information reasonably requested by the Trust as may be deemed necessary or advisable in order for the Trust to provide tax reporting. None of the Depositor, the Credit Support Provider or the Trustee will be responsible for making any tax payments or tax reporting other than as set forth in the Trust Agreement.  The Trust and each Sub-Trust, through its Accountant, shall be responsible for all tax reporting obligations and

withholding (if any) for the Trust, each Sub-Trust and Unitholders as required by law and consistent with the treatment of the Trust and each Sub-Trust as a grantor trust and the Unitholders as beneficial owners of a pro rata share of the Class A-2028 Trust Property (but subject further to the tax characterization described in the Trust Agreement), for purposes of the U.S. federal income tax, and any state and local taxes.  Such obligations shall include:  the timely filing of completed tax returns (if any) and the information statements (if any), including any extensions, and any filings or information as required by the Accountant.  To assure the foregoing, the Trustee shall utilize the Accountant, with fees and expenses of the Accountant being a cost of the applicable Sub-Trust.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee.  The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

EXHIBIT B2

FORM OF CLASS L-2038 UNIT


HTA CLASS 6 TRUST

CLASS L-2038 UNIT

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-TRUSTS TO WHICH THIS UNIT RELATES.

REGISTERED INITIAL OVERALL AMOUNT:                                    $154,012,500

HTA CLASS 6 TRUST

CLASS L-2038 UNIT

This certifies that _____ is
the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been
created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth
therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington
Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways
and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to,
with respect to the Calculation Agent obligations and the provisions relating to the Credit
Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support
Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to
such terms in the Trust Agreement.  This Unit is one of the Units described in the Trust
Agreement and is issued under and subject to the terms, provisions and conditions of the Trust
Agreement.  By acceptance of this Unit, the Unitholder assents to and becomes bound by the
Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds
composed of the bond issue identified as Puerto Rico Highways and Transportation Authority
Transportation Revenue Refunding Bonds, Series L, due July 1, 2038; (ii) the Class L-2038
Taxable HTA CVI/Bonds and all payments on or collections in respect thereof; (iii) the Class L-
2038 Non-Taxable HTA CVI/Bonds  and all payments on or collections in respect  thereof; (iv)
the benefit of the Class L-2038 Credit Support; (v) all Permitted Investments and all funds from
time to time deposited in the Class L-2038 Taxable Collection Account; (vi) all funds from time
to time deposited in the Class L-2038 Non-Taxable Collection Account and the Class L-2038
Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of
such Class L-2038 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the
Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees
and expenses of the Accountant and any other fees and expenses of the Trust in connection with
tax obligations, and until the obligations created by the Trust Agreement shall have terminated in
accordance therewith, any distributions shall be distributed on each Distribution Date, to the
Person in whose name this Unit is registered at the close of business on the related Record Date,
if applicable, and in the case of the Global Securities, in accordance with the procedures of the
Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class L-2038
Scheduled Final Redemption Date.

Distributions on this Certificate will be made by wire transfer of immediately available funds to an account designated in writing by a Unitholder to the Trustee.  If no such notice has been given, distributions will be made by the Trustee by check mailed to the Unitholder of record at its address as it appears in the Unit Register without the presentation or surrender of this Certificate or the making of any notation hereon.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class L-2038 Scheduled Final Redemption Date for this Certificate will be made only upon presentation and surrender of this Certificate at the office or agency maintained for that purpose by the Trustee.

This Certificate does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.  In addition, the Trustee will furnish to any Unitholder, upon written request and without charge, a copy of the Trust Agreement.

Reference is hereby made to the further terms of this Certificate set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Certificate shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Certificate to be duly executed.

HTA CLASS 6 TRUST

CLASS L-2038 UNIT NO. _____

By:   Wilmington Trust, N.A., as Trustee

By:   _____
       Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:   Wilmington Trust, N.A., as Trustee

By:   _____
       Authorized Signatory

[REVERSE OF UNIT CERTIFICATE]

HTA CLASS 6 TRUST

CLASS L-2038 UNIT

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, at the option of the Unitholder and at such Unitholder's expense, the transfer of this Certificate is registerable in the Unit Register upon surrender of this Certificate for registration of transfer at the office or agency maintained for such purpose, accompanied by a certificate of transfer substantially in the form of Exhibit D of the Trust Agreement, and thereupon the Unit Registrar shall execute, authenticate and deliver, in the name of the designated transferee or transferees, one or more new Certificates of any authorized denominations, of a like aggregate Notional Amount.  All transfers of Units are subject to the approval of the Unit Registrar and the Unit Registrar shall not register any transfer of Units if such transfer would violate any provision of the Trust Agreement.  All Units issued upon any registration of transfer or exchange of Units shall be entitled to the same benefits under the Trust Agreement as the Units surrendered upon such registration of transfer or exchange.  The Trustee may require payment by the Unitholder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Units.

As provided in the Trust Agreement and subject to certain limitations therein set forth, each Unit presented or surrendered for registration of transfer or exchange shall be duly endorsed (and in the case of a transfer, accompanied by a certificate of transfer in substantially the form of Exhibit D of the Trust Agreement), duly executed by the Unitholder thereof or its attorney duly authorized in writing or by a member firm of a national securities exchange, and surrendered along with such other documents as the Unit Registrar may require.  If, at any time, the Trustee learns that any of the representations or warranties provided by a potential transferee of any Certificate is false or that any agreement made therein has been violated, any transfer of such Unit to such potential transferee shall be null and void ab initio.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Unitholders will be responsible for the payment of all taxes with respect to the Trust Property.  Each Electing Holder receiving the Units on the Closing Date (and each assignee thereof) will be responsible for providing the Trust such information reasonably requested by the Trust as may be deemed necessary or advisable in order for the Trust to provide tax reporting.  None of the Depositor, the Credit Support Provider or the Trustee will be responsible for making any tax payments or tax reporting other than as set forth in the Trust Agreement.  The Trust and each Sub-Trust, through its Accountant, shall be responsible for all tax reporting obligations and

withholding (if any) for the Trust, each Sub-Trust and Unitholders as required by law and consistent with the treatment of the Trust and each Sub-Trust as a grantor trust and the Unitholders as beneficial owners of a pro rata share of the Class L-2038 Trust Property (but subject further to the tax characterization described in the Trust Agreement), for purposes of the U.S. federal income tax, and any state and local taxes. Such obligations shall include: the timely filing of completed tax returns (if any) and information statements (if any), including any extensions, and any filings or information as required by the Accountant. To assure the foregoing, the Trustee shall utilize the Accountant, with fees and expenses of the Accountant being a cost of the applicable Sub-Trust.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee. The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

EXHIBIT B3

FORM OF CLASS M-2023 UNIT

HTA CLASS 6 TRUST

CLASS M-2023 UNIT

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-TRUSTS TO WHICH THIS UNIT RELATES.

REGISTERED INITIAL OVERALL AMOUNT:                                    $470,000

HTA CLASS 6 TRUST

CLASS M-2023 UNIT

This certifies that _____ is
the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been
created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth
therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington
Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways
and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to,
with respect to the Calculation Agent obligations and the provisions relating to the Credit
Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support
Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to
such terms in the Trust Agreement.  This Unit is one of the Units described in the Trust
Agreement and is issued under and subject to the terms, provisions and conditions of the Trust
Agreement.  By acceptance of this Unit, the Unitholder assents to and becomes bound by the
Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds
composed of the bond issue identified as Puerto Rico Highways and Transportation Authority
Transportation Revenue Bonds, Series M, due July 1, 2023; (ii) the Class M-2023 Taxable HTA
CVI/Bonds and all payments on or collections in respect thereof; (iii) the Class M-2023 Non-
Taxable HTA CVI/Bonds and all payments on or collections in respect  thereof; (iv) the benefit
of the Class M-2023 Credit Support; (v) all Permitted Investments and all funds from time to
time deposited in the Class M-2023 Taxable Collection Account; (vi) all funds from time to time
deposited in the Class M-2023 Non-Taxable Collection Account and the Class M-2023 Credit
Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such
Class M-2023 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the
Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees
and expenses of the Accountant and any other fees and expenses of the Trust in connection with
tax obligations, and until the obligations created by the Trust Agreement shall have terminated in
accordance therewith, any distributions shall be distributed on each Distribution Date, to the
Person in whose name this Unit is registered at the close of business on the related Record Date,
if applicable, and in the case of the Global Securities, in accordance with the procedures of the
Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class M-2023
Scheduled Final Redemption Date.

Distributions on this Certificate will be made by wire transfer of immediately available funds to an account designated in writing by a Unitholder to the Trustee.  If no such notice has been given, distributions will be made by the Trustee by check mailed to the Unitholder of record at its address as it appears in the Unit Register without the presentation or surrender of this Certificate or the making of any notation hereon.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class M-2023 Scheduled Final Redemption Date for this Certificate will be made only upon presentation and surrender of this Certificate at the office or agency maintained for that purpose by the Trustee.

This Certificate does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.  In addition, the Trustee will furnish to any Unitholder, upon written request and without charge, a copy of the Trust Agreement.

Reference is hereby made to the further terms of this Certificate set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Certificate shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Certificate to be duly executed.

HTA CLASS 6 TRUST

CLASS M-2023 UNIT NO. _____

By:     Wilmington Trust, N.A., as Trustee


By:     _____
        Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:     Wilmington Trust, N.A., as Trustee


By:     _____
        Authorized Signatory

[REVERSE OF UNIT CERTIFICATE]

HTA CLASS 6 TRUST

CLASS M-2023 UNIT

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, at the option of the Unitholder and at such Unitholder's expense, the transfer of this Certificate is registerable in the Unit Register upon surrender of this Certificate for registration of transfer at the office or agency maintained for such purpose, accompanied by a certificate of transfer substantially in the form of Exhibit D of the Trust Agreement, and thereupon the Unit Registrar shall execute, authenticate and deliver, in the name of the designated transferee or transferees, one or more new Certificates of any authorized denominations, of a like aggregate Notional Amount.  All transfers of Units are subject to the approval of the Unit Registrar and the Unit Registrar shall not register any transfer of Units if such transfer would violate any provision of the Trust Agreement.  All Units issued upon any registration of transfer or exchange of Units shall be entitled to the same benefits under the Trust Agreement as the Units surrendered upon such registration of transfer or exchange.  The Trustee may require payment by the Unitholder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Units.

As provided in the Trust Agreement and subject to certain limitations therein set forth, each Unit presented or surrendered for registration of transfer or exchange shall be duly endorsed (and in the case of a transfer, accompanied by a certificate of transfer in substantially the form of Exhibit D of the Trust Agreement), duly executed by the Unitholder thereof or its attorney duly authorized in writing or by a member firm of a national securities exchange, and surrendered along with such other documents as the Unit Registrar may require.  If, at any time, the Trustee learns that any of the representations or warranties provided by a potential transferee of any Certificate is false or that any agreement made therein has been violated, any transfer of such Unit to such potential transferee shall be null and void ab initio.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Unitholders will be responsible for the payment of all taxes with respect to the Trust Property.  Each Electing Holder receiving the Units on the Closing Date (and each assignee thereof) will be responsible for providing the Trust such information reasonably requested by the Trust as may be deemed necessary or advisable in order for the Trust to provide tax reporting.  None of the Depositor, the Credit Support Provider or the Trustee will be responsible for making any tax payments or tax reporting other than as set forth in the Trust Agreement.  The Trust and each Sub-Trust, through its Accountant, shall be responsible for all tax reporting obligations and

withholding (if any) for the Trust, each Sub-Trust and Unitholders as required by law and consistent with the treatment of the Trust and each Sub-Trust as a grantor trust and the Unitholders as beneficial owners of a pro rata share of the Class M-2023 Trust Property (but subject further to the tax characterization described in the Trust Agreement), for purposes of the U.S. federal income tax, and any state and local taxes.  Such obligations shall include: the timely filing of completed tax returns (if any) and information statements (if any), including any extensions, and any filings or information as required by the Accountant.  To assure the foregoing, the Trustee shall utilize the Accountant, with fees and expenses of the Accountant being a cost of the applicable Sub-Trust.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee.  The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

EXHIBIT B4

## FORM OF CLASS N-2026 UNIT

### HTA CLASS 6 TRUST

### CLASS N-2026 UNIT

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-TRUSTS TO WHICH THIS UNIT RELATES.

REGISTERED INITIAL OVERALL AMOUNT:                              $880,000

## HTA CLASS 6 TRUST

### CLASS N-2026 UNIT

This certifies that _____ is
the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been
created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth
therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington
Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways
and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to,
with respect to the Calculation Agent obligations and the provisions relating to the Credit
Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support
Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to
such terms in the Trust Agreement.  This Unit is one of the Units described in the Trust
Agreement and is issued under and subject to the terms, provisions and conditions of the Trust
Agreement.  By acceptance of this Unit, the Unitholder assents to and becomes bound by the
Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds
composed of the bond issue identified as Puerto Rico Highways and Transportation Authority
Transportation Revenue Refunding Bonds, Series N, due July 1, 2026; (ii) the Class N-2026
Taxable HTA CVI/Bonds and all payments on or collections in respect thereof; (iii) the Class N-
2026 Non-Taxable HTA CVI/Bonds and all payments on or collections in respect  thereof; (iv)
the benefit of the Class N-2026 Credit Support; (v) all Permitted Investments and all funds from
time to time deposited in the Class N-2026 Taxable Collection Account; (vi) all funds from time
to time deposited in the Class N-2026 Non-Taxable Collection Account and the Class N-2026
Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of
such Class N-2026 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the
Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees
and expenses of the Accountant and any other fees and expenses of the Trust in connection with
tax obligations, and until the obligations created by the Trust Agreement shall have terminated in
accordance therewith, any distributions shall be distributed on each Distribution Date, to the
Person in whose name this Unit is registered at the close of business on the related Record Date,
if applicable, and in the case of the Global Securities, in accordance with the procedures of the
Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class N-2026
Scheduled Final Redemption Date.

Distributions on this Certificate will be made by wire transfer of immediately available funds to an account designated in writing by a Unitholder to the Trustee.  If no such notice has been given, distributions will be made by the Trustee by check mailed to the Unitholder of record at its address as it appears in the Unit Register without the presentation or surrender of this Certificate or the making of any notation hereon.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class N-2026 Scheduled Final Redemption Date for this Certificate will be made only upon presentation and surrender of this Certificate at the office or agency maintained for that purpose by the Trustee.

This Certificate does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.  In addition, the Trustee will furnish to any Unitholder, upon written request and without charge, a copy of the Trust Agreement.

Reference is hereby made to the further terms of this Certificate set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Certificate shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Certificate to be duly executed.

HTA CLASS 6 TRUST

CLASS N-2026 UNIT NO. _____

By:   Wilmington Trust, N.A., as Trustee

By:   _____
      Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:   Wilmington Trust, N.A., as Trustee

By:   _____
      Authorized Signatory

[REVERSE OF UNIT CERTIFICATE]

HTA CLASS 6 TRUST

CLASS N-2026 UNIT

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, at the option of the Unitholder and at such Unitholder's expense, the transfer of this Certificate is registerable in the Unit Register upon surrender of this Certificate for registration of transfer at the office or agency maintained for such purpose, accompanied by a certificate of transfer substantially in the form of Exhibit D of the Trust Agreement, and thereupon the Unit Registrar shall execute, authenticate and deliver, in the name of the designated transferee or transferees, one or more new Certificates of any authorized denominations, of a like aggregate Notional Amount.  All transfers of Units are subject to the approval of the Unit Registrar and the Unit Registrar shall not register any transfer of Units if such transfer would violate any provision of the Trust Agreement.  All Units issued upon any registration of transfer or exchange of Units shall be entitled to the same benefits under the Trust Agreement as the Units surrendered upon such registration of transfer or exchange.  The Trustee may require payment by the Unitholder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Units.

As provided in the Trust Agreement and subject to certain limitations therein set forth, each Unit presented or surrendered for registration of transfer or exchange shall be duly endorsed (and in the case of a transfer, accompanied by a certificate of transfer in substantially the form of Exhibit D of the Trust Agreement), duly executed by the Unitholder thereof or its attorney duly authorized in writing or by a member firm of a national securities exchange, and surrendered along with such other documents as the Unit Registrar may require.  If, at any time, the Trustee learns that any of the representations or warranties provided by a potential transferee of any Certificate is false or that any agreement made therein has been violated, any transfer of such Unit to such potential transferee shall be null and void ab initio.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Unitholders will be responsible for the payment of all taxes with respect to the Trust Property.  Each Electing Holder receiving the Units on the Closing Date (and each assignee thereof) will be responsible for providing the Trust such information reasonably requested by the Trust as may be deemed necessary or advisable in order for the Trust to provide tax reporting. None of the Depositor, the Credit Support Provider or the Trustee will be responsible for making any tax payments or tax reporting other than as set forth in the Trust Agreement.  The Trust and

each Sub-Trust, through its Accountant, shall be responsible for all tax reporting obligations and withholding (if any) for the Trust, each Sub-Trust and Unitholders as required by law and consistent with the treatment of the Trust and each Sub-Trust as a grantor trust and the Unitholders as beneficial owners of a pro rata share of the Class N-2026 Trust Property (but subject further to the tax characterization described in the Trust Agreement), for purposes of the U.S. federal income tax, and any state and local taxes.  Such obligations shall include: the timely filing of completed tax returns (if any) and information statements (if any), including any extensions, and any filings or information as required by the Accountant.  To assure the foregoing, the Trustee shall utilize the Accountant, with fees and expenses of the Accountant being a cost of the applicable Sub-Trust.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee.  The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

EXHIBIT B5

FORM OF CLASS N-2027 UNIT

HTA CLASS 6 TRUST

CLASS N-2027 UNIT

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-TRUSTS TO WHICH THIS UNIT RELATES.

REGISTERED INITIAL OVERALL AMOUNT:                    $6,040,000

HTA CLASS 6 TRUST

CLASS N-2027 UNIT

This certifies that _____ is
the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been
created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth
therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington
Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways
and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to,
with respect to the Calculation Agent obligations and the provisions relating to the Credit
Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support
Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to
such terms in the Trust Agreement.  This Unit is one of the Units described in the Trust
Agreement and is issued under and subject to the terms, provisions and conditions of the Trust
Agreement.  By acceptance of this Unit, the Unitholder assents to and becomes bound by the
Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds
composed of the bond issue identified as Puerto Rico Highways and Transportation Authority
Transportation Revenue Refunding Bonds, Series N (CPI Bonds), due July 1, 2027; (ii) the Class
N-2027 Taxable HTA CVI/Bonds and all payments on or collections in respect thereof; (iii) the
Class N-2027 Non-Taxable HTA CVI/Bonds  and all payments on or collections in
respect  thereof; (iv) the benefit of the Class N-2027 Credit Support; (v) all Permitted
Investments and all funds from time to time deposited in the Class N-2027 Taxable Collection
Account; (vi) all funds from time to time deposited in the Class N-2027 Non-Taxable Collection
Account and the Class N-2027 Credit Support Collection Account; and (vii) any other asset
constituting a portion or proceeds of such Class N-2027 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the
Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees
and expenses of the Accountant and any other fees and expenses of the Trust in connection with
tax obligations, and until the obligations created by the Trust Agreement shall have terminated in
accordance therewith, any distributions shall be distributed on each Distribution Date, to the
Person in whose name this Unit is registered at the close of business on the related Record Date,
if applicable, and in the case of the Global Securities, in accordance with the procedures of the
Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class N-2027
Scheduled Final Redemption Date.

Distributions on this Certificate will be made by wire transfer of immediately available funds to an account designated in writing by a Unitholder to the Trustee.  If no such notice has been given, distributions will be made by the Trustee by check mailed to the Unitholder of record at its address as it appears in the Unit Register without the presentation or surrender of this Certificate or the making of any notation hereon.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class N-2027 Scheduled Final Redemption Date for this Certificate will be made only upon presentation and surrender of this Certificate at the office or agency maintained for that purpose by the Trustee.

This Certificate does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.  In addition, the Trustee will furnish to any Unitholder, upon written request and without charge, a copy of the Trust Agreement

Reference is hereby made to the further terms of this Certificate set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Certificate shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Certificate to be duly executed.

HTA CLASS 6 TRUST

CLASS N-2027 UNIT NO. _____

By:    Wilmington Trust, N.A., as Trustee

By:    _____
       Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:    Wilmington Trust, N.A., as Trustee

By:    _____
       Authorized Signatory

[REVERSE OF UNIT CERTIFICATE]

HTA CLASS 6 TRUST

CLASS N-2027 UNIT

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, at the option of the Unitholder and at such Unitholder's expense, the transfer of this Certificate is registerable in the Unit Register upon surrender of this Certificate for registration of transfer at the office or agency maintained for such purpose, accompanied by a certificate of transfer substantially in the form of Exhibit D of the Trust Agreement, and thereupon the Unit Registrar shall execute, authenticate and deliver, in the name of the designated transferee or transferees, one or more new Certificates of any authorized denominations, of a like aggregate Notional Amount.  All transfers of Units are subject to the approval of the Unit Registrar and the Unit Registrar shall not register any transfer of Units if such transfer would violate any provision of the Trust Agreement.  All Units issued upon any registration of transfer or exchange of Units shall be entitled to the same benefits under the Trust Agreement as the Units surrendered upon such registration of transfer or exchange.  The Trustee may require payment by the Unitholder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Units.

As provided in the Trust Agreement and subject to certain limitations therein set forth, each Unit presented or surrendered for registration of transfer or exchange shall be duly endorsed (and in the case of a transfer, accompanied by a certificate of transfer in substantially the form of Exhibit D of the Trust Agreement), duly executed by the Unitholder thereof or its attorney duly authorized in writing or by a member firm of a national securities exchange, and surrendered along with such other documents as the Unit Registrar may require.  If, at any time, the Trustee learns that any of the representations or warranties provided by a potential transferee of any Certificate is false or that any agreement made therein has been violated, any transfer of such Unit to such potential transferee shall be null and void ab initio.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Unitholders will be responsible for the payment of all taxes with respect to the Trust Property.  Each Electing Holder receiving the Units on the Closing Date (and each assignee thereof) will be responsible for providing the Trust such information reasonably requested by the Trust as may be deemed necessary or advisable in order for the Trust to provide tax reporting.  None of the Depositor, the Credit Support Provider or the Trustee will be responsible for making any tax payments or tax reporting other than as set forth in the Trust Agreement.  The Trust and each Sub-Trust, through its Accountant, shall be responsible for all tax reporting obligations and

withholding (if any) for the Trust, each Sub-Trust and Unitholders as required by law and consistent with the treatment of the Trust and each Sub-Trust as a grantor trust and the Unitholders as beneficial owners of a pro rata share of the Class N-2027 Trust Property (but subject further to the tax characterization described in the Trust Agreement), for purposes of the U.S. federal income tax, and any state and local taxes. Such obligations shall include: the timely filing of completed tax returns (if any) and information statements (if any), including any extensions, and any filings or information as required by the Accountant. To assure the foregoing, the Trustee shall utilize the Accountant, with fees and expenses of the Accountant being a cost of the applicable Sub-Trust.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee. The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

EXHIBIT B6

FORM OF CLASS N-2028 UNIT

HTA CLASS 6 TRUST

CLASS N-2028 UNIT

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-TRUSTS TO WHICH THIS UNIT RELATES.

REGISTERED INITIAL OVERALL AMOUNT:                                    $13,491,000

HTA CLASS 6 TRUST

CLASS N-2028 UNIT

This certifies that _____ is
the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been
created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth
therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington
Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways
and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to,
with respect to the Calculation Agent obligations and the provisions relating to the Credit
Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support
Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to
such terms in the Trust Agreement.  This Unit is one of the Units described in the Trust
Agreement and is issued under and subject to the terms, provisions and conditions of the Trust
Agreement.  By acceptance of this Unit, the Unitholder assents to and becomes bound by the
Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds
composed of the bond issue identified as Puerto Rico Highways and Transportation Authority
Transportation Revenue Refunding Bonds, Series N (CPI Bonds), due July 1, 2028; (ii) the Class
N-2028 Taxable HTA CVI/Bonds and all payments on or collections in respect thereof; (iii) the
Class N-2028 Non-Taxable HTA CVI/Bonds  and all payments on or collections in
respect  thereof; (iv) the benefit of the Class N-2028 Credit Support; (v) all Permitted
Investments and all funds from time to time deposited in the Class N-2028 Taxable Collection
Account; (vi) all funds from time to time deposited in the Class N-2028 Non-Taxable Collection
Account and the Class N-2028 Credit Support Collection Account; and (vii) any other asset
constituting a portion or proceeds of such Class N-2028 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the
Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees
and expenses of the Accountant and any other fees and expenses of the Trust in connection with
tax obligations, and until the obligations created by the Trust Agreement shall have terminated in
accordance therewith, any distributions shall be distributed on each Distribution Date, to the
Person in whose name this Unit is registered at the close of business on the related Record Date,
if applicable, and in the case of the Global Securities, in accordance with the procedures of the
Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class N-2028
Scheduled Final Redemption Date.

Distributions on this Certificate will be made by wire transfer of immediately available funds to an account designated in writing by a Unitholder to the Trustee.  If no such notice has been given, distributions will be made by the Trustee by check mailed to the Unitholder of record at its address as it appears in the Unit Register without the presentation or surrender of this Certificate or the making of any notation hereon.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class N-2028 Scheduled Final Redemption Date for this Certificate will be made only upon presentation and surrender of this Certificate at the office or agency maintained for that purpose by the Trustee.

This Certificate does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.  In addition, the Trustee will furnish to any Unitholder, upon written request and without charge, a copy of the Trust Agreement.

Reference is hereby made to the further terms of this Certificate set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Certificate shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Certificate to be duly executed.

HTA CLASS 6 TRUST

CLASS N-2028 UNIT NO. _____

By:     Wilmington Trust, N.A., as Trustee


By:     _____
        Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:     Wilmington Trust, N.A., as Trustee


By:     _____
        Authorized Signatory

[REVERSE OF UNIT CERTIFICATE]

HTA CLASS 6 TRUST

CLASS N-2028 UNIT

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, at the option of the Unitholder and at such Unitholder's expense, the transfer of this Certificate is registerable in the Unit Register upon surrender of this Certificate for registration of transfer at the office or agency maintained for such purpose, accompanied by a certificate of transfer substantially in the form of Exhibit D of the Trust Agreement, and thereupon the Unit Registrar shall execute, authenticate and deliver, in the name of the designated transferee or transferees, one or more new Certificates of any authorized denominations, of a like aggregate Notional Amount.  All transfers of Units are subject to the approval of the Unit Registrar and the Unit Registrar shall not register any transfer of Units if such transfer would violate any provision of the Trust Agreement.  All Units issued upon any registration of transfer or exchange of Units shall be entitled to the same benefits under the Trust Agreement as the Units surrendered upon such registration of transfer or exchange.  The Trustee may require payment by the Unitholder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Units.

As provided in the Trust Agreement and subject to certain limitations therein set forth, each Unit presented or surrendered for registration of transfer or exchange shall be duly endorsed (and in the case of a transfer, accompanied by a certificate of transfer in substantially the form of Exhibit D of the Trust Agreement), duly executed by the Unitholder thereof or its attorney duly authorized in writing or by a member firm of a national securities exchange, and surrendered along with such other documents as the Unit Registrar may require.  If, at any time, the Trustee learns that any of the representations or warranties provided by a potential transferee of any Certificate is false or that any agreement made therein has been violated, any transfer of such Unit to such potential transferee shall be null and void ab initio.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Unitholders will be responsible for the payment of all taxes with respect to the Trust Property.  Each Electing Holder receiving the Units on the Closing Date (and each assignee thereof) will be responsible for providing the Trust such information reasonably requested by the Trust as may be deemed necessary or advisable in order for the Trust to provide tax reporting. None of the Depositor, the Credit Support Provider or the Trustee will be responsible for making any tax payments or tax reporting other than as set forth in the Trust Agreement.  The Trust and each Sub-Trust, through its Accountant, shall be responsible for all tax reporting obligations and

withholding (if any) for the Trust, each Sub-Trust and Unitholders as required by law and consistent with the treatment of the Trust and each Sub-Trust as a grantor trust and the Unitholders as beneficial owners of a pro rata share of the Class N-2028 Trust Property (but subject further to the tax characterization described in the Trust Agreement), for purposes of the U.S. federal income tax, and any state and local taxes.  Such obligations shall include: the timely filing of completed tax returns (if any) and information statements (if any), including any extensions, and any filings or information as required by the Accountant.  To assure the foregoing, the Trustee shall utilize the Accountant, with fees and expenses of the Accountant being a cost of the applicable Sub-Trust.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee.  The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

EXHIBIT B7

FORM OF CLASS N-2029 UNIT

HTA CLASS 6 TRUST

CLASS N-2029 UNIT

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-TRUSTS TO WHICH THIS UNIT RELATES.

REGISTERED INITIAL OVERALL AMOUNT:                                    $25,895,000

HTA CLASS 6 TRUST

CLASS N-2029 UNIT

This certifies that _____is
the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been
created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth
therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington
Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways
and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to,
with respect to the Calculation Agent obligations and the provisions relating to the Credit
Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support
Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to
such terms in the Trust Agreement.  This Unit is one of the Units described in the Trust
Agreement and is issued under and subject to the terms, provisions and conditions of the Trust
Agreement.  By acceptance of this Unit, the Unitholder assents to and becomes bound by the
Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds
composed of the bond issue identified as Puerto Rico Highways and Transportation Authority
Transportation Revenue Refunding Bonds, Series N, due July 1, 2029; (ii) the Class N-2029
Taxable HTA CVI/Bonds and all payments on or collections in respect thereof; (iii) the Class N-
2029 Non-Taxable HTA CVI/Bonds  and all payments on or collections in respect  thereof; (iv)
the benefit of the Class N-2029 Credit Support; (v) all Permitted Investments and all funds from
time to time deposited in the Class N-2029 Taxable Collection Account; (vi) all funds from time
to time deposited in the Class N-2029 Non-Taxable Collection Account and the Class N-2029
Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of
such Class N-2029 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the
Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees
and expenses of the Accountant and any other fees and expenses of the Trust in connection with
tax obligations, and until the obligations created by the Trust Agreement shall have terminated in
accordance therewith, any distributions shall be distributed on each Distribution Date, to the
Person in whose name this Unit is registered at the close of business on the related Record Date,
if applicable, and in the case of the Global Securities, in accordance with the procedures of the
Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class N-2029
Scheduled Final Redemption Date.

Distributions on this Certificate will be made by wire transfer of immediately available funds to an account designated in writing by a Unitholder to the Trustee.  If no such notice has been given, distributions will be made by the Trustee by check mailed to the Unitholder of record at its address as it appears in the Unit Register without the presentation or surrender of this Certificate or the making of any notation hereon.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class N-2029 Scheduled Final Redemption Date for this Certificate only upon presentation and surrender of this Certificate at the office or agency maintained for that purpose by the Trustee.

This Certificate does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.  In addition, the Trustee will furnish to any Unitholder, upon written request and without charge, a copy of the Trust Agreement.

Reference is hereby made to the further terms of this Certificate set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Certificate shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

     IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Certificate to be duly executed.

HTA CLASS 6 TRUST

CLASS N-2029 UNIT NO. _____

By:    Wilmington Trust, N.A., as Trustee


By:    _____
        Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:    Wilmington Trust, N.A., as Trustee


By:    _____
        Authorized Signatory

[REVERSE OF UNIT CERTIFICATE]

HTA CLASS 6 TRUST

CLASS N-2029 UNIT

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, at the option of the Unitholder and at such Unitholder's expense, the transfer of this Certificate is registerable in the Unit Register upon surrender of this Certificate for registration of transfer at the office or agency maintained for such purpose, accompanied by a certificate of transfer substantially in the form of Exhibit D of the Trust Agreement, and thereupon the Unit Registrar shall execute, authenticate and deliver, in the name of the designated transferee or transferees, one or more new Certificates of any authorized denominations, of a like aggregate Notional Amount.  All transfers of Units are subject to the approval of the Unit Registrar and the Unit Registrar shall not register any transfer of Units if such transfer would violate any provision of the Trust Agreement.  All Units issued upon any registration of transfer or exchange of Units shall be entitled to the same benefits under the Trust Agreement as the Units surrendered upon such registration of transfer or exchange.  The Trustee may require payment by the Unitholder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Units.

As provided in the Trust Agreement and subject to certain limitations therein set forth, each Unit presented or surrendered for registration of transfer or exchange shall be duly endorsed (and in the case of a transfer, accompanied by a certificate of transfer in substantially the form of Exhibit D of the Trust Agreement), duly executed by the Unitholder thereof or its attorney duly authorized in writing or by a member firm of a national securities exchange, and surrendered along with such other documents as the Unit Registrar may require.  If, at any time, the Trustee learns that any of the representations or warranties provided by a potential transferee of any Certificate is false or that any agreement made therein has been violated, any transfer of such Unit to such potential transferee shall be null and void ab initio.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Unitholders will be responsible for the payment of all taxes with respect to the Trust Property.  Each Electing Holder receiving the Units on the Closing Date (and each assignee thereof) will be responsible for providing the Trust such information reasonably requested by the Trust as may be deemed necessary or advisable in order for the Trust to provide tax reporting.  None of the Depositor, the Credit Support Provider or the Trustee will be responsible for making any tax payments or tax reporting other than as set forth in the Trust Agreement.  The Trust and each Sub-Trust, through its Accountant, shall be responsible for all tax reporting obligations and

withholding (if any) for the Trust, each Sub-Trust and Unitholders as required by law and consistent with the treatment of the Trust and each Sub-Trust as a grantor trust and the Unitholders as beneficial owners of a pro rata share of the Class N-2029 Trust Property (but subject further to the tax characterization described in the Trust Agreement), for purposes of the U.S. federal income tax, and any state and local taxes.  Such obligations shall include: the timely filing of completed tax returns (if any) and information statements (if any), including any extensions, and any filings or information as required by the Accountant.  To assure the foregoing, the Trustee shall utilize the Accountant, with fees and expenses of the Accountant being a cost of the applicable Sub-Trust.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee.  The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

EXHIBIT B8

FORM OF CLASS N-2030 UNIT

HTA CLASS 6 TRUST

CLASS N-2030 UNIT

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-TRUSTS TO WHICH THIS UNIT RELATES.

REGISTERED INITIAL OVERALL AMOUNT:                                   $49,220,000

## HTA CLASS 6 TRUST

### CLASS N-2030 UNIT

This certifies that _____ is
the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been
created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth
therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington
Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways
and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to,
with respect to the Calculation Agent obligations and the provisions relating to the Credit
Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support
Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to
such terms in the Trust Agreement.  This Unit is one of the Units described in the Trust
Agreement and is issued under and subject to the terms, provisions and conditions of the Trust
Agreement.  By acceptance of this Unit, the Unitholder assents to and becomes bound by the
Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds
composed of the bond issue identified as Puerto Rico Highways and Transportation Authority
Transportation Revenue Refunding Bonds, Series N, due July 1, 2030; (ii) the Class N-2030
Taxable HTA CVI/Bonds and all payments on or collections in respect thereof; (iii) the Class N-
2030 Non-Taxable HTA CVI/Bonds  and all payments on or collections in respect  thereof; (iv)
the benefit of the Class N-2030 Credit Support; (v) all Permitted Investments and all funds from
time to time deposited in the Class N-2030 Taxable Collection Account; (vi) all funds from time
to time deposited in the Class N-2030 Non-Taxable Collection Account and the Class N-2030
Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of
such Class N-2030 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the
Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees
and expenses of the Accountant and any other fees and expenses of the Trust in connection with
tax obligations, and until the obligations created by the Trust Agreement shall have terminated in
accordance therewith, any distributions shall be distributed on each Distribution Date, to the
Person in whose name this Unit is registered at the close of business on the related Record Date,
if applicable, and in the case of the Global Securities, in accordance with the procedures of the
Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class N-2030
Scheduled Final Redemption Date.

Distributions on this Certificate will be made by wire transfer of immediately available funds to an account designated in writing by a Unitholder to the Trustee.  If no such notice has been given, distributions will be made by the Trustee by check mailed to the Unitholder of record at its address as it appears in the Unit Register without the presentation or surrender of this Certificate or the making of any notation hereon.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class N-2030 Scheduled Final Redemption Date for this Certificate will be made only upon presentation and surrender of this Certificate at the office or agency maintained for that purpose by the Trustee.

This Certificate does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.  In addition, the Trustee will furnish to any Unitholder, upon written request and without charge, a copy of the Trust Agreement.

Reference is hereby made to the further terms of this Certificate set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Certificate shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Certificate to be duly executed.

HTA CLASS 6 TRUST

CLASS N-2030 UNIT NO. _____

By:   Wilmington Trust, N.A., as Trustee

By:   _____
       Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:   Wilmington Trust, N.A., as Trustee

By:   _____
       Authorized Signatory

[REVERSE OF UNIT CERTIFICATE]

HTA CLASS 6 TRUST

CLASS N-2030 UNIT

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, at the option of the Unitholder and at such Unitholder's expense, the transfer of this Certificate is registerable in the Unit Register upon surrender of this Certificate for registration of transfer at the office or agency maintained for such purpose, accompanied by a certificate of transfer substantially in the form of Exhibit D of the Trust Agreement, and thereupon the Unit Registrar shall execute, authenticate and deliver, in the name of the designated transferee or transferees, one or more new Certificates of any authorized denominations, of a like aggregate Notional Amount.  All transfers of Units are subject to the approval of the Unit Registrar and the Unit Registrar shall not register any transfer of Units if such transfer would violate any provision of the Trust Agreement.  All Units issued upon any registration of transfer or exchange of Units shall be entitled to the same benefits under the Trust Agreement as the Units surrendered upon such registration of transfer or exchange.  The Trustee may require payment by the Unitholder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Units.

As provided in the Trust Agreement and subject to certain limitations therein set forth, each Unit presented or surrendered for registration of transfer or exchange shall be duly endorsed (and in the case of a transfer, accompanied by a certificate of transfer in substantially the form of Exhibit D of the Trust Agreement), duly executed by the Unitholder thereof or its attorney duly authorized in writing or by a member firm of a national securities exchange, and surrendered along with such other documents as the Unit Registrar may require.  If, at any time, the Trustee learns that any of the representations or warranties provided by a potential transferee of any Certificate is false or that any agreement made therein has been violated, any transfer of such Unit to such potential transferee shall be null and void ab initio.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Unitholders will be responsible for the payment of all taxes with respect to the Trust Property.  Each Electing Holder receiving the Units on the Closing Date (and each assignee thereof) will be responsible for providing the Trust such information reasonably requested by the Trust as may be deemed necessary or advisable in order for the Trust to provide tax reporting.  None of the Depositor, the Credit Support Provider or the Trustee will be responsible for making any tax payments or tax reporting other than as set forth in the Trust Agreement.  The Trust and each Sub-Trust, through its Accountant, shall be responsible for all tax reporting obligations and

withholding (if any) for the Trust, each Sub-Trust and Unitholders as required by law and consistent with the treatment of the Trust and each Sub-Trust as a grantor trust and the Unitholders as beneficial owners of a pro rata share of the Class N-2030 Trust Property (but subject further to the tax characterization described in the Trust Agreement), for purposes of the U.S. federal income tax, and any state and local taxes.  Such obligations shall include: the timely filing of completed tax returns (if any) and information statements (if any), including any extensions, and any filings or information as required by the Accountant.  To assure the foregoing, the Trustee shall utilize the Accountant, the fees and expenses of the Accountant being a cost of the applicable Sub-Trust.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee.  The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

EXHIBIT B9

FORM OF CLASS N-2031 UNIT


HTA CLASS 6 TRUST

CLASS N-2031 UNIT

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-TRUSTS TO WHICH THIS UNIT RELATES.

REGISTERED INITIAL OVERALL AMOUNT:                                    $69,124,000

HTA CLASS 6 TRUST

CLASS N-2031 UNIT

This certifies that _____ is
the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been
created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth
therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington
Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways
and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to,
with respect to the Calculation Agent obligations and the provisions relating to the Credit
Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support
Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to
such terms in the Trust Agreement.  This Unit is one of the Units described in the Trust
Agreement and is issued under and subject to the terms, provisions and conditions of the Trust
Agreement.  By acceptance of this Unit, the Unitholder assents to and becomes bound by the
Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds
composed of the bond issue identified as Puerto Rico Highways and Transportation Authority
Transportation Revenue Refunding Bonds, Series N, due July 1, 2031; (ii) the Class N-2031
Taxable HTA CVI/Bonds and all payments on or collections in respect thereof; (iii) the Class N-
2031 Non-Taxable HTA CVI/Bonds  and all payments on or collections in respect  thereof; (iv)
the benefit of the Class N-2031 Credit Support; (v) all Permitted Investments and all funds from
time to time deposited in the Class N-2031 Taxable Collection Account; (vi) all funds from time
to time deposited in the Class N-2031 Non-Taxable Collection Account and the Class N-2031
Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of
such Class N-2031 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the
Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees
and expenses of the Accountant and any other fees and expenses of the Trust in connection with
tax obligations, and until the obligations created by the Trust Agreement shall have terminated in
accordance therewith, any distributions shall be distributed on each Distribution Date, to the
Person in whose name this Unit is registered at the close of business on the related Record Date,
if applicable, and in the case of the Global Securities, in accordance with the procedures of the
Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class N-2031
Scheduled Final Redemption Date.

Distributions on this Certificate will be made by wire transfer of immediately available funds to an account designated in writing by a Unitholder to the Trustee.  If no such notice has been given, distributions will be made by the Trustee by check mailed to the Unitholder of record at its address as it appears in the Unit Register without the presentation or surrender of this Certificate or the making of any notation hereon.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class N-2031 Scheduled Final Redemption Date for this Certificate will be made only upon presentation and surrender of this Certificate at the office or agency maintained for that purpose by the Trustee.

This Certificate does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.  In addition, the Trustee will furnish to any Unitholder, upon written request and without charge, a copy of the Trust Agreement.

Reference is hereby made to the further terms of this Certificate set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Certificate shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Certificate to be duly executed.

HTA CLASS 6 TRUST

CLASS N-2031 UNIT NO. _____

By:   Wilmington Trust, N.A., as Trustee

By:   _____
      Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:   Wilmington Trust, N.A., as Trustee

By:   _____
      Authorized Signatory

[REVERSE OF UNIT CERTIFICATE]

HTA CLASS 6 TRUST

CLASS N-2031 UNIT

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, at the option of the Unitholder and at such Unitholder's expense, the transfer of this Certificate is registerable in the Unit Register upon surrender of this Certificate for registration of transfer at the office or agency maintained for such purpose, accompanied by a certificate of transfer substantially in the form of Exhibit D of the Trust Agreement, and thereupon the Unit Registrar shall execute, authenticate and deliver, in the name of the designated transferee or transferees, one or more new Certificates of any authorized denominations, of a like aggregate Notional Amount. All transfers of Units are subject to the approval of the Unit Registrar and the Unit Registrar shall not register any transfer of Units if such transfer would violate any provision of the Trust Agreement. All Units issued upon any registration of transfer or exchange of Units shall be entitled to the same benefits under the Trust Agreement as the Units surrendered upon such registration of transfer or exchange. The Trustee may require payment by the Unitholder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Units.

As provided in the Trust Agreement and subject to certain limitations therein set forth, each Unit presented or surrendered for registration of transfer or exchange shall be duly endorsed (and in the case of a transfer, accompanied by a certificate of transfer in substantially the form of Exhibit D of the Trust Agreement), duly executed by the Unitholder thereof or its attorney duly authorized in writing or by a member firm of a national securities exchange, and surrendered along with such other documents as the Unit Registrar may require. If, at any time, the Trustee learns that any of the representations or warranties provided by a potential transferee of any Certificate is false or that any agreement made therein has been violated, any transfer of such Unit to such potential transferee shall be null and void ab initio.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Unitholders will be responsible for the payment of all taxes with respect to the Trust Property. Each Electing Holder receiving the Units on the Closing Date (and each assignee thereof) will be responsible for providing the Trust such information reasonably requested by the Trust as may be deemed necessary or advisable in order for the Trust to provide tax reporting. None of the Depositor, the Credit Support Provider or the Trustee will be responsible for making any tax payments or tax reporting other than as set forth in the Trust Agreement. The Trust and each Sub-Trust, through its Accountant, shall be responsible for all tax reporting obligations and

withholding (if any) for the Trust, each Sub-Trust and Unitholders as required by law and consistent with the treatment of the Trust and each Sub-Trust as a grantor trust and the Unitholders as beneficial owners of a pro rata share of the Class N-2031 Trust Property (but subject further to the tax characterization described in the Trust Agreement), for purposes of the U.S. federal income tax, and any state and local taxes.  Such obligations shall include: the timely filing of completed tax returns (if any) and information statements (if any), including any extensions, and any filings or information as required by the Accountant.  To assure the foregoing, the Trustee shall utilize the Accountant, with fees and expenses of the Accountant being a cost of the applicable Sub-Trust.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee.  The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

EXHIBIT B10

FORM OF CLASS N-2045 UNIT

HTA CLASS 6 TRUST

CLASS N-2045 UNIT

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-TRUSTS TO WHICH THIS UNIT RELATES.

REGISTERED INITIAL OVERALL AMOUNT:                                    $200,000

HTA CLASS 6 TRUST

CLASS N-2045 UNIT

This certifies that _____ is
the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been
created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth
therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington
Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways
and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to,
with respect to the Calculation Agent obligations and the provisions relating to the Credit
Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support
Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to
such terms in the Trust Agreement.  This Unit is one of the Units described in the Trust
Agreement and is issued under and subject to the terms, provisions and conditions of the Trust
Agreement.  By acceptance of this Unit, the Unitholder assents to and becomes bound by the
Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds
composed of the bond issue identified as Puerto Rico Highways and Transportation Authority
Transportation Revenue Refunding Bonds, Series N (LIBOR Bonds), due July 1, 2045; (ii) the
Class N-2045 Taxable HTA CVI/Bonds and all payments on or collections in respect thereof;
(iii) the Class N-2045 Non-Taxable HTA CVI/Bonds  and all payments on or collections in
respect  thereof; (iv) the benefit of the Class N-2045 Credit Support; (v) all Permitted
Investments and all funds from time to time deposited in the Class N-2045 Taxable Collection
Account; (vi) all funds from time to time deposited in the Class N-2045 Non-Taxable Collection
Account and the Class N-2045 Credit Support Collection Account; and (vii) any other asset
constituting a portion or proceeds of such Class N-2045 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the
Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees
and expenses of the Accountant and any other fees and expenses of the Trust in connection with
tax obligations, and until the obligations created by the Trust Agreement shall have terminated in
accordance therewith, any distributions shall be distributed on each Distribution Date, to the
Person in whose name this Unit is registered at the close of business on the related Record Date,
if applicable, and in the case of the Global Securities, in accordance with the procedures of the
Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class N-2045
Scheduled Final Redemption Date.

Distributions on this Certificate will be made by wire transfer of immediately available funds to an account designated in writing by a Unitholder to the Trustee.  If no such notice has been given, distributions will be made by the Trustee by check mailed to the Unitholder of record at its address as it appears in the Unit Register without the presentation or surrender of this Certificate or the making of any notation hereon.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class N-2045 Scheduled Final Redemption Date for this Certificate will be made only upon presentation and surrender of this Certificate at the office or agency maintained for that purpose by the Trustee.

This Certificate does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.  In addition, the Trustee will furnish to any Unitholder, upon written request and without charge, a copy of the Trust Agreement.

Reference is hereby made to the further terms of this Certificate set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Certificate shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Certificate to be duly executed.

HTA CLASS 6 TRUST

CLASS N-2045 UNIT NO. _____

By:    Wilmington Trust, N.A., as Trustee

By:    _____
        Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:    Wilmington Trust, N.A., as Trustee

By:    _____
        Authorized Signatory

[REVERSE OF UNIT CERTIFICATE]

HTA CLASS 6 TRUST

CLASS N-2045 UNIT

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, at the option of the Unitholder and at such Unitholder's expense, the transfer of this Certificate is registerable in the Unit Register upon surrender of this Certificate for registration of transfer at the office or agency maintained for such purpose, accompanied by a certificate of transfer substantially in the form of Exhibit D of the Trust Agreement, and thereupon the Unit Registrar shall execute, authenticate and deliver, in the name of the designated transferee or transferees, one or more new Certificates of any authorized denominations, of a like aggregate Notional Amount.  All transfers of Units are subject to the approval of the Unit Registrar and the Unit Registrar shall not register any transfer of Units if such transfer would violate any provision of the Trust Agreement.  All Units issued upon any registration of transfer or exchange of Units shall be entitled to the same benefits under the Trust Agreement as the Units surrendered upon such registration of transfer or exchange.  The Trustee may require payment by the Unitholder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Units.

As provided in the Trust Agreement and subject to certain limitations therein set forth, each Unit presented or surrendered for registration of transfer or exchange shall be duly endorsed (and in the case of a transfer, accompanied by a certificate of transfer in substantially the form of Exhibit D of the Trust Agreement), duly executed by the Unitholder thereof or its attorney duly authorized in writing or by a member firm of a national securities exchange, and surrendered along with such other documents as the Unit Registrar may require.  If, at any time, the Trustee learns that any of the representations or warranties provided by a potential transferee of any Certificate is false or that any agreement made therein has been violated, any transfer of such Unit to such potential transferee shall be null and void ab initio.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Unitholders will be responsible for the payment of all taxes with respect to the Trust Property.  Each Electing Holder receiving the Units on the Closing Date (and each assignee thereof) will be responsible for providing the Trust such information reasonably requested by the Trust as may be deemed necessary or advisable in order for the Trust to provide tax reporting.  None of the Depositor, the Credit Support Provider or the Trustee will be responsible for making any tax payments or tax reporting other than as set forth in the Trust Agreement.  The Trust and Sub-Trust, through its Accountant, shall be responsible for all tax reporting obligations and

withholding (if any) for the Trust, each Sub-Trust and Unitholders as required by law and consistent with the treatment of the Trust and each Sub-Trust as a grantor trust and the Unitholders as beneficial owners of a pro rata share of the Class N-2045 Trust Property (but subject further to the tax characterization described in the Trust Agreement), for purposes of the U.S. federal income tax, and any state and local taxes. Such obligations shall include: the timely filing of completed tax returns (if any) and information statements (if any), including any extensions, and any filings or information as required by the Accountant. To assure the foregoing, the Trustee shall utilize the Accountant, with fees and expenses of the Accountant being a cost of the applicable Sub-Trust.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee. The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

EXHIBIT C1

FORM OF CLASS A-2028 UNIT GLOBAL SECURITY

HTA CLASS 6 TRUST

CLASS A-2028 GLOBAL SECURITY

THIS CERTIFICATE IS A GLOBAL SECURITY (WITHIN THE MEANING OF THE TRUST AGREEMENT HEREINAFTER REFERRED TO) AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY.  THIS GLOBAL SECURITY IS EXCHANGEABLE FOR CERTIFICATES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE TRUST AGREEMENT, AND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY.  UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TRUST COMPANY ("DTC") TO THE TRUSTEE (AS DEFINED IN THE TRUST AGREEMENT) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY GLOBAL SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST THEREIN.

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-TRUSTS TO WHICH THIS UNIT RELATES.

NOTIONAL AMOUNT:  $2,251,000                          CUSIP NO.:  40440SAA0

SCHEDULED FINAL REDEMPTION DATE: July 1, 2028

HTA CLASS 6 TRUST

CLASS A-2028 UNIT GLOBAL SECURITY

This certifies that CEDE & CO. is the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to, with respect to the Calculation Agent obligations and the provisions relating to the Credit Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to such terms in the Trust Agreement.  This Global Security is one of the Global Securities described in the Trust Agreement and is issued under and subject to the terms, provisions and conditions of the Trust Agreement.  By acceptance of this Global Security, the Unitholder assents to and becomes bound by the Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds, Series A, due July 1, 2028; (ii) the Class A-2028 Taxable HTA CVI/Bonds and all payments on or collections in respect thereof; (iii) the Class A-2028 Non-Taxable HTA CVI/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class A-2028 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class A-2028 Taxable Collection Account; (vi) all funds from time to time deposited in the Class A-2028 Non-Taxable Collection Account and the Class A-2028 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class A-2028 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees and expenses of the Accountant and any other fees and expenses of the Trust in connection with tax obligations, and until the obligations created by the Trust Agreement shall have terminated in accordance therewith, any distributions shall be distributed on each Distribution Date to the Person in whose name this Unit is registered at the close of business on the related Record Date, if applicable, and in the case of the Global Securities, in accordance with the procedures of the Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class A-2028 Scheduled Final Redemption Date.

This Global Security may be reduced by prior distributions as provided in the Trust Agreement.

Distributions on this Global Security shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of the Trust Agreement, by wire transfer of immediately available funds to the Unitholder in accordance with the procedures of the Depositary.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class A-2028 Scheduled Final Redemption Date for this Global Security will be made only upon presentation and surrender of this Global Security at the office or agency maintained for that purpose by the Trustee.

This Global Security does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.  In addition, the Trustee will furnish to any Unitholder, upon written request and without charge, a copy of the Trust Agreement.

Reference is hereby made to the further terms of this Global Security set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Global Security shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Global Security to be duly executed.

HTA CLASS 6 TRUST

CLASS A-2028 GLOBAL SECURITY NO. _____

By:    Wilmington Trust, N.A., as Trustee


By:    _____
       Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:    Wilmington Trust, N.A., as Trustee


By:    _____
       Authorized Signatory

[REVERSE OF GLOBAL SECURITY]

HTA CLASS 6 TRUST

CLASS A-2028 GLOBAL SECURITY

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, if, at any time, the Trustee learns that a transfer of a Global Security (or a beneficial interest therein) shall have been made without the transferor complying with its obligations under the Trust Agreement, any transfer of such Global Security (or beneficial interest therein) to such potential transferee shall be null and void ab initio.

The transfer and exchange of this Global Security will be effected through the Depositary, in accordance with the provisions of the Trust Agreement and the Applicable Procedures. The Unitholder may transfer this Unit to Persons who take delivery thereof only in the form of a beneficial interest in the same Global Security.

This Global Security is exchangeable for Certificates registered in the name of Persons other than the Depositary or its nominee only in the limited circumstances described in the Trust Agreement.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Holders of a beneficial interest in this Global Security will be responsible for the payment of all taxes with respect to the Trust Property.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee. The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

SCHEDULE A

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The following increases or decreases in this Global Security have been made:

| Date | Amount of decrease in Registered Amount of this Global Security | Amount of increase in Registered Amount of this Global Security | Registered Amount of this Global Security following such decrease or increase | Signature of authorized officer of Trustee |
|------|------|------|------|------|

EXHIBIT C2

FORM OF CLASS L-2038 UNIT GLOBAL SECURITY

HTA CLASS 6 TRUST

CLASS L-2038 GLOBAL SECURITY

THIS CERTIFICATE IS A GLOBAL SECURITY (WITHIN THE MEANING OF THE TRUST AGREEMENT HEREINAFTER REFERRED TO) AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY.  THIS GLOBAL SECURITY IS EXCHANGEABLE FOR CERTIFICATES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE TRUST AGREEMENT, AND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY.  UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TRUST COMPANY ("DTC") TO THE TRUSTEE (AS DEFINED IN THE TRUST AGREEMENT) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY GLOBAL SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST THEREIN.

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-TRUSTS TO WHICH THIS UNIT RELATES.

NOTIONAL AMOUNT:  $154,012,500                    CUSIP NO.:  40440SAB8

SCHEDULED FINAL REDEMPTION DATE: July 1, 2038

<div align="center">

HTA CLASS 6 TRUST

CLASS L-2038 UNIT GLOBAL SECURITY

</div>

This certifies that CEDE & CO. is the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to, with respect to the Calculation Agent obligations and the provisions relating to the Credit Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to such terms in the Trust Agreement.  This Global Security is one of the Global Securities described in the Trust Agreement and is issued under and subject to the terms, provisions and conditions of the Trust Agreement.  By acceptance of this Global Security, the Unitholder assents to and becomes bound by the Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Puerto Rico Highways and Transportation Authority Transportation Revenue Refunding Bonds, Series L, due July 1, 2038; (ii) the Class L-2038 Taxable HTA CVI/Bonds and all payments on or collections in respect thereof; (iii) the Class L-2038 Non-Taxable HTA CVI/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class L-2038 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class L-2038 Taxable Collection Account; (vi) all funds from time to time deposited in the Class L-2038 Non-Taxable Collection Account and the Class L-2038 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class L-2038 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees and expenses of the Accountant and any other fees and expenses of the Trust in connection with tax obligations, and until the obligations created by the Trust Agreement shall have terminated in accordance therewith, any distributions shall be distributed on each Distribution Date to the Person in whose name this Unit is registered at the close of business on the related Record Date, if applicable, and in the case of the Global Securities, in accordance with the procedures of the Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class L-2038 Scheduled Final Redemption Date.

This Global Security may be reduced by prior distributions as provided in the Trust Agreement.

Distributions on this Global Security shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of the Trust Agreement, by wire transfer of immediately available funds to the Unitholder in accordance with the procedures of the Depositary.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class L-2038 Scheduled Final Redemption Date for this Global Security will be made only upon presentation and surrender of this Global Security at the office or agency maintained for that purpose by the Trustee.

This Global Security does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.

Reference is hereby made to the further terms of this Global Security set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Global Security shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Global Security to be duly executed.

HTA CLASS 6 TRUST

CLASS L-2038 GLOBAL SECURITY NO. _____

By:    Wilmington Trust, N.A., as Trustee


By:    _____
       Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:    Wilmington Trust, N.A., as Trustee


By:    _____
       Authorized Signatory

[REVERSE OF GLOBAL SECURITY]

HTA CLASS 6 TRUST

CLASS L-2038 GLOBAL SECURITY

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, if, at any time, the Trustee learns that a transfer of a Global Security (or a beneficial interest therein) shall have been made without the transferor complying with its obligations under the Trust Agreement, any transfer of such Global Security (or beneficial interest therein) to such potential transferee shall be null and void ab initio.

The transfer and exchange of this Global Security will be effected through the Depositary, in accordance with the provisions of the Trust Agreement and the Applicable Procedures.  The Unitholder may transfer this Unit to Persons who take delivery thereof only in the form of a beneficial interest in the same Global Security.

This Global Security is exchangeable for Certificates registered in the name of Persons other than the Depositary or its nominee only in the limited circumstances described in the Trust Agreement.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Holders of a beneficial interest in this Global Security will be responsible for the payment of all taxes with respect to the Trust Property.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee.  The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

SCHEDULE A

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The following increases or decreases in this Global Security have been made:

| Date | Amount of decrease in Registered Amount of this Global Security | Amount of increase in Registered Amount of this Global Security | Registered Amount of this Global Security following such decrease or increase | Signature of authorized officer of Trustee |
|------|---------------------------------------------------------------|------------------------------------------------------------------|--------------------------------------------------------------------------------|--------------------------------------------|

EXHIBIT C3

FORM OF CLASS M-2023 UNIT GLOBAL SECURITY

HTA CLASS 6 TRUST

CLASS M-2023 GLOBAL SECURITY

THIS CERTIFICATE IS A GLOBAL SECURITY (WITHIN THE MEANING OF THE
TRUST AGREEMENT HEREINAFTER REFERRED TO) AND IS REGISTERED IN THE
NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY.  THIS GLOBAL
SECURITY IS EXCHANGEABLE FOR CERTIFICATES REGISTERED IN THE NAME OF
A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE
LIMITED CIRCUMSTANCES DESCRIBED IN THE TRUST AGREEMENT, AND MAY
NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A
NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE
DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY.  UNLESS THIS
GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE
DEPOSITARY TRUST COMPANY ("DTC") TO THE TRUSTEE (AS DEFINED IN THE
TRUST AGREEMENT) OR ITS AGENT FOR REGISTRATION OF TRANSFER,
EXCHANGE OR PAYMENT, AND ANY GLOBAL SECURITY ISSUED IS REGISTERED
IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY
AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO
CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN
AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER
USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL
INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST
THEREIN.

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH
THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE
AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH
STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE
APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED
THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES
THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING
TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-
TRUSTS TO WHICH THIS UNIT RELATES.

NOTIONAL AMOUNT:  $470,000                    CUSIP NO.:  40440SAC6

SCHEDULED FINAL REDEMPTION DATE: July 1, 2023

## HTA CLASS 6 TRUST

## CLASS M-2023 UNIT GLOBAL SECURITY

This certifies that CEDE & CO. is the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to, with respect to the Calculation Agent obligations and the provisions relating to the Credit Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to such terms in the Trust Agreement.  This Global Security is one of the Global Securities described in the Trust Agreement and is issued under and subject to the terms, provisions and conditions of the Trust Agreement.  By acceptance of this Global Security, the Unitholder assents to and becomes bound by the Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds, Series M, due July 1, 2023; (ii) the Class M-2023 Taxable HTA CVI/Bonds and all payments on or collections in respect thereof; (iii) the Class M-2023 Non-Taxable HTA CVI/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class M-2023 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class M-2023 Taxable Collection Account; (vi) all funds from time to time deposited in the Class M-2023 Non-Taxable Collection Account and the Class M-2023 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class M-2023 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees and expenses of the Accountant and any other fees and expenses of the Trust in connection with tax obligations, and until the obligations created by the Trust Agreement shall have terminated in accordance therewith, any distributions shall be distributed on each Distribution Date to the Person in whose name this Unit is registered at the close of business on the related Record Date, if applicable, and in the case of the Global Securities, in accordance with the procedures of the Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class M-2023 Scheduled Final Redemption Date.

This Global Security may be reduced by prior distributions as provided in the Trust Agreement.

Distributions on this Global Security shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of the Trust Agreement, by wire transfer of immediately available funds to the Unitholder in accordance with the procedures of the Depositary.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class M-2023 Scheduled Final Redemption Date for this Global Security will be made only upon presentation and surrender of this Global Security at the office or agency maintained for that purpose by the Trustee.

This Global Security does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.

Reference is hereby made to the further terms of this Global Security set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Global Security shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

     IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Global Security to be duly executed.

HTA CLASS 6 TRUST

CLASS M-2023 GLOBAL SECURITY NO. ____

By:    Wilmington Trust, N.A., as Trustee

By:    _____
       Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:    Wilmington Trust, N.A., as Trustee

By:    _____
       Authorized Signatory

[REVERSE OF GLOBAL SECURITY]

HTA CLASS 6 TRUST

CLASS M-2023 GLOBAL SECURITY

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, if, at any time, the Trustee learns that a transfer of a Global Security (or a beneficial interest therein) shall have been made without the transferor complying with its obligations under the Trust Agreement, any transfer of such Global Security (or beneficial interest therein) to such potential transferee shall be null and void ab initio.

The transfer and exchange of this Global Security will be effected through the Depositary, in accordance with the provisions of the Trust Agreement and the Applicable Procedures. The Unitholder may transfer this Unit to Persons who take delivery thereof only in the form of a beneficial interest in the same Global Security.

This Global Security is exchangeable for Certificates registered in the name of Persons other than the Depositary or its nominee only in the limited circumstances described in the Trust Agreement.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Holders of a beneficial interest in this Global Security will be responsible for the payment of all taxes with respect to the Trust Property.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee. The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

SCHEDULE A

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The following increases or decreases in this Global Security have been made:

| Date | Amount of decrease in Registered Amount of this Global Security | Amount of increase in Registered Amount of this Global Security | Registered Amount of this Global Security following such decrease or increase | Signature of authorized officer of Trustee |
| --- | --- | --- | --- | --- |

EXHIBIT C4

FORM OF CLASS N-2026 UNIT GLOBAL SECURITY

HTA CLASS 6 TRUST

CLASS N-2026 GLOBAL SECURITY

THIS CERTIFICATE IS A GLOBAL SECURITY (WITHIN THE MEANING OF THE
TRUST AGREEMENT HEREINAFTER REFERRED TO) AND IS REGISTERED IN THE
NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY.  THIS GLOBAL
SECURITY IS EXCHANGEABLE FOR CERTIFICATES REGISTERED IN THE NAME OF
A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE
LIMITED CIRCUMSTANCES DESCRIBED IN THE TRUST AGREEMENT, AND MAY
NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A
NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE
DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY.  UNLESS THIS
GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE
DEPOSITARY TRUST COMPANY ("DTC") TO THE TRUSTEE (AS DEFINED IN THE
TRUST AGREEMENT) OR ITS AGENT FOR REGISTRATION OF TRANSFER,
EXCHANGE OR PAYMENT, AND ANY GLOBAL SECURITY ISSUED IS REGISTERED
IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY
AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO
CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN
AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER
USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL
INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST
THEREIN.

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH
THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE
AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH
STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE
APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED
THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES
THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING
TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-
TRUSTS TO WHICH THIS UNIT RELATES.

NOTIONAL AMOUNT:  $880,000                                    CUSIP NO.:  40440SAD4

SCHEDULED FINAL REDEMPTION DATE: July 1, 2026

<div align="center">HTA CLASS 6 TRUST</div>

<div align="center">CLASS N-2026 UNIT GLOBAL SECURITY</div>

This certifies that CEDE & CO. is the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to, with respect to the Calculation Agent obligations and the provisions relating to the Credit Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to such terms in the Trust Agreement.  This Global Security is one of the Global Securities described in the Trust Agreement and is issued under and subject to the terms, provisions and conditions of the Trust Agreement.  By acceptance of this Global Security, the Unitholder assents to and becomes bound by the Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Puerto Rico Highways and Transportation Authority Transportation Revenue Refunding Bonds, Series N, due July 1, 2026; (ii) the Class N-2026 Taxable HTA CVI/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2026 Non-Taxable HTA CVI/Bonds and all payments on or collections in respect  thereof; (iv) the benefit of the Class N-2026 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2026 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2026 Non-Taxable Collection Account and the Class N-2026 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2026 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees and expenses of the Accountant and any other fees and expenses of the Trust in connection with tax obligations, and until the obligations created by the Trust Agreement shall have terminated in accordance therewith, any distributions shall be distributed on each Distribution Date to the Person in whose name this Unit is registered at the close of business on the related Record Date, if applicable, and in the case of the Global Securities, in accordance with the procedures of the Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class N-2026 Scheduled Final Redemption Date.

This Global Security may be reduced by prior distributions as provided in the Trust Agreement.

Distributions on this Global Security shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of the Trust Agreement, by wire transfer of immediately available funds to the Unitholder in accordance with the procedures of the Depositary.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class N-2026 Scheduled Final Redemption Date for this Global Security will be made only upon presentation and surrender of this Global Security at the office or agency maintained for that purpose by the Trustee.

This Global Security does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.

Reference is hereby made to the further terms of this Global Security set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Global Security shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Global Security to be duly executed.

HTA CLASS 6 TRUST

CLASS N-2026 GLOBAL SECURITY NO. _____

By:     Wilmington Trust, N.A., as Trustee

By:     _____
        Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:     Wilmington Trust, N.A., as Trustee

By:     _____
        Authorized Signatory

[REVERSE OF GLOBAL SECURITY]

HTA CLASS 6 TRUST

CLASS N-2026 GLOBAL SECURITY

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, if, at any time, the Trustee learns that a transfer of a Global Security (or a beneficial interest therein) shall have been made without the transferor complying with its obligations under the Trust Agreement, any transfer of such Global Security (or beneficial interest therein) to such potential transferee shall be null and void ab initio.

The transfer and exchange of this Global Security will be effected through the Depositary, in accordance with the provisions of the Trust Agreement and the Applicable Procedures.  The Unitholder may transfer this Unit to Persons who take delivery thereof only in the form of a beneficial interest in the same Global Security.

This Global Security is exchangeable for Certificates registered in the name of Persons other than the Depositary or its nominee only in the limited circumstances described in the Trust Agreement.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Holders of a beneficial interest in this Global Security will be responsible for the payment of all taxes with respect to the Trust Property.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee.  The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

SCHEDULE A

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The following increases or decreases in this Global Security have been made:

| Date | Amount of decrease in Registered Amount of this Global Security | Amount of increase in Registered Amount of this Global Security | Registered Amount of this Global Security following such decrease or increase | Signature of authorized officer of Trustee |
|------|------|------|------|------|

EXHIBIT C5

FORM OF CLASS N-2027 UNIT GLOBAL SECURITY

HTA CLASS 6 TRUST

CLASS N-2027 GLOBAL SECURITY

THIS CERTIFICATE IS A GLOBAL SECURITY (WITHIN THE MEANING OF THE TRUST AGREEMENT HEREINAFTER REFERRED TO) AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY.  THIS GLOBAL SECURITY IS EXCHANGEABLE FOR CERTIFICATES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE TRUST AGREEMENT, AND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY.  UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TRUST COMPANY ("DTC") TO THE TRUSTEE (AS DEFINED IN THE TRUST AGREEMENT) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY GLOBAL SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST THEREIN.

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-TRUSTS TO WHICH THIS UNIT RELATES.

NOTIONAL AMOUNT:  $6,040,000                              CUSIP NO.:  40440SAE2

SCHEDULED FINAL REDEMPTION DATE: July 1, 2027

HTA CLASS 6 TRUST

CLASS N-2027 UNIT GLOBAL SECURITY

This certifies that CEDE & CO. is the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to, with respect to the Calculation Agent obligations and the provisions relating to the Credit Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to such terms in the Trust Agreement.  This Global Security is one of the Global Securities described in the Trust Agreement and is issued under and subject to the terms, provisions and conditions of the Trust Agreement.  By acceptance of this Global Security, the Unitholder assents to and becomes bound by the Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Puerto Rico Highways and Transportation Authority Transportation Revenue Refunding Bonds, Series N (CPI Bonds), due July 1, 2027; (ii) the Class N-2027 Taxable HTA CVI/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2027 Non-Taxable HTA CVI/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class N-2027 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2027 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2027 Non-Taxable Collection Account and the Class N-2027 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2027 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees and expenses of the Accountant and any other fees and expenses of the Trust in connection with tax obligations, and until the obligations created by the Trust Agreement shall have terminated in accordance therewith, any distributions shall be distributed on each Distribution Date to the Person in whose name this Unit is registered at the close of business on the related Record Date, if applicable, and in the case of the Global Securities, in accordance with the procedures of the Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class N-2027 Scheduled Final Redemption Date.

This Global Security may be reduced by prior distributions as provided in the Trust Agreement.

Distributions on this Global Security shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of the Trust Agreement, by wire transfer of immediately available funds to the Unitholder in accordance with the procedures of the Depositary.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class N-2027 Scheduled Final Redemption Date for this Global Security will be made only upon presentation and surrender of this Global Security at the office or agency maintained for that purpose by the Trustee.

This Global Security does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.

Reference is hereby made to the further terms of this Global Security set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Global Security shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Global Security to be duly executed.

HTA CLASS 6 TRUST

CLASS N-2027 GLOBAL SECURITY NO. _____

By:    Wilmington Trust, N.A., as Trustee


By:    _____
       Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:    Wilmington Trust, N.A., as Trustee


By:    _____
       Authorized Signatory

[REVERSE OF GLOBAL SECURITY]

HTA CLASS 6 TRUST

CLASS N-2027 GLOBAL SECURITY

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, if, at any time, the Trustee learns that a transfer of a Global Security (or a beneficial interest therein) shall have been made without the transferor complying with its obligations under the Trust Agreement, any transfer of such Global Security (or beneficial interest therein) to such potential transferee shall be null and void ab initio.

The transfer and exchange of this Global Security will be effected through the Depositary, in accordance with the provisions of the Trust Agreement and the Applicable Procedures. The Unitholder may transfer this Unit to Persons who take delivery thereof only in the form of a beneficial interest in the same Global Security.

This Global Security is exchangeable for Certificates registered in the name of Persons other than the Depositary or its nominee only in the limited circumstances described in the Trust Agreement.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Holders of a beneficial interest in this Global Security will be responsible for the payment of all taxes with respect to the Trust Property.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee. The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

SCHEDULE A

## SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The following increases or decreases in this Global Security have been made:

| Date | Amount of decrease in Registered Amount of this Global Security | Amount of increase in Registered Amount of this Global Security | Registered Amount of this Global Security following such decrease or increase | Signature of authorized officer of Trustee |
|---|---|---|---|---|

EXHIBIT C6

FORM OF CLASS N-2028 UNIT GLOBAL SECURITY


HTA CLASS 6 TRUST

CLASS N-2028 GLOBAL SECURITY

THIS CERTIFICATE IS A GLOBAL SECURITY (WITHIN THE MEANING OF THE TRUST AGREEMENT HEREINAFTER REFERRED TO) AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY.  THIS GLOBAL SECURITY IS EXCHANGEABLE FOR CERTIFICATES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE TRUST AGREEMENT, AND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY.  UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TRUST COMPANY ("DTC") TO THE TRUSTEE (AS DEFINED IN THE TRUST AGREEMENT) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY GLOBAL SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST THEREIN.

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST and SUB-TRUSTS TO WHICH THIS UNIT RELATES.

NOTIONAL AMOUNT:  $13,491,000                    CUSIP NO.:  40440SAF9

SCHEDULED FINAL REDEMPTION DATE: July 1, 2028

## HTA CLASS 6 TRUST

## CLASS N-2028 UNIT GLOBAL SECURITY

This certifies that CEDE & CO. is the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to, with respect to the Calculation Agent obligations and the provisions relating to the Credit Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to such terms in the Trust Agreement.  This Global Security is one of the Global Securities described in the Trust Agreement and is issued under and subject to the terms, provisions and conditions of the Trust Agreement.  By acceptance of this Global Security, the Unitholder assents to and becomes bound by the Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Puerto Rico Highways and Transportation Authority Transportation Revenue Refunding Bonds, Series N (CPI Bonds), due July 1, 2028; (ii) the Class N-2028 Taxable HTA CVI/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2028 Non-Taxable HTA CVI/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class N-2028 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2028 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2028 Non-Taxable Collection Account and the Class N-2028 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2028 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees and expenses of the Accountant and any other fees and expenses of the Trust in connection with tax obligations, and until the obligations created by the Trust Agreement shall have terminated in accordance therewith, any distributions shall be distributed on each Distribution Date to the Person in whose name this Unit is registered at the close of business on the related Record Date, if applicable, and in the case of the Global Securities, in accordance with the procedures of the Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class N-2028 Scheduled Final Redemption Date.

This Global Security may be reduced by prior distributions as provided in the Trust Agreement.

Distributions on this Global Security shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of the Trust Agreement, by wire transfer of immediately available funds to the Unitholder in accordance with the procedures of the Depositary.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class N-2028 Scheduled Final Redemption Date for this Global Security will be made only upon presentation and surrender of this Global Security at the office or agency maintained for that purpose by the Trustee.

This Global Security does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.

Reference is hereby made to the further terms of this Global Security set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Global Security shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Global Security to be duly executed.

HTA CLASS 6 TRUST

CLASS N-2028 GLOBAL SECURITY NO. _____

By:     Wilmington Trust, N.A., as Trustee

By:     _____
        Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:     Wilmington Trust, N.A., as Trustee

By:     _____
        Authorized Signatory

[REVERSE OF GLOBAL SECURITY]

HTA CLASS 6 TRUST

CLASS N-2028 GLOBAL SECURITY

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, if, at any time, the Trustee learns that a transfer of a Global Security (or a beneficial interest therein) shall have been made without the transferor complying with its obligations under the Trust Agreement, any transfer of such Global Security (or beneficial interest therein) to such potential transferee shall be null and void ab initio.

The transfer and exchange of this Global Security will be effected through the Depositary, in accordance with the provisions of the Trust Agreement and the Applicable Procedures. The Unitholder may transfer this Unit to Persons who take delivery thereof only in the form of a beneficial interest in the same Global Security.

This Global Security is exchangeable for Certificates registered in the name of Persons other than the Depositary or its nominee only in the limited circumstances described in the Trust Agreement.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Holders of a beneficial interest in this Global Security will be responsible for the payment of all taxes with respect to the Trust Property.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee. The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

SCHEDULE A

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The following increases or decreases in this Global Security have been made:

| Date | Amount of decrease in Registered Amount of this Global Security | Amount of increase in Registered Amount of this Global Security | Registered Amount of this Global Security following such decrease or increase | Signature of authorized officer of Trustee |
|------|------|------|------|------|

EXHIBIT C7

FORM OF CLASS N-2029 UNIT GLOBAL SECURITY

HTA CLASS 6 TRUST

CLASS N-2029 GLOBAL SECURITY

THIS CERTIFICATE IS A GLOBAL SECURITY (WITHIN THE MEANING OF THE TRUST AGREEMENT HEREINAFTER REFERRED TO) AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY.  THIS GLOBAL SECURITY IS EXCHANGEABLE FOR CERTIFICATES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE TRUST AGREEMENT, AND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY.  UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TRUST COMPANY ("DTC") TO THE TRUSTEE (AS DEFINED IN THE TRUST AGREEMENT) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY GLOBAL SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST THEREIN.

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-TRUSTS TO WHICH THIS UNIT RELATES.

NOTIONAL AMOUNT:  $25,895,000                              CUSIP NO.:  40440SAG7

SCHEDULED FINAL REDEMPTION DATE: July 1, 2029

<div align="center">

HTA CLASS 6 TRUST

CLASS N-2029 UNIT GLOBAL SECURITY

</div>

This certifies that CEDE & CO. is the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to, with respect to the Calculation Agent obligations and the provisions relating to the Credit Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to such terms in the Trust Agreement.  This Global Security is one of the Global Securities described in the Trust Agreement and is issued under and subject to the terms, provisions and conditions of the Trust Agreement.  By acceptance of this Global Security, the Unitholder assents to and becomes bound by the Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Puerto Rico Highways and Transportation Authority Transportation Revenue Refunding Bonds, Series N, due July 1, 2029; (ii) the Class N-2029 Taxable HTA CVI/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2029 Non-Taxable HTA CVI/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class N-2029 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2029 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2029 Non-Taxable Collection Account and the Class N-2029 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2029 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees and expenses of the Accountant and any other fees and expenses of the Trust in connection with tax obligations, and until the obligations created by the Trust Agreement shall have terminated in accordance therewith, any distributions shall be distributed on each Distribution Date to the Person in whose name this Unit is registered at the close of business on the related Record Date, if applicable, and in the case of the Global Securities, in accordance with the procedures of the Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class N-2029 Scheduled Final Redemption Date.

This Global Security may be reduced by prior distributions as provided in the Trust Agreement.

Distributions on this Global Security shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of the Trust Agreement, by wire transfer of immediately available funds to the Unitholder in accordance with the procedures of the Depositary.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class N-2029 Scheduled Final Redemption Date for this Global Security will be made only upon presentation and surrender of this Global Security at the office or agency maintained for that purpose by the Trustee.

This Global Security does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.

Reference is hereby made to the further terms of this Global Security set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Global Security shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Global Security to be duly executed.

HTA CLASS 6 TRUST

CLASS N-2029 GLOBAL SECURITY NO. _____

By:   Wilmington Trust, N.A., as Trustee

By:   _____
      Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:   Wilmington Trust, N.A., as Trustee

By:   _____
      Authorized Signatory

[REVERSE OF GLOBAL SECURITY]

HTA CLASS 6 TRUST

CLASS N-2029 GLOBAL SECURITY

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, if, at any time, the Trustee learns that a transfer of a Global Security (or a beneficial interest therein) shall have been made without the transferor complying with its obligations under the Trust Agreement, any transfer of such Global Security (or beneficial interest therein) to such potential transferee shall be null and void ab initio.

The transfer and exchange of this Global Security will be effected through the Depositary, in accordance with the provisions of the Trust Agreement and the Applicable Procedures. The Unitholder may transfer this Unit to Persons who take delivery thereof only in the form of a beneficial interest in the same Global Security.

This Global Security is exchangeable for Certificates registered in the name of Persons other than the Depositary or its nominee only in the limited circumstances described in the Trust Agreement.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Holders of a beneficial interest in this Global Security will be responsible for the payment of all taxes with respect to the Trust Property.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee. The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

SCHEDULE A

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The following increases or decreases in this Global Security have been made:

| Date | Amount of decrease in Registered Amount of this Global Security | Amount of increase in Registered Amount of this Global Security | Registered Amount of this Global Security following such decrease or increase | Signature of authorized officer of Trustee |
|------|------|------|------|------|
| | | | | |

EXHIBIT C8

FORM OF CLASS N-2030 UNIT GLOBAL SECURITY


HTA CLASS 6 TRUST

CLASS N-2030 GLOBAL SECURITY

THIS CERTIFICATE IS A GLOBAL SECURITY (WITHIN THE MEANING OF THE TRUST AGREEMENT HEREINAFTER REFERRED TO) AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY.  THIS GLOBAL SECURITY IS EXCHANGEABLE FOR CERTIFICATES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE TRUST AGREEMENT, AND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY.  UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TRUST COMPANY ("DTC") TO THE TRUSTEE (AS DEFINED IN THE TRUST AGREEMENT) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY GLOBAL SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST THEREIN.

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-TRUSTS TO WHICH THIS UNIT RELATES.

NOTIONAL AMOUNT:  $49,220,000                     CUSIP NO.:  40440SAH5

SCHEDULED FINAL REDEMPTION DATE: July 1, 2030

HTA CLASS 6 TRUST

CLASS N-2030 UNIT GLOBAL SECURITY

This certifies that CEDE & CO. is the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to, with respect to the Calculation Agent obligations and the provisions relating to the Credit Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to such terms in the Trust Agreement.  This Global Security is one of the Global Securities described in the Trust Agreement and is issued under and subject to the terms, provisions and conditions of the Trust Agreement.  By acceptance of this Global Security, the Unitholder assents to and becomes bound by the Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Puerto Rico Highways and Transportation Authority Transportation Revenue Refunding Bonds, Series N, due July 1, 2030; (ii) the Class N-2030 Taxable HTA CVI/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2030 Non-Taxable HTA CVI/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class N-2030 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2030 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2030 Non-Taxable Collection Account and the Class N-2030 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2030 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees and expenses of the Accountant and any other fees and expenses of the Trust in connection with tax obligations, and until the obligations created by the Trust Agreement shall have terminated in accordance therewith, any distributions shall be distributed on each Distribution Date to the Person in whose name this Unit is registered at the close of business on the related Record Date, if applicable, and in the case of the Global Securities, in accordance with the procedures of the Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class N-2030 Scheduled Final Redemption Date.

This Global Security may be reduced by prior distributions as provided in the Trust Agreement.

Distributions on this Global Security shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of the Trust Agreement, by wire transfer of immediately available funds to the Unitholder in accordance with the procedures of the Depositary.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class N-2030 Scheduled Final Redemption Date for this Global Security will be made only upon presentation and surrender of this Global Security at the office or agency maintained for that purpose by the Trustee.

This Global Security does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.

Reference is hereby made to the further terms of this Global Security set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Global Security shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Global Security to be duly executed.

HTA CLASS 6 TRUST

CLASS N-2030 GLOBAL SECURITY NO. _____

By:   Wilmington Trust, N.A., as Trustee


By:   _____
      Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:   Wilmington Trust, N.A., as Trustee


By:   _____
      Authorized Signatory

[REVERSE OF GLOBAL SECURITY]

HTA CLASS 6 TRUST

CLASS N-2030 GLOBAL SECURITY

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, if, at any time, the Trustee learns that a transfer of a Global Security (or a beneficial interest therein) shall have been made without the transferor complying with its obligations under the Trust Agreement, any transfer of such Global Security (or beneficial interest therein) to such potential transferee shall be null and void ab initio.

The transfer and exchange of this Global Security will be effected through the Depositary, in accordance with the provisions of the Trust Agreement and the Applicable Procedures.  The Unitholder may transfer this Unit to Persons who take delivery thereof only in the form of a beneficial interest in the same Global Security.

This Global Security is exchangeable for Certificates registered in the name of Persons other than the Depositary or its nominee only in the limited circumstances described in the Trust Agreement.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Holders of a beneficial interest in this Global Security will be responsible for the payment of all taxes with respect to the Trust Property.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee.  The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

SCHEDULE A

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The following increases or decreases in this Global Security have been made:

| Date | Amount of decrease in Registered Amount of this Global Security | Amount of increase in Registered Amount of this Global Security | Registered Amount of this Global Security following such decrease or increase | Signature of authorized officer of Trustee |
|------|------|------|------|------|
| | | | | |

EXHIBIT C9

FORM OF CLASS N-2031 UNIT GLOBAL SECURITY

HTA CLASS 6 TRUST

CLASS N-2031 GLOBAL SECURITY

THIS CERTIFICATE IS A GLOBAL SECURITY (WITHIN THE MEANING OF THE TRUST AGREEMENT HEREINAFTER REFERRED TO) AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY. THIS GLOBAL SECURITY IS EXCHANGEABLE FOR CERTIFICATES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE TRUST AGREEMENT, AND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY. UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TRUST COMPANY ("DTC") TO THE TRUSTEE (AS DEFINED IN THE TRUST AGREEMENT) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY GLOBAL SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST THEREIN.

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-TRUSTS TO WHICH THIS UNIT RELATES.

NOTIONAL AMOUNT:  $69,124,000                             CUSIP NO.:  40440SAJ1

SCHEDULED FINAL REDEMPTION DATE: July 1, 2031

HTA CLASS 6 TRUST

CLASS N-2031 UNIT GLOBAL SECURITY

This certifies that CEDE & CO. is the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to, with respect to the Calculation Agent obligations and the provisions relating to the Credit Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to such terms in the Trust Agreement.  This Global Security is one of the Global Securities described in the Trust Agreement and is issued under and subject to the terms, provisions and conditions of the Trust Agreement.  By acceptance of this Global Security, the Unitholder assents to and becomes bound by the Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Puerto Rico Highways and Transportation Authority Transportation Revenue Refunding Bonds, Series N, due July 1, 2031; (ii) the Class N-2031 Taxable HTA CVI/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2031 Non-Taxable HTA CVI/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class N-2031 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2031 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2031 Non-Taxable Collection Account and the Class N-2031 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2031 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees and expenses of the Accountant and any other fees and expenses of the Trust in connection with tax obligations, and until the obligations created by the Trust Agreement shall have terminated in accordance therewith, any distributions shall be distributed on each Distribution Date to the Person in whose name this Unit is registered at the close of business on the related Record Date, if applicable, and in the case of the Global Securities, in accordance with the procedures of the Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class N-2031 Scheduled Final Redemption Date.

This Global Security may be reduced by prior distributions as provided in the Trust Agreement.

Distributions on this Global Security shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of the Trust Agreement, by wire transfer of immediately available funds to the Unitholder in accordance with the procedures of the Depositary.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class N-2031 Scheduled Final Redemption Date for this Global Security will be made only upon presentation and surrender of this Global Security at the office or agency maintained for that purpose by the Trustee.

This Global Security does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.

Reference is hereby made to the further terms of this Global Security set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Global Security shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Global Security to be duly executed.

HTA CLASS 6 TRUST

CLASS N-2031 GLOBAL SECURITY NO. _____

By:   Wilmington Trust, N.A., as Trustee


By:   _____
      Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:   Wilmington Trust, N.A., as Trustee


By:   _____
      Authorized Signatory

[REVERSE OF GLOBAL SECURITY]

HTA CLASS 6 TRUST

CLASS N-2031 GLOBAL SECURITY

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, if, at any time, the Trustee learns that a transfer of a Global Security (or a beneficial interest therein) shall have been made without the transferor complying with its obligations under the Trust Agreement, any transfer of such Global Security (or beneficial interest therein) to such potential transferee shall be null and void ab initio.

The transfer and exchange of this Global Security will be effected through the Depositary, in accordance with the provisions of the Trust Agreement and the Applicable Procedures. The Unitholder may transfer this Unit to Persons who take delivery thereof only in the form of a beneficial interest in the same Global Security.

This Global Security is exchangeable for Certificates registered in the name of Persons other than the Depositary or its nominee only in the limited circumstances described in the Trust Agreement.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Holders of a beneficial interest in this Global Security will be responsible for the payment of all taxes with respect to the Trust Property.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee. The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

SCHEDULE A

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The following increases or decreases in this Global Security have been made:

| Date | Amount of decrease in Registered Amount of this Global Security | Amount of increase in Registered Amount of this Global Security | Registered Amount of this Global Security following such decrease or increase | Signature of authorized officer of Trustee |
|------|------|------|------|------|
| | | | | |

EXHIBIT C10

FORM OF CLASS N-2045 UNIT GLOBAL SECURITY

HTA CLASS 6 TRUST

CLASS N-2045 GLOBAL SECURITY

THIS CERTIFICATE IS A GLOBAL SECURITY (WITHIN THE MEANING OF THE TRUST AGREEMENT HEREINAFTER REFERRED TO) AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY.  THIS GLOBAL SECURITY IS EXCHANGEABLE FOR CERTIFICATES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE TRUST AGREEMENT, AND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY.  UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TRUST COMPANY ("DTC") TO THE TRUSTEE (AS DEFINED IN THE TRUST AGREEMENT) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY GLOBAL SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST THEREIN.

THIS UNIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS UNIT MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST AND SUB-TRUSTS TO WHICH THIS UNIT RELATES.

NOTIONAL AMOUNT:  $200,000                                          CUSIP NO.:  40440SAK8

SCHEDULED FINAL REDEMPTION DATE: July 1, 2045

<div align="center">

HTA CLASS 6 TRUST

CLASS N-2045 UNIT GLOBAL SECURITY

</div>

This certifies that CEDE & CO. is the registered owner of an undivided fractional interest in the Trust Property referred to below.

The Trust Property will be held in trust by the Trustee (the "Trust").  The Trust has been created pursuant to a Trust Agreement (the "Trust Agreement"), executed as of the date set forth therein among Wilmington Trust, N.A., as Trustee of the Trust (the "Trustee"), Wilmington Trust, N.A., as Delaware Trustee of the Trust (the "Delaware Trustee"), Puerto Rico Highways and Transportation Authority, as Depositor (the "Depositor"), and acknowledged and agreed to, with respect to the Calculation Agent obligations and the provisions relating to the Credit Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support Provider (the "Credit Support Provider").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to such terms in the Trust Agreement.  This Global Security is one of the Global Securities described in the Trust Agreement and is issued under and subject to the terms, provisions and conditions of the Trust Agreement.  By acceptance of this Global Security, the Unitholder assents to and becomes bound by the Trust Agreement.

The Trust Property consists of: (i) the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Puerto Rico Highways and Transportation Authority Transportation Revenue Refunding Bonds, Series N, due July 1, 2045; (ii) the Class N-2045 Taxable HTA CVI/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2045 Non-Taxable HTA CVI/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class N-2045 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2045 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2045 Non-Taxable Collection Account and the Class N-2045 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2045 Trust Property.

Subject to the terms and conditions of the Trust Agreement and to the prior obligation of the Trust to pay all unpaid Trustee Fees, Delaware Trustee Fees, Extraordinary Trust Expenses, fees and expenses of the Accountant and any other fees and expenses of the Trust in connection with tax obligations, and until the obligations created by the Trust Agreement shall have terminated in accordance therewith, any distributions shall be distributed on each Distribution Date to the Person in whose name this Unit is registered at the close of business on the related Record Date, if applicable, and in the case of the Global Securities, in accordance with the procedures of the Depositary.  Any remaining Aggregate Unit Balance shall be distributed on the Class N-2045 Scheduled Final Redemption Date.

This Global Security may be reduced by prior distributions as provided in the Trust Agreement.

Distributions on this Global Security shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of the Trust Agreement, by wire transfer of immediately available funds to the Unitholder in accordance with the procedures of the Depositary.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the distribution on the Class N-2045 Scheduled Final Redemption Date for this Global Security will be made only upon presentation and surrender of this Global Security at the office or agency maintained for that purpose by the Trustee.

This Global Security does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby.  A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by any Unitholder upon request.

Reference is hereby made to the further terms of this Global Security set forth on the reverse hereof, which further terms shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Global Security shall not entitle the Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and the applicable Sub-Trusts, and not in its individual capacity, has caused this Global Security to be duly executed.

HTA CLASS 6 TRUST

CLASS N-2045 GLOBAL SECURITY NO. _____

By:   Wilmington Trust, N.A., as Trustee

By:   _____
      Authorized Signatory

DATED:

[SEAL]

Trustee's Certificate of Authentication:

This is one of the Units referred to in the within-mentioned Agreement.

By:   Wilmington Trust, N.A., as Trustee

By:   _____
      Authorized Signatory

[REVERSE OF GLOBAL SECURITY]

HTA CLASS 6 TRUST

CLASS N-2045 GLOBAL SECURITY

The Trust Agreement permits the amendment thereof, in certain circumstances, without the consent of the Unitholders.

As provided in the Trust Agreement and subject to certain limitations therein set forth, if, at any time, the Trustee learns that a transfer of a Global Security (or a beneficial interest therein) shall have been made without the transferor complying with its obligations under the Trust Agreement, any transfer of such Global Security (or beneficial interest therein) to such potential transferee shall be null and void ab initio.

The transfer and exchange of this Global Security will be effected through the Depositary, in accordance with the provisions of the Trust Agreement and the Applicable Procedures. The Unitholder may transfer this Unit to Persons who take delivery thereof only in the form of a beneficial interest in the same Global Security.

This Global Security is exchangeable for Certificates registered in the name of Persons other than the Depositary or its nominee only in the limited circumstances described in the Trust Agreement.

The Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered on the related Record Date, if applicable, or Distribution Date as the owner of such Unit for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.

Holders of a beneficial interest in this Global Security will be responsible for the payment of all taxes with respect to the Trust Property.

The obligations and responsibilities created by the Trust Agreement, and the Trust and Sub-Trust created thereby, will terminate upon the payment to Unitholders of all amounts required to be paid to them pursuant to the Trust Agreement.

Notwithstanding anything contained in the Trust Agreement to the contrary, the Trust Agreement has been accepted by Wilmington Trust, N.A. not in its individual capacity but solely as Trustee. The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in the Trust Agreement.

SCHEDULE A

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The following increases or decreases in this Global Security have been made:

| Date | Amount of decrease in Registered Amount of this Global Security | Amount of increase in Registered Amount of this Global Security | Registered Amount of this Global Security following such decrease or increase | Signature of authorized officer of Trustee |
|------|------|------|------|------|
| | | | | |

EXHIBIT D

Form of Transfer Certificate for Definitive Certificates

ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER
OF ASSIGNEE _____

_____

(Please print or typewrite name and address, including postal zip code, of assignee)

_____

the within Certificate, and all rights thereunder, hereby irrevocably constituting and appointing

_____

attorney-in fact, to transfer said Certificate on the books of the Unit Registrar, with full power of substitution in the premises.

Dated:

_____

By: _____
     Assignor Name:
     Assignor Address:

     Assignor SS#:

EXHIBIT E

Notice of Non-Taxable HTA CVIs/Bonds and New HTA Bonds Permitted Distribution Event

NOTICE


Wilmington Trust, N.A.,
as Trustee
[Attention:
Telephone:
E-mail:]


Ambac Assurance Corporation,
as Credit Support Provider


Ambac Assurance Corporation
One World Trade Center, 41st Floor
New York, NY 10007
Attn:  Claims Processing
E-mail: claimsprocessing@ambac.com

Re: Non-Taxable Bond Permitted Disposition Event

Ladies and Gentlemen:

Reference is made to the Trust Agreement, effective [  ], 2022 (as amended and
supplemented from time to time, the "Trust Agreement"), among Wilmington Trust, N.A., as
Trustee (the "Trustee"), Wilmington Trust, N.A., as Delaware Trustee (the "Delaware Trustee"),
and Puerto Rico Highways and Transportation Authority, as Depositor (the "Depositor"), and
acknowledged and agreed to by Ambac Assurance Corporation, as Calculation Agent (the
"Calculation Agent") and as Credit Support Provider (the "Credit Support Provider").
Capitalized terms used but not otherwise defined herein have the meanings assigned to them in
the Trust Agreement.

This notice is being provided by the Calculation Agent to the Trustee and the Credit
Support Provider, pursuant to and in accordance with Section 6.02(c) of the Trust Agreement.
Accordingly, the Calculation Agent (i) hereby notifies the Trustee and the Credit Support
Provider that a Non-Taxable Bond Permitted Disposition Event has occurred and (ii) hereby
notifies the Trustee to dispose of some or all of the Non-Taxable Bonds listed in Annex A and at
the times and market rate specified on Annex A.

**IN WITNESS WHEREOF**, the Calculation Agent has executed and delivered this Notice as of the ___ day of _____.

**Ambac Assurance Corporation**,
as Calculation Agent

By: _____
Name:
Title:

E-2

## ACKNOWLEDGEMENT OF RECEIPT

The undersigned, the duly appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the forgoing Notice.


**Wilmington Trust, N.A.**,
as Trustee


By:_____
Name:
Title:

E-3

Annex A

| HTA Bonds | | | | |
|---|---|---|---|---|
| Series | CUSIP No. | Rate | Maturity Date | Amount Outstanding |
|  |  |  |  |  |

Date/Time for Disposition: [_____]

Market Rate: [_____]

E-4

EXHIBIT F

CERTIFICATE OF TRUST

OF

HTA CLASS 6 TRUST

This Certificate of Trust of HTA CLASS 6 TRUST (the "Trust") is being duly executed
and filed by Wilmington National Association, as Delaware Trustee, to form a grantor trust
under the Delaware Statutory Trust Act (12 *Del. C.*, Section 3801 *et seq.*) (the "Act").

1. <u>Name</u>:  The name of the statutory trust formed hereby is HTA Class 6 Trust.

2. <u>Delaware Trustee</u>:  The name and business address of a trustee of the Trust having its
principal place of business in the State of Delaware are Wilmington Trust, N.A., 1100 North
Market Street, Wilmington, DE 19890.

3. <u>Effective Date</u>:  This Certificate of Trust shall be effective upon its filing with the
Secretary of State of the State of Delaware.

IN WITNESS WHEREOF, the undersigned have executed this Certificate of Trust in
accordance with Section 3811(a) of the Act.

Wilmington Trust, N.A., not individually, but solely
in its capacity as Delaware Trustee

By: _____
Name:
Title:

F-1

EXHIBIT G

POLICY CLAIM FORM
(Interest Payments)

Date: [_____][1]

Bond Issuer:  Puerto Rico Highways and Transportation Authority ("HTA"):

Bond Description/Purpose:

☐  Transportation Revenue Bonds, Series A with a Maturity Date of July 1, 2028
Ambac Policy Number: 15011BE
CUSIP No.: 7451903T3

☐  Transportation Revenue Refunding Bonds, Series L with a Maturity Date of July 1, 2038
Ambac Policy Number: 24623BE
CUSIP No.: 745190UQ9

☐  Transportation Revenue Bonds, Series M with a Maturity Date of July 1, 2023
Ambac Policy Numbers: SP26300 & SP27362BE
CUSIP No.: 745190YL6
[CUSIP No.: 745190F86 (Secondary Market)]

☐  Transportation Revenue Refunding Bonds, Series N with a Maturity Date of July 1, 2026
Ambac Policy Number: SP26314 & SP27362BE
CUSIP No.: 745190ZH4
[CUSIP No.: 745190F94 (Secondary Market)]

☐  Transportation Revenue Refunding Bonds, Series N (CPI Bonds) with a Maturity Date of July 1,
2027
Ambac Policy Number: 26270BE
CUSIP No.: 745190ZJ0

☐  Transportation Revenue Refunding Bonds, Series N (CPI Bonds) with a Maturity Date of July 1,
2028
Ambac Policy Number: 26270BE
CUSIP No.: 745190ZK7

☐  Transportation Revenue Refunding Bonds, Series N with a Maturity Date of July 1, 2029
Ambac Policy Number: SP26280BE
CUSIP No.: 745190ZL5
[CUSIP No.: 745190E79 (Secondary Market)]

☐  Transportation Revenue Refunding Bonds, Series N with Maturity Dates of July 1, 2030
Ambac Policy Number: 26270BE
CUSIP No.: 745190ZM3

☐  Transportation Revenue Refunding Bonds, Series N with Maturity Dates of July 1, 2031
Ambac Policy Number: 26270BE
CUSIP No.: 745190ZN1

---

[1] To be dated and delivered five (5) Business Days prior to the applicable Interest Payment Date.

G-1

☐    Transportation Revenue Refunding Bonds, Series N (LIBOR Bonds) with a Maturity Date of July 1, 2045
Ambac Policy Number: 26270BE
CUSIP No.: 745190ZV3

Date of Issuance: _____ ____, 2022

Date Due for Payment:                                                [_____ 1, 20___][2]

Aggregate Interest Due for Payment:                      [$_____][3]

*Less* Amount Credited (*i.e.* Available Funds):            [$_____]

Amount Claimed Under the Policy:                     [$_____][4]

*IMPORTANT: All claim forms should be sent to Ambac Assurance Corporation ("Ambac") at the address identified below. Any Person who knowingly and with intent to injure, defraud, or deceive any insurance company, files a statement of claim containing any false, incomplete, or misleading information is guilty of a felony in the third degree.*

---

Wilmington Trust, N.A., not individually, but solely in its capacity as Trustee (the "Trustee") under the HTA Class 6 Trust (the "Trust"), hereby certifies that the Trust is the owner of the bonds identified above, all of the above information is true, accurate and correct and it is entitled to the payment on the above insured bonds. Trustee hereby makes claim for the Amount Claimed Under the Policy stated above in accordance with the Policy for those insured bonds which are now "Due for Payment" (as defined in the Policy) but for which sufficient funds for payment have not been provided. Capitalized terms used herein but not defined herein have the meaning assigned to them in the Trust Agreement, effective as of [    ], 2022 (as amended and supplemented from time to time, the "Trust Agreement") among the Trustee, Wilmington Trust, N.A., as Delaware Trustee, and HTA, and acknowledged and agreed by Ambac.

<u>DELIVERY</u>

An electronic copy of Policy Claim Forms should be sent to each of the following e-mail addresses (subject to update by Ambac):

claimsprocessing@ambac.com

jwilliams@ambac.com
rkolev@ambac.com
dabramowitz@ambac.com

Wiring instructions are as follows:

---

[2] Applicable Interest Payment Date.
[3] Amount due and payable on such date under the terms of the Ambac Prepetition Insured Bonds, as reduced from time to time to reflect distributions made or deemed made under the Trust Agreement.
[4] Amount Claimed under the Policy is the shortfall of any amounts in the Available Funds by 10:00 a.m. (Eastern) on the Interest Payment Date for the applicable Class.

Wilmington Trust, N.A.
Account# [_____]
Account Name:  Credit Support Collection Account
Attn:  [_____]

At the option of Ambac, original Policy Claims Forms (to be held at the Trustee) may be required to be sent to:

Ambac Assurance Corporation
One World Trade Center, 41st Floor
New York, New York  10007
Attention: Claims Processing

<u>CONVEYANCE: SUBROGATION</u>

Without limiting the rights previously granted to Ambac pursuant to the Trust Agreement and the Plan of Adjustment, Trustee on behalf of the Trust hereby transfers, delivers and assigns to Ambac all rights to the payment of the Amount Originally Due for Payment, together with any rights related to such Aggregate Amount Originally Due for Payment, with respect to the bonds identified above which bonds are now "Due for Payment" as defined in the Policy, but only to the extent of payment by or on behalf of Ambac of the above Amount Claimed Under the Policy.  Trustee on behalf of the Trust agrees that Ambac shall also be subrogated to all of the Trust's rights thereon or in relation thereto, including all rights to payment, to the extent of such payments made by or on behalf of Ambac.  Trustee represents that it has full corporate power and authority to execute and deliver this Policy Claim Form and this Policy Claim Form has been duly authorized, executed and delivered by Trustee and constitutes a legal, valid and binding obligation of Trustee enforceable in accordance with its terms.  Trustee agrees that Ambac may exercise any option, vote, right, power or the like (including, but not limited to any such rights arising in context of a bankruptcy, insolvency, liquidation or other reorganization of the Bond Issuer), it may have to the extent of payment by or on behalf of Ambac of the above Amount Claimed Under the Policy with respect to the bonds identified above.

Wilmington Trust, N.A.,
as Trustee

By: _____
Name:
Title:

G-3

POLICY CLAIM FORM
(Sinking Fund Payments)

Date: [_____]¹

Bond Issuer:  Puerto Rico Highways and Transportation Authority ("HTA"):

Bond Description/Purpose:

☐   Transportation Revenue Bonds, Series A with a Maturity Date of July 1, 2028
     Ambac Policy Number: 15011BE
     CUSIP No.: 7451903T3

☐   Transportation Revenue Refunding Bonds, Series L with a Maturity Date of July 1, 2038
     Ambac Policy Number: 24623BE
     CUSIP No.: 745190UQ9

☐   Transportation Revenue Refunding Bonds, Series N (LIBOR Bonds) with a Maturity Date of July 1, 2045
     Ambac Policy Number: 26270BE
     CUSIP No.: 745190ZV3

Date of Issuance: _____ _____, 2022

Date Due for Payment:                                              [July 1, 20____]²

Sinking Fund Payments Due for Payment:                            [$_____]³

*Less* Amount Credited (*i.e.* Available Funds):                   [$_____]

Amount Claimed Under the Policy:                                  [$_____]⁴

*IMPORTANT:  All claim forms should be sent to Ambac Assurance Corporation ("Ambac") at the address identified below.  Any Person who knowingly and with intent to injure, defraud, or deceive any insurance company, files a statement of claim containing any false, incomplete, or misleading information is guilty of a felony in the third degree.*

Wilmington Trust, N.A., not individually, but solely in its capacity as Trustee (the "Trustee") under the HTA Class 6 Trust (the "Trust"), hereby certifies that the Trust is the owner of the bonds identified above, all of the above information is true, accurate and correct and it is entitled to the payment on the above insured bonds.  Trustee hereby makes claim for the Amount Claimed Under the Policy stated above in

---

¹ To be dated and delivered five (5) Business Days prior to the applicable Sinking Fund Distribution Date.
² Applicable Sinking Fund Payment Date.
³ Amount due and payable on such date under the terms of the Ambac Prepetition Insured Bonds, as reduced from time to time to reflect distributions made or deemed made under the Trust Agreement.
⁴ Amount Claimed under the Policy is the shortfall of any amounts in the Available Funds by 10:00 a.m. (Eastern) on the Sinking Fund Distribution Date for the applicable Class.

G-4

accordance with the Policy for those insured bonds which are now "Due for Payment" (as defined in the Policy) but for which sufficient funds for payment have not been provided.   Capitalized terms used herein but not defined herein have the meaning assigned to them in the Trust Agreement, effective as of [ ], 2022 (as amended and supplemented from time to time, the "Trust Agreement") among the Trustee, Wilmington Trust, N.A., as Delaware Trustee, and HTA, and acknowledged and agreed by Ambac.

<u>DELIVERY</u>

An electronic copy of Policy Claim Forms should be sent to each of the following e-mail addresses (subject to update by Ambac):

claimsprocessing@ambac.com

jwilliams@ambac.com
rkolev@ambac.com
dabramowitz@ambac.com

Wiring instructions are as follows:

Wilmington Trust, N.A.
Account# [_____]
Account Name:  Credit Support Collection Account
Attn:  [_____]

At the option of Ambac, original Policy Claims Forms (to be held at the Trustee) may be required to be sent to:

Ambac Assurance Corporation
One World Trade Center, 41st Floor
New York, New York  10007
Attention: Claims Processing

<u>CONVEYANCE: SUBROGATION</u>

Without limiting the rights previously granted to Ambac pursuant to the Trust Agreement and the Plan of Adjustment, Trustee on behalf of the Trust hereby transfers, delivers and assigns to Ambac all rights to the payment of the Amount Originally Due for Payment, together with any rights related to such Aggregate Amount Originally Due for Payment, with respect to the bonds identified above which bonds are now "Due for Payment" as defined in the Policy, but only to the extent of payment by or on behalf of Ambac of the above Amount Claimed Under the Policy.  Trustee on behalf of the Trust agrees that Ambac shall also be subrogated to all of the Trust's rights thereon or in relation thereto, including all rights to payment, to the extent of such payments made by or on behalf of Ambac.  Trustee represents that it has full corporate power and authority to execute and deliver this Policy Claim Form and this Policy Claim Form has been duly authorized, executed and delivered by Trustee and constitutes a legal, valid and binding obligation of Trustee enforceable in accordance with its terms.  Trustee agrees that Ambac may exercise any option, vote, right, power or the like (including, but not limited to any such rights arising in context of a bankruptcy, insolvency, liquidation or other reorganization of the Bond Issuer), it may have to the extent of payment by or on behalf of Ambac of the above Amount Claimed Under the Policy with respect to the bonds identified above.

Wilmington Trust, N.A.,
as Trustee

By: _____
Name:
Title:

POLICY CLAIM FORM
(Scheduled Final Redemptions)


Date: [_____][1]

Bond Issuer:  Puerto Rico Highways and Transportation Authority ("HTA"):

Bond Description/Purpose:

☐   Transportation Revenue Bonds, Series A with a Maturity Date of July 1, 2028
     Ambac Policy Number: 15011BE
     CUSIP No.: 7451903T3

☐   Transportation Revenue Refunding Bonds, Series L with a Maturity Date of July 1, 2038
     Ambac Policy Number: 24623BE
     CUSIP No.: 745190UQ9

☐   Transportation Revenue Bonds, Series M with a Maturity Date of July 1, 2023
     Ambac Policy Numbers: SP26300 & SP27362BE
     CUSIP No.: 745190YL6
     [CUSIP No.: 745190F86 (Secondary Market)]

☐   Transportation Revenue Refunding Bonds, Series N with a Maturity Date of July 1, 2026
     Ambac Policy Number: SP26314 & SP27362BE
     CUSIP No.: 745190ZH4
     [CUSIP No.: 745190F86 (Secondary Market)]

☐   Transportation Revenue Refunding Bonds, Series N (CPI Bonds) with a Maturity Date of July 1, 2027
     Ambac Policy Number: 26270BE
     CUSIP No.: 745190ZJ0

☐   Transportation Revenue Refunding Bonds, Series N (CPI Bonds) with a Maturity Date of July 1, 2028
     Ambac Policy Number: 26270BE
     CUSIP No.: 745190ZK7

☐   Transportation Revenue Refunding Bonds, Series N with a Maturity Date of July 1, 2029
     Ambac Policy Number: SP26280BE
     CUSIP No.: 745190ZL5
     [CUSIP No.: 745190E79 (Secondary Market)]

☐   Transportation Revenue Refunding Bonds, Series N with Maturity Dates of July 1, 2030
     Ambac Policy Number: 26270BE
     CUSIP No.: 745190ZM3

☐   Transportation Revenue Refunding Bonds, Series N with Maturity Dates of July 1, 2031
     Ambac Policy Number: 26270BE
     CUSIP No.: 745190ZN1

---

[1] To be dated and delivered five (5) Business Days prior to the applicable Scheduled Final Redemption Date.

☐   Transportation Revenue Refunding Bonds, Series N (LIBOR Bonds) with a Maturity Date of July 1, 2045
  Ambac Policy Number: 26270BE
  CUSIP No.: 745190ZV3

Date of Issuance: _____ ____, 2022

Date Due for Payment:                                                      [July 1, 20___][2]

Aggregate Amount Due for Payment:                              [$_____][3]

*Less* Amount Credited (i.e. distributions to date plus Available Funds):   [$_____]

Amount Claimed Under the Policy:                                 [$_____][4]

*IMPORTANT: All claim forms should be sent to Ambac Assurance Corporation ("Ambac") at the address identified below. Any Person who knowingly and with intent to injure, defraud, or deceive any insurance company, files a statement of claim containing any false, incomplete, or misleading information is guilty of a felony in the third degree.*

Wilmington Trust, N.A., not individually, but solely in its capacity as Trustee (the "Trustee") under the HTA Class 6 Trust (the "Trust"), hereby certifies that the Trust is the owner of the bonds identified above, all of the above information is true, accurate and correct and it is entitled to the payment on the above insured bonds. Trustee hereby makes claim for the Amount Claimed Under the Policy stated above in accordance with the Policy for those insured bonds which are now "Due for Payment" (as defined in the Policy) but for which sufficient funds for payment have not been provided. Capitalized terms used herein but not defined herein have the meaning assigned to them in the Trust Agreement, effective as of [ ], 2022 (as amended and supplemented from time to time, the "Trust Agreement") among the Trustee, Wilmington Trust, N.A., as Delaware Trustee, and HTA, and acknowledged and agreed by Ambac.

DELIVERY

An electronic copy of Policy Claim Forms should be sent to each of the following e-mail addresses (subject to update by Ambac):

claimsprocessing@ambac.com

jwilliams@ambac.com
rkolev@ambac.com
dabramowitz@ambac.com

Wiring instructions are as follows:

---

[2] Applicable Scheduled Final Redemption Date.
[3] Aggregate Amount Due for Payment is (i) the applicable Interest Distributions plus (ii) the Aggregate Unit Balance on the Scheduled Final Redemption Date, due and payable on such date under the terms of the Ambac Prepetition Insured Bonds, as reduced from time to time to reflect distributions made or deemed made under the Trust Agreement.
[4] Amount Claimed under the Policy is the shortfall of any amounts in the Available Funds by 10:00 a.m. (Eastern) on the Interest Payment Date for the applicable Class.

Wilmington Trust, N.A.
Account# [_____]
Account Name:  Credit Support Collection Account
Attn:  [_____]

At the option of Ambac, original Policy Claims Forms (to be held at the Trustee) may be required to be sent to:

Ambac Assurance Corporation
One World Trade Center, 41st Floor
New York, New York  10007
Attention: Claims Processing

<u>CONVEYANCE: SUBROGATION</u>

Without limiting the rights previously granted to Ambac pursuant to the Trust Agreement and the Plan of Adjustment, Trustee on behalf of the Trust hereby transfers, delivers and assigns to Ambac all rights to the payment of the Amount Originally Due for Payment, together with any rights related to such Aggregate Amount Originally Due for Payment, with respect to the bonds identified above which bonds are now "Due for Payment" as defined in the Policy, but only to the extent of payment by or on behalf of Ambac of the above Amount Claimed Under the Policy.  Trustee on behalf of the Trust agrees that Ambac shall also be subrogated to all of the Trust's rights thereon or in relation thereto, including all rights to payment, to the extent of such payments made by or on behalf of Ambac.  Trustee represents that it has full corporate power and authority to execute and deliver this Policy Claim Form and this Policy Claim Form has been duly authorized, executed and delivered by Trustee and constitutes a legal, valid and binding obligation of Trustee enforceable in accordance with its terms.  Trustee agrees that Ambac may exercise any option, vote, right, power or the like (including, but not limited to any such rights arising in context of a bankruptcy, insolvency, liquidation or other reorganization of the Bond Issuer), it may have to the extent of payment by or on behalf of Ambac of the above Amount Claimed Under the Policy with respect to the bonds identified above.

Wilmington Trust, N.A.,
as Trustee

By: _____
Name:
Title:

G-9

EXHIBIT H

**Provisions Applicable to CPI Certificates**

**Definitions**

The following definitions apply to the descriptions of the CPI Interest Distributions contained in this Trust Agreement.

"Ambac Prepetition Insured Bonds" has the meaning set forth in this Trust Agreement.

"Bloomberg CPURNSA" (see "**Consumer Price Index**" below).

"BLS" (see "**Consumer Price Index**" below).

"Business Day" means a day other than (i) a Saturday and Sunday (ii) a day on which the CPI Calculation Agent or banks and trust companies in The City of New York are authorized or required to remain closed, or (iii) a day on which the New York Stock Exchange is closed.

"CPI Calculation Agent" means, initially Odeon Capital Group LLC, or such other CPI Calculation Agent as may be selected by the Credit Support Provider or the Holders of a majority in notional amount of outstanding CPI Certificates, their successors or assigns, and engaged by the Trustee for purposes of providing calculations of the CPI Interest Distributions under the Trust.

"CPI" (see "**Consumer Price Index**" below).

"CPI Certificates" has the meaning set forth in this Trust Agreement.

"CPI Interest Distributions" has the meaning set forth in this Trust Agreement.

"CPI Rate" (see "**CPI Rate**" below).

"Initial CPI Value" (see "**CPI Rate**" below)

"Interest Payment Date" means the first Business Day of each month.

"Interest Period" means each period from and including one Interest Reset Date to but excluding the next Interest Reset Date; provided that the final Interest Period shall end on but exclude the Scheduled Final Redemption Date for the CPI Certificates.

"Interest Reset Dates" means the first calendar date of each month.

"Maximum Interest Rate" means the maximum rate permitted by applicable Puerto Rico law (currently, 12%).

"Record Date" means the 15th day of the month immediately preceding the month which payment is due.

"Reference Month" means, with respect to an Interest Reset Date, the third calendar month preceding that Interest Reset Date.  For example, the Reference Month for the April Interest Reset Date will be January.

"Spread" means 1.12%.

**Consumer Price Index**

The amount of interest payable on the CPI Certificates on each applicable Interest Payment Date will be linked to changes in the Consumer Price Index.  The Consumer Price Index for purpose of the CPI Certificates is the non-seasonally adjusted U.S. City Average All Items Consumer Price Index for All Urban Consumers ("CPI"), published month by the Bureau of Labor Statistics of the U.S. Department of Labor ("BLS") and reported on Bloomberg CPURNSA or any successor service ("Bloomberg CPURNSA").  The CPI for a particular month is generally related and published during the following month.

The CPI is a measure of the average change over time in the prices paid by urban consumer for a market basket of consumer goods and services, including, but not limited to, food and beverages, housing, apparel, transportation, medical care, recreation, education and communications.  In calculating the index, price changes for the various items are averaged together with weights that represent their importance in the spending of urban household in the United States.  The contents of the market basket of goods and services and the weights assigned to the various items are updated periodically by the BLS to take into account changes in consumer expenditure patterns.  The CPI is expressed in relative terms in relation to a time base reference period for which the level is set at 100.0.  The base reference period for the CPI Certificates is the 1982-1984 average.

Starting with January 2023 data, the BLS plans to update weights annually for the CPI based on a single calendar year of data, using consumer expenditure data from 2021.  This reflects a change from prior practice of updating weights biennially using two years of expenditure data.

**CPI Rate**

The CPI Certificates will bear at an annual rate (the "CPI Rate") that the CPI Calculation Agent determines as of each Interest Reset Date, for the Interest Period beginning on that Interest Reset Date, pursuant to the following formula:

$[(CPI_t - CPI_{t-12}) / CPI_{t-12}] + Spread$

Where:

$CPI_t =$          CPI for the applicable Reference Month;

$CPI_{t-12} =$    CPI for the twelfth month prior to the applicable Reference Month; and

Spread=    1.12%

$CPI_t$ for each Interest Reset Date is the CPI for the applicable Reference Month, which is generally released and published in the second calendar month prior to such Interest Reset Date.

H-2

$CPI_{t-12}$ for each Interest Reset Date is the CPI for the twelfth month prior to the applicable Reference Month, which is generally released and published in the eleventh month prior to the applicable Reference Month. For example, for the July 1, 2023 Interest Reset Date, $CPI_t$ will be the CPI for April 2023 and $CPI_{t-12}$ will be the CPI for April 2022. The CPI for April 2023 is expected to be published by BLS and reported on Bloomberg CPURNSA in May 2023 and the CPI for April 2022 was published and reported in May 2022. For more information regarding the calculation of interest rates on the CPI Certificates, utilizing historical CPI levels, see "**Interest Rate Calculations**" below.

Movements in the CPI that have occurred in the past are not necessarily indicative of changes that may occur in the future. Actual changes in the CPI may be less than or greater than those that have occurred in the past.

The amount of interest accruing on the CPI Certificates during each Interest Period will be computed on the basis of a 360-day year of twelve 30-day calendar months and will be payable in arrears on the Interest Payment Date for each Interest Period to the owners thereof as of the applicable Record Date. If, for any Interest Period, the CPI Rate is zero or a negative number, the interest rate for the CPI Certificates for that Interest Period will be 0%. In no event will the CPI Rate be greater than the Maximum Interest Rate. All calculations and determinations by the CPI Calculation Agent will be final, absent manifest error.

At or prior to 12:00 noon, New York time, on each Interest Reset Date (or, if such Interest Reset Date is not a Business Day, on the next succeeding Business Day), the CPI Calculation Agent will calculate the CPI Rate applicable to that Interest Reset Date and shall supply to the Trustee and the Credit Support Provider the CPI Rate so determined in writing or by electronic communication promptly confirmed in writing. As noted, the calculation of the CPI Rate by the CPI Calculation Agent will be final and conclusive and binding on the Trustee, the holders of the CPI Certificates and the Credit Support Provider, absent manifest error.

If the CPI is not reported on Bloomberg CPURNSA for a particular month by 11:00 AM on an Interest Reset Date, but the CPI has otherwise been published by the BLS, the CPI Calculation Agent will determine the CPI as published by the BLS for such month using a source it deems to be accurate and appropriate. If the CPI is not published by the BLS for a particular month by 11:00 AM on an Interest Reset Date, the CPI Calculation Agent will determine the CPI with reference to an index number based on the last twelve-month change in the CPI available and announced by the Department of Treasury for its Inflation-Indexed Securities as described at 31 CFR Part 356 (the "Treasury Inflation-Indexed Securities Regulation") or, if no such index number is announced, in accordance with general market practice at the time.

In calculating $CPI_t$ and $CPI_{t-12}$, the CPI Calculation Agent will use the most recently available value of the CPI determined as described above on the applicable Interest Reset Date, even if such value has been adjusted from a prior reported value for the relevant month. However, if a value of $CPI_t$ and $CPI_{t-12}$ used by the CPI Calculation Agent on any Interest Reset Date to determine the interest rate on the CPI Certificates (an "Initial CPI Value") is subsequently revised by the BLS, the CPI Calculation Agent will continue to use the Initial CPI Value for all purposes hereunder, and the interest rate for the related Interest Period, as determined based upon the Initial CPI Value, will not be revised.

If the CPI is rebased to a different year or period, the base reference period for the CPI Certificates will continue to be the 1982-1984 reference period as long as the 1982-1984 CPI continues to be published. If the 1982-1984 CPI is not published, the CPI Calculation Agent will determine the percentage change in inflation in accordance with general market practice at the time.

If, while the CPI Certificates are outstanding, the CPI is discontinued or substantially altered, as determined in the sole discretion of the CPI Calculation Agent, the CPI Calculation Agent will determine the CPI Rate with reference to an applicable substitute index chosen by the Secretary of the Treasury for the Department of Treasury's Inflation-Indexed Securities as described in the Treasury Inflation-Indexed Securities Regulation or, if no such securities are outstanding or no such substitute index is chosen, in accordance with general market practice at the time.

There will be no adjustment to the notional amount of the CPI Certificates at the Scheduled Final Redemption Date or at any other time during the term of the CPI Certificates. The amount that holders of the CPI Certificates will receive at the Scheduled Final Redemption Date is equal to the notional amount of CPI Certificates issued to such holders.

**Rounding**

All values used in the interest rate formula for the CPI Certificates will be truncated to six decimal places and rounded to the nearest fifth decimal place (one-one hundred thousandth of a percentage point), rounding upwards if the sixth decimal place is five or greater (e.g., 9.876555% (or .09876555) would be rounded up to 9.87656% (or .0987656) and 9.876554% (or .09876554) would be rounded down to 9.87655% (or .0987655)). All percentages resulting from any calculation of the interest rate will be truncated to four decimal places and rounded to the nearest third decimal place ( one thousandth of a percentage point), rounding upwards if the fourth decimal place is five or greater (e.g., 9.8765% (or .098765) would be rounded up to 9.877% (or .09877) and 9.8764% (or .098764) would be rounded down to 9.876% (or .09876)). All dollar amounts used in or resulting from such calculation on the CPI Certificates will be rounded to the nearest cent (with one-half cent being rounded upward).

**Interest Rate Calculations**

The following table sets forth the unadjusted CPI from January 2015 to December 2021, as published by the BLS and reported on Bloomberg CPURNSA:

| MONTH | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|---|---|---|
| January | 261.582 | 257.971 | 251.712 | 247.867 | 242.839 | 236.916 | 233.707 |
| February | 263.014 | 258.678 | 252.776 | 248.991 | 243.603 | 237.111 | 234.722 |
| March | 264.877 | 258.115 | 254.202 | 249.554 | 254.801 | 238.132 | 236.119 |
| April | 267.054 | 256.389 | 255.548 | 250.546 | 244.524 | 239.261 | 236.599 |
| May | 269.195 | 256.394 | 256.092 | 251.588 | 244.733 | 240.229 | 237.805 |
| June | 271.696 | 257.797 | 256.143 | 251.989 | 244.955 | 241.018 | 238.638 |
| July | 273.003 | 259.101 | 256.571 | 252.006 | 244.786 | 240.628 | 238.654 |
| August | 273.567 | 259.918 | 256.558 | 252.146 | 245.519 | 240.849 | 238.316 |
| September | 274.589 | 260.280 | 256.759 | 252.439 | 246.819 | 241.428 | 237.945 |
| October | 276.589 | 260.388 | 257.346 | 252.885 | 246.663 | 241.729 | 237.838 |
| November | 277.948 | 260.229 | 257.208 | 252.038 | 246.669 | 241.353 | 237.336 |
| December | 278.802 | 260.474 | 256.974 | 251.233 | 246.524 | 241.432 | 236.525 |

By way of example, the following illustrates the way in which the CPI Rate will be calculated on the CPI Certificates.  Based upon the above table, the interest rate that would have been payable on the CPI Certificates for the Interest Period commencing on April 1, 2018, is 3.191%. This interest rate is calculated by inserting the following CPI levels into the interest rate formula described under **"CPI Rate"** above and using the Spread of 1.12%:

$CPI_t =$    247.867, which is equal to the CPI level for January 2018, which as the third calendar month prior to the Interest Reset Date of April 1, 2018, would be the Reference Month; and

$CPI_{t-12} =$ 242.839, which is equal to the CPI level for January 2017, the twelfth calendar month prior to the Reference Month for the Interest Reset Date of April 1, 2018,

as follows: 3.191%    $= (247.867 - 242.839)/242.839 + 1.12\%$

$= 2.07050762 + 1.12\%$

$= 3.190508\%$ (truncated to six decimal places)

$= 3.19051\%$ (rounded to five decimal places)

$= 3.1905\%$ (truncated to four decimal places)

H-5

= 3.191% (rounded to three decimal places)

The numbers in the foregoing example were provided by the CPI Calculation Agent and are given for illustration and information purposes only as the CPI calculation agent on the Ambac Prepetition Insured Bonds had been an entity other than the CPI Calculation Agent. The historical levels of the CPI should not be taken as an indication of future levels of the CPI, and no assurance can be given as to the level of the CPI for any Reference Month. The spread in the example is the Spread applicable to the CPI Certificates.

It should be noted that the CPI has increased markedly in 2022.

EXHIBIT I

**Provisions Applicable to LIBOR Interest Distributions**

*LIBOR-Based Interest Accrual Period*

During each interest period, the LIBOR Certificates will bear interest at the Class N-2045 Interest Distribution during the period commencing on and including a Class N-2045 Interest Payment Date to but not including the following Class N-2045 Interest Payment Date (each a "LIBOR-Based Interest Accrual Period").

As soon as possible after 11:00 a.m., New York time, on each LIBOR Rate Determination Date (as defined below), but in no event later than 11:00 a.m., New York time, on the Business Day immediately following each LIBOR Rate Determination Date, Odeon Capital Group LLC, or such other calculation agent as may be selected by the Credit Support Provider or the holders of a majority in notional amount of outstanding LIBOR Certificates, their successors or assigns, and engaged by the Trustee for purposes of providing calculations of the LIBOR Interest Distributions under the Trust (the "LIBOR Calculation Agent"), will notify the Trustee and the Credit Support Provider for the next LIBOR-Based Interest Accrual Period.

*Three-Month LIBOR Rate*

The "Three-Month LIBOR Rate" for each LIBOR-Based Interest Accrual Period, to be calculated by the LIBOR Calculation Agent, means the rate for deposits in U.S. dollars with a three-month maturity that appears on Moneyline Telerate Page 3750 as of 11:00 a.m., London time on the day that is two London Banking Days preceding the first day of such LIBOR-Based Interest Accrual Period (each a "LIBOR Rate Determination Date"). The term "London Banking Day" means any day on which commercial banks are open for general business (including dealings in foreign exchange currency deposits) in London. The term "Moneyline Telerate" means, when used in connection with any designated page, the display page so designated on Moneyline's Telerate Service (or such other page as may replace that page on that service, or such other service as may be nominated for the purpose of displaying rates or prices comparable to the Three-Month LIBOR Rate). The LIBOR Calculation Agent may utilize the US0003M Index as reported on Bloomberg in lieu of using Moneyline Telerate Page 3750.

*Three-Month LIBOR Rate Cessation*

The governmental regulator of the Three-Month LIBOR Rate, the United Kingdom Financial Conduct Authority ("UK FCA"), had previously announced that the publication of this rate will cease after June 30, 2023.  Recently, the UK FCA proposed that the cessation of the Three-Month LIBOR Rate be delayed until after September 30, 2024.

If the Three-Month LIBOR Rate does not appear on the Telerate Page 3750 on such LIBOR Rate Determination Date, the Three-Month LIBOR Rate will be determined on the basis of the rates at which deposits in U.S. dollars for a three-month maturity and for the amount outstanding which are offered at approximately 11:00 a.m., London time, on such LIBOR Rate Determination Date, to prime banks in the London interbank market by four major banks in the London interbank

market (the "Reference Banks") selected by a market agent appointed by the Credit Support Provider to identify such Reference Banks (the "Market Agent").

To the extent that the Three-Month LIBOR Rate is not available, a synthetic rate is not available and approved by the UK FCA, or the fallback rate referenced in the prior paragraph cannot be determined, the LIBOR Calculation Agent shall determine an alternative rate giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by such governmental entities so long as such governmental entities are currently represented in an official capacity on said committee (the "Official U.S. Committee"), or any successor thereto, (ii) the Official U.S. Committee recommended spread adjustment of 26.161 basis points approved March 5, 2021 (or as such recommended spread adjustment is subsequently amended by the Official U.S. Committee), and (iii) a rate that is determined by the LIBOR Calculation Agent as reasonably equivalent of the Three-Month LIBOR Rate immediately prior to cessation.

SCHEDULE 1

HTA CVIs and New HTA Bond Threshold Amounts

**Taxable**

HTA CVIs

| Designation | Maturity Date | CUSIP No. | Final Redemption Payment Date | Aggregate Maximum Notional Amount (US$) | Coupon (%) | Threshold Price / Yield to Maturity |
|---|---|---|---|---|---|---|
| Commonwealth Clawback CVIs | July 1, 2051 | 74514L4C8 | November 1, 2051 | $1,833,405,578 | N/A | 40% of Notional Amount |

**Non-Taxable**

New HTA Bonds[1]

| Designation | Type | Maturity | CUSIP No. | Initial Accreted Value (US$) | Maturity Value (US$) | Yield (%) | Threshold Price/Yield to Maturity |
|---|---|---|---|---|---|---|---|
| Restructured Toll Revenue Senior Bonds, Series 2022A | Current Interest Bonds | July 1, 2062 | 745197AA1 | 600,000,000 | 600,000,000 | 5.00% | 6.50% |
| Restructured Toll Revenue Senior Bonds, Series 2022B | Capital Appreciation Bonds (CABs) | July 1, 2032 | 745197AB9 | 237,955,868 | 389,919,000 | 5.00% | 7.00% |
| Restructured Toll Revenue Senior Bonds, Series 2022C | Convertible CABs | July 1, 2053 | 745197AC7 | 407,044,598 | 666,991,000 | 5.00% | 7.00% |

---

[1] Initial accredited values and maturity values reflect the full amounts of New HTA Bonds issued by HTA to be allocated to the Units per the Allocation Schedule.

**Redline of Exhibit D**

~~Draft 8/7/22~~

HTA CLASS 6 TRUST

Wilmington Trust, N.A.
(as Trustee),

and

Wilmington Trust, N.A.
(as Delaware Trustee),

and

Puerto Rico Highways and Transportation Authority
(as Depositor)

and

Acknowledged and agreed to by:

Ambac Assurance Corporation
(as Credit Support Provider)

~~and~~

~~The Commonwealth of Puerto Rico~~

~~(as Issuer)~~

# ~~Draft 8/7/22~~TABLE OF CONTENTS

**Page**

~~TABLE OF CONTENTS~~

~~Page~~ARTICLE I

DEFINITIONS; CONSTRUCTION 2

SECTION 1.01.   Definitions. ..................................................................... 2

SECTION 1.02.   Rules of Construction. ..................................... ~~35~~42

SECTION 1.03.   Article and Section References. ..................... ~~35~~43

ARTICLE II

DECLARATION OF TRUST;  ISSUANCE OF UNITS 43

SECTION 2.01.   Creation of Trust; Assignment of Trust Property. ......... ~~35~~43

SECTION 2.02.   Acceptance by Trustee. ................................... ~~37~~45

SECTION 2.03.   Agreement to Authenticate and Deliver Units. ......... ~~37~~46

ARTICLE III

TRUST POWERS; ADMINISTRATION OF THE TRUST
PROPERTY 46

SECTION 3.01.   Trust Property. ................................................ ~~38~~46

SECTION 3.02.   Administration of the Trust. ........................... ~~38~~47

SECTION 3.03.   Collection Account. ......................................... ~~39~~48

SECTION 3.04.   Investment of Funds in the Taxable Collection Account. ........ ~~41~~50

ARTICLE IV

DISTRIBUTIONS AND REPORTS TO CREDIT SUPPORT
PROVIDER AND UNITHOLDERS 50

SECTION 4.01.   Distributions. .................................................. ~~41~~50

SECTION 4.02.   Reports to Credit Support Provider and Unitholders. .......... ~~45~~54

SECTION 4.03.   Compliance with Tax Reporting and Withholding
Requirements. ................................................. ~~45~~55

SECTION 4.04.   Preservation of Information, Communications to Unitholders. ........ ~~47~~55

ARTICLE V

THE UNITS 56

 ~~Page i~~

**TABLE OF CONTENTS**
(continued)

**Page**

SECTION 5.01.   The Units.   4756

SECTION 5.02.   Execution, Authentication and Delivery.   4857

SECTION 5.03.   Registration; Registration of Transfer and Exchange.   4957

SECTION 5.04.   Mutilated, Destroyed, Lost and Stolen Certificates.   5058

SECTION 5.05.   Persons Deemed Owners.   5059

SECTION 5.06.   Cancellation.   5159

SECTION 5.07.   Appointment of Paying Agent.   5160

SECTION 5.08.   [Reserved].   5260

SECTION 5.09.   Issuance and Transfer Restrictions.   5260

ARTICLE VI

RIGHTS OF UNITHOLDERS AND CREDIT SUPPORT
PROVIDER 62

SECTION 6.01.   Voting Rights with Respect to HTA Clawback CVIs and New
HTA Bonds.   5462

SECTION 6.02.   HTA Clawback CVI and New HTA Bond Sales.   5462

SECTION 6.03.   Distribution of HTA Clawback CVIs and New HTA Bonds.   5664

SECTION 6.04.   Electing Ambac Prepetition Insured Bonds.   5766

ARTICLE VII

DEFAULT ON HTA CLAWBACK CVIS AND NEW HTA BONDS
AND PERMITTED INVESTMENTS 67

SECTION 7.01.   Realization Upon Default.   5867

ARTICLE VIII

TRUST WIND-UP EVENTS; TERMINATION 67

SECTION 8.01.   Trust Wind-Up Events.   5967

SECTION 8.02.   Trust Property Made Available.   5967

ARTICLE IX

CONCERNING THE TRUSTEE 68

SECTION 9.01.   Duties of Trustee.   6068

SECTION 9.02.   Certain Matters Affecting the Trustee.   6069

Page  ii

## TABLE OF CONTENTS
(continued)

Page

SECTION 9.03.   Limitation on Liability of Trustee.   6271

SECTION 9.04.   Trustee Fees and Expenses; Limited Indemnification.   6271

SECTION 9.05.   Eligibility Requirements for Trustee; Delaware Trustee.   6371

SECTION 9.06.   Resignation or Removal of the Trustee and, Delaware Trustee.   6372

SECTION 9.07.   Successor Trustee.   6473

SECTION 9.08.   Merger or Consolidation of Trustee.   6573

SECTION 9.09.   Appointment of Co-Trustee.   6573

SECTION 9.10.   Appointment of Office or Agency.   6674

SECTION 9.11.   Representations and Warranties of Trustee and Delaware Trustee.   6674

SECTION 9.12.   Limitation of Powers and Duties.   6877

SECTION 9.13.   Power and Authority of the Delaware Trustee.   6878

SECTION 9.14.   Delaware Trustee May Request Direction.   6979

SECTION 9.15.   Delaware Trustee's Capacity.   69 79

SECTION 9.16.   Duties.   70 79

SECTION 9.17.   Trustee.   7080

ARTICLE X

MISCELLANEOUS TERMS 80

SECTION 10.01.   Amendment of Trust Agreement.   7080

SECTION 10.02.   Counterparts.   7181

SECTION 10.03.   Limitation on Rights of Unitholders.   7181

SECTION 10.04.   Governing Law.   7181

SECTION 10.05.   Notices.   7282

SECTION 10.06.   Severability of Terms.   7283

SECTION 10.07.   Notice to Credit Support Provider.   7283

SECTION 10.08.   No Recourse.   7384

SECTION 10.09.   Third Party Beneficiary.   7384

**TABLE OF CONTENTS**
(continued)

**Page**

EXHIBIT A1     Class A-2028 Unit Sinking Fund Schedule

EXHIBIT A2     Class L-2038 Unit Sinking Fund Schedule

EXHIBIT A3     Class N-2045 Unit Sinking Fund Schedule

EXHIBIT B1     Form of Class A-2028 Unit

EXHIBIT B2     Form of Class L-2038 Unit

EXHIBIT B3     Form of Class M-2023 Unit ~~EXHIBIT B3~~     ~~Form of Class L-2038 Unit~~

EXHIBIT B4     Form of Class N-2026 Unit

EXHIBIT B5     Form of Class N-2027 Unit

EXHIBIT B6     Form of Class N-2028 Unit

EXHIBIT B7     Form of Class N-2029 Unit

EXHIBIT B8     Form of Class N-2030 Unit

EXHIBIT B9     Form of Class N-2031 Unit

EXHIBIT B10     Form of Class N-2045 Unit

EXHIBIT C1     Form of Class A-2028 Unit Global Security

EXHIBIT C2     ~~Form of Class M-2023 Unit Global Security~~~~EXHIBIT C3~~     Form of Class L-2038 Unit Global Security

EXHIBIT C3     Form of Class M-2023 Unit Global Security

EXHIBIT C4     Form of Class N-2026 Unit Global Security

EXHIBIT C5     Form of Class N-2027 Unit Global Security

EXHIBIT C6     Form of Class N-2028 Unit Global Security

EXHIBIT C7     Form of Class N-2029 Unit Global Security

EXHIBIT C8     Form of Class N-2030 Unit Global Security

EXHIBIT C9     Form of Class N-2031  Unit Global Security

EXHIBIT C10     Form of Class N-2045 Unit Global Security

EXHIBIT D     Form of Transfer Certificate

EXHIBIT E        Notice of Non-Taxable HTA ~~CVI/Bond~~ CVIs/Bonds and New HTA Bonds
                 Permitted Distribution Event

EXHIBIT F        Certificate of Trust

EXHIBIT G        Policy Claim ~~Form~~ Forms
                 •    Interests Payments
                 •    Sinking Fund Payments
                 •    Scheduled Final Redemptions

EXHIBIT H        Provisions Applicable to CPI Certificates

EXHIBIT I        Provisions Applicable to LIBOR Certificate

SCHEDULE  1~~A~~  Non-Taxable HTA Clawback CVIs and New HTA ~~Bonds (Class A 2028 Units)~~ Bond Threshold Amounts

~~SCHEDULE 1B   HTA Clawback CVIs and New HTA Bonds (Class M 2023 Units)~~

~~SCHEDULE 1C   HTA Clawback CVIs and New HTA Bonds (Class L 2038 Units)~~

~~SCHEDULE 1D   HTA Clawback CVIs and New HTA Bonds (Class N 2026 Units)~~

~~SCHEDULE 1E   HTA Clawback CVIs and New HTA Bonds (Class N 2027 Units)~~

~~SCHEDULE 1F   HTA Clawback CVIs and New HTA Bonds (Class N 2028 Units)~~

~~SCHEDULE 1G   HTA Clawback CVIs and New HTA Bonds (Class N 2029 Units)~~

~~SCHEDULE 1H   HTA Clawback CVIs and New HTA Bonds (Class N 2030 Units)~~

~~SCHEDULE 1I   HTA Clawback CVIs and New HTA Bonds (Class N 2031 Units)~~

~~SCHEDULE 1J   HTA Clawback CVIs and New HTA Bonds (Class N 2045 Units)~~

~~SCHEDULE  2   Non-Taxable HTA CVI/Bond and New HTA Bond Threshold Amounts~~

Draft 8/7/22



TRUST AGREEMENT

THIS TRUST AGREEMENT made as of [ ],December 6, 2022 (this "Trust Agreement") with respect to the HTA CLASS 6 TRUST (the "Trust"), by and among the Puerto Rico Highways and Transportation Authority (the "Depositor"), Wilmington Trust, N.A., a national banking corporation, not individually, but solely in its capacity as Trustee ("Wilmington" or the "Trustee") and Wilmington Trust, N.A., not individually, but solely in its capacity as Delaware Trustee ("Delaware Trustee" and together with the Trustee, collectively, the "Trustees"), and acknowledged and agreed to, with respect to the Calculation Agent obligations and the provisions relating to the Credit Support Provider, by Ambac Assurance Corporation, as Calculation Agent and as Credit Support Provider (the "Credit Support Provider") and acknowledged and agreed to, with respect to the provisions relating to the Issuer, by The Commonwealth of Puerto Rico (the "Commonwealth").

WHEREAS, on [ ],October 12, 2022, the Title III Court entered an order (the "Confirmation Order") confirming the Plan of Adjustment, which went effective on [ ]December 6, 2022 (the "Effective Date");

WHEREAS, the Plan of Adjustment provides for the creation of the HTA Class 6 Trust, and contemplates, together with the Confirmation Order, that the HTA Class 6 Trust will hold and administer:, on behalf of Electing Holders; (i) the Electing Ambac Prepetition Insured Bonds; (ii) HTA CVI/Bond Distributions, (iii) the CW/the New HTA Bonds allocable to the holders of Allowed HTA 98 Senior Bond Claims (Ambac); (iii) the cash and HTA Clawback RecoveryCVIs allocable to the holders of Allowed Ambac CW/HTA 98 Senior Bond Claims (Ambac) and (iv) the benefit of the Credit Support;

WHEREAS, the CW/cash and HTA Clawback RecoveryCVIs allocable to the holders of Allowed Ambac CW/HTA 98 Senior Bond Claims (Ambac) are being held in escrow pursuant to an escrow agreement, dated May 25, 2022, between Wilmington Trust, N.A., as escrow agent, and the Credit Support Provider, as the Plan of Adjustment party and the Commonwealth Plan of Adjustment party, pending elections by Electing Holders and the Effective Date;

WHEREAS, the Trust has been formed by the Depositor pursuant to the Plan of Adjustment and this Trust Agreement, and on behalf of the Electing Holders, for the purposes of (i) holding the Electing Ambac Prepetition Insured Bonds, (ii) receiving the New HTA Bonds pursuant to the Plan of Adjustment from the Electing Holders, (iii) receiving, pursuant to the Commonwealth Plan of Adjustment, the HTA CVI/Bond Distributions (including the HTA Clawback CVIs and the New HTA Bonds) from the Electing Holders, (iiiiv) being the beneficiary of the Credit Support and (ivv) issuing the Class A-2028 Units, Class L-2038 Units, Class M-2023 Units, Class L-2038 Units, Class N-2026 Units, Class N-2027 Units, Class N-2028 Units, Class N-2029 Units, Class N-2030 Units, Class N-2031 Units and Class N-2045 Units;

WHEREAS, pursuant to the terms of the Plan of Adjustment, the Electing Holders have elected to deposit their New HTA Bonds into the Trust;

WHEREAS, pursuant to the terms of the Plan of Adjustment, the Electing Holders have elected to deposit their HTA CVI/Bond Distributions, including their HTA Clawback CVIs and New HTA Bonds, into the Trust;

WHEREAS, on the date hereof the Trust will issue Global Securities to evidence the Units of the Electing Holders on the terms and conditions specified herein;

WHEREAS, except for the establishment of the Trust and as may otherwise be expressly provided in this Trust Agreement, the Depositor shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof;

WHEREAS, the Trustee shall have only the powers and obligations specifically enumerated in this Trust Agreement and shall not exercise discretion with regard to any matters;

WHEREAS, the Trust, and each Sub-Trust thereof, are intended to be classified as grantor trusts under subtitle A, chapter 1, subchapter J, Part I, subpart E of the Code; and

NOW THEREFORE, the Trustee for itself and its successors and assigns, hereby declares that it shall hold all the estate, right, title and interest in any property contributed to the Trust established hereunder in trust for the benefit of the Unitholders and the Credit Support Provider as provided herein and subject to the terms and provisions hereof.

ARTICLE I

Definitions; Construction

SECTION 1.01.   Definitions.

Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below:

"Accountant":  An independent public accountant of recognized national standing appointed by the Credit Support Provider and approved by the Trustee, it being understood and agreed that each of the firms in the 'top 10' accounting firms shall be deemed approved.

"Affiliate":  With respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control", when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Aggregate Unit Balance":  With respect to a particular Class and as of any date of determination the aggregate amount required to redeem such Class in full as of such date.  For the avoidance of doubt, the "Aggregate Unit Balance," with respect to a particular Class and as of any date of determination, is intended to be the aggregate of the Notional Amount of each Unit in such Class.

"Allocation Schedule":  The schedule(s) provided by the Credit Support Provider to the Trustee in connection with the Closing Date so as to allocate among the Class A-2028 Units, Class L-2038 Units, Class M-2023 Units, Class N-2026 Units, Class N-2027 Units, Class N-2028 Units, Class N-2029 Units, Class N-2030 Units, Class N-2031 Units and Class N-2045 Units (i) those HTA Clawback CVIs indicated as "Non-Taxable," (ii) those HTA Clawback CVIs indicated as "Taxable," (iii) those New HTA Bonds indicated as "Non-Taxable" and (iv) those New HTA Bonds indicated as "Taxable."  The foregoing schedule(s) may be adjusted from time to time as a result of redemptions, sales, distributions and re-characterizations as more fully described in this Trust Agreement.

"Allowed":  The meaning specified in the Plan of Adjustment.

"Ambac CW/HTA Bond Claims":  The meaning specified in the Plan of Adjustment.

"Ambac Prepetition Insured Bonds":  The six (6) issues of HTA identified as the:  (i) Transportation Revenue Bonds, Series A due July 1, 2028, (ii) Transportation Revenue Bonds, Series MA due July 1, 2023,2028, (iiiii) Transportation Revenue Refunding Bonds, Series L due July 1, 2038, (iii) Transportation Revenue Refunding Bonds, Series M due July 1, 2023, (iv) Transportation Revenue Refunding Bonds, Series N due July 1, 2026, July 1, 2029, July 1, 2030, July 1, 2031, (v) Transportation Revenue Refunding Bonds, Series N (CPI Bonds) due July 1, 2027 and July 1, 2028 and (vi) Transportation Revenue Refunding Bonds, Series N (LIBOR Bonds) due July 1, 2045.

"Applicable Procedures":  With respect to any transfer or exchange of a beneficial interest in any Global Security, the rules and procedures of the Depositary that apply to such transfer or exchange.

"Available Funds":  As the context may require, the Class A-2028 Available Funds, Class M-2023 Available Funds, Class L-2038 Available Funds, Class M-2023 Available Funds, Class N-2026 Available Funds, Class N-2027 Available Funds, Class N-2028 Available Funds, Class N-2029 Available Funds, Class N-2030 Available Funds, Class N-2031 Available Funds and Class N-2045 Available Funds. In addition, solely upon the occurrence of a Trust Termination Event, the amounts remaining in the Fee Reserve.

"Bond Counsel":  Nationally-recognized bond counsel as selected by HTA.

"Bond Resolution":  That certain Resolution No. 98-06, adopted by HTA on February 26, 1998, as amended and restated and as supplemented pursuant to certain supplemental resolutions entered into thereunder or adopted pursuant thereto.

"Business Day":  Any day excluding Saturday, Sunday and any day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in San Juan, Puerto Rico or New York, New York are authorized or required by law or other governmental action to close.

"Calculation Agent":  The agent making calculations as to (A) the fair market value of the HTA Clawback CVIs or New HTA Bonds, as applicable, pursuant to (i) Section 6.02(a) relating to Taxable HTA CVI/CVIs or Taxable New HTA Bonds, (ii) Section 6.02(b) relating to

Non-Taxable HTA CVI/CVIs or Non-Taxable New HTA Bonds and (c) Section 8.02(b) relating to Non-Taxable HTA CVI/CVIs or Taxable New HTA Bonds and (B) the value of the HTA Clawback CVIs or New HTA Bonds pursuant to Section 6.03(a) to the extent relating to Non-Taxable HTA CVI/CVIs or Non-Taxable New HTA Bonds.  The Calculation Agent shall be Ambac Assurance Corporation or, upon resignation of Ambac Assurance Corporation as Calculation Agent, the Credit Support Provider shall appoint another person to be the Calculation Agent.

"Certificate":  A definitive certificate in the form attached as Exhibit B1 evidencing a Class A-2028 Unit,  Exhibit B2 evidencing a Class M-2024 Unit, Exhibit B3 evidencing a Class L-2038 Unit, Exhibit B4 evidencing a Class N-2026 Unit, Exhibit B5 evidencing a Class N-2027 Unit, Exhibit B6 evidencing a Class N-2028 Unit, Exhibit B7 evidencing a Class N-2029 Unit, Exhibit B8 evidencing a Class N-2030 Unit, Exhibit B9 evidencing a Class N-2031 Unit or Exhibit B10 evidencing a Class N-2045 Unit, in each case registered in the name of the holder thereof.

"Certificate of Trust": The meaning specified in Section 2.01(a).

"Class" or "Classes":  As the context may require, the Class A-2028 Units, Class M-2023 Units, Class L-2038 Units, Class M-2023 Units, Class N-2026 Units, Class N-2027 Units, Class N-2028 Units, Class N-2029 Units, Class N-2030 Units, Class N-2031 Units or Class N-2045 Units.

"Class A-2028 Available Funds": With respect to a Class A-2028 Scheduled Final Redemption Date, a Class A-2028 Sinking Fund Distribution Date, a Class A-2028 Interest Payment Date or a Class A-2028 Sinking Fund Distribution Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class A-2028 Trust Property other than any amount deposited in the Class A-2028 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class A-2028 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class A-2028 Taxable Collection Account or Class A-2028 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class A-2028 Units (in the case of the Class A-2028 Scheduled Final Redemption Date).

"Class A-2028 Credit Support":  The Ambac Financial Guaranty Insurance Policy No. 15011BE effective March 19, 1998 with respect to the Electing Ambac Prepetition Insured Bonds that are Class A-2028 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class A-2028 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class A-2028 Units other than those made from the Class A-2028 Credit Support Collection Account, (iii) payments made on the Class A-2028 Credit Support (including

all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class A-2028 Units pursuant to Sections 4.01 and 6.03.

"Class A-2028 Credit Support Collection Account":  The meaning specified in Section 3.03(a).

"Class A-2028 Global Security":  One or more global certificates representing Class A-2028 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C1 attached hereto.

"Class A-2028 Interest Distribution": 5.00% per annum payable on the outstanding Class A-2028 Units, reflecting the rate on the applicable Ambac Prepetition Insured Bonds.

"Class A-2028 Interest Payment Date": January 1 and July 1, provided that if such date is not a Business Day, the next Business Day.[1]

"Class A-2028 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class A-2028 Non-Taxable ~~HTA CVI/Bonds": Those HTA Clawback CVIs and New HTA Bonds indicated as "Non-Taxable" on Schedule 1A hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class A-2028 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class A-2028 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class A-2028 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such recharacterized HTA Clawback CVIs and New HTA Bonds shall be considered Class A-2028 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date.  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.~~Funds": All amounts received by the Trustee on or with respect to the Class A-2028 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class A-2028 Non-Taxable ~~Funds": All amounts received by the Trustee on or with respect to the Class A-2028 Non-Taxable HTA CVI/Bonds (including from any sale thereof).~~HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class A-2028 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class A-2028 Taxable HTA CVIs from the effective

---

date of such re-characterization going forward), and (v) a re-characterization of Class A-2028 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class A-2028 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class A-2028 Non-Taxable HTA CVIs/Bonds": Collectively, the Class A-2028 Non-Taxable HTA CVIs and the Class A-2028 Non-Taxable New HTA Bonds.

"Class A-2028 Non-Taxable New HTA Bonds": Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class A-2028 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class A-2028 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class A-2028 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class A-2028 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class A-2028 Scheduled Final Redemption Date": July 1, 2028.

"Class A-2028 Sinking Fund Distribution Date": Means July 1, 2023, July 1, 2024, July 1, 2025, July 1, 2026, July 1, 2027 and July 1, 2028.

"Class A-2028 Sinking Fund Distributions:" With respect to each Class A-2028 Sinking Fund Distribution Date, the amount set forth on Exhibit A1 hereto, as it may be amended from time to time in accordance with the terms hereof.

"Class A-2028 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class A-2028 Taxable HTA CVI/Bonds": Those HTA Clawback CVIs and New HTA Bonds indicated as "Taxable" on Schedule 1A hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class A-2028 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class A-2028 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class A-2028 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class A-2028 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization

~~occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.~~Funds": All amounts received by the Trustee on or with respect to the Class A-2028 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class A-2028 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class A-2028 Taxable ~~Funds": All amounts received by the Trustee on or with respect to the Class A-2028 Taxable HTA CVI/Bonds and any Permitted Investments made with the proceeds of such Class A-2028 Taxable HTA CVI/Bonds (including from any sale of either of the foregoing).~~HTA CVIs": Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class A-2028 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class A-2028 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class A-2028 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class A-2028 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class A-2028 Taxable HTA CVIs/Bonds": Collectively, the Class A-2028 Taxable HTA CVIs and the Class A-2028 Taxable New HTA Bonds.

"Class A-2028 Taxable New HTA Bonds": Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01and Section 6.03, (iv) a re-characterization of Class A-2028 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class A-2028 Taxable New HTA Bonds from the effective date going forward), and (v) a re-characterization of Class A-2028 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class A-2028 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class A-2028 Trust Property": (i) ~~The~~the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Bonds, Series A, due July 1, 2028; (ii) the Class A-2028 Taxable HTA ~~CVI~~CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class A-2028 Non-Taxable HTA ~~CVI~~CVIs/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class A-2028 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class A-2028 Taxable Collection Account; (vi) all funds from time to time deposited in the Class A-2028 Non-Taxable Collection Account and the Class A-2028 Credit Support Collection

Account; and (vii) any other asset constituting a portion or proceeds of such Class A-2028 Trust Property.

"Class A-2028 Units":   The meaning specified in Section 5.01(b) designated as "Non-Taxable" and "Taxable".

"Class L-2038 Available Funds":  With respect to a Class L-2038 Scheduled Final Redemption Date, a Class L-2038 Interest Payment Date or a Class L-2038 Sinking Fund Distribution Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class L-2038 Trust Property other than any amount deposited in the Class L-2038 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class L-2038 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class L-2038 Taxable Collection Account or Class L-2038 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class L-2038 Units (in the case of the Class L-2038 Scheduled Final Redemption Date).

"Class L-2038 Credit Support":  The Ambac Financial Guaranty Insurance Policy No. #24623BE effective October 4, 2005 with respect to the Electing Ambac Prepetition Insured Bonds that are Class L-2038 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class L-2038 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class L-2038 Units other than those made from the Class L-2038 Credit Support Collection Account, (iii) payments made on the Class L-2038 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class L-2038 Units pursuant to Sections 4.01 and 6.03.

"Class L-2038 Credit Support Collection Account":  The meaning specified in Section 3.03(a).

"Class L-2038 Global Security":  One or more global certificates representing Class L-2038 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C3 attached hereto.

"Class L-2038 Interest Distribution": 5.25% per annum payable on the outstanding Class L-2038 Units, reflecting the rate on the applicable Ambac Prepetition Insured Bonds.

"Class L-2038 Interest Payment Date": January 1 and July 1, [provided that if such date is not a Business Day, the next Business Day].

"Class L-2038 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class L-2038 Non-Taxable ~~HTA CVI/Bonds": Those HTA Clawback CVIs and New HTA Bonds indicated as "Non-Taxable" on Schedule 1C hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class L-2038 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class L-2038 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class L-2038 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such recharacterized HTA Clawback CVIs and New HTA Bonds shall be considered Class L-2038 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.~~Funds": All amounts received by the Trustee on or with respect to the Class L-2038 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class L-2038 Non-Taxable ~~Funds": All amounts received by the Trustee on or with respect to the Class L-2038 Non-Taxable HTA CVI/Bonds (including from any sale thereof).~~HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class L-2038 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class L-2038 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class L-2038 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class L-2038 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class L-2038 Non-Taxable HTA CVIs/Bonds": Collectively, the Class L-2038 Non-Taxable HTA CVIs and the Class L-2038 Non-Taxable New HTA Bonds.

"Class L-2038 Non-Taxable New HTA Bonds": Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class L-2038 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class L-2038 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class L-2038 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class L-2038 Non-Taxable New HTA Bonds from the effective date of such

~~re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.~~

"Class L-2038 Scheduled Final Redemption Date": July 1, 2038.

"Class L-2038 Sinking Fund Distribution Date": Means July 1, 2036, July 1, 2037 and July 1, 2038.

"Class L-2038 Sinking Fund Distributions": With respect to each Class L-2038 Sinking Fund Distribution Date, the amount set forth on Exhibit A2 hereto, as it may be amended from time to time in accordance with the terms hereof.

"Class L-2038  Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class L-2038 Taxable ~~HTA CVI/Bonds": Those HTA Clawback CVIs and New HTA Bonds indicated as "Taxable" on Schedule 1C hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class L-2038 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class L-2038 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class L-2038 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class L-2038 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.~~Funds": All amounts received by the Trustee on or with respect to the L-2038 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class L-2038 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class L-2038 Taxable ~~Funds": All amounts received by the Trustee on or with respect to the M-2023 Taxable HTA CVI/Bonds and any Permitted Investments made with the proceeds of such Class L-2038  Taxable HTA CVI/Bonds (including from any sale of either of the foregoing).~~HTA CVIs":  Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class L-2038 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class L-2038 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class L-2038 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class L-2038 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the

Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class L-2038 Taxable New HTA CVIs/Bonds": Collectively, the Class L-2038 Taxable HTA CVIs and the Class L-2038 Taxable New HTA Bonds.

"Class L-2038 Taxable New HTA Bonds":  Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class L-2038 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized Bonds from the effective date of such re-characterization going forward) , and (v) a re-characterization of Class L-2038 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class L-2038 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class L-2038 Trust Property": (i) ~~The~~the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Refunding Bonds, Series L, due July 1, 2038; (ii) the Class L-2038 Taxable HTA ~~CVI~~CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class L-2038 Non-Taxable HTA ~~CVI~~CVIs/Bonds and all payments on or collections in respect  thereof; (iv) the benefit of the Class L-2038 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class L-2038 Taxable Collection Account; (vi) all funds from time to time deposited in the Class L-2038 Non-Taxable Collection Account and the Class L-2038 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class L-2038  Trust Property.

"Class L-2038 Units":  The meaning specified in Section 5.01(b) designated as "Non-Taxable and "Taxable".

"Class M-2023 Available Funds":  With respect to a Class M-2023 Scheduled Final Redemption Date or a Class M-2023 Interest Payment Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class M-2023 Trust Property other than any amount deposited in the Class M-2023 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class M-2023 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class M-2023 Taxable Collection Account or Class M-2023 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class M-2023 Units (in the case of the Class M-2023 Scheduled Final Redemption Date).

"Class M-2023 Credit Support":  The Ambac Financial Guaranty Insurance Policy No. SP26300BE effective March 6, 2007 with respect to the Electing Ambac Prepetition Insured Bonds that are Class M-2023 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the

cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class M-2023 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class M-2023 Units other than those made from the Class M-2023 Credit Support Collection Account, (iii) payments made on the Class M-2023 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class M-2023 Units pursuant to Sections 4.01 and 6.03.

"Class M-2023 Credit Support Collection Account":  The meaning specified in Section 3.03(a).

"Class M-2023 Global Security":  One or more global certificates representing Class M-2023 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C2 attached hereto.

"Class M-2023 Interest Distribution": 4.25% per annum payable on the outstanding Class M-2023 Units, reflecting the rate on the applicable Ambac Prepetition Insured Bonds.

"Class M-2023 Interest Payment Date": January 1 and July 1, [provided that if such date is not a Business Day, the next Business Day].

"Class M-2023 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class M-2023 Non-Taxable HTA CVI/Bonds": Those HTA Clawback CVIs and New HTA Bonds indicated as "Non-Taxable" on Schedule 1B hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class M-2023 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class M-2023 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class M-2023 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such recharacterized HTA Clawback CVIs and New HTA Bonds shall be considered Class M-2023 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date.  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee. Funds": All amounts received by the Trustee on or with respect to the Class M-2023 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class M-2023 Non-Taxable Funds": All amounts received by the Trustee on or with respect to the Class M-2023 Non-Taxable HTA CVI/Bonds (including from any sale thereof). HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as

may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class M-2023 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class M-2023 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class M-2023 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class M-2023 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class M-2023 Non-Taxable HTA CVIs/Bonds": Collectively, the Class M-2023 Non-Taxable New HTA CVIs and the Class M-2023 Non-Taxable New HTA Bonds.

"Class M-2023 Non-Taxable New HTA Bonds": Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class M-2023 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class M-2023 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class M-2023 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class M-2023 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class M-2023 Scheduled Final Redemption Date": July 1, 2023.

"Class M-2023 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class M-2023 Taxable HTA CVI/Bonds": Those HTA Clawback CVIs and New HTA Bonds indicated as "Taxable" on Schedule 1B hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI or New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class M-2023 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class M-2023 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class M-2023 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class M-2023 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the

~~Trustee.~~Funds": All amounts received by the Trustee on or with respect to the M-2023 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class M-2023 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class M-2023 Taxable ~~Funds": All amounts received by the Trustee on or with respect to the M-2023 Taxable HTA CVI/Bonds and any Permitted Investments made with the proceeds of such Class M-2023 Taxable HTA CVI/Bonds (including from any sale of either of the foregoing).~~HTA CVIs": Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class M-2023 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class M-2023 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class M-2023 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class M-2023 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class M-2023 Taxable HTA CVIs/Bonds": Collectively, the Class M-2023 Taxable New HTA CVIs and the Class M-2023 Taxable New HTA Bonds.

"Class M-2023 Taxable New HTA Bonds": Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class M-2023 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class M-2023 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class M-2023 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class M-2023 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class M-2023 Trust Property": (i) ~~The~~the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Bonds, Series M, due July 1, 2023; (ii) the Class M-2023 Taxable HTA ~~CVI~~CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class M-2023 Non-Taxable HTA ~~CVI~~CVIs/Bonds and all payments on or collections in respect thereof; (iv) the benefit of the Class M-2023 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class M-2023 Taxable Collection Account; (vi) all funds from time to time deposited in the Class M-2023 Non-Taxable Collection Account and the Class M-2023 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class M-2023 Trust Property.

"Class M-2023 Units":   The meaning specified in Section 5.01(b) designated as "Non-Taxable" and Taxable".

"Class N-2026 Available Funds":   With respect to a Class N-2026 Scheduled Final Redemption Date or a Class N-2026 Interest Payment Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class N-2026 Trust Property other than any amount deposited in the Class N-2026 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class N-2026 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class N-2026 Taxable Collection Account or Class N-2026 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class N-2026 Units (in the case of the Class N-2026 Scheduled Final Redemption Date).

"Class N-2026 Credit Support":   The Ambac Financial Guaranty Insurance Policy NosNo. SP26314BE and  SP27362BE effective January 1, 2008effective March 6, 2007 and the Ambac Financial Guaranty Insurance Policy No. SP27362BE with respect to the Electing Ambac Prepetition Insured Bonds that are Class N-2026 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class N-2026 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class N-2026 Units other than those made from the Class N-2026 Credit Support Collection Account, (iii) payments made on the Class N-2026 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class N-2026 Units pursuant to Sections 4.01 and 6.03.

"Class N-2026 Credit Support Collection Account":   The meaning specified in Section 3.03(a).

"Class N-2026 Global Security":   One or more global certificates representing Class N-2026 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C4 attached hereto.

"Class N-2026 Interest Distribution": 5.50% per annum payable on the outstanding Class N-2026 Units, reflecting the rate on the applicable Ambac Prepetition Insured Bonds.

"Class N-2026 Interest Payment Date": January 1 and July 1, [provided that if such date is not a Business Day, the next Business Day].

"Class N-2026 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2026 Non-Taxable HTA CVI/Bonds": Those HTA Clawback CVIs and New HTA Bonds indicated as "Non-Taxable" on Schedule 1D hereto, as may be adjusted from time to time

~~as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2026 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2026 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2026 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such recharacterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2026 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.~~<u>Funds": All amounts received by the Trustee on or with respect to the Class N-2026 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).</u>

"Class N-2026 Non-Taxable ~~Funds": All amounts received by the Trustee on or with respect to the Class N-2026 Non-Taxable HTA CVI/Bond (including from any sale thereof).~~<u>HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2026 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2026 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2026 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2026 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.</u>

<u>"Class N-2026 Non-Taxable HTA CVIs/Bonds": Collectively, the Class N-2026 Non-Taxable HTA CVIs and the Class N-2026 Non-Taxable New HTA Bonds.</u>

<u>"Class N-2026 Non-Taxable New HTA Bonds": Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2026 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2026 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2026 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2026 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.</u>

"Class N-2026 Scheduled Final Redemption Date": July 1, 2026.

"Class N-2026 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2026 Taxable ~~HTA CVI/Bonds": Those HTA Clawback CVIs and New HTA Bonds indicated as "Taxable" on Schedule 1D hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2026 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2026 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2026 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2026 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.~~Funds": All amounts received by the Trustee on or with respect to the Class N-2026 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class N-2026 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class N-2026 Taxable ~~Funds": All amounts received by the Trustee on or with respect to the Class N-2026 Taxable HTA CVI/Bonds and any Permitted Investments made with the proceeds of such Class N-2026 Taxable HTA CVI/Bonds (including from any sale of either of the foregoing).~~HTA CVIs": Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2026 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2026 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2026 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2026 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2026 Taxable HTA CVIs/Bonds": Collectively, the Class N-2026 Taxable HTA CVIs and the Class N-2026 Taxable New HTA Bonds.

"Class N-2026 Taxable New HTA Bonds": Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2026 Non-Taxable New Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which

case such re-characterized New HTA Bonds shall be considered Class N-2026 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2026 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2026 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2026 Trust Property": (i) ~~The~~the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Refunding Bonds, Series N due July 1, 2026; (ii) the Class N-2026 Taxable HTA ~~CVI~~CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2026 Non-Taxable HTA ~~CVI~~CVIs/Bonds and all payments on or collections in respect  thereof; (iv) the benefit of the Class N-2026 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2026 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2026 Non-Taxable Collection Account and the Class N-2026 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2026 Trust Property.

"Class N-2026 Units":   The meaning specified in Section 5.01(b) designated as "Non-Taxable" and "Taxable".

"Class N-2027 Available Funds":   With respect to a Class N-2027 Scheduled Final Redemption Date or a Class N-2027 Interest Payment Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class N-2027 Trust Property other than any amount deposited in the Class N-2027 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class N-2027 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class N-2027 Taxable Collection Account or Class N-2027 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class N-2027 Units (in the case of the Class N-2027 Scheduled Final Redemption Date).

"Class N-2027 Credit Support":   The Ambac Financial Guaranty Insurance Policy No. 26270BE effective March 6, 2007 with respect to the Electing Ambac Prepetition Insured Bonds that are Class N-2027 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class N-2027 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class N-2027 Units other than those made from the Class N-2027 Credit Support Collection Account, (iii) payments made on the Class N-2027 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class N-2027 Units pursuant to Sections 4.01 and 6.03.

"Class N-2027 Credit Support Collection Account":  The meaning specified in Section 3.03(a).

"Class N-2027 Global Security":  One or more global certificates representing Class N-2027 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C5 attached hereto.

"Class N-2027 Interest Distribution": A rate based on the [Consumer Price Index (as such term is used in Series M/Series N Official Statement) plus a per annum spread equal to 1.12% payable monthly, but not to exceed athe maximum rate ofunder Puerto Rico law (currently 12%).] payable on the outstanding Class N-2027 Units. [Currently, reflecting the Security Issuer has two (2) interest rate swap agreements outstanding whereby [    ] is expected to make each N-2027 Interest Distribution but, if not, each such N-2027 Interest Distribution is to be made by the Security Issuer.] rate on the applicable Ambac Prepetition Insured Bonds.  There will be no adjustment to the notional amount of the CPI Certificate evidencing a Class N-2027 Unit at the Scheduled Final Redemption Date or at any other time during the term of said CPI Certificate unless there have been distributions pursuant to Sections 4.01(b) and Section 6.03.  The amount that holders of said CPI Certificate will receive at the Scheduled Final Redemption Date is equal to the notional amount of said CPI Certificate issued to such holders unless otherwise so adjusted.

"Class N-2027 Interest Payment Date": The first Business Day each month.

"Class N-2027 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2027 Non-Taxable HTA CVI/Bonds": Those HTA Clawback CVIs and New HTA Bonds indicated as "Non-Taxable" on Schedule 1E hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2027 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2027 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2027 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such recharacterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2027 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date.  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.Funds": All amounts received by the Trustee on or with respect to the Class N-2027 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class N-2027 Non-Taxable Funds": All amounts received by the Trustee on or with respect to the Class N-2027 Non-Taxable HTA CVI/Bond (including from any sale thereof).HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs,

(ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2027 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2027 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2027 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2027 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2027 Non-Taxable HTA CVIs/Bonds": Collectively, the Class N-2027 Non-Taxable HTA CVIs and the Class N-2027 Non-Taxable New HTA Bonds.

"Class N-2027 Non-Taxable New HTA Bonds": Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2027 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2027 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2027 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2027 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward).  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2027 Scheduled Final Redemption Date":  July 1, 2027.

"Class N-2027 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2027 Taxable HTA CVI/Bonds":  Those HTA Clawback CVIs and New HTA Bonds indicated as "Taxable" on Schedule 1E hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2027 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2027 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2027 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2027 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.Funds": All amounts received by the Trustee on or with respect to the Class N-2027

Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class N-2027 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class N-2027 Taxable ~~Funds": All amounts received by the Trustee on or with respect to the Class N-2027 Taxable HTA CVI/Bonds and any Permitted Investments made with the proceeds of such Class N-2027 Taxable HTA CVI/Bonds (including from any sale of either of the foregoing).~~ HTA CVIs": Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2027 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2027 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2027 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2027 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2027 Taxable HTA CVIs/Bonds": Collectively, the Class N-2027 Taxable HTA CVIs and the Class N-2027 Taxable New HTA Bonds.

"Class N-2027 Taxable New HTA Bonds": Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2027 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2027 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2027 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2027 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2027 Trust Property": (i) ~~The~~the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Refunding Bonds, Series N (CPI Bonds) due July 1, 2027; (ii) the Class N-2027 Taxable HTA ~~CVI~~CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2027 Non-Taxable HTA ~~CVI~~CVIs/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class N-2027 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2027 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2027 Non-Taxable Collection Account and the Class N-2027 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2027 Trust Property.

"Class N-2027 Units":   The meaning specified in Section 5.01(b) designated as "Non-Taxable" and "Taxable".

"Class N-2028 Available Funds":   With respect to a Class N-2028 Scheduled Final Redemption Date or a Class N-2028 Interest Payment Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class N-2028 Trust Property other than any amount deposited in the Class N-2028 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class N-2028 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class N-2028 Taxable Collection Account or Class N-2028 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class N-2028 Units (in the case of the Class  N-2028 Scheduled Final Redemption Date).

"Class N-2028 Credit Support":   The Ambac Financial Guaranty Insurance Policy No. 26270BE effective March 6, 2007 with respect to the Electing Ambac Prepetition Insured Bonds that are Class N-2028 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class N-2028 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class N-2028 Units other than those made from the Class N-2028 Credit Support Collection Account, (iii) payments made on the Class N-2028 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class N-2028 Units pursuant to Sections 4.01 and 6.03.

"Class N-2028 Credit Support Collection Account":   The meaning specified in Section 3.03(a).

"Class N-2028 Global Security":   One or more global certificates representing Class N-2028 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C6 attached hereto.

"Class N-2028 Interest Distribution": [A rate based on the Consumer Price Index plus a per annum spread equal to 1.12% payable monthly, but not to exceed a the maximum rate of under Puerto Rico law (currently 12%).] payable on the outstanding Class N-2028 Units. [Currently, reflecting the Security Issuer has two (2) interest rate swap agreements outstanding whereby [ ] is expected to make each N-2027 Interest Distribution but, if not, each such N-2028 Interest Distribution is to be made by the Security Issuer.] rate on the applicable Ambac Prepetition Insured Bonds.  There will be no adjustment to the notional amount of the CPI Certificate evidencing a Class N-2028 Unit at the Scheduled Final Redemption Date or at any other time during the term of said CPI Certificate unless there have been distributions pursuant to Section 4.01(b) and Section 6.03.  The amount that holders of said CPI Certificate will receive at the

Scheduled Final Redemption Date is equal to the notional amount of said CPI Certificate issued to such holders unless otherwise so adjusted.

"Class N-2028 Interest Payment Date": The first Business Day of each month.

"Class N-2028 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2028 Non-Taxable ~~HTA CVI/Bonds": Those HTA Clawback CVIs and New HTA Bonds indicated as "Non-Taxable" on Schedule 1F hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2028 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2028 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2028 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such recharacterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2028 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.~~ Funds": All amounts received by the Trustee on or with respect to the Class N-2028 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class N-2028 Non-Taxable ~~Funds": All amounts received by the Trustee on or with respect to the Class N-2028 Non-Taxable HTA CVI/Bonds (including from any sale thereof).~~ HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2028 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2028 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2028 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2028 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2028 Non-Taxable HTA CVIs/Bonds": Collectively, the Class N-2028 Non-Taxable HTA CVIs and the Class N-2028 Non-Taxable New HTA Bonds.

"Class N-2028 Non-Taxable New HTA Bonds": Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class

N-2028 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2028 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2028 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2028 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable Bond Determination Date.  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2028 Scheduled Final Redemption Date":  July 1, 2028.

"Class N-2028 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2028 Taxable ~~HTA CVI/Bonds":  Those HTA Clawback CVIs and New HTA Bonds indicated as "Taxable" on Schedule 1F hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2028 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2028 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2028 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2028 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.~~Funds": All amounts received by the Trustee on or with respect to the Class N-2028 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class N-2028 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class N-2028 Taxable ~~Funds": All amounts received by the Trustee on or with respect to the Class N-2028 Taxable HTA CVI/Bonds and any Permitted Investments made with the proceeds of such Class N-2028 Taxable HTA CVI/Bonds (including from any sale of either of the foregoing).~~HTA CVIs":  Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2028 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2028 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2028 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2028 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the

Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2028 Taxable HTA CVIs/Bonds": Collectively, the Class N-2028 Taxable HTA CVIs and the Class N-2028 Taxable New HTA Bonds.

"Class N-2028 Taxable New HTA Bonds": Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2028 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2028 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2028 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2028 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2028 Trust Property": (i) Thethe portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Refunding Bonds, Series N (CPI Bonds) due July 1, 2028; (ii) the Class N-2028 Taxable HTA CVICVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2028 Non-Taxable HTA CVICVIs/Bonds and all payments on or collections in respect thereof; (iv) the benefit of the Class N-2028 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2028 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2028 Non-Taxable Collection Account and the Class N-2028 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2028 Trust Property.

"Class N-2028 Units": The meaning specified in Section 5.01(b) designated as "Non-Taxable" and "Taxable".

"Class N-2029 Available Funds": With respect to a Class N-2029 Scheduled Final Redemption Date or a Class N-2029 Interest Payment Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class N-2029 Trust Property other than any amount deposited in the Class N-2029 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class N-2029 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class N-2029 Taxable Collection Account or Class N-2029 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class N-2029 Units (in the case of the Class N-2029 Scheduled Final Redemption Date).

"Class N-2029 Credit Support": The Ambac Financial Guaranty Insurance Policy No. SP2628926280BE effective March 6, 2007 with respect to the Electing Ambac Prepetition Insured Bonds that are Class N-2029 Trust Property (and after giving effect to the reduction of

the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class N-2029 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class N-2029 Units other than those made from the Class N-2029 Credit Support Collection Account, (iii) payments made on the Class N-2029 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class N-2029 Units pursuant to Sections 4.01 and 6.03.

"Class N-2029 Credit Support Collection Account":  The meaning specified in Section 3.03(a).

"Class N-2029 Global Security":  One or more global certificates representing Class N-2029 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C7 attached hereto.

"Class N-2029 Interest Distribution": 5.50% per annum payable on the outstanding Class N-2029 Units, reflecting the rate on the applicable Ambac Prepetition Insured Bonds.

"Class N-2029 Interest Payment Date": January 1 and July 1, [provided that if such date is not a Business Day, the next Business Day].

"Class N-2029 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2029 Non-Taxable HTA CVI/Bonds": Those HTA Clawback CVIs and New HTA Bonds indicated as "Non-Taxable" on Schedule 1G hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2029 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2029 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2029 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such recharacterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2029 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date.  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.Funds":  All amounts received by the Trustee on or with respect to the Class N-2029 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class N-2029 Non-Taxable Funds": All amounts received by the Trustee on or with respect to the Class N-2029 Non-Taxable HTA CVI/Bonds (including from any sale thereof).HTA CVI": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be

adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2029 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2029 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2029 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2029 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2029 Non-Taxable HTA CVIs/Bonds": Collectively, the Class N-2029 Non-Taxable HTA CVIs and the Class N-2029 Non-Taxable New HTA Bonds.

"Class N-2029 Non-Taxable New HTA Bonds": Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2029 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2029 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2029 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2029 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2029 Scheduled Final Redemption Date": July 1, 2029.

"Class N-2029 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2029 Taxable HTA CVI/Bonds": Those HTA Clawback CVIs and New HTA Bonds indicated as "Taxable" on Schedule 1G hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2029 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2029 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2029 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2029 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the

~~Trustee.~~Funds": All amounts received by the Trustee on or with respect to the Class N-2029 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class N-2029 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class N-2029 Taxable ~~Funds": All amounts received by the Trustee on or with respect to the Class N-2029 Taxable HTA CVI/Bonds and any Permitted Investments made with the proceeds of such Class N-2029 Taxable HTA CVI/Bonds (including from any sale of either of the foregoing).~~ HTA CVI":  Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2029 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2029 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2029 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2029 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2029 Taxable HTA CVIs/Bonds": Collectively, the Class N-2029 Taxable HTA CVIs and the Class N-2029 Taxable New HTA Bonds.

"Class N-2029 Taxable New HTA Bonds": Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2029 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2029 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2029 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2029 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2029 Trust Property": (i) ~~The~~the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Refunding Bonds, Series N due July 1, 2029; (ii) the Class N-2029 Taxable HTA ~~CVI~~CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2029 Non-Taxable HTA ~~CVI~~CVIs/Bonds and all payments on or collections in respect  thereof; (iv) the benefit of the Class N-2029 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2029 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2029 Non-Taxable Collection Account and the Class N-2029 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2029 Trust Property.

"Class N-2029 Units":  The meaning specified in Section 5.01(b) designated as "Non-Taxable" and "Taxable".

"Class N-2030 Available Funds":  With respect to a Class N-2030 Scheduled Final Redemption Date or a Class N-2030 Interest Payment Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class N-2030 Trust Property other than any amount deposited in the Class N-2030 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class N-2030 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class N-2030 Taxable Collection Account or Class N-2030 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class N-2030 Units (in the case of the Class N-2030 Scheduled Final Redemption Date).

"Class N-2030 Credit Support":  The Ambac Financial Guaranty Insurance Policy No. 26270BE effective March 6, 2007 with respect to the Electing Ambac Prepetition Insured Bonds that are Class N-2030 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class N-2030 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class N-2030 Units other than those made from the Class N-2030 Credit Support Collection Account, (iii) payments made on the Class N-2030 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class N-2030 Units pursuant to Sections 4.01 and 6.03.

"Class N-2030 Credit Support Collection Account":  The meaning specified in Section 3.03(a).

"Class N-2030 Global Security":  One or more global certificates representing Class N-2030 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C8 attached hereto.

"Class N-2030 Interest Distribution": 5.25% per annum payable on the outstanding Class N-2030 Units, reflecting the rate on the applicable Ambac Prepetition Insured Bonds.

"Class N-2030 Interest Payment Date": January 1 and July 1, [provided that if such date is not a Business Day, the next Business Day].

"Class N-2030 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2030 Non-Taxable HTA CVI/Bonds": Those HTA Clawback CVIs and New HTA Bonds indicated as "Non-Taxable" on Schedule 1H hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA

~~Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2030 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2030 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2030 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such recharacterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2030 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.~~<u>Funds": All amounts received by the Trustee on or with respect to the Class N-2030 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).</u>

"Class N-2030 Non-Taxable ~~Funds": All amounts received by the Trustee on or with respect to the Class N-2030 Non-Taxable HTA CVI/Bonds (including from any sale thereof).~~<u>HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2030 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2030 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2030 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2030 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.</u>

<u>"Class N-2030 Non-Taxable HTA CVIs/Bonds": Collectively, the Class N-2030 Non-Taxable HTA CVIs and the Class N-2030 Non-Taxable New HTA Bonds.</u>

<u>"Class N-2030 Non-Taxable New HTA Bonds": Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2030 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2030 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2030 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2030 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.</u>

"Class N-2030 Scheduled Final Redemption Date": July 1, 2030.

"Class N-2030 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2030 Taxable ~~HTA CVI/Bonds": Those HTA Clawback CVIs and New HTA Bonds indicated as "Taxable" on Schedule 1H hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2030 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2030 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2030 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2030 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.~~Funds": All amounts received by the Trustee on or with respect to the Class N-2030 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class N-2030 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class N-2030 Taxable ~~Funds": All amounts received by the Trustee on or with respect to the Class N-2030 Taxable HTA CVI/Bonds and any Permitted Investments made with the proceeds of such Class N-2030 Taxable HTA CVI/Bonds (including from any sale of either of the foregoing).~~HTA CVIs": Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2030 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2030 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2030 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2030 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2030 Taxable HTA CVIs/Bonds": Collectively, the Class N-2030 Taxable HTA CVIs and the Class N-2030 Taxable New HTA Bonds.

"Class N-2030 Taxable New HTA Bonds": Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2030 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2030 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a

re-characterization of Class N-2030 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2030 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2030 Trust Property": (i) ~~The~~the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Refunding Bonds, Series N due July 1, 2030; (ii) the Class N-2030 Taxable HTA ~~CVI~~CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2030 Non-Taxable HTA ~~CVI~~CVIs/Bonds and all payments on or collections in respect thereof; (iv) the benefit of the Class N-2030 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2030 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2030 Non-Taxable Collection Account and the Class N-2030 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2030 Trust Property.

"Class N-2030 Units":  The meaning specified in Section 5.01(b) designated as "Non-Taxable" and "Taxable".

"Class N-2031 Available Funds":  With respect to a Class N-2031 Scheduled Final Redemption Date or a Class N-2031 Interest Payment Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class N-2031 Trust Property other than any amount deposited in the Class N-2031 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class N-2031 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class N-2031 Taxable Collection Account or Class N-2031 Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class N-2031 Units (in the case of the Class N-2031 Scheduled Final Redemption Date).

"Class N-2031 Credit Support":  The Ambac Financial Guaranty Insurance Policy No. 26270BE effective March 6, 2007 with respect to the Electing Ambac Prepetition Insured Bonds that are Class N-2031 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class N-2031 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class N-2031 Units other than those made from the Class N-2031 Credit Support Collection Account, (iii) payments made on the Class N-2031 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class N-2031 Units pursuant to Sections 4.01 and 6.03.

"Class N-2031 Credit Support Collection Account":  The meaning specified in Section 3.03(a).

"Class N-2031 Global Security": One or more global certificates representing Class N-2031 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of Exhibit C9 attached hereto.

"Class N-2031 Interest Distribution": 5.25% per annum payable on the outstanding Class N-2031 Units, reflecting the rate on the applicable Ambac Prepetition Insured Bonds.

"Class N-2031 Interest Payment Date": January 1 and July 1, [provided that if such date is not a Business Day, the next Business Day].

"Class N-2031 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2031 Non-Taxable HTA CVI/Bonds": Those HTA Clawback CVIs and New HTA Bonds indicated as "Non-Taxable" on Schedule II hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2031 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2031 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2031 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such recharacterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2031 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee. Funds": All amounts received by the Trustee on or with respect to the Class N-2031 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class N-2031 Non-Taxable Funds": All amounts received by the Trustee on or with respect to the Class N-2031 Non-Taxable HTA CVI/Bond (including from any sale thereof). HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2031 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2031 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2031 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2031 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2031 Non-Taxable HTA CVIs/Bonds":  Collectively, the Class N-2031 Non-Taxable HTA CVIs and the Class N-2031 Non-Taxable New HTA Bonds.

"Class N-2031 Non-Taxable New HTA Bonds": Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2031 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2031 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2031 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2031 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward).  Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2031 Scheduled Final Redemption Date":  July 1, 2031.

"Class N-2031 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2031 Taxable ~~HTA CVI/Bonds":  Those HTA Clawback CVIs and New HTA Bonds indicated as "Taxable" on Schedule II hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2031 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2031 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2031 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2031 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.~~ Funds": All amounts received by the Trustee on or with respect to the Class N-2031 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class N-2031 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class N-2031 Taxable ~~Funds": All amounts received by the Trustee on or with respect to the Class N-2031 Taxable HTA CVI/Bonds and any Permitted Investments made with the proceeds of such Class N-2031 Taxable HTA CVI/Bonds (including from any sale of either of the foregoing).~~ HTA CVIs":  Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2031 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2031 Taxable HTA

CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2031 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2031 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2031 Taxable HTA CVIs/Bonds": Collectively, the Class N-2031 Taxable HTA CVIs and the Class N-2031 Taxable New HTA Bonds.

"Class N-2031 Taxable New HTA Bonds": Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2031 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2031 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2031 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2031 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2031 Trust Property": (i) ~~The~~the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Refunding Bonds, Series N, due July 1, 2031; (ii) the Class N-2031 Taxable HTA ~~CVI~~CVIs/Bonds and all payments on or collections in respect thereof;~~]~~ (iii) the Class N-2031 Non-Taxable HTA ~~CVI~~CVIs/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class N-2031 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2031 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2031 Non-Taxable Collection Account and the Class N-2031 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2031 Trust Property.

"Class N-2031 Units":   The  meaning  specified  in  Section 5.01(b) designated as "Non-Taxable" and "Taxable".

"Class N-2045 Available Funds":   With respect to a Class N-2045 Scheduled Final Redemption Date, a Class N-2045 Interest Payment Date or a Class N-2045 Sinking Fund Distribution Date, all amounts available to the Trust on such date from the following sources: (i) all amounts received by the Trustee on or with respect to the Class N-2045 Trust Property other than any amount deposited in the Class N-2045 Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Class N-2045 Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(a)(ix), in each case on deposit in the Class N-2045 Taxable Collection Account or Class N-2045 Non-Taxable

Collection Account on such date up to the Aggregate Unit Balance for such Class N-2045 Units (in the case of the Class N-2045 Scheduled Final Redemption Date).

"Class N-2045 Credit Support": The Ambac Financial Guaranty Insurance Policy No. 26270BE effective March 6, 2007 with respect to the Electing Ambac Prepetition Insured Bonds that are Class N-2045 Trust Property (and after giving effect to the reduction of the obligations of the Credit Support Provider under such policy occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the commutation of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the HTA Clawback CVIs and/or New HTA Bonds that are Class N-2045 Trust Property, (ii) payments made pursuant to distributions under this Trust Agreement in respect of Class N-2045 Units other than those made from the Class N-2045 Credit Support Collection Account, (iii) payments made on the Class N-2045 Credit Support (including all principal and interest payments with respect to the Ambac Prepetition Insured Bonds) and (iv) distributions in respect of Class N-2045 Units pursuant to Sections 4.01 and 6.03.

"Class N-2045 Credit Support Collection Account": The meaning specified in Section 3.03(a).

"Class N-2045 Global Security": One or more global certificates representing Class N-2045 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of <u>Exhibit C10</u> attached hereto.

"Class N-2045 Interest Distribution": 67% of the Three-Month LIBOR <u>Rate</u> (as such term is ~~used in the Series M/Series N Official Statement~~<u>defined in Exhibit I hereto</u>) plus 0.53%, but not to exceed a maximum rate under Puerto Rico law ~~[~~(currently 12%~~]~~)~~,]~~ payable on the outstanding Class N-2045 Units~~. [Currently,~~ <u>reflecting</u> the ~~Security Issuer has two (2) interest rate swap agreements outstanding whereby [the swap providers] are expected to make each N-2045 Interest Distribution but, if not, each such N-2045 Interest Distribution is to be made by the Security Issuer. In addition, LIBOR is not~~ <u>rate on the applicable Ambac Prepetition Insured Bonds. In addition, it had been previously announced that publication of LIBOR is</u> expected to ~~be published~~<u>cease</u> subsequent to June 30, ~~2023.]²~~<u>2023; recently, it has been proposed that cessation of LIBOR be delayed until subsequent to September 30, 2024.</u>

"Class N-2045 Interest Payment Date": Each January 1, April 1, July 1 and October 1, ~~[~~<u>provided</u> that if such date is not a Business Day, the next Business Day~~]~~.

"Class N-2045 Non-Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2045 Non-Taxable ~~HTA CVI/Bonds": Those HTA Clawback CVIs and New HTA Bonds indicated as "Non-Taxable" on Schedule 1J hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2045 Non-Taxable HTA~~

---

² ~~LIBOR mechanics and replacement issues to be discussed with Ambac.~~

~~CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2045 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2045 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such recharacterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2045 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.~~Funds": All amounts received by the Trustee on or with respect to the Class N-2045 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).

"Class N-2045 Non-Taxable ~~Funds": All amounts received by the Trustee on or with respect to the Class N-2045 Non-Taxable HTA CVIs/Bonds (including from any sale thereof).~~HTA CVIs": Those HTA Clawback CVIs indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2045 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2045 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2045 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2045 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2045 Non-Taxable HTA CVIs/Bonds": Collectively, the Class N-2045 Non-Taxable HTA CVIs and the Class N-2045 Non-Taxable New HTA Bonds.

"Class N-2045 Non-Taxable New HTA Bonds": Those New HTA Bonds indicated as "Non-Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2045 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2045 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2045 New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2045 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2045 Scheduled Final Redemption Date": July 1, ~~2045.~~2042.

"Class N-2045 Sinking Fund Distribution Date": July 1, 2042.

"Class N-2045 Sinking Fund Distributions": With respect to the N-2045 Sinking Fund Distribution Date, the amount set forth on Exhibit A2 hereto, as it may be amended from time to time in accordance with the terms hereof.

"Class N-2045 Taxable Collection Account": The meaning specified in Section 3.03(a).

"Class N-2045 Taxable ~~HTA CVI/Bonds": Those HTA Clawback CVIs and New HTA Bonds indicated as "Taxable" on Schedule 1J hereto, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs and New HTA Bonds, (ii) HTA Clawback CVI and New HTA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2045 Non-Taxable HTA CVI/Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2045 Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2045 Taxable HTA CVI/Bonds as tax-exempt by Bond Counsel and the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs and New HTA Bonds shall be considered Class N-2045 Non-Taxable HTA CVI/Bonds from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI/Bond Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.~~Funds": All amounts received by the Trustee on or with respect to the Class N-2045 Taxable HTA CVIs/Bonds and any Permitted Investments made with the proceeds of such Class N-2045 Taxable HTA CVIs/Bonds (including from any sale of either of the foregoing).

"Class N-2045 Taxable ~~Funds": All amounts received by the Trustee on or with respect to the Class N-2045 Taxable HTA CVI/Bonds and any Permitted Investments made with the proceeds of such Class N-2045 Taxable HTA CVI/Bonds (including from any sale of either of the foregoing).~~HTA CVIs": Those HTA Clawback CVIs indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such HTA Clawback CVIs, (ii) HTA Clawback CVI sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2045 Non-Taxable HTA CVIs as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2045 Taxable HTA CVIs from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2045 Taxable HTA CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized HTA Clawback CVIs shall be considered Class N-2045 Non-Taxable HTA CVIs from the effective date of such re-characterization going forward) but only if such re-characterization occurs on or before the Outside Non-Taxable HTA CVI Determination Date. Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2045 Taxable HTA CVIs/Bonds": Collectively, the Class N-2045 Taxable HTA CVIs and the Class N-2045 Taxable New HTA Bonds.

"Class N-2045 Taxable New HTA Bonds": Those New HTA Bonds indicated as "Taxable" on the Allocation Schedule, as may be adjusted from time to time as a result of (i) redemptions of such New HTA Bonds, (ii) New HTA Bond sales pursuant to Section 6.02, (iii) distributions

pursuant to Section 4.01 and Section 6.03, (iv) a re-characterization of Class N-2045 Non-Taxable New HTA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2045 Taxable New HTA Bonds from the effective date of such re-characterization going forward), and (v) a re-characterization of Class N-2045 Taxable New HTA Bonds as tax-exempt by Bond Counsel or the Internal Revenue Service (in which case such re-characterized New HTA Bonds shall be considered Class N-2045 Non-Taxable New HTA Bonds from the effective date of such re-characterization going forward). Upon any such re-characterization, the Credit Support Provider will provide notice thereof to the Trustee.

"Class N-2045 Trust Property": (i) ~~The~~the portion of Electing Ambac Prepetition Insured Bonds composed of the bond issue identified as Transportation Revenue Refunding Bonds, Series N (LIBOR Bonds) due July 1, 2045; (ii) the Class N-2045 Taxable HTA ~~CVI~~CVIs/Bonds and all payments on or collections in respect thereof; (iii) the Class N-2045 Non-Taxable HTA ~~CVI~~CVIs/Bonds  and all payments on or collections in respect  thereof; (iv) the benefit of the Class N-2045 Credit Support; (v) all Permitted Investments and all funds from time to time deposited in the Class N-2045 Taxable Collection Account; (vi) all funds from time to time deposited in the Class N-2045 Non-Taxable Collection Account and the Class N-2045 Credit Support Collection Account; and (vii) any other asset constituting a portion or proceeds of such Class N-2045 Trust Property.

"Class N-2045 Units":   The meaning specified in Section 5.01(b) designated as "Non-Taxable" and "Taxable".

"Clawback CVIs":  Collectively, the general obligation securities, the payment for which the CVI Issuer has pledged its full faith, credit and taxing power as further described in the Plan of Adjustment, the Commonwealth Plan of Adjustment and the CVI Trist Agreement.

"Closing Date":  ~~[ ].~~December 6, 2022.

"Code":   The Internal Revenue Code of 1986, as amended, and Treasury Regulations promulgated thereunder.

"Collection Account":  Collectively, or individually, as the context may require, the Taxable Collection Accounts, the Non-Taxable Collection Accounts and the Credit Support Collection Accounts.

"Commonwealth": The Commonwealth of Puerto Rico.

"Commonwealth Plan of Adjustment":  That certain Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth, et al., filed on November 25, 2021 with the Title III Court by the Oversight Board in the Commonwealth Title III case, as amended, modified or supplemented from time to time.

"Confirmation Order":  The order of the Title III Court confirming the Plan of Adjustment in accordance with Section 314(b) of PROMESA and ~~section 1129~~Sections 944, 1123 and 1125 of the Bankruptcy Code, applicable to the Title III Case pursuant to Sections 301 and 314 of PROMESA.

"Consumer Price Index": [include pdf]. Such Consumer Price Index and related calculations are more fully described in Appendix VII entitled "Provisions Applicable to CPI Bonds" contained in the Series M/Series N Official StatementExhibit H.

"Corporate Trust Office": The Trustee's offices at 350 Park Avenue, 9th Floor, New York, NY 10022 or such other addresses as the Trustee may designate from time to time by notice to the Unitholders and the Credit Support Provider.

"CPI Certificate(s)": Collectively, or individually as the context may require, the Certificates evidencing Class N-2027 Units and the Certificates evidencing Class N-2028 Units.

"CPI Interest Distributions": Collectively, or individually as the context may require, the Class N-2027 Interest Distribution and the Class N-2028 Interest Distribution.

"CPI Rate" The meaning specified in Exhibit H.

"Credit Support": As the context may require, the Class A-2028 Credit Support, the Class M-2023 Credit Support, the Class L-2038 Credit Support, the Class M-2023 Credit Support, the Class N-2026 Credit Support, the Class N-2027 Credit Support, the Class N-2028 Credit Support, the Class N-2029 Credit Support, the Class N-2030 Credit Support, the Class N-2031 Credit Support and the Class N-2045 Credit Support. For the avoidance of doubt, the foregoing Credit Support insures the underlying Electing Ambac Prepetition Insured Bonds of each Class of Units, and not the Units themselves.

"Credit Support Collection Account": Collectively, or individually, either through the establishment of separate accounts or through book-entry allocations (at the discretion of the Trustee) as the context may require, the Class A-2028 Credit Support Collection Account, the Class L-2038 Credit Support Collection Account, the Class M-2023 Credit Support Collection Account, the Class L-2038 Credit Support Collection Account, the Class N-2026 Credit Support Collection Account, the Class N-2027 Credit Support Collection Account, the Class N-2028 Credit Support Collection Account, the Class N-2029 Credit Support Collection Account, the Class N-2030 Credit Support Collection Account, the Class N-2031 Credit Support Collection Account and the Class N-2045 Credit Support Collection Account.

"Credit Support Provider": Ambac Assurance Corporation.

"Credit Support Provider Request": A written order or request signed in the name of the Credit Support Provider and delivered to the Trustee.

"Custodian": The Trustee, as custodian with respect to the Global Securities, or any successor entity thereto.

"CVI Issuer": The Commonwealth of Puerto Rico.

"CVI Trust Agreement": The Trust Agreement (relating to CVIs), dated as of March 15, 2022, by and between the CVI Issuer and The Bank of New York Mellon, as trustee, as the same may be amended and supplemented.

"Deemed HTA Clawback CVI ~~or New HTA Bond~~ Valuation Amount":  In connection with any distribution of underlying HTA Clawback CVIs ~~or New HTA Bonds~~ pursuant to Section 6.03(a) hereof, the value to be attributed to such HTA Clawback CVIs ~~or New HTA Bonds~~ determined by the Credit Support Provider and delivered to the Trustee based on either of the following methods as the Credit Support Provider may elect (i) assuming there has been no disruption in trading in the relevant time period as determined by the Credit Support Provider, the volume-weighted average trading price of the particular type of HTA Clawback CVI ~~or New HTA Bond~~ to be distributed for the twenty (20) Business Day period immediately prior to the date the written notice from the Credit Support Provider is delivered (or if no volume-weighted average trading price is available for such period, a reasonable determination thereof made by the Calculation Agent) or (ii) the average price quoted by two or more brokers of national standing for a firm bid to purchase such type of HTA Clawback CVI ~~or New HTA Bond~~ in an aggregate principal amount of $~~[500,000]~~500,000, or is otherwise acceptable to the Credit Support Provider in its sole discretion.[3]

"Deemed New HTA Bond Valuation Amount":  In connection with any distribution of underlying New HTA Bonds pursuant to Section 6.03(a) hereof, the value to be attributed to such New HTA Bonds determined by the Credit Support Provider and delivered to the Trustee based on either of the following methods as the Credit Support Provider may elect (i) assuming there has been no disruption in trading in the relevant time period as determined by the Credit Support Provider, the volume-weighted average trading price of the particular type of New HTA Bond to be distributed for the twenty (20) Business Day period immediately prior to the date the written notice from the Credit Support Provider is delivered (or if no volume-weighted average trading price is available for such period, a reasonable determination thereof made by the Calculation Agent) or (ii) the average price quoted by two or more brokers of national standing for a firm bid to purchase such type of New HTA Bond in an aggregate principal amount of $500,000, or is otherwise acceptable to the Credit Support Provider in its sole discretion.

"Delaware Statutory Trust Act":  Chapter 38 of Title 12 of the Delaware Code.

"Delaware Trustee":  The meaning specified in the preamble hereto.

"Delaware Trustee Fee":  The amount set forth in the Trustee Fee Letter.

"Depositary":  DTC or such other clearing agency as selected by the Trustee in accordance with Section 5.09.

"Depositor":  The meaning specified in the preamble hereto.

"Directing Unitholders":  The meaning specified in Section 4.01(h).

"Discretionary Distribution":  The meaning specified in Section 4.01(b).

"Discretionary Distribution Date":  Each date on which the Trustee is directed to make a Discretionary Distribution pursuant to Section 4.01 hereof between Distribution Dates, which

---

[3] ~~To be confirmed.~~

date shall be a Business Day that is at least ten (10) days following the notice of such Discretionary Distribution.

"Distribution Date": A Non-Taxable Distribution Date, a Discretionary Distribution Date, an Interest Payment Date or a Sinking Fund Distribution Date.

"Dollar" or "$": Such currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

"DTC": The Depository Trust Company, a limited purpose trust company organized under the laws of the State of New York, its successors and assigns.

"DTC Participant": With respect to the Depositary, a Person who has an account with the Depositary or clears through or maintains a custodial relationship with a Person who has an account with the Depositary.

"Effective Date": With respect to the Plan of Adjustment, [ ], 2022///.December 6, 2022.

"Electing Ambac Prepetition Insured Bonds": The Ambac Prepetition Insured Bonds beneficially owned by the Electing Holders.

"Electing Holder": Each holder of the Ambac Prepetition Insured Bonds who has elected to receive Units pursuant to the non-commutation option set forth in Section [ ]26.4(b)(ii) of the Plan of Adjustment and associated Ballot (as such term is defined the Plan of Adjustment).

"Eligible Account": A non-interest bearing account, held in the United States in the name of the Trustee for the benefit of the Trust that is either a segregated account or segregated accounts maintained with (1) a Federal or State chartered depository institution that has (x) a long-term deposit rating (or, if a deposit rating is unavailable, senior unsecured debt rating) of at least "A" by S&P and a short-term rating of at least "A-1" by S&P, and (y) a long-term deposit rating (or, if a deposit rating is unavailable, senior unsecured debt rating) of at least "A2" by Moody's and a short-term rating of at least "P-1" by Moody's, or (2) with the corporate trust department of a Federal or State-chartered deposit institution having a CR Assessment of at least "Baa1(cr)" by Moody's (or, if such institution does not have a CR Assessment, with (x) a long-term unsecured credit rating of at least "Baa1" by Moody's and (y) a short-term rating of "P-1" by Moody's (and if rated "Baa1" by Moody's, such rating is not on watch for possible downgrade)). Such institution shall have a combined capital and surplus of at least U.S.$200,000,000 (or the equivalent in any other currency), or is otherwise acceptable to the Credit Support Provider in its sole discretion.

"EMMA": The Electronic Municipal Marketplace Access (EMMA®), an electronic repository for municipal securities data and disclosure documents, provided and administered by MSRB.

"Exchange Act": The U.S. Securities Exchange Act of 1934, as amended, or any successor statute, and the rules and regulations promulgated by the United States Securities and Exchange Commission thereunder.

"Executive Officer":  With respect to any corporation, the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, any Vice President, the Secretary, any Assistant Secretary, the Treasurer or any Assistant Treasurer of such corporation and with respect to any partnership, any general partner thereof and, as applicable, an authorized signatory.

"Extraordinary Trust Expense":  The meaning specified in Section 9.04(b).

"Fee Reserve": The Initial Fee Reserve and thereafter an amount equal to at least the Fee Reserve Threshold Amount established by the Trustee to cover payments of fees and expenses of the Trust, including, without limitation, the Trustee Fees, the Delaware Trustee Fees, Extraordinary Trust Expenses, and fees and expenses of the Accountant, the CPI Calculation Agent and the LIBOR Calculation Agent, and any other fees and expenses of the Trust in connection with tax obligations.

"Fee Reserve Threshold Amount": An amount equal to $[200,000].200,000.

"Funds":  The meaning specified in Section 4.01(i).

"Global Securities":  Individually and collectively, each of the Class A-2028 Global Security, Class M-2023 Global Security, Class L-2038 Global Security, Class M-2023 Global Security, Class N-2026 Global Security, Class N-2027 Global Security, Class N-2028 Global Security, Class N-2029 Global Security, Class N-2030 Global Security, Class N-2031 Global Security or Class N-2045 Global Security.

"Global Security Legend":  The legend set forth in Section 5.09(c)(iv).

"Grantor Trust":  The meaning provided under Sections 671 through 679 of the Code.

"HTA":  The Puerto Rico Highways and Transportation Authority.

"HTA CVI/Bond Distributions":  The [Ambac Plan Consideration]⁴ (as defined in the Plan of Adjustment), including the HTA Clawback CVIs and New HTA Bonds, that Electing Holders of an [Allowed CW/HTA Claim] have elected pursuant to the Plan of Adjustment to deposit into the Trust."HTA Clawback CVIs":  The HTA Clawback CVIs (as defined in the Plan of Adjustment) consisting of theClawback CVIs:  The Clawback CVIs issued on account of the Allowed CW/HTA_98 Senior Bond Claims (as defined in the Plan of Adjustment)Ambac) constituting a portion of the HTA Clawback Recovery, all as further described and issued under the Plan of Adjustment.⁵

"HTA Clawback CVI Trust Agreement": The HTA Clawback CVI Trust Agreement, dated as of [_____], 2022, by and between the Issuer and [_____], as trustee, as the same may be amended and supplemented."HTA Clawback Recovery":  The aggregate recovery by holders of Allowed CW/HTA Claims, consisting of HTA Clawback CVIs distributed to holders of such claims pursuant to the Commonwealth Plan of Adjustment, constituting 68.6% of the Clawback CVI allocation.

---

⁴ To be confirmed.
⁵ TBD: "HTA Clawback Recovery" – subject to the Annual Payment Waterfall.

["HTA Qualifying Modification": [  ].]

"HTA CVI Distributions":  The cash and HTA Clawback CVIs that Electing Holders of an Allowed HTA 98 Senior Bond Claim (Ambac) have elected pursuant to the Plan of Adjustment to deposit into the Trust.

"HTA 98 Senior Bond Claims (Ambac)":  The meaning specified in the Plan of Adjustment.

["Initial Adjusted Non-Taxable HTA CVICVIs/Bond Notional": An amount equal to the Initial Non-Taxable HTA CVICVIs/Bond Notional in the Trust Property for each Class of Units minus the amount corresponding to the initial percentage of Non-Taxable HTA CVIs/Bonds of Ambac Prepetition Insured Bonds that are not Electing Ambac Prepetition Insured Bonds for each Class of Units and further reduced for each subsequent disposal of Non-Taxable HTA CVIs/Bonds pursuant to Sections 4.01(a) and 6.02(b).]

["Initial Adjusted Notional Threshold Amount":  An amount equal to the Initial Notional Threshold Amount minus the amount corresponding to the initial percentage of Non-Taxable HTA CVICVIs/Bonds of Ambac Prepetition Insured Bonds that are not Electing Ambac Prepetition Insured Bonds  for each Class of Units and further reduced for each subsequent redemption of Non-Taxable HTA CVICVIs/Bonds pursuant to Sections 4.01(a), 6.02(b) and 6.03.]

"Initial Fee Reserve": The Fee Reserve on the Closing Date in an amount equal to $[400,000].400,000.

["Initial Non-Taxable HTA CVICVIs/Bond Notional": The initial maximum notional amount of the Non-Taxable HTA CVICVIs/Bonds attributed to the Electing Ambac Prepetition Insured Bonds that have been deposited into the Trust Property for each Class of Units and as set forth on Schedule 21 for each Class of Units, as adjusted as described below.  The Initial Non-Taxable HTA CVICVIs/Bond Notional is equal to $[  ].81,859,612, to be adjusted to reflect the initial maximum notional amount of the Non-Taxable HTA CVICVIs/Bond determined upon formation of the initial Non-Taxable Sub-Trust on or before the Outside Non-Taxable CVI Determination Date, pursuant to Section 3.01(d) and (e), as reduced for each redemption of the Non-Taxable HTA CVIs to be done on a pro rata basis (by Notional Amount), on each subsequent redemption, distribution or purchase of Non-Taxable HTA CVIs pursuant to Section 4.01(a), 6.02 and 6.03.]

["Initial Notional Threshold Amount": The amounts set forth on Schedule 21 for each Class of Units as reduced for each redemption of the Non-Taxable HTA CVIs to be done on a pro rata basis (by Notional Amount), on each subsequent redemption, distribution or purchase of Non-Taxable HTA CVIs pursuant to Section 4.01(a), 6.02 and 6.03.  The aggregate amount for all Classes of Units is $[  ].]321,583,500.

"Interest Distribution": Individually, or collectively as context requires, the Class A-2028 Interest Distribution, Class M-2023 Interest Distribution, Class L-2038 Interest Distribution, Class M-2023 Interest Distribution, Class N-2026 Interest Distribution, Class N-2027 Interest Distribution, Class N-2028 Interest Distribution, Class N-2029 Interest Distribution, Class N-2030 Interest Distribution, and Class N--2031 Interest Distribution and Class N-2045 Interest

Distribution, each computed on the basis of a 360-day year consisting of twelve (12) months of thirty (30) days, and the Class N-2045 Interest Distribution computed on the basis of a 365 or 366-day year, as applicable, and the actual number of days elapsed.[6]

"Interest Payment Date": The Class A-2028 Interest Payment Date, Class M-2023 Interest Payment Date, Class L-2038 Interest Payment Date, Class M-2023 Interest Payment Date, Class N-2026 Interest Payment Date, Class N-2027 Interest Payment Date, Class N-2028 Interest Payment Date, Class N-2029 Interest Payment Date, Class N-2030 Interest Payment Date, Class N-2031 Interest Payment Date and Class N-2045 Interest Payment Date.

"IRS Non-Taxable HTA CVI/BondCVIs/Bond Determination Date": With respect to each series of Non-Taxable HTA CVI/Bonds or New HTA CVIs/Bonds, the date on which the Internal Revenue Service makes a final determination as to whether such series of HTA Clawback CVIs or New HTA Bonds is non-taxable or taxable, which date shall be no later than the Outside Non-Taxable HTA CVI/Bond Determination Date.

"Issuer": The Commonwealth of Puerto Rico. "LIBOR":  The London InterBank Offered Rate.

"LIBOR-Based Interest Distribution": The Class N-2045 Interest Distribution.

"LIBOR-Based Interest Rate": The meaning specified in Exhibit I.

"LIBOR Certificate(s)": The Certificates evidencing Class N-2045 Units.

"Modification":  The meaning specified in Section 9.12(c).

"Moody's":  Moody's Investors Service, Inc.

"MSRB":   The Municipal Securities Rulemaking Board, a self-regulatory organization, governed by public and regulated entity representatives, and overseen by the Securities and Exchange Commission.

"New HTA Bond": The capital appreciation bonds issued by HTA pursuant to the Plan of Adjustment, the Confirmation Order and the New HTA Bond Indenture that Electing Holders have elected pursuant to the Plan of Adjustment to deposit into the Trust.

"New HTA Bond Indenture":  The Master Trust Agreement, dated as of the Effective Date, by and between HTA and The Bank of New York Mellon, as trustee, as it may be amended, supplemented or modified from time to time.

"Non-Taxable Collection Account":  The meaning specified in Section 3.03.

"Non-Taxable Distribution Date": Each date on which a distribution is made from the Non-Taxable Collection Account, which date shall be a Business Day that is at least ten (10) days following the notice of such Non-Taxable Distribution Date.

---

[6] NTD: Calculation mechanics TBD.

"Non-Taxable Funds":   All amounts received by the Trustee on or with respect to the Non-Taxable HTA ~~CVI~~CVIs/Bonds (including from any sale thereof).

"Non-Taxable HTA ~~CVI/Bond" or "Non-Taxable HTA CVI/Bonds~~CVIs":  The (i) Class A-2028 Non-Taxable HTA ~~CVI/Bonds~~CVIs, (ii) Class L-2038 Non-Taxable HTA ~~CVI/Bonds~~CVIs, (iii) Class M-2023 Non-Taxable HTA ~~CVI/Bonds~~CVIs, (iv) Class N-2026 Non-Taxable HTA ~~CVI/Bonds~~CVIs, (v) Class N-2027 Non-Taxable HTA ~~CVI/Bonds~~CVIs, (vi) Class N-2028 Non-Taxable HTA ~~CVI/Bonds~~CVIs, (vii) Class N-2029 Non-Taxable HTA ~~CVI/Bonds~~CVIs, (viii) Class N-2030 Non-Taxable HTA ~~CVI/Bonds~~CVIs, (ix) Class N-2031 Non-Taxable HTA ~~CVI/Bonds~~CVIs and (x) Class N-2045 Non-Taxable HTA ~~CVI/Bonds~~CVIs.

"Non-Taxable HTA ~~CVI~~CVIs/Bonds":  Collectively, the Non-Taxable HTA CVIs and the Non-Taxable New HTA Bonds.

"Non-Taxable New HTA Bonds":  The (i) Class A-2028 Non-Taxable New HTA Bonds, (ii) Class L-2038 Non-Taxable New HTA Bonds, (iii) Class M-2023 Non-Taxable New HTA Bonds, (iv) Class N-2026 Non-Taxable New HTA Bonds, (v) Class N-2027 Non-Taxable New HTA Bonds, (vi) Class N-2028 Non-Taxable New HTA Bonds, (vii) Class N-2029 Non-Taxable New HTA Bonds, (viii) Class N-2030 Non-Taxable New HTA Bonds, (ix) Class N-2031 Non Taxable New HTA Bonds and (x) Class N-2045 Non-Taxable New HTA Bonds.

"Non-Taxable HTA CVIs/Bond Permitted Disposition Event":  With respect to any series of Non-Taxable HTA ~~CVI/~~CVIs or Non-Taxable New HTA Bonds, as the case may be, the satisfaction of all of the following requirements:

(i) the Trustee shall have provided notice to the applicable Class of Unitholders in accordance with the notice requirements set forth in Section 10.05 hereof (a) notifying such Class of Unitholders of the instruction of the Credit Support Provider described in Section 6.02(b) and (b) requesting that any Unitholders in the Class objecting to such proposed disposition provide written notice of such objection to Trustee; and

(ii)   the Trustee shall not have received written objections with respect to such proposed disposition representing ~~10~~ten percent (10%) or more of the amount of outstanding Units of the Class (determined as of the date of the notice described in clause (i) above) within seven (7) Business Days of the date the notice provided in clause (i) above is provided.

"Non-Taxable HTA CVI/Bond Sale Event":  With respect to any series of Non-Taxable HTA ~~CVI/~~CVIs or Non-Taxable New HTA Bonds for any Class of Units, the occurrence of either (i) a Non-Taxable HTA CVI/Bond Threshold Event or (ii) a Non-Taxable HTA CVI/Bond Permitted Disposition Event applicable thereto.

"Non-Taxable HTA CVI/Bond Threshold Amount":   With respect to each series of Non-Taxable HTA ~~CVI/Bonds~~CVIs or Non-Taxable New HTA Bonds, as the case may be, and as of any applicable determination date, (i) the price equivalent to the Initial Adjusted Notional Threshold Amount set forth opposite such series of Non-Taxable HTA ~~CVI~~CVIs/Bonds on Schedule ~~2~~1 hereto, as adjusted (pursuant to the "Initial Non-Taxable HTA ~~CVI~~CVIs/Bond Notional" definition), or (ii) the price that equates to twenty-five percent (25%) above the

volume-weighted average trading price of the Non-Taxable HTA ~~CVI~~CVIs/Bonds for a 20-Business Day period beginning on the IRS Non-Taxable HTA ~~CVI/Bond~~CVIs/Bond Determination Date (provided that if no volume-weighted average trading price is available for such period, the Calculation Agent shall make a reasonable determination thereof). The Calculation Agent shall select either (i) or (ii) above as the applicable methodology for calculating the Non-Taxable HTA CVI/Bond Threshold Amount on or prior to the Outside Non-Taxable HTA CVI~~/Bond~~ Determination Date.

"Non-Taxable HTA CVI/Bond Threshold Event": With respect to any series of Non-Taxable HTA ~~CVI/~~CVIs or Non-Taxable New HTA Bonds, as the case may be, the receipt by the Trustee of a notice by the Calculation Agent that the sum of (A) the Pro Forma Proceeds plus (B) the Prior Payments with respect to such Non-Taxable HTA ~~CVI~~CVIs/Bonds exceeds the Non-Taxable HTA CVI/Bond Threshold Amount for such Non-Taxable HTA ~~CVI~~CVIs/Bonds, coupled with a written instruction from the Credit Support Provider in the form of Exhibit E-2 attached hereto.

"Non-Taxable Sub-Trust": The meaning specified in Section 3.01(d).

"Notional Amount": With respect to a particular Class and as of any date of determination, the amount required to redeem ~~one Unit~~the Units of such Class as of such date. As of the Closing Date, (i) the aggregate "Notional Amount" of ~~one Class A-2028 Unit shall be $[   ],~~ the the Class A-2028 Units shall be $2,251,000, (ii) the aggregate "Notional Amount" of the Class L-2038 Units shall be $154,012,500, (iii) the aggregate "Notional Amount" of ~~one~~the Class M-2023 ~~Unit~~Units shall be $~~[   ]~~,470,000, (iv) the aggregate "Notional Amount" of ~~one Class L-2038 Unit shall be $[   ], the "Notional Amount" of one~~the Class N-2026 ~~Unit~~Units shall be $~~[   ]~~,880,000, (v) the aggregate "Notional Amount" of ~~one~~the Class N-2027 ~~Unit~~Units shall be $~~[   ]~~,6,040,000, (vi) the aggregate "Notional Amount" of ~~one~~the N-2028 ~~Unit~~Units shall be $~~[   ]~~,13,491,000, (vii) the aggregate "Notional Amount" of ~~one~~the N-2029 ~~Unit~~Units shall be $~~[   ]~~,25,895,000, (viii) the aggregate "Notional Amount" of ~~one~~the N-2030 ~~Unit~~Units shall be $~~[   ]~~,49,220,000, (ix) the aggregate "Notional Amount" of ~~one~~the Class N-2031 ~~Unit~~Units shall be $~~[   ]~~69,124,000 and (x) the aggregate "Notional Amount" of ~~one~~the Class N-2045 ~~Unit~~Units shall be $~~[   ]~~,200,000.

"Officers' Certificate": A certificate signed by an Executive Officer of the applicable Person, and delivered to the Trustee.

"Opinion of Counsel": A written opinion of competent counsel, who may be counsel to the Credit Support Provider.

"Outside Non-Taxable ~~HTA~~ CVI~~/Bond~~ Determination Date": ~~[   ].~~[7]March 31, 2023.

"Outstanding": As of any date of determination, all Units theretofore authenticated and delivered under this Trust Agreement, except Units delivered to the Trustee for cancellation.

"Oversight Board": Financial Oversight and Management Board of Puerto Rico.

---

[7] ~~Confirm determination date.~~

"Paying Agent":  The meaning specified in Section 5.07(a).

"Permitted Investments":  All investments made by the Trustee at the direction of the Credit Support Provider for amounts in a Taxable Collection Account pursuant to Section 3.04 in any one or more of the following; provided, however, that each such obligation or security shall be held in the name of the Trustee on behalf of the Trust and, provided further, that each such investment must have a maturity date that is prior to the Distribution Date (other than a Discretionary Distribution Date that has not been set at the time such investment is made):

(i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States government or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States;

(ii) marketable direct obligations issued by any State, or any political subdivision or any agency, authority, public benefit corporation or instrumentality thereof, at the time of the acquisition thereof, a short-term rating of at least 'A-1' from S&P or at least 'P-1' from Moody's;

(iii) an obligation of any State, or any political subdivision or any agency, authority, public benefit corporation or instrumentality thereof;

(iv) debt obligations issued, assumed, or guaranteed by legal entities organized under the laws of the United States or any State;

(v) shares of any United States money market fund that (a) has substantially all of its assets invested continuously in the types of investments referred to in clause (i) or (ii), (b) has net assets in excess of $500,000,000 and (c) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; and

(vi)   tax-exempt securities exempt from Federal arbitrage provisions applicable to investments of tax-exempt bonds including, but not limited to, tax-exempt bonds of the Commonwealth of Puerto Rico or any agency, authority, public benefit corporation or instrumentality thereof, and, if available, State and Local Government Series (SLGS) issued by the United States Department of Treasury.

"Person":  Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government, or any agency or political subdivision thereof.

"Plan of Adjustment":   That certain ~~HTA~~Modified Fifth Amended Title III Plan of Adjustment of HTA filed ~~on [   ]~~September 6, 2022 with the Title III Court by the Oversight Board in the Title III Case, as amended, modified or supplemented from time to time.

"Prior Payments": Cumulative payments received by the Trust on account of Non-Taxable HTA CVI/Bond distributions Distributions and New HTA Bonds pursuant to Sections 4.01(a) and 6.02(b).

"Pro Forma Proceeds": The cash proceeds projected by the disposal of the Sale Notional.

"Proceeding":  Any suit in equity, action at law or other judicial or administrative proceeding.

"Purchase Offer Notice": The meaning specified in Section 6.03(c).

"Record Date": The fifteenth day of the month (whether or not a Business Day) preceding the month in which the applicable Interest Payment Date occurs.

"Reimbursement Rate": The lesser of (a) the maximum rate permissible under applicable usury or similar laws limiting interest rates and (b) the annual interest rate on the applicable Electing Ambac Prepetition Insured Bond.  The Reimbursement Rate shall be computed on the basis of a 360-day year consisting of twelve (12) months of thirty (30) days each.

"Responsible Officer":  With respect to the Trustee, any officer within the Corporate Trust Office of the Trustee, including any Vice President, Assistant Vice President, Secretary, Assistant Secretary, Executive Director or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject and, as applicable, an authorized signatory.

"S&P":  S&P Global Ratings.

"Sale Notional": The notional amount of Non-Taxable HTA CVICVIs/Bonds for sale.

"Scheduled Final Redemption Date":  The Class A-2028 Scheduled Final Redemption Date, Class M-2023 Scheduled Final Redemption Date, Class L-2038 Scheduled Final Redemption Date,  Class M-2023 Scheduled Final Redemption Date, Class N-2026 Scheduled Final Redemption Date, Class N-2027 Scheduled Final Redemption Date, Class N-2028 Scheduled Final Redemption Date, Class N-2029 Scheduled Final Redemption Date, Class N-2030 Scheduled Final Redemption Date, Class N-2031 Scheduled Final Redemption Date and Class N-2045 Scheduled Final Redemption Date, as applicable, or such earlier redemption date as determined by the Credit Support Provider so long as the Credit Support Provider pays (or has paid) all amounts due under the Credit Support as provided in Sections 3.02(b)(iv), and 4.01(e) and (h).

"Secretary of State":  The meaning specified in Section 2.01(a).

["Section 103 Cash":  The meaning specified in the Plan of Adjustment.][8]

"Securities Act":  The U.S. Securities Act of 1933, as amended, and the rules and regulations promulgated by the United States Securities and Exchange Commission thereunder.

[8] Defined term to be confirmed.

"Security Issuer":  HTA.

~~"Series M/Series N Official Statement":  The HTA Official Statement, dated February 15, 2007, with respect to the Ambac Prepetition Insured Bonds described in clauses of (ii), (iv), (v) and (vi) of said definition; and available on EMMA®.~~

"Sinking Fund Distribution Date": Individually or collectively, as the context may require, the Class A-2028 Sinking Fund Distribution Date, the Class L-2038 Sinking Fund Distribution Date and the Class N-2045 Sinking Fund Distribution Date.

"Sinking Fund Distributions":  Individually or collectively, as the context may require, the Class A-2028 Sinking Fund Distributions, the Class L-2038 Sinking Fund Distributions and the Class N-2045 Sinking Fund Distributions.

"Sinking Fund Schedule": The schedules set forth on <u>Exhibit A1</u>, <u>Exhibit A2</u> and <u>Exhibit A3</u>, initially adjusted to reflect exclusions of non-Electing Holders' Ambac Prepetition Insured Bonds, as it may be amended from time to time in accordance with the terms hereof.

"State":  Any one of the 50 states of the United States, the District of Columbia or its territories, including the Commonwealth.

"Sub-Trust":  Each Taxable Sub-Trust and Non-Taxable Sub-Trust described in Section 3.01(c) and (d).

"Taxable Collection Account" or "Taxable Collection Accounts": Collectively, or individually, as the context may require, the Class A-2028 Taxable Collection Account, <u>Class L-2038 Taxable Collection Account,</u> Class M-2023 Taxable Collection Account, Class ~~L-2038 Taxable Collection Account, Class~~ N-2026 Taxable Collection Account, Class N-2027 Taxable Collection Account, Class N-2028 Taxable Collection Account, Class N-2029 Taxable Collection Account, Class N-2030 Taxable Collection Account, Class N-2031 Taxable Collection Account and the Class N-2045 Taxable Collection Account.

~~"Taxable HTA CVI/Bond" or "Taxable HTA CVI/Bonds":  The (i) Class A-2028 Taxable HTA CVI/Bonds, (ii) Class L-2038 Taxable HTA CVI/Bonds, (iii) Class M-2023 Taxable HTA CVI/Bonds, (iv) Class N-2026 Taxable HTA CVI/Bonds, (v) Class N-2027 Taxable HTA CVI/Bonds, (vi) Class N-2028 Taxable HTA CVI/Bonds, (vii) Class N-2029 Taxable HTA CVI/Bonds, (viii) Class N-2030 Taxable HTA CVI/Bonds, (ix) Class N-2031 Taxable HTA CVI/Bonds and (x) Class N-2045 Taxable HTA CVI/Bonds.~~

"Taxable Funds":  All amounts received by the Trustee on or with respect to the Taxable HTA ~~CVI~~<u>CVIs</u>/Bonds and any Permitted Investments made with proceeds of such Taxable HTA ~~CVI~~<u>CVIs</u>/Bonds (including from any sale of either of the foregoing).

<u>"Taxable HTA CVIs":  The (i) Class A-2028 Taxable HTA CVIs, (ii) Class L-2038 Taxable HTA CVIs, (iii) Class M-2023 Taxable HTA CVIs, (iv) Class N-2026 Taxable HTA CVIs, (v) Class N-2027 Taxable HTA CVIs, (vi) Class N-2028 Taxable HTA CVIs, (vii) Class N-2029 Taxable HTA CVIs, (viii) Class N-2030 Taxable HTA CVIs, (ix) Class N-2031 Taxable HTA CVIs and (x) Class N-2045 Taxable HTA CVIs.</u>

"Taxable HTA CVIs/Bonds":  Collectively, the Taxable HTA CVIs and the Taxable New HTA Bonds.

"Taxable New HTA Bonds":  The (i) Class A-2028 Taxable New HTA Bonds, (ii) Class L-2038 Taxable New HTA Bonds, (iii) Class M-2023 Taxable New HTA Bonds, (iv) (a) Class N-2026 Taxable New HTA Bonds, (v) Class N-2027 Taxable New HTA Bonds, (vi) Class N-2028 Taxable New HTA Bonds, (vii) Class N-2029 Taxable New HTA Bonds, (viii) Class N-2030 Taxable New HTA Bonds, (ix) Class N-2031 Taxable New HTA Bonds and (x) Class N-2045 Taxable New HTA Bonds.

"Officers' Certificate":  A certificate signed by an Executive Officer of the applicable Person, and delivered to the Trustee.

"Taxable Sub-Trust":  The meaning specified in Section 3.01(c).

"Title III Case":  The meaning given to such term under the Plan of Adjustment.

"Title III Court":  The meaning given to such term under the Plan of Adjustment.

"Trust":  The trust created by this Trust Agreement.

"Trust Agreement":  The meaning specified in the preamble hereto.

"Trust Property":  The meaning specified in Section 3.01.

"Trust Termination Event":  The meaning specified in Section 8.01.

"Trustee":  Wilmington Trust, N.A., any successor trustee appointed pursuant to Section 9.06, or any co-trustee appointed pursuant to Section 9.09, until a successor Person shall have become the Trustee pursuant to the applicable terms of this Trust Agreement, and thereafter "Trustee" shall mean such successor Person.

"Trustee Fee Letter":  A letter agreement dated on or before the Closing Date setting forth the fees and expenses of the Trustee.

"Trustee Fees":  The amount or amounts set forth in the Trustee Fee Letter.

"Unit Register": The meaning specified in Section 5.03(a).

"Unit Registrar":  The meaning specified in Section 5.03(a).

"United States":  The United States of America (which includes the States and the District of Columbia), its territories (including the Commonwealth), its possessions and other areas subject to its jurisdiction.

"Unitholder":  The Person in whose name a Unit is registered in the Unit Register on any date of determination.

"Units":   The securities authorized by, and authenticated and delivered under, this Trust Agreement and evidenced by a Certificate or a Global Security with respect to the Class A-2028 Units, Class L-2038 Units, Class M-2023 Units, Class L-2038 Units, Class N-2026 Units, Class N-2027 Units, Class N-2028 Units, Class N-2029 Units, Class N-2030 Units, Class N-2031 Units and Class N-2045 Units, as applicable.

Certain additional defined terms have the meanings assigned thereto in other terms hereof.

SECTION 1.02.   Rules of Construction.

Unless the context otherwise requires:

(i)  a term has the meaning assigned to it;

(ii) an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect in the United States from time to time;

(iii)     "or" is not exclusive;

(iv) the words "herein", "hereof", "hereunder" and other words of similar import refer to this Trust Agreement as a whole and not to any particular Article, section or other subdivision;

(v) "including" means including without limitation; and

(vi) words in the singular include the plural and words in the plural include the singular.

SECTION 1.03.   Article and Section References.

All article and section references used in this Trust Agreement, unless otherwise provided, are to articles and sections in this Trust Agreement.  Any reference to "this Section" appearing within a particular paragraph of a section is a reference to such section as a whole.

ARTICLE II

Declaration of Trust;
Issuance of Units

SECTION 2.01.   Creation of Trust; Assignment of Trust Property.

(a) The Trust is being created by the Depositor on the date hereof on behalf of the Electing Holders pursuant to the execution of this Trust Agreement.  The Executive Director of the Depositor shall be the natural person and controlling person for purposes of Trust intake documentation for the Trustee and the Delaware Trustee.  The Delaware Trustee is hereby authorized and directed to file a Certificate of Trust for the HTA Class 6 Trust in the form of Exhibit F attached hereto (the "Certificate of Trust") with the Office of the Secretary of State of the State of Delaware (the "Secretary of State"), under the name "HTA Class 6 Trust" in which

name the Trust shall have power and authority, and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the business of the Trust.  It is the intention of the parties hereto that the Trust hereby created constitute a statutory trust under the Delaware Statutory Trust Act and that this document constitutes the governing instrument of the Trust.  It is the intention of the parties hereto that, solely for U.S. federal income or state and local income, franchise and value added tax purposes, the Trust and each Sub-Trust will be a Grantor Trust.  The parties agree that, unless otherwise required by appropriate tax authorities, neither the Trust nor any Sub-Trust will file or cause to be filed annual or other necessary returns (including information returns), reports or other forms inconsistent with the characterization of the Trust and each Sub-Trust as other than a Grantor Trust.  The parties further agree, unless otherwise required by appropriate taxing authorities or by law, not to take any action, or direct any other party to take any action, inconsistent therewith.  In furtherance of the foregoing, (i) the purpose of the Trust and each Sub-Trust shall be to protect and ~~preserve~~conserve the assets of the Trust or the relevant Sub-Trust, as applicable, and neither the Trust nor any Sub-Trust shall at any time engage in or carry out any kind of business for U.S. federal income tax purposes or any kind of commercial activity and (ii) the Trust, each Sub-Trust, the Trustee and the Credit Support Provider (and any agent of such Person) shall each take, or refrain from taking, all such action (other than pursuant to the specific provisions of this Trust Agreement) as is necessary to maintain the status of the Trust and each Sub-Trust as a Grantor Trust.  Notwithstanding anything to the contrary in this Trust Agreement or otherwise, ~~neither~~none of the Trust, any Sub-Trust, the Trustee nor the Credit Support Provider (nor any agent of such Person) shall (1) acquire any assets or dispose of any portion of the Trust or such Sub-Trust, as the case may be, other than pursuant to the specific provisions of the Commonwealth Plan of Adjustment or this Trust Agreement, (2) vary the investment of the Trust or any Sub-Trust within the meaning of Treasury Regulation Section 301.7701-4(c), or (3) substitute new investments or reinvest so as to enable the Trust or any Sub-Trust to take advantage of variations in the market to improve the investment of any Unitholder.  The provisions of this Trust Agreement shall be interpreted consistently with and to further the intention of the parties.  No election will be made by or on behalf of the Trust or any Sub-Trust to be classified as an association taxable as a corporation for U.S. federal income tax purposes.

(b) On the Closing Date, or as soon thereafter as is reasonably practicable, the Trust shall receive (i) the Electing Ambac Prepetition Insured Bonds, (ii) the New HTA Bonds, (iii) the HTA CVI~~/Bond~~ Distributions (including the HTA Clawback CVIs ~~and New HTA Bonds) and (iii)~~ pursuant to the Commonwealth Plan of Adjustment and (iv) the benefit of the Credit Support.  In addition, the Trustee has established on or prior to the date hereof (x) the applicable Taxable Collection Account, (y) the applicable Non-Taxable Collection Account, and (z) the applicable Credit Support Collection Account.  Each Unitholder (which term shall for purposes hereof include any holder of a beneficial interest in a Global Security), by electing to receive Units (which constitute beneficial interests in the Trust), and any assignee thereof, agrees to treat, for U.S. federal, state and local income tax purposes, the HTA CVI~~/Bond~~ Distributions (including the HTA Clawback CVIs ~~and New HTA Bonds~~) as having been received by such Unitholder prior to the formation of the Trust in a transaction that does not constitute a "recapitalization" of any of the outstanding debt obligations of HTA pursuant to Section 368(a)(1)(E) of the Code.

(c) The Trustee shall have power and authority, and is hereby authorized and empowered to execute and file with the Secretary of State any certificate required or permitted under the Delaware Statutory Trust Act to be filed with the Secretary of State.  The office of the Trust shall be in care of the Trustee at the Corporate Trust Office or at such other address as the Trustee may designate by written notice to the Unitholders, and the Depositor and the Issuer.

(d) Notwithstanding anything appearing herein or elsewhere to the contrary, the obligations of the Trust under each Class of Units and this Trust Agreement are non-recourse obligations of the Trust payable with respect to each Class of Units solely from the Trust Property applicable to such Class, and following any realization of any Trust Property of such Class and its respective reduction to zero, any claims of the applicable Unitholders shall be extinguished.  The Units are not obligations of, and are not guaranteed by, the Depositor, the CVI Issuer or the Trustee, and no recourse shall be had against the Depositor or the CVI Issuer, against any officer, director, manager or employee of the Depositor or the CVI Issuer, or against any of their respective successors or assigns, for the payment of any amounts payable under the Units or the payment or performance of any obligation of the Trust, the Trustee or the Credit Support Provider under or pursuant to this Trust Agreement.

(e) The recitals contained in this Trust Agreement and in the Units shall be taken as the statements of the Trust, and neither the Depositor nor the Issuer assumesdoes not assume any responsibility for their correctness.  Neither theThe Depositor nor the Issuerdoes not make any representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Units.

(f) In purchasing (or otherwise receiving) an interest in the Units represented by a Global Security, the purchaser shall be deemed to acknowledge, represent and agree, and, if applicable, in purchasing any Units in certificated form, the purchaser shall be required to acknowledge, represent and agree, (i) that none of the Depositor, the Issuer or any of theirits respective Affiliates nor the Calculation Agent, is acting as a fiduciary or financial or investment advisor for purchaser, and such purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, representations or recommendations (in each case whether written or oral) of the Depositor, the Issuer or any of their respectiveits Affiliates or the Calculation Agent (or any representative of any of the foregoing), (ii) it has received a copy of this Trust Agreement, the Plan of Adjustment, related disclosure statement and such other related documents, court orders and information as it deems necessary to make its decision to purchase (or otherwise receive) any Units and (iii) the Credit Support Provider has the option to prepay in whole or in part at any time and from time to time the accelerated principal of the Electing Ambac Prepetition Insured Bonds, together with the accrued interest as of such date, and upon any such payment on account of accelerated principal under the Electing Ambac Prepetition Insured Bonds, such bonds shall be deemed terminated, and the Credit Support and Credit Support Provider's obligations shall be satisfied and discharged.

(g) Neither theThe Depositor nor the Issuer shall not be accountable for the use or application by the Trust of the Units or the proceeds thereof or any moneys paid to the Trust pursuant to the provisions of this Trust Agreement.

(h) None of the Depositor, ~~the Issuer or~~ nor any of ~~their~~its respective Affiliates will have the authority to act for, or to assume any obligation or responsibility on behalf of, the Trust.

(i) General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to the Depositor, ~~the Issuer~~ or any of ~~their~~its respective Affiliates.

(j) The Trust will not (A) operate or purport to operate as an integrated, single economic unit with respect to the Depositor, ~~the Issuer~~ or any other affiliated or unaffiliated entity of the Depositor ~~or the Issuer~~; (B) seek or obtain credit or incur any obligation to any third party based upon the assets of the Depositor, ~~the Issuer~~ or any of ~~their~~its respective Affiliates; or (C) induce any such third party to reasonably rely on the creditworthiness of the Depositor, ~~the Issuer~~ or any affiliated or unaffiliated entity of the Depositor ~~or the Issuer~~ in its dealings with the Trust.

SECTION 2.02.    Acceptance by Trustee.

The Trustee acknowledges it expects to receive (i) the Electing Ambac Prepetition Insured Bonds, (ii) the New HTA Bonds and documents relating to the issuance of the New HTA Bonds, (iii) the HTA CVI~~/Bond~~ Distributions (including the HTA Clawback CVIs ~~and New HTA Bonds~~) and documents relating to the issuance of the HTA Clawback CVIs and ~~New HTA Bonds and (iii)~~(iv) the benefit of the Credit Support, and declares that it will hold such assets and all other assets comprising the Trust Property in trust, for the benefit of all present and future Unitholders and the Credit Support Provider, in each case as provided herein, and for the purposes and subject to the terms and conditions set forth in this Trust Agreement, including the Trustee's obligations, as and when they may arise.

SECTION 2.03.    Agreement to Authenticate and Deliver Units.

The Trustee agrees and acknowledges that it will, concurrently with the deposit to and receipt by it of the property described in Section 2.02, cause to be executed, authenticated and delivered, as applicable, to each Electing Holder its Units in the form of a beneficial interest in the applicable Global Security.

ARTICLE III

Trust Powers; Administration of the Trust Property

SECTION 3.01.    Trust Property.

(a) The "Trust Property" with respect to the Trust will consist of:  (i) the Class A-2028 Trust Property, (ii) the Class M~~L-2023~~2038 Trust Property, (iii) the Class ~~L-2038~~M-2023 Trust Property, (iv) the Class N-2026 Trust Property, (v) the Class N-2027 Trust Property, (vi) the Class N-2028 Trust Property, (vii) the Class N-2029 Trust Property, (viii) the Class N-2030 Trust Property, (ix) the Class N-2031 Trust Property, (x) the Class N-2045 Trust Property, (xi) the Fee Reserve and (xii) any other asset constituting a portion or proceeds of the foregoing.

(b) For the avoidance of doubt, for purposes of this Trust Agreement, the Global Securities and the Certificates, the ~~assts~~assets identified or determined (i) as ~~Section 103 Cash and~~ "Non-Taxable" shall only be the "Trust Property" of the applicable Unit labelled

"(Non-Taxable)" and the applicable Global Security and (ii) as ~~cash not constituting Section 103 Cash and ("~~Taxable~~)"~~ shall only be the "Trust Property" of the applicable Unit labelled "(Taxable)" and the applicable Global Security.

(c) On the date hereof, all Trust Property shall be held by one Sub-Trust (a "Taxable Sub-Trust").

(d) Upon a determination by Bond Counsel or the Internal Revenue Service by the Outside Non-Taxable CVI Determination Date, a new Sub-Trust will be formed to be the beneficiary of all assets identified or determined to be ~~Section 103 Cash and~~ "Non-Taxable" as the "Trust Property" of newly-issued Units labelled "("Non-Taxable") and applicable newly-issued Global Securities, and shall be held in a new Sub-Trust (a "Non-Taxable Sub-Trust"). Upon such a determination, the ~~Section 103 Cash and the other~~ assets identified or determined as "Non-Taxable" will no longer constitute Trust Property for the benefit of Units labelled "(Taxable)" and the applicable Global Security but will then constitute Trust Property for the benefit of the newly-issued Units labelled "(Non-Taxable)" and the applicable newly-issued Global Security. All such Non-Taxable HTA CVIs shall then constitute Non-Taxable Funds and ~~Section 103 Cash~~ will be transferred from the Taxable Collection Account to the Non-Taxable Collection Account.

(e) Upon such re-characterization, the notional amount of the applicable Units labelled "(Taxable)", if any, and the applicable Global Security will be reduced accordingly, and the Units labeled "(Non-Taxable)" and the applicable Global Security will be increased accordingly, with the aggregate notional amount to remain unchanged. For the avoidance of doubt, in the event of such a re-characterization, the benefit of the Credit Support will be allocated pro rata (by Notional Amount) between the Taxable Sub-Trust, if any, and the Non-Taxable Sub-Trust. The foregoing in respect of re-characterization set forth in Section 3.01(d) and in this Section 3.01(e) will be undertaken by the Trustee (i) solely to the extent permitted by the Depositary and (ii) at the direction of the Credit Support Provider.

(f) If such determination pursuant to paragraph (d) above and such re-characterization pursuant to paragraph (e) above results in the conversion of all of the outstanding notional amount of Taxable CVIs to Non-Taxable CVIs, then the Taxable Sub-Trust shall be redesignated as "Non Taxable," constituting "Non-Taxable" Trust Property for the benefit of Units and the applicable Global Security without the creation of a new Sub-Trust, new Units or new applicable Global Securities. The Trustee shall reflect the foregoing in newly-issued Certificates and, to the extent required by the Depositary, newly-issued Global Securities.

(g) If, on any date subsequent to the formation of the Non-Taxable Sub-Trust, any Taxable CVIs are re-characterized as Taxable CVIs, the HTA CVIs re-characterized on such date shall be transferred to a new Sub-Trust which shall be an additional Taxable Sub-Trust. If, on any date subsequent to the date hereof (other than covered by paragraphs (d) and (e) above), any Taxable CVIs are re-characterized as Non-Taxable CVIs, the HTA CVIs re-characterized ~~in~~on such date shall be transferred to a new Sub-Trust which shall be an additional Non-Taxable Sub-Trust. For the avoidance of doubt, in the event of such a transfer, the benefit of the Credit Support will be allocated pro rata (by Notional Amount) with the transferred HTA CVIs. The foregoing will be undertaken by the Trustee at the direction of the Credit Support Provider

consistent with paragraphs (d), (e) and (f) above and, for the avoidance of doubt, solely to the extent permitted by the Depositary.  The Trustee shall perform the duties imposed upon it by this paragraph (g) by such supplemental agreement to be agreed to between the Credit Support Provider and the Trustee in accordance therewith and in exchange for such supplemental fee (if any) as agreed by such parties with respect thereto.

SECTION 3.02.    Administration of the Trust.

(a) The Trustee shall take such actions with respect to the Trust Property as directed by the Credit Support Provider pursuant to Article VI hereof and as otherwise expressly provided herein.  Each Electing Holder (by its election under Section [        ]26.4(b)(ii) of the Plan of Adjustment and receipt of Units) and each other assignee thereof, consents to the provisions of this Trust Agreement and authorizes the Trustee to follow any direction of the Credit Support Provider delivered under the terms of this Trust Agreement.

(b) Subject to Article IX, the Trustee is hereby authorized to perform, and from time to time hereafter, shall perform only those acts which are described in this Trust Agreement as obligations of the Trustee.  Notwithstanding the generality of the foregoing, the Trustee is hereby specifically authorized to, and shall, do the following on behalf of the Trust:  (i) to issue the Global Securities and, if applicable, Certificates, evidencing Units; (ii) to establish and maintain the Taxable Collection Accounts, the Non-Taxable Collection Accounts and the Credit Support Collection Accounts hereunder; (iii) to accept delivery of the Electing Ambac Prepetition Insured Bonds, the New HTA Bonds, the HTA CVI/Bond Distributions including the HTA Clawback CVIs and New HTA Bonds, and the benefit of the Credit Support; (iv) to the extent the Available Funds for any Class of Units are insufficient to pay in full the Aggregate Unit Balance of the outstanding Units of such Class on the applicable Scheduled Final Redemption Date, to draw on the applicable Credit Support to the extent available on such Scheduled Final Redemption Date in the amount of such insufficiency; (v) to the extent Available Funds are insufficient to pay the Sinking Fund Distribution on the Sinking Fund Distribution Date or the Interest Distribution on any Interest Payment Date, to draw on the Credit Support to the extent available on such Sinking Fund Distribution Date or applicable Interest Payment Date in the amount of such insufficiency; (vi) to the extent available funds are insufficient to pay the Interest Distribution on the applicable Interest Payment Date for such Class of Units, to draw on the Credit Support to the extent available on such Interest Payment Date in the amount of such insufficiency; (vii) to make and dispose of Permitted Investments pursuant to Section 3.04 and in accordance with Section 2.01(a) and Sections 9.12(b), (c) and (d); (viii) to liquidate the Trust pursuant to Article VIII; (viii) to make distributions pursuant to Articles IV and VI; including, without limitation, Discretionary Distributions which result in the redemption and cancellation of Units, and (ix) to accept payments from the Credit Support Provider in satisfaction of its obligations under the Credit Support, or otherwise, including, for the avoidance of doubt, on dates other than an Interest Payment Date or a Scheduled Final Redemption Date, to be applied as designated by the Credit Support Provider and reduce the amount available under, or otherwise satisfy its obligations under the Credit Support, and a deemed corresponding reduction of the Credit Support.

(c) The Trustee shall not sell, assign, pledge or otherwise transfer the HTA Clawback CVIs, New HTA Bonds or any other Trust Property to any Person or Persons, except to a successor

trustee as provided in Section 9.07 or as otherwise expressly permitted hereunder (including, without limitation, Sections 6.02 and 6.03 hereto).  This section shall not be construed to prohibit transfers of the Units, or sale or substitution of Permitted Investments.

(d) For purposes of the preparation of any statement that the Trustee forwards or causes to be forwarded to the Credit Support Provider and each Unitholder pursuant to Section 4.02(a), the Trustee shall separately track each class of Taxable Funds and each class of Non-Taxable Funds including, without limitation, interest on the applicable Taxable HTA CVICVIs/Bonds and the applicable Non-Taxable HTA CVICVIs/Bonds.

SECTION 3.03.   Collection Account.

(a) The Trustee has established Eligible Accounts, either through the establishment of separate accounts or through book-entry allocations, (1) to hold Class A-2028 Taxable Funds (the "Class A-2028 Taxable Collection Account"), (2) to hold Class M-2023 Taxable Funds (the "Class M-2023 Taxable Collection Account"), (3) to hold Class L-2038 Taxable Funds (the "Class L-2038 Taxable Collection Account"), (3) to hold Class M-2023 Taxable Funds (the "Class M-2023 Taxable Collection Account"), (4) to hold Class N-2026 Taxable Funds (the "Class N-2026 Taxable Collection Account"), (5) to hold Class N-2027 Taxable Funds (the "Class N-2027 Taxable Collection Account"), (6) to hold Class N-2028 Taxable Funds (the "Class N-2028 Taxable Collection Account"), (7) to hold Class N-2029 Taxable Funds (the "Class N-2029 Taxable Collection Account"), (8) to hold Class N-2030 Taxable Funds (the "Class N-2030 Taxable Collection Account"), (9) to hold Class N-2031 Taxable Funds (the "Class N-2031 Taxable Collection Account"), (10) to hold Class N-2045 Taxable Funds (the "Class N-2045 Taxable Collection Account"), (11) to hold Class A-2028 Non-Taxable Funds (the "Class A-2028 Non-Taxable Collection Account"), (12) to hold Class M-2023L-2038 Non-Taxable Funds (the "Class M-2023L-2038 Non-Taxable Collection Account"), (13) to hold Class L-2038M-2023 Non-Taxable Funds (the "Class L-2038M-2023 Non-Taxable Collection Account"), (14) to hold Class N-2026 Non-Taxable Funds (the "Class N-2026 Non-Taxable Collection Account"), (15) to hold Class N-2027 Non-Taxable Funds (the "Class N-2027 Non-Taxable Collection Account"), (16) to hold Class N-2028 Non-Taxable Funds (the "Class N-2028 Non-Taxable Collection Account"), (17) to hold Class N-2029 Non-Taxable Funds (the "Class N-2029 Non-Taxable Collection Account"), (18) to hold Class N-2030 Non-Taxable Funds (the "Class N-2030 Non-Taxable Collection Account"), (19) to hold Class N-2031 Non-Taxable Funds (the "Class N-2031 Non-Taxable Collection Account"), (20) to hold Class N-2045 Non-Taxable Funds (the "Class N-2045 Non-Taxable Collection Account"), (21) to hold amounts received on account of the Class A-2028 Credit Support (the "Class A-2028 Credit Support Collection Account"), (22) to hold amounts received on account of the Class M-2023L-2038 Credit Support (the "Class M-2023L-2038 Credit Support Collection Account"), (23) to hold amounts received on account of the Class L-2038M-2023 Credit Support (the "Class L-2038M-2023 Credit Support Collection Account"), (24) to hold amounts received on account of the Class N-2026 Credit Support (the "Class N-2026 Credit Support Collection Account"), (25) to hold amounts received on account of the Class N-2027 Credit Support (the "Class N-2027 Credit Support Collection Account"), (26) to hold amounts received on account of the Class N-2028 Credit Support (the "Class N-2028 Credit Support Collection Account"), (27) to hold amounts received on account of the Class N-2029 Credit Support (the "Class N-2029 Credit Support Collection Account"), (28) to hold amounts received on account of the Class N-2030

Credit Support (the "Class N-2030 Credit Support Collection Account"), (29) to hold amounts received on account of the Class N-2031 Credit Support (the "Class N-2031 Credit Support Collection Account") and (30) to hold amounts received on account of the Class N-2045 Credit Support (the "Class N-2045 Credit Support Collection Account"), each held in trust for the benefit of the Unitholders and the Credit Support Provider, subject to the obligation of the Trust to pay the fees and expenses of the Trust, including, without limitation, the Trustee Fee Letter and Extraordinary Trust Expenses, all from proceeds held in the Collection Accounts listed above.  Each Taxable Collection Account, Non-Taxable Collection Account and Credit Support Collection Account shall be under the sole dominion and control of the Trustee, and the Trustee is entitled to look to the Taxable Collection Accounts or the Non-Taxable Collection Accounts, on a pro rata basis, for payment of its fees and expenses, funding the Fee Reserve from time to time, and the other fees and expenses of the Trust.

(b) If, at any time, a formerly Eligible Account no longer fulfills the definition of "Eligible Account", the Trustee shall within five (5) Business Days establish a new Taxable Collection Account, Non-Taxable Collection Account or Credit Support Collection Account, as applicable, meeting the conditions specified above and transfer any cash and any investments on deposit in the applicable Taxable Collection Account, Non-Taxable Collection Account or Credit Support Collection Account to such new Taxable Collection Account, Non-Taxable Collection Account or Credit Support Collection Account, and from the date such new Taxable Collection Account, Non-Taxable Collection Account or Credit Support Collection Account is established, it shall be the Taxable Collection Account, Non-Taxable Collection Account or Credit Support Collection Account under this Trust Agreement.

(c) The Trustee shall give notice to the Credit Support Provider of the location of each Eligible Account constituting a Taxable Collection Account, a Non-Taxable Collection Account and a Credit Support Collection Account prior to any change thereof.

(d) After payment of fees and expenses of the Trust, the Section 103 Cash received on the Closing Date shall be deposited into the applicable Non-Taxable Collection Account and be distributed pursuant to Section 4.01(a). (e)  [After payment of fees and expenses of the Trust, the cash portion of the HTA CVI/Bond Distribution Distributions received on the Closing Date, [other than the Section 103 Cash], shall be deposited into the applicable Taxable Collection Account and be distributed pursuant to Section 4.01(b) (without the requirement of a Credit Support Provider Request or other direction, the direction set forth in Section 4.01(b) being deemed made hereunder)].   The Credit Support Provider shall be entitled to receive reimbursement of any amounts paid by the Credit Support Provider pursuant to escrow arrangements governing the cash portion of HTA CVI Distributions.

SECTION 3.04.   Investment of Funds in the Taxable Collection Account.

(a) The Credit Support Provider may direct in writing the Trustee to (i) direct any depositary institution maintaining a Taxable Collection Account to invest the funds therein in one or more Permitted Investments or (ii) use funds on deposit in a Taxable Collection Account to purchase Units through open market purchases (and the Trustee shall cancel all such purchased Units and the applicable Aggregate Unit Balance for the Class or Classes purchased shall be reduced and the Sinking Fund Schedule, if applicable, for the Class or Classes subject to the purchase shall be

revised accordingly by the Trustee pursuant to the provisions of Section 5.01(b) in the amount specified by the Credit Support Provider). If the Credit Support Provider does not provide any investment directions to the Trustee, then the funds shall be held un-invested, without interest, in the applicable Taxable Collection Account. Unless maturing or otherwise directed by the Credit Support Provider to be sold sooner, all Permitted Investments held by the Trust shall be liquidated on the earliest of (i) the Business Day prior to the next applicable Distribution Date,, (ii) the Business Day prior to the Class N-2045 Scheduled Final Redemption Date or (iii) upon a Trust Termination Event.  Amounts in the Non-Taxable Collection Accounts and the Credit Support Collection Accounts shall not be invested.

(b) Notwithstanding the provisions of paragraph (a) above, there shall be no investment of funds in a Taxable Collection Account on or before the Outside Non-Taxable  HTA CVI/Bond Determination Date, other than the Credit Support Provider may direct in writing the Trustee to invest the funds in a Taxable Collection Account pursuant to clause (vi) in the definition of Permitted Investments.

ARTICLE IV

Distributions and Reports to Credit Support Provider and Unitholders

SECTION 4.01.    Distributions.

(a) Distributions from Non-Taxable Collection Accounts.  Within three (3) Business Days of receiving any amount with respect to any series of Non-Taxable HTA CVICVIs/Bonds in the applicable Non-Taxable Collection Account, including HTA Clawback CVICVIs  or New HTA Bond sale proceeds received with respect to a Non-Taxable HTA CVI/Bond pursuant to Section 6.02, the Trustee shall establish a Distribution Date and send notice to the applicable Unitholders of such Class, pursuant to the provisions in Section 10.05, of such Distribution Date, and the Trustee shall distribute the Non-Taxable Funds in the applicable Non-Taxable Collection Account on a pro rata basis or as close to a pro rata basis as practicable (based on the aggregate sum of the Notional Amounts of all applicable Units held by such Unitholder on such Distribution Date) to each applicable Unitholder in such Class of Units, by way of a redemption or otherwise, and in the case of Global Securities, subject to and in accordance with the applicable procedures of the Depositary.  Following any such redemption, the Trustee shall cancel all Units redeemed and there shall be a corresponding reduction to the Credit Support.  For the avoidance off doubt, amounts received with respect to any series of Non-Taxable HTA CVIs/Bonds in the applicable Non-Taxable Collection Account shall be used to make the foregoing redemptions and shall not be utilized to make Interest Distributions pursuant to clause (c) below.

(b) Discretionary Distributions.  Within three (3) Business Days of receiving a Credit Support Provider Request for a Discretionary Distribution (which must be made by the Credit Support Provider at least fifteen (15) days prior to the immediately following applicable Interest Payment Date) for a specific Class of Units, the Trustee shall establish a Discretionary Distribution Date for such Class of Units and send notice to the Unitholders of such Class pursuant to the provisions in Section 10.05, of such Discretionary Distribution Date.  On each Discretionary Distribution Date, the Trustee shall distribute amounts directed by the Credit Support Provider in

a Credit Support Provider Request (which Credit Support Provider Request shall be deemed a claim for payment from the Trustee under the Credit Support), from (1) proceeds received with respect to Taxable HTA Clawback ~~CVI~~CVIs/Bonds consisting of Trust Property of such Class of Units and from any related Permitted Investments, (2) sales of the Taxable HTA Clawback ~~CVI~~CVIs/Bonds consisting of Trust Property of such Class of Units pursuant to Section 6.02 or (3) any early payment made on the Credit Support of such Class of Units by the Credit Support Provider in its sole discretion, including, for the avoidance of doubt, payment in whole or in part of the accelerated Obligations (as defined in the Credit Support for such Class of Units) in satisfaction of its obligations under the Credit Support, and the Trustee shall accept such payments (and the Unitholders of such Class are deemed to have accepted and agreed that the Credit Support Provider's obligations under the Credit Support applicable to such Class shall be deemed satisfied and reduced by such payments (each, a "Discretionary Distribution")) and shall distribute such payments to Unitholders of the affected Class first, the applicable Interest Distribution and second, pro rata or on as close to a pro rata basis as practicable (based on the aggregate sum of the Notional Amounts of all outstanding Units of such Class held by such Unitholder on such Discretionary Distribution Date) by way of a redemption or otherwise or, with respect to amounts under clause (3) of this Section 4.01(b), as otherwise directed by the Credit Support Provider, and in the case of Global Securities, subject to and in accordance with the applicable procedures of the Depositary. Following any such redemption, the Trustee shall cancel all such Units redeemed and there shall be a deemed corresponding reduction to the Credit Support.

(c) <u>Interest Payments.</u> On each  Interest Payment Date for any Class of Units, the Trustee shall distribute the Available Funds applicable to such Class of Units in the amount of the Interest Distribution on the applicable Units then outstanding to each holder of record  of such Units on the Record Date.  To the extent the amounts available to be distributed from Available Funds would be insufficient to pay the Interest Distribution for such Class of Units on the applicable Interest Payment Date, five (5) Business Days prior to the Interest Payment Date, the Trustee shall make a claim on the Credit Support applicable to such Class of Units by delivering ~~a policy claim~~the form included in ~~the form of~~ Exhibit G entitled hereto 'Policy Claim Form (Interests Payments)' to the extent available in the amount of such insufficiency and, to the extent received, deposit such cash into the applicable Credit Support Collection Account to make up any shortfall between the amount of Available Funds and the Interest Distribution to be made on such Interest Payment Date and upon receipt thereof, which proceeds shall be received on the Business Day prior to such Interest Payment Date, distribute such amounts pro rata (by Notional Amount) to each Unitholder of such Class of applicable Units then outstanding.

(d) <u>Sinking Fund Payments.</u> On each Sinking Fund Distribution Date, the Trustee shall distribute the Available Funds applicable to such Class of Units in the amount of the Sinking Fund Distribution on the applicable Units ~~on the Record Date~~.  To the extent the amounts available to be distributed from Available Funds applicable to such Class of Units would be insufficient to pay the Sinking Fund Distribution for such Class of Units on the applicable Sinking Fund Distribution Date, five (5) Business Days prior to such Sinking Fund Distribution Date, the Trustee shall make a claim on the Credit Support applicable to such Class of Units by delivering ~~a policy claim~~the form included in ~~the form of~~ Exhibit G hereto entitled 'Policy Claim Form (Sinking Fund Payments)' to the extent available in the amount of such insufficiency and, to the extent received, deposit such cash into the applicable Credit Support Collection Account to

make up any shortfall between the amount of Available Funds and the Sinking Fund Distribution to be made on such Sinking Fund Distribution Date and upon receipt thereof, which proceeds shall be received on the Business Day prior to the Sinking Fund Distribution Date, and distribute such amounts pro rata (by Notional Amount)or on as close to a pro rata basis as practicable, by way of redemption or otherwise, to each Unitholder of such Class of applicable Units then outstanding.

(e) Final Payments. On each Scheduled Final Redemption Date for each Class of Units, the Trustee shall distribute to each Unitholder of the related Class presenting and surrendering its applicable Units, directly or through its DTC Participant, its ratable share of the Available Funds applicable to such Class of Units.   Any funds not distributed on such Scheduled Final Redemption Date shall be set aside and held in trust for the benefit of Unitholders not presenting and surrendering their Units in the aforesaid manner.  To the extent the amounts available to be distributed from such Available Funds are insufficient to pay first, applicable Interest Distributions and second, the Aggregate Unit Balance of such Units on the  Scheduled Final Redemption Date, five (5) Business Days prior to the applicable Scheduled Final Redemption Date, the Trustee shall make a claim on the Credit Support applicable to such Class of Units by delivering a policy claimthe form included in the form of Exhibit G hereto entitled 'Policy Claim Form (Scheduled Final Redemptions)' to the extent available in the amount of such insufficiency and, to the extent received, deposit such cash into the applicable Credit Support Collection Account to make up any shortfall between the amount of Available Funds and the Aggregate Unit Balance of such Class of Units to be redeemed on such Scheduled Final Redemption Date and upon receipt thereof, which proceeds shall be received on the Business Day prior to such Scheduled Final Redemption Date, distribute such amounts upon payment thereof, the Electing Ambac Prepetition Insured Bonds and the applicable Credit Support shall be released and cancelled and the Credit Support Provider's obligations thereunder shall be deemed satisfied in full.

(f) Any distribution to Unitholders shall be made to the Person in whose name such Unit is registered at the close of business on the related Record Date, if applicable, or on the Business Day prior to the Distribution Date, and in the case of the Global Securities, in accordance with the procedures of the Depositary.

(g) All interest payments on each Class of Units (whether or not such distributions are subject to any tax payable by or on behalf of the Trust or such Unitholder (as holder of a beneficial interest in a Global Security)) shall reduce the Aggregate Unit Balance of such Class by the gross amount (determined prior to giving effect to any reduction for such tax or withholding with respect thereto) of such distribution to such Class.  Each reduction in the schedule of Interest Distributions for such Class shall reduce the obligation of the Credit Support Provider under the Credit Support with respect to such Class.  On any date in which a Class of Units receive the amount required to be paid under Section 8.02 (or, if earlier, the Scheduled Final Redemption Date for such Class), such Class shall be deemed to be redeemed in full and no longer Outstanding hereunder and no further amounts shall be distributable on such Units from and after such time.

(h)  In the event the Trustee makes a valid claim against the Credit Support Provider as set forth in Section 4.01(c), (d) and (e) above and the Credit Support Provider fails to distribute

sufficient funds to the Trustee, then the Trustee shall provide notice to the applicable Unitholders and the Credit Support Provider within five (5) Business Days, pursuant to the provisions in Section 10.05, of the Credit Support Provider's failure.  Upon the occurrence and continuation of such Credit Support Provider failure, ~~which failure shall have been determined by a final, non-appealable order of a court of competent jurisdiction, obtained by the Trustee (acting at~~ the Trustee may solicit the direction of the Unitholders representing more than 50% of the outstanding Aggregate Unit Balance of the Units (the ~~"Directing Unitholders")~~ "Directing Unitholders") to obtain a determination of such Credit Support Provider failure by a final, non-appealable order of a court of competent jurisdiction.  Once such final, non-appealable order is obtained by the Trustee, the Directing Unitholders may (i) direct the Trustee to exercise any and all remedies available at law or in equity with respect to the Credit Support and (ii) exercise all voting, election and other rights of the Credit Support Provider enumerated throughout this Trust Agreement (and the Credit Support Provider shall have all of its voting, election and other rights under Sections 6.01(b) and 6.04(a), and other direction rights of the Credit Support Provider enumerated throughout this Trust Agreement suspended during the occurrence and continuation of such failure (other than those set forth in Section 10.01(c)); provided that, the Trustee shall be under no obligation to take any action in the event of a Credit Support Provider failure to pay a valid claim, other than providing notice of such failure to the applicable Unitholders unless, upon demand, the Trustee receives indemnification or security satisfactory to it from the applicable Unitholders against all liabilities, costs and expenses that, by reason of such action may be imposed on, incurred by or asserted against the Trustee.  For the avoidance of doubt, the Trustee shall continue to take direction from the Credit Support Provider as provided throughout this Trust Agreement unless and until a final, non-appealable order as described above is entered.

(i) If, prior to a Trust Termination Event, the Credit Support Provider has made a payment in respect of any Credit Support, the Credit Support Provider shall be entitled to receive, upon its written direction, which written direction, if in respect of available Non-Taxable Funds, shall be delivered to the Trustee in accordance with Section 10.05 within two (2) Business Days of receipt of any amount with respect to the Non-Taxable HTA ~~CVI~~ CVIs/Bonds, reimbursement of such amounts together with interest thereon at the Reimbursement Rate out of proceeds that would otherwise be paid by the Trust to Unitholders pursuant to this Section 4.01.  Such reimbursement shall be made out of all available Non-Taxable Funds and Taxable Funds (in the aggregate, the "Funds") in pro rata amounts (calculated based upon the Aggregate Unit Balance of each Class attributable to proceeds received from Taxable HTA ~~CVI~~ CVIs/Bonds and Non-Taxable HTA ~~CVI~~ CVIs/Bonds) to the extent of available Non-Taxable Funds and available Taxable Funds (and, if not available from the Non-Taxable Funds, then from other available Taxable Funds), or as otherwise provided in such direction, with the Funds being first applied to such reimbursement prior to making any distribution to Unitholders or making any reinvestment of the Funds. With respect to any such reimbursement, the Trustee shall (i) rely on the information provided by the Credit Support Provider; and (ii) be under no obligation to determine the Reimbursement Rate or the calculation of the pro rata allocation of available Non-Taxable Funds and Taxable Funds in satisfaction thereof. For the avoidance of doubt, the Trustee shall have no obligation at any time to determine whether the Credit Support Provider is entitled to receive reimbursement out of available Funds and shall rely solely on the information provided by the Credit Support Provider in its written direction with respect thereto.

(j) As a Credit Support Provider Request, the Credit Support Provider hereby directs that each Discretionary Distribution Date shall be no later than the immediately following applicable Interest Payment Date.  Each Distribution Date shall be no later than the immediately following applicable Interest Payment Date unless HTA CVI Distributions are received by the Trustee within two (2) Business Days of such Interest Payment Date, whereby the Distribution Date shall be within three (3) Business Days of receipt of such HTA CVI Distributions by the Trustee.

SECTION 4.02.   Reports to Credit Support Provider and Unitholders.

(a) On each Distribution Date (other than an Interest Payment Date), the Trustee shall forward or cause to be forwarded to the Credit Support Provider and each Unitholder a statement (a "Distribution Date Statement") setting forth:

(i)  the aggregate amount and type of such distribution to be made to the Unitholders of each Class on such date;

(ii) the Aggregate Unit Balance of each Class, as applicable, after giving effect to the distribution to be made on such Distribution Date;

(iii)    the amount of Extraordinary Trust Expense and other Trust fees and expenses paid or owing since the date of the immediately prior Distribution Date Statement, if any, on such Distribution Date, as well as the cumulative amount of such fees and expenses for the calendar year to date;

(iv) the cumulative amount of proceeds received in the applicable Collection Account since the date of the immediately prior Distribution Date Statement ~~and the sources thereof~~including an itemization of the amounts received from each source, based upon the itemization provided by the Credit Support Provider;

(v) the portion of each distribution made on such Distribution Date attributable to proceeds received from the applicable Taxable HTA ~~CVI~~CVIs/Bonds and applicable Non-Taxable HTA ~~CVI~~CVIs/Bonds, and from the applicable Credit Support; and

(vi) the information required to be reported pursuant to Section 3.02(d).

Notwithstanding the foregoing and for the avoidance of doubt, no Distribution Date Statement shall set forth or include any information in respect of any Interest Distribution.

(b) Within a reasonable period of time after the end of each calendar year, the Accountant shall furnish to each Person who at any time during such calendar year was a Unitholder a statement containing the information set forth in the above clause (a) with each such amount aggregated for such calendar year or the applicable portion thereof during which such Person was a Unitholder, which statement shall provide information to allow Unitholders to calculate their U.S. federal income tax liability with respect to ~~the~~their Units.

 (c) The Trustee will deliver to Unitholders and the Credit Support Provider copies of all notices and communications it receives from the Security Issuer as they relate to the HTA

Clawback CVIs or New HTA Bonds unless otherwise provided by the Security Issuer through EMMA as administered by the MSRB.

SECTION 4.03.   Compliance with Tax Reporting and Withholding Requirements.

(a) Unitholders (including for this purpose, the holders of beneficial interests in the Global Securities) (i) of Class A-2028 Units will be responsible for payment of all taxes with respect to the Class A-2028 Trust Property, (ii) of Class M~~L-2023~~2038 Units will be responsible for payment of all taxes with respect to the Class M-2023~~L-2038~~ Trust Property, (iii) of Class ~~L-2038~~M-2023 Units will be responsible for payment of all taxes with respect to the Class ~~L-2038~~M-2023 Trust Property, (iv) of Class N-2026 Units will be responsible for payment of all taxes with respect to the Class N-~~-~~2026 Trust Property, (v) of Class N-2027 Units will be responsible for payment of all taxes with respect to the Class N-2027 Trust Property, (vi) of Class N-2028 Units will be responsible for payment of all taxes with respect to the Class N-2028 Trust Property, (vii) of Class N-2029 Units will be responsible for payment of all taxes with respect to the Class N-2029 Trust Property, (viii) of Class N-2030 Units will be responsible for payment of all taxes with respect to the Class N-2030 Trust Property, (ix) of Class N-2031 Units will be responsible for payment of all taxes with respect to the Class N-2031 Trust Property and (x) of the Class N-2045 Units will  be responsible for payment of all taxes with respect to the Class N-2045 Trust Property.   Each Electing Holder receiving Units on the Closing Date (and each assignee thereof) and, to the extent required, each holder of a beneficial interest in a Global Security, will be responsible for providing the Trustee such information reasonably requested by the Trustee or the Accountant, on behalf of the Trust, as may be deemed necessary or advisable in order for the Trustee or the Accountant to provide tax reporting for applicable federal and state tax purposes.   None of the Depositor, ~~the Issuer,~~ the Credit Support Provider ~~or~~nor the Trustee will be responsible for making any tax payments or tax reporting other than as set forth in this Trust Agreement.   The Trust and each Sub-Trust, through its Accountant, shall be responsible for all tax reporting obligations and withholding (if any) for the Trust, each Sub-Trust and Unitholders as required by law and consistent with the treatment of the Trust and each Sub-Trust as a Grantor Trust and the Unitholders as beneficial owners of a pro rata share of the applicable Trust Property (but subject further to the tax characterization described in Section 2.01(b)), for purposes of U.S. federal income tax, and any state and local taxes.   Such obligations shall include:  the timely filing of completed tax returns (if any) and the information returns (if any), including any extensions, and any filings or information as required by the Accountant.   To assure the foregoing, the Trustee shall utilize the Accountant, with fees and expenses of the Accountant being a cost of the applicable Sub-Trust.  For the avoidance of doubt, the Trustee, on behalf of the Trust, shall have no individual obligation or duty to review the tax returns or information returns for accuracy.

SECTION 4.04.   Preservation of Information, Communications to Unitholders.

The Trust shall cause the Accountant to (i) preserve, in as current a form as is reasonably practicable, the names and addresses of the Unitholders contained in the most recent list furnished to the Accountant by the Unitholders and (ii) upon request, provide the Credit Support Provider and the Trustee (but not any Unitholder) with a copy of the list.  The Accountant shall be allowed to destroy any list furnished to it as provided upon receipt of a new list.

ARTICLE V

The Units

SECTION 5.01.   The Units.

(a) The Units shall be issued in the form of and be represented by one or more Global Securities in the form of Exhibit C1 through Exhibit C10 and, as provided by the terms hereof and subject to Section 5.09, by definitive Certificates substantially in the form of Exhibit B1 through Exhibit B10.  The aggregate amount of the Units that may be executed and delivered under this Trust Agreement is limited to the amount of Ambac Prepetition Insured Bonds deposited into the Trust.  The aggregate number of Units shall be allocated among Classes in the same proportion of the Ambac Prepetition Insured Bonds deposited into the Trust on the Closing Date.  All Units of the same Class shall be identical in all respects.  The Units of each Class will be transferable in denominations of the current Notional Amount of the applicable Class and integral multiples thereof which, for the avoidance of doubt, shall be a denomination of $1.00 of par value at the applicable Scheduled Final Redemption Date.  All Units of a Class issued under this Trust Agreement shall be in all respects equally and ratably entitled to the benefits to which such Class are entitled hereunder without preference, priority or distinction on account of the actual time or times of authentication and delivery.  No additional interests in the Trust other than the Units shall be issued hereunder, except in accordance with Sections 5.03 and 5.04.

(b) The Units issued under this Trust Agreement shall be in the form of separate Classes: a class of Units with a mandatory redemption date of the Class A-2028 Scheduled Final Redemption Date (the "Class A-2028 Units"), a class of Units with a mandatory redemption date of the Class L-2038 Scheduled Final Redemption Date (the "Class L-2038 Units"), a class of Units with a mandatory redemption date of the Class M-2023 Scheduled Final Redemption Date (the "Class M-2023 Units"), a class of Units with a mandatory redemption date of the Class L-2038N-2026 Scheduled Final Redemption Date (the "Class L-2038 Units"), a class of Units with a mandatory redemption date of the Class N-2026 Scheduled Final Redemption Date (the "Class N-2026 Units"), a class of Units with a mandatory redemption date of the Class N-2027 Scheduled Final Redemption Date (the "Class N-2027 Units"), a class of Units with a mandatory redemption date of the Class N-2028 Scheduled Final Redemption Date (the "Class N-2028 Units"), a class of Units with a mandatory redemption date of the Class N-2029 Scheduled Final Redemption Date (the "Class N-2029 Units"), a class of Units with a mandatory redemption date of the Class N-2030 Scheduled Final Redemption Date (the "Class N-2030 Units"), a class of Units with a mandatory redemption date of the Class N-2031 Scheduled Final Redemption Date (the "Class N-2031 Units") and a class of Units with a mandatory redemption date of the Class N-2045 Scheduled Final Redemption Date (the "Class N-2045 Units").  The Sinking Fund Schedule for any applicable Class shall be adjusted from time to time in connection with each distribution made on such Class.  Such adjustment shall be based on the gross amount of each distribution and shall not take into account taxes, if any, which may be required to be withheld by the Trust or paid by any Unitholder.  In connection with each distribution on a Class of Units for which there is a Sinking Fund Schedule, the Trustee shall provide to the Credit Support Provider a revised Sinking Fund Schedule for such Class which gives effect, in accordance with the foregoing, to receipt of such distribution by such Class and calculates the remaining Sinking Fund Schedule for such Class from and after

the date of such distribution. Any such revised Sinking Fund Schedule shall become effective hereunder upon written reasonable approval thereof by the Credit Support Provider.

(c) Unless and until it is exchanged in whole or in part for Certificates representing the individual Units represented thereby (as described in Section 5.09), a Global Security may not be transferred except as a whole by the Depositary for such Global Security to a nominee of such Depositary or by a nominee of such Depositary to such Depositary or another nominee of such Depositary or by such Depositary or any such nominee to a successor of such Depositary or a nominee of such successor.

SECTION 5.02.   Execution, Authentication and Delivery.

(a) Global Securities and/or Certificates evidencing Units shall be executed on behalf of the Trust by a Responsible Officer of the Trustee. The signature of any of these officers may be manual or facsimile. Certificates and Global Securities bearing the manual or facsimile signature of individuals who were at the time of execution and authentication the proper officers of the Trustee shall be binding, notwithstanding that such individuals or any of them have ceased to hold such offices subsequent to the authentication and delivery of such Certificates and/or Global Securities or did not hold such offices at the date of such Certificates and/or Global Securities.

(b) The Trustee shall not be required to authenticate any Certificates or Global Securities if the issuance of such Certificates or Global Securities pursuant to this Trust Agreement will adversely affect the Trustee's own rights, duties or immunities under this Trust Agreement.

(c) Each Certificate and Global Security shall be dated as of the date of its authentication.

(d) No Unit shall be entitled to any benefit under this Trust Agreement or be valid or obligatory for any purpose, unless there appears on the applicable Certificate or Global Security a certificate of authentication substantially in the form as contained in the form of Certificate or Global Security attached to this Trust Agreement as Exhibit B1, through Exhibit B10 and Exhibit C1 through Exhibit C10 executed by the Trustee by the manual or facsimile signature of a Responsible Officer, and such certificate upon any of the foregoing shall be conclusive evidence, and the only evidence, that the Unit represented thereby has been duly authenticated and delivered under this Trust Agreement and is entitled to the benefits of this Trust Agreement.

SECTION 5.03.   Registration; Registration of Transfer and Exchange.

(a) The Trustee shall cause to be kept a register for Units (the registers maintained in such office and in any other office or agency of the Trustee from which distributions are made being herein sometimes collectively referred to as the "Unit Register") in which, subject to such reasonable regulations as it may prescribe, a transfer agent and registrar (which initially shall be the Trustee but may be another entity) (the "Unit Registrar") shall provide for the registration of Units and the registration of transfers and exchanges of Units. The Trustee is hereby initially appointed Unit Registrar for the purpose of registering Units and transfers and exchanges of Units as herein provided, and the Trustee shall remain Unit Registrar for such purposes until the earlier to occur of (i) the resignation or termination of the Trustee and appointment of a successor trustee in accordance with Section 9.07, in which case such successor trustee shall assume the

duties of Unit Registrar, and (ii) the termination of the Trust and discharge of the Trustee's obligations under this Trust Agreement in accordance with the applicable terms of Article VIII; provided, however, that the Trustee may appoint one or more co-Unit Registrars upon notice to the Credit Support Provider and the Unitholders.

With respect to Units represented by Certificates (if applicable), upon surrender for registration of transfer of any Unit at the office or agency of the Unit Registrar, if the requirements of Section 8-401(1) of the Uniform Commercial Code are met to the Unit Registrar's satisfaction, and subject to the transfer restrictions set forth in Section 5.09 hereof, the Trustee shall execute, authenticate and deliver, in the name of the designated transferee or transferees, one or more new Units of the same Class of any authorized denominations, of a like aggregate Notional Amount.  All transfers of Units are subject to the approval of the Unit Registrar and the Unit Registrar shall not register any transfer of Units if such transfer would violate any provision of this Trust Agreement.  Notwithstanding the foregoing, beneficial interests in a Global Security shall be transferable in accordance with the Applicable Procedures, as further described in Section 5.09(c) hereof.

(b) At the option of the Unitholder and at such Unitholder's expense, Certificates representing Units may be exchanged for other Certificates of the same Class of any authorized denomination or denominations of like tenor and aggregate Notional Amount upon surrender of the Certificates to be exchanged at the office or agency of the Trustee maintained for such purpose.  Whenever any Certificates are so surrendered for exchange, the Trustee shall execute, authenticate and deliver the Certificates representing the Units that the Unitholder making the exchange is entitled to receive.

All Units issued upon any registration of transfer or exchange of Units shall be entitled to the same benefits under this Trust Agreement as the Units surrendered upon such registration of transfer or exchange.

(c) Every Unit represented by a Certificate presented or surrendered for registration of transfer or exchange shall be duly endorsed (and in the case of a transfer, accompanied by a written instrument of transfer substantially in the form of Exhibit D hereto), duly executed, by the Unitholder thereof or his/her attorney duly authorized in writing, or by a member firm of a national securities exchange, and such other documents as the Unit Registrar may require.

The Trustee may require payment by the Unitholders of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Units.

SECTION 5.04.   Mutilated, Destroyed, Lost and Stolen Certificates.

If (i) any mutilated Certificate is presented to the Unit Registrar or (ii) the Unit Registrar receives evidence to its satisfaction of the destruction, loss or theft of any Certificate, and there is delivered to the Unit Registrar such security or indemnity as it may require to save it and any Paying Agent harmless, and the Unit Registrar has not received notice that such Certificate (and the Units represented thereby) has been acquired by a bona fide purchaser, then, in each case, the Trustee shall execute, authenticate and deliver, in exchange for or in lieu of any such mutilated,

destroyed, lost or stolen Certificate, a new Certificate of like Class, tenor, form, terms and principal amount, bearing an identifying number not used by any contemporaneously existing Certificate, so that neither gain nor loss in interest shall result from such exchange or substitution.

Upon the issuance of any new Certificate under this Section, the Trustee may require the payment by the Unitholder of a sum sufficient to cover any tax or other governmental charge that may be imposed in respect thereto and any other expenses (including the fees and expenses of the Trustee or Unit Registrar) connected therewith.

Every new Certificate issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the applicable Trust Property to the extent provided herein, unless the destroyed, lost or stolen Certificate shall be legally enforceable as determined by a final court order at any time enforceable by anyone, and the Units represented thereby shall be entitled to all the benefits of this Trust Agreement equally and proportionately with any and all other Units of the related Class, if any, duly issued thereunder.

The terms of this Section shall apply, *mutatis mutandis*, with respect to the certificates representing the Global Securities, provided that any costs, taxes or expenses in connection therewith or with respect to a required indemnity, to the extent not paid or provided by a Unitholder, shall be borne by the Trustee and deemed an Extraordinary Trust Expense.

The terms of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Units.

SECTION 5.05.   Persons Deemed Owners.

Subject to Section 5.04 and except for the final distribution, the Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered as the owner of such Unit on the related Record Date, if applicable, or Distribution Date for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.  All distributions made to any such Unitholder, or upon his/her order, shall be valid, and, to the extent of the sum or sums paid, effectual to satisfy and discharge the liability for moneys distributable upon such Unit.

SECTION 5.06.   Cancellation.

(a) All Units evidenced by Certificates surrendered for payment, redemption, replacement, transfer or exchange shall be delivered to the Trustee and shall be promptly cancelled by the Trustee.  The Trustee (or, if different, the Unit Registrar) and no one else will cancel all such Units surrendered for registration of transfer, exchange, payment, replacement or cancellation and will dispose of such cancelled Units and the related Certificates in accordance with its customary procedures.  No Certificates evidencing Units shall be authenticated in lieu of or in exchange for any Units cancelled as provided in this Section, except as expressly permitted by this Trust Agreement.

(b)  At  such  time  as  all  beneficial  interests  in  a  particular  Global  Security  have  been exchanged for HTA Clawback CVIs and/or New HTA Bonds pursuant to Section 6.03 hereof or for Certificates representing Units, or a Trust Termination Event has occurred with respect to all Units represented by a particular Global Security, such Global Security will be cancelled and destroyed by the Trustee in accordance with Section 5.06(a).

SECTION 5.07.   Appointment of Paying Agent.

(a) The Trustee may appoint one or more paying agents (each, a "Paying Agent") with respect to the Units.  Any such Paying Agent shall be authorized to make distributions to Unitholders pursuant to this Trust Agreement and shall report the amounts of such distributions to the Trustee.  The Trustee may remove the Paying Agent if the Trustee determines in its sole discretion  that  the  Paying  Agent  shall  have  failed  to  perform  its  obligations  under  this  Trust Agreement  in  any  material  respect  or  if  the  Paying  Agent  fails  to  satisfy  the  eligibility requirements set forth in paragraph (b) of this Section.  The Paying Agent shall initially be the Trustee.  Any Paying Agent shall be permitted to resign as Paying Agent upon 30 days' written notice to the Trustee.  In the event that the Trustee shall no longer be the Paying Agent, the Trustee shall appoint a successor or additional Paying Agent and shall provide written notice of such appointment to the Credit Support Provider and the Unitholders.  The Trustee shall cause each such Paying Agent to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee that it will hold all sums, if any, held by it for distribution to the Unitholders in an Eligible Account in trust for the benefit of the Unitholders entitled thereto until such sums shall be distributed to such Unitholders.  The Paying Agent shall return all unclaimed funds to the Trustee within two years from the time such funds were first eligible to be claimed and promptly upon removal shall also return all funds in its possession to the Trustee or a successor Paying Agent.

(b)  The Paying Agent shall at all times be a bank or trust company, the combined capital and surplus of which is at least $200,000,000 and the long-term debt obligations of which are rated in one of the four highest categories assigned long-term debt obligations by each of S&P and Moody's or, notwithstanding such capital and surplus and rating requirements, is otherwise acceptable to the Credit Support Provider in its sole discretion, and is subject to supervision of examination by Federal or State authority.  If such bank or trust company publishes reports of conditions at least annually, pursuant to combined capital and surplus of such bank or trust company shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published.  In the event that at any time the Paying Agent shall cease to be eligible in accordance with the terms of this paragraph, the Paying Agent shall release all funds held by the Paying Agent to the Trustee and then resign immediately.  Upon such resignation, the Trustee shall act as Paying Agent until the appointment of a successor Paying Agent in accordance with paragraph (a) of this Section.

(c)  The terms of Sections 9.01, 9.02, 9.03, 9.05 and 9.06 shall be applicable to any Paying Agent, *mutatis mutandis*.

(d)  Any reference in this Trust Agreement to the Paying Agent shall include any co-paying agent unless the context requires otherwise.

SECTION 5.08.    [Reserved].

SECTION 5.09.    Issuance and Transfer Restrictions.

(a) The Units shall be issued on the Closing Date upon deposit of the Electing Ambac Prepetition Insured Bonds, the New HTA Bonds, the benefit of the Credit Support and the HTA CVI Bond Distributions (and related cash) into the Trust pursuant to the Plan of Adjustment and the due authentication by the Trustee of the Units in the form set forth in Exhibit C1 through Exhibit C10 attached hereto as applicable.

(b) No Unit shall be transferred except in accordance with the terms of Section 5.03 and this Section 5.09(b) or, if applicable, Section 5.09(c).  Each proposed transfer of a Unit shall not be effective until the transferor and transferee have provided the Trustee with a certificate of transfer in substantially the form of Exhibit D hereof and the acknowledgement of such certificate by the Trustee.  If, at any time, the Trustee learns that (i) a transfer of a beneficial interest in a Global Security shall have been made without the transferor complying with its obligations under Section 5.03 hereof or (ii) any of the representations or warranties provided by a potential transferee of any Certificate is false or that any agreement made therein has been violated, any transfer of such Unit (or beneficial interest therein) to such potential transferee shall be null and void ab initio.  The Trustee shall have such other powers to effect compliance with the terms of this Section 5.09 as it deems appropriate.

(c) With respect to any Units represented by Global Securities, the following terms shall apply:

(i)  The Units will be represented by one or more Global Securities registered in the name of the Depositary or its nominee.  The Trustee initially appoints DTC to act as Depositary with respect to the Global Securities.

(ii) Any Global Security shall be exchangeable for Certificates registered in the name of Persons other than the Depositary or its nominee *only* if (A)(x) the Depositary is no longer willing or able to continue to act as a depositary *or* (y) the Depositary ceases to be an Exchange Act registered clearing agency *and* (B) the Trustee is unable to appoint a qualified successor within 120 days.  Upon the occurrence of (1) either event described in subclause (A) of the previous sentence *and* (2) the event described in subclause (B) of the previous sentence, Certificates representing Units shall be issued in exchange for any applicable Units represented by Global Securities in such names as the Depositary shall instruct the Trustee.  Upon such issuance, the Trustee shall register such Certificates in the name of, and cause the same to be delivered to, such Person or Persons (or the nominee thereof) consistent with Section 5.02.  In addition, the Trustee may (and at the direction of the Credit Support Provider shall) cause the entire beneficial interest in a Global Security held by a Person that is in breach of its obligations under Section 5.03 hereof to be converted into a definitive Certificate.  For the avoidance of doubt, any Unit authenticated and delivered in exchange for a Global Security or any portion thereof pursuant to this Section 5.09(c)(ii) shall be authenticated and delivered in the form of, and shall be, a Certificate.  A Global Security may not be exchanged for a Certificate other than as provided in this Section 5.09(c)(ii); provided, however, that Units may be transferred and exchanged as provided in Section 5.09(c)(iii).

(iii)     The transfer and exchange of Units will be effected through the Depositary, in accordance with the provisions of this Trust Agreement and the Applicable Procedures. Units may be transferred to Persons who take delivery thereof only in the form of a beneficial interest in the same Global Security.  No written orders or instructions shall be required to be delivered to the Unit Registrar to effect the transfers of beneficial interests in a Global Security described in this Section 5.09(c)(iii).

(iv) Any Global Security shall bear a legend in substantially the following form:

> "This certificate is a Global Security (within the meaning of the Trust Agreement hereinafter referred to) and is registered in the name of a Depositary or a nominee of a Depositary.  This Global Security is exchangeable for Certificates registered in the name of a person other than the Depositary or its nominee only in the limited circumstances described in the Trust Agreement, and may not be transferred except as a whole by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary.  Unless this Global Security is presented by an authorized representative of The Depository Trust Company ("DTC") to the Trustee (as defined in the Trust Agreement) or its agent for registration of transfer, exchange or payment, and any Global Security issued is registered in the name of Cede & Co. or such other name as may be requested by an authorized representative of DTC (and any payment is made to Cede & Co. or such other entity as may be requested by an authorized representative of DTC), any transfer, pledge or other use of this Global Security (rather than the underlying Units which may be transferred pursuant to the Trust Agreement and which may be pledged) for value or otherwise by or to any person is wrongful inasmuch as the registered owner hereof, Cede & Co., has an interest therein."

## ARTICLE VI

### Rights of Unitholders and Credit Support Provider

SECTION 6.01.   Voting Rights with Respect to HTA Clawback CVIs and New HTA Bonds.

(a) Within two (2) Business Days after receipt of notice of any meeting of, or other occasion for the exercise of voting rights, the giving of consents or any other election right by, owners of any of the HTA Clawback CVIs or New HTA Bonds, the Trustee shall deliver a copy of such notice to the Credit Support Provider.

 (b) The voting, election and direction rights allocable to the owners of the HTA Clawback CVIs and New HTA Bonds pursuant to the terms thereof (including, without limitation, voting, election and direction rights in respect of remedies) will be allocated solely to the Credit Support Provider and no Unitholder shall have any right to direct the Trustee as to any voting, election or direction rights allocable to owners of the HTA Clawback CVIs and New HTA

Bonds except as described in Section 4.01(h).  Upon the written request of the Credit Support Provider, the Trustee shall vote, elect or act in accordance with any instruction set forth in such written request.  The Credit Support Provider may exercise its rights hereunder in its sole discretion.

SECTION 6.02.   HTA Clawback CVI and New HTA Bond Sales.

(a) Taxable HTA ~~CVI~~CVIs/Bonds.  The Credit Support Provider may, in its sole discretion at any time and from time to time, direct the Trustee to sell all or any portion of the Taxable HTA ~~CVI~~CVIs/Bonds that are Trust Property (except for the Non-Taxable Funds and the Non-Taxable HTA ~~CVI~~CVIs/Bonds set forth in Section 6.02(b)) attributed to such Class; provided that (i) any such sale is made for fair market value (as evidenced by one or more bids provided by brokers of national standing or such other information as to current market prices as the Credit Support Provider shall deem appropriate and delivered to the Trustee), and (ii) the proceeds of any such sale of Taxable HTA ~~CVI~~CVIs/Bonds from the Trust Property of a Class of Units shall be deposited into the Taxable Collection Account of such Class of Units for the benefit of the Unitholders of such Class.  The Trustee shall have no obligation to determine whether the requirements of the foregoing clause (i) are satisfied and shall be entitled to rely on the information provided by the Credit Support Provider.  In the case of any sale of Taxable HTA ~~CVI~~CVIs/Bonds, the Credit Support Provider shall direct the Trustee to, and the Trustee shall, in consultation with the Credit Support Provider, sell all or a portion of the applicable Taxable HTA ~~CVI~~CVIs/Bonds, to the extent possible, at a fair price in the context of the market at such time.  Each Unitholder (which term shall for purposes hereof include any holder of a beneficial interest in a Global Security), by electing to receive Units hereunder and any assignee thereof, shall be deemed to have consented to the sale of the applicable Taxable HTA ~~CVI~~CVIs/Bonds as directed by the Credit Support Provider from time to time as provided in this Section 6.02(a).  Notwithstanding the foregoing, there shall be no sales of Taxable HTA ~~CVI~~CVIs/Bonds on or before the Outside Non-Taxable HTA CVI~~/Bond~~ Determination Date.

(b) Non-Taxable HTA ~~CVI~~CVIs/Bonds.  The Trustee shall not sell any Non-Taxable HTA ~~CVI~~CVIs/Bonds except upon a Non-Taxable HTA CVI/Bond Sale Event.  Upon the occurrence of a Non-Taxable HTA CVI/Bond Sale Event with respect to one or more series of Non-Taxable HTA ~~CVI~~CVIs/Bonds, the Trustee shall sell such portion of the Non-Taxable HTA ~~CVI~~CVIs/Bonds to the extent subject to such Non-Taxable HTA CVI/Bond Sale Event; provided that, (i) any such sale is made for fair market value (as evidenced by one or more bids provided by brokers of national standing or such other information as to current market prices), (ii) the proceeds of any such sale of Non-Taxable HTA ~~CVI~~CVIs/Bonds from the Trust Property of a Class of Units shall be deposited into the Non-Taxable Collection Account of such Class of Units for the benefit of the Unitholders of such Class, and (iii) solely if the Calculation Agent selects clause (i) of the definition of Non-Taxable HTA CVI/Bond Threshold Amount, after the sale of the Non-Taxable HTA ~~CVI~~CVIs/Bonds, the notional amount of such HTA Clawback CVIs and New HTA Bonds and the amount of the proceeds from such sale shall be deducted from the Initial Adjusted Non-Taxable HTA CVI/Bond Notional, and the Initial Adjusted Notional Threshold Amount shall be ratably reduced.  The Trustee shall have no obligation to determine whether the requirements of the foregoing clause (i) are satisfied and shall be entitled to rely on the information provided by the Calculation Agent.  In the case of any permitted sale of Non-Taxable HTA ~~CVI~~CVIs/Bonds hereunder, the Trustee shall, in consultation with the

Credit Support Provider, sell all or a portion such Non-Taxable HTA ~~CVI~~CVIs/Bonds, to the extent possible, at a fair price in the context of the market at such time; provided, however, the Trustee shall rely on the information provided by the Calculation Agent and shall be under no obligation to determine the price.

(c) To effectuate the sales set forth in Sections 6.02(a) or 6.02(b) above, the Credit Support Provider must instruct the Trustee, by delivering a direction and notice in the form of Exhibit E-1 or Exhibit E-2 hereto, as applicable, to dispose of some or all of the applicable Non-Taxable HTA ~~CVI~~CVIs/Bonds.

(d) The Calculation Agent shall monitor on at least a monthly basis (or more frequently as the Calculation Agent may determine) the fair market value of the Non-Taxable HTA ~~CVI~~CVIs/Bonds to determine whether the fair market value of any series of Non-Taxable HTA ~~CVI~~CVIs/Bonds exceeds the applicable Non-Taxable HTA CVI/Bond Threshold Amount for such Non-Taxable HTA ~~CVI~~CVIs/Bonds. The Calculation Agent shall promptly notify the Trustee and the Credit Support Provider if the fair market value of any series of Non-Taxable HTA ~~CVI~~CVIs/Bonds (as evidenced by one or more bids provided by brokers of national standing or such other information as to current market prices) exceeds the applicable Non-Taxable HTA CVI/Bond Threshold Amount for such series of Non-Taxable HTA ~~CVI~~CVIs/Bonds.

(e) Upon distribution pursuant to Section 4.01(a) of the proceeds of any sale of Non-Taxable HTA ~~CVI~~CVIs/Bonds, the applicable Aggregate Unit Balance shall be reduced, and the Sinking Fund Schedule for all applicable Classes shall be reduced by the Trustee pursuant to the provisions of Section 5.01(b).

(f) Upon any Discretionary Distribution pursuant to Section 4.01(b) of the proceeds of any sale of Taxable HTA ~~CVI~~CVIs/Bonds, the applicable Aggregate Unit Balance shall be reduced, and the Sinking Fund Schedule for all applicable Classes shall be reduced by the Trustee pursuant to the provisions of Section 5.01(b).

SECTION 6.03.    Distribution of HTA Clawback CVIs and New HTA Bonds.

(a) As part of the payment in full of the Aggregate Unit Balance of any Class of Units, the Credit Support Provider may direct the Trustee to distribute all of the remaining underlying HTA Clawback CVIs and New HTA Bonds that are Trust Property attributable to such Class to the applicable Unitholders, upon written notice from the Credit Support Provider to the Trustee and the applicable Unitholders indicating that all HTA Clawback CVIs and New HTA Bonds shall be distributed via mandatory exchange in exchange for all remaining Units, and the Trustee shall distribute such amount and type of HTA Clawback CVIs and New HTA Bonds indicated in such notice to the applicable Unitholders of such Class on a pro rata basis or as close to a pro rata basis as practicable (based on the aggregate sum of the Notional Amounts of all Units of each Class held by such Unitholder) to the applicable Unitholders, and in the case of Global Securities, subject to and in accordance with the applicable procedures of the Depositary. At any time, solely to the extent permitted by the Depositary, the Credit Support Provider may direct the

Trustee to distribute a portion of the underlying HTA Clawback CVIs and New HTA Bonds that are Trust Property of a Class of Units to the applicable Unitholders of such Class of Units, upon written notice from the Credit Support Provider to the Trustee and the applicable Unitholders of such Class of Units indicating the HTA Clawback CVIs and New HTA Bonds to be distributed, and the Trustee shall distribute such amount and type of HTA Clawback CVIs and New HTA Bonds indicated in such notice on a pro rata basis within such Class or as close to a pro rata basis as practicable (based on the aggregate sum of the Notional Amounts of all applicable Units held by such Unitholder) to the applicable Unitholders of such Class of Units, by way of redemption or otherwise, and in the case of Global Securities, subject to and in accordance with the applicable procedures of the Depositary. Upon any such distribution described in the preceding sentence, any Units so redeemed or exchanged shall be cancelled by the Trustee, the applicable Aggregate Unit Balance for the Class or Classes receiving such distribution shall be reduced by the Deemed HTA Clawback CVI Valuation Amount or the Deemed New HTA Bond Valuation Amount, and the Sinking Fund Schedule for the Class or Classes, if applicable, receiving such distribution shall be revised by the Trustee accordingly in the amount specified in Section 5.01(b) and Section 6.04(c) and there shall be a deemed corresponding reduction to the Credit Support.

(b)  The Credit Support Provider may, at its sole discretion, at any time and from time to time, agree with any Unitholder (which term for purposes of this clause (b) shall include any holder of a beneficial interest in a Global Security) to exchange such Unitholder's Units for a proportional percentage of any portion of the underlying applicable Trust Property (including HTA Clawback CVIs, New HTA Bonds, Ambac Prepetition Insured Bonds, Credit Support, cash and/or proceeds of Permitted Investments then held by the Trust) and upon (i) delivery of such Units through DTC via DWAC, and (ii) written notice from the Credit Support Provider to the Trustee indicating the amount of such HTA Clawback CVIs (if any), New HTA Bonds (if any), Ambac Prepetition Insured Bonds (if any), Credit Support (if any), cash (if any) and proceeds of Permitted Investments (if any) to be released, the Trustee shall release such amount of, if applicable, HTA Clawback CVIs, New HTA Bonds Ambac Prepetition Insured Bonds, Credit Support, cash and/or proceeds of Permitted Investments to such Unitholder. In such event, such Unitholder shall execute a release, in form and substance satisfactory to the Credit Support Provider, releasing all rights and obligations owing to such Unitholder against the Trust and under the Credit Support (if applicable). The exchange with such Unitholder shall not give rise to any right of any other Unitholder to request such an exchange or to receive any other consideration with respect to its Units. Upon any such exchange the applicable Aggregate Unit Balance for such Class or Classes shall be reduced and the Sinking Fund Schedule, if applicable, for the Class or Classes subject to such exchange shall be revised by the Trustee in an amount specified by the Credit Support Provider, and the Trustee shall cancel all such exchanged Units (which cancellation, in the case of any Units represented by a Global Security, shall be effectuated by the Trustee by reducing the aggregate balance of Units comprising such Global Security).

(c) The Credit Support Provider may, at its sole discretion, at any time and from time to time, offer to purchase all or a portion of any Class of Units by providing the Trustee with a notice (the "Purchase Offer Notice"). The Purchase Offer Notice shall specify (i) the purchase price for such Units, (ii) the Class and number of available Units the Credit Support Provider is offering to purchase, (iii) the contact information and terms for acceptance of such purchase offer and (iv) the length of time such offer shall remain outstanding. The Trustee shall promptly provide the

Purchase Offer Notice to the applicable Unitholders, in the case of Global Securities, by transmitting such notice to the Depositary in accordance with its procedures and in the case of Certificates, if applicable, by transmitting such notice by facsimile to such number or by electronic mail at such address as may be provided to the Trustee.  In the event any Unitholder (which term for purposes of this clause (c) shall include any holder of a beneficial interest in a Global Security) agrees to such terms, such Unitholder shall execute a release, in form and substance satisfactory to the Credit Support Provider, releasing all rights and obligations owing to such Unitholder against the Trust and under the Credit Support, and thereafter the Credit Support Provider shall have all rights associated with ownership of such Units equivalent to any other Unitholder (including for the avoidance of doubt, the right set forth in Section 6.03(b) above).  In the event that Unitholders having a greater number of Units than are available for purchase accept the purchase offer, the Credit Support Provider shall purchase Units in the order the countersigned Purchase Offer Notices were received. For the avoidance of doubt, nothing in this Section 6.03(c) shall obligate the Trustee to act as tender agent in connection with any Purchase Offer Notice. To the extent that (i) the Credit Support Provider determines to appoint a tender agent in connection with any Purchase Offer Notice and (ii) the Trustee determines to accept such appointment, the Trustee shall perform the duties imposed upon the tender agent by such supplemental agreement to be agreed upon by the Credit Support Provider and the Trustee in accordance therewith and in exchange for such supplemental fee (if any) as agreed by such parties with respect thereto.

(d) In the event the Credit Support Provider makes an election under Sections 6.03(a), (b) or (c) above or Section 8.02(b) and the Depositary requests indemnification from the Trustee in order to effectuate the transaction, the Credit Support Provider shall provide matching indemnification to the Trustee, in writing, in order to effectuate the transaction.

SECTION 6.04.    Electing Ambac Prepetition Insured Bonds.

(a) Notwithstanding the deposit of the Electing Ambac Prepetition Insured Bonds in the Trust, the Electing Ambac Prepetition Insured Bonds shall not be cancelled (other than for tax purposes with respect to the Electing Ambac Prepetition Insured Bonds) and all rights and remedies under and in accordance with the Ambac Prepetition Insured Bonds, the Bond Resolution (other than with respect to the payment and other obligations of HTA (including any lien granted as security under such Bond Resolution)) and the applicable Credit Support shall be preserved and remain in full force and effect with respect to the Electing Ambac Prepetition Insured Bonds, including, without limitation, the option of the Credit Support Provider in its sole discretion to satisfy its obligations thereunder, in whole or in part, by providing for payment of all or part of the accelerated principal of the Electing Ambac Prepetition Insured Bonds, together with accrued interest.  The Credit Support Provider shall be deemed the sole holder of the Electing Ambac Prepetition Insured Bonds deposited in the Trust, including, without limitation, with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies subject to the provisions of Section 4.01(h).

(b) For the avoidance of doubt, the Ambac Prepetition Insured Bonds not beneficially owned by an Electing Holder shall be cancelled on the Closing Date and shall be deemed no longer outstanding for all purposes of the Bond Resolution.

(c) Each reference in this Trust Agreement to the Sinking Fund Schedule for a Class of Units being reduced shall be deemed to include a corresponding reduction to the Sinking Fund Schedule for the related Electing Ambac Prepetition Insured Bonds and a corresponding reduction (without duplication) in the Credit Support as a result thereof. Each reference in this Trust Agreement to an Interest Distribution when paid on an Interest Payment Date shall be deemed a corresponding reduction for the related Electing Ambac Prepetition Insured Bonds and a corresponding reduction (without duplication) in the Credit Support as a result thereof.

ARTICLE VII

Default on HTA Clawback CVIs and New HTA Bonds and Permitted Investments

SECTION 7.01.   Realization Upon Default.

(a) The Trustee shall assert claims under the HTA Clawback CVIs, the New HTA Bonds, the Permitted Investments, the applicable Credit Support and the other applicable Trust Property, and shall take such reasonable steps as are necessary to receive payment or to permit recovery thereunder with respect to any default, only at the direction of the Credit Support Provider with respect to the HTA Clawback CVIs, the New HTA Bonds and the Permitted Investments in accordance with the applicable document pursuant to which the Permitted Investment was issued or by which it is governed and Article VI hereof.

(b) If there is a breach, a default or an event of default (as defined in the ~~HTA Clawback~~ CVI Trust Agreement) with respect to any HTA Clawback CVI or New HTA Bond, or a breach, a default or an event of default (as defined in the applicable document pursuant to which the Permitted Investment was issued or by which it is governed) with respect to any Permitted Investment, and such breach, default or event of default is known to the Trustee, the Trustee shall give notice thereof to the Unitholders and the Credit Support Provider as promptly as practicable~~,~~ and, in any event, within two (2) Business Days after such event of default becomes known to the Trustee. However, if the Trustee receives notice of an anticipated payment default with respect to any HTA Clawback CVI or New HTA Bond, the Trustee shall promptly give notice thereof to the Unitholders and the Credit Support Provider within two (2) Business Days after           receipt           of           such           notice.

ARTICLE VIII

Trust Wind-Up Events; Termination

SECTION 8.01.   Trust Wind-Up Events.

The Trust shall dissolve and wind-up upon the earlier of (a) the Class N-2045 Scheduled Final Redemption Date or (b) payment in full of the Aggregate Unit Balance for each Class of Units (a "Trust Termination Event"). Upon the completion of the dissolution and winding-up of the Trust in accordance with this Article ~~8~~VIII and Section 3808 of the Delaware Statutory Trust Act, a certificate of cancellation of the Certificate of Trust shall be filed with the Secretary of

State. Upon the effectiveness of such filing, this Trust and this Trust Agreement, and the obligations and responsibilities of the Trustee hereunder, shall terminate.

SECTION 8.02.    <u>Trust Property Made Available</u>.

(a) Except with respect to a Trust Termination Event occurring on the Class N-2045 Scheduled Final Redemption Date, the Trustee shall provide notice to the Unitholders and the Credit Support Provider of the intent to effect a Trust Termination Event and that Unitholders should surrender their Units to the Trustee, for the greater of (x) their respective portion of the Aggregate Unit Balance of such Class or (y) their respective portion of any amount remaining in the Trust after making reimbursement payments required to be made to the Credit Support Provider for the amounts described in Section 8.02(b).  Such notice to the Unitholders shall also specify (i) the location and hours of the Corporate Trust Office at which Units should be presented and surrendered, and (ii) that each Unitholder must supply wire instructions in writing with respect to any cash distribution.

(b) Upon the occurrence of payment in full of the Aggregate Unit Balance on any Class of Units on account of the Credit Support Provider making a payment with respect to the Credit Support (whether upon a Trust Termination Event or earlier), the Credit Support Provider shall be entitled to receive reimbursement of any amounts paid by the Credit Support Provider pursuant to the Credit Support to the extent not previously reimbursed, in accordance with the manner set forth in Section 4.01.  Upon written direction to the Trustee from the Credit Support Provider, the amount required to be reimbursed to the Credit Support Provider shall be paid from the proceeds of a sale of the remaining Trust Property of a Class of Units (including upon the occurrence of a Trust Termination Event amounts remaining in the Fee Reserve) or, at the election of the Credit Support Provider, may be made in the form of HTA Clawback CVIs or New HTA Bonds that are Trust Property of a Class of Units having a fair market value (as evidenced by one or more bids provided by brokers of national standing or such other information as to current market prices) equal to the amount required to be paid to the Credit Support Provider pursuant to this Section 8.02(b).  Any excess proceeds in the Trust Property of a Class of Units with respect to the HTA Clawback CVIs and New HTA Bonds remaining after the reimbursement to the Credit Support Provider pursuant to this Section 8.02(b) shall be distributed pro rata within such Class or on an as close to a pro rata basis as practicable (based on the aggregate sum of the Notional Amounts of all applicable Units held by such Unitholder) to applicable Unitholders of such Class of Units as of the date of the Trust Termination Event, and in the case of Global Securities, subject to and in accordance with the applicable procedures of the Depositary.

(c) On the date on which all Classes of Units and the Credit Support Provider have received the amounts due them pursuant to Section 8.02(b), the Electing Ambac Prepetition Insured Bonds and the Credit Support shall be released and cancelled, and the Credit Support Provider's obligations thereunder shall be deemed satisfied in full.

ARTICLE IX

Concerning the Trustee

SECTION 9.01.    Duties of Trustee.

(a) The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Trust Agreement.  Any permissive right of the Trustee enumerated in this Trust Agreement shall not be construed as a duty.

(b) The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee which are specifically required to be furnished pursuant to any provision of this Trust Agreement, shall examine them to determine whether they conform to the requirements of this Trust Agreement.  If any such instrument is found not to conform to the requirements of this Trust Agreement, the Trustee shall take action as it deems appropriate to have the instrument corrected, and if the instrument is not corrected to the Trustee's satisfaction, the Trustee will provide notice thereof to the Unitholders and the Credit Support Provider.

(c) No provision of this Trust Agreement shall be construed to relieve the Trustee from liability for its own gross negligent action or its own gross negligent failure to act or its own misconduct; provided, however, that:

(i) the duties and obligations of the Trustee shall be determined solely by the express terms of this Trust Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Trust Agreement, no implied covenants or obligations shall be read into this Trust Agreement against the Trustee and, in the absence of gross negligence or willful misconduct on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee that conform to the requirements of this Trust Agreement;

(ii) the Trustee shall not be personally liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts; and

(iii)    the Trustee shall not be required to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers under this Trust Agreement.

SECTION 9.02.    Certain Matters Affecting the Trustee.

(a) Except as otherwise provided in Section 9.01:

(i) the Trustee may request and rely upon and shall be protected in acting or refraining from acting upon any resolution, Officers' Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document reasonably believed by it to be genuine and to have been signed by the proper party or parties;

(ii) the Trustee may consult with counsel and any advice or Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered

or omitted by it under this Trust Agreement in good faith and in accordance with such advice or Opinion of Counsel;

(iii)      except for the duties and obligations of the Trustee expressly created by this Trust Agreement (which for avoidance of doubt shall include matters for which the Credit Support Provider is entitled to direct the Trustee hereunder and for which this Section 9.02(a)(iii) shall not apply) and under the Delaware Statutory Trust Act, the Trustee shall be under no obligation to exercise any of the discretionary trusts or powers vested in it by this Trust Agreement or to institute, conduct or defend any litigation thereunder or in relation thereto, at the request, order or direction of any of the Unitholders or the Credit Support Provider, pursuant to the terms of this Trust Agreement;

(iv) the Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized, or within the discretion, rights or powers conferred upon it by this Trust Agreement;

(v)  the Trustee shall not be bound to make any investigation into the facts of matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, approval, bond or other paper or document believed by it to be genuine;

(vi) the Trustee may execute any of the trusts or powers or perform any duties under this Trust Agreement either directly or by or through agents or attorneys or a custodian or administrative agent;

(vii)      the Trustee shall not be personally liable for any loss resulting from the investment of funds held in any Collection Account pursuant to Section 3.03 and in investments directed pursuant to Section 3.04;

(viii)      the Trustee shall not be deemed to have notice or knowledge of any matter unless a Responsible Officer assigned to and working in the Corporate Trust Office has actual knowledge thereof or unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the Units generally or this Trust Agreement;

(ix)      the Trustee shall have the power to reimburse itself for any unpaid Extraordinary Trust Expense actually incurred in accordance with the terms and conditions of this Trust Agreement prior to the distribution of funds or Trust Property to applicable Unitholders, and shall have a charging lien upon the Taxable Collection Account and Non-Taxable Collection Account to secure payment of its fees and expenses, including the reasonable fees and expenses of its counsel; provided, however, that in the event that it has been finally adjudicated by a court of competent jurisdiction, evidenced by a final non-appealable order that the Trustee engaged in gross negligence, material breach or willful misconduct, the Trustee shall not be entitled to reimbursement of any fees and expenses incurred in defending against such suits brought by the Credit Support Provider or the Unitholders; and

(x) the Trustee shall establish a Fee Reserve, which Fee Reserve shall be replenished up to the Fee Reserve Threshold Amount pro rata from the amounts in the Collection Account on each Distribution Date, and the Trustee shall be permitted to apply the amounts therein to pay fees and expenses of the Trust, including, without limitation the Trustee Fees, the Delaware Trustee Fees, Extraordinary Trust Expenses, and fees and expenses of the Accountant, and any other fees and expenses of the Trust in connection with tax obligations, as and when due.

(b) All rights of action under this Trust Agreement or under any of the Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Units, or the production thereof at the trial or other Proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Unitholders, subject to the terms of this Trust Agreement.

SECTION 9.03.   Limitation on Liability of Trustee.

The Trustee assumes no responsibility for the correctness of the recitals contained in this Trust Agreement, the Units, or in any document issued in connection with the sale of the Units (other than the signature and authentication on the Units if done by Trustee).  Except as set forth in Section 9.11, the Trustee makes no representations or warranties as to the validity or sufficiency of this Trust Agreement, the Units (other than the signature and authentication on the Units if done by Trustee), any security or of any related document.  The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in this Trust Agreement.

SECTION 9.04.   Trustee Fees and Expenses; Limited Indemnification.

(a) As compensation for its services and in payment of its expenses under this Trust Agreement (including the reasonable compensation, expenses and disbursements of its counsel for services hereunder) the Trustee shall be entitled to the Trustee Fees and the Delaware Trustee shall be entitled to the Delaware Trustee Fee (which shall not be limited by any provision of law in regard to compensation or payment of a trustee of an express trust).  For avoidance of doubt, ~~neither~~ the Depositor ~~nor the Issuer~~ shall not be responsible for the Trustee Fees or the Delaware Trustee Fee.

(b) The Trustee, the Delaware Trustee, the Calculation Agent and any director, officer, employee or agent of the Trustee, the Delaware Trustee, or the Calculation Agent shall be indemnified and held harmless by the Trust against any loss, liability or expense incurred in connection with any Proceeding relating to this Trust Agreement or the Units or the performance of any of the Trustee's duties, Delaware Trustee's duties, or the Calculation Agent's duties (as applicable) under this Trust Agreement, other than, (w) with respect to the Trustee, any loss, liability or expense (i) that constitutes a specific liability of the Trustee under this Trust Agreement or (ii) incurred by reason of willful misfeasance or gross negligence in the performance of the Trustee's duties hereunder, (x) with respect to the Delaware Trustee, any loss, liability or expense (i) that constitutes a specific liability of the Delaware Trustee under this Trust Agreement or (ii) incurred by reason of willful misfeasance or gross negligence in the

performance of the Delaware Trustee's duties hereunder (such loss, liability or expense, other than as described in clauses (w)(i) and (ii) and (x)(i) and (ii) of this sentence, "Extraordinary Trust Expense"), and (y) with respect to the Calculation Agent, any loss, liability or expense incurred by reason of willful misfeasance or gross negligence in the performance of the Calculation Agent's duties hereunder.

SECTION 9.05.   Eligibility Requirements for Trustee; Delaware Trustee.

(a) The Trustee hereunder shall at all times be a bank or other financial institution organized and doing business under the laws of any State or the United States, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $200,000,000 and subject to supervision or examination by Federal or State authority, and the long-term debt obligations of which are rated in one of the four highest categories assigned long-term debt obligations by each of S&P and Moody's or, notwithstanding such capital and surplus and rating requirements, is otherwise acceptable to the Credit Support Provider in its sole discretion.  If such bank or trust company publishes reports of conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such bank or trust company shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published.  In the event that at any time the Trustee shall cease to be eligible in accordance with the terms of this Section, the Trustee shall resign immediately in the manner and with the effect specified in Section 9.06.

(b) Any successor Delaware Trustee, however appointed, shall be a bank or trust company satisfying the requirements of Section 3807(a) of the Delaware Statutory Trust Act.  Any bank or trust company into which the Delaware Trustee may be merged or converted or with which it may be consolidated, or any bank or trust company resulting from any merger, conversion or consolidation to which such Delaware Trustee shall be a party, or any bank or trust company to which substantially all the corporate trust business of the Delaware Trustee may be transferred, shall, subject to the preceding sentence, be the Delaware Trustee under this Trust Agreement without further act.

SECTION 9.06.   Resignation or Removal of the Trustee, Delaware Trustee.

(a) The Trustee or the Delaware Trustee may at any time resign and be discharged from the Trust by giving written notice thereof to the Credit Support Provider, the Depositor, the Issuer and to all Unitholders. The Trustee or the Delaware Trustee may be removed and be discharged from the Trust upon the Credit Support Provider's written notice of removal to the Trustee, Delaware Trustee, Depositor, the Issuer and all Unitholders, or upon approval of the Directing Unitholders and written notice of removal to the Credit Support Provider to effectuate such removal on behalf of the Unitholders. Upon receiving such notice of resignation or removal, the Credit Support Provider shall as promptly as practicable (and in any event within 30 days after the date of such notice of resignation or removal) appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the resigning or removed Trustee and to the successor trustee.  A copy of such instrument shall be delivered to the Depositor, the Issuer and the Unitholders by the Credit Support Provider.  If no such successor trustee shall have been so appointed and have accepted appointment within 30 days after the giving of such

notice of resignation or removal, the resigning or removed Trustee or Delaware Trustee (as applicable) may petition any court of competent jurisdiction for the appointment of a successor trustee for the Units.  If at any time the Trustee shall cease to be eligible in accordance with the terms of Section 9.05 and shall fail to resign after written request therefor by the Credit Support Provider, or if at any time the Trustee shall become incapable of acting, shall have breached its obligations hereunder, or shall be adjudged bankrupt or insolvent, or a receiver or a conservator of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, or for any other reason as determined in the sole discretion of the Credit Support Provider, then the Credit Support Provider may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.  A copy of such instrument shall be delivered to the Depositor, the Issuer and the Unitholders by the Credit Support Provider.

(b) Any resignation or removal of the Trustee and appointment of a successor trustee pursuant to any of the terms of this Section shall not become effective until acceptance of appointment by the successor trustee as provided in Section 9.07.

SECTION 9.07.    Successor Trustee.

(a) Any successor trustee appointed as provided in Section 9.06 shall execute, acknowledge and deliver to its predecessor trustee and the Credit Support Provider, with a copy to the Depositor and the Issuer, an instrument accepting such appointment under this Trust Agreement, and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor under this Trust Agreement, with the like effect as if originally named as trustee in this Trust Agreement.  The predecessor trustee shall deliver to the successor trustee the Trust Property and all documents and statements held by it under this Trust Agreement, and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations. No successor trustee shall accept appointment as provided in this Section unless, at the time of such acceptance, such successor trustee shall be eligible under the terms of Section 9.05.

(b) Upon acceptance of appointment by a successor trustee as provided in this Section, the Trustee shall transmit notice of the succession of such trustee under this Trust Agreement to the Depositor, the Issuer and all Unitholders in the manner provided pursuant to Section 10.05.

SECTION 9.08.    Merger or Consolidation of Trustee.

Any bank or trust company into which the Trustee may be merged or converted or with which it may be consolidated or any bank or trust company resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any bank or trust company succeeding to the business of the Trustee, shall be the successor of the Trustee under this Trust Agreement, provided such bank or trust company shall be eligible under the terms of Section 9.05, without the execution or filing of any paper or any further act on the part of any of the parties to this Trust Agreement, anything in this Trust Agreement to the contrary notwithstanding.

SECTION 9.09.   Appointment of Co-Trustee.

(a) Notwithstanding any other terms of this Trust Agreement, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any party of the Trust Property may at the time be located, the Trustee shall have the power and shall execute and deliver all instruments to appoint one or more Persons approved by the Trustee to act as co-trustee or co-trustees, jointly with the Trustee, of all or any part of the Trust Property, and to vest in such Person or Persons, in such capacity, such title to the Trust Property, or any part thereof, and, subject to the other terms of this Section, such powers, duties, obligations, rights and trusts as the Trustee and the Credit Support Provider may consider necessary or desirable. The Trustee shall remain liable for the actions and omissions of the co-trustee unless and until such co-trustee under this Trust Agreement shall (1) meet the terms of eligibility as a successor trustee under Section 9.05 and (2) provide notice to the Depositor, the Issuer, the Unitholders and the Credit Support Provider of the appointment of a co-trustee or co-trustees in the manner provided pursuant to Section 10.05.

(b) In the case of any appointment of a co-trustee pursuant to this Section, all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such co-trustee jointly, except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed by the Trustee, the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to such Trust Property or any portion thereof in any such jurisdiction) shall be exercised and performed by such co-trustee at the direction of the Trustee.

(c) Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the co-trustees, as effectively as if given to each of them. Every instrument appointing any co-trustee shall refer to this Trust Agreement and the conditions of this Article IX. Each co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, jointly with the Trustee subject to all the terms of this Trust Agreement, specifically including every provision of this Trust Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee. Every such instrument shall be filed with the Trustee.

(d) Any co-trustee may, at any time, constitute the Trustee, its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Trust Agreement delegated pursuant to Section 9.09(c) to such co-trustee on its behalf and in its name. If any co-trustee shall become incapable of acting, resign or be removed by the Trustee, the Credit Support Provider or the Directing Unitholders, all its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

SECTION 9.10.   Appointment of Office or Agency.

The Units may be surrendered for registration of transfer or exchange, and presented for the final distribution with respect thereto, and notices and demands to or upon the Trustee in respect of the Units and this Trust Agreement, shall be served at the Corporate Trust Office.

SECTION 9.11.   <u>Representations and Warranties of Trustee and Delaware Trustee</u>.

(a) The Trustee represents and warrants that:

(i)  the Trustee is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or association;

(ii) the Trustee has full power, authority and right to execute, deliver and perform its duties and obligations under this Trust Agreement, and the Global Securities and the Certificates, and has taken all necessary action to authorize the execution, delivery and performance by it of this Trust Agreement, and the Global Securities and the Certificates;

(iii)      the execution and delivery of this Trust Agreement, and the Global Securities and the Certificates by the Trustee and its performance of and compliance with the terms of this Trust Agreement, and the Global Securities and the Certificates will not violate the Trustee's articles of incorporation, association or other constitutive documents or by-laws or constitute a default under, or result in the breach or acceleration of, any material contract, agreement or other instrument to which the Trustee is a party or which may be applicable to the Trustee or any of its assets;

(iv) as of the Closing Date, each of this Trust Agreement, and the Global Securities and the Certificates, has been duly executed and delivered by the Trustee, and this Trust Agreement constitutes the legal, valid and binding obligation of the Trustee, enforceable in accordance with its terms, except as enforcement may be limited by the applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and general principles of equity;

(v) the Trustee is not in violation, and the execution and delivery of this Trust Agreement, and the Global Securities and the Certificates, by the Trustee and its performance and compliance with respective terms of this Trust Agreement, and the Global Securities and the Certificates, will not constitute a violation, of any order or decree of any court or any order or regulation of any Federal, State, municipal or governmental agency having jurisdiction over the Trustee or its properties, which violation would reasonably be expected to have a material adverse effect on the condition (financial or otherwise) or operations of the Trustee or its properties, or on the performance of its duties thereunder;

(vi) there are no actions or proceedings against, or investigations of, the Trustee pending, or, to the knowledge of the Trustee, threatened, before any court, administrative agency or other tribunal (A) that could reasonably be expected to prohibit its entering into this Trust Agreement or to render the Units invalid, (B) seeking to prevent the issuance of the Global Securities and the Certificates, or the consummation of any of the transactions contemplated by this Trust Agreement or (C) that could reasonably be expected to prohibit or materially and adversely affect the performance by the Trustee of its obligations under, or the validity or enforceability of, this Trust Agreement, or the Global Securities and the Certificates; and

(vii)   no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Trustee of, or compliance by the Trustee with, this Trust Agreement, or the Global Securities and the Certificates, or for the consummation of the transactions contemplated by this Trust Agreement, except for such consents, approvals, authorizations and orders, if any, that have been obtained prior to the Closing Date.

(b)  The Delaware Trustee represents and warrants that:

(i)  the Delaware Trustee is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or association;

(ii) the Delaware Trustee has full power, authority and right to execute, deliver and perform its duties and obligations under this Trust Agreement, and has taken all necessary action to authorize the execution, delivery and performance by it of this Trust Agreement;

(iii)   the execution and delivery of this Trust Agreement, by the Delaware Trustee and its performance of and compliance with the terms of this Trust Agreement, will not violate the Delaware Trustee's articles of incorporation, association or other constitutive documents or by-laws or constitute a default under, or result in the breach or acceleration of, any material contract, agreement or other instrument to which the Delaware Trustee is a party or which may be applicable to the Delaware Trustee or any of its assets;

(iv) as of the Closing Date, this Trust Agreement has been duly executed and delivered by the Delaware Trustee, and this Trust Agreement constitutes the legal, valid and binding obligation of the Delaware Trustee, enforceable in accordance with its terms, except as enforcement may be limited by the applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and general principles of equity;

(v) the Delaware Trustee is not in violation, and the execution and delivery of this Trust Agreement by the Delaware Trustee and its performance and compliance with respective terms of this Trust Agreement, and the Global Securities and the Certificates, will not constitute a violation, of any order or decree of any court or any order or regulation of any Federal, State, municipal or governmental agency having jurisdiction over the Delaware Trustee or its properties, which violation would reasonably be expected to have a material adverse effect on the condition (financial or otherwise) or operations of the Delaware Trustee or its properties, or on the performance of its duties thereunder;

(vi) there are no actions or proceedings against, or investigations of, the Delaware Trustee pending, or, to the knowledge of the Delaware Trustee, threatened, before any court, administrative agency or other tribunal (A) that could reasonably be expected to prohibit its entering into this Trust Agreement or to render the Units invalid, (B) seeking to prevent the issuance of the Global Securities and the Certificates, or the consummation of any of the transactions contemplated by this Trust Agreement or (C) that could reasonably be expected to prohibit or materially and adversely affect the performance by the

Delaware Trustee of its obligations under, or the validity or enforceability of, this Trust Agreement, or the Global Securities and the Certificates; and

(vii)   no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Delaware Trustee of, or compliance by the Delaware Trustee with, this Trust Agreement, or for the consummation of the transactions contemplated by this Trust Agreement, except for such consents, approvals, authorizations and orders, if any, that have been obtained prior to the Closing Date.

(c)  Within thirty (30) days of the earlier of discovery by the Trustee or Delaware Trustee, or receipt of notice by the Trustee or Delaware Trustee from the Credit Support Provider or the Unitholders, of a breach of any representation or warranty of the Trustee  or Delaware Trustee set forth in this Section 9.11 that materially and adversely affects the interests of the Unitholders, the Trustee or the Delaware Trustee, as the case may be, shall promptly cure such breach in all material respects or resign.

SECTION 9.12.    Limitation of Powers and Duties.

(a) The Trust is constituted solely for the purposes of acquiring and holding the Trust Property and issuing the Global Securities and the Certificates.  The Trust shall not incur any debt and may not issue additional Units except in accordance with Sections 5.03 and 5.04 hereof. The Trustee is not authorized to acquire any other investments or engage in any activities not authorized in this Trust Agreement and, in particular, the Trustee is not authorized to sell, assign, transfer, exchange, pledge, set-off or otherwise dispose of any of the HTA Clawback CVIs, New HTA Bonds or interests therein, including to Unitholders (except upon termination of the Trust in accordance with Article VIII of this Trust Agreement and at the direction of the Credit Support Provider (including in accordance with Sections 6.02 and 6.03 hereof)).

(b) Without first obtaining an Opinion of Counsel to the effect that such action will not, for U.S. federal income tax purposes, cause any Sub-Trust to be taxable as other than a Grantor Trust with respect to any Units labelled "(Taxable)", or to be subject to entity level taxation with respect to any Units labelled "(Non-Taxable)", and ~~neither~~none of the Trust, any Sub-Trust, nor anyone acting on behalf of the Trust or any Sub-Trust (including, but not limited to, the Trustee and the Credit Support Provider) shall have the power or authority to, cause the Trust to:

(i)  exchange any portion of the Trust Property for other property following the date hereof, except as explicitly permitted by this Trust Agreement;

(ii) acquire any other property with, or otherwise reinvest, any distributions, income or proceeds received with respect to the Trust's investments, including any proceeds from the sale of any such investment, except as explicitly permitted by this Trust Agreement;

(iii)            accept any contributions of cash or property following the date hereof, except as explicitly permitted by this Trust Agreement;

(iv) agree to receive, or negotiate for, any financing with which to acquire any investments, except as explicitly permitted by this Trust Agreement;

(v) exercise any rights or otherwise take any action that could vary the Trust's investments including the Trust Property; or

(vi) otherwise acquire or agree to acquire, by contribution, purchase, exchange, borrowing, or otherwise, any cash or property following the date hereof.

For the avoidance of doubt, when acting pursuant to written direction provided under the provisions of this Trust Agreement, the Trustee shall be under no obligation to determine whether the action prescribed by such written direction satisfies the requirements of this Section 9.12(b) and shall rely solely on the information provided in the written direction with respect to such action.

(c) Notwithstanding anything to the contrary in Section 9.12(b), the Trust may exchange a certificate representing a Taxable Clawback CVI for a certificate representing a Non-Taxable Clawback CVI in connection with a re-characterization of Taxable Clawback CVIs as tax-exempt by Bond Counsel or the Internal Revenue Service, together with an Opinion of Counsel, provided that there are no other changes to the terms of such previously Taxable Clawback CVI.  In the event of such an exchange, the Trust and each Unitholder, by electing to receive Units (which constitute beneficial interests) in the Trust, and any assignee thereof, agree to treat such exchange as a nonrealization event for U.S. federal, state and local income tax purposes.

(d) [Reserved].

(e) Consistent with the terms of this Trust Agreement, the Trustee or the Credit Support Provider may amend, waive, consent to the departure from or modify any term of any Trust Property (a "Modification"), provided either (i) such Modification will not result in a "significant modification" (within the meaning of Treasury Regulation §1.1001-3) or otherwise results in the receipt of property or a change in legal rights that differs materially either in kind or in extent from such Trust Property for U.S. federal income tax purposes or (ii) the Trust obtains an Opinion of Counsel to the effect that such action will not, for U.S. federal income tax purposes, cause any Sub-Trust holding such Trust Property to be subject to entity level taxation. Without limiting the generality of the foregoing, Trustee shall continue, and is hereby authorized and empowered, to execute and deliver on behalf of itself, the Trust and any Sub-Trust, all instruments of satisfaction or cancellation, or of partial or full release, discharge and all other comparable instruments, with respect to the Trust Property.  The Trust shall, as necessary, promptly furnish Trustee with such powers of attorney as are necessary and appropriate and with such other documents as are necessary or appropriate to enable Trustee to carry out its duties under this Trust Agreement.

(f) Sections 9.12(b) and (c) are intended to ensure that ~~neither~~none of the Trust, any Sub-Trust nor anyone acting on behalf of the Trust or any Sub-Trust (including, but not limited to, the Trustee and the Credit Support Provider) has the power to vary any Sub-Trust's investments and Trust Property within the meaning of Treasury Regulations § 301.7701-4(c) unless such action would not cause the Sub-Trust to be subject to entity level taxation and shall be interpreted and applied consistently with such intent.

SECTION 9.13.   Power and Authority of the Delaware Trustee.

The Delaware Trustee shall have the power and authority, and is hereby authorized and empowered, to (a) accept legal process served on the Trust in the State of Delaware and (b) execute any certificates that are required to be executed under the Delaware Statutory Trust Act and file such certificates in the office of the Secretary of State, and take such action or refrain from taking such action under this Trust Agreement as may be directed in a writing delivered to the Delaware Trustee by the Credit Support Provider; provided, however, that the Delaware Trustee shall not be required to take or to refrain from taking any such action if the Delaware Trustee shall reasonably believe, or shall have been advised by competent counsel, that such performance is likely to involve the Delaware Trustee in personal liability or to result in personal liability to the Delaware Trustee, or is contrary to the terms of this Trust Agreement or of any document contemplated hereby to which the Trust or the Delaware Trustee is or becomes a party or is otherwise contrary to law.  The Credit Support Provider agrees not to instruct the Delaware Trustee to take any action or to refrain from taking any action that is contrary to the terms of this Trust Agreement or of any document contemplated hereby to which the Trust or the Delaware Trustee is or becomes party or that is otherwise contrary to law.  Other than as expressly provided for in this Trust Agreement, the Delaware Trustee shall have no duty to take any action for or on behalf of the Trust.

SECTION 9.14.   Delaware Trustee May Request Direction.

If at any time the Delaware Trustee determines that it requires or desires guidance regarding the application of any provision of this Trust Agreement or any other document, or regarding action that must or may be taken in connection herewith or therewith, or regarding compliance with any direction it received under this Trust Agreement, then the Delaware Trustee may deliver a notice to a court of applicable jurisdiction requesting written instructions as to the desired course of action, and such instructions from the court shall constitute full and complete authorization and protection for actions taken and other performance by the Delaware Trustee in reliance thereon.  Until the Delaware Trustee has received such instructions after delivering such notice, it shall be fully protected in refraining from taking any action with respect to the matters described in such notice.

SECTION 9.15.   Delaware Trustee's Capacity.

In accepting the trust hereby created, Wilmington Trust, N.A. acts solely as Delaware Trustee under this Trust Agreement and not in its individual capacity, serves the Trust solely to fulfill the Trust's obligation pursuant to Section 3807(a) of the Delaware Statutory Trust Act to have at least one trustee who has its principal place of business in the State of Delaware, and all Persons having any claim against the Delaware Trustee by reason of the transactions contemplated by this Trust Agreement or any other document shall look only to the Trust Property for payment or satisfaction thereof.  Notwithstanding any provision of this Trust Agreement or any other document to the contrary, under no circumstances shall Wilmington Trust, N.A., in its individual capacity or in its capacity as Delaware Trustee, (a) have any duty to choose or supervise, nor shall it have any liability for the actions or inactions of, the Trustee or any officer, manager, employee, or other Person (other than Wilmington Trust, N.A. and its own employees), or (b) be liable or responsible for, or obligated to perform, any contract, representation, warranty,

obligation or liability of the Trust, the Trustee, or any officer, manager, employee, or other Person (other than Wilmington Trust, N.A. and its own employees); provided, however, that this limitation shall not protect Wilmington Trust, N.A. against any liability to the Credit Support Provider or the Unitholders to which it would otherwise be subject by reason of its bad faith, willful misconduct, fraud, gross negligence in the performance of its duties under this Trust Agreement.

SECTION 9.16.   Duties.

NoneNeither of the Delaware Trustee, or any successor Delaware Trustee shall have any duty or obligation under or in connection with this Trust Agreement, the Trust, or any transaction or document contemplated by this Trust Agreement, except as expressly provided by the terms of this Trust Agreement and, except as set forth in the Delaware Statutory Trust Act, no implied duties or obligations shall be read into this Trust Agreement against the Delaware Trustee, Wilmington Trust, N.A. or any successor Delaware Trustee.  The right of the Delaware Trustee to perform any discretionary act enumerated in this Trust Agreement shall not be construed as a duty.  To the fullest extent permitted by applicable law, including, without limitation Section 3806 of the Delaware Statutory Trust Act, the Delaware Trustee's, Wilmington Trust, N.A.'s or any successor Delaware Trustee's duties (including fiduciary duties) and liabilities relating thereto to the Trust and the Unitholders shall be restricted to those duties (including fiduciary duties) expressly set forth in this Trust Agreement and liabilities relating thereto, or enumerated in the Delaware Statutory Trust Act.

SECTION 9.17.   Trustee.

There shall be, at all times, a trustee, which trustee initially shall be the Trustee (and may include any co-trustee appointed pursuant to Section 9.09), to serve with the Delaware Trustee for the purpose of performing all obligations and duties other than fulfilling the Trust's obligations pursuant to Section 3807(a) of the Delaware Statutory Trust Act including, but not limited to, executing any documentation that may require the signature of more than one trustee of the Trust.  The Trust hereby grants the Trustee the power to act and sign documents on behalf of the Trust pursuant to the terms of the Trust Agreement.

ARTICLE X

Miscellaneous Terms

SECTION 10.01.  Amendment of Trust Agreement.

(a) This Trust Agreement may be amended from time to time by the Credit Support Provider and the Trustee without the consent of any of the Unitholders or any other Person, for any of the following purposes:  (i) to cure any ambiguity or to correct, clarify or supplement any provision in this Trust Agreement which may be defective or inconsistent with any other provision in this Trust Agreement; (ii) to evidence and provide for the acceptance of appointment under this Trust Agreement by a successor Trustee; (iii) to add or change any of the terms of this Trust Agreement as shall be necessary to provide for or facilitate the administration of the Trust; or (iv) upon delivery of an Officers' Certificate of the Credit Support Provider or an Opinion of

Counsel, to the effect that such amendment will not adversely affect the interests of any Unitholder. Any amendment pursuant to clause (iii) above in connection with implementation of Section 3.01(d), (e) and (f) that includes creation of a new trust rather than a Sub-Trust requires delivery of an Opinion of Counsel that any resulting new trust should be classified as a Grantor Trust or should not be subject to entity level taxation. In addition, any Unitholder may, with the consent of the Credit Support Provider and notice to the Trustee, subdivide any Class of Units into sub-classes without the consent of any other Unitholder, with such information to be provided from each Unitholder electing to receive such sub-class to the Trustee as it may require to facilitate such subdivision. For avoidance of doubt, nothing in this Section 10.01(a) shall obligate the Trustee to act as Trustee with respect to any Class of Units that have been sub-divided hereunder, unless and until the Trustee agrees, and the Credit Support Provider and the Trustee agree to a supplemental fee (if any) with respect thereto. Notwithstanding anything herein to the contrary, no amendment shall be made to this Trust Agreement that would cause any Sub-Trust to be classified as other than a Grantor Trust for U.S. federal income tax purposes unless such amendment would not cause the Sub-Trust to be subject to entity level taxation.

(b) Promptly after the execution of any such amendment or modification, the Trustee shall furnish a copy of such amendment or modification to each Unitholder, and the Depositor and the Issuer.

(c) This Trust Agreement may also be amended from time to time by the Credit Support Provider and the Trustee (in the case of the Trustee, acting with the consent of the Directing Unitholders) for any purpose not set forth in Section 10.01(a); provided, however, that no amendment shall, without the written consent of the Depositor, amend provisions of this Trust Agreement relating to the rights and obligations of the Depositor; provided however, that no amendment shall, without the written consent of the Issuer, amend provisions of this Trust Agreement relating to the rights, and the obligations of the CVI Issuer; provided further however, that no amendment shall, without the written consent of the Credit Support Provider, amend provisions of this Trust Agreement relating to the rights and obligations of the Credit Support Provider (including upon an occurrence and continuation of the Credit Support Provider's failure to pay under Section 4.01(h) hereof); provided further, that no amendment shall, without the written consent of the Calculation Agent, amend provisions of this Trust Agreement relating to the obligations of the Calculation Agent; provided further, that no amendment shall be made pursuant to this Section 10.01(c) unless the Trust receives an Opinion of Counsel that such amendment should not cause any Sub-Trust to be subject to entity level taxation.

SECTION 10.02. Counterparts.

This Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

SECTION 10.03. Limitation on Rights of Unitholders.

(a) The death or incapacity of any Unitholder shall not operate to dissolve or terminate this Trust Agreement or affect the Trust Property, nor entitle such Unitholder's legal representatives

or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust Property, nor otherwise affect the rights, obligations and liabilities of the parties thereto or any of them.

(b) No Unitholder shall have any right to control the operation and management of the Trust or any Trust Property, or the obligations of the parties thereto, nor shall anything in this Trust Agreement set forth, or contained in the terms of the Units, be construed so as to constitute the Unitholders from time to time as anything other than beneficial owners in the Trust; nor shall any Unitholder be under any liability to any third person by reason of any action taken by the parties to this Trust Agreement pursuant to any provision thereof.

(c) No Unitholder shall have any right by virtue of any provision of this Trust Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Trust Agreement.

SECTION 10.04.  <u>Governing Law</u>.

This Trust Agreement and each Unit issued thereunder shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely therein without reference to such State's principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby, and the obligations, rights and remedies of the parties thereunder shall be determined in accordance with such laws. Notwithstanding the foregoing, there shall not be applicable to the Trust, the parties hereunder, or this Trust Agreement any provision of the laws (common or statutory) of the State of Delaware pertaining to trusts (other than the Delaware Statutory Trust Act) that relate to or regulate, in a manner inconsistent with the terms hereof, (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding or investing trust assets, or (g) the establishment of fiduciary or other standards of responsibility or limitations on the acts or powers of trustees that are inconsistent with the limitations or authorities and powers set  forth in this Trust Agreement. Section 3540 of title 12 of the Delaware Code shall not apply to the Trust.

SECTION 10.05.  <u>Notices</u>.

All directions, demands and notices under this Trust Agreement shall be in writing and shall be delivered to the offices of the Trustee and the Delaware Trustee specified below.  Any notice required to be given to a Unitholder, in the case of Global Securities, will be transmitted to the Depositary in accordance with its procedures and in the case of Certificates, if applicable, will be given by facsimile to such number or by electronic mail at such address as may be provided to the Trustee.  Any notice so mailed within the time prescribed in this Trust Agreement shall be conclusively presumed to have been duly given when given or mailed, whether or not the

Unitholder receives such notice.   Notices given by ~~facsimile~~e-mail will be effective upon confirmation (including electronic confirmation) of effective transmission.

**Trustee:**

Wilmington Trust, N.A.
350 Park Avenue, 9th Floor
New York, NY 10022
Attention: Joseph Clark, Vice President
Telephone: (212) 941-4439
E-mail: jhclark@wilmingtontrust.com

**Delaware Trustee:**

Wilmington Trust, N.A.
1100 North Market Street
Wilmington, DE 19890
Attention: David B. Young, Vice President
Telephone: (302) 636-5216
E-mail: dyoung@wilmingtontrust.com

SECTION 10.06.  <u>Severability of Terms</u>.

If any one or more of the covenants, agreements or terms of this Trust Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements or terms shall be deemed severable from the remaining covenants, agreements or terms of this Trust Agreement and shall in no way affect the validity or enforceability of the other terms of this Trust Agreement or of the Units, or the rights of the Unitholders thereof or the parties hereto.

SECTION 10.07.  <u>Notice to Credit Support Provider</u>.

(a) In addition to notices required to be provided elsewhere under this Trust Agreement, the Trustee shall promptly provide notice to the Credit Support Provider with respect to each of the following of which it has actual knowledge:

(i)  the resignation or termination of the Trustee;

(ii) all payments to Unitholders; and

(iii)     any change in the location of the Collection Account.

In addition, the Trustee shall promptly furnish to the Credit Support Provider copies of each report to Unitholders described in Section 4.02.  Any notices to be given to the Credit Support Provider pursuant to this Trust Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, emailed or mailed by first class mail, postage prepaid, return receipt requested, or by express delivery service to the Credit Support Provider as specified

below, or at such other address as the Credit Support Provider shall have most recently specified to the Trustee in writing.

**Credit Support Provider:**

Ambac Assurance Corporation
One World Trade Center, 41st Floor
New York, NY 10007
Attention: Chief Risk Officer
Telephone: (212) 658-7470
E-mail:  dbarranco@ambac.com

With a copy to General Counsel
Email: sksenak@ambac.com
With a copy to: notices@ambac.com

(b) The Trustee shall promptly provide the Credit Support Provider with any additional information requested by the Credit Support Provider with respect to the Trust or the Trust Property.  Further, as necessary, the Trustee shall request from HTA such information as the Credit Support Provider reasonably requests related to the HTA Clawback CVIs, the New HTA Bonds and HTA, and shall thereafter provide such information to the Credit Support Provider. The Trustee shall, upon request of the Credit Support Provider, provide an accounting of the Trust Property.

SECTION 10.08.  <u>No Recourse</u>.

Each Unitholder by accepting a Unit acknowledges that such Unitholder's Units represent interests in the Trust only and do not represent interests in or obligations of the Trustee, the Credit Support Provider, other than the Credit Support, the Depositor, the Issuer or any Affiliate of the foregoing Persons and no recourse may be had against such Persons or their respective assets, except as may be expressly set forth in this Trust Agreement, the Credit Support or the Units.

SECTION 10.09.  <u>Third Party Beneficiary</u>.

Each party hereto hereby acknowledges that the Credit Support Provider shall be a third-party beneficiary of this Trust Agreement, entitled to enforce the provisions hereof as if a party hereto.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed by their respective officers thereunto duly authorized as of the date first above written.

Wilmington Trust, N.A., not individually, but solely in its capacity as Trustee

By _____
     Name: Joseph Clark
     Title:  Vice President

Wilmington Trust, N.A., not individually, but solely in its capacity as Delaware Trustee

By _____
     Name:  David B. Young
     Title:   Vice President

Puerto Rico Highways and Transportation Authority, as Depositor

By _____
     Name:  Edwin E. Gonzalez-Montalvo
     Title:  Executive Director

Acknowledging and Agreeing to the Calculation Agent obligations and to provisions related to the Credit Support by Ambac Assurance Corporation

By _____
     Name:  David P. Barranco
     Title:   Senior Managing Director

Acknowledging and Agreeing to the provisions
relating to the Issuer by the Commonwealth of
Puerto Rico

By _____
    Name:
    Title:

## **EXHIBIT E**

Assured Custodial Trust Documents

**STANDARD TERMS**

**TO**

**TRUST AGREEMENT**

Autoridad de Carreteras y Transportación de Puerto Rico, whose name in English is
PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY, as
Depositor,

ASSURED GUARANTY CORP.,

ASSURED GUARANTY MUNICIPAL CORP.,

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
as Trustee,

and

U.S. BANK TRUST NATIONAL ASSOCIATION,
as Delaware Trustee,

Custodial Trust Units

Dated as of December [●], 2022

# TABLE OF CONTENTS

**Page**

RECITALS ................................................................................................................ 1

STANDARD PROVISIONS ..................................................................................... 1

ARTICLE I  DEFINITIONS ...................................................................................... 1
    Section 1.01.    Defined Terms. ..........................................................................1
    Section 1.02.    Other Definitional Provisions. ....................................................15

ARTICLE II  TRUST ESTATE .................................................................................. 15
    Section 2.01.    Trust Assets..................................................................................15
    Section 2.02.    Acceptance by the Trustee............................................................20
    Section 2.03.    Purpose, Activities of the Trust. ..................................................20
    Section 2.04.    Limitations of the Trust. ..............................................................21
    Section 2.05.    Voting Rights................................................................................22

ARTICLE III  ADMINISTRATION OF THE TRUST ............................................ 22
    Section 3.01.    Accounts. .....................................................................................22
    Section 3.02.    Distributions; Prior to Maturity Date or in Connection with
                         Assured Advancement Option. ...................................................24
    Section 3.03.    Assured Advancement Option. ....................................................27
    Section 3.04.    Sale of New Securities. ................................................................28
    Section 3.05.    Adjustments to Principal Amounts and Compounded
                         Amounts.......................................................................................29
    Section 3.06.    Payments on Assured Insurance Policies.....................................31
    Section 3.07.    Exchange of Trust Units for Trust Assets.....................................33
    Section 3.08.    Payments at Maturity Date............................................................33

ARTICLE IV  REPORTING/REMITTING TO TRUST UNIT HOLDERS.................. 35
    Section 4.01.    Statements to Trust Unit Holders.................................................35
    Section 4.02.    Compliance with Withholding Requirements...............................35

ARTICLE V  TRUST UNITS ..................................................................................... 36
    Section 5.01.    The Trust Units. ...........................................................................36
    Section 5.02.    Book-Entry Trust Units.................................................................37
    Section 5.03.    Registration of and Limitation on Transfers and Exchanges
                         of Units.........................................................................................37
    Section 5.04.    No Obligation to Register.............................................................38
    Section 5.05.    Mutilated, Destroyed, Lost or Stolen Units. ................................38
    Section 5.06.    Persons Deemed Owners. .............................................................39
    Section 5.07.    Appointment of Trust Unit Paying Agent.....................................39

i

# TABLE OF CONTENTS
## (continued)

Page

ARTICLE VI  CONCERNING THE TRUSTEE ............................................................. 39
    Section 6.01.    Duties of Trustee .......................................................... 39
    Section 6.02.    Certain Matters Affecting the Trustee. ......................... 40
    Section 6.03.    Trustee Not Liable for Trust Units or Securities. .......... 43
    Section 6.04.    Trustee May Own Units. ................................................ 43
    Section 6.05.    Trustee's Fees and Expenses. ........................................ 43
    Section 6.06.    Eligibility Requirements for Trustee, Successor Trustee,
                  and Trust Unit Paying Agent. ................................... 45
    Section 6.07.    Resignation and Removal of the Trustee. ..................... 45
    Section 6.08.    Successor Trustee .......................................................... 46
    Section 6.09.    Merger or Consolidation of Trustee .............................. 47
    Section 6.10.    Reserved ........................................................................ 47
    Section 6.11.    Appointment of Custodians. .......................................... 47
    Section 6.12.    Trustee May Enforce Claims Without Possession of Trust
                  Units. ........................................................................ 47
    Section 6.13.    Trustee Indemnity ......................................................... 47

ARTICLE VII  TERMINATION OF TRUST ............................................................... 48
    Section 7.01.    Termination; No Redemption Rights. ............................ 48
    Section 7.02.    Procedure for Termination. ............................................ 48

ARTICLE VIII  TAX PROVISIONS ............................................................................. 49
    Section 8.01.    Grantor Trust Provisions ............................................... 49
    Section 8.02.    Characterization. ............................................................ 50
    Section 8.03.    Grantor Trust Administration. ....................................... 50
    Section 8.04.    Reports to Trust Unit Holders and Tax Authorities ...... 50

ARTICLE IX  MISCELLANEOUS PROVISIONS ....................................................... 52
    Section 9.01.    Amendment of Trust Agreement. .................................. 52
    Section 9.02.    Counterparts; Electronic Signatures. ............................. 53
    Section 9.03.    Limitation on Rights of Trust Unit Holders .................. 54
    Section 9.04.    Notices. ......................................................................... 55
    Section 9.05.    Severability of Provisions. ............................................ 56
    Section 9.06.    Third-Party Beneficiaries. ............................................. 56
    Section 9.07.    Acts of Trust Unit Holders ............................................ 56
    Section 9.08.    Headings. ....................................................................... 56
    Section 9.09.    No Waiver; Cumulative Remedies. ............................... 56
    Section 9.10.    Merger and Integration. ................................................. 57
    Section 9.11.    The Delaware Trustee .................................................... 57
    Section 9.12.    Timing of Distributions and other Trust Actions .......... 58

## RECITALS

Autoridad de Carreteras y Transportación de Puerto Rico, whose name in English is PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY ("HTA" or the "Depositor"), and ASSURED GUARANTY CORP. and ASSURED GUARANTY MUNICIPAL CORP. (together or individually, as applicable, "Assured") have entered into a Trust Agreement (the "Trust Agreement") with U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, a national banking association, as trustee (the "Trustee") and U.S. BANK TRUST NATIONAL ASSOCIATION, a national banking association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, the "Trustees"), which Trust Agreement provides for the issuance of trust units ("Trust Units"), each evidencing a beneficial ownership interest in the property owned by the Trust created by the Trust Agreement.  These Standard Terms are a part of, and are incorporated by reference into, the Trust Agreement.

## STANDARD PROVISIONS

NOW, THEREFORE, in consideration of the mutual promises, covenants, representations and warranties made in the Trust Agreement, the Depositor, Assured and the Trustees agree as follows:

## ARTICLE I

## DEFINITIONS

**Section 1.01.   *Defined Terms.***

Except as otherwise specified herein or in the Trust Agreement or as the context may otherwise require, whenever used herein, the following words and phrases shall have the meanings specified in this Article.  Capitalized words and phrases used herein but not defined herein shall, when applied to a Trust, have the meanings set forth in or pursuant to the Trust Agreement.

"**Acceleration Price**": With respect to an Assured Legacy Bond, an amount equal to the outstanding principal amount of such bond plus the accrued and unpaid interest thereon.

"**Accreted Value**": As defined in the New HTA Bonds Indenture.

"**Adverse Trust Event**": has the meaning set forth in Section 8.03 hereof.

"**Affiliate**": Any person or entity controlling, controlled by or under common control with the Depositor, Assured or either of the Trustees, as the context may require.  "Control" means the power to direct the management and policies of a person or entity, directly or indirectly, whether through ownership of voting securities, by contract or otherwise. "Controlling" and "controlled" shall have meanings correlative to the foregoing.

"**AGC Assured Legacy Bonds CUSIP**": An AGC Primary Market Assured Legacy Bonds CUSIP or AGC Secondary Market Assured Legacy Bonds CUSIP, as applicable.

1

"**AGC Double-Insured Custody Receipt**": A custody receipt evidencing a beneficial interest in the Assured Insured Bonds underlying an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP and the related AGC Insurance Policy.

"**AGC Double-Insured Custody Receipt (Complete)**": An AGC Double-Insured Custody Receipt evidencing a beneficial interest in the Assured Insured Bonds underlying an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Complete) and the related AGC Insurance Policy.

"**AGC Insurance Policy**": An Assured Insurance Policy issued by AGC.

"**AGC Insurance Policy SM-2007-267 Payments Account**": As defined in Section 3.01(d)(ii) hereof.

"**AGC Primary Market Assured Legacy Bond**": An Assured Legacy Bond insured by AGC in the primary market.

"**AGC Primary Market Assured Legacy Bonds CUSIP**": An Assured Legacy Bonds CUSIP insured by AGC in the primary market.

"**AGC Secondary Market Assured Legacy Bond**": An Assured Legacy Bond insured by AGC in the secondary market.

"**AGC Secondary Market Assured Legacy Bonds CUSIP**": A Secondary Market Assured Legacy Bonds CUSIP insured by AGC in the secondary market.

"**AGC Trust**": The Trust for an AGC Primary Market Assured Legacy Bonds CUSIP or AGC Secondary Market Assured Legacy Bonds CUSIP, as applicable.

"**AGC Trustee**": The Trustee for an AGC Trust.

"**AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP**": Secondary Market Assured Legacy Bonds CUSIP 745190R75, which evidences a beneficial ownership interest in (i) AGC Primary Market Assured Legacy Bonds having CUSIP 745190UR7 and related AGC Insurance Policy CIFGNA-562, and (ii) AGC Insurance Policy SM-2007-267, issued in the secondary market.

"**AGC-AGC Double-Insured Trust**": The Trust for AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190R75.

"**AGC-AGC Double-Insured Trustee**":  The Trustee for the AGC-AGC Double-Insured Trust.

"**AGC-AGC Double-Insured Trust Unit**": A Trust Unit issued by the AGC-AGC Double-Insured Trust.

"**AGM Double-Insured Custody Receipt**": A custody receipt evidencing a beneficial interest in an AGC Double-Insured Custody Receipt and the related AGM Double-Insured Insurance Policy.

"**AGM Double-Insured Custody Receipt (Complete)**": An AGM Double-Insured Custody Receipt evidencing a beneficial interest in an AGC Double-Insured Custody Receipt (Complete) and the related AGM Double-Insured Insurance Policy (Complete).

"**AGM Double-Insured Insurance Policy**": An Assured Insurance Policy issued by AGM and insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

"**AGM Double-Insured Insurance Policy (Complete)**": An AGM Double-Insured Insurance Policy insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Complete).

"**AGM Double-Insured Insurance Policy (Partial)**": An AGM Double-Insured Insurance Policy insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial).

"**AGM Double-Insured Insurance Policy Payments Account**": As defined in Section 3.01(c)(ii) hereof.

"**AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP**": A Secondary Market Assured Legacy Bonds CUSIP insured by AGM in the secondary market that relates to underlying Assured Legacy Bonds that are also insured by AGC in the primary or secondary market, consisting of (i) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190M70 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745190M54 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy), (ii) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190M88 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745190M62 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy), (iii) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190Q27 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745190E87 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy), (iv) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190R67 (evidencing a beneficial ownership interest in (x) AGC Primary Market Assured Legacy Bonds having CUSIP 745190ZR2 and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy), and (v) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190P51 (evidencing a beneficial ownership interest in (x) AGC Primary Market Assured Legacy Bonds having CUSIP 745190ZS0 and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy).

3

"**AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Complete)**": An AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP with respect to which all underlying Assured Legacy Bonds insured by an AGC Insurance Policy are also insured by the applicable AGM Double-Insured Insurance Policy, consisting of (i) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190M70 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745190M54 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds  and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy), (ii) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190M88 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745190M62 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy), and (iii) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190Q27 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745190E87 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy).

"**AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial)**": An AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP with respect to which only a portion of the underlying Assured Legacy Bonds insured by an AGC Insurance Policy are also insured by the applicable AGM Double-Insured Insurance Policy, consisting of (i) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190R67 (evidencing a beneficial ownership interest in (x) AGC Primary Market Assured Legacy Bonds having CUSIP 745190ZR2 and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy) and (ii) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190P51 (evidencing a beneficial ownership interest in (x) AGC Primary Market Assured Legacy Bonds having CUSIP 745190ZS0 and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy).

"**AGM Double-Insured Trust**": The Trust for an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

"**AGM Double-Insured Trust (Complete)**": The Trust for an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Complete), which, for the avoidance of doubt, shall be the Trust for the relevant Assured Legacy Bonds CUSIP (Combined).

"**AGM Double-Insured Trust (Partial)**": The AGM Double-Insured Trust for an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial).

"**AGM Double-Insured Trustee**": The Trustee for an AGM Double-Insured Trust.

"**AGM Double-Insured Trustee (Complete)**": The Trustee for an AGM Double-Insured Trust (Complete), which, for the avoidance of doubt, shall be the Trustee for the relevant Assured Legacy Bonds CUSIP (Combined).

"**AGM Double-Insured Trustee (Partial)**": The Trustee for an AGM Double-Insured Trust (Partial).

"**AGM Double-Insured Trust Unit (Partial)**": A Trust Unit issued by an AGM Double-Insured Trust (Partial).

"**AGM Secondary Market Assured Legacy Bonds CUSIP**": A Secondary Market Assured Legacy Bonds CUSIP insured by AGM in the secondary market.

"**Assured Acceleration Option**": Assured's right, in accordance with the terms of the Assured Insurance Policies and Section 26.1 of the HTA Plan, to elect to discharge its payment obligations with respect to any Assured Legacy Bonds CUSIP prior to the stated Maturity Date thereof by paying the applicable Acceleration Price to the holders thereof.

"**Assured Advancement Option**": Either (a) the Assured Acceleration Option or (b) the rights assigned by HTA to Assured pursuant to Section 26.1(d) of the HTA Plan to redeem and call the Assured Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Assured as if it were HTA for such purpose, and any amounts due in connection with such redemption shall be equal to the lesser of the applicable redemption price and the Acceleration Price.

"**Assured Bondholder Election 2**": As defined in the HTA Plan.

"**Assured Deferred Expenses**": Any Trustee Costs or Trust expenses paid in cash to the Trustee or the Trust by Assured.

"**Assured Insurance Policies**": The insurance policies, including insurance policies issued in the secondary market, pursuant to which Assured insured payments of principal and interest with respect to the Assured Legacy Bonds. In the event an Assured Insurance Policy must be deposited into more than one Trust, such Assured Insurance Policy shall be allocated among the applicable Trusts as if it were a separate policy for all purposes.

"**Assured Insured Bonds**": As defined in the HTA Plan.

"**Assured Insurer Event**": A default by Assured on its payment obligations under an applicable Assured Insurance Policy, which default is continuing.

"**Assured Legacy Bondholder**": The beneficial holder of an Assured Legacy Bond.

"**Assured Legacy Bond**": Any Assured Insured Bond the beneficial holder of which has validly elected, or is deemed to have elected, Assured Bondholder Election 2.

"**Assured Legacy Bonds CUSIP**": Any maturity of Assured Legacy Bonds that bears a unique CUSIP such that such maturity of Assured Legacy Bonds is separately identifiable from other maturities of Assured Legacy Bonds with unique CUSIPs; provided, however, that for all Secondary Market Assured Legacy Bonds, the "Assured Legacy Bonds CUSIP" for purposes of this Trust Agreement shall be the CUSIP of the related custody receipt evidencing a beneficial interest in such Secondary Market Assured Legacy Bonds and the related Assured

5

Insurance Policy rather than the CUSIP of the underlying Secondary Market Assured Legacy Bonds; provided, further, that for purposes of this Agreement (other than this Article I of the Standard Terms), in the case of any AGC Double-Insured Custody Receipt (Complete) and the related AGM Double-Insured Custody Receipt (Complete), the applicable Assured Legacy Bonds CUSIP (Combined) shall be treated as a single Assured Legacy Bonds CUSIP corresponding to a single Trust.  For the avoidance of doubt, each Assured Legacy Bonds CUSIP is either a Primary Market Assured Legacy Bonds CUSIP or a Secondary Market Assured Legacy Bonds CUSIP, and the Assured Legacy Bonds CUSIPs consist of (i) Primary Market Assured Legacy Bonds CUSIPs 745181C54, 745181C62, 745181C70, 745181C88, 745190HJ0, 745190UR7, 745190ZR2, and 745190ZS0 and (ii) Secondary Market Assured Legacy Bonds CUSIPs 745181D38, 745181F77, 745181D53, 745181D46, 745181F85, 745190R75, 745190M54, 745190M70, 745190M62, 745190M88, 745190E87, 745190Q27, 745190R67, 745190P51, 745190Y69, and 745190Z43.

"**Assured Legacy Bonds CUSIP (Combined)**":  In the case of any AGC Double-Insured Custody Receipt (Complete) and the related AGM Double-Insured Custody Receipt (Complete), together, (i) the CUSIP of the applicable AGC Double-Insured Custody Receipt (Complete) and (ii) the CUSIP of the related AGM Double-Insured Custody Receipt (Complete), which CUSIPs, together, shall be treated as a single Assured Legacy Bonds CUSIP and Secondary Market Assured Legacy Bonds CUSIP for purposes of this Trust Agreement (other than this Article I of the Standard Terms).  For the avoidance of doubt, the Assured Legacy Bond CUSIPs (Combined) consist of (i) 745190M70/745190M54, (ii) 745190M88/745190M62, and (iii) 745190Q27/745190E87.

"**Assured Reimbursement Amount**": An amount sufficient to reimburse Assured for all payments made by Assured under an Assured Insurance Policy for a particular Assured Legacy Bonds CUSIP or Assured Legacy Bonds CUSIP (Combined), as applicable, and payment of which to Assured shall be a requirement of the Unit Exchange Election.

"**Bankruptcy Code**": Title 11 of the United States Code, solely to the extent incorporated into PROMESA.

"**Beneficial Owner**": (i) With respect to any Book-Entry Trust Unit, the Person who is registered as owner of that Trust Unit in the books of the Depository for that Trust Unit or in the books of a Depository Participant, or in the books of an indirect participant for which a Depository Participant acts as agent; (ii) with respect to any Non-Book-Entry AGC Trust Unit held by an AGM Double-Insured Trust (Partial), the AGM Double-Insured Trustee (Partial) for such AGM Double-Insured Trust (Partial); (iii) with respect to any Non-Book-Entry AGC Trust Unit held by the AGC-AGC Double-Insured Trust, the AGC-AGC Double-Insured Trustee; and (iv) with respect to any Non-Book-Entry AGC Trust Unit not held by an AGM Double-Insured Trust (Partial), (a) the Person registered as the owner of such Trust Unit in the Unit Register or (b), to the extent such Non-Book-Entry AGC Trust Unit is held in trust by the Person registered as the owner of such Trust Unit in the Unit Register, the Person for whose benefit such Non-Book-Entry AGC Trust Unit is held in trust.

"**Bond Documents**": The bond resolutions, indentures, trust agreements, or similar agreements pursuant to which (i) the Assured Legacy Bonds and (ii) the New HTA Bonds were issued.

"**Bond Election**": As defined in <u>Section 3.04(b)</u> hereof.

"**Bond Sale**": As defined in <u>Section 3.04(a)</u> hereof.

"**Bonds**": Collectively, (i) the HTA Bonds and (ii) the New HTA Bonds.

"**Book-Entry Trust Units**": All Trust Units, other than the Non-Book-Entry AGC Trust Units.

"**Business Day**": Any day that is not a Saturday, Sunday, holiday, or other day on which commercial banking institutions in the City of New York, the city of San Juan, Puerto Rico or the State of Delaware or, if different, the city and state in which the Corporate Trust Office is located are authorized or obligated by law or executive order to be closed.

"**Capital Appreciation Bond**": An Assured Legacy Bond that is a capital appreciation bond.

"**Cash Account**": As defined in <u>Section 3.01(a)(iii)</u> hereof.

"**Cash Proceeds**": As defined in <u>Section 3.04(b)</u> hereof.

"**Clawback Structuring Fees**": The payments to which Assured is entitled pursuant to Section 86.1(b)(xvi) of the Commonwealth Plan, decretal paragraph 54 of the Commonwealth Confirmation Order, and any related provision of the HTA Plan or HTA Confirmation Order.

"**Code**": The Internal Revenue Code of 1986, as amended.

"**Commonwealth Confirmation Order**": The *Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority*, Case No. 17-03284-LTS, ECF No. 19813.

"**Commonwealth Plan**": The Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., Case No. 17-03284-LTS, ECF No. 19784, including as amended or superseded, but in all events solely to the extent in form and substance reasonably satisfactory to Assured and otherwise consistent with the Commonwealth PSA and HTA/CCDA PSA.

"**Commonwealth PSA**": That certain Amended and Restated Plan Support agreement, dated as of July 12, 2021, by and among (a) the Financial Oversight and Management Board for Puerto Rico and (b) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to GO Bonds and PBA Bonds, among other parties, including as amended or superseded, but

7

in all events only to the extent Assured remains a party thereto and has not terminated such agreement.

"**Compounded Amount**": With respect to any Capital Appreciation Bond, the compounded amount thereof.

"**Corporate Trust Office**": The respective principal corporate trust office of the Trustees at which the Trust is administered from time to time.

"**Current Interest Bond**": An Assured Legacy Bond that is a current interest bond.

"**Custodian**": The Trustee or the agent for the Trustee which shall hold all or a portion of the Trust Estate, or documents relating thereto, with respect to a specific Trust.

"**Depository**": The Depository Trust Company, or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Securities Exchange Act of 1934 and the regulations of the SEC thereunder.

"**Depository Participant**": A broker, dealer, bank, other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

"**Distribution**": Any distribution to Trust Unit Holders made pursuant to Section 3.02; provided, however, that, for purposes of Section 3.05 hereof, if a Distribution on a Non-Book-Entry Double-Insured AGC Trust Unit is subsequently passed through to an AGM Double-Insured Trust (Partial) and distributed as a Distribution on an AGM Double-Insured Trust Unit (Partial), such Distributions from the applicable AGC Trust and the related AGM Double-Insured Trust (Partial) shall constitute a single Distribution (with no double counting) for purposes of calculating amounts that remain outstanding with respect to the Assured Legacy Bonds held by the applicable AGC Trust and insured by the related AGM Double-Insured Insurance Policy (Partial); and provided, further, that for purposes of Section 3.05 hereof, if a Distribution made by the AGC Trust for CUSIP 745190UR7 on a Non-Book-Entry Double-Insured AGC Trust Unit is subsequently passed through to the AGC-AGC Double-Insured Trust and distributed as a Distribution on an AGC-AGC Double-Insured Trust Unit, such Distributions from the AGC Trust for CUSIP 745190UR7 and the AGC-AGC Double-Insured Trust shall constitute a single Distribution (with no double counting) for purposes of calculating amounts that remain outstanding with respect to the Assured Legacy Bonds held by the AGC Trust for CUSIP 745190UR7 and insured by AGC Insurance Policy CIFGNA-562 and AGC Insurance Policy SM-2007-267.

"**Effective Date**": The "HTA Effective Date" as defined in the HTA Plan and identified in a public notice by the Oversight Board; provided, however, that any action required by this Trust Agreement to be taken or event required by this Trust Agreement to have occurred on the Effective Date shall be deemed to have been taken or to have occurred on the Effective Date if such action is taken or such event occurs within ten (10) Business Days of the Effective Date.

"**EMMA**": The Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board, or, if not available for the purposes provided herein, a website specified by the Trustee. Any obligation to post a document to EMMA shall be understood as an obligation to post such document under the CUSIP for each Trust Unit to which such document relates.

"**Extraordinary Expenses**":  As defined in Section 6.05(b) hereof.

"**Fee Agreement**": The fee and indemnification agreement dated as of the date hereof providing for the Trustees' recovery from or reimbursement by Assured of certain reasonable compensation, certain reasonable expenses, costs, and disbursements, certain Extraordinary Expenses and certain indemnification payments.

"**FGIC**": Financial Guaranty Insurance Company.

"**FGIC Certificates**": As defined in the HTA Plan.

"**FGIC Certificates Account**": As defined in Section 3.01(b)(i) hereof.

"**FGIC Insurance Policies**": As defined in the HTA Plan.

"**FGIC Insured Bonds**": As defined in the HTA Plan.

"**FGIC Insured Bonds Insurance Policy Payments Account**": As defined in Section 3.01(b)(ii) hereof.

"**FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP**":  A Secondary Market Assured Legacy Bonds CUSIP with respect to which the underlying Secondary Market Assured Legacy Bonds are insured by FGIC in the primary market, consisting of (i) Secondary Market Assured Legacy Bonds CUSIP 745190Y69 (evidencing a beneficial ownership interest in (x) underlying Secondary Market Assured Legacy Bonds with CUSIP number 745190ZT8 insured by FGIC in the primary market and (y) the related Assured Insurance Policy) and (ii) Secondary Market Assured Legacy Bonds CUSIP 745190Z43 (evidencing a beneficial ownership interest in (x) underlying Secondary Market Assured Legacy Bonds with CUSIP number 745190ZT8 insured by FGIC in the primary market and (y) the related Assured Insurance Policy).

"**FGIC Plan Consideration**": As defined in the HTA Plan.

"**FGIC Trust**": As defined in the HTA Plan.

"**Floor Price**": The minimum weighted average sale price required to be obtained for the Subject Bonds with respect to any Bond Sale, as determined by Assured.

"**Franklin Fund**": Each of the funds managed by Franklin Advisers, Inc. that are Assured Legacy Bondholders and Trust Unit Holders, in their capacity as such and their successors and assigns.

"**Franklin Nuveen Trust**": As defined in Section 2.06(b) hereof.

"**Franklin Nuveen Trust Unit Holder**": a Beneficial Owner of a Trust Unit issued by a Franklin Nuveen Trust, in its capacity as such.

"**General Trust**": As defined in Section 2.06(b) hereof.

"**Grantor Trust Provisions**": Subpart E of Subchapter J of Chapter 1 of the Code and Section 7701 of the Code, and final Treasury Regulations, published rulings, notices and announcement, promulgated thereunder, as the foregoing may be in effect from time to time.

"**HTA Bonds**": As defined in the HTA Plan.

"**HTA Confirmation Order**": The order of the Title III Court confirming the HTA Plan in accordance with Section 314 of PROMESA and Section 1129 of the Bankruptcy Code.

"**HTA/CCDA PSA**": That certain HTA/CCDA Related Plan Support Agreement, dated as of May 5, 2021, by and among (a) the Financial Oversight and Management Board for Puerto Rico and (b) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to HTA Bonds and CCDA Bonds, each as defined therein, among other parties, including as amended or superseded, but in all events only to the extent Assured remains a party thereto and has not terminated such agreement.

"**HTA Fiscal Agent**": As defined in the HTA Plan.

"**HTA Payment Shortfall**":  As defined in Section 3.06(e) hereof.

"**HTA Payments**": Payments received by the Trustee on account of New HTA Bonds or FGIC Certificates.

"**HTA Plan**": The Modified Fifth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority, Case No. 17-03283-LTS, ECF No. 22581-1, including, without limitation, the exhibits and schedules thereto, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA and the Bankruptcy Code, but in all events solely to the extent in form and substance reasonably satisfactory to Assured and otherwise consistent with the Commonwealth PSA and HTA/CCDA PSA.

"**HTA Plan Cash Distributions**": Any cash distributions allocable to Assured Legacy Bondholders on account of Assured Legacy Bonds under the HTA Plan as a result of a valid election by the Commonwealth and HTA to substitute cash for the New HTA Bonds on the HTA Effective Date, but, for the avoidance of doubt, excluding any Consummation Costs, PSA Restriction Fees, HTA PSA Restriction Fees, or Clawback Structuring Fees payable to Assured, in each case as defined in the Commonwealth Plan, the HTA Plan, or in this Trust Agreement, as applicable.

"**Insurance Policy Account**": As defined in Section 3.01(a)(iv) hereof.

"**Insured Amount**": As of any date, (i) in the case of a Current Interest Bond, the accrued and unpaid interest on, and outstanding principal amount of, such Current Interest Bond as of such date, or (ii) in the case of a Capital Appreciation Bond, the Compounded Amount as of such date.

"**Maturity Date**": As defined in the Trust Agreement.

"**Maturity Notice**": As defined in Section 3.08(a) hereof.

"**New HTA Bonds**": As defined in the HTA Plan, and including the Taxable New HTA Bonds and Tax-Exempt New HTA Bonds.

"**New HTA Bonds Indenture**": As defined in the HTA Plan.

"**New Securities**": As applicable, the New HTA Bonds or FGIC Certificates held by the Trust.

"**Non-Book-Entry AGC Trust Units**": The Non-Book-Entry Double-Insured AGC Trust Units, together with any Trust Units (if any) issued by an AGC Trust in certificated form to Assured Insured Bondholders who, prior to the Effective Date, held custody receipts in certificated form.

"**Non-Book-Entry Double-Insured AGC Trust Units**": Trust Units to be issued in certificated rather than book-entry form by the AGC Trusts for Primary Market Assured Legacy Bonds CUSIPs 745190ZR2, 745190ZS0, and 745190UR7, consisting of the Trust Units to be issued by each such AGC Trust on account of the portion of the Assured Legacy Bonds held by such AGC Trust that also underlies (i) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial) or (ii) AGC-AGC Double-Insured Secondary Market Legacy Bonds CUSIP 745190R75, as applicable.

"**Non-Book-Entry Double-Insured AGC Trust Units Account**": As defined in Section 3.01(c)(i) or Section 3.01(d)(i) hereof, as applicable.

"**Notice of Claim and Certificate**": As defined in Section 3.06(a) hereof.

"**Notional Amount**": As of any day, the aggregate outstanding Notional Amount of all Trust Units shall be the aggregate outstanding principal amount (or, in the case of Capital Appreciation Bonds, the Compounded Amount) of all Assured Legacy Bonds as of such day.

"**Nuveen Fund**": Each of the funds managed by Nuveen Asset Management that are Assured Legacy Bondholders and Trust Unit Holders, in their capacity as such, and their successors and assigns.

"**Officer**": When used with respect to either of the Trustees, any senior vice president, any vice president, any assistant vice president, any assistant treasurer, any trust officer, any assistant secretary in the Corporate Trust Office of either of the Trustees, or any other officer of the Trustees customarily performing functions similar to those performed by the persons who at the time shall be such officers and who, in each case, shall have direct responsibility

for the administration of the Trust Agreement (including these Standard Terms), and also to whom with respect to a particular corporate trust matter such matter is referred because of such officer's knowledge of and familiarity with the particular subject.  With respect to any other Person, the chairman of the board, the president, a vice president (however designated), the treasurer or controller.

"**Opinion of Counsel**": A written opinion of either (a) nationally recognized counsel who is reasonably acceptable to the parties to whom it is delivered, or (b) internal counsel to Assured or any of its Affiliates.

"**Original Scheduled Interest Payment Date**"**:** With respect to a Current Interest Bond, a date, other than the Maturity Date, on which a scheduled payment of interest is due in respect of such Current Interest Bond in accordance with the terms of the applicable Assured Insurance Policy.

"**Original Scheduled Payment Date**": An Original Scheduled Interest Payment Date or Original Scheduled Principal Payment Date, as applicable, including, without limitation, the Maturity Date.

"**Original Scheduled Principal Payment Date**"**:** A date on which a scheduled payment of principal or Compounded Amount is due in respect of such Current Interest Bond or Capital Appreciation Bond, as applicable, in accordance with the terms of the applicable Assured Insurance Policy, including, without limitation, the Maturity Date.

"**Oversight Board**" As defined in the HTA Plan.

"**Payment Shortfall**" As defined in Section 3.06(a) hereof.

"**Person**": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency, instrumentality, or political subdivision thereof.

"**Primary Market Assured Legacy Bonds CUSIP**": Any Assured Legacy Bonds CUSIP that is not a Secondary Market Assured Legacy Bonds CUSIP.  For the avoidance of doubt, the Primary Market Assured Legacy Bonds CUSIPs consist of Assured Legacy Bonds CUSIPs 745181C54, 745181C62, 745181C70, 745181C88, 745190HJ0, 745190UR7, 745190ZR2, and 745190ZS0.

"**Principal Amount Reduction**": As defined in Section 3.05(c) hereof.

"**PROMESA**": The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et. seq.

"**pro rata**": Unless otherwise stated, any pro rata payment or distribution made to, or any pro rata allocation of any cost or expense borne by, (i) Holders of Trust Units for a particular Assured Legacy Bonds CUSIP or Assured Legacy Bonds CUSIP (Combined), as applicable, shall be calculated based on the Notional Amount of Trust Units outstanding with respect to such Assured Legacy Bonds CUSIP or Assured Legacy Bonds CUSIP (Combined),

as applicable, and (ii) all Holders of Trust Units without regard to Assured Legacy Bonds CUSIP shall be calculated based on the outstanding principal amount (or, in the case of Capital Appreciation Bonds, the Compounded Amount) of the Assured Legacy Bonds underlying such Trust Units.

"**Pro Rata Share**": As defined in the HTA Plan.

"**Reorganized HTA**": As defined in the HTA Plan.

"**Requisite Trust Unit Holders**": With respect to any Trust, Holders of a majority (measured by outstanding principal amount or, in the case of Capital Appreciation Bonds, the Compounded Amount of the underlying Assured Legacy Bonds CUSIP) of Trust Units.

"**Sale Notice**": As defined in Section 3.04(a) hereof.

"**Sale Notice Period**": As defined in Section 3.04(b) hereof.

"**SEC**": The Securities and Exchange Commission.

"**Secondary Market Assured Legacy Bonds**": The Assured Legacy Bonds that are insured through Assured Insurance Policies issued in the secondary market.

"**Secondary Market Assured Legacy Bonds CUSIP**": The Assured Legacy Bonds CUSIP of a Secondary Market Assured Legacy Bond, consisting of the CUSIP of the related custody receipt evidencing a beneficial interest in such Secondary Market Assured Legacy Bond and the related Assured Insurance Policies; provided, however, that for purposes of this Trust Agreement (other than this Article I of the Standard Terms), in the case of any AGC Double-Insured Custody Receipt (Complete) and the related AGM Double-Insured Custody Receipt (Complete), the applicable Assured Legacy Bonds CUSIP (Combined) shall be treated as a single Secondary Market Assured Legacy Bonds CUSIP corresponding to a single Trust. For the avoidance of doubt, the Secondary Market Assured Legacy Bonds CUSIPs consist of Assured Legacy Bonds CUSIPs 745181D38, 745181F77, 745181D53, 745181D46, 745181F85, 745190R75, 745190M54, 745190M70, 745190M62, 745190M88, 745190E87, 745190Q27, 745190R67, 745190P51, 745190Y69, and 745190Z43.

"**Securities**": Collectively, the Assured Legacy Bonds and the New Securities.

"**Securities Act**": The Securities Act of 1933, as amended.

"**Standard Terms**": These Standard Terms, as amended or supplemented, incorporated by reference into the Trust Agreement.

"**Subject Bonds**": As defined in Section 3.04(a) hereof.

"**Target Price**": With respect to any Bond Sale, the then-current trading price of the Subject Bonds, as measured by the most recently available sale price for no less than $1,000,000 of the Subject Bonds, as quoted on a nationally recognized exchange or a "bid" price on an electronic trading system such as Bloomberg L.P. posted within 10 Business Days

prior to the date of the Sale Notice, or if no such price is available, a bona fide bid quote provided for no less than $1,000,000 of the Subject Bonds by an independent broker-dealer operating in the over-the-counter market.

"**Tax Costs**": As defined in Section 8.04(c) hereof.

"**Taxable Bond Account**": As defined in Section 3.01(a)(ii) hereof.

"**Taxable New HTA Bonds**": New HTA Bonds that are not tax-exempt bonds (if any).

"**Tax-Exempt Bond Account**": As defined in Section 3.01(a)(i) hereof.

"**Tax-Exempt New HTA Bonds**": New HTA Bonds that are tax-exempt bonds.

"**Termination Notice**": As defined in Section 7.02 hereof.

"**Treasury Regulations**": Regulations, including proposed or temporary regulations, promulgated under the Code.  References herein to specific provisions of regulations, including proposed or temporary regulations shall include analogous provisions of final Treasury Regulations as well as any successor or replacement Treasury Regulations.

"**Trust**": With respect to each Assured Legacy Bonds CUSIP or Assured Legacy Bonds CUSIP (Combined), as applicable, the separate trust formed pursuant to the applicable Trust Agreement.  For the avoidance of doubt, in the case of any Assured Legacy Bonds CUSIP (Combined), only one such Trust shall be formed for each such Assured Legacy Bonds CUSIP (Combined).

"**Trust Assets**": With respect to each Trust, as applicable, (i) the property to be deposited into and/or held by such Trust pursuant to Section 2.01 hereof; (ii) any other property that Assured may determine, in its sole discretion, to deposit in the applicable Trust for the benefit of the Trust Unit Holders; and (iii) any proceeds of any of the foregoing.

"**Trust Estate**": Collectively, and with respect to any Trust, (a) the Trust Assets deposited and held in such Trust for the benefit of the Trust Unit Holders, and (b) any other property deposited and held in such Trust for the benefit of the Trust Unit Holders (if any).

"**Trust Unit**": With respect to each Trust that is formed for the benefit of the beneficial holders of an Assured Legacy Bonds CUSIP or Assured Legacy Bonds CUSIP (Combined), as applicable, the trust unit(s) to be issued by such Trust.

"**Trust Unit Holder**" or "**Holder**": As applicable, (i) a Beneficial Owner of a Trust Unit, or (ii) Assured, to the extent Assured has been subrogated to the rights of a Beneficial Owner of a Trust Unit.

"**Trust Unit Paying Agent**": The paying agent appointed pursuant to Section 5.07 hereof.

"**Trustee Costs**": As defined in Section 6.05(a) hereof.

14

"**Unit Exchange Election**": As defined in Section 3.07(a) hereof.

"**Unit Register**" and "**Unit Registrar**": The register maintained and the registrar appointed pursuant to Section 5.03 hereof.

"**U.S. Person**": A person who is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"**Voting Rights**": Any voting or control rights granted to holders of Securities.

"**WHFIT Regulations**": As defined in Section 8.04(a) hereof.

### Section 1.02.  *Other Definitional Provisions.*

The words "hereof," "herein" and "hereunder" and words of similar import when used in these Standard Terms shall refer to these Standard Terms as a whole and not to any particular provision of these Standard Terms, and Section, subsection, Annex and Exhibit references are to these Standard Terms unless otherwise specified.  The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms, and the singular shall include the plural as required by context.  The words "include" and "including" shall be deemed to be followed by the phrase "without limitation."  Any reference to any document in these Standard Terms shall be deemed to include any amendment, restatement, supplement or modification thereto.

## ARTICLE II

## TRUST ESTATE

### Section 2.01.  *Trust Assets.*

Pursuant to and in accordance with the Trust Agreement and the HTA Plan, upon the Effective Date:

(a)    Solely with respect to each Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), or (iii) the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(a) applies solely to Assured Legacy Bonds CUSIPs 745181C54, 745181C62, 745181C70, 745181C88, 745190HJ0, 745190UR7, 745190ZR2, 745190ZS0, 745181D38, 745181F77, 745181D53, 745181D46, 745181F85, 745190M70/745190M54, 745190M88/745190M62, and 745190Q27/745190E87:

(i)    The Depositor shall, on behalf of each of the Assured Legacy Bondholders holding such Assured Legacy Bonds CUSIP, deposit any New HTA Bonds allocable to such Assured Legacy Bonds CUSIP into the Trust for that Assured Legacy Bonds CUSIP.  The Trustee shall establish and maintain in the name of the Trust a Tax-Exempt Bond Account into which any such Tax-Exempt New HTA Bonds (and any proceeds thereof) shall be deposited, and a Taxable Bond Account

15

into which any such Taxable New HTA Bonds (and any proceeds thereof) shall be deposited; provided, however, that the Trustee shall transfer from the Taxable Bond Account to the Tax-Exempt Bond Account any Taxable New HTA Bonds which Assured has notified the Trustee in writing have become Tax-Exempt New HTA Bonds, and from the Tax-Exempt Bond Account to the Taxable Bond Account any Tax-Exempt New HTA Bonds which Assured has notified the Trustee in writing have become Taxable New HTA Bonds.

(ii) The Depositors shall, on behalf of each of the Assured Legacy Bondholders holding such Assured Legacy Bonds CUSIP, deposit any HTA Plan Cash Distributions allocable to such Assured Legacy Bonds CUSIP into the Trust for that Assured Legacy Bonds CUSIP. The Trustee shall establish and maintain in the name of the Trust a Cash Account into which any such HTA Plan Cash Distributions shall be deposited.

(iii) The Trustee shall establish and maintain in the name of the Trust an Insurance Policy Account into which such Assured Legacy Bonds CUSIP shall be deemed to have been deposited. Pursuant to Section 28.6 of the HTA Plan, the Assured Legacy Bonds deemed deposited into the Trust shall not be cancelled and all rights and remedies under the existing Assured Legacy Bonds and the applicable Bond Documents (other than payment obligations of the Depositor and the continuation of any lien granted as security for such Assured Legacy Bonds) shall remain in full force and effect solely to the extent necessary to preserve any claims relating to the Assured Legacy Bonds deposited in the Trust under the applicable Assured Insurance Policy. Such existing Assured Legacy Bonds shall not form the basis for the assertion of any claim against the Depositor or Reorganized HTA. The Assured Insurance Policies (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

(b) Solely with respect to each Primary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(b) applies solely to Assured Legacy Bonds CUSIPs 745181C54, 745181C62, 745181C70, 745181C88, 745190HJ0, 745190UR7, 745190ZR2, and 745190ZS0:

(i) The HTA Fiscal Agent shall, on behalf of each of the Assured Legacy Bondholders holding such Primary Market Assured Legacy Bonds CUSIP, transfer the Assured Insurance Policy for that Primary Market Assured Legacy Bonds CUSIP and any and all agreements, documents and instruments relating to such Assured Insurance Policy that are within its control to the applicable Trust, and all corresponding rights of the applicable Assured Legacy Bondholders shall be deemed to have been deposited into the applicable Trust.

(ii) The Depositor shall, on behalf of each of the Assured Legacy Bondholders holding such Primary Market Assured Legacy Bonds CUSIP, transfer any and all agreements, documents and instruments relating to the Assured Insurance Policy for that Primary Market Assured Legacy Bonds CUSIP that are within its control to the applicable Trust, and all corresponding rights of the applicable Assured

16

Legacy Bondholders shall be deemed to have been deposited into the applicable Trust.

(iii)    The Assured Legacy Bondholders holding such Primary Market Assured Legacy Bonds CUSIP shall be deemed to have deposited their Assured Legacy Bonds into the Trust for the applicable Primary Market Assured Legacy Bonds CUSIP as of the Effective Date.

(c)    Solely with respect to each Secondary Market Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), or (iii) the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(c) applies solely to Assured Legacy Bonds CUSIPs 745181D38, 745181F77, 745181D53, 745181D46, 745181F85, 745190M70/745190M54, 745190M88/745190M62, and 745190Q27/745190E87:

(i)    Each Assured Insured Bondholder holding custody receipts of such Secondary Market Assured Legacy Bonds CUSIP will be deemed to have deposited such custody receipts into the applicable Trust.

(ii)    The Trust (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement(s) with respect to such Secondary Market Assured Legacy Bonds CUSIP, such that the Trust will be deemed to hold the related Assured Insured Bonds underlying the applicable custody receipts and the related Assured Insurance Policies, without any further action on the part of the existing custodian(s).  In the event a single Assured Legacy Bonds CUSIP is insured by more than one Assured Insurance Policy, the Trust for such Assured Legacy Bonds CUSIP shall be deemed to hold all such Assured Insurance Policies insuring the Assured Legacy Bonds CUSIP corresponding to such Trust.

(d)    Solely with respect to each FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(d) applies solely to Assured Legacy Bonds CUSIPs 745190Y69 and 745190Z43:

(i)    Each Assured Insured Bondholder holding custody receipts of such FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP will be deemed to have deposited such custody receipts into the applicable Trust.

(ii)    The Trust (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement, such that the Trust will be deemed to hold the Assured Insured Bonds (which also qualify as FGIC Insured Bonds) underlying the applicable custody receipts and the related Assured Insurance Policies, without any further action on the part of the existing custodian. In the event a single Assured Legacy Bonds CUSIP is insured by more than one Assured Insurance Policy, the Trust for such Assured Legacy Bonds CUSIP shall be deemed to hold all such Assured Insurance Policies insuring the Assured

17

Legacy Bonds CUSIP corresponding to such Trust. The Assured Insurance Policies (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

(iii)    Without prejudice to the ability of the Trustee to draw on the applicable Assured Insurance Policy, such Assured Insured Bonds (which also qualify as FGIC Insured Bonds), the related FGIC Insurance Policies, and the related FGIC Plan Consideration shall be deemed to have been deposited into the applicable FGIC Trust pursuant to Section 26.3 of the HTA Plan.

(iv)    The applicable Trust shall be deemed to have received the Pro Rata Share of the FGIC Plan Consideration allocable to each Assured Insured Bondholder holding custody receipts of such FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, and shall receive the FGIC Certificates allocable to such Assured Insured Bondholder on account of the applicable custody receipts and Assured Insured Bonds (which also qualify as FGIC Insured Bonds). The Trustee shall establish and maintain in the name of the Trust a FGIC Certificates Account into which any such FGIC Certificates shall be deposited.

(v)    As a result of the steps described in subsections 2.01(d)(i)-(iv) above, the applicable Trust shall hold the applicable FGIC Certificates and the related Assured Insurance Policies.

(e)    Solely with respect to each AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), such that this Section 2.01(e) applies solely to Assured Legacy Bonds CUSIPs 745190R67 and 745190P51:

(i)    Each Assured Insured Bondholder holding custody receipts of such AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial) will be deemed to have deposited such custody receipts into the applicable AGM Double-Insured Trust (Partial).

(ii)    The AGM Double-Insured Trust (Partial) (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement, such that the AGM Double-Insured Trust (Partial) will be deemed to hold (i) the underlying AGC Primary Market Assured Legacy Bonds and the related AGC Insurance Policy, and (ii) the related AGM Double-Insured Insurance Policies (Partial), without any further action on the part of the existing custodian. In the event a single Assured Legacy Bonds CUSIP is insured by more than one AGM Double-Insured Insurance Policy (Partial), the Trust for such Assured Legacy Bonds CUSIP shall be deemed to hold all such AGM Double-Insured Insurance Policies (Partial) insuring the Assured Legacy Bonds CUSIP corresponding to such Trust. The AGM Double-Insured Insurance Policies (Partial) (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

(iii)    Without prejudice to the ability of the AGM Double-Insured Trustee (Partial) to draw on the applicable AGM Double-Insured Insurance Policy (Partial) to the extent authorized under this Trust Agreement, the AGM Double-Insured Trust (Partial) shall be deemed to have deposited such AGC Primary Market Assured Legacy Bonds and the related AGC Insurance Policies into the applicable AGC Trust.

(iv)    The applicable AGC Trust shall, on behalf of each of the Assured Legacy Bondholders holding such AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), deposit the Non-Book-Entry Double-Insured AGC Trust Units allocable to such AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial) into the AGM Double-Insured Trust (Partial) for that AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial). The AGM Double-Insured Trustee (Partial) shall establish and maintain in the name of the AGM Double-Insured Trust (Partial) a Non-Book-Entry Double-Insured AGC Trust Units Account into which such Non-Book-Entry Double-Insured AGC Trust Units shall be deposited.

(v)    As a result of the steps described in Subsections 2.01(e)(i)-(iv) above, the applicable AGM Double-Insured Trust (Partial) shall hold the applicable Non-Book-Entry Double-Insured AGC Trust Units and the related AGM Double-Insured Insurance Policies (Partial).

(f)    Solely with respect to the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(f) applies solely to Assured Legacy Bonds CUSIP 745190R75:

(i)    Each Assured Insured Bondholder holding custody receipts of the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP will be deemed to have deposited such custody receipts into the AGC-AGC Double-Insured Trust.

(ii)    The AGC-AGC Double-Insured Trust (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement, such that the AGC-AGC Double-Insured Trust will be deemed to hold (i) (a) the underlying AGC Primary Market Assured Legacy Bonds with CUSIP 745190UR7 and (b) AGC Insurance Policy CIFGNA-562, and (ii) AGC Insurance Policy SM-2007-267, without any further action on the part of the existing custodian.  AGC Insurance Policy SM-2007-267 (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

(iii)    Without prejudice to the ability of the AGC-AGC Double-Insured Trustee to draw on AGC Insurance Policy SM-2007-267 to the extent authorized under this Trust Agreement, the AGC-AGC Double-Insured Trust shall be deemed to have deposited (i) such AGC Primary Market Assured Legacy Bonds with

19

CUSIP 745190UR7 and (ii) AGC Insurance Policy CIFGNA-562 into the AGC Trust for CUSIP 745190UR7.

(iv)     The AGC Trust for CUSIP 745190UR7 shall, on behalf of each of the Assured Legacy Bondholders holding the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, deposit the Non-Book-Entry Double-Insured AGC Trust Units allocable to such AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP into the AGC-AGC Double-Insured Trust.  The AGC-AGC Double-Insured Trustee shall establish and maintain in the name of the AGC-AGC Double-Insured Trust a Non-Book-Entry Double-Insured AGC Trust Units Account into which such Non-Book-Entry Double-Insured AGC Trust Units shall be deposited.

(v)     As a result of the steps described in Subsections 2.01(f)(i)-(iv) above, the AGC-AGC Double-Insured Trust shall hold the applicable Non-Book-Entry Double-Insured AGC Trust Units and AGC Insurance Policy SM-2007-267.

**Section 2.02.  *Acceptance by the Trustee.***

(a)     By its execution of the Trust Agreement, the Trustee acknowledges and declares that it will hold or has agreed to hold all documents, instruments, and other property delivered to it or received by it from time to time with respect to the Trust Assets and all other assets included in the definition of Trust Estate, in each case in trust for the exclusive use and benefit of all present and future Trust Unit Holders and for the purposes of administering the trusts created by the Trust Agreement (including these Standard Terms). The Trustee represents and warrants that, except as expressly permitted by the Trust Agreement, (i) it has not and will not, other than in its capacity as trustee for the benefit of the Trust Unit Holders, assert any claim or interest in the Trust Estate and will hold (or its agent will hold) such Trust Estate and the proceeds thereof in trust pursuant to the terms of the Trust Agreement, and (ii) it has not encumbered or transferred, and will not encumber or transfer, its right, title or interest in the Trust Estate.

(b)     Reserved.

(c)     Except as specifically provided herein, the Trustee shall not sell, pledge or assign any interest in the Trust Estate.

**Section 2.03.  *Purpose, Activities of the Trust.***

It is the intention of the parties hereto that the Trust shall not engage in any business or activities other than certain non-business activities in connection with, or relating to the following:

(a)     receiving, accepting, and holding in trust the Trust Estate;

(b)     creating one or more accounts or sub-accounts in accordance with the terms of the Trust Agreement (including these Standard Terms);

(c)    making claims and receiving payments under the Assured Insurance Policies;

(d)    receiving payments pursuant to the HTA Plan and the securities issued thereunder;

(e)    issuing one or more series of Trust Units to holders of Assured Legacy Bonds in accordance with the terms of the Trust Agreement (including these Standard Terms);

(f)    making distributions to the Depository and Trust Unit Holders in accordance with the terms of the Trust Agreement (including these Standard Terms);

(g)    coordinating communications with Trust Unit Holders through the Depository or directly (in the case of Holders of Non-Book-Entry AGC Trust Units);

(h)    following, accepting or acting upon any instruction or direction from Assured or the Requisite Trust Unit Holders, as applicable, in each case only as expressly permitted in the Trust Agreement;

(i)    making public disclosures on EMMA;

(j)    making payments and distributions as contemplated by the Trust Agreement (including these Standard Terms); and

(k)    engaging in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto.

### Section 2.04.  *Limitations of the Trust.*

(a)    Except as otherwise provided herein, the affairs of the Trust will be managed by or under the direction of the Trustee.  None of the Depositor, Reorganized HTA, or Assured, or any of their respective Affiliates will have authority to act for, or to assume any obligation or responsibility on behalf of, the Trust or the Trustee in its capacity as Trustee.

(b)    The Trust will keep correct and complete books and records of accounts and minutes of the meetings and other proceedings of the Trust.  Any resolutions, agreements and other instruments will be continuously maintained by the Trustee as official records of the Trust.

(c)    The Trust will provide for its own operating expenses and liabilities from the Trust Estate.  General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to the Depositor, Reorganized HTA, or Assured or their respective Affiliates.

(d)      All oral and written communications, including letters, invoices, contracts, statements and applications, will be made solely in the name of the Trust if related to the Trust.

(e)      There will be no guarantees made by the Trust with respect to obligations of the Depositor, Reorganized HTA, or Assured or their respective Affiliates. There will not be any indebtedness relating to borrowings or loans between the Trust, the Depositor, Reorganized HTA, or Assured or their respective Affiliates; provided, that, Assured may own Trust Units.

(f)      The Trust will act solely in its own name, or in the Trustee's name on the Trust's behalf, and through its or the Trustee's duly authorized officers or agents in the conduct of its activities.  The Trust will not:  (i) operate or purport to operate as an integrated, single economic unit with respect to the Depositor, Reorganized HTA, or Assured or any other affiliated or unaffiliated entity; (ii) seek or obtain credit or incur any obligation to any third party based upon the assets of the Depositor, Reorganized HTA, or Assured or their respective Affiliates; or (iii) induce any such third party to reasonably rely on the creditworthiness of the Depositor, Reorganized HTA, or Assured or any other affiliated or unaffiliated entity in its dealings with the Trust.

(g)      The Trust will maintain a Delaware Trustee with an office in the State of Delaware.

(h)      The Trust will not engage in any transaction with an Affiliate on any terms other than would be obtained in an arm's-length transaction with a non-Affiliate.

**Section 2.05.   *Voting Rights.***

(a)      Assured shall be deemed the sole holder of the Voting Rights with respect to the Securities held by the Trust.

**Section 2.06.   *Franklin and Nuveen Trusts.***

(a)      Any Assured Legacy Bonds CUSIP held by a Franklin Fund and/or Nuveen Fund as of August 29, 2022, shall be treated as two Assured Legacy Bonds CUSIPs, one corresponding to the portion of such Assured Legacy Bonds CUSIP held by one or more Franklin Funds and/or Nuveen Funds and one corresponding to the portion of such Assured Legacy Bonds CUSIP not held by Franklin Funds and/or Nuveen Funds.

(b)      For any Assured Legacy Bonds CUSIP that will be treated as two Assured Legacy Bonds CUSIPs pursuant to Section 2.06(a), two separate Trusts shall be established, one for the portion of such Assured Legacy Bonds CUSIP held by one or more Franklin Funds and/or Nuveen Funds as of August 29, 2022 (each, a "**Franklin Nuveen Trust**"), and one for the portion of such Assured Legacy Bonds CUSIP not held by Franklin Funds and/or Nuveen Funds (each, a "**General Trust**").

(c)      The name of each Franklin Nuveen Trust shall be the same as the corresponding General Trust, except that the name of the Franklin Nuveen Trust shall begin with "FN".

(d)      For the avoidance of doubt, other than the right of Franklin Nuveen Trust Unit Holders to bring a challenge of the type described in Section 3.03(c) of these Standard Terms and any rights resulting from the success of any such challenge, the rights and treatment of the Franklin Nuveen Trust Unit Holders shall be identical to those of the Trust Unit Holders of the corresponding General Trust.

## ARTICLE III

## ADMINISTRATION OF THE TRUST

**Section 3.01.  *Accounts.***

The Trustee shall establish and maintain in the name of the Trust the following non-interest bearing accounts for the Trust to be held in trust for the benefit of the Trust Unit Holders (all amounts held in these accounts will be uninvested) and the name and number of such accounts shall be listed on Schedule II to the Trust Agreement:

(a)      Solely with respect to each Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), or (iii) the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.01(a) applies solely to Assured Legacy Bonds CUSIPs 745181C54, 745181C62, 745181C70, 745181C88, 745190HJ0, 745190UR7, 745190ZR2, 745190ZS0, 745181D38, 745181F77, 745181D53, 745181D46, 745181F85, 745190M70/745190M54, 745190M88/745190M62, and 745190Q27/745190E87:

(i)      Tax-Exempt Bond Account. An account into which the Trustee shall deposit any Tax-Exempt New HTA Bonds allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Tax-Exempt Bond Account**"), including any Taxable New HTA Bonds that become Tax-Exempt New HTA Bonds;

(ii)      Taxable Bond Account. An account into which the Trustee shall deposit any Taxable New HTA Bonds allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor), including any Tax-Exempt New HTA Bonds that become Taxable New HTA Bonds (the "**Taxable Bond Account**"); and

(iii)      Cash Account. An account into which the Trustee shall deposit any HTA Plan Cash Distributions allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Cash Account**").

(iv)    Insurance Policy Account. An account into which the Trustee shall deposit the applicable Assured Legacy Bonds CUSIP insured by the applicable Assured Insurance Policy (or any other securities, monies, proceeds or property received on account of or in exchange therefor) (the "**Insurance Policy Account**").

(b)    Solely with respect to each FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.01(b) applies solely to Assured Legacy Bonds CUSIPs 745190Y69 and 745190Z43:

(i)    FGIC Certificates Account.  An account into which the Trust shall deposit the FGIC Certificates allocable to the applicable FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**FGIC Certificates Account**"); and

(ii)    FGIC Insured Bonds Insurance Policy Payments Account.  An account into which the Trustee shall deposit any monies or other property resulting from a draw on the Assured Insurance Policy insuring the applicable FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP (the "**FGIC Insured Bonds Insurance Policy Payments Account**").

(c)    Solely with respect to each AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), such that this Section 3.01(c) applies solely to Assured Legacy Bonds CUSIPs 745190R67 and 745190P51:

(i)    Non-Book-Entry Double-Insured AGC Trust Units Account. An account into which the AGM Double-Insured Trustee (Partial) shall deposit the Non-Book-Entry Double-Insured AGC Trust Units allocable to the Assured Legacy Bonds underlying the applicable AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial) (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Non-Book-Entry Double-Insured AGC Trust Units Account**"); and

(ii)    AGM Double-Insured Insurance Policy Payments Account. An account into which the AGM Double-Insured Trustee (Partial) shall deposit any monies or other property resulting from a draw on the AGM Double-Insured Insurance Policy (Partial) insuring the appliable AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial) (the "**AGM Double-Insured Insurance Policy Payments Account**").

(d)    Solely with respect to the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.01(d) applies solely to Assured Legacy Bonds CUSIP 745190R75:

(i)    Non-Book-Entry Double-Insured AGC Trust Units Account. An account into which the AGC-AGC Double-Insured Trustee shall deposit the Non-Book-Entry Double-Insured AGC Trust Units allocable to the Assured Legacy Bonds underlying the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds

24

CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Non-Book-Entry Double-Insured AGC Trust Units Account**"); and

(ii) AGC Insurance Policy SM-2007-267 Payments Account. An account into which the AGC-AGC Double-Insured Trustee shall deposit any monies or other property resulting from a draw on AGC Insurance Policy SM-2007-267 (the "**AGC Insurance Policy SM-2007-267 Payments Account**").

**Section 3.02.** *Distributions; Prior to Maturity Date or in Connection with Assured Advancement Option.*

(a) Solely with respect to each Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), or (iii) the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.02(a) applies solely to Assured Legacy Bonds CUSIPs 745181C54, 745181C62, 745181C70, 745181C88, 745190HJ0, 745190UR7, 745190ZR2, 745190ZS0, 745181D38, 745181F77, 745181D53, 745181D46, 745181F85, 745190M70/745190M54, 745190M88/745190M62, and 745190Q27/745190E87:

(i) Tax-Exempt Distributions. Subject to Section 3.02(a)(v) below, promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments of principal, interest or other cash received by the Trust on or prior to the Maturity Date on account of the New HTA Bonds deposited in the Tax-Exempt Bond Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(ii) Taxable Distributions. Subject to Section 3.02(a)(v) below, promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments of principal, interest or other cash received by the Trust on or prior to the Maturity Date on account of the New HTA Bonds deposited in the Taxable Bond Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(iii) Insurance Policy Distributions. Subject to Section 3.02(a)(v) below, promptly following receipt thereof by the Trustee, the Trustee shall, subject to Section 3.06(e), be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust,

25

including payments received by the Trust on or prior to the Maturity Date on account
of the Assured Insurance Policy insuring the Assured Legacy Bonds CUSIP deposited
in the Insurance Policy Account (or on account of any other securities or property
received on account thereof or in exchange therefor), net of the allocable portion of
any outstanding Tax Costs as of the date of distribution.  Notwithstanding anything
herein or elsewhere to the contrary, Trustee Costs shall never be paid out of, or
deducted from, Distributions comprised of payments received by the Trust from
Assured on account of, and in accordance with, an Assured Insurance Policy insuring
the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account.

(iv)    Other Cash Distributions.  Subject to Section 3.02(a)(v) below,
promptly following receipt thereof by the Trustee, the Trustee shall be required to and
shall distribute to the Depository for distribution to the Trust Unit Holders, on a pro
rata "pass-through" basis, all income of the Trust, including any HTA Plan Cash
Distributions deposited in the Cash Account, net of of the allocable portion of any
outstanding Trustee Costs (solely to the extent not previously paid by Assured
pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(v)    Distributions on Account of Non-Book-Entry AGC Trust
Units.  Notwithstanding any other provision of this Trust Agreement, distributions on
account of the Non-Book-Entry AGC Trust Units shall be made directly to the
applicable Non-Book-Entry AGC Trust Unit Holder, on a pro rata "pass-through"
basis, rather than to the Depository.

(b)    Solely with respect to any FGIC-Insured Secondary Market Assured
Legacy Bonds CUSIP, such that this Section 3.02(b) applies solely to Assured Legacy Bonds
CUSIPs 745190Y69 and 745190Z43:

(i)    FGIC Certificate Distributions:  Promptly following receipt
thereof by the Trustee, the Trustee shall be required to and shall distribute to the
Depository for distribution to the Trust Unit Holders on a pro rata "pass-through"
basis, all income of the Trust, including payments received by the Trust on or prior to
the Maturity Date on account of the FGIC Certificates deposited in the FGIC
Certificates Account (or on account of any other securities or property received on
account thereof or in exchange therefor), net of the allocable portion of any
outstanding Trustee Costs (solely to the extent not previously paid by Assured
pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(ii)    FGIC Insured Bonds Insurance Policy Payments Distributions:
Promptly following receipt thereof by the Trustee, the Trustee shall, subject to
Section 3.06(e), be required to and shall distribute to the Depository for distribution
to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust,
including payments received by the Trust on or prior to the Maturity Date resulting
from a draw on the Assured Insurance Policy insuring the applicable FGIC-Insured
Secondary Market Assured Legacy Bonds CUSIP, net of any allocable portion of any
outstanding Tax Costs as of the date of distribution.  Notwithstanding anything herein
or elsewhere to the contrary, Trustee Costs shall never be paid out of, or deducted

26

from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP.

    (c)    Solely with respect to any AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), such that this Section 3.02(c) applies solely to Assured Legacy Bonds CUSIPs 745190R67 and 745190P51:

    (i)    Non-Book-Entry Double-Insured AGC Trust Units Distributions:  Promptly following receipt thereof by the AGM Double-Insured Trustee (Partial), the AGM Double-Insured Trustee (Partial) shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the AGM Double-Insured Trust (Partial), including payments received by the Trust on or prior to the Maturity Date on account of the Non-Book-Entry Double-Insured AGC Trust Units deposited in the Non-Book-Entry Double-Insured AGC Trust Units Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

    (ii)    AGM Double-Insured Insurance Policy Payments Distributions: Promptly following receipt thereof by the AGM Double-Insured Trustee (Partial), the AGM Double-Insured Trustee (Partial) shall, subject to Section 3.06(e), be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the AGM Double-Insured Trust (Partial), including payments received by the AGM Double-Insured Trust (Partial) on or prior to the Maturity Date resulting from a draw on the AGM Double-Insured Insurance Policy (Partial) insuring the applicable AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), net of the allocable portion of any outstanding Tax Costs as of the date of distribution. Notwithstanding anything herein or elsewhere to the contrary, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the AGM Double-Insured Trust (Partial) from Assured on account of, and in accordance with, an AGM Double-Insured Insurance Policy (Partial) insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial).

    (d)    Solely with respect to the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.02(d) applies solely to Assured Legacy Bonds CUSIP 745190R75:

    (i)    Non-Book-Entry Double-Insured AGC Trust Units Distributions:  Promptly following receipt thereof by the AGC-AGC Double-Insured Trustee, the AGC-AGC Double-Insured Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the AGC-AGC Double-Insured Trust, including payments received by the Trust on or prior to the Maturity Date on account of the

27

Non-Book-Entry Double-Insured AGC Trust Units deposited in the Non-Book-Entry Double-Insured AGC Trust Units Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(ii)     AGC Insurance Policy SM-2007-267 Payments Distributions: Promptly following receipt thereof by the AGC-AGC Double-Insured Trustee, the AGC-AGC Double-Insured Trustee shall, subject to Section 3.06(e), be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the AGC-AGC Double-Insured Trust, including payments received by the AGC-AGC Double-Insured Trust on or prior to the Maturity Date resulting from a draw on AGC Insurance Policy SM-2007-267, net of the allocable portion of any outstanding Tax Costs as of the date of distribution. Notwithstanding anything herein or elsewhere to the contrary, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the AGC-AGC Double-Insured Trustee from Assured on account of, and in accordance with, AGC Insurance Policy SM-2007-267.

**Section 3.03.  *Assured Advancement Option.***

(a)     Assured shall have the right to exercise the Assured Advancement Option with thirty (30) days' prior written notice to the relevant Assured Legacy Bond Holders and/or Trust Unit Holders.  Upon the exercise of any Assured Advancement Option and the payment of the applicable Acceleration Price or redemption price with respect to any Assured Legacy Bonds CUSIP, the Trustee shall be required to disburse such Acceleration Price or redemption price to the Trust Unit Holders of the relevant Trust as set forth in Section 3.02 above, net of the allocable portion of any outstanding Tax Costs as of the date of distribution, and Assured shall become fully subrogated to all of the rights of such Trust Unit Holders, including, upon the termination of the relevant Trust, rights to any then remaining Trust Assets.  Upon the disbursement of such Acceleration Price or redemption price to the relevant Trust Unit Holders as set forth above, the Trust Units of such Trust shall be retired, such Trust shall be terminated, and the Trustee shall deliver the remaining Trust Assets of such Trust, less any outstanding Trustee Costs and other remaining costs of the Trust, to or at the direction of Assured.  At any time on or after the date of receipt of such Trust Assets, Assured shall have the right to sell all or certain of the New HTA Bonds or FGIC Certificates constituting part of such Trust Assets for value, including by (i) selling all or certain of the applicable Tax-Exempt New HTA Bonds constituting part of such Trust Assets for value as tax-exempt bonds, (ii) selling all or certain of the Taxable New HTA Bonds constituting part of such Trust Assets for value as taxable bonds, and (iii) selling all or certain of the FGIC Certificates constituting part of such Trust Assets.

(b)     Payment of the applicable Acceleration Price or redemption price with respect to any Assured Insured Bond shall satisfy and discharge all of Assured's obligations under the applicable Assured Insurance Policy with respect to such Assured Insured Bond.

(c)     The Trust Agreement for each Franklin Nuveen Trust shall provide that, notwithstanding anything to the contrary therein (including these Standard Terms) or in the HTA Plan or HTA Confirmation Order, that with respect to any Franklin Nuveen Trust, upon (i) issuance of a notice of Assured's exercise of, or intent to exercise, any Assured Advancement Option, or (ii) issuance of, or issuance of notice of an intent to cause the issuance of, a Sale Notice that could cause a Cash Distribution or distribution of Subject Bonds that would, by operation of the Standard Terms or such Trust Agreement, otherwise reduce the outstanding principal of the applicable Assured Insured Bond prior to its Original Scheduled Principal Payment Date, then, in each case, a Franklin Nuveen Trust Unit Holder shall be permitted to challenge whether payment of the applicable Acceleration Price or Cash Distribution with respect to such Assured Insured Bond satisfies and discharges all (or any) of Assured's obligations to such Franklin Nuveen Trust Unit Holder under the applicable Assured Insurance Policy with respect to such Assured Insured Bond and all of the Franklin Funds' and/or Nuveen Funds' respective rights, arguments and defenses (and those of the Franklin Nuveen Trust Unit Holders) with respect to any such argument made by such Franklin Nuveen Trust Unit Holders (including, without limitation, whether any such payment or distribution would reduce the principal amount outstanding of the Assured Insured Bonds) are reserved and preserved, including any arguments as to whether Section 26.1(c) of the HTA Plan and Section 26(a) of the HTA Confirmation Order validly accelerated the Assured Insured Bonds in the Franklin Nuveen Trusts for purposes of the Assured Insurance Policy.  All of Assured's rights, arguments and defenses with respect to any such argument made by Franklin Funds and/or Nuveen Funds and/or other Franklin Nuveen Trust Unit Holders are reserved and preserved including any arguments as to whether Section 26.1(c) of the HTA Plan and Section 26(a) of the HTA Confirmation Order validly accelerated the Assured Insured Bonds in the Franklin Nuveen Trusts for purposes of the Assured Insurance Policy; provided that Assured shall not be permitted to assert laches or any similar defenses premised on Franklin Funds and/or Nuveen Funds and/or other Franklin Nuveen Trust Unit Holder failing to make such challenge prior to having notice of the occurrence of an event set forth in clauses (i) and (ii) in the preceding sentence.

(d)     Any determination made as a result of arguments made by a Franklin Nuveen Trust Unit Holder pursuant to Section 3.03(c) with respect to a Franklin Nuveen Trust and the applicable Assured Insurance Policy shall have no impact on the corresponding General Trust or any other Trust or Assured Insurance Policy.  For the avoidance of doubt, other than Franklin Nuveen Trust Unit Holders, whose rights have been reserved pursuant to the HTA Plan, no other Trust Unit Holders may argue that payment of the applicable Acceleration Price with respect to any Assured Insured Bond does not satisfy or discharge all of Assured's obligations under the applicable Assured Insurance Policy.

**Section 3.04.   *Sale of New Securities.***

(a)     At any time and from time to time prior to the Maturity Date, so long as an Assured Insurer Event is not occurring under the applicable Assured Insurance Policy, Assured shall have the right to instruct the Trustee to sell any New Securities of any series, in a minimum aggregate principal amount (or, with respect to capital appreciation bonds, a minimum aggregate current Accreted Value) of $1,000,000 (taking into account for such minimum, all concurrent sales of such series of New Securities in the Trusts) (it being

understood that such minimum shall not be applicable if all New Securities of such series held as part of the Trust Assets are included in such sale) (or any other securities or property received on account thereof or in exchange therefor) (the "**Subject Bonds**") that are part of the Trust Assets for cash (a "**Bond Sale**").  Assured will direct the Trustee to utilize a specific broker which will arrange the Bond Sale pursuant to the terms set forth in this <u>Section 3.04(a)</u>.  The Trustee shall not be responsible for the selection of the broker or for any determination required to be made in connection with the Bond Sale.  Prior to any Bond Sale, Assured will notify the Trustee of the intended Bond Sale and will direct the Trustee to promptly distribute a sale notice (the "**Sale Notice**") (i) through the Depository to all Book-Entry Trust Unit Holders and (ii) directly to all Non-Book-Entry AGC Trust Unit Holders.

(b)     The Sale Notice will include (i) a statement identifying the Subject Bonds, the principal amount (or, with respect to capital appreciation bonds, current Accreted Value) of Subject Bonds to be sold, the applicable Target Price and Floor Price, (ii) a statement regarding the right of each applicable Trust Unit Holder to elect to receive in-kind delivery of a pro rata share of the Subject Bonds, subject to payment by such Trust Unit Holder of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs (the "**Bond Election**"), in lieu of receiving a pro rata share of the actual net cash proceeds ("**Cash Proceeds**") from the Bond Sale and (iii) a statement that the Bond Sale will only be executed if the weighted average price obtainable for the Subject Bonds (prior to the deduction of customary commissions and other sales expense of an arm's length transaction) is equal to or greater than the Floor Price.  Book-Entry Trust Unit Holders that determine to make a Bond Election must make the election through the Depository within ten (10) Business Days after the Depository receives the Sale Notice (the "**Sale Notice Period**").  Non-Book-Entry AGC Trust Unit Holders that determine to make a Bond Election must inform the Trustee of such election within the Sale Notice Period.

(c)     Following the Sale Notice Period,

(i)     If any applicable Trust Unit Holders make valid Bond Elections, an amount of Subject Bonds representing a proportion of the Subject Bonds equivalent to such Trust Unit Holders' aggregate pro rata ownership of all applicable Trust Units shall be reserved from the Bond Sale and shall instead be distributed pro rata to each such Trust Unit Holder making a valid Bond Election (any such distribution to be rounded down to the nearest minimum denomination, with any reduction as a result of such rounding down to be distributed to such Trust Unit Holders in cash).  In order to make a valid Bond Election, a Trust Unit Holder shall be required to pay to the Trustee such Trust Unit Holder's allocable portion of any outstanding Trustee Costs and Tax Costs prior to the expiration of the Sale Notice Period.  To the extent a Trust Unit Holder has not paid its allocable portion of any such outstanding Trustee Costs and Tax Costs prior to the expiration of the Sale Notice Period, the Bond Election will be deemed invalid.

(ii)     Applicable Trust Unit Holders that did not make a valid Bond Election will promptly receive a pro rata share of Cash Proceeds from the sale of Subject Bonds (not subject to a valid Bond Election), net of the allocable portion of

any outstanding Trustee Costs and Tax Costs, and less any Cash Proceeds distributed as a result of rounding in accordance with Section 3.04(c)(i) to Trust Unit Holders making valid Bond Elections.

(iii)     If the broker specified in the Sale Notice is unable to arrange the sale of any of the Subject Bonds not subject to a valid Bond Election for a weighted average price (prior to the deduction of customary commissions and other sales expense of an arm's length transaction) equal to or greater than the Floor Price, the Trustee shall not sell or distribute any Subject Bonds, the Bond Sale shall be cancelled, and the Trustee shall send a notice, at the sole cost of Assured, to (A) the applicable Book-Entry Trust Unit Holders through the Depository and (B) the Non-Book-Entry AGC Trust Unit Holders directly, stating that such Bond Sale was cancelled, after which any future sale of the Subject Bonds shall be required to be made pursuant to a new Sale Notice.

**Section 3.05.   *Adjustments to Principal Amounts and Compounded Amounts.***

(a)     Each Distribution made on or prior to the Maturity Date to Trust Unit Holders shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, <u>first</u>, of any accrued and unpaid interest on, and <u>second</u>, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case, as of the date of such Distribution and in an amount equal to such Distribution.  For the purposes of such reduction, any deduction from any Distribution in respect of Tax Costs shall be treated as if such amounts deducted were paid to the applicable Trust Unit Holders in cash as part of the Distribution and shall reduce the applicable accrued and unpaid interest amount, outstanding principal amount, or Compounded Amount accordingly.  For the avoidance of doubt, any deduction from any Distribution in respect of Trustee Costs shall not reduce the applicable accrued and unpaid interest amount, outstanding principal amount or Compounded Amount, accordingly.  As set forth in Sections 3.02(a)(iii), 3.02(b)(ii), 3.02(c)(ii), and 3.02(d)(ii) above, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy (i) insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account, (ii) insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, (iii) insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), or (iv) insuring the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, as applicable.

(b)     Any Bond Sale resulting in a distribution of Cash Proceeds or Subject Bonds to Trust Unit Holders, as the case may be, shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, <u>first</u>, of any accrued and unpaid interest on, and <u>second</u>, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case as of the date the Cash Proceeds of such Bond Sale are distributed by the Trustee to the applicable Trust Unit Holders and in an amount equal to the aggregate Cash Proceeds from such Bond Sale

31

distributed to the applicable Trust Unit Holders.  For the purposes of such reduction, any deduction from the Cash Proceeds in respect of Tax Costs shall be treated as if such amounts deducted were paid to the applicable Trust Unit Holders in cash and shall reduce the applicable accrued and unpaid interest amount, outstanding principal amount, or Compounded Amount accordingly.  Further, for purposes of this Section 3.05(b), the aggregate Cash Proceeds shall be calculated as if each applicable Trust Unit Holder that took actual delivery of Subject Bonds had received the same amount of cash per Unit as a Trust Unit Holder that did not make a Bond Election, or if all applicable Trust Unit Holders participating in the Bond Sale made a Bond Election, the aggregate Cash Proceeds shall be calculated as if all Subject Bonds were sold at a net price equal to the Target Price.  For the avoidance of doubt, any deduction from any Distribution in respect of Trustee Costs shall not reduce the applicable accrued and unpaid interest amount, outstanding principal amount or Compounded Amount, accordingly.  As set forth in Sections 3.02(a)(iii), 3.02(b)(ii), 3.02(c)(ii), and 3.02(d)(ii) above, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy (i) insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account, (ii) insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, (iii) insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), or (iv) insuring the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, as applicable.

(c)      If any Assured Legacy Bonds CUSIP is subject to mandatory sinking fund redemptions, any reduction of the outstanding principal amount or Compounded Amount, as applicable, of such Assured Legacy Bonds CUSIP pursuant to Section 3.05(a) or (b) (a "**Principal Amount Reduction**") shall automatically result in the dollar-for-dollar reduction of the mandatory sinking fund redemption obligations for purposes of the Assured Insurance Policy insuring such Assured Legacy Bonds CUSIP, with such reduction to be applied sequentially against such mandatory sinking fund redemptions starting with the first mandatory sinking fund redemption occurring after such Principal Amount Reduction.

(d)      If the principal amount (or Compounded Amount, as applicable) of the applicable Assured Legacy Bonds CUSIP is reduced to zero at any time, Assured shall be entitled to any remaining Trust Assets, including any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the Insurance Policy Account, the FGIC Certificates Account, the FGIC Insured Bonds Insurance Policy Payments Account, the Non-Book-Entry Double-Insured AGC Trust Units Account, the AGM Double-Insured Insurance Policy Payments Account, and the AGC Insurance Policy SM-2007-267 Payments Account, as applicable.

(e)      For the avoidance of doubt, it is expressly understood and agreed that to the extent the principal amount (or Compounded Amount, as applicable) of the applicable Assured Legacy Bonds CUSIP is reduced to zero prior to the Maturity Date, as of the date the principal amount (or Compounded Amount, as applicable) is reduced to zero, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies and Assured Legacy Bonds will be satisfied and discharged; (iii) the applicable Assured Insurance Policies shall be indefeasibly cancelled;

and (iv) subject to Assured's entitlement to any remaining Trust Assets, the Trust shall terminate in accordance with the provisions of Article VII hereof.

**Section 3.06.   *Payments on Assured Insurance Policies.***

(a)        After taking into account any adjustments made pursuant to Section 3.05, if there are insufficient funds (determined without taking into account any securities or other non-cash Trust Assets) in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the Insurance Policy Account, the FGIC Certificates Account, the FGIC Insured Bonds Insurance Policy Payments Account, the Non-Book-Entry Double-Insured AGC Trust Units Account, the AGM Double-Insured Insurance Policy Payments Account, or the AGC Insurance Policy SM-2007-267 Payments Account, as applicable, to satisfy the accrued and unpaid interest and/or unpaid principal due on an Original Scheduled Payment Date (the amount of any such shortfall, the "**Payment Shortfall**"), then at least five (5) Business Days prior to such Original Scheduled Payment Date, the Trustee shall deliver a notice in substantially the form attached hereto as Exhibit A (a "**Notice of Claim and Certificate**") to Assured.  Assured agrees that such notice provided by the Trustee shall constitute a valid notice of the type required under the applicable Assured Insurance Policy in order for the Trustee to draw on the applicable Assured Insurance Policy, and the Trustee shall make draws on the applicable Assured Insurance Policy to make payment, from the Insurance Policy Account, the FGIC Insured Bonds Insurance Policy Payments Account, the AGM Double-Insured Insurance Policy Payments Account, or the AGC Insurance Policy SM-2007-267 Payments Account, as applicable, of any accrued and unpaid interest or any unpaid principal due on the Original Scheduled Payment Date.  The Trustee is authorized to take all actions necessary to draw on the Assured Insurance Policies for such purposes, including actions that, under the applicable Assured Insurance Policies and related agreements, would otherwise be taken by the HTA Fiscal Agent, and the Trustee shall have all powers and authority of the HTA Fiscal Agent for such purposes.  Except as otherwise provided in Section 3.06(b) and Section 3.06(c) below, in the event a particular Trust holds more than one Assured Insurance Policy insuring the same Assured Legacy Bonds CUSIP, the Trustee shall draw pro rata on all such Assured Insurance Policies insuring the same Assured Legacy Bonds CUSIP.

(b)        Notwithstanding any other provision of this Trust Agreement, no AGM Double-Insured Trustee shall make a draw on an AGM Double-Insured Insurance Policy, and Assured shall not be required to make any payment under such AGM Double-Insured Insurance Policy, unless either (i) Assured has confirmed to the AGM Double-Insured Trustee in writing, at least (5) Business Days prior to the relevant Original Scheduled Payment Date, that Assured will not be providing sufficient funds under the AGC Insurance Policy insuring the relevant AGC Assured Legacy Bonds CUSIP to cover any Payment Shortfall with respect to the relevant AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, or (ii) as of the Original Scheduled Payment Date, Assured has not in fact provided sufficient funds under the AGC Insurance Policy insuring the relevant AGC Assured Legacy Bonds CUSIP to cover any Payment Shortfall with respect to the relevant AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.  For the avoidance of doubt, this Section 3.06(b) applies both to AGM Double-Insured Trustees (Partial) and AGM Double-Insured Trustees (Complete), such that where the Trustee with respect to an

33

Assured Legacy Bonds CUSIP (Combined) holds both an AGM Double-Insured Insurance Policy (Complete) and an AGC Insurance Policy, such Trustee shall not make a draw on such AGM Double-Insured Insurance Policy (Complete), and Assured shall not be required to make any payment under such AGM Double-Insured Insurance Policy (Complete), except under the circumstances described in clauses (i) or (ii) of this Section 3.06(b).

(c)     Notwithstanding any other provision of this Trust Agreement, the AGC-AGC Double-Insured Trustee shall not make a draw on AGC Insurance Policy SM-2007-267, and Assured shall not be required to make any payment under AGC Insurance Policy SM-2007-267, unless either (i) Assured has confirmed to the AGC-AGC Double-Insured Trustee in writing, at least (5) Business Days prior to the relevant Original Scheduled Payment Date, that Assured will not be providing sufficient funds under AGC Insurance Policy CIFGNA-562 to cover any Payment Shortfall with respect to the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, or (ii) as of the Original Scheduled Payment Date, Assured has not in fact provided sufficient funds under AGC Insurance Policy CIFGNA-562 to cover any Payment Shortfall with respect to the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

(d)     Subject to Sections 3.06(b) and 3.06(c) above, if and to the extent Assured fails to make any payment at the time, in the amount and in the manner set forth herein, the Trustee shall take, subject to its rights and protections herein, all necessary or desirable actions to enforce the applicable Assured Insurance Policy (including, to the extent applicable, as and when directed by the Requisite Trust Unit Holders as set forth in Section 6.01 hereof).

(e)     If the Trustee receives HTA Payments, (i) after the Trustee draws on an Assured Insurance Policy pursuant to Section 3.06(a), but (ii) prior to the Trustee using the amounts drawn from the Assured Insurance Policy to pay accrued and unpaid interest and/or unpaid principal due on that Original Scheduled Payment Date, then the Trustee shall (x) distribute and apply the HTA Payments received in accordance with Sections 3.02 and 3.05, (y) only apply amounts drawn from the Assured Insurance Policy to pay accrued and unpaid interest and/or unpaid principal to the extent the HTA Payments received are insufficient (the amount of such insufficiency, the "**HTA Payment Shortfall**") to pay the accrued and unpaid interest and/or unpaid principal due on that Original Scheduled Payment Date such that the amounts so applied are not in excess of the HTA Payment Shortfall and (z) promptly return to Assured any amounts drawn on the Assured Insurance Policy that are in excess of such HTA Payment Shortfall.

Section 3.07.  *Exchange of Trust Units for Trust Assets.*

(a)     At any time on, or prior to, the Maturity Date, a Trust Unit Holder may exchange its Trust Units for a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the FGIC Certificates Account, or the Non-Book-Entry Double-Insured AGC Trust Units Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Trustee Costs, Tax Costs, and Assured Reimbursement Amount (the "**Unit Exchange Election**"), provided that the Trust Unit

Holder must provide thirty (30) days' prior written notice of such Unit Exchange Election by submitting the form attached hereto as <u>Exhibit B</u> to the Trustee.

(b)      Upon a Unit Exchange Election, the expiration of the thirty day (30) notice period set forth in <u>Section 3.07(a)</u> hereof and the presentation and surrender of the applicable Trust Units at the office of the Trustee therein designated on that date, the Trustee shall distribute to such Trust Unit Holder a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the FGIC Certificates Account, or the Non-Book-Entry Double-Insured AGC Trust Units Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, or Tax Costs, which shall be paid to Assured, the Trustee, or the relevant tax or governmental authority, as applicable (provided that, if cash is not available to satisfy in full such outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs, each applicable Trust Unit Holder shall pay in cash its applicable pro rata share of such Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs prior to the receipt of its share of remaining Trust Assets).  For the avoidance of doubt, the Assured Reimbursement Amount must be paid to Assured prior to the distribution of the applicable Trust Assets to the Trust Unit Holder.

(c)      Upon distribution of such Trust Assets in accordance with <u>Section 3.07(b)</u> hereof, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds will be satisfied and discharged; and (iii) the related Assured Insurance Policies shall be indefeasibly cancelled with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds.

(d)      (i) Upon receiving notice of any Unit Exchange Election, the Trustee shall provide notice of such Unit Exchange Election to Assured and (ii) upon making a distribution of Trust Assets pursuant to this <u>Section 3.07</u>, the Trustee shall provide notice of such distribution to Assured.

**Section 3.08.**   ***Payments at Maturity Date.***

(a)      If, (i) in the case of Current Interest Bonds, the outstanding principal amount or accrued and unpaid interest amount, or (ii) in the case of Capital Appreciation Bonds, the Compounded Amount, as the case may be, of the Assured Legacy Bonds at the Maturity Date is expected to be greater than zero, no later than thirty (30) calendar days and no earlier than thirty-five (35) calendar days prior to the Maturity Date, Assured shall direct the Trustee to deliver to (A) all applicable Book-Entry Trust Unit Holders through the Depository and (B) all Non-Book-Entry AGC Trust Unit Holders directly, a notice of maturity (the "**Maturity Notice**") in substantially the form attached hereto as <u>Exhibit C</u>.  The Maturity Notice will include (i) a statement identifying the Maturity Date and (ii) a statement regarding the right of each Trust Unit Holder to receive a Distribution (or multiple Distributions) in the aggregate amount of a pro rata share of the Insured Amount corresponding (i) in the case of any relevant Current Interest Bonds, to the outstanding principal amount of, and accrued and unpaid interest on, such Current Interest Bonds as of

the Maturity Date, or (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount as of the Maturity Date, in either case, to be paid to the Trustee by Assured and/or from the other Trust Assets. Notwithstanding anything herein to the contrary, Assured's failure to direct the Trustee to deliver a Maturity Notice or the Trustee's or Depository's failure to deliver a Maturity Notice to Trust Unit Holders in accordance with this Section 3.08 shall not affect or delay the occurrence of the applicable Maturity Date, or affect the amounts to be paid to Trust Unit Holders on the Maturity Date.

(b)    Reserved.

(c)    On the Maturity Date, after giving effect to any Distribution made from other Trust Assets on the Maturity Date, and subject to Assured having received a Notice of Claim and Certificate in accordance with Section 3.06 hereof, Assured shall pay to the Trustee, and the Trustee shall distribute to all Trust Unit Holders, a pro rata share of the Payment Shortfall, if any, net of any Tax Costs, following which Assured shall be entitled to any remaining Trust Assets, including any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the Insurance Policy Account, the FGIC Certificates Account, the FGIC Insured Bonds Insurance Policy Payments Account, the Non-Book-Entry Double-Insured AGC Trust Units Account, the AGM Double-Insured Insurance Policy Payments Account, or the AGC Insurance Policy SM-2007-267 Payments Account, as applicable.

(d)    On the Maturity Date, after giving effect to any Distributions made on the Maturity Date (including the payment and distribution of any Payment Shortfall (in accordance with Section 3.08(c) hereof)), (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies and Assured Legacy Bonds will be satisfied and discharged; (iii) the applicable Assured Insurance Policies shall be indefeasibly cancelled; and (iv) subject to Assured's entitlement to any Remaining Trust Assets following payment of any Trustee Costs and any other remaining Trust expenses, the Trust shall terminate in accordance with the provisions of Article VII hereof.

## ARTICLE IV

## REPORTING/REMITTING TO TRUST UNIT HOLDERS

**Section 4.01.  *Statements to Trust Unit Holders.***

No later than three (3) Business Days after the date on which the Trustee makes any Distribution to any Trust Unit Holder, the Trustee shall prepare and post a statement to EMMA, substantially in the form attached hereto as Exhibit D, and upon request, deliver such statement by mail to any Trust Unit Holder, setting forth:

(a)    With respect to the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the Insurance Policy Account, the FGIC Certificates Account, the FGIC Insured Bonds Insurance Policy Payments Account, the Non-Book-Entry Double-Insured AGC Trust Units Account, the AGM Double-Insured Insurance Policy Payments

Account, and the AGC Insurance Policy SM-2007-267 Payments Account, as applicable, distributions made from each such account during the month and during the year to date (on an aggregate and per unit basis);

   (b) The accrued and upaid interest on, and principal amount of (or Compounded Amount, as applicable) of the relevant Assured Legacy Bonds CUSIP (or any other securities or property received in respect thereof or in exchange therefor) (on an aggregate and per unit basis);

   (c) Any other distributions made to Trust Unit Holders;

   (d) Any required tax reporting for such period (as specified in Section 8.04); and

   (e) All other information required to complete Exhibit D.

The Trustee shall deliver a copy of any statement it posts to EMMA pursuant to this Section 4.01 to Assured promptly after such statement is posted to EMMA.

**Section 4.02.  *Compliance with Withholding Requirements.***

Notwithstanding any other provisions of the Trust Agreement, the Trustee shall comply with all federal withholding requirements with respect to payments to the Depository and Trust Unit Holders that the Trustee reasonably believes are applicable under the Code.  The consent of the Depository and Trust Unit Holders shall not be required for such withholding.  In the event the Trustee does withhold any amount from payments to the Depository or any Trust Unit Holder pursuant to federal withholding requirements, the Trustee shall indicate with any payment to the Depository or such Trust Unit Holders the amount withheld.  Any amounts withheld shall be treated as a distribution of cash to the Depository or Trust Unit Holder, as the case may be, in the amount of the withholding and shall thereby reduce amounts otherwise distributable to the Depository or such Trust Unit Holder.  If an amount required to be withheld was not withheld, the Trust may reduce subsequent distributions by the amount of such required withholding.

## ARTICLE V

## TRUST UNITS

**Section 5.01.  *The Trust Units.***

Each series of Trust Units shall bear unique CUSIPs and, other than the Non-Book-Entry AGC Trust Units, shall be freely tradable and transferable through The Depository Trust Company.  So long as an Assured Insurer Event is not occurring under the applicable Assured Insurance Policy, Assured shall be deemed the sole holder of the New Securities deposited in the respective Trusts with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings. In addition, Assured shall be fully subrogated to the rights of the

respective Trust Unit Holders in respect of the New Securities deposited in the respective Trusts.

The Trust Units shall be designated in the Trust Agreement.  Unless otherwise specified in the Trust Agreement, the Trust Units in the aggregate will represent the entire beneficial ownership interest in the Trust Estate.  With respect to any day, the Notional Amount of the Trust Units will be equal to the outstanding principal amount (or, in the case of Capital Appreciation Bonds, the Compounded Amount) of the Assured Legacy Bonds underlying such Trust Units.  The Trust Units will be substantially in the forms annexed to the Trust Agreement.  Unless otherwise provided in the Trust Agreement, the Trust Units will be issuable in book-entry form, in denominations equal to the denomination of the applicable underlying Assured Legacy Bonds or any integral multiple of the amount specified therein, subject to the requirements of the Depository; provided, however, that (i) any interest in a Trust Unit equal to or in excess of the applicable minimum denomination at the time of the issuance thereof which ceases or fails to be such minimum or multiple as a result of Distributions may be transferred in its entirety, and (ii) the Non-Book-Entry AGC Trust Units shall be issued in certificated rather than book-entry form (a) in the case of an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), to the applicable AGM Double-Insured Trust (Partial), (b) in the case of the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, to the AGC-AGC Double-Insured Trust, and (c) in the case of any Assured Insured Bondholder who, prior to the Effective Date, held in certificated form custody receipts evidencing a beneficial interest in an Assured Legacy Bond insured by AGC and the related AGC Insurance Policy, to such Assured Insured Bondholder who, prior to the Effective Date, held such custody receipts in certificated form; provided, however, that in the event any such Assured Insured Bondholder has not provided the existing custodian of the pre-Effective Date certificated custody receipts with the information necessary for the applicable Non-Book-Entry AGC Trust Units to be registered in the Assured Insured Bondholder's name, then the applicable Non-Book-Entry AGC Trust Units shall be issued in the name of the existing custodian of the pre-Effective Date certificated custody receipts, solely as custodian for the sole benefit of such Assured Insured Bondholder.  Each Trust Unit will share ratably in all Trust Assets of the applicable Trust and in all rights of the related Trust Unit Holders.

Upon original issue, the Trust Units shall be executed and delivered by the Trustee and the Trustee shall cause the Trust Units to be authenticated by the Unit Registrar upon receipt by the Trustee of the documents specified in Section 2.02.  The Trust Units shall be executed by manual or electronic signature on behalf of the Trustee by an authorized officer.  Trust Units bearing the manual or electronic signatures of individuals who were at any time the proper officers of the Trustee shall bind the Trustee, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Trust Units or did not hold such offices at the date of such Trust Units.  No Trust Unit shall be entitled to any benefit under the Trust Agreement or be valid for any purpose, unless there appears on such Trust Unit a certificate of authentication as set forth on such certificate executed by manual or electronic signature on behalf of the Unit Registrar by a duly authorized officer of the Unit Registrar, and such certificate of authentication shall be conclusive evidence, and the only evidence, that such Trust Unit has been duly authenticated and delivered hereunder.  All Trust Units shall be dated the date of their execution.

Section 5.02.   *Book-Entry Trust Units.*

(a)     The Book-Entry Trust Units will be represented initially by one or more global certificates registered in the name designated by the Depository. Notwithstanding anything herein to the contrary, the Trustee may for all intents and purposes (including the making of payments on the Book-Entry Trust Units) deal with the Depository or its nominee as the authorized representative of the Beneficial Owners of the Book-Entry Trust Units as if the Depository were the sole Book-Entry Trust Unit Holder for purposes of the Trust Agreement (including these Standard Terms) for as long as those Book-Entry Trust Units are registered in the name of the Depository or its nominee.  The rights of Beneficial Owners of the Book-Entry Trust Units shall be limited to those established by law, the Trust Agreement and agreements between such Beneficial Owners and the Depository and Depository Participants.  Requests and directions from, and votes of, the Depository, as Holder, shall not be deemed to be inconsistent if they are made with respect to different Beneficial Owners.  Subject to Section 5.03 below, a Book-Entry Trust Unit may not be transferred by the Depository or its nominee except to another nominee or the Depository, or another Depository or its nominee that agrees to hold the Book-Entry Trust Unit for the account of the respective Depository Participants and Beneficial Owners.

(b)     The Trustee will not have any liability to any person for any aspect of the records relating to or payment made on account of Beneficial Owners of the Book-Entry Trust Units held by the Depository, for monitoring or restricting any transfer of beneficial ownership in a Book-Entry Trust Unit or for maintaining, supervising or reviewing any records relating to such Beneficial Owners.

Section 5.03.   *Registration of and Limitation on Transfers and Exchanges of Units.*

The Trustee shall cause to be kept at its Corporate Trust Office a Unit Register in which, subject to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Trust Units and of transfers and exchanges of Trust Units as provided in the Trust Agreement (including these Standard Terms).  The Trustee will initially serve as Unit Registrar for the purpose of registering Trust Units and transfers and exchanges of Trust Units as herein provided.

Subject to Section 5.04, upon surrender for registration of transfer of any Trust Unit at the Corporate Trust Office of the Trustee or at any other office or agency of the Trustee maintained for such purpose, the Trustee shall execute and the Unit Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Trust Units of a like aggregate Notional Amount.

At the option of the Trust Unit Holders, each Trust Unit may be exchanged for other Trust Units with a like aggregate Notional Amount and in authorized denominations, upon surrender of such Trust Unit to be exchanged at any such office or agency.  Whenever any Trust Units are so surrendered for exchange, the Trustee shall execute and cause the Unit Registrar to authenticate and deliver the Trust Units which the Trust Unit Holder making the exchange is entitled to receive.  Every Trust Unit presented or surrendered for transfer or

exchange shall (if so required by the Trustee) be duly endorsed by, or be accompanied by a written instrument of transfer in form satisfactory to the Trustee duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge to the Trust Unit Holders shall be made for any transfer or exchange of Trust Units, but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Trust Units.

All Trust Units surrendered for transfer and exchange shall be disposed of by the Unit Registrar in accordance with its customary procedures.

The Trustee will cause the Unit Registrar (unless the Trustee is acting as Unit Registrar) to provide notice to the Trustee of each transfer of a Trust Unit, and will provide the Trustee with an updated copy of the Unit Register on January 1 of each year.

**Section 5.04.   *No Obligation to Register.***

The Trustee is not obligated to register or qualify any Trust Unit under the Securities Act or any other securities laws or to effect any qualification under the Trust Indenture Act of 1939, as amended.

**Section 5.05.   *Mutilated, Destroyed, Lost or Stolen Units.***

If (a) any mutilated Trust Unit is surrendered to the Trustee or the Unit Registrar, or the Trustee and the Unit Registrar receive evidence to their satisfaction of the destruction, loss or theft of any Trust Unit, and (b) there is delivered to the Trustee and the Unit Registrar such security or indemnity as may be required by them to save each of them harmless, then, in the absence of actual knowledge by the Trustee or the Unit Registrar that such Trust Unit has been acquired by a protected purchaser, the Trustee shall execute and deliver and the Unit Registrar shall authenticate, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Trust  Unit, a new Trust Unit of like tenor.  Upon the issuance of any new Trust Unit under this Section, the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trust Unit Registrar) connected therewith.  Any replacement Trust Unit issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust, as if originally issued, whether or not the destroyed, lost or stolen Trust Unit shall be found at any time.

**Section 5.06.   *Persons Deemed Owners*.**

Prior to due presentation of a Trust Unit for registration or transfer, the Trustee, the Unit Registrar and any agent of any of them may treat the person in whose name any Trust Unit is registered as the owner of such Trust Unit for the purpose of receiving distributions, and neither the Trustee, the Unit Registrar nor any agent of any of them shall be affected by notice to the contrary.

40

**Section 5.07.   *Appointment of Trust Unit Paying Agent.***

The Trustee shall serve as the initial Trust Unit Paying Agent hereunder and thereafter, solely in the event that legal or regulatory requirements require the appointment of a different Trust Unit Paying Agent, the Trustee may appoint on behalf of, and as an expense of, the Trust, any other Trust Unit Paying Agent for the purpose of making distributions to Trust Unit Holders; provided, however, that any replacement Trust Unit Paying Agent shall be required to meet the eligibility requirement set forth in Section 6.06.  The Trustee shall cause such Trust Unit Paying Agent to execute and deliver to the Trustee an instrument in which such Trust Unit Paying Agent shall agree with the Trustee that such Trust Unit Paying Agent will hold all sums held by it for the payment to Trust Unit Holders in trust for the benefit of the Trust Unit Holders entitled thereto until such sums shall be paid to the Trust Unit Holders.  All funds remitted by the Trustee to any such Trust Unit Paying Agent for the purpose of making distributions shall be paid to Trust Unit Holders as soon as practicable following receipt thereof by the Trust Unit Paying Agent and any amounts not so paid shall be returned as soon as practicable to the Trustee.

## ARTICLE VI

## CONCERNING THE TRUSTEE

**Section 6.01.  *Duties of Trustee.***

Every provision of the Trust Agreement (including these Standard Terms) relating to the conduct of, affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VI.

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Trust Agreement and no implied covenants or obligations shall be read into the Trust Agreements against the Trustee.

The Trustee shall (at the direction of the Requisite Trust Unit Holders), subject to its rights and protections herein, take all necessary or desireable actions to enforce the Assured Insurance Policies as set forth herein.

The Trustee shall deliver to all Trust Unit Holders copies of all notices and written communications received from Depositor, Reorganized HTA, or the trustee of a FGIC Trust as they relate to the Bonds and/or the FGIC Certificates, as applicable.

Except as provided in Section 6.02 hereof, no provision of the Trust Agreement shall be construed to relieve the Trustee from liability for its own grossly negligent action, grossly negligent failure to act or willful misconduct; *provided, however,* that:

(a)      The Trustee shall not be liable for an error of judgment made in good faith by an Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

41

(b)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of Assured or, in the event that the Voting Rights are held by a party other than Assured, Trust Unit Holders entitled to a majority of the Voting Rights (or such other percentage as may be specified herein) relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the New Securities or exercising any trust or power conferred upon the Trustee with respect to the New Securities, under the Trust Agreement;

(c)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Requisite Trust Unit Holders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Assured Insurance Policies or exercising any trust or power conferred upon the Trustee with respect to the Assured Insurance Policies, under the Trust Agreement; and

(d)     Any determination of gross negligence, willful misconduct or bad faith of the Trustee shall be made only upon the rendering of a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

**Section 6.02.  *Certain Matters Affecting the Trustee.***

(a)     The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties.  Further, the Trustee may accept a copy of the vote of the board of directors or equivalent governing body of any party certified by its clerk or assistant clerk or secretary or assistant secretary as conclusive evidence of the authority of any Person to act in accordance with such vote, and such vote may be considered as in full force and effect until receipt by the Trustee of written notice to the contrary;

(b)     The Trustee may, in the absence of bad faith on its part, conclusively rely upon an Opinion of Counsel or certificate of an Officer of the appropriate Person whenever in the administration of the Trust Agreement the Trustee shall deem it desirable that a matter be proved or established (unless other evidence be herein specifically prescribed) prior to taking, suffering or omitting any action hereunder;

(c)     The Trustee may consult with counsel of its own selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in reliance on such advice or Opinion of Counsel;

(d)     The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by the Trust Agreement or to institute, conduct, defend or continue any litigation thereunder or in relation thereto at the request, order or direction of any of the Trust Unit Holders, pursuant to the provisions of the Trust Agreement, unless such Trust Unit

42

Holders shall have offered to the Trustee security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(e) The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Trust Agreement (including these Standard Terms);

(f) The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by Assured or, in the event that the Voting Rights are held by a party other than Assured, Trust Unit Holders entitled to a majority of the Voting Rights; *provided, however,* that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of the Trust Agreement, the Trustee may require indemnity against such expense or liability as a condition to taking any such actions;

(g) The Trustee may execute any of the trusts or powers under the Trust Agreement or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for the supervision of or any misconduct or negligence on the part of any agent or attorney appointed with due care by it under the Trust Agreement (including these Standard Terms);

(h) Whenever the Trustee is authorized herein to require acts or documents in addition to those required to be provided it in any matter, it shall be under no obligation to make any determination whether or not such additional acts or documents should be required unless obligated to do so under Section 6.01;

(i) The Trustee shall not be deemed to have notice of any matter unless one of its Officers has received written notice thereof at the Corporate Trust Office and such notice references the applicable Trust Units generally, the applicable Depositor(s), the Trust or the Trust Agreement;

(j) None of the provisions of the Trust Agreement or these Standard Terms shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it;

(k) Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

43

(l)     The permissive rights of the Trustee to perform any discretionary act enumerated in the Trust Agreement or these Standard Terms shall not be construed as a duty or obligation, and the Trustee shall not be answerable in the performance of such act other than for its gross negligence or willful misconduct;

(m)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian, co-trustee and other Person employed to act hereunder;

(n)     The Trustee shall have no duty (A) to see to any recording, filing, or depositing of the Trust Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Trust Estate, or (D) to confirm or verify the contents of any reports or certificates delivered to the Trustee pursuant to the Trust Agreement (including these Standard Terms) believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties;

(o)     The Trustee shall have no liability or responsibility for the acts or omissions of any other party to any of the Trust Agreement, these Standard Terms or any related document;

(p)     The Trustee shall have no duty or obligation to obtain or solicit any collateral or any funds to be remitted in any of the accounts established under the Trust Agreement or these Standard Terms, and shall have a duty only to accept such collateral or funds delivered to it in accordance with the Trust Agreement (including these Standard Terms);

(q)     The Trustee may rely conclusively on certification from Assured as to the Compounded Amount;

(r)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(s)     The Trustee may request the delivery of a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Trust Agreement;

(t)     All rights of action under the Trust Agreement or under any of the Trust Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Trust Units, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of such Trust Units, subject to the provisions of the Trust Agreement; and

44

(u)     The rights, protections, priviledges and immunities granted to the Trustee shall be applicable to the Trustee in its capacity as Unit Registrar and Trust Unit Paying Agent, *mutatis mutandis*.

**Section 6.03.   *Trustee Not Liable for Trust Units or Securities.***

The Trustee assumes no responsibility for the correctness of the recitals contained in the Trust Agreement and in the Trust Units.  The Trustee makes no representations or warranties as to the validity or sufficiency of the Trust Agreement or of the Trust Units (other than the signature and authentication of the Trustee on the Trust Units) or of the Securities or related documents.  The Trustee shall not be accountable for the use or application of any of the Trust Units, or for the use or application of any funds in respect of the Securities or deposited in or withdrawn from the Trust in accordance with the Trust Agreement other than, in each case, any funds held by or on behalf of the Trustee in accordance with Sections 3.01 and 3.02.  The Trustee, in its capacity as Trustee hereunder, shall have no responsibility or obligation to comply with, or to monitor any other Person's compliance with, the Bond Documents.

**Section 6.04.   *Trustee May Own Units.***

The Trustee in its individual capacity or any other capacity may become the owner or pledgee of Trust Units with the same rights it would have if it were not Trustee.

**Section 6.05.   *Trustee's Fees and Expenses.***

(a)     Pursuant to the Fee Agreement, each of the Trustee and the Delaware Trustee shall be entitled to receive from Assured, and if not paid by Assured, the Trust, compensation agreed upon in writing (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by it in the execution of the trusts created under the Trust Agreement and in the exercise and performance of any of the powers and duties thereunder of the Trustee.  Each of the Trustee and the Delaware Trustee shall be entitled to reimbursement for (x) all reasonable fees, expenses, costs and disbursements (other than Extraordinary Expenses) incurred or made by the Trustee or the Delaware Trustee in accordance with any of the provisions of the Trust Agreement (including these Standard Terms) (including but not limited to the fees, expenses and disbursements of their respective counsel and of all persons not regularly in their respective employ), in each case to the extent set forth in the Fee Agreement and (y) Extraordinary Expenses reimbursable pursuant to Section 6.05(b).  Additionally each of the Trustee and the Delaware Trustee shall be entitled to indemnification as provided in Section 6.13.  All such amounts payable to the Trustees, collectively, the "**Trustee Costs**".  All such Trustee Costs shall be paid pursuant to the terms of the Fee Agreement and the provisions of this Trust Agreement and may be reimbursed to the Trustee and the Delaware Trustee in accordance with the provisions of the Fee Agreement and the terms of this Trust Agreement, including Section 3.02 hereof.  As set forth in the Fee Agreement, Trustee Costs will only be paid by the Trust in the event that Assured fails to do so pursuant to the terms of the Fee Agreement.  As set forth in Sections 3.02(a)(iii), 3.02(b)(ii), 3.02(c)(ii), and 3.02(d)(ii) above, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of

45

payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy (i) insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account, (ii) insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, (iii) insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), or (iv) insuring the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, as applicable.  For the avoidance of doubt, the obligations to the Trustee shall include the Trustee in its capacity as Unit Registar and Trust Unit Paying Agent.

(b)     In furtherance of Section 6.05(a), and subject to the terms of and limitations in the Fee Agreement, each of the Trustee (including in its capacities as the Unit Registrar and Trust Unit Paying Agent) and the Delaware Trustee shall be entitled to receive reimbursement for all reasonable out-of-pocket expenses which are properly documented and incurred or made by it, including costs of collection, payable as a result of or in connection with litigation, enforcement actions or other proceedings brought by Trust Unit Holders against the Depositor, Reorganizd HTA, the Trust, or each of the Trustees except for proceedings, litigation or enforcement actions that relate to the Trustee's or Delaware Trustee's, as the case may be, own grossly negligent action, grossly negligent failure to act or its own willful misconduct as determined by a final judgment of a court of competent jurisdiction no longer subject to appeal or review (the "**Extraordinary Expenses**").  Subject to the terms of the Fee Agreement, the Trustee may (i) demand reimbursement from Assured, or (ii) in the event Assured fails to pay in response to such demand, make withdrawals from the Trust, to pay or reimburse itself the amount of any Extraordinary Expenses, up to a payment limit of $150,000 in the aggregate for the Trusts of Extraordinary Expenses in any calendar year or pro rata portion thereof in the case of the initial and the final years of the Trust based upon the portion of the applicable calendar year in which the Trust exists; provided, however, that the Trustee shall not have any obligation to incur additional Extraordinary Expenses in excess of such annual limit unless it has received security or indemnity reasonably satisfactory to it for such additional Extraordinary Expenses; and provided, further, that if the Trustee does incur any additional Extraordinary Expenses in excess of such annual limit in any calendar year, nothing herein shall prohibit it from being reimbursed for such Extraordinary Expenses in any subsequent calendar year, to the extent of funds available for such reimbursement as provided hereunder and subject to the payment limit of $100,000 applicable for each such subsequent calendar year or such pro rata portion thereof in the case of the initial and final years of the Trust and provided further that the foregoing shall not limit the payment of any amounts to which the Trustee is entitled pursuant to its indemnification rights set forth in Section 6.13 and the Fee Agreement with respect to defending the Trustee against any claim asserted by any Person.

(c)     For the avoidance of doubt, the Depositor shall not be liable for any Trustee Costs or Extraordinary Expenses.

**Section 6.06.  *Eligibility Requirements for Trustee, Successor Trustee, and Trust Unit Paying Agent.***

The Trustee, any successor Trustee, and any successor Trust Unit Paying Agent shall at all times be a corporation or national banking association that: (i) is not an Affiliate of the

Depositor or Assured; (ii) is neither affilliated with the Commonwealth or its instrumentalities, public corporations, or municipalities, nor located in the Commonwealth; (iii) is organized and doing business under the laws of any state or the United States of America; (iv) is authorized under such laws to exercise corporate trust powers; (v) is in good standing under the law of the jurisdiction in which it is organized; (vi) has a combined capital and surplus of at least $50,000,000; (vii) is subject to supervision or examination by federal or state authority; and (viii) is regularly acting as a trustee in the municipal finance market.  If such corporation publishes reports of its conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published.  In case at any time any Trustee, successor Trustee, or successor Trust Unit Paying Agent shall cease to be eligible in accordance with the provisions of this Section, such Trustee, successor Trustee, or successor Trust Unit Paying Agent shall resign immediately in the manner and with the effect specified in Section 6.07.

**Section 6.07.   *Resignation and Removal of the Trustee.***

(a)      The Trustee may at any time resign and be discharged from the trusts created pursuant to a Trust Agreement by giving 60 days written notice, which shall be posted to EMMA by the Trustee.  Upon receiving such notice of resignation, Assured shall promptly appoint a successor trustee meeting the requirements set forth in Section 6.06 by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee.  A copy of such instrument shall be delivered to the Trust Unit Holders and posted to EMMA by the successor trustee.  If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee at the expense of the Trust.

(b)      If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 6.06 and shall fail to resign after written request therefor by Assured, or if any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then Assured may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.

(c)      Assured may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, in triplicate, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

Any resignation of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 6.07 shall not become effective until the acceptance of appointment by the successor trustee as provided in Section 6.08 hereof.  The compensation and reimbursement for fees and expenses of any successor trustee appointed in connection with

the resignation of the Trustee shall be the sole responsibility of Assured and the Trust, including without limitation, the costs and expenses incurred in connection with any such succession.

Any removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 6.07 shall not become effective until (i) acceptance of appointment by the successor trustee as provided in Section 6.08 hereof and (ii) payment of all costs, expenses and indemnities (other than Extraordinary Expenses) due and owing to the outgoing Trustee, including without limitation, the costs and expenses incurred in connection with any such succession.

Notwithstanding the replacement of the Trustee pursuant to this Section 6.07, the rights, benefits, protections and indemnities afforded to the Trustee under this Article VI shall continue to the benefit of the retiring Trustee.

### Section 6.08.  *Successor Trustee.*

Any successor trustee appointed as provided in Section 6.07 shall execute, acknowledge and deliver to the Trust Unit Holders and to the predecessor trustee an instrument accepting such appointment under the Trust Agreement and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor thereunder, with the like effect as if originally named as trustee therein.  The predecessor trustee shall deliver to the successor trustee all related documents and statements held by it under the Trust Agreement and the Trust Unit Holders and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 6.06 hereof.

Upon acceptance of appointment by a successor trustee as provided in this Section, the successor trustee shall (a) post to EMMA notice of the succession of such trustee under the Trust Agreement and (b) mail notice of the succession of such trustee under the Trust Agreement to all Holders of Trust Units at their addresses as shown in the Unit Register.

### Section 6.09.  *Merger or Consolidation of Trustee.*

Any Person into which the Trustee may be merged or converted or with which it may be consolidated or any Person resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee under the Trust Agreement provided such Person  shall be eligible under the provisions of Section 6.06, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

**Section 6.10.  *Reserved.***

**Section 6.11.  *Appointment of Custodians.***

The Trustee may appoint one or more Custodians to hold all or a portion of the Trust Estate as agent for the Trustee, by entering into a custodial agreement.  The appointment of any Custodian may at any time be terminated and a substitute custodian appointed therefor by the Trustee.  Subject to Article VI, the Trustee agrees to comply with the terms of each custodial agreement and to enforce the terms and provisions thereof against the Custodian for the benefit of the Trust Unit Holders.  Each Custodian shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and surplus of at least $10,000,000 and shall be qualified to do business in the jurisdiction in which it holds any asset constituting part of the Trust Estate.  Any such Custodian may not be an Affiliate of the Depositor or Assured.

**Section 6.12.  *Trustee May Enforce Claims Without Possession of Trust Units.***

All rights of action and claims under the Trust Agreement or the Trust Units may be prosecuted and enforced by the Trustee without the possession of any of the Trust Units or the production thereof in any proceeding relating thereto and any such proceeding instituted by the Trustee shall be brought in its own name or in its capacity as Trustee.  Any recovery of judgment shall, after provision for the payment of the reasonable compensation, fees, expenses, indemnities, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Trust Unit Holders in respect of which such judgment has been recovered.

**Section 6.13.  *Trustee Indemnity***

The Trustees' rights to claim indemnification for losses that they may incur with respect to the Trust Agreement (incorporating these Standard Terms) and each other document contemplated by the foregoing to which either of the Trustees is a party shall be as set forth in Annex I hereto and the Fee Agreement, subject to, with respect to Extraordinary Expenses, the provisions of Section 6.05(b).

<div align="center">

**ARTICLE VII**

**TERMINATION OF TRUST**

</div>

**Section 7.01.  *Termination; No Redemption Rights.***

Upon the indefeasible cancellation or other indefeasible termination of the relevant Assured Insurance Policy, the Trust (including the respective obligations and responsibilities under the Trust Agreement of the Trustee and Assured) shall terminate upon (i) the distribution to Assured or to Trust Unit Holders, as applicable, of any remaining Trust Assets held by or on behalf of the Trustee and required hereunder to be so distributed in accordance with the provisions of Section 3.03, 3.04, 3.05 3.07, or 3.08 hereof (the "Final Distribution"), (ii) payment in full of any Trustee Costs due and owing to the Trustees under the Trust Agreement (including these Standard Terms), (iii) payment in full of any Assured Deferred Expenses due and owing to Assured under the Trust Agreement (including these Standard Terms), (iv)

<div align="center">49</div>

payment in full of any known Tax Costs due and owing to any tax or governmental authority, and (v) solely to the extent the Final Distribution is required to be made to Trust Unit Holders and not to Assured, completion of the procedure for termination set forth in Section 7.02 below. In no event shall the Trust be terminated or the Securities be redeemed (except in the case of a redemption of the Securities permitted under the terms of the Bond Documents) or otherwise released from the Trust Estate (except pursuant to, and in accordance with, Sections 3.04 and 3.07 hereof) without the prior express written consent of Assured if either (i) the relevant Assured Insurance Policy has not been indefeasibly terminated or (ii) Assured has not been indefeasibly paid in full for any amounts owed pursuant to the Commonwealth Plan or the HTA Plan.

Upon the dissolution, wind up and termination of the Trust and the Trust Agreement, the Trustee or Delaware Trustee (acting solely at the written direction of the Trustee) is authorized to file a certificate of cancellation with the Secretary of State.

Notwithstanding anything contained herein to the contrary, the merger or consolidation of the Trustee shall not cause a termination of the Trust.

**Section 7.02.** *Procedure for Termination.*

At least thirty (30) days prior to the date on which the Trustee intends to make the Final Distribution from the Trust, solely to the extent such Final Distribution is required to be made to Trust Unit Holders and not to Assured, the Trustee shall give notice by letter to the Trust Unit Holders specifying: (a) the anticipated date of the Final Distribution; (b) any relevant amounts, or trust assets, remaining on deposit in the Trust will be distributed to the holders of record of the Trust Units on a pro rata basis to the extent necessary to satisfy the Insured Amount; and (c) that the Trustee believes that, following the occurrence of such Final Distribution, the conditions to termination of the Trust have been satisfied and that it intends to terminate the Trust (a "**Termination Notice**"); provided, however, that to the extent that the Final Distribution is to be made to Assured, no such Termination Notice or notice period shall be required.

In the event a Termination Notice is required, (i) the Trustee shall provide a copy of the Termination Notice to the Unit Registrar at the time such Termination Notice is given to Trust Unit Holders, and (ii) if the Requisite Trust Unit Holders do not object in writing within thirty (30) days after the Trustee has provided the Termination Notice as set forth herein, then, upon completion of the Final Distribution as set forth in the Termination Notice, the Trust shall be dissolved, wound up, and terminated; provided, however, that no Trust Unit Holder shall be permitted to object to the termination of the Trust on any grounds other than that the Insured Amount, as calculated in accordance with this Trust Agreement, the HTA Plan, the Commonwealth Confirmation Order, and other applicable law, is anticipated to be greater than zero as of the anticipated date of the Final Distribution.

## ARTICLE VIII

## TAX PROVISIONS

50

**Section 8.01.   *Grantor Trust Provisions.***

The Trustee, the Depositor, the Trust Unit Holders (by their acceptance of the Trust Units and book-entry beneficial interests therein) and Assured each agree and acknowledge or have agreed and acknowledged that the Trust is intended to qualify for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust, and it is neither the purpose nor the intent of the parties hereto to create a partnership, joint venture or association taxable as a corporation or to serve as associates in a joint enterprise for the conduct of business for profit.  In furtherance of the foregoing, (a) the purpose of the Trust is and shall be to protect and conserve the assets of the Trust Estate, and the Trust shall not at any time engage in or carry on any kind of business or any kind of commercial or investment activity, (b) the Trust is formed to facilitate direct investment in the Trust Assets, and (c) the Trustee (at the direction of Assured and/or the Requisite Trust Unit Holders), shall take, or refrain from taking, all such action as is necessary to maintain the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.  The Trustee shall not (i) acquire any assets or dispose of any portion of the Trust other than pursuant to the specific provisions of this Trust Agreement, (ii) vary the investment of the Trust within the meaning of Treasury Regulation § 301.7701-4(c), (iii) substitute new investments or reinvest so as to enable the Trust Estate to take advantage of variations in the market to improve the investment of any Trust Unit Holder or (iv) engage in any activity which may directly or indirectly, adversely affect the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.  The Trustee shall not have any authority to manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Estate except as required by the express terms of this Trust Agreement in accordance with the powers granted to or the authority conferred upon the Trustee pursuant to this Trust Agreement.  The Trustee and Assured each agree that they shall not take any action that would result in the Trust failing to be characterized for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.

**Section 8.02.   *Characterization.***

Each Trust Unit Holder acknowledges and agrees to treat the Trust Units and the book-entry beneficial interests therein as undivided interests in the Trust Estate.

**Section 8.03.   *Grantor Trust Administration.***

Notwithstanding anything in this Trust Agreement to the contrary, and notwithstanding any direction or instruction by less than all the Trust Unit Holders, the Trustee shall not be authorized to take any action that would cause the Trust not to be treated as a grantor trust under the Code all of the distributions and income from which would be subject to the tax treatment described in Subpart J of Chapter 1 of the Code as to the Trust Unit Holders.  The Trustee shall perform its duties hereunder so as to maintain the status of the Trust as a grantor trust under the Grantor Trust Provisions.  The Trustee shall not (a) exercise any discretionary rights with respect to the Trust Assets, (b) acquire an interest in any additional Trust Assets (other than proceeds of a sale of Trust Assets permitted under the terms of this Trust Agreement), (c) knowingly take any other action or fail to take (or fail to cause to be taken)

any other action that, under the Grantor Trust Provisions, if taken or not taken, as the case may be, could adversely affect the status of (i) the Trust as a grantor trust, (ii) the Trust as a U.S. trust, or (iii) the Trust Unit Holders as grantors with respect to the Trust under the Grantor Trust Provisions (any such adverse effect on trust status, an "**Adverse Trust Event**"), unless the Trustee has obtained or received an Opinion of Counsel from counsel nationally recognized as competent in matters relating to the U.S. federal income taxation of organizations such as the Trust (at the expense of the party requesting such action or at the expense of the Trust Estate if the Trustee seeks to take such action or to refrain from taking any action for the benefit of the Trust Unit Holders) to the effect that the contemplated action will not result in an Adverse Trust Event.  None of the other parties hereto shall take any action or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that the Trustee has received or obtained an Opinion of Counsel to the effect that an Adverse Trust Event could result from such action or failure to act.  The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Trust Agreement, but in no event at the cost or expense of the Trust Estate or the Trustee.

### Section 8.04.  *Reports to Trust Unit Holders and Tax Authorities*

(a)    The Trustee shall perform or cause to be performed on behalf of the Trust all reporting and other tax compliance duties that are required in respect thereof under the Code, the Grantor Trust Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority, including for the avoidance of doubt the filing of IRS Forms 1099 or providing other information statements to the extent required pursuant to U.S. Treasury Regulations Section 1.671-5, as amended, or any successor provision (the "**WHFIT Regulations**") (including U.S. Treasury Regulations Section 1.671-5(c)(1)).

(b)    Consistent with the Trust's characterization for U.S. federal income tax purposes as a grantor trust, except to the extent required pursuant to the WHFIT Regulations, no U.S. federal income tax return shall be filed on behalf of the Trust unless either (i) the Trustee shall receive an Opinion of Counsel that, based on a change in applicable law occurring after the date hereof, the Code requires such a filing or (ii) the Internal Revenue Service shall determine that the Trust is required to file such a return. In the event that the Trust is required to file tax returns, the Trustee shall prepare or cause to be prepared, and sign and file when due with the appropriate tax authorities all of the tax returns in respect of the Trust.  In no event shall the Trustees, the Depositor, or Assured be liable for any liabilities, costs or expenses of the Trust or the Trust Unit Holders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to the Trustee's gross negligence or willful misconduct.

(c)    If any tax, duty, assessment, or other governmental charge is imposed, levied or assessed on the Trust, or if the Trust becomes subject to deduction, withholding, or other charge or assessment from, or with respect to, any amounts received by the Trust or any

distributions made by the Trust, such tax, duty, assessment or other governmental charge, together with all incidental costs and expenses (including, without limitation, penalties and reasonable attorneys' fees) (collectively, the "**Tax Costs**") shall be the sole responsibility of, charged to and payable by the Trust Unit Holders on a pro rata basis.  To the extent known prior to the termination of the Trust, all Tax Costs that are withheld, collected, charged, assessed, or levied shall be paid by the Trustee from the Trust Assets and income to the applicable taxing or governmental authority and any amounts so withheld, collected and/or paid to the applicable taxing or governmental authority shall be deemed to have been paid as distributions to the applicable Trust Unit Holders and treated in accordance with the provisions of the Trust Agreement applicable to Tax Costs.  To the extent any Tax Costs become known after the termination of the Trust, the former Trust Unit Holders of such Trust shall remain responsible for such Tax Costs on a pro rata basis.

(d)     The Trustee shall, for U.S. federal income tax purposes, maintain books and records with respect to the Trust on a calendar year basis or such other basis as may be required under the Code.

(e)     All taxes due and payable on any amounts payable to a Trust Unit Holder with respect to a Trust Unit shall be that Trust Unit Holder's sole responsibility.

(f)     For the purposes of this <u>Article VIII</u> of these Standard Terms and any other provision of the Trust Agreement relating to the ownership of a Trust Unit for U.S. federal income tax purposes, including definitions, all references to Holder, Trust Unit Holder, or Beneficial Owner shall mean the beneficial owner of a Trust Unit for U.S. federal income tax purposes.  By acquiring an interest in a Trust Unit, a beneficial owner of the Trust Unit for U.S. federal income tax purposes shall be deemed to consent as a condition of acquiring such interest to comply with any requirements of such Articles, Sections, or provisions hereof.

(g)     Notwithstanding any other provision of the Trust Agreement (including these Standard Terms), Assured makes no representations, warranties, or guarantees, and shall have no liability, with respect to the tax treatment of the Trust, the Trust Units, any payments made in connection with the Trust or the Trust Units, any Tax Costs, or any securities or other property held in the Trust or issued in connection with the Trust, including, without limitation, the Trust Units.  By electing, or being deemed to elect, Assured Bondholder Election 2, all Trust Unit Holders expressly agree to hold Assured harmless, and not to seek to impose any liabiltiy on Assured, related to the tax treatment of the Trust, the Trust Units, any payments made in connection with the Trust or the Trust Units, any Tax Costs, or any securities or other property held in the Trust or issued in connection with the Trust, including, without limitation, the Trust Units.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

**Section 9.01.**  *Amendment of Trust Agreement.*

Promptly following the execution of the Trust Agreement, the Trustee shall post full and complete copies of the Trust Agreement (including these Standard Terms) on EMMA. The Trust Agreement (including these Standard Terms) may not be amended, waived or supplemented without the prior written consent of Assured.  The Trust Agreement (including these Standard Terms) may be amended, waived or supplemented from time to time by Assured and the Trustee without the consent of the Trust Unit Holders; provided, however, that no such amendment shall:

(a)      except as otherwise provided in the Trust Agreement (including these Standard Terms) reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Trust Unit Holder without the written consent of such Trust Unit Holder;

(b)      compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Assured Insurance Policy without the written consent of each Trust Unit Holder affected;

(c)      alter in any manner the calculation or treatment of the Compounded Amount without the written consent of each Trust Unit Holder affected;

(d)      amend this Section 9.01 without the written consent of each Trust Unit Holder;

(e)      adversely affect in any other material respect the interests of the Trust Unit Holders in any manner other than as described in (a), (b), or (c) without the written consent of the Trust Unit Holders evidencing at least a majority of such Trust Units in the applicable Trust (measured, in the case of Current Interest Bonds, by the outstanding principal amount, or, in the case of Capital Appreciation Bonds, the Compounded Amount, as the case may be, of the underlying Assured Legacy Bonds), excluding, from both the numerator and the denominator, any Trust Units held by Assured; *provided*, that only Trust Units that an Officer of the Trustee knows are so held shall be so disregarded; or

(f)      reduce the aforesaid percentage of Trust Units the Holders of which are required to consent to any such amendment, without the unanimous written consent of such Holders of all Trust Units then outstanding.

Prior to executing any amendment permitted by this Article IX, (i) the Trustee shall be required to obtain an Opinion of Counsel that is nationally recognized as competent in matters relating to the federal income taxation of organizations such as the Trust to the effect that such amendment will not result in an Adverse Trust Event and (ii) the Trustee shall be entitled to receive, and shall be fully protected in relying upon an Opinion of Counsel and a certificate from an Officer of Assured stating that the execution of such amendment is authorized or permitted by the Trust Agreement and that all conditions precedent have been met.  The Trustee may, but shall not be obligated to, enter into any such amendment that affects the Trustee's own rights, duties, liabilities, indemnities or immunities under the Trust Agreement, these Standard Terms or otherwise.

Promptly after the execution of any such amendment the Trustee shall furnish a copy of such amendment to each Trust Unit Holder and shall post a copy of such amendment to EMMA.

The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Trust Unit Holders shall be subject to such reasonable regulations as the Trustee may prescribe.

**Section 9.02.   *Counterparts; Electronic Signatures.***

The Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument. The words "execution," "signed," "signature," and words of like import in the Trust Agreement (including these Standard Terms) or in any other certificate, agreement or document related to the Trust Agreement (including these Standard Terms) shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and Adobe Sign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the US Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

**Section 9.03.   *Limitation on Rights of Trust Unit Holders.***

The death or incapacity of any Trust Unit Holder shall not operate to terminate the Trust Agreement or the Trust, nor entitle such Trust Unit Holder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, nor otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

No Trust Unit Holder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust, or the obligations of the parties hereto, nor shall anything herein set forth, or contained in the terms of the Trust Units, be construed so as to constitute the Trust Unit Holders from time to time as partners or members of an association; nor shall any Trust Unit Holder be under any liability to any third person by reason of any action taken by the parties to the Trust Agreement pursuant to any provision hereof.

Except with respect to enforcement of the applicable Assured Insurance Policies in accordance with the terms hereof, including without limitation the rights set forth in Section 3.03 of a Franklin Nuveen Trust Unit Holder, no Trust Unit Holder shall have any right by virtue of any provision of the Trust Agreement to institute any suit, action or proceeding in

equity or at law upon or under or with respect to the Trust Agreement, unless the Requisite Trust Unit Holders shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee under the Trust Agreement, and the Trustee, for 15 days after its receipt of such request shall have neglected or refused to institute any such action, suit or proceeding.  It is understood and intended, and expressly covenanted by each Trust Unit Holder with every other Trust Unit Holder and the Trustee, that no one or more Holders of Trust Units shall have any right in any manner whatever by virtue of any provision of the Trust Agreement to affect, disturb or prejudice the rights of the Holders of any other Trust Units, or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under the Trust Agreement, except in the manner therein provided and for the equal, ratable and common benefit of all Trust Unit Holders.  For the protection and enforcement of the provisions of this Section, each and every Trust Unit Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

In the event that an Officer of the Trustee receives a request for its consent to any amendment, modification or waiver of these Standard Terms, the Trust Agreement or any other document thereunder or relating thereto, or receives any other solicitation for any action with respect to the Securities or Assured Insurance Policies, the Trustee shall transmit a notice of such proposed amendment, modification, waiver, solicitation or action to each of the Trust Unit Holders within five (5) days of receipt thereof.  The Trustee shall request instructions from the Trust Unit Holders as to whether or not to consent to or vote to accept such amendment, modification, waiver, solicitation or action.

The Trustee shall consent or vote proportionally in accordance with the written direction of the Trust Unit Holders; provided, however, that the Trustee shall not:

(a)   without the prior written consent of any Trust Unit Holder, consent or affirmatively vote on behalf of such Trust Unit Holder on any matter that would: (i) terminate the Trust, (ii) except as expressly provided herein, sell some or all of the assets of the Trust; (iii) compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Assured Insurance Policy; and

(b)   without the prior written consent of Assured, consent or affirmatively vote on any matter that would amend, modify or waive any agreement in such a manner as to adversely impact Assured.  Any such determination as to whether any such amendment, modification or waiver adversely impacts Assured shall be made in the sole and absolute discretion of Assured and such determination shall be promptly provided by notice to the Trustee and the Trust Unit Holders.  The Trustee shall not be liable to any Trust Unit Holder or any other Person for refusing to consent or affirmatively vote on such a matter in accordance with such written direction of Assured.

### Section 9.04.  *Notices.*

All demands and notices under the Trust Agreement shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by first class mail, postage prepaid, or by express delivery service, to:

(a) in the case of the Trustee if the Trustee is U.S. Bank Trust Company, National Association, the notice address for the Trustee is 100 Wall Street, 6th Floor, New York, New York 10005. If the Trustee is not U.S. Bank Trust Company, National Association, the notice address shall be the address set forth in the Trust Agreement, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Trustee;

(b) in the case of the Delaware Trustee, if the Delaware Trustee is U.S. Bank Trust National Association, the notice address for the Delaware Trustee is 100 Wall Street, 6th Floor, New York, New York 10005. If the Delaware Trustee is not U.S. Bank Trust National Association, the notice address shall be the address set forth in the Trust Agreement, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Delaware Trustee;

(c) in the case of the Depositor, [●], or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Depositor; and

(d) in the case of Assured, 1633 Broadway, New York, NY 10019, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by Assured.

Any notice required or permitted to be mailed to a Trust Unit Holder shall be given by first-class mail, postage prepaid, or by express delivery service, at the address of such Trust Unit Holder as shown in the Unit Register. Notwithstanding the foregoing, so long as the Depository or its nominee is the registered holder of the Book-Entry Trust Units, notice may be given to the Book-Entry Trust Unit Holders by giving notice to the Depository in accordance with its applicable procedures. Notice may also be delivered by email in accordance with a separate side letter agreement entered into between the parties. Any notice so mailed within the time prescribed in the Trust Agreement shall be conclusively presumed to have been duly given, whether or not the Trust Unit Holder receives such notice. A copy of any notice required to be telecopied hereunder also shall be mailed to the appropriate party in the manner set forth above. A copy of any notice given hereunder to any other party shall be delivered to the Trustee.

### Section 9.05.  *Severability of Provisions.*

If any one or more of the covenants, agreements, provisions or terms of the Trust Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of the Trust Agreement and shall in no way affect the validity or enforceability of the other provisions of the Trust Agreement or of the Trust Units or the rights of the Holders thereof.

### Section 9.06.  *Third-Party Beneficiaries.*

The Trust Unit Holders and their successors and assigns shall be third-party beneficiaries of the provisions of the Trust Agreement (inclding these Standard Terms). For

the avoidance of doubt, beneficial holders of Trust Units are third party beneficiaries solely to the extent necessary to allow them to enforce the applicable Assured Insurance Policies as set forth herein.  Nothing in these Standard Terms or the Trust Agreement, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, and the Trust Unit Holders, any benefit or any legal or equitable right, remedy or claim under the Trust Agreement (including these standard terms).

Section 9.07.  *Acts of Trust Unit Holders.*

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Trust Agreement (including these Standard Terms) to be given or taken by Trust Unit Holders or a class of Trust Unit Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Trust Unit Holders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Trustee. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of the Trust Agreement (including these Standard Terms) and conclusive in favor of the Trustee.  The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner that the Trustee deems sufficient. The ownership of Trust Units shall be proved by the Unit Register.

Section 9.08.  *Headings.*

Section and subsection headings in these Standard Terms are included herein for convenience of reference only and shall not constitute a part of these Standard Terms for any other purpose or be given any substantive effect.

Section 9.09.  *No Waiver; Cumulative Remedies.*

No failure to exercise and no delay in exercising, on the part of any party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

Section 9.10.  *Merger and Integration.*

These Standard Terms and the Trust Agreement sets forth the entire understanding of the parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by the Trust Agreement (including these Standard Terms).

Section 9.11.  *The Delaware Trustee*

(a)   The Delaware Trustee is appointed to serve as the trustee of the Trust in the State of Delaware for the sole purpose of satisfying the requirement of Section 3807(a) of the Delaware Statutory Trust Act that the Trust have at least one trustee with a principal place of business in the State of Delaware.  It is understood and agreed by the parties hereto

that the Delaware Trustee shall have none of the duties or liabilities of the Trustee or any other trustees.

(b)     The duties of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Delaware Secretary of State which the Delaware Trustee is required to execute under Section 3811 of the Delaware Statutory Trust Act.  To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Trust or the Trust Unit Holders, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.  The Delaware Trustee shall have no liability for the acts or omissions of the Trustee or any other trustees and the Delaware Trustee shall not be liable for supervising or monitoring the performance of the duties of the Trustee, or any other trustees, or the Trust or of any other person or entity under the Trust Agreement or any related document.

(c)     The Delaware Trustee may be removed by Assured upon thirty days prior written notice to the Delaware Trustee.  The Delaware Trustee may resign upon thirty days prior written notice to Assured, with a copy to the Trustee.  No resignation or removal of the Delaware Trustee shall be effective except upon the appointment by Assured of a successor Delaware Trustee that (i) is reasonably acceptable to Assured, (ii) has a combined capital and surplus of at least $10,000,000 and (iii) is qualified to do business in the State of Delaware.  If no successor has been appointed within such thirty (30) day period, the Delaware Trustee, the Trustee or the Trust Unit Holders may petition a court to appoint a successor Delaware Trustee, which shall be at the expense of the Trust.

(d)     Any Person into which the Delaware Trustee may be merged or with which it may be consolidated, or any Person resulting from any merger or consolidation to which the Delaware Trustee shall be a party, or any Person which succeeds to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor Delaware Trustee under the Trust Agreement without the execution, delivery or filing of any paper or instrument or further act to be done on the part of the parties hereto, except as may be required by applicable law, provided that such resulting or successor entity otherwise satisfies the requirements set forth herein to serve as Delaware Trustee.

(e)     Assured and the Trust shall be responsible for the payment of any fees or expenses of the Delaware Trustee.  The Delaware Trustee shall be entitled to all of the same rights, protections, indemnities and immunities under the Trust Agreement and with respect to the Trust as the Trustee.  No amendment or waiver of any provision of the Trust Agreement which adversely affects the Delaware Trustee shall be effective against it without its prior written consent. This provision shall survive the resignation or removal of the Delaware Trustee.

### Section 9.12.   *Timing of Distributions and other Trust Actions*

Notwithstanding anything to the contrary contained in this Trust Agreement, the HTA Plan, or the HTA Confirmation Order, if the Trust or the Trustee (on behalf of the Trust), is

unable to perform any actions pursuant to this Trust Agreement within the time set forth herein due to circumstances outside the control of the Trust or Trustee, as applicable, then such actions shall be effectuated as soon as reasonably practicable thereafter, and the Trust or Trustee shall not be liable or held responsible for any such delays related thereto.

## ANNEX I

INDEMNIFICATION PROVISIONS

(i) The Trust shall indemnify each of the Trustees or any predecessor Trustees and their agents for, and to hold them harmless against, any and all loss, damage, claims, liability or expense, including taxes (other than taxes based upon, measured by or determined by the income of the Trustees), arising out of or in connection with the acceptance or administration of the Trust hereunder, including the costs and expenses of defending itself against any claim asserted by any other Person or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct as determined by a final judgment of a court of a competent jurisdiction no longer subject to appeal or review.

(ii) The Trustees shall have the right to employ separate counsel in any such action or proceeding and participate in the investigation and defense thereof, and the Trust shall pay the reasonable fees and expenses of such separate counsel; provided, however, that the Trustees may only employ separate counsel at the expense of the Trust if in the reasonable judgment of the Trustees (1) a conflict of interest exists by reason of common representation or (2) there are legal defenses available to the Trustees that are different from or are in addition to those available to the Trust or if all parties commonly represented do not agree as to the action (or inaction) of counsel.

## <u>EXHIBIT A</u>

NOTICE OF CLAIM AND CERTIFICATE

[Assured Guaranty Corp.] [Assured Guaranty Municipal Corp.]
1633 Broadway
New York, NY 10019
Attention:  Valery Marfitsin
E-Mail:  VMarfitsin@agltd.com

       Reference is made to the [Name of Series] Assured Custodial Trust Agreement, dated as of December [●], 2022, by and among the Puerto Rico Highways and Transportation Authority (the "**Depositor**"), [Assured Guaranty Corp.] [Assured Guaranty Municipal Corp.] ("**Assured**"), U.S. Bank Trust Company, National Association, (the "**Trustee**") and U.S. Bank Trust National Association (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of December [●], 2022 (the "**Standard Terms**").  This Notice of Claim and Certificate is delivered pursuant to Section 3.06(a) of the Standard Terms.  Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement and the Policy (as defined below).

       The undersigned, a duly authorized officer of Trustee, in its capacity as Trustee for the Trust, hereby certifies to Assured, with reference to the Trust Agreement and Municipal Bond Insurance Policy No. [●], dated [●], 20[●] (the "**Policy**"), issued in respect of the [Name of Series of Bonds] (the "**Assured Legacy Bonds CUSIP**") and deposited into the Trust, that:

       (i)     The Trustee is the Trustee under the Trust Agreement.

       (ii)     After taking into account any adjustments made pursuant to Section 3.05 of the Standard Terms, the sum of all amounts on deposit with the Trustee and available for distribution to the Trust Unit Holders pursuant to the Trust Agreement will be $[●] (such amount, the "**Payment Shortfall**") less than the principal and interest of $[●] (the "**Scheduled Payments**") Due for Payment under the Policy and Trust Agreement on [●], 20[●] (the "**Payment Date**").

       (iii)     The Trustee is hereby making a claim under the Policy and Trust Agreement for the Payment Shortfall to be applied to the payment of Scheduled Payments.

       (iv)     The Trustee agrees that, following its receipt of funds from Assured, it shall (a) hold such amounts in trust and, subject to Section 3.06(e) of the Trust Agreement, apply the same directly to the payment of Scheduled Payments when due; (b) not apply such funds for any other purpose; (c) not commingle such funds with other funds held by the Trustee, and (d) maintain an accurate record of such payments with respect to each Trust Unit and the corresponding claim on the Policy.

(v)      The Trustee, on behalf of the Trust Unit Holders, hereby assigns to Assured any rights of the Trust Unit Holders with respect to the Trust Assets to the extent that the principal amount (or Compounded Amount, as applicable) of the Assured Legacy Bonds CUSIP is reduced to zero.  The foregoing assignment is in addition to, and not in limitation of, rights of subrogation otherwise available to Assured in respect of such payments.  The Trustee shall take such action and deliver such instruments as may be reasonably requested or required by Assured to effectuate the purpose or provisions of this clause (v) and the applicable terms in the Trust Agreement.

(vi)     The Trustee, on behalf of the Trust Unit Holders, hereby acknowledges and agrees that, so long as Assured shall not be in default in its payment obligations under the Policy, Assured may at any time during the continuation of any proceeding by or against the Depositor under the United States Bankruptcy Code (if applicable) or any other applicable bankruptcy, insolvency, receivership, rehabilitation or similar law (an "**Insolvency Proceeding**"), direct all matters with respect to the Trust Units or Trust Assets relating to such Insolvency Proceeding, including without limitation, (A) all matters relating to any claim in connection with an Insolvency Proceeding seeking the avoidance as a preferential transfer of any payment made to the Trust or Trustee or in connection with the Trust Units (a "**Preference Claim**"), (B) the direction of any appeal of any order relating to any Preference Claim at the expense of Assured, and (C) the posting of any surety, supersedeas or performance bond pending any such appeal. In addition, and without limiting the foregoing, the Trustee hereby agrees that Assured shall be subrogated to the rights of each Trust Unit Holder in any Insolvency Proceeding to the extent it is subrogated pursuant to section (vii) below, including, without limitation, all rights of any party to an adversary proceeding action with respect to any court order issued in connection with any such Insolvency Proceeding.

(vii)    Assured shall, to the extent it makes any Scheduled Payments on the Trust Units under the Policy and Trust Agreement, become subrogated to the rights of the recipients of such payments in accordance with the terms of the Policy and the Trust Agreement.

(viii)     The Trustee hereby requests that the Payment Shortfall be deposited into the Insurance Policy Account by bank wire transfer or other immediately available funds using the following wiring instructions:

| | |
|---|---|
| Correspondent Bank: | [_____] |
| Fed ABA No: | [_____] |
| Account Name: | [_____] |
| Account No: | [_____] |
| Beneficiary A/C Name: | [_____] |
| Reference: | [_____] |

This Notice of Claim and Certificate may be revoked at any time by written notice of such revocation by the Trustee to Assured.

IN WITNESS WHEREOF, the Trustee has executed and delivered this Notice of Claim and Certificate as of the [ ● ]th day of [ ● ], 20[ ● ].

U.S. Bank Trust Company, National
Association, as Trustee

By:_____
    Name:
    Title:

For Assured or
Trustee Use Only
Wire transfer sent on _____ By _____
Confirmation Number _____

-3-

**Appendix I**

**Debt Service Payment for []/[]/20[]**

| Description of Bond Issue | CUSIP | Outstanding Amount | Maturity | Rate | Principal Insured Amount | Principal | Interest | Total | Insurer | Policy No. |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  | _____ |  |  | _____ | _____ | _____ | _____ |  |  |
|  |  | _____ |  |  | _____ | _____ | _____ | _____ |  |  |

A-1

**EXHIBIT B**

FORM UNIT EXCHANGE ELECTION NOTICE
[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

[Date]
Trust Unit Certificate No(s). __
Notional Amount: _____
CUSIP:  [●]

U.S. Bank Trust Company, National
Association
100 Wall Street, 6th Floor
New York, New York 10005

Ladies and Gentlemen:

Reference is made to the [[Name of Series] Assured Custodial Trust Agreement, dated as of December [●], 2022, by and among the the Puerto Rico Highways and Transportation Authority (the "**Depositor**"), [Assured Guaranty Corp.] OR [Assured Guaranty Municipal Corp.] ("**Assured**"), U.S. Bank Trust Company, National Association (the "**Trustee**") and U.S. Bank Trust National Association (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of December [●], 2022 (the "**Standard Terms**"). This Unit Exchange Election Notice is delivered pursuant to Section 3.07(a) of the Standard Terms.  Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement.

By delivering this Unit Exchange Election Notice, we hereby give thirty (30) days' written notice of our exercise of a Unit Exchange Election with respect to [  ] the Trust Unit(s) evidenced by the Trust Unit Certificate No(s). referenced above and direct the Trustee to distribute a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, or the FGIC Certificates Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, or Tax Costs, as applicable, no later than [Date], in accordance with the [delivery] instructions below.  We understand that such distribution will not be made until the applicable Trust Units are presented and surrendered at the office of the Trustee therein designated on that date.

If cash is not available to satisfy in full such outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs, we shall pay in cash the applicable pro rata share of such Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs prior to the receipt of our share of remaining Trust Assets.

B-1

By making a Unit Exchange Election, we acknowledge and agree that upon distribution of the Trust Assets in accordance with Section 3.07(b) of the Standard Terms, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds will be satisfied and discharged; and (iii) the related Assured Insurance Policies shall be indefeasibly cancelled with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds.

[Please include delivery instructions for the distribution of Trust Assets to be receive on account of this Unit Exchange Election]

[Please Include any other relevant information]

[],
as Trust Unit Holder


By:_____
Name:
Title:

## EXHIBIT C

FORM OF NOTICE OF MATURITY
[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

[Date]
CUSIP No.: [●]

Ladies and Gentlemen:

Reference is made to the [[Name of Series] Assured Custodial Trust Agreement, dated as of December [●], 2022, by and among the Puerto Rico Highways and Transportation Authority (the "**Depositor**"), [Assured Guaranty Corp.] OR [Assured Guaranty Municipal Corp.] ("**Assured**"), U.S. Bank Trust Company, National Association (the "**Trustee**") and U.S. Bank Trust National Association (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of December [●], 2022 (the "**Standard Terms**"). This Notice of Maturity is delivered pursuant to Section 3.08(a) of the Standard Terms.  Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement.

1. <u>Maturity Date</u>. Prior to acceleration, the Assured Legacy Bonds were scheduled to mature on [●] (the "**Maturity Date**").

2. <u>Trust Unit Holder Distribution</u>.  As a Trust Unit Holder, you are entitled receive a Distribution (or multiple Distributions) in the amount of a pro rata share of the Insured Amount on the Maturity Date corresponding (i) in the case of any relevant Current Interest Bonds, to the outstanding principal amount of, and accrued and unpaid interest on, such Current Interest Bonds as of the Maturity Date, or (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount as of the Maturity Date.

3. [Include any other relevant information required by the Depository or otherwise.]

## EXHIBIT D[1]

FORM OF NOTICE TO TRUST UNIT HOLDERS

[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]
STATEMENT FOR THE DISTRIBUTIONS MADE ON OR ABOUT [●], 20__

**POSTED TO EMMA**
**U.S. Bank Trust Company, National Association, as Trustee**

1. **Trust Units – CUSIP # [●]**

   a. Original Aggregate Notional Amount:

      **Total:** _____; **Per Trust Unit: $1,000**

   b. Aggregate Notional Amount Immediately Preceding Current Year:

      **Total:** _____; **Per Trust Unit:** _____

   c. Distributions and [Principal Amount] [Accreted Value]:

| | Distributions Made on or about [●], 20__ | | Year to date [●], 20__ | | As of [●], 20__ |
|---|---|---|---|---|---|
| | Aggregate distributions | Per Unit distributions[2] | Aggregate distributions | Per Unit distributions | [Aggregate principal amount of New HTA Bonds] [Accreted Value of New HTA Bonds] [Aggregate principal amount of Non-Book-Entry AGC Trust Units] (by CUSIP)[3] |
| Tax-Exempt Bond Account | $ | $ | $ | $ | |
| Taxable Bond Account | $ | $ | $ | $ | |
| Insurance Policy Account | $ | $ | $ | $ | [N/A (cash balance = $ [])] |

---

[1] Trustee to include only portions of this Exhibit D relevant to a particular Trust.
[2] "Per Unit distributions" and "Per Trust Unit" amounts herein are based on a Trust Unit's rate per $1,000 as of the Effective Date.
[3] Or any other securities or property received in respect thereof or in exchange therefor.

| | | | | |
|---|---|---|---|---|
| FGIC Certificates Account | $ | $ | $ | $ | |
| FGIC Insured Bonds Insurance Policy Payments Account | $ | $ | $ | $ | [N/A (cash balance = $ [])] |
| Non-Book-Entry AGC Trust Units Account | $ | $ | $ | $ | |
| AGM Double-Insured Insurance Policy Payments Account | $ | $ | $ | $ | [N/A (cash balance = $ [])] |
| AGC Insurance Policy SM-2007-267 Payments Account | $ | $ | $ | $ | [N/A (cash balance = $ [])] |

2. **Aggregate Payment /Insured Amount Reporting for [Assured Legacy Bonds CUSIP]**

As of [●]

    a. Payments Made Since Effective Date on [Assured Legacy Bonds CUSIP]:

        i. Aggregate Interest Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below):

        **Total** _____; **Per Trust Unit** _____

          1. Aggregate Interest Payments made by Assured on account of [Assured Legacy Bonds CUSIP]:

            **Total** _____; **Per Trust Unit** _____

          2. Aggregate Interest Payments from Other Sources on account of [Assured Legacy Bonds CUSIP]:

**Total** _____; **Per Trust Unit** _____

    ii.  Aggregate Principal Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below):

      **Total** _____; **Per Trust Unit** _____

        1.  Aggregate Principal Payments made by Assured on account of [Assured Legacy Bonds CUSIP]:

          **Total** _____; **Per Trust Unit** _____

        2.  Aggregate Principal Payments from Other Sources on account of [Assured Legacy Bonds CUSIP]: _____

          **Total** _____; **Per Trust Unit** _____

    iii.  Aggregate Interest and Principal Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below): _____

      **Total** _____; **Per Trust Unit** _____

        1.  Aggregate Interest and Principal Payments made by Assured on account of [Assured Legacy Bonds CUSIP] (sum of (i)(1) and (ii)(1) above):

          **Total** _____; **Per Trust Unit** _____

        2.  Aggregate Interest and Principal Payments from Other Sources on account of [Assured Legacy Bonds CUSIP] (sum of (i)(2) and (ii)(2) above):

          **Total** _____; **Per Trust Unit** _____

  b.  <u>Insured Amount for [Assured Legacy Bonds CUSIP] after most recent distributions</u>: _____

  c.  <u>Current Notional Amount of Trust Units after most recent distributions</u>:

    **Total** _____; **Per Trust Unit** _____

**3.**  **<u>Tax Reporting</u>**

    [_____]

**Draft 12/1/22**

[HTA SERIES NAME] ASSURED CUSTODIAL TRUST

———————

TRUST AGREEMENT

among

Autoridad de Carreteras y Transportación de Puerto Rico, whose name in English is PUERTO
RICO HIGHWAYS AND TRANSPORTATION AUTHORITY, as Depositor,

[ASSURED GUARANTY CORP.] [ASSURED GUARANTY MUNICIPAL CORP.]

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
as Trustee

and

U.S. BANK TRUST NATIONAL ASSOCIATION,
as Delaware Trustee

DATED AS OF

[●]

———————

TABLE OF CONTENTS

Page

SECTION 1.      STANDARD TERMS ..................................................................... 1

SECTION 2.      DEFINED TERMS ....................................................................... 1

SECTION 3.      ORGANIZATION OF TRUST ..................................................... 2

SECTION 4.      NOTIONAL AMOUNT ................................................................ 3

SECTION 5.      FORMS OF TRUST UNITS ........................................................ 3

SECTION 6.      SCHEDULES ............................................................................... 3

SECTION 7.      PATRIOT ACT ............................................................................ 3

SECTION 8.      GOVERNING LAW; VENUE; JURY WAIVER ......................... 3

SECTION 9.      FORCE MAJEURE ...................................................................... 4

SECTION 10.     INTENT OF PARTIES ................................................................. 4

SECTION 11.     NON-PETITION ........................................................................... 7

SECTION 12.     CERTAIN TERMS REGARDING THE DEPOSITOR ................ 7

TRUST AGREEMENT

THIS TRUST AGREEMENT, dated as of [●] (this "Agreement"), is hereby executed by and among Autoridad de Carreteras y Transportación de Puerto Rico, whose name in English is PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY ("HTA" or the "Depositor"), [and] [ASSURED GUARANTY CORP.][ ("AGC") and] [ASSURED GUARANTY MUNICIPAL CORP.] (["AGM" and together with AGC, ]"Assured"), U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, a national banking association, as trustee (the "Trustee") and U.S. BANK TRUST NATIONAL ASSOCIATION, a national banking association, as Delaware trustee (the "Delaware Trustee", and together with the Trustee, the "Trustees") under this Agreement and the Standard Terms to Trust Agreement, dated as of [●] (the "Standard Terms"), all the provisions of which are incorporated herein and shall be a part of this Agreement as if set forth herein in full (this Agreement with the Standard Terms so incorporated, the "Trust Agreement").

PRELIMINARY STATEMENT

The parties are entering into the Trust Agreement for purposes of forming the [] Assured Custodial Trust, a Delaware statutory trust (the "Trust"). In furtherance of the structure approved in the HTA Plan and in order to facilitate the implementation thereof, the Trust is being established by the Depositor and the Trustees solely for the benefit of and on behalf of the applicable Assured Legacy Bondholders holding Assured Legacy Bonds CUSIP [] that elected, or are deemed to have elected, Assured Bondholder Election 2 pursuant to the terms and provisions of the HTA Plan. Except for the establishment of the Trust and the deposit therein pursuant to the HTA Plan at the election (or deemed election) of the applicable Assured Legacy Bondholders, the Depositor shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof. The Trustees shall file a Certificate of Trust of the Trust with the Office of the Secretary of State of the State of Delaware on the date hereof. The Trust shall issue beneficial ownership interests consisting of trust units to be known as the "Trust Units" and each holder of a Trust Unit, a "Trust Unit Holder" or "Holder". The issue of Trust Units authorized under this Trust Agreement shall have a unique CUSIP, and the Book-Entry Trust Units authorized hereunder shall be issued in global form and be transferable through the Depository.

**Section 1.**     **Standard Terms**.

The Trustees acknowledge that the Standard Terms prescribe certain obligations of the Trustees with respect to the Trust and the Trust Units. The Trustees agree to observe and perform such prescribed duties, responsibilities and obligations, and acknowledge that the Standard Terms (including without limitation, the rights, protections, indemnities and immunities afforded to the Trustees thereunder) are and shall be a part of this Agreement to the same extent as if set forth herein in full.

**Section 2.**     **Defined Terms**.

With respect to the Trust Units and in addition to the definitions set forth in the Standard Terms, the following provisions shall govern the defined terms set forth below. To the extent the meanings assigned to the defined terms set forth below are inconsistent with the meanings assigned

to such terms in the Standard Terms, the meanings assigned herein shall control. Capitalized terms used herein but not defined herein or in the Standard Terms shall have the meanings ascribed to them in the HTA Plan.

"**Bankruptcy Code**": The Bankruptcy Reform Act of 1978, as amended from time to time, and as codified as 11 U.S.C. <u>Section 101</u> et seq.

"**Delaware Trust Statute**": Chapter 38 of Title 12 of the Delaware Code, 12 <u>Del</u>. <u>Code</u> § 3801 *et seq.,* as the same may be amended from time to time.

"**Delaware Trustee**": U.S. Bank Trust National Association, not in its individual capacity but solely in its capacity as Delaware Trustee hereunder, its successor in interest or any successor Delaware Trustee appointed as herein provided.

"**Maturity Date**": [], the original maturity date of the relevant Assured Legacy Bonds (prior to acceleration).

"**Trustee**": U.S. Bank Trust Company, National Association, in its capacity as Trustee hereunder, its successor in interest or any successor trustee appointed as herein provided.

"**Trustees**": The Delaware Trustee and the Trustee.

"**U.S.A. PATRIOT Act**": The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107 56 (signed into law October 26, 2001) and its implementing regulations.

## Section 3.    <u>Organization of Trust</u>.

The Trust is being created on the date hereof pursuant to the execution of this Agreement and the filing by the Trustees of a Certificate of Trust of the Trust (the "Certificate of Trust") with the Office of the Secretary of State of the State of Delaware (the "Secretary of State"), under the name "[] Assured Custodial Trust" in which name the Trust shall have power and authority and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the activities of the Trust. It is the intention of the parties hereto that the Trust hereby created constitutes a statutory trust under the Delaware Trust Statute and that the Trust Agreement (including the Standard Terms) constitutes the governing instrument of the Trust. Notwithstanding any other provision of this Agreement to the contrary, the Trustees are hereby authorized and directed to, and shall, on the date hereof, execute and file the Certificate of Trust with the Secretary of State in substantially the form attached as <u>Exhibit B</u> hereto. The Trustee shall have power and authority, and is hereby authorized and empowered to take all actions on behalf of the Trust as set forth in the Trust Agreement and each of the Trustees is authorized and empowered to execute and file with the Secretary of State any other certificate required or permitted under the Delaware Trust Statute to be filed with the Secretary of State. The office of the Trust shall be in the care of the Trustee at the Corporate Trust Office or at such other address as the Trustee may designate by written notice to the Trust Unit Holders and Assured.

**Section 4.       <u>Notional Amount</u>**.

The aggregate Notional Amount of the Trust Units that may be executed and delivered under this Agreement is limited to the outstanding principal amount (or, in the case of Capital Appreciation Bonds, the Compounded Amount) as of the Effective Date of the Assured Legacy Bonds deposited into the Trust as set forth on <u>Schedule I</u> hereto.

**Section 5.       <u>Forms of Trust Units</u>**.

The Trust Units shall be substantially in the form attached as <u>Exhibit A</u> hereto.  The Book-Entry Trust Units shall be issued in global form and transferable through the Depository.

**Section 6.       <u>Schedules</u>**.

<u>Schedule I</u> and <u>Schedule II</u> are attached hereto and incorporated herein by reference as contemplated herein or by the Standard Terms.

**Section 7.       <u>Patriot Act</u>**.

The parties hereto acknowledge that in accordance with Section 326 of the U.S.A. PATRIOT Act, the Trustees, like all financial institutions and in order to help fight the funding of terrorism and money laundering, are required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustees.  The parties to this Trust Agreement agree that they will provide the Trustees with such information as they may request in order for the Trustees to satisfy the requirements of the U.S.A. PATRIOT Act.

**Section 8.       <u>Governing Law; Venue; Jury Waiver</u>**.

THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON, ARISING OUT OF, OR LEADING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY OR PERFORMANCE, SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS. EACH PARTY HERETO HEREBY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, OR (B) IN ANY WAY IN CONNECTION WITH OR PERTAINING TO OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT TO THIS AGREEMENT OR IN CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW

EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE. EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY FEDERAL OR STATE COURTS SITTING IN THE STATE OF DELAWARE IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDINGS IN ANY SUCH COURT AND ANY CLAIM THAT ANY PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**Section 9.** <u>**Force Majeure**</u>.

In no event shall the Trustees be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

**Section 10.** <u>**Intent of Parties**</u>.

(a) The parties hereto intend that, for all purposes, the transfer to the Trust of the Trust Estate shall be, and shall be construed as, a transfer of such Trust Estate on behalf of the applicable Assured Legacy Bondholders in lieu of a transfer of such assets to the Trust directly by the applicable Assured Legacy Bondholders and shall constitute, in all respects, an absolute, irrevocable transfer, conveyance, and assignment, without recourse, of the Trust Estate to the Trust, and immediately after giving effect to the transfer contemplated hereby on the Effective Date, the Depositor will have no further interest (legal or equitable) in the Trust Estate and the Trust Estate will not be property of the Depositor or of the Depositor's estate in the event of a liquidation, reorganization, or similar proceeding of the Depositor and the Trust shall have the absolute right to take whatever action it may deem appropriate with respect to the Trust Estate. The parties agree to treat the transfer contemplated hereby for all purposes (including financial accounting purposes) as an absolute transfer on all relevant books, records, financial statements and other documents.

(b) The Trust Estate will be held by the Trust free and clear of any lien or encumbrance of any Person claiming through or under the Depositor.

(c) Notwithstanding anything to the contrary in the Trust Agreement or in any other document governing the formation, management, or operation of the Trust, if and for so long as any Trust Unit remains outstanding, none of the Trust Unit Holders, Assured, the Trustees, nor any other Person shall authorize, cause or permit the Trust to (and the Trust shall not and neither Trustee shall directly take any action that to its actual knowledge would constitute any of the following):

4

(i)      engage in any business or engage in any activity other than those activities expressly permitted under Section 2.03 of the Standard Terms and will not have, incur, guarantee or become liable for any indebtedness or obligations except as expressly contemplated in the Trust Agreement;

(ii)     acquire or own any assets other than the Trust Estate or lease (as lessor) any assets;

(iii)    fail to preserve its existence as an entity duly formed, validly existing and in good standing (if applicable) under the laws of the State of Delaware, or fail to remain qualified to do business in each state in which such qualification is required, for any reason, including, but not limited to, in order to perform its obligations under the Trust Agreement;

(iv)     fail to observe at any time any necessary, appropriate and customary corporate, organizational, company and/or other legal formalities to maintain its separate existence;

(v)      fail to act solely in its own name or in the name of the Trustee on behalf of the Trust through duly authorized agents in the conduct of its activities;

(vi)     provide for the payment of its expenses, indebtedness or other obligations other than from its own separate assets;

(vii)    have its debts or other obligations guaranteed by any other person or hold itself out as responsible for the debts or other obligations of any other Person;

(viii)   commingle its assets or liabilities with those of any other Person;

(ix)     fail to maintain its own records, books of account, bank accounts, accounting records and other entity documents separate and apart from those of any other Person;

(x)      divert funds for any purpose other than as set forth in the Trust Agreement;

(xi)     enter into any contract, agreement or transaction with any Trust Unit Holders, the Depositor, Assured, principal or other affiliate of the Trust, or any shareholder, general partner, member, principal or affiliate thereof, except as expressly authorized in the Trust Agreement;

(xii)    maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xiii)   incur, create or assume any indebtedness of or buy or hold evidence of indebtedness issued by any other Person (other than as contemplated by the Trust Agreement); guarantee or hold itself out to be responsible for the debts of another Person or otherwise pledge its assets to secure the obligations of any other Person, or hold out its credit or assets as being available to satisfy the obligations of any other Person or seek to incur, create or assume any indebtedness based upon the assets of any other Person;

5

(xiv)    perform any duties or obligations of the Depositor or any other Person;

(xv)    make any loans or advances to any third party, including, without limitation, any Trust Unit Holder, Depositor or Affiliate of the Trust, or any principal or Affiliate thereof;

(xvi)    fail to file its own tax returns as and if required to do so by applicable law (subject to any permitted extensions and except to the extent the Trust is treated as a grantor trust for tax purposes) and to pay any taxes required to be paid by it under applicable law;

(xvii)    fail to hold itself out to the public as a legal entity separate and distinct from any other Person, fail to conduct its activities solely in its own name or in the name of the Trustee and as a separate and distinct entity, or fail to correct any known misunderstanding regarding its separate identity;

(xviii)    identify itself as a department or division of any other Person;

(xix)    fail to observe all formalities required of a Delaware statutory trust;

(xx)    fail to pay its expenses and liabilities only out of its own funds to the extent such funds are available and fail to hold its assets only in its own name; provided, however, the foregoing shall not require the Depositor to sell any assets, or make any capital contribution, to the Trust;

(xxi)    conduct any oral or written communication, including, without limitation, letters, invoices, purchase orders, contracts, statements and applications, other than in its own name or in the name of the Trustee on behalf of the Trust;

(xxii)    (a) institute proceedings to have the Trust declared or adjudicated a bankrupt or insolvent, (b) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (c) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (d) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (e) make any assignment for the benefit of the Trust's creditors, (f) cause the Trust to admit in writing its inability to pay its debts generally as they become due or (g) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing;

(xxiii)    supplement, modify, amend, restate, replace, waive or repeal this Section 10 or Sections 2.03, 2.04, 9.01 or 9.03 of the Standard Terms, or the definitions used in such Sections, in each case except for any supplement, modification, amendment or restatement of any such provision that (x) corrects any error and (y) would not (individually or together with other changes) be reasonably likely to cause the Trust to no longer be a "special purpose entity" in accordance with applicable law and standards; or

(xxiv)  supplement, modify, amend, restate, replace, waive or repeal any portion of this Trust Agreement or the Standard Terms except as expressly permitted by <u>Section 9.01</u> of the Standard Terms.

(d) Failure of the Trust, the Depositor, Assured, any Trust Unit Holder, any Trustee or any other Person on behalf of the Trust, to comply with any of the foregoing covenants set forth in this <u>Section 10</u> shall not affect the status of the Trust as a separate legal entity (unless in violation of the Delaware Trust Statute) nor cause the Trust to dissolve or terminate.

(e) To the extent that any provision of this <u>Section 10</u> conflicts with, violates or otherwise is in contravention with any other provision of the Trust Agreement or the Standard Terms, the parties hereto and each Trust Unit Holder agree that the terms set forth in this <u>Section 10</u> shall be controlling as expressly set forth herein.

**Section 11.    <u>Non-Petition</u>**.  The Depositor, Assured, the Trustee and the Delaware Trustee, by entering into this Agreement, and the Trust Unit Holders, by electing (or being deemed to elect) Assured Bondholder Election 2, hereby covenant and agree that they will not at any time institute against the Trust, or join in instituting against the Trust, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law; provided, however, that in the event a bankruptcy or similar proceeding is instituted against the Trust by another person, the Trustee may file appropriate proofs of claim. For the avoidance of doubt, no adequate remedy at law exists with respect to any breach of this Section 11, and specific performance shall in all circumstances be available as a remedy for the enforcement of this Section 11.

**Section 12.    <u>Certain Terms Regarding the Depositor</u>**.  For the avoidance of doubt and notwithstanding any terms appearing herein or elsewhere to the contrary:

(i)    The obligations of the Trust under the Trust Units and this Trust Agreement are non-recourse obligations of the Trust payable solely from the Trust Estate, and following realization of the Trust Estate, and its reduction to zero, any claims of the Holders of the Trust Units shall be extinguished.  The Trust Units are not obligations of, and are not guaranteed by, the Depositor, and no recourse shall be had against any Officer, director, manager, employee, security holder or incorporator of the Depositor, or its successors or assigns, for the payment of any amounts payable under the Trust Units or the payment or performance of any obligation of the Trust under or pursuant to this Trust Agreement.

(ii)    The recitals contained in this Trust Agreement and in the Trust Units, shall be taken as the statements of the Trust, and the Depositor assumes no responsibility for their correctness.  The Depositor makes no representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Trust Units.

(iii)    In purchasing or acquiring any Trust Units in certificated form, the purchaser or acquirer shall be deemed to acknowledge, represent and agree, and in purchasing or acquiring any book-entry beneficial interests in the Trust Units, the purchaser or acquirer shall be deemed to acknowledge, represent and agree, that none of the Depositor nor any of its affiliates, is acting as a fiduciary or a financial or investment advisor for such

purchaser or acquirer, and such purchaser or acquirer is not relying (for purposes of making any investment decision or otherwise) upon any advice, representations or recommendations (in each case whether written or oral) of the Depositor or any of its affiliates.

(iv)    The Depositor shall not be accountable for the use or application by the Trust of the Trust Units or the proceeds thereof or any amounts paid to the Trust pursuant to the provisions of this Trust Agreement.

**Section 13.    [Franklin Nuveen Trust Reservation of Rights**.  In accordance with Section 3.03(c)-(d) of the Standard Terms and notwithstanding anything to the contrary herein, the Plan or Confirmation Order, upon (i) issuance of a notice of Assured's exercise of, or intent to exercise, any Assured Advancement Option, or (ii) issuance of, or issuance of notice of an intent to cause the issuance of, a Sale Notice that could cause a cash Distribution or distribution of Subject Bonds that would, by operation of this Agreement, otherwise reduce the outstanding principal of the applicable Assured Insured Bond prior to its Original Scheduled Principal Payment Date, then, in each case, a Franklin Nuveen Trust Unit Holder shall be permitted to challenge whether payment of the applicable Acceleration Price or cash Distribution with respect to such Assured Insured Bond satisfies and discharges all (or any) of Assured's obligations to such Franklin Nuveen Trust Unit Holder under the applicable Assured Insurance Policy with respect to such Assured Insured Bond and all of the Franklin Funds' and/or Nuveen Funds' respective rights, arguments and defenses (and those of the Franklin Nuveen Trust Unit Holders) with respect to any such argument made by such Franklin Nuveen Trust Unit Holders (including, without limitation, whether any such payment or distribution would reduce the principal amount outstanding of the Assured Insured Bonds) are reserved and preserved, including any arguments as to whether  Section 26.1(c) of the HTA Plan and Section 26(a) of the HTA Confirmation Order validly accelerated the Assured Insured Bonds in the Franklin Nuveen Trusts for purposes of the Assured Insurance Policy.  All of Assured's rights, arguments and defenses with respect to any such argument made by a Franklin Fund and/or Nuveen Fund and/or other Franklin Nuveen Trust Unit Holder pursuant to this Section 13, Section 3.03(c) of the Standard Terms and the HTA Plan are reserved and preserved, including any arguments as to whether Section 26.1(c) of the HTA Plan and Section 26(a) of the HTA Confirmation Order validly accelerated the Assured Insured Bonds in the Franklin Nuveen Trusts for purposes of the Assured Insurance Policy.  Any determination made as a result of arguments made by a Franklin Fund and/or Nuveen Fund and/or other Franklin Nuveen Trust Unit Holder pursuant to this Section 13 shall have no impact on any other Trust or Assured Insurance Policy.][1]

**Section 14.    [Authority to Act on Behalf of Assured**.  For so long as AGC continues to pay and otherwise meet its obligations under this Trust Agreement, AGC shall have sole authority to make any decisions required to be made by, and exercise any rights available to, Assured under this Trust Agreement.  In the event that AGC fails to pay or otherwise meet its obligations under

---

[1] [NTD: Section only to be included in Trust Agreements for Franklin Nuveen Trusts.]

this Trust Agreement, AGM shall have sole authority to make any decisions required to be made by, and exercise any rights available to, Assured under this Trust Agreement.][2]

---

[2] [NTD: Section only to be included in Trust Agreements relating to an Assured Legacy Bonds CUSIP (Combined).]

**IN WITNESS WHEREOF**, the Depositor, Assured, the Trustee and the Delaware Trustee have caused this Agreement to be duly executed by their respective officers thereunto duly authorized and all as of the date first set forth above.

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,**
As Depositor

By: _____

Name: _____

Its: _____

**[ASSURED GUARANTY CORP.] [ASSURED
GUARANTY MUNICIPAL CORP.]**

By: _____

Name: _____

Its: _____

[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

**U.S. BANK TRUST NATIONAL
ASSOCIATION,**
As Delaware Trustee

By: _____
Name: _____
Its: _____


**U.S. BANK TRUST COMPANY, NATIONAL
ASSOCIATION,**
As Trustee

By: _____
Name: _____
Its: _____

[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

## <u>SCHEDULE I</u>

**Assured Legacy Bonds Schedule**

| <u>Insured CUSIP[s]</u> | <u>Original CUSIP</u> | <u>Assured Bondholder Election 2 contra-CUSIP[s]</u> | <u>Insurance Policy Number(s)</u> | <u>Tax-Exempt /Taxable</u> | <u>Coupon</u> | <u>Outstanding Principal Amount (or Compounded Amount) as of the Effective Date</u> |
|---|---|---|---|---|---|---|
| [●] | [●] | [●] | [●] | Tax-Exempt | [●] | [●] |

### SCHEDULE II

**Relevant Trust Information**

**I. Trust Accounts[3]**

| Account | Account Number | Initial Deposits |
|---|---|---|
| Tax-Exempt Bond Account | [ ● ] | [ ● ] |
| Taxable Bond Account | [ ● ] | [ ● ] |
| Cash Account | [ ● ] | [ ● ] |
| Insurance Policy Account | [ ● ] | [ ● ] |
| FGIC Certificates Account | [ ● ] | [ ● ] |
| FGIC Insured Bonds Insurance Policy Payments Account | [ ● ] | [ ● ] |
| Non-Book-Entry Double-Insured AGC Trust Units Account | [ ● ] | [ ● ] |
| AGM Double-Insured Insurance Policy Payments Account | [ ● ] | [ ● ] |
| AGC Insurance Policy SM-2007-267 Payments Account | [ ● ] | [ ● ] |

**II.  Trust Unit CUSIP**

The CUSIP of the Trust Units initially issued pursuant to this Trust Agreement is: [ ● ]

**III.  References in Standard Terms**

In the Standard Terms, Assured Legacy Bonds CUSIP [ ● ] is referred to as a:

(i) [ ● ]; and

(ii) [ ● ].

See Section 2.01[ ● ] of the Standard Terms for more information regarding the Trust Assets deposited in this Trust.

See Section 3.01[ ● ] of the Standard Terms for more information regarding the accounts for this Trust.

See Section 3.02[ ● ] of the Standard Terms for more information regarding distributions to be made in connection with this Trust.

---

[3] [NTD: Schedule to include only those accounts held by the applicable Trust.]

## EXHIBIT A

FORM OF TRUST UNIT CERTIFICATE

[UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE TRUST, AS DEFINED HEREIN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

THIS CERTIFICATE DOES NOT REPRESENT AN INTEREST IN OR OBLIGATION OF THE DEPOSITOR, THE TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES, EXCEPT IN RESPECT OF AN INDIRECT INTEREST IN THE NEW SECURITIES UNDERLYING THE UNITS.

[] ASSURED CUSTODIAL TRUST

Trust Unit Certificate No. __

Original Notional Amount: _____

CUSIP:  [●]

Each Trust Unit represented by this Trust Unit certificate is one of a duly authorized issue of certificates designated as the Trust Units (herein collectively called the "Units"), and representing a beneficial ownership interest in the Trust Estate created by the Trust Agreement referred to below.

This certifies that [CEDE & CO.] is the registered owner of the Notional Amount of Trust Units evidenced by this certificate.  Capitalized terms used but not defined herein have the meanings assigned to such terms in the Trust Agreement and Standard Terms referred to below and the Trust Agreement contains rules as to construction that shall be applicable herein.

The Trust was created pursuant to a Trust Agreement (the "Trust Agreement") dated as of [●], by and among the Puerto Rico Highways and Transportation Authority (the "Depositor"), [Assured Guaranty Corp.] [and] [Assured Guaranty Municipal Corp.] ([collectively, ]"Assured"), U.S. Bank Trust Company, National Association, (the "Trustee") and U.S. Bank Trust National Association (the "Delaware Trustee", which term includes any successor under the Trust Agreement, and together with the Trustee, the "Trustees"), and the Standard Terms to Trust Agreement, dated as of [●] (the "Standard Terms"), a summary of certain of the pertinent provisions of which is set forth hereinafter.  This certificate is issued under and is subject to the terms, provisions and conditions of the Trust Agreement, to which Trust Agreement the Holder of this certificate by virtue of its acceptance hereof assents and by which such Holder is bound. Distributions on this certificate shall be made by the Trust Unit Paying Agent under the Trust Agreement.

This certificate is issued under the Trust Agreement to which reference is hereby made for a statement of the respective rights thereunder of the Depositor, the Trustees, Assured and the Holder of the certificate and the terms upon which the certificate is executed and delivered.

This certificate does not bear interest.  Distributions on this certificate represent a combination of certain payments made on the New Securities and certain other payments which derive from the Trust Estate and may vary from period to period. Each such Distribution made pursuant to the Trust Agreement shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case, as of the date of such Distribution and in an amount equal to such Distribution, as set forth in the Standard Terms[; provided, for the avoidance of doubt, with

A-2

respect to any Franklin Nuveen Trust, the foregoing shall be subject to the reservation of rights in Section 13 of the Trust Agreement and Sections 3.03(c)-(d) of the Standard Terms][4].

In certain circumstances, Assured may instruct the Trustee in writing to sell the New Securities (the "Subject Bonds") underlying the Units for cash (a "Bond Sale"). The Holder of this certificate shall have the option to elect to receive in-kind delivery of a pro rata share of the Subject Bonds, subject to payment by such Trust Unit Holder of the allocable portion of any outstanding Trustee Costs and Tax Costs, in lieu of receiving a pro rata share of the actual net cash proceeds from the Bond Sale, as set forth in the Standard Terms.

This certificate is not subject to repurchase by the Trust at the option of the Holder of this certificate.

The Holder, by its acceptance of this certificate, agrees that it will look solely to the funds allocated pursuant to the Trust Agreement for distribution hereunder and that none of the Trustee or the Trust Unit Paying Agent in their individual capacities nor the Depositor is personally liable to such Holder for any amount payable under this certificate or the Trust Agreement, subject in the case of the Trustee to any liability under the Trust Agreement, provided that the foregoing shall not prevent the Holder from appearing or litigating any such proceeding after it has been instituted.

The Holder, by its acceptance of this certificate hereby agrees that (i) the Trust Agreement is executed and delivered by U.S. Bank Trust Company, National Association and U.S. Bank Trust National Association, not individually or personally, but solely as Trustee and Delaware Trustee, respectively, in the exercise of the powers and authority conferred upon and vested in it, and pursuant to instructions set forth therein, (ii) each of the representations, undertakings and agreements herein made on the part of the Trustee, the Delaware Trustee or the Trust is made and intended not as personal representations, undertakings or agreements of U.S. Bank Trust Company, National Association or U.S. Bank Trust National Association, (iii) nothing herein contained shall be construed as creating or imposing any liability upon U.S. Bank Trust Company, National Association or U.S. Bank Trust National Association, individually or personally, or the Depositor to perform any covenant, either express or implied, contained herein, all such liability, if any, is hereby expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto and such waiver shall bind any third party making a claim by or through one of the parties hereto, and (iv) under no circumstances shall U.S. Bank Trust Company, National Association, U.S. Bank Trust National Association or the Depositor be personally liable for the payment of any indebtedness or expenses of the Trust, or be personally liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under the Trust Agreement.

The Holder, by its acceptance of this certificate, covenants and agrees that it will not at any time institute against the Depositor, Assured or the Trust, or join in any institution against the Depositor, Assured or the Trust of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy

---

[4] [NTD: This proviso only to be included in Trust Agreements for Franklin Nuveen Trusts.]

A-3

or similar law in connection with any obligations relating to this certificate or the Trust Agreement, that no adequate remedy at law exists with respect to any breach of such covenant and agreement, and that specific performance shall in all circumstances be available as a remedy for any breach of such covenant and agreement.

Distributions on this certificate will be made as provided in the Trust Agreement by the Trust Unit Paying Agent without the presentation or surrender of this certificate or the making of any notation hereon.

Reference is hereby made to the further provisions of this certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless this certificate has been executed by the manual or electronic signature of an authorized officer of the Trustee and the certificate of authentication hereon shall have been executed by an authorized officer of the Unit Registrar, or an authenticating agent by manual or electronic signature, this certificate shall not entitle the Holder hereof to any benefit under the Trust Agreement or be valid for any purpose.

THIS CERTIFICATE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAWS PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

A-4

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and not in its individual capacity, has caused this certificate to be duly executed.

[] ASSURED CUSTODIAL TRUST

By:  U.S. BANK TRUST COMPANY,
NATIONAL ASSOCIATION,
not in its individual capacity, but solely as Trustee

By:_____
    Authorized Signatory

Dated:  _____

CERTIFICATE OF AUTHENTICATION

This is the Trust Unit certificate referred to in the within-mentioned Trust Agreement.

U.S. BANK TRUST COMPANY, NATIONAL
ASSOCIATION,
not in its individual capacity, but solely as Unit
Registrar

By:_____
    Authorized Signatory

Dated:  _____

## [] ASSURED CUSTODIAL TRUST

## REVERSE OF TRUST UNIT CERTIFICATE

This certificate does not represent an obligation of, or an interest in, Assured, the Trustees, or any Affiliates of each of them and no recourse may be had against any such parties or their assets, except as expressly set forth or contemplated herein or in the Trust Agreement.  In addition, this certificate is not guaranteed by any governmental agency or instrumentality and is limited in right of payment to certain collections and recoveries with respect to the Trust Estate, all as more specifically set forth herein and under the Trust Agreement.  A copy of the Trust Agreement may be examined by any Holder upon written request during normal business hours at the principal office of the Trustee and at such other places, if any, designated by the Trustee.

The Trust Agreement (including the Standard Terms) may not be amended, waived or supplemented without the prior written consent of Assured.  The Trust Agreement (including the Standard Terms) may be amended, waived or supplemented from time to time by Assured and the Trustee without the consent of the Trust Unit Holders; provided, however, that no such amendment shall:

a) except as otherwise provided in the Trust Agreement (including the Standard Terms) reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Trust Unit Holder without the written consent of such Trust Unit Holder;

b) compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Assured Insurance Policy without the written consent of each Trust Unit Holder affected;

c) alter in any manner the calculation or treatment of the Compounded Amount without the written consent of each Trust Unit Holder affected;

d) amend Section 9.01 of the Standard Terms without the written consent of each Trust Unit Holder;

e) adversely affect in any other material respect the interests of the Trust Unit Holders in any manner other than as described in a), b), or c) without the written consent of the Trust Unit Holders evidencing at least a majority of the Trust Units (measured, in the case of Current Interest Bonds, by the outstanding principal amount, or, in the case of Capital Appreciation Bonds, the Compounded Amount, as the case may be, of the underlying Assured Legacy Bonds), excluding, from both the numerator and the denominator, any Trust Units held by Assured; *provided*, that only Trust Units that an Officer of the Trustee knows are so held shall be so disregarded; or

f) reduce the aforesaid percentage of Trust Units the Holders of which are required to consent to any such amendment, without the unanimous written consent of such Holders of all Trust Units then outstanding.

A-6

As provided in the Trust Agreement and subject to certain limitations therein set forth, including the limitations set forth in Article V of the Standard Terms, the transfer of this certificate is registrable in the Unit Register upon the surrendering of this certificate for registration of transfer at the offices or agencies of the Unit Registrar, accompanied by a written instrument of transfer in form satisfactory to the Unit Registrar duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon a new certificate will be issued to the designated transferee. The initial Unit Registrar appointed under the Trust Agreement is the Trustee.

No service charge will be made for any such registration of transfer or exchange, but the Trustee or the Unit Registrar may require payment of a sum sufficient to cover any tax or governmental charge payable in connection therewith or any expense incurred thereby.

Prior to due presentation of a Trust Unit for registration or transfer, the Trustee, the Unit Registrar and any agent of any of them may treat the person in whose name any Trust Unit is registered as the owner of such Trust Unit for the purpose of receiving distributions, and neither the Trustee, the Unit Registrar nor any agent of any of them shall be affected by notice to the contrary.

The obligations and responsibilities created by the Trust Agreement and the Trust shall terminate upon the payment to the Holders of the Trust Units of all amounts required to be paid to them pursuant to the Trust Agreement, the disposition of all property held as part of the Trust Estate and payment of any costs, expenses and indemnities due and owing to the Trustees under the Trust Agreement or of any other costs or expenses as provided in the Trust Agreement.

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s) and assign(s) and transfer(s) unto

_____

_____

(Please print or type name and address, including postal zip code, of assignee and social security number or employer identification number)

_____

the within certificate stating in the names of the undersigned in the Unit Register and does hereby irrevocably constitute and appoint

_____

to transfer such Certificate in such Unit Register of the Trust.

I [we] further direct the Unit Registrar to issue a new certificate of like principal to the above-named assignee and deliver such certificate to the following address:

_____

_____

| | |
|---|---|
| Dated:_____ | _____ |
| | Signature by or on behalf of Assignor |
| _____ | |
| Authorized Officer | _____ |
| | Signature Guaranteed |
| _____ | |
| Name of Institution | NOTICE: The signature(s) of this assignment must correspond with the name(s) on the face of this certificate without alteration or any change whatsoever.  The signature must be guaranteed by a participant in the Securities Transfer Agents Medallion Program, the New York Stock Exchange Medallion Signature Program or the Stock Exchanges Medallion Program.  Notarized or witnessed signatures are not acceptable as guaranteed signatures. |

## DISTRIBUTION INSTRUCTIONS

The assignee should include the following for the information of the Unit Registrar.

Distributions shall be made by wire transfer in immediately available funds to

_____

for the account  of

_____

account number _____ or, if mailed by check, to

_____

_____.

Applicable reports and statements should be mailed to

_____.

This information is provided by _____the

assignee named above, or _____ as its agent.

A-9

## EXHIBIT B

FORM OF CERTIFICATE OF TRUST OF
[] ASSURED CUSTODIAL TRUST

This Certificate of Trust of [] Assured Custodial Trust (the "Trust"), is being duly executed and filed by U.S. Bank Trust National Association, as Delaware Trustee and U.S. Bank Trust Company, National Association, as Trustee, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code, § 3801 et seq.) (the "Act").

1.  Name.   The name of the statutory trust formed hereby is "[] Assured Custodial Trust."

2.  Delaware Trustee.  The name and business address of a trustee of the Trust having its principal place of business in the State of Delaware are U.S. Bank Trust National Association, 1011 Centre Road, Suite 203, Wilmington, Delaware 19805.

3.  Effective Date.  This Certificate of Trust shall be effective upon filing.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

B-1

IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have executed this Certificate of Trust in accordance with Section 3811 of the Act.

U.S. BANK TRUST NATIONAL ASSOCIATION, not in its individual capacity but solely as Delaware Trustee

By:_____
Name:
Title:

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, not in its individual capacity but solely as Trustee

By:_____
Name:
Title:

**<u>Redline of Exhibit E</u>**

**Draft 9̶12/6̶1/22**

---

**STANDARD TERMS**

**TO**

**TRUST AGREEMENT**

Autoridad de Carreteras y Transportación de Puerto Rico, whose name in English is
PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY, as Depositor,

ASSURED GUARANTY CORP.,

ASSURED GUARANTY MUNICIPAL CORP.,

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,

as Trustee,

and

U.S. BANK TRUST NATIONAL ASSOCIATION,

2

as Delaware Trustee,

Custodial Trust Units

Dated as of December [●], 2022

# TABLE OF CONTENTS

**Page**

RECITALS ................................................................................................................. 1

STANDARD PROVISIONS ...................................................................................... 1

ARTICLE I  DEFINITIONS ...................................................................................... 1
    Section 1.01.    Defined Terms. ......................................................................... 1
    Section 1.02.    Other Definitional Provisions. .............................................. 15

ARTICLE II  TRUST ESTATE ................................................................................. 15
    Section 2.01.    Trust Assets. ........................................................................... 15
    Section 2.02.    Acceptance by the Trustee. .................................................. 20
    Section 2.03.    Purpose, Activities of the Trust. .......................................... 20
    Section 2.04.    Limitations of the Trust. ...................................................... 21
    Section 2.05.    Voting Rights. ........................................................................ 22

ARTICLE III  ADMINISTRATION OF THE TRUST ............................................ 22
    Section 3.01.    Accounts. ................................................................................ 22
    Section 3.02.    Distributions; Prior to Maturity Date or in Connection with
                 Assured Advancement Option. ........................................ 24
    Section 3.03.    Assured Advancement Option. ............................................ 27
    Section 3.04.    Sale of New Securities. ......................................................... 28
    Section 3.05.    Adjustments to Principal Amounts and Compounded
                 Amounts. ........................................................................... 29
    Section 3.06.    Payments on Assured Insurance Policies. ........................... 31
    Section 3.07.    Exchange of Trust Units for Trust Assets. .......................... 33
    Section 3.08.    Payments at Maturity Date. .................................................. 33

ARTICLE IV  REPORTING/REMITTING TO TRUST UNIT HOLDERS ............ 35
    Section 4.01.    Statements to Trust Unit Holders. ....................................... 35
    Section 4.02.    Compliance with Withholding Requirements. ..................... 35

ARTICLE V  TRUST UNITS ................................................................................... 36
    Section 5.01.    The Trust Units. ..................................................................... 36
    Section 5.02.    Book-Entry Trust Units. ....................................................... 37
    Section 5.03.    Registration of and Limitation on Transfers and Exchanges
                 of Units. ............................................................................ 37
    Section 5.04.    No Obligation to Register. .................................................... 38
    Section 5.05.    Mutilated, Destroyed, Lost or Stolen Units. ....................... 38
    Section 5.06.    Persons Deemed Owners. ..................................................... 39
    Section 5.07.    Appointment of Trust Unit Paying Agent. .......................... 39

i

# TABLE OF CONTENTS
## (continued)

Page

ARTICLE VI  CONCERNING THE TRUSTEE .......................................... 39
    Section 6.01.    Duties of Trustee. .......................................... 39
    Section 6.02.    Certain Matters Affecting the Trustee. .......................................... 40
    Section 6.03.    Trustee Not Liable for Trust Units or Securities. ................... 43
    Section 6.04.    Trustee May Own Units. .......................................... 43
    Section 6.05.    Trustee's Fees and Expenses. .......................................... 43
    Section 6.06.    Eligibility Requirements for Trustee, Successor Trustee,
        and Trust Unit Paying Agent. .......................................... 45
    Section 6.07.    Resignation and Removal of the Trustee. ........................... 45
    Section 6.08.    Successor Trustee. .......................................... 46
    Section 6.09.    Merger or Consolidation of Trustee. ................................ 47
    Section 6.10.    Reserved. .......................................... 47
    Section 6.11.    Appointment of Custodians. .......................................... 47
    Section 6.12.    Trustee May Enforce Claims Without Possession of Trust
        Units. .......................................... 47
    Section 6.13.    Trustee Indemnity .......................................... 47

ARTICLE VII  TERMINATION OF TRUST .......................................... 48
    Section 7.01.    Termination; No Redemption Rights. ................................ 48
    Section 7.02.    Procedure for Termination. .......................................... 48

ARTICLE VIII  TAX PROVISIONS .......................................... 49
    Section 8.01.    Grantor Trust Provisions. .......................................... 49
    Section 8.02.    Characterization. .......................................... 50
    Section 8.03.    Grantor Trust Administration. .......................................... 50
    Section 8.04.    Reports to Trust Unit Holders and Tax Authorities ........... 50

ARTICLE IX  MISCELLANEOUS PROVISIONS .......................................... 52
    Section 9.01.    Amendment of Trust Agreement. ................................ 52
    Section 9.02.    Counterparts; Electronic Signatures. ................................ 53
    Section 9.03.    Limitation on Rights of Trust Unit Holders. ..................... 54
    Section 9.04.    Notices. .......................................... 55
    Section 9.05.    Severability of Provisions. .......................................... 56
    Section 9.06.    Third-Party Beneficiaries. .......................................... 56
    Section 9.07.    Acts of Trust Unit Holders. .......................................... 56
    Section 9.08.    Headings. .......................................... 56
    Section 9.09.    No Waiver; Cumulative Remedies. ................................ 56
    Section 9.10.    Merger and Integration. .......................................... 57
    Section 9.11.    The Delaware Trustee .......................................... 57

**TABLE OF CONTENTS**
**(continued)**

**Page**

Section 9.12.    Timing of Distributions and other Trust Actions .......................... 58

## RECITALS

Autoridad de Carreteras y Transportación de Puerto Rico, whose name in English is PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY ("HTA" or the "Depositor"), and ASSURED GUARANTY CORP. and ASSURED GUARANTY MUNICIPAL CORP. (together or individually, as applicable, "Assured") have entered into a Trust Agreement (the "Trust Agreement") with U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, a national banking association, as trustee (the "Trustee") and U.S. BANK TRUST NATIONAL ASSOCIATION, a national banking association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, the "Trustees"), which Trust Agreement provides for the issuance of trust units ("Trust Units"), each evidencing a beneficial ownership interest in the property owned by the Trust created by the Trust Agreement.  These Standard Terms are a part of, and are incorporated by reference into, the Trust Agreement.

## STANDARD PROVISIONS

NOW, THEREFORE, in consideration of the mutual promises, covenants, representations and warranties made in the Trust Agreement, the Depositor, Assured and the Trustees agree as follows:

## ARTICLE I

## DEFINITIONS

**Section 1.01.  *Defined Terms.***

Except as otherwise specified herein or in the Trust Agreement or as the context may otherwise require, whenever used herein, the following words and phrases shall have the meanings specified in this Article.  Capitalized words and phrases used herein but not defined herein shall, when applied to a Trust, have the meanings set forth in or pursuant to the Trust Agreement.

"**Acceleration Price**": With respect to an Assured Legacy Bond, an amount equal to the outstanding principal amount of such bond plus the accrued and unpaid interest thereon.

"**Accreted Value**": As defined in the New HTA Bonds Indenture.

"**Adverse Trust Event**": has the meaning set forth in Section 8.03 hereof.

"**Affiliate**": Any person or entity controlling, controlled by or under common control with the Depositor, Assured or either of the Trustees, as the context may require.  "Control" means the power to direct the management and policies of a person or entity, directly or indirectly, whether through ownership of voting securities, by contract or otherwise.  "Controlling" and "controlled" shall have meanings correlative to the foregoing.

"**AGC Assured Legacy Bonds CUSIP**": An AGC Primary Market Assured Legacy Bonds CUSIP or AGC Secondary Market Assured Legacy Bonds CUSIP, as applicable.

1

"**AGC Double-Insured Custody Receipt**": A custody receipt evidencing a beneficial interest in the Assured Insured Bonds underlying an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP and the related AGC Insurance Policy.

"**AGC Double-Insured Custody Receipt (Complete)**": An AGC Double-Insured Custody Receipt evidencing a beneficial interest in the Assured Insured Bonds underlying an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Complete) and the related AGC Insurance Policy.

"**AGC Insurance Policy**": An Assured Insurance Policy issued by AGC.

"**AGC Insurance Policy SM-2007-267 Payments Account**": As defined in Section 3.01(d)(ii) hereof.

"**AGC Primary Market Assured Legacy Bond**": An Assured Legacy Bond insured by AGC in the primary market.

"**AGC Primary Market Assured Legacy Bonds CUSIP**": An Assured Legacy Bonds CUSIP insured by AGC in the primary market.

"**AGC Secondary Market Assured Legacy Bond**": An Assured Legacy Bond insured by AGC in the secondary market.

"**AGC Secondary Market Assured Legacy Bonds CUSIP**": A Secondary Market Assured Legacy Bonds CUSIP insured by AGC in the secondary market.

"**AGC Trust**": The Trust for an AGC Primary Market Assured Legacy Bonds CUSIP or AGC Secondary Market Assured Legacy Bonds CUSIP, as applicable.

"**AGC Trustee**": The Trustee for an AGC Trust.

"**AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP**": Secondary Market Assured Legacy Bonds CUSIP 745190R75, which evidences a beneficial ownership interest in (i) AGC Primary Market Assured Legacy Bonds having CUSIP 745190UR7 and related AGC Insurance Policy CIFGNA-562, and (ii) AGC Insurance Policy SM-2007-267, issued in the secondary market.

"**AGC-AGC Double-Insured Trust**": The Trust for AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190R75.

"**AGC-AGC Double-Insured Trustee**":  The Trustee for the AGC-AGC Double-Insured Trust.

"**AGC-AGC Double-Insured Trust Unit**": A Trust Unit issued by the AGC-AGC Double-Insured Trust.

2

"**AGM Double-Insured Custody Receipt**": A custody receipt evidencing a beneficial interest in an AGC Double-Insured Custody Receipt and the related AGM Double-Insured Insurance Policy.

"**AGM Double-Insured Custody Receipt (Complete)**": An AGM Double-Insured Custody Receipt evidencing a beneficial interest in an AGC Double-Insured Custody Receipt (Complete) and the related AGM Double-Insured Insurance Policy (Complete).

"**AGM Double-Insured Insurance Policy**": An Assured Insurance Policy issued by AGM and insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

"**AGM Double-Insured Insurance Policy (Complete)**": An AGM Double-Insured Insurance Policy insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Complete).

"**AGM Double-Insured Insurance Policy (Partial)**": An AGM Double-Insured Insurance Policy insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial).

"**AGM Double-Insured Insurance Policy Payments Account**": As defined in Section 3.01(c)(ii) hereof.

"**AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP**": A Secondary Market Assured Legacy Bonds CUSIP insured by AGM in the secondary market that relates to underlying Assured Legacy Bonds that are also insured by AGC in the primary or secondary market, consisting of (i) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190M70 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745190M54 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds  and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy), (ii) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190M88 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745190M62 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy), (iii) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190Q27 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745190E87 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy), (iv) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190R67 (evidencing a beneficial ownership interest in (x) AGC Primary Market Assured Legacy Bonds having CUSIP 745190ZR2 and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy), and (v) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190P51 (evidencing a beneficial ownership interest in (x) AGC Primary Market Assured Legacy Bonds having CUSIP 745190ZS0 and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy).

3

"**AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Complete)**": An AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP with respect to which all underlying Assured Legacy Bonds insured by an AGC Insurance Policy are also insured by the applicable AGM Double-Insured Insurance Policy, consisting of (i) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190M70 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745190M54 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds  and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy), (ii) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190M88 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745190M62 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy), and (iii) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190Q27 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745190E87 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy).

"**AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial)**": An AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP with respect to which only a portion of the underlying Assured Legacy Bonds insured by an AGC Insurance Policy are also insured by the applicable AGM Double-Insured Insurance Policy, consisting of (i) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190R67 (evidencing a beneficial ownership interest in (x) AGC Primary Market Assured Legacy Bonds having CUSIP 745190ZR2 and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy) and (ii) AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP 745190P51 (evidencing a beneficial ownership interest in (x) AGC Primary Market Assured Legacy Bonds having CUSIP 745190ZS0 and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy).

"**AGM Double-Insured Trust**": The Trust for an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

"**AGM Double-Insured Trust (Complete)**": The Trust for an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Complete), which, for the avoidance of doubt, shall be the Trust for the relevant Assured Legacy Bonds CUSIP (Combined).

"**AGM Double-Insured Trust (Partial)**": The AGM Double-Insured Trust for an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial).

"**AGM Double-Insured Trustee**": The Trustee for an AGM Double-Insured Trust.

"**AGM Double-Insured Trustee (Complete)**": The Trustee for an AGM Double-Insured Trust (Complete), which, for the avoidance of doubt, shall be the Trustee for the relevant Assured Legacy Bonds CUSIP (Combined).

4

"**AGM Double-Insured Trustee (Partial)**": The Trustee for an AGM Double-Insured Trust (Partial).

"**AGM Double-Insured Trust Unit (Partial)**": A Trust Unit issued by an AGM Double-Insured Trust (Partial).

"**AGM Secondary Market Assured Legacy Bonds CUSIP**": A Secondary Market Assured Legacy Bonds CUSIP insured by AGM in the secondary market.

"**Assured Acceleration Option**": Assured's right, in accordance with the terms of the Assured Insurance Policies and Section [26.1] of the HTA Plan, to elect to discharge its payment obligations with respect to any Assured Legacy Bonds CUSIP prior to the stated Maturity Date thereof by paying the applicable Acceleration Price to the holders thereof.

"**Assured Advancement Option**": Either (a) the Assured Acceleration Option or (b) the rights assigned by HTA to Assured pursuant to Section [26.1(d)] of the HTA Plan to redeem and call the Assured Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Assured as if it were HTA for such purpose, and any amounts due in connection with such redemption shall be equal to the lesser of the applicable redemption price and the Acceleration Price.

"**Assured Bondholder Election 2**": As defined in the HTA Plan.

"**Assured Deferred Expenses**": Any Trustee Costs or Trust expenses paid in cash to the Trustee or the Trust by Assured.

"**Assured Insurance Policies**": The insurance policies, including insurance policies issued in the secondary market, pursuant to which Assured insured payments of principal and interest with respect to the Assured Legacy Bonds. In the event an Assured Insurance Policy must be deposited into more than one Trust, such Assured Insurance Policy shall be allocated among the applicable Trusts as if it were a separate policy for all purposes.

"**Assured Insured Bonds**": As defined in the HTA Plan.

"**Assured Insurer Event**": A default by Assured on its payment obligations under an applicable Assured Insurance Policy, which default is continuing.

"**Assured Legacy Bondholder**": The beneficial holder of an Assured Legacy Bond.

"**Assured Legacy Bond**": Any Assured Insured Bond the beneficial holder of which has validly elected, or is deemed to have elected, Assured Bondholder Election 2.

"**Assured Legacy Bonds CUSIP**": Any maturity of Assured Legacy Bonds that bears a unique CUSIP such that such maturity of Assured Legacy Bonds is separately identifiable from other maturities of Assured Legacy Bonds with unique CUSIPs; provided, however, that for all Secondary Market Assured Legacy Bonds, the "Assured Legacy Bonds CUSIP" for purposes of this Trust Agreement shall be the CUSIP of the related custody receipt evidencing a beneficial interest in such Secondary Market Assured Legacy Bonds and the

5

related Assured Insurance Policy rather than the CUSIP of the underlying Secondary Market Assured Legacy Bonds; provided, further, that for purposes of this Trust Agreement (other than this Article I of the Standard Terms), in the case of any AGC Double-Insured Custody Receipt (Complete) and the related AGM Double-Insured Custody Receipt (Complete), the applicable Assured Legacy Bonds CUSIP (Combined) shall be treated as a single Assured Legacy Bonds CUSIP corresponding to a single Trust.  For the avoidance of doubt, each Assured Legacy Bonds CUSIP is either a Primary Market Assured Legacy Bonds CUSIP or a Secondary Market Assured Legacy Bonds CUSIP, and the Assured Legacy Bonds CUSIPs consist of (i) Primary Market Assured Legacy Bonds CUSIPs 745181C54, 745181C62, 745181C70, 745181C88, 745190HJ0, 745190UR7, 745190ZR2, and 745190ZS0 and (ii) Secondary Market Assured Legacy Bonds CUSIPs 745181D38, 745181F77, 745181D53, 745181D46, 745181F85, 745190R75, 745190M54, 745190M70, 745190M62, 745190M88, 745190E87, 745190Q27, 745190R67, 745190P51, 745190Y69, and 745190Z43.

"**Assured Legacy Bonds CUSIP (Combined)**":  In the case of any AGC Double-Insured Custody Receipt (Complete) and the related AGM Double-Insured Custody Receipt (Complete), together, (i) the CUSIP of the applicable AGC Double-Insured Custody Receipt (Complete) and (ii) the CUSIP of the related AGM Double-Insured Custody Receipt (Complete), which CUSIPs, together, shall be treated as a single Assured Legacy Bonds CUSIP and Secondary Market Assured Legacy Bonds CUSIP for purposes of this Trust Agreement (other than this Article I of the Standard Terms).  For the avoidance of doubt, the Assured Legacy Bond CUSIPs (Combined) consist of (i) 745190M70/745190M54, (ii) 745190M88/745190M62, and (iii) 745190Q27/745190E87.

"**Assured Reimbursement Amount**": An amount sufficient to reimburse Assured for all payments made by Assured under an Assured Insurance Policy for a particular Assured Legacy Bonds CUSIP or Assured Legacy Bonds CUSIP (Combined), as applicable, and payment of which to Assured shall be a requirement of the Unit Exchange Election.

"**Bankruptcy Code**": Title 11 of the United States Code, solely to the extent incorporated into PROMESA.

"**Beneficial Owner**": (i) With respect to any Book-Entry Trust Unit, the Person who is registered as owner of that Trust Unit in the books of the Depository for that Trust Unit or in the books of a Depository Participant, or in the books of an indirect participant for which a Depository Participant acts as agent; (ii) with respect to any Non-Book-Entry AGC Trust Unit held by an AGM Double-Insured Trust (Partial), the AGM Double-Insured Trustee (Partial) for such AGM Double-Insured Trust (Partial); (iii) with respect to any Non-Book-Entry AGC Trust Unit held by the AGC-AGC Double-Insured Trust, the AGC-AGC Double-Insured Trustee; and (iv) with respect to any Non-Book-Entry AGC Trust Unit not held by an AGM Double-Insured Trust (Partial), (a) the Person registered as the owner of such Trust Unit in the Unit Register or (b), to the extent such Non-Book-Entry AGC Trust Unit is held in trust by the Person registered as the owner of such Trust Unit in the Unit Register, the Person for whose benefit such Non-Book-Entry AGC Trust Unit is held in trust.

6

"**Bond Documents**": The bond resolutions, indentures, trust agreements, or similar agreements pursuant to which (i) the Assured Legacy Bonds and (ii) the New HTA Bonds were issued.

"**Bond Election**": As defined in Section 3.04(b) hereof.

"**Bond Sale**": As defined in Section 3.04(a) hereof.

"**Bonds**": Collectively, (i) the HTA Bonds and (ii) the New HTA Bonds.

"**Book-Entry Trust Units**": All Trust Units, other than the Non-Book-Entry AGC Trust Units.

"**Business Day**": Any day that is not a Saturday, Sunday, holiday, or other day on which commercial banking institutions in the City of New York, the city of San Juan, Puerto Rico or the State of Delaware or, if different, the city and state in which the Corporate Trust Office is located are authorized or obligated by law or executive order to be closed.

"**Capital Appreciation Bond**": An Assured Legacy Bond that is a capital appreciation bond.

"**Cash Account**": As defined in Section 3.01(a)(iii) hereof.

"**Cash Proceeds**": As defined in Section 3.04(b) hereof.

"**Clawback Structuring Fees**": The payments to which Assured is entitled pursuant to Section 86.1(b)(xvi) of the Commonwealth Plan, decretal paragraph 54 of the Commonwealth Confirmation Order, and any related provision of the HTA Plan or HTA Confirmation Order.

"**Code**": The Internal Revenue Code of 1986, as amended.

"**Commonwealth Confirmation Order**": The *Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority*, Case No. 17-03284-LTS, ECF No. 19813.

"**Commonwealth Plan**": The Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., Case No. 17-03284-LTS, ECF No. 19784, including as amended or superseded, but in all events solely to the extent in form and substance reasonably satisfactory to Assured and otherwise consistent with the Commonwealth PSA and HTA/CCDA PSA.

"**Commonwealth PSA**": That certain Amended and Restated Plan Support agreement, dated as of July 12, 2021, by and among (a) the Financial Oversight and Management Board for Puerto Rico and (b) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders,

7

or subrogees with respect to GO Bonds and PBA Bonds, among other parties, including as amended or superseded, but in all events only to the extent Assured remains a party thereto and has not terminated such agreement.

"**Compounded Amount**": With respect to any Capital Appreciation Bond, the compounded amount thereof.

"**Corporate Trust Office**": The respective principal corporate trust office of the Trustees at which the Trust is administered from time to time.

"**Current Interest Bond**": An Assured Legacy Bond that is a current interest bond.

"**Custodian**": The Trustee or the agent for the Trustee which shall hold all or a portion of the Trust Estate, or documents relating thereto, with respect to a specific Trust.

"**Depository**": The Depository Trust Company, or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Securities Exchange Act of 1934 and the regulations of the SEC thereunder.

"**Depository Participant**": A broker, dealer, bank, other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

"**Distribution**": Any distribution to Trust Unit Holders made pursuant to Section 3.02; provided, however, that, for purposes of Section 3.05 hereof, if a Distribution on a Non-Book-Entry Double-Insured AGC Trust Unit is subsequently passed through to an AGM Double-Insured Trust (Partial) and distributed as a Distribution on an AGM Double-Insured Trust Unit (Partial), such Distributions from the applicable AGC Trust and the related AGM Double-Insured Trust (Partial) shall constitute a single Distribution (with no double counting) for purposes of calculating amounts that remain outstanding with respect to the Assured Legacy Bonds held by the applicable AGC Trust and insured by the related AGM Double-Insured Insurance Policy (Partial); and provided, further, that for purposes of Section 3.05 hereof, if a Distribution made by the AGC Trust for CUSIP 745190UR7 on a Non-Book-Entry Double-Insured AGC Trust Unit is subsequently passed through to the AGC-AGC Double-Insured Trust and distributed as a Distribution on an AGC-AGC Double-Insured Trust Unit, such Distributions from the AGC Trust for CUSIP 745190UR7 and the AGC-AGC Double-Insured Trust shall constitute a single Distribution (with no double counting) for purposes of calculating amounts that remain outstanding with respect to the Assured Legacy Bonds held by the AGC Trust for CUSIP 745190UR7 and insured by AGC Insurance Policy CIFGNA-562 and AGC Insurance Policy SM-2007-267.

"**Effective Date**": The "HTA Effective Date" as defined in the HTA Plan and identified in a public notice by the Oversight Board; provided, however, that any action required by this Trust Agreement to be taken or event required by this Trust Agreement to have occurred on the Effective Date shall be deemed to have been taken or to have occurred on the Effective Date if such action is taken or such event occurs within ten (10) Business Days of the Effective Date.

**"EMMA"**: The Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board, or, if not available for the purposes provided herein, a website specified by the Trustee. Any obligation to post a document to EMMA shall be understood as an obligation to post such document under the CUSIP for each Trust Unit to which such document relates.

**"Extraordinary Expenses"**:  As defined in Section 6.05(b) hereof.

**"Fee Agreement"**: The fee and indemnification agreement dated as of the date hereof providing for the Trustees' recovery from or reimbursement by Assured of certain reasonable compensation, certain reasonable expenses, costs, and disbursements, certain Extraordinary Expenses and certain indemnification payments.

**"FGIC"**: Financial Guaranty Insurance Company.

**"FGIC Certificates"**: As defined in the HTA Plan.

**"FGIC Certificates Account"**: As defined in Section 3.01(b)(i) hereof.

**"FGIC Insurance Policies"**: As defined in the HTA Plan.

**"FGIC Insured Bonds"**: As defined in the HTA Plan.

**"FGIC Insured Bonds Insurance Policy Payments Account"**: As defined in Section 3.01(b)(ii) hereof.

**"FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP"**:  A Secondary Market Assured Legacy Bonds CUSIP with respect to which the underlying Secondary Market Assured Legacy Bonds are insured by FGIC in the primary market, consisting of (i) Secondary Market Assured Legacy Bonds CUSIP 745190Y69 (evidencing a beneficial ownership interest in (x) underlying Secondary Market Assured Legacy Bonds with CUSIP number 745190ZT8 insured by FGIC in the primary market and (y) the related Assured Insurance Policy) and (ii) Secondary Market Assured Legacy Bonds CUSIP 745190Z43 (evidencing a beneficial ownership interest in (x) underlying Secondary Market Assured Legacy Bonds with CUSIP number 745190ZT8 insured by FGIC in the primary market and (y) the related Assured Insurance Policy).

**"FGIC Plan Consideration"**: As defined in the HTA Plan.

**"FGIC Trust"**: As defined in the HTA Plan.

**"Floor Price"**: The minimum weighted average sale price required to be obtained for the Subject Bonds with respect to any Bond Sale, as determined by Assured.

**"Franklin Fund"**: Each of the funds managed by Franklin Advisers, Inc. that are Assured Legacy Bondholders and Trust Unit Holders, in their capacity as such and their successors and assigns.

9

"**Franklin Nuveen Trust**": As defined in Section 2.06(b) hereof.

"**Franklin Nuveen Trust Unit Holder**": a Beneficial Owner of a Trust Unit issued by a Franklin Nuveen Trust, in its capacity as such.

"**General Trust**": As defined in Section 2.06(b) hereof.

"**Grantor Trust Provisions**": Subpart E of Subchapter J of Chapter 1 of the Code and Section 7701 of the Code, and final Treasury Regulations, published rulings, notices and announcement, promulgated thereunder, as the foregoing may be in effect from time to time.

"**HTA Bonds**": As defined in the HTA Plan.

"**HTA Confirmation Order**": The order of the Title III Court confirming the HTA Plan in accordance with Section 314 of PROMESA and Section 1129 of the Bankruptcy Code.

"**HTA/CCDA PSA**": That certain HTA/CCDA Related Plan Support Agreement, dated as of May 5, 2021, by and among (a) the Financial Oversight and Management Board for Puerto Rico and (b) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to HTA Bonds and CCDA Bonds, each as defined therein, among other parties, including as amended or superseded, but in all events only to the extent Assured remains a party thereto and has not terminated such agreement.

"**HTA Fiscal Agent**": As defined in the HTA Plan.

"**HTA Payment Shortfall**":  As defined in Section 3.06(e) hereof.

"**HTA Payments**": Payments received by the Trustee on account of New HTA Bonds or FGIC Certificates.

"**HTA Plan**": The [Third]Modified Fifth Amended] Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority, Case No. 17-0328403283-LTS, ECF No. [21267],22581-1, including, without limitation, the exhibits and schedules thereto, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA and the Bankruptcy Code, but in all events solely to the extent in form and substance reasonably satisfactory to Assured and otherwise consistent with the Commonwealth PSA and HTA/CCDA PSA.

"**HTA Plan Cash Distributions**": Any cash distributions allocable to Assured Legacy Bondholders on account of Assured Legacy Bonds under the HTA Plan as a result of a valid election by the Commonwealth and HTA to substitute cash for the New HTA Bonds on the HTA Effective Date, but, for the avoidance of doubt, excluding any Consummation Costs, PSA Restriction Fees, HTA PSA Restriction Fees, or Clawback Structuring Fees payable to Assured, in each case as defined in the Commonwealth Plan, the HTA Plan, or in this Trust Agreement, as applicable.

10

"**Insurance Policy Account**": As defined in Section 3.01(a)(iv) hereof.

"**Insured Amount**": As of any date, (i) in the case of a Current Interest Bond, the accrued and unpaid interest on, and outstanding principal amount of, such Current Interest Bond as of such date, or (ii) in the case of a Capital Appreciation Bond, the Compounded Amount as of such date.

"**Maturity Date**": As defined in the Trust Agreement.

"**Maturity Notice**": As defined in Section 3.08(a) hereof.

"**New HTA Bonds**": As defined in the HTA Plan, and including the Taxable New HTA Bonds and Tax-Exempt New HTA Bonds.

"**New HTA Bonds Indenture**": As defined in the HTA Plan.

"**New Securities**": As applicable, the New HTA Bonds or FGIC Certificates held by the Trust.

"**Non-Book-Entry AGC Trust Units**:" The Non-Book-Entry Double-Insured AGC Trust Units, together with any Trust Units (if any) issued by an AGC Trust in certificated form to Assured Insured Bondholders who, prior to the Effective Date, held custody receipts in certificated form.

"**Non-Book-Entry Double-Insured AGC Trust Units**:" Trust Units to be issued in certificated rather than book-entry form by the AGC Trusts for Primary Market Assured Legacy Bonds CUSIPs 745190ZR2, 745190ZS0, and 745190UR7, consisting of the Trust Units to be issued by each such AGC Trust on account of the portion of the Assured Legacy Bonds held by such AGC Trust that also underlies (i) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial) or (ii) AGC-AGC Double-Insured Secondary Market Legacy Bonds CUSIP 745190R75, as applicable.

"**Non-Book-Entry Double-Insured AGC Trust Units Account**": As defined in Section 3.01(c)(i) or Section 3.01(d)(i) hereof, as applicable.

"**Notice of Claim and Certificate**": As defined in Section 3.06(a) hereof.

"**Notional Amount**": As of any day, the aggregate outstanding Notional Amount of all Trust Units shall be the aggregate outstanding principal amount (or, in the case of Capital Appreciation Bonds, the Compounded Amount) of all Assured Legacy Bonds as of such day.

"**Nuveen Fund**": Each of the funds managed by Nuveen Asset Management that are Assured Legacy Bondholders and Trust Unit Holders, in their capacity as such, and their successors and assigns.

"**Officer**": When used with respect to either of the Trustees, any senior vice president, any vice president, any assistant vice president, any assistant treasurer, any trust officer, any assistant secretary in the Corporate Trust Office of either of the Trustees, or any other officer

11

of the Trustees customarily performing functions similar to those performed by the persons who at the time shall be such officers and who, in each case, shall have direct responsibility for the administration of the Trust Agreement (including these Standard Terms), and also to whom with respect to a particular corporate trust matter such matter is referred because of such officer's knowledge of and familiarity with the particular subject. With respect to any other Person, the chairman of the board, the president, a vice president (however designated), the treasurer or controller.

"**Opinion of Counsel**": A written opinion of either (a) nationally recognized counsel who is reasonably acceptable to the parties to whom it is delivered, or (b) internal counsel to Assured or any of its Affiliates.

"**Original Scheduled Interest Payment Date**"**:** With respect to a Current Interest Bond, a date, other than the Maturity Date, on which a scheduled payment of interest is due in respect of such Current Interest Bond in accordance with the terms of the applicable Assured Insurance Policy.

"**Original Scheduled Payment Date**": An Original Scheduled Interest Payment Date or Original Scheduled Principal Payment Date, as applicable, including, without limitation, the Maturity Date.

"**Original Scheduled Principal Payment Date**"**:** A date on which a scheduled payment of principal or Compounded Amount is due in respect of such Current Interest Bond or Capital Appreciation Bond, as applicable, in accordance with the terms of the applicable Assured Insurance Policy, including, without limitation, the Maturity Date.

"**Oversight Board**" As defined in the HTA Plan.

"**Payment Shortfall**" As defined in Section 3.06(a) hereof.

"**Person**": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency, instrumentality, or political subdivision thereof.

"**Primary Market Assured Legacy Bonds CUSIP"**": Any Assured Legacy Bonds CUSIP that is not a Secondary Market Assured Legacy Bonds CUSIP. For the avoidance of doubt, the Primary Market Assured Legacy Bonds CUSIPs consist of Assured Legacy Bonds CUSIPs 745181C54, 745181C62, 745181C70, 745181C88, 745190HJ0, 745190UR7, 745190ZR2, and 745190ZS0.

"**Principal Amount Reduction**": As defined in Section 3.05(c) hereof.

"**PROMESA**": The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et. seq.

"**pro rata**": Unless otherwise stated, any pro rata payment or distribution made to, or any pro rata allocation of any cost or expense borne by, (i) Holders of Trust Units for a particular Assured Legacy Bonds CUSIP or Assured Legacy Bonds CUSIP (Combined), as

applicable, shall be calculated based on the Notional Amount of Trust Units outstanding with respect to such Assured Legacy Bonds CUSIP or Assured Legacy Bonds CUSIP (Combined), as applicable, and (ii) all Holders of Trust Units without regard to Assured Legacy Bonds CUSIP shall be calculated based on the outstanding principal amount (or, in the case of Capital Appreciation Bonds, the Compounded Amount) of the Assured Legacy Bonds underlying such Trust Units.

"**Pro Rata Share**": As defined in the HTA Plan.

"**Reorganized HTA**": As defined in the HTA Plan.

"**Requisite Trust Unit Holders**": With respect to any Trust, Holders of a majority (measured by outstanding principal amount or, in the case of Capital Appreciation Bonds, the Compounded Amount of the underlying Assured Legacy Bonds CUSIP) of Trust Units.

"**Sale Notice**": As defined in Section 3.04(a) hereof.

"**Sale Notice Period**": As defined in Section 3.04(b) hereof.

"**SEC**": The Securities and Exchange Commission.

"**Secondary Market Assured Legacy Bonds**": The Assured Legacy Bonds that are insured through Assured Insurance Policies issued in the secondary market.

"**Secondary Market Assured Legacy Bonds CUSIP**": The Assured Legacy Bonds CUSIP of a Secondary Market Assured Legacy Bond, consisting of the CUSIP of the related custody receipt evidencing a beneficial interest in such Secondary Market Assured Legacy Bond and the related Assured Insurance Policies; provided, however, that for purposes of this Trust Agreement (other than this Article I of the Standard Terms), in the case of any AGC Double-Insured Custody Receipt (Complete) and the related AGM Double-Insured Custody Receipt (Complete), the applicable Assured Legacy Bonds CUSIP (Combined) shall be treated as a single Secondary Market Assured Legacy Bonds CUSIP corresponding to a single Trust.  For the avoidance of doubt, the Secondary Market Assured Legacy Bonds CUSIPs consist of Assured Legacy Bonds CUSIPs 745181D38, 745181F77, 745181D53, 745181D46, 745181F85, 745190R75, 745190M54, 745190M70, 745190M62, 745190M88, 745190E87, 745190Q27, 745190R67, 745190P51, 745190Y69, and 745190Z43.

"**Securities**": Collectively, the Assured Legacy Bonds and the New Securities.

"**Securities Act**": The Securities Act of 1933, as amended.

"**Standard Terms**": These Standard Terms, as amended or supplemented, incorporated by reference into the Trust Agreement.

"**Subject Bonds**": As defined in Section 3.04(a) hereof.

"**Target Price**": With respect to any Bond Sale, the then-current trading price of the Subject Bonds, as measured by the most recently available sale price for no less than

$1,000,000 of the Subject Bonds, as quoted on a nationally recognized exchange or a "bid" price on an electronic trading system such as Bloomberg L.P. posted within 10 Business Days prior to the date of the Sale Notice, or if no such price is available, a bona fide bid quote provided for no less than $1,000,000 of the Subject Bonds by an independent broker-dealer operating in the over-the-counter market.

"**Tax Costs**": As defined in <u>Section 8.04(c)</u> hereof.

"**Taxable Bond Account**": As defined in <u>Section 3.01(a)(ii)</u> hereof.

"**Taxable New HTA Bonds**": New HTA Bonds that are not tax-exempt bonds (if any).

"**Tax-Exempt Bond Account**": As defined in <u>Section 3.01(a)(i)</u> hereof.

"**Tax-Exempt New HTA Bonds**": New HTA Bonds that are tax-exempt bonds.

"**Termination Notice**": As defined in <u>Section 7.02</u> hereof.

"**Treasury Regulations**": Regulations, including proposed or temporary regulations, promulgated under the Code.   References herein to specific provisions of regulations, including proposed or temporary regulations shall include analogous provisions of final Treasury Regulations as well as any successor or replacement Treasury Regulations.

"**Trust**": With respect to each Assured Legacy Bonds CUSIP or Assured Legacy Bonds CUSIP (Combined), as applicable, the separate trust formed pursuant to the applicable Trust Agreement.   For the avoidance of doubt, in the case of any Assured Legacy Bonds CUSIP (Combined), only one such Trust shall be formed for each such Assured Legacy Bonds CUSIP (Combined).

"**Trust Assets**"**:** With respect to each Trust, as applicable, (i) the property to be deposited into and/or held by such Trust pursuant to <u>Section 2.01</u> hereof; (ii) any other property that Assured may determine, in its sole discretion, to deposit in the applicable Trust for the benefit of the Trust Unit Holders; and (iii) any proceeds of any of the foregoing.

"**Trust Estate**": Collectively, and with respect to any Trust, (a) the Trust Assets deposited and held in such Trust for the benefit of the Trust Unit Holders, and (b) any other property deposited and held in such Trust for the benefit of the Trust Unit Holders (if any).

"**Trust Unit**": With respect to each Trust that is formed for the benefit of the beneficial holders of an Assured Legacy Bonds CUSIP or Assured Legacy Bonds CUSIP (Combined), as applicable, the trust unit(s) to be issued by such Trust.

"**Trust Unit Holder**" or "**Holder**": As applicable, (i) a Beneficial Owner of a Trust Unit, or (ii) Assured, to the extent Assured has been subrogated to the rights of a Beneficial Owner of a Trust Unit.

"**Trust Unit Paying Agent**": The paying agent appointed pursuant to Section 5.07 hereof.

"**Trustee Costs**": As defined in Section 6.05(a) hereof.

"**Unit Exchange Election**": As defined in Section 3.07(a) hereof.

"**Unit Register**" and "**Unit Registrar**": The register maintained and the registrar appointed pursuant to Section 5.03 hereof.

"**U.S. Person**": A person who is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"**Voting Rights**": Any voting or control rights granted to holders of Securities.

"**WHFIT Regulations**": As defined in Section 8.04(a) hereof.

**Section 1.02.  *Other Definitional Provisions.***

The words "hereof," "herein" and "hereunder" and words of similar import when used in these Standard Terms shall refer to these Standard Terms as a whole and not to any particular provision of these Standard Terms, and Section, subsection, Annex and Exhibit references are to these Standard Terms unless otherwise specified.  The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms, and the singular shall include the plural as required by context.  The words "include" and "including" shall be deemed to be followed by the phrase "without limitation."  Any reference to any document in these Standard Terms shall be deemed to include any amendment, restatement, supplement or modification thereto.

## ARTICLE II

## TRUST ESTATE

**Section 2.01.  *Trust Assets.***

Pursuant to and in accordance with the Trust Agreement and the HTA Plan, upon the Effective Date:

(a)     Solely with respect to each Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), or (iii) the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(a) applies solely to Assured Legacy Bonds CUSIPs 745181C54, 745181C62, 745181C70, 745181C88, 745190HJ0, 745190UR7, 745190ZR2, 745190ZS0, 745181D38, 745181F77, 745181D53, 745181D46, 745181F85, 745190M70/745190M54, 745190M88/745190M62, and 745190Q27/745190E87:

15

(i)     The Depositor shall, on behalf of each of the Assured Legacy Bondholders holding such Assured Legacy Bonds CUSIP, deposit any New HTA Bonds allocable to such Assured Legacy Bonds CUSIP into the Trust for that Assured Legacy Bonds CUSIP.  The Trustee shall establish and maintain in the name of the Trust a Tax-Exempt Bond Account into which any such Tax-Exempt New HTA Bonds (and any proceeds thereof) shall be deposited, and a Taxable Bond Account into which any such Taxable New HTA Bonds (and any proceeds thereof) shall be deposited; provided, however, that the Trustee shall transfer from the Taxable Bond Account to the Tax-Exempt Bond Account any Taxable New HTA Bonds which Assured has notified the Trustee in writing have become Tax-Exempt New HTA Bonds, and from the Tax-Exempt Bond Account to the Taxable Bond Account any Tax-Exempt New HTA Bonds which Assured has notified the Trustee in writing have become Taxable New HTA Bonds.

(ii)     The Depositors shall, on behalf of each of the Assured Legacy Bondholders holding such Assured Legacy Bonds CUSIP, deposit any HTA Plan Cash Distributions allocable to such Assured Legacy Bonds CUSIP into the Trust for that Assured Legacy Bonds CUSIP.  The Trustee shall establish and maintain in the name of the Trust a Cash Account into which any such HTA Plan Cash Distributions shall be deposited.

(iii)     The Trustee shall establish and maintain in the name of the Trust an Insurance Policy Account into which such Assured Legacy Bonds CUSIP shall be deemed to have been deposited.  Pursuant to Section 28.6 of the HTA Plan, the Assured Legacy Bonds deemed deposited into the Trust shall not be cancelled and all rights and remedies under the existing Assured Legacy Bonds and the applicable Bond Documents (other than payment obligations of the Depositor and the continuation of any lien granted as security for such Assured Legacy Bonds) shall remain in full force and effect solely to the extent necessary to preserve any claims relating to the Assured Legacy Bonds deposited in the Trust under the applicable Assured Insurance Policy. Such existing Assured Legacy Bonds shall not form the basis for the assertion of any claim against the Depositor or Reorganized HTA. The Assured Insurance Policies (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

(b)     Solely with respect to each Primary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(b) applies solely to Assured Legacy Bonds CUSIPs 745181C54, 745181C62, 745181C70, 745181C88, 745190HJ0, 745190UR7, 745190ZR2, and 745190ZS0:

(i)     The HTA Fiscal Agent shall, on behalf of each of the Assured Legacy Bondholders holding such Primary Market Assured Legacy Bonds CUSIP, transfer the Assured Insurance Policy for that Primary Market Assured Legacy Bonds CUSIP and any and all agreements, documents and instruments relating to such Assured Insurance Policy that are within its control to the applicable Trust, and all corresponding rights of the applicable Assured Legacy Bondholders shall be deemed to have been deposited into the applicable Trust.

16

(ii)     The Depositor shall, on behalf of each of the Assured Legacy Bondholders holding such Primary Market Assured Legacy Bonds CUSIP, transfer any and all agreements, documents and instruments relating to the Assured Insurance Policy for that Primary Market Assured Legacy Bonds CUSIP that are within its control to the applicable Trust, and all corresponding rights of the applicable Assured Legacy Bondholders shall be deemed to have been deposited into the applicable Trust.

(iii)     The Assured Legacy Bondholders holding such Primary Market Assured Legacy Bonds CUSIP shall be deemed to have deposited their Assured Legacy Bonds into the Trust for the applicable Primary Market Assured Legacy Bonds CUSIP as of the Effective Date.

(c)     Solely with respect to each Secondary Market Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), or (iii) the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(c) applies solely to Assured Legacy Bonds CUSIPs 745181D38, 745181F77, 745181D53, 745181D46, 745181F85, 745190M70/745190M54, 745190M88/745190M62, and 745190Q27/745190E87:

(i)     Each Assured Insured Bondholder holding custody receipts of such Secondary Market Assured Legacy Bonds CUSIP will be deemed to have deposited such custody receipts into the applicable Trust.

(ii)     The Trust (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement(s) with respect to such Secondary Market Assured Legacy Bonds CUSIP, such that the Trust will be deemed to hold the related Assured Insured Bonds underlying the applicable custody receipts and the related Assured Insurance Policies, without any further action on the part of the existing custodian(s).  In the event a single Assured Legacy Bonds CUSIP is insured by more than one Assured Insurance Policy, the Trust for such Assured Legacy Bonds CUSIP shall be deemed to hold all such Assured Insurance Policies insuring the Assured Legacy Bonds CUSIP corresponding to such Trust.

(d)     Solely with respect to each FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(d) applies solely to Assured Legacy Bonds CUSIPs 745190Y69 and 745190Z43:

(i)     Each Assured Insured Bondholder holding custody receipts of such FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP will be deemed to have deposited such custody receipts into the applicable Trust.

(ii)     The Trust (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement, such that the Trust will be deemed to hold the Assured Insured Bonds (which also qualify as FGIC Insured Bonds) underlying the applicable custody receipts and the related

17

Assured Insurance Policies, without any further action on the part of the existing custodian. In the event a single Assured Legacy Bonds CUSIP is insured by more than one Assured Insurance Policy, the Trust for such Assured Legacy Bonds CUSIP shall be deemed to hold all such Assured Insurance Policies insuring the Assured Legacy Bonds CUSIP corresponding to such Trust. The Assured Insurance Policies (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

(iii)     Without prejudice to the ability of the Trustee to draw on the applicable Assured Insurance Policy, such Assured Insured Bonds (which also qualify as FGIC Insured Bonds), the related FGIC Insurance Policies, and the related FGIC Plan Consideration shall be deemed to have been deposited into the applicable FGIC Trust pursuant to Section [26.3] of the HTA Plan.

(iv)     The applicable Trust shall be deemed to have received the Pro Rata Share of the FGIC Plan Consideration allocable to each Assured Insured Bondholder holding custody receipts of such FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, and shall receive the FGIC Certificates allocable to such Assured Insured Bondholder on account of the applicable custody receipts and Assured Insured Bonds (which also qualify as FGIC Insured Bonds).  The Trustee shall establish and maintain in the name of the Trust a FGIC Certificates Account into which any such FGIC Certificates shall be deposited.

(v)     As a result of the steps described in subsections 2.01(d)(i)-(iv) above, the applicable Trust shall hold the applicable FGIC Certificates and the related Assured Insurance Policies.

(e)     Solely with respect to each AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), such that this Section 2.01(e) applies solely to Assured Legacy Bonds CUSIPs 745190R67 and 745190P51:

(i)     Each Assured Insured Bondholder holding custody receipts of such AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial) will be deemed to have deposited such custody receipts into the applicable AGM Double-Insured Trust (Partial).

(ii)     The AGM Double-Insured Trust (Partial) (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement, such that the AGM Double-Insured Trust (Partial) will be deemed to hold (i) the underlying AGC Primary Market Assured Legacy Bonds and the related AGC Insurance Policy, and (ii) the related AGM Double-Insured Insurance Policies (Partial), without any further action on the part of the existing custodian. In the event a single Assured Legacy Bonds CUSIP is insured by more than one AGM Double-Insured Insurance Policy (Partial), the Trust for such Assured Legacy Bonds CUSIP shall be deemed to hold all such AGM Double-Insured Insurance Policies (Partial) insuring the Assured Legacy Bonds CUSIP corresponding to such Trust. The AGM Double-Insured Insurance Policies (Partial) (other than as

18

satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

(iii)     Without prejudice to the ability of the AGM Double-Insured Trustee (Partial) to draw on the applicable AGM Double-Insured Insurance Policy (Partial) to the extent authorized under this Trust Agreement, the AGM Double-Insured Trust (Partial) shall be deemed to have deposited such AGC Primary Market Assured Legacy Bonds and the related AGC Insurance Policies into the applicable AGC Trust.

(iv)     The applicable AGC Trust shall, on behalf of each of the Assured Legacy Bondholders holding such AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), deposit the Non-Book-Entry Double-Insured AGC Trust Units allocable to such AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial) into the AGM Double-Insured Trust (Partial) for that AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial). The AGM Double-Insured Trustee (Partial) shall establish and maintain in the name of the AGM Double-Insured Trust (Partial) a Non-Book-Entry Double-Insured AGC Trust Units Account into which such Non-Book-Entry Double-Insured AGC Trust Units shall be deposited.

(v)     As a result of the steps described in Subsections 2.01(e)(i)-(iv) above, the applicable AGM Double-Insured Trust (Partial) shall hold the applicable Non-Book-Entry Double-Insured AGC Trust Units and the related AGM Double-Insured Insurance Policies (Partial).

(f)     Solely with respect to the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(f) applies solely to Assured Legacy Bonds CUSIP 745190R75:

(i)     Each Assured Insured Bondholder holding custody receipts of the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP will be deemed to have deposited such custody receipts into the AGC-AGC Double-Insured Trust.

(ii)     The AGC-AGC Double-Insured Trust (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement, such that the AGC-AGC Double-Insured Trust will be deemed to hold (i) (a) the underlying AGC Primary Market Assured Legacy Bonds with CUSIP 745190UR7 and (b) AGC Insurance Policy CIFGNA-562, and (ii) AGC Insurance Policy SM-2007-267, without any further action on the part of the existing custodian. AGC Insurance Policy SM-2007-267 (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

(iii)     Without prejudice to the ability of the AGC-AGC Double-Insured Trustee to draw on AGC Insurance Policy SM-2007-267 to the extent authorized under this Trust Agreement, the AGC-AGC Double-Insured Trust shall be

19

deemed to have deposited (i) such AGC Primary Market Assured Legacy Bonds with CUSIP 745190UR7 and (ii) AGC Insurance Policy CIFGNA-562 into the AGC Trust for CUSIP 745190UR7.

(iv)     The AGC Trust for CUSIP 745190UR7 shall, on behalf of each of the Assured Legacy Bondholders holding the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, deposit the Non-Book-Entry Double-Insured AGC Trust Units allocable to such AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP into the AGC-AGC Double-Insured Trust.  The AGC-AGC Double-Insured Trustee shall establish and maintain in the name of the AGC-AGC Double-Insured Trust a Non-Book-Entry Double-Insured AGC Trust Units Account into which such Non-Book-Entry Double-Insured AGC Trust Units shall be deposited.

(v)     As a result of the steps described in Subsections 2.01(f)(i)-(iv) above, the AGC-AGC Double-Insured Trust shall hold the applicable Non-Book-Entry Double-Insured AGC Trust Units and AGC Insurance Policy SM-2007-267.

**Section 2.02.  *Acceptance by the Trustee.***

(a)     By its execution of the Trust Agreement, the Trustee acknowledges and declares that it will hold or has agreed to hold all documents, instruments, and other property delivered to it or received by it from time to time with respect to the Trust Assets and all other assets included in the definition of Trust Estate, in each case in trust for the exclusive use and benefit of all present and future Trust Unit Holders and for the purposes of administering the trusts created by the Trust Agreement (including these Standard Terms). The Trustee represents and warrants that, except as expressly permitted by the Trust Agreement, (i) it has not and will not, other than in its capacity as trustee for the benefit of the Trust Unit Holders, assert any claim or interest in the Trust Estate and will hold (or its agent will hold) such Trust Estate and the proceeds thereof in trust pursuant to the terms of the Trust Agreement, and (ii) it has not encumbered or transferred, and will not encumber or transfer, its right, title or interest in the Trust Estate.

(b)     Reserved.

(c)     Except as specifically provided herein, the Trustee shall not sell, pledge or assign any interest in the Trust Estate.

**Section 2.03.  *Purpose, Activities of the Trust.***

It is the intention of the parties hereto that the Trust shall not engage in any business or activities other than certain non-business activities in connection with, or relating to the following:

(a)     receiving, accepting, and holding in trust the Trust Estate;

(b)      creating one or more accounts or sub-accounts in accordance with the terms of the Trust Agreement (including these Standard Terms);

(c)      making claims and receiving payments under the Assured Insurance Policies;

(d)      receiving payments pursuant to the HTA Plan and the securities issued thereunder;

(e)       issuing one or more series of Trust Units to holders of Assured Legacy Bonds in accordance with the terms of the Trust Agreement (including these Standard Terms);

(f)      making distributions to the Depository and Trust Unit Holders in accordance with the terms of the Trust Agreement (including these Standard Terms);

(g)      coordinating communications with Trust Unit Holders through the Depository or directly (in the case of Holders of Non-Book-Entry AGC Trust Units);

(h)      following, accepting or acting upon any instruction or direction from Assured or the Requisite Trust Unit Holders, as applicable, in each case only as expressly permitted in the Trust Agreement;

(i)      making public disclosures on EMMA;

(j)      making payments and distributions as contemplated by the Trust Agreement (including these Standard Terms); and

(k)      engaging in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto.

**Section 2.04.   *Limitations of the Trust.***

(a)      Except as otherwise provided herein, the affairs of the Trust will be managed by or under the direction of the Trustee.  None of the Depositor, Reorganized HTA, or Assured, or any of their respective Affiliates will have authority to act for, or to assume any obligation or responsibility on behalf of, the Trust or the Trustee in its capacity as Trustee.

(b)      The Trust will keep correct and complete books and records of accounts and minutes of the meetings and other proceedings of the Trust.  Any resolutions, agreements and other instruments will be continuously maintained by the Trustee as official records of the Trust.

(c)      The Trust will provide for its own operating expenses and liabilities from the Trust Estate.  General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to the Depositor, Reorganized HTA, or Assured or their respective Affiliates.

21

(d)      All oral and written communications, including letters, invoices, contracts, statements and applications, will be made solely in the name of the Trust if related to the Trust.

(e)      There will be no guarantees made by the Trust with respect to obligations of the Depositor, Reorganized HTA, or Assured or their respective Affiliates. There will not be any indebtedness relating to borrowings or loans between the Trust, the Depositor, Reorganized HTA, or Assured or their respective Affiliates; provided, that, Assured may own Trust Units.

(f)      The Trust will act solely in its own name, or in the Trustee's name on the Trust's behalf, and through its or the Trustee's duly authorized officers or agents in the conduct of its activities.  The Trust will not:  (i) operate or purport to operate as an integrated, single economic unit with respect to the Depositor, Reorganized HTA, or Assured or any other affiliated or unaffiliated entity; (ii) seek or obtain credit or incur any obligation to any third party based upon the assets of the Depositor, Reorganized HTA, or Assured or their respective Affiliates; or (iii) induce any such third party to reasonably rely on the creditworthiness of the Depositor, Reorganized HTA, or Assured or any other affiliated or unaffiliated entity in its dealings with the Trust.

(g)      The Trust will maintain a Delaware Trustee with an office in the State of Delaware.

(h)      The Trust will not engage in any transaction with an Affiliate on any terms other than would be obtained in an arm's-length transaction with a non-Affiliate.

**Section 2.05.  *Voting Rights.***

(a)      Assured shall be deemed the sole holder of the Voting Rights with respect to the Securities held by the Trust.

**Section 2.06.  *Franklin and Nuveen Trusts.***

(a)      Any Assured Legacy Bonds CUSIP held by a Franklin Fund and/or Nuveen Fund as of August 29, 2022, shall be treated as two Assured Legacy Bonds CUSIPs, one corresponding to the portion of such Assured Legacy Bonds CUSIP held by one or more Franklin Funds and/or Nuveen Funds and one corresponding to the portion of such Assured Legacy Bonds CUSIP not held by Franklin Funds and/or Nuveen Funds.

(b)      For any Assured Legacy Bonds CUSIP that will be treated as two Assured Legacy Bonds CUSIPs pursuant to Section 2.06(a), two separate Trusts shall be established, one for the portion of such Assured Legacy Bonds CUSIP held by one or more Franklin Funds and/or Nuveen Funds as of August 29, 2022 (each, a "**Franklin Nuveen Trust**"), and one for the portion of such Assured Legacy Bonds CUSIP not held by Franklin Funds and/or Nuveen Funds (each, a "**General Trust**").

(c)      The name of each Franklin Nuveen Trust shall be the same as the corresponding General Trust, except that the name of the Franklin Nuveen Trust shall begin with "FN".

(d)      (a) For the avoidance of doubt, other than the right of Franklin Nuveen Trust Unit Holders to bring a challenge of the type described in Section 3.03(c) of these Standard Terms and any rights resulting from the success of any such challenge, the rights and treatment of the Franklin Nuveen Trust Unit Holders shall be identical to those of the Trust Unit Holders of the corresponding General Trust.

## ARTICLE III

## ADMINISTRATION OF THE TRUST

**Section 3.01.   *Accounts.***

The Trustee shall establish and maintain in the name of the Trust the following non-interest bearing accounts for the Trust to be held in trust for the benefit of the Trust Unit Holders (all amounts held in these accounts will be uninvested) and the name and number of such accounts shall be listed on Schedule II to the Trust Agreement:

(a)      Solely with respect to each Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), or (iii) the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.01(a) applies solely to Assured Legacy Bonds CUSIPs 745181C54, 745181C62, 745181C70, 745181C88, 745190HJ0, 745190UR7, 745190ZR2, 745190ZS0, 745181D38, 745181F77, 745181D53, 745181D46, 745181F85, 745190M70/745190M54, 745190M88/745190M62, and 745190Q27/745190E87:

(i)      Tax-Exempt Bond Account. An account into which the Trustee shall deposit any Tax-Exempt New HTA Bonds allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Tax-Exempt Bond Account**"), including any Taxable New HTA Bonds that become Tax-Exempt New HTA Bonds;

(ii)      Taxable Bond Account. An account into which the Trustee shall deposit any Taxable New HTA Bonds allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor), including any Tax-Exempt New HTA Bonds that become Taxable New HTA Bonds (the "**Taxable Bond Account**"); and

(iii)      Cash Account. An account into which the Trustee shall deposit any HTA Plan Cash Distributions allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Cash Account**").

23

(iv)     Insurance Policy Account. An account into which the Trustee shall deposit the applicable Assured Legacy Bonds CUSIP insured by the applicable Assured Insurance Policy (or any other securities, monies, proceeds or property received on account of or in exchange therefor) (the "**Insurance Policy Account**").

(b)     Solely with respect to each FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.01(b) applies solely to Assured Legacy Bonds CUSIPs 745190Y69 and 745190Z43:

(i)     FGIC Certificates Account.  An account into which the Trust shall deposit the FGIC Certificates allocable to the applicable FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**FGIC Certificates Account**"); and

(ii)     FGIC Insured Bonds Insurance Policy Payments Account.  An account into which the Trustee shall deposit any monies or other property resulting from a draw on the Assured Insurance Policy insuring the applicable FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP (the "**FGIC Insured Bonds Insurance Policy Payments Account**").

(c)     Solely with respect to each AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), such that this Section 3.01(c) applies solely to Assured Legacy Bonds CUSIPs 745190R67 and 745190P51:

(i)     Non-Book-Entry Double-Insured AGC Trust Units Account. An account into which the AGM Double-Insured Trustee (Partial) shall deposit the Non-Book-Entry Double-Insured AGC Trust Units allocable to the Assured Legacy Bonds underlying the applicable AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial) (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Non-Book-Entry Double-Insured AGC Trust Units Account**"); and

(ii)     AGM Double-Insured Insurance Policy Payments Account. An account into which the AGM Double-Insured Trustee (Partial) shall deposit any monies or other property resulting from a draw on the AGM Double-Insured Insurance Policy (Partial) insuring the appliable AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial) (the "**AGM Double-Insured Insurance Policy Payments Account**").

(d)     Solely with respect to the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.01(d) applies solely to Assured Legacy Bonds CUSIP 745190R75:

(i)     Non-Book-Entry Double-Insured AGC Trust Units Account. An account into which the AGC-AGC Double-Insured Trustee shall deposit the Non-Book-Entry Double-Insured AGC Trust Units allocable to the Assured Legacy

24

Bonds underlying the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Non-Book-Entry Double-Insured AGC Trust Units Account**"); and

(ii)   AGC Insurance Policy SM-2007-267 Payments Account. An account into which the AGC-AGC Double-Insured Trustee shall deposit any monies or other property resulting from a draw on AGC Insurance Policy SM-2007-267 (the "**AGC Insurance Policy SM-2007-267 Payments Account**").

**Section 3.02.   *Distributions; Prior to Maturity Date or in Connection with Assured Advancement Option.***

(a)   Solely with respect to each Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), or (iii) the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.02(a) applies solely to Assured Legacy Bonds CUSIPs 745181C54, 745181C62, 745181C70, 745181C88, 745190HJ0, 745190UR7, 745190ZR2, 745190ZS0, 745181D38, 745181F77, 745181D53, 745181D46, 745181F85, 745190M70/745190M54, 745190M88/745190M62, and 745190Q27/745190E87:

(i)   Tax-Exempt Distributions.  Subject to Section 3.02(a)(v) below, promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments of principal, interest or other cash received by the Trust on or prior to the Maturity Date on account of the New HTA Bonds deposited in the Tax-Exempt Bond Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(ii)   Taxable Distributions. Subject to Section 3.02(a)(v) below, promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments of principal, interest or other cash received by the Trust on or prior to the Maturity Date on account of the New HTA Bonds deposited in the Taxable Bond Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(iii)   Insurance Policy Distributions.  Subject to Section 3.02(a)(v) below, promptly following receipt thereof by the Trustee, the Trustee shall, subject to Section 3.06(e), be required to and shall distribute to the Depository for distribution to

the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date on account of the Assured Insurance Policy insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Tax Costs as of the date of distribution.  Notwithstanding anything herein or elsewhere to the contrary, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account.

(iv)    <u>Other Cash Distributions</u>.  Subject to <u>Section 3.02(a)(v)</u> below, promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders, on a pro rata "pass-through" basis, all income of the Trust, including any HTA Plan Cash Distributions deposited in the Cash Account, net of of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(v)    <u>Distributions on Account of Non-Book-Entry AGC Trust Units</u>.  Notwithstanding any other provision of this Trust Agreement, distributions on account of the Non-Book-Entry AGC Trust Units shall be made directly to the applicable Non-Book-Entry AGC Trust Unit Holder, on a pro rata "pass-through" basis, rather than to the Depository.

(b)    Solely with respect to any FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.02(b) applies solely to Assured Legacy Bonds CUSIPs 745190Y69 and 745190Z43:

(i)    <u>FGIC Certificate Distributions</u>:  Promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date on account of the FGIC Certificates deposited in the FGIC Certificates Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(ii)    <u>FGIC Insured Bonds Insurance Policy Payments Distributions</u>:  Promptly following receipt thereof by the Trustee, the Trustee shall, subject to <u>Section 3.06(e)</u>, be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date resulting from a draw on the Assured Insurance Policy insuring the applicable FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, net of the allocable portion of any outstanding Tax Costs as of the date of distribution.  Notwithstanding anything herein

26

or elsewhere to the contrary, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP.

(c)    Solely with respect to any AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), such that this Section 3.02(c) applies solely to Assured Legacy Bonds CUSIPs 745190R67 and 745190P51:

(i)    Non-Book-Entry Double-Insured AGC Trust Units Distributions:  Promptly following receipt thereof by the AGM Double-Insured Trustee (Partial), the AGM Double-Insured Trustee (Partial) shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the AGM Double-Insured Trust (Partial), including payments received by the Trust on or prior to the Maturity Date on account of the Non-Book-Entry Double-Insured AGC Trust Units deposited in the Non-Book-Entry Double-Insured AGC Trust Units Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(ii)    AGM Double-Insured Insurance Policy Payments Distributions: Promptly following receipt thereof by the AGM Double-Insured Trustee (Partial), the AGM Double-Insured Trustee (Partial) shall, subject to Section 3.06(e), be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the AGM Double-Insured Trust (Partial), including payments received by the AGM Double-Insured Trust (Partial) on or prior to the Maturity Date resulting from a draw on the AGM Double-Insured Insurance Policy (Partial) insuring the applicable AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), net of the allocable portion of any outstanding Tax Costs as of the date of distribution. Notwithstanding anything herein or elsewhere to the contrary, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the AGM Double-Insured Trust (Partial) from Assured on account of, and in accordance with, an AGM Double-Insured Insurance Policy (Partial) insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial).

(d)    Solely with respect to the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.02(d) applies solely to Assured Legacy Bonds CUSIP 745190R75:

(i)    Non-Book-Entry Double-Insured AGC Trust Units Distributions:  Promptly following receipt thereof by the AGC-AGC Double-Insured Trustee, the AGC-AGC Double-Insured Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the AGC-AGC Double-Insured Trust, including

payments received by the Trust on or prior to the Maturity Date on account of the Non-Book-Entry Double-Insured AGC Trust Units deposited in the Non-Book-Entry Double-Insured AGC Trust Units Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(ii)     <u>AGC Insurance Policy SM-2007-267 Payments Distributions</u>: Promptly following receipt thereof by the AGC-AGC Double-Insured Trustee, the AGC-AGC Double-Insured Trustee shall, subject to <u>Section 3.06(e)</u>, be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the AGC-AGC Double-Insured Trust, including payments received by the AGC-AGC Double-Insured Trust on or prior to the Maturity Date resulting from a draw on AGC Insurance Policy SM-2007-267, net of the allocable portion of any outstanding Tax Costs as of the date of distribution. Notwithstanding anything herein or elsewhere to the contrary, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the AGC-AGC Double-Insured Trustee from Assured on account of, and in accordance with, AGC Insurance Policy SM-2007-267.

**Section 3.03.  *Assured Advancement Option.***

(a)     Assured shall have the right to exercise the Assured Advancement Option with thirty (30) days' prior written notice to the relevant Assured Legacy Bond Holders and/or Trust Unit Holders.  Upon the exercise of any Assured Advancement Option and the payment of the applicable Acceleration Price or redemption price with respect to any Assured Legacy Bonds CUSIP, the Trustee shall be required to disburse such Acceleration Price or redemption price to the Trust Unit Holders of the relevant Trust as set forth in <u>Section 3.02</u> above, net of the allocable portion of any outstanding Tax Costs as of the date of distribution, and Assured shall become fully subrogated to all of the rights of such Trust Unit Holders, including, upon the termination of the relevant Trust, rights to any then remaining Trust Assets.  Upon the disbursement of such Acceleration Price or redemption price to the relevant Trust Unit Holders as set forth above, the Trust Units of such Trust shall be retired, such Trust shall be terminated, and the Trustee shall deliver the remaining Trust Assets of such Trust, less any outstanding Trustee Costs and other remaining costs of the Trust, to or at the direction of Assured.  At any time on or after the date of receipt of such Trust Assets, Assured shall have the right to sell all or certain of the New HTA Bonds or FGIC Certificates constituting part of such Trust Assets for value, including by (i) selling all or certain of the applicable Tax-Exempt New HTA Bonds constituting part of such Trust Assets for value as tax-exempt bonds, (ii) selling all or certain of the Taxable New HTA Bonds constituting part of such Trust Assets for value as taxable bonds, and (iii) selling all or certain of the FGIC Certificates constituting part of such Trust Assets.

(b)     Payment of the applicable Acceleration Price or redemption price with respect to any Assured Insured Bond shall satisfy and discharge all of Assured's obligations under the applicable Assured Insurance Policy with respect to such Assured Insured Bond.

(c)     The Trust Agreement for each Franklin Nuveen Trust shall provide that, notwithstanding anything to the contrary therein (including these Standard Terms) or in the HTA Plan or HTA Confirmation Order, that with respect to any Franklin Nuveen Trust, upon (i) issuance of a notice of Assured's exercise of, or intent to exercise, any Assured Advancement Option, or (ii) issuance of, or issuance of notice of an intent to cause the issuance of, a Sale Notice that could cause a Cash Distribution or distribution of Subject Bonds that would, by operation of the Standard Terms or such Trust Agreement, otherwise reduce the outstanding principal of the applicable Assured Insured Bond prior to its Original Scheduled Principal Payment Date, then, in each case, a Franklin Nuveen Trust Unit Holder shall be permitted to challenge whether payment of the applicable Acceleration Price or Cash Distribution with respect to such Assured Insured Bond satisfies and discharges all (or any) of Assured's obligations to such Franklin Nuveen Trust Unit Holder under the applicable Assured Insurance Policy with respect to such Assured Insured Bond and all of the Franklin Funds' and/or Nuveen Funds' respective rights, arguments and defenses (and those of the Franklin Nuveen Trust Unit Holders) with respect to any such argument made by such Franklin Nuveen Trust Unit Holders (including, without limitation, whether any such payment or distribution would reduce the principal amount outstanding of the Assured Insured Bonds) are reserved and preserved, including any arguments as to whether Section 26.1(c) of the HTA Plan and Section 26(a) of the HTA Confirmation Order validly accelerated the Assured Insured Bonds in the Franklin Nuveen Trusts for purposes of the Assured Insurance Policy.  All of Assured's rights, arguments and defenses with respect to any such argument made by Franklin Funds and/or Nuveen Funds and/or other Franklin Nuveen Trust Unit Holders are reserved and preserved including any arguments as to whether Section 26.1(c) of the HTA Plan and Section 26(a) of the HTA Confirmation Order validly accelerated the Assured Insured Bonds in the Franklin Nuveen Trusts for purposes of the Assured Insurance Policy; provided that Assured shall not be permitted to assert laches or any similar defenses premised on Franklin Funds and/or Nuveen Funds and/or other Franklin Nuveen Trust Unit Holder failing to make such challenge prior to having notice of the occurrence of an event set forth in clauses (i) and (ii) in the preceding sentence.

(d)     Any determination made as a result of arguments made by a Franklin Nuveen Trust Unit Holder pursuant to Section 3.03(c) with respect to a Franklin Nuveen Trust and the applicable Assured Insurance Policy shall have no impact on the corresponding General Trust or any other Trust or Assured Insurance Policy.  For the avoidance of doubt, other than Franklin Nuveen Trust Unit Holders, whose rights have been reserved pursuant to the HTA Plan, no other Trust Unit Holders may argue that payment of the applicable Acceleration Price with respect to any Assured Insured Bond does not satisfy or discharge all of Assured's obligations under the applicable Assured Insurance Policy.

**Section 3.04.   *Sale of New Securities.***

(a)     At any time and from time to time prior to the Maturity Date, so long as an Assured Insurer Event is not occurring under the applicable Assured Insurance Policy, Assured shall have the right to instruct the Trustee to sell any New Securities of any series, in a minimum aggregate principal amount (or, with respect to capital appreciation bonds, a minimum aggregate current Accreted Value) of $1,000,000 (taking into account for such minimum, all concurrent sales of such series of New Securities in the Trusts) (it being

29

understood that such minimum shall not be applicable if all New Securities of such series held as part of the Trust Assets are included in such sale) (or any other securities or property received on account thereof or in exchange therefor) (the "**Subject Bonds**") that are part of the Trust Assets for cash (a "**Bond Sale**").  Assured will direct the Trustee to utilize a specific broker which will arrange the Bond Sale pursuant to the terms set forth in this Section 3.04(a).  The Trustee shall not be responsible for the selection of the broker or for any determination required to be made in connection with the Bond Sale.  Prior to any Bond Sale, Assured will notify the Trustee of the intended Bond Sale and will direct the Trustee to promptly distribute a sale notice (the "**Sale Notice**") (i) through the Depository to all Book-Entry Trust Unit Holders and (ii) directly to all Non-Book-Entry AGC Trust Unit Holders.

(b)     The Sale Notice will include (i) a statement identifying the Subject Bonds, the principal amount (or, with respect to capital appreciation bonds, current Accreted Value) of Subject Bonds to be sold, the applicable Target Price and Floor Price, (ii) a statement regarding the right of each applicable Trust Unit Holder to elect to receive in-kind delivery of a pro rata share of the Subject Bonds, subject to payment by such Trust Unit Holder of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs (the "**Bond Election**"), in lieu of receiving a pro rata share of the actual net cash proceeds ("**Cash Proceeds**") from the Bond Sale and (iii) a statement that the Bond Sale will only be executed if the weighted average price obtainable for the Subject Bonds (prior to the deduction of customary commissions and other sales expense of an arm's length transaction) is equal to or greater than the Floor Price.  Book-Entry Trust Unit Holders that determine to make a Bond Election must make the election through the Depository within ten (10) Business Days after the Depository receives the Sale Notice (the "**Sale Notice Period**").  Non-Book-Entry AGC Trust Unit Holders that determine to make a Bond Election must inform the Trustee of such election within the Sale Notice Period.

(c)     Following the Sale Notice Period,

(i)     If any applicable Trust Unit Holders make valid Bond Elections, an amount of Subject Bonds representing a proportion of the Subject Bonds equivalent to such Trust Unit Holders' aggregate pro rata ownership of all applicable Trust Units shall be reserved from the Bond Sale and shall instead be distributed pro rata to each such Trust Unit Holder making a valid Bond Election (any such distribution to be rounded down to the nearest minimum denomination, with any reduction as a result of such rounding down to be distributed to such Trust Unit Holders in cash).  In order to make a valid Bond Election, a Trust Unit Holder shall be required to pay to the Trustee such Trust Unit Holder's allocable portion of any outstanding Trustee Costs and Tax Costs prior to the expiration of the Sale Notice Period.  To the extent a Trust Unit Holder has not paid its allocable portion of any such outstanding Trustee Costs and Tax Costs prior to the expiration of the Sale Notice Period, the Bond Election will be deemed invalid.

(ii)     Applicable Trust Unit Holders that did not make a valid Bond Election will promptly receive a pro rata share of Cash Proceeds from the sale of

Subject Bonds (not subject to a valid Bond Election), net of the allocable portion of any outstanding Trustee Costs and Tax Costs, and less any Cash Proceeds distributed as a result of rounding in accordance with Section 3.04(c)(i) to Trust Unit Holders making valid Bond Elections.

(iii)    If the broker specified in the Sale Notice is unable to arrange the sale of any of the Subject Bonds not subject to a valid Bond Election for a weighted average price (prior to the deduction of customary commissions and other sales expense of an arm's length transaction) equal to or greater than the Floor Price, the Trustee shall not sell or distribute any Subject Bonds, the Bond Sale shall be cancelled, and the Trustee shall send a notice, at the sole cost of Assured, to (A) the applicable Book-Entry Trust Unit Holders through the Depository and (B) the Non-Book-Entry AGC Trust Unit Holders directly, stating that such Bond Sale was cancelled, after which any future sale of the Subject Bonds shall be required to be made pursuant to a new Sale Notice.

**Section 3.05.   *Adjustments to Principal Amounts and Compounded Amounts.***

(a)    Each Distribution made on or prior to the Maturity Date to Trust Unit Holders shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case, as of the date of such Distribution and in an amount equal to such Distribution.  For the purposes of such reduction, any deduction from any Distribution in respect of Tax Costs shall be treated as if such amounts deducted were paid to the applicable Trust Unit Holders in cash as part of the Distribution and shall reduce the applicable accrued and unpaid interest amount, outstanding principal amount, or Compounded Amount accordingly.  For the avoidance of doubt, any deduction from any Distribution in respect of Trustee Costs shall not reduce the applicable accrued and unpaid interest amount, outstanding principal amount or Compounded Amount, accordingly.  As set forth in Sections 3.02(a)(iii), 3.02(b)(ii), 3.02(c)(ii), and 3.02(d)(ii) above, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy (i) insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account, (ii) insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, (iii) insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), or (iv) insuring the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, as applicable.

(b)    Any Bond Sale resulting in a distribution of Cash Proceeds or Subject Bonds to Trust Unit Holders, as the case may be, shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case as of the date the Cash Proceeds of such Bond Sale are distributed by the Trustee to the applicable Trust Unit

Holders and in an amount equal to the aggregate Cash Proceeds from such Bond Sale distributed to the applicable Trust Unit Holders.  For the purposes of such reduction, any deduction from the Cash Proceeds in respect of Tax Costs shall be treated as if such amounts deducted were paid to the applicable Trust Unit Holders in cash and shall reduce the applicable accrued and unpaid interest amount, outstanding principal amount, or Compounded Amount accordingly.  Further, for purposes of this Section 3.05(b), the aggregate Cash Proceeds shall be calculated as if each applicable Trust Unit Holder that took actual delivery of Subject Bonds had received the same amount of cash per Unit as a Trust Unit Holder that did not make a Bond Election, or if all applicable Trust Unit Holders participating in the Bond Sale made a Bond Election, the aggregate Cash Proceeds shall be calculated as if all Subject Bonds were sold at a net price equal to the Target Price.  For the avoidance of doubt, any deduction from any Distribution in respect of Trustee Costs shall not reduce the applicable accrued and unpaid interest amount, outstanding principal amount or Compounded Amount, accordingly.  As set forth in Sections 3.02(a)(iii), 3.02(b)(ii), 3.02(c)(ii), and 3.02(d)(ii) above, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy (i) insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account, (ii) insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, (iii) insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), or (iv) insuring the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, as applicable.

(c)     If any Assured Legacy Bonds CUSIP is subject to mandatory sinking fund redemptions, any reduction of the outstanding principal amount or Compounded Amount, as applicable, of such Assured Legacy Bonds CUSIP pursuant to Section 3.05(a) or (b) (a "**Principal Amount Reduction**") shall automatically result in the dollar-for-dollar reduction of the mandatory sinking fund redemption obligations for purposes of the Assured Insurance Policy insuring such Assured Legacy Bonds CUSIP, with such reduction to be applied sequentially against such mandatory sinking fund redemptions starting with the first mandatory sinking fund redemption occurring after such Principal Amount Reduction.

(d)     If the principal amount (or Compounded Amount, as applicable) of the applicable Assured Legacy Bonds CUSIP is reduced to zero at any time, Assured shall be entitled to any remaining Trust Assets, including any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the Insurance Policy Account, the FGIC Certificates Account, the FGIC Insured Bonds Insurance Policy Payments Account, the Non-Book-Entry Double-Insured AGC Trust Units Account, the AGM Double-Insured Insurance Policy Payments Account, and the AGC Insurance Policy SM-2007-267 Payments Account, as applicable.

(e)     For the avoidance of doubt, it is expressly understood and agreed that to the extent the principal amount (or Compounded Amount, as applicable) of the applicable Assured Legacy Bonds CUSIP is reduced to zero prior to the Maturity Date, as of the date the principal amount (or Compounded Amount, as applicable) is reduced to zero, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies and Assured Legacy Bonds will be satisfied and discharged; (iii) the applicable Assured Insurance Policies shall be indefeasibly cancelled;

and (iv) subject to Assured's entitlement to any remaining Trust Assets, the Trust shall terminate in accordance with the provisions of Article VII hereof.

**Section 3.06.  *Payments on Assured Insurance Policies.***

(a)      After taking into account any adjustments made pursuant to Section 3.05, if there are insufficient funds (determined without taking into account any securities or other non-cash Trust Assets) in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the Insurance Policy Account, the FGIC Certificates Account, the FGIC Insured Bonds Insurance Policy Payments Account, the Non-Book-Entry Double-Insured AGC Trust Units Account, the AGM Double-Insured Insurance Policy Payments Account, or the AGC Insurance Policy SM-2007-267 Payments Account, as applicable, to satisfy the accrued and unpaid interest and/or unpaid principal due on an Original Scheduled Payment Date (the amount of any such shortfall, the "**Payment Shortfall**"), then at least five (5) Business Days prior to such Original Scheduled Payment Date, the Trustee shall deliver a notice in substantially the form attached hereto as Exhibit A (a "**Notice of Claim and Certificate**") to Assured.  Assured agrees that such notice provided by the Trustee shall constitute a valid notice of the type required under the applicable Assured Insurance Policy in order for the Trustee to draw on the applicable Assured Insurance Policy, and the Trustee shall make draws on the applicable Assured Insurance Policy to make payment, from the Insurance Policy Account, the FGIC Insured Bonds Insurance Policy Payments Account, the AGM Double-Insured Insurance Policy Payments Account, or the AGC Insurance Policy SM-2007-267 Payments Account, as applicable, of any accrued and unpaid interest or any unpaid principal due on the Original Scheduled Payment Date.  The Trustee is authorized to take all actions necessary to draw on the Assured Insurance Policies for such purposes, including actions that, under the applicable Assured Insurance Policies and related agreements, would otherwise be taken by the HTA Fiscal Agent, and the Trustee shall have all powers and authority of the HTA Fiscal Agent for such purposes.  Except as otherwise provided in Section 3.06(b) and Section 3.06(c) below, in the event a particular Trust holds more than one Assured Insurance Policy insuring the same Assured Legacy Bonds CUSIP, the Trustee shall draw pro rata on all such Assured Insurance Policies insuring the same Assured Legacy Bonds CUSIP.

(b)      Notwithstanding any other provision of this Trust Agreement, no AGM Double-Insured Trustee shall make a draw on an AGM Double-Insured Insurance Policy, and Assured shall not be required to make any payment under such AGM Double-Insured Insurance Policy, unless either (i) Assured has confirmed to the AGM Double-Insured Trustee in writing, at least (5) Business Days prior to the relevant Original Scheduled Payment Date, that Assured will not be providing sufficient funds under the AGC Insurance Policy insuring the relevant AGC Assured Legacy Bonds CUSIP to cover any Payment Shortfall with respect to the relevant AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, or (ii) as of the Original Scheduled Payment Date, Assured has not in fact provided sufficient funds under the AGC Insurance Policy insuring the relevant AGC Assured Legacy Bonds CUSIP to cover any Payment Shortfall with respect to the relevant AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.  For the avoidance of doubt, this Section 3.06(b) applies both to AGM Double-Insured Trustees (Partial) and AGM Double-Insured Trustees (Complete), such that where the Trustee with

33

respect to an Assured Legacy Bonds CUSIP (Combined) holds both an AGM Double-Insured Insurance Policy (Complete) and an AGC Insurance Policy, such Trustee shall not make a draw on such AGM Double-Insured Insurance Policy (Complete), and Assured shall not be required to make any payment under such AGM Double-Insured Insurance Policy (Complete), except under the circumstances described in clauses (i) or (ii) of this Section 3.06(b).

(c)        Notwithstanding any other provision of this Trust Agreement, the AGC-AGC Double-Insured Trustee shall not make a draw on AGC Insurance Policy SM-2007-267, and Assured shall not be required to make any payment under AGC Insurance Policy SM-2007-267, unless either (i) Assured has confirmed to the AGC-AGC Double-Insured Trustee in writing, at least (5) Business Days prior to the relevant Original Scheduled Payment Date, that Assured will not be providing sufficient funds under AGC Insurance Policy CIFGNA-562 to cover any Payment Shortfall with respect to the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, or (ii) as of the Original Scheduled Payment Date, Assured has not in fact provided sufficient funds under AGC Insurance Policy CIFGNA-562 to cover any Payment Shortfall with respect to the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

(d)        Subject to Sections 3.06(b) and 3.06(c) above, if and to the extent Assured fails to make any payment at the time, in the amount and in the manner set forth herein, the Trustee shall take, subject to its rights and protections herein, all necessary or desirable actions to enforce the applicable Assured Insurance Policy (including, to the extent applicable, as and when directed by the Requisite Trust Unit Holders as set forth in Section 6.01 hereof).

(e)        If the Trustee receives HTA Payments, (i) after the Trustee draws on an Assured Insurance Policy pursuant to Section 3.06(a), but (ii) prior to the Trustee using the amounts drawn from the Assured Insurance Policy to pay accrued and unpaid interest and/or unpaid principal due on that Original Scheduled Payment Date, then the Trustee shall (x) distribute and apply the HTA Payments received in accordance with Sections 3.02 and 3.05, (y) only apply amounts drawn from the Assured Insurance Policy to pay accrued and unpaid interest and/or unpaid principal to the extent the HTA Payments received are insufficient (the amount of such insufficiency, the "**HTA Payment Shortfall**") to pay the accrued and unpaid interest and/or unpaid principal due on that Original Scheduled Payment Date such that the amounts so applied are not in excess of the HTA Payment Shortfall and (z) promptly return to Assured any amounts drawn on the Assured Insurance Policy that are in excess of such HTA Payment Shortfall.

Section 3.07.   *Exchange of Trust Units for Trust Assets.*

(a)        At any time on, or prior to, the Maturity Date, a Trust Unit Holder may exchange its Trust Units for a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the FGIC Certificates Account, or the Non-Book-Entry Double-Insured AGC Trust Units Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Trustee Costs, Tax Costs, and Assured Reimbursement Amount (the "**Unit Exchange Election**"), provided that the Trust

Unit Holder must provide thirty (30) days' prior written notice of such Unit Exchange Election by submitting the form attached hereto as Exhibit B to the Trustee.

(b)        Upon a Unit Exchange Election, the expiration of the thirty day (30) notice period set forth in Section 3.07(a) hereof and the presentation and surrender of the applicable Trust Units at the office of the Trustee therein designated on that date, the Trustee shall distribute to such Trust Unit Holder a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the FGIC Certificates Account, or the Non-Book-Entry Double-Insured AGC Trust Units Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, or Tax Costs, which shall be paid to Assured, the Trustee, or the relevant tax or governmental authority, as applicable (provided that, if cash is not available to satisfy in full such outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs, each applicable Trust Unit Holder shall pay in cash its applicable pro rata share of such Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs prior to the receipt of its share of remaining Trust Assets).  For the avoidance of doubt, the Assured Reimbursement Amount must be paid to Assured prior to the distribution of the applicable Trust Assets to the Trust Unit Holder.

(c)        Upon distribution of such Trust Assets in accordance with Section 3.07(b) hereof, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds will be satisfied and discharged; and (iii) the related Assured Insurance Policies shall be indefeasibly cancelled with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds.

(d)        (i) Upon receiving notice of any Unit Exchange Election, the Trustee shall provide notice of such Unit Exchange Election to Assured and (ii) upon making a distribution of Trust Assets pursuant to this Section 3.07, the Trustee shall provide notice of such distribution to Assured.

Section 3.08.    *Payments at Maturity Date.*

(a)        If, (i) in the case of Current Interest Bonds, the outstanding principal amount or accrued and unpaid interest amount, or (ii) in the case of Capital Appreciation Bonds, the Compounded Amount, as the case may be, of the Assured Legacy Bonds at the Maturity Date is expected to be greater than zero, no later than thirty (30) calendar days and no earlier than thirty-five (35) calendar days prior to the Maturity Date, Assured shall direct the Trustee to deliver to (A) all applicable Book-Entry Trust Unit Holders through the Depository and (B) all Non-Book-Entry AGC Trust Unit Holders directly, a notice of maturity (the "**Maturity Notice**") in substantially the form attached hereto as Exhibit C.  The Maturity Notice will include (i) a statement identifying the Maturity Date and (ii) a statement regarding the right of each Trust Unit Holder to receive a Distribution (or multiple Distributions) in the aggregate amount of a pro rata share of the Insured Amount corresponding (i) in the case of any relevant Current Interest Bonds, to the outstanding principal amount of, and accrued and unpaid interest on, such Current Interest Bonds as of

35

the Maturity Date, or (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount as of the Maturity Date, in either case, to be paid to the Trustee by Assured and/or from the other Trust Assets.  Notwithstanding anything herein to the contrary, Assured's failure to direct the Trustee to deliver a Maturity Notice or the Trustee's or Depository's failure to deliver a Maturity Notice to Trust Unit Holders in accordance with this Section 3.08 shall not affect or delay the occurrence of the applicable Maturity Date, or affect the amounts to be paid to Trust Unit Holders on the Maturity Date.

(b)     Reserved.

(c)     On the Maturity Date, after giving effect to any Distribution made from other Trust Assets on the Maturity Date, and subject to Assured having received a Notice of Claim and Certificate in accordance with Section 3.06 hereof, Assured shall pay to the Trustee, and the Trustee shall distribute to all Trust Unit Holders, a pro rata share of the Payment Shortfall, if any, net of any Tax Costs, following which Assured shall be entitled to any remaining Trust Assets, including any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the Insurance Policy Account, the FGIC Certificates Account, the FGIC Insured Bonds Insurance Policy Payments Account, the Non-Book-Entry Double-Insured AGC Trust Units Account, the AGM Double-Insured Insurance Policy Payments Account, or the AGC Insurance Policy SM-2007-267 Payments Account, as applicable.

(d)     On the Maturity Date, after giving effect to any Distributions made on the Maturity Date (including the payment and distribution of any Payment Shortfall (in accordance with Section 3.08(c) hereof)), (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies and Assured Legacy Bonds will be satisfied and discharged; (iii) the applicable Assured Insurance Policies shall be indefeasibly cancelled; and (iv) subject to Assured's entitlement to any Remaining Trust Assets following payment of any Trustee Costs and any other remaining Trust expenses, the Trust shall terminate in accordance with the provisions of Article VII hereof.

## ARTICLE IV

## REPORTING/REMITTING TO TRUST UNIT HOLDERS

**Section 4.01.  *Statements to Trust Unit Holders.***

No later than three (3) Business Days after the date on which the Trustee makes any Distribution to any Trust Unit Holder, the Trustee shall prepare and post a statement to EMMA, substantially in the form attached hereto as Exhibit D, and upon request, deliver such statement by mail to any Trust Unit Holder, setting forth:

(a)     With respect to the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the Insurance Policy Account, the FGIC Certificates Account, the FGIC Insured Bonds Insurance Policy Payments Account, the Non-Book-Entry Double-Insured AGC Trust Units Account, the AGM Double-Insured Insurance Policy Payments Account, and the AGC Insurance Policy SM-2007-267 Payments Account, as

applicable, distributions made from each such account during the month and during the year to date (on an aggregate and per unit basis);

(b)     The accrued and upaid interest on, and principal amount of (or Compounded Amount, as applicable) of the relevant Assured Legacy Bonds CUSIP (or any other securities or property received in respect thereof or in exchange therefor) (on an aggregate and per unit basis);

(c)     Any other distributions made to Trust Unit Holders;

(d)     Any required tax reporting for such period (as specified in Section 8.04); and

(e)     All other information required to complete Exhibit D.

The Trustee shall deliver a copy of any statement it posts to EMMA pursuant to this Section 4.01 to Assured promptly after such statement is posted to EMMA.

**Section 4.02.   *Compliance with Withholding Requirements.***

Notwithstanding any other provisions of the Trust Agreement, the Trustee shall comply with all federal withholding requirements with respect to payments to the Depository and Trust Unit Holders that the Trustee reasonably believes are applicable under the Code. The consent of the Depository and Trust Unit Holders shall not be required for such withholding.   In the event the Trustee does withhold any amount from payments to the Depository or any Trust Unit Holder pursuant to federal withholding requirements, the Trustee shall indicate with any payment to the Depository or such Trust Unit Holders the amount withheld.   Any amounts withheld shall be treated as a distribution of cash to the Depository or Trust Unit Holder, as the case may be, in the amount of the withholding and shall thereby reduce amounts otherwise distributable to the Depository or such Trust Unit Holder.   If an amount required to be withheld was not withheld, the Trust may reduce subsequent distributions by the amount of such required withholding.

## ARTICLE V

## TRUST UNITS

**Section 5.01.   *The Trust Units.***

Each series of Trust Units shall bear unique CUSIPs and, other than the Non-Book-Entry AGC Trust Units, shall be freely tradable and transferable through The Depository Trust Company.  So long as an Assured Insurer Event is not occurring under the applicable Assured Insurance Policy, Assured shall be deemed the sole holder of the New Securities deposited in the respective Trusts with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings. In addition, Assured shall be fully subrogated to the rights of the respective Trust Unit Holders in respect of the New Securities deposited in the respective Trusts.

The Trust Units shall be designated in the Trust Agreement.  Unless otherwise specified in the Trust Agreement, the Trust Units in the aggregate will represent the entire beneficial ownership interest in the Trust Estate.  With respect to any day, the Notional Amount of the Trust Units will be equal to the outstanding principal amount (or, in the case of Capital Appreciation Bonds, the Compounded Amount) of the Assured Legacy Bonds underlying such Trust Units.  The Trust Units will be substantially in the forms annexed to the Trust Agreement.  Unless otherwise provided in the Trust Agreement, the Trust Units will be issuable in book-entry form, in denominations equal to the denomination of the applicable underlying Assured Legacy Bonds or any integral multiple of the amount specified therein, subject to the requirements of the Depository; provided, however, that (i) any interest in a Trust Unit equal to or in excess of the applicable minimum denomination at the time of the issuance thereof which ceases or fails to be such minimum or multiple as a result of Distributions may be transferred in its entirety, and (ii) the Non-Book-Entry AGC Trust Units shall be issued in certificated form rather than book-entry form (a) in the case of an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), to the applicable AGM Double-Insured Trust (Partial), (b) in the case of the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, to the AGC-AGC Double-Insured Trust, and (c) in the case of any Assured Insured Bondholder who, prior to the Effective Date, held in certificated form custody receipts evidencing a beneficial interest in an Assured Legacy Bond insured by AGC and the related AGC Insurance Policy, to such Assured Insured Bondholder who, prior to the Effective Date, held such custody receipts in certificated form; provided, however, that in the event any such Assured Insured Bondholder has not provided the existing custodian of the pre-Effective Date certificated custody receipts with the information necessary for the applicable Non-Book-Entry AGC Trust Units to be registered in the Assured Insured Bondholder's name, then the applicable Non-Book-Entry AGC Trust Units shall be issued in the name of the existing custodian of the pre-Effective Date certificated custody receipts, solely as custodian for the sole benefit of such Assured Insured Bondholder.  Each Trust Unit will share ratably in all Trust Assets of the applicable Trust and in all rights of the related Trust Unit Holders.

Upon original issue, the Trust Units shall be executed and delivered by the Trustee and the Trustee shall cause the Trust Units to be authenticated by the Unit Registrar upon receipt by the Trustee of the documents specified in Section 2.02.  The Trust Units shall be executed by manual or electronic signature on behalf of the Trustee by an authorized officer.  Trust Units bearing the manual or electronic signatures of individuals who were at any time the proper officers of the Trustee shall bind the Trustee, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Trust Units or did not hold such offices at the date of such Trust Units.  No Trust Unit shall be entitled to any benefit under the Trust Agreement or be valid for any purpose, unless there appears on such Trust Unit a certificate of authentication as set forth on such certificate executed by manual or electronic signature on behalf of the Unit Registrar by a duly authorized officer of the Unit Registrar, and such certificate of authentication shall be conclusive evidence, and the only evidence, that such Trust Unit has been duly authenticated and delivered hereunder.  All Trust Units shall be dated the date of their execution.

**Section 5.02.  *Book-Entry Trust Units.***

(a)     The Book-Entry Trust Units will be represented initially by one or more global certificates registered in the name designated by the Depository. Notwithstanding anything herein to the contrary, the Trustee may for all intents and purposes (including the making of payments on the Book-Entry Trust Units) deal with the Depository or its nominee as the authorized representative of the Beneficial Owners of the Book-Entry Trust Units as if the Depository were the sole Book-Entry Trust Unit Holder for purposes of the Trust Agreement (including these Standard Terms) for as long as those Book-Entry Trust Units are registered in the name of the Depository or its nominee.  The rights of Beneficial Owners of the Book-Entry Trust Units shall be limited to those established by law, the Trust Agreement and agreements between such Beneficial Owners and the Depository and Depository Participants.  Requests and directions from, and votes of, the Depository, as Holder, shall not be deemed to be inconsistent if they are made with respect to different Beneficial Owners.  Subject to Section 5.03 below, a Book-Entry Trust Unit may not be transferred by the Depository or its nominee except to another nominee or the Depository, or another Depository or its nominee that agrees to hold the Book-Entry Trust Unit for the account of the respective Depository Participants and Beneficial Owners.

(b)     The Trustee will not have any liability to any person for any aspect of the records relating to or payment made on account of Beneficial Owners of the Book-Entry Trust Units held by the Depository, for monitoring or restricting any transfer of beneficial ownership in a Book-Entry Trust Unit or for maintaining, supervising or reviewing any records relating to such Beneficial Owners.

**Section 5.03.   *Registration of and Limitation on Transfers and Exchanges of Units.***

The Trustee shall cause to be kept at its Corporate Trust Office a Unit Register in which, subject to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Trust Units and of transfers and exchanges of Trust Units as provided in the Trust Agreement (including these Standard Terms).  The Trustee will initially serve as Unit Registrar for the purpose of registering Trust Units and transfers and exchanges of Trust Units as herein provided.

Subject to Section 5.04, upon surrender for registration of transfer of any Trust Unit at the Corporate Trust Office of the Trustee or at any other office or agency of the Trustee maintained for such purpose, the Trustee shall execute and the Unit Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Trust Units of a like aggregate Notional Amount.

At the option of the Trust Unit Holders, each Trust Unit may be exchanged for other Trust Units with a like aggregate Notional Amount and in authorized denominations, upon surrender of such Trust Unit to be exchanged at any such office or agency.  Whenever any Trust Units are so surrendered for exchange, the Trustee shall execute and cause the Unit Registrar to authenticate and deliver the Trust Units which the Trust Unit Holder making the exchange is entitled to receive.  Every Trust Unit presented or surrendered for transfer or exchange shall (if so required by the Trustee) be duly endorsed by, or be accompanied by a

written instrument of transfer in form satisfactory to the Trustee duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge to the Trust Unit Holders shall be made for any transfer or exchange of Trust Units, but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Trust Units.

All Trust Units surrendered for transfer and exchange shall be disposed of by the Unit Registrar in accordance with its customary procedures.

The Trustee will cause the Unit Registrar (unless the Trustee is acting as Unit Registrar) to provide notice to the Trustee of each transfer of a Trust Unit, and will provide the Trustee with an updated copy of the Unit Register on January 1 of each year.

**Section 5.04.**   *No Obligation to Register.*

The Trustee is not obligated to register or qualify any Trust Unit under the Securities Act or any other securities laws or to effect any qualification under the Trust Indenture Act of 1939, as amended.

**Section 5.05.**   *Mutilated, Destroyed, Lost or Stolen Units.*

If (a) any mutilated Trust Unit is surrendered to the Trustee or the Unit Registrar, or the Trustee and the Unit Registrar receive evidence to their satisfaction of the destruction, loss or theft of any Trust Unit, and (b) there is delivered to the Trustee and the Unit Registrar such security or indemnity as may be required by them to save each of them harmless, then, in the absence of actual knowledge by the Trustee or the Unit Registrar that such Trust Unit has been acquired by a protected purchaser, the Trustee shall execute and deliver and the Unit Registrar shall authenticate, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Trust  Unit, a new Trust Unit of like tenor.  Upon the issuance of any new Trust Unit under this Section, the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trust Unit Registrar) connected therewith. Any replacement Trust Unit issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust, as if originally issued, whether or not the destroyed, lost or stolen Trust Unit shall be found at any time.

**Section 5.06.**   *Persons Deemed Owners*.

Prior to due presentation of a Trust Unit for registration or transfer, the Trustee, the Unit Registrar and any agent of any of them may treat the person in whose name any Trust Unit is registered as the owner of such Trust Unit for the purpose of receiving distributions, and neither the Trustee, the Unit Registrar nor any agent of any of them shall be affected by notice to the contrary.

**Section 5.07.  *Appointment of Trust Unit Paying Agent.***

The Trustee shall serve as the initial Trust Unit Paying Agent hereunder and thereafter, solely in the event that legal or regulatory requirements require the appointment of a different Trust Unit Paying Agent, the Trustee may appoint on behalf of, and as an expense of, the Trust, any other Trust Unit Paying Agent for the purpose of making distributions to Trust Unit Holders; provided, however, that any replacement Trust Unit Paying Agent shall be required to meet the eligibility requirement set forth in Section 6.06.  The Trustee shall cause such Trust Unit Paying Agent to execute and deliver to the Trustee an instrument in which such Trust Unit Paying Agent shall agree with the Trustee that such Trust Unit Paying Agent will hold all sums held by it for the payment to Trust Unit Holders in trust for the benefit of the Trust Unit Holders entitled thereto until such sums shall be paid to the Trust Unit Holders.  All funds remitted by the Trustee to any such Trust Unit Paying Agent for the purpose of making distributions shall be paid to Trust Unit Holders as soon as practicable following receipt thereof by the Trust Unit Paying Agent and any amounts not so paid shall be returned as soon as practicable to the Trustee.

## ARTICLE VI

## CONCERNING THE TRUSTEE

**Section 6.01.  *Duties of Trustee.***

Every provision of the Trust Agreement (including these Standard Terms) relating to the conduct of, affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VI.

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Trust Agreement and no implied covenants or obligations shall be read into the Trust Agreements against the Trustee.

The Trustee shall (at the direction of the Requisite Trust Unit Holders), subject to its rights and protections herein, take all necessary or desireable actions to enforce the Assured Insurance Policies as set forth herein.

The Trustee shall deliver to all Trust Unit Holders copies of all notices and written communications received from Depositor, Reorganized HTA, or the trustee of a FGIC Trust as they relate to the Bonds and/or the FGIC Certificates, as applicable.

Except as provided in Section 6.02 hereof, no provision of the Trust Agreement shall be construed to relieve the Trustee from liability for its own grossly negligent action, grossly negligent failure to act or willful misconduct; *provided, however,* that:

(a)     The Trustee shall not be liable for an error of judgment made in good faith by an Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(b)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of Assured or, in the event that the Voting Rights are held by a party other than Assured, Trust Unit Holders entitled to a majority of the Voting Rights (or such other percentage as may be specified herein) relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the New Securities or exercising any trust or power conferred upon the Trustee with respect to the New Securities, under the Trust Agreement;

(c)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Requisite Trust Unit Holders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Assured Insurance Policies or exercising any trust or power conferred upon the Trustee with respect to the Assured Insurance Policies, under the Trust Agreement; and

(d)     Any determination of gross negligence, willful misconduct or bad faith of the Trustee shall be made only upon the rendering of a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

**Section 6.02.   *Certain Matters Affecting the Trustee.***

(a)     The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties.  Further, the Trustee may accept a copy of the vote of the board of directors or equivalent governing body of any party certified by its clerk or assistant clerk or secretary or assistant secretary as conclusive evidence of the authority of any Person to act in accordance with such vote, and such vote may be considered as in full force and effect until receipt by the Trustee of written notice to the contrary;

(b)     The Trustee may, in the absence of bad faith on its part, conclusively rely upon an Opinion of Counsel or certificate of an Officer of the appropriate Person whenever in the administration of the Trust Agreement the Trustee shall deem it desirable that a matter be proved or established (unless other evidence be herein specifically prescribed) prior to taking, suffering or omitting any action hereunder;

(c)     The Trustee may consult with counsel of its own selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in reliance on such advice or Opinion of Counsel;

(d)     The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by the Trust Agreement or to institute, conduct, defend or continue any litigation thereunder or in relation thereto at the request, order or direction of any of the Trust Unit Holders, pursuant to the provisions of the Trust Agreement, unless such Trust Unit

Holders shall have offered to the Trustee security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(e)     The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Trust Agreement (including these Standard Terms);

(f)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by Assured or, in the event that the Voting Rights are held by a party other than Assured, Trust Unit Holders entitled to a majority of the Voting Rights; *provided, however,* that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of the Trust Agreement, the Trustee may require indemnity against such expense or liability as a condition to taking any such actions;

(g)     The Trustee may execute any of the trusts or powers under the Trust Agreement or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for the supervision of or any misconduct or negligence on the part of any agent or attorney appointed with due care by it under the Trust Agreement (including these Standard Terms);

(h)     Whenever the Trustee is authorized herein to require acts or documents in addition to those required to be provided it in any matter, it shall be under no obligation to make any determination whether or not such additional acts or documents should be required unless obligated to do so under Section 6.01;

(i)     The Trustee shall not be deemed to have notice of any matter unless one of its Officers has received written notice thereof at the Corporate Trust Office and such notice references the applicable Trust Units generally, the applicable Depositor(s), the Trust or the Trust Agreement;

(j)     None of the provisions of the Trust Agreement or these Standard Terms shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it;

(k)     Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

(l)      The permissive rights of the Trustee to perform any discretionary act enumerated in the Trust Agreement or these Standard Terms shall not be construed as a duty or obligation, and the Trustee shall not be answerable in the performance of such act other than for its gross negligence or willful misconduct;

(m)      The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian, co-trustee and other Person employed to act hereunder;

(n)      The Trustee shall have no duty (A) to see to any recording, filing, or depositing of the Trust Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Trust Estate, or (D) to confirm or verify the contents of any reports or certificates delivered to the Trustee pursuant to the Trust Agreement (including these Standard Terms) believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties;

(o)      The Trustee shall have no liability or responsibility for the acts or omissions of any other party to any of the Trust Agreement, these Standard Terms or any related document;

(p)      The Trustee shall have no duty or obligation to obtain or solicit any collateral or any funds to be remitted in any of the accounts established under the Trust Agreement or these Standard Terms, and shall have a duty only to accept such collateral or funds delivered to it in accordance with the Trust Agreement (including these Standard Terms);

(q)      The Trustee may rely conclusively on certification from Assured as to the Compounded Amount;

(r)      The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(s)      The Trustee may request the delivery of a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Trust Agreement;

(t)      All rights of action under the Trust Agreement or under any of the Trust Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Trust Units, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of such Trust Units, subject to the provisions of the Trust Agreement; and

44

(u)     The rights, protections, priviledges and immunities granted to the Trustee shall be applicable to the Trustee in its capacity as Unit Registrar and Trust Unit Paying Agent, *mutatis mutandis*.

### Section 6.03.   *Trustee Not Liable for Trust Units or Securities.*

The Trustee assumes no responsibility for the correctness of the recitals contained in the Trust Agreement and in the Trust Units.   The Trustee makes no representations or warranties as to the validity or sufficiency of the Trust Agreement or of the Trust Units (other than the signature and authentication of the Trustee on the Trust Units) or of the Securities or related documents.   The Trustee shall not be accountable for the use or application of any of the Trust Units, or for the use or application of any funds in respect of the Securities or deposited in or withdrawn from the Trust in accordance with the Trust Agreement other than, in each case, any funds held by or on behalf of the Trustee in accordance with Sections 3.01 and 3.02.   The Trustee, in its capacity as Trustee hereunder, shall have no responsibility or obligation to comply with, or to monitor any other Person's compliance with, the Bond Documents.

### Section 6.04.   *Trustee May Own Units.*

The Trustee in its individual capacity or any other capacity may become the owner or pledgee of Trust Units with the same rights it would have if it were not Trustee.

### Section 6.05.   *Trustee's Fees and Expenses.*

(a)     Pursuant to the Fee Agreement, each of the Trustee and the Delaware Trustee shall be entitled to receive from Assured, and if not paid by Assured, the Trust, compensation agreed upon in writing (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by it in the execution of the trusts created under the Trust Agreement and in the exercise and performance of any of the powers and duties thereunder of the Trustee.   Each of the Trustee and the Delaware Trustee shall be entitled to reimbursement for (x) all reasonable fees, expenses, costs and disbursements (other than Extraordinary Expenses) incurred or made by the Trustee or the Delaware Trustee in accordance with any of the provisions of the Trust Agreement (including these Standard Terms) (including but not limited to the fees, expenses and disbursements of their respective counsel and of all persons not regularly in their respective employ), in each case to the extent set forth in the Fee Agreement and (y) Extraordinary Expenses reimbursable pursuant to Section 6.05(b).   Additionally each of the Trustee and the Delaware Trustee shall be entitled to indemnification as provided in Section 6.13.   All such amounts payable to the Trustees, collectively, the "**Trustee Costs**".   All such Trustee Costs shall be paid pursuant to the terms of the Fee Agreement and the provisions of this Trust Agreement and may be reimbursed to the Trustee and the Delaware Trustee in accordance with the provisions of the Fee Agreement and the terms of this Trust Agreement, including Section 3.02 hereof.   As set forth in the Fee Agreement, Trustee Costs will only be paid by the Trust in the event that Assured fails to do so pursuant to the terms of the Fee Agreement.   As set forth in Sections 3.02(a)(iii), 3.02(b)(ii), 3.02(c)(ii), and 3.02(d)(ii) above, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of

45

payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy (i) insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account, (ii) insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, (iii) insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (Partial), or (iv) insuring the AGC-AGC Double-Insured Secondary Market Assured Legacy Bonds CUSIP, as applicable.  For the avoidance of doubt, the obligations to the Trustee shall include the Trustee in its capacity as Unit Registar and Trust Unit Paying Agent.

(b)      In furtherance of Section 6.05(a), and subject to the terms of and limitations in the Fee Agreement, each of the Trustee (including in its capacities as the Unit Registrar and Trust Unit Paying Agent) and the Delaware Trustee shall be entitled to receive reimbursement for all reasonable out-of-pocket expenses which are properly documented and incurred or made by it, including costs of collection, payable as a result of or in connection with litigation, enforcement actions or other proceedings brought by Trust Unit Holders against the Depositor, Reorganizd HTA, the Trust, or each of the Trustees except for proceedings, litigation or enforcement actions that relate to the Trustee's or Delaware Trustee's, as the case may be, own grossly negligent action, grossly negligent failure to act or its own willful misconduct as determined by a final judgment of a court of competent jurisdiction no longer subject to appeal or review (the "**Extraordinary Expenses**").  Subject to the terms of the Fee Agreement, the Trustee may (i) demand reimbursement from Assured, or (ii) in the event Assured fails to pay in response to such demand, make withdrawals from the Trust, to pay or reimburse itself the amount of any Extraordinary Expenses, up to a payment limit of $150,000 in the aggregate for the Trusts of Extraordinary Expenses in any calendar year or pro rata portion thereof in the case of the initial and the final years of the Trust based upon the portion of the applicable calendar year in which the Trust exists; provided, however, that the Trustee shall not have any obligation to incur additional Extraordinary Expenses in excess of such annual limit unless it has received security or indemnity reasonably satisfactory to it for such additional Extraordinary Expenses; and provided, further, that if the Trustee does incur any additional Extraordinary Expenses in excess of such annual limit in any calendar year, nothing herein shall prohibit it from being reimbursed for such Extraordinary Expenses in any subsequent calendar year, to the extent of funds available for such reimbursement as provided hereunder and subject to the payment limit of $100,000 applicable for each such subsequent calendar year or such pro rata portion thereof in the case of the initial and final years of the Trust and provided further that the foregoing shall not limit the payment of any amounts to which the Trustee is entitled pursuant to its indemnification rights set forth in Section 6.13 and the Fee Agreement with respect to defending the Trustee against any claim asserted by any Person.

(c)      For the avoidance of doubt, the Depositor shall not be liable for any Trustee Costs or Extraordinary Expenses.

**Section 6.06.  *Eligibility Requirements for Trustee, Successor Trustee, and Trust Unit Paying Agent.***

The Trustee, any successor Trustee, and any successor Trust Unit Paying Agent shall at all times be a corporation or national banking association that: (i) is not an Affiliate of the

Depositor or Assured; (ii) is neither affiliated with the Commonwealth or its instrumentalities, public corporations, or municipalities, nor located in the Commonwealth; (iii) is organized and doing business under the laws of any state or the United States of America; (iv) is authorized under such laws to exercise corporate trust powers; (v) is in good standing under the law of the jurisdiction in which it is organized; (vi) has a combined capital and surplus of at least $50,000,000; (vii) is subject to supervision or examination by federal or state authority; and (viii) is regularly acting as a trustee in the municipal finance market.  If such corporation publishes reports of its conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published. In case at any time any Trustee, successor Trustee, or successor Trust Unit Paying Agent shall cease to be eligible in accordance with the provisions of this Section, such Trustee, successor Trustee, or successor Trust Unit Paying Agent shall resign immediately in the manner and with the effect specified in Section 6.07.

### Section 6.07.  *Resignation and Removal of the Trustee.*

(a)  The Trustee may at any time resign and be discharged from the trusts created pursuant to a Trust Agreement by giving 60 days written notice, which shall be posted to EMMA by the Trustee.  Upon receiving such notice of resignation, Assured shall promptly appoint a successor trustee meeting the requirements set forth in Section 6.06 by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee.  A copy of such instrument shall be delivered to the Trust Unit Holders and posted to EMMA by the successor trustee.  If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee at the expense of the Trust.

(b)  If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 6.06 and shall fail to resign after written request therefor by Assured, or if any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then Assured may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.

(c)  Assured may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, in triplicate, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

Any resignation of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 6.07 shall not become effective until the acceptance of appointment by the successor trustee as provided in Section 6.08 hereof.  The compensation and reimbursement for fees and expenses of any successor trustee appointed in connection

47

with the resignation of the Trustee shall be the sole responsibility of Assured and the Trust, including without limitation, the costs and expenses incurred in connection with any such succession.

Any removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 6.07 shall not become effective until (i) acceptance of appointment by the successor trustee as provided in Section 6.08 hereof and (ii) payment of all costs, expenses and indemnities (other than Extraordinary Expenses) due and owing to the outgoing Trustee, including without limitation, the costs and expenses incurred in connection with any such succession.

Notwithstanding the replacement of the Trustee pursuant to this Section 6.07, the rights, benefits, protections and indemnities afforded to the Trustee under this Article VI shall continue to the benefit of the retiring Trustee.

### Section 6.08.  *Successor Trustee.*

Any successor trustee appointed as provided in Section 6.07 shall execute, acknowledge and deliver to the Trust Unit Holders and to the predecessor trustee an instrument accepting such appointment under the Trust Agreement and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor thereunder, with the like effect as if originally named as trustee therein.  The predecessor trustee shall deliver to the successor trustee all related documents and statements held by it under the Trust Agreement and the Trust Unit Holders and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 6.06 hereof.

Upon acceptance of appointment by a successor trustee as provided in this Section, the successor trustee shall (a) post to EMMA notice of the succession of such trustee under the Trust Agreement and (b) mail notice of the succession of such trustee under the Trust Agreement to all Holders of Trust Units at their addresses as shown in the Unit Register.

### Section 6.09.  *Merger or Consolidation of Trustee.*

Any Person into which the Trustee may be merged or converted or with which it may be consolidated or any Person resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee under the Trust Agreement provided such Person  shall be eligible under the provisions of Section 6.06, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

**Section 6.10.  *Reserved.***

**Section 6.11.  *Appointment of Custodians.***

The Trustee may appoint one or more Custodians to hold all or a portion of the Trust Estate as agent for the Trustee, by entering into a custodial agreement.  The appointment of any Custodian may at any time be terminated and a substitute custodian appointed therefor by the Trustee.  Subject to Article VI, the Trustee agrees to comply with the terms of each custodial agreement and to enforce the terms and provisions thereof against the Custodian for the benefit of the Trust Unit Holders.  Each Custodian shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and surplus of at least $10,000,000 and shall be qualified to do business in the jurisdiction in which it holds any asset constituting part of the Trust Estate.  Any such Custodian may not be an Affiliate of the Depositor or Assured.

**Section 6.12.  *Trustee May Enforce Claims Without Possession of Trust Units.***

All rights of action and claims under the Trust Agreement or the Trust Units may be prosecuted and enforced by the Trustee without the possession of any of the Trust Units or the production thereof in any proceeding relating thereto and any such proceeding instituted by the Trustee shall be brought in its own name or in its capacity as Trustee.  Any recovery of judgment shall, after provision for the payment of the reasonable compensation, fees, expenses, indemnities, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Trust Unit Holders in respect of which such judgment has been recovered.

**Section 6.13.  *Trustee Indemnity***

The Trustees' rights to claim indemnification for losses that they may incur with respect to the Trust Agreement (incorporating these Standard Terms) and each other document contemplated by the foregoing to which either of the Trustees is a party shall be as set forth in Annex I hereto and the Fee Agreement, subject to, with respect to Extraordinary Expenses, the provisions of Section 6.05(b).

## ARTICLE VII

## TERMINATION OF TRUST

**Section 7.01.  *Termination; No Redemption Rights.***

Upon the indefeasible cancellation or other indefeasible termination of the relevant Assured Insurance Policy, the Trust (including the respective obligations and responsibilities under the Trust Agreement of the Trustee and Assured) shall terminate upon (i) the distribution to Assured or to Trust Unit Holders, as applicable, of any remaining Trust Assets held by or on behalf of the Trustee and required hereunder to be so distributed in accordance with the provisions of Section 3.03, 3.04, 3.05 3.07, or 3.08 hereof (the "Final Distribution"), (ii) payment in full of any Trustee Costs due and owing to the Trustees under the Trust Agreement (including these Standard Terms), (iii) payment in full of any Assured Deferred

Expenses due and owing to Assured under the Trust Agreement (including these Standard Terms), (iv) payment in full of any known Tax Costs due and owing to any tax or governmental authority, and (v) solely to the extent the Final Distribution is required to be made to Trust Unit Holders and not to Assured, completion of the procedure for termination set forth in Section 7.02 below. In no event shall the Trust be terminated or the Securities be redeemed (except in the case of a redemption of the Securities permitted under the terms of the Bond Documents) or otherwise released from the Trust Estate (except pursuant to, and in accordance with, Sections 3.04 and 3.07 hereof) without the prior express written consent of Assured if either (i) the relevant Assured Insurance Policy has not been indefeasibly terminated or (ii) Assured has not been indefeasibly paid in full for any amounts owed pursuant to the Commonwealth Plan or the HTA Plan.

Upon the dissolution, wind up and termination of the Trust and the Trust Agreement, the Trustee or Delaware Trustee (acting solely at the written direction of the Trustee) is authorized to file a certificate of cancellation with the Secretary of State.

Notwithstanding anything contained herein to the contrary, the merger or consolidation of the Trustee shall not cause a termination of the Trust.

**Section 7.02.  *Procedure for Termination.***

At least thirty (30) days prior to the date on which the Trustee intends to make the Final Distribution from the Trust, solely to the extent such Final Distribution is required to be made to Trust Unit Holders and not to Assured, the Trustee shall give notice by letter to the Trust Unit Holders specifying: (a) the anticipated date of the Final Distribution; (b) any relevant amounts, or trust assets, remaining on deposit in the Trust will be distributed to the holders of record of the Trust Units on a pro rata basis to the extent necessary to satisfy the Insured Amount; and (c) that the Trustee believes that, following the occurrence of such Final Distribution, the conditions to termination of the Trust have been satisfied and that it intends to terminate the Trust (a "**Termination Notice**"); provided, however, that to the extent that the Final Distribution is to be made to Assured, no such Termination Notice or notice period shall be required.

In the event a Termination Notice is required, (i) the Trustee shall provide a copy of the Termination Notice to the Unit Registrar at the time such Termination Notice is given to Trust Unit Holders, and (ii) if the Requisite Trust Unit Holders do not object in writing within thirty (30) days after the Trustee has provided the Termination Notice as set forth herein, then, upon completion of the Final Distribution as set forth in the Termination Notice, the Trust shall be dissolved, wound up, and terminated; provided, however, that no Trust Unit Holder shall be permitted to object to the termination of the Trust on any grounds other than that the Insured Amount, as calculated in accordance with this Trust Agreement, the HTA Plan, the Commonwealth Confirmation Order, and other applicable law, is anticipated to be greater than zero as of the anticipated date of the Final Distribution.

## ARTICLE VIII

## TAX PROVISIONS

**Section 8.01.   *Grantor Trust Provisions.***

The Trustee, the Depositor, the Trust Unit Holders (by their acceptance of the Trust Units and book-entry beneficial interests therein) and Assured each agree and acknowledge or have agreed and acknowledged that the Trust is intended to qualify for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust, and it is neither the purpose nor the intent of the parties hereto to create a partnership, joint venture or association taxable as a corporation or to serve as associates in a joint enterprise for the conduct of business for profit.  In furtherance of the foregoing, (a) the purpose of the Trust is and shall be to protect and conserve the assets of the Trust Estate, and the Trust shall not at any time engage in or carry on any kind of business or any kind of commercial or investment activity, (b) the Trust is formed to facilitate direct investment in the Trust Assets, and (c) the Trustee (at the direction of Assured and/or the Requisite Trust Unit Holders), shall take, or refrain from taking, all such action as is necessary to maintain the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.  The Trustee shall not (i) acquire any assets or dispose of any portion of the Trust other than pursuant to the specific provisions of this Trust Agreement, (ii) vary the investment of the Trust within the meaning of Treasury Regulation § 301.7701-4(c), (iii) substitute new investments or reinvest so as to enable the Trust Estate to take advantage of variations in the market to improve the investment of any Trust Unit Holder or (iv) engage in any activity which may directly or indirectly, adversely affect the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.  The Trustee shall not have any authority to manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Estate except as required by the express terms of this Trust Agreement in accordance with the powers granted to or the authority conferred upon the Trustee pursuant to this Trust Agreement.  The Trustee and Assured each agree that they shall not take any action that would result in the Trust failing to be characterized for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.

**Section 8.02.   *Characterization.***

Each Trust Unit Holder acknowledges and agrees to treat the Trust Units and the book-entry beneficial interests therein as undivided interests in the Trust Estate.

**Section 8.03.   *Grantor Trust Administration.***

Notwithstanding anything in this Trust Agreement to the contrary, and notwithstanding any direction or instruction by less than all the Trust Unit Holders, the Trustee shall not be authorized to take any action that would cause the Trust not to be treated as a grantor trust under the Code all of the distributions and income from which would be subject to the tax treatment described in Subpart J of Chapter 1 of the Code as to the Trust Unit Holders.  The Trustee shall perform its duties hereunder so as to maintain the status of the Trust as a grantor trust under the Grantor Trust Provisions.  The Trustee shall not (a) exercise any discretionary rights with respect to the Trust Assets, (b) acquire an interest in any additional Trust Assets (other than proceeds of a sale of Trust Assets permitted under the

terms of this Trust Agreement), (c) knowingly take any other action or fail to take (or fail to cause to be taken) any other action that, under the Grantor Trust Provisions, if taken or not taken, as the case may be, could adversely affect the status of (i) the Trust as a grantor trust, (ii) the Trust as a U.S. trust, or (iii) the Trust Unit Holders as grantors with respect to the Trust under the Grantor Trust Provisions (any such adverse effect on trust status, an "**Adverse Trust Event**"), unless the Trustee has obtained or received an Opinion of Counsel from counsel nationally recognized as competent in matters relating to the U.S. federal income taxation of organizations such as the Trust (at the expense of the party requesting such action or at the expense of the Trust Estate if the Trustee seeks to take such action or to refrain from taking any action for the benefit of the Trust Unit Holders) to the effect that the contemplated action will not result in an Adverse Trust Event.  None of the other parties hereto shall take any action or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that the Trustee has received or obtained an Opinion of Counsel to the effect that an Adverse Trust Event could result from such action or failure to act.  The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Trust Agreement, but in no event at the cost or expense of the Trust Estate or the Trustee.

### Section 8.04.   *Reports to Trust Unit Holders and Tax Authorities*

(a)     The Trustee shall perform or cause to be performed on behalf of the Trust all reporting and other tax compliance duties that are required in respect thereof under the Code, the Grantor Trust Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority, including for the avoidance of doubt the filing of IRS Forms 1099 or providing other information statements to the extent required pursuant to U.S. Treasury Regulations Section 1.671-5, as amended, or any successor provision (the "**WHFIT Regulations**") (including U.S. Treasury Regulations Section 1.671-5(c)(1)).

(b)     Consistent with the Trust's characterization for U.S. federal income tax purposes as a grantor trust, except to the extent required pursuant to the WHFIT Regulations, no U.S. federal income tax return shall be filed on behalf of the Trust unless either (i) the Trustee shall receive an Opinion of Counsel that, based on a change in applicable law occurring after the date hereof, the Code requires such a filing or (ii) the Internal Revenue Service shall determine that the Trust is required to file such a return. In the event that the Trust is required to file tax returns, the Trustee shall prepare or cause to be prepared, and sign and file when due with the appropriate tax authorities all of the tax returns in respect of the Trust.  In no event shall the Trustees, the Depositor, or Assured be liable for any liabilities, costs or expenses of the Trust or the Trust Unit Holders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to the Trustee's gross negligence or willful misconduct.

(c)     If any tax, duty, assessment, or other governmental charge is imposed, levied or assessed on the Trust, or if the Trust becomes subject to deduction, withholding, or

other charge or assessment from, or with respect to, any amounts received by the Trust or any distributions made by the Trust, such tax, duty, assessment or other governmental charge, together with all incidental costs and expenses (including, without limitation, penalties and reasonable attorneys' fees) (collectively, the "**Tax Costs**") shall be the sole responsibility of, charged to and payable by the Trust Unit Holders on a pro rata basis.  To the extent known prior to the termination of the Trust, all Tax Costs that are withheld, collected, charged, assessed, or levied shall be paid by the Trustee from the Trust Assets and income to the applicable taxing or governmental authority and any amounts so withheld, collected and/or paid to the applicable taxing or governmental authority shall be deemed to have been paid as distributions to the applicable Trust Unit Holders and treated in accordance with the provisions of the Trust Agreement applicable to Tax Costs.  To the extent any Tax Costs become known after the termination of the Trust, the former Trust Unit Holders of such Trust shall remain responsible for such Tax Costs on a pro rata basis.

(d)     The Trustee shall, for U.S. federal income tax purposes, maintain books and records with respect to the Trust on a calendar year basis or such other basis as may be required under the Code.

(e)     All taxes due and payable on any amounts payable to a Trust Unit Holder with respect to a Trust Unit shall be that Trust Unit Holder's sole responsibility.

(f)     For the purposes of this Article VIII of these Standard Terms and any other provision of the Trust Agreement relating to the ownership of a Trust Unit for U.S. federal income tax purposes, including definitions, all references to Holder, Trust Unit Holder, or Beneficial Owner shall mean the beneficial owner of a Trust Unit for U.S. federal income tax purposes.  By acquiring an interest in a Trust Unit, a beneficial owner of the Trust Unit for U.S. federal income tax purposes shall be deemed to consent as a condition of acquiring such interest to comply with any requirements of such Articles, Sections, or provisions hereof.

(g)     Notwithstanding any other provision of the Trust Agreement (including these Standard Terms), Assured makes no representations, warranties, or guarantees, and shall have no liability, with respect to the tax treatment of the Trust, the Trust Units, any payments made in connection with the Trust or the Trust Units, any Tax Costs, or any securities or other property held in the Trust or issued in connection with the Trust, including, without limitation, the Trust Units.  By electing, or being deemed to elect, Assured Bondholder Election 2, all Trust Unit Holders expressly agree to hold Assured harmless, and not to seek to impose any liabiltiy on Assured, related to the tax treatment of the Trust, the Trust Units, any payments made in connection with the Trust or the Trust Units, any Tax Costs, or any securities or other property held in the Trust or issued in connection with the Trust, including, without limitation, the Trust Units.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

**Section 9.01.  *Amendment of Trust Agreement.***

Promptly following the execution of the Trust Agreement, the Trustee shall post full and complete copies of the Trust Agreement (including these Standard Terms) on EMMA. The Trust Agreement (including these Standard Terms) may not be amended, waived or supplemented without the prior written consent of Assured.  The Trust Agreement (including these Standard Terms) may be amended, waived or supplemented from time to time by Assured and the Trustee without the consent of the Trust Unit Holders; provided, however, that no such amendment shall:

(a)     except as otherwise provided in the Trust Agreement (including these Standard Terms) reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Trust Unit Holder without the written consent of such Trust Unit Holder;

(b)     compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Assured Insurance Policy without the written consent of each Trust Unit Holder affected;

(c)     alter in any manner the calculation or treatment of the Compounded Amount without the written consent of each Trust Unit Holder affected;

(d)     amend this Section 9.01 without the written consent of each Trust Unit Holder;

(e)     adversely affect in any other material respect the interests of the Trust Unit Holders in any manner other than as described in (a), (b), or (c) without the written consent of the Trust Unit Holders evidencing at least a majority of such Trust Units in the applicable Trust (measured, in the case of Current Interest Bonds, by the outstanding principal amount, or, in the case of Capital Appreciation Bonds, the Compounded Amount, as the case may be, of the underlying Assured Legacy Bonds), excluding, from both the numerator and the denominator, any Trust Units held by Assured; *provided*, that only Trust Units that an Officer of the Trustee knows are so held shall be so disregarded; or

(f)     reduce the aforesaid percentage of Trust Units the Holders of which are required to consent to any such amendment, without the unanimous written consent of such Holders of all Trust Units then outstanding.

Prior to executing any amendment permitted by this Article IX, (i) the Trustee shall be required to obtain an Opinion of Counsel that is nationally recognized as competent in matters relating to the federal income taxation of organizations such as the Trust to the effect that such amendment will not result in an Adverse Trust Event and (ii) the Trustee shall be entitled to receive, and shall be fully protected in relying upon an Opinion of Counsel and a certificate from an Officer of Assured stating that the execution of such amendment is authorized or permitted by the Trust Agreement and that all conditions precedent have been met.  The Trustee may, but shall not be obligated to, enter into any such amendment that affects the Trustee's own rights, duties, liabilities, indemnities or immunities under the Trust Agreement, these Standard Terms or otherwise.

Promptly after the execution of any such amendment the Trustee shall furnish a copy of such amendment to each Trust Unit Holder and shall post a copy of such amendment to EMMA.

The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Trust Unit Holders shall be subject to such reasonable regulations as the Trustee may prescribe.

**Section 9.02.   *Counterparts; Electronic Signatures.***

The Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument. The words "execution," "signed," "signature," and words of like import in the Trust Agreement (including these Standard Terms) or in any other certificate, agreement or document related to the Trust Agreement (including these Standard Terms)  shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and Adobe Sign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the US Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

**Section 9.03.   *Limitation on Rights of Trust Unit Holders.***

The death or incapacity of any Trust Unit Holder shall not operate to terminate the Trust Agreement or the Trust, nor entitle such Trust Unit Holder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, nor otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

No Trust Unit Holder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust, or the obligations of the parties hereto, nor shall anything herein set forth, or contained in the terms of the Trust Units, be construed so as to constitute the Trust Unit Holders from time to time as partners or members of an association; nor shall any Trust Unit Holder be under any liability to any third person by reason of any action taken by the parties to the Trust Agreement pursuant to any provision hereof.

Except with respect to enforcement of the applicable Assured Insurance Policies in accordance with the terms hereof, including without limitation the rights set forth in Section 3.03 of a Franklin Nuveen Trust Unit Holder, no Trust Unit Holder shall have any right by virtue of any provision of the Trust Agreement to institute any suit, action or proceeding in

equity or at law upon or under or with respect to the Trust Agreement, unless the Requisite Trust Unit Holders shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee under the Trust Agreement, and the Trustee, for 15 days after its receipt of such request shall have neglected or refused to institute any such action, suit or proceeding. It is understood and intended, and expressly covenanted by each Trust Unit Holder with every other Trust Unit Holder and the Trustee, that no one or more Holders of Trust Units shall have any right in any manner whatever by virtue of any provision of the Trust Agreement to affect, disturb or prejudice the rights of the Holders of any other Trust Units, or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under the Trust Agreement, except in the manner therein provided and for the equal, ratable and common benefit of all Trust Unit Holders. For the protection and enforcement of the provisions of this Section, each and every Trust Unit Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

In the event that an Officer of the Trustee receives a request for its consent to any amendment, modification or waiver of these Standard Terms, the Trust Agreement or any other document thereunder or relating thereto, or receives any other solicitation for any action with respect to the Securities or Assured Insurance Policies, the Trustee shall transmit a notice of such proposed amendment, modification, waiver, solicitation or action to each of the Trust Unit Holders within five (5) days of receipt thereof. The Trustee shall request instructions from the Trust Unit Holders as to whether or not to consent to or vote to accept such amendment, modification, waiver, solicitation or action.

The Trustee shall consent or vote proportionally in accordance with the written direction of the Trust Unit Holders; provided, however, that the Trustee shall not:

(a) without the prior written consent of any Trust Unit Holder, consent or affirmatively vote on behalf of such Trust Unit Holder on any matter that would: (i) terminate the Trust, (ii) except as expressly provided herein, sell some or all of the assets of the Trust; (iii) compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Assured Insurance Policy; and

(b) without the prior written consent of Assured, consent or affirmatively vote on any matter that would amend, modify or waive any agreement in such a manner as to adversely impact Assured. Any such determination as to whether any such amendment, modification or waiver adversely impacts Assured shall be made in the sole and absolute discretion of Assured and such determination shall be promptly provided by notice to the Trustee and the Trust Unit Holders. The Trustee shall not be liable to any Trust Unit Holder or any other Person for refusing to consent or affirmatively vote on such a matter in accordance with such written direction of Assured.

### Section 9.04. *Notices.*

All demands and notices under the Trust Agreement shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by first class mail, postage prepaid, or by express delivery service, to:

(a) in the case of the Trustee if the Trustee is U.S. Bank Trust Company, National Association, the notice address for the Trustee is 100 Wall Street, 6th Floor, New York, New York 10005.  If the Trustee is not U.S. Bank Trust Company, National Association, the notice address shall be the address set forth in the Trust Agreement, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Trustee;

(b) in the case of the Delaware Trustee, if the Delaware Trustee is U.S. Bank Trust National Association, the notice address for the Delaware Trustee is 100 Wall Street, 6th Floor, New York, New York 10005.  If the Delaware Trustee is not U.S. Bank Trust National Association, the notice address shall be the address set forth in the Trust Agreement, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Delaware Trustee;

(c) in the case of the Depositor, [ ● ], or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Depositor; and

(d) in the case of Assured, 1633 Broadway, New York, NY 10019, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by Assured.

Any notice required or permitted to be mailed to a Trust Unit Holder shall be given by first-class mail, postage prepaid, or by express delivery service, at the address of such Trust Unit Holder as shown in the Unit Register.  Notwithstanding the foregoing, so long as the Depository or its nominee is the registered holder of the Book-Entry Trust Units, notice may be given to the Book-Entry Trust Unit Holders by giving notice to the Depository in accordance with its applicable procedures.  Notice may also be delivered by email in accordance with a separate side letter agreement entered into between the parties.  Any notice so mailed within the time prescribed in the Trust Agreement shall be conclusively presumed to have been duly given, whether or not the Trust Unit Holder receives such notice.  A copy of any notice required to be telecopied hereunder also shall be mailed to the appropriate party in the manner set forth above.  A copy of any notice given hereunder to any other party shall be delivered to the Trustee.

**Section 9.05.  *Severability of Provisions.***

If any one or more of the covenants, agreements, provisions or terms of the Trust Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of the Trust Agreement and shall in no way affect the validity or enforceability of the other provisions of the Trust Agreement or of the Trust Units or the rights of the Holders thereof.

**Section 9.06.  *Third-Party Beneficiaries.***

The Trust Unit Holders and their successors and assigns shall be third-party beneficiaries of the provisions of the Trust Agreement (inclding these Standard Terms).  For

the avoidance of doubt, beneficial holders of Trust Units are third party beneficiaries solely to the extent necessary to allow them to enforce the applicable Assured Insurance Policies as set forth herein.  Nothing in these Standard Terms or the Trust Agreement, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, and the Trust Unit Holders, any benefit or any legal or equitable right, remedy or claim under the Trust Agreement (including these standard terms).

### Section 9.07.  *Acts of Trust Unit Holders.*

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Trust Agreement (including these Standard Terms) to be given or taken by Trust Unit Holders or a class of Trust Unit Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Trust Unit Holders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Trustee.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of the Trust Agreement (including these Standard Terms) and conclusive in favor of the Trustee.  The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner that the Trustee deems sufficient.  The ownership of Trust Units shall be proved by the Unit Register.

### Section 9.08.  *Headings.*

Section and subsection headings in these Standard Terms are included herein for convenience of reference only and shall not constitute a part of these Standard Terms for any other purpose or be given any substantive effect.

### Section 9.09.  *No Waiver; Cumulative Remedies.*

No failure to exercise and no delay in exercising, on the part of any party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

### Section 9.10.  *Merger and Integration.*

These Standard Terms and the Trust Agreement sets forth the entire understanding of the parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by the Trust Agreement (including these Standard Terms).

### Section 9.11.  *The Delaware Trustee*

(a)     The Delaware Trustee is appointed to serve as the trustee of the Trust in the State of Delaware for the sole purpose of satisfying the requirement of Section 3807(a) of the Delaware Statutory Trust Act that the Trust have at least one trustee with a principal place of business in the State of Delaware.  It is understood and agreed by the parties hereto

that the Delaware Trustee shall have none of the duties or liabilities of the Trustee or any other trustees.

(b)     The duties of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Delaware Secretary of State which the Delaware Trustee is required to execute under Section 3811 of the Delaware Statutory Trust Act.  To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Trust or the Trust Unit Holders, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.  The Delaware Trustee shall have no liability for the acts or omissions of the Trustee or any other trustees and the Delaware Trustee shall not be liable for supervising or monitoring the performance of the duties of the Trustee, or any other trustees, or the Trust or of any other person or entity under the Trust Agreement or any related document.

(c)     The Delaware Trustee may be removed by Assured upon thirty days prior written notice to the Delaware Trustee.  The Delaware Trustee may resign upon thirty days prior written notice to Assured, with a copy to the Trustee.  No resignation or removal of the Delaware Trustee shall be effective except upon the appointment by Assured of a successor Delaware Trustee that (i) is reasonably acceptable to Assured, (ii) has a combined capital and surplus of at least $10,000,000 and (iii) is qualified to do business in the State of Delaware.  If no successor has been appointed within such thirty (30) day period, the Delaware Trustee, the Trustee or the Trust Unit Holders may petition a court to appoint a successor Delaware Trustee, which shall be at the expense of the Trust.

(d)     Any Person into which the Delaware Trustee may be merged or with which it may be consolidated, or any Person resulting from any merger or consolidation to which the Delaware Trustee shall be a party, or any Person which succeeds to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor Delaware Trustee under the Trust Agreement without the execution, delivery or filing of any paper or instrument or further act to be done on the part of the parties hereto, except as may be required by applicable law, provided that such resulting or successor entity otherwise satisfies the requirements set forth herein to serve as Delaware Trustee.

(e)     Assured and the Trust shall be responsible for the payment of any fees or expenses of the Delaware Trustee.  The Delaware Trustee shall be entitled to all of the same rights, protections, indemnities and immunities under the Trust Agreement and with respect to the Trust as the Trustee.  No amendment or waiver of any provision of the Trust Agreement which adversely affects the Delaware Trustee shall be effective against it without its prior written consent. This provision shall survive the resignation or removal of the Delaware Trustee.

### Section 9.12.  *Timing of Distributions and other Trust Actions*

Notwithstanding anything to the contrary contained in this Trust Agreement, the HTA Plan, or the HTA Confirmation Order, if the Trust or the Trustee (on behalf of the Trust), is

unable to perform any actions pursuant to this Trust Agreement within the time set forth herein due to circumstances outside the control of the Trust or Trustee, as applicable, then such actions shall be effectuated as soon as reasonably practicable thereafter, and the Trust or Trustee shall not be liable or held responsible for any such delays related thereto.

## ANNEX I

INDEMNIFICATION PROVISIONS

(i) The Trust shall indemnify each of the Trustees or any predecessor Trustees and their agents for, and to hold them harmless against, any and all loss, damage, claims, liability or expense, including taxes (other than taxes based upon, measured by or determined by the income of the Trustees), arising out of or in connection with the acceptance or administration of the Trust hereunder, including the costs and expenses of defending itself against any claim asserted by any other Person or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct as determined by a final judgment of a court of a competent jurisdiction no longer subject to appeal or review.

(ii) The Trustees shall have the right to employ separate counsel in any such action or proceeding and participate in the investigation and defense thereof, and the Trust shall pay the reasonable fees and expenses of such separate counsel; provided, however, that the Trustees may only employ separate counsel at the expense of the Trust if in the reasonable judgment of the Trustees (1) a conflict of interest exists by reason of common representation or (2) there are legal defenses available to the Trustees that are different from or are in addition to those available to the Trust or if all parties commonly represented do not agree as to the action (or inaction) of counsel.

## EXHIBIT A

NOTICE OF CLAIM AND CERTIFICATE

[Assured Guaranty Corp.] [Assured Guaranty Municipal Corp.]
1633 Broadway
New York, NY 10019
Attention: Valery Marfitsin
E-Mail: VMarfitsin@agltd.com

Reference is made to the [Name of Series] Assured Custodial Trust Agreement, dated as of December [●], 2022, by and among the Puerto Rico Highways and Transportation Authority (the "**Depositor**"), [Assured Guaranty Corp.] [Assured Guaranty Municipal Corp.] ("**Assured**"), U.S. Bank Trust Company, National Association, (the "**Trustee**") and U.S. Bank Trust National Association (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of December [●], 2022 (the "**Standard Terms**"). This Notice of Claim and Certificate is delivered pursuant to Section 3.06(a) of the Standard Terms. Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement and the Policy (as defined below).

The undersigned, a duly authorized officer of Trustee, in its capacity as Trustee for the Trust, hereby certifies to Assured, with reference to the Trust Agreement and Municipal Bond Insurance Policy No. [●], dated [●], 20[●] (the "**Policy**"), issued in respect of the [Name of Series of Bonds] (the "**Assured Legacy Bonds CUSIP**") and deposited into the Trust, that:

(i)     The Trustee is the Trustee under the Trust Agreement.

(ii)    After taking into account any adjustments made pursuant to Section 3.05 of the Standard Terms, the sum of all amounts on deposit with the Trustee and available for distribution to the Trust Unit Holders pursuant to the Trust Agreement will be $[●] (such amount, the "**Payment Shortfall**") less than the principal and interest of $[●] (the "**Scheduled Payments**") Due for Payment under the Policy and Trust Agreement on [●], 20[●] (the "**Payment Date**").

(iii)   The Trustee is hereby making a claim under the Policy and Trust Agreement for the Payment Shortfall to be applied to the payment of Scheduled Payments.

(iv)    The Trustee agrees that, following its receipt of funds from Assured, it shall (a) hold such amounts in trust and, subject to Section 3.06(e) of the Trust Agreement, apply the same directly to the payment of Scheduled Payments when due; (b) not apply such funds for any other purpose; (c) not commingle such funds with other funds held by the Trustee, and (d) maintain an accurate record of such payments with respect to each Trust Unit and the corresponding claim on the Policy.

(v)      The Trustee, on behalf of the Trust Unit Holders, hereby assigns to Assured any rights of the Trust Unit Holders with respect to the Trust Assets to the extent that the principal amount (or Compounded Amount, as applicable) of the Assured Legacy Bonds CUSIP is reduced to zero.  The foregoing assignment is in addition to, and not in limitation of, rights of subrogation otherwise available to Assured in respect of such payments.  The Trustee shall take such action and deliver such instruments as may be reasonably requested or required by Assured to effectuate the purpose or provisions of this clause (v) and the applicable terms in the Trust Agreement.

(vi)      The Trustee, on behalf of the Trust Unit Holders, hereby acknowledges and agrees that, so long as Assured shall not be in default in its payment obligations under the Policy, Assured may at any time during the continuation of any proceeding by or against the Depositor under the United States Bankruptcy Code (if applicable) or any other applicable bankruptcy, insolvency, receivership, rehabilitation or similar law (an "**Insolvency Proceeding**"), direct all matters with respect to the Trust Units or Trust Assets relating to such Insolvency Proceeding, including without limitation, (A) all matters relating to any claim in connection with an Insolvency Proceeding seeking the avoidance as a preferential transfer of any payment made to the Trust or Trustee or in connection with the Trust Units (a "**Preference Claim**"), (B) the direction of any appeal of any order relating to any Preference Claim at the expense of Assured, and (C) the posting of any surety, supersedeas or performance bond pending any such appeal. In addition, and without limiting the foregoing, the Trustee hereby agrees that Assured shall be subrogated to the rights of each Trust Unit Holder in any Insolvency Proceeding to the extent it is subrogated pursuant to section (vii) below, including, without limitation, all rights of any party to an adversary proceeding action with respect to any court order issued in connection with any such Insolvency Proceeding.

(vii)      Assured shall, to the extent it makes any Scheduled Payments on the Trust Units under the Policy and Trust Agreement, become subrogated to the rights of the recipients of such payments in accordance with the terms of the Policy and the Trust Agreement.

- 2-

(viii)    The Trustee hereby requests that the Payment Shortfall be deposited into the Insurance Policy Account by bank wire transfer or other immediately available funds using the following wiring instructions:

Correspondent Bank:          [_____]

Fed ABA No:                  [_____]

Account Name:                [_____]

Account  No:                 [_____]

Beneficiary A/C Name:        [_____]

Reference:                   [_____]

This Notice of Claim and Certificate may be revoked at any time by written notice of such revocation by the Trustee to Assured.

IN WITNESS WHEREOF, the Trustee has executed and delivered this Notice of Claim and Certificate as of the [ ● ]th day of [ ● ], 20[ ● ].

U.S. Bank Trust Company, National
     Association, as Trustee

By:_____
     Name:
     Title:

For Assured or
Trustee Use Only
Wire transfer sent on _____ By _____
Confirmation Number _____

- 3-

**Appendix I**

**Debt Service Payment for [|/[]/20[]**

| Description of Bond Issue | CUSIP | Outstanding Amount | Maturity | Rate | Principal Insured Amount | Principal | Interest | Total | Insurer | Policy No. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | _____ | | | _____ | _____ | _____ | _____ | | |
| | | ══════ | | | ══════ | ══════ | ══════ | ══════ | | |

A- 1

**EXHIBIT B**

FORM UNIT EXCHANGE ELECTION NOTICE
[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

[Date]
Trust Unit Certificate No(s). __
Notional Amount: _____
CUSIP:  [●]

U.S. Bank Trust Company, National
Association
100 Wall Street, 6th Floor
New York, New York 10005

Ladies and Gentlemen:

Reference is made to the [[Name of Series] Assured Custodial Trust Agreement, dated as of December [●], 2022, by and among the the Puerto Rico Highways and Transportation Authority (the "**Depositor**"), [Assured Guaranty Corp.] OR [Assured Guaranty Municipal Corp.] ("**Assured**"), U.S. Bank Trust Company, National Association (the "**Trustee**") and U.S. Bank Trust National Association (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of December [●], 2022 (the "**Standard Terms**"). This Unit Exchange Election Notice is delivered pursuant to Section 3.07(a) of the Standard Terms.  Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement.

By delivering this Unit Exchange Election Notice, we hereby give thirty (30) days' written notice of our exercise of a Unit Exchange Election with respect to [   ] the Trust Unit(s) evidenced by the Trust Unit Certificate No(s). referenced above and direct the Trustee to distribute a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, or the FGIC Certificates Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, or Tax Costs, as applicable, no later than [Date], in accordance with the [delivery] instructions below.  We understand that such distribution will not be made until the applicable Trust Units are presented and surrendered at the office of the Trustee therein designated on that date.

If cash is not available to satisfy in full such outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs, we shall pay in cash the applicable pro rata share of such Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs prior to the receipt of our share of remaining Trust Assets.

By making a Unit Exchange Election, we acknowledge and agree that upon distribution of the Trust Assets in accordance with Section 3.07(b) of the Standard Terms, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds will be satisfied and discharged; and (iii) the related Assured Insurance Policies shall be indefeasibly cancelled with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds.

[Please include delivery instructions for the distribution of Trust Assets to be receive on account of this Unit Exchange Election]

[Please Include any other relevant information]

[],
as Trust Unit Holder


By:_____
Name:
Title:

**<u>EXHIBIT C</u>**

FORM OF NOTICE OF MATURITY
[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

[Date]
CUSIP No.: [●]


Ladies and Gentlemen:

Reference is made to the [[Name of Series] Assured Custodial Trust Agreement, dated as of <u>December</u> [●], 2022, by and among the Puerto Rico Highways and Transportation Authority (the "**Depositor**"), [Assured Guaranty Corp.] OR [Assured Guaranty Municipal Corp.] ("**Assured**"), U.S. Bank Trust Company, National Association (the "**Trustee**") and U.S. Bank Trust National Association (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of <u>December</u> [●], 2022 (the "**Standard Terms**"). This Notice of Maturity is delivered pursuant to Section 3.08(a) of the Standard Terms.  Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement.

1. <u>Maturity Date</u>. Prior to acceleration, the Assured Legacy Bonds were scheduled to mature on [●] (the "**Maturity Date**").

2. <u>Trust Unit Holder Distribution</u>.  As a Trust Unit Holder, you are entitled receive a Distribution (or multiple Distributions) in the amount of a pro rata share of the Insured Amount on the Maturity Date corresponding (i) in the case of any relevant Current Interest Bonds, to the outstanding principal amount of, and accrued and unpaid interest on, such Current Interest Bonds as of the Maturity Date, or (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount as of the Maturity Date.

3. [Include any other relevant information required by the Depository or otherwise.]

C- 1

# EXHIBIT D[1]

## FORM OF NOTICE TO TRUST UNIT HOLDERS

### [[NAME OF SERIES] ASSURED CUSTODIAL TRUST]
### STATEMENT FOR THE DISTRIBUTIONS MADE ON OR ABOUT [●], 20__

**POSTED TO EMMA**
**U.S. Bank Trust Company, National Association, as Trustee**

1.  **Trust Units – CUSIP # [●]**

    a.   Original Aggregate Notional Amount:

         **Total: _____; Per Trust Unit: $1,000**

    b.   Aggregate Notional Amount Immediately Preceding Current Year:

         **Total: _____; Per Trust Unit: _____**

    c.   Distributions and [Principal Amount] [Accreted Value]:

| | Distributions Made on or about [●], 20__ | | Year to date [●], 20__ | | As of [●], 20__ |
|---|---|---|---|---|---|
| | Aggregate distributions | Per Unit distributions[2] | Aggregate distributions | Per Unit distributions | [Aggregate principal amount of New HTA Bonds] [Accreted Value of New HTA Bonds] [Aggregate principal amount of Non-Book-Entry AGC Trust Units] (by CUSIP)[3] |
| Tax-Exempt Bond Account | $ | $ | $ | $ | |
| Taxable Bond Account | $ | $ | $ | $ | |
| Insurance Policy Account | $ | $ | $ | $ | [N/A (cash balance = $ [])] |
| FGIC Certificates Account | $ | $ | $ | $ | |

[1] Trustee to include only portions of this Exhibit D relevant to a particular Trust.
[2] "Per Unit distributions" and "Per Trust Unit" amounts herein are based on a Trust Unit's rate per $1,000 as of the Effective Date.
[3] Or any other securities or property received in respect thereof or in exchange therefor.

D- 1

| | | | | |
|---|---|---|---|---|
| FGIC Insured Bonds Insurance Policy Payments Account | $ | $ | $ | $ [N/A (cash balance = $ [])] |
| Non-Book-Entry AGC Trust Units Account | $ | $ | $ | $ |
| AGM Double-Insured Insurance Policy Payments Account | $ | $ | $ | $ [N/A (cash balance = $ [])] |
| AGC Insurance Policy SM-2007-267 Payments Account | $ | $ | $ | $ [N/A (cash balance = $ [])] |

2. **Aggregate Payment /Insured Amount Reporting for [Assured Legacy Bonds CUSIP]**

As of [●]_

   a. Payments Made Since Effective Date on [Assured Legacy Bonds CUSIP]:

      i. Aggregate Interest Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below):

        **Total** _____; **Per Trust Unit** _____

        1. Aggregate Interest Payments made by Assured on account of [Assured Legacy Bonds CUSIP]:

          **Total** _____; **Per Trust Unit** _____

        2. Aggregate Interest Payments from Other Sources on account of [Assured Legacy Bonds CUSIP]:

          **Total** _____; **Per Trust Unit** _____

      ii. Aggregate Principal Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below):

**Total** _____; **Per Trust Unit** _____

    1.  Aggregate Principal Payments made by Assured on account of [Assured Legacy Bonds CUSIP]:

        **Total** _____; **Per Trust Unit** _____

    2.  Aggregate Principal Payments from Other Sources on account of [Assured Legacy Bonds CUSIP]: _____

        **Total** _____; **Per Trust Unit** _____

  iii.  Aggregate Interest and Principal Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below): _____

**Total** _____; **Per Trust Unit** _____

    1.  Aggregate Interest and Principal Payments made by Assured on account of [Assured Legacy Bonds CUSIP] (sum of (i)(1) and (ii)(1) above):

        **Total** _____; **Per Trust Unit** _____

    2.  Aggregate Interest and Principal Payments from Other Sources on account of [Assured Legacy Bonds CUSIP] (sum of (i)(2) and (ii)(2) above):

        **Total** _____; **Per Trust Unit** _____

  b.  <u>Insured Amount for [Assured Legacy Bonds CUSIP]</u> after most recent distributions: _____

  c.  <u>Current Notional Amount of Trust Units after most recent distributions</u>:

    **Total** _____; **Per Trust Unit** _____

**3.  Tax Reporting**

[_____]

**Draft 912/61/22**

[HTA SERIES NAME] ASSURED CUSTODIAL TRUST

————————————

TRUST AGREEMENT

among

Autoridad de Carreteras y Transportación de Puerto Rico, whose name in English is PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY, as Depositor,

[ASSURED GUARANTY CORP.] [ASSURED GUARANTY MUNICIPAL CORP.]

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
as Trustee

and

U.S. BANK TRUST NATIONAL ASSOCIATION,
as Delaware Trustee

DATED AS OF

[●]

————————————

TABLE OF CONTENTS

Page

SECTION 1.      STANDARD TERMS ..................................................... 1

SECTION 2.      DEFINED TERMS ........................................................ 1

SECTION 3.      ORGANIZATION OF TRUST ....................................... 2

SECTION 4.      NOTIONAL AMOUNT ................................................. 3

SECTION 5.      FORMS OF TRUST UNITS .......................................... 3

SECTION 6.      SCHEDULES ................................................................ 3

SECTION 7.      PATRIOT ACT .............................................................. 3

SECTION 8.      GOVERNING LAW; VENUE; JURY WAIVER .............. 3

SECTION 9.      FORCE MAJEURE ......................................................... 4

SECTION 10.     INTENT OF PARTIES .................................................... 4

SECTION 11.     NON-PETITION ............................................................. 7

SECTION 12.     CERTAIN TERMS REGARDING THE DEPOSITOR ...... 7

TRUST AGREEMENT

THIS TRUST AGREEMENT, dated as of [●] (this "Agreement"), is hereby executed by and among Autoridad de Carreteras y Transportación de Puerto Rico, whose name in English is PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY ("HTA" or the "Depositor"), [and] [ASSURED GUARANTY CORP.][ ("AGC") and] [ASSURED GUARANTY MUNICIPAL CORP.] (["AGM" and together with AGC, ]"Assured"), U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, a national banking association, as trustee (the "Trustee") and U.S. BANK TRUST NATIONAL ASSOCIATION, a national banking association, as Delaware trustee (the "Delaware Trustee", and together with the Trustee, the "Trustees") under this Agreement and the Standard Terms to Trust Agreement, dated as of [●] (the "Standard Terms"), all the provisions of which are incorporated herein and shall be a part of this Agreement as if set forth herein in full (this Agreement with the Standard Terms so incorporated, the "Trust Agreement").

PRELIMINARY STATEMENT

The parties are entering into the Trust Agreement for purposes of forming the [] Assured Custodial Trust, a Delaware statutory trust (the "Trust"). In furtherance of the structure approved in the HTA Plan and in order to facilitate the implementation thereof, the Trust is being established by the Depositor and the Trustees solely for the benefit of and on behalf of the applicable Assured Legacy Bondholders holding Assured Legacy Bonds CUSIP [] that elected, or are deemed to have elected, Assured Bondholder Election 2 pursuant to the terms and provisions of the HTA Plan. Except for the establishment of the Trust and the deposit therein pursuant to the HTA Plan at the election (or deemed election) of the applicable Assured Legacy Bondholders, the Depositor shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof. The Trustees shall file a Certificate of Trust of the Trust with the Office of the Secretary of State of the State of Delaware on the date hereof. The Trust shall issue beneficial ownership interests consisting of trust units to be known as the "Trust Units" and each holder of a Trust Unit, a "Trust Unit Holder" or "Holder". The issue of Trust Units authorized under this Trust Agreement shall have a unique CUSIP, and the Book-Entry Trust Units authorized hereunder shall be issued in global form and be transferable through the Depository.

**Section 1.**     **Standard Terms**.

The Trustees acknowledge that the Standard Terms prescribe certain obligations of the Trustees with respect to the Trust and the Trust Units. The Trustees agree to observe and perform such prescribed duties, responsibilities and obligations, and acknowledge that the Standard Terms (including without limitation, the rights, protections, indemnities and immunities afforded to the Trustees thereunder) are and shall be a part of this Agreement to the same extent as if set forth herein in full.

**Section 2.**     **Defined Terms**.

With respect to the Trust Units and in addition to the definitions set forth in the Standard Terms, the following provisions shall govern the defined terms set forth below. To the extent the

meanings assigned to the defined terms set forth below are inconsistent with the meanings assigned to such terms in the Standard Terms, the meanings assigned herein shall control. Capitalized terms used herein but not defined herein or in the Standard Terms shall have the meanings ascribed to them in the HTA Plan.

"**Bankruptcy Code**": The Bankruptcy Reform Act of 1978, as amended from time to time, and as codified as 11 U.S.C. Section 101 et seq.

"**Delaware Trust Statute**": Chapter 38 of Title 12 of the Delaware Code, 12 Del. Code § 3801 *et seq.,* as the same may be amended from time to time.

"**Delaware Trustee**":  U.S. Bank Trust National Association, not in its individual capacity but solely in its capacity as Delaware Trustee hereunder, its successor in interest or any successor Delaware Trustee appointed as herein provided.

"**Maturity Date**": [], the original maturity date of the relevant Assured Legacy Bonds (prior to acceleration).

"**Trustee**":  U.S. Bank Trust Company, National Association, in its capacity as Trustee hereunder, its successor in interest or any successor trustee appointed as herein provided.

"**Trustees**":  The Delaware Trustee and the Trustee.

"**U.S.A. PATRIOT Act**": The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107 56 (signed into law October 26, 2001) and its implementing regulations.

**Section 3.**    **Organization of Trust**.

The Trust is being created on the date hereof pursuant to the execution of this Agreement and the filing by the Trustees of a Certificate of Trust of the Trust (the "Certificate of Trust") with the Office of the Secretary of State of the State of Delaware (the "Secretary of State"), under the name "[] Assured Custodial Trust" in which name the Trust shall have power and authority and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the activities of the Trust.  It is the intention of the parties hereto that the Trust hereby created constitutes a statutory trust under the Delaware Trust Statute and that the Trust Agreement (including the Standard Terms) constitutes the governing instrument of the Trust. Notwithstanding any other provision of this Agreement to the contrary, the Trustees are hereby authorized and directed to, and shall, on the date hereof, execute and file the Certificate of Trust with the Secretary of State in substantially the form attached as Exhibit B hereto.  The Trustee shall have power and authority, and is hereby authorized and empowered to take all actions on behalf of the Trust as set forth in the Trust Agreement and each of the Trustees is authorized and empowered to execute and file with the Secretary of State any other certificate required or permitted under the Delaware Trust Statute to be filed with the Secretary of State.  The office of the Trust shall be in the care of the Trustee at the Corporate Trust Office or at such other address as the Trustee may designate by written notice to the Trust Unit Holders and Assured.

**Section 4.**     __Notional Amount__.

The aggregate Notional Amount of the Trust Units that may be executed and delivered under this Agreement is limited to the outstanding principal amount (or, in the case of Capital Appreciation Bonds, the Compounded Amount) as of the Effective Date of the Assured Legacy Bonds deposited into the Trust as set forth on __Schedule I__ hereto.

**Section 5.**     __Forms of Trust Units__.

The Trust Units shall be substantially in the form attached as __Exhibit A__ hereto.  The Book-Entry Trust Units shall be issued in global form and transferable through the Depository.

**Section 6.**     __Schedules__.

__Schedule I__ and __Schedule II__ are attached hereto and incorporated herein by reference as contemplated herein or by the Standard Terms.

**Section 7.**     __Patriot Act__.

The parties hereto acknowledge that in accordance with Section 326 of the U.S.A. PATRIOT Act, the Trustees, like all financial institutions and in order to help fight the funding of terrorism and money laundering, are required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustees.  The parties to this Trust Agreement agree that they will provide the Trustees with such information as they may request in order for the Trustees to satisfy the requirements of the U.S.A. PATRIOT Act.

**Section 8.**     __Governing Law; Venue; Jury Waiver__.

THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON, ARISING OUT OF, OR LEADING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY OR PERFORMANCE, SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS. EACH PARTY HERETO HEREBY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, OR (B) IN ANY WAY IN CONNECTION WITH OR PERTAINING TO OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT TO THIS AGREEMENT OR IN CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE, OR THE

CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE.   EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY FEDERAL OR STATE COURTS SITTING IN THE STATE OF DELAWARE IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDINGS IN ANY SUCH COURT AND ANY CLAIM THAT ANY PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**Section 9.**       **Force Majeure**.

In no event shall the Trustees be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

**Section 10.**       **Intent of Parties**.

(a) The parties hereto intend that, for all purposes, the transfer to the Trust of the Trust Estate shall be, and shall be construed as, a transfer of such Trust Estate on behalf of the applicable Assured Legacy Bondholders in lieu of a transfer of such assets to the Trust directly by the applicable Assured Legacy Bondholders and shall constitute, in all respects, an absolute, irrevocable transfer, conveyance, and assignment, without recourse, of the Trust Estate to the Trust, and immediately after giving effect to the transfer contemplated hereby on the Effective Date, the Depositor will have no further interest (legal or equitable) in the Trust Estate and the Trust Estate will not be property of the Depositor or of the Depositor's estate in the event of a liquidation, reorganization, or similar proceeding of the Depositor and the Trust shall have the absolute right to take whatever action it may deem appropriate with respect to the Trust Estate. The parties agree to treat the transfer contemplated hereby for all purposes (including financial accounting purposes) as an absolute transfer on all relevant books, records, financial statements and other documents.

(b) The Trust Estate will be held by the Trust free and clear of any lien or encumbrance of any Person claiming through or under the Depositor.

(c) Notwithstanding anything to the contrary in the Trust Agreement or in any other document governing the formation, management, or operation of the Trust, if and for so long as any Trust Unit remains outstanding, none of the Trust Unit Holders, Assured, the Trustees, nor any other Person shall authorize, cause or permit the Trust to (and the Trust shall not and neither

4

Trustee shall directly take any action that to its actual knowledge would constitute any of the following):

(i)     engage in any business or engage in any activity other than those activities expressly permitted under <u>Section 2.03</u> of the Standard Terms and will not have, incur, guarantee or become liable for any indebtedness or obligations except as expressly contemplated in the Trust Agreement;

(ii)     acquire or own any assets other than the Trust Estate or lease (as lessor) any assets;

(iii)     fail to preserve its existence as an entity duly formed, validly existing and in good standing (if applicable) under the laws of the State of Delaware, or fail to remain qualified to do business in each state in which such qualification is required, for any reason, including, but not limited to, in order to perform its obligations under the Trust Agreement;

(iv)     fail to observe at any time any necessary, appropriate and customary corporate, organizational, company and/or other legal formalities to maintain its separate existence;

(v)     fail to act solely in its own name or in the name of the Trustee on behalf of the Trust through duly authorized agents in the conduct of its activities;

(vi)     provide for the payment of its expenses, indebtedness or other obligations other than from its own separate assets;

(vii)     have its debts or other obligations guaranteed by any other person or hold itself out as responsible for the debts or other obligations of any other Person;

(viii)     commingle its assets or liabilities with those of any other Person;

(ix)     fail to maintain its own records, books of account, bank accounts, accounting records and other entity documents separate and apart from those of any other Person;

(x)     divert funds for any purpose other than as set forth in the Trust Agreement;

(xi)     enter into any contract, agreement or transaction with any Trust Unit Holders, the Depositor, Assured, principal or other affiliate of the Trust, or any shareholder, general partner, member, principal or affiliate thereof, except as expressly authorized in the Trust Agreement;

(xii)     maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xiii)     incur, create or assume any indebtedness of or buy or hold evidence of indebtedness issued by any other Person (other than as contemplated by the Trust

Agreement); guarantee or hold itself out to be responsible for the debts of another Person or otherwise pledge its assets to secure the obligations of any other Person, or hold out its credit or assets as being available to satisfy the obligations of any other Person or seek to incur, create or assume any indebtedness based upon the assets of any other Person;

(xiv)   perform any duties or obligations of the Depositor or any other Person;

(xv)   make any loans or advances to any third party, including, without limitation, any Trust Unit Holder, Depositor or Affiliate of the Trust, or any principal or Affiliate thereof;

(xvi)   fail to file its own tax returns as and if required to do so by applicable law (subject to any permitted extensions and except to the extent the Trust is treated as a grantor trust for tax purposes) and to pay any taxes required to be paid by it under applicable law;

(xvii)   fail to hold itself out to the public as a legal entity separate and distinct from any other Person, fail to conduct its activities solely in its own name or in the name of the Trustee and as a separate and distinct entity, or fail to correct any known misunderstanding regarding its separate identity;

(xviii)  identify itself as a department or division of any other Person;

(xix)   fail to observe all formalities required of a Delaware statutory trust;

(xx)   fail to pay its expenses and liabilities only out of its own funds to the extent such funds are available and fail to hold its assets only in its own name; provided, however, the foregoing shall not require the Depositor to sell any assets, or make any capital contribution, to the Trust;

(xxi)   conduct any oral or written communication, including, without limitation, letters, invoices, purchase orders, contracts, statements and applications, other than in its own name or in the name of the Trustee on behalf of the Trust;

(xxii)  (a) institute proceedings to have the Trust declared or adjudicated a bankrupt or insolvent, (b) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (c) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (d) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (e) make any assignment for the benefit of the Trust's creditors, (f) cause the Trust to admit in writing its inability to pay its debts generally as they become due or (g) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing;

(xxiii)  supplement, modify, amend, restate, replace, waive or repeal this Section 10 or Sections 2.03, 2.04, 9.01 or 9.03 of the Standard Terms, or the definitions used in such Sections, in each case except for any supplement, modification, amendment or

restatement of any such provision that (x) corrects any error and (y) would not (individually or together with other changes) be reasonably likely to cause the Trust to no longer be a "special purpose entity" in accordance with applicable law and standards; or

(xxiv) supplement, modify, amend, restate, replace, waive or repeal any portion of this Trust Agreement or the Standard Terms except as expressly permitted by Section 9.01 of the Standard Terms.

(d) Failure of the Trust, the Depositor, Assured, any Trust Unit Holder, any Trustee or any other Person on behalf of the Trust, to comply with any of the foregoing covenants set forth in this Section 10 shall not affect the status of the Trust as a separate legal entity (unless in violation of the Delaware Trust Statute) nor cause the Trust to dissolve or terminate.

(e) To the extent that any provision of this Section 10 conflicts with, violates or otherwise is in contravention with any other provision of the Trust Agreement or the Standard Terms, the parties hereto and each Trust Unit Holder agree that the terms set forth in this Section 10 shall be controlling as expressly set forth herein.

**Section 11.    Non-Petition**.  The Depositor, Assured, the Trustee and the Delaware Trustee, by entering into this Agreement, and the Trust Unit Holders, by electing (or being deemed to elect) Assured Bondholder Election 2, hereby covenant and agree that they will not at any time institute against the Trust, or join in instituting against the Trust, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law; provided, however, that in the event a bankruptcy or similar proceeding is instituted against the Trust by another person, the Trustee may file appropriate proofs of claim.  For the avoidance of doubt, no adequate remedy at law exists with respect to any breach of this Section 11, and specific performance shall in all circumstances be available as a remedy for the enforcement of this Section 11.

**Section 12.    Certain Terms Regarding the Depositor**.  For the avoidance of doubt and notwithstanding any terms appearing herein or elsewhere to the contrary:

(i)    The obligations of the Trust under the Trust Units and this Trust Agreement are non-recourse obligations of the Trust payable solely from the Trust Estate, and following realization of the Trust Estate, and its reduction to zero, any claims of the Holders of the Trust Units shall be extinguished.  The Trust Units are not obligations of, and are not guaranteed by, the Depositor, and no recourse shall be had against any Officer, director, manager, employee, security holder or incorporator of the Depositor, or its successors or assigns, for the payment of any amounts payable under the Trust Units or the payment or performance of any obligation of the Trust under or pursuant to this Trust Agreement.

(ii)    The recitals contained in this Trust Agreement and in the Trust Units, shall be taken as the statements of the Trust, and the Depositor assumes no responsibility for their correctness.  The Depositor makes no representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Trust Units.

(iii)     In purchasing or acquiring any Trust Units in certificated form, the purchaser or acquirer shall be deemed to acknowledge, represent and agree, and in purchasing or acquiring any book-entry beneficial interests in the Trust Units, the purchaser or acquirer shall be deemed to acknowledge, represent and agree, that none of the Depositor nor any of its affiliates, is acting as a fiduciary or a financial or investment advisor for such purchaser or acquirer, and such purchaser or acquirer is not relying (for purposes of making any investment decision or otherwise) upon any advice, representations or recommendations (in each case whether written or oral) of the Depositor or any of its affiliates.

(iv)     The Depositor shall not be accountable for the use or application by the Trust of the Trust Units or the proceeds thereof or any amounts paid to the Trust pursuant to the provisions of this Trust Agreement.

**Section 13.     [Franklin Nuveen Trust Reservation of Rights.**  In accordance with Section 3.03(c)-(d) of the Standard Terms and notwithstanding anything to the contrary herein, the Plan or Confirmation Order, upon (i) issuance of a notice of Assured's exercise of, or intent to exercise, any Assured Advancement Option, or (ii) issuance of, or issuance of notice of an intent to cause the issuance of, a Sale Notice that could cause a cash Distribution or distribution of Subject Bonds that would, by operation of this Agreement, otherwise reduce the outstanding principal of the applicable Assured Insured Bond prior to its Original Scheduled Principal Payment Date, then, in each case, a Franklin Nuveen Trust Unit Holder shall be permitted to challenge whether payment of the applicable Acceleration Price or cash Distribution with respect to such Assured Insured Bond satisfies and discharges all (or any) of Assured's obligations to such Franklin Nuveen Trust Unit Holder under the applicable Assured Insurance Policy with respect to such Assured Insured Bond and all of the Franklin Funds' and/or Nuveen Funds' respective rights, arguments and defenses (and those of the Franklin Nuveen Trust Unit Holders) with respect to any such argument made by such Franklin Nuveen Trust Unit Holders (including, without limitation, whether any such payment or distribution would reduce the principal amount outstanding of the Assured Insured Bonds) are reserved and preserved, including any arguments as to whether  Section 26.1(c) of the HTA Plan and Section 26(a) of the HTA Confirmation Order validly accelerated the Assured Insured Bonds in the Franklin Nuveen Trusts for purposes of the Assured Insurance Policy.  All of Assured's rights, arguments and defenses with respect to any such argument made by a Franklin Fund and/or Nuveen Fund and/or other Franklin Nuveen Trust Unit Holder pursuant to this Section 13, Section 3.03(c) of the Standard Terms and the HTA Plan are reserved and preserved, including any arguments as to whether Section 26.1(c) of the HTA Plan and Section 26(a) of the HTA Confirmation Order validly accelerated the Assured Insured Bonds in the Franklin Nuveen Trusts for purposes of the Assured Insurance Policy.  Any determination made as a result of arguments made by a Franklin Fund and/or Nuveen Fund and/or other Franklin Nuveen Trust Unit Holder pursuant to this Section 13 shall have no impact on any other Trust or Assured Insurance Policy.][1]

[**Authority to Act on Behalf of Assured**.  For so long as AGC continues to pay and otherwise meet its obligations under this Trust Agreement, AGC shall have sole authority to make any decisions required to be made by, and exercise any rights available to, Assured under

---

[1] [NTD: Section only to be included in Trust Agreements for Franklin Nuveen Trusts.]

8

this Trust Agreement.  In the event that AGC fails to pay or otherwise meet its obligations under this Trust Agreement, AGM shall have sole authority to make any decisions required to be made by, and exercise any rights available to, Assured under this Trust Agreement.][2]

---

[2] [NTD: Section only to be included in Trust Agreements relating to an Assured Legacy Bonds CUSIP (Combined).]

**IN WITNESS WHEREOF**, the Depositor, Assured, the Trustee and the Delaware Trustee have caused this Agreement to be duly executed by their respective officers thereunto duly authorized and all as of the date first set forth above.

**PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY,**
As Depositor

By: _____

Name: _____

Its: _____

**[ASSURED GUARANTY CORP.] [ASSURED
GUARANTY MUNICIPAL CORP.]**

By: _____

Name: _____

Its: _____

[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

**U.S. BANK TRUST NATIONAL ASSOCIATION**,
As Delaware Trustee

By: _____
Name: _____
Its: _____


**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,**
As Trustee

By: _____
Name: _____
Its: _____

[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

**<u>SCHEDULE I</u>**

**Assured Legacy Bonds Schedule**

| <u>Insured CUSIP[s]</u> | <u>Original CUSIP</u> | <u>Assured Bondholder Election 2 contra-CUSIP[s]</u> | <u>Insurance Policy Number(s)</u> | <u>Tax-Exempt /Taxable</u> | <u>Coupon</u> | <u>Outstanding Principal Amount (or Compounded Amount) as of the Effective Date</u> |
|---|---|---|---|---|---|---|
| [ ● ] | [ ● ] | [ ● ] | [ ● ] | [ ● ] <u>Tax-Exempt</u> | [ ● ] | [ ● ] |

S-I

## SCHEDULE II

### Relevant Trust Information

**I.  Trust Accounts**[13]

| Account | Account Number | Initial Deposits |
|---|---|---|
| Tax-Exempt Bond Account | [ ● ] | [ ● ] |
| Taxable Bond Account | [ ● ] | [ ● ] |
| Cash Account | [ ● ] | [ ● ] |
| Insurance Policy Account | [ ● ] | [ ● ] |
| FGIC Certificates Account | [ ● ] | [ ● ] |
| FGIC Insured Bonds Insurance Policy Payments Account | [ ● ] | [ ● ] |
| Non-Book-Entry Double-Insured AGC Trust Units Account | [ ● ] | [ ● ] |
| AGM Double-Insured Insurance Policy Payments Account | [ ● ] | [ ● ] |
| AGC Insurance Policy SM-2007-267 Payments Account | [ ● ] | [ ● ] |

**II.  Trust Unit CUSIP**

The CUSIP of the Trust Units initially issued pursuant to this Trust Agreement is: [ ● ]

**III.  References in Standard Terms**

In the Standard Terms, Assured Legacy Bonds CUSIP [ ● ] is referred to as a:

(i) [ ● ]; and

(ii) [ ● ].

See Section 2.01[ ● ] of the Standard Terms for more information regarding the Trust Assets deposited in this Trust.

See Section 3.01[ ● ] of the Standard Terms for more information regarding the accounts for this Trust.

See Section 3.02[ ● ] of the Standard Terms for more information regarding distributions

---

[13] [NTD: Schedule to include only those accounts held by the applicable Trust.]

to be made in connection with this Trust.

WEIL:\96747648\17\64984.0005
\\NY - 021918/000052 - 10387916 v4
KL2 3301237.4

## <u>EXHIBIT A</u>

FORM OF TRUST UNIT CERTIFICATE

[UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE TRUST, AS DEFINED HEREIN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

THIS CERTIFICATE DOES NOT REPRESENT AN INTEREST IN OR OBLIGATION OF THE DEPOSITOR, THE TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES, EXCEPT IN RESPECT OF AN INDIRECT INTEREST IN THE NEW SECURITIES UNDERLYING THE UNITS.

[] ASSURED CUSTODIAL TRUST

Trust Unit Certificate No. __

Original Notional Amount: _____

CUSIP:  [●]

Each Trust Unit represented by this Trust Unit certificate is one of a duly authorized issue of certificates designated as the Trust Units (herein collectively called the "Units"), and representing a beneficial ownership interest in the Trust Estate created by the Trust Agreement referred to below.

This certifies that [CEDE & CO.] is the registered owner of the Notional Amount of Trust Units evidenced by this certificate.  Capitalized terms used but not defined herein have the meanings assigned to such terms in the Trust Agreement and Standard Terms referred to below and the Trust Agreement contains rules as to construction that shall be applicable herein.

The Trust was created pursuant to a Trust Agreement (the "Trust Agreement") dated as of [●], by and among the Puerto Rico Highways and Transportation Authority (the "Depositor"), [Assured Guaranty Corp.] [and] [Assured Guaranty Municipal Corp.] ([collectively, ]"Assured"), U.S. Bank Trust Company, National Association, (the "Trustee") and U.S. Bank Trust National Association (the "Delaware Trustee"), which term includes any successor under the Trust Agreement, and together with the Trustee, the "Trustees"), and the Standard Terms to Trust Agreement, dated as of [●] (the "Standard Terms"), a summary of certain of the pertinent provisions of which is set forth hereinafter.  This certificate is issued under and is subject to the terms, provisions and conditions of the Trust Agreement, to which Trust Agreement the Holder of this certificate by virtue of its acceptance hereof assents and by which such Holder is bound. Distributions on this certificate shall be made by the Trust Unit Paying Agent under the Trust Agreement.

This certificate is issued under the Trust Agreement to which reference is hereby made for a statement of the respective rights thereunder of the Depositor, the Trustees, Assured and the Holder of the certificate and the terms upon which the certificate is executed and delivered.

This certificate does not bear interest.  Distributions on this certificate represent a combination of certain payments made on the New Securities and certain other payments which derive from the Trust Estate and may vary from period to period. Each such Distribution made pursuant to the Trust Agreement shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case, as of the date of such Distribution and in an amount equal to such Distribution, as set forth in the Standard Terms[; provided, for the avoidance of doubt, with

respect to any Franklin Nuveen Trust, the foregoing shall be subject to the reservation of rights in Section 13 of the of the Trust Agreement and Sections 3.03(c)-(d) of the Standard Terms][4].

In certain circumstances, Assured may instruct the Trustee in writing to sell the New Securities (the "Subject Bonds") underlying the Units for cash (a "Bond Sale"). The Holder of this certificate shall have the option to elect to receive in-kind delivery of a pro rata share of the Subject Bonds, subject to payment by such Trust Unit Holder of the allocable portion of any outstanding Trustee Costs and Tax Costs, in lieu of receiving a pro rata share of the actual net cash proceeds from the Bond Sale, as set forth in the Standard Terms.

This certificate is not subject to repurchase by the Trust at the option of the Holder of this certificate.

The Holder, by its acceptance of this certificate, agrees that it will look solely to the funds allocated pursuant to the Trust Agreement for distribution hereunder and that none of the Trustee or the Trust Unit Paying Agent in their individual capacities nor the Depositor is personally liable to such Holder for any amount payable under this certificate or the Trust Agreement, subject in the case of the Trustee to any liability under the Trust Agreement, provided that the foregoing shall not prevent the Holder from appearing or litigating any such proceeding after it has been instituted.

The Holder, by its acceptance of this certificate hereby agrees that (i) the Trust Agreement is executed and delivered by U.S. Bank Trust Company, National Association and U.S. Bank Trust National Association, not individually or personally, but solely as Trustee and Delaware Trustee, respectively, in the exercise of the powers and authority conferred upon and vested in it, and pursuant to instructions set forth therein, (ii) each of the representations, undertakings and agreements herein made on the part of the Trustee, the Delaware Trustee or the Trust is made and intended not as personal representations, undertakings or agreements of U.S. Bank Trust Company, National Association or U.S. Bank Trust National Association, (iii) nothing herein contained shall be construed as creating or imposing any liability upon U.S. Bank Trust Company, National Association or U.S. Bank Trust National Association, individually or personally, or the Depositor to perform any covenant, either express or implied, contained herein, all such liability, if any, is hereby expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto and such waiver shall bind any third party making a claim by or through one of the parties hereto, and (iv) under no circumstances shall U.S. Bank Trust Company, National Association, U.S. Bank Trust National Association or the Depositor be personally liable for the payment of any indebtedness or expenses of the Trust, or be personally liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under the Trust Agreement.

The Holder, by its acceptance of this certificate, covenants and agrees that it will not at any time institute against the Depositor, Assured or the Trust, or join in any institution against the Depositor, Assured or the Trust of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations relating to this certificate or the Trust Agreement, that no adequate remedy at law exists with respect to any breach of such

---

[4] [NTD: This proviso only to be included in Trust Agreements for Franklin Nuveen Trusts.]

A- 3

covenant and agreement, and that specific performance shall in all circumstances be available as a remedy for any breach of such covenant and agreement.

Distributions on this certificate will be made as provided in the Trust Agreement by the Trust Unit Paying Agent without the presentation or surrender of this certificate or the making of any notation hereon.

Reference is hereby made to the further provisions of this certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless this certificate has been executed by the manual or electronic signature of an authorized officer of the Trustee and the certificate of authentication hereon shall have been executed by an authorized officer of the Unit Registrar, or an authenticating agent by manual or electronic signature, this certificate shall not entitle the Holder hereof to any benefit under the Trust Agreement or be valid for any purpose.

THIS CERTIFICATE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAWS PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and not in its individual capacity, has caused this certificate to be duly executed.

[] ASSURED CUSTODIAL TRUST

By:  U.S. BANK TRUST COMPANY,
NATIONAL ASSOCIATION,
not in its individual capacity, but solely as Trustee

By:_____
    Authorized Signatory

Dated: _____

CERTIFICATE OF AUTHENTICATION

This is the Trust Unit certificate referred to in the within-mentioned Trust Agreement.

U.S. BANK TRUST COMPANY, NATIONAL
ASSOCIATION,
not in its individual capacity, but solely as Unit
Registrar

By:_____
    Authorized Signatory

Dated: _____

**[] ASSURED CUSTODIAL TRUST**

**REVERSE OF TRUST UNIT CERTIFICATE**

This certificate does not represent an obligation of, or an interest in, Assured, the Trustees, or any Affiliates of each of them and no recourse may be had against any such parties or their assets, except as expressly set forth or contemplated herein or in the Trust Agreement.  In addition, this certificate is not guaranteed by any governmental agency or instrumentality and is limited in right of payment to certain collections and recoveries with respect to the Trust Estate, all as more specifically set forth herein and under the Trust Agreement.  A copy of the Trust Agreement may be examined by any Holder upon written request during normal business hours at the principal office of the Trustee and at such other places, if any, designated by the Trustee.

The Trust Agreement (including the Standard Terms) may not be amended, waived or supplemented without the prior written consent of Assured.  The Trust Agreement (including the Standard Terms) may be amended, waived or supplemented from time to time by Assured and the Trustee without the consent of the Trust Unit Holders; provided, however, that no such amendment shall:

a) except as otherwise provided in the Trust Agreement (including the Standard Terms) reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Trust Unit Holder without the written consent of such Trust Unit Holder;

b) compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Assured Insurance Policy without the written consent of each Trust Unit Holder affected;

c) alter in any manner the calculation or treatment of the Compounded Amount without the written consent of each Trust Unit Holder affected;

d) amend Section 9.01 of the Standard Terms without the written consent of each Trust Unit Holder;

e) adversely affect in any other material respect the interests of the Trust Unit Holders in any manner other than as described in a), b), or c) without the written consent of the Trust Unit Holders evidencing at least a majority of the Trust Units (measured, in the case of Current Interest Bonds, by the outstanding principal amount, or, in the case of Capital Appreciation Bonds, the Compounded Amount, as the case may be, of the underlying Assured Legacy Bonds), excluding, from both the numerator and the denominator, any Trust Units held by Assured; *provided*, that only Trust Units that an Officer of the Trustee knows are so held shall be so disregarded; or

f) reduce the aforesaid percentage of Trust Units the Holders of which are required to consent to any such amendment, without the unanimous written consent of such Holders of all Trust Units then outstanding.

As provided in the Trust Agreement and subject to certain limitations therein set forth, including the limitations set forth in Article V of the Standard Terms, the transfer of this certificate is registrable in the Unit Register upon the surrendering of this certificate for registration of transfer at the offices or agencies of the Unit Registrar, accompanied by a written instrument of transfer in form satisfactory to the Unit Registrar duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon a new certificate will be issued to the designated transferee.  The initial Unit Registrar appointed under the Trust Agreement is the Trustee.

No service charge will be made for any such registration of transfer or exchange, but the Trustee or the Unit Registrar may require payment of a sum sufficient to cover any tax or governmental charge payable in connection therewith or any expense incurred thereby.

Prior to due presentation of a Trust Unit for registration or transfer, the Trustee, the Unit Registrar and any agent of any of them may treat the person in whose name any Trust Unit is registered as the owner of such Trust Unit for the purpose of receiving distributions, and neither the Trustee, the Unit Registrar nor any agent of any of them shall be affected by notice to the contrary.

The obligations and responsibilities created by the Trust Agreement and the Trust shall terminate upon the payment to the Holders of the Trust Units of all amounts required to be paid to them pursuant to the Trust Agreement, the disposition of all property held as part of the Trust Estate and payment of any costs, expenses and indemnities due and owing to the Trustees under the Trust Agreement or of any other costs or expenses as provided in the Trust Agreement.

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s) and assign(s) and transfer(s) unto

_____

_____

      (Please print or type name and address, including postal zip code, of assignee and social security number or employer identification number)

_____

the within certificate stating in the names of the undersigned in the Unit Register and does hereby irrevocably constitute and appoint

_____

to transfer such Certificate in such Unit Register of the Trust.

      I [we] further direct the Unit Registrar to issue a new certificate of like principal to the above-named assignee and deliver such certificate to the following address:

_____

_____

Dated:_____

                       _____
                       Signature by or on behalf of Assignor

_____

      Authorized Officer
                       _____
                       Signature Guaranteed

_____

      Name of Institution
                       NOTICE: The signature(s) of this assignment must correspond with the name(s) on the face of this certificate without alteration or any change whatsoever.  The signature must be guaranteed by a participant in the Securities Transfer Agents Medallion Program, the New York Stock Exchange Medallion Signature Program or the Stock Exchanges Medallion Program.  Notarized or witnessed signatures are not acceptable as guaranteed signatures.

## DISTRIBUTION INSTRUCTIONS

The assignee should include the following for the information of the Unit Registrar.

Distributions shall be made by wire transfer in immediately available funds to

_____

for the account  of

_____

account number _____ or, if mailed by check, to

_____

_____.

Applicable reports and statements should be mailed to

_____.

This information is provided by _____the

assignee named above, or _____ as its agent.

A- 9

**EXHIBIT B**

FORM OF CERTIFICATE OF TRUST OF
[] ASSURED CUSTODIAL TRUST


~~THIS~~This Certificate of Trust of [] Assured Custodial Trust (the "Trust"), is being duly executed and filed by ~~the undersigned, as trustees~~U.S. Bank Trust National Association, as Delaware Trustee and U.S. Bank Trust Company, National Association, as Trustee, to form a statutory trust under the Delaware Statutory Trust Act (12 ~~DEL. CODE, Sections~~ Del. Code, § 3801 et seq.) (the "Act").

1.    ~~NAME~~Name.    The name of the statutory trust formed hereby is "[] Assured Custodial Trust."

2.    ~~DELAWARE TRUSTEE~~Delaware Trustee.  The name and business address of a trustee of the Trust having its principal place of business in the State of Delaware are U.S. Bank Trust National Association, 1011 Centre Road, Suite 203, Wilmington, Delaware 19805.

3.    ~~EFFECTIVE DATE~~Effective Date.  This Certificate of Trust shall be effective upon filing.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

B- 1

IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

<div style="margin-left:40%">

U.S. BANK TRUST NATIONAL ASSOCIATION, not in its individual capacity but solely as Delaware Trustee


By:_____
Name:
Title:


U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, not in its individual capacity but solely as Trustee


By:_____
Name:
Title:

</div>

## **<u>EXHIBIT F</u>**

FGIC Trust Agreement

Draft 12.1.2022

_____

[_____] CUSTODIAL TRUST[1]


RELATED TO


SETTLEMENT OF PUERTO RICO
HIGHWAYS AND TRANSPORTATION
AUTHORITY


[_____] Puerto Rico Highways and Transportation Authority [INSERT BOND ISSUE] maturing [OLD BOND MATURITY DATE]

_____

This Agreement is


among


Puerto Rico Highways and
Transportation Authority,


Financial Guaranty Insurance Company,


U.S. Bank Trust Company, National
Association,
(as Trustee)


and


U.S. Bank Trust National Association,
(as Delaware Trustee)

_____

[1] Form of Custodial Trust to be formed for each CUSIP of FGIC Insured Bonds (HTA 98 Senior Bonds) under the Plan.

Draft 12.1.2022

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS; CONSTRUCTION .......................................................................... 1
    Section 1.1    Definitions ......................................................................................... 1
    Section 1.2    Rules of Construction ....................................................................... 7
    Section 1.3    Article and Section References ......................................................... 7

ARTICLE II TRUST ESTATE .................................................................................................... 8
    Section 2.1    Creation of Trust. .............................................................................. 8
    Section 2.2    Trust Assets. ...................................................................................... 8
    Section 2.3    Acceptance by Trustee. ..................................................................... 9
    Section 2.4    Purpose, Activities of the Trust....................................................... 10
    Section 2.5    Limitations of the Trust. .................................................................. 11

ARTICLE III ADMINISTRATION OF TRUST ....................................................................... 11
    Section 3.1    Accounts........................................................................................... 11
    Section 3.2    Investment of Funds in the Collection Accounts. ........................... 12
    Section 3.3    FGIC Insurance Policy and Effect of Distributions. ...................... 12
    Section 3.4    Distributions..................................................................................... 14
    Section 3.5    Threshold Event or Permitted Sale Event. ...................................... 15
    Section 3.6    Surrendered Units............................................................................. 15
    Section 3.7    FGIC Election to Accelerate Policy Payments. .............................. 16

ARTICLE IV REPORTING/REMITTING TO UNITHOLDERS............................................ 17
    Section 4.1    Statements to Unitholders and FGIC................................................ 17
    Section 4.2    Compliance with Withholding Requirements. ................................ 18

ARTICLE V THE UNITS .......................................................................................................... 18
    Section 5.1    The Units. ......................................................................................... 18
    Section 5.2    The Certificate; Book-Entry-only System....................................... 18
    Section 5.3    Mutilated, Destroyed, Lost and Stolen Certificate. ........................ 19
    Section 5.4    No Obligation to Register. ............................................................... 20
    Section 5.5    Persons Deemed Owners.................................................................. 20
    Section 5.6    Cancellation...................................................................................... 20

ARTICLE VI NEW HTA BONDS AND HTA Clawback CVIs ............................................. 21
    Section 6.1    Voting Rights with Respect to New HTA Bonds and HTA
                     Clawback CVIs. ............................................................................... 21

ARTICLE VII CONCERNING THE TRUSTEE.................................................................... 21
    Section 7.1    Duties of Trustee. ............................................................................. 21
    Section 7.2    Certain Matters Affecting the Trustee. .......................................... 22
    Section 7.3    Trustee Not Liable for Units or New HTA Bonds, HTA Clawback
                      CVIs, the Covered FGIC Insured Bonds or the Covered FGIC
                      Insurance Policy. ............................................................................ 24
    Section 7.4    Trustee May Own Units. ................................................................. 25
    Section 7.5    Trustee Costs and Expenses. .......................................................... 25
    Section 7.6    Eligibility Requirements for Trustee and Successor Trustee. .................. 26
    Section 7.7    Resignation and Removal of the Trustee. ....................................... 26
    Section 7.8    Successor Trustee. .......................................................................... 27
    Section 7.9    Merger or Consolidation of Trustees. ............................................ 28
    Section 7.10   Appointment of Trustee Custodians. .............................................. 28
    Section 7.11   Trustee May Enforce Claims Without Possession of Certificate. ............. 28
    Section 7.12   Trustee Indemnity. ......................................................................... 29
    Section 7.13   Acceptance by Trustees, Representations and Warranties of Trustees. ..... 29
    Section 7.14   The Delaware Trustee. ................................................................... 30

ARTICLE VIII DEFAULT ON NEW HTA BONDS OR HTA Clawback CVIs ...................... 32
    Section 8.1    Realization Upon Default. .............................................................. 32

ARTICLE IX TERMINATION OF TRUST ........................................................................ 32
    Section 9.1    Termination; No Redemption Rights. ............................................ 32
    Section 9.2    Procedure for Termination. ............................................................ 33

ARTICLE X TAX PROVISIONS ....................................................................................... 33
    Section 10.1   Grantor Trust Provisions. .............................................................. 33
    Section 10.2   Characterization. ............................................................................ 34
    Section 10.3   Grantor Trust Administration. ........................................................ 34
    Section 10.4   Reports to Unitholders and Tax Authorities. ................................. 35

ARTICLE XI MISCELLANEOUS PROVISIONS ............................................................... 36
    Section 11.1   Amendment of Trust Agreement. ................................................... 36
    Section 11.2   Counterparts. .................................................................................. 37
    Section 11.3   Limitation on Rights of Unitholders. ............................................. 37
    Section 11.4   Notices. .......................................................................................... 38
    Section 11.5   Severability of Provisions. ............................................................. 38
    Section 11.6   Acts of Unitholders. ...................................................................... 38
    Section 11.7   Headings. ....................................................................................... 39

Section 11.8   No Waiver; Cumulative Remedies.............................................................. 39

Section 11.9   Merger and Integration........................................................................... 39

Section 11.10  [Reserved]............................................................................................... 39

Section 11.11  Patriot Act............................................................................................... 39

Section 11.12  Governing Law; Venue Jury Waiver. ....................................................... 39

Section 11.13  Force Majeure. ......................................................................................... 40

Section 11.14  Intent of Parties. ..................................................................................... 40

Section 11.15  Non-Petition. ........................................................................................... 43

Section 11.16  Certain Terms Regarding HTA................................................................. 43

Section 11.17  Certain Terms Regarding FGIC. .............................................................. 44


**EXHIBITS**

Exhibit A - Trust Assets................................................................................................. A-1
Exhibit B - Form of Notice to Unitholder and FGIC ......................................................B-1
Exhibit C - Form of Certificate .....................................................................................C-1
Exhibit D - Form of Certificate of Trust ....................................................................... D-1
Exhibit E-1 - Form of Notice Relating to Permitted Sale Event.................................... E-1-1
Exhibit E-2 - Form of Notice and Instruction Relating to Threshold Event................... E-2-1
Exhibit E-3 - Form of Instruction Relating to Permitted Sale Event ............................. E-3-1
Exhibit F - Form of Trustee's Certification of Receipt of Certain Trust Assets ............. F-1
Exhibit G - Form of Assignment .................................................................................... G-1

**SCHEDULES**

Schedule I - Threshold Prices ........................................................................................ S-I-1
Schedule II - Trustees Fee Schedule .............................................................................. S-II-1

**[_____] CUSTODIAL TRUST**

**TRUST AGREEMENT**

**THIS TRUST AGREEMENT**, dated as of December 6, 2022 (this "Trust Agreement" or this "Agreement"), with respect to the [_____] Custodial Trust (the "Trust"), by and among the Puerto Rico Highways and Transportation Authority ("HTA"), Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, collectively the "Trustees", and with HTA and FGIC, collectively, the "Parties").

**WHEREAS,** in furtherance of the structure approved in HTA's Plan of Adjustment and in order to facilitate the implementation thereof, the Trust is being established by HTA and the Trustees solely for the benefit of and on behalf of the Unitholders and FGIC;

**WHEREAS**, except for the establishment of the Trust and the deposits therein pursuant to the Plan of Adjustment or as contemplated hereby, HTA shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof; and

**WHEREAS**, the Trust is one of the FGIC Trusts contemplated by Section 26.3(a) of the Plan of Adjustment and is being formed for the purposes of (i) holding the Covered FGIC Insured Bonds, (ii) receiving FGIC Plan Consideration allocable or distributable in accordance with Section 12.1 of the Plan to the Original Holders, each component of which is identified on Exhibit A hereto (collectively, the "Allocable Plan Consideration"), (iii) being the sole holder and beneficiary of the Covered FGIC Insurance Policy, and (iv) issuing a single class of beneficial ownership interests consisting of trust units that shall be assigned a CUSIP number, be issued in global form and be registered in the name (or nominee name) of and transferable through the Depositary.

**NOW THEREFORE**, in consideration of the mutual promises, covenants, representations and warranties made in this Trust Agreement, the Parties hereby agree as follows;

**ARTICLE I**

**DEFINITIONS; CONSTRUCTION**

Section 1.1    Definitions

(a)    Capitalized terms used in this Trust Agreement (including the recitals hereto), and not otherwise defined in this Trust Agreement, shall have the respective meanings assigned to such terms in the Plan.

(b)    Except as otherwise specified herein or as the context may otherwise require, the followingterms have the respective meanings set forth below:

1

"Affiliate": With respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control", when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Business Day": Any day excluding Saturday, Sunday and any day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in San Juan, Puerto Rico or New York, New York are authorized or required by law or other governmental action to close.

"Cash Acceleration Payment": The meaning specified in Section 3.7.

"Cash Payment": The meaning specified in Section 3.3(b).

"Certificate": A definitive certificate substantially in the form attached as Exhibit C evidencing the Units and issued by the Trust pursuant to Article V hereof.

"Certificate of Trust":  The Certificate of Trust of the Trust substantially in the form attached as Exhibit D hereto.

"Closing Date":  December 6, 2022.

"Code": The Internal Revenue Code of 1986, as amended, and Treasury Regulations promulgated thereunder.

"Corporate Trust Office": The Trustees' offices at 100 Wall Street, 6th floor, New York, NY 10005, or such other addresses as either of the Trustees' may designate from time to time by notice to the Unitholders  FGIC and the other Trustee.

"Covered FGIC Insured Bonds": The FGIC Insured Bonds held or beneficially owned by the Original Holders in the aggregate principal amount specified on Exhibit A, which are deposited into the Trust on the Closing Date and thereafter held by the Trust (as such bonds may be deemed to be paid, reduced or satisfied in accordance with the terms of this Trust Agreement or the FGIC Insurance Policy).

"Covered FGIC Insurance Policy": The FGIC Insurance Policy solely insofar as it applies and relates to the Covered FGIC Insured Bonds, including, for the avoidance of doubt, all rights relating to payments (if any) required to be made by FGIC in respect of any DPO and DPO Accretion associated with such Covered FGIC Insured Bonds under such FGIC Insurance Policy in accordance with the terms and conditions of the FGIC Rehabilitation Plan.  For the avoidance of doubt, (i) all FGIC Insured Bonds other than the Covered FGIC Insured Bonds shall be deemed no longer covered by the FGIC Insurance Policy as of the Closing Date for all purposes, and (ii) neither the Trust nor the Trustee shall have any rights under the FGIC Insurance Policy except in respect of the Covered FGIC Insured Bonds.

2

"Delaware Trustee": The meaning specified in the preamble hereto and any successor Delaware Trustee appointed in accordance with Section 11.10.

"Delaware Trust Statute": Chapter 38 of Title 12 of the Delaware Code.

"Depositary": DTC or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder.

"Dollar" or "$": Such currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

"DPO": The meaning specified in the FGIC Rehabilitation Plan.

"DPO Accretion": The meaning specified in the FGIC Rehabilitation Plan.

"DTC": The Depository Trust Company, a limited purpose trust company organized under the laws of the State of New York, its successors and assigns.

"Eligible Account": A non-interest bearing account, held in the United States in the name of the Trust for the benefit of the Unitholders and FGIC, which is a segregated account maintained with either (1) a Federal or State chartered depository institution that has (x) a short-term deposit or unsecured debt rating of at least "A-1" and "P-1" by S&P and Moody's respectively, (y) a long-term deposit rating (or, if a deposit rating is unavailable, senior unsecured debt rating) of at least "A" and "A2" by S&P and Moody's, respectively and (z) a combined capital and surplus of at least U.S.$200,000,000 or (2) the corporate trust department of such a Federal or State-chartered deposit institution.

"EMMA": The Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board, or, if not available for the purposes provided herein, a website specified by the Trustee. Any obligation to post a document to EMMA shall be understood as an obligation to post such document under the CUSIP number for the Units.

"Escrow Account": The escrow account established by the Escrow Account Agreement.

"Escrow Account Agreement": The Escrow Account Agreement FGIC CW/HTA Bond Claims Arising From HTA 98 Senior Bonds dated March 15, 2022 among the Commonwealth, FGIC, as the bond insurer and FGIC, as the escrow agent.

"Executive Officer": With respect to any corporation, the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, any Vice President, the Secretary, any Assistant Secretary, the Treasurer or any Assistant Treasurer of such corporation and with respect to any partnership, any general partner thereof and, as applicable, an authorized signatory.

"Fair Market Value" means, in respect of any New HTA Bond or HTA Clawback CVI as of any date of determination, the lower of (i) the price for such New HTA Bond or HTA Clawback CVI, as applicable, as quoted by Bloomberg L.P. for any trade with total proceeds of at least $1 million as of the close of business on the prior Business Day, if Bloomberg L.P. has quoted a price

for such New HTA Bond or HTA Clawback CVI, as applicable, as of such Business Day, and (ii) the fair market price for such New HTA Bond or HTA Clawback CVI, as applicable, including accrued and unpaid interest (if applicable), determined by soliciting bids from at least two broker-dealers of national standing, each of which is independent of each other and unaffiliated with the Trustee, and shall be the average of such bids, provided that, for the avoidance of doubt, there shall be no requirement to solicit such bids, in which case only clause (i) shall apply.

"Fee Reserve": Funds held from time to time by the Trustee in the General Collection Account, in an amount up to the Fee Reserve Threshold Amount, to cover payments of Trustee Costs as they arise from time to time.

"Fee Reserve Threshold Amount": The fee reserve threshold amount set forth in the Trustee Fee Schedule.

"FGIC Insurance Policy": The existing insurance policy issued by FGIC with respect to the FGIC Insured Bonds, which is listed on Exhibit A hereto, as modified by the FGIC Rehabilitation Plan and this Trust Agreement.

"FGIC Insurance Policy Collection Account": The meaning specified in Section 3.1(a).

"FGIC Insured Bonds": The bonds previously issued by HTA, which are described and the CUSIP number for which is identified on Exhibit A hereto.

"FGIC Rehabilitation Plan": The First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013, together with all exhibits thereto and the documents contained in the plan supplement thereto, in each case as the same may be amended, revised, supplemented or otherwise modified from time to time.

"General Collection Account": The meaning specified in Section 3.1(a).

"HTA Clawback CVI Distribution Date": With respect to each series of HTA Clawback CVIs, each date specified in the Clawback CVI Indenture or CVI Legislation on which distributions of amounts due on such securities are scheduled to be paid, subject to any business day adjustments and conventions specified therein.

"Moody's": Moody's Investors Service, Inc.

"New HTA Bond Distribution Date": With respect to each series of New HTA Bonds, each date specified in the applicable New HTA Bonds Indenture on which distributions of principal or interest on such bonds are scheduled to be paid, subject to any business day adjustments and conventions specified therein.

"Notional Amount": With respect to the Units as of any date of determination, the amount of Trust Units issued as provided in this Trust Agreement on the Closing Date, excluding any Units that may have been surrendered or canceled or otherwise are no longer outstanding on or prior to such date.

"Officer's Certificate": A certificate signed by an Executive Officer of the applicable Person and delivered to the Trustee.

"Opinion of Counsel": A written opinion of counsel, who may be counsel to FGIC.

"Original Holder": Each holder of an Allowed FGIC Insured Bond Claim on the Closing Date arising from FGIC Insured Bonds (other than FGIC), as provided in Section 26.3(a) of the Plan.

"Other Trust Costs": Any filing fees or other costs or expenses of the Trust that have not been paid by either of the Trustees or the Trust at the time of any election by FGIC under Section 7.5(c).

"Permitted Sale Event": With respect to any series of New HTA Bonds or the HTA Clawback CVIs, the satisfaction of all of the following requirements:

(i)      FGIC is not in default under the Covered FGIC Insurance Policy;

(ii)     FGIC shall have notified the Trustee, by delivering a notice substantially in the form of Exhibit E-1 attached hereto, of its intention to instruct the Trustee to sell some or all of (A) such series of New HTA Bonds, or (B) the HTA Clawback CVIs and setting forth the Permitted Sale Price for such New HTA Bonds or such HTA Clawback CVIs, as applicable.

(iii)    The Trustee shall have provided notice to Unitholders in accordance with the notice requirements set forth in Section 11.4 hereof (a) notifying Unitholders of the notice of FGIC described in clause (ii) above and the Permitted Sale Price set forth in such notice and (b) requesting that any Unitholders objecting to such proposed sale provide written notice of such objection to the Trustee; and

(iv)     The Trustee shall not have received a written objection from the Requisite Unitholders (determined as of the date of the notice described in clause (ii) above) with respect to such proposed sale within seven (7) Business Days of the date the notice provided in clause (iii) above is provided.

"Permitted Sale Price": With respect to any Permitted Sale Event regarding some or all of any series of New HTA Bonds or the HTA Clawback CVIs, the price equal to the percentage of the par amount of such New HTA Bonds or of the outstanding notional amount of such HTA Clawback CVIs set forth in the related notice delivered by FGIC to the Trustee.

"Person": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"Plan of Adjustment" or "Plan": The *Title III Plan of Adjustment of the Puerto Rico Transportation Authority,* Case No. 17 BK 3567-LTS, confirmed by order entered October 12, 2022, as amended, modified or supplemented from time to time.

"pro rata": With respect to any payment or distribution, or any allocation of any cost or expense, to Unitholders hereunder, pro rata shall be calculated based on the Notional Amount of the Units then outstanding.

"Proof of Policy Claim Form": The Proof of Policy Claim Form required to be filed in order to submit a policy claim to FGIC in accordance with the FGIC Rehabilitation Plan.

"Record Date":  With respect to any distribution to be made to Unitholders: (i) based on the Cash to be deposited into the Trust on the Closing Date, the Closing Date, (ii) based on any scheduled payment of principal or interest in respect of any series of New HTA Bonds, the tenth day preceding the related New HTA Bond Distribution Date, (iii) based on any scheduled payment of any amount due in respect of HTA Clawback CVIs, the tenth day preceding the related HTA Clawback CVI Distribution Date, and (iv) based on any other funds deposited or to be deposited in the General Collection Account or any payment made or to be made under or with respect to the Covered FGIC Insurance Policy, the Record Date established by the Trustee pursuant to Section 3.4(b), provided that if such tenth day under clause (ii) or (iii) above is not a Business Day, the Record Date shall be the preceding Business Day.

"Requisite Unitholders":  As of any date, Unitholders holding more than fifty (50) percent of the Notional Amount of the Trust Units as of such date, excluding from both the numerator and the denominator the Notional Amount of any Trust Units held by FGIC.

"Secretary of State": The meaning specified in Section 2.1.

"State": Any one of the 50 states of the United States, the District of Columbia or its territories.

"S&P": S&P Global Ratings.

"Threshold Price": With respect to the New HTA CIBs, the New HTA Convertible CABs, the New HTA CABs and the HTA Clawback CVIs, the respective prices set forth on Schedule I.

"Threshold Event": With respect to any series of New HTA Bonds or the HTA Clawback CVIs, the receipt by the Trustee of a notice by FGIC that the current market price of such series of New HTA Bonds or the HTA Clawback CVIs exceeds the Threshold Price for such series of New HTA Bonds or the HTA Clawback CVIs, coupled with a written instruction from FGIC to sell some or all of such series of New HTA Bonds or the HTA Clawback CVIs, such notice and instruction to be substantially in the form of Exhibit E-2 attached hereto.

"Trust": The trust created by this Trust Agreement as specified in the preamble hereto.

"Trust Agreement": The meaning specified in the preamble hereto.

"Trust Assets" or "Trust Estate": The property, assets and rights set forth in clauses (a), (b) and (c) of Section 2.2, and any other  securities, monies, proceeds or property received on account thereof or exchanged therefor from time to time, as  well as any other rights, benefits, protections, remedies and claims pertaining thereto.

"Trustee": The meaning specified in the preamble hereto and any successor Trustee appointed pursuant to Section 7.6 or Section 7.8.

"Trustee Costs": The meaning specified in Section 7.5(a).

"Trustee Fee Schedule": The Schedule II to this Trust Agreement.

"Trustees": Collectively, the Trustee and the Delaware Trustee.

"United States": The United States of America (including the States and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction.

"Unitholder": The Person in whose name a Unit is registered in the records of the Depositary on any date of determination.

"Units" or "Trust Units": The single class of beneficial ownership interests in the Trust evidenced by the Certificate.

"U.S.A. PATRIOT Act": The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107 56 (signed into law October 26, 2001) and its implementing regulations.

Section 1.2    Rules of Construction

Unless the context otherwise requires:

(i)    a term has the meaning assigned to it;

(ii)    an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect in the United States from time to time;

(iii)    "or" is not exclusive;

(iv)    the words "herein", "hereof", "hereunder" and other words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or other subdivision;

(v)    the words "include" and "including" shall be deemed to be followed by the phrase "without limitation"; and

(vi)    the meanings given to defined terms are applicable to the singular and plural forms thereof as appropriate.

Section 1.3    Article and Section References

All Article and Section references used in this Trust Agreement, unless otherwise provided, are to Articles and Sections in this Trust Agreement. Any reference to "this Article" appearing within a particular Section of an Article is a reference to such Article as a whole. Any reference to "this

Section" appearingwithin a particular paragraph of a Section is a reference to such Section as a whole.

## ARTICLE II

## TRUST ESTATE

Section 2.1    Creation of Trust.

The Trust is being created on the date hereof pursuant to the execution of this Agreement and the filing by the Trustees of the Certificate of Trust with the Office of the Secretary of State of the State of Delaware (the "Secretary of State"), under the name written above the heading of this Trust Agreement, in which name the Trust shall have power and authority and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the activities of the Trust. It is the intention of the Parties that the Trust hereby created constitutes a statutory trust under the Delaware Trust Statute and that this Trust Agreement constitutes the governing instrument of the Trust. The Trustees are hereby authorized and directed to, and shall, on the date hereof file the Certificate of Trust with the Secretary of State. The Trustee shall have power and authority, and is hereby authorized and empowered, to take all actions on behalf of the Trust as set forth in this Trust Agreement and each of the Trustees is authorized and empowered to execute and file with the Secretary of State any other certificate required or permitted under the Delaware Trust Statute to be filed with the Secretary of State. The office of the Trust shall be in the care of the Trustee at the Corporate Trust Office or at such other address as the Trustee may designate by written notice to the Unitholders and FGIC.

Section 2.2    Trust Assets.

Pursuant to and in accordance with this Trust Agreement and the Plan, on the Closing Date:

(a)    (i) HTA shall, on behalf of the Original Holders and as required by Section 26.3(a) of the Plan, deposit into the Trust (y) the Allocable Plan Consideration comprising Cash and New HTA Bonds as specified on Exhibit A hereto; and (z) any and all agreements, documents and instruments relating to the Covered FGIC Insurance Policy; and (ii) FGIC shall, in connection with the Escrow Account Agreement, deposit into the Trust the HTA Clawback CVIs specified on Exhibit A hereto, which also comprise the Allocable Plan Consideration, and were deposited into the Escrow Account by the Commonwealth upon the satisfaction of the HTA Distribution Conditions pursuant to the Escrow Account Agreement, provided, however, that if any of such HTA Clawback CVIs were sold by FGIC in accordance with the Escrow Account Agreement prior to the Closing Date, then FGIC shall instead deposit the aggregate proceeds of such sale(s) together with the remaining HTA Clawback CVIs, in each case as specified on Exhibit A hereto, into the Trust in accordance with the Escrow Account Agreement.

(b)    All Covered FGIC Insured Bonds shall be deposited, or be deemed to have been deposited, into the Trust by the Depositary on behalf of the Original Holders and as required by Section 26.3(a) of the Plan.  All rights and remedies under or with respect to the Covered FGIC Insured Bonds and the applicable related legislative bond resolutions (other than with respect to

the payment obligations of HTA) and the Covered FGIC Insurance Policy (including the rights with respect to any related DPO and DPO Accretion under the FGIC Rehabilitation Plan) shall be preserved and remain in full force and effect solely to the extent necessary to preserve any claims relating the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy; and

(c)    Each holder/beneficiary of the Covered FGIC Insurance Policy shall, on behalf of the Original Holders and as required by Section 26.3(a) of the Plan, deposit, or be deemed to have deposited, into the Trust the Covered FGIC Insurance Policy and relinquished all rights thereunder to the Trustee, on the Closing Date and thereafter.

Section 2.3    <u>Acceptance by Trustee.</u>

(a)    By its execution of this Trust Agreement, the Trustee acknowledges and declares that it will hold or has agreed to hold all Trust Assets, including all documents or instruments delivered to it or received by it from time to time with respect to the Trust Assets, in each case in trust for the exclusive use and benefit of all present and future Unitholders. The Trustee represents and warrants that, except as expressly permitted by this Trust Agreement, (i) it has not and will not, in any capacity, assert any claim or interest in the Trust Estate and will hold (or its agent will hold) such Trust Estate and the proceeds thereof in trust pursuant to the terms of this Trust Agreement, and (ii) it has not encumbered or transferred its right, title or interest in the Trust Estate.

(b)    The Trustee shall, on the Closing Date, deliver to the Unitholders and FGIC in accordance with the Notice provisions of Section 11.4 a certification substantially in the form of Exhibit F hereto that it (i) is in possession of Allocable Plan Consideration comprising cash in the amount specified on Exhibit A hereto, (ii) either (x) confirms that the New HTA Bonds and the HTA Clawback CVIs have been deposited to and are being held in the participant account of U.S. Bank Trust Company, National Association at the Depositary for the benefit of the Unitholders and FGIC or (y) has received written statements from the trustees with respect to the New HTA Bonds and the HTA Clawback CVIs, respectively, confirming that the New HTA Bonds and the HTA Clawback CVIs are beneficially owned by the Trust for the benefit of the Unitholders and FGIC and being held by such trustees for the benefit of the Trust until the deposit of the New HTA Bonds and the HTA Clawback CVIs to such account, and (iii) confirms that the Trust Units have been issued to the Original Holders.

(c)    The Trustee shall, on the Closing Date, (i) take such reasonable action as shall be necessary to facilitate or permit the deposit of the New HTA Bonds and the HTA Clawback CVIs to the participant account of U.S. Bank Trust Company, National Association at the Depositary for the benefit of the Unitholders and FGIC, and (ii) assuming that such New HTA Bonds and HTA Clawback CVIs have been so deposited, no later than the Business Day following such action, confirm to the Unitholders and FGIC in writing (to the extent not covered in the certification delivered pursuant to Section 2.3(b) above) that the New HTA Bonds and the HTA Clawback CVIs have been deposited to and are being held in such account.

(d)    Except as specifically provided herein, the Trustee shall not sell, pledge or assign any interest in the Trust Estate.

Section 2.4     Purpose, Activities of the Trust.

It is the intention of the Parties that the Trust shall not engage in any business or activities other than certain non-business activities in connection with, or relating to, the following:

(a)     accept the conveyance, assignment and transfer of the Trust Assets pursuant to the Plan or as contemplated by this Trust Agreement;

(b)     create one or more accounts or sub-accounts in accordance with the terms of this Trust Agreement;

(c)     make claims and assignments and receive payments under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and this Trust Agreement;

(d)     receive payments pursuant to the Plan;

(e)     issue the Trust Units to the Original Holders through the issuance of the corresponding Certificate to the Depositary or its nominee in accordance with the terms of this Trust Agreement and take such reasonable action as shall be necessary to facilitate or permit the deposit of the New HTA Bonds and the HTA Clawback CVIs to the participant account of U.S. Bank Trust Company, National Association at the Depositary for the benefit of the Unitholders and FGIC;

(f)     make distributions to the Depositary and Unitholders in accordance with the terms of this Trust Agreement;

(g)     coordinate Unitholder communications through the Depositary;

(h)     follow, accept or act upon any instruction or direction from FGIC or the Requisite Unitholders, as applicable, in each case only as expressly permitted herein;

(i)     hold the Trust Assets;

(j)     sell or assign New HTA Bonds and HTA Clawback CVIs or portions thereof only as expressly provided in Section 3.5 or 3.6 hereof;

(k)     effectuate Unitholder Elections as provided in Section 3.6 hereof;

(l)     make public disclosures on EMMA as contemplated by this Trust Agreement;

(m)     make payments, reimbursements and distributions as contemplated by this Trust Agreement;

(n)     otherwise perform its obligations in accordance with, and take such other actions as are expressly provided for or permitted under, the terms of this Trust Agreement; and

(o)      engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

Section 2.5      Limitations of the Trust.

(a)      Except as otherwise provided herein, the affairs of the Trust will be managed by or under the direction of the Trustee. Neither HTA or FGIC nor any of their respective Affiliates will have authority to act for, or to assume any obligation or responsibility on behalf of, the Trust or the Trustee in its capacity as Trustee;

(b)      The Trust will keep correct and complete books and records of accounts and minutes of the meetings and other proceedings of the Trust. Any such resolutions, agreements and other instruments will be continuously maintained by the Trustee as official records of the Trust;

(c)      The Trust will provide for its own operating expenses and liabilities from the Trust Assets. General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to HTA or FGIC or their respective Affiliates;

(d)      All oral and written communications, including letters, invoices, contracts, statements and applications, will be made solely in the name of the Trust if related to the Trust;

(e)      There will be no guarantees made by the Trust with respect to obligations of HTA or FGIC or their respective Affiliates. There will not be any indebtedness relating to borrowings or loans between the Trust and HTA or FGIC or their respective Affiliates; provided that FGIC or its Affiliates may own Trust Units;

(f)      The Trust will act solely in its own name or the Trustee's on its behalf and through its or the Trustee's duly authorized officers or agents in the conduct of its activities. The Trust will not: (i) operate or purport to operate as an integrated, single economic unit with respect to HTA or FGIC or any other affiliated or unaffiliated entity; (ii) seek or obtain credit or incur any obligation to any third party based upon the assets of HTA or FGIC or their respective Affiliates; or (iii) induce any third party to reasonably rely on the creditworthiness of HTA or FGIC or any other affiliated or unaffiliated entity in its dealings with the Trust;

(g)      The Trust will maintain a Delaware Trustee with its office in the State of Delaware; and

(h)      The Trust will not engage in any transaction with an Affiliate on any terms other than would be obtained in an arm's-length transaction with a non-Affiliate.

## ARTICLE III

## ADMINISTRATION OF TRUST

Section 3.1      Accounts.

(a)      The Trustee has established and will maintain Eligible Accounts (i) to hold all amounts received on or in respect of the Trust Assets except the Covered FGIC Insurance Policy

11

(the "General Collection Account") and (ii) to hold all amounts received on account of the Covered FGIC Insurance Policy (including, any amounts received on account of DPO or DPO Accretion) (the "FGIC Insurance Policy Collection Account"), each held in trust for the benefit of the Unitholders and FGIC. The Trustee shall deposit all cash received pursuant to clause (a) of Section 2.2 into the General Collection Account on the Closing Date. U.S. Bank Trust Company, National Association has established and will maintain its participant account at the Depositary into which the New HTA Bonds and HTA Clawback CVIs received pursuant to clause (a) of Section 2.2 shall be deposited and held in trust for the benefit of the Unitholders and FGIC. Each of the General Collection Account and the FGIC Insurance Policy Collection Account and such other accounts shall be under the sole dominion and control of the Trustee, and the Trustee shall be entitled to look solely to the General Collection Account for payment of any Trustee Costs and funding of the Fee Reserve from time to time in accordance with the terms of this Trust Agreement.  All distributions to Unitholders shall be made only from cash on deposit in either the General Collection Account or the FGIC Insurance Policy Collection Account in accordance with the terms hereof.

(b)     If, at any time, a formerly Eligible Account no longer fulfills the definition of Eligible Account, the Trustee shall within thirty (30) days establish a new General Collection Account or FGIC Insurance Policy Collection Account, as applicable, meeting the conditions specified in such definition and transfer any cash on deposit in the General Collection Account or FGIC Insurance Policy Collection Account to such new General Collection Account or FGIC Insurance Policy Collection Account, and from the date such new General Collection Account or FGIC Insurance Policy Collection Account is established, it shall be the General Collection Account or FGIC Insurance Policy Collection Account under this Trust Agreement.

(c)     The Trustee shall give notice to FGIC and Unitholders of the location of each Eligible Account and other account and to the proposed new location of any Eligible Account or other account prior to any change thereof.

Section 3.2     Investment of Funds in the Collection Accounts.

Amounts in the General Collection Account and the FGIC Insurance Policy Collection Account shall not be invested.

Section 3.3     FGIC Insurance Policy and Effect of Distributions.

(a)     The Trust is deemed to hold the Covered FGIC Insured Bonds and is the sole Person entitled under the terms of the Covered FGIC Insured Bonds to payment thereof. Accordingly, the Trust is and shall be the sole "Bondholder" entitled to assert claims and receive payments under or with respect to the Covered FGIC Insurance Policy.

(b)     The Trustee shall have the sole authority to assert, and shall assert, subject to its rights and protections herein, claims under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and to take all actions required to enforce the Covered FGIC Insurance Policy, including in the event that FGIC fails to make any payment when due under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy. The Trustee shall be authorized to take, and shall take, subject to its rights and protections herein, all actions it

deems necessary or advisable to satisfy any and all conditions to the obligations to make payment of any claim asserted by the Trustee under the Covered FGIC Insurance Policy or any payment in respect of any DPO or DPO Accretion related to the Covered FGIC Insurance Policy which may become payable in accordance with the FGIC Rehabilitation Plan. The following are conditions to FGIC's obligation to make any such payment, and the Trustee is authorized and directed to satisfy such conditions: (i) the Trustee shall have submitted to FGIC with respect to each claim a fully completed and duly executed Proof of Policy Claim Form in accordance with the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan, and (ii) with respect to each such payment (other than on account of DPO Accretion) relating or with respect to the principal of the Covered FGIC Insured Bonds, which is paid or deemed to be paid by FGIC in cash (each a "Cash Payment"), the Trustee shall have executed and delivered on behalf of the Trust to FGIC (or its fiscal agent) assignments in substantially the form of Exhibit G with respect to a proportionate share (based on the proportion of such Cash Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust) of the Trust Assets held by the Trust, as confirmed by FGIC, and taken such actions as shall be necessary to transfer such Trust Assets to the account of FGIC or its custodian, in either case as directed by FGIC in writing, and receipt of such Trust Assets shall have been confirmed by FGIC.

(c)     All claims that are properly submitted to FGIC by the Trustee under the Covered FGIC Insurance Policy shall be paid to the extent permitted by FGIC under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan, subject to satisfaction of any conditions to such payments, including the conditions set forth in this Trust Agreement. All payments to the Trustee under or with respect to the Covered FGIC Insurance Policy shall be deposited into the FGIC Insurance Policy Collection Account on the date received if received prior to 11:00 a.m. New York time, on any Business Day or, if received after such time on any Business Day, on the following Business Day.  In the event that FGIC has defaulted in its payment obligations under the Covered FGIC Insurance Policy, the Requisite Unitholders shall have the right to direct the Trustee in writing to take, and the Trustee is authorized to take, and shall take, subject to its rights and protections herein,  any and all actions necessary or desirable to enforce and recover such payment obligations.

(d)     Each distribution of cash to the Unitholders from the General Collection Account shall automatically and immediately reduce on a dollar-for-dollar basis the outstanding principal amount of the Covered FGIC Insured Bonds and shall automatically and immediately result in a corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy.  All payments from the FGIC Insurance Policy Collection Account under or with respect to the Covered FGIC Insurance Policy arising from or related to principal of or interest on the Covered FGIC Insured Bonds (other than on account of DPO Accretion) shall be deemed to automatically and immediately reduce on a dollar-for-dollar basis the outstanding principal amount of or the accrued and unpaid interest on the Covered FGIC Insured Bonds, respectively. For the avoidance of doubt, all payments on account of a claim for accrued and unpaid interest due shall reduce on a dollar-for-dollar basis the outstanding interest amount of the Covered FGIC Insured Bonds, and all payments of a claim for principal shall reduce on a dollar-for-dollar basis the outstanding principal amount of the Covered FGIC Insured Bonds.

(e)     If at any time the principal amount of the Covered FGIC Insured Bonds shall be reduced to zero, then thereafter each distribution of cash to the Unitholders under this

Trust Agreement (other than distributions from the FGIC Insurance Policy Collection Account on account of payments made by FGIC under or with respect to the Covered FGIC Insurance Policy) shall automatically and immediately reduce on a dollar-for-dollar basis the accrued and unpaid interest, if any, due on the Covered FGIC Insured Bonds and shall automatically and immediately result in a corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy. If at any time the principal amount of and the accrued and unpaid interest on the Covered FGIC Insured Bonds and the DPO Accretion balance under the Covered FGIC Insurance Policy shall be reduced to zero, then (i) the Covered FGIC Insurance Policy shall be indefeasibly canceled, (ii) within three (3) Business Days thereafter, the Trustee shall (x) first, assign to FGIC ownership of the Trust Assets held by the Trust at that time to the extent required to reimburse FGIC for any unreimbursed payments previously made under the Covered FGIC Insurance Policy and (y) second, distribute to the Unitholders any remaining Trust Assets, and (iii) upon making such assignment and distributions (if any), the Units shall be deemed to be redeemed in full and the Trust shall terminate in accordance with the provisions of Article IX hereof.

(f)     Each of FGIC and each Unitholder shall have and retain all rights set forth in the Plan applicable to it, including those set forth in Section 26.3 of the Plan.

(g)     In addition to any other rights FGIC may have hereunder or otherwise, due to the subrogation rights under the Covered FGIC Insurance Policy, upon making each Cash Payment or Cash Acceleration Payment to the Trust, FGIC shall automatically become the owner of a proportionate share (as described in Section 3.3(b)) of the Trust Assets held by the Trust and shall be fully subrogated to all of the Trust's rights therein, including any payments on or in respect thereof.

Section 3.4     <u>Distributions.</u>

(a)     All cash received by the Trust or the Trustee from any source shall be applied and distributed in accordance with the terms of this Trust Agreement. Within two (2) Business Days of the Trust's receipt of (i) the Cash to be deposited into the Trust pursuant to clause (a) of Section 2.2 on the Closing Date, (ii) any scheduled payment of principal or interest in respect of any series of the New HTA Bonds, or (iii) any scheduled payment due on the HTA Clawback CVIs, the Trustee shall distribute such amounts, net of any outstanding Trustee Costs that are due and payable or to be reimbursed to the Trustees as of the related distribution date, Other Trust Costs to be reimbursed under Section 7.5(c) and amounts necessary to fund the Fee Reserve to the Fee Reserve Threshold Amount, to the Depositary for distribution on a pro rata "pass-through" basis to each Unitholder as of the related Record Date. The Trustee shall pay or reimburse such Trustee Costs, reimburse such Other Trust Costs and fund the Fee Reserve at the time of such distribution.

(b)     The Trustee shall establish the Record Date for the distribution of (i) any other funds deposited or to be deposited in the General Collection Account or (ii) any payment made or to be made under or with respect to the Covered FGIC Insurance Policy, and the Trustee shall send notice to the Unitholders of such Record Date and the related anticipated distribution date of such amounts, in accordance with Section 11.4, in each case not later than two (2) Business Days after the Trust's receipt of such funds or payments.  Such Record Date shall be at least 10 days and no more than 15 days after the date such notice is posted on EMMA.  On such distribution

14

date, the Trustee shall distribute such amounts, in the case of clause (i) net of any outstanding Trustee Costs that are due and payable as of such distribution date, to the Depositary for distribution on a pro rata "pass-through" basis to each Unitholder as of the related Record Date.

(c)     Any distribution to Unitholders shall be made to the Person in whose name such Unit is registered at the close of business on the related Record Date in accordance with the procedures of the Depositary.

Section 3.5     Threshold Event or Permitted Sale Event.

(a)     The Trustee shall not sell any New HTA Bonds or HTA Clawback CVIs except upon a Threshold Event or Permitted Sale Event and subject to the terms of Section 3.5(b), provided that the Trustee shall be authorized to make the assignments and transfers contemplated by Sections 3.3 and 3.6.  Upon the Trustee's receipt of a notice substantially in the form of Exhibit E-1 attached hereto as contemplated by clause (ii) of the definition of "Permitted Sale Event", the Trustee shall (i) provide the notice to Unitholders contemplated by clause (iii) of such definition (with a copy of such notice to FGIC) as soon as practicable and in any event within three (3) Business Days of receiving FGIC's notice, and (ii) no later than the tenth (10th) Business Day following the date of such notice to Unitholders, notify FGIC in writing whether the Trustee has received a written objection from the Requisite Unitholders as contemplated by clause (iv) of such definition.

(b)     Upon the occurrence of a Threshold Event or Permitted Sale Event with respect to which FGIC has provided written instruction to the Trustee (substantially in the form of Exhibit E-2 hereto, in the case of a Threshold Event, or Exhibit E-3 hereto, in the case of a Permitted Sale Event) to sell some or all of one or more series of New HTA Bonds or the HTA Clawback CVIs, the Trustee shall seek to sell such New HTA Bonds or HTA Clawback CVIs to the person(s) identified to the Trustee by FGIC in such instruction (which instruction shall also include the applicable sale price(s), the information for the account(s) to which such New HTA Bonds or HTA Clawback CVIs shall be transferred by the Trustee and any other details, including relevant broker(s), to be utilized by the Trustee for such sale) as soon as practicable and in any event within one (1) Business Day of receiving such instruction, provided that: (i) any such sale is made at price(s) that equal or exceed the Fair Market Value applicable to such sale, as confirmed to the Trustee by FGIC, (ii) any such sale is made at price(s) that equal or exceed the applicable Threshold Price in the case of a Threshold Event or the applicable Permitted Sale Price in the case of a Permitted Sale Event, and (iii) all proceeds of such sales shall be deposited into the General Collection Account.

Section 3.6     Surrendered Units.

(a)     Subject to satisfaction of the conditions set forth in Section 3.6(b), any Unitholder may, at any time and from time to time, elect to surrender Units held by such Unitholder (as confirmed by the Depositary) to the Trustee for cancellation (the "Surrendered Units") in exchange for a transfer to such Unitholder of its proportional percentage of the New HTA Bonds and HTA Clawback CVI (orany other securities or property received in respect thereof or in exchange therefor) held by the Trust at that time, by giving written notice thereof to FGIC and the Trustee (a "Unitholder Election").

15

(b)    The following conditions must be satisfied to permit and effectuate any Unitholder Election: (i) FGIC shall, in its sole discretion, have consented in writing to such Unitholder Election (other than any Unitholder Election in connection with which FGIC shall not have agreed or otherwise be obligated to pay any consideration for the release set forth in clause (iv) below), (ii) the Surrendered Units shall be cancelled by the Trustee with an automatic and immediate corresponding reduction in the aggregate Notional Amount of the Units and the Trustee shall deliver written notice of such cancellation and reduction to the Depositary, (iii) the outstanding principal amount of the Covered FGIC Insured Bonds shall automatically and immediately be reduced on a proportionate dollar-for-dollar basis (based on the proportion of the Notional Amount of such Surrendered Units to the aggregate Notional Amount of the Units at that time) with an automatic and immediate corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy, which reductions shall be acknowledged by the Trustee, and (iv) such Unitholder shall execute and deliver a release, in form and substance satisfactory to FGIC, releasing all rights and claims of any kind it may have relating to the Surrendered Units or the Covered FGIC Insurance Policy subject to receipt of consideration, if any, that FGIC shall have agreed in writing to pay to such Unitholder in consideration for release.  Upon satisfaction of such conditions, the Trustee shall transfer to the Unitholder ownership of the applicable proportional percentage of the New HTA Bonds and HTA Clawback CVI (or any other securities or property received in respect thereof or in exchange therefor) held by the Trust at that time, as directed by FGIC.  FGIC's consent to any Unitholder Election shall not limit its right, in its sole discretion, to deny its consent to any other Unitholder Election.

Section 3.7    FGIC Election to Accelerate Policy Payments.

(a)    Section 3.7(b) shall apply to the Trust and the Covered FGIC Insurance Policy as of the date that is thirty (30) Business Days following the Closing Date unless the Requisite Unitholders notify the Trustee in writing prior to such date of their election that Section 3.7(b) shall not so apply.

(b)    Pursuant to the Plan, the payment of the principal of the Covered FGIC Insured Bonds was accelerated and such Covered FGIC Insured Bonds are due and payable at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus accrued interest thereon, or 100% of accreted amounts thereon, to the date of payment.  FGIC is not obligated to pay any claims on an accelerated basis under the Covered FGIC Insurance Policy. FGIC shall have the right, in its sole and absolute discretion, to elect at any time to permit a claim under the Covered FGIC Insurance Policy in the amount of such acceleration price at such time (regardless of whether the Trustee shall have submitted a claim therefor to FGIC) and to make payment to the Trustee in respect of such permitted claim under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan; provided, however, that FGIC shall not be obligated to make all or any portion of such payment, unless and until, with respect to the portion of such payment relating to the principal of the Covered FGIC Insured Bonds which will be paid or deemed to be paid by FGIC in cash (the "Cash Acceleration Payment"), the Trustee shall have executed and delivered to FGIC (or its fiscal agent) assignments in substantially the form of Exhibit G with respect to a proportionate share (based on the proportion of such Cash Acceleration Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust) of the Trust Assets held by the Trust, as confirmed by FGIC, and taken such action as shall be necessary to transfer such Trust Assets to the account of FGIC

16

or its custodian, in either case as directed by FGIC in writing, and receipt of such Trust Assets shall have been confirmed by FGIC.

(c)     At any time, Requisite Unitholders can notify the Trustee of an election that Section 3.7(b) shall apply notwithstanding a prior election under Section 3.7(a), and such notice will be effective upon agreement by FGIC within 30 Business Days of such notification.

## ARTICLE IV

### REPORTING/REMITTING TO UNITHOLDERS

Section 4.1     <u>Statements to Unitholders and FGIC.</u>

On a quarterly basis, the Trustee shall prepare and post a statement to EMMA, in the form attached hereto as Exhibit B and provide notice of such statement to the Unitholders and FGIC in accordance with the Notice provisions of Section 11.4 setting forth:

(a)     all distributions made from the General Collection Account during the quarter and during the year to date (on an aggregate and per Unit basis), identifying the portion thereof attributable to the amount of (i) asset sales; (ii) principal and interest payments; and (iii) CVI payments;

(b)     all distributions made from the FGIC Insurance Policy Collection Account during the quarter and during the year to date (on an aggregate and per Unit basis);

(c)     the principal amount (or accreted amount, as applicable) as of the quarter end of each CUSIP number of New HTA Bonds and HTA Clawback CVI held by the Trust (or any other securities or property received in respect thereof or in exchange therefor) (on an aggregate and per Unit basis);

(d)     the DPO balance and DPO Accretion balance associated with the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy as of the quarter end, to the extent such information has been furnished to the Trustee by FGIC;

(e)     the principal amount of, and the accrued and unpaid interest on, the Covered FGIC Insured Bonds as of the end of the quarter, together with a description of the changes in such amounts during the quarter;

(f)     any notices received by the Trustee from FGIC in connection with any required DPO and DPO Accretion payments associated with the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy;

(g)     (i) the respective amounts paid to the Trustees for trustee fees, other Trustee Costs under Section 7.5(a), Trustee Costs under Section 7.5(b) and indemnification amounts under Section 7.12, a description of such indemnification amounts and Trustee Costs, (ii) the amount of any Other Trust Costs reimbursed under Section 7.5(c), if applicable, and (iii) the ending Fee Reserve balance for each quarter; and

17

(h)     any required tax reporting for such period.

Section 4.2     Compliance with Withholding Requirements.

Notwithstanding any other provisions of the Trust Agreement, the Trustee shall comply with all federal withholding requirements with respect to payments to the Depositary and the Unitholders that the Trustee reasonably believes are applicable under the Code. The consent of the Depositary and the Unitholders shall not be required for such withholding. In the event the Trustee does withhold any amount from payments to the Depositary or any Unitholder pursuant to federal withholding requirements, the Trustee shall indicate with any payment to the Depositary or such Unitholder the amount withheld. Any amounts withheld shall be treated as a distribution of cash to the Depositary or Unitholder, as the case may be, in the amount of the withholding for all purposes and shall thereby reduce amounts otherwise distributable to the Depositary or such Unitholder. If an amount required to be withheld was not withheld, the Trust may reduce subsequent distributions by the amount of such required withholding.

## ARTICLE V

## THE UNITS

Section 5.1     The Units.

(a)     The Units shall be evidenced by the Certificate issued by the Trustee to the Depositary in accordance with Section 5.2(a).

(b)     As of the Closing Date, the Notional Amount of the Units issued under this Trust Agreement shall be the Notional Amount set forth in Exhibit C, which is the aggregate original principal amount as of their date of issuance of those Covered FGIC Insured Bonds deposited, or deemed hereunder to have been deposited, into the Trust. The beneficial ownership of the Units as of the Closing Date shall be allocated by the Depositary among the Original Holders on a proportionate basis based on the aggregate original principal amount as of their date of issuance of each original Holder's respective Covered FGIC Insured Bonds that are deposited, or deemed hereunder to have been deposited, into the Trust on the Closing Date.

(c)     All Units issued under this Trust Agreement shall be evidenced by the same Certificate, subject to the requirements of the Depositary, and otherwise identical in all respects. All Units issued under this Trust Agreement shall be in all respects equally and ratably entitled to the benefits hereunder without preference, priority or distinction on account of the actual time or times of authentication and delivery, and shall be held and transferable only through the Depositary.

(d)      No additional interests in the Trust other than the Certificate and the Units shall be issued hereunder, except in accordance with Section 5.3.

Section 5.2     The Certificate; Book-Entry-only System.

(a)     On the Closing Date, upon deposit of all of the Trust Assets into the Trust pursuant to the Plan of Adjustment and as provided in Section 2.2, the Trustee shall issue to the

18

Depositary the initial Certificate by executing and delivering the Certificate, on behalf of this Trust, with the manual or facsimile signature of an authorized officer or other agent of the Trustee.

(b)    The Trust shall issue the Certificates to the Depositary.  Consistent with DTC book-entry provisions, one or more typewritten Certificates shall be prepared and registered in the name of the Depositary or its nominee.  There shall be no physical delivery of the Certificate or Units to the Unitholders (other than the Depositary) or other beneficial owners.

(c)    DTC is hereby appointed as the initial Depositary, with Cede & Co., a nominee thereof, being the initial registered owner of the Certificate. In the event that any Depositary resigns or is removed, the Trustee shall select a substitute Depositary. Notwithstanding anything herein to the contrary, the Trust and each of the Trustees, and any agent of the Trust or either of the Trustees, may treat any Depositary in whose name any Certificate is registered as the owner of the Units for all purposes, including for actions by Unitholders. For so long as the Depositary is the registered owner of the Certificate, procedures with respect to the transmission of notices and the transfer of ownership and payment of Units shall be in accordance with arrangements between the Trustee and the Depositary. The Certificate shall be issued in global form and the Units represented thereby shall be freely tradeable and transferable through the Depositary.

(d)    Notwithstanding anything herein to the contrary, so long as the Certificate is registered in the name of the Depositary, the Trust and the Trustee shall have no responsibility or obligation to any Depositary participant, indirect participant or beneficial owner of the Certificate or Units. Without limiting the immediately preceding sentence, the Trust and the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of any Depositary or any Depositary participant or indirect participant with respect to any beneficial ownership interest in the Certificate, (ii) the delivery to any Depositary participant, indirect participant, beneficial owner or any other person, other than the Depositary, of any notice with respect to the Certificate or Units, including any notice of Record Date, distribution date, payment, redemption or tender, or (iii) the payment to any Depositary participant, indirect participant, beneficial owner or any other person, other than the Depositary, of any amount with respect to Units or Certificate. The rights of Unitholders shall be limited to those established by law and agreements between the Unitholders and the Depositary and Depositary participants and as provided herein.

(e)    A CUSIP number will be imprinted on the Certificate, but such CUSIP number shall not constitute a part of the contract evidenced by the Certificate or Units. As a convenience to the Depositary and Unitholders, the Trust and the Trustees may use such CUSIP numbers in any notices to the Depositary and Unitholders.

Section 5.3    <u>Mutilated, Destroyed, Lost and Stolen Certificate.</u>

(a)    If (i) any mutilated Certificate is presented to the Trustee or (ii) the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Certificate, and there is delivered to the Trustee such security or indemnity as it may require to save it harmless, and the Trustee has not received notice that such Certificate (and the Units represented thereby) has been acquired by a protected purchaser, then, in each case, the Trustee shall execute, authenticate and

deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like tenor, form, terms and principal amount, bearing an identifying number not used by any contemporaneously existing Certificate, so that neither gain nor loss in interest shall result from such exchange or substitution.

(b)     Upon the issuance of any new Certificate under this Section, the Trustee may require the payment by the Certificate holder of a sum sufficient to cover any tax or other governmental charge that may be imposed in respect thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

(c)     Every new Certificate issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust Assets to the extent provided herein, whether or not the destroyed, lost or stolen Certificate shall be at any time enforceable by anyone, and the Units represented thereby shall be entitled to all the benefits of this Trust Agreement.

(d)     The terms of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Units.

Section 5.4     No Obligation to Register.

The Trustee is not obligated to register or qualify any Certificate or Unit under the Securities Act of 1933, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder, or any other securities laws or to effect any qualification under the Trust Indenture Act of 1939, as amended.

Section 5.5     Persons Deemed Owners.

Subject to Section 5.3, but notwithstanding anything else in this Trust Agreement, the Trustee and any agent of the Trustee may treat the Depositary or its nominee in whose name the Certificate is registered as the owner of the Units on the related distribution date for the purpose of receiving distributions on such Units and for all other purposes whatsoever, including for actions by Unitholders, and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary. All distributions made hereunder to the Depositary or its nominee, or upon its order, shall be valid, and, to the extent of the sum or sums paid, effectual to satisfy and discharge the liability for moneys distributable upon the Units.

Section 5.6     Cancellation.

All Certificates evidencing Units surrendered for payment, redemption, transfer or exchange shall be delivered to the Trustee and shall be promptly canceled by the Trustee. The Trustee and no one else will cancel all such Certificates surrendered for registration of transfer, exchange, payment, replacement or cancellation and will dispose of such cancelled Certificates in accordance with its customary procedures. No Certificate shall be authenticated in lieu of or in exchange for any Certificates canceled as provided in this Section, except as expressly permitted by this Trust Agreement.

## ARTICLE VI

## NEW HTA BONDS AND HTA CLAWBACK CVIs

Section 6.1      Voting Rights with Respect to New HTA Bonds and HTA Clawback CVIs.

(a)      Within three (3) Business Days after receipt of notice of any meeting of, or other occasion for the exercise of voting rights or the giving of consents by, owners of any of the New HTA Bonds or the HTA Clawback CVIs (or any other securities or property received in respect thereof or in exchange therefor), the Trustee shall deliver a copy of such notice to FGIC and the Unitholders.

(b)      The voting and direction rights allocable to the owners of the New HTA Bonds and HTA Clawback CVIs (or any other securities or property received in respect thereof or in exchange therefor) pursuant to the terms thereof (including voting and direction rights in respect of remedies) ("Voting Rights") shall be allocated to FGIC unless FGIC is in default under the Covered FGIC Insurance Policy (a "Voting Rights Condition"). Upon the written request of FGIC, subject to the immediately preceding sentence, the Trustee shall vote in accordance with any instruction set forth in such written request.  Upon the occurrence and continuation of a Voting Rights Condition, the Voting Rights will be deemed to be held on a pro rata basis by the Unitholders, and the Trustee may act at the direction of the Requisite Unitholders.

## ARTICLE VII

## CONCERNING THE TRUSTEE

Section 7.1      Duties of Trustee.

(a)      Every provision of this Trust Agreement relating to the conduct of, affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VII.

(b)      The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Trust Agreement and no implied covenants or obligations shall be read into this Trust Agreement against the Trustee.

(c)      The Trustee shall (at the direction of the Requisite Unitholders) take all necessary or desirable actions to enforce the Covered FGIC Insurance Policy against FGIC as set forth herein.

(d)      The Trustee shall deliver to all Unitholders copies of all notices and written communications received from HTA as they relate to the New HTA Bonds and HTA Clawback CVIs.

(e)      Except as provided in Section 7.2 hereof, no provision of this Trust Agreement shall be construed to relieve the Trustee from liability for its own grossly negligent action, grossly negligent failure to act, bad faith or willful misconduct; provided, however, that:

21

(i)      The Trustee shall not be liable for an error of judgment made in good faith by an Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(ii)      The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of FGIC or the Requisite Unitholders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the New HTA Bonds or HTA Clawback CVIs exercising any trust or power conferred upon the Trustee with respect to the New HTA Bonds or HTA Clawback CVIs, under this Trust Agreement;

(iii)      The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Requisite Unitholders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Covered FGIC Insurance Policy or exercising any trust or power conferred upon the Trustee with respect to the Covered FGIC Insurance Policy, under this Trust Agreement; and

(iv)      Any determination of gross negligence, bad faith or willful misconduct of the Trustee shall be made only upon the rendering of a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

Section 7.2      Certain Matters Affecting the Trustee.

(a)      The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties. Further, the Trustee may accept a copy of the vote of the board of directors or equivalent governing body of any party certified by its clerk or assistant clerk or secretary or assistant secretary as conclusive evidence of the authority of any Person to act in accordance with such vote, and such vote may be considered as in full force and effect until receipt by the Trustee of written notice to the contrary;

(b)      The Trustee may, in the absence of bad faith on its part, conclusively rely upon an Opinion of Counsel or certificate of an Officer of the appropriate Person whenever in the administration of this Trust Agreement the Trustee shall deem it desirable that a matter be proved or established (unless other evidence be herein specifically prescribed) prior to taking, suffering or omitting any action hereunder;

(c)      The Trustee may consult with counsel of its own selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in reliance on such advice or Opinion of Counsel;

(d)      The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Trust Agreement or to institute, conduct, defend or continue any litigation thereunder or in relation thereto at the request, order or direction of the Requisite

22

Unitholders, pursuant to the provisions of this Trust Agreement, unless such Unitholders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(e)  The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Trust Agreement;

(f)  The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by FGIC or the Requisite Unitholders; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of this Trust Agreement, the Trustee may require indemnity against such expense or liability as a condition to taking any such actions;

(g)  The Trustee may execute any of the trusts or powers under this Trust Agreement or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for the supervision of or any misconduct or negligence on the part of any agent or attorney appointed with due care by it under this Trust Agreement;

(h)  Whenever the Trustee is authorized herein to require acts or documents in addition to those required to be provided it in any matter, it shall be under no obligation to make any determination whether or not such additional acts or documents should be required unless obligated to do so under Section 7.1;

(i)  The Trustee shall not be deemed to have notice of any matter unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the applicable Trust Units generally, HTA, the Trust or this Trust Agreement;

(j)  None of the provisions of this Trust Agreement shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it;

(k)  Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

(l)  The permissive rights of the Trustee to perform any discretionary act enumerated in this Trust Agreement shall not be construed as a duty or obligation, and the Trustee shall not be answerable in the performance of such act other than for its gross negligence, bad faith or willful misconduct;

(m)     The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian, co-trustee and other Person employed to act hereunder;

(n)     The Trustee shall have no duty (A) to see to any recording, filing, or depositing of this Trust Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Trust Estate, or (D) to confirm or verify the contents of any reports or certificates delivered to the Trustee pursuant to this Trust Agreement believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties;

(o)     The Trustee shall have no liability or responsibility for the acts or omissions of any other party to any of this Trust Agreement or any related document;

(p)     The Trustee shall have no duty or obligation to obtain or solicit any collateral or any funds to be remitted in any of the accounts established under this Trust Agreement, and shall have a duty only to accept such collateral or funds delivered to it in accordance with this Trust Agreement;

(q)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(r)     The Trustee may request the delivery of a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement;

(s)     All rights of action under this Trust Agreement or under any of the Trust Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Trust Units or the Certificate, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Unitholders, subject to the provisions of this Trust Agreement; and

(t)     The Trustee shall establish a Fee Reserve, which Fee Reserve shall be replenished up to the Fee Reserve Threshold Amount in accordance with Section 3.4(a), and the Trustee shall be permitted to apply the amounts therein to pay Trustee Costs.

Section 7.3     Trustee Not Liable for Units or New HTA Bonds, HTA Clawback CVIs, the Covered FGIC Insured Bonds or the Covered FGIC Insurance Policy.

The Trustee assumes no responsibility for the correctness of the recitals contained in this Trust Agreement and in the Trust Units or Certificate. The Trustee makes no representations or warranties as to the validity or sufficiency of this Trust Agreement or of the Trust Units (other than the signature and authentication of the Trustee on the Certificate) or of the New HTA Bonds, HTA Clawback CVIs, the Covered FGIC Insured Bonds, the Covered FGIC Insurance Policy or related

documents. The Trustee shall not be accountable for the use or application of any of the Trust Units, or for the use or application of any funds in respect of the New HTA Bonds or HTA Clawback CVIs or deposited in or withdrawn from the Trust in accordance with this Trust Agreement other than, in each case, any funds held by or on behalf of the Trustee in accordance with Article III. The Trustee, in its capacity as Trustee hereunder, shall have no responsibility or obligation to comply with, or to monitor any other Person's compliance with, the HTA Enabling Act, the CVI Legislation,  the New HTA Bond Indenture, or the Clawback CVI Indenture.

Section 7.4      Trustee May Own Units.

The Trustee in its individual capacity or any other capacity may become the owner or pledgee of Trust Units with the same rights it would have if it were not Trustee.

Section 7.5      Trustee Costs and Expenses.

(a)      The Trustees shall each be entitled to receive from the Trust (i) fees agreed upon in writing, including such fees set forth in the Trustee Fee Schedule, (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by each of the Trustees in the execution of the trusts created under this Trust Agreement and in the exercise and performance of any of the powers and duties thereunder or the administration of the Trust, (ii) reimbursement for (x) all reasonable fees, expenses, costs and disbursements incurred or made by either of the Trustees in accordance with any of the provisions of this Trust Agreement, including Section 7.5(b) hereof (including the fees, expenses and disbursements of their respective counsel and of all persons not regularly in their respective employ), and (y) their indemnities pursuant to Section 7.12 hereof, and (iii) amounts to be promptly used by the Trustee to pay any reasonable fees, expenses or costs then owed by the Trust in accordance with this Trust Agreement and not covered by clause (ii) of this Section 7.5(a) (collectively, the "Trustee Costs"). For the avoidance of doubt, it is understood and agreed by the Parties that Trustee Costs under clause (ii) or (iii) of this Section 7.5(a) may include amounts of reasonable fees, expenses, costs, disbursements or indemnities that properly relate to the Trust and to one or more other trusts created under other trust agreements to which HTA, FGIC and the Trustees are party, which amounts have been reasonably and fairly allocated by the Trustee to the Trust in good faith as the Trust's share and are described in each relevant statement prepared and provided by the Trustee pursuant to Section 4.1. All such Trustee Costs shall be paid to the Trustees in accordance with the provisions of Section 3.4 hereof or taken from the Fee Reserve.

(b)      In furtherance of Section 7.5(a), each of the Trustees shall be entitled to receive reimbursement for all reasonable out-of-pocket expenses which are properly documented and incurred or made by it, including costs of collection, payable as a result of or in connection with litigation, enforcement actions or other proceedings brought by Unitholders against HTA, the Trust, or such Trustee except for proceedings, litigation or enforcement actions that relate to such Trustee's grossly negligent action, grossly negligent failure to act, bad faith or its own willful misconduct as determined by a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

(c)      For the avoidance of doubt, neither HTA nor FGIC shall be liable for any Trustee Costs or Other Trust Costs.  FGIC may, in its sole discretion, elect to pay any Other Trust

25

Costs, in which case FGIC shall be reimbursed by the Trustee at the time of the next distribution of any amount under Section 3.4(a) hereof upon notifying the Trustee of the amount to be so reimbursed.

Section 7.6    Eligibility Requirements for Trustee and Successor Trustee.

The Trustee and any successor Trustee shall at all times be a corporation or national banking association that: (i) is not an Affiliate of HTA, the Commonwealth of Puerto Rico or any of its instrumentalities, or FGIC; (ii) is neither affiliated with HTA, the Commonwealth of Puerto Rico or any of its instrumentalities, nor located in the Commonwealth of Puerto Rico; (iii) is organized and doing business under the laws of any state or the United States of America; (iv) is authorized under such laws to exercise corporate trust powers; (v) is in good standing under the law of the jurisdiction in which it is organized; (vi) has a combined capital and surplus of at least $50,000,000; (vii) is subject to supervision or examination by federal or state authority; and (viii) is a nationally recognized financial institution and fiduciary regularly acting as a trustee in the municipal finance market. If such corporation or national banking association publishes reports of its conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published. In case at any time any Trustee or successor Trustee shall cease to be eligible in accordance with the provisions of this Section, such Trustee or successor Trustee shall resign immediately in the manner and with the effect specified in Section 7.7.

Section 7.7    Resignation and Removal of the Trustee.

(a)    The Trustee may at any time resign and be discharged from the trusts created pursuant to this Trust Agreement by giving 60 days written notice, which shall be posted to EMMA by the Trustee. Upon receiving such notice of resignation, FGIC shall promptly appoint a successor trustee meeting the requirements set forth in Section 7.6 by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee. A copy of such instrument shall be delivered to the Unitholders and posted to EMMA by the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee at the expense of the Trust.

(b)    If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 7.6 and shall fail to resign after written request therefor by FGIC or the Requisite Unitholders, or if any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then FGIC or the Requisite Unitholders may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.

(c)    FGIC, with the written consent of the Requisite Unitholders, may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments,

26

signed by such Requisite Unitholders or their attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

(d)     The Requisite Unitholders, with the written consent of FGIC (which consent shall not be unreasonably withheld or delayed by FGIC in the event the Trustee is in default of its obligations hereunder to enforce the Covered FGIC Insurance Policy), may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, signed by such Requisite Unitholders or their attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

(e)     Any resignation of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.7 shall not become effective until the acceptance of appointment by the successor trustee as provided in Section 7.8 hereof. The compensation and reimbursement for fees and expenses of any successor trustee appointed in connection with the resignation of the Trustee shall be the sole responsibility of the Trust, including the costs and expenses incurred in connection with any such succession.

(f)     Any removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.7 shall not become effective until (i) acceptance of appointment by the successor trustee as provided in Section 7.8 hereof and (ii) payment of all costs, expenses and indemnities due and owing to the outgoing Trustee, including the costs and expenses incurred in connection with any such succession. In the event the Trustee is removed due to a request by the Requisite Unitholders pursuant to Section 7.7(b), then the fees and expenses of the successor trustee incurred in connection with any such succession shall be the sole responsibility of the Unitholders requesting such removal.

(g)     The compensation for any successor trustee shall be paid in substantially the same manner as compensation was paid to the predecessor trustee.

(h)     Notwithstanding the replacement of the Trustee pursuant to this Section 7.7, the rights, benefits, protections and indemnities afforded to the Trustee under this ARTICLE VII shall continue to the benefit of the retiring Trustee.

Section 7.8     Successor Trustee.

(a)     Any successor trustee appointed as provided in Section 7.7 shall execute, acknowledge and deliver to the Unitholders, FGIC and the predecessor trustee an instrument accepting such appointment under this Trust Agreement and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee herein. The predecessor trustee shall deliver to the successor trustee all related documents and statements held by it under this Trust Agreement and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully

27

and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

(b)     No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of this Section 7.6 hereof.

(c)     Upon acceptance of appointment by a successor trustee as provided in this Section, the successor trustee shall (a) post to EMMA notice of the succession of such trustee under this Trust Agreement and (b) provide notice of the succession of such trustee under this Trust Agreement to the Depositary.

Section 7.9     Merger or Consolidation of Trustees.

Any Person into which either of the Trustees may be merged or converted or with which it may be consolidated or any Person resulting from any merger, conversion or consolidation to which such Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of such Trustee, shall be the successor of such Trustee under this Trust Agreement, provided such Person shall be eligible under the provisions of Section 7.6 (as to the Trustee) and 7.14 (as to the Delaware Trustee), without the execution or filing of any paper or any further act on the part of any of the Parties, anything herein to the contrary notwithstanding.

Section 7.10     Appointment of Trustee Custodians.

The Trustee may appoint one or more custodians (each a "Trustee Custodian") to hold all or a portion of the Trust Estate as agent for the Trustee, by entering into a custodial agreement. The appointment of any Trustee Custodian may at any time be terminated and a substitute custodian appointed therefor by the Trustee. Subject to ARTICLE VII, the Trustee agrees to comply with the terms of each custodial agreement and to enforce the terms and provisions thereof against the Trustee Custodian for the benefit of the Unitholders. Each Trustee Custodian shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and surplus of at least $10,000,000 and shall be qualified to do business in the jurisdiction in which it holds any asset constituting part of the Trust Estate. Any such Trustee Custodian may not be an Affiliate of HTA or FGIC. The Trustee is responsible for the fees and expenses of any Trustee Custodian appointed hereunder.

Section 7.11     Trustee May Enforce Claims Without Possession of Certificate.

All rights of action and claims under this Trust Agreement or the Certificate may be prosecuted and enforced by the Trustee without the possession of any of the Trust Units or the production thereof in any proceeding relating thereto and any such proceeding instituted by the Trustee shall be brought in its own name or in its capacity as Trustee. Any recovery of judgment shall, after provision for the payment of the reasonable compensation, fees, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Unitholders in respect of which such judgment has been recovered.

Section 7.12    Trustee Indemnity.

The Trust shall indemnify the Trustees for, and hold them harmless against, any loss, liability or expense arising out of or in connection with their acceptance or administration of the Trust, including the reasonable costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their respective powers or duties hereunder, provided in each case that such loss, liability, expense, cost or claim does not relate to or arise out of or in connection with either Trustee's gross negligence, bad faith or willful misconduct.

Section 7.13    Acceptance by Trustees, Representations and Warranties of Trustees.

The Trustees each hereby undertake to perform their respective obligations set forth herein. The Trustee hereby agrees to hold the Trust Assets, as trustee in trust on behalf of the Trust upon the terms and conditions and for the use and benefit of the Unitholders as herein set forth. The Trustees each as to itself hereby represent and warrant to each of HTA, FGIC, holder of the Certificate and holders of the Units that as of the Closing Date:

(a)    it is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or association;

(b)    it has full corporate power, authority and right to execute, deliver and perform its duties and obligations under this Trust Agreement, and has taken all necessary corporate action to authorize the execution, delivery and performance by it of this Trust Agreement, including the execution and delivery of the Certificate on behalf of the Trust;

(c)    the execution and delivery of this Trust Agreement by it and its performance of and compliance with the terms of this Trust Agreement will not violate its certificate of incorporation, association or other constituent documents or by-laws or constitute a default under, or result in the material breach or acceleration of, any material contract, agreement or other instrument to which it is a party or which may be applicable to it or any of its assets;

(d)    as of the Closing Date, this Trust Agreement has been duly executed and delivered by it and, assuming the due authorization, execution and delivery of this Trust Agreement by each of the other parties hereto, constitutes the legal, valid and binding obligation of it, enforceable in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and general principles of equity;

(e)    it is not in violation, and the execution and delivery of this Trust Agreement by it and its performance and compliance with the terms thereof will not constitute a violation, of any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over it or its properties, which violation would reasonably be expected to have a material adverse effect on the condition (financial or otherwise) or operations of it or its properties or on the performance of its duties hereunder;

(f)    there are no actions or proceedings against, or investigations of, it pending, or, to its knowledge, threatened, before any court, administrative agency or other tribunal (i) that

29

could reasonably be expected to prohibit its entering into this Trust Agreement, (ii) seeking to prevent the issuance of the Certificate contemplated by this Trust Agreement or (iii) that could reasonably be expected to materially affect the performance by it of its obligations under, or the validity or enforceability against it of, this Trust Agreement; and

(g)     no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by it of, or compliance by it with, this Trust Agreement, or for the consummation of the transactions contemplated by this Trust Agreement, except for such consents, approvals, authorizations and orders, if any, that have been obtained prior to the Closing Date, other than the filing of the Certificate of Trust with the Secretary of State.

Section 7.14   The Delaware Trustee.

(a)     There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law and acts through one or more persons authorized to bind such entity.  The initial Delaware Trustee shall be U.S. Bank Trust National Association.  The Delaware Trustee shall be entitled to all of the rights, privileges, immunities, indemnities and protections afforded to the Trustee hereunder, but will only have such responsibilities and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)     The Delaware Trustee shall be one of the trustees of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Delaware Trust Statute and for taking such actions as are required to be taken by a Delaware Trustee under the Delaware Trust Statute. The duties, liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware; and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Delaware Trust Statute (only upon the written direction of the Trustee); and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.  With the exception of the express duties set forth in this Section 7.14 (b), and the implied contractual covenant of good faith and fair dealing, all other duties of the Delaware Trustee, including fiduciary duties, are expressly eliminated.  The Delaware Trustee shall have no liability to the Trust, to the Trustee, to any beneficiary, or to any other person that is a party to or is otherwise bound by this Trust Agreement for breach of contract or breach of duties (including fiduciary duties), except for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.  The Delaware Trustee shall not be liable for any acts or omissions, except for such losses, damages or expenses which have been finally adjudicated by a court of competent jurisdiction to have directly resulted from the Delaware Trustee's gross negligence, bad faith or willful misconduct.

(c)     The Delaware Trustee shall not be liable for the acts or omissions of the Trust, the Trustee or any other person or entity, nor shall the Delaware Trustee be liable for supervising or

30

monitoring the performance of the duties of the Trustee or the Trust or of any other person or entity under this Trust Agreement or any related document.

(d)     The Delaware Trustee shall not be personally liable for any error of judgment made by an Officer of the Delaware Trustee having direct responsibility for the administration of this Trust Agreement in good faith.

(e)     No provision of this Trust Agreement shall require the Delaware Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its duties hereunder.

(f)     Under no circumstance shall the Delaware Trustee, in its individual capacity or in its capacity as Delaware Trustee, or any member, partner, shareholder, director, officer, employee, agent, affiliate or advisor of the Delaware Trustee or their respective affiliates be personally liable for any representation, warranty, covenant, agreement, liability or indebtedness of the Trust, as all such representations, warranties, covenants, agreements, liabilities or indebtedness of the Trust are those of the Trust as an entity.

(g)     The recitals contained herein shall not be taken as the statements of the Delaware Trustee, and the Delaware Trustee does not assume any responsibility for their correctness.  The Delaware Trustee shall not be personally responsible for or in respect of, and the Delaware Trustee makes no representations as to, the title to, or value or condition of, the property of the Trust or any part thereof, including the Trust Assets or Trust Estate, nor as to the validity or sufficiency of this Trust Agreement or any related certificate, instrument or other document.

(h)     The Delaware Trustee may conclusively rely and shall be fully protected, and shall incur no liability to anyone, in acting or refraining from acting in good faith and in reliance upon any signature, instrument, notice, resolution, request, instruction, direction, consent, order, certificate, report, opinion, bond or other document or paper believed by it to be genuine and believed by it to be signed by the proper party or parties.  The Delaware Trustee may accept a certified copy of a resolution of any governing body of any person as conclusive evidence that such resolution has been duly adopted by such person and that the same is in full force and effect. As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein or whenever the Delaware Trustee shall deem it desirable that a fact or matter be proved or established prior to taking, suffering or omitting any action hereunder (including, direction by the Trustee with respect to such action), the Delaware Trustee may for all purposes hereof rely on a certificate, signed by any officer of the party delivering the certificate or, in the case of the Trustee, signed by the Trustee, as to such fact or matter, and such certificate shall constitute full protection to the Delaware Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

(i)     In accepting and performing its duties hereunder the Delaware Trustee acts solely as Delaware Trustee hereunder and not in its individual capacity, and all persons having any claim against the Delaware Trustee by reason of the transactions contemplated by this Trust Agreement shall look only to the Trust Assets for payment or satisfaction thereof.

(j)      The Delaware Trustee may be removed by FGIC with the written consent of the Requisite Unitholders upon thirty (30) days prior written notice to the Delaware Trustee, with a copy to the Trustee. The Delaware Trustee may resign upon thirty (30) days prior written notice to FGIC, with a copy to the Trustee. No resignation or removal of the Delaware Trustee shall be effective except upon the appointment of a successor Delaware Trustee that (i) is reasonably acceptable to FGIC, (ii) has a combined capital and surplus of at least $10,000,000 and (iii) is qualified to do business in the State of Delaware and satisfies the requirements of the Delaware Trust Statute. If no successor has been appointed within such thirty (30) day period, the Delaware Trustee, FGIC or the Unitholders may petition a court to appoint a successor Delaware Trustee, which shall be at the expense of the Trust.

## ARTICLE VIII

## DEFAULT ON NEW HTA BONDS OR HTA CLAWBACK CVIs

Section 8.1    Realization Upon Default.

(a)      The Trustee shall assert claims under the New HTA Bonds or HTA Clawback CVIs and the Covered FGIC Insurance Policy, and shall take such reasonable steps as are necessary to receive payment or to permit recovery thereunder following any default thereunder, with respect to the Covered FGIC Insurance Policy, in accordance with Section 3.3(b) hereof and, with respect to the New HTA Bonds or HTA Clawback CVIs, in accordance with Section 6.1(b) hereof.

(b)      If there is a breach, a default or an event of default with respect to any New HTA Bond or HTA Clawback CVI and such breach, default or event of default is known to the Trustee in accordance with Section 7.2(i), the Trustee shall give notice thereof to the Unitholders (through the Depositary) and FGIC as promptly as practicable, and, in any event, within three (3) Business Days after such breach, default or event of default becomes known to the Trustee. If the Trustee receives notice of an anticipated payment default with respect to any New HTA Bond or the HTA Clawback CVIs in accordance with Section 7.2(i), the Trustee shall give notice thereof to the Unitholders (through the Depositary) and FGIC within three (3) Business Days after receipt of such notice.

(c)      The foregoing provisions of this Section 8.1 shall apply equally to any other securities or property received in respect of the New HTA Bonds or HTA Clawback CVIs or in exchange therefor.

## ARTICLE IX

## TERMINATION OF TRUST

Section 9.1    Termination; No Redemption Rights.

Upon the indefeasible cancellation or other indefeasible termination or discharge of the Covered FGIC Insurance Policy or FGIC's obligations thereunder, the Trust (including the respective obligations and responsibilities under this Trust Agreement of the Trustee and FGIC)

32

shall terminate upon (i) the pro rata payment or distribution to the Unitholders of all amounts or Trust Assets (including the New HTA Bonds and HTA Clawback CVIs) held by or on behalf of the Trustee and required hereunder to be so paid or distributed, (ii) payment in full of any Trustee Costs due and owing to the Trustee under this Trust Agreement, and (iii) receipt by the Trustee of an Opinion of Counsel stating that all conditions precedent herein relating to the satisfaction and discharge of this Trust Agreement have been complied with. In no event shall the Trust be terminated or the New HTA Bonds or HTA Clawback CVIs be redeemed (except in the case of a redemption of the New HTA Bonds or HTA Clawback CVIs permitted under the terms of the New HTA Bond Indenture, the HTA Enabling Act, the Clawback CVI Indenture or the CVI Legislation) or otherwise released from the Trust Estate without the prior express written consent of FGIC if either (i) the Covered FGIC Insurance Policy or FGIC's obligations thereunder has not been indefeasibly terminated or discharged, or (ii) FGIC has not been indefeasibly paid in full for any amounts owed pursuant to the Plan.

Notwithstanding anything contained herein to the contrary, the merger or consolidation of the Trustee shall not cause a termination of the Trust.

Section 9.2    Procedure for Termination.

(a)    During the month in which the Trustee intends to make the final distribution from the Trust, the Trustee shall give notice to the Unitholders in accordance with Section 11.4 specifying: (a) the anticipated final distribution date; (b) that the final payment with respect to the Trust Units will be made upon presentation and surrender of the Certificate at the office of the Trustee therein designated on that date and the amount of any such final payment; (c) any amounts, or trust assets, remaining on deposit in the Trust will be distributed to the holders of record of the Trust Units on a pro rata basis; and (d) that the Trustee believes that, following the occurrence of such final distributions, the conditions to termination of the Trust have been satisfied and that it intends to terminate the Trust (a "Termination Notice").

(b)    If the Requisite Unitholders do not object in writing within 30 days after the Trustee has provided the Termination Notice as set forth herein then, upon completion of final distributions as set forth in the Termination Notice, the Trust shall be dissolved, wound up, and terminated.

(c)    Upon the dissolution, wind up and termination of the Trust and this Trust Agreement, the Trustee or Delaware Trustee (acting solely at the written direction of the Trustee) is authorized to file a certificate of cancellation with the Secretary of State.

# ARTICLE X

# TAX PROVISIONS

Section 10.1    Grantor Trust Provisions.

The Trustee, HTA, the Unitholders (by their acceptance of the Trust Units) and FGIC each agree and acknowledge or have agreed and acknowledged that the Trust is intended to qualify for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust, and it is neither the purpose nor the intent of the

33

parties hereto to create a partnership, joint venture or association taxable as a corporation or to serve as associates in a joint enterprise for the conduct of business for profit. In furtherance of the foregoing, (a) the purpose of the Trust is and shall be to protect and conserve the assets of the Trust Estate, and the Trust shall not at any time engage in or carry on any kind of business or any kind of commercial or investment activity, (B) the Trust is formed to facilitate direct investment in the Trust Assets and the existence of multiple classes of ownership interests is incidental to that purpose, and (c) the Trustee (at the direction of FGIC and/or the Requisite Unitholders), shall take, or refrain from taking, all such action as is necessary to maintain the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not (i) acquire any assets or dispose of any portion of the Trust other than pursuant to the specific provisions of this Trust Agreement, (ii) vary the investment of the Trust within the meaning of Treasury Regulation § 301.7701- 4(c), (iii) substitute new investments or reinvest so as to enable the Trust Estate to take advantage of variations in the market to improve the investment of any Unitholder or (iv) engage in any activity which may directly or indirectly, adversely affect the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not have any authority to manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Estate except as required by the express terms of this Trust Agreement in accordance with the powers granted to or the authority conferred upon the Trustee pursuant to this Trust Agreement. The Trustee and FGIC each agree that they shall not take any action that would result in the Trust failing to be characterized for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.

Section 10.2   Characterization.

Each Unitholder acknowledges and agrees to treat the Trust Units as undivided interests in the Trust Estate.

Section 10.3   Grantor Trust Administration.

Notwithstanding anything in this Trust Agreement to the contrary, and notwithstanding any direction or instruction by less than all the Unitholders, the Trustee shall not be authorized to take any action that would cause the Trust not to be treated as a grantor trust under the Code all of the distributions and income from which would be subject to the tax treatment described in Subpart J of Chapter 1 of the Code as to the Unitholders. The Trustee shall perform its duties hereunder so as to maintain the status of the Trust as a grantor trust as provided in Section 10.1 hereof. The Trustee shall not (a) exercise any discretionary rights with respect to the Trust Assets, (b) acquire an interest in any additional Trust Assets (other than proceeds of a sale of Trust Assets permitted under the terms of this Trust Agreement), (c) knowingly take any other action or fail to take (or fail to cause to be taken) any other action that, under the Grantor Trust Provisions, if taken or not taken, as the case may be, could adversely affect the status of (i) the Trust as a grantor trust, (ii) the Trust as a U.S. trust, or (iii) the Unitholders as grantors with respect to the Trust under the Grantor Trust Provisions (any such adverse effect on trust status, an "Adverse Trust Event"), unless the Trustee has obtained or received an Opinion of Counsel nationally recognized as competent in matters relating to the U.S. federal income taxation of organizations such as the Trust (at the expense of the party requesting such action or at the expense of the Trust Estate if the Trustee seeks to take such action or to refrain from taking any action for the benefit of the

Unitholders) to the effect that the contemplated action will not result in an Adverse Trust Event. None of the other parties hereto shall take any action or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that the Trustee has received or obtained an Opinion of Counsel to the effect that an Adverse Trust Event could result from such action or failure to act. The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Trust Agreement, but in no event at the cost or expense of the Trust Estate or the Trustee.

Section 10.4   <u>Reports to Unitholders and Tax Authorities.</u>

(a)     The Trustee shall perform or cause to be performed on behalf of the Trust all reporting and other tax compliance duties that are required in respect thereof under the Code, the Grantor Trust Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority, including for avoidance of doubt the filing of IRS Forms 1099 or providing other information statements to the extent required pursuant to U. S. Treasury Regulations Section 1.671-5 (including U.S. Treasury Regulations Section 1.671-5(c)(1)), as amended or any successor provision (the "WHFIT Regulations").

(b)     Consistent with the Trust's characterization for U.S. federal income tax purposes as a grantor trust, except to the extent required pursuant to WHFIT Regulations, no U.S. federal income tax return shall be filed on behalf of the Trust unless either (i) the Trustee shall receive an Opinion of Counsel that, based on a change in applicable law occurring after the date hereof, the Code requires such a filing or (ii) the Internal Revenue Service shall determine that the Trust is required to file such a return. In the event that the Trust is required to file tax returns, the Trustee shall prepare or cause to be prepared, and sign and file when due with the appropriate tax authorities all of the tax returns in respect of the Trust. In no event shall the Trustees, FGIC or HTA be liable for any liabilities, costs or expenses of the Trust or the Unitholders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to the Trustee's gross negligence, bad faith or willful misconduct.

(c)     If any tax is imposed on the Trust, such tax, together with all incidental costs and expenses (including, without limitation, penalties and reasonable attorneys' fees) shall be charged to and payable by the Unitholders on a pro rata basis; provided that in each case the Trustee shall be authorized to withhold the applicable amounts from Distributions on the applicable Trust Units and pay such amounts to the applicable taxing authority and that any amounts so withheld and paid to the applicable taxing authority shall be deemed to have been paid as a Distribution to the applicable Unitholders.

(d)     The Trustee shall, for U.S. federal income tax purposes, maintain books and records with respect to the Trust on a calendar year basis or such other basis as may be required under the Code.

(e)     All taxes due and payable on any amounts payable to a Unitholder with respect to a Trust Unit shall be that Unitholder's sole responsibility.

(f)     For the purposes of this ARTICLE X and any other provision of the Trust Agreement relating to the ownership of a Trust Unit for U.S. federal income tax purposes, including definitions, all references to holder, Unitholder, or beneficial owner shall mean the beneficial owner of a Trust Unit for U.S. federal income tax purposes. By acquiring an interest in a Trust Unit, a beneficial owner of the Trust Unit for U.S. federal income tax purposes shall be deemed to consent as a condition of acquiring such interest to comply with any requirements of such Article and other provisions hereof.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

Section 11.1    Amendment of Trust Agreement.

(a)     This Trust Agreement may not be amended, waived or supplemented without the prior written consent of FGIC. This Trust Agreement may be amended, waived or supplemented from time to time by FGIC and the Trustee without the consent of any other Party or the Depositary or any Unitholders; provided, however, that no such amendment shall:

(i)     reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Unitholder without the written consent of such Unitholder;

(ii)     alter in any manner the treatment of the Covered FGIC Insurance Policy without the written consent of each Unitholder affected;

(iii)     amend this Section 11.1 without the written consent of each Unitholder; or

(iv)     amend the definition of Requisite Unitholders without the written consent of all Unitholders; or

(v)     adversely affect in any material respect the interests of the Unitholders in any manner other than as described in clause (i), (ii), (iii) or (iv) above without the written consent of the Requisite Unitholders.

(b)     Prior to executing any amendment permitted by this ARTICLE XI, (i) the Trustee shall be required to obtain an Opinion of Counsel that is nationally recognized as competent in matters relating to the federal income taxation of organizations such as the Trust to the effect that such amendment will not result in an Adverse Trust Event and (ii) the Trustee shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such amendment is authorized or permitted by this Trust Agreement and that all conditions precedent have been met. The Trustee may, but shall not be obligated to, enter into any such amendment that affects the Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement or otherwise. The Delaware Trustee may, but shall not be obligated to, enter into any such amendment that affects the Delaware Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement or otherwise.  No amendment that affects the Delaware Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement shall be effective against the Delaware Trustee unless the Delaware Trustee

has consented thereto in writing. Prior to executing any amendment permitted by this ARTICLE XI, the Delaware Trustee shall be entitled to receive and conclusively and exclusively rely upon written direction from the Trustee that such amendment is authorized and permitted by this Trust Agreement.

(c)     Promptly following the execution of this Trust Agreement, the Trustee shall post full and complete copies of this Trust Agreement on EMMA. Promptly after the execution of any amendment to this Trust Agreement, the Trustee shall furnish a copy of such amendment to the Depositary and shall post a copy of such amendment on EMMA.

(d)     The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Unitholders shall be subject to such reasonable regulations as the Trustee may prescribe in coordination with the Depositary.

Section 11.2     Counterparts.

This Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts may be delivered by electronic messaging system and shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument. The words "execution," "signed," "signature," and words of like import in this Agreement or in any other certificate, agreement or document related to this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and Adobe Sign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the US Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

Section 11.3     Limitation on Rights of Unitholders.

(a)     The death or incapacity of any Unitholder shall not operate to terminate this Trust Agreement or the Trust, nor entitle such Unitholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, nor otherwise affect the rights, obligations and liabilities of the Parties or any of them.

(b)     No Unitholder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust, or the obligations of the Parties, nor shall anything herein set forth, or contained in the terms of the Trust Units, be construed so as to constitute the Unitholders from time to time as partners or members of an association; nor shall any Unitholder be under any liability to any third person by reason of any action taken by the Parties pursuant to any provision hereof.

(c)     No Unitholder shall have any right by virtue of any provision of this Trust Agreement to institute any suit, action or proceeding in equity or at law upon or under or with

37

respect to this Trust Agreement or any of the Trust Assets. Nothing in this paragraph shall be construed to limit in any manner the ability of any Party (notwithstanding the ownership by such Party of Trust Units) to institute any suit, action or proceeding upon or under or otherwise with respect to this Trust Agreement or to enforce in any manner its rights as a party hereunder.

Section 11.4   Notices.

All demands, notices and certifications under this Trust Agreement shall be in writing. All demands, notices and certifications under this Trust Agreement shall be deemed to have been duly given to each Party other than FGIC when personally delivered or mailed by first class mail, postage prepaid, or by express delivery service, to such Party at (a) in the case of the Trustee, U.S. Bank Trust Company, National Association, 100 Wall Street, 6th floor, New York, NY 10005, (b) in the case of the Delaware Trustee, U.S. Bank Trust National Association, 100 Wall Street, 6th floor, New York, NY 10005, and (c) in the case of HTA, c/o Fiscal Agency and Financial Advisory Authority, Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, Puerto Rico 00907, Attn: Office of the Executive Director, or in each of the above cases such other address as may hereafter be furnished by such Party to each other Party in writing. All demands, notices and certifications under this Trust Agreement shall be deemed to have been duly given to FGIC when transmitted by email to FGIC at both of the following email addresses: generalcounsel@fgic.com and edward.turi@fgic.com, or at such other email addresses as may hereafter be furnished by FGIC Party to each other Party in writing.  Unless a different means of giving notice or communication to Unitholders is specified herein, any notice or communication required or permitted to be given to a Unitholder shall be transmitted to the Depositary in accordance with its procedures. Any notice or communication so transmitted to the Depositary within the time prescribed in this Trust Agreement shall be conclusively presumed to have been duly given to the Unitholders at the time of transmission, whether or not and regardless of when any Unitholder actually receives such notice or communication. A copy of any notice given hereunder to any other Party shall be delivered to the Trustee.  The Trustee shall post all notices delivered hereunder to EMMA within five (5) Business Days of receiving such notice or a copy of such notice, as applicable.

Section 11.5   Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Trust Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Trust Agreement and shall in no way affect the validity or enforceability of the other provisions of this Trust Agreement or of the Trust Units or the related rights of the Unitholders.

Section 11.6   Acts of Unitholders.

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Trust Agreement to be given or taken by Unitholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Unitholders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the

Trustee and ownership of the Units held by such Unitholders is confirmed by Depositary. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Trust Agreement and conclusive in favor of the Trustee. The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner that the Trustee deems sufficient. The ownership of Trust Units shall be proved by the Depositary.

Section 11.7   Headings.

Article and Section headings in this Trust Agreement are included herein for convenience of reference only and shall not constitute a part of this Trust Agreement for any other purpose or be given any substantive effect.

Section 11.8   No Waiver; Cumulative Remedies.

No failure to exercise and no delay in exercising, on the part of any Party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

Section 11.9   Merger and Integration.

This Trust Agreement and the documents and exhibits expressly incorporated herein set forth the entire understanding of the Parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by this Trust Agreement.

Section 11.10   [Reserved].

Section 11.11   Patriot Act.

The Parties acknowledge that in accordance with Section 326 of the U.S.A.PATRIOT Act, the Trustees, like all financial institutions and in order to help fight the funding ofterrorism and money laundering, are required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustees. The Parties agree that they will provide the Trustees with such information as they may request in order for the Trustees to satisfy the requirements of the U.S.A.PATRIOT Act.

Section 11.12   Governing Law; Venue Jury Waiver.

THIS TRUST AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDERTHIS TRUST AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLYBASED UPON, ARISING OUT OF, OR LEADING TO THIS TRUST AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS TRUST AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY OR PERFORMANCE, SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW

PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS. EACH PARTY HERETO HEREBY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS TRUST AGREEMENT, OR (B) IN ANY WAY IN CONNECTION WITH OR PERTAINING TO OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT TO THIS TRUST AGREEMENT OR IN CONNECTION WITH THIS TRUST AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS TRUST AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE. EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY FEDERAL OR STATE COURTS SITTING IN THE STATE OF DELAWARE IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS TRUST AGREEMENT. EACH PARTY TO THIS TRUST AGREEMENT IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDINGS IN ANY SUCH COURT AND ANY CLAIM THAT ANY PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

Section 11.13   Force Majeure.

In no event shall the Trustees be responsible or liable for any failure or delay in the performance of their obligations hereunder arising out of or caused by, directly or indirectly, forcesbeyond their control, including strikes, work stoppages, accidents, acts of war orterrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustees shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 11.14   Intent of Parties.

(a)   The Parties intend that, for all purposes, the transfer to the Trust of the Trust Estate pursuant to Section 2.2 in each case shall be, and shall be construed as, a transfer thereof to the Trust on behalf of the Original Holders in lieu of a transfer thereof to the Trust directly by the Original Holders and shall constitute, in all respects, an absolute, irrevocable transfer, conveyance, and assignment, without recourse, of the Trust Estate to the Trust, and immediately after giving effect to the transfer contemplated hereby on the Closing Date, HTA will have no further interest (legal or equitable) in the Trust Estate and the Trust Estate will not be property of HTA or HTA's estate in the event of a liquidation, reorganization, or similar proceeding of HTA and the Trust shall have the absolute right to take whatever action it may deem appropriate with respect to the Trust Estate. The Parties agree to treat the transfer contemplated hereby for all purposes (including financial accounting purposes) as an absolute transfer on all relevant books, records, financial statements and other documents.

(b)    The Trust Estate will be held by the Trust free and clear of any lien or encumbrance of any Person claiming through or under HTA.

(c)    Notwithstanding anything to the contrary in this Trust Agreement or in any other document governing the formation, management, or operation of the Trust, if and for so long as any Trust Unit remains outstanding, none of the Unitholders, FGIC, the Trustees, nor any other Person shall authorize, cause or permit the Trust to (and the Trust shall not, and neither Trustee shall directly take any action that to its actual knowledge would, violate any of the following):

(i)    engage in any business or engage in any activity other than those activities expressly permitted in this Trust Agreement and will not have, incur, guarantee or become liable for any indebtedness or obligations except as expressly contemplated in this Trust Agreement;

(ii)    acquire or own any assets other than the Trust Estate or lease any assets;

(iii)    fail to preserve its existence as an entity duly formed, validly existing and in good standing (if applicable) under the laws of the State of Delaware, or fail to remain qualified to do business in each state in which such qualification is required, for any reason, including in order to perform its obligations under this Trust Agreement;

(iv)    fail to observe at any time any necessary, appropriate and customary corporate, organizational, company and/or other legal formalities to maintain its separate existence;

(v)    fail to act solely in its own name or in the name of the Trustee through duly authorized agents in the conduct of its activities;

(vi)    provide for the payment of its expenses, indebtedness or other obligations other than from its own separate assets;

(vii)    have its debts or other obligations guaranteed by any other Person or hold itself out as responsible for the debts or other obligations of any other Person;

(viii)    commingle its assets or liabilities with those of any other Person;

(ix)    fail to maintain its own records, books of account, bank accounts, accounting records and other entity documents separate and apart from those of any other Person;

(x)    divert funds for any purpose other than as set forth in this Trust Agreement;

(xi)    enter into any contract, agreement or transaction with any Unitholders, HTA, FGIC, any principal or other Affiliate of the Trust, or any shareholder, general partner, member, principal or Affiliate thereof, except as expressly authorized herein;

(xii)   maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xiii)   incur, create or assume any indebtedness of or buy or hold evidence of indebtedness issued by any other Person (other than as contemplated by this Trust Agreement); guarantee or hold itself out to be responsible for the debts of another Person or otherwise pledge its assets to secure the obligations of any other Person, or hold out its credit or assets as being available to satisfy the obligations of any other Person or seek to incur, create or assume any indebtedness based upon the assets of any other Person;

(xiv)   perform any duties or obligations of HTA or any other Person;

(xv)   make any loans or advances to any third party, including any Unitholder, HTA or any Affiliate of the Trust, or any principal or Affiliate thereof;

(xvi)   fail to file its own tax returns as and if required to do so by applicable law (subject to any permitted extensions and except to the extent the Trust is treated as a grantor trust for tax purposes) and to pay any taxes required to be paid by it under applicable law;

(xvii)   fail to hold itself out to the public as a legal entity separate and distinct from any other Person, fail to conduct its activities solely in its own name or in the name of the Trustee and as a separate and distinct entity, or fail to correct any known misunderstanding regarding its separate identity;

(xviii)   identify itself as a department or division of any other Person;

(xix)   fail to observe all formalities required of a Delaware statutory trust;

(xx)   fail to pay its expenses and liabilities only out of its own funds to the extent such funds are available and fail to hold its assets only in its own name; provided, however, the foregoing shall not require HTA to sell any assets, or make any capital contribution, to the Trust;

(xxi)   conduct any oral or written communication, including letters, invoices, purchase orders, contracts, statements and applications, other than in its own name or in the name of the Trustee; or

(xxii)   (a) institute proceedings to have the Trust declared or adjudicated a bankrupt or insolvent, (b) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (c) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (d) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (e) make any assignment for the benefit of the Trust's creditors, (f) cause the Trust to admit in writing its inability to pay its debts generally as they become due or (g) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing.

(d)     Failure of the Trust, HTA, FGIC, any Unitholder, any Trustee or any other Person on behalf of the Trust, to comply with any of the foregoing covenants set forth in this Section 11.14 shall not affect the status of the Trust as a separate legal entity (unless in violation of the Delaware Trust Statute) nor cause the Trust to dissolve or terminate.

(e)     To the extent that any provision of this Section 11.14 conflicts with, violates or otherwise is in contravention with any other provision of this Trust Agreement, the Parties and each Unitholder agree that the terms set forth in this Section 11.14 shall be controlling as expressly set forth herein.

Section 11.15   Non-Petition.

HTA, FGIC, the Trustee and the Delaware Trustee, by entering into this Agreement, and the Unitholders, by accepting a Trust Unit, hereby covenant and agree that they will not at any time institute against the Trust, or join in instituting against the Trust, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law; provided, however, that in the event a bankruptcy or similar proceeding is instituted against the Trust by another Person, theTrustee may file appropriate proofs of claim.

Section 11.16   Certain Terms Regarding HTA.

For the avoidance of doubt andnotwithstanding any terms appearing herein or elsewhere to the contrary:

(i)     The obligations of the Trust under the Trust Units and this Trust Agreement are non-recourse obligations of the Trust payable solely from the Trust Estate, and following realization of the Trust Estate, and its reduction to zero, any claims of the Unitholders shall be extinguished. The Trust Units are not obligations of, and are not guaranteed by, HTA, and no recourse shall be had against any officer, director, manager, employee, security holder or incorporator of HTA, or its successors or assigns, for the payment of any amounts payable under the Trust Units or the payment or performance of any obligation of the Trust under or pursuant to this Trust Agreement.

(ii)     The recitals contained in this Trust Agreement and in the Trust Units, shall be taken as the statements of the Trust, and HTA assumes no responsibility for their correctness. HTA makes no representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Trust Units.

(iii)     In purchasing any Trust Units, the purchaser shall be deemed to acknowledge, represent and agree, that none of HTA nor any of its affiliates, is acting as a fiduciary or a financial or investment advisor for such purchaser, and such purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, representations or recommendations (in each case whether written or oral) of HTA or any of its affiliates.

(iv)     HTA shall not be accountable for the use or application by the Trust of the Trust Units or the proceeds thereof or any amounts paid to the Trust pursuant to the provisions of this Trust Agreement.

Section 11.17  <u>Certain Terms Regarding FGIC.</u>

(a)      In addition to notices required to be provided elsewhere under this Trust Agreement, the Trustee shall promptly provide notice to FGIC with respect to each of the following:

(i)      any determination or intention of the Trustee or the Delaware Trustee to resign or terminate its duties hereunder;

(ii)      the amount of any cash received by the Trust, and the date on which it was received; and

(iii)      the amount of, and the Record Date and distribution date for, any distributions that the Trust is required to make to Unitholders.

(b)      The Trustee shall promptly furnish FGIC with copies of each report, notice or other communication sent to Unitholders. The Trustee shall seek to discuss and consult with FGIC regarding the same before sending them to Unitholders.

(c)      The Trustee, upon FGIC's request, shall provide additional information with respect to the Trust or the Trust Assets, including requesting from HTA information concerning the New HTA Bonds or the HTA Clawback CVIs and thereafter providing any such information received to FGIC.

(d)      The Trustee, upon FGIC's request, will discuss and consult with FGIC regarding matters concerning (i) the Covered FGIC Insured Bonds and FGIC's remaining obligations under the Covered FGIC Insurance Policy, including claims that the Trustee intends to assert thereunder, and (ii) the New HTA Bonds and the HTA Clawback CVIs held by the Trust.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the Parties have caused this Trust Agreement to be duly executed by their respective officers thereunto duly authorized and all as of the date first set forth above.

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

By: _____

Name: Edwin E. Gonzalez-Montalvo

Title:   Executive Director

[Signature Page]

Custodial Trust Agreement

**FINANCIAL GUARANTY INSURANCE COMPANY**


By:_____
Name: Derek Donnelly
Title: Senior Managing Director

[Signature Page]

**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,**
as Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

**U.S. BANK TRUST NATIONAL ASSOCIATION,** as Delaware Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

[Signature Page]

Custodial Trust Agreement

**<u>EXHIBIT A</u>**

Trust Assets

FGIC Insurance Policy Number:

FGIC Insured Bonds description and CUSIP number:

Covered FGIC Insured Bond principal amount:  [$_____] in aggregate principal amount

Allocable Plan Consideration:

       Cash:

       New HTA CIBs:

       New HTA CABs:

       New HTA Convertible CABs:

       HTA Clawback CVIs

If any HTA Clawback CVIs were sold by FGIC prior to the Closing Date, [$_____] in cash and the remaining HTA Clawback CVIs in the aggregate notional amount of [$_____].

A-1

## EXHIBIT B

[Form of Notice to Unitholders and FGIC]

[_____] CUSTODIAL TRUST
STATEMENT OF QUARTER ENDED [_], 20[__]

### POSTED TO EMMA
U.S. Bank Trust Company, National Association, as Trustee

Trust Units                                                                [CUSIP]

**1.      Distributions to Unitholders (Sections 4.1(a) and (b))**

| Source of Distributions | For Quarter Ended [_], 20__ | | Year to date, [_], 20[__] | |
|---|---|---|---|---|
| | Aggregate Distributions | Per Unit Distributions | Aggregate Distributions | Per Unit Distributions |
| Asset Sales (Section 4.1(a)(i))<br><br>Principal and interest payments (Section 4.1(a)(ii))<br><br>CVI payments (Section 4.1(a)(iii))<br><br>Policy Claim payments (Section 4.1(b))<br><br>DPO payments (Section 4.1(b))<br><br>DPO Accretion payments (Section 4.1(b)) | $ | $ | $ | $ |

**2.      Balances of New HTA Bonds and HTA Clawback CVIs (Section 4.1(c))**

| As of [_], 20[__] | | |
|---|---|---|
| | Aggregate | Per Unit |

| | principal/accreted amount of New HTA Bonds/HTA Clawback CVIs (by CUSIP) | principal/accreted amount of New HTA Bonds/HTA Clawback CVIs (by CUSIP) |
|---|---|---|
| New HTA Bonds<br>CUSIP<br>CUSIP<br>CUSIP<br><br>HTA Clawback CVIs<br>CUSIP | $ | $ |

**3.      DPO and DPO Accretion Balances** (Section 4.1(d))

DPO balance as of the Closing Date:

DPO balance as of last day of quarter:  $

DPO Accretion balance as of last day of quarter:  $

**4.      Covered FGIC Insured Bonds** (Section 4.1(e))

Accrued and unpaid interest on Covered FGIC Insured Bonds as of last day of quarter:  $

Principal amount of Covered FGIC Insured Bonds as of last day of quarter:  $

Description of change(s) in such amounts since prior quarter:

**5.      Payments to Trustees for such Quarter** (Section 4.1(g))

Fees paid to the Trustee:

Fees paid to the Delaware Trustee:

Trustee Cost amount(s) paid pursuant to Section 7.5(a)(ii) and description:

Trustee Cost amount(s) paid pursuant to Section 7.5(b) and description:

Indemnification amount(s) paid pursuant to Section 7.12 and description:

Ending Fee Reserve Balance:

**6.** **Notices received by Trustee during such Quarter**
[Copy attached] [Not applicable]


**7.** **Tax Reporting Required for such [Quarter][Year]**
[Copy attached] [Not applicable[2]]


**[8.** **Other Trust Costs for such Quarter (Section 4.1(g)(ii))**

Other Trust Cost amount(s) reimbursed pursuant to Section 7.5(c):][3]

---

[2] May be used for quarterly reporting only.
[3] Include item 8 only if applicable to the Quarter.

B-3

## <u>EXHIBIT C</u>

[Form of Certificate]

[_____] CUSTODIAL TRUST CERTIFICATE

THIS CERTIFICATE IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY. THIS CERTIFICATE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("<u>DTC</u>") TO THE TRUSTEE (AS DEFINED IN THE TRUST AGREEMENT REFERRED TO BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST THEREIN.

THIS CERTIFICATE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS CERTIFICATE MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST TO WHICH THIS CERITIFCATE RELATES.

C-1

[_____] CUSTODIAL TRUST

Certificate No.  1

Initial Notional Amount of Units: [_____]

CUSIP:[_____]

This certifies that CEDE & CO. is the registered owner of this Certificate and of the [Notional Amount of the] Units evidenced by this Certificate.

The Units evidenced by this Certificate represent a beneficial ownership interest in the Trust created by the Trust Agreement (the "Trust Agreement"), dated as of December 6, 2022, with respect to the [_____] Custodial Trust (the "Trust"), by and among the Puerto Rico Highways and Transportation Authority ("HTA"), Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, collectively the "Trustees").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to such terms in the Trust Agreement. This Certificate is issued under and subject to the terms, provisions andconditions of the Trust Agreement. By acceptance of this Certificate, the registered owner of this Certificate and each Unitholder assents to and becomes bound by the Trust Agreement.

The Trust Assets, on the Closing Date, consist of: (i) the Allocable Plan Consideration comprising Cash, New HTA Bonds and HTA Clawback CVIs as specified on Exhibit A to the Trust Agreement; (ii) the Covered FGIC Insured Bonds as specified on Exhibit A to the Trust Agreement; (iii) the Covered FGIC Insurance Policy as specified on Exhibit A to the Trust Agreement; (iv) any and all agreements, documents and instruments relating to the Covered FGIC Insurance Policy; and (v) and any other  securities, monies, proceeds or property received on account thereof or exchanged therefor from time to time, as  well as any other rights, benefits, protections, remedies and claims pertaining thereto.

Subject to the terms and conditions of the Trust Agreement and until the obligations created by the Trust Agreement shall have terminated in accordance therewith, any distributions to Unitholders shall be distributed on each distribution date to the Person in whose name this Certificate is registered at the close of business on the related Record Date for such distribution and all distributions shall be in accordance with the terms of the Trust Agreement.

Distributions on this Certificate shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of the Trust Agreement, by wire transfer of immediately available funds to the Person in whose name this Certificate is registered at the close of business on the related Record Date for such distribution in accordance with the procedures of the Depositary.

This Certificate does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and

C-2

duties evidenced thereby. A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by the holder of this Certificate or any Unitholder at a time agreed upon by such holder or Unitholder and the Trustee.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Certificate shall not entitle the holder of this Certificate or any Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust, and not in its individual capacity, has caused this Certificate to be duly executed.

[_____] CUSTODIAL TRUST

CERTIFICATE NO. _____

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

DATED:

Trustee's Certificate of Authentication:

This is the Certificate referred to in the within-mentioned Trust Agreement.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

C-3

## EXHIBIT D

[Form of Certificate of Trust]

CERTIFICATE OF TRUST OF
[_____] CUSTODIAL TRUST

THIS Certificate of Trust of [_____] Custodial Trust (the "Trust"), is being executed and filed by the undersigned as trustees, to form a statutory trust under the Delaware Statutory Trust Act (12 DEL. CODE, Sections 3801, *et seq.*) (the "Act").

1.      NAME.   The name of the statutory trust formed hereby is "[_____] Custodial Trust."

2.      DELAWARE TRUSTEE.  The name and business address of a trustee of the Trust having its principal place of business in the State of Delaware are U.S. Bank Trust National Association, 1011 Centre Road, Suite 203, Wilmington, Delaware  19805.

3.      EFFECTIVE DATE.  This Certificate of Trust shall be effective December 6, 2022.

IN WITNESS WHEREOF, the undersigned, being the trustees of the Trust, have executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

U.S.  BANK  TRUST  NATIONAL ASSOCIATION, as Delaware Trustee


By:_____
Name: Michelle Mena-Rosado
Title: Vice President


U.S.  BANK  TRUST  COMPANY, NATIONAL ASSOCIATION,
as Trustee


By:_____
Name: Michelle Mena-Rosado
Title: Vice President

D-1

## EXHIBIT E-1

[Form of Notice Relating to Permitted Sale Event]

NOTICE

U.S. Bank Trust Company, National Association
100 Wall Street, 6th floor
New York, NY 10005
         Re: Permitted Sale Event

Ladies and Gentlemen:

Reference is made to the Trust Agreement, dated as of December 6, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

This notice is being provided to the Trustee, as contemplated by clause (ii) of the definition of "Permitted Sale Event" and Section 3.5(a) of the Trust Agreement. Accordingly, FGIC hereby notifies the Trustee of its intention to instruct the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, [[the][each] series of the New HTA Bonds] [and] [the HTA Clawback CVIs] listed in Annex A in the [respective] amount[s] specified on Annex A, and notifies the Trustee that the [respective] Permitted Sale Price[s] for [such series of New HTA Bonds] [and] [the HTA Clawback CVIs] are as set forth on Annex A.

**IN WITNESS WHEREOF,** FGIC has executed and delivered this Notice as of _____, 20__.

                                        FINANCIAL  GUARANTY  INSURANCE
                                        COMPANY
                                        By:_____
                                        Name:_____
                                        Title:_____

**ACKNOWLEDGEMENT OF RECEIPT**

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Notice.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____
Name:_____
Title:_____

**Annex A**

| NEW HTA BONDS | |
|---|---|
| Series | CUSIP No. |
| | |

Principal Amount to be Sold: $[_____]

Permitted Sale Price:[_____]

| NEW HTA BONDS | |
|---|---|
| Series | CUSIP No. |
| | |

Principal Amount to be Sold: $[_____]

Permitted Sale Price:[_____]

| HTA CLAWBACK CVIs |
|---|
| CUSIP No. |
| |

Amount to be Sold: $[_____]

Permitted Sale Price:[_____]

E-1-3

**EXHIBIT E-2**

[Form of Notice and Instruction Relating to Threshold Event]

NOTICE AND INSTRUCTION

U.S. Bank Trust Company, National Association
100 Wall Street, 6th Floor
New York, NY 10005
     Re: Threshold Event

Ladies and Gentlemen:

     Reference is made to the Trust Agreement, dated as of December 6, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

     This notice and instruction is being provided to the Trustee, pursuant to and in accordance with Section 3.5(b) of the Trust Agreement and as contemplated by the definition of "Threshold Event".  Accordingly, FGIC hereby (i) notifies the Trustee that the [respective] current market price[s] of [[the][each] series of New HTA Bonds] [and] [the HTA Clawback CVIs] listed in Annex A exceed[s] the [respective] Threshold Price[s] for [such series of New HTA Bonds] [and] [such HTA Clawback CVIs] specified on Annex A, and (ii) instructs the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, [such series of New HTA Bonds] [and] [such HTA Clawback CVIs] in the amount[s], at the sale price[s] and to the person[s] and account[s], and using the broker, if any, specified on Annex A.

     **IN WITNESS WHEREOF,** FGIC has executed and delivered this Notice as of _____, 20__.

                                FINANCIAL GUARANTY INSURANCE COMPANY

                                By:_____
                                Name:_____
                                Title:_____

## ACKNOWLEDGEMENT OF RECEIPT

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Notice and Instruction.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____

Name:_____

Title:_____

**Annex A**

| **NEW HTA BONDS** | |
| --- | --- |
| Series | CUSIP No. |
|  |  |

Principal Amount to be Sold: $[_____]

Threshold Price:[_____]

Sale Price:[_____]

| **NEW HTA BONDS** | |
| --- | --- |
| Series | CUSIP No. |
|  |  |

Principal Amount to be Sold: $[_____]

Threshold Price:[_____]

Sale Price:[_____]

| **HTA CLAWBACK CVIs** |
| --- |
| CUSIP No. |
|  |

Amount to be Sold: $[_____]

Threshold Price:[_____]

Sale Price:[_____]

[Insert details of persons/accounts to whom the sale shall be made and any other details, including relevant broker, if any, necessary for such sale.]

## **EXHIBIT E-3**

[Form of Instruction Relating to Permitted Sale Event]

INSTRUCTION

U.S. Bank Trust Company, National Association
100 Wall Street, 6th floor
New York, NY 10005

   Re: Permitted Sale Event

Ladies and Gentlemen:

   Reference is made to the Trust Agreement, dated as of December 6, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee. Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

   This instruction is being provided to the Trustee pursuant to and in accordance with Section 3.5(b) of the Trust Agreement, based on FGIC's understanding that a Permitted Sale Event has occurred.  Accordingly, as contemplated by its related Notice Relating to Permitted Sale Event dated as of [*] (the "Notice"), FGIC hereby instructs the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, the [respective] amount[s] of [[the][each] series of New HTA Bonds] [and] [the HTA Clawback CVIs] referenced in the Notice, at the sale price[s] (which equal[s] or exceed[s] the [respective] Permitted Sale Price[s]) and to the person[s] and account[s], and utilizing the broker[s], if any, specified in Annex A hereto.

   **IN WITNESS WHEREOF,** FGIC has executed and delivered this Instruction as of _____, 20__.

                                   **FINANCIAL GUARANTY INSURANCE COMPANY**


                                   By:_____
                                   Name:_____
                                   Title:_____

E-3-1

**ACKNOWLEDGEMENT OF RECEIPT**

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Instruction.

U.S.   BANK   TRUST   COMPANY NATIONAL ASSOCIATION, as Trustee

By:_____
Name:_____
Title:_____

**Annex A**

| NEW HTA BONDS | |
|---|---|
| Series | CUSIP No. |
| | |

Principal Amount to be Sold: $[_____]

Sale Price:[_____][4]

| NEW HTA BONDS | |
|---|---|
| Series | CUSIP No. |
| | |

Principal Amount to be Sold: $[_____]

Sale Price:[_____][5]

| HTA Clawback CVIs |
|---|
| CUSIP No. |
| |

Amount to be Sold: $[_____]

Sale Price:[_____][6]

[Insert details of persons/accounts to whom the sale shall be made and any other details, including relevant broker, if any, necessary for such sale.]

---

[4] Equals or exceeds the Permitted Sale Price of [_____].
[5] Equals or exceeds the Permitted Sale Price of [_____].
[6] Equals or exceeds the Permitted Sale Price of [_____].

**EXHIBIT F**

Form of Trustee's Certification of Receipt of Certain Trust Assets

CERTIFICATION

To: FGIC and the Unitholders

Re: Receipt of Certain Trust Assets

Ladies and Gentlemen:

Reference is made to the Trust Agreement, dated as of December 6, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

This certification is being provided to the Unitholders and FGIC, pursuant to and in accordance with Section 2.3(b) of the Trust Agreement. Accordingly, the Trustee hereby certifies that as of the Closing Date, the Trustee (i) is in possession of Allocable Plan Consideration comprising cash in the amount set forth on Exhibit A of the Trust Agreement, (ii) confirms that [the New HTA Bonds and the HTA Clawback CVIs listed on Exhibit A of the Trust Agreement have been deposited to and are being held in the participant account of U.S. Bank Trust Company, National Association  at the Depositary for the benefit of the Unitholders and FGIC] [it has received written statements from the trustees with respect to the New HTA Bonds and the HTA Clawback CVIs, respectively, confirming that the New HTA Bonds and the HTA Clawback CVIs listed on Exhibit A of the Trust Agreement are beneficially owned by the Trust for the benefit of the Unitholders and FGIC and being held by such trustees for the benefit of the Trust until the deposit of such New HTA Bonds and HTA Clawback CVIs to such account], and (iii) confirms that the Trust Units have been issued to the Original Holders.

F-1

**IN WITNESS WHEREOF,** the Trustee has executed and delivered this Certification as of _____, 2022.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By: _____
Name: _____
Title: _____

## EXHIBIT G

[Form of Assignment]

## [_____] CUSTODIAL TRUST ASSIGNMENT

ASSIGNMENT, dated as of _____, [__], 20____(this "<u>Assignment</u>"), by U.S. Bank Trust Company, National Association, as trustee for and on behalf of the Trust listed on Annex A hereto (the "<u>Trust</u>", and such trustee being the "<u>Trustee</u>"), to and for the benefit of Financial Guaranty Insurance Company ("<u>FGIC</u>").

## WITNESSETH:

WHEREAS, reference is made to (a) the Trust Agreement, dated as [_____] (the "<u>Trust Agreement</u>"), with respect to the Trust, by and among the Puerto Rico Highways and Transportation Authority, FGIC, the Trustee, and U.S. Bank Trust National Association, as Delaware trustee for and on behalf of the Trust, and (b) the Covered FGIC Insurance Policy listed on Annex A hereto, issued by FGIC with respect to the Covered FGIC Insured Bonds described and the CUSIP for which is identified on Annex A hereto;

WHEREAS, Section 3.3(b) of the Trust Agreement[7] provides, among other things, that the execution and delivery of assignments (in substantially this form) by the Trustee on behalf of the Trust to FGIC (or its fiscal agent) is one of the conditions to FGIC's obligation to make payment of any claim asserted by the Trustee under the Covered FGIC Insurance Policy or any payment in respect of any DPO related to the Covered FGIC Insurance Policy which may become payable in accordance with the FGIC Rehabilitation Plan, in each case relating or with respect to the principal of the Covered FGIC Insured Bonds;

WHEREAS, Section 3.3(b) of the Trust Agreement further provides that, with respect to each such payment relating or with respect to the principal of the Covered FGIC Insured Bonds, which is paid or deemed to be paid by FGIC in cash (each a "<u>Cash Payment</u>"), the Trustee shall execute and deliver on behalf of the Trust to FGIC (or its fiscal agent) assignments (in substantially this form) with respect to a proportionate share (based on the proportion of such Cash Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust (the "<u>Proportionate Share</u>")) of the Trust Assets held by the Trust,;

WHEREAS, for purpose of this Assignment, the Cash Payment and Proportional Share are set forth on Annex A hereto;

WHEREAS, in accordance with the terms of the Covered FGIC Insurance Policy and Section 3.3(b) of the Trust Agreement, FGIC (or its fiscal agent) will pay, or be deemed to have paid, the Cash Payment to the Trust, as the Bondholder under the Covered FGIC Insured Policy,

---

[7] This form of assignment shall also be used for any assignments pursuant to Section 3.7(b) of the Trust Agreement with conforming changes made by FGIC.

only after FGIC (or its fiscal agent) receives this Assignment executed and delivered by the Trustee on behalf of the Trust; and

WHEREAS, in accordance with the provisions of the Trust Agreement, the Trustee intends to effect the assignments and transfers to FGIC contemplated hereby on behalf of the Trust.

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto do hereby agree as follows:

**SECTION 1.   DEFINITIONS. CAPITALIZED TERMS USED HEREIN AND NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE RESPECTIVE MEANINGS SET FORTH IN THE TRUST AGREEMENT.**

**SECTION 2.   ASSIGNMENT.**

(a)    Effective as of the date hereof and pursuant to the Covered FGIC Insurance Policy and Section 3.3(b) of the Trust Agreement, the Trustee on behalf of the Trust hereby irrevocably sells, assigns, transfers and conveys to FGIC the Proportionate Share of the Trust Assets held by the Trust as set forth in Annex A hereto (the "Assigned Trust Assets"), including all rights to payment under or with respect to the Assigned Trust Assets and all other rights therein or in relation thereto.  The Trustee shall (i) revise its registration books, and any other documents of record for the Trust Assets maintained by it, to reflect that the Assigned Trust Assets are no longer held by the Trust and have been sold, assigned, transferred and conveyed to FGIC hereunder and (ii) take such other actions as shall be necessary to transfer the Assigned Trust Assets to the account of FGIC or its custodian, in either case as directed by FGIC in writing.

(b)    The Trustee on behalf of the Trust hereby covenants and agrees to convey to FGIC, if and when received following the date hereof, any amounts related to the Assigned Trust Assets (including any sums payable as interest in respect thereof) paid to or for the benefit of the Trust that, under subsection (a) above, belong to FGIC.

**SECTION 3.   REPRESENTATIONS AND WARRANTIES.** The Trustee hereby represents and warrants to FGIC that:

(a)    The Trust is the holder of the Assigned Trust Assets, and the Trustee has all requisite power and authority to execute, deliver and perform its obligations under this Assignment and to consummate the assignment contemplated herein on behalf of the Trust, and such assignment and execution and delivery of this Assignment by the Trustee  have been duly authorized.

(b)    This Assignment has been duly executed and delivered by the Trustee on behalf of the Trust and constitutes a legal, valid and binding obligation of the Trust enforceable in accordance with its terms.

(c)     The Assigned Trust Assets are free and clear of all liens and encumbrances.

**SECTION 4.   <u>GOVERNING LAW</u>. THIS ASSIGNMENT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE.**

**SECTION 5.   <u>COUNTERPARTS</u>. THIS ASSIGNMENT MAY BE EXECUTED IN ANY NUMBER OF COUNTERPARTS, EACH OF WHICH MAY BE DELIVERED BY ELECTRONIC MESSAGING SYSTEM AND SHALL BE DEEMED AN ORIGINAL, BUT ALL OF WHICH TOGETHER SHALL CONSTITUTE ONE AND THE SAME ASSIGNMENT.**

IN WITNESS WHEREOF, the Trustee has caused this Assignment to be duly executed and delivered on behalf of the Trust on the date first above written.

U.S. BANK TRUST COMPANY,
NATIONAL ASSOCIATION, as Trustee

By:_____
Name:_____
Title:_____

**ANNEX A**

Trust:  [_____] Custodial Trust

Covered FGIC Insurance Policy Number:

Covered FGIC Insured Bonds description and CUSIP number:

Cash Payment:  [$_____]

Total Principal Amount of Covered FGIC Insured Bonds held by the Trust as the date of this
Assignment (immediately prior to receiving, or being deemed to have received, the Cash
Payment):  [$_____]

Proportionate Share:  [XX.XXXX]% (Cash Payment/Total Principal Amount of Covered FGIC
Insured Bonds)

Proportionate Share of the Trust Assets assigned by the Trustee hereunder:

> Cash:
>
> New HTA CIBs:
>
> New HTA CABs:
>
> New HTA Convertible CABs:
>
> HTA Clawback CVIs:

## <u>SCHEDULE I</u>

Threshold Prices

With respect to the New HTA CIBs, the price equal to 45% of the par amount of such bonds, with respect to the New HTA Convertible CABs the price equal to 50% of the then accreted amount of such bonds and with respect to the New HTA CABs, the price equal to 65% of the then accreted amount of such bonds, as calculated by FGIC, and with respect to the HTA Clawback CVIs, the price equal to 30% of the notional amount of such HTA Clawback CVIs.

## SCHEDULE II

Trustee Fee Schedule

The fees and expenses set forth below are payable or reimbursable to the Trustees[8] for their services as Trustees under the Trust Agreement to which this Schedule II is attached (the "Trust Agreement"). The Trust Agreement is by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company, U.S. Bank Trust Company, National Association, as Trustee, and U.S. Bank Trust National Association, as Delaware Trustee. Such fees and expenses are each payable or reimbursable by or on behalf of the Trust in accordance with the terms of the Trust Agreement.

**Acceptance Fee:**                                                                    **$1,067**

The acceptance fee includes the review and execution of the Trust Agreement and the certificates and other documents related to the Trust, the creation of the Trust and initial establishment of the accounts referred to in Section 3.1 of the Trust Agreement. Additional duties covered by this acceptance fee include the acceptance of the Trust Assets, actions referred to in Section 2.3 of the Trust Agreement, the initial issuance of the Certificate and Units, distributions under Section 3.4(a)(i) of the Trust Agreement and any other activity contemplated under the Trust Agreement to occur on or in connection with the Closing Date. The acceptance fee is payable on the Closing Date.

**Fee Reserve Threshold Amount:**                                                      **$9,000**

**Annual Administration Fee:**                                                         **$3,667**

The annual administration fee covers the routine duties of the Trustees associated with the administration of the Trust in accordance with the terms of the Trust Agreement, including without limitation the distribution of payments on any Trust Assets received from time to time by the Trust, processing of trades, presentation of claims under the FGIC Insurance Policy and effecting the related assignments and transfers of Trust Assets to FGIC, distribution of policy claims payments and DPO and DPO Accretion payments made by FGIC, preparation, posting and distribution of statements, reports and notices and other routine responsibilities, in each case as contemplated by the Trust Agreement. The administration fee is payable in advance and not subject to proration.

---

[8] Capitalized terms used and not otherwise defined in this Schedule II have the respective meanings ascribed thereto in the Trust Agreement.

**Fee for Sales of Trust Assets due to Threshold Event or Permitted Sale Event/Unitholder Election (per effectuated Threshold Event, Permitted Sale Event or Unitholder Election), and for other Non-Routine Disbursements:**     **$2,000 each**

This fee is payable separate from the annual administration fee and not inclusive of DTC charges.

**Legal Fee & Expenses:**     **AT COST**

Includes fees and expenses for legal services provided by legal counsel to the Trustees as and to the extent such fees and expenses are payable or reimbursable to the Trustees pursuant to the terms of the Trust Agreement.

**Out-of-Pocket Expenses:**     **AT COST**

Includes all related expenses of the Trustees as and to the extent such expenses are payable or reimbursable to the Trustees pursuant to the terms of the Trust Agreement.

**Extraordinary administration services ("EAS"):**

EAS are duties, responsibilities or activities not expected to be provided by the Trustees at the outset of the matter, not routine or customary, and/or not incurred in the ordinary course of business and may require analysis or interpretation, in each case unless contemplated by any other fee description in this Schedule II and if not in contravention of the Trust Agreement, provided that it is acknowledged and agreed by the Parties that duties, responsibilities and activities performed by the Trustee as contemplated under Article VIII of the Trust Agreement, or in connection with litigation, enforcement actions or other proceedings that are brought against the Trust or the Trustees and don't relate to or arise out of or in connection with either of the Trustees' gross negligence, bad faith or willful misconduct, constitute EAS. Billing for reasonable fees and expenses related to EAS is appropriate in instances where particular inquiries, events or developments are unexpected, even if the possibility of such circumstances could have been identified at the inception of the matter, or as changes in law, or in procedures or the cost of doing business related to EAS, demand. At the Trustees' option, EAS may be charged to the Trust on an hourly (time expended multiplied by current hourly rate), flat or special fee basis at such rates or in such amounts in effect at the time of such services. EAS fees are due and payable in addition to annual or ordinary administration fees. Failure to pay for EAS owed to the Trustees when due may result in interest being charged on amounts owed to the Trustees for extraordinary administration services fees and expenses at the prevailing market rate.

**General terms and conditions**

The Trust's obligation to pay under this Trustee Fee Schedule pursuant to the terms of the Trust Agreement shall govern the matters described herein and shall, in accordance with the terms of the Trust Agreement, survive any termination of the Trust or Trust Agreement and the resignation or removal of the Trustees. This Trustee Fee Schedule shall be construed and interpreted in accordance with the laws of the state identified in the Trust Agreement without giving effect to the conflict of laws principles thereof. The Parties agree to the sole and exclusive jurisdiction of the state and federal courts of the state identified in the Trust Agreement over any proceeding relating

to or arising regarding the matters described herein. Payment of fees constitutes acceptance of the terms and conditions described herein.

Fees paid in advance will not be prorated. The fees set forth above and any subsequent modifications thereof by the Parties pursuant to the terms of the Trust Agreement are part of the Trust Agreement. Execution of the Trust Agreement or acceptance of the Certificate or any Unit constitutes agreement to the above Trustee Fee Schedule.

Draft 12.1.2022

_____

[_____] CUSTODIAL TRUST [1]


RELATED TO


SETTLEMENT OF PUERTO RICO
HIGHWAYS AND TRANSPORTATION
AUTHORITY


[_____] Puerto Rico Highways and
Transportation Authority [INSERT BOND
ISSUE] maturing [OLD BOND
MATURITY DATE]

_____

This Agreement is


among


Puerto Rico Highways and
Transportation Authority,


Financial Guaranty Insurance Company,


U.S. Bank Trust Company, National
Association,
(as Trustee)


and


U.S. Bank Trust National Association,

_____

[1] Form of Custodial Trust to be formed for each CUSIP of FGIC Insured Bonds (HTA 98 Sub Bonds)
under the Plan.

Draft 12.1.2022

(as Delaware Trustee)

TABLE OF CONTENTS

ARTICLE I DEFINITIONS; CONSTRUCTION ............................................................... 1
    Section 1.1    Definitions ........................................................................... 1

    Section 1.2    Rules of Construction ........................................................... 7

    Section 1.3    Article and Section References ............................................ 7

ARTICLE II TRUST ESTATE ..................................................................................... 7
    Section 2.1    Creation of Trust. ................................................................. 7

    Section 2.2    Trust Assets. ......................................................................... 8

    Section 2.3    Acceptance by Trustee. ........................................................ 8

    Section 2.4    Purpose, Activities of the Trust. .......................................... 9

    Section 2.5    Limitations of the Trust. ...................................................... 10

ARTICLE III ADMINISTRATION OF TRUST ........................................................... 11
    Section 3.1    Accounts. .............................................................................. 11

    Section 3.2    Investment of Funds in the Collection Accounts. ................. 12

    Section 3.3    FGIC Insurance Policy and Effect of Distributions. ............ 12

    Section 3.4    Distributions. ....................................................................... 14

    Section 3.5    Threshold Event or Permitted Sale Event. ........................... 14

    Section 3.6    Surrendered Units. ............................................................... 15

    Section 3.7    FGIC Election to Accelerate Policy Payments. ................... 16

ARTICLE IV REPORTING/REMITTING TO UNITHOLDERS ................................... 16
    Section 4.1    Statements to Unitholders and FGIC ................................... 16

    Section 4.2    Compliance with Withholding Requirements. ...................... 17

ARTICLE V THE UNITS ........................................................................................... 17
    Section 5.1    The Units. ............................................................................. 17

    Section 5.2    The Certificate; Book-Entry-only System ............................ 18

    Section 5.3    Mutilated, Destroyed, Lost and Stolen Certificate. ............. 19

    Section 5.4    No Obligation to Register. ................................................... 19

    Section 5.5    Persons Deemed Owners. ..................................................... 20

    Section 5.6    Cancellation. ........................................................................ 20

ARTICLE VI HTA CLAWBACK CVIS ...................................................................... 20
    Section 6.1    Voting Rights with Respect to HTA Clawback CVIs. ........... 20

ARTICLE VII CONCERNING THE TRUSTEE.................................................................... 21

    Section 7.1    Duties of Trustee. ................................................................ 21

    Section 7.2    Certain Matters Affecting the Trustee. ............................... 22

    Section 7.3    Trustee Not Liable for Units or HTA Clawback CVIs, the Covered FGIC Insured Bonds or the Covered FGIC Insurance Policy.................. 24

    Section 7.4    Trustee May Own Units. ..................................................... 24

    Section 7.5    Trustee Costs and Expenses. .............................................. 24

    Section 7.6    Eligibility Requirements for Trustee and Successor Trustee. ................. 25

    Section 7.7    Resignation and Removal of the Trustee. ................................. 26

    Section 7.8    Successor Trustee. ............................................................... 27

    Section 7.9    Merger or Consolidation of Trustees. ................................. 27

    Section 7.10    Appointment of Trustee Custodians........................................ 28

    Section 7.11    Trustee May Enforce Claims Without Possession of Certificate.............. 28

    Section 7.12    Trustee Indemnity. ............................................................. 28

    Section 7.13    Acceptance by Trustees, Representations and Warranties of Trustees..... 28

    Section 7.14    The Delaware Trustee. ....................................................... 29

ARTICLE VIII DEFAULT ON HTA CLAWBACK CVIS.............................................. 31

    Section 8.1    Realization Upon Default. .................................................. 31

ARTICLE IX TERMINATION OF TRUST ............................................................. 32

    Section 9.1    Termination; No Redemption Rights. ................................. 32

    Section 9.2    Procedure for Termination. ................................................. 32

ARTICLE X TAX PROVISIONS ....................................................................... 33

    Section 10.1    Grantor Trust Provisions. ................................................... 33

    Section 10.2    Characterization. ................................................................. 34

    Section 10.3    Grantor Trust Administration................................................. 34

    Section 10.4    Reports to Unitholders and Tax Authorities. ..................... 34

ARTICLE XI MISCELLANEOUS PROVISIONS................................................... 35

    Section 11.1    Amendment of Trust Agreement.......................................... 35

    Section 11.2    Counterparts. ....................................................................... 36

    Section 11.3    Limitation on Rights of Unitholders. ................................. 37

    Section 11.4    Notices.................................................................................. 37

    Section 11.5    Severability of Provisions. ................................................... 38

    Section 11.6    Acts of Unitholders. ........................................................... 38

    Section 11.7    Headings............................................................................... 38

Section 11.8    No Waiver; Cumulative Remedies........................................................... 38

Section 11.9    Merger and Integration.................................................................................. 39

Section 11.10  [Reserved]......................................................................................................... 39

Section 11.11  Patriot Act......................................................................................................... 39

Section 11.12  Governing Law; Venue Jury Waiver. ......................................................... 39

Section 11.13  Force Majeure. ................................................................................................. 40

Section 11.14  Intent of Parties. .............................................................................................. 40

Section 11.15  Non-Petition. .................................................................................................... 42

Section 11.16  Certain Terms Regarding HTA. .................................................................. 43

Section 11.17  Certain Terms Regarding FGIC. ................................................................. 43

## EXHIBITS

Exhibit A - Trust Assets.......................................................................................................... A-1
Exhibit B - Form of Notice to Unitholder and FGIC......................................................... B-1
Exhibit C - Form of Certificate .............................................................................................. C-1
Exhibit D - Form of Certificate of Trust .............................................................................. D-1
Exhibit E-1 - Form of Notice Relating to Permitted Sale Event................................... E-1-1
Exhibit E-2 - Form of Notice and Instruction Relating to Threshold Event............. E-2-1
Exhibit E-3 - Form of Instruction Relating to Permitted Sale Event........................... E-3-1
Exhibit F - Form of Trustee's Certification of Receipt of Certain Trust Assets ......... F-1
Exhibit G - Form of Assignment ........................................................................................... G-1

## SCHEDULES

Schedule I - Threshold Prices ............................................................................................... S-I-1
Schedule II - Trustees Fee Schedule..................................................................................... S-II-1

## [_____] CUSTODIAL TRUST

### TRUST AGREEMENT

**THIS TRUST AGREEMENT**, dated as of December 6, 2022 (this "Trust Agreement" or this "Agreement"), with respect to the [_____] Custodial Trust (the "Trust"), by and among the Puerto Rico Highways and Transportation Authority ("HTA"), Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, collectively the "Trustees", and with the HTA and FGIC, collectively, the "Parties").

**WHEREAS,** in furtherance of the structure approved in HTA's Plan of Adjustment and in order to facilitate the implementation thereof, the Trust is being established by HTA and the Trustees solely for the benefit of and on behalf of the Unitholders and FGIC;

**WHEREAS**, except for the establishment of the Trust and the deposits therein pursuant to the Plan of Adjustment or as contemplated hereby, HTA shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof; and

**WHEREAS**, the Trust is one of the FGIC Trusts contemplated by Section 26.3(a) of the Plan of Adjustment and is being formed for the purposes of (i) holding the Covered FGIC Insured Bonds, (ii) receiving FGIC Plan Consideration allocable or distributable in accordance with Section 16.1 of the Plan to the Original Holders, each component of which is identified on Exhibit A hereto (collectively, the "Allocable Plan Consideration"), (iii) being the sole holder and beneficiary of the Covered FGIC Insurance Policy, and (iv) issuing a single class of beneficial ownership interests consisting of trust units that shall be assigned a CUSIP number, be issued in global form and be registered in the name (or nominee name) of and transferable through the Depositary.

**NOW THEREFORE**, in consideration of the mutual promises, covenants, representations and warranties made in this Trust Agreement, the Parties hereby agree as follows;

### ARTICLE I

### DEFINITIONS; CONSTRUCTION

Section 1.1    Definitions

(a)    Capitalized terms used in this Trust Agreement (including the recitals hereto), and not otherwise defined in this Trust Agreement, shall have the respective meanings assigned to such terms in the Plan.

(b)    Except as otherwise specified herein or as the context may otherwise require, the followingterms have the respective meanings set forth below:

1

"Affiliate": With respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control", when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Business Day": Any day excluding Saturday, Sunday and any day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in San Juan, Puerto Rico or New York, New York are authorized or required by law or other governmental action to close.

"Cash Acceleration Payment": The meaning specified in Section 3.7.

"Cash Payment": The meaning specified in Section 3.3(b).

"Certificate": A definitive certificate substantially in the form attached as Exhibit C evidencing the Units and issued by the Trust pursuant to Article V hereof.

"Certificate of Trust":  The Certificate of Trust of the Trust substantially in the form attached as Exhibit D hereto.

"Closing Date":  December 6, 2022.

"Code": The Internal Revenue Code of 1986, as amended, and Treasury Regulations promulgated thereunder.

"Corporate Trust Office": The Trustees' offices at 100 Wall Street, 6th floor, New York, NY 10005, or such other addresses as either of the Trustees' may designate from time to time by notice to the Unitholders , FGIC and the other Trustee.

"Covered FGIC Insured Bonds": The FGIC Insured Bonds held or beneficially owned by the Original Holders in the aggregate principal amount specified on Exhibit A, which are deposited into the Trust on the Closing Date and thereafter held by the Trust (as such bonds may be deemed to be paid, reduced or satisfied in accordance with the terms of this Trust Agreement or the FGIC Insurance Policy).

"Covered FGIC Insurance Policy": The FGIC Insurance Policy solely insofar as it applies and relates to the Covered FGIC Insured Bonds, including, for the avoidance of doubt, all rights relating to payments (if any) required to be made by FGIC in respect of any DPO and DPO Accretion associated with such Covered FGIC Insured Bonds under such FGIC Insurance Policy in accordance with the terms and conditions of the FGIC Rehabilitation Plan.  For the avoidance of doubt, (i) all FGIC Insured Bonds other than the Covered FGIC Insured Bonds shall be deemed no longer covered by the FGIC Insurance Policy as of the Closing Date for all purposes, and (ii) neither the Trust nor the Trustee shall have any rights under the FGIC Insurance Policy except in respect of the Covered FGIC Insured Bonds.

"Delaware Trustee": The meaning specified in the preamble hereto and any successor Delaware Trustee appointed in accordance with Section 11.10.

"Delaware Trust Statute": Chapter 38 of Title 12 of the Delaware Code.

"Depositary": DTC or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder.

"Dollar" or "$": Such currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

"DPO": The meaning specified in the FGIC Rehabilitation Plan.

"DPO Accretion": The meaning specified in the FGIC Rehabilitation Plan.

"DTC": The Depository Trust Company, a limited purpose trust company organized under the laws of the State of New York, its successors and assigns.

 "Eligible Account": A non-interest bearing account, held in the United States in the name of the Trust for the benefit of the Unitholders and FGIC, which is a segregated account maintained with either (1) a Federal or State chartered depository institution that has (x) a short-term deposit or unsecured debt rating of at least "A-1" and "P-1" by S&P and Moody's respectively, (y) a long-term deposit rating (or, if a deposit rating is unavailable, senior unsecured debt rating) of at least "A" and "A2" by S&P and Moody's, respectively and (z) a combined capital and surplus of at least U.S.$200,000,000 or (2) the corporate trust department of such a Federal or State-chartered deposit institution.

"EMMA": The Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board, or, if not available for the purposes provided herein, a website specified by the Trustee. Any obligation to post a document to EMMA shall be understood as an obligation to post such document under the CUSIP number for the Units.

"Escrow Account": The escrow account established by the Escrow Account Agreement.

"Escrow Account Agreement": The Escrow Account Agreement FGIC CW/HTA Bond Claims Arising From HTA 98 Sub Bonds dated March 15, 2022 among the Commonwealth, FGIC, as the bond insurer and FGIC, as the escrow agent.

"Executive Officer": With respect to any corporation, the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, any Vice President, the Secretary, any Assistant Secretary, the Treasurer or any Assistant Treasurer of such corporation and with respect to any partnership, any general partner thereof and, as applicable, an authorized signatory.

"Fair Market Value" means, in respect of any HTA Clawback CVI as of any date of determination, the lower of (i) the price for such HTA Clawback CVI, as quoted by Bloomberg L.P. for any trade with total proceeds of at least $1 million as of the close of business on the prior Business Day, if Bloomberg L.P. has quoted a price for such HTA Clawback CVI, as of such

Business Day, and (ii) the fair market price for such HTA Clawback CVI, including accrued and unpaid interest (if applicable), determined by soliciting bids from at least two broker-dealers of national standing, each of which is independent of each other and unaffiliated with the Trustee, and shall be the average of such bids, provided that, for the avoidance of doubt, there shall be no requirement to solicit such bids, in which case only clause (i) shall apply.

"Fee Reserve": Funds held from time to time by the Trustee in the General Collection Account, in an amount up to the Fee Reserve Threshold Amount, to cover payments of Trustee Costs as they arise from time to time.

"Fee Reserve Threshold Amount": The fee reserve threshold amount set forth in the Trustee Fee Schedule.

"FGIC Insurance Policy": The existing insurance policy issued by FGIC with respect to the FGIC Insured Bonds, which is listed on Exhibit A hereto, as modified by the FGIC Rehabilitation Plan and this Trust Agreement.

"FGIC Insurance Policy Collection Account": The meaning specified in Section 3.1(a).

"FGIC Insured Bonds": The bonds previously issued by HTA, which are described and the CUSIP number for which is identified on Exhibit A hereto.

"FGIC Rehabilitation Plan": The First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013, together with all exhibits thereto and the documents contained in the plan supplement thereto, in each case as the same may be amended, revised, supplemented or otherwise modified from time to time.

"General Collection Account": The meaning specified in Section 3.1(a).

"HTA Clawback CVI Distribution Date": With respect to the HTA Clawback CVIs, each date specified in the Clawback CVI Indenture or CVI Legislation on which distributions of amounts due on such securities are scheduled to be paid, subject to any business day adjustments and conventions specified therein.

"Moody's": Moody's Investors Service, Inc.

"Notional Amount": With respect to the Units as of any date of determination, the amount of Trust Units issued as provided in this Trust Agreement on the Closing Date, excluding any Units that may have been surrendered or canceled or otherwise are no longer outstanding on or prior to such date.

"Officer's Certificate": A certificate signed by an Executive Officer of the applicable Person and delivered to the Trustee.

"Opinion of Counsel": A written opinion of counsel, who may be counsel to FGIC.

"Original Holder": Each holder of an Allowed FGIC Insured Bond Claim on the Closing Date arising from FGIC Insured Bonds (other than FGIC), as provided in Section 26.3(a) of the Plan.

"Other Trust Costs": Any filing fees or other costs or expenses of the Trust that have not been paid by either of the Trustees or the Trust at the time of any election by FGIC under Section 7.5(c).

"Permitted Sale Event": With respect to the HTA Clawback CVIs, the satisfaction of all of the following requirements:

(i)     FGIC is not in default under the Covered FGIC Insurance Policy;

(ii)     FGIC shall have notified the Trustee, by delivering a notice substantially in the form of Exhibit E-1 attached hereto, of its intention to instruct the Trustee to sell some or all of the HTA Clawback CVIs and setting forth the Permitted Sale Price for such HTA Clawback CVIs.

(iii)     The Trustee shall have provided notice to Unitholders in accordance with the notice requirements set forth in Section 11.4 hereof (a) notifying Unitholders of the notice of FGIC described in clause (ii) above and the Permitted Sale Price set forth in such notice and (b) requesting that any Unitholders objecting to such proposed sale provide written notice of such objection to the Trustee; and

(iv)     The Trustee shall not have received a written objection from the Requisite Unitholders (determined as of the date of the notice described in clause (ii) above) with respect to such proposed sale within seven (7) Business Days of the date the notice provided in clause (iii) above is provided.

"Permitted Sale Price": With respect to any Permitted Sale Event regarding some or all of the HTA Clawback CVIs, the price equal to the percentage of the outstanding notional amount of such HTA Clawback CVIs set forth in the related notice delivered by FGIC to the Trustee.

"Person": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"Plan of Adjustment" or "Plan": The *Title III Plan of Adjustment of the Puerto Rico Transportation Authority,* Case No. 17 BK 3567-LTS, confirmed by order entered October 12, 2022, as amended, modified or supplemented from time to time.

"pro rata": With respect to any payment or distribution, or any allocation of any cost or expense, to Unitholders hereunder, pro rata shall be calculated based on the Notional Amount of the Units then outstanding.

"Proof of Policy Claim Form": The Proof of Policy Claim Form required to be filed in order to submit a policy claim to FGIC in accordance with the FGIC Rehabilitation Plan.

"Record Date": With respect to any distribution to be made to Unitholders: (i) based on the Cash to be deposited into the Trust on the Closing Date, the Closing Date, (ii) based on any scheduled payment of any amount due in respect of HTA Clawback CVIs, the tenth day preceding the related HTA Clawback CVI Distribution Date, and (iii) based on any other funds deposited or to be deposited in the General Collection Account or any payment made or to be made under or with respect to the Covered FGIC Insurance Policy, the Record Date established by the Trustee pursuant to Section 3.4(b), provided that if such tenth day under clause (ii) above is not a Business Day, the Record Date shall be the preceding Business Day.

"Requisite Unitholders": As of any date, Unitholders holding more than fifty (50) percent of the Notional Amount of the Trust Units as of such date, excluding from both the numerator and the denominator the Notional Amount of any Trust Units held by FGIC.

"Secretary of State": The meaning specified in Section 2.1.

"State": Any one of the 50 states of the United States, the District of Columbia or its territories.

"S&P": S&P Global Ratings.

"Threshold Price": With respect to HTA Clawback CVIs, the respective prices set forth on Schedule I.

"Threshold Event": With respect to the HTA Clawback CVIs, the receipt by the Trustee of a notice by FGIC that the current market price of the HTA Clawback CVIs exceeds the Threshold Price for the HTA Clawback CVIs, coupled with a written instruction from FGIC to sell some or all of the HTA Clawback CVIs, such notice and instruction to be substantially in the form of Exhibit E-2 attached hereto.

"Trust": The trust created by this Trust Agreement as specified in the preamble hereto.

"Trust Agreement": The meaning specified in the preamble hereto.

"Trust Assets" or "Trust Estate": The property, assets and rights set forth in clauses (a), (b) and (c) of Section 2.2, and any other securities, monies, proceeds or property received on account thereof or exchanged therefor from time to time, as well as any other rights, benefits, protections, remedies and claims pertaining thereto.

"Trustee": The meaning specified in the preamble hereto and any successor Trustee appointed pursuant to Section 7.6 or Section 7.8.

"Trustee Costs": The meaning specified in Section 7.5(a).

"Trustee Fee Schedule": The Schedule II to this Trust Agreement.

"Trustees": Collectively, the Trustee and the Delaware Trustee.

"United States": The United States of America (including the States and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction.

"Unitholder": The Person in whose name a Unit is registered in the records of the Depositary on any date of determination.

"Units" or "Trust Units":  The single class of beneficial ownership interests in the Trust evidenced by the Certificate.

"U.S.A. PATRIOT Act": The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107 56 (signed into law October 26, 2001) and its implementing regulations.

Section 1.2    Rules of Construction

Unless the context otherwise requires:

(i)    a term has the meaning assigned to it;

(ii)    an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect in the United States from time to time;

(iii)    "or" is not exclusive;

(iv)    the words "herein", "hereof", "hereunder" and other words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or other subdivision;

(v)    the words "include" and "including" shall be deemed to be followed by the phrase "without limitation"; and

(vi)    the meanings given to defined terms are applicable to the singular and plural forms thereof as appropriate.

Section 1.3    Article and Section References

All Article and Section references used in this Trust Agreement, unless otherwise provided, are to Articles and Sections in this Trust Agreement. Any reference to "this Article" appearing within a particular Section of an Article is a reference to such Article as a whole. Any reference to "this Section" appearingwithin a particular paragraph of a Section is a reference to such Section as a whole.

## ARTICLE II

## TRUST ESTATE

Section 2.1     Creation of Trust.

The Trust is being created on the date hereof pursuant to the execution of this Agreement and the filing by the Trustees of the Certificate of Trust with the Office of the Secretary of State of the State of Delaware (the "Secretary of State"), under the name written above the heading of this Trust Agreement, in which name the Trust shall have power and authority and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the activities of the Trust. It is the intention of the Parties that the Trust hereby created constitutes a statutory trust under the Delaware Trust Statute and that this Trust Agreement constitutes the governing instrument of the Trust. The Trustees are hereby authorized and directed to, and shall, on the date hereof file the Certificate of Trust with the Secretary of State. The Trustee shall have power and authority, and is hereby authorized and empowered, to take all actions on behalf of the Trust as set forth in this Trust Agreement and each of the Trustees is authorized and empowered to execute and file with the Secretary of State any other certificate required or permitted under the Delaware Trust Statute to be filed with the Secretary of State. The office of the Trust shall be in the care of the Trustee at the Corporate Trust Office or at such other address as the Trustee may designate by written notice to the Unitholders and FGIC.

Section 2.2     Trust Assets.

Pursuant to and in accordance with this Trust Agreement and the Plan, on the Closing Date:

(a)      (i) HTA shall, on behalf of the Original Holders and as required by Section 26.3(a) of the Plan, deposit into the Trust any and all agreements, documents and instruments relating to the Covered FGIC Insurance Policy; and (ii) FGIC shall, in accordance the Escrow Account Agreement, deposit into the Trust the HTA Clawback CVIs specified on Exhibit A hereto, which comprise the Allocable Plan Consideration, and were deposited into the Escrow Account by the Commonwealth upon the satisfaction of the HTA Distribution Conditions pursuant to the Escrow Account Agreement, provided, however, that if any of such HTA Clawback CVIs were sold by FGIC in accordance with the Escrow Account Agreement prior to the Closing Date, then FGIC shall instead deposit the aggregate proceeds of such sale(s) together with the remaining HTA Clawback CVIs, in each case as specified on Exhibit A hereto, into the Trust in accordance with the Escrow Account Agreement.

(b)      All Covered FGIC Insured Bonds shall be deposited, or be deemed to have been deposited, into the Trust by the Depositary on behalf of the Original Holders and as required by Section 26.3(a) of the Plan.  All rights and remedies under or with respect to the Covered FGIC Insured Bonds and the applicable related legislative bond resolutions (other than with respect to the payment obligations of HTA) and the Covered FGIC Insurance Policy (including the rights with respect to any related DPO and DPO Accretion under the FGIC Rehabilitation Plan) shall be preserved and remain in full force and effect solely to the extent necessary to preserve any claims relating the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy; and

8

(c)     Each holder/beneficiary of the Covered FGIC Insurance Policy shall, on behalf of the Original Holders and as required by Section 26.3(a) of the Plan, deposit, or be deemed to have deposited, into the Trust the Covered FGIC Insurance Policy and relinquish all rights thereunder to the Trustee, on the Closing Date and thereafter.

Section 2.3     Acceptance by Trustee.

(a)     By its execution of this Trust Agreement, the Trustee acknowledges and declares that it will hold or has agreed to hold all Trust Assets, including all documents or instruments delivered to it or received by it from time to time with respect to the Trust Assets, in each case in trust for the exclusive use and benefit of all present and future Unitholders. The Trustee represents and warrants that, except as expressly permitted by this Trust Agreement, (i) it has not and will not, in any capacity, assert any claim or interest in the Trust Estate and will hold (or its agent will hold) such Trust Estate and the proceeds thereof in trust pursuant to the terms of this Trust Agreement, and (ii) it has not encumbered or transferred its right, title or interest in the Trust Estate.

(b)     The Trustee shall, on the Closing Date, deliver to the Unitholders and FGIC in accordance with the Notice provisions of Section 11.4 a certification substantially in the form of Exhibit F hereto that it (i) confirms that the HTA Clawback CVIs have been deposited to and are being held in the participant account of U.S. Bank Trust Company, National Association at the Depositary for the benefit of the Unitholders and FGIC, subject to Section 2.3(c) below, and (ii) confirms that the Trust Units have been issued to the Original Holders.

(c)     The Trustee shall, on the Closing Date, (i) take such reasonable action as shall be necessary to facilitate or permit the deposit of the HTA Clawback CVIs to the participant account of U.S. Bank Trust Company, National Association at the Depositary for the benefit of the Unitholders and FGIC, and (ii) assuming that such HTA Clawback CVIs have been so deposited, no later than the Business Day following such action, confirm to the Unitholders and FGIC in writing (to the extent not covered in the certification delivered pursuant to Section 2.3(b) above) that the HTA Clawback CVIs have been deposited to and are being held in such account.

(d)     Except as specifically provided herein, the Trustee shall not sell, pledge or assign any interest in the Trust Estate.

Section 2.4     Purpose, Activities of the Trust.

It is the intention of the Parties that the Trust shall not engage in any business or activities other than certain non-business activities in connection with, or relating to, the following:

(a)     accept the conveyance, assignment and transfer of the Trust Assets pursuant to the Plan or as contemplated by this Trust Agreement;

(b)     create one or more accounts or sub-accounts in accordance with the terms of this Trust Agreement;

(c)     make claims and assignments and receive payments under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and this Trust Agreement;

(d)     receive payments pursuant to the Plan;

(e)     issue the Trust Units to the Original Holders through the issuance of the corresponding Certificate to the Depositary or its nominee in accordance with the terms of this Trust Agreement and take such reasonable action as shall be necessary to facilitate or permit the deposit of the HTA Clawback CVIs to the participant account of U.S. Bank Trust Company, National Association at the Depositary for the benefit of the Unitholders and FGIC;

(f)     make distributions to the Depositary and Unitholders in accordance with the terms of this Trust Agreement;

(g)     coordinate Unitholder communications through the Depositary;

(h)     follow, accept or act upon any instruction or direction from FGIC or the Requisite Unitholders, as applicable, in each case only as expressly permitted herein;

(i)     hold the Trust Assets;

(j)     sell or assign HTA Clawback CVIs or portions thereof only as expressly provided in Section 3.5 or 3.6 hereof;

(k)     effectuate Unitholder Elections as provided in Section 3.6 hereof;

(l)     make public disclosures on EMMA as contemplated by this Trust Agreement;

(m)     make payments, reimbursements and distributions as contemplated by this Trust Agreement;

(n)     otherwise perform its obligations in accordance with, and take such other actions as are expressly provided for or permitted under, the terms of this Trust Agreement; and

(o)     engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

Section 2.5     <u>Limitations of the Trust.</u>

(a)     Except as otherwise provided herein, the affairs of the Trust will be managed by or under the direction of the Trustee. Neither HTA or FGIC nor any of their respective Affiliates will have authority to act for, or to assume any obligation or responsibility on behalf of, the Trust or the Trustee in its capacity as Trustee;

(b)     The Trust will keep correct and complete books and records of accounts and minutes of the meetings and other proceedings of the Trust. Any such resolutions, agreements and other instruments will be continuously maintained by the Trustee as official records of the Trust;

(c)     The Trust will provide for its own operating expenses and liabilities from the Trust Assets. General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to HTA or FGIC or their respective Affiliates;

(d)     All oral and written communications, including letters, invoices, contracts, statements and applications, will be made solely in the name of the Trust if related to the Trust;

(e)     There will be no guarantees made by the Trust with respect to obligations of HTA or FGIC or their respective Affiliates. There will not be any indebtedness relating to borrowings or loans between the Trust and HTA or FGIC or their respective Affiliates; provided that FGIC or its Affiliates may own Trust Units;

(f)     The Trust will act solely in its own name or the Trustee's on its behalf and through its or the Trustee's duly authorized officers or agents in the conduct of its activities. The Trust will not: (i) operate or purport to operate as an integrated, single economic unit with respect to HTA or FGIC or any other affiliated or unaffiliated entity; (ii) seek or obtain credit or incur any obligation to any third party based upon the assets of HTA or FGIC or their respective Affiliates; or (iii) induce any third party to reasonably rely on the creditworthiness of HTA or FGIC or any other affiliated or unaffiliated entity in its dealings with the Trust;

(g)     The Trust will maintain a Delaware Trustee with its office in the State of Delaware; and

(h)     The Trust will not engage in any transaction with an Affiliate on any terms other than would be obtained in an arm's-length transaction with a non-Affiliate.

## ARTICLE III

## ADMINISTRATION OF TRUST

Section 3.1     Accounts.

(a)     The Trustee has established and will maintain Eligible Accounts (i) to hold all amounts received on or in respect of the Trust Assets except the Covered FGIC Insurance Policy (the "General Collection Account") and (ii) to hold all amounts received on account of the Covered FGIC Insurance Policy (including, any amounts received on account of DPO or DPO Accretion) (the "FGIC Insurance Policy Collection Account"), each held in trust for the benefit of the Unitholders and FGIC. The Trustee shall deposit all cash received pursuant to clause (a) of Section 2.2 into the General Collection Account on the Closing Date. U.S. Bank Trust Company, National Association has established and will maintain its participant account at the Depositary into which the HTA Clawback CVIs received pursuant to clause (a) of Section 2.2 shall be deposited and held in trust for the benefit of the Unitholders and FGIC. Each of the General Collection Account and the FGIC Insurance Policy Collection Account and such other accounts shall be under the sole dominion and control of the Trustee, and the Trustee shall be entitled to look solely to the General

11

Collection Account for payment of any Trustee Costs and funding of the Fee Reserve from time to time in accordance with the terms of this Trust Agreement.  All distributions to Unitholders shall be made only from cash on deposit in either the General Collection Account or the FGIC Insurance Policy Collection Account in accordance with the terms hereof.

(b)     If, at any time, a formerly Eligible Account no longer fulfills the definition of Eligible Account, the Trustee shall within thirty (30) days establish a new General Collection Account or FGIC Insurance Policy Collection Account, as applicable, meeting the conditions specified in such definition and transfer any cash on deposit in the General Collection Account or FGIC Insurance Policy Collection Account to such new General Collection Account or FGIC Insurance Policy Collection Account, and from the date such new General Collection Account or FGIC Insurance Policy Collection Account is established, it shall be the General Collection Account or FGIC Insurance Policy Collection Account under this Trust Agreement.

(c)     The Trustee shall give notice to FGIC and Unitholders of the location of each Eligible Account and other account and to the proposed new location of any Eligible Account or other account prior to any change thereof.

Section 3.2     Investment of Funds in the Collection Accounts.

Amounts in the General Collection Account and the FGIC Insurance Policy Collection Account shall not be invested.

Section 3.3     FGIC Insurance Policy and Effect of Distributions.

(a)     The Trust is deemed to hold the Covered FGIC Insured Bonds and is the sole Person entitled under the terms of the Covered FGIC Insured Bonds to payment thereof. Accordingly, the Trust is and shall be the sole "Bondholder" entitled to assert claims and receive payments under or with respect to the Covered FGIC Insurance Policy.

(b)     The Trustee shall have the sole authority to assert, and shall assert, subject to its rights and protections herein, claims under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and to take all actions required to enforce the Covered FGIC Insurance Policy, including in the event that FGIC fails to make any payment when due under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy. The Trustee shall be authorized to take, and shall take, subject to its rights and protections herein, all actions it deems necessary or advisable to satisfy any and all conditions to the obligations to make payment of any claim asserted by the Trustee under the Covered FGIC Insurance Policy or any payment in respect of any DPO or DPO Accretion related to the Covered FGIC Insurance Policy which may become payable in accordance with the FGIC Rehabilitation Plan. The following are conditions to FGIC's obligation to make any such payment, and the Trustee is authorized and directed to satisfy such conditions: (i) the Trustee shall have submitted to FGIC with respect to each claim a fully completed and duly executed Proof of Policy Claim Form in accordance with the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan, and (ii) with respect to each such payment (other than on account of DPO Accretion) relating or with respect to the principal of the Covered FGIC Insured Bonds, which is paid or deemed to be paid by FGIC in cash (each a "Cash Payment"), the Trustee shall have executed and delivered on behalf of the Trust to FGIC (or its

12

fiscal agent) assignments in substantially the form of Exhibit G with respect to a proportionate share (based on the proportion of such Cash Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust) of the Trust Assets held by the Trust, as confirmed by FGIC, and taken such actions as shall be necessary to transfer such Trust Assets to the account of FGIC or its custodian, in either case as directed by FGIC in writing, and receipt of such Trust Assets shall have been confirmed by FGIC.

(c)     All claims that are properly submitted to FGIC by the Trustee under the Covered FGIC Insurance Policy shall be paid to the extent permitted by FGIC under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan, subject to satisfaction of any conditions to such payments, including the conditions set forth in this Trust Agreement. All payments to the Trustee under or with respect to the Covered FGIC Insurance Policy shall be deposited into the FGIC Insurance Policy Collection Account on the date received if received prior to 11:00 a.m. New York time, on any Business Day or, if received after such time on any Business Day, on the following Business Day.  In the event that FGIC has defaulted in its payment obligations under the Covered FGIC Insurance Policy, the Requisite Unitholders shall have the right to direct the Trustee in writing to take, and the Trustee is authorized to take, and shall take, subject to its rights and protections herein,  any and all actions necessary or desirable to enforce and recover such payment obligations.

(d)     Each distribution of cash to the Unitholders from the General Collection Account shall automatically and immediately reduce on a dollar-for-dollar basis the outstanding principal amount of the Covered FGIC Insured Bonds and shall automatically and immediately result in a corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy.  All payments from the FGIC Insurance Policy Collection Account under or with respect to the Covered FGIC Insurance Policy arising from or related to principal of or interest on the Covered FGIC Insured Bonds (other than on account of DPO Accretion) shall be deemed to automatically and immediately reduce on a dollar-for-dollar basis the outstanding principal amount of or the accrued and unpaid interest on the Covered FGIC Insured Bonds, respectively. For the avoidance of doubt, all payments on account of a claim for accrued and unpaid interest due shall reduce on a dollar-for-dollar basis the outstanding interest amount of the Covered FGIC Insured Bonds, and all payments of a claim for principal shall reduce on a dollar-for-dollar basis the outstanding principal amount of the Covered FGIC Insured Bonds.

(e)     If at any time the principal amount of the Covered FGIC Insured Bonds shall be reduced to zero, then thereafter each distribution of cash to the Unitholders under this Trust Agreement (other than distributions from the FGIC Insurance Policy Collection Account on account of payments made by FGIC under or with respect to the Covered FGIC Insurance Policy) shall automatically and immediately reduce on a dollar-for-dollar basis the accrued and unpaid interest, if any, due on the Covered FGIC Insured Bonds and shall automatically and immediately result in a corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy. If at any time the principal amount of and the accrued and unpaid interest on the Covered FGIC Insured Bonds and the DPO Accretion balance under the Covered FGIC Insurance Policy shall be reduced to zero, then (i) the Covered FGIC Insurance Policy shall be indefeasibly canceled, (ii) within three (3) Business Days thereafter, the Trustee shall (x) first, assign to FGIC ownership of the Trust Assets held by the Trust at that time to the extent required to reimburse FGIC for any unreimbursed payments previously made under the Covered FGIC Insurance Policy

and (y) second, distribute to the Unitholders any remaining Trust Assets, and (iii) upon making such assignment and distributions (if any), the Units shall be deemed to be redeemed in full and the Trust shall terminate in accordance with the provisions of Article IX hereof.

(f)     Each of FGIC and each Unitholder shall have and retain all rights set forth in the Plan applicable to it, including those set forth in Section 26.3 of the Plan.

(g)     In addition to any other rights FGIC may have hereunder or otherwise, due to the subrogation rights under the Covered FGIC Insurance Policy, upon making each Cash Payment or Cash Acceleration Payment to the Trust, FGIC shall automatically become the owner of a proportionate share (as described in Section 3.3(b)) of the Trust Assets held by the Trust and shall be fully subrogated to all of the Trust's rights therein, including any payments on or in respect thereof.

Section 3.4     Distributions.

(a)     All cash received by the Trust or the Trustee from any source shall be applied and distributed in accordance with the terms of this Trust Agreement. Within two (2) Business Days of the Trust's receipt of (i) the Cash to be deposited into the Trust pursuant to clause (a) of Section 2.2 on the Closing Date, or (ii) any scheduled payment due on the HTA Clawback CVIs, the Trustee shall distribute such amounts, net of any outstanding Trustee Costs that are due and payable or to be reimbursed to the Trustees as of the related distribution date, Other Trust Costs to be reimbursed under Section 7.5(c) and amounts necessary to fund the Fee Reserve to the Fee Reserve Threshold Amount, to the Depositary for distribution on a pro rata "pass-through" basis to each Unitholder as of the related Record Date. The Trustee shall pay or reimburse such Trustee Costs, reimburse such Other Trust Costs and fund the Fee Reserve at the time of such distribution.

(b)     The Trustee shall establish the Record Date for the distribution of (i) any other funds deposited or to be deposited in the General Collection Account or (ii) any payment made or to be made under or with respect to the Covered FGIC Insurance Policy, and the Trustee shall send notice to the Unitholders of such Record Date and the related anticipated distribution date of such amounts, in accordance with Section 11.4, in each case not later than two (2) Business Days after the Trust's receipt of such funds or payments. Such Record Date shall be at least 10 days and no more than 15 days after the date such notice is posted on EMMA. On such distribution date, the Trustee shall distribute such amounts, in the case of clause (i) net of any outstanding Trustee Costs that are due and payable as of such distribution date, to the Depositary for distribution on a pro rata "pass-through" basis to each Unitholder as of the related Record Date.

(c)     Any distribution to Unitholders shall be made to the Person in whose name such Unit is registered at the close of business on the related Record Date in accordance with the procedures of the Depositary.

Section 3.5     Threshold Event or Permitted Sale Event.

(a)     The Trustee shall not sell any HTA Clawback CVIs except upon a Threshold Event or Permitted Sale Event and subject to the terms of Section 3.5(b), provided that the Trustee shall be authorized to make the assignments and transfers contemplated by Sections

14

3.3 and 3.6.  Upon the Trustee's receipt of a notice substantially in the form of Exhibit E-1 attached hereto as contemplated by clause (ii) of the definition of "Permitted Sale Event", the Trustee shall (i) provide the notice to Unitholders contemplated by clause (iii) of such definition (with a copy of such notice to FGIC) as soon as practicable and in any event within three (3) Business Days of receiving FGIC's notice, and (ii) no later than the tenth (10th) Business Day following the date of such notice to Unitholders, notify FGIC in writing whether the Trustee has received a written objection from the Requisite Unitholders as contemplated by clause (iv) of such definition.

(b)    Upon the occurrence of a Threshold Event or Permitted Sale Event with respect to which FGIC has provided written instruction to the Trustee (substantially in the form of Exhibit E-2 hereto, in the case of a Threshold Event, or Exhibit E-3 hereto, in the case of a Permitted Sale Event) to sell some or all of the HTA Clawback CVIs, the Trustee shall seek to sell HTA Clawback CVIs to the person(s) identified to the Trustee by FGIC in such instruction (which instruction shall also include the applicable sale price(s), the information for the account(s) to which such HTA Clawback CVIs shall be transferred by the Trustee and any other details, including relevant broker(s), to be utilized by the Trustee for such sale) as soon as practicable and in any event within one (1) Business Day of receiving such instruction, provided that: (i) any such sale is made at price(s) that equal or exceed the Fair Market Value applicable to such sale, as confirmed to the Trustee by FGIC, (ii) any such sale is made at price(s) that equal or exceed the applicable Threshold Price in the case of a Threshold Event or the applicable Permitted Sale Price in the case of a Permitted Sale Event, and (iii) all proceeds of such sales shall be deposited into the General Collection Account.

Section 3.6    Surrendered Units.

(a)    Subject to satisfaction of the conditions set forth in Section 3.6(b), any Unitholder may, at any time and from time to time, elect to surrender Units held by such Unitholder (as confirmed by the Depositary) to the Trustee for cancellation (the "Surrendered Units") in exchange for a transfer to such Unitholder of its proportional percentage of HTA Clawback CVI (orany other securities or property received in respect thereof or in exchange therefor) held by the Trust at that time, by giving written notice thereof to FGIC and the Trustee (a "Unitholder Election").

(b)    The following conditions must be satisfied to permit and effectuate any Unitholder Election: (i) FGIC shall, in its sole discretion, have consented in writing to such Unitholder Election (other than any Unitholder Election in connection with which FGIC shall not have agreed or otherwise be obligated to pay any consideration for the release set forth in clause (iv) below), (ii) the Surrendered Units shall be cancelled by the Trustee with an automatic and immediate corresponding reduction in the aggregate Notional Amount of the Units and the Trustee shall deliver written notice of such cancellation and reduction to the Depositary, (iii) the outstanding principal amount of the Covered FGIC Insured Bonds shall automatically and immediately be reduced on a proportionate dollar-for-dollar basis (based on the proportion of the Notional Amount of such Surrendered Units to the aggregate Notional Amount of the Units at that time) with an automatic and immediate corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy, which reductions shall be acknowledged by the Trustee, and (iv) such Unitholder shall execute and deliver a release, in form and substance satisfactory to FGIC, releasing all rights and claims of any kind it may have relating to the Surrendered Units or the

15

Covered FGIC Insurance Policy subject to receipt of consideration, if any, that FGIC shall have agreed in writing to pay to such Unitholder in consideration for release. Upon satisfaction of such conditions, the Trustee shall transfer to the Unitholder ownership of the applicable proportional percentage of the HTA Clawback CVI (or any other securities or property received in respect thereof or in exchange therefor) held by the Trust at that time, as directed by FGIC. FGIC's consent to any Unitholder Election shall not limit its right, in its sole discretion, to deny its consent to any other Unitholder Election.

Section 3.7    FGIC Election to Accelerate Policy Payments.

(a)    Section 3.7(b) shall apply to the Trust and the Covered FGIC Insurance Policy as of the date that is thirty (30) Business Days following the Closing Date unless the Requisite Unitholders notify the Trustee in writing prior to such date of their election that Section 3.7(b) shall not so apply.

(b)    Pursuant to the Plan, the payment of the principal of the Covered FGIC Insured Bonds was accelerated and such Covered FGIC Insured Bonds are due and payable at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus accrued interest thereon, or 100% of accreted amounts thereon, to the date of payment. FGIC is not obligated to pay any claims on an accelerated basis under the Covered FGIC Insurance Policy. FGIC shall have the right, in its sole and absolute discretion, to elect at any time to permit a claim under the Covered FGIC Insurance Policy in the amount of such acceleration price at such time (regardless of whether the Trustee shall have submitted a claim therefor to FGIC) and to make payment to the Trustee in respect of such permitted claim under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan; provided, however, that FGIC shall not be obligated to make all or any portion of such payment, unless and until, with respect to the portion of such payment relating to the principal of the Covered FGIC Insured Bonds which will be paid or deemed to be paid by FGIC in cash (the "Cash Acceleration Payment"), the Trustee shall have executed and delivered to FGIC (or its fiscal agent) assignments in substantially the form of Exhibit G with respect to a proportionate share (based on the proportion of such Cash Acceleration Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust) of the Trust Assets held by the Trust, as confirmed by FGIC, and taken such action as shall be necessary to transfer such Trust Assets to the account of FGIC or its custodian, in either case as directed by FGIC in writing, and receipt of such Trust Assets shall have been confirmed by FGIC.

(c)    At any time, Requisite Unitholders can notify the Trustee of an election that Section 3.7(b) shall apply notwithstanding a prior election under Section 3.7(a), and such notice will be effective upon agreement by FGIC within 30 Business Days of such notification.

16

## ARTICLE IV

## REPORTING/REMITTING TO UNITHOLDERS

Section 4.1      Statements to Unitholders and FGIC.

On a quarterly basis, the Trustee shall prepare and post a statement to EMMA, in the form attached hereto as Exhibit B and provide notice of such statement to the Unitholders and FGIC in accordance with the Notice provisions of Section 11.4 setting forth:

(a)      all distributions made from the General Collection Account during the quarter and during the year to date (on an aggregate and per Unit basis), identifying the portion thereof attributable to the amount of (i) asset sales; and (ii) CVI payments;

(b)      all distributions made from the FGIC Insurance Policy Collection Account during the quarter and during the year to date (on an aggregate and per Unit basis);

(c)      the principal amount (or accreted amount, as applicable) as of the quarter end of each CUSIP number of HTA Clawback CVI held by the Trust (or any other securities or property received in respect thereof or in exchange therefor) (on an aggregate and per Unit basis);

(d)      the DPO balance and DPO Accretion balance associated with the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy as of the quarter end, to the extent such information has been furnished to the Trustee by FGIC;

(e)      the principal amount of, and the accrued and unpaid interest on, the Covered FGIC Insured Bonds as of the end of the quarter, together with a description of the changes in such amounts during the quarter;

(f)      any notices received by the Trustee from FGIC in connection with any required DPO and DPO Accretion payments associated with the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy;

(g)      (i) the respective amounts paid to the Trustees for trustee fees, other Trustee Costs under Section 7.5(a), Trustee Costs under Section 7.5(b) and indemnification amounts under Section 7.12, a description of such indemnification amounts and Trustee Costs, (ii) the amount of any Other Trust Costs reimbursed under Section 7.5(c), if applicable, and (iii) the ending Fee Reserve balance for each quarter; and

(h)      any required tax reporting for such period.

Section 4.2      Compliance with Withholding Requirements.

Notwithstanding any other provisions of the Trust Agreement, the Trustee shall comply with all federal withholding requirements with respect to payments to the Depositary and the Unitholders that the Trustee reasonably believes are applicable under the Code. The consent of the Depositary and the Unitholders shall not be required for such withholding.  In the event the Trustee does withhold any amount from payments to the Depositary or any Unitholder pursuant to federal

withholding requirements, the Trustee shall indicate with any payment to the Depositary or such Unitholder the amount withheld. Any amounts withheld shall be treated as a distribution of cash to the Depositary or Unitholder, as the case may be, in the amount of the withholding for all purposes and shall thereby reduce amounts otherwise distributable to the Depositary or such Unitholder.  If an amount required to be withheld was not withheld, the Trust may reduce subsequent distributions by the amount of such required withholding.

## ARTICLE V

## THE UNITS

Section 5.1     The Units.

(a)     The Units shall be evidenced by the Certificate issued by the Trustee to the Depositary in accordance with Section 5.2(a).

(b)     As of the Closing Date, the Notional Amount of the Units issued under this Trust Agreement shall be the Notional Amount set forth in Exhibit C, which is the aggregate original principal amount as of their date of issuance of those Covered FGIC Insured Bonds deposited, or deemed hereunder to have been deposited, into the Trust.  The beneficial ownership of the Units as of the Closing Date shall be allocated by the Depositary among the Original Holders on a proportionate basis based on the aggregate original principal amount as of their date of issuance of each original Holder's respective Covered FGIC Insured Bonds that are deposited, or deemed hereunder to have been deposited, into the Trust on the Closing Date.

(c)     All Units issued under this Trust Agreement shall be evidenced by the same Certificate, subject to the requirements of the Depositary, and otherwise identical in all respects. All Units issued under this Trust Agreement shall be in all respects equally and ratably entitled to the benefits hereunder without preference, priority or distinction on account of the actual time or times of authentication and delivery, and shall be held and transferable only through the Depositary.

(d)     No additional interests in the Trust other than the Certificate and the Units shall be issued hereunder, except in accordance with Section 5.3.

Section 5.2     The Certificate; Book-Entry-only System.

(a)     On the Closing Date, upon deposit of all of the Trust Assets into the Trust pursuant to the Plan of Adjustment and as provided in Section 2.2, the Trustee shall issue to the Depositary the initial Certificate by executing and delivering the Certificate, on behalf of this Trust, with the manual or facsimile signature of an authorized officer or other agent of the Trustee.

(b)     The Trust shall issue the Certificates to the Depositary.  Consistent with DTC book-entry provisions, one or more typewritten Certificates shall be prepared and registered in the name of the Depositary or its nominee.  There shall be no physical delivery of the Certificate or Units to the Unitholders (other than the Depositary) or other beneficial owners.

(c)      DTC is hereby appointed as the initial Depositary, with Cede & Co., a nominee thereof, being the initial registered owner of the Certificate. In the event that any Depositary resigns or is removed, the Trustee shall select a substitute Depositary. Notwithstanding anything herein to the contrary, the Trust and each of the Trustees, and any agent of the Trust or either of the Trustees, may treat any Depositary in whose name any Certificate is registered as the owner of the Units for all purposes, including for actions by Unitholders. For so long as the Depositary is the registered owner of the Certificate, procedures with respect to the transmission of notices and the transfer of ownership and payment of Units shall be in accordance with arrangements between the Trustee and the Depositary. The Certificate shall be issued in global form and the Units represented thereby shall be freely tradeable and transferable through the Depositary.

(d)      Notwithstanding anything herein to the contrary, so long as the Certificate is registered in the name of the Depositary, the Trust and the Trustee shall have no responsibility or obligation to any Depositary participant, indirect participant or beneficial owner of the Certificate or Units. Without limiting the immediately preceding sentence, the Trust and the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of any Depositary or any Depositary participant or indirect participant with respect to any beneficial ownership interest in the Certificate, (ii) the delivery to any Depositary participant, indirect participant, beneficial owner or any other person, other than the Depositary, of any notice with respect to the Certificate or Units, including any notice of Record Date, distribution date, payment, redemption or tender, or (iii) the payment to any Depositary participant, indirect participant, beneficial owner or any other person, other than the Depositary, of any amount with respect to Units or Certificate. The rights of Unitholders shall be limited to those established by law and agreements between the Unitholders and the Depositary and Depositary participants and as provided herein.

(e)      A CUSIP number will be imprinted on the Certificate, but such CUSIP number shall not constitute a part of the contract evidenced by the Certificate or Units. As a convenience to the Depositary and Unitholders, the Trust and the Trustees may use such CUSIP numbers in any notices to the Depositary and Unitholders.

Section 5.3      Mutilated, Destroyed, Lost and Stolen Certificate.

(a)      If (i) any mutilated Certificate is presented to the Trustee or (ii) the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Certificate, and there is delivered to the Trustee such security or indemnity as it may require to save it harmless, and the Trustee has not received notice that such Certificate (and the Units represented thereby) has been acquired by a protected purchaser, then, in each case, the Trustee shall execute, authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like tenor, form, terms and principal amount, bearing an identifying number not used by any contemporaneously existing Certificate, so that neither gain nor loss in interest shall result from such exchange or substitution.

(b)      Upon the issuance of any new Certificate under this Section, the Trustee may require the payment by the Certificate holder of a sum sufficient to cover any tax or other

19

governmental charge that may be imposed in respect thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

(c)    Every new Certificate issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust Assets to the extent provided herein, whether or not the destroyed, lost or stolen Certificate shall be at any time enforceable by anyone, and the Units represented thereby shall be entitled to all the benefits of this Trust Agreement.

(d)    The terms of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Units.

Section 5.4    No Obligation to Register.

The Trustee is not obligated to register or qualify any Certificate or Unit under the Securities Act of 1933, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder, or any other securities laws or to effect any qualification under the Trust Indenture Act of 1939, as amended.

Section 5.5    Persons Deemed Owners.

Subject to Section 5.3, but notwithstanding anything else in this Trust Agreement, the Trustee and any agent of the Trustee may treat the Depositary or its nominee in whose name the Certificate is registered as the owner of the Units on the related distribution date for the purpose of receiving distributions on such Units and for all other purposes whatsoever, including for actions by Unitholders, and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary. All distributions made hereunder to the Depositary or its nominee, or upon its order, shall be valid, and, to the extent of the sum or sums paid, effectual to satisfy and discharge the liability for moneys distributable upon the Units.

Section 5.6    Cancellation.

All Certificates evidencing Units surrendered for payment, redemption, transfer or exchange shall be delivered to the Trustee and shall be promptly canceled by the Trustee. The Trustee and no one else will cancel all such Certificates surrendered for registration of transfer, exchange, payment, replacement or cancellation and will dispose of such cancelled Certificates in accordance with its customary procedures. No Certificate shall be authenticated in lieu of or in exchange for any Certificates canceled as provided in this Section, except as expressly permitted by this Trust Agreement.

## ARTICLE VI

## HTA CLAWBACK CVIs

Section 6.1    Voting Rights with Respect to HTA Clawback CVIs.

(a)    Within three (3) Business Days after receipt of notice of any meeting of, or other occasion for the exercise of voting rights or the giving of consents by, owners of any of the

HTA Clawback CVIs (or any other securities or property received in respect thereof or in exchange therefor), the Trustee shall deliver a copy of such notice to FGIC and the Unitholders.

(b)     The voting and direction rights allocable to the owners of the HTA Clawback CVIs (or any other securities or property received in respect thereof or in exchange therefor) pursuant to the terms thereof (including voting and direction rights in respect of remedies) ("Voting Rights") shall be allocated to FGIC unless FGIC is in default under the Covered FGIC Insurance Policy (a "Voting Rights Condition"). Upon the written request of FGIC, subject to the immediately preceding sentence, the Trustee shall vote in accordance with any instruction set forth in such written request.  Upon the occurrence and continuation of a Voting Rights Condition, the Voting Rights will be deemed to be held on a pro rata basis by the Unitholders, and the Trustee may act at the direction of the Requisite Unitholders.

## ARTICLE VII

## CONCERNING THE TRUSTEE

Section 7.1     Duties of Trustee.

(a)     Every provision of this Trust Agreement relating to the conduct of, affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VII.

(b)     The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Trust Agreement and no implied covenants or obligations shall be read into this Trust Agreement against the Trustee.

(c)     The Trustee shall (at the direction of the Requisite Unitholders) take all necessary or desirable actions to enforce the Covered FGIC Insurance Policy against FGIC as set forth herein.

(d)     The Trustee shall deliver to all Unitholders copies of all notices and written communications received from HTA as they relate to the HTA Clawback CVIs.

(e)     Except as provided in Section 7.2 hereof, no provision of this Trust Agreement shall be construed to relieve the Trustee from liability for its own grossly negligent action, grossly negligent failure to act, bad faith or willful misconduct; provided, however, that:

(i)     The Trustee shall not be liable for an error of judgment made in good faith by an Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(ii)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of FGIC or the Requisite Unitholders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the HTA Clawback CVIs exercising any trust or power conferred upon the Trustee with respect to the HTA Clawback CVIs, under this Trust Agreement;

(iii)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Requisite Unitholders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Covered FGIC Insurance Policy or exercising any trust or power conferred upon the Trustee with respect to the Covered FGIC Insurance Policy, under this Trust Agreement; and

(iv)     Any determination of gross negligence, bad faith or willful misconduct of the Trustee shall be made only upon the rendering of a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

Section 7.2     <u>Certain Matters Affecting the Trustee.</u>

(a)     The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties. Further, the Trustee may accept a copy of the vote of the board of directors or equivalent governing body of any party certified by its clerk or assistant clerk or secretary or assistant secretary as conclusive evidence of the authority of any Person to act in accordance with such vote, and such vote may be considered as in full force and effect until receipt by the Trustee of written notice to the contrary;

(b)     The Trustee may, in the absence of bad faith on its part, conclusively rely upon an Opinion of Counsel or certificate of an Officer of the appropriate Person whenever in the administration of this Trust Agreement the Trustee shall deem it desirable that a matter be proved or established (unless other evidence be herein specifically prescribed) prior to taking, suffering or omitting any action hereunder;

(c)     The Trustee may consult with counsel of its own selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in reliance on such advice or Opinion of Counsel;

(d)     The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Trust Agreement or to institute, conduct, defend or continue any litigation thereunder or in relation thereto at the request, order or direction of the Requisite Unitholders, pursuant to the provisions of this Trust Agreement, unless such Unitholders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(e)     The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Trust Agreement;

(f)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by

FGIC or the Requisite Unitholders; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of this Trust Agreement, the Trustee may require indemnity against such expense or liability as a condition to taking any such actions;

(g)    The Trustee may execute any of the trusts or powers under this Trust Agreement or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for the supervision of or any misconduct or negligence on the part of any agent or attorney appointed with due care by it under this Trust Agreement;

(h)    Whenever the Trustee is authorized herein to require acts or documents in addition to those required to be provided it in any matter, it shall be under no obligation to make any determination whether or not such additional acts or documents should be required unless obligated to do so under Section 7.1;

(i)    The Trustee shall not be deemed to have notice of any matter unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the applicable Trust Units generally, HTA, the Trust or this Trust Agreement;

(j)    None of the provisions of this Trust Agreement shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it;

(k)    Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

(l)    The permissive rights of the Trustee to perform any discretionary act enumerated in this Trust Agreement shall not be construed as a duty or obligation, and the Trustee shall not be answerable in the performance of such act other than for its gross negligence, bad faith or willful misconduct;

(m)    The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian, co-trustee and other Person employed to act hereunder;

(n)    The Trustee shall have no duty (A) to see to any recording, filing, or depositing of this Trust Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or

levied against, any part of the Trust Estate, or (D) to confirm or verify the contents of any reports or certificates delivered to the Trustee pursuant to this Trust Agreement believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties;

(o)     The Trustee shall have no liability or responsibility for the acts or omissions of any other party to any of this Trust Agreement or any related document;

(p)     The Trustee shall have no duty or obligation to obtain or solicit any collateral or any funds to be remitted in any of the accounts established under this Trust Agreement, and shall have a duty only to accept such collateral or funds delivered to it in accordance with this Trust Agreement;

(q)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(r)     The Trustee may request the delivery of a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement;

(s)     All rights of action under this Trust Agreement or under any of the Trust Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Trust Units or the Certificate, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Unitholders, subject to the provisions of this Trust Agreement; and

(t)     The Trustee shall establish a Fee Reserve, which Fee Reserve shall be replenished up to the Fee Reserve Threshold Amount in accordance with Section 3.4(a), and the Trustee shall be permitted to apply the amounts therein to pay Trustee Costs.

Section 7.3     Trustee Not Liable for Units or HTA Clawback CVIs, the Covered FGIC Insured Bonds or the Covered FGIC Insurance Policy.

The Trustee assumes no responsibility for the correctness of the recitals contained in this Trust Agreement and in the Trust Units or Certificate. The Trustee makes no representations or warranties as to the validity or sufficiency of this Trust Agreement or of the Trust Units (other than the signature and authentication of the Trustee on the Certificate) or of the, HTA Clawback CVIs, the Covered FGIC Insured Bonds, the Covered FGIC Insurance Policy or related documents. The Trustee shall not be accountable for the use or application of any of the Trust Units, or for the use or application of any funds in respect of the HTA Clawback CVIs or deposited in or withdrawn from the Trust in accordance with this Trust Agreement other than, in each case, any funds held by or on behalf of the Trustee in accordance with Article III. The Trustee, in its capacity as Trustee hereunder, shall have no responsibility or obligation to comply with, or to monitor any other Person's compliance with, the CVI Legislation or the Clawback CVI Indenture.

Section 7.4     Trustee May Own Units.

The Trustee in its individual capacity or any other capacity may become the owner or pledgee of Trust Units with the same rights it would have if it were not Trustee.

Section 7.5       Trustee Costs and Expenses.

(a)      The Trustees shall each be entitled to receive from the Trust (i) fees agreed upon in writing, including such fees set forth in the Trustee Fee Schedule, (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by each of the Trustees in the execution of the trusts created under this Trust Agreement and in the exercise and performance of any of the powers and duties thereunder or the administration of the Trust, (ii) reimbursement for (x) all reasonable fees, expenses, costs and disbursements incurred or made by either of the Trustees in accordance with any of the provisions of this Trust Agreement, including Section 7.5(b) hereof (including the fees, expenses and disbursements of their respective counsel and of all persons not regularly in their respective employ), and (y) their indemnities pursuant to Section 7.12 hereof, and (iii) amounts to be promptly used by the Trustee to pay any reasonable fees, expenses or costs then owed by the Trust in accordance with this Trust Agreement and not covered by clause (ii) of this Section 7.5(a) (collectively, the "Trustee Costs"). For the avoidance of doubt, it is understood and agreed by the Parties that Trustee Costs under clause (ii) or (iii) of this Section 7.5(a) may include amounts of reasonable fees, expenses, costs, disbursements or indemnities that properly relate to the Trust and to one or more other trusts created under other trust agreements to which HTA, FGIC and the Trustees are party, which amounts have been reasonably and fairly allocated by the Trustee to the Trust in good faith as the Trust's share and are described in each relevant statement prepared and provided by the Trustee pursuant to Section 4.1. All such Trustee Costs shall be paid to the Trustees in accordance with the provisions of Section 3.4 hereof or taken from the Fee Reserve.

(b)      In furtherance of Section 7.5(a), each of the Trustees shall be entitled to receive reimbursement for all reasonable out-of-pocket expenses which are properly documented and incurred or made by it, including costs of collection, payable as a result of or in connection with litigation, enforcement actions or other proceedings brought by Unitholders against HTA, the Trust, or such Trustee except for proceedings, litigation or enforcement actions that relate to such Trustee's grossly negligent action, grossly negligent failure to act, bad faith or its own willful misconduct as determined by a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

(c)      For the avoidance of doubt, neither HTA nor FGIC shall be liable for any Trustee Costs or Other Trust Costs.  FGIC may, in its sole discretion, elect to pay any Other Trust Costs, in which case FGIC shall be reimbursed by the Trustee at the time of the next distribution of any amount under Section 3.4(a) hereof upon notifying the Trustee of the amount to be so reimbursed.

Section 7.6       Eligibility Requirements for Trustee and Successor Trustee.

The Trustee and any successor Trustee shall at all times be a corporation or national banking association that: (i) is not an Affiliate of HTA, , the Commonwealth of Puerto Rico or any of its instrumentalities, or FGIC; (ii) is neither affiliated with HTA, the Commonwealth of Puerto Rico or any of its instrumentalities, nor located in the Commonwealth of Puerto Rico; (iii) is organized and doing business under the laws of any state or the United States of America; (iv) is authorized under such laws to exercise corporate trust powers; (v) is in good standing under the law of the jurisdiction in which it is organized; (vi) has a combined capital and surplus of at least

25

$50,000,000; (vii) is subject to supervision or examination by federal or state authority; and (viii) is a nationally recognized financial institution and fiduciary regularly acting as a trustee in the municipal finance market. If such corporation or national banking association publishes reports of its conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published. In case at any time any Trustee or successor Trustee shall cease to be eligible in accordance with the provisions of this Section, such Trustee or successor Trustee shall resign immediately in the manner and with the effect specified in Section 7.7.

Section 7.7     <u>Resignation and Removal of the Trustee.</u>

(a)     The Trustee may at any time resign and be discharged from the trusts created pursuant to this Trust Agreement by giving 60 days written notice, which shall be posted to EMMA by the Trustee. Upon receiving such notice of resignation, FGIC shall promptly appoint a successor trustee meeting the requirements set forth in Section 7.6 by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee. A copy of such instrument shall be delivered to the Unitholders and posted to EMMA by the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee at the expense of the Trust.

(b)     If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 7.6 and shall fail to resign after written request therefor by FGIC or the Requisite Unitholders, or if any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then FGIC or the Requisite Unitholders may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.

(c)     FGIC, with the written consent of the Requisite Unitholders, may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, signed by such Requisite Unitholders or their attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

(d)     The Requisite Unitholders, with the written consent of FGIC (which consent shall not be unreasonably withheld or delayed by FGIC in the event the Trustee is in default of its obligations hereunder to enforce the Covered FGIC Insurance Policy), may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, signed by such Requisite Unitholders or their attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

(e)      Any resignation of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.7 shall not become effective until the acceptance of appointment by the successor trustee as provided in Section 7.8 hereof. The compensation and reimbursement for fees and expenses of any successor trustee appointed in connection with the resignation of the Trustee shall be the sole responsibility of the Trust, including the costs and expenses incurred in connection with any such succession.

(f)      Any removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.7 shall not become effective until (i) acceptance of appointment by the successor trustee as provided in Section 7.8 hereof and (ii) payment of all costs, expenses and indemnities due and owing to the outgoing Trustee, including the costs and expenses incurred in connection with any such succession. In the event the Trustee is removed due to a request by the Requisite Unitholders pursuant to Section 7.7(b), then the fees and expenses of the successor trustee incurred in connection with any such succession shall be the sole responsibility of the Unitholders requesting such removal.

(g)      The compensation for any successor trustee shall be paid in substantially the same manner as compensation was paid to the predecessor trustee.

(h)      Notwithstanding the replacement of the Trustee pursuant to this Section 7.7, the rights, benefits, protections and indemnities afforded to the Trustee under this ARTICLE VII shall continue to the benefit of the retiring Trustee.

Section 7.8      Successor Trustee.

(a)      Any successor trustee appointed as provided in Section 7.7 shall execute, acknowledge and deliver to the Unitholders, FGIC and the predecessor trustee an instrument accepting such appointment under this Trust Agreement and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee herein. The predecessor trustee shall deliver to the successor trustee all related documents and statements held by it under this Trust Agreement and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

(b)      No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of this Section 7.6 hereof.

(c)      Upon acceptance of appointment by a successor trustee as provided in this Section, the successor trustee shall (a) post to EMMA notice of the succession of such trustee under this Trust Agreement and (b) provide notice of the succession of such trustee under this Trust Agreement to the Depositary.

Section 7.9     Merger or Consolidation of Trustees.

Any Person into which either of the Trustees may be merged or converted or with which it may be consolidated or any Person resulting from any merger, conversion or consolidation to which such Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of such Trustee, shall be the successor of such Trustee under this Trust Agreement, provided such Person shall be eligible under the provisions of Section 7.6 (as to the Trustee) and 7.14 (as to the Delaware Trustee), without the execution or filing of any paper or any further act on the part of any of the Parties, anything herein to the contrary notwithstanding.

Section 7.10     Appointment of Trustee Custodians.

The Trustee may appoint one or more custodians (each a "Trustee Custodian") to hold all or a portion of the Trust Estate as agent for the Trustee, by entering into a custodial agreement. The appointment of any Trustee Custodian may at any time be terminated and a substitute custodian appointed therefor by the Trustee. Subject to ARTICLE VII, the Trustee agrees to comply with the terms of each custodial agreement and to enforce the terms and provisions thereof against the Trustee Custodian for the benefit of the Unitholders. Each Trustee Custodian shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and surplus of at least $10,000,000 and shall be qualified to do business in the jurisdiction in which it holds any asset constituting part of the Trust Estate. Any such Trustee Custodian may not be an Affiliate of HTA or FGIC. The Trustee is responsible for the fees and expenses of any Trustee Custodian appointed hereunder.

Section 7.11     Trustee May Enforce Claims Without Possession of Certificate.

All rights of action and claims under this Trust Agreement or the Certificate may be prosecuted and enforced by the Trustee without the possession of any of the Trust Units or the production thereof in any proceeding relating thereto and any such proceeding instituted by the Trustee shall be brought in its own name or in its capacity as Trustee. Any recovery of judgment shall, after provision for the payment of the reasonable compensation, fees, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Unitholders in respect of which such judgment has been recovered.

Section 7.12     Trustee Indemnity.

The Trust shall indemnify the Trustees for, and hold them harmless against, any loss, liability or expense arising out of or in connection with their acceptance or administration of the Trust, including the reasonable costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their respective powers or duties hereunder, provided in each case that such loss, liability, expense, cost or claim does not relate to or arise out of or in connection with either Trustee's gross negligence, bad faith or willful misconduct.

Section 7.13     Acceptance by Trustees, Representations and Warranties of Trustees.

The Trustees each hereby undertake to perform their respective obligations set forth herein. The Trustee hereby agrees to hold the Trust Assets, as trustee in trust on behalf of the Trust upon

the terms and conditions and for the use and benefit of the Unitholders as herein set forth. The Trustees each as to itself hereby represent and warrant to each of HTA, FGIC, holder of the Certificate and holders of the Units that as of the Closing Date:

(a) it is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or association;

(b) it has full corporate power, authority and right to execute, deliver and perform its duties and obligations under this Trust Agreement, and has taken all necessary corporate action to authorize the execution, delivery and performance by it of this Trust Agreement, including the execution and delivery of the Certificate on behalf of the Trust;

(c) the execution and delivery of this Trust Agreement by it and its performance of and compliance with the terms of this Trust Agreement will not violate its certificate of incorporation, association or other constituent documents or by-laws or constitute a default under, or result in the material breach or acceleration of, any material contract, agreement or other instrument to which it is a party or which may be applicable to it or any of its assets;

(d) as of the Closing Date, this Trust Agreement has been duly executed and delivered by it and, assuming the due authorization, execution and delivery of this Trust Agreement by each of the other parties hereto, constitutes the legal, valid and binding obligation of it, enforceable in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and general principles of equity;

(e) it is not in violation, and the execution and delivery of this Trust Agreement by it and its performance and compliance with the terms thereof will not constitute a violation, of any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over it or its properties, which violation would reasonably be expected to have a material adverse effect on the condition (financial or otherwise) or operations of it or its properties or on the performance of its duties hereunder;

(f) there are no actions or proceedings against, or investigations of, it pending, or, to its knowledge, threatened, before any court, administrative agency or other tribunal (i) that could reasonably be expected to prohibit its entering into this Trust Agreement, (ii) seeking to prevent the issuance of the Certificate contemplated by this Trust Agreement or (iii) that could reasonably be expected to materially affect the performance by it of its obligations under, or the validity or enforceability against it of, this Trust Agreement; and

(g) no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by it of, or compliance by it with, this Trust Agreement, or for the consummation of the transactions contemplated by this Trust Agreement, except for such consents, approvals, authorizations and orders, if any, that have been obtained prior to the Closing Date, other than the filing of the Certificate of Trust with the Secretary of State.

Section 7.14   The Delaware Trustee.

(a)       There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law and acts through one or more persons authorized to bind such entity.  The initial Delaware Trustee shall be U.S. Bank Trust National Association.  The Delaware Trustee shall be entitled to all of the rights, privileges, immunities, indemnities and protections afforded to the Trustee hereunder, but will only have such responsibilities and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)       The Delaware Trustee shall be one of the trustees of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Delaware Trust Statute and for taking such actions as are required to be taken by a Delaware Trustee under the Delaware Trust Statute. The duties, liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware; and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Delaware Trust Statute (only upon the written direction of the Trustee); and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.  With the exception of the express duties set forth in this Section 7.14 (b), and the implied contractual covenant of good faith and fair dealing, all other duties of the Delaware Trustee, including fiduciary duties, are expressly eliminated.  The Delaware Trustee shall have no liability to the Trust, to the Trustee, to any beneficiary, or to any other person that is a party to or is otherwise bound by this Trust Agreement for breach of contract or breach of duties (including fiduciary duties), except for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.  The Delaware Trustee shall not be liable for any acts or omissions, except for such losses, damages or expenses which have been finally adjudicated by a court of competent jurisdiction to have directly resulted from the Delaware Trustee's gross negligence, bad faith or willful misconduct.

(c)       The Delaware Trustee shall not be liable for the acts or omissions of the Trust, the Trustee or any other person or entity, nor shall the Delaware Trustee be liable for supervising or monitoring the performance of the duties of the Trustee or the Trust or of any other person or entity under this Trust Agreement or any related document.

(d)       The Delaware Trustee shall not be personally liable for any error of judgment made by an Officer of the Delaware Trustee having direct responsibility for the administration of this Trust Agreement in good faith.

(e)       No provision of this Trust Agreement shall require the Delaware Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its duties hereunder.

(f)       Under no circumstance shall the Delaware Trustee, in its individual capacity or in its capacity as Delaware Trustee, or any member, partner, shareholder, director, officer, employee, agent, affiliate or advisor of the Delaware Trustee or their respective affiliates be personally liable

for any representation, warranty, covenant, agreement, liability or indebtedness of the Trust, as all such representations, warranties, covenants, agreements, liabilities or indebtedness of the Trust are those of the Trust as an entity.

(g)     The recitals contained herein shall not be taken as the statements of the Delaware Trustee, and the Delaware Trustee does not assume any responsibility for their correctness.  The Delaware Trustee shall not be personally responsible for or in respect of, and the Delaware Trustee makes no representations as to, the title to, or value or condition of, the property of the Trust or any part thereof, including the Trust Assets or Trust Estate, nor as to the validity or sufficiency of this Trust Agreement or any related certificate, instrument or other document.

(h)     The Delaware Trustee may conclusively rely and shall be fully protected, and shall incur no liability to anyone, in acting or refraining from acting in good faith and in reliance upon any signature, instrument, notice, resolution, request, instruction, direction, consent, order, certificate, report, opinion, bond or other document or paper believed by it to be genuine and believed by it to be signed by the proper party or parties.  The Delaware Trustee may accept a certified copy of a resolution of any governing body of any person as conclusive evidence that such resolution has been duly adopted by such person and that the same is in full force and effect. As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein or whenever the Delaware Trustee shall deem it desirable that a fact or matter be proved or established prior to taking, suffering or omitting any action hereunder (including, direction by the Trustee with respect to such action), the Delaware Trustee may for all purposes hereof rely on a certificate, signed by any officer of the party delivering the certificate or, in the case of the Trustee, signed by the Trustee, as to such fact or matter, and such certificate shall constitute full protection to the Delaware Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

(i)     In accepting and performing its duties hereunder the Delaware Trustee acts solely as Delaware Trustee hereunder and not in its individual capacity, and all persons having any claim against the Delaware Trustee by reason of the transactions contemplated by this Trust Agreement shall look only to the Trust Assets for payment or satisfaction thereof.

(j)     The Delaware Trustee may be removed by FGIC with the written consent of the Requisite Unitholders upon thirty (30) days prior written notice to the Delaware Trustee, with a copy to the Trustee. The Delaware Trustee may resign upon thirty (30) days prior written notice to FGIC, with a copy to the Trustee. No resignation or removal of the Delaware Trustee shall be effective except upon the appointment of a successor Delaware Trustee that (i) is reasonably acceptable to FGIC, (ii) has a combined capital and surplus of at least $10,000,000 and (iii) is qualified to do business in the State of Delaware and satisfies the requirements of the Delaware Trust Statute. If no successor has been appointed within such thirty (30) day period, the Delaware Trustee, FGIC or the Unitholders may petition a court to appoint a successor Delaware Trustee, which shall be at the expense of the Trust.

## ARTICLE VIII

## DEFAULT ON HTA CLAWBACK CVIs

Section 8.1     Realization Upon Default.

(a)     The Trustee shall assert claims under the HTA Clawback CVIs and the Covered FGIC Insurance Policy, and shall take such reasonable steps as are necessary to receive payment or to permit recovery thereunder following any default thereunder, with respect to the Covered FGIC Insurance Policy, in accordance with Section 3.3(b) hereof and, with respect to the HTA Clawback CVIs, in accordance with Section 6.1(b) hereof.

(b)     If there is a breach, a default or an event of default with respect to any HTA Clawback CVI and such breach, default or event of default is known to the Trustee in accordance with Section 7.2(i), the Trustee shall give notice thereof to the Unitholders (through the Depositary) and FGIC as promptly as practicable, and, in any event, within three (3) Business Days after such breach, default or event of default becomes known to the Trustee. If the Trustee receives notice of an anticipated payment default with respect to any the HTA Clawback CVIs in accordance with Section 7.2(i), the Trustee shall give notice thereof to the Unitholders (through the Depositary) and FGIC within three (3) Business Days after receipt of such notice.

(c)     The foregoing provisions of this Section 8.1 shall apply equally to any other securities or property received in respect of the HTA Clawback CVIs or in exchange therefor.

## ARTICLE IX

## TERMINATION OF TRUST

Section 9.1     Termination; No Redemption Rights.

Upon the indefeasible cancellation or other indefeasible termination or discharge of the Covered FGIC Insurance Policy or FGIC's obligations thereunder, the Trust (including the respective obligations and responsibilities under this Trust Agreement of the Trustee and FGIC) shall terminate upon (i) the pro rata payment or distribution to the Unitholders of all amounts or Trust Assets (including the HTA Clawback CVIs) held by or on behalf of the Trustee and required hereunder to be so paid or distributed, (ii) payment in full of any Trustee Costs due and owing to the Trustee under this Trust Agreement, and (iii) receipt by the Trustee of an Opinion of Counsel stating that all conditions precedent herein relating to the satisfaction and discharge of this Trust Agreement have been complied with. In no event shall the Trust be terminated or the HTA Clawback CVIs be redeemed (except in the case of a redemption of the HTA Clawback CVIs permitted under the terms of the Clawback CVI Indenture or the CVI Legislation) or otherwise released from the Trust Estate without the prior express written consent of FGIC if either (i) the Covered FGIC Insurance Policy or FGIC's obligations thereunder has not been indefeasibly terminated or discharged, or (ii) FGIC has not been indefeasibly paid in full for any amounts owed pursuant to the Plan.

Notwithstanding anything contained herein to the contrary, the merger or consolidation of the Trustee shall not cause a termination of the Trust.

Section 9.2      Procedure for Termination.

(a)      During the month in which the Trustee intends to make the final distribution from the Trust, the Trustee shall give notice to the Unitholders in accordance with Section 11.4 specifying: (a) the anticipated final distribution date; (b) that the final payment with respect to the Trust Units will be made upon presentation and surrender of the Certificate at the office of the Trustee therein designated on that date and the amount of any such final payment; (c) any amounts, or trust assets, remaining on deposit in the Trust will be distributed to the holders of record of the Trust Units on a pro rata basis; and (d) that the Trustee believes that, following the occurrence of such final distributions, the conditions to termination of the Trust have been satisfied and that it intends to terminate the Trust (a "Termination Notice").

(b)      If the Requisite Unitholders do not object in writing within 30 days after the Trustee has provided the Termination Notice as set forth herein then, upon completion of final distributions as set forth in the Termination Notice, the Trust shall be dissolved, wound up, and terminated.

(c)      Upon the dissolution, wind up and termination of the Trust and this Trust Agreement, the Trustee or Delaware Trustee (acting solely at the written direction of the Trustee) is authorized to file a certificate of cancellation with the Secretary of State.

# ARTICLE X

# TAX PROVISIONS

Section 10.1      Grantor Trust Provisions.

The Trustee, HTA, the Unitholders (by their acceptance of the Trust Units) and FGIC each agree and acknowledge or have agreed and acknowledged that the Trust is intended to qualify for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust, and it is neither the purpose nor the intent of the parties hereto to create a partnership, joint venture or association taxable as a corporation or to serve as associates in a joint enterprise for the conduct of business for profit. In furtherance of the foregoing, (a) the purpose of the Trust is and shall be to protect and conserve the assets of the Trust Estate, and the Trust shall not at any time engage in or carry on any kind of business or any kind of commercial or investment activity, (B) the Trust is formed to facilitate direct investment in the Trust Assets and the existence of multiple classes of ownership interests is incidental to that purpose, and (c) the Trustee (at the direction of FGIC and/or the Requisite Unitholders), shall take, or refrain from taking, all such action as is necessary to maintain the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not (i) acquire any assets or dispose of any portion of the Trust other than pursuant to the specific provisions of this Trust Agreement, (ii) vary the investment of the Trust within the meaning of Treasury Regulation § 301.7701- 4(c), (iii) substitute new investments or reinvest so as to enable the Trust Estate to take advantage of variations in the market to improve the investment of any Unitholder or (iv) engage in any activity which may directly or indirectly, adversely affect the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not have any authority to

33

manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Estate except as required by the express terms of this Trust Agreement in accordance with the powers granted to or the authority conferred upon the Trustee pursuant to this Trust Agreement. The Trustee and FGIC each agree that they shall not take any action that would result in the Trust failing to be characterized for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.

Section 10.2     Characterization.

Each Unitholder acknowledges and agrees to treat the Trust Units as undivided interests in the Trust Estate.

Section 10.3     Grantor Trust Administration.

Notwithstanding anything in this Trust Agreement to the contrary, and notwithstanding any direction or instruction by less than all the Unitholders, the Trustee shall not be authorized to take any action that would cause the Trust not to be treated as a grantor trust under the Code all of the distributions and income from which would be subject to the tax treatment described in Subpart J of Chapter 1 of the Code as to the Unitholders. The Trustee shall perform its duties hereunder so as to maintain the status of the Trust as a grantor trust as provided in Section 10.1 hereof. The Trustee shall not (a) exercise any discretionary rights with respect to the Trust Assets, (b) acquire an interest in any additional Trust Assets (other than proceeds of a sale of Trust Assets permitted under the terms of this Trust Agreement), (c) knowingly take any other action or fail to take (or fail to cause to be taken) any other action that, under the Grantor Trust Provisions, if taken or not taken, as the case may be, could adversely affect the status of (i) the Trust as a grantor trust, (ii) the Trust as a U.S. trust, or (iii) the Unitholders as grantors with respect to the Trust under the Grantor Trust Provisions (any such adverse effect on trust status, an "Adverse Trust Event"), unless the Trustee has obtained or received an Opinion of Counsel nationally recognized as competent in matters relating to the U.S. federal income taxation of organizations such as the Trust (at the expense of the party requesting such action or at the expense of the Trust Estate if the Trustee seeks to take such action or to refrain from taking any action for the benefit of the Unitholders) to the effect that the contemplated action will not result in an Adverse Trust Event. None of the other parties hereto shall take any action or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that the Trustee has received or obtained an Opinion of Counsel to the effect that an Adverse Trust Event could result from such action or failure to act. The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Trust Agreement, but in no event at the cost or expense of the Trust Estate or the Trustee.

Section 10.4     Reports to Unitholders and Tax Authorities.

(a)     The Trustee shall perform or cause to be performed on behalf of the Trust all reporting and other tax compliance duties that are required in respect thereof under the Code, the Grantor Trust Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority, including for avoidance of doubt the filing of IRS Forms 1099 or providing other information statements to the extent required pursuant to U. S. Treasury

34

Regulations Section 1.671-5 (including U.S. Treasury Regulations Section 1.671-5(c)(1)), as amended or any successor provision (the "WHFIT Regulations").

(b)     Consistent with the Trust's characterization for U.S. federal income tax purposes as a grantor trust, except to the extent required pursuant to WHFIT Regulations,  no U.S. federal income tax return shall be filed on behalf of the Trust unless either (i) the Trustee shall receive an Opinion of Counsel that, based on a change in applicable law occurring after the date hereof, the Code requires such a filing or (ii) the Internal Revenue Service shall determine that the Trust is required to file such a return. In the event that the Trust is required to file tax returns, the Trustee shall prepare or cause to be prepared, and sign and file when due with the appropriate tax authorities all of the tax returns in respect of the Trust. In no event shall the Trustees, FGIC or HTA be liable for any liabilities, costs or expenses of the Trust or the Unitholders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to the Trustee's gross negligence, bad faith or willful misconduct.

(c)     If any tax is imposed on the Trust, such tax, together with all incidental costs and expenses (including, without limitation, penalties and reasonable attorneys' fees) shall be charged to and payable by the Unitholders on a pro rata basis; provided that in each case the Trustee shall be authorized to withhold the applicable amounts from Distributions on the applicable Trust Units and pay such amounts to the applicable taxing authority and that any amounts so withheld and paid to the applicable taxing authority shall be deemed to have been paid as a Distribution to the applicable Unitholders.

(d)     The Trustee shall, for U.S. federal income tax purposes, maintain books and records with respect to the Trust on a calendar year basis or such other basis as may be required under the Code.

(e)     All taxes due and payable on any amounts payable to a Unitholder with respect to a Trust Unit shall be that Unitholder's sole responsibility.

(f)     For the purposes of this ARTICLE X and any other provision of the Trust Agreement relating to the ownership of a Trust Unit for U.S. federal income tax purposes, including definitions, all references to holder, Unitholder, or beneficial owner shall mean the beneficial owner of a Trust Unit for U.S. federal income tax purposes. By acquiring an interest in a Trust Unit, a beneficial owner of the Trust Unit for U.S. federal income tax purposes shall be deemed to consent as a condition of acquiring such interest to comply with any requirements of such Article and other provisions hereof.

# ARTICLE XI

## MISCELLANEOUS PROVISIONS

Section 11.1    Amendment of Trust Agreement.

(a)    This Trust Agreement may not be amended, waived or supplemented without the prior written consent of FGIC. This Trust Agreement may be amended, waived or supplemented from time to time by FGIC and the Trustee without the consent of any other Party or the Depositary or any Unitholders; provided, however, that no such amendment shall:

(i)    reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Unitholder without the written consent of such Unitholder;

(ii)    alter in any manner the treatment of the Covered FGIC Insurance Policy without the written consent of each Unitholder affected;

(iii)    amend this Section 11.1 without the written consent of each Unitholder; or

(iv)    amend the definition of Requisite Unitholders without the written consent of all Unitholders; or

(v)    adversely affect in any material respect the interests of the Unitholders in any manner other than as described in clause (i), (ii), (iii) or (iv) above without the written consent of the Requisite Unitholders.

(b)    Prior to executing any amendment permitted by this ARTICLE XI, (i) the Trustee shall be required to obtain an Opinion of Counsel that is nationally recognized as competent in matters relating to the federal income taxation of organizations such as the Trust to the effect that such amendment will not result in an Adverse Trust Event and (ii) the Trustee shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such amendment is authorized or permitted by this Trust Agreement and that all conditions precedent have been met. The Trustee may, but shall not be obligated to, enter into any such amendment that affects the Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement or otherwise. The Delaware Trustee may, but shall not be obligated to, enter into any such amendment that affects the Delaware Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement or otherwise.  No amendment that affects the Delaware Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement shall be effective against the Delaware Trustee unless the Delaware Trustee has consented thereto in writing.  Prior to executing any amendment permitted by this ARTICLE XI, the Delaware Trustee shall be entitled to receive and conclusively and exclusively rely upon written direction from the Trustee that such amendment is authorized and permitted by this Trust Agreement.

(c)    Promptly following the execution of this Trust Agreement, the Trustee shall post full and complete copies of this Trust Agreement on EMMA . Promptly after the execution

36

of any amendment to this Trust Agreement, the Trustee shall furnish a copy of such amendment to the Depositary and shall post a copy of such amendment on EMMA.

(d)     The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Unitholders shall be subject to such reasonable regulations as the Trustee may prescribe in coordination with the Depositary.

Section 11.2     Counterparts.

This Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts may be delivered by electronic messaging system and shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument. The words "execution," "signed," "signature," and words of like import in this Agreement or in any other certificate, agreement or document related to this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and Adobe Sign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the US Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

Section 11.3     Limitation on Rights of Unitholders.

(a)     The death or incapacity of any Unitholder shall not operate to terminate this Trust Agreement or the Trust, nor entitle such Unitholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, nor otherwise affect the rights, obligations and liabilities of the Parties or any of them.

(b)     No Unitholder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust, or the obligations of the Parties, nor shall anything herein set forth, or contained in the terms of the Trust Units, be construed so as to constitute the Unitholders from time to time as partners or members of an association; nor shall any Unitholder be under any liability to any third person by reason of any action taken by the Parties pursuant to any provision hereof.

(c)     No Unitholder shall have any right by virtue of any provision of this Trust Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Trust Agreement or any of the Trust Assets. Nothing in this paragraph shall be construed to limit in any manner the ability of any Party (notwithstanding the ownership by such Party of Trust Units) to institute any suit, action or proceeding upon or under or otherwise with respect to this Trust Agreement or to enforce in any manner its rights as a party hereunder.

Section 11.4    <u>Notices.</u>

All demands, notices and certifications under this Trust Agreement shall be in writing. All demands, notices and certifications under this Trust Agreement shall be deemed to have been duly given to each Party other than FGIC when personally delivered or mailed by first class mail, postage prepaid, or by express delivery service, to such Party at (a) in the case of the Trustee, U.S. Bank Trust Company, National Association, 100 Wall Street, 6th floor, New York, NY 10005, (b) in the case of the Delaware Trustee, U.S. Bank Trust National Association, 100 Wall Street, 6th floor, New York, NY 10005, and (c) in the case of HTA, c/o Fiscal Agency and Financial Advisory Authority, Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, Puerto Rico 00907, Attn: Office of the Executive Director, or in each of the above cases such other address as may hereafter be furnished by such Party to each other Party in writing. All demands, notices and certifications under this Trust Agreement shall be deemed to have been duly given to FGIC when transmitted by email to FGIC at both of the following email addresses: generalcounsel@fgic.com and edward.turi@fgic.com, or at such other email addresses as may hereafter be furnished by FGIC Party to each other Party in writing.  Unless a different means of giving notice or communication to Unitholders is specified herein, any notice or communication required or permitted to be given to a Unitholder shall be transmitted to the Depositary in accordance with its procedures. Any notice or communication so transmitted to the Depositary within the time prescribed in this Trust Agreement shall be conclusively presumed to have been duly given to the Unitholders at the time of transmission, whether or not and regardless of when any Unitholder actually receives such notice or communication. A copy of any notice given hereunder to any other Party shall be delivered to the Trustee.  The Trustee shall post all notices delivered hereunder to EMMA within five (5) Business Days of receiving such notice or a copy of such notice, as applicable.

Section 11.5    <u>Severability of Provisions.</u>

If any one or more of the covenants, agreements, provisions or terms of this Trust Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Trust Agreement and shall in no way affect the validity or enforceability of the other provisions of this Trust Agreement or of the Trust Units or the related rights of the Unitholders.

Section 11.6    <u>Acts of Unitholders.</u>

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Trust Agreement to be given or taken by Unitholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Unitholders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Trustee and ownership of the Units held by such Unitholders is confirmed by Depositary. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Trust Agreement and conclusive in favor of the Trustee. The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner that the Trustee deems sufficient. The ownership of Trust Units shall be proved by the Depositary.

38

Section 11.7    Headings.

     Article and Section headings in this Trust Agreement are included herein for convenience of reference only and shall not constitute a part of this Trust Agreement for any other purpose or be given any substantive effect.

Section 11.8    No Waiver; Cumulative Remedies.

     No failure to exercise and no delay in exercising, on the part of any Party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

Section 11.9    Merger and Integration.

     This Trust Agreement and the documents and exhibits expressly incorporated herein set forth the entire understanding of the Parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by this Trust Agreement.

Section 11.10    [Reserved].

Section 11.11    Patriot Act.

     The Parties acknowledge that in accordance with Section 326 of the U.S.A.PATRIOT Act, the Trustees, like all financial institutions and in order to help fight the funding ofterrorism and money laundering, are required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustees. The Parties agree that they will provide the Trustees with such information as they may request in order for the Trustees to satisfy the requirements of the U.S.A.PATRIOT Act.

Section 11.12    Governing Law; Venue Jury Waiver.

     THIS TRUST AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDERTHIS TRUST AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLYBASED UPON, ARISING OUT OF, OR LEADING TO THIS TRUST AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS TRUST AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY OR PERFORMANCE, SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS. EACH PARTY HERETO HEREBY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS TRUST AGREEMENT, OR (B) IN ANY WAY IN CONNECTION WITH OR PERTAINING TO OR

39

RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT
TO THIS TRUST AGREEMENT OR IN CONNECTION WITH THIS TRUST AGREEMENT
OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS TRUST
AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE
PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING
OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE.
EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY
FEDERAL OR STATE COURTS SITTING IN THE STATE OF DELAWARE IN RESPECT
OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH
THIS TRUST AGREEMENT. EACH PARTY TO THIS TRUST AGREEMENT
IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE
LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING
OF VENUE OF ANY SUCH PROCEEDINGS IN ANY SUCH COURT AND ANY CLAIM
THAT ANY PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN
AN INCONVENIENT FORUM.

Section 11.13   Force Majeure.

In no event shall the Trustees be responsible or liable for any failure or delay in the
performance of their obligations hereunder arising out of or caused by, directly or indirectly,
forcesbeyond their control, including strikes, work stoppages, accidents, acts of war orterrorism,
civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics,
pandemics, and interruptions, loss or malfunctions of utilities, communications or computer
(software and hardware) services; it being understood that the Trustees shall use reasonable
efforts which are consistent with accepted practices in the banking industry to resume
performance as soon as practicable under the circumstances.

Section 11.14   Intent of Parties.

(a)      The Parties intend that, for all purposes, the transfer to the Trust of the Trust
Estate pursuant to Section 2.2 in each case shall be, and shall be construed as, a transfer thereof to
the Trust on behalf of the Original Holders in lieu of a transfer thereof to the Trust directly by the
Original Holders and shall constitute, in all respects, an absolute, irrevocable transfer, conveyance,
and assignment, without recourse, of the Trust Estate to the Trust, and immediately after giving
effect to the transfer contemplated hereby on the Closing Date, HTA will have no further interest
(legal or equitable) in the Trust Estate and the Trust Estate will not be property of HTA or HTA's
estate in the event of a liquidation, reorganization, or similar proceeding of HTA and the Trust
shall have the absolute right to take whatever action it may deem appropriate with respect to the
Trust Estate. The Parties agree to treat the transfer contemplated hereby for all purposes (including
financial accounting purposes) as an absolute transfer on all relevant books, records, financial
statements and other documents.

(b)      The Trust Estate will be held by the Trust free and clear of any lien or
encumbrance of any Person claiming through or under HTA.

(c)      Notwithstanding anything to the contrary in this Trust Agreement or in any
other document governing the formation, management, or operation of the Trust, if and for so long

as any Trust Unit remains outstanding, none of the Unitholders, FGIC, the Trustees, nor any other Person shall authorize, cause or permit the Trust to (and the Trust shall not, and neither Trustee shall directly take any action that to its actual knowledge would, violate any of the following):

(i)      engage in any business or engage in any activity other than those activities expressly permitted in this Trust Agreement and will not have, incur, guarantee or become liable for any indebtedness or obligations except as expressly contemplated in this Trust Agreement;

(ii)     acquire or own any assets other than the Trust Estate or lease any assets;

(iii)    fail to preserve its existence as an entity duly formed, validly existing and in good standing (if applicable) under the laws of the State of Delaware, or fail to remain qualified to do business in each state in which such qualification is required, for any reason, including in order to perform its obligations under this Trust Agreement;

(iv)     fail to observe at any time any necessary, appropriate and customary corporate, organizational, company and/or other legal formalities to maintain its separate existence;

(v)      fail to act solely in its own name or in the name of the Trustee through duly authorized agents in the conduct of its activities;

(vi)     provide for the payment of its expenses, indebtedness or other obligations other than from its own separate assets;

(vii)    have its debts or other obligations guaranteed by any other Person or hold itself out as responsible for the debts or other obligations of any other Person;

(viii)   commingle its assets or liabilities with those of any other Person;

(ix)     fail to maintain its own records, books of account, bank accounts, accounting records and other entity documents separate and apart from those of any other Person;

(x)      divert funds for any purpose other than as set forth in this Trust Agreement;

(xi)     enter into any contract, agreement or transaction with any Unitholders, HTA, FGIC, any principal or other Affiliate of the Trust, or any shareholder, general partner, member, principal or Affiliate thereof, except as expressly authorized herein;

(xii)    maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xiii)   incur, create or assume any indebtedness of or buy or hold evidence of indebtedness issued by any other Person (other than as contemplated by this Trust Agreement); guarantee or hold itself out to be responsible for the debts of another Person or otherwise pledge

its assets to secure the obligations of any other Person, or hold out its credit or assets as being available to satisfy the obligations of any other Person or seek to incur, create or assume any indebtedness based upon the assets of any other Person;

(xiv)   perform any duties or obligations of HTA or any other Person;

(xv)   make any loans or advances to any third party, including any Unitholder, HTA or any Affiliate of the Trust, or any principal or Affiliate thereof;

(xvi)   fail to file its own tax returns as and if required to do so by applicable law (subject to any permitted extensions and except to the extent the Trust is treated as a grantor trust for tax purposes) and to pay any taxes required to be paid by it under applicable law;

(xvii)   fail to hold itself out to the public as a legal entity separate and distinct from any other Person, fail to conduct its activities solely in its own name or in the name of the Trustee and as a separate and distinct entity, or fail to correct any known misunderstanding regarding its separate identity;

(xviii)   identify itself as a department or division of any other Person;

(xix)   fail to observe all formalities required of a Delaware statutory trust;

(xx)   fail to pay its expenses and liabilities only out of its own funds to the extent such funds are available and fail to hold its assets only in its own name; provided, however, the foregoing shall not require HTA to sell any assets, or make any capital contribution, to the Trust;

(xxi)   conduct any oral or written communication, including letters, invoices, purchase orders, contracts, statements and applications, other than in its own name or in the name of the Trustee; or

(xxii)   (a) institute proceedings to have the Trust declared or adjudicated a bankrupt or insolvent, (b) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (c) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (d) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (e) make any assignment for the benefit of the Trust's creditors, (f) cause the Trust to admit in writing its inability to pay its debts generally as they become due or (g) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing.

(d)   Failure of the Trust, HTA, FGIC, any Unitholder, any Trustee or any other Person on behalf of the Trust, to comply with any of the foregoing covenants set forth in this Section 11.14 shall not affect the status of the Trust as a separate legal entity (unless in violation of the Delaware Trust Statute) nor cause the Trust to dissolve or terminate.

(e)   To the extent that any provision of this Section 11.14 conflicts with, violates or otherwise is in contravention with any other provision of this Trust Agreement, the Parties and

each Unitholder agree that the terms set forth in this Section 11.14 shall be controlling as expressly set forth herein.

Section 11.15   Non-Petition.

HTA, FGIC, the Trustee and the Delaware Trustee, by entering into this Agreement, and the Unitholders, by accepting a Trust Unit, hereby covenant and agree that they will not at any time institute against the Trust, or join in instituting against the Trust, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law; provided, however, that in the event a bankruptcy or similar proceeding is instituted against the Trust by another Person, theTrustee may file appropriate proofs of claim.

Section 11.16   Certain Terms Regarding HTA.

For the avoidance of doubt andnotwithstanding any terms appearing herein or elsewhere to the contrary:

(i)     The obligations of the Trust under the Trust Units and this Trust Agreement are non-recourse obligations of the Trust payable solely from the Trust Estate, and following realization of the Trust Estate, and its reduction to zero, any claims of the Unitholders shall be extinguished. The Trust Units are not obligations of, and are not guaranteed by, HTA, and no recourse shall be had against any officer, director, manager, employee, security holder or incorporator of HTA, or its successors or assigns, for the payment of any amounts payable under the Trust Units or the payment or performance of any obligation of the Trust under or pursuant to this Trust Agreement.

(ii)    The recitals contained in this Trust Agreement and in the Trust Units, shall be taken as the statements of the Trust, and HTA assumes no responsibility for their correctness. HTA makes no representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Trust Units.

(iii)   In purchasing any Trust Units, the purchaser shall be deemed to acknowledge, represent and agree, that none of HTA nor any of its affiliates, is acting as a fiduciary or a financial or investment advisor for such purchaser, and such purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, representations or recommendations (in each case whether written or oral) of HTA or any of its affiliates.

(iv)    HTA shall not be accountable for the use or application by the Trust of the Trust Units or the proceeds thereof or any amounts paid to the Trust pursuant to the provisions of this Trust Agreement.

Section 11.17   Certain Terms Regarding FGIC.

(a)     In addition to notices required to be provided elsewhere under this Trust Agreement, the Trustee shall promptly provide notice to FGIC with respect to each of the following:

(i)     any determination or intention of the Trustee or the Delaware Trustee to resign or terminate its duties hereunder;

43

(ii)     the amount of any cash received by the Trust, and the date on which it was received; and

(iii)     the amount of, and the Record Date and distribution date for, any distributions that the Trust is required to make to Unitholders.

(b)     The Trustee shall promptly furnish FGIC with copies of each report, notice or other communication sent to Unitholders. The Trustee shall seek to discuss and consult with FGIC regarding the same before sending them to Unitholders.

(c)     The Trustee, upon FGIC's request, shall provide additional information with respect to the Trust or the Trust Assets, including requesting from HTA information concerning the HTA Clawback CVIs and thereafter providing any such information received to FGIC.

(d)     The Trustee, upon FGIC's request, will discuss and consult with FGIC regarding matters concerning (i) the Covered FGIC Insured Bonds and FGIC's remaining obligations under the Covered FGIC Insurance Policy, including claims that the Trustee intends to assert thereunder, and (ii) the HTA Clawback CVIs held by the Trust.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the Parties have caused this Trust Agreement to be duly executed by their respective officers thereunto duly authorized and all as of the date first set forth above.

**PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY**

By: _____
Name: Edwin E. Gonzalez-Montalvo
Title:   Executive Director

[Signature Page]

Custodial Trust Agreement

**FINANCIAL GUARANTY INSURANCE COMPANY**


By:_____
Name: Derek Donnelly
Title: Senior Managing Director

[Signature Page]

Custodial Trust Agreement

**U.S.   BANK   TRUST   COMPANY,
NATIONAL ASSOCIATION,**
as Trustee


By:_____
Name: Michelle Mena-Rosado
Title: Vice President



**U.S. BANK TRUST NATIONAL
ASSOCIATION,** as Delaware Trustee



By:_____
Name: Michelle Mena-Rosado
Title: Vice President

[Signature Page]

Custodial Trust Agreement

# **<u>EXHIBIT A</u>**

Trust Assets

FGIC Insurance Policy Number:

FGIC Insured Bonds description and CUSIP number:

Covered FGIC Insured Bond principal amount:  [$_____] in aggregate principal amount

Allocable Plan Consideration:


   HTA Clawback CVIs

If any HTA Clawback CVIs were sold by FGIC prior to the Closing Date, [$_____] in cash
and the remaining HTA Clawback CVIs in the aggregate notional amount of [$_____].

A-1

## EXHIBIT B

[Form of Notice to Unitholders and FGIC]

[_____] CUSTODIAL TRUST
STATEMENT OF QUARTER ENDED [_], 20[__]

### POSTED TO EMMA
U.S. Bank Trust Company, National Association, as Trustee

Trust Units                                                    [CUSIP]

**1.     Distributions to Unitholders (Sections 4.1(a) and (b))**

| Source of Distributions | For Quarter Ended [_], 20__ | | Year to date, [_], 20[__] | |
| | Aggregate Distributions | Per Unit Distributions | Aggregate Distributions | Per Unit Distributions |
|---|---|---|---|---|
| Asset Sales (Section 4.1(a)(i)) | $ | $ | $ | $ |
| CVI payments (Section 4.1(a)(ii)) | | | | |
| Policy Claim payments (Section 4.1(b)) | | | | |
| DPO payments (Section 4.1(b)) | | | | |
| DPO Accretion payments (Section 4.1(b)) | | | | |

**2.     Balances of HTA Clawback CVIs (Section 4.1(c))**

| | As of [_], 20[__] | |
| | Aggregate principal/accreted amount of HTA Clawback CVIs (by CUSIP) | Per Unit principal/accreted amount of HTA Clawback CVIs (by CUSIP) |
|---|---|---|
| HTA Clawback CVIs CUSIP | $ | $ |

3.     **DPO and DPO Accretion Balances (Section 4.1(d))**

DPO balance as of the Closing Date:

DPO balance as of last day of quarter:  $

DPO Accretion balance as of last day of quarter:  $

4.     **Covered FGIC Insured Bonds (Section 4.1(e))**

Accrued and unpaid interest on Covered FGIC Insured Bonds as of last day of quarter:  $

Principal amount of Covered FGIC Insured Bonds as of last day of quarter:  $

Description of change(s) in such amounts since prior quarter:

5.     **Payments to Trustees for such Quarter (Section 4.1(g))**

Fees paid to the Trustee:

Fees paid to the Delaware Trustee:

Trustee Cost amount(s) paid pursuant to Section 7.5(a)(ii) and description:

Trustee Cost amount(s) paid pursuant to Section 7.5(b) and description:

Indemnification amount(s) paid pursuant to Section 7.12 and description:

Ending Fee Reserve Balance:

6.     **Notices received by Trustee during such Quarter**
[Copy attached] [Not applicable]

7.     **Tax Reporting Required for such [Quarter][Year]**
[Copy attached] [Not applicable[2]]

[8.     **Other Trust Costs for such Quarter (Section 4.1(g)(ii))**

---

[2] May be used for quarterly reporting only.

Other Trust Cost amount(s) reimbursed pursuant to Section 7.5(c):][3]

---

[3] Include item 8 only if applicable to the Quarter.

## EXHIBIT C

[Form of Certificate]

[_____] CUSTODIAL TRUST CERTIFICATE

THIS CERTIFICATE IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY. THIS CERTIFICATE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC") TO THE TRUSTEE (AS DEFINED IN THE TRUST AGREEMENT REFERRED TO BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST THEREIN.

THIS CERTIFICATE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS CERTIFICATE MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST TO WHICH THIS CERITIFICATE RELATES.

[_____]CUSTODIAL TRUST

Certificate No.  1

Initial Notional Amount of Units[_____]

CUSIP:[_____]

This certifies that CEDE & CO. is the registered owner of this Certificate and of the [Notional Amount of the] Units evidenced by this Certificate.

The Units evidenced by this Certificate represent a beneficial ownership interest in the Trust created by the Trust Agreement (the "Trust Agreement"), dated as of December 6, 2022, with respect to the [_____] Custodial Trust (the "Trust"), by and among the Puerto Rico Highways and Transportation Authority ("HTA"), Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, collectively the "Trustees").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to such terms in the Trust Agreement. This Certificate is issued under and subject to the terms, provisions andconditions of the Trust Agreement. By acceptance of this Certificate, the registered owner of this Certificate and each Unitholder assents to and becomes bound by the Trust Agreement.

The Trust Assets, on the Closing Date, consist of: (i) the Allocable Plan Consideration comprising HTA Clawback CVIs as specified on Exhibit A to the Trust Agreement; (ii) the Covered FGIC Insured Bonds as specified on Exhibit A to the Trust Agreement; (iii) the Covered FGIC Insurance Policy as specified on Exhibit A to the Trust Agreement; (iv) any and all agreements, documents and instruments relating to the Covered FGIC Insurance Policy; and (v) and any other  securities, monies, proceeds or property received on account thereof or exchanged therefor from time to time, as  well as any other rights, benefits, protections, remedies and claims pertaining thereto.

Subject to the terms and conditions of the Trust Agreement and until the obligations created by the Trust Agreement shall have terminated in accordance therewith, any distributions to Unitholders shall be distributed on each distribution date to the Person in whose name this Certificate is registered at the close of business on the related Record Date for such distribution and all distributions shall be in accordance with the terms of the Trust Agreement.

Distributions on this Certificate shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of the Trust Agreement, by wire transfer of immediately available funds to the Person in whose name this Certificate is registered at the close of business on the related Record Date for such distribution in accordance with the procedures of the Depositary.

This Certificate does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and

duties evidenced thereby. A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by the holder of this Certificate or any Unitholder at a time agreed upon by such holder or Unitholder and the Trustee.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Certificate shall not entitle the holder of this Certificate or any Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust, and not in its individual capacity, has caused this Certificate to be duly executed.

[_____] CUSTODIAL TRUST

CERTIFICATE NO. _____

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

DATED:

Trustee's Certificate of Authentication:

This is the Certificate referred to in the within-mentioned Trust Agreement.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

C-3

## **EXHIBIT D**

[Form of Certificate of Trust]

CERTIFICATE OF TRUST OF
[_____] CUSTODIAL TRUST

THIS Certificate of Trust of [_____] Custodial Trust (the "Trust"), is being executed and filed by the undersigned as trustees, to form a statutory trust under the Delaware Statutory Trust Act (12 DEL. CODE, Sections 3801, *et seq.*) (the "Act").

1.      NAME.   The name of the statutory trust formed hereby is "[_____] Custodial Trust."

2.      DELAWARE TRUSTEE.  The name and business address of a trustee of the Trust having its principal place of business in the State of Delaware are U.S. Bank Trust National Association, 1011 Centre Road, Suite 203, Wilmington, Delaware  19805.

3.      EFFECTIVE DATE.  This Certificate of Trust shall be effective December 6, 2022.

IN WITNESS WHEREOF, the undersigned, being the trustees of the Trust, have executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

U.S.   BANK   TRUST   NATIONAL
ASSOCIATION, as Delaware Trustee


By:_____
Name: Michelle Mena-Rosado
Title: Vice President


U.S.   BANK   TRUST   COMPANY,
NATIONAL ASSOCIATION,
as Trustee


By:_____
Name: Michelle Mena-Rosado
Title: Vice President

D-1

## **EXHIBIT E-1**

[Form of Notice Relating to Permitted Sale Event]

NOTICE

U.S. Bank Trust Company, National Association
100 Wall Street, 6th floor
New York, NY 10005

      Re: Permitted Sale Event

Ladies and Gentlemen:

      Reference is made to the Trust Agreement, dated as of December 6, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

      This notice is being provided to the Trustee, as contemplated by clause (ii) of the definition of "Permitted Sale Event" and Section 3.5(a) of the Trust Agreement. Accordingly, FGIC hereby notifies the Trustee of its intention to instruct the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, the HTA Clawback CVIs listed in Annex A in the amount specified on Annex A, and notifies the Trustee that the Permitted Sale Price for the HTA Clawback CVIs is as set forth on Annex A.

      **IN WITNESS WHEREOF,** FGIC has executed and delivered this Notice as of _____, 20__.

                                   FINANCIAL GUARANTY INSURANCE COMPANY

                                   By:_____
                                   Name:_____
                                   Title:_____

**ACKNOWLEDGEMENT OF RECEIPT**

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Notice.

U.S.    BANK    TRUST    COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____
Name:_____
Title:_____

**Annex A**

| **HTA CLAWBACK CVIs** |
|---|
| CUSIP No. |
|  |

Amount to be Sold: $[_____]

Permitted Sale Price:[_____]

## **EXHIBIT E-2**

[Form of Notice and Instruction Relating to Threshold Event]

NOTICE AND INSTRUCTION

U.S. Bank Trust Company, National Association
100 Wall Street, 6th Floor
New York, NY 10005

   Re: Threshold Event

Ladies and Gentlemen:

   Reference is made to the Trust Agreement, dated as of December 6, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee. Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

   This notice and instruction is being provided to the Trustee, pursuant to and in accordance with Section 3.5(b) of the Trust Agreement and as contemplated by the definition of "Threshold Event". Accordingly, FGIC hereby (i) notifies the Trustee that the current market price of the HTA Clawback CVIs listed in Annex A exceeds the Threshold Price for such HTA Clawback CVIs specified on Annex A, and (ii) instructs the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, such HTA Clawback CVIs in the amount, at the sale price and to any person and account, and using the broker, if any, specified on Annex A.

   **IN WITNESS WHEREOF,** FGIC has executed and delivered this Notice as of _____, 20__.

       FINANCIAL GUARANTY INSURANCE
       COMPANY

       By:_____
       Name:_____
       Title:_____

## ACKNOWLEDGEMENT OF RECEIPT

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Notice and Instruction.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____
Name:_____
Title:_____

**Annex A**

| HTA CLAWBACK CVIs |
|---|
| CUSIP No. |
| |

Amount to be Sold: $[_____]

Threshold Price:[_____]

Sale Price:[_____]

[Insert details of persons/accounts to whom the sale shall be made and any other details, including relevant broker, if any, necessary for such sale.]

## **EXHIBIT E-3**

[Form of Instruction Relating to Permitted Sale Event]

INSTRUCTION

U.S. Bank Trust Company, National Association
100 Wall Street, 6th floor
New York, NY 10005

      Re: Permitted Sale Event

Ladies and Gentlemen:

      Reference is made to the Trust Agreement, dated as of December 6, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee. Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

      This instruction is being provided to the Trustee pursuant to and in accordance with Section 3.5(b) of the Trust Agreement, based on FGIC's understanding that a Permitted Sale Event has occurred.  Accordingly, as contemplated by its related Notice Relating to Permitted Sale Event dated as of [*] (the "Notice"), FGIC hereby instructs the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, the amount of the HTA Clawback CVIs referenced in the Notice, at the sale price (which equals or exceeds the Permitted Sale Price) and to the person and account, and utilizing the broker, if any, specified in Annex A hereto.

      **IN WITNESS WHEREOF,** FGIC has executed and delivered this Instruction as of _____, 20__.

                            **FINANCIAL GUARANTY INSURANCE COMPANY**

                            By:_____

                            Name:_____

                            Title:_____

**ACKNOWLEDGEMENT OF RECEIPT**

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Instruction.

U.S.    BANK    TRUST    COMPANY
NATIONAL ASSOCIATION, as Trustee


By:_____
Name:_____
Title:_____

**Annex A**

| HTA Clawback CVIs |
|---|
| CUSIP No. |
|  |

Amount to be Sold: $[_____]

Sale Price:[_____][4]

[Insert details of persons/accounts to whom the sale shall be made and any other details, including relevant broker, if any, necessary for such sale.]

---

[4] Equals or exceeds the Permitted Sale Price of [_____].

**EXHIBIT F**

Form of Trustee's Certification of Receipt of Certain Trust Assets

CERTIFICATION

To: FGIC and the Unitholders

Re: Receipt of Certain Trust Assets

Ladies and Gentlemen:

Reference is made to the Trust Agreement, dated as of December 6, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee. Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

This certification is being provided to the Unitholders and FGIC, pursuant to and in accordance with Section 2.3(b) of the Trust Agreement. Accordingly, the Trustee hereby certifies that as of the Closing Date, the Trustee (i) confirms that the HTA Clawback CVIs listed on Exhibit A of the Trust Agreement have been deposited to and are being held in the participant account of U.S. Bank Trust Company, National Association at the Depositary for the benefit of the Unitholders and FGIC subject to Section 2.3(c), and (ii) confirms that the Trust Units have been issued to the Original Holders.

F-1

**IN WITNESS WHEREOF,** the Trustee has executed and delivered this Certification as of _____, 2022.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____
Name:_____
Title:_____

## EXHIBIT G

[Form of Assignment]

[_____] CUSTODIAL TRUST ASSIGNMENT

ASSIGNMENT, dated as of _____, [__], 20____(this "Assignment"), by U.S. Bank Trust Company, National Association, as trustee for and on behalf of the Trust listed on Annex A hereto (the "Trust", and such trustee being the "Trustee"), to and for the benefit of Financial Guaranty Insurance Company ("FGIC").

## WITNESSETH:

WHEREAS, reference is made to (a) the Trust Agreement, dated as [_____] (the "Trust Agreement"), with respect to the Trust, by and among the Puerto Rico Highways and Transportation Authority, FGIC, the Trustee, and U.S. Bank Trust National Association, as Delaware trustee for and on behalf of the Trust, and (b) the Covered FGIC Insurance Policy listed on Annex A hereto, issued by FGIC with respect to the Covered FGIC Insured Bonds described and the CUSIP for which is identified on Annex A hereto;

WHEREAS, Section 3.3(b) of the Trust Agreement[5] provides, among other things, that the execution and delivery of assignments (in substantially this form) by the Trustee on behalf of the Trust to FGIC (or its fiscal agent) is one of the conditions to FGIC's obligation to make payment of any claim asserted by the Trustee under the Covered FGIC Insurance Policy or any payment in respect of any DPO related to the Covered FGIC Insurance Policy which may become payable in accordance with the FGIC Rehabilitation Plan, in each case relating or with respect to the principal of the Covered FGIC Insured Bonds;

WHEREAS, Section 3.3(b) of the Trust Agreement further provides that, with respect to each such payment relating or with respect to the principal of the Covered FGIC Insured Bonds, which is paid or deemed to be paid by FGIC in cash (each a "Cash Payment"), the Trustee shall execute and deliver on behalf of the Trust to FGIC (or its fiscal agent) assignments (in substantially this form) with respect to a proportionate share (based on the proportion of such Cash Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust (the "Proportionate Share")) of the Trust Assets held by the Trust,;

WHEREAS, for purpose of this Assignment, the Cash Payment and Proportional Share are set forth on Annex A hereto;

WHEREAS, in accordance with the terms of the Covered FGIC Insurance Policy and Section 3.3(b) of the Trust Agreement, FGIC (or its fiscal agent) will pay, or be deemed to have paid, the Cash Payment to the Trust, as the Bondholder under the Covered FGIC Insured Policy,

---

[5] This form of assignment shall also be used for any assignments pursuant to Section 3.7(b) of the Trust Agreement with conforming changes made by FGIC.

only after FGIC (or its fiscal agent) receives this Assignment executed and delivered by the Trustee on behalf of the Trust; and

WHEREAS, in accordance with the provisions of the Trust Agreement, the Trustee intends to effect the assignments and transfers to FGIC contemplated hereby on behalf of the Trust.

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto do hereby agree as follows:

**SECTION 1.   DEFINITIONS. CAPITALIZED TERMS USED HEREIN AND NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE RESPECTIVE MEANINGS SET FORTH IN THE TRUST AGREEMENT.**

**SECTION 2.   ASSIGNMENT.**

(a)     Effective as of the date hereof and pursuant to the Covered FGIC Insurance Policy and Section 3.3(b) of the Trust Agreement, the Trustee on behalf of the Trust hereby irrevocably sells, assigns, transfers and conveys to FGIC the Proportionate Share of the Trust Assets held by the Trust as set forth in Annex A hereto (the "Assigned Trust Assets"), including all rights to payment under or with respect to the Assigned Trust Assets and all other rights therein or in relation thereto.   The Trustee shall (i) revise its registration books, and any other documents of record for the Trust Assets maintained by it, to reflect that the Assigned Trust Assets are no longer held by the Trust and have been sold, assigned, transferred and conveyed to FGIC hereunder and (ii) take such other actions as shall be necessary to transfer the Assigned Trust Assets to the account of FGIC or its custodian, in either case as directed by FGIC in writing.

(b)     The Trustee on behalf of the Trust hereby covenants and agrees to convey to FGIC, if and when received following the date hereof, any amounts related to the Assigned Trust Assets (including any sums payable as interest in respect thereof) paid to or for the benefit of the Trust that, under subsection (a) above, belong to FGIC.

**SECTION 3.   REPRESENTATIONS AND WARRANTIES.** The Trustee hereby represents and warrants to FGIC that:

(a)     The Trust is the holder of the Assigned Trust Assets, and the Trustee has all requisite power and authority to execute, deliver and perform its obligations under this Assignment and to consummate the assignment contemplated herein on behalf of the Trust, and such assignment and execution and delivery of this Assignment by the Trustee  have been duly authorized.

(b)     This Assignment has been duly executed and delivered by the Trustee on behalf of the Trust and constitutes a  legal, valid and binding obligation of the Trust enforceable in accordance with its terms.

(c)      The Assigned Trust Assets are free and clear of all liens and encumbrances.

**SECTION 4.   <u>GOVERNING LAW</u>. THIS ASSIGNMENT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE.**

**SECTION 5.   <u>COUNTERPARTS</u>. THIS ASSIGNMENT MAY BE EXECUTED IN ANY NUMBER OF COUNTERPARTS, EACH OF WHICH MAY BE DELIVERED BY ELECTRONIC MESSAGING SYSTEM AND SHALL BE DEEMED AN ORIGINAL, BUT ALL OF WHICH TOGETHER SHALL CONSTITUTE ONE AND THE SAME ASSIGNMENT.**

IN WITNESS WHEREOF, the Trustee has caused this Assignment to be duly executed and delivered on behalf of the Trust on the date first above written.

U.S. BANK TRUST COMPANY,
NATIONAL ASSOCIATION, as Trustee

By:_____
Name:_____
Title:_____

G-3

**ANNEX A**

Trust:  [_____] Custodial Trust

Covered FGIC Insurance Policy Number:

Covered FGIC Insured Bonds description and CUSIP number:

Cash Payment:  [$_____]

Total Principal Amount of Covered FGIC Insured Bonds held by the Trust as the date of this
Assignment (immediately prior to receiving, or being deemed to have received, the Cash
Payment):  [$_____]

Proportionate Share:  [XX.XXXX]% (Cash Payment/Total Principal Amount of Covered FGIC
Insured Bonds)

Proportionate Share of the Trust Assets assigned by the Trustee hereunder:

     Cash:

     HTA Clawback CVIs:

## **SCHEDULE I**

Threshold Prices

With respect to the HTA Clawback CVIs, the price equal to 5% of the notional amount of such HTA Clawback CVIs.

**SCHEDULE II**

Trustee Fee Schedule

The fees and expenses set forth below are payable or reimbursable to the Trustees[6] for their services as Trustees under the Trust Agreement to which this Schedule II is attached (the "Trust Agreement"). The Trust Agreement is by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company, U.S. Bank Trust Company, National Association, as Trustee, and U.S. Bank Trust National Association, as Delaware Trustee. Such fees and expenses are each payable or reimbursable by or on behalf of the Trust in accordance with the terms of the Trust Agreement.

**Acceptance Fee:**                                                                 **$1,067**
The acceptance fee includes the review and execution of the Trust Agreement and the certificates and other documents related to the Trust, the creation of the Trust and initial establishment of the accounts referred to in Section 3.1 of the Trust Agreement.   Additional duties covered by this acceptance fee include the acceptance of the Trust Assets, actions referred to in Section 2.3 of the Trust Agreement, the initial issuance of the Certificate and Units, distributions under Section 3.4(a)(i) of the Trust Agreement and any other activity contemplated under the Trust Agreement to occur on or in connection with the Closing Date. The acceptance fee is payable on the Closing Date.

**Fee Reserve Threshold Amount:**                                                   **$9,000**

**Annual Administration Fee:**                                                      **$3,667**
The annual administration fee covers the routine duties of the Trustees associated with the administration of the Trust in accordance with the terms of the Trust Agreement, including without limitation the distribution of payments on any Trust Assets received from time to time by the Trust, processing of trades, presentation of claims under the FGIC Insurance Policy and effecting the related assignments and transfers of Trust Assets to FGIC, distribution of policy claims payments and DPO and DPO Accretion payments made by FGIC, preparation, posting and distribution of statements, reports and notices and other routine responsibilities, in each case as contemplated by the Trust Agreement.  The administration fee is payable in advance and not subject to proration.

---

[6] Capitalized terms used and not otherwise defined in this Schedule II have the respective meanings ascribed thereto in the Trust Agreement.

**<u>Fee for Sales of Trust Assets due to Threshold Event or Permitted Sale Event/Unitholder Election (per effectuated Threshold Event, Permitted Sale Event or Unitholder Election), and for other Non-Routine Disbursements:</u>**  $2,000 each

This fee is payable separate from the annual administration fee and not inclusive of DTC charges.

**<u>Legal Fee & Expenses:</u>**  AT COST

Includes fees and expenses for legal services provided by legal counsel to the Trustees as and to the extent such fees and expenses are payable or reimbursable to the Trustees pursuant to the terms of the Trust Agreement.

**<u>Out-of-Pocket Expenses</u>:**  AT COST

Includes all related expenses of the Trustees as and to the extent such expenses are payable or reimbursable to the Trustees pursuant to the terms of the Trust Agreement.

**<u>Extraordinary administration services ("EAS"):</u>**

EAS are duties, responsibilities or activities not expected to be provided by the Trustees at the outset of the matter, not routine or customary, and/or not incurred in the ordinary course of business and may require analysis or interpretation, in each case unless contemplated by any other fee description in this Schedule II and if not in contravention of the Trust Agreement, <u>provided</u> that it is acknowledged and agreed by the Parties that duties, responsibilities and activities performed by the Trustee as contemplated under Article VIII of the Trust Agreement, or in connection with litigation, enforcement actions or other proceedings that are brought against the Trust or the Trustees and don't relate to or arise out of or in connection with either of the Trustees' gross negligence, bad faith or willful misconduct, constitute EAS. Billing for reasonable fees and expenses related to EAS is appropriate in instances where particular inquiries, events or developments are unexpected, even if the possibility of such circumstances could have been identified at the inception of the matter, or as changes in law, or in procedures or the cost of doing business related to EAS, demand. At the Trustees' option, EAS may be charged to the Trust on an hourly (time expended multiplied by current hourly rate), flat or special fee basis at such rates or in such amounts in effect at the time of such services. EAS fees are due and payable in addition to annual or ordinary administration fees. Failure to pay for EAS owed to the Trustees when due may result in interest being charged on amounts owed to the Trustees for extraordinary administration services fees and expenses at the prevailing market rate.

**<u>General terms and conditions</u>**

The Trust's obligation to pay under this Trustee Fee Schedule pursuant to the terms of the Trust Agreement shall govern the matters described herein and shall, in accordance with the terms of the Trust Agreement, survive any termination of the Trust or Trust Agreement and the resignation or removal of the Trustees. This Trustee Fee Schedule shall be construed and interpreted in accordance with the laws of the state identified in the Trust Agreement without giving effect to the conflict of laws principles thereof. The Parties agree to the sole and exclusive jurisdiction of the state and federal courts of the state identified in the Trust Agreement over any proceeding relating

to or arising regarding the matters described herein. Payment of fees constitutes acceptance of the terms and conditions described herein.

Fees paid in advance will not be prorated. The fees set forth above and any subsequent modifications thereof by the Parties pursuant to the terms of the Trust Agreement are part of the Trust Agreement. Execution of the Trust Agreement or acceptance of the Certificate or any Unit constitutes agreement to the above Trustee Fee Schedule.

**<u>Redline of Exhibit F</u>**

Butler Snow  9/8/2022Draft As of 12.1.2022

[_____] CUSTODIAL TRUST[1]

RELATED TO

SETTLEMENT OF PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY

[_____] Puerto Rico Highways and Transportation Authority [INSERT BOND ISSUE] maturing [OLD BOND MATURITY DATE]

This Agreement is

among

Puerto Rico Highways and Transportation Authority,

Financial Guaranty Insurance Company,

U.S. Bank Trust Company, National Association,

(as Trustee)

and

U.S. Bank Trust National Association, (as Delaware Trustee)

---

[1] Form of Custodial Trust to be formed for each CUSIP of FGIC Insured Bonds (HTA 98 Senior Bonds) under the Plan.

TABLE OF CONTENTS

ARTICLE I DEFINITIONS; CONSTRUCTION ................................................................. 1
    Section 1.1    Definitions ........................................................................................ 1
    Section 1.2    Rules of Construction ..................................................................... 7
    Section 1.3    Article and Section References ....................................................... 7

ARTICLE II TRUST ESTATE ...................................................................................... 8
    Section 2.1    Creation of Trust. ............................................................................ 8
    Section 2.2    Trust Assets. ..................................................................................... 8
    Section 2.3    Acceptance by Trustee. ................................................................... 9
    Section 2.4    Purpose, Activities of the Trust. .................................................... 10
    Section 2.5    Limitations of the Trust. ................................................................ 11

ARTICLE III ADMINISTRATION OF TRUST ............................................................... 11
    Section 3.1    Accounts. ........................................................................................ 11
    Section 3.2    Investment of Funds in the Collection Accounts. ......................... 12
    Section 3.3    FGIC Insurance Policy and Effect of Distributions. ..................... 12
    Section 3.4    Distributions. ................................................................................. 14
    Section 3.5    Threshold Event or Permitted Sale Event. .................................... 15
    Section 3.6    Surrendered Units. ......................................................................... 15
    Section 3.7    FGIC Election to Accelerate Policy Payments. ............................. 16

ARTICLE IV REPORTING/REMITTING TO UNITHOLDERS ......................................... 17
    Section 4.1    Statements to Unitholders and FGIC. ............................................ 17
    Section 4.2    Compliance with Withholding Requirements. ............................... 18

ARTICLE V THE UNITS ............................................................................................ 18
    Section 5.1    The Units. ....................................................................................... 18
    Section 5.2    The Certificate; Book-Entry-only System. .................................... 18
    Section 5.3    Mutilated, Destroyed, Lost and Stolen Certificate. ...................... 19
    Section 5.4    No Obligation to Register. ............................................................. 20
    Section 5.5    Persons Deemed Owners. ............................................................... 20
    Section 5.6    Cancellation. .................................................................................. 20

ARTICLE VI NEW HTA BONDS AND HTA Clawback CVIs ....................................... 21
    Section 6.1    Voting Rights with Respect to New HTA Bonds and HTA
                     Clawback CVIs. ............................................................................ 21

ARTICLE VII CONCERNING THE TRUSTEE ............................................................... 21

Section 7.1       Duties of Trustee. .................................................................... 21

Section 7.2       Certain Matters Affecting the Trustee. ....................................... 22

Section 7.3       Trustee Not Liable for Units or New HTA Bonds, HTA Clawback
                  CVIs, the Covered FGIC Insured Bonds or the Covered FGIC
                  Insurance Policy. ...................................................................... 24

Section 7.4       Trustee May Own Units. ............................................................ 25

Section 7.5       Trustee Costs and Expenses. ...................................................... 25

Section 7.6       Eligibility Requirements for Trustee and Successor Trustee. ...... 26

Section 7.7       Resignation and Removal of the Trustee. .................................... 26

Section 7.8       Successor Trustee. ..................................................................... 27

Section 7.9       Merger or Consolidation of Trustees. ......................................... 28

Section 7.10      Appointment of Trustee Custodians. .......................................... 28

Section 7.11      Trustee May Enforce Claims Without Possession of Certificate. ... 28

Section 7.12      Trustee Indemnity. .................................................................... 29

Section 7.13      Acceptance by Trustees, Representations and Warranties of Trustees. ... 29

Section 7.14      The Delaware Trustee. ............................................................... 30

ARTICLE VIII DEFAULT ON NEW HTA BONDS OR HTA Clawback CVIs .......................... 32

Section 8.1       Realization Upon Default. .......................................................... 32

ARTICLE IX TERMINATION OF TRUST ............................................................................ 32

Section 9.1       Termination; No Redemption Rights. .......................................... 32

Section 9.2       Procedure for Termination. ........................................................ 33

ARTICLE X TAX PROVISIONS ........................................................................................... 33

Section 10.1      Grantor Trust Provisions. .......................................................... 33

Section 10.2      Characterization. ....................................................................... 34

Section 10.3      Grantor Trust Administration. .................................................... 34

Section 10.4      Reports to Unitholders and Tax Authorities. ............................... 35

ARTICLE XI MISCELLANEOUS PROVISIONS .................................................................. 36

Section 11.1      Amendment of Trust Agreement. ............................................... 36

Section 11.2      Counterparts. ............................................................................ 37

Section 11.3      Limitation on Rights of Unitholders. .......................................... 37

Section 11.4      Notices. ..................................................................................... 38

Section 11.5      Severability of Provisions. ......................................................... 38

Section 11.6      Acts of Unitholders. .................................................................. 38

Section 11.7      Headings. .................................................................................. 39

Section 11.8   No Waiver; Cumulative Remedies. .................................................. 39

Section 11.9   Merger and Integration. ................................................................... 39

Section 11.10  [Reserved]. ...................................................................................... 39

Section 11.11  Patriot Act. ...................................................................................... 39

Section 11.12  Governing Law; Venue Jury Waiver. .............................................. 39

Section 11.13  Force Majeure. ................................................................................. 40

Section 11.14  Intent of Parties. .............................................................................. 40

Section 11.15  Non-Petition. ................................................................................... 43

Section 11.16  Certain Terms Regarding HTA. ...................................................... 43

Section 11.17  Certain Terms Regarding FGIC. ..................................................... 44

**EXHIBITS**

Exhibit A - Trust Assets ........................................................................................ A-1

Exhibit B - Form of Notice to Unitholder and FGIC .......................................... B-1

Exhibit C - Form of Certificate ............................................................................ C-1

Exhibit D - Form of Certificate of Trust .............................................................. D-1

Exhibit E-1 - Form of Notice Relating to Permitted Sale Event .......................... E-1-1

Exhibit E-2 - Form of Notice and Instruction Relating to Threshold Event ......... E-2-1

Exhibit E-3 - Form of Instruction Relating to Permitted Sale Event .................... E-3-1

Exhibit F - Form of Trustee's Certification of Receipt of Certain Trust Assets ..... F-1

Exhibit G - Form of Assignment .......................................................................... G-1

**SCHEDULES**

Schedule I - Threshold Prices ............................................................................... S-I-1

Schedule II - Trustees Fee Schedule ..................................................................... S-II-1

**[_____] CUSTODIAL TRUST**

**TRUST AGREEMENT**

**THIS TRUST AGREEMENT**, dated as of ~~[_____]~~December 6, 2022 (this "Trust Agreement" or this "Agreement"), with respect to the [_____] Custodial Trust (the "Trust"), by and among the Puerto Rico Highways and Transportation Authority ("HTA"), Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, collectively the "Trustees", and with HTA and FGIC, collectively, the "Parties").

**WHEREAS**, in furtherance of the structure approved in HTA's Plan of Adjustment and in order to facilitate the implementation thereof, the Trust is being established by HTA and the Trustees solely for the benefit of and on behalf of the Unitholders and FGIC;

**WHEREAS**, except for the establishment of the Trust and the deposits therein pursuant to the Plan of Adjustment or as contemplated hereby, HTA shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof; and

**WHEREAS**, the Trust is one of the FGIC Trusts contemplated by Section 26.3(a) of the Plan of Adjustment and is being formed for the purposes of (i) holding the Covered FGIC Insured Bonds, (ii) receiving FGIC Plan Consideration allocable or distributable in accordance with Section 12.1 of the Plan to the Original Holders, each component of which is identified on Exhibit A hereto (collectively, the "Allocable Plan Consideration"), (iii) being the sole holder and beneficiary of the Covered FGIC Insurance Policy, and (iv) issuing a single class of beneficial ownership interests consisting of trust units that shall be assigned a CUSIP number, be issued in global form and be registered in the name (or nominee name) of and transferable through the Depositary.

**NOW THEREFORE**, in consideration of the mutual promises, covenants, representations and warranties made in this Trust Agreement, the Parties hereby agree as follows;

**ARTICLE I**

**DEFINITIONS; CONSTRUCTION**

Section 1.1    Definitions

(a)    Capitalized terms used in this Trust Agreement (including the recitals hereto), and not otherwise defined in this Trust Agreement, shall have the respective meanings assigned to such terms in the Plan.

(b)    Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below:

1

"Affiliate": With respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control", when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Business Day": Any day excluding Saturday, Sunday and any day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in San Juan, Puerto Rico or New York, New York are authorized or required by law or other governmental action to close.

"Cash Acceleration Payment": The meaning specified in Section 3.7.

"Cash Payment": The meaning specified in Section 3.3(b).

"Certificate": A definitive certificate substantially in the form attached as Exhibit C evidencing the Units and issued by the Trust pursuant to Article V hereof.

"Certificate of Trust":  The Certificate of Trust of the Trust substantially in the form attached as Exhibit D hereto.

"Closing Date":  [~~_____~~]December 6, 2022.

"Code": The Internal Revenue Code of 1986, as amended, and Treasury Regulations promulgated thereunder.

"Corporate Trust Office": The Trustees' offices at 100 Wall Street, 6th floor, New York, NY 10005, or such other addresses as either of the Trustees' may designate from time to time by notice to the Unitholders ~~,~~ FGIC and the other Trustee.

"Covered FGIC Insured Bonds": The FGIC Insured Bonds held or beneficially owned by the Original Holders in the aggregate principal amount specified on Exhibit A, which are deposited into the Trust on the Closing Date and thereafter held by the Trust (as such bonds may be deemed to be paid, reduced or satisfied in accordance with the terms of this Trust Agreement or the FGIC Insurance Policy).

"Covered FGIC Insurance Policy": The FGIC Insurance Policy solely insofar as it applies and relates to the Covered FGIC Insured Bonds, including, for the avoidance of doubt, all rights relating to payments (if any) required to be made by FGIC in respect of any DPO and DPO Accretion associated with such Covered FGIC Insured Bonds under such FGIC Insurance Policy in accordance with the terms and conditions of the FGIC Rehabilitation Plan.  For the avoidance of doubt, (i) all FGIC Insured Bonds other than the Covered FGIC Insured Bonds shall be deemed no longer covered by the FGIC Insurance Policy as of the Closing Date for all purposes, and (ii) neither the Trust nor the Trustee shall have any rights under the FGIC Insurance Policy except in respect of the Covered FGIC Insured Bonds.

"Delaware Trustee": The meaning specified in the preamble hereto and any successor Delaware Trustee appointed in accordance with Section 11.10.

"Delaware Trust Statute": Chapter 38 of Title 12 of the Delaware Code.

"Depositary": DTC or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder.

"Dollar" or "$": Such currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

"DPO": The meaning specified in the FGIC Rehabilitation Plan.

"DPO Accretion": The meaning specified in the FGIC Rehabilitation Plan.

"DTC": The Depository Trust Company, a limited purpose trust company organized under the laws of the State of New York, its successors and assigns.

"Eligible Account": A non-interest bearing account, held in the United States in the name of the Trust for the benefit of the Unitholders and FGIC, which is a segregated account maintained with either (1) a Federal or State chartered depository institution that has (x) a short-term deposit or unsecured debt rating of at least "A-1" and "P-1" by S&P and Moody's respectively, (y) a long-term deposit rating (or, if a deposit rating is unavailable, senior unsecured debt rating) of at least "A" and "A2" by S&P and Moody's, respectively and (z) a combined capital and surplus of at least U.S.$200,000,000 or (2) the corporate trust department of such a Federal or State-chartered deposit institution.

"EMMA": The Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board, or, if not available for the purposes provided herein, a website specified by the Trustee. Any obligation to post a document to EMMA shall be understood as an obligation to post such document under the CUSIP number for the Units.

"Escrow Account": The escrow account established by the Escrow Account Agreement.

"Escrow Account Agreement": The Escrow Account Agreement FGIC CW/HTA Bond Claims Arising From HTA 98 Senior Bonds dated March 15, 2022 among the Commonwealth, FGIC, as the bond insurer and FGIC, as the escrow agent.

"Executive Officer": With respect to any corporation, the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, any Vice President, the Secretary, any Assistant Secretary, the Treasurer or any Assistant Treasurer of such corporation and with respect to any partnership, any general partner thereof and, as applicable, an authorized signatory.

"Fair Market Value" means, in respect of any New HTA Bond or HTA Clawback CVI as of any date of determination, the lower of (i) the price for such New HTA Bond or HTA Clawback CVI, as applicable, as quoted by Bloomberg L.P. for any trade with total proceeds of

at least $1 million as of the close of business on the prior Business Day, if Bloomberg L.P. has quoted a price for such New HTA Bond or HTA Clawback CVI, as applicable, as of such Business Day, and (ii) the fair market price for such New HTA Bond or HTA Clawback CVI, as applicable, including accrued and unpaid interest (if applicable), determined by soliciting bids from at least two broker-dealers of national standing, each of which is independent of each other and unaffiliated with the Trustee, and shall be the average of such bids, provided that, for the avoidance of doubt, there shall be no requirement to solicit such bids, in which case only clause (i) shall apply.

"Fee Reserve": Funds held from time to time by the Trustee in the General Collection Account, in an amount up to the Fee Reserve Threshold Amount, to cover payments of Trustee Costs as they arise from time to time.

"Fee Reserve Threshold Amount": The fee reserve threshold amount set forth in the Trustee Fee Schedule.

"FGIC Insurance Policy": The existing insurance policy issued by FGIC with respect to the FGIC Insured Bonds, which is listed on Exhibit A hereto, as modified by the FGIC Rehabilitation Plan and this Trust Agreement.

"FGIC Insurance Policy Collection Account": The meaning specified in Section 3.1(a).

"FGIC Insured Bonds": The bonds previously issued by HTA, which are described and the CUSIP number for which is identified on Exhibit A hereto.

"FGIC Rehabilitation Plan": The First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013, together with all exhibits thereto and the documents contained in the plan supplement thereto, in each case as the same may be amended, revised, supplemented or otherwise modified from time to time.

"General Collection Account": The meaning specified in Section 3.1(a).

"HTA Clawback CVI Distribution Date": With respect to each series of HTA Clawback CVIs, each date specified in the Clawback CVI Indenture or CVI Legislation on which distributions of amounts due on such securities are scheduled to be paid, subject to any business day adjustments and conventions specified therein.

"Moody's": Moody's Investors Service, Inc.

"New HTA Bond Distribution Date": With respect to each series of New HTA Bonds, each date specified in the applicable New HTA Bonds Indenture on which distributions of principal or interest on such bonds are scheduled to be paid, subject to any business day adjustments and conventions specified therein.

"Notional Amount": With respect to the Units as of any date of determination, the amount of Trust Units issued as provided in this Trust Agreement on the Closing Date,

excluding any Units that may have been surrendered or canceled or otherwise are no longer outstanding on or prior to such date.

"Officer's Certificate": A certificate signed by an Executive Officer of the applicable Person and delivered to the Trustee.

"Opinion of Counsel": A written opinion of counsel, who may be counsel to FGIC.

"Original Holder": Each holder of an Allowed FGIC Insured Bond Claim on the Closing Date arising from FGIC Insured Bonds (other than FGIC), as provided in Section 26.3(a) of the Plan.

"Other Trust Costs": Any filing fees or other costs or expenses of the Trust that have not been paid by either of the Trustees or the Trust at the time of any election by FGIC under Section 7.5(c).

"Permitted Sale Event": With respect to any series of New HTA Bonds or the HTA Clawback CVIs, the satisfaction of all of the following requirements:

(i)     FGIC is not in default under the Covered FGIC Insurance Policy;

(ii)    FGIC shall have notified the Trustee, by delivering a notice substantially in the form of Exhibit E-1 attached hereto, of its intention to instruct the Trustee to sell some or all of (A) such series of New HTA Bonds, or (B) the HTA Clawback CVIs and setting forth the Permitted Sale Price for such New HTA Bonds or such HTA Clawback CVIs, as applicable.

(iii)   The Trustee shall have provided notice to Unitholders in accordance with the notice requirements set forth in Section 11.4 hereof (a) notifying Unitholders of the notice of FGIC described in clause (ii) above and the Permitted Sale Price set forth in such notice and (b) requesting that any Unitholders objecting to such proposed sale provide written notice of such objection to the Trustee; and

(iv)    The Trustee shall not have received a written objection from the Requisite Unitholders (determined as of the date of the notice described in clause (ii) above) with respect to such proposed sale within seven (7) Business Days of the date the notice provided in clause (iii) above is provided.

"Permitted Sale Price": With respect to any Permitted Sale Event regarding some or all of any series of New HTA Bonds or the HTA Clawback CVIs, the price equal to the percentage of the par amount of such New HTA Bonds or of the outstanding notional amount of such HTA Clawback CVIs set forth in the related notice delivered by FGIC to the Trustee.

"Person": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"Plan of Adjustment" or "Plan": The *Title III Plan of Adjustment of the Puerto Rico Transportation Authority,* Case No. 17 BK 3567-LTS, confirmed by order entered [_____]October 12, 2022, as amended, modified or supplemented from time to time.

"pro rata": With respect to any payment or distribution, or any allocation of any cost or expense, to Unitholders hereunder, pro rata shall be calculated based on the Notional Amount of the Units then outstanding.

"Proof of Policy Claim Form": The Proof of Policy Claim Form required to be filed in order to submit a policy claim to FGIC in accordance with the FGIC Rehabilitation Plan.

"Record Date":  With respect to any distribution to be made to Unitholders: (i) based on the Cash to be deposited into the Trust on the Closing Date, the Closing Date, (ii) based on any scheduled payment of principal or interest in respect of any series of New HTA Bonds, the tenth day preceding the related New HTA Bond Distribution Date, (iii) based on any scheduled payment of any amount due in respect of HTA Clawback CVIs, the tenth day preceding the related HTA Clawback CVI Distribution Date, and (iv) based on any other funds deposited or to be deposited in the General Collection Account or any payment made or to be made under or with respect to the Covered FGIC Insurance Policy, the Record Date established by the Trustee pursuant to Section 3.4(b), provided that if such tenth day under clause (ii) or (iii) above is not a Business Day, the Record Date shall be the preceding Business Day.

"Requisite Unitholders":  As of any date, Unitholders holding more than fifty (50) percent of the Notional Amount of the Trust Units as of such date, excluding from both the numerator and the denominator the Notional Amount of any Trust Units held by FGIC.

"Secretary of State": The meaning specified in Section 2.1.

"State": Any one of the 50 states of the United States, the District of Columbia or its territories.

"S&P": S&P Global Ratings.

"Threshold Price": With respect to the New HTA CIBs, the New HTA Convertible CABs, the New HTA CABs and the HTA Clawback CVIs, the respective prices set forth on Schedule I.

"Threshold Event": With respect to any series of New HTA Bonds or the HTA Clawback CVIs, the receipt by the Trustee of a notice by FGIC that the current market price of such series of New HTA Bonds or the HTA Clawback CVIs exceeds the Threshold Price for such series of New HTA Bonds or the HTA Clawback CVIs, coupled with a written instruction from FGIC to sell some or all of such series of New HTA Bonds or the HTA Clawback CVIs, such notice and instruction to be substantially in the form of Exhibit E-2 attached hereto.

"Trust": The trust created by this Trust Agreement as specified in the preamble hereto.

"Trust Agreement": The meaning specified in the preamble hereto.

"Trust Assets" or "Trust Estate": The property, assets and rights set forth in clauses (a), (b) and (c) of Section 2.2, and any other securities, monies, proceeds or property received on account thereof or exchanged therefor from time to time, as well as any other rights, benefits, protections, remedies and claims pertaining thereto.

"Trustee": The meaning specified in the preamble hereto and any successor Trustee appointed pursuant to Section 7.6 or Section 7.8.

"Trustee Costs": The meaning specified in Section 7.5(a).

"Trustee Fee Schedule": The Schedule II to this Trust Agreement.

"Trustees": Collectively, the Trustee and the Delaware Trustee.

"United States": The United States of America (including the States and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction.

"Unitholder": The Person in whose name a Unit is registered in the records of the Depositary on any date of determination.

"Units" or "Trust Units": The single class of beneficial ownership interests in the Trust evidenced by the Certificate.

"U.S.A. PATRIOT Act": The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107 56 (signed into law October 26, 2001) and its implementing regulations.

Section 1.2      Rules of Construction

Unless the context otherwise requires:

(i)      a term has the meaning assigned to it;

(ii)      an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect in the United States from time to time;

(iii)      "or" is not exclusive;

(iv)      the words "herein", "hereof", "hereunder" and other words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or other subdivision;

(v)      the words "include" and "including" shall be deemed to be followed by the phrase "without limitation"; and

(vi)      the meanings given to defined terms are applicable to the singular and plural forms thereof as appropriate.

7

Section 1.3       Article and Section References

All Article and Section references used in this Trust Agreement, unless otherwise provided, are to Articles and Sections in this Trust Agreement. Any reference to "this Article" appearing within a particular Section of an Article is a reference to such Article as a whole. Any reference to "this Section" appearing within a particular paragraph of a Section is a reference to such Section as a whole.

## ARTICLE II

## TRUST ESTATE

Section 2.1       Creation of Trust.

The Trust is being created on the date hereof pursuant to the execution of this Agreement and the filing by the Trustees of the Certificate of Trust with the Office of the Secretary of State of the State of Delaware (the "Secretary of State"), under the name written above the heading of this Trust Agreement, in which name the Trust shall have power and authority and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the activities of the Trust. It is the intention of the Parties that the Trust hereby created constitutes a statutory trust under the Delaware Trust Statute and that this Trust Agreement constitutes the governing instrument of the Trust. The Trustees are hereby authorized and directed to, and shall, on the date hereof file the Certificate of Trust with the Secretary of State. The Trustee shall have power and authority, and is hereby authorized and empowered, to take all actions on behalf of the Trust as set forth in this Trust Agreement and each of the Trustees is authorized and empowered to execute and file with the Secretary of State any other certificate required or permitted under the Delaware Trust Statute to be filed with the Secretary of State. The office of the Trust shall be in the care of the Trustee at the Corporate Trust Office or at such other address as the Trustee may designate by written notice to the Unitholders and FGIC.

Section 2.2       Trust Assets.

Pursuant to and in accordance with this Trust Agreement and the Plan, on the Closing Date:

(a)       (i) HTA shall, on behalf of the Original Holders and as required by Section 26.3(a) of the Plan, deposit into the Trust (y) the Allocable Plan Consideration comprising Cash and New HTA Bonds as specified on Exhibit A hereto; and (z) any and all agreements, documents and instruments relating to the Covered FGIC Insurance Policy; and (ii) FGIC shall, in connection with the Escrow Account Agreement, deposit into the Trust the HTA Clawback CVIs specified on Exhibit A hereto, which also comprise the Allocable Plan Consideration, and were deposited into the Escrow Account by the Commonwealth upon the satisfaction of the HTA Distribution Conditions pursuant to the Escrow Account Agreement, provided, however, that if any of such HTA Clawback CVIs were sold by FGIC in accordance with the Escrow Account Agreement prior to the Closing Date, then FGIC shall instead deposit

8

the aggregate proceeds of such sale(s) together with the remaining HTA Clawback CVIs, in each case as specified on Exhibit A hereto, into the Trust in accordance with the Escrow Account Agreement.

(b)     All Covered FGIC Insured Bonds shall be deposited, or be deemed to have been deposited, into the Trust by the Depositary on behalf of the Original Holders and as required by Section 26.3(a) of the Plan.  All rights and remedies under or with respect to the Covered FGIC Insured Bonds and the applicable related legislative bond resolutions (other than with respect to the payment obligations of HTA) and the Covered FGIC Insurance Policy (including the rights with respect to any related DPO and DPO Accretion under the FGIC Rehabilitation Plan) shall be preserved and remain in full force and effect solely to the extent necessary to preserve any claims relating the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy; and

(c)     Each holder/beneficiary of the Covered FGIC Insurance Policy shall, on behalf of the Original Holders and as required by Section 26.3(a) of the Plan, deposit, or be deemed to have deposited, into the Trust the Covered FGIC Insurance Policy and relinquished all rights thereunder to the Trustee, on the Closing Date and thereafter.

Section 2.3     <u>Acceptance by Trustee.</u>

(a)     By its execution of this Trust Agreement, the Trustee acknowledges and declares that it will hold or has agreed to hold all Trust Assets, including all documents or instruments delivered to it or received by it from time to time with respect to the Trust Assets, in each case in trust for the exclusive use and benefit of all present and future Unitholders. The Trustee represents and warrants that, except as expressly permitted by this Trust Agreement, (i) it has not and will not, in any capacity, assert any claim or interest in the Trust Estate and will hold (or its agent will hold) such Trust Estate and the proceeds thereof in trust pursuant to the terms of this Trust Agreement, and (ii) it has not encumbered or transferred its right, title or interest in the Trust Estate.

(b)     The Trustee shall, on the Closing Date, deliver to the Unitholders and FGIC in accordance with the Notice provisions of Section 11.4 a certification substantially in the form of Exhibit F hereto that it (i) is in possession of Allocable Plan Consideration comprising cash in the amount specified on Exhibit A hereto, (ii) either (x) confirms that the New HTA Bonds and the HTA Clawback CVIs have been deposited to and are being held in the participant account of U.S. Bank Trust Company, National Association at the Depositary for the benefit of the Unitholders and FGIC or (y) has received written statements from the trustees with respect to the New HTA Bonds and the HTA Clawback CVIs, respectively, confirming that the New HTA Bonds and the HTA Clawback CVIs are beneficially owned by the Trust for the benefit of the Unitholders and FGIC and being held by such trustees for the benefit of the Trust until the deposit of the New HTA Bonds and the HTA Clawback CVIs to such account, and (iii) confirms that the Trust Units have been issued to the Original Holders.

(c)     The Trustee shall, on the Closing Date, (i) take such reasonable action as shall be necessary to facilitate or permit the deposit of the New HTA Bonds and the HTA Clawback CVIs to the participant account of U.S. Bank Trust Company, National Association at

the Depositary for the benefit of the Unitholders and FGIC, and (ii) assuming that such New HTA Bonds and HTA Clawback CVIs have been so deposited, no later than the Business Day following such action, confirm to the Unitholders and FGIC in writing (to the extent not covered in the certification delivered pursuant to Section 2.3(b) above) that the New HTA Bonds and the HTA Clawback CVIs have been deposited to and are being held in such account.

(d)    Except as specifically provided herein, the Trustee shall not sell, pledge or assign any interest in the Trust Estate.

Section 2.4    Purpose, Activities of the Trust.

It is the intention of the Parties that the Trust shall not engage in any business or activities other than certain non-business activities in connection with, or relating to, the following:

(a)    accept the conveyance, assignment and transfer of the Trust Assets pursuant to the Plan or as contemplated by this Trust Agreement;

(b)    create one or more accounts or sub-accounts in accordance with the terms of this Trust Agreement;

(c)    make claims and assignments and receive payments under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and this Trust Agreement;

(d)    receive payments pursuant to the Plan;

(e)    issue the Trust Units to the Original Holders through the issuance of the corresponding Certificate to the Depositary or its nominee in accordance with the terms of this Trust Agreement and take such reasonable action as shall be necessary to facilitate or permit the deposit of the New HTA Bonds and the HTA Clawback CVIs to the participant account of U.S. Bank Trust Company, National Association at the Depositary for the benefit of the Unitholders and FGIC;

(f)    make distributions to the Depositary and Unitholders in accordance with the terms of this Trust Agreement;

(g)    coordinate Unitholder communications through the Depositary;

(h)    follow, accept or act upon any instruction or direction from FGIC or the Requisite Unitholders, as applicable, in each case only as expressly permitted herein;

(i)    hold the Trust Assets;

(j)    sell or assign New HTA Bonds and HTA Clawback CVIs or portions thereof only as expressly provided in Section 3.5 or 3.6 hereof;

10

(k)      effectuate Unitholder Elections as provided in Section 3.6 hereof;

(l)      make public disclosures on EMMA as contemplated by this Trust Agreement;

(m)      make payments, reimbursements and distributions as contemplated by this Trust Agreement;

(n)      otherwise perform its obligations in accordance with, and take such other actions as are expressly provided for or permitted under, the terms of this Trust Agreement; and

(o)      engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

Section 2.5      Limitations of the Trust.

(a)      Except as otherwise provided herein, the affairs of the Trust will be managed by or under the direction of the Trustee. Neither HTA or FGIC nor any of their respective Affiliates will have authority to act for, or to assume any obligation or responsibility on behalf of, the Trust or the Trustee in its capacity as Trustee;

(b)      The Trust will keep correct and complete books and records of accounts and minutes of the meetings and other proceedings of the Trust. Any such resolutions, agreements and other instruments will be continuously maintained by the Trustee as official records of the Trust;

(c)      The Trust will provide for its own operating expenses and liabilities from the Trust Assets. General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to HTA or FGIC or their respective Affiliates;

(d)      All oral and written communications, including letters, invoices, contracts, statements and applications, will be made solely in the name of the Trust if related to the Trust;

(e)      There will be no guarantees made by the Trust with respect to obligations of HTA or FGIC or their respective Affiliates. There will not be any indebtedness relating to borrowings or loans between the Trust and HTA or FGIC or their respective Affiliates; provided that FGIC or its Affiliates may own Trust Units;

(f)      The Trust will act solely in its own name or the Trustee's on its behalf and through its or the Trustee's duly authorized officers or agents in the conduct of its activities. The Trust will not: (i) operate or purport to operate as an integrated, single economic unit with respect to HTA or FGIC or any other affiliated or unaffiliated entity; (ii) seek or obtain credit or incur any obligation to any third party based upon the assets of HTA or FGIC or their respective Affiliates; or (iii) induce any third party to reasonably rely on the creditworthiness of HTA or FGIC or any other affiliated or unaffiliated entity in its dealings with the Trust;

11

(g)      The Trust will maintain a Delaware Trustee with its office in the State of Delaware; and

(h)      The Trust will not engage in any transaction with an Affiliate on any terms other than would be obtained in an arm's-length transaction with a non-Affiliate.

## ARTICLE III

## ADMINISTRATION OF TRUST

Section 3.1      Accounts.

(a)      The Trustee has established and will maintain Eligible Accounts (i) to hold all amounts received on or in respect of the Trust Assets except the Covered FGIC Insurance Policy (the "General Collection Account") and (ii) to hold all amounts received on account of the Covered FGIC Insurance Policy (including, any amounts received on account of DPO or DPO Accretion) (the "FGIC Insurance Policy Collection Account"), each held in trust for the benefit of the Unitholders and FGIC. The Trustee shall deposit all cash received pursuant to clause (a) of Section 2.2 into the General Collection Account on the Closing Date. U.S. Bank Trust Company, National Association has established and will maintain its participant account at the Depositary into which the New HTA Bonds and HTA Clawback CVIs received pursuant to clause (a) of Section 2.2 shall be deposited and held in trust for the benefit of the Unitholders and FGIC. Each of the General Collection Account and the FGIC Insurance Policy Collection Account and such other accounts shall be under the sole dominion and control of the Trustee, and the Trustee shall be entitled to look solely to the General Collection Account for payment of any Trustee Costs and funding of the Fee Reserve from time to time in accordance with the terms of this Trust Agreement.  All distributions to Unitholders shall be made only from cash on deposit in either the General Collection Account or the FGIC Insurance Policy Collection Account in accordance with the terms hereof.

(b)      If, at any time, a formerly Eligible Account no longer fulfills the definition of Eligible Account, the Trustee shall within thirty (30) days establish a new General Collection Account or FGIC Insurance Policy Collection Account, as applicable, meeting the conditions specified in such definition and transfer any cash on deposit in the General Collection Account or FGIC Insurance Policy Collection Account to such new General Collection Account or FGIC Insurance Policy Collection Account, and from the date such new General Collection Account or FGIC Insurance Policy Collection Account is established, it shall be the General Collection Account or FGIC Insurance Policy Collection Account under this Trust Agreement.

(c)      The Trustee shall give notice to FGIC and Unitholders of the location of each Eligible Account and other account and to the proposed new location of any Eligible Account or other account prior to any change thereof.

Section 3.2      Investment of Funds in the Collection Accounts.

Amounts in the General Collection Account and the FGIC Insurance Policy Collection Account shall not be invested.

12

Section 3.3    FGIC Insurance Policy and Effect of Distributions.

(a)    The Trust is deemed to hold the Covered FGIC Insured Bonds and is the sole Person entitled under the terms of the Covered FGIC Insured Bonds to payment thereof. Accordingly, the Trust is and shall be the sole "Bondholder" entitled to assert claims and receive payments under or with respect to the Covered FGIC Insurance Policy.

(b)    The Trustee shall have the sole authority to assert, and shall assert, subject to its rights and protections herein, claims under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and to take all actions required to enforce the Covered FGIC Insurance Policy, including in the event that FGIC fails to make any payment when due under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy. The Trustee shall be authorized to take, and shall take, subject to its rights and protections herein, all actions it deems necessary or advisable to satisfy any and all conditions to the obligations to make payment of any claim asserted by the Trustee under the Covered FGIC Insurance Policy or any payment in respect of any DPO or DPO Accretion related to the Covered FGIC Insurance Policy which may become payable in accordance with the FGIC Rehabilitation Plan. The following are conditions to FGIC's obligation to make any such payment, and the Trustee is authorized and directed to satisfy such conditions: (i) the Trustee shall have submitted to FGIC with respect to each claim a fully completed and duly executed Proof of Policy Claim Form in accordance with the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan, and (ii) with respect to each such payment (other than on account of DPO Accretion) relating or with respect to the principal of the Covered FGIC Insured Bonds, which is paid or deemed to be paid by FGIC in cash (each a "Cash Payment"), the Trustee shall have executed and delivered on behalf of the Trust to FGIC (or its fiscal agent) assignments in substantially the form of Exhibit G with respect to a proportionate share (based on the proportion of such Cash Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust) of the Trust Assets held by the Trust, as confirmed by FGIC, and taken such actions as shall be necessary to transfer such Trust Assets to the account of FGIC or its custodian, in either case as directed by FGIC in writing, and receipt of such Trust Assets shall have been confirmed by FGIC.

(c)    All claims that are properly submitted to FGIC by the Trustee under the Covered FGIC Insurance Policy shall be paid to the extent permitted by FGIC under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan, subject to satisfaction of any conditions to such payments, including the conditions set forth in this Trust Agreement. All payments to the Trustee under or with respect to the Covered FGIC Insurance Policy shall be deposited into the FGIC Insurance Policy Collection Account on the date received if received prior to 11:00 a.m. New York time, on any Business Day or, if received after such time on any Business Day, on the following Business Day.  In the event that FGIC has defaulted in its payment obligations under the Covered FGIC Insurance Policy, the Requisite Unitholders shall have the right to direct the Trustee in writing to take, and the Trustee is authorized to take, and shall take, subject to its rights and protections herein,  any and all actions necessary or desirable to enforce and recover such payment obligations.

(d)    Each distribution of cash to the Unitholders from the General Collection Account shall automatically and immediately reduce on a dollar-for-dollar basis the outstanding

13

principal amount of the Covered FGIC Insured Bonds and shall automatically and immediately result in a corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy. All payments from the FGIC Insurance Policy Collection Account under or with respect to the Covered FGIC Insurance Policy arising from or related to principal of or interest on the Covered FGIC Insured Bonds (other than on account of DPO Accretion) shall be deemed to automatically and immediately reduce on a dollar-for-dollar basis the outstanding principal amount of or the accrued and unpaid interest on the Covered FGIC Insured Bonds, respectively. For the avoidance of doubt, all payments on account of a claim for accrued and unpaid interest due shall reduce on a dollar-for-dollar basis the outstanding interest amount of the Covered FGIC Insured Bonds, and all payments of a claim for principal shall reduce on a dollar-for-dollar basis the outstanding principal amount of the Covered FGIC Insured Bonds.

(e)      If at any time the principal amount of the Covered FGIC Insured Bonds shall be reduced to zero, then thereafter each distribution of cash to the Unitholders under this Trust Agreement (other than distributions from the FGIC Insurance Policy Collection Account on account of payments made by FGIC under or with respect to the Covered FGIC Insurance Policy) shall automatically and immediately reduce on a dollar-for-dollar basis the accrued and unpaid interest, if any, due on the Covered FGIC Insured Bonds and shall automatically and immediately result in a corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy. If at any time the principal amount of and the accrued and unpaid interest on the Covered FGIC Insured Bonds and the DPO Accretion balance under the Covered FGIC Insurance Policy shall be reduced to zero, then (i) the Covered FGIC Insurance Policy shall be indefeasibly canceled, (ii) within three (3) Business Days thereafter, the Trustee shall (x) first, assign to FGIC ownership of the Trust Assets held by the Trust at that time to the extent required to reimburse FGIC for any unreimbursed payments previously made under the Covered FGIC Insurance Policy and (y) second, distribute to the Unitholders any remaining Trust Assets, and (iii) upon making such assignment and distributions (if any), the Units shall be deemed to be redeemed in full and the Trust shall terminate in accordance with the provisions of Article IX hereof.

(f)      Each of FGIC and each Unitholder shall have and retain all rights set forth in the Plan applicable to it, including those set forth in Section 26.3 of the Plan.

(g)      In addition to any other rights FGIC may have hereunder or otherwise, due to the subrogation rights under the Covered FGIC Insurance Policy, upon making each Cash Payment or Cash Acceleration Payment to the Trust, FGIC shall automatically become the owner of a proportionate share (as described in Section 3.3(b)) of the Trust Assets held by the Trust and shall be fully subrogated to all of the Trust's rights therein, including any payments on or in respect thereof.

Section 3.4      Distributions.

(a)      All cash received by the Trust or the Trustee from any source shall be applied and distributed in accordance with the terms of this Trust Agreement. Within two (2) Business Days of the Trust's receipt of (i) the Cash to be deposited into the Trust pursuant to clause (a) of Section 2.2 on the Closing Date, (ii) any scheduled payment of principal or interest in respect of any series of the New HTA Bonds, or (iii) any scheduled payment due on the HTA

Clawback CVIs, the Trustee shall distribute such amounts, net of any outstanding Trustee Costs that are due and payable or to be reimbursed to the Trustees as of the related distribution date, Other Trust Costs to be reimbursed under Section 7.5(c) and amounts necessary to fund the Fee Reserve to the Fee Reserve Threshold Amount, to the Depositary for distribution on a pro rata "pass-through" basis to each Unitholder as of the related Record Date. The Trustee shall pay or reimburse such Trustee Costs, reimburse such Other Trust Costs and fund the Fee Reserve at the time of such distribution.

(b)     The Trustee shall establish the Record Date for the distribution of (i) any other funds deposited or to be deposited in the General Collection Account or (ii) any payment made or to be made under or with respect to the Covered FGIC Insurance Policy, and the Trustee shall send notice to the Unitholders of such Record Date and the related anticipated distribution date of such amounts, in accordance with Section 11.4, in each case not later than two (2) Business Days after the Trust's receipt of such funds or payments.  Such Record Date shall be at least 10 days and no more than 15 days after the date such notice is posted on EMMA.  On such distribution date, the Trustee shall distribute such amounts, in the case of clause (i) net of any outstanding Trustee Costs that are due and payable as of such distribution date, to the Depositary for distribution on a pro rata "pass-through" basis to each Unitholder as of the related Record Date.

(c)     Any distribution to Unitholders shall be made to the Person in whose name such Unit is registered at the close of business on the related Record Date in accordance with the procedures of the Depositary.

Section 3.5     Threshold Event or Permitted Sale Event.

(a)     The Trustee shall not sell any New HTA Bonds or HTA Clawback CVIs except upon a Threshold Event or Permitted Sale Event and subject to the terms of Section 3.5(b), provided that the Trustee shall be authorized to make the assignments and transfers contemplated by Sections 3.3 and 3.6. Upon the Trustee's receipt of a notice substantially in the form of Exhibit E-1 attached hereto as contemplated by clause (ii) of the definition of "Permitted Sale Event", the Trustee shall (i) provide the notice to Unitholders contemplated by clause (iii) of such definition (with a copy of such notice to FGIC) as soon as practicable and in any event within three (3) Business Days of receiving FGIC's notice, and (ii) no later than the tenth (10th) Business Day following the date of such notice to Unitholders, notify FGIC in writing whether the Trustee has received a written objection from the Requisite Unitholders as contemplated by clause (iv) of such definition.

(b)     Upon the occurrence of a Threshold Event or Permitted Sale Event with respect to which FGIC has provided written instruction to the Trustee (substantially in the form of Exhibit E-2 hereto, in the case of a Threshold Event, or Exhibit E-3 hereto, in the case of a Permitted Sale Event) to sell some or all of one or more series of New HTA Bonds or the HTA Clawback CVIs, the Trustee shall seek to sell such New HTA Bonds or HTA Clawback CVIs to the person(s) identified to the Trustee by FGIC in such instruction (which instruction shall also include the applicable sale price(s), the information for the account(s) to which such New HTA Bonds or HTA Clawback CVIs shall be transferred by the Trustee and any other details, including relevant broker(s), to be utilized by the Trustee for such sale) as soon as practicable

15

and in any event within one (1) Business Day of receiving such instruction, provided that: (i) any such sale is made at price(s) that equal or exceed the Fair Market Value applicable to such sale, as confirmed to the Trustee by FGIC, (ii) any such sale is made at price(s) that equal or exceed the applicable Threshold Price in the case of a Threshold Event or the applicable Permitted Sale Price in the case of a Permitted Sale Event, and (iii) all proceeds of such sales shall be deposited into the General Collection Account.

Section 3.6    Surrendered Units.

(a)    Subject to satisfaction of the conditions set forth in Section 3.6(b), any Unitholder may, at any time and from time to time, elect to surrender Units held by such Unitholder (as confirmed by the Depositary) to the Trustee for cancellation (the "Surrendered Units") in exchange for a transfer to such Unitholder of its proportional percentage of the New HTA Bonds and HTA Clawback CVI (or any other securities or property received in respect thereof or in exchange therefor) held by the Trust at that time, by giving written notice thereof to FGIC and the Trustee (a "Unitholder Election").

(b)    The following conditions must be satisfied to permit and effectuate any Unitholder Election: (i) FGIC shall, in its sole discretion, have consented in writing to such Unitholder Election (other than any Unitholder Election in connection with which FGIC shall not have agreed or otherwise be obligated to pay any consideration for the release set forth in clause (iv) below), (ii) the Surrendered Units shall be cancelled by the Trustee with an automatic and immediate corresponding reduction in the aggregate Notional Amount of the Units and the Trustee shall deliver written notice of such cancellation and reduction to the Depositary, (iii) the outstanding principal amount of the Covered FGIC Insured Bonds shall automatically and immediately be reduced on a proportionate dollar-for-dollar basis (based on the proportion of the Notional Amount of such Surrendered Units to the aggregate Notional Amount of the Units at that time) with an automatic and immediate corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy, which reductions shall be acknowledged by the Trustee, and (iv) such Unitholder shall execute and deliver a release, in form and substance satisfactory to FGIC, releasing all rights and claims of any kind it may have relating to the Surrendered Units or the Covered FGIC Insurance Policy subject to receipt of consideration, if any, that FGIC shall have agreed in writing to pay to such Unitholder in consideration for release.  Upon satisfaction of such conditions, the Trustee shall transfer to the Unitholder ownership of the applicable proportional percentage of the New HTA Bonds and HTA Clawback CVI (or any other securities or property received in respect thereof or in exchange therefor) held by the Trust at that time, as directed by FGIC.  FGIC's consent to any Unitholder Election shall not limit its right, in its sole discretion, to deny its consent to any other Unitholder Election.

Section 3.7    FGIC Election to Accelerate Policy Payments.

(a)    Section 3.7(b) shall apply to the Trust and the Covered FGIC Insurance Policy as of the date that is thirty (30) Business Days following the Closing Date unless the Requisite Unitholders notify the Trustee in writing prior to such date of their election that Section 3.7(b) shall not so apply.

16

(b)      Pursuant to the Plan, the payment of the principal of the Covered FGIC Insured Bonds was accelerated and such Covered FGIC Insured Bonds are due and payable at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus accrued interest thereon, or 100% of accreted amounts thereon, to the date of payment.  FGIC is not obligated to pay any claims on an accelerated basis under the Covered FGIC Insurance Policy. FGIC shall have the right, in its sole and absolute discretion, to elect at any time to permit a claim under the Covered FGIC Insurance Policy in the amount of such acceleration price at such time (regardless of whether the Trustee shall have submitted a claim therefor to FGIC) and to make payment to the Trustee in respect of such permitted claim under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan; provided, however, that FGIC shall not be obligated to make all or any portion of such payment, unless and until, with respect to the portion of such payment relating to the principal of the Covered FGIC Insured Bonds which will be paid or deemed to be paid by FGIC in cash (the "Cash Acceleration Payment"), the Trustee shall have executed and delivered to FGIC (or its fiscal agent) assignments in substantially the form of Exhibit G with respect to a proportionate share (based on the proportion of such Cash Acceleration Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust) of the Trust Assets held by the Trust, as confirmed by FGIC, and taken such action as shall be necessary to transfer such Trust Assets to the account of FGIC or its custodian, in either case as directed by FGIC in writing, and receipt of such Trust Assets shall have been confirmed by FGIC.

(c)      At any time, Requisite Unitholders can notify the Trustee of an election that Section 3.7(b) shall apply notwithstanding a prior election under Section 3.7(a), and such notice will be effective upon agreement by FGIC within 30 Business Days of such notification.

## ARTICLE IV

## REPORTING/REMITTING TO UNITHOLDERS

Section 4.1      Statements to Unitholders and FGIC.

On a quarterly basis, the Trustee shall prepare and post a statement to EMMA, in the form attached hereto as Exhibit B and provide notice of such statement to the Unitholders and FGIC in accordance with the Notice provisions of Section 11.4 setting forth:

(a)      all distributions made from the General Collection Account during the quarter and during the year to date (on an aggregate and per Unit basis), identifying the portion thereof attributable to the amount of (i) asset sales; (ii) principal and interest payments; and (iii) CVI payments;

(b)      all distributions made from the FGIC Insurance Policy Collection Account during the quarter and during the year to date (on an aggregate and per Unit basis);

(c)      the principal amount (or accreted amount, as applicable) as of the quarter end of each CUSIP number of New HTA Bonds and HTA Clawback CVI held by the Trust (or

any other securities or property received in respect thereof or in exchange therefor) (on an aggregate and per Unit basis);

(d)     the DPO balance and DPO Accretion balance associated with the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy as of the quarter end, to the extent such information has been furnished to the Trustee by FGIC;

(e)     the principal amount of, and the accrued and unpaid interest on, the Covered FGIC Insured Bonds as of the end of the quarter, together with a description of the changes in such amounts during the quarter;

(f)     any notices received by the Trustee from FGIC in connection with any required DPO and DPO Accretion payments associated with the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy;

(g)     (i) the respective amounts paid to the Trustees for trustee fees, other Trustee Costs under Section 7.5(a), Trustee Costs under Section 7.5(b) and indemnification amounts under Section 7.12, a description of such indemnification amounts and Trustee Costs, (ii) the amount of any Other Trust Costs reimbursed under Section 7.5(c), if applicable, and (iii) the ending Fee Reserve balance for each quarter; and

(h)     any required tax reporting for such period.

Section 4.2     Compliance with Withholding Requirements.

Notwithstanding any other provisions of the Trust Agreement, the Trustee shall comply with all federal withholding requirements with respect to payments to the Depositary and the Unitholders that the Trustee reasonably believes are applicable under the Code. The consent of the Depositary and the Unitholders shall not be required for such withholding. In the event the Trustee does withhold any amount from payments to the Depositary or any Unitholder pursuant to federal withholding requirements, the Trustee shall indicate with any payment to the Depositary or such Unitholder the amount withheld. Any amounts withheld shall be treated as a distribution of cash to the Depositary or Unitholder, as the case may be, in the amount of the withholding for all purposes and shall thereby reduce amounts otherwise distributable to the Depositary or such Unitholder. If an amount required to be withheld was not withheld, the Trust may reduce subsequent distributions by the amount of such required withholding.

**ARTICLE V**

**THE UNITS**

Section 5.1     The Units.

(a)     The Units shall be evidenced by the Certificate issued by the Trustee to the Depositary in accordance with Section 5.2(a).

(b)     As of the Closing Date, the Notional Amount of the Units issued under this Trust Agreement shall be the Notional Amount set forth in Exhibit C, which is the aggregate

original principal amount as of their date of issuance of those Covered FGIC Insured Bonds deposited, or deemed hereunder to have been deposited, into the Trust.  The beneficial ownership of the Units as of the Closing Date shall be allocated by the Depositary among the Original Holders on a proportionate basis based on the aggregate original principal amount as of their date of issuance of each original Holder's respective Covered FGIC Insured Bonds that are deposited, or deemed hereunder to have been deposited, into the Trust on the Closing Date.

(c)     All Units issued under this Trust Agreement shall be evidenced by the same Certificate, subject to the requirements of the Depositary, and otherwise identical in all respects. All Units issued under this Trust Agreement shall be in all respects equally and ratably entitled to the   benefits hereunder without preference, priority or distinction on account of the actual time or times of authentication and delivery, and shall be held and transferable only through the Depositary.

(d)      No additional interests in the Trust other than the Certificate and the Units shall be issued hereunder, except in accordance with Section 5.3.

Section 5.2     The Certificate; Book-Entry-only System.

(a)     On the Closing Date, upon deposit of all of the Trust Assets into the Trust pursuant to the Plan of Adjustment and as provided in Section 2.2, the Trustee shall issue to the Depositary the initial Certificate by executing and delivering the Certificate, on behalf of this Trust, with the manual or facsimile signature of an authorized officer or other agent of the Trustee.

(b)     The Trust shall issue the Certificates to the Depositary.  Consistent with DTC book-entry provisions, one or more typewritten Certificates shall be prepared and registered in the name of the Depositary or its nominee.  There shall be no physical delivery of the Certificate or Units to the Unitholders (other than the Depositary) or other beneficial owners.

(c)     DTC is hereby appointed as the initial Depositary, with Cede & Co., a nominee thereof, being the initial registered owner of the Certificate. In the event that any Depositary resigns or is removed, the Trustee shall select a substitute Depositary. Notwithstanding anything herein to the contrary, the Trust and each of the Trustees, and any agent of the Trust or either of the Trustees, may treat any Depositary in whose name any Certificate is registered as the owner of the Units for all purposes, including for actions by Unitholders. For so long as the Depositary is the registered owner of the Certificate, procedures with respect to the transmission of notices and the transfer of ownership and payment of Units shall be in accordance with arrangements between the Trustee and the Depositary. The Certificate shall be issued in global form and the Units represented thereby shall be freely tradeable and transferable through the Depositary.

(d)     Notwithstanding anything herein to the contrary, so long as the Certificate is registered in the name of the Depositary, the Trust and the Trustee shall have no responsibility or obligation to any Depositary participant, indirect participant or beneficial owner of the Certificate or Units. Without limiting the immediately preceding sentence, the Trust and the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records

of any Depositary or any Depositary participant or indirect participant with respect to any beneficial ownership interest in the Certificate, (ii) the delivery to any Depositary participant, indirect participant, beneficial owner or any other person, other than the Depositary, of any notice with respect to the Certificate or Units, including any notice of Record Date, distribution date, payment, redemption or tender, or (iii) the payment to any Depositary participant, indirect participant, beneficial owner or any other person, other than the Depositary, of any amount with respect to Units or Certificate. The rights of Unitholders shall be limited to those established by law and agreements between the Unitholders and the Depositary and Depositary participants and as provided herein.

(e)      A CUSIP number will be imprinted on the Certificate, but such CUSIP number shall not constitute a part of the contract evidenced by the Certificate or Units. As a convenience to the Depositary and Unitholders, the Trust and the Trustees may use such CUSIP numbers in any notices to the Depositary and Unitholders.

Section 5.3      Mutilated, Destroyed, Lost and Stolen Certificate.

(a)      If (i) any mutilated Certificate is presented to the Trustee or (ii) the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Certificate, and there is delivered to the Trustee such security or indemnity as it may require to save it harmless, and the Trustee has not received notice that such Certificate (and the Units represented thereby) has been acquired by a protected purchaser, then, in each case, the Trustee shall execute, authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like tenor, form, terms and principal amount, bearing an identifying number not used by any contemporaneously existing Certificate, so that neither gain nor loss in interest shall result from such exchange or substitution.

(b)      Upon the issuance of any new Certificate under this Section, the Trustee may require the payment by the Certificate holder of a sum sufficient to cover any tax or other governmental charge that may be imposed in respect thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

(c)      Every new Certificate issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust Assets to the extent provided herein, whether or not the destroyed, lost or stolen Certificate shall be at any time enforceable by anyone, and the Units represented thereby shall be entitled to all the benefits of this Trust Agreement.

(d)      The terms of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Units.

Section 5.4      No Obligation to Register.

The Trustee is not obligated to register or qualify any Certificate or Unit under the Securities Act of 1933, as amended, and the rules and regulations promulgated by the Securities

20

and Exchange Commission thereunder, or any other securities laws or to effect any qualification under the Trust Indenture Act of 1939, as amended.

Section 5.5      Persons Deemed Owners.

Subject to Section 5.3, but notwithstanding anything else in this Trust Agreement, the Trustee and any agent of the Trustee may treat the Depositary or its nominee in whose name the Certificate is registered as the owner of the Units on the related distribution date for the purpose of receiving distributions on such Units and for all other purposes whatsoever, including for actions by Unitholders, and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary. All distributions made hereunder to the Depositary or its nominee, or upon its order, shall be valid, and, to the extent of the sum or sums paid, effectual to satisfy and discharge the liability for moneys distributable upon the Units.

Section 5.6      Cancellation.

All Certificates evidencing Units surrendered for payment, redemption, transfer or exchange shall be delivered to the Trustee and shall be promptly canceled by the Trustee. The Trustee and no one else will cancel all such Certificates surrendered       for registration of transfer, exchange, payment, replacement or cancellation and will dispose of such cancelled Certificates in accordance with its customary procedures. No Certificate shall be authenticated in lieu of or in exchange for any Certificates canceled as provided in this Section, except as expressly permitted by this Trust Agreement.

## ARTICLE VI

## NEW HTA BONDS AND HTA CLAWBACK CVIs

Section 6.1      Voting Rights with Respect to New HTA Bonds and HTA Clawback CVIs.

(a)      Within three (3) Business Days after receipt of notice of any meeting of, or other occasion for the exercise of voting rights or the giving of consents by, owners of any of the New HTA Bonds or the HTA Clawback CVIs (or any other securities or property received in respect thereof or in exchange therefor), the Trustee shall deliver a copy of such notice to FGIC and the Unitholders.

(b)      The voting and direction rights allocable to the owners of the New HTA Bonds and HTA Clawback CVIs (or any other securities or property received in respect thereof or in exchange therefor) pursuant to the terms thereof (including voting and direction rights in respect of remedies) ("Voting Rights") shall be allocated to FGIC unless FGIC is in default under the Covered FGIC Insurance Policy (a "Voting Rights Condition"). Upon the written request of FGIC, subject to the immediately preceding sentence, the Trustee shall vote in accordance with any instruction set forth in such written request.  Upon the occurrence and continuation of a Voting Rights Condition, the Voting Rights will be deemed to be held on a pro rata basis by the Unitholders, and the Trustee may act at the direction of the Requisite Unitholders.

# ARTICLE VII

## CONCERNING THE TRUSTEE

Section 7.1     <u>Duties of Trustee.</u>

(a)     Every provision of this Trust Agreement relating to the conduct of, affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VII.

(b)     The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Trust Agreement and no implied covenants or obligations shall be read into this Trust Agreement against the Trustee.

(c)     The Trustee shall (at the direction of the Requisite Unitholders) take all necessary or desirable actions to enforce the Covered FGIC Insurance Policy against FGIC as set forth herein.

(d)     The Trustee shall deliver to all Unitholders copies of all notices and written communications received from HTA as they relate to the New HTA Bonds and HTA Clawback CVIs.

(e)     Except as provided in Section 7.2 hereof, no provision of this Trust Agreement shall be construed to relieve the Trustee from liability for its own grossly negligent action, grossly negligent failure to act, bad faith or willful misconduct; <u>provided</u>, <u>however</u>, that:

(i)     The Trustee shall not be liable for an error of judgment made in good faith by an Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(ii)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of FGIC or the Requisite Unitholders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the New HTA Bonds or HTA Clawback CVIs exercising any trust or power conferred upon the Trustee with respect to the New HTA Bonds or HTA Clawback CVIs, under this Trust Agreement;

(iii)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Requisite Unitholders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Covered FGIC Insurance Policy or exercising any trust or power conferred upon the Trustee with respect to the Covered FGIC Insurance Policy, under this Trust Agreement; and

(iv)     Any determination of gross negligence, bad faith or willful misconduct of the Trustee shall be made only upon the rendering of a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

Section 7.2      Certain Matters Affecting the Trustee.

(a)      The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties. Further, the Trustee may accept a copy of the vote of the board of directors or equivalent governing body of any party certified by its clerk or assistant clerk or secretary or assistant secretary as conclusive evidence of the authority of any Person to act in accordance with such vote, and such vote may be considered as in full force and effect until receipt by the Trustee of written notice to the contrary;

(b)      The Trustee may, in the absence of bad faith on its part, conclusively rely upon an Opinion of Counsel or certificate of an Officer of the appropriate Person whenever in the administration of this Trust Agreement the Trustee shall deem it desirable that a matter be proved or established (unless other evidence be herein specifically prescribed) prior to taking, suffering or omitting any action hereunder;

(c)      The Trustee may consult with counsel of its own selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in reliance on such advice or Opinion of Counsel;

(d)      The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Trust Agreement or to institute, conduct, defend or continue any litigation thereunder or in relation thereto at the request, order or direction of the Requisite Unitholders, pursuant to the provisions of this Trust Agreement, unless such Unitholders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(e)      The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Trust Agreement;

(f)      The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by FGIC or the Requisite Unitholders; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of this Trust Agreement, the Trustee may require indemnity against such expense or liability as a condition to taking any such actions;

(g)      The Trustee may execute any of the trusts or powers under this Trust Agreement or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for the supervision of or any

23

misconduct or negligence on the part of any agent or attorney appointed with due care by it under this Trust Agreement;

(h)     Whenever the Trustee is authorized herein to require acts or documents in addition to those required to be provided it in any matter, it shall be under no obligation to make any determination whether or not such additional acts or documents should be required unless obligated to do so under Section 7.1;

(i)     The Trustee shall not be deemed to have notice of any matter unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the applicable Trust Units generally, HTA, the Trust or this Trust Agreement;

(j)     None of the provisions of this Trust Agreement shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it;

(k)     Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

(l)     The permissive rights of the Trustee to perform any discretionary act enumerated in this Trust Agreement shall not be construed as a duty or obligation, and the Trustee shall not be answerable in the performance of such act other than for its gross negligence, bad faith or willful misconduct;

(m)     The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian, co-trustee and other Person employed to act hereunder;

(n)     The Trustee shall have no duty (A) to see to any recording, filing, or depositing of this Trust Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Trust Estate, or (D) to confirm or verify the contents of any reports or certificates delivered to the Trustee pursuant to this Trust Agreement believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties;

(o)     The Trustee shall have no liability or responsibility for the acts or omissions of any other party to any of this Trust Agreement or any related document;

(p)     The Trustee shall have no duty or obligation to obtain or solicit any collateral or any funds to be remitted in any of the accounts established under this Trust Agreement, and shall have a duty only to accept such collateral or funds delivered to it in accordance with this Trust Agreement;

(q)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(r)     The Trustee may request the delivery of a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement;

(s)     All rights of action under this Trust Agreement or under any of the Trust Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Trust Units or the Certificate, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Unitholders, subject to the provisions of this Trust Agreement; and

(t)     The Trustee shall establish a Fee Reserve, which Fee Reserve shall be replenished up to the Fee Reserve Threshold Amount in accordance with Section 3.4(a), and the Trustee shall be permitted to apply the amounts therein to pay Trustee Costs.

Section 7.3     Trustee Not Liable for Units or New HTA Bonds, HTA Clawback CVIs, the Covered FGIC Insured Bonds or the Covered FGIC Insurance Policy.

The Trustee assumes no responsibility for the correctness of the recitals contained in this Trust Agreement and in the Trust Units or Certificate. The Trustee makes no representations or warranties as to the validity or sufficiency of this Trust Agreement or of the Trust Units (other than the signature and authentication of the Trustee on the Certificate) or of the New HTA Bonds, HTA Clawback CVIs, the Covered FGIC Insured Bonds, the Covered FGIC Insurance Policy or related documents. The Trustee shall not be accountable for the use or application of any of the Trust Units, or for the use or application of any funds in respect of the New HTA Bonds or HTA Clawback CVIs or deposited in or withdrawn from the Trust in accordance with this Trust Agreement other than, in each case, any funds held by or on behalf of the Trustee in accordance with Article III. The Trustee, in its capacity as Trustee hereunder, shall have no responsibility or obligation to comply with, or to monitor any other Person's compliance with, the HTA Enabling Act, the CVI Legislation,  the New HTA Bond Indenture, or the Clawback CVI Indenture.

Section 7.4     Trustee May Own Units.

The Trustee in its individual capacity or any other capacity may become the owner or pledgee of Trust Units with the same rights it would have if it were not Trustee.

Section 7.5     Trustee Costs and Expenses.

(a)     The Trustees shall each be entitled to receive from the Trust (i) fees agreed upon in writing, including such fees set forth in the Trustee Fee Schedule, (which shall

not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by each of the Trustees in the execution of the trusts created under this Trust Agreement and in the exercise and performance of any of the powers and duties thereunder or the administration of the Trust, (ii) reimbursement for (x) all reasonable fees, expenses, costs and disbursements incurred or made by either of the Trustees in accordance with any of the provisions of this Trust Agreement, including Section 7.5(b) hereof (including the fees, expenses and disbursements of their respective counsel and of all persons not regularly in their respective employ), and (y) their indemnities pursuant to Section 7.12 hereof, and (iii) amounts to be promptly used by the Trustee to pay any reasonable fees, expenses or costs then owed by the Trust in accordance with this Trust Agreement and not covered by clause (ii) of this Section 7.5(a) (collectively, the "Trustee Costs"). For the avoidance of doubt, it is understood and agreed by the Parties that Trustee Costs under clause (ii) or (iii) of this Section 7.5(a) may include amounts of reasonable fees, expenses, costs, disbursements or indemnities that properly relate to the Trust and to one or more other trusts created under other trust agreements to which HTA, FGIC and the Trustees are party, which amounts have been reasonably and fairly allocated by the Trustee to the Trust in good faith as the Trust's share and are described in each relevant statement prepared and provided by the Trustee pursuant to Section 4.1. All such Trustee Costs shall be paid to the Trustees in accordance with the provisions of Section 3.4 hereof or taken from the Fee Reserve.

(b)     In furtherance of Section 7.5(a), each of the Trustees shall be entitled to receive reimbursement for all reasonable out-of-pocket expenses which are properly documented and incurred or made by it, including costs of collection, payable as a result of or in connection with litigation, enforcement actions or other proceedings brought by Unitholders against HTA, the Trust, or such Trustee except for proceedings, litigation or enforcement actions that relate to such Trustee's grossly negligent action, grossly negligent failure to act, bad faith or its own willful misconduct as determined by a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

(c)     For the avoidance of doubt, neither HTA nor FGIC shall be liable for any Trustee Costs or Other Trust Costs.  FGIC may, in its sole discretion, elect to pay any Other Trust Costs, in which case FGIC shall be reimbursed by the Trustee at the time of the next distribution of any amount under Section 3.4(a) hereof upon notifying the Trustee of the amount to be so reimbursed.

Section 7.6     Eligibility Requirements for Trustee and Successor Trustee.

The Trustee and any successor Trustee shall at all times be a corporation or national banking association that: (i) is not an Affiliate of HTA, the Commonwealth of Puerto Rico or any of its instrumentalities, or FGIC; (ii) is neither affiliated with HTA, the Commonwealth of Puerto Rico or any of its instrumentalities, nor located in the Commonwealth of Puerto Rico; (iii) is organized and doing business under the laws of any state or the United States of America; (iv) is authorized under such laws to exercise corporate trust powers; (v) is in good standing under the law of the jurisdiction in which it is organized; (vi) has a combined capital and surplus of at least $50,000,000; (vii) is subject to supervision or examination by federal or state authority; and (viii) is a nationally recognized financial institution and fiduciary regularly acting as a trustee in the municipal finance market. If such corporation or national banking association

publishes reports of its conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published. In case at any time any Trustee or successor Trustee shall cease to be eligible in accordance with the provisions of this Section, such Trustee or successor Trustee shall resign immediately in the manner and with the effect specified in Section 7.7.

Section 7.7    Resignation and Removal of the Trustee.

(a)    The Trustee may at any time resign and be discharged from the trusts created pursuant to this Trust Agreement by giving 60 days written notice, which shall be posted to EMMA by the Trustee. Upon receiving such notice of resignation, FGIC shall promptly appoint a successor trustee meeting the requirements set forth in Section 7.6 by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee. A copy of such instrument shall be delivered to the Unitholders and posted to EMMA by the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee at the expense of the Trust.

(b)    If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 7.6 and shall fail to resign after written request therefor by FGIC or the Requisite Unitholders, or if any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then FGIC or the Requisite Unitholders may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.

(c)    FGIC, with the written consent of the Requisite Unitholders, may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, signed by such Requisite Unitholders or their attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

(d)    The Requisite Unitholders, with the written consent of FGIC (which consent shall not be unreasonably withheld or delayed by FGIC in the event the Trustee is in default of its obligations hereunder to enforce the Covered FGIC Insurance Policy), may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, signed by such Requisite Unitholders or their attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

(e)    Any resignation of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.7 shall not become effective until the acceptance of appointment by the successor trustee as provided in Section 7.8 hereof. The

27

compensation and reimbursement for fees and expenses of any successor trustee appointed in connection with the resignation of the Trustee shall be the sole responsibility of the Trust, including the costs and expenses incurred in connection with any such succession.

(f)     Any removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.7 shall not become effective until (i) acceptance of appointment by the successor trustee as provided in Section 7.8 hereof and (ii) payment of all costs, expenses and indemnities due and owing to the outgoing Trustee, including the costs and expenses incurred in connection with any such succession. In the event the Trustee is removed due to a request by the Requisite Unitholders pursuant to Section 7.7(b), then the fees and expenses of the successor trustee incurred in connection with any such succession shall be the sole responsibility of the Unitholders requesting such removal.

(g)     The compensation for any successor trustee shall be paid in substantially the same manner as compensation was paid to the predecessor trustee.

(h)     Notwithstanding the replacement of the Trustee pursuant to this Section 7.7, the rights, benefits, protections and indemnities afforded to the Trustee under this ARTICLE VII shall continue to the benefit of the retiring Trustee.

Section 7.8     Successor Trustee.

(a)     Any successor trustee appointed as provided in Section 7.7 shall execute, acknowledge and deliver to the Unitholders, FGIC and the predecessor trustee an instrument accepting such appointment under this Trust Agreement and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee herein. The predecessor trustee shall deliver to the successor trustee all related documents and statements held by it under this Trust Agreement and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

(b)     No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of this Section 7.6 hereof.

(c)     Upon acceptance of appointment by a successor trustee as provided in this Section, the successor trustee shall (a) post to EMMA notice of the succession of such trustee under this Trust Agreement and (b) provide notice of the succession of such trustee under this Trust Agreement to the Depositary.

Section 7.9     Merger or Consolidation of Trustees.

Any Person into which either of the Trustees may be merged or converted or with which it may be consolidated or any Person resulting from any merger, conversion or consolidation to which such Trustee shall be a party, or any Person succeeding to all or substantially all of the

corporate trust business of such Trustee, shall be the successor of such Trustee under this Trust Agreement, provided such Person shall be eligible under the provisions of Section 7.6 (as to the Trustee) and 7.14 (as to the Delaware Trustee), without the execution or filing of any paper or any further act on the part of any of the Parties, anything herein to the contrary notwithstanding.

Section 7.10    Appointment of Trustee Custodians.

The Trustee may appoint one or more custodians (each a "Trustee Custodian") to hold all or a portion of the Trust Estate as agent for the Trustee, by entering into a custodial agreement. The appointment of any Trustee Custodian may at any time be terminated and a substitute custodian appointed therefor by the Trustee. Subject to ARTICLE VII, the Trustee agrees to comply with the terms of each custodial agreement and to enforce the terms and provisions thereof against the Trustee Custodian for the benefit of the Unitholders. Each Trustee Custodian shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and surplus of at least $10,000,000 and shall be qualified to do business in the jurisdiction in which it holds any asset constituting part of the Trust Estate. Any such Trustee Custodian may not be an Affiliate of HTA or FGIC. The Trustee is responsible for the fees and expenses of any Trustee Custodian appointed hereunder.

Section 7.11    Trustee May Enforce Claims Without Possession of Certificate.

All rights of action and claims under this Trust Agreement or the Certificate may be prosecuted and enforced by the Trustee without the possession of any of the Trust Units or the production thereof in any proceeding relating thereto and any such proceeding instituted by the Trustee shall be brought in its own name or in its capacity as Trustee. Any recovery of judgment shall, after provision for the payment of the reasonable compensation, fees, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Unitholders in respect of which such judgment has been recovered.

Section 7.12    Trustee Indemnity.

The Trust shall indemnify the Trustees for, and hold them harmless against, any loss, liability or expense arising out of or in connection with their acceptance or administration of the Trust, including the reasonable costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their respective powers or duties hereunder, provided in each case that such loss, liability, expense, cost or claim does not relate to or arise out of or in connection with either Trustee's gross negligence, bad faith or willful misconduct.

Section 7.13    Acceptance by Trustees, Representations and Warranties of Trustees.

The Trustees each hereby undertake to perform their respective obligations set forth herein. The Trustee hereby agrees to hold the Trust Assets, as trustee in trust on behalf of the Trust upon the terms and conditions and for the use and benefit of the Unitholders as herein set forth. The Trustees each as to itself hereby represent and warrant to each of HTA, FGIC, holder of the Certificate and holders of the Units that as of the Closing Date:

29

(a)      it is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or association;

(b)      it has full corporate power, authority and right to execute, deliver and perform its duties and obligations under this Trust Agreement, and has taken all necessary corporate action to authorize the execution, delivery and performance by it of this Trust Agreement, including the execution and delivery of the Certificate on behalf of the Trust;

(c)      the execution and delivery of this Trust Agreement by it and its performance of and compliance with the terms of this Trust Agreement will not violate its certificate of incorporation, association or other constituent documents or by-laws or constitute a default under, or result in the material breach or acceleration of, any material contract, agreement or other instrument to which it is a party or which may be applicable to it or any of its assets;

(d)      as of the Closing Date, this Trust Agreement has been duly executed and delivered by it and, assuming the due authorization, execution and delivery of this Trust Agreement by each of the other parties hereto, constitutes the legal, valid and binding obligation of it, enforceable in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and general principles of equity;

(e)      it is not in violation, and the execution and delivery of this Trust Agreement by it and its performance and compliance with the terms thereof will not constitute a violation, of any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over it or its properties, which violation would reasonably be expected to have a material adverse effect on the condition (financial or otherwise) or operations of it or its properties or on the performance of its duties hereunder;

(f)      there are no actions or proceedings against, or investigations of, it pending, or, to its knowledge, threatened, before any court, administrative agency or other tribunal (i) that could reasonably be expected to prohibit its entering into this Trust Agreement, (ii) seeking to prevent the issuance of the Certificate contemplated by this Trust Agreement or (iii) that could reasonably be expected to materially affect the performance by it of its obligations under, or the validity or enforceability against it of, this Trust Agreement; and

(g)      no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by it of, or compliance by it with, this Trust Agreement, or for the consummation of the transactions contemplated by this Trust Agreement, except for such consents, approvals, authorizations and orders, if any, that have been obtained prior to the Closing Date, other than the filing of the Certificate of Trust with the Secretary of State.

Section 7.14    The Delaware Trustee.

(a)      There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware,

30

otherwise meets the requirements of applicable Delaware law and acts through one or more persons authorized to bind such entity.  The initial Delaware Trustee shall be U.S. Bank Trust National Association.  The Delaware Trustee shall be entitled to all of the rights, privileges, immunities, indemnities and protections afforded to the Trustee hereunder, but will only have such responsibilities and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)     The Delaware Trustee shall be one of the trustees of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Delaware Trust Statute and for taking such actions as are required to be taken by a Delaware Trustee under the Delaware Trust Statute. The duties, liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware; and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Delaware Trust Statute (only upon the written direction of the Trustee); and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.  With the exception of the express duties set forth in this Section 7.14 (b), and the implied contractual covenant of good faith and fair dealing, all other duties of the Delaware Trustee, including fiduciary duties, are expressly eliminated.  The Delaware Trustee shall have no liability to the Trust, to the Trustee, to any beneficiary, or to any other person that is a party to or is otherwise bound by this Trust Agreement for breach of contract or breach of duties (including fiduciary duties), except for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.  The Delaware Trustee shall not be liable for any acts or omissions, except for such losses, damages or expenses which have been finally adjudicated by a court of competent jurisdiction to have directly resulted from the Delaware Trustee's gross negligence, bad faith or willful misconduct.

(c)     The Delaware Trustee shall not be liable for the acts or omissions of the Trust, the Trustee or any other person or entity, nor shall the Delaware Trustee be liable for supervising or monitoring the performance of the duties of the Trustee or the Trust or of any other person or entity under this Trust Agreement or any related document.

(d)     The Delaware Trustee shall not be personally liable for any error of judgment made by an Officer of the Delaware Trustee having direct responsibility for the administration of this Trust Agreement in good faith.

(e)     No provision of this Trust Agreement shall require the Delaware Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its duties hereunder.

(f)     Under no circumstance shall the Delaware Trustee, in its individual capacity or in its capacity as Delaware Trustee, or any member, partner, shareholder, director, officer, employee, agent, affiliate or advisor of the Delaware Trustee or their respective affiliates be personally liable for any representation, warranty, covenant, agreement, liability or indebtedness of the Trust, as all such representations, warranties, covenants, agreements, liabilities or indebtedness of the Trust are those of the Trust as an entity.

(g)     The recitals contained herein shall not be taken as the statements of the Delaware Trustee, and the Delaware Trustee does not assume any responsibility for their correctness. The Delaware Trustee shall not be personally responsible for or in respect of, and the Delaware Trustee makes no representations as to, the title to, or value or condition of, the property of the Trust or any part thereof, including the Trust Assets or Trust Estate, nor as to the validity or sufficiency of this Trust Agreement or any related certificate, instrument or other document.

(h)     The Delaware Trustee may conclusively rely and shall be fully protected, and shall incur no liability to anyone, in acting or refraining from acting in good faith and in reliance upon any signature, instrument, notice, resolution, request, instruction, direction, consent, order, certificate, report, opinion, bond or other document or paper believed by it to be genuine and believed by it to be signed by the proper party or parties. The Delaware Trustee may accept a certified copy of a resolution of any governing body of any person as conclusive evidence that such resolution has been duly adopted by such person and that the same is in full force and effect.   As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein or whenever the Delaware Trustee shall deem it desirable that a fact or matter be proved or established prior to taking, suffering or omitting any action hereunder (including, direction by the Trustee with respect to such action), the Delaware Trustee may for all purposes hereof rely on a certificate, signed by any officer of the party delivering the certificate or, in the case of the Trustee, signed by the Trustee, as to such fact or matter, and such certificate shall constitute full protection to the Delaware Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

(i)     In accepting and performing its duties hereunder the Delaware Trustee acts solely as Delaware Trustee hereunder and not in its individual capacity, and all persons having any claim against the Delaware Trustee by reason of the transactions contemplated by this Trust Agreement shall look only to the Trust Assets for payment or satisfaction thereof.

(j)     The Delaware Trustee may be removed by FGIC with the written consent of the Requisite Unitholders upon thirty (30) days prior written notice to the Delaware Trustee, with a copy to the Trustee. The Delaware Trustee may resign upon thirty (30) days prior written notice to FGIC, with a copy to the Trustee. No resignation or removal of the Delaware Trustee shall be effective except upon the appointment of a successor Delaware Trustee that (i) is reasonably acceptable to FGIC, (ii) has a combined capital and surplus of at least $10,000,000 and (iii) is qualified to do business in the State of Delaware and satisfies the requirements of the Delaware Trust Statute. If no successor has been appointed within such thirty (30) day period, the Delaware Trustee, FGIC or the Unitholders may petition a court to appoint a successor Delaware Trustee, which shall be at the expense of the Trust.

# ARTICLE VIII

## DEFAULT ON NEW HTA BONDS OR HTA CLAWBACK CVIs

Section 8.1     <u>Realization Upon Default.</u>

(a)     The Trustee shall assert claims under the New HTA Bonds or HTA Clawback CVIs and the Covered FGIC Insurance Policy, and shall take such reasonable steps as are necessary to receive payment or to permit recovery thereunder following any default thereunder, with respect to the Covered FGIC Insurance Policy, in accordance with Section 3.3(b) hereof and, with respect to the New HTA Bonds or HTA Clawback CVIs, in accordance with Section 6.1(b) hereof.

(b)     If there is a breach, a default or an event of default with respect to any New HTA Bond or HTA Clawback CVI and such breach, default or event of default is known to the Trustee in accordance with Section 7.2(i), the Trustee shall give notice thereof to the Unitholders (through the Depositary) and FGIC as promptly as practicable, and, in any event, within three (3) Business Days after such breach, default or event of default becomes known to the Trustee. If the Trustee receives notice of an anticipated payment default with respect to any New HTA Bond or the HTA Clawback CVIs in accordance with Section 7.2(i), the Trustee shall give notice thereof to the Unitholders (through the Depositary) and FGIC within three (3) Business Days after receipt of such notice.

(c)     The foregoing provisions of this Section 8.1 shall apply equally to any other securities or property received in respect of the New HTA Bonds or HTA Clawback CVIs or in exchange therefor.

# ARTICLE IX

## TERMINATION OF TRUST

Section 9.1     <u>Termination; No Redemption Rights.</u>

Upon the indefeasible cancellation or other indefeasible termination or discharge of the Covered FGIC Insurance Policy or FGIC's obligations thereunder, the Trust (including the respective obligations and responsibilities under this Trust Agreement of the Trustee and FGIC) shall terminate upon (i) the pro rata payment or distribution to the Unitholders of all amounts or Trust Assets (including the New HTA Bonds and HTA Clawback CVIs) held by or on behalf of the Trustee and required hereunder to be so paid or distributed, (ii) payment in full of any Trustee Costs due and owing to the Trustee under this Trust Agreement, and (iii) receipt by the Trustee of an Opinion of Counsel stating that all conditions precedent herein relating to the satisfaction and discharge of this Trust Agreement have been complied with. In no event shall the Trust be terminated or the New HTA Bonds or HTA Clawback CVIs be redeemed (except in the case of a redemption of the New HTA Bonds or HTA Clawback CVIs permitted under the terms of the New HTA Bond Indenture, the HTA Enabling Act, the Clawback CVI Indenture or the CVI Legislation) or otherwise released from the Trust Estate without the prior express written consent of FGIC if either (i) the Covered FGIC Insurance Policy or FGIC's obligations

thereunder has not been indefeasibly terminated or discharged, or (ii) FGIC has not been indefeasibly paid in full for any amounts owed pursuant to the Plan.

Notwithstanding anything contained herein to the contrary, the merger or consolidation of the Trustee shall not cause a termination of the Trust.

Section 9.2   Procedure for Termination.

(a)   During the month in which the Trustee intends to make the final distribution from the Trust, the Trustee shall give notice to the Unitholders in accordance with Section 11.4 specifying: (a) the anticipated final distribution date; (b) that the final payment with respect to the Trust Units will be made upon presentation and surrender of the Certificate at the office of the Trustee therein designated on that date and the amount of any such final payment; (c) any amounts, or trust assets, remaining on deposit in the Trust will be distributed to the holders of record of the Trust Units on a pro rata basis; and (d) that the Trustee believes that, following the occurrence of such final distributions, the conditions to termination of the Trust have been satisfied and that it intends to terminate the Trust (a "Termination Notice").

(b)   If the Requisite Unitholders do not object in writing within 30 days after the Trustee has provided the Termination Notice as set forth herein then, upon completion of final distributions as set forth in the Termination Notice, the Trust shall be dissolved, wound up, and terminated.

(c)   Upon the dissolution, wind up and termination of the Trust and this Trust Agreement, the Trustee or Delaware Trustee (acting solely at the written direction of the Trustee) is authorized to file a certificate of cancellation with the Secretary of State.

## ARTICLE X

## TAX PROVISIONS

Section 10.1   Grantor Trust Provisions.

The Trustee, HTA, the Unitholders (by their acceptance of the Trust Units) and FGIC each agree and acknowledge or have agreed and acknowledged that the Trust is intended to qualify for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust, and it is neither the purpose nor the intent of the parties hereto to create a partnership, joint venture or association taxable as a corporation or to serve as associates in a joint enterprise for the conduct of business for profit. In furtherance of the foregoing, (a) the purpose of the Trust is and shall be to protect and conserve the assets of the Trust Estate, and the Trust shall not at any time engage in or carry on any kind of business or any kind of commercial or investment activity, (B) the Trust is formed to facilitate direct investment in the Trust Assets and the existence of multiple classes of ownership interests is incidental to that purpose, and (c) the Trustee (at the direction of FGIC and/or the Requisite Unitholders), shall take, or refrain from taking, all such action as is necessary to maintain the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not (i) acquire any assets or dispose of any portion of the Trust other than pursuant to the specific provisions of this Trust Agreement,

(ii) vary the investment of the Trust within the meaning of Treasury Regulation § 301.7701-4(c), (iii) substitute new investments or reinvest so as to enable the Trust Estate to take advantage of variations in the market to improve the investment of any Unitholder or (iv) engage in any activity which may directly or indirectly, adversely affect the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not have any authority to manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Estate except as required by the express terms of this Trust Agreement in accordance with the powers granted to or the authority conferred upon the Trustee pursuant to this Trust Agreement. The Trustee and FGIC each agree that they shall not take any action that would result in the Trust failing to be characterized for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.

Section 10.2   <u>Characterization.</u>

Each Unitholder acknowledges and agrees to treat the Trust Units as undivided interests in the Trust Estate.

Section 10.3   <u>Grantor Trust Administration.</u>

Notwithstanding anything in this Trust Agreement to the contrary, and notwithstanding any direction or instruction by less than all the Unitholders, the Trustee shall not be authorized to take any action that would cause the Trust not to be treated as a grantor trust under the Code all of the distributions and income from which would be subject to the tax treatment described in Subpart J of Chapter 1 of the Code as to the Unitholders. The Trustee shall perform its duties hereunder so as to maintain the status of the Trust as a grantor trust as provided in Section 10.1 hereof. The Trustee shall not (a) exercise any discretionary rights with respect to the Trust Assets, (b) acquire an interest in any additional Trust Assets (other than proceeds of a sale of Trust Assets permitted under the terms of this Trust Agreement), (c) knowingly take any other action or fail to take (or fail to cause to be taken) any other action that, under the Grantor Trust Provisions, if taken or not taken, as the case may be, could adversely affect the status of (i) the Trust as a grantor trust, (ii) the Trust as a U.S. trust, or (iii) the Unitholders as grantors with respect to the Trust under the Grantor Trust Provisions (any such adverse effect on trust status, an "<u>Adverse Trust Event</u>"), unless the Trustee has obtained or received an Opinion of Counsel nationally recognized as competent in matters relating to the U.S. federal income taxation of organizations such as the Trust (at the expense of the party requesting such action or at the expense of the Trust Estate if the Trustee seeks to take such action or to refrain from taking any action for the benefit of the Unitholders) to the effect that the contemplated action will not result in an Adverse Trust Event. None of the other parties hereto shall take any action or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that the Trustee has received or obtained an Opinion of Counsel to the effect that an Adverse Trust Event could result from such action or failure to act. The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Trust Agreement, but in no event at the cost or expense of the Trust Estate or the Trustee.

Section 10.4    Reports to Unitholders and Tax Authorities.

(a)    The Trustee shall perform or cause to be performed on behalf of the Trust all reporting and other tax compliance duties that are required in respect thereof under the Code, the Grantor Trust Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority, including for avoidance of doubt the filing of IRS Forms 1099 or providing other information statements to the extent required pursuant to U. S. Treasury Regulations Section 1.671-5 (including U.S. Treasury Regulations Section 1.671-5(c)(1)), as amended or any successor provision (the "WHFIT Regulations").

(b)    Consistent with the Trust's characterization for U.S. federal income tax purposes as a grantor trust, except to the extent required pursuant to WHFIT Regulations,  no U.S. federal income tax return shall be filed on behalf of the Trust unless either (i) the Trustee shall receive an Opinion of Counsel that, based on a change in applicable law occurring after the date hereof, the Code requires such a filing or (ii) the Internal Revenue Service shall determine that the Trust is required to file such a return. In the event that the Trust is required to file tax returns, the Trustee shall prepare or cause to be prepared, and sign and file when due with the appropriate tax authorities all of the tax returns in respect of the Trust. In no event shall the Trustees, FGIC or HTA be liable for any liabilities, costs or expenses of the Trust or the Unitholders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to the Trustee's gross negligence, bad faith or willful misconduct.

(c)    If any tax is imposed on the Trust, such tax, together with all incidental costs and expenses (including, without limitation, penalties and reasonable attorneys' fees) shall be charged to and payable by the Unitholders on a pro rata basis; provided that in each case the Trustee shall be authorized to withhold the applicable amounts from Distributions on the applicable Trust Units and pay such amounts to the applicable taxing authority and that any amounts so withheld and paid to the applicable taxing authority shall be deemed to have been paid as a Distribution to the applicable Unitholders.

(d)    The Trustee shall, for U.S. federal income tax purposes, maintain books and records with respect to the Trust on a calendar year basis or such other basis as may be required under the Code.

(e)    All taxes due and payable on any amounts payable to a Unitholder with respect to a Trust Unit shall be that Unitholder's sole responsibility.

(f)    For the purposes of this ARTICLE X and any other provision of the Trust Agreement relating to the ownership of a Trust Unit for U.S. federal income tax purposes, including definitions, all references to holder, Unitholder, or beneficial owner shall mean the beneficial owner of a Trust Unit for U.S. federal income tax purposes. By acquiring an interest in a Trust Unit, a beneficial owner of the Trust Unit for U.S. federal income tax purposes shall be

deemed to consent as a condition of acquiring such interest to comply with any requirements of such Article and other provisions hereof.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

Section 11.1    Amendment of Trust Agreement.

(a)    This Trust Agreement may not be amended, waived or supplemented without the prior written consent of FGIC. This Trust Agreement may be amended, waived or supplemented from time to time by FGIC and the Trustee without the consent of any other Party or the Depositary or any Unitholders; provided, however, that no such amendment shall:

(i)    reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Unitholder without the written consent of such Unitholder;

(ii)    alter in any manner the treatment of the Covered FGIC Insurance Policy without the written consent of each Unitholder affected;

(iii)    amend this Section 11.1 without the written consent of each Unitholder; or

(iv)    amend the definition of Requisite Unitholders without the written consent of all Unitholders; or

(v)    adversely affect in any material respect the interests of the Unitholders in any manner other than as described in clause (i), (ii), (iii) or (iv) above without the written consent of the Requisite Unitholders.

(b)    Prior to executing any amendment permitted by this ARTICLE XI, (i) the Trustee shall be required to obtain an Opinion of Counsel that is nationally recognized as competent in matters relating to the federal income taxation of organizations such as the Trust to the effect that such amendment will not result in an Adverse Trust Event and (ii) the Trustee shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such amendment is authorized or permitted by this Trust Agreement and that all conditions precedent have been met. The Trustee may, but shall not be obligated to, enter into any such amendment that affects the Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement or otherwise. The Delaware Trustee may, but shall not be obligated to, enter into any such amendment that affects the Delaware Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement or otherwise.  No amendment that affects the Delaware Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement shall be effective against the Delaware Trustee unless the Delaware Trustee has consented thereto in writing.  Prior to executing any amendment permitted by this ARTICLE XI, the Delaware Trustee shall be entitled to receive

and conclusively and exclusively rely upon written direction from the Trustee that such amendment is authorized and permitted by this Trust Agreement.

(c)    Promptly following the execution of this Trust Agreement, the Trustee shall post full and complete copies of this Trust Agreement on EMMA . Promptly after the execution of any amendment to this Trust Agreement, the Trustee shall furnish a copy of such amendment to the Depositary and shall post a copy of such amendment on EMMA.

(d)    The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Unitholders shall be subject to such reasonable regulations as the Trustee may prescribe in coordination with the Depositary.

Section 11.2    Counterparts.

This Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts may be delivered by electronic messaging system and shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument. The words "execution," "signed," "signature," and words of like import in this Agreement or in any other certificate, agreement or document related to this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and Adobe Sign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the US Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

Section 11.3    Limitation on Rights of Unitholders.

(a)    The death or incapacity of any Unitholder shall not operate to terminate this Trust Agreement or the Trust, nor entitle such Unitholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, nor otherwise affect the rights, obligations and liabilities of the Parties or any of them.

(b)    No Unitholder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust, or the obligations of the Parties, nor shall anything herein set forth, or contained in the terms of the Trust Units, be construed so as to constitute the Unitholders from time to time as partners or members of an association; nor shall any Unitholder be under any liability to any third person by reason of any action taken by the Parties pursuant to any provision hereof.

(c)    No Unitholder shall have any right by virtue of any provision of this Trust Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Trust Agreement or any of the Trust Assets. Nothing in this paragraph shall be

construed to limit in any manner the ability of any Party (notwithstanding the ownership by such Party of Trust Units) to institute any suit, action or proceeding upon or under or otherwise with respect to this Trust Agreement or to enforce in any manner its rights as a party hereunder.

Section 11.4    Notices.

All demands, notices and certifications under this Trust Agreement shall be in writing. All demands, notices and certifications under this Trust Agreement shall be deemed to have been duly given to each Party other than FGIC when personally delivered or mailed by first class mail, postage prepaid, or by express delivery service, to such Party at (a) in the case of the Trustee, U.S. Bank Trust Company, National Association, 100 Wall Street, 6th floor, New York, NY 10005, (b) in the case of the Delaware Trustee, U.S. Bank Trust National Association, 100 Wall Street, 6th floor, New York, NY 10005, and (c) in the case of HTA, c/o Fiscal Agency and Financial Advisory Authority, Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, Puerto Rico 00907, Attn: Office of the Executive Director, or in each of the above cases such other address as may hereafter be furnished by such Party to each other Party in writing. All demands, notices and certifications under this Trust Agreement shall be deemed to have been duly given to FGIC when transmitted by email to FGIC at both of the following email addresses: generalcounsel@fgic.com and edward.turi@fgic.com, or at such other email addresses as may hereafter be furnished by FGIC Party to each other Party in writing.  Unless a different means of giving notice or communication to Unitholders is specified herein, any notice or communication required or permitted to be given to a Unitholder shall be transmitted to the Depositary in accordance with its procedures. Any notice or communication so transmitted to the Depositary within the time prescribed in this Trust Agreement shall be conclusively presumed to have been duly given to the Unitholders at the time of transmission, whether or not and regardless of when any Unitholder actually receives such notice or communication. A copy of any notice given hereunder to any other Party shall be delivered to the Trustee.  The Trustee shall post all notices delivered hereunder to EMMA within five (5) Business Days of receiving such notice or a copy of such notice, as applicable.

Section 11.5    Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Trust Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Trust Agreement and shall in no way affect the validity or enforceability of the other provisions of this Trust Agreement or of the Trust Units or the related rights of the Unitholders.

Section 11.6    Acts of Unitholders.

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Trust Agreement to be given or taken by Unitholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Unitholders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Trustee and ownership of the Units held by such Unitholders is confirmed by Depositary.

Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Trust Agreement and conclusive in favor of the Trustee. The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner that the Trustee deems sufficient. The ownership of Trust Units shall be proved by the Depositary.

Section 11.7   Headings.

Article and Section headings in this Trust Agreement are included herein for convenience of reference only and shall not constitute a part of this Trust Agreement for any other purpose or be given any substantive effect.

Section 11.8   No Waiver; Cumulative Remedies.

No failure to exercise and no delay in exercising, on the part of any Party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

Section 11.9   Merger and Integration.

This Trust Agreement and the documents and exhibits expressly incorporated herein set forth the entire understanding of the Parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by this Trust Agreement.

Section 11.10   [Reserved].

Section 11.11   Patriot Act.

The Parties acknowledge that in accordance with Section 326 of the U.S.A. PATRIOT Act, the Trustees, like all financial institutions and in order to help fight the funding of terrorism and money laundering, are required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustees. The Parties agree that they will provide the Trustees with such information as they may request in order for the Trustees to satisfy the requirements of the U.S.A. PATRIOT Act.

Section 11.12   Governing Law; Venue Jury Waiver.

THIS TRUST AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS TRUST AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON, ARISING OUT OF, OR LEADING TO THIS TRUST AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS TRUST AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY OR PERFORMANCE, SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF

THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS. EACH PARTY HERETO HEREBY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS TRUST AGREEMENT, OR (B) IN ANY WAY IN CONNECTION WITH OR PERTAINING TO OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT TO THIS TRUST AGREEMENT OR IN CONNECTION WITH THIS TRUST AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS TRUST AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE. EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY FEDERAL OR STATE COURTS SITTING IN THE STATE OF DELAWARE IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS TRUST AGREEMENT. EACH PARTY TO THIS TRUST AGREEMENT IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDINGS IN ANY SUCH COURT AND ANY CLAIM THAT ANY PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

Section 11.13   Force Majeure.

In no event shall the Trustees be responsible or liable for any failure or delay in the performance of their obligations hereunder arising out of or caused by, directly or indirectly, forces   beyond their control, including strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustees shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 11.14   Intent of Parties.

(a)     The Parties intend that, for all purposes, the transfer to the Trust of the Trust Estate pursuant to Section 2.2 in each case shall be, and shall be construed as, a transfer thereof to the Trust on behalf of the Original Holders in lieu of a transfer thereof to the Trust directly by the Original Holders and shall constitute, in all respects, an absolute, irrevocable transfer, conveyance, and assignment, without recourse, of the Trust Estate to the Trust, and immediately after giving effect to the transfer contemplated hereby on the Closing Date, HTA will have no further interest (legal or equitable) in the Trust Estate and the Trust Estate will not be property of HTA or HTA's estate in the event of a liquidation, reorganization, or similar proceeding of HTA and the Trust shall have the absolute right to take whatever action it may deem appropriate with respect to the Trust Estate. The Parties agree to treat the transfer

contemplated hereby for all purposes (including financial accounting purposes) as an absolute transfer on all relevant books, records, financial statements and other documents.

(b)     The Trust Estate will be held by the Trust free and clear of any lien or encumbrance of any Person claiming through or under HTA.

(c)     Notwithstanding anything to the contrary in this Trust Agreement or in any other document governing the formation, management, or operation of the Trust, if and for so long as any Trust Unit remains outstanding, none of the Unitholders, FGIC, the Trustees, nor any other Person shall authorize, cause or permit the Trust to (and the Trust shall not, and neither Trustee shall directly take any action that to its actual knowledge would, violate any of the following):

(i)     engage in any business or engage in any activity other than those activities expressly permitted in this Trust Agreement and will not have, incur, guarantee or become liable for any indebtedness or obligations except as expressly contemplated in this Trust Agreement;

(ii)     acquire or own any assets other than the Trust Estate or lease any assets;

(iii)     fail to preserve its existence as an entity duly formed, validly existing and in good standing (if applicable) under the laws of the State of Delaware, or fail to remain qualified to do business in each state in which such qualification is required, for any reason, including in order to perform its obligations under this Trust Agreement;

(iv)     fail to observe at any time any necessary, appropriate and customary corporate, organizational, company and/or other legal formalities to maintain its separate existence;

(v)     fail to act solely in its own name or in the name of the Trustee through duly authorized agents in the conduct of its activities;

(vi)     provide for the payment of its expenses, indebtedness or other obligations other than from its own separate assets;

(vii)     have its debts or other obligations guaranteed by any other Person or hold itself out as responsible for the debts or other obligations of any other Person;

(viii)     commingle its assets or liabilities with those of any other Person;

(ix)     fail to maintain its own records, books of account, bank accounts, accounting records and other entity documents separate and apart from those of any other Person;

(x)     divert funds for any purpose other than as set forth in this Trust Agreement;

(xi)     enter into any contract, agreement or transaction with any Unitholders, HTA, FGIC, any principal or other Affiliate of the Trust, or any shareholder, general partner, member, principal or Affiliate thereof, except as expressly authorized herein;

(xii)    maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xiii)   incur, create or assume any indebtedness of or buy or hold evidence of indebtedness issued by any other Person (other than as contemplated by this Trust Agreement); guarantee or hold itself out to be responsible for the debts of another Person or otherwise pledge its assets to secure the obligations of any other Person, or hold out its credit or assets as being available to satisfy the obligations of any other Person or seek to incur, create or assume any indebtedness based upon the assets of any other Person;

(xiv)    perform any duties or obligations of HTA or any other Person;

(xv)     make any loans or advances to any third party, including any Unitholder, HTA or any Affiliate of the Trust, or any principal or Affiliate thereof;

(xvi)    fail to file its own tax returns as and if required to do so by applicable law (subject to any permitted extensions and except to the extent the Trust is treated as a grantor trust for tax purposes) and to pay any taxes required to be paid by it under applicable law;

(xvii)   fail to hold itself out to the public as a legal entity separate and distinct from any other Person, fail to conduct its activities solely in its own name or in the name of the Trustee and as a separate and distinct entity, or fail to correct any known misunderstanding regarding its separate identity;

(xviii)  identify itself as a department or division of any other Person;

(xix)    fail to observe all formalities required of a Delaware statutory trust;

(xx)     fail to pay its expenses and liabilities only out of its own funds to the extent such funds are available and fail to hold its assets only in its own name; provided, however, the foregoing shall not require HTA to sell any assets, or make any capital contribution, to the Trust;

(xxi)    conduct any oral or written communication, including letters, invoices, purchase orders, contracts, statements and applications, other than in its own name or in the name of the Trustee; or

(xxii)   (a) institute proceedings to have the Trust declared or adjudicated a bankrupt or insolvent, (b) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (c) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (d) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar

43

official) of the Trust or a substantial portion of the property of the Trust, (e) make any assignment for the benefit of the Trust's creditors, (f) cause the Trust to admit in writing its inability to pay its debts generally as they become due or (g) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing.

(d)     Failure of the Trust, HTA, FGIC, any Unitholder, any Trustee or any other Person on behalf of the Trust, to comply with any of the foregoing covenants set forth in this Section 11.14 shall not affect the status of the Trust as a separate legal entity (unless in violation of the Delaware Trust Statute) nor cause the Trust to dissolve or terminate.

(e)     To the extent that any provision of this Section 11.14 conflicts with, violates or otherwise is in contravention with any other provision of this Trust Agreement, the Parties and each Unitholder agree that the terms set forth in this Section 11.14 shall be controlling as expressly set forth herein.

Section 11.15   Non-Petition.

HTA, FGIC, the Trustee and the Delaware Trustee, by entering into this Agreement, and the Unitholders, by accepting a Trust Unit, hereby covenant and agree that they will not at any time institute against the Trust, or join in instituting against the Trust, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law; provided, however, that in the event a bankruptcy or similar proceeding is instituted against the Trust by another Person, the Trustee may file appropriate proofs of claim.

Section 11.16   Certain Terms Regarding HTA.

For the avoidance of doubt and notwithstanding any terms appearing herein or elsewhere to the contrary:

(i)     The obligations of the Trust under the Trust Units and this Trust Agreement are non-recourse obligations of the Trust payable solely from the Trust Estate, and following realization of the Trust Estate, and its reduction to zero, any claims of the Unitholders shall be extinguished. The Trust Units are not obligations of, and are not guaranteed by, HTA, and no recourse shall be had against any officer, director, manager, employee, security holder or incorporator of HTA, or its successors or assigns, for the payment of any amounts payable under the Trust Units or the payment or performance of any obligation of the Trust under or pursuant to this Trust Agreement.

(ii)     The recitals contained in this Trust Agreement and in the Trust Units, shall be taken as the statements of the Trust, and HTA assumes no responsibility for their correctness. HTA makes no representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Trust Units.

(iii)     In purchasing any Trust Units, the purchaser shall be deemed to acknowledge, represent and agree, that none of HTA nor any of its affiliates, is acting as a fiduciary or a financial or investment advisor for such purchaser, and such purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice,

44

representations or recommendations (in each case whether written or oral) of HTA or any of its affiliates.

       (iv)    HTA shall not be accountable for the use or application by the Trust of the Trust Units or the proceeds thereof or any amounts paid to the Trust pursuant to the provisions of this Trust Agreement.

Section 11.17 <u>Certain Terms Regarding FGIC.</u>

       (a)    In addition to notices required to be provided elsewhere under this Trust Agreement, the Trustee shall promptly provide notice to FGIC with respect to each of the following:

       (i)    any determination or intention of the Trustee or the Delaware Trustee to resign or terminate its duties hereunder;

       (ii)    the amount of any cash received by the Trust, and the date on which it was received; and

       (iii)    the amount of, and the Record Date and distribution date for, any distributions that the Trust is required to make to Unitholders.

       (b)    The Trustee shall promptly furnish FGIC with copies of each report, notice or other communication sent to Unitholders. The Trustee shall seek to discuss and consult with FGIC regarding the same before sending them to Unitholders.

       (c)    The Trustee, upon FGIC's request, shall provide additional information with respect to the Trust or the Trust Assets, including requesting from HTA information concerning the New HTA Bonds or the HTA Clawback CVIs and thereafter providing any such information received to FGIC.

       (d)    The Trustee, upon FGIC's request, will discuss and consult with FGIC regarding matters concerning (i) the Covered FGIC Insured Bonds and FGIC's remaining obligations under the Covered FGIC Insurance Policy, including claims that the Trustee intends to assert thereunder, and (ii) the New HTA Bonds and the HTA Clawback CVIs held by the Trust.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the Parties have caused this Trust Agreement to be duly executed by their respective officers thereunto duly authorized and all as of the date first set forth above.

**PUERTO RICO HIGHWAYS AND
TRANSMISSION AUTHORITY**

By: _____

Name: ~~Luis Santiago Reyes~~Edwin E. Gonzalez-Montalvo_____ Title: Executive Director ~~of Finance~~

[Signature Page]

Custodial Trust Agreement

**FINANCIAL GUARANTY INSURANCE COMPANY**


By:_____
Name: Derek Donnelly
Title: Senior Managing Director

[Signature Page]

**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,** as Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

**U.S. BANK TRUST NATIONAL ASSOCIATION,** as Delaware Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

Custodial Trust Agreement

[Signature Page]

Custodial Trust Agreement

**<u>EXHIBIT A</u>**

Trust Assets

FGIC Insurance Policy Number:

FGIC Insured Bonds description and CUSIP number:

Covered FGIC Insured Bond principal amount:  [$_____] in aggregate principal amount

Allocable Plan Consideration:

      Cash:

      New HTA CIBs:

      New HTA CABs:

      New HTA Convertible CABs:

      HTA Clawback CVIs

If any HTA Clawback CVIs were sold by FGIC prior to the Closing Date, [$_____] in cash and the remaining HTA Clawback CVIs in the aggregate notional amount of [$_____].

## EXHIBIT B

[Form of Notice to Unitholders and FGIC]

[_____] CUSTODIAL TRUST
STATEMENT OF QUARTER ENDED [ ], 20[__]

**POSTED TO EMMA**
U.S. Bank Trust Company, National Association, as Trustee

Trust Units                                                                                        [CUSIP]

1.      **Distributions to Unitholders (Sections 4.1(a) and (b))**

| Source of Distributions | For Quarter Ended [ ], 20 | | Year to date, [ ], 20[   ] | |
|---|---|---|---|---|
| | Aggregate Distributions | Per Unit Distributions | Aggregate Distributions | Per Unit Distributions |
| Asset Sales (Section 4.1(a)(i)) | $ | $ | $ | $ |
| Principal and interest payments (Section 4.1(a)(ii)) | | | | |
| CVI payments (Section 4.1(a)(iii)) | | | | |
| Policy Claim payments (Section 4.1(b)) | | | | |
| DPO payments (Section 4.1(b)) | | | | |
| DPO Accretion payments (Section 4.1(b)) | | | | |

2.      **Balances of New HTA Bonds and HTA Clawback CVIs (Section 4.1(c))**

| | As of [ ], 20[   ] | |
|---|---|---|
| | Aggregate principal/accreted amount of New HTA Bonds/HTA | Per Unit principal/accreted amount of New HTA Bonds/HTA |

B-1

| | Clawback CVIs (by CUSIP) | Clawback CVIs (by CUSIP) |
|---|---|---|
| New HTA Bonds<br>CUSIP<br>CUSIP<br>CUSIP<br><br>HTA Clawback CVIs<br>CUSIP | $ | $ |

**3.**    **DPO and DPO Accretion Balances (Section 4.1(d))**

DPO balance as of the Closing Date:

DPO balance as of last day of quarter:  $

DPO Accretion balance as of last day of quarter:  $

**4.**    **Covered FGIC Insured Bonds (Section 4.1(e))**

Accrued and unpaid interest on Covered FGIC Insured Bonds as of last day of quarter:  $

Principal amount of Covered FGIC Insured Bonds as of last day of quarter:  $

Description of change(s) in such amounts since prior quarter:

**5.**    **Payments to Trustees for such Quarter (Section 4.1(g))**

Fees paid to the Trustee:

Fees paid to the Delaware Trustee:

Trustee Cost amount(s) paid pursuant to Section 7.5(a)(ii) and description:

Trustee Cost amount(s) paid pursuant to Section 7.5(b) and description:

Indemnification amount(s) paid pursuant to Section 7.12 and description:

Ending Fee Reserve Balance:

**6.**    **Notices received by Trustee during such Quarter**
[Copy attached] [Not applicable]

7.     **Tax Reporting Required for such [Quarter][Year]**

[Copy attached] [Not applicable[2]]


[8.     **Other Trust Costs for such Quarter (Section 4.1(g)(ii))**

Other Trust Cost amount(s) reimbursed pursuant to Section 7.5(c):][3]

---

[2] May be used for quarterly reporting only.

[3] Include item 8 only if applicable to the Quarter.

B-3

## EXHIBIT C

[Form of Certificate]

[_____] CUSTODIAL TRUST CERTIFICATE

THIS CERTIFICATE IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY. THIS CERTIFICATE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE   DEPOSITORY TRUST COMPANY ("DTC") TO THE TRUSTEE (AS DEFINED IN THE TRUST AGREEMENT REFERRED TO BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST THEREIN.

THIS CERTIFICATE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS CERTIFICATE MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST TO WHICH THIS CERITIFICATE RELATES.

[_____] CUSTODIAL TRUST

Certificate No.  1

Initial Notional Amount of Units: [_____]

CUSIP:[_____]

This certifies that CEDE & CO. is the registered owner of this Certificate and of the [Notional Amount of the] Units evidenced by this Certificate.

The Units evidenced by this Certificate represent a beneficial ownership interest in the Trust created by the Trust Agreement (the "Trust Agreement"), dated as of December 6, 2022, with respect to the [_____] Custodial Trust (the "Trust"), by and among the Puerto Rico Highways and Transportation Authority ("HTA"), Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, collectively the "Trustees").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to such terms in the Trust Agreement. This Certificate is issued under and subject to the terms, provisions and conditions of the Trust Agreement. By acceptance of this Certificate, the registered owner of this Certificate and each Unitholder assents to and becomes bound by the Trust Agreement.

The Trust Assets, on the Closing Date, consist of: (i) the Allocable Plan Consideration comprising Cash, New HTA Bonds and HTA Clawback CVIs as specified on Exhibit A to the Trust Agreement; (ii) the Covered FGIC Insured Bonds as specified on Exhibit A to the Trust Agreement; (iii) the Covered FGIC Insurance Policy as specified on Exhibit A to the Trust Agreement; (iv) any and all agreements, documents and instruments relating to the Covered FGIC Insurance Policy; and (v) and any other securities, monies, proceeds or property received on account thereof or exchanged therefor from time to time, as well as any other rights, benefits, protections, remedies and claims pertaining thereto.

Subject to the terms and conditions of the Trust Agreement and until the obligations created by the Trust Agreement shall have terminated in accordance therewith, any distributions to Unitholders shall be distributed on each distribution date to the Person in whose name this Certificate is registered at the close of business on the related Record Date for such distribution and all distributions shall be in accordance with the terms of the Trust Agreement.

Distributions on this Certificate shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of the Trust Agreement, by wire transfer of immediately available funds to the Person in whose name this Certificate is registered at the close of business on the related Record Date for such distribution in accordance with the procedures of the Depositary.

This Certificate does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby. A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by the holder of this Certificate or any Unitholder at a time agreed upon by such holder or Unitholder and the Trustee.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Certificate shall not entitle the holder of this Certificate or any Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust, and not in its individual capacity, has caused this Certificate to be duly executed.

[_____] CUSTODIAL TRUST

CERTIFICATE NO. _____

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

DATED:

Trustee's Certificate of Authentication:

This is the Certificate referred to in the within- mentioned Trust Agreement.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

C-3

## <u>EXHIBIT D</u>

[Form of Certificate of Trust]

CERTIFICATE OF TRUST OF
[_____] CUSTODIAL TRUST

THIS Certificate of Trust of [_____] Custodial Trust (the "<u>Trust</u>"), is being executed and filed by the undersigned as trustees, to form a statutory trust under the Delaware Statutory Trust Act (12 DEL. CODE, <u>Sections 3801</u>, *et seq.*) (the "<u>Act</u>").

1. NAME.  The name of the statutory trust formed hereby is "[_____] Custodial Trust."

2. DELAWARE TRUSTEE.  The name and business address of a trustee of the Trust having its principal place of business in the State of Delaware are U.S. Bank Trust National Association, 1011 Centre Road, Suite 203, Wilmington, Delaware  19805.

3. EFFECTIVE DATE.  This Certificate of Trust shall be effective [_____]December 6, 2022.

IN WITNESS WHEREOF, the undersigned, being the trustees of the Trust, have executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

U.S. BANK TRUST NATIONAL ASSOCIATION, as Delaware Trustee


By:_____
Name: Michelle Mena-Rosado
Title: Vice President


U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
as Trustee


By:_____
Name: Michelle Mena-Rosado
Title: Vice President

D-1

**EXHIBIT E-1**

[Form of Notice Relating to Permitted Sale Event]

NOTICE

U.S. Bank Trust Company, National Association
100 Wall Street, 6th floor
New York, NY 10005
     Re: Permitted Sale Event

Ladies and Gentlemen:

      Reference is made to the Trust Agreement, dated as of [—————————]December 6, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

      This notice is being provided to the Trustee, as contemplated by clause (ii) of the definition of "Permitted Sale Event" and Section 3.5(a) of the Trust Agreement. Accordingly, FGIC hereby notifies the Trustee of its intention to instruct the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, [[the][each] series of the New HTA Bonds] [and] [the HTA Clawback CVIs] listed in Annex A in the [respective] amount[s] specified on Annex A, and notifies the Trustee that the [respective] Permitted Sale Price[s] for [such series of New HTA Bonds] [and] [the HTA Clawback CVIs] are as set forth on Annex A.

      **IN WITNESS WHEREOF,** FGIC has executed and delivered this Notice as of _____, 20__.

FINANCIAL GUARANTY INSURANCE COMPANY
By:_____
Name:_____
Title:_____

E-1-1

E-1-2

## ACKNOWLEDGEMENT OF RECEIPT

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Notice.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____

Name:_____

Title:_____

**Annex A**

| NEW HTA BONDS | |
|---|---|
| Series | CUSIP No. |
|  |  |

Principal Amount to be Sold: $[_____]

Permitted Sale Price:[_____]

| NEW HTA BONDS | |
|---|---|
| Series | CUSIP No. |
|  |  |

Principal Amount to be Sold: $[_____]

Permitted Sale Price:[_____]

| HTA CLAWBACK CVIs |
|---|
| CUSIP No. |
|  |

Amount to be Sold: $[_____]

Permitted Sale Price:[_____]

E-1-4

**EXHIBIT E-2**

[Form of Notice and Instruction Relating to Threshold Event]

NOTICE AND INSTRUCTION

U.S. Bank Trust Company, National Association
100 Wall Street, 6th Floor
New York, NY 10005
        Re: Threshold Event

Ladies and Gentlemen:

        Reference is made to the Trust Agreement, dated as of [~~——————~~]December 6, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

        This notice and instruction is being provided to the Trustee, pursuant to and in accordance with Section 3.5(b) of the Trust Agreement and as contemplated by the definition of "Threshold Event".  Accordingly, FGIC hereby (i) notifies the Trustee that the [respective] current market price[s] of [[the][each] series of New HTA Bonds] [and] [the HTA Clawback CVIs] listed in Annex A exceed[s] the [respective] Threshold Price[s] for [such series of New HTA Bonds] [and] [such HTA Clawback CVIs] specified on Annex A, and (ii) instructs the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, [such series of New HTA Bonds] [and] [such HTA Clawback CVIs] in the amount[s], at the sale price[s] and to the person[s] and account[s], and using the broker, if any, specified on Annex A.

        **IN WITNESS WHEREOF,** FGIC has executed and delivered this Notice as of _____, 20__.

                                    FINANCIAL  GUARANTY  INSURANCE
                                    COMPANY

                                    By:_____
                                    Name:_____
                                    Title:_____

E-2-1

## ACKNOWLEDGEMENT OF RECEIPT

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Notice and Instruction.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____
Name:_____
Title:_____

**Annex A**

| **NEW HTA BONDS** | |
|---|---|
| Series | CUSIP No. |
|  |  |

Principal Amount to be Sold: $[_____]

Threshold Price:[_____]

Sale Price:[_____]

| **NEW HTA BONDS** | |
|---|---|
| Series | CUSIP No. |
|  |  |

Principal Amount to be Sold: $[_____]

Threshold Price:[_____]

Sale Price:[_____]

| **HTA CLAWBACK CVIs** |
|---|
| CUSIP No. |
|  |

Amount to be Sold: $[_____]

Threshold Price:[_____]

Sale Price:[_____]

[Insert details of persons/accounts to whom the sale shall be made and any other details, including relevant broker, if any, necessary for such sale.]

**EXHIBIT E-3**

[Form of Instruction Relating to Permitted Sale Event]

INSTRUCTION

U.S. Bank Trust Company, National Association
100 Wall Street, 6th floor
New York, NY 10005

     Re: <u>Permitted Sale Event</u>

Ladies and Gentlemen:

     Reference is made to the Trust Agreement, dated as of [——————]December 6, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee. Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

     This instruction is being provided to the Trustee pursuant to and in accordance with Section 3.5(b) of the Trust Agreement, based on FGIC's understanding that a Permitted Sale Event has occurred. Accordingly, as contemplated by its related Notice Relating to Permitted Sale Event dated as of [*] (the "Notice"), FGIC hereby instructs the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, the [respective] amount[s] of [[the][each] series of New HTA Bonds] [and] [the HTA Clawback CVIs] referenced in the Notice, at the sale price[s] (which equal[s] or exceed[s] the [respective] Permitted Sale Price[s]) and to the person[s] and account[s], and utilizing the broker[s], if any, specified in Annex A hereto.

     **IN WITNESS WHEREOF,** FGIC has executed and delivered this Instruction as of _____, 20__.

                    **FINANCIAL GUARANTY INSURANCE COMPANY**

                    By:_____
                    Name:_____
                    Title:_____

## ACKNOWLEDGEMENT OF RECEIPT

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Instruction.

U.S.    BANK    TRUST    COMPANY NATIONAL ASSOCIATION, as Trustee


By:_____
Name:_____
Title:_____

**Annex A**

| NEW HTA BONDS | |
| --- | --- |
| Series | CUSIP No. |
|  |  |

Principal Amount to be Sold: $[_____]

Sale Price:[_____]<sup>4</sup>

| NEW HTA BONDS | |
| --- | --- |
| Series | CUSIP No. |
|  |  |

Principal Amount to be Sold: $[_____]

Sale Price:[_____]<sup>5</sup>

| HTA Clawback CVIs |
| --- |
| CUSIP No. |
|  |

Amount to be Sold: $[_____]

Sale Price:[_____]<sup>6</sup>

[Insert details of persons/accounts to whom the sale shall be made and any other details, including relevant broker, if any, necessary for such sale.]

---

[4] Equals or exceeds the Permitted Sale Price of [_____].
[5] Equals or exceeds the Permitted Sale Price of [_____].
[6] Equals or exceeds the Permitted Sale Price of [_____].

**EXHIBIT F**

Form of Trustee's Certification of Receipt of Certain Trust Assets

CERTIFICATION

To: FGIC and the Unitholders

Re: Receipt of Certain Trust Assets

Ladies and Gentlemen:

Reference is made to the Trust Agreement, dated as of [~~_____~~]December 6, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

This certification is being provided to the Unitholders and FGIC, pursuant to and in accordance with Section 2.3(b) of the Trust Agreement.  Accordingly, the Trustee hereby certifies that as of the Closing Date, the Trustee (i) is in possession of Allocable Plan Consideration comprising cash in the amount set forth on Exhibit A of the Trust Agreement, (ii) confirms that [the New HTA Bonds and the HTA Clawback CVIs listed on Exhibit A of the Trust Agreement have been deposited to and are being held in the participant account of U.S. Bank Trust Company, National Association  at the Depositary for the benefit of the Unitholders and FGIC] [it has received written statements from the trustees with respect to the New HTA Bonds and the HTA Clawback CVIs, respectively, confirming that the New HTA Bonds and the HTA Clawback CVIs listed on Exhibit A of the Trust Agreement are beneficially owned by the Trust for the benefit of the Unitholders and FGIC and being held by such trustees for the benefit of the Trust until the deposit of such New HTA Bonds and HTA Clawback CVIs to such account], and (iii) confirms that the Trust Units have been issued to the Original Holders.

F-1

**IN WITNESS WHEREOF,** the Trustee has executed and delivered this Certification as of _____, 2022.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee


By:_____
Name:_____
Title:_____

**EXHIBIT G**

[Form of Assignment]

([_____] CUSTODIAL TRUST) ASSIGNMENT

ASSIGNMENT, dated as of _____, [__], 20____ (this "Assignment"), by U.S. Bank Trust Company, National Association, as trustee for and on behalf of the Trust listed on Annex A hereto (the "Trust", and such trustee being the "Trustee"), to and for the benefit of Financial Guaranty Insurance Company ("FGIC").

**WITNESSETH:**

WHEREAS, reference is made to (a) the Trust Agreement, dated as [_____] (the "Trust Agreement"), with respect to the Trust, by and among the Puerto Rico Highways and Transportation Authority, FGIC, the Trustee, and U.S. Bank Trust National Association, as Delaware trustee for and on behalf of the Trust, and (b) the Covered FGIC Insurance Policy listed on Annex A hereto, issued by FGIC with respect to the Covered FGIC Insured Bonds described and the CUSIP for which is identified on Annex A hereto;

WHEREAS, Section 3.3(b) of the Trust Agreement[7] provides, among other things, that the execution and delivery of assignments (in substantially this form) by the Trustee on behalf of the Trust to FGIC (or its fiscal agent) is one of the conditions to FGIC's obligation to make payment of any claim asserted by the Trustee under the Covered FGIC Insurance Policy or any payment in respect of any DPO related to the Covered FGIC Insurance Policy which may become payable in accordance with the FGIC Rehabilitation Plan, in each case relating or with respect to the principal of the Covered FGIC Insured Bonds;

WHEREAS, Section 3.3(b) of the Trust Agreement further provides that, with respect to each such payment relating or with respect to the principal of the Covered FGIC Insured Bonds, which is paid or deemed to be paid by FGIC in cash (each a "Cash Payment"), the Trustee shall execute and deliver on behalf of the Trust to FGIC (or its fiscal agent) assignments (in substantially this form) with respect to a proportionate share (based on the proportion of such Cash Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust (the "Proportionate Share")) of the Trust Assets held by the Trust,;

WHEREAS, for purpose of this Assignment, the Cash Payment and Proportional Share are set forth on Annex A hereto;

WHEREAS, in accordance with the terms of the Covered FGIC Insurance Policy and Section 3.3(b) of the Trust Agreement, FGIC (or its fiscal agent) will pay, or be deemed to have paid, the Cash Payment to the Trust, as the Bondholder under the Covered FGIC Insured Policy,

---

[7] This form of assignment shall also be used for any assignments pursuant to Section 3.7(b) of the Trust Agreement with conforming changes made by FGIC.

only after FGIC (or its fiscal agent) receives this Assignment executed and delivered by the Trustee on behalf of the Trust; and

WHEREAS, in accordance with the provisions of the Trust Agreement, the Trustee intends to effect the assignments and transfers to FGIC contemplated hereby on behalf of the Trust.

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto do hereby agree as follows:

**SECTION 1.   DEFINITIONS. CAPITALIZED TERMS USED HEREIN AND NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE RESPECTIVE MEANINGS SET FORTH IN THE TRUST AGREEMENT.**

**SECTION 2.   ASSIGNMENT.**

(a)   Effective as of the date hereof and pursuant to the Covered FGIC Insurance Policy and Section 3.3(b) of the Trust Agreement, the Trustee on behalf of the Trust hereby irrevocably sells, assigns, transfers and conveys to FGIC the Proportionate Share of the Trust Assets held by the Trust as set forth in Annex A hereto (the "Assigned Trust Assets"), including all rights to payment under or with respect to the Assigned Trust Assets and all other rights therein or in relation thereto.  The Trustee shall (i) revise its registration books, and any other documents of record for the Trust Assets maintained by it, to reflect that the Assigned Trust Assets are no longer held by the Trust and have been sold, assigned, transferred and conveyed to FGIC hereunder and (ii) take such other actions as shall be necessary to transfer the Assigned Trust Assets to the account of FGIC or its custodian, in either case as directed by FGIC in writing.

(b)   The Trustee on behalf of the Trust hereby covenants and agrees to convey to FGIC, if and when received following the date hereof, any amounts related to the Assigned Trust Assets (including any sums payable as interest in respect thereof) paid to or for the benefit of the Trust that, under subsection (a) above, belong to FGIC.

**SECTION 3.   REPRESENTATIONS AND WARRANTIES.** The Trustee hereby represents and warrants to FGIC that:

(a)   The Trust is the holder of the Assigned Trust Assets, and the Trustee has all requisite power and authority to execute, deliver and perform its obligations under this Assignment and to consummate the assignment contemplated herein on behalf of the Trust, and such assignment and execution and delivery of this Assignment by the Trustee  have been duly authorized.

(b)     This Assignment has been duly executed and delivered by the Trustee on behalf of the Trust and constitutes a legal, valid and binding obligation of the Trust enforceable in accordance with its terms.

(c)     The Assigned Trust Assets are free and clear of all liens and encumbrances.

**SECTION 4.**     **GOVERNING LAW. THIS ASSIGNMENT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE.**

**SECTION 5.**     **COUNTERPARTS. THIS ASSIGNMENT MAY BE EXECUTED IN ANY NUMBER OF COUNTERPARTS, EACH OF WHICH MAY BE DELIVERED BY ELECTRONIC MESSAGING SYSTEM AND SHALL BE DEEMED AN ORIGINAL, BUT ALL OF WHICH TOGETHER SHALL CONSTITUTE ONE AND THE SAME ASSIGNMENT.**

IN WITNESS WHEREOF, the Trustee has caused this Assignment to be duly executed and delivered on behalf of the Trust on the date first above written.

U.S. BANK TRUST COMPANY,
NATIONAL ASSOCIATION, as Trustee

By:_____
Name:_____
Title:_____

G-3

**ANNEX A**

Trust:  [_____] Custodial Trust

Covered FGIC Insurance Policy Number:

Covered FGIC Insured Bonds description and CUSIP number:

Cash Payment:  [$_____]

Total Principal Amount of Covered FGIC Insured Bonds held by the Trust as the date of this Assignment (immediately prior to receiving, or being deemed to have received, the Cash Payment):  [$_____]

Proportionate Share:  [XX.XXXX]% (Cash Payment/Total Principal Amount of Covered FGIC Insured Bonds)

Proportionate Share of the Trust Assets assigned by the Trustee hereunder:

     Cash:

     New HTA CIBs:

     New HTA CABs:

     New HTA Convertible CABs:

     HTA Clawback CVIs:

## <u>SCHEDULE I</u>

Threshold Prices

With respect to the New HTA CIBs, the price equal to ~~50~~45% of the par amount of such bonds, with respect to the New HTA Convertible CABs the price equal to 50% of the then accreted amount of such bonds and with respect to the New HTA CABs, the price equal to 65% of the then accreted amount of such bonds, as calculated by FGIC, and with respect to the HTA Clawback CVIs, the price equal to ~~38~~30% of the notional amount of such HTA Clawback CVIs.

**SCHEDULE II**

Trustee Fee Schedule

The fees and expenses set forth below are payable or reimbursable to the Trustees[8] for their services as Trustees under the Trust Agreement to which this Schedule II is attached (the "Trust Agreement"). The Trust Agreement is by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company, U.S. Bank Trust Company, National Association, as Trustee, and U.S. Bank Trust National Association, as Delaware Trustee. Such fees and expenses are each payable or reimbursable by or on behalf of the Trust in accordance with the terms of the Trust Agreement.

**Acceptance Fee:**                                                             **$1,067**
The acceptance fee includes the review and execution of the Trust Agreement and the certificates and other documents related to the Trust, the creation of the Trust and initial establishment of the accounts referred to in Section 3.1 of the Trust Agreement. Additional duties covered by this acceptance fee include the acceptance of the Trust Assets, actions referred to in Section 2.3 of the Trust Agreement, the initial issuance of the Certificate and Units, distributions under Section 3.4(a)(i) of the Trust Agreement and any other activity contemplated under the Trust Agreement to occur on or in connection with the Closing Date. The acceptance fee is payable on the Closing Date.

**Fee Reserve Threshold Amount:**                                              **$9,000**

**Annual Administration Fee:**                                                 **$3,667**
The annual administration fee covers the routine duties of the Trustees associated with the administration of the Trust in accordance with the terms of the Trust Agreement, including without limitation the distribution of payments on any Trust Assets received from time to time by the Trust, processing of trades, presentation of claims under the FGIC Insurance Policy and effecting the related assignments and transfers of Trust Assets to FGIC, distribution of policy claims payments and DPO and DPO Accretion payments made by FGIC, preparation, posting and distribution of statements, reports and notices and other routine responsibilities, in each case as contemplated by the Trust Agreement. The administration fee is payable in advance and not subject to proration.

**Fee for Sales of Trust Assets due to Threshold Event or Permitted Sale**     **$2,000 each**
**Event/Unitholder Election (per effectuated Threshold Event, Permitted Sale**
**Event or Unitholder Election), and for other Non-Routine Disbursements:**
This fee is payable separate from the annual administration fee and not inclusive of DTC charges.

---

[8] Capitalized terms used and not otherwise defined in this Schedule II have the respective meanings ascribed thereto in the Trust Agreement.

**Legal Fee & Expenses:**                                                                    **AT COST**

Includes fees and expenses for legal services provided by legal counsel to the
Trustees as and to the extent such fees and expenses are payable or reimbursable
to the Trustees pursuant to the terms of the Trust Agreement.

**Out-of-Pocket Expenses:**                                                                  **AT COST**

Includes all related expenses of the Trustees as and to the extent such expenses
are payable or reimbursable to the Trustees pursuant to the terms of the Trust
Agreement.

**Extraordinary administration services ("EAS"):**

EAS are duties, responsibilities or activities not expected to be provided by the Trustees at the
outset of the matter, not routine or customary, and/or not incurred in the ordinary course of
business and may require analysis or interpretation, in each case unless contemplated by any
other fee description in this Schedule II and if not in contravention of the Trust Agreement,
_provided_ that it is acknowledged and agreed by the Parties that duties, responsibilities and
activities performed by the Trustee as contemplated under Article VIII of the Trust Agreement,
or in connection with litigation, enforcement actions or other proceedings that are brought
against the Trust or the Trustees and don't relate to or arise out of or in connection with either of
the Trustees' gross negligence, bad faith or willful misconduct, constitute EAS. Billing for
reasonable fees and expenses related to EAS is appropriate in instances where particular
inquiries, events or developments are unexpected, even if the possibility of such circumstances
could have been identified at the inception of the matter, or as changes in law, or in procedures
or the cost of doing business related to EAS, demand. At the Trustees' option, EAS may be
charged to the Trust on an hourly (time expended multiplied by current hourly rate), flat or
special fee basis at such rates or in such amounts in effect at the time of such services. EAS fees
are due and payable in addition to annual or ordinary administration fees. Failure to pay for EAS
owed to the Trustees when due may result in interest being charged on amounts owed to the
Trustees for extraordinary administration services fees and expenses at the prevailing market
rate.

**General terms and conditions**

The Trust's obligation to pay under this Trustee Fee Schedule pursuant to the terms of the Trust
Agreement shall govern the matters described herein and shall, in accordance with the terms of
the Trust Agreement, survive any termination of the Trust or Trust Agreement and the
resignation or removal of the Trustees. This Trustee Fee Schedule shall be construed and
interpreted in accordance with the laws of the state identified in the Trust Agreement without
giving effect to the conflict of laws principles thereof. The Parties agree to the sole and exclusive
jurisdiction of the state and federal courts of the state identified in the Trust Agreement over any
proceeding relating to or arising regarding the matters described herein. Payment of fees
constitutes acceptance of the terms and conditions described herein.

Fees paid in advance will not be prorated. The fees set forth above and any subsequent
modifications thereof by the Parties pursuant to the terms of the Trust Agreement are part of the
Trust Agreement. Execution of the Trust Agreement or acceptance of the Certificate or any Unit
constitutes agreement to the above Trustee Fee Schedule.

Butler Snow Draft
As of ~~9/8/2022~~12.1.2022

[_____] CUSTODIAL TRUST [1]

RELATED TO

SETTLEMENT OF PUERTO RICO
HIGHWAYS AND TRANSPORTATION
AUTHORITY

[_____] Puerto Rico Highways
and Transportation Authority [INSERT
BOND ISSUE] maturing [OLD BOND
MATURITY DATE]

---

This Agreement is

among

Puerto Rico Highways and
Transportation Authority,

Financial Guaranty Insurance Company,

U.S. Bank Trust Company, National
Association,

(as Trustee)

and

U.S. Bank Trust National Association,

---

[1] Form of Custodial Trust to be formed for each CUSIP of FGIC Insured Bonds (HTA 98 Sub Bonds)
under the Plan.

Butler Snow Draft
As of ~~9/8/2022~~12.1.2022

(as Delaware Trustee)

---

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS; CONSTRUCTION ........................................................ 1
    Section 1.1    Definitions ........................................................ 1

    Section 1.2    Rules of Construction ........................................ 7

    Section 1.3    Article and Section References ......................... 7

ARTICLE II TRUST ESTATE ................................................................................ 7
    Section 2.1    Creation of Trust. .............................................. 7

    Section 2.2    Trust Assets. ....................................................... 8

    Section 2.3    Acceptance by Trustee. ..................................... 8

    Section 2.4    Purpose, Activities of the Trust. ....................... 9

    Section 2.5    Limitations of the Trust. ................................... 10

ARTICLE III ADMINISTRATION OF TRUST .................................................. 11
    Section 3.1    Accounts. ........................................................... 11

    Section 3.2    Investment of Funds in the Collection Accounts. ......... 12

    Section 3.3    FGIC Insurance Policy and Effect of Distributions. ..... 12

    Section 3.4    Distributions. .................................................... 14

    Section 3.5    Threshold Event or Permitted Sale Event. ...... 14

    Section 3.6    Surrendered Units. ........................................... 15

    Section 3.7    FGIC Election to Accelerate Policy Payments. ... 16

ARTICLE IV REPORTING/REMITTING TO UNITHOLDERS ........................ 16
    Section 4.1    Statements to Unitholders and FGIC. .............. 16

    Section 4.2    Compliance with Withholding Requirements. ... 17

ARTICLE V THE UNITS ..................................................................................... 17
    Section 5.1    The Units. .......................................................... 17

    Section 5.2    The Certificate; Book-Entry-only System. ....... 18

    Section 5.3    Mutilated, Destroyed, Lost and Stolen Certificate. ..... 19

    Section 5.4    No Obligation to Register. ................................ 19

    Section 5.5    Persons Deemed Owners. ................................. 20

    Section 5.6    Cancellation. .................................................... 20

ARTICLE VI HTA CLAWBACK CVIS ............................................................. 20
    Section 6.1    Voting Rights with Respect to HTA Clawback CVIs. ... 20

ARTICLE VII CONCERNING THE TRUSTEE .......................................................... 21

    Section 7.1     Duties of Trustee. ............................................................................. 21

    Section 7.2     Certain Matters Affecting the Trustee. ......................................... 22

    Section 7.3     Trustee Not Liable for Units or HTA Clawback CVIs, the Covered
                       FGIC Insured Bonds or the Covered FGIC Insurance Policy. ...... 24

    Section 7.4     Trustee May Own Units. ................................................................. 24

    Section 7.5     Trustee Costs and Expenses. ......................................................... 24

    Section 7.6     Eligibility Requirements for Trustee and Successor Trustee. ....... 25

    Section 7.7     Resignation and Removal of the Trustee. .................................... 26

    Section 7.8     Successor Trustee. .......................................................................... 27

    Section 7.9     Merger or Consolidation of Trustees. .......................................... 27

    Section 7.10   Appointment of Trustee Custodians. ........................................... 28

    Section 7.11   Trustee May Enforce Claims Without Possession of Certificate. ... 28

    Section 7.12   Trustee Indemnity. ........................................................................ 28

    Section 7.13   Acceptance by Trustees, Representations and Warranties of Trustees. .. 28

    Section 7.14   The Delaware Trustee. .................................................................. 29

ARTICLE VIII DEFAULT ON HTA CLAWBACK CVIS ........................................ 31

    Section 8.1     Realization Upon Default. ............................................................. 31

ARTICLE IX TERMINATION OF TRUST ............................................................... 32

    Section 9.1     Termination; No Redemption Rights. ........................................... 32

    Section 9.2     Procedure for Termination. ........................................................... 32

ARTICLE X TAX PROVISIONS ............................................................................... 33

    Section 10.1   Grantor Trust Provisions. .............................................................. 33

    Section 10.2   Characterization. ........................................................................... 34

    Section 10.3   Grantor Trust Administration. ...................................................... 34

    Section 10.4   Reports to Unitholders and Tax Authorities. ............................... 34

ARTICLE XI MISCELLANEOUS PROVISIONS ..................................................... 35

    Section 11.1   Amendment of Trust Agreement. ................................................. 35

    Section 11.2   Counterparts. ................................................................................. 36

    Section 11.3   Limitation on Rights of Unitholders. ........................................... 37

    Section 11.4   Notices. .......................................................................................... 37

    Section 11.5   Severability of Provisions. ............................................................ 38

    Section 11.6   Acts of Unitholders. ...................................................................... 38

Section 11.7    Headings. ........................................................................................... 38

Section 11.8    No Waiver; Cumulative Remedies. ..................................................... 38

Section 11.9    Merger and Integration. ...................................................................... 39

Section 11.10   [Reserved]. .......................................................................................... 39

Section 11.11   Patriot Act. .......................................................................................... 39

Section 11.12   Governing Law; Venue Jury Waiver. ................................................. 39

Section 11.13   Force Majeure. ..................................................................................... 40

Section 11.14   Intent of Parties. .................................................................................. 40

Section 11.15   Non-Petition. ........................................................................................ 42

Section 11.16   Certain Terms Regarding HTA. .......................................................... 43

Section 11.17   Certain Terms Regarding FGIC. ......................................................... 43


**EXHIBITS**

Exhibit A - Trust Assets ................................................................................................ A-1
Exhibit B - Form of Notice to Unitholder and FGIC ................................................... B-1
Exhibit C - Form of Certificate ..................................................................................... C-1
Exhibit D - Form of Certificate of Trust ....................................................................... D-1
Exhibit E-1 - Form of Notice Relating to Permitted Sale Event .................................. E-1-1
Exhibit E-2 - Form of Notice and Instruction Relating to Threshold Event ................ E-2-1
Exhibit E-3 - Form of Instruction Relating to Permitted Sale Event ........................... E-3-1
Exhibit F - Form of Trustee's Certification of Receipt of Certain Trust Assets ........... F-1
Exhibit G - Form of Assignment ................................................................................... G-1


**SCHEDULES**

Schedule I - Threshold Prices ....................................................................................... S-I-1
Schedule II - Trustees Fee Schedule ............................................................................. S-II-1

# [_____] CUSTODIAL TRUST

## TRUST AGREEMENT

**THIS TRUST AGREEMENT**, dated as of [~~_____~~]December 6, 2022 (this "Trust Agreement" or this "Agreement"), with respect to the [_____] Custodial Trust (the "Trust"), by and among the Puerto Rico Highways and Transportation Authority ("HTA"), Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, collectively the "Trustees", and with the HTA and FGIC, collectively, the "Parties").

**WHEREAS,** in furtherance of the statute approved in HTA's Plan of Adjustment and in order to facilitate the implementation thereof, the Trust is being established by HTA and the Trustees solely for the benefit of and on behalf of the Unitholders and FGIC;

**WHEREAS**, except for the establishment of the Trust and the deposits therein pursuant to the Plan of Adjustment or as contemplated hereby, HTA shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof; and

**WHEREAS**, the Trust is one of the FGIC Trusts contemplated by Section 26.3(a) of the Plan of Adjustment and is being formed for the purposes of (i) holding the Covered FGIC Insured Bonds, (ii) receiving FGIC Plan Consideration allocable or distributable in accordance with Section 16.1 of the Plan to the Original Holders, each component of which is identified on Exhibit A hereto (collectively, the "Allocable Plan Consideration"), (iii) being the sole holder and beneficiary of the Covered FGIC Insurance Policy, and (iv) issuing a single class of beneficial ownership interests consisting of trust units that shall be assigned a CUSIP number, be issued in global form and be registered in the name (or nominee name) of and transferable through the Depositary.

**NOW THEREFORE**, in consideration of the mutual promises, covenants, representations and warranties made in this Trust Agreement, the Parties hereby agree as follows;

## ARTICLE I

## DEFINITIONS; CONSTRUCTION

Section 1.1    Definitions

(a)    Capitalized terms used in this Trust Agreement (including the recitals hereto), and not otherwise defined in this Trust Agreement, shall have the respective meanings assigned to such terms in the Plan.

(b)    Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below:

"Affiliate": With respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control", when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Business Day": Any day excluding Saturday, Sunday and any day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in San Juan, Puerto Rico or New York, New York are authorized or required by law or other governmental action to close.

"Cash Acceleration Payment": The meaning specified in Section 3.7.

"Cash Payment": The meaning specified in Section 3.3(b).

"Certificate": A definitive certificate substantially in the form attached as Exhibit C evidencing the Units and issued by the Trust pursuant to Article V hereof.

"Certificate of Trust":  The Certificate of Trust of the Trust substantially in the form attached as Exhibit D hereto.

"Closing Date":  [⸻]December 6, 2022.

"Code": The Internal Revenue Code of 1986, as amended, and Treasury Regulations promulgated thereunder.

"Corporate Trust Office": The Trustees' offices at 100 Wall Street, 6th floor, New York, NY 10005, or such other addresses as either of the Trustees' may designate from time to time by notice to the Unitholders , FGIC and the other Trustee.

"Covered FGIC Insured Bonds": The FGIC Insured Bonds held or beneficially owned by the Original Holders in the aggregate principal amount specified on Exhibit A, which are deposited into the Trust on the Closing Date and thereafter held by the Trust (as such bonds may be deemed to be paid, reduced or satisfied in accordance with the terms of this Trust Agreement or the FGIC Insurance Policy).

"Covered FGIC Insurance Policy": The FGIC Insurance Policy solely insofar as it applies and relates to the Covered FGIC Insured Bonds, including, for the avoidance of doubt, all rights relating to payments (if any) required to be made by FGIC in respect of any DPO and DPO Accretion associated with such Covered FGIC Insured Bonds under such FGIC Insurance Policy in accordance with the terms and conditions of the FGIC Rehabilitation Plan.  For the avoidance of doubt, (i) all FGIC Insured Bonds other than the Covered FGIC Insured Bonds shall be deemed no longer covered by the FGIC Insurance Policy as of the Closing Date for all purposes, and (ii) neither the Trust nor the Trustee shall have any rights under the FGIC Insurance Policy except in respect of the Covered FGIC Insured Bonds.

"Delaware Trustee": The meaning specified in the preamble hereto and any successor Delaware Trustee appointed in accordance with Section 11.10.

"Delaware Trust Statute": Chapter 38 of Title 12 of the Delaware Code.

"Depositary": DTC or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder.

"Dollar" or "$": Such currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

"DPO": The meaning specified in the FGIC Rehabilitation Plan.

"DPO Accretion": The meaning specified in the FGIC Rehabilitation Plan.

"DTC": The Depository Trust Company, a limited purpose trust company organized under the laws of the State of New York, its successors and assigns.

"Eligible Account": A non-interest bearing account, held in the United States in the name of the Trust for the benefit of the Unitholders and FGIC, which is a segregated account maintained with either (1) a Federal or State chartered depository institution that has (x) a short-term deposit or unsecured debt rating of at least "A-1" and "P-1" by S&P and Moody's respectively, (y) a long-term deposit rating (or, if a deposit rating is unavailable, senior unsecured debt rating) of at least "A" and "A2" by S&P and Moody's, respectively and (z) a combined capital and surplus of at least U.S.$200,000,000 or (2) the corporate trust department of such a Federal or State-chartered deposit institution.

"EMMA": The Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board, or, if not available for the purposes provided herein, a website specified by the Trustee. Any obligation to post a document to EMMA shall be understood as an obligation to post such document under the CUSIP number for the Units.

"Escrow Account": The escrow account established by the Escrow Account Agreement.

"Escrow Account Agreement": The Escrow Account Agreement FGIC CW/HTA Bond Claims Arising From HTA 98 Sub Bonds dated March 15, 2022 among the Commonwealth, FGIC, as the bond insurer and FGIC, as the escrow agent.

"Executive Officer": With respect to any corporation, the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, any Vice President, the Secretary, any Assistant Secretary, the Treasurer or any Assistant Treasurer of such corporation and with respect to any partnership, any general partner thereof and, as applicable, an authorized signatory.

"Fair Market Value" means, in respect of any HTA Clawback CVI as of any date of determination, the lower of (i) the price for such HTA Clawback CVI, as quoted by Bloomberg L.P. for any trade with total proceeds of at least $1 million as of the close of business on the

prior Business Day, if Bloomberg L.P. has quoted a price for such HTA Clawback CVI, as of such Business Day, and (ii) the fair market price for such HTA Clawback CVI, including accrued and unpaid interest (if applicable), determined by soliciting bids from at least two broker-dealers of national standing, each of which is independent of each other and unaffiliated with the Trustee, and shall be the average of such bids, provided that, for the avoidance of doubt, there shall be no requirement to solicit such bids, in which case only clause (i) shall apply.

"Fee Reserve": Funds held from time to time by the Trustee in the General Collection Account, in an amount up to the Fee Reserve Threshold Amount, to cover payments of Trustee Costs as they arise from time to time.

"Fee Reserve Threshold Amount": The fee reserve threshold amount set forth in the Trustee Fee Schedule.

"FGIC Insurance Policy": The existing insurance policy issued by FGIC with respect to the FGIC Insured Bonds, which is listed on Exhibit A hereto, as modified by the FGIC Rehabilitation Plan and this Trust Agreement.

"FGIC Insurance Policy Collection Account": The meaning specified in Section 3.1(a).

"FGIC Insured Bonds": The bonds previously issued by HTA, which are described and the CUSIP number for which is identified on Exhibit A hereto.

"FGIC Rehabilitation Plan": The First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013, together with all exhibits thereto and the documents contained in the plan supplement thereto, in each case as the same may be amended, revised, supplemented or otherwise modified from time to time.

"General Collection Account": The meaning specified in Section 3.1(a).

"HTA Clawback CVI Distribution Date": With respect to the HTA Clawback CVIs, each date specified in the Clawback CVI Indenture or CVI Legislation on which distributions of amounts due on such securities are scheduled to be paid, subject to any business day adjustments and conventions specified therein.

"Moody's": Moody's Investors Service, Inc.

"Notional Amount": With respect to the Units as of any date of determination, the amount of Trust Units issued as provided in this Trust Agreement on the Closing Date, excluding any Units that may have been surrendered or canceled or otherwise are no longer outstanding on or prior to such date.

"Officer's Certificate": A certificate signed by an Executive Officer of the applicable Person and delivered to the Trustee.

"Opinion of Counsel": A written opinion of counsel, who may be counsel to FGIC.

"Original Holder": Each holder of an Allowed FGIC Insured Bond Claim on the Closing Date arising from FGIC Insured Bonds (other than FGIC), as provided in Section 26.3(a) of the Plan.

"Other Trust Costs": Any filing fees or other costs or expenses of the Trust that have not been paid by either of the Trustees or the Trust at the time of any election by FGIC under Section 7.5(c).

"Permitted Sale Event": With respect to the HTA Clawback CVIs, the satisfaction of all of the following requirements:

       (i)     FGIC is not in default under the Covered FGIC Insurance Policy;

       (ii)    FGIC shall have notified the Trustee, by delivering a notice substantially in the form of Exhibit E-1 attached hereto, of its intention to instruct the Trustee to sell some or all of the HTA Clawback CVIs and setting forth the Permitted Sale Price for such HTA Clawback CVIs.

       (iii)   The Trustee shall have provided notice to Unitholders in accordance with the notice requirements set forth in Section 11.4 hereof (a) notifying Unitholders of the notice of FGIC described in clause (ii) above and the Permitted Sale Price set forth in such notice and (b) requesting that any Unitholders objecting to such proposed sale provide written notice of such objection to the Trustee; and

       (iv)   The Trustee shall not have received a written objection from the Requisite Unitholders (determined as of the date of the notice described in clause (ii) above) with respect to such proposed sale within seven (7) Business Days of the date the notice provided in clause (iii) above is provided.

"Permitted Sale Price": With respect to any Permitted Sale Event regarding some or all of the HTA Clawback CVIs, the price equal to the percentage of the outstanding notional amount of such HTA Clawback CVIs set forth in the related notice delivered by FGIC to the Trustee.

"Person": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"Plan of Adjustment" or "Plan": The *Title III Plan of Adjustment of the Puerto Rico Transportation Authority,* Case No. 17 BK 3567-LTS, confirmed by order entered October 12, 2022, as amended, modified or supplemented from time to time.

"pro rata": With respect to any payment or distribution, or any allocation of any cost or expense, to Unitholders hereunder, pro rata shall be calculated based on the Notional Amount of the Units then outstanding.

"Proof of Policy Claim Form": The Proof of Policy Claim Form required to be filed in order to submit a policy claim to FGIC in accordance with the FGIC Rehabilitation Plan.

"Record Date":  With respect to any distribution to be made to Unitholders: (i) based on the Cash to be deposited into the Trust on the Closing Date, the Closing Date, (ii) based on any scheduled payment of any amount due in respect of HTA Clawback CVIs, the tenth day preceding the related HTA Clawback CVI Distribution Date, and (iii) based on any other funds deposited or to be deposited in the General Collection Account or any payment made or to be made under or with respect to the Covered FGIC Insurance Policy, the Record Date established by the Trustee pursuant to Section 3.4(b), provided that if such tenth day under clause (ii) above is not a Business Day, the Record Date shall be the preceding Business Day.

"Requisite Unitholders":  As of any date, Unitholders holding more than fifty (50) percent of the Notional Amount of the Trust Units as of such date, excluding from both the numerator and the denominator the Notional Amount of any Trust Units held by FGIC.

"Secretary of State": The meaning specified in Section 2.1.

"State": Any one of the 50 states of the United States, the District of Columbia or its territories.

"S&P": S&P Global Ratings.

"Threshold Price": With respect to HTA Clawback CVIs, the respective prices set forth on Schedule I.

"Threshold Event": With respect to the HTA Clawback CVIs, the receipt by the Trustee of a notice by FGIC that the current market price of the HTA Clawback CVIs exceeds the Threshold Price for the HTA Clawback CVIs, coupled with a written instruction from FGIC to sell some or all of the HTA Clawback CVIs, such notice and instruction to be substantially in the form of Exhibit E-2 attached hereto.

"Trust": The trust created by this Trust Agreement as specified in the preamble hereto.

"Trust Agreement": The meaning specified in the preamble hereto.

"Trust Assets" or "Trust Estate": The property, assets and rights set forth in clauses (a), (b) and (c) of Section 2.2, and any other securities, monies, proceeds or property received on account thereof or exchanged therefor from time to time, as well as any other rights, benefits, protections, remedies and claims pertaining thereto.

"Trustee": The meaning specified in the preamble hereto and any successor Trustee appointed pursuant to Section 7.6 or Section 7.8.

"Trustee Costs": The meaning specified in Section 7.5(a).

"Trustee Fee Schedule": The Schedule II to this Trust Agreement.

"Trustees": Collectively, the Trustee and the Delaware Trustee.

6

"United States": The United States of America (including the States and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction.

"Unitholder": The Person in whose name a Unit is registered in the records of the Depositary on any date of determination.

"Units" or "Trust Units": The single class of beneficial ownership interests in the Trust evidenced by the Certificate.

"U.S.A. PATRIOT Act": The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107 56 (signed into law October 26, 2001) and its implementing regulations.

Section 1.2    Rules of Construction

Unless the context otherwise requires:

(i)    a term has the meaning assigned to it;

(ii)    an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect in the United States from time to time;

(iii)    "or" is not exclusive;

(iv)    the words "herein", "hereof", "hereunder" and other words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or other subdivision;

(v)    the words "include" and "including" shall be deemed to be followed by the phrase "without limitation"; and

(vi)    the meanings given to defined terms are applicable to the singular and plural forms thereof as appropriate.

Section 1.3    Article and Section References

All Article and Section references used in this Trust Agreement, unless otherwise provided, are to Articles and Sections in this Trust Agreement. Any reference to "this Article" appearing within a particular Section of an Article is a reference to such Article as a whole. Any reference to "this Section" appearing within a particular paragraph of a Section is a reference to such Section as a whole.

## ARTICLE II

## TRUST ESTATE

Section 2.1    Creation of Trust.

The Trust is being created on the date hereof pursuant to the execution of this Agreement and the filing by the Trustees of the Certificate of Trust with the Office of the Secretary of State of the State of Delaware (the "Secretary of State"), under the name written above the heading of this Trust Agreement, in which name the Trust shall have power and authority and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the activities of the Trust. It is the intention of the Parties that the Trust hereby created constitutes a statutory trust under the Delaware Trust Statute and that this Trust Agreement constitutes the governing instrument of the Trust. The Trustees are hereby authorized and directed to, and shall, on the date hereof file the Certificate of Trust with the Secretary of State. The Trustee shall have power and authority, and is hereby authorized and empowered, to take all actions on behalf of the Trust as set forth in this Trust Agreement and each of the Trustees is authorized and empowered to execute and file with the Secretary of State any other certificate required or permitted under the Delaware Trust Statute to be filed with the Secretary of State. The office of the Trust shall be in the care of the Trustee at the Corporate Trust Office or at such other address as the Trustee may designate by written notice to the Unitholders and FGIC.

Section 2.2    Trust Assets.

Pursuant to and in accordance with this Trust Agreement and the Plan, on the Closing Date:

(a)    (i) HTA shall, on behalf of the Original Holders and as required by Section 26.3(a) of the Plan, deposit into the Trust any and all agreements, documents and instruments relating to the Covered FGIC Insurance Policy; and (ii) FGIC shall, in accordance the Escrow Account Agreement, deposit into the Trust the HTA Clawback CVIs specified on Exhibit A hereto, which comprise the Allocable Plan Consideration, and were deposited into the Escrow Account by the Commonwealth upon the satisfaction of the HTA Distribution Conditions pursuant to the Escrow Account Agreement, provided, however, that if any of such HTA Clawback CVIs were sold by FGIC in accordance with the Escrow Account Agreement prior to the Closing Date, then FGIC shall instead deposit the aggregate proceeds of such sale(s) together with the remaining HTA Clawback CVIs, in each case as specified on Exhibit A hereto, into the Trust in accordance with the Escrow Account Agreement.

(b)    All Covered FGIC Insured Bonds shall be deposited, or be deemed to have been deposited, into the Trust by the Depositary on behalf of the Original Holders and as required by Section 26.3(a) of the Plan.  All rights and remedies under or with respect to the Covered FGIC Insured Bonds and the applicable related legislative bond resolutions (other than with respect to the payment obligations of HTA) and the Covered FGIC Insurance Policy (including the rights with respect to any related DPO and DPO Accretion under the FGIC

8

Rehabilitation Plan) shall be preserved and remain in full force and effect solely to the extent necessary to preserve any claims relating the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy; and

(c)     Each holder/beneficiary of the Covered FGIC Insurance Policy shall, on behalf of the Original Holders and as required by Section 26.3(a) of the Plan, deposit, or be deemed to have deposited, into the Trust the Covered FGIC Insurance Policy and relinquished all rights thereunder to the Trustee, on the Closing Date and thereafter.

Section 2.3     Acceptance by Trustee.

(a)     By its execution of this Trust Agreement, the Trustee acknowledges and declares that it will hold or has agreed to hold all Trust Assets, including all documents or instruments delivered to it or received by it from time to time with respect to the Trust Assets, in each case in trust for the exclusive use and benefit of all present and future Unitholders. The Trustee represents and warrants that, except as expressly permitted by this Trust Agreement, (i) it has not and will not, in any capacity, assert any claim or interest in the Trust Estate and will hold (or its agent will hold) such Trust Estate and the proceeds thereof in trust pursuant to the terms of this Trust Agreement, and (ii) it has not encumbered or transferred its right, title or interest in the Trust Estate.

(b)     The Trustee shall, on the Closing Date, deliver to the Unitholders and FGIC in accordance with the Notice provisions of Section 11.4 a certification substantially in the form of Exhibit F hereto that it (i) confirms that the HTA Clawback CVIs have been deposited to and are being held in the participant account of U.S. Bank Trust Company, National Association at the Depositary for the benefit of the Unitholders and FGIC, subject to Section 2.3(c) below, and (ii) confirms that the Trust Units have been issued to the Original Holders.

(c)     The Trustee shall, on the Closing Date, (i) take such reasonable action as shall be necessary to facilitate or permit the deposit of the HTA Clawback CVIs to the participant account of U.S. Bank Trust Company, National Association at the Depositary for the benefit of the Unitholders and FGIC, and (ii) assuming that such HTA Clawback CVIs have been so deposited, no later than the Business Day following such action, confirm to the Unitholders and FGIC in writing (to the extent not covered in the certification delivered pursuant to Section 2.3(b) above) that the HTA Clawback CVIs have been deposited to and are being held in such account.

(d)     Except as specifically provided herein, the Trustee shall not sell, pledge or assign any interest in the Trust Estate.

Section 2.4     Purpose, Activities of the Trust.

It is the intention of the Parties that the Trust shall not engage in any business or activities other than certain non-business activities in connection with, or relating to, the following:

(a)     accept the conveyance, assignment and transfer of the Trust Assets pursuant to the Plan or as contemplated by this Trust Agreement;

(b)     create one or more accounts or sub-accounts in accordance with the terms of this Trust Agreement;

(c)     make claims and assignments and receive payments under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and this Trust Agreement;

(d)     receive payments pursuant to the Plan;

(e)     issue the Trust Units to the Original Holders through the issuance of the corresponding Certificate to the Depositary or its nominee in accordance with the terms of this Trust Agreement and take such reasonable action as shall be necessary to facilitate or permit the deposit of the HTA Clawback CVIs to the participant account of U.S. Bank Trust Company, National Association at the Depositary for the benefit of the Unitholders and FGIC;

(f)     make distributions to the Depositary and Unitholders in accordance with the terms of this Trust Agreement;

(g)     coordinate Unitholder communications through the Depositary;

(h)     follow, accept or act upon any instruction or direction from FGIC or the Requisite Unitholders, as applicable, in each case only as expressly permitted herein;

(i)     hold the Trust Assets;

(j)     sell or assign HTA Clawback CVIs or portions thereof only as expressly provided in Section 3.5 or 3.6 hereof;

(k)     effectuate Unitholder Elections as provided in Section 3.6 hereof;

(l)     make public disclosures on EMMA as contemplated by this Trust Agreement;

(m)     make payments, reimbursements and distributions as contemplated by this Trust Agreement;

(n)     otherwise perform its obligations in accordance with, and take such other actions as are expressly provided for or permitted under, the terms of this Trust Agreement; and

(o)     engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

Section 2.5     <u>Limitations of the Trust.</u>

(a)     Except as otherwise provided herein, the affairs of the Trust will be managed by or under the direction of the Trustee. Neither HTA or FGIC nor any of their

10

respective Affiliates will have authority to act for, or to assume any obligation or responsibility on behalf of, the Trust or the Trustee in its capacity as Trustee;

(b)     The Trust will keep correct and complete books and records of accounts and minutes of the meetings and other proceedings of the Trust. Any such resolutions, agreements and other instruments will be continuously maintained by the Trustee as official records of the Trust;

(c)     The Trust will provide for its own operating expenses and liabilities from the Trust Assets. General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to HTA or FGIC or their respective Affiliates;

(d)     All oral and written communications, including letters, invoices, contracts, statements and applications, will be made solely in the name of the Trust if related to the Trust;

(e)     There will be no guarantees made by the Trust with respect to obligations of HTA or FGIC or their respective Affiliates. There will not be any indebtedness relating to borrowings or loans between the Trust and HTA or FGIC or their respective Affiliates; provided that FGIC or its Affiliates may own Trust Units;

(f)     The Trust will act solely in its own name or the Trustee's on its behalf and through its or the Trustee's duly authorized officers or agents in the conduct of its activities. The Trust will not: (i) operate or purport to operate as an integrated, single economic unit with respect to HTA or FGIC or any other affiliated or unaffiliated entity; (ii) seek or obtain credit or incur any obligation to any third party based upon the assets of HTA or FGIC or their respective Affiliates; or (iii) induce any third party to reasonably rely on the creditworthiness of HTA or FGIC or any other affiliated or unaffiliated entity in its dealings with the Trust;

(g)     The Trust will maintain a Delaware Trustee with its office in the State of Delaware; and

(h)     The Trust will not engage in any transaction with an Affiliate on any terms other than would be obtained in an arm's-length transaction with a non-Affiliate.

## ARTICLE III

## ADMINISTRATION OF TRUST

Section 3.1     Accounts.

(a)     The Trustee has established and will maintain Eligible Accounts (i) to hold all amounts received on or in respect of the Trust Assets except the Covered FGIC Insurance Policy (the "General Collection Account") and (ii) to hold all amounts received on account of the Covered FGIC Insurance Policy (including, any amounts received on account of DPO or DPO Accretion) (the "FGIC Insurance Policy Collection Account"), each held in trust for the benefit of the Unitholders and FGIC. The Trustee shall deposit all cash received pursuant to clause (a) of Section 2.2 into the General Collection Account on the Closing Date. U.S. Bank Trust Company, National Association has established and will maintain its participant account at

the Depositary into which the HTA Clawback CVIs received pursuant to clause (a) of Section 2.2 shall be deposited and held in trust for the benefit of the Unitholders and FGIC. Each of the General Collection Account and the FGIC Insurance Policy Collection Account and such other accounts shall be under the sole dominion and control of the Trustee, and the Trustee shall be entitled to look solely to the General Collection Account for payment of any Trustee Costs and funding of the Fee Reserve from time to time in accordance with the terms of this Trust Agreement.  All distributions to Unitholders shall be made only from cash on deposit in either the General Collection Account or the FGIC Insurance Policy Collection Account in accordance with the terms hereof.

(b)    If, at any time, a formerly Eligible Account no longer fulfills the definition of Eligible Account, the Trustee shall within thirty (30) days establish a new General Collection Account or FGIC Insurance Policy Collection Account, as applicable, meeting the conditions specified in such definition and transfer any cash on deposit in the General Collection Account or FGIC Insurance Policy Collection Account to such new General Collection Account or FGIC Insurance Policy Collection Account, and from the date such new General Collection Account or FGIC Insurance Policy Collection Account is established, it shall be the General Collection Account or FGIC Insurance Policy Collection Account under this Trust Agreement.

(c)    The Trustee shall give notice to FGIC and Unitholders of the location of each Eligible Account and other account and to the proposed new location of any Eligible Account or other account prior to any change thereof.

Section 3.2    Investment of Funds in the Collection Accounts.

Amounts in the General Collection Account and the FGIC Insurance Policy Collection Account shall not be invested.

Section 3.3    FGIC Insurance Policy and Effect of Distributions.

(a)    The Trust is deemed to hold the Covered FGIC Insured Bonds and is the sole Person entitled under the terms of the Covered FGIC Insured Bonds to payment thereof. Accordingly, the Trust is and shall be the sole "Bondholder" entitled to assert claims and receive payments under or with respect to the Covered FGIC Insurance Policy.

(b)    The Trustee shall have the sole authority to assert, and shall assert, subject to its rights and protections herein, claims under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and to take all actions required to enforce the Covered FGIC Insurance Policy, including in the event that FGIC fails to make any payment when due under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy. The Trustee shall be authorized to take, and shall take, subject to its rights and protections herein, all actions it deems necessary or advisable to satisfy any and all conditions to the obligations to make payment of any claim asserted by the Trustee under the Covered FGIC Insurance Policy or any payment in respect of any DPO or DPO Accretion related to the Covered FGIC Insurance Policy which may become payable in accordance with the FGIC Rehabilitation Plan. The following are conditions to FGIC's obligation to make any such payment, and the Trustee is authorized and directed to satisfy such conditions: (i) the Trustee

12

shall have submitted to FGIC with respect to each claim a fully completed and duly executed Proof of Policy Claim Form in accordance with the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan, and (ii) with respect to each such payment (other than on account of DPO Accretion) relating or with respect to the principal of the Covered FGIC Insured Bonds, which is paid or deemed to be paid by FGIC in cash (each a "Cash Payment"), the Trustee shall have executed and delivered on behalf of the Trust to FGIC (or its fiscal agent) assignments in substantially the form of Exhibit G with respect to a proportionate share (based on the proportion of such Cash Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust) of the Trust Assets held by the Trust, as confirmed by FGIC, and taken such actions as shall be necessary to transfer such Trust Assets to the account of FGIC or its custodian, in either case as directed by FGIC in writing, and receipt of such Trust Assets shall have been confirmed by FGIC.

(c)     All claims that are properly submitted to FGIC by the Trustee under the Covered FGIC Insurance Policy shall be paid to the extent permitted by FGIC under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan, subject to satisfaction of any conditions to such payments, including the conditions set forth in this Trust Agreement. All payments to the Trustee under or with respect to the Covered FGIC Insurance Policy shall be deposited into the FGIC Insurance Policy Collection Account on the date received if received prior to 11:00 a.m. New York time, on any Business Day or, if received after such time on any Business Day, on the following Business Day.  In the event that FGIC has defaulted in its payment obligations under the Covered FGIC Insurance Policy, the Requisite Unitholders shall have the right to direct the Trustee in writing to take, and the Trustee is authorized to take, and shall take, subject to its rights and protections herein,  any and all actions necessary or desirable to enforce and recover such payment obligations.

(d)     Each distribution of cash to the Unitholders from the General Collection Account shall automatically and immediately reduce on a dollar-for-dollar basis the outstanding principal amount of the Covered FGIC Insured Bonds and shall automatically and immediately result in a corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy.  All payments from the FGIC Insurance Policy Collection Account under or with respect to the Covered FGIC Insurance Policy arising from or related to principal of or interest on the Covered FGIC Insured Bonds (other than on account of DPO Accretion) shall be deemed to automatically and immediately reduce on a dollar-for-dollar basis the outstanding principal amount of or the accrued and unpaid interest on the Covered FGIC Insured Bonds, respectively. For the avoidance of doubt, all payments on account of a claim for accrued and unpaid interest due shall reduce on a dollar-for-dollar basis the outstanding interest amount of the Covered FGIC Insured Bonds, and all payments of a claim for principal shall reduce on a dollar-for-dollar basis the outstanding principal amount of the Covered FGIC Insured Bonds.

(e)     If at any time the principal amount of the Covered FGIC Insured Bonds shall be reduced to zero, then thereafter each distribution of cash to the Unitholders under this Trust Agreement (other than distributions from the FGIC Insurance Policy Collection Account on account of payments made by FGIC under or with respect to the Covered FGIC Insurance Policy) shall automatically and immediately reduce on a dollar-for-dollar basis the accrued and unpaid interest, if any, due on the Covered FGIC Insured Bonds and shall automatically and immediately result in a corresponding reduction in FGIC's obligations under the Covered FGIC

Insurance Policy. If at any time the principal amount of and the accrued and unpaid interest on the Covered FGIC Insured Bonds and the DPO Accretion balance under the Covered FGIC Insurance Policy shall be reduced to zero, then (i) the Covered FGIC Insurance Policy shall be indefeasibly canceled, (ii) within three (3) Business Days thereafter, the Trustee shall (x) first, assign to FGIC ownership of the Trust Assets held by the Trust at that time to the extent required to reimburse FGIC for any unreimbursed payments previously made under the Covered FGIC Insurance Policy and (y) second, distribute to the Unitholders any remaining Trust Assets, and (iii) upon making such assignment and distributions (if any), the Units shall be deemed to be redeemed in full and the Trust shall terminate in accordance with the provisions of Article IX hereof.

(f)     Each of FGIC and each Unitholder shall have and retain all rights set forth in the Plan applicable to it, including those set forth in Section 26.3 of the Plan.

(g)     In addition to any other rights FGIC may have hereunder or otherwise, due to the subrogation rights under the Covered FGIC Insurance Policy, upon making each Cash Payment or Cash Acceleration Payment to the Trust, FGIC shall automatically become the owner of a proportionate share (as described in Section 3.3(b)) of the Trust Assets held by the Trust and shall be fully subrogated to all of the Trust's rights therein, including any payments on or in respect thereof.

Section 3.4     Distributions.

(a)     All cash received by the Trust or the Trustee from any source shall be applied and distributed in accordance with the terms of this Trust Agreement. Within two (2) Business Days of the Trust's receipt of (i) the Cash to be deposited into the Trust pursuant to clause (a) of Section 2.2 on the Closing Date, or (ii) any scheduled payment due on the HTA Clawback CVIs, the Trustee shall distribute such amounts, net of any outstanding Trustee Costs that are due and payable or to be reimbursed to the Trustees as of the related distribution date, Other Trust Costs to be reimbursed under Section 7.5(c) and amounts necessary to fund the Fee Reserve to the Fee Reserve Threshold Amount, to the Depositary for distribution on a pro rata "pass-through" basis to each Unitholder as of the related Record Date. The Trustee shall pay or reimburse such Trustee Costs, reimburse such Other Trust Costs and fund the Fee Reserve at the time of such distribution.

(b)     The Trustee shall establish the Record Date for the distribution of (i) any other funds deposited or to be deposited in the General Collection Account or (ii) any payment made or to be made under or with respect to the Covered FGIC Insurance Policy, and the Trustee shall send notice to the Unitholders of such Record Date and the related anticipated distribution date of such amounts, in accordance with Section 11.4, in each case not later than two (2) Business Days after the Trust's receipt of such funds or payments.  Such Record Date shall be at least 10 days and no more than 15 days after the date such notice is posted on EMMA.  On such distribution date, the Trustee shall distribute such amounts, in the case of clause (i) net of any outstanding Trustee Costs that are due and payable as of such distribution date, to the Depositary for distribution on a pro rata "pass-through" basis to each Unitholder as of the related Record Date.

14

(c)     Any distribution to Unitholders shall be made to the Person in whose name such Unit is registered at the close of business on the related Record Date in accordance with the procedures of the Depositary.

Section 3.5     Threshold Event or Permitted Sale Event.

(a)     The Trustee shall not sell any HTA Clawback CVIs except upon a Threshold Event or Permitted Sale Event and subject to the terms of Section 3.5(b), provided that the Trustee shall be authorized to make the assignments and transfers contemplated by Sections 3.3 and 3.6. Upon the Trustee's receipt of a notice substantially in the form of Exhibit E-1 attached hereto as contemplated by clause (ii) of the definition of "Permitted Sale Event", the Trustee shall (i) provide the notice to Unitholders contemplated by clause (iii) of such definition (with a copy of such notice to FGIC) as soon as practicable and in any event within three (3) Business Days of receiving FGIC's notice, and (ii) no later than the tenth (10th) Business Day following the date of such notice to Unitholders, notify FGIC in writing whether the Trustee has received a written objection from the Requisite Unitholders as contemplated by clause (iv) of such definition.

(b)     Upon the occurrence of a Threshold Event or Permitted Sale Event with respect to which FGIC has provided written instruction to the Trustee (substantially in the form of Exhibit E-2 hereto, in the case of a Threshold Event, or Exhibit E-3 hereto, in the case of a Permitted Sale Event) to sell some or all of the HTA Clawback CVIs, the Trustee shall seek to sell HTA Clawback CVIs to the person(s) identified to the Trustee by FGIC in such instruction (which instruction shall also include the applicable sale price(s), the information for the account(s) to which such HTA Clawback CVIs shall be transferred by the Trustee and any other details, including relevant broker(s), to be utilized by the Trustee for such sale) as soon as practicable and in any event within one (1) Business Day of receiving such instruction, provided that: (i) any such sale is made at price(s) that equal or exceed the Fair Market Value applicable to such sale, as confirmed to the Trustee by FGIC, (ii) any such sale is made at price(s) that equal or exceed the applicable Threshold Price in the case of a Threshold Event or the applicable Permitted Sale Price in the case of a Permitted Sale Event, and (iii) all proceeds of such sales shall be deposited into the General Collection Account.

Section 3.6     Surrendered Units.

(a)     Subject to satisfaction of the conditions set forth in Section 3.6(b), any Unitholder may, at any time and from time to time, elect to surrender Units held by such Unitholder (as confirmed by the Depositary) to the Trustee for cancellation (the "Surrendered Units") in exchange for a transfer to such Unitholder of its proportional percentage of HTA Clawback CVI (or any other securities or property received in respect thereof or in exchange therefor) held by the Trust at that time, by giving written notice thereof to FGIC and the Trustee (a "Unitholder Election").

(b)     The following conditions must be satisfied to permit and effectuate any Unitholder Election: (i) FGIC shall, in its sole discretion, have consented in writing to such Unitholder Election (other than any Unitholder Election in connection with which FGIC shall not have agreed or otherwise be obligated to pay any consideration for the release set forth in

clause (iv) below), (ii) the Surrendered Units shall be cancelled by the Trustee with an automatic and immediate corresponding reduction in the aggregate Notional Amount of the Units and the Trustee shall deliver written notice of such cancellation and reduction to the Depositary, (iii) the outstanding principal amount of the Covered FGIC Insured Bonds shall automatically and immediately be reduced on a proportionate dollar-for-dollar basis (based on the proportion of the Notional Amount of such Surrendered Units to the aggregate Notional Amount of the Units at that time) with an automatic and immediate corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy, which reductions shall be acknowledged by the Trustee, and (iv) such Unitholder shall execute and deliver a release, in form and substance satisfactory to FGIC, releasing all rights and claims of any kind it may have relating to the Surrendered Units or the Covered FGIC Insurance Policy subject to receipt of consideration, if any, that FGIC shall have agreed in writing to pay to such Unitholder in consideration for release.  Upon satisfaction of such conditions, the Trustee shall transfer to the Unitholder ownership of the applicable proportional percentage of the HTA Clawback CVI (or any other securities or property received in respect thereof or in exchange therefor) held by the Trust at that time, as directed by FGIC.  FGIC's consent to any Unitholder Election shall not limit its right, in its sole discretion, to deny its consent to any other Unitholder Election.

Section 3.7    FGIC Election to Accelerate Policy Payments.

(a)    Section 3.7(b) shall apply to the Trust and the Covered FGIC Insurance Policy as of the date that is thirty (30) Business Days following the Closing Date unless the Requisite Unitholders notify the Trustee in writing prior to such date of their election that Section 3.7(b) shall not so apply.

(b)    Pursuant to the Plan, the payment of the principal of the Covered FGIC Insured Bonds was accelerated and such Covered FGIC Insured Bonds are due and payable at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus accrued interest thereon, or 100% of accreted amounts thereon, to the date of payment.  FGIC is not obligated to pay any claims on an accelerated basis under the Covered FGIC Insurance Policy.  FGIC shall have the right, in its sole and absolute discretion, to elect at any time to permit a claim under the Covered FGIC Insurance Policy in the amount of such acceleration price at such time (regardless of whether the Trustee shall have submitted a claim therefor to FGIC) and to make payment to the Trustee in respect of such permitted claim under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan; provided, however, that FGIC shall not be obligated to make all or any portion of such payment, unless and until, with respect to the portion of such payment relating to the principal of the Covered FGIC Insured Bonds which will be paid or deemed to be paid by FGIC in cash (the "Cash Acceleration Payment"), the Trustee shall have executed and delivered to FGIC (or its fiscal agent) assignments in substantially the form of Exhibit G with respect to a proportionate share (based on the proportion of such Cash Acceleration Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust) of the Trust Assets held by the Trust, as confirmed by FGIC, and taken such action as shall be necessary to transfer such Trust Assets to the account of FGIC or its custodian, in either case as directed by FGIC in writing, and receipt of such Trust Assets shall have been confirmed by FGIC.

(c)     At any time, Requisite Unitholders can notify the Trustee of an election that Section 3.7(b) shall apply notwithstanding a prior election under Section 3.7(a), and such notice will be effective upon agreement by FGIC within 30 Business Days of such notification.

## ARTICLE IV

## REPORTING/REMITTING TO UNITHOLDERS

Section 4.1     Statements to Unitholders and FGIC.

On a quarterly basis, the Trustee shall prepare and post a statement to EMMA, in the form attached hereto as Exhibit B and provide notice of such statement to the Unitholders and FGIC in accordance with the Notice provisions of Section 11.4 setting forth:

(a)     all distributions made from the General Collection Account during the quarter and during the year to date (on an aggregate and per Unit basis), identifying the portion thereof attributable to the amount of (i) asset sales; and (ii) CVI payments;

(b)     all distributions made from the FGIC Insurance Policy Collection Account during the quarter and during the year to date (on an aggregate and per Unit basis);

(c)     the principal amount (or accreted amount, as applicable) as of the quarter end of each CUSIP number of HTA Clawback CVI held by the Trust (or any other securities or property received in respect thereof or in exchange therefor) (on an aggregate and per Unit basis);

(d)     the DPO balance and DPO Accretion balance associated with the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy as of the quarter end, to the extent such information has been furnished to the Trustee by FGIC;

(e)     the principal amount of, and the accrued and unpaid interest on, the Covered FGIC Insured Bonds as of the end of the quarter, together with a description of the changes in such amounts during the quarter;

(f)     any notices received by the Trustee from FGIC in connection with any required DPO and DPO Accretion payments associated with the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy;

(g)     (i) the respective amounts paid to the Trustees for trustee fees, other Trustee Costs under Section 7.5(a), Trustee Costs under Section 7.5(b) and indemnification amounts under Section 7.12, a description of such indemnification amounts and Trustee Costs, (ii) the amount of any Other Trust Costs reimbursed under Section 7.5(c), if applicable, and (iii) the ending Fee Reserve balance for each quarter; and

(h)     any required tax reporting for such period.

Section 4.2        Compliance with Withholding Requirements.

        Notwithstanding any other provisions of the Trust Agreement, the Trustee shall comply with all federal withholding requirements with respect to payments to the Depositary and the Unitholders that the Trustee reasonably believes are applicable under the Code. The consent of the Depositary and the Unitholders shall not be required for such withholding. In the event the Trustee does withhold any amount from payments to the Depositary or any Unitholder pursuant to federal withholding requirements, the Trustee shall indicate with any payment to the Depositary or such Unitholder the amount withheld. Any amounts withheld shall be treated as a distribution of cash to the Depositary or Unitholder, as the case may be, in the amount of the withholding for all purposes and shall thereby reduce amounts otherwise distributable to the Depositary or such Unitholder. If an amount required to be withheld was not withheld, the Trust may reduce subsequent distributions by the amount of such required withholding.

## ARTICLE V

## THE UNITS

Section 5.1        The Units.

        (a)        The Units shall be evidenced by the Certificate issued by the Trustee to the Depositary in accordance with Section 5.2(a).

        (b)        As of the Closing Date, the Notional Amount of the Units issued under this Trust Agreement shall be the Notional Amount set forth in Exhibit C, which is the aggregate original principal amount as of their date of issuance of those Covered FGIC Insured Bonds deposited, or deemed hereunder to have been deposited, into the Trust.   The beneficial ownership of the Units as of the Closing Date shall be allocated by the Depositary among the Original Holders on a proportionate basis based on the aggregate original principal amount as of their date of issuance of each original Holder's respective Covered FGIC Insured Bonds that are deposited, or deemed hereunder to have been deposited, into the Trust on the Closing Date.

        (c)        All Units issued under this Trust Agreement shall be evidenced by the same Certificate, subject to the requirements of the Depositary, and otherwise identical in all respects. All Units issued under this Trust Agreement shall be in all respects equally and ratably entitled to the   benefits hereunder without preference, priority or distinction on account of the actual time or times of authentication and delivery, and shall be held and transferable only through the Depositary.

        (d)        No additional interests in the Trust other than the Certificate and the Units shall be issued hereunder, except in accordance with Section 5.3.

Section 5.2        The Certificate; Book-Entry-only System.

        (a)        On the Closing Date, upon deposit of all of the Trust Assets into the Trust pursuant to the Plan of Adjustment and as provided in Section 2.2, the Trustee shall issue to the Depositary the initial Certificate by executing and delivering the Certificate, on behalf of this

Trust, with the manual or facsimile signature of an authorized officer or other agent of the Trustee.

(b)      The Trust shall issue the Certificates to the Depositary.  Consistent with DTC book-entry provisions, one or more typewritten Certificates shall be prepared and registered in the name of the Depositary or its nominee.  There shall be no physical delivery of the Certificate or Units to the Unitholders (other than the Depositary) or other beneficial owners.

(c)      DTC is hereby appointed as the initial Depositary, with Cede & Co., a nominee thereof, being the initial registered owner of the Certificate. In the event that any Depositary resigns or is removed, the Trustee shall select a substitute Depositary. Notwithstanding anything herein to the contrary, the Trust and each of the Trustees, and any agent of the Trust or either of the Trustees, may treat any Depositary in whose name any Certificate is registered as the owner of the Units for all purposes, including for actions by Unitholders. For so long as the Depositary is the registered owner of the Certificate, procedures with respect to the transmission of notices and the transfer of ownership and payment of Units shall be in accordance with arrangements between the Trustee and the Depositary. The Certificate shall be issued in global form and the Units represented thereby shall be freely tradeable and transferable through the Depositary.

(d)      Notwithstanding anything herein to the contrary, so long as the Certificate is registered in the name of the Depositary, the Trust and the Trustee shall have no responsibility or obligation to any Depositary participant, indirect participant or beneficial owner of the Certificate or Units. Without limiting the immediately preceding sentence, the Trust and the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of any Depositary or any Depositary participant or indirect participant with respect to any beneficial ownership interest in the Certificate, (ii) the delivery to any Depositary participant, indirect participant, beneficial owner or any other person, other than the Depositary, of any notice with respect to the Certificate or Units, including any notice of Record Date, distribution date, payment, redemption or tender, or (iii) the payment to any Depositary participant, indirect participant, beneficial owner or any other person, other than the Depositary, of any amount with respect to Units or Certificate. The rights of Unitholders shall be limited to those established by law and agreements between the Unitholders and the Depositary and Depositary participants and as provided herein.

(e)      A CUSIP number will be imprinted on the Certificate, but such CUSIP number shall not constitute a part of the contract evidenced by the Certificate or Units. As a convenience to the Depositary and Unitholders, the Trust and the Trustees may use such CUSIP numbers in any notices to the Depositary and Unitholders.

Section 5.3      Mutilated, Destroyed, Lost and Stolen Certificate.

(a)      If (i) any mutilated Certificate is presented to the Trustee or (ii) the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Certificate, and there is delivered to the Trustee such security or indemnity as it may require to save it harmless, and the Trustee has not received notice that such Certificate (and the Units represented thereby) has been acquired by a protected purchaser, then, in each case, the Trustee shall

execute, authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like tenor, form, terms and principal amount, bearing an identifying number not used by any contemporaneously existing Certificate, so that neither gain nor loss in interest shall result from such exchange or substitution.

(b)     Upon the issuance of any new Certificate under this Section, the Trustee may require the payment by the Certificate holder of a sum sufficient to cover any tax or other governmental charge that may be imposed in respect thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

(c)     Every new Certificate issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust Assets to the extent provided herein, whether or not the destroyed, lost or stolen Certificate shall be at any time enforceable by anyone, and the Units represented thereby shall be entitled to all the benefits of this Trust Agreement.

(d)     The terms of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Units.

Section 5.4     No Obligation to Register.

The Trustee is not obligated to register or qualify any Certificate or Unit under the Securities Act of 1933, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder, or any other securities laws or to effect any qualification under the Trust Indenture Act of 1939, as amended.

Section 5.5     Persons Deemed Owners.

Subject to Section 5.3, but notwithstanding anything else in this Trust Agreement, the Trustee and any agent of the Trustee may treat the Depositary or its nominee in whose name the Certificate is registered as the owner of the Units on the related distribution date for the purpose of receiving distributions on such Units and for all other purposes whatsoever, including for actions by Unitholders, and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary. All distributions made hereunder to the Depositary or its nominee, or upon its order, shall be valid, and, to the extent of the sum or sums paid, effectual to satisfy and discharge the liability for moneys distributable upon the Units.

Section 5.6     Cancellation.

All Certificates evidencing Units surrendered for payment, redemption, transfer or exchange shall be delivered to the Trustee and shall be promptly canceled by the Trustee. The Trustee and no one else will cancel all such Certificates surrendered     for registration of transfer, exchange, payment, replacement or cancellation and will dispose of such cancelled Certificates in accordance with its customary procedures. No Certificate shall be authenticated in lieu of or in exchange for any Certificates canceled as provided in this Section, except as expressly permitted by this Trust Agreement.

# ARTICLE VI

# HTA CLAWBACK CVIs

Section 6.1    Voting Rights with Respect to HTA Clawback CVIs.

(a)    Within three (3) Business Days after receipt of notice of any meeting of, or other occasion for the exercise of voting rights or the giving of consents by, owners of any of the HTA Clawback CVIs (or any other securities or property received in respect thereof or in exchange therefor), the Trustee shall deliver a copy of such notice to FGIC and the Unitholders.

(b)    The voting and direction rights allocable to the owners of the HTA Clawback CVIs (or any other securities or property received in respect thereof or in exchange therefor) pursuant to the terms thereof (including voting and direction rights in respect of remedies) ("Voting Rights") shall be allocated to FGIC unless FGIC is in default under the Covered FGIC Insurance Policy (a "Voting Rights Condition"). Upon the written request of FGIC, subject to the immediately preceding sentence, the Trustee shall vote in accordance with any instruction set forth in such written request. Upon the occurrence and continuation of a Voting Rights Condition, the Voting Rights will be deemed to be held on a pro rata basis by the Unitholders, and the Trustee may act at the direction of the Requisite Unitholders.

# ARTICLE VII

# CONCERNING THE TRUSTEE

Section 7.1    Duties of Trustee.

(a)    Every provision of this Trust Agreement relating to the conduct of, affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VII.

(b)    The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Trust Agreement and no implied covenants or obligations shall be read into this Trust Agreement against the Trustee.

(c)    The Trustee shall (at the direction of the Requisite Unitholders) take all necessary or desirable actions to enforce the Covered FGIC Insurance Policy against FGIC as set forth herein.

(d)    The Trustee shall deliver to all Unitholders copies of all notices and written communications received from HTA as they relate to the HTA Clawback CVIs.

(e)    Except as provided in Section 7.2 hereof, no provision of this Trust Agreement shall be construed to relieve the Trustee from liability for its own grossly negligent action, grossly negligent failure to act, bad faith or willful misconduct; provided, however, that:

(i)     The Trustee shall not be liable for an error of judgment made in good faith by an Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(ii)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of FGIC or the Requisite Unitholders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the HTA Clawback CVIs exercising any trust or power conferred upon the Trustee with respect to the HTA Clawback CVIs, under this Trust Agreement;

(iii)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Requisite Unitholders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Covered FGIC Insurance Policy or exercising any trust or power conferred upon the Trustee with respect to the Covered FGIC Insurance Policy, under this Trust Agreement; and

(iv)     Any determination of gross negligence, bad faith or willful misconduct of the Trustee shall be made only upon the rendering of a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

Section 7.2     Certain Matters Affecting the Trustee.

(a)     The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties. Further, the Trustee may accept a copy of the vote of the board of directors or equivalent governing body of any party certified by its clerk or assistant clerk or secretary or assistant secretary as conclusive evidence of the authority of any Person to act in accordance with such vote, and such vote may be considered as in full force and effect until receipt by the Trustee of written notice to the contrary;

(b)     The Trustee may, in the absence of bad faith on its part, conclusively rely upon an Opinion of Counsel or certificate of an Officer of the appropriate Person whenever in the administration of this Trust Agreement the Trustee shall deem it desirable that a matter be proved or established (unless other evidence be herein specifically prescribed) prior to taking, suffering or omitting any action hereunder;

(c)     The Trustee may consult with counsel of its own selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in reliance on such advice or Opinion of Counsel;

(d)     The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Trust Agreement or to institute, conduct, defend or continue any litigation thereunder or in relation thereto at the request, order or direction of the Requisite

22

Unitholders, pursuant to the provisions of this Trust Agreement, unless such Unitholders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(e)    The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Trust Agreement;

(f)    The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by FGIC or the Requisite Unitholders; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of this Trust Agreement, the Trustee may require indemnity against such expense or liability as a condition to taking any such actions;

(g)    The Trustee may execute any of the trusts or powers under this Trust Agreement or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for the supervision of or any misconduct or negligence on the part of any agent or attorney appointed with due care by it under this Trust Agreement;

(h)    Whenever the Trustee is authorized herein to require acts or documents in addition to those required to be provided it in any matter, it shall be under no obligation to make any determination whether or not such additional acts or documents should be required unless obligated to do so under Section 7.1;

(i)    The Trustee shall not be deemed to have notice of any matter unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the applicable Trust Units generally, HTA, the Trust or this Trust Agreement;

(j)    None of the provisions of this Trust Agreement shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it;

(k)    Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

(l)    The permissive rights of the Trustee to perform any discretionary act enumerated in this Trust Agreement shall not be construed as a duty or obligation, and the Trustee shall not be answerable in the performance of such act other than for its gross negligence, bad faith or willful misconduct;

(m)     The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian, co-trustee and other Person employed to act hereunder;

(n)     The Trustee shall have no duty (A) to see to any recording, filing, or depositing of this Trust Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Trust Estate, or (D) to confirm or verify the contents of any reports or certificates delivered to the Trustee pursuant to this Trust Agreement believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties;

(o)     The Trustee shall have no liability or responsibility for the acts or omissions of any other party to any of this Trust Agreement or any related document;

(p)     The Trustee shall have no duty or obligation to obtain or solicit any collateral or any funds to be remitted in any of the accounts established under this Trust Agreement, and shall have a duty only to accept such collateral or funds delivered to it in accordance with this Trust Agreement;

(q)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(r)     The Trustee may request the delivery of a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement;

(s)     All rights of action under this Trust Agreement or under any of the Trust Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Trust Units or the Certificate, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Unitholders, subject to the provisions of this Trust Agreement; and

(t)     The Trustee shall establish a Fee Reserve, which Fee Reserve shall be replenished up to the Fee Reserve Threshold Amount in accordance with Section 3.4(a), and the Trustee shall be permitted to apply the amounts therein to pay Trustee Costs.

Section 7.3     <u>Trustee Not Liable for Units or HTA Clawback CVIs, the Covered FGIC Insured Bonds or the Covered FGIC Insurance Policy.</u>

The Trustee assumes no responsibility for the correctness of the recitals contained in this Trust Agreement and in the Trust Units or Certificate. The Trustee makes no representations or warranties as to the validity or sufficiency of this Trust Agreement or of the Trust Units (other than the signature and authentication of the Trustee on the Certificate) or of the, HTA Clawback

CVIs, the Covered FGIC Insured Bonds, the Covered FGIC Insurance Policy or related documents. The Trustee shall not be accountable for the use or application of any of the Trust Units, or for the use or application of any funds in respect of the HTA Clawback CVIs or deposited in or withdrawn from the Trust in accordance with this Trust Agreement other than, in each case, any funds held by or on behalf of the Trustee in accordance with Article III. The Trustee, in its capacity as Trustee hereunder, shall have no responsibility or obligation to comply with, or to monitor any other Person's compliance with, the CVI Legislation or the Clawback CVI Indenture.

Section 7.4    Trustee May Own Units.

The Trustee in its individual capacity or any other capacity may become the owner or pledgee of Trust Units with the same rights it would have if it were not Trustee.

Section 7.5    Trustee Costs and Expenses.

(a)    The Trustees shall each be entitled to receive from the Trust (i) fees agreed upon in writing, including such fees set forth in the Trustee Fee Schedule, (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by each of the Trustees in the execution of the trusts created under this Trust Agreement and in the exercise and performance of any of the powers and duties thereunder or the administration of the Trust, (ii) reimbursement for (x) all reasonable fees, expenses, costs and disbursements incurred or made by either of the Trustees in accordance with any of the provisions of this Trust Agreement, including Section 7.5(b) hereof (including the fees, expenses and disbursements of their respective counsel and of all persons not regularly in their respective employ), and (y) their indemnities pursuant to Section 7.12 hereof, and (iii) amounts to be promptly used by the Trustee to pay any reasonable fees, expenses or costs then owed by the Trust in accordance with this Trust Agreement and not covered by clause (ii) of this Section 7.5(a) (collectively, the "Trustee Costs"). For the avoidance of doubt, it is understood and agreed by the Parties that Trustee Costs under clause (ii) or (iii) of this Section 7.5(a) may include amounts of reasonable fees, expenses, costs, disbursements or indemnities that properly relate to the Trust and to one or more other trusts created under other trust agreements to which HTA, FGIC and the Trustees are party, which amounts have been reasonably and fairly allocated by the Trustee to the Trust in good faith as the Trust's share and are described in each relevant statement prepared and provided by the Trustee pursuant to Section 4.1. All such Trustee Costs shall be paid to the Trustees in accordance with the provisions of Section 3.4 hereof or taken from the Fee Reserve.

(b)    In furtherance of Section 7.5(a), each of the Trustees shall be entitled to receive reimbursement for all reasonable out-of-pocket expenses which are properly documented and incurred or made by it, including costs of collection, payable as a result of or in connection with litigation, enforcement actions or other proceedings brought by Unitholders against HTA, the Trust, or such Trustee except for proceedings, litigation or enforcement actions that relate to such Trustee's grossly negligent action, grossly negligent failure to act, bad faith or its own willful misconduct as determined by a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

(c)     For the avoidance of doubt, neither HTA nor FGIC shall be liable for any Trustee Costs or Other Trust Costs.  FGIC may, in its sole discretion, elect to pay any Other Trust Costs, in which case FGIC shall be reimbursed by the Trustee at the time of the next distribution of any amount under Section 3.4(a) hereof upon notifying the Trustee of the amount to be so reimbursed.

Section 7.6     <u>Eligibility Requirements for Trustee and Successor Trustee.</u>

The Trustee and any successor Trustee shall at all times be a corporation or national banking association that: (i) is not an Affiliate of HTA, , the Commonwealth of Puerto Rico or any of its instrumentalities, or FGIC; (ii) is neither affiliated with HTA, the Commonwealth of Puerto Rico or any of its instrumentalities, nor located in the Commonwealth of Puerto Rico; (iii) is organized and doing business under the laws of any state or the United States of America; (iv) is authorized under such laws to exercise corporate trust powers; (v) is in good standing under the law of the jurisdiction in which it is organized; (vi) has a combined capital and surplus of at least $50,000,000; (vii) is subject to supervision or examination by federal or state authority; and (viii) is a nationally recognized financial institution and fiduciary regularly acting as a trustee in the municipal finance market. If such corporation or national banking association publishes reports of its conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published. In case at any time any Trustee or successor Trustee shall cease to be eligible in accordance with the provisions of this Section, such Trustee or successor Trustee shall resign immediately in the manner and with the effect specified in Section 7.7.

Section 7.7     <u>Resignation and Removal of the Trustee.</u>

(a)     The Trustee may at any time resign and be discharged from the trusts created pursuant to this Trust Agreement by giving 60 days written notice, which shall be posted to EMMA by the Trustee. Upon receiving such notice of resignation, FGIC shall promptly appoint a successor trustee meeting the requirements set forth in Section 7.6 by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee. A copy of such instrument shall be delivered to the Unitholders and posted to EMMA by the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee at the expense of the Trust.

(b)     If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 7.6 and shall fail to resign after written request therefor by FGIC or the Requisite Unitholders, or if any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then FGIC or the Requisite Unitholders

26

may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.

(c)     FGIC, with the written consent of the Requisite Unitholders, may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, signed by such Requisite Unitholders or their attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

(d)     The Requisite Unitholders, with the written consent of FGIC (which consent shall not be unreasonably withheld or delayed by FGIC in the event the Trustee is in default of its obligations hereunder to enforce the Covered FGIC Insurance Policy), may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, signed by such Requisite Unitholders or their attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

(e)     Any resignation of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.7 shall not become effective until the acceptance of appointment by the successor trustee as provided in Section 7.8 hereof. The compensation and reimbursement for fees and expenses of any successor trustee appointed in connection with the resignation of the Trustee shall be the sole responsibility of the Trust, including the costs and expenses incurred in connection with any such succession.

(f)     Any removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.7 shall not become effective until (i) acceptance of appointment by the successor trustee as provided in Section 7.8 hereof and (ii) payment of all costs, expenses and indemnities due and owing to the outgoing Trustee, including the costs and expenses incurred in connection with any such succession. In the event the Trustee is removed due to a request by the Requisite Unitholders pursuant to Section 7.7(b), then the fees and expenses of the successor trustee incurred in connection with any such succession shall be the sole responsibility of the Unitholders requesting such removal.

(g)     The compensation for any successor trustee shall be paid in substantially the same manner as compensation was paid to the predecessor trustee.

(h)     Notwithstanding the replacement of the Trustee pursuant to this Section 7.7, the rights, benefits, protections and indemnities afforded to the Trustee under this ARTICLE VII shall continue to the benefit of the retiring Trustee.

Section 7.8     <u>Successor Trustee.</u>

(a)     Any successor trustee appointed as provided in Section 7.7 shall execute, acknowledge and deliver to the Unitholders, FGIC and the predecessor trustee an instrument accepting such appointment under this Trust Agreement and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee

27

herein. The predecessor trustee shall deliver to the successor trustee all related documents and statements held by it under this Trust Agreement and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

(b)    No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of this Section 7.6 hereof.

(c)    Upon acceptance of appointment by a successor trustee as provided in this Section, the successor trustee shall (a) post to EMMA notice of the succession of such trustee under this Trust Agreement and (b) provide notice of the succession of such trustee under this Trust Agreement to the Depositary.

Section 7.9    Merger or Consolidation of Trustees.

Any Person into which either of the Trustees may be merged or converted or with which it may be consolidated or any Person resulting from any merger, conversion or consolidation to which such Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of such Trustee, shall be the successor of such Trustee under this Trust Agreement, provided such Person shall be eligible under the provisions of Section 7.6 (as to the Trustee) and 7.14 (as to the Delaware Trustee), without the execution or filing of any paper or any further act on the part of any of the Parties, anything herein to the contrary notwithstanding.

Section 7.10    Appointment of Trustee Custodians.

The Trustee may appoint one or more custodians (each a "Trustee Custodian") to hold all or a portion of the Trust Estate as agent for the Trustee, by entering into a custodial agreement. The appointment of any Trustee Custodian may at any time be terminated and a substitute custodian appointed therefor by the Trustee. Subject to ARTICLE VII, the Trustee agrees to comply with the terms of each custodial agreement and to enforce the terms and provisions thereof against the Trustee Custodian for the benefit of the Unitholders. Each Trustee Custodian shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and surplus of at least $10,000,000 and shall be qualified to do business in the jurisdiction in which it holds any asset constituting part of the Trust Estate. Any such Trustee Custodian may not be an Affiliate of HTA or FGIC. The Trustee is responsible for the fees and expenses of any Trustee Custodian appointed hereunder.

Section 7.11    Trustee May Enforce Claims Without Possession of Certificate.

All rights of action and claims under this Trust Agreement or the Certificate may be prosecuted and enforced by the Trustee without the possession of any of the Trust Units or the production thereof in any proceeding relating thereto and any such proceeding instituted by the Trustee shall be brought in its own name or in its capacity as Trustee. Any recovery of judgment shall, after provision for the payment of the reasonable compensation, fees, expenses,

disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Unitholders in respect of which such judgment has been recovered.

Section 7.12   Trustee Indemnity.

The Trust shall indemnify the Trustees for, and hold them harmless against, any loss, liability or expense arising out of or in connection with their acceptance or administration of the Trust, including the reasonable costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their respective powers or duties hereunder, provided in each case that such loss, liability, expense, cost or claim does not relate to or arise out of or in connection with either Trustee's gross negligence, bad faith or willful misconduct.

Section 7.13   Acceptance by Trustees, Representations and Warranties of Trustees.

The Trustees each hereby undertake to perform their respective obligations set forth herein. The Trustee hereby agrees to hold the Trust Assets, as trustee in trust on behalf of the Trust upon the terms and conditions and for the use and benefit of the Unitholders as herein set forth. The Trustees each as to itself hereby represent and warrant to each of HTA, FGIC, holder of the Certificate and holders of the Units that as of the Closing Date:

(a)   it is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or association;

(b)   it has full corporate power, authority and right to execute, deliver and perform its duties and obligations under this Trust Agreement, and has taken all necessary corporate action to authorize the execution, delivery and performance by it of this Trust Agreement, including the execution and delivery of the Certificate on behalf of the Trust;

(c)   the execution and delivery of this Trust Agreement by it and its performance of and compliance with the terms of this Trust Agreement will not violate its certificate of incorporation, association or other constituent documents or by-laws or constitute a default under, or result in the material breach or acceleration of, any material contract, agreement or other instrument to which it is a party or which may be applicable to it or any of its assets;

(d)   as of the Closing Date, this Trust Agreement has been duly executed and delivered by it and, assuming the due authorization, execution and delivery of this Trust Agreement by each of the other parties hereto, constitutes the legal, valid and binding obligation of it, enforceable in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and general principles of equity;

(e)   it is not in violation, and the execution and delivery of this Trust Agreement by it and its performance and compliance with the terms thereof will not constitute a violation, of any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over it or its properties, which violation

would reasonably be expected to have a material adverse effect on the condition (financial or otherwise) or operations of it or its properties or on the performance of its duties hereunder;

(f)     there are no actions or proceedings against, or investigations of, it pending, or, to its knowledge, threatened, before any court, administrative agency or other tribunal (i) that could reasonably be expected to prohibit its entering into this Trust Agreement, (ii) seeking to prevent the issuance of the Certificate contemplated by this Trust Agreement or (iii) that could reasonably be expected to materially affect the performance by it of its obligations under, or the validity or enforceability against it of, this Trust Agreement; and

(g)     no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by it of, or compliance by it with, this Trust Agreement, or for the consummation of the transactions contemplated by this Trust Agreement, except for such consents, approvals, authorizations and orders, if any, that have been obtained prior to the Closing Date, other than the filing of the Certificate of Trust with the Secretary of State.

Section 7.14    The Delaware Trustee.

(a)     There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law and acts through one or more persons authorized to bind such entity.  The initial Delaware Trustee shall be U.S. Bank Trust National Association.  The Delaware Trustee shall be entitled to all of the rights, privileges, immunities, indemnities and protections afforded to the Trustee hereunder, but will only have such responsibilities and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)     The Delaware Trustee shall be one of the trustees of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Delaware Trust Statute and for taking such actions as are required to be taken by a Delaware Trustee under the Delaware Trust Statute. The duties, liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware; and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Delaware Trust Statute (only upon the written direction of the Trustee); and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.  With the exception of the express duties set forth in this Section 7.14 (b), and the implied contractual covenant of good faith and fair dealing, all other duties of the Delaware Trustee, including fiduciary duties, are expressly eliminated.  The Delaware Trustee shall have no liability to the Trust, to the Trustee, to any beneficiary, or to any other person that is a party to or is otherwise bound by this Trust Agreement for breach of contract or breach of duties (including fiduciary duties), except for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.  The Delaware Trustee shall not be liable for any acts or omissions, except for such losses, damages or expenses which have been finally

30

adjudicated by a court of competent jurisdiction to have directly resulted from the Delaware Trustee's gross negligence, bad faith or willful misconduct.

(c)     The Delaware Trustee shall not be liable for the acts or omissions of the Trust, the Trustee or any other person or entity, nor shall the Delaware Trustee be liable for supervising or monitoring the performance of the duties of the Trustee or the Trust or of any other person or entity under this Trust Agreement or any related document.

(d)     The Delaware Trustee shall not be personally liable for any error of judgment made by an Officer of the Delaware Trustee having direct responsibility for the administration of this Trust Agreement in good faith.

(e)     No provision of this Trust Agreement shall require the Delaware Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its duties hereunder.

(f)     Under no circumstance shall the Delaware Trustee, in its individual capacity or in its capacity as Delaware Trustee, or any member, partner, shareholder, director, officer, employee, agent, affiliate or advisor of the Delaware Trustee or their respective affiliates be personally liable for any representation, warranty, covenant, agreement, liability or indebtedness of the Trust, as all such representations, warranties, covenants, agreements, liabilities or indebtedness of the Trust are those of the Trust as an entity.

(g)     The recitals contained herein shall not be taken as the statements of the Delaware Trustee, and the Delaware Trustee does not assume any responsibility for their correctness. The Delaware Trustee shall not be personally responsible for or in respect of, and the Delaware Trustee makes no representations as to, the title to, or value or condition of, the property of the Trust or any part thereof, including the Trust Assets or Trust Estate, nor as to the validity or sufficiency of this Trust Agreement or any related certificate, instrument or other document.

(h)     The Delaware Trustee may conclusively rely and shall be fully protected, and shall incur no liability to anyone, in acting or refraining from acting in good faith and in reliance upon any signature, instrument, notice, resolution, request, instruction, direction, consent, order, certificate, report, opinion, bond or other document or paper believed by it to be genuine and believed by it to be signed by the proper party or parties. The Delaware Trustee may accept a certified copy of a resolution of any governing body of any person as conclusive evidence that such resolution has been duly adopted by such person and that the same is in full force and effect.   As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein or whenever the Delaware Trustee shall deem it desirable that a fact or matter be proved or established prior to taking, suffering or omitting any action hereunder (including, direction by the Trustee with respect to such action), the Delaware Trustee may for all purposes hereof rely on a certificate, signed by any officer of the party delivering the certificate or, in the case of the Trustee, signed by the Trustee, as to such fact or matter, and such certificate shall constitute full protection to the Delaware Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

(i)      In accepting and performing its duties hereunder the Delaware Trustee acts solely as Delaware Trustee hereunder and not in its individual capacity, and all persons having any claim against the Delaware Trustee by reason of the transactions contemplated by this Trust Agreement shall look only to the Trust Assets for payment or satisfaction thereof.

(j)      The Delaware Trustee may be removed by FGIC with the written consent of the Requisite Unitholders upon thirty (30) days prior written notice to the Delaware Trustee, with a copy to the Trustee. The Delaware Trustee may resign upon thirty (30) days prior written notice to FGIC, with a copy to the Trustee. No resignation or removal of the Delaware Trustee shall be effective except upon the appointment of a successor Delaware Trustee that (i) is reasonably acceptable to FGIC, (ii) has a combined capital and surplus of at least $10,000,000 and (iii) is qualified to do business in the State of Delaware and satisfies the requirements of the Delaware Trust Statute. If no successor has been appointed within such thirty (30) day period, the Delaware Trustee, FGIC or the Unitholders may petition a court to appoint a successor Delaware Trustee, which shall be at the expense of the Trust.

## ARTICLE VIII

## DEFAULT ON HTA CLAWBACK CVIs

Section 8.1      Realization Upon Default.

(a)      The Trustee shall assert claims under the HTA Clawback CVIs and the Covered FGIC Insurance Policy, and shall take such reasonable steps as are necessary to receive payment or to permit recovery thereunder following any default thereunder, with respect to the Covered FGIC Insurance Policy, in accordance with Section 3.3(b) hereof and, with respect to the HTA Clawback CVIs, in accordance with Section 6.1(b) hereof.

(b)      If there is a breach, a default or an event of default with respect to any HTA Clawback CVI and such breach, default or event of default is known to the Trustee in accordance with Section 7.2(i), the Trustee shall give notice thereof to the Unitholders (through the Depositary) and FGIC as promptly as practicable, and, in any event, within three (3) Business Days after such breach, default or event of default becomes known to the Trustee. If the Trustee receives notice of an anticipated payment default with respect to any the HTA Clawback CVIs in accordance with Section 7.2(i), the Trustee shall give notice thereof to the Unitholders (through the Depositary) and FGIC within three (3) Business Days after receipt of such notice.

(c)      The foregoing provisions of this Section 8.1 shall apply equally to any other securities or property received in respect of the HTA Clawback CVIs or in exchange therefor.

# ARTICLE IX

# TERMINATION OF TRUST

Section 9.1    Termination; No Redemption Rights.

Upon the indefeasible cancellation or other indefeasible termination or discharge of the Covered FGIC Insurance Policy or FGIC's obligations thereunder, the Trust (including the respective obligations and responsibilities under this Trust Agreement of the Trustee and FGIC) shall terminate upon (i) the pro rata payment or distribution to the Unitholders of all amounts or Trust Assets (including the HTA Clawback CVIs) held by or on behalf of the Trustee and required hereunder to be so paid or distributed, (ii) payment in full of any Trustee Costs due and owing to the Trustee under this Trust Agreement, and (iii) receipt by the Trustee of an Opinion of Counsel stating that all conditions precedent herein relating to the satisfaction and discharge of this Trust Agreement have been complied with. In no event shall the Trust be terminated or the HTA Clawback CVIs be redeemed (except in the case of a redemption of the HTA Clawback CVIs permitted under the terms of the Clawback CVI Indenture or the CVI Legislation) or otherwise released from the Trust Estate without the prior express written consent of FGIC if either (i) the Covered FGIC Insurance Policy or FGIC's obligations thereunder has not been indefeasibly terminated or discharged, or (ii) FGIC has not been indefeasibly paid in full for any amounts owed pursuant to the Plan.

Notwithstanding anything contained herein to the contrary, the merger or consolidation of the Trustee shall not cause a termination of the Trust.

Section 9.2    Procedure for Termination.

(a)    During the month in which the Trustee intends to make the final distribution from the Trust, the Trustee shall give notice to the Unitholders in accordance with Section 11.4 specifying: (a) the anticipated final distribution date; (b) that the final payment with respect to the Trust Units will be made upon presentation and surrender of the Certificate at the office of the Trustee therein designated on that date and the amount of any such final payment; (c) any amounts, or trust assets, remaining on deposit in the Trust will be distributed to the holders of record of the Trust Units on a pro rata basis; and (d) that the Trustee believes that, following the occurrence of such final distributions, the conditions to termination of the Trust have been satisfied and that it intends to terminate the Trust (a "Termination Notice").

(b)    If the Requisite Unitholders do not object in writing within 30 days after the Trustee has provided the Termination Notice as set forth herein then, upon completion of final distributions as set forth in the Termination Notice, the Trust shall be dissolved, wound up, and terminated.

(c)    Upon the dissolution, wind up and termination of the Trust and this Trust Agreement, the Trustee or Delaware Trustee (acting solely at the written direction of the Trustee) is authorized to file a certificate of cancellation with the Secretary of State.

# ARTICLE X

# TAX PROVISIONS

Section 10.1    Grantor Trust Provisions.

The Trustee, HTA, the Unitholders (by their acceptance of the Trust Units) and FGIC each agree and acknowledge or have agreed and acknowledged that the Trust is intended to qualify for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust, and it is neither the purpose nor the intent of the parties hereto to create a partnership, joint venture or association taxable as a corporation or to serve as associates in a joint enterprise for the conduct of business for profit. In furtherance of the foregoing, (a) the purpose of the Trust is and shall be to protect and conserve the assets of the Trust Estate, and the Trust shall not at any time engage in or carry on any kind of business or any kind of commercial or investment activity, (B) the Trust is formed to facilitate direct investment in the Trust Assets and the existence of multiple classes of ownership interests is incidental to that purpose, and (c) the Trustee (at the direction of FGIC and/or the Requisite Unitholders), shall take, or refrain from taking, all such action as is necessary to maintain the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not (i) acquire any assets or dispose of any portion of the Trust other than pursuant to the specific provisions of this Trust Agreement, (ii) vary the investment of the Trust within the meaning of Treasury Regulation § 301.7701-4(c), (iii) substitute new investments or reinvest so as to enable the Trust Estate to take advantage of variations in the market to improve the investment of any Unitholder or (iv) engage in any activity which may directly or indirectly, adversely affect the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not have any authority to manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Estate except as required by the express terms of this Trust Agreement in accordance with the powers granted to or the authority conferred upon the Trustee pursuant to this Trust Agreement. The Trustee and FGIC each agree that they shall not take any action that would result in the Trust failing to be characterized for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.

Section 10.2    Characterization.

Each Unitholder acknowledges and agrees to treat the Trust Units as undivided interests in the Trust Estate.

Section 10.3    Grantor Trust Administration.

Notwithstanding anything in this Trust Agreement to the contrary, and notwithstanding any direction or instruction by less than all the Unitholders, the Trustee shall not be authorized to take any action that would cause the Trust not to be treated as a grantor trust under the Code all of the distributions and income from which would be subject to the tax treatment described in Subpart J of Chapter 1 of the Code as to the Unitholders. The Trustee shall perform its duties hereunder so as to maintain the status of the Trust as a grantor trust as provided in Section 10.1

34

hereof. The Trustee shall not (a) exercise any discretionary rights with respect to the Trust Assets, (b) acquire an interest in any additional Trust Assets (other than proceeds of a sale of Trust Assets permitted under the terms of this Trust Agreement), (c) knowingly take any other action or fail to take (or fail to cause to be taken) any other action that, under the Grantor Trust Provisions, if taken or not taken, as the case may be, could adversely affect the status of (i) the Trust as a grantor trust, (ii) the Trust as a U.S. trust, or (iii) the Unitholders as grantors with respect to the Trust under the Grantor Trust Provisions (any such adverse effect on trust status, an "Adverse Trust Event"), unless the Trustee has obtained or received an Opinion of Counsel nationally recognized as competent in matters relating to the U.S. federal income taxation of organizations such as the Trust (at the expense of the party requesting such action or at the expense of the Trust Estate if the Trustee seeks to take such action or to refrain from taking any action for the benefit of the Unitholders) to the effect that the contemplated action will not result in an Adverse Trust Event. None of the other parties hereto shall take any action or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that the Trustee has received or obtained an Opinion of Counsel to the effect that an Adverse Trust Event could result from such action or failure to act. The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Trust Agreement, but in no event at the cost or expense of the Trust Estate or the Trustee.

Section 10.4    Reports to Unitholders and Tax Authorities.

(a)    The Trustee shall perform or cause to be performed on behalf of the Trust all reporting and other tax compliance duties that are required in respect thereof under the Code, the Grantor Trust Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority, including for avoidance of doubt the filing of IRS Forms 1099 or providing other information statements to the extent required pursuant to U. S. Treasury Regulations Section 1.671-5 (including U.S. Treasury Regulations Section 1.671-5(c)(1)), as amended or any successor provision (the "WHFIT Regulations").

(b)    Consistent with the Trust's characterization for U.S. federal income tax purposes as a grantor trust, except to the extent required pursuant to WHFIT Regulations,  no U.S. federal income tax return shall be filed on behalf of the Trust unless either (i) the Trustee shall receive an Opinion of Counsel that, based on a change in applicable law occurring after the date hereof, the Code requires such a filing or (ii) the Internal Revenue Service shall determine that the Trust is required to file such a return. In the event that the Trust is required to file tax returns, the Trustee shall prepare or cause to be prepared, and sign and file when due with the appropriate tax authorities all of the tax returns in respect of the Trust. In no event shall the Trustees, FGIC or HTA be liable for any liabilities, costs or expenses of the Trust or the Unitholders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to the Trustee's gross negligence, bad faith or willful misconduct.

(c)    If any tax is imposed on the Trust, such tax, together with all incidental costs and expenses (including, without limitation, penalties and reasonable attorneys' fees) shall

be charged to and payable by the Unitholders on a pro rata basis; provided that in each case the Trustee shall be authorized to withhold the applicable amounts from Distributions on the applicable Trust Units and pay such amounts to the applicable taxing authority and that any amounts so withheld and paid to the applicable taxing authority shall be deemed to have been paid as a Distribution to the applicable Unitholders.

(d)     The Trustee shall, for U.S. federal income tax purposes, maintain books and records with respect to the Trust on a calendar year basis or such other basis as may be required under the Code.

(e)     All taxes due and payable on any amounts payable to a Unitholder with respect to a Trust Unit shall be that Unitholder's sole responsibility.

(f)     For the purposes of this ARTICLE X and any other provision of the Trust Agreement relating to the ownership of a Trust Unit for U.S. federal income tax purposes, including definitions, all references to holder, Unitholder, or beneficial owner shall mean the beneficial owner of a Trust Unit for U.S. federal income tax purposes. By acquiring an interest in a Trust Unit, a beneficial owner of the Trust Unit for U.S. federal income tax purposes shall be deemed to consent as a condition of acquiring such interest to comply with any requirements of such Article and other provisions hereof.

## ARTICLE XI

### MISCELLANEOUS PROVISIONS

Section 11.1     Amendment of Trust Agreement.

(a)     This Trust Agreement may not be amended, waived or supplemented without the prior written consent of FGIC. This Trust Agreement may be amended, waived or supplemented from time to time by FGIC and the Trustee without the consent of any other Party or the Depositary or any Unitholders; provided, however, that no such amendment shall:

(i)     reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Unitholder without the written consent of such Unitholder;

(ii)     alter in any manner the treatment of the Covered FGIC Insurance Policy without the written consent of each Unitholder affected;

(iii)     amend this Section 11.1 without the written consent of each Unitholder; or

(iv)     amend the definition of Requisite Unitholders without the written consent of all Unitholders; or

(v)      adversely affect in any material respect the interests of the Unitholders in any manner other than as described in clause (i), (ii), (iii) or (iv) above without the written consent of the Requisite Unitholders.

(b)      Prior to executing any amendment permitted by this ARTICLE XI, (i) the Trustee shall be required to obtain an Opinion of Counsel that is nationally recognized as competent in matters relating to the federal income taxation of organizations such as the Trust to the effect that such amendment will not result in an Adverse Trust Event and (ii) the Trustee shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such amendment is authorized or permitted by this Trust Agreement and that all conditions precedent have been met. The Trustee may, but shall not be obligated to, enter into any such amendment that affects the Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement or otherwise. The Delaware Trustee may, but shall not be obligated to, enter into any such amendment that affects the Delaware Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement or otherwise.  No amendment that affects the Delaware Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement shall be effective against the Delaware Trustee unless the Delaware Trustee has consented thereto in writing.  Prior to executing any amendment permitted by this ARTICLE XI, the Delaware Trustee shall be entitled to receive and conclusively and exclusively rely upon written direction from the Trustee that such amendment is authorized and permitted by this Trust Agreement.

(c)      Promptly following the execution of this Trust Agreement, the Trustee shall post full and complete copies of this Trust Agreement on EMMA . Promptly after the execution of any amendment to this Trust Agreement, the Trustee shall furnish a copy of such amendment to the Depositary and shall post a copy of such amendment on EMMA.

(d)      The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Unitholders shall be subject to such reasonable regulations as the Trustee may prescribe in coordination with the Depositary.

Section 11.2   Counterparts.

This Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts may be delivered by electronic messaging system and shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument. The words "execution," "signed," "signature," and words of like import in this Agreement or in any other certificate, agreement or document related to this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and Adobe Sign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the US Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and

Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

Section 11.3   <u>Limitation on Rights of Unitholders.</u>

(a)   The death or incapacity of any Unitholder shall not operate to terminate this Trust Agreement or the Trust, nor entitle such Unitholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, nor otherwise affect the rights, obligations and liabilities of the Parties or any of them.

(b)   No Unitholder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust, or the obligations of the Parties, nor shall anything herein set forth, or contained in the terms of the Trust Units, be construed so as to constitute the Unitholders from time to time as partners or members of an association; nor shall any Unitholder be under any liability to any third person by reason of any action taken by the Parties pursuant to any provision hereof.

(c)   No Unitholder shall have any right by virtue of any provision of this Trust Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Trust Agreement or any of the Trust Assets. Nothing in this paragraph shall be construed to limit in any manner the ability of any Party (notwithstanding the ownership by such Party of Trust Units) to institute any suit, action or proceeding upon or under or otherwise with respect to this Trust Agreement or to enforce in any manner its rights as a party hereunder.

Section 11.4   <u>Notices.</u>

All demands, notices and certifications under this Trust Agreement shall be in writing. All demands, notices and certifications under this Trust Agreement shall be deemed to have been duly given to each Party other than FGIC when personally delivered or mailed by first class mail, postage prepaid, or by express delivery service, to such Party at (a) in the case of the Trustee, U.S. Bank Trust Company, National Association, 100 Wall Street, 6th floor, New York, NY 10005, (b) in the case of the Delaware Trustee, U.S. Bank Trust National Association, 100 Wall Street, 6th floor, New York, NY 10005, and (c) in the case of HTA, c/o Fiscal Agency and Financial Advisory Authority, Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, Puerto Rico 00907, Attn: Office of the Executive Director, or in each of the above cases such other address as may hereafter be furnished by such Party to each other Party in writing. All demands, notices and certifications under this Trust Agreement shall be deemed to have been duly given to FGIC when transmitted by email to FGIC at both of the following email addresses: generalcounsel@fgic.com and edward.turi@fgic.com, or at such other email addresses as may hereafter be furnished by FGIC Party to each other Party in writing.  Unless a different means of giving notice or communication to Unitholders is specified herein, any notice or communication required or permitted to be given to a Unitholder shall be transmitted to the Depositary in accordance with its procedures. Any notice or communication so transmitted to the Depositary within the time prescribed in this Trust Agreement shall be conclusively presumed to have been duly given to the Unitholders at the time of transmission, whether or not and regardless of when any Unitholder actually receives such notice or

communication. A copy of any notice given hereunder to any other Party shall be delivered to the Trustee. The Trustee shall post all notices delivered hereunder to EMMA within five (5) Business Days of receiving such notice or a copy of such notice, as applicable.

Section 11.5   Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Trust Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Trust Agreement and shall in no way affect the validity or enforceability of the other provisions of this Trust Agreement or of the Trust Units or the related rights of the Unitholders.

Section 11.6   Acts of Unitholders.

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Trust Agreement to be given or taken by Unitholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Unitholders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Trustee and ownership of the Units held by such Unitholders is confirmed by Depositary. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Trust Agreement and conclusive in favor of the Trustee. The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner that the Trustee deems sufficient. The ownership of Trust Units shall be proved by the Depositary.

Section 11.7   Headings.

Article and Section headings in this Trust Agreement are included herein for convenience of reference only and shall not constitute a part of this Trust Agreement for any other purpose or be given any substantive effect.

Section 11.8   No Waiver; Cumulative Remedies.

No failure to exercise and no delay in exercising, on the part of any Party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

Section 11.9   Merger and Integration.

This Trust Agreement and the documents and exhibits expressly incorporated herein set forth the entire understanding of the Parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by this Trust Agreement.

Section 11.10  [Reserved].

Section 11.11  Patriot Act.

The Parties acknowledge that in accordance with Section 326 of the U.S.A. PATRIOT Act, the Trustees, like all financial institutions and in order to help fight the funding of terrorism and money laundering, are required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustees. The Parties agree that they will provide the Trustees with such information as they may request in order for the Trustees to satisfy the requirements of the U.S.A. PATRIOT Act.

Section 11.12  Governing Law; Venue Jury Waiver.

THIS TRUST AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS TRUST AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON, ARISING OUT OF, OR LEADING TO THIS TRUST AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS TRUST AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY OR PERFORMANCE, SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS. EACH PARTY HERETO HEREBY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS TRUST AGREEMENT, OR (B) IN ANY WAY IN CONNECTION WITH OR PERTAINING TO OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT TO THIS TRUST AGREEMENT OR IN CONNECTION WITH THIS TRUST AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS TRUST AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE. EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY FEDERAL OR STATE COURTS SITTING IN THE STATE OF DELAWARE IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS TRUST AGREEMENT. EACH PARTY TO THIS TRUST AGREEMENT IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDINGS IN ANY SUCH COURT AND ANY CLAIM THAT ANY PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

Section 11.13  Force Majeure.

In no event shall the Trustees be responsible or liable for any failure or delay in the performance of their obligations hereunder arising out of or caused by, directly or indirectly, forces  beyond their control, including strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustees shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 11.14  Intent of Parties.

(a)    The Parties intend that, for all purposes, the transfer to the Trust of the Trust Estate pursuant to Section 2.2 in each case shall be, and shall be construed as, a transfer thereof to the Trust on behalf of the Original Holders in lieu of a transfer thereof to the Trust directly by the Original Holders and shall constitute, in all respects, an absolute, irrevocable transfer, conveyance, and assignment, without recourse, of the Trust Estate to the Trust, and immediately after giving effect to the transfer contemplated hereby on the Closing Date, HTA will have no further interest (legal or equitable) in the Trust Estate and the Trust Estate will not be property of HTA or HTA's estate in the event of a liquidation, reorganization, or similar proceeding of HTA and the Trust shall have the absolute right to take whatever action it may deem appropriate with respect to the Trust Estate. The Parties agree to treat the transfer contemplated hereby for all purposes (including financial accounting purposes) as an absolute transfer on all relevant books, records, financial statements and other documents.

(b)    The Trust Estate will be held by the Trust free and clear of any lien or encumbrance of any Person claiming through or under HTA.

(c)    Notwithstanding anything to the contrary in this Trust Agreement or in any other document governing the formation, management, or operation of the Trust, if and for so long as any Trust Unit remains outstanding, none of the Unitholders, FGIC, the Trustees, nor any other Person shall authorize, cause or permit the Trust to (and the Trust shall not, and neither Trustee shall directly take any action that to its actual knowledge would, violate any of the following):

(i)    engage in any business or engage in any activity other than those activities expressly permitted in this Trust Agreement and will not have, incur, guarantee or become liable for any indebtedness or obligations except as expressly contemplated in this Trust Agreement;

(ii)    acquire or own any assets other than the Trust Estate or lease any assets;

(iii)    fail to preserve its existence as an entity duly formed, validly existing and in good standing (if applicable) under the laws of the State of Delaware, or fail to

41

remain qualified to do business in each state in which such qualification is required, for any reason, including in order to perform its obligations under this Trust Agreement;

(iv)    fail to observe at any time any necessary, appropriate and customary corporate, organizational, company and/or other legal formalities to maintain its separate existence;

(v)    fail to act solely in its own name or in the name of the Trustee through duly authorized agents in the conduct of its activities;

(vi)    provide for the payment of its expenses, indebtedness or other obligations other than from its own separate assets;

(vii)    have its debts or other obligations guaranteed by any other Person or hold itself out as responsible for the debts or other obligations of any other Person;

(viii)    commingle its assets or liabilities with those of any other Person;

(ix)    fail to maintain its own records, books of account, bank accounts, accounting records and other entity documents separate and apart from those of any other Person;

(x)    divert funds for any purpose other than as set forth in this Trust Agreement;

(xi)    enter into any contract, agreement or transaction with any Unitholders, HTA, FGIC, any principal or other Affiliate of the Trust, or any shareholder, general partner, member, principal or Affiliate thereof, except as expressly authorized herein;

(xii)    maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xiii)    incur, create or assume any indebtedness of or buy or hold evidence of indebtedness issued by any other Person (other than as contemplated by this Trust Agreement); guarantee or hold itself out to be responsible for the debts of another Person or otherwise pledge its assets to secure the obligations of any other Person, or hold out its credit or assets as being available to satisfy the obligations of any other Person or seek to incur, create or assume any indebtedness based upon the assets of any other Person;

(xiv)    perform any duties or obligations of HTA or any other Person;

(xv)    make any loans or advances to any third party, including any Unitholder, HTA or any Affiliate of the Trust, or any principal or Affiliate thereof;

(xvi)    fail to file its own tax returns as and if required to do so by applicable law (subject to any permitted extensions and except to the extent the Trust is treated

42

as a grantor trust for tax purposes) and to pay any taxes required to be paid by it under applicable law;

(xvii)  fail to hold itself out to the public as a legal entity separate and distinct from any other Person, fail to conduct its activities solely in its own name or in the name of the Trustee and as a separate and distinct entity, or fail to correct any known misunderstanding regarding its separate identity;

(xviii)  identify itself as a department or division of any other Person;

(xix)  fail to observe all formalities required of a Delaware statutory trust;

(xx)  fail to pay its expenses and liabilities only out of its own funds to the extent such funds are available and fail to hold its assets only in its own name; provided, however, the foregoing shall not require HTA to sell any assets, or make any capital contribution, to the Trust;

(xxi)  conduct any oral or written communication, including letters, invoices, purchase orders, contracts, statements and applications, other than in its own name or in the name of the Trustee; or

(xxii)  (a) institute proceedings to have the Trust declared or adjudicated a bankrupt or insolvent, (b) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (c) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (d) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (e) make any assignment for the benefit of the Trust's creditors, (f) cause the Trust to admit in writing its inability to pay its debts generally as they become due or (g) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing.

(d)  Failure of the Trust, HTA, FGIC, any Unitholder, any Trustee or any other Person on behalf of the Trust, to comply with any of the foregoing covenants set forth in this Section 11.14 shall not affect the status of the Trust as a separate legal entity (unless in violation of the Delaware Trust Statute) nor cause the Trust to dissolve or terminate.

(e)  To the extent that any provision of this Section 11.14 conflicts with, violates or otherwise is in contravention with any other provision of this Trust Agreement, the Parties and each Unitholder agree that the terms set forth in this Section 11.14 shall be controlling as expressly set forth herein.

Section 11.15   Non-Petition.

HTA, FGIC, the Trustee and the Delaware Trustee, by entering into this Agreement, and the Unitholders, by accepting a Trust Unit, hereby covenant and agree that they will not at any time institute against the Trust, or join in instituting against the Trust, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under

any federal or state bankruptcy or similar law; provided, however, that in the event a bankruptcy or similar proceeding is instituted against the Trust by another Person, the Trustee may file appropriate proofs of claim.

Section 11.16  Certain Terms Regarding HTA.

For the avoidance of doubt and notwithstanding any terms appearing herein or elsewhere to the contrary:

(i)      The obligations of the Trust under the Trust Units and this Trust Agreement are non-recourse obligations of the Trust payable solely from the Trust Estate, and following realization of the Trust Estate, and its reduction to zero, any claims of the Unitholders shall be extinguished. The Trust Units are not obligations of, and are not guaranteed by, HTA, and no recourse shall be had against any officer, director, manager, employee, security holder or incorporator of HTA, or its successors or assigns, for the payment of any amounts payable under the Trust Units or the payment or performance of any obligation of the Trust under or pursuant to this Trust Agreement.

(ii)      The recitals contained in this Trust Agreement and in the Trust Units, shall be taken as the statements of the Trust, and HTA assumes no responsibility for their correctness. HTA makes no representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Trust Units.

(iii)      In purchasing any Trust Units, the purchaser shall be deemed to acknowledge, represent and agree, that none of HTA nor any of its affiliates, is acting as a fiduciary or a financial or investment advisor for such purchaser, and such purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, representations or recommendations (in each case whether written or oral) of HTA or any of its affiliates.

(iv)      HTA shall not be accountable for the use or application by the Trust of the Trust Units or the proceeds thereof or any amounts paid to the Trust pursuant to the provisions of this Trust Agreement.

Section 11.17  Certain Terms Regarding FGIC.

(a)      In addition to notices required to be provided elsewhere under this Trust Agreement, the Trustee shall promptly provide notice to FGIC with respect to each of the following:

(i)      any determination or intention of the Trustee or the Delaware Trustee to resign or terminate its duties hereunder;

(ii)      the amount of any cash received by the Trust, and the date on which it was received; and

44

(iii)     the amount of, and the Record Date and distribution date for, any distributions that the Trust is required to make to Unitholders.

(b)     The Trustee shall promptly furnish FGIC with copies of each report, notice or other communication sent to Unitholders. The Trustee shall seek to discuss and consult with FGIC regarding the same before sending them to Unitholders.

(c)     The Trustee, upon FGIC's request, shall provide additional information with respect to the Trust or the Trust Assets, including requesting from HTA information concerning the HTA Clawback CVIs and thereafter providing any such information received to FGIC.

(d)     The Trustee, upon FGIC's request, will discuss and consult with FGIC regarding matters concerning (i) the Covered FGIC Insured Bonds and FGIC's remaining obligations under the Covered FGIC Insurance Policy, including claims that the Trustee intends to assert thereunder, and (ii) the HTA Clawback CVIs held by the Trust.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the Parties have caused this Trust Agreement to be duly executed by their respective officers thereunto duly authorized and all as of the date first set forth above.

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

By: _____

Name: ~~Luis Santiago Reyes~~Edwin E. Gonzalez-Montalvo

Title: Executive Director ~~of Finance~~

[Signature Page]

Custodial Trust Agreement

**FINANCIAL GUARANTY INSURANCE
COMPANY**


By:_____
Name: Derek Donnelly
Title: Senior Managing Director


[Signature Page]

Custodial Trust Agreement

**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,** as Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President


**U.S. BANK TRUST NATIONAL ASSOCIATION,** as Delaware Trustee


By:_____
Name: Michelle Mena-Rosado
Title: Vice President

Custodial Trust Agreement

[Signature Page]

Custodial Trust Agreement

## **EXHIBIT A**

Trust Assets

FGIC Insurance Policy Number:

FGIC Insured Bonds description and CUSIP number:

Covered FGIC Insured Bond principal amount:  [$_____] in aggregate principal amount

Allocable Plan Consideration:

HTA Clawback CVIs

If any HTA Clawback CVIs were sold by FGIC prior to the Closing Date, [$_____] in cash
and the remaining HTA Clawback CVIs in the aggregate notional amount of [$_____].

A-1

## EXHIBIT B

[Form of Notice to Unitholders and FGIC]

[_____] CUSTODIAL TRUST
STATEMENT OF QUARTER ENDED [ ], 20[__]

**POSTED TO EMMA**
U.S. Bank Trust Company, National Association, as Trustee

Trust Units                                                           [CUSIP]

### 1.    Distributions to Unitholders (Sections 4.1(a) and (b))

|  | For Quarter Ended [ ], 20 | | Year to date, [ ], 20[   ] | |
|---|---|---|---|---|
| Source of Distributions | Aggregate Distributions | Per Unit Distributions | Aggregate Distributions | Per Unit Distributions |
| Asset Sales (Section 4.1(a)(i)) | $ | $ | $ | $ |
| CVI payments (Section 4.1(a)(ii)) | | | | |
| Policy Claim payments (Section 4.1(b)) | | | | |
| DPO payments (Section 4.1(b)) | | | | |
| DPO Accretion payments (Section 4.1(b)) | | | | |

### 2.    Balances of HTA Clawback CVIs (Section 4.1(c))

|  | As of [ ], 20[   ] | |
|---|---|---|
|  | Aggregate principal/accreted amount of HTA Clawback CVIs (by CUSIP) | Per Unit principal/accreted amount of HTA Clawback CVIs (by CUSIP) |
| HTA Clawback CVIs CUSIP | $ | $ |

**3.**      **DPO and DPO Accretion Balances (Section 4.1(d))**

DPO balance as of the Closing Date:

DPO balance as of last day of quarter:  $

DPO Accretion balance as of last day of quarter:  $

**4.**      **Covered FGIC Insured Bonds (Section 4.1(e))**

Accrued and unpaid interest on Covered FGIC Insured Bonds as of last day of quarter:  $

Principal amount of Covered FGIC Insured Bonds as of last day of quarter:  $

Description of change(s) in such amounts since prior quarter:

**5.**      **Payments to Trustees for such Quarter (Section 4.1(g))**

Fees paid to the Trustee:

Fees paid to the Delaware Trustee:

Trustee Cost amount(s) paid pursuant to Section 7.5(a)(ii) and description:

Trustee Cost amount(s) paid pursuant to Section 7.5(b) and description:

Indemnification amount(s) paid pursuant to Section 7.12 and description:

Ending Fee Reserve Balance:

**6.**      **Notices received by Trustee during such Quarter**
[Copy attached] [Not applicable]

**7.**      **Tax Reporting Required for such [Quarter][Year]**
[Copy attached] [Not applicable[2]]

**[8**.      **Other Trust Costs for such Quarter (Section 4.1(g)(ii))**

---

[2] May be used for quarterly reporting only.

B-2

Other Trust Cost amount(s) reimbursed pursuant to Section 7.5(c):][3]

---

[3] Include item 8 only if applicable to the Quarter.

## **EXHIBIT C**

[Form of Certificate]

[_____] CUSTODIAL TRUST CERTIFICATE

THIS CERTIFICATE IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY. THIS CERTIFICATE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE  DEPOSITORY TRUST COMPANY ("DTC") TO THE TRUSTEE (AS DEFINED IN THE TRUST AGREEMENT REFERRED TO BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST THEREIN.

THIS CERTIFICATE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS CERTIFICATE MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST TO WHICH THIS CERITIFICATE RELATES.

[_____] CUSTODIAL TRUST

Certificate No.  1

Initial Notional Amount of Units[_____]

CUSIP:[_____]

This certifies that CEDE & CO. is the registered owner of this Certificate and of the [Notional Amount of the] Units evidenced by this Certificate.

The Units evidenced by this Certificate represent a beneficial ownership interest in the Trust created by the Trust Agreement (the "Trust Agreement"), dated as of [_____]December 6, 2022, with respect to the [_____] Custodial Trust (the "Trust"), by and among the Puerto Rico Highways and Transportation Authority ("HTA"), Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, collectively the "Trustees").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to such terms in the Trust Agreement. This Certificate is issued under and subject to the terms, provisions and conditions of the Trust Agreement. By acceptance of this Certificate, the registered owner of this Certificate and each Unitholder assents to and becomes bound by the Trust Agreement.

The Trust Assets, on the Closing Date, consist of: (i) the Allocable Plan Consideration comprising HTA Clawback CVIs as specified on Exhibit A to the Trust Agreement; (ii) the Covered FGIC Insured Bonds as specified on Exhibit A to the Trust Agreement; (iii) the Covered FGIC Insurance Policy as specified on Exhibit A to the Trust Agreement; (iv) any and all agreements, documents and instruments relating to the Covered FGIC Insurance Policy; and (v) and any other securities, monies, proceeds or property received on account thereof or exchanged therefor from time to time, as well as any other rights, benefits, protections, remedies and claims pertaining thereto.

Subject to the terms and conditions of the Trust Agreement and until the obligations created by the Trust Agreement shall have terminated in accordance therewith, any distributions to Unitholders shall be distributed on each distribution date to the Person in whose name this Certificate is registered at the close of business on the related Record Date for such distribution and all distributions shall be in accordance with the terms of the Trust Agreement.

Distributions on this Certificate shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of the Trust Agreement, by wire transfer of immediately available funds to the Person in whose name this Certificate is registered at the close of business on the related Record Date for such distribution in accordance with the procedures of the Depositary.

C-2

This Certificate does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby. A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by the holder of this Certificate or any Unitholder at a time agreed upon by such holder or Unitholder and the Trustee.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Certificate shall not entitle the holder of this Certificate or any Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust, and not in its individual capacity, has caused this Certificate to be duly executed.

[_____] CUSTODIAL TRUST

CERTIFICATE NO. _____

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

DATED:

Trustee's Certificate of Authentication:

This is the Certificate referred to in the within- mentioned Trust Agreement.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

C-3

## EXHIBIT D

[Form of Certificate of Trust]

CERTIFICATE OF TRUST OF
[_____] CUSTODIAL TRUST

THIS Certificate of Trust of [_____] Custodial Trust (the "Trust"), is being executed and filed by the undersigned as trustees, to form a statutory trust under the Delaware Statutory Trust Act (12 DEL. CODE, Sections 3801, *et seq.*) (the "Act").

1.      NAME.  The name of the statutory trust formed hereby is "[_____] Custodial Trust."

2.      DELAWARE TRUSTEE.  The name and business address of a trustee of the Trust having its principal place of business in the State of Delaware are U.S. Bank Trust National Association, 1011 Centre Road, Suite 203, Wilmington, Delaware  19805.

3.      EFFECTIVE  DATE.   This  Certificate  of  Trust  shall  be  effective [_____]December 6, 2022.

IN WITNESS WHEREOF, the undersigned, being the trustees of the Trust, have executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

U.S.   BANK   TRUST   NATIONAL ASSOCIATION, as Delaware Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

U.S.   BANK   TRUST   COMPANY, NATIONAL ASSOCIATION,
as Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

D-1

**EXHIBIT E-1**

[Form of Notice Relating to Permitted Sale Event]

NOTICE

U.S. Bank Trust Company, National Association
100 Wall Street, 6th floor
New York, NY 10005

      Re: Permitted Sale Event

Ladies and Gentlemen:

      Reference is made to the Trust Agreement, dated as of [————————]December 6, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

      This notice is being provided to the Trustee, as contemplated by clause (ii) of the definition of "Permitted Sale Event" and Section 3.5(a) of the Trust Agreement. Accordingly, FGIC hereby notifies the Trustee of its intention to instruct the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, the HTA Clawback CVIs listed in Annex A in the amount specified on Annex A, and notifies the Trustee that the Permitted Sale Price for the HTA Clawback CVIs is as set forth on Annex A.

      **IN WITNESS WHEREOF,** FGIC has executed and delivered this Notice as of _____, 20__.

FINANCIAL GUARANTY INSURANCE COMPANY

By:_____
Name:_____
Title:_____

**ACKNOWLEDGEMENT OF RECEIPT**

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Notice.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____

Name:_____

Title:_____

**Annex A**

| **HTA CLAWBACK CVIs** |
|---|
| CUSIP No. |
| |

Amount to be Sold: $[_____]

Permitted Sale Price:[_____]

**EXHIBIT E-2**

[Form of Notice and Instruction Relating to Threshold Event]

NOTICE AND INSTRUCTION

U.S. Bank Trust Company, National Association
100 Wall Street, 6th Floor
New York, NY 10005

      Re: Threshold Event

Ladies and Gentlemen:

      Reference is made to the Trust Agreement, dated as of ~~[~~~~]~~December 6, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

      This notice and instruction is being provided to the Trustee, pursuant to and in accordance with Section 3.5(b) of the Trust Agreement and as contemplated by the definition of "Threshold Event". Accordingly, FGIC hereby (i) notifies the Trustee that the current market price of the HTA Clawback CVIs listed in Annex A exceeds the Threshold Price for such HTA Clawback CVIs specified on Annex A, and (ii) instructs the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, such HTA Clawback CVIs in the amount, at the sale price and to any person and account, and using the broker, if any, specified on Annex A.

      **IN WITNESS WHEREOF,** FGIC has executed and delivered this Notice as of _____, 20__.

                         FINANCIAL GUARANTY INSURANCE COMPANY

                         By:_____
                         Name:_____
                         Title:_____

## ACKNOWLEDGEMENT OF RECEIPT

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Notice and Instruction.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee


By:_____

Name:_____

Title:_____

**Annex A**

| **HTA CLAWBACK CVIs** |
|---|
| CUSIP No. |
|  |

Amount to be Sold: $[_____]

Threshold Price:[_____]

Sale Price:[_____]

[Insert details of persons/accounts to whom the sale shall be made and any other details, including relevant broker, if any, necessary for such sale.]

**EXHIBIT E-3**

[Form of Instruction Relating to Permitted Sale Event]

INSTRUCTION

U.S. Bank Trust Company, National Association
100 Wall Street, 6th floor
New York, NY 10005
      Re: Permitted Sale Event

Ladies and Gentlemen

      Reference is made to the Trust Agreement, dated as of [~~———————~~]December 6, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee. Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

      This instruction is being provided to the Trustee pursuant to and in accordance with Section 3.5(b) of the Trust Agreement, based on FGIC's understanding that a Permitted Sale Event has occurred. Accordingly, as contemplated by its related Notice Relating to Permitted Sale Event dated as of [*] (the "Notice"), FGIC hereby instructs the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, the amount of the HTA Clawback CVIs referenced in the Notice, at the sale price (which equals or exceeds the Permitted Sale Price) and to the person and account, and utilizing the broker, if any, specified in Annex A hereto.

      **IN WITNESS WHEREOF,** FGIC has executed and delivered this Instruction as of _____, 20__.

                          **FINANCIAL GUARANTY INSURANCE COMPANY**

                          By:_____
                          Name:_____
                          Title:_____

**ACKNOWLEDGEMENT OF RECEIPT**

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Instruction.

U.S. BANK TRUST COMPANY NATIONAL ASSOCIATION, as Trustee

By:_____

Name:_____

Title:_____

E-3-2

**Annex A**

| **HTA Clawback CVIs** |
|---|

| CUSIP No. |
|---|
| |

Amount to be Sold: $[_____]

Sale Price:[_____][4]

[Insert details of persons/accounts to whom the sale shall be made and any other details, including relevant broker, if any, necessary for such sale.]

---

[4] Equals or exceeds the Permitted Sale Price of [_____].

**EXHIBIT F**

Form of Trustee's Certification of Receipt of Certain Trust Assets

CERTIFICATION

To: FGIC and the Unitholders

Re: Receipt of Certain Trust Assets

Ladies and Gentlemen:

Reference is made to the Trust Agreement, dated as of [~~_____~~]December 6, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

This certification is being provided to the Unitholders and FGIC, pursuant to and in accordance with Section 2.3(b) of the Trust Agreement. Accordingly, the Trustee hereby certifies that as of the Closing Date, the Trustee (i) confirms that the HTA Clawback CVIs listed on Exhibit A of the Trust Agreement have been deposited to and are being held in the participant account of U.S. Bank Trust Company, National Association at the Depositary for the benefit of the Unitholders and FGIC subject to Section 2.3(c), and (ii) confirms that the Trust Units have been issued to the Original Holders.

        **IN WITNESS WHEREOF,** the Trustee has executed and delivered this Certification as of _____, 2022.

                                        U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

                                        By:_____

                                        Name:_____

                                        Title:_____

## EXHIBIT G

[Form of Assignment]

~([_____] CUSTODIAL TRUST~) ASSIGNMENT

ASSIGNMENT, dated as of _____, [__], 20___(this "<u>Assignment</u>"), by U.S. Bank Trust Company, National Association, as trustee for and on behalf of the Trust listed on Annex A hereto (the "<u>Trust</u>", and such trustee being the "<u>Trustee</u>"), to and for the benefit of Financial Guaranty Insurance Company ("<u>FGIC</u>").

## WITNESSETH:

WHEREAS, reference is made to (a) the Trust Agreement, dated as [_____] (the "<u>Trust Agreement</u>"), with respect to the Trust, by and among the Puerto Rico Highways and Transportation Authority, FGIC, the Trustee, and U.S. Bank Trust National Association, as Delaware trustee for and on behalf of the Trust, and (b) the Covered FGIC Insurance Policy listed on Annex A hereto, issued by FGIC with respect to the Covered FGIC Insured Bonds described and the CUSIP for which is identified on Annex A hereto;

WHEREAS, Section 3.3(b) of the Trust Agreement[5] provides, among other things, that the execution and delivery of assignments (in substantially this form) by the Trustee on behalf of the Trust to FGIC (or its fiscal agent) is one of the conditions to FGIC's obligation to make payment of any claim asserted by the Trustee under the Covered FGIC Insurance Policy or any payment in respect of any DPO related to the Covered FGIC Insurance Policy which may become payable in accordance with the FGIC Rehabilitation Plan, in each case relating or with respect to the principal of the Covered FGIC Insured Bonds;

WHEREAS, Section 3.3(b) of the Trust Agreement further provides that, with respect to each such payment relating or with respect to the principal of the Covered FGIC Insured Bonds, which is paid or deemed to be paid by FGIC in cash (each a "<u>Cash Payment</u>"), the Trustee shall execute and deliver on behalf of the Trust to FGIC (or its fiscal agent) assignments (in substantially this form) with respect to a proportionate share (based on the proportion of such Cash Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust (the "<u>Proportionate Share</u>")) of the Trust Assets held by the Trust,;

WHEREAS, for purpose of this Assignment, the Cash Payment and Proportional Share are set forth on Annex A hereto;

WHEREAS, in accordance with the terms of the Covered FGIC Insurance Policy and Section 3.3(b) of the Trust Agreement, FGIC (or its fiscal agent) will pay, or be deemed to have paid, the Cash Payment to the Trust, as the Bondholder under the Covered FGIC Insured Policy,

---

[5] This form of assignment shall also be used for any assignments pursuant to Section 3.7(b) of the Trust Agreement with conforming changes made by FGIC.

G-1

only after FGIC (or its fiscal agent) receives this Assignment executed and delivered by the Trustee on behalf of the Trust; and

WHEREAS, in accordance with the provisions of the Trust Agreement, the Trustee intends to effect the assignments and transfers to FGIC contemplated hereby on behalf of the Trust.

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto do hereby agree as follows:

**SECTION 1.   DEFINITIONS. CAPITALIZED TERMS USED HEREIN AND NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE RESPECTIVE MEANINGS SET FORTH IN THE TRUST AGREEMENT.**

**SECTION 2.   ASSIGNMENT.**

(a)     Effective as of the date hereof and pursuant to the Covered FGIC Insurance Policy and Section 3.3(b) of the Trust Agreement, the Trustee on behalf of the Trust hereby irrevocably sells, assigns, transfers and conveys to FGIC the Proportionate Share of the Trust Assets held by the Trust as set forth in Annex A hereto (the "Assigned Trust Assets"), including all rights to payment under or with respect to the Assigned Trust Assets and all other rights therein or in relation thereto.  The Trustee shall (i) revise its registration books, and any other documents of record for the Trust Assets maintained by it, to reflect that the Assigned Trust Assets are no longer held by the Trust and have been sold, assigned, transferred and conveyed to FGIC hereunder and (ii) take such other actions as shall be necessary to transfer the Assigned Trust Assets to the account of FGIC or its custodian, in either case as directed by FGIC in writing.

(b)     The Trustee on behalf of the Trust hereby covenants and agrees to convey to FGIC, if and when received following the date hereof, any amounts related to the Assigned Trust Assets (including any sums payable as interest in respect thereof) paid to or for the benefit of the Trust that, under subsection (a) above, belong to FGIC.

**SECTION 3.   REPRESENTATIONS AND WARRANTIES.** The Trustee hereby represents and warrants to FGIC that:

(a)     The Trust is the holder of the Assigned Trust Assets, and the Trustee has all requisite power and authority to execute, deliver and perform its obligations under this Assignment and to consummate the assignment contemplated herein on behalf of the Trust, and such assignment and execution and delivery of this Assignment by the Trustee  have been duly authorized.

(b)     This Assignment has been duly executed and delivered by the Trustee on behalf of the Trust and constitutes a  legal, valid and binding obligation of the Trust enforceable in accordance with its terms.

(c)     The Assigned Trust Assets are free and clear of all liens and encumbrances.

**SECTION 4.   <u>GOVERNING LAW</u>. THIS ASSIGNMENT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE.**

**SECTION 5.   <u>COUNTERPARTS</u>. THIS ASSIGNMENT MAY BE EXECUTED IN ANY NUMBER OF COUNTERPARTS, EACH OF WHICH MAY BE DELIVERED BY ELECTRONIC MESSAGING SYSTEM AND SHALL BE DEEMED AN ORIGINAL, BUT ALL OF WHICH TOGETHER SHALL CONSTITUTE ONE AND THE SAME ASSIGNMENT.**

IN WITNESS WHEREOF, the Trustee has caused this Assignment to be duly executed and delivered on behalf of the Trust on the date first above written.

U.S. BANK TRUST COMPANY,
NATIONAL ASSOCIATION, as Trustee

By:_____
Name:_____
Title:_____

**ANNEX A**

Trust:  [_____] Custodial Trust

Covered FGIC Insurance Policy Number:

Covered FGIC Insured Bonds description and CUSIP number:

Cash Payment:  [$_____]

Total Principal Amount of Covered FGIC Insured Bonds held by the Trust as the date of this Assignment (immediately prior to receiving, or being deemed to have received, the Cash Payment):  [$_____]

Proportionate Share:  [XX.XXXX]% (Cash Payment/Total Principal Amount of Covered FGIC Insured Bonds)

Proportionate Share of the Trust Assets assigned by the Trustee hereunder:

    Cash:

    HTA Clawback CVIs:

## SCHEDULE I

Threshold Prices

With respect to the HTA Clawback CVIs, the price equal to ~~10~~5% of the notional amount of such HTA Clawback CVIs.

## SCHEDULE II

Trustee Fee Schedule

The fees and expenses set forth below are payable or reimbursable to the Trustees[6] for their services as Trustees under the Trust Agreement to which this Schedule II is attached (the "Trust Agreement").   The Trust Agreement is by and among the Puerto Rico Highways and Transportation Authority, Financial Guaranty Insurance Company, U.S. Bank Trust Company, National Association, as Trustee, and U.S. Bank Trust National Association, as Delaware Trustee.  Such fees and expenses are each payable or reimbursable by or on behalf of the Trust in accordance with the terms of the Trust Agreement.

**Acceptance Fee:**                                                                                    **$1,067**
The acceptance fee includes the review and execution of the Trust Agreement and the certificates and other documents related to the Trust, the creation of the Trust and initial establishment of the accounts referred to in Section 3.1 of the Trust Agreement.  Additional duties covered by this acceptance fee include the acceptance of the Trust Assets, actions referred to in Section 2.3 of the Trust Agreement, the initial issuance of the Certificate and Units, distributions under Section 3.4(a)(i) of the Trust Agreement and any other activity contemplated under the Trust Agreement to occur on or in connection with the Closing Date. The acceptance fee is payable on the Closing Date.

**Fee Reserve Threshold Amount:**                                                        **$9,000**

**Annual Administration Fee:**                                                             **$3,667**
The annual administration fee covers the routine duties of the Trustees associated with the administration of the Trust in accordance with the terms of the Trust Agreement, including without limitation the distribution of payments on any Trust Assets received from time to time by the Trust, processing of trades, presentation of claims under the FGIC Insurance Policy and effecting the related assignments and transfers of Trust Assets to FGIC, distribution of policy claims payments and DPO and DPO Accretion payments made by FGIC, preparation, posting and distribution of statements, reports and notices and other routine responsibilities, in each case as contemplated by the Trust Agreement. The administration fee is payable in advance and not subject to proration.

**Fee for Sales of Trust Assets due to Threshold Event or Permitted Sale**   **$2,000 each**
**Event/Unitholder Election (per effectuated Threshold Event, Permitted Sale**
**Event or Unitholder Election), and for other Non-Routine Disbursements:**
This fee is payable separate from the annual administration fee and not inclusive of DTC charges.

---

[6] Capitalized terms used and not otherwise defined in this Schedule II have the respective meanings ascribed thereto in the Trust Agreement.

**Legal Fee & Expenses:**                                                    **AT COST**

Includes fees and expenses for legal services provided by legal counsel to the
Trustees as and to the extent such fees and expenses are payable or reimbursable
to the Trustees pursuant to the terms of the Trust Agreement.

**Out-of-Pocket Expenses:**                                                  **AT COST**

Includes all related expenses of the Trustees as and to the extent such expenses
are payable or reimbursable to the Trustees pursuant to the terms of the Trust
Agreement.

**Extraordinary administration services ("EAS"):**

EAS are duties, responsibilities or activities not expected to be provided by the Trustees at the
outset of the matter, not routine or customary, and/or not incurred in the ordinary course of
business and may require analysis or interpretation, in each case unless contemplated by any
other fee description in this Schedule II and if not in contravention of the Trust Agreement,
provided that it is acknowledged and agreed by the Parties that duties, responsibilities and
activities performed by the Trustee as contemplated under Article VIII of the Trust Agreement,
or in connection with litigation, enforcement actions or other proceedings that are brought
against the Trust or the Trustees and don't relate to or arise out of or in connection with either of
the Trustees' gross negligence, bad faith or willful misconduct, constitute EAS. Billing for
reasonable fees and expenses related to EAS is appropriate in instances where particular
inquiries, events or developments are unexpected, even if the possibility of such circumstances
could have been identified at the inception of the matter, or as changes in law, or in procedures
or the cost of doing business related to EAS, demand. At the Trustees' option, EAS may be
charged to the Trust on an hourly (time expended multiplied by current hourly rate), flat or
special fee basis at such rates or in such amounts in effect at the time of such services. EAS fees
are due and payable in addition to annual or ordinary administration fees. Failure to pay for EAS
owed to the Trustees when due may result in interest being charged on amounts owed to the
Trustees for extraordinary administration services fees and expenses at the prevailing market
rate.

**General terms and conditions**

The Trust's obligation to pay under this Trustee Fee Schedule pursuant to the terms of the Trust
Agreement shall govern the matters described herein and shall, in accordance with the terms of
the Trust Agreement, survive any termination of the Trust or Trust Agreement and the
resignation or removal of the Trustees. This Trustee Fee Schedule shall be construed and
interpreted in accordance with the laws of the state identified in the Trust Agreement without
giving effect to the conflict of laws principles thereof. The Parties agree to the sole and exclusive
jurisdiction of the state and federal courts of the state identified in the Trust Agreement over any
proceeding relating to or arising regarding the matters described herein. Payment of fees
constitutes acceptance of the terms and conditions described herein.

Fees paid in advance will not be prorated. The fees set forth above and any subsequent
modifications thereof by the Parties pursuant to the terms of the Trust Agreement are part of the
Trust Agreement. Execution of the Trust Agreement or acceptance of the Certificate or any Unit
constitutes agreement to the above Trustee Fee Schedule.

# **<u>EXHIBIT G</u>**

Initial Board of Directors of Reorganized HTA

## Initial Board of Directors of Reorganized HTA

**Eileen M. Vélez Vega**
President of the Board
DTOP Secretary

**Francisco Parés Alicea**
Board Member
PR Treasury Secretary

**Martha L. Acevedo Peñuela, Esq.**
Board Member
AAFAF

**Julio Lassus Ruíz**
Board Member
Planning Board

**Coral M. Cummings Pino, Esq.**
Board Member

# **EXHIBIT H**

First Supplemental Trust Agreement (New HTA Bonds)

Draft 12/2/2022

# FIRST SUPPLEMENTAL TRUST AGREEMENT

**by and between**

## PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY

**and**

## THE BANK OF NEW YORK MELLON, as Trustee

———————————

*Dated as of December 6, 2022*

———————————

4876-1750-1700.17

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS AND AUTHORITY ............................................................... 2

    Section 1.01    Definitions ................................................................ 2
    Section 1.02    Rules of Construction ........................................... 3

ARTICLE II. THE SERIES 2022 BONDS ........................................................................ 3

    Section 2.01    Authorization, Designation and Series ................. 3
    Section 2.02    Place of Payment ................................................... 4
    Section 2.03    Form, Denominations, Numbers and Letters ........ 4
    Section 2.04    Dating of Series 2022 Bonds ................................ 4
    Section 2.05    Record Date ........................................................... 4
    Section 2.06    Paying Agent ........................................................ 4
    Section 2.07    Book Entry Bond Procedures ............................... 4
    Section 2.08    CUSIP Numbers ................................................... 5
    Section 2.09    Application of Proceeds ........................................ 5

ARTICLE III. SERIES 2022A BONDS ........................................................................... 5

    Section 3.01    Maturity Dates, Principal Amount and Interest Rate for the Series 2022A Bonds .............................................................. 5
    Section 3.03    Redemption Prices and Terms .............................. 5

ARTICLE IV. SERIES 2022B BONDS ............................................................................ 7

    Section 4.01    Maturity Dates, Initial Accreted Value, Maturity Value and Accretion Rate for the Series 2022B Bonds ............................ 7
    Section 4.02    Interest Accretion ................................................. 7
    Section 4.03    Redemption Prices and Terms .............................. 7

ARTICLE V. SERIES 2022C BONDS .............................................................................. 9

    Section 5.01    Maturity Dates, Initial Accreted Values, Maturity Value and Accretion Rate and Interest Rate for the Series 2022C Bonds ................. 9
    Section 5.02    Interest ................................................................... 9
    Section 5.03    Redemption Prices and Terms .............................. 9

ARTICLE VI. SPECIAL COVENANTS ......................................................................... 11

    Section 6.01    Tax Covenant ...................................................... 11

ARTICLE VII. MISCELLANEOUS ............................................................................... 12

    Section 7.01    Limitation of Rights ........................................... 12
    Section 7.02    Successors and Assigns ...................................... 12
    Section 7.03    Severability of Invalid Provision ........................ 12
    Section 7.04    Applicable Law ................................................... 12
    Section 7.05    Signature and Counterparts ................................ 12
    Section 7.06    Amendments and Supplements .......................... 12

EXHIBIT A – FORM OF SERIES 2022A CURRENT INTEREST BONDS

i

# TABLE OF CONTENTS
## (continued)

**Page**

EXHIBIT B – FORM OF SERIES 2022B CAPITAL APPRECIATION BONDS

EXHIBIT C – FORM OF SERIES 2022C CONVERTIBLE CAPITAL APPRECIATION
BONDS

EXHIBIT D- ACCRETED VALUE TABLE

4876-1750-1700.17

## FIRST SUPPLEMENTAL TRUST AGREEMENT

**THIS FIRST SUPPLEMENTAL TRUST AGREEMENT**, is entered into as of December 6, 2022, by and between **PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**, (together with any successors thereto, the "**Authority**") a body both corporate and politic of the Commonwealth of Puerto Rico (the "**Commonwealth**"), and **THE BANK OF NEW YORK MELLON**, as trustee (the "**Trustee**"), a banking corporation organized and existing under and by virtue of the laws of New York and authorized to exercise corporate trust powers in the Commonwealth with a place of business located in New York, and supplements the Master Trust Agreement, dated as of December 6, 2022, by and between the Authority and the Trustee (the "**Master Agreement**").

## W  I  T  N  E  S  S  E  T  H:

**WHEREAS**, the Authority has determined that it is desirable at this time to authorize the issuance of (i) $600,000,000 aggregate principal amount of its Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Senior Bonds, Series 2022A (the "**Series 2022A Bonds**"), (ii) $237,955,868.13 aggregate initial Accreted Value of its Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Senior Bonds, Series 2022B (Capital Appreciation Bonds) (the "**Series 2022B Bonds**") and (iii) $407,044,597.57 aggregate initial Accreted Value of its Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Senior Bonds, Series 2022C (Convertible Capital Appreciation Bonds) (the "**Series 2022C Bonds**" and, together with the Series 2022A Bonds and the Series 2022B Bonds, the "**Series 2022 Bonds**");

**WHEREAS**, the Series 2022 Bonds are issued under and pursuant to the Master Agreement, and are, therefore, entitled to the security provided thereby (including, without limitation, a perfected first-priority lien on, and first-priority security interest in the Trust Estate) and all protections and covenants contained therein, all of which are incorporated into this First Supplemental Agreement as if set forth fully herein; and

**WHEREAS**, this First Supplemental Agreement is entered into to supplement the Master Agreement to provide for the issuance of the Series 2022 Bonds on a parity with Bonds hereafter issued in accordance with the Master Agreement; and

**WHEREAS**, the Authority has taken all necessary action to make the Series 2022 Bonds, when authenticated by the Trustee and issued by the Authority, valid and binding obligations of the Authority and to constitute this First Supplemental Agreement a valid and binding instrument for the authorization of and security for the Series 2022 Bonds; and

**WHEREAS**, the United States District Court for the District of Puerto Rico (the "**Title III Court**") has made binding determinations concerning the Series 2022 Bonds, which determinations are more particularly set forth in the recitals of the Master Agreement.

**NOW, THEREFORE, WITNESSETH** that the Authority does covenant and agree with the Trustee and with the Holders of the Series 2022 Bonds, as follows:

# ARTICLE I.

## DEFINITIONS AND AUTHORITY

**Section 1.01   Definitions.**  Capitalized terms used herein and not otherwise defined shall have the respective meanings accorded such terms in the Master Agreement.  In addition, the following terms shall have the following meanings herein unless the context otherwise requires:

**"Accreted Value Payments"** means, with respect to the Series 2022B Bonds, all payments of Accreted Value to be made in accordance with Section 4.02 hereof, including, without limitation, the Sinking Fund Installment payments and the payment at stated maturity.

**"Agreement"** means the Master Agreement, as supplemented by this Supplemental Agreement.

**"Authorized Denomination"** means, (i) with respect to the Series 2022A Bonds, $1.00 principal amount or any integral multiple thereof, and (ii) and with respect to the Series 2022B Bonds and the Series 2022C Bonds, $1.00 in principal amount in Maturity Value or any integral multiple thereof.

 **"Conversion Date"** means July 1, 2032.

**"First Supplemental Agreement"** means this First Supplemental Trust Agreement, which supplements the Master Agreement to authorize the issuance of the Series 2022 Bonds.

**"Master Agreement"** shall have the meaning set forth in the preamble of this First Supplemental Agreement.

**"Maturity Value"** means, (i) with respect to a Series 2022B Bond, the Accreted Value due at stated maturity if no Accreted Value Payments on such Bond are paid prior to stated maturity and (ii) with respect to a Series 2022C Bond, the Accreted Value as of the Conversion Date if no payments in accordance with Section 5.03 on such Bond are paid prior to the Conversion Date.

"**Redemption Date**" means (i) with respect to the Series 2022A Bonds, each date of redemption specified in Section 3.03(b) hereof for the redemption of the Series 2022A Bonds, (ii) with respect to the Series 2022B Bonds, each date of redemption specified in Section 4.03(b) hereof for the redemption of the Series 2022B Bonds and (iii) with respect to the Series 2022C Bonds, each date of redemption specified in Section 5.03(b) hereof for the redemption of the Series 2022C Bonds.

"**Series 2022 Bonds**" means collectively, the Series 2022A Bonds, the Series 2022B Bonds and the Series 2022C Bonds.

**"Series 2022A Bonds"** means the $600,000,000 aggregate principal amount of Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Senior Bonds, Series 2022A.

- 2 -

"**Series 2022B Bonds**" means the $237,955,868.13 aggregate initial Accreted Value of Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Senior Bonds, Series 2022B (Capital Appreciation Bonds).

"**Series 2022C Bonds**" means the $407,044,597.57 aggregate initial Accreted Value of Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Senior Bonds, Series 2022C (Convertible Capital Appreciation Bonds).

"**Tax Certificate**" means the Tax Certificate dated the date of the original delivery of the Series 2022 Bonds relating to the requirements of certain provisions of the Code, as such certificate may from time to time be modified or supplemented in accordance with the terms thereof.

**Section 1.02   Rules of Construction.**  Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.  Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing persons shall include firms, associations and corporations, including public bodies as well as natural persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in the First Supplemental Agreement, refer to the First Supplemental Agreement.  All references to Articles and Sections in this First Supplemental Agreement refer to the Articles and Sections hereof unless otherwise expressly stated.  All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

"**$**" and "**dollars**" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

## ARTICLE II.

## THE SERIES 2022 BONDS

**Section 2.01   Authorization, Designation and Series**.  The Series 2022 Bonds are hereby to be issued in three series, consisting of (A) $600,000,000 aggregate principal amount of Series 2022A Bonds, (B) $237,955,868.13 aggregate initial Accreted Value of Series 2022B Bonds and (C) $407,044,597.57 aggregate initial Accreted Value of Series 2022C Bonds.  The Series 2022 Bonds are issued under the Master Agreement and this First Supplemental Agreement and secured by the Master Agreement, this First Supplemental Agreement and the Trust Estate. Each maturity of the Series 2022 Bonds is hereby designated as a Term Bond.  The Series 2022A Bonds [are Tax-Exempt Bonds and] are hereby designated "Restructured Toll Revenue Senior Bonds, Series 2022A". The Series 2022B Bonds [are Tax Exempt Bonds and] are hereby designated "Restructured Toll Revenue Senior Bonds, Series 2022B (Capital Appreciation Bonds)". The Series 2022C [are Tax-Exempt Bonds and] are hereby designated "Restructured Toll Revenue Senior Bonds, Series 2022C (Convertible Capital Appreciation Bonds)".  The Authority is hereby authorized, upon the request of a Holder, to take the following actions with respect to such Holder's Series 2022 Bonds: combine one or more Series or subseries of Series 2022 Bonds

into a single Series or subseries or to divide a Series or subseries of the Series 2022 Bonds into two or more subseries and to determine the principal amount of such subseries; **provided, however**, that (x) no combination or division shall permit or result in a change to the aggregate Principal or Accreted Value amount, the applicable maturity date, the applicable interest rate or accretion rate, or the redemption periods, Redemption Dates or amounts due at redemption of the Outstanding Bonds of any Series or subseries subject to such combination or division, and (y) prior to combining or dividing any such Series or subseries of Tax-Exempt Bonds, the Authority and the Trustee shall have received an opinion of Transaction Counsel that such combination or division will not cause interest on the Tax-Exempt Bonds to become includable in gross income for federal income tax purposes.

**Section 2.02   Place of Payment**.  The Series 2022 Bonds shall be payable at the designated Corporate Trust Office of the Trustee.

**Section 2.03   Form, Denominations, Numbers and Letters**.  The Series 2022A Bonds shall be issued as fully registered bonds in Authorized Denominations. The Series 2022B Bonds and Series 2022C Bonds shall be issued as fully registered bonds with Maturity Values in Authorized Denominations.

Unless the Authority shall otherwise direct, (i) the Series 2022A Bonds shall be numbered and lettered "22A-R-_," followed by the number of the Bond, (ii) the Series 2022B Bonds shall be numbered and lettered "22B-R_", followed by the number of the Bond, and (iii) the Series 2022C Bonds shall be numbered and lettered "22C-R_", followed by the number of the Bond.  Each of the Series 2022 Bonds shall, in each case be numbered consecutively from one (1) upward.

Subject to the provisions of the Master Agreement, the form of the Series 2022A Bonds and the Trustee's Certificate of Authentication thereon shall be substantially in the form annexed hereto as Exhibit A, the form of the Series 2022B Bonds and the Trustee's Certificate of Authentication thereon shall be substantially in the form annexed hereto as Exhibit B, the form of the Series 2022C Bonds and the Trustee's Certificate of Authentication thereon shall be substantially in the form annexed hereto as Exhibit C.

**Section 2.04   Dating of Series 2022 Bonds**.  The Series 2022 Bonds issued prior to the first Interest Payment Date or first Valuation Date shall be dated July 1, 2022.  Each Series 2022 Bond issued on or after the first Interest Payment Date or the first Valuation Date, as applicable, shall be dated as provided in Section 3.01 of the Master Agreement.

**Section 2.05   Record Date**.  The Record Date for the Series 2022 Bonds shall be the fifteenth (15th) day (whether or not a Business Day) of the calendar month next preceding the applicable Valuation Date, Interest Payment Date or Principal Payment Date.  The Record Date for the payment of interest on the Effective Date shall be the Effective Date.

**Section 2.06   Paying Agent**.  The Trustee is hereby appointed Paying Agent for the Series 2022 Bonds, such appointment to be effective immediately upon the filing of this First Supplemental Agreement with the Trustee.

**Section 2.07   Book Entry Bond Procedures**.  Notwithstanding any other provision of this First Supplemental Agreement to the contrary, so long as any Series 2022 Bond is registered in the name of Cede & Co., as nominee of the Depository, all payments on such Series 2022 Bond,

4876-1750-1700.17

and all deliveries to be made and notices to be delivered with respect to such Series 2022 Bond, shall be made and given pursuant to the Depository's rules and procedures then in effect.

**Section 2.08   CUSIP Numbers**.  Neither the Authority nor the Trustee shall be liable for any defect or inaccuracy in the CUSIP number as it appears on any Series 2022 Bond or in any notice of redemption.  The Authority shall promptly notify the Trustee of any change in the CUSIP numbers assigned to any Series 2022 Bond of which the Authority has knowledge.

**Section 2.09   Application of Proceeds**.  No deposit of proceeds shall be made in connection with the issuance of the Series 2022 Bonds.

<div align="center">

**ARTICLE III.**

**SERIES 2022A BONDS**

</div>

**Section 3.01   Maturity Dates, Principal Amount and Interest Rate for the Series 2022A Bonds**.  The Series 2022A Bonds shall be issued as Current Interest Bonds, in the aggregate principal amount of $600,000,000, bear interest at five percent (5.00%) per annum, shall mature on July 1, 2062 and have CUSIP number _____.

**Section 3.02   Interest Payments**.  The Series 2022A Bonds shall bear interest from July 1, 2022 until paid (whether at maturity, prior redemption or after maturity following payment default by the Authority), payable on the Effective Date and semiannually thereafter on each Interest Payment Date, commencing on July 1, 2023, at the rate of five percent (5.00%) per annum. Interest on the Series 2022A Bonds shall be computed on the basis of a 360-day year consisting of twelve 30-day months.  Interest shall accrue on overdue interest and Principal at the rate provided above, and shall compound on each Interest Payment Date.  All overdue interest and Principal (and any interest accruing thereon) shall remain due and payable until paid. The Series 2022A Bonds shall be issued as fully registered bonds in Authorized Denominations.  If any such Interest Payment Date or Principal Payment Date is not a Business Day, any action to be taken on such date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of such delay.

**Section 3.03   Redemption Prices and Terms**.  The Series 2022A Bonds shall be subject to redemption prior to stated maturity as provided in this Section 3.03.

(a)   *Optional Redemption*.  The Series 2022A Bonds are subject to redemption prior to maturity on and after July 1, 2032, at the election or direction of the Authority, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day, at a redemption price equal to the principal amount thereof, plus accrued interest to the date fixed for redemption.

(b)   *Mandatory Redemption of the Series 2022A Bonds*.  The Series 2022A Bonds shall be subject to mandatory redemption, in part, through application of Sinking Fund Installments, as herein provided, upon notice given as prescribed in Article IV of the Master Agreement, at the Redemption Price of one hundred per centum (100%) of the Principal amount to be redeemed, plus accrued interest, if any, to the date of redemption.  Subject to the provisions of Section 5.06(b) of the Master Agreement and of Section 3.03(d) hereof permitting amounts to be credited to part or all of any one or more Sinking Fund Installments or the payment due at stated

<div align="center">- 5 -</div>

maturity, there shall be due and the Authority shall be required to pay for the retirement of the Series 2022A Bonds on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of the Series 2022A Bonds:

$600,000,000
Series 2022A Bonds
maturing July 1, 2062

| Year | Amount |
|------|--------|
| 2053 | $14,190,000 |
| 2054 | 53,125,000 |
| 2055 | 55,785,000 |
| 2056 | 58,575,000 |
| 2057 | 61,500,000 |
| 2058 | 64,575,000 |
| 2059 | 67,805,000 |
| 2060 | 71,195,000 |
| 2061 | 74,755,000 |
| 2062[†] | 78,495,000 |

_____
[†] Stated maturity.

(c)     *Extraordinary Mandatory Redemption.*  The Series 2022A Bonds are subject to extraordinary mandatory redemption, at the election or direction of the Authority, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day, at a redemption price equal to the principal amount thereof, plus accrued interest to the date fixed for redemption upon the financial closing of a lease, long-term concession or other public-private partnership arrangement for all or any portion of the Toll Facilities.  For sake of clarity, in the case of an extraordinary mandatory redemption of the Series 2002A Bonds in connection with a Partial Disposition of the Toll Facilities, the Authority must demonstrate compliance with Section 7.18(b) of the Master Agreement.

(d)     *Credit Against Sinking Fund Installments.*  There shall be credited against and in satisfaction of the Sinking Fund Installments or the payment due at stated maturity payable on the Series 2022A Bond entitled to the payment of such Sinking Fund Installments and the payment due at stated maturity an amount equal to the Principal amount of the Series 2022A Bond (A) purchased by the Authority with moneys in the Debt Service Fund pursuant to Section 5.06(b) of the Master Agreement, (B) redeemed at the option of the Authority pursuant to paragraph (a) of this Section, (C) purchased by the Authority and delivered to the Trustee for cancellation, and (D) deemed to have been paid in accordance with Section 13.01 of the Master Agreement.  Series 2022A Bonds purchased pursuant to Section 5.06(b) of the Master Agreement shall be applied in satisfaction of a Sinking Fund Installment in accordance with such Section.  Series 2022A Bonds redeemed at the option of the Authority, purchased by the Authority (other than pursuant to Section 5.06(b) of the Master Agreement), or deemed to have been paid in accordance with Section 13.01 of the Master Agreement shall be applied in satisfaction, in whole or in part, of one or more Sinking Fund Installments payable on such dates as the Authority shall specify in a written direction of the

- 6 -

Authority delivered to the Trustee at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 2022A Bonds entitled to such Sinking Fund Installment may be given by the Trustee and the Sinking Fund Installment payable on each date specified in such direction shall be reduced by the Principal amount of the Series 2022A Bonds (or portions thereof) so purchased, redeemed or deemed to have been paid in accordance with Section 13.01 of the Master Agreement to be applied in satisfaction of such Sinking Fund Installment as set forth in such direction.

## ARTICLE IV.

## SERIES 2022B BONDS

**Section 4.01   Maturity Dates, Initial Accreted Value, Maturity Value and Accretion Rate for the Series 2022B Bonds**.   The Series 2022B Bonds shall be issued as Capital Appreciation Bonds, in the initial Accreted Value of $237,955,868.13 and in the Maturity Value of $389,919,000, shall accrue and accrete interest at five percent (5.00%) per annum and shall mature on July 1, 2032, with a CUSIP Number _____.

**Section 4.02   Interest Accretion.**  Interest on the Series 2022B Bonds shall accrue and accrete from July 1, 2022 until paid (whether at maturity, prior redemption or after maturity following payment default by the Authority).  Interest on the Series 2022B Bonds will not be paid on a current basis, but will be added to the Principal thereof in the form of accretion on the Effective Date and semiannually thereafter on each Valuation Date, and will be treated as if accruing on the basis of a 360-day year consisting of twelve 30-day months between Valuation Dates, until paid (whether at stated maturity, prior redemption or after maturity following payment default by the Authority).  Exhibit D sets forth the Accreted Value for the Series 2022B Bonds on each Valuation Date, assuming that no Accreted Value Payments will be made prior to stated maturity. All overdue amounts (and any interest thereon) shall remain due and payable until paid.

**Section 4.03   Redemption Prices and Terms**.  The Series 2022B Bonds shall be subject to redemption prior to stated maturity as provided in this Section 4.03.

(a)   *Optional Redemption*.  The Series 2022B Bonds are not subject to optional redemption prior to stated maturity.

(b)   *Mandatory Redemption for the Series 2022B Bonds*.  The Series 2022B Bonds shall be subject to redemption, in part, through application of Sinking Fund Installments as herein provided, upon notice given as prescribed in Article IV of the Master Agreement, at the Redemption Price of one hundred per centum (100%) of the Accreted Value calculated to the Redemption Date of each Series 2022B Bonds or portion thereof to be redeemed.  Unless none of the Series 2022B Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Section 5.06(b) of the Master Agreement and of Section 4.03(d) hereof permitting amounts to be credited to part or all of any one or more Accreted Value Payments, there shall be due and the Authority shall be required to pay for the retirement of the Series 2022B Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2022B Bonds:

$389,919,000 Maturity Value
Series 2022B Bonds
maturing July 1, 2032

| Fiscal Year | Initial Accreted Value | Accreted Value at each Mandatory Redemption Date[1] | Maturity Value[2] |
|---|---|---|---|
| 2025 | $25,289,588.80 | $29,327,916.80 | $41,440,000 |
| 2026 | 22,310,860.93 | 27,183,444.45 | 36,559,000 |
| 2027 | 25,083,317.54 | 32,108,471.38 | 41,102,000 |
| 2028 | 28,817,559.67 | 38,756,163.54 | 47,221,000 |
| 2029 | 35,543,345.34 | 50,221,494.18 | 58,242,000 |
| 2030 | 35,310,832.47 | 52,419,172.95 | 57,861,000 |
| 2031 | 33,610,009.98 | 52,419,983.94 | 55,074,000 |
| 2032[†] | 31,990,353.40 | 52,420,000.00 | 52,420,000 |

[†]Stated maturity
(1) Equals the initial Accreted Value plus accreted interest to each sinking fund redemption date.
(2) Equals the total Accreted Value that would be represented by the portion of the Series 2022B Bonds being redeemed if held to maturity.

(c)    *Extraordinary Mandatory Redemption.*    The Series 2022B Bonds are subject to extraordinary mandatory redemption, at the election or direction of the Authority, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day, at a redemption price equal to the principal amount thereof, plus accrued interest to the date fixed for redemption upon the financial closing of a lease, long-term concession or other public-private partnership arrangement for all or any portion of the Toll Facilities.  For sake of clarity, in the case of an extraordinary mandatory redemption of the Series 2002B Bonds in connection with a Partial Disposition of the Toll Facilities, the Authority must demonstrate compliance with Section 7.18(b) of the Master Agreement.

(d)    *Credit Against Sinking Fund Installments.*  There shall be credited against and in satisfaction of the Accreted Value Payments payable on a Series 2022B Bonds entitled to the payment of such Accreted Value Payments an amount equal to the Accreted Value calculated to the Redemption Date  of such Series 2022B Bonds (A) purchased by the Authority with moneys in the Debt Service Fund pursuant to Section 5.06(b) of the Master Agreement, (B) purchased by the Authority and delivered to the Trustee for cancellation, and (C) deemed to have been paid in accordance with Section 13.01 of the Master Agreement.  Series 2022 CABs purchased pursuant to Section 5.06(b) of the Master Agreement shall be applied in satisfaction of a Sinking Fund Installment in accordance with such Section.  Series 2022B Bonds redeemed at the option of the Authority, purchased by the Authority (other than pursuant to Section 5.06(b) of the Master Agreement) and delivered to the Trustee for cancellation, or deemed to have been paid in accordance with Section 13.01 of the Master Agreement shall be applied in satisfaction, in whole or in part of one or more Accreted Value Payments payable on such dates as the Authority shall specify in a written direction of the Authority delivered to the Trustee, together with a revised redemption schedule, which must be certified to as correct by a qualified municipal advisor firm, for the affected maturity of Series 2022B Bonds, at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 2022B Bonds entitled to such Accreted Value Payments may be given by the Trustee and the Accreted Value Payment due on each date specified in such direction shall be reduced by the Accreted Value on the Redemption Date of the Series 2022B Bonds so purchased, redeemed or deemed to have been paid in accordance with Section 13.01 of the Master Agreement to be applied in satisfaction of such Accreted Value Payments  as set forth in such direction.

- 8 -

# ARTICLE V.

## SERIES 2022C BONDS

**Section 5.01   Maturity Dates, Initial Accreted Values, Maturity Value and Accretion Rate and Interest Rate for the Series 2022C Bonds**.  The Series 2022C Bonds shall be issued as Convertible Capital Appreciation Bonds in the initial Accreted Value of $407,044,597.57 and in the Maturity Value of $666,991,000, shall accrue and accrete interest at five percent (5.00%) per annum and shall mature on July 1, 2053, with a CUSIP Number _____.

**Section 5.02   Interest.**  Interest on the Series 2022C Bonds shall accrue and accrete from July 1, 2022 until the Conversion Date (whether at maturity, prior redemption or after maturity following payment default by the Authority).  Interest on the Series 2022C Bonds will not be paid on a current basis prior to the Conversion Date, but will be added to the Principal thereof in the form of accretion on the Effective Date and semiannually thereafter on each Valuation Date prior to the Conversion Date, and will be treated as if accruing on the basis of a 360-day year consisting of twelve 30-day months between Valuation Dates, until paid (whether at stated maturity, prior redemption or after maturity following payment default by the Authority).  Exhibit D sets forth the Accreted Value for the Series 2022C Bonds on each Valuation Date, assuming that no payments in accordance with Section 5.03 will be made prior to the Conversion Date.  On and after the Conversion Date, the Series 2022C Bonds shall bear interest at five percent 5% per annum, payable on each Interest Payment Date, commencing January 1, 2033.  Interest shall accrue on overdue interest and Principal on the Series 2022C Bonds at the rate of five percent (5.00%) per annum, and shall compound on each Interest Payment Date.  All overdue interest and Principal (and any interest accruing thereon) shall remain due and payable until paid. The Series 2022C Bonds shall be issued as fully registered bonds in Authorized Denominations.  If any such Interest Payment Date or Principal Payment Date is not a Business Day, any action to be taken on such date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of such delay.

**Section 5.03   Redemption Prices and Terms**.  The Series 2022C Bonds shall be subject to redemption prior to stated maturity as provided in this Section 5.03.

(a)      *Optional Redemption.*  The Series 2022C Bonds are subject to redemption prior to maturity on and after January 1, 2033, at the election or direction of the Authority, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day at a Redemption Price equal to the principal amount thereof, plus accrued interest to the dated fixed for redemption.

(b)      *Mandatory Redemption for the Series 2022C Bonds.*  The Series 2022C Bonds shall be subject to mandatory redemption, in part, through application of Sinking Fund Installments, as herein provided, upon notice given as prescribed in Article IV of the Master Agreement, at the Redemption Price of one hundred per centum (100%) of the Principal amount to be redeemed, plus accrued interest, if any, to the date of redemption.  Subject to the provisions of Section 5.06(b) of the Master Agreement and of Section 5.03(d) hereof permitting amounts to be credited to part or all of any one or more Sinking Fund Installments or the payment due at stated maturity, there shall be due and the Authority shall be required to pay for the retirement of the Series 2022C Bonds on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby

- 9 -

established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of the Series 2022C Bonds:

$666,991,000
Series 2022C Bonds
maturing July 1, 2052

| Year | Amount |
|------|--------|
| 2033 | $19,070,000 |
| 2034 | 20,024,000 |
| 2035 | 21,025,000 |
| 2036 | 22,076,000 |
| 2037 | 23,180,000 |
| 2038 | 24,339,000 |
| 2039 | 25,556,000 |
| 2040 | 26,834,000 |
| 2041 | 28,176,000 |
| 2042 | 29,585,000 |
| 2043 | 31,064,000 |
| 2044 | 32,617,000 |
| 2045 | 34,248,000 |
| 2046 | 35,960,000 |
| 2047 | 37,758,000 |
| 2048 | 39,646,000 |
| 2049 | 41,628,000 |
| 2050 | 43,710,000 |
| 2051 | 45,895,000 |
| 2052 | 48,190,000 |
| 2053[†] | 36,410,000 |

[†] Stated maturity.

(c)     *Extraordinary Mandatory Redemption.*   The Series 2022C Bonds are subject to extraordinary mandatory redemption, at the election or direction of the Authority, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day, at a redemption price equal to the principal amount thereof, plus accrued interest to the date fixed for redemption upon the financial closing of a lease, long-term concession or other public-private partnership arrangement for all or any portion of the Toll Facilities.  For sake of clarity, in the case of an extraordinary mandatory redemption of the Series 2002C Bonds in connection with a Partial Disposition of the Toll Facilities, the Authority must demonstrate compliance with Section 7.18(b) of the Master Agreement.

(d)     *Credit Against Sinking Fund Installments.*   There shall be credited against and in satisfaction of the Sinking Fund Installments or the payment due at stated maturity payable on the Series 2022C Bond entitled to the payment of such Sinking Fund Installments and the payment due at stated maturity an amount equal to the Principal amount of the Series 2022C Bond (A) purchased by the Authority with moneys in the Debt Service Fund pursuant to Section 5.06(b) of the Master Agreement, (B) redeemed at the option of the Authority pursuant to paragraph (a) of this Section, (C) purchased by the Authority and delivered to the Trustee for cancellation, and (D) deemed to have been paid in accordance with Section 13.01 of the Master Agreement.   Series

- 10 -

2022C Bonds purchased pursuant to Section 5.06(b) of the Master Agreement shall be applied in satisfaction of a Sinking Fund Installment in accordance with such Section.  Series 2022C Bonds redeemed at the option of the Authority, purchased by the Authority (other than pursuant to Section 5.06(b) of the Master Agreement), or deemed to have been paid in accordance with Section 13.01 of the Master Agreement shall be applied in satisfaction, in whole or in part, of one or more Sinking Fund Installments payable on such dates as the Authority shall specify in a written direction of the Authority delivered to the Trustee at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 2022C Bonds entitled to such Sinking Fund Installment may be given by the Trustee and the Sinking Fund Installment payable on each date specified in such direction shall be reduced by the Principal amount of the Series 2022C Bonds (or portions thereof) so purchased, redeemed or deemed to have been paid in accordance with Section 13.01 of the Master Agreement to be applied in satisfaction of such Sinking Fund Installment as set forth in such direction.

## ARTICLE VI.

## SPECIAL COVENANTS

**Section 6.01    Tax Covenant.**

(a)    *Tax Compliance.*  In order to maintain the exclusion from gross income for purposes of federal income taxation of interest on the Series 2022 Bonds, the Authority shall comply with the provisions of the Code applicable to the Series 2022 Bonds necessary to maintain such exclusion, including without limitation the provisions of the Code which prescribe yield and other limits within which proceeds of the Series 2022 Bonds are to be invested, and which, in certain circumstances, require the rebate of certain earnings on such amounts to the Department of the Treasury of the United States of America in accordance with Section 148(f) of the Code.  In furtherance of the foregoing, the Authority shall comply with the Tax Certificate relating to the Series 2022 Bonds.

(b)    *No Arbitrage Covenant.*  The Authority shall not take any action or fail to take any action which would cause the Series 2022 Bonds to be "arbitrage bonds" within the meaning of Section 148(a) of the Code; nor shall any part of the proceeds of Series 2022 Bonds or any other funds of the Authority be used directly or indirectly to acquire any investment property the acquisition of which would cause any Series 2022 Bonds to be "arbitrage bonds" within the meaning of Section 148(a) of the Code.

(c)    *No Private Use or Private Loans.*  The Authority shall not use any part of the proceeds of the Series 2022 Bonds in a manner which would cause such Series 2022 Bonds to be "private activity bonds" within the meaning of Section 141(a) of the Code.

(d)    *Survival.*  Notwithstanding any provision of this First Supplemental Agreement to the contrary, the obligation of the Authority to comply with the requirements of this Section and Section 7.15 of the Master Agreement shall survive the payment, redemption or defeasance of any and all Series 2022 Bonds.

- 11 -

# ARTICLE VII.

## MISCELLANEOUS

**Section 7.01   Limitation of Rights.**   Nothing in this First Supplemental Agreement expressed or implied is intended or shall be construed to confer upon, or to give or grant to, any person or party, other than the Authority, the Trustee, the Paying Agent and the registered owners of the Series 2022 Bonds, any rights, remedies or claims under or by reason hereof or of the Master Agreement or any covenant, condition or stipulation hereof or of the Master Agreement.  All covenants, stipulations, promises and agreements in this First Supplemental Agreement shall be for the sole and exclusive benefit of the Authority, the Trustee, the Paying Agent and the registered owners of the Series 2022 Bonds.

**Section 7.02   Successors and Assigns.**   This First Supplemental Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

**Section 7.03   Severability of Invalid Provision.**   If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein on the part of the Authority or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions of the Master Agreement or of this Supplemental Agreement or of the Series 2022 Bonds.

**Section 7.04   Applicable Law.**   This First Supplemental Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction. Any disputes, legal action, suit, or proceeding arising from or related to the Agreement or the Bonds (a) shall be brought in accordance herewith in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept jurisdiction, in any federal district court sitting in the Commonwealth and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**Section 7.05   Signature and Counterparts.**   This First Supplemental Agreement may be executed and delivered in any number of counterparts, each of which shall be an original, but such counterparts together shall constitute one and the same instrument.

**Section 7.06   Amendments and Supplements.**   This First Supplemental Agreement may only be amended or supplemented in accordance with the provisions of Articles IX and X of the Master Agreement.

[Remainder of page intentionally left blank; signature page follows.]

4876-1750-1700.17

**IN WITNESS WHEREOF**, the Authority and the Trustee have caused this First Supplemental Agreement to be executed in their respective corporate names by their duly authorized officers, all as of the date first above written.

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

By: _____
Name:
Title:

**THE BANK OF NEW YORK MELLON,** as Trustee

By: _____
Name:
Title:

4876-1750-1700.17

EXHIBIT A

FORM OF SERIES 2022A BONDS

4876-1750-1700.17

EXHIBIT A

FORM OF SERIES 2022A CURRENT INTEREST BONDS

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE ____ DAY OF _____, 2022.**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE.  DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID.  THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.  OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number:                                                                                                          $

UNITED STATES OF AMERICA
PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY
RESTRUCTURED TOLL REVENUE SENIOR BONDS,
SERIES 2022A

| INTEREST RATE | MATURITY DATE | DATED DATE | CUSIP NO. |
|---|---|---|---|
| % | | | |

Registered Owner:     CEDE & CO.

Principal Amount:     _____ DOLLARS

**FOR VALUE RECEIVED**, **PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY** (the "Authority"), a body corporate and politic constituting a public corporation and government instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, hereby promises to pay, but solely in the manner and from the revenues and sources hereinafter provided, to the **REGISTERED OWNER** named above, or registered assigns, the **PRINCIPAL AMOUNT** stated above on the **MATURITY DATE** stated above (except to the extent that such Principal Amount due on the Maturity Date is reduced by prior redemption as provided in the Trust Agreement), upon the presentation and surrender hereof at the principal corporate trust office of the Trustee hereinafter mentioned, and to pay to the registered owner interest on such Principal Amount from the **DATED DATE** stated above at the **INTEREST RATE** per annum stated above until the Principal Amount is paid, payable on the Effective Date and semiannually thereafter on each January 1 and July 1 (each, an "Interest Payment Date"). Interest shall accrue on overdue interest and Principal at the rate provided above, and shall compound on each Interest Payment Date. Principal and Redemption Price of this Bond shall be payable at the principal corporate trust office of **THE BANK OF NEW YORK MELLON**, as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Payment of the interest hereon shall be payable by the Trustee as provided in Section 3.01 of the Master Trust Agreement (hereinafter defined), or at the option of any owner of $1,000,000 or more in aggregate Principal amount of the Series 2022A Bonds, by wire transfer to such registered owner at the wire transfer address in the continental United States to which such registered owner has not later than the Record Date immediately preceding such Interest Payment Date directed the Trustee to wire such interest payment. The Record Date is the fifteenth (15th) day (whether or not a Business Day) of the calendar month next preceding the applicable Interest Payment Date; provided, however, that the Record Date for the interest payable on the Effective Date is the Effective Date. All overdue interest and Principal (and any interest accruing on such overdue amounts) shall remain due and payable until paid.

THE TRUST AGREEMENT (HEREINAFTER DEFINED) PROVIDES THAT THE BONDS, INCLUDING THIS BOND, SHALL BE PAYABLE SOLELY FROM THE TRUST ESTATE. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR OF INSTRUMENTALITIES (OTHER THAN THE AUTHORITY), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE AUTHORITY) SHALL BE LIABLE FOR THE PAYMENT THEREOF. THE AUTHORITY HAS NO TAXING POWER.

THIS BOND IS A SPECIAL OBLIGATION OF THE AUTHORITY, PAYABLE SOLELY FROM THE TRUST ESTATE. This Bond is secured by a perfected first-priority lien on and first-priority security interest in the Trust Estate for the payment of the Principal and Redemption Price of and interest on all Outstanding Bonds. The Bonds and any first-priority lien and first-priority security interest securing such Bonds shall in all respects be senior and superior to the Subordinated Indebtedness and the subordinate lien and subordinate security interest granted in the Trust Estate for the benefit of the Holders of Subordinated Indebtedness.

This Bond is one of a duly authorized issue of bonds of the Authority designated as "Restructured Toll Revenue Senior Bonds, Series 2022A" (herein called the "Series 2022A Bonds"), issued pursuant to the Act and a Master Trust Agreement by and between the Authority and the Trustee, dated as of _____, 2022 (the "Master Trust Agreement"), including as supplemented by a First Supplemental Trust Agreement, by and between the Authority and the Trustee, dated as of _____, 2022 (the "First Supplemental Trust Agreement", and together with the Master Trust Agreement, collectively referred to herein as the "Trust Agreement"). The Trust Agreement may be amended to the extent and in the manner provided therein. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Trust Agreement.

The Series 2022A Bonds are subject to optional, mandatory and extraordinary mandatory redemption prior to maturity as provided in the Trust Agreement. Notice of redemption shall be given as provided in the Trust Agreement.

Copies of the Trust Agreement are on file at the office of the Authority, and at the corporate trust office of the Trustee, and reference to the Trust Agreement and any and all supplements thereto and amendments thereof, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the Trust Agreement and subject to the conditions therein, the provisions of the Trust Agreement or any Supplemental Trust Agreement amendatory thereof or supplemental thereto may be modified or amended.

It is hereby certified, recited, and declared that the Authority has taken all necessary action to make the Series 2022A Bonds, when authenticated by the Trustee and issued by the Authority, valid and binding obligations of the Authority and to constitute the First Supplemental Trust Agreement a valid and binding instrument for the authorization of and security for the Series 2022A Bonds.

The registered owner of this Bond shall have no right to enforce the provisions of the Trust Agreement, to institute action to enforce the provisions of the Trust Agreement or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Trust Agreement.

This Bond is transferable, as provided in the Trust Agreement, only upon the books of the Authority maintained for that purpose at the corporate trust office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this Bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2022A Bond or Bonds in the same aggregate Principal amount, and of the same series, maturity and interest rate, shall be issued to the transferee in exchange therefor as provided in the Master Trust Agreement and upon the payment of the charges, if any, therein prescribed. The Authority and the Trustee may treat and consider the person in whose name this Bond is registered as the absolute owner hereof for the purpose of receiving payments due on this Bond and for all other purposes whatsoever.

**IN WITNESS WHEREOF, THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY** has caused this Bond to be signed in its name and on its behalf by [       ] and [       ] and attested by its [       ] (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2022A Bonds.

_____

_____

**ATTEST:**

By: _____
Name:
Title:

A-4

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Bond is one of the Bonds described in the within mentioned Trust Agreement and is one of the Restructured Toll Revenue Senior Bonds, Series 2022A, of the Puerto Rico Highways and Transportation Authority.

[          ], as Trustee


By: _____
            Authorized Signatory


Date of authentication: _____, 2022

A-5

## ASSIGNMENT

FOR VALUE RECEIVED:

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

| | |
|---|---|
| | _____ |

_____   Please print or typewrite name and address,
including zip code, of transferee

the within-mentioned Bond and hereby irrevocably constitutes and appoints
_____, attorney-in-fact, to transfer the same on the
books of registry in the office of the Trustee, as registrar, with full power of substitution in the
premises.

Dated:  _____        _____

NOTE: The signature to this assignment must
correspond with the name as written on the within
Bond in every particular, without alteration or
enlargement or any change whatsoever.

Signature Guaranteed:

A-6

4877-6935-9914.5

EXHIBIT B

FORM OF SERIES 2022B BONDS

4876-1750-1700.17

EXHIBIT B

FORM OF SERIES 2022B CAPITAL APPRECIATION BONDS

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE ____ DAY OF _____, 2022.**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE. DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID. THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number:                                                                                                            $

UNITED STATES OF AMERICA
PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY
RESTRUCTURED TOLL REVENUE SENIOR BONDS,
SERIES 2022B (CAPITAL APPRECIATION BONDS)

<u>ACCRETION RATE</u>   <u>MATURITY DATE</u>   <u>DATED DATE</u>   <u>CUSIP NO.</u>

Registered Owner:     CEDE & CO.

Principal Amount at Issuance: _____ DOLLARS

B-1

Maturity Value[1]: _____ DOLLARS

**FOR VALUE RECEIVED, PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY** (the "Authority"), a body corporate and politic constituting a public corporation and government instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, hereby promises to pay, but solely in the manner and from the revenues and sources hereinafter provided, to the **REGISTERED OWNER** named above, or registered assigns, the **MATURITY VALUE** stated above on the **MATURITY DATE** stated above (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Trust Agreement), upon the presentation and surrender hereof at the principal corporate trust office of the Trustee hereinafter mentioned. Interest on this Bond shall accrete at the **ACCRETION RATE** set forth above from the **DATED DATE** shown above and shall not be payable on a current basis but shall be compounded, and added to Principal, on the Effective Date and on each January 1 and July 1 (each, a "Valuation Date") such that the **PRINCIPAL AMOUNT AT ISSUANCE** specified above shall accrete to equal the **MATURITY VALUE** specified above on the **MATURITY DATE** stated above (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Trust Agreement). Interest shall accrete on overdue interest and Principal at the rate provided above, and shall compound on each Valuation Date. Principal and Redemption Price of this Bond shall be payable at the principal corporate trust office of **THE BANK OF NEW YORK MELLON**, as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. All overdue Principal (and any interest accruing thereon) shall remain due and payable until paid.

THE TRUST AGREEMENT (HEREINAFTER DEFINED) PROVIDES THAT THE BONDS, INCLUDING THIS BOND, SHALL BE PAYABLE SOLELY FROM THE TRUST ESTATE. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR OF INSTRUMENTALITIES (OTHER THAN THE AUTHORITY), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE AUTHORITY) SHALL BE LIABLE FOR THE PAYMENT THEREOF. THE AUTHORITY HAS NO TAXING POWER.

THIS BOND IS A SPECIAL OBLIGATION OF THE AUTHORITY, PAYABLE SOLELY FROM THE TRUST ESTATE. This Bond is secured by a perfected first-priority lien on and first-priority security interest in the Trust Estate for the payment of the Principal and Redemption Price of and interest on all Outstanding Bonds. The Bonds and any first-priority lien and first-priority security interest securing such Bonds shall in all respects be senior and superior to the Subordinated Indebtedness and the subordinate lien and subordinate security interest granted in the Trust Estate for the benefit of the Holders of Subordinated Indebtedness.

This Bond is one of a duly authorized issue of bonds of the Authority designated as "Restructured Toll Revenue Senior Bonds, Series 2022B (Capital Appreciation Bonds)" (herein

---

[1] Reflects Accreted Value at maturity if no Accreted Value Payments are made prior to stated maturity.

called the "Series 2022B Bonds"), issued pursuant to the Act and a Master Trust Agreement by and between the Authority and the Trustee, dated as of _____, 2022 (the "Master Trust Agreement"), including as supplemented by a First Supplemental Trust Agreement, by and between the Authority and the Trustee, dated as of _____, 2022 (the "First Supplemental Trust Agreement", and together with the Master Trust Agreement, collectively referred to herein as the "Trust Agreement").  The Trust Agreement may be amended to the extent and in the manner provided therein.  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Trust Agreement.

The Series 2022B Bonds are subject to optional, mandatory and extraordinary mandatory redemption prior to maturity as provided in the Trust Agreement.  Notice of redemption shall be given as provided in the Trust Agreement.

Copies of the Trust Agreement are on file at the office of the Authority, and at the corporate trust office of the Trustee, and reference to the Trust Agreement and any and all supplements thereto and amendments thereof, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the Trust Agreement and subject to the conditions therein, the provisions of the Trust Agreement or any Supplemental Trust Agreement amendatory thereof or supplemental thereto may be modified or amended.

It is hereby certified, recited, and declared that the Authority has taken all necessary action to make the Series 2022B Bonds, when authenticated by the Trustee and issued by the Authority, valid and binding obligations of the Authority and to constitute the First Supplemental Trust Agreement a valid and binding instrument for the authorization of and security for the Series 2022B Bonds.

The registered owner of this Bond shall have no right to enforce the provisions of the Trust Agreement, to institute action to enforce the provisions of the Trust Agreement or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Trust Agreement.

This Bond is transferable, as provided in the Trust Agreement, only upon the books of the Authority maintained for that purpose at the corporate trust office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this Bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2022B Bond or Bonds in the same aggregate Accreted Value, and of the same series, maturity and accretion rate, shall be issued to the transferee in exchange therefor as provided in the Master Trust Agreement and upon the payment of the charges, if any, therein prescribed. The Authority and the Trustee may treat and consider the person in whose name this Bond is registered as the absolute owner hereof for the purpose of receiving payments due on this Bond and for all other purposes whatsoever.

**IN WITNESS WHEREOF, THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY** has caused this Bond to be signed in its name and on its behalf by [       ] and [       ] and attested by its [       ] (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2022B Bonds.

_____

_____

**ATTEST:**

By: _____

Name:

Title:

B-4

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Bond is one of the Bonds described in the within mentioned Trust Agreement and is one of the Restructured Toll Revenue Senior Bonds, Series 2022B, of the Puerto Rico Highways and Transportation Authority.

**THE BANK OF NEW YORK MELLON**, as Trustee

By: _____

Authorized Signatory

Date of authentication: _____, 2022

B-5

ASSIGNMENT

FOR VALUE RECEIVED:

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

| | |
|---|---|
| | _____ |

_____     Please print or typewrite name and address,
                                      including zip code, of transferee

the within-mentioned Bond and hereby irrevocably constitutes and appoints
_____, attorney-in-fact, to transfer the same on the
books of registry in the office of the Trustee, as registrar, with full power of substitution in the
premises.

Dated:  _____       _____

                                  NOTE: The signature to this assignment must
                                  correspond with the name as written on the within
                                  Bond in every particular, without alteration or
                                  enlargement or any change whatsoever.

                                  ┌─────────────────────────────────┐
                                  │  Signature Guaranteed:          │
                                  │                                 │
                                  │                                 │
                                  └─────────────────────────────────┘

B-6

EXHIBIT C

FORM OF SERIES 2022C BONDS

4876-1750-1700.17

EXHIBIT C

FORM OF SERIES 2022C CONVERTIBLE CAPITAL APPRECIATION BONDS

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE ____ DAY OF _____, 2022.**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE.  DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID.  THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.  OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number:                                                                                                      $

UNITED STATES OF AMERICA
PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY
RESTRUCTURED TOLL REVENUE SENIOR BONDS,
SERIES 2022C (CONVERTIBLE CAPITAL APPRECIATION BONDS)

| Accretion Rate through Conversion Date | Interest Rate after the Conversion Date | Conversion Date | Maturity Date | Dated Date | CUSIP |
|---|---|---|---|---|---|
| % | % | | | | |

Registered Owner:      CEDE & CO.

Principal Amount at Issuance:            _____ DOLLARS

C-1

Maturity Value[2]:     _____ DOLLARS

     **FOR VALUE RECEIVED, PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY** (the "Authority"), a body corporate and politic constituting a public corporation and government instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, hereby promises to pay, but solely in the manner and from the revenues and sources hereinafter provided, to the **REGISTERED OWNER** named above, or registered assigns, the **MATURITY VALUE** stated above on the **MATURITY DATE** stated above, together with current interest thereon after the Conversion Date set forth above at the interest rate set forth above until the Maturity Value hereof shall have been paid or provided for, in accordance with the Trust Agreement (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Trust Agreement), upon the presentation and surrender hereof at the principal corporate trust office of the Trustee hereinafter mentioned. Interest on this Bond with respect to the initial Accreted Value shall accrete at the **ACCRETION RATE** per annum shown above from the **DATED DATE** shown above and will be compounded semiannually on each January 1 and July 1 until the Conversion Date set forth above.  Such accreted value shall be payable only at maturity or upon prior redemption, if any. The Accreted Value of this Bond at the Conversion Date is referred to herein as the Maturity Value.  After the Conversion Date, current interest on this Bond shall accrue on the Maturity Value of this Bond at the rate set forth above.  Current interest of this Bond accruing after the Conversion Date is payable on each January 1 and July 1 (each, a "Interest Payment Date") in each year to be registered owner hereof from the Interest Payment Date next proceeding the date on which Bond is registered (unless it is registered after the close of business on the fifteenth calendar day of the month next preceding any Interest Payment Date (a "Record Date") and before the close of business on the immediately following Interest Payment Date, in which event it shall bear interest from such following Interest Payment Date, or unless this Bond is registered prior to the close of business on the Record Date preceding the first Interest Payment Date after the Conversion Date, in which event it shall bear interest from the Conversion Date set forth above; provided, however, that if at the time of registration of this Bond interest with respect hereto is in default, interest with respect hereto shall be payable from the Interest Payment Date to which interest has previously been paid or made available for payment).  Principal and Redemption Price of this Bond shall be payable at the principal corporate trust office of **THE BANK OF NEW YORK MELLON**, as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts.  All overdue Principal (and any interest accruing thereon) shall remain due and payable until paid.

     THE TRUST AGREEMENT (HEREINAFTER DEFINED) PROVIDES THAT THE BONDS, INCLUDING THIS BOND, SHALL BE PAYABLE SOLELY FROM THE TRUST ESTATE.  THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR OF INSTRUMENTALITIES (OTHER THAN THE AUTHORITY), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES

---

[2] Reflects Accreted Value as of the Conversion Date if no payments are made prior to stated Conversion Date.

4877-6935-9914.5

(OTHER THAN THE AUTHORITY) SHALL BE LIABLE FOR THE PAYMENT THEREOF.
THE AUTHORITY HAS NO TAXING POWER.

THIS BOND IS A SPECIAL OBLIGATION OF THE AUTHORITY, PAYABLE
SOLELY FROM THE TRUST ESTATE. This Bond is secured by a perfected first-priority lien
on and first-priority security interest in the Trust Estate for the payment of the Principal and
Redemption Price of and interest on all Outstanding Bonds. The Bonds and any first-priority lien
and first-priority security interest securing such Bonds shall in all respects be senior and superior
to the Subordinated Indebtedness and the subordinate lien and subordinate security interest granted
in the Trust Estate for the benefit of the Holders of Subordinated Indebtedness.

This Bond is one of a duly authorized issue of bonds of the Authority designated as
"Restructured Toll Revenue Senior Bonds, Series 2022C" (herein called the "Series 2022C
Bonds"), issued pursuant to the Act and a Master Trust Agreement by and between the Authority
and the Trustee, dated as of _____, 2022 (the "Master Trust Agreement"), including as
supplemented by a First Supplemental Trust Agreement, by and between the Authority and the
Trustee, dated as of _____, 2022 (the "First Supplemental Trust Agreement", and together with
the Master Trust Agreement, collectively referred to herein as the "Trust Agreement"). The Trust
Agreement may be amended to the extent and in the manner provided therein. Capitalized terms
used herein and not otherwise defined shall have the meanings ascribed thereto in the Trust
Agreement.

The Series 2022C Bonds are subject to optional, mandatory and extraordinary mandatory
redemption prior to maturity as provided in the Trust Agreement. Notice of redemption shall be
given as provided in the Trust Agreement.

Copies of the Trust Agreement are on file at the office of the Authority, and at the
corporate trust office of the Trustee, and reference to the Trust Agreement and any and all
supplements thereto and amendments thereof, the terms and conditions upon which Bonds have
been issued and additional Bonds may be issued, the rights and remedies of the registered owners
of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent
and in the manner permitted by the terms of the Trust Agreement and subject to the conditions
therein, the provisions of the Trust Agreement or any Supplemental Trust Agreement amendatory
thereof or supplemental thereto may be modified or amended.

It is hereby certified, recited, and declared that the Authority has taken all necessary action
to make the Series 2022C Bonds, when authenticated by the Trustee and issued by the Authority,
valid and binding obligations of the Authority and to constitute the First Supplemental Trust
Agreement a valid and binding instrument for the authorization of and security for the Series
2022C Bonds.

The registered owner of this Bond shall have no right to enforce the provisions of the Trust
Agreement, to institute action to enforce the provisions of the Trust Agreement or to institute,
appear in or defend any suit or other proceeding with respect thereto, except as provided in the
Trust Agreement.

This Bond is transferable, as provided in the Trust Agreement, only upon the books of the
Authority maintained for that purpose at the corporate trust office of the Trustee by the registered

owner hereof in person or by his attorney duly authorized in writing, upon surrender of this Bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2022C Bond or Bonds in the same aggregate Accreted Value, and of the same series, maturity, accretion rate and interest rate shall be issued to the transferee in exchange therefor as provided in the Master Trust Agreement and upon the payment of the charges, if any, therein prescribed. The Authority and the Trustee may treat and consider the person in whose name this Bond is registered as the absolute owner hereof for the purpose of receiving payments due on this Bond and for all other purposes whatsoever.

IN WITNESS WHEREOF, THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY has caused this Bond to be signed in its name and on its behalf by [     ] and [     ] and attested by its [     ] (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2022C Bonds.

_____


_____


**ATTEST:**

By: _____
Name:
Title:

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Bond is one of the Bonds described in the within mentioned Trust Agreement and is one of the Restructured Toll Revenue Senior Bonds, Series 2022C, of the Puerto Rico Highways and Transportation Authority.

<div align="right">

**THE BANK OF NEW YORK MELLON**,
as Trustee

</div>

By: _____

                     Authorized Signatory

Date of authentication: _____, 2022

ASSIGNMENT

FOR VALUE RECEIVED:

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

_____     _____

_____          Please print or typewrite name and address,
                                                    including zip code, of transferee

the within-mentioned Bond and hereby irrevocably constitutes and appoints _____, attorney-in-fact, to transfer the same on the books of registry in the office of the Trustee, as registrar, with full power of substitution in the premises.

Dated:  _____          _____

                                                    NOTE: The signature to this assignment must correspond with the name as written on the within Bond in every particular, without alteration or enlargement or any change whatsoever.

Signature Guaranteed:

C-6

4877-6935-9914.5

# EXHIBIT D

## ACCRETED VALUE TABLE

| Fiscal Year | Series 2022B Bonds | | | Series 2022C Bonds | |
|---|---|---|---|---|---|
| | Initial Accreted Value | Accreted Value at each Redemption Date [1] | Maturity Value [2] | Initial Accreted Value | Maturity Value [2] |
| 2025 | $25,289,588.80 | $29,327,916.80 | $41,440,000 | | |
| 2026 | 22,310,860.93 | 27,183,444.45 | 36,559,000 | | |
| 2027 | 25,083,317.54 | 32,108,471.38 | 41,102,000 | | |
| 2028 | 28,817,559.67 | 38,756,163.54 | 47,221,000 | | |
| 2029 | 35,543,345.34 | 50,221,494.18 | 58,242,000 | | |
| 2030 | 35,310,832.47 | 52,419,172.95 | 57,861,000 | | |
| 2031 | 33,610,009.98 | 52,419,983.94 | 55,074,000 | | |
| 2032 | 31,990,353.40 | 52,420,000.00 | 52,420,000 | | |
| 2033 | | | | $11,637,848.90 | $19,070,000 |
| 2034 | | | | 12,220,046.48 | 20,024,000 |
| 2035 | | | | 12,830,926.75 | 21,025,000 |
| 2036 | | | | 13,472,320.52 | 22,076,000 |
| 2037 | | | | 14,146,058.60 | 23,180,000 |
| 2038 | | | | 14,853,361.53 | 24,339,000 |
| 2039 | | | | 15,596,060.12 | 25,556,000 |
| 2040 | | | | 16,375,985.18 | 26,834,000 |
| 2041 | | | | 17,194,967.52 | 28,176,000 |
| 2042 | | | | 18,054,837.95 | 29,585,000 |
| 2043 | | | | 18,957,427.28 | 31,064,000 |
| 2044 | | | | 19,905,176.59 | 32,617,000 |
| 2045 | | | | 20,900,526.96 | 34,248,000 |
| 2046 | | | | 21,945,309.20 | 35,960,000 |
| 2047 | | | | 23,042,574.66 | 37,758,000 |
| 2048 | | | | 24,194,764.42 | 39,646,000 |
| 2049 | | | | 25,404,319.56 | 41,628,000 |
| 2050 | | | | 26,674,901.70 | 43,710,000 |
| 2051 | | | | 28,008,341.65 | 45,895,000 |
| 2052 | | | | 29,408,911.30 | 48,190,000 |
| 2053 | | | | 22,219,930.70 | 36,410,000 |

[1] Equals the initial principal amount plus accreted interest to each sinking fund redemption date
[2] Equals the total accreted value that would be represented by the portion of the bonds being redeemed if held to maturity

4876-1750-1700.17

**<u>Redline of Exhibit H</u>**

Draft 9/6/2212/2/2022

# FIRST SUPPLEMENTAL TRUST AGREEMENT

**by and between**

# PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY

**and**

# THE BANK OF NEW YORK MELLON, as Trustee

*Dated as of _____,December 6, 2022*

*NTD: Document assumes that the bonds are being issued as tax-exempt, but a final determination on the tax status remains pending.*

4876-1750-1700.151700.17

## TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS AND AUTHORITY ........................................................... 2
    Section 1.01    Definitions ........................................................................................ 2
    Section 1.02    Rules of Construction ...................................................................... 3

ARTICLE II. THE SERIES 2022 BONDS ..................................................................... 3
    Section 2.01    Authorization, Designation and Series ........................................... 3
    Section 2.02    Place of Payment .............................................................................. 4
    Section 2.03    Form, Denominations, Numbers and Letters ................................. 4
    Section 2.04    Dating of Series 2022 Bonds .......................................................... 4
    Section 2.05    Record Date ...................................................................................... 4
    Section 2.06    Paying Agent .................................................................................... 4
    Section 2.07    Book Entry Bond Procedures ......................................................... 4
    Section 2.08    CUSIP Numbers .............................................................................. 5
    Section 2.09    Application of Proceeds ................................................................... 5

ARTICLE III. SERIES 2022A BONDS .......................................................................... 5
    Section 3.01    Maturity Dates, Principal Amount and Interest Rate for the Series
                         2022A Bonds ................................................................................... 5
    Section 3.03    Redemption Prices and Terms ........................................................ 5

ARTICLE IV. SERIES 2022B BONDS ........................................................................... 7
    Section 4.01    Maturity Dates, Initial Accreted Value, Maturity Value and
                         Accretion Rate for the Series 2022B Bonds .................................. 7
    Section 4.02    Interest Accretion ............................................................................ 7
    Section 4.03    Redemption Prices and Terms ........................................................ 7

ARTICLE V. SERIES 2022C BONDS ............................................................................ 9
    Section 5.01    Maturity Dates, Initial Accreted Values, Maturity Value and
                         Accretion Rate and Interest Rate for the Series 2022C Bonds ..... 9
    Section 5.02    Interest ............................................................................................. 9
    Section 5.03    Redemption Prices and Terms ........................................................ 9

ARTICLE VI. SPECIAL COVENANTS ....................................................................... 11
    Section 6.01    Tax Covenant ................................................................................. 11

ARTICLE VII. MISCELLANEOUS .............................................................................. 12
    Section 7.01    Limitation of Rights ...................................................................... 12
    Section 7.02    Successors and Assigns ................................................................. 12
    Section 7.03    Severability of Invalid Provision .................................................. 12
    Section 7.04    Applicable Law .............................................................................. 12
    Section 7.05    Signature and Counterparts ........................................................... 12
    Section 7.06    Amendments and Supplements ..................................................... 12

EXHIBIT A – FORM OF SERIES 2022A CURRENT INTEREST BONDS

1

**TABLE OF CONTENTS**
**(continued)**

**Page**

EXHIBIT B – FORM OF SERIES 2022B CAPITAL APPRECIATION BONDS
EXHIBIT C – FORM OF SERIES 2022C CONVERTIBLE CAPITAL APPRECIATION
          BONDS
EXHIBIT D- ACCRETED VALUE TABLE

4876-1750-1700.15-1700.17

## FIRST SUPPLEMENTAL TRUST AGREEMENT

**THIS FIRST SUPPLEMENTAL TRUST AGREEMENT**, is entered into as of December 6, 2022, by and between **PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**, (together with any successors thereto, the "**Authority**") a body both corporate and politic of the Commonwealth of Puerto Rico (the "**Commonwealth**"), and **THE BANK OF NEW YORK MELLON**, as trustee (the "**Trustee**"), a banking corporation organized and existing under and by virtue of the laws of New York and authorized to exercise corporate trust powers in the Commonwealth with a place of business located in New York, and supplements the Master Trust Agreement, dated as of December 6, 2022, by and between the Authority and the Trustee (the "**Master Agreement**").

## W I T N E S S E T H:

**WHEREAS**, the Authority has determined that it is desirable at this time to authorize the issuance of (i) $600,000,000 aggregate principal amount of its Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Senior Bonds, Series 2022A (the "**Series 2022A Bonds**"), (ii) $237,955,868.13 aggregate initial Accreted Value of its Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Senior Bonds, Series 2022B (Capital Appreciation Bonds) (the "**Series 2022B Bonds**") and (iii) $407,044,597.57 aggregate initial Accreted Value of its Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Senior Bonds, Series 2022C (Convertible Capital Appreciation Bonds) (the "**Series 2022C Bonds**" and, together with the Series 2022A Bonds and the Series 2022B Bonds, the "**Series 2022 Bonds**");

**WHEREAS**, the Series 2022 Bonds are issued under and pursuant to the Master Agreement, and are, therefore, entitled to the security provided thereby (including, without limitation, a perfected first-priority lien on, and first-priority security interest in the Trust Estate) and all protections and covenants contained therein, all of which are incorporated into this First Supplemental Agreement as if set forth fully herein; and

**WHEREAS**, this First Supplemental Agreement is entered into to supplement the Master Agreement to provide for the issuance of the Series 2022 Bonds on a parity with Bonds hereafter issued in accordance with the Master Agreement; and

**WHEREAS**, the Authority has taken all necessary action to make the Series 2022 Bonds, when authenticated by the Trustee and issued by the Authority, valid and binding obligations of the Authority and to constitute this First Supplemental Agreement a valid and binding instrument for the authorization of and security for the Series 2022 Bonds; and

**WHEREAS**, the United States District Court for the District of Puerto Rico (the "**Title III Court**") has made binding determinations concerning the Series 2022 Bonds, which determinations are more particularly set forth in the recitals of the Master Agreement.

**NOW, THEREFORE, WITNESSETH** that the Authority does covenant and agree with the Trustee and with the Holders of the Series 2022 Bonds, as follows:

# ARTICLE I.

## DEFINITIONS AND AUTHORITY

**Section 1.01   Definitions.**   Capitalized terms used herein and not otherwise defined shall have the respective meanings accorded such terms in the Master Agreement.  In addition, the following terms shall have the following meanings herein unless the context otherwise requires:

**"Accreted Value Payments"** means, with respect to the Series 2022B Bonds, all payments of Accreted Value to be made in accordance with Section ~~4.03~~4.02 hereof, including, without limitation, the Sinking Fund Installment payments and the payment at stated maturity.

**"Agreement"** means the Master Agreement, as supplemented by this Supplemental Agreement.

**"Authorized Denomination"** means, (i) with respect to the Series 2022A Bonds, $1.00 principal amount or any integral multiple thereof, and (ii) and with respect to the Series 2022B Bonds and the Series 2022C Bonds, $1.00 in principal amount in Maturity Value or any integral multiple thereof.

~~**"Concession Agreement"** means a lease, long-term concession or other public-private partnership arrangement with respect to any real or personal property relating to the Toll Facilities.~~

**"Conversion Date"** means July 1, 2032.

**"First Supplemental Agreement"** means this First Supplemental Trust Agreement, which supplements the Master Agreement to authorize the issuance of the Series 2022 Bonds.

**"Master Agreement"** shall have the meaning set forth in the preamble of this First Supplemental Agreement.

**"Maturity Value"** means, (i) with respect to a Series 2022B Bond, the Accreted Value due at stated maturity if no Accreted Value Payments on such Bond are paid prior to stated maturity and (ii) with respect to a Series 2022C Bond, the Accreted Value as of the Conversion Date if no payments in accordance with Section 5.03 on such Bond are paid prior to the Conversion Date.

**"Redemption Date"** means (i) with respect to the Series 2022A Bonds, each date of redemption specified in Section 3.03(b) hereof for the redemption of the Series 2022A Bonds, (ii) with respect to the Series 2022B Bonds, each date of redemption specified in Section 4.03(b) hereof for the redemption of the Series 2022B Bonds and (iii) with respect to the Series 2022C Bonds, each date of redemption specified in Section 5.03(b) hereof for the redemption of the Series 2022C Bonds.

**"Series 2022 Bonds"** means collectively, the Series 2022A Bonds, the Series 2022B Bonds and the Series 2022C Bonds.

"**Series 2022A Bonds**" means the $600,000,000 aggregate principal amount of Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Senior Bonds, Series 2022A.

"**Series 2022B Bonds**" means the $237,955,868.13 aggregate initial Accreted Value of Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Senior Bonds, Series 2022B (Capital Appreciation Bonds).

"**Series 2022C Bonds**" means the $407,044,597.57 aggregate initial Accreted Value of Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Senior Bonds, Series 2022C (Convertible Capital Appreciation Bonds).

"**Tax Certificate**" means the Tax Certificate dated the date of the original delivery of the Series 2022 Bonds relating to the requirements of certain provisions of the Code, as such certificate may from time to time be modified or supplemented in accordance with the terms thereof.

**Section 1.02   Rules of Construction.**  Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.  Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing persons shall include firms, associations and corporations, including public bodies as well as natural persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in the First Supplemental Agreement, refer to the First Supplemental Agreement.  All references to Articles and Sections in this First Supplemental Agreement refer to the Articles and Sections hereof unless otherwise expressly stated.  All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

"**$**" and "**dollars**" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

## ARTICLE II.

## THE SERIES 2022 BONDS

**Section 2.01   Authorization, Designation and Series**.  The Series 2022 Bonds are hereby to be issued in three series, consisting of (A) $600,000,000 aggregate principal amount of Series 2022A Bonds, (B) $237,955,868.13 aggregate initial Accreted Value of Series 2022B Bonds and (C) $407,044,597.57 aggregate initial Accreted Value of Series 2022C Bonds.  The Series 2022 Bonds are issued under the Master Agreement and this First Supplemental Agreement and secured by the Master Agreement, this First Supplemental Agreement and the Trust Estate.  Each maturity of the Series 2022 Bonds is hereby designated as a Term Bond.  The Series 2022A Bonds [are Tax-Exempt Bonds and] are hereby designated "Restructured Toll Revenue Senior Bonds, Series 2022A". The Series 2022B Bonds [are Tax Exempt Bonds and]

- 3 -

are hereby designated "Restructured Toll Revenue Senior Bonds, Series 2022B (Capital Appreciation Bonds)". The Series 2022C [are Tax-Exempt Bonds and] are hereby designated "Restructured Toll Revenue Senior Bonds, Series 2022C (Convertible Capital Appreciation Bonds)".  The Authority is hereby authorized, upon the request of a Holder, to take the following actions with respect to such Holder's Series 2022 Bonds: combine one or more Series or subseries of Series 2022 Bonds into a single Series or subseries or to divide a Series or subseries of the Series 2022 Bonds into two or more subseries and to determine the principal amount of such subseries; **provided, however**, that (x) no combination or division shall permit or result in a change to the aggregate Principal or Accreted Value amount, the applicable maturity date, the applicable interest rate or accretion rate, or the redemption periods, Redemption Dates or amounts due at redemption of the Outstanding Bonds of any Series or subseries subject to such combination or division, and (y) prior to combining or dividing any such Series or subseries of Tax-Exempt Bonds, the Authority and the Trustee shall have received an opinion of Transaction Counsel that such combination or division will not cause interest on the Tax-Exempt Bonds to become includable in gross income for federal income tax purposes.

**Section 2.02   Place of Payment**.   The Series 2022 Bonds shall be payable at the designated ~~corporate trust office~~Corporate Trust Office of the Trustee.

**Section 2.03   Form, Denominations, Numbers and Letters**.  The Series 2022A Bonds shall be issued as fully registered bonds in Authorized Denominations. The Series 2022B Bonds and Series 2022C Bonds shall be issued as fully registered bonds with Maturity Values in Authorized Denominations.

Unless the Authority shall otherwise direct, (i) the Series 2022A Bonds shall be numbered and lettered "22A-R-_," followed by the number of the Bond, (ii) the Series 2022B Bonds shall be numbered and lettered "22B-R_", followed by the number of the Bond, and (iii) the Series 2022C Bonds shall be numbered and lettered "22C-R_", followed by the number of the Bond.  Each of the Series 2022 Bonds shall, in each case be numbered consecutively from one (1) upward.

Subject to the provisions of the Master Agreement, the form of the Series 2022A Bonds and the Trustee's Certificate of Authentication thereon shall be substantially in the form annexed hereto as Exhibit A, the form of the Series 2022B Bonds and the Trustee's Certificate of Authentication thereon shall be substantially in the form annexed hereto as Exhibit B, the form of the Series 2022C Bonds and the Trustee's Certificate of Authentication thereon shall be substantially in the form annexed hereto as Exhibit C.

**Section 2.04   Dating of Series 2022 Bonds**.  The Series 2022 Bonds issued prior to the first Interest Payment Date or first Valuation Date shall be dated July 1, 2022.  Each Series 2022 Bond issued on or after the first Interest Payment Date or the first Valuation Date, as applicable, shall be dated as provided in Section 3.01 of the Master Agreement.

**Section 2.05   Record Date**.  The Record Date for the Series 2022 Bonds shall be the fifteenth (15th) day (whether or not a Business Day) of the calendar month next preceding the applicable Valuation Date, Interest Payment Date or Principal Payment Date.  The Record Date for the payment of interest on the Effective Date shall be the Effective Date.

**Section 2.06   Paying Agent**.  The Trustee is hereby appointed Paying Agent for the Series 2022 Bonds, such appointment to be effective immediately upon the filing of this First Supplemental Agreement with the Trustee.

**Section 2.07   Book Entry Bond Procedures**.  Notwithstanding any other provision of this First Supplemental Agreement to the contrary, so long as any Series 2022 Bond is registered in the name of Cede & Co., as nominee of the Depository, all payments on such Series 2022 Bond, and all deliveries to be made and notices to be delivered with respect to such Series 2022 Bond, shall be made and given pursuant to the Depository's rules and procedures then in effect.

**Section 2.08   CUSIP Numbers**.  Neither the Authority nor the Trustee shall be liable for any defect or inaccuracy in the CUSIP number as it appears on any Series 2022 Bond or in any notice of redemption.  The Authority shall promptly notify the Trustee of any change in the CUSIP numbers assigned to any Series 2022 Bond of which the Authority has knowledge.

**Section 2.09   Application of Proceeds**.  No deposit of proceeds shall be made in connection with the issuance of the Series 2022 Bonds.

## ARTICLE III.

## SERIES 2022A BONDS

**Section 3.01   Maturity Dates, Principal Amount and Interest Rate for the Series 2022A Bonds**.  The Series 2022A Bonds shall be issued as Current Interest Bonds, in the aggregate principal amount of $600,000,000, bear interest at five percent (5.00%) per annum, shall mature on July 1, 2062 and have CUSIP number _____.

**Section 3.02   Interest Payments**.  The Series 2022A Bonds shall bear interest from July 1, 2022 until paid (whether at maturity, prior redemption or after maturity following payment default by the Authority), payable on the Effective Date and semiannually thereafter on each Interest Payment Date, commencing on July 1, 2023, at the rate of five percent (5.00%) per annum.  Interest on the Series 2022A Bonds shall be computed on the basis of a 360-day year consisting of twelve 30-day months.  Interest shall accrue on overdue interest and Principal at the rate provided above, and shall compound on each Interest Payment Date.  All overdue interest and Principal (and any interest accruing thereon) shall remain due and payable until paid. The Series 2022A Bonds shall be issued as fully registered bonds in Authorized Denominations.  If any such Interest Payment Date or Principal Payment Date is not a Business Day, any action to be taken on such date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of such delay.

**Section 3.03   Redemption Prices and Terms**.  The Series 2022A Bonds shall be subject to redemption prior to stated maturity as provided in this Section 3.03.

(a)   *Optional Redemption*.  The Series 2022A Bonds are subject to redemption prior to maturity on and after July 1, 2032, at the election or direction of the Authority, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day, at a redemption price equal to the principal amount thereof, plus accrued interest to the date fixed for redemption.

- 5 -

(b)     *Mandatory Redemption of the Series 2022A Bonds*.  The Series 2022A Bonds shall be subject to mandatory redemption, in part, through application of Sinking Fund Installments, as herein provided, upon notice given as prescribed in Article IV of the Master Agreement, at the Redemption Price of one hundred per centum (100%) of the Principal amount to be redeemed, plus accrued interest, if any, to the date of redemption.  Subject to the provisions of Section 5.06(b) of the Master Agreement and of Section 3.03(d) hereof permitting amounts to be credited to part or all of any one or more Sinking Fund Installments or the payment due at stated maturity, there shall be due and the Authority shall be required to pay for the retirement of the Series 2022A Bonds on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of the Series 2022A Bonds:

$600,000,000
Series 2022A Bonds
maturing July 1, 2062

| Year | Amount |
|------|--------|
| 2053 | $14,190,000 |
| 2054 | 53,125,000 |
| 2055 | 55,785,000 |
| 2056 | 58,575,000 |
| 2057 | 61,500,000 |
| 2058 | 64,575,000 |
| 2059 | 67,805,000 |
| 2060 | 71,195,000 |
| 2061 | 74,755,000 |
| 2062[†] | 78,495,000 |

[†] Stated maturity.

(c)     *Extraordinary Mandatory Redemption.*  The Series 2022A Bonds are subject to extraordinary mandatory redemption, at the election or direction of the Authority, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day, at a redemption price equal to the principal amount thereof, plus accrued interest to the date fixed for redemption upon the financial closing of a ~~Concession Agreement~~lease, long-term concession or other public-private partnership arrangement for all or any portion of the Toll Facilities.  For sake of clarity, in the case of an extraordinary mandatory redemption of the Series 2002A Bonds in connection with a Partial Disposition of the Toll Facilities, the Authority must demonstrate compliance with Section 7.18(b) of the Master Agreement.

(d)     *Credit Against Sinking Fund Installments*.  There shall be credited against and in satisfaction of the Sinking Fund Installments or the payment due at stated maturity payable on the Series 2022A Bond entitled to the payment of such Sinking Fund Installments and the payment due at stated maturity an amount equal to the Principal amount of the Series 2022A Bond (A) purchased by the Authority with moneys in the Debt Service Fund pursuant to Section 5.06(b) of the Master Agreement, (B) redeemed at the option of the Authority pursuant to paragraph (a) of this Section, (C) purchased by the Authority and delivered to the Trustee for

- 6 -

cancellation, and (D) deemed to have been paid in accordance with Section 13.01 of the Master Agreement.   Series 2022A Bonds purchased pursuant to Section 5.06(b) of the Master Agreement shall be applied in satisfaction of a Sinking Fund Installment in accordance with such Section.   Series 2022A Bonds redeemed at the option of the Authority, purchased by the Authority (other than pursuant to Section 5.06(b) of the Master Agreement), or deemed to have been paid in accordance with Section 13.01 of the Master Agreement shall be applied in satisfaction, in whole or in part, of one or more Sinking Fund Installments payable on such dates as the Authority shall specify in a written direction of the Authority delivered to the Trustee at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 2022A Bonds entitled to such Sinking Fund Installment may be given by the Trustee and the Sinking Fund Installment payable on each date specified in such direction shall be reduced by the Principal amount of the Series 2022A Bonds (or portions thereof) so purchased, redeemed or deemed to have been paid in accordance with Section 13.01 of the Master Agreement to be applied in satisfaction of such Sinking Fund Installment as set forth in such direction.

## ARTICLE IV.

## SERIES 2022B BONDS

**Section 4.01**   **Maturity Dates, Initial Accreted Value, Maturity Value and Accretion Rate for the Series 2022B Bonds**.   The Series 2022B Bonds shall be issued as Capital Appreciation Bonds, in the initial Accreted Value of $237,955,868.13 and in the Maturity Value of $389,919,000, shall accrue and accrete interest at five percent (5.00%) per annum and shall mature on July 1, 2032, with a CUSIP Number _____.

**Section 4.02   Interest Accretion.**  Interest on the Series 2022B Bonds shall accrue and accrete from July 1, 2022 until paid (whether at maturity, prior redemption or after maturity following payment default by the Authority).  Interest on the Series 2022B Bonds will not be paid on a current basis, but will be added to the Principal thereof in the form of accretion on the Effective Date and semiannually thereafter on each Valuation Date, and will be treated as if accruing on the basis of a 360-day year consisting of twelve 30-day months between Valuation Dates, until paid (whether at stated maturity, prior redemption or after maturity following payment default by the Authority).  Exhibit D sets forth the Accreted Value for the Series 2022B Bonds on each Valuation Date, assuming that no Accreted Value Payments will be made prior to stated maturity. All overdue amounts (and any interest thereon) shall remain due and payable until paid.

**Section 4.03   Redemption Prices and Terms**.   The Series 2022B Bonds shall be subject to redemption prior to stated maturity as provided in this Section 4.03.

(a)   *Optional Redemption*.  The Series 2022B Bonds are not subject to optional redemption prior to stated maturity.

(b)　　*Mandatory Redemption for the Series 2022B Bonds*.  The Series 2022B Bonds shall be subject to redemption, in part, through application of Sinking Fund Installments as herein provided, upon notice given as prescribed in Article IV of the Master Agreement, at the Redemption Price of one hundred per centum (100%) of the Accreted Value calculated to the Redemption Date of each Series 2022B Bonds or portion thereof to be redeemed.  Unless none of the Series 2022B Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Section 5.06(b) of the Master Agreement and of Section 4.03(d) hereof permitting amounts to be credited to part or all of any one or more Accreted Value Payments, there shall be due and the Authority shall be required to pay for the retirement of the Series 2022B Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2022B Bonds:

<center>$389,919,000 Maturity Value<br>Series 2022B Bonds<br><u>maturing July 1, 2032</u></center>

| Fiscal Year | Initial Accreted Value | Accreted Value at each Mandatory Redemption Date[1] | Maturity Value[2] |
|---|---|---|---|
| 2025 | $25,289,588.80 | $29,327,916.80 | $41,440,000 |
| 2026 | 22,310,860.93 | 27,183,444.45 | 36,559,000 |
| 2027 | 25,083,317.54 | 32,108,471.38 | 41,102,000 |
| 2028 | 28,817,559.67 | 38,756,163.54 | 47,221,000 |
| 2029 | 35,543,345.34 | 50,221,494.18 | 58,242,000 |
| 2030 | 35,310,832.47 | 52,419,172.95 | 57,861,000 |
| 2031 | 33,610,009.98 | 52,419,983.94 | 55,074,000 |
| 2032[†] | 31,990,353.40 | 52,420,000.00 | 52,420,000 |

[†]Stated maturity
(1) Equals the initial Accreted Value plus accreted interest to each sinking fund redemption date.
(2) Equals the total Accreted Value that would be represented by the portion of the Series 2022B Bonds being redeemed if held to maturity.

(c)　　*Extraordinary Mandatory Redemption.*  The Series 2022B Bonds are subject to extraordinary mandatory redemption, at the election or direction of the Authority, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day, at a redemption price equal to the principal amount thereof, plus accrued interest to the date fixed for redemption upon the financial closing of a ~~Concession Agreement~~lease, long-term concession or other public-private partnership arrangement for all or any portion of the Toll Facilities.  For sake of clarity, in the case of an extraordinary mandatory redemption of the Series 2002B Bonds in connection with a Partial Disposition of the Toll Facilities, the Authority must demonstrate compliance with Section 7.18(b) of the Master Agreement.

(d)　　*Credit Against Sinking Fund Installments*.  There shall be credited against and in satisfaction of the Accreted Value Payments payable on a Series 2022B Bonds entitled to the payment of such Accreted Value Payments an amount equal to the Accreted Value calculated to the Redemption Date   of such Series 2022B Bonds (A) purchased by the Authority with moneys in the Debt Service Fund pursuant to Section 5.06(b) of the Master Agreement, (B) purchased by the Authority and delivered to the Trustee for cancellation, and (C) deemed to have been paid in accordance with Section 13.01 of the Master Agreement.  Series 2022 CABs purchased pursuant to Section 5.06(b) of the Master Agreement shall be applied in satisfaction of

<center>- 8 -</center>

a Sinking Fund Installment in accordance with such Section.  Series 2022B Bonds redeemed at the option of the Authority, purchased by the Authority (other than pursuant to Section 5.06(b) of the Master Agreement) and delivered to the Trustee for cancellation, or deemed to have been paid in accordance with Section 13.01 of the Master Agreement shall be applied in satisfaction, in whole or in part of one or more Accreted Value Payments payable on such dates as the Authority shall specify in a written direction of the Authority delivered to the Trustee, together with a revised redemption schedule, which must be certified to as correct by a ~~Qualified Municipal Advisor Firm~~qualified municipal advisor firm, for the affected maturity of Series 2022B Bonds, at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 2022B Bonds entitled to such Accreted Value Payments may be given by the Trustee and the Accreted Value Payment due on each date specified in such direction shall be reduced by the Accreted Value on the Redemption Date of the Series 2022B Bonds so purchased, redeemed or deemed to have been paid in accordance with Section 13.01 of the Master Agreement to be applied in satisfaction of such Accreted Value Payments  as set forth in such direction.

## ARTICLE V.

## SERIES 2022C BONDS

Section 5.01    **Maturity Dates, Initial Accreted Values, Maturity Value and Accretion Rate and Interest Rate for the Series 2022C Bonds**.  The Series 2022C Bonds shall be issued as Convertible Capital Appreciation Bonds in the initial Accreted Value of $407,044,597.57 and in the Maturity Value of $666,991,000, shall accrue and accrete interest at five percent (5.00%) per annum and shall mature on July 1, 2053, with a CUSIP Number _____.

**Section 5.02   Interest.**   Interest on the Series 2022C Bonds shall accrue and accrete from July 1, 2022 until the Conversion Date (whether at maturity, prior redemption or after maturity following payment default by the Authority).  Interest on the Series 2022C Bonds will not be paid on a current basis prior to the Conversion Date, but will be added to the Principal thereof in the form of accretion on the Effective Date and semiannually thereafter on each Valuation Date prior to the Conversion Date, and will be treated as if accruing on the basis of a 360-day year consisting of twelve 30-day months between Valuation Dates, until paid (whether at stated maturity, prior redemption or after maturity following payment default by the Authority). Exhibit D sets forth the Accreted Value for the Series 2022C Bonds on each Valuation Date, assuming that no payments in accordance with Section 5.03 will be made prior to the Conversion Date.   On and after the Conversion Date, the Series 2022C Bonds shall bear interest at five percent ~~[5%]~~% per annum, payable on each Interest Payment Date, commencing January 1, 2033. Interest shall accrue on overdue interest and Principal on the Series 2022C Bonds at the rate of five percent (5.00%) per annum, and shall compound on each Interest Payment Date.   All overdue interest and Principal (and any interest accruing thereon) shall remain due and payable until paid. The Series 2022C Bonds shall be issued as fully registered bonds in Authorized Denominations.  If any such Interest Payment Date or Principal Payment Date is not a Business Day, any action to be taken on such date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of such delay.

- 9 -

**Section 5.03   Redemption Prices and Terms**.   The Series 2022C Bonds shall be subject to redemption prior to stated maturity as provided in this Section 5.03.

(a)   *Optional Redemption*.   The Series 2022C Bonds are subject to redemption prior to maturity on and after January 1, 2033, at the election or direction of the Authority, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day at a Redemption Price equal to the principal amount thereof, plus accrued interest to the dated fixed for redemption.

(b)   *Mandatory Redemption for the Series 2022C Bonds*.   The Series 2022C Bonds shall be subject to mandatory redemption, in part, through application of Sinking Fund Installments, as herein provided, upon notice given as prescribed in Article IV of the Master Agreement, at the Redemption Price of one hundred per centum (100%) of the Principal amount to be redeemed, plus accrued interest, if any, to the date of redemption.   Subject to the provisions of Section 5.06(b) of the Master Agreement and of Section 5.03(d) hereof permitting amounts to be credited to part or all of any one or more Sinking Fund Installments or the payment due at stated maturity, there shall be due and the Authority shall be required to pay for the retirement of the Series 2022C Bonds on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of the Series 2022C Bonds:

$666,991,000
Series 2022C Bonds
maturing July 1, 2052

| Year | Amount |
|------|--------|
| 2033 | $19,070,000 |
| 2034 | 20,024,000 |
| 2035 | 21,025,000 |
| 2036 | 22,076,000 |
| 2037 | 23,180,000 |
| 2038 | 24,339,000 |
| 2039 | 25,556,000 |
| 2040 | 26,834,000 |
| 2041 | 28,176,000 |
| 2042 | 29,585,000 |
| 2043 | 31,064,000 |
| 2044 | 32,617,000 |
| 2045 | 34,248,000 |
| 2046 | 35,960,000 |
| 2047 | 37,758,000 |
| 2048 | 39,646,000 |
| 2049 | 41,628,000 |
| 2050 | 43,710,000 |
| 2051 | 45,895,000 |
| 2052 | 48,190,000 |
| 2053[†] | 36,410,000 |

(c)

-----

- 10 -

4876-1750-1700.151700.17

† Stated maturity.

(d)    *Extraordinary Mandatory Redemption.*   The Series 2022C Bonds are subject to extraordinary mandatory redemption, at the election or direction of the Authority, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day, at a redemption price equal to the principal amount thereof, plus accrued interest to the date fixed for redemption upon the financial closing of a ~~Concession Agreement~~lease, long-term concession or other public-private partnership arrangement for all or any portion of the Toll Facilities.  For sake of clarity, in the case of an extraordinary mandatory redemption of the Series 2002C Bonds in connection with a Partial Disposition of the Toll Facilities, the Authority must demonstrate compliance with Section 7.18(b) of the Master Agreement.

(e)    *Credit Against Sinking Fund Installments*.   There shall be credited against and in satisfaction of the Sinking Fund Installments or the payment due at stated maturity payable on the Series 2022C Bond entitled to the payment of such Sinking Fund Installments and the payment due at stated maturity an amount equal to the Principal amount of the Series 2022C Bond (A) purchased by the Authority with moneys in the Debt Service Fund pursuant to Section 5.06(b) of the Master Agreement, (B) redeemed at the option of the Authority pursuant to paragraph (a) of this Section, (C) purchased by the Authority and delivered to the Trustee for cancellation, and (D) deemed to have been paid in accordance with Section 13.01 of the Master Agreement.  Series 2022C Bonds purchased pursuant to Section 5.06(b) of the Master Agreement shall be applied in satisfaction of a Sinking Fund Installment in accordance with such Section. Series 2022C Bonds redeemed at the option of the Authority, purchased by the Authority (other than pursuant to Section 5.06(b) of the Master Agreement), or deemed to have been paid in accordance with Section 13.01 of the Master Agreement shall be applied in satisfaction, in whole or in part, of one or more Sinking Fund Installments payable on such dates as the Authority shall specify in a written direction of the Authority delivered to the Trustee at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 2022C Bonds entitled to such Sinking Fund Installment may be given by the Trustee and the Sinking Fund Installment payable on each date specified in such direction shall be reduced by the Principal amount of the Series 2022C Bonds (or portions thereof) so purchased, redeemed or deemed to have been paid in accordance with Section 13.01 of the Master Agreement to be applied in satisfaction of such Sinking Fund Installment as set forth in such direction.

## ARTICLE VI.

## SPECIAL COVENANTS

### Section 6.01   Tax Covenant.

(a)    *Tax Compliance*.   In order to maintain the exclusion from gross income for purposes of federal income taxation of interest on the Series 2022 Bonds, the Authority shall comply with the provisions of the Code applicable to the Series 2022 Bonds necessary to maintain such exclusion, including without limitation the provisions of the Code which prescribe yield and other limits within which proceeds of the Series 2022 Bonds are to be invested, and which, in certain circumstances, require the rebate of certain earnings on such amounts to the Department of the Treasury of the United States of America in accordance with Section 148(f) of

the Code.  In furtherance of the foregoing, the Authority shall comply with the Tax Certificate relating to the Series 2022 Bonds.

(b)     *No Arbitrage Covenant*.  The Authority shall not take any action or fail to take any action which would cause the Series 2022 Bonds to be "arbitrage bonds" within the meaning of Section 148(a) of the Code; nor shall any part of the proceeds of Series 2022 Bonds or any other funds of the Authority be used directly or indirectly to acquire any investment property the acquisition of which would cause any Series 2022 Bonds to be "arbitrage bonds" within the meaning of Section 148(a) of the Code.

(c)     *No Private Use or Private Loans*.  The Authority shall not use any part of the proceeds of the Series 2022 Bonds in a manner which would cause such Series 2022 Bonds to be "private activity bonds" within the meaning of Section 141(a) of the Code.

(d)     *Survival*.  Notwithstanding any provision of this First Supplemental Agreement to the contrary, the obligation of the Authority to comply with the requirements of this Section and Section 7.15 of the Master Agreement shall survive the payment, redemption or defeasance of any and all Series 2022 Bonds.

## ARTICLE VII.

## MISCELLANEOUS

**Section 7.01   Limitation of Rights.**   Nothing in this First Supplemental Agreement expressed or implied is intended or shall be construed to confer upon, or to give or grant to, any person or party, other than the Authority, the Trustee, the Paying Agent and the registered owners of the Series 2022 Bonds, any rights, remedies or claims under or by reason hereof or of the Master Agreement or any covenant, condition or stipulation hereof or of the Master Agreement. All covenants, stipulations, promises and agreements in this First Supplemental Agreement shall be for the sole and exclusive benefit of the Authority, the Trustee, the Paying Agent and the registered owners of the Series 2022 Bonds.

**Section 7.02   Successors and Assigns.**   This First Supplemental Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

**Section 7.03   Severability of Invalid Provision.**   If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein on the part of the Authority or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions of the Master Agreement or of this Supplemental Agreement or of the Series 2022 Bonds.

**Section 7.04   Applicable Law.**   This First Supplemental Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction. Any disputes, legal action, suit, or

4876-1750-~~1700.15~~1700.17

proceeding arising from or related to the Agreement or the Bonds (a) shall be brought in accordance herewith in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept jurisdiction, in any federal district court sitting in the Commonwealth and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**Section 7.05   Signature and Counterparts.**   This First Supplemental Agreement may be executed and delivered in any number of counterparts, each of which shall be an original, but such counterparts together shall constitute one and the same instrument.

**Section 7.06   Amendments and Supplements.**   This First Supplemental Agreement may only be amended or supplemented in accordance with the provisions of Articles IX and X of the Master Agreement.

[Remainder of page intentionally left blank; signature page follows.]

4876-1750-~~1700.15~~1700.17

**IN WITNESS WHEREOF**, the Authority and the Trustee have caused this First Supplemental Agreement to be executed in their respective corporate names by their duly authorized officers, all as of the date first above written.

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

By:  _____

Name:

Title:

**THE BANK OF NEW YORK MELLON,** as Trustee

By:  _____

Name:

Title:

4876-1750-1700.15 1700.17

EXHIBIT A

FORM OF SERIES 2022A BONDS

4876-1750-1700.15 1700.17

EXHIBIT A

FORM OF SERIES 2022A CURRENT INTEREST BONDS

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE ____ DAY OF _____, 2022.**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE.  DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID.  THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.  OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number:                                                                                                    $

UNITED STATES OF AMERICA
PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY
RESTRUCTURED TOLL REVENUE SENIOR BONDS,
SERIES 2022A


| INTEREST RATE | MATURITY DATE | DATED DATE | CUSIP NO. |
|---|---|---|---|
| % | | | |

Registered Owner:     CEDE & CO.

Principal Amount:     _____ DOLLARS

**FOR VALUE RECEIVED**, **PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY** (the "Authority"), a body corporate and politic constituting a public corporation and government instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, hereby promises to pay, but solely in the manner and from the revenues and sources hereinafter provided, to the **REGISTERED OWNER** named above, or registered assigns, the **PRINCIPAL AMOUNT** stated above on the **MATURITY DATE** stated above (except to the extent that such Principal Amount due on the Maturity Date is reduced by prior redemption as provided in the Trust Agreement), upon the presentation and surrender hereof at the principal corporate trust office of the Trustee hereinafter mentioned, and to pay to the registered owner interest on such Principal Amount from the **DATED DATE** stated above at the **INTEREST RATE** per annum stated above until the Principal Amount is paid, payable on the Effective Date and semiannually thereafter on each January 1 and July 1 (each, an "Interest Payment Date"). Interest shall accrue on overdue interest and Principal at the rate provided above, and shall compound on each Interest Payment Date.  Principal and Redemption Price of this Bond shall be payable at the principal corporate trust office of **THE BANK OF NEW YORK MELLON**, as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts.  Payment of the interest hereon shall be payable by the Trustee as provided in Section 3.01 of the Master Trust Agreement (hereinafter defined), or at the option of any owner of $1,000,000 or more in aggregate Principal amount of the Series 2022A Bonds, by wire transfer to such registered owner at the wire transfer address in the continental United States to which such registered owner has not later than the Record Date immediately preceding such Interest Payment Date directed the Trustee to wire such interest payment.  The Record Date is the fifteenth (15th) day (whether or not a Business Day) of the calendar month next preceding the applicable Interest Payment Date; provided, however, that the Record Date for the interest payable on the Effective Date is the Effective Date.  All overdue interest and Principal (and any interest accruing on such overdue amounts) shall remain due and payable until paid.

THE TRUST AGREEMENT (HEREINAFTER DEFINED) PROVIDES THAT THE BONDS, INCLUDING THIS BOND, SHALL BE PAYABLE SOLELY FROM THE TRUST ESTATE.  THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR OF INSTRUMENTALITIES (OTHER THAN THE AUTHORITY), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE AUTHORITY) SHALL BE LIABLE FOR THE PAYMENT THEREOF. THE AUTHORITY HAS NO TAXING POWER.

THIS BOND IS A SPECIAL OBLIGATION OF THE AUTHORITY, PAYABLE SOLELY FROM THE TRUST ESTATE. This Bond is secured by a perfected first-priority lien on and first-priority security interest in the Trust Estate for the payment of the Principal and Redemption Price of and interest on all Outstanding Bonds. The Bonds and any first-priority lien and first-priority security interest securing such Bonds shall in all respects be senior and superior to the Subordinated Indebtedness and the subordinate lien and subordinate security interest granted in the Trust Estate for the benefit of the Holders of Subordinated Indebtedness.

This Bond is one of a duly authorized issue of bonds of the Authority designated as "Restructured Toll Revenue Senior Bonds, Series 2022A" (herein called the "Series 2022A Bonds"), issued pursuant to the Act and a Master Trust Agreement by and between the Authority and the Trustee, dated as of _____, 2022 (the "Master Trust Agreement"), including as supplemented by a First Supplemental Trust Agreement, by and between the Authority and the Trustee, dated as of _____, 2022 (the "First Supplemental Trust Agreement", and together with the Master Trust Agreement, collectively referred to herein as the "Trust Agreement"). The Trust Agreement may be amended to the extent and in the manner provided therein. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Trust Agreement.

The Series 2022A Bonds are subject to optional, mandatory and extraordinary mandatory redemption prior to maturity as provided in the Trust Agreement. Notice of redemption shall be given as provided in the Trust Agreement.

Copies of the Trust Agreement are on file at the office of the Authority, and at the corporate trust office of the Trustee, and reference to the Trust Agreement and any and all supplements thereto and amendments thereof, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the Trust Agreement and subject to the conditions therein, the provisions of the Trust Agreement or any Supplemental Trust Agreement amendatory thereof or supplemental thereto may be modified or amended.

It is hereby certified, recited, and declared that the Authority has taken all necessary action to make the Series 2022A Bonds, when authenticated by the Trustee and issued by the Authority, valid and binding obligations of the Authority and to constitute the First Supplemental Trust Agreement a valid and binding instrument for the authorization of and security for the Series 2022A Bonds.

The registered owner of this Bond shall have no right to enforce the provisions of the Trust Agreement, to institute action to enforce the provisions of the Trust Agreement or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Trust Agreement.

This Bond is transferable, as provided in the Trust Agreement, only upon the books of the Authority maintained for that purpose at the corporate trust office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this Bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2022A Bond or Bonds in the same aggregate Principal amount, and of the same series, maturity and interest rate, shall be issued to the transferee in exchange therefor as provided in the Master Trust Agreement and upon the payment of the charges, if any, therein prescribed. The Authority and the Trustee may treat and consider the person in whose name this Bond is registered as the absolute owner hereof for the purpose of receiving payments due on this Bond and for all other purposes whatsoever.

A-3

**IN WITNESS WHEREOF, THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY** has caused this Bond to be signed in its name and on its behalf by [      ] and [        ] and attested by its [      ] (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2022A Bonds.

_____

_____

**ATTEST:**

By: _____
Name:
Title:

A-4

### TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Bond is one of the Bonds described in the within mentioned Trust Agreement and is one of the Restructured Toll Revenue Senior Bonds, Series 2022A, of the Puerto Rico Highways and Transportation Authority.

[        ], as Trustee

By:   _____

Authorized Signatory

Date of authentication: _____, 2022

4877-6935-9914.5

ASSIGNMENT

FOR VALUE RECEIVED:

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

| | |
|---|---|
| _____ | _____ |

Please print or typewrite name and address,
including zip code, of transferee

the within-mentioned Bond and hereby irrevocably constitutes and appoints
_____, attorney-in-fact, to transfer the same on the
books of registry in the office of the Trustee, as registrar, with full power of substitution in the
premises.

Dated: _____     _____

NOTE: The signature to this assignment must
correspond with the name as written on the within
Bond in every particular, without alteration or
enlargement or any change whatsoever.

Signature Guaranteed:

A-6

EXHIBIT B

FORM OF SERIES 2022B BONDS

EXHIBIT B

FORM OF SERIES 2022B CAPITAL APPRECIATION BONDS

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE ____ DAY OF _____, 2022.**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE. DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID. THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number:                                                                                      $

UNITED STATES OF AMERICA
PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY
RESTRUCTURED TOLL REVENUE SENIOR BONDS,
SERIES 2022B (CAPITAL APPRECIATION BONDS)

<u>ACCRETION RATE</u>    <u>MATURITY DATE</u>    <u>DATED DATE</u>    <u>CUSIP NO.</u>

Registered Owner:      CEDE & CO.

Principal Amount at Issuance:      _____ DOLLARS

B-1

Maturity Value[1]: _____ DOLLARS

**FOR VALUE RECEIVED, PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY** (the "Authority"), a body corporate and politic constituting a public corporation and government instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, hereby promises to pay, but solely in the manner and from the revenues and sources hereinafter provided, to the **REGISTERED OWNER** named above, or registered assigns, the **MATURITY VALUE** stated above on the **MATURITY DATE** stated above (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Trust Agreement), upon the presentation and surrender hereof at the principal corporate trust office of the Trustee hereinafter mentioned. Interest on this Bond shall accrete at the **ACCRETION RATE** set forth above from the **DATED DATE** shown above and shall not be payable on a current basis but shall be compounded, and added to Principal, on the Effective Date and on each January 1 and July 1 (each, a "Valuation Date") such that the **PRINCIPAL AMOUNT AT ISSUANCE** specified above shall accrete to equal the **MATURITY VALUE** specified above on the **MATURITY DATE** stated above (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Trust Agreement). Interest shall accrete on overdue interest and Principal at the rate provided above, and shall compound on each Valuation Date. Principal and Redemption Price of this Bond shall be payable at the principal corporate trust office of **THE BANK OF NEW YORK MELLON**, as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. All overdue Principal (and any interest accruing thereon) shall remain due and payable until paid.

THE TRUST AGREEMENT (HEREINAFTER DEFINED) PROVIDES THAT THE BONDS, INCLUDING THIS BOND, SHALL BE PAYABLE SOLELY FROM THE TRUST ESTATE. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR OF INSTRUMENTALITIES (OTHER THAN THE AUTHORITY), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE AUTHORITY) SHALL BE LIABLE FOR THE PAYMENT THEREOF. THE AUTHORITY HAS NO TAXING POWER.

THIS BOND IS A SPECIAL OBLIGATION OF THE AUTHORITY, PAYABLE SOLELY FROM THE TRUST ESTATE. This Bond is secured by a perfected first-priority lien on and first-priority security interest in the Trust Estate for the payment of the Principal and Redemption Price of and interest on all Outstanding Bonds. The Bonds and any first-priority lien and first-priority security interest securing such Bonds shall in all respects be senior and superior to the Subordinated Indebtedness and the subordinate lien and subordinate security interest granted in the Trust Estate for the benefit of the Holders of Subordinated Indebtedness.

This Bond is one of a duly authorized issue of bonds of the Authority designated as "Restructured Toll Revenue Senior Bonds, Series 2022B (Capital Appreciation Bonds)" (herein

---

[1] Reflects Accreted Value at maturity if no Accreted Value Payments are made prior to stated maturity.

called the "Series 2022B Bonds"), issued pursuant to the Act and a Master Trust Agreement by and between the Authority and the Trustee, dated as of _____, 2022 (the "Master Trust Agreement"), including as supplemented by a First Supplemental Trust Agreement, by and between the Authority and the Trustee, dated as of _____, 2022 (the "First Supplemental Trust Agreement", and together with the Master Trust Agreement, collectively referred to herein as the "Trust Agreement").  The Trust Agreement may be amended to the extent and in the manner provided therein.  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Trust Agreement.

The Series 2022B Bonds are subject to optional, mandatory and extraordinary mandatory redemption prior to maturity as provided in the Trust Agreement.  Notice of redemption shall be given as provided in the Trust Agreement.

Copies of the Trust Agreement are on file at the office of the Authority, and at the corporate trust office of the Trustee, and reference to the Trust Agreement and any and all supplements thereto and amendments thereof, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the Trust Agreement and subject to the conditions therein, the provisions of the Trust Agreement or any Supplemental Trust Agreement amendatory thereof or supplemental thereto may be modified or amended.

It is hereby certified, recited, and declared that the Authority has taken all necessary action to make the Series 2022B Bonds, when authenticated by the Trustee and issued by the Authority, valid and binding obligations of the Authority and to constitute the First Supplemental Trust Agreement a valid and binding instrument for the authorization of and security for the Series 2022B Bonds.

The registered owner of this Bond shall have no right to enforce the provisions of the Trust Agreement, to institute action to enforce the provisions of the Trust Agreement or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Trust Agreement.

This Bond is transferable, as provided in the Trust Agreement, only upon the books of the Authority maintained for that purpose at the corporate trust office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this Bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2022B Bond or Bonds in the same aggregate Accreted Value, and of the same series, maturity and accretion rate, shall be issued to the transferee in exchange therefor as provided in the Master Trust Agreement and upon the payment of the charges, if any, therein prescribed. The Authority and the Trustee may treat and consider the person in whose name this Bond is registered as the absolute owner hereof for the purpose of receiving payments due on this Bond and for all other purposes whatsoever.

**IN WITNESS WHEREOF, THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY** has caused this Bond to be signed in its name and on its behalf by [     ] and [     ] and attested by its [     ] (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2022B Bonds.

_____

_____

**ATTEST:**

By: _____

Name:

Title:

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Bond is one of the Bonds described in the within mentioned Trust Agreement and is one of the Restructured Toll Revenue Senior Bonds, Series 2022B, of the Puerto Rico Highways and Transportation Authority.

**THE BANK OF NEW YORK MELLON**, as Trustee

By: _____
                 Authorized Signatory

Date of authentication: _____, 2022

B-5

ASSIGNMENT

FOR VALUE RECEIVED:

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

_____        _____

Please print or typewrite name and address, including zip code, of transferee

_____

the within-mentioned Bond and hereby irrevocably constitutes and appoints _____, attorney-in-fact, to transfer the same on the books of registry in the office of the Trustee, as registrar, with full power of substitution in the premises.

Dated:  _____        _____

NOTE: The signature to this assignment must correspond with the name as written on the within Bond in every particular, without alteration or enlargement or any change whatsoever.

Signature Guaranteed:

B-6

EXHIBIT C

FORM OF SERIES 2022C BONDS

EXHIBIT C

FORM OF SERIES 2022C CONVERTIBLE CAPITAL APPRECIATION BONDS

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE ____ DAY OF _____, 2022.**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE.  DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID.  THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.  OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number:                                                                                                   $

UNITED STATES OF AMERICA
PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY
RESTRUCTURED TOLL REVENUE SENIOR BONDS,
SERIES 2022C (CONVERTIBLE CAPITAL APPRECIATION BONDS)

| Accretion Rate through Conversion Date | Interest Rate after the Conversion Date | Conversion Date | Maturity Date | Dated Date | CUSIP |
|---|---|---|---|---|---|
| % | % | | | | |

Registered Owner:      CEDE & CO.

Principal Amount at Issuance:      _____ DOLLARS

C-1

Maturity Value[2]:  _____ DOLLARS

      **FOR VALUE RECEIVED, PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY** (the "Authority"), a body corporate and politic constituting a public corporation and government instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, hereby promises to pay, but solely in the manner and from the revenues and sources hereinafter provided, to the **REGISTERED OWNER** named above, or registered assigns, the **MATURITY VALUE** stated above on the **MATURITY DATE** stated above, together with current interest thereon after the Conversion Date set forth above at the interest rate set forth above until the Maturity Value hereof shall have been paid or provided for, in accordance with the Trust Agreement (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Trust Agreement), upon the presentation and surrender hereof at the principal corporate trust office of the Trustee hereinafter mentioned. Interest on this Bond with respect to the initial Accreted Value shall accrete at the **ACCRETION RATE** per annum shown above from the **DATED DATE** shown above and will be compounded semiannually on each January 1 and July 1 until the Conversion Date set forth above. Such accreted value shall be payable only at maturity or upon prior redemption, if any. The Accreted Value of this Bond at the Conversion Date is referred to herein as the Maturity Value. After the Conversion Date, current interest on this Bond shall accrue on the Maturity Value of this Bond at the rate set forth above. Current interest of this Bond accruing after the Conversion Date is payable on each January 1 and July 1 (each, a "Interest Payment Date") in each year to be registered owner hereof from the Interest Payment Date next proceeding the date on which Bond is registered (unless it is registered after the close of business on the fifteenth calendar day of the month next preceding any Interest Payment Date (a "Record Date") and before the close of business on the immediately following Interest Payment Date, in which event it shall bear interest from such following Interest Payment Date, or unless this Bond is registered prior to the close of business on the Record Date preceding the first Interest Payment Date after the Conversion Date, in which event it shall bear interest from the Conversion Date set forth above; provided, however, that if at the time of registration of this Bond interest with respect hereto is in default, interest with respect hereto shall be payable from the Interest Payment Date to which interest has previously been paid or made available for payment).  Principal and Redemption Price of this Bond shall be payable at the principal corporate trust office of **THE BANK OF NEW YORK MELLON**, as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts.  All overdue Principal (and any interest accruing thereon) shall remain due and payable until paid.

      THE TRUST AGREEMENT (HEREINAFTER DEFINED) PROVIDES THAT THE BONDS, INCLUDING THIS BOND, SHALL BE PAYABLE SOLELY FROM THE TRUST ESTATE.  THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR OF INSTRUMENTALITIES (OTHER THAN THE AUTHORITY), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES

---

[2] Reflects Accreted Value as of the Conversion Date if no payments are made prior to stated Conversion Date.

(OTHER THAN THE AUTHORITY) SHALL BE LIABLE FOR THE PAYMENT THEREOF. THE AUTHORITY HAS NO TAXING POWER.

THIS BOND IS A SPECIAL OBLIGATION OF THE AUTHORITY, PAYABLE SOLELY FROM THE TRUST ESTATE. This Bond is secured by a perfected first-priority lien on and first-priority security interest in the Trust Estate for the payment of the Principal and Redemption Price of and interest on all Outstanding Bonds. The Bonds and any first-priority lien and first-priority security interest securing such Bonds shall in all respects be senior and superior to the Subordinated Indebtedness and the subordinate lien and subordinate security interest granted in the Trust Estate for the benefit of the Holders of Subordinated Indebtedness.

This Bond is one of a duly authorized issue of bonds of the Authority designated as "Restructured Toll Revenue Senior Bonds, Series 2022C" (herein called the "Series 2022C Bonds"), issued pursuant to the Act and a Master Trust Agreement by and between the Authority and the Trustee, dated as of _____, 2022 (the "Master Trust Agreement"), including as supplemented by a First Supplemental Trust Agreement, by and between the Authority and the Trustee, dated as of _____, 2022 (the "First Supplemental Trust Agreement", and together with the Master Trust Agreement, collectively referred to herein as the "Trust Agreement"). The Trust Agreement may be amended to the extent and in the manner provided therein. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Trust Agreement.

The Series 2022C Bonds are subject to optional, mandatory and extraordinary mandatory redemption prior to maturity as provided in the Trust Agreement. Notice of redemption shall be given as provided in the Trust Agreement.

Copies of the Trust Agreement are on file at the office of the Authority, and at the corporate trust office of the Trustee, and reference to the Trust Agreement and any and all supplements thereto and amendments thereof, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the Trust Agreement and subject to the conditions therein, the provisions of the Trust Agreement or any Supplemental Trust Agreement amendatory thereof or supplemental thereto may be modified or amended.

It is hereby certified, recited, and declared that the Authority has taken all necessary action to make the Series 2022C Bonds, when authenticated by the Trustee and issued by the Authority, valid and binding obligations of the Authority and to constitute the First Supplemental Trust Agreement a valid and binding instrument for the authorization of and security for the Series 2022C Bonds.

The registered owner of this Bond shall have no right to enforce the provisions of the Trust Agreement, to institute action to enforce the provisions of the Trust Agreement or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Trust Agreement.

This Bond is transferable, as provided in the Trust Agreement, only upon the books of the Authority maintained for that purpose at the corporate trust office of the Trustee by the registered

owner hereof in person or by his attorney duly authorized in writing, upon surrender of this Bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2022C Bond or Bonds in the same aggregate Accreted Value, and of the same series, maturity, accretion rate and interest rate shall be issued to the transferee in exchange therefor as provided in the Master Trust Agreement and upon the payment of the charges, if any, therein prescribed. The Authority and the Trustee may treat and consider the person in whose name this Bond is registered as the absolute owner hereof for the purpose of receiving payments due on this Bond and for all other purposes whatsoever.

**IN WITNESS WHEREOF, THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY** has caused this Bond to be signed in its name and on its behalf by [     ] and [     ] and attested by its [     ] (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2022C Bonds.

_____

_____

**ATTEST:**

By: _____
Name:
Title:

C-4

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This Bond is one of the Bonds described in the within mentioned Trust Agreement and is one of the Restructured Toll Revenue Senior Bonds, Series 2022C, of the Puerto Rico Highways and Transportation Authority.

**THE BANK OF NEW YORK MELLON**, as Trustee

By: _____
Authorized Signatory

Date of authentication: _____, 2022

4877-6935-9914.5

ASSIGNMENT

FOR VALUE RECEIVED:

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

<div style="border: 1px solid black; width: 200px; height: 50px;"></div>

_____

_____          Please print or typewrite name and address,
                                                 including zip code, of transferee

the within-mentioned Bond and hereby irrevocably constitutes and appoints _____, attorney-in-fact, to transfer the same on the books of registry in the office of the Trustee, as registrar, with full power of substitution in the premises.

Dated: _____          _____

NOTE: The signature to this assignment must correspond with the name as written on the within Bond in every particular, without alteration or enlargement or any change whatsoever.

_____
| Signature Guaranteed: |
|                       |
|                       |
_____

C-6

# EXHIBIT D

## ACCRETED VALUE TABLE

| Fiscal Year | Series 2022B Bonds | | | Series 2022C Bonds | |
|---|---|---|---|---|---|
| | Initial Accreted Value | Accreted Value at each Redemption Date [1] | Maturity Value [2] | Initial Accreted Value | Maturity Value[2] |
| 2025 | $25,289,588.80 | $29,327,916.80 | $41,440,000 | | |
| 2026 | 22,310,860.93 | 27,183,444.45 | 36,559,000 | | |
| 2027 | 25,083,317.54 | 32,108,471.38 | 41,102,000 | | |
| 2028 | 28,817,559.67 | 38,756,163.54 | 47,221,000 | | |
| 2029 | 35,543,345.34 | 50,221,494.18 | 58,242,000 | | |
| 2030 | 35,310,832.47 | 52,419,172.95 | 57,861,000 | | |
| 2031 | 33,610,009.98 | 52,419,983.94 | 55,074,000 | | |
| 2032 | 31,990,353.40 | 52,420,000.00 | 52,420,000 | | |
| 2033 | | | | $11,637,848.90 | $19,070,000 |
| 2034 | | | | 12,220,046.48 | 20,024,000 |
| 2035 | | | | 12,830,926.75 | 21,025,000 |
| 2036 | | | | 13,472,320.52 | 22,076,000 |
| 2037 | | | | 14,146,058.60 | 23,180,000 |
| 2038 | | | | 14,853,361.53 | 24,339,000 |
| 2039 | | | | 15,596,060.12 | 25,556,000 |
| 2040 | | | | 16,375,985.18 | 26,834,000 |
| 2041 | | | | 17,194,967.52 | 28,176,000 |
| 2042 | | | | 18,054,837.95 | 29,585,000 |
| 2043 | | | | 18,957,427.28 | 31,064,000 |
| 2044 | | | | 19,905,176.59 | 32,617,000 |
| 2045 | | | | 20,900,526.96 | 34,248,000 |
| 2046 | | | | 21,945,309.20 | 35,960,000 |
| 2047 | | | | 23,042,574.66 | 37,758,000 |
| 2048 | | | | 24,194,764.42 | 39,646,000 |
| 2049 | | | | 25,404,319.56 | 41,628,000 |
| 2050 | | | | 26,674,901.70 | 43,710,000 |
| 2051 | | | | 28,008,341.65 | 45,895,000 |
| 2052 | | | | 29,408,911.30 | 48,190,000 |
| 2053 | | | | 22,219,930.70 | 36,410,000 |

[1] Equals the initial principal amount plus accreted interest to each sinking fund redemption date

[2] Equals the total accreted value that would be represented by the portion of the bonds being redeemed if held to maturity

4876-1750-1700.151700.17

# **<u>EXHIBIT I</u>**

Second Supplemental Trust Agreement (Subordinated Indebtedness)

Draft 12/2/2022

**SECOND SUPPLEMENTAL TRUST AGREEMENT**

**by and between**

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

**and**

**THE BANK OF NEW YORK MELLON, as Trustee**

———————————

*Dated as of December 6, 2022*

———————————

4865-9777-5143.10

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS AND AUTHORITY ................................................................ 2

    Section 1.01    Definitions ................................................................ 2
    Section 1.02    Rules of Construction ............................................... 3

ARTICLE II. THE SERIES 2022-1 SUBORDINATED INDEBTEDNESS .............................. 3

    Section 2.01    Authorization, Principal Amount, Designation and Series .................... 3
    Section 2.02    Dating, Maturity Dates and Interest Rate ................................ 3
    Section 2.03    Interest Payments........................................................ 3
    Section 2.04    Sinking Fund Installments.............................................. 4
    Section 2.05    Redemption Terms ..................................................... 5
    Section 2.06    Place of Payment ...................................................... 5
    Section 2.07    Purpose and Application of Proceeds......**Error! Bookmark not defined.**
    Section 2.08    Priority and Lien ...................................................... 6
    Section 2.09    Form, Denominations, Numbers and Letters ......................... 6
    Section 2.10    Paying Agent .......................................................... 6
    Section 2.11    Book Entry Procedures ................................................ 6
    Section 2.12    CUSIP Numbers ...................................................... 6

ARTICLE III. MISCELLANEOUS ................................................................ 6

    Section 3.01    Limitation of Rights ................................................... 6
    Section 3.02    Successors and Assigns ............................................... 7
    Section 3.03    Severability of Invalid Provision..................................... 7
    Section 3.04    Applicable Law ....................................................... 7
    Section 3.05    Signature and Counterparts ........................................... 7
    Section 3.06    Amendments and Supplements ....................................... 7

EXHIBIT A – FORM OF SERIES 2022-1 SUBORDINATED INDEBTEDNESS

## SECOND SUPPLEMENTAL TRUST AGREEMENT

**THIS SECOND SUPPLEMENTAL TRUST AGREEMENT**, is entered into as of December 6, 2022, by and between **PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**, (together with any successors thereto, the "**Authority**") a body both corporate and politic of the Commonwealth of Puerto Rico (the "**Commonwealth**"), and **THE BANK OF NEW YORK MELLON**, as trustee (the "**Trustee**"), a banking corporation organized and existing under and by virtue of the laws of New York and authorized to exercise corporate trust powers in the Commonwealth with a place of business located in New York, and supplements the Master Trust Agreement, dated as of December 6, 2022, by and between the Authority and the Trustee (the "**Master Agreement**").

## W I T N E S S E T H:

**WHEREAS**, on February 21, 2022, the Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**") certified a joint resolution approving the Commonwealth's modified annual budget for Fiscal Year 2022, which provides that the Secretary of the Treasury, on behalf of the Commonwealth, is authorized "to make one or more loans or extend one or more credit facilities to the Authority, pursuant to those agreed upon terms and conditions, to satisfy payments required in accordance with the POA, Confirmation Order, and Section 1(II)(D)(ii)(c) of this Joint Resolution" and authorizes the Authority "to receive the proceeds of such loan or credit facility, which shall be repaid pursuant to the terms and conditions agreed to with the Secretary of the Treasury;"

**WHEREAS**, the Authority and the Commonwealth entered into a Loan Agreement, dated as of July 8, 2022 (the "**Loan Agreement**"), in order for the Authority to make payments, in cash, to (i) holders of HTA 68 Bond Claims, (ii) holders of HTA 98 Senior Bond Claims and (iii) certain creditors entitled to the HTA Restriction Fee (as defined in the HTA/CCDA Related Plan Support Agreement, dated as of May 5, 2021) and (iv) the GUC Reserve;

**WHEREAS**, the Master Agreement provides that the Authority may issue Subordinated Indebtedness from time to time as authorized by a Supplemental Trust Agreement, which Subordinated Indebtedness is to be secured by a subordinate lien on and subordinate security interest in the Trust Estate for the payment of the Principal and Redemption Price of and interest on all Outstanding Subordinated Indebtedness, which lien and security interest shall in all respects be subject to and subordinate to the senior lien and senior security interest on the Trust Estate granted to the Holders of Outstanding Bonds;

**WHEREAS**, under the Loan Agreement, the Commonwealth made a multi-draw term loan to the Authority in the aggregate principal amount of $359,635,806.68 (the "**Loan**");

**WHEREAS**, on the date hereof, the Loan shall be converted into Subordinated Indebtedness of the Authority entitled "Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Subordinated Indebtedness, Series 2022-1" (the "**Series 2022-1 Subordinated Indebtedness**"), to be issued by the Authority and accepted by the Commonwealth in an aggregate principal amount of $[*NTD: principal amount equal to the outstanding principal amount of the Loan at the date of issuance*];

4865-9777-5143.10

**WHEREAS**, the Series 2022-1 Subordinated Indebtedness is issued under and pursuant to the Master Agreement, and is, therefore, entitled to the security provided thereby and all protections and covenants contained therein, all of which are incorporated into this Second Supplemental Agreement as if set forth fully herein; and

**WHEREAS**, the Authority has taken all necessary action to make the Series 2022-1 Subordinated Indebtedness, when authenticated by the Trustee and issued by the Authority, valid and binding obligations of the Authority and to constitute this Second Supplemental Agreement a valid and binding instrument for the authorization of and security for the Series 2022-1 Subordinated Indebtedness; and

**WHEREAS**, the United States District Court for the District of Puerto Rico (the "**Title III Court**") has made binding determinations concerning the Series 2022-1 Subordinated Indebtedness, which determinations are more particularly set forth in the recitals of the Master Agreement.

**NOW, THEREFORE, WITNESSETH** that the Authority does covenant and agree with the Trustee and with the Holder of the Series 2022-1 Subordinated Indebtedness, as follows:

## ARTICLE I.

## DEFINITIONS AND AUTHORITY

**Section 1.01   Definitions.**  Capitalized terms used herein and not otherwise defined shall have the respective meanings accorded such terms in the Master Agreement.  In addition, the following terms shall have the following meanings herein unless the context otherwise requires:

"**Agreement**" means the Master Agreement, as supplemented by this Second Supplemental Agreement.

"**Authorized Denomination**" means $1.00 principal amount or any integral multiple thereof.

"**CW Plan of Adjustment**" means the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated January 14, 2022 [Case No. 17-03283-LTS, ECF No. 19813-1], as confirmed by the Title III Court.

"**GUC Reserve**" has the meaning set forth in the Plan of Adjustment.

"**HTA 68 Bonds**" has the meaning set forth in the CW Plan of Adjustment.

"**HTA 98 Senior Bonds**" has the meaning set forth in the CW Plan of Adjustment.

"**Master Agreement**" shall have the meaning set forth in the Second paragraph of this Second Supplemental Agreement.

"**Second Supplemental Agreement**" means this Second Supplemental Trust Agreement, which supplements the Master Agreement to authorize the issuance of the Puerto Rico Highways

- 2 -

and Transportation Authority Restructured Toll Revenue Subordinated Indebtedness, Series 2022-1.

**Section 1.02   Rules of Construction.**   Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.   Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing persons shall include firms, associations and corporations, including public bodies as well as natural persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in the Second Supplemental Agreement, refer to the Second Supplemental Agreement.   All references to Articles and Sections in this Second Supplemental Agreement refer to the Articles and Sections hereof unless otherwise expressly stated.   All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

"**$**" and "**dollars**" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

## ARTICLE II.

## THE SERIES 2022-1 SUBORDINATED INDEBTEDNESS

**Section 2.01   Authorization, Principal Amount, Designation and Series**.   The Series 2022-1 Subordinated Indebtedness is hereby created and authorized to be issued in the aggregate principal amount of $[*NTD: principal amount equal to the outstanding principal amount of the Loan at the date of issuance*].   The Series 2022-1 Subordinated Indebtedness is issued under the Master Agreement and this Second Supplemental Agreement and secured on a junior and subordinate basis by the Master Agreement, this Second Supplemental Agreement and the Trust Estate.   The Series 2022-1 Subordinated Indebtedness is hereby designated as "Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Subordinated Indebtedness, Series 2022-1."

**Section 2.02   Dating, Maturity Dates and Interest Rate**.   The Series 2022-1 Subordinated Indebtedness shall be dated the date of their original issuance and shall mature on July 1, 2052 and bear interest at two and one half percent (2.50%) per annum and have CUSIP number _____.

**Section 2.03   Interest Payments.**   Interest on the Series 2022-1 Subordinated Indebtedness shall be computed on the basis of a 360-day year consisting of twelve 30-day months and shall be payable for the actual number of days elapsed (including the first day but excluding the last day) and shall be payable semiannually on each Interest Payment Date, commencing July 1, 2023; provided that in the event of redemption of the Series 2022-1 Subordinated Indebtedness, accrued interest shall be payable on the date of redemption.   All overdue interest and Principal (and any interest accruing thereon) shall remain due and payable until paid.   If any such Interest Payment Date or Principal Payment Date is not a Business Day, any action to be taken on such

- 3 -

date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of such delay.

        **Section 2.04   Sinking Fund Installments.** The Series 2022-1 Subordinated Indebtedness shall be subject to mandatory redemption, in part, through the application of Sinking Fund Installments, as herein provided, upon notice given as prescribed in Article IV of the Master Agreement, at the Redemption Price of one hundred per centum (100%) of the Principal amount of the Series 2022-1 Subordinated Indebtedness or portion thereof to be redeemed, plus accrued interest, if any, to the date of redemption.   Unless none of the Series 2022-1 Subordinated Indebtedness of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions below permitting amounts to be credited to part or all of any one or more Sinking Fund Installments or the payment due at stated maturity, there shall be due and the Authority shall be required to pay for the retirement of the Series 2022-1 Subordinated Indebtedness maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2022-1 Subordinated Indebtedness.

<div align="center">

$
Series 2022-1 Subordinated Indebtedness
maturing July 1, 2052
CUSIP:

</div>

| Year | Amount *[NTD: Amounts to be revised per final principal amount of Subordinated Indebtedness]* |
|------|------|
| 7/1/2023 | $10,763,135.00 |
| 7/1/2024 | 9,447,509.00 |
| 7/1/2025 | 4,810,622.00 |
| 7/1/2026 | 5,197,995.00 |
| 7/1/2027 | 5,600,394.00 |
| 7/1/2028 | 6,018,302.00 |
| 7/1/2029 | 6,452,216.00 |
| 7/1/2030 | 6,902,647.00 |
| 7/1/2031 | 7,370,121.00 |
| 7/1/2032 | 7,855,180.00 |
| 7/1/2033 | 8,358,382.00 |
| 7/1/2034 | 8,880,300.00 |
| 7/1/2035 | 9,421,525.00 |
| 7/1/2036 | 9,982,665.00 |
| 7/1/2037 | 10,564,346.00 |
| 7/1/2038 | 11,167,211.00 |
| 7/1/2039 | 11,791,923.00 |
| 7/1/2040 | 12,439,163.00 |
| 7/1/2041 | 13,109,633.00 |

| | |
|---|---|
| 7/1/2042 | 13,804,055.00 |
| 7/1/2043 | 14,523,171.00 |
| 7/1/2044 | 15,267,745.00 |
| 7/1/2045 | 16,038,563.00 |
| 7/1/2046 | 16,836,434.00 |
| 7/1/2047 | 17,662,190.00 |
| 7/1/2048 | 18,516,687.00 |
| 7/1/2049 | 19,400,805.00 |
| 7/1/2050 | 20,315,451.00 |
| 7/1/2051 | 21,261,555.00 |
| 7/1/2052 | 19,875,881.68 |

There shall be credited against and in satisfaction of the Sinking Fund Installments or the payment due at stated maturity payable on a Series 2022-1 Subordinated Indebtedness entitled, as applicable, to the payment of such Sinking Fund Installments and the payment due at stated maturity an amount equal to the Principal amount of such Series 2022-1 Subordinated Indebtedness (A) redeemed by the Authority pursuant to Section 2.05 hereof, (B) purchased by the Authority (so long as no Bonds are Outstanding) and delivered to the Trustee for cancellation, and (C) deemed to have been paid in accordance with Section 13.01 of the Master Agreement. Series 2022-1 Subordinated Indebtedness redeemed at the option of the Authority, purchased by the Authority or deemed to have been paid in accordance with Section 13.01 of the Master Agreement under this paragraph shall be applied in satisfaction, in whole or in part, of one or more Sinking Fund Installments payable on such dates as the Authority shall specify in a written direction of the Authority delivered to the Trustee at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 2022-1 Subordinated Indebtedness entitled to such Sinking Fund Installment may be given by the Trustee and the Sinking Fund Installment payable on each date specified in such direction shall be reduced by the Principal amount of the Series 2022-1 Subordinated Indebtedness (or portions thereof) so purchased, redeemed or deemed to have been paid in accordance with Section 13.01 of the Master Agreement to be applied in satisfaction of such Sinking Fund Installment as set forth in such direction.

**Section 2.05   Redemption Terms**.  The Series 2022-1 Subordinated Indebtedness is subject to redemption prior to maturity, at the election or direction of the Authority (with the prior written consent of the Oversight Board for so long as the Oversight Board remains in existence), in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day at a Redemption Price equal to the principal amount thereof, plus accrued interest to the dated fixed for redemption; *provided, however*, that no part of the Trust Estate shall be used to pay the Redemption Price of the Series 2022-1 Subordinated Indebtedness for so long as any Bonds remain Outstanding under the Master Agreement; *provided, further,* that any redemption of the Series 2022-1 Subordinated Indebtedness shall be subject in all respects to Article XII of the Master Agreement.  In the event the Series 2022-1 Subordinated Indebtedness is being redeemed in connection with a Partial Disposition of the Toll Facilities, the Authority must demonstrate compliance with Section 7.18(b) of the Master Agreement.

**Section 2.06   Place of Payment**.  The Series 2022-1 Subordinated Indebtedness shall be payable at the designated Corporate Trust Office of the Trustee.

- 5 -

**Section 2.07**   [Reserved]

**Section 2.08   Priority and Lien**.  The Series 2022-1 Subordinated Indebtedness and the subordinate lien on and subordinate security interest in the Trust Estate securing such Subordinated Indebtedness shall be expressly junior, inferior, and subordinate in all respects to and subject in all respects to the prior payment in full of the Bonds and to any liens securing the Bonds.  The Subordinated Indebtedness shall be special obligations of the Authority payable solely from the Trust Estate in the manner provided in the Master Agreement.

**Section 2.09 Form, Denominations, Numbers and Letters**.   The Series 2022-1 Subordinated Indebtedness shall be issued as fully registered notes in Authorized Denominations. Unless the Authority shall otherwise direct, the Series 2022-1 Subordinated Indebtedness shall be numbered and lettered "22-1-R-_," followed by the number of the note.  Each of the Series 2022-1 Subordinated Indebtedness shall, in each case be numbered consecutively from one (1) upward. Subject to the provisions of the Master Agreement, the form of the Series 2022-1 Subordinated Indebtedness and the Trustee's Certificate of Authentication thereon shall be substantially in the form annexed hereto as Exhibit A.

**Section 2.10   Paying Agent**.  The Trustee is hereby appointed Paying Agent for the Series 2022-1 Subordinated Indebtedness, such appointment to be effective immediately upon the filing of this Second Supplemental Agreement with the Trustee.

**Section 2.11   Book Entry Procedures**.  Notwithstanding any other provision of this Second Supplemental Agreement to the contrary, so long as any Series 2022-1 Subordinated Indebtedness is registered in the name of Cede & Co., as nominee of the Depository, all payments on such Series 2022-1 Subordinated Indebtedness, and all deliveries to be made and notices to be delivered with respect to such Series 2022-1 Subordinated Indebtedness, shall be made and given pursuant to the Depository's rules and procedures then in effect.

**Section 2.12   CUSIP Numbers**.  Neither the Authority nor the Trustee shall be liable for any defect or inaccuracy in the CUSIP number as it appears on any Series 2022-1 Subordinated Indebtedness or in any notice of redemption.  The Authority shall promptly notify the Trustee of any change in the CUSIP numbers assigned to any Series 2022-1 Subordinated Indebtedness of which the Authority has knowledge.

### ARTICLE III.

### MISCELLANEOUS

**Section 3.01   Limitation of Rights.**  Nothing in this Second Supplemental Agreement expressed or implied is intended or shall be construed to confer upon, or to give or grant to, any person or party, other than the Authority, the Trustee, the Paying Agent and the registered owners of the Series 2022-1 Subordinated Indebtedness, any rights, remedies or claims under or by reason hereof or of the Master Agreement or any covenant, condition or stipulation hereof or of the Master Agreement.  All covenants, stipulations, promises and agreements in this Second Supplemental Agreement shall be for the sole and exclusive benefit of the Authority, the Trustee, the Paying Agent and the registered owners of the Series 2022-1 Subordinated Indebtedness.

4865-9777-5143.10

**Section 3.02   Successors and Assigns.**  This Second Supplemental Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

**Section 3.03   Severability of Invalid Provision.**  If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein on the part of the Authority or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions of the Master Agreement or of this Supplemental Agreement or of the Series 2022-1 Subordinated Indebtedness.

**Section 3.04   Applicable Law.**  This Second Supplemental Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction. Any disputes, legal action, suit, or proceeding arising from or related to the Agreement or the Series 2022-1 Subordinated Indebtedness (a) shall be brought in accordance herewith in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept jurisdiction, in any federal district court sitting in the Commonwealth and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**Section 3.05   Signature and Counterparts.**  This Second Supplemental Agreement may be executed and delivered in any number of counterparts, each of which shall be an original, but such counterparts together shall constitute one and the same instrument.

**Section 3.06   Amendments and Supplements.**  This Second Supplemental Agreement may only be amended or supplemented in accordance with the provisions of Articles IX and X of the Master Agreement, ***provided***, ***however***, that no amendment or supplement to any provision of this Second Supplemental Agreement shall in any event be effective unless the same shall be approved by the Oversight Board, while still in existence, pursuant to Section 207 of PROMESA.

4865-9777-5143.10

**IN WITNESS WHEREOF**, the Authority and the Trustee have caused this Second Supplemental Agreement to be executed in their respective corporate names by their duly authorized officers, all as of the date Second above written.

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

By: _____
Name:
Title:

**THE BANK OF NEW YORK MELLON,** as Trustee

By: _____
Name:
Title:

[Second Supplemental Trust Agreement Signature Page]

EXHIBIT A

FORM OF SERIES 2022-1 SUBORDINATED INDEBTEDNESS

4865-9777-5143.10

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE ____ DAY OF _____, 2022.**

Number: 22-1-R-1                                                                                               $

UNITED STATES OF AMERICA
PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY
RESTRUCTURED TOLL REVENUE
SUBORDINATED INDEBTEDNESS, SERIES 2022-1

<u>INTEREST RATE</u>          <u>MATURITY DATE</u>          <u>DATED DATE</u>

2.500%                        July 1, 2052

Registered Owner:        COMMONWEALTH OF PUERTO RICO

Principal Amount:

The **PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY** (the "Authority"), a body corporate and politic constituting a public corporation and government instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), for value received, hereby promises to pay from the Subordinated Indebtedness Fund to the **REGISTERED OWNER** named above, on the **MATURITY DATE** stated above (or earlier as hereinafter referred to), upon the presentation and surrender hereof at the corporate trust office of the Trustee (hereinafter defined), the **PRINCIPAL AMOUNT** stated above and to pay interest thereon from the date hereof or from the January 1 or July 1 next preceding the date of authentication to which interest shall have been paid, unless such date of authentication is a January 1 or July 1, in which case from such date, at the Interest Rate per annum specified above, until payment of such Principal, such interest to the payment hereof being payable semi-annually on the first (1st) day of each January and July (each, an "Interest Payment Date"). Principal and Redemption Price of this note shall be payable at the principal corporate trust office of **THE BANK OF NEW YORK MELLON**, as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Payment of the interest hereon shall be payable by the Trustee as provided in Section 3.01 of the Master Trust Agreement (hereinafter defined), by wire transfer to such registered owner at the wire transfer address in the continental United States to which such registered owner has not later than the Record Date immediately preceding such Interest Payment Date directed the Trustee to wire such interest payment. The Record Date is the fifteenth (15th) day (whether or not a Business Day) of the calendar month next preceding the applicable Interest Payment Date. All overdue interest and Principal (and any interest accruing on such overdue amounts) shall remain due and payable until paid.

THE TRUST AGREEMENT (HEREINAFTER DEFINED) PROVIDES THAT THE SECURED OBLIGATIONS, INCLUDING THIS NOTE, SHALL BE PAYABLE SOLELY FROM THE TRUST ESTATE PROVIDED FOR SUCH PAYMENT. THE SECURED

OBLIGATIONS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR OF INSTRUMENTALITIES (OTHER THAN THE AUTHORITY), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE AUTHORITY) SHALL BE LIABLE FOR THE PAYMENT THEREOF. THE AUTHORITY HAS NO TAXING POWER.

THIS NOTE IS A SPECIAL OBLIGATION OF THE AUTHORITY, PAYABLE SOLELY FROM THE TRUST ESTATE IN THE MANNER PROVIDED IN THE MASTER TRUST AGREEMENT (AS DEFINED BELOW). This note is secured by a perfected subordinate lien on and subordinate security interest in the Trust Estate for the payment of the Principal and Redemption Price of and interest on all Outstanding Subordinated Indebtedness. This note and all Outstanding Subordinated Indebtedness and the subordinate lien on and subordinate security interest in the Trust Estate securing such Subordinated Indebtedness shall be expressly junior, inferior, and subordinate in all respects to and subject in all respects to the prior payment in full of the Bonds and to any liens securing the Bonds.

This note is a duly authorized subordinated note of the Authority designated as "Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Subordinated Indebtedness, Series 2022-1" (herein called the "Series 2022-1 Subordinated Indebtedness"), issued pursuant to the Act and a Master Trust Agreement, by and between the Authority and the Trustee, dated as of [      ], 2022 (the "Master Trust Agreement"), including as supplemented by a Second Supplemental Trust Agreement, by and between the Authority and the Trustee, dated as of [      ], 2022 (the "Second Supplemental Trust Agreement", and together with the Master Trust Agreement, collectively referred to herein as the "Trust Agreement"). The Trust Agreement may be amended to the extent and in the manner provided therein. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Trust Agreement.

The Series 2022-1 Subordinated Indebtedness is subject to optional and extraordinary mandatory redemption prior to maturity as provided in the Trust Agreement. Notice of redemption shall be given as provided in the Trust Agreement.

Copies of the Trust Agreement are on file at the office of the Authority, and at the corporate trust office of the Trustee, and reference to the Trust Agreement and any and all supplements thereto and amendments thereof, the terms and conditions upon which Secured Obligations have been issued and additional Secured Obligations may be issued, the rights and remedies of the registered owners of the Secured Obligations with respect thereto, and to other terms and provisions of the Secured Obligations. To the extent and in the manner permitted by the terms of the Trust Agreement and subject to the conditions therein, the provisions of the Trust Agreement or any Supplemental Trust Agreement amendatory thereof or supplemental thereto may be modified or amended.

It is hereby certified, recited, and declared that the Authority has taken all necessary action to make the Series 2022-1 Subordinated Indebtedness, when authenticated by the Trustee and issued by the Authority, valid and binding obligations of the Authority and to constitute the Second

Supplemental Trust Agreement a valid and binding instrument for the authorization of and security for the Series 2022-1 Subordinated Indebtedness.

The registered owner of this note shall have no right to enforce the provisions of the Trust Agreement, to institute action to enforce the provisions of the Trust Agreement or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Trust Agreement.

This note is non-transferable and may not be assigned by the Authority or the Registered Owner hereof.

**IN WITNESS WHEREOF, THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY** has caused this note to be signed in its name and on its behalf by the [_____] and attested by [            ] (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2022-1 Subordinated Indebtedness, all as of the Dated Date specified above.

_____

_____

**ATTEST:**

_____
            [            ]

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This note is one of the Subordinated Indebtedness described in the within mentioned Trust Agreement and is one of the Restructured Toll Revenue Subordinated Indebtedness, Series 2022-1, of the Puerto Rico Highways and Transportation Authority.

**THE BANK OF NEW YORK MELLON**, as Trustee

By: _____

Authorized Signatory

Date of authentication:   [_____], 2022

4883-3020-4458.8

**ASSIGNMENT**

FOR VALUE RECEIVED:   _____

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

_____

Please print or typewrite name and address,
including zip code, of transferee

the   within-mentioned   note   and   hereby   irrevocably   constitutes   and   appoints
_____, attorney-in-fact, to transfer the same on the
books of registry in the office of the Trustee, as registrar, with full power of substitution in the
premises.

Dated: _____       _____

NOTE: The signature to this assignment must
correspond with the name as written on the within
note in every particular, without alteration or
enlargement or any change whatsoever.

Signature Guaranteed:

**<u>Redline of Exhibit I</u>**

Draft 9/6/22 12/2/2022

**SECOND SUPPLEMENTAL TRUST AGREEMENT**

**by and between**

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

**and**

**THE BANK OF NEW YORK MELLON, as Trustee**

———————————————

***Dated as of ———————, December 6, 2022***

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS AND AUTHORITY ........................................................ 2

    Section 1.01    Definitions ........................................................................... 2
    Section 1.02    Rules of Construction .......................................................... 3

ARTICLE II. THE SERIES 2022-1 SUBORDINATED INDEBTEDNESS ............. 3

    Section 2.01    Authorization, Principal Amount, Designation and Series ... 3
    Section 2.02    Dating, Maturity Dates and Interest Rate ........................... 3
    Section 2.03    Interest Payments. ................................................................ 3
    Section 2.04    Sinking Fund Installments.. ................................................. 4
    Section 2.05    Redemption Terms ............................................................... 5
    Section 2.06    Place of Payment ................................................................. 5
    Section 2.07    Purpose and Application of Proceeds ....... **Error! Bookmark not defined.**
    Section 2.08    Priority and Lien ................................................................. 6
    Section 2.09    Form, Denominations, Numbers and Letters ...................... 6
    Section 2.10    Paying Agent ....................................................................... 6
    Section 2.11    Book Entry Procedures ....................................................... 6
    Section 2.12    CUSIP Numbers ................................................................. 6

ARTICLE III. MISCELLANEOUS .......................................................................... 6

    Section 3.01    Limitation of Rights ............................................................ 6
    Section 3.02    Successors and Assigns ....................................................... 7
    Section 3.03    Severability of Invalid Provision ......................................... 7
    Section 3.04    Applicable Law .................................................................... 7
    Section 3.05    Signature and Counterparts ................................................. 7
    Section 3.06    Amendments and Supplements ........................................... 7

EXHIBIT A – FORM OF SERIES 2022-1 SUBORDINATED INDEBTEDNESS

## SECOND SUPPLEMENTAL TRUST AGREEMENT

 **THIS SECOND SUPPLEMENTAL TRUST AGREEMENT**, is entered into as of December 6, 2022, by and between **PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**, (together with any successors thereto, the "**Authority**") a body both corporate and politic of the Commonwealth of Puerto Rico (the "**Commonwealth**"), and **THE BANK OF NEW YORK MELLON**, as trustee (the "**Trustee**"), a banking corporation organized and existing under and by virtue of the laws of New York and authorized to exercise corporate trust powers in the Commonwealth with a place of business located in New York, and supplements the Master Trust Agreement, dated as of December 6, 2022, by and between the Authority and the Trustee (the "**Master Agreement**").

<h3 style="text-align:center">W I T N E S S E T H:</h3>

 **WHEREAS**, on February 21, 2022, the Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**") certified a joint resolution approving the Commonwealth's modified annual budget for Fiscal Year 2022, which provides that the Secretary of the Treasury, on behalf of the Commonwealth, is authorized "to make one or more loans or extend one or more credit facilities to the Authority, pursuant to those agreed upon terms and conditions, to satisfy payments required in accordance with the POA, Confirmation Order, and Section 1(II)(D)(ii)(c) of this Joint Resolution" and authorizes the Authority "to receive the proceeds of such loan or credit facility, which shall be repaid pursuant to the terms and conditions agreed to with the Secretary of the Treasury;"

 **WHEREAS**, the Authority and the Commonwealth entered into a Loan Agreement, dated as of July 8, 2022 (the "**Loan Agreement**"), in order for the Authority to make payments, in cash, to (i) holders of HTA 68 Bond Claims, (ii) holders of HTA 98 Senior Bond Claims and (iii) certain creditors entitled to the HTA Restriction Fee (as defined in the HTA/CCDA Related Plan Support Agreement, dated as of May 5, 2021) and (iv) the GUC Reserve;

 **WHEREAS**, the Master Agreement provides that the Authority may issue Subordinated Indebtedness from time to time as authorized by a Supplemental Trust Agreement, which Subordinated Indebtedness is to be secured by a subordinate lien on and subordinate security interest in the Trust Estate for the payment of the Principal and Redemption Price of and interest on all Outstanding Subordinated Indebtedness, which lien and security interest shall in all respects be subject to and subordinate to the senior lien and senior security interest on the Trust Estate granted to the Holders of Outstanding Bonds;

 **WHEREAS**, under the Loan Agreement, the Commonwealth made a multi-draw term loan to the Authority in the aggregate principal amount of $359,635,806.68 (the "**Loan**");

 **WHEREAS**, on the date hereof, the Loan shall be converted into Subordinated Indebtedness of the Authority entitled "Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Subordinated Indebtedness, Series 2022-1" (the "**Series 2022-1 Subordinated Indebtedness**"), to be issued by the Authority and accepted by the Commonwealth in an aggregate principal amount of $[*NTD: principal amount equal to the outstanding principal amount of the Loan at the date of issuance*];

**WHEREAS**, the Series 2022-1 Subordinated Indebtedness is issued under and pursuant to the Master Agreement, and is, therefore, entitled to the security provided thereby and all protections and covenants contained therein, all of which are incorporated into this Second Supplemental Agreement as if set forth fully herein; and

**WHEREAS**, the Authority has taken all necessary action to make the Series 2022-1 Subordinated Indebtedness, when authenticated by the Trustee and issued by the Authority, valid and binding obligations of the Authority and to constitute this Second Supplemental Agreement a valid and binding instrument for the authorization of and security for the Series 2022-1 Subordinated Indebtedness; and

**WHEREAS**, the United States District Court for the District of Puerto Rico (the "**Title III Court**") has made binding determinations concerning the Series 2022-1 Subordinated Indebtedness, which determinations are more particularly set forth in the recitals of the Master Agreement.

**NOW, THEREFORE, WITNESSETH** that the Authority does covenant and agree with the Trustee and with the Holder of the Series 2022-1 Subordinated Indebtedness, as follows:

## ARTICLE I.

## DEFINITIONS AND AUTHORITY

**Section 1.01   Definitions.**   Capitalized terms used herein and not otherwise defined shall have the respective meanings accorded such terms in the Master Agreement.  In addition, the following terms shall have the following meanings herein unless the context otherwise requires:

"**Agreement**" means the Master Agreement, as supplemented by this Second Supplemental Agreement.

"**Authorized Denomination**" means $1.00 principal amount or any integral multiple thereof.

"**CW Plan of Adjustment**" means the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated January 14, 2022 [Case No. 17-03283-LTS, ECF No. 19813-1], as confirmed by the Title III Court.

"**GUC Reserve**" has the meaning set forth in the Plan of Adjustment.

"**HTA 68 Bonds**" has the meaning set forth in the CW Plan of Adjustment.

"**HTA 98 Senior Bonds**" has the meaning set forth in the CW Plan of Adjustment.

"**Master Agreement**" shall have the meaning set forth in the Second paragraph of this Second Supplemental Agreement.

"**Second Supplemental Agreement**" means this Second Supplemental Trust Agreement, which supplements the Master Agreement to authorize the issuance of the Puerto Rico Highways

- 2 -

and Transportation Authority Restructured Toll Revenue Subordinated Indebtedness, Series 2022-1.

**Section 1.02   Rules of Construction.**   Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.   Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing persons shall include firms, associations and corporations, including public bodies as well as natural persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in the Second Supplemental Agreement, refer to the Second Supplemental Agreement.  All references to Articles and Sections in this Second Supplemental Agreement refer to the Articles and Sections hereof unless otherwise expressly stated.   All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

"**$**" and "**dollars**" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

## ARTICLE II.

## THE SERIES 2022-1 SUBORDINATED INDEBTEDNESS

**Section 2.01   Authorization, Principal Amount, Designation and Series**.  The Series 2022-1 Subordinated Indebtedness is hereby created and authorized to be issued in the aggregate principal amount of $[*NTD: principal amount equal to the outstanding principal amount of the Loan at the date of issuance*].   The Series 2022-1 Subordinated Indebtedness is issued under the Master Agreement and this Second Supplemental Agreement and secured on a junior and subordinate basis by the Master Agreement, this Second Supplemental Agreement and the Trust Estate.   The Series 2022-1 Subordinated Indebtedness is hereby designated as "Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Subordinated Indebtedness, Series 2022-1."

**Section 2.02   Dating, Maturity Dates and Interest Rate**.   The Series 2022-1 Subordinated Indebtedness shall be dated the date of their original issuance and shall mature on July 1, 2052 and bear interest at two and one half percent (2.50%) per annum and have CUSIP number _____.

**Section 2.03   Interest Payments.** Interest on the Series 2022-1 Subordinated Indebtedness shall be computed on the basis of a 360-day year consisting of twelve 30-day months and shall be payable for the actual number of days elapsed (including the first day but excluding the last day) and shall be payable semiannually on each Interest Payment Date, commencing July 1, 2023; provided that in the event of redemption of the Series 2022-1 Subordinated Indebtedness, accrued interest shall be payable on the date of redemption.   All overdue interest and Principal (and any interest accruing thereon) shall remain due and payable until paid.  If any such Interest Payment Date or Principal Payment Date is not a Business Day,

- 3 -

any action to be taken on such date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of such delay.

    **Section 2.04  Sinking Fund Installments.**    The Series 2022-1 Subordinated Indebtedness shall be subject to mandatory redemption, in part, through the application of Sinking Fund Installments, as herein provided, upon notice given as prescribed in Article IV of the Master Agreement, at the Redemption Price of one hundred per centum (100%) of the Principal amount of the Series 2022-1 Subordinated Indebtedness or portion thereof to be redeemed, plus accrued interest, if any, to the date of redemption.  Unless none of the Series 2022-1 Subordinated Indebtedness of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions below permitting amounts to be credited to part or all of any one or more Sinking Fund Installments or the payment due at stated maturity, there shall be due and the Authority shall be required to pay for the retirement of the Series 2022-1 Subordinated Indebtedness maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2022-1 Subordinated Indebtedness.

<div align="center">

$

Series 2022-1 Subordinated Indebtedness

maturing July 1, 2052

CUSIP:

</div>

| Year | Amount *[NTD: Amounts to be revised per final principal amount of Subordinated Indebtedness]* |
|:---:|:---:|
| 7/1/2023 | $10,763,135.00 |
| 7/1/2024 | 9,447,509.00 |
| 7/1/2025 | 4,810,622.00 |
| 7/1/2026 | 5,197,995.00 |
| 7/1/2027 | 5,600,394.00 |
| 7/1/2028 | 6,018,302.00 |
| 7/1/2029 | 6,452,216.00 |
| 7/1/2030 | 6,902,647.00 |
| 7/1/2031 | 7,370,121.00 |
| 7/1/2032 | 7,855,180.00 |
| 7/1/2033 | 8,358,382.00 |
| 7/1/2034 | 8,880,300.00 |
| 7/1/2035 | 9,421,525.00 |
| 7/1/2036 | 9,982,665.00 |
| 7/1/2037 | 10,564,346.00 |
| 7/1/2038 | 11,167,211.00 |
| 7/1/2039 | 11,791,923.00 |
| 7/1/2040 | 12,439,163.00 |

| | |
|---|---|
| 7/1/2041 | 13,109,633.00 |
| 7/1/2042 | 13,804,055.00 |
| 7/1/2043 | 14,523,171.00 |
| 7/1/2044 | 15,267,745.00 |
| 7/1/2045 | 16,038,563.00 |
| 7/1/2046 | 16,836,434.00 |
| 7/1/2047 | 17,662,190.00 |
| 7/1/2048 | 18,516,687.00 |
| 7/1/2049 | 19,400,805.00 |
| 7/1/2050 | 20,315,451.00 |
| 7/1/2051 | 21,261,555.00 |
| 7/1/2052 | 19,875,881.68 |

There shall be credited against and in satisfaction of the Sinking Fund Installments or the payment due at stated maturity payable on a Series 2022-1 Subordinated Indebtedness entitled, as applicable, to the payment of such Sinking Fund Installments and the payment due at stated maturity an amount equal to the Principal amount of such Series 2022-1 Subordinated Indebtedness (A) redeemed by the Authority pursuant to Section 2.05 hereof, (B) purchased by the Authority (so long as no Bonds are Outstanding) and delivered to the Trustee for cancellation, and (C) deemed to have been paid in accordance with Section 13.01 of the Master Agreement. Series 2022-1 Subordinated Indebtedness redeemed at the option of the Authority, purchased by the Authority  or deemed to have been paid in accordance with Section 13.01 of the Master Agreement under this paragraph shall be applied in satisfaction, in whole or in part, of one or more Sinking Fund Installments payable on such dates as the Authority shall specify in a written direction of the Authority delivered to the Trustee at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 2022-1 Subordinated Indebtedness entitled to such Sinking Fund Installment may be given by the Trustee and the Sinking Fund Installment payable on each date specified in such direction shall be reduced by the Principal amount of the Series 2022-1 Subordinated Indebtedness (or portions thereof) so purchased, redeemed or deemed to have been paid in accordance with Section 13.01 of the Master Agreement to be applied in satisfaction of such Sinking Fund Installment as set forth in such direction.

**Section 2.05   Redemption Terms**.  The Series 2022-1 Subordinated Indebtedness is subject to redemption prior to maturity, at the election or direction of the Authority (with the prior written consent of the Oversight Board for so long as the Oversight Board remains in existence), in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day at a Redemption Price equal to the principal amount thereof, plus accrued interest to the dated fixed for redemption; *provided, however*, that no part of the Trust Estate shall be used to pay the Redemption Price of the Series 2022-1 Subordinated Indebtedness for so long as any Bonds remain Outstanding under the Master Agreement; *provided, further,* that any redemption of the Series 2022-1 Subordinated Indebtedness shall be subject in all respects to Article XII of the Master Agreement.  In the event the Series 2022-1 Subordinated Indebtedness is being redeemed in connection with a Partial Disposition of the Toll Facilities, the Authority must demonstrate compliance with Section 7.18(b) of the Master Agreement.

**Section 2.06   Place of Payment**.  The Series 2022-1 Subordinated Indebtedness shall be payable at the designated ~~corporate trust office~~Corporate Trust Office of the Trustee.

**Section 2.07**   [Reserved]

**Section 2.08   Priority and Lien**.  The Series 2022-1 Subordinated Indebtedness and the subordinate lien on and subordinate security interest in the Trust Estate securing such Subordinated Indebtedness shall be expressly junior, inferior, and subordinate in all respects to and subject in all respects to the prior payment in full of the Bonds and to any liens securing the Bonds.  The Subordinated Indebtedness shall be special obligations of the Authority payable solely from the Trust Estate in the manner provided in the Master Agreement.

**Section 2.09 Form, Denominations, Numbers and Letters**.  The Series 2022-1 Subordinated Indebtedness shall be issued as fully registered notes in Authorized Denominations.  Unless the Authority shall otherwise direct, the Series 2022-1 Subordinated Indebtedness shall be numbered and lettered "22-1-R-_," followed by the number of the note.  Each of the Series 2022-1 Subordinated Indebtedness shall, in each case be numbered consecutively from one (1) upward.  Subject to the provisions of the Master Agreement, the form of the Series 2022-1 Subordinated Indebtedness and the Trustee's Certificate of Authentication thereon shall be substantially in the form annexed hereto as Exhibit A.

**Section 2.10   Paying Agent**.  The Trustee is hereby appointed Paying Agent for the Series 2022-1 Subordinated Indebtedness, such appointment to be effective immediately upon the filing of this Second Supplemental Agreement with the Trustee.

**Section 2.11   Book Entry Procedures**.  Notwithstanding any other provision of this Second Supplemental Agreement to the contrary, so long as any Series 2022-1 Subordinated Indebtedness is registered in the name of Cede & Co., as nominee of the Depository, all payments on such Series 2022-1 Subordinated Indebtedness, and all deliveries to be made and notices to be delivered with respect to such Series 2022-1 Subordinated Indebtedness, shall be made and given pursuant to the Depository's rules and procedures then in effect.

**Section 2.12   CUSIP Numbers**.  Neither the Authority nor the Trustee shall be liable for any defect or inaccuracy in the CUSIP number as it appears on any Series 2022-1 Subordinated Indebtedness or in any notice of redemption.  The Authority shall promptly notify the Trustee of any change in the CUSIP numbers assigned to any Series 2022-1 Subordinated Indebtedness of which the Authority has knowledge.

## ARTICLE III.

## MISCELLANEOUS

**Section 3.01   Limitation of Rights.**  Nothing in this Second Supplemental Agreement expressed or implied is intended or shall be construed to confer upon, or to give or grant to, any person or party, other than the Authority, the Trustee, the Paying Agent and the registered owners of the Series 2022-1 Subordinated Indebtedness, any rights, remedies or claims under or by reason hereof or of the Master Agreement or any covenant, condition or stipulation hereof or of the Master Agreement.  All covenants, stipulations, promises and agreements in this Second

- 6 -

Supplemental Agreement shall be for the sole and exclusive benefit of the Authority, the Trustee, the Paying Agent and the registered owners of the Series 2022-1 Subordinated Indebtedness.

**Section 3.02   Successors and Assigns.**  This Second Supplemental Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

**Section 3.03   Severability of Invalid Provision.**  If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein on the part of the Authority or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions of the Master Agreement or of this Supplemental Agreement or of the Series 2022-1 Subordinated Indebtedness.

**Section 3.04   Applicable Law.**   This Second Supplemental Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction. Any disputes, legal action, suit, or proceeding arising from or related to the Agreement or the Series 2022-1 Subordinated Indebtedness (a) shall be brought in accordance herewith in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept jurisdiction, in any federal district court sitting in the Commonwealth and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**Section 3.05   Signature and Counterparts.**   This Second Supplemental Agreement may be executed and delivered in any number of counterparts, each of which shall be an original, but such counterparts together shall constitute one and the same instrument.

**Section 3.06   Amendments and Supplements.**  This Second Supplemental Agreement may only be amended or supplemented in accordance with the provisions of Articles IX and X of the Master Agreement, ***provided***, ***however***, that no amendment or supplement to any provision of this Second Supplemental Agreement shall in any event be effective unless the same shall be approved by the Oversight Board, while still in existence, pursuant to Section 207 of PROMESA.

**IN WITNESS WHEREOF**, the Authority and the Trustee have caused this Second Supplemental Agreement to be executed in their respective corporate names by their duly authorized officers, all as of the date Second above written.

**PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY**

By: _____
Name:
Title:

**THE BANK OF NEW YORK MELLON,** as
Trustee

By: _____
Name:
Title:

EXHIBIT A

FORM OF SERIES 2022-1 SUBORDINATED INDEBTEDNESS

4865-9777-5143.95143.10

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE ____ DAY OF _____, 2022.**

Number: 22-1-R-1                                                                                     $

UNITED STATES OF AMERICA
PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY
RESTRUCTURED TOLL REVENUE
SUBORDINATED INDEBTEDNESS, SERIES 2022-1

<u>INTEREST RATE</u>          <u>MATURITY DATE</u>          <u>DATED DATE</u>

2.500%                          July 1, 2052

Registered Owner:      COMMONWEALTH OF PUERTO RICO

Principal Amount:

     The **PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY** (the "Authority"), a body corporate and politic constituting a public corporation and government instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), for value received, hereby promises to pay from the Subordinated Indebtedness Fund to the **REGISTERED OWNER** named above, on the **MATURITY DATE** stated above (or earlier as hereinafter referred to), upon the presentation and surrender hereof at the corporate trust office of the Trustee (hereinafter defined), the **PRINCIPAL AMOUNT** stated above and to pay interest thereon from the date hereof or from the January 1 or July 1 next preceding the date of authentication to which interest shall have been paid, unless such date of authentication is a January 1 or July 1, in which case from such date, at the Interest Rate per annum specified above, until payment of such Principal, such interest to the payment hereof being payable semi-annually on the first (1st) day of each January and July (each, an "Interest Payment Date"). Principal and Redemption Price of this note shall be payable at the principal corporate trust office of **THE BANK OF NEW YORK MELLON**, as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Payment of the interest hereon shall be payable by the Trustee as provided in Section 3.01 of the Master Trust Agreement (hereinafter defined), by wire transfer to such registered owner at the wire transfer address in the continental United States to which such registered owner has not later than the Record Date immediately preceding such Interest Payment Date directed the Trustee to wire such interest payment. The Record Date is the fifteenth (15th) day (whether or not a Business Day) of the calendar month next preceding the applicable Interest Payment Date. All overdue interest and Principal (and any interest accruing on such overdue amounts) shall remain due and payable until paid.

     THE TRUST AGREEMENT (HEREINAFTER DEFINED) PROVIDES THAT THE SECURED OBLIGATIONS, INCLUDING THIS NOTE, SHALL BE PAYABLE SOLELY FROM THE TRUST ESTATE PROVIDED FOR SUCH PAYMENT. THE SECURED

OBLIGATIONS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR OF INSTRUMENTALITIES (OTHER THAN THE AUTHORITY), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE AUTHORITY) SHALL BE LIABLE FOR THE PAYMENT THEREOF. THE AUTHORITY HAS NO TAXING POWER.

THIS NOTE IS A SPECIAL OBLIGATION OF THE AUTHORITY, PAYABLE SOLELY FROM THE TRUST ESTATE IN THE MANNER PROVIDED IN THE MASTER TRUST AGREEMENT (AS DEFINED BELOW). This note is secured by a perfected subordinate lien on and subordinate security interest in the Trust Estate for the payment of the Principal and Redemption Price of and interest on all Outstanding Subordinated Indebtedness. This note and all Outstanding Subordinated Indebtedness and the subordinate lien on and subordinate security interest in the Trust Estate securing such Subordinated Indebtedness shall be expressly junior, inferior, and subordinate in all respects to and subject in all respects to the prior payment in full of the Bonds and to any liens securing the Bonds.

This note is a duly authorized subordinated note of the Authority designated as "Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Subordinated Indebtedness, Series 2022-1" (herein called the "Series 2022-1 Subordinated Indebtedness"), issued pursuant to the Act and a Master Trust Agreement, by and between the Authority and the Trustee, dated as of [      ], 2022 (the "Master Trust Agreement"), including as supplemented by a Second Supplemental Trust Agreement, by and between the Authority and the Trustee, dated as of [      ], 2022 (the "Second Supplemental Trust Agreement", and together with the Master Trust Agreement, collectively referred to herein as the "Trust Agreement"). The Trust Agreement may be amended to the extent and in the manner provided therein. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Trust Agreement.

The Series 2022-1 Subordinated Indebtedness is subject to optional and extraordinary mandatory redemption prior to maturity as provided in the Trust Agreement. Notice of redemption shall be given as provided in the Trust Agreement.

Copies of the Trust Agreement are on file at the office of the Authority, and at the corporate trust office of the Trustee, and reference to the Trust Agreement and any and all supplements thereto and amendments thereof, the terms and conditions upon which Secured Obligations have been issued and additional Secured Obligations may be issued, the rights and remedies of the registered owners of the Secured Obligations with respect thereto, and to other terms and provisions of the Secured Obligations. To the extent and in the manner permitted by the terms of the Trust Agreement and subject to the conditions therein, the provisions of the Trust Agreement or any Supplemental Trust Agreement amendatory thereof or supplemental thereto may be modified or amended.

It is hereby certified, recited, and declared that the Authority has taken all necessary action to make the Series 2022-1 Subordinated Indebtedness, when authenticated by the Trustee and issued by the Authority, valid and binding obligations of the Authority and to constitute the Second

Supplemental Trust Agreement a valid and binding instrument for the authorization of and security for the Series 2022-1 Subordinated Indebtedness.

The registered owner of this note shall have no right to enforce the provisions of the Trust Agreement, to institute action to enforce the provisions of the Trust Agreement or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Trust Agreement.

This note is non-transferable and may not be assigned by the Authority or the Registered Owner hereof.

**IN WITNESS WHEREOF, THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY** has caused this note to be signed in its name and on its behalf by the [_____] and attested by [              ] (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2022-1 Subordinated Indebtedness, all as of the Dated Date specified above.

_____

_____

**ATTEST:**

_____
        [              ]

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This note is one of the Subordinated Indebtedness described in the within mentioned Trust Agreement and is one of the Restructured Toll Revenue Subordinated Indebtedness, Series 2022-1, of the Puerto Rico Highways and Transportation Authority.

**THE BANK OF NEW YORK MELLON**, as Trustee

By: _____

Authorized Signatory

Date of authentication:    [_____], 2022

## ASSIGNMENT

FOR VALUE RECEIVED: _____

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

_____

Please print or typewrite name and address,
including zip code, of transferee

the within-mentioned note and hereby irrevocably constitutes and appoints
_____, attorney-in-fact, to transfer the same on the
books of registry in the office of the Trustee, as registrar, with full power of substitution in the
premises.

Dated: _____        _____

NOTE: The signature to this assignment must
correspond with the name as written on the within
note in every particular, without alteration or
enlargement or any change whatsoever.

Signature Guaranteed:

# **<u>EXHIBIT J</u>**

HTA Debt Management Policy

[HTA LOGO]

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY
DEBT MANAGEMENT POLICY**

**November [●], 2022**

## PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY
## DEBT MANAGEMENT POLICY

### ARTICLE I- GENERAL PROVISIONS

**1.1     Title**

    This document shall be known and may be cited as the "Puerto Rico Highways and Transportation Authority Debt Management Policy" (the "**Policy**").

**1.2     Adoption**

    This Policy is adopted pursuant to Section [25.3] of the Plan of Adjustment.

**1.3     Definitions**

    As used in this Policy, the following terms have the meanings set forth below:

    a.     **AAFAF:** means the Puerto Rico Fiscal Agency and Financial Advisory Authority.

    b.     **Authority:** means the Puerto Rico Highways and Transportation Authority, a public corporation and instrumentality of the Commonwealth of Puerto Rico created by Act No. 74 of June 23, 1965, as amended.

    c.     **Capital Improvements:** means any project or projects (i) funded, or proposed to be funded, in whole or in part, by or through public monies, to construct, reconstruct, restore, rehabilitate or purchase any equipment, property or facilities of HTA, including, without limitation, buildings, infrastructure, information technology systems or other equipment that is funded on a necessarily non-repeating basis that is to be used as a public asset or for the public benefit, or (ii) financed or proposed to be financed, in whole or in part, through the issuance of private activity bonds or other similar instruments.[1]

    d.     **Cumulative Cash Flow Deficit:** means the excess of the expenses to be paid during a Fiscal Year that would ordinarily be paid out of or financed by anticipated revenues over the aggregate amount available (other than from the proceeds of the notes issued to fund the cumulative cash flow deficit) during such period for the payment of such expenses, as further provided in Section 148 of the U.S. Internal Revenue Code of 1986, as amended, and the U.S. Treasury regulations and rulings thereunder.

    e.     **Debt:** means, collectively, bonds, notes, loans, contingent value instruments, and any other evidence of indebtedness for borrowed money, including revenue bonds or notes, bond and grant anticipation notes, certificates of participation, conduit financings, lines of credit, interfund borrowing, special financing programs or structures offered by the federal or state government or other tax credit obligations or obligations that provide subsidized interest payments, _provided_,

---

[1] NTD: Section 1.62 of the Plan.

1

_however_, that, unless otherwise determined by AAFAF, revenue anticipation notes, grant anticipation notes, capital leases and lease-purchase transactions shall not be considered Debt subject to the provisions of Sections 2.2 to 2.5 of this Policy.[2]

   f.   **Debt Policy Period:** has the meaning provided in Article 1.5 hereof.

   g.   **Effective Date:** means the date on which the Plan of Adjustment becomes effective in accordance with its terms.

   h.   **Fiscal Year:** means a fiscal year of the Authority, commencing on July 1st and concluding on June 30th of the following calendar year.

   i.   **Natural Disaster:** A disaster, such as a hurricane, earthquake, pandemic, terrorism or other natural disaster or similar emergency, that results in a federally declared disaster declaration.[3]

   x.   **New Authority Bonds:** means the Puerto Rico Highways and Transportation Authority Restructured Toll Revenue Bonds issued by the Authority on the Effective Date pursuant to the Plan.

   y.   **Outstanding:** means Debt that (i) has not been paid in full in accordance with its terms or (ii) has not been legally defeased in accordance with the defeasance requirements set forth in the applicable definitive issuance documents.

   z.   **Plan of Adjustment:** means the [Fourth] Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority, including the exhibits and schedules thereto (including, for the avoidance of doubt, the Plan Supplement), certified under Title III of PROMESA, as the same is amended, supplemented, or modified from time to time.

   aa.   **Policy**: has the meaning provided in Article 1.1 hereof.

   bb.   **PROMESA:** means the Puerto Rico Oversight, Management and Economic Stability Act, Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq.

## 1.4   Effectiveness

   This Policy shall become effective on the first (1st) calendar day immediately following the Effective Date and shall end on the first (1st) calendar day on which no New Authority Bonds or refinancings thereof remain Outstanding.[4] (the "**Debt Policy Period**").

---

[2] NTD: Based on Section 1.96 of the Plan and the Government of Puerto Rico's Debt Management Policy and including proviso for clarity.
[3] NTD: Section 25.3(d) of Plan.
[4] NTD: Section 1.99 of the Plan.

### 1.5     Amendments

This Policy may be amended, modified or supplemented by HTA from time to time, with AAFAF's prior approval, and provided that such amendments, modifications or supplements are consistent with the Plan of Adjustment.

### 1.6     Derivatives and Capital Leases

The use of derivatives by the Authority shall be governed by the Government of Puerto Rico Interest Rate Derivatives Policy adopted by AAFAF, dated September 9, 2022, as the same may be amended from time to time. The use of capital leases by the Authority shall be governed by the policies adopted by AAFAF for such purposes in accordance with the Government of Puerto Rico Debt Management Policy.

## ARTICLE II - LIMITATIONS ON THE ISSUANCE OF AUTHORITY DEBT

### 2.1     AAFAF Approval

Any issuance of Debt by the Authority must be approved by resolution of the Board of Directors of AAFAF, in its role as fiscal agent, prior to its issuance.

### 2.2     Long-Term Borrowing for Capital Improvements Only

The Authority may only incur Debt during the Debt Policy Period to finance Capital Improvements, as determined by the Authority and approved by AAFAF, or to refinance Debt in accordance with the terms and provision of Article 2.5 hereof. Proceeds derived from any such issuance may be used to cover any and all direct and indirect expenses that are necessary to carry out such Capital Improvements, including, without limitation, any and all expenses incurred in connection with the issuance itself. [5]

### 2.3     Maturity Limitation on Authority Debt

No Debt issued by the Authority during the Debt Policy Period may have a legal final maturity later than thirty (30) years from the date of its original issuance, and no such Debt (except for bond or grant anticipation notes) may be refinanced by any Debt extending such legal final maturity date beyond such original thirty (30)-year maturity date limitation or, if the legal original issuance maturity date is less than 30 years, beyond such original issuance maturity date; provided, however, that, the foregoing shall not apply to Debt issued to refinance the New Authority Bonds[6] or to conduit Debt issued by HTA that is not payable from HTA revenues.

---

[5] NTD: Section 25.3(a) of the Plan.
[6] NTD: Section 25.3(b) of the Plan.

## 2.4     Mandatory Principal Amortization

No series of Debt issued by the Authority during the Debt Policy Period may be issued unless (a) its principal commences to amortize within two (2) years from the placed-in-service date of the project being financed, and (b) continues amortizing in each and every year until such Debt is no longer Outstanding.[7]  Required principal amortization shall be set according to the type, purpose and size of the Debt being issued.

## 2.5     Refinancings Permitted only for Cash Flow Savings in Every Fiscal Year

Refinancings of Debt are permitted only if (a) there is no increase in the aggregate amount of principal and interest payable in any Fiscal Year and (b) such refinancing produces positive net present value savings of at least three percent (3%), after taking into consideration transaction expenses, which shall not exceed three percent (3%) of the principal amount of the refinanced Debt unless otherwise specifically authorized by AAFAF; provided, however, that, (i) refinancings without cash flow savings in every Fiscal Year are permitted if the refinancing is completed in direct response to a Natural Disaster that results in a disruption in services or revenues, the debt service due in any future Fiscal Year does not increase by more than ten percent (10%) and the financing is required by its terms to be repaid in full within ten (10) years; (ii) refinancings with net present value savings of less than three percent (3%) shall be permitted if the refinancing (x) allows for amendments to the underlying bond resolution, indenture or trust agreement or for other reasons, that AAFAF determines, in its discretion, are beneficial to the Government or the Authority[8] and (y) does not increase debt service in any fiscal year; and (iii) notwithstanding anything to the contrary herein, the Authority shall be permitted to refinance (including, for the avoidance of doubt, to issue new bonds in exchange for) the Authority's Special Facility Revenue Refunding Bonds, 2003 Series A (Teodoro Moscoso Bridge) upon a termination of the Concession Agreement by and between Autopistas de Puerto Rico y Compañía, S.E. and the Authority dated as of December 20, 1991, as amended; [9] provided, that debt service on any such bonds issued by the Authority shall be level debt service.

### 2.6     Additional Contractual Restrictions

The Authority shall be subject to such additional limitations and restrictions on the issuance of Debt and creation of liens as may be set forth in the Master Trust Agreement for the New Authority Bonds and in any other trust agreement or indenture entered into by the Authority from time to time.

---

[7] NTD: Section 25.3(c) of the Plan.
[8] NTD: Based on Section 25.3(d) of the Plan and the Commonwealth's Debt Management Policy.
[9] NTD: Required by the Concession Agreement and the Trust Agreement for the Teodoro Moscoso Bonds.

## ARTICLE III– LIMITATIONS ON SHORT-TERM BORROWING AND ADVANCE FUNDING

### 3.1    Limitations on the Issuance of Revenue Anticipation Notes

No revenue anticipation notes shall be issued by the Authority in any given Fiscal Year which would cause the principal amount of all of the Authority's revenue anticipation notes Outstanding to be greater than 110% of the projected Cumulative Cash Flow Deficit for such Fiscal Year. Revenue anticipation notes shall mature no later than the last day of the Fiscal Year in which they were issued.

### 3.2    Limitations on the Issuance of Bond Anticipation Notes

No bond anticipation note issued by the Authority shall mature later than three years after its date of issuance.

### 3.3    Limitations on the Issuance of Grant Anticipation Notes

The Authority shall be authorized to issue grant anticipation notes, which shall mature no later than the anticipated date of receipt of the grant. In the event it is determined by the Authority that the anticipated grant will not be received on or before the maturity date of the grant anticipation note and the payment of the grant anticipation note is not otherwise provided for, the Authority shall refinance such grant anticipation note with Authority revenue bonds. For the avoidance of doubt, such refinancing shall not be subject to the restrictions on refinancing of debt set forth in Section 2.5 of this Policy.