# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br><br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al*.,<br><br>Debtors.[1] | PROMESA<br><br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br><br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br><br>Title III<br><br>No. 17-BK-4780-LTS<br><br>(Jointly Administered) |

## URGENT CONSENSUAL MOTION FOR
## EXTENSION OF STATUS REPORT DEADLINE

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19- BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

To the Honorable United States District Court Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as Title III representative of the Puerto Rico Electric Power Authority ("PREPA" or the "Debtor") pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"), and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF," and together with PREPA and the Oversight Board, the "Government Parties"), respectfully submit this urgent consensual motion (the "Urgent Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), extending the deadline to file a status report established at the June 29, 2022 Omnibus Hearing (the "June 2022 Omnibus Hearing"), the transcript of which is attached hereto as **Exhibit B** (the "June 2022 Omnibus Hearing Transcript") and state as follows:

## Background

1.      On September 30, 2019, Cobra Acquisitions LLC ("Cobra") filed a motion with the Title III Court seeking allowance and payment of a $216.1 million administrative expense claim, stemming from outstanding debts owed under two contracts with PREPA. *Cobra Acquisitions LLC's Motion for Allowance and Payment of Administrative Expense Claims* [Case No. 17-BK-3283-LTS, ECF No. 8789] (the "Administrative Expense Motion").

2.      On October 10, 2019 the Government Parties filed a joint motion to stay litigation related to the Administrative Expense Claim.  [Case No. 17-BK-3283-LTS, ECF No. 8838] (the "Joint Stay Motion").  The Title III Court granted the Joint Stay Motion on October 17, 2019. [Case No. 17-BK-3283-LTS, ECF No. 8886] (the "Stay Order").  The Title III Court continued the Stay Order's effectiveness through a series of subsequent orders. *See* [Case No. 17-BK-3283-

2

LTS, ECF Nos. 10607, 13373, 15396, 16410, 17729]; [Case No. 17 BK 4780-LTS, ECF Nos. 2520, 2694].

3.      On June 7, 2022, Cobra filed a motion to lift the stay in effect pursuant to the Stay Order.  [Case No. 17-03283, ECF No. 21145] (the "Lift Stay Motion").  The Government Parties objected [Case No. 17-03283, ECF No. 21241], and the Title III Court subsequently denied the Lift Stay Motion at the June 2022 Omnibus Hearing.  June 2022 Omnibus Hearing Transcript, 41:15-19; *see also* [Case No. 17-03283, ECF No. 21385].  As part of its oral ruling, the Title III Court directed the Government Parties and Cobra to file a joint status report "by January 6th, 2023, or, if earlier, 30 days following the issuance of a FEMA determination concerning the second contract."  June 2022 Omnibus Hearing Transcript, 41:17-19.

4.      As detailed previously,[2] there are two FEMA projects that capture the costs invoiced by Cobra to PREPA under the second contract.  With respect to the second contract, FEMA initially created Project Worksheet ("PW") 466 and obligated funds thereunder to reimburse costs under the second contract at a 100% federal cost share.  The cost share was later reduced to 90% for costs incurred after August 16, 2018 (with a 10% match requirement to be paid by PREPA).  As a result, to avoid obligating costs at two different cost shares under one PW, FEMA advised it would reduce the obligation under PW 466 to only those costs incurred subject to 100% federal cost share period and create a new project, Grants Manager Project ("GMP") 49831 for the costs incurred subject to the 90% cost share period (after August 16, 2018).

---

[2]  *See e.g.*, *Joint Objection of the Financial Oversight and Management Board for Puerto Rico, Puerto Rico Electric Power Authority, and Puerto Rico Fiscal Agency and Financial Advisory Authority to Cobra Acquisitions LLC's Motion For Stay Relief* [Case No. 17-03283, ECF No. 21241] ¶¶ 4, 14-15.

5.      On November 21, 2022, FEMA issued a "Determination Memorandum" ("DM")
regarding PW 466 and concurrently advised it would issue, at a date in the near future, a DM for
GMP 49831.

### Request for Relief

6.      The parties are currently in receipt of a partial determination on the second contract.
FEMA has furthermore communicated to the Government Parties that it expects to issue a DM
regarding the remaining portions of the second contract in the coming weeks.  Rather than provide
the Title III Court with a report on FEMA's partial determination, the Government Parties
respectfully submit it is in the best interest of judicial efficiency, and the parties, to grant the parties
the opportunity to submit a comprehensive report after FEMA has issued a determination on the
remaining portions of the second contract.

7.      Accordingly, and with the consent of the Cobra, the Government Parties propose
to extend deadline to file a status report to **January 6, 2023,** by which time the parties hope to
receive the second DM and be in a position to provide a full report on the second contract.

8.      Pursuant to Paragraph 1.H of the *Sixteenth Amended Notice, Case Management and
Administrative Procedures* [ECF No. 20190-1] (the "Case Management Procedures"), the
Oversight Board certifies that it has carefully examined the matter and concluded that there is a
true need for an urgent motion; it has not created the urgency through any lack of due diligence;
has made a bona fide effort to resolve the issues presented in the Urgent Motion; and has made
reasonable, good-faith communications in an effort to resolve or narrow the issues that are being
brought to the Court.

## Notice

9.     The Oversight Board has provided notice of this motion in accordance with the

Case Management Procedures to the following parties: (a) the Office of the United States Trustee

for the District of Puerto Rico; (b) the indenture trustees and/or agents, as applicable, for the

Debtors' bonds; (c) the entities on the list of creditors holding the 20 largest unsecured claims

against the Debtors; (d) counsel to the statutory committees appointed in these Title III cases; (e)

the Office of the United States Attorney for the District of Puerto Rico; (f) counsel to the Oversight

Board; (g) the Puerto Rico Department of Justice; (h) the Other Interested Parties;[3] (i) the

Applicable Movants; and (j) all parties filing a notice of appearance in these Title III cases. A copy

of the motion is also available at https://cases.ra.kroll.com/puertorico/.

10.     The Oversight Board submits that, in light of the nature of the relief requested, no

other or further notice need be given.

*[Remainder of page intentionally left blank]*

---

[3]   The "Other Interested Parties" include the following: (i) counsel to certain of the insurers and trustees of the bonds
issued or guaranteed by the Debtors; and (ii) counsel to certain ad hoc groups of holders of bonds issued or
guaranteed by the Debtors.

**WHEREFORE** the Debtors request the Court enter the Proposed Order and grant such

other relief as is just and proper.

San Juan, Puerto Rico
December 21, 2022

Respectfully submitted,

**O'NEILL & BORGES LLC**

By: /s/ *Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Telephone: (787) 764-8181
Facsimile: (787) 753-8944
Email: hermann.bauer@oneillborges.com

**PROSKAUER ROSE LLP**

By: /s/ *Paul V. Possinger*
Martin J. Bienenstock*
Paul V. Possinger*
Ehud Barak*
Eleven Times Square New York, NY 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
Email: mbienenstock@proskauer.com
ppossinger@proskauer.com
ebarak@proskauer.com
* admitted *pro hac vice*

*Attorneys for the Financial Oversight and
Management Board as representative of the
Puerto Rico Electric Power Authority*

**DÍAZ & VÁZQUEZ LAW FIRM, P.S.C.**

By: /s/ *Katiuska Bolaños*
Katiuska Bolaños
kbolanos@diazvaz.com
USDC-PR 231812
290 Jesús T. Piñero Ave.
Oriental Tower, Suite 803
San Juan, PR 00918
Tel. (787) 395-7133
Fax. (787) 497-9664

*Co-Attorneys for Puerto Rico Electric Power
Authority*

**MARINI PIETRANTONI MUÑIZ LLC**

By: /s/ *Luis C. Marini-Biaggi*
Luis C. Marini-Biaggi
USDC No. 222301
Email: lmarini@mpmlawpr.com
250 Ponce de León Ave., Suite 900
San Juan, Puerto Rico 00918
Tel: (787) 705-2171
Fax: (787) 936-7494

*Attorneys for the Puerto Rico Fiscal
Agency and Financial Advisory Authority*

**O'MELVENY & MYERS LLP**

By: /s/ *Maria J. DiConza*
John J. Rapisardi*
Maria J. DiConza*
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000

6

Facsimile: (212) 326-2061
Email: jrapisardi@omm.com
mdiconza@omm.com

-and-

Peter Friedman* 1625 Eye
Street, NW
Washington, D.C. 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
pfriedman@omm.com

-and-

Elizabeth L. McKeen*
610 Newport Center Drive,
17th Floor Newport Beach,
CA 92660
Tel: (949) 823-6900
Fax: (949) 823-6994
emckeen@omm.com

* admitted pro hac vice

*Attorneys for the Puerto Rico
Fiscal Agency and Financial
Advisory Authority and
Puerto Rico Electric Power
Authority*

**Exhibit A**

**Proposed Order**

# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>**Re: ECF No. _____**<br><br>(Jointly Administered) |

## ORDER GRANTING URGENT CONSENSUAL MOTION FOR EXTENSION OF STATUS REPORT DEADLINE

Upon the *Urgent Consensual Motion for Extension of Status Report Deadline*, dated December 21, 2022 (Docket Entry No. _____)[2] (the "Extension Motion"),[3] in which the Government Parties request the extension of deadlines with respect to the filing of a joint status

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Last Four Digits of Federal Tax ID: 3801) (Last Four Digits of Federal Tax ID: 3801) (Bankruptcy Case No. 19-BK-5523-LTS). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2]   All docket entry references are to entries in Case No. 17-3283, unless otherwise specified.

[3]   Capitalized terms used but not otherwise defined herein have the meanings given to them in the Extension Motion.

report with Cobra, which deadline was previously set at the June 2022 Omnibus Hearing; and the

Court having found that the Government Parties provided adequate and appropriate notice of the

Extension Motion under the circumstances and that no other or further notice is required; and the

Court having reviewed the Extension Motion; and the Court having determined that the factual

bases set forth in the Extension Motion establish just cause for the relief granted herein; and after

due deliberation and sufficient cause appearing therefor, it is hereby ORDERED that:

    1.      The Extension Motion is granted as set forth herein.

    2.      The deadline for the Government Parties and Cobra to file a joint status report as

directed by this Court at the June 29, 2022 Omnibus Hearing shall be extended to **January 6,**

**2023**.

    3.      This Order resolves Docket Entry No. \_\_\_\_\_ in Case No. 17-3283.


    SO ORDERED.

Dated: December \_\_\_, 2022

                                  _____
                                  LAURA TAYLOR SWAIN
                                  United States District Judge

## Exhibit B

**June 2022 Omnibus Hearing Transcript**

```
 1                    UNITED STATES DISTRICT COURT

 2                     DISTRICT OF PUERTO RICO

 3
        In Re:                   )     Docket No. 3:17-BK-3283(LTS)
 4                               )
                                 )     PROMESA Title III
 5      The Financial Oversight and )
        Management Board for      )
 6      Puerto Rico,              )     (Jointly Administered)
                                 )
 7      as representative of      )
                                 )
 8      The Commonwealth of       )
        Puerto Rico, et al.       )     June 29, 2022
 9                               )
                    Debtors,     )
10

11      _____

12      In Re:                   )     Docket No. 3:17-BK-4780(LTS)
                                 )
13                               )     PROMESA Title III
        The Financial Oversight and )
14      Management Board for      )
        Puerto Rico,              )     (Jointly Administered)
15                               )
        as representative of      )
16                               )
        The Puerto Rico Electric  )
17      Power Authority,          )
                                 )
18                  Debtors,     )

19      _____

20                       OMNIBUS HEARING

21      BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

22              UNITED STATES DISTRICT COURT JUDGE

23      AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

24              UNITED STATES DISTRICT COURT JUDGE

25      _____
```

```
1      APPEARANCES:

2      ALL PARTIES APPEARING VIA VIDEOCONFERENCE OR TELEPHONICALLY

3
       For The Commonwealth
4      of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
                                Mr. Brian S. Rosen, PHV
5                               Ms. Laura Stafford, PHV
                                Mr. Scott P. Cooper, PHV
6                               Mr. Daniel Desatnik, PHV

7      For Puerto Rico Fiscal
       Agency and Financial
8      Advisory Authority:      Ms. Carolina Velaz-Rivero, Esq.

9      For Isla Del Rio, Inc.:  Mr. Eduardo Capdevila, Esq.

10     For PV Properties:       Mr. Fernando E. Agrait, Esq.

11     For Cobra Acquisitions,
       LLC:                     Mr. Abid Qureshi, PHV
12

13

14

15

16

17

18

19

20

21

22

23

24

25     Proceedings recorded by stenography.  Transcript produced by
       CAT.
```

```
 1                              I N D E X

 2   WITNESSES:                                    PAGE

 3          None.

 4

 5   EXHIBITS:

 6          None.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                    San Juan, Puerto Rico

 2                                    June 29, 2022

 3                                    At or about 9:34 AM

 4                          *      *      *

 5          THE COURT:  Good morning.  This is Judge Swain

 6   speaking.

 7          Ms. Tacoronte, would you please call the case?

 8          COURTROOM DEPUTY:  Good morning, Your Honor.

 9          In re: The Financial -- I'm sorry, Your Honor.  The

10   United States District Court for the District of Puerto Rico

11   is now in session.

12          THE COURT:  Your sound is fading out a little bit,

13   Ms. Tacoronte.

14          COURTROOM DEPUTY:  I'm sorry, Your Honor.  Is this

15   better?

16          THE COURT:  Yes, it is, much better.  Thank you.

17          COURTROOM DEPUTY:  Okay.  The United States District

18   Court for the District of Puerto Rico is now in session.  The

19   Honorable Laura Taylor Swain presiding.  Also sitting,

20   Honorable Magistrate Judge Judith Dein.  God save the United

21   States of America and this Honorable Court.

22          In re:  The Financial Oversight and Management Board

23   for Puerto Rico, as representative of the Commonwealth of

24   Puerto Rico, et al., Case No. 2017-BK-3283, and In re: The

25   Financial Oversight and Management Board for Puerto Rico as
```

1    *representative of the Puerto Rico Electric Power Authority,*

2    Case No. 2017-BK-4780, for Omnibus Hearing.

3            THE COURT:  Thank you.

4            Buenos dias.  Counsel who are participating by Zoom,

5    please turn your cameras on for these introductory remarks and

6    instructions, but keep your microphones muted.

7            Welcome, counsel, parties in interest, and members of

8    the public, and press.  To ensure the orderly operation of

9    today's virtual hearing once we turn to our agenda items, all

10   parties appearing by Zoom must mute their microphones when

11   they're not speaking, and turn off their video cameras if they

12   are not directly involved in the presentation or argument.

13   When you need to speak, you must turn your camera on and

14   unmute your microphone on the Zoom screen.

15           I remind everyone that consistent with court and

16   Judicial Conference policies and the orders that have been

17   issued, no recording or retransmission of the hearing is

18   permitted by anyone, including but not limited to the parties,

19   members of the public, and members of the press.  Violations

20   of this rule may be punished with sanctions.

21           I will be calling on each speaker during the

22   proceeding.  When I do, please turn your camera on, unmute

23   yourself, and identify yourself by name for clarity of the

24   record.  After the speakers listed on the agenda for each of

25   today's matters have spoken, I may permit other parties in

1    interest to address briefly any issues raised during the

2    presentations that require further remarks.  If you want to be

3    heard under these circumstances, please use the "raise hand"

4    feature of Zoom at the appropriate time, and that can be

5    accessed by selecting the reactions icon in the tool bar

6    located at the bottom of your Zoom screen.  I'll then call on

7    the speakers one by one.  If you've raised your hand, when

8    you're finished, please use the "lower hand" feature in that

9    reactions tool bar.

10            Please don't interrupt each other or me during the

11    hearing.  If we interrupt each other, it's difficult to create

12    an accurate transcript.  But having said that, and as usual, I

13    apologize in advance for breaking this rule as I may interrupt

14    if I have questions or if you go beyond your allotted time.

15    If anyone has difficulty hearing me or another participant at

16    any time, please use the "raise hand" feature immediately.

17            The agenda, which was filed as Docket Entry No. 21368

18    in Case No. 17-3283 is available to the public at no cost on

19    Prime Clerk for those who are interested.  Although Prime

20    Clerk is now known as Kroll Restructuring Administration, the

21    Prime Clerk website addresses and telephone numbers are still

22    operational.

23            I encourage each speaker to keep track of his or her

24    own time.  The Court will also be keeping track of the time,

25    and will alert each speaker when there are two minutes

1   remaining with one buzz, and, when time is up, with two

2   buzzes.  If you're speaking for three minutes or less, you'll

3   only hear the final two buzzes.  Here's an example of the buzz

4   sound.

5           I think our buzzer extraordinaire needs to unmute.

6           (Sound played.)

7           THE COURT:  That's very faint.  Can you hold that any

8   closer to your microphone?

9           (Sound played.)

10          THE COURT:  It's still very faint, so I will listen

11  carefully for it, and, counsel, as I said, please keep track

12  of your own time.  I will also make an effort to keep track of

13  the time.

14          This morning we will proceed until 12:50.  In the

15  unlikely event that we need to resume for the afternoon, we

16  will resume from 2:10 to 5:00 PM.  If we need to take a break,

17  I will announce that, and the telephone listen-in-only

18  participants who are on the AT&T line should keep that line

19  open and not hang the phone up during the break.

20          Please turn your cameras off now, and turn your

21  camera back on when we reach your agenda item or if I call on

22  you.

23          The first agenda item is, as usual, status reports

24  from the Oversight Board and AAFAF.  As requested in the

25  Procedures Order, these reports have been made in writing in

1  advance of this virtual hearing, and are available on the

2  public docket at Docket Entry Nos. 21376 and 21377 in Case No.

3  17-3283, respectively.  I thank the Oversight Board and AAFAF

4  for the care and detail reflected in their reports, which, as

5  always, are informative and cover important matters.

6          I'll first call on counsel for the Oversight Board

7  for any comments in addition to the written report.

8          MR. BIENENSTOCK:  Thank you, Judge Swain.  Martin

9  Bienenstock of Proskauer Rose, LLP, for the Oversight Board.

10  The Board doesn't have additional comments this morning, Your

11  Honor.

12          THE COURT:  Thank you, and good morning,

13  Mr. Bienenstock.  I do have one question for you.  Your report

14  indicates that the timetable for the PFC Title VI has shifted

15  because of a disagreement about certain elements, and so my

16  question for you is whether and to what extent there is a new

17  timetable, and whether there is active engagement in an effort

18  to resolve that dispute?

19          MR. BIENENSTOCK:  Your Honor, I see my partner,

20  Mr. Rosen, has opened his video, and if it's okay, I will

21  defer to Mr. Rosen to answer that.

22          THE COURT:  Certainly.

23          Good morning, Mr. Rosen.

24          MR. ROSEN:  Good morning, Your Honor.  Thank you very

25  much.  Brian Rosen, Proskauer Rose, on behalf of the Oversight

1 Board.

2     Yes, Your Honor.  We had indicated in our prior

3 status report that we thought that we would be able to file

4 the qualifying modification by June 17.  One component of that

5 understanding was the issuance of certain additional bonds,

6 excuse me, in connection with DRA.  As reflected in this

7 status report, Your Honor, there is an ongoing discussion

8 among AAFAF, actually, the Oversight Board as well, the DRA

9 Collateral Monitor, as well as the U.S. Trus -- excuse me, the

10 U.S. Bank Trustee, on behalf of certain noteholders,

11 concerning the amount of those bonds that will be issued.

12     We thought that there was an understanding way back

13 in November, Your Honor, when the understanding was announced

14 by counsel for U.S. Bank.  However, it continues.  There is

15 active engagement among the parties, although I cannot tell

16 you a specific timetable at this point in time.  The parties

17 are still quite far apart, and we're still trying to engage

18 all in the discussions to see if an agreement can be reached,

19 but nothing at this time.

20     THE COURT:  All right.  Let's see.  Our next Omni and

21 next regular status report is not until August, and so do you

22 expect to be sufficiently engaged that you would be in a

23 position to file a status report that would be informative and

24 useful by August 1st?

25     MR. ROSEN:  Your Honor, I think we will certainly

1    have an update by that point in time that we could report back

2    to the Court as to the progress that has been made, yes.

3              THE COURT:  Very well then.  I am directing you to

4    file a status report on PFC by August 1st.  Thank you very

5    much.

6              MR. ROSEN:  Your Honor, if I could take one more

7    second to update the Court on one item?

8              THE COURT:  Yes.

9              MR. ROSEN:  There was an EMMA filing with respect to

10   this, but I would like to let the Court know about this as

11   well.  In connection with the Commonwealth Plan, Your Honor,

12   there was something that was referred to as distribution

13   conditions, with respect to the distribution of certain monies

14   and CVI for HTA holders, and that would be pursuant to the

15   Commonwealth Plan.

16             At the time of the effective date, Your Honor, the

17   distribution conditions had not been satisfied.  We're happy

18   to report that the -- those conditions have been satisfied

19   now.  And, Your Honor, specifically, what they were was the

20   documentation of the HTA Plan, which, as you know, is on file,

21   a draft confirmation order, which the parties agreed to at

22   this point in form, as well as the terms of a new HTA bond

23   indenture.

24             With that being concluded, Your Honor, we have filed

25   this EMMA notice with AAFAF to reflect that, and distributions

1    will be made in accordance with the terms of the HTA-CCDA Plan

2    Support Agreement.  That will provide considerable

3    distributions to holders of HTA bonds, Your Honor.

4            THE COURT:  Thank you.

5            MR. ROSEN:  You're welcome, Your Honor.

6            THE COURT:  I have no further questions for the

7    Oversight Board.

8            Does anyone else have any questions or comments in

9    relation to the Oversight Board report?  If so, please raise

10   your hand.

11           I see no hands raised, and so I'll call on counsel

12   for AAFAF for any comments in addition to the report.

13           MS. VELAZ-RIVERO:  Good morning, Your Honor.

14   Carolina Velaz-Rivero from Marini Pietrantoni Muniz on behalf

15   of AAFAF.

16           THE COURT:  Good morning.

17           MS. VELAZ-RIVERO:  Good morning.  We don't have any

18   additional comments to what we included in the report.

19           THE COURT:  Thank you.

20           Are there any further comments or questions in

21   connection with AAFAF's report?  If so, please raise your

22   hand.

23           I see no further hands raised, so thank you very

24   much, Ms. Velaz-Rivero.

25           We will now go on to the next agenda item in Section

1    II of the agenda, which is contested matters.  The first such

2    matter is the 458th Omnibus Objection to claims, and I have

3    the Oversight Board as the sole speaker with respect to that

4    objection for five minutes.

5         MS. STAFFORD:  Yes.  Thank you, Your Honor.  This is

6    Laura Stafford of Proskauer Rose on behalf of the Oversight

7    Board.

8         As Your Honor mentioned, the first contested matter

9    or contested Omnibus Claim Objection is the 458th Omnibus

10   Claim Objection, which was filed at ECF No. 20789, and seeks

11   to reclassify proofs of claim that incorrectly or improperly

12   assert entitlement to priority or secured status.

13        Only one response to this objection was timely filed,

14   and it was filed by two entities related to Ferrovial Agroman,

15   Ferrovial Agroman, LLC, and Ferrovial Agroman, SA.  It

16   addresses Proof of Claim Nos. 24230 and 17738, and was filed

17   at ECF No. 21159.  Each of these claims assert liabilities

18   associated with construction projects initiated by HTA, and

19   claim to be secured under budget of federal funds.

20        I'm pleased to report that we conferred with counsel

21   for Ferrovial Agroman -- for both Ferrovial Agroman entities

22   with respect to these proofs of claim, and the parties have

23   reached agreement with respect to the results of this Omnibus

24   Objection.  We've agreed that the Ferrovial entities do not

25   oppose the relief requested as to either proof of claim, which

1    would be reclassified in these proofs of claim as general

2    unsecured claims in their entirety.  Ferrovial reserves its

3    rights to amend its claims, and the debtors reserve their

4    rights to object to the claims on any other grounds

5    whatsoever.  And for that reason, Your Honor, we'd request the

6    Court sustain the 458th Omnibus Objection, and disallow -- I

7    apologize, reclassify the Ferrovial Agroman claims,

8    notwithstanding the response.

9         THE COURT:  Thank you.

10        Having reviewed the submission and heard the remarks

11   of counsel this morning regarding the agreement, the Court

12   rules as follows:  The 458th Omnibus Objection is sustained as

13   to Proof of Claim No. 24320 filed by Ferrovial Agroman, LLC,

14   against the Puerto Rico Highways and Transportation Authority,

15   and Proof of Claim No. 17738 filed by Ferrovial Agroman, SA,

16   against the Puerto Rico Highways and Transportation Authority.

17   The portions of those claims that are currently classified as

18   secured are reclassified as general unsecured claims.  The

19   claimant has failed to identify any prima facie factual or

20   legal basis supporting the assertion that the claims are

21   secured.

22        I ask that counsel for the Oversight Board submit a

23   comprehensive proposed order resolving all matters raised in

24   the 458th Omnibus Objection.

25        MS. STAFFORD:  We will do so, Your Honor.  Thank you.

1          THE COURT:  Thank you, Ms. Stafford.

2          The next contested matter is the 468th Omnibus

3    Objection to claims.  That is Docket Entry No. 20799 in Case

4    No. 17-3283.  I have as the first speaker on this objection

5    the Oversight Board for three minutes, followed by counsel for

6    Isla Del Rio, Inc., for five minutes, and then with a reply.

7          So, Ms. Stafford.

8          MS. STAFFORD:  Thank you very much, Your Honor.

9          This 468th Omnibus Objection seeks to disallow in

10   their entirety certain proofs of claim that were subsequently

11   amended and superseded by additional proofs of claim filed by

12   the claimant -- as subsequently filed by the claimant.  Only

13   one response to this objection was timely received as well,

14   and it was filed by Isla Del Rio with respect to Proof of

15   Claim No. 11464 at ECF No. 21296.

16         Isla filed an initial proof of claim, Proof of Claim

17   No. 11464, on May 8th, 2018, asserting liabilities associated

18   with pending litigations between PREPA and Isla.  Isla then

19   filed a second proof of claim on March 10th of 2022, which was

20   docketed by Kroll as Proof of Claim No. 179740.  That second

21   proof of claim purports to amend the first proof of claim, and

22   asserts the same pending litigations between PREPA and Isla,

23   but with a higher claim amount, and with the addition of

24   additional supporting documentation relating to evaluation

25   reports submitted in connection with the litigations.

1          Isla's response acknowledges that the objection is

2    correct, and that Proof of Claim No. 179740 was intended to

3    amend Proof of Claim No. 11464.  Because Isla does not dispute

4    that Proof of Claim No. 179740 amends Proof of Claim No.

5    11464, PREPA requests the Court grant the objection and

6    disallow Proof of Claim No. 11464.  Isla will not be

7    prejudiced by this, because it will retain Proof of Claim No.

8    17974 against PREPA, which asserts the same litigation at an

9    increased amount.

10         Thank you, Your Honor.

11         THE COURT:  Thank you.  Just a question.  Is the

12   second one Claim No. 179740 or 17974?

13         MS. STAFFORD:  I apologize, Your Honor.  179740.

14         THE COURT:  Thank you.

15         Does counsel for Isla Del Rio wish to be heard?

16         MR. CAPDEVILA-DIAZ:  Good morning, Your Honor.  For

17   the record, Eduardo Capdevila on behalf of Isla Del Rio.

18         What Counsel Stafford just said is correct.  My

19   client accidentally -- he filed a duplicate claim, instead of

20   amending it.  To that end, while we apologize to the Court and

21   the Board for the mistake, I just want to add that the stay

22   was lifted to liquidate this claim to judgment, and as soon as

23   it is reduced to judgment in state court, as allowed by this

24   Court on Docket 3795, our client will amend the claim,

25   correctly this time may I add.

1          THE COURT:  Thank you, Mr. Capdevila.

2          Ms. Stafford, any further comments?

3          MS. STAFFORD:  No, Your Honor.

4          THE COURT:  Thank you.

5          MR. CAPDEVILA-DIAZ:  Your Honor.

6          THE COURT:  Mr. Capdevila, yes.

7          MR. CAPDEVILA-DIAZ:  Your Honor, yes.  That's the

8  only matter for my client.  May I be excused from the hearing?

9          THE COURT:  Let me just rule, and then you can be

10  excused.

11          MR. CAPDEVILA-DIAZ:  Okay.

12          THE COURT:  So this is my ruling:  The 468th Omnibus

13  Objection is sustained as to Proof of Claim No. 14464 filed by

14  Isla Del Rio, Inc., against the Puerto Rico Electric Power

15  Authority.  The claim shall be disallowed in its entirety,

16  because it has been amended and superseded by Proof of Claim

17  No. 179740, also filed against PREPA, which is recognized as

18  an active claim to which no objection is currently pending.

19          The debtor is directed to submit a comprehensive

20  proposed order resolving all matters raised in the 468th

21  Omnibus Objection.  That concludes my ruling.  Thank you,

22  Counsel.

23          Mr. Capdevila, you are excused.  Thank you.

24          MS. STAFFORD:  Thank you, Your Honor.

25          THE COURT:  The next matter on today's agenda is

1   contested matter no. 3, which is the Cobra Lift Stay of

2   Litigation of Administrative Expense Claim Motion.  I have

3   speaking first for eight minutes Mr. Qureshi for Cobra.

4            Good morning, Mr. Qureshi.

5            MR. QURESHI:  Good morning, Your Honor.

6            THE COURT:  Good morning.

7            MR. QURESHI:  Your Honor, for the record, Abid

8   Qureshi of Akin Gump Strauss Hauer & Feld on behalf of Cobra.

9   May I proceed?

10           THE COURT:  Yes, you may.

11           MR. QURESHI:  Thank you, Your Honor.

12           Your Honor, we are back yet again in an attempt to

13  lift a stay that has now been in place for almost three years.

14  Your Honor, before I get into the factual details to explain

15  why the interests of justice now demand that that stay be

16  lifted, I want to start with revisiting the legal standard,

17  and, in particular, Your Honor, with the words of the Supreme

18  Court in the *Landis* decision, which we cite in our papers.  In

19  that case, the Court said that, in exercising its discretion

20  to impose a stay, a court must, quote, weigh competing

21  interests and maintain an even balance.

22           Additionally, Your Honor, and very relevant for

23  today's purposes, the Supreme Court in that same ruling

24  cautioned against what it termed an immoderate stay without

25  reasonable limits, and it instructed that once those limits

1    have been reached, quote, the fetters should fall off.  And

2    that, Your Honor, respectfully, is where we are today.

3        There is no further justification for the stay, so

4    let's look at what the justifications have, in fact, been.

5    Just to remind Your Honor of the timeline, Cobra completed its

6    restoration work in March of 2019.  The last payment it

7    received was in May of 2019.  In September of 2019, Cobra's

8    former president, along with two FEMA officials, was indicted.

9    That same month, Cobra filed its administrative expense claim.

10       Now, when the government parties first moved to stay

11   the admin claims motion, they looked for what they call the

12   limited stay, and they pointed to the criminal indictment.

13   What they said was that PREPA might have been fraudulently

14   induced to enter into the contract.  They further said that

15   PREPA might have a, quote, unquote, complete defense to

16   Cobra's claim, and even that they, PREPA, may have claims

17   against Cobra for disgorgement or damages.  They argued that

18   discovery duplicative with the criminal proceeding would be

19   unnecessary, and they argued that whether the contracts, the

20   Cobra contracts were procured or effected by bribery or fraud

21   would be relevant to their obligation to pay.

22       Now, when Your Honor granted that motion in October

23   of '19, Your Honor stated that significant factual, legal

24   questions that could bear upon the motion would likely be

25   addressed in the criminal matter.  Your Honor also noted that

1    the criminal indictment related to the same contracts that

2    were at issue in the administrative claims motion.

3          So, Your Honor, fast forward six months from that

4    initial stay, and Cobra came back before this Court to seek

5    limited relief, which was payment on undisputed taxes that

6    Cobra paid to the Commonwealth, and for which it has a

7    contractual reimbursement right.  That motion, too, was

8    denied.  And again, Your Honor, the government parties in

9    opposing it pointed to the criminal proceedings, and they said

10   that if the allegations in the Indictment were proven at

11   trial, it might be a complete or a partial defense to Cobra.

12         Fast forward once again, Your Honor, to August of

13   2021, and we again moved to lift the stay.  And if -- this

14   time the justification had been further delay in that criminal

15   trial, and, again, it was the criminal trial that was -- that

16   was pointed to.  And Your Honor, in denying that motion, ruled

17   that there were not sufficient changes that warranted lifting

18   the stay.

19         Well, now, Your Honor, we believe that there have

20   been.  The criminal matter is over.  Plea agreements have been

21   entered.  The only step that remains in the criminal matter,

22   Your Honor, is a sentencing hearing, which is scheduled to

23   occur on August the 17th.

24         In the Plea Agreement that was filed with and

25   accepted by the Court, Your Honor, there is a stipulation of

1   facts, and we filed that stipulation and that plea agreement

2   as an exhibit to our motion.  And that establishes, Your

3   Honor, certain uncontroverted and important facts.

4          First of all, Mr. Ellison, the former Cobra president

5   that was indicted, engaged in conduct that was entirely

6   unrelated to the two contracts that are at issue in the admin

7   claims motion.  Instead, his conduct related to a contract

8   that Cobra was never awarded, and work that Cobra never

9   performed.

10          Now, despite PREPA's wishes that he was convicted of

11   bribery, which they state repeatedly in their opposition, he

12   was not.  In fact, Your Honor, the bribery count was dismissed

13   as part of the Plea Agreement.  What he plead guilty to was a

14   gratuity, which consisted of approximately $8,000 in hotel,

15   airfare, and security expenses that he paid on behalf of a

16   FEMA official.  That's it, Your Honor.

17          So we submit that that criminal matter is now

18   entirely irrelevant to whether Cobra has an allowed

19   administrative claim or not.  If PREPA wishes to argue, Your

20   Honor, that it is relevant, they are free to do so.  There is

21   nothing about a lifting of the stay that takes away from PREPA

22   the ability to argue whatever it wishes with respect to that

23   criminal plea agreement, but, Your Honor, as the First Circuit

24   has made clear, the government parties do bear a heavy burden

25   to demonstrate that there is a clear case of hardship that

1    they would suffer absent the stay, and they can't do that.

2         So moving on to the second justification that to

3    varying degrees we have heard over time, that is, FEMA's

4    ongoing contract review, and with respect to that, Your Honor,

5    first, it was PREPA and not FEMA --

6         (Sound played.)

7         MR. QURESHI:  -- that agreed to the terms of the

8    contract.  They did so after multiple levels of review, and of

9    course with the benefit of legal advice.

10        Your Honor, Cobra does not have standing before FEMA.

11   It's not part of the FEMA review process.  The contracts that

12   are at issue in the admin claims motion, they raise FEMA, Your

13   Honor, in only one respect, and that is that PREPA could be

14   relieved of its obligation to pay only if PREPA fails to

15   receive federal funding due to Cobra's, quote, unquote, sole

16   fault.  That's not even alleged here, Your Honor.

17        So PREPA says that the outcome of the FEMA review, it

18   might give to PREPA a material defense to the administrative

19   claims motion, and they variously assert that FEMA will issue

20   its determinations with respect to the second contract in one

21   case, quote, unquote, soon, and in another case, by the end of

22   the year.  We have history to guide us with respect to those

23   deadlines, Your Honor.  And so --

24        THE COURT:  Mr. Qureshi.

25        MR. QURESHI:  Yes.

1              THE COURT:  I'd like to just interrupt you now.

2              MR. QURESHI:  Please.

3              THE COURT:  As to the FEMA review of the first

4    contract, it seems to me from reading the submissions that the

5    Oversight Board is no longer raising the sort of granular, too

6    many hours, not enough people on site, those sort of

7    objections that it had said would need to be the subject of

8    extensive discovery and litigation, and the Oversight Board

9    seems to be accepting the claims, or at least the

10   quantification of the claims as -- to the extent they have

11   been approved by FEMA.  At this point, there is 22 million

12   that are still in dispute that I understand has to do with

13   taxes.  And there's a mechanism for working on it, but it does

14   seem to me that progress was made, and litigation of a lot of

15   details was avoided by letting FEMA take the first pass

16   through the first contract.

17             Is that understanding unfounded?

18             MR. QURESHI:  It is not unfounded, Your Honor, but

19   there is one very material thing that Your Honor left out, and

20   that is that Cobra has already been paid with respect to the

21   first contract.  What is at issue is almost entirely amounts

22   owing with respect to the second contract, and also with

23   respect to interest that continues to accrue.

24             So while it is correct, Your Honor, that of course

25   PREPA would have the ability to object to amounts that it had

1    previously paid with respect to the first contract, and PREPA

2    appears with respect to the first contract to not be taking

3    that position, in light of FEMA's review, it is really the

4    second contract that is the higher priority item for Cobra,

5    Your Honor, for the simple and obvious reason that we have not

6    been paid on that contract.

7         THE COURT:  Is there any reason sitting here to think

8    that PREPA would not back off the technical objections to

9    amounts approved by FEMA, and that FEMA, in fact, has approved

10   substantial amounts for related work under the first

11   contract?

12        MR. QURESHI:  So, Your Honor, my understanding is

13   that PREPA has assured us, albeit I don't believe in a

14   pleading, but my understanding is that PREPA has assured us

15   that whatever amounts PREPA actually receives from FEMA, on

16   account of the work that Cobra has performed, whether with

17   respect to the first or the second contract, PREPA intends to

18   pay those amounts over to Cobra.  So that is certainly the

19   understanding.

20        Your Honor, the diff -- and additionally, Your Honor

21   could well be correct, and I would certainly hope that it

22   would be the case, that if, in fact, on whatever timeline FEMA

23   is operating under FEMA ultimately approves the invoices that

24   are the subject of the second contract, and ultimately

25   releases those funds to PREPA, that PREPA will, in fact, turn

1    that money over to Cobra to satisfy the claim.  That is

2    certainly our expectation.

3        The reason, Your Honor, that we continue to implore

4    this Court to lift the stay is that Cobra is -- or PREPA, I

5    should say, has no contractual entitlement to defer dealing

6    with Cobra until FEMA has finished its process.  Remember that

7    the way this works under the --

8        (Sound played.)

9        MR. QURESHI:  -- first contract, Your Honor, is that

10   Cobra performed the work, Cobra submitted invoices, PREPA paid

11   those invoices, and then, after the fact, PREPA sought

12   reimbursement from FEMA.  And then PREPA stopped paying those

13   invoices.

14       Now, they say that that was because FEMA said, as a

15   result of the criminal matter, it was no longer going to

16   reimburse it, although there's a timing disconnect in that

17   regard, but fundamentally, Your Honor, the case remains that

18   the basis of the administrative claim that Cobra has filed is

19   its contract with PREPA.

20       The legal standard that Your Honor must determine, in

21   terms of whether that is an allowed administrative claim, has

22   nothing whatsoever to do with FEMA and whatever process FEMA

23   is engaging in.  If PREPA wants to point to a FEMA

24   disallowance and independently try to establish that as a

25   basis to disallow a portion of the administrative claim, they

1   are allowed to do so, but, Your Honor, what Cobra did not

2   bargain for and what PREPA did not get contractual rights with

3   respect to is to bring FEMA into this process, and to put on

4   PREPA -- I apologize, Your Honor, to put on Cobra the entire

5   risk with respect to both the timing and the outcome of the

6   FEMA process.

7            And we know --

8            THE COURT:  Well, Mr. --

9            MR. QURESHI:  Sorry.

10           THE COURT:  Sorry.  Mr. Qureshi, I think I do

11  understand your point with respect to the contractual

12  relationships and the role of FEMA, as well as the genuine

13  I'll call it disadvantage to which your client has been put by

14  these delays.  This litigation stay, however, is imposed and

15  these issues exist within the context of a Title III

16  proceeding in which there remains an automatic stay.

17           There is Section 305 of PROMESA, which prevents the

18  Court from ordering the government entity to make a payment

19  without the consent of the Oversight Board, and the provisions

20  with respect to payment of administrative expenses are tied to

21  plan confirmation.  So while in the ordinary course, with a

22  litigation stay, as you say, there is a weighing of

23  disadvantage to both parties with respect to the delay of

24  progress toward the end goal of the litigation, and there

25  remains that sort of weighing in the determination, on this

1   stay here, we have the practical situation that PREPA is not,

2   in the Title III context, required to make the payment to your

3   client until there is a confirmation proceeding to the extent

4   it's going to be paid as an administrative claim.

5         So here PREPA raises an efficiency point of view that

6   seems to have played out in connection with the first

7   contract, which is that PREPA is certainly saved time and

8   transaction costs of litigating contract-based objections

9   that may well go away if PREPA's comfortable that it's going

10  to be paid by FEMA, and PREPA has legal protection from having

11  to front the money before confirmation.  So in that context,

12  what is there to be gained that would benefit the debtor,

13  PREPA, quite frankly, in litigating the granular contract

14  objections before FEMA makes its evaluation?

15        MR. QURESHI:  So a couple of things, Your Honor.

16  First of all, I don't think the primary analysis should be

17  what is the benefit to PREPA.  I think, instead, it should be,

18  and the case law requires that it be, what is the prejudice to

19  Cobra.  While Your Honor is correct that payment may not be

20  required until the time of confirmation of a plan, Your Honor

21  should not conflate payment with allowability of the claim.

22  Cobra is substantially prejudiced when it does not even have

23  an allowed administrative claim.

24        Given the size of the claim, in excess of 300 million

25  dollars, inclusive of interest that continues to accrue, Your

1    Honor, this has had very real and very severe financial

2    consequences on Cobra.  The allowance of the claim, even if

3    payment were not to occur until we get to confirmation, would

4    itself be very significant in relieving some of the harm that

5    Cobra has suffered as a result of the stay.

6         In addition, Your Honor, and this now does come into

7    play in terms of benefit to PREPA, and in fact to all of the

8    constituents involved in these proceedings, given the size of

9    the claim, it will be a litigated issue at confirmation

10   proceedings with respect to the ability, the financial ability

11   of PREPA to satisfy the claim, and, therefore, the feasibility

12   of whatever plan may be proposed.

13        PREPA benefits, and all of the parties in this

14   proceeding benefit from certainty, certainty as to what the

15   allowed amount of that claim is, so everybody knows how much

16   funding PREPA needs to have available in order to satisfy the

17   claim at the time of confirmation.

18        In addition, Your Honor, to the extent that PREPA, if

19   that claim were to be allowed prior to confirmation, pays any

20   portion of it, the interest clock would stop ticking, and the

21   estate would be relieved of the burden of ongoing interest

22   expense.

23        Finally, in responding to Your Honor's question, I

24   would point to the fact -- and, by the way, in the First

25   Circuit's list of seven factors that are relevant in this type

1    of a proceeding, this is one of them.  Your Honor, there's a

2    very important public interest at stake here, and that is that

3    the whole point of granting an administrative priority is so

4    that parties like Cobra are willing to step in and provide

5    services to an estate.  And let's not forget the circumstances

6    in which that occurred here.

7         There was no power on the island, Your Honor, and

8    Cobra stepped in under extremely difficult circumstances.  And

9    we are not talking about Cobra being before the Court merely

10   to seek its profit.  We're talking about hundreds of millions

11   of dollars that was paid out by Cobra to employees on account

12   of taxes for workers, for materials, and the like.

13        The policy consideration of making sure that parties

14   in other cases are incentivized to provide a debtor with those

15   types of services under those circumstances is a very

16   important one.  If every administrative creditor received the

17   treatment that Cobra has received here, where they are

18   precluded even from seeking allowance of the claim for work,

19   the substance of which is not subject to any serious dispute,

20   Your Honor, those policy considerations would be undermined.

21   And so I would urge the Court to come back to that list of

22   factors that the First Circuit instructs should be considered,

23   because every single one of them weighs in favor of lifting

24   the stay, so that at least we can get to the point where Cobra

25   has an allowed claim.

1        And, Your Honor, the argument that there will be

2   duplicative discovery, these vague notions that FEMA -- that

3   PREPA points to, they need to do more than that to allow the

4   stay to continue, and they haven't done it.  The reality is

5   that Cobra, at its own expense, has responded to all of the

6   information requests.  We know, although we don't see it, tons

7   of information has been provided to FEMA.  That's all

8   information that PREPA has access to.

9        So I doubt very much that extensive discovery is even

10  needed.  This is really about PREPA saying they would prefer

11  to sit here and wait for FEMA to issue its ruling, whether

12  that happens in six months, or one year, or two years, and

13  that's just not fair.  It's contrary to the considerations

14  that the First Circuit lays out.  It's not provided for in the

15  contract.  And respectfully, Your Honor, this Court should not

16  allow it.

17            THE COURT:  Thank you, Mr. Qureshi.

18            MR. QURESHI:  Thank you.

19            THE COURT:  I'll now turn to counsel for the

20  Oversight Board.

21            MR. COOPER:  Good morning, Your Honor.  Scott Cooper

22  of Proskauer Rose, LLP, counsel for the Oversight Board as

23  representative of PREPA.

24            THE COURT:  Good morning.

25            MR. COOPER:  Your Honor, I think Mr. Qureshi has the

1    standard here backward.  Each of the arguments, save the

2    development of the entry of the felony guilty pleas by Cobra's

3    former president and FEMA's former on-island representative,

4    is the only new event since the Court has previously ruled on

5    essentially every argument that Cobra has offered this

6    morning.  And as your exchange with Cobra has already

7    reflected during this argument, the reasons for the

8    continuation of the stay are grounded primarily on the fact

9    that there is efficiency to be gained, and nothing essentially

10   from a legal standpoint to be lost, by allowing the FEMA

11   review of the second contract to continue and be completed

12   before the parties attempt to join the issue on whether there

13   are any -- after that process completes, any remaining issues

14   to be litigated in this Court regarding the amounts still

15   arguably due to Cobra.  And for those reasons, the stay should

16   be continued.

17        We do not believe that the entry of the felony guilty

18   pleas in criminal actions are a sufficient basis, indeed any

19   justification, for a modification of the stay.  And since no

20   other events have occurred that justify a change in the

21   Court's prior reasons for continuing the stay, we submit it

22   should be continued.

23        Cobra's attempt to portray the entry of the criminal

24   pleas as exonerating of Cobra and as sufficient basis for the

25   modification of the stay is inaccurate in our view.  Indeed,

1    Cobra places more importance on the continuing relevance of

2    the criminal proceedings than the government parties did in

3    their objection.  The status of the criminal proceeding has

4    not been the sole basis on which the Court has premised the

5    stay in the past, and we don't believe it is the primary basis

6    for the continuation of the stay now.

7         We also believe that Cobra's characterization of the

8    felony guilty pleas is not entirely accurate, but I think it's

9    unnecessary, unless the Court has an interest and -- in

10   understanding more of the details.  I think it's all covered

11   in our papers.  I won't go into detail about exactly what the

12   pleas were or about what the factual basis was.  Suffice to

13   say that they establish, on a stipulated basis, that

14   Mr. Ellison and Ms. Tribble engaged in criminal conduct, at

15   least from April 2018 through December of 2018, the same time

16   period during which the second contract was being negotiated,

17   executed, and performed by Cobra.  And while it is true that

18   the conduct that is being stipulated to was not directly

19   related to the second contract, it could be relevant to FEMA's

20   review of the second contract.  But, more importantly, it

21   simply isn't a basis for the lifting of the stay.

22        Even Cobra admits the issues being addressed by the

23   FEMA contract review overlap substantially with what Cobra

24   asks the Court to address.  FEMA is engaged in an extensive,

25   detailed analysis of Cobra's contractual entitlement to

32

1   payment based on a legal stand -- required under the

2   Bankruptcy Code.  FEMA reviews the corporate invoices --

3          COURT REPORTER:  I'm sorry, Counsel.  Your Honor,

4   this is the court reporter.  If counsel could please repeat?

5   The audio broke up from when he said "FEMA is engaged in an

6   extensive detailed analysis" --

7          THE COURT:  Can you go back to that point, please,

8   Mr. Cooper?

9          MR. COOPER:  Yes.  Yes.

10          THE COURT:  Thank you.

11          MR. COOPER:  That FEMA is engaged in an extensive

12   detailed analysis of Cobra's entitlement to payment based on a

13   legal standard similar to the one required under the

14   Bankruptcy Code.  FEMA reviews the Cobra invoices to determine

15   whether the costs were necessary and reasonable to accomplish

16   the work properly and efficiently, and whether the claimed

17   costs at issue were authorized under the contract pursuant to

18   which they were incurred or can be directly tied to the

19   performance of eligible work.  Those are the standards

20   applicable to FEMA's review under federal regulations, and the

21   standards FEMA applied in its determination memorandum in its

22   review of corporate invoices under the first contract, and

23   will be the standards applied in its review under the second

24   contract.

25          That necessary and reasonable standard is very

1   similar to the actual and necessary standard under Bankruptcy

2   Code Section 503(b).

3         THE COURT:  Mr. Cooper, how do you respond to

4   Mr. Qureshi's argument that the First Circuit's litigation

5   stay standard requires the Court to recognize and weigh

6   heavily the practical effect on Cobra's business of the delay,

7   even in determination as to whether the claim is allowed in

8   its commercial dealings?  So Mr. Qureshi is saying Cobra

9   doesn't have the money, and that's a problem, but even if

10  Cobra can't be forced to -- can't enforce collection of the

11  money now, not even having an allowed claim affects it

12  materially in its commercial dealings.

13        MR. COOPER:  I think the first thing I'd say about

14  that, Your Honor, is this is by no means the first time that

15  argument has been raised to the Court, and it has been

16  rejected in each of the instances in which it's been raised in

17  the past.

18        Second, I would say that under the factors that are

19  established in *Microfinancial, Inc., v. Premier Holidays

20  International, Inc.*, the First Circuit 2004 case that we've

21  previously cited to the Court, the relevant factors are the

22  hardship to PREPA, the interests of Cobra in proceeding

23  expeditiously, and the convenience of the Court.

24        I would submit that the -- the consensual advantage

25  to Cobra of having an adjudicated amount that would be due to

1   it at the time that the Title III proceeding is concluded does

2   not outweigh the very significant disadvantages that the Court

3   has already identified of duplicative litigation, potentially

4   inconsistent outcomes, and warrant the kind of proceeding that

5   Cobra proposes, again, and that the Court has previously

6   rejected, on the same arguments, be conducted on a

7   simultaneous basis.

8         It's not efficient.  It's likely to cause the

9   litigation -- unnecessary litigation here of issues that

10  likely would be resolved if the FEMA review is completed

11  instead in the first instance, and that's really been proven,

12  Your Honor, by the outcome, as you've noted, of the first

13  contract review by FEMA.  We're now down to just an appeal

14  process with respect to the last issues on that, and in --

15  those issues will be resolved before any issue could be

16  resolved in this Court on the first contract.

17        We submit the same outcome should occur with respect

18  to the second contract, and that the weighing of the benefits

19  and costs should result in the same outcome here.  That is,

20  that the stay should be continued.

21        THE COURT:  Thank you.  Anything further?

22        MR. COOPER:  Not from me, Your Honor.

23        THE COURT:  Okay.  Thank you.

24        Mr. Qureshi, you have two minutes for your further

25  response.

1          MR. QURESHI:  Thank you, Your Honor.

2          So, Your Honor, the arguments that the Court just

3   heard about the similarity of whatever FEMA standard is being

4   applied to the review of the invoices with the administrative

5   claim standard might be interesting, Your Honor, but it is not

6   legally relevant.  So let me come back to what is legally

7   relevant, which is the seven factor First Circuit test.  And I

8   want to quickly tick through those factors, the first of which

9   is the interests of the plaintiff in proceeding expeditiously,

10  including the avoidance of prejudice should there be a delay.

11  There's been a three-year delay.  I think we have more than

12  established the prejudice to Cobra of not even having an

13  allowed claim.

14          Second, hardship to the defendant.  What you are

15  hearing, Your Honor, is that what PREPA wants is the benefit

16  of doing nothing while FEMA does whatever it is that FEMA

17  does.  But, Your Honor, they didn't contract for that.  We had

18  a negotiation.  That negotiation resulted in a contract.  That

19  contract gave PREPA one out, and one out only with respect to

20  FEMA, and that is, if they don't get FEMA money because of

21  Cobra's, quote, unquote, sole fault.  That's not at issue.  So

22  while it may be more convenient, and even less expensive for

23  PREPA, it's not legally relevant, Your Honor.

24          Third point, third factor, convenience of both the

25  civil and criminal courts, not relevant.  Fourth factor, the

1    interest of third parties.  I've already stated why every

2    third party in this proceeding would benefit from certainty of

3    having the claim go forward.  Fifth factor, public interest.

4    Again, I've talked about the important public interest, the

5    underlying administrative priority, and why it even exists.

6    Sixth factor, good faith of the litigants, not at issue.

7    Seventh factor, status of the case.  Again, weighs in favor of

8    doing this now --

9            (Sound played.)

10           MR. QURESHI:  -- so we don't have another litigated

11   confirmation issue.

12           Your Honor, the interests of justice overwhelmingly

13   weigh in favor of lifting the stay.  Thank you.

14           THE COURT:  Thank you.  I will now make my oral

15   ruling.

16           Pending before the Court is the Motion to Lift the

17   Stay Order, which is Docket Entry No. 21145 in Case No.

18   17-3283 and Docket Entry No. 2841 in Case No. 17-480, which

19   I'll refer to as the "Lift Stay Motion," filed by Cobra

20   Acquisitions, LLC, which I'll refer to as "Cobra", as we have

21   been doing.

22           The Court has reviewed the relevant pleadings

23   carefully and listened carefully to today's arguments.  The

24   Court now makes its oral ruling as to the Lift Stay Motion,

25   and reserves the right to make non-substantive corrections in

1   the transcript of the ruling.  For the following reasons, the

2   Lift Stay Motion is denied.

3          Cobra requests termination of the litigation stay

4   imposed by the Court in October of 2019 and continued since

5   that time so that the parties may litigate Cobra's

6   administrative expense motion, which is Docket Entry No. 8789

7   in Case No. 17-3283.  The Court originally imposed the

8   litigation stay, which was requested by the government

9   parties, based on its conclusions that factual and legal

10  questions that could affect the outcome of the administrative

11  expense motion would likely be addressed in connection with

12  certain criminal proceedings against Cobra's former president,

13  and that the then pending FEMA investigation could also affect

14  the parties' rights and obligations with respect to the

15  amounts for which Cobra seeks administrative expense

16  treatment.

17         The power to stay proceedings is incidental to the

18  power inherent in every court to control the disposition of

19  the causes on its docket with economy of time and effort for

20  itself, for counsel, and for litigants, *Landis v. North*

21  *American Corporation*, 299 U.S. 248, 254, (1936).

22         As this Court noted in its order imposing the stay,

23  federal courts possess the inherent power to stay proceedings

24  for prudential reasons, and I refer you to Docket Entry No.

25  8886 in Case No. 17-3283, which was the first stay order.

1    That order quoted *Microfinancial, Inc., v. Premier Holidays*

2    *International, Inc.*, 385 F.3d 72, 77 (1st Cir. 2004).

3         It follows from these principles that after

4    imposition of a stay for prudential reasons, the Court retains

5    the ability to modify or dissolve the stay.  *Green v. Cosby*,

6    177 F. Supp. 3d 673, 681 (D. Mass. 2016).  Such circumstances

7    include material changes in the circumstances that the Court

8    originally determined warranted the stay.

9         Cobra contends that such material changes have

10   occurred.  First, the criminal trial is no longer imminent,

11   because certain defendants have entered into plea agreements

12   with the prosecution, and the defendants, including Cobra's

13   former president, are now awaiting sentencing.  Second, Cobra

14   characterizes the ongoing cost analysis and determination

15   awaited from the Federal Emergency Management Agency, or FEMA,

16   as incomplete, insofar as only the first of two contracts

17   between Cobra and PREPA has been reviewed and a determination

18   issued.

19        While Cobra acknowledges that an administrative

20   appeal of the determination concerning the first contract

21   remains ongoing, that administrative appeal does not appear to

22   be a material issue to either party, but Cobra, in any event,

23   asserts that further FEMA-related delay is unwarranted.

24   Specifically, Cobra argues that it will be unduly prejudiced

25   by continuation of the stay pending FEMA review of the second

1   contract and any related appeals, because the ultimate

2   resolution of the claim will require further litigation, and

3   more immediately, that the continuing financial uncertainty

4   for Cobra is harmful to its business interests.

5          The government parties argue that the outcome,

6   including sentencing of the criminal matter, may be relevant

7   to Cobra's entitlement to administrative expense treatment and

8   to payment, and they emphasize that the stay should remain in

9   place until a cost analysis and determination memo is issued

10  by FEMA concerning the entirety of the second contract,

11  asserting that the result of the memorandum concerning the

12  review of the first contract demonstrates the utility of such

13  FEMA scrutiny in that issues that might well have been

14  litigated in terms of contractual entitlement were essentially

15  mooted by the -- by FEMA's approval of expenses.  So the

16  government argues that the FEMA cost analysis mitigates the

17  need for costly discovery and motion practice.

18         The Court has considered these arguments carefully.

19  This Court previously held that adjournment of the criminal

20  trial did not justify modification of the stay orders.  See *In*

21  *re: Financial Oversight and Management Board for Puerto Rico*,

22  617 B.R. 173, 180, (D.P.R. 2020).

23         Here, the Plea Agreement shows substantial progress

24  toward a resolution, but there is still contentions that the

25  resolution may be significant to party positions in litigating

1  certain aspects of the motion.  The Court, as it recognized in

2  its August 10th, 2021, order, must evaluate all aspects of the

3  current factual and procedural landscape in considering

4  whether the stay should be lifted or maintained.  The FEMA

5  analysis of the first contract appears to have eliminated the

6  need for litigation of certain PREPA objections to Cobra's

7  costs under the first contract, and that review was

8  comprehensive.

9        The FEMA administrative review process allows for a

10  targeted investigation into potentially disputed expenses and

11  an avenue for administrative appeal for any adverse finding,

12  and so although FEMA is not a party to the contract, the FEMA

13  process, which turns on similar issues as Bankruptcy Code and

14  contractual entitlement to payment of Cobra, is one that

15  reduces the need for extensive litigation and discovery

16  proceedings to resolve disputes regarding the amounts billed,

17  and is an important factor in conserving court resources and

18  the resources of the parties.

19        The Court understands that the plaintiff, Cobra --

20  well, the movant, Cobra, has an interest in expeditious

21  determination of its ultimate entitlement to payment of its

22  invoices.  That is an important consideration.  It is not a

23  determinative consideration.

24        PREPA here and the Court would face what would be

25  potentially and probably unnecessary use of resources, and

1   potentially conflicting outcomes if the entitlements to

2   payment under the second contract were litigated prior to the

3   FEMA determination, and the public interest in this particular

4   setting of a Title III bankruptcy is one that the public

5   entity defendant has presumably also weighed in determination

6   as to the risks and benefits of expending public resources on

7   potentially unnecessary and potentially duplicative litigation

8   of this particular claim.

9          The Court finds that the delay of determination

10  outcome here is not clearly inconsistent with the public

11  interest in the context of this particular controversy, and

12  the Court also notes that the prejudice being suffered by

13  Cobra isn't materially different from that of others who are

14  awaiting payments of administrative expense claims.

15         Accordingly, the Court will enter an appropriate

16  order denying the motion, and the parties are directed to file

17  a further status report by January 6th, 2023, or, if earlier,

18  30 days following the issuance of a FEMA determination

19  concerning the second contract.

20         Thank you.  Thank you, Counsel, for your arguments

21  and submissions.

22         MR. COOPER:  Thank you, Your Honor.

23         THE COURT:  The final contested matter is No. 4 on

24  the agenda, the PV Properties Motion for Relief from Stay,

25  which is Docket Entry No. 2779 in Case No. 17-4780, and I have

1   counsel for the movant, PV Properties, down for opening

2   remarks of four minutes.

3           Would counsel for PV Properties please turn on your

4   camera and your microphone?

5           MR. AGRAIT:  Good morning, Your Honor.

6           THE COURT:  Good morning, Mr. Agrait.

7           MR. AGRAIT:  For PV Properties, Attorney Fernando

8   Agrait.

9           Your Honor, we are here today because 12 years ago,

10  2010, a new asset was created by the government of Puerto

11  Rico.  The asset was the RECs -- renewable energy

12  certificates, and it is --

13          COURT REPORTER:  I'm sorry, Counsel.  This is the

14  court reporter.  If you could repeat?  The audio broke off.

15  "The asset was the" -- it broke off.

16          MR. AGRAIT:  The renewable energy certificate.

17          THE COURT:  So that's renewable energy certificate,

18  which you are referring to as the REC, R-E-C; is that correct?

19          MR. AGRAIT:  An asset.  Yes.

20          THE COURT:  The RECs are an asset.  Thank you.

21          Did you get that, madam court reporter?

22          COURT REPORTER:  Yes, Your Honor.  Thank you.

23          THE COURT:  Thank you.

24          Please continue, Mr. Agrait.

25          MR. AGRAIT:  The asset was created as an instrument

1    of public policy to increase the investment, financing, and

2    promotion of renewable energy providers by the private sector.

3    The RECs' asset value depends both on the market and/or

4    specific private negotiations between parties, or with PREPA.

5    That -- and the reason and the key for the RECs' value is that

6    PREPA, a public monopoly, must comply with Puerto Rico law,

7    with the renewable portfolio standard, meaning a certain

8    amount of renewable energy has to be part of its portfolio of

9    production.

10        The only way that PREPA can comply with the RPS is

11   either by self production, that they don't have capacity as a

12   matter of fact, by buying renewable energy and RECs from

13   private producers, that there are not enough in Puerto Rico to

14   provide what they need for the RPS, or by buying RECs.

15        What is happening is that PREPA is notifying the

16   public agency, which is the PREB, on its compliance with the

17   renewable portfolio standard and its actions.  The RECs, that

18   is acquired from people, entities that have PPOAs with PREPA,

19   but it's also adding the renewable energy production of

20   private consumers who have --

21        (Sound played.)

22        MR. AGRAIT:  -- net metering programs with PREPA.

23   And none of the RECs of the net metering consumers are

24   acquired by PREPA.  The net effect is that if PREPA can comply

25   with the RPS by using renewable energy that it has not

1    acquired, the RECs, like it is informing now the PREB, the end

2    result is the RECs lose all their value.  It just disappears,

3    because, as I mentioned, the reason for the value of the RECs

4    is that PREPA must comply and must buy in order to add their

5    own self-production, or PPOA acquired RECs.

6          THE COURT:  Mr. Agrait, in my June 17th order, I

7    directed the parties to provide specific citations to language

8    in the reports to PREB that show that PREPA is, in fact,

9    claiming that it is in compliance with the RPS, but the

10   documents that we have here seem to indicate that PREPA is not

11   claiming that it's in compliance.  It's reporting

12   substantially lower amounts than would be required to meet the

13   RPS target.

14         So what is your -- what's the basis of your claim

15   that PREPA is saying that it's in compliance?

16         MR. AGRAIT:  I might have made a mistake in an

17   expression of mine, saying that they are claiming that they

18   are in compliance.  They have to file the reports in order to

19   show the PREB, Puerto Rico Energy Bureau, whether they are in

20   compliance or not, and there they present as amount of

21   renewable energy to be taken into account for their

22   compliance, both PPOAs, RECs, and energy by the -- the super

23   energy consumers with net metering programs that they don't

24   acquire the RECs, and the RECs are not paid to these

25   consumers.  So the total they are presenting, even the very

1 low total they are presenting, includes energy produced by

2 private consumers where they have not acquired the RECs.

3 So they -- noncompliance is worse than what they

4 report, and they have a legal obligation to comply.  Whether

5 it's the Puerto Rico Energy Bureau or some other entity that

6 has to impose sanctions on them for not doing so, but the fact

7 is that they are including, as information of renewable energy

8 to be taken into account for compliance, energy from the civil

9 generators that -- generators that have not -- that they

10 haven't purchased the RECs.

11 THE COURT:  Now, there are other renewable energy

12 suppliers in Puerto Rico.  Is there any reason why the RECs

13 would have to have been bought from PV Properties in

14 particular?

15 MR. AGRAIT:  Well, two things.  One, there are not

16 enough producers of renewable energy in Puerto Rico, PPOAs, to

17 comply with PREPA'S RPS obligations under the law.  That's

18 one.  So in order to move toward compliance, they must buy all

19 the RECs available from PPOA contracts, and buy PPOA RECs from

20 private producers, like the case of the net metering

21 consumers.  That's one.  And, two -- and PV Properties have

22 production of renewable energy with net metering contracts for

23 the RECs.  We are actually doing that and not receiving -- not

24 being bought on the RECs.  That is the main reason.  And, two,

25 whether other parties claim their rights to this Court, well,

1  it's their decision.  We are claiming ours.

2         We are not here in a class action representing all

3  the PPOA producers or all the consumers with net metering

4  programs.  We're just requesting our rights, where we have an

5  asset that value collapses to zero when PREPA claims that it's

6  moving to compliance with energy -- renewable energy portfolio

7  standard without acquiring the RECs.

8         THE COURT:  And what -- even if you are correct that

9  PREPA's actions that you have described would support

10  nondischargeable takings claims, what harm would you suffer if

11  the Court does not grant immediate stay relief?  Can't the

12  dischargeability arguments be addressed equally well later in

13  connection with a claim or plan confirmation proceedings?

14         MR. AGRAIT:  Yes, Your Honor, I think that our claims

15  could be taken care of later in -- in the bankruptcy

16  proceedings, yes.

17         THE COURT:  Do you have any specific response to the

18  Oversight Board's analysis of the *Sonnax* factors, in which the

19  Oversight Board argues that those factors do not indicate a

20  need for immediate stay relief?

21         MR. AGRAIT:  Well, Your Honor, I think that certainly

22  there is a harm to PREPA -- or to the movant here of not

23  having the value of its assets protected and paid for.  And

24  there is no -- I don't think that PREPA can argue that it

25  suffers a harm, because it has to comply with the law.  I

1   mean, PREPA, it's a public entity, and it can only act within

2   the framework of the law that it operates.  And arguing that

3   they would be harmed by complying with the law makes no sense

4   in a public entity.

5          So I think that the -- the balance, the *Sonnax*

6   factors would go in favor of raising the --

7          COURT REPORTER:  I'm sorry, Counsel.

8          THE COURT:  Thank you.  I'm sorry.

9          COURT REPORTER:  Your Honor, I'm sorry.  This is the

10  court reporter.  If counsel could repeat the very last part of

11  his sentence?  It dropped off, the audio --

12         THE COURT:  So, Mr. Agrait, would you repeat your

13  last point there?

14         MR. AGRAIT:  Instead of concerning the harm to PREPA,

15  to the debtor, I don't think it's reasonable for PREPA to say

16  that it will suffer harm because it has to comply with the

17  law.  PREPA is a public entity, and all its actions must

18  comply with the law.  There's no space outside of the law.

19  The law created it, and -- the structure and framework of

20  renewable energy that the Government of Puerto Rico created by

21  law.

22         So, in the balance, the harm suffered by PV versus

23  the harm, quote, unquote, suffered by PREPA remains in favor

24  of PV.

25         THE COURT:  Madam court reporter, were you able to

1   get that this time?

2         COURT REPORTER:  Yes, Your Honor.  Thank you.

3         THE COURT:  Thank you.

4         So now I will turn to counsel for the Oversight

5   Board, Mr. Desatnik.  Good morning.

6         MR. DESATNIK:  Good morning, Your Honor.  Daniel

7   Desatnik, Proskauer Rose, LLP, for the Oversight Board, as

8   Title III representative of PREPA.

9         THE COURT:  Good morning.

10        MR. DESATNIK:  Your Honor, this is movant's third

11  attempt to lift the stay to compel PREPA to buy its RECs.  The

12  Court denied movant's prior two attempts for failure to show

13  cause on *Sonnax* factors grounds.  That is the legally relevant

14  test.

15        As Your Honor just asked movant, what is the harm

16  from adjudicating your claim in the claims administration

17  process like everyone else?  I don't want to overstate what

18  movant said, but I believe he just told the Court there is no

19  harm, there is no reason why movant cannot adjudicate its

20  claim, if it believes it's a takings claim and is not

21  dischargeable.  PREPA obviously disagrees, but that's really

22  the crux of the issue, and we believe that that is dispositive

23  of the motion.

24        The Court denied movant's past two lift stays on

25  *Sonnax* factors grounds, and we believe its reasoning in those

1  two motions -- in the denial of those two motions is equally

2  applicable here.  Movant did say that PREPA would not be

3  harmed by lifting the stay.  We disagree for much of the same

4  reasons that the Court just articulated in the Cobra stay

5  motion.

6       As the Court is well aware, PREPA is in the midst of

7  global mediation with key stakeholders.  The Court just

8  declined an invitation from some of those mediation parties to

9  proceed with litigation while mediation is ongoing.  The Court

10  also just recognized that maintaining the stay is in the

11  public interest, because it weighs in favor of not potentially

12  engaging in unnecessary litigation.

13       Judge, we don't believe that PREPA should have to

14  divert its limited resources at this critical juncture to

15  engage in litigation, particularly litigation on a claim that

16  is not commenced.  Your Honor, because Your Honor asked for

17  supplemental briefing, even though we maintain that the merits

18  of the underlying claim here are not relevant on a lift stay

19  motion, all that is relevant is whether movant has shown cause

20  to lift the stay, and they have not, I do want to briefly

21  address some of the factual contentions of movant's motion.

22       Movant's takings claim is entirely built on its

23  contention that PREPA has reported to PREB that it owns

24  movant's RECs in order to comply with the RPS.  Based on my

25  review of the client's reports and my discussions with PREPA's

1    counsel, that simply is not the case.

2         As shown in the joint status report that we

3    submitted, PREPA does not take credit for RECs from

4    distributed generation providers such as PV Properties.

5    Movant actually concedes as much in the joint status report,

6    saying that there's nowhere in the report that it expressly

7    takes credit.  It further does not explain how those reports

8    take credit for those RECs by implication.

9         Second, Judge, as you yourself noted, PREPA is not

10   claiming compliance with the RPS.  Unfortunately, PREPA is

11   quite far from compliance.  My understanding is, in its latest

12   report, it is only 3.7 percent of the way to the 20 percent

13   compliance threshold, and that, again, it is my understanding,

14   is a bright-line requirement.  It doesn't matter if PREPA is

15   3.7 percent or maybe 3.8 percent, because now it has movant's

16   RECs.  If it fails to meet that 20 percent threshold, PREB

17   issues a noncompliance notice, and then PREPA must show that

18   noncompliance was excusable for one of seven reasons.

19        If PREPA's able to meet that standard, there's really

20   no benefit to PREPA from not complying or punishment to PREPA,

21   and so there's really no prejudice to movant here from not

22   engaging in the sale of the RECs at this moment in time.

23        Third, Judge, for the same reason, this motion is

24   premature because PREB has yet to regulate the market for

25   RECs.  We cover this extensively in our brief, but PREB needs

1  to set the minimum price for RECs, and PREPA has determined

2  that it cannot engage in the purchase of RECs from distributed

3  generation providers such as PV Properties until that has been

4  done.

5           Movant actually quotes a letter that PREPA sent to

6  Windmar, which is an affiliate of PV Properties, in which

7  PREPA says, once PREB has passed those regulations, PREPA will

8  engage with it in potentially buying its RECs.  And given that

9  PREPA is so far from its compliance standards, there is a

10  likelihood here that that conversation will need to take

11  place.  So going back to the Court's observation in the Cobra

12  matter, that we want to avoid unnecessary litigation, this

13  could be rendered unnecessary as well in due time.

14           Finally, Judge, for the same reason, you know, even

15  if the factual contentions were true, and my view is that they

16  are not, there's no per se taking of property here.

17           (Sound played.)

18           MR. DESATNIK:  Movant retains title to its RECs.

19  It's free to sell or trade them once the regulations have been

20  passed by PREB.  There's also no regulatory taking against

21  PREPA, because PREB is the relevant regulator, and PREPA has

22  not passed any regulation that would deprive movant of the

23  value of its RECs.

24           So unless Your Honor has any questions, we

25  respectfully submit that the Court should deny the Lift Stay

1    Motion.  Thank you.

2              THE COURT:  Thank you, Mr. Desatnik.

3              Anything further, Mr. Agrait?

4              MR. AGRAIT:  Yes.  Very short.

5              First, the Law 17 of 2019, which is the public policy

6    in Puerto Rico --

7              THE COURT:  I'm sorry.  After -- would you go back

8    and repeat what you said after the reference to Law 17 of

9    2019?  The sound didn't come through.

10             MR. AGRAIT:  The Law 17, Law 17 of 2019 is Puerto

11   Rico's public policy, Your Honor.  It specifically states that

12   the obligations of the government parties is not subject, nor

13   limited, nor can be pro -- pending on the regulations are

14   approved.  Such is the law, and that law applies to PREPA.  So

15   PREPA saying that they don't have to act because there's no

16   regulations is simply against the law and is incorrect.

17   That's my -- two --

18             COURT REPORTER:  I'm sorry, Counsel.  This is the

19   court reporter.  Against the law and -- I didn't hear the last

20   part --

21             MR. AGRAIT:  And incorrect.  And incorrect.  So if

22   PREPA reports to the PREB only the RECs they have acquired

23   from PPOA contracts, which they do in their report, and don't

24   add to those numbers the energy -- renewable energy produced

25   by consumers who have not been paid for the RECs, then there

1   would be no problem.

2        The issue here, different from the prior cases that

3   PV Properties and Windmar brought to this Court concerning the

4   RECs, is that we are arguing that by reporting to the PREB the

5   value -- the value of the energy that they don't pay for the

6   RECs, they are, one, misleading a government agency and

7   submitting wrong information; and, two, the net effect is to

8   eliminate the value of the RECs, because the RECs have value

9   only when PREPA has to buy them in order to comply with the

10  RPS.

11       That will be all, Your Honor.

12       THE COURT:  Thank you, Mr. Agrait, and thank you

13  also, Mr. Desatnik, for your arguments.  I will now make my

14  ruling.

15       Before the Court is PV Properties, Inc.'s, Motion for

16  Relief from the Automatic Stay, which is Docket Entry No. 2779

17  in Case No. 17-4780.  I'll refer to that as the "Motion".  The

18  Court has carefully reviewed the relevant pleadings, and

19  listened to the arguments today.  The Court now makes its oral

20  ruling as to the Motion, and reserves the right to make

21  nonsubstantive corrections in the transcript of this ruling.

22       For the reasons that follow, the Court denies the

23  motion to the extent that the automatic stay bars the

24  prosecution of the movant's claims.  This reminds me that

25  there is a question that I had intended to put to

54

1  Mr. Desatnik, and so I'm going to ask Mr. Desatnik to return

2  to camera for a moment.

3          Mr. Desatnik, is it the Oversight -- is it PREPA's

4  position that the automatic stay bars PV Properties from

5  seeking relief with respect to post-petition RECs, and, if so,

6  on what aspect of Section 362 is that position premised?

7          MR. DESATNIK:  Yes, Your Honor.  I don't want to

8  overstate the Board's position on the automatic stay, but from

9  my analysis, 362(a)(3) stays any act to obtain possession of

10  property of the estate, or property from the estate, or to

11  exercise control over property of the estate.

12          As the Court is aware, under PROMESA 301, property of

13  the estate is substituted for property of the debtor.  So if

14  PV Properties is trying to commence an action against PREPA to

15  collect on a judgment against PREPA, at this point in time,

16  they are committing an act to exercise control over PREPA's

17  property, meaning its funds.

18          So we do believe, or at least, you know, my analysis

19  -- and I don't want to overcommit the Board's position on this

20  -- is that the stay would apply here to the post-petition

21  RECs.  But I also do want to say that I'm not sure if the

22  post-petition/pre-petition lens is correct here, because this

23  is just the same continuation of PV Properties' claims that

24  existed pre-petition.  They're saying that they have RECs.

25  They're saying that, Puerto Rico law complies us to buy those

1    RECs -- compels PREPA to buy those RECs.  And now it's just a

2    change of theory.  Now they're saying that the Court's decided

3    Puerto Rico law does not require us to buy those RECs.  Now

4    it's a takings claim.

5          So I do think that this is just a different theory of

6    a pre-petition claim, but even to the extent there might be

7    some post-petition element, the stay would still apply.

8          THE COURT:  But there is no judgment that they're

9    trying to collect now.  What they're talking about is

10   instituting an inverse condemnation action that would result

11   in the first instance in a determination as to whether there

12   is liability.  Is that correct?

13         MR. DESATNIK:  Well, they say that in their motion,

14   Your Honor, but the order that they proposed does not have

15   such qualification, so it's unclear to us if this is just a

16   quantification, or if it's to seek a judgment.

17         I would, you know, still take the position that even

18   a quantification that seeks to reserve a portion of PREPA's

19   property for it is still an act to control PREPA's property,

20   but, nevertheless, if the stay does apply, if they're just

21   seeking quantification purposes of their claim, there's no

22   reason that it can't be done in the claims administration

23   process.

24         THE COURT:  Thank you, Mr. Desatnik.

25         So now I will go on with my ruling.  For the reasons

1    that follow, the Court denies the Motion to the extent that

2    the automatic stay bars the prosecution of the movant's

3    claims.  To determine whether cause exists to lift the

4    automatic stay, the Court analyzes the factors set out by the

5    Second Circuit in *Sonnax Industries v. Tri Component Products,*

6    *Corp.*, in the *In re: Sonnax Industries* bankruptcy case, 907

7    F.2d 1280, 1286 (2nd Cir. 1990).  See *Gracia-Gracia v.*

8    *Financial Oversight and Management Board for Puerto Rico* in

9    the *In re: Financial Oversight and Management Board for Puerto*

10   *Rico,* Title III case, 939 F.3d 340, 347 (1st Cir. 2019).

11         The following factors identified in *Sonnax* are

12   particularly relevant to this controversy:  Whether relief

13   would result in a partial or complete resolution of the

14   issues.  That is the first factor.  Connection with or

15   interference with the bankruptcy case.  That is the second

16   factor.  The interest of judicial economy, and the expeditious

17   and economical resolution of litigation.  That is the 10th

18   factor.  Whether the parties are ready for trial.  That is the

19   11th factor.  And the impact of the stay on the parties and

20   the balance of harms, which is the 12th factor.

21         The party requesting stay relief bears the initial

22   burden of establishing prima facie eligibility for stay

23   relief, after which the debtor has the ultimate burden of

24   persuasion on all issues other than the debtor's equity in

25   property, and I cite for that the *Gracia-Gracia* decision,

1   which quoted *Sonnax*.

2       The first factor does not weigh in favor of lifting

3   the automatic stay.  Granting the motion and providing relief

4   from the automatic stay so that PV Properties can commence an

5   inverse condemnation proceeding against PREPA would not result

6   in the resolution of issues that will speed the resolution of

7   PREPA's Title III case.  While PV Properties would like its

8   claims to be adjudicated by a court sooner rather than later,

9   that is no doubt true of many creditors who would like their

10  claims to be resolved and paid as soon as possible.

11      The fact that PV Properties has cast its claims as

12  arising under the Takings Clause does not make their immediate

13  resolution more pressing.  As the Court has previously held,

14  granting stay relief simply because a movant has asserted

15  constitutionally protected rights would invite unsecured

16  creditors to seek to challenge in alternative fora the

17  validity of any government act that they contend has affected

18  their rights by simply recasting their claim in constitutional

19  terms, thereby disrupting significantly and undermining the

20  fundamental purpose of these Title III proceedings.  *In re:*

21  *Financial Oversight and Management Board for Puerto Rico*, 485

22  F. Supp. 3d 351, 362 (D.P.R. 2020), affirmed 989 F.3d 170,

23  (1st Cir. 2021).

24      Moreover, even if PV Properties' claims have merit,

25  so do many creditors' claims.  If the mere existence of

1    meritorious claims constituted cause for relief from the

2    automatic stay, the automatic stay would cease to provide the

3    breathing spell that is critical to debtors' rehabilitation.

4    *In re:  Oversight -- Financial Oversight and Management Board*

5    *for Puerto Rico*, Case No. 17-3283, reported at 2019 Westlaw

6    4735362, at *4, (D.P.R. June 28th, 2019).

7         Granting stay relief would, however, divert PREPA's

8    resources and attention during a period when its employees and

9    advisors are focused on the critical task of negotiating and

10   formulating a plan of adjustment with the aid of the mediation

11   team.  Permitting PV Properties to circumvent the orderly

12   claims resolution process and distract from efforts to

13   formulate a plan for the benefit of all stakeholders is

14   potentially prejudicial to other interested parties, and is

15   not an efficient use of the debtors' resources.  Thus, the

16   second factor also weighs against stay relief.  Nor do factors

17   ten and 11 support stay relief.  The inverse condemnation

18   proceeding contemplated by PV Properties has not even been

19   commenced, and, therefore, is not ready for trial.

20        Accordingly, the Court is not inclined to require

21   PREPA to take on the significant transaction costs of trying

22   to untangle the factual and legal basis for PV Properties'

23   claims, and to respond to them in another judicial forum at

24   this time.  For these reasons, the Court will enter an order

25   denying the motion.

1          Thank you, Counsel, for your arguments and your

2     appearance today.  This concludes the matter.

3          MR. AGRAIT:  Thank you, Your Honor.

4          THE COURT:  Mr. Agrait?  I'm sorry, Mr. Agrait.  Did

5     you want to --

6          MR. AGRAIT:  I just said thank you, Your Honor.

7          THE COURT:  Thank you.  Take care.

8          So this concludes the scheduled agenda matters.  If

9     counsel need to raise anything else before I adjourn, please

10    raise your hand on the screen.

11         I do not see any hands raised, so this concludes the

12    hearing agenda for this Omnibus Hearing.  The next scheduled

13    hearing is the August 8th, 2022, pretrial conference in

14    connection with the proposed Plan of Adjustment for the Puerto

15    Rico Highways and Transportation Authority.  As with today's

16    hearing, that hearing will occur over a combination of Zoom

17    and a listen-only telephone line.

18         The Court previously entered an Order adjourning the

19    August 10th Omnibus Hearing, so that Omnibus Hearing is now

20    scheduled to be held in conjunction with the Confirmation

21    Hearing to be held the following week on August 17th and 18th,

22    2022.  I expect to conduct the August 17th and 18th hearings

23    in San Juan, conditions permitting.

24         As always, I thank our court staff in Puerto Rico, in

25    Boston, and in New York for their work in managing today's

60

1   proceedings, and their ongoing work in managing and

2   administering these very complex proceedings under

3   circumstances that continue to be challenging.  Stay safe and

4   keep well everyone.  We are now adjourned.

5             (At 11:12 AM, proceedings concluded.)

6                         *      *      *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  U.S. DISTRICT COURT    )

 2  DISTRICT OF PUERTO RICO)

 3

 4      I certify that this transcript consisting of 61 pages is

 5  a true and accurate transcription to the best of my ability of

 6  the proceedings in this case before the Honorable United

 7  States District Court Judge Laura Taylor Swain, and the

 8  Honorable United States Magistrate Judge Judith Gail Dein on

 9  June 29, 2022.

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```