MCEDPROH1

```
 1                       UNITED STATES DISTRICT COURT
                          DISTRICT OF PUERTO RICO
 2     ------------------------------------x
       In re:
 3
       THE FINANCIAL OVERSIGHT AND              PROMESA
 4     MANAGEMENT BOARD FOR PUERTO RICO,       Title III

 5         as representative of              Case No. 17 BK 3283 (LTS)

 6     THE COMMONWEALTH OF PUERTO RICO,
       et al.,                                 (Jointly Administered)
 7
           Debtors.
 8     ------------------------------------x
                                               New York, N.Y.
 9                                             December 14, 2022
                                               8:30 a.m.
10

11     Before:

12                       HON. LAURA TAYLOR SWAIN,

13                                        Chief U.S. District Judge

14     APPEARANCES:

15     For the Financial
       Oversight and Management
16     Board for Puerto Rico:        Martin J. Bienenstock, Esq.
                                      Brian S. Rosen, Esq.
17                                    Steve Y. Ma, Esq.
                                      Libbie B. Osaben, Esq.
18                                    Javier F. Sosa, Esq.
                                      Laura Stafford, Esq.
19
       For the Official Committee
20     of Unsecured Creditors
       (the "Committee"):            Luc A. Despins, Esq.
21
       For Assured Guaranty
22     Corp. and Assured
       Guaranty Municipal Corp:      William J. Natbony, Esq.
23

24

25
```

MCEDPROH1

```
 1   APPEARANCES, Continued:

 2   For The Puerto Rico
     Fiscal Agency and
 3   Financial Advisory
     Authority:              Peter Friedman, Esq.
 4                           Matthew P. Kremer, Esq.
                             Carolina Velaz-Rivero, Esq.
 5
     For The Ad Hoc Group
 6   of PREPA Bondholders:   Amy Caton, Esq.

 7   For U.S. Bank:          Ronald J. Silverman, Esq.
                             Pieter van Tol, Esq.
 8
     For Syncora:            Susheel Kirpalani, Esq.
 9   For Bonistas del Patio: Donald S. Bernstein, Esq.
                             Benjamin S. Kaminetzky, Esq.
10
     Also present:  Judge Shelley Chapman
11                  Judge Robert Drain
                    Judge Brendan Shannon
12                  Yusif Mafuz-Blanco

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings recorded by stenography.  Transcript produced by
     CAT.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MCEDPROH1

1      THE COURT:  Buenos dias.  Good morning, everyone.

2  This is Judge Swain.

3      Would the courtroom deputy please announce the case?

4      THE DEPUTY CLERK:  The United States District Court

5  for the District of Puerto Rico is now in session.  The

6  Honorable Laura Taylor Swain presiding.  Also present, the

7  Honorable Magistrate Judge Judith Dein.  God save the United

8  States of America and this Honorable Court.

9      *In re: The Financial Oversight and Management Board of*

10  *Puerto Rico, as representative of the Commonwealth of Puerto*

11  *Rico, et al,* PROMESA, Title III, Case No. 2017-BK-3283, for

12  Omnibus Hearing.

13      THE COURT:  Thank you, Ms. Ramirez.

14      Mr. Bienenstock, you have your hand up.

15      MR. BIENENSTOCK:  Yes, your Honor.

16      Good morning.  I just wanted to put my hand up because

17  I'm getting a message the host stopped my video.  I don't mind

18  not seeing my face, but I just didn't want you to think that I

19  didn't have it on on purpose.

20      THE COURT:  Alright.  Thank you for letting us know.

21      MR. BIENENSTOCK:  Oh, it's fixed.

22      THE COURT:  There you are.  You're back.

23      I'd ask that everyone turn their video on for the

24  opening remarks.

25      I'm wearing a mask.  I'm here in the courtroom with

MCEDPROH1

1  other people, and our numbers are higher in New York, so in

2  order to be courteous to the court staff with me, you'll see me

3  masked.  If you have real difficulty understanding me, which

4  you really shouldn't, but if anyone does, raise your hand and

5  we'll work on doing something about that.

6          MR. NATBONY:  Judge Swain, it's Bill Natbony at

7  Cadwalader.  I have the same problem.

8          THE COURT:  Of the video?

9          MR. NATBONY:  No picture.  No picture.

10          THE COURT:  Alright.  Let's see what we can do about

11  that.

12          Okay.  I think we're fixing those going along.  So if

13  I see your name, I will assume that it is our fault and not

14  yours.

15          MR. NATBONY:  Thank you.

16          THE COURT:  Welcome, counsel, parties in interest, and

17  members of the public and press.  We are about to begin today's

18  Omnibus Hearing in the PROMESA Title III cases.  After the

19  conclusion of the Omnibus Hearing, we will proceed to a hearing

20  on the application, pursuant to Title VI of PROMESA, for the

21  approval of the proposed Qualifying Modification of certain

22  bonds issued by the Puerto Rico Public Finance Corporation,

23  which is referred to as PFC.

24          To ensure the orderly operation of today's virtual

25  hearings, all parties appearing by Zoom must mute their

1   microphones when they're not speaking and, after these initial

2   remarks, turn off their video cameras if they're not directly

3   involved in the presentation or argument.  When you need to

4   speak, you must turn your camera on and unmute your microphone

5   on the Zoom screen.

6          I again remind everyone that consistent with court and

7   judicial conference policies, and the orders that have been

8   issued, no recording or retransmission of the hearing is

9   permitted by anyone, including, but not limited to, the

10  parties, members of the public, and the press.  Violations of

11  this rule may be punished with sanctions.

12         I'll be calling on each speaker during the

13  proceedings, and when I do call on you, please turn on your

14  camera, unmute yourself, and identify yourself by name for

15  clarity of the record.  After the speakers listed on the agenda

16  for each of today's matters have spoken, I may permit other

17  parties in interest to address briefly any issues pertinent to

18  the presentations that require further remarks.  If you wish to

19  be heard under these circumstances, please use the "raise hand"

20  feature at the appropriate time.  That feature can be accessed

21  by selecting the reactions icon in the tool bar located at the

22  bottom of your Zoom screen.  I will then call on the speakers

23  one by one.  After you finish speaking, please select the

24  "lower hand" feature also in the reactions area.

25         Please don't interrupt each other or me, so that we

1   can have an accurate transcript; and, as usual, I apologize in

2   advance for breaking the interruption rule, because I may

3   interrupt if I have questions or if you go beyond your allotted

4   time.  If anyone has trouble hearing me or another participant,

5   please use the "raise hand" feature.

6           The Amended Agenda, which was filed as Docket Entry

7   No. 23055 in Case No. 17-3283 and as Docket Entry No. 68 on the

8   PFC docket, which is Case No. 22-CV-01517, is available to the

9   public at no cost on the Kroll Restructuring website,

10  previously known as Prime Clerk, for those interested.  The

11  Prime Clerk website addresses and telephone numbers are still

12  operational.

13          I encourage each speaker to keep track of his or her

14  own time.  The Court will also be keeping track of the time and

15  will alert each speaker when there are two minutes remaining

16  with one buzz and, when time is up, with two buzzes.  If you're

17  speaking for three minutes or less, you'll only hear the final

18  two buzzes.  Here's an example of the buzz sound.

19          (Sound played)

20          THE COURT:  If we need to take a break, people who are

21  on the AT&T listen-only line should put their phones on hold

22  but not hang up.  So if we're on a break, put your listen-in

23  line on hold, and then take it off hold at the time when we're

24  scheduled to restart.

25          This morning we will proceed until 11:50 Eastern

1    Standard Time, which is 12:50 Atlantic Standard Time, and we'll

2    resume, if necessary, from 1:10 Eastern Time to 4:00 p.m.

3    Eastern Time.  I'll aim to take a break at about 10:30 Eastern

4    Time, which would be 11:30 Atlantic Standard Time, and that

5    would be a ten-minute break.  Again, during the break, people

6    who are on the listen-in line should just put the line on hold

7    and not hang up.

8            So please, everyone except Mr. Bienenstock, turn your

9    cameras off now, and then when we reach your agenda item or I

10   call on you, turn your camera back on.

11           Good morning, Mr. Bienenstock.

12           MR. BIENENSTOCK:  Good morning, Judge.

13           THE COURT:  Thank you.

14           Before we turn to the first item on the filed Agenda,

15   I note that last night the Oversight Board, rather than filing

16   a plan in accordance with the deadlines set by the extension

17   order that was filed on December 12, filed an urgent motion

18   requesting a further extension of the PREPA Plan-related

19   deadlines.  That urgent motion is Docket Entry No. 23064 in

20   Case No. 17-3283 and Docket Entry No. 3108 in Case No. 17-4780.

21           The urgent motion indicates that the resolution of

22   some type of problem with the production of information by the

23   Board has created a need and opportunity for further

24   discussions and potentially for a material change in the

25   Oversight Board's position.

1          Do I have that right, Mr. Bienenstock?

2          MR. BIENENSTOCK:  Yes, your Honor.  I think that's

3     what we wrote in the motion.  Yes.

4          THE COURT:  So I'd just like a little bit more insight

5     into the situation.  Is this information information that the

6     Board had undertaken to produce in connection with the earlier

7     order?

8          MR. BIENENSTOCK:  Your Honor, the answer -- I'm not

9     absolutely sure.  It was information that was put into a data

10    room.  Not everyone realized it was there.  It obviously was

11    not manufactured by the Board.  It was uploaded into the data

12    room, and if we had -- if the Board had understood it had been

13    there earlier, it would have produced it earlier.  There were

14    just a series of I think people not knowing things, and it all

15    pertained to one of many issues at stake.  And it was disclosed

16    a couple evenings ago.

17         That's the best I can tell you, your Honor.

18         THE COURT:  Yes.  There was certainly good news in the

19    extension notice from my perspective hearing that the Board's

20    willing to hear information that might move more productively

21    the mediation.  I am aware that all participants have been

22    working hard in the mediation, but it also sounds as though,

23    whether by reason of information tracking, communications, or

24    otherwise that some responsibility and perhaps significant

25    responsibility for delays that have brought us past the

MCEDPROH1

```
 1    original time target that I set and the extended time target
 2    that I set may be traceable to the Board and those the Board
 3    works with.
 4              Given the importance to Puerto Rico and all of the
 5    stakeholders of the issues that we're dealing with in seeking
 6    to get a proper PREPA plan to confirmation in a timely manner
 7    by the middle of this year, I'm deeply disturbed by that.  And
 8    so I will expect that the Board, as Debtor representative, will
 9    be scrupulous and more scrupulous, to the extent necessary, in
10    its attention to the full range of matters that are important
11    here and the need to use the time of the Court and the
12    mediators and the other parties in interest well in moving
13    toward confirmation of a plan for PREPA and a more solid future
14    for Puerto Rico moving forward, and the ability of Puerto Rico
15    to focus on repairing infrastructure and reviving the economy.
16    None of that should be surprising, but I felt a need to share
17    that this morning, having read the statement in the extension
18    request.
19              So now I would invite you to speak further to the
20    extension request.
21              MR. BIENENSTOCK:  Your Honor --
22              THE COURT:  I'm sorry.  Shelley Chapman, the lead
23    mediator, has her hand up.
24              Judge Chapman, did you want to be heard before
25    Mr. Bienenstock speaks further?
```

MCEDPROH1

| 1 | JUDGE CHAPMAN:  No.  Good morning, your Honor.  I'm

2 sorry.  I'm perfectly happy to wait until after Mr. Bienenstock

3 has concluded his remarks.

4 THE COURT:  Thank you.  So I'll call on you after

5 Mr. Bienenstock has concluded his remarks.

6 Thank you.  Please proceed, Mr. Bienenstock.

7 MR. BIENENSTOCK:  Okay, your Honor.  As the Court

8 understands, the mediation confidentiality severely constrains

9 what I think any of us can and should be saying.  So to the

10 extent something more than what we wrote in the motion is

11 beneficial to the Court, I think I would just point out a few

12 things, and hopefully not breach any mediation confidentiality

13 in doing it.

14 THE COURT:  I do want you to be careful not to breach

15 mediation confidentiality, so I appreciate your attention to

16 that.  I just want to give you an opportunity to say anything

17 further that you're comfortable in saying.

18 MR. BIENENSTOCK:  So outside of the mediation, and

19 from the beginning of this case, the Board has taken a position

20 in respect of its fiscal plans and budgets, that those are not

21 up for negotiation, because the welfare of Puerto Rico and its

22 people is not something that can be negotiated.  That said, the

23 Board has always specified that it would change its fiscal

24 plans and budget on at least two conditions -- on either of two

25 factual scenarios.  One is if someone shows that it made a

MCEDPROH1

1    mistake, and the other is if it gets additional material

2    information that would change its conclusions.

3          In the mediation, from the Board's point of view, its

4    positions on that are just its positions, whether it's in

5    mediation or not.  Suffice it to say, in connection with the

6    mediation, some people think that the issue in particular in

7    respect of the data that was the subject of the problem is

8    material and should change positions.  Some people not.  Some

9    people think there are other issues that overwhelm the single

10   issue that that data concerns.  But from the public record, the

11   public and the Court knows that so far the Board has done deals

12   with Vitol, as one impaired accepting class, and the Fuel Line

13   Lenders, whose claims exceed $800 million as a second impaired

14   accepting class.

15         Certainly a goal of the Board and the entire

16   mediation, is to see if that can be expanded to include the

17   bondholders, which is comprised of the largest class of

18   creditors.  The Board, as the motion states, will continue to

19   negotiate what the bondholders and other parties who are not on

20   board yet -- significantly, we have the unions, which the

21   biggest issue with the unions is they have an underfunded

22   pension plan.  That's public knowledge.  And there's no --

23   there's no at least finalized understanding with the statutory

24   -- the Official Creditors Committee.  So negotiations with all

25   those parties, from the Board's point of view, will continue

MCEDPROH1

1    whether or not the Board files a proposed plan without those

2    things being settled.

3           As the motion says, the Board is and has been prepared

4    to do that, but because of the view that reaching a deal, at

5    least with the bondholders, might be more difficult if a

6    proposed plan is on file than if it's not, the Board has been

7    more than willing to accommodate various inputs that it should

8    ask for extensions of the mediation so as to try to reach those

9    deals without the proposed plan being on file.  Whether that

10   will prove true, we don't know, but since the litigation that

11   resolves some of the key issues has not been slowed down, and,

12   in fact, yesterday reply briefs were filed -- I think the only

13   thing left is on December 20 the intervenors can file some

14   supplemental pleadings -- the Board has felt that by requesting

15   extensions of the mediation, it has not slowed down the

16   progress or reduced the likelihood of confirmation in July.

17          So, essentially, the Board's request is to try to

18   accommodate those parties who believe it's better to negotiate

19   without a plan on file, and that's why we made the request.

20   And because it is important to some parties, we hope the Court

21   will grant it.  If it doesn't, the Board is prepared to file

22   its proposed plan and disclosure statement and to continue

23   negotiating.

24          THE COURT:  Thank you, Mr. Bienenstock.

25          Judge Chapman.

1          JUDGE CHAPMAN:  Good morning, your Honor.  Can you

2     hear me?

3          THE COURT:  Yes, I can.  Good morning.

4          JUDGE CHAPMAN:  Good morning, your Honor.

5          Shelley Chapman from the law firm of Willkie Farr &

6     Gallagher, appearing this morning on behalf of the mediation

7     team.

8          Your Honor, I must confess that Mr. Bienenstock's

9     remarks have gone off in a direction that I did not anticipate,

10    so I'm not going to fully address and respond to a number of

11    the observations that he's made with respect to the overall

12    plan process, but I do believe that I need to correct the

13    record, if you will, and give you an explanation from our

14    vantage point as to what happened and why we are now here

15    before you today in connection with a third extension request.

16         THE COURT:  Again, you, too, will be scrupulous about

17    mediation confidentiality?

18         JUDGE CHAPMAN:  Yes.  Indeed I will.  And, your Honor,

19    if I am anywhere near the line, please let me know and I will

20    stop on a dime.

21         We got here today first as a result of an initial

22    extension request that was made by the mediation team in a

23    December 1st filing.  That extension request contained a number

24    of conditions.  The condition primarily at issue today was the

25    following:  That the Oversight Board shall promptly deliver to

1    the Ad Hoc Group and the Monolines, on a rolling basis, all of

2    the information on which the Oversight Board had relied in

3    formulating its current position in the ongoing plan

4    negotiations, with such delivery to be completed by the close

5    of business on December 2nd, 2022.  That's in the extension

6    request.  It's a matter of public record.

7         Your Honor, the word "all" meant all, and up until

8    that point, the document request had been extensive and had

9    been discussed over and over again.  And, indeed, in connection

10   with the filing of the December 1st report, the mediation team

11   made it crystal clear specifically what it was looking for, and

12   on an included but not limited to basis.

13        There can be no doubt, respectfully, I'll say contrary

14   to Mr. Bienenstock's observation, that the documents that

15   emerged in the early hours of the morning, not several days ago

16   but yesterday morning, up until 3:00 a.m., prior to the time

17   that mediation was to commence at 9:30 in the morning, had

18   previously been requested multiple times.  And while the

19   mediation team is well aware of the process of the Board in

20   connection with the fiscal plan and otherwise, the mediation

21   team is determined that these negotiations proceed based on

22   data and facts, and we believe that that's the only way that

23   there can be a sensible, well-informed negotiation.

24        So, your Honor, just to put a little more color on it,

25   because I think this is very important, December 2nd came and

MCEDPROH1

1   went, and document production was obviously not complete.

2   Documents continued to be produced over that subsequent weekend

3   and into the week of December 5th.  Another extension request

4   was filed as we were all staring down the deadline.  The

5   mediators felt that it was important that the document

6   production be completed.

7          This is not simple stuff, your Honor.  It's not a

8   matter of just documents, you know, in a box the way we all

9   grew up with.  There are -- I don't want to get too granular,

10  but there's data, there's methodologies and the like that's all

11  required for the advisors to fully present a picture to the

12  parties so that they can negotiate.

13         Over the weekend, over the weekend of December 10th

14  and 11th, the Ad Hoc Group's advisors feverishly worked with

15  such information as had been provided in order to prepare for

16  ongoing meetings.  We thought we were finally done, and then

17  low and behold, beginning at midnight through the night before

18  the mediation session that occurred yesterday, critical data

19  appeared for the first time.

20         And it does appear to us that it's not a matter of

21  simply that folks -- you know, this just happened and folks

22  didn't know it was there.  I am unwilling to accept that

23  characterization.  But I'm going to -- I'm going to try to stop

24  short, because I want to have a good and productive line of

25  communication and dialogue open with the Board's advisors, but

MCEDPROH1

1    we do believe that they need to be held to account.  A

2    tremendous amount of time and effort has been expended here,

3    your Honor.  It could have gone differently, but we insist that

4    the process has integrity and that it be data based.

5          Your Honor, we think that what's been lacking here, in

6    addition to, you know, the data itself, is an overall

7    atmosphere of candor and cooperation.  I expect to hear from

8    everybody.  I want my phone to be ringing off the hook.  It's

9    essential to the success of any mediation, and, in my

10   experience, that's what drives a successful outcome.  So we

11   hope and we expect that going forward that will be the case

12   during this latest and presumably last extension request.

13         It's not just a matter of holding up the filing,

14   filing of the plan.  These parties are big, big folks.  They've

15   been -- they're very sophisticated.  They know how to move

16   forward.

17         Your Honor, if the mediators are in a position to make

18   a proposal, which will be the case if the Board indicates its

19   willingness to make a material move, rest assured that the

20   mediators' proposal will be informed by the entirety of the

21   record, by everything that the mediators have been privy to,

22   and will take into account the newly disclosed data.  We're

23   seeking a data-based solution that is fair to the creditors,

24   but, above all, is fair and in the best interest to the people

25   of Puerto Rico, and that ensures a solid future for PREPA.

MCEDPROH1

```
1              Your Honor, if we're not in a position to make a
2    proposal and the plan has to be filed, we would ask that we
3    have an opportunity to come back before you, give you our
4    additional thoughts, and address scheduling matters.
5              Thank you, your Honor.
6              THE COURT:  Thank you.
7              Mr. Bienenstock, you have your hand up again, and I
8    also see that Ms. Caton's hand is up.  But first,
9    Mr. Bienenstock.
10             MR. BIENENSTOCK:  Thank you, your Honor.
11             I have to very respectfully disagree with Ms. Chapman.
12   The Board and its -- the people doing the production did not
13   fail to comply with any condition or any request, and the
14   reason I can say that so definitively is that the conditions
15   and requests were to produce all information the Board relied
16   upon.  The information that's been the subject of this hearing
17   is not information the Board relied on, and, in fact, it didn't
18   really know about it.
19             The reason it was produced at all, given that it was
20   not something that the Board had relied on, was that in a
21   Monday discussion with some of the creditors or their advisors,
22   there was a specific request for the type of information that
23   was, and when the Board looked, it found it and produced it
24   even though it had not relied on it.  All that said, I am
25   extremely proud of the way the Board has methodically attempted
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1     to continue to try to make consensual deals.  It will continue

2     to do so.  And we've made solid progress.

3            As your Honor knows, we've confirmed a lot of plans

4     where there were a lot of issues even more difficult than

5     these, and with creditors, and we hope to have the same success

6     here.  And I think, directionally, we are exactly where the

7     mediators are, but I simply cannot leave the Board undefended

8     when it comes to the remarks that Ms. Chapman made.

9            THE COURT:  Thank you, Mr. Bienenstock.

10           I think that there is clearly identified here ongoing

11    issues of clarity, trust, and candor that need to be attended

12    to continually to make that progress and to make sure that

13    there is an atmosphere in mediation that is constructive and in

14    which there are no unnecessary barriers.  So everyone is a

15    grown-up.  We all know what our goals are and what our duties

16    are.  So I will urge you to, on all sides, err in the direction

17    of communication and substance and style that will facilitate

18    productive work.  If there's any doubt as to whether something

19    would raise an unnecessary barrier or not, don't raise the

20    unnecessary barrier.

21           This is not a rocket science speech, but it is a

22    remark that comes from my concern about the dynamics hindering

23    progress.  So --

24           JUDGE CHAPMAN:  Your Honor.

25           THE COURT:  Yes, Judge Chapman.

```
 1            JUDGE CHAPMAN:  Yes.  I'm sorry.  May I just have 30

 2    seconds more, your Honor?

 3            THE COURT:  Yes, but I don't want this to end up being

 4    a back and forth.  So 30 seconds.

 5            JUDGE CHAPMAN:  I don't want it to be a back and forth

 6    either, and I suppose we're going to have to agree to disagree.

 7    The one thing I'll say is that, on the granular basis, the

 8    dispute centers on a request that had been made over and over

 9    again.  And, beyond that, I think we're mincing words.

10            I did want to ask your Honor, I have two very

11    wonderful co-mediators, and I did want to ask your Honor if you

12    wanted to hear from them as well.  So -- I didn't want to speak

13    to the exclusion of them.  And with that, your Honor, I'll

14    conclude.

15            THE COURT:  Thank you.

16            If either of the co-mediators who is on would like to

17    add a comment, please raise your hand now and I'll call on you

18    before I call on Ms. Caton.

19            So Judge Drain has just raised his hand.

20            Good morning, Judge Drain.

21            JUDGE DRAIN:  Good morning, your Honor.

22            I agree with Judge Chapman's remarks entirely, and

23    would say that with all of the work that has been done, and

24    there's been a lot done to pull out information, because this

25    is ultimately a data-driven determination we believe, this is,
```

1    in our belief, the best time to reach an agreement with the

2    largest group of creditors.  And we have tried very hard to

3    keep these deadlines as short as possible in light of that and

4    obviously the Court's concerns to move this process along.

5             JUDGE SHANNON:  Good morning, your Honor.  This is

6    Judge Shannon.  I'll keep it very, very brief.

7             To the comments of my colleagues, me, too.  I could

8    not agree more with the observations, and I do believe this is

9    both a critical time and a meaningful opportunity to try to

10   move forward with the process.  And we are committed to it.

11            Thank you.

12            THE COURT:  Thank you, Judge Shannon, and thank you,

13   Judge Drain.

14            Ms. Caton, did you -- I will now hear from

15   representatives of other parties in interest who wish to be

16   heard on the question of whether the extension should be

17   granted.  I would ask that each speaker be as brief as

18   possible.  I will have a beep sounded at three minutes and

19   another at five.  Please don't make me get to the five.  If you

20   can do it in under the three, that would be great, too.

21            So I think Mr. Kirpalani's hand is up.

22            Ms. Caton had her hand up, but it's no longer up.  So,

23   Ms. Caton, if you wish to speak, put it up again, but first

24   I'll call on Mr. Kirpalani.

25            I'm sorry, Ms. Caton.  You got your hand up right

1    away, so, Ms. Caton, you go first.

2              MS. CATON:  Thank you, your Honor.

3              I appreciate it.  Amy Caton on behalf of the Ad Hoc

4    Group of bondholders.  I am going to be brief this morning, and

5    I want to note we did not request this extension, but nor did

6    we object.  And I will be very careful about breaching the

7    confidentiality of the mediation and keeping my comments

8    productive.

9              I do want to note that Mr. Bienenstock, in his

10   statements about the document request, specifically have his

11   facts wrong, and we can leave that for another day.  And I'm

12   also going to leave for another day when this data was actually

13   received, whose control it was in, but I do want to note, your

14   Honor, that these are really critical issues that we think

15   warrant full discussion and review at a later date, because

16   they really do go to the heart of mediation and the plan

17   process and the intent of the parties.

18             And I also want to note that while Mr. Bienenstock's

19   extension request states that the parties need time to

20   determine whether this information is meaningful or not, that,

21   again, without getting into the depths of the mediation, I

22   believe it was observed by all the parties, including the

23   mediators and Oversight Board's advisors yesterday that this

24   information was indeed important to review.

25             Finally, on this point, I do want to note that it's

1   our view that the Court mediators have tried everything in

2   their power not to just get to a deal here, any deal, but also

3   to understand the critical issues before them, and this is what

4   PREPA can afford to pay to its creditors and how PREPA's

5   electricity rates drive that question.

6          And we've done everything we could to try to answer

7   the mediator's questions on these critical issues, and I hope

8   that all of the parties have done the same.  So I hope that the

9   Board members and their advisors have the opportunity to review

10  this data, discuss their next steps, and see where we go from

11  here.  And I'm sorry that my description can't be more robust,

12  but I do think -- I think I've met the requirement of keeping

13  within the mediation privilege.

14         Finally, the Board's report yesterday notes that it's

15  reached a settlement with the Fuel Line Lenders, and towards

16  that settlement, I just again note that the Board continued

17  sort of statements about litigation with the bondholders rather

18  than focusing on trying to get a deal, in its comments to the

19  Court, bring us back to what is probably the intent of the

20  settlement, which is to create an impaired accepting class that

21  may be acceptable to your Honor.  I think that that is also

22  going to have to be reviewed fully at another date.

23         So with that, I will conclude my remarks and thank

24  you, your Honor, for your time.

25         THE COURT:  Thank you, Ms. Caton.

MCEDPROH1

```
1              Mr. Kirpalani.
2              MR. KIRPALANI:  Thank you, your Honor.  Susheel
3   Kirpalani from Quinn Emmanuelli on behalf of Syncora Guarantee,
4   who is a member of the Ad Hoc Group.  I'll be very brief.
5              Your Honor can probably tell from reading between the
6   lines of the pleading that was filed by the Board that they
7   have a plan that's ready to go.  So thanks to the hard work of
8   the mediators, the Board is willing to continue hearing and
9   reacting to points of contention or disagreement, which is
10  positive.
11             I would just say if we don't reach a deal, your Honor
12  -- and we have in multiple scenarios been the leading voice in
13  getting to a deal.  You know, that's what we're trying to do,
14  rather than litigate.  The Board I feel, with some fresh eyes
15  that I could add to this process, has set up the litigation
16  schedule to claim objections only because they feel that gives
17  them the greatest amount of optionality without ever having to
18  reach threshold issues that will have to be answered by the
19  Court at confirmation.  And it creates a bad dynamic for them
20  to deal.
21             I'm not going to go back through the history, but I
22  just want to alert the Court that if the deal can't be
23  negotiated, and I'm going to remain hopeful that we can, but if
24  a deal can't be negotiated based on all the relevant evidence
25  to be considered, we're going to come back to the Court at the
```

MCEDPROH1

1    disclosure statement hearing phase and ask your Honor to find

2    points of intersection where the Court could lawfully exercise

3    its jurisdiction to determine some threshold issues that would

4    actually facilitate determining whether it's a good use of

5    judicial resources to entertain the plan along the lines of

6    what the Board has in mind currently.

7             Thank you, your Honor.

8             THE COURT:  Thank you, Mr. Kirpalani.

9             Mr. Natbony.  You're muted, Mr. Natbony.

10            MR. NATBONY:  Can you hear me now?

11            THE COURT:  I can.  Thank you.

12            MR. NATBONY:  Thank you.

13            Your Honor, first I need to apologize for not being

14   properly suited.  I had a family crisis and had to fly away and

15   did not bring a suit.  So I apologize to you.  No disrespect is

16   meant.

17            THE COURT:  Understood.  My sympathies in your family

18   crisis.  I hope that it is resolved well and quickly.

19            MR. NATBONY:  Thank you, your Honor.

20            I'll be very brief.  I just want to basically say, on

21   behalf of Assured -- William Natbony on behalf of Assured.

22            I want to reiterate and confirm and support the

23   comments of the mediation team and Ms. Caton and Mr. Kirpalani.

24   Assured stands ready, willing, and able to continue

25   negotiations in good faith to reach a deal relating to the

MCEDPROH1

```
 1    PREPA debt.  We are hopeful, but, at the same time, have the
 2    same concerns that have been previously expressed.
 3              Thank you, your Honor.
 4              THE COURT:  Thank you, Mr. Natbony.
 5              I have someone labeled as Creditors Committee.  I
 6    don't know if that's Mr. Despins or someone else, so Creditors
 7    Committee representative -- it looks like Mr. Despins.
 8              MR. DESPINS:  Good morning, your Honor.  I thought it
 9    said Luc Despins.
10              THE COURT:  Well, actually, it does now that you're
11    up.  I couldn't read the full label in my side list.
12              Good morning.
13              MR. DESPINS:  Good morning, your Honor.
14              So, obviously you know the Committee's position, I
15    will not restate it, but, you know, again, we are very
16    concerned about what's going on here.  You know, counsel for
17    the bondholders really let the cat out of the bag saying, oh,
18    mediators are doing a great job because they're focusing on
19    PREPA'S ability to pay, and that's -- that was the words
20    expressed, so I'm not reading anything -- but that's the
21    problem.
22              The PREPA and the people of Puerto Rico should not pay
23    for something that they don't have to pay legally for,
24    regardless of what they can afford.  And, by the way, there are
25    huge issues about what they can afford, but aside, there is a
```

1   threshold issue before the Court, and it is, is PREPA liable

2   for these billions of dollars of bonds.  And, you know, I'm

3   very concerned, when I hear that the focus is apparently solely

4   or largely on the issue of ability to pay, and also I'm

5   concerned about -- I'm sorry.

6            THE COURT:  I just want to say that I hear and

7   understand that concern, and understand that it is prompted by

8   a statement that was made intending to be with care not to go

9   into the substance of matters being discussed in the mediation.

10  So I will say that I am certainly aware of the parties'

11  consistent position as to the rights, if any, of these credits,

12  and I will shortly have fully briefed that merits dispute.

13           My schedule, in terms of attending to litigation,

14  hasn't changed, and so I would -- today I don't -- I would like

15  to avoid having discussions of the merits of positions while

16  still encouraging everyone to make, within the mediation

17  context, their -- themselves heard as to what is critical and

18  what isn't, or is less critical.

19           Sorry to interrupt, Mr. Despins.  You can go on.

20           MR. DESPINS:  Oh, yes, and, by the way, I was not

21  going to go into the merit of the claims.  I just stated the

22  Committee's position, which is there is a threshold issue which

23  is, regardless of one's ability to pay whether there's a legal

24  entitlement to pay, and that's it.  So I'm not going to go into

25  the merits of that.

MCEDPROH1                                                                            27

```
 1              I'm also concerned about having these exchanges in
 2    open court about whether the Board is operating with candor.
 3    By the way, you know we are no friend of the Board, and we've
 4    had numerous battles with the Board, but, you know, this is a
 5    pretty serious outfit with former Bankruptcy Judge Gonzalez in
 6    there.  And the implication that somehow the Board, with people
 7    like Judge Gonzalez, would not be operating in full candor is
 8    really troubling.
 9              But I'm not involved, so I don't know -- meaning I'm
10    not part of these negotiations, so I cannot opine, but I would
11    say these are pretty serious allegations given the people
12    involved here.  So I just want to state my position on that.
13              Thank you, your Honor.
14              THE COURT:  Thank you, Mr. Despins.
15              Mr. Friedman, for AAFAF.
16              MR. FRIEDMAN:  Yeah.  Good morning, your Honor.
17              I think you know where AAFAF stands, as it has in
18    every facet of these cases over the last five, five and a half
19    years.
20              We support restructurings when they foster
21    reliability, resilience, a strong bridge.  We don't, if they
22    can't --
23              THE COURT:  I'm sorry.  Mr. Friedman, you broke up
24    there.  So if you can go back to "we support restructurings
25    where they foster reliability, resilience --" and then we
```

1   started to lose you.

2          MR. FRIEDMAN:  Sorry.  Affordability, sustainable debt

3   burdens, as Mr. Despins referenced, we think where they're

4   consistent with applicable law, in particular with respect to

5   PREPA, affordability is a real issue, to the extent that is

6   what this turns on, and obviously there are really important

7   legal issues, affordability is a major issue, it is a driving

8   factor, or certainly we believe strongly correlates with

9   poverty issues.

10          And the Court knows about the poverty levels in Puerto

11   Rico.  This restructuring has to result in affordable

12   electricity rates for individuals, as well as industrial and

13   commercial customers, and if there isn't a deal in mediation

14   that reaches that, while that's a credible outcome from the

15   mediation perspective, from an overall perspective in Puerto

16   Rico, and what's supposed to happen under PROMESA, and what has

17   to happen for a successful Puerto Rico in the future, that may

18   be an okay result, or it is an okay result.

19          An affordable deal and a deal that reflects legal

20   rights is more important to us than seeing a mediated outcome

21   with a result that doesn't work for the people of Puerto Rico

22   and is inconsistent with AAFAF's mandate.  We take the process

23   seriously.  We've done that with mediators throughout, but the

24   process, as I said, I think to us, as sacred as it is and as

25   much as it needs to be respected by everybody who's a party to

MCEDPROH1

1   it, as much as there needs to be an atmosphere of trust -- and

2   we do worry that what goes on at the hearings can sometimes

3   undermine that process.  We think it -- the ultimate issue is

4   the bigger issue, is what is the outcome of this Title III

5   process.

6           Thank you.

7           THE COURT:  Thank you, Mr. Friedman.

8           Mr. Bienenstock's hand had been up momentarily.  I

9   don't see it up now.  If he or anyone else wishes to be heard

10  before I decide --

11          Mr. Bienenstock, I see you on one monitor, but that

12  may not be because you've raised your hand.  So --

13          MR. BIENENSTOCK:  I don't need to say several things I

14  was going to say because of comments of Mr. Despins and

15  Mr. Friedman.  I'll say that I have to say that I totally take

16  issue with what Ms. Caton said about incorrect facts, but one

17  fact, which is the key fact, that cannot be incorrect and she

18  cannot know about is what the Board relied on.  And I know

19  personally and from my colleagues and other advisors, the Board

20  did not rely on the data she's talking about, because we didn't

21  even know we had it until Monday.  But, again, it's sort of a

22  side show we think.  But we hope there's a deal.

23          We have the constraints identified by Mr. Despins,

24  Mr. Friedman, the Bankruptcy Code provisions that require only

25  allowable claims be paid.  And with that all said, we think we

MCEDPROH1

```
 1   should just get back to the negotiations and see if we can do a

 2   deal in the near term or, if not, in the medium term.

 3              THE COURT:  Thank you, Mr. Bienenstock, and thank you

 4   all for your comments.

 5              I am persuaded that it is in the best interests of

 6   this process to grant the extension, and I am hopeful that, you

 7   know, further and more informed communications can help the

 8   parties reach a result that is -- if possible, that's

 9   negotiated and that serves the key issues for Puerto Rico going

10   forward.  And so the extension request is granted, and so that

11   takes the deadline to Friday, unless the Oversight Board

12   indicates that it is willing to proceed further, in which case

13   the deadline goes out until Wednesday for filing the plan.  And

14   the extension request specifies the activity to take place

15   between Friday and Wednesday.

16              So I will sign the proposed order and, again, I thank

17   you all for speaking to this issue.

18              I now turn to item one on the agenda, the prepared

19   agenda, which is the status report of the Oversight Board and

20   AAFAF.  I thank the Oversight Board and AAFAF for those

21   informative status reports.

22              Does the Oversight Board have any further comment to

23   its report?

24              MR. BIENENSTOCK:  Thank you for asking, your Honor,

25   but we do not, unless the Court has any questions.
```

```
 1            THE COURT:  I do not have any questions.  Thank you.

 2            Does AAFAF have any comments further to report?

 3            MS. VELAZ RIVERO:  Good morning, your Honor.  Carolina

 4   Velaz-Rivero or Marini Pietrantoni Muniz for AAFAF.

 5            We do not have anything further to add, unless your

 6   Honor has any questions.

 7            THE COURT:  Thank you, Ms. Velaz.  I do not have any

 8   further questions.

 9            If anyone has a question or further comment in

10   connection with the status reports, please raise your hand now.

11            I see no raised hands.

12            Item two, the fee application related matters, has

13   been dealt with in an order filed prior to this hearing, and

14   so, at this point, we can go on to the first matter which is

15   listed as uncontested, and that is the motion of the Oversight

16   Board for an order authorizing amendments to the ADR

17   procedures.  I believe that Ms. Stafford is to be speaking to

18   that.

19            Ms. Stafford, would you please turn on your camera and

20   unmute yourself?

21            MS. STAFFORD:  Yes.  Good morning, your Honor.  Laura

22   Stafford on behalf of Proskauer Rose on behalf of the Oversight

23   Board.

24            THE COURT:  Good morning, Ms. Stafford, and welcome

25   back to these proceedings.
```

MCEDPROH1

1          MS. STAFFORD:  Thank you, your Honor.  It's a pleasure

2     to be back.

3          THE COURT:  Thank you.

4          MS. STAFFORD:  I apologize, your Honor.

5          THE COURT:  No.  No.  Please go ahead and make your

6     statement.

7          MS. STAFFORD:  Of course.

8          So, as we noted in the agenda, we're not intending to

9     speak on this item unless the Court has questions, but just to

10    briefly summarize, the motion seeks to revise our ADR

11    procedures order for two limited purposes.  First, to allow

12    objections to claims that have -- to claimants who have not

13    responded to offers or further offers in the ADR procedures,

14    and to allow the processing of administrative expense claims to

15    these procedures.  We think in both instances it will help us

16    preserve the cost effective purposes of the ADR procedures,

17    while allowing us to represent the claims more efficiently.

18         So if your Honor has any questions, I'm happy to

19    answer them.

20         THE COURT:  Thank you.  I do have some concerns from

21    the Court administration point of view about efficiency, and

22    Judge Dein and I have put a lot of attention into this and have

23    some suggestions for some important tweaks to the proposed

24    procedures.  So I'd like to lay them out now and hear you on

25    them.  Of course it's my goal that the procedures continue to

1    provide opportunities for a cost efficient, consensual

2    resolution, but I do want to ensure that the Court's time and

3    resources, and especially the work of the people who have

4    agreed to work as mediators as necessary, is used wisely and

5    meaningfully, and not unnecessarily.

6         So, first of all, the proposed amendments to section

7    6(c), 7(b), and 7(c) to expand the scope of claims that can be

8    transferred to include administrative expense claims as defined

9    in the proposal is acceptable to the Court.  It's fine.  I

10   recognize that there is a need for it, and that that can help

11   to promote efficiency.  The proposed amendment to 7(e),  to

12   include a timeline for the filing of an informative motion

13   regarding resolved claims, is also something that will help us

14   continue to move along and process things through efficiently,

15   and so that's fine.

16        It is the proposed amendment to 3(f), which

17   contemplates, as it is written now, identification of the

18   evaluative mediation process, where a claimant has been

19   non-responsive to an offer or further offer, that raises some

20   concerns, the Court's concern is that, as written, the

21   initiation of evaluative mediation as the next step after, you

22   know, what seems to us could be a simple failure to respond to

23   an offer or a further offer, would not be an efficient use of

24   resources on our side at least, and also on the debtor's side,

25   because it could lead to the necessity for creation of an

MCEDPROH1                                                                            34

1    evaluative mediation case and compilation and review of

2    materials where there is a claimant who has no actual intention

3    of engaging with the evaluative mediation process.  As you

4    know, it is not until something is transferred into evaluative

5    mediation that we match it up with a mediator and that person

6    starts working, and so we think that an additional threshold

7    requirement, or a more robust requirement for the predicate for

8    an impasse notice would be helpful here.

9           So what I am suggesting, and we have particular

10   language but I'll just describe it conceptually, is that the

11   Oversight Board's impasse notice would have to include an

12   affirmative -- would have to be preceded by an affirmative

13   effort by the Debtor to elicit an indication that the

14   designated claimant, although it doesn't want to engage on that

15   offer, is, in fact, willing to engage in evaluative mediation.

16          So the additional language would be something to the

17   effect of, if the designated claimant is deemed to have

18   rejected an offer or further offer by failing to timely respond

19   to an offer or further offer, the offer exchange impasse notice

20   must include a certification that the debtor has been in

21   contact with the designated claimant and the designated

22   claimant has consented to proceed to evaluative mediation.  So

23   that tells us when we get the impasse notice that the Debtor

24   does expect that there will be someone for us to talk to on the

25   other side, since mediation statements are optional and the

1   process, as currently written up, doesn't include a point of

2   engagement before the preparation of the evaluation, which may

3   not be very meaningful if there is only one-sided input.

4           So, similarly, we think that it is a salutary thing to

5   build on the Debtors' suggestion that there be some sort of

6   outreach by the mediator that would allow the mediator to

7   assess whether the person is engaging in the evaluative

8   mediation, but I'd like to tweak that a little bit and make it

9   a little bit more specific, so, basically, to add a provision

10  that says that if the designated claimant fails to submit a

11  mediation statement, then the mediator may solicit engagement

12  of the designated claimant in advance of the formulation of the

13  evaluation.  That outreach by the mediator would include

14  notifying the designated claimant that failure to respond and

15  participate may result in the termination of the evaluative

16  mediation process.  Then, if the designated claimant is not

17  responsive to the mediators' reasonable outreach efforts during

18  the evaluative mediation process at that time or at another

19  time that's material in that process, the mediator has the

20  ability to file a -- what we're calling a notice of

21  non-engagement, and the filing of a notice of non-engagement

22  would be an additional predicate event that would render an

23  evaluative mediation case an unresolved matter prior to the

24  preparation of evaluation in this instance where the designated

25  claimant is not responding in a way that enables the evaluative

1    mediator to move forward appropriately.

2          There are existing provisions on what happens with

3    unresolved claims, which we would not propose to change, we see

4    no need to change.  So do you have questions about or concerns

5    about these suggested revisions?

6          MS. STAFFORD:  No, your Honor.  That all sounds very

7    reasonable and efficient to us.

8          THE COURT:  Very good.  So what I will do is file an

9    order with the specific language that we're suggesting, and

10   order you to file on presentment a revised note of order and

11   notice incorporating these concepts, and then we'll see if

12   there are any objections to that.  There haven't been

13   objections to this change so far.  Then we would have an order

14   and an amended process that I do believe will serve the goals

15   and help to expand the ability to address these claims

16   sufficiently.

17         For the record, I will state that I expect to approve

18   these amendments adjusted in the way that we've discussed

19   pursuant to the Court's broad authority to grant relief from a

20   final judgment or order pursuant to Rule 60(b)(6) of the

21   Federal Rules of Civil Procedure.  I've evaluated the requisite

22   factors, which include whether the application's timely,

23   whether exceptional circumstances warrant amending the ADR

24   Procedures Order, and whether the proposed amendment unfairly

25   prejudices claimants.  See Liljeberg v. Health Services

MCEDPROH1

1    Acquisition Corp., 486 U.S. 847 (1988), and Bouret-Echevarria
2    v. Caribbean Aviation Maintenance Corp., 784 F.3d 37, 43 (1st
3    Cir. 2015).

4           I find that the motion is timely; and that the
5    Commonwealth Plan of Adjustment recently became effective on
6    March 15th, 2022; that a need exists for an additional,
7    efficient process for liquidating administrative expense
8    priority claims; and that the interests of justice and
9    efficiency require a mechanism for terminating the evaluative
10   mediation process if a party begins but disengages from
11   participation in the evaluative mediation process.

12          So I will file that order with suggested language for
13   incorporation into the revised procedures.  I did have one
14   other question for information and context for our team.  Can
15   you preview for us the types of administrative expense claims
16   that you anticipate would be transferred into the ADR process?

17          MS. STAFFORD:  At this time, I don't have a clear
18   sense of exactly which types of administrative expense claims
19   we might be anticipating would go into the process.  Our review
20   of those administrative expense claims is ongoing, but I'm
21   happy to provide more information as we start to develop it
22   over the next few months.

23          THE COURT:  Alright.  We will await further
24   developments.

25          MS. STAFFORD:  Thank you.

MCEDPROH1

```
1              THE COURT:  Thank you very much.

2              That concludes Item III.1 of the Agenda, which is the

3    motion of the Oversight Board that was filed at Docket Entry

4    No. 22936 in 17-3283.

5              Thank you, Ms. Stafford.

6              MS. STAFFORD:  Thank you, your Honor.

7              THE COURT:  So next we move to the contested matters

8    in section IV of the Agenda, the first of which is the motion

9    of the Bonistas Del Patio for payment of certain professional

10   fees and expenses by the Commonwealth, and I have as the

11   opening speaker Mr. Bernstein for six minutes.

12             Are you there, Mr. Bernstein?

13             MR. BERNSTEIN:  I am.  Can you hear me?

14             THE COURT:  Yes.  Good morning.

15             MR. BERNSTEIN:  Good morning.  Thank you, your Honor.

16   Don Bernstein from Davis Polk & Wardwell for the Bonistas Del

17   Patio, Inc.

18             A lot of this is going to seem like ancient history,

19   because it's related to the COFINA case, so I hope you'll bear

20   with me.  So Bonistas Del Patio requested entry of an order for

21   payment of $2 million in professional expenses for their

22   lawyers, Davis Polk and $5 million of professional expenses of

23   their financial advisors, Ducera Partners.  These were incurred

24   in connection with --

25             THE COURT:  Mr. Bernstein, I need you to slow down,
```

1   because the signal is not so consistent.  You're breaking up a

2   little bit, so the court reporter is having trouble and I am,

3   too.

4            MR. BERNSTEIN:  Okay.  Hopefully I can get my comments

5   within the requested timeframe, but, if not, I hope you'll

6   indulge me at the end if necessary.

7            THE COURT:  Yes.  Also, bear in mind that, yes, I was

8   there in COFINA.  I've also read all of your papers.  I'm going

9   to stop the clock for a minute, because this may help you.  My

10  particular issues of concern go to the -- well, first all, the

11  fact that Bonistas' sort of status within these proceedings,

12  2019, has never been filed for Bonistas' year, not -- your

13  client isn't itself a creditor, it's not an intervenor, and so

14  there's the 2019 question.

15            I do want to make sure that I understand well your

16  theory as to why these expenses should be considered as having

17  been incurred by the Commonwealth or COFINA within the meaning

18  of section 15.2, and if they weren't incurred by the

19  Commonwealth or COFINA, what basis there would be for approval

20  under section 15.2 of the plan.

21            Then I also have a concern about Bonistas' standing to

22  present the application given that the representation is that

23  Bonistas has no liability for these expenses.  The other big

24  one is, to the extent the application's made under 503(b)(4),

25  Ducera is not an accountant and is not a law firm, and so how

1    503(b)(4) would apply.  I give you this preview without

2    prejudice of my ability to ask further questions as we go

3    along, but I'm hopeful that that will help you direct your

4    remarks in the most efficient way.

5         MR. BERNSTEIN:  That is helpful, and I will use my

6    time accordingly.  So let me address Bonistas' and -- the 2019

7    issue first.  Now, Bonistas really is not for profit.  It was

8    there to represent 60,000 bondholders, you know, who were

9    on-island holders.  Everyone recognized that that was a proper

10   role for Bonistas, despite the fact it wasn't itself a

11   creditor.

12        And we also were extremely scrupulous about not

13   presenting ourselves as anything other than a not for profit

14   who was there in the interest of all bondholders on the island.

15   And, in fact, we took a role that was essentially an honest

16   broker role.  And I think that's been commented on before you

17   by some of the creditors in the case, because we had

18   constituents who were in all three categories of bonds, we had

19   people who were Commonwealth bondholders, we had people who

20   were COFINA seniors, we had people who were COFINA juniors, so

21   we really were taking a point of view not of any individual

22   bondholders, but connectively on behalf of the island, not to

23   mention the fact that our constituents are taxpayers and also

24   suffer the reduction of services from any fiscal plan or

25   bargaining between COFINA and the Commonwealth.

MCEDPROH1

1          So, in terms of 2019, I don't think we were required

2     to file, but we had a role that was recognized by all parties

3     as an extremely important role, because parties had to

4     communicate with the on-island bondholders and also parties

5     needed to understand what the views were, because at one point

6     during these negotiations, the on-island bondholders had over

7     $10 million of bonds.

8          So there was nobody there to negotiate.  The on-island

9     holders couldn't afford to be part of the mediation, or many of

10    them couldn't.  So we were there as a way of conveying those

11    views, and also we were requested by the parties to be there.

12    We were requested to be party to the PSA.  We were named

13    numerous times in the plan and disclosure statement.  We were

14    referred to in the order of the Court confirming the plan.  So

15    we were an essential component of this despite not being

16    creditors, so that's the first thing.

17         So let me -- and if you have questions on any of this,

18    let me know.  On the question of being incurred -- so there was

19    a long history here, your Honor.  It goes back even before

20    2017, and, you know, our role on behalf of the Bonistas started

21    in 2017, that summer.  But Bonistas had been in conversations

22    with the government and even the Board about the fact that, to

23    participate in these negotiations, it needed professionals, and

24    of course, since it was a not for profit, it had no resources

25    to pay, so the expectation on the part of all parties,

1    including the government parties, was that if Bonistas was

2    going to participate actively, resources would have to be found

3    for payment of their professionals.  And, you know, over time,

4    again and again, the participation of Bonistas and their

5    professionals was requested by the parties.  That included even

6    after the mediation deal was struck.

7             (Sound played)

8             MR. BERNSTEIN:  Bonistas had to go out and communicate

9    with bondholders about the plan.  They held a webinar.  They

10   held conversations and meetings with bondholders at large.

11   They really were working on behalf of the government parties in

12   order to get the deal done, and, in fact, there were comments

13   made at the disclosure statement hearing and the confirmation

14   hearing about Bonistas' role in that regard.  And, in fact,

15   Bonistas has helped to locate on-island bondholders who

16   appeared at the hearing, so they were able to express their

17   views.

18             So, your Honor, again, whether you call that -- that

19   sort of request to do things and expectation that the fees will

20   be paid as documented by the way -- by letters that were

21   received from AAFAF and also the stipulation that was filed

22   before the Court in 2019 --

23             THE COURT:  That stipulation was withdrawn, correct?

24             MR. BERNSTEIN:  It was withdrawn.  It was withdrawn.

25             THE COURT:  AAFAF said -- I'm interrupting you again.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MCEDPROH1

 1    AAFAF said in the letter that it wouldn't object to some

 2    obligation or provision that would obligate it, but I don't see

 3    anything that is a written undertaking by AAFAF or any other

 4    Commonwealth entity, either before the services were rendered

 5    or indeed as we stand here today afterward, to pay these

 6    expenses as Commonwealth expenses.

 7            MR. BERNSTEIN:  Your Honor, I'm not going to belabor

 8    that point now.  You've seen what we said in the brief about

 9    it, but that was within the reasons that we were also making

10    this substantial contribution application.  And of course if

11    the Court finds that we are entitled to payment for substantial

12    contribution, then the obligation is an obligation of either

13    COFINA or the Commonwealth or both.  And under 15.2 in the

14    plan, it's been incurred and is supposed to be paid by the

15    Commonwealth.

16            So that's the second arrow in this quiver, is that, as

17    a substantial contribution, if there's an administrative

18    expense, that administrative expense is an incurred obligation

19    that's required to be paid under the plan.

20            (Sound played)

21            THE COURT:  An incurred obligation not of the creditor

22    but of the Commonwealth, and your argument for it being

23    incurred is this atmosphere of expectation and invitation to

24    represent Bonistas as a participant in negotiations?

25            MR. BERNSTEIN:  No, your Honor.  Your Honor, I think

MCEDPROH1

1    it's two-fold.  I think that is the first prong, which would be

2    sort of a quasi contract prong reliance and the like, but,

3    again, I don't want to belabor that.  I think the second prong

4    is Bonistas itself made a substantial contribution to the case,

5    and if they did, they're entitled to have their professional

6    expenses paid to the extent approved by the Court under 503(b).

7            And once the Court reaches that conclusion, that

8    Bonistas is entitled to have them paid, as I said, because of

9    its substantial contribution, then they're an incurred

10   obligation of the Debtors.  So at that point, once they've been

11   incurred, the plan provides that obligations with respect to

12   these negotiations that we're talking about, that have been

13   incurred by the Commonwealth, are supposed to be paid under

14   section 15.2 of the plan.

15           THE COURT:  Thank you.  You can go on.

16           MR. BERNSTEIN:  Okay, your Honor.  And that also I

17   think addresses to some degree the standing issue.  Obviously,

18   one of the problems with representation of a party is that if

19   they don't have the wherewithal to pay, you know, you can still

20   work on a contingency, and one of the contingencies here was

21   getting approval for payment of expenses through the Court

22   proceedings and from the parties.

23           So, you know, I don't think the issue of incurrence is

24   a bar to standing to request substantial contribution approval

25   of the Bonistas' expenses.

1           Let me address the Ducera Partners' issue under

2   503(b)(4).  And this also covers some of the other issues that

3   perhaps the committee has raised in some of the pleadings a few

4   years ago.  If you look at the First Circuit rulings on the

5   questions of the scope of 503(b), they focus on the fact that

6   503(b) is not exhaustive, it's not an exhaustive list of

7   expenses that are to be paid.

8           And, in fact, subsequent to the First Circuit's ruling

9   on that issue, the Sixth Circuit actually took up the scope of

10  503(b)(3), and in that particular case, and I can give you the

11  citations if you would like them, your Honor, the Sixth Circuit

12  actually looked at this question.  And they took the same view

13  as the First Circuit about the word "including" in 503(b) so

14  it's a non-exhaustive list.  And what they said was in that

15  particular case, even though Chapter Seven is not mentioned in

16  503(b)(3) on substantial contribution, the payment can still be

17  authorized because the list of people or situations where

18  payment is warranted under the substantial contribution test in

19  that subsection is not exhaustive.

20          And so the Court has discretion to allow, in cases of

21  substantial contribution, other than in a Chapter 7 case -- in

22  a Chapter 11 or Chapter 9, and the Court found that in a

23  Chapter 7, you would make those payments even though Chapter 7

24  wasn't referred to.  And, in doing that, the Court also refers

25  to the fact that many, many parties can make a contribution to

1    the case, and so the whole section is really illustrative and

2    non-exhaustive.  And I can give you the citations to those

3    cases if you'd like.

4              THE COURT:  Are the citations in your submission?

5              MR. BERNSTEIN:  I think the citations are in our

6    submission, your Honor.

7              THE COURT:  Alright.  If they're in your submission,

8    then I don't need you to repeat them here.

9              MR. BERNSTEIN:  Thank you, your Honor.

10             That applies to the Ducera issue, because the same

11   issue arises in reference to attorneys and accountants.

12   Financial advisors certainly have been considered for

13   compensation.  Some courts have indicated that they would be

14   eligible.  But a number if cases the financial advisors are

15   simply financial advisors for a bidder and they bid for the

16   company, a failed bid, and the question is, because they're a

17   stalking horse, can they get their professionals compensated,

18   did they make a substantial contribution.

19             I think the courts in those cases have denied by and

20   large the compensation, but the role here Ducera had was very

21   different.  They were working here with the attorneys as part

22   of the negotiation.  They were in the negotiations.  You could

23   even say that they were working on behalf of the attorneys,

24   because we were working hand-in-hand with them, your Honor, in

25   order to conduct the negotiations on behalf of Bonistas.

MCEDPROH1

1        Mr. Myer has indicated there were 351 meetings and

2   calls in which he participated on this matter, and many of

3   those were, as other parties in the case have indicated, with

4   the professionals for those parties.  And obviously some of

5   those professionals were expressly paid under the plan, because

6   they were professionals for creditors.  And here we were

7   representing an extremely large creditor class, but because

8   none of them were in our client group, we did not share in any

9   of that compensation that went to creditors.

10       So, your Honor, I think -- I think the First Circuit

11  and Sixth Circuit precedents are very relevant to the scope of

12  503(b)(4).  And I think, under that standard, certainly

13  Ducera's work should be included.

14       Your Honor, do you feel willing to accept the Resnick

15  Declaration, which was originally filed a number of years ago

16  but, again, was attached to our motion?  We'd like to put that

17  in as Exhibit One.  And Mr. Resnick is with me in the

18  conference room and is available for direct testimony should

19  you desire it, Judge.  I know that you want to accelerate the

20  schedule here, but he is available and he's obviously available

21  to the extent anyone needs cross-examination.

22       THE COURT:  Well, to the extent that I get across the

23  threshold issues of eligibility for payment, I do have a

24  concern -- I do accept the Resnick Declaration, which you've

25  tendered in your written submissions, but even that is -- it's

1   a characterization at very high level of the work that was

2   done, and, yes, I'm not sure that -- yes, I don't think that

3   testimony here today would solve that issue --

4           MR. BERNSTEIN:  Your Honor.

5           THE COURT:  Yes.

6           MR. BERNSTEIN:  I was just going to say we did supply

7   the Fee Examiner with extensive backup, and, as you've seen,

8   the Fee Examiner concluded that the fees were reasonable and

9   necessary, et cetera.  So we'd -- I was personally involved in

10  all of the negotiations, and if you have questions for me, I'd

11  be delighted to answer them within the confines of mediation

12  confidentiality.

13          THE COURT:  I accept that proffer.  I will now turn to

14  the UCC's argument, and we'll talk about next steps when you

15  come back.

16          MR. BERNSTEIN:  Okay.  Thank you, your Honor.

17          THE COURT:  Thank you.

18          MR. DESPINS:  Good morning, your Honor.

19          We actually were going to rest on our pleadings, your

20  Honor.

21          THE COURT:  Alright.  I have reviewed those pleadings.

22          So, Mr. Bernstein, it seems that the -- and you may

23  even be saying this, the services that were provided were

24  similar to the type of involvement of a representative of

25  another creditor representing the creditor's interests, and so

1   you were advocating for the membership of Bonistas as a

2   creditor and marshaling support for positions that you believed

3   were in the best interests of your clients.  Typically, service

4   providers don't get paid for a substantial contribution for

5   doing what they should be doing as advocates for their clients,

6   and so would I be correct in hearing you to say that there was

7   an extraordinary gap in the circumstances that renders your

8   work a substantial contribution because it supplied advocacy

9   that was necessary for negotiations, because there was no other

10  source?

11          MR. BERNSTEIN:  Your Honor, I would say that, and let

12  me explain why.  Because this was a gating issue for the

13  Commonwealth Plan, that the COFINA case be resolved.  The major

14  negotiating parties were the COFINA agent -- the Commonwealth

15  agent in the person of Mr. Despins, and also the three main

16  creditor constituencies, the senior COFINA bonds, the junior

17  COFINA bonds, and the Commonwealth GO bondholders.  All of

18  those people had to be present, but every single one of them

19  had a monochromatic parochial interest.  The only party that

20  stood among all of those parties who did not have a

21  monochromatic interest was Bonistas Del Patio, and that is why

22  they were so integral to the negotiation.

23          We had to see everything from all perspectives and try

24  to facilitate, as the mediators were trying to facilitate, a

25  fair deal, because, as I say, not only did we have billions of

MCEDPROH1

1   dollars of bondholders in all three classes, but we also had

2   60,000 taxpayers who were going to bear the cost of whatever

3   the result was.  And the cost in -- are two different ways,

4   through taxes and through reductions in services.

5            So we had a role that was much more akin to -- I'm not

6   going to say a mediator, but an honest broker.  And, frankly,

7   there were meetings at Davis Polk's offices among the creditor

8   groups because of the position Bonistas was in.

9            Let me say that, without going further on the -- you

10  know, with respect to mediation confidentiality, but we were in

11  a pivotal role in that entire process.  And I think the fact

12  that we were one -- you know, in addition to the bondholders,

13  we were one of the parties to the PSA.  We had approval rights

14  under the plan over the documents.  Just as with the government

15  parties and the bondholders, Bonistas were mentioned as having

16  approval rights over the confirmation order, which was a

17  condition, approval rights over any waivers.  You know, our

18  consent was required for effectiveness, so, you know, it wasn't

19  a coincidence that we were there even though the three other

20  constituencies were all represented.

21           The fact is we had a unique perspective that wasn't

22  being brought to the table by any of those constituencies and

23  wasn't being brought to the table by the Commonwealth

24  Committee, as the Commonwealth Agent, or by the COFINA agent.

25  And, your Honor, again, nobody should take too much credit for

MCEDPROH1

1    anything, but I think Bonistas deserves a lot of credit for

2    keeping the parties together and moving things along.  And I

3    can only say I think the people who were in the room would

4    agree.

5              (Sound played)

6              THE COURT:  Thank you.

7              MR. BERNSTEIN:  Your Honor, if you have any other

8    questions --

9              THE COURT:  Pardon?

10             MR. BERNSTEIN:  I said, if you have any other

11   questions, I'd be delighted to answer.

12             THE COURT:  I actually have a question for the

13   representatives of the Oversight Board and AAFAF, who have not

14   made any submissions on this motion, which strikes me as

15   curious given the representations that all of this work that is

16   argued to be a substantial contribution for which the

17   Commonwealth had undertaken to pay.

18             So right now, I will give first the Oversight Board

19   the opportunity to make any statement it wishes to make in this

20   connection.

21             Mr. Bernstein.  I'm sorry.  Mr. Bernstein, did you

22   want to say something?

23             MR. BERNSTEIN:  Yes.  He's on mute.  I can't hear

24   Mr. Rosen.

25             THE COURT:  Okay.  I'm not even seeing Mr. Rosen.

```
 1              So, Mr. Rosen, would you unmute yourself and have your
 2       camera on?  There you are, Mr. Rosen.
 3              MR. BERNSTEIN:  I'm seeing him, but I'm not hearing
 4       him.
 5              THE COURT:  You still have to unmute, Mr. Rosen, or at
 6       least I'm not hearing you.  Still not hearing you.
 7              It looks like he's going to telephone in.
 8              MR. ROSEN:  Your Honor, can you hear me now?
 9              THE COURT:  Yes, I can hear you now.  Thank you.
10              MR. ROSEN:  So we'll try to do it by phone until we
11       figure out our other issues.
12              You're going to have to mute that.  Thanks.
13              Your Honor, can you still hear me?
14              THE COURT:  Yes, I can.
15              MR. ROSEN:  Okay.  Thank you, your Honor.
16              Your Honor, yes, the Oversight Board -- as you know, I
17       was intimately involved in the COFINA confirmation process and
18       negotiation of the plan support agreement, and, actually, was
19       the draftsperson of that document.  Your Honor, the Oversight
20       Board up until this moment in time has chosen to allow the
21       Bonistas to file their application and not take a position with
22       respect to it.  While the Oversight Board does have a position,
23       I would ask that the Court allow me to go back to the Oversight
24       Board and to put together a statement that it would file with
25       the Court stating clearly stating what the Oversight Board's
```

1   position is at this time.

2          I think for me to do it just now would -- I may not

3   capture all the views of the members of the Oversight Board and

4   the other professionals who are involved.

5          THE COURT:  I will permit that.  Thank you.

6          MR. ROSEN:  Thank you, your Honor.

7          THE COURT:  That was Mr. Brian Rosen representing the

8   Oversight Board.

9          I don't think we got your full name into the

10  transcript when you started speaking.

11         MR. ROSEN:  Thank you, your Honor.

12         We'll start trying to fix the video for the subsequent

13  hearing.

14         THE COURT:  Good.  We'll have a break within the

15  subsequent hearing.

16         Mr. Friedman, for AAFAF, is there anything you'd wish

17  to contribute here?

18         MR. FRIEDMAN:  Good morning, your Honor.  Peter

19  Friedman for O'Melveny & Myers on behalf of AAFAF.

20         What I would say is AAFAF was certainly involved in

21  the process of mediation, particularly after a deal was reached

22  on the economic split, but while many, many, many issues remain

23  to be resolved around the treatment of local bondholders, and

24  we did recognize Bonistas -- the real work they did,

25  particularly in that phase, which was the phase we were most

1    involved with, we do believe that their joining the RSA was

2    important.  They played an important role in the

3    Commonwealth-COFINA settlement, was extremely important with --

4    you know, we acknowledge their impact in bringing local

5    bondholders and representing local bondholders was really

6    important.

7           So we are sympathetic to their request, and, you know,

8    it's not something AAFAF has the power on its own to do.  We

9    did file something early in the case seeking to have a payment

10   made.  The Court raised, you know, it's concerns and sort of

11   put a halt to the process, but we don't have an objection to

12   this because we recognize the contribution that Davis Polk and

13   DCR made on behalf of their client, which we did think played

14   an important role here.

15          THE COURT:  So you don't have an objection to the

16   argument that the services -- this important role was played at

17   the invitation and in the expectation that the Commonwealth

18   would ultimately -- well, this is an application in the

19   Commonwealth case.

20          MR. FRIEDMAN:  Yes.

21          THE COURT:  That the Commonwealth would ultimately pay

22   for the expenses of that representation and financial advice?

23          MR. FRIEDMAN:  That's right, your Honor.

24          I would state two things:  One, it can't be COFINA,

25   right?  We definitely understood, thought, believed that COFINA

```
 1    would be the payor, so we think the Commonwealth is the right

 2    payor, if there is a payor, because of the value this

 3    settlement brought for the Commonwealth, and we also do think,

 4    you know, we made representations that we would not be

 5    objecting or that we understood that this work was being

 6    undertaken with the prospect of them being paid by the

 7    Commonwealth.

 8           Certainly it's not something AAFAF could pay for.  The

 9    Commonwealth would be the logical payor.  And so we don't have

10    an objection to their making that representation.

11           I wasn't there perfectly at the time -- you know,

12    exactly at the time, I can't testify, but it is my

13    understanding that's why they undertook this obligation and

14    that the work they did was helpful.

15           THE COURT:  Thank you, Mr. Friedman.

16           Mr. Rosen has his hand up again.

17           MR. ROSEN:  Thank you, your Honor.  I only raised my

18    hand because I think we needed the Court to unmute us off of

19    the other system and then we could speak through that.

20           THE COURT:  My deputy here is telling me that you were

21    unmuted on our system already.

22           MR. ROSEN:  We'll try again.  Hold on, your Honor.

23           Okay.  So --

24           THE COURT:  Yes.  I'm seeing that our screen is giving

25    us the option of muting you, not unmuting you.
```

1          So do you want to just click him mute and then unclick

2     him again just in case there's some glitch there?

3          Okay.  We've just clicked you to mute, and now we're

4     going to find you and unmute you I think.  Yes.  You are now

5     unmuted again on our system.

6          I still can't hear you.  I can't hear you with the

7     phone now.

8          MR. ROSEN:  Can you hear me, your Honor?

9          THE COURT:  Yes.

10         MR. ROSEN:  Your Honor, can you hear me?

11         THE COURT:  Yes.  Can you hear me?

12         MR. ROSEN:  Alright.  We will disconnect and re-login,

13    your Honor.  We'll figure out what the problem is here.

14         THE COURT:  Alright.  So, before you disconnect and

15    before we break, I will take this matter under advisement.

16         I will not ask for any additional testimony today.  I

17    will accept by December 28 a submission on behalf of the

18    Oversight Board as to its position, and any further

19    supplementation, written supplementation of legal arguments or

20    factual representations that the movant may wish to tender in

21    light of the discussion and the Court's questions, and then,

22    unless the Court reaches out for further input or there's a

23    request from the UCC or anyone else to make a further response,

24    the matter will be under advisement and decided on those

25    augmented submissions.

MCEDPROH1

```
 1              Mr. Bernstein, is there anything further that you'd
 2    like to say before we move away from this agenda item?
 3              MR. BERNSTEIN:  No, your Honor.
 4              I just want to thank you for considering this
 5    carefully, and we will review the questions you asked and take
 6    you up on making another submission.
 7              If we see something that is in Mr. Rosen's pleading
 8    that we feel we need to respond to, could we get a day or two
 9    to do that?
10              We don't know what he's going to file or say, and it
11    would be helpful to have an opportunity to respond if
12    necessary.
13              THE COURT:  Yes.  So the first submission date is
14    December 28.  Any response to that further submission -- we'll
15    give you another week, which I think would be January 4th or
16    January 5th, but I don't have my calendar up right in front of
17    me now.  Actually, I figured out January 4th.
18              Is that okay?
19              MR. BERNSTEIN:  Okay, your Honor.  Thank you very
20    much.  Yes.
21              THE COURT:  Thank you.
22              Alright.  At this point we have two contested claim
23    objections, and it is also 20 minutes past 10:00, so what we'll
24    do is take a break at this time of ten minutes and reconvene at
25    10:30 Eastern, 11:30 Atlantic Standard.
```

MCEDPROH1

```
1          Those who are on the listen-in line, please just put
2   your line on hold and come back in ten minutes.  Thank you very
3   much.  We are adjourned.
4          (Recess)
5          THE COURT:  Good morning again.  This is Judge Swain.
6          We are now resuming the Omnibus Hearing.  The next
7   agenda item, which is number IV.2, is the 453rd Omnibus
8   Objection to claims, which is Docket Entry No. 20784 in
9   relation to the response of Maria Figueroa-Torres.
10         So I have Ms. Osaben starting with remarks for the
11  Oversight Board.
12         MS. OSABEN:  Good morning, your Honor.  Can you hear
13  me?
14         THE COURT:  Yes, I can.  Good morning.
15         MS. OSABEN:  Good morning.  Libbie Osaben of Proskauer
16  Rose on behalf of the Oversight Board.
17         At the November Omnibus Hearing, the Court heard
18  argument regarding the objection to the 453rd Omnibus Objection
19  filed by Maria Torres with respect to Proof of Claim No.
20  179281-1 at ECF No. 21310.  The Court may recall the claimant
21  asserts liabilities against the Commonwealth for wages for work
22  the plaintiff performed at the Ponce District Hospital.  As the
23  Ponce District Hospital seems to be a part of the Department of
24  Health and thus seems to be a part of the Commonwealth, in
25  2000, bifurcated the claimant's claim into two claims, one
```

MCEDPROH1

1   claim for the period when the hospital was a part of the

2   Department of Health and one claim for the period when the

3   hospital was no longer a part of the Department of Health.

4           At the hearing and in a subsequent order at ECF No.

5   22798, the Court directed the Oversight Board to file a

6   supplement brief providing evidence that the Ponce District

7   Hospital is not part of the Department of Health of the

8   Commonwealth.  The Oversight Board on behalf of the

9   Commonwealth filed a supplement brief providing such evidence

10  as ECF No. 22928.  The Oversight Board included as Exhibit A to

11  the supplemental brief a letter to the claimant dated May 26,

12  2000, which explains that pursuant to Act 31 of July 6, 1997,

13  the Ponce District Hospital was transferred to private

14  ownership for management and operation, and that such transfer

15  became effective on July 1st, 2000.

16          Accordingly, the Ponce District Hospital is not a

17  Title III debtor or an agency of any of the debtors.  The

18  Oversight Board reiterates to the extent the Commonwealth is

19  liable to the claimant with respect to work performed by the

20  claimant for the Ponce District Hospital prior to July 1, 2000,

21  such liability will be determined in accordance with the

22  resolution of proof of claim 179281.  That proof of claim has

23  been transferred to ACR and at this time is not subject to

24  objection.

25          For the foregoing reasons we respectfully request that

MCEDPROH1

1    the Court sustain the 453rd Omnibus Objection with respect to

2    Proof of Claim No. 179281-1 and disallow the claim.

3         THE COURT:  Thank you.

4         I have a couple of questions for you.  Just to be

5    clear, the claimant filed a claim as 179281 with supporting

6    documentation, and was it the Oversight Board that determined

7    to create 179281-1 as a bifurcated separate claim representing

8    claims in connection with employment, if any, after June 30th

9    of 2000?

10        MS. OSABEN:  That is correct, your Honor.

11        THE COURT:  That letter that the Oversight Board

12   referred to in the supplemental submission, the May 26, 2000,

13   letter, appears to have been part of the original submission by

14   this claimant which also included salary documentation and

15   other documentation of work at the Ponce District Hospital that

16   all seemed to predate the July 1, 2000, date, and so was there

17   anything concrete that gave the Oversight Board concern that

18   the claimant is, in fact, seeking to recover for compensation

19   after the DX session of the hospital facility?

20        MS. OSABEN:  I believe it was out of an abundance of

21   caution.

22        THE COURT:  Alright.  Is Ms. Figueroa-Torres'

23   attorney, Vanessa Hernandez-Rodriguez, present to speak?

24        She is not signed into Zoom.

25        Did you have any indication, Ms. Osaben, that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Ms. Hernandez-Rodriguez intended to come to speak?

2            MS. OSABEN:  We did not.  We reached out to her but

3    did not receive a response.

4            THE COURT:  Alright.  Very well.  I will make a ruling

5    based on the record before the Court.

6            Pending before the Court is the 453rd Omnibus

7    Objection, non-substantive, of the Commonwealth of Puerto Rico,

8    the Employees Retirement System of the Government of the

9    Commonwealth of Puerto Rico, and the Puerto Rico Highways and

10   Transportation Authority to claims asserting liabilities owed

11   by entities that are not Title III debtors.

12           That is Docket Entry No. 20784 in case 17-3283, which

13   I'll refer to as the Omnibus Objection filed by the Financial

14   Oversight and Management Board for Puerto Rico.  The Omnibus

15   Objection seeks disallowance of several proofs of claim,

16   including Proof of Claim No. 179281-1 filed by Maria C.

17   Figueroa-Torres, who I'll refer to as the claimant.  The

18   objection is on the basis that the claims represented by that

19   claim number, arose out of debts allegedly owed by non-Title

20   III debtors.

21           This Claim No. 179281 was created as a place holder by

22   the Oversight Board by bifurcating the proof of claim that was

23   filed by the claimant.  So the claimant currently has two

24   proofs of claim, one is No. 179281, which now represents

25   compensation allegedly owed by the Department of Health arising

1  out of claimant's employment prior to July 1 of the year 2000

2  and claim no. 179281-1, representing any claim for compensation

3  owed by the Ponce District Hospital following the privatization

4  of the hospital and the termination of claimant's employment

5  with the Department of Health.

6       Only Claim No. 179281-1 is subject to the Omnibus

7  Objection, so I will refer to that in these remarks as the

8  "Subject Proof of Claim."  In opposition to the Omnibus

9  Objection, the claimant contends that her claim arises from

10 services she provided to the Ponce District Hospital during a

11 time when the hospital was part of the Puerto Rico Department

12 of Health, which itself was part of the Commonwealth

13 Government.

14       The Court has carefully considered the pleadings

15 submitted by the Oversight Board and the claimant concerning

16 the Omnibus Objection, as well as the arguments on behalf of

17 the Oversight Board today, and for the following reasons the

18 Omnibus Objection is sustained as to the subject proof of

19 claim.

20       A proof of claim which comports with the requirements

21 of Bankruptcy Rule 3001(f) constitutes prima facie evidence of

22 the validity and amount of the claim.  *In re Hemingway*

23 *Transport, Inc.*, 993 F.2d 915, 925 (1st Cir. 1993).  However,

24 if a debtor proffers an objection supported by substantial

25 evidence, the burden of demonstrating the validity of the claim

1    shifts to the claimant.

2         Claimant's original proof of claim included, as part

3    of its documentation of the validity of her claim, a letter

4    dated May 26, 2000.  That letter gave notice to the claimant

5    that her employment with the Puerto Rico Department of Health

6    would be terminated as of June 30th, 2000, because the

7    government had privatized the hospital at which she was

8    employed.

9         That state of affairs is consistent with the

10   certification from the Commonwealth Health Services and

11   Facility Administration that claimant included with her proof

12   of claim, which states that claimant's employment as a nurse

13   ended on June 30th, 2000.  In light of that documentation,

14   stating that claimant's employment with the Commonwealth ended

15   on June 30th, 2000, the Oversight Board has established a

16   sufficient record that any services to the hospital provided by

17   claimant after that point are not liabilities of the

18   Commonwealth or any other Title III debtor.

19        The Oversight Board has, thus, rebutted any prima

20   facie validity that the Subject Proof of Claim, which covers

21   only claims against the Ponce District Hospital arising after

22   June 30th, 2000, may have had, and claimant has not

23   demonstrated any basis for any claim against the Commonwealth

24   or any other Title III debtor arising out of employment after

25   June 30th, 2000, with the Ponce District Hospital.

MCEDPROH1

```
1              Accordingly, the Omnibus Objection is sustained as to

2    Proof of Claim No. 179281-1, and the Oversight Board is

3    directed to submit a proposed order to chambers reflecting that

4    disposition when all outstanding responses to the Omnibus

5    Objection have been resolved.  Thank you.

6              The next agenda item, number IV.3, is the 514th

7    Omnibus Objection, and that is filed at Docket Entry No. 22251,

8    and in this case an opposing response has been filed at 22770

9    by ICPR Junior College.

10             Ms. Osaben.

11             MR. SOSA:  Good morning, your Honor.  Actually it's

12   Javier Sosa of Proskauer Rose on behalf of the Oversight Board.

13   We'll address this one.

14             THE COURT:  Good morning, Mr. Sosa.

15             MR. SOSA:  Good morning, your Honor.

16             Your Honor, this morning I heard from counsel from

17   ICPR Junior College informing me that he was unaware until this

18   morning that the hearing had been changed to virtual and, thus,

19   neither he nor his client had any credentials to appear in

20   today's hearing.  As such, unless the Court wishes to proceed,

21   we ask to adjourn the hearing with respect to the ICPR response

22   filed at ECF No. 22251 until the next Omnibus Hearing.

23             THE COURT:  That adjournment request is granted.

24   Thank you.

25             MR. SOSA:  Thank you, your Honor.
```

MCEDPROH1

1          THE COURT:  Please, since it appears that ICPR's

2     counsel is not a regular participant in these proceedings, I'll

3     be grateful if you'll help to keep them up to speed on the

4     location and format of the hearing, which, in these pandemic

5     times, can change, so that we'll all be in the same place,

6     virtual or physical, for the next Omni.

7          Thank you, Mr. Sosa.

8          This concludes the matters scheduled for hearing at

9     the Omnibus Hearing in the Title III cases.  Matters that are

10    adjourned, in addition to the one that was just adjourned, are

11    listed in the agenda filed by the Oversight Board and will be

12    taken up at future Omnis as they become ready for attention.

13          (Whereupon the Qualifying Modification Hearing was

14    held)

15          (Adjourned)

16

17

18

19

20

21

22

23

24

25