# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et. al.*,<br><br>Debtors | PROMESA Title III<br><br>No. 17-03283 -LTS<br><br>(Jointly Administered) |
| LUIS A. RIVERA SIACA<br><br>Movant,<br><br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Debtors | **Re: ECF No. 23145** |

## REPLY TO OBJECTION OF THE COMMONWEALTH OF PUERTO RICO TO MOTION FOR THE PAYMENT OF ADMINISTRATIVE RENT

The Debtors in these Title III cases, along with each Debtor's respective Title III Case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as bankruptcy case numbers due to software limitations).

## TABLE OF CONTENTS

**Page**

I.   **PRELIMINARY STATEMENT**……………………………………………..……...…1

II.  **BACKGROUND**…………………………………………………………………..6

III. **ARGUMENT**……………………………………………………………………...…7

    A. The Board Utilizes a Congressionally-Authorized Policy Requiring Prior Board Review of Certain Unspecified Contracts is Applicable Only to Governmental Institutions of the Commonwealth When Entering Into Contracts or Leases Proposed Thereto Rather Than Those Proposed by Governmental Institutions to Third Parties Acting in Good Faith………………….…………………………7

    B. The Contract Should not be Subject to Review Pursuant to the Contract Review Policy…………………………………………………………………………14

    C. The Contract Complies with Puerto Rico Certification and Registration Requirements…………………………………………………………………..15

    D. The Motion is Not Barred as Untimely…………………………………….…16

IV.  **CONCLUSION**…………………………………………………………..…....18

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

Broadrick v. Okla., 413 U.S. 601, 607 (1973)……………………………………………………7

*Butner v. United States*, 440 U.S. 48 (1979)………………………………………………...…6

*Centro de Periodismo Investigativo, Inc. v. Fin. Oversight & Mgmt. Bd. for P.R.*, 35 F.4th 1 (2022)………………………………………………………………………………………………...8

*Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926)……………………...…7

*Duncan v. Walker*, 533 U.S. 167, 174 (2001)……………………………………………..7

*Grogan v. Garner*, 498 U.S. 279, 283 (1991)……………………………………………..9

*In re Fin. Oversight & Mgmt. Bd. for P.R.*, 2022 WL 1401506, at *4 (D.P.R. May 4, 2022)…9

*In re Fin. Oversight & Mgmt. Bd.*, 481 F. Supp. 3d 60 (D.C. P.R. 2020)……………………17

*In re Fin. Oversight & Mgmt. Bd.*, 583 B.R. 626 (D.C. P.R. 2017)……………………….....8

*In re GT Advanced Techs., Inc.*, 547 B.R. 3 (Bankr. N.H. 2016)……………………...…5

*In re Hotel Airport, Inc.*, 2014 Bankr. LEXIS 3990 (Bankr. P.R. 2014)……………………5

*In re Mammoth Mart, Inc.*, 536 F.2d 950, 955 (1st Cir. 1976)……………………………....5

*In re PYXSYS Corp.*, 288 B.R. 309, 317 (Bankr. D. Mass. 2003)……………………….....5

*In re Salutaris Dialysis & Nephrology Ctr.*, 2012 Bankr. LEXIS 4914 (Bankr. P.R. 2012)..…6

*Rámos Lozada v. Orientalist Rattan Furniture, Inc.*, 130 P.R. Dec. 712 (1992)……………...12

*Stern v. Marshall*, 564 U.S. 462, 495 (2011)……………………………………………...6

*Travelers Cas. & Sur. Co. of Am. v. PG&E*, 549 U.S. 443, 451 (2007)……………………6

*Trinidad Rodríguez v. Doe*, 2001 TSPR 7, 153 P.R. Dec. 280………………………………12

*TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)……………………………………………7

*United States v. Davis*, 139 S. Ct. 2319, 2323 (2019)……………………………………7

*Vicar Builders Dev., Inc. v. E.L.A.*, 192 D.P.R. 256 (2015)……………………………..…13

## STATUTES

11 U.S.C. § 503(a)……………………………………………………………………..17

11 U.S.C. § 503(b)(1)………………………………………………………………....5

11 U.S.C. § 503(b)(1)(A)……………………………………………………………....5

23 L.P.R.A. § 108……………………………………………………………………...10

3 L.P.R.A. § 9166…………………………………………………………………...11

31 L.P.R.A. § 10101…………………………………………………………………...12

31 L.P.R.A. § 10162………………………………………………………………...…12

31 L.P.R.A. § 10162……………………………………………………………………5

31 L.P.R.A. § 10171…………………………………………………………………...12

31 L.P.R.A. § 8981……………………………………………………………………5

31 L.P.R.A. § 8983………………………………………………………………….....7

31 L.P.R.A. § 9008……………………………………………………………………5

31 L.P.R.A. § 9009……………………………………………………………….…...5

PROMESA § 106……………………………………………………………………8

PROMESA § 204(b)…………………………………………………………….....4, 8, 16

PROMESA § 204(b)(2)………………………………………………………….3, 4, 7, 8

PROMESA § 204(b)(3)……………………………………………………….…...4, 9

## OTHER AUTHORITIES

General Services Administration's Regulation 9232…………………………………13, 14

Office of the Comptroller of Puerto Rico Regulation 33………………………………....15

Puerto Rico Department of Education's Regulation for the Acquisition, Sales and Auctions of Goods, Works and Non-Personal Services (Regulation 7040)…………………………..4

iv

**TO THE HONORABLE COURT:**

Luis A. Rivera Siaca ("LARS"), through his undersigned counsel, files his reply to the objection of the Commonwealth of Puerto Rico's (the "Commonwealth") objection to LARS' motion for the payment of administrative rent due LARS by the Commonwealth (the "Motion") and in support thereof respectfully states and requests:

## I.   PRELIMINARY STATEMENT

1.      LARS has two lease agreements with the Department of Education of the Commonwealth ("PRDE"), pursuant to which the PRDE has been occupying and utilizing leased premises from LARS without any payments thereto, owing LARS a substantial amount which increases from month to month, PRDE or the Financial Oversight and Management Board for Puerto Rico (the "Board") pretending for PRDE  to continue occupying and using the premises for PRDE and the Commonwealth's benefit and that of its citizens of for free in constitutes a taking under the Fifth Amendment to the Constitution of the United States without just compensation to LARS.

2.      The first lease agreement consists of non-residential unexpired lease contract number 081-2021, object of a motion for an order directing PRDE, as lessee, to comply with the payment of post-petition rent due LARS, as lessor, regarding a 123,106.55 square feet building, including floors 1-5 and 150 parking spaces, where hundreds of employees from PRDE's main offices work at Calle Calaf Number 34, San Juan, Puerto Rico, filed on July 1, 2022 at **ECF No. 21408**. This contract was entered into on January 15, 2021, with an expiration date of December 31, 2025, and was recorded with the Office of the Comptroller of Puerto Rico ("OCPR") on January 22, 2021(the "First Contract"). As of January 9, 2023, PRDE owes LARS $3,741,755.27 for rent under the First Contract and water services (**Exhibit I**). PRDE has occupied the premises

1

under the First Contract since 1969 under different lease agreements renewed from time to time. As **Exhibit II** hereto, LARS is including the floor-by-floor occupancy by PRDE under the First Contract.

3.        The second lease agreement between LARS as lessor, and PRDE, as lessee, and object of the Motion, is non-residential unexpired lease agreement number 081-2021-0180 consisting of a one level 28,431 square feet building with a parking area for 135 vehicles, where PRDE's offices for Postal Services, San Juan Region State Agency, Retirement Office, Auction Board, Human Resources, Technology Office, CATAL Time Assistance and License Support Center, Auction Review Office, TAL System of Time, Attendance and License,  State Food Agency, Transportation Office and Security Office are located at Calle Juan Calaf Number 33, Puerto Rico. This contract was entered into on May 21, 2021, with an expiration date of June 30, 2026, and was recorded with the OCPR on May 28, 2021 (the "Second Contract"). As of December 31, 2022, PRDE owes LARS $420,923.10 in rent for the premises leased under the Second Contract (**Exhibit III**). PRDE has been in occupancy of the premises under the Second Contract since 1989 pursuant to contracts renewed from time to time. The premises leased to PRDE under the Second Contract are an annex to those leased under the First Contract.

4.        While the Motion is the one to which the captioned case refers, in its objection thereto, filed at **ECF No. 23210** (the "Objection"), it refers to the First and Second Contracts, treating them in common, sustaining that the Contracts are not enforceable because they were not entered into in compliance with applicable law. Since, as represented by the Commonwealth, "the facts, circumstances, and agreements" of the parties are substantially similar, LARS incorporates herein by reference all facts and argument to its Motion to *Comply with Payment of Administrative Rent* filed at **ECF No. 21408** and his *Response to Debtor's Objection to Motion to Comply with*

*Payment of Administrative Rent* filed at **ECF No. 21706**. LARS will address the objections to both Contracts jointly.

5.      The Commonwealth claims that the Contracts are not enforceable because they were executed without the Board's prior review and approval in violation of the Board's contract review policy established pursuant to PROMESA Section 204(b)(2) (the "Policy").

6.      PROMESA Section 204(b)(2) and the Policy promulgated pursuant thereto are directed to the Commonwealth's governmental agencies for them to establish a competitive procurement system, but such provisions and/or the Policy can't undermine or render ineffective contracts validly entered by such agencies with third parties as LARS, pursuant to the Civil Code of Puerto Rico and the applicable case law, and under the guise thereof unconstitutionally take over LARS' properties for PRDE's use and enjoyment without compensation.

7.      At paragraph three (3) of the Objection, it is stated that since May 18, 2022, the Board has been reviewing the Second Contract "engaged in analysis and correspondence, including several requests for additional information from PRDE, all in an effort to determine the Second Contract's market competitiveness and compliance with Puerto Rico contracting law and the 2022 Commonwealth Fiscal Plan (the "Fiscal Plan"). During such review, the Board identified irregularities with respect to PRDE's procurement process with LARS and overall lack of competitive procurement process involving the Second Contract".

8.      As illustrated by the quoted language, it is clear that the Policy and the intended procurement process is directed to the governmental agencies and not to third parties entering into contracts therewith, particularly when as here, the Contracts are not initial contracts but renewals of existing ones, with PRDE in possession of the leased premises for many years. As will be

shown hereafter, under both Contracts LARS is the lowest, responsive, responsible available party to meet PRDE's existing rental needs.

9.      The nature, intent and purpose of the Policy and PROMESA Section 204(b)(2), as being directed to governmental agencies of the Commonwealth, is made clear by the Board's expressions in the Objection and its findings of deficiencies in the approval of the Second Contract by the Real Property Review Board ("REPRB") and the Office of Management and Budget ("OMB") as to not approving its full term and PRDE not adequately explaining why it did not follow a competitive procurement process as required by Regulation 7040 for real estate agreements with terms exceeding five (5) years. The Second Contract exceeds by thirty-nine (39) days the 5-year term and the First Contract is for less than 5 years.

10.      LARS agrees that by enacting PROMESA Section 204(b), Congress intended for the agencies of the Commonwealth to promote competitive bidding and efficient use of the Commonwealth's resources, but a thereof reveals that any established policies by the Board for said purposes requiring its review and approval of non-defined contracts, are directed to governmental entities or government-owned corporations rather than private enterprises or persons such as LARS. This becomes clear when PROMESA Section 204(b)(2) is read in conjunction with Section 204(b)(3), which states "[i]t is the sense of Congress that any policies established by the Board pursuant to paragraph two (2) should be designated to make the government contracting process more effective, to increase the public's faith in this process, to make appropriate use of the Board's time and resources, to make the territorial government a facilitator and not a competitor to private enterprise, and to avoid creating any additional bureaucratic obstacles to efficient contracting".

4

11.     In its submission, the Board ignores that the Motion, as well as that relative to the First Contract, refers to a demand for payment pursuant to a valid lease agreement entered into after the filing of the Commonwealth Title III petition, which has been breached and is subject to specific performance by the provisions of Articles 1060, 1073, 1074 and 1346(e) of Puerto Rico's Civil Code[1], independently of those of 11 U.S.C. § 503(b)(1)(A), warranting the payment of what is due LARS for the use and occupancy of the leased premises by PRDE, consisting in itself "actual, necessary costs of preserving" the Commonwealth by allowing PRDE to be able to operate, and as such allowable under 11 U.S.C. § 503(b)(1).

12.     As held in *In re GT Advanced Techs., Inc.*, 547 B.R. 3 (Bankr. N.H. 2016) under First Circuit precedent, a claim is entitled to administrative priority under 11 U.S.C. § 503(b)(1)(A) if: 1) the right to payment arose  from a post-petition transaction with the estate; and 2) the consideration supporting the claimed right to payment was beneficial to the estate. See *In re PYXSYS Corp.*, 288 B.R. 309, 317 (Bankr. D. Mass. 2003). When the debtor-in-possession's actions themselves give rise to a legal liability, as here, the claimant is entitled to the priority of a cost and expense of administration. *In re Mammoth Mart, Inc.*, 536 F.2d 950, 955 (1st Cir. 1976).

13.     Here, the two Contracts entered into post-petition are necessary to preserve or rehabilitate the Commonwealth's estate.

14.     By continuing with the use and occupancy of the leased premises, PRDE ratified the Contracts and its post-petition performance, at the very least, falls within the scope of administrative expenses with priority status under 11 U.S.C. § 503(b)(1)(A). *In re Hotel Airport, Inc.*, 2014 Bankr. LEXIS 3990 (Bankr. P.R. 2014).

15. It is settled that the rights of the parties to a lease are governed by state law. See *Butner v.*

---

[1] Both Contracts were executed after November 28, 2020, the effective date of Puerto Rico's New Civil Code and the cited Articles to in this Reply are those of the New Code.

*United States*, 440 U.S. 48 (1979); *Stern v. Marshall*, 564 U.S. 462, 495 (2011); *Travelers Cas. & Sur. Co. of Am. v. PG&E*, 549 U.S. 443, 451 (2007); *In re Salutaris Dialysis & Nephrology Ctr.*, 2012 Bankr. LEXIS 4914 (Bankr. P.R. 2012) (Under Puerto Rico law, obligations from contracts have legal force between the contracting parties, and must be fulfilled in accordance therewith).

16. A court cannot release a party from its contractual obligations when said contract is legal and valid and has no defect whatsoever. *In re Salutaris Dialysis & Nephrology Ctr.*, supra at p. 13.

17. As a general rule, "the fact that a plaintiff who alleges a breach of contract has an adequate remedy by way of damages does not bar him from seeking performance of the contract." *In re Salutaris Dialysis & Nephrology Ctr.*, supra at p. 13

## II. BACKGROUND

18. Of the Background section of the Objection, LARS admits the statements of paragraph 8, 9, 10 and 19, that it negotiated the First Contract, as the Second Contract with PRDE, averring that the Contracts were submitted by PRDE to LARS in the form in which they were executed following all applicable requirements under Commonwealth law, as set forth therein[2], the only item subject to arm's length negotiation being the contract price, resulting in the execution of the First Contract on January 15, 2021, and the Second Contract on May 21, 2021.

19. The remaining statements of paragraphs 10 to 22 of the Background section of the Objection consisting of matters and issues between PRDE, the Board, OCPR, the Puerto Rico Department of Justice, REPRB or OMB, are unknown to LARS, who had no participation therein, and can't be attributed to him.

20. As admitted by the Board at paragraph twenty-two (22) of the Background section of the Objection "both contracts remain under the Board's review".

---

[2] See **Exhibit A** to **ECF No. 22338**, the First Contract, and **Exhibit A** to **ECF No. 23212**, the Second Contract.

## III. ARGUMENT

**A. The Board Utilizes a Congressionally-Authorized Policy Requiring Prior Board Review of Certain Unspecified Contracts is Applicable Only to Governmental Institutions of the Commonwealth When Entering Into Contracts or Leases Proposed Thereto Rather Than Those Proposed by Governmental Institutions to Third Parties Acting in Good Faith**

21. The Board can only apply the control it advocates in the manner indicated above, since otherwise a contracting party, as LARS, would be totally blindsided as to the contracts proposed thereto by governmental entities and entered into in good faith[3], relying on the representations made thereto by the governmental entities, as LARS did.

22. At page 8 of the Objection, without any legal source, the Board states that the Policy pertains to contracts with an aggregate expected value of $10 million or more, to be entered into by the Commonwealth or any covered instrumentality, which excludes the Second Contract. Furthermore, the authority claimed by the Board under Section 204(b)(2) would otherwise be constitutionally vague in its application to LARS constituting an unbridled prohibited delegation of legislative powers to the Board.

23. A statute is vague, when as here, a person of reasonable intelligence "must necessarily guess at its meaning" *Broadrick v. Okla.*, 413 U.S. 601, 607 (1973) (quoting *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926)). The statute "should be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). "When Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again". *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).

---

[3] As set forth in Article 1062 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 8983, both the debtor and the creditor must perform in good faith in compliance with the obligation.

24. As held in *Centro de Periodismo Investigativo, Inc. v. Fin. Oversight & Mgmt. Bd. for P.R.*, 35 F.4th 1 (2022), in interpreting PROMESA Section 106, regarding the abrogation of the Board's sovereign immunity "[w]hile we write on a blank slate with respect to this part of PROMESA, however, we are guided by long-standing and well-settled principles of statutory construction. "[T]he critical first step in any statutory-interpretation inquiry" is to "closely examine the statutory text." We give the phrases or words Congress did not specifically define within PROMESA their "ordinary meaning." As we have previously noted when interpreting PROMESA, "[c]ourts interpret statutes to 'give effect, if possible, to every word Congress used,' and . . . reject 'interpretation[s] of the statute that would render an entire subparagraph meaningless.'" This court "indeed prefer[s] 'the most natural reading' of a statute, one that 'harmonizes the various provisions in [it] and avoids the oddities that [a contrary] interpretation would create.'" (Citations omitted)

25. This Court in *In re Fin. Oversight & Mgmt. Bd.*, 583 B.R. 626 (D.C. P.R. 2017) in discussing the limitation of the Board's power under PROMESA Section 204 to review new legislation and executive acts as being tied to the Commonwealth government's initial responsibility to present certifications as to lack of significant inconsistency with the Fiscal Plan, and to respond to requests by the Board for information and explanation, stated:

> Similarly, the FOMB's negative power to review contracts under section 204(b) is limited to "certain contracts," and is granted to enable the FOMB to ensure that those contracts "promote market competition and are not inconsistent with the approved [f]iscal [p]lan." Id. § 204(b)(2). By denying approval, the FOMB can prevent the Commonwealth or an instrumentality from going forward with a proposed course of action, but nothing in section 204(b) affirmatively grants the FOMB the power to "control virtually everything PREPA does." The Court need not attempt to map the boundaries of the FOMB's contracting-related power at this juncture, but the plain language of section 204(b) makes clear that it cannot be read to reach any and all contracts. Although the FOMB could conceivably use its power under section 204(b) to create bureaucratic obstacles to hobble PREPA's

day-to-day functions, such actions would be irresponsible in this Court's view, and would be directly contrary to the sense of Congress expressed in section 204(b)(3). See PROMESA § 204(b)(3) ("[A]ny policies established by the Oversight Board . . . should be designed to make the government contracting process more effective, to increase the public's faith in this process, to make appropriate use of the Oversight Board's time and resources, to make the territorial government a facilitator and not a competitor to private enterprise, and to avoid creating any additional bureaucratic obstacles to efficient contracting.").

26. The quoted language is equally applicable to PRDE's contracting with LARS.

27. Different from *In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 17-bk-4780, 2022 WL 1401506, at \*4 (D.P.R. May 4, 2022), here PRDE's obligation to pay rent to LARS arises from LARS' contractual rights under the Civil Code of Puerto Rico, *Grogan v. Garner*, 498 U.S. 279, 283 (1991) ("The validity of a creditor's claim is determined by rules of state law"). This aside from the amount due LARS thereunder constituting "actual, necessary costs and expenses" of preserving the Commonwealth's Department of Education.

28. Due to his long-standing relationship with PRDE and his financial position, LARS has refrained to date from going forward with a request for Writs of Possession of the leased premises or from eviction proceedings against PRDE, which would create a chaos in PRDE's operations, if not a shutdown, due to the indispensable use of the leased premises by PRDE for its operations, where hundreds of governmental employees work and earn their livelihood. However, LARS can't refrain from doing so much longer, while not been paid for PRDE's occupancy and having to continue providing services thereto.

29. LARS' inequitable position is underscored by having *ex-post facto* learned of the dispute regarding the process resulting in the execution of the Contracts, entirely performed by PRDE with no responsibility on LARS' part or involvement in the internal governmental affairs. LARS followed every notification and instruction from PRDE in the process of executing the Contracts

and can't be made responsible for any governmental errors or internal controversies relative thereto. There is no justification for PRDE's failing to pay LARS what is due under the Contracts.

30. According to the provisions of Law 147-1980, OMB is precluded from committing a governmental budget beyond the fiscal year in which general elections are held[4]. This responds to fiscal measures that limit OMB's power to allocate funds for the execution of contracts during the governmental transition process. Therefore, it is under that framework that any evaluation of the First Contract should be made. Here, OMB's authorization of the First Contract occurred on November 10, 2020[5], the year in which general elections were held. As such, by the limitations imposed by law, although OMB had the Contract in hand when authorizing the same, it could only allocate funds thereto until June 30, 2021, the day on which the fiscal year ended. Although from an outsider's perspective, what transpired may seem irregular, when the relevant legal background is considered, it becomes evident that there was no wrongdoing, since by virtue of the statute the OMB could only budget funds to PRDE for the term allowed by law. For the subsequent term, PRDE had to procure an additional budgetary allocation. If there were any subsequent mishaps or negligence on the part of PRDE and/or OMB's process, it falls outside LARS' control or responsibility. Note that from the foregoing it appears that the allocation of funds made by the OMB until June 30, 2021, responds to the limitation, and not to non-availability of funds or a question as to the legality of the First Contract.

31. As to the Board's position regarding competitive bidding, the fact is that for the time period during which PRDE entered into the First Contract, the governing process was established by Act 235-2014. The purpose of the statute was to establish a Multidisciplinary Board composed of different Heads of Agencies to ensure the preservation of public funds. In order to do so, the

---

[4] *See*, Art. 8, Law 147-1980, Organic Law of the Office of Management and Budget (23 L.P.R.A. § 108)
[5] The authorization came quite some time before OGP's Circular Letter 001-2021.

REPRB had to perform the corresponding financial analysis. As such, to muster a generic argument of market rates and competitive bidding would be to turn a blind eye to the scope of work performed by REPRB. Throughout the relevant period, RPRB was the entity responsible for issuing resolutions to the public agencies, dependencies or instrumentalities of the Commonwealth, denying or granting the entry into lease agreements or purchases[6]. In this case, on July 22, 2022, REPRB issued resolution no. 2021-000148 authorizing the First Contract until December 31, 2025. Therefore, not only the First Contract complies with all applicable legislation, but the process of acquiring the required authorizations was undertaken according to the law. As it turned out, PRDE and REPRB were so zealous in the process that no single comparable contract has been found providing for a rent lower than the one set forth (but unpaid) in the First Contract, as indicated below.

32. An examination of all the existing leases for PRDE's main offices reveals that LARS' rental rates are significantly less than any other competitor. Yet, for unknown reasons, LARS is the entity suffering the consequences of the breach of the First Contract, albeit it being the one with lower rates to PRDE. For example, the following tenants have sizeable contracts and rates with PRDE vis a vis LARS:

| Company name: | Sq. ft. | Price/Sf Average Over Contract | Contract number: |
|---|---|---|---|
| LARS | Floors 1-5: 123,106.55 Annex: 28,431 | $20.93 $20.43 | 081-000148 / 2021-000148 081-2021-0180 / 2021-000180 |
| Alisios | 13,586.1553 | $25.74 | 081-2023-000036 |
| Desarrollos Inmobiliarios Hato Tejas, LLC | 108,296.171 | $23.00 | 2021-000142 |

[6] *See*, Art. 6 Law to create the Real Property Review Board of the Commonwealth of Puerto Rico, Law 235-2014. (3 L.P.R.A. § 9166)

33. Pursuant to Puerto Rico's Civil Code: "By the lease agreement, the lessor agrees to temporarily give the lessee the use and enjoyment of a good in exchange for a certain price[7]." The Civil Code further provides that one of the obligations of the lessee is to: "pay the rent on time, according to the agreed terms[8]" and that the lessor is entitled to terminate the contract when the lessee fails to comply with the lease payments[9].

34. As an abecedarian principle applicable to breach of contracts, the case law has consistently held that: "[…] once a contract is perfected, it is binding upon the parties with regard to the fulfillment of what was expressly stipulated and to the consequences derived therefrom, in accordance with good faith, use, and the law[10]." Likewise, the Puerto Rico Supreme Court has held that: "Actions ex contractu are based on the breach of a duty that arises from an express or implied contract and seek fulfillment of promises agreed to by the contracting parties[11]." The Supreme Court has repeatedly held that: "[…] an action for damages for breach of contract lies only when the damage suffered arises exclusively as a consequence of the breach of an obligation specifically agreed upon, which damage would not occur without the existence of a contract[12]." In the scenario of a contractual relationship between a lessor and a lessee, the Supreme Court has stated: " […] this does not bar, in appropriate cases, the action for damages[13]." When perfecting contracts with a governmental entity in Puerto Rico, it has been said that the private vendor must execute additional steps which in this case were all performed.

35. Regarding the governmental contracting processes, Puerto Rico's Supreme Court has held that the following requirements must be met: 1) reduce the contract to writing, 2) keep a record to

---

[7] See, 31 L.P.R.A. § 10101.
[8] See, 31 L.P.R.A. § 10162.
[9] See, 31 L.P.R.A. § 10171.
[10] See also, *Trinidad Rodríguez v. Doe*, 2001 TSPR 7, 153 P.R. Dec. 280.
[11] *Id*.
[12] See, *Rámos Lozada v. Orientalist Rattan Furniture, Inc.*, 130 P.R. Dec. 712 (1992)
[13] *Id*.

establish its existence, 3) send a copy to OCPR, 4) certify the certainty of time, all of which was complied with in the execution of the Contract. See, *Vicar Builders Dev., Inc. v. E.L.A.*, 192 D.P.R. 256 (2015). All the internal affairs as to any additional process to be completed with other agencies within the Commonwealth or even the Board are matters outside LARS' responsibility.

36. Just 4 days prior to the execution of the First Contract, OMB issued Circular Letter 001-2021. When that letter was distributed is unknown to LARS.  It provides that the entities of the Executive Branch interested in contracting services in excess of ten thousand dollars ($10,000.00) in the same fiscal year: "[..] must initiate the request for authorization through OMB, using the Contract Processing System (PCo)". The Circular Letter also establishes that: "[t]he remainder of the process will be governed by the General Services Administration (GSA) […] and the regulations applicable to the GSA." In what is relevant, GSA's Regulation 9232 states that any lease must be carried out in accordance with the provisions of the applicable statutes, to wit: the statute creating the REPRB, Act 235 of December 19, 2014. Act 235 effectively superseded all regulations or other statutes related to real estate leasing transactions. Again, LARS is an innocent bystander that had no vision, knowledge or control of the process followed by PRDE in its dealings for the execution of the Contract.

37. As the government contracting doctrine provides, the process met all the necessary requirements. To this effect, the Contracts were reduced to writing, a record was kept establishing their existence, a copy thereof was sent to OCPR, and finally, the requirement of them being registered fifteen days thereafter was met.

38. PRDE recently forwarded a draft of an amendment to the First Contract proposing for LARS to relinquish his contractual rights by terminating the First Contract on December 31, 2022. LARS has requested the reasons for such a proposal, PRDE failing to date in providing an answer.

39. Notwithstanding, as established Circular Letter 001-2021, and admitted by the Board, PRDE has requested the corresponding authorization to ratify the First Contract. According to the same Circular Letter, the remainder of the process was carried out through GSA and its Regulation 9232. The latter establishes that the authorization process for the leasing of real estate was specifically delegated to REPRB, who on July 22, 2022, issued resolution no. 2021-000148, authorizing the Contract until December 31, 2025.  As such, to simply propose the unilateral cancellation of the Contract by amending its termination date without payment of the arrears up to said date is untenable.

40. To further underscore LARS' position as to the legitimacy of the Contracts and the right to be paid what is owed to him, on December 8, 2022, PRDE issued an invitation for bids for the administrative offices object of the two Contracts, with a pre-bid meeting scheduled for December 14, 2022 at and January 18, 2023, as the bar date for submission of bids as to a contract which mirrors LARS, for a minimum term of 5 years. The only participants at the pre-bid meeting were LARS' representatives making evident the legitimacy of the two Contracts, underscoring LARS being the lowest, responsive, responsible bidder as to both.

**B.  The Contract Should Not be Subject to Review Pursuant to the Contract Review Policy**

41. While here, the Board limits its statement to the Second Contract, as set forth in paragraph 5, page 3 of the Objection it admits that both Contracts are still under review, for what is an extraordinary unreasonable period of time.

42. There is no reason for the Board to combine the value of both Contracts to vacuously argue that they exceed $15,787,611.42 in rent, when they are 2 and distinct contracts. A reading of the Contracts show that the First Contract is for $12,883,100.46 and the Second Contract for $2,904,510.96.

Case:17-03283-LTS   Doc#:23249   Filed:01/13/23   Entered:01/13/23 11:37:35   Desc: Main
Document    Page 19 of 23

43. The only purpose in the Board commingling the value of the Contracts can be to mislead the Court in believing that the Second Contract surpasses the $10,000,000.00 threshold as a requisite for its prior review and approval as its doesn't exceed the 5 years mark.

44. It would be totally inequitable and unfair for LARS to be tangled in the governmental maze as to which he doesn't have any knowledge or control.

## C. The Contract Complies with Puerto Rico Certification and Registration Requirements

45. As indicated above, both Contracts were registered with the OCPR within 15 days of their execution. As to the First Contract see **Exhibit A** at **ECF No. 22338**. As to the Second Contract see **Exhibit A** at **ECF No. 23212**. Both Contracts were submitted by PRDE and registered by OCPR with their full terms and conditions. In addition to the above requirements having been met in the case of the two Contracts, the Board seeks to impose on LARS additional requirements which by the clear letter of the law are PRDE's responsibility, that is the keeping of a registry of the Contracts. (See paragraphs 30-32 of the Objection), particularly when in paragraph 32 the Board states as to the Second Contract that "while it appears to have been submitted and registered with OCPR, the contract value that the registry identifies is inaccurate because it only reflects the Second Contract's annual rent payment for the first year of each of the lease agreements and not its total amount". If there are any errors in their recording by OCPR neither PRDE or LARS can be blamed therefor. The fact is that both Contracts were delivered to OCPR by PRDE and recorded with their full terms and conditions, see **Exhibit B** at **ECF No. 22338** and **Exhibit C** at **ECF No. 23212**. In any event as recognized by the Board, Article 8.1(f) of Regulation 33 is directed to government entities, such as PRDE, which are required thereunder, when registering a contract with OCPR, to submit the total amount to be paid, as PRDE did as to the two Contracts by submitting full copies to said office.

46. At paragraph 33 of the Objection, the Board states that OMP and REPRB approved the Second Contract only until June 30, 2021, that is for forty (40) days, when the term of the Contract is for five (5) years and forty (40) days. This posture is untenable, senseless and contrary to the provisions of the Second Contract, not only as to its term but as to the PRDE's representations therein that as well as in the First Contract as to having "obtained all approvals required by law prior to the execution of this Agreement, including the approval of the Office of Management and Budget, the Office of the Governor and the Real Estate Property Review Board pursuant to Act 235 of 2014 and circular letters enacted thereunder". **Exhibit A** at **ECF No. 22338** and **Exhibit A** at **ECF No. 23212**.

47. At paragraph 34 of the Objection, the Board avers that the costs asserted in the Motion as to the Second Contract are not within the period covered by the existing certifications from REPRB and OMP, and the registration with OCPR, and therefore the asserted costs are not entitled to administrative expense priority. In doing so, the Board ignores that the Motion is also premised on a specific performance of contract action under the Civil Code of Puerto Rico.

48. The two Contracts don't contravene the goals with respect to any policy established pursuant to Section 204(b), considering the specific facts thereof, underscored by LARS being the sole appearing bidder at the pre-bid meeting of December 14, 2022 regarding a new bidding process established by PRDE, which mirrors the needs fulfilled by the First Contract as complemented by the Second Contract, both of which were entered into by LARS and PRDE in the best interests of the Commonwealth and the citizens of Puerto Rico, and which the Board represents are still being evaluated thereby.

**D.  The Motion is Not Barred as Untimely**

49. The Board avers that pursuant to Section 1.51 and Article III of the *Modified Eighth*

*Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico* (the "PAD")
(**ECF No. 19813-1**) and the confirming the PAD (**ECF No. 19813**), the deadline for filing proof
of claims or requests for payment of Administrative Expense Claims was June 13, 2022 (the "Bar
Date"), and that LARS being notified of such bar date on March 15, 2022, having filed the Motion
as to the Second Contract on December 22, 2022, the same is untimely.

50. The Board forgets that the Motion constitutes an action for specific performance of a
contract pursuant to the Civil Code of Puerto Rico, which is of a continuous nature, where the
amount claimed increases from month to month and not finally by a date certain prior to the
establishment of the Bar Date. To this effect the Confirmation Order exempts from the Bar Date,
the filing of an administrative claim if it, as in the case of the Second Contract, relates to actions
occurring in the ordinary course during the period from and after the petition date up to and
including the Effective Date. Assuming the applicability of the Bar Date, which is denied, due to
the special circumstances relative to the Second Contract and the promises of payment by PRDE,
in consideration of the fundamental fairness doctrine, pursuant to the provisions of 11 U.S.C. §
503(a) the Court can grant LARS leave to tardily file the Motion, as there would be sufficient
cause therefor.

51. As held by the Court in *In re Fin. Oversight & Mgmt. Bd.*, 481 F. Supp. 3d 60 (D.C. P.R.
2020), the "fundamental fairness" doctrine has been interpreted within the First Circuit to support
administrative expense priority to tortious actions arising from post-petition activities by a debtor
or when the post-petition actions deliberately violate applicable law and damage others.
Inclusively an administrative claim as to the contracts may not be ripe at this moment, since the
Board has repeatedly stated that both Contracts are still under its evaluation, meaning that it may
grant its approval thereto. Thus, LARS claims under the Contracts are in a limbo status and

warrant the decision of the Board approving the Contracts. To underscore this enigma if the Board approves the two Contracts, and LARS is paid pursuant thereto, the matters at bench will become moot. If the Board disapproves the Contracts, LARS' claims will still be alive with the possible consequences of PRDE having to vacate the leased premises and relocate hundreds of governmental employees and the creation of a chaos in PRDE, with the resulting adverse consequences on the Commonwealth and its citizens. Thus, more than justification for the Court to decide LARS' claim as to the Second Contract.

## IV. CONCLUSION

52. Considering the particular facts relative to the two Contracts and the unusual circumstances under which PRDE is in the use and possession of the leased premises, without paying rent therefor, it is warranted that this unconstitutional taking of LARS' properties be remedied by this Court directing PRDE to pay LARS what is owed thereto, as set forth in **Exhibits I** and **III** to this Reply and further directing the Board to state its final position regarding its review and approval or disapproval of the two Contracts entered into by LARS and PRDE.

**Respectfully submitted.**

San Juan, Puerto Rico this 13th day of January 2023

_s_/**Charles A. Cuprill-Hernández**
USDC-PR 114312
Charles A. Cuprill, P.S.C. Law Offices
356 Fortaleza Street - Second Floor
San Juan, PR  00901
Tel. 787-977-0515
Fax: 787-977-0518
E-mail: cacuprill@cuprill.com

**CERTIFICATE OF SERVICE**: I hereby certify that on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all ECF participants; and to those parties listed in this Court's Sixteenth Amended Notice, Case Management and Administrative Procedures (**ECF No. 20190-1**) not served by the CM/ECF system.